# EXHIBIT A

515

```
 1         IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                 RICHMOND DIVISION
 3    - - - - - - - - - - - - - - - - - -
                                    :
 4    ePLUS, INC.,                  :
                                    :
 5         Plaintiff,    :
      v.                  : Civil Action
 6                        : No. 3:09CV620
      LAWSON SOFTWARE, INC.,        :
 7                       : January 6, 2011
           Defendant.    :
 8    - - - - - - - - - - - - - - - - - -:
 9
10
11         COMPLETE TRANSCRIPT OF JURY TRIAL
         BEFORE THE HONORABLE ROBERT E. PAYNE
12     UNITED STATES DISTRICT JUDGE, AND A JURY
13
14
15    APPEARANCES:
16    Scott L. Robertson, Esq.
       Jennifer A. Albert, Esq.
17    Michael T. Strapp, Esq.
       David M. Young, Esq.
18    GOODWIN PROCTOR
       901 New York Avenue, NW
19     Washington, D.C.  20001
20    Craig T. Merritt, Esq.
       CHRISTIAN & BARTON
21     909 E. Main Street, Suite 1200
       Richmond, VA  23219-3095
22
           Counsel for the plaintiff ePlus
23
24
25         DIANE J. DAFFRON, RPR
           OFFICIAL COURT REPORTER
           UNITED STATES DISTRICT COURT
```

516

```
 1    APPEARANCES:  (Continuing)
 2    Daniel W. McDonald, Esq.
       Kirstin L. Stoll-DeBell, Esq.
 3    William D. Schultz, Esq.
       MERCHANT & GOULD
 4    3200 IDS Center
       80 South Eighth Street
 5    Minneapolis, MN  55402-2215
 6    Dabney J. Carr, IV, Esq.
       TROUTMAN SANDERS
 7    Troutman Sanders Building
       1001 Haxall Point
 8    P.O. Box 1122
       Richmond, VA  23218-1122
 9
           Counsel for the defendant Lawson Software.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

517

```
 1         (The proceedings in this matter commenced at
 2    9:20 a.m.)
 3         THE CLERK:  Civil Action No. 3:09CV00620,
 4    ePlus, Incorporated v. Lawson Software, Incorporated.
 5    Mr. Scott L. Robertson, Mr. Craig T. Merritt,
 6    Ms. Jennifer A. Albert, Mr. Michael T. Strapp, and Mr.
 7    David M. Young represent the plaintiff.
 8         Mr. Daniel W. McDaniel, Mr. Dabney J. Carr,
 9    IV, Ms. Kirstin L. Stoll-DeBell, and Mr. William D.
10    Schultz represent the defendant.
11         Are counsel ready to proceed?
12         MR. ROBERTSON:  Yes, Your Honor.
13         MR. McDONALD:  Yes, Your Honor.
14         THE COURT:  All right.  Thank you very much.
15         I apologize for keeping you-all waiting this
16    morning.  I had a mechanical malfunction that I needed
17    to attend to, and I'm not very mechanically oriented.
18         All right, Mr. Robertson.
19         Dr. Weaver, I remind you you're under the
20    same oath which you took yesterday.
21         THE WITNESS:  Yes, Your Honor.
22    BY MR. ROBERTSON:  (Continuing)
23    Q   Good morning, Dr. Weaver.
24    A   Good morning.
25    Q   If we could have Plaintiff's Exhibit No. 1 back up
```

518

```
 1    on the screen again, the '683 patent, the cover page
 2    here.
 3         Dr. Weaver, the jurors have seen this exhibit now
 4    several times and it's in their jury notebooks.  This
 5    is at tab 2.  Can you just tell us what is the title
 6    of the patent?
 7    A   Electronic Sourcing System and Method.
 8    Q   Has the Court defined the term "electronic
 9    sourcing system"?
10    A   Yes, it has.
11    Q   What's your understanding as to what that
12    construction is?
13    A   In the glossary of claim terms, the "electronic
14    sourcing system" has been defined by the Court to be
15    an electronic system for use by a prospective buyer to
16    locate and find items to purchase from sources,
17    suppliers or vendors.
18    Q   What is your understanding of what a source is,
19    sir?
20    A   A source would be a vendor or a manufacturer or a
21    distributor.
22    Q   In the Court's construction of the claim term
23    "catalog" or "product catalog," how does the Court
24    define what a vendor can be?
25    A   The vendor, in the Court's construction, a vendor
```

547

1    request for proposal and this is Lawson's response to
2    that RFP.
3    Q   What is the date of this?
4    A   December 14, 2005.
5    Q   Let me focus you then on -- well, what was your
6    understanding that the Scottsdale Unified School
7    District, No. 48, was requesting Lawson to make a
8    proposal for?
9    A   Financial management software.
10   Q   Did it also include procurement software?
11   A   Yes, it did.
12   Q   Can I direct you to the page that ends with the
13   Bates label 687.  And at the top of the page there's a
14   heading called "Lawson's Procurement Suite."  Do you
15   see that?
16   A   I do.
17   Q   There's a subheading, "Purchase Order."  Do you
18   see that?
19   A   I do.
20   Q   Is the purchase order module one of the pieces of
21   software that you did some analysis with respect to
22   your infringement opinions?
23   A   Yes, it's one of those modules.
24   Q   And what does Lawson represent here, focusing now
25   on about --

548

1        MR. ROBERTSON:  Starting at the beginning
2    down to about "receiving goods," midway through that
3    paragraph, if you could highlight that for me, Mike.
4    The entire paragraph.
5    Q   What is Lawson indicating here in response to this
6    request for proposal as to the purchase order module
7    of its procurement suite?
8    A   So after the words "Lawson's purchase order," it
9    says that it streamlines the procurement process from
10   establishing vendor pricing, agreements, and
11   contracts, importing and maintaining item information,
12   creating and issuing purchase orders to receiving
13   goods.
14   Q   And purchase order is a subject of the claims that
15   are at issue in this case?
16   A   Yes.
17   Q   What does Lawson say there with respect to the
18   advantage of this purchase order module that they are
19   offering?
20   A   That it's going to improve efficiency.
21   Q   How is it going to do that?
22   A   By automating this process of putting everything
23   on a computer.
24   Q   All right.  Can you explain to the jury what this
25   vendor price agreement that's referenced here?

549

1    A   Sure.  The vendor price agreement is a contractual
2    agreement between Lawson's customer and a particular
3    vendor that the vendor is going to supply a set of
4    items at a fixed cost or at a particular cost.
5    Q   It references here to importing item information.
6    What's your understanding with respect to what
7    importing item information means in Plaintiff's
8    Exhibit 219, this response to an RFP?
9    A   When you have a database of information, it has to
10   be filled.  We call it populate.  You populate the
11   database.  And the way that or one of the ways that
12   you can do that is to bring in data and put it into
13   the format that is appropriate for the database.  And
14   that process is called importing.  Importing data into
15   the database.
16   Q   Can you turn to the next page, please.  And on
17   this page it's entitled, Requisitions.  Do you see
18   that?
19   A   Yes.
20   Q   Is that one of the software modules that you
21   examined in order to determine your make your
22   infringement analysis?
23   A   Yes, it's part of the procurement suite.
24   Q   At the bottom there's a heading that says, Several
25   Features of Lawson's Requisition Include.  Do you see

550

1    that?
2    A   I do.
3    Q   There are six bullet points, I believe.  Can you
4    focus us in on the bullet points you think are
5    significant to your opinions?
6    A   The two that I think are important here are the
7    first bullet point, custom catalogs and templates.
8    And the fourth one; stock, nonstock, special items or
9    services on a single requisition.
10   Q   Why do you find those significant?
11   A   Because these relate to the patent claims.
12   Q   In what way?
13   A   In that the patent talks about being able to have
14   electronic catalogs, and that as items are picked on a
15   hit list, then it becomes ultimately an order list, a
16   chosen set of items.  That ultimately becomes a
17   requisition.  And that is what the requisitioning
18   system in Lawson does.
19   Q   It indicates you can have stock, nonstock, special
20   items or services on a single requisition.  Is that
21   significant in your analysis?
22   A   Oh, yes.  If you recall from yesterday, when I was
23   starting my computer lab back in the '70s, the
24   purchasing specialist and I had to write -- had to
25   take my list of wants and divide that so that we were

551

1  sending requisitions to an individual vendor to get
2  quotes. So it's a convenience and a time saver and a
3  cost saver if I can put all of the items that I want
4  to order on a single requisition.
5     And then in this case because it's computerized,
6  the purchase order module can look at the requisition
7  and look at that single requisition and divide it into
8  purchase orders automatically. So the single
9  requisition is a big deal.
10  Q  What's a nonstock item, sir?
11  A  Well, that's something that the company does not
12  have in stock and so it's bought from an external
13  vendor.
14  Q  This ability to buy various items from various
15  vendors and place them on a single requisition, is
16  that included in any of the claim elements that you
17  have examined?
18  A  Yes, it is.
19  Q  Can you give us just an example. Can I look at
20  Claim Three of the '683 patent?
21  A  Sure.
22  Q  Tell us where that particular feature is.
23  A  Sure. That is being color-coded in blue. Means
24  for building a requisition using data related to
25  selected matching items and their associated sources.

552

1  Q  So we could have a requisition with matching items
2  from more than one source; is that right?
3  A  That's right.
4  Q  Is that consistent with the representation that
5  Lawson is making in its response to a request for
6  proposal on page 868 of Plaintiff's Exhibit 219?
7  A  Yes, it is. It's talking about nonstock items on
8  a single requisition.
9  Q  Can you take a look at the next page titled
10  "Inventory Control." Is the inventory control module
11  one of the modules you examined in conducting your
12  infringement analysis?
13  A  Yes, it is a third module in the procurement
14  suite.
15  Q  Is there anything you'd like to direct us to here?
16  What does the inventory control module permit you to
17  do?
18  A  Yes. The introductory sentence there explains
19  what's going on. Inventory control enables you to
20  effectively monitor and manage inventory throughout
21  the organization. It's flexible design and complete
22  integration with requisitions and purpose order
23  applications help facilitate a smooth flow of
24  information and products.
25     So, again, this inventory control is one of the

553

1  three main software modules in the procurement suite
2  along with requisitions that we just looked at, and
3  before that, the purchase order module.
4  Q  Could we go to, in 219, could we go to the page
5  that ends in 013? It's actually PX 219 at 0179. Let
6  me make sure I've got it. Thank you. Okay.
7     There's a series of questions here. Let me just
8  go to the beginning of it. They start at page 177 of
9  this exhibit. Do you see it says,
10  Requisition/purchase order process, No. 9, at the top
11  there?
12  A  I'm sorry. What page?
13  Q  177 of 180. It's in the middle at the bottom
14  there.
15  A  Page 177?
16  Q  Yes, sir. It ends with 0119011.
17     THE COURT: What do you mean ends with?
18     MR. ROBERTSON: Excuse me?
19     THE COURT: It ends? What's the "it"?
20     MR. ROBERTSON: The Bates number, Your Honor.
21     THE COURT: The lower number in the number is
22  a Bates number, and what number is that one?
23     MR. ROBERTSON: This is exhibit number --
24     THE COURT: No, what number is the Bates
25  number? Sorry.

554

1     MR. ROBERTSON: 9011.
2     THE COURT: Can you find that, Doctor?
3     THE WITNESS: Yes. That's my page 180.
4  BY MR. ROBERTSON:
5  Q  So there's a heading 9 there called
6  Requisition/purchase order process. Do you see that?
7  A  Right. I've got it now.
8  Q  Well, there are a number of questions that are
9  being asked under that heading, correct?
10  A  Right.
11  Q  And Lawson is giving a number of responses. Do
12  you see that?
13  A  I do.
14  Q  Okay. Can you go now to page 179 of 180 or where
15  it ends with the Bates label 9013, and there's a
16  question G. Do you see that?
17  A  I do.
18  Q  Now, confirm for me that we're still talking about
19  the requisition/purchase order process questions that
20  are being asked by Scottsdale Unified School District?
21  A  Yes.
22  Q  Okay. There's a question there: Does the system
23  allow for a catalog of preapproved items for the
24  requisitioners to choose from. Do you see that?
25  A  I do.

555

1  Q  What was Lawson's response?

2  A  Individual departments and users can establish

3  custom catalogs that reflect their unique ordering

4  patterns.  Furthermore, you can establish catalogs for

5  certain days of the week by item classification,

6  vendor, or other criteria.

7  Q  Turning back to that Claim Three demonstrative we

8  have, the first element says at least two product

9  catalogs.  Do you see that?

10  A  I do.

11  Q  Can there be more than two?

12  A  Oh, yes.

13  Q  But there must be a minimum of two?

14  A  That's right.

15  Q  When we're talking about these, the claim element

16  three, which says, Means for selecting product

17  catalogs to search, just explain what your

18  understanding of that is from the perspective of a

19  person of ordinary skill in the art.

20  A  This means that there must be a user interface

21  capability that allows a user to select one or more of

22  the catalogs that are available in the system.

23  Q  Can we go to -- this is demonstrative 093, page 1.

24  Side by side.  This is the short form color-coded

25  demonstrative.  Can you put that next to the 093, page

556

1  2?

2      You mention the term "user interface," Doctor.

3  What did you mean by that term?

4  A  That's a computer science term of art and it means

5  the way that the computer program is going to

6  converse, as it were, with the human user.  And if

7  you're familiar with Google or Yahoo, you're familiar

8  with a text box where you type in.  In Google, you're

9  typing in a search query.  But that text box is an

10  example of a user interface.

11     If you're represented with a drop down menu and

12  you click on the top element, the drop down menu opens

13  up, and you can scroll down and pick one of those

14  elements.

15     If you have a selection to make and you have a

16  series of radio buttons, then you can click on one

17  button, and you have made a selection of one out of

18  however many choices there are.

19     If you double click on a hyperlink, then that user

20  interface element is directing the browser to go to

21  another page.  So --

22  Q  Let me stop and ask you what a hyperlink is?

23  A  Hyperlink is an encoding within a web page that

24  says -- that redirects the browser to a different page

25  when you click on it.

557

1  Q  Sir, with respect to this claim element, for

2  purposes of the jury's determination, what is relevant

3  to your determination in their assessment of whether

4  infringement occurred?

5  A  It's whether or not that user interface exists in

6  the Lawson system.

7  Q  And in your analysis of the Lawson system, does

8  that, in fact, exist?

9  A  Yes.  I'm going to demonstrate that later.

10  Q  This claim element we've been looking at for the

11  means of selecting the product catalogs to search,

12  does the claim require that the user select multiple

13  product catalogs to search simultaneously?

14  A  No, not simultaneously.  You could search one

15  catalog and then search another one.  So a serial

16  search would satisfy this claim element.

17  Q  Going back to the third element of Claim Three,

18  which recites means for searching for matching items

19  among the selected product catalogs, and you have

20  illustrated this in your diagram.  What's your

21  understanding of how the system needs to perform in

22  order to accomplish that element?

23  A  Well, if you're going to search, then you need a

24  search program.  And the search program has to have

25  input, a query, so it knows what to search for.  And

558

1  so if you have a search program and if the user can

2  input a search request, then that search program can

3  identify matching items, items that match the query

4  term among the selected product catalogs.

5      You could also do it not only with textual search,

6  but with drop down menus.  You could search that way,

7  too.

8  Q  You used the term "drop down menu."  Could you

9  just explain what you mean when you use that term?

10  A  Yes.  So in building a web page, this is done

11  using hypertext markup language, HTML, and there's a

12  standard construct there that's a drop down menu.  So

13  you program this so when this is displayed to the

14  user, there is a top level catagory, and it typically

15  says "select."  And if you click on select, then the

16  menu opens up.  It drops down and a series of choices

17  are presented.  And then you can take the mouse and

18  pick one of those.

19      The most insidious of these is when you're trying

20  to fill in your address and the choice is state.  You

21  click on state, and all the 50 states fill up your

22  whole screen, and you have got to go pick one.

23  Q  In one of these demonstrations you're going to do

24  on the Lawson accused product, will we see this drop

25  down menu?

559

1    A  We sure will.

2    Q  The next element of Claim Three, which is

3    color-coded blue and has this means for building a

4    requisition using data relating to selected matching

5    items and their associated sources, what's your

6    understanding as to what a requisition is?

7    A  The requisition is the formal list of items that

8    you wish to purchase.

9    Q  Moving on to the next element of Claim Three,

10   which is yellow in your illustration.  It says, A

11   means for processing the requisition to generate one

12   or more purchase orders for the selected matching

13   items.  You mention the term "purchase order" when you

14   were discussing requisitions.  How does a purchase

15   order differ from a requisition?

16   A  The requisition is the list of things you want.  A

17   purchase order is the contract vehicle for buying.  So

18   when I have a purchase order and I send it to a

19   company, this is the legal document that says I want

20   to buy the item or items on this purchase order.

21     Requisition is your total list of things you'd

22   like to buy.  Purchase orders go to individual

23   companies.

24   Q  When you're providing your understanding of the

25   definitions and the meanings of these terms, is that

560

1    the same understanding as a person of ordinary skill

2    in the art at the time?

3    A  Yes.

4    Q  So how would the fifth element of Claim Three be

5    satisfied?

6    A  We would have to see a requisition module that can

7    take the formal requisition, which could have many

8    items from many vendors, and then turn that into one

9    or more purchase orders.  And, typically, you have all

10   the items from one vendor on one purchase order if you

11   can do it.  If they are present.

12   Q  Moving on to the sixth and last element of Claim

13   Three, which you have color-coded brown.  That element

14   recites means for converting data relating to a

15   selected matching item and an associated source to

16   data relating to an item and a different source.  How

17   are we to understand that claim element?

18   A  So if I have a list of items and for some

19   reason -- let's say I want to do comparison shopping

20   or say that the item that I want, I've checked the

21   inventory, and it's not available.  So there has to be

22   a converting means whereby I can look for similar

23   items, and this is all computer assisted.  I can find

24   similar items that I might choose instead of the one

25   that I had initially inquired about.

561

1         MR. McDONALD:  Your Honor, I'm going to

2    object to this question about this.  This is a

3    means-plus-function clause and he's asking him what it

4    means.  It should be done in the context of the --

5         THE COURT:  I was just looking at page 2 of

6    the glossary.  I think that's been defined over there.

7         MR. ROBERTSON:  I was just going to ask him

8    to go to that page.

9         THE COURT:  Don't be having him give his own

10   constructions, please, before you ask him to go to the

11   ones that have been construed.

12   BY MR. ROBERTSON:

13   Q  If you go to page 2 of the Court's glossary, Dr.

14   Weaver.

15   A  Yes.

16   Q  What's the function that's being defined here on

17   the means for converting data for this claim element?

18   A  The function of this element is converting data

19   related to a selected matching item and an associated

20   source.

21   Q  According to the Court, how can this function be

22   accomplished?  By what structure?

23   A  The corresponding structures, materials or acts of

24   this element are disclosed as one or more non-catalog

25   databases identifying cross-referenced items,

562

1    identical items, or generally equivalent items; one or

2    more cross-reference tables or file identifying

3    cross-referenced items, identical items, or generally

4    equivalent items; one or more codes corresponding to

5    cross-referenced items, identical items or generally

6    equivalent items; and their equivalents.

7    Q  In that definition there are non-catalog databases

8    identifying cross-referenced items, identical items or

9    generally equivalent items, cross-reference tables or

10   files and one or more codes.

11     As a computer scientist, can you tell us what your

12   understanding as a person of ordinary skill in the art

13   would understand those three terms to mean?

14   A  Sure.  So a non-catalog database is a file that is

15   not part of the physical structure of the database

16   system.  So it's an external file.

17     In this context, it's identifying the

18   cross-referenced items.  So, for instance, we might

19   have a vendor -- think of a file that has records.

20   Think of that as a row in a table.  We might have one

21   vendor's part number and a second vendor's part number

22   in that row.  We might have a cross-reference

23   index that indicates in this context that those two

24   part numbers are identical or generally equivalent --

25   let's see.  What was the next one?  Okay.

563

1  Cross-reference tables or files.  So this is a larger
2  structure, but it contains that same type of
3  information.  Vendor part No. 1 is equivalent to this
4  other vendor part No. 2.
5      And by equivalent, I mean identical or generally
6  equivalent.
7      And then by codes, this means that there is an
8  understood structure, understood by the computer and
9  perhaps by the human inputting these codes as to what
10  the codes mean.  So in one case --
11      MR. McDONALD:  Your Honor, I'm going to
12  object.  I don't think his interpretation of codes is
13  in his report.
14  BY MR. ROBERTSON:
15  Q  Doctor, did you do analysis of whether or not the
16  Lawson system employs codes for performing this
17  cross-referencing capability or this means for
18  converting data as the Court has construed the claim?
19  A  Yes, it does.
20  Q  What type of codes?
21  A  That particular code is called a UNSPSC code,
22  United Nations Standard Products and Services Codes.
23  Q  We're going to come back to that, but could you
24  just briefly explain to the jury what type of code
25  that is.

564

1      THE COURT:  Why don't you tell me where it is
2  here because that's what the objection is.
3      MR. McDONALD:  He's talking about UNSPSC
4  codes, Your Honor.  I will agree that's in there.
5      THE COURT:  The objection is withdrawn.
6      MR. ROBERTSON:  Thank you.
7  Q  In examining this kind of cross-referencing or
8  converting capability, is it described in the patent?
9  A  Yes.
10  Q  Why don't we use the '683 patent, if we can, and
11  go to column 16.  That's tab 2 in the juror
12  notebook specifically at about lines 19 through 27.
13  What's the example being given here as how this
14  cross-referencing or converting process for finding
15  identical or generally equivalent items can be
16  accomplished?
17  A  The general idea here is that a particular part
18  number has been entered into this electronic sourcing
19  system and that particular part number is not
20  available, but the cross-referencing system using the
21  cross-reference index finds that another vendor's part
22  number is the same or generally equivalent, and it
23  substitutes the second part number for the first.
24  Q  Why don't we go to a different claim now, Claim 26
25  of the '683 patent.  And I want to focus on this last

565

1  element.  This determining whether selected matching
2  items is available in inventory.  Can you tell us how
3  the patent describes that process?
4  A  When the customer service representative who is
5  using the system does a search for an item, one of the
6  functions that is supported here is inquiring about
7  what quantity of those items is available in the
8  inventory database.  And so if you inquire and you get
9  back a quantity of zero or if you get back a quantity
10  that's less than the number you want, you know that
11  those items are not available in inventory.
12  Q  You indicated there could be a CSR.  That's a
13  customer service representative.  Does it have to be
14  in the patent?
15  A  No, that's just an example.
16  Q  The claim itself doesn't recite whoever the user
17  is, does it?
18  A  No.
19  Q  I'd like to talk a little bit now about sort of a
20  general overview of the Lawson accused systems and
21  methods that you have examined as part of your
22  analysis.  Would that be all right?
23  A  Sure.
24  Q  Do we have a demonstrative that you have prepared
25  as to what you consider the procurement system in the

566

1  various modules to be?
2  A  We do.
3  Q  Now, this was prepared at your direction?
4  A  Yes.
5  Q  What are you intending to illustrate here, sir?
6  A  I'm trying to show the various modules and
7  components that are in the Lawson system, and I've
8  tried to map them by color to the claims of the '683,
9  Claim 26.
10  Q  By the way, Doctor, is your touch screen working?
11  A  Yes.
12  Q  So you might want to, if you need to, you can
13  utilize that capability.
14  A  I can use my pointer.
15  Q  All right.  So I'm sorry.  I interrupted you.  You
16  have got a catalog database icon there.  Do you see
17  that?
18  A  Right here.  So this is the set of catalogs in
19  electronic form.
20  Q  Actually is that the user sitting at the computer?
21  Do you see the catalog database?
22  A  Yes.
23  Q  Where?
24  A  You're talking about this one.
25  Q  Yes, sir.

567

1  A  Yeah, okay.  So the catalog database is the
2  electronic form of the catalogs all put together so
3  that they can be searched.  That is the catalog
4  database.
5  Q  Does the Lawson procurement system include a
6  database in its inventory control module?
7  A  Yes, it does.
8  Q  Can supplier product catalog be loaded into that
9  control module?
10  A  Yes, we'll see that.
11  Q  What's the selection icon?
12  A  Of all the catalogs that are in the database, the
13  user interface provides a way to select one or more
14  that are going to be searched.
15  Q  Now, you have all of these modules I see here
16  within a gray box.  What are you trying to illustrate
17  there?
18  A  The gray box is the Lawson system.
19  Q  And these are the various components?
20  A  These are components, modules.
21  Q  There's an icon there for searching for matching
22  items.  Do you see that?
23  A  Yes.
24  Q  What did you intend to illustrate there?
25  A  Using the user interface, one engages a search

568

1  program and gives it a search query or initiates a
2  search using a characteristic of a drop down menu.
3  And the search engine then engages and returns items
4  that match the query.
5  Q  Did you examine a Lawson software program that
6  permits a user of a Lawson system to perform that
7  functionality?
8  A  Yes, the requisitioning system does that.
9  Q  You have building a requisition icon here.  Do you
10  see that?
11  A  Yes.
12  Q  Please explain what you're intending to illustrate
13  there?
14  A  So in the Lawson system you build a shopping cart,
15  then you add and delete items from it until you're
16  satisfied with it.  And then you do a checkout from
17  the Lawson system.  And that engages the requisition
18  system and builds the requisition of all the items
19  that you want to order.
20  Q  Are you familiar with the term "a shopping cart"?
21  A  Yes.
22  Q  Is that consistent with your understanding of
23  building a requisition?
24  A  Well, it's not the requisition.  It's the data
25  structure that can be modified.  You can add and

569

1  delete to it.  So in computer terminology, we call
2  this a cache, a C-A-C-H-E.  So it's a data structure
3  that holds data, and then it's going to be transferred
4  to the requisition module, and it's in the requisition
5  module that the requisition is created.
6  Q  All right.  Thank you for that correction.  So is
7  it consistent with an order list?
8  A  The order list is the shopping cart and that's
9  what becomes the requisition.
10  Q  Did the Court define what an order list is in its
11  glossary of claim terms?
12  A  Yes.  A list of desired catalog items.
13  Q  Did you apply that construction in doing your
14  infringement analysis?
15  A  Absolutely.
16  Q  Next you have an icon for generating purchase
17  orders.  Do you see that as part of the overview of
18  the Lawson procurement system?
19  A  Yes.
20  Q  Can you explain that process here?
21  A  So we've got our requisition.  This is our formal
22  list of the things we want to buy.  It might have one
23  item.  It might have a hundred items.  The items might
24  be from one vendor or they might be from 100 vendors.
25  Whatever that requisition says, the purchase order

570

1  module takes that requisition and typically pulls out
2  all of the requisition items that are going to be
3  ordered from a single vendor and creates a purchase
4  order for that vendor.  Then it pulls all the items
5  that go to another vendor and creates a separate
6  purchase order for the second vendor and so on until
7  all the items in the requisition have appeared in some
8  purchase order.
9  Q  Did you do analysis of any Lawson software program
10  or module that performs that functionality?
11  A  Yes, we're going to see that, and it's going to be
12  the Lawson P.O. 100 program.  Their purchase order
13  program that converts a requisition into one or more
14  purchase orders.
15  Q  Now, you've illustrated a number of arrows between
16  these various software programs or modules that you've
17  identified as part of the overall Lawson infringing
18  system.  What are you intending to indicate by those
19  arrows?
20  A  Well, the arrows with the single head indicate
21  unit directional information flow.  The arrows that
22  are double-headed indicate bidirectional data flow
23  back and forth.
24  So, for instance, the arrow here between selection
25  and searching, you use that user interface to engage

571

1   the search engine.  That's one-way data flow.
2       Down here, for instance, purchase orders go out to
3   the Internet, but responses come back.  So there's
4   bidirectional data flow there.
5   Q   You've got outside of the Lawson system you've got
6   this little cloud that you have illustrated that has
7   Internet in it.  What are you attempting to illustrate
8   there?
9   A   Well, the cloud is the classic icon for the
10  Internet, meaning lost of networks, lots of computers,
11  you don't necessarily know whether they are, you don't
12  usually care, but the computer can by sending
13  addresses through the Internet can arrive at a
14  particular destination.  So here Bio-Rad is an example
15  of a vendor.
16      So by using this route I can send information to
17  the vendor.  When the vendor gets that purchase order,
18  it can send a purchase order acknowledgment back to
19  the Lawson software.
20  Q   Is there a software module or software program
21  that you did an analysis of that permits the Lawson
22  system, the accused system, to employ the Internet to
23  go out to vendors and obtain information, do searches,
24  and then return data to complete requisitions and
25  purchase orders?

573

1   selection and determination as to what it might want
2   to purchase?
3   A   So when we use the Punchout capability, some of
4   these vendors support the capability of reporting
5   whether the item that you want is available in
6   inventory.  And so we can see in what's called the
7   Punchout response, we see on a web page displayed in
8   the Lawson system whether or not the item is available
9   in inventory.
10      And if we're using the electronic data interchange
11  module, the purchase order goes to a vendor, and the
12  vendor can reply, and the purchase order responds as
13  to whether that item is available in inventory.
14  Q   So you have this software module within the Lawson
15  system about determining availability and inventory.
16  Do you see that?
17  A   Right here, yes.
18  Q   I think you may have touched on it, but can you
19  tell us the ways in which this accused Lawson system
20  can satisfy the element of determining the
21  availability of inventory within its accused system?
22  A   Yes.  So using the Punchout system, I can look
23  into the external catalog of a vendor.  And if this
24  vendor supports this capability, I can determine
25  whether the item I want to order is available in

572

1   A   Yes.  There's a system called Punchout that we'll
2   see that allows us to access vendors.  There's also an
3   electronic data interchange software module that
4   allows us to send purchase orders and get purchase
5   order responses.
6   Q   You used the term "Punchout."  Is that the term
7   that Lawson uses for its software module?
8   A   Yes, this is their term.
9   Q   Have you seen that term "Punchout" employed in
10  other procurement systems?
11  A   Yes, it's a common term of art.
12  Q   Now, what's your understanding as to what is meant
13  when they use the term "Punchout"?
14  A   So there's the Lawson system.  The user engages
15  the Lawson system and using the capabilities of the
16  Lawson system goes to a vendor website, one that's
17  been created for this customer.  And so this idea of
18  looking at an external vendor's specialized website is
19  called punching out of the Lawson system.
20  Q   Have you done a demonstration of that using a
21  Lawson system?
22  A   Yes.
23  Q   When this purchase order response comes back from
24  a supplier, what types of information can be in it
25  that might be useful to the user in making its

574

1   inventory.  That's one1 way.
2       The other way is this purchase order being sent to
3   a vendor and the purchase order response coming back
4   there's two ways to do that.
5   Q   Are you familiar with the term EDI?
6   A   Electronic data interchange.
7   Q   Can you explain to the jury what that is?
8   A   So this was big in the 1970s and has gotten even
9   bigger today.  When companies want to communicate with
10  each other -- well, let me start with individuals.  If
11  you and I want to exchange information, a typical way
12  would be email.  So email works for individuals, but
13  it isn't structured.  You don't know what's going to
14  be in the email.
15      So electronic data interchange is a set of
16  standardized forms like purchase order, purchase order
17  response, invoice, advance ship notification.  And
18  what is standardized about them is the information
19  that's in it is in a particular place and it's of a
20  particular length and it's of a particular type of
21  data so that a computer then doesn't have any problem
22  figuring out what it means.
23      So that's what EDI does.  It exchanges information
24  in a structured formal way between companies.
25  Q   You indicated that EDI has been available since

575

1    the '70s, but the overall components of this system,

2    they haven't been available since the '70s, have they?

3    A  I don't think so.

4    Q  And you can take known technology and combine it

5    to come up with something new and useful; is that

6    right, Doctor?

7    A  Sure.

8    Q  The converting icon, I think you talked a little

9    bit about this, but in the Lawson system, how do they

10   perform this functionality of the conversion to find

11   similar, identical or generally equivalent items?

12   A  I mentioned these UNSPSC codes.  So I'll explain

13   later in detail what they mean, but the gist of it is

14   that by using an 8-digit code, you are drilling down

15   to what's going to be called the commodity level of

16   information.  And if multiple items have this same

17   8-digit code, then by the definition of the code they

18   are generally equivalent and substitutable.

19       So the Lawson system uses this UNSPSC code in

20   order to accomplish that task.

21   Q  So now that you have discussed sort of the overall

22   functionality of the system in general terms and how

23   it can perform it, you identified various software

24   programs or modules that Lawson offers to do that

25   functionality.  Can they be configured in various

576

1    ways?

2    A  Yes.  Certain modules are required and certain

3    modules are optional.

4    Q  Did you prepare a demonstrative to show how these

5    various Lawson procurement S3 modules can be -- these

6    components can build to an infringing system?

7    A  Yes, I have several demonstratives that build on

8    each other to illustrate how the software modules

9    build on each other.

10   Q  Let's go to the first demonstrative you have.  And

11   this one is entitled "Lawson's electronic sourcing

12   systems."  And you have a yellow box there.  What is

13   that?

14   A  So as the name suggests, the platform technology

15   foundation contains the modules that have to be in a

16   functioning Lawson system.

17       Two of those are the Lawson system foundation,

18   which is, again, a set of common computer implemented

19   activities that every software module is going to

20   need.  For instance, communication with other modules.

21       The process flow is a module that controls and

22   directs the approval process.  So when a requisition

23   comes in, typically a manager approves it, and that

24   approval process is done by the process flow module.

25       So these two are required for all of the S3

577

1    procurement systems.

2    Q  In your analysis and review of the documents and

3    the deposition testimony, did you make a determination

4    that these foundational software modules were required

5    as part of the Lawson infringing system?

6    A  Yes, in the documentation that I read it was very

7    clear that the Lawson system foundation, LSF, had to

8    be installed before you could install the modules of

9    the S3 procurement system.  Likewise, the process flow

10   had to be there as well.

11   Q  In your report, you called the Lawson system

12   foundation a prerequisite module.  What did you mean

13   by that?

14   A  The LSF must be there before you can load the

15   modules that are the procurement suite.

16   Q  In order to purchase the procurement suite

17   license, the procurement suite, does a customer of

18   Lawson have to license this Lawson system foundation

19   and process flow?

20   A  That's what the documentation says.

21   Q  Well, I think you touched on the process flow

22   already, but let's take a look, if we can, at the

23   Lawson requisition self service installation guide,

24   which is PX 131.  It's in binder 3, Dr. Weaver.

25       Is this document is entitled, "Lawson requisitions

578

1    Self Service Installation Guide."  Did you review this

2    as part of your preparation for your expert report?

3    A  Yes, I did.

4    Q  So what is this document?

5    A  This document explains to the customer how they

6    should go about installing this requisition self

7    service module.  We're going to call it the RSS.

8    Q  If we could go to bar code 4.  It's item 4 of this

9    document.  There's a box entitled, "System

10   Requirements" there.  Do you see that?

11   A  I do.

12   Q  Where is the information relevant to the Lawson

13   system foundation here?

14   A  It says that the following software and hardware

15   requirements must be met before you install the

16   product.  And then in the table below, the first row

17   says, "Lawson system foundation."

18   Q  Okay.  So before you can install Lawson's

19   requisition self service, one of the requirement

20   components is the Lawson system foundation; is that

21   right?

22   A  That's what this says.

23       MR. McDONALD:  Your Honor, I object.  It's a

24   little unclear at this point because requisition self

25   service is a different module from the ones we were

579

1  talking about earlier.  So I would object as
2  ambiguous.
3      MR. ROBERTSON:  It's one of the component
4  modules that Dr. Weaver has already mentioned.  We can
5  go back and finish building the blocks if you'd like.
6  Q  Let's go back to your building components, if we
7  could.  Then we can circle back.
8    So you have got your platform technology here of
9  the Lawson system foundation and the process flow.
10  What is the next software module or program that you
11  need in order to have an infringing system?
12  A  The procurement modules that are needed for an
13  infringing system include purchase order, requisitions
14  and inventory control.  These are the three that we
15  just saw in the previous documents.  And for
16  clarification, the requisition self service is going
17  to sit on top of this.
18  Q  But at this point, let's go back, at this point
19  with this platform and these three modules, does that
20  comprise an infringing system?
21  A  Yes, it does.
22  Q  And you're going to discuss in detail the purchase
23  order module, the requisitions module, and the
24  inventory control module in the context of Lawson's
25  documents and witness testimony?

580

1  A  Yes, I am.
2  Q  Well, let's go to the next build then.  So the
3  next thing you placed on top of this platform here
4  we're building is this module or software program
5  called "requisition self service."  Do you see that?
6  A  I do.
7  Q  Why did you do that?  Why did you make the
8  arrangement like this?
9  A  Because the requisition self service is a module
10  that is modern and user friendly.  So it has a web
11  based interface.  But it uses the functionality of the
12  requisition module below it.
13    So requisition self service can be installed only
14  if you already have the requisition module beneath it.
15  So you can think of, in software terms, the
16  requisition module provides a certain set of
17  capabilities and functionalities, and requisition self
18  service is a user friendly overlay on top of that.
19  Q  Does it permit more end users to utilize the --
20  A  Yes.  By user friendly, this means that you don't
21  need as much training.  You don't need to be as much
22  of a specialist.  It's more for the guy on the street.
23  Q  Does the requisition self service permit Lawson to
24  distribute the functionality for this electronic
25  sourcing and procurement to a greater number of

581

1  individuals within a company, for example?
2  A  Yes, it does.
3  Q  Do you know whether or not Lawson when it licenses
4  this requisition self service module, licenses it on
5  the basis of the number of potential users of that
6  software module?
7  A  Yes.
8  Q  Do they?
9  A  Yes.
10  Q  Just so I'm clear, the requisition self service
11  module can't work without the requisition module that
12  sits upon the Lawson system foundation and process
13  flow flat on technology foundation.  Is that what
14  you're indicating?
15  A  Yes, that's correct.
16  Q  Is there another module that you did an analysis
17  of?
18  A  Yes.  So there's a Punchout module, which I kind
19  of indicated for.  It sits on top of requisition self
20  service.
21  Q  Are we going to see some documentation and have
22  you reviewed some testimony in which the purchase
23  order requisitions and inventory control modules that
24  are all the S3 procuring modules require the Lawson
25  system foundation?

582

1  A  Yes.
2  Q  Do they?
3  A  They do.
4  Q  So just going back then to Plaintiff's Exhibit
5  No. 131, which was the --
6      THE COURT:  Go back to the other one just a
7  minute.
8      Are you saying that you can't use the
9  procurement Punchout without also using the RSS, the
10  S3, and the foundation?
11      THE WITNESS:  Yes, Your Honor.
12      THE COURT:  All right.  Go ahead.
13      MR. ROBERTSON:  I was going to come to that,
14  Your Honor, but thank you.
15  BY MR. ROBERTSON:
16  Q  Let's go back to that for a second since the Court
17  has raised the question.
18    So if I'm going to have procurement Punchout, that
19  capability to go out over the Internet and go to
20  individual vendors for specially created Lawson vendor
21  website in order to do my shopping, I must have
22  licensed requisition self service, the three S3
23  procurement modules, and the platform technology
24  foundation including Lawson's system foundation and
25  process flow; is that right?

583

1   A  That's correct.

2   Q  Is that reflected in the documents and the

3   testimony that you have seen?

4   A  Yes, it is.

5   Q  And just so we're clear, procurement Punchout

6   sitting alone, can it perform the functionality of

7   going out over the Internet to individual vendors in

8   order to do this shopping function?

9   A  No.

10  Q  Requisition self service sitting alone without the

11  S3 procurement modules and the platform technology,

12  can it perform any of the functionality that's

13  described in the patents?

14  A  No.

15  Q  Let me just be clear then.  So Punchout

16  procurement alone in your opinion doesn't infringe any

17  of the claims of the patent?

18  A  Not by itself.

19  Q  Well, requisition self service alone doesn't

20  infringe any of the claims of the patent?

21  A  Correct.

22  Q  If we could go back to just the yellow and blue.

23  In this configuration, are you going to have opinions

24  with respect to whether or not the functionality

25  provided by the software here, the capability of the

584

1   software infringes the claims of the patent?

2   A  I'm going to have an opinion on that.

3   Q  Why don't you just preview that opinion?

4   A  And my opinion is that this is an instance of an

5   infringing system.

6   Q  Let's add the next module.  Is this going to be

7   also instances of infringing activity under the claims

8   at issue here?

9   A  Yes, it is.

10  Q  Let's add the next module.  Is this also going to

11  be instances of infringing activity under the claims

12  that are at issue here?

13  A  Yes.

14  Q  Let's add the next module.  Here's a module that

15  sits on these S3 procurement modules called the

16  electronic data interchange.  You talked a little bit

17  about that.  Is that a module that Lawson offers as

18  part of its infringing system?

19  A  Yes, it is.

20  Q  And that is sitting on top of your S3 procurement

21  modules and your platform technology modules.  Do you

22  see that?

23  A  That's right.

24  Q  With just the electronic data interchange and the

25  S3 procurement modules and the platform technology

585

1   foundation, can that be an instance of infringing

2   activity under the asserted claims?

3   A  Yes, it can.

4   Q  Again, just to be clear, though, because this can

5   be a little confusing.  I don't need all of these

6   modules in order to infringe the claims, do I?

7   A  You do not.

8       THE COURT:  Are you at a transition point?

9       MR. ROBERTSON:  This would be a good time to

10  break, Your Honor.

11      THE COURT:  All right, ladies and gentlemen.

12  We'll have the morning recess for about 20 minutes.

13  And, if you will, just take your notepads with you.

14  That will be fine.

15      (The jury is out.)

16      All right.  We'll be in recess for 20

17  minutes.

18      (Brief recess taken.)

19

20

21

22

23

24

25

586

1       THE COURT:  All right.

2   Q  Dr. Weaver, this platform technology foundation, the

3   yellow box that has the Lawson Software foundation, you are

4   aware that Lawson sells other, what they call a suite of

5   business solutions for doing financial accounting, things like

6   that, human resource, business processing; correct?

7   A  Yes, I saw that in their documents.

8   Q  Those software modules, can they also sit on this platform

9   technology foundation?

10  A  Yes, they can.

11  Q  By adding additional applications to this platform

12  technology foundation, does that avoid infringement in your

13  opinion?

14  A  It does not.

15  Q  Is that consistent with your opinion that by adding

16  functionality, you can't avoid infringement if at least you

17  have the claimed functionality that is satisfied by the

18  elements at issue in the claim?

19  A  For any claim, if you have all the elements of a claim,

20  adding additional functionality does not change the

21  infringement picture.

22  Q  If we widen this platform technology a little bit and on

23  top of it we put human resource, the software module, we put

24  the financial accounting module and some other kind of module,

25  adding those other modules wouldn't avoid infringement if we

587

1   had, in this instance at least, the yellow box and the blue
2   box; right?
3   A   That's correct.
4   Q   Even if we had those other modules and we had the yellow
5   box, the blue box, the green box, the brown box, and the purple
6   box, and four other boxes sitting on the platform, would that
7   still be an infringing configuration?
8   A   This is an infringing configuration.  So is this, so is
9   this, so is this.  So adding more to that doesn't change that
10  picture.
11  Q   At a minimum, just so we're clear again, we need the blue
12  and the yellow.
13  A   That's the minimum.
14  Q   Would you take a look at binder five.  This is going to be
15  Plaintiff's Exhibit Number 211.  Can you tell us what this is?
16  A   This is the Lawson Punchout -- the procurement Punchout
17  installation guide that's going to tell you how to install this
18  Punchout application.
19  Q   And when was this published?
20  A   This was May 2008.
21  Q   Why don't we go to the page that is bar-coded by page ten,
22  but it is Bates labeled 4788 called installation overview.
23  A   Okay.
24  Q   And do you see there, there are system requirements
25  identified?

588

1   A   I do.
2   Q   And under system requirements, it says, listed below are
3   the software requirements for running Lawson procurement
4   Punchout.  These requirements must be met before you begin
5   installing.  Do you see that?
6   A   Yes.
7   Q   What are the components, the Lawson server requirements
8   for the Lawson procurement Punchout module?
9   A   It's the S3 Lawson system foundation, server applications,
10  and process flow designer.
11  Q   Is that consistent with your build there, that
12  demonstrative you had as to what were some of the foundational
13  software requirements?
14  A   Yes.
15  Q   Also, it says, Lawson procurement Punchout server
16  requirements.  Do you see that as well?
17  A   I do.
18  Q   What is the additional component there that's required in
19  order to be able to install Lawson procurement Punchout?
20  A   You must have the Lawson requisition self-service.
21  Q   And, so, is that consistent with the illustration you had
22  for us?
23  A   Certainly is.
24  Q   Can you turn to the page that is actually -- the barcode
25  at page 12 has the Bates label that ends 4790, Exhibit 211.

589

1   What is being illustrated -- first, what's it entitled?
2   A   The Lawson procurement Punchout network architecture
3   example.
4   Q   And can you help tell us what this is illustrating?
5   A   This is complex.  This is going to illustrate the
6   communications flow as one moves from a Lawson system through
7   the Punchout process into an external vendor's website with
8   catalog and database and so on.
9       It's going to explain how we get there and then how we get
10  back carrying with us whatever items have been added to the
11  shopping cart at the external vendor and then how that shopping
12  cart gets loaded into the Lawson shopping cart.
13  Q   Are we going to see this in one of your demonstrations?
14  A   We are.
15  Q   So that would probably be the best way to understand this
16  complex process?
17  A   Well, this is the way you understand the communications
18  flow.  You will simply observe it in the demonstration.
19  Q   Next exhibit is going to be PX-97, Dr. Weaver.  It's in
20  binder one.  Do you have it, Doctor?
21  A   I do.
22  Q   What is this document?
23  A   This is the requisitions user guide, so this one is going
24  to tell us how to use the requisition module.
25  Q   Is that one of the modules that was in your illustration?

590

1   A   It was.
2   Q   Does Lawson provide this guide to its customers?
3   A   It does.
4   Q   Let's go to the page then, barcode 11, which is Bates
5   label 1108?
6   A   Okay.
7   Q   And at the top, it says overview of requisitions?
8   A   Right.
9   Q   What significance on this overview of requisitions would
10  you like to show the jury?
11  A   That first paragraph that explains that the Lawson
12  requisitions application lets you create requests with demand
13  on stock and demand on vendors, replenish cart par locations,
14  and process and manage requisitions.  So we're going to be
15  interested in that demand on vendors and managing requisitions.
16  Q   What next of significant on this page would you like to
17  point out to the jury?
18  A   We move down here to creating requisitions.  When you
19  create a requisition, you request items from inventory or from
20  vendors.  The requisitions application provides different
21  methods for creating requisitions that allow you to customize
22  the requesting process to suit your business needs.
23  Q   So what is Lawson telling us here with respect to creating
24  requisitions --
25  A   Sorry.  That confirms that Lawson is able to create a

591

1  requisition to request items from vendors.
2  Q   Under the heading processing requisitions, what, if
3  anything, would you like to point out to the jury?
4  A   The first paragraph here, and then its continuation on the
5  next page, the approval process places monetary limits on the
6  amount a requester can request.  The requisitions application
7  provides options for an approver to authorize, reject, or
8  un-release for requisition.
9      Moving on to the next page at the end of the first line,
10  purchase orders are created from requisitions in the purchase
11  order application to fill demand on vendors.
12  Q   And what is Lawson indicating here is the capability of
13  this requisitions module?
14  A   So it's confirming that the requisitions module has to be
15  integrated with the purchase order module if we're going to be
16  able to use it to create purchase orders.  Actually do -- yes,
17  to process requisitions into purchase orders.
18  Q   Can we go on to the next page, Bates labeled -- that is
19  barcoded 13 and ends with the Bates label 110.  It says at the
20  top, how requisitions integrate with other applications.  This
21  section explains how the requisitions application interfaces
22  with other Lawson applications.  What of interest to the jury
23  would you like to point out here?
24  A   That here in the diagram, we have -- so we have
25  requisitions sitting in the middle of this -- this is a

592

1  software architecture explaining how these modules interact
2  with each other and how information flow goes from module to
3  module, and we're going to be interested in the interaction
4  between the requisition and the inventory control and,
5  likewise, the requisition and the purchase order.
6  Q   There are bidirectional and unidirectional arrows which
7  you mentioned earlier.  Can you tell us what your understanding
8  is they are illustrating?
9  A   Sure.  Inventory control is providing information to the
10  requisition module.  Requisition is exchanging information in
11  both directions with purchase order.
12  Q   Is there anything else of interest you want to point out
13  on that page?
14  A   That's it.
15      MR. ROBERTSON:  Can we go to the next page which is
16  Bates labeled 111.
17  Q   What, if any, interest on this page would you like to
18  inform the jury about?
19  A   In the inventory control description, it says that the
20  requisitions application receives item information from the
21  inventory control application.  Now, that was that
22  unidirectional arrow that we just saw.  The item numbers and
23  descriptions used by requisitions are stored in the inventory
24  control application.  So it needs that information.
25  Q   And item numbers in description, are they the item numbers

593

1  in the description of products that are available?
2  A   Yes.  Products that are being requested, being
3  requisitioned.
4  Q   Under the heading purchase order, what is Lawson telling
5  us there as to the capability of the requisitions application
6  interacting with the purchase order application, the module?
7  A   It says that the requisitions application sends order
8  requests for goods or services to the purchase order
9  application.  Purchase orders can then be created automatically
10  to fill the order.  The requisition application receives item
11  costs from price agreements defined in purchase order, and
12  that's why we had the bidirectional arrow between requisitions
13  and purchase order.  Information flows both ways.
14  Q   Can you turn to the next page of Exhibit 97 which ends
15  with Bates label 112, and there's a heading there, process
16  flow.  What is Lawson indicating about the functionality of the
17  requisition module here with respect to process flow?
18  A   It says that the requisitions application sends a request
19  for service to the Lawson process flow application.  The
20  predefined services for the requisitions application are the
21  requisitions approval service and the rush item processing
22  service.  So this says that the process control application has
23  to be integrated with requisitions if we're going to be able to
24  support the approval mechanism.
25  Q   If you'll turn now to page 63, barcode -- or the Bates

594

1  label ending 160, the page at the top says what is a price
2  agreement.  Do you see that?
3  A   I do.
4  Q   Do you have an understanding as to what a price agreement
5  is?
6  A   Yes.
7  Q   How does Lawson define price agreement here?
8  A   A price agreement is a pricing tool set up in the purchase
9  order application that provides the item costs which is the
10  unit cost for purchase order and requisition lines.
11  Q   What, if any, significance does that have to this case?
12  A   Well, it's telling us here that -- excuse me -- that the
13  customer needs to set up this price agreement with the vendor
14  so that the vendor can electronically say what the cost of the
15  items is going to be.
16  Q   Does this relate to the testimony earlier you had as to
17  what the vendor price agreements were?
18  A   Yes, it does.
19  Q   Lawson also references here a catalog or quote price
20  agreement?
21  A   Yes.
22  Q   What significance does that have to your opinions?
23  A   This says that a catalog or quote price agreement is a
24  list of items and unit costs supplied by a vendor.  You can set
25  up the cost defaulting structure at the company level to

603

1    A   So between the purchase order and the requisitions -- we
2    saw those as two circles with the arrow between them.  As they
3    exchange information, they're going to do it in what we call
4    asynchronously meaning they are not aligned in time.
5        The purchase order interface goes out and looks for work
6    to do, and if it finds a requisition in a file that needs to be
7    created into purchase orders, it gets that file, reads it, and
8    processes it.
9        So the significance that we're going to see when we do the
10   demonstration is that you will see a delay as we create a
11   requisition, and then we have to have another step to create
12   the purchase order.  But you will see that.
13   Q   Why is it necessary, though, that a requisition include a
14   vendor?
15   A   Oh, well, how would you know who you are going to buy it
16   from if you didn't have a vendor?
17   Q   Can we go to page 155 of this exhibit, and it ends with
18   Bates label 173, and it's referencing here using EDI to issue
19   purchase orders.  What significance in this page of Exhibit 108
20   would you like to point out to the jury?
21   A   We'll start with the first three paragraphs.  EDI is the
22   paperless exchange of documents between trading partners.
23   Companies that use Lawson's EDI capability can communicate
24   instantly with suppliers and vendors.  Data is transmitted from
25   one company's computer to another electronically.

604

1        The basic transaction for all EDI purchasing is the
2    electronic purchase order.  With electronic purchase orders,
3    EDI users can order materials from vendors electronically.
4    After receiving a purchase order, the vendor returns a detailed
5    purchase order acknowledgment to the client.  This
6    acknowledgment summarizes the information on the purchase order
7    and validates the order's authenticity.
8    Q   What, if any, relevance does that have to your opinions,
9    Doctor?
10   A   Well, what we are going to see is that every purchase
11   order that goes out through EDI, called a PO 850 transaction,
12   EDI 850 transaction is going to generate a response, the
13   purchase order acknowledgment which is EDI 855, and that's
14   where there is the opportunity for the supplier to tell the
15   customer whether or not the order can be filled and whether or
16   not the items that are being ordered are available in
17   inventory.
18   Q   This availability in inventory, is that of relevance to
19   the claims that are being asserted here?
20   A   Yes, it is.
21   Q   There's a heading called using internet email to issue
22   purchase orders?
23   A   Right.
24   Q   How does Lawson indicate this process works?
25   A   So this first paragraph under that heading says, purchase

605

1    orders can be issued to vendors using internet email.  This
2    kind of issue method is possible by using Lawson procurement
3    Punchout or another third-party tool that's capable of email
4    delivery.  With Lawson procurement Punchout, you also need
5    Lawson requisition self service to get the PO dispatcher or
6    sweeper.
7    Q   So is that consistent with your diagram earlier in which
8    you need requisition self service to support the Punchout
9    capability?
10   A   That's correct.
11   Q   Is there a description on this page of Plaintiff's Exhibit
12   Number 108 that explains how the procurement Punchout
13   application works?
14   A   Yes, it's the next paragraph below.  So Lawson procurement
15   Punchout lets users of Lawson requisition self service order
16   supplies from a specific vendor's website.  With Lawson
17   procurement Punchout, a vendor page is linked to a shopping
18   icon, called a Punchout, on the Lawson requisition self service
19   home page.
20       When the user chooses a specified vendor, that vendor's
21   website catalog appears.  From this catalog, Lawson requisition
22   self service users can choose items to order.  By separate
23   agreement between the customer and the vendor, the vendor
24   displays the customer's special cost information for catalog
25   items and can limit the catalog items that are displayed.

606

1        When users have filled their shopping carts and checked
2    out from the vendor website, the chosen items and their cost
3    are returned to the Lawson server where a requisition is
4    created using the Lawson requisition self service application.
5    A purchase order is then created from the requisition.
6        After the requisition is interfaced into the purchase
7    application, the Lawson procurement Punchout enables the
8    transmission of purchase order documentation back to the vendor
9    so that the vendor can fill the order.
10   Q   Now, you talked about this Punchout capability a little
11   bit before, but, again, just since that was a lot of
12   information to take in, can you give us a high overview of what
13   is actually the functionality that's going on here --
14   A   Yes.
15   Q   -- that's being performed by the Lawson procurement
16   Punchout module?
17   A   Right.  So we had that complicated diagram that we
18   essentially skipped, but what it was documenting was the data
19   transfers.  So when the Lawson system punches out to this
20   special vendor website that has been created for this
21   particular customer, it first has to have a handshake.  By that
22   I mean that information is transmitted in both directions where
23   the Lawson application and the vendor website authenticate each
24   other so that they know that they are valid.  So they exchange
25   some secret information.  That's how they authenticate.

607

1    So after that security handshake, then the user is given
2    access to the specialized external website, can browse, can
3    search, can put items in a shopping cart, and then when the
4    shopping session is over, the user can click check out, and the
5    information in that external vendor's shopping cart is returned
6    to the RSS module.
7    Q    The RSS module being?
8    A    Requisition self service. Thank you. And so now we know
9    from there -- from that returned information we know the
10   vendor, we know the cost, we know the availability, and then
11   within the requisition self service module, we can now turn it
12   into a requisition and then a purchase order, and then using
13   EDI or email, that purchase order can then be sent to the
14   vendor.
15   Q    Now, you mentioned requisition self service when we were
16   talking about the Punchout capability. Before in your diagram
17   as to how these various modules needed to be configured, did
18   Punchout procurement need to sit on top of requisition self
19   service?
20   A    Yes. We just saw documentation saying that's how it had
21   to be configured.
22
23        (Discussion off the record.)
24
25        MR. ROBERTSON: Thank you for the brief indulgence.

608

1    Q    Can we go to page 158 of that exhibit. At the top is the
2    PO acknowledgment report. What is a PO acknowledgment report?
3    Can you tell the jury what, if any, significance this page has
4    to your opinions in the case?
5    A    First paragraph and the first two bullets. Let's
6    highlight those. So the PO acknowledgement report is a
7    combined summary and exception report that lists processed
8    purchase orders. If there is an error processing a purchase
9    order or differences between a purchase order and the
10   acknowledgment, there will be message lines under the purchase
11   order identifying the error or the difference. Examples of
12   errors and differences listed include the item is rejected, the
13   item is on backorder.
14        So those are examples of errors that might occur when the
15   purchase order is sent. It may be the testimony is not
16   available anymore. The purchase order acknowledgment can tell
17   the RSS system that that's the case so the user is informed.
18   Q    So communication back to the user that the item might be
19   on backorder, is that of any relevance that this requisition
20   self service and Punchout capability, Punchout module has this
21   capability?
22   A    Yes, because if you'll recall, one of the claims had as
23   its last element the determining of whether or not an item was
24   available in inventory. So this is a mechanism that makes that
25   possible.

609

1    Q    I'd like you to turn to Plaintiff's Exhibit Number 112
2    which is in binder two, Dr. Weaver, if you would. And can you
3    tell us, what is that document, sir?
4    A    The inventory control user guide that is going to explain
5    to us how this module seen in my demonstrative, how this module
6    works.
7    Q    What is the date of this document?
8    A    November of 2008.
9    Q    Are you familiar with the document?
10   A    Yes, I've read it.
11   Q    And did you review it for purposes of rendering your
12   opinions?
13   A    I did.
14   Q    Why don't we turn to the page that has the barcode 13 and
15   the Bates label 261. And this is chapter one, overview of
16   inventory control?
17   A    Right.
18   Q    What would you like to point out to the jury with respect
19   to this inventory control module?
20   A    The first paragraph.
21   Q    Okay.
22   A    The Lawson inventory control application lets you define
23   items and manage inventory. The application receives items
24   that you purchase from a vendor or replenish from another
25   location and moves out items by issue, transfer, or allocation.

610

1    So this is telling us that the item master is the central
2    table of the database that contains a list of all of the items
3    that are available.
4    Q    So what component is used to define these to define those
5    items and manage the inventory?
6    A    That's item master.
7    Q    Let's look at page 31 of Exhibit 112. This is entitled
8    setting up purchase order?
9    A    Right.
10   Q    If a system wants, a system user wants to be able to
11   purchase items from vendors, what does Lawson indicate that
12   inventory control module, how it must operate with any other
13   applications?
14   A    Well, in the very first paragraph, it says, if you
15   purchase inventory from vendors, you must set up the purchase
16   order application. And then you can see below it, there's a
17   series of steps of how to set up purchase orders.
18   Q    Is that consistent with your diagram that showed the
19   foundational building blocks for an infringing system?
20   A    Yes.
21   Q    That was part of the blue block that was above the Lawson
22   platform, the yellow block?
23   A    So inventory control must be integrated with the purchase
24   order. Those two modules were on the same level in the blue
25   box.

611

1　Q　Can we go to barcode -- page 70 in this document.  If I
2　can find it myself.  The Bates number ends with 318.
3　　　MR. McDONALD:  Your Honor, I hate to interrupt.  Our
4　Exhibit 112 ends at page 64 of the 301.
5　　　MR. ROBERTSON:  Mr. McDonald, what page does it end
6　in?
7　　　MR. McDONALD:  My version ends at page 64.
8　Q　So we were at page 70 in Plaintiff's Exhibit 112 at the
9　Bates label that ended 318.  And you just referenced this item
10　master, and in this document, this Lawson document says what is
11　an item master.  What does Lawson tell us as to how it defines
12　an item master?
13　A　In the first sentence it says, an item master is a file
14　which holds information about an item regardless of where that
15　item is used.
16　Q　So what, if any, relevance does that have to the opinions
17　you're going to be offering in this case?
18　A　Well, it confirms that the item master is going to be
19　utilized by requisitions and by purchase orders and that it is
20　the central repository where most of the vendor data lies.
21　Q　And can this item master data store both stock and
22　nonstock items?
23　A　Yes, both.
24　Q　By nonstock items, what do you mean by that?
25　A　Those are items that would be ordered from an external

612

1　vendor.
2　Q　What information about the items is maintained in the item
3　master?
4　A　So that would be things like item number, the item
5　description, the unit of measure, the cost, the vendor name,
6　and other attributes that the user can define.  So there's a
7　set of things that must be there like vendor name and cost and
8　unit of measure, and there's also, as we're going to see later,
9　there's some user defined fields so the user can put in
10　information that the user thinks is important about the
11　particular item.
12　Q　Did it also have commodity and classifications codes?
13　A　Oh, that's right, it can.  There's special place for
14　UNSPSC codes, and there's programs to load that information.
15　Q　Refresh the jury, if you would again, on what a commodity
16　classification code is at a high level, if you would?
17　A　Yes.  So using these UNSPSC codes, these are eight-digit
18　codes.  When you use all eight digits, it is a classification
19　for items that are generally equivalent or substitutable.  So
20　it's a way of finding similar items.
21　Q　So this various data points, data information that you
22　just identified, item number and item description and unit of
23　measure and pricing, are all those -- that type of data and
24　information consistent or inconsistent with the Court's
25　construction of an associated -- or, excuse me, organized

613

1　collection of items and associated information including
2　various things?
3　A　Consistent.
4　　　MR. McDONALD:  I object to the characterization of
5　the Court's construction.
6　　　THE COURT:  I didn't hear the last part.
7　　　MR. McDONALD:  Maybe it would be helpful just to put
8　up the construction itself.
9　　　THE COURT:  All right.
10　　　MR. ROBERTSON:  Sure.  Do you have glossary terms?
11　The jury has them.
12　　　THE COURT:  The jury has them in the notebook.
13　Q　So let me --
14　　　THE COURT:  What he objected to is you abbreviated
15　the term.  Isn't that what your objection was?
16　　　MR. McDONALD:  That is correct, Your Honor.
17　　　MR. ROBERTSON:  I misunderstood.  Let me go back
18　then.
19　　　THE COURT:  That's all he's objecting to.
20　　　MR. ROBERTSON:  Thank you for the clarification, Your
21　Honor.
22　Q　There's a catalog definition; correct?
23　A　Yes.
24　Q　You have it, and the jury has it.  And it says it's an
25　organized collection of items and associated information

614

1　published by a vendor which includes suppliers, manufacturers,
2　and distributors which preferably includes, and then there's a
3　number of specified things, part number, price, catalog number,
4　vendor name, vendor ID, a textual description of the item, and
5　images of or relating to the item.  Do you understand that
6　that's the Court's construction?
7　A　Yes, I do.
8　Q　Is that consistent or inconsistent with the various item
9　data that can be included in the item master?
10　A　Consistent.
11　Q　The vendor cost information, is that contained in the
12　vendor item table in a purchase order module?
13　A　Yes.
14　Q　Are we going to see that at some point?
15　A　Yes.
16　Q　If we can, in the same exhibit, going back to barcode page
17　46, Bates label 294?
18　　　THE COURT:  Excuse me just a minute.  Are you saying
19　that in your view, item master fits the defined term catalog?
20　　　THE WITNESS:  Yes, along with the vendor item table.
21　　　THE COURT:  You mean you have to have the vendor item
22　table and the item master for it to be a catalog?
23　　　THE WITNESS:  Yes, sir.
24　Q　Let me have PX-108 again.  Let me just ask you a question,
25　Doctor, about this.  Is a vendor associated with the item data

627

1 training.

2 Q   Can you turn to the page that is barcoded 18 which ends

3 with a Bates label 491, and there is a heading there called

4 prerequisite applications setup.  Why is this significant to

5 your opinions?

6 A   As it says, before you can use the Lawson requisitions

7 self service application, you must set up other Lawson

8 applications.  The prerequisite applications affect the way

9 processing occurs in the Lawson requisitions self-service

10 application.  So as I showed in my demonstrative, this sits on

11 top of our modules.

12 Q   I want to turn to the next page and that first bullet

13 point.

14 A   Before you can create requisitions, you must set up the

15 requisitions application including requester's requesting

16 locations and approval codes if used.

17 Q   Why don't we turn to page 22 of the document, ends with a

18 Bates label 495.  There's a heading called setting up the

19 purchase order application?

20 A   At the top.

21 Q   What did you consider on this page, if anything, when you

22 were doing your analysis?

23 A   The very first sentence.  Before you can use the

24 application, this is the purchase order application --

25      THE COURT:  That doesn't say that.  It says "before

628

1 you use," not "before you can use."

2      THE WITNESS:  Thank you, Your Honor.  Before you use

3 the application, you must define purchase order vendors and

4 locations.

5 Q   What, if any, significance did that have to your opinions?

6 A   That the purchase order and requisition self service have

7 to work together, that PO has to be present before RSS can

8 work.

9 Q   Let me also take you back to page 21 of the document which

10 ends 494.  That is entitled setting up the inventory control

11 application?

12 A   Right.

13 Q   What, if any, significance on this page for your opinions,

14 Doctor, would you like to point out to the jury?

15 A   The first sentence.  Before you set up the requisitions

16 application, you must set up the inventory control application.

17 Q   Thank you.  Is that consistent with your understanding in

18 the diagram that you put together to illustrate?

19 A   Yes, it is.

20 Q   Can we go to page 27 which ends with Bates label 500?

21 This page is entitled defining categories optional; do you see

22 that?

23 A   I do.

24 Q   They are describing or discussing the UNSPSC.  Do you see

25 that?

629

1 A   Yes.

2 Q   What, if any, significance does that have with respect to

3 the requisition self server module?

4 A   So these first four paragraphs explain the purpose, and

5 then down below are instructions on how to do this.  The

6 categories task is designed to use UNSPSC, United Nations

7 Standards Products and Services Codes.  Categories let you

8 search for items by category.

9      After you import UNSPSC codes, you can assign them to

10 items using item master.  IC 11.1 is one of these programs.

11 The codes have four levels:  Segment, family, class, and

12 commodity.  These levels create an item hierarchy and let you

13 search each level for items in the item master file.  These

14 codes are attached to items on IC 11.  That's the item master.

15      After you define categories, you can click on a category

16 top level to open the segment tree to the product, family,

17 class, commodity, branches, and items.  You select items at any

18 of the levels.

19 Q   Okay.  Is this the same kind of UNSPSC classification

20 codes that can be used to do the converting as defined by the

21 Court that we saw before in, I believe it was the inventory

22 control module?

23 A   Yes, they are.

24 Q   So then this is available functionality as part of the

25 requisitions self-service application as well?

630

1 A   Right.  This is part of RSS.

2 Q   Let me direct you, if I could, Dr. Weaver, to Plaintiff's

3 Exhibit Number 109 which is in volume two.  Have you seen this

4 document before?

5 A   Yes, I have.

6 Q   What is it?

7 A   This document is entitled S3 EDI for supply chain

8 management.  This was reviewed during the depositions of the

9 Lawson personnel.

10 Q   Let me go to page Bates labeled five of this document that

11 ends -- excuse me, barcode five that ends with the Bates label

12 618.  It's entitled Lawson S3 EDI for supply chain management.

13 Do you know what the S3 product is?

14 A   Sure.  It's the Lawson procurement suite.

15 Q   Can you define that with respect to the modules that

16 you've identified in your diagram?

17 A   Yes; requisitions, purchase order, and inventory control.

18 Q   What significance is in this particular page of

19 Plaintiff's Exhibit 109?

20 A   The first paragraph explaining what this does.  It links,

21 or rather it says links your enterprise to its trading partners

22 to electronically send transactions such as purchase orders,

23 price/catalogs, and invoices electronically.

24 Q   So using this application, can you receive electronically

25 transmitted catalogs from suppliers?

631

1    A   Yes, you can.

2    Q   Now that we've gone through some of the various -- and

3    overviewed some of the various different Lawson Software

4    modules that can be used to implement these electronic

5    procurement systems, do you have any demonstrations that you'd

6    like to do to show the Lawson system in operation?

7    A   First demonstration would show the category search

8    feature.

9    Q   And you have this, these demonstrations, as I understand,

10   both in captured screen shots -- is that right -- captured

11   software and also in hard copies?

12   A   That's right.

13       MR. ROBERTSON:  Your Honor, I'm going to be offering

14   both those for ease of review at the appropriate time.

15   Q   How were you able to capture a demonstration of the system

16   using the Lawson Software?

17   A   So Lawson provided a demonstration system that included

18   these modules that we've been talking about, and it runs on a

19   laptop.  So we used -- we practiced to get the demo correct in

20   the sense that it showed what I wanted it to show, and then we

21   used software that was present on the machine that we were

22   given that did a realtime recording of whatever was on the

23   screen.  So it's a realtime movie capture.

24   Q   Who provided that software?

25   A   That was provided by Lawson on the machine we got.  So as

632

1    we did these demonstrations, we used that Lawson-provided

2    software to create a realtime movie which we saved and which

3    now we're going to play back.

4    Q   Did that laptop come with item data?

5    A   Well, it came with some item data which turns out to be an

6    issue.  The database that we were provided from Lawson was

7    actually pretty sparse, so, yes, it had some items in there,

8    but it wasn't fleshed out like a production system would be.

9    Q   In order to demonstrate some of the capabilities and

10   functionality of, say, comparison shopping or using the UNSPSC

11   codes to identify goods that are similar, identical, or

12   generally equivalent, do you need data, item data in the

13   database to demonstrate that?

14   A   Absolutely.

15   Q   And if you don't have, for example, a sufficient number of

16   black pens to compare, or if you have only have some items in there,

17   and you're searching for black pens, can you demonstrate some

18   of the functionality of the system if that item data is not

19   there?

20   A   That's right.  Without equivalent items, there are no

21   equivalent items to be found.

22   Q   So were you aware that a request was made to Lawson to

23   provide additional data on this demonstration laptop that they

24   gave us so that we could demonstrate the functionality of the

25   system?

633

1    A   Yes, I'm aware of that.

2    Q   And what was your understanding as to what the outcome of

3    that was when the requests were made?

4    A   Well, I don't know the details.  What I know is that

5    eventually a Lawson consultant was hired to help load some

6    additional data.  Even so, three of the demonstrations that I'm

7    going to give were on the system as provided by Lawson.  Only

8    one needed additional data loaded.

9    Q   And a Lawson employee or personnel worked with ePlus

10   personnel to help them load additional data -- excuse me.

11   Worked with ePlus's counsel to load additional data on this

12   laptop for that one presentation?

13   A   That's my understanding.

14   Q   Now, based on the documents you've reviewed and based on

15   testimony reviewed, do these Lawson accused procurement systems

16   typically come with lots of item data?

17   A   Well, when the database is loaded, the witnesses said that

18   there are typically hundreds of catalogs and thousands,

19   sometimes tens of thousands of items.

20   Q   So with that kind of robust data in the database, it's

21   easier to show the full functionality of the system; is that

22   fair to say?

23   A   That's fair to say.  However, we're going to do it.

24   Q   All right.  Then as I understand it, three of the four

25   demonstrations were just as the laptop was provided to counsel

634

1    for ePlus?

2    A   Yeah.  We could say out of the box, the box being the

3    laptop.

4    Q   One being with the additional data that Lawson assisted

5    ePlus's counsel in loading; is that right?

6    A   That's correct.

7    Q   The first demonstration you have, what do you want to

8    illustrate?

9    A   I want to illustrate the category search in which we can

10   find generally equivalent items and then we can find other

11   items and build a requisition, and then we can build one or

12   more purchase orders from that requisition.

13   Q   Okay.  And did you direct the preparation of this

14   demonstration?

15   A   Yes, I did.

16   Q   All right.  If we can, before we do that, just so we can

17   orient the jury as to what they're going to see, can we see

18   claim three and claim 28 side by side on the screen?

19       Now, both these claims, claim three being the system claim

20   and claim 28 being a method claim, has this element concerning

21   converting data relating to a selected matching item and

22   associated source to data relating to an item in a different

23   source; do you see that?

24   A   Yes.  That's the sixth element.

25   Q   The Judge has construed both these claim terms; correct?

2011.01.06 Trial Transcript Day 3  1/6/2011  3:03:00 PM

635

1    A  Yes.

2    Q  And I'm not going to go through it again because we read

3    them at one point, but the jury has them in their glossary.

4    And, of course, all the other elements need to be there as

5    well.  Are we going to be seeing, as we walk through this

6    demonstration, the existence of these other elements that you

7    described?

8    A  Yes.

9    Q  Why don't you go ahead.

10   A  All right.  So Mike is going to play this movie, and

11   you'll see there are some waits involved in here, but that's

12   just because it's recording exactly what was seen.

13   Q  Stop here for a second and let me ask you a question here.

14   There's a box in the lower right-hand corner.  Is that part of

15   the Lawson system or not part of the Lawson system?

16   A  That was part of the system provided, and it's part of the

17   realtime capturing software, so you can -- what's showing --

18   can you see this?  So what you are seeing right now is a clock

19   that says we're 12.4 seconds into the movie, and then there's a

20   button that if you were on the real laptop, you could click it

21   and it would toggle from pause to play to pause to play.  We've

22   chosen just to let it play.

23   Q  If we wanted to --

24      MR. McDONALD:  Your Honor, could I get a

25   clarification on which exhibit, and is there a paper version of

636

1    this one so we know what you are using?

2       MR. ROBERTSON:  It's going to be Plaintiff's

3    Exhibit 376 is the video, and Plaintiff's Exhibit 374 would be

4    the hard copy paper capture of the screen shots.

5    Q  So we're clear, this is like the video playback?  We can

6    do the stop, forward, reverse by using these tools if we need

7    to go back at any time?

8    A  Well, these tools are for the original capture.  Mike and

9    I are going to do it manually.  I'm going to say stop and

10   continue and probably say go back.

11   Q  We may have to go back because it moves quickly sometimes?

12   A  Sometimes it's too quick, and sometimes it's too slow.

13   Right now we're going to start with a go back, so go back to

14   the beginning.

15      All right, so as the laptop screen exists, first I'm going

16   to bring up the browser.  I'm going to use Internet Explorer,

17   so here we go.  Stop.  Now, again, I'm just going to tell you,

18   you're going to see some times when not much is happening, but

19   this is just a true-to-life recording of exactly what was on

20   the screen at the time.

21      Okay, so in your ordinary Internet Explorer browser, I've

22   clicked on the favorites tab, and one of the favorites that

23   I've saved is the Lawson portal.

24   Q  Is this an example of the drop-down menu you were talking

25   about earlier?

637

1    A  Sure.  Exactly.  So I'm going to go down and click on

2    Lawson portal.  Continue.  Now, this is one of those waits.

3    Okay.  We get to the Lawson log-in screen.  So we put in the

4    user name and password and then click on log in.  This will be

5    one of those longer waits.  You can see the time clicking away

6    in the bottom right-hand corner.

7       Stop.  So now we are at the Lawson home page, and if you

8    are familiar with browsers, you see up here, there is the URL

9    that we're using.  LSF server, that's Lawson server foundation,

10   that's what we talked about before.  Server.corpnet.lawson.com.

11   So we're looking at the portal.

12   Q  All right, you used the term URL.  Can you explain to the

13   jurors what you mean by that?

14   A  Falling back into my vernacular.  Universal resource

15   locator, so commonly called a web address.  Okay, so we can

16   continue.  Top.  Stop.  That was stop, not top.  Here's another

17   one of those drop-down menus.  So on the left-hand side, I have

18   a menu.  One of the top level choices was requisition self

19   service.  So I'm going into the RSS module, and I'm picking one

20   of the activities that is there.  This is one of the

21   capabilities.  All right, so I'm going to click on the shopping

22   selection.  Continue.

23      Stop.  So, now we come to the shopping screen.  Again, if

24   you look up here at the top, you will see there are some

25   choices that can be made.  These are, again, top levels of what

638

1    will be drop-down menus.  I'm going to go click on this

2    find/shop, and that's going to give me additional choices.

3    Continue.

4       Stop.  So here are the choices.  I can search the

5    catalogs, I can do a Punchout.  I'm going to do that later.

6    Down there at the bottom are categories.  So I'm going to go

7    down and click on categories, because I want to do a category

8    search.  Continue.

9       Stop.  Now, remember with the UNSPSC codes, we said that

10   there were four levels:  Segment, family, class, and commodity.

11   So what is showing here in the category tab, the category

12   window, is the first three of a small set of these top level

13   categories, these segment categories.  So, remember, there

14   could have been a hundred of them, 00 to 99, but here, for

15   clarity, everyone exchanges those digits for names so that they

16   have -- they make sense to humans.

17      So my top choice there, live plant and animal material and

18   accessories and supplies, that's one of the segment codes.

19   Now, I don't know what code it is, 23, 99, I don't know.  It

20   doesn't matter.  It is representative of what is in this very

21   broad segment.  So I'm going to scroll down and show you the

22   others, and then I'm going to come back and pick one in the

23   middle.  Continue.  See, we only had about six there.  Stop.

24   Q  Let me ask you a question about that then.  There are only

25   six here to illustrate the functionality of it.  Does the

639

1  Lawson requisition self service you are using here have the
2  capability to have more?
3  A  Absolutely.
4  Q  How many could it have?
5  A  It could be a hundred different segments.  Each of those
6  segments could have a hundred families.  They could each have a
7  hundred classes.  They could each have a hundred commodities.
8  Q  I noticed you clicked on one of these segments?
9  A  The one I clicked there in the middle is communications
10  and computer equipment and peripherals and components and
11  supplies.  So you can see how broad a category that segment
12  name represents.  So what we're going to do now is drill down
13  to become finer-grained.
14      So having clicked on that top level segment -- continue --
15  stop.  So underneath the segment is the family.  Now, here we
16  show that there's very little data in the system we were
17  provided.  Whereas there could be a hundred family
18  names, there's only one.  So due to the paucity of data here,
19  I'm going to click the only possibility I've got.
20      All right, so I've done the segment.  This is the family.
21  I'm going to click on the family name, hardware and
22  accessories.  Continue.
23      Stop.  So now we're down to the class.  There could have
24  been a hundred classes, but, again, because there's so little
25  data here, there's only two.  So as I look at the class, I have

640

1  a choice of computers or monitors and displays.  So I'm going
2  to go for computers.  Continue.
3      Stop.  Now I'm down to the commodity level.  The
4  commodities, there should be a lot of them, but because of the
5  paucity of data here, we have only one commodity category,
6  notebook computers.  So I'll click the only choice I've got,
7  and then that will list the actual item data that is underneath
8  the notebook computers commodity code.  Continue.
9      Stop.  So now we see all of the items in the database that
10  have the UNSPSC code for notebook computers, and there's only
11  two, okay?  Small database.
12  Q  So I understand, for the segments, there could have been
13  thousands, for families there have been --
14  A  Hundreds.
15  Q  Hundreds.  What is the next level?
16  A  So you start with segment.
17  Q  Class?
18  A  Could be a hundred.  Then family -- each of those segments
19  could have a hundred, and then each of those families could
20  have a hundred classes, and each of the classes could have a
21  hundred commodities.
22  Q  Those commodities, you could have thousands of items?
23  A  Right.  Once you get down to the commodity level, you have
24  unlimited number of items that map to that code.  Here we have
25  two.  Okay, it's going to do the job, though.

641

1      All right, so I'm going to look at these two computers.
2  You can see the first line item there is an IBM ThinkPad, and
3  it has an item number of 6001.  The one below it is a Dell
4  Inspiron 8000.  It has an item number of 6020.  So I'm going to
5  go click on the item number, and that's going to get us a
6  description of this item.
7  Q  Before you do that, Doctor, does it have unit measure
8  category?
9  A  Right.  Under UOM, you see each.
10  Q  Does it have cost information?
11  A  Under cost, the ThinkPad is 2,500.  The Dell is 2,000.
12  Q  Does it have description of the item?
13  A  It has a description, IBM ThinkPad T20 or Dell Inspiron
14  8000 with Intel Pentium processors.
15  Q  You indicated it had an item number?
16  A  There is an item number.
17  Q  And it even provides for the Intel Pentium or the Dell
18  Inspiron, the manufacturer?
19  A  I just covered up the description.  Yeah.  So not only do
20  we have in this case the name of the computer, Dell Inspiron
21  8000, we also have a little more descriptive information, that
22  it's an Intel Pentium III processor.
23      Okay.  We'll continue.  Oh, and stop.  I should also note
24  while we're here that over here is the Dell shopping cart, and
25  it's obviously empty.  It's supposed to be empty --

642

1  Q  I think you misspoke.  I think you said the Dell shopping
2  cart.
3  A  I misspoke.  This is the Lawson shopping cart right here
4  where it says my cart.  And so as I select items, they will
5  show up in the shopping cart, but we'll see that.  All right,
6  so now I'm READY to drill down on the ThinkPad.  Continue.
7      So I click on that item number.  Stop.  And this retrieves
8  the data in the item master and vendor item table database and
9  tells me about the item.  So we have an item number, we have a
10  description, a unit of measure, a cost.
11      We have a source vendor ID, 118, and a source vendor name,
12  Office Max.  So from observing this information that is
13  produced, I know that this IBM ThinkPad has a vendor source of
14  Office Max.
15  Q  Let me stop and ask a question, Doctor.  There's a box
16  there that says image not available.  Does this RSS application
17  have the ability to load images of the items offered for sale?
18  A  It does, and the documentation encourages one to do so.
19  But, again, because of the paucity of data, we didn't have any
20  item images in the data we were given.
21  Q  This is how it was provided to us; it could have been
22  provided with an image, because the software permits you to do
23  that?
24  A  Right.  It could have been chock-full of images, but it
25  wasn't.  Okay, so I'm going to scroll down and up so you see

643

1  all of the information that was presented to me as the user of
2  the RSS system, and then we'll go back and look at the other
3  Dell computer.  So continue.  So now I'm going to add that to
4  the cart.
5      Stop.  So here in the Lawson shopping cart, I have my IBM
6  ThinkPad T20, item number 6001; quantity, one; unit of measure,
7  each; cost, $2,500.  So I'm going to park this item in the
8  shopping cart, but then I'm going to go back and look at the
9  equivalent items, equivalent in that they had the same UNSPSC
10  code.
11     All right, so we'll continue, and I'll click on this back
12  button over here.  So here -- stop.  Here is that second line
13  item as we saw before, the Dell Inspiron.  So I'm clicking on
14  its item number, and we'll drill down on that and see what
15  information is provided there.  Continue.
16     Stop.  So similarly to what we saw before, this is the
17  other machine.  It's an item -- I wiped it out.  Item 6020, a
18  Dell Inspiron 8000 with Pentium III processor, a unit of
19  measure each, and a cost of 2,000.  But it has a source vendor,
20  ID code of 124, and a source vendor name of Diablo.
21     So the first computer, the ThinkPad was coming from the
22  Office Max catalog.  This is coming from the Diablo catalog.
23  So I stare at that, and I think which of these machines is a
24  better choice for me.  I'm cheap, so I'm going to go with this
25  one.  So I will add this one to the shopping cart, Lawson

644

1  shopping cart, and delete the other one.  So continue.
2      Okay, now stop.  So now I have both notebook computers in
3  the Lawson shopping cart, and I'm going to go up here to this X
4  and delete the ThinkPad.  Continue.
5      And like all good software, it asks me, do you really want
6  to delete that, and I say, yes.  Okay.  Stop.  So at this
7  point, I have done the UNSPSC code, found two generally
8  equivalent notebook computers, chose one, added it to the
9  shopping cart, added the other one to the shopping cart,
10  deleted the first one.
11     So I've been able to convert one item from one source, the
12  ThinkPad from Office Max, into an equivalent item from another
13  source, the Dell Inspiron here, and having done that, I'm now
14  going to go back and pick another category and find another
15  item to add so that I'll have multiple items in my shopping
16  cart.
17     Okay, so I'm backed out -- because I did that drop-down
18  menu to categories, I'm back at the highest level, the segment
19  level.  So continue.  Scroll down.  Stop.  So this time my
20  segment level is laboratory and measuring and observing and
21  testing equipment.  Continue.  Stop.  My family, again, there's
22  only two here, laboratory and scientific equipment, or
23  measuring or observing, or testing instruments and accessories.
24  Continue.
25     So I pick at my family, laboratory and scientific

645

1  equipment.  Stop.  Oh, I might also note that the hierarchy
2  tree is being kept for me up here at the top.  Here's my
3  segment level, here's my family level.  As soon as I click here
4  on my class level, it will appear here and so on.
5      All right, so I'm about to click on laboratory,
6  environmental conditioning equipment for my third category.
7  Continue.
8      Stop.  Okay, now, again, we're down to commodities.  There
9  could be a hundred of these, but there's not.  There's just
10  one.  There's one commodity called glove boxes.  So when I
11  click on this, I will see all the items in the item master
12  database and the vendor item table that have been encoded with
13  the UNSPSC code for glove boxes.  Continue.
14     Stop.  Once again, the database is small, so there's only
15  two entries under the commodity heading.  Both of these are
16  boxes of sterile surgical gloves, so I'm going to pick one and
17  add that to my Lawson shopping cart.  Continue.  I'm going to
18  look at it first.  Smart shopper.
19     Stop.  All right.  So I just did a drill-down as I did
20  with the computers.  So you see we have an item number, 1036,
21  we have a description, gloves, sterile surgical, size seven.  A
22  unit of measure.  Here it's case, cost, 400 bucks, source
23  vendor.  The ID number is 117, and the source vendor name is
24  Baxter Healthcare.
25     Continue.  So scroll down and back up, and add that to my

646

1  shopping cart.  So here it is, gloves at the top, Dell computer
2  at the bottom.  Now stop.  I have finished shopping, so I have
3  the information from the database now in the shopping cart.  My
4  next goal is to create a requisition.  Then I'll need to get
5  that approved, and then I'll need to get that turned into
6  purchase orders.
7      So since the gloves and the Dell came from different
8  vendors, I will need two POs, one to each of those vendors, so
9  I'm going to click on checkout.  Continue.  All right, saved.
10     Stop.  So it gives it a number, 911.  So when I come into
11  this system next, I'm going to come in as a manager, and I'm
12  going to look for this order 911 that is existing in the
13  system.  I'm going to find it among all other orders, and then
14  I'm going to get it approved.  All right, continue.  Status
15  needs approval.
16     All right, back to the portal home page, and now I'm going
17  to come in as a manager.  Here are some requisitions, but 911
18  is not among them.  Stop.  Here is the requisition 911, and
19  that's the one I need to have approved.  Continue.
20     Stop.  So here we pull up the requisition, you see right
21  there, and we have the two line items, the Dell Inspiron and
22  the case of gloves.  So I've logged in now as the manager when
23  I clicked on manager, and so here are the actions I can take:
24  Approve, reject, or unrelease, so I'm going to approve these.
25  Continue.

647

1    Okay, approve, approve action to be taken.  Okay.  Work
2  object.  Taken, all right.  Stop.  So at this point, it looks
3  like -- superficially it looks like I'm done.  It looks like
4  I've got it approved, but in this particular example, there
5  were additional business logic rules that said, aha, you have a
6  computer in there.  That's a technical thing, so you need
7  technical approval in addition to manager's approval.  Okay,
8  we'll go get that, too, so back I go as a manager.  Continue.
9    Approve technical items, find 911.  There it is.  Stop.
10  And so now what I'm going to be approving is the fact that it's
11  got a computer in there.  Continue.
12    Stop.  While we're here, we may as well show, to show that
13  I'm doing the technical approval, we have this item detailed
14  down here that says it's the Dell computer from Diablo that I'm
15  approving.  So I go back up to approve it.
16  Q   Let me stop you for a second, Doctor, and ask you, we've
17  been seeing a number -- some of the features that we're going
18  to be talking about in the claims that were necessary about the
19  product catalog and selecting product catalogs and doing
20  comparison shopping using UNSPSC codes.
21    MR. McDONALD:  I object to the form, Your Honor.
22  That wasn't a question.
23  Q   Let me ask this question:  This approval process, is this
24  part of the claimed elements that are being asserted here?
25  A   No.

648

1  Q   Because there's an approval process which is an additional
2  step or additional feature that's there beyond the claim
3  elements, does that render a system non-infringing?
4  A   No.
5  Q   Having this approval process is irrelevant to the analysis
6  when the jury needs to go back and determine whether or not the
7  functionality either satisfies a system or method?
8  A   That's correct.
9  Q   Thank you.
10  A   Okay, so we're ready now to do the technical approval.
11  Continue.  So I'll click approval, approval action taken.  Work
12  object dispatched.  Stop.  Now, you heard me say earlier that
13  in the purchase order module, there's a program called PO 100
14  that turns requisitions into purchase orders.  So I'm going to
15  run that program, PO 100, and I'm going to tell it which
16  requisition to go get.  You might -- you may or may not recall
17  that I said that information gets cached in the system and
18  retrieved.
19    This is retrieving the requisition data by the purchase
20  order module, and then we'll see it generate POs.  Okay, so now
21  we're ready to run the PO 100 program.  Continue.
22    Stop.  Here is the opening screen for the PO 100
23  program.  So I'm going to fill in job name and job description,
24  I'm going to put in three pieces of information that the system
25  requires.  Here this has -- this part has nothing to do with

649

1  infringing.  This is just how you make the system work, and
2  then we'll see it -- turn the requisition or choose the
3  requisition and then we'll see it.
4    We've chosen the requisition, or have we?  No, we're about
5  to because I'm going to give it a name, and then we'll see it
6  generate POs.
7    So I'll call this job RQ911, give it a name, requisition
8  number 911.  Default delivery is five days.  Release the
9  purchase orders, yes.  Choose an option for exception reports.
10  There are some other boxes that are available.  I don't need
11  any of these.  I'll go back to the main tab, and, okay, that's
12  all I need to do, so I add this.  And now I'm ready to submit
13  it to the system for -- by submit, I mean turn the requisition
14  into a PO.  So I click on submit, give this a submit -- all
15  right, and stop.
16    Now, this process is actually running what we call in the
17  background.  The foreground is this PO 100 screen, and the
18  program is running in the background converting the requisition
19  to a purchase order, so when this was done in realtime, enough
20  time had elapsed for that process to occur and for a report to
21  be generated which is the purchase order.
22    So what I'm going to do next is just go look at it,
23  because it's been created.  I just can't see it yet, so
24  continue.  I'm going to go up here to the print manager and
25  click on that.  Stop.

650

1    So here this print manager keeps copies of the things it
2  creates, and the very top one on the list is that job that I
3  just named requisition number 911, and it was operated on by
4  the PO 100 program.  So when I go click on this, I'm going to
5  reveal the purchase orders that have been created.  Continue.
6    Stop.  So if you think of this screen and then the
7  scroll-down menu as a big piece of paper, up here at the top we
8  have some information like when it was run, and then here we
9  have information that's important to a purchase order, namely
10  who is doing the purchasing.
11    So in this case, the buyer is the Metropolis Medical
12  Center, and it's their -- somewhere in here it will say the
13  delivery location is main.  Well, I don't see that yet.  It
14  doesn't matter.  What we're going to do now is scroll down a
15  bit more.  Okay, continue.
16    Move from side to side, there's nothing to the right.
17  Stop.  So here is the first purchase order.  Our buyer,
18  Metropolis Medical Center, we have a vendor, 117.  Baxter
19  Healthcare is that vendor.  We have an item number 1036.  We
20  have a description, sterile surgical gloves, size seven.  Its
21  source document was requisition 911.  Quantity is one.  Unit of
22  measure is a case, and that's what I was looking for.  The
23  requesting location is main.  And then here, the PO has been
24  released.  So this system has created the purchase order and
25  released it.

651

1  Now, that's the first of two.  So now I'm going to scroll
2  down some more.  Continue.  Stop.  And here's the second PO.
3  So it's at the bottom of this conceptual sheet of paper.  So,
4  again, we have the buyer, Metropolis.  We have a vendor, number
5  124 from Diablo.  The item number is 6020.  The item
6  description is the Dell Inspiron 8000.  It came from the 911
7  requisition.  I'm ordering one of them in unit of measure each,
8  and I'm delivering it to main.
9      Now, here, for the second PO, it has been released.  So
10  two POs have been created and released, and the report
11  summarizes two POs created.  That's the end.
12  Q  Thank you.  Now, Doctor we're going to be going through
13  some more documents, and we have three more demonstrations to
14  sort of illustrate the functionality of this accused system.
15  And at some point, I'm going to be asking you to go through all
16  12 of these asserted claims for each element under the Court's
17  claim construction.  Are you going to be able to do that for
18  me?
19  A  Sure.
20  Q  At this point, just keeping the Court's claim terms in
21  mind, let me just ask you, at a high level with respect to this
22  demonstration we just saw, and keeping the claim three and
23  claim 28 we talked about which include that element for
24  converting, did we see at least two product catalogs?
25  A  Yes, we did.

652

1  Q  Did we see the ability to select those product catalogs to
2  search?
3  A  We did that through the categories.
4  Q  Tell me what two product catalogs we saw?
5  A  Office Max and Baxter Healthcare.
6  Q  Did we also see Dell and Diablo?
7  A  Yeah, that's right, we did.
8  Q  And was there an ability to select the product catalogs?
9  A  Yes, we did it through the categories.
10  Q  Was there an ability to search for matching items in those
11  product catalogs?
12  A  We did that.
13  Q  How did we do that?
14  A  We put in the -- we did the category search by marching
15  through the UNSPSC codes, picking a commodity and then picking
16  items.
17  Q  Once you had selected those items from the office, from
18  the shopping cart, were you able to put them into a
19  requisition?
20  A  Yes.
21  Q  And did you -- were you able, from that requisition, after
22  you got the appropriate approvals which are not part of the
23  claims of the -- elements of claim, excuse me, were you able to
24  generate one or more purchase orders from that requisition?
25  A  Yes, we did.

653

1  Q  And were you able, using the UNSPSC, to find items that
2  were similar, generally equivalent?
3  A  Yes, I converted that ThinkPad into a Dell.
4  Q  Thank you.  Doctor, I'd like you to take a look at
5  Plaintiff's Exhibit 280, and can you identify what this
6  document is?
7  A  This is the Lawson Software response to Presbyterian
8  Healthcare Services.
9  Q  So this is another one of those responses to an RFP?
10  A  That's correct.
11  Q  And what is it dated?
12  A  March 22nd, 2005.
13  Q  And if you could take a look at the page that begins with
14  barcode 196, if you would, sir.  And here -- which has a Bates
15  number that ends 848.
16  A  Yes, I'm there.
17  Q  And here Presbyterian Hospital, in this -- here Lawson, in
18  this response to the request for proposal from the Presbyterian
19  Healthcare Services, is ask asking about requisitioning
20  capability from Lawson; is that right?
21  A  Yes.  That's exactly what it says.
22  Q  And it says in the requisitioning capability, it's asking
23  to describe your ordering tools for various types of items,
24  stock, nonstock, and non-catalogs; do you see that?
25  A  Mike, it is below there.  There it is.

654

1  Q  Okay.  And the response, is that on the next page?
2  A  That's on the next page.
3  Q  Let me -- okay, let's go to the next page.  And in
4  response to this RFP, this Lawson requisition, is that one of
5  the modules that you've been describing today?
6  A  It is.
7  Q  What does it say that the capability is of Lawson
8  requisitions that Lawson is representing to the Presbyterian
9  Healthcare Services?
10  A  That first paragraph says, Lawson requisitions enables
11  users to view online catalogs for stock and nonstock items,
12  select items from the catalog or a template, and add additional
13  comments to their requisitions.
14      Also, requesters can add non-catalog items such as service
15  or specials through item free form input.  Additionally,
16  requester can view all previously created requisitions and
17  status with requisition inquiry.
18      So this tells us that the users can view online catalogs,
19  they can select items, and they can prepare requisitions.
20  Q  And this is using that requisitions module that you
21  described; is that right?
22  A  It is.
23  Q  Let me ask you, there's an additional question on this
24  page where Presbyterian Healthcare Services asks Lawson to
25  quote, describe your system's ability to establish global

655

1 requisition templates and its ability to support role-based
2 modification of requisition templates. Can you tell us how
3 Lawson responded to that question?
4 A  Right. Underneath that is the answer. Users have the
5 ability to select items from the item catalog, external vendor
6 catalogs called Punchout, or from predefined shopping lists.
7     So this is telling us that we have the ability to select
8 items from the internal catalog, item master and vendor item
9 table, or from external catalogs, and that external vendor
10 catalogs are enabled through the Punchout mechanism.
11 Q  So earlier this morning, the Court had asked the question
12 concerning whether there were two different types of catalogs
13 that might be -- that might satisfy the claim language as the
14 Court has interpreted it. Is this an illustration of two types
15 of catalogs available from the Lawson system?
16 A  Absolutely. It's selecting from the item catalog, that's
17 the internal one, and then the external ones are the Punchout
18 catalogs.
19 Q  If we could go to page 194 of this document which has the
20 Bates label 846. There's a question by this requester, how can
21 an end user utilize your solution to order an item from CS for
22 direct delivery to floor. Do you see that?
23 A  I do.
24 Q  What do you understand CS to mean?
25 A  I forget.

656

1 Q  Okay. What is Lawson's response?
2 A  Lawson requisition self service enables users to order any
3 type of item, stock, nonstock, special, or service, from a
4 single user interface. Lawson enables users to perform
5 searches within the catalog or utilize UNSPSC categories for
6 selection.
7     This next phrase says, Lawson eProcurement -- that
8 eProcurement is the prior name of the Punchout product. Lawson
9 e-Procurement also supports Punchout technology that enables
10 users to access external supplier catalogs and bring selected
11 items back to the Lawson requisition for processing.
12 Q  When you said Lawson eProcurement was the prior name for
13 Lawson Punchout, did you see documentation in the review of
14 materials you were provided that indicated that?
15 A  Yes, I did.
16 Q  Now, this is talking about Lawson requisition self server;
17 correct?
18 A  Yes.
19 Q  And that was the software that we saw in the first
20 demonstration you did; correct?
21 A  Correct.
22 Q  And that Lawson is representing here it can perform
23 searches within the catalog or utilize the UNSPSC categories
24 for selection; is that right?
25 A  Yes.

657

1 Q  And did you demonstrate that capability in your video?
2 A  Yes, I did.
3 Q  Going back to page 197 for a moment with respect to this
4 representation about viewing online catalogs and select items
5 from that catalog, why is that relevant to any determination
6 the jury may have to make with respect to the asserted claims
7 here?
8 A  Would you repeat the question.
9 Q  Sure. We talked about Lawson requisitions here, and it
10 was enabling the users to view online catalogs for stock and
11 nonstock items and select items from that catalog. Why is that
12 important?
13 A  Well, the ability to view catalogs, to select catalogs and
14 to view items and to view these external catalogs, those relate
15 to the claim, to the elements of the claims that we're
16 discussing.
17 Q  Going back -- sorry for switching back and forth, but
18 going back to page 194, there was a description here about this
19 Punchout capability. Do you have a video that you are going to
20 be showing the jury demonstrating the Punchout capability?
21 A  Yes, I'm going to do that.
22 Q  There was a document that we were referring to earlier
23 with respect to Punchout that had a diagram with kind of logic
24 flow or process flow on that document.
25 A  I remember that.

658

1 Q  I'm just identifying that document, and we'll go back and
2 address what was illustrated there with respect to Punchout if
3 we could for a moment.
4     MR. ROBERTSON: If I might have a brief indulgence,
5 Your Honor, to find that document. Can we see Exhibit 211.
6 Q  It is 211, and it's the barcode 12 of the document ending
7 in a Bates label 790, and we just confirmed, just go back to
8 the first page, Mike, that it's the Lawson procurement Punchout
9 installation guide. Do you see that?
10 A  I do.
11 Q  Now back to page 12, top of the document, it says, Lawson
12 procurement Punchout network architecture example. Do you see
13 that?
14 A  I sure do.
15 Q  I'm going to ask you if you can try and walk us through
16 this, because it's fairly complicated, and, unfortunately, it's
17 a little bit difficult to read.
18 A  What I'll ask Mike to do is to blow up parts of it. This
19 is a series of eight steps, and I want you to be able to see
20 what the document says about each of the eight as I explain
21 what it means.
22     So to set the context here, a user is using the Lawson
23 system, and if you remember that find/shop drop-down menu, one
24 of the things on there was Punchout, and I said we would get to
25 that. Well, we've gotten to that.

659

1    So this document is explaining technically what's going to
2  go on when we do the Punchout, when we go on the external
3  vendor catalog.  When we do the memo, of course, you'll see the
4  interactions, but this is explaining the information flow, and
5  that turns out to be important for the claims that we're
6  talking about.
7    Okay, so it begins, as you are going to see, the user
8  clicks on a Punchout vendor icon in RSS.  So the user is
9  sitting at the requisition self service and will have a series
10  of icons like Staples or Office Max or Dell, and the user is
11  going to click on one of those, and that's going to initiate
12  this Punchout session.
13    So now we'll go to step two.  RSS sends, and this is --
14  what you see here, Punchoutsetuprequest, all one word.  So that
15  is a computer function that's being called.
16  Q   When you say RSS --
17  A   Requisition self service.  So it makes this function call
18  and sends a Punchoutsetuprequest to the vendor for
19  authorization.  So this is an outbound communication from
20  Lawson -- so let's, for convenience, let's just name an
21  external vendor.  Let's say Dell.
22    So it's going to send a message to the external vendor,
23  Dell, and it's going to have information in there that nobody
24  but Lawson and Dell would know, and that's how it's going to
25  authenticate, or authorize in this case, and you can see this

660

1  is for security.  You don't want just anybody highjacking your
2  session.
3    This information goes to the external vendor site.  This
4  is a website.  And when that message arrives, it's going to
5  invoke a remote Punchout servlet, s-e-r-v-l-e-t.  A servlet
6  is -- computer science doesn't have many jokes, but this is one
7  of them.  It's a baby server, a servlet, and so the servlet is
8  a piece of code that is watching for incoming information.
9    So when this Punchoutsetuprequest arrives, the Punchout
10  servlet grabs it, decodes it, and operates on it.  What does it
11  do?
12  Q   Can I ask you who provides this Punchout servlet?
13  A   All of this comes from Lawson.  So now we're moving to
14  step three.  The vendor responds with a Punchoutsetupresponse
15  sent back to Lawson requisition self service.  So this is the
16  symmetric communication that comes back.  What went out was the
17  Punchoutsetuprequest.  What's coming back is the
18  Punchoutsetupresponse.  So now the two entities, Lawson and the
19  external vendor, have authenticated each other.
20    THE COURT:  What are -- I'm using the system, and I'm
21  calling Dell on the computer.
22    THE WITNESS:  Yes, sir.
23    THE COURT:  What am I asking Dell; send me a catalog
24  or buy me a beer or what?
25    THE WITNESS:  No, sir.  The Lawson computer and the

661

1  Dell computer are merely identifying each other.  The user has
2  not really done anything but one mouse click on let's say the
3  Dell icon.
4    In our computer parlance, the two computers are
5  setting up a communication path.  That's all that's happened.
6  Q   At this stage?
7  A   So far.  All right, step four, so, we mentioned the
8  universal resource locator, the URL.  That's the web address of
9  a computer.  This is why this technical detail is important.
10  When the Lawson system contacts the external vendor, part of
11  the code design is that the servlet sends back to Lawson the
12  address, the URL, and embeds it in the Punchoutsetupresponse,
13  and that is how Lawson knows where to redirect the user so that
14  the user finds the specific customized catalog that that vendor
15  has created by agreement with the user.
16    So the web address is provided by, in this case Dell, so
17  it's not www.dell.com.  It's something special, and we're going
18  to see that.  So that URL comes back in this
19  Punchoutsetupresponse, and then the Lawson system is going to
20  redirect to there.  And we're going to see that happen.
21    THE COURT:  When you say Lawson is doing it, do you
22  mean Lawson system?
23    THE WITNESS:  I do, sir.
24    THE COURT:  So if I'm using the Lawson system where
25  you just said Lawson does it, it's the Lawson system that's

662

1  doing it when I punch that one button that you told me you
2  punched a minute ago.
3    THE WITNESS:  Yes, sir, that is exactly right.
4    THE COURT:  But it doesn't have to be somebody
5  sitting in Lawson's office, or it can be me or --
6    THE WITNESS:  No, sir.  It's not you or me.  After
7  that first click, everything I've talked about is just
8  computers talking to each other, and this whole experience
9  takes microseconds.  Milliseconds.  It's really fast.  (Making
10  noise) and that information is exchanged.
11    Step five, new shopping window opens.  Okay, now
12  that's easy to understand.  So a window is going to open, and
13  it's connected to this special external vendor site.  We're
14  saying Dell.  And so now you start shopping.  That's you, the
15  user.  You're doing shopping at the special Dell website.  You
16  pick some items, you put them in the Dell shopping cart, you
17  click checkout.  That part is easy to understand.
18    THE COURT:  Well, now you say I'm connected to the
19  vendor site.  Am I just looking in the vendor's catalog at this
20  point in time, or am I doing something else?
21    THE WITNESS:  You are looking at a special catalog,
22  one that was designed by Dell for whoever you, the customer,
23  are, and you are shopping within that catalog.  So now you
24  check out.
25  Q   Let me ask you then, Doctor, you, the user, are using the

663

1    Lawson requisition self service?

2    A   I realize that can be ambiguous.  So I, the human user,

3    using the Lawson system, have connected to the external special

4    Dell site.  I have shopped.  I have put some items in the Dell

5    shopping cart.  I have clicked on the Dell checkout.

6    Q   I want to stop you there because this is a little

7    confusing when you say special Dell website.  This is not the

8    Dell website that I can just open a browser and go to and shop

9    from my home computer.  What is this special Dell website you

10   are referring to here?

11   A   It is a website that Dell has created for this customer,

12   and its address is that URL I showed you in step four.

13   Q   But let me ask you, to get to this special website you've

14   been talking about, what software are we using to do that?

15   A   This is the Lawson software.  It's redirecting me to this

16   special site.

17   Q   When you do this demonstration that is going to illustrate

18   this Punchout capability of this requisition self service, are

19   we going to be able to see that we're not just at the

20   commercially available Internet Explorer website of Dell but

21   we're at some sort of specialized website that has been set up,

22   directed, and controlled in some way by Lawson?

23   A   That's right.  That's why I wanted -- that's why this

24   technical detail is necessary, so that we can see and observe

25   and interpret that in the demonstration.

664

1    Q   I didn't mean to interrupt.  I'm sorry.

2    A   That's fine.  So we check out, me, the human user.  I

3    check out.  Step six, vendor, so that's Dell, sends the

4    shopping cart content in a special message, this Punchout order

5    request.  So we had a Punchoutsetuprequest and a setup

6    response.  Now we have an order request.

7        So Dell is sending the content of the shopping cart back

8    to Lawson in this message, the Punchout order request.

9    Symmetrically to the servlet running over on the Dell side is a

10   servlet running on the Lawson side.  So that servlet picks up

11   this document, this Punchout order request from where it's

12   temporarily cached, just temporarily stored.

13   Q   Before we move on, Doctor, can you tell us who specifies

14   the format for the data that's come back to Lawson?

15   A   Lawson controls all of this, and we have documents that

16   show what those formats are.

17   Q   Sorry to interrupt.

18   A   So the order comes back into the Lawson system.  The

19   shopping session ends, and your special window closes.  Now you

20   will be visibly back in the Lawson system.  We've never really

21   left it, but you'll be back from the Dell side to the Lawson

22   side.

23       Step seven.  So the shopping session ended.  So detecting

24   that, RSS submits a request to the Punchout servlet to retrieve

25   the cached shopping cart content.  So that's go get that order

665

1    request document and pull it into the Lawson system.

2    Q   Where did that directive come from?

3    A   All of this, all of this code, all of these directions,

4    all of these formats are provided by Lawson.  They are in the

5    documents.  The code is given to the external vendors and a

6    partnership is created.  So all of this stuff that is quite

7    technical just appears miraculously to work.

8    Q   Have you seen documentation where Lawson actually calls

9    these vendors Punchout partners?

10   A   Yes.

11   Q   Will we see some of that?

12   A   Yes, I hope so.

13   Q   Thank you.

14   A   So this is the next-to-the-last step.  So we go on to step

15   eight.  Requisition self service creates a Lawson requisition

16   from this retrieved content.  So the shopping cart was returned

17   in the order request document.  That was cached or saved.  Now

18   it's been retrieved, and Lawson requisition creates -- the

19   requisition software module creates a requisition for whatever

20   it was I bought, ordered at Dell.

21       Okay, so that's the technical side of what we're going to

22   see in the demonstration.

23   Q   Thank you for that.  I brought that all up in the context

24   of Plaintiff's Exhibit Number 280 that was offering that

25   Punchout capability that was the response to the Presbyterian

666

1    Health Services request for proposal.  I'd like to go back to

2    that if I could for a second, Doctor.  It's volume six.

3        Specifically, could you go to the page when you get it,

4    Bates label -- barcode 201 that ends with a Bates label 853.

5    You recall we were talking about the requisition capability

6    that was being offered to Presbyterian Healthcare Services?

7    A   Yes.

8    Q   Here is a question they ask in this RFP.  Describe your

9    system's ability to search for common items via a synonym

10   search, partial name, or other criteria; do you see that?

11   A   Yes.

12   Q   How did Lawson respond?

13   A   Lawson enables users to easily search for items by almost

14   any item field within the system.  Common search fields include

15   item number, item description, secondary item description, item

16   class, purchasing class, vendor item, manufacturer item,

17   generic name, universal product code, national drug code, shop

18   keeping unit, health industry business commodity code,

19   universal commodity code, et cetera.  Additionally, users can

20   utilize synonyms for keyword searches.

21   Q   So what is Lawson telling Presbyterian Hospital about the

22   capability of its requisitioning module?

23   A   That their users will be able to search the catalogs in

24   their database using many different search criteria including

25   the ones I just named.

667

1  Q  Why is that of relevance to any determination the jury
2  needs to make with respect to infringement here?
3  A  Because the user will be able to search these catalogs to
4  find matching items.
5  Q  By using any one of the these --
6  A  By using any of these attributes that have been listed
7  here.
8  Q  Turn to the page in Exhibit 280 which is barcode 73 which
9  ends in the Bates label 725, sir, please.  And the question
10  being asked here by Presbyterian Healthcare Services is, show
11  us an automated routing of requisition for stock picking,
12  purchase order creation, or EDI purchase order, (ANSI, X12 850)
13  to predefined vendor.  Do you see that?
14  A  I do.
15  Q  Do you know what ANSI stands for?
16  A  American National Standards Institute.
17  Q  Standardized --
18  A  It's an institute that manages standards in America.
19  Q  Are you familiar with this particular standard?
20  A  Well, there's all kinds of them, but the X12 set of
21  standards is the electronic data interchange set.
22  Q  So what does Lawson represent here as far as the
23  capabilities of it, its ability to perform this functionality?
24  A  The answer is on the next page.  So under the heading
25  nonstock items --

668

1  Q  Refresh us again what nonstock items are.
2  A  These are items that are not owned and stocked by the
3  using entities but instead are being purchased from external
4  vendors.  When requisition lines that require the generation of
5  a purchase order are created and approved, the system routes
6  these lines to a holding area to await processing by the
7  purchase order module.  The cost must be included in order for
8  a requisition line to be created.
9    Moving down on the page --
10  Q  Let me stop you there.  When you talk about nonstock
11  items, you mentioned from external vendors.  Could these
12  external vendors be both the Punchout vendors that you
13  described and the internal catalogs that are composed from the
14  item master list and the vendor table?
15  A  Yes.
16  Q  Thank you.  Where are you now?
17  A  So in order for a PO to be created automatically, a vendor
18  must also be included on the requisition line.  And then,
19  skipping down to the start of the next paragraph, if the
20  necessary information is present in the requisition line, a
21  scheduled job will pull the items from the holding area and put
22  the item on a purchase order for the vendor.
23    So this confirms that we need a vendor name, and we need a
24  cost in the requisition in order for that to become a purchase
25  order, and that is information that comes from the vendor.

669

1  Q  If I could direct you to page 182 barcode, Bates labeled
2  834, another question is being asked in this RFP.  Here it
3  says, define capabilities for uploading foreign data such as
4  price files that are not available as an 832, describe
5  exporting capabilities.  What is Lawson's response?
6  A  In addition to supporting 832 catalog imports, Lawson also
7  enables item information to be imported via Excel uploads or
8  utilizing the vendor pricing import functionality.  The vendor
9  pricing import program supports the uploading of vendor
10  agreements, and at the top of the next page, and creating or
11  updating item master information.
12  Q  Do you know what this 832 catalog import is?
13  A  Yes.  So electronic data interchange has lots of
14  predefined standards for how documents are to be exchanged and
15  what their formats are.  So the 832 is the format for an
16  electronic vendor catalog.
17  Q  You mentioned the uploading of vendor agreements before.
18  The vendor agreements, what did you indicate with respect to
19  them as to whether they could have catalog data?
20  A  Those are the vendor price agreements, so they provide the
21  cost information.
22  Q  Turn to page 190 of this exhibit.  There's a question
23  being asked in this requisitions module, what electronic
24  transaction sets can be handled.  Do you see that?
25  A  Yes.

670

1  Q  What is Lawson's response?
2  A  Lawson procurement supports electronic data interchange
3  with numerous vendors and suppliers.  Transactions that are
4  currently supported include 850 purchase order, 855 purchase
5  order acknowledgment, 856 advance ship notification, 810
6  invoice, and 832 item catalog.  Additionally, Lawson provides
7  interface files within each module to further the exchange of
8  information as needed.
9  Q  So what, if any, relevance does that have to the issues
10  the jury needs to determine?
11  A  This says that Lawson supports these standardized EDI
12  transactions, so they can send purchase orders to vendors, they
13  can receive the purchase order acknowledgment that tells
14  whether or not the order was accepted, whether it had errors,
15  whether items that were in there were backordered or not
16  available in stock, and using that 832 transaction, that Lawson
17  can import a vendor catalog using the EDI functionality.
18    MR. ROBERTSON:  I'm moving on to another document,
19  Your Honor.  I don't know when it was you wanted to take your
20  afternoon break, but I'm happy to move forward.
21    THE COURT:  Well, we probably need go ahead and
22  change court reporters.
23    THE COURT REPORTER:  I can go a little bit longer.
24    THE COURT:  Go ahead, and we'll see.  We'll take a
25  break in maybe 15 minutes.

671

1   Q   I'd like you to look at Plaintiff's Exhibit Number 170
2   which, I believe, is in binder four.  Again, this is another
3   response to a request for proposal from, in this case CML
4   Healthcare?
5   A   That's right.
6   Q   What is the date of this response?
7   A   April 30th, 2009.
8   Q   I forget if I ask this but it's a Lawson response; is that
9   right?
10  A   Yes, it is.
11  Q   Why don't we take a look at page five of this document
12  which is -- ends with the barcode 852, and this is a section
13  entitled 1.0 executive summary; is that right?
14  A   No, I don't think my page five is the same as yours.  Do
15  you have a Bates number?
16  Q   852.  Do you have Plaintiff's Exhibit 170?
17  A   It was in the other direction.
18  Q   Are we on the same page?
19  A   We're finally on the same page.
20  Q   Executive summary, do you see that?
21  A   Yes.
22  Q   There's a discussion as to the Lawson solution overview?
23  A   Yes.
24  Q   And there are a number of applications that they are going
25  to be addressing; is that right?

672

1   A   That's right.
2   Q   And some of these don't have relevance to this case -- is
3   that right, Dr. Weaver -- like, for example, general ledger and
4   accounts payable and accounts receivable, et cetera?
5   A   Right.  That's not what we're concerned about.
6   Q   And you do recall this morning we were discussing that
7   this Lawson system foundation can support a number of Lawson
8   business solution modules; is that right?
9   A   Correct.
10  Q   Which modules should we focus on here in this response to
11  proposal which is Plaintiff's Exhibit Number 170?
12  A   There are six here that are of interest to us:  The
13  inventory control, purchase order, the requisition system, EDI,
14  requisition self service, and procurement Punchout.
15  Q   This is a proposal to offer all of those modules that you
16  were referring to before that would provide functionality right
17  up to the Punchout level; is that right?
18  A   That's right.
19  Q   So this was an offer by Lawson to provide them with this
20  functionality; is that right?
21  A   Correct.
22  Q   Now, why don't we look at the page that has the barcode
23  36, if you will, which has the Bates label of 883.  This is a
24  section entitled master file management.  Do you see that?
25  A   Yes, I do, section five.

673

1   Q   And, again, we have these headings that are A, B, C, and
2   D.  Do you see that?
3   A   I do.
4   Q   Is there a description of what A entails?
5   A   We saw it earlier this morning.  That A means that the
6   capability is installed and currently available.
7   Q   Does CML Healthcare ask Lawson to provide any explanation
8   for responses under B, C, or D?
9   A   Right.  If the response is not going to be A, then CML is
10  asking for an explanation of why the response is B, C, or D.
11  Q   This is a number of questions here that go on for a number
12  of pages; is that right?
13  A   Oh, yes.
14  Q   With respect to the capability of this column entitled
15  item master file, there's a requirement number 12.  Do you see
16  that?
17  A   Yes.
18  Q   What's the description that this requester in this case --
19  sorry, it's CML Healthcare.  What question are they asking if
20  the system has the capability were they asking Lawson to
21  represent?
22  A   So CML is asking, does the system have the ability for
23  expanded item search by vendor, catalog number, partial
24  description, manufacturer code, classification code, vendor
25  name, manufacturer name, and the response is A.

674

1   Q   Does that indicate that they have that capability?
2   A   That that capability is available and already installed.
3   Q   How did Lawson respond to question number 13, does the
4   system perform automatic and/or manual number assignment?
5   A   The same, A.
6       THE COURT:  What is that over there on the right?
7   "Or only," what does that mean?
8       THE WITNESS:  I don't know.
9       THE COURT:  Is that what it says, "or only," or am I
10  reading it wrong?
11      MR. ROBERTSON:  That's what it appears to say, Your
12  Honor.
13  Q   Let me take you to page 46 of this response.  I'm sorry.
14  I probably directed you to the wrong question.  This
15  requirement number 13, under purchasing, do you see that?  It
16  ends with the Bates label 893?
17  A   Okay.  13, question 13.  Requirement 13, actually.
18  Q   Let me read it for you.  Does your system provide
19  automatic electronic notification to requisitioners when there
20  is a backorder or invalid/discontinued items.  And what does
21  Lawson represent there?
22  A   So the response is A so that that capability is available,
23  and then there's a note just explaining how that functionality
24  is evidenced, and it says, via Lawson's process flow, which we
25  saw the block this morning, or Lawson business intelligence,

675

1    LBI.
2         MR. ROBERTSON:  That's all I have for that document.
3    Thank you, Doctor.  I'd like --
4         THE COURT:  Why don't we go ahead and take our
5    afternoon break then.  All right, ladies and gentlemen, just
6    take your pad with you.
7
8         (Jury out.)
9
10        THE COURT:  How much longer with this witness do you
11   think you have, Mr. Robertson?
12        MR. ROBERTSON:  Your Honor, I'm more than halfway
13   through my outline, but I still have --
14        THE COURT:  I hope so.  What does that mean?  We've
15   been here almost a day with him.  I think he started about four
16   o'clock, quarter of 4:00 yesterday.  That's the longest expert
17   witness I've ever had.  You're going to have to figure out a
18   way to go ahead and do something else.
19        MR. ROBERTSON:  During the break, let me see what I
20   can do.  Your Honor, but, of course, we want to make sure we
21   satisfy all the elements that we need to.
22        THE COURT:  I agree that you do, but there's an awful
23   lot of repetition in what I've heard so far.  You are picking
24   out different -- saying the same thing in some of these
25   purchase orders.  Take it to a demonstration and let him

676

1    demonstrate.  I don't understand why we're doing what we're
2    doing right now.
3         MR. ROBERTSON:  Let me see what I can do to try to
4    cut this back a bit, Your Honor.
5         THE COURT:  Okay.
6         MR. ROBERTSON:  But let me be candid.  I don't think
7    I'm going to be able to finish today, and I think -- I might be
8    able to finish by the close of today.  I'm going to shoot for
9    finishing by close today, but that's where I am.  The
10   demonstrations we're going to see, again, we're going to move a
11   little bit faster on.
12        THE COURT:  All right.  I haven't put you on a clock,
13   but my concern is that -- I think the jury has been paying
14   attention, but you can get to a point with the detail that you
15   lose them, and it's at that point that nobody's interest is
16   served, and that's all I'm interested in.  I'm going to be here
17   one way or the other.  All right.
18
19        (Recess taken.)
20
21
22
23
24
25

677

1         THE COURT:  All right, Mr. Robertson.
2         MR. ROBERTSON:  Thank you, Your Honor.
3    BY MR. ROBERTSON:
4    Q   Dr. Weaver, if you would go to Volume 1 of the
5    exhibits, and specifically Plaintiff's Exhibit 105,
6    please.  This document is entitled "Lawson Procurement
7    Punchout Trading Partner List."  Do you see that?
8    A   I do.
9    Q   It says version 8X and 9.0, and it's dated
10   February 2009.  Are you with me on that?
11   A   Yes, sir.
12   Q   What is this document?
13   A   This is a list of the external vendors that Lawson
14   has set up partnerships with to make these people
15   Punchout partners.
16   Q   There's a paragraph that beings "As specified
17   below," do you see that?
18   A   On this?
19   Q   On this first page, 105.
20        THE COURT:  It's not on the first page.
21   BY MR. ROBERTSON:
22   Q   I'm sorry.  I apologize.  On page 3 of the
23   document.
24   A   Sure.
25   Q   I was on the page.  What does it indicate that?

678

1    A   As specified below, Lawson delivers generic Rick
2    Punchout transaction sets and Commercial Extended
3    Markup Language purchase order formats for the listed
4    trading partner.
5    Q   What does that mean with respect to this
6    procurement Punchout capability?
7    A   It means that what they call transaction sets, the
8    exchange of information, this has already been
9    implemented and it's available.  So when I, as a
10   customer, want to do business with a Punchout trading
11   partner that's already established by Lawson, it's
12   quick.
13   Q   What do the next few pages indicate?
14   A   These are lists of the names of the trading
15   partners.
16   Q   In that same book, can you go to Exhibit 104,
17   Plaintiff's Exhibit 104.  This document is entitled,
18   Punchout Partner Program?
19   A   Right.
20   Q   Have you reviewed this document?
21   A   Yes, I have.
22   Q   Were you aware that this document was discussed at
23   some depositions?
24   A   Yes.
25   Q   Did you review that testimony?

679

1   A  Yes, I did.

2   Q  Going to page 2 of the document, what does the

3   program overview provide?

4   A  The program overview says, "Provide a formal

5   program for requesting, reviewing and adding new

6   Punchout or EDI trading partners."

7   Q  Turn to page 5 of that exhibit.  What's described

8   there?

9   A  This is talking about the initial setup fees that

10  would be required to become a Punchout trading

11  partner.  So in the first line, "Partners will be

12  expected to pay for initial setup."  And the next to

13  the last paragraph, "Lawson Development will perform

14  the work required to enable the trading partner and

15  that trading partner will be added to our list of

16  supported partners."

17  Q  What does Lawson tell its potential Punchout

18  trading partners its proposed benefits are on page 6

19  of this document?

20  A  "Listing on our site as a procurement Punchout

21  partner.  Listing in our documentation as a supported

22  Procurement Punchout Trading Partner.  Invitation to

23  attend CUE," which are customer meetings.  "Ability to

24  use Lawson Partner logo.  An alliance contact."  So

25  somebody at Lawson who will be responsible for trading

680

1   partner.  "Access to Punchout specifications."  And

2   "Listing in the Lawson's Partner directory."

3          THE COURT:  Does your screen stay on?

4          THE JURY:  Yes.

5          THE COURT:  How about you-all?  Are yours

6   going out on you?

7          THE LAWYERS:  No.

8          THE COURT:  I think it's just me.  What

9   happens is I tap it and it will come back on

10  sometimes.  Go ahead.  Excuse me.

11  BY MR. ROBERTSON:

12  Q  Dr. Weaver, I'd like you to take a look at

13  Plaintiff's Exhibit No. 212.  And that is in Volume V.

14  And it's entitled, "Vendor Implementation Technical

15  Specifications Punchout Connectivity."  Have you

16  reviewed this document?

17  A  Yes, I have.

18  Q  What is it?

19  A  Lawson is providing the specifications that are in

20  this document to their Punchout trading partners

21  explaining how they implement this connectivity that I

22  talked about between the partner and Lawson.  All

23  those exchanges of messages and formats and so on.

24  Q  Can you go to page 3 of the document with the

25  Bates label 372?

681

1   A  Yes.

2   Q  There's a heading there called "Integration

3   Process"?

4   A  Yes.

5   Q  And it says, "Vendor/B2B partner connectivity."

6   Do you see that?

7   A  I do.

8   Q  What's your understanding as to what is being

9   discussed here?

10  A  This is talking about the integration between the

11  Lawson Punchout capability and the technical items

12  that a Punchout vendor needs to have in order to do

13  this communication.

14  Q  Is there further detail as to the Punchout setup

15  request provided in this document at page 6?

16  A  Yes, there is.

17  Q  I certainly don't want to go into all the detail

18  of that code that's there, but can you tell us

19  generally what your understanding is that is being

20  depicted there?

21  A  Well, Mike, if you could do the bottom half of the

22  page.

23     In this exchange of information that's required

24  between Lawson and the Punchout partner, all the data

25  that's being exchanged has to be in a particular

682

1   format.

2      This is the format for just one of those functions

3   I talked about, the Punchout setup requests.  So these

4   things like the data type definition and the computer

5   elements and the attribute list, all of this is just

6   an explicit listing of what data is required, in what

7   order it's required, what kind of data it should be.

8   Should it be digits, should it be alphabetic

9   characters.  It's a complete specification of what's

10  needed to do the communication.

11  Q  Earlier you talked about the Punchout setup

12  request when you were discussing that diagram?

13  A  Eight-step diagram.

14  Q  Is that what's being described there?

15  A  Yes.  This is the Punchout setup request.

16  Q  If you turn to the next page, it says Punchout

17  setup response.  Do you see that?

18  A  So here is more code for Punchout setup response.

19  Q  Next page is the Punchout order message or PO

20  requisition.  Do you see that?

21  A  Right.

22  Q  Can you explain that as well?

23  A  It's the same type of thing.  It's the data type

24  definition for what occurs when and what type of data

25  has being transmitted.

683

1  Q  Page 11, there's a discussion of the purchase

2  order?

3  A  Yes, same type of thing for purchase order.

4  Q  So who is providing all this code?

5  A  All of this is being provided by Lawson.

6  Q  So, Dr. Weaver, you've indicated earlier, you did

7  a demonstration concerning the operation of the Lawson

8  system with this procurement Punchout functionality;

9  is that right?

10  A  That's right.

11  Q  Why don't you preview it and tell us what we're

12  about to see here.

13  A  All right.  So I'm going to go to one of those

14  drop down menus.  I find shop menu.  I'm going to

15  click on Punchout.  And then I'm going to go shopping

16  at two Punchout sites.

17  Q  For the record, the video is Plaintiff's Exhibit

18  No. 368, and the hard copy screen shots of that video

19  are Plaintiff's Exhibit 367.

20  A  Ready?

21  Q  Yes.

22  A  Okay.

23  Q  I'm going to try not interrupt you so much this

24  time.

25  A  So we're just looking at the screen of the laptop.

684

1  Continue.  I'll click on Internet Explorer.  I'll go

2  to favorites.

3       THE COURT:  Before do you that --

4       THE WITNESS:  Stop.

5       THE COURT:  Just one minute.

6       Are you able to see your screens all right or

7  would it we better if we turned the lights out?

8       THE JURY:  I'm okay.

9       A JUROR:  I just need bifocals.

10       THE COURT:  We don't provide those.

11       A JUROR:  I know.

12       THE COURT:  Okay.  Excuse me, Dr. Weaver.

13  A  So I've chosen the favorites tab, and the drop

14  down menu, and I chose the Lawson portal.  Continue.

15       I do my user name and password.  I login.  So

16  there's a brief wait here, but I'll arrive at the

17  Lawson portal home.  Okay.  I'm finally there.

18       So I'll go over to that requisition self service,

19  and I'll come down to the shopping tab as I did

20  before.  Stop.

21       So now here I am at the entrance to the shopping

22  module.  I'm going to go up here to find and shop.

23  And I'm going to drop down that menu and choose

24  Punchout.  Continue.  Stop.

25       Before I get to making a choice of the Punchout

685

1  sites, I want to show you up here at the top the URL,

2  Universe Resource Locator, Web address that we're

3  talking to right now is this

4  lsfserver.corpnet.lawson. com.  So that's the server

5  that is providing all the Lawson software that I'm

6  seeing here, which is the requisition self service.

7  But I want you to notice that URL because it's going

8  to change, and that's an important part of the case.

9  Continue.  Stop.

10       So you notice that two icons were displayed.  Dell

11  and Staples.  So these are the two Punchout partners

12  that were available in the demonstration system that

13  we were given.

14       THE COURT:  Do you know, Dr. Weaver, if you

15  hadn't been limited to these two, the two that you

16  were given, when you hit the Punchout button on the

17  drop down menu, would all of the punched out partners

18  come up in here or do you know that?

19       THE WITNESS:  It would be all of the Punchout

20  partners that this customer had an agreement with.

21       THE COURT:  So this customer first has to go

22  in and say, I want to do business with Dell, Staples,

23  Office Depot, Home Depot, whatever?

24       THE WITNESS:  That's right, but there has to

25  be an agreement between the parties so that the

686

1  catalog can be customized and the prices can be

2  customized for customer.

3       THE COURT:  Okay.

4  BY MR. ROBERTSON:

5  Q  There's an agreement between Lawson and its --

6  when Lawson provides this Punchout capability, the

7  customer can tell Lawson what Punchout websites it

8  wants to go to?

9  A  Exactly.

10       MR. McDONALD:  Objection, leading.

11       THE COURT:  Went out with the Coolidge

12  Administration on something like this.

13       MR. McDONALD:  I have to have an objection to

14  move.

15       THE COURT:  I know you need to move, but

16  that's --

17  Q  I just want to follow up on the Judge's questions

18  because there was some ambiguity between who the

19  agreements were between.  Does the Lawson customer

20  who's going to use this Punchout module, do they tell

21  Lawson what Punchout website they want to be able to

22  go to?

23  A  That's correct.

24  Q  So then Lawson puts that capability on this

25  Punchout module?

691

1    the Staples item number.  There's the manufacturer
2    number.  The unit of measure and the price.
3        All right.  Continue.  Stop.  What I did there was
4    click.  In fact, Mike, can you back up a little bit?
5    I was too slow on the draw.
6        Okay.  Stop.  So I showed you that the catalog
7    items where I'm going next, that was the catalog
8    information.  And what, if I can draw, what I'm going
9    to do next is click on delivery date.  So I'm going to
10   check whether or not this item is available in
11   inventory.
12       Continue.  So click on delivery date.  Stop.  So
13   here is the information that we saw before plus --
14       THE COURT:  We've got a problem.
15       MR. McDONALD:  Thank you, Your Honor.  I'm
16   just trying to keep up with the paper version, but my
17   version of 367 ends here.  Sorry, Your Honor.
18       THE COURT:  You have a lot of paper.  You all
19   have done very well with all that paper.  Just a few
20   little slip-ups shows me that the legal assistants
21   have been doing what they should have done.
22       MR. McDONALD:  I agree.
23       THE COURT:  They are all human, but there
24   have been very few problems.  So don't you worry about
25   it.

692

1        MR. McDONALD:  Thank you, Your Honor.
2        THE COURT:  Have you got it now?
3        MR. McDONALD:  Yes, sir.
4        THE COURT:  Okay.
5    A   Okay.  So now when we look at this expanded
6    information, we see the column of expected delivery.
7    And you notice it says backordered.  So this item is
8    not available in inventory.  I'm going to have to wait
9    for this.  So I'd rather not do that.  I wanted a
10   desk.  So I'm going to continue.  Go back.  Go back.
11   So this takes me back into that cherry standard
12   suites.
13       So I'll look for something else.  Go to the next
14   page.  So now I'll pick this Bush Milano bowfront
15   desk.  Here's its description.  Stop.
16       And as you saw.  So here's the catalog
17   description.  Here's the item number.  Here's the
18   manufacturer number.  Here's the unit each and here is
19   the price.  And we also have the opportunity to check
20   the delivery date on this.  So I'll do that.
21       Continue.  Click delivery date.  Stop.  And we
22   have a specific expected delivery date.  Nothing about
23   backordered.  So this item is available in inventory.
24   So I'll take this one.
25       So we continue.  I add this to my order.  Stop.

693

1    So this is my order as it stands here at Staples.
2    Notice that we're co-branded here with both Lawson and
3    the Punchout partner.
4        Okay.  So that's the item that I want.  So I'll
5    add that to the order.  Continue.  Stop.  Review my
6    order.  Stop.
7        So here's the same information that we saw before.
8    Looks good.  So I'm now going to submit this order to
9    Staples.
10       So continue.  Stop.  So back to that 8-step
11   diagram I talked about, the exchange of information.
12   One of those steps was having the Punchout trading
13   partner take the content of the shopping cart and
14   return that information to Lawson.  And so that is
15   what has happened with this last screen change.
16       Here's my Lawson shopping cart with that Bush
17   Milano desk in it.  So I'm going to shop some more.
18   So we continue.  I'll go to Dell.  So now were at the
19   Punchout Dell site.  And let me just stop.
20       Once again, I'll point out here that URL you see
21   from the Lawson server, the Dell site has provided a
22   different URL different the normal Dell site.  This
23   one is signin.Dell.com/Delllogin/portal/login.aspx.
24   ASPX is programming language.  So I've been redirected
25   to this Dell training partner site.

694

1        Continue.  Go full screen.  And now I do a keyword
2    search for printer.  I'll look at some printers.  Go
3    to the next page.
4        I'll pick this Kodak Easy Share Printer.  So I
5    drill down on this.  Stop.  And I've got the title.
6    I've got the description.  I've got the price, but the
7    catalog tells me that it's temporarily out of stock.
8    Please check back soon.  So this item is not available
9    in inventory.  Okay.  So I'll go get something else.
10       Continue.  So I go up here to photo printers.  And
11   look at the selection available from Dell for that.
12   Here's a Canon wireless printer.  Stop.
13       Got my description.  Got my price.  Usually ships
14   within 24 hours.  In addition, there's this other
15   information, the manufacturer part number.  The Dell
16   part number and the UNSPSC code.
17       So this usually ships within 24 hours.  So this
18   one is available in inventory.  So I'm going to take
19   this one.  So continue.
20       So I'll add this to the cart.  All right.  So
21   here's my Dell shopping cart.  So it has the order
22   information.  I'll create the order.  Then Dell has
23   some trade compliance requirements not relevant to us.
24   Continue.
25       All right.  Stop.  Now, I guess we better continue

2011.01.06 Trial Transcript Day 3  1/6/2011  3:03:00 PM

695

1   so we can see the descriptions.  So continue.  Right.
2   Now stop.
3       So here is that wireless printer.  Look at the
4   information.  It looks good.  So I'm going to submit
5   this order.  So continue.  Stop.
6       So now I have exited the Dell partner site and I'm
7   back into the screen from the Lawson Punchout.  And
8   notice that it says I'm retrieving items.  So, again,
9   as part of that 8-step process flow between Lawson and
10   the trading partners, now Dell is taking the content
11   of the Dell shopping cart and returning that as the
12   Punchout order document, which is now being accepted
13   and saved by the Lawson system, and then we're going
14   to see that it will go into the Lawson shopping cart
15   up here.  So continue.  Stop.
16       So there is my wireless printer up here along with
17   my Bush Milano desk.  All right.  So those are the
18   only two things I wanted.  So I now am going to
19   checkout from the Lawson shopping cart.  Okay.
20   Continue.
21       All right.  Stop.  So this has created an order
22   within Lawson with the number, the identifier 919.
23   Like the first demonstration, this one needs approval.
24   So we'll March through that.  So continue.
25       So back to the portal.  Login as the manager.

696

1   Find the requisition.  It's 919.  Get the requisition.
2   Take a look at it.  Okay.  Stop.
3       I'm sorry, Mike.  I went a little too long.  Would
4   you back up just a tad?  That's it.
5       So you see we have two line items here; the desk
6   and the printer.
7       When we scroll down here, you see we've got item
8   numbers and we've got manufacturer numbers.  So
9   continue.
10       All right.  So looks good to me.  I'm going to
11   approve it.  Okay.  We've got that.  So now I'm going
12   to run a PO 100 program.  So like we saw before, I'll
13   enter a job name and a job description.  I'll call it
14   requisition No. 919.  I'll fill in these other items
15   that I need to below.  Give it a delivery day of five.
16   Release the purchase order.  Don't need the filters.
17   Back to main.
18       Okay.  So this goods good.  Looks good.  I'm going
19   to add it.  Now I'm going to submit the job to run.
20   And I explained about foregrounds and backgrounds.  So
21   this is going to run and create the POs.  So here's
22   the submission.
23       So now the POs are being created and in just a
24   second I can look at them.  Give it time to process.
25   And then I'll go up and click on print manager.

697

1       I'll pick up requisition 919.  Stop.  And so here
2   we have the header of the PO that tells who is doing
3   the buying.  It's our good old Metropolis Medical
4   Center.  And then we'll scroll down to see the items.
5   Continue.  Stop.
6       So here's our first PO.  So it's coming from
7   Staples.  It has a vendor item number.  It's our Bush
8   Milano desk.  It's a quantity of one.  It's an unit of
9   each.  And the PO is released.  So the purchase order
10   has been created and released for this desk that I've
11   ordered from Staples.
12       Scroll down.  Continue.  Stop.  So here's my
13   second PO.  So this one is the wireless office
14   printer.  It's coming from -- I'm not getting my
15   arrows.  Oh, well.  It's coming from Dell Computer.
16   It's got a vendor item number.  The purchase order has
17   been released, and then at the bottom of this entire
18   document the report is complete and two purchase
19   orders were created.
20       So from my Punchout I picked a desk.  I found out
21   it was not available in inventory.  I picked another
22   desk.  Put it in my shopping cart.  Went to Dell.
23   Picked a printer.  Found out it was not available.
24   Picked another printer.  Put it in my shopping cart
25   checked out.  Brought that back to Lawson.  Created a

698

1   requisition.  Created, in this case, two purchase
2   orders.  That's it.
3   Q  Thank you, Doctor.  So with respect to this
4   demonstration, just like I asked you with respect to
5   the last demonstration, at a high level, I didn't want
6   to go through all the claim terminology right now, but
7   were we able to see in that demonstration that there
8   were at least two product catalogs?
9   A  Yes.
10   Q  Were you able to select the product catalogs?
11   A  Yes.
12   Q  Were you able to search for matching items in
13   those catalogs?
14   A  Yes.
15   Q  You did that?
16   A  I did that.
17   Q  Were you able to build a requisition?
18   A  I did it.
19   Q  Were you able to generate a purchase order?
20   A  I did.
21   Q  Did you see information about whether a product
22   was available in inventory?
23   A  Yes, for the desk and the printer.
24   Q  And there were images of the product?
25   A  Since they were Punchouts we had images for all of

699

1 them.
2 Q Were there various descriptions and associated
3 information with the items?
4 A We saw the vendor item number. We saw the
5 manufacturer item number. We saw a description.
6 Q Did you see price?
7 A We certainly saw a price.
8 Q Was everything you saw consistent with your
9 understanding of what a catalog is as defined by the
10 Court?
11 A Yes, it is.
12 Q Thank you.
13 I'd like to talk, just a little bit, about some
14 representatives that Lawson has made about how to
15 select among product catalogs if we could because
16 there's some dispute about whether there's one catalog
17 or more catalogs.
18 Could you go to -- let me first ask you what are
19 some of the item attributes that can be used for
20 selecting product catalogs to be searched?
21 A Well, we could use vendor item number. We could
22 use vendor name. Manufacturer item number.
23 Manufacturer name. Or partial description of the item
24 or the UNSPSC classification codes.
25 Q Going back to Plaintiff's Exhibit 170 again. This

700

1 is a response to an RFP. Specifically at page 37,
2 question 12. Are you with me?
3 A Not on page 37.
4 Q Of 170.
5 A 170. Right. So let's do the Bates number.
6 Q I'm sorry. 884.
7 A Okay.
8 Q In this question, the requester is asking does the
9 system have the ability for expand the item search by
10 a vendor catalog number, partial description,
11 manufacturer code, classification code, vendor name,
12 and manufacturer name. What does Lawson indicate of
13 its ability to do that?
14 A They put an X in column A, which says that that
15 capability is installed and is available.
16 Q Thank you. I'd like to go to Exhibit --
17 THE CLERK: I'm sorry. We couldn't hear you.
18 THE COURT: Which exhibit?
19 MR. ROBERTSON: Plaintiff's 215.
20 Q Again, this is in response to an RFP. Do you see
21 that, Doctor?
22 A Yes. This is the response to Jackson Health
23 System.
24 Q And it's dated May 18, 2006?
25 A Correct.

701

1 Q If you could go to the page that has the Bates
2 label 6172.
3 A Okay.
4 Q Again, we're talking about functional capability
5 here about expanded search. Do you see that?
6 A Yes.
7 Q Just confirm for me this is Lawson's response to
8 this request by the Public Health Trust, Jackson
9 Health system; is that right?
10 A That is correct, but we need to get the right page
11 up here.
12 Q If you'll look at the bottom, it has Bates No. 150
13 of 307. Right at the bottom middle.
14 A Your page numbers are different than mine, but I'm
15 on the right page.
16 Q You're on the page that ends 6172?
17 A 6172, but that's not what's on the screen.
18 Q Okay.
19 A There we go.
20 Q We were discussing here functional capability and
21 expanded items searched by. Do you see that?
22 A Yes.
23 Q It says here "vendor catalog number." What does
24 Lawson say about its availability?
25 A Under the currently available column, it says yes.

702

1 Q And partial description of item, e.g. wildcard
2 contains, etc.?
3 A Yes.
4 Q Manufacturer catalog number?
5 A Yes.
6 Q Classification code?
7 A Yes.
8 Q Vendor name?
9 A Yes.
10 Q Manufacturer name?
11 A Yes.
12 Q Are you aware of the contention that Lawson
13 maintains that an item master is a single catalog
14 rather than a collection of catalogs?
15 A Yes.
16 Q Do you agree or disagree with that?
17 A I disagree.
18 Q Why is that, sir.
19 A I think if you have multiple vendor catalogs and
20 you import them into a single database, you have one
21 database, but you still have multiple item catalogs
22 because it has all of the information in it that was
23 originally in the vendor catalogs.
24 Q And what about with respect to the Punchout
25 catalogs that were available? Do you have an opinion

703

1 as to whether that's a multiple catalog availability

2 or a single catalog?

3 A Well, as we just saw when we did our Punchout

4 Staples and Dell, those were two completely separate

5 catalogs on separate websites run by different people.

6 So those are unquestionably separate catalogs.

7 Q Do you have an understanding about whether the

8 '683 patent, for example, requires catalogs to be

9 searched simultaneously?

10 A It does not.

11 Q Did the Court in any of its claim constructions

12 have that requirement?

13 A No, that's not in the claim construction.

14 Q Does the Lawson system have the capability of

15 enabling you to select search first a product catalog

16 and then subsequently select a search in another

17 product catalog?

18 A Yes.

19 Q Do you see that in any of your demonstrations?

20 A Yes, we did. The Bush or Basyx.

21 Q In the demonstration in Punchout, did we see that

22 ability to select those product catalogs?

23 A Yes, we did because we saw that in Dell and in

24 Staples.

25 Q Why don't we talk a little bit about searching for

704

1 selected product catalogs using the Lawson keyword

2 index?

3 THE COURT: Excuse me. Before you do that,

4 are you saying in your view item master is not a

5 single catalog but is a multiple catalog because it

6 has imported into it all number of parts of other

7 catalogs?

8 THE WITNESS: Well, let me just be clear.

9 THE COURT: Yes.

10 THE WITNESS: If the item master is built by

11 importing multiple vendor catalogs, then in my opinion

12 is that database contains multiple vendor catalogs.

13 THE COURT: But what if it is built by

14 importing part of multiple catalogs, parts of

15 catalogs?

16 THE WITNESS: In my opinion, it's still

17 multiple catalogs.

18 THE COURT: I just want to know -- and it's

19 because in those instances you think it's a function

20 of importation?

21 THE WITNESS: Yes, sir.

22 THE COURT: All right.

23 BY MR. ROBERTSON:

24 Q Does the Lawson system have the capability of

25 importing multiple vendor catalogs?

705

1 A Yes. We saw that in the documentation with the PO

2 536 program.

3 Q Did you see representation that Lawson said they

4 could import multiple catalogs?

5 A Yes, we did.

6 Q So I did want to address this searching the

7 selected product catalogs using Lawson's keyword

8 search. You're familiar with that?

9 A Yes.

10 Q Are you familiar with Lawson's contention that it

11 searches the entire item master and therefore the

12 Lawson systems don't, and its search engine, does not

13 search only selected portions of catalogs, but rather

14 the entire item master?

15 A I'm aware of that, but I disagree with that.

16 Q Why do you disagree with that?

17 A Because the way that the system is built it uses a

18 search index. If you think about building a complex

19 system, you would never build it such that you had to

20 search through every single item in order to match a

21 search query. It would take forever if the database

22 was of any size. So that's not the way relational

23 databases get built.

24 Instead there's a search index, and so like the

25 index of a book, you have keywords, and they point to

706

1 where in the database those items reside.

2 So if I do a keyword search for Dell, I look it up

3 in the index, and that tells me where the Dell items

4 are, and I only look at those.

5 Q Do you have any demonstratives that you prepared

6 to help illustrate this point?

7 A I do.

8 Q Could we go to 09 at page 15. Okay. Here you

9 have a definition of an index from Webster's New World

10 Computer Dictionary. What significance here should we

11 be focused on as you talk about this computer search

12 index that's being utilized?

13 A This part here. When searching or sorting the

14 database, the program uses the index rather than the

15 full database. Such operations are faster than sorts

16 or searches performed on the actual database.

17 Q As a computer scientist, is using an index in

18 order to search a relational database something that

19 is utilized in order to make those faster searches?

20 A Absolutely.

21 Q Do you know how the Lawson's system search index

22 is created?

23 A Yes.

24 Q What is that?

25 A There's a process by which keywords are defined

707

1  that are going to become searchable.  So there's a
2  keyword search setup program that you run, and then
3  after you've defined what keywords are going to be
4  searchable and you've got your database loaded, and
5  the item master is now full of data, you run the
6  keyword search load program.  That builds the index.
7      And now until you have changed the database, you
8  have got an index into all the searchable keywords
9  that -- all of the keywords that were chosen to be
10 searchable.
11 Q  Are some of those keywords like item description,
12 item number, classification code that you've been
13 addressing already?
14 A  Yes, they are.
15 Q  Which database tables is the search index built?
16 A  I'm sorry.  Say that again.
17 Q  Sure.  From which database tables is the search
18 index built?
19 A  The item master.  Well, and the vendor item table,
20 too.
21 Q  Once the user has selected the field of the item
22 data that are to be searchable, what is the next step
23 in building this index?
24 A  So after you have chosen your keywords, you have
25 to load them all, and then you -- the computer system,

708

1  the keyword search load program, builds this index
2  that is search engine then uses thereafter.
3  Q  Can you take a look at Plaintiff's Exhibit
4  No. 136.  It's in Volume III.  It's entitled,
5  "Requisition Self Service 8.1, 9.0."
6  A  Yes.
7  Q  What is this exhibit, if you know?
8  A  This is a training program for requisition self
9  service.  This particular one is a copy of what a
10 human trainer would be using in terms of slides and
11 notes.  So if you're familiar with Microsoft
12 PowerPoint, it has a notes feature.  So here is the
13 slide itself, and below it are the notes.  So if I
14 were a trainer training you as an RSS class, I would
15 be showing you this picture up here, and then this
16 would be my reminder text of what I wanted to tell you
17 about the slide that I'm showing you.  Instead of
18 having an audio recording, you've got words.
19 Q  Is this a presentation that Lawson gives to train
20 its customers?
21 A  Yes.
22 Q  Why don't we go to page 3 of the document, if we
23 could.  It's Bates label is 687.
24 A  Right.
25 Q  What would you like us to focus on here?

709

1  A  The first two paragraphs.  You can search the
2  catalog, which will search for items in your item
3  master or vendor items.  It also allows you to search
4  for keywords for up to 29 fields based on your set up.
5  You can also search based on categories which can use
6  the UNSPSC code categories.  And I think we've heard
7  the rest of that before.
8  Q  We've gone over that.  Let me direct you then to
9  page 12 of the document.  Is this a Lawson keyword
10 search setup proposal?
11 A  Well, this is the training guide and --
12 Q  This is teaching the customers how to set up the
13 keywords?
14 A  Yes, it is.
15 Q  What's the next page?
16 A  Keyword search load.
17 Q  What is that?
18 A  So that was the second program that you have to
19 run.  The first one, the keyword search set up, this
20 is where you choose which of the 29 different fields
21 will become searchable.  So after you have got them
22 chosen, and you've got your item master database
23 loaded, then you run the keyword search load, and it
24 builds the index.
25 Q  Then if you will turn to page 29.  There's a slide

710

1  there that says "creating a requisition by searching
2  the catalog"?
3  A  Yes.
4  Q  What's being depicted there?
5  A  So this is something that we have seen.  When I
6  did the catagory search and picked items and built a
7  requisition.  So it says down here, When using the
8  search catalog task, you enter the value you want to
9  look for in the search field.  As soon as you type in
10 the third letter, the system begins searching for the
11 matching keywords and displays the result as a drop
12 down list.
13     Keywords exist because you enable certain fields
14 as searchable in this IC00.5 program and run IC800 to
15 build keywords from these fields.
16     So that's the setup and load.  IC800 is the
17 keyword load.
18 Q  So what if anything do the pages of this document
19 have with respect to your understanding of how the
20 Lawson system or whether the Lawson system uses a
21 search index to conduct its searches?
22 A  Well, it absolutely does such that it need not
23 search the entire database.  That's what keyword setup
24 is about and how a keyword load turns that into an
25 actual index.

711

1  Q  So once you have enabled the keyword terms and you
2  built the search index, how does the Lawson search
3  engine conduct a search of the item data in the
4  database?
5  A  So if I type in a word into a text box, say Dell,
6  and engage the search engine, it goes to the search
7  index.  It looks up Dell.  It finds records in the
8  database that match the keyword Dell.  And then it
9  extracts that data from the database and presents that
10  to me on the screen.
11  Q  Do you have a demonstrative you prepared to try
12  and illustrate how this search index operates?
13  A  I do.
14  Q  What's being illustrated here, sir?
15  A  Okay.  So up here at the top we have the text box,
16  which is the search query.  I don't know where that
17  popping is coming from.
18      THE COURT:  That's because you, like some
19  witnesses, but not all, articulate your P's in a
20  particular way at a particular length from the
21  microphone, and there isn't anything that we've been
22  able to do about it.  And it's not your fault.  It's a
23  function of the way things are.
24      THE WITNESS:  Thank you, Your Honor.
25      THE COURT:  It's annoying, but --

712

1      THE WITNESS:  I would have worried about that
2  all night.
3      THE COURT:  Well, don't.
4      MR. McDONALD:  As long as he doesn't use the
5  T sound for the rest of the testimony, it's fine.
6      THE COURT:  No, it's a P, generally.
7  Does this have an exhibit number?
8      MR. ROBERTSON:  No, Your Honor.  It's simply
9  demonstrative.
10      THE COURT:  All right.
11  A  So we have our keywords at the top, our query
12  text, and for this example I want to look for the
13  keywords Dell and monitor.  We'll assume that we have
14  enabled at least two fields, two keyword fields to be
15  searchable.  One of them would be a user-defined field
16  for the manufacturer.  We haven't actually talked
17  about user defined fields yet, but this is part of the
18  Lawson product.  So a user defined field or
19  manufacturer has been determined to be searchable.  It
20  has been declared to be searchable.  And a second
21  field, the item description, which is one of the
22  fields, one of the 29 fields supported by Lawson, that
23  one has also been declared to be searchable.
24      Now, after I do the search load and I build my
25  index, then what I have is for each of the entries in

713

1  the user-defined field for manufacturer, like Dell or
2  Hewlett-Packard or Gateway, for each of those I have
3  pointers into the database that tell me where I will
4  find a record, a product, in which the Dell keyword
5  was located in the user-defined field for
6  manufacturer.
7      Likewise, for the item description fields, if I've
8  got a database that contains keywords like keyboard
9  and mouse and monitor, every time a descriptive term
10  is found that is searchable for item description like
11  keyboard, in this database there are pointers from the
12  index into the database that say where that item is
13  found.
14      So the way this then works is when I put in Dell
15  and monitor, the search engine goes to the search
16  index, finds the keyword Dell, finds all of the places
17  that the keyword Dell would appear in the database.
18  In this case its locations are 10, 20, 25, 26, 27 and
19  28.
20      Then it would look for the next keyword in the
21  query box.  That's monitor.  It would look up all of
22  the places in the database where monitor appears as
23  keyword.  And that's 15, 16, 17, 19, 20, 21, 22, 23,
24  25 and 27.
25      Then having found where the records containing the

714

1  keyword Dell are located and where the records
2  containing the keyword monitor are located, then we do
3  the intersection of those.  That is, from those two
4  lists of numbers, we find where the numbers are
5  exactly the same.
6      So in my example here, 25 and 27 are the database
7  records that contain both the keywords Dell and
8  monitor.
9      So I go fetch records 25 and 27.  And that's what
10  I display to the user.  So I don't search the whole
11  database.  I just the index to search selected parts.
12      THE COURT:  Mr. Robertson, what is this
13  testimony related to?  We had that at the beginning.
14  Now we've had a lot of testimony, and I'm confused a
15  little bit, and the jury may be, about what exactly
16  this line relates to.  Does it have to do with whether
17  there's a search of a single catalog or not?  Is that
18  what we're still on?
19      MR. ROBERTSON:  No, Your Honor.  There are
20  some claims that say you have to search portions of
21  the database or search among the selected catalogs.
22  And so in order to search portions of the database,
23  you need a search index.  Lawson contends that the
24  index is -- that the search searches the entire
25  database all the time.  So, therefore, they can't

715

1  satisfy the selected portions.

2     So they employ a search index in order to be

3  able to go quickly to find the data record that they

4  need.

5     THE COURT:  I understand.  I have this

6  question now.  The database that is being searched in

7  either version, either Lawson's theory or ePlus'

8  theory, is made up of what?

9     THE WITNESS:  What is the database made up

10  of?

11     THE COURT:  Yeah, what's it searching?

12     THE WITNESS:  Well, it uses the index to

13  search the item master and the vendor item table.

14     THE COURT:  It's searching the item master

15  and --

16     THE WITNESS:  Let me be more precise.

17     THE COURT:  I know we're talking about

18  searching catalogs, and I think I'm confused about

19  what the issue is.  So go ahead and try it again.

20  A  So what's going on is that there are many keyword

21  fields like item number, item description, these

22  user-defined fields that can be marked as searchable.

23  This's part of the setup.

24     Then when information is loaded into the item

25  master and vendor item table, you use this keyword

716

1  search load program, and it builds this index, the one

2  that I'm showing on the screen.

3     Thereafter, whenever I do a search, I'm using the

4  index to search only selected parts of the database,

5  not the whole database.

6     THE COURT:  All right.  I understand that,

7  but the database is what?

8     THE WITNESS:  The database is the item master

9  table and the vendor item table.

10     THE COURT:  And the database contains

11  extracts or parts of different catalogs, right?

12     THE WITNESS:  Each item record and item

13  master represents some product from a vendor catalog.

14  BY THE COURT:

15  Q  Doctor, let me ask you this.

16     THE COURT:  I think I may be confusing things

17  more than I am doing any good.  So I'll leave it

18  alone.

19  BY MR. ROBERTSON:

20  Q  Have you ever seen this search index being

21  analogized to an index for a book, for example?

22  A  I have.

23  Q  If we had a book that was his history of the Civil

24  Wear, and it had an index with a number of topic

25  headings and number of pages.  If I wanted to go to

717

1  the Battle of Vicksburg, instead of going through

2  every single page of the book to find the chapter on

3  the Battle of Vicksburg, how could I use an index in

4  order to go directly to where that data record would

5  be located in that database, if you will?

6  A  That's a good analogy.  So if I've got this Civil

7  War history book and I want to learn about Battle of

8  Vicksburg, I don't start on page 1 and go to page 2

9  and 3 and 4 reading it all to see if it says anything

10  about Battle of Vicksburg.

11     I go to the back to the index.  I look up under

12  the alphabetical list.  I looked up V.  I find the

13  Battle of Vicksburg.  And it says pages 301 and 402.

14  So I go back to the book and I look up pages 301 and

15  402.  And those are the data record items that are

16  analogous to the Lawson system.

17  Q  So referring back now to your demonstrative,

18  what's happened is someone has assigned essentially a

19  number to a particular topic, and those can actually

20  be cross-referenced, is that right, to go immediately

21  to where the data record is locate in the database?

22  A  They're not cross-referenced, but they are

23  pointers into the database.

24  Q  And using those pointers, you can quickly go to

25  the record rather than going through every single

718

1  record that's in the database?

2  A  Exactly.

3  Q  And just so I can -- this is relevant to Claim One

4  of the '172, for example.  Do you have that in front

5  of you?

6  A  This is the database claim.

7  Q  It's Plaintiff's Exhibit 3, for example.  Go to

8  Claim One.  We'll just focus on that first element.

9  Some of the other claims now, Doctor, you have seen

10  that they have referred to at least two other product

11  catalogs?

12  A  Yes, we've seen a lot of those.

13  Q  In this Claim One, there's not a catalog

14  requirement, is there?

15  A  No, nothing about catalogs here.  It's talking

16  about a database.

17  Q  If we could just highlight that first element.  So

18  here it says a database containing data relating to

19  items associated with at least two vendors maintained

20  so that selected portions of the database may be

21  searched separately.  Do you see that?

22  A  I do.

23  Q  Is this index a useful tool in being able to

24  search selected portions of the database separately?

25  A  Yes, it is.

719

1   Q  Let me ask you to look down at Plaintiff's Exhibit
2   No. 136, I believe.  I'm sorry.  I apologize.  127,
3   which is the first exhibit in Volume III.  Have you
4   seen this document before?
5   A  I have.
6   Q  It's entitled, "Application Design Document for S3
7   Item Search Center."
8   A  Correct.
9   Q  Let me direct you to the page that ends with Bates
10  label 060.
11  A  Okay.
12  Q  The heading there, it's 3.1 S3 item search.  Do
13  you see that?
14  A  Yes.
15  Q  This S3 product, is that the procurement system
16  that Lawson offers that's being accused here?
17  A  It is.
18  Q  What does it represent here with respect to the
19  search index that's available for Lawson?
20  A  The S3 item search center has the capability to
21  search for item information within the item master,
22  the item master table.  Item location, item log table,
23  and vendor item, P.O. item inventory table.
24      The table below lists the database tables and
25  fields that are searchable.

720

1   Q  What does that indicate to you?
2   A  So what we have here are a list of fields that can
3   be marked as searchable.  And then this index is built
4   from these fields.
5   Q  Does it include vendor item?
6   A  The first one is vendor item.  The second one is
7   description.  And below that we have what I referred
8   to earlier as user-defined fields.  So there are five
9   user-defined fields, which simply means that the user
10  can use them anyway the user likes.  You could use the
11  field as a vendor code, for example.
12  Q  Going to the next page, is it also indexed for
13  commodity code?
14  A  Yes, there's commodity code, there's stock unit of
15  measure, and down at the bottom is vendor.
16  Q  Can you turn to the last page of Plaintiff's
17  Exhibit 127, and there's an asterisk there that
18  says -- well, why don't you tell me what you
19  understand that to mean?
20  A  After vendor was the asterisk.  And on this page
21  the asterisk is explained.  This is true for more
22  fields than just vendor.  These elements can only be
23  used in combination with a search value to filter the
24  results of a search.
25  Q  Can you translate that for us?  What does that

721

1   mean?
2   A  So in the advanced search page that is a part of
3   this system, you can put in keywords that you want to
4   search for, and you can put in keywords that you want
5   to ignore.
6   Q  Does this table tell us anything about whether you
7   can search in the Lawson S3 system by vendor?
8   A  It says you can.
9   Q  Now, you reviewed Lawson's expert report; is that
10  right?
11  A  I did.
12  Q  Do you know whether or not he acknowledged that
13  the vendor name field can be used in combination with
14  another search value to filter the search by vendor
15  name using this search functionality?
16  A  He did.
17  Q  Dr. Weaver, I'd like to talk to you a little bit
18  about the '516 patent claims, and we're going to have
19  a video at some point with respect to some of that
20  functionality that's claimed in that patent; is that
21  right?
22  A  Yes.
23  Q  Can we just go to Claim One of '516?  Now, this is
24  a fairly lengthy claim, Doctor, and I certainly don't
25  want to take the time to read it into the record here,

722

1   but at a high level, can you tell us generally what is
2   going on here directed to this type of claim and what
3   the elements are doing here with the sort of overall
4   essence of what this claim is?
5   A  Okay.  So there's a collection of catalogs.
6   There's a first set of predetermined criteria.
7   Q  That's tricky word.  At least it sounds tricky.
8   What is it?
9   A  The things that that could be are many of the
10  items that -- yeah.  Many of the things that we've
11  already mentioned like item number, manufacturer
12  number, vendor number, vendor name, description of the
13  product, UNSPSC classification code.
14  Q  These are all criteria that can be used for
15  searching that are determined ahead of time?
16  A  Yes.  And then there is a second set of those
17  criteria, and the content of that set could be the
18  same as the content of the first set.
19      Then there's a catalog selection protocol whereby
20  you use the first predetermined criteria to select
21  less than all of the catalogs.  And then you use the
22  second predetermined criteria to search within that
23  subset in order to find matching items.
24  Q  So let me see if I understand then.  What we're
25  doing here is search refinement.  That is, we can

723

1  start out with broad categories and narrow our search
2  in order to arrive at the object of what we want to
3  purchase, for example, in this configuration of
4  electronic sourcing system; is that right?
5  A  Right.  So an example would be if my first
6  predetermined criteria was Dell, I could select a
7  subset of the catalogs that contain an item from Dell,
8  and if my second criteria was Dimension 8100, which is
9  a particular Dell model, I could look within those
10  catalogs for those items that are Dell Dimension
11  8100s.
12  Q  Are there some of the catalog selection protocols
13  described there?  What is your understanding of what a
14  catalog selection protocol is?  First of all, the
15  Court has defined what a protocol is.  So let's just
16  that your definition.  Do you recall what that is?
17  A  For protocol?
18  Q  Yes.  It's on the first page.
19  A  A procedure.
20  Q  So let's call a catalog selection procedure, if
21  you will, since that is the Court's definition, and
22  can you tell us your understanding of that element?
23  What is it?
24  A  So there's a user interface that allows me to
25  input a criteria that's going to select less than all

724

1  of the catalogs.
2  Q  There was criteria we talked about.  It could be
3  the first set of criteria.  These attributes we've
4  been talking about such as vendor name and
5  manufacturer number, vendor number, textural
6  description?
7  A  Right.  All of those I mentioned as examples of a
8  first set of predetermined criteria.
9  Q  Then you can use that second set of criteria that
10  include those in the first set that then refine the
11  search?
12  A  Correct.
13  Q  This last element is search program.  Search
14  program relying on said second set of criteria to
15  select specific items from the catalogs for said
16  catalogs determined from the catalog selection
17  protocol.  What is going on there?
18  A  So you need a search program that uses that second
19  criteria in order to find specific items within the
20  catalogs that were sub selected by your choice of the
21  first criteria.
22  Q  Do you have a demonstration to illustrate whether
23  or not the Lawson system performs in a manner that is
24  implicated by Claim One of the '516 patent?
25  A  Yes.

725

1  Q  It's been represented to me it's very short.
2  Would you like me to proceed, Your Honor.  It's
3  Plaintiff's Exhibit 364 is the video and Plaintiff's
4  Exhibit 363 are the corresponding hard copy screen
5  shots.
6  A  Stop.
7  Q  Dr. Weaver --
8  A  Are you ready?
9  Q  Maybe we should make an effort not to stop as much
10  so we can have more of a narrative if the Court would
11  permit.
12     THE COURT:  Whatever he wants to do.  I think
13  he was waiting for you to do a question.
14  Q  Can we proceed with the demonstration?
15  A  We can.  All right.
16  Q  Can you preview it for the jury and tell us what
17  we're going to see here?
18  A  Yes, we're going to see searching for the first
19  criteria of Dell.  And then from those catalogs, we'll
20  see that there are multiple vendors for Dell.  And
21  then we'll refine the search with a Dimension 8100,
22  and we'll find that there are multiple vendors for a
23  more specific search inquiry, and that satisfies the
24  elements of Claim One of the '516.
25     THE COURT:  What are the exhibit numbers?

726

1     MR. ROBERTSON:  364 is the video and 363 are
2  the hard copies.
3  A  Let's go.  Pick the browser.  Pick the favorite.
4  Pick the portal.
5  Q  Don't go so fast, Doctor, that we lose the import
6  of the point you're trying to make?
7  A  I have contradictory instructions.
8  Q  I apologize.
9  A  This part you have seen before.  So no problem.
10  We're waiting for the portal to load.  Okay.  We're
11  there.  Some requisition self service, shopping, and
12  from our drop down menu we'll now pick search catalog.
13  Stop.
14     So here is the query text box into which I am
15  going to put the first predetermined criteria.
16  Continue.
17     THE COURT:  Excuse me.  What do you
18  understand the catalog that's being searched in the
19  drop down when it says "search catalog"?
20     THE WITNESS:  Well, in this case --
21     THE COURT:  Where is it going to search?
22     THE WITNESS:  In this case it's searching the
23  database of item master and vendor table and, this
24  contains all the catalogs that are in the internal
25  database.

727

1    THE COURT:  But it's not Punchout at all?

2    THE WITNESS:  No, sir.

3    THE COURT:  Because you have Punchout to get

4    the outside vendors?

5    THE WITNESS:  That's exactly right.

6    THE COURT:  So you search item master and

7    what do you call it?

8    THE WITNESS:  Vendor item table.

9    THE COURT:  Vendor item table.  It says

10   search catalog.  Okay.  Go ahead.

11   A  So stop.  Now, I'm about to enter the first

12   predetermined criteria.  I need to tell you, though,

13   that you see over here as part of this advanced search

14   feature there are -- you only see a partial list of

15   keyword fields that can be searched.

16      So if I wanted to really tightly control the

17   aspects of this search, I could go in and pick, say,

18   the item number.  I wish I had the -- I'll try this.

19   I can pick the item number.  I can pick the item

20   description.  I could pick, say, the first alphabetic

21   user field.  I could designate what fields I want to

22   be searched by whatever I put in this text box, but

23   what I have done is to click over here on search all

24   the fields.

25      So in my demonstration all of the fields that are

728

1    available are going to be searched using that search

2    index.  Okay.  Go.

3       So I type in Dell.  Stop.  So here are the records

4    in the database that include the keyword Dell.

5    Continue.

6       So there are several.  Let me pick the first one

7    and drill down on that.  Okay, stop.  So this is a

8    Dell Dimension 8100 Pentium 4 computer.  It's

9    available from Dell Computer.  Okay.  Continue.

10      I go back.  I look at another entry.  Stop.  All

11   right.  Here's a Dell Dimension 8100 Pentium 4, but

12   this one is available from Diablo.  The first one from

13   Dell, the second one from Diablo.  Continue.

14      Go back.  Now, I'm going to add the second

15   predetermined criteria.  So I'll put in Dimension

16   8100.  I'll search for that.  Stop.

17      Now, instead of all entries and catalogs that

18   contain the keyword Dell, I have those catalogs

19   containing the keyword Dell that contain the keyword

20   Dimension 8100.  Continue.

21      So here's that first one.  That was available from

22   Dell.  Here's the second one.  It's available from

23   Diablo.  And that's important because when we drill

24   down to the claim, what it says is that I have to be

25   able to find an item from one vendor and then the item

729

1    from a second vendor.  And that's what I've done here.

2    THE COURT:  So you can compare and find one

3    is $1,000 and one is $1,400?

4    THE WITNESS:  Yes.

5    THE COURT:  And decide which one you want to

6    buy.  Do you have the same product?

7    THE WITNESS:  In this case I do, yes.

8    MR. ROBERTSON:  Your Honor, we're about to

9    move onto another topic.  It's not going to be that

10   long, but it's another topic.

11   THE COURT:  Well, you're using time

12   measurements of which I am familiar; very short and

13   not that long.  What do you have in mind?  The jury

14   has been at it for a while.  I think this is a good

15   time to let them go home.  You get worn out after a

16   while focusing on all the details.  You're paying

17   attention carefully and we all appreciate that very

18   much, but why don't you go have a nice evening, and

19   leave your notebooks with Mr. Neal.

20      Drive carefully and don't discuss the case

21   with anybody if you don't mind.  Don't go online now

22   and try to find a cheap computer.

23   MR. ROBERTSON:  Thank you.

24      (The jury is out for the evening.)

25   THE COURT:  Tell them we'll start at nine in

730

1    the morning before they get out of here.

2       How much longer do you expect your

3    examination is going to be?  I've interrupted a lot.

4    So I know I've slowed you down.  So I'm sorry.

5    MR. ROBERTSON:  Don't apologize, Your Honor.

6    It's been helpful in many instances.  So thank you.

7       When I sat down at the break, I tried to cut

8    out about 40 pages of it, and I just wanted to make

9    sure I didn't cut out something that was critical.  I

10   need to go through indirect infringement and do that

11   at a fairly high level.  Then I need to march through

12   the claims, and that takes a little bit of time.

13   THE COURT:  I'm just asking you roughly how

14   much time instead of some unit I don't understand.

15   I'm not going to hold you to it.  I don't think that's

16   fair in a case like this, particularly when I

17   interrupt and take your time.

18   MR. ROBERTSON:  You have been patient, sir.

19   I'd like to look at my outline, but I'm going to give

20   you my best estimate right now, and that would be two

21   hours.

22   THE COURT:  We'll start in the morning.

23      Anything else we need to deal with?  What

24   about this issue about the briefing on graphic user

25   interface?  Did you all discuss that as you told me

739

1      MR. ROBERTSON:  I don't know who he's going

2   to question about it.

3      THE COURT:  I'm sure he's going to question

4   Dr. Weaver based on what he said.  Not because I'm

5   prescient or anything.

6      MR. ROBERTSON:  I guess I don't have an

7   objection to that.

8      THE COURT:  Well, good then.  We solved

9   something.

10      Raise the blinds so that in the morning it

11   will be open.

12      All right.  I think that's everything.  And

13   you don't expect to finish tomorrow, is that right,

14   Mr. Robertson?  You don't expect to finish tomorrow,

15   is that what your situation is?

16      MR. ROBERTSON:  I do not, sir.  I expect Mr.

17   McDonald might have a half an hour or 45 minutes of

18   cross-examination.

19      THE COURT:  If you ask your questions bullet

20   points, 30 minutes is plenty.  Once you get beyond

21   that, the expert bets you is generally what happens.

22      All right.  Okay.  So we're not going on

23   Monday.  You're going back on Tuesday.  Thank you very

24   much.  Hope you feel better, all of you.  Don't bring

25   anything else up here.

740

1

2      (The proceedings were adjourned at 5:15 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

741

```
1        IN THE UNITED STATES DISTRICT COURT
2       FOR THE EASTERN DISTRICT OF VIRGINIA
3               RICHMOND DIVISION
4
5    --------------------------------------
6    ePLUS, INC.          : Civil Action No.
                          : 3:09CV620
7    vs.                  :
                          :
8    LAWSON SOFTWARE, INC.      :  January 7, 2011
                          :
9    --------------------------------------
10
11      COMPLETE TRANSCRIPT OF THE JURY TRIAL
12      BEFORE THE HONORABLE ROBERT E. PAYNE
13    UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24      Peppy Peterson, RPR
           Official Court Reporter
25      United States District Court
```

742

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

743

```
              P R O C E E D I N G S
1
2
3        THE CLERK:  Civil action number 3:09CV620, ePlus,
4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr.
6    Michael G. Strapp, and Mr. David Young represent the plaintiff.
7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
9    the defendant.  Are counsel ready to proceed?
10       MR. ROBERTSON:  Yes, Your Honor.
11       MR. McDONALD:  Yes, sir.
12       THE COURT:  Good morning.  Good morning, ladies and
13   gentlemen.  I was informed by the clerk that you all needed to
14   know the procedure for asking questions, and if you have
15   questions, it's all right.
16       I think the best way to do this is for you to write
17   your question out and then send it up to Mr. Neal, and he'll
18   give it to me, because there's some kind of questions that,
19   perhaps, are better -- I will tell you immediately, I can't
20   answer that or we can't get into that.
21       Others -- and I found this to be the case most of the
22   time.  Other questions are very helpful to the lawyers to have,
23   because if you have -- you are the ones who have to decide the
24   case, and if you have a question, they need to know it and need
25   to work out a way to get the information to you through their
```

744

```
1    questions.
2        So if you feel like you have a question, you can
3    write them out, send them to me, and I'll take them and look at
4    them.  Unless it's something that I can't allow, we'll work out
5    a way to get you the information that you need.
6        You all look like you're not as drained as you were
7    when you left yesterday afternoon.  I feel the same way, so
8    let's get a fresh start.  Let's go ahead, Mr. Robertson.
9        MR. ROBERTSON:  Thank you, Your Honor.  Good morning.
10
11          ALFRED C. WEAVER,
12   a witness, called by the plaintiff, having been previously
13   duly sworn, testified as follows:
14          DIRECT EXAMINATION
15   BY MR. ROBERTSON:  (resuming)
16   Q   Good morning, Dr. Weaver.
17   A   Good morning, Mr. Robertson.
18   Q   I'd like to start out looking at Plaintiff's Exhibit
19   Number 219, if I could, sir, in binder number five.  Before we
20   get there, I have a few preliminary questions.
21       Do you know whether or not Lawson provides services to its
22   customers to assist them in importing vendor catalog data into
23   its item master?
24   A   Yes, I do.  There was witness testimony to that from the
25   customers.
```

745

1  Q   And did you see any testimony from Lawson personnel that
2  they provide those services?
3  A   Yes, I did.
4  Q   Are you familiar with the nature of those implementation
5  projects that Lawson conducts on behalf of the customers?
6  A   Yes.
7  Q   Can you tell the jury what they are?
8  A   So the Lawson system is quite complex.  So this is not a
9  case of going to Best Buy and getting a shrink-wrapped CD and
10  putting it in your computer.
11     All of those modules that we talked about need to have
12  data loaded.  They need to be customized for the needs of the
13  individual customer.  So the Lawson witnesses, the corporate
14  witnesses and the Lawson customer witnesses, explained that it
15  was very common for Lawson personnel to be on their site for
16  months, sometimes more than a year, in order to get their
17  system brought up, to get data loaded, to get it tested, and to
18  make it operational.
19  Q   So they test the system?
20  A   Yes, they do.
21  Q   Do they train the customer's personnel how to use the
22  systems?
23  A   Yes, and we saw some of the training material yesterday.
24  Q   Do Lawson employees assist the customers in bringing the
25  system live?

746

1  A   Absolutely.
2  Q   So back to this Exhibit Number 219 which is a Lawson
3  response to an RFP, if you could take a look at the page that
4  has the barcode 120 which, I believe, will have the Bates label
5  ending 954.
6  A   Yes.
7  Q   And at the top of this document, it says, detailed steps
8  to complete data conversion by proposed data module.  Do you
9  see that?
10  A   I do.
11  Q   Can you tell the jury what your understanding is of data
12  conversion in the context of this document?
13  A   Sure.  Data conversion means that you are trying to move
14  data from some older system, some legacy system the customers
15  owns, and gets that data reformatted into what is appropriate
16  for the Lawson system.  So data conversion is a reformatting
17  issue.
18     THE COURT:  Reformatting of the customer's data?
19     THE WITNESS:  Of the data -- of the customer's data
20  in a legacy system.
21  Q   Can you explain to the jury what a legacy system is?
22  A   Sure.
23     THE COURT:  I don't know that we need to get into
24  that explanation.  Just say to a customer's system that the
25  customers has.

747

1  Q   Would that be a type of procurement system the customer
2  had, and now they're upgrading or moving over to a Lawson
3  system?
4  A   Yes, sir.
5  Q   On this exhibit at page 120, tell us who is responsible
6  for the data conversion.
7  A   Well, there is a table here that lists various conversion
8  tasks.  That's in the first column.  In the third column, it
9  says who is the owner of the task; in other words, who is
10  responsible for that particular task.
11  Q   Can you just go through and identify for us those tasks
12  that Lawson is responsible and those tasks that Lawson as well
13  as, in this case, the school district is responsible?
14  A   Sure.  So just moving from top to bottom, the first one,
15  provide conversion workbooks, that's owned by Lawson.  Conduct
16  a one-day mapping session for each conversion program, that is
17  a Lawson task.  Document all conversion programs required,
18  that's a Lawson task.
19     And skipping down a bit, code program logic to map data
20  from legacy or non-Lawson system to Lawson API file layout
21  formats, that is a shared responsibility between Lawson and the
22  district.  Create detailed program specifications, develop
23  prototype, unit tests, and document customizations, that is a
24  shared task between Lawson and the school district.
25     Load small sample of converted data, that is a Lawson and

748

1  district task, and then skipping down two more, complete data
2  mapping is Lawson and the district.  Develop final data extract
3  and mapping programs, that's Lawson and the district, and load
4  converted data for system task is a shared task between Lawson
5  and the district.
6  Q   And turning over to the next page.
7  A   Yes.  At the top of the next page, final conversion of
8  live data is Lawson and district.
9  Q   Underneath that, there's a list of conversions included
10  within the scope of this project.  Do you see that?
11  A   I do.
12  Q   What, if anything, would you like to direct the attention
13  of the jury to within this conversion scope?
14  A   So in the middle of this document, here is item master,
15  and so the title of that column is the conversion file, and so
16  the item master has to be -- has to convert the data to the
17  proper format for the item master.  And over to the right, for
18  the conversion recommendations, it says, all active items.
19     So all active items in the legacy or the non-Lawson system
20  have to be converted, that is reformatted, into the proper
21  format for the Lawson system.
22  Q   Also this purchase order vendor master?
23  A   Yes.  I was going to say that just below here is the
24  purchase order vendor master, and to the right of that, all of
25  the active PO vendors.  So that file needs conversion as well.

749

1   Q   If you'll turn in the same volume you have there, Dr.
2   Weaver, to Plaintiff's Exhibit Number 216?
3         THE COURT:  Before you do that, if the customer has,
4   say, catalogs in its system, is that then converted into the
5   Lawson system, too?
6         THE WITNESS:  Well, the data in the catalog could be
7   converted, yes, sir.  Well, the answer to your question is yes.
8   The catalogs that are in the non-Lawson system, their data gets
9   converted so the same data is now in the proper format for the
10  Lawson system.
11        THE COURT:  Who decides what needs to be taken from
12  the old system and put into the -- converted to the Lawson
13  system; Lawson or the customer?
14        THE WITNESS:  Well, it's probably a joint decision.
15  The customer would decide what catalog data needs to be
16  converted --
17        THE COURT:  No, I beyond just catalogs.  I mean
18  anything.  Of all the conversions, who makes the decisions
19  about what has to be converted for the Lawson system to work?
20  I didn't ask that question right, so try that one.
21        THE WITNESS:  That would have to be a joint decision,
22  because the customers would know what catalogs it needs, and
23  Lawson would know what data needs to be converted to make that
24  happen.
25  Q   Does the data sometimes need to be reformulated when it's

750

1   converted from an older procurement system to the Lawson
2   system?
3   A   Yes.  That's what the reformatting does.
4   Q   If the customer wants the same catalog data from its older
5   system put into the new Lawson system it's acquiring, it has to
6   tell Lawson what catalog data it wants migrated over to the new
7   Lawson system; is that correct?
8   A   That's correct.
9   Q   In the course of your review of the testimony and the
10  documents, is that a fairly common practice?
11  A   Yes, it is.
12  Q   So we were at Plaintiff's Exhibit 216, and specifically
13  let's go to page seven, if we could.  And there's a heading
14  there called proposed application landscape?
15  A   Yes.
16  Q   And going down to the last sentence under that paragraph,
17  it says, the following applications will be implemented upon
18  completion of both phases of the project are completed.  The
19  breakout of the application roll-out by phase is described in
20  section 4.1.  Do you see that?
21  A   I do.
22  Q   Can we go over to the next page, and there's a box
23  entitled business management system; do you see that?
24  A   I do.
25  Q   Then there's a heading called Lawson procurement suite.

751

1   Tell us what you understanding is going on with respect to the
2   scope of the project here that's being implemented?
3   A   Okay, so this is the list of -- this is the list of
4   modules in the Lawson procurement suite that are going to have
5   to be used, so that in this list, there's requisitions,
6   purchase order, inventory control, requisition self-service,
7   and procurement Punchout.
8   Q   Are those the modules we were discussing yesterday, sir?
9   A   Very same.
10  Q   Should have gone back to the cover page of Plaintiff's
11  Exhibit Number 216, and this is identified as a Lawson
12  professional services statement of work.  Do you see that?
13  A   I do.
14  Q   I think you touched upon that a little bit yesterday, but
15  can you refresh us on what a statement of work is?
16  A   So after a company like Jackson Health System writes an
17  RFP and gets a response and decides to award a contract, the
18  statement of work is the specific items of work that are going
19  to be accomplished as a part of the contract.  So it's the
20  agreement on what work will be done.
21  Q   Why don't we turn to page Bates label 374 of this document
22  which is page 15.  What does it indicate here under section
23  3.5, data migration and conversions?
24  A   So this is going to describe what scope of work is
25  involved, and that is what, by contract, is going to be done in

752

1   order to convert data from an old system to the new Lawson
2   system.
3   Q   Now, sir, if you'll turn the page here, there's a table
4   that has responsibilities for master file and configuration
5   table value builds, and there are headings for activity,
6   responsible, key assumptions, and descriptions.
7         Focusing right now on activities and responsibilities,
8   what significance would you like to identify in this particular
9   exhibit?
10  A   So in those first two columns, the data migration workshop
11  is a Lawson responsibility.  The migration of strategy and
12  process description is the responsibility of Lawson.  Down
13  toward the bottom, training and data migration tools is a
14  Lawson responsibility.  Test load and sample data is a Lawson
15  responsibility, and there's more on the next page.
16  Q   Let's go to the next page then.
17  A   Okay.  So on this next page, production data load is a
18  Lawson responsibility.  Full migration systems test is a Lawson
19  responsibility.  Full migration full scale test is a Lawson
20  responsibility, and the live migration is a Lawson
21  responsibility.
22  Q   It does indicate here there are some tasks that are
23  customer responsibilities; is that right?
24  A   Yes, it does.
25  Q   Does Lawson provide instructions to the customers for how

757

1  A  I do.

2  Q  Let's turn to the next page.  These are, again, activities

3  and responsibilities for particular tasks that need to be

4  accomplished in order to perform this statement of work for the

5  Deaconess Health System; is that right?

6  A  That's right.

7  Q  What, of significance, would you like to point out here?

8  A  So at the top, data migration workshops are a Lawson

9  responsibility, and the description over on the right says that

10  the workshops will define the data migration process and the

11  mapping required.

12      And then two down from that, the task or the activity is

13  transform data.  That's a Lawson responsibility, and a

14  description is that the legacy data is transformed into the new

15  database structure.  And there at the bottom of the page is

16  live migration.  That's a Lawson task, and the description is

17  live data migration.

18      So that's taking the real production data in the

19  non-Lawson system and legacy system and moving that into the

20  Lawson system to make a production system, one that's up and

21  running.

22  Q  So when you say production system, you've now taken the

23  old data, including catalog data, migrated over to the new item

24  master in the Lawson system, and then assisted the customer in

25  getting that up and functional?

758

1  A  Yes, to make it fully operational.

2  Q  Can we go to page ten of the document.  Again, there's a

3  number of what are called interface activities; do you see that

4  on the chart blow there?

5  A  Yes, I do.

6  Q  What, if anything, does this have for significance for

7  your opinions?

8  A  So these are the activities that are going to be necessary

9  to integrate the system.  By integrate, we mean integrate the

10  procurement suite with the financial and accounting information

11  or with the financial and accounting software that's part of

12  the Lawson system.

13      So focusing on the activities that are of relevance to us,

14  in the fourth line we have, technical design doc,

15  documentation.  That's the responsibility of Lawson.  Two below

16  that, the activity is develop, and the description or -- excuse

17  me -- yeah, it is the description over on the right-hand

18  column.  Lawson will develop the interfaces defined in the

19  scope.  Below that unit test, and below that deliver.  Both the

20  unit test and deliver are Lawson responsibilities.

21  Q  Doctor, that's all I have with respect to that document.

22  So I'd like to talk to you briefly about this procurement

23  Punchout application and who performs the installation and

24  implementation of that module.  Are you familiar with that,

25  sir?

759

1  A  I am.

2  Q  I want to direct you to binder one.  So my first question

3  is, who typically performs that installation and implementation

4  of a system that utilizes the procurement Punchout?

5  A  That would be Lawson.

6  Q  Did you review any Lawson testimony with respect to that?

7  A  Yes, I did.  The Lawson witnesses said that it was very

8  common for the Lawson personnel to implement the procurement

9  Punchout system.

10  Q  Have you reviewed any documents that would confirm that?

11  A  Yes, I have.

12  Q  Why don't you take a look at Plaintiff's Exhibit

13  Number 103.  Have you seen this document before?

14  A  Yes, I have.

15  Q  And what is it?

16  A  So this is a list of frequently asked questions -- that's

17  the FAQ -- with regard to procurement Punchout, and this was

18  written by a Lawson employee.

19  Q  And can you turn to page -- let me -- prefatory question.

20  So a Lawson employee is putting together a document that

21  proposes frequently asked questions during this procurement

22  Punchout functionality you described?

23  A  The idea here is Lawson knows what questions are

24  frequently asked, so they prepare a list of questions and

25  answers so that they can easily disseminate answers to

760

1  frequently asked questions.

2  Q  Why don't you turn to page six of this document.  So the

3  questions that are being formed here are by Lawson that they

4  feel are typical or that are frequently asked by their

5  customers?

6  A  That's right.

7  Q  What is the question Lawson identifies is frequently asked

8  at the top of page six?

9  A  The top question is, who typically performs the

10  installation, and the answer is Lawson Professional Services.

11  Q  Thank you, sir.  That's all I have with respect to that

12  document.

13      Doctor, you had another demonstration that you wanted to

14  show, and in this demonstration, is this the demonstration in

15  which we were able to, with the assistance of a Lawson

16  employee, load additional item data to be able to show fuller,

17  more robust functionality?

18  A  Yes, it is.

19  Q  This is Plaintiff's Exhibit Number 380, and the hard copy

20  screen shots would be Plaintiff's Exhibit Number 379.  So would

21  you please explain to the jury what's going on in this capture

22  of a process operating on the Lawson demonstration system?

23  A  Sure.  We'll just play this, and I'll narrate it as we go.

24  Q  If you need to stop at any appropriate point, fine.  If

25  you want to skip over some of the things that are not at issue

2011.01.07 Trial Transcript Day 4  1/7/2011  3:42:00 PM

761

1  in the case, like the approval process or work process flow,

2  that's fine.

3  A   Okay.  All right, Mike, let's begin.  We launch the

4  browser and go to the portal.  We've seen the login before.

5  We're at the home page, and we'll go to requisition

6  self-service and choose shopping.  Find/shop tab, and from that

7  drop-down menu we choose the categories.  You saw these

8  high-level segment categories before.

9     Stop.  This time, you will notice there are more of them,

10  and that's because additional data was loaded in this version

11  of the demonstration.

12     Okay, in the middle of that list is lighting and

13  electrical accessories and supplies, so I'll scroll down the

14  list and go back and choose that high level segment category.

15  Continue.

16     So here's our second level, lamps and light bulbs; our

17  third level, lamps; and our fourth level, which is the

18  commodity, that is halogen lamps.  So stop.  So now we have a

19  list of all the items in the database that are halogen lamps.

20  Continue.

21     We scroll through the list, choose one, and this is a

22  lamp -- stop.  This is a lamp.  So that we can remember what it

23  is, it's a 120-watt halogen lamp, and it's available from the

24  vendor ^ Granger.  Continue.  Add that to my shopping cart.  Go

25  back.  Scroll through the list, choose another lamp, drill down

762

1  on that, stop.

2     And so that we can tell the difference, this one is a

3  150-watt lamp.  So I've done some comparison shopping here.  I

4  have searched by categories.  I found a number of lamps which

5  are generally equivalent.  I chose one, a 120-watt one, and now

6  I change my mind, and I'm going to choose the 150-watt lamp.

7     Notice that this is available from a different vendor.

8  This one is from ^ Gexpro.  Continue.  So I add it to my

9  shopping cart.  There it is at the top, and I delete the

10  120-watt lamp at the bottom of the shopping cart.

11     So I'll go back to the drop-down menu, and now I'll do

12  Punchout.  I'll punch out to Dell.

13  Q   Let me just stop you there.  You went to an internal

14  catalog database?

15  A   The first halogen lamps that we saw were all in the

16  internal database.

17  Q   And now you're going to an external catalog database?

18  A   This is the external catalog at the special Dell site.

19  Q   So the Lawson system has the ability to both search the

20  internal catalog database and add items to a requisition, and

21  then it can also, in the same process, punch out and go to an

22  external catalog database in order to search a catalog and

23  retrieve items?

24  A   That's right.

25  Q   Is that what you are illustrating?

763

1  A   That's what we're illustrating here.  Okay, so continue.

2  So we punch out to Dell, go full screen and shop by brand.  So

3  at the Dell site, we'll see a list of brands, of products that

4  they carry, and it's a long list.

5     We'll just quickly scroll through some of it, and we'll

6  shop by Kensington brand.  So here are some Kensington

7  products.  I'll look for carrying cases.  So I want a case for

8  my laptop.  I'll scroll through these, look at a second page,

9  choose this one, a counterbalance laptop roller.  Stop.

10  Q   Let me ask you this, Dr. Weaver, while you stopped:  Are

11  we actually at the Dell commercially available website?

12  A   No.  This is the special Dell site that's been created for

13  this customer.

14     THE COURT:  Dell or Kensington?

15     THE WITNESS:  Dell is the site, and Kensington is the

16  brand of carrying case that Dell is selling.

17     THE COURT:  Dell sells Dell and others including

18  Kensington, and they are on this site.

19     THE WITNESS:  Dell sells, of course, many items and

20  many brands, but they are all on the Dell site, yes.

21  Q   How do we know that this is the Dell site?  I see it also

22  has the Lawson logo at the top.  What are we seeing here that

23  tells us we're not at the Dell commercially available site but

24  rather some site that Lawson is making available to the

25  customer?

764

1  A   When we look at that URL, universal resource locator web

2  address at the top, we start at the

3  lsfserver.corpnet.lawson.com.

4  Q   LSF, does that stand for Lawson System Foundation server?

5  A   Yes, it does.

6  Q   That's the foundational software that's necessary to have

7  this S3 procurement software run on top of?

8  A   Right.  That was the bottom yellow block in my

9  demonstrative.  Then as we look to the right of that, we see

10  we're being redirected to this special website which is

11  signin.dell.com/dellogin/port.  I'm sorry, that was portal,

12  /login.ASPX.  So this is running software that loads this Dell

13  site.

14     So we have now gone to the Kensington counterbalance

15  laptop roller, but in looking at the catalog description, it

16  says, temporarily out of stock, please check back soon.  So I

17  need my cases sooner than that, so I'm going to get a different

18  laptop case.  So, continue.

19     So I'll go up to rollers.  So in the special Dell site,

20  I'm looking at roller cases.  Here is one from Case Logic, so I

21  drill down on that.  Stop.  So now I have the description, I

22  have the manufacturer part number, I have the Dell part number,

23  I have the UNSPSC code that I used, and now that I look at the

24  information on availability, it says usually ships within

25  24 hours.  So this case is available in inventory as opposed to

765

1   the previous one that was not.  So this case is satisfactory,
2   so I'll choose this one.  So continue.
3       I'll add it to my Dell shopping cart.  So here's that
4   description.  I'll change the quantity to three.  I'll create
5   the order, and I'll do the trade compliance.  Continue.  So
6   here we have the verify and submit.  So there is my case,
7   quantity three.  That's all right, so I'll submit the order.
8       Stop.  So now that I've submitted that order, I have
9   checked out of the Dell site, and here in my Lawson shopping
10  cart I have three roller cases and one incandescent halogen
11  lamp.  Continue.  So I'm going to check out.  I guess I'm going
12  to look at the lamp again.  Okay.
13      So here is the detail on the lamp, and -- stop.  If you
14  will recall, this one came from Gexpro.  Continue, and I'll
15  look at the detail on the laptop cases.  So there's my rolling
16  laptop case, and this comes from the Punchout site, from Dell
17  computer.
18      All right.  So I'm satisfied with this, so I check out,
19  and now this is saving the Lawson shopping cart into temporary
20  storage where I can turn it into a requisition and then into a
21  purchase order.  So back to the portal.  You've seen the
22  approval before.  I find my requisition number 940.  There's my
23  halogen lamp and my three roller cases, so I approve that.
24  Then I'll run that PO 100 program.
25      I give it a job description, I fill in this required

766

1   information.  Don't need the filters.  Now we'll submit this
2   job.  The job name RQ 940 is running.  I go to the print
3   manager, I get the requisition -- the purchase order and --
4   stop.
5       Here at the top of the purchase order we have the
6   information on the buyer, Metropolis Medical Center.  Continue.
7       Stop.  So here is our roller laptop case, quantity three
8   coming from Dell Computer, purchase order released.  Continue.
9   Stop.  And so here then is our second item, the incandescent
10  halogen lamp.  It's coming from Gexpro, quantity one, PO
11  released, and the report is complete, two purchase orders
12  created.  That's the end.
13  Q   Doctor, in this process in which you searched among
14  product catalogs and an internal catalog database, and you went
15  to an external catalog database at the Lawson Punchout partner
16  Dell, at any time, have you left the Lawson system while doing
17  that?
18  A   Never.
19  Q   Now, Doctor, you talked a little bit about the UNSPSC
20  classification coding yesterday for finding items of general
21  equivalents that could be substituted for each other; you are
22  familiar with that?
23  A   Yes.
24  Q   I don't want to go through the whole segment and family
25  and class and commodity code again, but I do want to ask you --

767

1   you may have touched on this yesterday, but is there a module
2   that Lawson provides that permits you to -- a program that
3   permits you to automatically upload that UNSPSC classification
4   schema?
5   A   Yes, there is.
6   Q   What inventory module -- excuse me.  What module does that
7   come with?
8   A   Inventory control.
9   Q   Is that one of the core modules that you have to have in
10  order to do this procurement process?
11  A   Right.  It's one of the three in my blue box.
12  Q   Does Lawson tell the customers where it can obtain these
13  codes?
14  A   Yes.  It tells you the website to go to.
15  Q   And does Lawson have a program in that inventory control
16  where you can automatically download those?
17  A   Yes, it does.
18  Q   I'd like you -- well, let me as you this:  Have you
19  reviewed documents explaining how these UNSPSC codes work in
20  the procurement process?
21  A   I certainly have.
22  Q   Could I ask you to go to Plaintiff's Exhibit Number 11
23  which is in volume one?  Now, at the top of this, there's an
24  organization called Grenada Research; do you see that?
25  A   I do.

768

1   Q   Is that associated with Lawson in any way?
2   A   No.
3   Q   So this is some independent third party who is going to
4   tells us about using UNSPSC coding?
5   A   That's right.
6   Q   It's called a white paper.  What's a white paper, if you
7   know?
8   A   A white paper is a statement of position, so it's what you
9   know or what you think about a subject.  It's intended to
10  educate.
11  Q   Underneath there, there's a -- what does it say as to
12  these UNSPSC codes?
13  A   So the white -- the topic of the white paper is why coding
14  and classifying products is critical to success in electronic
15  commerce.
16  Q   Can you go to page five of this exhibit.  There's a
17  heading right in the middle called, for finding and purchasing;
18  do you see that?
19  A   I do.
20  Q   There's a table that says, classifying products and
21  services supports procurement activities; do you see that?
22  A   I do.
23  Q   Do you agree with that statement?
24  A   Yes.
25  Q   And there is a pros and cons.  Do you see that?

769

```
 1    A  I do.
 2    Q  What is one of the pros that Grenada Research identifies
 3    here?
 4    A  So the first one, enables buyers and employee
 5    requisitioners to find all suppliers of a given category.
 6    Q  Is there a con?
 7    A  Yes.  Requires up-front effort to apply codes, can be done
 8    by third party.
 9    Q  And have you seen -- is this the Lawson that says its
10    customers will provides that service?
11    A  Yes.
12    Q  Underneath that table, there is a heading called product
13    discovery?
14    A  Yes.
15    Q  What, if any, significance does this have to your opinions
16    with respect to how the UNSPSC assists buyers and
17    requisitioners to find suppliers in a given category?
18    A  The first two sentences are relevant.  A common naming
19    conventional allows computer systems to automatically list
20    similar products under a single category.  When a person is
21    searching for the category, he or she finds precisely the
22    things being discovered and nothing else.
23    Q  Can you turn to page ten of the document which ends with a
24    Bates label 041.  And there's a heading called unique item
25    codes for schema modifications and multi-language uses.
```

770

```
 1    A  Yes.
 2    Q  And at the end, I don't want to have to go through this
 3    entire paragraph -- the jury is going to have this in the jury
 4    room -- but what, of significance, in that paragraph would you
 5    like to point out?
 6    A  In the fourth paragraph, it's the last sentence which
 7    says, in effect, unique numbers allow cross-referencing to
 8    assure consistency.
 9    Q  Is cross-referencing relevant in this case?
10    A  Yes.  That's a term in the patent.
11    Q  Is it a term that the Court's described in its glossary of
12    terms?
13    A  Yes, it is.
14    Q  Why don't you go to that if you could for a second.  Cross
15    reference table, do you see the Court defined that?
16    A  It's the third one down.
17    Q  It says, the Court's construction is a table that links
18    vendor items determined to be equivalent between two or more
19    different vendors.  Do you see that?
20    A  I do.
21    Q  Does this UNSPSC hierarchical schema permit the
22    cross-referencing capability the Judge has defined there?
23    A  Yes, it does.
24    Q  Turn to page 13 of the document for now, and just I want
25    to focus on that hierarchy.  Is this -- this has the segment,
```

771

```
 1    the family, the class, and the commodity for office equipment
 2    going down to pen refills.  Is this the same kind of example
 3    you gave yesterday with how, in effect, this eight-digit coding
 4    can drill down to get you to a specific product that you want?
 5    A  Yes, it is.  The example we used yesterday went down to
 6    black pens.  This was a different class, so it ends up with a
 7    different commodity, but it's the same schema.
 8    Q  Why don't you go, then, to page 12 on this exhibit, and if
 9    we could, just the chart.  So, again, this is describing the
10    levels of the UNSPSC -- actually, this even has one additional
11    level down there.  Do you see this business function?
12    A  Yes.
13    Q  What does it say by the time you get down to the commodity
14    level, that last level?  What does it say with regard to what
15    you can now do with this tool in order to identify product or
16    service?  How does it characterize it?
17    A  What it says, by the time you've gotten down to the
18    commodity level, you have found a group of substitutable
19    products or services, and we just saw that with the halogen
20    lamps.
21    Q  Doctor, your opinion, if the parts are substitutable,
22    would they be similar or generally equivalent?
23    A  Yes, they would.
24    Q  Thank you, Doctor.  That is all I have with respect to
25    that document.
```

772

```
 1        THE COURT:  Is that 111 or 11?
 2        MR. ROBERTSON:  11, sir.  I may have misspoken.
 3        THE COURT:  No, I didn't write it down.
 4    Q  Doctor, I'd like to talk to you a little bit now about
 5    what's known as indirect infringement.  You are familiar with
 6    that concept?
 7    A  Yes.
 8    Q  You understand that ePlus is also accusing Lawson of
 9    inducing infringement of the patent claims in this case by
10    encouraging, aiding, abetting, or assisting its customers to
11    directly infringe the method claims at issue in this case?
12    A  Yes, I understand.
13    Q  What evidence have you reviewed with respect to whether or
14    not Lawson does, in fact, encourage, assist, urge, aid, or abet
15    its customers to use the Lawson systems in a manner that are
16    covered by ePlus's claims?
17    A  Well, we saw yesterday that there were training courses
18    that were being offered.  We looked at one which was the notes
19    for a training session, but there are live training sessions,
20    there are archived on-line training sessions that you can play
21    back.  There are live training sessions that are using an
22    interactive tool so that you can watch a training session and
23    participate in it.
24        We know from testimony of both the Lawson witnesses and
25    their customers that Lawson provides consulting services to
```

773

1   help with things like the data migration that we talked about
2   moments ago. Lawson maintains a help website where customers
3   can go to find documents or to get answers to frequently asked
4   questions.
5       We know that Lawson has partnerships with some companies
6   that provide multiple vendor catalogs. One of those is the
7   Global Health Exchange. So this helps their customers find
8   more items that they might want to purchase, and then as you've
9   seen already, there's voluminous documentation that Lawson
10  provided to its customers about how to use its software
11  products.
12  Q   Will they install, build, configure, maintain, and service
13  those systems?
14  A   They will.
15  Q   Does Lawson provide on-demand online courses?
16  A   Yes, they do.
17  Q   Will they perform product simulation training for you?
18  A   Yes, they will.
19  Q   Do they have interactive webcast training?
20  A   Yes, they do.
21  Q   Do they provide virtual labs where students can interact
22  with a simulation system?
23  A   Yes, they do.
24  Q   Do they offer courses in how to do the electronic
25  procurement?

774

1   A   They do.
2   Q   Do they provide manuals and guides to the customers to
3   train them how to set up the S3 item master and add item data?
4   A   Yes.
5   Q   Do we see something about, or are you familiar with
6   courses explaining how to import vendor agreements?
7   A   Yes, we saw that.
8   Q   Do they have a website you can go to if you have any
9   questions?
10  A   Yes, a help website.
11  Q   Do they provide answers to frequently asked questions of
12  their customers?
13  A   They do. We saw one.
14  Q   Are you aware of any kind of technical support tools that
15  Lawson provides to its customers?
16  A   Yes.
17  Q   Are you familiar with a case management and problem
18  management tool?
19  A   Yes.
20  Q   What kind of technical support do they provide, if you're
21  aware?
22  A   If the customer wants them to assist with creating a new
23  system, which most customers do, we saw that in the frequently
24  answered questions, then Lawson support personnel will go to
25  the customer site and help them convert from an old system to a

775

1   new system or just install a new system.
2       So they'll do whatever the customer needs to get a new
3   system up and running. And Lawson will even host the entire
4   system for the customer, that is provide the hardware and
5   software and then train the customers about how to use the
6   Lawson system even if it's running at the Lawson site.
7   Q   So when you say host the system, that is the customer
8   doesn't have to actually have the software implemented on its
9   computer servers; Lawson will have it loaded there, and the
10  customer can go to the Lawson system and use it?
11  A   That's right. Yeah. The customer doesn't have to
12  actually have any of the hardware or software. All of that can
13  be run from Lawson-owned and managed and maintained computers.
14  Q   So when Lawson is hosting that software, is it performing
15  the method claims that are at issue?
16  A   Yes, it is.
17  Q   Doctor, when Lawson sells a system that has those core
18  procurement modules you identified, inventory control,
19  requisitions, and purchase order, and the prerequisite modules
20  you identified being the Lawson System Foundation and process
21  flow -- can you put up those two -- yellow and blue box, and
22  there are at least two vendor catalogs either loaded, or
23  through the Punchout system available in the databases, does
24  that system have any substantial non-infringing use?
25  A   No. The suite is intended for one purpose, and that's to

776

1   do the kind of procurement that we've been discussing now for
2   more than a day.
3   Q   And then when Lawson sells a system that has each of these
4   foundation and these three core modules that make up an
5   infringing system, plus the requisition self-service
6   application on top of that which makes it more user-friendly as
7   I think you identified --
8   A   Right.
9   Q   -- and there are loaded at least two vendor catalogs,
10  either external or combined with an internal -- let me rephrase
11  that. Let me start over.
12      When you have this requisition self-service loaded on top
13  of these core modules to make it more user-friendly, and when
14  you have available to you either at least two internal catalogs
15  or an internal catalog and at least one external catalog that
16  can be accessed, does that system have any substantial
17  non-infringing use?
18  A   No.
19  Q   We have those three core procurement modules, the
20  requisition self-service and the Punchout procurement
21  application, and available to us at least two product catalogs,
22  does that system have any substantial non-infringing use?
23  A   No.
24  Q   If you would just again for me, I'd like to just confirm
25  the three different scenarios that you have given opinions on

777

1   with respect to what forms an infringing system.

2   A   All right.

3   Q   Maybe you want to identify them by circling or whatever on

4   the touch screen.

5   A   Okay.

6   Q   So --

7   A   Waiting on me, okay.

8   Q   What is the first core infringing system?

9   A   That was this one, the three, S3 procurement modules,

10  purchase order requisitions, and inventory control running on

11  top of the Lawson system foundation and process flow.  The

12  second one was to add requisition self-service.

13      So that was the user-friendly overlay on top of the

14  requisition module itself, and the third one here was

15  procurement Punchout.  Your Honor, I see what you mean about

16  the Ps.  The.

17      THE COURT:  Not all of them, though.  I'm sorry, but

18  I have asked to see if they can do something about it, but I

19  think it will only help the next case, not us.  It's nothing

20  you're doing wrong.  Just one of those things that happens.

21      THE WITNESS:  That's curious.  So the third one is to

22  add the procurement Punchout which is how you get access to

23  those external sites like Dell and Staples.

24  Q   When I add the electronic interchange on top of that, is

25  that still an infringing configuration?

778

1   A   It is, because even if we have just this much, we have the

2   requisitions module that can talk to EDI to do the purchase

3   orders and to get the purchase order acknowledgements.

4   Q   Just so we're clear, can you remove the Punchout?  Now,

5   this is an infringing configuration.  Does it become

6   non-infringing by adding those additional modules?

7   A   It does not.

8   Q   So, Doctor, I'd like to talk to you now about your

9   ultimate opinions with respect to infringement in this case.

10  Are you prepared to do that?

11  A   Sure.

12  Q   First I'd like to start with claim three of the '683

13  patent.  You are aware, Doctor, and understand that ePlus is

14  accusing Lawson of directly infringing claim three by making,

15  using, selling, and offering to sell or importing systems that

16  directly infringe this claim?

17  A   Yes.

18  Q   Do you have an opinion as to whether or not Lawson

19  directly infringes this claim by doing all those things and

20  offering a system that's capable of including at least two

21  product catalogs containing data relating to items associated

22  with their respective sources?

23  A   Yes, I believe they do.

24  Q   Have we seen examples of multiple product catalogs that

25  can be imported into a system database or accessed via Punchout

779

1   and that Lawson software includes various catalog import

2   utilities?

3   A   Yes.  We saw that in my most recent demonstration where we

4   had multiple vendor catalogs for the lamps, and then we did the

5   Punchout, and we had access to Dell and Staples.

6   Q   The first introductory preamble here says that claim three

7   has to be an electronic sourcing system.  Do you see that?

8   A   Yes.

9   Q   Do you know whether the Judge has construed the term

10  electronic sourcing system?

11  A   Yes.

12  Q   What has the Judge indicated an electronic sourcing system

13  is?

14  A   An electronic system for use by a prospective buyer to

15  locate and find items to purchase from sources, suppliers, or

16  vendors.

17  Q   Do you have an opinion as to whether or not the accused

18  Lawson system here satisfies that claim element?

19  A   It does.

20  Q   The next element is at least two product catalogs

21  containing -- I'm sorry.  You probably already did that one.

22  Did you satisfy -- did Lawson satisfy direct infringement for

23  this electronic sourcing system, and you said yes.

24  A   Yes.

25  Q   Does Lawson provide to its customers an electronic

780

1   sourcing system in your opinion?

2   A   Yes.

3   Q   And I think you've already answered the question with

4   respect to that Lawson provides or permits access to and

5   provides services that provide at least two product catalogs

6   containing data relating to items associated with their

7   respective sources; is that right?

8   A   That's right --

9       MR. McDONALD:  Object to the form of that question,

10  Your Honor.

11      MR. ROBERTSON:  I'll rephrase.

12  Q   Does Lawson directly infringe the second claim element?

13  A   Yes.

14  Q   Satisfies it when -- does it satisfy it?

15  A   Yes.

16  Q   Okay.  And do they assist, aid, abet, or encourage or urge

17  their customers to do the same?

18  A   Sure, when they license these software modules.

19  Q   Do you have an opinion as to whether or not Lawson's

20  systems, the accused systems provide a means for selecting the

21  product catalogs to search?

22  A   They do.

23  Q   And what evidence have we seen for that?

24  A   We know that there is a user interface that allows the

25  user to either select one catalog and then serially to select

789

1    they use the system with that capability?

2    A    Yes.

3    Q    Go to claim 29. This is a dependent claim; correct,

4    Doctor?

5    A    Yes, it is.

6    Q    So this dependent claim has to have all the steps that you

7    just indicated were present in claim 28 plus the additional

8    step of determining whether selective matching items available

9    in inventory; do you see that?

10   A    I do.

11   Q    What is your opinion with respect to direct infringement

12   and indirect infringement as to this dependent claim 29?

13   A    I believe that Lawson is a direct infringer and an

14   indirect infringer.  We just saw with claim 28 that we went all

15   the way through the converting process, and in the demo that I

16   just showed you, we did both the conversion with the UNSPSC

17   codes, and then we did the determination of whether or not it

18   was available in inventory when we did the laptop roller cases.

19   Q    And by providing this capability to its customers, is

20   Lawson encouraging aiding, abetting, or assisting them in

21   performing this step?

22   A    Yes.

23   Q    Let's go to claim one of the '172, if we can, please.

24   That's also an electronic sourcing system.

25        THE COURT:  That's tab four in your books, ladies and

790

1    gentlemen.

2    Q    Now, this also starts out with a preamble, an electronic

3    sourcing system comprising; do you see that?

4    A    Yes.

5    Q    Did you apply the same definition that the Court gave for

6    that?

7    A    I did.

8    Q    Both for direct and indirect infringement?

9    A    Yes.

10   Q    This is a system claim, so this involves the system or the

11   product we're talking about here; is that right?

12   A    That's right.

13   Q    By providing a system capable of performing all of the

14   structures disclosed here, do you have an opinion, first, as to

15   whether or not Lawson provides a database containing data

16   relating to items associated with at least two vendors

17   maintained so that selected portions of the database may be

18   searched separately?

19        MR. McDONALD:  Object to the form of the question,

20   Your Honor.  He said something about capable of performing some

21   structures or something.  I think it's ambiguous as to what

22   that means.

23        THE COURT:  I don't see structures in there.

24        MR. ROBERTSON:  I will rephrase the question, Your

25   Honor.

791

1    Q    Does the Lawson system, as -- is the Lawson system capable

2    of providing a database containing data relating to items

3    associated with at least two vendors maintained so that

4    selected portions of the database may be searched separately?

5        MR. McDONALD:  I object to the form of the question,

6    Your Honor.  The element doesn't say capable of.  It says a

7    database.

8        THE COURT:  He's objected to the form of the

9    question.

10       MR. ROBERTSON:  The law is, Your Honor, all they have

11   to do is provide a system that's capable of doing that.  So I

12   think the objection is not well-taken.

13       THE COURT:  Anything else?

14       MR. McDONALD:  There's a distinction I'm making

15   between the database versus function.  Capable of performing a

16   function is one thing.  Having a database is another.

17       THE COURT:  I think they're two different questions.

18   I think the first question is, does it have a database.  If it

19   doesn't, then you have to say something else.  Your objection

20   is sustained to the form of the question.

21   Q    Does the Lawson system have a database containing data

22   relating to items associated with at least two vendors

23   maintained so that selected portions of the database maybe

24   searched separately?

25   A    Yes.  We saw the database in the item master and the

792

1    vendor item table, and selecting portions of the database to be

2    searched separately was done by the search index.

3    Q    Have we seen examples where Lawson has implemented

4    scenarios in which they have provided vendor data for their

5    customers?

6    A    Yes.

7    Q    Have we seen examples where they do what you identified as

8    data migration of the customer's catalog data to the new Lawson

9    system?

10   A    We saw that in the statement of work.

11   Q    Is the Lawson system capable of containing data relating

12   to items associated with at least two vendors maintained so

13   that selected portions of the database may be searched

14   separately?

15   A    Yes.

16   Q    Did Lawson assist, aid, abet, or encourage its customers

17   to maintain a database that would satisfy the first claim

18   element?

19   A    Yes.

20   Q    These next five elements are means-plus-function claim

21   elements.  You are familiar with that?

22   A    I am.

23   Q    The Court's construed these claim elements.  You've

24   reviewed those constructions; is that right?

25   A    Yes.

797

1  let's go through direct infringement first and identify which
2  system infringes which claim.
3  A   Okay.
4  Q   And in each of these system configurations, do you have an
5  opinion as to whether or not all five satisfy the preamble that
6  they are electronic sourcing systems as defined by the Judge?
7  A   Yes, all five.
8  Q   In each of these configurations, does Lawson provide an
9  accused system, all five system that's capable of having at
10  least two product catalogs containing data related to items and
11  items associated with respect to sources?
12  A   Yes.
13  Q   In each of these scenarios, does all five systems, do they
14  provide the means for selecting a product catalog to search?
15  A   Yes.
16  Q   In each of these systems, do they provide means for
17  searching for matching items among the selected product
18  catalogs?
19  A   Yes.
20  Q   In each of these systems, have we seen evidence that shows
21  that they have the means for building a requisition using data
22  relating to selected matching item and their associated
23  sources?
24  A   Yes.
25  Q   In each of these five system that we've identified, does

798

1  it have the means for processing the requisition to generate
2  one or more purchase orders for the selected matching items?
3  A   Yes.
4  Q   Which of the five systems have we seen have the ability
5  for converting data relating to a selected matching item and
6  associated source to data relating to an item and a different
7  source?
8  A   The ones that contain the requisition self-service module.
9  Q   So if it had the requisition self-service module, that
10  would be able to satisfy this last claim element?
11  A   Yes.
12  Q   So that would be system, two, three, four, and five as we
13  defined them; is that right?
14  A   That's what my diagram says, yes.
15  Q   For each of these elements, does Lawson encourage, aid,
16  abet, or assist their customers to satisfy them?
17  A   Yes.
18  Q   These two product catalogs, have we seen instances where
19  Lawson will make catalogs available, multiple catalogs
20  available to their customers either through external, Punchout
21  catalogs, or internal catalog databases?
22  A   Yes, we have.
23  Q   Let's go to claim 26 if we can.  Let's do that.  If we can
24  put claim 26 next to claim 28, put those side by side.  They're
25  a little difficult to read, but can you confirm for me, Doctor,

799

1  that both of these are method claims?
2  A   That's correct.
3  Q   And both of these have -- the first five elements are
4  identical?
5  A   They are.
6  Q   Now, earlier you said the direct infringement, I
7  understood your opinion to be, would be by the customers
8  performing the steps of this method claim as well as Lawson
9  when it hosts a system that can perform the steps of these
10  claims; is that right?
11  A   That's correct.
12  Q   So do you have an opinion as to whether or not customers
13  can perform the step of maintaining at least two product
14  catalogs on a database containing data relating to items
15  associated with the respective sources?
16  A   Yes, all of the systems do that.
17  Q   Okay, all five?
18  A   All five.
19  Q   Now, the same for claim 28, do you have an opinion as to
20  whether or not customers, using all five of the systems as they
21  are configured and defined, can select or -- can perform the
22  steps of selecting product catalogs to search?
23  A   Yes, they can.
24  Q   Now, that would be the same for both claim 26 and 28?
25  A   Yes, it's the same.

800

1  Q   All right.  The next step in these method claims is
2  searching for matching items among the selected product
3  catalogs.  Do you see that?
4  A   I do.
5  Q   That's for both claim 26 and claim 28?
6  A   Correct.
7  Q   We see the ability to search for matching items among the
8  selected product catalogs in evidence you offered?
9  A   Yes.  We saw it in the demonstrations.
10  Q   Did we see it in documentation?
11  A   Certainly.
12  Q   That would be for both claims?
13  A   For both claims.
14  Q   Does all five of the accused Lawson systems have the
15  ability to, capability of building a requisition using data
16  relating to selected matching items and their associated
17  sources?
18  A   Yes.
19  Q   Can the customers perform that step with all five
20  configurations that we've defined?
21  A   Yes.
22  Q   The next step is processing requisition to generate one or
23  more purchase orders for the selected matching items.  Did we
24  see that step could be performed in the demonstrations?
25  A   We saw it in the demonstrations.

801

1   Q   Can that be performed for all five of their configurations

2   as we've defined them?

3   A   Yes, it can.

4   Q   Is there indirect infringement of that as well?

5   A   Yes.

6   Q   That would be for both claim 26 and claim 28?

7   A   Correct.

8   Q   Is that because the step there --

9   A   Because it's identical.

10  Q   Now, the next and last step in claim 26 is determining

11  whether a selected matching item is available in inventory.

12  Which of the five configurations of these accused Lawson

13  systems has the capability of performing that step?

14  A   It's, it would be the system that we called system three

15  which was Punchout, requisition self-service, the procurement

16  modules, and the platform; system four, which was the EDI

17  module on top of the procurement system on top of the platform;

18  and system five, which had Punchout, requisition self-service,

19  electronic data interchange, the procurement modules, and the

20  platform.

21  Q   Do you have an opinion as to whether or not Lawson

22  indirectly infringes that claim as well?

23  A   Yes, I believe they do.

24  Q   How do they do that?

25  A   By providing those training courses, that assistance,

802

1   those manuals, online training, professional services.

2   Q   The last element of claim 28, is this converting-data

3   element that had to do with the ability to find a selected

4   matching item and an associated source and relating it to data

5   relating to an item in a different source; do you see that?

6   A   I do.

7   Q   What systems, in your opinion, satisfy that claim element?

8   A   The ones containing the requisition self-service module

9   which would be two, three, and five.

10  Q   Does four have a requisition self-service module?

11  A   No.

12      THE COURT:  Four is core plus EDI.

13      MR. ROBERTSON:  I apologize.

14  Q   All right.  Do you have an opinion as to whether or not

15  they indirectly infringe claim 28 in the same manner they

16  infringe claim 26?

17  A   Yes.

18      THE COURT:  And is the answer that they do or they

19  don't?

20      THE WITNESS:  The answer is that they do.

21      MR. ROBERTSON:  Thank you, Your Honor.

22  Q   Claim 29, this was that dependent claim that depends from

23  claim 28; correct?

24  A   Correct.

25  Q   So in order to infringe claim 29, you have to satisfy all

803

1   of the elements of the method claim of claim 28 in order to

2   infringe claim 29; is that right?

3   A   Right.

4   Q   So you have to be able to perform that converting-data

5   step to find items associated with one source and items

6   associated with another source; correct?

7   A   Right.

8   Q   Then to infringe this claim, you'd also be able to have to

9   take that system and have a step of determining whether a

10  selected matching item is available in inventory; is that

11  correct?

12  A   Correct.

13  Q   Which of the systems, as we've identified them, would

14  infringe or directly infringe claim 29?

15  A   Three and five.

16  Q   Why is that?

17  A   Because they contain the Punchout module that lets us

18  check inventory externally, the requisition self-service that

19  allows us to do the conversion using those UNSPSC codes, and

20  system five also had the EDI module which was the purchase

21  order and purchase order acknowledgment exchange.

22  Q   And does Lawson indirectly infringe claim 29 by assisting,

23  aiding, abetting, encouraging its customers to perform this

24  method step?

25  A   Yes.

804

1   Q   And do they also indirectly -- actually, strike that.  I

2   think we're done with claim 29.  Why don't we go to claim one

3   of the '172 patent.  Again, this is an electronic sourcing

4   system.  Do you see that?

5   A   Yes.

6   Q   Now, it also uses the term comprising as all these claims

7   have used.  Would you just refresh the jury as to what your

8   understanding is of the term comprising?

9   A   Comprising means including but not limited to.

10  Q   So we're going to have to have all of these elements, but

11  we could have additional elements, and that would make it

12  non-infringing; is that right?  All the elements here are

13  satisfied?

14  A   Correct.

15  Q   So, for example, in your demonstrations, there was some

16  steps in which you had to seek certain approvals from managers

17  or technical people in order to be able to complete the

18  requisition and purchase order process?

19  A   Right, but that's irrelevant to this claim.

20      THE COURT:  Your opinion, they infringe all five

21  systems or infringement -- if there's infringement, the mere

22  fact that there is the process of going to the managers, et

23  cetera, doesn't change the fact that they infringe if you

24  conclude there's infringement, and that is the way --

25      THE WITNESS:  Yes, it is.

817

WEAVER - DIRECT      817

1   containing data relating to items associated with at
2   least two vendors maintained so that selected portions
3   of the database may be searched separately?
4   A  Yes, they do.
5   Q  And in your opinion by the acts that we have
6   described does Lawson satisfy that element for
7   indirect infringement?
8   A  Yes.
9   Q  Do configurations 2, 3 and 5 have means for
10  entering product information that at least partially
11  describes at least one desired item?
12  A  Yes, 2, 3 and 5, they do.
13  Q  Do 2, 3 and 5 satisfy the element of means for
14  searching for matching items that matched the entered
15  product information in the selected portions of the
16  database?
17  A  They do.
18  Q  How did we see that?
19  A  Because of the user interface that we saw in the
20  requisition self service.
21  Q  And we saw that in your demonstrations?
22  A  Sure, we did.
23  Q  Do configurations 2, 3 and 5 have means for
24  generating an order list that includes at least one
25  matching item selected by said means for searching?

818

WEAVER - DIRECT      818

1   A  They do.
2   Q  Is it that RSS module that provides that order
3   list or shopping cart as you referred to it?
4   A  Yes, the RSS is where the shopping cart
5   functionality resides.
6   Q  Do configurations 2, 3 and 5 of the accused Lawson
7   systems have a means for building a requisition that
8   uses data obtained from said database related to
9   selected matching items on said order list?
10  A  They do.
11  Q  Do configurations 2, 3 and 5 have a means for
12  processing said requisition to generate purchase
13  orders for said selected matching items?
14  A  They do. We saw that in the demo.
15  Q  The searching that's the subject of the means for
16  searching which permits you to search a database,
17  selected portions of a database, what evidence did we
18  see that that was present?
19  A  That was the search index that selected only --
20  that searched only selected portions of the database.
21  Q  Now, if Lawson provides such an electronic
22  sourcing system to its customers and assists them in
23  implementation, maintenance, servicing and all the
24  training materials, guides, manuals, online services,
25  etc., do you have an opinion as to whether or not all

819

WEAVER - DIRECT      819

1   these remaining elements are indirectly infringed by
2   Lawson by providing those services?
3   A  My opinion is that they do.
4   Q  Why don't we go to the claims of the '516 patent.
5   And that's behind tab 3 in the jurors' notebook.  The
6   first claim we're going to talk about there is Claim
7   One.  And, again, the preamble says it's an electronic
8   sourcing system.  Do you see that?
9   A  Yes.
10  Q  And the Court has defined that.  It's the same for
11  Claim One, for example, of the '172 patent.  Is it
12  your opinion that all five configurations that are
13  accused here are electronic sourcing systems as the
14  Court has defined them?
15  A  Yes.
16  Q  This electronic sourcing system also comprises a
17  collection of catalogs of items stored in electronic
18  format.  Do all five configurations, as we have
19  defined them, satisfy that claim element?
20  A  Right, all five have multiple electronic
21  catalogs, and when you add Punchout, you can add
22  external catalogs as well.
23  Q  Do all five configurations of these accused Lawson
24  systems as we've defined them satisfy the claim
25  element of having a first set of predetermined

820

WEAVER - DIRECT      820

1   criteria associated with said collection of catalogs?
2   A  Yes, they do.
3   Q  What evidence do we see for that?
4   A  We saw in my demonstration that you could enter an
5   item number, or vendor item, manufacturer number.  You
6   have a text box in the user interface that allowed
7   that.
8   Q  Do all five configurations of the accused Lawson
9   systems as we've defined them a second set of
10  predetermined criteria associated with items from each
11  of said catalogs?
12  A  Yes, they do.
13  Q  How do they do that?
14  A  Again, that's the text box.
15  Q  Do all five configurations have a catalog
16  selection protocol, said catalog selection protocol
17  relying on said first set of predetermined criteria to
18  select less than said entire collection of catalogs,
19  including a matching vendor identification code with a
20  subset of said collection of catalogs wherein said
21  subset of catalogs includes both a vendor catalog from
22  a predetermined vendor and a second catalog from a
23  predetermined third party that's one of a manufacturer
24  and a competing vendor, said predetermined third party
25  selling items corresponding to items in said vendor

821

WEAVER - DIRECT     821

1    catalog?

2    A   That's a mouthful, isn't it?  The answer is yes.

3    And we saw that yesterday when I did the demonstration

4    where I first searched for Dell and got back items

5    that included Dell as one of these keywords.  So that

6    was my first predetermined criteria.

7        And then I added a second predetermined criteria,

8    the Dimension 8100, and that narrowed the search down

9    to just two items, but they were from different

10   vendors, Dell and Diablo.  So one of them was a

11   competing vendor.  Dell is a manufacturer.  Dell is a

12   competing vendor.

13       So, yes, we've seen evidence that these systems

14   that we're talking about directly infringe the fourth

15   element of Claim One.

16   Q   The last element of Claim One of the '516 patent

17   is a search program.  Said search program relying on

18   said second set of criteria to select specific items

19   from said catalogs determined from said catalog

20   selection protocol.  Did I read that correctly?

21   A   I think so.  Again, we saw that yesterday in the

22   demonstration where Dimension 8100 was the second set

23   of predetermined criteria.

24   Q   Did you use that second set of predetermined

25   criteria to conduct the search?

822

WEAVER - DIRECT     822

1    A   Yes, I did.

2    Q   So do all five configurations of the accused

3    systems as we've defined them satisfy all of the

4    elements of Claim One of the '516 patent?

5    A   Yes, they do.

6    Q   If Lawson offers all five of those configurations,

7    manufacturers, sells or imports, do they directly

8    infringe this claim?

9    A   Yes, they would.

10   Q   And in the same manner, if they provide such a

11   system to their customers and then induce them to use

12   that system by the evidence that you've offered of

13   assisting, aiding, abetting, encouraging, etc.,

14   through all the various services and implementation

15   and educational services they provide, what is your

16   opinion with respect to whether or not Lawson

17   indirectly infringes Claim One?

18   A   I believe they do.

19   Q   So they would satisfy all of the elements if they

20   provided a system that had this capability and then

21   performed those acts that would constitute inducement?

22   A   Yes.

23   Q   Let's look at Claim Two of the '516 patent, which

24   is a dependent claim.  Do you understand that?

25   A   Sure.  It depends from Claim One.

823

WEAVER - DIRECT     823

1    Q   So we have to satisfy all the elements of Claim

2    One, which you just indicated for all five

3    configurations is infringing.

4        Claim Two talks about having catalogs stored in

5    separate databases.  Do you see that?

6    A   I do.

7    Q   How would the configurations as we've defined them

8    satisfy this separate database requirement?

9    A   These would be external databases that are

10   accessible through the Punchout module.

11   Q   Could they be a Punchout external plus Lawson

12   internal catalogs?

13   A   Of course.

14   Q   So if it requires Punchout, only configurations 3

15   and 5, as we've defined them, have Punchout; is that

16   right?

17   A   That's my diagram, yes.

18   Q   So your opinions with respect to Claim Two, I'd

19   like you to confine them to just configurations 3 and

20   5 that have the Punchout application.  Okay?

21   A   Right.

22   Q   Does Lawson configurations 3 and 5 satisfy the

23   claim cited in Claim Two of an electronic sourcing

24   system as recited in Claim One wherein catalogs

25   comprised of said collection of catalogs are stored in

824

WEAVER - DIRECT     824

1    separate databases?

2    A   Yes, we saw that in the Punchout to Dell and

3    Staples.

4    Q   Do they indirectly infringe in the same manner

5    that you have been describing?

6    A   Yes.

7    Q   Let's go to Claim Six if we can.  Again, Claim Six

8    is a dependent claim that depends on Claim One.  So

9    all the elements of Claim One need to be satisfied,

10   and you have already rendered an opinion that that is

11   present.

12       Claim Six recites an electronic sourcing system as

13   recited in Claim One where it said second set of a

14   predetermined criteria includes at least one of a

15   catalog number and an item textual information.  Do

16   you see that?

17   A   I do.

18   Q   Do configurations 3 and 5 including -- excuse me.

19   Let me step back.  What configurations satisfy Claim

20   Six that has at least one of the catalogs -- excuse

21   me -- wherein said set of predetermined criteria

22   includes at least one of the catalog number and item

23   textual information?

24   A   All five.

25   Q   Does Lawson indirectly infringe in your opinion in

825

WEAVER - DIRECT        825

1  the same manner you have been describing?
2  A  Yes.
3  Q  Let's look at Claim Nine if we could.  Claim Nine
4  is an independent claim, is that right, Doctor?
5  A  It is.
6  Q  Again, it has the an electronic sourcing system
7  comprising.  Is that in your view the same electronic
8  sourcing system that the Court has defined?
9  A  It is.
10  Q  Which of the configurations has a collection of
11  catalog items stored in electronic format?
12  A  All five have this first element.
13  Q  Which of the configurations have a first
14  identification code associated with a first term in a
15  first catalog?
16  A  First item in a first catalog.  That's all five.
17  Q  Okay.  This last element has a second
18  identification code associated with a second item in a
19  second catalog.  Said first item and said second item
20  being generally equivalent and wherein a selection of
21  one identification code from one of said first and
22  second catalogs provides the other identification code
23  from the other of said catalogs.
24      MR. McDONALD:  Your Honor, I object.  I think
25  for this claim we're just talking about all the

826

WEAVER - DIRECT        826

1  systems except one.  So I did rather the questions
2  were phrased in that context.
3      MR. ROBERTSON:  I think when he answers the
4  question, we can find out which configurations satisfy
5  this element and therefore that will identify the
6  configurations that are infringed.
7      MR. McDONALD:  The prior ones he's already
8  used all the systems.  I was a little slow in reacting
9  there.
10      THE COURT:  Which ones do you say are charged
11  with infringement in the complaint of Claim Nine.
12      MR. McDONALD:  All except No. 1.  Systems 2
13  through 5 are accused of infringing Claim Nine, as I
14  understand it.
15      THE COURT:  Is that right or is it wrong?
16      MR. ROBERTSON:  I don't have it committed
17  right to my memory right there.
18      Your Honor, let me rephrase it.
19      THE COURT:  But you have to go back and
20  rephrase all of them if he's right.
21      You-all know which ones allegedly are
22  infringed.  He says that all five infringe it, but
23  whether he accused them of that in the complaint, I
24  don't know.  I don't have it in front of me.
25      Do you have it over there, somebody?

827

WEAVER - DIRECT        827

1      MR. ROBERTSON:  Let me do it this way, if I
2  could.
3  BY MR. ROBERTSON:
4  Q  Doctor, this last element of Claim Nine, let's
5  focus on that.  A second identification code
6  associated with a second item in a second catalog said
7  first item and said second item being generally
8  equivalent and wherein a selection of one
9  identification code from one of said first and second
10  catalogs provides the other identification code from
11  the other of said catalogs, what configurations have
12  we seen that can satisfy this claim element of Claim
13  Nine?
14  A  That one needs the catagory searched, which I
15  demonstrated with the UNSPSC codes, and that's
16  implemented by the requisition self service module.
17  And as we have defined them, that's configurations 2,
18  3 and 5.
19  Q  Just configurations 2, 3 and 5 have the ability to
20  do that UNSPSC capability in order to satisfy this
21  claim element?
22  A  That's correct.
23  Q  Let's just focus on configurations 2, 3 and 5 for
24  purposes of this claim.
25      THE COURT:  The objection to the question,

828

WEAVER - DIRECT        828

1  though, I think, has been cured.  When he said all
2  five satisfy element one and satisfy element two, then
3  per force that includes 2, 3 and 5.  So he's answered
4  the questions, but the bottom line is that only the
5  configurations 2, 3 and 5 are charged to infringe
6  directly or indirectly Claim Nine; is that right?
7      THE WITNESS:  That's right, sir.
8      THE COURT:  Was that your opinion, sir?
9      THE WITNESS:  Yes, sir, it is.
10      THE COURT:  All right.  Now, what about
11  indirect?
12  BY MR. ROBERTSON:
13  Q  By Lawson making, using, selling, offering for
14  sale or importing electronic sourcing system that's
15  capable of performing all of these elements and by
16  encouraging, aiding, assisting and abetting their
17  customers to use that same system through all of the
18  various evidence you have offered as to providing
19  manuals and guides and online services and training
20  and implementation and servicing, do you have an
21  opinion as to whether all of the elements of Claim
22  Nine are satisfied and Lawson indirectly infringes
23  that claim?
24      THE COURT:  As to which systems?
25      MR. ROBERTSON:  Two, 3 and 5.

829

WEAVER - DIRECT      829

1   A  Yes, I do.

2   Q  What is the opinion?

3   A  I believe that they indirectly infringe for

4   configurations 2, 3 and 5.

5   Q  Okay.  Let's focus on Claim 21 if we can for a

6   minute, of the '516.  Let me focus on the last element

7   first, if I could.

8       The last element says, Wherein said determination

9   system includes a cross-reference table matching an

10  identification code from a first located item with a

11  second identification code from a second located item.

12  Do you see that?

13  A  I do.

14  Q  So this element requires a cross-reference table.

15  Do you see that?

16  A  I do.

17  Q  What software application or module of Lawson is

18  required in order to do this cross-reference table

19  matching?

20  A  That's requisition self service.

21  Q  So, therefore, that would include configurations

22  2, 3 and 5; is that right?

23  A  That's right.

24  Q  So focusing only on configurations 2, 3 and 5 for

25  the purposes of Claim 21, is it your opinion that

830

WEAVER - DIRECT      830

1   those configurations comprise an electronic sourcing

2   system?

3   A  Yes, it is.

4   Q  Do those configurations have a requisition module

5   including data fields, user generated criteria entered

6   into at least one of said data fields to generate at

7   least partial criteria corresponding to a desired

8   item?

9   A  They do.  The requisition module has data fields

10  like the name of the requester.  And the user

11  generated criteria could be things like the vendor

12  number, vendor name, item number, manufacturer number.

13  Q  Do the configurations 2, 3 and 5 have a catalog

14  collection searching module, said searching module

15  including a collection of catalogs of items stored in

16  an electronic format, a catalog collection criteria

17  used to select less than the entire collection, said

18  searching module being used to generate additional

19  search module criteria for said data fields of said

20  requisition module?

21  A  They do.  And we saw that when I did a search for

22  Dell, and that returned items, and I drilled down on

23  the items.  And the item page produced the -- what's

24  the proper name for it?  Yeah, to generate additional

25  search module criteria.

831

WEAVER - DIRECT      831

1       So in the item description, there were things like

2   that cost, and the unit of measure, and the vendor

3   name, and I could have used those items like vendor

4   name as the additional search criteria.

5   Q  Do configurations 2, 3 and five have a multiple

6   purchase order generation module, said purchase order

7   generation module creating multiple purchase orders

8   from a single requisition created with said user

9   generated criteria and said search module criteria?

10  A  Yes, they do, and we saw that in three of my

11  demos.

12  Q  Do configurations 2, 3 and 5 of the accused Lawson

13  systems satisfy the element wherein each of at least

14  two catalogs include a generally equivalent item from

15  a different source of said requisition module working

16  in combination with said catalog searching module to

17  determine multiple sources for said item?

18  A  They do, and we saw that in my first demo where I

19  looked for -- I used the UNSPSC codes to look for

20  notebook computers and found two different computers

21  from two different vendors.

22  Q  Do configurations 2, 3 and 5 satisfy the element

23  wherein said multiple sources is limited by said

24  catalog searching module providing a match according

25  to said user generated criteria, said search module

832

WEAVER - DIRECT      832

1   criteria in a determination system that located items

2   are generally equivalent?

3   A  They do.  And, again, we saw that in my first demo

4   using the UNSPSC codes to drill down to notebook

5   computers, and we found the IBM ThinkPad and the Dell

6   notebook.

7   Q  Do configurations 2, 3 and 5 satisfy the claim

8   element wherein said determination system includes a

9   cross-reference table matching identification codes

10  from a first located item with a second identification

11  code from a second located item?

12      THE COURT:  He's already answered that.  He

13  answered that.  That's what you started with.  You

14  started with six, and you did 1, 2, 3 and 4 and 5

15  elements.

16      Is your answer yes or no?

17      THE WITNESS:  The answer is yes.

18  Q  Do you have an opinion as to whether or not Lawson

19  indirectly infringes Claim 21 by inducing infringement

20  by all of the activities that we've previously

21  described by offering a system that's capable of

22  performing these claim elements?

23  A  My opinion is that they do.

24  Q  Would that be for all the elements?

25  A  It would.

833

WEAVER - DIRECT      833

1   Q  Can we go to Claim 22?  Claim 22, again, is one of
2   these dependent claims which depends on Claim 21,
3   which adds the additional limitation wherein said
4   determination system includes an identical
5   identification code for each of said located items.
6   Do you have an opinion as to whether or not the
7   configurations of the accused Lawson systems 2, 3 and
8   5 satisfy that claim element?
9   A  My opinion is that they do.  We saw this twice.
10  Once in the demonstration where we drilled down to
11  notebook computers and this morning where we drilled
12  down to halogen lamps.  The UNSPSC codes were
13  identical for the two notebook computers and identical
14  for the two halogen lamps.
15       THE COURT:  Which of the configurations are
16  we talking about; 2, 3 and 5?
17       THE WITNESS:  Two, 3 and 5.
18  BY MR. ROBERTSON:
19  Q  Why don't we go to Claim 29 of the '516.
20  Actually, I'm reminded I may have overlooked indirect
21  infringement on this one.  Does Lawson indirectly
22  infringe Claim 22 in the same manner that you have
23  been describing, for example, as they indirectly
24  infringe Claim 21?
25  A  Yes.

834

WEAVER - DIRECT      834

1   Q  Okay.  Thank you.
2       Claim 29 recites an electronic sourcing system.
3   I'd like you to focus only on configurations 2, 3 and
4   5 for purposes of this claim.
5       Are configurations 2, 3 and 5 an electronic
6   sourcing system in your opinion as the Court has
7   defined it?
8   A  They are.
9   Q  Do configurations 2, 3 and 5 have a collection of
10  catalogs of items stored in electronic format?
11  A  They do.
12  Q  Do configurations 2, 3 and 5 have a first set of
13  predetermined criteria associated with said collection
14  of catalogs?
15  A  They do.
16  Q  Do configurations 2, 3 and 5 have a second set of
17  predetermined criteria associated with items from each
18  of said catalogs?
19  A  They do.
20  Q  Do configurations 2, 3 and 5 have a catalog
21  selection protocol, said catalog selection protocol
22  relying on said first set of predetermined criteria to
23  select less than said entire collection of catalogs
24  and including matching a vendor identification code
25  with a subset of said collection of catalogs wherein

835

WEAVER - DIRECT      835

1   said subset of catalogs includes both a vendor catalog
2   from a predetermined vendor and a second catalog from
3   a predetermined third party?
4   A  Yes, they do.  We saw that in my demo for the
5   notebook computers.
6   Q  The Court has defined "subset" in its glossary.
7   What has the Court defined "subset" to be?
8   A  Less than all of a set.
9   Q  Did you apply that construction in rendering your
10  opinions?
11  A  I did.
12  Q  Next element of Claim 29 of the '516 recites a
13  search program, said search program relying on said
14  second set of criteria to select specific items from
15  said catalogs determined from said catalog selection
16  protocol.  Do you see that?
17  A  I do.
18  Q  Do you have an opinion as to whether or not
19  configurations 2, 3 and 5 satisfy that claim element?
20  A  They do.  We saw that in my demonstration
21  searching for Dell as the first predetermined criteria
22  and the Dimension 8100 as the second.
23  Q  The last element of Claim 29 recites the
24  cross-reference table linking a vendor item catalog
25  number from said vendor catalog with an item catalog

836

WEAVER - DIRECT      836

1   number from said predetermined third party.
2       Do configurations 2, 3 and 5 satisfy that claim
3   element?
4   A  They do using the UNSPSC codes.
5   Q  Do you have an opinion as to whether or not Lawson
6   induces infringement of its customers by providing an
7   electronic sourcing system that's capable of doing all
8   of these elements of Claim 29?
9   A  My opinion is that they do.
10  Q  Earlier I asked you whether or not these five
11  configurations in the manner that they are configured
12  as we've defined them had any kind of substantial
13  non-infringing use if they had at least two product
14  catalogs available to them.  Do you recall that?
15  A  I recall the question.
16  Q  With respect to indirect infringement as to all
17  the claims you have just identified for any of the
18  configurations that are the subject of indirect
19  infringement, do you have an opinion as to whether or
20  not Lawson would contribute to infringement if those
21  systems as configured had no substantial
22  non-infringing use?
23  A  I didn't understand the question.
24  Q  Sure.  Let me go back.  Earlier you went through
25  this issue of whether or not there was a substantial

873

1   right?

2   A   It's the average, but you can't draw the

3   conclusion that therefore there are few items per

4   vendor.  You can say on average there are 12 in that

5   instance, but there could be 30,000 from one vendor

6   and the rest distributed over the others.  I didn't

7   ask that question.  I didn't read --

8       THE COURT:  That's enough.  Thank you.

9       I think you can go on to another topic.

10  Q   Do you have an understanding, Dr. Weaver, as to

11  how many words a Lawson customer can use to

12  describe the product in the item master?

13  A   No, because that's not a part of the Court's

14  definition of "catalog."

15  Q   Would you agree that the purpose of the Lawson

16  item master is different from the purpose of a typical

17  published catalog like a Sears catalog?

18  A   No.

19  Q   Would you agree that the typical published Sears

20  catalog is intended to sell products to people?

21  A   That is one of its purposes.

22  Q   Would you agree that the Lawson item master, its

23  purpose is not to sell products to people?

24  A   Its purpose is to find items, yes.

25  Q   You would agree that the Lawson item master's

874

1   purpose is not to sell products, correct?

2   A   I would.

3   Q   Now, you talked a little bit in your direct

4   testimony about selecting portions of a database to be

5   search, correct?

6   A   Yes, I did.

7       THE COURT:  Before you go there, do you have

8   any understanding about what happens if I'm a customer

9   of Lawson's, and I order a Punchout, and it comes from

10  Dell, whether Lawson gets any money from that or not?

11  Do they get paid or does the money all go to Dell?

12      THE WITNESS:  In my testimony yesterday and

13  in the documentation I showed, I said that when Lawson

14  sets up an agreement with a Punchout partner, Dell or

15  whoever, that the Punchout partner pays a fee.

16      THE COURT:  I'm talking about on an

17  individual purchase.  Does Lawson get a cut or a

18  percentage or fee or anything on the purchase basis?

19      THE WITNESS:  I don't know on a per purchase.

20      THE COURT:  Sorry for interrupting.  I

21  apologize.  Excuse me, Mr. McDonald.

22  BY MR. McDONALD:

23  Q   If you can give me a second, I will try to get to

24  the Punchout and pick up where you left off.

25      THE COURT:  I interrupted you.  I shouldn't

875

1   have.  But you had just gotten started, and I wanted

2   to follow-up with what he was saying.

3   BY MR. McDONALD:

4   Q   You do understand, don't you, Dr. Weaver, that

5   Lawson doesn't dictate what vendors make available to

6   customers when they are a Punchout partner?

7   A   I think that's right.

8   Q   All those websites you mentioned yesterday from

9   Staples, that Stapleslink.com, Lawson has no control

10  over that website, correct?

11  A   Oh, goodness, that's not true.  Lawson has immense

12  control over that website.

13  Q   Tell me about the control Lawson has over

14  Stapleslink.com.

15  A   When the Lawson customer clicks on that -- which

16  one did you say.  Staples?

17      THE COURT:  Stapleslink.com; is that right?

18      MR. McDONALD:  That's right.

19  A   When the customer clicks on that Staples icon,

20  then Lawson sets up a special connection with the

21  Staples link, and it exchanges authentication

22  information.  It issues that Punchout setup request.

23  It waits for the servlet on the Stapleslink.com

24  website to send back the Punchout setup response that

25  includes the URL to which Lawson is supposed to

876

1   redirect this particular customer.

2       So the customer goes to that site.  The customer

3   shops.  Presumably buys something.  Puts it in the

4   shopping cart.  Then the shopping cart contents at the

5   time of checkout are returned in a special format.

6   Lawson interprets that format.  Puts it in a cache

7   data file.  Closes out the session securely, and then

8   starts processing the checkout items to put them into

9   the Lawson shopping cart.  So Lawson has immense

10  control.

11  Q   Isn't everything you just described relating to

12  simply the communication back and forth with the

13  Stapleslink.com website as opposed to what is actually

14  posted or shown or displayed or done at the website

15  itself?

16  A   That's what I'm trying to say, yes, that Lawson

17  has complete control over the communication system.

18  Q   Let me ask you a different question.

19  A   Sure.

20  Q   The website itself, who controls the

21  Stapleslink.com website?  That's a different question

22  from how is the communication to that website, right?

23  A   I just explained the communications.

24  Q   I'm exploring the issue of the difference between

25  the communication with the website and who is actually

877

1  controlling the website itself.  Do you understand
2  that distinction?
3  A  Well, the control of the website, as I've just
4  explained, is a shared responsibility because the
5  servlet, which is part of Staples, is returning a URL
6  to Lawson saying where should we redirect the user's
7  browser.
8  Q  When I have --
9     THE COURT:  Excuse me, Mr. McDonald.  Are you
10  asking him who has control over putting on the Staples
11  link website whatever is on the website?
12     MR. McDONALD:  That's where I was going.
13     THE COURT:  Well, that's different than
14  whether there's control because control has a
15  component of it in the interrelated nature of things,
16  according to him, that I think is distracting from the
17  purpose.
18     What you want to know is:  Who is it that
19  puts products on the Staples link website, right?
20     MR. McDONALD:  Let's try that.
21     THE COURT:  Try that and see if you like it
22  and go from there and see if you can find another one
23  you like.
24  BY MR. McDONALD:
25  Q  With the Stapleslink.com website, who is in charge

878

1  of loading up a list of products on that website?
2  A  Staples is in charge of the content displayed on
3  the website.
4  Q  Does Lawson have any say in what content Staples
5  displays at that website?
6  A  I don't know.
7  Q  If I understood you right, when a customer uses
8  that Stapleslink.com Punchout, can they do a search
9  for products at the Stapleslink.com website?
10  A  Yes.
11  Q  Whose responsible for putting together the
12  computer stuff that you need to do a search at the
13  Stapleslink.com website?
14  A  The search on the stapleslink.com website uses the
15  Staples search engine.
16  Q  How do you know that?
17  A  Because that's the way these systems work.
18  Q  Have you ever done anything to check it out?
19  A  Well, I know how the protocols operate.  And once
20  you're redirected to that site, now you're working in
21  that environment at Staples.
22  Q  My question is did you do anything for your
23  $160,000 to check that out?
24  A  No.
25  Q  Did I understand right for this case you did talk

879

1  to a source code expert, right?
2  A  I did.
3  Q  Because you thought that was pretty important to
4  understand the source code and how that operated
5  behind the scenes in the Lawson system, right?
6  A  Yes.
7  Q  You didn't check that out for the Punchout
8  partners that do the actual searching and display the
9  actual data that you showed us in those demonstrations
10  yesterday, right?
11  A  I never made an issue of it, so no.  There's no
12  need to check it out.
13  Q  I think in your demo of the Punchout websites
14  yesterday you were also going through the issue of
15  availability of inventory; is that correct?
16  A  Correct.
17  Q  Is it true that in your examples the Staples and
18  the Dell, not Lawson, would have control over checking
19  out the inventory?
20  A  That's true, the information comes from the
21  Punchout partner.
22  Q  Lawson has no idea what Dell or Staples has in
23  inventory, right?
24  A  Probably not.
25  Q  And you understand that for purposes of the claims

880

1  in this case there's some structure that has to be
2  analyzed and compared to the Court's interpretation of
3  the claims to make sure the structure corresponds?
4  A  Of course.
5  Q  You didn't do that analysis with respect to the
6  searching or checking inventory functions at the
7  Punchout vendor websites, correct?
8  A  I think you've mischaracterized what I did.  I
9  understand how -- let's use Staples as your example.
10  I understand how a website works.  I understand how a
11  search engine works.  I understand how one checks
12  inventory.  What I was concentrating on, and this is
13  consistent -- in my opinion, it's consistent with the
14  Court's construction of the means-plus-function claims
15  was that Lawson had control over what information was
16  sent to the Staples site and what information was
17  returned.  And I think I demonstrated that clearly.
18  Q  So you just think because you have knowledge, you
19  can assume what's going on at those vendor websites
20  that you didn't have to check that out?
21  A  That's right.
22     THE COURT:  Is this a convenient place in
23  your examination to break for lunch, Mr. McDonald?
24     MR. McDONALD:  This would be a dandy spot,
25  Your Honor.

917

Weaver - Redirect                917

1  that?

2  A   I remember the question.

3  Q   And does it matter, for the purposes of your analysis for

4  infringement, whether or not Lawson receives a payment when a

5  customer uses the Lawson Punchout system?

6  A   Certainly not. That's not any part of the claims.

7  Q   Do you know whether Lawson receives fees, sometimes tens

8  of thousands, hundreds of thousands of dollars for licensing

9  this software?

10  A   Yes.

11  Q   Is that your understanding as how Lawson receives

12  compensation for these products?

13  A   Well, the licensing of the software as well as the

14  professional services.

15  Q   So Lawson receives fees also --

16        MR. McDONALD:  Your Honor, we object as outside the

17  scope of cross.

18        MR. ROBERTSON:  Fair enough, Your Honor.  This was a

19  question raised by the Court, so I'll move on.

20        MR. McDONALD:  Actually, I move to strike those

21  answers that were related to Lawson's revenues.

22        MR. ROBERTSON:  I think it was within fair scope of

23  followup of the Court's question.  I just wanted to --

24        THE COURT:  Objection to the last question is

25  sustained.  The request to strike the answers is not.

918

Weaver - Redirect                918

1  Previously given.

2  Q   Can the customer select the Punchout sites that it wants

3  Lawson to provide that customer with access to?

4  A   Not only can it, it does.

5  Q   And then does Lawson actually facilitate access to those

6  Punchout partner sites?

7  A   Absolutely.  We spent some time discussing that.

8  Q   Did you have access to any of the Lawson customer source

9  code?

10  A   No.

11        MR. McDONALD:  Object to that as to vague as to what

12  Lawson's customer source code is.

13        MR. ROBERTSON:  Well, you asked the Doctor if he had

14  access to the Lawson customer source code.  I'm just asking the

15  Doctor if it was provided in any way.

16        MR. McDONALD:  I never that.  We were asking about

17  the vendors.

18        THE COURT:  I don't remember that question, but --

19        MR. ROBERTSON:  I had a note of it, Your Honor, but

20  I'll move with on.  I'll withdraw the question.

21        THE COURT:  There was a question about the vendor

22  source code, but I don't think there was one about customers.

23  Q   Did you have access to the vendor source code?

24  A   No.

25  Q   Can you also use the EDI module to obtain information on

919

Weaver - Redirect                919

1  availability of inventory?

2  A   Absolutely.  We talked about that PO 850, the purchase

3  order -- I'm so sorry, Your Honor -- and the PO 855, purchase

4  order acknowledgment, that could contain information on whether

5  an item was available in inventory.

6  Q   Now, Dr. Weaver, claim one of the '172 patent, if you

7  could look at that for a moment.  Maybe we can bring that up on

8  the screen.

9        You were asked some questions about your report and

10  whether a database -- when we refer to the database here as a

11  catalog; do you recall that?

12  A   Yes.

13  Q   Were you attempting in your report to perform a claim

14  construction on this first element as to what a database

15  containing data relating to items associated with at least two

16  vendors means?

17  A   No. That's not my job.

18  Q   So you weren't trying to rewrite this claim in any way,

19  were you?

20  A   No, sir.

21  Q   Confirm for me that the claim does include the term

22  database; correct?

23  A   It does say database.

24  Q   I'm sorry. Let me rephrase the question.  It doesn't

25  include the claims term catalog which the Court has construed;

920

Weaver - Redirect                920

1  is that right?

2  A   It does not contain the term catalog.

3  Q   I just want to have some clarity here if I can, because I

4  want to make sure I understand it, on what constitutes the

5  catalogs in the Lawson accused systems, and for this time we

6  can talk about all five configurations.  So can you tell us,

7  because I do recall the Judge had a question, so what is it?

8  A   It's the item master and the vendor item table.

9        THE COURT:  So that's a catalog?

10        THE WITNESS:  It contains data from catalogs.

11        THE COURT:  But is that a catalog within the meaning

12  of the claim construction as you see it?

13        THE WITNESS:  It is a catalog, and it is many

14  catalogs.  It's important that I make clear that it contains

15  items from many catalogs, in the plural.

16        THE COURT:  All right.  And then is there any other

17  catalog in the Lawson system?

18        THE WITNESS:  No, sir.  It has only one database.

19  Q   I guess my question is, do those two tables need to have

20  item data in them to constitute the catalogs?

21  A   Absolutely.

22  Q   So in addition to those two tables, we need actual data;

23  correct?

24  A   Oh, yeah.  The tables are the repository of the data.

25        THE COURT:  Before you leave that area, I'm confused,

933

1    THE COURT:  Okay.  Are you about ready to get
2  back to where we were, sir?
3    MR. GREER:  Yes, sir.
4    THE COURT:  When you're ready, plunk your
5  magic button.
6    (The video deposition of Jeffrey P. Frank is
7  resumed.)
8    THE COURT:  Looks like they are still working
9  on the other matter.  So do you have another witness?
10    MR. ROBERTSON:  Yes, Your Honor.  I do have
11  the Excel Spreadsheet was sent to Lawson on
12  December 31 containing the excerpts of the Frank
13  deposition that were to be played.  The ones that
14  are --
15    THE COURT:  Well, give it to them.  They are
16  working on it.
17    MR. ROBERTSON:  If they are working on it,
18  fine, Your Honor.  We don't need to delay and retain
19  the jury.
20    THE COURT:  No, we're not going to hold the
21  jury up for this.  We're moving right along.
22    MS. ALBERT:  EPlus would call Hannah Raleigh.
23    THE COURT:  Where is Ms. Raleigh?
24    MS. ALBERT:  I understood she was here in
25  person.

934

1    THE COURT:  Who is she?
2    MS. ALBERT:  She's an employee from Lawson.
3    THE COURT:  Okay.
4    MS. ALBERT:  Your Honor, if I could just have
5  a brief moment.  We have some exhibit binders for
6  Ms. Raleigh and the Court.
7    THE COURT:  You're going to trust
8  Mr. Robertson to handle that?
9    MR. ROBERTSON:  We're all in trouble then.
10    THE COURT:  Here he comes.  Oh, no.
11    MS. ALBERT:  It's not quite as daunting as it
12  might appear.  There are just a couple of voluminous
13  documents.  I think there are two binders total.
14    THE COURT:  I wonder if your cap and trade
15  bill would include deductions for paper killing for
16  law firms.  Tree killing.
17    Is that for me?  Thank you for my present.
18  Thank you, sir.
19    All right.
20    HANNAH RALEIGH, called by the Plaintiff, first
21  being duly sworn, testified as follows:
22
23    DIRECT EXAMINATION
24  BY MS. ALBERT:
25  Q  Would you state your full name for the record,

935

1  please?
2  A  Hannah Edmundson Austin Raleigh.
3  Q  You are currently employed by Lawson with its
4  professional services organization; is that correct?
5  A  That's correct.
6    THE COURT:  Can you hear all right, ladies
7  and gentlemen?
8    THE JURY:  Yes.
9    THE COURT:  If you have any problems, let us
10  know.
11    MS. ALBERT:  I have a little bit of a hoarse
12  voice.
13    THE COURT:  No, I was talking about the
14  witness.
15  BY MS. ALBERT:
16  Q  Your current position at Lawson is one of practice
17  director; is that correct?
18  A  That's correct.
19  Q  And your responsibilities as practice director are
20  to oversee customer implementations of Lawson's
21  products at new customers and significant
22  implementations of current customers in the eastern
23  region of the United States; is that correct?
24  A  That's right.
25  Q  And your responsibilities as practice director

936

RALEIGH - DIRECT     936

1  include overseeing customer implementations of
2  Lawson's procurement products; is that correct?
3  A  That's correct.
4  Q  Now, Lawson's Professional Services Organization
5  has roughly 1500 employees worldwide; is that correct?
6  A  That's roughly correct, sure.
7  Q  Isn't it true that 90 percent or more of Lawson's
8  customers engage Lawson Professional Services at some
9  time for some form of assistance over the course of
10  their relationship with Lawson?
11  A  Yes, over the course of their full use of the
12  products, yes.
13  Q  Now, among the different types of services
14  provided by Lawson's Professional Services
15  Organization to Lawson's customers, those services
16  would include training services; is that correct?
17  A  Absolutely.
18  Q  And Lawson's Professional Services Organization
19  also provides services that are referred to as project
20  management services to Lawson's customers; is that
21  correct?
22  A  Yes, we do.
23  Q  Lawson's Professional Services Organization also
24  services that are referred to as implementation
25  consulting services; is that correct?

937

RALEIGH - DIRECT        937

1    A  That's correct.

2    Q  And Lawson's Professional Services Organization

3    also provides services that are referred to as upgrade

4    consulting services; is that correct?

5    A  That's correct.

6    Q  And those upgrade services would involve assisting

7    the clients with upgrading from one version of a

8    Lawson system to the next released version of that

9    system; is that correct?

10   A  That's correct.

11   Q  Lawson's Professional Services Organization also

12   provides technical development services to customers

13   such as interface development and customization

14   development services; is that correct?

15   A  We do at times, yes.

16   Q  Lawson's Professional Services Organization also

17   offers services to Lawson's customers that are

18   referred to as learning services; is that correct?

19   A  That's true.

20   Q  Among the learning services that Lawson's

21   Professional Services Organization provides to

22   Lawson's customers would be public instructor led

23   training in one of Lawson's offices or on site

24   instructor led training for a specific customer at

25   their site; is that correct?

938

RALEIGH - DIRECT        938

1    A  Sure.

2        MS. ALBERT:  Mike, if you would, could we

3    have Plaintiff's Exhibit 202.

4    Q  And, Ms. Raleigh, that is in Volume I of your

5    binders.

6        THE COURT:  Before you go anywhere, what was

7    the exhibit number for that Frank deposition?  You're

8    going to have to put it in the record because the

9    court reporter wasn't taking it down.  Just look it up

10   and tell me later.

11       Go ahead, Ms. Albert.

12   Q  Do you have Plaintiff's Exhibit 202?

13   A  I do.

14   Q  Is Plaintiff's Exhibit 202 a catalog of online

15   courses that Lawson offers to its customers?

16   A  Yeah.  It's a catalog that was published at a

17   certain point in time, but yes.

18   Q  Can you turn, please, to page 5 of that exhibit,

19   and the Bates number on that page ends with 4027?

20   A  I'm there.

21   Q  Do you see at the top of the page there's a course

22   entitled inventory control 8.1/9.0 X?

23   A  I do.

24   Q  And Lawson offers this two-day course entitled

25   Inventory Control 8.1/9.0 X that provides its

939

RALEIGH - DIRECT        939

1    customers with -- and I'm reading from the first line

2    there.  Instructions on the key setup components and

3    processing functionality of the inventory control

4    application; is that correct?

5    A  That's correct.

6    Q  And among the training included in that course

7    would be, in following along with the second sentence,

8    instructions on the key setup components and

9    processing functionality -- excuse me, instructions

10   concerning how to set up the item master associated

11   with the inventory control application; is that

12   correct?

13   A  Yes, that's right.

14   Q  Turn to page 6 of that exhibit, please.  Do you

15   see on that page there's a course entitled,

16   Requisition Self Service 8.1-9.0?

17   A  Yes.

18   Q  Lawson also offers a course entitled, Requisition

19   Self Service 8.1/9.0, which introduces major features

20   of requisition self service such as requisition

21   approvals, receiving, and the shopping experience

22   which includes searching the catalog for items, using

23   shopping lists, ordering specials or services, and

24   ordering by categories; is that correct?

25   A  Yes.

940

RALEIGH - DIRECT        940

1    Q  In this course, Lawson enables its customers to

2    have an experience using an actual Lawson training

3    system that would have the requisition self service

4    application installed; is that correct?

5    A  Yes.

6    Q  I believe I'm done with that document.

7    A  Okay.

8    Q  Lawson's Professional Services Organization also

9    provides services to Lawson's customers that consist

10   of installing the Lawson software on the customers'

11   hardware; is that correct?

12   A  Yes.

13   Q  And you previously mentioned that Lawson provides

14   implementation services to its customers.  Do you

15   recall that?

16   A  Yes.

17   Q  Among the implementation services that Lawson

18   provides to its customers, those services would

19   include assistance with designing the configuration of

20   the Lawson software to meet the customer's business

21   requirements; is that correct?

22   A  Yes.

23   Q  Also included among the implementation services

24   that Lawson would provide to its customers would be

25   assisting the customer with developing test scripts

941

RALEIGH - DIRECT      941

1   and assisting the customer with testing the software
2   on that equipment; is that correct?
3   A  Yes, we assist with customer with all the aspects
4   of implementing the software and those would be
5   included.
6   Q  Among the aspects included with implementation
7   would be all aspects up to and including bringing a
8   system live into actual production operation; is that
9   correct?
10  A  That's right.
11  Q  Lawson also provides -- when a customer's system
12  goes live, that means it's actually operational and in
13  an actual production environment to perform the
14  procurement process; is that correct?
15  A  We hope so, yes.
16  Q  Now, also included among the services that Lawson
17  would provide to its customers, Lawson can provide
18  hosting services or Lawson physically hosts the
19  customer's system in space that Lawson owns if the
20  customer so desires; is that correct?
21  A  We can.
22  Q  And Lawson also provides services to its customers
23  to support converting existing systems and conversion
24  of data from those existing systems into the proper
25  format for importation into a Lawson system; is that

942

RALEIGH - DIRECT      942

1   correct?
2   A  Yes.  All of our customers are importing from a
3   previous system, so yes.
4       THE COURT:  Excuse me just a minute.  I don't
5   know that any of us over here know what hosting means.
6   The way it's been explained sort of leads me to the
7   impression that Lawson has everything on its computer
8   system, but if I'm the customer, I can be in Timbuktu
9   and just use my computer, and I go through you to get
10  what I want.  Is that basically right or wrong?
11      THE WITNESS:  The only clarification I would
12  make to that is that the system is actually still the
13  customer's system.  So it is their system.  It is
14  physically housed in a Lawson-owned or leased
15  facility.  Obviously, we take care of keeping the
16  lights on and the electricity and those of things, but
17  the system can be accessed, you're correct, from
18  Timbuktu or anywhere else in the world using Internet
19  protocols.
20  Q  And Lawson will assist its customer with
21  implementing those systems that it hosts in its own
22  facilities among other services; is that correct?
23  A  Yes.  It makes no difference where that hardware
24  lives.
25  Q  Lawson also provides workshops to educate its

943

RALEIGH - DIRECT      943

1   customers on data migration requirements and data
2   mapping to put this data that's imported from a prior
3   system into a Lawson system; is that correct?
4   A  That's right.
5   Q  And Lawson Software includes within the software
6   import and export utilities that can be utilized for
7   this data conversion process; is that correct?
8   A  That's correct.
9   Q  As part of the data conversion effort, Lawson's
10  Professional Services Organization will actually
11  convert item master data from a client's preexisting
12  system to a format for use in the Lawson procurement
13  system; is that correct?
14  A  Yes.  When requested to help them with that, yes.
15  Q  Have you actually been involved in implementation
16  projects where the customer has so requested Lawson to
17  perform data conversion efforts?
18  A  Yes, I have been involved in some projects where
19  the customer needed assistance from the Lawson team to
20  do various elements of that conversion process.
21  Sometimes some steps and sometimes other systems, but
22  certainly I've been involved in projects where we
23  participate in that process.
24      MS. ALBERT:  Mike, if we could have
25  Plaintiff's Exhibit 216.  And, Ms. Raleigh, that's in

944

RALEIGH - DIRECT      944

1   Volume II of your binders.
2   Q  Are you there?
3   A  I'm here.
4   Q  Ms. Raleigh, is this a copy of Lawson's statement
5   of work for system implementation it performed for the
6   Public Health Trust Jackson Health System?
7   A  Yes, it is.
8   Q  And you were Lawson's practice director that
9   oversees the implementation of Lawson's system for
10  this client; is that correct?
11  A  That's correct.
12  Q  And Lawson received the award of the contract for
13  this particular implementation project; is that
14  correct?
15  A  That's right.
16      MS. ALBERT:  Mike, if you could turn to page
17  15 of the exhibit and the Bates number on that page
18  ends with 5374.
19  Q  Do you see the heading on that page entitled "Data
20  migration and conversion scope"?
21  A  I do.
22  Q  Below that there's an item, 3.5.1 that refers to
23  master file and configuration table value builds, do
24  you see that?
25  A  I do.

945

RALEIGH - DIRECT          945

1    Q  And the text below that indicates that the data to
2    be converted will be identified during the design
3    phase.  The Lawson functional consultants will provide
4    assistance with data mapping support, data loading
5    support, and executing uploads via Lawson add-ins tool
6    to build the required master files and
7    configuration/setup table values.  Do you see that?
8    A  I do.
9    Q  And the Lawson professional consultants did
10   actually provide this assistance to Jackson Health
11   System as indicated in the statement of work; is that
12   correct?
13   A  We did.
14   Q  And in the second paragraph below that, the second
15   sentence of that paragraph, indicates that the
16   customer will have access to Lawson's conversion
17   manuals and file layouts.  Do you see that?
18   A  I do.
19   Q  Did Lawson actually provide the customer Jackson
20   with the Lawson conversion manuals and file layout as
21   indicated in the statement of work?
22   A  We did.  I want to clarify that this entire
23   section does refer to all of the aspects of the
24   implementation, not purely the procurement
25   implementation.  So our involvement over the course of

946

RALEIGH - DIRECT          946

1    the project may have, you know, been different
2    depending on which part of the system we were building
3    at the time.  So there could be differences, but yes.
4    Q  But this particular implementation project did
5    include the procurement modules; is that correct?
6    A  It did.
7    Q  Continuing on with that second sentence in the
8    second paragraph, it indicates that conversion work
9    session will be conducted to review the Lawson's
10   standard conversion programs and conversion process.
11   Do you see that?
12   A  I do.
13   Q  And Lawson did provide that conversion work
14   session to review the Lawson standard conversion
15   programs and conversion process for Jackson, correct?
16   A  Absolutely.
17   Q  Can you turn to page 16 of the exhibit and the
18   Bates number on that page ends with 375.
19   A  Yes, I'm there.
20   Q  That's table on this page entitled
21   "Responsibilities for master file and configuration
22   table value builds," do you see that?
23   A  I do.
24   Q  The table on this page relates to which party is
25   going to have responsibility for particular tasks

947

RALEIGH - DIRECT          947

1    during the implementation project; is that correct?
2    A  That's right.
3    Q  The second task in the table indicates that Lawson
4    would be responsibility to provide cross functional
5    workshops to define the data migration process and
6    mapping required for Jackson.  Lawson did actually
7    provide such a cross functional workshop to define the
8    data migration process and mapping for Jackson Health
9    System, didn't it?
10   A  We did.
11   Q  And the next activity below that in the table
12   relates to migration strategy and process description.
13   Do you see that?
14   A  I do.
15   Q  And Lawson also provided Jackson Health System
16   with migration strategy and process description,
17   correct?
18   A  We did.
19   Q  And if you proceed down, I believe it's the sixth
20   task in the chart, it's identified as training and
21   data migration tools.  Do you see that?
22   A  Yeah, I do.
23   Q  And the Lawson personnel delivered standard
24   training and education courses relating to data
25   migration tools to Jackson personnel; isn't that true?

948

RALEIGH - DIRECT          948

1    A  We did.  I would probably refer to it more as
2    knowledge transfer than standard training or
3    education.  It was less formal than it maybe sounds
4    here, but we did help them understand those tools.
5    Q  And the last task on that page is identified as
6    test load sample data, do you see that?
7    A  I do.
8    Q  It indicates that the client would be responsible
9    for providing sample data and then Lawson is
10   responsible for executing the load of the test data.
11   Lawson, in fact, executed the load of the test data
12   for Jackson in connection with this project; is that
13   correct?
14   A  Yes, we did.
15   Q  Can you turn to the next page of the exhibit.
16   That Bates No. on that page ends with 376?
17   A  I'm there.
18   Q  The first task on this page is identified as
19   production data load.  Do you see that?
20   A  I do.
21   Q  And the table indicates that Lawson was
22   responsible for executing the load of the test data
23   for Jackson.  Lawson did in fact, load the production
24   data for Jackson in connection with this
25   implementation project, correct?

949

RALEIGH - DIRECT        949

1    A  We did.  I believe we did.

2    Q  And continuing down the page.  Lawson also

3    conducted a full migration system test for Jackson in

4    connection with this project; is that correct?

5    A  We did.

6    Q  And Lawson was also responsible for the live data

7    migration for Jackson system, correct?

8    A  We were.

9    Q  If you look down below that table on the same page

10   there's another table, table 3.5.1.1.1, do you see

11   that?

12   A  I do.

13   Q  And the title on that table is master file in

14   configuration table value build and scope; do you see

15   that?

16   A  I do.

17   Q  And the table on this page identifies the master

18   files and configuration tables that were included

19   within the scope of the implementation project that

20   Lawson conducted for Jackson; is that correct?

21   A  Yes.

22   Q  So the data conversions that were included within

23   the scope of the project that Lawson performed for

24   Jackson included the vendor master, the item master

25   and the vendor catalog; is that correct?

950

RALEIGH - DIRECT        950

1    A  I would agree with the vendor master and the item

2    master, but if you note, there's a bolded Lawson

3    response next to the vendor catalog specification.

4    I'll also note that the system that was being convert

5    from was Eclipsys, right?  So the terminology used

6    here to describe the data is really more relevant to

7    the system from which the data was coming.

8        But if you note the Lawson response related to

9    catalog, vendor catalog, it's really more that that is

10   purely item master data.  So we really included the

11   item master data that they may be referring to based

12   on Eclipsys' terminology of the vendor catalog.

13   Q  If lawson provided a response to Jackson here that

14   said catalog information is a part of Lawson's item

15   master, it wouldn't be converted as part of conversion

16   item No. 22 above; is that correct?

17   A  Based on the definition of catalog information

18   that, I believe, was related to Eclipsys' definition

19   of vendor catalog information.

20   Q  But Lawson told Jackson that the vendor catalog

21   data in Jackson's prior system would be included as

22   part of the data that would be converted in connection

23   with this project, right?

24   A  Right.  Essentially, we told them that is

25   item master data, so it would be included under item 2

951

RALEIGH - DIRECT        951

1    there for item master.

2    Q  Lawson also provides maintenance and support

3    services to its customers; is that correct?

4    A  We do.

5        MS. ALBERT:  Mike, if you could, could you

6    put up Plaintiff's Exhibit 208.

7    Q  And, Ms. Raleigh, that's in Volume I of your

8    binders.

9    A  I'm there.

10   Q  Plaintiff's Exhibit 208, this a handbook that

11   Lawson publishes to its customers to tell them about

12   the types of support services that Lawson offers; is

13   that correct?

14   A  That's correct.

15   Q  Could you go to page 17 of the exhibit, and the

16   Bates number on that page ends with 050?

17   A  I'm there.

18   Q  Now, with reference to the chart on that page, it

19   shows that Lawson has four different levels of support

20   services; is that correct?

21   A  That's correct.

22   Q  There's a bronze level of support service.

23   There's a base maintenance support level; is that

24   accurate?

25   A  That's accurate.

952

RALEIGH - DIRECT        952

1    Q  There's a silver level of support services.

2    That's an enhanced level of support; is that correct?

3    A  That's right.

4    Q  And then there's a gold level of support services

5    that's entitled, Application Management; is that

6    accurate?

7    A  It incorporates Application Management in addition

8    to others, yes.

9    Q  Well, as we're proceeding up this chart, for each

10   successive level of support, Lawson would provide all

11   of the support at the level beneath that level plus

12   the additional support listed for the level that it

13   relates to; is that accurate?

14   A  That's accurate.

15   Q  Then there's a top level of support entitled,

16   Platinum that relates to hosted solutions; is that

17   correct?

18   A  That's right.

19   Q  So some services that would fall within the base

20   or bronze level of maintenance services that Lawson's

21   provides to its customers would include providing them

22   with upgrades to licensed products; is that accurate?

23   A  That's true.

24   Q  The enhanced level of support service that Lawson

25   provides to its customers at the silver level of

953

RALEIGH - DIRECT      953

1  support would include 24 by 7 emergency support; is
2  that correct?
3  A  Yes, that's correct.
4  Q  By 24 by 7 emergency support, that means 24 hour
5  by seven-day emergency support; is that correct?
6  A  That's right.
7  Q  In addition to the support services, Lawson can
8  also provide various different types of documentation
9  to its customers through its support website; is that
10  correct?
11  A  That's right.
12  Q  And at the bottom of the page there's some
13  additional options listed there.  So Lawson will also
14  provide, for example, an additional option of pager
15  support services for a client; is that correct?
16  A  That's right.
17  Q  So if a customer has a critical event happening
18  during nonbusiness hours, a Lawson support person
19  would be on call for the customer to respond to that
20  problem; is that correct?
21  A  That's right.
22  Q  And Lawson also offers something that's called a
23  Lawson knowledge base; is that accurate?
24  A  We do.
25  Q  That's included for customers that subscribe to

954

RALEIGH - DIRECT      954

1  the base level of support; is that correct?
2  A  That's right.
3  Q  And this knowledge base includes documentation
4  such as user manuals and product release notes and
5  frequently asked questions and documentations of that
6  of support; is that correct?
7  A  That's right.
8  Q  And Lawson also offers services that are referred
9  to as WebEx online support center services where a
10  Lawson support person may access a customer system
11  over the Internet and take control of the customer's
12  system to diagnose a problem; is that correct?
13  A  Depending on the nature of the problem, yes, we
14  might use that tool.
15      MS. ALBERT:  No further questions.
16      THE COURT:  Any questions?
17      MR. SCHULTZ:  Yes, Your Honor.
18
19      CROSS-EXAMINATION
20  BY MR. SCHULTZ:
21  Q  Good afternoon, Ms. Raleigh.
22  A  Good afternoon.
23  Q  It's fair to say that Lawson helps its customers?
24  A  Absolutely.
25  Q  As part of helping your customers, do you learn

955

1  about what your customers do with the Lawson system?
2  A  Certainly.
3  Q  I'd like you to refer back to Exhibit 216, please.
4  A  Yes, sir.
5  Q  Are you there?
6  A  I am.
7  Q  This is the same exhibit that you were referenced
8  to during the examination by Ms. Albert?
9  A  Yes.  The statement of work, yes.
10  Q  Before Lawson gets to a statement of work, what is
11  the process for Lawson to obtain the work from a
12  particular customer?
13  A  The process often starts with and did for Jackson
14  start with requests for proposal that the customer
15  issued to multiple software vendors based on the
16  business processes or the functionality of what they
17  needed to run their business.  So that process enables
18  each of the vendors to respond to the customer's
19  questions about what functionality we have within our
20  software and hopefully get to a point where they
21  understand that we can meet their business needs.
22      So that process takes quite awhile and certainly,
23  you know, is fairly iterative.  At the, you know,
24  conclusion of the sales process, typically when a
25  customer has chosen to work with a particular vendor,

956

1  in this case Lawson, they then also begin to talk
2  about how they're going to get the software
3  implemented.
4      So there may be a separate competitive cycle or
5  maybe not for choosing a services partner, choosing
6  someone to help them, train them, and work with them
7  throughout the process of getting the software
8  implemented.
9  Q  In the RFP process, that's when the customer is
10  actually providing to Lawson and other potential
11  vendors what it wants; is that right?
12  A  Exactly.
13  Q  So as part of that have process, whose language is
14  being used in an RFP?
15  A  The customer is using their language essentially
16  because they're issuing it to different vendors.  So
17  there's no common language, if you will, between
18  different vendors and how they, you know, how they
19  describe their software, the business processes.
20  There are lots of terms that are unique to different
21  vendors.
22      So a customer generally would base that RFP and
23  their questions on their past experience, whether it's
24  the way in which they describe a business process
25  inside their organization -- as an example, some

989

989

1    the afternoon on Tuesday, it looks like.  If not, you

2    may be kicking off on Wednesday morning, it depends.

3        My wife criticizes me substantially for

4    checking out the NOAA weather and other weather items

5    like the Weather Channel, and she accuses me of being

6    an old man with nothing to do because I do that, but

7    there are times when it comes into play.  And I saw

8    that there is a very significant snowstorm supposed to

9    hit the Midwest, and I don't want you-all to go home

10   over the weekend and get trapped there.

11       So be advised that being trapped in the snow

12   is not a sufficient excuse not to start the trial.

13   Mr. Carr will be ready to go.

14       And I am not, I want you to know, being paid

15   by any merchant in town to keep you-all here.

16       All right.  Thank you very much.  Have a nice

17   weekend.  Get some rest.

18       (The proceedings were adjourned at 5:17 p.m.)

19

20

21

22

23

24

25

990

```
 1         IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF VIRGINIA
 3                RICHMOND DIVISION
 4
 5   -----------------------------------
 6   ePLUS, INC.         : Civil Action No.
                         : 3:09CV620
 7   vs.                 :
                         :
 8   LAWSON SOFTWARE, INC.    : January 11, 2011
                         :
 9   -----------------------------------
10
11      COMPLETE TRANSCRIPT OF THE JURY TRIAL
12      BEFORE THE HONORABLE ROBERT E. PAYNE
13   UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24        Peppy Peterson, RPR
            Official Court Reporter
25        United States District Court
```

991

```
 1   APPEARANCES:  (cont'g)
 2   Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
 3   Troutman Sanders Building
     1001 Haxall Point
 4   Richmond, Virginia  23219
 5   Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
 6   William D. Schultz, Esquire
     Merchant & Gould, PC
 7   80 South Eighth Street
     Suite 3200
 8   Minneapolis, Minnesota  55402
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

992

```
 1              P R O C E E D I N G S
 2
 3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
 4   Incorporated versus Lawson Software, Incorporated.  Mr. Scott
 5   L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr.
 6   Michael G. Strapp, and Mr. David Young represent the plaintiff.
 7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
 8   Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
 9   the defendant.  Are counsel ready to proceed?
10        MR. ROBERTSON:  Plaintiff is, Your Honor.
11        MR. McDONALD:  Yes, we are, Your Honor.
12        THE COURT:  What did you all need to talk about?
13        MS. STOLL-DeBELL:  We actually resolved it, Your
14   Honor, between the time we that mentioned --
15        THE COURT:  Tell them to bring the jury in.  What do
16   we have this morning?
17        MR. ROBERTSON:  The first witness we're calling this
18   morning is Mr. Keith Lohkamp, Your Honor.  He's a Lawson
19   employee.  I have a number of binders associated with the
20   witnesses this morning.  I want to make sure my paralegal --
21   oh.
22
23        (Jury in.)
24
25        THE COURT:  Good morning, ladies and gentlemen.  All
```

993

```
 1   right, we have a witness.  Next witness.
 2        MR. ROBERTSON:  Mr. Keith Lohkamp.
 3        THE COURT:  All right, Keith Lohkamp.
 4
 5           KEITH LOHKAMP,
 6   a witness, called by the plaintiff, having been first duly
 7   sworn, testified as follows:
 8        DIRECT EXAMINATION
 9   BY MR. ROBERTSON:
10   Q   Good morning, Mr. Lohkamp.
11   A   Good morning.
12   Q   Mr. Lohkamp, you are a Lawson Software employee; correct?
13   A   Yes, I am.
14   Q   And you are a product strategist for supply chain
15   management; correct?
16   A   Yes.
17        THE COURT:  Can we get the witness to spell his last.
18   Q   Can you please spell your last name, sir, for the record.
19   A   It's L-o-h-k-a-m-p.
20   Q   Can you explain to the jury essentially what supply chain
21   management is?
22   A   Supply chain management involves the procurement of goods
23   and services and the management of the inventory related to
24   managing those goods.  It also includes, can include the sell
25   side, so selling those goods and services as well.
```

994

1   Q   And Lawson offers a suite of products that involve supply
2   chain management; correct?
3   A   Yes, Lawson offers a suite of supply chain products.
4   Q   Can you identify some of them for us, sir?
5   A   Some examples of the supply chain management applications
6   include strategic sourcing, contract management, procurement,
7   requisition self-service, procurement punchout, EDI, mobile
8   supply chain management.
9   Q   Inventory control?
10  A   Inventory control is a module that's part of the
11  procurement application.
12  Q   And you mentioned EDI.  That term has been bandied about
13  in the courtroom before.  Can you explain what your
14  understanding of EDI is as far as that application goes?
15  A   EDI stands for electronic data interchange, and what it
16  means is it's an application that sends electronic messages
17  from a buying organization to a selling organization and can
18  receive electronic documents back from the selling
19  organization.
20  Q   The vendor?
21  A   The vendor, yes.
22  Q   And you have been the supply chain management product
23  strategist since 2005; correct?
24  A   Correct.
25  Q   And that falls within the product management department?

995

1   A   Yes, it's part of the product management department.
2   Q   And part of your responsibilities and duties as this
3   product strategist include supporting sales and marketing; is
4   that right?
5   A   Yes.
6   Q   And as part of your role in supporting sales and
7   marketing, it's true that you conduct competitive analysis from
8   time to time; correct?
9   A   Yes, I do conduct competitive analysis from time to time.
10  Q   Why don't you tell the jury what you understand
11  competitive analysis to be?
12  A   When I do competitive analysis, I'm looking at what other
13  companies may offer in terms of software and what features and
14  comparing that to what Lawson offers and then trying to figure
15  out how to position our software against the competitors.
16  Q   And you've done this in the sphere of procurement;
17  correct, competitive analysis?
18  A   I have done competitive analysis in procurement.
19  Q   That is, actually go out and look at competitors and see
20  what kinds of features and functionality they are offering for
21  their products, see how Lawson can position itself to better
22  compete; correct?
23  A   Yes, I will look at the features competitors offer.
24  Q   You've done that, in fact, for the last five years for
25  Lawson; right?

996

1   A   As part of my responsibilities, I will look at certain
2   products that we may be competing against.
3   Q   For the last five years?
4   A   For the last five years.
5   Q   Isn't it true that you obtain information that use these
6   competitive analyses from actually looking at competitor
7   websites; correct?
8   A   Competitor websites are one source I use.
9   Q   What are some of the other sources you use?
10  A   The other sources might be conferences I attend.  I might
11  pick up materials from competitive booths, for example.
12  Q   Anything else?
13  A   I also may look at analysts' reports on particular
14  companies.
15  Q   Are there specific analysts' reports that are dedicated to
16  the procurement field?
17  A   There are certain analysts that will publish different
18  reports on procurement.
19  Q   And you also speak to Lawson sales employees for their
20  experiences in competing with other companies in the
21  procurement field; correct?
22  A   Yes, I will speak with the sales team to get their input
23  as well.
24  Q   And as product strategist in supply chain management, you
25  provide product information with respect to marketing

997

1   brochures; correct?
2   A   For the products that I work on, I'll provide input on
3   marketing brochures.
4   Q   You also do that for the products you work on in the
5   supply chain management, you provide information for content
6   for white papers; correct?
7   A   Yes.
8   Q   And you also, as part of your responsibilities as the
9   product strategist in procurement, have provided information
10  for the content of Lawson's website; correct?
11  A   Yes, I've provided input to the Lawson website.
12  Q   And you also provide product information with respect to
13  the content for product presentations at some of these trade
14  shows, for example, you talked about; correct?
15  A   Yeah, for the products I work on, I provide content for
16  presentations.
17  Q   Which includes procurement; right?
18  A   Includes procurement.
19  Q   And those various informational documents we just talked
20  about, the website, the brochures, the white papers, in most
21  instances, those are prepared for external audiences; isn't
22  that right?
23  A   Brochures and the website and white papers are prepared
24  for the external audiences.
25  Q   And they are reviewed by Lawson's legal department for

998

1  accuracy; isn't that right?

2  A  It's my understanding that the legal department reviews

3  those documents.

4  Q  And, of course, when you provide that kind of information

5  with respect to sales or marketing materials in brochures or

6  websites, white papers or other material, you try to be as

7  accurate as possible in that information; isn't that right?

8  A  Yes, we try to be accurate.

9  Q  And so it's not your intent to try to mislead anybody by

10  the content of those documents; correct?

11  A  That's correct.

12  Q  Let's talk a little bit about the Lawson supply chain

13  management and the various modules and applications that are at

14  issue here.  Is there a core functionality for the supply

15  chain management that's necessary in order to be able to search

16  for items and then be able to build requisitions and generate

17  purchase orders?

18  A  The core application to be able to requisition items would

19  be the procurement application.

20  Q  That would include inventory control?

21  A  That includes the inventory control module.

22  Q  That would include the requisitions module?

23  A  Includes the requisition module.

24  Q  And that would include the purchase order module; correct?

25  A  Yes, it includes the purchase order.

999

1  Q  Now, there are various applications, aren't there, that

2  need to sit on top of those core functional modules that Lawson

3  also offers its products; correct?

4  A  Yeah.  Lawson offers additional applications that sit on

5  top of that application.

6  Q  So, for example, one of those would be this requisition

7  self-service application?

8  A  Yes.

9  Q  And another one could be a punchout procurement

10  application?

11  A  Yes, sir, procurement punchout.

12  Q  Procurement punchout, that's an application that, if you

13  will, following my analogy, needs to sit on top of the

14  requisition self-service application; correct?

15  A  It requires requisition self-service, yes.

16  Q  If I want to have procurement punchout, I need to have

17  requisition self-service; right?

18  A  That's correct.

19  Q  There's also this EDI application you talked about?

20  A  Yes.

21  Q  Now, I don't need requisition self-service for the EDI

22  application; correct?

23  A  That's correct.

24  Q  So that can just sit on top of foundation, of this core

25  procurement technology we talked about, inventory control,

1000

1  requisitions, and purchase order; right?

2  A  Yes.

3  Q  There's something within the inventory control module

4  known as the item master; isn't that right?

5  A  Yes.

6  Q  And the item master is a list of products within the

7  inventory module; correct?

8  A  Yes, a list of products within the inventory control.

9  Q  So a user of this supply chain management software

10  solution we've been talking about -- can we call it S3 solution

11  for short?  Are you comfortable with that?

12  A  Yes.

13  Q  This S3 software solution offered by Lawson can have an

14  item master, a list of goods that are available from various

15  suppliers; isn't that right?

16  A  Yes.  It's a list of goods that the customers want to

17  purchase.  They can come from various sources.

18  Q  And so for each item in the item master, you have a number

19  of data fields associated with that item; isn't that right?

20  A  Yes.

21  Q  So you can have a stock unit of measure, for example?

22  A  Yes.

23  Q  You can have manufacturer information?

24  A  Yes.

25  Q  Manufacturer name?

1001

1  A  Yes.

2  Q  Vendor name?

3  A  No.

4  Q  Can't have a vendor name in it?

5  A  Not in the item master itself.

6  Q  Where would that vendor information be located; in a

7  vendor table?

8  A  The vendor name is in the vendor table.

9  Q  Okay.  Thank you.  Isn't one of the data fields you can

10  associate with an item, is a vendor item number?

11  A  Yes.  You can associate a vendor item number.

12  Q  And this vendor item number is a catalog number that can

13  be used to order from a supplier; correct?

14  A  Yes.  It's the catalog number to order from that

15  particular vendor.

16  Q  This Lawson S3 procurement product we've been talking

17  about has the capability of doing a vendor catalog load; isn't

18  that right?

19  A  It has the capability of loading items that were provided

20  by a vendor into the item master.

21  Q  It has the capability of doing a vendor catalog load;

22  isn't that right?

23  A  Well, there's a program called vendor catalog load that

24  can be used to upload items provided from a vendor.

25  Q  And it's called vendor catalog load?

1010

1  A  Yes, for certain vendors.

2  Q  I'd like to talk to you a little bit about the

3  requisitions module if we could.

4  A  Okay.

5  Q  That's part of the core three modules we talked about for

6  the S3 procurement product; right?

7  A  Yes.

8  Q  Isn't it true that more often than not Lawson's customers

9  in the public sector have some sort of requisition module or

10  application they've acquired from Lawson?

11  A  I believe that's correct.

12  Q  Let's talk a little bit about requisition self-service for

13  a moment if we could, sir.  Would it be fair to say that the

14  requisition self-service application is intended to be

15  user-friendly?

16  A  That is the intent.

17  Q  That's one of its goals; right?

18  A  Yes.

19  Q  This requisition self-service application that Lawson

20  offers, that provides the ability of hundreds, perhaps even

21  thousands of individuals at a customer to have access to this

22  procurement capability at their desktop or laptop PC; correct?

23  A  Yes, for the requisitioning capability.

24  Q  Isn't it, in fact, how Lawson markets this requisition

25  self-service application, by saying, in effect, you can now

1011

1  distribute that capability to many of your employees to have

2  the ability to search for matching items, build requisitions,

3  and generate multiple purchase orders; correct?

4  A  We market it as a way for them to search those items and

5  create requisitions.

6  Q  And then you need the other modules in order to do the --

7  generate the requisition and purchase orders and complete the

8  transaction; correct?

9  A  Right.  You need the purchase order to generate the

10  purchase.

11        THE COURT:  Excuse me just a minute.  If a vendor

12  with whom the customer has a need to interact has a large list

13  of items, and each one of these people over here of these

14  tables, the lawyers, they are different customers or different

15  employees of the customer, could Mr. Carr, one of those people

16  over here, have one segment of the vendor items available to

17  him because he's in department A, and Mr. McDonald have another

18  segment of the same vendor's items but not the same ones

19  because he's in department B, et cetera?  Could that be done in

20  this system?

21        THE WITNESS:  In that example, we would load all the

22  items into the item master, and then certain departments, you

23  may restrict who has access to certain items in the item master

24  so that an individual in a particular department may not be

25  able to buy, say, computers, for example.  So you could set

1012

1  that up to one user --

2        THE COURT:  Okay.  Excuse me.  Go ahead.

3  Q  All right.  So I'm clear on this, this requisition

4  self-service application differs from the requisition module in

5  it's more of a widespread application that can be used by

6  multiple users as opposed to the requisitions module in which

7  typically the requisitions department is authorized to make

8  purchases and not all these other employees?

9  A  Requisition self-service is designed to be available

10  through a web browser and available to more people.

11  Q  Now, you call some of these things modules and some of

12  these things applications, but really that's terminology you

13  just use in the way you market it; isn't that right?

14  A  It's terminology from the marketing, how we market and

15  sell it.

16  Q  It's still software; right?

17  A  Still software, yes.

18  Q  One of the things you can do with this requisition

19  self-service application is you can click on a drop-down menu

20  for find/shop to specify to search a catalog; isn't that right?

21  A  It's a find/shop search catalog.

22  Q  Requisition self-service has that capability; right?

23  A  Yes, it has that drop-down menu.

24  Q  And a user can also input keywords into a search box in

25  this requisition self-service application and the user

1013

1  interface to locate products; isn't that right?

2  A  Yes, they can.

3  Q  You have some familiarity with a standard known as the

4  universal standard products and services classification code,

5  also known as the UNSPSC code; correct?

6  A  Yes.

7  Q  And the UNSPSC code can be assigned to items in the Lawson

8  procurement suite and used in a way to navigate this

9  requisition self-service application we've been talking about;

10  isn't that right?

11  A  Yes.

12  Q  And so this -- actually where is the UNSPSC load for

13  inputting that data?  How do you do that?

14  A  For importing the UNSPSC code?

15  Q  Classification codes.

16  A  Okay.  So all the commodity structure, so all the codes

17  and the hierarchy are loaded into inventory control.

18  Q  Inventory control module has the capability to load that

19  as offered; right?

20  A  Yes.

21  Q  So out of the box, inventory control module, one of these

22  core modules that make up this S3 product we're talking about

23  has that capability to get those UNSPSC classification codes

24  right into it; right?

25  A  Yes.

1018

1    THE COURT:  Is or is not?

2    MR. ROBERTSON:  Is not.

3  Q   It's part of a foundational software on which the S3 core

4  software exists in any of these other applications; correct?

5  A   Yes.  Part of our core technology.

6  Q   To use punchout, procurement punchout, excuse me, it's

7  necessary to have this process flow; correct?

8  A   No.

9    THE COURT:  Process flow is part of the core

10  technology; is that what you said?

11    THE WITNESS:  Yes.

12    THE COURT:  Is the core technology necessary to use

13  procurement punchout?

14    THE WITNESS:  Um, so the core technology, it's

15  included.  People will get process flow when they get the core

16  technology.  Process flow is only used if you want to send XML

17  purchase orders from procurement punchout.  So if customers

18  aren't sending XML purchase orders, they don't need process

19  flow.

20  Q   If they are, they do need process flow?

21  A   They do need process flow.

22    THE COURT:  What is XML?

23    THE WITNESS:  XML is a type of document format.  It

24  stands for extended markup language, so it's an electronic file

25  format.

1019

1  Q   The Lawson system foundation is part of the core

2  technology, correct, in order to have procurement operate,

3  functional?

4  A   Yes.

5  Q   Let's talk a little about this punchout part of the

6  program if we could.  In order to assist Lawson's customers

7  with obtaining vendor information with respect to items that

8  are being offered for sale, Lawson establishes partnerships

9  with third-party vendors such that the Lawson system can punch

10  out to those vendors; isn't that right?

11  A   Sorry, could you repeat that, the question?

12  Q   In order to assist its customers with obtaining vendor

13  information with respect to items that are being offered for

14  sale, Lawson established partnerships with third-party vendors?

15  A   Yes, we've established partnerships for punchout to assure

16  that people can punch out to those vendors' websites.

17  Q   And Lawson refers to these third-party vendors as punchout

18  partners; correct?

19  A   We refer to them as punchout trading partners.

20  Q   And Lawson enters into agreements with some of these

21  Punchout trading partners; correct?

22  A   Yes.

23  Q   Others you have long-standing relationships with?

24  A   Sorry?

25  Q   Other of these punchout trading partners you have

1020

1  long-standing relationships with; right?

2  A   Right.  Others have been supported for a number of years.

3    THE COURT:  Excuse me just a second.  Earlier I

4  thought you said, and I'm not suggesting that you said anything

5  deliberately at odds or even maybe not at odds at all, so I'm

6  asking the question.

7    I thought you said that the customers, Lawson's

8  customers had to execute the contracts with the trading

9  partners, the punchout partners, and then you just said that

10  Lawson has contracts with the trading, punchout trading

11  partners.  Are there two different contracts that are involved?

12    THE WITNESS:  Yes, sir.  There are two different

13  contracts that are involved.

14    THE COURT:  What does the contract between Lawson and

15  the punchout partner, basically what does it arrange for?

16    THE WITNESS:  It arranged for the testing of the

17  communication between procurement punchout and the vendor's

18  maintained website.  We make sure there's really the handshake

19  so that if a customer wants to use our software with that third

20  party, we'll test it to make sure that it works and that when

21  they check out, that the items they've selected were able to

22  bring them back into our software, and so it covers that

23  initial testing and then ongoing maintenance of that.

24    THE COURT:  And then the customer's contract with the

25  punchout partner, what generally does it cover?

1021

1    THE WITNESS:  So the customers are contracting with

2  those vendors to buy goods and services from them, so they go

3  and negotiate that they're going to purchase from them, any

4  contract, any contracted prices as well.  So they are

5  establishing that business relationship for the purchase of

6  products.

7    THE COURT:  So basically if I'm doing something

8  through punchout, I go establish a purchase arrangement

9  contract with them, and then I can go in and order, and I can

10  put in what I need and it gets dealt with pursuant to that

11  contract; is that what happens?

12    THE WITNESS:  Yes.

13    THE COURT:  It obligates me to pay for it and then to

14  send it and et cetera, whatever the contract says; right?

15    THE WITNESS:  Yes.

16    THE COURT:  Your role in it is to set up the whole

17  process so I, as your customer, can do that, and that has to be

18  done in part by using -- by making sure there's an interconnect

19  between my system, your customer's system, and the punchout

20  partner system?

21    THE WITNESS:  Yes.  We're making sure that if our

22  customer wants to try it, technically it works.

23    THE COURT:  All right.

24  Q   So you indicated that Lawson enters into these punchout

25  trading partner agreements, but if the customer says, I want to

1022

1  be -- I have a relationship with Dell and Hewlett-Packard and

2  Compaq and IBM, Staples, Office Max, Office Depot, and I want

3  you to facilitate and set up those communication protocols you

4  talked about, that handshake I think you referred to it, Lawson

5  in fact does that; right?

6  A   If the customer --

7  Q   Can you answer that question fairly yes or no, sir?

8      THE COURT:  Wait a minute.  Do you understand the

9  question, Mr. Lohkamp?

10     THE WITNESS:  If you could repeat the question.

11  Q   You mentioned these communication protocols, this

12  handshake I think is how you referred to it in response to the

13  Court's questions with regard to how these -- the relationships

14  are set out.  The user tells Lawson which trading partners it

15  wants Lawson to create that communication with; isn't that

16  right?

17  A   If they've asked us to set it up as part of the services.

18  Q   If they want punchout partners, and you provided them with

19  this procurement punchout application and they come to you,

20  that's a service that you provide in order to make this

21  punchout capability work; isn't that right?

22  A   Yes, yes, we can provide the service.

23  Q   And, in fact, you do provide that service; right?

24  A   Yes, we do.

25  Q   And these punchout partners need to renew their agreements

1023

1  with Lawson annually; isn't that right?

2  A   For the ones we've signed agreements with, yes.

3  Q   And you also work with some punchout trading partners that

4  you haven't signed agreements with; is that right?

5  A   Yes.

6  Q   But you still have to set up these same communication

7  protocols notwithstanding that there's no formal written

8  agreement; right?

9  A   If the customer asks us to do it.

10  Q   And you'll do it?

11  A   Yes.

12  Q   And you have done it?

13  A   Yes.

14  Q   And in order to facilitate access to this punchout trading

15  partner item data, it's Lawson's services team that configures

16  within the procurement punchout application to make those

17  trading partners accessible to customers; isn't that right?

18  A   Yes, if the customer has asked us to do that.

19  Q   And customers ask you to do that, don't they?

20  A   Yes.

21  Q   And you do it, don't you?

22  A   Yes, we do.

23  Q   And this configuration that you're talking about, this

24  handshake involves setting up logging credentials and

25  information, other information in order to get to that

1024

1  particular vendor's site; isn't that right?

2  A   Yes.

3  Q   Forgive me if I've asked you this already, but when you do

4  this and you configure this and you provide these credentials

5  and establish that handshake with a punchout trading partner at

6  the customer's request, Lawson charges a fee for that service;

7  is that right?

8  A   Yes, it does.

9  Q   And Lawson enters a statement of work with a trading

10  partner for this punchout implementation and configuration

11  services; isn't that right?

12  A   Sorry.  Statement of work would be with the trading

13  partners; is that what you are asking?

14  Q   Yes.

15  A   We would do a statement of work for the initial testing as

16  part of the punchout partner agreement.

17  Q   And testing is essential in order to make sure this is

18  going to work for the customer; isn't that right?

19  A   To know that it works, yes.

20  Q   Lawson charges a fee for that?

21  A   Yes.

22      THE COURT:  Charges who a fee, sir?

23      THE WITNESS:  We charge the trading partner who wants

24  to sign up for our program.

25  Q   Can you turn to Plaintiff's Exhibit 104, please, sir.

1025

1  You've seen this document before; is that right?

2  A   Yes, I have.

3  Q   Indeed, you are the author of this document, aren't you,

4  sir?

5  A   Yes, I am.

6  Q   And as part of your job as product strategist at Lawson,

7  you were proposing a new punchout partner program; isn't that

8  right?

9  A   Yes, I was.

10      THE COURT:  You mean you are the one who proposed

11  that it get into being in your company?

12      THE WITNESS:  Yes, I proposed having a formal program

13  around this.

14  Q   Formal punchout partner program; right?

15  A   Yes, formal punchout partner program.

16  Q   That's the title of this document; correct?

17  A   Correct.

18  Q   And this formal punchout partner program was later adopted

19  at Lawson along similar lines as you laid out in this document;

20  isn't that right?

21  A   Yes, on similar lines.

22  Q   And there are certain program characteristics for this

23  punchout partner program that you outline for Lawson; isn't

24  that right?

25  A   Yes.

1034

1  agreement; right?

2  A  I was involved in some portions, mostly just around

3  reviewing some of the content as well as the benefits.

4  Q  Why don't we go to Plaintiff's Exhibit 191 if we could.

5  You've seen this document before; correct?

6  A  Correct.

7  Q  This services order form is part of the agreement between

8  Lawson and its punchout partners; isn't that right?

9  A  Yes, if they're going to do testing.

10  Q  Didn't I understand you to say before that when you set up

11  these communication protocols, that handshake, if you will, you

12  always do testing in order to determine that it's going to be

13  functional for the customer?

14  A  Yes.  We do that testing.

15  Q  So to be sure, why don't we go to page three of the

16  documents which ends with the Bates label 591, and one of the

17  things to be provided here by a senior technical consultant as

18  a deliverable is punchout testing, internal testing and testing

19  with partner to validate cXML compliant punchout messages and

20  cXML order requests, purchase order; do you see that?

21  A  Yes, I do.

22  Q  And then upon successful completion of this testing,

23  Lawson updates its procurement punchout trading partner list;

24  is that right?

25  A  That's right.

1035

1  Q  And at the investment there over on the bottom right-hand

2  corner is the $2,000 you said is the fee that you charge for

3  that; right?

4  A  That's for this proposal, is $2,000.

5  Q  I thought -- I understood you to say that was the standard

6  fee.

7  A  Well, it's $2,000 a day for consultants depending upon how

8  much work it might take.  This example is $2,000.

9  Q  That's all I have with respect to that document, sir.  Now

10  I'd like to talk to you a little bit about some of the services

11  that Lawson provides to its S3 procurement customers.

12  A  Okay.

13  Q  One service that Lawson offers to its customers with

14  respect to this S3 procurement product is what are called

15  managed services; isn't that right?

16  A  Yes.

17  Q  You are familiar generally with the term known as hosting?

18  A  Yes, I am.

19  Q  And hosting is part of these managed services; isn't that

20  right?

21  A  Yes, it can be part of managed services.

22  Q  Managed services, I infer from your answer, can include

23  more than just hosting; right?

24  A  Yes.

25  Q  And managed services, however, are a service that Lawson

1036

1  charges fees to its customers; correct?

2  A  Yes.

3  Q  And so some of these managed services could be

4  installation; correct?

5  A  Installation, my understanding, is separate from the

6  managed services.

7  Q  Would you consider those to be under consulting services?

8  A  Yes, I would.

9  Q  So do you charge for those consulting services as well?

10  A  Yes.

11  Q  So installation falls in the consulting services bucket?

12  A  Yes, that's my understanding.

13  Q  Hosting falls within the managed services bucket?

14  A  I'm not sure exactly where that would fall.

15  Q  Wherever it falls, though, managed services is something

16  that Lawson provides; correct?

17  A  Yes.

18  Q  There's also training which could include managed

19  services; is that right?

20  A  No, training is separate from managed services.

21  Q  Is that consulting services?

22  A  I think that -- I'm not 100 percent certain.  I think it

23  falls under the consulting umbrella.

24  Q  Let's talk about these managed services where Lawson is

25  hosting, that is actually providing the system, making it

1037

1  available to the customer instead of having the customer having

2  the software operating on its own servers.  You are familiar

3  with that; right?

4  A  Yes, to some degree.

5  Q  So where Lawson provides this managed or hosted

6  procurement capability, this service, the user is actually

7  accessing the Lawson system over the internet; isn't that

8  right?

9  A  Yes.  They access that over a secured connection to the

10  hosting computers.

11  Q  Why do you want it to be secure?

12  A  So that other people don't have access to that data.  You

13  only want our customers to be able to log in and access that

14  data.

15  Q  And so the customer doesn't actually have to have this

16  procurement software operating on its internal system, it just

17  accesses the system, a secure system that Lawson is operating

18  that makes it available so they can purchase items from

19  multiple vendors; isn't that right?

20  A  I'm not sure I completely understand the question.  Could

21  you repeat that?

22  Q  Sure.  Customers don't actually have to have the Lawson

23  software operating on its internal system, its servers; it can

24  just access the procurement system that Lawson is operating and

25  make that available to them so they can purchase items from

1038

1 multiple vendors?

2 A  Yes.  Our customers don't have to have it operating on

3 their own servers.  They can access a hosted set of procurement

4 applications.

5 Q  And they can perform these purchasing functions we've been

6 talking about for multiple vendors, can't they?

7 A  They can perform the purchasing functions and order from

8 multiple vendors.

9 Q  And this hosting operation that Lawson conducts also

10 includes procurement punchout; isn't that right?

11 A  It is an option for our customers to use procurement

12 punchout.

13 Q  So a customer might prefer to have Lawson host the

14 procurement software as opposed to having it on their own

15 system so they would not have to manage the servers or update

16 the applications; isn't that right?

17 A  That's right.

18 Q  One of the services Lawson provides with respect to this

19 S3 procurement product we've been talking about is

20 installation; is that right?

21 A  That's right.

22 Q  And you charge for installation, don't you?

23 A  Yes, we do.

24 Q  And isn't it true that Lawson's customers choose to have

25 Lawson consultants perform the installation or implementation

1039

1 of this S3 procurement product we've been talking about more

2 often than not?

3 A  I don't know for certain about that.

4 Q  Do you recall being asked that question in your

5 deposition?

6 A  I don't recall being asked that.

7 Q  Why don't we turn to your deposition which is the first

8 day, October 20, 2009, at page 103.

9     THE COURT:  Page what?

10     MR. ROBERTSON:  103, Your Honor.

11 Q  You'll see starting at about line 13, a question was

12 asked, if I'm a customer and I'm having a supply chain

13 management solution installed or implemented, it's your

14 understanding that there's a revenue stream that is associated

15 specifically for that service that can be attributable to, for

16 example, supply chain management if that's the product I'm

17 getting.

18     MS. STOLL-DeBELL:  Can you tell me where you are?

19     THE COURT:  103 starting at line ten -- I mean line

20 13, and it's the first part of the deposition, the first day.

21 Q  This was a preliminary question, and your answer was, yes,

22 if they choose Lawson consultants to do the work.

23     My next question was, let's just -- focusing on supply

24 chain management licensing for now, you indicated in your last

25 answer there's a revenue associated with the installation of

1040

1 that product if they choose Lawson.  Can you tell me in your

2 experience what percentage of Lawson's customers who are

3 implementing a supply chain management solution select Lawson

4 to do -- conduct that implementation or installation, and your

5 answer, I don't know that percentage.

6     My follow-up question was, is it more often than not.

7 Your answer was, yes.  Did I read that correctly?

8 A  Yes, you did.

9 Q  Okay.  Thank you.  Lawson also charges for the service of

10 transferring item data from what's called a legacy system into

11 the Lawson S3 procurement system; isn't that right?

12 A  Yes.

13 Q  And from time to time, Lawson consultants actually visit

14 with customers to conduct training sessions for this S3

15 product; right?

16 A  Yes.

17 Q  And Lawson charges fees for that service as well; right?

18 A  Yes.

19 Q  And Lawson provides learning tools to its customers with

20 respect to its S3 procurement product; correct?

21 A  Yes.

22 Q  One of these learning tools is an online classroom

23 training for its customers; right?

24 A  Yes.

25 Q  Let's talk a little bit about maintenance as a service.

1041

1 If a Lawson user is having a problem with their particular

2 product and they want to go and access a guide that might

3 assist them in working out some of their issues, does Lawson

4 make that type of assistance available to its customers online?

5 A  Yes.

6 Q  And Lawson charges for that type of service as well;

7 correct?

8 A  The charge is part of the maintenance agreement.

9 Q  Does everyone need a maintenance agreement when they

10 license these products?

11 A  Yes, if they want to have updates.

12 Q  By updates, you mean periodically the product may have new

13 features or functionalities or fixes of bugs in the system, and

14 Lawson provides those upgrades for a fee as part of

15 maintenance; is that right?

16 A  We provide that -- as part of their maintenance agreement,

17 they get the fixes and the upgrades.

18 Q  So as part of the maintenance agreement, everybody gets

19 these upgrades; right?

20 A  For the products they own, yes.

21 Q  That's why they have to pay the maintenance fee?

22 A  Yes.

23 Q  And the maintenance fee, just to be clear, is separate

24 from the licensing fee for actually getting the software;

25 right?

1042

1  A  Yes.

2  Q  And the services, those fees, they are separate from the

3  maintenance fee; right?

4  A  Yes, they are.

5  Q  Lawson enjoys revenues from both licensing, maintenance,

6  and from servicing; correct?

7  A  Correct.

8  Q  Of those three categories of revenues that Lawson enjoys

9  proceeds, payments, licensing is, in fact, the smallest; isn't

10  it?

11  A  I'm not a hundred percent sure.  I think it is.

12  Q  So -- let's -- are you sure of this:  If I add services

13  and maintenance, in every instance that's going to be larger

14  than the licensing fee?

15  A  Every time an individual customer or for Lawson as a

16  company as a whole?  I want to make sure I understand what you

17  are asking.

18  Q  Let me clarify.  Let's talk about first Lawson as a

19  company as a whole for all of its software solutions.

20  Maintenance and servicing revenues together are always larger

21  than licensing revenues for the company as a whole; correct?

22  A  That's my understanding, yes.

23  Q  For this S3 procurement application we're talking about,

24  the same holds true; right?

25  A  Yes.

1043

1  Q  Just so I'm clear, everybody who licenses this also has to

2  enter into a maintenance service agreement with Lawson as well.

3  When I say "this," I mean the S3 procurement product we're

4  talking about?

5  A  And you're asking when they initially sign their

6  contracts?

7  Q  Yes.

8  A  Yes.

9  Q  Do they have to periodically, from time to time, pay

10  updated maintenance fees?

11  A  Periodically they have to renew their maintenance, and it

12  could go up or change.

13  Q  Does everybody have to enter into a services contract with

14  Lawson?

15  A  No.

16  Q  What percentage of the customers involved in this S3

17  procurement product do enter into service agreements?

18  A  I don't know that percentage.

19  Q  More than half?

20  A  I said at my deposition it's more often than not.

21  Q  Let's talk a little about this process that involve

22  request for proposals.  You are familiar with those; right, Mr.

23  Lohkamp?

24  A  Yes, I am.

25  Q  From time to time, Lawson's called upon to provide

1044

1  responses to specific questions in a request for a proposal

2  from an existing or potential new customer; isn't that right?

3  A  Yes, I'm sometimes called upon to provide answers.

4  Q  And we've discussed -- I think the jury has a general

5  understanding as to what RFPs are.

6  A  Okay.

7  Q  But just so we're clear, you understand them to be a

8  series of questions the customer may be asking about the

9  capability of a particular product; correct?

10  A  Yes.

11  Q  And you are involved in that RFP process at Lawson; is

12  that right?

13  A  Only when in certain situations where I'm asked specific

14  questions.  I'm not involved on a day-to-day basis.

15  Q  But you have been involved in the RFP process where people

16  come to you and ask you specific questions; is that right?

17  A  Yes.

18  Q  Your role is typically to help answer these RFP questions

19  that the salesperson at Lawson are unable to answer; isn't that

20  right?

21  A  Yes.

22  Q  And in many instances, persons who answer those questions

23  are account executives or solutions consultant, and they

24  provide the content for the responses to the RFPs; isn't that

25  right?

1045

1  A  That's my understanding, yes.

2  Q  But you work with the account executives and solution

3  consultants in providing that content; right?

4  A  Are you asking specifically for those RFPs?

5  Q  Yes.

6  A  So only when I'm requested for those particular questions.

7  Q  But when you are asked, you assist in the process;

8  correct?

9  A  Yes, I do.

10  Q  And you've reviewed those responses and provided guidance

11  on how to answer those questions; correct?

12  A  For the questions I'm asked to review or respond to.

13  Q  When you do that, you are attempting to provide the most

14  accurate information possible in responding to the questions;

15  correct?

16  A  Yes, I'm trying to provide accurate information.

17      MR. ROBERTSON:  Your Honor, may I have a minute?  I

18  had a section of my outline here that I believe I left over on

19  the table which I believe would be appropriate at this point.

20  See if I can lay my hands on it.  I apologize.

21      Your Honor, this might take a minute.  May I ask the

22  Court for a short indulgence in order --

23      THE COURT:  We'll take the morning recess now, ladies

24  and gentlemen.  We'll have 20 minutes.

25      MR. ROBERTSON:  Thank you, Your Honor.

1046

1    THE COURT:  Have they already gotten their menus back
2 there?
3    THE CLERK:  They've already filled them out
4 downstairs.
5    THE COURT:  We won't subject you to the elements in
6 order to eat today.  All right, please take your note pads with
7 you.
8
9        (Jury out.)
10
11    THE COURT:  Maybe it edited itself out.
12    MR. ROBERTSON:  I'm sorry, sir?
13    THE COURT:  Maybe it edited itself out.  How much
14 longer do you have with this witness assuming you can find that
15 piece that edited itself out?
16    MR. ROBERTSON:  I think probably about 45 minutes,
17 Your Honor.
18    THE COURT:  45 minutes more.  You're not moving along
19 at a pace that will allow us to finish today given the other
20 testimony that you told me you were going to have.
21    MR. ROBERTSON:  Yes, Your Honor.  And to be fair, I
22 didn't represent that I thought we were going to finish today.
23 I don't think --
24    THE COURT:  To be fair, I thought you did, because I
25 told him to have his people here based on what you told me.  So

1047

1 maybe I misunderstand, but don't be planning on extending this.
2 The curtains will have to come down here at sometime.
3    MR. ROBERTSON:  I understand, Your Honor.
4    THE COURT:  We're doing a lot of repetition.  So
5 maybe you can hone it down.
6    MR. ROBERTSON:  I'll try that, Your Honor.
7    THE COURT:  I notice this morning we have gone the
8 one hour and a half, approximately, without any cough at all,
9 and I think that's a very good thing.  All right, we'll be in
10 recess.
11
12        (Recess taken.)
13
14
15
16
17
18
19
20
21
22
23
24
25

1048

1        (The jury is present.)
2    THE COURT:  All right.
3 BY MR. ROBERTSON:
4    Q  Mr. Lohkamp, I just want to get back to that
5 question I was asking you about that hosting service
6 that is Lawson will provide.  The hosting of that is
7 at a Lawson facility; is that correct?
8    A  My understanding is it's at a third party
9 facility.
10    Q  A third party facility that is being leased by
11 Lawson for hosting those servers that have the
12 operational software?
13    A  We are leasing space at the third party hosting
14 site.
15    Q  It's Lawson's servers that are operating the
16 hosting service?
17    A  I don't know exactly how that's structured.
18    Q  You have a rather large binder next to you right
19 there on the left-hand corner of the table.  That's
20 Plaintiffs' Exhibit No. 118.  I just want to ask you a
21 few questions about that, if we could.
22       If you will flip through quickly, you will see
23 that that binder is just one Lawson response to a
24 request for a proposal for Cherry Creek Schools; do
25 you see that?

LOHKAMP - DIRECT        1049

1    A  Yes, yes.
2    Q  This is a Lawson authored document?
3    A  It looks like it is, yes.
4    Q  And there's an executive summary at page 7 of the
5 document, Section 1.0, ends with Bates label 173.
6 Page 7 is identified in the lower left-hand corner.
7    A  Yes.
8    Q  One of the software solutions that Cherry Creek
9 School is seeking, you'll see in that first paragraph,
10 is to include the ability to conduct business online
11 with vendors and other partners.  The school wants to
12 have procurement activities and resources available
13 there.  Do you see that?
14    A  Yes, I see that.
15    Q  That would be part of the procurement solutions
16 we've been talking about; is that right?
17    A  That's what I would interpret, yes.
18    Q  If you'll turn to the page that is page 27495 and
19 ends with Bates label 193.  There's a heading
20 entitled, Custom catalogs.  Do you see that?
21    A  Yes, I see that.
22    Q  Under that heading it says, Individual department
23 and users can establish custom catalogs that reflect
24 their unique ordering patterns.  Do you see that?
25    A  Yes, I do.

1050

LOHKAMP - DIRECT      1050

1  Q  Next sentence that Lawson is representing to this
2  potential customer is that, Furthermore, you can
3  establish catalogs for certain days of the week by
4  item classification, vendor or other criteria.  Did I
5  read that correctly?
6  A  Yes, you did.
7  Q  That's a representation that Lawson was making to
8  this school district?
9  A  Yes.
10  Q  I want you to turn to page 179 of this document,
11  and there's a heading there called "functional
12  catagory purchasing."  Do you see that?
13  A  I'm just flipping to it, sir.
14  Q  Are you with me now?
15  A  I am.
16  Q  There's a legend there for certain things that are
17  provided by Lawson or are provided by third parties or
18  whether some people require some configuration, etc.
19  Do you see that?
20  A  Yes.
21  Q  Lawson represent there that when they use the term
22  "F," that the functionality is fully provided out of
23  the box.  Do you see that?
24  A  Yes.
25  Q  And you'll see below there there's a table that

1051

LOHKAMP - DIRECT      1051

1  has certain headings including a reference number and
2  functional requirements.  Do you see that?
3  A  Yes.
4  Q  And the third column has a response.
5  A  Yes.
6  Q  And under that response, for example, for the
7  reference No. PO 1.00, the response would be F, right?
8  So that means that the Lawson purchasing of the
9  procurement solution they are offering here, for
10  example, would have that capability fully provided out
11  of the box.  Is that how you would understand this
12  table?
13  A  Yes, that's what the response means.
14  Q  If you would turn to page that ends 192, which is
15  Bates label 9358.  There's a question from the school
16  district at PO 161 on that page.  Do you see that?
17  A  Yes.
18  Q  So the school district is asking Lawson for this
19  procurement solution whether it has the ability to
20  generate various catalogs, including vendor catalogs,
21  stockroom catalogs, textbook catalogs or food service
22  catalogs in print and online.  Do you see that?
23  A  Yes.
24  Q  And lawson indicated that that capability was
25  fully provided out of the box, correct?

1052

LOHKAMP - DIRECT      1052

1  A  Yes, we answered F.
2  Q  That's all I have of that document, sir.
3  I'd like you to go to Exhibit No. 215 now if I
4  could, plaintiff's exhibit.
5  A  I'm sorry?
6  THE COURT:  It's not in the notebook, is it?
7  MR. ROBERTSON:  No, Your Honor.  That was my
8  mistake, but he does have it now.
9  Q  Well, do you have Plaintiff's Exhibit No. 215 now,
10  sir?
11  A  Yes.
12  Q  Now, again, this is a Lawson authored document,
13  correct?
14  A  Yes, it looks like it.
15  Q  And it looks like it's a response to Jackson
16  Health Care System; correct?
17  A  Yes.
18  Q  And if you'd go to the executive summary again,
19  there's a mention of Lawson's ERP systems, which
20  include this procurement software we've been talking
21  about, correct?  That falls under the heading of
22  electronic -- what's called enterprise resource
23  planning solutions?
24  A  Yes.  ERP would include purchasing.
25  Q  If you go to the page that ends with the Bates

1053

LOHKAMP - DIRECT      1053

1  label No. 149, sir.  I'm sorry.  It's the page that's
2  at the left-hand corner ends with 149.  It ends with
3  the Bates label 171.  And again, in this table in the
4  left column is a heading called functional capability.
5  Do you see that?
6  A  Yes.
7  Q  Then there's another heading that, says currently
8  "available."  And then there's another heading that
9  says "currently not available."  And then there's a
10  heading that says "attachment."  Do you see that?
11  A  Yes, I do.
12  Q  And if you go down to the column with the heading
13  9 G commodity management functions?
14  A  Yes.
15  Q  The second question there says, Does the system
16  support generic and vendor catalogs with sub
17  categories of inventory and stockless items?  Do you
18  see that?
19  A  Yes, I do.
20  Q  What did Lawson indicate about whether its system
21  had that capability?
22  A  It indicated yes.
23  Q  Two lines down, sir, from that you'll see a
24  heading under "commodity management functions,"
25  support X12832, electronic price catalog data from

1054

LOHKAMP - DIRECT      1054

1    vendors to the JHS item catalogs with updates to
2    existing items only.  Do you see that?
3    A   Yes.
4    Q   JHS is this Jackson Health System, a potential
5    customer, right?
6    A   I believe that's what it stands for.
7    Q   What did Lawson represent to Jackson Health System
8    with respect to whether its procurement system had
9    that capability?
10   A   Yes.
11   Q   The next line down says, "Ability to update our
12   catalogs with external vendor provided files."  Do you
13   see that?
14   A   Yes.
15   Q   What did Lawson represent to the Jackson Health
16   Care system as to its procurement software capability?
17   A   We indicated yes.
18   Q   If you'll turn to the next page still under this
19   functional capability column, there's a subheading
20   there that says, "Expanded item searched by," do you
21   see that?
22   A   Yes.
23   Q   With respect to whether or not the Lawson
24   procurement solution offered to Jackson Health System
25   had the ability to do a search by vendor catalog

1055

LOHKAMP - DIRECT      1055

1    number, what did Lawson answer?
2    A   Yes.
3    Q   What did Lawson answer when it was asked whether
4    it could do a search by a hospital specific code?
5    A   Yes.
6    Q   What did Lawson answer when it was asked whether
7    it could do a partial description of an item, for
8    example, wild card, contains, etc.?
9    A   We answered yes.
10   Q   What did Lawson answer when it was asked by this
11   health system whether or not it could do searches by
12   manufacturer catalog number?
13   A   We answered yes.
14   Q   What did Lawson answer when it was asked whether
15   it could search by classification code?
16   A   We answered yes.
17   Q   What did Lawson answer when it was asked whether
18   it could search by a vendor name?
19   A   We answered yes.
20   Q   What did Lawson answer when it was asked whether
21   it could search by a manufacturer's name?
22   A   We answered yes.
23   Q   The next category said whether or not it could
24   answer questions with respect to item availability.
25   Do you see that where it says, "currently available"?

1056

LOHKAMP - DIRECT      1056

1    A   What section?
2    Q   Actually, that's all I have with respect to that
3    document sir.
4    A   All right.
5    Q   Thank you.  Do you have Plaintiff's Exhibit 149 up
6    there?
7    A   Here it is.
8        THE COURT:  It's not in his book either.
9        MR. ROBERTSON:  He has it now, Your Honor, in
10   his book.
11   Q   This is another response to a request for
12   information, isn't it, by the Holland Hospital?
13   A   Yes.
14   Q   It's a Lawson authored document?
15   A   It appears so.
16   Q   And let me just go right to it.  There's some
17   questions about functional requirements for
18   procurement solutions being discussed by Lawson in
19   this document.  This is at the page that ends with the
20   Bates label 58.  I'm sorry.  It's page 58 of 91, and
21   it has the Bates label ending 796.
22   A   Okay.
23   Q   I apologize.  I've directed you to the wrong page.
24   It's 149 and it's at page 29.  So let's start over, if
25   we could.  I apologize, Mr. Lohkamp.

1057

LOHKAMP - DIRECT      1057

1        There's a heading there for material
2    requirements -- excuse me.  Materials requirements.
3    Then there's a subheading "inventory control," do you
4    see that?
5    A   Yes.
6    Q   Could you read out loud No. 10 for the jury?
7    A   "Ability to produce supply catalogs by item
8    number, manufacturer, vendor, class, inventory
9    location."
10   Q   And there's a response key at the top.  Do you see
11   that?
12   A   Yes.
13   Q   What does Lawson represent that A means?
14   A   Available/install.
15   Q   If you will go back to page 21 of 91, there is
16   instructions for the application of functional
17   requirement questions there?
18   A   Yes.
19   Q   So you have already identified that have A means
20   available and currently installed.  Underneath that
21   there's a rating column.
22   A   Okay.
23   Q   It says, For each requirement listed, rate the
24   application's performance on a scale from 0 to 7, with
25   0 indicating no performance to 7 indicating leading

1062

LOHKAMP - DIRECT      1062

1  order form that modifies a statement of work for
2  Community Medical Centers.
3      Q   What's a change order form modifying statement of
4  work?  Does that mean the statement of work has been
5  modified in some way?
6      A   Yeah.  My understanding of what a change order
7  form is someone is requesting a change to the services
8  we provide.
9      Q   What is the next document in that binder?
10     A   It's PX 501 L.  And it's a statement of work for
11  Deaconess Health System.
12     Q   Can you go to the next one?
13     A   The next one is PX 501 M, and it's the master
14  terms and conditions, Lawson Software and user
15  agreement.
16     Q   What's the next document?
17     A   That's the last one in this binder.  Should I go
18  to the next binder?
19     Q   All right.  Sorry, sir.  What's the first document
20  in there?
21     A   In this first binder?
22     Q   No, in the second binder.
23     A   I haven't got that.  Sorry.  It's PX 501 N.  And
24  the first page is a sales and use tax certification of
25  exemption.

1063

LOHKAMP - DIRECT      1063

1      Q   What's the next page?
2      A   The next page is a services turnover document.
3      Q   Okay.  Next page?
4      A   It's a services order form for Holland Hospital.
5      Q   What's the exhibit number for that one, sir?
6      A   This one is PX 501 N.
7      Q   Services order form, is that the order form for
8  the services that Lawson is going to be providing to
9  Holland Hospital?
10     A   Yes, it is.
11     Q   What's the next document, sir?
12     A   The next document is PX 501 R, and it states,
13  "Server sizing estimate for Owensboro Medical Health
14  System."
15     Q   Can you turn to the page where it indicates it's
16  going to be a contract for services provided?
17     A   The next page is "What is a server sizing
18  estimate?"
19     Q   What about the next page?
20     A   "Parameters overview."  It's still part of the
21  sizing.
22     Q   Next page, sir?
23     A   "Proposed architecture."
24         THE COURT:  Interesting, but not useful.
25  What are we doing?  These exhibits are in.

1064

LOHKAMP - DIRECT      1064

1          MR. ROBERTSON:  Well, Your Honor, I'd like to
2  offer what we had discussed before was is a Federal
3  Rule of Evidence 1006 summary of the documentation.
4  We've provided it to the defendant, and I believe with
5  one modification it was not objected to.  It's
6  Plaintiff's Exhibit 516.
7          THE COURT:  Any objections to Plaintiff's
8  Exhibit 516?
9          MS. STOLL-DeBELL:  No, Your Honor.
10         THE COURT:  What is it?
11         MR. ROBERTSON:  What is it?  I'm sorry, Your
12  Honor?
13         THE COURT:  Summary of what?
14         MR. ROBERTSON:  Of these contracts and what,
15  in fact, the software applications and modules that
16  were licensed, the involvement and the implementation
17  of those, and the various customers and information
18  detailing what the implementation was and what the
19  particular applications or modules that were
20  licensed.
21         THE COURT:  And there's no objection to PX
22  516.  It's admitted.
23         (Plaintiff's Exhibit 516 is admitted into
24  evidence.)
25         THE COURT:  And all of the PX 501s are

1065

LOHKAMP - DIRECT      1065

1  admitted, aren't they?
2          All right.  Let's go.
3  BY MR. ROBERTSON:
4      Q   I'd like to talk to you, sir, a little bit about
5  some industry analyst reports and publications that
6  you review as part of your job as product strategist.
7  All right?
8          So in your role as a product strategist, you have
9  had occasion to review industry analyst reports; is
10  that right?
11     A   That is correct.
12     Q   Among the industry analyst reports you review on
13  occasion is Gartner, correct?
14     A   Correct.
15     Q   And you also review industry analyst reports from
16  Aberdeen; is that right?
17     A   Yes, I do.
18     Q   These are industry analyst reports that often
19  refer to products that were within your
20  responsibilities at the company including procurement,
21  right?
22     A   Yes.
23     Q   And you have also reviewed industry analyst
24  reports from Forester; is that right?
25     A   Yes, I have.

1066

LOHKAMP - DIRECT     1066

1  Q  Particularly, in the procurement area; is that
2  correct?
3  A  Yes, I have.
4  Q  And for procurement industry, you have also looked
5  at analyst reports from AMR; is that right?
6  A  Yes.
7  Q  And you have also looked at analyst reports from
8  an outfit known as VDC; is that right?
9  A  That's correct.
10  Q  And Lawson reviews and sometimes relies on the
11  information provided in those industry analyst reports
12  for making its own internal decision; isn't that
13  right?
14  A  Yes, we sometimes lavish those into our planning.
15  Q  Isn't it true that you provide information
16  concerning Lawson's products including procurement
17  products in the supply chain management industry to
18  those analyst reports?
19  A  Yes, I do.
20  Q  And part of your duties as a product strategist
21  for Lawson is to speak with these industry analysts
22  about the procurement solutions like S3 offered by
23  Lawson; isn't that right?
24  A  Yes, it is.
25  Q  And among the industry analysts that you speak

1067

LOHKAMP - DIRECT     1067

1  with in your role as a product strategist is Garter,
2  correct?
3  A  Yes.
4  Q  And Forester?
5  A  Yes.
6  Q  Aberdeen?
7  A  Yes, Aberdeen.
8  Q  VDC?
9  A  Yes.
10  Q  AMR?
11  A  Yes.
12  Q  And you use these industry analyst reports to
13  provide Lawson with intelligence with respect to
14  market trends; isn't that right?
15  A  Some of the reports I do use for that.
16  Q  What are the ones you find most reliable, sir?
17  A  Gartner is one of the more reliable ones.
18  Q  And you have a personal subscription to one of
19  more of these publications; isn't that right?
20  A  I have a personal subscription to AMR, but then it
21  converted into Gartner when they were purchased.
22  Q  But the ones you use most are Gartner and
23  Forester; isn't that right?
24  A  Gartner, Forester and AMR.
25  Q  Now, outside of these industry analyst reports,

1068

LOHKAMP - DIRECT     1068

1  you also keep abreast of trends and developments in
2  the supply chain management industry, right?
3  A  I try to.
4  Q  So if there are any mainstream periodicals or news
5  services that are discussing the procurement sphere,
6  for example, you try to pay attention to those as part
7  of your job responsibilities?
8  A  I certainly pay attention to certain publications.
9  Q  What would those be outside of the analyst reports
10  we've talked about?
11  A  I follow Health Care Purchasing News, Materials
12  Management and Health Care.  I also get emails from IT
13  Toolbox.  I also get emails from Supply Chain
14  Management Review.  So those are some of the key
15  publications I look at.
16  Q  How about just general news publications,
17  newspapers, that kind of thing?  If they have articles
18  of interest involving electronic procurement, do you
19  keep abreast press of them?
20  A  If I see the articles, I would read them.
21  Q  Let's talk a little bit now about your knowledge
22  of ePlus, if we can.
23  A  Okay.
24  Q  Isn't true that you knew of ePlus prior to the
25  filing of this lawsuit?

1069

LOHKAMP - DIRECT     1069

1  A  Yes, I did.
2  Q  And you initially became aware of ePlus at a
3  health association conference in 2003; isn't that
4  right?
5  A  Yes.
6  Q  Is that one of those conferences you were talking
7  about before where various companies go and have
8  booths in order to display the software solutions that
9  they have?
10  A  That was an industry conference where they did
11  have booths set up for vendors.
12  Q  You saw that ePlus had a booth set up there; is
13  that right?
14  A  Yes, I did.
15  Q  And you visited that booth; isn't that right, sir?
16  A  I did stop by that booth.
17  Q  And you recall that ePlus was exhibiting product
18  offerings in procurement relating to catalogs; isn't
19  that right.
20  A  Yes, I recall they had software related to
21  catalogs.
22  Q  And it's also true that you're aware of ePlus
23  prior to the filing of this law suit by their listing
24  in the Forester e-Procurement Wave; isn't that right?
25  A  I didn't recall seeing that, and I went back and

2011.01.11 Trial Transcript Day 5  1/11/2011  3:46:00 PM

1070

LOHKAMP - DIRECT      1070

1  looked at that wave after the lawsuit had been filed.
2       THE COURT:  The question is were you aware of
3  it from Forester's listing?
4       THE WITNESS:  I did not recall seeing them in
5  the Forester listing.  I went back and checked after
6  this to see if they were on that list.
7       THE COURT:  Were they?
8       THE WITNESS:  They were.
9       THE COURT:  Did looking at that refresh your
10 knowledge about whether or not you knew about them
11 before the filing of the lawsuit?
12      THE WITNESS:  I had the prior knowledge from
13 2003 when I ran across them, but I hadn't run across
14 them prior to the law suit except for where they came
15 up at a Cleveland Clinic where Cleveland Clinic was
16 looking between ePlus and Sciquest.
17      THE COURT:  When was that?
18      THE WITNESS:  I believe that was in
19 approximately 2008.
20 Q  You're aware that the lawsuit was filed in May of
21 2009?
22 A  Yes.
23 Q  Isn't it true that prior to this lawsuit you had
24 also spoken to sales people at Lawson who had competed
25 with ePlus for business?

1071

LOHKAMP - DIRECT      1071

1  A  The situation with Cleveland Clinic where they
2  were bidding for a portion of the business there.
3  Q  How did you come to learn that ePlus was competing
4  for that customer?
5  A  The solution consultant contacted me and said that
6  Cleveland Clinic, who was already a Lawson customer at
7  the time, was trying to decide between Sciquest and
8  ePlus for a catalog solution.  They were expecting to
9  use Lawson's Punchouts to connect to whichever they
10 chose.  So he was asking me about our Punchout
11 capability.
12 Q  When you say "solution consultant," you're talking
13 about a Lawson salesperson, right?
14 A  The Lawson salesperson who does the demos.
15 Q  And that individual's name was Brett Weiss?
16 A  That's correct.
17      THE COURT:  You mentioned the name of some
18 other company; Science Quest or something.
19      THE WITNESS:  Sciquest.
20      THE COURT:  But his question was how did you
21 know about ePlus.
22      THE WITNESS:  I knew about it from the
23 Cleveland Clinic.  So, specifically, he was asking me
24 about the Cleveland Clinic opportunity.  So the
25 solution consultant from Lawson called me and

1072

LOHKAMP - DIRECT      1072

1  explained that Cleveland Clinic was trying to
2  decide -- they were looking at Lawson's Punchout and
3  they were trying to decide between ePlus and Sciquest
4  in terms of catalog and content solution.
5  Q  And Lawson was going to partner with Sciquest if
6  they got the bid for the Cleveland Clinic; isn't that
7  right?
8  A  Yes.
9  Q  And you mentioned that Forester e-Procurement Wave
10 that you reviewed in reference to ePlus, that was
11 published in 2007; is that right?
12 A  I don't recall exactly when.
13 Q  What is that actually?
14 A  The Forester e-Procurement Wave is a report where
15 Forester goes out and interviews different software
16 companies, asks them about their capabilities, and
17 then scores and rates them and summarizes it.
18 Q  Are you aware of other competition between ePlus
19 and Lawson?
20 A  The only other one that I'm aware of is that of
21 Novant where ePlus was also vying for a portion of the
22 business.
23      MS. STOLL-DeBELL:  Objection, Your Honor.
24 There's no foundation that there was any competition
25 between Lawson and ePlus at the Cleveland Clinic.

1073

LOHKAMP - DIRECT      1073

1       THE COURT:  He just said there was.  This
2  witness has provided that foundation.
3       MS. STOLL-DeBELL:  I don't think so, Your
4  Honor.
5       THE COURT:  Well, I'll let the jury decide
6  that.  I heard what I heard.  Overruled.
7       You're talking about something else now.
8  You're talking about ePlus in competition with
9  somebody else.  Who was that?
10      MR. ROBERTSON:  Your Honor, I'm asking --
11 Q  You mentioned Novant.  You're aware that ePlus was
12 in competition with Lawson for Novant; is that right?
13 A  Well, I --
14 Q  Can you answer that question fairly yes or no,
15 sir?
16 A  I didn't think they were competing directly for
17 the business.
18 Q  So you thought they were competing indirectly?
19 A  I thought they were competing for a different
20 portion like the content side of it.
21 Q  Let me ask you this, sir.
22      THE COURT:  What is Novant?
23      MR. ROBERTSON:  It's a medical center.
24      THE COURT:  I'm asking the witness.
25      THE WITNESS:  It's a health care center.

1074

LOHKAMP - DIRECT      1074

1    THE COURT:  It's different from the Cleveland

2    Clinic?

3    THE WITNESS:  Yes, it is.

4    THE COURT:  You were aware that ePlus was

5    bidding for some component of Novant's business?

6    THE WITNESS:  I was aware of it after the

7    fact when it was pointed out that they had been there.

8    Q   This RFP process, that's often done in secret.

9    And by that I mean been the person, the potential

10   customer, doesn't always inform the bidder who all the

11   other competition is; isn't that fair to say?

12   A   That's correct.

13   Q   And that's typical, isn't it?

14   A   It's typical for a lot of situations.

15   Q   Sometimes your sales people get intelligence that

16   there may be somebody else in competition, but other

17   times they are completely in the dark as to who the

18   competition might be; fair to say?

19   A   That does happen, yes.

20   Q   So when that happens Lawson, might not even know

21   it's competing with ePlus on a particular request for

22   a proposal; is that right?

23   A   It's possible that we wouldn't know if ePlus was

24   bidding for a business.

25   Q   But even if you didn't know and it's a fact then,

1075

LOHKAMP - DIRECT      1075

1    that competition is occurring, right?  It doesn't turn

2    on whether you know or not know, right?

3    A   No, it doesn't.

4    MR. ROBERTSON:  Thank you.  I have no further

5    questions.

6

7    CROSS-EXAMINATION

8    BY MS. STOLL-DeBELL:

9    Q   Good morning, Mr. Lohkamp.

10   A   Good moaning.

11   Q   Let's start off first by talking about these

12   competition issues that you just talked about with

13   Mr. Robertson.

14   Can you explain to me who ePlus was competing with

15   for the Cleveland Clinic deal?

16   A   My understanding is they were competing against

17   Sciquest.

18   Q   Why is it your understanding that they were

19   competing against Sciquest?

20   A   Because when I spoke with the solution consultant,

21   Brett Weiss, he mentioned that Cleveland Clinic was

22   trying to decide between two solutions for catalog and

23   content, and they were trying to decide between

24   Sciquest and ePlus.  They were looking to use Lawson

25   Software and Lawson procurement regardless to connect

1076

1    to whichever solution they were going to choose.

2    Q   So Lawson, had they selected ePlus, Lawson would

3    have been in a position that it was working with

4    ePlus?

5    MR. ROBERTSON:  Objection, leading.

6    THE COURT:  Overruled.

7    A   So if they had selected ePlus, we would have --

8    Cleveland Clinic would have been using Lawson, and we

9    would have been open to working with ePlus.

10   Q   And that was to use Lawson's Punchout product to

11   connect to some catalog product provided by ePlus?

12   A   That's what I would have expected was using

13   Punchouts to connect to ePlus.

14   Q   The same is true for Sciquest?  It would be

15   Lawson's Punchout product to connect to some catalogs

16   provided by Sciquest?

17   A   Yes, Punchout is used to connect to Sciquest.

18   Q   So the customer wasn't actually making a decision

19   between whether to purchase something from Lawson

20   versus ePlus?

21   A   That's my understanding.

22   Q   Is that the same situation for Novant as well?

23   A   That would be my understanding.

24   Q   And the Novant situation, did you learn about that

25   as part of this lawsuit?

1077

1    A   Yes, I did.

2    Q   So not as part of your daily job duties as a

3    product strategist?

4    A   Not as part of my daily duties.

5    Q   Other than the Cleveland Clinic situation that you

6    just described for us, are you aware of any other

7    situation where ePlus has been bidding for the same

8    customer against Lawson?

9    A   Not in the course of my day-to-day activities.

10   Only the situations mentioned as part of this lawsuit.

11   Q   Who are Lawson's main competitors for supply chain

12   management products?

13   MR. ROBERTSON:  Objection, Your Honor.

14   Outside the scope.

15   MS. STOLL-DeBELL:  I think he talked about

16   competition and competition with ePlus, so I think it

17   is within the scope.

18   MR. ROBERTSON:  I didn't ask anything about

19   any other outside competitors.

20   MS. STOLL-DeBELL:  I still think it's within

21   the scope of who is Lawson's competition.

22   MR. ROBERTSON:  It is, but that wasn't within

23   the scope of my questions and my examination.

24   MS. STOLL-DeBELL:  I think his questions

25   related to competition, and I'm following up on that.

1146

Lohkamp - Cross                    1146

1    THE COURT:  Objection is to the form of the question.
2  There's no foundation for it.  Sustained.
3    MS. STOLL-DeBELL:  Your Honor, I was asking what
4  products Cleveland Clinic had of Lawson, whether they had
5  Lawson products.
6    THE COURT:  You haven't established that he knew
7  whether Cleveland Clinic had any products yet.  You have to
8  establish that foundation.  The answer to that has to be yes,
9  and then you can see what products.
10  Q  Mr. Lohkamp, did Cleveland Clinic -- do you know whether
11  Cleveland Clinic had any Lawson products?
12  A  Yes.
13  Q  You do know?
14  A  Yes.
15  Q  What products did they have?
16    THE COURT:  The next question is how do you know.
17  Q  How do you know?
18  A  I know because they were a customer of ours at the time
19  the bid came through.
20  Q  What products did they have?
21    MR. ROBERTSON:  I'm sorry, Your Honor, but ^ the
22  foundation for how he knows they were a customer.
23    THE COURT:  No, that's not the proper objection.
24  This is, I guess, evidence 101, but how did you find out what
25  products they had?  Did you learn that from somebody else?

1147

1    THE WITNESS:  Yes --
2    THE COURT:  Or do you have personal knowledge because
3  you sold them something, for example?  Did you sell them any
4  products?
5    THE WITNESS:  I did not.
6    THE COURT:  Did you supervise in your line of
7  business any work that caused you to learn what products
8  Cleveland Clinic had at the time they are talking about?
9    THE WITNESS:  I learned from the account executive.
10    THE COURT:  Some account executive told you what the
11  products were; is that right?
12    THE WITNESS:  Yes.
13    THE COURT:  Sustained.  That's why the Rules of
14  Evidence are as they are.
15    MS. STOLL-DeBELL:  If I can have a minute to check my
16  notes, Your Honor.
17    THE COURT:  All right.
18    MS. STOLL-DeBELL:  I think that's it.  Thank you.
19  Thank you.
20    THE COURT:  Any redirect?  Unfortunately, Mr.
21  Lohkamp, you may not be freed yet.
22    MR. ROBERTSON:  Yes, Your Honor.  I'll be brief.
23    THE COURT:  Promises, promises.
24
25

1148

1148

1    REDIRECT EXAMINATION
2  BY MR. ROBERTSON:
3  Q  Could you go to that vendor agreement, please, Plaintiff's
4  Exhibit Number 113.
5    THE COURT:  Number what?
6    MR. ROBERTSON:  113.  I'm sorry, Your Honor, it was
7  190.
8  A  Okay.
9  Q  Are you with me yet, sir?
10  A  Yes, I am.
11  Q  You referred to various paragraphs in this agreement; is
12  that right?
13  A  I was asked about various paragraphs.
14  Q  I noticed one thing you weren't directed to is at the
15  bottom of page one under article two called intent of the
16  agreement; do you see that?
17  A  Yes.
18  Q  The intention of the parties to an agreement is a pretty
19  important thing; wouldn't you agree?
20  A  Yes.
21  Q  Okay.  Let's see what you said here about what the intent
22  of this punchout partner agreement was.  It's got two
23  intentions, doesn't it, identified there, small i and small ii?
24  A  Yes, it does.
25  Q  So it says, the intent of this agreement is to provide the

1149

Lohkamp - Redirect                    1149

1  opportunity for the parties to -- now we're talking about the
2  parties there are Lawson and its punchout trading partner;
3  right?  That's your understanding?
4  A  Yes.
5  Q  For the parties to facilitate the use of their respective
6  products by entering into a relationship that will
7  facilitate -- now, this is the first intent of the parties;
8  right?  The development of the appropriate interfaces or
9  punchout between Lawson products and the partner's website; do
10  you see that?
11  A  Yes, I do.
12  Q  So the parties were going to jointly develop the
13  interfaces, the appropriate interfaces in order to do this
14  punchout between Lawson products and the partner website;
15  right?  That's number one intention; correct?
16  A  Yes.
17  Q  Okay.  Number two is the performance of joint marketing
18  activities; right?  You use the word "joint" there; correct?
19  A  Correct.
20  Q  Now, paragraph three about this licensing ^ in sport all
21  it says here, each party shall contract for its own products
22  and services directly with the customers; do you see that?
23  A  (No response.)
24  Q  Your reference to that?
25  A  Yes.

1150

Lohkamp - Redirect                    1150

1   Q   But the intent of this agreement then is not the
2   relationship that Lawson might have with its customer or the
3   punchout trading partner might have with its customer, the
4   intent of this agreement is how you formulate your joint
5   marketing activities for your mutual benefit; isn't that right?
6   A   It is for the joint agreement with them.
7   Q   To your mutual benefit, sir; right?
8   A   Yes.
9   Q   Lawson does specify the format for how the item data needs
10  to come back from the punchout catalog to the RSS shopping
11  cart; isn't that right?
12  A   We specify the format, the standard.
13  Q   So the answer to my question is yes; right?
14  A   Yes.
15  Q   And if the customer using the Lawson software wants to get
16  to a punchout trading partner website, whether they be under
17  agreement or not under agreement, it needs the Lawson punchout
18  application; isn't that right?
19  A   To use punchout to that vendor website.
20  Q   They can't get there without the procurement punchout
21  application; right?
22  A   Yeah.  Using our software, yeah.
23  Q   That's how they do it?
24  A   Yes.
25  Q   You were asked questions about how many punchout products

1152

Lohkamp - Redirect                    1152

1   Q   There's no question you've been aware of ePlus patents
2   since May of 2009 when the lawsuit was filed; right?
3   A   Right.
4   Q   Everyone at Lawson has been aware of the ePlus patent
5   since May of 2009; isn't that right?
6   A   I believe so.
7       MR. ROBERTSON:  Thank you.  No further questions.
8       THE COURT:  All right.  Mr. Lohkamp, it's obvious
9   you're going to be called back as a witness in the case, and
10  you can be temporarily excused and go about your business until
11  you are called back, and you agree to come back then?
12      THE WITNESS:  Yes.
13      THE COURT:  Or you can remain here and wait.  Which
14  would you rather do, go about your business upon agreement to
15  come back?
16      THE WITNESS:  Yes.  Come back.
17      THE COURT:  Is that satisfactory, counsel?
18      MS. STOLL-DeBELL:  Yes, Your Honor.
19      THE COURT:  Mr. Lohkamp, you can't discuss your
20  testimony with anybody because you may be called back as a
21  witness; all right?
22      THE WITNESS:  Okay.
23      THE COURT:  Thank you.
24      THE WITNESS:  Thank you.
25      MR. ROBERTSON:  Your Honor, the next witness we'll be

1151

Lohkamp - Redirect                    1151

1   you've sold.  I think you said around a hundred, and you've got
2   about 3- or 400 RSS, or requisition self-services applications
3   ^; right?  Now, if together the jury concludes that those
4   applications permit Lawson's customers to infringe the patents,
5   it's not an excuse for Lawson to say that we infringe just a
6   little bit, is it?
7       MS. STOLL-DeBELL:  Objection, Your Honor.  It calls
8   for a legal conclusion, and it's not relevant for this witness,
9   and it's prejudicial.
10      THE COURT:  Because it's not relevant, it's
11  prejudicial.
12      MS. STOLL-DeBELL:  Sure.
13      THE COURT:  Sustained.  It's a legal matter.
14  Q   You specified that a lot of your trading partners don't
15  use the vendor agreement that we've been referring to here as
16  Plaintiff's Exhibit Number 190; is that right?
17  A   That's correct.
18  Q   But the technology for punchout doesn't change for
19  Lawson's punchout trading partners whether they use the
20  agreement or don't use the agreement; isn't that right?
21  Technology is the same?
22  A   That's correct.
23  Q   You indicated that you were not aware of ePlus patents
24  prior to filing this lawsuit; is that right?
25  A   Yes.

1153

Lohkamp - Redirect                    1153

1   calling is a witness by videotape.  I believe Mr. Strapp can
2   identify what it is and tell you approximately how long the
3   videotape deposition is.  It's a customer of Lawson.
4       MR. STRAPP:  Your Honor, our next witness, we're
5   going to play the videotaped deposition of Kristy Oliver.
6   Kristy Oliver is an employee of Blount Memorial Hospital.
7   Blount Memorial Hospital is a customer of Lawson and a customer
8   for the accused Lawson S3 system.
9       The deposition videotape is a little bit under an
10  hour, and we can provide Your Honor with a booklet of the
11  exhibits that will be referenced during the deposition.  We've
12  marked the transcript, excerpted portions also as an exhibit,
13  and we will provide that to Your Honor.
14
15      (Videotaped deposition of Kristy Oliver played for
16  the jury.)
17
18      MR. STRAPP:  Your Honor, for the record, exhibits
19  referenced during the deposition transcript of Ms. Oliver were
20  Plaintiff's Exhibits 225, 226, 228, 229, 230, 231, 234, 237,
21  238, and 239, and the excerpted portions of the transcript that
22  were played on the video are marked as Plaintiff's Exhibit 518.
23      THE COURT:  All right.  They are admitted.  Next
24  witness?
25      MR. ROBERTSON:  Your Honor, plaintiff would call Mr.

1154

Lohkamp - Redirect                    1154

1   Dale Christopherson.

2        THE COURT:  How long is this going to take?

3        MR. ROBERTSON:  Your Honor, I'm trying to cut it back

4   considerably.  I think I'd be less than 45 minutes.

5        THE COURT:  Mr. Niemeyer, how long is his examination

6   going to be?

7        MR. ROBERTSON:  Less than an hour.

8        THE COURT:  Let's go.  There was a lot of stuff that

9   that could have been excised from that.

10       MR. ROBERTSON:  I tried to limit it, Your Honor, but

11  both parties got to cross-designate, so...

12       THE COURT:  611 is in effect in full force.

13

14       DALE CHRISTOPHERSON,

15  a witness, called by the plaintiff, having been first duly

16  sworn, testified as follows:

17

18       MR. ROBERTSON:  May I proceed, Your Honor?

19       THE COURT:  Please.

20

21       DIRECT EXAMINATION

22  BY MR. ROBERTSON:

23  Q   Will you state your full name for the record, sir?

24  A   Dale Arnold Christopherson.

25  Q   And you are currently the director of development at

1155

1   Lawson Software; correct?

2   A   That's correct.

3   Q   Then in your role as the director of development, you have

4   responsibilities for these software modules that we've been

5   talking about, Lawson requisition self-service, Lawson

6   procurement punchout, Lawson purchase order, Lawson

7   requisitions, Lawson inventory control, and Lawson EDI;

8   correct?

9   A   Those are some of the many that I do have under my

10  control, yes.

11  Q   You are familiar also with the Lawson system foundation;

12  is that right?

13  A   Depends on how deep you want to go into it, but, yes, I am

14  familiar with it at some length.

15  Q   You were asked in your deposition whether Lawson system

16  foundation is a technology layer that sits below these current

17  applications we've been talking about.  Do you recall that?

18  A   I certainly do.

19  Q   You said it was?

20  A   Yes, it was and still is.

21  Q   And so isn't it true now that all customers of Lawson are

22  required to license the Lawson system foundation in order to

23  use the current version of the Lawson applications?

24  A   That's correct.

25  Q   And in this procurement version nine plus, any version

1156

1   nine plus you have to do that; isn't that right?

2   A   In nine plus?

3   Q   Any version nine and above?

4   A   Oh, any version nine and above, that's correct.

5   Q   There are several versions of this software we've been

6   talking about; correct?

7   A   Yes, there are.

8   Q   And there's a separate license fee associated with Lawson

9   system foundation; is that correct?

10  A   That's correct.

11  Q   Now, there's been a lot of discussion about these vendor

12  catalogs.  A customer can import a vendor catalog into the item

13  master of the Lawson system; isn't that right?

14  A   They can go basically through a three-step process, yes.

15  Q   And you are aware also of this UNSPSC we've been talking

16  about?

17  A   I certainly am.

18  Q   So isn't it true that you can use the UNSPSC to find items

19  from different vendors that were all cross-referenced using the

20  same product category?

21  A   Let me think about what you are really saying there.

22  Could you restate that?

23  Q   Sure.  Isn't it true that a user of the Lawson system that

24  has this UNSPSC capability can find items from different

25  vendors that were all cross-referenced to the same product

1157

1   category?

2   A   That's correct, yes.

3   Q   The shopping cart in Lawson requisition self-service can

4   be dynamically built from results of conducting searches in the

5   item master; isn't that right?

6   A   That is correct.

7   Q   And it's also true that the shopping cart can also be

8   dynamically built using the results of searches in the vendor

9   punchout catalogs; right?

10  A   That is also correct.

11  Q   And when the user clicks a checkout in the items in your

12  shopping cart, they are moved into the requisition system, and

13  an actual requisition is created; isn't that right?

14  A   I would actually define that slightly different.

15  Q   All right.  Do you recall giving a deposition in this

16  case?

17  A   I certainly do.

18  Q   And you were under oath?

19  A   Uh-huh.

20  Q   I believe you have your deposition transcript.  It should

21  be in the first volume.

22  A   Yep.

23  Q   Could you go to page 77?  Excuse me.  I misspoke.  177.

24  A   177?

25  Q   Yes, sir.

1158

1 A  Okay.  I'm not there yet.

2 Q  Okay, take your time.

3 A  Okay, 177.

4 Q  Starting at about line 18?

5 A  Starting with question, and then on the right-hand screen?

6 Q  Let me read the question for you.

7     Question:  And then on the right-hand screen in the card,

8 here you have four items that have been included in your

9 shopping cart.  What happens to that when you click checkout?

10    Your answer:  When you click checkout, then it would move

11 that information into the requisition system and actually

12 create a requisition.

13    Did you give that answer to that question at that time?

14 A  I certainly did.

15 Q  Okay.  Thank you.  Once a requisition is approved, the

16 requisition is released and then transferred to the purchase

17 order system; correct?

18 A  That's correct, after it's been approved.

19 Q  Talking just now about procurement punchout, when users

20 have filled their shopping carts, virtually speaking, and

21 checked out from the vendor website using the Lawson

22 procurement punchout, the chosen items and their prices are

23 returned to the Lawson server and a requisition is created

24 using the Lawson requisition self-service application; correct?

25 A  Can you state that again?  The second half of it basically

1159

1 is where I lost you.  ^you check out at the customer, not the

2 customer but the vendor site and then it was at that point

3 where I got lost.

4 Q  Let me start over.  Let's hear the whole question.  When

5 users have filled their shopping carts, virtually speaking, and

6 checked out from the vendor website using Lawson procurement

7 punchout, the chosen items and their price are then returned to

8 the Lawson server, and a requisition is created using the

9 Lawson requisition self-service application; correct?

10 A  That's correct.

11 Q  Isn't it true that the current version of the Lawson

12 procurement punchout includes the capability to punch out to

13 multi-vendor catalogs?

14 A  That's correct.

15 Q  One of those examples of a site that you can go that is a

16 multi-catalog vendor -- excuse me, multi-vendor catalog, is

17 SciQuest; correct?

18 A  That's correct.

19 Q  Another example of a multi-vendor catalog site that's

20 available for the punchout procurement is an organization known

21 as GHX; correct?

22 A  That is correct.

23 Q  That stands for Global Healthcare Exchange?

24 A  That's correct.

25 Q  And Global Healthcare Exchange that provides this

1160

1 multi-vendor catalog capability is a punchout trading partner

2 of Lawson; correct?

3 A  That's correct.  They are on the list, yes.

4 Q  It's an accurate statement to say that if Lawson could not

5 market a requisition module, it could not effectively compete

6 in the supply chain management product market?

7 A  I would say that that would be an accurate statement, yes.

8 Q  It's also accurate to say if Lawson could not offer a

9 purchase order module, Lawson could not effectively compete in

10 the supply chain management product market?

11 A  That would also be correct.

12 Q  You've heard a lot of talk about the implementation and

13 installation services that Lawson offers.  I just want to be

14 clear that Lawson will provide implementation services to

15 assist its customers with importing vendor catalog data into

16 the item master.

17 A  I didn't hear a question in that, sir.

18 Q  Let me restate it then.  Perhaps I misspoke.  Is it true

19 that Lawson provides implementation services to assist its

20 customers with importing vendor catalog data into the item

21 master?

22 A  If the customer so chooses and wants that service, yes, we

23 do.

24 Q  So for most situations where a customer licenses the

25 supply chain management suite or the procurement modules we've

1161

1 been talking about in supply chain management, Lawson

2 professional services is going to provide the actual

3 installation and implementation services for that system;

4 correct?

5 A  That's correct, yes.

6 Q  All existing Lawson customers today are under maintenance

7 contracts with Lawson; correct?

8 A  That's correct.

9 Q  So all of the supply chain -- excuse me.  All of the

10 supply -- let me restate that.  All of the S3 procurement

11 products that are under contract today with Lawson customers,

12 they have maintenance contracts; is that right?

13 A  Could you restate that?

14 Q  Yeah.  I'm sorry.  It was a bad question.  With respect to

15 the Lawson S3 procurement product that's at issue here, any

16 customer that has that product is under an existing maintenance

17 contract?

18 A  That's correct.

19 Q  There's been a lot of talk about this RFP process, and I

20 don't want to go through it again in detail, certainly, but

21 there is a standard set of answers for those common questions

22 that customers have about the S3 procurement product; correct?

23 A  That is correct, yes.

24 Q  I think if you'll look in your book to Exhibit 117.

25 A  Okay.

1162

1  Q   You've seen this document before?

2  A   I don't believe I've actually seen this document except as

3  this exhibit.

4  Q   But you are aware that this is the document that is the

5  proposal automation suite for providing answers with respect to

6  stock questions for the S3 product; right?

7  A   I couldn't confirm or deny that.

8  Q   It's a Lawson document; is that right, sir?  You have no

9  reason to doubt it's --

10  A   I have no reason to doubt it.  I mean literally, I've not

11  seen the document like this or in any form like this.  I've

12  seen a couple answers out of the database, and when I say a

13  couple, probably two or three over the last couple years.  So

14  for me to comment on this document, I don't know how many pages

15  it is, it's just not fair.

16  Q   Fair enough.  But Lawson does maintain such a document

17  that has stock answers to requests for proposals?

18  A   They do maintain a database, yes.

19       THE COURT:  Does the database you are talking about

20  have stock answers for the RFPs?

21       THE WITNESS:  Sure.  It will have -- there will be

22  things like about the company history, you know, things that

23  are very generic questions that almost all customers will ask

24  in the RFP process, and there's a set of answers that will come

25  up there along with other questions that maybe not all

1163

1  customers ask, but they're routinely asked by a fair number.

2  So the sales team has asked, look, can we get what the answers

3  should be for these so that we can just cut and paste that in

4  so we don't get -- if we had 20 salespeople, you don't have 28

5  different answers for the same thing.

6  Q   This document is 297 pages long.  Can you just confirm

7  that, and it has 398 stock questions that often get asked and

8  stock answers that are often provided; is that fair enough?  Do

9  you just want to take a look at it for a minute?

10  A   I see it's 297, and keep in mind they are a pretty wide

11  product space.  This is just a few, a small number of products

12  that I actually have under my control.

13  Q   If you look --

14  A   398 -- I see the last page is 398, answers to 398

15  questions.

16  Q   And just going back to the first page, this has to do --

17  it says there's a database identified there, and then it says

18  Lawson S3 data.  Do you see that?

19  A   Uh-huh.

20  Q   So this Exhibit 117 is specifically dealing with just the

21  Lawson S3 product; right?

22  A   It appears to be, yes.

23  Q   And, I mean, if I just randomly open up a page -- for

24  example, I opened up to 106.

25  A   Sure.

1164

1  Q   Question 149 of 398, and this has to deal with a fairly

2  complex question concerning EDI for supply chain management;

3  correct?

4  A   Uh-huh.

5  Q   Not simply what the company is about and that kind of

6  thing?

7  A   Absolutely.  It would be a variety of questions.

8  Q   Specific to the functions and features of the S3 product?

9  A   Correct.

10  Q   All right, there was some discussion about industry

11  analyst reports; do you recall that?

12  A   I certainly do.

13  Q   And Mr. Lohkamp, I understood him to indicate that he

14  personally subscribes to a number of those publications;

15  correct?  You heard that?

16  A   I certainly heard that, yes.

17  Q   But the company also subscribes to them as a company;

18  isn't that right?

19  A   That's my understanding.

20  Q   And, I mean, in your deposition, you were asked whether or

21  not the company subscribes to Aberdeen, Gartner, and Forrester;

22  right?

23  A   That's correct.

24  Q   And you indicated that some of those reports concerning

25  Lawson's newer products and possible competitor products are

1165

1  disseminated fairly widespread throughout the company; isn't

2  that right?

3  A   If I said widespread, I certainly wasn't meaning -- take a

4  4,000-person company, it's not going out to even 3,000 of those

5  probably.

6  Q   It's available, though, over a Lawson intranet website,

7  isn't it?

8  A   I'm trying to recall the last time I've actually been able

9  to go out and look at any of the documents, and I don't recall

10  any -- I mean, I actually see very few in my current role.

11  Q   Well, it's actually, according to you in your deposition,

12  disseminated among the director level?

13  A   Correct.

14  Q   The manager level?

15  A   Yes.

16  Q   And in some instances, down to individual contributor

17  level; do you recall that?

18  A   Yes, I certainly do.  That's going to depend on the

19  product and what the content is.

20  Q   Isn't it a fact that before a new enhancement is released,

21  for example, with respect to this S3 supply chain management

22  module we've been talking about, Lawson does not engage in any

23  kind of intellectual property clearance investigation to insure

24  that enhanced features will not infringe the intellectual

25  property rights of third parties?

1166

1  A   That's correct.

2  Q   You don't do that, do you?

3  A   I do not, no.

4  Q   The company doesn't do that as a policy; correct?

5  A   That's correct.

6  Q   And since May of 2009 when this lawsuit was instituted,

7  Lawson has undertaken no efforts to modify or redesign its

8  existing S3 procurement products; is that right?

9  A   That's correct.

10       MR. ROBERTSON:  That's all the questions I have.

11  Thank you.

12       THE COURT:  Why don't we take the afternoon recess.

13  It's time to take 20 minutes, ladies and gentlemen.  You just

14  take your pads with you.

15

16            (Jury out.)

17

18       THE COURT:  Counsel, I have word from the clerk's

19  office that ePlus intends to file 30,000 pages of exhibits

20  under seal.  What is that about?

21       MR. MERRITT:  Sounds terribly daunting.  Let me try

22  to address this, Your Honor.  Under Rule 103, we think that

23  we're required to make an offer of proof -- we'd like to do it

24  before we close -- with regard to damages testimony in exhibits

25  that were excluded by the Court's earlier rulings several

1167

1  months ago.  It has nothing to do with the matters that are

2  currently being tried before this jury, but it's an offer of

3  proof as to lay testimony and to associate exhibits that would

4  have gone to the damages part of the case.

5       The 30,000 is driven significantly by the fact that

6  there are -- it includes some Lawson internal information that

7  are these huge electronic spreadsheets that if they were

8  actually printed out would be an enormous number of pages.

9       We have suggested that with the Court's permission we

10  might be able to simply file a written index and lodge a DVD

11  physically with the clerk's office that keeps us from having to

12  put boxes and boxes of these spreadsheets into the offer of

13  proof.

14       We'll take the Court's guidance on that, do whatever

15  the Court would like us to do.  We really are disinclined to

16  burden the Court with all that paper, but the clerk tells us

17  that absent special permission from the Court to put it on a

18  disk, that the default is the paper would have to be filed.

19       THE COURT:  Their problem is they don't want the disk

20  imported into the system.  I don't see why -- how long is the

21  index?

22       MR. STRAPP:  Approximately five pages.

23       THE COURT:  Why don't you file the index and then

24  file the -- is it a DVD or CD or what?

25       MR. MERRITT:  I believe it's a DVD, Your Honor.

1168

1       THE COURT:  As your proffer proofs and log that as an

2  item, and then it will be filed, and I guess it needs to be

3  filed under seal since it has their financial information.

4       MR. MERRITT:  Yes, sir, it has financial information

5  from Lawson.  It would need to be under seal.

6       THE COURT:  Is this something that is different than

7  the Court has considered in making its ruling on the expert,

8  because you can't get anything in that wasn't before me on the

9  expert's opinion.

10       MR. MERRITT:  No, sir.

11       THE COURT:  These things were all part of the

12  expert's report, were they?

13       MR. MERRITT:  Well, there were two pieces of it, if

14  Your Honor recalls.  First of all, the expert was excluded on

15  the motion in limine.  His report and the attachments are

16  already a part of the record, and we can't improve upon that in

17  any way obviously.  We can't move the ball on that or go back

18  and fill.

19       There was a second motion that the Court granted that

20  was a Rule 37 discovery motion that precluded the use of lay

21  testimony or additional witnesses as an alternative means of

22  proving the damages.

23       THE COURT:  That was for failure to comply with the

24  discovery.

25       MR. MERRITT:  That was for failure to comply with the

1169

1  discovery, and the only opportunity for an offer as to what

2  that proof would have been was on September 7th when that was

3  being argued.

4       In fact, Your Honor may recall that I argued that.  I

5  believe Mr. McDonald did as well, and you asked, well, what

6  sort of proof would you put in, and on the fly, based on some

7  notes, I was able to say, well, here are the people we think we

8  might call and what some of the evidence might be.

9       What we would like to do is take the opportunity to

10  simply make clear, in a particularized form, what those

11  witnesses and what that evidence would be since the one

12  opportunity previously that was available was on the fly in

13  that hearing.  So this is simply to say what the lay testimony

14  and exhibits would be and to try to put that into the record as

15  an offer of proof that's sufficiently particular so somebody

16  would understand what we were talking about on September 7th.

17       THE COURT:  Mr. McDonald, do you want a chance to

18  review the index and/or CD or DVD and then respond?

19       MR. McDONALD:  I haven't had a chance.  I don't know

20  our team has had a chance to see what's involved here.

21  I think they made their record back in September.  I don't know

22  why at this point they would be proffering evidence that's not

23  part of what they had even offered up in connection with the

24  joint pretrial order.  It sounds like it goes well beyond that,

25  but I guess I don't want to weigh in.  Maybe we can work

1186

1   truly apologize, and maybe you'll get another judge to handle
2   the rest of the case.
3        MR. McDONALD:  I'm not sure I picked up all that --
4        THE COURT:  I'm asking if you said something and I
5   forgot what it was, because I actually don't remember you
6   saying anything.
7        MR. McDONALD:  You didn't miss a thing.  We haven't
8   formulated our position, Your Honor.  I have a couple concerns,
9   though, I can flag and maybe give --
10       THE COURT:  That would be helpful to talk about it.
11       MR. McDONALD:  Well, this language about "by a
12  vendor" means at some point in time.  I think the "by a vendor"
13  for one thing was pretty much agreed to at the Markman hearing,
14  what it did mean, and do inject the concept in time, of time
15  into a phrase like "by a vendor" could create some confusion, I
16  think, do more harm than good, actually.  We would probably
17  object to that, but I haven't finalized my position.
18       THE COURT:  But I think it's quite clear from the
19  specification that it's an antecedent event to the use of the
20  invention no matter how you cut it.
21       MR. McDONALD:  I just think --
22       THE COURT:  I understand what you are saying.  Think
23  about it and see what you --
24       MR. McDONALD:  The other concern I have is anything
25  we do with that, because our experts who have given opinions

1187

1   relating to claim construction, I'm concerned that if we now
2   move the ball on what the claims mean, what is the implication
3   of that for the testimony that's already been given, the
4   testimony that's yet to come that the Court repeatedly says has
5   to be limited to what's in the expert reports, there were prior
6   decisions by the Court relating to prior art exclusions and
7   things like that.  I think there's many implications of making
8   any changes here, so I'm concerned about that.
9        THE COURT:  I think -- I'm not sure there are a
10  lot -- that is not a claim construction answer.  That's an
11  instruction, and the fact of the matter is that it is not at
12  all unusual for Courts to give revised claim constructions
13  during the trial.
14       In fact, for a good while, it was common to give the
15  claim construction only as part of the instructions.  Now, I've
16  never done that just because I didn't want to put myself
17  through that agony, but that's what happens sometimes, and in
18  that event, experts have to take their positions -- take out
19  their position and see what happens.  So we'll see.
20       MR. McDONALD:  In this case, the experts were allowed
21  to give their reports after the Court's Markman ruling, so I
22  think that really changes the dynamic.
23       THE COURT:  Okay.  Anything else?  Thank you.  We'll
24  see you all tomorrow at nine o'clock.
25            (Court adjourned.)

1188

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF VIRGINIA
 3               RICHMOND DIVISION
 4
 5   -------------------------------------
                        :
 6   ePLUS, INC.        :  Civil Action No.
                        :  3:09CV620
 7   vs.                :
                        :
 8   LAWSON SOFTWARE, INC.    :  January 12, 2011
                        :
 9   -------------------------------------
10
11      COMPLETE TRANSCRIPT OF THE JURY TRIAL
12      BEFORE THE HONORABLE ROBERT E. PAYNE
13   UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24      Peppy Peterson, RPR
          Official Court Reporter
25      United States District Court
```

1189

```
 1   APPEARANCES:  (cont'g)
 2   Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
 3   Troutman Sanders Building
     1001 Haxall Point
 4   Richmond, Virginia  23219
 5   Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
 6   William D. Schultz, Esquire
     Merchant & Gould, PC
 7   80 South Eighth Street
     Suite 3200
 8   Minneapolis, Minnesota  55402
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1190

```
 1             P R O C E E D I N G S
 2
 3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
 4   Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
 5   L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr.
 6   Michael G. Strapp represent the plaintiff.
 7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
 8   Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
 9   the defendant.  Are counsel ready to proceed?
10        MR. ROBERTSON:  Plaintiff is, Your Honor.
11        MR. McDONALD:  Yes, Your Honor.
12        THE COURT:  All right.  You said you wanted to see me
13   before the jury comes in.
14        MR. McDONALD:  Yeah, there's basically three issues
15   we wanted to raise.
16        THE COURT:  The court reporters always can hear
17   better if you come to the lectern.
18        MR. McDONALD:  There's basically three issues that we
19   wanted to raise this morning.  One is our third witness in our
20   case that we start today is Ms. Raleigh.
21        THE COURT:  Third witness in what?
22        MR. McDONALD:  In our case when we start presenting
23   our case today.  We have Mr. Richard Lawson first, Mr.
24   Christopherson second, and then Hannah Raleigh was supposed to
25   come back and be third today.
```

1191

```
 1        She was supposed to be back last night from New York,
 2   and New York is getting hammered real bad by this blizzard.
 3   She's trying to get another flight, but her flight is not going
 4   to get her here until after the trial day is over today.  So
 5   we've been trying to work something out with ePlus about what
 6   we would do next because we haven't disclosed any exhibits or
 7   anything for the next witness.
 8        THE COURT:  Just call the next witness, the expert or
 9   whoever you've got here.  There's no magic to the order of
10   putting people on.
11        MR. McDONALD:  The next witness we would have
12   actually here is Mr. Lohkamp, calling him back.
13        THE COURT:  Good.
14        MR. McDONALD:  That's fine.  They haven't had a
15   chance to get ready for their cross-examination.
16        THE COURT:  They'll be ready.  They knew basically
17   what you were going to do anyway.  They're not going to do it
18   on your cross-examination; they were going to do redirect, so
19   we're going to reverse things.
20        MR. McDONALD:  We do have a deposition of Ms.
21   O'Loughlin on the RIMS prior art issue that we can move up in
22   the order.
23        THE COURT:  Is that carefully edited to eliminate the
24   trash?
25        MR. McDONALD:  That's being worked on as we speak,
```

1232

1    A   In general, sure.  It's a remote computer.

2    Q   Using this demonstrative, would you explain the source

3    code architecture of Lawson's system and the components you've

4    illustrated in your demonstrative?

5    A   Yes.  The portion on the left labeled client is, contains

6    components that run in the user's web browser.  Some items

7    labeled there are JavaScript which I mentioned earlier is a

8    programming language that executes within the browser.  HTML

9    are the actual pages that display the information.

10       The right portion on the right labeled service side are

11   the components that run on the server.  There is a Java -- box

12   labeled Java web application.  That's essentially a web server

13   that feeds the data to the web browser.

14       Below that, the area labeled Lawson transaction manager

15   and Lawson 4GL COBOL comprise what I would call the business

16   logic of the application and contains the Lawson 4GL COBOL

17   code.  The transaction manager and supporting features are also

18   -- my understanding is they are termed by Lawson as Lawson

19   system foundation.  So it's sort of the back end portion of

20   that.

21       There's the database indicated there which contains the

22   data for the application, and the final box up on the right

23   labeled MCI is just an alternate mechanism for the Java

24   components to talk to the database.

25   Q   Now, you discussed in your demonstrative that there are

1233

1    both Lawson web-based applications and Lawson 4GL applications

2    within the Lawson system.  Could you describe at a high level

3    the kinds of functionality that are implemented in the system

4    using the 4GL application?

5    A   Yes, the Lawson 4GL COBOL code implements the feature of

6    the S3 system including requisition, inventory control, and

7    purchase order.

8    Q   Could you describe at a high level the functionality

9    implemented in the system using the web-based applications?

10   A   The web-based components including the Java web, or Java

11   application server and the components that run the browser

12   together comprise a web-based interface to that Lawson 4GL

13   functionality.  They are sort of an overlay or an add-on that

14   provides that browser-based access to those components.

15   Q   What are some examples of the Lawson web-based

16   applications that you studied?

17   A   I believe Lawson calls the system the requisition

18   self-service component, and I believe they also called it --

19   refer to their punchout component as a web-based component.

20   Q   Now, you also mentioned this Lawson system foundation.

21   Could you briefly explain why the Lawson system foundation is

22   important to the functioning of the Lawson system?

23   A   Yes.  So the Lawson system foundation, inasmuch as it

24   contains the transaction manager, is responsible for running

25   the Lawson 4GL COBOL programs.  It is a runtime environment or

1234

1    a container of sorts that holds that code, determines what's

2    running at what time, and moves the data into and out of it.

3    It's required to run those applications.

4    Q   Could you describe at a high level what the functionality

5    is with respect to the Lawson transaction manager?

6    A   Yes.  The Lawson transaction manager would be the key

7    component there that actually runs the COBOL programs for the

8    requisition, inventory control, and purchase order

9    applications.

10   Q   And how does the Lawson transaction manager execute the

11   4GL applications, or what does it do?

12   A   Well, so as I tried to describe, it determines which

13   programs are running at what time.  It moves data into and out

14   of the associated working storage structures, and it collects

15   the results.  It may also intermediate access to the database,

16   provide access to the database.

17   Q   And you talked about this DB thin API.  First of all, what

18   is an API?

19   A   The term API, the acronym API stands for application

20   programmer interface, and it is just a collection of functions

21   or utilities, features which can be used by the programmer.

22   Q   And what do you mean by the term DB thin?

23   A   In this case, it is a database API which just means it's a

24   collection of features that allow the Java code to talk to the

25   database.  The term thin to me implies that is it a streamlined

1235

1    or otherwise not complex mechanism.  It's a delegating

2    mechanism that delegates to another layer.

3    Q   What do you mean by delegate?

4    A   So it's sort of a thin wrapper around some more

5    complicated functionality.  It passes off requests to another

6    layer for additional processing.

7    Q   Now, you've shown in your demonstrative that the system

8    has a database associated with it.  Have you prepared another

9    demonstrative to help you explain the database that's used by

10   the system?

11   A   Yes, I have.

12       MS. ALBERT:  Mike, if we could, could we have slide

13   number 85, please.

14   Q   Is this a demonstrative that you prepared to illustrate

15   the database?

16   A   Yes, it is.

17   Q   Could you describe at a high level the nature of the

18   database?

19   A   Yes.  So it is what's known as a relational database.

20   Lawson refers to this database as the item master database.

21   The database contains numerous tables.  Tables within a

22   database, you can roughly analogize to files in a filing

23   cabinet.  They may contain different types of information.

24       There are a number of actual tables from the Lawson item

25   master database illustrated here.  The one that I'll mention, a

1236

1 key table is the ITEMMAST table on the left of this diagram
2 which contains information about items that can be
3 requisitioned within the system, and from -- another table that
4 I'll point out is the POITEMVEN which contains vendor
5 information pertaining to specific items within the ITEMMAST
6 table.
7    Q   You mentioned this term relational database.  What is a
8 relational database?
9    A   The term relational just means that a piece of data within
10 the database can refer to or point to another piece of data in
11 various ways.
12    Q   Would you explain the difference between when you say the
13 item master database and when you are referring to this item
14 master or ITEMMAST table?
15    A   Yes.  So the ITEMMAST table is a specific table within the
16 database.  More generally, Lawson documentation refers to the
17 database as a whole or collectively as the item master
18 database, presumably drawing its name from that key table.
19       THE COURT:  The ITEMMAST table has what in it?
20       THE WITNESS:  It consequence /TAEUPBS information
21 about items which can be requisitioned.
22    Q   What are some of the types of information about the items
23 that are contained in that table?
24    A   It contains an item number for the item, a textual
25 description of the item, and other information about the item.

1237

1    Q   Now, you have a few other tables illustrated on your
2 demonstrative.  Could you provide us with a high level
3 description of the purpose of the table that's listed R-E-Q
4 header or REQHEADER?
5    A   Yes.  The abbreviation R-E-Q is short for requisition, so
6 this is the requisition header table, and it is involved in
7 both shopping cart and requisition functionality.
8    Q   And then you have another table that is referred to as P-O
9 inter F-A-C, POINTERFAC.  What is the purpose behind that
10 table?
11    A   The POINTERFAC table is involved in making requisitions
12 available to the purchase order system.  It's kind of an
13 intermediator.
14    Q   And I believe you talked about the POITEMVEN table.  You
15 have another table shown that's labeled KWDDETAIL.  Can you
16 explain at a high level the purpose of that table?
17    A   Yes.  Here the acronym, the abbreviation KWD stands for
18 keyword, so it would be keyword detail table, and it is an
19 index used in keyword searches.
20    Q   Now, we referenced this requisition self-service
21 application earlier.  Can you explain to the jury from a source
22 code perspective what the requisition self-service application
23 is?
24    A   Yes.  So, it is a -- as I described, it is a web-based
25 interface to the Lawson purchase order, requisition, and

1238

1 inventory control systems.
2    Q   And is that a more -- can you say whether or not that's a
3 more user-friendly interface?
4    A   Certainly, yes.  It's the main reason for adding a
5 web-based interface to an application, is to provide increased
6 or ease of use and flexibility.
7    Q   Could you explain from a source code perspective what
8 Lawson's procurement punchout application is?
9    A   Yes.  So procurement punchout is a feature of the -- which
10 runs in the context of the requisition self-service application
11 that allows a user to connect to a remote Lawson partner vendor
12 site, perform -- well, it communicates with the site.
13    The Lawson system communicates with the site over a secure
14 communications channel, performs a handshake using a protocol
15 known at cXML is which is a business standard for this type of
16 communication.  It allows the user to perform certain shopping
17 operations on the partner site, the vendor site, and ultimately
18 to have those shopping results returned to the Lawson system
19 for incorporation into their shopping cart.
20    Q   I'd like to turn now to the category search functionality
21 that you studied.  Does the source code of Lawson system
22 implement functionality that allows a user to search for items
23 by category?
24    A   Yes, it does.  There is an option from the find/shop menu,
25 the requisition self-service that brings up a category search

1239

1 screen.
2    Q   What, if any, database tables does the source code use to
3 conduct this category search functionality?
4    A   There are two.  One is called IC item code, ICITEMCODE,
5 and the other is the previously mentioned ITEMMAST table.
6    Q   Do both of those tables belong to that same item master
7 database that you described earlier?
8    A   Yes, they do.
9    Q   What information is contained within that ICITEMCODE table
10 that would be relevant to searching by category?
11    A   The ICITEMCODE table contains the textual description of
12 the levels of the UNSPSC hierarchy and the corresponding codes
13 that are assigned to those levels.
14    Q   And what information does the item master table store that
15 is relevant to searching by category?
16    A   The item master table contains -- in addition to the item
17 descriptions, contains the corresponding UNSPSC codes
18 indicating where they belonged in that hierarchy.
19    Q   When the category selection is chosen by a user from that
20 find/shop menu, what is the first thing that happens in the
21 source code?
22    A   When a user chooses to bring up a category search screen,
23 a request is made from the user's web browser to the back end
24 of the Lawson system.  Specifically Lawson calls this kind of
25 request a data request, and it is -- it is handled by the --

1240

1 passed from the Java code to the -- using the DB thin API that
2 I mentioned previously and results in a search of the
3 ICITEMCODE table for the top levels of the UNSPSC hierarchy.
4      Those top level initial part of the drill-down are
5 returned to the -- formatted as XML and returned to the
6 client's web browser where it's presented to the user to make
7 their initial choice.
8 Q   After the system retrieves these top level categories from
9 the database, would you explain what happens in the source code
10 as the user navigates the available hierarchy of categories?
11 A   Yes.  So the process is very similar to that of retrieving
12 those initial top level categories with the exception that as
13 the user chooses levels in the browser, the corresponding
14 UNSPSC codes are conveyed with the request to the back end
15 system, and the ICITEMCODE table is searched to find the
16 corresponding levels, the children or the child levels
17 underneath the selected level.  That information is returned
18 and then formatted for the user.  In this fashion they can
19 drill down, expanding from the parent to the child.
20 Q   When the user finds his desired category --
21      THE COURT:  Excuse me.  The parent is the larger and
22 the child just means the more specific; is that right?
23      THE WITNESS:  Yes.  If you imagine like a family
24 tree, there is a parent, and the children kind of branch out
25 and grandchildren branch out from there.  That's what I meant

1241

1 in terms of that hierarchy.
2 Q   Once the user finds his desired category and chooses to
3 view the items that belong to that category, will you explain
4 what happens in the source code to cause the items that belong
5 to that category to be displayed?
6 A   Yes.  So when the user selects the items link, the UNSPSC
7 codes for that particular level of the hierarchy are packaged
8 up as part of a request.  In this case, it is what's known as a
9 transaction request.  It's passed from the user's browser to
10 the back end, the server component of the Lawson system.
11      This results in a Lawson 4GL COBOL program called RQIB
12 being executed which searches the ITEMMAST table for items
13 which have the corresponding UNSPSC codes.  The resulting item
14 information is then formatted as XML and returned to the
15 client's web browser where it is formatted as a search result
16 list.
17 Q   Now, Mr. Niemeyer, I'd like to turn to the keyword search
18 functionality in the Lawson system that you studied.  Does the
19 source code of Lawson system implement functionality that
20 allows a user to search by a keyword?
21 A   Yes.  The user may choose search catalog option from the
22 find/shop menu of the requisition self-service application
23 which brings up a keyword search screen with a field in which
24 the user can enter one or more search terms.  That screen has
25 some additional functionality, advanced search functionality

1242

1 which allows the user to limit the search, the scope of the
2 search to Lawson certain origin fields and optionally provide
3 what it's called an exclusion term.
4 Q   What do you mean by an origin field?
5 A   It determines where in the information associated with an
6 item the term is located.  So there are multiple tables which
7 can relate to a given item within the ITEMMAST table, and
8 different textual and numeric information may be found in those
9 tables.  They named those different locations as origin fields,
10 and the user can limit the search if they wish.
11 Q   Can you give us an example of an origin field?
12 A   Well, so the primary description within the ITEMMAST
13 table, there's a field for the description, is the particular
14 origin field.  There is also a vendor description in the
15 POITEMVEN table.  That is another example of an origin field.
16 Q   Have you prepared a demonstrative to help explain how the
17 keyword search functionality is implemented in the source code?
18 A   Yes, I have.
19      MS. ALBERT:  Mike, could we have slide 24, please.
20 Q   Is this the demonstrative that you prepared?
21 A   Yes, it is.
22 Q   What, if any, database tables are involved in this keyword
23 search functionality?
24 A   Well, there are seven depicted here, but the four that I
25 would describe as first are the keyword tables at the bottom.

1243

1 These are prefixed with the KWD abbreviation, and they are
2 keyword synonym, keyword master, keyword detail, and keyword
3 setup.  These tables comprise an index of the available search
4 terms, and then there are three tables above, ITEMMAST which I
5 previously mentioned, POITEMVEN, and a table called ITEMLOC,
6 I-T-E-M-L-O-C, are used after the search is performed to
7 retrieve the item information.
8 Q   And do all of these tables belong to that item master
9 database that you illustrated earlier?
10 A   Yes, they do.
11 Q   What data is contained or what is the keyword detail
12 table?
13 A   Keyword detail table is the key index of search terms, and
14 it relates a specific search term which has been found to the
15 origin field in which it was located and the item number of the
16 item in which it was found.
17 Q   And what types of data is contained in that table?
18 A   Well, as I said, there's an item number, a keyword, and an
19 origin field.
20 Q   Would you please explain briefly how the functionality to
21 build the keyword detail table is implemented in the source
22 code?
23 A   So my understanding is when the system is set up
24 initially, users determine which origin fields are to be
25 enabled for search, and the terms are gathered from the data

1244

1    and placed into the keyword detail table.  For each item, there
2    is a corresponding keyword and an origin field.
3    Q    And what database tables are indexed by the keyword detail
4    table?
5    A    My understanding is that at minimum, the ITEMMAST,
6    POITEMVEN, and ITEMLOC tables.
7    Q    In the context of this source code, what is the purpose of
8    having an index like the keyword detail table?
9    A    It's common practice to create an index to -- an
10   optimization to increase the speed of the search and to
11   eliminate to need to search the whole collection of data when
12   you can condense it to an index that you can search more
13   rapidly.
14   Q    Can you explain how the item vendor table or the POITEMVEN
15   table is used in the implementation of a keyword search in the
16   source code?
17   A    After the search is performed against the keyword tables
18   and item information is being retrieved, corresponding vendor
19   information for the items is retrieved from the POITEMVEN
20   table.
21   Q    Do the records in the item vendor or POITEMVEN table link
22   in any way to the records in the item master or ITEMMAST table?
23   A    Yes, they do.  They contain a field which holds the item
24   number for a given item in the ITEMMAST table.
25   Q    Have you prepared a demonstrative to help you explain how

1245

1    the information in these two tables can be related?
2    A    Yes, I have.
3         MS. ALBERT:  Mike, can we have slide 68, please.
4    Q    Is this the demonstrative that you prepared?
5    A    Yes, it is.
6    Q    Now, using your demonstrative, would you please explain
7    how records in the item vendor or POITEMVEN table can be
8    related to records in the item master table or ITEMMAST table?
9    A    Yes.  So within the ITEMMAST table, or the item master
10   table, there is a field called ITITEM which holds the item
11   number for that item.  That item number uniquely identifies the
12   item within the ITEMMAST table.
13        The PO item vendor table then can -- given record within
14   that table can refer to an item within the ITEMMAST table using
15   that unique number.  It's what's known as a key field in the
16   ITEMMAST table.  Within the POITEMVEN table, there's a field
17   called PIV item which holds that number, and, therefore, if you
18   want to, for a given item in the POITEMVEN table, you can point
19   back to a specific unique item within the ITEMMAST.
20        MS. ALBERT:  Mike, could we go back to slide 24,
21   please.
22   Q    Now, going back to your demonstrative on keyword search
23   query execution, can you explain how the keyword search
24   functionality is implemented in the Lawson system source code?
25   A    Yes.  So after the user enters a search term in the

1246

1    browser and hits the search button, the search term is conveyed
2    as part of a request to the server side components which causes
3    the Lawson 4GL COBOL program called RQIC to be executed.  The
4    RQIC program ultimately performs a search of the keyword detail
5    table for occurrences of that term that have been previously
6    indexed.
7         Any matching records from the keyword detail table are
8    then used to find the corresponding items in the ITEMMAST table
9    and data gets gathered from the PO and ITEMLOC tables.  All of
10   those results are formatted as XML and ultimately returned to
11   the item web browser and formatted as a search word.
12   Q    When the search code searches the keyword tables to locate
13   the keywords that the user typed in, does the source code
14   search the item master table at all?
15   A    No, it does not.  It only searches the keyword detail
16   table and the associated keyword tables.
17   Q    Now, I'd like to turn to the functionality for the adding
18   items to a shopping cart and building a requisition.  Does the
19   source code of the Lawson system implement functionality that
20   allows a user to select desired items for requisition from a
21   list of results returned from either this category or keyword
22   search that you discussed?
23   A    Yes, it implements a shopping cart functionality whereby
24   the user can indicate that an item from a search result should
25   be added to the shopping cart.  Items can be added and removed

1247

1    until checkout operation is performed.  Similar to the way you
2    shop on Amazon or another web business.
3    Q    Now, what, if any, database tables are involved in this
4    shopping cart functionality?
5    A    There are three.  Two of them are prefixed with the term
6    REQ.  One is called REQHEADER and the other is called REQLINE.
7    The third is called PO interface which we mentioned before,
8    POITERFAC.
9    Q    And what information is stored in that REQLINE table
10   that's relevant to the shopping cart functionality?
11   A    The REQLINE table holds the individual line items
12   representing items that were selected to be added to the
13   shopping cart.
14   Q    Does this REQLINE table also contain a status field?
15   A    Yes, it does.  In addition to the item information, it
16   contains a status which can indicate that the item is either --
17   while in the shopping cart, it's in a state called unreleased.
18   Q    What does that mean?
19   A    It means that it is part of a shopping cart and not yet
20   part of a requisition.
21   Q    And is there another status that can be indicated in this
22   status field in addition to the unreleased status that you
23   mentioned?
24   A    Yes.  So I'd just say both the REQLINE and REQHEADER table
25   that I mentioned which are involved in this contain a status

1248

1  field which indicates the disposition of the information,
2  whether it's part of the shopping cart or whether it's part of
3  requisition, that the two values can be what's called
4  unreleased or released.
5     It indicates it's either in a status of unreleased or
6  released where unreleased is the status used while the items
7  are in the shopping cart, and released is -- indicates that
8  they are now part of the requisition.
9  Q   What information is stored in that REQHEADER table that's
10  relevant to the shopping cart function?
11  A   The REQHEADER table represents the shopping cart as a
12  whole in this case, and it groups the REQLINE records together.
13  Q   Can you explain how this shopping cart functionality is
14  implemented in the source code?
15  A   Yes.  So as the user indicates that they would like to add
16  an item to the shopping cart, when the user indicates the item
17  should be added to the shopping cart, the item number for that
18  item is conveyed as part of a request to the server side at
19  which point a Lawson 4GL COBOL program is executed to add a
20  line to the REQLINE, and a record to the REQLINE table
21  corresponding to that item.
22  Q   Have you created some demonstrative to show what happens
23  in the source code when the user clicks on the checkout button
24  after he has added items to the shopping cart?
25  A   Yes, there should be two.

1249

1     MS. ALBERT:  Mike, can we go first to slide 25,
2  please.
3  Q   Now, using these demonstratives, would you please explain
4  what happens in the source code when the user clicks on that
5  checkout button after he's added items to the shopping cart?
6  A   So when a user clicks on the checkout button, there's two
7  major -- two phases that happen, and this depicts the first.
8     If at this point a requisition header, REQHEADER record
9  has not previously been created, one will be created at this
10  time.  This happens when a request is made from the client's
11  web browser to the server side causing the Lawson COBOL program
12  RQIB, or create requisition header which is shown here, to be
13  executed.  That program adds a record to the REQHEADER table.
14  Q   What is a requisition header?
15  A   Again, in this case, it represents either the shopping
16  cart as a whole or the requisition as a whole.  It serves to
17  group the requisition lines and to contain a status for the
18  overall shopping cart or requisition.
19     MS. ALBERT:  Mike, can we go to slide 26, please.
20  Q   So now can you explain what happens in the source code in
21  the next step in this process?
22  A   In this step, there are two activities of importance.
23  This, again, is happening after the user has clicked the
24  checkout button.  Request is -- second request is made from the
25  client's browser to the server side.  In this case, the Lawson

1250

1  4GL COBOL program called RQIF, or release requisition, is
2  invoked.
3     Its first job is to update the status that I mentioned
4  before in both the REQHEADER and REQLINE tables from an
5  unreleased to a released value.  The second step is to create
6  records in the PO interface table, POINTERFAC table, which make
7  those records, make that information then available to the
8  purchase order system.
9  Q   Are records created in this PO interface table at the time
10  when items are initially added to the shopping cart?
11  A   No.  They are only created after the checkout operation is
12  performed.
13  Q   Are the records in the REQHEADER and REQLINE tables
14  available to the purchase order system prior to that checkout
15  button being pressed?
16  A   No, they are made available by virtue of the records in
17  the PO interface table.
18  Q   Now I'd like to turn to the process for generating a
19  purchase order.  Does a source code of the Lawson system
20  implement functionality that generates one or more purchase
21  orders corresponding to the items listed in a requisition built
22  using the Lawson system?
23  A   Yes, it does.  The user can use a program called PO 100 to
24  generate one or more purchase orders from a requisition.
25  Q   Does the source code indicate anything about when multiple

1251

1  purchase orders would be created from line items in a single
2  requisition?
3  A   Yes.  As part of the purchase order generation process,
4  the requisition items are essentially sorted in order to
5  produce a separate purchase order for each vendor corresponding
6  to items in the requisition.
7  Q   Have you prepared a demonstrative to explain how this
8  functionality is implemented in the source code?
9  A   Yes, I have.
10     MS. ALBERT:  Mike, could we have slide 27, please.
11  Q   Now, what, if any, database tables are involved in this
12  purchase order functionality?
13  A   There are three depicted here.  The first is the PO
14  interface table which I mentioned previously.  The two new
15  tables are -- one is called PURCHORDER, short for purchase
16  order, P-U-R-C-H-O-R-D-E-R, and the second is POLINE,
17  P-O-L-I-N-E, short for purchase order line.
18  Q   What information is stored in the PO interface table
19  that's relevant to the purchase order generation function?
20  A   Well, I mentioned before, this serves to make the
21  requisition information available to the purchase order system.
22  Q   And what information does the PURCHORDER or purchase order
23  table store that's relevant to the purchase order generation
24  function?
25  A   A record in the PURCHORDER table represents a specific

1252

1    purchase order for a given vendor.
2    Q    What information does the POLINE table store that's
3    relevant to this purchase order generation function?
4    A    The POLINE table contains the individual line items for a
5    specific purchase order.  They relate to a given record in the
6    PURCHORDER table, and they contain the information by an
7    individual requested item.
8    Q    Using your diagram, would you explain how that
9    functionality, generating one or more purchase orders, is
10   implemented in the source code?
11   A    Yes.  So after the user indicates that they would like to
12   generate purchase orders for a requisition, a request is made
13   to the server side, and the Lawson 4GL program PO 100 is
14   executed.  That program reads records from the PO interface
15   table, and as I described before, essentially sorts them in
16   order to create a separate PURCHORDER record for each vendor
17   having items within the requisition.
18       The corresponding line items are added to the POLINE table
19   for that PURCHORDER, and while this process is happening, a
20   textual report is being generated that the user can later print
21   as an actual purchase order.
22   Q    Now, Mr. Niemeyer, I'd like to turn to the procurement
23   punchout application which we discussed earlier.  Does the
24   source code of the Lawson system implement the procurement
25   punchout functionality?

1253

1    A    Yes, it does.
2    Q    Of the procurement punchout functionality, what is the
3    first step that's implemented by the source code?
4    A    When a user indicates that they would like to start the
5    punchout process, they are presented with a list of Lawson
6    partner vendors from which to choose.  That list is derived
7    from configuration within the system.
8        The user may select one of those at which point the Lawson
9    system establishes or performs a handshake with the remote
10   system.  It has established a secure connection, essentially
11   logs the user in remotely, and in return it receives a URL or
12   web address that can be used to establish the shopping session.
13   Q    And once the shopping session is established, can you
14   describe the next step that's implemented by the source code to
15   achieve this punchout functionality?
16   A    Yes.  So at this point, what's known as an IFRAME,
17   I-F-R-A-M-E, is opened within the browser.  Essentially like a
18   little browser window within the browser.  It allows the user
19   to perform their shopping activity on the partner website.  At
20   the completion of their shopping, the results of their
21   shopping, remote shopping cart is communicated back to the
22   Lawson system over the network by virtue of a Java servlet on
23   the Lawson system and ultimately incorporated into their
24   shopping cart within RSS.  At that point, those items can be
25   used just as they would if they had been shopped for using the

1254

1    other mechanisms we described.
2    Q    How is this punchout process different, for instance, from
3    when I access a retail website for my home computer on my
4    browser at my computer?
5    A    It's different in that the Lawson system is intermediating
6    it or controlling it in several ways.  When you do -- when you
7    shop on your computer at home you are connecting directly to a
8    website like Amazon or something, and all the communication is
9    direct.
10       In the case of the Lawson system foundation, this is
11   happening within the context of the requisition self-service
12   application.  The Lawson system both establishes the connection
13   to their remote site, performs a login operation for the user,
14   and then finally when the shopping is done, those results are
15   communicated back to the Lawson system directly which it then
16   incorporates into the user shopping cart within RSS,
17   requisition self-service.
18       MS. ALBERT:  Thank you, Mr. Niemeyer.  I have no
19   further questions.  Please answer any questions that Ms.
20   Stoll-DeBell may have.
21
22           CROSS-EXAMINATION
23   BY MS. STOLL-DEBELL:
24   Q    Good morning, Mr. Niemeyer.
25   A    Good morning.

1255

Niemeyer - Cross                    1255

1    Q    Prior to your involvement in this case, you had never used
2    Lawson's procurement software; isn't that true?
3    A    That's true.
4    Q    And, in fact, before you began working on this case, you
5    had never used any kind of procurement software.
6    A    I've worked on enterprise systems including eCommerce
7    systems that resulted in procurement and similar types of
8    systems, but not a procurement system per se, no.
9    Q    And in -- do you recall being deposed in this case?
10   A    Yes.
11   Q    And you told the truth and the whole truth in your
12   deposition?
13   A    Of course.
14   Q    And do you recall saying that you had never worked with
15   procurement software in your deposition?
16   A    I don't recall --
17       THE COURT:  Ms. Stoll-DeBell, we need to get on the
18   point of use.  It didn't impeach what he said.  He just
19   qualified it somewhat.  So let's don't do things that don't
20   actually correspond item to item, so to speak.  That's not
21   impeaching.  That's just an explanation of his testimony.  All
22   right.
23   Q    And you reviewed only one version of Lawson source code
24   for this case?
25   A    I reviewed the source code that was provided.  I wasn't

1264

Niemeyer - Cross                        1264

1   A   Yes.
2   Q   And the schema is defined in the source code for Lawson's
3   inventory control module.
4        MS. ALBERT:  This is beyond the scope of my direct.
5        MS. STOLL-DeBELL:  Your Honor, I'm just trying to
6   understand.  I'm going to get into the fields and what fields
7   he looked at for the ITEMMAST table which relates to the
8   schema.  So I'm trying to set up some foundation for the next
9   couple of questions I'm going to ask him, and also in a way
10  that maybe lay some background so that the jury can attempt to
11  follow what we're talking about.
12       THE COURT:  It doesn't help me in ruling on the
13  objection to tell me what you're doing.  Her objection was that
14  it wasn't something she inquired about.  And so the question
15  is, for you, what does it relate to that she did inquire about,
16  and that's what you need to tell me.  Otherwise, I'm going to
17  sustain the objection.
18       MS. STOLL-DeBELL:  It relates to the fields in the
19  ITEMMAST table and what those are, and she did ask him
20  questions about that.
21       THE COURT:  And your question right now isn't related
22  to anything she asked, but it's going to get there because you
23  are laying a foundation.
24       MS. STOLL-DeBELL:  Yes.
25       THE COURT:  Get there quickly.  Overruled.

1265

Niemeyer - Cross                        1265

1   Q   So I think I'll reask the question, because I'm not sure I
2   got an answer to it.  There is a schema for the item data in
3   the ITEMMAST table.
4   A   Yes, yes, there is.
5   Q   And that's defined by the source code for Lawson's
6   inventory control module?
7   A   Loosely described, yes.  There are files which describe
8   the schema -- there are files which describe the schema which I
9   found within the source code.  Technically I wouldn't call them
10  source code.  They are schema files.
11  Q   And schema defines what fields are included in the
12  ITEMMAST table?
13  A   Yes, it describes them.
14  Q   And is a field -- I think of it as being an attribute for
15  an item.  Would you agree with that?
16  A   Sure.
17  Q   So, for example, item number would be a field of the
18  ITEMMAST items?
19  A   Yes.  It has a different name, but there is a field that
20  represents the item number.
21  Q   And item description would be another one?
22  A   Yes.
23  Q   Unit of measure another one?
24  A   Yes.
25  Q   You could have provided a list of all of the item master

1266

Niemeyer - Cross                        1266

1   fields in your expert report; that is something you are capable
2   of doing?
3   A   Yes.
4   Q   But you did not do so?
5   A   No, I did not.
6   Q   Do you agree with me that the item master schema does not
7   include a field for vendor name?
8   A   The ITEMMAST table contains, among other things, what are
9   known as user defined fields which can be supplied by the user
10  with whatever information they like which could include vendor
11  name or vendor number, things like that.  Additionally, I point
12  out that the POITEMVEN table relates to the item master table
13  by virtue of its item number.
14  Q   But that's not what I asked you.  I asked you does the
15  ITEMMAST table have a field for vendor name?
16  A   Other than the user defined field which could be used for
17  that purpose, it doesn't have a specific field.
18  Q   It can be used for any purpose, you can put anything in
19  there at all; correct?
20  A   Yes.
21  Q   So I'll ask you again.  Does the ITEMMAST table --
22       THE COURT:  I think he's answered.  He said twice now
23  that --
24       MS. STOLL-DeBELL:  I'd just like him to say no, Your
25  Honor.

1267

Niemeyer - Cross                        1267

1        THE COURT:  I know you would, but that's not his
2   answer.  His answer isn't no.  His answer is it can be used for
3   that purpose if one wants to use it for that purpose which, per
4   force, precludes a no answer.  So let's go on.  I understand
5   how we'd like to get things, but we don't always get what we
6   like.
7   Q   Okay.  Assuming that the user defined fields are not --
8   someone doesn't choose to put vendor names in there -- let's
9   make that assumption -- there's not otherwise a vendor field.
10  So do you agree with me that a user cannot search the ITEMMAST
11  table by vendor name?
12  A   Users don't directly search tables.  I don't really know
13  how to address that.  Users use the application which runs code
14  which performs searches against many tables.
15  Q   So going through a process, it is possible to search the
16  ITEMMAST table?
17  A   Yes, I'll agree with that generally, sure.
18  Q   If a user field isn't set up as a vendor name, then you
19  can't search the ITEMMAST table by vendor name?
20  A   If the user has not defined a field as such, then there
21  would be no way to search by vendor name that I'm aware of.
22  Q   I want to talk a little bit about the keyword search
23  functionality in RSS.
24  A   Okay.
25  Q   You did review that; correct?

1304

1  case anymore, Your Honor.

2      MR. STRAPP:  Marking goes to constructive

3  knowledge of the patents, which is relevant to the

4  issue we just discussed.

5      MR. McDONALD:  It is not relevant to notice

6  to Lawson.  It's just general public marking.  That is

7  not appropriate.

8      MR. STRAPP:  Your Honor, the witness will

9  testify that the various products are marked, and we

10  have testimony from Lawson witnesses that they have

11  seen those products at trade shows back as far as

12  2003.  That information is relevant to knowledge.

13      MR. McDONALD:  The Lawson people have already

14  testified.  They never testified to that.

15      THE COURT:  I think one of them testified

16  that he went to a trade show and looked at their

17  products.

18      MR. McDONALD:  He said he saw the booth, but

19  they never saw the products or any patent markings.

20      THE COURT:  He says there's no foundation

21  because you haven't established that they actually

22  looked at the products that have the marking.

23      MR. STRAPP:  Your Honor, first of all,

24  circumstantial evidence is relevant to indirect

25  infringement.

1305

1      Secondly, we believe there is direct evidence

2  that we have established through Mr. Lohkamp's

3  testimony.

4      And third, under the case law --

5      THE COURT:  Evidence of what?

6      MR. STRAPP:  That Lawson employees knew of

7  ePlus, that they have seen ePlus --

8      THE COURT:  Somebody said they knew about

9  ePlus, but that's not the point.  The point is did

10  they see these patents or these products that had the

11  notice of the patent on them.

12      MR. McDONALD:  Mr. Lohkamp's testimony about

13  seeing ePlus at the trade show in 2003 before he

14  even worked for Lawson.  So there's no evidence that a

15  Lawson employee saw that.

16      MR. STRAPP:  Your Honor, there's evidence

17  that Lawson has known of ePlus.  There's

18  circumstantial evidence at least that Lawson knows

19  that ePlus competes in this particular marketplace.

20  EPlus marks its website, its software, and under the

21  case law, marking is evidence of constructive

22  knowledge of the patents, which can be relevant to

23  indirect infringement.

24      THE COURT:  Yes, it is.  But do you

25  understand the concept of linkage, foundation?

1306

1      MR. STRAPP:  Yes, Your Honor.

2      THE COURT:  Well, do you have it?

3      MR. STRAPP:  We have testimony from Lawson

4  employees that they have known of ePlus.  We have

5  testimony from a Lawson employee that he attended a

6  trade show in which ePlus had set up a booth

7  demonstrating --

8      THE COURT:  But he says that's before he even

9  was an ePlus employee.  Is that right?

10      MR. McDONALD:  Lawson.

11      THE COURT:  I mean a Lawson employee.  Is

12  that right?

13      MR. STRAPP:  I don't know the answer to that

14  one way or the other, Judge.

15      THE COURT:  Isn't that something you need to

16  know to establish the foundation.

17      MR. STRAPP:  Well, Your Honor, I believe

18  under the case law, even if we don't have direct

19  evidence, circumstantial evidence is sufficient to at

20  least go to the jury so that they can consider whether

21  or not there is sufficient evidence for the indirect

22  infringement claim.

23      THE COURT:  All right.  Anything else?

24      MR. McDONALD:  No, Your Honor.

25      THE COURT:  Objection overruled.  The

1307

1  exhibits and testimony right now is admitted for the

2  limited purpose of whether or not Lawson may have

3  knowledge of ePlus and their patents.  EPlus as a

4  competitor and their patents.

5  BY MR. STRAPP:

6  Q  Mr. Farber, can you just tell me briefly what this

7  document is?

8  A  Sure.  This is a document, which I believe

9  describes at a high level a little bit about the

10  functionality and features of the Procure Plus

11  product.

12  Q  Can I direct your attention to the bottom

13  right-hand corner of the first page of this document?

14  A  Yes.

15  Q  Do you see there a list of U.S. patent numbers?

16  A  I do.

17  Q  Do you recognize any of those patents numbers as

18  patents that are at issue in this case?

19  A  Yes.

20  Q  Are those the first three patents listed there?

21  A  Yes, they are.

22  Q  Can you explain to me why it is that ePlus has

23  decided to mark this particular Procure Plus brochure

24  with the three patents numbers that are at issue in

25  this case?

1308

1   A   Well, it's my understanding from working with our
2   counsel that when you have a patents marking, it is a
3   necessity, and it's a form of providing general notice
4   to the industry that you have patents.
5       So we mark things that are publicly disseminated.
6   Q   Let me ask you to turn to Plaintiff's Exhibit 417,
7   please.  What is this document, Mr. Farber?
8       MR. McDONALD:  For the record, I have the
9   exact same objections.  I think I know what you're
10  going to say, but I just want to make sure you know I
11  have the same objections to this one.
12      THE COURT:  Are these the same kind of
13  documents, it's just another kind of product?
14      MR. STRAPP:  Correct.  We've discussed --
15      THE COURT:  Is that what it is?
16      MR. McDONALD:  Yes, it is, Your Honor, and I
17  guess you did have a limiting instruction.  So I'd at
18  least request the same limiting instruction.
19      THE COURT:  Well, this Exhibit 417 and this
20  testimony is, again, limited to -- for you to consider
21  as evidence respecting whether Lawson is on notice of
22  ePlus as a competitor and its patents that are at
23  issue in this case.  That's the only purpose that this
24  is admitted to.
25  BY MR. STRAPP:

1309

1   Q   Mr. Farber, this is Plaintiff's Exhibit 417?
2   A   It's a similar document and brochure that shows up
3   in written form and on the website that relates to our
4   product information management solutions.
5   Q   Which product specifically does this relate to?
6   A   Catalog and Content Plus.
7   Q   Can you take a look at the bottom right-hand
8   corner of this document, please?
9   A   Yes.
10  Q   Do you see there a list of U.S. patent numbers?
11  A   I do.
12  Q   Do you see the same three U.S. patent numbers
13  listed first there that we had discussed with respect
14  to Plaintiff's Exhibit 443?
15  A   Yes.
16  Q   I'm sorry, 448.
17      Are these the three patents that are at issue in
18  this lawsuit?
19  A   Yes, that's the '683, the '516, and the '172
20  patent.
21  Q   What types of additional documents or other
22  documents, if any, does ePlus mark with '683, '516 and
23  '172 patents?
24  A   We mark the products themselves so that when
25  people utilize the system, they see the patents as

1310

1   soon as they login.  Anybody that goes to our website
2   sees markings at numerous locations on our website.
3   Our printed materials, our documentation, information
4   that we hand out at things like trade shows are also
5   marked.  So it's basically we try to mark everything
6   that's publicly disseminated.
7   Q   Since when has ePlus marked its products and its
8   literature?
9   A   I think that was since 2002, if I'm not mistaken.
10  Q   What types of customers does ePlus target for
11  these Procure Plus and Content Plus products?
12  A   In terms of who we try to attract and sell to, I
13  would say the mid market.
14  Q   What do you mean by "mid market"?
15  A   Well, similar type customers that Lawson, you
16  know, talked about earlier in the week.  You know,
17  they're not necessarily the largest.  They're not
18  necessarily the smallest.  They fall within a range.
19  It can be, you know, a company that may be in revenue,
20  does, you know, 50 million to 2 1/2 billion.  That's a
21  very wide range, but that's what's considered mid
22  market in industry terms.
23  Q   Do you know whether or not ePlus competes with
24  Lawson for sales of its e-Procurement software?
25  A   Yes.

1311

1   Q   How do you know that ePlus competes with Lawson?
2   A   Well, I know through personal conversations that I
3   have with prospects and meetings that I attend, sales
4   meetings with my sales executives or account
5   representatives that are meeting with prospects to try
6   to sell them a solution.
7   Q   Any other ways that you know?
8   A   Yeah.  That's one way.  Other ways, through emails
9   at times that you, know, these prospects would send to
10  my sales organizations that I get copied on.  And
11  sometimes in situations where you're on a conference
12  call, you know, with a lot of vendors, you know, and
13  the prospect that's looking to buy a solution would
14  generally ask some general questions so that, you
15  know, they give the benefit to all the vendors to hear
16  the answer.
17      And sometimes there may be occasion to hear of a
18  competitor situation that way as well.
19  Q   Like the Lawson employees we've heard testimony
20  from, do you also pay attention to industry analyst
21  reports?
22  A   I do.
23  Q   Can you please turn to Plaintiff's Exhibit 463.
24  A   463?
25  Q   That's correct.

1316

1    the RFP process from Lawson consistent with your

2    understanding of how the RFP process works for

3    e-Procurement software?

4    A  Yes, I believe so.

5    Q  When ePlus receives an RFP, does ePlus itself

6    draft a response and ensure that the response that it

7    gives to the RFP is accurate?

8    A  Yes, ePlus would draft the response, yes.

9    Q  In addition to industry analyst reports, what

10   other types of media or publications do you follow to

11   try to keep abreast of trends or developments in the

12   e-Procurement industry?

13   A  In addition, to analysts reports?

14   Q  Correct.

15   A  There's a lot of sources.  You know, we do --

16   besides the reports, you get to have briefings with

17   the analysts.  We actually sit down and they disclose

18   some information to you about competition.  There's

19   times where we follow -- not times.  We do follow a

20   number of different trade magazines.  There's web

21   based information such as blogs that are written now

22   in this discipline of procurement sourcing and catalog

23   management.

24       There's the competitors websites that we looked at

25   very often to see what the competitors are doing and

1317

1    try to gain insight based on whatever public

2    information is available to help us position our

3    products and solutions.

4    Q  Do you know whether in these types of publications

5    you've been discussing there's ever been any mention

6    of ePlus or its patents?

7    A  Yes.

8    Q  What are you referring to specifically?

9    A  There have been authors that have written things

10   on blogs, on websites.  There have been newspaper

11   articles, trade magazines widely published --

12       MR. McDONALD:  Your Honor, we already went

13   through these issues as to foundations for some

14   exhibit that's been excluded.  Now he's talking about

15   the same thing.  That has been excluded.

16       THE COURT:  It sounds like I like it.

17       MR. STRAPP:  Your Honor, I wasn't planning to

18   go into any detail about these exhibits or show them,

19   obviously.  I was just asking about his personal

20   knowledge as the president of ePlus, what does he do

21   to keep abreast of industry developments.

22       THE COURT:  What's that got to do with

23   anything in the case?

24       MR. STRAPP:  It's relevant to understanding

25   how the marketplace works and how people in the

1318

1    industry, including the president of ePlus keeps track

2    of what's going on in the industry.

3       THE COURT:  Objection sustained.

4    BY MR. STRAPP:

5    Q  All right.  Mr. Farber, you heard some testimony

6    that individuals at Lawson consider publications from

7    Gartner, I think that's an industry analyst, to be

8    some of the most reliable industry publications.  Is

9    that consistent with your understanding as well?

10   A  That's what they said, yes.

11       THE COURT:  The question is:  Is it

12   consistent with your understanding?

13       THE WITNESS:  That Gartner is a widely

14   recognized --

15   Q  And reliable publication?

16   A  For the most part.

17   Q  Is Gartner an industry analyst report that ePlus

18   subscribes to?

19   A  We have.

20   Q  Have you personally reviewed Gartner research

21   reports and industry analyst reports?

22   A  I have.

23   Q  I'd like you to turn, please, to Plaintiff's

24   Exhibit 325.

25   A  I don't know that I have a 325.  Here it is.  It's

1319

1    out of order.  Okay.  I got it.

2    Q  It's also up on the screen for your reference if

3    you want to see a larger version there.

4    A  Okay.

5    Q  Does this appear, Mr. Farber, to be a Gartner

6    research report?

7    A  Yes.

8    Q  And is this the type of Gartner research report

9    that you have reviewed in the past?

10   A  Yes.

11   Q  What's the date of this particular Gartner

12   research report?

13   A  This is February 17, 2005.

14   Q  What is the title of this report?

15   A  Ariba/ePlus settlement could spark more patent

16   lawsuits.

17   Q  From reading that title, what do you understand

18   the subject matter of this particular report to be?

19   A  On the subject line, it's referring to a

20   settlement agreement that Ariba and ePlus had

21   pertaining to a certain number of our patents, and

22   Gartner, you know, is letting people know that it

23   could potentially result in some more litigation or

24   lawsuits.

25   Q  What patents were the subject of this patent

1320

1  infringement settlement referenced in the Gartner

2  report?

3  A  The same ones that are at issue here today.

4  Q  The three patents that are at issue in this case?

5  A  That's correct.

6  Q  All three of those were at issue in this Ariba

7  and ePlus litigation?

8  A  Yes, that's correct.

9  Q  What is the recommendation here at the second

10  sentence of the first page?

11  A  Starting with investigate, investigate the risk of

12  challenges to your products and whether others have

13  infringed on your patents.

14  Q  What do you understand that to mean?

15  A  They are giving advice, the research analysts --

16       MR. McDONALD:  Objection, Your Honor.  I

17  don't think the witness can interpret the report.

18       THE COURT:  Sustained.

19  Q  Let's turn to the next page of the document,

20  please.

21       THE COURT:  Ladies and gentlemen, this

22  document is admitted for a limited purpose.  Whether

23  or not Ariba and ePlus settled a lawsuit involving the

24  infringement of this case, I mean of the

25  patents-in-suit in this case, is not one of -- is

1321

1  admitted only for the purpose of whether -- for you to

2  to consider as evidence of whether Lawson knew about

3  ePlus and the patents-in-suit in the case in view of

4  the fact that one of the witnesses from Lawson

5  testified about reviewing the Gartner reports as a

6  regular proposition.

7       You may not conclude from this information

8  that because Ariba thought it might have infringed

9  ePlus' patents and reached a settlement of that matter

10  that Lawson infringes those same patents, but you can

11  consider the evidence of whether Lawson knew about

12  ePlus as a competitor and ePlus' patents, and also in

13  deciding on some of the as, I'll tell you later, some

14  of the defenses that have been offered in the case by

15  Lawson.  And those are the limited purposes.

16       Are there any other requests for limiting

17  instruction other than what I just gave?

18       MR. McDONALD:  No, Your Honor.  Thank you.

19       THE COURT:  All right.

20  Q  Mr. Farber, I'd like to direct your attention to

21  the bottom of the second page of this Gartner report.

22  Do you see that there are some recommendations listed

23  there in bullet points?

24  A  Yes.

25  Q  I want you to take a look in particular at the

1322

1  recommendations for ISVs.  Is ISV a term that's used

2  in the supply chain management industry?

3  A  It's used in the computer industry.

4  Q  What does it refer to?

5  A  It means independent software vendors.  Those

6  vendors that develop and install software.

7  Q  Is ePlus an ISV?

8  A  Yes.

9  Q  Is Lawson an ISV?

10  A  Yes.

11  Q  What recommendations is Gartner providing to

12  companies like ePlus and Lawson in this particular

13  Gartner research report?

14  A  What Gartner is recommending is to make sure that

15  your innovations are patented, which is the marking

16  that we talked about earlier, and then do an extensive

17  review of the functionality of your software against

18  patents that are known to be in dispute.

19       MR. McDONALD:  Your Honor, we don't need this

20  witness to read this document to us.  I object.

21       THE COURT:  I think that's enough.

22       MR. STRAPP:  I have no further ear questions.

23  Thank you for your time, Mr. Farber.

24       THE COURT:  Cross-examination.

25

1323

1       CROSS-EXAMINATION

2  BY MR. McDONALD:

3  Q  Good afternoon, Mr. Farber.

4       EPlus never gave Lawson any notice of these

5  patents directly before they sued them, did they?

6  A  No.

7  Q  And so the first time there's a direct

8  communication between ePlus and Lawson is when ePlus

9  filed a complaint and served that complaint on Lawson?

10  A  Yes, that's my understanding.  That's the way we

11  were instructed to do that.

12  Q  That was in May of 2009; is that correct?

13  A  I believe that's correct, yes.

14  Q  You talked at the beginning of your testimony

15  about some documents that you said put the patent

16  number out there in the public so that the public

17  would see you had these patents numbers.  Do you

18  remember that?

19  A  I said that we put the information out because it

20  was our understanding that that's how you have to

21  disseminate the patent, and we put it on documents

22  that are publicly available.

23  Q  And those documents that you picked as examples of

24  those publicly available documents, those are a couple

25  of exhibits that were put up on the computer monitors

1324

FARBER - CROSS      1324

1  during your testimony, right?

2  A  I didn't select them but I think my attorneys did,

3  yes.

4  Q  You weren't surprised that they were asking you

5  about those documents, are you?

6  A  I'm not surprised at anything.

7  Q  So let's put up Exhibit 448 for a moment.

8  Plaintiff's Exhibit 448.

9  A  Okay.

10  Q  Do you recall this was one of the documents that

11  Mr. Strapp asked you about?

12  A  Yes.

13  Q  This is one of these examples of these publicly

14  disseminated documents that have the patent number?

15  A  Yes.

16  Q  Can we blow up -- on the first page of Plaintiff's

17  Exhibit 448, the lower left corner, all the way down

18  to the very bottom of the page, as far as you can go.

19  A  Yes.

20  Q  Isn't it true, Mr. Farber, that the document that

21  you said was publicly disseminated was, in fact,

22  designated by ePlus, your company, as confidential and

23  proprietary to ePlus, Inc.?

24  A  On this it was, but I don't know if this was a

25  brochure, Mr. McDonald, or if it was on our website

1325

FARBER - CROSS      1325

1  screen that gets published.

2  Q  Are you saying you have on a website information

3  that would be publicly available that you're going to

4  say that that is confidential and proprietary to

5  ePlus?

6  A  It could be.

7  Q  Do you actually know what you're talking about or

8  not?

9  THE COURT:  Wait a minute.  That's not a

10  proper question.

11  But let me tell you-all something.  This

12  designation is confidential.  All of this.  This is

13  something that happened during the lawsuit under a

14  protective order.  And what happens is when the

15  parties exchange documents, the lawyers can say they

16  are confidential or certain kind of categories or not.

17  That's how it was put on there.

18  MR. McDONALD:  That's only the very bottom

19  one, Your Honor.  That's the only one that's in all

20  capitals that was marked --

21  THE COURT:  I'm sorry.  Anyway.  That's what

22  this big thing that says, Confidential, PX 004, page 1

23  of 8 means.

24  Now, he's talking about this section of the

25  first page.  Can you highlight that?  Proprietary and

1326

FARBER - CROSS      1326

1  confidential, ePlus, Inc.  That means that when ePlus

2  put this out to the public, they also put out the fact

3  that it was proprietary and confidential ePlus

4  information.  Whatever that means.  All right.

5  BY MR. McDONALD:

6  Q  Do you see that highlighting here on the screen,

7  Mr. Farber, that proprietary and confidential, ePlus,

8  Inc.?

9  A  I do.

10  Q  That was a marking that the company put on this

11  document, right?

12  A  I would imagine so.

13  Q  Then there's another one below that that the Judge

14  was talking about that was done by the lawyers for

15  ePlus in producing this to Lawson?

16  A  That's what I heard.

17  MR. McDONALD:  So if we look above the

18  highlighting, if we could highlight that paragraph

19  above that, Bill.

20  Q  The sentence that begins, All information.  So

21  that's in addition to the proprietary and confidential

22  legend from the company.  Above there's actually

23  a paragraph that says, All information contained

24  within this document is confidential and proprietary

25  to ePlus, Inc.  Do you see that?

1327

FARBER - CROSS      1327

1  A  I do.

2  Q  This document wasn't publicly distributed, was

3  it?

4  A  I disagree with you.  I believe it was.

5  Q  What's your basis for believing this document that

6  was designated by ePlus was confidential and

7  proprietary was publicly distributed?

8  A  Because I'm familiar with the document, and I know

9  of certain instances of where it was used, and I know

10  that it was freely distributed in certain trade shows

11  and to certain customers, and the information as

12  depicted here is also on our website.

13  Q  Well, you mentioned distributing information to

14  customers.  Is it true that from time to time you've

15  distributed information to customers, but you want to

16  limit the distribution of it so it doesn't go beyond

17  the customers?

18  A  And we usually have a nondisclosure in place for

19  that, yes.

20  Q  So this is something that you might have disclosed

21  to a customer with the intent that it not be further

22  distributed to other companies such as Lawson,

23  correct?

24  A  No, I don't believe I said that.

25  Q  But I'm asking you, isn't it true when you put a

1352

REDIRECT EXAMINATION

BY MR. STRAPP:

Q   I'm going to ask Lawson to put back up on the
screen the press release that was shown to you,
Mr. Farber.

    Mr. Farber, what's the purpose of ePlus' press
releases generally?  Why does ePlus issue press
releases?

A   A press release is issued to, you know, let the
industry know what's going on at ePlus and what we
think are notable events.

Q   Do you see at the top of this document there's a
date, July 21, 2003?  Do you see that?

A   Yes.

Q   Right above it, it says "market wire."  What's
your understanding of market wire?  What does that
imply about where this was disseminated to?

A   Market wire is a public relations organization
that picks up will press releases and then
redistributes them on their own vehicles of
communication.

Q   So who would have been the target audience of a
press release about ePlus' patent and the subject
matter of the patent?

A   Well, it would have had a very broad distribution.

FARBER - REDIRECT   1353

Certainly, you know, to ISVs and certain customers
that look at the releases.  The financial world as
well.

Q   This press release specifically mentions one of
the patent numbers that's at issue in this case,
doesn't it?  The '172?

A   Yes.

Q   You were asked a few questions by Mr. McDonald
regarding marking.  Do you recall that?

A   Yes.

Q   Does ePlus mark any of its products or patent
literature that is disseminated publicly without
restriction?

A   Yes.

Q   Which particular --

    MR. McDONALD:  Objection.  This is already
covered.

    THE COURT:  Overruled.

Q   Which particular products or product literature
are marked with a patent that aren't restricted in any
way?

A   Sales brochures, sales presentations that are
provided at either a prospect's or industry conference
that we speak at.

Q   Trade shoes?

FARBER - REDIRECT   1354

A   Trade shoes.  Information that's, you know, widely
available and nonrestricted on our websites.

Q   For example, at an industry trade show, can anyone
walk up, take a product brochure and walk away?

A   Absolutely.

Q   Can anyone go to the ePlus website and see the
patent numbers marked there?

A   Yes.

    MR. STRAPP:  No further questions.

    THE COURT:  All right.  You may step down,
sir.

    (The witness was excused from the witness
stand.)

    MR. ROBERTSON:  Your Honor, we have a few
housekeeping matters to take care of, a few
stipulations to read into the record.  If you'd like,
I can do that now.

    THE COURT:  The lunches are here.  I think
I'll let you-all clean up and get things straightened
out.  We'll take one hour for lunch.  You can take
your notebooks with you.

    (The jury is out.)

    THE COURT:  Do you have something,
Mr. Robertson, you wanted to give me that I had asked
for or something and I told you to do it after the

1355

examination at the break?

    MR. ROBERTSON:  Yes, sir.  Two thinks, Your
Honor.  The first issue had to do with this deposition
destination of that was Kristy Oliver.

    THE COURT:  And the issue there was whether
Lawson had designated that part of it on item No. 18,
page 29, as a fairness designation or whether you had
designated it.

    MR. ROBERTSON:  Yes, sir, and we have the
answer to that question.

    THE COURT:  And the answer is?

    MR. ROBERTSON:  It was Lawson.  And let me
direct you to where you can find it.

    THE COURT:  Do you all agree?

    MR. SCHULTZ:  Yes.

    THE COURT:  All right.

    MR. McDONALD:  It was ePlus' counsel that
asked it during the actual taking of the deposition,
but we at Lawson actually designated it for the
reading.

    THE COURT:  All right.  The fact that ePlus
asked it but didn't offer it doesn't change the
fundamental issue, that it who opened the door at
the trial.  So this doesn't open the door.

    MR. McDONALD:  We put it in without their

1488

1   And there's also a case called SEB from the Federal

2   Circuit which has to do with the standard of intent

3   for the inducement infringement, which I understand

4   also includes a reckless disregard for the patent.

5        THE COURT:  I want you to give Ms. Haggard

6   the citations for those two cases, plus --

7        MR. ROBERTSON:  Let me be candid with the

8   Court.

9        THE COURT:  What is it?

10       MR. McDONALD:  Akamai.

11       THE COURT:  Alkamai?

12       MR. ROBERTSON:  Alkamai is how it's

13  pronounced.

14       THE COURT:  I can't pronounce it.  All right.

15  I want you to give her the cites, so I make sure I've

16  read those while I'm working on the instructions.

17       MR. ROBERTSON:  The Supreme Court has granted

18  a writ of certiorari with respect to this SAB case I

19  just referenced.  But the Federal Circuit just came

20  down with a case I think in the last week that said

21  that the pendency of a writ of certiorari has no

22  impact whatsoever on what the state of the law is.

23       THE COURT:  Why did the Federal Circuit feel

24  compelled to decide that?  I think that's been the law

25  forever.

1489

1        MR. ROBERTSON:  I think it was because one of

2   the litigants made the argument.

3        THE COURT:  I understood that to be the case

4   for as long as I've been practicing law.

5        MR. ROBERTSON:  All right.  Thank you, Your

6   Honor.

7        THE COURT:  All right.  Thank you all very

8   much.  Give the citations to her tonight so she can

9   print those out for me.  Give her the books and we'll

10  be ready to go.

11       Thank you very much.

12

13       (The proceedings were adjourned at 5:34 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1490

```
1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE EASTERN DISTRICT OF VIRGINIA
3           RICHMOND DIVISION
4
5    --------------------------------------
6    ePLUS, INC.          : Civil Action No.
                          : 3:09CV620
7    vs.                  :
                          :
8    LAWSON SOFTWARE, INC.  : January 13, 2011
                          :
9    --------------------------------------
10
11      COMPLETE TRANSCRIPT OF THE JURY TRIAL
12      BEFORE THE HONORABLE ROBERT E. PAYNE
13      UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24        Peppy Peterson, RPR
             Official Court Reporter
25        United States District Court
```

1491

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1492

```
                    P R O C E E D I N G S
1
2
3        THE CLERK:  Civil action number 3:09CV620, ePlus,
4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
6    Mr. Michael G. Strapp represent the plaintiff.
7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
9    the defendant.  Are counsel ready to proceed?
10        MR. ROBERTSON:  Plaintiff is, Your Honor.  Thank you.
11        MR. McDONALD:  Yes, Your Honor.  Thank you.
12        THE COURT:  Do you need to see me about something
13   before the jury comes in?
14        MR. ROBERTSON:  Yes, Your Honor.  You had asked us to
15   take a look at those appendices with respect to our motion on
16   this implementation on a customer-by-customer basis.
17        THE COURT:  Yeah.
18        MR. ROBERTSON:  We have done that, and the reason I
19   raised it, Your Honor, is one of the witnesses that's going to
20   be called this morning is Ms. Hannah Raleigh.  You may recall
21   she testified once already.  She is involved with Lawson
22   Professional Services that has to do -- that has responsibility
23   for implementation of the Lawson software products, and we're
24   concerned that she's going to be getting into areas in and
25   presenting testimony that Lawson is going to contend are
```

1493

```
1    defenses to infringement later that are directly implicated by
2    that interrogatory number 24.
3        What I have provided Your Honor with is the
4    appendices that were referenced in the answers to the
5    interrogatories, the transcript from the March 26th hearing,
6    telephonic hearing on the motion to compel, and the relevant
7    citations to the transcript where this issue came up, and I do
8    want to continue to press the motion, Your Honor.
9        We do think that the answers, even with the
10   appendices, were nowhere near what was called for and what Your
11   Honor directed Lawson to do in response to that.
12        If I might just, Your Honor, you may recall that
13   these appendices that are being referenced were provided to
14   ePlus three months before the motion to compel was presented,
15   and the appendices do not respond to the interrogatory as
16   represented by counsel for Lawson.
17        Indeed, if you look at some of the appendices, for
18   example --
19        THE COURT:  Is A appendix A?
20        MR. ROBERTSON:  Yes, sir.  Under the tab December 23,
21   2009, response to interrogatory number -- yeah, A is one.
22        THE COURT:  March 26th is the first tab, the
23   transcript, and then there's an A behind that.  Is that
24   appendix A or not?
25        MR. ROBERTSON:  I believe appendix A, Your Honor, is
```

1554

CHRISTOPHERSON - DIRECT     1554

1   That's not a proper relevant line of questioning.
2        MS. STOLL-DeBELL: I'm asking him to comment
3   on how the software works.
4        THE COURT: Your asking him to comment on
5   what another witness did. So what's the difference
6   between asking him -- can I ask another witness does
7   he believe the other witness was telling the truth? I
8   can't ask that, can I?
9        MS. STOLL-DeBELL: No.
10        THE COURT: If you're testifying, I can't ask
11   you do you believe that witness A was telling the
12   truth, can I?
13        MS. STOLL-DeBELL: No, but I think this is
14   different because we're talking about Lawson's accused
15   software in this case. And Mr. Christopherson does
16   know how that software works. He's worked with it for
17   nine years. So I'm asking him about that.
18        THE COURT: No, you're asking him about what
19   somebody else did.
20        MS. STOLL-DeBELL: Your Honor, I'm asking him
21   about what he saw Dr. Weaver do with the software he
22   works with.
23        THE COURT: I know. Your asking him to
24   comment on Dr. Weaver's testimony, right?
25        MS. STOLL-DeBELL: What he saw the software

1555

CHRISTOPHERSON - DIRECT     1555

1   do. What he saw Dr. Weaver do with the software in
2   this case.
3        THE COURT: Objection sustained. Please
4   disregard the answer. One witness can't comment upon
5   what another witness has testified to in that fashion.
6   BY MS. STOLL-DeBELL:
7   Q   I'm going to ask you some questions about UNSPSC
8   codes. Okay?
9   A   Okay.
10   Q   Are UNSPSC codes used to categorize similar
11   products for use with different kinds of analysis?
12        MR. ROBERTSON: Objection. Lack of
13   foundation.
14        MS. STOLL-DeBELL: I can lay a foundation.
15        THE COURT: All right.
16   BY MS. STOLL-DeBELL:
17   Q   Do you know what UNSPSC codes are?
18   A   Yes.
19   Q   Do you work with them as part of your work for
20   Lawson software?
21   A   Yes.
22   Q   Does Lawson Software have the capability of using
23   UNSPSC codes?
24   A   Yes.
25   Q   Are UNSPSC codes used in Lawson Software to

1556

CHRISTOPHERSON - DIRECT     1556

1   categorize similar products to be used for different
2   kinds of analysis?
3   A   Yes.
4   Q   Do they help companies analyze spending patterns?
5   A   Yes.
6   Q   Do UNSPSC codes identify generally equivalent
7   items?
8        MR. ROBERTSON: Objection, Your Honor. I
9   think that calls for an opinion, and it also intrudes
10   on an opinion with respect to infringement issues. So
11   it calls for a legal conclusion.
12        THE COURT: It calls for expert opinion, did
13   you say, or legal conclusion or what?
14        MR. ROBERTSON: It calls for an expert
15   opinion.
16        THE COURT: Your voice dropped off right
17   there at the end and I didn't hear it.
18        MR. ROBERTSON: I apologize, Your Honor.
19   Yes, it's seeking a legal opinion from this witness
20   and it calls for a legal conclusion in this case.
21        THE COURT: A legal opinion? Why is it a
22   legal opinion?
23        MR. ROBERTSON: Excuse me. I misspoke. It
24   calls for an expert opinion, Your Honor, and it seeks
25   a legal conclusion.

1557

CHRISTOPHERSON - DIRECT     1557

1        THE COURT: All right. And the question was?
2        MS. STOLL-DeBELL: The question was, Do
3   UNSPSC codes identify generally equivalent items. I
4   don't think it calls for an expert opinion. I'm just
5   asking him a fact about whether these codes categorize
6   generally equivalent items. It's not an expert
7   opinion.
8        THE COURT: It's a lay opinion. So you're
9   asking him whether in his opinion that's what they do?
10        MS. STOLL-DeBELL: Yes.
11        THE COURT: Why is his opinion relevant?
12        MS. STOLL-DeBELL: Because he works with the
13   software. The software uses these codes. And so he
14   can talk about what the codes do.
15        THE COURT: You can ask him his opinion as a
16   lay person what it does. It's up to the jury to
17   decide what weight to give to the opinion.
18        MS. STOLL-DeBELL: Okay.
19   BY MS. STOLL-DeBELL:
20   Q   Do you understand or do you want me to ask it
21   again?
22   A   Will you ask the question again? I think it's a
23   yes or no.
24   Q   Okay. It might be. In your lay opinion, do
25   UNSPSC codes identify generally equivalent items?

1566

CHRISTOPHERSON - DIRECT     1566

1  THE COURT:  Can you tell?

2  THE WITNESS:  I can tell.

3  THE COURT:  Now the next question is how do

4  you tell because that's the foundational question.

5  Q  How do you tell?

6  A  How do you tell?  When we open up a window, which

7  is what's occurred here, when you have selected, in

8  this case I believe it's Staples link, a brand new web

9  page is opened up.  And there's a frame put on that.

10  That frame is much like a picture frame.  In this

11  case, really closer to a digital picture frame.

12     So the outside of the frame looks like the frames

13  in any of the pictures here.  You can put a label on

14  that frame.  The label is Lawson.  We happen to put

15  our logo, our brand, always with Punchout since we've

16  come out with that product always in the upper

17  left-hand corner.

18     Everything below that is the picture.  So we have

19  created the frame, but we don't care what happens

20  inside of that picture.  At that point everything

21  below that is being run by and controlled by the

22  vendor.

23  Q  Okay.  So in this slide you can see there's a list

24  of categories?

25  A  Yes.

1567

CHRISTOPHERSON - DIRECT     1567

1  Q  Are you saying that that is controlled by the

2  vendor?

3  A  Correct.

4  Q  And not Lawson?

5  A  Correct.

6  Q  We can go to the next page.  And within the

7  picture frame, do you see results of a search?

8  A  What I see is they have drilled down into the

9  catagory further.

10  Q  Is it the vendors software that's providing that

11  drill down of catagory?

12  A  Yes.

13  Q  And not Lawson?

14  A  Correct.

15  Q  Okay.  If we can go to the page ending in 1269.

16  It's a couple pages ahead.  What is this showing?

17  A  In this case, they have selected some paper.  And

18  you can start seeing the item description, more

19  information about that particular product.

20  Q  Is it the vendor software that's providing that

21  item description and additional detail regarding that

22  product?

23  A  Yes.

24  Q  And not Lawson?

25  A  Correct.

1568

CHRISTOPHERSON - DIRECT     1568

1  THE COURT:  In view of what you said earlier,

2  whose software is providing the whole page?

3  THE WITNESS:  The whole page, Your Honor, is

4  actually being constructed by two parties.  You've got

5  the very -- actually, three parties.  You've got in

6  this case Internet Explorer is done by Microsoft.

7  That's creating the blue bar and the borders around

8  it.  Right below that is Lawson.  So you have the

9  Lawson logo.  All we're putting up is an image of that

10  and it enters blank space.

11  THE COURT:  Whose software is being used to

12  enable me to view this?

13  THE WITNESS:  To enable you to view it?  It

14  would be Microsoft.  It's Internet Explorer in this

15  particular example.  That's the browser that's being

16  used.

17  THE COURT:  That's not what I'm asking.

18  THE WITNESS:  Sir, I didn't understand then.

19  THE COURT:  Do I have to have one of the

20  Lawson systems in order to see what's on this screen?

21  THE WITNESS:  To use Punchout, yes.

22  THE COURT:  All right.  Now I understand.

23  Thank you.

24  THE WITNESS:  It would help maybe, Your

25  Honor -- Punchout is what opens up --

1569

CHRISTOPHERSON - DIRECT     1569

1  MR. ROBERTSON:  Your Honor, I just object.

2  The question has been answered.

3  THE WITNESS:  Okay.

4  THE COURT:  You may have objected to my

5  question.

6  MS. STOLL-DeBELL:  I think he did actually.

7  BY MS. STOLL-DeBELL:

8  Q  Okay.  Are there some of these Punchout vendor

9  websites that customers can go to without using

10  Punchout?

11  A  Can you say that again?

12  Q  Yes.  So, for example, Staples link, is that one

13  of the Punchout vendors that can be used with Lawson's

14  Punchout product?

15  A  Yes, it is.

16  Q  Okay.  Can a customer use Stapleslink.com without

17  having the Punchout product?

18  A  I do not know.

19  MR. ROBERTSON:  No objection.

20  Q  I think we're done with that line of questioning

21  so I'm going to transition again just for you.

22  A  Sure.

23  Q  While you take a drink.

24  A  That's okay.  Go ahead.

25  Q  When did you first learn about ePlus' patents?

CHRISTOPHERSON - DIRECT     1570

1   A  May 10, 2009.

2   Q  Is that when you first learned about the law suit

3   that ePlus had filed against Lawson?

4   A  Yes.

5   Q  What did you do when you learned that ePlus had

6   filed suit against Lawson for patent infringement?

7   A  What I first did was I got the three patents and

8   reviewed those, read those.

9   Q  What did you think when you finished reading those

10  patents?

11      MR. ROBERTSON:  Objection, Your Honor.  This

12  is calling for a legal conclusion and it's --

13      THE COURT:  I'm sorry?

14      MR. ROBERTSON:  It's calling for a legal

15  conclusion, Your Honor, and it's not relevant.

16      THE COURT:  What did he think?  Is that the

17  question?

18      MS. STOLL-DeBELL:  Yes, what did he think.

19      MR. ROBERTSON:  It's a little vague and

20  ambiguous, too.

21      THE COURT:  Well, I think maybe that's the

22  right objection.  Sustained.

23      We have to have a more precise question to

24  understand whether it's objectionable or not.

25      MS. STOLL-DeBELL:  Okay.

---

CHRISTOPHERSON - DIRECT     1571

1   BY MS. STOLL-DeBELL:

2   Q  After reading the patents, did you think Lawson

3   had a problem with these patents?

4       MR. ROBERTSON:  Objection.  That's an

5   important question and that's leading.

6       THE COURT:  Well, it is.  Sustained.

7   BY MS. STOLL-DeBELL:

8   Q  What was your first reaction after reading the

9   patents?

10      MR. ROBERTSON:  Objection, vague and

11  ambiguous.

12      MS. STOLL-DeBELL:  Your Honor, I'm trying --

13      THE COURT:  I guess my basic inquiry here is

14  why is it what he thinks is relevant?  To what

15  issue does it go that this jury has to decide?  That's

16  the question.  So just name the issue that it goes to.

17      MS. STOLL-DeBELL:  It goes to the intent

18  element of indirect infringement.  And Mr. Robertson

19  actually asked Mr. Christopherson about this same

20  topic when he put him on the stand in his case.  And

21  so it goes to that.

22      MR. ROBERTSON:  I didn't ask him anything

23  about what he thought or his reaction or anything.  I

24  just asked him if he was aware that a lawsuit was

25  filed and if he had notice since that date.

---

CHRISTOPHERSON - DIRECT     1572

1       THE COURT:  What he thought is the irrelevant

2   to this case except with respect to the intent element

3   of indirect infringement; is that right?

4       MS. STOLL-DeBELL:  Yes.

5       THE COURT:  This information can be

6   considered by you, ladies and gentlemen, only in

7   deciding whether or not a certain element of in

8   direction infringement has been met, and that is

9   whether there was an intent to have an infringement.

10  And so you can consider it for that purpose and that

11  purpose alone.  And I'll give you some more

12  instructions later about what indirect infringement

13  is.

14      But for your purposes, you can just keynote

15  this testimony of what his reaction was goes to the

16  intent to indirectly infringe or to have indirect

17  infringement.  Excuse me.  Go ahead.

18  Q  Can you go ahead and answer the question?

19  A  Can you restate the question.  It's been awhile.

20  Q  Sure.  After you read the patents, what was your

21  first reaction?

22  A  My first reaction was that it didn't appear as

23  though we were actually doing that, the three patents.

24  Q  Why did you think it didn't appear that you were

25  doing what was in the three patents?

---

CHRISTOPHERSON - DIRECT     1573

1       MR. ROBERTSON:  Your Honor, now I'm going to

2   object.  This calls for a legal conclusion and an

3   expert opinion.

4       MS. STOLL-DeBELL:  Your Honor, it doesn't.

5   I'm asking him what he thought.  I'm not asking him

6   for his opinion.  I'm not asking him about the claims.

7       THE COURT:  When you asked him what he

8   thought, why isn't that asking him for an opinion?

9       MS. STOLL-DeBELL:  Well, I suppose it is a

10  lay opinion on some level, but Mr. Robertson asked him

11  what Lawson as a company did after this lawsuit was

12  filed.  And Mr. Christopherson was involved in that,

13  and I'm just trying to inquire further into the issue

14  of Lawson's intent.

15      THE COURT:  What he said was he didn't think

16  that Lawson practiced the patent.  That's what his

17  reaction was.

18      MS. STOLL-DeBELL:  Yes.

19      THE COURT:  And you want to know why he

20  thought that?

21      MS. STOLL-DeBELL:  Yes.

22      THE COURT:  You can consider that for the

23  same limited purpose, ladies and gentlemen.

24  BY MS. STOLL-DeBELL:

25  Q  Why did you think that Lawson was doing something

---

1590

1  Q  Does that refresh your recollection that this new

2  functionality was added with respect to 8.0.3 when

3  this release note came out?

4  A  This reflects -- it does help refresh my memory

5  about these particular release notes, yes.

6      THE COURT:  That wasn't the question.  The

7  question was:  Does it refresh your recollection that

8  the new functionality has been added to electronically

9  load a vendor file which contains vendor item, unit of

10  measure, and unit of price information into the

11  purchase order application?  Does it refresh your

12  recollection on that point?

13      THE WITNESS:  Yes, it does.

14      THE COURT:  All right.  And did it?

15      THE WITNESS:  Did it do what?

16      THE COURT:  Did it do what it said in that

17  first sentence that you've been talking about?

18      THE WITNESS:  Yes, it did, Your Honor.

19      THE COURT:  All right.  Let's go.

20  BY MR. ROBERTSON:

21  Q  The next bullet point says, Item 3 identifies how

22  a Lawson item number should be created when adding the

23  catalog item to the item master.  Do you see that?

24  A  Yes.

25  Q  Those are the terms you used, the catalog item,

1591

1  isn't that right, when you made this new release note

2  for Version 8.0.3?

3  A  That's a term that was used by the technical

4  writer.

5  Q  You're not trying to run away from "catalog," are

6  you, sir?

7  A  No.  You did ask me "did you use that term," and I

8  did not use that term.

9  Q  I'm sorry.  It was an indefinite pronoun.  Did

10  Lawson use "catalog item" when it did these release

11  notes?

12  A  Yes, it did.

13  Q  On this import process?

14  A  Yes.

15  Q  It's the vendor that are provides the item catalog

16  in a CSV format; is that right?

17  A  That's correct.

18  Q  The vendor discloses or makes known that item

19  information in that CSV format, correct?

20  A  Discloses to whom?

21  Q  The customer.

22  A  To the customer, yes.

23  Q  And Lawson in this vendor import agreement process

24  calls that vendor information "item catalog

25  information," right?

1592

1  A  That's correct.

2  Q  And you would agree with me that that item catalog

3  information disclosed by the vendor or the supplier

4  through a vendor agreement import process ends up in

5  the item master, correct?

6  A  Say that again.

7  Q  Yes.  The vendor or the supplier who provides this

8  item catalog information to the customer can be

9  imported through this process we're talking about

10  here, this vendor agreement import, into the item

11  master?

12      MS. STOLL-DeBELL:  Objection to form of the

13  question.  It's unclear.

14      MR. ROBERTSON:  I'll rephrase, Your Honor.

15      THE COURT:  All right.

16      MS. STOLL-DeBELL:  I think he talked about a

17  supplier being loaded in.

18      MR. ROBERTSON:  I'll rephrase the question.

19  BY MR. ROBERTSON:

20  Q  The vendor that has provided the catalog item

21  information in a CSV format ends up through this

22  process in the item master; isn't that right?

23      MS. STOLL-DeBELL:  Objection.  The vendor --

24  the question is unclear.

25      THE COURT:  Are you asking whether the vendor

1593

1  ends up in the item master?

2      MR. ROBERTSON:  No.

3      THE COURT:  That's what her objection is and

4  I think it's well taken.

5      MR. ROBERTSON:  Let me rephrase then.

6      THE COURT:  It's the item that ends up there,

7  I think.

8  BY MR. ROBERTSON:

9  Q  The vendor provides the item catalog information

10  that ends up in the item master; isn't that right?

11  A  That is some of the information that ends up

12  there.

13  Q  Why don't you take a look at this vendor import

14  price agreement again.  Let me see if I can refresh

15  your recollection on the process.  If you would look

16  at the page that ends 428.

17  A  Sorry about that.  I was in the wrong document.

18  Q  That's all right.  Take your time.  Do you see

19  that page is entitled, Vendor agreement import?

20  A  That's correct.

21  Q  And in the first box, it says, Vendor provides

22  item catalog in CSV format.  Do you see that?

23  A  That's correct.

24      MS. STOLL-DeBELL:  Your Honor, he hasn't

25  asked him if this refreshes his recollection, and the

1594

1  witness has already testified that he hasn't seen this
2  document before.
3      MR. ROBERTSON:  I was just about to ask that
4  question since I just directed him to it.
5      THE COURT:  All he said is that's what it
6  says.
7      MS. STOLL-DeBELL:  He should ask him that
8  before he reads from the document and then ask the
9  witness to testify.
10     MR. ROBERTSON:  I had to use the document to
11 refresh the witness' recollection.
12     THE COURT:  Yes, you can.  Objection to that
13 part of the process is overruled.
14 BY MR. ROBERTSON:
15 Q  So it says here --
16     THE COURT:  Just ask him.
17 Q  Does this refresh your recollection that the
18 vendor provides item catalog in CSV format?
19 A  Yes.
20 Q  When you were talking about your ETL process, one
21 of the things you talked about was an extraction.  Do
22 you recall that?
23 A  Correct.
24 Q  You said you could have a CD or a DVD and you even
25 said a flat file, and that's when you identified the

1595

1  term CSV, correct?
2  A  Yes.
3  Q  Can you tell the jury again what a CSV file is?
4  A  CSV is basically a comma separated values.
5      THE COURT:  C-o-m-m-a?
6      THE WITNESS:  Yes.
7  Q  And those values that are being separated is data
8  with respect to the catalog item; isn't that right?
9  A  It starts out that way, yes.
10 Q  And that was disclosed or made known to the
11 customer by the vendor, right?
12 A  Correct.
13 Q  And in this page that we're looking at here now,
14 428, you'll see that there is a series of arrows
15 pointing to other boxes, and at the very end there's a
16 database, I believe.
17    Would you agree with me that that's what's being
18 characterized there?
19 A  Some sort of a data repository, yes.
20 Q  In there, it says, Create item master vendor item
21 records, do you see that?
22 A  Correct.
23 Q  So this through this chart, Lawson is showing a
24 customer how this vendor item catalog information that
25 it disclosed or made generally known ends up in this

1596

1  database that is creating the item master and
2  containing vendor item records, correct?
3  A  At a very high level, yes.
4  Q  And in this imported file, which is this comma
5  separated value format, there are certain required
6  fields, correct?
7  A  That's correct.
8  Q  One of the required fields is a vendor item
9  number; isn't that right, sir?
10 A  Correct.
11 Q  And one of the required fields is a vendor
12 description, correct?
13 A  Correct.
14 Q  And one of the required fields is a unit of
15 measure; isn't that right?
16 A  Correct.
17 Q  And one of the required fields is a unit price;
18 isn't that right?
19 A  Correct.
20 Q  If you turn to the page that ends 431, there are a
21 number of fields there.  Are you comfortable now with
22 this exhibit that it is describing the vendor import
23 price agreements at a very high level?
24 A  It appears to be, yes.
25     MR. ROBERTSON:  Your Honor, then I would move

1597

1  admission of this document.
2      THE COURT:  Any objection?
3      MS. STOLL-DeBELL:  No.
4      THE COURT:  All right.  It's admitted as
5  what?
6      MR. ROBERTSON:  I think it's Plaintiff's
7  Exhibit No. 521.
8      THE CLERK:  521?
9      MR. ROBERTSON:  Yes, sir.
10     (Plaintiff's Exhibit No. 521 is admitted into
11 evidence.)
12 BY MR. ROBERTSON:
13 Q  If you will turn to the page -- actually, why
14 don't we, now that it's admitted, let's go back and
15 take a look at that page I was talking about, which
16 ends with the Bates label 428.
17 A  Okay.
18 Q  So we've agreed that this item catalog information
19 is disclosed or made known by a vendor.  That's the
20 first box.  And I understood you to agree with me that
21 this sort of barrel-shaped thing at the bottom, that's
22 a database, correct?
23 A  Correct.
24 Q  So you go through phase 1 where the Lawson
25 Software reads the CSV file from the vendor to create

1598

1 a vendor agreement, correct?

2 A  That's correct.

3 Q  And we go through this phase 2, mark or unmark a

4 subset of vendor items for inclusion in the vendor

5 agreement, right?

6 A  That's correct.

7 Q  If it's a new item, it goes over and it's

8 indicated as yes to phase 3, import marked vendor

9 items for inclusion on vendor agreement, correct?

10 A  That's correct.

11 Q  And then it ends up in the item master there where

12 it says, Create item master vendor item records,

13 right?

14 A  That's correct.

15 Q  Let's go to the page we talked about that has

16 required fields which ends at 430.

17 A  Ends at 430?

18 Q  The Bates label that ends with 430, sir.  Now,

19 it's talking about what actually was imported in that

20 file, right?  I asked you about whether these were

21 required fields.

22 A  It could.  I've not seen this before, so give me a

23 chance to look at it.  You've obviously had that

24 chance.

25 Q  That's fair.

1599

1 A  Yes.  Okay.

2 Q  Just confirm for us that you agreed with me when I

3 asked you whether all four of these things were

4 required fields, correct?

5 A  Correct.

6 Q  If you turn to the next page, there's additional

7 fields, isn't there?

8 A  That's correct.

9 Q  One of the fields in this importing vendor

10 catalogs into the item master is, in No. 2, a vendor

11 item description.  Do you see that?

12 A  Correct.

13 Q  And it's described as the vendor's item

14 description, right?

15 A  That is correct.

16 Q  That is who disclosed or made generally known that

17 description, right?

18 A  That's correct.

19 Q  The next one is a vendor item number.  Do you see

20 that, number 3?

21 A  Uh-huh.

22 Q  It's the vendor identification code for the item;

23 isn't that right?

24 A  That's correct.

25 Q  The vendor made generally known or disclosed that

1600

1 information when it provided this catalog data,

2 correct?

3 A  That's correct.

4 Q  The next one is UOM, do you see that, sir?

5 A  Correct.  Yes, I do.

6 Q  That's the unit of measure, right?

7 A  That is, yes.

8 Q  That's one of the required things the vendor had

9 to do, right?

10 A  Yes.

11 Q  The next one is the item cost.  Do you see that?

12 A  Yes, I do.

13 Q  That's also one of those required things that the

14 vendor had to make known or generally available to the

15 customer in order for this to be loaded into the item

16 master, correct?

17 A  Correct.

18 Q  The next one is a Lawson item number, okay?  Do

19 you see that?

20 A  Yes.

21 Q  So now Lawson can create its own item number for

22 that, right?

23 A  Correct.

24 Q  But you can also have a field for a universal

25 product code, correct?

1601

1 A  Correct.

2 Q  You can also have a field for stock-keeping units;

3 isn't that right?

4 A  Correct.

5 Q  Go down to No. 12.  Do you see there they have

6 manufacturer item number?

7 A  Yes, I do.

8 Q  That's also information the vendor can provide

9 that can then be imported into the item master,

10 correct?

11 A  That's correct.

12 Q  And talked a little about these UNSPSC codes?

13 A  Correct.

14 Q  No. 16 talks about the -- actually, let me

15 rephrase.  You're familiar with that UNSPSC code,

16 right?

17 A  Right.

18 Q  It's a hierarchy to drill down to try and identify

19 products, correct?

20 A  Correct.

21 Q  And yesterday I asked you if that could be used in

22 order for cross-referencing products, and I think you

23 agreed with me.  Do you mean that?

24 A  That was not yesterday.  Two days ago, but yes.

25 Q  Okay.  Sorry.  They're starting to blur together.

1602

1    I appreciate that.
2        It also has a field for the UNSPSC family.  Do you
3    see that?
4    A   Correct.
5    Q   Now, if you turn to the next page.  There's a
6    black box around those four required fields there.  Do
7    you see that?
8    A   Correct.
9    Q   So what's being emphasized here is this black box.
10   These are the required fields, but all these other
11   fields are available, right?
12   A   Fair.  We don't understand the content, but that
13   appears to be it, yes.
14   Q   But these are the fields that are available in
15   this import process; isn't that right?
16   A   These are the fields that are available?
17   Q   That can be filled with catalog item data?
18   A   These are for the fields, yes.
19   Q   Why don't you turn to the next page.
20       THE COURT:  Wait a minute.  Is everything
21   listed on that page an available field?
22       THE WITNESS:  Correct.
23       THE COURT:  Including the four that are
24   bracketed.
25       THE WITNESS:  Yes.

1603

1    BY MR. ROBERTSON:
2    Q   I think you said earlier when we were talking
3    about -- I think I made an objection as to what fields
4    we were talking about.
5    A   Sure.
6    Q   And the Court asked the question:  Are they
7    between 0 and 100?
8    A   Right.
9    Q   These are the fields we're talking about, right?
10   A   Absolutely.
11   Q   Well, the next page that's now ending with 433
12   also has a field that can be completed for UNSPSC
13   class, right?
14   A   Correct.
15   Q   And then the next field that can be completed is
16   for UNSPSC commodity, right?
17   A   That's correct.
18   Q   If you drop down a little bit, there's a number of
19   user defined alpha fields.  Do you see that?  That's
20   on 24 through 28 are user defined alpha fields,
21   correct?
22   A   Uh-huh.
23   Q   If you look over, it says, This is a client
24   defined alphanumeric field.  Do you see that?
25   A   Yes, I do.

1604

1    Q   So alphanumeric means you can use the alphabet to
2    describe something or identify it or you can use
3    numbers, right?
4    A   Correct.
5    Q   You can use both?
6    A   Correct.
7    Q   There are at least five available user defined
8    fields for that purpose isn't that right?
9    A   For alphanumeric, yes.
10   Q   One of the things I can put in that field, isn't
11   it, sir, is the vendor name?
12   A   You could put the vendor name there, yes.
13   Q   If I put the vendor name in there, I come search
14   in the Lawson system by vendor name; is that right?
15   A   You're searching for the alpha field.
16   Q   If I'm searching in that alpha field, and it has
17   the vendor name, I could search by vendor name,
18   correct?
19   A   You would get back those entries, yes.
20   Q   Those vendors?
21   A   Yes.
22   Q   That I put in that user defined field?
23   A   Correct.
24   Q   Could you just go to the page that ends with 437.
25   That actually is identifying this vendor price

1605

1    agreement import system as PO 536, which you indicated
2    was the catalog load, right?
3    A   Correct.
4    Q   Why don't you go to the second to last page of
5    what is now Plaintiff's Exhibit 521.
6    A   Bates number on that?  477?
7    Q   477, yes, it is.
8    A   Okay.
9    Q   Do you see there's referenced at the bottom --
10   actually, I'm sorry.  Let me just start over and lay a
11   better foundation.  This is a screen shot; is that
12   right?
13   A   Yes.
14   Q   And it's at a web address, an URL, of
15   HTTP://support.lawson.com, correct?
16   A   That's correct.
17   Q   That's a Lawson website?
18   A   Yes.
19   Q   And we're looking here at a page on the Lawson
20   website for customer support?
21   A   That's correct.
22   Q   And one of the things it says here under chapter
23   6, Importing vendor price agreements, are you with me?
24   A   Importing -- okay.  Got it.  Yes.  Chapter 6, yes,
25   Importing vendor price agreements.

1606

1   Q  And it states underneath there, "With more
2 business being conducted electronically, you," and you
3 understand you to be the customer, right?
4   A  Correct.
5   Q  "You may have a need to load vendor information in
6 your Lawson application.  The vendor agreement import
7 process lets you automatically load vendor pricing
8 information and create item master and purchase order
9 vendor item records," do you see that?
10   A  Right.
11   Q  That's an accurate statement, correct?
12   A  That's correct.
13   Q  The heading below that says, Purchase order 8.0.3
14 release notes.  Do you recall we talked about those
15 release notes earlier?
16   A  Yes.
17      MR. ROBERTSON:  Your Honor, I'd like to move
18 those release notes as Plaintiff's Exhibit 522.
19      THE COURT:  Any objection?
20      MS. STOLL-DeBELL:  No, Your Honor.
21      THE COURT:  It's admitted.
22      (Plaintiff's Exhibit No. 522 is admitted into
23 evidence.)
24 BY MR. ROBERTSON:
25   Q  It's states under that heading, Purchase order

1607

1 release notes, 8.03, purchase order release notes 1,
2 8.0.3, purchase order release notes.  Let me focus on
3 what I want to get here.
4     This document contains release notes for the
5 purchase order application for 8.0.3, 28.0.3, purchase
6 order, purchase notes, purpose order release notes,
7 vendor catalog load, correct?
8   A  Correct.
9   Q  Now, there's another way for the item master to
10 get vendor catalog data into the -- excuse me.
11 There's another procedure that Lawson employs to get
12 catalog data into the item master, isn't there?
13   A  Correct.
14   Q  One of those processes is an EDI transaction;
15 isn't that right?
16   A  You're talking about which transaction type?
17   Q  EDI 832?
18   A  Correct.
19   Q  So you know if a Lawson customer, for example, has
20 that EDI Lawson module available to it as part of its
21 procurement process, it can use that EDI 832
22 transaction, right?
23   A  832 transaction gets it to the front door, yes.
24   Q  And getting in through the front door in order to
25 get into that item master, you can get a price catalog

1608

1 file; isn't that right?
2   A  You do get a file, yes.
3   Q  It's a catalog file, isn't it, sir?
4   A  Correct, yes.
5   Q  All right.  And that price catalog file can
6 contain data such as the vendors item description,
7 correct?
8   A  Correct.
9   Q  Vendor identifier?
10   A  Correct.
11   Q  The price?
12   A  Correct.
13   Q  The unit of measure?
14   A  Correct.
15   Q  And the vendor's catalog number, correct?
16   A  Correct.
17   Q  And the vendor can send the user the vendor price
18 agreement import program, this vendor catalog we've
19 been talking about, in a CSV file that contains a
20 catalog of all the items the vendor can sell the user;
21 isn't that right?
22   A  It could.
23   Q  Do you have any doubt about that?
24   A  I have no doubt that they can do it, yes.
25   Q  In fact, customers who have the EDI module that

1609

1 you sell use that EDI 832 to import catalog data,
2 don't they?  You are familiar with that?
3   A  Yes, I am.  Which catalog data are you referring
4 to?  The whole catalog?
5   Q  Well, it can be the whole catalog, can't it?
6   A  It could be the whole catalog.
7   Q  And it could be part of the catalog, right?
8   A  Correct.
9   Q  So it could be the entirety of the catalog or some
10 subset of the catalog, right?
11   A  Right.
12   Q  The customer having this EDI 832 module has the
13 capability of importing an entire vendor catalog into
14 the item master, right?
15   A  It has that capability as you're defining it, yes.
16      MS. STOLL-DeBELL:  I'm going to object.  It's
17 outside the scope of direct.
18      THE COURT:  Overruled.
19      MS. STOLL-DeBELL:  Your Honor, I didn't even
20 get into EDI at all.
21      MR. ROBERTSON:  She asked him about the
22 manners and the way the data was imported.
23      THE COURT:  He testified as to three manners
24 of getting data in, and now he's testifying to a
25 fourth that you didn't ask him about, but the opening

1610

1 of the three opens the door to the fourth, and the
2 fourth includes the EDI.  So I think the questioning
3 line is well taken.
4 BY MR. ROBERTSON:
5 Q  All right, sir.  In this EDI 832 process, you can
6 also get catalog items that give, among other
7 information, the cost of the item and the date on
8 which that cost becomes effective, right?
9 A  Correct.
10 Q  An then the vendor price agreement import program
11 can take that information and put it into the user's
12 purchasing database, correct?
13 A  Correct.
14 Q  This 832 catalog sales catalog import, that
15 transaction can be set up to provide for customary and
16 established business and industry practice relative to
17 furnishing or requesting the price of goods or
18 services in the form of a catalog; isn't that right,
19 sir?
20 A  That is one of the purposes of 832, yes.
21 Q  And that would also include the item
22 identification?
23 A  Yes.
24 Q  And the product item description?
25 A  Yes.

1611

1 MR. ROBERTSON:  Your Honor, I'd like to show
2 the witness another document, if I could.
3 Q  This is a Lawson document; is that right, sir.
4 A  Yes.
5 Q  And you recognize this, sir?
6 A  I do not.
7 MS. STOLL-DeBELL:  Your Honor, I'm going to
8 object.  These are all Lawson documents.  They were
9 produced during discovery.  They should have been on
10 the exhibit list and --
11 THE COURT:  He can cross-examine from things
12 that aren't on the exhibit list, but he can't get them
13 into evidence unless you agree.
14 MS. STOLL-DeBELL:  Your Honor, I think he can
15 use them for impeachment, but this isn't impeachment
16 testimony.  He's asking about documents that should
17 have been on the exhibit list, and they're not.
18 THE COURT:  That doesn't have anything to do
19 with whether it's impeachment or not.  The correct way
20 to do it is ask him a question first.  Don't be
21 getting the document in.  Ask him the question.  Then
22 ask him an impeaching question if you've got one.
23 BY MR. ROBERTSON:
24 Q  Would you agree --
25 MS. STOLL-DeBELL:  These are new exhibits.

1612

1 THE COURT:  They are not new exhibits because
2 they haven't been admitted, and he erred in handing
3 out the document before he asked the question.
4 MR. ROBERTSON:  I apologize, Your Honor.
5 THE COURT:  So turn the document over.
6 Forget about the document, Mr. Christopherson.  And
7 he's going to ask you a question, and then we may go
8 somewhere, but who knows.
9 As my colleague Judge Williams says, let's
10 abide that event.  All right.
11 BY MR. ROBERTSON:
12 Q  This EDI 832 price and sales catalog process for
13 importing catalog data, that would provide us with
14 item identification information and product and item
15 description, right?
16 A  Correct.
17 Q  And I may have asked this already, but it also can
18 provide you with a unit of measure?
19 THE COURT:  You asked him all those before.
20 MR. ROBERTSON:  I don't think I asked him
21 with respect to EDI, but I asked him with respect to
22 the other import process.
23 Q  You could have unit of measure through this EDI
24 transaction process?
25 A  Right.

1613

1 Q  And you could have the price, too?
2 A  Correct.
3 Q  All right.  That's fine.  That's all I have with
4 respect to that.
5 THE COURT:  See, the document never came in.
6 BY MR. ROBERTSON:
7 Q  Now, are you familiar with the PO 25 vendor
8 catalog load changes?
9 A  No.
10 Q  Well, do you agree that the vendor catalog load
11 process automatically loads item and vendor item
12 information into the Lawson system?
13 A  Say that again.
14 Q  That the vendor catalog load process automatically
15 loads item and vendor item information into the Lawson
16 system?  Do you agree or disagree with that statement?
17 MS. STOLL-DeBELL:  Your Honor, I object.  I'm
18 not sure what he's talking about.  He just said he
19 wasn't familiar with it.  So I don't know if he's
20 moved on.
21 THE COURT:  He said he wasn't familiar with
22 something else, and then he changed the question and
23 asked something else.
24 MS. STOLL-DeBELL:  Okay.
25 BY MR. ROBERTSON:

1618

1  A  It's not freshing of memory on it.

2  Q  You have no reason to doubt that Lawson offers --

3      THE COURT:  That's enough.  If it doesn't

4  refresh his memory, that's the end of that line of

5  questioning.

6      MR. ROBERTSON:  Can you put up your

7  demonstrative again, please?

8      THE COURT:  Which demonstrative?

9      MR. ROBERTSON:  I'm sorry.  The only one that

10  was used with the witness.

11      THE COURT:  Item information changes.  Can

12  somebody do that?

13      MS. STOLL-DeBELL:  Yes.

14  BY MR. ROBERTSON:

15  Q  Okay.  At the top of this item information

16  changes, the first box you put there is vendor gives

17  the information to the customer, is that right, after

18  they change it into an electronic format like a CSV

19  file you've been talking about?

20  A  That's correct.

21  Q  So that vendor item information on your chart is

22  published at some point in time because it was made

23  generally known to the customer; isn't that right?

24  A  It was --

25      MS. STOLL-DeBELL:  Objection.  Generally

1619

1  known to one person?  I mean, I don't think he's using

2  the ordinary meaning of "generally known."  Objection

3  to the form of the question.

4  BY MR. ROBERTSON:

5  Q  Is it generally known to your customers?

6      THE COURT:  Overruled.

7  A  What's the question again?

8  Q  Yes.  This vendor information that's put in

9  electronic format like we've been talking about, this

10  catalog CSV that the vendor can provide, in your chart

11  is given to a customer, correct.

12  A  That's correct.

13  Q  So it's made generally known by publishing it to

14  that customer at some point in time; isn't that right?

15      MS. STOLL-DeBELL:  Objection.  It calls for a

16  legal conclusion.  Now we're using "publishing."  He's

17  asking questions --

18      THE COURT:  Do you think you can improve on

19  that objection?

20      MS. STOLL-DeBELL:  I can, yes.

21      THE COURT:  Okay.  Go ahead.

22      MS. STOLL-DeBELL:  I am objecting to question

23  because he's using the word "publishing."  He's

24  objecting to the same kind of questioning that I asked

25  and he objected to me.

1620

1      THE COURT:  So that's sort of under the rule

2  of what's sauce for the goose is sauce for the gander,

3  right?

4      MS. STOLL-DeBELL:  Yes, Your Honor.

5      MR. ROBERTSON:  I understood, Your Honor,

6  that the question was he was able to answer in his

7  understanding.

8      THE COURT:  Well, he was.  And he's probing

9  the understanding.  He was given the right to answer

10  as to his understanding.  But you didn't ask the

11  question as to his understanding.  You asked the

12  question in an objectionable form, and her objection

13  is sustained.

14  Q  Let me ask it based on your understanding.

15  A  Correct.

16  Q  This is a chart that you created, right?

17  A  That is correct.

18  Q  And in this chart, you're saying that the vendor

19  gives this electronic format, which we've identified,

20  for example, as this CSV catalog file, gives that

21  information to the customer, okay.  Is that right?

22  A  That's correct.

23  Q  So in your lay person understanding, by giving

24  that information, is it disclosing it to the customer?

25  A  It's disclosing that to the customer.

1621

1  Q  And it's making it generally known to the

2  customer, right?

3  A  It's making it known to that customer, yes.

4  Q  You can load lots of catalog item data in this

5  item master, can't you, sir?

6  A  Define "lots."

7  Q  For example, Mr. Matias testified, he's from

8  Robert Wood Johnson that he had 36,000 items in his

9  item master, right?

10  A  That's correct.

11  Q  From 3,000 vendors.  You were in the courtroom

12  when that testimony was played?

13  A  I don't recall the exact numbers.

14  Q  It was thousands?

15  A  Yes.

16  Q  And the Lawson procurement system has that ability

17  to load thousands of items from thousands of vendors,

18  right?

19  A  Thousands of items from thousands of vendors?

20  Q  Yes.

21  A  So you're going to be saying tens of millions?

22  Q  Well, it can have at least we know from the record

23  36,000 items can be loaded into it from 3,000 or so

24  vendors, right?

25  A  Cumulative, yes.

1622

1 Q  Do you know what upper limit there is on the
2 number of items?
3 A  It would depend on the field length of the item
4 number that Lawson has, and I don't recall what that
5 was, but that's in one of the previous slides, I
6 believe, that we looked at.  It may have been.
7 Q  Could it be more than 100,000 items?
8 A  Could be.
9 Q  Could it be more than 10,000 separate vendors?
10 A  Yes.
11 Q  And Lawson's procurement system, even it's core
12 procurement system out of the box, has that
13 capability, right?
14 A  Correct.
15 Q  You were asked whether or not Lawson sells
16 computers, right?
17 A  Correct.
18 Q  But you do sell services, right, sir?
19 A  Correct, services for the software that we sell.
20 Q  And services for the software that's at issue in
21 this case, right?
22 A  Correct.
23 Q  And one of the services you sell is you implement
24 the software modules and applications that are accused
25 in this case on the servers, the computers of your

1623

1 customers, right?  You've done that, sir, right?
2 A  I have not, no.
3 Q  But the company does it?
4 A  Yes.
5 Q  And the company makes a lot of money from doing
6 that, don't they?
7 A  I actually do not get into any of the financials
8 on that.
9 Q  But you know that the company does that as one of
10 its regular practices; isn't that right?
11 A  Correct.
12 Q  And the software that we're talking about is
13 intended to be used on computers, right?
14 A  All software is intended to be used on computers.
15 Q  Right.  I mean, they're not doorstops or bookends.
16 They are intended to run on computers, right?
17 A  One hopes so.
18 Q  And Lawson knows that when it's implementing it on
19 the customers' computers, right?
20 A  That's correct.
21 Q  And these implementations, we know, for loading
22 this software that's at issue in this case can take
23 months, can't it?
24 A  It can, yes.
25 Q  It can take up to a year sometimes, can't it?

1624

1 A  Which particular software?
2 Q  The software that's accused in this case, this
3 procurement software.
4 A  Generally, it's not going to take a year to do
5 that.
6 Q  Did you see the deposition testimony of Blount
7 that said it took seven months to load the software?
8 A  Correct.
9 Q  That's not a typical, is it?
10 A  Seven months, not atypical, but also you have to
11 look at the full product set that they were probably
12 putting in.  It may go beyond just the accused
13 products.
14 Q  You talked a lot about the item master table.  You
15 are familiar with the vendor item table, correct?
16 A  The vendor item table?
17 Q  Yes.
18 A  Yes.
19 Q  In that table there's a vendor identification,
20 right?
21 A  Correct.
22 Q  And I understood you to say that there can be
23 communication among these modules, right?
24 A  There is, yes.
25 Q  You're familiar with the table that's the

1625

1 POITEMVEN?
2 A  POITEMVEN?
3 Q  Yes.  That's the vendor item table?
4 A  That's what it is, yes.  That's the computer name
5 for it.
6 Q  That's where that vendor item identification can
7 be, right?
8 A  Correct.
9 Q  That's also where you can have price information?
10 A  Yes.
11 Q  And the item number there serves to link the item
12 record to the ITEMMAST table; is that right?
13 A  That's now the communication occurs, yes.
14 Q  And the ITEMMAST table is the item master table;
15 isn't that right, sir?
16 A  Correct.
17 Q  And so between those two tables you can link the
18 item information that we've been talking about that's
19 in the item master table to the vendor information
20 that's provided in the vendor item table, right, sir?
21 A  Correct.
22 Q  You heard Mr. Niemeyer, the source code expert,
23 testify exactly to that, didn't you?
24 A  That's the way relational databases work.
25 Q  Exactly.  Do you have the exhibit notebook that

1626

1    you were handed by Ms. Stoll-DeBell?
2    A  Sure.
3    Q  If you'd look at Plaintiff's Exhibit 361.
4    A  Okay.
5    Q  Specifically, if we go to -- just to fresh the
6    jury's recollection.  This was screen shots from the
7    demonstration of the Lawson requisition system; is
8    that right?
9    A  That's correct.
10   Q  And this is not RSS, this is just the requisition
11   module we're talking about, right?
12   A  I have not looked through all the slides, so --
13   Q  Let's go to the page that ends with the Bates
14   label 255.
15   A  Okay.  255?
16   Q  Yes, sir.
17   A  Okay.
18   Q  Now, this is a screen shot of the Lawson
19   requisition module as it appears to the user when they
20   are using it.  Do you see it says RQ 10.1 at the top?
21   A  I do see that, yes.
22   Q  This isn't requisition self service, this is just
23   the requisition module?
24   A  This is one program within that module, yes.
25   Q  What we see here is a item description, isn't that

1627

1    right?  Right in the middle, sir?
2    A  All I see right now is fuzzy.  But it appears to
3    be something there, yes.  Item description, yes.
4    Q  Would it help --
5    A  Oh, okay.
6        THE COURT:  Can you read it?  If you can't,
7    you don't have to testify about it.
8        THE WITNESS:  I can read it now that he's
9    highlighted it, yes.
10   Q  It says, Item description, Dell Dimension 8100,
11   correct?
12   A  Correct.
13   Q  And that item description was disclosed or made
14   generally known by the vendor in this instance,
15   correct?
16   A  I would say probably not.
17   Q  Well, it came from that vendor, didn't it?
18   A  I would say that the first few words, yes.
19   Q  Okay.  And the unit cost is there, too.  Do you
20   see that?  Up on the upper right?
21   A  Right.
22   Q  That cost, that pricing information, you said
23   comes from the vendor, correct?
24   A  That's correct.
25   Q  And at the bottom under the item description

1628

1    there's a vendor item and there's a number there,
2    right?
3    A  That's correct.
4    Q  That vendor item comes from the vendor as well,
5    correct?
6    A  That's correct, yes.
7    Q  That's all I have with that notebook, sir.
8    A  Okay.
9    Q  You were asked questions concerning Plaintiff's
10   Exhibit No. 101.  This was involving a procurement
11   Punchout.  Do you see that?
12   A  Yes.
13   Q  I think you identified that this was a Lawson
14   document, right?
15   A  I identified it as a joint document between Lawson
16   and Trinity Information Services.
17   Q  This was some presentation that was being made to
18   Trinity?
19   A  I would say -- I cannot say I have no idea who the
20   audience was.
21   Q  But you recognized the document when you were
22   asked about it on direct examination by Ms.
23   Stoll-DeBell, correct?
24   A  That's correct.
25   Q  And Mr. Lohkamp, he was the product strategist who

1629

1    testified here a few days ago?
2    A  That is correct.
3    Q  Will you go to the page that ends with the Bates
4    label 239?  There's a page concerning Lawson
5    requisition self service.  That's this RSS application
6    we've been talking about?
7    A  Correct.
8    Q  I'm going to ask you some questions that are
9    represented in this document, Plaintiff's Exhibit 101.
10   Is it true that it's a web-based user interfaced with
11   a familiar shopping looking field?
12   A  Yes.
13   Q  And you can have shopping lists for frequently
14   ordered items?
15   A  That's correct.
16   Q  And you have the ability to request off catalog
17   items and services?
18   A  Correct.
19   Q  And you can integrate it with Lawson procurement
20   and Procurement Punchout, right?
21   A  Correct.
22   Q  And one of the benefits that Lawson is identifying
23   here as to this procurement application is that it
24   eliminates manual paper-based requisitioning by
25   providing web-based end user template-based

1630

1 requisitioning and workflow approval leading to faster
2 order cycle times, increased standardization and
3 reduced costs, correct?
4    A  That is correct.
5    Q  That's one of the benefits of having this kind of
6 procurement software over the old fashioned
7 paper-based procurement process, right?
8    A  That's correct.
9    Q  Like every invention, you want it to be doing to
10 do something fast, better cheaper?
11       MS. STOLL-DeBELL:  Objection, Your Honor.
12       THE COURT:  Sort of.
13       MR. ROBERTSON:  I'll withdraw the question,
14 Your Honor.
15       THE COURT:  Yes, I think so.
16    Q  Turn to the next page, sir.
17    A  Sure.
18    Q  You see the representation there under Lawson
19 Procurement Punchout?  You can seamlessly browse from
20 Lawson's requisition self service to vendor websites.
21 Do you see that?
22    A  Yes.
23    Q  That's an accurate statement, right?
24    A  Yes.
25    Q  Seamlessly, right?

1631

1    A  You have to define what seamlessly means.
2    Q  This is your document.  Do you have an
3 understanding of what "seamlessly" means?
4    A  It's not my document, sir.
5    Q  Well, it's a Lawson document.  Lawson was
6 representing that the process is seamless, right?
7    A  Well, we know --
8    Q  Lawson was representing that --
9       THE COURT:  You know, it would have just been
10 sufficient to have left the question where it was
11 because he already answered it was seamless and then
12 you get into it.
13       MR. ROBERTSON:  I'll move on, Your Honor.
14 BY MR. ROBERTSON:
15    Q  When the Lawson system punches out to the Punchout
16 creating the partner's catalog, you remain connected
17 to the Lawson system; is that right?
18    A  Say that again.
19    Q  Yes.  When the Lawson system punches out to the
20 Punchout creating the partner's catalog, you remain
21 connected to the Lawson system, correct?
22    A  Correct.
23    Q  Let's take a look at the page that ends with Bates
24 label 261, if we could.
25       So here's the representation of this RSS Punchout

1632

1 process flow.  Do you see that?
2    A  I see it, yes.
3    Q  So this is saying how we're going to navigate
4 through this process to build our shopping cart and
5 then pull it back as a requisition and make purchase
6 orders; isn't that right?
7    A  Give me a chance to review it.
8    Q  Sure.
9    A  Okay.  At a very high level, yes.
10    Q  So at this high level, Lawson is representing that
11 the first step is that Lawson requesters use this RSS
12 screen to punch out to external vendors, correct?
13    A  That is correct.
14    Q  So then the Lawson requester is presented to the
15 externals vendor's website to search and add items to
16 the vendor's shopping cast.  The shopping cart is
17 being checked out and submitted, right?
18    A  That's correct.
19    Q  Then the shopping cart contents are returned back
20 to Lawson RSS, right?
21    A  Right.
22    Q  Then the requester checks out their RSS shopping
23 cart and requisition is sent for approval, right?
24    A  Correct.
25    Q  Once the requisition is approved, the purchase

1633

1 order, the PO there, is created by PO 100.  That's
2 accurate, right?
3    A  That's correct.
4    Q  Then the purchase order can be sent to the vendor
5 using the Lawson EDI module, right?
6    A  It can be, yes.
7    Q  When the Lawson system was doing that, you
8 remained connected to the Lawson system at all times;
9 isn't that right, sir?  Didn't you testify to that in
10 your deposition?
11    A  It's connected, yes.
12    Q  You were asked about page 265, sir.  If you could
13 turn to that.  Now, there's some questions about where
14 the software was running on this in this Punchout
15 demonstration.  Let me just ask you, this was a joint
16 presentation by Lawson and Trinity Information
17 Systems, right?
18    A  Correct.
19    Q  So it's operating, as you can tell, I think you
20 pointed to it, sir, the URL address is Trinity Health
21 Organization, right?
22    A  That is correct.
23    Q  But after where it says TrinityHealth.org/, it
24 says "Lawson/portal," right?
25    A  It does say that, yes.

2011.01.13 Trial Transcript Day 7  1/13/2011  3:01:00 PM

1634

1  Q  So it's using the Lawson portal to be able to
2  access this data that appears here on this web page?
3  A  On this screen, yes, absolutely.
4  Q  And there are four vendors here, correct?  There's
5  HP.  There's Standard Register.  There's Corporate
6  Express, and there's Grainger; is that right?
7  A  That's correct.
8  Q  So the Trinity customer using RSS and Punchout
9  from their computer has access this page to select the
10  product catalog it wants to search, right?
11  A  That's correct.
12  Q  When a customer such as Trinity -- excuse me.  Let
13  me just make it generic.  When a customer asks Lawson
14  to provide them with access to a Punchout trading
15  partner, Lawson provides that service for them, right?
16  A  Can you state that again?
17  Q  Sure.  If a customer comes to Lawson and says that
18  I've got RSS, and I've got Punchout, and I want the
19  following 10 vendor catalogs to be available to me,
20  lawson will make that happen?  They'll facilitate it,
21  right?  It's one of the services you provide?
22  A  We don't actually facilitate.  The customer has to
23  have contract with those providers.
24  Q  If the Court has a contract with that provider,
25  and they came to you, and they say, Will you put these

1635

1  10 vendor catalogs on the system, Lawson provides that
2  service, right?
3  A  Lawson will type in the appropriate characters
4  that need to be in filled in the configuration file.
5  Q  Right.  Then it has to do those communication
6  protocols that Mr. Lohkamp talked about in order to
7  have a handshake with that vendor catalog; isn't that
8  right?
9  A  That's correct.
10  Q  At least here we see we have four catalogs that we
11  can click on, is that right, to access the catalog
12  content, right?
13  A  That's correct.
14  Q  And one of those catalogs there is from Grainger.
15  Do you see that?
16  A  That's correct.
17  Q  Grainger is a Lawson Punchout trading partner,
18  correct?
19  A  Yes.
20  Q  And Grainger actually is a catalog that has
21  multiple catalogs within it.  You are familiar with
22  that, right, sir?
23  A  I'm not very familiar with Grainger itself.  I
24  know it is a Punchout provider.
25  Q  You don't know if it has multiple vendor catalogs

1636

1  within it?
2  A  I do not.
3  Q  What you've indicated here, for example, is that
4  we're selecting the vendor catalog that we want to go
5  to; isn't that right?
6  A  Correct.
7      MR. ROBERTSON:  Your Honor, if I may just
8  take one minute to check my notes.
9      With the exception of that one follow-up
10  question I wanted to have, Your Honor, with respect to
11  the issue you're aware of, I'll -- subject to that,
12  Your Honor, I'm finished with the witness.  Thank you.
13      THE COURT:  All right.
14      THE COURT:  Do you have any redirect?
15      MS. STOLL-DeBELL:  Yes.
16      THE COURT:  How long is your estimate?
17      MS. STOLL-DeBELL:  My estimate is maybe 20
18  minutes.  We have that issue we need to resolve, too.
19  So --
20      THE COURT:  I think probably this is a good
21  time for you all to take a lunch break.  And we're not
22  trying to hold you captive while you're here, so we're
23  not going to get you lunch.  You can go ahead and find
24  someplace to eat, get out and enjoy the fresh air and
25  stretch your legs a little bit.

1637

1  Give your notepads to Mr. Neal.  He'll hold
2  them for you during the lunch recess.
3      (The jury is out.)
4      THE COURT:  Have you got some case law for
5  me, both of you?
6      MR. ROBERTSON:  I've got this Broadcom v.
7  Qualcomm case, Your Honor.
8      THE COURT:  Do you have cases for me, Ms.
9  Stoll-DeBell?  Did you have case law for me?
10      MS. STOLL-DeBELL:  Your Honor, there are
11  cases cited in here that I think are relevant.
12      THE COURT:  Cited in where?
13      MS. STOLL-DeBELL:  Cited in the Broadcom case
14  that I think Mr. Robertson just handed you.
15      THE COURT:  Where in the Broadcom case is
16  this dealt with?
17      MS. STOLL-DeBELL:  So, Your Honor, there's a
18  case out of the Federal Circuit called Knorr-Bremse
19  and it talks about how there should not be a negative
20  inference drawn from a party's decision not to waive
21  the attorney-client privilege and not to disclose it
22  to opposing counsel.
23      THE COURT:  What part of Broadcom are you
24  talking about?
25      MR. ROBERTSON:  I'm trying to find it right

1702

1    THE WITNESS:  Yes, sir.

2  Q  When was the latest upgrade that Lawson provided to

3  Novant?

4  A  The upgrade was to the 9.01 release.

5  Q  And when was that?

6  A  I think it was 2009.

7  Q  And Novant installed that upgrade?

8  A  Yes.

9  Q  We mentioned the UNSPSC codes before, the UNSPSC codes as

10  you phrased them.  Does Novant use the UNSPSC codes in its

11  Lawson system?

12  A  We have them loaded in the data set up in the item master.

13  Q  In the item master using the Lawson system, does the

14  UNSPSC code, does that enable a user to locate an equivalent

15  item?

16    MR. STRAPP:  Objection, foundation.

17    THE COURT:  He can testify about what he thinks his

18  does, but he can't testify about what all the rest of them do.

19    MR. STRAPP:  Your Honor, I also object that it calls

20  for a legal conclusion as well.

21    THE COURT:  How?

22    MR. STRAPP:  It's asking for an expert opinion

23  regarding a claim in the claim construction terms, term of

24  equivalents.

25    MR. SCHULTZ:  There is no equivalents -- Your Honor,

1703

1  that's not a claim term.

2    THE COURT:  You can ask him his understanding.

3    MR. SCHULTZ:  Yes.

4  Q  Mr. Yuhasz, your understanding with respect to the UNSPSC

5  codes, does the Lawson system installed by Novant have the

6  ability to locate an equivalent item?

7  A  No.

8  Q  Why not?

9  A  In more of a clinical setting, it is difficult to

10  determine equivalent items.  We would rely on a clinical

11  specialist to tell us that, two different syringes from

12  different manufacturers or even gauze or even hand sanitizer is

13  an equivalent product.

14    THE COURT:  Wait a minute.  Clinical, you mean

15  doctors?

16    THE WITNESS:  Physicians, nurses, yes, sir.

17    THE COURT:  Medical people.

18    THE WITNESS:  Medical people.

19    THE COURT:  So you don't think it operates that way

20  because you want the doctors and the nurses to be making that

21  decision, not to have a computer make it.

22    THE WITNESS:  Yes.

23    THE COURT:  Okay, thank you.

24  Q  Do you have an example of a situation where the UNSPSC

25  codes would not work for finding matching equivalent items?

1704

1    THE COURT:  Mr. Schultz, on this situation, let's

2  move on.  That's just sort of topical specific in their

3  hospital because of their situation, and for good reason they

4  don't want anybody but doctors and nurses telling them what's

5  comparable or equivalent.  That's what he's talking about, so

6  that's not what we're dealing with this in this case.  Let's go

7  on.

8    MR. SCHULTZ:  Actually, Your Honor, that's all I've

9  got.

10    THE COURT:  Okay.

11    MR. SCHULTZ:  Thank you, Mr. Yuhasz.

12

13    CROSS-EXAMINATION

14  BY MR. STRAPP:

15  Q  Good afternoon, Mr. Yuhasz.

16  A  Afternoon.

17  Q  Could you please put Plaintiff's Exhibit 337 back on the

18  screen for a minute, and page three of the exhibit.  Now, we

19  were -- you were discussing just recently this proposal from

20  Lawson and SciQuest.  I want to be perfectly clear here.  This

21  is just a proposal from Lawson and SciQuest; correct?  This

22  isn't the system as actually implemented at Novant; isn't that

23  correct?

24  A  That's correct.

25  Q  And even in this depiction here, graphical proposal

Yuhasz - Cross                    1705

1  representation, the item master, the item data, that's Lawson's

2  in this depiction; correct?

3  A  That's correct.

4  Q  Let's talk about the products that are actually installed

5  at Novant.  Novant uses the Lawson inventory control module;

6  correct?

7  A  Yes.

8  Q  And Novant also uses the Lawson purchase order module;

9  correct?

10  A  Yes.

11  Q  And Novant uses RSS or requisition self-service; is that

12  correct?

13  A  Yes.

14  Q  And Novant has also licensed procurement punchout; is that

15  correct?

16  A  Yes.

17  Q  Novant's been using Lawson requisition self-service for

18  about five years; is that correct?

19  A  Yes.

20  Q  And prior to that, Lawson was using the requisitions

21  module; is that correct?

22  A  Yes.

23  Q  Isn't it true that Lawson provided personnel to assist

24  Novant with the initial implementation of requisition

25  self-service?

1706

Yuhasz - Cross                              1706

1   A   Yes.
2   Q   And that initial implementation took about four months;
3   isn't that correct?
4   A   I think that was -- I couldn't put an exact date on just
5   the requisition self-service because it is part of a larger
6   project.
7   Q   That larger project took approximately four months; is
8   that correct?
9   A   No, the larger project took more than that.
10  Q   How long did it take?
11  A   I'm not sure I can recollect at this moment.
12      THE COURT:  Don't guess.  It's okay.
13  Q   Isn't it true that during that initial implementation,
14  Lawson provided Novant with application consulting services?
15  A   Yes.
16  Q   And with technical consulting services?
17  A   Yes.
18  Q   And isn't it true that during that initial implementation
19  of requisition self-service, Lawson also provided Novant with
20  client site training?
21  A   For requisition self-service?
22  Q   Correct.
23  A   Yes.
24  Q   And Lawson personnel actually traveled to Novant to
25  provide some classroom training on requisition self-service;

1707

Yuhasz - Cross                              1707

1   isn't that correct?
2   A   Yes.
3   Q   Novant has a maintenance agreement with Lawson for the
4   requisition self-service software; isn't that correct?
5   A   Yes.
6   Q   And isn't it true that that maintenance agreement also
7   allows Novant to receive ongoing upgrades to its software?
8   A   Yes.
9   Q   Lawson also provides Novant with an online library of
10  educational materials regarding its procurement package?
11  A   Yes.
12  Q   Including specific product guides, for example?
13  A   Yes.
14  Q   Is it true that Novant currently has about 70,000 to
15  80,000 active items in its item master database?
16  A   Yes.
17  Q   And those are all available for ordering through
18  requisition self-service?
19  A   Yes.
20  Q   And isn't it correct that those 70,000 to 80,000 items are
21  associated with approximately 10,000 different vendors; is that
22  correct?
23  A   Yes.  In rough numbers.
24  Q   And each of those items, those items have textual
25  descriptions, correct, in the item master?

1708

Yuhasz - Cross                              1708

1   A   Yes.
2   Q   And those items also have part numbers sometimes; isn't
3   that correct?
4   A   Yes.
5   Q   And items will have vendor or manufacturer numbers;
6   correct?
7   A   Yes.
8   Q   And items sometimes have images associated with them;
9   correct?
10  A   Yes.
11  Q   Items have price information; is that right?
12  A   Yes.
13  Q   And items sometimes will have inventory availability;
14  correct?
15  A   Yes.
16  Q   Now, isn't it true that the manufacturer or the vendor
17  provides the contract price for the items in the item master?
18  A   Yes.
19  Q   And isn't it also true that the description of the items
20  in the item master are provided by the manufacturer or vendor?
21  A   Not without transformation by Novant personnel.
22  Q   You get the descriptions of the goods from the
23  manufacturers; right?
24  A   Yes.
25  Q   You understand UNSPSC to be a classification system for

1709

Yuhasz - Cross                              1709

1   particular items; correct?  We've discussed that?
2   A   Yes.
3   Q   Isn't it true that Lawson requisition self-service, the
4   application that's used at Novant, has the capability of using
5   those UNSPSC codes?
6   A   Capability exists, not used.
7       THE COURT:  You say it exists but you don't use it?
8       THE WITNESS:  Yes, sir.
9   Q   Isn't it true that by searching for items using a UNSPSC
10  code in Lawson requisition self-service, that if a user at
11  Novant was to use that capability, it could find items from
12  multiple vendors with a particular UNSPSC code?
13      MR. SCHULTZ:  Objection, foundation.  He said he
14  doesn't use it.
15      MR. STRAPP:  Your Honor, we've been talking about the
16  capability of the Lawson system.  The door was opened on
17  direct.
18      THE COURT:  It's on cross-examination.  I think he
19  can answer that.
20  A   Could you repeat the question.
21  Q   Sure.
22      THE COURT:  If you did use it is the question.  You
23  may ask that.
24  Q   If a user at Novant was using Lawson requisition
25  self-service searching for an item by using a UNSPSC code, that

1710

Yuhasz - Cross                                    1710

1  user could find items from multiple vendors with the same
2  UNSPSC code; isn't that correct?
3  A  Yes.
4  Q  You talked a little bit about a competition, an RFP
5  process at Lawson; do you recall that testimony?
6  A  Yes.
7  Q  And the RFP that was sent was for procure to pay solution;
8  correct?
9  A  Yes.
10 Q  By a procure to pay solution, Novant means an end-to-end
11 solution that starts all the way from requisitioning and goes
12 through payment; correct?
13 A  Yes.
14 Q  The Novant Health -- the RPF, that was issued around 2008;
15 is that correct?
16 A  Yes.
17 Q  And that RFP we saw was sent to Lawson; isn't that
18 correct, Lawson and SciQuest?
19 A  Yes.
20 Q  It was also sent to ePlus?
21 A  Yes.
22 Q  Isn't it true that Novant sought the same functionality
23 from ePlus that it sought from all the other vendors as part of
24 this process including Lawson and SciQuest?
25 A  Yes.

1711

1711

1  MR. STRAPP:  I have no further questions, Your Honor.
2  THE COURT:  Any redirect?
3
4  REDIRECT EXAMINATION
5  BY MR. SCHULTZ:
6  Q  Mr. Yuhasz, Mr. Strapp just asked you about the RFP
7  process.  Did either ePlus or Lawson win that RFP process?
8  A  No.
9  Q  Who did?
10 A  Ariba.
11 Q  And why?
12 MR. STRAPP:  Objection, Your Honor, relevancy.
13 THE COURT:  What difference does it make who won it?
14 MR. SCHULTZ:  It goes to the functionality that was
15 selected by Novant for fulfilling what they wanted out of their
16 RFP process.
17 MR. STRAPP:  Your Honor, the functionality -- what
18 Novant wanted is irrelevant.  What matters here is the
19 functionality that Lawson has in its accused system.
20 THE COURT:  It's marginally relevant, but it
21 introduces delay and confusion and opens up a lot of other
22 areas that we don't need to get into that really aren't
23 relevant, so sustained.
24 MR. SCHULTZ:  Mr. Yuhasz, thank you for your time.
25 THE COURT:  Can Mr. Yuhasz be permanently excused?

1712

1712

1  MR. STRAPP:  Yes, Your Honor.
2  MR. SCHULTZ:  Yes, Your Honor.
3  THE COURT:  Mr. Yuhasz, thank you for being here and
4  giving us your testimony, and you are released from your
5  obligation to be here.  Thank you, sir.
6  THE WITNESS:  Thank you.
7  THE COURT:  Next witness?
8  MS. STOLL-DeBELL:  Your Honor, we're calling Mr.
9  Keith Lohkamp back to the stand.
10
11 KEITH LOHKAMP,
12 a witness, called by the defendant, having been first duly
13 sworn, testified as follows:
14 DIRECT EXAMINATION
15 BY MS. STOLL-DeBELL:
16 Q  Mr. Lohkamp, do you have a college degree?
17 A  Yes, I do.
18 Q  When did you get your college degree?
19 A  In 1991.
20 Q  Where did you get it from?
21 A  Stanford University.
22 Q  And what kind of college degree did you get?
23 A  Bachelor's in international relations.
24 Q  Do you have an advanced degree?
25 A  Yes, I do.

1713

Lohkamp - Direct                                  1713

1  Q  Will you describe that for me, please.
2  A  Yes, I have an MBA from the Haas School of Business at UC
3  Berkeley.
4  Q  When did you get that?
5  A  I got that in 1996.
6  Q  When did you start working for Lawson?
7  A  May 2005.
8  Q  I think the other day you testified that you first learned
9  about ePlus when you saw them at a trade show in 2003?
10 A  Yes, that's correct.
11 Q  Is that correct?  But at that time, you were not working
12 for Lawson; isn't that correct?
13 A  That's correct.
14 Q  And then I believe that you testified that you didn't hear
15 again of ePlus until 2008 in connection with a Cleveland Clinic
16 bid; is that correct?
17 MR. ROBERTSON:  Your Honor, I'm going to object.
18 This is cumulative.  We went through this all on the first day,
19 both on direct and cross-examination.
20 THE COURT:  Well, what do you say in response to
21 that, Ms. Stoll-DeBell?
22 MS. STOLL-DeBELL:  I'm trying to establish when he
23 was an employee for Lawson and compare that to when he heard
24 information about ePlus, and I will say this is the last
25 question on it as well, Your Honor.

1738

Shamos - Direct                    1738

1  revolves around the concept of the catalog and whether the
2  Lawson system uses a catalog or multiple catalogs, collection
3  of catalogs, and whether those -- there are such things as
4  separately searchable portions of those catalogs.
5      Q   And so how does the catalogs issue relate to your
6  conclusions?
7      A   The, I think, 11 out of the 12 claims, asserted claims
8  require catalogs, and I used the construction that was
9  propounded by the Court for the word catalog and didn't find
10  catalogs in the Lawson system.
11     Q   When you say Lawson system, we've had a number of initials
12  and things thrown around in the case, so let's make sure we're
13  on the same page.  Can you tell me what system or systems you
14  looked at from Lawson to do your analysis?
15     A   I looked at everything that Dr. Weaver accused of
16  infringement, S3, RSS, punchout.  There was an earlier system
17  in the case that I also looked at that I understand is no
18  longer in the case.
19     Q   Now, with respect to S3 procurement, are you familiar with
20  the names of some modules that comprise that S3 procurement
21  suite?
22     A   I don't know their literal names.  I know functionally
23  what they do.
24     Q   What functionally do the S3 procurement suite modules do?
25     A   Well, there's a search function that enables somebody to

1739

Shamos - Direct                    1739

1  look within the database to determine if particular items are
2  there.  There's a mechanism for producing requisitions, and
3  requisition purchase orders can be produced.
4      Q   Are you familiar with the module called inventory control
5  or IC?
6      A   Yes.
7      Q   Is that one of the modules you looked at as well?
8      A   It's one of the modules I considered.  When I say looked
9  at, I didn't actually look at source code of these modules
10  except as appeared in other experts' reports.
11     Q   Now, are you familiar with the phrase RSS?
12     A   Yes.
13     Q   What is your understand as to what that is?
14     A   Requisition self-service is a mechanism that allows
15  someone to create a requisition.
16     Q   Is that part of a Lawson product?
17     A   Yes.
18         THE COURT:  Excuse me just a minute, Dr. Shamos.
19  Will you pull that mic down a little bit?  I'm just -- no, so
20  it's closer to you.  You are sort of dropping off at the bottom
21  of the question, and I'm -- are you having trouble hearing?
22  See if you can pick it up at the bottom.  The front is okay.
23
24         (Brief interruption.)
25

1740

1  (The jury is present.)
2      THE COURT:  Excuse me.  I interrupted you.
3  So you need to go back to go whatever question you
4  were on before.
5  BY MR. McDONALD:
6      Q   Doctor, how about if we put up slide No. 4,
7  please.
8         THE COURT:  Doctor, it's right there in front
9  of you.  Can you see it?
10         THE WITNESS:  Yes, I can.  I was just
11  wondering how the jury is seeing it.
12         THE COURT:  They have some down there.
13         THE WITNESS:  I got that.  Okay.
14  BY MR. McDONALD:
15     Q   Everybody has a tv.  So don't worry.
16     A   Is this one of those draw on it screens?
17     Q   Yes.  So if you hit the lower left corner, all
18  those marks you just put on will disappear.
19     Now, did you put some slides together in
20  connection with getting ready to testify here today,
21  Dr. Shamos?
22     A   Yes.
23     Q   I'm going to use a few of those this afternoon and
24  probably a few more tomorrow, but you have a summary
25  that you put together.  Is this one of the slides you

1741

1  put together?
2      A   Yes.
3      Q   Just to clarify here, Mr. Robertson asked me to do
4  this.  So we've got four numbered systems on this
5  slide, correct?
6      A   Yes.
7      Q   Also there's a combination of that EDI plus S3
8  Procurement.  Did you also look at EDI plus S3
9  Procurement with the RSS system as well?
10     A   Yes, I looked at everything that was alleged in
11  Dr. Weaver's report.
12     Q   Would that be a fifth system, in effect, if we
13  were going to add another number or would you just
14  consider that as part of No. 3?
15     A   I didn't specifically list it.  It should be a
16  fifth one.
17     Q   So that would be a fifth one.  Then the EDI system
18  plus S3 plus the Punchout, is that the sixth one?  Did
19  you look at that one as well?
20     A   Yes.
21     Q   Now, you have got some brackets here with 1, 2, 3.
22  Do you see that?
23     A   Correct.
24     Q   What was your summary with respect to those first
25  three products regarding the infringement issue?

1786

1    instructions that we think will be appropriate.

2       THE COURT:  Several?  How about one good one?

3       MS. STOLL-DeBELL:  One with many facets, Your

4    Honor.

5       THE COURT:  Listen, I'm going to make you sit

6    on the jury.  I think every lawyer ought to have to

7    sit on a jury and ought to have to listen to these

8    instructions and try to figure out what do they mean.

9    Because if you read them from the jury's standpoint,

10   particularly these model instructions in the patent

11   area, what they're doing is -- nobody has really made

12   a real good effort to simplify them yet.

13       Judge Spencer did better in SAP in

14   simplifying the instructions than almost anybody I've

15   ever seen, but there with some legal changes

16   since that time that prohibit me from adopting them

17   full scale.

18       All right.  That takes care of them.  I'm not

19   real hopeful that you're going to get your evidence or

20   I don't think you ought to be hopeful that you're

21   going to get that evidence in, Mr. Robertson, because

22   it seems to me it invites the jury to speculate and

23   it's a problem, I think.

24       MR. ROBERTSON:  I understand, Your Honor.

25   We're also concerned about prejudice given the fact we

1787

1    proffered that in good faith when it came up with the

2   witness that he had a lay opinion as to his intent.  I

3   thought it was relevant then because his lay opinion

4   as to the intent I didn't think was very persuasive,

5   but if you go get a legal opinion on these issues that

6   obviously involve the patents, and then you make the

7   conscious decision not to disclose it, I think that's

8   part of the circumstantial evidence they can consider.

9       I understand Your Honor's ruling.

10       THE COURT:  I haven't rules.

11       MR. ROBERTSON:  I understand Your Honor's

12   suggestion which way you might rule, but you're going

13   to be fair and read the papers.

14       THE COURT:  I thought maybe if I gave you all

15   some insight into where I was right now since we're on

16   the fly that your arguments might be better informed

17   in the morning, just as my thinking will be better

18   informed if I read what you-all tendered for me to

19   read.

20       Thank you so much for the overnight present.

21   I appreciate it.

22

23       (The proceedings were adjourned at 5:26 p.m.)

24

25

1788

1789

```
1         IN THE UNITED STATES DISTRICT COURT
2        FOR THE EASTERN DISTRICT OF VIRGINIA
3                 RICHMOND DIVISION
4
5    -----------------------------------
6    ePLUS, INC.          : Civil Action No.
                          : 3:09CV620
7    vs.                  :
                          :
8    LAWSON SOFTWARE, INC.    :  January 14, 2011
                          :
9    -----------------------------------
10
11       COMPLETE TRANSCRIPT OF THE JURY TRIAL
12       BEFORE THE HONORABLE ROBERT E. PAYNE
13     UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24       Peppy Peterson, RPR
         Official Court Reporter
25       United States District Court
```

1790

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1791

```
1                P R O C E E D I N G S
2
3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
6    Mr. Michael G. Strapp represent the plaintiff.
7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin Stoll-DeBell, and Mr. William D. Schultz represent
9    the defendant.  Are counsel ready to proceed?
10       MR. ROBERTSON:  Plaintiff is, Your Honor.
11       MR. McDONALD:  Yes, we are.
12       THE COURT:  All right.  Ladies and gentlemen, I'm
13   pleased to report to you my unofficial survey that the economy
14   is recovered.  For the first time in 40 years of trading at the
15   Westhampton Bakery, I had to wait 20 to 30 minutes even to get
16   served, and this the lowest period of the year for that bakery,
17   they tell me.  So I just wanted you to know, but I told them I
18   was waiting because I had promised you would get your donuts
19   and I don't want to be guilty.
20       Dr. Shamos, I saw him earlier.  Dr. Shamos, I remind
21   you -- everybody is renaming you, aren't they?
22       THE WITNESS:  We'll see.
23       THE COURT:  I remind you you are under the same oath
24   you took yesterday, sir.
25       THE WITNESS:  Yes, sir.
```

1792

```
1        THE COURT:  Thank you.
2
3        MICHAEL I. SHAMOS,
4    a witness, called by the defendant, having been previously
5    duly sworn, testified as follows:
6        DIRECT EXAMINATION
7    BY MR. McDONALD:  (resuming)
8    Q  Good morning, Dr. Shamos.  How are you?
9    A  Good morning.  I'm good.
10   Q  I would like to pick up where we left off, if I got it
11   right anyway here this morning, with this slide showing some of
12   the elements of claim one of the '516 patent on this slide that
13   you put together.  Can you walk us through --
14       THE COURT:  Mr. McDonald, excuse me.  Just for
15   orientation purposes, when we left off, you had said that you
16   were going through each claim one by one to show, and that's
17   what you are doing.
18       MR. McDONALD:  Thank you, yes.
19       THE COURT:  I said it's a good time to take a break,
20   so that's what we'll be doing now, is hearing Dr. Shamos's
21   opinion on each claim that's at issue.
22   Q  We have the 12 claims.  We're going to take them one at a
23   time; right, Dr. Shamos?
24   A  Yes.
25   Q  Okay.  So let's start here with what you have on your
```

1817

1 whether or not the Lawson accused system satisfies that element
2 of claim nine?
3 A  Yes.  In order for there to be a second identification
4 code, there has to be a second catalog, and even if there's one
5 catalog, there weren't two catalogs in S3.  So that element
6 can't be present.
7 Q  Is there some language in this element about the second
8 item being, quote, generally equivalent?
9 A  Yes.
10 Q  Do you have an opinion as to whether in the Lawson system,
11 the Lawson systems accused here, satisfy that part of that
12 element?
13 A  There's no notion in the Lawson systems of general
14 equivalents.  There's no way to ask the system for a generally
15 equivalent item.
16 Q  Do you have an understanding as to what aspect of the
17 Lawson system is dependent in this case to satisfy that part of
18 that element?
19 A  Only from expert reports.
20 Q  Let's go to slide 30 then, if we can turn to that, Bill.
21 Dr. Weaver, did you look at --
22     MR. ROBERTSON:  Dr. Weaver?
23 A  I am Shamos.
24     MR. McDONALD:  I made it this far today.
25 Q  Dr. Shamos, did you look at all at the issue of whether or

1818

1 not in the Lawson system the use of the UNSPSC codes would
2 satisfy any claim elements of any of the asserted claims in
3 this case relating to generally equivalent items?
4 A  Did I look at that?
5 Q  What was your conclusion about that?
6 A  That it doesn't.
7 Q  Why not?
8 A  So, the UNSPSC code is a generally accepted international
9 coding to categorize products.  There's a big difference
10 between desks and chairs, and so if you gave a code to desks,
11 you could immediately tell that something was a desk and it
12 wasn't a chair.  And it happens to be hierarchically organized.
13     That is, it has different levels, so you can get to office
14 furniture, and then within office furniture you could have
15 desks, and then within desks you can desks with drawers or
16 without drawers, et cetera.
17     The Lawson software does provide the ability for a
18 customer to enter UNSPSC codes into the item master database if
19 he wants to do that, and sometimes it's useful for people who
20 are ordering things to know what the UNSPSC code is associated
21 with a particular item, but those UNSPSC codes are not used for
22 the purpose of determining whether things are generally
23 equivalent.
24     There's no automatic conversion.  I can't go and say, if
25 you're out of stock of this product, please give me another one

1819

1 that has the same UNSPSC code.  So there's no converting that's
2 going on.  There's no matching that goes on with respect to
3 UNSPSC codes even though they may be physically present in the
4 database.
5 Q  You have here, and this is another slide we have up on the
6 screen that you prepared; is that right?
7 A  Yes.
8 Q  On the last point there, what's the last bullet point?
9 Can you explain what you meant by that?
10 A  It's only within RSS, not the totality of the systems that
11 are accused.  It's only RSS that allows even searching of the
12 UNSPSC code.
13 Q  Can we turn to the next slide, please, 31.
14 A  Yes.
15 Q  Is this another slide you put together, Dr. Shamos?
16 A  Well, I put it together, but literally it's copied out of
17 a white paper that was published explaining what UNSPSC codes
18 are.  So I didn't write the words that are on the slide except
19 for the title.
20     THE COURT:  In other words, you made the slide.
21     THE WITNESS:  I made the slide.  I had an electronic
22 copy of that white paper.  I had it on the screen.  I used a
23 photo editor, and I did a screen capture and then cropped it
24 down and stuck it on the slide directly out of that UNSPSC
25 white paper.

1820

1 Q  Can you tell us in a nutshell, Dr. Shamos, what your main
2 point was for putting together this particular slide as it
3 relates to your testimony here?
4 A  Yes.  It was to show this eight-digit classification of
5 items and why it's hierarchical.  This is the UNSPSC
6 explanation of what these codes look like.  The code, as you
7 can see at the bottom where it says pen refills equals UNSPSC
8 classification 44-12-19-03.
9     The significance of those numbers, 12, 19, and 03, depend
10 on the fact that they are coming from 44.  So 44 is office
11 equipment, accessories, and supplies.  Within that, 12 is
12 office supplies.  Within 12, 19 is ink and led refills, and
13 within 19, 03 is pen refills.  And so what 44-12-19-03 tells
14 you is it's a pen refill.
15     It doesn't tell you what kind of pen, and so if I want to
16 buy a refill for my pen, it's going to have to have -- if
17 there's any UNSPSC classification at all, it's going to have to
18 have 44, 12, 19, 03, but I can't just buy any pen refill.  It
19 has to fit in that particular pen.  So these UNSPSC codes don't
20 describe substitutable or generally equivalent items.
21 Q  Can we turn to the next slide, please, number 32.  I think
22 you've essentially already covered the first three bullet
23 points on this slide?
24 A  Yes, we can go right to number four.
25 Q  What was your point with bullet point number four?

1877

1 A It's very difficult to show --

2 Q If you would answer that yes or no fairly, I'd

3 appreciate it.

4 A No, I didn't.

5 Q You know that Dr. Weaver made some demonstrations,

6 correct?

7 A Yes.

8 Q Now, did I understand that you applied the Court's

9 claim construction, is that right, with respect to

10 "catalog"?

11 A Yes.

12 Q And one of your arguments for non-infringement or

13 one of your opinions for non-infringement is that the

14 accused systems don't have catalogs, correct?

15 A Yes.

16 Q But you've seen a lot of Lawson documents that

17 talk about importing catalog data into the item

18 master, haven't you?

19 MR. McDONALD: Objection, Your Honor,

20 irrelevance regarding the Lawson documents for

21 business purposes. They were not written with an eye

22 towards the Court's construction.

23 MR. ROBERTSON: I was going to follow-up,

24 Your Honor, with respect to that.

25 THE COURT: Overruled.

1878

1 Q You have seen a lot of Lawson documents that use

2 the term "catalog," correct?

3 A Yes.

4 Q Now, how do you know that Lawson's using that term

5 "catalog" inconsistent with the Court's claim

6 construction?

7 A Because Lawson had no idea what the Court's claim

8 construction would be when it wrote those documents.

9 Q How do you know it's inconsistent with the Court's

10 claim construction?

11 A Well, because I know what the structure of the

12 Lawson database is.

13 Q When Lawson was using the term "catalog" in its

14 documents, you have no idea if they were using it

15 inconsistent with the Court's claim construction;

16 isn't that right?

17 A I didn't really consider the fact that they used

18 the word "catalogs." I don't think it has any

19 relevance.

20 Q What if they were using it consistent with the

21 Court's construction?

22 A Then they would have been wrong.

23 Q Well, did you ask anybody at Lawson whether they

24 were using the term "catalog" consistently with the

25 Court's claim construction?

1879

1 A No.

2 Q Because you didn't talk to anybody at Lawson,

3 right?

4 A If I had, I don't think I would have brought up

5 the Court's claim construction with them.

6 Q Well, if you saw a lot of documents that were

7 using the term "catalog," wouldn't you be at least

8 curious as to whether or not that satisfied the

9 Court's claim construction when they used had term?

10 A No, because terms are frequently used in a way

11 that's different from the way they are construed in a

12 particular patent.

13 A Sure. And sometimes they are used as they are

14 construed in a particular patent, aren't they?

15 A It can occur.

16 Q But you didn't make that inquiry, right?

17 THE COURT: He's already answered that

18 already.

19 MR. ROBERTSON: I'll move on.

20 Q Can we take a look at the Court's claim

21 construction for "catalog"? I understood you to say

22 yesterday that an organized collection of items and

23 associated information was -- I think you said the

24 item master there is certainly an organized collection

25 of items and associated information in the item

1880

1 master. So that prong of the construction would be

2 satisfied?

3 A Yes.

4 Q Then you also testified that the item master can

5 have information in it such as part number, price,

6 catalog number, vendor name, vendor ID, a textual

7 description of the item, and images that were relating

8 to the item. You know that the item master didn't

9 have that kind of data, right?

10 A I didn't mention images, but I mentioned some of

11 the others.

12 Q You do know that the Lawson software is capable of

13 including images of the item, right?

14 A I actually didn't know one way or the other.

15 Q You didn't investigate that?

16 A No.

17 Q So if that is evidence in the record that they

18 can, that wouldn't affect your opinion one way or the

19 other?

20 A No.

21 MR. McDONALD: Objection. Lack of

22 foundation.

23 THE COURT: Overruled.

24 Q So you'd agree with me also that you faithfully

25 applied the Court's construction for vendor to include

1885

1   MR. ROBERTSON:  All right.

2   THE COURT:  Just remember, the witness is

3   here.  And I know zealous advocacy animates us all to

4   get enthusiastic about our causes, but remember the

5   concept of civility and politeness governs all court

6   proceedings.  And I'm not suggesting you weren't civil

7   and polite, but don't let it get out of hand.

8   MR. ROBERTSON:  Yes, sir.

9   BY MR. McDONALD:

10   Q  The next bullet point that you have here is when

11   Lawson software is installed, the item master is

12   empty.  Do you see that?

13   A  Well, in a second.

14   THE COURT:  Wait a minute.

15   Q  I apologize.  Do we have the slides.  Why don't we

16   do that?

17   THE COURT:  What system are we working with?

18   Your system?  So Mr. Neal can activate the ePlus side

19   of things.

20   Q  The second bullet point says, When the Lawson

21   software is installed, the item master is empty,

22   correct?

23   A  Yes.

24   Q  But you understand from your review of the

25   document that Lawson also provides services,

1886

1   implementation in which they will either migrate the

2   data from a legacy system to the new Lawson system or

3   they'll assist the customers in loading the item data,

4   correct?

5   A  Yes, I've testified to that.

6   Q  When the Court was construing "catalog," it was

7   referring to this collection of items and associated

8   information that is existing in electronic format in

9   the database, right?  You understood that in the

10   context of the patent?

11   A  I thought you just told me to take "database" out

12   of the claim.

13   Q  Well, I told you to take the single database out

14   of the claim, but you understand that that's where

15   this information, this electronic information, data,

16   resides, correct, in the Lawson system?  The item

17   master, the database, right?

18   A  Yes.

19   Q  The next bullet point you say is an item master

20   data is selected by inclusion by a customer.  Do you

21   see that?

22   A  Yes.

23   Q  And not a vendor.  Tell me where in the Court's

24   claim construction that the Judge has said that the

25   actual selection of the item data has to be made by

1887

1   anyone.

2   A  The catalog has to be published by a vendor.  If

3   the information is merely selected by a customer, it's

4   not published by a vendor.

5   Q  So you have your own construction of what

6   "published by a vendor" means?

7   A  No.

8   MR. McDONALD:  Objection, Your Honor.

9   THE COURT:  Overruled.

10   Q  Are you aware of the Court's construction?

11   A  Yes.

12   Q  The Court says "published by a vendor" simply

13   means that at some point in time a vendor, such as a

14   supplier, a manufacturer, or a distributor has made

15   generally known or has disclosed an organized

16   collection of items and associated information

17   preferably but not necessarily including all these

18   descriptions for the product.

19   MR. McDONALD:  Your Honor, I don't think he

20   read the very first sentence of the Court's

21   construction.

22   THE COURT:  I also don't think I said

23   anything about disclosed.  I don't know where you got

24   that.

25   MR. ROBERTSON:  I'm looking at what was

1888

1   handed out, Your Honor, I think.

2   THE COURT:  Well, that was what you-all got.

3   That isn't what I read.  What I read was published by

4   a vendor as used in the definition of the claim term

5   "catalog/product catalog."

6   "Published" simply means to make generally

7   known.  At one time I was thinking about "or to

8   disclose," but I didn't say that.  "Published by a

9   vendor" simply means that at some point in time a

10   vendor such as a supplier, a manufacturer or a

11   distributor has made generally known or has disclosed

12   an organized collection of items or associated

13   information preferably but not necessarily including a

14   part number, price, catalog number, vendor name,

15   vendor ID, a textual description of the item, and

16   images of or relating to the item.  And it should be

17   items and associated information, I think.  But that's

18   what I think I read.

19   MR. ROBERTSON:  I thought I was asking him

20   whether it just needs to be made generally known or

21   disclosed.  I think Your Honor said --

22   THE COURT:  I didn't say "disclosed."  I took

23   it out when I read it.  You've got a typographically

24   erroneous description.

25   MR. ROBERTSON:  All right, Your Honor.  I

1893

1  catalog that was published by a vendor.

2  Q  Well, the item master doesn't have to be published

3  by the vendor, does it?  It's the collection of

4  information -- excuse me.  It's the organized

5  collection of items and associated information that's

6  published by a vendor, correct?

7  A  But that's what a catalog is.  The vendor

8  publishes the catalog.

9  Q  The vendor makes that organized collection of

10 items and associated information available to the

11 customer, right?

12 A  Yes, the vendor publishes the catalog.  I don't

13 think there's any doubt about that.

14 Q  Okay.  So that's all that's required of the claim

15 that the vendor publish the catalog?

16        THE COURT:  Is that a question?

17 Q  Isn't that correct?

18        MR. McDONALD:  Object to the form.

19        THE COURT:  Overruled.

20 A  No.  If there's to be a catalog in the Lawson

21 system, the catalog had to have been published by the

22 vendor.

23 Q  Fine.  So point to the language then in the

24 Court's construction of "catalog" that you rely on to

25 say that this organized collection of items and

1894

1  associated information has to be selected by the

2  customer, not somebody else.

3  A  It's not that it has to be selected by the

4  customer.  It is selected by the customer, therefore,

5  it's not an organized collection published by a

6  vendor.  I'm explaining why it doesn't meet the

7  Court's construction, not why it does.

8  Q  So what language are you relying on?

9  A  Published by a vendor.

10 Q  That's the only language you're relying on about

11 this organized collection of items and associated

12 information is that it's got to be published by a

13 vendor?

14 A  You just took me through that.  We went through

15 everything else in the Court's construction and found

16 it was satisfied except "published by a vendor."

17        THE COURT:  I think he's made his position

18 clear.  Whether you agree with it or not is a

19 different issue, but I think his position is clear.

20        MR. ROBERTSON:  I understand, Your Honor.

21 I'll move on.

22        THE COURT:  Let's move on.

23 Q  Does it matter then if the customer loads just

24 some of the item information?

25 A  Of course.  My personal address book was not

1895

1  published by the phone company even though it has

2  phone numbers of some people in it.

3  Q  Where in the Court's construction of "catalog"

4  does it say that you have to have all of the item

5  information included?

6  A  Well, I don't think that it says all.  I know it

7  doesn't say all, and I don't think you have to have

8  all.

9  Q  Where does it say you have to have most?

10 A  There's a matter of degree.

11 Q  Where does it say that in here?  It just says "a

12 collection of items and associated information."

13 A  Published by a vendor.  The question is:  What's

14 published by a vendor?

15 Q  And you interpret that as meaning you have to have

16 how much?

17 A  I don't know.  There's some point at which it's no

18 longer published by a vendor in the same sense that my

19 address book is not published by the phone company.

20 Q  If I have 50 percent of it, is that enough?

21 A  I don't know.

22 Q  75 percent?

23 A  I don't know.

24 Q  You know that the system, the Lawson system, is

25 capable of incorporating all of the item data from an

1896

1  electronically produced catalog from a vendor, right?

2  A  It may or may not be.  That may be true for some

3  catalogs.

4  Q  Did you make any investigation into that?

5  A  Well, I know what the structure of item master is.

6  And item master has fields, some of which are in

7  vendor catalogs and some of which are not in some

8  vendor catalogs.  And if there's a field in a vendor

9  catalog for which there's no place in item master, it

10 cannot be imported into item master.

11 Q  Does it have to import all the fields?

12 A  No.

13 Q  The Court's claim construction made clear that

14 some of the data about the item is just preferably but

15 not necessarily; isn't that right?

16 A  Correct.

17 Q  So it doesn't even have to include all the things

18 that the Court identifies in its construction, right?

19 A  I never assumed it did have to include those.

20 Q  But you have seen in the item master this kind of

21 data, haven't you?  Part number, price, catalog

22 number, vendor name, vendor ID, textual description of

23 the item?

24 A  Yes.

25 Q  Now, you know that a system or device that is

1901

1   Dell was inserted.
2   Q   That's where you're doing the keyword search.  I'm
3   talking about the user fields that are in the system.
4   You can actually enter into a user field a vendor
5   name, can't you, sir?
6   A   I think you can.  I'm not sure whether you can
7   search on that field, but you can enter it.
8   Q   So you don't know one way or the other whether you
9   can search once you have entered a vendor name in that
10  field?
11  A   In a use defined field, I don't know.
12  Q   Would it change your opinion if there was evidence
13  in the record that if you did enter the vendor name
14  into one of those user fields, you could search by
15  vendor?
16  A   No, because what you're postulating is the user
17  taking the system and making his own additions and
18  changes to it.
19  Q   The user of the Lawson system, according to you,
20  populates all the data in the item master; isn't that
21  right?
22  A   Yes, I think that's an important point.
23  Q   And if the user inserts a vendor name in one of
24  those user defined fields that it can use, then it
25  could search by vendor, couldn't it?

1902

1   A   If the proposition is that --
2   Q   Can you answer that question fairly yes or no?
3        THE COURT:  Just a minutes.  Listen to the
4   question he asked and answer that question.
5        THE WITNESS:  Okay.
6   A   Could you repeat it?
7   Q   Sure.  If the user who's populating the fields
8   with information, price, unit of measure, textual
9   description also uses one of these user created fields
10  and enters a vendor name, you could search by that
11  vendor name; isn't that right?
12  A   Yes.  You could search by that vendor name, but --
13  Q   That's fine.  You have answered the question.
14      Now, let me ask you this:  If I had two
15  catalogs -- just assume I have two catalogs in the
16  item database, the item master, a Home Depot catalog
17  and a Dell computer catalog, right?  And just assume
18  for purposes of my question that Home Depot is not
19  selling computers, all right?
20  A   Yes.
21  Q   If I type in a keyword "laptop," I'm not going to
22  get any catalog data from Home Depot, am I?
23  A   Not if they don't have any laptops.
24  Q   I'm going to get laptops from the Dell computer,
25  correct?

1903

1   A   Yes.
2   Q   So in that scenario by using the term "laptop,"
3   which only appears in the Dell catalog, I only
4   selected the Dell catalog to search; isn't that right?
5   A   No, that's false.  It looked over the whole
6   database.  It just happened because of the
7   circumstances you have set up that there were no
8   responsive hits from the Home Depot catalog.
9   Q   So I got all the Dell items that corresponded to
10  that keyword laptop and none of the items in the home
11  Depot catalog, right?
12  A   Well, that's the output of the search, yes.  But
13  if Home Depot had had a laptop, then you would have
14  retrieved the laptop from the Home Depot catalog.
15  Q   Well, if I added a Hewlett-Packard catalog to my
16  catalog database with Home Depot, Dell, and now
17  Hewlett-Packard, and I searched for laptops, I would
18  get hits for Hewlett-Packard and Dell, right?
19  A   Yes.
20  Q   So the selection of the catalog was made by using
21  that keyword because I didn't get any Home Depo hits,
22  but I did get Dell and Hewlett-Packard, correct?
23  A   That's nonsense.  It makes no sense at all.  It's
24  a happenstance that one particular vendor doesn't sell
25  a thing.  So by asking for pens, for example, the fact

1904

1   that you don't get a vendor who doesn't sell pens
2   doesn't mean you have selected particular catalogs to
3   search.
4        There's structure in the software.  The software
5   does certain things.  In Lawson, it searches the
6   entire item master database.  It's fortuitous that a
7   particular vendor doesn't sell a particular thing.
8   That's not a means for selection.
9   Q   Why not?  It didn't come back from the Home Depot
10  catalog.
11  A   Because there was nothing responsive in there.  If
12  you search for an item that doesn't exist, you
13  certainly wouldn't be saying that you selected no
14  catalogs.
15  Q   No, but if I search for an item that does exist in
16  two catalogs that sell computers and I get results
17  from there, I've selected those two as a subset of the
18  three that are there?
19  A   You have not.
20  Q   All right.  You understand that the item master
21  can hold a hundred thousand items or more, correct?
22  A   Yes.
23  Q   And tens of thousands of vendors, correct?
24  A   Yes.
25  Q   And you would agree, wouldn't you, Dr. Shamos,

1909

1  Q  Vendor item number?
2  A  Yes.
3  Q  Unit of measure?
4  A  Probably.
5  Q  The item cost?
6  A  Maybe.
7  Q  You haven't seen pricing information in the --
8  A  There's pricing information.
9     THE COURT:  Lawson and price are two
10  different things, I think, is the distinction.
11     MR. ROBERTSON:  I understand.
12  Q  You can also have these UNSPSC hierarchal codes do
13  you understand that, on the bottom of the page
14  starting at 16 and 17?
15  A  Yes.  Those are the two highest levels of the 8
16  digit code that I talked about earlier.
17  Q  And you also, if you could go to No. 12, you have
18  the manufacturer item number?
19  A  Yes.
20  Q  If you will turn to the page that ends 433, you
21  have the next two UNSPSC codes, correct?
22  A  Yes.
23  Q  No. 24 is a user defined alpha field one, do you
24  see that?
25  A  Yes.

1910

1  Q  If you will go over to the far column, it says,
2  This is a client defined alphanumeric field?
3  A  Yes.
4  Q  And alphanumeric, you understand, to be either
5  letters or numbers, correct?
6  A  Or both.
7  Q  Or both, right?
8  A  Yes.
9  Q  So that's a user defined field that the user could
10  but the vendor name, isn't it?
11  A  He could if he wanted to.
12     MR. ROBERTSON:  Could I have Exhibit 522,
13  please.
14     THE COURT:  I have a copy of that, too.
15  Q  You know what purchase order release notes are,
16  don't you, sir?  Do you know generally what release
17  notes are with respect to Lawson software?
18  A  Well, I know what release notes are generally,
19  with respect to software, and I don't think Lawson
20  uses that term in any different sense.
21  Q  Well, release notes talk about new futures that
22  have come available with the software?
23  A  Yes.
24  Q  You understand that this 8.0.3 is one of the
25  systems that's being accused of infringement in this

1911

1  case?
2  A  Yes.
3  Q  If you'll turn to the second page of Plaintiff's
4  Exhibit 522, at the top you see there there's a new
5  feature called the vendor catalog load?
6  A  Yes.
7  Q  And the description that Lawson provided was "New
8  functionality has been added to electronically load a
9  vendor file which contains vendor item, unit of
10  measure, and unit price information into the purchase
11  order application."  Do you see that?
12  A  Yes.
13  Q  That's the representation that Lawson made was
14  part of the new functionality of this accused 8.0.3
15  procurement system, correct?
16  A  Well, it's a statement that they have made in
17  their documentation.
18  Q  The price information and the unit of measure,
19  that's some of the elements that are in the Court's
20  claim construction for "catalog," correct?
21  A  Yes.
22  Q  You talked a little bit about this UNSPSC
23  classification codes.  Do you recall that?
24  A  Yes.
25  Q  And you referred to a white paper; is that right,

1912

1  sir?
2  A  Yes.
3  Q  Can I have Plaintiff's Exhibit No. 11, please.
4     THE CLERK:  Are we talking about Plaintiff's
5  Exhibit 11?  Is that what you said?
6     MR. ROBERTSON:  Yes.
7     THE CLERK:  Thank you.
8  Q  Is this the white paper you were referring to when
9  you gave your testimony on direct?
10  A  Well, I think it is.
11  Q  This is a white paper concerning the UNSPSC,
12  correct?
13  A  Oh, it is.  I'm just looking to see whether it's
14  the same one, and I'm not actually sure that it is.
15  Q  Why don't you take a look at the page that ends
16  with the Bates label 044.
17  A  Yes.
18  Q  That's the --
19  A  I have no reason to dispute that this is the one.
20  I could check against my report.  I could check the
21  Bates number, but I'm not disputing it.
22  Q  I understand.  But that's the example you used in
23  your demonstratives; isn't that right, sir?
24  A  Yes.
25  Q  And we can both agree that Granada Research is an

1925

1    THE COURT:  Do you have a copy of his report
2  for him?
3    MR. ROBERTSON:  Yes, sir.
4    THE COURT:  What paragraph?
5    MR. ROBERTSON:  Paragraph 134, on page 40.
6    THE COURT:  Page 40, paragraph 134, Dr.
7  Shamos, is what he's going to ask you about.
8  BY MR. ROBERTSON:
9    Q  You indicate here that as a hypothetical
10  proposition, it's possible in a sense to avoid
11  searching an entire database each time by creating
12  indexes that allow particular records containing
13  specific data to be located quickly.  Did you say that
14  in that your report?
15    A  Yes, it says "in a sense."
16    Q  Thank you.  You also said in this regard, a
17  database index is similar to the index of a book which
18  makes it unnecessary to scan the entire book to locate
19  the occurrence of a word each time a search is
20  performed, correct?
21    A  Yes.
22    Q  With respect to the Punchout functionality and
23  Punchout procurement, you understand that when the
24  customer is using that functionality with the
25  requisition self service module, they're operating

1926

1  within the Lawson system during the entire process,
2  correct?
3    A  No.
4    Q  So if there were testimony in the record with
5  respect to that, that that is the case, would that
6  change your opinion?
7    MR. McDONALD:  Objection.  He wasn't able to
8  hear the testimony.
9    THE COURT:  That's a proper question.  It's
10  the functional equivalent of a hypothetical.  That's
11  all right.
12    A  I'm an open-minded guy.  If whoever said that
13  would explain what he meant by it, it's possible he
14  might change my mind, but merely hearing such
15  testimony exists doesn't change my mind.
16    Q  You're aware that it's Lawson who creates the
17  communication protocols with its Punchout trading
18  partners, correct?
19    A  Okay.  As a general proposition, in order
20  to connect to --
21    Q  As a general proposition, do you agree with that?
22  Yes or no?
23    A  Repeat it then.
24    Q  It's Lawson that creates the communication
25  protocols used in the Punchout procurement process?

1927

1    A  The phrase I'm having trouble with is
2  "communication protocols."
3    THE COURT:  You do not know what they are?
4    THE WITNESS:  I know what they are.
5    THE COURT:  Do you not know what he means?
6    THE WITNESS:  I think I know what he means,
7  but I think it's different from what he said.
8  BY MR. ROBERTSON:
9    Q  What do you understand communication protocols to
10  mean?
11    A  Well, you can't create communication protocols
12  over the Internet.  You have to use standardized
13  communication protocols.
14    If what you mean is Lawson's facility have the
15  ability to connect to the vendors so that you can
16  search the vendor's website, the answer is yes.
17    Q  And law also creates those protocols to return the
18  data from a vendor for inclusion into a requisition
19  and then a purchase order; isn't that right?
20    A  I'll have a lot easier time if we don't use the
21  word "protocols."  Just say mechanism and I'll agree
22  with you.
23    Q  Well, Lawson creates that mechanism?
24    A  Yes.
25    Q  Are you familiar with the term handshake used in

1928

1  that context?
2    A  Yes.
3    Q  Lawson creates that handshake, right?
4    A  Lawson implements part of that handshake, yes.
5    Q  If there were testimony in this case that Lawson,
6  in fact, creates that handshake, would that affect
7  your opinions in any way?
8    A  No, because I understand how handshakes work and
9  it's a two-way street.  The vendor has to do certain
10  things, too, as part of the handshake.
11    Q  Isn't it true in this Punchout process, selecting
12  checkout on the shopping cart releases the requisition
13  to the next stage of process?  And checkout saves
14  items to the cart to the requisition lines, and it
15  goes into the requisition to the next processing
16  stage?
17    A  Yes.
18    Q  So the shopping cart then is not the same as the
19  final requisition, correct?
20    A  I haven't opined on that.  I haven't looked at it.
21    THE COURT:  You say you haven't looked at it?
22    THE WITNESS:  I haven't looked at that.  I
23  haven't considered it.
24    Q  You were asked some questions about some of these
25  means-plus-function claim constructions.  Do you

1929

1    recall that?

2    A   Yes.

3    Q   Can we go to the page 5 of the glossary, the means

4    for selecting product catalogs to search?

5        You were asked about this particular claim element

6    in Claim Three of the '683 patent?

7    A   Yes.

8    Q   One of the structures the Court indicated there is

9    a user interface that allows the user to select a

10   catalog, do you see that?

11   A   Yes.

12   Q   If in one of those user defined fields, I had the

13   vendor name, the Lawson software presents a user

14   interface that would allow me to select that vendor in

15   that field, correct?

16   A   If you -- yes, in a sense.

17   Q   Thank you.  Also in this claim construction, the

18   Court indicated that the structure, corresponding

19   structure, is what's described, and at the end he

20   indicates "and their equivalents," do you see that?

21   A   Yes.

22   Q   You weren't asked by Mr. McDonald about the

23   equivalents, were you?

24   A   No.

25   Q   If you'll go to page 3, the means for generating

1930

1    an order list.  '172 patent, Claim One.

2        Now, for this means claim, the Court identified

3    the corresponding structure as being a user interface

4    operating on a computer through which a user may

5    select from results of a search program or a search

6    program that generates an order list of matching

7    items; is that right?

8    A   That was almost right.  I think you read one word

9    wrong.

10   Q   Let me start over then.  The Court identified the

11   corresponding structures that are disclosed as a user

12   interface operating on a computer through which a user

13   may select from results a search program or a search

14   program that generates an order list of matching

15   items?

16   A   You omitted a word that time.  I don't think it

17   really matters.

18   Q   Tell me which word I omitted.

19   A   "From."  Select from results from a search

20   program.  The second "from" was omitted.

21       THE COURT:  It probably was a typographical

22   error, isn't it?  I don't know.

23   Q   Well, in any event, the reason you say this can't

24   be satisfied is because you say catalogs aren't

25   present in the accused system, right?

1931

1    A   Well, no, the function isn't performed.  The

2    function has to -- first of all, there has to be a

3    means for searching, which we didn't have, and there

4    has to be a matching item selected by said means for

5    searching.

6        If you don't perform the function, it doesn't

7    matter what structure you have.

8    Q   Well, the Court construed means for searching for

9    matching items among the select product catalogs,

10   right?

11   A   Yes.

12   Q   While we're on that one still, Mr. McDonald didn't

13   ask you about any equivalents, did he?

14   A   In the interest of brevity, I don't think he asked

15   me about equivalents or any of the means-plus-function

16   elements.

17   Q   Let's go to means for searching for matching

18   items.  Now, it's your position that you can't search

19   for matching items among the selected product catalogs

20   because, first, you say there are no catalogs in the

21   item master, right?

22   A   That's one reason.

23   Q   Let's assume there are catalogs there.

24   A   Yes.

25   Q   Let's assume that the vendor identified the vendor

1932

1    name in one of those user defined fields.  I could

2    then select that catalog, I think you've indicated, by

3    using the vendor name, and then I could search in it,

4    couldn't I?

5    A   I did not indicate that, and you can't.

6    Q   Doesn't the Court indicate that the corresponding

7    structure here is a search program and modules

8    operating on a computer system with access to data in

9    a database or other file system, correct?

10   A   Yes, but you were talking about selected product

11   catalogs.

12   Q   I said assume that we have a vendor name and a

13   vendor field and we have selected that vendor name and

14   got results.

15   A   That's not selecting a vendor catalog.  That's

16   selecting a particular field in a database.

17   Q   Don't I get results from that is the catalog that

18   has that vendor name?

19   A   Well --

20   Q   Can you answer that fairly yes or no?  If I just

21   search using that vendor field that I've populated

22   with the vendor names, and I just want Dell, and I put

23   Dell computer in that vendor name, I'll get Dell

24   results, won't I?

25   A   Yes, you search the entire catalog to get Dell

2045

ENG - REDIRECT      2045

1   and get these binders that you sent up here at the

2   very beginning, not now, because you-all are both

3   adopting a new mode, and I need the space to put in

4   the exhibits that you are using.

5          I'd like to say that I'd like to commend, and

6   it's obvious to me there's been some hard work put in

7   by the legal assistants in this case.  There have been

8   very few problems, and when there have been problems,

9   they have been solved immediately.  And you can't do

10  that unless you know what you're doing.

11         And the IT people, I think you-all have done

12  a fine job, too.  Of course, the lawyers.  I don't

13  mean to take anything away from you, but I remember

14  well who does most of the work.

15         MR. McDONALD:  Your Honor, just one more

16  thing with respect to that last video that Ms. Huey

17  would like to offer.

18         MS. HUGHEY:  I'd like to offer it as

19  Defendant's Exhibit 401.

20         THE COURT:  What is it?

21         MS. HUGHEY:  This is the transcript of what

22  was read in.  My understanding is that

23  Ms. O'Loughlin's deposition transcript was read in, I

24  believe, and it will be marked as an exhibit for the

25  record.

2046

ENG - REDIRECT      2046

1          THE COURT:  Any objections?  It's admitted.

2          THE CLERK:  What number is that?

3          THE COURT:  401.  Defendant's 401.

4          (Defendant's Exhibit 401 is admitted into

5   evidence.)

6          THE COURT:  All right.  Anything else anybody

7   has so we can get ready to go on Tuesday morning?

8          MR. McDONALD:  Nothing else, Your Honor, for

9   the defense.

10         THE COURT:  All right.

11         MR. ROBERTSON:  Sorry, Your Honor.  I didn't

12  hear you.

13         THE COURT:  I just want to know if there's

14  anything else so that we can solve it and get going

15  and actively out of the box at nine o'clock Tuesday

16  morning.

17         MR. ROBERTSON:  Nothing by the plaintiff.

18         THE COURT:  Okay.  That sounds good.  All

19  right.

20

21         (The proceedings were adjourned at 5:20 p.m.)

22

23

24

25

2797

```
1            IN THE UNITED STATES DISTRICT COURT
2          FOR THE EASTERN DISTRICT OF VIRGINIA
3                    RICHMOND DIVISION
4
5    ------------------------------------
                                        :
6    ePLUS, INC.          : Civil Action No.
                          : 3:09CV620
7    vs.                  :
                          :
8    LAWSON SOFTWARE, INC.      :  January 21, 2011
                          :
9    ------------------------------------
10
11       COMPLETE TRANSCRIPT OF THE JURY TRIAL
12        BEFORE THE HONORABLE ROBERT E. PAYNE
13      UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24       Peppy Peterson, RPR
          Official Court Reporter
25      United States District Court
```

2798

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2799

```
1                 P R O C E E D I N G S
2
3         THE CLERK:  Civil action number 3:09CV00620, ePlus,
4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
6    Mr. Michael G. Strapp represent the plaintiffs.
7         Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin L. Stoll-DeBell, Mr. William D. Schultz, and Ms. Rachel
9    Hughey represent the defendant.  Are counsel ready to proceed?
10        MR. ROBERTSON:  Yes, Your Honor.
11        MR. McDONALD:  Yes, Your Honor.
12        THE COURT:  All right.  We'll take plaintiff's JMOL
13   motion first.
14        MR. ROBERTSON:  Good morning, Your Honor.
15        THE COURT:  Good morning.
16        MR. ROBERTSON:  I'm going to be arguing plaintiff's
17   judgment as a matter of law with respect to infringement, and
18   Ms. Albert will be addressing plaintiff's judgment as a matter
19   of law with respect to the invalidity issues.
20        Your Honor, Rule 50 provides that judgment as a
21   matter of law may be granted when a reasonable jury would not
22   have a legally sufficient evidentiary basis to find for the
23   party Lawson on that issue.  ePlus moves for JMOL that Lawson
24   infringes all the asserted claims of the patents-in-suit, both
25   directly and indirectly, both through inducement of
```

2800

```
1    infringement and contributory infringement.
2         I'm not going to go through all the asserted claims,
3    Your Honor.  I know Your Honor is familiar with them, and that
4    would just take up too much time, and I know we're pressed for
5    time here this morning with the Court's schedule this
6    afternoon, but let me hit a high point, first start off by
7    saying, we contend that the defendants non-infringement case in
8    this proceeding has been really based on misdirection, that
9    they have ignored the Court's claim construction with respect
10   to catalog.  They rewrote the provision for published by a
11   vendor to suit their manufactured non-infringement positions.
12        It required the Court, I think midcourse through this
13   case, to issue the instruction with respect to published by a
14   vendor to bring some clarity to what the Court intended when it
15   gave its instruction with respect to what a catalog is.
16        It did not mean, as the defendant contended, that the
17   item data associated with the catalog could not be selected --
18   or had to be selected by the customer or modified or deleted or
19   reformatted or be an entire catalog.  That was never intended
20   by the Court, and its revised published-by-a-vendor
21   construction made that clear, and I think the arguments made on
22   that, the non-infringement arguments that were based on that
23   have no sound footing in the record on this case.
24        We believe that the best evidence in this case has
25   come from, indeed, Lawson's own witnesses and documents.  Mr.
```

2849

1    THE COURT:  Is that what the case holds?  That's what

2    this case holds -- that's what this case about the travel

3    candle holds, that, in fact, there was no evidence that the

4    travel candle was used in the infringing way.

5        MR. ROBERTSON:  There's amble evidence in this case

6    that it's used in the infringing way, both from Mr.

7    Christopherson and --

8        THE COURT:  Here's the bottom line.  I'm the finder

9    of the fact.  I would clearly find that there is infringement

10   of everything that Dr. Weaver said, that each system infringed

11   each claim for the reasons he stated.  There isn't any question

12   that I would do that.

13       But I'm not the finder of the fact.  So under these

14   facts, under the evidence in this case, don't I have to let the

15   jury decide that case and then come back at the end of the day

16   and see whether that's right?  So what I'm inclined to do is

17   reserve judgment on this motion, because I will tell you -- I

18   personally am having real trouble deciding why there's any

19   defense to infringement at all.

20       MR. ROBERTSON:  I understand.

21       THE COURT:  But I believe that I do have to let the

22   case go to the jury subject to my ability to control that, and

23   I'm going to take this motion under advisement, deny the motion

24   of no infringement by Lawson, keep your motion under

25   advisement.

2850

1        MR. ROBERTSON:  I understand, Your Honor.  Thank you.

2        THE COURT:  All right, now, invalidity.  I believe

3    that -- Ms. Hughey, are you doing that one, too?

4        MS. HUGHEY:  I am, Your Honor, and I promise to be

5    much slower this time.

6        THE COURT:  Because if you don't, you're going to get

7    knee-capped but not buy me.

8        Let's see.  Is this a good place for the court

9    reporters to switch and for us to take a little recess?

10

11       (Recess taken.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2851

1        THE COURT:  All right.

2        MS. HUGHEY:  Hello, Your Honor.  May it

3    please the Court.  Lawson moves for judgment as a

4    matter of law on the issue of invalidity because a

5    reasonable jury does not have a reasonable evidentiary

6    basis to find for ePlus on the issue.

7        At trial documents demonstrated and witnesses

8    testified --

9        THE COURT:  Now, there are three grounds of

10   invalidity.  One is anticipation.

11       MS. HUGHEY:  Correct.

12       THE COURT:  One is obviousness.

13       MS. HUGHEY:  Correct.

14       THE COURT:  And the other is written

15   description.

16       MS. HUGHEY:  No, Your Honor, Lawson is not

17   asserting written description.

18       THE COURT:  That was there at one time.

19       MS. HUGHEY:  Correct.

20       THE COURT:  That's no longer there.  So I

21   don't need to deal with that one.

22       MS. HUGHEY:  Correct.

23       THE COURT:  So you have anticipation and

24   obviousness.

25       MS. HUGHEY:  Correct, Your Honor.  At trial

2852

1    the documents demonstrated and the witnesses testified

2    regarding the features and functionality of the prior

3    art RIMS system disclosed in the '989 patent.

4        THE COURT:  Let's take the anticipation.

5    What is it that anticipates?

6        MS. HUGHEY:  The RIMS system alone

7    anticipates every single claim of the patents-in-suit.

8        THE COURT:  All right.

9        MS. HUGHEY:  In combination, the RIMS system

10   and the TV/2 product render every single one of the

11   claims of the patents-in-suit obvious.

12       Dr. Shamos went through every single claim

13   and explained both the anticipation and obviousness

14   analysis.  The evidence at trial further demonstrated

15   that both systems are prior art.

16       The combination of RIMS plus TV/2 renders

17   every single asserted claim of the patents-in-suit

18   obvious.  The preferred embodiment disclosed in the

19   patents is the combination of RIMS plus TV/2 and the

20   Court's construction is consistent with that.

21       The TV/2 literature specifically says to

22   combine TV/2 with the parts ordering system and

23   inventory management system.  The RIMS system

24   disclosed in the '989 patent was a part ordering and

25   inventory management system.

2011.01.21 Trial Transcript Day 12   1/21/2011  8:22:00 PM



3077

1    arguments, Your Honor?

2        THE COURT:  We told the jury to come back at 9:00.

3    So you're going to get those instructions over here by -- I

4    need them by four o'clock tomorrow afternoon.  So if that lets

5    you sleep a little later, have at it.  Does that take care of

6    everything?  I don't intend to clean up night.

7

8        (Court adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25