**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | | |
|---|---|---|
| ePLUS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:09CV620 (REP) |
| | ) | |
| LAWSON SOFTWARE, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT LAWSON SOFTWARE, INC.'S BRIEF IN SUPPORT OF ITS RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW**

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................. 1

III.  SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE JURY'S VERDICT
     THAT THE ASSERTED CLAIMS ARE INFRINGED. ................................. 2

     A.  Substantial Evidence Does Not Support the Infringement
         Verdict for the Punchout Configurations. ......................................... 2

         1.  There is No Direct Infringer of the Asserted Method
             Claims. .................................................................................... 2
         2.  Lawson Does Not Directly Infringe the System Claims ........... 5

     B.  The RSS and Punchout Configurations Do Not Infringe the
         Means-Plus-Function Claims as a Matter of Law. ............................ 6

     C.  The RSS Configuration Does Not Infringe Claim 1 of the '172
         Patent. ................................................................................................. 6

     D.  The Jury Did Not Have a Legally Sufficient Basis to Find
         Indirect Infringement. ....................................................................... 8

     E.  ePlus Cannot Rely on the Doctrine of Joint Infringement to
         Support the Jury's Verdict. ............................................................. 10

IV.  SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE JURY'S VERDICT
     THAT THE CLAIMS ARE VALID. ........................................................... 10

     A.  Claim 1 of the '172 Patent is Obvious Based on the Combination
         of RIMS + TV/2, and No Substantial Evidence Showed
         Otherwise. ......................................................................................... 10

         1.  The Level of Skill in the Art is not Disputed. ...................... 10

         2.  No Substantial Evidence Refuted that RIMS and TV/2 Are
             Prior Art. .............................................................................. 11

             a)  The RIMS '989 Patent and System is Prior Art, and
                 No Substantial Evidence Showed the Contrary. ........... 11

             b)  The Commercial RIMS System Available in April
                 1993 Was Also Prior Art. .............................................. 11

c)     The Prior Art TV/2 System, Manual, and Brochure....................14

3.     The Combination of RIMS and/or the '989 Patent and TV/2 Teaches All of the Elements of Claim 1 of the '172 Patent....................15

a)     ePlus's Expert Admitted that TV/2 Included the First Three Elements of Claim 1 ....................16

b)     RIMS or TV/2 Meet the Definition of an "Electronic Sourcing System." ....................16

c)     TV/2 Was Capable of Generating an Order List that Included Search Results....................18

d)     RIMS Had a Requisition Module. ....................20

e)     RIMS Generated Purchase Orders from a Single Requisition ....................21

4.     The Evidence Showed an Express Teaching to Combine RIMS and TV/2....................23

5.     The Secondary Considerations Do Not Negate Obviousness....................24

**B.     There is no *Bona fide* Dispute in the Evidence that Claims 3 and 28 of the '683 Patent are Obvious Based on the Combination of RIMS + TV/2 Prior Art. ....................25**

1.     The TV/2 System Searched Catalogs. ....................25

2.     The TV/2 System Was Capable of Searching Selected Catalogs....................26

3.     The '989 Patent Discloses Converting Data Relating to a Selected Matching Item and an Associated Source to Data Relating to an Item and a Different Source. ....................27

**C.     Claims 26 and 29 of the '683 Patent are Obvious Based on the Combination of RIMS + TV/2. ....................29**

**D.     The System Claims are Invalid Under 35 U.S.C. §112, ¶¶ 2 and 6....................29**

**E.     The Asserted Claims are Invalid Under 35 U.S.C. § 101. ....................30**

**V.     CONCLUSION ....................30**

iii

**EXHIBIT INDEX**

Exhibit 1:  Excerpt transcript pages from the *ePlus v. Lawson* Trial

Exhibit 2:  Slides from the Invalidity PowerPoint of Dr. Shamos

Exhibit 3:  Excerpt transcript pages from the testimony of Johanna O'Loughlin


**Previously Marked Trial Exhibits:**

DX-7:  U.S. Patent No. 5,712,989

DX-61:  Fisher RIMS Brochure

DX-107:  IBM Technical Viewer/2 Manual

DX-230:  IMB Technical Viewer/2 General Information Manual

DX-402:  1989- First RIMS Development

PX-1:  U.S. Patent No. 6,023,683

PX-3:  U.S. Patent No. 6,505,172

PX-190:  Lawson Software Americas, Inc. Procurement Punchout Partner Agreement

## I.    <u>INTRODUCTION</u>

Lawson respectfully renews its motion for judgment as a matter of law of invalidity and non-infringement pursuant to Fed. R. Civ. P. 50(b).  A reasonable jury could not find the evidence sufficient to show that Lawson's acts regarding the RSS product (System No. 2) infringed claim 1 of the '172 patent or that Lawson's acts regarding the Punchout product (System Nos. 3 and 5) infringed claim 1 of the '172 patent or claims 3, 26, 28, or 29 of the '683 patent.  Additionally, a reasonable jury could not find the evidence sufficient to show that the claims are valid.  Thus, Lawson respectfully renews its motion for judgment as a matter of law for the reasons set forth below and in its previous JMOL motion arguments and briefs, and alternately seeks a new trial for the reasons set forth in its motion for a new trial pursuant to Fed. R. Civ. P. 59, filed concurrently herewith.

## II.    <u>BACKGROUND</u>

During trial, ePlus accused the following five configurations of infringing twelve claims of U.S. Patent Nos. 6,023,683 ("the '683 patent"), 6,055,516 ("the '516 patent"), and 6,505,172 ("the '172 patent") (collectively "the patents-in-suit"):

> (1)    S3 Core Procurement (referred to as "System 1");
> (2)    RSS combined with S3 Core Procurement ("System 2");
> (3)    Punchout combined with RSS and S3 Core Procurement ("System 3");
> (4)    EDI combined with S3 Core Procurement ("System 4"), and
> (5)    Punchout combined with RSS, EDI, and S3 Core Procurement ("System 5").

(Ex. 1[1] - Weaver, Tr. at 795:15-796:22).  The jury found that the Systems 1 and 4 did not infringe any of the asserted claims.  (Dkt. 600).  The jury found that RSS (without Punchout) infringed only claim 1 of the '172 patent.  (*Id.*)  The jury found that Systems 3 and 5 (the ones with Punchout) infringed claim 1 of the '172 patent and claims 3, 26, 28, and 29 of the '683

---

[1] All cited transcripts pages are attached as Exhibit 1.

patent.  (*Id.*)

The jury also found that none of the asserted claims was obvious in light of the combination of (1) the RIMS System, the RIMS brochure, and/or U.S. Patent No. 5,712,989 and (2) the TV/2 System, the TV/2 brochure, and/or the TV/2 general information manual.

On January 12, 2011, Lawson orally moved for judgment as a matter of law of non-infringement.  (Tr. at 1359-366).  Lawson followed this oral motion with a written brief seeking judgment as a matter of law on non-infringement.  (Dkt. 574-75, 587-89).  On January 20, 2011, Lawson orally moved for judgment as a matter of law on invalidity.  (Tr. at 2614).  Lawson followed this oral motion with a written brief seeking judgment as a matter of law on invalidity. (Dkt. 574-75). On January 21, 2011, this Court heard oral argument on Lawson's motions for judgment as a matter of law.  (Tr. at 2824-60).   On January 24, 2011, Lawson filed a written brief seeking a judgment as a matter of law with respect to subject matter invalidity, and it supplemented its motion for judgment as a matter of law with respect to infringement.  (Dkt. 587-89).  The Court denied these motions.  (Dkt. 602).

