# EXHIBIT 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                     RICHMOND DIVISION

 4

 5   ------------------------------------

 6   ePLUS, INC.                    :    Civil Action No.
                                    :    3:09CV620
 7   vs.                            :
                                    :
 8   LAWSON SOFTWARE, INC.          :    January 4, 2011
                                    :
 9   ------------------------------------

10

11           COMPLETE TRANSCRIPT OF THE JURY TRIAL

12          BEFORE THE HONORABLE ROBERT E. PAYNE

13        UNITED STATES DISTRICT JUDGE, AND A JURY

14   APPEARANCES:

15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001

20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23

24              Peppy Peterson, RPR
              Official Court Reporter
25          United States District Court
```

1   value-added systems.  What that really would do is it would

2   establish a good business relationship, partnership between

3   ourselves and our customers, and in many ways kind of lock that

4   customer in to doing business with Fisher.

5        We would do things like provide a customized invoice,

6   provide for remote order entry capabilities where the customer

7   themselves could enter the order, and these kind of things

8   would allow the customer to, in many ways, become more

9   efficient in their day-to-day operations as well as to reduce

10  their costs of operation.

11  Q    And do you understand one of the objectives then was to

12  promote the sale of Fisher product through these value-added

13  features you've mentioned?

14  A    Absolutely.

15  Q    Generally the goal of any business?

16  A    That's right.

17  Q    Now, you mentioned, I think, in one of your value-added

18  features that there was this inventory management aspect; do

19  you recall?

20  A    I didn't mention that.

21  Q    Okay, I'm sorry.  Did you have any value-added feature

22  that involved inventory management?

23  A    Yes, that was a value-added -- we did find a good tool to

24  allow us to get involved in a good relationship with our

25  customers, and what we do -- and we actually did this before we

Momyer - Direct

1    had a system to manage it.

2         We would put inventory, Fisher owned inventory at our

3    customers' site to allow them to -- and get those products and

4    use those products that are in the inventory for their daily

5    use, and that would allow them to very quickly have access to

6    inventory and not have to wait a day or so until the ordered

7    item would be delivered from a Fisher distribution center.

8    Q    I'd like to sort of focus, if we could, on how we got to

9    the inventions that are the patents-in-suit, the ones in issue

10   here, Plaintiff's Exhibit 1, 2, and 3 and what led up to the

11   inventors, yourself, as well as the other inventors that are

12   identified in the patent solving some of the problems that

13   needed to be solved.  Are you capable of doing that with me?

14   A    Sure.

15   Q    You mentioned this inventory management system where you

16   kept actual Fisher inventory at customers' sites.  Is that

17   Fisher-owned inventory?

18   A    Yes.  We actually -- initially it was Fisher-owned

19   inventory, but the system we developed actually would allow us

20   to manage the customers' inventory as well.

21   Q    What was that inventory management system called?

22   A    RIMS, R-I-M-S.

23   Q    And what did RIMS stand for, sir?

24   A    Requisition inventory management system.

25   Q    Just at a high level, can you tell me what RIMS could do?

Momyer - Direct

1    A     Sure.  The -- basically the RIMS system would keep track

2    of the inventory that was in the stockroom.  That inventory

3    could be both customer-owned or Fisher-owned and could keep

4    track of who pulled the product out, and would also -- keeping

5    track of the inventory, also determine if the inventory,

6    specific product had to be restocked.

7         So there was a component of the system that would allow us

8    to, based upon the order point and reorder quantity, would

9    actually reorder and transmit orders to Fisher to refill,

10   refill the stockroom for the products and how much was needed

11   in them.

12   Q     Did you help develop the RIMS system?

13   A     Yes, I did.

14   Q     When did you work on that RIMS system?

15   A     1989 would be probably when we started.  I think we had

16   our first installation around 1981.

17   Q     Did that RIMS system that you've generally described at a

18   high level go through various iterations or versions?

19   A     Oh, sure.  The first version that was put out there really

20   handled -- only handled recording of requisitions without

21   dealing with the inventory management.

22   Q     Let me just stop you there and say, approximately how many

23   iterations or variations did the system go through?

24   A     Dozens if not more than that.  The Fisher RIMS system was

25   in existence from 1991 all the way through until I left in

1    2003, and there were many iterations of that, and primarily

2    those iterations were based upon some unique requirements the

3    customer had or some business initiative that Fisher wanted to

4    undertake in the area of inventory control and inventory

5    management at a customer's site.

6    Q    Could you open to Plaintiff's Exhibit Number 10 that's in

7    your notebook, and I'd ask you if you could identify that

8    document for me.

9    A    That is a patent for a just-in-time requisition inventory

10   management system.

11   Q    Just-in-time requisition and inventory management system;

12   is that right?

13   A    That's correct.

14   Q    What does just in time mean in the context of that

15   invention?

16   A    If you think about what we were trying to do, tried to

17   explain a little bit when I talked about the invention itself,

18   the RIMS system, it is providing product to the customer when

19   they need it.

20        A very typical scenario would be a chemist who is doing

21   some research may need a reagent or a test tube, and it's very

22   critical they have it right away, so by putting inventory at

23   the customer's site, this would allow them to have inventory

24   just in time, just when they need it.  It is a value added to

25   our customers.

Momyer - Direct

1   Q    So this just in time has often been referred to as JIT?

2   A    JIT, yes.

3   Q    This ability to replenish product quickly, was that

4   something desirable on Fisher's part in order to service their

5   customers?

6   A    Absolutely.  Once again, it was value both to Fisher as

7   well as their customer.  As a result, I think it created a good

8   relationship, a good business partnership.

9   Q    On Plaintiff's Exhibit Number 10, this patent involving

10  just-in-time requisition and inventory management system, is

11  that something that you -- subject matter associated with this

12  commercial system you were discussing known as RIMS?

13  A    Yes.

14  Q    And I understood you to say that there were multiple

15  variations and iterations of RIMS; is that right?

16  A    That's correct.

17  Q    Are all those variations described in this patent, this

18  '989 patent, Plaintiff's Exhibit Number 10?

19  A    No.

20  Q    Let me just go back.  I should have done this earlier.

21  Are you one of the named inventors on this patent as well?

22  A    Yes, I am, number two.

23  Q    And there's also a Mr. James Johnson named on this '989

24  patent, Plaintiff's Exhibit Number 10; do you see that?

25  A    Yes, I do.

Momyer - Direct

1    Q    Do you know just from memory whether or not Mr. Johnson is

2    also a named inventor on Plaintiff's Exhibit Number 1, 2, and

3    3, the three patents issued in this case?

4    A    Yes, he is.

5    Q    I want to focus a little bit briefly on this RIMS system

6    and its functionality that you were talking to.  You mentioned

7    in the prior non-computerized world where someone would have to

8    pick up the phone and call in, there was a customer service

9    representative or a CSR.

10   A    That's correct.

11   Q    Was the CSR required in this RIMS system you are talking

12   about that Fisher utilized?

13   A    Yes, it was.  The RIMS system was entirely dependent upon

14   an on-site customer service rep to operate.

15   Q    What was the responsibility of that customer service

16   representative or CSR?

17   A    Twofold.  To manage the stockroom, or -- as well as take

18   the requisitions that the customers had for the, primarily for

19   the inventory that was in the stockroom.

20   Q    And what happened if one of the customers needed some

21   just-in-time inventory with this RIMS system?  How would that

22   work?

23   A    The customer would have to contact in some manner the

24   on-site customer service rep, and that contact would be

25   numerous ways.  They could make a phone call from the facility,

1   the customer facility.  They could come directly to the

2   customer service rep, or they could pass in the interoffice

3   mail a requisition form which would then come to the customer

4   service rep that way.

5   Q   When you say interoffice, we're not talking email or

6   something like that?

7   A   No, piece of paper.  Because in many cases what had to

8   happen was these requisitions would have to go through a level

9   of approval.  Any time you would take a requisition, in most

10   cases you're going to have to get some sign-off from some

11   supervisor along the way saying it's okay to buy this product.

12   Q   So in utilizing this RIMS system, there are number of

13   individuals who may need to be involved in the process

14   including the customer who wants to make the purchase, some

15   sort of intermediate approval, management, CSR, someone to fill

16   the item that's being desired; correct?

17   A   That's correct.  Now, that last step as far as picking the

18   product and delivering the product could be the same person.

19   Very often, it was with a customer service rep --

20   Q   Did Fisher charge its customers for this RIMS value-added

21   service you described?

22   A   It wasn't a for-sell product.  It was really a tool that

23   Fisher used to manage the on-site inventory.

24   Q   Did you ever try to sell this service to your customers?

25   A   No.  I will tell you it did provide some significant value

Momyer - Direct

1    to our customers, and that would be in a couple ways.  One is

2    the cost of ownership would be eliminated for the customer, so

3    if it's Fisher-owned inventory sitting there, the customer is

4    not going to have to pay any kind -- any taxes for that

5    inventory sitting around in a crib.  They don't have to pay for

6    it until they used it.  That's one; cost of ownership goes

7    down.

8         Secondly -- and often what would happen would be there

9    would be the ability for the customer to reallocate a person

10   who was taking orders at their site, procurement person, or

11   even reallocating a crib attendant to another job.  These are

12   Fisher personnel, Fisher paid for them.

13   Q    It had some benefits obviously therefor.  Did it have some

14   problems, some issues associated with it?

15   A    Yeah.  There would have been some problems with it.

16   Typically, if we take a look at the requisition itself coming

17   in, there often, if we had to seek approval on a req, it came

18   in from someone and we didn't know if that person had approved

19   req, we --

20   Q    Req?

21   A    Requisition.

22   Q    Okay, thank you.

23   A    We would have to -- very often a req, requisition would

24   come in with a piece of paper saying, give me a test tube, and,

25   of course, there are many types of test tubes.  So what the

Momyer - Direct

1    get it down, identification down to a Fisher product number,

2    catalog number.

3         That is the only way that the RIMS system was set up to

4    operate, to identify products.  You needed a Fisher part number

5    to input to start the process going.

6              THE COURT:  So I'm ordering from you, I call and tell

7    you, Mr. Momyer, I'd like to have such-and-such.  You talk to

8    me and tell me -- you are the CSR.  You tell me, well, that's

9    product number, our product such-and-such and such-and-such,

10   and you put it down, and you are using RIMS, I don't have it;

11   is that right?

12             THE WITNESS:  That's correct.

13   Q    You talked about the product number.  Are we talking about

14   Fisher product or other supplier product?

15   A    We're only talking about Fisher products at that time.

16   The RIMS system only dealt with -- primarily dealt with Fisher

17   products and Fisher products that Fisher purchased.

18   Q    And so if I wanted a specific product, did I need to know

19   the Fisher part number in order to be able to look up and find

20   out whether that was either available in inventory at the

21   customer site or perhaps back at some Fisher warehouse?

22   A    Yes.  The starting point for the whole process as far as

23   entering a requisition into the RIMS system was identify who

24   you were, and typically this would have been account number,

25   and then who the customer was, and then identify the product,

Momyer - Direct

1    and by the product identification, I think what you could put

2    in was the Fisher product number.

3    Q    Is that what you could enter in as a lookup feature for

4    the RIMS system?

5    A    Yes.

6              THE COURT:  Excuse me, Mr. Robertson.  I think we

7    need to change court reporters here.

8

9              (Recess taken.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MOMYER - DIRECT                243

1    distributor?

2    A    Yes.

3         THE COURT:  Did Fisher make anything?

4         THE WITNESS:  Yes, about a third of the

5    products that it sold it manufactured.

6         THE COURT:  And it bought two-thirds of the

7    other products it sold from other people and kept them

8    in inventory or had some arrangement to get it to

9    them?

10        THE WITNESS:  That's correct.

11   Q    What is this mainframe or host computer you

12   described, sir?

13   A    Well --

14   Q    The one specifically we're talking about used in

15   this RIMS system back in the late '80s and early

16   '90's?

17   A    It would have been an IBM computer running an NBS

18   operating system.  I don't know if that helps or not.

19   Q    Well, but was it able to communicate with a local

20   computer or something located --

21   A    Absolutely.  We talked about it.  There was a

22   dataline between the RIMS computer and this mainframe.

23   And that dataline allowed for the interaction,

24   electronic interaction, between two computers.

25        You basically -- the program would say, I need to

1   Q   When you say "source it," do you mean source it

2   from Fisher?

3   A   It's always sourced from Fisher.   I'm sorry.   It's

4   provide availability of this product.   Where is it

5   stored within the Fisher distribution network.

6           THE COURT:   As you're using "source," it

7   means where it is?

8           THE WITNESS:   In this instance, yes.

9           THE COURT:   Where it is within the Fisher

10  system?

11          THE WITNESS:   That's correct.

12  BY MR. ROBERTSON:

13  Q   Since this was Fisher-owned inventory, wherever it

14  was kept, whether it was at Fisher warehouse or at a

15  customer-owned warehouse or stockroom, how did Fisher

16  go about getting paid for these items?

17  A   Well, actually, if it's Fisher-owned inventory,

18  which means we own it.   It's sitting at the customer

19  site.   The customer hasn't purchased it yet.   Whenever

20  the product is pulled off the shelf and was recorded

21  in the RIMS system, that would kick off another

22  transaction, which would be sent off to the Fisher

23  mainframe, which would say, Bill this customer for

24  this product.

25          So the issuing of a Fisher-owned item in a RIMS

1  technical people in utilizing the RIMS system you have

2  been discussing?

3  A    No.  No, it would not have been.

4  Q    Do you know whether or not, if you want to just

5  peruse the document, whether it's actually discussing

6  all the features of the RIMS system?  I can direct you

7  to the page that ends 598, for example.

8  A    Some of them features were in the RIMS system.

9  Many of them were put in various releases of the

10 product.  Some of the features were not actually

11 employed.

12 Q    When you say not actually employed, you mean never

13 employed by the RIMS system?

14 A    No.

15 Q    When you say no, you mean that statement I just

16 made was correct?

17 A    That's correct.  The statement you made is

18 correct.  We never did those.  I think we had some

19 aspirations to do them, but we never pulled them off.

20 Q    So could you just give me an example, if you

21 would?

22 A    Under requisition management features, four down,

23 "Allows flexible remote requisitioning by formatted

24 screen," we really never provide for remote

25 requisitioning in the system.

1   Q     Anything else?

2   A     The third point down in that requisition

3   management features, that's really kind of a bold

4   statement there.  We did not interface all types of

5   purchases.  We did have some interfaces.  As I can

6   recall we had two interfaces that we developed, but it

7   wasn't all types.  So it was somewhat restrictive.

8        Under "Inventory Control Features," if you take a

9   look at "Utilizes customized bar codes and labels to

10  expedite your receiving process," that feature was

11  talked about but never implemented.

12       And then finally under "System Customization

13  Features," we did utilize some file transfers, but we

14  never got to the point we used EDI.

15  Q    Was the RIMS system then, the RIMS system that

16  Fisher created, and I think I understood you to say

17  went through many iterations, was that ever made

18  publicly available, the technical information?

19  A     No.

20  Q    If I wanted to learn more about the RIMS system in

21  the early '90s, would I have been able to do so?

22  A     If you were an employee of Fisher.

23  Q    Was it maintained proprietary and confidential to

24  Fisher?

25  A     Yes.

258

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - - - - -
                                    :
ePLUS, INC.,                        :
                                    :
                 Plaintiff,         :
                                    :   Civil Action
       v.                           :   No. 3:09CV620
                                    :
LAWSON SOFTWARE, INC.,              :
                                    :   January 5, 2011
                 Defendant.         :
- - - - - - - - - - - - - - - - - -:


COMPLETE TRANSCRIPT OF **JURY TRIAL**
BEFORE THE HONORABLE ROBERT E. PAYNE
UNITED STATES DISTRICT JUDGE, AND A JURY


APPEARANCES:

Scott L. Robertson, Esq.
Jennifer A. Albert, Esq.
**Michael T. Strapp, Esq.**
**David M. Young, Esq.**
GOODWIN PROCTOR
901 New York Avenue, NW
Washington, D.C.   20001

Craig T. Merritt, Esq.
CHRISTIAN & BARTON
909 E. Main Street, Suite 1200
Richmond, VA   23219-3095

      Counsel for the plaintiff ePlus


            DIANE J. DAFFRON, RPR
           OFFICIAL COURT REPORTER
         UNITED STATES DISTRICT COURT

1  Q    Do you know approximately when that was?

2  A    1993.

3  Q    Did you have an understanding whether this TV/2

4  program was commercially available when you had that

5  initial meeting with the IBM people?

6  A    It's our understanding it was commercially

7  available, yes.

8  Q    Did you sign a confidentiality agreement with IBM?

9  A    Yes.

10 Q    Just if you could just say yes or no for now.

11 I'll follow-up with a question.

12 A    Yes.

13 Q    Why don't you take a look at Plaintiff's Exhibit

14 No. 13 in your book.  Tell me if you can identify what

15 that is.

16 A    That's a confidential agreement with IBM.

17 Q    That was an agreement, if you look at page 2, for

18 exchange of confidential information.  Do you see

19 that?

20 A    That's correct.

21 Q    And the customer name in the block at the lower

22 right-hand side, do you see that?

23 A    Yes.

24 Q    Can you recognize that signature?

25 A    It would be Frank Melly.

Momyer - Cross

1    deal with that on redirect.

2            THE WITNESS:   Okay.

3    Q    Now, with respect to the RIMS system, Mr. Momyer, that was

4    described in a patent application in April of '93; correct?

5    A    Yes.

6    Q    If you need some help on that, I believe it's Plaintiff's

7    Exhibit Number 10 in your notebook that ePlus gave you.   That's

8    the RIMS patent.   The filing day was April 2nd, '93, for the

9    RIMS patent?

10   A    Yes.

11   Q    So at least whatever features the RIMS patent had as of

12   that April '93 date, it's fair to say that those features are

13   pretty -- that description is a pretty comprehensive

14   description of RIMS as it existed in April of '93?

15   A    There were some things that weren't developed that were in

16   the patent.

17   Q    But they were described in the patent as something you

18   were going to develop?

19   A    They were described as being in the patent but not that we

20   were going to develop.   They were things that as of '93, as

21   of -- really have never been developed yet.

22   Q    You at least describe some functionality that you had

23   conceived of at that time; right?

24   A    Yes.

25   Q    That's more than a year before the August '94 filing date

Momyer - Cross

1    on the patents involved in suit here; right?

2    A    Yes.

3    Q    Before April of '93, is it true that the RIMS system could

4    search for items using a catalog search?

5    A    The search would be significantly different than the

6    search in electronic sourcing.

7    Q    Well, you are not saying that with respect to the claims,

8    are you?  I'm just asking you, didn't the RIMS system have

9    searching by part or catalog number?

10   A    It did look up by part.

11   Q    Didn't it have searching by part or catalog number in it?

12   A    I guess you need to define what you mean by search.

13   Q    Didn't you, in your own patent, because you were one of

14   the inventors --

15   A    Search in that case would be a product lookup.

16   Q    Let me finish my question, please.  As one of the

17   inventors who also signed off on the RIMS system, isn't it true

18   that you describe that search by part number as a search, not

19   just a lookup; right?

20   A    It did say that, yes.

21   Q    Your application said that; right?

22   A    Yes.

23            THE COURT:  Is there some difference between a search

24   and a lookup?

25            THE WITNESS:  Yes.

Momyer - Cross

1    Q    If we turn to the exhibit tab ten, the RIMS '989 patent,

2    if we go to figure three of that patent.

3    A    Which patent are you in?

4    Q    Exhibit 10 which is the RIMS patent.

5              THE COURT:  The RIMS patent which you have in front

6    of you, and he wants to go to figure three which is on the page

7    that has 1899 at the bottom of the right-hand corner.

8              THE WITNESS:  I see it.

9              MR. McDONALD:  If you can blow up the top four boxes

10   on that page, please.

11   Q    So didn't you say there in box 202 that one of the steps

12   here of the process after the customer service representative,

13   or CSR, enters the stock number, and that gets entered into the

14   requisition item table, that the local computer searches the

15   parts master table for a stock number?

16   A    It searches the part master table, yes.

17   Q    Part master table, I'm sorry.  So you did describe that as

18   being a search within the part master specifically in RIMS;

19   right?

20   A    Correct.

21   Q    That was a search for matching items; right?

22   A    It was a search for specific item.

23   Q    An item that matched the part number you put in; right?

24   A    Yes.  An exact match.

25   Q    Okay.  Now, was that parts master in the RIMS system,

Momyer - Cross

1    that right?

2    A    That is a distinction, yes.

3    Q    So that RIMS parts master isn't the same thing as the

4    catalogs you had in mind as the invention for these patents in

5    this suit; right?

6    A    I don't think so.  For me, no they aren't the same.

7    Q    Again, the parts master, that's the same sort of thing as

8    an item master; correct?

9    A    Yes.

10   Q    Now, that RIMS system, it also had another database I

11   think you mentioned at the host which would be the distributor;

12   right?

13   A    Yes.

14   Q    And the way you guys used it, that would be at Fisher;

15   right?

16   A    Yes.

17   Q    Now, at that host database, did that database have a list

18   of products that Fisher sold?

19   A    Yes.

20   Q    Now, I think you mentioned about a third of Fisher's

21   products were made by Fisher, and two-thirds came from other

22   places; is that right?

23   A    Yes, but they still -- lists were still parts that Fisher

24   sold.

25   Q    Okay, fair enough, but Fisher was a distributor.  They

1    would acquire the product from another source, a manufacturer,

2    for example; correct?

3    A    Correct.

4    Q    Then they would turn around and then, in effect, resell

5    that product to the Fisher customers; is that how that worked?

6    A    That's correct.

7    Q    So that Fisher catalog had items that were actually made

8    by Fisher as well; correct?

9    A    That's correct.

10   Q    And then products made by somebody else that Fisher

11   resold; right?

12   A    Which is typical distributor operation.

13   Q    Now, did you consider that database at the host in the

14   RIMS system to be multiple catalogs published by vendors?

15   A    No.  It was a single parts table.

16   Q    Okay.  Did you consider it to be a single catalog

17   published by Fisher as a vendor?

18   A    Once again, I didn't, wouldn't consider it a catalog

19   because I have -- in my mind, a catalog involves some larger

20   textual description as well as some image or picture that

21   represents, gives further meaning to the product.

22   Q    It is the reason why you have that description of a

23   catalog in your mind, because that additional information helps

24   people select the products in the catalog to buy?

25   A    That's right.

Momyer - Cross

1   Q    Now, isn't it true that wasn't really a change from the

2   old RIMS system, the idea of generating requisitions in terms

3   of getting to the patents involved in this suit?

4          THE COURT:  Wait a minute.  That question was all

5   right until you add the prepositional phrase that you tacked on

6   at the end, so do it over again.

7          MR. McDONALD:  All right.

8          THE COURT:  Then it became a different issue.

9   Listen, are we going to pay attention to the questions over

10  there, folks, get with it?  Let's go.

11  Q    Mr. Momyer, would you agree that the RIMS system, the old

12  RIMS system that predates the patents here, that could build

13  requisitions?

14  A    For a single source.

15  Q    Well, we'll get to the source issue in a moment, okay, but

16  can just you answer --

17         THE COURT:  The answer is yes for a single source; is

18  that right?

19         THE WITNESS:  Yes.

20  Q    Isn't it true that the RIMS system had in it the data that

21  would relate to products that came from third-party vendors

22  other than Fisher?

23  A    You would always order products through Fisher.  So those

24  third-party products would have been purchased through Fisher.

25  Q    So those third-party products were -- there was a

1   third-party source for those products that Fisher acquired them

2   from; right?

3   A    Third party being parts that weren't in the Fisher parts

4   master.

5   Q    With that definition, are you agreeing with me then that

6   the RIMS system did allow Fisher to source products from

7   third-party sources?

8   A    No.

9   Q    So where did Fisher get those other products from?

10  A    The RIMS system lodges source from Fisher.  The Fisher

11  host system would determine where you would buy those products

12  from.

13          THE COURT:  You are using the word "you" in your

14  answer.  I understood from your testimony earlier that it was

15  the Fisher customer representative who had access to the

16  catalog.  Is that the "you" you are talking about, or are you

17  talking about some other "you"?

18          THE WITNESS:  I apologize.  I wasn't sure where I

19  used the word "you."

20          THE COURT:  You said you would source it.  I thought

21  -- the customer rep was the one doing the sourcing, wasn't he?

22          THE WITNESS:  Yes.

23          THE COURT:  I would call you.  You are the customer

24  rep.  You say -- I say, I want a beaker.

25          THE WITNESS:  Yes.

Momyer - Cross

1   A    No.  It would pass data up to a host program which are

2   figure 2B, number 120 purchase order.  That's what would build

3   the purchase order.

4   Q    So this sentence that I just read made it sound like it's

5   the local computer --

6        THE COURT:  Wait a minute now.  You're not

7   testifying.

8   A    I understand that.  I understand how that reads, but it's

9   a transaction -- purchase order build program initiates the

10  purchase order program.

11  Q    Okay.

12  A    Which is on the host and builds on the host.

13  Q    So we're talking about the RIMS system now; correct?

14  A    Correct.

15  Q    The RIMS system includes both the local computer and a

16  host computer; right?

17  A    The invention does say that, yes.

18  Q    So the RIMS system, as a whole, generates purchase orders;

19  correct?

20       MR. ROBERTSON:  Object to the form of the question,

21  Your Honor.

22       THE COURT:  What do you say?

23       MR. McDONALD:  I think it's a good form.

24       THE COURT:  You all really helped me with that one.

25       MR. ROBERTSON:  Well --

Momyer - Cross

1          THE COURT:  What's objectionable to the form?

2          MR. ROBERTSON:  As a whole?  I don't understand what

3    that means, the RIMS invention as a whole.

4          THE COURT:  Is your objection then it's ambiguous?

5          MR. ROBERTSON:  Yes, sir.

6          THE COURT:  Sustained.

7    Q    Mr. Momyer, would you agree that the RIMS system, which

8    includes both the local computer and a host computer, generates

9    purchase orders?

10   A    Yes.

11   Q    And the sentence talks about product types 01, 03, and 04;

12   do you see that?

13   A    Yes.

14   Q    And do you know what those types are?

15   A    Yes, I do.

16   Q    What are they?

17   A    If product type 01 is a customer-owned inventory, that's

18   locally represented, stored locally.

19   Q    Okay.

20   A    On a customer's site.  03 is a product type which is a

21   product that's stored, would be stored within one of Fisher's

22   warehouses, and 04 would be a product that would be -- an off

23   catalog product that would be sourced from another vendor.

24   Q    Would be sourced from a third party; correct?

25   A    Yes.

Momyer - Cross

1    Q    In fact, if you turn to column six of the '989 patent,

2    Exhibit 10, which is page 17 of Exhibit 10.

3    A    Column six?

4    Q    Yes.

5    A    What are the lines again?

6    Q    I haven't given lines yet.  We have column six, page 17 of

7    Exhibit 10.  I want to help you get there first.

8    A    I got it.

9    Q    Okay.  Then you see there there's a table that actually

10   begins at the bottom of column five and continues at the top of

11   column six; correct?

12   A    Correct.

13   Q    And the product types 01 and 02 are defined at the bottom

14   of column five; correct?

15   A    Yes.

16   Q    And then the other product types, 03, 04, 05, and 06,

17   they're all at the top of column six; right?

18   A    Yes.

19          MR. McDONALD:  Could you blow up the column six

20   portion of that table, please.

21   Q    So it has those types 03 and 04 that we were just talking

22   about; correct?

23   A    Yes.

24   Q    So 04, third-party item the distributor orders, that's

25   what you were just talking about in terms of sourcing; correct?

Momyer - Cross

1    A    Correct.

2    Q    Now, is it true that when the system generates purchase

3    orders, it even generates purchase orders when it's part of the

4    customer's own inventory sometimes?

5    A    Are we talking about product type 05?

6    Q    Not necessarily.  Isn't it true that there are certain

7    types of products that even if they are owned by the customer,

8    the RIMS system would generate purchase orders for them?

9    A    If I can give a little clarification.

10         THE COURT:  If you don't understand the question --

11         THE WITNESS:  I understand the question, but I wanted

12   to clarify the answer that I'll be giving.  If it's

13   customer-owned inventory, you can designate that inventory as,

14   to replenish in two ways.  One is to replenish and order the

15   product from Fisher, because in many cases the products that

16   the customers owned would be bought from Fisher, so that would

17   be one way to replenish.

18         The second way is it's customer-owned, and it's

19   really sourced by the customer and in the customer's system.

20   The product, local inventory product that is to be replenished

21   by ordering from Fisher would generate a purchase order to

22   Fisher.  Ultimately, through that process, where you go through

23   and you create -- the purchase order build goes and talks to

24   the host program which goes and builds the purchase order, but

25   that would be a Fisher order.  The second one, there is no

Momyer - Cross

1   purchase order created within RIMS.

2   Q    Well, in the RIMS patent, doesn't it say that when it is a

3   customer internal transaction, a purchase order is created and

4   printed?

5   A    No.  As a matter of fact, I think it states somewhere in

6   that patent that it is not an order, that it's something that

7   is -- it's only there for record-keeping.  Let me see if I can

8   find that.

9   Q    Can you turn to figure 5A --

10           THE COURT:  Wait a minute.  He's looking for what he

11  wants to tell you.

12  A    Take a look at column 11 starting at line 14.  Items of

13  product type 05, the CSR may order the item for the customer.

14  These orders are not placed or filled using the system of the

15  present invention, although data regarding these transactions

16  may be entered on non-catalog information data 80 to record

17  these transactions.

18           Instead, either the proposed purchase order record is

19  uploaded into the customer's computer for processing or a

20  document is printed at local printer 43 for signature and

21  action by the customer's purchasing agent or the CSR confirms

22  that the order has been placed with the designated vendor by

23  some other means.

24  Q    Okay, so --

25           THE COURT:  So that described what you were talking

Momyer - Cross

1    about when you testified respecting what happens when there's

2    an order placed for a customer, an item in the customer's

3    inventory that was not bought from Fisher originally.

4              THE WITNESS:  That's correct.

5              THE COURT:  And there's no purchase order generated

6    in that situation.

7              THE WITNESS:  That's correct.

8              THE COURT:  But when -- there's a purchase order

9    generated when the item supplied as a purchase is an item

10   bought from Fisher, and there is a purchase order so that that

11   same product goes back into the inventory.

12             THE WITNESS:  That's correct.

13             THE COURT:  Is that right?

14             THE WITNESS:  That's correct.

15   Q    So customer orders from Fisher, RIMS generates a purchase

16   order; right?

17   A    A single purchase -- a purchase order to Fisher.

18   Q    And even if Fisher is getting it from a third-part source,

19   the customer is ordering it from Fisher, and a purchase order

20   is generated in that situation as well; right?

21   A    What happens is that order that's created, it's a purchase

22   order that is transmitted from RIMS for the customer, and it

23   is -- Fisher bills the customer for that third party, so it is

24   sourced outside of the PO.  PO is -- a single PO for Fisher,

25   and the customer pays Fisher for that product.  So that -- it's

1   PO to Fisher.

2   Q     By PO, you mean purchase order?

3   A     Purchase order.

4   Q     You were just talking about type 05.  Is that the one

5   where it's the proposed purchase order that's generated?

6   A     That's what we just talked about.

7   Q     That's a proposed purchase order that's generated in that

8   case; right?

9   A     Yes, but all the other product types we're talking about

10  in RIMS, the PO that's sent up from RIMS builds an order for

11  that customer, and the customer pays for that.  Any items are

12  bought by Fisher, the customer pays Fisher for that, so,

13  therefore, POs to Fisher, single source.

14  Q     How about types 06?  That's the situation where it's a

15  customer-owned item, but in some cases, even then the RIMS

16  system would generate a purchase order for that customer;

17  right?

18  A     That's exactly the same -- we're talking about that

19  replenishment type.  It could be a customer-owned inventory,

20  and it could be either an 05 or an 06, an 06 being it's

21  customer-owned, but basically Fisher buys it for them.

22  Q     Isn't it true that for that type 06 product, the RIMS

23  system, as described in the RIMS patent, calls that a purchase

24  order, doesn't it?

25  A     Purchase order to Fisher.

Momyer - Cross

1    Q    Well, I'm talking about the type 06 now, the internal

2    customer transaction.

3    A    No.

4    Q    That is --

5    A    It's kind -- let me try to explain this.  If it's a

6    customer-owned inventory, there are two ways to replenish that

7    inventory.  You can replenish it by buying product from Fisher,

8    or you can replenish them by this administrative thing, this

9    05.  Those are the only two ways.

10        So in the customer's stockroom are products that are

11   either purchased by Fisher for the customer or items that the

12   customer buys for themselves and just sticks in the stockroom.

13   Q    Could you turn to figure 5A of the RIMS patent,

14   Exhibit 10, which is page 11, please.

15        MR. McDONALD:  Could you blow up the box, the diamond

16   beginning at 332 and going down to the box 336.

17   Q    This is a flow chart; right, Mr. Momyer?

18   A    Yes.

19   Q    And it's depicting the RIMS system and how it accepts a

20   source requisition; correct?

21   A    Correct.

22   Q    So we got this diamond here that asks a question in the

23   system whether it's type 01, 03, or 04; correct?  That's the

24   diamond number 332?

25   A    Yes.

Momyer - Cross

1    Q    If the answer is yes, it goes to the right in this figure,

2    and if the answer is no, it goes to the left; right?

3    A    Yes.

4    Q    And so if it's a type 05 or 06, it goes to the left;

5    right?  Excuse me, I'll rephrase that.  If it's a type 05 or

6    06, it goes to left into that diamond 334; correct?

7    A    Correct.

8    Q    And what is the purpose of diamond 334 for those types, 05

9    and 06?

10   A    Excuse me.  05 and 06 are the replenishment types that

11   have identified for customer-owned inventory.

12   Q    This diamond is asking whether or not there should be an

13   internal purchase order generated for the customer; right?

14   A    That's internal PO.

15   Q    If the answer to that question is yes, then the RIMS

16   system, as described in Exhibit 10, creates and prints purchase

17   order internal to customer; correct?

18   A    That would be the 05.  This is not a well-constructed flow

19   chart.  If it's customer internal PO, it creates and prints

20   purchase order internal -- create -- the other part that I read

21   is what happens on that, and that basically would be an NO

22   five.  It does not -- you are looking to say create, you mean

23   building a purchase order.  It isn't building a purchase order.

24   I read in the patent what it does with the 05.

25   Q    06 also goes through this flow though, doesn't it, because

Momyer - Cross

1   it's going to be a no to the question of whether it's a product

2   type 01, 03, or 04; correct?

3           THE COURT:  The question is, if the order is of 06,

4   does it go to the left of the diamond that is 332 and down to

5   the diamond that is 334 if it's an 06?

6           THE WITNESS:  I guess I'm not quite sure what that

7   diamond means, the customer internal PO.

8           THE COURT:  In other words, you'd have to read the

9   patent again to see what it means.

10          THE WITNESS:  Yes.

11          THE COURT:  All right.

12  Q    Let's move on, Mr. Momyer, to the idea of checking

13  inventory.  Did the RIMS system have the capability of checking

14  inventory?

15          THE COURT:  Are you talking about in the patent or

16  the one that they modified?

17  Q    The RIMS system as it existed at the time the RIMS patent

18  was filed in April of '93.

19  A    It had the ability to check inventory locally as well as

20  Fisher inventory in Fisher distribution centers.

21  Q    Did the RIMS system, as it existed in April of 1993, have

22  the ability, or have -- actually have in it cross-reference

23  tables that would show you equivalent products from vendor A

24  and vendor B?

25          MR. ROBERTSON:  Objection, Your Honor.  Again, it's

1   get into the Court's claim construction.  The Court has

2   construed these terms, so I object.  It calls for an expert

3   opinion.

4              MR. McDONALD:  Which term is he talking about?

5              THE COURT:  Cross-reference.

6              MR. McDONALD:  I can try to rephrase the question.

7              THE COURT:  All right.

8   Q    Mr. Momyer, did the RIMS system, as it existed in April of

9   '93, have tables in it that would have a reference between one

10  vendor and a second vendor for products that were found to be

11  equivalents?

12  A    Yes, only for the purpose of directing it back to a Fisher

13  part number.

14  Q    Well, the idea was to find an equivalent part; right?

15  A    No.  The idea was to bring it back to a Fisher part

16  number.

17  Q    Bring what back to a Fisher part number?

18  A    The lookup.  We're doing a cross-reference, and what we're

19  talking about is primarily if you have a competitor's number up

20  there, it would be the same product or equivalent.  It would

21  convert that number over to a Fisher number.

22       If you recall, it's the ultimate -- you have -- you can

23  only in RIMS use a Fisher parts number to submit the

24  requisition.  So you would only take -- that cross-reference

25  table is only there to bring it, the number, back,

1    cross-reference back to a Fisher part number.

2    Q    So in that situation, it could be a part number from a

3    third-party source that would then be converted to a Fisher

4    part number?

5    A    No.  I don't think we -- I don't think it could be third

6    party.  I'm not sure.

7    Q    How about we get back to the RIMS patent, Plaintiff's

8    Exhibit 10, and can we turn to page 31 of Exhibit 10.

9    Actually, let's go all the way to page 30, because there's a

10   heading we can start with.  Page 30 of the RIMS patent,

11   Exhibit 10.

12              MR. ROBERTSON:  Mr. McDonald, you mean column three?

13              MR. McDONALD:   Page 30 of the document.

14   A    Column 31, 32?

15   Q    That's exactly right.  At the bottom there, I just wanted

16   to get the heading of this section here that begins at the

17   bottom.  The heading is cross-referencing; do you see that?

18   A    Yes, I do.

19   Q    So then there's a discussion of cross-referencing that

20   goes on from, beginning at the bottom of column 31 of the RIMS

21   patent; right?

22   A    Yes.

23   Q    So if we continue, that discussion of cross-referencing

24   continues on to column 33 as well; right?

25   A    Yes.  Yes.  And 34.

1        Now, you see on column 33, there's a paragraph beginning

2   at line 15.

3            MR. McDONALD:  Will you blow that paragraph up,

4   please.  It's on page 31.

5            THE COURT:  The next table?

6            MR. McDONALD:  Right.

7            THE COURT:  Host computer ten; is that what you are

8   talking about?

9            MR. McDONALD:  Yes.

10  Q    Now, this is a section talking about that table that can

11  match up the parts that are equivalents; right Mr. Momyer?

12  A    Yes.

13  Q    In that paragraph, it talks about -- down to about line

14  30 --

15  A    Yes.

16  Q    -- there's a line representing a requisition for 1000250

17  which is, in parentheses, Corning's part number for the beaker.

18  A    Yes.

19  Q    And it says, a match will be found in the vendor

20  cross-reference file in host database 20, and that item

21  converted --

22  A    To the Fisher number.

23  Q    Yes, to the Fisher number.  So it starts as another

24  vendor's number, and it's converted to the Fisher number; is

25  that right?

Momyer - Cross

1    A    Yes.

2    Q    Now, is it true -- I'd like to go to the issue now of just

3    how the invention came about where you started from the RIMS

4    system we've been talking about and got to the system described

5    in the patents in this suit.

6         Is it true that back in the 1992 time frame, you would,

7    from time to time, visit installations that had the RIMS

8    system?

9    A    That's correct.

10   Q    And at those installations, sometimes would you see that

11   the computer operator operating the RIMS system would also have

12   in their office or at their station a bookshelf of paper

13   catalogs from other vendors?

14   A    By operator, you are speaking of Fisher customer service?

15   Q    Yes.  The person sitting at the computer operating the

16   RIMS system; right?

17   A    They would typically have a collection of catalogs.

18            THE COURT:  The installations that you are visiting,

19   are they Fisher offices or some other place?

20            THE WITNESS:  These would be customer sites, customer

21   sites where the RIMS system would be installed.

22            THE COURT:  Do you have a customer representative on

23   site, Fisher employee that's running that system?

24            THE WITNESS:  That's correct.

25   Q    So in that situation, when you visited back in the '92

Momyer - Cross

1   time frame, that user of the system, the representative, would

2   have paper catalogs from other vendors?

3   A    Correct.

4   Q    These would be pretty big catalogs; right?

5   A    Yes.

6   Q    Did it come up at that point that people wanted to get

7   those paper catalogs in an electronic form but also usable

8   through the RIMS system?

9   A    I can't say that it did come up.  It was something that --

10       THE COURT:  You are talking about in 1992?  That's

11  what you said.  You started us off with whether he visited

12  installations in 1992.

13       MR. McDONALD:  Right.

14       THE COURT:  In 1992, did people raise that with you?

15       THE WITNESS:  May have talked about it --

16       THE COURT:  If you remember, then say yes or no.  If

17  you don't remember --

18       THE WITNESS:  I don't remember.  At this time, I

19  don't remember having that conversation --

20       THE COURT:  All right.

21       THE WITNESS:  -- with customer service persons.

22  Q    Well, whether you actually talked to them or not, would

23  you agree at least that one of the motivations for developing

24  the system described in the patents-in-suit is that customers

25  were asking Fisher to also manage inventory of products from

Momyer - Cross

1    other suppliers?

2            MR. ROBERTSON:  Objection, Your Honor.  The witness

3    just testified he didn't have any such conversations, can't

4    recall any such conversations.

5            MR. McDONALD:  My question wasn't limited to a

6    conversation.  I was just asking about the motivations, whether

7    he had the conversation himself or not.

8            MR. ROBERTSON:  He asked hypothetically if someone

9    had said that, would it motivate him to make paper catalogs.

10           THE COURT:  Actually he didn't ask that question at

11   all or anything near it, I don't think.  I'm not --

12           MR. ROBERTSON:  Then I misunderstood the question.

13           THE COURT:  It was a fairly -- there has been a lot

14   of discussion in between the question and now.  Ask it again,

15   please, Mr. McDonald.

16   Q    Mr. Momyer, putting apart whether you recall particular

17   conversations with customers now, is it fair to say that one of

18   the motivations for creating the systems that are the subject

19   of the patents-in-suit was that customers were asking Fisher,

20   as a company, not just to manage Fisher inventory but also

21   manage inventory of products from other suppliers?

22   A    I can't say that would be the reason that would generate

23   the electronic sourcing patents, but there were discussions

24   that our customers would ask us to take over inventory that

25   would be owned by the customer, and we would bring it in under

Momyer - Cross

371

1   a product type of file.

2   Q    Was the main reason for developing the patents in this

3   case to address that customer desire that Fisher manage

4   inventory of products from other suppliers?

5   A    When you say inventory, it would -- one of the reasons

6   that we developed the system was to support this strategic

7   procurement services initiative which was to allow us to take

8   over the procurement activities for our customers which

9   included buying from companies other than Fisher.

10  Q    Can you turn back to the December 9th, 2009, deposition

11  that you gave in this case, please, and at page 25 beginning at

12  line 14, the transcript that I handed up or that was handed up

13  to you earlier.

14  A    I got it.

15  Q    And we're looking at page 25 beginning at line 14.

16  A    25, okay.

17  Q    And do you see there where the question to you was, at the

18  time you were developing the concept for the electronic

19  sourcing system that's described in the three patents, and you

