# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Richmond Division

| | | |
|---|---|---|
| *e*PLUS, INC., | **)** | |
| | **)** | |
| | **)** | Civil Action No. 3:09-cv-620 |
| Plaintiff, | **)** | |
| | **)** | |
| v. | **)** | |
| | **)** | |
| LAWSON SOFTWARE, INC. | **)** | |
| | **)** | |
| | **)** | |
| Defendant. | **)** | |


## REPORT OF EXPERT MICHAEL I. SHAMOS, PH.D, J.D. <u>CONCERNING INVALIDITY</u>

.

criteria, and these are not recited in the claim.  It cannot be determined what it means for two items to "match."

96. Claims 26 and 28 of the '683 Patent recites a first step of "maintaining at least two products catalogs on a database containing data relating to items associated with the respective sources."  The term "the respective sources" has no antecedent basis and is indefinite as discussed above in connection with '683 claim 3.

97. Claims 26 and 28 of the '683 Patent recites the step of "selecting the product catalogs to search."  The phrase "the product catalogs to search" has no antecedent basis and it is not clear whether "the catalogs to search" refers to the "at least two products catalogs on a database" or some subset of them.  A potential infringer would accordingly have no way of determining whether its database would fall within the scope of the claim.

98. Claims 26 and 29 of the '683 Patent recites the step of "determining whether a selected matching item is available in inventory."  This phrase is indefinite because is it not clear whose inventory is meant, whether it refers to the user's own inventory or the inventory of the "respective source."  Furthermore, an item may be in multiple inventories.

99. Each Asserted Claim is indefinite.

## ANTICIPATION AND OBVIOUSNESS OF THE ASSERTED CLAIMS

100.  In performing my analysis, I reviewed numerous items of prior art, located anticipating references and utilized express suggestions in the prior art to combine technologies, such as the suggestion to use advertising display systems in elevators, as a basis for opining that certain claims are obvious.  Further, I applied appropriate legal standards, listed earlier, which include the *John Deere* factors and *KSR* principles concerning obviousness.

101.  In particular, I have relied on at least the following items of prior art, which I am informed qualify as prior art at least as set forth below:

| Prior Art Reference | Type of Prior Art? |
|---|---|
| 1.  Fisher Scientific Requisition and Inventory Management System ("RIMS system") (described in U.S. Patent 5,712,989 and the RIMS brochure) | Known or used – 102(a) On sale or public use – 102(b) |

| Prior Art Reference | Type of Prior Art? |
|---|---|
| a.  U.S. Patent 5,712,989 ("Johnson '989") | 102(e) patent |
| b.  RIMS brochure | 102(b) publication |
| 2.  IBM Technical Viewer/2 system ("IBM TV/2 system") (described in several documents) | Known or used – 102(a) On sale or public use – 102(b) |
| a.  TV/2 General Information brochure | 102(b) publication |
| b.  TV/2 brochure | 102(b) publication |
| 3.  U.S. Patent No. 4,992,940 ("Dworkin '940") | 102(b) patent |
| 4.  U.S. Patent No. U.S. Patent No. 5,319,542 ("King Jr. '542") | 102(a) patent |
| 5.  US 5,694,551 ("Doyle '551") | 102(e) patent |
| 6.  Gateway 2000/MRO Version (described in the Gateway Manual) | 102(b) publication |
| 7.  J-Con System (described in the J-Con manual) | Known or used – 102(a) On sale or public use – 102(b) |
| a.  J-Con Manual | 102(a) publication |
| 8.  P.O. Writer Plus system (described in the P.O. Writer Plus Version 10 manual) | Known or used – 102(a) On sale or public use – 102(b) |
| a.  P.O. Writer Plus Version 10 manual | 102(b) publication |
| 9.  SABRE system (described in the SABRE Practical Guide) | 102(b) publication |
| 10. Lawson V. 6 system (described in several documents) | Known or used – 102(a) On sale or public use – 102(b) |
| a.  Lawson Inventory Control v. 6 Manual | 102(a) publication |
| b.  Lawson Requisitions V. 6 Manual | 102(a) publication |
| c.  Lawson Purchase Order V. 6 Manual | 102(a) publication |
| 11. Lawson V. 5 system | Known or used – 102(a) On sale or public use – 102(b) |

102.  Exhibit 3, which is an integral part of this report, contains a claim chart demonstrating the invalidity of each Asserted Claim.  Exhibit 3 is a spreadsheet in which the rows are claim elements and steps and the columns are prior art references.  The cell corresponding to an element and a reference contains text if the element is disclosed in the reference or is obvious in light of the reference.  The color coding of Exhibit 3 is explained at the top of the spreadsheet.

103.  Exhibit 3 also contains matter from Lawson's interrogatories concerning invalidity, which are included in columns that are distinct from my opinions.  I adopt the prior art citations

from Lawson's interrogatories, but I do not necessarily adopt the opinions expressed in the interrogatories concerning which claims are invalid in light of which references.  On that issue I have expressed my own opinion in columns containing headings beginning "Shamos Opinion."

104.  To the extent that any reference listed in this report as anticipating any of the Asserted Claims is not deemed to be anticipating, it is my opinion that any missing element or step would have been obvious in light of the art referenced in this report with the motivation to combine as explained herein.

