# EXHIBIT 3

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF VIRGINIA

 3                     RICHMOND DIVISION

 4

 5    -------------------------------------
                                          :
 6    ePLUS, INC.                         :    Civil Action No.
                                          :    3:09CV620
 7    vs.                                 :
                                          :
 8    LAWSON SOFTWARE, INC.               :    January 4, 2011
                                          :
 9    -------------------------------------

10

11           COMPLETE TRANSCRIPT OF THE JURY TRIAL

12          BEFORE THE HONORABLE ROBERT E. PAYNE

13        UNITED STATES DISTRICT JUDGE, AND A JURY

14
      APPEARANCES:
15
      Scott L. Robertson, Esquire
16    Michael G. Strapp, Esquire
      Jennifer A. Albert, Esquire
17    David M. Young, Esquire
      Goodwin Procter, LLP
18    901 New York Avenue NW
      Suite 900
19    Washington, D.C.  20001

20    Craig T. Merritt, Esquire
      Christian & Barton, LLP
21    909 East Main Street
      Suite 1200
22    Richmond, Virginia  23219-3095
      Counsel for the plaintiff
23

24              Peppy Peterson, RPR
               Official Court Reporter
25            United States District Court
```

134

1  and Mr. Johnson.  And it was a method.  It was a

2  product and method for managing Fisher-Scientific

3  inventory such that they could try and fulfill their

4  inventory needs of their client by selling Fisher

5  products.

6         Now, the continuation is made here that the

7  Patent Office was unaware of that.  I would suggest to

8  you that it is in the very patent directly in the

9  background of the invention.  And it even says

10 underneath it that the disclosure is incorporated

11 herein by reference.

12        Now, you may also recall -- it was a lot of

13 information in that video, but you may also recall

14 that one of the things the narrator said was how you

15 disclose a patent was to put it in your application

16 and put it in your specification.

17        Here it is.  And I've gone through and I've

18 counted.  It's referenced no less, in its structure

19 and functionality, referenced no less than 52 times,

20 but at some point in time the suggestion is going to

21 be made by one of Lawson's experts is that they were

22 unaware of this patent and that this patent in

23 combination with some other alleged prior art would

24 invalidate or render the claims obvious.

25        One of those other pieces of prior art they

135

1    are going to reference was a document viewer program

2    that my inventors, the inventors you're going to hear

3    from, went out and identified and used as part of a

4    tool to build what became this electronic sourcing

5    procurement patent.

6           Again, if you can go to column 4 of the same

7    patent.  Specifically, starting at line 5 through 9.

8    Just highlight that.

9           Here, in fact, it indicates that preferably,

10   but not necessarily, this Technical Viewer 2 search

11   program available from IBM is used as a search program

12   in this invention.

13          So the inventors actually told the Patent

14   Office in no uncertain terms that you could use

15   aspects of this RIMS system that the inventors

16   developed with aspects of this TV2 system, which they

17   actually went out and contracted with IBM as a

18   work-for-hire in order to have it included pursuant to

19   their specifications in the overall invention that

20   they ultimately decided on.

21          The suggestion now is that somehow this RIMS

22   system and TV2 system in combination or alone

23   invalidates the patents and the Patent Office could

24   not have been aware of it.

25          Well, the Patent Office, as the video

1    indicated this morning, is required to review this

2    specification, required to review this application,

3    and determine in the face of it whether or not it is

4    patentable.

5         So we certainly think it was no mystery to

6    the Patent Office that these inventors considered

7    these to be tools that would help them make a

8    commercial embodiment of their inventions.

9         In fact, they worked towards that goal.  They

10   really made a prototype of this first invention.  They

11   didn't have to.  You don't really have to make a model

12   or a prototype.  All you have to do is disclose to the

13   Patent Office what your invention is and you're

14   entitled to get a patent if it is new, useful and

15   nonobvious.

16        If I could just go to claim 26 of the '683

17   patent.  This is a method claim that I wanted to

18   identify.  It is always a claim that is being asserted

19   in this case.  You may recall I indicated a method

20   claim is sort of a process or if you think about it,

21   the sort of steps of doing something.  A good

22   comparison might be it's kind of a recipe for

23   achieving an outcome or a result.

24        If I had a method of making or baking an

25   apple pie, I might have the steps of taking the flour

1       And we're going to be talking about those
2  inventions and the applications that were filed at
3  that time on these early processes.
4       Now, the fact is there is going to be a lot
5  of discussion in the patent as to how they put
6  together the invention back in 1994, but that's not
7  important.  That supported the fact that the Patent
8  Office recognized they had something new and useful
9  and not obvious.  And then they claimed it.
10      Now, the fact is, as I said before, it's the
11 claims we're all going to have to focus on because
12 it's those claims that define what is, in fact, at
13 issue in this case and whether if indeed Lawson
14 infringes.
15      Now, have these patents been successful for
16 ePlus?  They have been enormously successful.  Since
17 they were acquired as part of this acquisition from a
18 company that Mr. Farber was at, at ProcureNet, in
19 2004, they have now received almost $60 million in
20 royalty revenues associated for licensing these
21 patents to five separate companies including SAP, one
22 of the largest manufacturers of software in the world,
23 and a company known as Ariba.
24      Now, to be sure, ePlus has had to enforce its
25 rights sometimes in court in order to have others

1   it has the capability of doing it, but our customers

2   just don't want to do that a lot.  It's like saying, I

3   could sell a car with infringing windshield wipers,

4   but I just never turn them on.  So that's not an

5   infringement.  Well, if the product is sold with the

6   capability of doing it, that is infringement.

7            So, Your Honor, with that I have concluded my

8   issues with respect to infringement.  As I understand,

9   I would like to address some of the issues on

10  invalidity after Mr. McDonald has an opportunity to

11  speak to the jury.

12           Is that what I understood Your Honor to be

13  suggesting?

14           THE COURT:  I want to know if he wants to

15  agree to that?

16           MR. McDONALD:  He already went into

17  invalidity.  He should finish his opening statement.

18           THE COURT:  Finish your statement.  I'm not

19  sure that's how we're going to try the case, but we're

20  going to finish it.

21           MR. ROBERTSON:  Let's talk a little bit about

22  invalidity because the case now is raised with respect

23  to what are going to be called six prior art

24  references.  Four of those six were considered by the

25  Patent Office.  Two of them I already referenced to

1  you being that RIMS system and the TV2 system.

2           They represent either alone or in isolation

3  or in combination, those references invalidate all 12

4  of the patent claims that are at issue.

5           We believe the evidence will show exactly the

6  opposite, that the Patent Office was fully aware of it

7  and that the RIMS system is radically different from

8  what the patented system is.  And that can be

9  explained by at least two of the inventors who were

10 responsible for and were the named inventors on the

11 RIMS system.

12          There are two other systems that are going to

13 be identified.  One is called the J-CONN, which was

14 essentially a parts ordering inventory system in our

15 view, and our expert will address how it doesn't have

16 all the elements of the claims.

17          Indeed, Lawson admits that it doesn't

18 anticipate any of the 12 claims that are at issue

19 here.  In other words, it doesn't have all of the

20 elements.

21          Another system that they'll be raising is

22 called P.O. Writer, which we really think was simply

23 nothing more than a sort of electronic form filler for

24 purchase orders.  And Lawson even admits that it

25 doesn't anticipate or have every element of nine out

1   of the 12 claims here.

2           So what they need to do is then try and put

3   together what's known as an obviousness case.  To say,

4   Well, a person of ordinary skill in the art back in

5   1994 would have somehow known to take the J-CONN

6   system and combine it with the P.O. system and take

7   the J-CONN system and combine it with some other

8   patent they are going to point you to, and then really

9   in hindsight make up the invention that was conceived

10  of and reduced to practice back in 1994.

11          We think the analysis done by their expert on

12  that is going to be significantly lacking.  And,

13  indeed, it's interesting to note that even their

14  expert concedes that he doesn't even agree with

15  Lawson's lawyers on how the invalidity should be put

16  together.  So I gather that reasonable minds in that

17  respect can differ.

18          So I think, Your Honor, with that I would say

19  thank you.  I think the bottom line is that the

20  evidence will show that Lawson infringes and that the

21  patents are invalid, and we would respectfully ask

22  that you return a verdict of infringement at the end

23  of the evidence.  I thank you for your attention.

24          THE COURT:  We'll take our lunch recess for

25  45 minutes.  It will probably be closer to an hour by

156

1    the time I talk to the lawyers.

2            All right.  You can take your pads with you

3    if you would.  Put your names on them.

4            (The jury is out.)

5            THE COURT:  Anything we need to go over?

6            MR. McDONALD:  Your Honor, in response to

7    your question I would like to do my opening about

8    validity and infringement.

9            THE COURT:  Well, if you want to.  I

10   understand the need to cover these things in opening

11   statement, but there was so little said about

12   infringement I got the idea that basically it was a

13   closing argument on invalidity.

14           So you can do it, but I'm wondering whether

15   it's not better to just try the case on the issues of

16   invalidity, let the jury return a verdict -- I mean of

17   infringement.  Let the jury return a verdict on

18   infringement or not.  And then we'll try the

19   invalidity case.  After hearing the statements and the

20   way you-all are proceeding.  Why isn't that the best

21   way to proceed now, Mr. Robertson?

22           I don't think you have it within you to

23   fragment the case the way it's supposed to be.  You

24   had nothing to say about invalidity in your opening

25   part of the case.  None.  It's not your business.

157

1   It's not what you're hear to prove.  And I don't want

2   to hear anything about it.

3          And you-all are getting things so commingled,

4   you're going to get the jury confused.  I now after

5   listening to the opening statements have come to the

6   conclusion that's really how we ought to try the case

7   and just let the jury have the instructions and

8   verdict on infringement and then try the invalidity if

9   they return an infringement finding.  If they don't,

10  the case is over.

11         I think you-all ought to think about that.

12  It seems to me as if I've told you before how the case

13  needs to be tried, that you don't anticipate or put on

14  all your evidence in anticipation or *in apprehendo* and

15  then come back and try to do it again.  We're not

16  going to do it that way.

17         I thought I told you that from the very

18  beginning of the case.  It looks to me like maybe

19  you're going to have to think about that at the lunch

20  hour.

21         MR. McDONALD:  Your Honor, during the opening

22  statements of Mr. Roberson, he made statements saying

23  that the RIMS prior art was considered by the Patent

24  Office.  That's directly contrary to a statement by

25  the Patent Office on the reexams of all three patents.

158

1      THE COURT:  Look, if it was in the patent, if
2  was in the patent, they're bound to have considered
3  it.
4      MR. McDONALD:  It was not in the information
5  disclosure statements.  It was not identified as to
6  references cited --
7      THE COURT:  How did it get in the
8  specification?
9      MR. McDONALD:  They wrote it in there.  What
10 he was talking about, he showed them the issued
11 patent, but as filed, it didn't show the patent number
12 on it.
13     THE COURT:  Well, somehow in the process it
14 got in there, and I don't care what they found there.
15 Somehow the Patent Office issued a document that had
16 actually in it the RIMS system.
17     You tell me they didn't consider it even
18 though they put it in there?
19     MR. McDONALD:  There's a new issue raised by
20 the reexams because of the RIMS prior art because they
21 found, the Patent Office found, in the re-exams that
22 it was not --
23     THE COURT:  We're not going to deal with the
24 reexams and maybe this is an example where the Patent
25 Office is all wet.  When the Patent Office puts in the

159

1    specification something that says you have a patent on

2    this, to let them then come back in here and say,

3    Well, we didn't consider it is almost farcical.

4          MR. McDONALD:   There's a procedure for

5    disclosing prior art.   Very easy process.   Put it on

6    your disclosure statement.   They didn't do it.   That's

7    why it didn't show up on the cover page of the patent

8    under the references cited.   TV/2 is in there too, but

9    they also disclose the prior art as references cited.

10          THE COURT:   That looks to me like an excuse

11   for doing a sloppy job at the Patent Office.   I'm not

12   dealing with the reexamination.   I'll have to deal

13   with the other issue later.

14          All right.   We'll be in recess.   Since I've

15   kept you this long, we'll take an hour from the time I

16   let the jury go.

17

18

19

20

21

22

23

24

25

213

1   A    That's correct.

2   Q    In fact, the procurement division of Mr. Farber, that's

3   less than two percent of the company, isn't it?

4   A    That sounds about accurate, yes.

5           MR. McDONALD:  I have no further questions.  Thank

6   you.

7

8                    REDIRECT EXAMINATION

9   BY MR. ROBERTSON:

10  Q    Just so I'm clear, Ms. Marion, this document that was

11  shown to you called strategic competitors analysis has nothing

12  at all to do with this electronic procurement software we've

13  been discussing?

14  A    No, it does not.

15  Q    Doesn't have anything to do with that part of the

16  business; is that right?

17  A    It does not, sir.  Who prepared it has nothing to do with

18  the procurement business.

19  Q    When I asked you about the almost $60 million in royalty

20  revenues that were enjoyed by licensing these patents, they

21  weren't --

22          MR. McDONALD:  Your Honor, we didn't get into that on

23  direct, because I objected and you sustained.

24          THE COURT:  Correct.

25          MR. ROBERTSON:  He's opened up the issue about

258

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
2                    RICHMOND DIVISION

3  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                              :
4    ePLUS, INC.,                             :
                                              :
5                        Plaintiff,           :
     v.                                       :   Civil Action
6                                             :   No. 3:09CV620
   LAWSON SOFTWARE, INC.,                     :
7                                             :   January 5, 2011
                         Defendant.           :
8  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

9

10

11            COMPLETE TRANSCRIPT OF **JURY TRIAL**
           BEFORE THE HONORABLE ROBERT E. PAYNE
12       UNITED STATES DISTRICT JUDGE, AND A JURY

13

14

15   APPEARANCES:

16   Scott L. Robertson, Esq.
     Jennifer A. Albert, Esq.
17   **Michael T. Strapp, Esq.**
     **David M. Young, Esq.**
18   GOODWIN PROCTOR
     901 New York Avenue, NW
19   Washington, D.C.    20001

20   Craig T. Merritt, Esq.
     CHRISTIAN & BARTON
21   909 E. Main Street, Suite 1200
     Richmond, VA    23219-3095
22
                Counsel for the plaintiff ePlus
23

24
                   DIANE J. DAFFRON, RPR
25               OFFICIAL COURT REPORTER
                UNITED STATES DISTRICT COURT

MOMYER - DIRECT                    261

1   inventor along with Mr. Johnson.  Do you recall that?

2   A    Yes, I do.

3   Q    I'd like to move on now to this electronic

4   sourcing system and method, the inventions that are

5   subject of the patents that are at issue here if we

6   could.  All right?

7   A    Okay.

8   Q    Tab 1 in your witness notebook, I believe it's

9   Plaintiff's Exhibit No. 1, if you could go to column

10  1.

11          THE COURT:  That's also in your small book

12  there if you need to.

13  Q    And tab 2.  Thank you.

14      So we're on column 1 now of the '683 patent,

15  Exhibit No. 1.  Now, suggestion was made yesterday

16  that the Patent Office was unaware of the RIMS patent.

17  Did you disclose the RIMS patent to the Patent Office?

18  A    Yes, I believe so.

19          MR. McDONALD:  Objection, Your Honor.  This

20  is going to the validity issue.  Again, I thought we

21  were going to stick with infringement.

22          THE COURT:  Isn't it?

23          MR. ROBERTSON:  No, Your Honor.

24          THE COURT:  Why does it have to do with

25  infringement?

1              MR. ROBERTSON:  Because there's going to be

2      discussion as to scope of the claims and how they are

3      to be applied to the accused product.  And one of the

4      embodiments that was raised was this RIMS embodiment,

5      and I want to go and discuss in the claims whether

6      they are limited to that RIMS embodiment or whether

7      they are broader than that RIMS embodiment.  It was

8      raised during the opening statement as to whether RIMS

9      was the essential component of the claims.  So how the

10     claims are to be applied to the accused system depends

11     on how they are to be understood in the specification

12     of the patent itself.

13             THE COURT:  It's in the patent, isn't it?

14             MR. ROBERTSON:  Well, the -- I mean --

15             THE COURT:  What kind of testimony is this?

16     It sounds to me like expert testimony.

17             MR. ROBERTSON:  I just want to ask the

18     witness --

19             THE COURT:  Look, what you want to ask the

20     witness is one thing.  He's objected to the question

21     as invalidity.  Is it or not?

22             MR. ROBERTSON:  It's not, Your Honor.

23             THE COURT:  You heard his argument, Mr.

24     McDonald.  What do you say?

25             MR. McDONALD:  I think he can talk to him

MOMYER - DIRECT                              263

1  about RIMS and the difference between RIMS and the

2  claims.  That's fine.  But I don't see what the

3  disclosures to the Patent Office at this point in the

4  trial, why we need to go into that.

5           MR. ROBERTSON:  Let me ask it this way.

6  Q   Was RIMS one of the embodiments that we're

7  disclosed in the patent for requisition and purchasing

8  module?

9  A   Yes.

10 Q   Do you know whether or not in your review of the

11 specification --

12          THE COURT:  Wait a minute.  Are you saying

13 was RIMS disclosed as an embodiment of the patent, of

14 the invention?  Is that what your question was?

15          MR. ROBERTSON:  No.  I'm saying, Your

16 Honor --

17          THE COURT:  If that's the case, then this

18 case -- we don't have a case, do we?

19          MR. ROBERTSON:  No, Your Honor.

20          THE COURT:  Then ask the question a different

21 way.

22 BY MR. ROBERTSON:

23 Q   Was RIMS identified as one of a requisition

24 purchasing system that could be used as part of an

25 embodiment of the invention that you Mr. Kinross,

1    Mr. Johnson, and Mr. Melly invented?

2    A    Yes.

3    Q    Did you identify in the patent whether or not

4    there were some problems associated with the RIMS

5    requisition and purchasing system for use in the

6    patent?

7    A    Yes, we did identify several.

8    Q    Let me direct you, if I can, to the bottom of

9    column 1.  First, before I do that, at the top of

10   column 1, starting at about line 10 through line 16,

11   could we just -- is this the RIMS patent that we have

12   identified that you're one of the inventors, the '989?

13   A    That wording is pulled out of '683, yes.   '989 is

14   the RIMS patent.

15   Q    So it's saying here that there were a number of

16   known requisition and purchasing systems, is that

17   right, including this Fisher RIMS system?

18   A    Yes.

19   Q    Now, if you will look down at the bottom of column

20   1 starting at about line 60, going over to column 2

21   around line 2, what are you representing there to the

22   Patent Office with respect to these requisition and

23   purchasing systems which include the Fisher RIMS

24   system?

25   A    It identifies that there's some shortcomings to

1  the requisition purchasing systems, including RIMS,

2  for the ability to have a catalog be able to search

3  multiple catalogs and then move that information into

4  the requisition purchasing system.

5  Q    Are there any other problems that have been

6  identified with these requisition and purchasing

7  systems including RIMS in this section of the patent?

8  A    Yes.  As you look down column 2, maybe line 10,

9  computer systems for searching vendor catalogs are

10  limited, and only one such vendor catalog is

11  accessible to the user at any given time.  They were

12  also limited in they can only create a particular

13  vendor catalog database.

14  Q    You have to go a little slower, Mr. Momyer.

15  A    Sorry.  They were also limited in that they can

16  only create an order within the particular vendor

17  catalog database.  They cannot source items to be

18  requisitioned from a database containing multiple

19  catalogs or interact with the requisition purchasing

20  system or create a purchase order or orders including

21  the items located from the sourcing operation.

22  Q    Now, you discussed this RIMS system throughout out

23  the patent.  Let me ask you to go to column 4 at the

24  top.  Did you indicate to the Patent Office that this

25  RIMS system was necessary to your electronic sourcing

1  patent?

2  A    I think it's preferably but not necessarily in the

3  Fisher RIMS system is what it says in column 4.

4  Q    There's also a discussion here about a Technical

5  Viewer 2 Search Program called TV/2.  Do you see that

6  as well?

7  A    Yes.

8  Q    Are you familiar with that program?

9  A    Yes.

10  Q    It indicates in your patent that that was a

11  program that was available from IBM?

12  A    That's correct.

13  Q    Does it indicate that that program was necessary

14  to your invention?

15  A    The wording says preferably but not necessarily in

16  the Technical Viewer 2 Search Program.

17  Q    Let me direct you if I could to column 6 of the

18  patent beginning at about line 34 going down to about

19  line 39.

20  A    Column 6?

21  Q    Yes, sir.

22  A    Line 44?

23  Q    34.

24  A    34.  Okay.

25  Q    You state here the following description

MOMYER - DIRECT                    267

1  illustrates the use of the Fisher RIMS as a

2  requisition purchasing system and the TV/2 search

3  program as a search program; however, it will be

4  understood that the present invention is not limited

5  to such system or program.  Do you see that?

6  A    Yes, I do.

7  Q    Is that consistent with your understanding as to

8  what you disclosed in your patent?

9  A    Yes.

10 Q    Well, so you used the Fisher RIMS system to

11 describe certain features of functionality in your

12 patent.  Was it necessary to your patent to use the

13 Fisher RIMS system?

14 A    No, it was not.

15 Q    You also use the TV/2 search program to describe

16 certain capabilities and functionalities in your

17 patent.  Was it necessary for your patent, for your

18 electronic sourcing patent?

19 A    No, it was not.

20 Q    Can I just -- I put a juror notebook over on your

21 witness stand that the jury has, and in it starting at

22 tab 2 are the three patents that are at issue here.

23 And you'll see there are yellow tabs where the claims

24 appear.  And I'd like you to just briefly take a

25 moment to go through any of those claims and tell us

1    the end user never turns it on?

2    A    Yes.

3    Q    Now, I've asked you a lot about these documents, and I

4    don't want to repeat them all, but the types of documents we've

5    been talking about, technical manuals and guides and these

6    RFPs, are these the type of documents that an expert in your

7    field who is going to be offering opinions on the capabilities

8    and functionality of computer software would reasonably rely on

9    in forming opinions about the infringement issues that are at

10   issue in this case?

11   A    Yes, they are.

12   Q    And have you, in the past, in these patents and other

13   patents, relied on these kind of documents in rendering your

14   opinions?

15   A    I have.

16   Q    Did you have the opportunity to review the expert reports

17   of Lawson's technical witnesses?

18   A    Yes, I did.

19   Q    Did any of those materials assist you in formulating

20   opinions that you will be rendering in this matter?

21   A    Yes, they did.

22   Q    Just generally, you understand the patents to be directed

23   to the subject matter of electronic sourcing and procurement?

24   A    I do.

25   Q    Have you had any personal experience in your job to engage

515

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                  RICHMOND DIVISION

 3    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                      :
 4    ePLUS, INC.,                    :
                                      :
 5                    Plaintiff,      :
      v.                              :   Civil Action
 6                                    :   No. 3:09CV620
      LAWSON SOFTWARE, INC.,          :
 7                                    :   January 6, 2011
                      Defendant.      :
 8    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

 9

10

11            COMPLETE TRANSCRIPT OF JURY TRIAL
          BEFORE THE HONORABLE ROBERT E. PAYNE
12       UNITED STATES DISTRICT JUDGE, AND A JURY

13

14

15    APPEARANCES:

16    Scott L. Robertson, Esq.
      Jennifer A. Albert, Esq.
17    Michael T. Strapp, Esq.
      David M. Young, Esq.
18    GOODWIN PROCTOR
      901 New York Avenue, NW
19    Washington, D.C.   20001

20    Craig T. Merritt, Esq.
      CHRISTIAN & BARTON
21    909 E. Main Street, Suite 1200
      Richmond, VA   23219-3095
22
              Counsel for the plaintiff ePlus
23

24
              DIANE J. DAFFRON, RPR
25           OFFICIAL COURT REPORTER
          UNITED STATES DISTRICT COURT
```

1   would include suppliers, manufacturers, and

2   distributors.

