# EXHIBIT J

## 1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
 2                  RICHMOND DIVISION
 3   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                     :
 4   ePLUS, INC.,                    :
                                     :
 5           Plaintiff,              :
       v.                  : Civil Action
 6                         : No. 3:09CV620
     LAWSON SOFTWARE, INC.,          :
 7                         : March 25, 2011
             Defendant.    :
 8   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:
 9
10              DAILY COPY
11
12     COMPLETE TRANSCRIPT OF EVIDENTIARY HEARING
          BEFORE THE HONORABLE ROBERT E. PAYNE
13             UNITED STATES DISTRICT JUDGE
14
15   APPEARANCES:
16   Scott L. Robertson, Esq.
     Jennifer A. Albert, Esq.
17   Michael T. Strapp, Esq.
     GOODWIN PROCTOR
18   901 New York Avenue, NW
     Washington, D.C.  20001
19
     Craig T. Merritt, Esq.
20   CHRISTIAN & BARTON
     909 E. Main Street, Suite 1200
21   Richmond, VA  23219-3095
22      Counsel for the plaintiff ePlus
23
             DIANE J. DAFFRON, RPR
24           OFFICIAL COURT REPORTER
          UNITED STATES DISTRICT COURT
25
```

## 2

```
 1   APPEARANCES:  (Continuing)
 2   Daniel W. McDonald, Esq.
     Kirstin L. Stoll-DeBell, Esq.
 3   William D. Schultz, Esq.
     MERCHANT & GOULD
 4   3200 IDS Center
     80 South Eighth Street
 5   Minneapolis, MN  55402-2215
 6   Dabney J. Carr, IV, Esq.
     TROUTMAN SANDERS
 7   Troutman Sanders Building
     1001 Haxall Point
 8   P.O. Box 1122
     Richmond, VA  23218-1122
 9
        Counsel for the defendant Lawson.
10
```

## 3

```
 1         (The proceedings in this matter commenced at
 2   9:30 a.m.)
 3
 4         THE CLERK:  Civil Action No. 3:09CV620,
 5   ePlus, Incorporated v. Lawson Software, Incorporated.
 6         Mr. Scott L. Robertson, Mr. Craig T. Merritt,
 7   Ms. Jennifer A. Albert, Mr. Michael G. Strapp
 8   represent the plaintiff.  Mr. Daniel W. McDonald,
 9   Mr. Dabney J. Carr IV, Ms. Kirstin L. Stoll-DeBell,
10   Mr. William D. Schultz, and Ms. Rachel C. Huey
11   represent the defendant.
12         Are counsel ready to proceed?
13         MR. ROBERTSON:  The plaintiff is, Your Honor.
14         MR. McDONALD:  Lawson is as well, Your Honor.
15         THE COURT:  All right.  This is the
16   evidentiary hearing on the issue of an injunction.
17         Is there another firm coming into this case
18   for you-all?
19         MR. McDONALD:  The Finnegan firm is involved,
20   Your Honor, but they are not going to be participating
21   in this hearing.  They are going to be involved with
22   the appeal primarily, but they wanted to have access
23   to the documents.
24         THE COURT:  Oh, okay.
25         Mr. Robertson.
```

## 4