III.   **SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE JURY'S VERDICT THAT THE ASSERTED CLAIMS ARE INFRINGED.**

   A.   **Substantial Evidence Does Not Support the Infringement Verdict for the Punchout Configurations.**

      1.   There is No Direct Infringer of the Asserted Method Claims.

As discussed in Lawson's initial JMOL motion, the jury did not have a legally sufficient basis to find that the Punchout configurations (Systems 3 and 5) infringe the asserted method claims, 26, 28, and 29 of the '683 patent.  (Dkt. 575 at 2-6).

Direct infringement requires ***a single party*** to perform every step of a claimed method. *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1379-80 (Fed. Cir. 2007); Jury

Instructions, Tr. at 3253:23-24).  Thus, for Lawson to be liable for direct infringement of the method claims, ePlus had the burden to prove that Lawson, itself, performed all of the steps of the claimed methods.  Lawson sells software to customers, who then use the software to procure items from third party punchout vendors.  There is no evidence in the record that Lawson performed the required method steps with regard to Punchout, or any other accused product.  For example, ePlus's expert Dr. Weaver never stated that Lawson performs the step of selecting punchout catalogs to search, or that Lawson searches for matching items, or that Lawson checks the punchout vendor's inventory.

Regarding direct infringement of the method claims by Lawson, Dr. Weaver only agreed with a conclusory statement that "when Lawson is hosting that software," it is "performing the method claims."  (Tr. at 775:3-16).  Conclusory statements are insufficient to prove infringement.  Indeed, Weaver made this conclusion immediately after admitting that in the hosting environment "the customer can go to the Lawson system and use it," which refutes direct infringing use by *Lawson*.  (*Id.*)  When Lawson hosts the software, ePlus's expert agreed with Lawson's fact witnesses that it is still the customer who uses the software.  (Weaver, Tr. at 546:8-16; Raleigh, Tr. at 941:16-942:24; Lohkamp, Tr. at 1036:24-1038:17).  Thus, there was no substantial evidence to support Dr. Weaver's conclusory statement that Lawson, itself, directly infringed the method claims when it hosts.

Dr. Weaver did not identify evidence that showed Lawson's customers *actually* performed any of these method steps, which is what he needed to do meet ePlus's burden to prove infringement.  *See, e.g., Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 775 (Fed. Cir. 1993).  Instead, Dr. Weaver opined that the software was *capable of being used* to practice the method steps.  For example, Dr. Weaver testified:

> Q. Does all five of the accused Lawson systems **have the ability to, capability of**
> building a requisition using data relating to selected matching items and their associated
> sources?
> A. Yes.
> Q. *Can* the **customers** perform that step with all five configurations that we've defined?
> A. Yes.

(Tr. at 800:14-21 (emphasis added)).  Showing a capability is not enough to prove anyone

practiced the method claims.

Moreover, with respect to the inventory steps of claims 26 and 29 of the '683 patent, Dr.

Weaver admitted that it is the third party vendor, not Lawson or its customers, who performs the

step of determining whether an item is available in inventory:

> Q. Is it true that in your examples the Staples and the Dell, not Lawson, would have
> control over checking out the inventory?
> A. That's true, the information comes from the Punchout partner.
> Q. Lawson has no idea what Dell or Staples has in inventory, right?
> A. Probably not.

(Tr. at 879:17-24; *see also* 573:3-9 ("So when we use the Punchout **capability**, **some of these**

**vendors** support the **capability** of reporting whether the item that you want is available in

inventory.") (emphasis added)).

Thus, the jury did not have a legally sufficient basis to find that anyone, let alone

Lawson, directly infringed the method claims because: 1) there was no evidence that anyone

actually performed the method steps; and 2) the steps are performed, if at all, by different

entities.[2]  ePlus did not meet its burden to show specific evidence that a single entity actually

performed every step of these claims.  Therefore, there is no direct infringement.  Because

---

[2] The Federal Circuit has recently ordered en banc rehearing in *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 2011 WL 1518909 (Fed. Cir. Apr. 20, 2011) and *McKesson Techs., Inc. v. Epic Sys. Corp.*, 2011 WL 2173401 (Fed. Cir. May 26, 2011).  To the extent ePlus may attempt to rely upon joint infringement, they have not proved that Lawson had direction or control as required by *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318 (Fed. Cir. 2008), and *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373 (Fed. Cir. 2007), which remain good law.

indirect infringement requires a direct infringer, Lawson cannot be liable for indirect infringement of these claims. *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1379 (Fed. Cir. 2007) (holding indirect infringement requires proof of direct infringer). Thus, this Court should grant judgment as a matter of law that Lawson does not directly or indirectly infringe the method claims of the '683 patent.

        2.    <u>Lawson Does Not Directly Infringe the System Claims.</u>

As discussed in Lawson's initial JMOL motion (Dkt. 575 at 4), the jury did not have a legally sufficient basis to find that Lawson's actions involving the Punchout configurations (Systems 3 and 5) infringe system claim 3 of the '683 patent or claim 1 of the '172 patent because Lawson does not make, use, offer for sale, or sell an entire, purportedly-infringing system. For example, claim 1 requires an item database relating to items associated with at least two vendors, and claim 3 requires multiple catalogs. ePlus asserted that the Lawson systems without Punchout had catalogs, but the jury rejected this claim, finding no infringement of any claim that required catalogs. ePlus also relied on external catalogs/item databases created and maintained by third party Punchout vendors to establish these elements in the Punchout configurations. (*See, e.g.,* Weaver, Tr. at 605:20-25, 606:19-21, 616:7-21, 618:24-619:5, 661:7-20, 573:22-23; Lohkamp, Tr. at 1130:19-1131:4). There is no dispute that the Punchout "external catalogs" are "external" to Lawson's software and "external" to the customer's computer system. ePlus admitted that Lawson's software does not include the search engine used to search for items within the Punchout vendor's catalogs. (Weaver, Tr. at 878:11-13; *see* Lohkamp, Tr. at 1140:5-13).[3] Moreover, as shown below the Lawson systems without Punchout

_____

[3] To the extent that ePlus may rely upon *Centillion Data Systems, LLC v. Qwest Commc'ns Int'l*, 621 F.3d 1279 (Fed. Cir. 2011), to argue that the customer is a single user of the system, this

do not infringe claim 1.  Thus, this Court should grant JMOL that Lawson does not directly

infringe claim 3 of the '683 patent or claim 1 of the '172 patent with the Punchout product.

      **B.**     **The RSS and Punchout Configurations Do Not Infringe the Means-Plus-Function Claims as a Matter of Law.**

The jury did not have a legally sufficient basis to find infringement of means-plus-

function claim 1 of the '172 patent and claim 3 of the '683 patent because Dr. Weaver's

conclusory allegations of infringement (Tr. at 797:13-15, 818:11-14, 1831:2-18, 1859:15-23,

557:17-558:7, 781:8-11, 797:16-19, 813:20-814:1, 557:17-558:7, 781:8-11, 797:16-19, 813:20-

814:1, 781:22-782:3, 797:20-24, 560:4-11, 797:25-798:3, 561:16-562:6, 798:4-11, 783:1-9,

793:1-7, 817:9-12, 813:22-814:1, 817:13-22, 818:15-20, 817:23-818:5, 815:16-25, 818:6-10) are

insufficient to meet ePlus's burden of proving infringement of these means-plus-function claims.

"An expert's unsupported conclusion on the ultimate issue of infringement will not alone create a

genuine issue of material fact."  *Intellectual Science and Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d

1179, 1184-86 (Fed. Cir. 2009).  Lawson incorporates its earlier JMOL arguments on this issue.

(Dkt. 575 at 6-10).

      **C.**     **The RSS Configuration Does Not Infringe Claim 1 of the '172 Patent.**

Claim 1 of the '172 patent requires a system that searches the selected portions of a

database.  Specifically, claim 1 has the limitations of (emphasis added):

- "a ***database*** containing data relating to items associated with at least two vendors maintained *so that selected portions **of the database** may be **searched separately***"; and
- "means for ***searching*** for matching items that match the entered product information *in the **selected** portions **of the database***."