20  interrupted and said, yes.  Question continues, involved in

21  this case, did you learn that customers were asking Fisher to

22  manage other types of product inventories other than the

23  products that Fisher supplied.  And you answered that yes;

24  right?

25          MR. ROBERTSON:  I'd object.

1          THE COURT:  It's not impeaching.  It's entirely

2    consistent with the answer he just gave you.

3          MR. McDONALD:  It's the next question, actually.

4          THE COURT:  I know.  I read line ten, that customers

5    were asking Fisher; right?

6          MR. McDONALD:  That was the main reason.

7          THE COURT:  I understand, but your question wasn't

8    circumscribed in the way this question was with the background

9    of it, so it's not impeaching.  The witness does not need to

10   answer the question.  Objection sustained.

11   Q    Would you agree that the main reason that Fisher was

12   developing the concept for the three patents was that customers

13   were asking Fisher to do more than just manage Fisher inventory

14   but also manage inventory from products of other suppliers?

15         MR. ROBERTSON:  Again, Your Honor, that's not

16   impeachment.  It's consistent with what the witness --

17         THE COURT:  He's not trying to impeach him now.  He's

18   asking an entirely different question.  The question was

19   whether -- what you said, was that the main reason.  Is that

20   what you meant to say?

21         MR. ROBERTSON:  I'm sorry, sir.

22         THE COURT:  I said, Mr. McDonald, your question said

23   was it the main reason, and the answer here doesn't say that.

24   It says a main reason which connotes there are more than one

25   main reason.  Do it right or don't do it at all.

Momyer - Cross

1              MR. McDONALD:  Can I rephrase, Your Honor?

2              THE COURT:  Yes.

3    Q    Mr. Momyer, would you at least agree that a main reason

4    for developing the system in the patents in this suit was that

5    customers were asking Fisher to do more than just manage Fisher

6    inventory but also manage inventory from products from other

7    suppliers?

8    A    Yes.

9              THE COURT:  Your answer --

10             THE WITNESS:  Products other than -- yes, that is one

11   reason it was developed, to be able for us to manage not

12   necessarily the inventory but manage the products and purchase

13   the products.

14   Q    Now, I'd like to turn now to working with IBM about the

15   TV/2 system.  Your understanding, when you went to IBM, is that

16   they already had a system that they called the Technical Viewer

17   2 system; correct?

18   A    That's correct.

19   Q    Now, that system, as it existed when you got to them --

20   was that in 1993 that you started talking to them?

21   A    To the best of my recollection, yes, it as around 1993.

22   Q    And at that time, of 1993, did the TV/2 system have the

23   ability of searching a list of selected topics?

24   A    Searching a list of -- it was my understanding that the

25   TV/2 that we had was -- at that time was only a text search

Momyer - Cross

1    capability.

2    Q     But could a text search a list of selected topics?

3    A     I guess I'm not sure what you mean by selected topics.

4    Q     Do you know what that means in the context of the TV/2

5    system?

6    A     No.

7    Q     Would you agree at the time that you filed the patents

8    involved in this suit there was known to be able to search a

9    single catalog on a CD-ROM?

10                THE COURT:  That what was known?

11                MR. McDONALD:  That it was known in the field of

12   purchasing and requisition systems to be able to search a

13   single CD-ROM with a catalog on it.

14                MR. ROBERTSON:  Your Honor, again, this is outside

15   the scope of my direct.

16                THE COURT:  I don't remember him asking anything

17   about that on his direct, Mr. McDonald.

18                MR. McDONALD:  Fair enough.  I'll withdraw it.

19   Q     Can we turn to the '683 patent now, Plaintiff's Exhibit 1,

20   and turn to figure 1A which is the third page, I believe.

21   A     Okay.

22   Q     Now, on that picture, figure 1A, this is in the '683

23   patent in this suit; right, Mr. Momyer?

24   A     Yes.

25   Q     You have shown here the catalog database number 36 kind of

Momyer - Cross

1    in the middle of the page there.   Do you see that?

2    A     Yes.

3    Q     That was something that didn't exist in the RIMS system;

4    right?

5    A     Correct.

6    Q     Now, what database did exist in the RIMS system was a

7    parts master or item master; right?

8    A     As well as inventory tables.   You are talking about the

9    inventory database?

10   Q     Talking about the parts master.

11   A     There was a parts master.

12   Q     Which box was the parts master?

13   A     It would have been included in that grouping called

14   inventory databases.

15   Q     So that's 42B up above?

16   A     Yes.

17   Q     So parts master was over there, and so it's -- certainly

18   in your picture here, you were not depicting the parts master

19   should be part of the catalog database; right?

20   A     Yes.

21   Q     And the Fisher product list, that was in the host

22   database; correct?

23   A     Yes.

24   Q     And so would that be in this picture represented by what's

25   in host databases box number 11 in the upper right corner?

1    A    Yes.

2    Q    So, again, there are even that list of Fisher products in

3    the host database, you were showing it in your patent as not

4    part of the catalog databases; right?

5    A    Yes.

6    Q    And the reason for is that is that catalog database had a

7    different purpose and function than those other databases?

8    A    Yes.  It was to -- yes.  It would have had a different

9    purpose and function.

10   Q    What would be the difference in purpose and function?

11   A    Well, one, it would allow you to place an order for a

12   specific part.  The catalog database in itself would not -- you

13   could pull the information from the catalog.  You can go and do

14   validation of that part against both the local part master and

15   then up against the host.

16        Another benefit or purpose would be inventory control,

17   inventory management.  The product information at that level,

18   that information wouldn't be in the catalog database but would

19   be in the part master.

20   Q    Earlier you testified about some subset searching

21   capability; do you recall that?

22   A    Yes.

23   Q    Is that something different from what the patents-in-suit

24   describe when they talk about selecting catalogs to search, or

25   is that the same thing?

Momyer - Cross

1          MR. ROBERTSON:  Your Honor, we're getting into the

2     Court's claim construction here, so I object as calling for a

3     legal opinion.

4          MR. McDONALD:  Maybe I can tie it specifically to an

5     embodiment in the patent, Your Honor, and avoid that issue.

6          THE COURT:  All right.

7          MR. McDONALD:  Give me a moment, please.

8     Q    Mr. Momyer, can you turn in the '683 patent to column

9     nine.  If you look at the bottom part of column nine beginning

10    at about line 52.

11         THE COURT:  When multiple catalogs?

12         MR. McDONALD:  Yes.

13         THE COURT:  Where are you going, how far down?

14         MR. McDONALD:  Basically to the end of that column.

15    We might have to continue up to ten, but I think we can cover

16    it with what's at the bottom of column nine.

17    Q    So do you have that again, Mr. Momyer?  Bigger print on

18    the screen there if that helps you.

19    A    Thank you.  Yes, I do.  I have it.

20    Q    This part of your patent, the '683 patent, talks about an

21    option where when multiple catalogs are in the catalog

22    database, there's a function that allows for selecting catalogs

23    to be searched; right?

24    A    Yes.

25    Q    So the idea here is you don't have to select all the

1   catalogs?

2   A    That's correct.

3   Q    Is this something that's different from that search within

4   a search that you said you were working on with IBM?

5   A    I'm not certain.  I'd refer that to Mr. Kinross.

6   Q    You don't know one way or the other?

7   A    Yeah.  I think I can't give you a good answer on that.

8   Q    But at least you understand the idea here is that these

9   are pretty big catalogs, and it might streamline the search if

10   you can, in effect, eliminate some of the catalogs; right?

11   A    Yes.

12   Q    I'd like to turn finally now to that RIMS brochure,

13   Defendant's Exhibit 61.

14           THE CLERK:  Defendant's 61?

15           MR. McDONALD:  Yes.

16   Q    Mr. Momyer, I think you said you had seen this brochure

17   before.  Can you tell me the circumstances which you had seen

18   it?

19   A    I saw it on several occasions.  I know it was developed by

20   our internal IT organization, and it was developed to be handed

21   out at trade shows to -- as well as to give information to our

22   customers on the high level feature of RIMS and what it could

23   do for the customer.

24   Q    Was it, in fact, distributed?

25   A    I believe it was.  I'm not -- don't know for a fact at

Momyer - Cross

1    that point, but I believe it was.

2    Q    I think you referred to IT?

3    A    Information technology.  That's the software development

4    group.

5    Q    Are those the people that were actually the ones that had

6    worked on developing the RIMS system?

7    A    It would have been a different group within the IT

8    organization.  It would have been like the documentation group,

9    the group that was develop documentation, doing training.

10   Q    Is it your understanding that this brochure was developed

11   in conjunction with people who knew what RIMS did?

12   A    Yes.

13   Q    And did you ever tell anybody that there was anything in

14   this brochure that you thought was inaccurate?

15   A    Yes.

16   Q    When did you do that?

17   A    I think -- what was put out was -- everything that was on

18   the brochure at the time we intended to do, and some things

19   didn't occur.  Many of the things were developed, but, yes, I

20   did tell them, and we went ahead and put the product out in

21   anticipation of getting to -- getting these things done.

22        THE COURT:  Are you saying there's some things in

23   this brochure that are wrong?

24        THE WITNESS:  Yeah.  I pointed a couple of those

25   things out.

Momyer - Cross

1   customized interface.

2   Q    It was something you knew you could do?

3   A    Yes.

4   Q    One of the things you didn't say was wrong was that first

5   bullet point that says consolidates all supplier activity

6   including third-party and administrative purchases; right?

7   A    That's correct.

8   Q    Now, if we go two more pages to page six --

9        MR. McDONALD:  Now, if you could blow up the image

10  below the big black box there where it says a system that's

11  easy to use and then the paragraph right to the right of that,

12  please.

13  Q    Now, in this part of this RIMS brochure, I'll give you a

14  chance to look at it.  Isn't it true that the brochure

15  indicated that customers of the RIMS system now could either

16  use a customer service representative or they could enter

17  requisitions or purchase orders remotely through the people in

18  their organization who would be using the product?

19  A    I see that.

20  Q    The computer system itself, it doesn't actually know who

21  is sitting at the keyboard; right?  That could be anybody.

22  A    Well, other than the fact -- it couldn't be anybody.  It

23  would have to be someone who would have had a password and a

24  log-in ID to log in.

25  Q    But that could be an employee of the customer as well as

Momyer - Cross

1   the customer service representative; right?

2           MR. ROBERTSON:  Your Honor, calls for speculation.

3           THE COURT:  Overruled.

4   Q    Is that what this is communicating?

5   A    I don't know of any instance that a customer was

6   interacting with RIMS.  Doesn't mean it didn't happen.  I just

7   don't recall any instance of that happening.

8   Q    Now, is it true that the brochure -- if you turn to page

9   ending in 603, I think that's page seven?

10          THE COURT:  What about it?

11          MR. McDONALD:  I'm trying to get it up on the screen

12  here.

13  Q    This is a page that has a heading, simplified information

14  flow, clear audit trail.  Is that the page you have?

15  A    Yes.

16  Q    This is -- if we could blow up that left column below the

17  black box.  You didn't mention yesterday that there was any

18  inaccuracies in this section, did you?

19  A    No, I did not.

20  Q    And in this section, doesn't it indicate that the Fisher

21  RIMS handles purchases of various types including Fisher

22  products, third-party purchases delivered from a Fisher

23  warehouse, third-party purchases delivered direct, and then if

24  we can blow up the next column over, administrative purchases

25  which Fisher RIMS initiates for the supplier to ship and

KINROSS - CROSS                              428

1    toward putting catalogs on CD ROM, and that's why I

2    was investigating the search engines.

3            THE COURT:  You said also that your company

4    wanted to get an entry into the field, I think.  Is

5    that right?

6            THE WITNESS:  Yes, that's right.

7            THE COURT:  So now we have an orientation.

8    BY MR. McDONALD:

9    Q   So at the time Fisher was looking to get into

10   making its catalogs on CDs, other companies were

11   already doing that?

12   A   My recollection is our competitors weren't doing

13   that, and Fisher was challenged to do that because the

14   catalogs in our industry were so large.

15   Q   Were there non-competitors that were putting their

16   catalogs on CD at the time already?

17   A   I don't know.

18           MR. ROBERTSON:  Could we pull up Exhibit 1,

19   please, the '682 patent.

20           THE COURT:  What did you mean by saying that

21   others were putting --

22           THE WITNESS:  We knew that catalogs could be

23   put -- we knew that catalogs could be put on CDs.

24           THE COURT:  For instance, you don't compete

25   with Sears.

1          THE WITNESS:  Right.  I don't know of any

2     vendors who had catalogs on CDs at that time.  I

3     couldn't cite Sears as being an example.

4          THE COURT:  But there were people, you just

5     don't remember who they were?

6          THE WITNESS:  Yes, that's right.

7     Q   It was some sort of a vendor; is that fair?

8          THE COURT:  What his question is, was it the

9     vendors who were putting the catalogs on CD ROM or was

10    it your competitors, and you said it wasn't your

11    competitors.

12         THE WITNESS:  It wasn't our competitors.

13         THE COURT:  Was it vendors or not?

14         THE WITNESS:  No, I don't know.  I think

15    based on the Technical Viewer documentation it could

16    be like parts lists that were put on CDs.

17         THE COURT:  All right.  Go ahead.  Excuse me.

18    BY MR. McDONALD:

19    Q   Could we turn to column 2, please, and go to the

20    top of column 2 of the '683 patent, Plaintiff's

21    Exhibit 1, around lines 3 to 5.

22         THE COURT:  That's in your small book there,

23    if you want to look at it, or you can look at it on

24    the screen.  It's up to you.

25              Column what?

KINROSS - CROSS                437

1      MR. ROBERTSON:  I object.  That's outside the

2   scope.

3      THE COURT:  I think this was.

4      MR. McDONALD:  Well, he brought customer

5   service representative --

6      THE COURT:  I know, but not every answer

7   generates an opening of the door.  I sustain the

8   objection.

9   BY MR. McDONALD:

10  Q   Let's go back to --

11     THE COURT:  Just kind of go around with what

12  he was doing there on direct.

13     MR. McDONALD:  Okay.

14  Q   Let's talk now about the TV/2 system, Mr. Kinross,

15  at the time you started talking to IBM.  Now, there

16  was such a system that was available from IBM the day

17  you started talking to them about searching, right?

18  A   There was what?

19  Q   A TV/2 system.

20  A   There was a TV/2 system, yes.

21  Q   And that system already had an application program

22  and interface on it, right?

23  A   My understanding is that it came with a sample

24  program that showed the use of the API, correct.

25  Q   Was it your understanding specifically that the

1   data."

2   A   Right.   That's true.

3            THE COURT:   That wasn't inconsistent with

4   what he said earlier.

5            THE WITNESS:   That's right.

6            THE COURT:   Your question was different.   So

7   it really doesn't impeach him.   He said that earlier,

8   basically.   I think he said it almost in those words.

9            THE WITNESS:   Right.   This lets you do it,

10  but it didn't do it.   You had to program it.

11           THE COURT:   Whether he did it or whether he

12  had the facility to do it.

13           THE WITNESS:   Correct.

14           THE COURT:   I think in both places he said

15  the same thing.

16           THE WITNESS:   Thank you.

17           MR. McDONALD:   I misunderstood.

18           THE COURT:   I just wanted Mr. McDonald to

19  know that I was paying attention.

20           MR. McDONALD:   I have no doubt.

21  BY MR. ROBERTSON:

22  Q   Did the Technical Viewer 2 system have the

23  capability of searching databases that were on a

24  computer other than in the form of a CD ROM?

25  A   Yes.

KINROSS - CROSS                          440

1   Q   That was before Fisher started working with IBM,

2   right?

3   A   Yes.

4   Q   Now, this research, I think you mentioned you did

5   some research as to different products and through

6   that process you picked the TV/2 product; is that

7   right?

8   A   That's correct.

9   Q   And you picked the TV/2 product because you

10  thought that would be a good fit for the purposes you

11  were looking to fulfill, correct?

12  A   There were a number of reasons we picked the

13  Technical Viewer product.  Do you want me to go into

14  those reasons?

15          THE COURT:  Was that one of them, that it was

16  a good fit?

17          THE WITNESS:  I wouldn't specify it as a good

18  fit.  I thought it was a development platform that

19  could be used to achieve what we were trying to

20  accomplish.

21  Q   But A good fit was one of the factors you used to

22  pick the TV/2 system; is that fair?

23  A   No.  I think a good fit would be more inclined to

24  selecting a package that had all the features and

25  functionality that your business required and you just

KINROSS - CROSS                     442

1   Q   At the time was the RIMS system built on OS/2 IBM

2   operating system?

3           MR. ROBERTSON:   Your Honor, I didn't ask

4   anything about the RIMS system.

5           THE COURT:   Mr. McDonald, it seems to me

6   that's beyond the scope of the direct examination.

7           MR. McDONALD:   I guess we can come back to

8   that, Your Honor.

9   BY MR. McDONALD:

10  Q   Now, with the IBM system as it existed when you

11  started working with them regarding TV/2, did it have

12  the capability of putting technical publications on a

13  single CD ROM?

14  A   Yes.

15  Q   Technical publications could include things like

16  bulletins and catalogs, right?

17  A   The only thing that they mentioned as far as what

18  they used Technical Viewer for was a parts catalog in

19  Europe for a car company.  And the Manassas people

20  indicated that they worked with the U.S. Navy on their

21  documents but didn't specify what documents the Navy

22  was using it for.

23  Q   Did you work with someone from IBM named Pam Eng?

24  A   Yes, Pam Jenkins at the time, but I think she's

25  been married and changed her name.

1   Q    She was working on this project from the IBM side;

2   is that right?

3   A    Correct.

4   Q    Chuck DeNaris, is that also a name that's familiar

5   to you?

6   A    Yes, he was the salesman from IBM.

7   Q    So you interacted with him on this project?

8   A    He attended the meetings and yes.

9   Q    The IBM system could do a word search, correct?

10  A    Correct, which we termed keyword search.

11  Q    But that was already in existence before you

12  started talking to IBM about the TV/2, right?

13  A    That was part of the Technical Viewer, yes.

14  Q    Then you choose the TV/2 system because of its

15  features and because you didn't want to reinvent the

16  wheel, right?

17  A    Correct.  The prospect of writing a search engine

18  when others we are available on the market really

19  didn't make sense to us to rewrite something that

20  already existed if it performed up to our

21  specifications.

22         MR. McDONALD:  I have no further questions.

23  Thank you.

24         THE COURT:  Any redirect?

25

471

1    A    It's the only representation that we put in, I believe.

2    Q    Finally, I think you mentioned that the RIMS system did

3    not communicate with the catalog.  Did I understand that right?

4    A    That's correct.

5    Q    The RIMS system did have a parts master; right?

6    A    It had a part master, yes.

7    Q    You didn't consider that a catalog, though, for purposes

8    of your answer; is that right?

9    A    No.

10   Q    So when you say no, you are agreeing with me?

11   A    I did not consider that a catalog.

12   Q    Thanks for fixing the question.  Also the RIMS system had

13   a host database with Fisher products on it as well; right?

14   A    It had -- yes.

15   Q    And when you answered that question about RIMS not

16   communicating with a catalog, did you consider that Fisher

17   database of items to be a catalog or not?

18   A    No.

19            MR. McDONALD:  No further questions.  Thank you, Your

20   Honor.

21

22                     REDIRECT EXAMINATION

23   BY MR. ROBERTSON:

24   Q    Mr. Johnson, do you have the '683 patent in front of you?

25   It's Plaintiff's Exhibit Number 1.  You testified about this

1    reduced to practice?

2    A    Correct.

3    Q    And you are familiar that the filing date of this patent,

4    these patents has what's called a priority date back to 1994?

5    A    Yes.

6    Q    Can you tell the jury what you understand that term to

7    mean, a priority date?

8    A    That means that the protection of the patents that we'll

9    talk about later, what the claims mean, goes back to that date,

10   the filing date.

11   Q    So in undertaking your study of these patents to determine

12   who this hypothetical person of ordinary skill in the art would

13   be for purposes of viewing the context, the historical context

14   where these patents were, did you come to any conclusions?

15   A    I did.

16   Q    And can you tell us what your opinion is as to who this

17   hypothetical person of ordinary skill in the art would be for

18   these ePlus patents?

19   A    So based on my experience, this person would be a college

20   graduate with a degree in computer science or something

21   related, like electrical engineering, and would have a year or

22   two of practical experience with writing software and

23   understanding the flow of information that is necessary for the

24   purchase of goods and services.

25   Q    And did you apply that person to the opinions you're going

Weaver - Direct

1  to be offering in this case both on the issue of infringement

2  and on the issue of validity?

3  A    Yes, I did.

4  Q    Did you have an opportunity to review who the hypothetical

5  person of ordinary skill in the art would be under Lawson's

6  expert's perspective?

7  A    Yes, and it's similar.

8          MR. ROBERTSON:  Mr. McDonald, do you want to agree on

9  that if we can at this point?

10          MR. McDONALD:  I thought we already did.

11          MR. ROBERTSON:  All right.

12          THE COURT:  I thought you stipulated that, haven't

13  you?

14          The person of ordinary skill in the art, ladies and

15  gentlemen, is something you'll hear from these experts, and

16  it's been explained what it is, and there'll be instructions

17  for you later, but that person is a person, the parties

18  agree -- excuse me -- who is a college graduate with a degree

19  in computer science or electrical engineering or like studies

20  with a year or so of experience writing software and

21  understanding -- and who understands the procurement process,

22  electronic procurement process; is that right, counsel?

23          MS. STOLL-DeBELL:  I think it's close enough, Your

24  Honor.

25          THE COURT:  Good enough for government work.

1          MS. STOLL-DeBELL:  I think so.

2    Q    Let me ask you this:  Are you familiar with that person of

3    that level of skill and knowledge during the time period we're

4    discussing?

5    A    Yes.  I was teaching people like that.

6    Q    In the 1993 time frame?

7    A    Right, 1993, 1994, yes.

8    Q    Did you work on any projects during that period for any

9    companies in which the subject, type of subject matter of this

10   might involve persons who had similar experience and education?

11   A    Right.  So I mentioned this research project.  There was

12   this company call Epcom that wanted to build an electronic

13   distributorship, and so they came to my research group, and the

14   person I hired to work on this was two years out of the          .

15   computer science bachelor's degree, and she and I worked on the

16   design of this system whereby there was an electronic catalog,

17   and a consumer using the internet could look at the catalog and

18   could order from it and kind of a rudimentary inventory

19   management.

20   Q    Why don't we go to Plaintiff's Exhibit Number 1.

21          THE COURT:  Are you going to get into infringement

22   opinions now?

23          MR. ROBERTSON:  I'm going to get into a little bit

24   more about high level overview, and then I'm going to start

25   looking at specific claims, Your Honor, within a few pages.

515

1                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
2                          RICHMOND DIVISION

3      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                         :
4       ePLUS, INC.,                     :
                                         :
5                        Plaintiff,      :
        v.                               :   Civil Action
6                                        :   No. 3:09CV620
       LAWSON SOFTWARE, INC.,            :
7                                        :   January 6, 2011
                         Defendant.      :
8      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ :

9

10

11             COMPLETE TRANSCRIPT OF **JURY TRIAL**
              BEFORE THE HONORABLE ROBERT E. PAYNE
12         UNITED STATES DISTRICT JUDGE, AND A JURY

13

14

15     APPEARANCES:

16     Scott L. Robertson, Esq.
       Jennifer A. Albert, Esq.
17     **Michael T. Strapp, Esq.**
       **David M. Young, Esq.**
18     GOODWIN PROCTOR
       901 New York Avenue, NW
19     Washington, D.C.   20001

20     Craig T. Merritt, Esq.
       CHRISTIAN & BARTON
21     909 E. Main Street, Suite 1200
       Richmond, VA   23219-3095

22
                  Counsel for the plaintiff ePlus
23

24
                    DIANE J. DAFFRON, RPR
25                 OFFICIAL COURT REPORTER
                 UNITED STATES DISTRICT COURT

1       THE WITNESS:  Yeah, that was exactly what my

2   answer was going to be.  Depending on the question,

3   the response might be that Lawson would license a

4   software module to the hospital, and the hospital

5   personnel could run it and maintain it.  Or perhaps

6   Lawson would install it for them or perhaps Lawson

7   would host it for them.

8       THE COURT:  What does that mean?  What does

9   host it mean?

10      THE WITNESS:  Host it means that the software

11  that runs the system physically resides on a computer

12  server, a big computer system, that Lawson itself owns

13  and maintains so that it's always available.

14      THE COURT:  But the hospital could use it?

15      THE WITNESS:  Yes, it would be for the

16  hospital's use.

17      MR. ROBERTSON:  Thank you, Doctor.

18  BY MR. ROBERTSON:

19  Q   Let me ask you to take a look at Plaintiff's

20  Exhibit No. 219.  It's in Volume V.

21      THE COURT:  319?

22      MR. ROBERTSON:  219, Your Honor.

23  BY MR. ROBERTSON:

24  Q   Doctor, tell us what Plaintiff's Exhibit 219 is.

25  A   The Scottsdale Unified School District wrote a

1      MR. ROBERTSON:  Starting at the beginning

2   down to about "receiving goods," midway through that

3   paragraph, if you could highlight that for me, Mike.

4   The entire paragraph.

5   Q    What is Lawson indicating here in response to this

6   request for proposal as to the purchase order module

7   of its procurement suite?

8   A    So after the words "Lawson's purchase order," it

9   says that it streamlines the procurement process from

10  establishing vendor pricing, agreements, and

11  contracts, importing and maintaining item information,

12  creating and issuing purchase orders to receiving

13  goods.

14  Q    And purchase order is a subject of the claims that

15  are at issue in this case?

16  A    Yes.

17  Q    What does Lawson say there with respect to the

18  advantage of this purchase order module that they are

19  offering?

20  A    That it's going to improve efficiency.

21  Q    How is it going to do that?

22  A    By automating this process of putting everything

23  on a computer.

24  Q    All right.  Can you explain to the jury what this

25  vendor price agreement is that's referenced here?

1   Q    Sir, with respect to this claim element, for

2   purposes of the jury's determination, what is relevant

3   to your determination in their assessment of whether

4   infringement occurred?

5   A    It's whether or not that user interface exists in

6   the Lawson system.

7   Q    And in your analysis of the Lawson system, does

8   that, in fact, exist?

9   A    Yes.  I'm going to demonstrate that later.

10  Q    This claim element we've been looking at for the

11  means of selecting the product catalogs to search,

12  does the claim require that the user select multiple

13  product catalogs to search simultaneously?

14  A    No, not simultaneously.  You could search one

15  catalog and then search another one.  So a serial

16  search would satisfy this claim element.

17  Q    Going back to the third element of Claim Three,

18  which recites means for searching for matching items

19  among the selected product catalogs, and you have

20  illustrated this in your diagram.  What's your

21  understanding of how the system needs to perform in

22  order to accomplish that element?

23  A    Well, if you're going to search, then you need a

24  search program.  And the search program has to have

25  input, a query, so it knows what to search for.  And

1   so if you have a search program and if the user can

2   input a search request, then that search program can

3   identify matching items, items that match the query

4   term among the selected product catalogs.

5       You could also do it not only with textual search,

6   but with drop down menus.  You could search that way,

7   too.

8   Q   You used the term "drop down menu."  Could you

9   just explain what you mean when you use that term?

10  A   Yes.  So in building a web page, this is done

11  using hypertext markup language, HTML, and there's a

12  standard construct there that's a drop down menu.  So

13  you program this so when this is displayed to the

14  user, there is a top level catagory, and it typically

15  says "select."  And if you click on select, then the

16  menu opens up.  It drops down and a series of choices

17  are presented.  And then you can take the mouse and

18  pick one of those.

19      The most insidious of these is when you're trying

20  to fill in your address and the choice is state.  You

21  click on state, and all the 50 states fill up your

22  whole screen, and you have got to go pick one.

23  Q   In one of these demonstrations you're going to do

24  on the Lawson accused product, will we see this drop

25  down menu?

1  the same understanding as a person of ordinary skill

2  in the art at the time?

3  A    Yes.

4  Q    So how would the fifth element of Claim Three be

5  satisfied?

6  A    We would have to see a requisition module that can

7  take the formal requisition, which could have many

8  items from many vendors, and then turn that into one

9  or more purchase orders.  And, typically, you have all

10  the items from one vendor on one purchase order if you

11  can do it.  If they are present.

12  Q    Moving on to the sixth and last element of Claim

13  Three, which you have color-coded brown.  That element

14  recites means for converting data relating to a

15  selected matching item and an associated source to

16  data relating to an item and a different source.  How

17  are we to understand that claim element?

18  A    So if I have a list of items and for some

19  reason -- let's say I want to do comparison shopping

20  or say that the item that I want, I've checked the

21  inventory, and it's not available.  So there has to be

22  a converting means whereby I can look for similar

23  items, and this is all computer assisted.  I can find

24  similar items that I might choose instead of the one

25  that I had initially inquired about.

WEAVER - DIRECT                    561

1    MR. McDONALD:  Your Honor, I'm going to

2    object to this question about this.  This is a

3    means-plus-function clause and he's asking him what it

4    means.  It should be done in the context of the --

5    THE COURT:  I was just looking at page 2 of

6    the glossary.  I think that's been defined over there.

7    MR. ROBERTSON:  I was just going to ask him

8    to go to that page.

9    THE COURT:  Don't be having him give his own

10   constructions, please, before you ask him to go to the

11   ones that have been construed.

12   BY MR. ROBERTSON:

13   Q   If you go to page 2 of the Court's glossary, Dr.

14   Weaver.

15   A   Yes.

16   Q   What's the function that's being defined here on

17   the means for converting data for this claim element?

18   A   The function of this element is converting data

19   related to a selected matching item and an associated

20   source.

21   Q   According to the Court, how can this function be

22   accomplished?  By what structure?

23   A   The corresponding structures, materials or acts of

24   this element are disclosed as one or more non-catalog

25   databases identifying cross-referenced items,

WEAVER - DIRECT                    562

1  identical items, or generally equivalent items; one or

2  more cross-reference tables or file identifying

3  cross-referenced items, identical items, or generally

4  equivalent items; one or more codes corresponding to

5  cross-referenced items, identical items or generally

6  equivalent items; and their equivalents.

7  Q    In that definition there are non-catalog databases

8  identifying cross-referenced items, identical items or

9  generally equivalent items, cross-reference tables or

10 files and one or more codes.

11      As a computer scientist, can you tell us what your

12 understanding as a person of ordinary skill in the art

13 would understand those three terms to mean?

14 A    Sure.  So a non-catalog database is a file that is

15 not part of the physical structure of the database

16 system.  So it's an external file.

17      In this context, it's identifying the

18 cross-referenced items.  So, for instance, we might

19 have a vendor -- think of a file that has records.

20 Think of that as a row in a table.  We might have one

21 vendor's part number and a second vendor's part number

22 in that row.  And if this is in a cross-reference

23 index that indicates in this context that those two

24 part numbers are identical or generally equivalent --

25 let's see.  What was the next one?  Okay.

1  selection and determination as to what it might want

2  to purchase?

3  A    So when we use the Punchout capability, some of

4  these vendors support the capability of reporting

5  whether the item that you want is available in

6  inventory.  And so we can see in what's called the

7  Punchout response, we see on a web page displayed in

8  the Lawson system whether or not the item is available

9  in inventory.

10        And if we're using the electronic data interchange

11  module, the purchase order goes to a vendor, and the

12  vendor can reply, and the purchase order responds as

13  to whether that item is available in inventory.

14  Q    So you have this software module within the Lawson

15  system about determining availability and inventory.

16  Do you see that?

17  A    Right here, yes.

18  Q    I think you may have touched on it, but can you

19  tell us the ways in which this accused Lawson system

20  can satisfy the element of determining the

21  availability of inventory within its accused system?

22  A    Yes.  So using the Punchout system, I can look

23  into the external catalog of a vendor.  And if this

24  vendor supports this capability, I can determine

25  whether the item I want to order is available in

1    orders can be issued to vendors using internet email.  This

2    kind of issue method is possible by using Lawson procurement

3    Punchout or another third-party tool that's capable of email

4    delivery.  With Lawson procurement Punchout, you also need

5    Lawson requisition self service to get the PO dispatcher or

6    sweeper.

7    Q    So is that consistent with your diagram earlier in which

8    you need requisition self service to support the Punchout

9    capability?

10   A    That's correct.

11   Q    Is there a description on this page of Plaintiff's Exhibit

12   Number 108 that explains how the procurement Punchout

13   application works?

14   A    Yes, it's the next paragraph below.  So Lawson procurement

15   Punchout lets users of Lawson requisition self service order

16   supplies from a specific vendor's website.  With Lawson

17   procurement Punchout, a vendor page is linked to a shopping

18   icon, called a Punchout, on the Lawson requisition self service

19   home page.

20        When the user chooses a specified vendor, that vendor's

21   website catalog appears.  From this catalog, Lawson requisition

22   self service users can choose items to order.  By separate

23   agreement between the customer and the vendor, the vendor

24   displays the customer's special cost information for catalog

25   items and can limit the catalog items that are displayed.

1      When users have filled their shopping carts and checked

2   out from the vendor website, the chosen items and their cost

3   are returned to the Lawson server where a requisition is

4   created using the Lawson requisition self service application.

5   A purchase order is then created from the requisition.

6      After the requisition is interfaced into the purchase

7   order application, the Lawson procurement Punchout enables the

8   transmission of purchase order documentation back to the vendor

9   so that the vendor can fill the order.

10  Q    Now, you talked about this Punchout capability a little

11  bit before, but, again, just since that was a lot of

12  information to take in, can you give us a high overview of what

13  is actually the functionality that's going on here --

14  A    Yes.

15  Q    -- that's being performed by the Lawson procurement

16  Punchout module?

17  A    Right.  So we had that complicated diagram that we

18  essentially skipped, but what it was documenting was the data

19  transfers.  So when the Lawson system punches out to this

20  special vendor website that has been created for this

21  particular customer, it first has to have a handshake.  By that

22  I mean that information is transmitted in both directions where

23  the Lawson application and the vendor website authenticate each

24  other so that they know that they are valid.  So they exchange

25  some secret information.  That's how they authenticate.

Q    And you indicated there's this specialized website that Lawson works with its Punchout partners to create such that users of the Lawson system that have the Punchout procurement module can go out to these special websites and purchase items; is that right?

A    Yes.

Q    Do you have an opinion as to whether the catalog data available at these Punchout partners that Lawson utilizes also meets the definition of the Court's claim term catalog?

A    I believe they do, yes.

Q    We'll be coming back to that; is that right?

A    I'm sure we will.

THE COURT:  Then your opinion of what in the Lawson system infringes is not confined only to -- excuse me.  Your opinion of what in the Lawson system meets the Court's definition of catalog is not confined to the item master plus the vendor item table?

THE WITNESS:  You are correct, Your Honor.  The item master and vendor item table would be an instance of a catalog within the Lawson system.  These Punchout catalogs are external.  They are an additional instance of catalogs.

Q    Okay.  Why don't we go then to page 46 of Plaintiff's Exhibit 112, and there's a heading there that says, what are UNSPSC codes.  You referenced those several times, so why don't we see what Lawson has to say with respect to these codes.

1    Now, that's a lot of items.  So it's hierarchical.  If you

2    add the family designation, two digits there, 00 to 99, you

3    narrow it down.  So if the code is 4410, you've narrowed it

4    from office equipment to office machines.  If the code is 4411,

5    you've narrowed it within office equipment down to computer

6    supplies.

7        So now let's take the example 4412 under office equipment.

8    We're now narrowing it to office supplies, but we can become

9    more specific by adding more digits.  So if I add the two-digit

10   class, if I added 15, then I'm talking about the type of office

11   supplies that are mailing supplies; if the code is 16, writing

12   implements.  So if my code so far is 441216, I'm talking about

13   writing implements.

14       If I go down to the commodity level, the full eight

15   digits, I get to a finer-grained description of items.  So if

16   that commodity code is 01, it's mechanical pencils, 02 is black

17   stylus pens, 03 is black pens.  So if I wanted to search for

18   black pens, I could put in the code 44121603, and what I would

19   get back is a listing of all of the black pens in the item

20   master database from all the vendors that have put item data

21   there.

22   Q    Now --

23            THE COURT:  Put item data where?

24            THE WITNESS:  That using vendor catalog load program

25   provided by Lawson, catalog items from the vendor has been put

1    into the item master and the vendor item table.

2              THE COURT:  Are those the Punchout catalogs you

3    talked about?

4              THE WITNESS:  No, sir.  Punchout catalogs remain

5    external.  This is -- as a setup to using the Lawson system, if

6    I, as a customer, want to do business with Staples, I, as the

7    customer, make a deal with Staples, and Staples has a vendor

8    price agreement.  I can load the vendor catalogs, Staples

9    catalog and the vendor price agreement, and that populates the

10   data in the item master and the vendor item table.  So now I

11   have an internal catalog.

12             THE COURT:  In the Lawson system.

13             THE WITNESS:  In the Lawson system.

14             THE COURT:  Is that in the item master?

15             THE WITNESS:  Yes, sir, item master and vendor item

16   table.

17             THE COURT:  Suppose all you really need from

18   Staples -- you don't need the computers and you don't need the

19   printers and all of that.  What you really need are the office

20   supplies.  Can you just load the office supplies of the Staples

21   catalog into the Lawson system?

22             THE WITNESS:  So in your agreement with Staples, your

23   agreement might say, I am only buying office supplies, and so

24   the specialized catalog that Staples provides to you only

25   contains office supply information.

1    Dell computer are merely identifying each other.  The user has

2    not really done anything but one mouse click on let's say the

3    Dell icon.

4              In our computer parlance, the two computers are

5    setting up a communication path.  That's all that's happened.

6    Q    At this stage?

7    A    So far.  All right, step four, so, we mentioned the

8    universal resource locator, the URL.  That's the web address of

9    a computer.  This is why this technical detail is important.

10   When the Lawson system contacts the external servlet, part of

11   the code design is that the servlet sends back to Lawson the

12   address, the URL, and embeds it in the Punchoutsetupresponse,

13   and that is how Lawson knows where to redirect the user so that

14   the user finds the specific customized catalog that that vendor

15   has created by agreement with the user.

16        So the web address is provided by, in this case Dell, so

17   it's not www.dell.com.  It's something special, and we're going

18   to see that.  So that URL comes back in this

19   Punchoutsetupresponse, and then the Lawson system is going to

20   redirect to there.  And we're going to see that happen.

21             THE COURT:  When you say Lawson is doing it, do you

22   mean Lawson system?

23             THE WITNESS:  I do, sir.

24             THE COURT:  So if I'm using the Lawson system where

25   you just said Lawson does it, it's the Lawson system that's

1    where in the database those items reside.

2        So if I do a keyword search for Dell, I look it up

3    in the index, and that tells me where the Dell items

4    are, and I only look at those.

5    Q    Do you have any demonstratives that you prepared

6    to help illustrate this point?

7    A    I do.

8    Q    Could we go to 09 at page 15.   Okay.   Here you

9    have a definition of an index from Webster's New World

10   Computer Dictionary.   What significance here should we

11   be focused on as you talk about this computer search

12   index that's being utilized?

13   A    This part here.   When searching or sorting the

14   database, the program uses the index rather than the

15   full database.   Such operations are faster than sorts

16   or searches performed on the actual database.

17   Q    As a computer scientist, is using an index in

18   order to search a relational database something that

19   is utilized in order to make those faster searches?

20   A    Absolutely.

21   Q    Do you know how the Lawson's system search index

22   is created?

23   A    Yes.

24   Q    What is that?

25   A    There's a process by which keywords are defined

1  that are going to become searchable.  So there's a

2  keyword search setup program that you run, and then

3  after you've defined what keywords are going to be

4  searchable and you've got your database loaded, and

5  the item master is now full of data, you run the

6  keyword search load program.  That builds the index.

7       And now until you have changed the database, you

8  have got an index into all the searchable keywords

9  that -- all of the keywords that were chosen to be

10 searchable.

11 Q   Are some of those keywords like item description,

12 item number, classification code that you've been

13 addressing already?

14 A   Yes, they are.

15 Q   Which database tables is the search index built?

16 A   I'm sorry.  Say that again.

17 Q   Sure.  From which database tables is the search

18 index built?

19 A   The item master.  Well, and the vendor item table,

20 too.

21 Q   Once the user has selected the field of the item

22 data that are to be searchable, what is the next step

23 in building this index?

24 A   So after you have chosen your keywords, you have

25 to load them all, and then you -- the computer system,

1  Q   So once you have enabled the keyword terms and you

2  built the search index, how does the Lawson search

3  engine conduct a search of the item data in the

4  database?

5  A   So if I type in a word into a text box, say Dell,

6  and engage the search engine, it goes to the search

7  index.  It looks up Dell.  It finds records in the

8  database that match the keyword Dell.  And then it

9  extracts that data from the database and presents that

10 to me on the screen.

11 Q   Do you have a demonstrative you prepared to try

12 and illustrate how this search index operates?

13 A   I do.

14 Q   What's being illustrated here, sir?

15 A   Okay.  So up here at the top we have the text box,

16 which is the search query.  I don't know where that

17 popping is coming from.

18         THE COURT:  That's because you, like some

19 witnesses, but not all, articulate your P's in a

20 particular way at a particular length from the

21 microphone, and there isn't anything that we've been

22 able to do about it.  And it's not your fault.  It's a

23 function of the way things are.

24         THE WITNESS:  Thank you, Your Honor.

25         THE COURT:  It's annoying, but --

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                    RICHMOND DIVISION

 4

 5     ---------------------------------
                                       :
 6     ePLUS, INC.                     :   Civil Action No.
                                       :   3:09CV620
 7     vs.                             :
                                       :
 8     LAWSON SOFTWARE, INC.           :   January 7, 2011
                                       :
 9     ---------------------------------

10

11            COMPLETE TRANSCRIPT OF THE JURY TRIAL

12          BEFORE THE HONORABLE ROBERT E. PAYNE

13       UNITED STATES DISTRICT JUDGE, AND A JURY

14
       APPEARANCES:
15
       Scott L. Robertson, Esquire
16     Michael G. Strapp, Esquire
       Jennifer A. Albert, Esquire
17     David M. Young, Esquire
       Goodwin Procter, LLP
18     901 New York Avenue NW
       Suite 900
19     Washington, D.C.  20001

20     Craig T. Merritt, Esquire
       Christian & Barton, LLP
21     909 East Main Street
       Suite 1200
22     Richmond, Virginia  23219-3095
       Counsel for the plaintiff
23

24              Peppy Peterson, RPR
              Official Court Reporter
25          United States District Court
```