105.  Although the identified art is cited herein as relevant to invalidity, the fact that these systems existed in the prior art may well be relevant to the case in other ways.  For example, the existence of non-infringing alternatives may be relevant to damages.  I do not opine on these other potential grounds for relevance, but understand my analysis of the prior art may be used for other purposes.

106.  A condensed summary of the opinions contained in Exhibit 3 can be found in Exhibit 4, which is also an integral part of this report.  The color coding in Exhibit 4 differs slightly from that of Exhibit 3.  In Exhibit 3, cells corresponding to claim elements are colored individually, based on whether the element is anticipated, obvious or not disclosed.  In Exhibit 4, the cells corresponding to elements of a claim are colored only if the entire claim is anticipated (green) or obvious (yellow).

## THE PRIOR ART

### Electronic Sourcing Systems

107.    The prior art of electronic sourcing systems is long and extensive. Traditionally, distributors and suppliers, such as American Hospital Supply Corporation (AHSC), sold their products using field salespeople, who worked from their homes and called directly on their customers (e.g. hospitals and other organizations).   Orders were generally taken in person by the salesperson, who would then mail the orders to company headquarters.  (L0340561).  This was time consuming, slow and costly.  In 1957, AHSC began to automate its order entry and purchasing system by installing IBM 632 tab-card billing machines in its distribution centers.

obvious choice to integrate with the TV/2 system, since RIMS was a type of order entry, inventory management, and customer record system.

c.   "You can also create a 'shopping list' just by selecting items and passing that list to another application.  For example, you might select parts to be ordered from the exploded drawing in a parts catalogue.  The parts list could then be sent directly to your parts ordering system."  (L0132133).  Again, because the RIMS system was a parts ordering system, one of ordinary skill reading this material would conclude that the TV/2 system was designed to interface with systems just like the RIMS system.

### P.O. Writer Plus V.10

180.   During reexamination of all three patents-in-suit, the Patent Office found that the P.O. Writer Manual qualifies as prior art.  (*See, e.g.,* Final Rejection in the '683 Patent Reexamination at 4-8; '516 Reexam Order at 14-15; Non-Final Rejection in the '172 Patent Reexamination at 6-7).

181.   The P.O. Writer Plus system was an electronic sourcing system that included an electronic database that retained and retrieved product information from multiple vendors, including information such as an item number, item description, inventory location, price, commodity code, unit of measure, and vendor identification.  (The P.O. Writer Manual, Guided Tour at 22 & 130-31; Final Rejection in the '683 Patent Reexamination at 21 & 60; Non-Final Rejection in the '172 Patent Reexamination at 18-19).  Product information could be maintained within the P.O. Writer Plus system as product catalogs organized in various ways, including by vendor or by product type.

182.   The P.O. Writer Plus system allowed a user to select product catalogs to search, resulting in a search of less than the entire data set in the database.  The system allowed a user to search for matching items among selected product catalogs by specifying various search criteria including item number, commodity code, and keyword associated to the item description.  (The

P.O. Writer Manual, Guided Tour at 46-47; Final Rejection in the '683 Patent Reexamination at 21 & 60; Non-Final Rejection in the '172 Patent Reexamination at 19).

183.    After a desired item was selected from the results of a database search, the P.O. Writer Plus system was capable of transferring the relevant product information for the selected item from the database onto an electronic requisition.  (The P.O. Writer Manual, Guided Tour at 47-49 & 117-47; Final Rejection in the '683 Patent Reexamination at 21 & 60; Non-Final Rejection in the '172 Patent Reexamination at 19).  For a selected item in the requisition, the P.O. Writer Plus system was capable of: (1) determining the availability of the item in the inventory of the customer; (2) utilizing EDI transactions or issuing RFQs to multiple vendors to ascertain, record, and retrieve the availability of the selected item from a prospective vendor; (3) determining the price of an item; (4) cross-referencing or converting data relating to the selected item to a generally equivalent item from a different source; and (5) generating multiple purchase orders from a single requisition.  (The P.O. Writer Manual, Guided Tour at 49 & 149-53; Final Rejection in the '683 Patent Reexamination at 22-23, 60-61, 70, 102; Non-Final Rejection in the '172 Patent Reexamination at 19-21).

184.    The P.O. Writer Manual was not cited by the Applicant or considered by the Examiner during prosecution of the patents-in-suit.

185.    In the '516 Reexam Order, the Patent Office found:  "it is agreed that the consideration of the P.O. Writer raises a substantial new question with respect to claims 1-29 of the '516 Patent. With respect to independent claim 16 of the '516 Patent, the P.O. Writer reference is seen to teach of a converting means for converting data relating to an item from a first catalog to data relating to an item from a second catalog [see the P.O Writer Plus, Requisition Interface, Exhibit 15, pages 11 through 15, particularly on page 11, which states 'When Requisitions come into Purchasing, they must first be split up by a buyer or by vendor. ... Some requisitions will need to be split because there are multiple items that are purchased from different vendors. The P.O. Writer Plus Requisitioning Interface does all of this automatically!. .. Assignment of vendors and buyers is based on the last purchase of a given item.']. With this

section, the P.O Writer reference can be interpreted as converting data relating to an item from a first catalog to data relating to an item from a second catalog, as required in independent claim 16. As noted above, this feature was the only mentioned in the original prosecution to be that of allowable subject matter for each of the claims in the original prosecution. Therefore, the P.O. Writer is seen to raise a substantial new question of patentability that was not present in the prosecution of the application which became the' 516 Patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable. Accordingly, the P.O. Writer raises a substantial new question of patentability as to claims 1-29, which question has not been decided in a previous examination of the '516 Patent." ('516 Reexam Order at 14-15).