3   Q    Did you apply those terms when you conducted your

4   infringement analysis?

5   A    Yes, I did.

6   Q    Just what's your understanding at a high level

7   overview of what these patents are about, sir?

8   A    The invention in the patents is to bring together

9   electronic technology so that we can have electronic

10  catalogs.  They can be kept in a database.  They can

11  be searched.  Items could be found.  Items could be

12  selected.  Items could be put on a requisition, and

13  then the requisition could be turned into a purchase

14  order.  And then depending on which claims we're

15  talking about, there's also the capability of checking

16  on whether an item is available in inventory and

17  taking one item and finding generally similar items

18  that you might want to substitute.

19  Q    The title in the patent says, "Electronic Sourcing

20  System and Method."  So what's your understanding of

21  the term "method" in the title of the patent?

22  A    A method is a process.

23  Q    What types of processes are we talking about in

24  this electronic sourcing system?

25  A    So these are steps that a computer would follow.

1490

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                    RICHMOND DIVISION

 4

 5    ------------------------------------

 6    ePLUS, INC.                      :     Civil Action No.
                                       :     3:09CV620
 7    vs.                              :
                                       :
 8    LAWSON SOFTWARE, INC.            :     January 13, 2011
                                       :
 9    ------------------------------------

10

11            COMPLETE TRANSCRIPT OF THE JURY TRIAL

12          BEFORE THE HONORABLE ROBERT E. PAYNE

13        UNITED STATES DISTRICT JUDGE, AND A JURY

14

      APPEARANCES:
15
      Scott L. Robertson, Esquire
16    Michael G. Strapp, Esquire
      Jennifer A. Albert, Esquire
17    David M. Young, Esquire
      Goodwin Procter, LLP
18    901 New York Avenue NW
      Suite 900
19    Washington, D.C.  20001

20    Craig T. Merritt, Esquire
      Christian & Barton, LLP
21    909 East Main Street
      Suite 1200
22    Richmond, Virginia  23219-3095
      Counsel for the plaintiff
23

24              Peppy Peterson, RPR
                Official Court Reporter
25            United States District Court
```

1  he's just testifying in his capacity as an employee

2  for Lawson.  So I don't think there was a requirement

3  for him to do an expert report.

4          THE COURT:  If he's giving expert testimony,

5  if he' testifying as an expert for Lawson, he has to

6  give a report.  I don't care whether he's an employee

7  or not.

8          MS. STOLL-DeBELL:  He wasn't professionally

9  retained to give expert testimony.

10          THE COURT:  You can't have an employee

11  professionally retained or otherwise give expert

12  testimony without a report.

13          MS. STOLL-DeBELL:  Okay.  I don't think it

14  matters because I don't think I'm asking him for

15  expert testimony.  I want to -- I think it goes to the

16  intent --

17          THE COURT:  You're just asking him whether he

18  thought Lawson did something different.

19          MS. STOLL-DeBELL:  Yes, were they different.

20          THE COURT:  Okay.  Why don't you ask him

21  that?

22  BY MS. STOLL-DeBELL:

23  Q   Did you think Lawson was doing something different

24  than the patents?

25  A   Yes.

CHRISTOPHERSON - DIRECT                    1576

1  Q    Did you have a meeting with your team members

2  regarding the lawsuit?

3  A    Yes.

4  Q    Did they agree with you?

5              MR. ROBERTSON:  Objection, Your Honor.

6              MS. STOLL-DeBELL:  Let me ask a better

7  question.

8              THE COURT:  Yes.  She's going to ask a

9  different question.

10 BY MS. STOLL-DeBELL:

11 Q    Did they agree with you that what Lawson was doing

12 was different than the patents?

13             MR. ROBERTSON:  Objection, Your Honor.  It

14 still calls for a legal conclusion, and it's

15 inappropriate expert testimony, and it's hearsay.

16             THE COURT:  It's sustained as hearsay.  It's

17 offered for the truth of the matter.  So it doesn't

18 have any nonhearsay use.

19 BY MS. STOLL-DeBELL:

20 Q    Was it your recommendation that Lawson not make

21 any changes --

22             THE COURT:  What did you do after this?  Ask

23 him.  Let him testify.

24 Q    What did you do after you read the patents?

25 A    I'll provided recommendation that in my belief, my

CHRISTOPHERSON - DIRECT          1577

1    reading, we weren't doing that patent, first, and that

2    they didn't need to do any changes with the software

3    that was currently available.

4          MS. STOLL-DeBELL:  I have no further

5    questions right now, Your Honor.

6          THE COURT:  All right.  Cross-examination.

7

8      CROSS-EXAMINATION

9    BY MR. ROBERTSON:

10   Q    Let's start with that last topic first if we

11   could, Mr. Christopherson.

12   A    Sure.

13   Q    You did something else, didn't you, sir, besides

14   making the recommendation that no changes would be

15   made to the software?

16   A    I'm not sure what you're referring to, sir.

17   Q    Lawson went out and sought a legal opinion with

18   respect to these patents, didn't they, sir?

19         MS. STOLL-DeBELL:  Objection, Your Honor.  I

20   don't think it's appropriate to get into whether we

21   got an opinion or not.  It's not relevant.

22         MR. ROBERTSON:  It goes to the whole intent

23   issue, Your Honor, under the *Broadcomm v. Qualcomm*

24   case.

25         MS. STOLL-DeBELL:  Your Honor, it goes to

CHRISTOPHER - CROSS                    1578

1    jury instructions that you're going to give, and I

2    think there's a disputed issue of law here on that

3    point.  And I think the law is clear that we don't

4    have to get into it.  It's just not relevant.  We

5    shouldn't be getting into this.  We have no duty to go

6    get an opinion.  And so he shouldn't be getting into

7    this.  It's prejudicial.

8           MR. ROBERTSON:  The door was opened, Your

9    Honor, when they asked him what he did and steps he

10   took.  And under the *Broadcom v. Qualcomm* case, if he

11   sought a legal opinion and then failed to disclose it,

12   that can go to the intent issue, and that's what I

13   want to ask him.

14          MS. STOLL-DeBELL:  I was going to say I asked

15   him what he thought and what he did.  I did not ask

16   him about any communications he had with any of

17   Lawson's attorneys outside or inside.  I was merely

18   asking him what he personally thought and what he did.

19   So it's outside the scope as well.

20          THE COURT:  Well, I don't think it is.  I

21   think it's fair cross-examination.

22          Just answer the question yes or no because

23   I'm going to have to take it question by question.  I

24   think what he did, whether he got a legal opinion, can

25   be considered depending on what the answer is.  If his

CHRISTOPHER - CROSS                    1579

1   answer was no, he didn't, then I'll tell the jury one
2   thing.  If the answer is yes, then I have to tell the
3   jury something else.
4         So the objection is overruled.  You may
5   answer the question whether you sought a legal opinion
6   respecting whether your products infringed.
7         MR. ROBERTSON:  Well, actually, I don't know
8   what the legal opinion says and whether it was
9   infringement, Your Honor, or was some other basis.
10         THE COURT:  All right.  You can ask your own
11   question.  Did you seek a legal opinion of any kind,
12   whatever?
13         MR. ROBERTSON:  Yes.
14   BY MR. ROBERTSON:
15   Q   I don't want to know the content of that because
16   that was privileged; however, the fact is you didn't
17   turn it over in discovery to ePlus; isn't that right?
18         MS. STOLL-DeBELL:  Objection, Your Honor.
19   That's really not relevant and it's outside the scope
20   of my direct examination and --
21         THE COURT:  I'm waiting to hear what you have
22   to say.  I thought you were conferring with Mr.
23   McDonald about what you were going to say.  And so I
24   just held everything in abeyance until you finished
25   your remarks.

CHRISTOPHER - CROSS                1642

1  whether it's on infringement or validity or both, but

2  it hasn't been turned over.  And the case stands

3  generally for the proposition that opinions of

4  counsel, whether it's for infringement or whether it's

5  for validity or both, and whether or not those

6  opinions have been turned over can be considered as

7  part of the intent prong of the indirect infringement.

8          THE COURT:  Where does it say that?

9          MR. STRAPP:  Well, Your Honor, Qualcomm's

10 position was that it couldn't.  The fact they hadn't

11 obtained an infringement opinion and that they had

12 obtained a validity opinion, but not turned it over,

13 couldn't be considered, and, therefore, the jury

14 instruction that had been submitted was incorrect.

15         THE COURT:  But that was on the issue of

16 willfulness.

17         MR. STRAPP:  Well, Your Honor, specifically.

18         THE COURT:  That's precisely what the

19 instruction says on page 12.

20         MR. STRAPP:  Your Honor, actually the

21 instruction went both to -- there was an instruction

22 on willfulness, and an instruction -- the specific

23 instruction that's at issue in this case was an

24 instruction on indirect infringement.

25         THE COURT:  Where is it?

1          MR. STRAPP:  Your Honor, it's at the bottom

2     of page 13 on the left column.

3          THE COURT:  Because opinion of counsel

4     evidence along with other factors may reflect whether

5     the accused infringer knew or should have known that

6     its actions would cause another to directly infringe,

7     we hold that such evidence remains relevant to the

8     second prong of the intent analysis.

9          MR. STRAPP:  Yes, Your Honor.

10         THE COURT:  Well, what evidence were they

11    talking about?  What the opinion was or the failure

12    provide it?

13         MR. STRAPP:  Your Honor, it was --

14         THE COURT:  Or failure to get it?  Excuse me.

15         MR. STRAPP:  It was the failure to obtain an

16    non-infringement opinion in that case.

17         THE COURT:  Okay.

18         MS. STOLL-DeBELL:  Your Honor --

19         THE COURT:  Just a minute.

20         MS. STOLL-DeBELL:  Okay.

21         THE COURT:  Okay.

22         MS. STOLL-DeBELL:  Okay, Your Honor.  If

23    we're looking at the totality of the circumstances and

24    this issue of whether we chose to waive privilege or

25    not comes into evidence, I think it is highly relevant

CHRISTOPHER - CROSS                    1644

1   to look at the evidence of the reexams as well.

2            THE COURT:  Wait a minute.  Just quit

3   bringing that reexam up.

4            MS. STOLL-DeBELL:  Your Honor --

5            THE COURT:  I don't want to hear about it

6   anymore right now.  I'm dealing with your objection to

7   the allowing the opinion in or the failure to disclose

8   the opinion in.  That's what I want to hear right now.

9   I'll deal with the other at some other time if it's

10  pertinent, but I certainly don't want to hear it as

11  part of this.

12           MS. STOLL-DeBELL:  Okay.  Going to this

13  issue, we did not fail to get opinions.  We got them.

14  We made a choice, as is our right, to not waive the

15  privilege on them and not disclose them to ePlus'

16  counsel.

17           I think this case is dealing with failure get

18  an opinion.  Mr. Strapp said that as well.  So that's

19  the first issue.

20           The second is I think it's very prejudicial

21  because we have no duty to go get an opinion.  The

22  case law says that.  The case is cited in here.  So by

23  talking about whether we got an opinion or not implies

24  to the jury that we had a duty and an obligation to

25  get one, which we did not.

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF VIRGINIA

 3                    RICHMOND DIVISION

 4

 5    ------------------------------------
                                         :
 6    ePLUS, INC.                        :    Civil Action No.
                                         :    3:09CV620
 7    vs.                                :
                                         :
 8    LAWSON SOFTWARE, INC.              :    January 14, 2011
                                         :
 9    ------------------------------------

10

11         COMPLETE TRANSCRIPT OF THE JURY TRIAL

12        BEFORE THE HONORABLE ROBERT E. PAYNE

13      UNITED STATES DISTRICT JUDGE, AND A JURY

14
      APPEARANCES:
15
      Scott L. Robertson, Esquire
16    Michael G. Strapp, Esquire
      Jennifer A. Albert, Esquire
17    David M. Young, Esquire
      Goodwin Procter, LLP
18    901 New York Avenue NW
      Suite 900
19    Washington, D.C.  20001

20    Craig T. Merritt, Esquire
      Christian & Barton, LLP
21    909 East Main Street
      Suite 1200
22    Richmond, Virginia  23219-3095
      Counsel for the plaintiff
23

24              Peppy Peterson, RPR
              Official Court Reporter
25          United States District Court
```

1868

1       THE COURT:  Even though there's a specific

2   case law that says that you can't draw --

3       MR. STRAPP:  Your Honor, all the cases

4   that --

5       THE COURT:  -- a negative inference that you

6   seek.

7       MR. STRAPP:  Your Honor, *Knorr-Bremse* is the

8   case on the adverse inference.  That's strictly

9   limited to willfulness.  That was the Federal

10  Circuit's only question addressing the other district

11  court case cited by Lawson in its papers, which is

12  also a willfulness case, and, in fact, distinguishes

13  itself from *Broadcom* because it's willfulness.

14      THE COURT:  That's the same argument as

15  you've made before.  I'm going on with life.  Let's

16  go.

17      Anything else?

18      MS. STOLL-DeBELL:  The only thing I wanted to

19  point out is I think you've got two proposed

20  corrective instructions here, Your Honor.  We think

21  ours is better.  It's shorter.  It's simpler and it

22  just gets to the issues that need to be addressed and

23  doesn't get into Mr. Christopher's opinion, which is a

24  completely separate issue.  He's not an attorney.  He

25  didn't waive privilege to give it.  He just said what

1869

1  he thought.  They opened the door when they asked him

2  what Lawson did after they learned of the patents.

3         So the questions I asked about that were

4  simply responding to the questions that ePlus asked

5  him.

6         THE COURT:  All right.  Thank you.

7         MS. STOLL-DeBELL:  Thank you.

8         THE COURT:  In my judgment, there's a fairly

9  substantial disconnect in the basic law applying to

10 opinions of counsel and how they can be used and how

11 they can't be used, but the law, as it exists, is, I

12 think, fairly clear on some points.

13        And the question is whether if an accused

14 infringer obtains an opinion of counsel and doesn't

15 waive the attorney-client privilege, the plaintiff or

16 patentee can use that fact as part of the totality of

17 circumstances that may be considered in adjudicating

18 by the finder of fact of the intent component of

19 induced infringement.

20        There is no case on the point that either

21 parted has cited.  The case of *Broadcom* deals with the

22 failure to obtain an opinion of counsel.  The

23 Knorr-Bremse decision provides that no adverse

24 inference shall arise from invocation of the

25 attorney-client and/or work product privilege.

2047

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                     RICHMOND DIVISION

4

5    ---------------------------------------
                                          :
6    ePLUS, INC.                          :    Civil Action No.
                                          :    3:09CV620
7    vs.                                  :
                                          :
8    LAWSON SOFTWARE, INC.                :    January 18, 2011
                                          :
9    ---------------------------------------

10

11          COMPLETE TRANSCRIPT OF THE JURY TRIAL

12          BEFORE THE HONORABLE ROBERT E. PAYNE

13        UNITED STATES DISTRICT JUDGE, AND A JURY

14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001

20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23

24              Peppy Peterson, RPR
               Official Court Reporter
25          United States District Court

Momyer -  Direct

2093

1    by disclosed?

2            MR. McDONALD:  Let me clarify it.

3    Q    Mr. Momyer, did you through a process of gathering

4    information --

5    A    Yes, I did.

6    Q    Let me finish the question because that's a pretty rough

7    question right there.  -- information in connection with your

8    patent application in this case?

9    A    Yes.

10   Q    And did that include some prior Fisher product materials?

11   A    Yes.

12   Q    So StockPro was one of them; right?

13   A    StockPro was one.

14   Q    And go to the second column.  There's one called

15   PurchasePro; do you see that?

16   A    Yes.

17   Q    Did you gather up literature about PurchasePro for

18   disclosure to the Patent Office?

19   A    One of the inventors may have.  I don't recall myself

20   pulling that together.

21           THE COURT:  Excuse me a minute.  When he asks him a

22   question about a particular part, it would be better if you

23   would zero in on the part of the text, if you can blow it up,

24   because it's hard to read those things.

25           THE WITNESS:  That's what I'm looking at right now.

Momyer - Direct

1    Q    And there's some other Fisher products, for example the

2    next one listed, Fisher Lightning product; is that right?

3    A    It's not up on the screen, but -- right now.

4    Q    We'll try to get it up on the screen for you here.

5    A    Yes, I see that.

6    Q    These were some prior Fisher products that would help with

7    the electronic order entry and purchasing and things like that;

8    correct?

9    A    That's correct.

10   Q    But you disclosed no literature at all to the Patent

11   Office, no publication at all that related to the RIMS system,

12   did you?

13           MR. ROBERTSON:  Objection, Your Honor.  No allegation

14   in this case whatsoever that the inventors withheld anything

15   material from the Patent Office.  There's nothing within the

16   Court's final pretrial order that was agreed upon that would

17   have any relevancy to whether or not they disclosed the RIMS

18   publication.  As Your Honor observed, they incorporated by

19   reference the RIMS patent.

20           MR. McDONALD:  This is testifying by Mr. Robertson at

21   this point.

22           THE COURT:  It's also something I think I've ruled on

23   and I think the witness testified about it earlier, if I

24   remember.  There's a statement about the RIMS patent in column

25   one right up at the top, and he said, yes, we told them that.

Momyer - Direct

2095

1   That's what -- whether you like that answer or not, that's the
2   one he gave before.  Has it changed?
3              MR. McDONALD:  Your Honor, I'm just clarifying that
4   there were no publications regarding the RIMS system that were
5   disclosed to the patent.  I don't think that's even disputed
6   yet at all, but --
7              THE COURT:  That's not an issue in the case.
8              MR. McDONALD:  Yes, it is.
9              THE COURT:  What is it?
10             MR. McDONALD:  That the RIMS brochure, the fact that
11  the RIMS system was on sale.  That is a discrete piece of prior
12  art --
13             THE COURT:  That doesn't mean it was disclosed.  You
14  don't content that it wasn't disclosed.  You contend that it
15  was on sale.  They are two different proof items.
16             MR. McDONALD:  Well, we're going to prove both, it
17  was on sale --
18             THE COURT:  Is that an issue in the case?  I don't
19  remember --
20             MR. McDONALD:  The fact that the RIMS system was on
21  sale as prior art --
22             THE COURT:  No, no, no.  I know that is an issue.
23  The failure to disclosure is not an issue.
24             MR. McDONALD:  They have disputed, and we dispute
25  that the patent --

Momyer - Direct

1      THE COURT:  That's not what I -- I just want you to

2   listen.  I think you need listen.  Is that, is the failure to

3   disclose an issue; yes or no?  Is it an issue that's in the

4   case?  Did you raise it as a defense?

5      MR. McDONALD:  It's not -- that answer -- it's hard

6   to answer that question because it is disputed whether or not

7   the Patent Office did consider it.

8      THE COURT:  That's not the issue, what they

9   considered.  It's what was disclosed.  Listen.  Are you

10  contending that there was a failure to disclose on the Patent

11  Office?  I don't remember it.

12     MR. McDONALD:  It's not a separate defense, Your

13  Honor, but it's part of our explanation of why the Patent

14  Office did what they did here, that it wasn't disclosed, and,

15  therefore, the Patent Office --

16     THE COURT:  Then the question is simply this:  Was

17  one of those brochures listed in the other publication; right?

18     MR. McDONALD:  Yes.

19     THE COURT:  Then ask that.  Quit using the words that

20  animate a defense that you haven't actually pleaded.

21  Q   Mr. Momyer, would you agree that at least here in the '683

22  patent -- if we can back up to that whole list of publications

23  and blow that up as best we can -- that there's no RIMS, no

24  reference to any RIMS publications or literature in that list?

25     MR. ROBERTSON:  I understand the Court's ruling.  I

1   Q    The second one, IBM Technical Viewer/2 product information

2   and brochure, IBM Corporation undated; right?

3   A    Yes.

4   Q    And so even though the TV/2 system is mentioned in the

5   body of the patent, you also disclosed and listed these other

6   publications involving TV/2; correct?

7   A    Yes.

8   Q    But you didn't do that for the RIMS system; did you?

9            MR. ROBERTSON:  Objection, asked and answered three

10   times.

11            THE COURT:  Yes.  I agree.  Sustained.  You don't

12   have to answer.

13   Q    Now, at the time -- if we can go back to the cover page

14   here, when this application for the patents-in-suit was filed

15   in August of 1994 --

16            THE COURT:  Excuse me, Mr. McDonald.  This is not the

17   application.  You said when this application.  This isn't the

18   application.  It's the final issued patent.

19            If you want to ask him about the application, then

20   get the application in front of him or -- you all have to

21   remember something.  You all deal with these terms all the

22   time.  The jury doesn't, and it's easy for the jury to be

23   confused, and I'd like you to make sure your question is

24   precise.  If you want to ask him about the application, do

25   that.  If you want to ask him about the patent, that's fine,

1    too.  Just be precise.

2              MR. McDONALD:  That's fair enough.

3    Q    Mr. Johnson, I think just to keep our dates straight here,

4    I think you talked about the RIMS application --

5              MR. ROBERTSON:  I think you misspoke.  You called him

6    Mr. Johnson.

7              MR. McDONALD:  At least I didn't call him Dr. Weaver.

8    Q    Mr. Momyer, you recall that the RIMS application for the

9    patent was filed in April of '93 'right?

10   A    Yes.

11   Q    I think we talked earlier, it was actually issued in '98;

12   correct?

13   A    Yes.

14   Q    So the patent application that gave rise to the '683

15   patent as shown here, that was filed in August of '94; correct?