```
 1         MR. ROBERTSON:  Good morning, Your Honor.
 2         If I might, I just have a few brief opening
 3   remarks to just sort of put some of the issues in
 4   context and then preview for the Court or highlight
 5   some of the topics that are going to be addressed
 6   today by Mr. Farber's testimony, if that's
 7   permissible.
 8         THE COURT:  All right.
 9         MR. ROBERTSON:  First, we are here to discuss
10   the supplemental evidence, testimony and documentation
11   that have been provided to the Court and exchanged by
12   the parties since the trial ended that we believe will
13   support the Court's discretion to grant an injunction
14   in this case to prevent the ongoing infringement of
15   ePlus' patents.
16         We certainly don't want to be here today, and
17   I know the Court doesn't want to retry the case, or
18   reargue a number of the issues involving hotly
19   contested issues that are before the Court.
20         That said, there will be some additional
21   details concerning evidence that did come out that we
22   think would be important for the Court to consider.
23         I'd just like to highlight Section 154 of the
24   Patent Act.  Your Honor, the only right conferred upon
25   a patent owner under the Patent Statute is the right
```

217

HAGER - DIRECT  218

1  So try to confine it to what actually
2  happens. That's what's important anyway. And that's
3  really what he knows most about, I would assume.
4  MR. McDONALD: Fair enough.
5  BY MR. McDONALD:
6  Q  Can we talk, Mr. Hager, about the tracking that
7  your system does for those medical supplies for
8  operations? Can you walk us through how the Lawson
9  system is used to track, for example, the supplies
10  that are used for surgery in a hospital?
11  A  Again, at the beginning of the process is the
12  inventory management and inventory counting that is
13  done. And that all gets loaded up into the system
14  where somebody looks at the system and determines in
15  what hospitals they need to have which materials
16  purchased, so that they have the adequate in stock
17  equipment.
18     And then they run those through the purchase and
19  were able to follow it through the process to the
20  loading dock, to the invoice matching, and ultimately
21  follow that device all the way into the operating
22  room.
23  Q  So your system actually tracks the inventory used
24  in surgery all the way into the operating room?
25  A  Correct.

218

HAGER - DIRECT  219

1  Q  You indicated the amount of time it would take to
2  go to an alternative system. Do you have an estimate
3  as to how long it would take a customer to actually
4  select and verify and implement a system that would
5  replace the Lawson eProcurement functionality?
6  A  It's entirely up to the customer as to how long it
7  would take to select, but from an implementation
8  perspective knowing how complex those implementations
9  are, and I don't believe it's overstating it to say it
10  would be nine months probably on average.
11  Q  Is that within the range Mr. Farber provided
12  today?
13  A  He provided 30 days to six months to potentially
14  longer. Because of the very complex health care
15  organization we run, I believe it would fall in the
16  typically longer.
17     I do say that with some level of expertise. We
18  have 277 requisition self service health care only
19  customers that represent 2500 different hospitals,
20  which is about a third of the hospitals in the United
21  States. We do have a lot of experience.
22  THE COURT: You have a lot of business and
23  you have a lot of infringement, according to the jury.
24  So the question I have to deal with is how to deal
25  with it.

219

HAGER - DIRECT  220

1  THE WITNESS: I understand.
2  THE COURT: Now, if you're shut down and a
3  government agency comes in and finds that you're
4  committing fraud and shuts down all your operations to
5  do a search and seizure, how is somebody, for example,
6  who's using your system going to operate? Do you know
7  that?
8  THE WITNESS: On day one, they would simply
9  operate at risk.
10  THE COURT: They would find a way is what
11  would happen.
12  THE WITNESS: For money, yes, they would.
13  THE COURT: Of course, it would. Of course,
14  it would.
15     Now, suppose that we had a terrible
16  catastrophe that wiped out where you have most of your
17  support system. Are the hospitals going to be able to
18  find somebody to help them straighten out and track
19  what's going on and be able to provide surgeries to
20  people; yes or no?
21  THE WITNESS: There's always a way.
22  THE COURT: There's a way. The question is:
23  How much, right?
24  THE WITNESS: Correct.
25  THE COURT: And how much inconvenience?

220

HAGER - DIRECT  221

1  THE WITNESS: Correct.
2  THE COURT: Okay. That's the way you
3  circumscribe the issue, not try to convince somebody
4  that it's just going to all stop, the world is going
5  to stop, because it's not going to stop.
6     Is it going to be costly? Yes. Is it going
7  to be a problem? Yes. Is it some risk? Yes.
8     That's what the balancing in this case has to
9  deal with. Not overselling. Don't oversell the
10  product. The risk is the hearer just says that's just
11  more puffery and I'm not going to pay anymore
12  attention to it. It's serious enough the way it is.
13  BY MR. McDONALD:
14  Q  With respect to the support service Lawson
15  provides for these RSS and Punchout customers, Lawson,
16  do they actually generate purchase orders when they
17  are servicing customers?
18  A  I'm sorry. I didn't understand.
19  Q  Does Lawson itself actually generate purchase
20  orders for supplies when they're servicing customers
21  or is it more a matter of just solving the problem
22  from a software or technical standpoint?
23  A  When you say --
24  THE COURT: Hold on.
25  MR. ROBERTSON: It's vague and ambiguous.

2011.03.25 Hearing - Injunctive Relief  3/25/2011  8:54:00 AM

261

1  that have RSS if they had to make a change; do you recall that?
2  A    Yes.
3  Q    Do you have an estimate as to how much it would cost