This Court interpreted the function of the means for searching as:  "***searching*** for matching items

_____

would require a showing that Lawson indirectly infringed, and ePlus has not shown that Lawson
possessed the knowledge required to support a verdict of indirect infringement.

that match the entered product information *in the selected portions of the database*."  (Dkt. 204 at 49 (emphasis added)).

Dr. Weaver testified that "Lawson's database" is "the item master, the vendor item table, and the item location table."  (Tr. at 925:5-16).  Dr. Weaver's definition of Lawson's database did *not* include an index.  Yet Dr. Weaver testified that the "searching" element of this claim is satisfied when the *index, not the database*, is searched in Lawson's system.  Distinguishing the index from the database, he testified that the index is used to perform the claimed searching function, because such searches are "*faster than* sorts or searches performed on the *actual database*."  (Tr. at 706:13-16 (emphasis added)).

There is no testimony that Lawson's system searches portions of the *actual database*, let alone portions of that database that have already been selected.  To the contrary, the testimony was that the purported Lawson database is *not* searched *at all*.  (Weaver, Tr. at 925:5-16, 706:13-16).  Moreover, Dr. Weaver testified that the index as a whole, not mere selected portions, are searched.  (Tr. at 706-707).  Thus, there is no Lawson database which has "selected portions" searched.

The '172 patent supports the fact that an index is not the database in claim 1.  The patent addresses the issue of selecting portions of the database and performing searches.  The patent does not mention the term index.  Rather, the patent describes the selected portions of the database only as selected catalogs.  ('683 patent 9:55-10:21 (PX-001)).

Additionally, ePlus's infringement theory cannot be supported because it does not reflect the order of functions required by the plain meaning of the claims, consistent with the patent as quoted above.  *See E-Pass Tech., Inc. v. 3COM Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) (the step of "transferring a data set" must come before the later recited step of "storing said

*transferred* data set"). Here, the "means for searching" element of claim 1 refers to "select*ed* portions of the database." The ordinary meaning of the claim indicates that the searching function operates on portions of a database that are already selected *before* the searching occurs. There was no testimony that the search function was performed on database portions after they were "selected." Dr. Weaver never described searching any portion of a database after a portion of it was selected, but rather only discussed searching the keyword index. (Tr. at 711:1-10). Thus, claim 1 of the '172 patent cannot be infringed.

### D.   The Jury Did Not Have a Legally Sufficient Basis to Find Indirect Infringement.

As previously discussed, the jury did not have a legally sufficient basis to find that Lawson indirectly infringes any claims. (Dkt. 575 at 10-14). First, there is no indirect infringement because there is no direct infringer. (*Id.*) Further, the legal requirements for indirect infringement are not met. (*Id.*) That is still the case and Lawson incorporates its earlier arguments by reference.

That the indirect infringement limitation was not properly met is even clearer in light of the Supreme Court's May 31, 2011 *SEB* decision, which raised the bar for proving indirect infringement. Contributory infringement requires proof that the accused infringer offers a "component of a patented machine . . . *knowing the same to be especially made or especially adapted for use in infringement of such patent*, and not a staple article or commodity of commerce suitable for substantial noninfringing use." 35 U.S.C. § 271(c) (emphasis added). The Federal Circuit has instructed that for this requirement to be met, "plaintiff must show that defendant 'knew that the combination for which its components were especially made was both patented and infringing.'" *Cross Medical Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005). The Supreme Court announced in *SEB* that inducement under

8

271(b) also "requires knowledge of the existence of the patent that is infringed" and "knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, __ U.S. __, 2011 U.S. LEXIS 4022 at *20-21 (Sup. Ct. May 31, 2011). The decisions in *SEB* and *Cross Medical* show that, as a matter of law, Lawson cannot be liable for induced or contributory infringement for the time period *before* it had actual knowledge the patents-in-suit. The evidence at trial demonstrated that Lawson did not learn of the patents-in-suit until ePlus filed this lawsuit in May 2009. All Lawson witnesses testified that Lawson had no knowledge of the patents-in-suit or any possible infringement of the patents before suit. (Christopherson, Tr. at 1569:25-1570:4; Lohkamp, Tr. at 1079:6-9). There are no allegations in this case that Lawson had any access to ePlus's patented products, copied any aspect of those products, or reverse-engineered any aspect of the ePlus products. Dr. Weaver did not give any opinion regarding Lawson's intent to induce direct infringement.

ePlus cannot establish the requisite intent to infringe after this lawsuit was filed either. The only evidence at trial demonstrates that Lawson reasonably believed there was no infringement. (Christopherson, Tr. at 1572:5-1577:3). Moreover, Lawson reasonably defended itself at trial and argued that its products did not infringe. The jury agreed with Lawson on 27 of ePlus's 38 infringement assertions. Verdict at 1-3 (Dkt. 600). ePlus dropped its willfulness claim after trial, at least implicitly acknowledging there was no evidence of intent. (Tr. at 3295).

As such, substantial evidence does not support a verdict that Lawson had the requisite intent to commit indirect infringement. The jury verdict is entitled to no deference on this issue because it was based on a flawed, pre-*SEB* standard for intent. *See generally Adv. Di. Sys. v. Kent State Univ.*, 212 F.3d 1272, 1275 (Fed. Cir. 2000). Judgment as a matter of law should be granted in favor of Lawson.

**E.      ePlus Cannot Rely on the Doctrine of Joint Infringement to Support the Jury's Verdict.**

ePlus cannot rely on the doctrine of joint infringement at least because it dropped the theory in response to Lawson's JMOL motion during trial.  (Tr. at 1382:10-1384:10).  The jury was not given an instruction on joint infringement.  Further, the evidence at trial did not support the theory.  ePlus provided no evidence that the requirements of joint infringement, such as "control and direction" of the infringing acts by others, were met.  *See Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1324 (Fed. Cir. 2008).  Indeed, Lawson does not control or direct its clients or the Punchout vendors to perform any infringing acts.  (Weaver, Tr. at 875:4-879:24; Lohkamp, Tr. at 1020:14-23, 1131:5-1135:14, 1140:5-13, 1140:20-1441:3; PX-190).

**IV.     SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE JURY'S VERDICT THAT THE CLAIMS ARE VALID.**

Obviousness is a question of law based on underlying findings of fact that may be decided on a motion for judgment as a matter of law.  *See, e.g., Wyers v. Master Lock Co.*, 616 F.3d 1231, 1240 (Fed. Cir. 2010) (reversing the district court's order denying JMOL because the claims were obvious as a matter of law); *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1324 (Fed. Cir. 2008) (same); *Asyst Techs., Inc. v. Emtrak, Inc.,* 544 F.3d 1310, 1312 (Fed. Cir. 2008) (affirming district court's order granting JMOL that the claims were obvious).  The underlying factual inquires are (1) the level of ordinary skill in the pertinent art, (2) the scope and content of the prior art, (3) the differences between the prior art and the claims at issue, and (4) secondary considerations of non-obviousness.  *KSR Int'l v. Teleflex*, 550 U.S. 398, 406 (2007).

**A.      Claim 1 of the '172 Patent is Obvious Based on the Combination of RIMS + TV/2, and No Substantial Evidence Showed Otherwise.**

1.      The Level of Skill in the Art is not Disputed.

The parties agreed a person of skill in the art is "a college graduate with a degree in

computer science or something related, like electrical engineering, and would have a year or two

of practical experience with writing software and understanding the flow of information that is

necessary for the purchase of goods and services."  (Tr. at 507:16-509:1).  Such a person would

be more than capable of combining the TV/2 and Fisher RIMS (and/or the '989 patent) systems.