Weaver - Direct

1    new system or just install a new system.

2         So they'll do whatever the customer needs to get a new

3    system up and running.  And Lawson will even host the entire

4    system for the customer, that is provide the hardware and

5    software and then train the customers about how to use the

6    Lawson system even if it's running at the Lawson site.

7    Q    So when you say host the system, that is the customer

8    doesn't have to actually have the software implemented on its

9    computer servers; Lawson will have it loaded there, and the

10   customer can go to the Lawson system and use it?

11   A    That's right.  Yeah.  The customer doesn't have to

12   actually have any of the hardware or software.  All of that can

13   be run from Lawson-owned and managed and maintained computers.

14   Q    So when Lawson is hosting that software, is it performing

15   the method claims that are at issue?

16   A    Yes, it is.

17   Q    Doctor, when Lawson sells a system that has those core

18   procurement modules you identified, inventory control,

19   requisitions, and purchase order, and the prerequisite modules

20   you identified being the Lawson System Foundation and process

21   flow -- can you put up those two -- yellow and blue box, and

22   there are at least two vendor catalogs either loaded, or

23   through the Punchout system available in the databases, does

24   that system have any substantial non-infringing use?

25   A    No.  The suite is intended for one purpose, and that's to

Weaver - Direct

1   another one.  We just saw that in the Punchout.  You can also

2   do that with the internal catalogs, and you can search by

3   keywords like Dell, or you can search by categories like we did

4   as we marched through the UNSPSC codes.

5   Q    So does Lawson also indirectly infringe that by

6   encouraging its customers to do the same?

7   A    Yes.

8   Q    Do you have an opinion as to whether or not Lawson systems

9   include a means for searching for matching items among the

10  selected product catalogs?

11  A    Yes, they do, and we saw that when I used the search

12  engine.

13  Q    And did they indirectly infringe that claim element by

14  assisting their customers to do the same?

15  A    Yes.

16  Q    The search engine you talked about, you also gave some

17  evidence with respect to the search index; is that right?

18  A    That's right.

19  Q    We'll come back to that later in the context of some of

20  the other claims.  The search engine, though, just to refresh

21  the jury was for what purpose?

22  A    This is to find the matching items.

23  Q    Do you have an opinion as to whether or not Lawson accused

24  systems include means for building a requisition using data

25  relating to selected matching items and their associated

Weaver - Direct

1   sources?

2   A      They do.  We saw that in my, three of my demos and in

3   their documentation.

4   Q      The Court defined matching items as search results.  Is

5   that consistent with your opinion?

6   A      Yes, it is.

7   Q      Does Lawson encourage its customers to directly infringe

8   that claim by using the systems?

9   A      They do, and we had that list of evidence like training

10  courses and help sites and Lawson employees going to the

11  customer site to help them build or maintain their system.

12  Q      Do you have an opinion as to whether or not the accused

13  Lawson systems have a capability of processing the requisition

14  to generate one or more purchase orders for the selected

15  matching items?

16  A      Yes.  We saw that in my demo and in the system

17  documentation.

18  Q      The Judge has defined selected matching items as

19  requisition items.  Is that -- is your opinion consistent with

20  that?

21  A      Yes, it is.

22  Q      Does Lawson indirectly infringe -- meet this claim element

23  by encouraging its customers to do the same by providing them

24  with these systems?

25  A      Yes.

1  Q    Do you have an opinion, Doctor, as to whether or not the

2  accused Lawson systems satisfied the claim element means for

3  converting data relating to a selected matching item and an

4  associated source to data relating to an item in a different

5  source?

6  A    Yes, and we saw that when we did the category search using

7  the UNSPSC codes.  And we also know this is made possible by

8  that IC 516 program that loads UNSPSC codes into the item

9  master.

10 Q    And this capability, is that provided to their customers?

11 A    Yes.

12 Q    And that is in the core IC module you mentioned?

13 A    Yes.

14 Q    And were there any demonstrations you put on for the jury

15 to show how you could use that UNSPSC classification code to

16 find generally equivalent items?

17 A    Yes.  We just did that with the halogen lamps.

18 Q    So what is your opinion now -- I'm sorry.  Did we see any

19 evidence with respect to whether or not Lawson encourages or

20 urges its customers to use the Lawson system to perform that

21 cross-referencing capability or conversion capability?

22 A    Yes.  We saw that in the training documents.

23 Q    The Judge has defined converting data related to a

24 selected matching item and an associated source to an item in a

25 different source.  Do you see that?

Weaver - Direct

1   Q    Did you apply those -- they are at pages two and three of

2   the glossary that has been provided to the jurors at tab six.

3   Having reviewed them, Doctor, I'm going to just ask you whether

4   or not the Lawson system, as defined by the Court, has a means

5   for entering product information that at least partially

6   describes at least one desired item?

7   A    It does.  It provides a user interface that permits that.

8   Q    Does it indirectly infringe by providing that to their

9   customers?

10  A    Yes.

11  Q    And assisting them in its operation.  Under the Court's

12  construction as you know it, does the Lawson accused system

13  have a means for searching for matching items that match the

14  entered product information and selected portions of the

15  database?

16          MR. McDONALD:  Objection, Your Honor.  He said the

17  Lawson accused system.  I think he has already said there are

18  three or four different Lawson accused systems.

19          THE COURT:  So your question is to the form of the

20  question because the evidence deals with more than one system,

21  and his question is in the singular.

22          MR. McDONALD:  Correct.

23          THE COURT:  Isn't that a well-taken objection?  In

24  other words, don't you need to specify which system if you want

25  to ask about one, or are you asking about all?  If you're

Weaver - Direct

1   and you're doing it because I prompted you to try to expedite

2   things, but in this instance, I think that it's important the

3   jury understand each one, so go ahead and do it --

4           MR. ROBERTSON:  All right, thank you.

5           THE COURT:  -- the old-fashioned way.

6           MR. ROBERTSON:  I'll do that Your Honor.

7   Q    We're back to claim three, Dr. Weaver --

8           THE COURT:  What I meant, ladies and gentlemen, is I

9   suggested to the lawyers that they move right along, and

10  they've been trying to do that, and I think in this instance,

11  them adhering to my instruction to move along resulted in some

12  short forms that Mr. McDonald objects to, and the objection is

13  well-taken.  So it's not his fault, so he'll start again on

14  this issue.

15  Q    So, Doctor, let's break this down if we can into the four

16  accused Lawson systems.  System one I'll call the core system

17  which has the blue block -- the yellow block and the blue

18  block; okay?  And system two, let's add the RSS.  System three,

19  let's add Punchout procurement.

20          THE COURT:  Now, wait a minute.  Is that the core

21  plus RSS plus the Punchout procurement?

22          MR. ROBERTSON:  Yes.

23          THE COURT:  Or is it just core plus Punchout?

24          MR. ROBERTSON:  No, you need the requisition

25  self-service.  That's why it's sitting on top of that, Your

Weaver - Direct

1    Honor.

2            THE COURT:  I just want you to make sure your

3    question is right.  I think I know the answer, but I think the

4    question needs to be clarified.  System three is the core plus

5    the RSS plus the Punchout.

6            MR. ROBERTSON:  Yes, sir.

7            THE COURT:  Right?

8            MR. ROBERTSON:  Right.

9            THE COURT:  And system four?

10           MR. ROBERTSON:  We'll call that the plus the

11   electronic data interchange module.

12           THE COURT:  So it's the core, which is the yellow and

13   the blue, plus the EDI; is that what you are saying, or are you

14   saying something else?

15           MR. ROBERTSON:  Well, that actually -- we should do

16   the core plus just EDI.

17           THE COURT:  That's what the testimony has been so

18   far.

19   Q    Then you actually could also have, I would think, the

20   system five, would you agree with me, Doctor, that has all five

21   of these boxes?

22   A    Yes, you could.

23   Q    Let's go back to claim one of -- excuse me, claim three of

24   the '683 patent.  Doctor, for indirect infringement, once we

25   get to it, I'm just going to ask you for all these elements,

1   let's go through direct infringement first and identify which

2   system infringes which claim.

3   A     Okay.

4   Q     And in each of these system configurations, do you have an

5   opinion as to whether or not all five satisfy the preamble that

6   they are electronic sourcing systems as defined by the Judge?

7   A     Yes, all five.

8   Q     In each of these configurations, does Lawson provide an

9   accused system, all five system that's capable of having at

10  least two product catalogs containing data related to items and

11  items associated with respect to sources?

12  A     Yes.

13  Q     In each of these scenarios, does all five systems, do they

14  provide the means for selecting a product catalog to search?

15  A     Yes.

16  Q     In each of these systems, do they provide means for

17  searching for matching items among the selected product

18  catalogs?

19  A     Yes.

20  Q     In each of these systems, have we seen evidence that shows

21  that they have the means for building a requisition using data

22  relating to selected matching item and their associated

23  sources?

24  A     Yes.

25  Q     In each of these five system that we've identified, does

Weaver - Direct

1  it have the means for processing the requisition to generate

2  one or more purchase orders for the selected matching items?

3  A    Yes.

4  Q    Which of the five systems have we seen have the ability

5  for converting data relating to a selected matching item and

6  associated source to data relating to an item and a different

7  source?

8  A    The ones that contain the requisition self-service module.

9  Q    So if it had the requisition self-service module, that

10 would be able to satisfy this last claim element?

11 A    Yes.

12 Q    So that would be system, two, three, four, and five as we

13 defined them; is that right?

14 A    That's what my diagram says, yes.

15 Q    For each of these elements, does Lawson encourage, aid,

16 abet, or assist their customers to satisfy them?

17 A    Yes.

18 Q    These two product catalogs, have we seen instances where

19 Lawson will make catalogs available, multiple catalogs

20 available to their customers either through external, Punchout

21 catalogs, or internal catalog databases?

22 A    Yes, we have.

23 Q    Let's go to claim 26 if we can.  Let's do that.  If we can

24 put claim 26 next to claim 28, put those side by side.  They're

25 a little difficult to read, but can you confirm for me, Doctor,

800

Weaver - Direct

1   Q    All right.  The next step in these method claims is

2   searching for matching items among the selected product

3   catalogs.  Do you see that?

4   A    I do.

5   Q    That's for both claim 26 and claim 28?

6   A    Correct.

7   Q    We see the ability to search for matching items among the

8   selected product catalogs in evidence you offered?

9   A    Yes.  We saw it in the demonstrations.

10  Q    Did we see it in documentation?

11  A    Certainly.

12  Q    That would be for both claims?

13  A    For both claims.

14  Q    Does all five of the accused Lawson systems have the

15  ability to, capability of building a requisition using data

16  relating to selected matching items and their associated

17  sources?

18  A    Yes.

19  Q    Can the customers perform that step with all five

20  configurations that we've defined?

21  A    Yes.

22  Q    The next step is processing requisition to generate one or

23  more purchase orders for the selected matching items.  Did we

24  see that that step could be performed in the demonstrations?

25  A    We saw it in the demonstrations.

1   A   That's correct because "catalog" does not appear

2   in the first element of this Claim One of the '172

3   patent.

4   Q   Do you have an opinion as to whether or not the

5   Lawson -- which Lawson accused systems -- let me start

6   over.  Do you have an opinion as to whether or not

7   the five systems as we have defined them satisfy the

8   claim element of means for entering product

9   information that at least partially describes at least

10  one desired item?

11  A   Yes, all five.

12  Q   Where do we see examples of that?

13  A   In the product documentation and in my

14  demonstrations.

15  Q   How do you do that?

16  A   You enter a keyword into a text box using the user

17  interface that is provided by either the RQ, the

18  requisitions module, or the requisition self service

19  module.

20  Q   Do you have an opinion as to whether all five

21  systems, as we've defined them, satisfy the claim

22  element of means for searching for matching items that

23  match the entered product information in the selected

24  portions of the database?

25  A   Yes, all five do that.  They all provide a search

WEAVER - DIRECT                    814

1  engine and they all use the keyword search index.

2           MR. McDONALD:  Your Honor, configuration

3  No. 1 is not accused with this claim, so I think it's

4  confusing to have them going element through element

5  for all five of them.  I think the ones that include

6  the RSS should be --

7           THE COURT:  Mr. Robertson, what saith thou?

8           MR. McDONALD:  I'm actually confused by --

9           THE COURT:  Let me let you-all do this.  I

10  thought we'd be through with Dr. Weaver by now and

11  we'd take our morning break, but you have been here

12  for four hours working at it now.  I think it's a good

13  time to stretch your legs and get this sorted out, and

14  then we'll come back and conclude with Dr. Weaver's

15  direct and have cross-examination.

16           Take your pads with you.  We'll take a

17  20-minute recess.

18           It's different in different courts, isn't it?

19  In state court here you stand up or you used to.  It's

20  been so long since I've been in state court I don't

21  know.  But you can sit down and examine witnesses.

22           You-all get that straight, will you?  What he

23  said basically is that the first configuration, which

24  is the platforms, the yellow box, plus the S3 modules,

25  which has purchase order inventory and requisitions

WEAVER - DIRECT                    815

1    aren't accused.  Isn't that what your objection was?

2            MR. McDONALD:  That's right.

3            THE COURT:  The question was confusing if he

4    is giving opinion that it does infringe.  In addition

5    to that, it is beyond where you are in the discovery

6    process.  And we have to sort that out and then get

7    your question straight, and go forward from there

8    while we're having a recess.

9            Thank you.  Recess for 20 minutes.

10           (Brief recess taken.)

11           THE COURT:  All right.  Have we gotten

12   ourselves ready to go now?

13           MR. ROBERTSON:  Yes, sir.

14           THE COURT:  All right.  Let's go.

15   BY MR. ROBERTSON:

16   Q   Dr. Weaver, we were looking at Claim One, the '172

17   patent.  The fifth element down I'd like you to focus

18   on as.  It's a means for building a requisition that

19   uses data obtained from a database relating to

20   selected matching items on said order list.  Do you

21   see that, the order list?

22   A   Yes.

23   Q   Which Lawson application did we see that had the

24   capability of providing an order list?

25   A   The shopping cart.  So the RSS module.

WEAVER - DIRECT                    817

1    containing data relating to items associated with at

2    least two vendors maintained so that selected portions

3    of the database may be searched separately?

4    A    Yes, they do.

5    Q    And in your opinion by the acts that we have

6    described does Lawson satisfy that element for

7    indirect infringement?

8    A    Yes.

9    Q    Do configurations 2, 3 and 5 have means for

10   entering product information that at least partially

11   describes at least one desired item?

12   A    Yes, 2, 3 and 5, they do.

13   Q    Do 2, 3 and 5 satisfy the element of means for

14   searching for matching items that matched the entered

15   product information in the selected portions of the

16   database?

17   A    They do.

18   Q    How did we see that?

19   A    Because of the user interface that we saw in the

20   requisition self service.

21   Q    And we saw that in your demonstrations?

22   A    Sure, we did.

23   Q    Do configurations 2, 3 and 5 have means for

24   generating an order list that includes at least one

25   matching item selected by said means for searching?

1   A    They do.

2   Q    Is it that RSS module that provides that order

3   list or shopping cart as you referred to it?

4   A    Yes, the RSS is where the shopping cart

5   functionality resides.

6   Q    Do configurations 2, 3 and 5 of the accused Lawson

7   systems have a means for building a requisition that

8   uses data obtained from said database related to

9   selected matching items on said order list?

10  A    They do.

11  Q    Do configurations 2, 3 and 5 have a means for

12  processing said requisition to generate purchase

13  orders for said selected matching items?

14  A    They do.  We saw that in the demo.

15  Q    The searching that's the subject of the means for

16  searching which permits you to search a database,

17  selected portions of a database, what evidence did we

18  see that that was present?

19  A    That was the search index that selected only --

20  that searched only selected portions of the database.

21  Q    Now, if Lawson provides such an electronic

22  sourcing system to its customers and assists them in

23  implementation, maintenance, servicing and all the

24  training materials, guides, manuals, online services,

25  etc., do you have an opinion as to whether or not all

1   have.  But you had just gotten started, and I wanted

2   to follow-up with what he was saying.

3   BY MR. McDONALD:

4   Q   You do understand, don't you, Dr. Weaver, that

5   Lawson doesn't dictate what vendors make available to

6   customers when they are a Punchout partner?

7   A   I think that's right.

8   Q   All those websites you mentioned yesterday from

9   Staples, that Stapleslink.com, Lawson has no control

10  over that website, correct?

11  A   Oh, goodness, that's not true.  Lawson has immense

12  control over that website.

13  Q   Tell me about the control Lawson has over

14  Stapleslink.com.

15  A   When the Lawson customer clicks on that -- which

16  one did you say.  Staples?

17         THE COURT:  Stapleslink.com; is that right?

18         MR. McDONALD:  That's right.

19  A   When the customer clicks on that Staples icon,

20  then Lawson sets up a special connection with the

21  Staples link, and it exchanges authentication

22  information.  It issues that Punchout setup request.

23  It waits for the servlet on the Stapleslink.com

24  website to send back the Punchout setup response that

25  includes the URL to which Lawson is supposed to

1  redirect this particular customer.

2      So the customer goes to that site.  The customer

3  shops.  Presumably buys something.  Puts it in the

4  shopping cart.  Then the shopping cart contents at the

5  time of checkout are returned in a special format.

6  Lawson interprets that format.  Puts it in a cache

7  data file.  Closes out the session securely, and then

8  starts processing the checkout items to put them into

9  the Lawson shopping cart.  So Lawson has immense

10  control.

11  Q   Isn't everything you just described relating to

12  simply the communication back and forth with the

13  Stapleslink.com website as opposed to what is actually

14  posted or shown or displayed or done at the website

15  itself?

16  A   That's what I'm trying to say, yes, that Lawson

17  has complete control over the communication system.

18  Q   Let me ask you a different question.

19  A   Sure.

20  Q   The website itself, who controls the

21  Stapleslink.com website?  That's a different question

22  from how is the communication to that website, right?

23  A   I just explained the communications.

24  Q   I'm exploring the issue of the difference between

25  the communication with the website and who is actually

WEAVER - CROSS                            877

1   controlling the website itself.  Do you understand

2   that distinction?

3   A   Well, the control of the website, as I've just

4   explained, is a shared responsibility because the

5   servlet, which is part of Staples, is returning a URL

6   to Lawson saying where should we redirect the user's

7   browser.

8   Q   When I have --

9           THE COURT:  Excuse me, Mr. McDonald.  Are you

10  asking him who has control over putting on the Staples

11  link website whatever is on the website?

12          MR. McDONALD:  That's where I was going.

13          THE COURT:  Well, that's different than

14  whether there's control because control has a

15  component of it in the interrelated nature of things,

16  according to him, that I think is distracting from the

17  purpose.

18          What you want to know is:  Who is it that

19  puts products on the Staples link website, right?

20          MR. McDONALD:  Let's try that.

21          THE COURT:  Try that and see if you like it

22  and go from there and see if you can find another one

23  you like.

24  BY MR. McDONALD:

25  Q   With the Stapleslink.com website, who is in charge

WEAVER - CROSS                           878

1   of loading up a list of products on that website?

2   A    Staples is in charge of the content displayed on

3   the website.

4   Q    Does Lawson have any say in what content Staples

5   displays at that website?

6   A    I don't know.

7   Q    If I understood you right, when a customer uses

8   that Stapleslink.com Punchout, can they do a search

9   for products at the Stapleslink.com website?

10  A    Yes.

11  Q    Whose responsible for putting together the

12  computer stuff that you need to do a search at the

13  Stapleslink.com website?

14  A    The search on the stapleslink.com website uses the

15  Staples search engine.

16  Q    How do you know that?

17  A    Because that's the way these systems work.

18  Q    Have you ever done anything to check it out?

19  A    Well, I know how the protocols operate.  And once

20  you're redirected to that site, now you're working in

21  that environment at Staples.

22  Q    My question is did you do anything for your

23  $160,000 to check that out?

24  A    No.

25  Q    Did I understand right for this case you did talk

1  to a source code expert, right?

2  A   I did.

3  Q   Because you thought that was pretty important to

4  understand the source code and how that operated

5  behind the scenes in the Lawson system, right?

6  A   Yes.

7  Q   You didn't check that out for the Punchout

8  partners that do the actual searching and display the

9  actual data that you showed us in those demonstrations

10 yesterday, right?

11 A   I never made an issue of it, so no.  There's no

12 need to check it out.

13 Q   I think in your demo of the Punchout websites

14 yesterday you were also going through the issue of

15 availability of inventory; is that correct?

16 A   Correct.

17 Q   Is it true that in your examples the Staples and

18 the Dell, not Lawson, would have control over checking

19 out the inventory?

20 A   That's true, the information comes from the

21 Punchout partner.

22 Q   Lawson has no idea what Dell or Staples has in

23 inventory, right?

24 A   Probably not.

25 Q   And you understand that for purposes of the claims

1    testified earlier about a database, and then I asked him a

2    question, and the question is, the item master plus the item

3    table plus the item question mark equals a database, and that

4    really wasn't what he said, but it was close.

5             Will you recite, sir, what you said was the database

6    in response to the question we were talking about earlier?

7             THE WITNESS:  Yes, Your Honor.  The database is the

8    item master, the vendor table, and the item location table.

9             THE COURT:  Item location table is the other question

10   mark.  All right.

11            MR. ROBERTSON:  Can I ask you what database is that,

12   Dr. Weaver?

13            THE COURT:  That's fine.  You can ask that question.

14   Then Mr. McDonald, since he's the one that started it all

15   anyway, can have a shot at it, too.

16            THE WITNESS:  That's the Lawson database.

17            MR. ROBERTSON:  Thank you.

18            THE COURT:  Mr. McDonald, do you want to ask him

19   anything?

20            MR. McDONALD:  Nothing else, Your Honor.

21            THE COURT:  All right, Dr. Weaver, you're excused

22   subject to the recall we talked about a little while ago.

23            THE WITNESS:  Thank you, Your Honor.  Thanks to the

24   jury.

25            THE COURT:  All right, your next witness, please,

1   and assisting the customer with testing the software

2   on that equipment; is that correct?

3   A   Yes, we assist with customer with all the aspects

4   of implementing the software and those would be

5   included.

6   Q   Among the aspects included with implementation

7   would be all aspects up to and including bringing a

8   system live into actual production operation; is that

9   correct?

10  A   That's right.

11  Q   Lawson also provides -- when a customer's system

12  goes live, that means it's actually operational and in

13  an actual production environment to perform the

14  procurement process; is that correct?

15  A   We hope so, yes.

16  Q   Now, also included among the services that Lawson

17  would provide to its customers, Lawson can provide

18  hosting services or Lawson physically hosts the

19  customer's system in space that Lawson owns if the

20  customer so desires; is that correct?

21  A   We can.

22  Q   And Lawson also provides services to its customers

23  to support converting existing systems and conversion

24  of data from those existing systems into the proper

25  format for importation into a Lawson system; is that

1  correct?

2  A   Yes.  All of our customers are importing from a

3  previous system, so yes.

4       THE COURT:  Excuse me just a minute.  I don't

5  know that any of us over here know what hosting means.

6  The way it's been explained sort of leads me to the

7  impression that Lawson has everything on its computer

8  system, but if I'm the customer, I can be in Timbuktu

9  and just use my computer, and I go through you to get

10 what I want.  Is that basically right or wrong?

11      THE WITNESS:  The only clarification I would

12 make to that is that the system is actually still the

13 customer's system.  So it is their system.  It is

14 physically housed in a Lawson-owned or leased

15 facility.  Obviously, we take care of keeping the

16 lights on and the electricity and those of things, but

17 the system can be accessed, you're correct, from

18 Timbuktu or anywhere else in the world using Internet

19 protocols.

20 Q   And Lawson will assist its customer with

21 implementing those systems that it hosts in its own

22 facilities among other services; is that correct?

23 A   Yes.  It makes no difference where that hardware

24 lives.

25 Q   Lawson also provides workshops to educate its

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                      RICHMOND DIVISION

4

5    ------------------------------------
                                         :
6    ePLUS, INC.                         :    Civil Action No.
                                         :    3:09CV620
7    vs.                                 :
                                         :
8    LAWSON SOFTWARE, INC.               :    January 11, 2011
                                         :
9    ------------------------------------

10

11          COMPLETE TRANSCRIPT OF THE JURY TRIAL

12        BEFORE THE HONORABLE ROBERT E. PAYNE

13      UNITED STATES DISTRICT JUDGE, AND A JURY

14

15   APPEARANCES:

16   Scott L. Robertson, Esquire
     Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001

20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff

23

24              Peppy Peterson, RPR
               Official Court Reporter
25           United States District Court

1   long-standing relationships with; right?

2   A    Right.  Others have been supported for a number of years.

3        THE COURT:  Excuse me just a second.  Earlier I

4   thought you said, and I'm not suggesting that you said anything

5   deliberately at odds or even maybe not at odds at all, so I'm

6   asking the question.

7        I thought you said that the customers, Lawson's

8   customers had to execute the contracts with the trading

9   partners, the punchout partners, and then you just said that

10  Lawson has contracts with the trading, punchout trading

11  partners.  Are there two different contracts that are involved?

12       THE WITNESS:  Yes, sir.  There are two different

13  contracts that are involved.

14       THE COURT:  What does the contract between Lawson and

15  the punchout partner, basically what does it arrange for?

16       THE WITNESS:  It arranged for the testing of the

17  communication between procurement punchout and the vendor's

18  maintained website.  We make sure there's really the handshake

19  so that if a customer wants to use our software with that third

20  party, we'll test it to make sure that it works and that when

21  they check out, that the items they've selected were able to

22  bring them back into our software, and so it covers that

23  initial testing and then ongoing maintenance of that.

24       THE COURT:  And then the customer's contract with the

25  punchout partner, what generally does it cover?

1    charges fees to its customers; correct?

2    A    Yes.

3    Q    And so some of these managed services could be

4    installation; correct?

5    A    Installation, my understanding, is separate from the

6    managed services.

7    Q    Would you consider those to be under consulting services?

8    A    Yes, I would.

9    Q    So do you charge for those consulting services as well?

10   A    Yes.

11   Q    So installation falls in the consulting services bucket?

12   A    Yes, that's my understanding.

13   Q    Hosting falls within the managed services bucket?

14   A    I'm not sure exactly where that would fall.

15   Q    Wherever it falls, though, managed services is something

16   that Lawson provides; correct?

17   A    Yes.

18   Q    There's also training which could include managed

19   services; is that right?

20   A    No, training is separate from managed services.

21   Q    Is that consulting services?

22   A    I think that -- I'm not 100 percent certain.  I think it

23   falls under the consulting umbrella.

24   Q    Let's talk about these managed services where Lawson is

25   hosting, that is actually providing the system, making it

Lohkamp - Direct

1   available to the customer instead of having the customer having

2   the software operating on its own servers.  You are familiar

3   with that; right?

4   A    Yes, to some degree.

5   Q    So where Lawson provides this managed or hosted

6   procurement capability, this service, the user is actually

7   accessing the Lawson system over the internet; isn't that

8   right?

9   A    Yes.  They access that over a secured connection to the

10  hosting computers.

11  Q    Why do you want it to be secure?

12  A    So that other people don't have access to that data.  You

13  only want our customers to be able to log in and access that

14  data.

15  Q    And so the customer doesn't actually have to have this

16  procurement software operating on its internal system, it just

17  accesses the system, a secure system that Lawson is operating

18  that makes it available so they can purchase items from

19  multiple vendors; isn't that right?

20  A    I'm not sure I completely understand the question.  Could

21  you repeat that?

22  Q    Sure.  Customers don't actually have to have the Lawson

23  software operating on its internal system, its servers; it can

24  just access the procurement system that Lawson is operating and

25  make that available to them so they can purchase items from

Lohkamp - Direct

1   multiple vendors?

2   A    Yes.  Our customers don't have to have it operating on

3   their own servers.  They can access a hosted set of procurement

4   applications.

5   Q    And they can perform these purchasing functions we've been

6   talking about for multiple vendors, can't they?

7   A    They can perform the purchasing functions and order from

8   multiple vendors.

9   Q    And this hosting operation that Lawson conducts also

10  includes procurement punchout; isn't that right?

11  A    It is an option for our customers to use procurement

12  punchout.

13  Q    So a customer might prefer to have Lawson host the

14  procurement software as opposed to having it on their own

15  system so they would not have to manage the servers or update

16  the applications; isn't that right?

17  A    That's right.

18  Q    One of the services Lawson provides with respect to this

19  S3 procurement product we've been talking about is

20  installation; is that right?

21  A    That's right.

22  Q    And you charge for installation, don't you?

23  A    Yes, we do.

24  Q    And isn't it true that Lawson's customers choose to have

25  Lawson consultants perform the installation or implementation

1   in it about ePlus?

2   A    Yes, I did.

3   Q    Did it?

4   A    Not that I could find.

5   Q    I'm going to move onto another topic.

6   Mr. Robertson asked you about your knowledge of ePlus

7   when you first learned about them.  When did you first

8   learn about ePlus' patents?

9   A    When this lawsuit was filed.

10  Q    So as part of your earlier knowledge, you did not

11  know that they owned patents?

12  A    That's correct.

13  Q    I'm going to ask you some questions about some of

14  the accused products in this case, the core modules

15  and also RSS.  Let's start by talking about RSS.  When

16  you select search catalog in RSS, what does it

17  actually search?

18  A    It's searching the Lawson item master.

19  Q    Who selects the items that are included within

20  Lawson's item master?

21          MR. ROBERTSON:  Objection, Your Honor

22  relevancy.

23          MS. STOLL-DeBELL:  Your Honor, it goes to

24  infringement.

25          MR. ROBERTSON:  It has nothing to do with the

1130

Lohkamp - Cross

```
 1              THE COURT:  Resolution, ladies and gentlemen, is the

 2    questioning on that issue will be put off pending further

 3    consideration of the matter by the Court, so we'll proceed to

 4    another topic.

 5    BY MS. STOLL-DeBELL:  (resuming)

 6    Q    Okay, Mr. Lohkamp, I'm going to ask you some questions

 7    about the punchout product now.

 8    A    Okay.

 9    Q    Do customers need to purchase RSS to be able to use

10    punchout?

11    A    Yes, they do.

12    Q    How many of Lawson's customers actually -- that have RSS

13    actually purchased punchout?

14    A    We have approximately a hundred punchout customers.

15    Q    And how many RSS customers do you have?

16    A    We have about 300 to 400.

17    Q    So what percentage is that?

18    A    Approximately 25 percent.

19    Q    What benefits does the punchout product offer that RSS

20    does not?

21    A    The punchout product allows our customers to bring more

22    categories ^ expanded under management by allowing them to

23    punch out to a vendor-managed website and search their list of

24    items and prices that the vendor set up for them encouraging

25    people to buy off that catalog and hopefully save money.
```

Lohkamp - Cross

1    Q    How is that different than RSS?

2    A    It's different than RSS in that customers wouldn't have to

3    maintain their another -- wouldn't have to load those items in

4    their item master.