### The SABRE System

186.    During reexamination of the patents-in-suit, the Patent Office found that the Practical Guide to SABRE qualifies as prior art.  (*See, e.g.,* Final Rejection in the '683 Patent Reexamination at 4-8; '516 Reexam Order at 15-16; Non-Final Rejection in the '172 Patent Reexamination at 5).

187.    American Airlines' SABRE system maintained a massive collection of catalogs of travel offerings in the SABRE system information database, portions of which could be selected and searched to locate, for example, a particular desired flight or flights using multiple search criteria.  (The Practical Guide to SABRE at 2, 51 & 377; Final Rejection in the '683 Patent Reexamination at 16 & 47; Non-Final Rejection in the '172 Patent Reexamination at 14).  Upon selection of a desired flight from the results of a database search, the SABRE system could transfer the relevant flight segment information to an electronic itinerary (called a "Passenger Name Record" or "PNR" in the SABRE literature).  (The Practical Guide to SABRE at 7, 9-11 & 15-16; Final Rejection in the '683 Patent Reexamination at 17 & 47; Non-Final Rejection in the '172 Patent Reexamination at 14).

188.    For a selected flight segment on the itinerary, the SABRE system could: (1) determine the seat availability in airlines' inventory; (2) determine the price of the airline seat on

**The J-CON system**

195.    During reexamination of all three patents-in-suit, the Patent Office found that the J-CON Manual qualifies as prior art.  (*See, e.g.,* Final Rejection in the '683 Patent Reexamination at 4-8; '516 Reexam Order at 14-15; Non-Final Rejection in the '172 Patent Reexamination at 7).

196.    The J-CON Manual describes an electronic-sourcing system, the J-CON ("Jobber-Connection") system, that was designed for use in the operation and management of automotive parts stores (automotive parts stores were called "Jobbers" in the J-CON literature).  The J-CON system maintained a library of automotive parts catalogs from many sources in an electronic database, portions of which could be selected and searched for a desired automotive part.  (The J-CON Manual at Ch. 3,   Sec. 2, Pages 1 & 11 & Ch. 5, Sec. 3, Page 1; Final Rejection in the '683 Patent Reexamination at 10 & 33; Non-Final rejection in the '172 Patent Reexamination at 22).

197.    Upon selection of desired parts from database search results, the J-CON system could transfer the relevant automotive parts information for the selected parts from the database onto an electronic requisition (called a "ticket" in the J-CON literature).  (The J-CON Manual at Ch. 3, Sec. 2, Pages 1, 4 & 8-9; Final Rejection in the '683 Patent Reexamination at 11-12 & 34; Non-Final rejection in the '172 Patent Reexamination at 23).  For a selected item on the requisition, the J-CON system could electronically determine the current availability in the inventory of the automotive parts store, any sister stores associated with the automotive parts store, and/or independent distributors to the automotive parts store.  (The J-CON Manual at Ch. 2, Sec. 10, Page 15 & Ch. 3, Sec. 2, Pages 6 & 10; Final Rejection in the '683 Patent Reexamination at 13 & 34; Non-Final rejection in the '172 Patent Reexamination at 25-26).

198.    The J-CON system user could determine the price of parts from data maintained in its local automotive parts database and/or by electronically communicating with its distributor(s).  (The J-CON Manual at Ch. 3, Sec. 2, Page 4; Non-Final rejection in the '172 Patent Reexamination at 25).

199.    The J-CON system could perform a cross-referencing or converting of data relating to an item on the requisition to determine an alternative source for the same item and/or

an acceptable substitute for the item initially selected.  (The J-CON Manual at Ch. 3, Sec. 2, Pages 6 & 11 & Ch. 3, Sec. 4, Pages 1-5; Final Rejection in the '683 Patent Reexamination at 13-14 & 35-36; Non-Final rejection in the '172 Patent Reexamination at 25-26).

200.     Finally, the J-CON system could generate multiple purchase orders from a single requisition.  (The J-CON Manual at Ch. 4, Sec. 3, Page 1 & Ch. 4, Sec. 4, Pages 1-7; Final Rejection in the '683 Patent Reexamination at 12; Non-Final rejection in the '172 Patent Reexamination at 23-24).

201.     The J-CON Manual was not cited by the applicant or considered by the Examiner during prosecution of the patents-in-suit.