16   A    That's correct.

17   Q    So at that point, the RIMS patent hadn't issued yet;

18   right?

19   A    Yes.

20   Q    So when you filed it, you weren't trying to tell the

21   Patent Office in August of '94 that the RIMS patent had

22   actually issued and would be considered prior art as an issued

23   patent, were you?

24             MR. ROBERTSON:  Objection, that lacks foundation and

25   calls for legal expertise that I'm not sure this witness has,

2128

1        (The jury is present.)

2        THE COURT:  Cross-examination.

3

4    CROSS-EXAMINATION

5  BY MR. ROBERTSON:

6  Q    Good morning, Mr. Momyer.

7  A    Good morning.

8        MR. ROBERTSON:  I'd like you to put the '683

9  patent up, Exhibit No. 1, specifically column 1

10  starting at line 10 going down to about line 17.

11  Q    You recognize this as the '683 patent, you're

12  patent?

13  A    Yes.

14  Q    I'm sorry?

15  A    Yes.

16  Q    Did you disclose in your patent and the Patent

17  Office that there were a number of known --

18        THE COURT:  Can you speak up, please.

19        MR. ROBERTSON:  Sure, Your Honor.  I'm sorry.

20  Q    Did you disclose to the Patent Office in your

21  patent that there are a number of known

22  requisition/purchasing systems that manage and process

23  requisitions and purchase orders, one such system is

24  the Fisher-Scientific Requisition and Inventory

25  Management System, Fisher RIMS, described in United

MOMYER - CROSS                2129

1   States No. 5,712,989 filed April 2, 1993, and assigned

2   to the Fisher-Scientific Company of Pittsburgh,

3   Pennsylvania, the disclosure of which is incorporated

4   herein by reference; do you see that?

5   A   Yes, I do.

6   Q   Did you make that representation to the Patent

7   Office?

8   A   Yes.

9   Q   Why did you do that, sir?

10  A   Well, RIMS was an inventory control purchasing

11  requisition system, and we actually would use the

12  basis for RIMS to build the component for the

13  electronic sourcing application.

14  Q   So did you want them to be aware that such a

15  system existed out there?

16  A   Yes.

17  Q   Can you go down to about line 35?  Just the first

18  two lines.  There's a statement in your patent that

19  says, Other requisition/purchasing systems can be

20  grouped broadly into four classes; do you see that?

21  A   Yes.

22  Q   Just generally, if you would just refer to your

23  patent, did you go on to describe for the Patent

24  Office what those four classes of requisition

25  purchasing systems were?

MOMYER - CROSS                    2138

1   starting at about line 20.  If you could read over to

2   the top of page 100.

3   A    Page --

4   Q    99 starting at line 20 at the bottom.

5   A    Okay.

6   Q    And going over.

7   A    Sorry, Mr. Robertson.  I'm having trouble with the

8   page.  93, 94 to 97, 98 to what?

9          MR. ROBERTSON:  99, starting at line 20.  It

10  says, Question:  Welcome back.

11  A    99, line 20, yes, I see that.

12  Q    Why don't you read that over to page 100 down

13  through line 9.  Just read it to yourself, sir.

14  A    How far did you want me to read?

15  Q    Down to line 9.

16  A    Okay.

17  Q    Now, you were asked a question concerning when the

18  RIMS product was complete.  Do you see that shortly

19  after the luncheon break?

20  A    Yes.

21  Q    Does that fresh your recollection now as to what

22  you told the attorney under oath in your testimony as

23  to when the RIMS system was completed?

24  A    Yes.

25  Q    What does it refresh your recollection to be and

MOMYER - CROSS                                        2139

1  what did you indicate there?

2  A    Pretty much what I just said.  We continue

3  developing RIMS up until I left Fisher.

4          MR. McDONALD:  Your Honor, I don't know what

5  he's referring to at this point, but I think the

6  question and answer should just be red.

7          MR. ROBERTSON:  I'm happy to do that, Your

8  Honor.

9          THE COURT:  He asked if it refreshed his

10 recollection, and he said yes.  What was the

11 recollection that was refreshed?  He's entitled to

12 answer how it was refreshed.  And if you'd like to

13 read the question and answer, both of you, go ahead.

14 BY MR. ROBERTSON:

15 Q    Well, I thought you had answered the question, but

16 I understood you to say it refreshed your

17 recollection.  So what recollection was refreshed by

18 referring to this testimony that you gave under oath?

19 A    My recollection was that the RIMS system was an

20 evolutionary system that continued to be developed

21 over a period of time up to and through 2000, 2003.

22 Q    Is it your testimony there under oath consistent

23 with your recollection now?

24 A    Yes.

25 Q    Can we just go to the RIMS patent?  The RIMS

1  system is mentioned multiple times in your patent; is

2  that right?

3  A    Yes, it is.

4  Q    I've got just a graphic here of your '683 patent.

5  If we could just go along.  Do you know how many times

6  RIMS is mentioned in this patent?

7  A    No, I don't.

8  Q    I've indicated here in red in each instance that

9  the RIMS system or the RIMS features or capabilities

10  are described or as modified.  If we could just scan

11  through this.  This is column 1 and 2, there's 3 and

12  4, 5 and 6, 7 and 8, 10, columns 11 and 12, 13, 14,

13  15, 16, 18.  All right.  Would it surprise you, sir,

14  if you disclosed RIMS functionality and feature in

15  your patent more than 55 times in your patent

16  application?

17  A    No.

18  Q    You weren't trying to mislead the Patent Office by

19  withholding descriptions of what the RIMS capability

20  was, were you?

21  A    No, I wasn't.

22  Q    Can you tell us whether or not you think you fully

23  disclosed the features and capability and the

24  revisions and modifications that were necessary in

25  order to come up with your electronic sourcing

Kinross - Direct

2211

1        MR. ROBERTSON:  Objection, Your Honor.  This has been

2    gone over in direct examination already.

3        MR. McDONALD:  I'm trying to tie it into this

4    timeline, Your Honor.  Now that we have some clarity on the

5    timing of everything, I think it's helpful to put it in the

6    context.

7        MR. ROBERTSON:  Same timeline.

8        THE COURT:  It seems to me like we're plowing old

9    ground, Mr. McDonald, and remember what I told you before we

10   started today?  Let's go ahead.

11   Q    I'd like to now turn, Mr. Kinross, to how much demand

12   there was for the system.  We can take this off the screen

13   now -- for the system that corresponds to the patents that have

14   been asserted in this case.

15       Now, the SupplyLink was the brand name used for the system

16   described in the three patents in this case; right?

17   A    Yes.

18   Q    Is it true that only a small portion of RIMS customers

19   ever adopted the SupplyLink system to use with RIMS?

20   A    Well, I think the system would have replaced RIMS, not

21   been used with RIMS.

22   Q    Well, did some portion of RIMS customers adopt the

23   SupplyLink system to use with RIMS?

24   A    Well, no.  If you are getting SupplyLink, you don't need

25   RIMS anymore.

Kinross - Direct                                                    2212

1    Q    Turning to the patents-in-suit in, the patents-in-suit are

2    referred to as the RIMS system, RIMS in a number of places;

3    right?

4    A    Yes.

5    Q    Are there any places in any of the three patents-in-suit

6    where the RIMS system is specifically identified as prior art?

7    A    I couldn't tell you.  If I'd have to do a search to see

8    prior art.

9    Q    You would agree that no documents related to the RIMS

10   system are identified on the cover pages of any of the three

11   patents-in-suit as a reference cited, wouldn't you?

12          MR. ROBERTSON:  Objection, Your Honor.  I mean, I

13   don't even know the relevancy of that question, but I don't

14   know how he could possibly have that in his memory.

15          MR. McDONALD:  We can refer to the patents if you

16   need to, Mr. Kinross, if you don't know the answer.

17          MR. ROBERTSON:  We have a stipulation, Your Honor,

18   that the '989 is incorporated by reference in the patents.

19          MR. McDONALD:  That's not what we're taking about.

20   That stipulation has nothing do with my question.

21          THE COURT:  You asked what was disclosed.

22          MR. McDONALD:  Disclosed as a reference cited on the

23   cover of these patents as part of the information disclosure

24   process.

25          THE COURT:  Whether it was disclosed on the cover or

Kinross - Direct

1   disclosed in the text doesn't make any difference.

2          MR. McDONALD:  Well, it makes a difference if that

3   one is prior art and the other one isn't.

4          THE COURT:  Depends.

5          MR. McDONALD:  Well, the information in the

6   disclosure statement is where --

7          THE COURT:  I'm not going to get into that.  Reframe

8   your question.

9   Q   Would you agree with me that there are --

10         THE COURT:  You've got a showing -- do you want me to

11  show you how to do it?  You ask him, do you know what the prior

12  art references are on the patent, and if he says, yes, then you

13  say, okay, did they include that.  If he says no, then you show

14  him the patent.

15         That's how you do it.  He's told you three times he

16  does not remember everything in these patents or the other

17  ones, so just ask him the right way, and we will get going.

18  I'm going to put an end to it if we don't get going.

19         MR. McDONALD:  I'm about wrapped up anyway, Your

20  Honor, but I'll --

21         THE COURT:  All right.  Do it the right way.

22  Q   Mr. Kinross, could we go ahead and just put Plaintiff's

23  Exhibit 1, the '683 patent, up on the screen so you'll know

24  what we're talking about.

25         Go to the first page there, the part references cited --

Kinross - Direct

1    there's a section, do you see in the lower left of what's blown

2    up on the screen, Mr. Kinross, the words references cited?

3    A    Yes, I see that.

4    Q    And over on the right side -- let's leave that up the way

5    you had it, Bill -- there's a list of patents.  That list of

6    patents doesn't include the RIMS patent.  That's number

7    5712989; correct?

8                THE COURT:  You mean under references cited?

9                MR. McDONALD:  Yeah, under the U.S. patents

10   documents, references cited.

11   Q    It does not include 5719 -- excuse me, 5712989; correct?

12               MR. ROBERTSON:  For the record, Your Honor, let me

13   pose a relevancy objection.

14               THE COURT:  I think it's fairly obvious from reading

15   the patents whether it's in there or not, but let's go.  Let's

16   get to it.

17   A    I don't see it under references cited, no.

18   Q    Then there's a few entries under the title other

19   publications on this page; right, Mr. Kinross?  Right side

20   there?

21   A    Yes.

22   Q    And there's no reference to any RIMS publications there;

23   correct?

24   A    That's correct.

25   Q    If we go to the next page of the document, please, the

2215

```
 1    patent, the other publications listed there, give you a chance
 2    to look at that.  There are some Fisher Scientific product
 3    publications listed on this page of the patent under the
 4    heading other publications; right?  Systems such as the
 5    Lightning system or StockPro?
 6    A    Fisher StockPro, systems by Fisher inventory management
 7    system.
 8    Q    Do you see any Fisher references in the other publications
 9    page here to a publication regarding the Fisher RIMS system?
10         MR. ROBERTSON:  Your Honor, I object.  This is fairly
11    cumulative.  We went through this exercise with Mr. Momyer.  I
12    don't know why we need to do it again.
13         THE COURT:  I am assuming that you have some question
14    that followed up there.  If that was the only purpose, was to
15    establish what was there, then that's the end of it.  Do you
16    have some following question?
17         MR. McDONALD:  I don't have any other questions.
18         THE COURT:  Thank you.  Can he be excused
19    permanently?
20         MR. ROBERTSON:  May I cross-examine him, Your Honor,
21    or redirect briefly?
22         THE COURT:  Can you what?
23         MR. ROBERTSON:  Can I cross-examine the witness?
24         THE COURT:  I thought you had an opportunity to
25    cross-examine.
```

2272

1            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                 RICHMOND DIVISION

3    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                      :
4    ePLUS, INC.,                     :
                                      :
5                    Plaintiff,       :
     v.                               :   Civil Action
6                                     :   No. 3:09CV620
     LAWSON SOFTWARE, INC.,           :
7                                     :   January 19, 2011
                     Defendant.       :
8    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

9

            COMPLETE TRANSCRIPT OF **JURY TRIAL**
10       BEFORE THE HONORABLE ROBERT E. PAYNE
         UNITED STATES DISTRICT JUDGE, AND A JURY
11

12

13

14   APPEARANCES:

15   Scott L. Robertson, Esq.
     Jennifer A. Albert, Esq.
16   **Michael T. Strapp, Esq.**
     GOODWIN PROCTOR
17   901 New York Avenue, NW
     Washington, D.C.   20001
18

19   Craig T. Merritt, Esq.
     CHRISTIAN & BARTON
20   909 E. Main Street, Suite 1200
     Richmond, VA   23219-3095
21
              Counsel for the plaintiff ePlus
22

23

24            DIANE J. DAFFRON, RPR
            OFFICIAL COURT REPORTER
25        UNITED STATES DISTRICT COURT

1    to testify about.  So he's not testifying as an expert

2    on infringement or validity.  He's just saying this is

3    what I sold and here's its features.

4              THE COURT:  What is his doctorate in?

5              MR. SCHULTZ:  Electrical engineering.

6              MR. McDONALD:  I don't know if that's

7    relevant.

8              THE COURT:  It sounds to me like he's an

9    expert.

10             MR. McDONALD:  No, no, no.  He was there

11   selling this product.  He was the head of the company.

12   I don't think we'll make a big deal about his

13   doctorate.  He's a computer guy just like the IBM

14   people or the other folks.  He just knows something

15   about computers.  He's not an expert.  And I don't

16   think the jury was confused about that with these

17   other witnesses, and I don't think they will be

18   confused with Mr. Staats.

19             MR. ROBERTSON:  Your Honor, the confusion may

20   be resulting because at one point Lawson tried to

21   substitute Dr. Staats for Dr. Shamos and dropped Dr.

22   Shamos.  You ruled that he couldn't testify as an

23   expert.  They are representing he's going to be

24   testifying about this J-CON system.  It's going to

25   come up with respect to the slides that we want to

2301

1     MS. STOLL-DeBELL:  P.O. Writer.  And he cites

2  to the various documents, in this case it's DX 17, to

3  show where P.O. Writer teaches this element.

4     THE COURT:  All right.

5     MS. STOLL-DeBELL:  Then skip column R and go

6  to column S.

7     THE COURT:  S is his opinion re:  J-CON.

8     MS. STOLL-DeBELL:  Yes.

9     THE COURT:  Okay.

10     MS. STOLL-DeBELL:  And in this column you can

11  see he has quotes from the J-CON manual about where

12  J-CON teaches this element.

13     THE COURT:  Yes.

14     MS. STOLL-DeBELL:  He does this for every

15  element, which I agree, is required by KSR.  You must

16  say where in each reference you're using in your

17  obviousness combination that reference teaches these

18  claim elements.

19     THE COURT:  But nowhere does he explain in

20  this chart how the combination renders the matter

21  obvious.  He does explain, according to you, and he

22  does this -- it's a funny way of saying things and

23  doing things, but it perhaps can be read to say that

24  P.O. Writer, standing alone, it helps render it

25  obvious.  But, you see, the problem is he's really --

2302

1  this chart is built around anticipation, right?

2          MS. STOLL-DeBELL:  No.

3          THE COURT:  Yes.

4          MS. STOLL-DeBELL:  No.

5          THE COURT:  And then he says -- this is the

6  argument you made before.  You told me to do this, and

7  I kind of understood it then.  You said you take the

8  chart, and it was anticipation, and then if you read

9  the text of 236 it says to the extent it's not

10 anticipated, it's obvious, and you say it's the same.

11 Then as to a single reference, I can understand that

12 perhaps that's one way to read this.  Are you

13 following me?

14         MS. STOLL-DeBELL:  I am, and I think that --

15         THE COURT:  That's what you just told me,

16 right?

17         MS. STOLL-DeBELL:  I told you earlier, yes.

18 There is obviousness for a single reference in this

19 chart.  There's obviousness for a combination of

20 references and there's anticipation.

21         THE COURT:  Where is the obviousness for the

22 combination of J-CON and P.O. Writer in this chart?

23         MS. STOLL-DeBELL:  This chart, all it does is

24 say where each reference teaches each claim element.

25 Then you go back to the report.

2303

1    THE COURT:  Which report?  Where?

2    MS. STOLL-DeBELL:  To his report.

3    THE COURT:  What paragraph?

4    MS. STOLL-DeBELL:  Well, let's look at

5    paragraph 104.  That's where he says, My Exhibit 3 is

6    an invalidity chart.  And it deals with anticipation

7    and obviousness.  And he also explained this to

8    Ms. Albert in his deposition.  You have to read them

9    together, Your Honor.

10    THE COURT:  Do you have to read them

11    together, but nowhere do I see where the combination

12    is explained.  That's what I'm trying to get to.

13    MS. STOLL-DeBELL:  So there are two parts you

14    have to show for obviousness.

15    THE COURT:  And I don't want to have any

16    general sentence or statement.  I want it he says in

17    paragraph such and such at sentence such and such that

18    there is this combination analysis that's made for

19    these two things.  Where does he say that?

20    MS. STOLL-DeBELL:  We go back to 236.  But

21    what I'm saying, Your Honor, for obviousness you have

22    to have two things, right?  You have to have an

23    element by element analysis to show that somewhere

24    within your combination of references they teach all

25    of the elements of the claim.  That's what

2304

1    Mr. Robertson was saying with KSR.  That's what the

2    claim chart does.

3            Then you also have to show for obviousness

4    that there is a reason to combine them together.

5    That's what paragraph 236 does.

6            THE COURT:  But the predicate is that there

7    are two elements that are combined, and he doesn't say

8    that in the chart that I see.

9            MS. STOLL-DeBELL:  No, he says that in

10   paragraph 236.  He says all of the elements for both

11   references are taught in Exhibit 3.  And I would

12   combine them for these reasons.

13           THE COURT:  Where?

14           MS. STOLL-DeBELL:  236.

15           THE COURT:  I'm trying to get there.  Okay.

16   All right.  Okay.  Excuse me.

17           It is my opinion that such claim would have

18   been obvious in view of the combination of J-CON with

19   P.O. Writer, right?

20           MS. STOLL-DeBELL:  Yes.

21           THE COURT:  Where does he say the reasons?

22   The only thing that I see that remotely resembles

23   reasons in 236 is -- that's a conclusion that he just

24   stated.  The reasons sentence is as follows:  The same

25   reasons for making the previous two combinations

1   apply.  Now, what are the previous two combinations?

2           MS. STOLL-DeBELL:  So we have to go to -- he

3   talks about RIMS plus Dworkin.  That's the first of

4   the two.  And that starts at paragraph 65.

5           THE COURT:  What's the next one?

6           MS. STOLL-DeBELL:  I'm sorry.  Page 65, Your

7   Honor.

8           The second combination is J-CON plus Dworkin,

9   and that starts at paragraph 230 on page 67.  So --

10          THE COURT:  Page what?

11          MS. STOLL-DeBELL:  Page 67, paragraph 230.

12  In both of those he explains that all of the claims he

13  believes are obvious as shown in Exhibits 3 and 4.

14          So, for example, I'm reading paragraph 230 of

15  page 67.  And then he goes on to explain his reasons.

16  EPlus contends that J-CON is a single source system.

17  P.O. Writer is a multiple source system.  Or he says

18  that with J-CON and Dworkin.

19          THE COURT:  But he's not going to testify

20  about it.

21          MS. STOLL-DeBELL:  He's not.

22          THE COURT:  About RIMS plus Dworkin.

23          MS. STOLL-DeBELL:  He's not actually.

24          THE COURT:  Where are the imported reasons

25  then?  Help me with -- let's take what begins on page

2306

1   65 with the combination of RIMS plus Dworkin, 940.

2   Where is the reason?

3        MS. STOLL-DeBELL:  Well, so the reasons start

4   at paragraph 225 on page 66.  But, Your Honor, I'll

5   tell you that Dr. Shamos, as far as his reasons for

6   combining J-CON and P.O. Writer, he looks at what he

7   says in paragraph 236 for that.  And then he will rely

8   on what he says in this claim chart for the element by

9   element analysis.

10       So I don't intend to have him get up and talk

11  about RIMS plus Dworkin or --

12       THE COURT:  But he can't even do -- so you're

13  not -- you're taking that sentencing out of the

14  equation then?

15       MS. STOLL-DeBELL:  Yes, because I don't think

16  we need it.  I think he's got a reason why he would

17  combine J-CON and P.O. Writer in paragraph 236 and

18  that's what he'll testify to.

19       THE COURT:  I'm not talking about that.

20  You're taking out the sentences, out of 36, that the

21  same reasons for making the previous two combinations

22  applies to combining J-CON system as described in the

23  J-CON system with P.O. Writer Plus V 10 as described

24  in the P.O. Writer Plus manual.  You're taking all of

25  that out.

2307

1      MS. STOLL-DeBELL:  I'm taking all of that out

2 except to the extent that they say his opinions on

3 element by element are shown in Exhibits 3 and 4.

4      THE COURT:  Where is Exhibit 3 and 4?

5      MS. STOLL-DeBELL:  Exhibit 3 is this claim

6 chart we just looked at.  That's Exhibit 3.

7      THE COURT:  Okay.  What's 4?

8      MS. STOLL-DeBELL:  Four is just a shorter --

9 a shorter version of this.

10      THE COURT:  Of 3?

11      MS. STOLL-DeBELL:  Yes.  It doesn't get into

12 the actual citations.

13      THE COURT:  Okay.

14      MS. STOLL-DeBELL:  I don't think we need to

15 look at Exhibit 4.

16      THE COURT:  Then that takes us back to

17 whether this claim chart that he did shows a

18 combination.

19      MS. STOLL-DeBELL:  I agree.

20      THE COURT:  Where does he show a combination?

21      MS. STOLL-DeBELL:  It shows where each

22 reference teaches each element.  The reason to combine

23 those references are in paragraph 236 of his report.

24      THE COURT:  And the reason is, "It is my

25 opinion that such claim would have been obvious in

2308

1   view of the combination of J-CON with P.O. Writer," is

2   that right?

3           MS. STOLL-DeBELL:  Plus it goes on to say,

4   The P.O. Writer system provided a multiple vendor

5   capability demanded by the industry at and before the

6   time of the invention.  J-CON included features that

7   one of ordinary skill in the art would be motivated to

8   use with the P.O. Writer system including additional

9   details about performing cross referencing of data

10  relating to an item or requisition to determine an

11  alternative source for the same item and/or an

12  acceptable substitute for the item initially selected.

13          THE COURT:  Where does he talk about the

14  Exhibits 3 and 4 in this paragraph?

15          MS. STOLL-DeBELL:  I think he mistakenly did

16  not refer to Exhibit 3 in this paragraph, Your Honor,

17  so for that I would refer back up to the two earlier

18  combinations, paragraph 224 and 230, where he says his

19  obviousness opinions are shown in Exhibit 3, which is

20  the one we're talking about here.