4  your -- let's take a hospital, how much money it would actually
5  cost them to make a change or not?
6       MR. ROBERTSON:  Objection, lack of foundation, Your
7  Honor, and I think it's outside the scope of my cross-examine.
8       THE COURT:  I think it's within the scope of your
9  cross-examination.  I don't know whether he -- I think he's
10 asking a foundational question, that is whether he knows or has
11 any basis to know what the cost is.
12      MR. ROBERTSON:  Also, certainly there was no
13 documentation produced in the supplemental period with respect
14 to the cost issue.
15      MR. McDONALD:  But he asked about it, so I thought we
16 should flush that out.  I'll ask the foundational question.
17 Q    Mr. Hager, from your experience, do you have an idea of
18 how much it would cost, for example, a hospital to make that
19 change away from RSS?
20 A    I do have some experience with that, yes.
21 Q    Based on your experience, what would you believe to be the
22 likely cost to a hospital for that change?
23 A    For a hospital, the hospital -- very large hospitals I
24 think would be more expensive than some of the non-hospital RSS
25 customers we have, so if I were to take the simplest

262

1  implementation of our RSS and pull it out and put something
2  else in, you know, probably the simplest would be three months,
3  but I think on average for our hospitals, I bet you would it
4  probably be closer to nine months because of the complexities
5  of the hospital.
6  Q    You gave me the time.  I was actually asking -- maybe you
7  were thinking of time cost, but I think the question is
8  actually going to the monetary cost.
9  A    Yeah, that's going to run somewhere north of 300,000, 3-
10 to 500,000 probably for that length of time.  Maybe up to
11 750,000 on average.  Some will be greater than a million.
12      THE COURT:  Does it cost that much to put RSS in?
13      THE WITNESS:  Some of our projects -- again, we put
14 RSS in in conjunction with everything else, but it's so tied
15 into the work flow approvals, and our work flow approvals are
16 based off everything that happens in RSS, so pulling RSS out
17 means you are rebuilding all those work flow approvals to go
18 with whatever new tool you are bringing in, and that's really
19 where the complication comes.  I wish it didn't take this long,
20 but it does.
21 Q    And finally, Mr. Robertson asked you about the advantages
22 of selling the full suite, and I want to clarify, if the
23 customer already has an SAP ERP suite, for example, do you have
24 an advantage over ePlus in selling to a customer like that
25 that's looking for eProcurement?

263

1  A    No.  As a matter of fact, a disadvantage, because our RSS
2  and Punchout won't work with an SAP suite.  We wouldn't even
3  attempt to make that sell.
4  Q    So when is it that Lawson would have actually have some
5  advantage for offering the full suite that Mr. Robertson was
6  asking about?
7       MR. ROBERTSON:  Your Honor, I didn't ask -- I asked
8  him about whether or not having that full suite put my client
9  at a disadvantage.
10      THE COURT:  Sustained.
11 Q    So in that situation then, can you explain what type of
12 customer would be the customer --
13      THE COURT:  What situation?
14 Q    Where Lawson would have that advantage or ePlus would have
15 the disadvantage to Lawson, what specific market situation
16 might that be?
17 A    As was mentioned, when we're selling the entire integrated
18 suite, it's obviously because the customer wants a fully
19 integrated suite, so that would become our competitive
20 advantage.  I should also mention that, you know, our RSS --
21      MR. ROBERTSON:  Objection, Your Honor.  He's
22 responded to the question.
23      THE COURT:  Sustained.
24      THE WITNESS:  Actually, it's a follow-on to the --
25      THE COURT:  No, that's enough.

264

1  Q    If I understand, that's a situation where you are offering
2  a full suite including nonprocurement products?  Did I
3  understand correct?
4  A    Correct.
5  Q    Does ePlus even offer nonprocurement products?
6  A    Not to my knowledge, no.
7       MR. McDONALD:  No further questions.  Thank you.
8       THE COURT:  Thank you very much.  You may step down,
9  sir.
10      MR. ROBERTSON:  Your Honor, if I might address one
11 issue.  I just want to make sure that with the conclusion of
12 this testimony now and the submission that we've exchanged,
13 that this closes the evidentiary record.
14      THE COURT:  The record on the injunction is closed.
15 Now --
16      MR. McDONALD:  Just to clarify, Your Honor, there are
17 some exhibits that we put into these disclosures.  We'd like
18 the option of referring to some of the other documents that
19 have been -- that involve these customers, for example.  We
20 didn't want to bog down the testimony today with these
21 witnesses who may not have had personal knowledge.
22      There were certain things we were trying to get in
23 the testimony.  I think maybe Mr. Robertson meant to include
24 the documents from our disclosures as part of the record, but
25 for live testimony, I think we agreed they were closed.

2011.03.25 Hearing - Injunctive Relief  3/25/2011  8:54:00 AM

289

```
 1     MR. McDONALD:  Your Honor, I'm not sure where we're
 2  at.  I've been asked to point out, in my self interest as well,
 3  we have a 7:20 flight.  Is it something that's going to end
 4  soon, or do you want us --
 5     THE COURT:  Goodbye.  I'm thinking about a slight
 6  moving of the date of the hearing because of the length of what
 7  you all have done on this one, but I won't do it, so go catch
 8  your plane.
 9     MR. McDONALD:  Thank you, Your Honor.
10     THE COURT:  All right.
11
12          (End of proceedings.)
13
14
15     We certify that the foregoing is a correct transcript
16  from the record of proceedings in the above-entitled matter.
17
18
19     /s/                    _____
       P. E. Peterson, RPR         Date
20
21
            /s/                    _____
22     Diane J. Daffron, RPR       Date
23
24
25
```