2.   <u>No Substantial Evidence Refuted that RIMS and TV/2 Are Prior Art.</u>

With respect to the second obviousness inquiry, the scope and content of the prior art, it

was undisputed at trial that the prior art included requisition and purchasing systems that could

build a requisition based on results of a search for items and generate a purchase order from the

requisition.  (Momyer, Tr. at 2071:13-22).  The prior art included the '989 patent and related

systems that allowed a user to search a database containing a single catalog to create purchase

orders that could be saved, printed, or faxed to a vendor.  (Momyer, Tr. at 2073:21-25; 2075:8-

23).  That single catalog could include products from multiple manufacturers.  (Momyer, Tr. at

2078:6-12).  The prior art included catalogs on CDs.  (Kinross, Tr. at 428:22-429:6).

a)   <u>The RIMS '989 Patent and System is Prior Art, and No Substantial<br>Evidence Showed the Contrary.</u>

By the early 1990s, there were many different examples of electronic sourcing systems,

including the Fisher-Scientific *R*equisition and *I*nventory *M*anagement *S*ystem disclosed in U.S.

Patent No. 5,712,989 ("RIMS" or "the '989 patent").  On April 2, 1993, Fisher filed a patent

application describing the RIMS system, which issued as the '989 patent.  (DX-007).  The '989

patent qualifies as prior art to the patents-in-suit under 35 U.S.C. § 102(e).

b)   <u>The Commercial RIMS System Available in April 1993 Was Also<br>Prior Art.</u>

In addition to being prior art under § 102(e), the '989 patent describes a commercial

RIMS system that ePlus admitted was "out in the market" and in use at customer locations in

11

April 1993.  (Momyer, Tr. at 233:9-19; 2084:23-2085:6).  At trial, Lawson showed that this April 1993 Fisher RIMS system (hereinafter the "RIMS System") was also prior art because it was: 1) on sale and in public use more than one year before the patents' filing date of August 10, 1994 (§102(b)); and/or 2) known or used by others before the invention (filing) date of the patents-in-suit (August 10, 1994) (§102(a)).

The RIMS System was a "commercial" requisitioning and inventory management system that Fisher offered to customers as a "value-added" service to increase sales.  (Momyer, 229:21-230:7, 233:9-13, 235:20-236:12, 2088:23-2089:1).  RIMS was first installed at customer sites in 1991 and used in the 1992-93 timeframe.  (Momyer, Tr. at 231:14-232:5, 2087:18-2088:7).

On April 30, 1993, Fisher filed a federal trademark application for RIMS for:

> computer based services for processing requisitions, entering purchase orders, maintaining inventory records, transferring related reports and data to other computers and generating documents for picking, packing, shipping, and receiving requisitioned and ordered products . . . .

(DX-61 at 5).  Fisher's Vice-President and General Counsel, Joanna O'Loughlin, swore under oath that the RIMS trademark was first used in interstate commerce for these computer services in April 1992.  (*Id.* at 6; (Ex. 3 - O'Loughlin at 2 (12:03-12:15), 3-4 (15:18-16:02), 9 (38:10-21)).  On April 30, 1993, Fisher filed the RIMS brochure with the U.S. Patent and Trademark Office to provide a specimen to show how the RIMS mark was being used in interstate commerce in connection with these computer services.  (DX-61 at 43).  The RIMS brochure is dated "3/93."  (DX-61 at 43).  Mr. Moymer admitted that the purpose of the RIMS brochure was to be publicly distributed at trade shows and handed out to Fisher's customers.  (Tr. at 378:16-379:1; *see also Ex. 3* - O'Loughlin at 9 (37:21-25)).  The RIMS brochure was developed in conjunction with people who knew what RIMS did.  (Momyer, Tr. at 379:10-12).

Mr. Momyer, a named inventor and ePlus's primary fact witness on the RIMS system,

admitted that the brochure was accurate when it said that RIMS "consolidates all supplier activity including third-party and administrative purchases." (Tr. at 381:4-7). Ms. O'Loughlin also testified that this statement was accurate. (Ex. 3 - O'Loughlin at 10 (39:7-18). The RIMS brochure said that RIMS could be used by a Fisher CSR or by the customer. (Tr. at 381:13-382:7). Mr. Momyer admitted that a customer could have used the RIMS system. (*Id.*) Mr. Momyer specifically identified only four things in the RIMS brochure that were not found in the commercial version of RIMS, none of which distinguishes any of the asserted claims of the ePlus patents. (Momyer, Tr. at 253:15-254:14).

ePlus's own witnesses and the documents admitted at trial that the commercial RIMS System as it existed by April 1993 (and thus was prior art) included at least:

- A host database (host database 20) that included items sold by Fisher. (Momyer, Tr. at 333:22-334:6, 339:10-340:12, 2117:23-2118:23; '989 patent, col. 3:16-4:3). The items in the host database included items manufactured by Fisher and items manufactured by others and resold by Fisher. (Momyer, Tr. at 243:3-9, 339:17-24).

- A parts master database (local database 50) on the customer's local computer. (Momyer, Tr. at 374:25-376:1; Johnson, Tr. at 471:2-18; '989 patent, col. 4:23-44).

- Multiple inventory sourcing – the ability to source items from the customer's inventory or Fisher's inventory. (DX-402; Kinross, Tr. at 2206:22-2207:4; '989 patent, col. 5:20-6:15).

- The ability to handle off-catalog items (type 04 products as described in the '989 patent) at the host computer. These were third party vendor products that were not in Fisher's catalog. The customer ordered off-catalog product with the RIMS system at the local computer – they would then be "sourced" by Fisher. Fisher would buy the product from the third party vendor and resell it to the customer. (DX-402; Momyer, Tr. at 355:13-356:25, 357:24-378:1, 2160:4-2161:17; Kinross, Tr. at 2202:24-2206:8; Shamos, Tr. at 2575:20-2577:25, 2595:6-19; '989 patent, cols. 3:61-4:3, 5:57-6:15, 31:55-60; Fig 1).

- The ability to find items in databases by part number. (Momyer, Tr. at 333:22-335:20). The '989 patent called this lookup a "search." (DX-7 ('989 patent, col. 8:40-61)).

- The ability to create a requisition using the results of a part number lookup.

13

(Momyer, Tr. at 238:18-239:5).

- The ability to generate a purchase order to Fisher from a requisition.  (Momyer, Tr. at 356:7-10).

- The ability to generate an "internal purchase order" recording an internal transfer of funds from the department requisitioning a product to the purchasing department that owned the product being purchased by the requisitioning department.  (Momyer, Tr. at 2114:18-24, 2115:22-2116:11; '989 patent, cols. 17:35-52, 18:4-15, Fig. 5A).  The commercial '989 patent called this transfer an "internal purchase order."  (Momyer, Tr. at 363:12-14, 2113:23-2114:17).

- The ability to check availability in local inventories and at Fisher's distribution centers.  (Momyer, Tr. at 2109:16-24; DX-402; '989 patent 3:18-21, 9:2-15).

- The conversion system for equivalent products as described in detail in the '989 patent.  (Momyer, Tr. at 2105:14-2108:10; '989 patent 31:59-34:67).

c)      The Prior Art TV/2 System, Manual, and Brochure.

ePlus's inventor witnesses admitted that TV/2 was a prior art system that existed before Fisher started working with IBM in 1993 on the commercial embodiment of the patents-in-suit (the "TV/2 System").  (Kinross, Tr. at 437:14-24; Momyer, Tr. at 302:1-7; 373:14-21).  The invention date is August 10, 1994.  (Tr. at 3270).  The application as originally filed on August 10, 1994 states that the TV/2 search program was "available from IBM" ('683 patent, col. 4:5-7) and thus admits that it was prior art.  *Riverwood Int'l Corp. v. R. A. Jones & Co.*, 324 F.3d 1346, 1354 (Fed. Cir. 2003) ("prior art may be created by the admissions of the parties.").  The patents show two TV/2 documents as "References Cited," one of which (the "IBM Technical Viewer/2 General Information Manual") is admitted to have a 1991 date.