5    Q    Does Lawson control the content or functionality of a

6    punchout vendor's website?

7    A    No, we do not.

8    Q    If Lawson doesn't control the punchout vendor's website,

9    why does Lawson have contracts with the punchout vendor?

10   A    We have contracts with the punchout vendor so we can

11   accomplish that testing to insure that handshake of the

12   messaging so that when our customers use punchout, they are

13   able to log in, and then when they're done using the vendor's

14   website, able to get the data back from the shopping cart of

15   the things they want to order.

16   Q    Okay.  Can you explain what that handshake is for us,

17   please?

18   A    Well, it's we -- we kind of refer to it as a cXML message,

19   but it's an electronic formatted document that is sent to the

20   vendor's website with certain information.  First transaction

21   sends their login credentials and basically helps authenticate

22   the user, and then at the end, when the user is done using the

23   vendor website and decided to purchase something, then the

24   vendor website creates a message that we're waiting to receive

25   an electronic message that has the details of the cart, and

1    then we bring that into RSS.

2    Q    Okay.  So to make sure I understood this, a cXML message

3    is sent from Lawson's punchout software to the vendor's

4    website?

5    A    Yes.

6    Q    And that contains this handshake you've been talking

7    about?

8    A    Yes.  Contains the login credentials.

9    Q    And what are the login credentials?

10   A    It's a user name and password, an agreed-upon way for

11   the -- for our customers to access the vendor's website.

12   Q    Does Lawson select the user name or password that's sent

13   in this cXML message?

14   A    No, we do not.

15   Q    Who does that?

16   A    The customer in combination with the vendor.

17   Q    So is all that you're doing is requiring that that login

18   credential be sent in a certain format?

19              MR. ROBERTSON:  Objection, Your Honor, to the form of

20   the question; leading.

21              THE COURT:  Sustained.  Let him testify.

22   Q    What does Lawson require with regard to the login

23   credentials?

24   A    It may vary from vendor site to vendor site, but it

25   usually includes a URL which is the website address for the

1133

Lohkamp - Cross

1 where the vendor website is, and then it's usually an

2 identifier to identify the customer to the vendor, and then

3 usually a sort of what's called a shared secret which is

4 essentially the password, and then any other user identifier to

5 help identify who is logging in.

6 Q    And does Lawson control the URL that's part of that?

7 A    No, we do not.

8 Q    Do you care what that URL is?

9 A    No, we don't.

10 Q    So does Lawson control the identifier?

11 A    No.

12 Q    Do you care what it is?

13 A    No.

14 Q    Does Lawson control the shared secret?

15 A    No, we do not.

16 Q    Do you care what it is?

17 A    No.

18 Q    So that takes care of the handshake then?

19 A    The vendor website responds back with another XML message

20 saying that, yes, they've logged in, so it confirms that we've

21 logged in.

22 Q    What happens on the Lawson side of the system?

23 A    On the Lawson side of the system, we're -- our software is

24 waiting to hear back from the vendor website when the user is

25 done using that vendor website.

1134

Lohkamp - Cross

1   Q     Then I think you talked about receiving details of the

2   cart back from the vendor website?

3   A     Yes.

4   Q     Can you explain to us what that's all about?

5   A     When the customer has decided what they wanted to purchase

6   and they go through a checkout process, instead of the order

7   being placed on the website, the vendor website then creates an

8   XML message.  It's an electronic document that gives us all the

9   details of what was in the shopping cart, and we're waiting to

10  receive that information so we can pass that back into

11  requisition self-service.

12  Q     Where does it go once it's received by requisition

13  self-service?

14  A     Once it's received by requisition self-service, it gets

15  put into the shopping ^ cart in requisition self-service

16  requisition lines.

17  Q     Does Lawson control the content of that XML message that

18  the vendor's website sends back?

19  A     No.

20  Q     I think you said that Lawson's system waits around after

21  the customer has accessed and gained access to the vendor's

22  website?

23  A     Yes.  It's waiting for a message back.

24  Q     While it's waiting for a message back, does it have any

25  control over what the customer is actually doing at the vendor

Lohkamp - Cross

1    website?

2    A    No, it does not.

3    Q    So does it control any searching functionality that

4    happens at the vendor website?

5    A    No, it does not.

6    Q    Does it control how the items are displayed at the vendor

7    website?

8    A    No, it does not.

9    Q    Does it control any kind of inventory checking that may

10   happen at the vendor website?

11   A    No, it does not.

12   Q    Does it dictate what kind of searching functionality

13   happens at the vendor's website?

14   A    No, it does not.

15            THE COURT:  I think that's sufficient to have asked

16   the question, which you did at the beginning, that Lawson, in

17   his view, doesn't control the function or content of the

18   punchout vendor's website or the communication in establishing

19   it, and you don't need to go through every component of it to

20   do it.

21            Once you have the whole, established the principle of

22   the whole, then you don't need to go in and add up each word in

23   the sentence.  So let's go on to something else.

24            MR. STOLL-DeBELL:  Okay, Your Honor.

25   Q    I want to talk to you about the contract that you have

Lohkamp - Cross

1140

1   term that's used to describe a third party that you're doing

2   business with.  So when we use the word trading partners, our

3   customer is going to recognize that as a third party they might

4   be doing business with.

5   Q    When a Lawson customer punches out to a punchout vendor's

6   website, whose software is actually doing the searching at that

7   vendor website?

8   A    The vendor's website is doing the searching.

9   Q    Does Lawson's RSS software have a search engine?

10  A    Yes, it does.

11  Q    Does that search engine ever do any searching on a

12  punchout vendor's website?

13  A    No, it does not.

14  Q    For punchout to work, does a punchout vendor need to be a

15  supported punchout trading partner?

16  A    No, it does not.

17  Q    I think you testified that some of the punchout vendors

18  have contracted with Lawson and some do not; is that correct?

19  A    That is correct.

20  Q    How many of the punchout vendors have contracts with

21  Lawson?

22  A    It's about four or five.

23  Q    Can you give me some examples of punchout vendors that do

24  not have contracts with Lawson?

25  A    Yes.  Dell, Office Depot, McKesson, Hewlett-Packard, IBM,

1   Staples, Fisher, ^ steal case, ABC schools.   There's a number,

2   at least probably more ablations, school /PERBL /TEU.   Majority

3   don't have contracts with us.

4   Q      ePlus's counsel asked you about a number of industry

5   analyst reports.

6   A      Yes.

7   Q      Gartner was one of them, AMR, Forrester.   What were the

8   others?

9   A      Aberdeen and VDC.

10   Q      When did you get a subscription to Gartner?

11   A      I got a subscription to Gartner when my AMR subscription

12   converted over to Gartner.

13   Q      When was that?

14   A      That converted over last year.

15           THE COURT:   Was that because Gartner bought AMR?

16           THE WITNESS:   Gartner purchased AMR.

17           THE COURT:   How long did you have the AMR one?

18           THE WITNESS:   I had that ARM for about a year and a

19   half.

20           THE COURT:   And then it just changed over to Gartner

21   ^ to.

22           THE WITNESS:   It just changed over to Gartner.

23   Q      Okay.   So you got the subscription to AMR in around 2008?

24   A      I believe so, yes.

25   Q      Did you have a subscription to any of those analyst

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                     RICHMOND DIVISION

 4

 5     ---------------------------------------
                                            :
 6     ePLUS, INC.                          :    Civil Action No.
                                            :    3:09CV620
 7     vs.                                  :
                                            :
 8     LAWSON SOFTWARE, INC.                :    January 12, 2011
                                            :
 9     ---------------------------------------

10

11            COMPLETE TRANSCRIPT OF THE JURY TRIAL

12          BEFORE THE HONORABLE ROBERT E. PAYNE

13        UNITED STATES DISTRICT JUDGE, AND A JURY

14
       APPEARANCES:
15
       Scott L. Robertson, Esquire
16     Michael G. Strapp, Esquire
       Jennifer A. Albert, Esquire
17     David M. Young, Esquire
       Goodwin Procter, LLP
18     901 New York Avenue NW
       Suite 900
19     Washington, D.C.  20001

20     Craig T. Merritt, Esquire
       Christian & Barton, LLP
21     909 East Main Street
       Suite 1200
22     Richmond, Virginia  23219-3095
       Counsel for the plaintiff
23

24              Peppy Peterson, RPR
              Official Court Reporter
25          United States District Court
```

```
 1            THE COURT:  The jury reports that they'd like to work
 2   both Saturday and Monday.  You're really not sure, are you, Mr.
 3   Strapp?
 4            The jury doesn't want to work -- they said they don't
 5   want to work either day, so I think we'll not work on Monday.
 6            MR. ROBERTSON:  Is it a unanimous decision, Your
 7   Honor?
 8            MR. McDONALD:  Can we poll the jury?
 9            THE COURT:  I didn't poll them -- I didn't ask them
10   either.
11            COURT SECURITY OFFICER:  It was the majority.
12            THE COURT:  Okay.  You want to make your Rule 50
13   motion.
14            MR. McDONALD:  I've been replaced for this one.  Ms.
15   Hughey will be arguing.
16            THE COURT:  All right.
17            MS. HUGHEY:  Thank you, Your Honor.  Lawson
18   respectfully moves this Court for judgment as a matter of law
19   under Rule 50 of the Federal Rules of Civil Procedure.  ePlus
20   has been fully heard on the issue of infringement, and a
21   reasonable jury does not have a legally sufficient evidentiary
22   basis for find for ePlus on this issue.
23            The testimony and documents introduced at trial
24   demonstrate that Lawson did not directly or indirectly infringe
25   asserted claims three, 26, 28, or 29 of the '683 patent, claims
```

1   one, two, six, nine, 21, 22, or 29 of the '516 patent, or claim

2   one of the '172 patent.  For this reason, Lawson requests the

3   Court resolve the issue of infringement against ePlus in this

4   case.

5        With respect to direct infringement, ePlus has not

6   proven that Lawson directly infringes the asserted claims.

7   During trial, Dr. Weaver provided his infringement opinion on

8   five Lawson accused systems:  Inventory control, purchase order

9   and requisitions, also referred to as S3 procurement, RSS

10  combined with S3 procurement, punchout combined with S3 and RSS

11  procurement, EDI combined with S3 procurement and all modules

12  combined.

13       ePlus has not proven that it is more likely than not

14  that Lawson has made, used, offered to sell, or sold the

15  inventions defined in the asserted claims.  A reasonable jury

16  does not have a legally sufficient evidentiary basis to find

17  otherwise.

18       With respect to the asserted systems claim three of

19  the '683 patents, claims one, two, six, nine, 21, 22, or 29 of

20  the '516 patent and claim one of 172 patent, ePlus has not

21  proven that Lawson's accused products have any of the required

22  elements.  ePlus's expert, Dr. Weaver's testimony was

23  conclusory, unsupported, and insufficient to meet ePlus's

24  burden to prove that Lawson's accused systems have these

25  required elements.

1    ePlus also has not proven that Lawson practices all

2  of the steps required by method claims 26, 28, and 29 of the

3  '683 patent.  At trial, ePlus did not even accuse Lawson of

4  performing all of the steps of these method claims.  Indeed,

5  when questioned, Dr. Weaver never opined that Lawson performed

6  the step of maintaining at least two product catalogs on the

7  database containing data related to items associated with the

8  respective sources, selecting the product catalogs to search,

9  or searching for matching items among the selected product

10  catalogs.

11    Thus, the jury does not have a legally sufficient

12  basis to find for ePlus on the issue of direct infringement of

13  the method claims, and this Court should grant judgment as a

14  matter of law that Lawson does not directly infringe any of the

15  method claims.

16    With respect to indirect infringement, ePlus has also

17  not proven that Lawson indirectly infringes the asserted

18  claims.  A reasonable jury does not have a legally sufficient

19  evidentiary basis to find otherwise.  First, liability for

20  indirect infringement, either contributory or induced

21  infringement, requires proof of direct infringement.

22    ePlus has failed to prove that any third party,

23  either customers, vendor, or other, directly infringed any of

24  the claims in suit.  Thus, a reasonable jury does not have a

25  legally sufficient evidentiary basis to find indirect

1    infringement.

2           Second, ePlus has not proven that the legal

3    requirements of indirect infringement have been met.   Among

4    other things, both contributory and induced infringement

5    require intent, an element ePlus has failed to prove.

6    Contributory infringement requires proof that the accused

7    infringer offers a component of a patented machine knowing the

8    same to be especially made or especially adapted for use in

9    infringement of such patent and not a stable article or

10   commodity of commerce suitable for substantial non-infringing

11   use.

12          The Federal Circuit has instructed that for this

13   requirement to be met, plaintiff must show the defendant knew

14   that the combination for which its components were especially

15   made was both patented and infringing.

16          For induced infringement, a patentee must demonstrate

17   that the accused infringer's actual or constructive notice of

18   the patent and its intent to induce infringement of the patent

19   requires culpable conduct, namely that the alleged infringer's

20   actions induced infringing acts and that he knew or should have

21   known his actions would induce actual infringement.

22          Legal requirements for contributory and induced

23   infringement have not been met in this case.   There is no

24   evidence that Lawson knew of the patents before the lawsuit was

25   filed in May of 2009, let alone had the intent required for the

1    contributory or induced infringement.  Further, there is no

2    evidence that Lawson should have known of ePlus's patents.

3           Dr. Weaver's opinion on the issue of induced

4    infringement is totally irrelevant.  Not only is it conclusory,

5    he did not consider the knowledge issue at all.  The same is

6    true with respect to contributory infringement.  With respect

7    to the accused punchout system, the jury does not have a

8    legally sufficient evidentiary basis to find for ePlus on the

9    issue of infringement.

10          Lawson did not practice all of the claimed method

11   steps with respect to the punchout product, and Lawson's system

12   does not meet all of the required system limitations with

13   respect to the punchout product.  This Court should grant

14   judgment as a matter of law that the punchout system does not

15   infringe any of the asserted claims.

16          First, with respect to method claim 26, 28, and 29 of

17   the '683 patent, there has been no showing that any one party

18   performs every single one of the claimed method steps for the

19   punchout products.

20          There is no dispute that ePlus relies on the actions

21   of customers and third-party vendors in its argument that the

22   claim limitations are met with respect to this product.  For

23   example, ePlus argues the step of maintaining at least two

24   product catalogs on a database containing data related to items

25   associated with the respective sources is met by external

1  vendor catalog, not Lawson.

2          Likewise, Dr. Weaver never asserted Lawson practiced

3  the step of determining whether a selected matching item is

4  available in inventory; instead, merely opining in a conclusory

5  fashion that punchout allows the step to happen while admitting

6  that Lawson did not have any idea what was available in the

7  inventory of the third-party vendors, and with respect to

8  searching for matching items, ePlus argues a user searches on a

9  vendor's website using a vendor search engine, which, again, is

10  a step that Lawson does not practice.

11          The systems claims are likewise deficient.  Claim

12  three of the '683 patent and claims one, two, six, nine, 21,

13  22, and 29 of the '516 patent all require multiple catalogs.

14  Dr. Weaver opined that these claims were infringed by the

15  punchout product because punchout allows users to have access

16  to external vender catalogs, not Lawson catalogs.

17          Claim one of '172 patent is also a system claim which

18  requires a database containing data relating to items

19  associated with at least two vendors maintained so that

20  selected portions of the database may be searched separately.

21  Dr. Weaver opined that this limitation was met by the separate

22  databases of the external punchout site, but there is no

23  dispute that Lawson has not maintained separate databases of

24  the external punchout sites.  Those external vendor catalogs

25  are maintained by the vendor.

1    ePlus cannot rely on the doctrine of joint

2  infringement to resolve the issue of direct infringement as it

3  has failed to show that Lawson has the required control over

4  the third parties or that Lawson performs the remaining steps.

5    In a situation in which more than one party is

6  required to perform the steps of a claimed method, there is no

7  infringement unless one party exercises control or direction

8  over the entire process such that every step is attributable to

9  the controlling party.

10    The same requirement for direction and control

11  applies to the system claims as well.  Lawson does not exercise

12  control or direction over any third party, suppliers, vendors,

13  distributors, manufacturers, or others who sell items to

14  Lawson's customers.  Likewise, Lawson exercises no control over

15  its customers.  Lawson does not have an agency relationship

16  with any party that performs any of the remaining steps from

17  the system or method claims.

18    While Lawson may reach an agreement with certain

19  vendors to allow them to provide services to its clients --

20    THE COURT:  What's the difference, Ms. Hughey,

21  between joint infringement and induced infringement in this

22  case on this record?  I know conceptually what the difference

23  is, but is there really any difference in this case between

24  those two?

25    MS. HUGHEY:  With respect to joint infringement,

1    that's related to direct infringement.  Under direct

2    infringement, one party has to actively engage in every single

3    step or method claim.  If, however, a party has an agency

4    relationship with another, in certain limited circumstances,

5    the Court has allowed that to be a direct infringement.

6                For indirect infringement to occur, there must be at

7    least one direct infringer.  That is to say that someone must

8    be practicing the steps.

9                THE COURT:  Are you saying joint infringement doesn't

10   apply to indirect infringement?

11               MS. HUGHEY:  In theory you could have two parties

12   engaging in joint infringement and a third party guilty of --

13               THE COURT:  But on this record, is there any theory

14   of joint infringement that exists as to indirect infringement?

15   Any basis any jury could find that?

16               MS. HUGHEY:  I don't believe so, Your Honor, no.

17               THE COURT:  Why?

18               MS. HUGHEY:  On this record, there's no -- on this

19   record, ePlus could not prove joint infringement because it

20   hasn't demonstrated that there is an agency relationship

21   between Lawson and any third party.

22               THE COURT:  I thought you said, though, that that

23   made it direct infringement.

24               MS. HUGHEY:  That's right.  Joint infringement is

25   direct infringement.

1382

1    With respect to that case, what the Federal Circuit

2    found was that there was no joint infringement because the

3    accused infringer did not perform all of the steps of the

4    accused claims, and there was no evidence that the accused

5    infringer's customers performed the remaining steps as agents

6    of the accused infringer.

7    In that case, the patents related to a system and

8    method for allowing a content provider to outsource the storage

9    and delivery of discrete portions of its website content.

10   THE COURT:  Let me ask you something.  Since he's

11   saying, he's not arguing there's any joint infringement, why

12   are you bringing to me an issue of joint infringement in the

13   first place?  Why don't you just say, he has agreed there's no

14   issue of joint infringement, and so we don't have to discuss

15   that any further?  In other words, I have cornered the fox in

16   his den.  And he has folded.

17   MS. HUGHEY:  Your Honor, I would like to say that I

18   have cornered the fox in his den, and he has folded.

19   THE COURT:  Thank you.

20   MR. ROBERTSON:  Your Honor, can I respond to that?

21   THE COURT:  Don't get out of the den, and it's her

22   motion, so she gets the last word.  Don't try to get out of the

23   den.

24   MR. ROBERTSON:  We're only talking about this

25   punchout scenario here.

```
 1            THE COURT:  No, no.  That's like -- you just folded

 2   over here.

 3            MR. ROBERTSON:  Your Honor --

 4            THE COURT:  Not only did you fold, you induced her to

 5   quit.

 6            MR. ROBERTSON:  But the joint infringement context

 7   didn't come out in the initial opening argument outside of the

 8   context of what the third party punchout partners did.

 9            Now, did they do anything?  Yeah, they provided the

10   catalog content, and they'll let you search a site and it all

11   comes back to Lawson.  So there are two steps that they have to

12   perform.

13            Now, they can even be inducing those steps by the

14   facts that I already have adduced to the Court.  They can be

15   inducing those parties to do it, or they can be doing under

16   their direction or control.  So as I say, Your Honor, I think

17   we win on alternative theories of --

18            THE COURT:  But you didn't have that theory, and you

19   told me you didn't have the joint infringement theory under the

20   direct infringement --

21            MR. ROBERTSON:  I don't think we need to -- first of

22   all, I want to make clear we're talking -- I was talking only

23   about punchout, because there are method claims that are

24   performed by the customers when Lawson provides them with

25   features and functionality, the five software --
```

1          THE COURT:  You are through.  You don't have any

2    joint infringement claim under anything.  That's what you told

3    me, and that's it.  Sit down.  Have a seat.  That's it.  I

4    mean, there's a limit to what I have, what I can deal with here

5    and what is allowed, and you just transcended it by saying

6    that.  I don't have to rule on that now.  It's already been

7    dealt with by way of a concession as to the Rule 50 motion,

8    there is -- and there is no doctrine of equivalents claim

9    notwithstanding what some of the instructions that were

10   tendered say.

11         So to the extent the doctrine of equivalents is

12   asserted on any claim, the motion for judgment as a matter of

13   law is granted, but I believe they said they don't have the

14   claim, so the rest of the issue is whether there is, as to any

15   of the patents, claims of the patents-in-suit, a reasonable

16   basis for a reasonable jury to find patent infringement, and

17   there is under theories of both direct and indirect

18   infringement, and the motion for relief under Rule 50 is

19   denied.  All right?  Are we ready for the jury?

20         No?  Yeah.  You have to rest in front of a jury.

21   Read the stipulations, and let's go.

22         MR. ROBERTSON:  We have these exhibits in binders.

23   We're bringing the stipulations, and then I'll be ready.

24         THE COURT:  First witness then is whom, Mr. McDonald?

25         MR. McDONALD:  Mr. Lawson will be our first witness,

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF VIRGINIA

 3                      RICHMOND DIVISION

 4

 5     ------------------------------------
                                          :
 6     ePLUS, INC.                        :    Civil Action No.
                                          :    3:09CV620
 7     vs.                                :
                                          :
 8     LAWSON SOFTWARE, INC.              :    January 13, 2011
                                          :
 9     ------------------------------------

10

11           COMPLETE TRANSCRIPT OF THE JURY TRIAL

12         BEFORE THE HONORABLE ROBERT E. PAYNE

13       UNITED STATES DISTRICT JUDGE, AND A JURY

14

15     APPEARANCES:

       Scott L. Robertson, Esquire
16     Michael G. Strapp, Esquire
       Jennifer A. Albert, Esquire
17     David M. Young, Esquire
       Goodwin Procter, LLP
18     901 New York Avenue NW
       Suite 900
19     Washington, D.C.  20001

20     Craig T. Merritt, Esquire
       Christian & Barton, LLP
21     909 East Main Street
       Suite 1200
22     Richmond, Virginia  23219-3095
       Counsel for the plaintiff

23

24                Peppy Peterson, RPR
                Official Court Reporter
25            United States District Court
```

CHRISTOPHERSON - DIRECT                    1569

1   MR. ROBERTSON:  Your Honor, I just object.

2   The question has been answered.

3   THE WITNESS:  Okay.

4   THE COURT:  You may have objected to my

5   question.

6   MS. STOLL-DeBELL:  I think he did actually.

7   BY MS. STOLL-DeBELL:

8   Q   Okay.  Are there some of these Punchout vendor

9   websites that customers can go to without using

10  Punchout?

11  A   Can you say that again?

12  Q   Yes.  So, for example, Staples link, is that one

13  of the Punchout vendors that can be used with Lawson's

14  Punchout product?

15  A   Yes, it is.

16  Q   Okay.  Can a customer use Stapleslink.com without

17  having the Punchout product?

18  A   I do not know.

19  MR. ROBERTSON:  No objection.

20  Q   I think we're done with that line of questioning

21  so I'm going to transition again for you.

22  A   Sure.

23  Q   While you take a drink.

24  A   That's okay.  Go ahead.

25  Q   When did you first learn about ePlus' patents?

CHRISTOPHERSON - DIRECT                1570

1   A   May 10, 2009.

2   Q   Is that when you first learned about the law suit

3   that ePlus had filed against Lawson?

4   A   Yes.

5   Q   What did you do when you learned that ePlus had

6   filed suit against Lawson for patent infringement?

7   A   What I first did was I got the three patents and

8   reviewed those, read those.

9   Q   What did you think when you finished reading those

10  patents?

11          MR. ROBERTSON:  Objection, Your Honor.  This

12  is calling for a legal conclusion and it's --

13          THE COURT:  I'm sorry?

14          MR. ROBERTSON:  It's calling for a legal

15  conclusion, Your Honor, and it's not relevant.

16          THE COURT:  What did he think?  Is that the

17  question?

18          MS. STOLL-DeBELL:  Yes, what did he think.

19          MR. ROBERTSON:  It's a little vague and

20  ambiguous, too.

21          THE COURT:  Well, I think maybe that's the

22  right objection.  Sustained.

23          We have to have a more precise question to

24  understand whether it's objectionable or not.

25          MS. STOLL-DeBELL:  Okay.

CHRISTOPHERSON - DIRECT                1572

1      THE COURT:  What he thought is the irrelevant

2   to this case except with respect to the intent element

3   of indirect infringement; is that right?

4      MS. STOLL-DeBELL:  Yes.

5      THE COURT:  This information can be

6   considered by you, ladies and gentlemen, only in

7   deciding whether or not a certain element of in

8   direction infringement has been met, and that is

9   whether there was an intent to have an infringement.

10   And so you can consider it for that purpose and that

11   purpose alone.  And I'll give you some more

12   instructions later about what indirect infringement

13   is.

14      But for your purposes, you can just keynote

15   this testimony of what his reaction was goes to the

16   intent to indirectly infringe or to have indirect

17   infringement.  Excuse me.  Go ahead.

18   Q   Can you go ahead and answer the question?

19   A   Can you restate the question.  It's been awhile.

20   Q   Sure.  After you read the patents, what was your

21   first reaction?

22   A   My first reaction was that it didn't appear as

23   though we were actually doing that, the three patents.

24   Q   Why did you think it didn't appear that you were

25   doing what was in the three patents?

CHRISTOPHERSON - DIRECT                1573

1      MR. ROBERTSON:  Your Honor, now I'm going to

2   object.  This calls for a legal conclusion and an

3   expert opinion.

4      MS. STOLL-DeBELL:  Your Honor, it doesn't.

5   I'm asking him what he thought.  I'm not asking him

6   for his opinion.  I'm not asking him about the claims.

7      THE COURT:  When you asked him what he

8   thought, why isn't that asking him for an opinion?

9      MS. STOLL-DeBELL:  Well, I suppose it is a

10   lay opinion on some level, but Mr. Robertson asked him

11   what Lawson as a company did after this lawsuit was

12   filed.  And Mr. Christopherson was involved in that,

13   and I'm just trying to inquire further into the issue

14   of Lawson's intent.

15      THE COURT:  What he said was he didn't think

16   that Lawson practiced the patent.  That's what his

17   reaction was.

18      MS. STOLL-DeBELL:  Yes.

19      THE COURT:  And you want to know why he

20   thought that?

21      MS. STOLL-DeBELL:  Yes.

22      THE COURT:  You can consider that for the

23   same limited purpose, ladies and gentlemen.

24   BY MS. STOLL-DeBELL:

25   Q   Why did you think that Lawson was doing something

1   different than what was in the patents?

2   A   Keep in mind, this is the first initial look at

3   the patents.  Some of the key things I was noticing

4   were catalogs and what I was going back to was the

5   state of where catalogs were back in the mid '90s or

6   around the time the patents were filed.  And in

7   looking at screens, for instance, and they were

8   mentioning page numbers from catalogs.  Very much like

9   a printed catalog except they turned it into an

10   electronic form.  That was the first thing.

11   Q   Why did you think that was different from what

12   Lawson was doing?

13          MR. ROBERTSON:  Objection, Your Honor.

14   There's a claim construction in this case with respect

15   to catalog, and now we're asking the lay witness to

16   opine on what his understanding of a catalog is.  It

17   doesn't have any relevancy to this case.

18          THE COURT:  You're getting into expert

19   testimony, and he wasn't qualified as an expert, and

20   what you're doing is you're offering it without a

21   report or anything.  And he's involved in in-house

22   development of the systems and knows about them, and

23   he can be qualified as a person who's an expert, but

24   he wasn't.

25          MS. STOLL-DeBELL:  Your Honor, first of all,

CHRISTOPHERSON - DIRECT          1575

1  he's just testifying in his capacity as an employee

2  for Lawson.  So I don't think there was a requirement

3  for him to do an expert report.

4          THE COURT:  If he's giving expert testimony,

5  if he' testifying as an expert for Lawson, he has to

6  give a report.  I don't care whether he's an employee

7  or not.

8          MS. STOLL-DeBELL:  He wasn't professionally

9  retained to give expert testimony.

10          THE COURT:  You can't have an employee

11  professionally retained or otherwise give expert

12  testimony without a report.

13          MS. STOLL-DeBELL:  Okay.  I don't think it

14  matters because I don't think I'm asking him for

15  expert testimony.  I want to -- I think it goes to the

16  intent --

17          THE COURT:  You're just asking him whether he

18  thought Lawson did something different.

19          MS. STOLL-DeBELL:  Yes, were they different.

20          THE COURT:  Okay.  Why don't you ask him

21  that?

22  BY MS. STOLL-DeBELL:

23  Q    Did you think Lawson was doing something different

24  than the patents?

25  A    Yes.

1   Q    Did you have a meeting with your team members

2   regarding the lawsuit?

3   A    Yes.

4   Q    Did they agree with you?

5           MR. ROBERTSON:  Objection, Your Honor.

6           MS. STOLL-DeBELL:  Let me ask a better

7   question.

8           THE COURT:  Yes.  She's going to ask a

9   different question.

10  BY MS. STOLL-DeBELL:

11  Q    Did they agree with you that what Lawson was doing

12  was different than the patents?

13          MR. ROBERTSON:  Objection, Your Honor.  It

14  still calls for a legal conclusion, and it's

15  inappropriate expert testimony, and it's hearsay.

16          THE COURT:  It's sustained as hearsay.  It's

17  offered for the truth of the matter.  So it doesn't

18  have any nonhearsay use.

19  BY MS. STOLL-DeBELL:

20  Q    Was it your recommendation that Lawson not make

21  any changes --

22          THE COURT:  What did you do after this?  Ask

23  him.  Let him testify.

24  Q    What did you do after you read the patents?

25  A    I'll provided recommendation that in my belief, my

1    reading, we weren't doing that patent, first, and that

2    they didn't need to do any changes with the software

3    that was currently available.

4            MS. STOLL-DeBELL:  I have no further

5    questions right now, Your Honor.

6            THE COURT:  All right.  Cross-examination.

7

8        CROSS-EXAMINATION

9    BY MR. ROBERTSON:

10   Q    Let's start with that last topic first if we

11   could, Mr. Christopherson.

12   A    Sure.

13   Q    You did something else, didn't you, sir, besides

14   making the recommendation that no changes would be

15   made to the software?

16   A    I'm not sure what you're referring to, sir.

17   Q    Lawson went out and sought a legal opinion with

18   respect to these patents, didn't they, sir?

19           MS. STOLL-DeBELL:  Objection, Your Honor.  I

20   don't think it's appropriate to get into whether we

21   got an opinion or not.  It's not relevant.

22           MR. ROBERTSON:  It goes to the whole intent

23   issue, Your Honor, under the *Broadcomm v. Qualcomm*

24   case.

25           MS. STOLL-DeBELL:  Your Honor, it goes to

1789

```
1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                    RICHMOND DIVISION

4

5      ------------------------------------
                                          :
6      ePLUS, INC.                        :    Civil Action No.
                                          :    3:09CV620
7      vs.                                :
                                          :
8      LAWSON SOFTWARE, INC.              :    January 14, 2011
                                          :
9      ------------------------------------

10

11            COMPLETE TRANSCRIPT OF THE JURY TRIAL

12          BEFORE THE HONORABLE ROBERT E. PAYNE

13      UNITED STATES DISTRICT JUDGE, AND A JURY

14

       APPEARANCES:
15
       Scott L. Robertson, Esquire
16     Michael G. Strapp, Esquire
       Jennifer A. Albert, Esquire
17     David M. Young, Esquire
       Goodwin Procter, LLP
18     901 New York Avenue NW
       Suite 900
19     Washington, D.C.  20001

20     Craig T. Merritt, Esquire
       Christian & Barton, LLP
21     909 East Main Street
       Suite 1200
22     Richmond, Virginia  23219-3095
       Counsel for the plaintiff
23

24                Peppy Peterson, RPR
                Official Court Reporter
25          United States District Court
```

1    A    It describes how you select a catalog.

2    Q    Is this section one of the sections of the patent that the

3    Court said was the structure that corresponds to the "means for

4    selecting the product catalogs to search" element of claim

5    three of the '683 patent?

6    A    Yes.

7    Q    Can you explain to us then how this section of the patent

8    describes selecting product catalogs to search?

9    A    I think it's very straightforward.  This is showing an

10   example where the database would have four different catalogs,

11   and they are numbered one, two, three, four.  They are distinct

12   catalogs, and a mechanism is provided so that the user can make

13   a selection from one, two, three, four, or possibly any subset

14   of one, two, three, four to restrict the search to just those

15   catalogs.

16   Q    Did you see anything like that in the Lawson systems

17   accused of infringement in this case?

18   A    Not even remotely.

19   Q    Let's -- you can take that off the screen, I guess.  Can

20   we go back to that slide, the slide we left off at?  It's 42.

21   Let's go back to 42.  This has the element regarding selecting

22   product catalogs to search; correct?

23   A    Yes.

24   Q    You looked at the search issue as part of your analysis;

25   correct?

Shamos - Direct

1    Let's move on to something else now because you are

2    getting in an area that's going to engender confusion and delay

3    because there's going to have to be a lot more testimony that

4    will come in if we keep up with this approach, and I think I've

5    told you that a couple times, so let's go.

6    MR. McDONALD:  Your Honor, will I at least be able to

7    go through that with the inventors when I call them back?

8    THE COURT:  I don't rule in apprehendo.  We won't

9    take the time until that comes up.  I don't think it's a proper

10   thing to do at this point.

11   Q    Why don't we go back to your slides, Dr. Shamos, slide --

12   let's go to slide 55, actually, at this point, continue with

13   claim one of the '172 patent.  I think we're getting near the

14   end here.

15   Can you summarize for us the reasons for your opinion that

16   claim one of the '172 patent is not infringed with respect to

17   these elements E and F that are on page 55 of your slides?

18   A    Yes.  These are not new reasons.  We've already talked

19   about the order list.  Since there's no order list, there can't

20   be selected matching items on said order list, and for means F,

21   since there are no selected matching items on said order list,

22   you can't generate purchase orders from them.  So neither of

23   those means is present in the Lawson system.

24   Q    Dr. Shamos, did you also look at the Lawson punchout,

25   procurement punchout module as part of your analysis?

1    Q    Have you seen this document or this particular list

2    before?

3    A    Yes.

4    Q    Is it your understanding that the IBM TV/2 product, as it

5    existed back in 1992, had the features listed here?

6    A    Yes.

7    Q    Did the TV/2 system have a search feature?

8    A    Yes.

9    Q    Is that described anywhere in this page?

10   A    It's the third item.

11   Q    That's now blown up on the page here.  Can you explain,

12   Ms. /EPG, in your own words how the search function in the

13   Technical Viewer system worked back in '92?

14   A    Well, you could just type in a word, so, for example, if

15   you are looking in a parts catalog, you could type in beaker,

16   and it would find all the list of beakers.  It says here, you

17   can even find it from a current topic, which is one section, or

18   you can select several sections, or you can go through one

19   catalog or go across multiple documents.

20   Q    When you say a topic is a section, can you explain more

21   specifically what you mean by that?

22   A    Just like a section in this book, you had one section, you

23   had another section.  You would see the table of contents in

24   any document or the parts catalog.  You would see those, and

25   you could go through all of them or just pick one section and

```
1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                     RICHMOND DIVISION

4

5     -------------------------------------    .
                                          :
6     ePLUS, INC.                         :     Civil Action No.
                                          :     3:09CV620
7     vs.                                 :
                                          :
8     LAWSON SOFTWARE, INC.               :     January 18, 2011
                                          :
9     -------------------------------------

10

11          COMPLETE TRANSCRIPT OF THE JURY TRIAL

12         BEFORE THE HONORABLE ROBERT E. PAYNE

13      UNITED STATES DISTRICT JUDGE, AND A JURY

14
    APPEARANCES:
15
    Scott L. Robertson, Esquire
16  Michael G. Strapp, Esquire
    Jennifer A. Albert, Esquire
17  David M. Young, Esquire
    Goodwin Procter, LLP
18  901 New York Avenue NW
    Suite 900
19  Washington, D.C.  20001

20  Craig T. Merritt, Esquire
    Christian & Barton, LLP
21  909 East Main Street
    Suite 1200
22  Richmond, Virginia  23219-3095
    Counsel for the plaintiff
23

24            Peppy Peterson, RPR
            Official Court Reporter
25        United States District Court
```

Momyer - Direct

1   Q     Could you restate your name for the record, Mr. Momyer.

2   A     Douglas Momyer.

3   Q     And you've already testified earlier in this trial;

4   correct?

5   A     Yes, I have.

6   Q     Mr. Momyer, I'd like to start with talking to you about

7   what it is that was real -- what you thought was the invention

8   that's described in the patents involved in this case, all

9   right?

10  A     Do you want a description?

11  Q     I'm just getting on the same page here; okay?

12  A     Okay.

13  Q     Would you agree that before you came up with the invention

14  in these patents, there were known requisition and purchasing

15  systems?

16  A     Yes.

17  Q     They could build requisitions as a result of searching for

18  part numbers; right?

19  A     Yes.

20  Q     They could take those requisitions and generate purchase

21  orders out of those requisitions; right?

22  A     A single purchase order.

23  Q     We'll talk about that issue in a little bit.  But at least

24  you would agree a purchase order could be generated from a

25  requisitions in the old systems; right?