202.  In the '516 Reexam Order, the Patent Office found "the J-CON Manual raises a substantial new question with respect to claims 1-29 of the '516 Patent. With respect to claim 16 of the '516 Patent, the J-CON Manual is seen to teach of a converting means for converting data relating to an item from a first catalog to data relating to an item from a second catalog [see Ch. 2, Sec. 1, Page 2, wherein "Interchange is J-CON's electronic cross-reference for parts ..."; also see Ch. 3, Sec. 1, Page 1, wherein "Interchange cross-references parts in lines you don't stock (called competitive parts) to parts in lines you do stock (called Interchange parts)."  With these sections, the J-CON Manual can be interpreted as converting data relating to an item from a first catalog to data relating to an item from a second catalog, as required in claim 16. Further, as noted above, this feature was the only feature mentioned in the original prosecution to be that of allowable subject matter for each of the claims. Therefore, the J-CON Manual is seen to raise a substantial new question of patentability that was not present in the prosecution of the application which became the '516 Patent. Further, there is a substantial likelihood that a Page 17 reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable. Accordingly, the J-CON Manual raises a substantial new question of patentability as to claims 1-29, which question has not been decided in a previous examination of the '516 Patent."   ('516 Reexam Order at 15-16).

SHAMOS EXPERT REPORT ON INVALIDITY                                                    CASE NO.3:09cv620

## OBVIOUSNESS

### The Combination of TV/2 Plus RIMS Renders the Asserted Claims Obvious

213.    It is my opinion that RIMS as disclosed in the '989 patent anticipates all the Asserted Claims.

214.    To the extent that RIMS as disclosed in the '989 patent is not deemed to anticipate any Asserted Claim, it is my opinion that such claim would have been obvious under 35 U.S.C. §103 in view of the combination of the Fisher RIMS system as described in the '989 patent and the RIMS brochure with the IBM TV/2 system as described in the 5799-IBM Technical Viewer/2, IBM Technical Viewer/2, General Information Manual, and IBM Technical Viewer/2 brochure.

215.    The combination of these two systems, RIMS and TV/2 teaches all of the elements of asserted claims 3, 6, 26, 28, and 29 of the '683 patent, asserted claims 1, 2, 6, 9, 21, 22, and 29 of the '516 patent, and asserted claim 1 of the '172 patent as shown in Exhibits 3 and 4).  As such, the combination of RIMS and TV/2 renders these claims invalid under 35 U.S.C. §103.

216.    As stated in the patents in suit, the claimed electronic sourcing system "includes requisition/purchasing system 40, preferably but not necessarily the [prior art] Fisher RIMS system, and a search program 50 . . . Preferably, but not necessarily, the Technical Viewer 2 search program ("TV/2"), available from IBM, is used as search program 50."  E.g. '683 patent 4:1-9.

217.    The TV/2 documents include an explicit motivation to combine the Fisher RIMS and TV/2 systems.  The IBM Technical Viewer/2 brochure teaches:  "You can also create a 'shopping list' just by selecting items and passing that list to another application.  For example, you might select parts to be ordered from the exploded drawings in the parts catalogue.  The part list could then be sent directly to your parts ordering system . . . ."  (L0132133.)  It also teaches: "Technical Viewer/2 is suitable for whole ranges of uses and industries in which information is supplied in large quantities and updated regularly, and where uses need fast access to precise

details.  Potential uses include:  . . . .  Integrating part catalogues with dealers' computer systems such as order entry, inventory management and customer records . . . ."  (L0132134.)

218.    The RIMS system as described in the '989 patent is a part ordering system that allows order entry and inventory management.  ('989 patent, 1:5-7 ("This invention generally relates to systems for requisition and inventory management."); '989 patent, 1:4-17 (Background explaining that the RIMS system is a requisition system, which generally "process purchase orders for items and track inventory."); 8:25-38 (discussing RIMS Parts Master record, which includes "part number")).

219.    The TV/2 system was designed with an applications program interface (API) for interfacing the TV/2 system with other systems such as parts ordering systems, like RIMS. Thus, there is reason to combine the Fisher RIMS and TV/2 systems.

220.    I understand that there will be testimony at trial to the effect that the patented invention resulted from customers asking Fisher Scientific to manage other types of product inventories other than the products that Fisher supplied, and to provide access to other supplier catalogs.  This provided an obvious motive for one of ordinary skill in the art to combine the Fisher RIMS system and the TV/2 system, which was capable of searching for products from Fisher and non-Fisher catalogs and transmitting the results of such searches to a system such as the RIMS system.  Indeed, Baxter Healthcare had recognized this need and provided this functionality in connection with the ASAP Express electronic sourcing system in mid-1980s.

221.    The RIMS system and TV/2 systems were both designed to operate on the IBM OS/2 operating system platform, which further demonstrates that it would have been obvious to one of ordinary skill seeking to have a system with both extended searching capabilities and a requisition/purchasing system to combine the Fisher RIMS system with the TV/2 system. Dynamic data exchange (DDE) was the known, preferred protocol for exchanging information between applications operating on an OS/2 system.