21          THE COURT:  What paragraph?

22          MS. STOLL-DeBELL:  Paragraph 224.

23          The second to last line of paragraph 224 on

24  page 65, he says the combination teaches all of the

25  elements of the asserted claims.  And then if you go

2309

1    on to page 66, first line, As shown in Exhibits 3 and

2    4.

3              THE COURT:  Exhibits 3 -- I mean, 4 is

4    nothing but something less than 3?

5              MS. STOLL-DeBELL:  Yes.

6              THE COURT:  So I don't need to pay attention

7    to it.

8              MS. STOLL-DeBELL:  No.  Then he does the same

9    thing again at paragraph 230.  He says the combination

10   teaches all of the elements.  I'm at page 67,

11   paragraph 230, THE fourth line down.  The combination

12   teaches all the elements of the asserted claims as

13   shown in Exhibit 3.

14             THE COURT:  Okay.

15             MS. STOLL-DeBELL:  I mean he should have said

16   that again for J-CON and P.O. Writer, but he did refer

17   back up.  So he was maybe being shorter than what he

18   should have been.  But the bottom line is the

19   combination is taught in Exhibit 3.

20             THE COURT:  All right.

21             MS. STOLL-DeBELL:  Which is the claim chart

22   in front of you.  Also, Your Honor, at paragraph 104

23   of his report, which is on page 27 -- actually, I'm

24   sorry.  It's paragraph 102 at page 26.

25             THE COURT:  104 says to the extent that any

2310

1   reference.

2          MS. STOLL-DeBELL:  I meant to direct you to

3   paragraph 102, page 26.  I'm sorry.

4          THE COURT:  102.

5          MS. STOLL-DeBELL:  This is talking about what

6   Exhibit 3 is, which is the claim chart that you looked

7   at.

8          Exhibit 3 is an integral part of his report

9   and contains a claim chart demonstrating the

10  invalidity of each asserted claim.

11         Exhibit 3 is a spreadsheet in which the rows

12  are claim elements and steps and columns are prior art

13  references.  A cell corresponding to an element and a

14  reference contains text if the element is disclosed in

15  the reference or is obvious in light of the reference.

16  The color coding is explained.

17         THE COURT:  All right.  Anything else?

18         MS. STOLL-DeBELL:  Yes.  In his deposition,

19  he explained this in detail.  They asked him.  "Are

20  you asserting the combination of J-CON and P.O.

21  Writer?"

22         He answered:  Yes.

23         Ms. Albert went through -- she printed up her

24  version of that Exhibit 3 and he went through and he

25  explained exactly what it meant, and that it did, in

2311

1  fact, show both anticipation and obviousness.  And

2  walked her through exactly how it was and how the

3  combinations worked and how they tied back to his

4  report.

5          THE COURT:  What does that do?  Because he's

6  to do this in perspective of his report, not in his

7  deposition.  Do you understand?

8          I think maybe you-all have lost sight of

9  something.  In 1993, the federal rules were amended.

10 They were amended to prohibit just this sort of

11 gamesmanship that's going on here.  They were amended

12 to say that an expert must put in his report all of

13 the things that he's going to rely on, the statement

14 of reasons, and it must be complete.

15         The very idea, if you look at the history of

16 it, was to allow me as the receiver of the report to

17 decide, Well, I'm happy to just rely on this

18 deposition if I want to because it's got everything in

19 it.  And the other reason was that the expert cannot

20 go beyond what was in that report.  And if he steps

21 one foot outside that boundary, he cannot testify to

22 that issue.  And you-all seem to have the view that

23 these rule changes didn't mean anything.

24         And this expert is -- this is the amazing

25 thing to he me about the way this guy has done his

1    cross-examination.  And that's what has to be done

2    here.  That's the cure.  Plus the need to have its own

3    expert reassess all of the testimony now being offered

4    in the form that it's now being offered in order to

5    adjust to the surprise.

6            And that would be a method that conceptually

7    could be available to cure, but to do that would allow

8    this testimony, if presented, by Dr. Shamos to disrupt

9    the trial.  And I don't really have any good

10   explanation on the record for failure to sort this out

11   in the way that they were going to use it at trial.

12           I've told the parties from the beginning they

13   needed to sort this out specifically.  And I on

14   numerous occasions said the consequence can be

15   exclusion, and you need to be aware of all that and

16   tried to give the parties an opportunity to make sure

17   they understood what the consequence were.  And so I

18   don't find the explanation for the failure to disclose

19   what should have been disclosed adequate.  And the

20   importance of the testimony, it's the lynchpin of the

21   J-CON, P.O. Writer obviousness argument, and so it's

22   critical, and it's important to both sides, obviously.

23           Applying all those tests, I find that there

24   has been a failure to disclose as required, and the

25   sanctions are imposing of attorneys' fees, inform the

2356

1    jury of the failure are other sanctions including any

2    of the others listed in 37(D)(2)(a) 1 through 6 and

3    (B)(2)(a) 1 through 6, directing that matters embraced

4    in the order or other designated facts be taken as

5    established for purposes of the action as the

6    prevailing party claims, prohibiting the disobedient

7    party from supporting or opposing designated claims of

8    defenses or from introducing designated matters in

9    evidence, striking pleadings in whole or in part,

10   staying further proceedings until the order is obeyed,

11   dismissing the action or proceeding in whole or in

12   part, rendering a default judgment against the

13   disobedient party.  I believe that's the right

14   reference, (a) 1 through 6.

15          So the remedy here is, the only practical

16   remedy given the situation, is to preclude the

17   testimony of Dr. Shamos on the issue of combination of

18   J-CON and P.O. Writer.  The motion to that extent is

19   granted.

20          Now, you said there's something else about

21   Dr. Staats.

22          MR. ROBERTSON:  Yes, Your Honor.  Can I refer

23   you back to Dr. Shamos' report beginning at page 68?

24          THE COURT:  Well, let me ask you this

25   fundamental question.  Can an invalidity or

2372

1   evidence that Staats would give about the J-CON system

2   is relevant to support the opinions that Shamos would

3   give in 242, 246 and 247. Why can't Shamos do that?

4   I mean, why can't Staats do that?

5        MR. ROBERTSON: Dr. Staats would give Dr.

6   Shamos' opinions in those paragraphs?

7        THE COURT: Oh, come on.

8        MR. ROBERTSON: I don't understand.

9        THE COURT: For Pete's sake. Just listen.

10  What she said, and it's simple as it can be, and I

11  don't want to spend a lot of time reiterating things

12  you're not listening to. Staats testifies about the

13  components and the operation of J-CON, she says, in

14  order to provide a factual basis for this testimony

15  forecast in paragraphs 242, 246 and 247 of the Shamos

16  report, which go to the secondary considerations,

17  which secondary considerations are pertinent still in

18  the case because there still is an obviousness issue

19  on RIMS and TV/2.

20       Why can't Staats testify about that topic,

21  that kind of topic?

22       MR. ROBERTSON: Well, if Staats can testify

23  he has a prior art system that he says allowed

24  comparison shopping among multiple vendors, and that's

25  it, then if it's limited to that, fine. If it's going

2373

1    to be 2 1/2 hours of him describing the entire system

2    that is no longer relevant to invalidity, I don't

3    understand what the purpose is.  If he wanted to say,

4    for example, that --

5              THE COURT:  No.  So he can do that as long as

6    his testimony is confined to those issues.

7              MR. ROBERTSON:  On paragraphs 242, 246 --

8              THE COURT:  Yes, that's what she said.

9         She also says that this issue of J-CON being

10   combined with P.O. Writer can go to the jury without

11   an expert, and that your objection to Staats'

12   testimony on other aspects of the J-CON operation is

13   not well taken even in the face of the ruling that

14   keeps out Dr. Shamos' testimony on that issue because

15   the issue can go to the jury without an expert.

16         Isn't that your second point, Ms.

17   Stoll-DeBell?

18             MS. STOLL-DeBELL:  Yes, Your Honor.

19             THE COURT:  What's your response to that?

20             MR. ROBERTSON:  My response to that is I

21   haven't had an opportunity to look at the case she's

22   referenced.  I don't believe that that is, in fact,

23   the case, but if it is, I'm certain it's going to be

24   in a case that is of such simple technology with a

25   lack of complexity that the cases that I have cited to

2374

1  Your Honor in which an expert has to provide some sort

2  of roadmap and guidance.

3          THE COURT:  Have you got the case?

4          MS. STOLL-DeBELL:  I do.

5          THE COURT:  Give it to him.

6          I'm going to take a break and let the court

7  reporters shift, and I'll finish this up, and then

8  we're going to get going with the testimony.

9          MS. STOLL-DeBELL:  We're going to deal with

10  all this issue and ask only that Staats be put on to

11  do a factual predicate for paragraphs 242, 246 and

12  247, and withdraw our request to put the issue of

13  J-CON plus P.O. Writer -- whatever paragraphs I said.

14          THE COURT:  You said 242, 246 and 247.  And

15  he's saying 244.  And you didn't talk about that.

16          MS. STOLL-DeBELL:  Your Honor, I guess I

17  missed a paragraph when I was talking about it.

18          THE COURT:  You want to include 244?

19          MS. STOLL-DeBELL:  Yes, I would.

20          THE COURT:  That's all right.  That happens.

21          MS. STOLL-DeBELL:  But we're going to

22  withdraw our request to put P.O. Writer plus J-CON to

23  the jury without an expert.

24          THE COURT:  All right.  Thank you.

25          We'll take a recess and we'll come can and he

2375

1    can testify to that.

2              How long will his testimony be?

3              MR. SCHULTZ:  About 45 minutes, Your Honor.

4              THE COURT:  All right.  Thank you very much.

5    We'll take a recess.  Tell the jury.

6              Did we order lunch for them?

7              MR. LANGFORD:  They are eating downstairs.

8              THE COURT:  Are they down there now?

9              MR. LANGFORD:  No.

10             THE COURT:  Can they go on down there now?

11             MR. LANGFORD:  Yes.

12             THE COURT:  Let's let the jury go to lunch

13   and we'll take a lunch recess.  Then we'll come back

14   at 1 o'clock and be ready to go with the whole

15   shooting match including Dr. Shamos.

16             Thank you.

17             (Luncheon recess at 12:01 p.m.)

18

19

20

21

22

23

24

25

1    sort of a long-felt but unmet need that the patents-in-suit

2    would have addressed?

3    A    Yes.   Long-felt and unmet need is very close to failure of

4    others.

5    Q    Did you find that there was some long-felt but unmet need

6    in the marketplace that the systems in the patents-in-suit

7    addressed?

8    A    No.   The need was met, so there's no unmet need.

9    Q    Are you familiar with the product called PO Writer?

10   A    Yes.

11   Q    How did your analysis of the PO Writer product relate to

12   your assessment of the secondary considerations on obviousness?

13   A    PO Writer is an example of a prior art system that met the

14   need, so thus proving that there was no unmet need.

15   Q    Can we go to slide number ten, please.   Is this a slide

16   you prepared, Dr. Shamos, regarding the PO Writer system?

17   A    Yes.

18   Q    Can you walk us through what you are showing us here on

19   slide number ten?

20   A    Yes.   This is from DX-117, and I apologize again for the

21   poor quality of the original, but I thought it was more

22   effective to take it right out of the original.

23   Q    When you say the original, what are you talking about?

24   A    Well, the original document that was admitted as DX-117.

25   Q    What is DX-117?

2497

1   A    It's a literature describing -- it's a manual describing

2   the PO Writer system.

3   Q    Why don't you go ahead and walk us through what you have

4   here on slide ten.

5   A    Yes.  Well, in PO Writer, you could specify a catalog for

6   searching and give a partial specification of an item.  And so

7   it says at the top, for example, say you want to display all

8   items in the --

9            MR. ROBERTSON:  I object, because in the section of

10  this gentleman's report, there's no specific citation to these

11  documents that he's now referring to.

12           MR. McDONALD:  He refers to the secondary

13  considerations specifically --

14           THE COURT:  Give me the page, and I'll look at it and

15  we'll go from there.

16           MR. McDONALD:  We've got the section here on the

17  unmet needs.

18           THE COURT:  What paragraph, page and paragraph are

19  you talking about?

20           MR. McDONALD:  In Dr. Shamos's report beginning at

21  page 70.

22           THE COURT:  7-0?

23           MR. McDONALD:  Yes.

24           THE COURT:  Just a minute.  And what paragraph?

25           MR. McDONALD:  Beginning at the top of the page

Shamos - Direct

2498

1   there, 241.  He's going through the analysis there of the

2   benefits of the system and whether other prior art systems

3   existed --

4           THE COURT:  It says, though, that he didn't cite this

5   document.  Isn't that the objection, Mr. Robertson?  And the

6   rule, federal rule says that you shall identify every document

7   or reference that forms the basis of your opinion as part of

8   your report, and the objection is it's not -- this document

9   isn't identified, and there is no document identified in

10  paragraph 241 that I know of.

11          MR. McDONALD:  Okay.  So what it does say on the

12  third line of paragraph 241, the however -- actually begins at

13  the second line.

14          THE COURT:  Second sentence.  Okay, let me read that.

15  Well, that doesn't cite the specific reference; therefore, it

16  doesn't comply with the requirement of Rule 26 that the

17  specific reasons for the inclusions be articulated, so it's not

18  compliant with the disclosure requirement of 26(e), and the

19  objection is sustained to the use of that document unless it's

20  somewhere else disclosed in the record, and if it is -- that

21  paragraph doesn't do it, is all I was trying to say rather

22  inarticulately.

23          MR. McDONALD:  The PO Writer system and the manual

24  cited, specifically at paragraphs 180 through 180 --

25          THE COURT:  Just a minute.  What paragraph?

Shamos - Direct                                              2499

```
 1              MR. McDONALD:  Let's zero in on 181 at page 54.

 2              THE COURT:  Paragraph 181.

 3              MR. McDONALD:  That's right.

 4              THE COURT:  What sentence does it cite this exhibit?

 5              MR. McDONALD:  The fourth line, it refers to the PO

 6    Writer manual.

 7              THE COURT:  The parenthetical?

 8              MR. McDONALD:  Yes.

 9              THE COURT:  Is that where this is?  Is that what this

10    is from?

11              THE WITNESS:  I think it's actually paragraph 182.

12              MR. McDONALD:  Actually what's on this page, if you

13    continue to the top of page 55, Your Honor, the next paragraph,

14    there's a specific cite to the PO Writer manual guided tour at

15    46 to 47.  This excerpt, I understand, is right from those two

16    pages.

17              THE COURT:  Is that correct, sir?  You prepared it.

18    Is that where this reference came from?

19              THE WITNESS:  It came from that manual.  I can't

20    remember if it was exactly that page, but we can pull up that

21    page.

22              MR. McDONALD:  Maybe that's the best thing to do.

23    How about I pull up that particular page.

24              THE COURT:  Mr. Robertson, does that refresh your

25    recollection that this has been adequately disclosed?
```

1          MR. ROBERTSON:  Your Honor, that exhibit has been

2   disclosed.  I don't know if that particular page has.  I'm as

3   befuddled as the witness and Mr. McDonald with respect to that.

4          THE COURT:  So you want us to go look for that page

5   and see whether it does.  Get us that exhibit and that page,

6   please.

7          MR. McDONALD:  Put up Defendant's Exhibit 117, and

8   put up the guided tour at pages 46 and 47, please.  I guess 46.

9          THE COURT:  Just so the record is clear, it's not the

10  guided tour at page 22 and 130, 31 in paragraph 81.  It is the

11  reference in paragraph 182 to the guided tour at 46 and 47; is

12  that where this is from?

13         MR. McDONALD:  Can you blow up page 46 from

14  Exhibit 117?  In the lower left there is a number 46.  Does

15  that also correspond -- go back to the main page, please.  Is

16  that also in the lower right corner L0126576?  That's what's

17  cited on the slide, Your Honor.  This is that page 46 that is

18  exactly the page --

19         THE COURT:  So do you stand down?

20         MR. ROBERTSON:  I'll accept the representation.  It

21  is in a different completely section of the report that doesn't

22  have to do with secondary considerations, but I understand the

23  Court's ruling.

24  Q    Let's go back to slide ten, Dr. Shamos.

25  A    Yes.

Shamos - Direct

1    Q    Can you tell us what you are showing us here?

2    A    Yes.  Basically this says that if I want to restrict my

3    search to just the Bayless catalog, then I can search for a

4    particular item that has this partial description in just that

5    catalog.  So this was done by PO Writer.

6    Q    With respect to this issue of whether there's a long-felt

7    unmet need in the marketplace for something, how does this

8    relate to that particular secondary consideration?

9    A    Well, the only thing that allegedly was missing, as least

10   at recited by the patents, is the ability to search multiple

11   catalogs, and this did that.

12            MR. ROBERTSON:  I object to that, Your Honor.

13   There's no basis or foundation for that in the patent.  That is

14   not -- the claims define what the invention is.  There is no

15   characterization that's the only thing that was the missing.

16   That mischaracterizes the document, and that characterization

17   is certainly not in his report.

18            THE COURT:  If what he says is true, we've been

19   trying this case for an awful long time on a lot of issues

20   other than that.  I think maybe Mr. Robertson 's objection is

21   well-taken.

22            MR. McDONALD:  If we go to paragraph 244 of Dr.

23   Shamos's report, you'll see he's referring to a discussion of a

24   purported need that actually ePlus had raised in their

25   interrogatory as a reason --

Shamos - Direct

1  Q    Let's go through your slides here.  Let's go to slide 11.

2  Did you do some analysis as to whether or not the PO Writer

3  product would satisfy marketplace needs related to systems that

4  create a requisition?

5  A    Yes.

6  Q    What did you conclude about that?

7  A    That's shown here, and that's, again, from the PO Writer

8  guided tour.

9  Q    What is shown here?

10  A    What's shown here is the creation of a requisition

11  containing multiple items from multiple catalogs, and you can

12  create -- in this case, it's Bayless catalog, but if you had

13  done a search over the entire database and found items from

14  more than one catalog, you could have created a requisition

15  with items from multiple catalogs.

16  Q    Can we go to slide 12, please.  Did you also look at

17  whether or not the PO Writer system met any market needs

18  regarding creating multiple purchase orders from the

19  requisition?

20  A    Yes.  This is creating multiple purchase orders from a

21  single requisition, and that's what the last sentence of the

22  citation says, a requisition can also be split creating any

23  number of purchase orders.

24  Q    Are you again quoting from that same PO Writer guided tour

25  document?

Shamos - Direct

1    A    Yes, DX-117.

2    Q    Did you look at whether or not the J-CON system also was

3    in existence before the patents-in-suit were filed that met any

4    of the needs in the marketplace at that time?

5    A    Yes.

6    Q    What was your conclusion about the J-CON system?

7    A    That the J-CON system met numerous of the allegedly unmet

8    needs.  In fact, apparently, all of them.

9    Q    Did you look at any particular J-CON documents as part of

10   your analysis of the J-CON system?

11   A    Yes.  There was a huge J-CON manual, I think called volume

12   one.  It was over a thousand pages long.

13   Q    Can we put up the first page of Defendant's Exhibit 96,

14   please.

15   A    That's it.

16   Q    That's page one of that thing; is that right, Dr. Shamos?

17   A    Yes.

18   Q    What did you determine from reviewing the J-CON manual

19   about the features of that system that would be relevant to

20   whether or not that system met the market needs that were in

21   existence back in the early '90s?

22         MR. ROBERTSON:  Your Honor, I'm going to object.  It

23   calls for a narrative.  That's a pretty wide-open question

24   there.

25         THE COURT:  Do you want him to lead?

1  Q   Can you walk us through this and tell us what features you

2  saw when you looked at Defendant's Exhibit 96 about the J-CON

3  system?

4  A   J-CON maintained multiple catalogs, allowed you to do

5  product searches among the multiple catalogs.  It enabled you

6  to create requisitions from the hit results that you got from

7  the catalogs.  You could then generate multiple purchase orders

8  from a single requisition.  You could do inventory checking and

9  also cross-referencing.  You could convert a catalog number

10 from one vendor to that of another vendor.

11 Q   Thank you.  Can we go back to the PO Writer issue.  Well,

12 actually, let's do this:  Let's go back to slide number 90.  I

13 want to make sure we have something clear here.

14     You mentioned that the, something about the structure in

15 these claims, claim elements corresponded to the structure in

16 the corresponding elements of claim three of the '683 patent.

17 I want to be clear, though.  Was the function the same in these

18 two elements as it was in the '683 patent or not?

19 A   I thought that there was an agreement that the means were

20 to be treated identically.  There may have been slight

21 differences in the wording of the function.  I don't recall.

22 Q   Well, did you look at the Court's construction of the

23 function of those two means elements of claim one of the '172

24 patent?

25 A   Oh, yes.  But for the purposes of testifying here today,

```
 1   fresh start in the morning at nine o'clock.  If you'll leave
 2   your pads with Mr. Neal.
 3             Now, let me ask you something.  Did you like those
 4   donuts?
 5             A JUROR:  Yes, very much.
 6             THE COURT:  Would you like some more?
 7             A JUROR:  Sure.
 8             A JUROR:  I said that today.
 9
10                       (Jury out.)
11
12             THE COURT:  We'll make a copy of this after this.
13   This involves the testimony of someone else, so I believe we
14   need to excuse Dr. Shamos.  Thank you very much.  He needs to
15   go get dressed for the Jets game.
16             THE WITNESS:  Yes, sir.
17             THE COURT:  Nine o'clock tomorrow morning, Dr.
18   Shamos.
19             THE WITNESS:  Yes, sir.
20             THE COURT:  Thank you very much.  I'm going to leave
21   this question with you.  Were PO Writer and J-CON patented.  If
22   so, when?  Next question -- I mean statement.  Question -- I
23   don't know what this is, but it's below this.  Didn't Dr.
24   Staats say that within a year of starting his company
25   Cooperative Computing, Inc., the company decided to stick to
```

2512

1    their area of expertise which was the automotive industry?  So
2    was the J-CON system only used for automobile purposes and
3    couldn't be used for, say, medical company purposes?
4          That's the way I read this.  I think you'll be able
5    to read the same thing.  I'm going to mark that as Court
6    Exhibit whatever it is.  All right.  Just get it before you
7    leave.
8          Also, somebody from each side can stay here and get
9    the instructions.  What I did was take what you all tendered,
10   those that were agreed upon and the ones you differed, and the
11   objections, and have arrived at a set of instructions which I
12   think are appropriate.  Some of the ones that were given were
13   rejected, and some were incorporated into the others.
14         You are going to have to worry about where all that
15   fits.  I didn't spend a lot of time trying to cite what I did,
16   but I'm sure you're able to do that.  I'm sure there are issues
17   in there that perhaps we aren't going to need anything on
18   because of the way the case has been tried, but I started off
19   with the concepts that each of you -- that you all, as a whole,
20   have put together and have instructions on those topics, I
21   think, with the exception of some of the things I've tossed
22   out.
23         So you can take a look at those and see.  They'll be
24   ready in just a minute.  Ms. Hooper is going to number them,
25   and then we will hereafter refer to them by those numbers, and

2528

1          THE COURT:  He actually ended up coming pretty close,

2  but for awhile I was beginning to think we were all going to

3  become grayer than we are.