The admissions by ePlus's witnesses at trial and the 1991 TV/2 prior art Manual disclosed to the Patent Office and listed on the patents demonstrate that the prior art TV/2 System as it existed before Fisher started working with IBM included at least:

- The capability of searching databases on a computer. (Kinross, Tr. at 439:22-440:3).

14

- The capability of putting multiple technical publications onto a single CD-ROM. (Kinross, Tr. at 442:10-14).

- The capability of searching a parts catalog:

  ***Parts Catalog:*** Special parts catalog functions that enable parts to be identified and selected. Applications can be written which, in conjunction with Technical Viewer/2, allow users to select parts by picking call out numbers on a diagram, or by selecting parts from lists. Hypertext links can be made to and from parts assemblies.

  (TV/2 Manual at 6 (copyright 1991) (DX-230) (emphasis in original)).

- The capability of doing keyword searches. (Kinross, Tr. at 443:9-12).

- Searching selected portions of a document (topics) or an entire document:

  ***Search:*** A search facility that can locate every occurrence of a word or phrase in either the current topic, a list of selected topics, the complete document, or another document. A global character can be used to search for a partial string.

  (1991 TV/2 Manual at 5 (DX-230)).

- A graphic user interface. (Momyer, Tr. at 2126).

- An application programming interface ("API") to allow TV/2 to communicate with and transfer information to another computer system:

  Technical Viewer/2 enables information provides to develop applications around the information to give added value to the user. For example, in addition to finding a part number from a parts catalog, **users can extract that information and transfer it electronically to their data processing system.** They can then make immediate online requests to stock availability and price information. By using a pointing device, such as a mouse, **the user selects and transfers data to another system** without needing to use the keyboard. In this way, typing errors are avoided when transferring part numbers.

  (1991 TV/2 Manual at 2 (emphasis added); Kinross, Tr. at 437:14-24).

> 3.    The Combination of RIMS and/or the '989 Patent and TV/2 Teaches All of the Elements of Claim 1 of the '172 Patent.

The third prong of the obviousness inquiry addresses whether there are differences

between the claims at issue and the prior art. Here, the admitted features of the prior art RIMS

and TV/2 systems and the '989 patent disclose every element of the asserted claims, so there are

no differences.  Claim 1 of the '172 patent, the only claim that does not require catalogs, recites:

1.      An electronic sourcing system comprising:
        [1] a database containing data relating to items associated with at least two
vendors maintained so that selected portions of the database may be searched separately
        [2] means for entering product information that at least partially describes at least
one desired item
        [3] means for searching for matching items that match the entered product
information in the selected portions of the database
        [4] means for generating an order list that includes at least one matching item
selected by said means for searching
        [5] means for building a requisition that uses data obtained from said database
relating to selected matching items on said order list; and
        [6] means for processing said requisition to generate purchase orders for said
selected matching items.

        a)      ePlus's Expert Admitted that TV/2 Included the First Three
                Elements of Claim 1

ePlus's validity expert, Mr. Hilliard, admitted that the TV/2 system included the first

three elements of claim 1:

In order to render Claim One of the '172 patent obvious, it would have to satisfy all of
the elements of the '172, Claim One. And because there are no catalogs in this case,
conceivably in this case TV/2 does bring something to the party. **It does bring the
ability to support portions of the database separately**.

**It does bring a means for entering product information that partially describes an
item**.  You can put a description in, and it can search on the description.
**And it does provides [sic] a means for searching for matching items that match the
product information**. **So it does in fact, the combination, satisfy three of the
elements,** but it doesn't bring anything to the combination with regard to satisfying the
other elements.

(Tr. at 2739:1-17 (emphasis added)).  Despite Mr. Hilliard's protests, there is no *bona fide*

dispute that the combination of RIMS and TV/2 includes the remaining elements.

        b)      RIMS or TV/2 Meet the Definition of an "Electronic Sourcing
                System."

Regarding the preamble, the Court defined an electronic sourcing system as "an

electronic system for use by a prospective buyer to locate and find items to purchase from

16

sources, suppliers or vendors." (Dkt. 204 at 28). The plain meaning of "source" as well as the specification and prosecution history of the patents show that the term "source" in this Court's definition of electronic sourcing system is broad enough to cover a third party vendor's inventory. Dr. Shamos testified that both RIMS and TV/2 meet this definition. (Tr. at 2428:12-2429:1, 2435:12-2436:19; *see also* DX-007).

TV/2 meets the Court's definition of electronic sourcing system. It is undisputed that the TV/2 product that was available before Fisher started working with IBM on the commercial embodiment of the patents-in-suit ("the Prior Art TV/2") could be used by a prospective buyer to search larges volumes of product information. (Momyer, Tr. at 2155:2-13; Kinross, Tr. at 2175:16-19). TV/2 could display information from multiple manufacturer's catalogs:

> Technical Viewer/2 is an electronic documentation program that any organization can use to produce and display large amounts of information. In particular, information providers (such as manufacturers) can use the program to make parts catalogs and service manuals available to users (for example, their sales and service agents) in an electronic (online) format.

(DX-230 at 1; Shamos, Tr. at 2435:12-2436:19). TV/2 also had a search facility: "So if you understand the TV/2 had catalogs and had a search facility, which would allow a prospective buyer to locate and find items to purchase." (*Id.*) However, Mr. Hilliard grudgingly admitted that the TV/2 Information Manual stated that it was designed to search multiple catalogs. (Tr. at 2751; DX-230 at 1). There was no testimony or evidence to the contrary. Mr. Hilliard admitted that TV/2 had the first element of claim 1, namely "a database containing data relating to items associated with at least two vendors maintained so that selected portions of the database may be searched separately . . . ." (Tr. at 2739:1-17). Thus, TV/2 met the Court's definition of an electronic sourcing system.

Dr. Shamos testified that RIMS also was an electronic sourcing system because it could be used to locate items to buy from multiple sources: 1) distributor (Fisher); 2) other suppliers

and distributors; and 3) third party distributors (vendors 37 and 38). ('989 patent, cols. 3:18-28; 3:32-37; and 3:62-4:3; Shamos, Tr. at 2428:12-2430:6 (Exh. 2, slide 27)). Mr. Kinross testified that by 1989, the RIMS system included "multiple inventory sourcing" that included either the customer's inventory or Fisher's inventory. (Tr. at 2206:22-2207:4). The 1993 RIMS Brochure accurately stated that RIMS "consolidates all supplier activity including third-party and administrative purchases." (Momyer, Tr. at 381:4-7; Ex. 3 - O'Loughlin at 10 (39:7-18)). Mr. Hilliard admitted that the RIMS system had a single source, namely Fisher, and did not dispute that the RIMS database included items that were owned and stored by third party vendors (Type 04 products) that could be shipped directly from the vendor's inventory to the customer. ('989 patent 5:37-45; Hilliard, Tr. at 2695:4-12; Shamos, Tr. at 2575:25-2576:12).

Moreover, the RIMS prior art taught use by a prospective buyer. The RIMS patent teaches operation by a customer service representative (CSR), just like the patents in suit, who acts on behalf of and under control of a prospective buyer. The RIMS brochure expressly teaches not only use by a CSR, but tells customers that "Your requisition or purchase order can be entered remotely by the people in your organization who will be using the product." (DX-61 at 6.)