Momyer - Direct

```
 1    A    Correct.
 2    Q    Would you agree that it was also old to be able to search
 3    a database of -- containing a product catalog of a particular
 4    vendor, for example, on a CD-ROM?
 5    A    Be able to search a particular vendor's catalog on a
 6    CD-ROM, yes.
 7    Q    That was old; right?
 8    A    Yes.
 9    Q    You could search those old CD-ROMs for the purpose of
10    picking out a product that you might want to buy; right?
11    A    I don't know -- I'm not sure that there were any products
12    that I was aware of that actually turned around and pulled that
13    product out and actually created an order directly.
14    Q    I didn't talk about creating an order?
15    A    You said buy.  To me, that's kind of inclusion of the
16    transaction, is you pick an item --
17              THE COURT:  He interpreted the word buy in your
18    question to mean purchase which connotes a purchase order; is
19    that what you are saying?
20              THE WITNESS:  That's correct.
21    Q    Would you agree that the systems that could look at a
22    single catalog could search for user-requested information
23    about products and create orders which the user could save,
24    print, or fax to a vendor?
25    A    Save, print, or fax, yes.
```

1    Q    So that single catalog on a CD-ROM system could be used to
2    create orders to buy products; right?
3    A    Not directly from that system.  At least my understanding.
4    Q    Do you have the binders there?  I think there's a couple
5    of big binders.  Go to volume one.
6    A    Okay.
7    Q    Go to PX-1.  That's the '683 patent?
8    A    Yes.
9            THE COURT:  That's in your book, ladies and
10   gentlemen, at tab two.
11   A    I see DX-5.
12   Q    We're just looking at PX-1.
13   A    Oh, PX, I'm sorry.
14   Q    That should be in your volume there.
15   A    I got it.
16           THE COURT:  It's PX, in your book, 0001; do you see
17   that, sir?
18           THE WITNESS:  I've got it.  Thank you.
19   Q    You understand that's one of the patents involved in this
20   lawsuit; right?
21   A    Yes.
22   Q    Could you turn to column two of the patent, please, past
23   the figures.
24   A    Excuse me for squinting here.  Okay.  I have it.
25           MR. McDONALD:  Bill, can you blow up the upper left,

1    about the first ten lines or so of column two.  I said upper

2    left, didn't I?  I meant upper right.  I'm sorry.

3    Q    Now, this patent, you actually reviewed this application

4    that led to the three patents-in-suit; right, Mr. Momyer?

5    A    Yes, I did.

6    Q    And you did sign an oath and declaration saying you had

7    reviewed it and it was accurate as far as you knew; correct?

8    A    At the time the patent was filed, yes.

9    Q    And that declaration includes statements that you've

10   reviewed the claims as well; right?

11   A    That's correct.

12   Q    And that you believe that what was described in the patent

13   as claimed was the thing that you considered to be your

14   invention; right?

15   A    Yes.

16   Q    And you also put in that declaration that you were aware

17   of your duty to disclose prior art; right?

18   A    Yes, although I haven't seen a copy of that declaration in

19   a while, but, yes, I did sign a declaration.

20   Q    Well, does that ring a bell, though, that the declaration

21   specifically acknowledged your duty to disclose information

22   that would be relevant or material to the Patent Office?

23   A    Yes.

24   Q    So if we go up to this line beginning at -- the paragraph,

25   excuse me, of column two, line three, of the '683 patent?

1   A    Yes.

2   Q    Do you see there about -- actually the second sentence of

3   that paragraph -- well, we'll start with the first sentence

4   just to make sure we have the context here.  It says, computer

5   systems that are capable of searching databases containing a

6   product catalog of a particular vendor, for example on CD-ROM,

7   are also known.  Do you see that sentence?

8   A    Yes, I do.

9   Q    By saying it was also known, were you acknowledging in

10  effect I'm not trying to get a patent on a system that is

11  capable of searching databases containing a product catalog of

12  a particular vendor?

13  A    Yes.

14  Q    All right.  Then you go on the next sentence to say, such

15  systems can search for user-requested information about

16  products and create orders which the user can save, print, or,

17  in some cases, facsimile directly to a vendor; do you see that?

18  A    Yes, I do.

19  Q    So you did believe it was true at the time you filed the

20  application and still today believe it's true that there were

21  such systems that worked with a product catalog of a particular

22  vendor; right?

23  A    Yes.

24           THE COURT:  He answered that earlier.  He said that

25  it could be used to a create orders to be faxed, saved, or

Momyer -   Direct

1   the computer to send it directly to the vendor.   I think that's

2   what he said; is that right?

3                   THE WITNESS:   Yes.   Thank you.

4                   THE COURT:   I think he said it now at least twice, so

5   let's pay attention.

6   Q    Well, that system with what you call the single product

7   catalog of a particular vendor, for example, that could be a

8   store like an Office Depot; right?

9   A    Yes.

10  Q    But they could have products that came from computer

11  companies like Dell and HP or Post-it Notes from 3M; right?

12  A    Yes, they could.

13  Q    Now, in those cases, would you consider that actually

14  multiple catalogs because there could be multiple

15  manufacturers?

16  A    No, I wouldn't consider it multiple catalogs.

17  Q    Now, there might be products in that catalog that might be

18  described according to color or other characteristics; right?

19  A    Yes.

20  Q    Would the fact that you could search that single CD-ROM

21  for products of a certain color, would that mean that CD-ROM

22  actually contains multiple catalogs depending on what word you

23  search with?

24  A    It would be -- to me, the catalog would indicate the

25  company you were buying the product from.   So if -- to me, it

Momyer - Direct

1           THE COURT:  I'm going to sustain the objection to the

2    question.

3           MR. McDONALD:  Let me lay some more foundation.

4    Q   Mr. Momyer, you didn't go, as the inventor on this RIMS

5    patent, and actually add material to the patent after April of

6    '93 when it was filed about later developments, did you?

7    A   I didn't.  I don't know if the attorneys did, but I didn't

8    do anything.

9    Q   Isn't it your understanding that when you file the

10   application, that's what you are working from as you proceed

11   forward from there to acquire your patent; you can't just keep

12   adding new things along the way to the patent?

13          MR. ROBERTSON:  Objection, lacks foundation.

14          MR. McDONALD:  I'm asking for his understanding.

15          THE COURT:  Overruled.

16   A   There were -- I think we stated this earlier in my

17   testimony, that what was outlined in this patent, there were

18   things that, as of that date, that 1993, weren't in the

19   existing RIMS system.

20   Q   They were described in the patent but not in the existing

21   RIMS system?

22   A   It was the system that was operational in 1993.

23   Q   Please let me finish my question.  I want to make sure we

24   get it clear.  What you are saying is you did describe some

25   things for a RIMS system in April of 1993 in the patent

Momyer - Direct

1    application that weren't actually implemented yet in the RIMS

2    system that was on the market; is that right?

3    A    That's correct.

4    Q    But there was a RIMS system out in the market as of April

5    of '93, wasn't there?

6    A    Yes, there a was.

7    Q    Isn't it true that RIMS development work that you were

8    involved in was actually pretty much wrapped up by 1991?

9    A    No, that's not true.

10   Q    Can you turn to your September 2004 deposition,

11   Mr. Momyer?

12            THE COURT:  Which volume is that in?

13            MR. McDONALD:  Volume one, I believe.

14            THE COURT:  Remember how to do it.

15            THE WITNESS:  What exhibit?

16            MR. McDONALD:  September 2004 deposition transcript.

17   You should have some tabs in your volume number one.  I think

18   you might be in volume two right now.  So we have to go back to

19   volume one.

20            THE WITNESS:  Okay.

21            THE COURT:  September what date?

22            THE WITNESS:  What is the tab on that?

23            THE COURT:  They are all tabbed by name, your name,

24   and then --

25            MR. McDONALD:  September 16, 2004, I believe.

Momyer -  Direct

1    question, and how long did you work on the RIMS development

2    effort, and you said several years?  Then the question, through

3    1993?  And then your answer, early, we pretty much wrapped up

4    the RIMS system early '90s.  You were asked, can you be more

5    specific than early '90s, and you answered '91; correct?

6    A    Correct.

7    Q    Thank you.

8    A    Can I respond to that?

9    Q    Well, I'll ask you some more questions about that, all

10   right?

11   A    The --

12   Q    Mr. Momyer, you've answered the question.  I'll ask you

13   more questions about it, all right?

14          THE COURT:  Mr. Momyer, Mr. Robertson will have a

15   chance to ask you questions about that segment, and you can

16   explain it then.

17          THE WITNESS:  Thank you.

18   Q    Would you agree that Fisher customers started using a RIMS

19   system as described in the '989 patent by late 1992?

20   A    I know we talked about.  Those dates are kind of fuzzy to

21   me, and I think I might have -- in the '92/'93 time frame is

22   when we would have had customers using it.

23   Q    Well, the difference between '92 and '93 could be kind of

24   important here, so I'll ask you, Mr. Momyer, would you agree

25   that 1992, late '92 was actually when the RIMS system, as

1    described in the patent, was actually being first sold to

2    customers?

3    A    First of all, it wasn't being sold.  We didn't sell the

4    RIMS system.

5    Q    You talked about used at customers' facilities; right?

6    A    Used at customer facilities.  It wasn't sold.  It wasn't

7    something we sold.

8    Q    Well, you got a trademark on the RIMS trademark; you

9    understand that, don't you?

10   A    Yes.

11   Q    And that's something that you have to get only if you are

12   using it in commerce; right?

13              MR. ROBERTSON:  Objection, lacks foundation.

14              THE COURT:  Do you know about getting a trademark?

15              THE WITNESS:  I know what a trademark is.

16   Q    Isn't it true --

17              THE COURT:  He's twice now said they were using it,

18   that people were using it, it wasn't being sold.

19   Q    Mr. Momyer, wasn't the RIMS system, though, part of the

20   sales pitch to Fisher's customers at the time that if you buy

21   products from Fisher, we'll provide to you the RIMS system as

22   part of our services?

23   A    It was definitely a tool that was used to help Fisher

24   perform its duties better at a customer's location and,

25   therefore, convince the customer that they should continue to

Momyer - Direct

1    do business with them.

2    Q    Would you agree that the RIMS system was on sale more than

3    one year before the patents involved in this suit were filed?

4         MR. ROBERTSON:  Objection.  He just testified several

5    times it wasn't on sale.

6         THE COURT:  How many more times does he have to say

7    it wasn't on sale, it was used.  Now, whether you like that or

8    not is a different issue, but it was used.  I think he was

9    saying it was used by people who were -- what do you call them?

10        THE WITNESS:  Customer service representatives.

11        THE COURT:  And they were employed by whom?

12        THE WITNESS:  Fisher.

13        THE COURT:  And sometimes they were stationed at

14   customers' locations, and sometimes they were stationed at

15   Fisher's location; is that right?

16        THE WITNESS:  That's correct.

17        THE COURT:  He said it was used.

18   Q    The RIMS system was marketed to customers through a

19   brochure; correct?

20        MR. ROBERTSON:  Your Honor, I'm going to object

21   because the RIMS system is vague and ambiguous.  The witness

22   has testified repeatedly that there were several iterations or

23   versions of the RIMS system.  It's important that we know which

24   one we're talking about at which point in time.

25        MR. McDONALD:  I'm just trying to lay some

1    in that patent as it was filed, the RIMS patent.

2            THE COURT:  I don't remember that being asked either.

3    So is that what you want to ask him?

4            MR. McDONALD:  Yes.

5            THE COURT:  Do you remember whether the patent for

6    RIMS, which is PX-10, has a description of cross-referencing

7    that is somewhat detailed?

8            THE WITNESS:  Yes.

9            MR. ROBERTSON:  Can I object to Your Honor's question

10   because cross-referencing is a claim term.  I just want to make

11   sure we're using -- are we using it in --

12           THE COURT:  He's using it as used in the RIMS patent,

13   not as I have construed it in these patents.

14   Q    Mr. Momyer, if you can turn to Exhibit 10 and go to the

15   bottom of column 31 of the '989 patent.  Do you have that

16   before you now?  Do you see at the bottom of column 31 it talks

17   about cross-referencing and begins a whole section, really,

18   titled cross-referencing; correct?

19   A    Which column is that in?

20   Q    Bottom of column 31.

21   A    Okay.

22   Q    That discussion of cross-referencing continues for all of

23   columns 32 -- all of column 32; correct?

24   A    Yes.

25   Q    And also continues in column 33 and column 34 if you go to

1    the next page; correct?

2    A    Yes.

3    Q    And in that discussion, it does talk specifically about

4    cross-referencing a similar product from two different vendors;

5    correct?

6              THE COURT:  Do you want him to read all three of

7    those columns and then ask him the question?  It's there or

8    it's not.

9              MR. McDONALD:  You would agree --

10             THE COURT:  Point him to the page and the line.  You

11   are asking somebody to look back at something that's dated a

12   long time ago, and you guys are familiar with it, but he

13   doesn't study this stuff all the time.

14   Q    Can we zero in on the bottom of column 33 beginning at

15   about line 52, Mr. Momyer.  Column 33, about line 52.  Let's go

16   ahead and highlight it or expand it, Bill, all the way to the

17   end of that column.  Do you see here this is a section talking

18   about a product having a vendor number such as 1,000 --

19   A    It's lost.

20             THE COURT:  It's not there.

21   Q    Do you see that around line 54 of column 33, Mr. Momyer,

22   where there's a reference -- this is in the RIMS patent now;

23   right, correct?  Just so you have your bearings, Mr. Momyer,

24   we're in the RIMS patent; right?

25   A    Yes.

1   Q    So, if you see, there's a reference to vendor number such

2   as 1000 space 250, or a competitor's number such as B2650250;

3   right?

4   A    Yes, I see that.

5   Q    Then it goes on to say, the hose computer will search

6   various files in the host database as during sourcing described

7   above and recognize each as a number corresponding to

8   distributor catalog number 02 540K.  Do you see that?

9   A    Yes.

10  Q    And then you see there's a little code there at about line

11  61 that has two numbers that start off with the letters VN?

12  One has the number VN00002047; correct?

13  A    Yes.

14  Q    And the other one is VN with a long string of zeros

15  followed by the number one; right?

16  A    Correct.

17  Q    Those are two different vendor numbers that represent

18  Corning and the distributor in this example; correct?

19  A    One thing you have to be aware of, this is all within

20  Fisher product files.  All it's really doing is

21  cross-referencing the fact of a Fisher number.  That is the

22  intent of that cross-reference.

23  Q    Whatever the intent is, I understand its cross-reference

24  Fisher.  That Fisher would be the distributor there, right,

25  with the capital D there?

Momyer - Direct

1   A    Yes.

2   Q    But there's another vendor number for Corning; right?

3   A    It's a vendor number internal to the Fisher environment.

4   Q    But it represents a different vendor; right?

5        THE COURT:  Which "it"?

6        MR. McDONALD:  The vendor number representing

7   Corning.

8   A    Yes.  It does represent -- VN00002047 would be another

9   vendor, but it's a vendor internal to Fisher, Fisher vendor

10  number.

11  Q    So the RIMS system, as it existed in April of '93, had

12  this conversion system there?

13  A    This was the host-based.

14  Q    I'm just asking for the timing on it right now,

15  Mr. Momyer.  Would you agree that the RIMS system, as of April

16  of '93, had this conversion system in it?

17       MR. ROBERTSON:  Conversion system as described by the

18  RIMS patent?  I think it's vague and ambiguous.

19       MR. McDONALD:  As we've been going through it here.

20  A    Yes.

21  Q    I'd like to turn now to the inventory, issue of checking

22  inventory.  Would you agree with me that the RIMS system, at

23  least as of April of '93, was capable of checking inventory?

24       MR. ROBERTSON:  Objection, vague and ambiguous as to

25  whose inventory.  That is an important issue here.

Momyer - Direct

1        MR. McDONALD:  No, it's not.  It's not in the claims.

2        THE COURT:  What?

3        MR. McDONALD:  The issue of whose inventory you are

4   checking is not in any of the claims in this case.  It is not

5   an important issue.

6        MR. ROBERTSON:  In the patent, you are checking

7   multiple catalog inventory of suppliers.  That's what's going

8   on here.  The testimony has been in the RIMS systems, you are

9   checking Fisher inventory.

10       MR. McDONALD:  We have no testimony from Mr. Weaver

11  or anybody else that said that checking inventory had to be

12  specific to any particular type of source.

13       THE COURT:  We'll deal with that --

14       MR. McDONALD:  -- limited to checking inventory.

15       THE COURT:  We'll deal with that later.  Overruled.

16  Q    Would you agree, Mr. Momyer, that the RIMS system, at

17  least as of April of '93, was a system that did check

18  inventory?

19  A    It checked local inventory it was managing and Fisher

20  inventory at its distribution centers.

21  Q    And that local inventory could include stockroom inventory

22  for the customer; correct?

23  A    It could include both customer and Fisher-owned inventory,

24  yes.

25  Q    And the RIMS system included a parts master, like an item

Momyer -  Direct

1    recordkeeping purposes.  I think there were several references

2    in my prior testimony.

3    Q    Okay.  So that is product type 05, and then product type

4    06 is a customer-owned item located in a customer warehouse at

5    or near the customer's site; correct?

6    A    Yes.

7    Q    So that is also something that's different from a product

8    that was owned by the distributor such as Fisher; correct?

9    A    No.  Yes, it is, but it's -- 06, most of our product type

10   06s were for customer-owned inventory.  Most of those were

11   products that Fisher had and the customer bought from Fisher.

12   When the inventory replenishing came to replenish that order,

13   the replenishment order went straight to Fisher.

14   Q    But there are situations separate from that where a

15   customer would actually replenish by generating an internal

16   purchase order; correct?

17   A    Those 06s, they are really two different replenishment

18   types for those 06s, multiple replenishment types.  The primary

19   ones would be it's a Fisher product or it's an 05, in which

20   case it would do same thing.  It would create a requisition

21   that would go through, create a paper, req, go buy this amount

22   and turn over to the customer, the customer would buy it.

23   Q    Isn't it true that for that product type 06, the RIMS

24   patent itself describes the document it created as a customer

25   internal purchase order?

Momyer - Direct

2114

1    A    Yes.  But also, there's numerous places throughout that it

2    says product type requires that the RIMS system isn't

3    responsible for placing the purchase order.  Numerous places in

4    the patent.

5    Q    But you do agree -- I think you said the word yes before

6    you gave that explanation.  Wouldn't you agree that the patent,

7    the RIMS patent application that's incorporated by reference in

8    the patents-in-suit calls that document an internal customer

9    purchase order for that product type 06?

10           THE COURT:  Wait a minute.  You asked him about the

11   patent application, and the patent application, is that

12   incorporated in the patent?

13           MR. McDONALD:  Yes.  That's what that page shows on

14   that.

15   Q    And you said yes in answer to my question?

16   A    There is wording in the patent, I recall, that does call

17   it internal customer.

18   Q    And the RIMS system, as it existed in April of '93 when

19   that application for RIMS was filed, that can generate a

20   purchase order for the Fisher system and also that internal

21   customer purchase order for a type 06 product; right?

22   A    I understand what it said, but as I said, there's numerous

23   places in that patent that says that the RIMS system does not

24   place the purchase order.

25   Q    Let's talk about the places it does say that.  Let's turn

1    to figure 5A of the '989 patent, Mr. Momyer.  Can we blow up

2    the boxes going from about the diamond 332 down to including

3    336, both left and right side.  This is a flow chart,

4    Mr. Momyer, from the RIMS patent; correct?

5    A    Yes.

6    Q    This is a flow chart that the patent says describes

7    programs employed by an embodiment of the system of the

8    invention to accept a source requisition; right?

9    A    Yes.

10   Q    So in this RIMS system, we see that diamond there where

11   the question is, is it a product type 01, 03, or 04; right?

12           MR. ROBERTSON:  Your Honor, I'm just going to object.

13   It's cumulative.  We went through this figure at length within

14   Mr. Momyer's direct testimony.  Cross-examination by Mr.

15   McDonald --

16           THE COURT:  Really have been through it a lot, Mr.

17   McDonald.  Even I remember it.

18           MR. McDONALD:  Well, I'll just try to wrap it up

19   maybe, Your Honor.

20           THE COURT:  Let's just move on.  Go on and ask

21   something else.  The record is clear on that.

22   Q    Now, is it true that the reason why there would be an

23   internal customer order generated is that for some companies,

24   there's actually an obligation for a requisitioner who is in

25   department A to pay stockroom management who is in another part

1    of the company?

2            MR. ROBERTSON:  Objection, lacks foundation.

3            THE COURT:  What?

4            MR. ROBERTSON:  I think it lacks foundation.

5            THE COURT:  He can ask him if he knows it.

6    Overruled.

7    A    That was one of the things that it did keep track of, was

8    the ability to -- for an internal transfer of funds within that

9    customer from requisition department to the owning department.

10           THE COURT:  Within the same customer?

11           THE WITNESS:  Within the same customer.

12   Q    Would you agree that -- we'll go away from that topic now

13   and move on to some other things.  Would you agree that the

14   parts master in the RIMS system is not organized like a catalog

15   from the vendor?

16   A    Yes.  I don't think it is.

17   Q    How, if at all, is a parts master organized?

18   A    This particular parts master in RIMS?

19   Q    Yes.

20   A    The key to it is the Fisher part number, and then it has

21   data specific to that.  Primarily it's stock-keeping

22   information relating to the product.

23   Q    Is a parts master, is that basically organized in terms of

24   just the order the products get ordered into the parts master

25   list, that's how it's organized?

Momyer - Direct

1    A    No.  It's -- they all, the products get entered.  The way

2    the system works is there's a key, which is the product number,

3    and that key -- if you enter the product number, it allows you

4    to specifically pull up all the detailed information about the

5    product.  So it's a keyed table.

6    Q    Now, the RIMS system include both a local computer and a

7    host computer; right?

8    A    Yes.

9         MR. ROBERTSON:  Object as to the RIMS system because

10   I think there's been testimony there's been dozens of

11   iterations, so I think it's vague and ambiguous what we're

12   taking about.

13        MR. McDONALD:  I can rephrase that.

14   Q    The RIMS system, as it existed in April of '93, had a

15   local computer and a host computer; right?

16   A    It had components that ran locally and a host, yes.

17   Q    At the host, was there a database there with a list of the

18   Fisher products as part of the RIMS system that existed in

19   April of '93?

20   A    I don't know if I'd consider that part of the RIMS system,

21   but there was a product file that was on the Fisher host which

22   had all the products that Fisher would buy.

23   Q    Okay.  Are you saying you don't agree that the Fisher

24   system included both the host system --

25   A    I have trouble in my mind separating where the RIMS system

Momyer -   Direct

 1   ends and the Fisher system, other Fisher systems pick up.   I

 2   will agree that there's a product file that's on the host that

 3   contains product information.

 4   Q    All right.  Well, let's get at least on the same page in

 5   terms of whether the RIMS system holds the host computer as

 6   well.  Could you turn to the bottom of column two of

 7   Plaintiff's Exhibit 10 still, the RIMS patent that was filed in

 8   April of '93.

 9        Do you see there under the first sentence under the

10   heading detailed description of the invention, it says, quote,

11   the requisition and inventory management system of the present

12   invention, which is shown in figure one, employs at least two

13   computers, a host computer 10 located at a distributor site and

14   a local computer 40 used by a customer service representative,

15   CSR --

16   A    I think --

17   Q    -- at or near the customer site and the site of JIT

18   inventory?

19   A    I think I already said that.

20   Q    So you would agree that the system in the RIMS application

21   described as the RIMS systems does include both a local and the

22   host computer?

23   A    Yes.

24   Q    Okay.  So at that host computer, then that Fisher

25   database, would you consider that to be a Fisher catalog?

1  system just like they appear in the paper version of the Fisher

2  catalog?  You saw it; right?

3  A   I'm trying to recall that.  I'm not the best one to ask

4  that --

5         THE COURT:  Do you remember?  If you don't remember,

6  you don't remember.

7         THE WITNESS:  I remember seeing the demo.  I don't

8  remember if that demo was scanned pages or not.

9  Q   Do you remember seeing on the screen pages that looked

10 like a Fisher catalog or not?

11        THE COURT:  You mean such as a reproduction of a page

12 itself?

13        MR. McDONALD:  Right, with the same words and the

14 same images just like in the paper catalog.

15 A   Honestly, I can't recall the demo.  I know there was a

16 demo.  I can't visualize it.

17 Q   Wasn't that the purpose of the demo, to show that?

18        THE COURT:  Mr. McDonald, he's now said several times

19 he knows there was a demo, he just can't remember what it was.

20 Move on.

21 Q   Do you recall that the TV/2 system did have a graphical

22 user interface with it?

23 A   Yes, it did.

24 Q   That was before Fisher ever came to IBM to add that;

25 correct?

1         MR. ROBERTSON:  Objection.  How would he know that?

2         THE COURT:  Your objection is to lack of foundation?

3         MR. ROBERTSON:  Yes, sir.

4         THE COURT:  Sustained.

5    Q    When you first started talking to IBM about using the TV/2

6    system, the first time you saw that, did the TV/2 system have a

7    graphical user interface?

8    A    Yes.

9         MR. McDONALD:  I have no further questions.  Thank

10   you.

11        THE COURT:  Ladies and gentlemen, we'll take the

12   morning recess for 20 minutes.  Go ahead and take your pads

13   with you.

14

15             (Jury out.)

16

17        THE COURT:  We'll be in recess.

18

19             (Recess taken.)

20

21

22

23

24

25

Momyer - Direct

1    Q    Threw you off a bit, but I'd just like to talk about

2    Fisher working with IBM now to develop a system that led to the

3    patents that are asserted in this case, okay, so can we shift

4    gears on that topic?

5    A    Yes.

6    Q    You were involved with working with IBM; right?

7    A    Yes, although not -- I wasn't the primary person working

8    with IBM, but, yes, I was involved.

9    Q    And did IBM's system have a search capability that could

10   do keyword searches before you started working with them?

11   A    Technical Viewer/2 could do keyword searches against a

12   document, yes.

13   Q    And that TV/2 system, you saw some literature about that

14   product from IBM; correct?

15   A    I've seen that literature really after the fact.  I have

16   seen that literature, but when I saw the literature, that's why

17   I recall it was when we first started talking about these

18   cases, in this case.  Not this particular cases but prior

19   cases, but I have seen that document, yes, talking about TV/2.

20   Q    Okay, but you do understand that the TV/2 system before

21   Fisher ever showed up at IBM was capable of searching a number

22   of technical publications that could be held on a single CD?

23   A    That wasn't my understanding.  My understanding, you could

24   search a single document.

25   Q    Could we turn to Defendant's Exhibit 107.  Let's start

1  invention?

2  A    Yes, to the best of my understanding we did.

3  Q    I want to talk to you a little bit about

4  cross-referencing in the RIMS system.  Do you recall

5  being directed to sections in the RIMS patent?

6  A    Yes, I do.

7  Q    In your electronic -- well, let me ask you this

8  basic question.  Is the cross-referencing, as

9  identified in the RIMS patent, the same

10 cross-referencing as utilized in your invention of the

11 electronic sourcing system?

12 A    No, it's not.

13 Q    Can you tell us how it's different?

14 A    The cross reference in the RIMS system was

15 intended to be a means to do a look-up from a

16 competitor or vendor's catalog number, part number,

17 over to Fisher, and always convert it to that.  The

18 cross referencing in the electronic sourcing was much

19 broader in that it didn't specifically cross reference

20 you to any specific Fisher part number.  It wasn't

21 tied back to a specific Fisher part number.

22 Q    Let me ask you this about the RIMS system.  If you

23 were able to identify a part number, for example, of

24 your competitor, was the RIMS system then able to

25 source it from that vendor?

MOMYER - REDIRECT                    2150

1      MR. ROBERTSON:  Objection.

2      MR. McDONALD:  I'll rephrase that.

3  Q   It was your understanding when you started working

4  with IBM that the TV/2 system could not search a

5  catalog?

6  A   Search a document.

7  Q   That's a different question, Mr. Momyer.  My

8  question is when you started working with IBM, didn't

9  you know that the TV/2 system was fully capable of

10 searching catalogs?

11 A   No, not to the requirements that we needed it to.

12 Q   You knew it could search catalogs, though, right?

13 A   It could search a document.  If you want to

14 consider a catalog a document, then --

15 Q   Wasn't that exactly the sort of document that the

16 TV/2 system was designed to work with was a catalog?

17 A   That's not what was presented to us.

18 Q   Do you remember -- did IBM ever communicate to you

19 in your experience that the TV/2 system was actually

20 designed to work with documents specifically including

21 parts catalogs?

22 A   We actually went there with the intent of -- that

23 that was a requirement for us to be able --

24 Q   I have a different question for you.  My question

25 is:  Did IBM, anybody from IBM, ever communicate to

1   you that the TV/2 system was capable of searching

2   parts catalogs?

3   A    I'm sure it came up during the discussions when I

4   was at the meeting as far as being able to search a

5   document, a list of products, and find some keywords,

6   find some products.

7   Q    In fact, isn't it true that the TV/2 system was

8   specifically designed to work with a CD ROM that could

9   have multiple catalogs on it?

10  A    I don't recall that.

11  Q    All right.  So when you said this statement here

12  was truthful, you're saying basically as far as you

13  know without really knowing the details about the TV/2

14  system, is that what meant by that?

15          MR. ROBERTSON:  I object to the form of that

16  question.

17          THE COURT:  Sustained.

18  BY MR. McDONALD:

19  Q    Let's go to the next sentence.  They are also

20  limited in that they can only create an order within

21  the particular vendor catalog database.  Do you see

22  that sentence?

23  A    Yes.

24  Q    Did you understand, was there any limitation on

25  the TV/2's system ability to communicate with the RIMS

MOMYER - REDIRECT                    2154

1    truthful, not anything about this document.

2             THE COURT:  Objection is sustained.

3    BY MR. McDONALD:

4    Q    Let's go back to column 2 of the '683 patent and

5    pick up where we left off there.  I think that would

6    be at column 2, line 18.  The next sentence.

7         You were asked about this sentence that says, Thus

8    it would be desirable to provide an electronic

9    sourcing system that provides a means for transferring

10   information between a requisition purchasing system

11   that may use the results of a search of product

12   information and a means for searching large volumes of

13   product information such as would be included in a

14   vendor product catalog or catalogs, right, Mr. Momyer?

15   A    Yes.

16   Q    Isn't it true that the TV/2 system was already a

17   system that provided a means for transferring

18   information between a requisition purchasing system

19   that may use the results of a search of product

20   information and a means for searching large volumes of

21   products' information such as would be included in a

22   vendor product catalog or catalogs?

23   A    It did have a means for transferring information.

24   That's the reason that we selected it is that we could

25   take advantage of that and customize it to meet our

1   requirements.

2   Q    And TV/2 also had the means for searching through

3   large volumes of product information, right?

4   A    To an extent.   There were some changes we had to

5   make to allow us to have multiple catalogs.

6   Q    That was one of the features that the TV/2 system

7   touted by IBM to Fisher, specifically the feature of

8   searching large volumes of product information?

9             MR. ROBERTSON:   Objection.   Lacks foundation.

10  It calls for hearsay as well.

11            THE COURT:   Overruled.

12  A    They did say they could search large volumes of

13  information, yes.

14  Q    Let's go to the next sentence.   I think we have

15  already covered this one, Mr. Momyer, in a little

16  different form, but let's just take a look at it here.

17  Do you see this sentence, also one Mr. Robertson asked

18  you about, "It would also be desirable to provide an

19  electronic sourcing system that is capable of

20  searching a database containing at least two vendor

21  product catalogs for product information."   Do you see

22  that?

23  A    Yes, I do.

24  Q    Isn't it true that the TV/2 system already had the

25  capability of searching a database containing at least

MOMYER - REDIRECT                    2160

1   the RIMS system didn't track vendor names or numbers,

2   and I just wanted to clarify that.

3           THE COURT:  Overruled.

4   Q   Do you see that reference, Mr. Momyer, to vendor

5   NVR and vendor name in table 5 of the RIMS patent?

6   A   I do see that.

7   Q   And the NVR, that would refer to a vendor number,

8   correct?

9   A   What that was used for was --

10  Q   Is it for a number?

11  A   Yes.

12          THE COURT:  He was just answering what it was

13  used for.

14  A   What it's used for is the ability for dealing with

15  the product type 04s, which was, if you'll recall how

16  we talked about how that worked was, it was basically

17  some information that was sent up to the Fisher host

18  to basically print off a piece of paper for a customer

19  service person to enter an order into the Fisher

20  system to buy for the customer a product.

21  Q   So that order would be placed at the host end of

22  the system, right?

23  A   It would actually -- it would be placed manually.

24  Someone would actually key that information in.  That

25  particular piece of information would get passed up in

1   the data block that RIMS would send up.  As it was

2   going through and building the order, it would create

3   for all that information, basically put that

4   information on a paper document, and would print it

5   off as a procurement area within Fisher, who would

6   then look at the piece of paper, and then proceed to

7   enter an order with the supplier that was requested.

8   Q    Did you consider that inventive to take that piece

9   of paper and simply load it onto a computer

10  electronically?

11  A    No.

12  Q    So this table 5 is called non-catalog information,

13  right?

14  A    Yes.

15  Q    And that relates to the information that's tracked

16  in those cross reference tables, right?

17  A    It can do a look-up on them, yes.

18  Q    If we go to table No. 17 on column 43 of the '989

19  patent --

20        MR. ROBERTSON:  I'm going the object now,

21  Your Honor.  This is far outside the scope.

22        MR. McDONALD:  This is just closing the loop

23  on the vendor numbers on the cross-reference table.

24        MR. ROBERTSON:  I didn't ask anything about

25  those tables with respect to that, Your Honor.

MOMYER - REDIRECT                    2162

1       THE COURT:  Can I see the table?

2       MR. McDONALD:   The table is 17 in column 43.

3    Can you blow that up, please.

4       THE COURT:   Overruled.

5    BY MR. McDONALD:

6    Q    Do you have table 17 before you, Mr. Momyer?

7    A    Yes, I do.

8    Q    So this is the cross reference number list,

9    correct?

10   A    Yes.

11   Q    This does have columns for vendor number and

12   vendor, correct?

13   A    It has columns for vendor, the vendor ID, and the

14   vendor part number, yes.

15   Q    And so that's all in the RIMS system and the

16   tracking of the vendor number, right?

17   A    Once, again, the cross reference, it's back to a

18   specific Fisher part number, that's correct.

19       MR. McDONALD:  I have no further questions.

20       THE COURT:  Can he be excused permanently or

21   do you need him further?

22       MR. ROBERTSON:  He can be excused, Your

23   Honor.

24       THE COURT:  Mr. McDonald?

25       MR. McDONALD:  I'm done also, Your Honor.

1  Viewer.

2  Q    Did IBM do that through that process that you just

3  described?

4  A    Did they do it?  They tried to do it.  I don't

5  think they were completely successful.

6  Q    It was their job as part of the project, though,

7  to do that conversion?

8  A    Yes.  And what their programs couldn't do, they do

9  manually.

10  Q    So one way or the other they got it into their

11  system?

12  A    Yes.

13  Q    Ands that's part of what Fisher paid them for,

14  correct?

15  A    Right.

16  Q    And that IBM system as it existed when Fisher

17  first started working with IBM, it did have the

18  ability to do keyword searches, right?

19  A    Correct.

20  Q    It had the ability to search a document, a

21  complete document, or a list of selected topics,

22  right?

23  A    I don't think the list of selected topics was part

24  of it.

25  Q    Could you turn to Defendant's Exhibit 105, please,

1   Q    What did you actually see?

2   A    Well, when you brought Technical Viewer up, it

3   would have the content that could be searched.  If you

4   did a search, it would search that content.

5   Q    Did it give you a menu of things you could search

6   through such as part catalogs or other types of

7   documents?

8   A    No.

9   Q    Did you ever see a demo of the Volvo parts system?

10  A    No, I didn't.  There are other things in this

11  manual that in my opinion did not exist in the product

12  as well.

13  Q    If we go farther down in the same page, do you see

14  near the bottom of the page it talks about Windows?

15  A    Yes, sir.

16  Q    That's a graphic user interface, correct, as used

17  there?

18  A    Right.

19  Q    Did the IBM Technical Viewer/2 as you first saw it

20  have that Windows graphical user interface?

21  A    Well, Windows to me is the windows we all know

22  from Microsoft which IBM also had as its OS/2 version.

23  So a Window would -- my definition of this is just a

24  portion of the screen that can be manipulated,

25  resized, just like Windows is today.

KINROSS - DIRECT                    2180

1    Q    You'd consider that a graphical user interface,

2    right?

3    A    Yes.

4    Q    Isn't true that the TV/2 system could search

5    either data on a CD ROM or data saved on the hard

6    drive of the TV/2 computer system?

7    A    Yes.

8    Q    That was before Fisher started working with IBM

9    that the TV/2 had that capability, right?

10   A    It was just a matter of where the data was placed.

11   Q    So you're agreeing with me that it had that

12   capability?

13   A    Yes, I'm agreeing with you.

14   Q    It's IBM that actually programmed the search

15   engine capability for TV/2, not anybody from Fisher,

16   right?

17   A    Yes, IBM programmed the search in Technical

18   Viewer, right.

19            THE COURT:  How much longer do you with the

20   witness, Mr. McDonald?

21            MR. McDONALD:  I'd say maybe about a half

22   hour, Your Honor.

23            THE COURT:  I think this is a good place to

24   break for lunch.

25            They're going out today.

Kinross - Direct

1    included vendor ID.  So, based on the last four items, that

2    would disqualify it from being the same as what was in the

3    electronic sourcing system.

4    Q    Okay.  I'd like to turn now to the process in the context

5    of combining the RIMS system with the TV/2 system with IBM;

6    okay?  Now, is it fair to say that both the RIMS system and the

7    TV/2 systems were designed to operate on that IBM OS/2

8    operating system?

9    A    Yes.

10   Q    And both the RIMS system and the TV/2 system used

11   characters called ASCII, A-S-C-I-I, characters; correct?

12   A    Correct.

13   Q    Can you explain in lay terms what ASCII characters are?

14   A    They're a numerical representation of what a letter should

15   be based on, I believe seven bits of information.  So you have

16   seven individual bits of information that you can fill up to

17   represent the character A.  You have a different set of bits to

18   fill up to represent the character B.

19        The alternative to ASCII is EBCDIC which was IBM's version

20   of character representation, and that was based on an eight-bit

21   architecture instead of seven.  So that was my definition of

22   what ASCII characters were, bit representation that the

23   computer would understand to define a character set.  Both

24   numbers, letters, and special symbols.

25   Q    Did Fisher work on developing the RIMS side of the

Kinross - Direct

1   Q    That's what I'm talking about.

2   A    Well, you refer to the whole thing as an interface.  The

3   other side of it is an application that does requisitioning and

4   purchasing.

5   Q    Well, I'm talking about the interface right now.

6            THE COURT:  Just the -- is it DDE?

7            THE WITNESS:  Yeah, DDE, dynamic data exchange.

8   Q    That DDE, that was a known technique for interfacing two

9   applications on the same operating system at the time you came

10  up with this; right?

11  A    That's right.

12  Q    And, in fact, DDE was even the preferred method at the

13  time you were working with IBM of interfacing on a computer

14  using OS/2; right?

15  A    It's hard to say if it was the preferred method.  It had

16  some advantages that other methods did not.  We viewed it as

17  the best way to link the two systems because of the speed and

18  the amount of resources that it would consume.

19  Q    And anybody with knowledge of the possible interfaces

20  would have probably reached the same conclusion you did; right?