222.    The documents show and I understand that there will be testimony at trial to the effect that the process of creating an interface between TV/2 and RIMS applications was for the

most part straightforward and providing communication between the two was well within the capability of one of ordinary skill in the art.  (ePLUS0221672-1693; ePLUS0214243-4265). Most of the time and work that was done on the interface was directed to optimizing the connection to achieve the desired performance and speed, or otherwise enhance or add features. However, none of these changes relate to the limitations of the claims at issue.  The changes that were made to each of these systems were not radical and the systems when combined were not dramatically different from what they were before they were combined.  In other words, they were the minor, obvious types of changes that are typically required when combining two programs to operate together.  Several of these changes related not to making the systems work together, but rather to making the combined system work faster and better.  However, such performance improvements are not part of the claimed invention, and thus are irrelevant to the obviousness issue.  The most-time consuming part of the process was scanning in Fisher's 2000 page catalog and then cleaning up and formatting the scanned material and building in additional type of searching capabilities into TV/2, such as Boolean and sub-set searches.  None of these specific details are required by the asserted claims.  Building the interface, which was actually between three systems (TV/2, RIMS, and SPS), was estimated to take about 200 hours, which was a small fraction of the total time spent to build Fisher's sourcing system.  (ePLUS0214259-4263).  The fact that the process of building the commercial embodiment of the claimed invention was straightforward further supports obviousness.

### The Combination of RIMS Plus Dworkin '940 Renders the Asserted Claims Obvious

223.    It is my opinion that RIMS as disclosed in the '989 patent anticipates all the Asserted Claims.

224.    To the extent that RIMS as disclosed in the '989 patent is not deemed to anticipate any Asserted Claim, it is my opinion that such claim would have been obvious in view of the combination of the Fisher RIMS system as described in the '989 patent and the RIMS brochure together with the Dworkin '940 patent.  Such a combination teaches all of the elements of asserted claims 3, 6, 26, 28, and 29 of the '683 patent, asserted claims 1, 2, 6, 9, 21, 22, and 29

of the '516 patent, and asserted claim 1 of the '172 patent as shown in Exhibits 3 and 4). As such, the combination RIMS and the '940 patent renders these claims invalid under 35 U.S.C. §103.

225. One of skill in the art would have been motivated to combine the Fisher RIMS system with the '940 patent. The alleged improvement of RIMS over prior art sourcing systems was its ability to track just-in-time (JIT) inventory. '989 patent, 1:49-50. It therefore teaches combining inventory tracking with prior art sourcing systems.

226. The RIMS system allowed a user to purchase goods offered by plurality of sources (for example, Fisher and Promega as described above and as set forth in detail in Exhibit 3). However, I understand that in trying to distinguish the asserted claims from the RIMS system, ePlus will argue that the RIMS system was actually a "single source system" – that is, it allowed the customer to purchase only from the distributor that ran the RIMS system. While I disagree that RIMS was a "single source system" and dispute that the asserted claims require purchases to be made from different entities as interpreted by ePlus, it is my opinion that even if these were true, there was reason to combine the so-called single source system of RIMS with the '940 patent, which disclosed a system that "assists a user with locating and purchasing goods or services sold by a plurality of vendors." ('940 patent, Abstract.)

227. By 1988, there were over fifty different automated order-entry/material management systems in the marketplace. (L0343536). As order efficiency decreased and logistical costs increased with multiple, incompatible systems, customers became interested in multi-vendor systems. (L0343536-537; L0340565). A multi-vendor system could reduce logistical costs by 10% and provide the advantages of consolidated data. (L0340565). Consolidating information about multiple vendors removed the need for customers to consult hundreds or thousands of vendor catalogs to find the best price for an item. ('940 patent, 1:14-60.) Baxter Healthcare offered a multiple-vendor electronic sourcing system in the late-1980s, years before the patents-in-suit were filed. Thus, even if the Fisher RIMS system as described in

the '989 patent was single-source and the asserted claims require purchases from multiple sources, market pressure would provide a motivation to combine RIMs with the '940 patent.

228.     During prosecution of the '683 and '516 patents, the Patent Office found that the '940 disclosed all of the claim elements except:  1) converting items found in one vendor's catalog to another vendor; and 2) searching only portions of a catalog database.  During the prosecution of the '172 patent, the Applicant argued that Dworkin did not teach a single requisition that could include multiple items and be sourced to different vendors.  It is my opinion that the RIMS system teaches these missing elements (as described more fully in Exhibits 3 and 4).  Additionally, the '940 patent at least implicitly recognized a need to search a subset of the database – it required a user to first select a category of items to search (hardware vs. software).  Thus, it would have been obvious to combine the teaching of RIMS that allowed users to search portions of the RIMS database (see exhibit 3).  Further, the '940 patent recognized that items might have two product numbers (a number identifying the product in the database and a manufacturer's model number), thus it would have been obvious to combine the '940 patent with the cross-reference table in RIMS to associate these different numbers together.  Finally, to the extent that the '940 patent is deemed not to teach a single requisition that could include multiple items and generate multiple purchase orders (I believe it does teach this element as shown in Exhibit 3), it would have been obvious to combine it with RIMS which teaches multiple purchase orders from a single requisition ('989 patent, Fig. 5A).

### The Combination of J-CON Plus Dworkin '940 Renders the Asserted Claims Obvious

229.     It is my opinion that J-CON anticipates all the Asserted Claims.

230.     To the extent that J-CON is not deemed to anticipate any Asserted Claim, it is my opinion that such claim would have been obvious in view of the combination of J-CON with the Dworkin '940 patent. The combination teaches all of the elements of asserted claims 3, 6, 26, 28, and 29 of the '683 patent, asserted claims 1, 2, 6, 9, 21, 22, and 29 of the '516 patent, and asserted claim 1 of the '172 patent as shown in Exhibits 3 and 4).  As such, the combination of J-Con and the '940 patent renders these claims invalid under 35 U.S.C. §103.