4          MR. ROBERTSON:  Well, the reason I think I can

5  streamline it some more is because J-CON is no longer prior

6  art, and we're going to be asking for instruction on that

7  because I think there is some confusion just from the jury's

8  question.  J-CON is no longer being offered for any purposes of

9  invalidity --

10          THE COURT:  If you want instructions, I want you all

11  to get me the instructions and get them to the other side in

12  plenty of time for me to think about.

13          MR. ROBERTSON:  It might just be a matter of removing

14  the items listed or identified as the prior art in there.  I

15  think PO Writer is no longer prior art for purposes of

16  invalidity or for any reason, so it's a matter -- that will

17  help me streamline my presentation of Mr. Hilliard.

18          THE COURT:  Okay.  All right.  Is there anything else

19  that any of you -- I know you don't want to, but I've got life

20  that I've got to sort out for the next several weeks.  So

21  you'll finish tomorrow?

22          MR. ROBERTSON:  I'm fairly -- yes.

23          THE COURT:  He may have some redirect, of course, of

24  Dr. Shamos.  So that's Thursday.  And then you're going --

25  we're going to have to deal with the instructions.  I don't see

2532

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
2                    RICHMOND DIVISION

3   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                       :
4   ePLUS, INC.,                       :
                                       :
5                      Plaintiff,      :
     v.                                :   Civil Action
6                                      :   No. 3:09CV620
    LAWSON SOFTWARE, INC.,             :
7                                      :   January 20, 2011
                       Defendant.      :
8   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ :

9

10          COMPLETE TRANSCRIPT OF **JURY TRIAL**
         BEFORE THE HONORABLE ROBERT E. PAYNE
11        UNITED STATES DISTRICT JUDGE, AND A JURY

12

13

14   APPEARANCES:

15   Scott L. Robertson, Esq.
     Jennifer A. Albert, Esq.
16   **Michael T. Strapp, Esq.**
     GOODWIN PROCTOR
17   901 New York Avenue, NW
     Washington, D.C.   20001
18

19   Craig T. Merritt, Esq.
     CHRISTIAN & BARTON
20   909 E. Main Street, Suite 1200
     Richmond, VA   23219-3095
21
              Counsel for the plaintiff ePlus
22

23

24            DIANE J. DAFFRON, RPR
            OFFICIAL COURT REPORTER
25        UNITED STATES DISTRICT COURT

2535

1   yesterday?  Court Exhibit 4.

2           Are P.O. Writer and J-CON patented, if so,

3   when?  Didn't Dr. Staats say that it was within a

4   year?

5           Basically, what he said is for them to

6   remember.  So was the J-CON system only used for

7   automotive purposes and couldn't be used, all that big

8   long text is something he testified to or didn't, and

9   they'll have to remember that testimony.  And you-all

10  will address it in argument; is that right?

11          MR. McDONALD:  I think that's fair, Your

12  Honor.

13          MR. ROBERTSON:  Your Honor, I think the real

14  response, what I would suggest, Your Honor, is that

15  just you need not concern yourself with it.  Whether

16  the J-CON system addressed auto parts or medical

17  systems, the J-CON system is not prior art in this

18  case, and that's why they don't need to consider it.

19  Dr. Shamos didn't over any opinions with respect to it

20  and I think this is just ripe for confusion if we say

21  it had some significance.

22          The same thing with were P.O. Writer and

23  J-CON patented.  That's evidence of some confusion on

24  the part of the jury.  First of all, they need not

25  concern themselves with whether J-CON or P.O. Writer

2536

1  were patented at all because that was no bearing on

2  any issue in this case.  Moreover, J-CON and P.O.

3  Writer are not prior art because there's been no

4  opinions on them.

5       THE COURT:  I'm just going to tell them I'll

6  deal with this later.

7       MR. ROBERTSON:  All right.  There's one other

8  issue I wanted to bring to the Court's attention.  In

9  the final pretrial order, there's a factual issue with

10 whether some of the claims had an adequate written

11 description as phrased.  There's been no evidence

12 offered with respect to it.

13      THE COURT:  They are still in their case.

14      MR. ROBERTSON:  I'm sorry?

15      THE COURT:  They are still in their case.

16      MR. ROBERTSON:  They already called Dr.

17 Shamos and they're not presenting any additional

18 evidence on that.  That's been represented to me by

19 Mr. McDonald.

20      THE COURT:  Okay.  He's the last witness, so

21 there's no more evidence on it.

22      MR. ROBERTSON:  There's no evidence on it

23 whatsoever.  So my question is do I need to call Dr.

24 Weaver?  It's not that I need to rebut anything, but

25 Dr. Weaver is prepared to offer opinions that there is

2538

1  them.  But they gave them to somebody else.  I'm not

2  getting anymore donuts.  So I had to wait anyway.

3        THE JURY:  We appreciate it.

4        THE COURT:  Dr. Shamos, you can come on back

5  to the witness stand.  Thank you, sir.

6        DR. SHAMOS:  Good morning.

7        THE COURT:  Good morning.

8        I'll deal with the question that was asked

9  later.  Okay?  At the end of the day yesterday.

10        Dr. Shamos, I just remind you you're under

11  the same oath which you took yesterday.

12        THE WITNESS:  Yes, Your Honor.

13        MR. ROBERTSON:  May I proceed, Your Honor?

14        THE COURT:  Sure.

15

16      CROSS-EXAMINATION

17  BY MR. ROBERTSON:

18  Q    Good morning, Dr. Shamos.

19  A    Good morning.

20  Q    Dr. Shamos, these questions were asked of Dr.

21  Weaver, so I'd like to just ask them of you as well.

22  You are a retained expert on behalf of Lawson; is that

23  right?

24  A    Yes.

25  Q    And you are charging Lawson $550 an hour for

SHAMOS - CROSS                    2543

1    A    Yes.

2    Q    So the electronic sourcing system here is a very

3    specific electronic sourcing system that has to have

4    at least all six of these elements, right, sir?

5    A    Yes.

6    Q    So when you said that the J-CON system was an

7    electronic sourcing system, you weren't talking in

8    terms that J-CON had all these elements, correct?

9    A    I didn't testify to that, no.

10   Q    You didn't give any specific testimony on an

11   element by element, claim by claim basis with respect

12   to J-CON, correct?

13   A    That's right.

14   Q    In fact, you offered zero opinions that the J-CON

15   system from any version from 1988 to 1992 rendered any

16   of the 12 asserted claims here obvious in any way,

17   shape or form; isn't that right?

18   A    Not in this courtroom, no.

19   Q    Well, that's what's important.  We're in the this

20   courtroom, right?  So is the answer to my question you

21   offered zero opinions that J-CON invalidated or

22   rendered obvious any of the 12 claims?

23   A    It's the same question, and I'm giving you the

24   same answer.  I didn't do it in this courtroom.

25   Q    Can you answer the question fairly yes or no?  Did

SHAMOS - CROSS                    2544

1   you offer it in this courtroom?

2        MR. McDONALD:  Objection, Your Honor, asked

3   and answered.

4        THE COURT:  Sustained.

5   Q   Did you --

6        THE COURT:  It doesn't make any difference

7   what he's testified to elsewhere, ladies and

8   gentlemen.  It's only what is testified to here that

9   is important.

10       MR. ROBERTSON:  Thank you, Your Honor.

11  BY MR. ROBERTSON:

12  Q   You offered zero opinions that J-CON anticipated

13  any of the 12 claims at issue in this case here,

14  correct?

15  A   In this room.

16  Q   You offered zero opinions that J-CON in

17  combination with any other prior art reference

18  invalidates the claims in this courtroom, right?

19  A   Right.

20  Q   You are the only Lawson expert testifying on

21  invalidity opinions, right?

22  A   I believe so.

23  Q   You don't know of any other Lawson expert on

24  invalidity, do you?

25  A   No.

SHAMOS - CROSS                                        2545

1    Q    So as far as the jury is concerned with regard to

2    the testimony on J-CON, they can forget about that for

3    any purposes of an element by element, claim by claim

4    analysis for anticipation and obviousness, right?

5    A    I don't know if it's my place to say what the jury

6    can forget about.

7    Q    But you didn't give them any opinions that it

8    invalidates any claims, right?

9    A    Not in this courtroom.

10            THE COURT:  Well, you didn't give the jury

11   any, Dr. Shamos, so it had to be in this courtroom.

12   So the answer to that is no.

13            THE WITNESS:  Correct.

14   Q    And let me ask you this:  You put up --

15            MR. ROBERTSON:  Can you put up just the cover

16   page of Defendant's Exhibit No. 96, please.

17   Q    Now, you showed this J-CON manual, Volume I, cover

18   page, correct?

19   A    Yes.

20   Q    That's the only thing you offered to the jury when

21   you brought up J-CON, this cover page that has the

22   title of the manual, and that's it, right?

23   A    No, I had a slide with the bullet points about

24   J-CON.

25   Q    I'm talking about this exhibit, Defendant's

SHAMOS - CROSS                    2553

1   side, Mike, where it says "other publications."

2   BY MR. ROBERTSON:

3   Q    You're aware, Dr. Shamos, that the inventors

4   disclosed to the Patent Office the two documents that

5   you rely on for your invalidity opinions; this IBM

6   Technical Viewer general information manual and this

7   IBM Technical Viewer/2 product information brochure,

8   correct?

9   A    Yes.

10  Q    And you understand that the product brochure is,

11  in fact, undated, correct?

12  A    Yes.

13  Q    You had no personal knowledge, do you, that either

14  of these documents were ever in the public domain

15  prior to August of 1993, do you?

16  A    I have no direct personal knowledge of that.

17  Q    So you understand that when these documents are

18  disclosed to the Patent Office, the Patent Office can

19  review them and consider them as part of the

20  examination, correct?

21  A    Yes.

22  Q    Now, let me ask you about this RIMS patent and the

23  disclosure in the patent at issue in this case.  Is it

24  your position that the '989 patent was not disclosed

25  to the Patent Office?

SHAMOS - CROSS                    2554

1    A    It was not disclosed as prior art.

2    Q    And you don't think when you disclose something in

3    the background of the invention it can be considered

4    by the Patent Office?

5    A    Not for prior art purposes.

6    Q    What's the basis of that opinion?

7              THE WITNESS:  Your Honor, I can't answer that

8    question without violating a ruling of the Court.

9              THE COURT:  It's a legal opinion.

10   Q    Let me ask you this:  Have you seen places where

11   the '989 patent was disclosed in the specification of

12   the patent?

13   A    Not as prior art.

14   Q    Have you seen places in the patent, sir, can you

15   answer my question, where the '989 patent was

16   disclosed?

17   A    It is disclosed not as prior art.

18   Q    Was it disclosed as incorporated by reference?

19   A    Yes.

20             MR. ROBERTSON:  Why don't we pull up column 1

21   of the '683 patent if we could.

22   Q    If you'd go, please, to column 1, starting at line

23   10, going down to line 17.  The inventors here are

24   telling the Patent Office that there are a number of

25   known requisition purchasing systems that manage and

1    process requisitions and purchase orders.   One such

2    system is the Fisher-Scientific requisition and

3    inventory management system, Fisher RIMS, described

4    United States Patent No. 5,712,989, filed April 2,

5    1993, and assigned to Fisher-Scientific Company of

6    Pittsburgh, Pennsylvania.   The disclosure of which is

7    incorporated herein by references.   Do you see that?

8    A    Yes.

9    Q    Do you understand that when someone incorporates a

10   patent by reference in the specification, it's as if

11   it was fully set forth therein, isn't it?

12   A    Yes.

13   Q    And you don't have any misapprehension that when

14   the inventors told the examiner and the Patent Office

15   about this patent that they couldn't fully understand

16   and comprehend that the inventors were saying

17   everything that's in this patent is now considered to

18   be part of the '683; isn't that right?   That's what

19   incorporated by reference means?

20   A    Yes.

21   Q    And you're aware, are you not, sir, that the RIMS

22   patent and the RIMS system is mentioned in this patent

23   more than 50 times, right?

24   A    Yes.

25   Q    So, again, the examiner couldn't have been under

1   any misapprehension as to what was being disclosed as

2   part of what RIMS functionality was necessary to be

3   modified in order to come up with the inventions of

4   the electronic sourcing patent, correct?

5   A   Well, the examiner didn't consider it as prior

6   art.  The examiner considered it for what it said

7   about the RIMS system.

8   Q   Well, the examiner has access to be able to go and

9   look at any patent, doesn't he, that's available in

10  the Patent Office?

11  A   Yes.

12  Q   And if the inventors repeatedly throughout all 28

13  columns of the patent described what they thought the

14  RIMS system disclosed, he wasn't under any illusions

15  as to what they were representing, was he?

16  A   He was under an illusion.

17  Q   Oh, I see.  So you know what the examiner was

18  thinking when he was reviewing the RIMS patent?

19  A   Yes, I do because I read the file history.  I read

20  what he said.

21  Q   You didn't offer any opinions in direct testimony

22  with respect to the file history and what the examiner

23  said, did you, sir?

24  A   No, but you're asking me about it now.

25  Q   So the answer to my question is no, you didn't

SHAMOS - CROSS                    2557

1  offer any opinions with respect to the file history,

2  correct?

3  A    That's right.

4            MR. ROBERTSON:   Could we go back and look at

5  Claim Three again.

6  Q    Now, you understand that for purposes of both

7  infringement and invalidity you need to consider the

8  claim as a whole; is that right?

9  A    Yes.

10  Q    And just using this claim as an example, this has

11  six elements, I think, we've already confirmed, right?

12  A    Yes.

13  Q    And the preamble of the electronic sourcing system

14  is also an element of the claim the Court has

15  construed, right?

16  A    Yes.

17  Q    So when we go through this on an element by

18  element basis, you're familiar with the term what's

19  called an antecedent basis?

20  A    Yes.

21  Q    So let's look at the first element.  The first

22  element says that the electronic sourcing system has

23  to have at least two product catalogs.  I just want to

24  zero in on that.  Right?

25  A    Yes.

SHAMOS - CROSS                    2599

1   Q   Does it refer to figures 5A and 5B to support that
2   statement or not?
3   A   Yes.
4   Q   What does it indicate in terms of what system uses
5   the purchase order build program?  Was it that local
6   computer?
7          THE COURT:  Let him testify.
8   A   Well, it says for items of product types 01, 03
9   and 04, local computer 40 uses purchase order build
10  program 112 to create a purchase order.
11  Q   If we go to figure 2A of the '989 patent --
12         MR. ROBERTSON:  Objection, outside the scope.
13  I didn't ask anything about figure 2A.
14         MR. McDONALD:  It's referred to in this
15  paragraph that refers to 5A.
16         THE COURT:  Well, that doesn't make it
17  something that was a topic of his examination.
18  Sustained.
19  BY MR. McDONALD:
20  Q   Let's turn now to the patent, the file history,
21  Exhibit 4, that Mr. Robertson was asking you about.
22  He was asking you about whether or not -- well, let's
23  talk about the issue of whether or not there was a
24  disclosure to the Patent Office that any aspect of the
25  RIMS system was actually prior art.  Did you look at

SHAMOS - CROSS                    2600

1   the file history, Exhibit 4, to determine whether or

2   not the RIMS system was actually disclosed as prior

3   art?

4   A   Yes.

5   Q   What did you conclude about that?

6   A   It wasn't.

7   Q   What's the basis for that conclusion?

8           MR. ROBERTSON:  Objection.  This calls for

9   legal conclusions.

10          MR. McDONALD:  He's asked the exact same

11  questions.  I want to get a chance for him to explain

12  his reasoning.

13          MR. ROBERTSON:  I didn't ask --

14          THE COURT:  He didn't ask him the reasoning.

15  He volunteered that.  Mr. Robertson opposed it.

16          MR. McDONALD:  Well, the exact issue was is

17  the RIMS system disclosed as prior art.

18          THE COURT:  I ruled.  It's over.  I'm not

19  going to have you testifying about the law.

20  BY MR. McDONALD:

21  Q   Dr. Shamos, is there any documentation in the file

22  history of Plaintiff's Exhibit 4, the '683 file

23  history, that goes specifically to the issue of

24  disclosing prior art to the Patent Office?

25          MR. ROBERTSON:  Objection, Your Honor.  It's

SHAMOS - CROSS                    2601

1  the same question asked in a way --

2          MR. McDONALD:  This is a fact.  I'm not

3  asking him for an opinion.  This is a fact.

4          THE COURT:  It's the same.  It's another way

5  of doing the same thing, I think.  There may be a

6  question you can ask.  I'm not going to get into

7  asking it, but that isn't the one.

8  BY MR. McDONALD:

9  Q   Dr. Shamos, is there -- I think you were asked

10  about whether the TV/2 documentation was considered by

11  the Patent Office, correct?

12  A   Yes.

13  Q   Now, is there something in the file history of the

14  '683 patent that would indicate how it was that the

15  TV/2 publications were disclosed to the Patent Office?

16          MR. ROBERTSON:  I'm going to object, Your

17  Honor, because now we're just going over the direct

18  examination again.  This was already asked in direct

19  and I didn't raise this issue again in my

20  cross-examination.  I just asked him where the '989

21  was referenced in the file history and the

22  specification.

23          MR. McDONALD:  You did ask him about the

24  TV/2.

25          THE COURT:  Yeah, but not that.  You're

SHAMOS - CROSS                      2602

1   really retreading.  You're repeating basically what

2   you said on direct examination, and that isn't what

3   redirect is about.  So let's go on to something that

4   he actually asked about.

5             MR. McDONALD:  Okay.

6   BY MR. McDONALD:

7   Q   Can we go to the office action in the file

8   history?  Turn to page, I think it would be about 182.

9             MR. McDONALD:  Could you blow that up, Bill.

10  The number ending with 3720.

11            THE COURT:  Do you want to blow the number up

12  or the picture up?

13            MR. McDONALD:  I just want to help Dr.

14  Shamos --

15            THE WITNESS:  I have it.

16  BY MR. McDONALD:

17  Q   So this is the same office action you were asked

18  about earlier, correct?

19  A   Yes.

20            MR. McDONALD:  Can we go to the two pages

21  later, please.  Its part of this office action.

22            THE COURT:  Can you blow that up?  Can you

23  read that, Dr. Shamos?

24            THE WITNESS:  Well, I'm reading from the

25  original document.

SHAMOS - CROSS                     2603

1      THE COURT:  All right.  Well, the jury is

2  being asked to look at it here, and I can't read it,

3  and I don't see how they can read it.  So if you can

4  blow it up, let's get to where you want to go.  Where

5  are you going?

6      MR. McDONALD:  Paragraph No. 7 here from the

7  office action.

8      MR. ROBERTSON:  I'm going to object, Your

9  Honor.  I didn't ask anything about this page or

10  paragraph 7.

11      MR. McDONALD:  Well, he was asking about this

12  in the context of the disclosure of the RIMS prior

13  art. I'd like to go to that exact same issue.  They

14  are part of the same document and talk about that

15  issue of disclosure of RIMS as prior art.

16      MR. ROBERTSON:  The only reason I sited this

17  office action was to show --

18      THE COURT:  Come up here, please.

19      (The following sidebar conference is begun.)

20      THE COURT:  Is it your view of the law that

21  if something is disclosed in the text of the patent

22  that it can't be considered as prior art unless it is

23  listed somewhere else in the patent as prior art?  Is

24  that what you say the law is?

25      MR. McDONALD:  I think the law is just

SHAMOS - CROSS                    2604

1   because it's incorporated by reference does not

2   mean --

3             THE COURT:   What case do you have that says

4   that?

5             MR. McDONALD:   Well, I don't have a case.   I

6   have all the Patent Office actions on the reexams.

7             THE COURT:   I don't care about that.   I care

8   about the law.   What you're suggestion is something

9   that I don't understand to be the law.

10            And do you have a case on it?

11            MR. ROBERTSON:   I have what's called the

12   MPEP, which is the Manual for Prosecution and

13   Examination Procedures, and I believe there's a

14   procedure in there that if it's disclosed in the

15   background of the invention, it's presumed that the

16   examiner has considered it.   He can read, Your Honor.

17   It's there 59 times.

18            THE COURT:   And there is no section in the

19   patent that says prior art?

20            MR. McDONALD:   Well, the references cited is

21   the section that refers to the prior art.

22            THE COURT:   No.   That's how you refer to it,

23   but it doesn't call it prior art.   It doesn't say --

24   is there any rule that says you have to put all of

25   your prior art in the references section?

SHAMOS - CROSS                    2605

1          MR. McDONALD:  That is, again, the MPEP

2     process is that you disclose prior art --

3          THE COURT:  I didn't ask you that.  I said,

4     Is there rule that says that?  Not what they do, but

5     what is the rule?

6          MR. McDONALD:  I believe there is a rule that

7     the Patent Office puts all the prior art in the list

8     of references cited.  I don't have the rule cite at my

9     fingertips.

10         THE COURT:  Well, you're making a lot of

11    paper over nothing unless there's a rule that does it.

12    Somebody has got to know the answer to that.

13         MR. ROBERTSON:  I'll look into it, Your

14    Honor.  We'll tell you on the video that you played

15    said the examiner can look at the prior art references

16    and the references discussed in the background of the

17    invention.

18         THE COURT:  It's in the video.  I know.

19    That's why I'm asking the question, for Pete's sake.

20    It's confusing to the jury to be doing what you're

21    doing.  That's why I'm concerned about this.  So the

22    way you're asking these questions suggests that it's

23    required when in fact they have already been told that

24    it isn't.

25         And if that reference is wrong, then I need

SHAMOS - CROSS                    2606

1    to know it and straighten it out, but I don't think it

2    is wrong.

3              MR. ROBERTSON:  We did give you the case law

4    for a supplemental instruction on what incorporated by

5    reference means.

6              THE COURT:  That's different.

7              MR. ROBERTSON:  When it's incorporated by

8    reference, it's all -- the entire patent is fully

9    disclosed therein.  It's as if it's part and parcel of

10   the whole patent.

11             THE COURT:  That's correct unless there is a

12   rule that says to be considered prior art, it has to

13   be in the -- is it cited references?