The RIMS system prior art taught locating and finding items to purchase from multiple sources, namely Fisher's inventory, the customer's inventory, and third party vendor's inventory. It also taught use by a prospective buyer. Thus, RIMS was an electronic sourcing system as defined by the Court. There is no substantial evidence to support a contrary conclusion.

c)   <u>TV/2 Was Capable of Generating an Order List that Included Search Results.</u>

The evidence showed that TV/2 included the fourth element of claim 1 of the '172 patent. (PX-3). This Court defined "order list" to be "a list of desired catalog items." (Doc. No. 204 at

18

14).  The function of the fourth element is "generating an order list that includes at least one matching item selected by said means for searching."  (*Id.* at 50).  The corresponding structure includes structure from the TV/2 system: "a user interface operating on a computer through which a user may select from results from a search program or a search program that generates an order list of matching items, and their equivalents.  (*See, e.g.*, '172 patent 4:6-6:28, 7:66-8:13, 9:55-12:28, 18:23-50, Appendix VI, FIGS. 1-2 (describing local computer 20, graphical interface 254, search program 50, interface 60, "**TV/2 and search program 250**" (emphasis added))).

It is undisputed that TV/2 had a search engine that did keyword searching of technical documents that included parts numbers *before* the inventors of the patents-in-suit began working with IBM to develop the commercial embodiment of the patents-in-suit.  (Momyer, Tr. at 2121:9-12, 2150:24-2151:6).  It is undisputed that the TV/2 system had a graphical user interface *before* the inventors of the patents-in-suit began working with IBM to develop the commercial embodiment of the patents-in-suit.  (Momyer, Tr. at 2127:5-8; Kinross, Tr. at 2179:19-2180:3).  The 1991 TV/2 manual describes this function and structure exactly:

> For example, in addition to finding a part number from a parts catalog, **users can extract that information and transfer it electronically to their data processing system.**  They can then make immediate online requests to stock availability and price information.  By using a pointing device, such as a mouse, **the user selects and transfers data to another system** without needing to use the keyboard.  In this way, typing errors are avoided when transferring part numbers.

(DX-230 - TV/2 General Information Manual at 2).  The TV/2 Brochure indicates that you can select parts from catalogs to create a shopping list that can be transferred to a parts ordering system:

> You can also create a 'shopping list' just by selecting items and passing that list to another application. For example, you might select parts to be ordered from the exploded drawing in a parts catalogue. The parts list could then be sent directly to your parts ordering system - all without moving from your PS/2.

(DX-107 at G32-33)(emphasis added).  Dr. Shamos testified that this element was met by TV/2. (Tr. at 2492:2-22).  The structure is one of the structures specifically identified in the patents as corresponding structure in suit according to the Court's Markman Order.  (Tr. at 2492:23-2493:2).  Mr. Hillard admitted that TV/2 is a search program that has a means for searching for matching items.  (Tr. at 2739:1-17).  Further, he never rebutted Dr. Shamos's testimony and never explained why TV/2 does not satisfy this claim element.  Thus, the evidence showed that TV/2 met the fourth element of claim 1 and there was no substantial evidence to the contrary.

d)     RIMS Had a Requisition Module.

The evidence showed that RIMS included the fifth element of claim 1 of the '172 patent, namely a "means for building a requisition that uses data obtained from said database relating to selected matching items on said order list."  The Court defined "selected matching item" to be a "requisition item."  (Dkt. 204 at 21).  The function is "building a requisition that uses data obtained from said database relating to selected matching items on said order list."  (*Id.* at 50). The corresponding structure of this element is "a requisition module operating on a computer system having access to data in the database, and its equivalents."  (*Id.* at 51).  The structure the Court cited in the definition was RIMS.  (*Id.* at 51 ("describing various embodiments of requisition modules including requisition/purchasing system 40"); '172 patent 4:6-8 ("Electronic sourcing system 5 also includes a requisition/purchasing system 40, preferably but not necessarily the Fisher RIMS system")).

Dr. Shamos testified that the RIMS system included a requisition module that used data

from the database to build a requisition.  (Tr. at 2476:12-2477:11 (discussing a similar element in the '683 patent claim 3; Tr. at 2493 (indicating his analysis for claim 1 of the '172 patent is the same); *see also* DX-007).  Mr. Hilliard admitted that the RIMS system had a database and built requisitions from data in the database.  (Tr. at 2686-87).  The inventors admitted that RIMS was capable of building a requisition containing items from multiple inventory sources, as described above.

e)    <u>RIMS Generated Purchase Orders from a Single Requisition</u>

This Court defined the function of the last element of claim 1 of the '172 patent to be "processing a requisition to generate purchase orders for selected matching items."  (Dkt. 204 at 51).  This Court defined the structure as "a purchase order generation module operating on a computer system having access to the requisition, and its equivalents."  (*Id.*)  The  corresponding structure in the Court's definition included parts of RIMS.  (*Id.* ("requisition/purchasing system 40"); '172 patent 4:6-8).  The RIMS system had the ability to generate multiple purchase orders from a requisition using a purchase order generation module.  (Tr. at 2462:9-2464:2).  Specifically, Fig. 5A of the '989 patent shows that two purchase orders may be created from the same requisition:  a purchase order internal to the customer and a purchase order that is external to the customer.  (*Id.*)  The two common inventors of the prior art '989 patent (DX-7), incorporated by reference into the '172 patent, refer to this internal purchase order as a "purchase order" recording the sale of a product from one department in the customer to another.  (Tr. at 2596:1-2598:11, 2580:17-2582:1).  The '989 patent states:



**18**

by line by the respective computers before transmitting data to the other computer. Similarly, only one purchase order is generated for the requisition.

If the line item has a product type of 06, control is passed to block 334. As shown in steps 334 and 336, a Purchase Order record internal to the Customer may (at the option of the Customer) be created and printed out on printer 43 at this stage, recording a sale from the Customer's purchasing department to the requisitioning department or account. This internal purchase order can be used by the Customer's host computer in making accounting adjustments. Since the implementation of such an internal sale will vary depending on the Customer's own accounting software in a manner easily understood by one skilled in the art, these steps will not be further described here.

(DX-7 at 18, Fig. 5A (partial view); Tr. at 2596:1-2598:11).

Further, the '172 patent *also* refers to an internal purchase order as one of the three types of "purchase orders" that may be generated from a requisition as part of a preferred embodiment of the claimed invention:

> Once a requisition has been inventory sourced and accepted by the CSR, it can be converted to one or more purchase orders, as represented by step **114** in FIG. **3**. For example, the requisition represented by the Requisition Item Table **46** of Appendix IX, if accepted without further revision by pressing function key F6 ("ACCEPT"), would result in the generation of the following three purchase orders:
>
> A. Line **002** would be ordered from on-site distributor-owned inventory;
>
> B. Line **004** would be ordered from on-site customer-owned inventory (a transfer internal to the customer); and
>
> C. Lines **001** and **003** would be ordered, respectively, from Distributor's "DEL and "EDC" warehouses.

(PX-1 - '683 patent 15:19-33).  Mr. Hilliard acknowledged that the '989 patent calls an internal purchase order a "purchase order," but chose to ignore that fact by saying the patent is wrong. (Tr. at 2695:13-2696:9).  However, the language of the patent controls, and ePlus failed to raise a bona fide dispute of fact that the RIMS system generates purchase orders.

In sum, the evidence shows that TV/2 met *at least* the preamble and the first four elements of claim 1 of the '172 patent and that RIMS included *at least* the limitations of the

preamble and last two elements of claim 1.  There was no substantial evidence to the contrary.