21           MR. ROBERTSON:  Objection, calls for speculation.

22  A    I don't know.

23           THE COURT:  Overruled.

24  Q    There was nothing extraordinary about the ability of the

25  TV/2 system to communicate with the RIMS system, was there?

1          MR. ROBERTSON:  Objection.

2          THE COURT:  Sustained.

3    Q    IBM did tell Fisher that they had an application program

4    interface with the TV/2 system that would allow interfacing

5    with the RIMS product; right?

6    A    They indicated that the Technical Viewer had application

7    programming interface.  Whether they said it would interface to

8    the requisitioning system was a requirement that we had.  I

9    don't know if IBM suggested that or not.

10   Q    But they did tell you that their API, their interface,

11   would allow Technical Viewer to communicate with RIMS; right?

12   A    I think that the fact that it had an API would indicate

13   that it could do other things to extend the product.

14   Q    Those other things would include interfacing with a

15   product like RIMS; right?

16   A    Correct.  Or requisitioning.

17   Q    Several years ago you put a timeline together about the

18   development of the RIMS product; right?

19   A    Yes.

20   Q    And in that timeline, you indicated that in 1989, the RIMS

21   product worked with multiple vendors, cutting purchase orders

22   to multiple vendors from one requisition; right?

23   A    I would have to review that document.

24         MR. McDONALD:  May I approach, Your Honor?

25   A    This --

1    saying now inconsistent with that.  You made the assertion that

2    it is.  It may not be.  It depends on how you read things.

3    Q    Well, Mr. Kinross, is what you are saying consistent or

4    inconsistent with what's on the timeline here which indicates

5    in 1989 RIMS had multiple vendors cutting purchase orders to

6    multiple vendors from one requisition?

7         MR. ROBERTSON:  Object to the form of the question as

8    vague and ambiguous.

9         THE COURT:  Overruled.

10   A    I think that it cut one purchase order.  It's not saying

11   it's cutting multiple purchase orders here.  And that purchase

12   order was to Fisher.

13   Q    So you are saying that the phrase, quote, cutting purchase

14   orders to multiple vendors from one requisition is actually

15   referring to just one purchase order?

16   A    Yes.

17   Q    And in this timeline, doesn't it also indicate by 1991,

18   the RIMS system had third-party procurement?

19   A    Yes, it indicates third-party procurement.

20        THE COURT:  He didn't ask you whether it indicated.

21   He said whether the RIMS system did in 1991.  You changed from

22   shifting from what the document said to whether or not it, in

23   fact, did.

24   Q    Well, Mr. Kinross, your timeline does indicate that in

25   1991, the RIMS system had the feature third-party procurement;

1    right?

2    A    That's a heading above 1991, yes.

3    Q    So it is linked to 1991 here; right?

4    A    Yes.

5    Q    And the features with that were, one, source off catalog

6    items, no existing part number, and two, assign vendor and

7    create purchase order; right?

8    A    That's what it says, yes.

9    Q    And the RIMS system did have those features in 1991;

10   right?

11   A    Well, this goes back to those third-party items that I was

12   talking about in the 1998 bullet point.

13   Q    I'm sorry, what year?

14   A    1989.

15   Q    Okay.

16   A    Bullet point.  There was an aspect of Fisher systems that

17   allowed non-catalog items to be ordered, and they would be

18   researched by some purchasing agent and ordered on behalf of a

19   customer.

20   Q    What year --

21   A    In that process, they would have to assign a vendor number

22   and create a purchase order to that vendor to order the item.

23   Q    That was true in 1991 with the RIMS system?

24   A    That's what it says, 1991.

25              THE COURT:  That's what it says, but the question was

1    not what it said.  The question was, is that true of the RIMS

2    system in 1991.

3                    THE WITNESS:  I don't know.

4                    THE COURT:  Okay.

5                    THE WITNESS:  In terms of the RIMS features, I was

6    not the key person to include these bullet points.  It was Doug

7    Momyer who was working in conjunction with me to create this.

8    So he was basically coming up with these bullet points to

9    develop a timeline.

10   Q    This was a document that you had produced from your files;

11   is that right, with this RK number on it?

12   A    No.

13   Q    What does that RK number indicate as you understand it?

14   A    It would indicate it came from me, and I did send it via

15   email to the attorneys just to document some of the time frames

16   of development.

17   Q    Do you know whether or not Mr. Momyer ever produced a copy

18   of this document?

19   A    I don't know.  He was in the room when I sent it to the

20   attorneys.

21                    THE COURT:  I don't think that you --

22                    THE WITNESS:  So I don't know --

23                    THE COURT:  It's not really a good idea to be asking

24   who produced something.  That's a vernacular term that the

25   lawyers have.

Kinross - Direct

1           In your recollection, no matter where the file copy

2    came from, who wrote this up; you or Mr. Momyer or somebody

3    else?

4           THE WITNESS:  Well --

5           THE COURT:  I think that's what he wants to know.

6           THE WITNESS:  We met at Doug's house on a Saturday

7    morning, and we discussed development issues that we thought

8    related to the patent.  We came up with a timeline because we

9    thought that would be helpful because they were going to be

10   asking us dates of when things happened in the system.  So we

11   produced this in a morning based on our recollection of when we

12   did things.

13          Now, I'm certain all this RIMS development came from

14   Mr. Momyer and not me, so I'm not the one that, you know, that

15   should be answering what does this mean or what does this mean.

16          THE COURT:  Let me ask you this question:  This is a

17   typed piece of paper, obviously.  Who typed it?

18          THE WITNESS:  I typed it.

19          THE COURT:  You typed it, and then you gave

20   Mr. Momyer a copy of it?

21          THE WITNESS:  I don't even know if I did that.  He

22   read it.  It was on the computer.  It was a laptop in his

23   house.  We decided, well, this is what we wanted to send over

24   to the attorneys after the meeting that we had with them, and

25   they were asking us dates and times of when certain development

```
 1   happened.
 2              THE COURT:  Okay.
 3              THE WITNESS:  To the best of our recollection, this
 4   is what we came up, and that is the genesis of this document.
 5              THE COURT:  All right, thank you.
 6              MR. McDONALD:  At this point, I'd like to mark this
 7   as 402 and offer it into evidence.
 8              MR. ROBERTSON:  No objection, Your Honor.
 9              THE COURT:  What?
10              MR. ROBERTSON:  No objection.
11              THE COURT:  All right, Defendants's Exhibit 402.
12   Make sure you get this done, folks.  Make sure you get that in
13   the system as it exists today.
14              MR. McDONALD:  Well, we pretty much already talked
15   about the multiple vendors, part three under the 1989 bullet
16   point features; is that right, Mr. Kinross?
17   A    Yes.
18   Q    So let's hit a couple of other ones we haven't talked
19   about.  Up on the screen, this is a copy of that timeline you
20   were just referring to; right?
21   A    Yes.
22   Q    So the first feature indicated in the '89 version of RIMS
23   was multiple inventory sourcing, either customer location or
24   Fisher location, search for inventory.  Do you see that?
25   A    Yes.
```

1   Q    Is it your understanding that's an accurate description of

2   the RIMS system as it indicated in '89 that it had that

3   feature?

4   A    Yes.

5   Q    The second point, realtime pricing and availability, do

6   you see that?

7   A    Yes.

8   Q    Is it your understanding that the RIMS system, in '89,

9   also had that feature?

10  A    Well, yes, but all of this is just Fisher's system, just

11  Fisher.

12  Q    Okay.  And then we already talked about number three;

13  right?

14  A    Yes.

15  Q    So let's go to number four, product cross-reference.  Do

16  you see that one?

17  A    Yes.

18  Q    Did the RIMS system, as it existed in '89, have that

19  product cross-reference feature?

20  A    It had a way to reference competitors' numbers to Fisher

21  numbers, yes.

22  Q    So that would be a similar or equivalent product?  It

23  would have a Fisher number and a competitor number; is that

24  what you are talking about?

25  A    Yes.

2272

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
2                   RICHMOND DIVISION

3    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                    :
4    ePLUS, INC.,                   :
                                    :
5                   Plaintiff,      :
      v.                            :    Civil Action
6                                   :    No. 3:09CV620
     LAWSON SOFTWARE, INC.,         :
7                                   :    January 19, 2011
                    Defendant.      :
8    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ :

9

10           COMPLETE TRANSCRIPT OF **JURY TRIAL**
           BEFORE THE HONORABLE ROBERT E. PAYNE
11         UNITED STATES DISTRICT JUDGE, AND A JURY

12

13

14   APPEARANCES:

15   Scott L. Robertson, Esq.
     Jennifer A. Albert, Esq.
16   **Michael T. Strapp, Esq.**
     GOODWIN PROCTOR
17   901 New York Avenue, NW
     Washington, D.C.   20001
18

19   Craig T. Merritt, Esq.
     CHRISTIAN & BARTON
20   909 E. Main Street, Suite 1200
     Richmond, VA   23219-3095
21
           Counsel for the plaintiff ePlus
22

23

24           DIANE J. DAFFRON, RPR
           OFFICIAL COURT REPORTER
25         UNITED STATES DISTRICT COURT

1    invalidity, if it turns out that Lawson item master meets the

2    Court's definition of catalog, then RIMS alone had all the

3    elements of the asserted claims.

4    Q    Why is it that RIMS alone would have all the elements of

5    the asserted claims with that assumption?

6    A    Because RIMS alone has a database that is, for all

7    practical purposes, identical to that of Lawson's system.  It

8    had a database that had information about items from multiple

9    sources.

10   Q    What was that database called in the RIMS system?

11   A    I think it was called parts master.

12   Q    Let's go to your slide number 25.  Did you look at the

13   issue of whether the RIMS system was a single source or

14   multiple source system, Dr. Shamos?

15   A    Yes.

16   Q    What did you conclude about that?

17   A    Well, that it's not a single source system.

18   Q    What was the basis for that conclusion?

19   A    There's a citation here from column two of the patent

20   that's explaining figures 4A through 4D, that they are flow

21   charts describing program employed by an embodiment of the

22   system of the present invention to source requisition JIT

23   inventory owned by either the distributor or the customer,

24   other inventory owned by the distributor, and inventory owned

25   by other vendors.  Those different inventories are the

Shamos - Direct

1   different sources.

2   Q    That term JIT, J-I-T, that's just-in-time inventory;

3   right?

4   A    Yes.

5   Q    We talked about that earlier today; right?

6   A    Yes.

7   Q    Can we turn to slide 27, please.  Did you have some other

8   analysis you did, Dr. Shamos, regarding whether or not the RIMS

9   system was a single source system or a multiple source system?

10  A    Yes.

11  Q    Is this slide 27 another slide you prepared on that topic?

12  A    Yes.

13  Q    Can you walk us through what you are trying to show us

14  here in slide 27, please?

15  A    Yes.  These are three paragraphs of column three of the

16  '989 patent, and I've highlighted in blue the part where

17  there's discussion of where the items are coming from.  So in

18  the first paragraph, there's reference to records for each

19  product regularly sold by the distributor.

20  Q    Is that what you have in the blue box there in the first

21  paragraph?

22  A    Yes.  Well, I read a little bit more than what was in the

23  blue box, but, yes.  Then in the second paragraph, there's

24  information in the database about similar catalog numbers of

25  other suppliers or distributors.  It would be necessary to have

1    that or the cross-reference table wouldn't make any sense.

2         Then in the third citation, it says, post database 20 also

3    includes data regarding items from third party suppliers.  And

4    so we have the distributor, we have other suppliers'

5    distributors, and we have items from third-party suppliers, all

6    of which could be searched for in the RIMS database.

7    Q    Let's go ahead and go forward to slide 29, please.  As

8    part of your analysis of the RIMS system, did you look at the

9    issue of whether or not the RIMS system generates purchase

10   orders from requisitions?

11   A    Yes, I did.

12   Q    What did you conclude after reviewing the RIMS literature

13   about that issue?

14   A    I think it's clear from both the text and the figures of

15   the RIMS patent that it does those things.  There's reference

16   to accepting the requisition, and then there's another

17   reference shown in blue, create a purchase order, and then

18   furthermore, down in figure 2A at the bottom, there's a

19   requisition maintenance block, 108, over on the left, and that

20   is interacting with the build purchase order block, 112.  So

21   that shows building of a purchase order from a requisition.

22   Q    This excerpt that you have here above the figure, there's

23   reference there to figures 5A and 5B.  Do you see that?

24   A    Yes.

25   Q    What are figures 5A and 5B from that RIMS '989 patent?

2435

1    A    Yes.

2              THE COURT:  So it's clear, which patents did you mean

3    in that situation?  Did you mean this patent?

4              THE WITNESS:  The patents-in-suit, yes.

5              THE COURT:  I don't know whether TV/2 is patented or

6    not.

7              THE WITNESS:  I don't know whether it was patented

8    either.

9              THE COURT:  So you were talking about the

10   patents-in-suit.  You covered that.

11             MR. McDONALD:  Thank you.

12   Q    So this definition in yellow here, this is the Court's

13   definition for purposes of this case and the patents in this

14   lawsuit; right?

15   A    Yes.

16   Q    And then right below that yellow box, what do you have

17   there?

18   A    That is the actual construction, the Court's construction

19   of electronic sourcing system.

20   Q    That's in the yellow box.  I'm actually asking what's

21   below the yellow box.

22   A    Oh, I'm sorry.  Citations from the IBM general information

23   manual.

24   Q    That's --

25   A    -- about TV/2.

Shamos - Direct                                              2436

1    Q    That is the manual we blew up the first page of a little

2    earlier in your testimony today?

3    A    Yes.

4    Q    So why did you pick this particular except to put on this

5    slide?

6    A    Because the first citation there mentions the use of the

7    program to make parts catalogs and service manuals available to

8    users.  But -- so that takes care of the fact that there are

9    sources of suppliers or vendors, but that paragraph doesn't say

10   searching or finding.

11        So to show that it meets the finding requirement of the

12   construction, I have this other quote about a search which is

13   in the list of features of the TV/2 system.  One of them was

14   called search.  Search facility that can locate every

15   occurrence of a word or phrase in either the current topic, a

16   list of selected topics, the complete document, or another

17   document.  So if you understand the TV/2 had catalogs and had a

18   search facility, that would allow a prospective buyer to locate

19   and find items to purchase.

20   Q    Can we turn now to the issue of combining the RIMS and

21   TV/2 system and the additional information you looked at

22   regarding that issue.  Did you prepare -- well let's go right

23   to slide 37.  Did you prepare this particular slide, Dr.

24   Shamos?

25   A    Yes.

2437

1   Q     And this slide with the heading here is TV/2 teaches

2   combining TV/2 with order entry and inventory management

3   systems; correct?

4   A     Yes.

5   Q     How does that topic relate to the obviousness evaluation

6   for purposes of your opinions in this case?

7   A     As a general matter, one can't simply pick and choose

8   arbitrary prior art references from the past.  It has to be

9   some reason or motivation to take one particular prior art

10  reference, a second reference, and put them together for

11  obviousness purposes.

12        One of the ways in which that motivation can be shown is

13  by a statement in the prior art that says to do that.  If

14  there's a statement in the prior art that says to do that, then

15  it's obvious to do it.  I'm showing here in -- this is from the

16  brochure, the TV/2 brochure -- I'm showing such statements.

17        THE COURT:  So the record is clear, DX-107 is what

18  he's referring to as the parts or brochure he described.

19        MR. McDONALD:  Is that right, Dr. Shamos, the DX-107,

20  is that the TV/2 brochure that you referred to?

21  A     Yes.

22        THE COURT:  The reason I said it is because he cited

23  it here in the slide, but the slide is not in evidence.  So I

24  want the record just to be clear.

25        MR. McDONALD:  Thank you, Your Honor.

1            THE COURT:  Everybody understands what his basis is.

2  Q    Can we go to Exhibit 107, please, and to that page

3  G0000032.  Can you blow up the paragraphs starting off, you can

4  also.

5  A    It's the bottom of the first column.

6  Q    So this is that -- you actually cut and pasted this in

7  this particular document or paragraph from this document into

8  your slide; is that right?

9  A    Yes.

10  Q    What is it about this paragraph that you think is

11  important to this issue of whether or not it would be obvious

12  to combine the TV/2 system with an order entry and inventory

13  management system?

14  A    This is expressly teaching a combination.  It says you can

15  also create a shopping list just by selecting items and passing

16  that list to another application.  So TV/2 --

17  Q    Let's stop.  Can you explain that one sentence?  Please

18  explain that first sentence.

19  A    Yes.  So when it says you can also create a shopping list,

20  it means using TV/2 you can create a shopping list, but because

21  TV/2 is not a parts ordering system, you can't order the parts

22  directly from TV/2, so you have to pass that list to another

23  application by which is meant another piece of computer

24  software, another piece of application software.

25            Then the next sentence is giving an example of what kind

1    of application you might be passing that list to.  It says, for

2    example, you might select parts to be ordered from the exploded

3    drawing in a parts catalog.  The parts list could then be sent

4    directly to your parts ordering system all without moving from

5    your PS/2.  PS/2 was a popular personal computer at the time.

6    Q    So that second or that last sentence there, is that

7    indicating that the parts ordering system and the TV/2 system

8    would both be on the PS/2 computer system?

9    A    They could be.

10              MR. ROBERTSON:  Objection, leading.

11              THE COURT:  Overruled.  I don't know that the answer

12   was heard, so you may want to start again.

13              MR. McDONALD:  Okay.

14   Q    Can you explain what it means in that last sentence, as

15   you understood it, Dr. Shamos, where it says, the parts list

16   could then be sent directly to your parts ordering system, all

17   without moving from your PS/2.  What does that mean?

18   A    Yes.  Here's what that means:  It's conceivable that you

19   could have a parts ordering system on your PS/2 in which case

20   since TV/2 ran on the PS/2, you could take the parts list or

21   the shopping list directly out of TV/2 and send it directly

22   into that parts ordering system not only without you physically

23   moving away from your PS/2, but without even having to access

24   another computer to do it.

25              It also contemplates the capability or the possibility

Shamos - Direct

1    that your parts ordering system might not be on your PS/2 in

2    which case you'd have to find some way of sending the shopping

3    list over to your parts ordering system.

4    Q    What was it about the TV/2 system, if anything, that would

5    facilitate its ability to pass something like a shopping list

6    or a parts list to another application?

7    A    Well, the PS/2 was an IBM computer.  TV/2 was an IBM

8    product.  They designed it to be able to run on the PS/2, and

9    so they made the integration of TV/2 particularly easy with

10   respect to other software that was running on the PS/2.

11   Q    How did they make it particularly easy?

12   A    The -- well, for one thing, if I create a shopping list

13   and save it to a file that's actually on the hard disk of the

14   computer, then it's easy for another application that's running

15   on the same computer to simply read that file.  So it's easy to

16   perform the integration if it's all on the same machine.

17   Q    So it's your understanding that the TV/2 system had

18   something called an application program interface?

19   A    Yes.

20   Q    What is that?

21   A    An application program interface is basically a set of

22   rules that are devised by the creator of that application that

23   tells developers who are developing other software how to

24   integrate, contact, transmit information to and from the

25   application that they've created.

Shamos - Direct

1    So TV/2 wouldn't be particularly useful if it could only

2    be used with one particular parts ordering system.  So when it

3    refers to your parts ordering system, what they are essentially

4    saying is it doesn't matter what parts ordering system you've

5    got, if you use our API, application program interface, you

6    will be able to talk to TV/2 and acquire information from TV/2.

7         MR. McDONALD:  Can we go to the next page of the

8    brochure here, DX-107, please, and can you highlight the right

9    column, some of the possibilities.

10   Q    In that slide number 37 you were looking at before we went

11   to the brochure, Dr. Shamos, I think you had highlighted, I

12   believe -- actually it's the left side.  The third bullet

13   point, is that the one you had in that slide?

14   A    Yes.

15   Q    Why don't we blow that one up here.

16   A    Before you do -- okay, highlighting is good.  I didn't

17   want to blow it up because up at the top, the last piece of the

18   first paragraph says potential uses, and that means uses of

19   TV/2.  Potential uses include, and one of the uses is

20   integrating parts catalogs with dealers' computer systems such

21   as order entry, inventory management, and customer records.

22   Q    What was the significance of that bullet point to your

23   analysis?

24   A    Well, that's an expressed teaching to integrate TV/2 with

25   ordering entry inventory management systems.

1  Q    Let's go back to slide 37 now, please.  So have we --

2  actually back to the original document, DX-107, to find both of

3  the quotes that you put in the blue box here on this slide?

4  A    We're done with this slide.

5  Q    Let's go on to slide number 38.  What is the point of this

6  slide, Dr. Shamos?

7  A    Well, it's to show that RIMS falls within the category of

8  system that TV/2 taught ought to be integrated with TV/2.

9  Q    Why don't you walk us through this one bullet point at a

10 time, and please pause between bullets.

11 A    Yes.  Column one of the RIMS '989 patent states, quote,

12 this invention generally relates to systems for requisition and

13 inventory management.  Requisition is essentially a synonym for

14 order entry.

15 Q    So this is supporting the title on this slide?

16 A    Yes.

17 Q    What are you conveying by the second bullet point?

18 A    RIMS is a requisition system which will generally, quote,

19 process purchase orders for items and track inventory.

20 Purchase order system is an order entry system.

21 Q    These numbers that you have following your quotes in the

22 first two bullet points, what are you referring to with those

23 numbers?

24 A    Those are the express citations to the column and lines

25 numbers within the RIMS '989 patent.

1    of the '989 patent?

2    A    Well, basically this is generating additional search

3    criteria, because when you look at the item stock number, then

4    the product type information associated with that stock number,

5    it says, is used to determine what database in host databases

6    20 to search.  So those are additional search criteria,

7    selecting less than the whole set of catalogs and I'm searching

8    those.

9    Q    Let's go to slide 58 then and go to element E of claim 21

10   of the '516 patent.  Why don't you tell us what you are

11   communicating here.

12   A    Yes.  In element E, there has to be a multiple purchase

13   order generation module, and that purchase order generation

14   module has to create multiple purchase orders from a single

15   requisition created with said user-generated criteria and said

16   search module criteria.

17        Simply put, you do a search, and then you create a

18   requisition from the hits that you get in your search, and now

19   it's time for the purchase order generation module to come into

20   play and generate purchase orders.  And in this figure 5A from

21   DX-7, what I'm showing is that it has the ability, that is RIMS

22   had the ability to generate multiple purchase orders from the

23   same requisition, and it's useful to take it from the top of

24   that flow chart to show exactly how that happened.

25   Q    Can we blow up that flow chart a little bit?

Shamos - Direct

1    A     At the top, box 330, it says, CSR accepts requisition, so

2    we're talking about one requisition here.

3         It's not necessary to look at 331 since it doesn't relate

4    to what I'm going to talk about, so let's go down to box 332.

5    Box 332 is a test criteria.  That is, it's going to look for a

6    condition, and depending on whether the condition is satisfied

7    or not, we are going to branch out either to the right or to

8    the left.

9         So for each item in the requisition, each item is going to

10   have a product type.  If the product type equals one, three, or

11   four, then the answer to that would be yes, and you go over to

12   the right.  And if you follow the logic down the right, it says

13   create and send purchase orders data block including relevant

14   requisition data from requisition header and item tables.  So

15   it's going to go create a purchase order there.

16        If the product type was something other than one, three,

17   or four, then you take the branch to the left, and if the

18   branch -- then there's another test that asks whether it's an

19   internal purchase order, and if it's an internal purchase

20   order, it says yes, create and print purchase order internal to

21   customer.

22        So in some cases, you're going to create a purchase order

23   internal to customer, and in some cases, from the same

24   requisition, you're going to create a purchase order that is

25   not internal to customer, so they're going to be different

Shamos - Direct

1    purchase orders.  That's multiple purchase orders from the same

2    requisition.

3    Q    Let's go to slide number 60, please, and the next element

4    of claim 21 of the '516 patent.  This is the element -- next

5    two elements, F and G; correct?

6    A    Yes.

7    Q    What, in essence, is element F of claim 21?

8    A    Element F is basically the equivalent searching that we

9    talked about before.  I have at least two catalogs, I found an

10   item in one catalog, and I'd like to know if there's a

11   generally equivalent item in another catalog.  We talked about

12   that already.  So that's present in RIMS.

13   Q    How about element G?

14   A    This says, wherein said multiple sources is limited by

15   said catalog searching module providing a match, according to

16   the search criteria, and a determination system that located

17   items are generally equivalent, and so what this says is --

18   this citation from DX-7 talks about the host cross-reference

19   table including information on items shown in the blue box

20   which have been determined to be equivalent.  So RIMS satisfies

21   this limitation on '516, claim 21.

22   Q    Let's go to slide 61, please.  What are you showing here

23   on slide 61 regarding claim 21?

24   A    This is a further limitation that says that determination

25   system, whatever it is, has to include a cross-reference table

Shamos - Direct

1    patent itself.  That can't invalidate the patent, its own

2    specification.

3            MR. McDONALD:  That is an entirely different

4    question, but whenever you want to give the instruction is fine

5    with me.  Our preference is together with the other

6    instructions so the jury has context.

7            THE COURT:  You tender one for me.

8            MR. ROBERTSON:  All right.  Thank you.

9

10           (End of sidebar discussion.)

11

12   Q    I believe we left off with slide number 71 and the fourth

13   element of claim three; right, Dr. Shamos?

14   A    Yes.

15   Q    Can we pick up where we left off then, please?

16   A    Yes.

17   Q    You have the Court's description of the function and

18   structure for that claim element here on slide 71; correct?

19   A    Yes.

20   Q    So did you find that the combination of the RIMS and TV/2

21   prior art systems perform that same function that you've got

22   described here or not?

23   A    Yes.  That's all in RIMS.

24   Q    That function being building a requisition using data

25   relating to selected matching items and their associated

1   sources?

2   A    Yes.   The location of the matching items comes from TV/2.

3   TV/2 then sends the data about them to RIMS, and RIMS builds

4   the requisition from that.

5   Q    What is the structure in the RIMS system that performs

6   that function that you relied on here?

7   A    The structure is something that's actually called the

8   requisition module in RIMS.

9   Q    That RIMS system, that's a module operating on a computer

10  system that has access to data in the database; is that right?

11  A    Yes.

12  Q    Let's go to the next element here on slide 73.   This is

13  the fifth element of claim three; correct?

14  A    Yes.

15  Q    Again, in the yellow box, do you have the Court's

16  construction of the function and corresponding structure for

17  that means for processing the requisition to generate one or

18  more purchase orders for the selected matching items?

19  A    Yes.

20  Q    Did you find in either or both of RIMS and TV/2 prior art

21  systems that that function, as the Court defined it, was

22  satisfied?

23  A    Yes, I showed that earlier when I showed the purchase

24  order building flow chart that starts with the requisition and

25  makes purchase orders.

1   is TV/2, and TV/2 was present in TV/2, so it's there.

2   Q    So we can go back to the slides.  Let's go to 88, the

3   fourth element of the claim one of the '172 patent.  Can you

4   walk us through your analysis of that fourth element, Dr.

5   Shamos?

6   A    Yes.  Means for generating an order list that include at

7   least one matching item selected by said means for searching.

8   All that's going on here is that you are getting first a hit

9   list, which is the items that are responsive to your search

10  criteria, but you may not want to order all of those.  So you

11  go down the hit list, and you select from the hit list the ones

12  that you actually want to order.   Then those are going to end

13  up on one or more requisitions.

14       So this is just a means for generating that order list.

15  The function is generating a list of desired catalog items that

16  includes at least one search result selected by said means for

17  searching.  Well, that's the whole purpose of searchable order

18  entry system, is to do that, and RIMS did that.

19       So did TV/2, actually, because it's a search program.  And

20  then remember the idea was in TV/2, to do a search, you find

21  the items you want, and then that data gets transmitted over to

22  RIMS for subsequent processing.  So the function is performed.

23       It's easy to show that the structure is present because on

24  the next to last line of the Court's construction, TV/2 is

25  listed as one of the possible structures that's disclosed in

1    the patent as performing this function.  And so since TV/2

2    includes TV/2, it's automatically there.

3    Q    Let's go to slide 90, please, and the last two elements of

4    claim one of the '172 patent.

5    A    Yes.

6    Q    Why don't you walk us through first that fifth element

7    that you labeled --

8    A    I think it was agreed that the means in this claim are the

9    same as the corresponding means in the '683 patent, claim

10   three.  So we've already been through '683-3.

11   Q    This relates to means for building a requisition, at least

12   that's a short form of the means; correct?

13   A    Yes.  And the same thing is true for means of processing

14   said requisition.  It's the same means as in the '683 patent,

15   claim three.

16   Q    So you've already shown us why those two elements of '683,

17   claim three, were satisfied using the Court's construction of

18   the means clauses; correct?

19   A    Yes.

20   Q    And so that same analysis shows that the Court's

21   construction of these two elements of claim one of the '172

22   patent are met; is that correct or not?

23   A    That's correct.

24   Q    So now we've walked through all 12 of the asserted claims

25   with the RIMS plus TV/2 foundation, haven't we?

1    That was covered in his report, and Mr. Lipscomb was our

2    rebuttal to Mr. Manbec.

3           I'm not sure that the Court's exclusion, though, was

4    dependent on this issue.  I think it was independent of any

5    issues here.  I think they are both out, as I understand it.

6           THE COURT:  What is his name?

7           MR. McDONALD:  Ernest Lipscomb, L-i-p-s-c-o-m-b.  I

8    believe I got that right.

9           THE COURT:  I have to tell you, I don't remember

10   exactly how I handled the re-examination issue, and since the

11   time that I handled it, you all have agreed willfulness will be

12   tried by the Court, and that may, in fact, affect what evidence

13   can come in.

14          Depending upon -- my recollection is I considered the

15   willful -- the re-examination to be of marginal relevance to

16   the issues here except willfulness and that 403 kept it all out

17   because it would be very hard for the jury to segregate all

18   that out, and after that, you all agreed to have the case tried

19   to the Court, the willfulness case tried to the Court.  So I

20   don't know exactly where we stand, but that's sort of where my

21   general recollection is.

22          MR. ROBERTSON:  Your Honor, the willfulness issues

23   was fully briefed in the context of re-examinations, and I've

24   been handed, I believe it's Document 375 was Your Honor's order

25   on July 26th of 2010.  While you are talking about this perhaps

1    hearing that we might have, there are these issues of

2    patentability and indefiniteness that I just brought to your

3    attention.

4          I think as pure issues of laws, there is no real

5    facts in dispute.  Whether it's patentable or not, you have to

6    focus on the claim and the specifics.  Those are not in

7    dispute.  With respect to the indefiniteness, you have to focus

8    on the claim and the specifics.  Those are not in dispute.

9          THE COURT:  You take the view that patentability and

10   indefiniteness are legal -- you take the view that

11   patentability and indefiniteness are legal questions, that no

12   fact issues need to be considered as respects those; is that

13   right?

14         MR. ROBERTSON:  I think the parties are in agreement

15   on that.

16         THE COURT:  Are you in agreement?

17         MR. McDONALD:  I believe there aren't any disputed

18   facts, Your Honor.  I think there are factual underpinnings to

19   those determinations, but I don't think the actual facts are in

20   dispute.

21         THE COURT:  There are no papers filed at this time,

22   are there?

23         MR. McDONALD:  No.

24         THE COURT:  Has the Federal Circuit decided a case

25   since *Bilski*?

2532

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
2                    RICHMOND DIVISION

3     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                      :
4     ePLUS, INC.,                    :
                                      :
5                     Plaintiff,      :
       v.                             :   Civil Action
6                                     :   No. 3:09CV620
      LAWSON SOFTWARE, INC.,          :
7                                     :   January 20, 2011
                      Defendant.      :
8     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

9

10            COMPLETE TRANSCRIPT OF **JURY TRIAL**
           BEFORE THE HONORABLE ROBERT E. PAYNE
          UNITED STATES DISTRICT JUDGE, AND A JURY

11

12

13

14    APPEARANCES:

15    Scott L. Robertson, Esq.
      Jennifer A. Albert, Esq.
16    **Michael T. Strapp, Esq.**
      GOODWIN PROCTOR
17    901 New York Avenue, NW
      Washington, D.C.    20001
18

19    Craig T. Merritt, Esq.
      CHRISTIAN & BARTON
20    909 E. Main Street, Suite 1200
      Richmond, VA    23219-3095
21
                Counsel for the plaintiff ePlus
22

23

24              DIANE J. DAFFRON, RPR
             OFFICIAL COURT REPORTER
25           UNITED STATES DISTRICT COURT

1  part of the disclosure of the patent.

2  Q    But the next thing says you create and print a

3  purchase order internal to the customer; isn't that

4  right?

5  A    Yes.

6  Q    That's the customer's purchase order, right?

7  A    Yes.

8  Q    Do you see these; 01, 03 and 04?

9  A    Yes.

10 Q    01 is at table 1, these product types are in a

11 table at column 5 and column 6 of the patent.  01 is

12 the distributor-owned product, correct?  That's

13 distributor-owned item in a Just In Time warehouse

14 located at or near the customer site, right?

15 A    Right.

16 Q    And 03 is a distributor catalog item like a Fisher

17 catalog item stored in the distributor's warehouse,

18 correct?

19 A    Yes.

20 Q    So that's a Fisher product, for example, a catalog

21 product that they are storing in their own warehouse.

22 And 04 is a third-party item that the distributor

23 orders, correct?

24 A    Yes.

25 Q    So none of those are products that are from a

1   vendor that is not a Fisher vendor, correct?

2   A   Well, of course, they are.

3   Q   Well, it's the distributors who has the product,

4   isn't it?

5   A   No, the distributor is just the intermediary.  The

6   distributor for product type 4, the distributor orders

7   the part or item from whatever is manufacturing it or

8   whoever is vending it.

9   Q   But it's the distributor who actually is selling

10  it, isn't it?

11  A   Well, the distributor buys it from somebody else,

12  and then the distributor sells it to the customer.

13  Q   But that doesn't go through the RIMS system, isn't

14  that right, for 04 type products?

15  A   I don't know what you mean that it doesn't go

16  through the RIMS system.  It goes through the system

17  that's described in the patent.

18  Q   But then the customer service representative has

19  to go out and actually outside of the RIMS system

20  order that product, right?

21  A   Well, that's one way of doing it.

22  Q   Well, isn't that the way it's taught in the

23  patent?

24  A   It's in the preferred embodiment.

25  Q   Human intervention is actually doing it, correct?

1   It's not happening as part of an electronic process?

2   A    There's a flow chart in figure 5.   That flow chart

3   can be implemented electronically.   It can be

4   implemented by computer.

5   Q    But when you go to order that product, you

6   understand, and what's disclosed in the patent you

7   called preferred embodiment, the CSR then goes and

8   actually contacts and obtains that product from the

9   vendor; isn't that right?

10  A    Well, that's one way of doing it, but when the

11  distributor receives an order for a part that he does

12  not have or does not stock, he goes and orders it.   He

13  can order it by having somebody pick up the phone or

14  he can order it through electronic data exchange or

15  whatever other interfaces he may have to its

16  suppliers.

17  Q    And that's not part of the electronic sourcing

18  system that's claimed in the '683 patent, is it?

19  That's all part of an electronic sourcing system, not

20  somebody stopping all of a sudden saying I'm going to

21  pick up the telephone and call a vendor and purchase

22  an item; isn't that right?

23  A    Well, I would agree that for the

24  means-plus-function claims, the means isn't a human

25  being.

1  of the claim terms.  I don't even know which one he's

2  talking about right now.  I think it's getting very

3  confusing.

4          MR. ROBERTSON:  I'm using Claim Three, the

5  one we've been going through this morning.

6          THE COURT:  The objection was to the form of

7  the question?

8          MR. McDONALD:  Yes.

9          THE COURT:  Sustained.

10         MR. ROBERTSON:  I'll rephrase.

11  Q  All you have identified here in this slide which

12  you say discloses that RIMS checked inventory is the

13  customer-owned inventory at a facility and the

14  distributor-owned inventory, which is the Fisher

15  product, correct?

16  A  Yes, and those are two different sources.

17  Q  The customer-owned inventory is what the customer

18  already owns.  It's not vending.  It's not a vendor,

19  supplier or manufacturer, is it?

20  A  That's not true.  That's what an internal purchase

21  order is.

22  Q  It's already customer-owned inventory sitting in a

23  warehouse, isn't it?

24  A  But it's not owned by the department that wants

25  it.  The department that wants it has to pay for it.

1   Q   Well, the company owns it, don't they?  So you're

2   saying that a vendor is an internal department of the

3   company?

4   A   It certainly can be.  The department has to expend

5   its funds in order to get that material.

6   Q   So the internal department, say, of a company is

7   in your view a manufacturer, a vendor or a supplier

8   under the Court's definition?

9   A   It certainly can be, yes.

10          THE COURT:  So are you saying that if it's in

11  the inventory of the customer, and -- well, let me ask

12  you this:  To be in the inventory of the customer, the

13  customer has to pay for it, right?

14          THE WITNESS:  Well, for it to get there in

15  the first place, the customer --

16          THE COURT:  Somebody has to pay for it.

17          THE WITNESS:  The customer has to pay for it.

18          THE COURT:  That's the company paying for it,

19  right?

20  A   Yes.

21          THE COURT:  Does the department within the

22  company according to your testimony have to pay again?

23          THE WITNESS:  It has to pay another entity

24  within the company.  It can't go to the inventory and

25  just take what it wants.  It has to pay for it with

1   internal funds.

2          MR. ROBERTSON:  Can we go to slide 38, if we

3   could.

4   BY MR. ROBERTSON:

5   Q    Here you're saying RIMS was an order entry and

6   inventory management system, correct?

7   A    Yes.

8   Q    And you rely on that for -- at column 1, lines 5

9   through 7, correct?

10  A    Well, that's an example.

11  Q    Well, then you go on to say RIMS is a requisition

12  system which will generally, and then quote "process

13  purchase orders for items and track inventory."  Do

14  you see that?

15  A    I didn't say that.  That's from the patent.

16  Q    Why don't we go to the patent if we can switch

17  back.  Column 1.

18         It's actually referring to -- if you go down below

19  that -- two other systems, isn't it?  To process

20  purchase order items and track local inventory.

21  A    I'm sorry.  What's the question?

22  Q    There it's being referred to two other systems in

23  patent, 4888208 and 4972318, correct?

24         THE COURT:  The question is whether the cited

25  reference supports what he says because the cited

1          MR. McDONALD:  Can we blow up the next

2   sentence, please.

3   Q   Sourcing in the preferred embodiment of the

4   system, we're talking but the RIMS system here, right?

5   A   Yes.

6   Q    Of the present invention can involve up to four

7   different product types:  01, local distributor-owned

8   JIT the items; 03, distributor catalog items; 04,

9   third party items which are ordered by the

10  distributor; type 06, customer-owned JIT items; do you

11  see that?