231.    One of skill in the art would have been motivated to make the combination because

232.    One of skill in the art would also have been motivated to make the combination because the '940 patent states, "It is another object to provide a system and method which facilitates the processing of orders for goods or services transmitted by a user." 3:9-11.  This capability is provided by J-CON.

233.    Furthermore, the '940 patent provided the multi-source capability demanded by the industry at and before the time of the invention.

234.    Additionally, the J-CON system included features that one or ordinary skill in the art would have been motivated to use with the '940 invention, including the ability to electronically determine the current availability in the inventory at multiple locations, to perform a cross-referencing of data relating to an item on a requisition to determine an alternative source for the same item and/or an acceptable substitute for the item initially selected, and the ability to generate multiple purchase orders from a single requisition (as described above and in detail in Exhibit 3).

**<u>The Combination of J-CON and P.O. Writer Renders the Asserted Claims Obvious</u>**

235.    It is my opinion that J-CON anticipates all the Asserted Claims.  It is also my opinion that P.O. Writer anticipates all of the asserted claims.

236.  To the extent that J-CON and/or P.O. Writer are not deemed to anticipate any Asserted Claim, it is my opinion that such claim would have been obvious in view of the combination of J-CON with P.O. Writer.  The same reasons for making the previous two combinations apply to combining the J-CON system as described in the "J-CON Manual" with P.O. Writer Plus V. 10 as described in the P.O. Writer Plus Manual.  The P.O. Writer Plus V. 10 system provided the multi-vendor capability demanded by the industry at and before the time of the invention.  The J-CON system included features that one or ordinary skill in the art would have been motivated to use with the PO Writer system, including additional details about

performing a cross-referencing of data relating to an item on a requisition to determine an alternative source for the same item and/or an acceptable substitute for the item initially selected.

### The Combination of J-CON and Gateway Renders the Asserted Claims Obvious

237.    It is my opinion that J-CON anticipates all the Asserted Claims.  It is also my opinion that the Gateway 2000/MRO system anticipates all of the asserted claims.

238.   To the extent that J-CON and/or Gateway are not deemed to anticipate any Asserted Claim, it is my opinion that such claim would have been obvious in view of the combination of J-CON with Gateway.  The same reasons for making the previous three combinations apply to combining the J-CON system with the Gateway system.

239.   Additionally, the J-CON system had a sophisticated system for keeping track of equivalent items, dividing them into "Replaced Parts," "Substitute Parts," and "Can-Use Parts" and a number of different methods of converting among item numbers and substituting alternate parts that one of ordinary skill would have been motivated to use with the Gateway system. (See, e.g., L0124837; L0123551).  Similarly, the Gateway Manual discloses in detail how to select a subset of catalogs from a collection of catalogs and then limit a search for items to the selected subset of catalogs, which one of ordinary skill would have been motivated to use with J-CON system.  (See, e.g., SAP_2531709-10, SAP_2531615-16, L0128380).

### Secondary Considerations

240.    I understand that ePlus contends that secondary considerations demonstrate that the invention is not obvious.  (See, e.g., "Plaintiff ePlus Inc.'s First Supplemental Answers and Objections to Defendant Lawson Software, Inc.'s Second Set of Interrogatories" (hereinafter, "Rog. 6").)  I understand that ePlus will allege commercial success, demand for the patented product, and praise by others.  While I reserve the right to reply to these arguments after I have reviewed ePlus's expert report, the evidence ePlus intends to present (as I currently understand it) does not demonstrate a nexus between these secondary considerations and the claimed invention.

241.    ePlus correctly observes that businesses benefit from efficient procurement. (Rog. 6, pp. 12-13).  However, numerous prior art system existed that automated the procurement process, as described earlier in this report.  Therefore, even if the claimed inventions also accomplish this goal, that is not evidence of nonobviousness.  Quite the opposite. The fact that numerous artisans built, used and patented a variety of automated procurement system is evidence of obviousness because it tends to show contemporaneous invention by others.

242.    ePlus asserts, speaking of the prior art, that  "since the electronic catalogs were limited to a single vendor's product, comparison shopping among different vendors could not be conducted." (Rog. 6, p. 13).  This statement is incorrect.  At least the following prior art systems allowed comparison shopping among multiple vendors: Johnson '989, P.O. Writer, SABRE, Gateway, J-CON, TV/2, King '542, Doyle '551, and Dworkin '940.

243.    ePlus asserts that "there was a long-felt, but unmet need for an electronic sourcing system and process that could integrate product information, such as is typically found in vendor catalogs that are provided to customers and requisition and ordering systems that could use the results of searches of product information in vendor catalogs." (Rog. 6, p. 13).  This statement is incorrect.  The aforementioned prior art systems provided such integration.

244.    ePlus asserts that "there was a need to provide an electronic sourcing system that was capable of conducting searches of product catalogs of multiple vendors and transferring information about items selected from the results of a vendor catalog database search … to a requisition building module for inclusion of the catalog items as entries in a requisition generated by the system."  (Rog. 6, p. 13).  Such a need, to the extent it ever existed, was amply satisfied by prior art systems.