14             MR. ROBERTSON:  Yes, sir.

15             MR. McDONALD:  References cited.

16             THE COURT:  References cited.  And I don't

17   think it is.

18             MR. ROBERTSON:  I don't think so either.

19             THE COURT:  I don't think it is, which is why

20   I don't think it's the rule.

21             MR. McDONALD:  I did want to show in this

22   section --

23             THE COURT:  You can do it, but change your

24   question so you don't do this.  Don't cause that

25   problem.  You can ask a question without -- and I

SHAMOS - CROSS                    2607

1   don't want him saying another thing about has it been

2   disclosed as prior art.

3          MR. ROBERTSON:  We're going into a different

4   section.  It has nothing to do with --

5          THE COURT:  What does it have to do with?

6          MR. McDONALD:  Well, the RIMS patent

7   application clearly disclosed --

8          THE WITNESS:  Put that back up.  Okay.  I've

9   got what I want.  I can't make any sense out of this

10  because I don't have the whole text.

11         MR. McDONALD:  I'll just move on.

12         THE COURT:  Okay.

13  BY MR. McDONALD:

14  Q   Dr. Shamos, you were shown a part of the file

15  history that showed that the original application, the

16  RIMS application, was described as an application

17  about a patent number, correct?

18  A   Yes.

19  Q   When the patents in this suit were filed, was that

20  disclosure of the RIMS patent application that was not

21  in the issued patent, was that something that you

22  considered to be prior art at that point in time?

23         MR. ROBERTSON:  I'm going to object, Your

24  Honor.

25         THE COURT:  The question is whether he

SHAMOS - CROSS                          2608

1  considered it.  And the answer is yes or no.

2              In forming your opinion, did you consider

3  the prior art or not?

4  BY MR. McDONALD:

5  Q   At that point in time on the filing date of the

6  patents.

7  A   I'm not sure that I understand the question.

8              THE COURT:  Okay.  Then let him rephrase it.

9  BY MR. McDONALD:

10 Q   When is it that the RIMS patent became prior art?

11             MR. ROBERTSON:  That's actually calling for a

12 legal conclusion.

13             THE COURT:  Yes, it is.

14 Q   Did you have an understanding, Dr. Shamos, from

15 your standpoint as to when that RIMS patent would have

16 become prior art?

17             THE COURT:  Start all over again.  Did you

18 consider when you were making your analysis that, as

19 of the date of the patent at issue, did you consider

20 the RIMS patent as prior art?  Is that what you asked

21 him?

22             MR. McDONALD:  I think the question is when

23 did it become prior art?

24             THE COURT:  What?

25             MR. McDONALD:  My question is what is his

1    understanding as to when the RIMS patent became prior

2    art.

3               THE COURT:  No.  The question is whether he

4    considered it as prior art.  That's where you started

5    out.  Did you consider as prior art the RIMS patent,

6    '989, right?

7    BY MR. McDONALD:

8    Q    Okay, we can start there.

9    A    For purposes of forming my opinions on validity, I

10   considered the '989 patent to be prior art.

11   Q    And that patent issued in January of '98, right?

12   A    Yes.

13   Q    How long after the patents were filed did that

14   issue approximately?

15              MR. ROBERTSON:  Your Honor, I didn't go into

16   any inquiry about this.

17              THE COURT:  Actually, you did.

18              MR. ROBERTSON:  As to the date --

19              THE COURT:  It's obvious between the date of

20   the application and the date of the issuance.  It's

21   right on the face of the patent.  And I think you did

22   ask him about it.

23              Are you asking him what's the difference

24   between the dates?

25              It was filed when?  Do you remember.  It's on

SHAMOS - CROSS                    2610

1   the face of the patent.

2           THE WITNESS:  It was filed in 1993.  I'm

3   sorry.  1994.

4   BY MR. McDONALD:

5   Q   So let's talk a little bit about the J-CON and

6   P.O. Writer prior art that Mr. Robertson asked you

7   about.

8           MR. ROBERTSON:  I object, Your Honor,

9   referencing this prior art.

10          THE COURT:  He didn't testify about it.  In

11  fact, he said he didn't.  So you can't ask him about

12  that.

13          MR. McDONALD:  He was asked about it in his

14  cross-examination.

15          THE COURT:  But the fact that he was -- I

16  don't think that I would have asked that question, but

17  that didn't open the door to a whole new set of

18  testimony on that topic.  All he did is say he asked

19  him whether he gave the opinion or not.  And he said,

20  No, I didn't.  And that's the end of it because you

21  don't need to go into it unless you think that he did

22  give an opinion, and that that answer was wrong by

23  Dr. Shamos, and you need to correct it.  And he didn't

24  give the opinion.  So you don't need to correct

25  anything.  So let's move on.

1   and the instructions and deliberate and decide on the basic

2   issues of patent infringement and patent validity.  Once you

3   return the verdict on those, then the rest of what happens, if

4   anything, is for the Court to decide.  Is that satisfactory;

5   counsel?

6           MR. ROBERTSON:  Yes.  Thank you, Your Honor.

7           THE COURT:  All right, Mr. Strapp, are you taking

8   over now?

9           MR. STRAPP:  Yes.  Your Honor, ePlus calls as its

10  next witness Mr. Ken Farber.

11

12              **KENNETH FARBER,**

13  a witness, called by the plaintiff, having been first duly

14  sworn, testified as follows:

15              DIRECT EXAMINATION

16  BY MR. STRAPP:

17  Q   Could you please state your name again for the record.

18  A   Kenneth Farber.

19  Q   And just to refresh everyone's memories, can you please

20  describe your present employment.

21  A   Sure.  I'm the president of ePlus Systems and content

22  services.

23  Q   How long have you been in that position?

24  A   Ten years.

25  Q   Mr. Farber, last time you were on the stand, you offered

Farber - Direct

1    some testimony about the ePlus/Ariba license agreement; do you

2    recall that?

3    A    Yes.

4    Q    Has ePlus ever licensed the three patents that are at

5    issue in this case to any other companies?

6    A    Yes.

7    Q    What other companies has ePlus licensed the patents to?

8    A    We've licensed the patents to companies such as SAP,

9    SciQuest, Verian, Perfect Commerce.

10   Q    And approximately how much revenue has ePlus received for

11   licensing the three patents that are in suit in this case?

12   A    Close to 58 million.

13   Q    Do you see in front of you, Mr. Farber, is that a complete

14   list of the licensees for ePlus's patents-in-suit?

15   A    Yes, it is.

16   Q    Has ePlus ever licensed the patents-in-suit to anyone else

17   besides these five companies?

18   A    There was a patent license granted to a company called

19   ProcureNet which is the company -- or piece of the company that

20   ePlus had acquired.

21   Q    And that was back in what time frame?

22   A    It was around the acquisition, about ten years or so ago.

23   Q    Would you consider each of the five companies listed here,

24   Ariba, SAP, Perfect Commerce, Verian, and SciQuest to be

25   competitors of ePlus?

Farber - Direct

1   A    Yes.  They are direct competitors.

2   Q    And competitors in the e-procurement software industry?

3   A    That's correct.

4   Q    What about ProcureNet, are they a competitor of ePlus?

5   A    No, ProcureNet is not a competitor.

6   Q    Listed here you have the five license agreements for the

7   companies ePlus considers as competitors to the e-procurement

8   software industry?

9   A    That's correct.

10  Q    Are you personally familiar with license agreements, the

11  five license agreements that you've described?

12  A    I am.

13  Q    How do you have any familiarity with these agreements?

14  A    I was directly responsible and involved in the negotiation

15  and the finalization of these agreements.

16  Q    For each five of the agreements?

17  A    Correct.

18  Q    Mr. Farber, you have a notebook in front of you.  Could

19  you please turn to Plaintiff's Exhibit 43.

20  A    Okay.

21  Q    Do you recognize the document in front of you?

22  A    Yes.

23  Q    What is this document here?

24  A    This is the license and settlement agreement between Ariba

25  and ePlus.

Farber - Direct                                                    2622

1            MR. STRAPP:  Can you blow up the first paragraph

2     there, please.

3     Q    When was this particular agreement entered into between

4     ePlus and Ariba?

5     A    February 12th, 2005.

6     Q    Mr. Farber, can you turn, please, to section F of the

7     agreement.  That's on page four of the license, bottom of the

8     page, paragraph 11.  It's got the Bates number on the bottom

9     right 600.

10    A    600?

11    Q    It's up on your screen as well.

12           THE COURT:  May I see counsel for just a minute.

13

14           (Discussion at sidebar as follows:)

15

16           THE COURT:  I'm a little bit confused about using

17    these exhibits.  Mr. McDonald, do you want the exhibits in?

18           MR. McDONALD:  We had opposed their admission at one

19    point, Your Honor, but you said they could come in.  We would

20    stipulate to what he's already testified about the cumulative

21    numbers.  I think he could probably get through it without

22    having to go through these things.

23           THE COURT:  Why do we need to have the documents in

24    if they'll agree to the amounts?

25           MR. STRAPP:  I wanted to show that each one of the

Farber - Direct

1   licenses were for the same three patents that are in suit in

2   this case and that each of these companies are the competitors.

3   I mean, maybe I can do that without showing the documents.

4           MR. McDONALD:  I've seen them all.  They all are the

5   three patents-in-suit.

6           THE COURT:  I'm sure if he knows that, he'll testify

7   to it.  Then we don't have to get into any discussion of that.

8           MR. McDONALD:  That would certainly be what we'd

9   appreciate, Your Honor.

10          MR. STRAPP:  All right, so we'll do it without

11  showing them the documents.

12          THE COURT:  Then we don't have to get into -- the

13  reason I ask this is because if you want to show that they were

14  the product of settlements, I need to give the jury some

15  instructions about it.

16          In other words, if you want to discount their

17  effectiveness by examining on -- that they came out of

18  litigation, there are different lawyers that approach that

19  issue differently about whether they want to get into that or

20  not.  Certainly you can get into it, and you can have the

21  exhibits in in that event, but if you're not going to approach

22  it that way --

23          MR. McDONALD:  Well, I think he's already identified

24  them as settlement and license agreements.  That's what they're

25  all called, and if he just has him establish that they are in

Farber - Direct

2624

1   settlements of litigation, I don't know that --

2           THE COURT:  That's sufficient for you?

3           MR. McDONALD:  Yeah.

4           THE COURT:  Then let's do it that way, and don't use

5   the documents.

6

7           (End of sidebar discussion.)

8

9   Q   Mr. Farber, we were talking about the ePlus/Ariba license

10  agreement.  Can you tell me specifically what was exchanged or

11  what was licensed as part of that agreement between ePlus and

12  Ariba?  Let's start first with Ariba.  What did Ariba license,

13  if anything, to ePlus as part of that agreement?

14  A   What Ariba licensed to ePlus is the ability for ePlus to

15  utilize its patents.

16  Q   So Ariba licensed its own patents to ePlus as part of this

17  license agreement?

18  A   That's correct.

19          THE COURT:  When you say its patents, you mean the

20  right to use Ariba's patents?

21          THE WITNESS:  That's correct.

22          THE COURT:  All right, go ahead.

23  Q   What did ePlus license to Ariba?

24  A   Conversely, we had provided the rights for Ariba to

25  utilize our patents.

Farber - Direct

2625

```
1              THE COURT:  The patents-in-suit?
2              THE WITNESS:  Correct, the patents-in-suit.
3    Q    That is the '683, the '172, and '516 patents?
4    A    Correct, the same ones we're talking about.
5    Q    Did Ariba agree to pay any amount of money for this
6    license agreement?
7    A    Yes.
8    Q    How much was that?
9    A    I believe it was -- let me go to that, refresh my memory
10   exactly, but it was 37 million.
11   Q    $37 million?
12   A    Correct.
13   Q    So in sum then, Ariba granted a license to ePlus for its
14   patents, paid ePlus $37 million, and in exchange, ePlus
15   licensed the three patents that are in suit in this case; is
16   that correct?
17   A    That's correct.
18   Q    Now, you had mentioned there were four other license
19   agreements that ePlus has entered into with its competitors.
20   What was the next one in time after Ariba?  What was the next
21   license that ePlus granted?
22   A    The next one would be SAP.
23   Q    And do you recall approximately what time frame that was?
24   A    Let me try to find an agreement.
25   Q    In your binder, it's at Plaintiff's Exhibit 318.
```

Farber - Direct                                                2626

1    A    Okay.  It was -- looks like it was finalized

2    December 11th, 2006.

3    Q    Who is SAP?

4    A    SAP is a large company that some of the products that they

5    offer competed with our solutions.

6    Q    And I didn't get a chance to ask you, but who is Ariba?

7    A    Same.  Ariba was a large company that competed with ePlus

8    in the market.

9    Q    Can you describe for me what was licensed as part of the

10   ePlus/SAP license agreement?

11   A    We had provided, in a similar fashion as we had done for

12   Ariba, we provided them the ability to utilize the three

13   patents that are in suit here.  We granted them a license to

14   utilize those patents.

15   Q    And what did SAP give to ePlus in exchange for a right to

16   use the three patents that are in suit in this case?

17   A    I have to just refresh my memory if they had

18   cross-granted --

19   Q    Let me direct your attention to section four of the

20   agreement.

21   A    Okay.

22   Q    4.1?

23   A    Yeah, what this is is that in exchange for the grant by

24   ePlus to the three patents-in-suit, SAP paid ePlus 17 and a

25   half million dollars.

Farber - Direct                                            2627

1    Q    $17.5 million?

2    A    That's correct.

3    Q    We've talked about the Ariba and SAP license agreements.

4    I think you mentioned that there were three additional

5    agreements.  Can you just refresh my memory what those three

6    agreements are?

7    A    Sure.  There was Verian, it was Perfect Commerce, and

8    SciQuest.

9    Q    Let's start with Perfect Commerce.  If you could turn to

10   Plaintiff's Exhibit 317 in your binder.

11   A    Okay.

12   Q    When did ePlus enter into a license agreement with Perfect

13   Commerce?

14   A    That would be August 28, 2009.

15   Q    Who is Perfect Commerce?

16   A    Perfect Commerce is a company that competes with ePlus.

17   Q    And, again, can you describe for us what the subject

18   matter was that was licensed as part of this ePlus/Perfect

19   Commerce license agreement?

20   A    Specifically associated with the three patents that are in

21   suit here.

22   Q    ePlus licensed the three patents-in-suit to Perfect

23   Commerce?

24   A    That's correct.

25   Q    So that Perfect Commerce could use, sell, make, or offer

Farber - Direct

1   products that incorporated the technology in those three

2   patents?

3   A     Yes, that's correct.

4   Q     And how much money, if any, did Perfect Commerce pay for

5   the right to have a license to the ePlus patents?

6   A     Let me just make sure.

7   Q     Let me direct your attention to Exhibit A to the Perfect

8   Commerce --

9   A     I have it.

10  Q     -- agreement.

11  A     In exchange for the patents, they paid $750,000.

12  Q     Well, as the negotiator for ePlus, why was ePlus willing

13  to accept $750,000 from Perfect Commerce if ePlus -- if SAP and

14  Ariba had agreed to pay millions of dollars more?

15          MR. McDONALD:  I object to this, Your Honor.  We

16  tried getting into the details, but there was claims of

17  privilege, so we weren't able to inquire into all the whys and

18  wherefores of these settlements.  I don't think it's

19  appropriate to go into them now, and also cumulative.

20          THE COURT:  It isn't cumulative, I don't think, but

21  if in fact you claimed a privilege and foreclosed their inquiry

22  in depositions, then you can't inquire into it because that's

23  not been allowed.

24          MR. STRAPP:  Your Honor, I was not present when

25  privilege was claimed --

1       THE COURT:  You read the deposition, I take it, in

2  preparation.

3       MR. STRAPP:  I did read that deposition, and I

4  believe that we didn't make a claim of privilege with

5  respect to --

6       THE COURT:  You did?

7       MR. STRAPP:  We did not with respect to this

8  particular agreement.

9       THE COURT:  Mr. McDonald.

10       MR. McDONALD:  I'm looking for it.

11       THE COURT:  If they did, if you did, your objection

12  is well-taken.  If they did not, your objection is not

13  well-taken.

14       MR. McDONALD:  What we're able to find at this point,

15  Your Honor, is at pages 416 to 417 of Mr. Farber's testimony

16  regarding the SAP agreement, he was asked, how did you come up

17  with a settlement number in the case, and his answer was, I

18  used my counsel to determine what they thought was fair, et

19  cetera, and then we got into some privilege issues there.

20       THE COURT:  This relates to the Perfect Commerce

21  agreement.  They did the same thing.  No?

22       MR. McDONALD:  Nothing specific to Perfect Commerce,

23  Your Honor.

24       THE COURT:  All right.  Objection overruled.

25  Q   Mr. Farber, let me ask you that question again.  Why was

Farber - Direct

1    it that ePlus agreed to license the patents to Perfect Commerce

2    for $750,000 if Ariba had paid 37 million and SAP had paid 17

3    and a half million for the patents?

4    A    Well, I mean, quite simply --

5          MR. McDONALD:   I object, Your Honor, because I think

6    he worked SAP into that question, and that is the one we were

7    able to find --

8          MR. STRAPP:   Your Honor, I'm asking about Perfect

9    Commerce and why ePlus, the --

10         THE COURT:   Why don't you reframe your question.

11         MR. STRAPP:   Sure.

12   Q    Mr. Farber, why was it that ePlus accepted $750,000 for a

13   license, to grant a license to Perfect Commerce if Ariba was

14   willing to pay $37 million for a license?

15   A    Well, they were a much, much smaller company for starters.

16   Secondly, we had the opportunity during the negotiation to

17   actually physically go to their location and audit their

18   financials, and, you know, we had some significant concerns of

19   them being a going concern, that they would actually stay in

20   business over time, and we came to an amicable agreement, you

21   know, and considered this to be a fair settlement agreement

22   based upon what their situation was at the time as a business.

23   Q    And Perfect Commerce, again, that was a company that

24   competed in the e-procurement software industry?

25   A    That's correct.

Farber - Direct

2631

1   Q      I think you mentioned that ePlus also granted a license to
2   SciQuest; is that right?
3   A      That is correct.
4   Q      Can you turn to Plaintiff's Exhibit 319 in your notebook,
5   please.
6   A      Okay.
7   Q      When did ePlus enter into a license agreement with
8   SciQuest?
9   A      That's August 19th of 2009.
10  Q      And what was the subject matter that was granted by ePlus
11  to SciQuest as part of this license agreement?
12  A      This, again, is the licensing of the three
13  patents-in-suit.
14  Q      The three patents in this suit?
15  A      Yes, the '683, the '516, and '172 patent.
16  Q      And what, if anything, did SciQuest give to ePlus in
17  exchange for a license to the three patents, same patents that
18  are in suit in this case?
19  A      Let me check here.  In exchange for the licenses that were
20  granted by ePlus, SciQuest paid us $2.4 million.
21  Q      And the last, I think the last license you mentioned was
22  with a company called Verian; is that right?
23  A      Yes, that's correct.
24  Q      Who is Verian?
25  A      Verian was also and also is a competitor of ePlus in the

Farber - Direct

1    market.

2    Q    And let's just take a look quickly at that license

3    agreement.  That's at Plaintiff's Exhibit 320?

4    A    Yes.

5    Q    When did ePlus enter into a license agreement with Verian?

6    A    July 7th, 2009.

7    Q    What did ePlus grant to Verian as part of this license

8    agreement?

9    A    The same as the other licenses.  We granted the three

10   patents that have been in suit here.

11   Q    And can you tell me what, if anything, Verian agreed to

12   pay ePlus for a right to use the patented technology?

13   A    Sure.  They had an initial payment of $500,000.

14   Q    Was there any other arrangement between the two companies

15   for their licenses?

16   A    Yeah.  We had settled on -- they were also a small

17   company, similarly to Perfect, but we saw them more as an

18   ongoing concern, and we agreed to associate a royalty so that

19   when they exceeded $15 million within a calendar year, that we

20   would receive two and a half percent of those revenues.

21   Q    What was the reason that you felt like that was a fair and

22   reasonable license arrangement with Verian, this royalty

23   provision?

24   A    Why did we think it was fair?

25   Q    Yeah.

Farber - Direct

2633

1   A    Well, I think it was fair to both parties.  I mean, we

2   weren't necessarily looking to, you know, press a thumb on them

3   and put them out of business.  You know, we did see them as

4   staying in business.

5         They didn't have the funds to pay what we thought, you

6   know, the patents were worth at that time, but, you know, we

7   gave them an opportunity.  As they grew, then, you know, there

8   was a percentage associated as a royalty to the patents.

9   Q    Mr. Farber, has there been any recognition in the supply

10  chain industry for the products that ePlus sells that

11  incorporated the patented technology?

12  A    Yes.  Yes.

13  Q    What kind of recognition?

14  A    There's been industry awards, industry reports.

15  Q    And have you or your customers been recognized for any

16  specific benefits or specific recognition for the Procure+ or

17  Content+ products?

18  A    Yeah.  Well, one of our clients recently was just awarded

19  what's called Pros to Know which is a supply chain.  We

20  actually nominated one of our clients --

21             THE COURT:  What's it called, sir?

22             THE WITNESS:  Supply chain.

23             THE COURT:  No.

24             THE WITNESS:  Oh, pros, as in professionals, to know.

25             THE COURT:  Right, t-o, and then k-n-o-w.

Farber - Cross

2652

1    and this was the way he was going to get into it, I understood.

2         THE WITNESS:  Okay.  Repeat the question, I'm sorry.

3    Q    Mr. Farber, isn't it true that all the licenses you've

4    talked about were involving companies ePlus had sued; is that

5    right?

6    A    Yes, that's correct.

7    Q    And all of those agreements were settlements of those

8    lawsuits; correct?

9    A    Correct.

10   Q    So the parties hadn't finalized -- there was no final

11   decisions in those cases; correct?

12   A    I don't understand what you mean.

13        MR. McDONALD:  I'll withdraw the question.

14        THE COURT:  Let's don't get into that.  I'm going to

15   tell the jury about -- I think that's getting further than you

16   need to get.

17   Q    EPlus has dozens and dozens of competitors in the software

18   procurement area; right?

19   A    We have competitors, sure.

20        THE COURT:  The question he's getting at is how many.

21   Why don't you try again, and you ask him if he knows how many

22   competitors he has in that area.

23   Q    Isn't it true that you have dozens and dozens of

24   competitors, Mr. Farber, in the software procurement area?