### 4. The Evidence Showed an Express Teaching to Combine RIMS and TV/2.

Dr. Shamos showed that the TV/2 prior art documentation expressly taught that it could be combined with order entry and inventory management systems, like RIMS.  Indeed, it was specifically designed for combining with systems like the prior art RIMS system:



(Ex. 2 and Shamos, Tr. at 2436:20-2442:4).  Further, he showed that TV/2 had features that facilitated the ability to send a shopping list of desired parts to a parts ordering system, like RIMS.  These features included the fact that both TV/2 and RIMS ran on the OS/2 operation system.  Indeed, TV/2's application programming interface ("API") was designed to connect it to other systems, such as parts ordering systems.  (Shamos, Tr. at 2440:4-2441:6; Kinross, Tr. at 2194:4-9).

ePlus did not refute this evidence.  Mr. Momyer testified that Fisher selected the TV/2 because it could transfer its search results to another program like RIMS, where the results could be used for further processing.  (Tr. at 2154:16-2155:1).  Similarly, Mr. Kinross admitted that the

fact that TV/2 had an API and indicated that TV/2 could interface with a product like RIMS. (Tr. at 2198:3-16). Mr. Kinross testified that the technique used to interface RIMS and TV/2 was "known" at the time that they came up with the invention. (Tr. at 2197:8-11).

Dr. Shamos testified that it would have been obvious to combine TV/2 with RIMS, such as to use the matching items from the results of the TV/2 search to build a requisition in RIMS. (Tr. at 2476:12-2477:11). Mr. Hilliard said he was "not sure" it would be obvious to make this combination of RIMS and TV/2. (Tr. at 2785:8-2788:10). Thus, there was no *bona fide* dispute in the evidence that it would have been obvious to combine the RIMS and TV/2 prior art. Indeed, the TV/2 materials expressly taught combining it with parts ordering systems like RIMS.

5.     The Secondary Considerations Do Not Negate Obviousness

No amount of secondary factors related to purported commercial success or the like can erase the express teaching that TV /2 should be combined with a parts ordering system (such as the RIMS system). "Moreover, as we have often held, evidence of secondary considerations does not always overcome a strong prima facie showing of obviousness." *Asyst*, 544 F.3d at 1316 (affirming judgment as a matter of law on obviousness). When the other three issues—the level of skill in the art, the scope and content of the prior art, and the differences between the prior art and the claims—are not in dispute, and show the invention is obvious, that should end the inquiry on summary judgment. As stated in *KSR Int'l v Teleflex*:

> A 'patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what is already known into the field of its monopoly and diminishes the resources available to skillful men.' This is a principal reason for declining to allow patents for what is obvious. The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.

550 U.S. 398, 416, 427 (2007). In this case, the TV/2 literature expressly taught to combine it with an inventory management and parts ordering system, like RIMS. No amount of secondary

24

considerations can overcome that.

**B.      There is no _Bona fide_ Dispute in the Evidence that Claims 3 and 28 of the '683 Patent are Obvious Based on the Combination of RIMS + TV/2 Prior Art.**

Claim 3 of the '683 patent is similar to claim 1 of the '172 patent except that it

additionally requires:

> at least two product catalogs containing data relating to items associated with the respective sources;
> means for selecting the product catalogs to search;
> . . .
> means for converting data related to a selected matching item and an associated source to data relating to an item and a different source.

Claims 28 of the '683 patent is very similar to claim 3 except that it is a method claim.  The

above analysis is thus incorporated by reference.  The additional elements required by claims 3

and 28 will be addressed below.

### 1.      The TV/2 System Searched Catalogs.

The Court defined "catalog" as "an organized collection of items and associated

information, published by a vendor (which includes suppliers, manufacturers, and distributors),

which preferably includes a part number, price, catalog number, vendor name, vendor ID, a

textual description of the item, and images of or relating to the item."  (Dkt. 204 at 11).

It is undisputed that the prior art TV/2 product included the ability to search such larges

volumes of product information.  (Momyer, Tr. at 2155:2-13; Kinross, Tr. at 2175:16-19).  The

1991 TV/2 General Information Manual states it was designed to search for parts in parts

catalogs.  T/2 Manual at 6 (DX-230).  Mr. Hilliard did not contest these facts, but rather made

the irrelevant point that TV/2 was not sold _with_ catalogs loaded into the system.  (Tr. at 2711:25-

2712:13).  However, this is not a legal requirement for Lawson to prove invalidity of this claim

because the TV/2 General Information Manual (DX-230) is a printed publication under § 102(b)

that *described* the use of TV/2 with catalogs.  Thus, substantial evidence supports a conclusion

that the TV/2 prior art satisfied the Court's definition of "catalog."

        2.      The TV/2 System Was Capable of Searching Selected Catalogs.

The Court interpreted the function of this element as "to select the product catalogs to

search" and the structure as "a user interface that allows the user to select a catalog; a catalog

module that selects product catalogs based on preferences or history; a catalog search module

that identifies product catalogs or a combination thereof; and their equivalents."  (Dkt. 204 at 44-

45).  TV2 is the search program.  (*Id.* at 45 ("(describing search program 50 and

requisition/purchasing system 40)"); '172 patent 4:10-12 ("Preferably but not necessarily, the

Technical Viewer 2 search program ('TV/2'), available from IBM, is used as search program

50.")).  Only one catalog need be selected to be searched at one time.  (Dkt. 204 at 41).

The 1991 TV/2 Manual discloses that it could search different documents and could

search selected topics:

> **Search:**  A search facility that can locate every occurrence of a word or phrase in
> either the current topic, a list of selected topics, the complete document, or another
> document.  A global character can be used to search for a partial string.

(DX-230 - TV/2 Manual at 5).  Testimony at trial showed:

> Q That's now blown up on the page here. Can you explain, Ms. Eng, in your own words
> how the search function in the Technical Viewer system worked back in '92?
> A Well, you could just type in a word, so, for example, if you are looking in a parts
> catalog, you could type in beaker, and it would find all the list of beakers. It says here,
> you can even find it from a current topic, which is one section, or you can select several
> sections, or you can go through one catalog or go across multiple documents.
> . . . .
> Q What sort of user interface was used with a Technical Viewer/2 system back in the '92
> time frame?
> A It was graphical user interface.

(Eng, Tr. at 1966:11-19).  The inventors admitted that the TV/2 System did keyword searching

and that it had a user interface.  (Kinross, Tr. at 443:9-12; Momyer, Tr. at 2126).  Further, the

evidence at trial was undisputed that TV/2 had this capability before Fisher started working with

IBM.  Moreover, the 1991 TV/2 Manual disclosed selective searching of documents and said TV/2 can search catalogs.  As such, the evidence at trial showed that the means for selecting element and the selecting step of claims 3 and 28 of the '683 patent were disclosed by the 1991 TV/2 brochure. There was no substantial evidence at trial to allow the jury to reach a contrary result.

> 3. The '989 Patent Discloses Converting Data Relating to a Selected Matching Item and an Associated Source to Data Relating to an Item and a Different Source.

With regard to the means for converting of claim 3, this Court interpreted the function as "converting data relating to a selected matching item and an associated source to data relating to an item and a different source" and the structure as "one or more non-catalog databases identifying cross-referenced items, identical items, or generally equivalent items; one or more cross-reference tables or file identifying cross-referenced items, identical items or generally equivalent items; one or more codes corresponding to cross-referenced items, identical items or generally equivalent items. . . ." (Dkt. 204 at 48).  The corresponding structure cited in the construction again refers to structure from the RIMS system.  With regard to the converting step of claim 28, the Court interpreted that as "substituting data relating to a selected matching item and an associated source to data relating to an item and a different source."  (*Id.* at 31).

The court included "cross-reference tables" in the corresponding structure.  '989 patent dedicates over three columns to "cross-referencing" equivalent items having multiple corresponding part numbers from different vendors through the use of a Host Cross-Reference Table and a Local Cross-Reference Table.  (DX-7 - '989 patent 31:58-34:67 (Ex. 20)).