12  A   Yes.

13  Q   So these are the different product types that are

14  all sourced in the RIMS system, correct?

15  A   Yes.

16  Q   Now, the internal customer purchase order that you

17  were referring to, is that sometimes called an

18  administrative purchase?

19  A   Yes.

20          MR. McDONALD:  Can we turn to the '683

21  patent, please, the patent-in-suit.  Can we go to

22  column 18.  Can you blow up the section beginning at

23  line 17 or 18 of column 18, and then the list of 3

24  bullet points.

25  BY MR. McDONALD:

1   Q    So this is from the '683 patent, but this is in

2   all the patents-in-suit; is that right, Dr. Shamos?

3   A    Yes.

4   Q    Can you tell us what being described here in the

5   '683 patent at column 18?

6   A    Well, what's being described is the generation of

7   one or more purchase orders.

8   Q    That first item there, what is that?  It says, "An

9   order from the customer to the supplier, an

10  administrative purchase."

11  A    Well, that seems to contradict what we were

12  talking about before about what an administrative

13  purchase is because that doesn't look internal.

14          THE COURT:  Well, it can't be internal

15  according to the construction.

16  Q    Well, if we look at --

17          THE COURT:  Can it?

18          MR. McDONALD:  Yes, it can.  Well, let me

19  walk through this.

20          THE COURT:  Are you trying to make a point

21  here that when a company owns something in inventory,

22  and it's paid for it, and one department has it but

23  another department wants it, and there's a bookkeeping

24  entry to reallocate funds within the company, that you

25  have a vending going on; is that the point?

SHAMOS - CROSS                    2597

1    MR. McDONALD:  That's sourcing, Your Honor.

2    THE COURT:  Well, I'll let the jury decide

3  whether it is or not, I guess, but --

4  BY MR. McDONALD:

5  Q    You just testified that the whole RIMS

6  specification is incorporated by reference into the

7  patents in this suit, correct?

8  A    Yes.

9  Q    And in the RIMS patent, doesn't it specifically

10  say that those customer internal transactions are

11  called purchase orders?

12    MR. ROBERTSON:  Objection, leading.

13    THE COURT:  Let him testify.  That's enough.

14  Q    All right.  So does --

15    THE COURT:  Sustained.

16  Q    Does the RIMS specification describe the internal

17  customer transaction?

18  A    Yes, we went through this in discussing figure 5,

19  which has the decision block when processing a

20  requisition looking at the different type codes and

21  deciding whether to issue an internal purchase order

22  or not an internal purchase order.

23  Q    That was from that figure 5A of the RIMS patent,

24  correct?

25  A    Yes.

SHAMOS - CROSS                    2598

1       MR. McDONALD:  Can we put figure 5A back up,

2   please, from the '989 patent.

3   BY MR. McDONALD:

4   Q   So for purposes of the RIMS disclosure that's

5   incorporated into the patents-in-suit, is there

6   anything from figure 5A that indicates what that

7   internal customer transaction is actually called?

8   A   Well, it says -- it refers to in block 334,

9   customer internal P.O.

10  Q   What does P.O. stand for?

11  A   Purchase order.

12      MR. McDONALD:  Well, can we go to column 17

13  of the '989 patent.  Could you blow up a section from

14  lines 35 to 43, please.

15  BY MR. McDONALD:

16  Q   I think you were asked some questions about

17  whether the system generates the purchase orders in

18  those figures 5A and 5B or not.  I'd like to direct

19  your attention to this paragraph, Dr. Shamos.  Can you

20  tell us what this paragraph of the RIMS patent is

21  explaining about that purchase order building process?

22  A   Yes, it's describing what happens, for example,

23  for items of product types 1, 3 and 4.  It creates a

24  purchase order between the customer and the

25  distributor.

2614

1   to make a motion.

2           MR. McDONALD:  I get to rest first.

3           THE COURT:  You can't make anything yet.

4           MR. McDONALD:  The defense rests, Your Honor.

5           THE COURT:  Thank you.

6           Ladies and gentlemen, we'll take the morning

7   recess now.  It may be a little bit longer than 20

8   minutes because I have a matter to take up with the

9   lawyers.  We'll let you know.

10          (The jury is exiting the courtroom.)

11          THE COURT:  All right.  You're motion is

12  going to take how long, Mr. McDonald?

13          MR. McDONALD:  Our motion?

14          THE COURT:  Yes, your motion.

15          MR. ROBERTSON:  I understood we were making

16  JMOL -- no invalidity, but I understood Your Honor to

17  indicate that we were going to take that up on Friday.

18          THE COURT:  I'm trying to figure out just

19  timing, that's all.  How long do you see this motion

20  process taking, given that we're going to hear the

21  arguments on Friday?  Just a short one?

22          MR. McDONALD:  We have infringement and

23  validity as well.

24          MR. ROBERTSON:  Can we confer at the break,

25  Your Honor.  I think we could probably -- I estimate

Hilliard - Direct

1   to locate and find items to purchase, to purchase from sources,

2   suppliers, or vendors, and in this case, I believe sources,

3   suppliers, and vendors are synonymous.

4   Q    And how is it relevant to the issue of whether the RIMS

5   system satisfies the claim requirement of an electronic

6   sourcing system, of whether or not the user of the system is

7   the distributor's customer service representative?

8   A    The RIMS system is a seller's system.  It's not for use by

9   the prospective buyer.  It's for use by the Fisher customer

10  service representative or CSR.

11  Q    Could the RIMS system be used to purchase goods from

12  multiple different sources, suppliers, or distributors?

13  A    No.  Only from Fisher.

14  Q    Now, did the RIMS system have a database?

15  A    Yes.

16  Q    Did it have a database with records of items?

17  A    Yes.

18  Q    Do you have an opinion as to whether or not that database

19  constitutes a database with multiple vendor catalogs?

20  A    I do have an opinion, yes.

21  Q    What is your opinion?

22  A    It does not.

23  Q    Why not?

24  A    It is not -- the items have no vendor or source

25  association with them as a catalog item would, because all of

2686

1           (The jury is present.)

2    BY MS. ALBERT:   (Continuing)

3    Q   Mr. Hilliard, before the lunch break, we were

4    talking about the functionality of the RIMS system for

5    building a requisition, and I had asked -- I guess

6    I'll just ask you again.   Could the RIMS system at the

7    customer's facility build a requisition from data

8    relating to selected matching items found in searching

9    vendor catalogs and their associated sources?

10   A   No, it couldn't.

11   Q   Why not?

12   A   Because there's no catalog.   There's no selection

13   of catalogs.   Even if you were to interpret the parts

14   file to be a catalog, there would only be one.

15   There's no search of the catalog.   Just a part number

16   look-up.   So there would be no search results to build

17   the requisition from.

18   Q   The RIMS system did build a requisition, though;

19   isn't that right?

20   A   Yes, it did.

21           MS. ALBERT:   Now, can we take a look at this

22   requisition that's built in the RIMS system.   Can we

23   look at DX 7 at table Roman numeral 3, column 37.   And

24   could you blow up, yes.

25   Q   What's illustrated in this table III?

1  A    This is a requisition screen from the RIMS system.

2  Q    I'm sorry.  Go ahead.

3  A    It shows the account number, which is a

4  department, and line items.

5  Q    Now, do the line items that are listed in that

6  requisition include information relating to the

7  sources from which the item are to be procured?

8  A    No, there's no source information.  There's only

9  one source in the Fisher RIMS system.

10  Q   Why didn't the requisition built by the RIMS

11  system need to include vendor information?

12  A    There's only one vendor.

13  Q    Does the electronic sourcing system of the ePlus

14  patents require that the requisition line items have

15  associated source or vendor information?

16  A    Yes.

17  Q    Why is that necessary?

18  A    Well, because in the patents-in-suit they call for

19  the ability of the buyer to go through catalogs and to

20  select the sources from which he or she wants to buy.

21  And so the requisition needs to reflect the sources

22  that are selected or vendors - source and vendor I'm

23  using interchangeably - that the buyer has selected.

24  Q    Then does the system take that requisition and

25  need to be able to generate purchase orders using the

1  explain what happens in the RIMS system after the CSR

2  accepts a requisition and at the point where you reach

3  the decision block 332?

4  A    Yes.   The diamond-shaped block indicates that

5  there's a logic decision that's made by the Fisher

6  RIMS system to determine whether the item that's being

7  requisitioned is a type 1 item, which is a

8  distributor-owned item that's located at the Just In

9  Time location at the customer's site, a type 3 item,

10 which is a distributor-owned item that's located at

11 the warehouse, or a type 4 item, which is an item that

12 the distributor buys and resells to the customer.

13     If so, the system creates a purchase order data

14 block, as I mentioned in response to your prior

15 question, over here on the right.   And if not, the

16 system generates what's called a customer internal

17 P.O., although that internal P.O. is really not a

18 purchase order.   It's a material transfer request.

19 Q   What's the difference between a material transfer

20 request and a purchase order?

21 A   In a purchase order something is going to be

22 purchased as is the case with the type 1, 3 or 4.   The

23 other types that are active are the 5 and 6.   Five

24 being an item that's not handled by the system and 6

25 being a -- so I'm going to ignore 5 for a moment.   Six

1    being a customer-owed item that's located at the Just

2    In Time warehouse at the customer's location.

3        Now, in the case of that type 6, since it's a

4    customer-owned item, there is no purchase.  The

5    customer doesn't need to purchase that item because

6    the customer already owns that item.  So this is

7    really a material transfer, not a purchase.  Although,

8    there's a reason, I believe, why it's called that in

9    this patent.

10   Q    Does this diagram show the RIMS system generating

11   multiple purchase orders from a single requisition?

12   A    No, it does not.  It shows on the right-hand side

13   a purchase order block, which is sent to the host

14   system, and the left-hand side the initiation of

15   basically a material transfer that transfers the

16   customer's own inventory from one department to

17   another.  No purchase or sale occurs.

18   Q    Now, I want to turn to the converting

19   functionality that's required by some of the claims.

20   Is there any description in the '989 patent of using

21   the RIMS system to convert a selected matching item

22   associated with one vendor to another item from a

23   different vendor by means of cross referencing

24   functionality?

25   A    No, there isn't.

HILLIARD - DIRECT                    2697

1   Q    What about the cross reference tables at the

2   Fisher mainframe computer.   Would those satisfy the

3   claim requirements?

4   A    No, they don't.   The cross reference tables are

5   basically a table that's in there for the purpose of

6   allowing Fisher to supply a Fisher item in place of an

7   item that has a competitor's product number.   There's

8   no alternative vendor.   The only vendor to the

9   customer is Fisher.   So you can't -- the system

10  doesn't provide for the conversion of an item from one

11  vendor to another vendor because -- to include the

12  item of another vendor because it's all one vendor.

13          MS. ALBERT:   Mike, could we take a look at

14  Claim Three of the '683 patent?

15  Q    You see at the bottom there there's this claim

16  element means for converting data relating to a

17  selected matching item and an associated source to

18  data relating to an item in a different source?   Do

19  you see that?

20  A    Yes.

21  Q    Has the Court construed the meaning of the term

22  "selected matching item"?

23  A    Yes, it has.

24  Q    Do you know what that construction is?

25  A    A selected matching item is an item that is the

1  result of -- that's found as a result of a search,

2  something that the patent refers to as a hit.

3       MR. McDONALD:  Your Honor, I object.  The

4  Court has defined the term "matching item," and you

5  did want use the word "hit."

6  Q   Why don't we look at the Court's construction.

7       MS. ALBERT:  I want to go back, Mike, to the

8  first page, and I want to blow up the second to the

9  last item there; selected matching items.

10 Q   What's the Court's construction for selected

11 matching items?

12 A   These are requisition items.

13 Q   So could we go back to Claim Three for a moment,

14 please?  So with respect to this means for converting

15 data requirement, does that relate to requisition

16 items and an associated source?

17 A   No, there's no associated source.  There's only

18 one source.  There's only one vendor.  And there's no

19 different source because, once again, there's only one

20 vendor.

21 Q   So would the RIMS system satisfy that claim

22 requirement?

23 A   No.

24 Q   We saw earlier the requisitions that are actually

25 built by the RIMS system.  Did those requisitions

HILLIARD - DIRECT          2700

1    Is the catalog selection protocol requirement

2  relevant to Claim 29?

3  A   Yes, it is.  Once again, it's the fourth element.

4  The fourth, yeah, element.

5  Q   Now, with respect to inventory capability, could

6  the RIMS system determine the availability of a

7  selected matching item in inventory?

8  A   As I understand it, inventory refers to a third

9  party vendor's inventory.  And there's nothing in the

10 RIMS system --

11          MR. McDONALD:  Objection, Your Honor.  The

12 term "inventory" is not construed by the Court as

13 limited to third party inventory.

14          MS. ALBERT:  Can I take a look at Claim 26 of

15 the '683 patent?

16          THE COURT:  Is "inventory" a construed term?

17          MS. ALBERT:  No, it wasn't.  So I think he

18 could give his opinion from the perspective of a

19 person of ordinary skill in the art, how a person of

20 ordinary skill in the art from review of the ePlus

21 patent specification would understand the meaning of

22 that term as it's used in the claim with reference to

23 the claim as a whole.

24          MR. McDONALD:  Well, if they wanted a special

25 meaning, Your Honor, that's what they should have

1   asked you to give it.  The word "inventory" has a

2   meaning.  If he wants to say what "inventory" means as

3   he would understand it or one of ordinary skill,

4   that's one thing.  But to say it's a specific party's

5   inventory, well, that's adding additional words to it,

6   and that's a whole different thing.  He shouldn't be

7   allowed do that.

8                MS. ALBERT:  Maybe I can just walk him

9   through the claim.

10               THE COURT:  Maybe that would be a better

11  approach.

12  BY MS. ALBERT:

13  Q    Now, do you see this inventory functionality

14  referenced in the last element of Claim 26?

15  A    Yes.

16  Q    Do we also see a reference to a selected matching

17  item?

18  A    Yes.

19  Q    Earlier we referred to the Court's claim term

20  glossary and its construction of "selected matching

21  item."  What was that construction?

22  A    A selected matching item is an item in a

23  requisition.

24  Q    Does that selected matching item refer back then

25  to the fourth element in the claim that relates to

HILLIARD - DIRECT                    2702

1   building a requisition using data relating to selected

2   matching items and their associated sources?

3   A    Yes, at this time does.

4   Q    And what are the sources that are associated with

5   those selected matching items in the requisition?

6   A    Those sources are the catalogs of vendors from

7   whom the customer -- multiple vendors from whom the

8   customer is potentially going to buy.

9   Q    Did the RIMS system have catalogs associated with

10  vendors?

11  A    No.

12  Q    Did the RIMS system build a requisition using data

13  relating to selected matching items and their

14  associated sources?

15  A    No.

16  Q    So do you have an understanding then that the

17  selected matching item relates back to the vendor

18  product catalogs if you follow back through the claim?

19  A    I think that's quite clear.

20  Q    The '989 patent does use the term "sourcing," is

21  that right?

22  A    Yes, it does.  And it defines it right in the

23  description.

24  Q    How is the reference to sourcing used in

25  connection with the '989 patent?

1  shows a definition of sourcing.  Sourcing the

2  requisition is the process of determining what

3  inventory will be used to fill requisition.

4       And in the case of the '989 patent, this

5  definition of "sourcing" is different than the

6  definition of "sourcing" in the patents-in-suit, and

7  the reason it's different is because the '989 patent

8  is a seller's system and the patents-in-suit is a

9  buyer's system.  So you can't look at the word in the

10  two patents and say they mean the same thing or the

11  combination of patents-in-suit versus the '989 because

12  sourcing is clearly defined differently in the '989

13  than sourcing is used in the connotation of an

14  electronic sourcing system.

15  Q    Now, Mr. Hilliard, do you have a slide that

16  summarizes what you consider to be the major

17  differences between the RIMS system and the electronic

18  sourcing system of the asserted claims?

19  A    Yes.

20            MS. ALBERT:  Could we have slide 51 from

21  slide deck 93.

22  Q    What have you summarized here?

23  A    This is basically a summary of the characteristics

24  of the Fisher or of the RIMS system, the requisition

25  and inventory management system.  And in summarizing

1   these items fit that characterization.

2   Q   Have you reviewed any evidence that would

3   substantiate whether or not IBM had ever had a

4   commercial version of the TV/2 search program prior to

5   IBM's work with the inventors on the electronic

6   sourcing system project?

7   A   There was no evidence at all to that effect.

8   Q   Now, can you describe at a high level the nature

9   of this Technical Viewer/2 search program?

10  A   Yes.  It's a piece of software that allows the

11  user or buyer to search through electronic information

12  to find information that's included in that electronic

13  document and to view the items that were found as a

14  result of the search.

15  Q   Was TV/2 an electronic sourcing system?

16  A   No.

17  Q   Why not?

18  A   It doesn't have any of the characteristics of an

19  electronic sourcing system.  There's no -- well, can

20  we put up the construction?

21  Q   Well, sure.

22          MS. ALBERT:  Can we look at the glossary of

23  claim terms.  Blow up that middle one, electronic

24  sourcing system.

25  Q   So what characteristics are missing from the TV/2

1  program that are required in order to constitute an

2  electronic sourcing system?

3  A    An ability to complete the process described in

4  that description.   You can find items, but there is no

5  purchasing capability from sources, suppliers or

6  vendors.   There's nothing relating to sources,

7  suppliers or vendors at all in the TV/2 system.

8  Q    Did the TV/2 program prior to 1994 include any

9  product catalogs in its database?

10  A    No, it didn't come with a database.

11  Q    Did TV/2 prior to August of 1994 have multiple

12  product catalogs?

13  A    No.

14  Q    Was there any capability using TV/2 to search for

15  items and build a requisition using those search

16  results?

17  A    No, there's no requisition logic in TV/2 at all.

18  It's simply a search and display engine.

19  Q    Could we take a look at DX 107, and the Bates

20  number on the page I would like to refer you to is

21  G33.

22          MS. ALBERT:  Could we blow up the left-hand

23  column there?

24  Q    Under some of the possibilities, we see some

25  potential uses include -- and about three bullet

1  A   In order to render Claim One of the '172 patent

2  obvious, it would have to satisfy all of the elements

3  of the '172, Claim One.  And because there are no

4  catalogs in this case, conceivably in this case TV/2

5  does bring something to the party.  It does bring the

6  ability to support portions of the database

7  separately.

8      It does bring a means for entering product

9  information that partially describes an item.  You can

10  put a description in, and it can search on the

11  description.

12     And it does provides a means for searching for

13  matching items that match the product information.  So

14  it does in fact, the combination, satisfy three of the

15  elements, but it doesn't bring anything to the

16  combination with regard to satisfying the other

17  elements.

18     So in order for the combination to anticipate the

19  claim, we'd have to have a checkmark on every single

20  one of these, not just three of them, which we don't.

21  Q   Mr. Hilliard, did you also consider other evidence

22  that would show that the patented inventions were

23  innovative?

24  A   Yes.

25  Q   What other evidence did you consider in forming

Hilliard - Cross                                          2751

1    the brochure clearly states that it doesn't come with a

2    computer, that there's a prerequisite that the buyer has to

3    have, so it's a piece of software.  It's not a CD or a

4    computer, it's a piece of software, and that certainly

5    indicates and it indicates in the brochure that it's used to

6    read data that can be input into it through a CD, yes.

7    Q    So you would agree that this brochure does teach or

8    suggest to that person with the computer science degree and a

9    couple of years of experience that you take that TV/2 software,

10   load it on a computer, and put a catalog on a CD into the

11   system?  That would at least be one way to use it; right?

12   A    It says that's one of the possibilities, yes.

13   Q    So your testimony about TV/2 not having catalogs, you are

14   just saying when you buy the system from IBM, it's not going to

15   come with your own personal catalogs that you would select to

16   load on; right?

17   A    That's what I'm saying, yes.

18   Q    Okay.  But you do understand that the materials regarding

19   the TV/2 system would teach or suggest to one of ordinary skill

20   in the art that they could use that system with one or two or

21   more CDs of catalogs depending on what their needs are; right?

22   A    This is an undated brochure, number one.  We don't know

23   when it was published.  Number two, it certainly indicates that

24   it has that capability, but we know that it didn't have the

25   capability of doing the catalogs that were necessary for the

Hilliard - Cross

1   $600,000, a version of TV/2 that had interfaces to the

2   electronic sourcing system, had the ability to search

3   individual portions based on tags, it had a data loading

4   capability, and it had an order list capability, that all of

5   those things were developed onto the TV/2 system, not as it's

6   described in the 105 and 107, but after that $600,000, one-year

7   plus project was complete.

8   Q    Would you agree that one of ordinary skill reading the

9   Technical Viewer/2 brochure would think it would be obvious to

10   combine a system like the RIMS system described in the '989

11   patent with a searching system like the TV/2 system?

12   A    No.

13   Q    Well --

14   A    Well, for what purpose?

15   Q    For the purposes described in the TV/2 brochure.

16   A    No, because the RIMS system -- to combine the -- the RIMS

17   system was a requisition and inventory management system.   The

18   TV/2 is a search and viewer system.   The -- there's nothing in

19   the brochure that suggests combining it with a requisition and

20   inventory management system.

21        I mean, I'd have to look at the purpose, but it doesn't

22   seem obvious to me from the point of view of one of ordinary

23   skill in the art that it would be an obvious thing to combine

24   for the purposes described in that brochure in either of the

25   two brochures.

1   Q   Can we turn to the TV/2 brochure, Defendant's Exhibit 107,

2   please.  Go to the fourth page of that document.  Blow up the

3   column on the left, and specifically let's blow up the third

4   bullet point.  And maybe I should -- I don't know if you can

5   read the fine print there.  Let's blow up the whole left column

6   so we can see the context.  This is a part of the TV/2 brochure

7   that's talking about potential uses; correct?

8   A   Yes.

9   Q   And the third one is, integrating parts catalogs with

10  dealers' computer systems such as order entry, inventory

11  management, and customer records; right?

12  A   Yes.

13  Q   Wouldn't you agree, Mr. Hilliard, that someone with a

14  computer science degree and one or two years of experience in

15  working with computer procurement systems reading this bullet

16  point in the TV/2 brochure would understand that it would be a

17  good idea to combine the TV/2 system with an inventory

18  management system like the RIMS system to get the features

19  discussed in this brochure?

20  A   What features are you referring to?

21  Q   Any of the features that the brochure highlights as

22  benefits of the TV/2 system?

23  A   I don't see a feature.

24  Q   Well, we've already gone through that brochure, haven't

25  we, a little bit, Mr. Hilliard?  You know the brochure talks

Hilliard - Cross

1   about some potential benefits of the TV/2 system, don't you?

2   A    It talks about -- features are different than benefits.  I

3   didn't see any features described.

4   Q    I'll rephrase the question.

5   A    It talks about potential benefits as -- I don't recall it

6   talking about features.

7   Q    Let's talk about benefits then.  Would you agree that one

8   of ordinary skill in the art, seeing this paragraph about

9   integrating parts catalogs, would agree that if they had a RIMS

10  system, an inventory management system like RIMS, and they

11  wanted to get the benefits described in this brochure, that it

12  would be an obvious thing to combine a TV/2 system with the

13  RIMS system?

14  A    If one had a RIMS system, would it -- well, the only

15  company that had a RIMS system was Fisher, and it wasn't

16  obvious -- Fisher didn't sell the RIMS system to competitors or

17  to customers.  They installed the RIMS system in their

18  customers' site.

19  Q    I wasn't asking about selling, Mr. Hilliard.  I had a very

20  specific question?

21  A    You're saying if someone had a RIMS system.  So the only

22  one who had a RIMS system was Fisher.

23  Q    All right.

24  A    Okay.

25  Q    But let's make sure we're clear.  I'm talking about one of

Hilliard - Cross                                                    2788

1   ordinary skill in the art who knew about the RIMS system and

2   was looking at this brochure.  Wouldn't they read this and say

3   it's an obvious thing to combine that RIMS system with the TV/2

4   system?

5   A    They might look at that and say that it's a possibility to

6   do that.  I'm not sure that you'd look at it and say it was

7   obvious to do that.  You'd have to -- obvious for what purpose?

8   It's not clear to me for what purpose it would be -- I mean, if

9   you give me a purpose, I can say, well, would it be obvious for

10  that purpose.

11  Q    Mr. Hilliard, based on all your investigation for purposes

12  of this case, do you have an understanding as to what the

13  benefits of the TV/2 system were as they were described in the

14  TV/2 literature?

15  A    I understand that the claimed benefits are the ability to

16  search and view databases or data on CDs or so forth.

17  Q    Things likes catalog that are large volumes of data;

18  right?

19  A    Such as that, right.

20  Q    And could include images and things likes that?

21  A    Yes.

22  Q    Using that as the benefits of the TV/2 system, isn't it

23  true that one of ordinary skill back in 1993, April of '93, if

24  they knew about the RIMS system in the '989 patent, they saw

25  this TV/2 brochure, it would be obvious to them, to get the

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                    RICHMOND DIVISION

 4

 5    ---------------------------------------
                                            :
 6    ePLUS, INC.                           :    Civil Action No.
                                            :    3:09CV620
 7    vs.                                   :
                                            :
 8    LAWSON SOFTWARE, INC.                 :    January 21, 2011
                                            :
 9    ---------------------------------------

10

11          COMPLETE TRANSCRIPT OF THE JURY TRIAL

12        BEFORE THE HONORABLE ROBERT E. PAYNE

13    UNITED STATES DISTRICT JUDGE, AND A JURY

14
      APPEARANCES:
15
      Scott L. Robertson, Esquire
16    Michael G. Strapp, Esquire
      Jennifer A. Albert, Esquire
17    David M. Young, Esquire
      Goodwin Procter, LLP
18    901 New York Avenue NW
      Suite 900
19    Washington, D.C.  20001

20    Craig T. Merritt, Esquire
      Christian & Barton, LLP
21    909 East Main Street
      Suite 1200
22    Richmond, Virginia  23219-3095
      Counsel for the plaintiff
23

24              Peppy Peterson, RPR
              Official Court Reporter
25         United States District Court
```

```
1    don't know if the Court has any other questions.  I think, just
2    to summarize, that the most compelling evidence in this case
3    that ePlus should be entitled to a JMOL of infringement has
4    come from the defendant's own mouths and their own documents
5    and the demonstration and the source code that we think
6    established beyond peradventure that Lawson indeed infringes
7    these claims in the configurations as set forth by Dr. Weaver
8    in his testimony.  Thank you.
9             MS. HUGHEY:  Good morning, Your Honor.
10            THE COURT:  Morning.
11            MS. HUGHEY:  I'd like to start by clearing up
12   something that may not have been clear from Mr. Robertson's
13   discussion today.  The fact is, if there's no catalog as
14   defined by the Court, then Lawson does not infringe, and we
15   don't have to go any further.  However --
16            THE COURT:  I think he said that.
17            MS. HUGHEY:  Yes.  However, even if there are
18   multiple catalogs, Lawson still does not infringe.  It doesn't
19   do the searching, the selecting, the equivalent items, the
20   things Mr. Robertson went into.  So I just want to make that
21   clear on the record, that catalogs are not the only
22   non-infringement argument in this case.
23            However, because it was discussed in great detail
24   with Mr. Robertson, I'd like to start with that.  I think both
25   parties agree that a full vendor catalog, like the Sears
```

1  catalog, meets the Court's definition of a catalog, and I think

2  both parties agree that at some point, single items don't meet

3  the definition of a catalog, like a phone list.  So the

4  question is, where is that line drawn.

5          What ePlus wants to do is drawn a line and say, if an

6  item, at some point, was in a catalog at any point, then it's a

7  catalog.  Even if --

8          THE COURT:  If I'm a user, and I have in front of me

9  a catalog, and I say, well, look, all I really am interested in

10 are the sweaters.  I don't care about boots and fly rods or

11 jack hammers and other things, and I take all of the section of

12 that catalog out of the vendor's catalog and put it into my

13 catalog, my item master, I have put a catalog or part of a

14 catalog in there, haven't I?

15         MS. HUGHEY:  That's an interesting argument, Your

16 Honor, but that's not the argument that ePlus is making --

17         THE COURT:  Answer my question, because whether it's

18 interesting or not to ePlus, it is interesting to me.  Haven't

19 I put a catalog into that database?

20         MS. HUGHEY:  So you're saying that you've ripped a

21 page out of that catalog --

22         THE COURT:  No, whatever.  I've taken the whole

23 section.

24         MS. HUGHEY:  That's not a vendor catalog.

25         THE COURT:  Not yet.  That's part of a vendor

```
 1    catalog.

 2              MS. HUGHEY:  That is a piece of data from a vendor

 3    catalog.

 4              THE COURT:  A piece of data.  Now, suppose that I

 5    take the whole catalog and put it into my database; is that a

 6    catalog?  Is that a vendor catalog?  Yeah.

 7              MS. HUGHEY:  I think the evidence in this case would

 8    be yes.  If you took the entire Sears catalog, it would be

 9    considered still a catalog.

10              THE COURT:  Now, if I take Sears -- somebody used

11    Montgomery Ward.  I didn't even know it was still in business.

12    How did you know it was still in business?

13              MS. HUGHEY:  Saw it on eBay®.

14              THE COURT:  But I take three catalogs, I take

15    L.L.Bean, Magellan, and somebody else, and I put them in my

16    database, in my legacy system so it's got catalogs.  It's

17    got -- what I've got in my legacy system is vendor catalogs;

18    right?

19              MS. HUGHEY:  No, Your Honor.

20              THE COURT:  No?

21              MS. HUGHEY:  No.

22              THE COURT:  Why not?

23              MS. HUGHEY:  The actual facts in this case are --

24              THE COURT:  Why don't I have a catalog there under

25    what I just asked you?
```

1          MS. HUGHEY:  I feel like there may be two questions

2     pending.  The general question, is a Sears catalog a catalog,

3     yes.  The question of the Lawson's customers' legacy system is

4     a catalog is no.

5          THE COURT:  Even if they have all of those three

6     catalogs in there, and you bring it into the -- and Lawson

7     imports it into the customer's system for them, they don't have

8     catalogs in the item master and vendor table?

9          MS. HUGHEY:  In your hypothetical, that may be the

10    case, but those aren't the facts that we're dealing with.

11         THE COURT:  That doesn't make any difference.  How

12    your customers use it don't make any difference.  If the

13    principle is correct that if your system is capable of doing

14    that, then you are infringing.  Do you agree as to the

15    capability argument that Mr. Robertson made?

16         MS. HUGHEY:  I disagree for two reasons.  With

17    respect to the specific issue of the capability, the fact of

18    the matter is that whether a party is capable of infringing is

19    not the question.  It's whether it actually --

20         THE COURT:  No, it's not whether a party is capable

21    of infringing, it's whether the system, once it's sold, is

22    capable of an infringing use; right?

23         MS. HUGHEY:  That's right.  Same question, same

24    answer.  Capability is not the same as infringement.

25         THE COURT:  What case is that?

1          MS. HUGHEY:  I'm going to send you the *Ball Aerosol*

2     case.  The cite is 555 F.3d 984, and it's a 2009 Federal

3     Circuit case.  I'll read from it first.

4          THE COURT:  Has anybody highlighted it here?

5          MS. HUGHEY:  I haven't highlighted it, Your Honor.

6          THE COURT:  Where do I go?

7          MS. HUGHEY:  I'll direct you to page eight of the

8     actual -- in the right-hand corner, it says page eight, and the

9     heading starts on the left side, infringement.

10         What happened at the District Court was the District

11    Court found infringement right under the heading infringement.

12    We next turn to the second sentence.  The District Court found

13    infringement because the accused travel candle, quote, is

14    reasonably capable of being configured in such a way that the

15    holder is supported by the cover when the cover is placed open

16    and down on a surface.

17         The Court then went on, the next full paragraph at

18    the top of the second column, BASC's reliance on the cases that

19    found infringement by accused products that were reasonably

20    capable of operating in an infringing manner is misplaced since

21    that lines of cases is relevant only to claim language that

22    specified that the claim is drawn to capability.

23         What this is saying, Your Honor, is that if the

24    claims -- -in this case require actual catalogs, not the

25    capability of having catalogs, and because that element is not

```
 1   met, there is no infringement.

 2              To answer your question, I do agree with ePlus's

 3   position that capability allows for infringement.  The second

 4   question with respect to the specific issue of catalogs is that

 5   here, there is no catalog.  Like I said, both parties agree

 6   that at some point data that's been drawn from a catalog, a

 7   vendor catalog and changed is not a catalog.

 8              THE COURT:  But you don't even agree if I put my

 9   whole catalog in, that I've got a catalog in the item master

10   vendor table.

11              MS. HUGHEY:  I would agree that that would be an

12   infringement if that happened, but it does not, nor is it

13   capable of happening.  That's my point.

14              THE COURT:  Why isn't it capable of happening?  In

15   fact, every witness that testified said it is, including Mr.

16   Christopherson.  What he said was, in words of one syllable,

17   sure, that can done, but that isn't the way it's usually used.

18   That's what he said.

19              MS. HUGHEY:  The evidence that was coming in was that

20   the item master -- all the evidence that came in about the item

21   master is that it is uniquely organized and created by a

22   customer, it does not look like a published catalog, it's a

23   private collection of personal items, has special price

24   information.  These are not -- this is a not a catalog, a

25   vendor catalog like the Sears catalog.  This is a grocery list.
```

1          THE COURT:  That isn't the question.  Your witness

2     testified that the -- that I could put one or more entire

3     catalogs into the item master if I wanted to depending on the

4     capacity of the item master I bought, and your position is that

5     even if I do that, the item master parts list, vendor item list

6     isn't a catalog, and I don't understand that at all.

7          MS. HUGHEY:  Your Honor, the evidence that came into

8     this case is that the item master is like a grocery list, and

9     so, yes, people were saying in theory -- in context, they were

10     talking about what kind of information could be drawn in, but

11     in reality, all the evidence came in that that item master is a

12     grocery list.  It is not a catalog.

13          THE COURT:  What about something -- you make it sound

14     like a grocery list that my wife goes to the store or sends me

15     to the store with a list of 20 items.  There are hundreds of

16     thousands of items in most of these item masters, and they

17     came -- all that information came from vendors, and it was --

18     and the information -- your user transformed some of it, edited

19     some of it and moved some of it, gave some information that's

20     not in the catalog such as price because they worked out a

21     special price deal, but what's in the catalog that is created

22     by the item master is the price, or what's in the item master,

23     whatever you want to call it, is the price, for example.

24          Now, I don't understand how you can have something

25     that's a hundred thousand items, or in many instances more than

 1     that, and 10,000 vendors and you don't have a catalog of what's
 2     in there just because it came from multiple sources.  That's
 3     what you are saying.  You're saying you can't -- you don't have
 4     a catalog because it came from 10,000 different vendors or a
 5     thousand.
 6              MS. HUGHEY:  No, that's not why it's not a catalog.
 7     It's not a catalog because it doesn't meet the Court's
 8     definition of catalog.  The Court's definition of catalog
 9     requires an organized collection of items and associated
10     information published by a vendor.
11              At no point was any of the information pulled from a
12     catalog and then transformed, as we've gone through in great
13     detail, and then put into the item master, also known as a
14     grocery list.
15              THE COURT:  In fact, that's exactly what Mr.
16     Christopherson said did happen under the ETL process that he
17     testified to in connection with this exhibit, and the T in that
18     is transformation.  That is exactly what he did.
19              MS. HUGHEY:  The transformation is the whole point of
20     change.  There is a -- everyone agrees that the Sears catalog
21     or the Montgomery Ward catalog is a catalog.  It comes from
22     that point, it is -- it is changed and then put in the item
23     master like a grocery list.  That is the T.  That is what we're
24     talking about.  It's not the same.
25              THE COURT:  I don't understand why it isn't.