245.    ePlus asserts that "Moreover, such an electronic sourcing system would enable the automation of necessary approvals that may be required with respect to a requisition prior to placing an order with a vendor."  (Rog. 6, p. 14).  Such a capability, even if needed and even if

satisfied by the alleged inventions, is not claimed in the Asserted Claims.  Therefore, the assertion in no way tends to show that the Asserted Claims are nonobvious.

246.    ePlus asserts that " The inventors recognized that the electronic sourcing system could also include databases having vendors' inventory information or other inventory determination means so that, for a particular selected item from a catalog database search, the system could determine its availability in the inventory of a vendor." (Rog. 6, p 14).  Even if the inventors had that realization, so did numerous others before them.  Such a capability was provided by at least the following prior art systems: Johnson '989, P.O. Writer, SABRE, Gateway, J-CON, Doyle '551 and Dworkin '940.

247.    ePlus asserts that "If a particular vendor was out-of-stock with respect to a selected item, the inventors recognized that the system should be capable of finding another item available from a different vendor in another vendor catalog by means of, for example, a database which identifies cross-referenced items." (Rog. 6, p. 14).  Even if the inventors had that realization, so did numerous others before them.  Such a capability was provided by at least the following prior art systems: Johnson '989, SABRE, Gateway, J-CON and Dworkin '940.

248.    ePlus asserts that it received various awards and that these are evidence of nonobviousness. (Rog. 6, pp. 14-16).  ePlus is unable to establish any nexus between these awards and the inventions of the Asserted Claims.  I note that none of the cited awards mentions any of ePlus's patents or inventions.  For example, ePlus points to the "Internet and Electronic Commerce Conference (iEC) Award for Best Internet Infrastructure" award Fisher won in March 1997.  ePLUS 0134639-40.  The award citation refers to the fact that "Procure Net enables vendors to create electronic storefronts to display and sell their products over the Internet. Fisher's electronic mall interfaces directly to participants' legacy systems-order entry, customer service, inventory-to fulfill and complete the purchasing process."  There is no Asserted Claim that refers in any way to an electronic mall or tying an electronic storefront to legacy systems.  In fact, the quotation specifically mentions that procurement is not performed by ProcureNet, but

by the user's own legacy system.  There is no nexus between this award and the Asserted Claims, so it is not evidence of nonobviousness.

249.    ePlus refers to an "Aberdeen White Paper" that indicated that "adopters of e-Procurement technology realized a 5 to 10% cost reduction in the prices of the non-production goods purchased."  I note that the Aberdeen White Paper makes no mention of Fisher, ePlus or the asserted patents.  It generically concludes that e-Procurement can result in significant cost savings.  Even assuming this to be true, there were numerous prior art e-procurement systems in existence and there is no nexus between the Aberdeen White Paper and the Asserted Claims.

250.    ePlus asserts that "Lawson has recognized the benefits achieved by automating the e-procurement process as claimed in the patented inventions." (Rog. 6, p. 15).  However, ePlus has failed to mention the fact that Lawson operated an e-procurement system of its own that is prior art to the asserted patents.

251.    ePlus asserts that "*ePlus* was named one of the 2003 and 2004 Supply & Demand Chain Executive 100 List of Leading Supply Chain Product Providers. *See, e.g.,* ePLUS0027032-33." (Rog. 6, p. 16).  However, the cited reference is a press release authored by ePlus itself.  The website of Supply & Demand Chain Executive magazine explained the criteria used to determine the top 100[1]: "The 'Top 100' are selected by the magazine's editorial staff and advisors based on information submitted by solution providers.  The criteria for the selection process were derived from those factors that the magazine's readers have indicated matter most as they consider possible solutions to enable their supply and demand chains today, including stability, industry knowledge and expertise, return on investment and innovation."  Thus the award was based on ePlus's own submission.  Further, inclusion in the list establishes no nexus with the Asserted Claims.

252.    ePlus asserts that "in 2003, *ePlus* was ranked #1 on the Aberdeen Group's Supply Chain 50 Report as the leading supply chain management technology provider for its suite of electronic procurement and procurement catalog content management products and services that

---

[1] See http://www.sdcexec.com/web/online/Trends/Turning-the-Spotlight-on-Top-Supply-and-Demand-Chain-Enablers/20$5310

SHAMOS EXPERT REPORT ON INVALIDITY                                      CASE NO.3:09cv620

can be used to support customers' strategic sourcing and management initiatives." (Rog. 6, p. 16). The document cited in support of this statement, ePLUS0026955-57, is ePlus's own press release. The actual criteria used by the Aberdeen Group in its Supply Chain 50 Reports are listed on the Aberdeen Group's website[2]: "The SC 50 rewards companies that show significant results in Overall dollar increase in revenue, Revenue growth in proportion to their own size, Profitability posture and improvements, Gaining market share." There is no mention of any technology, products or innovations. The ranking is based purely on financial factors, regardless of ePlus's assertions in its press release.