25   A    I don't know if it's dozens and dozens, but I think it's

Farber - Redirect

1   Q    And did that $12,000 valuation turn out to be accurate?

2   A    No.

3   Q    How so?

4   A    Well, there were a number of things -- let me try to

5   explain it this way:  Well, first of all, if it was valued at

6   $12,000, we obviously were able to license almost $60 million

7   worth of the patents.  So somebody, you know, really estimated

8   incorrectly.  So I think ePlus made a very good assessment of

9   its own value in the acquisition, but --

10  Q    Let me ask you this:  Do you have any knowledge about how

11  that valuation was actually done?

12  A    I do.

13  Q    How do you know how this valuation was done?

14  A    When I spoke to the principals that were involved in the

15  valuation on both sides --

16       MR. McDONALD:  Your Honor, this is outside the scope.

17  He didn't get into these things.

18       THE COURT:  In fact, he was kept from going into it

19  because he said he wasn't involved in it, and in addition to

20  that, his answer is hearsay.

21       MR. STRAPP:  Your Honor, he was asked about whether

22  or not --

23       THE COURT:  Hearsay.  Who was asked what.  Doesn't

24  count in dealing with hearsay.

25       MR. STRAPP:  We're not offering it for the truth of

Farber - Redirect                                                2655

1    the matter of whether or not it was a $12,000 valuation was

2    accurate.

3            THE COURT:   What's the non-hearsay purpose?

4            MR. STRAPP:   The process involved in coming up with

5    the valuation.

6            MR. McDONALD:   He knows the process because somebody

7    told him, so it's still hearsay.

8            THE COURT:   But if he's offering it for a non-hearsay

9    purpose, then the non-hearsay purpose has to be relevant and

10   has to be judged by Rule 403 as well.   Why is it relevant?

11           MR. STRAPP:   It's relevant because it shows why the

12   number $12,000 was come up with.

13           THE COURT:   That's for the truth of the matter.

14   Thank you.   That's what I thought it was relevant for.   All

15   right.   Let's move right on.   Objection sustained.

16   Q   Mr. Farber, you mentioned that the valuation turned out to

17   be inaccurate in the sense that you received almost $60 million

18   in license revenue.   Was it inaccurate in any other way besides

19   that?

20   A   I'm not sure I understand.

21   Q   Has the patents brought any other value beyond the

22   $60 million to ePlus?

23           MR. McDONALD:   Objection, beyond the scope, Your

24   Honor.

25           THE COURT:   Overruled.

Hilliard - Direct

1    legal principles that govern your analyses?

2    A    Yes, I was.

3    Q    Did you have an opportunity to personally review and use

4    any of the alleged prior art systems?

5    A    Well, I have had that experience with the PO Writer system

6    during the SAP trial.  SAP was able to produce a copy of that

7    software, and I was able to experiment with it, exercise it,

8    and determine how it functioned.  I did so prior to that trial,

9    and I also did so in court during that trial.

10   Q    Did you review file listings relating to the computer code

11   for that system?

12   A    I did.

13   Q    And do you recall any relevant information about the dates

14   that were included in those file listings?

15   A    Yes.  The dates included both dates preceding and dates

16   following August of 1994.

17        MR. McDONALD:  I'll object, Your Honor, as irrelevant

18   and confusing.  We haven't proffered any, and he's talking

19   about dates of things that weren't in evidence in this case.

20        MS. ALBERT:  I'll move on.

21        THE COURT:  I think he's just relating what he did

22   and his familiarity with the systems at issue.

23   Q    Did you have the opportunity to review the validity report

24   submitted by ePlus's other technical expert, Dr. Alfred Weaver?

25   A    Yes, I did.

Hilliard - Direct                                                    2671

1   perhaps I should ask you, what is your understanding of a

2   computer software system that is modular?

3   A    Having worked in the computer industry for computer

4   vendors before going out on my own as a consultant, companies I

5   worked for produced modular systems, and by that I meant they

6   were systems that were sold in pieces.  Customers didn't have

7   to buy every single module.  There typically might be a

8   required module and optional modules.

9   Q    So suppose a prior art system was modular.  Is that

10  relevant to the issues that the jury needs to consider?

11  A    I believe.

12        MR. McDONALD:  Objection, Your Honor.  I don't think

13  he's in a position to tell the jury what's relevant here.  Plus

14  modular is not even part of the claims.  I think it's

15  irrelevant.

16        THE COURT:  I think the focus here is what's the

17  reason for his -- what is his opinion and what is the reason

18  for it, not what's relevant for the jury.  I'm not going to let

19  in irrelevant evidence, but he shouldn't be commenting upon it.

20  Let's frame the question another way, please.

21        MS. ALBERT:  Thank you, Your Honor.

22        THE COURT:  Sustained.

23        MS. ALBERT:  I will move on.

24  Q    With respect to the PO Writer system, did you seek

25  contemporaneous documents that supported each of the assertions

Hilliard - Direct                                                    2672

1    that Lawson has made with respect to the features and

2    functionalities that that system allegedly had?

3    A     No, I did not.  No such documents were produced by the

4    inventor or the developer of the system, and no such documents

5    were produced by Lawson.

6              THE COURT:  Are you talking about in August of 1984?

7    1994?

8              THE WITNESS:  I'm sorry, Your Honor.  What was it?

9              THE COURT:  Are you talking about the functionality

10   and features as they existed in August of 1994?

11             THE WITNESS:  Yes.  Yes, Your Honor, that's what -- I

12   saw no evidence of what the functions and features were at that

13   time, or for that matter, any time.

14             THE COURT:  You didn't see any contemporary

15   documentation that supported what the features or functionality

16   were of the PO Writer in August of 1984 -- '94?

17             THE WITNESS:  I saw some contemporaneous

18   documentation of some features and functions, but I did not see

19   complete contemporaneous documentation of all of the features

20   and functions that it's my understanding are part of the

21   contention that that system anticipates the patents-in-suit.

22   Q     Did you review the PO Writer guided tour manual?

23   A     I did.

24   Q     Now, were these PO Writer documents that you referenced

25   publicly available?

1    A    No, they were not.

2    Q    Did you see any pre-1994 documentation relating to a

3    license by any company to a PO Writer system having all of the

4    alleged features and modules that Lawson relies upon for its

5    contentions?

6    A    I didn't see any of that, no, and it's my understanding

7    that Mrs. McEneny was asked if she had that, and she said she

8    didn't in her deposition.

9    Q    Did you see any pre-1994 documentation relating to a

10   license by any company to a RIMS system having all of the

11   alleged features that Lawson contends existed at that time?

12   A    No.

13   Q    Did Lawson produce any documentation to corroborate that

14   the TV/2 search program, having all of the alleged features

15   that it relies upon, was ever licensed to anyone prior to IBM's

16   contract with Fisher Scientific relating to the patented

17   electronic sourcing system?

18   A    I saw no such document, no such corroboration.

19   Q    Now, turning to the patents-in-suit, Mr. Hilliard, do you

20   have an opinion as to what the problem was that the inventors

21   were trying to solve in those patents based upon your review of

22   the patent specification and the patent claims?

23   A    Yes, I do.

24   Q    Can you describe your understanding.

25   A    Yes.  The patents-in-suit solve a problem that's been, to

 1   so general, maybe, I don't know that it's helpful.  Why don't

 2   you try to get more specific.

 3   Q    In your opinion, did the PO Writer system satisfy the

 4   needs that were recognized by the inventors in their patents?

 5            MR. McDONALD:  Same objection, Your Honor.  I think

 6   we need to tie it to the claims.

 7            MS. ALBERT:  I'll rephrase.

 8   Q    Mr. Hilliard, do you have an opinion as to whether or not

 9   the PO Writer system satisfied the needs or the requirements of

10   the ePlus patent claims?

11   A    Yes, I do have an opinion of that.

12   Q    What is your opinion?

13   A    Even if it did operate as described in the documents, even

14   under those circumstances, and there's no corroboration that it

15   did, but even if that were the case, it wouldn't satisfy the

16   claims.

17   Q    What were some of your reasons why it doesn't satisfy the

18   claims?

19   A    Primarily the PO Writer is a system that allows users to

20   review catalogs, but the items in the catalogs are not

21   associated with vendors, and that's one of the key elements of

22   almost every single claim in that the patents-in-suit, the

23   claims of the patents-in-suit all call for the buyer to be able

24   to look for items and to select items to create requisitions

25   where the items in the requisitions are associated with the

1    vendors from whom that buyer wants to purchase, and then to

2    turn those requisitions into one or more purchase orders where

3    the items on the purchase order -- and you only send one

4    purchase order to each vendor.  You wouldn't send a purchase

5    order to a vendor that doesn't sell the item or from whom you

6    don't want to buy the items.  So where the purchase orders pick

7    up the association of vendors from the requisition and

8    translate that into the purchase order.

9         The PO Writer system is simply a form-filling system.

10   It's designed for the purchasing agent, someone in the

11   purchasing department of the company to make the determination

12   of who the vendor or supplier will be, not the buyer, not the

13   one who specifies.  So at every step along the way in that

14   system, even if the buyer indicates a preferred vendor, or even

15   if the item comes out of a catalog selected by the buyer and

16   that catalog is associated with a vendor, by the time that item

17   gets into the requisition, the vendor association is lost.

18        The purchasing agent has to reenter the vendor, and then

19   once again, once the requisition is completed, it's the

20   purchasing agent, not the requisition, that determines what

21   supplier the purchase order goes to.  So it doesn't satisfy

22   almost all of the claims because it looses that connection

23   between the selection of the buyer who wanted to pick out

24   vendors that he knows and is comfortable with and the ultimate

25   purchase.

HILLIARD - DIRECT                    2740

1   your opinions?

2   A    Well, I considered the fact that it was considered

3   to be an innovative invention by the industry.   There

4   was an industry research and evaluation group known as

5   the Aberdeen Group that ranked it very high.   And then

6   the Internet and Electronic Commerce Conference, which

7   is an industry organization that provides awards, gave

8   it an award shortly after it was developed as a

9   Supplylink or Cornerstone product, that it was above

10   the capabilities of comparable -- of other systems

11   that attempt to do the same thing.   And also it's been

12   licensed by other vendors.

13        So all of those put together are really sort of

14   additional indications that it's an innovative

15   invention.

16            MS. ALBERT:   Thank you, Mr. Hilliard.   I have

17   no furthest questions.

18            THE COURT:   I think Mr. McDonald may have

19   more than five mints or so.   So I think it will be a

20   good time to take the afternoon recess.

21            Just take your books with you if you would,

22   please.

23            (The jury is exiting the courtroom.)

24            THE COURT:   How long do you think you're

25   going to take?

```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF VIRGINIA

 3                   RICHMOND DIVISION

 4

 5    -------------------------------------
                                          :
 6    ePLUS, INC.                         :    Civil Action No.
                                          :    3:09CV620
 7    vs.                                 :
                                          :
 8    LAWSON SOFTWARE, INC.               :    January 21, 2011
                                          :
 9    -------------------------------------

10

11            COMPLETE TRANSCRIPT OF THE JURY TRIAL

12           BEFORE THE HONORABLE ROBERT E. PAYNE

13        UNITED STATES DISTRICT JUDGE, AND A JURY

14

      APPEARANCES:
15
      Scott L. Robertson, Esquire
16    Michael G. Strapp, Esquire
      Jennifer A. Albert, Esquire
17    David M. Young, Esquire
      Goodwin Procter, LLP
18    901 New York Avenue NW
      Suite 900
19    Washington, D.C.  20001

20    Craig T. Merritt, Esquire
      Christian & Barton, LLP
21    909 East Main Street
      Suite 1200
22    Richmond, Virginia  23219-3095
      Counsel for the plaintiff
23

24               Peppy Peterson, RPR
                Official Court Reporter
25             United States District Court
```

2922

1   only worked 18.  Come one.  Let's go.

2              Go get me if law and I'll look at it.

3              MR. ROBERTSON:  I simply observed, Your

4   Honor, the MPEP sections that you have that they have

5   provided you and we provided you come from the same

6   edition.  The 1998 version.  So that section says that

7   they read the application, and if it has the prior

8   art, they must consider it.  That's from the same MPEP

9   that Mr. Schultz is relying on.

10             THE COURT:  And it seems to me that the basic

11  rule is you read these things together so that they

12  make sense, and one provision doesn't gut the other

13  provision, and that's a standard rule of

14  interpretation that is generally to be followed.  And

15  the other thing is the rule of reason.

16             I just don't believe that just to make the

17  job easier for a patent examiner, they clearly

18  disclosed information that is clearly considered by a

19  patent examiner can't be taken into account in

20  assessing things.  That would make the Patent Office

21  exercise almost absurd.  And we can't construe

22  regulations as absurd.  We just can't do that.

23             MR. McDONALD:  Your Honor, I'd also note for

24  the record, I know the reexams aren't before the jury,

25  but the Patent Office on reexam for each of the three

2923

1   patents specifically said that this '989 patent

2   presented a substantial new question of patentability

3   because it wasn't a fact not considered.

4           I do think it's very unfair to do anything

5   that would portray to the jury that the Patent Office

6   must have considered it.  I know the reexam isn't

7   coming in, but when it's actually directly contrary to

8   the Patent Office's findings, and we agreed back at

9   the motions in limine, I just think that would be very

10  unfair.

11          THE COURT:  You know, you can deal with the

12  reexamination procedure in whatever way you want to in

13  the instructions, but that's not before me now.

14          MS. HUGHEY:  Your Honor, I don't want to beat

15  a dead horse, but can I have one moment to wrap up

16  before we close this?

17          MS. STOLL-DeBELL:  I have one short thing.

18          The 102(e) issue that Ms. Albert raised with

19  that *Riverwood* case, I wanted to explain -- and I

20  actually -- I want to explain what's going on with

21  that, Your Honor.

22          Each claim may have different inventors.  And

23  so you have the inventors on a patent, and it would be

24  all the inventors that may apply to all the claims.

25  But you do look at inventorship on a claim by claim

2942

1    questioned about it, but the definition I gave did not have as

2    disclosed in it, and that's what the jury has been told.  So I

3    think the correct instruction is as edited in Lawson's 20.

4        MR. ROBERTSON:  Well, Your Honor, I guess our concern

5    is, I mean, we received that from --

6        THE COURT:  You got that.  I don't know how you got

7    it, but you didn't get it from me.

8        MR. ROBERTSON:  Well, not directly, sir.

9        THE COURT:  Well, you did get it.  What you did is --

10   it is my words, but it was my words before I finished the

11   instruction.  It was articulated at the beginning.  We then had

12   discussion, and as a consequence of the discussion, I took out

13   as disclosed basically because all of the definitions that

14   anybody provided me just has made known, and I don't, frankly,

15   think there's any difference with it out.

16       MR. ROBERTSON:  Your Honor, could I just -- I won't

17   quibble with that.  Let me just make this for the record then,

18   if I could, sir, and that is, we did cross-examine witnesses on

19   it, and I did ask questions that utilized this language and did

20   get what I thought were favorable answers with respect to it.

21       Now if it's coming out, I don't think the jury is

22   going to have a specific memory of that, but I don't want to

23   hear -- I'd appreciate not hearing an argument made that

24   somehow the questions that were asked would not apply to this.

25       THE COURT:  They don't, because has made known and

2943

1    has disclosed is the same thing.  It's redundant.

2            MR. MERRITT:  Your Honor, for the clarity of the

3    record, this may be where some of the confusion comes from.  At

4    page 1523 of the trial transcript, the Court was reading from

5    that piece of paper, and in that iteration, the transcript says

6    that the Court did use the term disclosed in talking to the

7    jury.  So that may be where some of our confusion is coming

8    from.

9            THE COURT:  I did use it to the jury?

10           MR. MERRITT:  Yes, sir, you did.  It was during the

11   Christopherson direct, and it's at page 1523.

12           THE COURT:  Read what's before that.

13           MR. MERRITT:  This is during an exchange with Ms.

14   Stoll-DeBell, and then the Court says, beginning at line three,

15   he was asked a different question.  I'm going to tell the jury

16   what the definition is --

17           THE COURT:  That's where I did it.

18           MR. MERRITT:  That's enough.

19           THE COURT:  What I did was take it out in the typed

20   form and left it in in the question if that's what the

21   transcript shows.  Then that's what -- that's the one the jury

22   was told about, and that ought to stay in then.

23           MR. MERRITT:  Beginning at line seven, just to

24   confirm --

25           THE COURT:  The reason I asked you to read what went

1    before is I know what triggered the issuance of the instruction

2    at that particular time.  It was made necessary by the

3    questioning, and so I decided that was the time to do it, and

4    if that's what the transcript shows, that -- it's obvious that

5    while I had edited out, or has disclosed, I did not edit it out

6    in telling the jury, and that's what the instruction should say

7    here.  Shouldn't be different.

8            Frankly, I don't think there's a whit of difference

9    between has disclosed and made generally known, and the only

10   reason I took it out is because all of the other definitions,

11   one way or the other, sort of equate disclosing and made known,

12   and I saw no difference, and so I was just trying to make it

13   simple.  But if that's what happened, then that's what

14   happened.  That's the way it needs to stay, I think.

15           So your objection, if that's what you have still --

16   who is that, Mr. McDonald talking or -- who is going to talk?

17   Do you object now with that background or not given what I

18   actually did?

19           MR. McDONALD:  What I recall is actually in the first

20   sentence, you also -- or the second sentence, you used to have

21   the language, or as disclosed, and you did remove it from that.

22   In this instruction, even as in the transcript here just read,

23   it just says, published simply means to make generally known

24   just as in instruction 20 in the second sentence.

25           I do have the remaining concern, though, that we have

2945

1   this second reference to generally known that now has that

2   language on it.  So we're --

3         THE COURT:  I see what happened --

4         MR. McDONALD:  -- talking about the same thing in two

5   different ways.

6         THE COURT:  It is the same thing, and I did take it

7   out up there at the top, but I didn't take it out down in the

8   bottom in my edit.  That's what happened.

9         MR. McDONALD:  Exactly.  My concern is --

10        THE COURT:  What do you want me to do?

11        MR. McDONALD:  Take it out the second time --

12        THE COURT:  Not going to do it.  Objection overruled

13   and preserved.  I think I need to be consistent with what I've

14   already told the jury, particularly if I articulated it and you

15   all answered questions on it.  Either I'm right or wrong that

16   -- I don't think as disclosed makes any difference.  Then I

17   think you all are entitled to rely on what I the jury in open

18   court.  If I did it wrong, then I'm sure you'll be able to get

19   the Federal Circuit to do something with it.

20         All right, 21.  No objection to 21?

21        MR. ROBERTSON:  No, sir.

22        THE COURT:  22.

23        MR. ROBERTSON:  No objection.

24        THE COURT:  Now, 23, Lawson has a suggestion

25   somewhere.

1    relying on this *SEB* case, Your Honor, which is an outlier case

2    talking about deliberate indifference.   The facts of that case

3    are very different than what we are talking about here.

4              In that case, the defendant actually copied the

5    patentee's product.   They sent it to their manufacturer, and

6    they copied every feature of it.   Then they went and had a

7    patent infringement -- or an opinion done, and they didn't tell

8    the patent attorney that they had copied the patentee's

9    product.

10             And in that case, the Federal Circuit found that they

11   had acted with reckless disregard for the patent rights by

12   copying the product and then having a search done and not

13   telling their patent attorney that they copped it.   In that

14   case, the Federal Circuit found that they basically did know

15   about the patent in that case because of those bad acts.

16             We don't have those facts here, Your Honor, and I

17   think this reckless disregard standard is confusing.   As Mr.

18   Robertson noted, the Supreme Court has granted cert on that

19   case, and I just don't think it's good law, and I don't think

20   it makes sense to put it in this case.

21             MR. ROBERTSON:   Your Honor, it is the Federal

22   Circuit's most recent pronouncement on this case.   They didn't

23   announce the standard based on the facts.   They announced the

24   standard can be reckless disregard, and I did raise this with

25   Your Honor before.   A case that's on certiori is still the law

2968

1    of the land until and -- if and until the Supreme Court

2    overturns it.

3                MS. STOLL-DeBELL:  It is one case, Your Honor,

4    talking about --

5                THE COURT:  Excuse me.  Reckless disregard has always

6    been -- as far as I know, the concept of willful blindness,

7    deliberate indifference, all of those meld together and are

8    components that typically, in the law of intent, have been

9    considered -- have been appropriately considered as factors in

10   the analysis.

11               MS. STOLL-DeBELL:  Your Honor, that may be true, but

12   it doesn't fit the facts of this case.  We don't have any

13   copying here.  In fact, as you know, Lawson has been selling

14   these products since the 1980s.  There's just no facts that are

15   even anywhere close to the facts that they looked at in the *SEB*

16   case that would support instructing the jury on reckless

17   disregard here.

18               THE COURT:  This case says, this Court has made

19   clear, however, that inducement requires a showing of specific

20   intent to encourage another's infringement.  As other Courts

21   have observed, specific intent in the civil context is not so

22   narrow as to allow an accused wrongdoer to actively disregard a

23   known risk that an element of the offense exists.

24               And isn't that -- this Court notes that the Supreme

25   Court has indicated, in a different civil context, that

2971

```
1              THE COURT:  What?

2              MR. ROBERTSON:  It's on the deliberate indifference

3   standard.

4              THE COURT:  Well, that's somewhat different from

5   this, though.  There is a relationship between deliberately

6   disregarding and deliberate indifference in the context of the

7   civil rights case.  Indifference constitutes -- suggests

8   something different than disregard.  So they are not exactly

9   the same, and I think the way the instruction is framed is

10  probably -- it certainly is consistent with the current state

11  of the Federal Circuit law, and I'm obligated to apply the

12  Federal Circuit law, not what I think the Court would do, the

13  Supreme Court is going to do.

14             Now that brings us to number -- let me ask you

15  something, Ms. Stoll-DeBell, while I'm thinking about it.  Did

16  you file these so they are in the record?

17             MS. STOLL-DeBELL:  Yes, sir.

18             THE COURT:  I don't need to separately deal with

19  them?

20             MS. STOLL-DeBELL:  Yes.  So the next one, Your Honor

21  we reached an agreement on it.

22             THE COURT:  You're going to give me shock.  What is

23  it?

24             MS. STOLL-DeBELL:  27.

25             THE COURT:  You all agreed to the added language?
```

3032

1        MR. McDONALD:  We do have an objection to a

2    part of that, and that's the part that would exclude

3    the lay testimony.  We don't think the fact that we

4    proffered nonprivileged evidence on the issue should

5    --

6        THE COURT:  This is the language that you

7    proposed.  Oh, no.  This came from ePlus.

8        MR. McDONALD:  Our proposal was to focus on

9    the opinion of counsel issue and just have the jury

10   disregard the evidence relating to that issue, but

11   allow the testimony about the analysis apart from

12   counsel.