> The Host Cross-Reference Table includes, for each item regularly stocked or supplied by the Distributor (i.e., items of product type 01 or 03) a list of the corresponding part numbers of Distributor's vendor and other distributors (which are identified by a competitor number) **for items which have been determined to be equivalent**.  This

> relational database is created by the Distributor by, for example, reviewing the catalogs of other distributors and determining which items are equivalent to items in the Distributor catalog.

('989 patent 32:17-20 (emphasis added)).  This cross-reference table is used to convert a

competitor's part number for an item to Fisher's item number for the item:

> The next table host computer 10 searches contains the Distributor catalog numbers. Thus, if the data block contains a line representing a requisition for 02 540K, it will be recognized and host computer will proceed to sourcing 306 and pricing 308. **If, however, the data block contains a 20 line representing a requisition for 1000250 (Corning's part number for the beaker), a match will be found in the vendor cross reference file in host database 20 and that item converted to 02 540K for sourcing 306 and pricing 308.**

('989 patent 33:15-23 (emphasis added)).  Mr. Momyer testified that the RIMS system as it

existed in April 1993 had this conversion capability.  (Tr. at 2105:14-2108:10; '989 patent, col.

31:59-34:67).

ePlus admitted that the purpose of the RIMS cross-reference tables was to find equivalent

Fisher parts.  (Hilliard, Tr. at 2697:1-2698:23 ("The cross reference tables are basically a table

that's in there for the purpose of allowing Fisher to supply a Fisher item in place of an item that

has a competitor's product number."); Momyer, Tr. at 365:8-13, 2162:8-18, 2141:7-21 ("The

cross reference in the RIMS system was intended to be a means to do a look-up from a

competitor or vendor's catalog number, part number, over to Fisher, and always convert it to

that."); Kinross, Tr. at 2207:19-25).

ePlus argued that converting *to* Fisher part numbers is not "converting" as the claims

require.  (Momyer, Tr. at 365-367).  But this is a distinction without a difference that could have

only confused the jury, because the claims do not require conversion to any particular source.

Rather they require only that "data relating to a selected matching item and an associated source"

be converted to data related to "an item and a different source."  Conversions from a non-Fisher

source to Fisher squarely meet this requirement.  Thus, the conversion process and cross-reference tables described in the '989 patent meet the converting claim elements of claims 3 and 28 of the '683 patent.  There was no substantial evidence at trial which would allow the jury to reach a contrary result.

### C.  Claims 26 and 29 of the '683 Patent are Obvious Based on the Combination of RIMS + TV/2.

Claims 26 and 29 of the '683 patent differ from claim 28 in that they additionally require the step of "determining whether a selected matching item is available in inventory."  The remainder of the obviousness analysis for these claims is the same as described above in Sections IV(A) and (B) with respect to claim 1 of the '172 patent and claim 28 of the '683 patent.

The '989 patent discloses a system for checking availability in local inventories and at Fisher's distribution centers.  (Momyer, Tr. at 2109:16-24; DX-402; *see also* '989 patent 3:18-21, 9:2-15).  Mr. Hilliard admitted RIMS checked the customer's inventory and Fisher's inventory.  He argued, however, that the inventory that had to be checked under the claim was a *third party vendor's* inventory.  (Hilliard, Tr. at 2700-2702).  But this only confused the jury, as the claim language is not so limited.  There was no substantial evidence at trial that would allow the jury to reach a contrary result. Therefore, these claims are obvious.

### D.  The System Claims are Invalid Under 35 U.S.C. §112, ¶¶ 2 and 6.

For the reasons described in the briefing and argument on claim construction and in its motion for summary judgment (Dkt.  241 at 24-26 and 340 at 9-10), Lawson renews its motion for judgment as a matter of law (Tr. at 2928-2931) that claim 1 of the '172 patent and claim 3 of the '683 patent are invalid because they are indefinite under 35 U.S.C. § 112 ¶¶ 2 and 6.  These claims are written in "means-plus-function" format.  To properly construe means-plus-function

claims under 35 U.S.C. § 112 ¶ 6, a court must (1) identify the claimed function, which most often is simply the function recited in the claim following the word "means"; and (2) locate in the specification the precise structure that the patent identifies as corresponding to the recited function. *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007).

Where, as here, the structure for performing a claimed function is a computer programmed with software to carry out the claimed function, the corresponding structure under § 112 ¶ 6 must be sufficient to avoid indefiniteness under § 112 ¶ 2. *Encyclopedia Britannica, Inc. v. Alpine Elecs., Inc.*, 355 Fed. App'x 389, 395 (Fed. Cir. 2009). ePlus at least implicitly acknowledged this, as its proposed construction included a purported algorithm. However, the Court rejected both parties' proposed constructions, adopting broader constructions that failed to identify any specific algorithms to perform several of the claimed functions. *See id.* Indeed, the specification shared by the patents contains no such algorithm support. There are no issues of disputed fact. (Tr. at 2521-22). These claims, therefore, are indefinite under § 112 ¶ 2 as a matter of law.

### E.    The Asserted Claims are Invalid Under 35 U.S.C. § 101.

Lawson renews its motion for judgment as a matter of law (Dkt. 587-588) that the claims are invalid under 35 U.S.C. § 101 for the same reasons previously set forth in its summary judgment brief filed on July 7, 2010. (Dkt. 316, 351).

## V.    CONCLUSION

For all of the foregoing reasons, as well as those described in Lawson's claim construction briefing and argument, Lawson's motion for summary judgment, and Lawson's initial motions for judgment as a matter of law, Lawson respectfully requests that this Court enter

judgment as a matter of law in favor of Lawson on the issues of non-infringement and invalidity.

LAWSON SOFTWARE, INC.


By: _____/s/_____
          Of Counsel

Dabney J. Carr, IV, VSB #28679
Robert A. Angle, VSB #37691
**TROUTMAN SANDERS LLP**
P. O. Box 1122
Richmond, Virginia  23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com

Daniel McDonald (admitted *pro hac vice*)
William D. Schultz (admitted *pro hac vice*)
Rachel C. Hughey (admitted *pro hac vice*)
Andrew J. Lagatta (admitted *pro hac vice*)
Joshua P. Graham (admitted *pro hac vice*)
**MERCHANT & GOULD P.C.**
3200 IDS Center, 80 South Eighth Street,
Minneapolis, MN  55402
Telephone:  (612) 332-5300
Facsimile:  (612) 332-9081

Donald R. Dunner (admitted *pro hac vice*)
Erika H. Arner (admitted *pro hac vice*)
**FINNEGAN, HENDERSON, FARABOW,**
**GARRETT & DUNNER, L.L.P.**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 408-4000
Facsimile:  (202) 408-4400

*Counsel for Defendant Lawson Software, Inc.*

## CERTIFICATE OF SERVICE

I certify that on this 22nd day of June, 2011, a true copy of the foregoing will be filed electronically with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Craig T. Merritt
Henry I. Willett, III
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
cmerritt@cblaw.com
hwillett@cblaw.com

Scott L. Robertson
Jennifer A. Albert
David M. Young (VSB No. 35997)
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001
srobertson@goodwinprocter.com
jalbert@goodwinprocter.com
dyoung@goodwinprocter.com

*Attorneys for Plaintiff*

James D. Clements
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, MA 02109-2881
jclements@goodwinprocter.com

　　　　　/s/
Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
Megan C. Rahman (VSB No. 42678)
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
megan.rahman@troutmansanders.com
**TROUTMAN SANDERS LLP**
1001 Haxall Point
Richmond, VA 23219
Telephone:  (804) 697-1200
Facsimile:  (804) 697-1339
*Counsel for Defendant Lawson Software, Inc.*