```
 1              MS. HUGHEY:  It's not the same because it doesn't
 2   meet the Court's definition of catalog.  The Court's definition
 3   of catalog is an organized collection of items and associated
 4   information published by a vendor.
 5              THE COURT:  What is wrong with that?  You can't just
 6   cite the whole thing.  You now need to tell me what part of the
 7   definition it doesn't fit.
 8              MS. HUGHEY:  Yes.  Specifically the published by a
 9   vendor.  It requires the items --
10              THE COURT:  Why isn't it published by a vendor?
11              MS. HUGHEY:  The items in the item master have never
12   been published by a vendor.
13              THE COURT:  Of course they have.  Where did they come
14   from in the first place?
15              MS. HUGHEY:  There was a published vendor catalog.
16              THE COURT:  And that was published by the vendor.
17              MS. HUGHEY:  That was.
18              THE COURT:  Then I go to the catalog, I look at it,
19   and then I have Remmington shotgun model 12 in there.  Well, my
20   system won't take a Remmington shotgun model 12, so what I do
21   is I take that vendor information, and I transform it to RSG
22   and 12 so it will fit the number of characters.
23              All I've done is transformed the exact data, loaded
24   that into my system, and I have my own little catalog there.
25   If I want a AK-47 and a Berretta and a long gun, and I take
```

1    that and put it in there, too, and I change all those

2    definitions, what I've done is take from that catalog those

3    four kinds of guns.  Then I go to the next part of the catalog,

4    and I take the four kinds of ammunition for those four kinds of

5    guns, and then I go to the next part of the catalog and I take

6    the cleaning equipment for that kind of guns, and that's all I

7    want.

8            And I take that information, which is vendor

9    published information, I put it into my system, and when I do,

10   I transform it to a smaller segment of data so that it will fit

11   the computer that I'm using.  Why on earth isn't that still

12   data published by a vendor, it's just been transformed into

13   some different format?

14           MS. HUGHEY:  That's a database, right?  That list is

15   a database much like you could say your typed up grocery list

16   is a database.  It's not an organized collection of items

17   associated --

18           THE COURT:  Why isn't it an organized collection?

19   It's very organized.  It's my guns.  I've got it all under

20   guns.  I've got guns, ammunition.  That's about as organized as

21   you can get.

22           MS. HUGHEY:  ePlus's argument is that that grocery

23   list, that database is multiple catalogs, and the way they get

24   there is by saying, well, there's a metal catalog, you could

25   search metal; and there's a blue catalog because if any of

1    those guns or bullets are blue, that's a catalog, but the fact

2    is that just demonstrates exactly why this is not a catalog.

3    It's just a list of items, and it's not published by a vendor.

4           Yes, at some point maybe that gun was in a published

5    vendor catalog, but then it was put on my grocery list, and I

6    put my own special information; do I have a coupon, do I want

7    to get a specific color.

8           THE COURT:  Does that make the information that came

9    from a vendor, the published information, any less the vendor

10    published information just because you add some individual

11    information to it?

12          MS. HUGHEY:  And take away and transform it.  That's

13    the whole point.  It's not the same.  I think even ePlus will

14    agree at some point a list is no longer a catalog.  So the

15    question is, where is that line drawn.

16          THE COURT:  Where is it drawn?

17          MS. HUGHEY:  I believe it's drawn --

18          THE COURT:  Where is it drawn?

19          MS. HUGHEY:  The evidence in this case demonstrates

20    that the line between a catalog as defined by the Court is a

21    vendor catalog with the data in it versus my private personal

22    list with my private personal pricing information --

23          THE COURT:  There's nothing in the Court's definition

24    that even remotely does that.

25          MS. HUGHEY:  But that's my point.

1        THE COURT:  Your argument is, in essence, that if you

2   take a just little bit from a catalog, that you don't -- and

3   make your own smaller kind of catalog out of it, that you are

4   not using data published by a vendor to create your catalog,

5   and you are.

6        MS. HUGHEY:  The words in the Court's construction,

7   published by a vendor, have to have some meaning.  If they

8   don't, then it could just be an organized collection of items,

9   and that's what it is when it's on the item master.  It's --

10       THE COURT:  I may have erred by injecting published

11  by a vendor into the construction, but I think I've

12  straightened it out by the definition that I've given.

13       MS. HUGHEY:  Even the Court's additional definition

14  recognizes that it has to be -- at some point, that information

15  was publicly available.

16       THE COURT:  It was.  It was publicly available in the

17  vendor's catalog.  That catalog is made available to the world

18  of people who want it, and you took it, and you took some of it

19  and you fixed.

20       Look, this is the world of computers, and it really

21  is wonderful that we're able to do these things.  What you've

22  got is a system that uses the vendor published information to

23  put together your item master, and the fact that you transform

24  it, I don't think, changes one bit the fact that it is

25  information published by a vendor.  That's what it was, and

```
 1   that's what it is, and I don't think you can change that.  Do
 2   you have any other argument?
 3            MS. HUGHEY:  Yes, I have many arguments.  I'd like to
 4   make one more --
 5            THE COURT:  You don't have too much time.
 6            MS. HUGHEY:  Yes, I understand.  One more point on
 7   this is that ePlus's own expert, Dr. Hilliard, went on record
 8   as saying that RIMS did not have a catalog of items, and the
 9   reasons that he provided are identical to the reasons that
10   we're talking about in this case.  So I just want to make that
11   very clear.
12            But, Your Honor, as I said at the beginning of this
13   argument, it's not just the question of whether Lawson has a
14   catalog that's relevant to the issue of infringement in this
15   case.  There are many other reasons why there is no
16   infringement.
17            Even if the item master is a single catalog, even if
18   the item master could be considered multiple catalogs, the
19   evidence in this case demonstrates that the other elements of
20   the claim are not met.  As Mr. Robertson discussed, the claims
21   in this case, all but, I think, one of them, and I can get you
22   the list, requires selecting and searching these multiple
23   catalogs, and Lawson's --
24            THE COURT:  '172-1 doesn't have any catalog component
25   to it.
```

1          MS. HUGHEY:  '172-1 does not have a catalog component

2     to it in the claim language.  However, I was referring

3     specifically to the selecting and searching requirement, and

4     that is met in claim one of the '172 patent.

5          Also, claim one of the 172 patent requires an order

6     list, and on the stand Dr. Weaver's infringement position on

7     claim one of the '172 patent was that the order list was met

8     because of the multiple catalogs requirements.

9          So while I will agree with you the words multiple

10     catalog -- catalogs do not occur in claim one of the '172

11     patent, ePlus's infringement argument relies on the requirement

12     of the multiple catalogs.

13          THE COURT:  Okay.

14          MS. HUGHEY:  Your Honor, so as I said before, the

15     selecting and searching requirements aren't met.  The

16     cross-reference table, the equivalent items, Dr. Shamos went

17     through, in great detail, why, even if there are multiple

18     catalogs, even if you consider the item master, which is just a

19     list of items, to be somehow catalog blue, catalog gun, catalog

20     however they decide they want to sort it -- because at this

21     point, we're all agreeing that it's not a catalog sort of by

22     any specific way by Lawson, right?  Even if that could be met,

23     these other requirements aren't met.

24          He went through in great detail, and with respect to

25     the UNSPSC codes, and I know that you discussed with Mr.

```
 1   Robertson, again, to clear up any confusion that might have
 2   been raised, the UNSPSC codes do not go down to this fifth
 3   level in the item master.  There's no field to do that.
 4         So just to be clear, Your Honor, when you were
 5   talking about black pens, blue pens, that's not what the UNSPSC
 6   codes are.  They get you to the row in the grocery store that
 7   says -- or a Target that says, whatever, bath products, and
 8   then from that point you have to go in and find what it is you
 9   want by yourself.  It's not being done by the system.
10         So these UNSPSC codes do not meet this requirement of
11   equivalent items, cross-reference table.  ePlus has tried to
12   have them meet many different claim limitations.
13         In addition, Mr. Robertson relies on the parties'
14   statement of catalog.  There's no dispute in this case that
15   when the parties were using that term, quote, catalog, they
16   were not aware of the Court's definition, and they explained
17   what they meant.  Ms. Raleigh explained that she was using the
18   terminology of the customer.  So I think that it's clear on the
19   record that just because that word --
20         THE COURT:  I think that's all smoke and mirrors.
21   Your people knew what catalog meant, and it doesn't mean
22   anything different than what the Court's construction meant,
23   and the meaning those people were playing -- that's just a post
24   hoc rationalization concocted to defend a case.  They knew what
25   catalogs were, and they spent a lot of money to deal with
```

1    catalogs.  The whole business was converting catalogs, so I
2    can't buy that at all, but that's a question of credibility for
3    the jury, isn't it?
4              MS. HUGHEY:  That's right, Your Honor.
5              THE COURT:  So if I were the finder of the fact, I
6    would say, don't spend any time talking to me about that.
7              MS. HUGHEY:  Yes, Your Honor.  I'd briefly like to
8    move to the issues that Lawson -- just to be clear, not only
9    does Lawson oppose ePlus's motion for judgment as a matter of
10   law for the reasons that have been set forth, both in this oral
11   argument and during the course of the case, Lawson itself moves
12   for judgment as a matter of law on the issue of infringement.
13             ePlus has been fully heard, and no -- a reasonable
14   jury does not have a legally sufficient basis to find for ePlus
15   on the issue of infringement.
16             I'd like to just obviously point out the fact the
17   patentee bears the burden of proving infringement, and the
18   patentee must show that every single element is met.  The loss
19   of a single element is insufficient for a finding of
20   infringement.
21             THE COURT:  What does it mean for a claim to be drawn
22   to capability?  What does that mean?
23             MS. HUGHEY:  If the claim language demonstrates a
24   capability is what the claim is covering.  That's not what's
25   happening in this case.

1                Your Honor, I understand with respect to the

2     capability issue, I think that's something the parties are also

3     going to dispute with respect to the Court's jury instructions.

4                With respect to the punchout product specifically,

5     there is no single entity that performs all of the claimed

6     steps either of the method claims or of the systems claims with

7     respect to the punchout product.  And for that reason, there's

8     no direct infringement of the punchout product.  This Court can

9     grant judgment as a matter of law on that issue.

10               THE COURT:  Thank you.  All right.

11               MS. HUGHEY:  With respect to the method claims, I'm

12    not even sure that ePlus argues that Lawson practices the steps

13    of the method claims.  That evidence certainly didn't come into

14    the record during the trial.

15               When Dr. Weaver was opining on the issue of

16    infringement, he repeatedly asked -- was asked and answered

17    whether the customers performed the steps.  There was no

18    allegation that Lawson was performing the steps.  And really

19    there can be no argument that Lawson does not perform the steps

20    of selecting the products catalogs to search, searching for

21    matching items among the selected catalogs, or maintaining at

22    least two product catalogs on a database containing data --

23               THE COURT:  What if Lawson's hosting the system?

24               MS. HUGHEY:  What about Lawson's hosting system?

25               THE COURT:  What if Lawson's hosting the system?

1    Isn't Lawson doing it then?

2                MS. HUGHEY:   If Lawson is hosting the system, that

3    doesn't mean that Lawson is practicing the method step of

4    selecting product catalogs to search.   That's not what Lawson

5    is doing.   Method steps -- for direct infringement of a method

6    claim, it means that a party must perform every single step of

7    the method.

8                In this case, there's not even an allegation that

9    Lawson performs the steps of selecting the product catalogs to

10   search.   There's not even an allegation that Lawson performs

11   the step of searching for matching items among the selected

12   product catalogs.

13               That allegation was made of Lawson's customers.

14   There's no evidence on the record that Lawson does those

15   things, nor was an allegation made that that would be an

16   infringement.

17               THE COURT:   All right.   Thank you.

18               MS. HUGHEY:   Yes, Your Honor, just one final point

19   that was raised in our brief, but I'd like to raise it here at

20   oral argument.   ePlus's expert, Dr. Weaver, was extremely

21   conclusory with respect to the infringement allegations made at

22   trial.

23               THE COURT:   You say his testimony was conclusory?

24               MS. HUGHEY:   Yes, Your Honor.

25               THE COURT:   Can you put that one back in the barn?

1    Anybody who testified as long as he did, it's hard to say it

2    was conclusory.  I think the Federal Circuit would laugh me out

3    of the courthouse if I did that.

4         MS. HUGHEY:  No, Your Honor, actually what the

5    Federal Circuit has said -- specifically the means plus

6    function limitations, the Federal Circuit itself has said, to

7    establish infringement of a means plus function claim, quote,

8    it is insufficient for the patent-holder to present testimony

9    based only on a functional, not structural analysis.

10        Based on this requirement, the Court has repeatedly

11   either granted summary judgment, granted judgment as a matter

12   of law, or reversed District Courts that allowed the

13   infringement verdict to stand when the expert merely made

14   conclusory statements that the function was performed or that

15   the structure element was met without any statement of where

16   the structure was in the accused products, and I'll give you

17   two examples.

18        For the means for selecting a products catalog to

19   search, claim three of the '683 patent, Dr. Weaver opined as

20   follows, quote:  This is Mr. Robertson.  In each of these

21   scenarios, all five systems, do they provide the means for

22   selecting a product catalog to search?  Answer:  Yes.

23        That is the extent of Dr. Weaver's testimony on that

24   element.  Now, there is not just a mere, well, it's not really

25   in dispute, so let's just get it out there.  Whether these

1    claim elements were met is a disputed issue in this case.   Dr.

2    Shamos specifically said with respect to the means for

3    selecting product catalogs to search, there is not even

4    remotely any structure in the Lawson accused systems that

5    correspond to this element.

6          So what I'm telling you is that specifically with

7    respect to the means plus function claims, when the only

8    statement of infringement was, yes, that's met, that is

9    insufficient as a matter of law for this to be sent to the

10   jury.  ePlus does not have a basis to find for infringement on

11   these claims.

12         THE COURT:  All right.

13         MS. HUGHEY:  The same issue permeates the system

14   claims, but I wanted to point out the method claims because the

15   Federal Circuit has been so clear that you cannot just make a

16   conclusory statement, you must point out the structure.

17         THE COURT:  All right.  Thank you.  She just served

18   you up an air ball.  Take a swing at it and tell me why she is

19   not right on Dr. Weaver's testimony on means plus function.

20         MR. ROBERTSON:  Well, Dr. Weaver said he faithfully

21   applied the Court's construction, and the Court's construction

22   identified what the structures were that performed the

23   function.  Dr. Weaver introduced --

24         THE COURT:  Yes, but did he say what the structures

25   were on the Lawson side?  The point she's making, you have to

1    say what the structures were in the --

2         MR. ROBERTSON:  He did when he went through all the

3    modules and he talked about the guides that talked about the

4    purchase order module, the requisition module, the search

5    program, the order list, the user interface.  All those were

6    the structures that the Court defined as performing the various

7    functions.  So he went through that first in great detail as to

8    what all those modules were and --

9         THE COURT:  That's all I need.  I think that's

10   correct.  He didn't in response to that particular question,

11   but the hour or so that preceded that conclusion question dealt

12   with that, I believe, so I don't need to hear any more.

13        What about this capability thing?  These cases she's

14   talking about seems to say -- the copy from Lexus is fouled up.

15   It doesn't have in it -- it's got -- I don't know how it did

16   it, but it begins at one part, what is set out below in another

17   column, and it's almost as if -- one time I had a defendant on

18   the stand when I was a prosecutor, and I showed him a copy of

19   his confession, and his excuse for why the confession wasn't

20   right was that the computer -- that the copier had changed the

21   text of his confession, and I didn't find that very persuasive.

22        Now, for the first time, I find that a computer may

23   be capable of doing that, so I'm going to get a new copy of the

24   case and see if I can get it right, read the right part of it.

25   And I'm not saying anybody did anything funny.  I'm saying that

1     we think that the computer may have done something here.

2             MR. ROBERTSON:   Let me address that while I can.

3             THE COURT:   You know the case law?

4             MR. ROBERTSON:   I do.   I think one of the most

5     instructive cases --

6             THE COURT:   Capability has to be recited as an

7     element of the claim for the capability doctrine to apply

8     according to the case she cited.

9             MR. ROBERTSON:   I don't believe that's the case, Your

10    Honor.   Indeed, in fact in this case, I note that it's a simple

11    device.   It's a candle, a travel candle, a mechanical device,

12    and there was no evidence -- in fact, this section of the case

13    wasn't right.   There was no proof that this travel candle was

14    ever placed in the infringing configuration, and it's clear

15    that the travel candle does not necessarily have to be placed

16    in the infringing configuration.

17            Now, let me just say, we had ample evidence in here

18    that not only is it capable of doing it, but it, in fact, does

19    it.   For example, you will recall Mr. Matias.   He testified by

20    deposition.   He was a Lawson customer.   He had 36,000 catalog

21    items in his database, and he had 3,000 vendor catalogs.   You

22    recall that.

23            I asked Mr. Christopherson.   He said you could load

24    entire catalogs.   Ms. Albert asked Ms. Raleigh with respect to

25    specific customers, Jackson Health, for example.   The statement

1   of work says they loaded thousands of catalogs into their

2   system.  So this isn't a theoretical construct here.  We are

3   talking about actual evidence in this case that shows that it

4   performs in this way.

5          Now, I'd just briefly like to address the grocery

6   list argument, and that is, nobody pays hundreds of thousands

7   of dollars, even millions of dollars once these systems are

8   fully installed and maintained and serviced during the course

9   of their life, to put two catalogs and 15 items on them.

10  They're intended to have robust data in order to be able to

11  perform the kind of purchasing functionality that a large

12  corporation wants to do for its employees, and that was the

13  evidence in this case, and that's just a practical, common

14  sense approach to this stuff.

15         The documents that we saw that they provided

16  indicated they can do and they, in fact, do load the entire

17  vendor catalog.  The PO user guide said expressly that.

18  Indeed, there's no question, these capable-of-infringing cases,

19  Your Honor, often arise in the context of software, because

20  software is a situation where I can turn on some features and

21  turn off other features, or I can decide not to use any

22  features that might be there.  Your e-mail and your Microsoft

23  Outlook has a lot of features that I can use my calendar, I can

24  use my task list, I can use --

25         THE COURT:  If the fact that it has it and is there

1    to be used, it's infringed in that situation even if I don't

2    use it that way.

3            MR. ROBERTSON:  That's exactly right, because it's

4    capable of doing that.

5            THE COURT:  Is that a claim that recites capability?

6            MR. ROBERTSON:  It doesn't have to recite capability.

7    I think -- I haven't had a chance to review this case.  We have

8    provided --

9            THE COURT:  He cited *Fantasy Sports Propositions v.*

10   *Sportsline* in this case, this opinion, and it says, BASC's

11   reliance on cases that found infringement by accused products

12   that were reasonably capable of operating in an infringing

13   manner is misplaced since that line of cases is relevant only

14   to claim language that specifies that the claim is drawn

15   capability parenthetically.

16           Here, the language of the claims specifies that

17   infringement occurs only if the accused product is configured

18   with the cover being used as a base underneath the candle

19   holder with feet.  That the travel candle was reasonably

20   capable of being put into the claimed configuration is

21   insufficient for a finding of infringement.

22           MR. ROBERTSON:  I would respectfully suggest, Your

23   Honor, that all these claims are directed to something that's

24   reasonably capable of performing it, because it says it's an

25   electronic sourcing system comprising, and then it --

1        THE COURT:  Comprising means including but not

2   limited to.

3        MR. ROBERTSON:  Your Honor, exactly right, and then

4   it lays out that you just have to have means for doing this and

5   means for doing that and means for doing that.  That's all

6   about does it have the capability --

7        THE COURT:  Means for doing it means it is capable of

8   doing it.  Isn't that what that means?

9        MR. ROBERTSON:  I think that's exactly right, and

10  even the ones --

11       THE COURT:  Is there a case that says means for is a

12  capability kind of claim?

13       MR. ROBERTSON:  I don't know as I stand right here,

14  Your Honor.  I would direct, Your Honor, to the Hilgraeve case

15  which is listed in our proposed jury instructions, but I have

16  the cite here.  265 F.3d 1336 at 1343, Federal Circuit 2001.

17  It's a case that both Judge Brinkema and Judge Spencer relied

18  on when they issued their capable of infringing instruction.

19       THE COURT:  265 F.3d what?

20       MR. ROBERTSON:  1336, 1343.  I actually have some

21  familiarity with the *Fantasy Sports* case because I represented

22  the plaintiff in that case at one point in time, and that was a

23  case that was tried before Judge Friedman, and the fact is,

24  there was no evidence that the system was used in the manner

25  that was suggested by the plaintiff.

```
 1              THE COURT:  Is that what the case holds?  That's what
 2    this case holds -- that's what this case about the travel
 3    candle holds, that, in fact, there was no evidence that the
 4    travel candle was used in the infringing way.
 5              MR. ROBERTSON:  There's amble evidence in this case
 6    that it's used in the infringing way, both from Mr.
 7    Christopherson and --
 8              THE COURT:  Here's the bottom line.  I'm the finder
 9    of the fact.  I would clearly find that there is infringement
10    of everything that Dr. Weaver said, that each system infringed
11    each claim for the reasons he stated.  There isn't any question
12    that I would do that.
13              But I'm not the finder of the fact.  So under these
14    facts, under the evidence in this case, don't I have to let the
15    jury decide that case and then come back at the end of the day
16    and see whether that's right?  So what I'm inclined to do is
17    reserve judgment on this motion, because I will tell you -- I
18    personally am having real trouble deciding why there's any
19    defense to infringement at all.
20              MR. ROBERTSON:  I understand.
21              THE COURT:  But I believe that I do have to let the
22    case go to the jury subject to my ability to control that, and
23    I'm going to take this motion under advisement, deny the motion
24    of no infringement by Lawson, keep your motion under
25    advisement.
```

1              MR. ROBERTSON:  I understand, Your Honor.  Thank you.

2              THE COURT:  All right, now, invalidity.  I believe

3     that -- Ms. Hughey, are you doing that one, too?

4              MS. HUGHEY:  I am, Your Honor, and I promise to be

5     much slower this time.

6              THE COURT:  Because if you don't, you're going to get

7     knee-capped but not buy me.

8              Let's see.  Is this a good place for the court

9     reporters to switch and for us to take a little recess?

10

11              (Recess taken.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2851

1          THE COURT:  All right.

2          MS. HUGHEY:  Hello, Your Honor.  May it

3   please the Court.  Lawson moves for judgment as a

4   matter of law on the issue of invalidity because a

5   reasonable jury does not have a reasonable evidentiary

6   basis to find for ePlus on the issue.

7          At trial documents demonstrated and witnesses

8   testified --

9          THE COURT:  Now, there are three grounds of

10   invalidity.  One is anticipation.

11          MS. HUGHEY:  Correct.

12          THE COURT:  One is obviousness.

13          MS. HUGHEY:  Correct.

14          THE COURT:  And the other is written

15   description.

16          MS. HUGHEY:  No, Your Honor, Lawson is not

17   asserting written description.

18          THE COURT:  That was there at one time.

19          MS. HUGHEY:  Correct.

20          THE COURT:  That's no longer there.  So I

21   don't need to deal with that one.

22          MS. HUGHEY:  Correct.

23          THE COURT:  So you have anticipation and

24   obviousness.

25          MS. HUGHEY:  Correct, Your Honor.  At trial

2852

1   the documents demonstrated and the witnesses testified

2   regarding the features and functionality of the prior

3   art RIMS system disclosed in the '989 patent.

4            THE COURT:  Let's take the anticipation.

5   What is it that anticipates?

6            MS. HUGHEY:  The RIMS system alone

7   anticipates every single claim of the patents-in-suit.

8            THE COURT:  All right.

9            MS. HUGHEY:  In combination, the RIMS system

10  and the TV/2 product render every single one of the

11  claims of the patents-in-suit obvious.

12           Dr. Shamos went through every single claim

13  and explained both the anticipation and obviousness

14  analysis.  The evidence at trial further demonstrated

15  that both systems are prior art.

16           The combination of RIMS plus TV/2 renders

17  every single asserted claim of the patents-in-suit

18  obvious.  The preferred embodiment disclosed in the

19  patents is the combination of RIMS plus TV/2 and the

20  Court's construction is consistent with that.

21           The TV/2 literature specifically says to

22  combine TV/2 with the parts ordering system and

23  inventory management system.  The RIMS system

24  disclosed in the '989 patent was a part ordering and

25  inventory management system.

2853

1           The patents-in-suit do no more than combine

2     the RIMS system with TV/2.  This is an obvious

3     combination that renders the claims invalid.

4           In addition, there are no secondary

5     considerations of non-obviousness.

6           THE COURT:  There aren't any?

7           MS. HUGHEY:  There are not any.

8           THE COURT:  I thought we had evidence on it.

9           MS. HUGHEY:  I think that ePlus attempted to

10    provide some evidence about commercial success of its

11    commercial products, but there's no evidence that the

12    commercial products are claimed by the

13    patents-in-suit.

14          THE COURT:  Well, Mr. Farber testified that

15    they were yesterday afternoon, didn't he?

16          MS. HUGHEY:  Mr. Farber is not a technical

17    expert.  He said it was his opinion they were covered

18    by the patents-in-suit, but no evidence has come in

19    regarding the features and functionality of ePlus'

20    commercial products.

21          THE COURT:  In your evidence, didn't you

22    introduce evidence that or didn't -- I don't know who.

23    Let me back away from that.

24          MS. HUGHEY:  Yes, Your Honor.

25          THE COURT:  There's some brochures about

2854

1   these e -- is it eContent and --

2            MR. ROBERTSON:  Content+ and Procure+.

3            THE COURT:  They put the patent down there on

4   the bottom of the thing.

5            MS. HUGHEY:  The fact that ePlus marks its

6   product with a patent does not mean that the product

7   is actually covered by the patents-in-suit.

8            THE COURT:  I know that, but isn't that

9   evidence that it is?

10           MS. HUGHEY:  No, Your Honor, because even if

11  ePlus' products --

12           THE COURT:  Just so I understand, you have to

13  have a technical expert come in and say the

14  products -- what are they again?  Content+ --

15           MS. HUGHEY:  Content+ and Procure+.

16           THE COURT:  Procure+ practiced the patent.

17  Don't you have to have an expert come in and say that?

18           MS. HUGHEY:  I'm not sure that you need to

19  have an expert, Your Honor, but you have to have some

20  disclosure of the functionality because commercial

21  success requires --

22           THE COURT:  How do you prove disclosure of

23  the functionality?  What do you mean by that?

24           MS. HUGHEY:  They would have to have some

25  disclosure about what their product actually is.

2855

1   There's nothing in the record.  The fact is for

2   commercial success to be relevant, it has to be

3   relevant to the patented features.  And because

4   there's no evidence in the record, we have no idea.

5   Even if Procure+ and Content+ were covered by the

6   patents-in-suit, and let me be clear, there's no

7   evidence on that point, even if that were the case,

8   there's no evidence that any commercial success was

9   related to the patented features.

10          Moreover, there's actually no evidence of

11   commercial success in this case at all.  So even if

12   ePlus' products are covered by the patents.

13          THE COURT:  What do you mean by that?

14          MS. HUGHEY:  The only evidence that came in

15   was --

16          THE COURT:  When you make statements like

17   that, you kind of leave me floating around.  So it's

18   okay for you to say that, and then say, Let me explain

19   why I say that.  Because those are fairly conclusory

20   statements on which to base some kind of motion.

21          MS. HUGHEY:  Absolutely, Your Honor.

22          THE COURT:  Or judgment as a matter of law.

23          MS. HUGHEY:  Absolutely.  The evidence that

24   came in at trial with respect to Content+ and

25   Procure+, let's call them the ePlus products, was that

2856

1   those divisions were not commercially successful.

2   Those products never made money.

3          I believe that on the stand Dr. Farber may

4   have said, We won some awards.  We had some praise.

5   But no documents came in suggesting that that was

6   related to any of the features or functionality

7   related to the commercial products, let alone that

8   that was tied back to the claimed features and

9   functionality of the patents-in-suit.

10         And more importantly, Your Honor, evidence of

11  commercial success, the secondary considerations,

12  would only be relevant if there were for some reason

13  no motivation to combine the prior art references.  In

14  this case what we have is an explicit motivation to

15  combine the TV/2 system and the RIMS system.  For that

16  reason, these secondary considerations of

17  non-obviousness don't apply.

18         THE COURT:  Well, you were at one point

19  making the argument in your papers, I think it was at

20  summary judgment, that you can't count the income that

21  came to ePlus from the settlements as evidence of

22  commercial success.  Are you still taking that

23  position?

24         MS. HUGHEY:  That's absolutely correct.

25         THE COURT:  Aren't those things paid up

2857

1    royalties.

2          MS. HUGHEY:  No, Your Honor.

3          THE COURT:  Isn't that what Ariba is?  It's a

4    $37 million paid up royalty.  And SAP is what?  It's a

5    $17.5 million paid up royalty.  And the others are

6    paid up royalties except one of them has a runner of

7    2.5 after the first $15 million of sale in a calendar

8    year?

9          MS. HUGHEY:  The facts you just recited are

10   correct, Your Honor, about the license agreements, but

11   the fact is commercial success, the question is

12   whether or not the patented products were commercially

13   successful.  Those license agreements have nothing to

14   do with ePlus' commercial products.  That's the point.

15         THE COURT:  You mean you can't consider other

16   products that are licensed under the patents that are

17   sold pursuant to a license in considering commercial

18   success?

19         Suppose, for example, that I'm a company that

20   doesn't make anything.  I just own patent rights.  Are

21   you saying that in considering commercial success in

22   a challenge to an obviousness issue of one of those

23   patents that a finder of the fact could not consider

24   the revenues generated by the license agreements in

25   determining whether there was commercial success?

2858

1  Because in that instance the patentee would have no

2  commercial product at all.  And you're saying you have

3  to only consider the commercial product.  Is that

4  really what you want me to do?

5          If I did that, do you think the Federal

6  Circuit would say, Hmm, not a good decision, fellow?

7          MS. HUGHEY:  I'm confident in this case if

8  you conclude that there was no evidence of commercial

9  success, that the Federal Circuit would agree with

10 you.

11         THE COURT:  Boy, are you a thrill seeker.  Do

12 you know the extent that the Federal Circuit agrees

13 with District Courts is about 40 percent?  You know,

14 you don't want to the take that one to Las Vegas.

15         Okay.  But seriously, why does commercial

16 success have to be linked only to the products that

17 ePlus sells?

18         MS. HUGHEY:  Well, I think that that's what

19 ePlus is saying what's commercially successful is its

20 commercial products.

21         Now, with respect to the license agreement is

22 separate from ePlus's commercial.  So my point is I

23 think we're going to agree that ePlus' commercial

24 product was not commercially successful.

25         The second question is, well, can we look at

2859

1    those license agreements and say, well, they were

2    licensing it.  So much like a company that had no

3    product, they were able to generate license revenue.

4    That's a different question.  And with respect to that

5    question, certainly in a scenario you gave, you don't

6    make a product but you go out and you license it, that

7    might be evidence of -- that might be a secondary

8    consideration.

9            In this case, the only evidence we have is

10   that they sue those companies and that those companies

11   pay to not be sued anymore.  To consider that --

12           THE COURT:  Well, they took licenses.

13           MS. HUGHEY:  They did take licenses to avoid

14   the litigation.  To consider that evidence of

15   commercial success would be like saying because that

16   company doesn't want to pay however millions of

17   dollars for attorneys' fees, therefore you should pay

18   a million dollars because you're saying that someone

19   else's decision not to be involved in litigation is

20   therefore somehow going to apply to a company that

21   isn't willing to make that payment.

22           Those license agreements aren't tied to the

23   commercial products.  We can both agree to that.

24           THE COURT:  Not to that commercial product.

25   They are tied to the commercial products of the

2860

1   licensee.

2          MS. HUGHEY:  Yes.  So --

3          THE COURT:  Which practiced the patents.

4          MS. HUGHEY:  Yes, Your Honor.

5          The third question is, Well, could you look

6   at those licensees and see if they are commercially

7   successful because they're using your patented

8   products?  But there's no evidence in this case of any

9   commercial success of SAP, Ariba, or those licensees.

10  So that evidence doesn't exist.

11         I would agree with you that in theory that

12  might be relevant that you have licensed someone and

13  your licensee has gone off and been commercially

14  successful because all the features and functionality

15  of your patented technology.  That evidence isn't in

16  that case.  That's not the same as in this case.

17         So that's what I'm saying that there is no

18  evidence of secondary considerations of

19  non-obviousness in this case.

20         THE COURT:  All right.

21         MS. ALBERT:  Good morning, Your Honor.

22         THE COURT:  Good morning.

23         MS. ALBERT:  Not only does ePlus oppose

24  Lawson's motion, but ePlus' crossclaims for judgment

25  as a matter of law under Rule 50 that all the asserted

2928

1    MS. HUGHEY:  I actually agreed with Your

2  Honor at that time that it didn't make sense.

3    THE COURT:  I know that if you were wrong and

4  I was wrong, we ought to straighten it out.

5    MS. HUGHEY:  Yes, that's right.  I suppose

6  the point is, Your Honor, I don't believe that ePlus

7  is entitled to judgment as a matter of law on written

8  description or enablement because those aren't defense

9  that we even raised at trial; however, if it's Your

10  Honor's position that a defense that was at some point

11  in the case and not dropped before trial can then have

12  a judgment as a matter of law granted against it, then

13  the same should apply to Lawson and we're entitled to

14  judgment as a matter of law on all those other claims.

15    THE COURT:  I think you're right about that.

16    MS. HUGHEY:  Okay.  To make that record

17  clear.

18    The second point, Ms. Albert raised the 112,

19  paragraph 6, and paragraph 2 on 101, issues of law.

20  The enablement issue of law and statutory subject

21  matter issue of law.

22    I agree with Ms. Albert.  That's an issue for

23  the Court to decide.  Lawson moved for summary

24  judgment on those pure issues of law.

25    THE COURT:  And I denied it.

2929

1          MS. HUGHEY:  That summary judgment was

2   denied.  It's my understanding that that issue is now

3   preserved for appeal and that Your Honor doesn't have

4   to rerule on it, but just to make the record clear,

5   Lawson again moves for judgment as a matter of law on

6   the 112, paragraph 6, and 101 claims.

7          THE COURT:  How can you do that?

8          MS. HUGHEY:  Your Honor --

9          THE COURT:  You didn't try them.

10         MS. HUGHEY:  We did not try them.

11         THE COURT:  You relied for better or for

12  worse on the summary judgment decision.

13         MS. HUGHEY:  Correct.

14         THE COURT:  And your appeal point is that the

15  Court erred in failing to grant summary judgment.

16         MS. HUGHEY:  Correct, Your Honor.

17         THE COURT:  That's where the matter stays.

18  There's no judgment to be obtained on that at this

19  juncture, I don't think.

20         Now that was with respect to what issue?

21         MS. HUGHEY:  112, paragraph 2 and 6,

22  enablement issue, and the 101 statutory subject matter

23  issue.

24         THE COURT:  You mean the patentability issue?

25         MS. HUGHEY:  Correct, Your Honor.

2930

1        THE COURT:  112, six and what?

2        MS. HUGHEY:  Paragraph 2 and paragraph 6.

3        THE COURT:  And 2 is indefiniteness, right?

4        MS. HUGHEY:  That is indefiniteness, Your

5    Honor.

6        THE COURT:  And 6 is enablement, right?

7        MS. HUGHEY:  I'm sorry, Your Honor.  The 112,

8    paragraph 2, is --

9        THE COURT:  You-all quit using patent terms.

10   I don't have the statutes up here, and I don't have

11   them committed to memory like you-all do.  And I have

12   so much else going on up here, that I need to know

13   what you're talking about.  I use the short form

14   references to trigger my memory.

15       MS. HUGHEY:  I'm sorry, Your Honor.  I'm just

16   trying to make sure I'm very clear.  112, paragraph 2

17   and paragraph 6.

18       THE COURT:  Let's take 112, paragraph 2.

19   What are you talking about?  What is that one?

20       MS. HUGHEY:  Indefiniteness.  I'm sorry, Your

21   Honor.  I was having a moment.  112, paragraph 2 is

22   indefiniteness.

23       THE COURT:  And six is what?

24       MS. HUGHEY:  Also indefiniteness.  They go

25   together.

2931

1        THE COURT:  All right.  And those have

2   already been decided in the motion for summary

3   judgment, right?

4        MS. HUGHEY:  Correct.

5        THE COURT:  So I don't need to address those.

6        MS. HUGHEY:  That's any understanding.

7        THE COURT:  And then the 101 is the issue of

8   patentability, which is the subject matter or, i.e.,

9   the Bilski issue, and I erred as a matter of law in

10  failing to grant the summary judgment on that, right?

11       MS. HUGHEY:  Correct.

12       THE COURT:  And that's where it lies because

13  it never came into trial one way or the other?

14       MS. HUGHEY:  Correct.

15       THE COURT:  I don't need to deal with that

16  either.

17       MS. HUGHEY:  Okay.  And I think the issues

18  have been fully raised, but just for the record I

19  disagree with Ms. Albert.  Dr. Shamos explained every

20  element.

21       THE COURT:  You disagree with Ms. Albert on

22  general principles on everything she said.

23       MS. HUGHEY:  Correct, Your Honor.

24       If you have any questions, I'm happy to

25  answer them.

3078

1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF VIRGINIA

3                        RICHMOND DIVISION

4

5      ------------------------------------

                                         :

6      ePLUS, INC.                       :    Civil Action No.
                                         :    3:09CV620
7      vs.                               :
                                         :
8      LAWSON SOFTWARE, INC.             :    January 24, 2011
                                         :
9      ------------------------------------

10

11              COMPLETE TRANSCRIPT OF THE JURY TRIAL

12            BEFORE THE HONORABLE ROBERT E. PAYNE

13         UNITED STATES DISTRICT JUDGE, AND A JURY

14

        APPEARANCES:
15
        Scott L. Robertson, Esquire
16      Michael G. Strapp, Esquire
        David M. Young, Esquire
17      Goodwin Procter, LLP
        901 New York Avenue NW
18      Suite 900
        Washington, D.C.  20001
19
        Craig T. Merritt, Esquire
20      Christian & Barton, LLP
        909 East Main Street
21      Suite 1200
        Richmond, Virginia  23219-3095
22      Counsel for the plaintiff

23

24                 Peppy Peterson, RPR
                   Official Court Reporter
25              United States District Court

1    burdens so much in our arguments, the lawyers did, if you need

2    to refresh your memory on what preponderance means for ePlus

3    and what clear convincing means for invalidity for Lawson, you

4    can look at 23.  That's for infringement.  Invalidity is dealt

5    with in another thing.  I'll tell you what that is later.

6              Now, infringement, of course, has to be based, as you

7    know and you've learned, on a claim-by-claim basis so that

8    there may be infringement of one claim and not another.  That's

9    something you're going to have to decide.

10             Now, when you are deciding infringement, you must

11   only compare Lawson's accused systems and methods to the claims

12   of the ePlus patents.  In deciding the issue of infringement,

13   you may not compare Lawson's accused systems and methods to

14   ePlus's commercial products and methods.  You don't compare

15   product to product.  You do the system that's accused, whether

16   it's a system or a method, against the claims of the patent.

17   So whether or not Lawson's products that they sell and ePlus's

18   products are the same or different is not a matter that you get

19   into.

20             A patent can be infringed directly or indirectly.

21   Direct infringement occurs if the accused system or method is

22   covered by one or more or all of the claims in the patent.

23   Direct infringement of a method claim results if a single actor

24   performs all of the steps of that claim.

25             What's indirect infringement?  Indirect infringement

3270

1    invention defined in those claims were publicly known

2    by others in the United States before they were

3    invented by the inventors.  The inventions defined by

4    the ePlus patent claims were invented on August 10,

5    1994.

6           A patent claim is invalid if the invention

7    defined in that claim was publicly known by others in

8    the United States before it was invented by the

9    inventors.

10          Lawson also contends that all of the claims

11   of the ePlus patents were anticipated because the

12   inventions defined in those claims were publicly used

13   by others in the United States before they were

14   invented by the inventors or they were publicly used

15   in the United States more than one year before the

16   ePlus inventors filed their application on August 10,

17   1994.

18          A patent claim is invalid if the invention

19   defined in that claim was publicly used by a person

20   other than the patentee in the United States before it

21   was invented by the patentee or was publicly used by

22   anyone in the United States more than a year before

23   the effective filing date of the patentee's patent

24   application.

25          An invention is publicly used if it is used

3295

1    instructions, and I will get the exhibits back to the

2    counsel.

3         THE COURT:  All right.  We'll be in recess.

4    There's nothing else we need to do now because we

5    don't have any willfulness trial; is that right?

6         MR. ROBERTSON:  That's right, Your Honor.

7         MR. McDONALD:  Yes, sir.

8         THE COURT:  Now that you've done this

9    exercise, do you think there's a reason why the chief

10   people of each side ought not go down and talk to --

11   who was it, Judge Dohnal or Judge Lauck?

12        MR. MERRITT:  Judge Dohnal.

13        THE COURT:  And talk to Judge Dohnal and see

14   if you can compromise?  Or do you still want to beat

15   heads against each other and give Mr. McDonald a

16   Mercedes and give Mr. Robertson a BMW?

17        MR. ROBERTSON:  I have a Ford 150 truck.

18        THE COURT:  You want a Ford 150?

19        THE CLERK:  He says he has one.

20        THE COURT:  You-all ought to think about that

21   and decide.  If I were you, I'd be trying to work out

22   a compromise that didn't result in a total wipeout.

23   It's particularly risky for Lawson.

24        All right.

25        (Recess taken.)