253.    ePlus asserts that "The iSource 100 list recognized *ePlus* for its innovative Enterprise Cost Management platform which includes its suite of electronic procurement, product and catalog content management products." The document cited in support of this statement, ePLUS 0026860-61, is ePlus's own press release. The actual criteria used by iSource were announced in its own press release dated June 2, 2003[3]: "The iSource 100 are enabling organizations and consulting organizations with innovative, enterprise-wide solutions and services that are leading the way in helping traditional companies make their supply and demand chains more effective and efficient." The fact that all 100 companies on the list met these criteria and all were supply chain companies negates any inference that ePlus had any unique offering. Even if ePlus somehow manages to show a nexus between the Asserted Claim and its appearance on the iSource 100, if 99 other companies had offerings of equal stature, that tends to show obviousness through contemporaneous invention by others.

254.    Rog. 6, p. 17 deals with supposed licensing of the patented technology by others. I understand that SAP and Ariba took licenses in connection with settlement of hotly contested litigation.

255.    The fact that ePlus as a company has enjoyed commercial success, even if true, does not establish that any success is tied to the Asserted Claims. Many companies enjoy commercial success but own no patents at all, so mere commercial success is certainly not

---

[2] See http://v1.aberdeen.com/summary/report/sca/sc50method.asp
[3] See http://www.cincom.com/us/eng/news/news-room/news-releases/search/newsDetailDisplay.jsp?recordId=472

indicative of non-obviousness of anything unless some nexus can be shown between the Asserted Claims and the success. Furthermore, I understand that only a small percentage of the revenue of ePlus is derived from products covered by the asserted patents, and such revenue has been relatively flat for several years, so ePlus will not be able to tie any "success" to the Asserted Claims.

256. At Rog. 6, pp. 17-18, ePlus attempts to establish skepticism by others. But the cited quotation from FTG's chief executive does not do that. He merely says that "Most buyers and suppliers hadn't modified their business process to facilitate electronic commerce." That does not establish skepticism. Furthermore, there is no evidence that anyone was skeptical that the inventions of the Asserted Claims could be made.

257. The ePlus website states that "ePlus' products are covered by one or more of the following: U.S. Patent Nos. 6,023,683; 6,055,516; 6,505,172; 6,892,185; 6,182,127; 6,510,459; 7,047,211; 7,185,069; 7,254,581 and corresponding foreign and patents pending."[4] Of the nine U.S. patents listed, only the first three are asserted in this litigation. ePlus has not shown that any success it may have relates to the specific patents asserted in this case. Furthermore, the ePlus products offer features that do not appear in the Asserted Claims, or anywhere else in the asserted patents. These include[5]:

**Approval Workflow** - No matter how many approvals are required, Procure+ routes requisitions and blanket order releases through the process via email in minutes.

**Budget Checking** - It's better to check fund availability before an order is issued than get an end of month report on overruns. Supports multiple allocations per line item.

**Sourcing and Bidding** - RFQs, reverse auctions, and bid analysis are included.

**Receiving** - Deliveries can be recorded at the desktop or at a central location.

**Invoice Matching** - Also available in Procure+ Enterprise Edition, this module provides a three way match with existing purchase order and receipt information.

**Evaluated Receipt Settlement (ERS)** - This process issues payment approvals to trusted vendors when goods or services are received, bypassing invoices.

---

[4] See http://www.eplus.com/legal_notices.htm
[5] See http://www.eplus.com/eprocurement_features.htm

SHAMOS EXPERT REPORT ON INVALIDITY                                    CASE NO.3:09cv620

**Reporting -** Every transaction in the ordering process is stored and viewable within Procure+, including audit trails and departmental and management reports.

**Navigator+ and Queries -** Users can define their own queries plus build and store their own workspaces, showing only those transactions that need their attention.

258.  I do not see any connection between the Asserted Claims and the secondary considerations cited by ePlus in Rog. 6.  In the event that ePlus or its experts come forward with any additional assertions of nonobviousness, I reserve the right to respond to them.

## CONCLUSIONS

259.    None of the Asserted Claims is valid.

260.    All the Asserted Claims are anticipated, as explained in Exhibits 3 and 4.

261.    All the Asserted Claims are also obvious in light of single references, as explained in Exhibits 3 and 4.

262.    All the Asserted Claims are also obvious in light of combinations of at most two references, as explained in the main body of this report.

263.    Applicants did not invent e-procurement software.

264.    Applicants did not invent requisition/purchasing software.

265.    Applicants did not invent electronic sourcing systems.

266.    Applicants did not invent multiple source electronic sourcing systems.

267.    Applicants did not invent a searchable collection of product catalogs.

268.    Applicants did not invent search engines for searching parts lists or product catalogs.

269.    Plaintiff has not demonstrated secondary considerations sufficient to negate the obviousness of any Asserted Claim.

270.    All the Asserted Claims, as detailed above and in Exhibits 3 and 4, are invalid as indefinite.

271.    The following claims, as detailed above and in Exhibits 3 and 4, are invalid as lacking written description:

'516 claims 1, 2, 6, 9, 21, 22, 29.

'683 claims 3, 6, 28, 29.

272.    The following claims, as detailed above and in Exhibits 3 and 4, are invalid as lacking enablement:

'516 claims 1, 2, 6, 9, 21, 22, 29.

273.    The following claims, as detailed above and in Exhibits 3 and 4, are invalid as not reciting statutory subject matter, also including hybrid claims:

'516 claims 1, 2, 6, 9, 21, 22, 29.

Executed on May 5, 2010, in Pittsburgh, PA.

_____

Michael Ian Shamos, Ph.D., J.D.

76