13       So we had proposed jury instruction No. 3

14   that says, "Lawson had no duty to get an opinion from

15   counsel on whether or not it infringes ePlus' patents.

16   Both parties in this case have received advice from

17   counsel without disclosing that advice to the other

18   party.  This is normal.  You may make no

19   determinations based on the fact that Lawson did not

20   disclose the opinion it received from its Lawson's to

21   ePlus.  That fact has nothing to do with this case."

22       MR. ROBERTSON:  Your Honor, we'd object to

23   that.

24       THE COURT:  I'm not giving that.  I'm going

25   to strike the part that says whether he or other lay

3033

1  witnesses at Lawson formed a viewpoint about whether

2  Lawson infringed the patents, and it will read, "The

3  other day Mr. Christopherson testified there was some

4  testimony about whether Lawson obtained an opinion of

5  non-infringement or invalidity of the patents.  I

6  instruct you now I've excluded all that testimony and

7  I'm instructing you to disregard it."

8          MR. McDONALD:  Our objection, Your Honor,

9  just to be clear, is that we do think the jury needs

10 to be clear that the fact that we didn't produce the

11 advice shouldn't be held against us in a sense.

12 That's what we think is missing.

13         MR. ROBERTSON:  I think the instruction makes

14 that clear and is adequate.

15         THE COURT:  I'll just add that has nothing do

16 with the case.

17         All right.  And that will be inserted in

18 instruction number No. 13A.

19         Now, is there anything else I need to go over

20 here with the instructions?

21         MR. ROBERTSON:  Well, Your Honor, we need to

22 get together and give you a summary of what the prior

23 art is going to be.  I would anticipate we could do

24 something like Lawson contends that the prior art at

25 issue is X and ePlus contends the alleged prior art

1          THE COURT:  42, plaintiff's proposed

2     instruction, prior art considered by the examiner.  I

3     understand your position that you think that it's not

4     even prior art.  I disagree with that, and I think the

5     cases that were cited -- I think if you read the

6     manual as a whole, and what do you call it, the MPEP

7     as a whole, it is clear that the disclosure made in

8     this case in this patent can be considered as having

9     been considered as prior art on the facts of this

10    case, and the objection that you've made to striking

11    it -- I guess you made a request to strike it, didn't

12    you?

13         MR. SCHULTZ:  Yes, sir, with respect to

14    instruction No. 42, I am.

15         THE COURT:  I think that's the ruling in the

16    *Gould* case and the --

17         MR. ROBERTSON:  *Eastman Kodak*?

18         THE COURT:  *Polaroid v. Eastman Kodak*,

19    *Indiana Mills*, and the manual taken as a whole teach

20    that that's the applicable rule.

21         So now that being the case, what do we do

22    about instructing it?  Why does it come up?  Why does

23    it come up at all if nobody argues it?

24         Suppose I just say you can't make the

25    argument that it's not prior art or wasn't considered?

3042

1   Because there really isn't any evidence on that except

2   what appears in the file folder, and the guy actually

3   wrote something in the file folder about the matter.

4           So how do you propose that we deal with it

5   now we're at this point on the law, Mr. Schultz?

6           MR. SCHULTZ:  We also submitted an

7   instruction on this matter, Your Honor, and it's in

8   our proposed instruction, the red line version you

9   have there.

10          THE COURT:  Which one is it?

11          MR. SCHULTZ:  Lawson proposed jury

12  instruction No. 1.

13          THE COURT:  I don't have it.

14          MR. SCHULTZ:  Your Honor, it's actually

15  No. 2.

16          THE COURT:  I start with 8.

17          MR. SCHULTZ:  It's at the back, Your Honor.

18          THE COURT:  Oh, it's at the back.  Excuse me.

19  Three.

20          MR. SCHULTZ:  It's No. 2.  So Lawson proposed

21  jury instruction No. 2.

22          THE COURT:  Two.  Okay.  The face of any

23  patent issued by the United States Patent and

24  Trademark Office list of references that are cited to

25  the Patent and Trademark Office under the heading

3043

1  "References cited."  This list includes all the

2  references the examiner considered as prior art when

3  determining whether to grant a patent to the claimed

4  subject matter.

5          Okay.  I can't give that given the ruling of

6  law that I've made.  So what about the one that they

7  gave?

8          MR. SCHULTZ:  Your Honor, I think Plaintiff's

9  Proposed Instruction No. 42 would be very highly

10  prejudicial to Lawson.

11          THE COURT:  Let's get down to where the

12  rubber meets the road.  Why are we going to have this

13  issue argued to the jury at all now?  Why does that

14  even come in and, therefore, why do we need to

15  instruct, Mr. Robertson?

16          MR. ROBERTSON:  If the defendant doesn't

17  argue it, I don't think we need an instruction.  But

18  I've asked counsel --

19          THE COURT:  Given the ruling of law that I've

20  made, how can you argue it?

21          MR. McDONALD:  I guess given your ruling,

22  Your Honor, I understand we can't argue it.  So if we

23  can't argue it, I don't see the need for that

24  instruction.

25          THE COURT:  There's no need for an

3044

1   instruction, do you agree?

2          MR. McDONALD:  That's right.  I understand

3   the ruling specific to the RIMS patent, the '989

4   patent.  The RIMS brochure, for example, that wasn't

5   disclosed to the Patent Office.  I assume we could

6   talk about that.

7          THE COURT:  Absolutely.

8          MR. ROBERTSON:  My colleagues reminded me

9   throughout the case --

10         THE COURT:  But you can't do it by saying it

11  has to be in those lists.

12         MR. McDONALD:  Okay.

13         THE COURT:  Because that would then implicate

14  the effect of the '989 that was disclosed.  You just

15  have to figure out a way to do it and say --

16         MR. McDONALD:  That's not inconsistent with

17  your ruling.

18         THE COURT:  Yes.

19         MR. McDONALD:  I understand.

20         MR. ROBERTSON:  Given Your Honor's ruling as

21  to what the state of the law is, we can certainly

22  argue that it was considered since it's cited

23  throughout the patent 59 times and listed as

24  incorporated by reference.

25         THE COURT:  Why is that an issue?

3045

1      MR. ROBERTSON:  Because the presumption of

2  validity attaches there and also because --

3      THE COURT:  Well, I'm going to tell them the

4  presumption -- let me tell you something.  Don't be

5  outthinking owls now about whether or not -- because

6  could you open up a door that doesn't need to be

7  opened up.  I think it's a neutral factor here in this

8  case.

9      MR. ROBERTSON:  I think Dr. Shamos was asked

10  whether or not it was considered by the Patent Office.

11  So I think there's been testimony in the case that it

12  wasn't considered.

13      THE COURT:  I think I said he couldn't

14  testify to that.  Go back and check it because I do

15  remember that in cross-examination, I believe, of one

16  witness there was the file wrapper was an exhibit, and

17  there was the question, Well, now look at this.  And

18  he had marked through the application number and

19  written in the patent number.  And I'm not sure what

20  came of all of that.

21      MR. ROBERTSON:  We'll go back and check, Your

22  Honor.

23      THE COURT:  All right.  But if you're going

24  to argue that, you look at what I ruled and whether it

25  came in.  I think I precluded him from testifying

3046

1    about it.

2            MR. McDONALD:   We don't think it should be at

3    issue, and we'll stir clear of it.  I understand your

4    ruling and we'll argue it consistent with that and any

5    instruction we think would be prejudicial, especially

6    in view of what's going on with the reexaminations in

7    the case.

8            THE COURT:   Is there any issue that you think

9    isn't impacted by the reexaminations?

10           MR. McDONALD:   Those reexams are looking

11   pretty good right now.

12           THE COURT:   I'm sure they are.  See what

13   happens when you kind of zing those little zingers in?

14   It doesn't have anything to do with what I'm doing on

15   a particular issue.

16           Do you have some issue that I need to

17   actually confront with respect to the reexaminations

18   that, in fact, I haven't already ruled on?

19           MR. McDONALD:   No.   The issue is whether they

20   are going to be able to argue it in closing arguments

21   that the Patent Office did consider the '989 patent,

22   and I'm saying that on specific issue I think you're

23   saying we shouldn't be talking about it anyway.

24           Maybe I'm kicking a sleeping dog here.   I'm

25   not sure, but I think if you allowed them to go there,

3047

1   and I can't talk about it, but they can go there on

2   that, that's going to be prejudicial to me anyway, but

3   it's going to be especially prejudicial and unfair in

4   view of what's going on in the reexams.

5          MR. ROBERTSON:  The reexams aren't in

6   evidence.  The patent is in evidence.  And Your Honor

7   made a ruling of law that said consistent with all

8   those other cases and the MPEP, that it must be

9   considered by the examiner.

10          THE COURT:  No, that it's there to be

11   considered as prior art by the examiner.  There's a

12   big difference.  I'm not going to say that the

13   examiner considered it.  I don't know whether he did

14   or not.

15          If I were the finder of the fact, I would

16   find from the law that he could consider it, and that,

17   in fact, it was considered.  But my question is:  How

18   does that issue come up with respect to what they have

19   to decide?  Is there an issue that they actually have

20   to decide with respect to what was considered by the

21   Patent Office now?

22          MR. McDONALD:  The context, I guess, really

23   is the burden we have is clear and convincing evidence

24   either way, and some people might say that shifts

25   because if you assume that the examiner saw the prior,

3048

1   art, that might make the burden higher or lower.

2   That's one of these patent lawyer debates on the head

3   of a pin.

4          THE COURT:  I agree it's how many angels can

5   stand on a head of a pin, and I never have been good

6   about deciding that issue.

7          All right.  Now, so there are no other

8   instructions at this time.  Are you going to get those

9   over to me first thing in the morning?

10          MS. STOLL-DeBELL:  Email them?

11          THE COURT:  You can email them to

12   Ms. Haggard.  She will get them taken care of for me.

13          MR. ROBERTSON:  Your Honor, we did have that

14   curative instruction with respect to Dr. Shamos' slide

15   that had the Court's claim constructions in it.  I

16   proposed that if the defendant was not going to use

17   those in closing arguments, then we don't need a

18   curative instruction, but I don't think we resolved

19   that.

20          MR. McDONALD:  I asked for a copy of what

21   slides they were talking about.

22          THE COURT:  That was the last topic I

23   heard -- discussion I heard on the topic was Mr.

24   McDonald requested what is it you're talking about,

25   and I think that's a reasonable thing.

1    Also for purposes of review, and because there's been some

2    confusion in this case with respect to a lot of evidence that

3    has come in with respect to, say, PO Writer and J-CON, and what

4    we don't want to have is a situation where the jury comes back

5    and says, well, PO Writer or J-CON invalidated.

6         You know there's a question from one of the jurors

7    which we still haven't resolved, so there is some apparent

8    confusion about that.  So for purposes of review, for example,

9    if they were to come back and say J-CON invalidates claim three

10   of the '683 patent, it could go back with an explanation that

11   you can't consider J-CON for that, and we could clear up that

12   confusion.  Otherwise, it's simply a black box.  We have no way

13   to understand --

14        THE COURT:  If you do that, don't -- I understand

15   your point, but if you do that, you then have to have separate

16   inquiries, one invalid for anticipation and the other invalid

17   for obviousness, because you are using different prior arts for

18   each, as I understand it, from what Ms. Stoll-DeBell said, and

19   I don't think you can actually -- if you're going to have a

20   more detailed specific finding on a verdict form as in the

21   special interrogatory, for example, which is sort of what you

22   are talking about here, then you need to make sure it conforms

23   to the evidence in the case.

24        MR. ROBERTSON:  Well, there will be instructions,

25   Your Honor, as to which references can be considered for

3078

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF VIRGINIA

 3                     RICHMOND DIVISION

 4

 5    ---------------------------------------
                                            :
 6    ePLUS, INC.                           :    Civil Action No.
                                            :    3:09CV620
 7    vs.                                   :
                                            :
 8    LAWSON SOFTWARE, INC.                 :    January 24, 2011
                                            :
 9    ---------------------------------------

10

11           COMPLETE TRANSCRIPT OF THE JURY TRIAL

12          BEFORE THE HONORABLE ROBERT E. PAYNE

13        UNITED STATES DISTRICT JUDGE, AND A JURY

14
      APPEARANCES:
15
      Scott L. Robertson, Esquire
16    Michael G. Strapp, Esquire
      David M. Young, Esquire
17    Goodwin Procter, LLP
      901 New York Avenue NW
18    Suite 900
      Washington, D.C.  20001
19
      Craig T. Merritt, Esquire
20    Christian & Barton, LLP
      909 East Main Street
21    Suite 1200
      Richmond, Virginia  23219-3095
22    Counsel for the plaintiff

23

24              Peppy Peterson, RPR
               Official Court Reporter
25           United States District Court
```

1    ProcureNet, and my client, ePlus, acquired ProcureNet back in

2    2001 with all of its assets, all of its products, and it's

3    patents.

4            If we could have the first slide.  It's not on my

5    screen.  Is it on anybody else's screen?

6            THE COURT:  His screen doesn't work.

7            MR. ROBERTSON:  It's always something.  Everybody has

8    it?  All right.  So ePlus acquired these patents, and they've

9    been proven to be very valuable.  We've had five of ePlus's

10   competitors that have now taken license to the patents-in-suit,

11   and ePlus has earned almost $60 million in royalties.

12           ePlus and its customers have received awards for

13   these products as you heard from Mr. Farber for the patented

14   technology.  It was a long-felt need in this industry, and

15   there was, as I say, even initial skepticism from Fisher

16   Scientific's own management.

17           Notwithstanding that five of our competitors have

18   taken licenses, Lawson, however, now wants you to let them

19   skate free.  Lawson now argues the invention was obvious.

20   That's an argument that can only be made 20 years after the

21   fact with 20/20 hindsight.

22           Lawson suggests that sitting here now, it should have

23   been obvious to create an invention that several engineers

24   spent millions of dollars and more than a year, two years to

25   create and that the Patent Office got it wrong, not once, not

3162

1   RIMS and TV/2 both out there.  Both going together.

2   Now, we showed you a little bit of additional prior

3   art as well to give you the context for the

4   marketplace and show that the needs in the market for

5   these types of products for purchasing and requisition

6   systems were already being met by some pretty old

7   systems.  That was those P.O. Writer and J-CON

8   systems.  And heard some testimony about both of those

9   things.

10          If we could go to the next slide, please.

11  This was one of Mr. Shamos' slides talking about that

12  P.O. Writer system.  That was Ms. McEneny who

13  testified what you saw in the video.  She talked about

14  the P.O. Writer system.  And Mr. Shamos gave some

15  examples of the features of this thing.  It was a

16  requisition and purchasing system that even allowed a

17  user to specify a catalog for searching.  And then

18  once you've picked a catalog like Bayless that's shown

19  in this page, then you could pick a particular part or

20  look for a part within that specific Bayless catalog.

21          So selecting catalogs to search, selecting

22  parts of the database to search, and then searching

23  them in a two-step process.

24          And if we go to the next slide.  Another one

25  of Mr. Shamos' slides here just to give an example of

3163

1  how this P.O. Writer documentation described that a

2  user could create a requisition.  Pick the part.  Now,

3  I put it on that requisition list.

4          THE COURT:  Why are we talking about P.O.

5  Writer?  Instruction 29 and 30A don't have that in

6  there at all.

7          MR. McDONALD:  This was to show the needs of

8  the marketplace were being met and goes to the

9  obviousness issue.

10         THE COURT:  It does not go as prior art, and

11 you're arguing it as prior art, and it's inconsistent

12 with what you said you want as prior art.  You can't

13 have that argument.  That's not right.

14         We've gone beyond that in this case.  Excuse

15 me.  Disregard that about the P.O. Writer.

16         MR. McDONALD:  All right.  Can we go back to

17 slide 43.  So these were the key parts of the IBM

18 literature that really show it's obvious to combine

19 this with RIMS.  So we've got all these features from

20 the RIMS system.  We've got all these features from

21 the TV/2 system.  Together they have all the elements

22 of the claims here.  So now the question is, is it

23 obvious to combine them?  The Judge will give you an

24 instruction on that, but that's the question for one

25 of ordinary skill in the art at the time August of '94

1    recollection, isn't an uncommon experience.  And so in weighing

2    the effect of some discrepancy, always consider, does that

3    discrepancy pertain to a matter of importance or to some

4    unimportant detail?  And does that discrepancy result from

5    innocent error or from deliberate falsehood?

6         After making your own judgment, you're going to give

7    the testimony of each witness such credibility, if any, as you

8    may think it deserves.  That is up to you to do.

9         Something came up during the trial that I need to

10   sort out for you.  Several days ago, Mr. Christopherson

11   testified, and there was some testimony about whether Lawson

12   obtained an opinion of counsel of non-infringement or

13   invalidity on the patents.  I instruct you now that I have

14   excluded that testimony.  That issue is simply not pertinent to

15   the case.  It has nothing to do with the case, and I'm

16   instructing you to disregard whatever was said about the

17   intention or nonintention of counsel by Lawson.

18        Now, several times during the trial, the lawyers have

19   pulled out depositions and have asked a witness a question and

20   said, on such and such a date, didn't you say this after the

21   witness has said something here in court.

22        A deposition is a sworn statement made out of court

23   but under oath, but the testimony of a witness can be

24   discredited or impeached by showing that a witness made

25   statements earlier which are different or are inconsistent with

3266

1   contends they are obvious by prior art references.

2        The following things can be prior art:

3        (1)  Any product or method that was publicly

4   known or used by others in the United States before

5   the patented invention was made;

6        (2)  publications having a date more than one

7   year before the filing date of the patent;

8        (3)  any product or method that was in public

9   use or on sale in the United States more than one year

10  before the patent was filed;

11       (4)  any patent granted on an application for

12  patent by another person filed in the United States

13  before the invention by the applicant for the patent.

14       Lawson contends that the following, each one

15  of them, are prior art that anticipates.  Now, there's

16  a difference between their contention of what is prior

17  art that anticipates the patent and what is prior art

18  that makes the patent obvious.  And this is the prior

19  art for purposes of anticipation.  And that is what

20  they call the Fisher RIMS system and also U.S. Patent

21  number, what's been called the '989 patent.

22       EPlus disputes that any of those are prior

23  art or that any of these anticipate the asserted

24  claims.  It is up to you to decide what is or isn't

25  prior art in accord with instructions that I give you.

```
                                                         3301

  1            IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
  2                  RICHMOND DIVISION

  3   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                        :
  4   ePLUS, INC.,                      :
                                        :
  5                     Plaintiff,      :
      v.                                :  Civil Action
  6                                     :  No. 3:09CV620
      LAWSON SOFTWARE, INC.,            :
  7                                     :  January 25, 2011
                        Defendant.      :
  8   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

  9

 10

 11            COMPLETE TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE ROBERT E. PAYNE
 12         UNITED STATES DISTRICT JUDGE, AND A JURY

 13

 14

 15   APPEARANCES:

 16   Scott L. Robertson, Esq.
      Michael T. Strapp, Esq.
 17   GOODWIN PROCTOR
      901 New York Avenue, NW
 18   Washington, D.C.    20001

 19   Craig T. Merritt, Esq.
      CHRISTIAN & BARTON
 20   909 E. Main Street, Suite 1200
      Richmond, VA    23219-3095
 21
                 Counsel for the plaintiff ePlus
 22

 23

                      DIANE J. DAFFRON, RPR
 24                  OFFICIAL COURT REPORTER
                   UNITED STATES DISTRICT COURT
 25
```

3306

1          THE COURT:  All right.  In Section II,

2     validity, (A) what are we supposed to use to define

3     "Fisher RIMS" in A?

4          Next question:  Since J-CON and P.O. Writer

5     aren't listed on our verdict sheet, are we to consider

6     them as prior art?  Isn't that what they were included

7     in the case for?

8          Next question:  Was P.O. Writer meant to be

9     considered as a competing, similar system or was that

10    evidence not to be included in deliberations?

11         Next question:  In jury instruction, Judge

12    Payne spoke of anticipation.  Two items combined are

13    not prior art.  So anticipation does not apply

14    anymore; is that correct?

15         Let's take the easy ones first at the back.

16    I propose to call them back in here and refer them to

17    the anticipation instructions and to remind them that

18    you can't combine two pieces of prior art for purposes

19    of anticipation, that it all has to be -- that you

20    have to consider whether there's anything in one

21    single prior reference, prior art reference.  And

22    anticipation is in the case but not in terms of the

23    combination, that the combination applies only to the

24    obviousness; is that right?

25         MR. ROBERTSON:  I think, Your Honor, there

3324

1  claim by claim basis.

2          It is for you to decide whether Lawson has

3  met its burden by clear and convincing evidence.   In

4  other words, you decide whether Lawson has proved what

5  I outlined for you.   Does that help you?

6          THE JURY:   Yes.

7          THE COURT:   Okay.

8          The next question is:   Since J-CON and P.O.

9  Writer aren't listed on our verdict sheet, are we to

10  consider them as prior art?   Isn't that what they were

11  included in the case for?   Was P.O. Writer meant to be

12  considered as a competing, similar system or was that

13  evidence not to be included in deliberations?

14          There really are two parts of that, and for

15  that I would like to refer you to instruction 30,

16  which lists prior art for purposes of anticipation,

17  and to instruction 39, which lists the prior art

18  that's at issue for obviousness.

19          You will note that neither J-CON or P.O.

20  Writer is listed as prior art either for purposes of

21  anticipation or for purposes of obviousness.   That

22  means that you cannot consider either P.O. Writer or

23  J-CON or the combination thereof for purposes of

24  deciding anticipation or obviousness.

25          Are you with me so far?

3325

1          THE JURY:  Yes.

2          THE COURT:  Now, you asked is that evidence

3   in the case still?  That is, that there existed

4   something called J-CON and P.O. Writer.  And the

5   answer to that is I refer you to instruction 42.  42,

6   I told you, has certain factors which, if established,

7   may indicate that the invention would not have been

8   obvious.  In other words, these are things that show

9   non-obviousness.  None of those factors alone is

10  dispositive and you must consider the obviousness or

11  non-obviousness of this invention as a whole.

12          But if you'll look at No. 2 in that list,

13  there are six things or seven things, I think, in that

14  list.  Yes.  No. 2 says, Was there a long felt but

15  unresolved need for a solution to the problem facing

16  the inventors?  The inventors meaning of the '683, the

17  '516, and the '172 patents, which was satisfied by the

18  claimed invention.  And the evidence about that there

19  is a J-CON and there is a P.O. Writer was admitted for

20  you to consider in deciding whether or not you think

21  there was a long felt but unresolved need for a

22  solution to the problem facing the inventors in this

23  case, which was satisfied by the claimed invention.

24  In other words, that evidence is related and admitted

25  only for the purpose for you to consider in deciding