# EXHIBIT D

515

```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                   RICHMOND DIVISION
 3     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                         :
 4     ePLUS, INC.,                      :
                                         :
 5          Plaintiff,     :
       v.                   : Civil Action
 6                          : No. 3:09CV620
       LAWSON SOFTWARE, INC.,            :
 7                          : January 6, 2011
            Defendant.      :
 8     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:
 9
10
11          COMPLETE TRANSCRIPT OF JURY TRIAL
          BEFORE THE HONORABLE ROBERT E. PAYNE
12       UNITED STATES DISTRICT JUDGE, AND A JURY
13
14
15     APPEARANCES:
16     Scott L. Robertson, Esq.
       Jennifer A. Albert, Esq.
17     Michael T. Strapp, Esq.
       David M. Young, Esq.
18     GOODWIN PROCTOR
       901 New York Avenue, NW
19     Washington, D.C.  20001
20     Craig T. Merritt, Esq.
       CHRISTIAN & BARTON
21     909 E. Main Street, Suite 1200
       Richmond, VA  23219-3095
22
            Counsel for the plaintiff ePlus
23
24
25          DIANE J. DAFFRON, RPR
            OFFICIAL COURT REPORTER
            UNITED STATES DISTRICT COURT
```

516

```
 1     APPEARANCES:  (Continuing)
 2     Daniel W. McDonald, Esq.
       Kirstin L. Stoll-DeBell, Esq.
 3     William D. Schultz, Esq.
       MERCHANT & GOULD
 4     3200 IDS Center
       80 South Eighth Street
 5     Minneapolis, MN  55402-2215
 6     Dabney J. Carr, IV, Esq.
       TROUTMAN SANDERS
 7     Troutman Sanders Building
       1001 Haxall Point
 8     P.O. Box 1122
       Richmond, VA  23218-1122
 9
            Counsel for the defendant Lawson Software.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

517

```
 1          (The proceedings in this matter commenced at
 2     9:20 a.m.)
 3          THE CLERK:  Civil Action No. 3:09CV00620,
 4     ePlus, Incorporated v. Lawson Software, Incorporated.
 5     Mr. Scott L. Robertson, Mr. Craig T. Merritt,
 6     Ms. Jennifer A. Albert, Mr. Michael T. Strapp, and Mr.
 7     David M. Young represent the plaintiff.
 8          Mr. Daniel W. McDaniel, Mr. Dabney J. Carr,
 9     IV, Ms. Kirstin L. Stoll-DeBell, and Mr. William D.
10     Schultz represent the defendant.
11          Are counsel ready to proceed?
12          MR. ROBERTSON:  Yes, Your Honor.
13          MR. McDONALD:  Yes, Your Honor.
14          THE COURT:  All right.  Thank you very much.
15          I apologize for keeping you-all waiting this
16     morning.  I had a mechanical malfunction that I needed
17     to attend to, and I'm not very mechanically oriented.
18          All right, Mr. Robertson.
19          Dr. Weaver, I remind you you're under the
20     same oath which you took yesterday.
21          THE WITNESS:  Yes, Your Honor.
22     BY MR. ROBERTSON:  (Continuing)
23     Q   Good morning, Dr. Weaver.
24     A   Good morning.
25     Q   If we could have Plaintiff's Exhibit No. 1 back up
```

518

```
 1     on the screen again, the '683 patent, the cover page
 2     here.
 3          Dr. Weaver, the jurors have seen this exhibit now
 4     several times and it's in their jury notebooks.  This
 5     is at tab 2.  Can you just tell us what is the title
 6     of the patent?
 7     A   Electronic Sourcing System and Method.
 8     Q   Has the Court defined the term "electronic
 9     sourcing system"?
10     A   Yes, it has.
11     Q   What's your understanding as to what that
12     construction is?
13     A   In the glossary of claim terms, the "electronic
14     sourcing system" has been defined by the Court to be
15     an electronic system for use by a prospective buyer to
16     locate and find items to purchase from sources,
17     suppliers or vendors.
18     Q   What is your understanding of what a source is,
19     sir?
20     A   A source would be a vendor or a manufacturer or a
21     distributor.
22     Q   In the Court's construction of the claim term
23     "catalog" or "product catalog," how does the Court
24     define what a vendor can be?
25     A   The vendor, in the Court's construction, a vendor
```

575

1    the '70s, but the overall components of this system,
2    they haven't been available since the '70s, have they?
3    A  I don't think so.
4    Q  And you can take known technology and combine it
5    to come up with something new and useful; is that
6    right, Doctor?
7    A  Sure.
8    Q  The converting icon, I think you talked a little
9    bit about this, but in the Lawson system, how do they
10   perform this functionality of the conversion to find
11   similar, identical or generally equivalent items?
12   A  I mentioned these UNSPSC codes.  So I'll explain
13   later in detail what they mean, but the gist of it is
14   that by using an 8-digit code, you are drilling down
15   to what's going to be called the commodity level of
16   information.  And if multiple items have this same
17   8-digit code, then by the definition of the code they
18   are generally equivalent and substitutable.
19      So the Lawson system uses this UNSPSC code in
20   order to accomplish that task.
21   Q  So now that you have discussed sort of the overall
22   functionality of the system in general terms and how
23   it can perform it, you identified various software
24   programs or modules that Lawson offers to do that
25   functionality.  Can they be configured in various

576

1    ways?
2    A  Yes.  Certain modules are required and certain
3    modules are optional.
4    Q  Did you prepare a demonstrative to show how these
5    various Lawson procurement S3 modules can be -- these
6    components can build to an infringing system?
7    A  Yes, I have several demonstratives that build on
8    each other to illustrate how the software modules
9    build on each other.
10   Q  Let's go to the first demonstrative you have.  And
11   this one is entitled "Lawson's electronic sourcing
12   systems."  And you have a yellow box there.  What is
13   that?
14   A  So as the name suggests, the platform technology
15   foundation contains the modules that have to be in a
16   functioning Lawson system.
17      Two of those are the Lawson system foundation,
18   which is, again, a set of common computer implemented
19   activities that every software module is going to
20   need.  For instance, communication with other modules.
21      The process flow is a module that controls and
22   directs the approval process.  So when a requisition
23   comes in, typically a manager approves it, and that
24   approval process is done by the process flow module.
25      So these two are required for all of the S3

577

1    procurement systems.
2    Q  In your analysis and review of the documents and
3    the deposition testimony, did you make a determination
4    that these foundational software modules were required
5    as part of the Lawson infringing system?
6    A  Yes, in the documentation that I read it was very
7    clear that the Lawson system foundation, LSF, had to
8    be installed before you could install the modules of
9    the S3 procurement system.  Likewise, the process flow
10   had to be there as well.
11   Q  In your report, you called the Lawson system
12   foundation a prerequisite module.  What did you mean
13   by that?
14   A  The LSF must be there before you can load the
15   modules that are the procurement suite.
16   Q  In order to purchase the procurement suite
17   license, the procurement suite, does a customer of
18   Lawson have to license this Lawson system foundation
19   and process flow?
20   A  That's what the documentation says.
21   Q  Well, I think you touched on the process flow
22   already, but let's take a look, if we can, at the
23   Lawson requisition self service installation guide,
24   which is PX 131.  It's in binder 3, Dr. Weaver.
25      Is this document is entitled, "Lawson requisitions

578

1    Self Service Installation Guide."  Did you review this
2    as part of your preparation for your expert report?
3    A  Yes, I did.
4    Q  So what is this document?
5    A  This document explains to the customer how they
6    should go about installing this requisition self
7    service module.  We're going to call it the RSS.
8    Q  If we could go to bar code 4.  It's item 4 of this
9    document.  There's a box entitled, "System
10   Requirements" there.  Do you see that?
11   A  I do.
12   Q  Where is the information relevant to the Lawson
13   system foundation here?
14   A  It says that the following software and hardware
15   requirements must be met before you install the
16   product.  And then in the table below, the first row
17   says, "Lawson system foundation."
18   Q  Okay.  So before you can install Lawson's
19   requisition self service, one of the requirement
20   components is the Lawson system foundation; is that
21   right?
22   A  That's what this says.
23      MR. McDONALD:  Your Honor, I object.  It's a
24   little unclear at this point because requisition self
25   service is a different module from the ones we were

579

1  talking about earlier.  So I would object as
2  ambiguous.
3      MR. ROBERTSON:  It's one of the component
4  modules that Dr. Weaver has already mentioned.  We can
5  go back and finish building the blocks if you'd like.
6  Q  Let's go back to your building components, if we
7  could.  Then we can circle back.
8    So you have got your platform technology here of
9  the Lawson system foundation and the process flow.
10  What is the next software module or program that you
11  need in order to have an infringing system?
12  A  The procurement modules that are needed for an
13  infringing system include purchase order, requisitions
14  and inventory control.  These are the three that we
15  just saw in the previous documents.  And for
16  clarification, the requisition self service is going
17  to sit on top of this.
18  Q  But at this point, let's go back, at this point
19  with this platform and these three modules, does that
20  comprise an infringing system?
21  A  Yes, it does.
22  Q  And you're going to discuss in detail the purchase
23  order module, the requisitions module, and the
24  inventory control module in the context of Lawson's
25  documents and witness testimony?

580

1  A  Yes, I am.
2  Q  Well, let's go to the next build then.  So the
3  next thing you placed on top of this platform here
4  we're building is this module or software program
5  called "requisition self service."  Do you see that?
6  A  I do.
7  Q  Why did you do that?  Why did you make the
8  arrangement like this?
9  A  Because the requisition self service is a module
10  that is modern and user friendly.  So it has a web
11  based interface.  But it uses the functionality of the
12  requisition module below it.
13    So requisition self service can be installed only
14  if you already have the requisition module beneath it.
15  So you can think of, in software terms, the
16  requisition module provides a certain set of
17  capabilities and functionalities, and requisition self
18  service is a user friendly overlay on top of that.
19  Q  Does it permit more end users to utilize the --
20  A  Yes.  By user friendly, this means that you don't
21  need as much training.  You don't need to be as much
22  of a specialist.  It's more for the guy on the street.
23  Q  Does the requisition self service permit Lawson to
24  distribute the functionality for this electronic
25  sourcing and procurement to a greater number of

581

1  individuals within a company, for example?
2  A  Yes, it does.
3  Q  Do you know whether or not Lawson when it licenses
4  this requisition self service module, licenses it on
5  the basis of the number of potential users of that
6  software module?
7  A  Yes.
8  Q  Do they?
9  A  Yes.
10  Q  Just so I'm clear, the requisition self service
11  module can't work without the requisition module that
12  sits upon the Lawson system foundation and process
13  flow flat on technology foundation.  Is that what
14  you're indicating?
15  A  Yes, that's correct.
16  Q  Is there another module that you did an analysis
17  of?
18  A  Yes.  So there's a Punchout module, which I kind
19  of indicated for.  It sits on top of requisition self
20  service.
21  Q  Are we going to see some documentation and have
22  you reviewed some testimony in which the purchase
23  order requisitions and inventory control modules that
24  are all the S3 procuring modules require the Lawson
25  system foundation?

582

1  A  Yes.
2  Q  Do they?
3  A  They do.
4  Q  So just going back then to Plaintiff's Exhibit
5  No. 131, which was the --
6      THE COURT:  Go back to the other one just a
7  minute.
8      Are you saying that you can't use the
9  procurement Punchout without also using the RSS, the
10  S3, and the foundation?
11      THE WITNESS:  Yes, Your Honor.
12      THE COURT:  All right.  Go ahead.
13      MR. ROBERTSON:  I was going to come to that,
14  Your Honor, but thank you.
15  BY MR. ROBERTSON:
16  Q  Let's go back to that for a second since the Court
17  has raised the question.
18    So if I'm going to have procurement Punchout, that
19  capability to go out over the Internet and to
20  individual vendors for specially created Lawson vendor
21  website in order to do my shopping, I must have
22  licensed requisition self service, the three S3
23  procurement modules, and the platform technology
24  foundation including Lawson's system foundation and
25  process flow; is that right?

583

1   A  That's correct.

2   Q  Is that reflected in the documents and the

3   testimony that you have seen?

4   A  Yes, it is.

5   Q  And just so we're clear, procurement Punchout

6   sitting alone, can it perform the functionality of

7   going out over the Internet to individual vendors in

8   order to do this shopping function?

9   A  No.

10   Q  Requisition self service sitting alone without the

11   S3 procurement modules and the platform technology,

12   can it perform any of the functionality that's

13   described in the patents?

14   A  No.

15   Q  Let me just be clear then.  So Punchout

16   procurement alone in your opinion doesn't infringe any

17   of the claims of the patent?

18   A  Not by itself.

19   Q  Well, requisition self service alone doesn't

20   infringe any of the claims of the patent?

21   A  Correct.

22   Q  If we could go back to just the yellow and blue.

23   In this configuration, are you going to have opinions

24   with respect to whether or not the functionality

25   provided by the software here, the capability of the

584

1   software infringes the claims of the patent?

2   A  I'm going to have an opinion on that.

3   Q  Why don't you just preview that opinion?

4   A  And my opinion is that this is an instance of an

5   infringing system.

6   Q  Let's add the next module.  Is this going to be

7   also instances of infringing activity under the claims

8   at issue here?

9   A  Yes, it is.

10   Q  Let's add the next module.  Is this also going to

11   be instances of infringing activity under the claims

12   that are at issue here?

13   A  Yes.

14   Q  Let's add the next module.  Here's a module that

15   sits on these S3 procurement modules called the

16   electronic data interchange.  You talked a little bit

17   about that.  Is that a module that Lawson offers as

18   part of its infringing system?

19   A  Yes, it is.

20   Q  And that is sitting on top of your S3 procurement

21   modules and your platform technology modules.  Do you

22   see that?

23   A  That's right.

24   Q  With just the electronic data interchange and the

25   S3 procurement modules and the platform technology

585

1   foundation, can that be an instance of infringing

2   activity under the asserted claims?

3   A  Yes, it can.

4   Q  Again, just to be clear, though, because this can

5   be a little confusing.  I don't need all of these

6   modules in order to infringe the claims, do I?

7   A  You do not.

8       THE COURT:  Are you at a transition point?

9       MR. ROBERTSON:  This would be a good time to

10   break, Your Honor.

11       THE COURT:  All right, ladies and gentlemen.

12   We'll have the morning recess for about 20 minutes.

13   And, if you will, just take your notepads with you.

14   That will be fine.

15       (The jury is out.)

16       All right.  We'll be in recess for 20

17   minutes.

18       (Brief recess taken.)

19

20

21

22

23

24

25

586

1       THE COURT:  All right.

2   Q  Dr. Weaver, this platform technology foundation, the

3   yellow box that has the Lawson Software foundation, you are

4   aware that Lawson sells other, what they call a suite of

5   business solutions for doing financial accounting, things like

6   that, human resource, business processing; correct?

7   A  Yes, I saw that in their documents.

8   Q  Those software modules, can they also sit on this platform

9   technology foundation?

10   A  Yes, they can.

11   Q  By adding additional applications to this platform

12   technology foundation, does that avoid infringement in your

13   opinion?

14   A  It does not.

15   Q  Is that consistent with your opinion that by adding

16   functionality, you can't avoid infringement if at least you

17   have the claimed functionality that is satisfied by the

18   elements at issue in the claim?

19   A  For any claim, if you have all the elements of a claim,

20   adding additional functionality does not change the

21   infringement picture.

22   Q  If we widen this platform technology a little bit and on

23   top of it we put human resource, the software module, we put

24   the financial accounting module and some other kind of module,

25   adding those other modules wouldn't avoid infringement if we

587

1  had, in this instance at least, the yellow box and the blue
2  box; right?
3  A  That's correct.
4  Q  Even if we had those other modules and we had the yellow
5  box, the blue box, the green box, the brown box, and the purple
6  box, and four other boxes sitting on the platform, would that
7  still be an infringing configuration?
8  A  This is an infringing configuration.  So is this, so is
9  this, so is this.  So adding more to that doesn't change that
10  picture.
11  Q  At a minimum, just so we're clear again, we need the blue
12  and the yellow.
13  A  That's the minimum.
14  Q  Would you take a look at binder five.  This is going to be
15  Plaintiff's Exhibit Number 211.  Can you tell us what this is?
16  A  This is the Lawson Punchout -- the procurement Punchout
17  installation guide that's going to tell you how to install this
18  Punchout application.
19  Q  And when was this published?
20  A  This was May 2008.
21  Q  Why don't we go to the page that is bar-coded by page ten,
22  but it is Bates labeled 4788 called installation overview.
23  A  Okay.
24  Q  And do you see there, there are system requirements
25  identified?

588

1  A  I do.
2  Q  And under system requirements, it says, listed below are
3  the software requirements for running Lawson procurement
4  Punchout.  These requirements must be met before you begin
5  installing.  Do you see that?
6  A  Yes.
7  Q  What are the components, the Lawson server requirements
8  for the Lawson procurement Punchout module?
9  A  It's the S3 Lawson system foundation, server applications,
10  and process flow designer.
11  Q  Is that consistent with your build there, that
12  demonstrative you had as to what were some of the foundational
13  software requirements?
14  A  Yes.
15  Q  Also, it says, Lawson procurement Punchout server
16  requirements.  Do you see that as well?
17  A  I do.
18  Q  What is the additional component there that's required in
19  order to be able to install Lawson procurement Punchout?
20  A  You must have the Lawson requisition self-service.
21  Q  And, so, is that consistent with the illustration you had
22  for us?
23  A  Certainly is.
24  Q  Can you turn to the page that is actually -- the barcode
25  at page 12 has the Bates label that ends 4790, Exhibit 211.

589

1  What is being illustrated -- first, what's it entitled?
2  A  The Lawson procurement Punchout network architecture
3  example.
4  Q  And can you help tell us what this is illustrating?
5  A  This is complex.  This is going to illustrate the
6  communications flow as one moves from a Lawson system through
7  the Punchout process into an external vendor's website with
8  catalog and database and so on.
9     It's going to explain how we get there and then how we get
10  back carrying with us whatever items have been added to the
11  shopping cart at the external vendor and then how that shopping
12  cart gets loaded into the Lawson shopping cart.
13  Q  Are we going to see this in one of your demonstrations?
14  A  We are.
15  Q  So that would probably be the best way to understand this
16  complex process?
17  A  Well, this is the way you understand the communications
18  flow.  You will simply observe it in the demonstration.
19  Q  Next exhibit is going to be PX-97, Dr. Weaver.  It's in
20  binder one.  Do you have it, Doctor?
21  A  I do.
22  Q  What is this document?
23  A  This is the requisitions user guide, so this one is going
24  to tell us how to use the requisition module.
25  Q  Is that one of the modules that was in your illustration?

590

1  A  It was.
2  Q  Does Lawson provide this guide to its customers?
3  A  It does.
4  Q  Let's go to the page then, barcode 11, which is Bates
5  label 1108?
6  A  Okay.
7  Q  And at the top, it says overview of requisitions?
8  A  Right.
9  Q  What significance on this overview of requisitions would
10  you like to show the jury?
11  A  That first paragraph that explains that the Lawson
12  requisitions application lets you create requests with demand
13  on stock and demand on vendors, replenish cart par locations,
14  and process and manage requisitions.  So we're going to be
15  interested in that demand on vendors and managing requisitions.
16  Q  What next of significant on this page would you like to
17  point out to the jury?
18  A  We move down here to creating requisitions.  When you
19  create a requisition, you request items from inventory or from
20  vendors.  The requisitions application provides different
21  methods for creating requisitions that allow you to customize
22  the requesting process to suit your business needs.
23  Q  So what is Lawson telling us here with respect to creating
24  requisitions --
25  A  Sorry.  That confirms that Lawson is able to create a

591

1   requisition to request items from vendors.
2   Q   Under the heading processing requisitions, what, if
3   anything, would you like to point out to the jury?
4   A   The first paragraph here, and then its continuation on the
5   next page, the approval process places monetary limits on the
6   amount a requester can request.  The requisitions application
7   provides options for an approver to authorize, reject, or
8   un-release for requisition.
9       Moving on to the next page at the end of the first line,
10  purchase orders are created from requisitions in the purchase
11  order application to fill demand on vendors.
12  Q   And what is Lawson indicating here is the capability of
13  this requisitions module?
14  A   So it's confirming that the requisitions module has to be
15  integrated with the purchase order module if we're going to be
16  able to use it to create purchase orders.  Actually do -- yes,
17  to process requisitions into purchase orders.
18  Q   Can we go on to the next page, Bates labeled -- that is
19  barcoded 13 and ends with the Bates label 110.  It says at the
20  top, how requisitions integrate with other applications.  This
21  section explains how the requisitions application interfaces
22  with other Lawson applications.  What of interest to the jury
23  would you like to point out here?
24  A   That here in the diagram, we have -- so we have
25  requisitions sitting in the middle of this -- this is a

592

1   software architecture explaining how these modules interact
2   with each other and how information flow goes from module to
3   module, and we're going to be interested in the interaction
4   between the requisition and the inventory control and,
5   likewise, the requisition and the purchase order.
6   Q   There are bidirectional and unidirectional arrows which
7   you mentioned earlier.  Can you tell us what your understanding
8   is they are illustrating?
9   A   Sure.  Inventory control is providing information to the
10  requisition module.  Requisition is exchanging information in
11  both directions with purchase order.
12  Q   Is there anything else of interest you want to point out
13  on that page?
14  A   That's it.
15      MR. ROBERTSON:  Can we go to the next page which is
16  Bates labeled 111.
17  Q   What, if any, interest on this page would you like to
18  inform the jury about?
19  A   In the inventory control description, it says that the
20  requisitions application receives item information from the
21  inventory control application.  Now, that was that
22  unidirectional arrow that we just saw.  The item numbers and
23  descriptions used by requisitions are stored in the inventory
24  control application.  So it needs that information.
25  Q   And item numbers in description, are they the item numbers

593

1   in the description of products that are available?
2   A   Yes.  Products that are being requested, being
3   requisitioned.
4   Q   Under the heading purchase order, what is Lawson telling
5   us there as to the capability of the requisitions application
6   interacting with the purchase order application, the module?
7   A   It says that the requisitions application sends order
8   requests for goods or services to the purchase order
9   application.  Purchase orders can then be created automatically
10  to fill the order.  The requisition application receives item
11  costs from price agreements defined in purchase order, and
12  that's why we had the bidirectional arrow between requisitions
13  and purchase order.  Information flows both ways.
14  Q   Can you turn to the next page of Exhibit 97 which ends
15  with Bates label 112, and there's a heading there, process
16  flow.  What is Lawson indicating about the functionality of the
17  requisition module here with respect to process flow?
18  A   It says that the requisitions application sends a request
19  for service to the Lawson process flow application.  The
20  predefined services for the requisitions application are the
21  requisitions approval service and the rush item processing
22  service.  So this says that the process control application has
23  to be integrated with requisitions if we're going to be able to
24  support the approval mechanism.
25  Q   If you'll turn now to page 63, barcode -- or the Bates

594

1   label ending 160, the page at the top says what is a price
2   agreement.  Do you see that?
3   A   I do.
4   Q   Do you have an understanding as to what a price agreement
5   is?
6   A   Yes.
7   Q   How does Lawson define price agreement here?
8   A   A price agreement is a pricing tool set up in the purchase
9   order application that provides the item costs which is the
10  unit cost for purchase order and requisition lines.
11  Q   What, if any, significance does that have to this case?
12  A   Well, it's telling us here that -- excuse me -- that the
13  customer needs to set up this price agreement with the vendor
14  so that the vendor can electronically say what the cost of the
15  items is going to be.
16  Q   Does this relate to the testimony earlier you had as to
17  what the vendor price agreements were?
18  A   Yes, it does.
19  Q   Lawson also references here a catalog or quote price
20  agreement?
21  A   Yes.
22  Q   What significance does that have to your opinions?
23  A   This says that a catalog or quote price agreement is a
24  list of items and unit costs supplied by a vendor.  You can set
25  up the cost defaulting structure at the company level to

739

1       MR. ROBERTSON:  I don't know who he's going

2   to question about it.

3       THE COURT:  I'm sure he's going to question

4   Dr. Weaver based on what he said.  Not because I'm

5   prescient or anything.

6       MR. ROBERTSON:  I guess I don't have an

7   objection to that.

8       THE COURT:  Well, good then.  We solved

9   something.

10      Raise the blinds so that in the morning it

11  will be open.

12      All right.  I think that's everything.  And

13  you don't expect to finish tomorrow, is that right,

14  Mr. Robertson?  You don't expect to finish tomorrow,

15  is that what your situation is?

16      MR. ROBERTSON:  I do not, sir.  I expect Mr.

17  McDonald might have a half an hour or 45 minutes of

18  cross-examination.

19      THE COURT:  If you ask your questions bullet

20  points, 30 minutes is plenty.  Once you get beyond

21  that, the expert bets you is generally what happens.

22      All right.  Okay.  So we're not going on

23  Monday.  You're going back on Tuesday.  Thank you very

24  much.  Hope you feel better, all of you.  Don't bring

25  anything else up here.

740

1

2       (The proceedings were adjourned at 5:15 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

990

```
 1          IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF VIRGINIA
 3                   RICHMOND DIVISION
 4
 5    --------------------------------------
 6    ePLUS, INC.            :  Civil Action No.
                             :  3:09CV620
 7    vs.                    :
                             :
 8    LAWSON SOFTWARE, INC.  :  January 11, 2011
                             :
 9    --------------------------------------
10
11       COMPLETE TRANSCRIPT OF THE JURY TRIAL
12        BEFORE THE HONORABLE ROBERT E. PAYNE
13     UNITED STATES DISTRICT JUDGE, AND A JURY
14
      APPEARANCES:
15
      Scott L. Robertson, Esquire
16    Michael G. Strapp, Esquire
      Jennifer A. Albert, Esquire
17    David M. Young, Esquire
      Goodwin Procter, LLP
18    901 New York Avenue NW
      Suite 900
19    Washington, D.C.  20001
20    Craig T. Merritt, Esquire
      Christian & Barton, LLP
21    909 East Main Street
      Suite 1200
22    Richmond, Virginia  23219-3095
      Counsel for the plaintiff
23
24        Peppy Peterson, RPR
            Official Court Reporter
25        United States District Court
```

991

```
 1    APPEARANCES:  (cont'g)
 2    Dabney J. Carr, IV, Esquire
      Troutman Sanders, LLP
 3    Troutman Sanders Building
      1001 Haxall Point
 4    Richmond, Virginia  23219
 5    Daniel W. McDonald, Esquire
      Kirstin L. Stoll-DeBell, Esquire
 6    William D. Schultz, Esquire
      Merchant & Gould, PC
 7    80 South Eighth Street
      Suite 3200
 8    Minneapolis, Minnesota  55402
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

992

```
                  P R O C E E D I N G S
 1
 2
 3         THE CLERK:  Civil action number 3:09CV00620, ePlus,
 4    Incorporated versus Lawson Software, Incorporated.  Mr. Scott
 5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr.
 6    Michael G. Strapp, and Mr. David Young represent the plaintiff.
 7         Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
 8    Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
 9    the defendant.  Are counsel ready to proceed?
10         MR. ROBERTSON:  Plaintiff is, Your Honor.
11         MR. McDONALD:  Yes, we are, Your Honor.
12         THE COURT:  What did you all need to talk about?
13         MS. STOLL-DeBELL:  We actually resolved it, Your
14    Honor, between the time we that mentioned --
15         THE COURT:  Tell them to bring the jury in.  What do
16    we have this morning?
17         MR. ROBERTSON:  The first witness we're calling this
18    morning is Mr. Keith Lohkamp, Your Honor.  He's a Lawson
19    employee.  I have a number of binders associated with the
20    witnesses this morning.  I want to make sure my paralegal --
21    oh.
22
23         (Jury in.)
24
25         THE COURT:  Good morning, ladies and gentlemen.  All
```

993

```
 1    right, we have a witness.  Next witness.
 2         MR. ROBERTSON:  Mr. Keith Lohkamp.
 3         THE COURT:  All right, Keith Lohkamp.
 4
 5              KEITH LOHKAMP,
 6    a witness, called by the plaintiff, having been first duly
 7    sworn, testified as follows:
 8         DIRECT EXAMINATION
 9    BY MR. ROBERTSON:
10    Q   Good morning, Mr. Lohkamp.
11    A   Good morning.
12    Q   Mr. Lohkamp, you are a Lawson Software employee; correct?
13    A   Yes, I am.
14    Q   And you are a product strategist for supply chain
15    management; correct?
16    A   Yes.
17         THE COURT:  Can we get the witness to spell his last.
18    Q   Can you please spell your last name, sir, for the record.
19    A   It's L-o-h-k-a-m-p.
20    Q   Can you explain to the jury essentially what supply chain
21    management is?
22    A   Supply chain management involves the procurement of goods
23    and services and the management of the inventory related to
24    managing those goods.  It also includes, can include the sell
25    side, so selling those goods and services as well.
```

1062

LOHKAMP - DIRECT    1062

1 order form that modifies a statement of work for

2 Community Medical Centers.

3    Q  What's a change order form modifying statement of

4 work?  Does that mean the statement of work has been

5 modified in some way?

6    A  Yeah.  My understanding of what a change order

7 form is someone is requesting a change to the services

8 we provide.

9    Q  What is the next document in that binder?

10    A  It's PX 501 L.  And it's a statement of work for

11 Deaconess Health System.

12    Q  Can you go to the next one?

13    A  The next one is PX 501 M, and it's the master

14 terms and conditions, Lawson Software and user

15 agreement.

16    Q  What's the next document?

17    A  That's the last one in this binder.  Should I go

18 to the next binder?

19    Q  All right.  Sorry, sir.  What's the first document

20 in there?

21    A  In this first binder?

22    Q  No, in the second binder.

23    A  I haven't got that.  Sorry.  It's PX 501 N.  And

24 the first page is a sales and use tax certification of

25 exemption.

1063

LOHKAMP - DIRECT    1063

1    Q  What's the next page?

2    A  The next page is a services turnover document.

3    Q  Okay.  Next page?

4    A  It's a services order form for Holland Hospital.

5    Q  What's the exhibit number for that one, sir?

6    A  This one is PX 501 N.

7    Q  Services order form, is that the order form for

8 the services that Lawson is going to be providing to

9 Holland Hospital?

10    A  Yes, it is.

11    Q  What's the next document, sir?

12    A  The next document is PX 501 R, and it states,

13 "Server sizing estimate for Owensboro Medical Health

14 System."

15    Q  Can you turn to the page where it indicates it's

16 going to be a contract for services provided?

17    A  The next page is "What is a server sizing

18 estimate?"

19    Q  What about the next page?

20    A  "Parameters overview."  It's still part of the

21 sizing.

22    Q  Next page, sir?

23    A  "Proposed architecture."

24    THE COURT:  Interesting, but not useful.

25 What are we doing?  These exhibits are in.

1064

LOHKAMP - DIRECT    1064

1    MR. ROBERTSON:  Well, Your Honor, I'd like to

2 offer what we had discussed before was is a Federal

3 Rule of Evidence 1006 summary of the documentation.

4 We've provided it to the defendant, and I believe with

5 one modification it was not objected to.  It's

6 Plaintiff's Exhibit 516.

7    THE COURT:  Any objections to Plaintiff's

8 Exhibit 516?

9    MS. STOLL-DeBELL:  No, Your Honor.

10    THE COURT:  What is it?

11    MR. ROBERTSON:  What is it?  I'm sorry, Your

12 Honor?

13    THE COURT:  Summary of what?

14    MR. ROBERTSON:  Of these contracts and what,

15 in fact, the software applications and modules that

16 were licensed, the involvement and the implementation

17 of those, and the various customers and information

18 detailing what the implementation was and what the

19 particular applications or modules that were

20 licensed.

21    THE COURT:  And there's no objection to PX

22 516.  It's admitted.

23    (Plaintiff's Exhibit 516 is admitted into

24 evidence.)

25    THE COURT:  And all of the PX 501s are

1065

LOHKAMP - DIRECT    1065

1 admitted, aren't they?

2    All right.  Let's go.

3 BY MR. ROBERTSON:

4    Q  I'd like to talk to you, sir, a little bit about

5 some industry analyst reports and publications that

6 you review as part of your job as product strategist.

7 All right?

8    So in your role as a product strategist, you have

9 had occasion to review industry analyst reports; is

10 that right?

11    A  That is correct.

12    Q  Among the industry analyst reports you review on

13 occasion is Gartner, correct?

14    A  Correct.

15    Q  And you also review industry analyst reports from

16 Aberdeen; is that right?

17    A  Yes, I do.

18    Q  These are industry analyst reports that often

19 refer to products that were within your

20 responsibilities at the company including procurement,

21 right?

22    A  Yes.

23    Q  And you have also reviewed industry analyst

24 reports from Forester; is that right?

25    A  Yes, I have.

1066

LOHKAMP - DIRECT      1066

1  Q  Particularly, in the procurement area; is that
2  correct?
3  A  Yes, I have.
4  Q  And for procurement industry, you have also looked
5  at analyst reports from AMR; is that right?
6  A  Yes.
7  Q  And you have also looked at analyst reports from
8  an outfit known as VDC; is that right?
9  A  That's correct.
10  Q  And Lawson reviews and sometimes relies on the
11  information provided in those industry analyst reports
12  for making its own internal decision; isn't that
13  right?
14  A  Yes, we sometimes lavish those into our planning.
15  Q  Isn't it true that you provide information
16  concerning Lawson's products including procurement
17  products in the supply chain management industry to
18  those analyst reports?
19  A  Yes, I do.
20  Q  And part of your duties as a product strategist
21  for Lawson is to speak with these industry analysts
22  about the procurement solutions like S3 offered by
23  Lawson; isn't that right?
24  A  Yes, it is.
25  Q  And among the industry analysts that you speak

1067

LOHKAMP - DIRECT      1067

1  with in your role as a product strategist is Garter,
2  correct?
3  A  Yes.
4  Q  And Forester?
5  A  Yes.
6  Q  Aberdeen?
7  A  Yes, Aberdeen.
8  Q  VDC?
9  A  Yes.
10  Q  AMR?
11  A  Yes.
12  Q  And you use these industry analyst reports to
13  provide Lawson with intelligence with respect to
14  market trends; isn't that right?
15  A  Some of the reports I do use for that.
16  Q  What are the ones you find most reliable, sir?
17  A  Gartner is one of the more reliable ones.
18  Q  And you have a personal subscription to one of
19  more of these publications; isn't that right?
20  A  I have a personal subscription to AMR, but then it
21  converted into Gartner when they were purchased.
22  Q  But the ones you use most are Gartner and
23  Forester; isn't that right?
24  A  Gartner, Forester and AMR.
25  Q  Now, outside of these industry analyst reports,

1068

LOHKAMP - DIRECT      1068

1  you also keep abreast of trends and developments in
2  the supply chain management industry, right?
3  A  I try to.
4  Q  So if there are any mainstream periodicals or news
5  services that are discussing the procurement sphere,
6  for example, you try to pay attention to those as part
7  of your job responsibilities?
8  A  I certainly pay attention to certain publications.
9  Q  What would those be outside of the analyst reports
10  we've talked about?
11  A  I follow Health Care Purchasing News, Materials
12  Management and Health Care.  I also get emails from IT
13  Toolbox.  I also get emails from Supply Chain
14  Management Review.  So those are some of the key
15  publications I look at.
16  Q  How about just general news publications,
17  newspapers, that kind of thing?  If they have articles
18  of interest involving electronic procurement, do you
19  keep abreast press of them?
20  A  If I see the articles, I would read them.
21  Q  Let's talk a little bit now about your knowledge
22  of ePlus, if we can.
23  A  Okay.
24  Q  Isn't it true that you knew of ePlus prior to the
25  filing of this lawsuit?

1069

LOHKAMP - DIRECT      1069

1  A  Yes, I did.
2  Q  And you initially became aware of ePlus at a
3  health association conference in 2003; isn't that
4  right?
5  A  Yes.
6  Q  Is that one of those conferences you were talking
7  about before where various companies go and have
8  booths in order to display the software solutions that
9  they have?
10  A  That was an industry conference where they did
11  have booths set up for vendors.
12  Q  You saw that ePlus had a booth set up there; is
13  that right?
14  A  Yes, I did.
15  Q  And you visited that booth; isn't that right, sir?
16  A  I did stop by that booth.
17  Q  And you recall that ePlus was exhibiting product
18  offerings in procurement relating to catalogs; isn't
19  that right.
20  A  Yes, I recall they had software related to
21  catalogs.
22  Q  And it's also true that you're aware of ePlus
23  prior to the filing of this law suit by their listing
24  in the Forester e-Procurement Wave; isn't that right?
25  A  I didn't recall seeing that, and I went back and

1150

Lohkamp - Redirect                    1150

1  Q   But the intent of this agreement then is not the
2  relationship that Lawson might have with its customer or the
3  punchout trading partner might have with its customer, the
4  intent of this agreement is how you formulate your joint
5  marketing activities for your mutual benefit; isn't that right?
6  A   It is for the joint agreement with them.
7  Q   To your mutual benefit, sir; right?
8  A   Yes.
9  Q   Lawson does specify the format for how the item data needs
10 to come back from the punchout catalog to the RSS shopping
11 cart; isn't that right?
12 A   We specify the format, the standard.
13 Q   So the answer to my question is yes; right?
14 A   Yes.
15 Q   And if the customer using the Lawson software wants to get
16 to a punchout trading partner website, whether they be under
17 agreement or not under agreement, it needs the Lawson punchout
18 application; isn't that right?
19 A   To use punchout to that vendor website.
20 Q   They can't get there without the procurement punchout
21 application; right?
22 A   Yeah.  Using our software, yeah.
23 Q   That's how they do it?
24 A   Yes.
25 Q   You were asked questions about how many punchout products

1151

Lohkamp - Redirect                    1151

1  you've sold.  I think you said around a hundred, and you've got
2  about 3- or 400 RSS, or requisition self-services applications
3  ^ ; right?  Now, if together the jury concludes that those
4  applications permit Lawson's customers to infringe the patents,
5  it's not an excuse for Lawson to say that we infringe just a
6  little bit, is it?
7       MS. STOLL-DeBELL:  Objection, Your Honor.  It calls
8  for a legal conclusion, and it's not relevant for this witness,
9  and it's prejudicial.
10      THE COURT:  Because it's not relevant, it's
11 prejudicial.
12      MS. STOLL-DeBELL:  Sure.
13      THE COURT:  Sustained.  It's a legal matter.
14 Q   You specified that a lot of your trading partners don't
15 use the vendor agreement that we've been referring to here as
16 Plaintiff's Exhibit Number 190; is that right?
17 A   That's correct.
18 Q   But the technology for punchout doesn't change for
19 Lawson's punchout trading partners whether they use the
20 agreement or don't use the agreement; isn't that right?
21 Technology is the same?
22 A   That's correct.
23 Q   You indicated that you were not aware of ePlus patents
24 prior to filing this lawsuit; is that right?
25 A   Yes.

1152

Lohkamp - Redirect                    1152

1  Q   There's no question you've been aware of ePlus patents
2  since May of 2009 when the lawsuit was filed; right?
3  A   Right.
4  Q   Everyone at Lawson has been aware of the ePlus patent
5  since May of 2009; isn't that right?
6  A   I believe so.
7       MR. ROBERTSON:  Thank you.  No further questions.
8       THE COURT:  All right.  Mr. Lohkamp, it's obvious
9  you're going to be called back as a witness in the case, and
10 you can be temporarily excused and go about your business until
11 you are called back, and you agree to come back then?
12      THE WITNESS:  Yes.
13      THE COURT:  Or you can remain here and wait.  Which
14 would you rather do, go about your business upon agreement to
15 come back?
16      THE WITNESS:  Yes.  Come back.
17      THE COURT:  Is that satisfactory, counsel?
18      MS. STOLL-DeBELL:  Yes, Your Honor.
19      THE COURT:  Mr. Lohkamp, you can't discuss your
20 testimony with anybody because you may be called back as a
21 witness; all right?
22      THE WITNESS:  Okay.
23      THE COURT:  Thank you.
24      THE WITNESS:  Thank you.
25      MR. ROBERTSON:  Your Honor, the next witness we'll be

1153

Lohkamp - Redirect                    1153

1  calling is a witness by videotape.  I believe Mr. Strapp can
2  identify what it is and tell you approximately how long the
3  videotape deposition is.  It's a customer of Lawson.
4       MR. STRAPP:  Your Honor, our next witness, we're
5  going to play the videotaped deposition of Kristy Oliver.
6  Kristy Oliver is an employee of Blount Memorial Hospital.
7  Blount Memorial Hospital is a customer of Lawson and a customer
8  for the accused Lawson S3 system.
9       The deposition videotape is a little bit under an
10 hour, and we can provide Your Honor with a booklet of the
11 exhibits that will be referenced during the deposition.  We've
12 marked the transcript, excerpted portions also as an exhibit,
13 and we will provide that to Your Honor.
14
15      (Videotaped deposition of Kristy Oliver played for
16 the jury.)
17
18      MR. STRAPP:  Your Honor, for the record, exhibits
19 referenced during the deposition transcript of Ms. Oliver were
20 Plaintiff's Exhibits 225, 226, 228, 229, 230, 231, 234, 237,
21 238, and 239, and the excerpted portions of the transcript that
22 were played on the video are marked as Plaintiff's Exhibit 518.
23      THE COURT:  All right.  They are admitted.  Next
24 witness?
25      MR. ROBERTSON:  Your Honor, plaintiff would call Mr.

1162

1    Q   You've seen this document before?

2    A   I don't believe I've actually seen this document except as

3    this exhibit.

4    Q   But you are aware that this is the document that is the

5    proposal automation suite for providing answers with respect to

6    stock questions for the S3 product; right?

7    A   I couldn't confirm or deny that.

8    Q   It's a Lawson document; is that right, sir?  You have no

9    reason to doubt it's --

10   A   I have no reason to doubt it.  I mean literally, I've not

11   seen the document like this or in any form like this.  I've

12   seen a couple answers out of the database, and when I say a

13   couple, probably two or three over the last couple years.  So

14   for me to comment on this document, I don't know how many pages

15   it is, it's just not fair.

16   Q   Fair enough.  But Lawson does maintain such a document

17   that has stock answers to requests for proposals?

18   A   They do maintain a database, yes.

19       THE COURT:  Does the database you are talking about

20   have stock answers for the RFPs?

21       THE WITNESS:  Sure.  It will have -- there will be

22   things like about the company history, you know, things that

23   are very generic questions that almost all customers will ask

24   in the RFP process, and there's a set of answers that will come

25   up there along with other questions that maybe not all

1163

1    customers ask, but they're routinely asked by a fair number.

2    So the sales team has asked, look, can we get what the answers

3    should be for these so that we can just cut and paste that in

4    so we don't get -- if we had 20 salespeople, you don't have 28

5    different answers for the same thing.

6    Q   This document is 297 pages long.  Can you just confirm

7    that, and it has 398 stock questions that often get asked and

8    stock answers that are often provided; is that fair enough?  Do

9    you just want to take a look at it for a minute?

10   A   I see it's 297, and keep in mind they are a pretty wide

11   product space.  This is just a few, a small number of products

12   that I actually have under my control.

13   Q   I understand.  But if you look --

14   A   398 -- I see the last page is 398, answers to 398

15   questions.

16   Q   And just going back to the first page, this has to do --

17   it says there's a database identified there, and then it says

18   Lawson S3 data.  Do you see that?

19   A   Uh-huh.

20   Q   So this Exhibit 117 is specifically dealing with just the

21   Lawson S3 product; right?

22   A   It appears to be, yes.

23   Q   And, I mean, if I just randomly open up a page -- for

24   example, I opened up to 106.

25   A   Sure.

1164

1    Q   Question 149 of 398, and this has to deal with a fairly

2    complex question concerning EDI for supply chain management;

3    correct?

4    A   Uh-huh.

5    Q   Not simply what the company is about and that kind of

6    thing?

7    A   Absolutely.  It would be a variety of questions.

8    Q   Specific to the functions and features of the S3 product?

9    A   Correct.

10   Q   All right, there was some discussion about industry

11   analyst reports; do you recall that?

12   A   I certainly do.

13   Q   And Mr. Lohkamp, I understood him to indicate that he

14   personally subscribes to a number of those publications;

15   correct?  You heard that?

16   A   I certainly heard that, yes.

17   Q   But the company also subscribes to them as a company;

18   isn't that right?

19   A   That's my understanding.

20   Q   And, I mean, in your deposition, you were asked whether or

21   not the company subscribes to Aberdeen, Gartner, and Forrester;

22   right?

23   A   That's correct.

24   Q   And you indicated that some of those reports concerning

25   Lawson's newer products and possible competitor products are

1165

1    disseminated fairly widespread throughout the company; isn't

2    that right?

3    A   If I said widespread, I certainly wasn't meaning -- take a

4    4,000-person company, it's not going out to even 3,000 of those

5    probably.

6    Q   It's available, though, over a Lawson intranet website,

7    isn't it?

8    A   I'm trying to recall the last time I've actually been able

9    to go out and look at any of the documents, and I don't recall

10   any -- I mean, I actually see very few in my current role.

11   Q   Well, it's actually, according to you in your deposition,

12   disseminated among the director level?

13   A   Correct.

14   Q   The manager level?

15   A   Yes.

16   Q   And in some instances, down to individual contributor

17   level; do you recall that?

18   A   Yes, I certainly do.  That's going to depend on the

19   product and what the content is.

20   Q   Isn't it a fact that before a new enhancement is released,

21   for example, with respect to this S3 supply chain management

22   module we've been talking about, Lawson does not engage in any

23   kind of intellectual property clearance investigation to insure

24   that enhanced features will not infringe the intellectual

25   property rights of third parties?

1166

1    A    That's correct.

2    Q    You don't do that, do you?

3    A    I do not, no.

4    Q    The company doesn't do that as a policy; correct?

5    A    That's correct.

6    Q    And since May of 2009 when this lawsuit was instituted,

7    Lawson has undertaken no efforts to modify or redesign its

8    existing S3 procurement products; is that right?

9    A    That's correct.

10        MR. ROBERTSON:  That's all the questions I have.

11   Thank you.

12        THE COURT:  Why don't we take the afternoon recess.

13   It's time to take 20 minutes, ladies and gentlemen.  You just

14   take your pads with you.

15

16            (Jury out.)

17

18        THE COURT:  Counsel, I have word from the clerk's

19   office that ePlus intends to file 30,000 pages of exhibits

20   under seal.  What is that about?

21        MR. MERRITT:  Sounds terribly daunting.  Let me try

22   to address this, Your Honor.  Under Rule 103, we think that

23   we're required to make an offer of proof -- we'd like to do it

24   before we close -- with regard to damages testimony in exhibits

25   that were excluded by the Court's earlier rulings several

1167

1    months ago.  It has nothing to do with the matters that are

2    currently being tried before this jury, but it's an offer of

3    proof as to lay testimony and to associate exhibits that would

4    have gone to the damages part of the case.

5        The 30,000 is driven significantly by the fact that

6    there are -- it includes some Lawson internal information that

7    are these huge electronic spreadsheets that if they were

8    actually printed out would be an enormous number of pages.

9        We have suggested that with the Court's permission we

10   might be able to simply file a written index and lodge a DVD

11   physically with the clerk's office that keeps us from having to

12   put boxes and boxes of these spreadsheets into the offer of

13   proof.

14        We'll take the Court's guidance on that, do whatever

15   the Court would like us to do.  We really are disinclined to

16   burden the Court with all that paper, but the clerk tells us

17   that absent special permission from the Court to put it on a

18   disk, that the default is the paper would have to be filed.

19        THE COURT:  Their problem is they don't want the disk

20   imported into the system.  I don't see why -- how long is the

21   index?

22        MR. STRAPP:  Approximately five pages.

23        THE COURT:  Why don't you file the index and then

24   file the -- is it a DVD or CD or what?

25        MR. MERRITT:  I believe it's a DVD, Your Honor.

1168

1        THE COURT:  As your proffer proofs and log that as an

2    item, and then it will be filed, and I guess it needs to be

3    filed under seal since it has their financial information.

4        MR. MERRITT:  Yes, sir, it has financial information

5    from Lawson.  It would need to be under seal.

6        THE COURT:  Is this something that is different than

7    the Court has considered in making its ruling on the expert,

8    because you can't get anything in that wasn't before me on the

9    expert's opinion.

10        MR. MERRITT:  No, sir.

11        THE COURT:  These things were all part of the

12   expert's report, were they?

13        MR. MERRITT:  Well, there were two pieces of it, if

14   Your Honor recalls.  First of all, the expert was excluded on

15   the motion in limine.  His report and the attachments are

16   already a part of the record, and we can't improve upon that in

17   any way obviously.  We can't move the ball on that or go back

18   and fill.

19        There was a second motion that the Court granted that

20   was a Rule 37 discovery motion that precluded the use of lay

21   testimony or additional witnesses as an alternative means of

22   proving the damages.

23        THE COURT:  That was for failure to comply with the

24   discovery.

25        MR. MERRITT:  That was for failure to comply with the

1169

1    discovery, and the only opportunity for an offer as to what

2    that proof would have been was on September 7th when that was

3    being argued.

4        In fact, Your Honor may recall that I argued that.  I

5    believe Mr. McDonald did as well, and you asked, well, what

6    sort of proof would you put in, and on the fly, based on some

7    notes, I was able to say, well, here are the people we think we

8    might call and what some of the evidence might be.

9        What we would like to do is take the opportunity to

10   simply make clear, in a particularized form, what those

11   witnesses and what evidence would be since the one

12   opportunity previously that was available on the fly in

13   that hearing.  So this is simply to say what the lay testimony

14   and exhibits would be and to try to put that into the record as

15   an offer of proof that's sufficiently particular so somebody

16   would understand what we were talking about on September 7th.

17        THE COURT:  Mr. McDonald, do you want a chance to

18   review the index and/or CD or DVD and then respond?

19        MR. McDONALD:  I haven't had a chance.  I don't know

20   our team has had a chance to see what's involved here.

21   I think they made their record back in September.  I don't know

22   why at this point they would be proffering evidence that's not

23   part of what they had even offered up in connection with the

24   joint pretrial order.  It sounds like it goes well beyond that,

25   but I guess I don't want to weigh in.  Maybe we can work

1186

1  truly apologize, and maybe you'll get another judge to handle
2  the rest of the case.
3       MR. McDONALD:  I'm not sure I picked up all that --
4       THE COURT:  I'm asking if you said something and I
5  forgot what it was, because I actually don't remember you
6  saying anything.
7       MR. McDONALD:  You didn't miss a thing.  We haven't
8  formulated our position, Your Honor.  I have a couple concerns,
9  though, I can flag and maybe give --
10      THE COURT:  That would be helpful to talk about it.
11      MR. McDONALD:  Well, this language about "by a
12  vendor" means at some point in time.  I think the "by a vendor"
13  for one thing was pretty much agreed to at the Markman hearing,
14  what it did mean, and do inject the concept in time, of time
15  into a phrase like "by a vendor" could create some confusion, I
16  think, do more harm than good, actually.  We would probably
17  object to that, but I haven't finalized my position.
18      THE COURT:  But I think it's quite clear from the
19  specification that it's an antecedent event to the use of the
20  invention no matter how you cut it.
21      MR. McDONALD:  I just think --
22      THE COURT:  I understand what you are saying.  Think
23  about it and see what you --
24      MR. McDONALD:  The other concern I have is anything
25  we do with that, because our experts who have given opinions

1187

1  relating to claim construction, I'm concerned that if we now
2  move the ball on what the claims mean, what is the implication
3  of that for the testimony that's already been given, the
4  testimony that's yet to come that the Court repeatedly says has
5  to be limited to what's in the expert reports, there were prior
6  decisions by the Court relating to prior art exclusions and
7  things like that.  I think there's many implications of making
8  any changes here, so I'm concerned about that.
9       THE COURT:  I think -- I'm not sure there are a
10  lot -- that is not a claim construction answer.  That's an
11  instruction, and the fact of the matter is that it is not at
12  all unusual for Courts to give revised claim constructions
13  during the trial.
14      In fact, for a good while, it was common to give the
15  claim construction only as part of the instructions.  Now, I've
16  never done that just because I didn't want to put myself
17  through that agony, but that's what happens sometimes, and in
18  that event, experts have to take their positions -- take out
19  their position and see what happens.  So we'll see.
20      MR. McDONALD:  In this case, the experts were allowed
21  to give their reports after the Court's Markman ruling, so I
22  think that really changes the dynamic.
23      THE COURT:  Okay.  Anything else?  Thank you.  We'll
24  see you all tomorrow at nine o'clock.
25           (Court adjourned.)

1188

```
1         IN THE UNITED STATES DISTRICT COURT
2         FOR THE EASTERN DISTRICT OF VIRGINIA
3               RICHMOND DIVISION
4
5    --------------------------------------
                                :
6    ePLUS, INC.                : Civil Action No.
                                : 3:09CV620
7    vs.                        :
                                :
8    LAWSON SOFTWARE, INC.      :  January 12, 2011
                                :
9    --------------------------------------
10
11        COMPLETE TRANSCRIPT OF THE JURY TRIAL
12         BEFORE THE HONORABLE ROBERT E. PAYNE
13      UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24        Peppy Peterson, RPR
             Official Court Reporter
25         United States District Court
```

1189

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1190

```
1                    P R O C E E D I N G S
2
3         THE CLERK:  Civil action number 3:09CV00620, ePlus,
4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr.
6    Michael G. Strapp represent the plaintiff.
7         Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
9    the defendant.  Are counsel ready to proceed?
10        MR. ROBERTSON:  Plaintiff is, Your Honor.
11        MR. McDONALD:  Yes, Your Honor.
12        THE COURT:  All right.  You said you wanted to see me
13   before the jury comes in.
14        MR. McDONALD:  Yeah, there's basically three issues
15   we wanted to raise.
16        THE COURT:  The court reporters always can hear
17   better if you come to the lectern.
18        MR. McDONALD:  There's basically three issues that we
19   wanted to raise this morning.  One is our third witness in our
20   case that we start today is Ms. Raleigh.
21        THE COURT:  Third witness in what?
22        MR. McDONALD:  In our case when we start presenting
23   our case today.  We have Mr. Richard Lawson first, Mr.
24   Christopherson second, and then Hannah Raleigh was supposed to
25   come back and be third today.
```

1191

```
1         She was supposed to be back last night from New York,
2    and New York is getting hammered real bad by this blizzard.
3    She's trying to get another flight, but her flight is not going
4    to get her here until after the trial day is over today.  So
5    we've been trying to work something out with ePlus about what
6    we would do next because we haven't disclosed any exhibits or
7    anything for the next witness.
8         THE COURT:  Just call the next witness, the expert or
9    whoever you've got here.  There's no magic to the order of
10   putting people on.
11        MR. McDONALD:  The next witness we would have
12   actually here is Mr. Lohkamp, calling him back.
13        THE COURT:  Good.
14        MR. McDONALD:  That's fine.  They haven't had a
15   chance to get ready for their cross-examination.
16        THE COURT:  They'll be ready.  They knew basically
17   what you were going to do anyway.  They're not going to do it
18   on your cross-examination; they were going to do redirect, so
19   we're going to reverse things.
20        MR. McDONALD:  We do have a deposition of Ms.
21   O'Loughlin on the RIMS prior art issue that we can move up in
22   the order.
23        THE COURT:  Is that carefully edited to eliminate the
24   trash?
25        MR. McDONALD:  That's being worked on as we speak,
```

1300

1　　related applications that we've been hearing about
2　　over the last week or so.
3　　Q  Can you tell me just briefly about your
4　　professional experience in the computer science
5　　industry?
6　　A  I've been in the field a little over 30 years.
7　　About 32 years now.
8　　Q  What types of jobs have you held in the field?
9　　A  I've held everything from -- I started out as a
10　　computer operator.  I went into systems programming.
11　　So I programmed in a number of different application
12　　languages.  Managed development staffs.  Did
13　　statistical analysis on computer performance.  Ran
14　　marketing organizations, sales organizations, and just
15　　kind of moved up the ranks of the field.
16　　Q  When did you join ProcureNet?
17　　A  I joined ProcureNet roughly -- I think it was
18　　around 2000.
19　　Q  What was your position at ProcureNet?
20　　A  Senior vice president.
21　　Q  How long did you work there at ProcureNet?
22　　A  I think it was just under a year before the
23　　acquisition.
24　　Q  So is it true then that ePlus acquired
25　　ProcureNet's business in 2001?

1301

1　　A  Yes, that would be correct.
2　　Q  What specific portions or assets of ProcureNet's
3　　business were acquired by ePlus in 2001?
4　　A  They acquired the procurement and catalog systems.
5　　All the associated things that would go with that such
6　　as the documentation.  They acquired the patents that
7　　we've been talking about that are in dispute here.
8　　And they also acquired the people that were associated
9　　with those applications.
10　　Q  How many employees from ProcureNet joined ePlus as
11　　part of the acquisition?
12　　A  Mid thirties, 35 or 38 or so.
13　　Q  Do any of those employees from ProcureNet still
14　　work at ePlus?
15　　A  For the most part, they all work at ePlus with the
16　　exception of a couple that have since retired.
17　　Q  Have you been continuously employed by ePlus since
18　　you joined after the acquisition of ProcureNet?
19　　A  I have.
20　　Q  To whom do you report at ePlus?
21　　A  I report to the CEO, Phillip Norton.
22　　Q  You mentioned that you are the president of ePlus
23　　Systems and ePlus Content Services; is that correct?
24　　A  Yes.
25　　Q  Can you describe the businesses of those divisions

1302

1　　of ePlus?
2　　A  Sure.  Those divisions are responsible for
3　　developing, supporting and selling applications that
4　　are involved in the procurement and catalog management
5　　fields.
6　　Q  What are the primary software products that are
7　　developed and sold by ePlus Systems and ePlus Content
8　　Services?
9　　A  They are referred to as Procure Plus and Content
10　　Plus.
11　　Q  Can you just give us a brief high level overview
12　　of Procure Plus and Content Plus?
13　　A  Sure.  The products work in conjunction with one
14　　another, and it provides the ability for our customers
15　　and end users to be able to select items from multiple
16　　vendors in a catalog, compare those items, decide
17　　which ones they would like to purchase from vendors,
18　　put those items on a requisition, and the system goes
19　　through a work flow for corporate approval.  Inventory
20　　is checked to make sure that the items are available
21　　in inventory or if they are backordered, if you will.
22　　　　　Then the items are placed -- there's usually a lot
23　　of different line items on a requisition that somebody
24　　orders.  They're not just ordering like a blue pen.
25　　They may order different items from different vendors,

1303

1　　and then the system distributes those items once
2　　approved from one single requisition that creates
3　　multiple purchase orders to the suppliers and vendors
4　　that they're ordering from.
5　　Q  Can you turn, please, to Plaintiff's Exhibit 448
6　　in your binder in front of you?
7　　A  Okay.
8　　　　　MR. McDONALD:  I'm going to object to this
9　　line of questioning to the extent it goes into any
10　　detail about the products because that's not
11　　really relevant to the infringement issue because it
12　　compares the Lawson products to the patent.
13　　　　　MR. STRAPP:  Your Honor, I don't intend to go
14　　into any detail about the products.
15　　　　　THE COURT:  Why are you offering it?
16　　　　　MR. STRAPP:  It will become apparent in
17　　the --
18　　　　　THE COURT:  Can you make it apparent now in a
19　　word?
20　　　　　MR. STRAPP:  Yes.  The bottom right-hand
21　　corner of the document, list the patents, I want to
22　　demonstrate that these products are marked with the
23　　patents that are in suit in this case.
24　　　　　THE COURT:  All right.
25　　　　　MR. McDONALD:  That's not an issue in the

1304

1  case anymore, Your Honor.
2      MR. STRAPP:  Marking goes to constructive
3  knowledge of the patents, which is relevant to the
4  issue we just discussed.
5      MR. McDONALD:  It is not relevant to notice
6  to Lawson.  It's just general public marking.  That is
7  not appropriate.
8      MR. STRAPP:  Your Honor, the witness will
9  testify that the various products are marked, and we
10  have testimony from Lawson witnesses that they have
11  seen those products at trade shows back as far as
12  2003.  That information is relevant to knowledge.
13      MR. McDONALD:  The Lawson people have already
14  testified.  They never testified to that.
15      THE COURT:  I think one of them testified
16  that he went to a trade show and looked at their
17  products.
18      MR. McDONALD:  He said he saw the booth, but
19  they never saw the products or any patent markings.
20      THE COURT:  He says there's no foundation
21  because you haven't established that they actually
22  looked at the products that have the marking.
23      MR. STRAPP:  Your Honor, first of all,
24  circumstantial evidence is relevant to indirect
25  infringement.

1305

1      Secondly, we believe there is direct evidence
2  that we have established through Mr. Lohkamp's
3  testimony.
4      And third, under the case law --
5      THE COURT:  Evidence of what?
6      MR. STRAPP:  That Lawson employees knew of
7  ePlus, that they have seen ePlus --
8      THE COURT:  Somebody said they knew about
9  ePlus, but that's not the point.  The point is did
10  they see these patents or these products that had the
11  notice of the patent on them.
12      MR. McDONALD:  Mr. Lohkamp's testimony about
13  seeing ePlus at the trade show in 2003 before he
14  even worked for Lawson.  So there's no evidence that a
15  Lawson employee saw that.
16      MR. STRAPP:  Your Honor, there's evidence
17  that Lawson has known of ePlus.  There's
18  circumstantial evidence at least that Lawson knows
19  that ePlus competes in this particular marketplace.
20  EPlus marks its website, its software, and under the
21  case law, marking is evidence of constructive
22  knowledge of the patents, which can be relevant to
23  indirect infringement.
24      THE COURT:  Yes, it is.  But do you
25  understand the concept of linkage, foundation?

1306

1      MR. STRAPP:  Yes, Your Honor.
2      THE COURT:  Well, do you have it?
3      MR. STRAPP:  We have testimony from Lawson
4  employees that they have known of ePlus.  We have
5  testimony from a Lawson employee that he attended a
6  trade show in which ePlus had set up a booth
7  demonstrating --
8      THE COURT:  But he says that's before he even
9  was an ePlus employee.  Is that right?
10      MR. McDONALD:  Lawson.
11      THE COURT:  I mean a Lawson employee.  Is
12  that right?
13      MR. STRAPP:  I don't know the answer to that
14  one way or the other, Judge.
15      THE COURT:  Isn't that something you need to
16  know to establish the foundation.
17      MR. STRAPP:  Well, Your Honor, I believe
18  under the case law, even if we don't have direct
19  evidence, circumstantial evidence is sufficient to at
20  least go to the jury so that they can consider whether
21  or not there is sufficient evidence for the indirect
22  infringement claim.
23      THE COURT:  All right.  Anything else?
24      MR. McDONALD:  No, Your Honor.
25      THE COURT:  Objection overruled.  The

1307

1  exhibits and testimony right now is admitted for the
2  limited purpose of whether or not Lawson may have
3  knowledge of ePlus and their patents.  EPlus as a
4  competitor and their patents.
5  BY MR. STRAPP:
6  Q  Mr. Farber, can you just tell me briefly what this
7  document is?
8  A  Sure.  This is a document, which I believe
9  describes at a high level a little bit about the
10  functionality and features of the Procure Plus
11  product.
12  Q  Can I direct your attention to the bottom
13  right-hand corner of the first page of this document?
14  A  Yes.
15  Q  Do you see there a list of U.S. patent numbers?
16  A  I do.
17  Q  Do you recognize any of those patents numbers as
18  patents that are at issue in this case?
19  A  Yes.
20  Q  Are those the first three patents listed there?
21  A  Yes, they are.
22  Q  Can you explain to me why it is that ePlus has
23  decided to mark this particular Procure Plus brochure
24  with the three patents numbers that are at issue in
25  this case?

1308

1  A  Well, it's my understanding from working with our
2  counsel that when you have a patents marking, it is a
3  necessity, and it's a form of providing general notice
4  to the industry that you have patents.
5     So we mark things that are publicly disseminated.
6  Q  Let me ask you to turn to Plaintiff's Exhibit 417,
7  please.  What is this document, Mr. Farber?
8     MR. McDONALD:  For the record, I have the
9  exact same objections.  I think I know what you're
10  going to say, but I just want to make sure you know I
11  have the same objections to this one.
12     THE COURT:  Are these the same kind of
13  documents, it's just another kind of product?
14     MR. STRAPP:  Correct.  We've discussed --
15     THE COURT:  Is that what it is?
16     MR. McDONALD:  Yes, it is, Your Honor, and I
17  guess you did have a limiting instruction.  So I'd at
18  least request the same limiting instruction.
19     THE COURT:  Well, this Exhibit 417 and this
20  testimony is, again, limited to -- for you to consider
21  as evidence respecting whether Lawson is on notice of
22  ePlus as a competitor and its patents that are at
23  issue in this case.  That's the only purpose that this
24  is admitted to.
25  BY MR. STRAPP:

1309

1  Q  Mr. Farber, this is Plaintiff's Exhibit 417?
2  A  It's a similar document and brochure that shows up
3  in written form and on the website that relates to our
4  product information management solutions.
5  Q  Which product specifically does this relate to?
6  A  Catalog and Content Plus.
7  Q  Can you take a look at the bottom right-hand
8  corner of this document, please?
9  A  Yes.
10  Q  Do you see there a list of U.S. patent numbers?
11  A  I do.
12  Q  Do you see the same three U.S. patent numbers
13  listed first there that we had discussed with respect
14  to Plaintiff's Exhibit 443?
15  A  Yes.
16  Q  I'm sorry, 448.
17     Are these the three patents that are at issue in
18  this lawsuit?
19  A  Yes, that's the '683, the '516, and the '172
20  patent.
21  Q  What types of additional documents or other
22  documents, if any, does ePlus mark with '683, '516 and
23  '172 patents?
24  A  We mark the products themselves so that when
25  people utilize the system, they see the patents as

1310

1  soon as they login.  Anybody that goes to our website
2  sees markings at numerous locations on our website.
3  Our printed materials, our documentation, information
4  that we hand out at things like trade shows are also
5  marked.  So it's basically we try to mark everything
6  that's publicly disseminated.
7  Q  Since when has ePlus marked its products and its
8  literature?
9  A  I think that was since 2002, if I'm not mistaken.
10  Q  What types of customers does ePlus target for
11  these Procure Plus and Content Plus products?
12  A  In terms of who we try to attract and sell to, I
13  would say the mid market.
14  Q  What do you mean by "mid market"?
15  A  Well, similar type customers that Lawson, you
16  know, talked about earlier in the week.  You know,
17  they're not necessarily the largest.  They're not
18  necessarily the smallest.  They fall within a range.
19  It can be, you know, a company that may be in revenue,
20  does, you know, 50 million to 2 1/2 billion.  That's a
21  very wide range, but that's what's considered mid
22  market in industry terms.
23  Q  Do you know whether or not ePlus competes with
24  Lawson for sales of its e-Procurement software?
25  A  Yes.

1311

1  Q  How do you know that ePlus competes with Lawson?
2  A  Well, I know through personal conversations that I
3  have with prospects and meetings that I attend, sales
4  meetings with my sales executives or account
5  representatives that are meeting with prospects to try
6  to sell them a solution.
7  Q  Any other ways that you know?
8  A  Yeah.  That's one way.  Other ways, through emails
9  at times that you, know, these prospects would send to
10  my sales organizations that I get copied on.  And
11  sometimes in situations where you're on a conference
12  call, you know, with a lot of vendors, you know, and
13  the prospect that's looking to buy a solution would
14  generally ask some general questions so that, you
15  know, they give the benefit to all the vendors to hear
16  the answer.
17     And sometimes there may be occasion to hear of a
18  competitor situation that way as well.
19  Q  Like the Lawson employees we've heard testimony
20  from, do you also pay attention to industry analyst
21  reports?
22  A  I do.
23  Q  Can you please turn to Plaintiff's Exhibit 463.
24  A  463?
25  Q  That's correct.

1316

1    the RFP process from Lawson consistent with your

2    understanding of how the RFP process works for

3    e-Procurement software?

4    A  Yes, I believe so.

5    Q  When ePlus receives an RFP, does ePlus itself

6    draft a response and ensure that the response that it

7    gives to the RFP is accurate?

8    A  Yes, ePlus would draft the response, yes.

9    Q  In addition to industry analyst reports, what

10   other types of media or publications do you follow to

11   try to keep abreast of trends or developments in the

12   e-Procurement industry?

13   A  In addition, to analysts reports?

14   Q  Correct.

15   A  There's a lot of sources.  You know, we do --

16   besides the reports, you get to have briefings with

17   the analysts.  We actually sit down and they disclose

18   some information to you about competition.  There's

19   times where we follow -- not times.  We do follow a

20   number of different trade magazines.  There's web

21   based information such as blogs that are written now

22   in this discipline of procurement sourcing and catalog

23   management.

24       There's the competitors websites that we looked at

25   very often to see what the competitors are doing and

1317

1    try to gain insight based on whatever public

2    information is available to help us position our

3    products and solutions.

4    Q  Do you know whether in these types of publications

5    you've been discussing there's ever been any mention

6    of ePlus or its patents?

7    A  Yes.

8    Q  What are you referring to specifically?

9    A  There have been authors that have written things

10   on blogs, on websites.  There have been newspaper

11   articles, trade magazines widely published --

12       MR. McDONALD:  Your Honor, we already went

13   through these issues as to foundations for some

14   exhibit that's been excluded.  Now he's talking about

15   the same thing.  That has been excluded.

16       THE COURT:  It sounds to me like it.

17       MR. STRAPP:  Your Honor, I wasn't planning to

18   go into any detail about these exhibits or show them,

19   obviously.  I was just asking about his personal

20   knowledge as the president of ePlus, what does he do

21   to keep abreast of industry developments.

22       THE COURT:  What's that got to do with

23   anything in the case?

24       MR. STRAPP:  It's relevant to understanding

25   how the marketplace works and how people in the

1318

1    industry, including the president of ePlus keeps track

2    of what's going on in the industry.

3       THE COURT:  Objection sustained.

4    BY MR. STRAPP:

5    Q  All right.  Mr. Farber, you heard some testimony

6    that individuals at Lawson consider publications from

7    Gartner, I think that's an industry analyst, to be

8    some of the most reliable industry publications.  Is

9    that consistent with your understanding as well?

10   A  That's what they said, yes.

11       THE COURT:  The question is:  Is it

12   consistent with your understanding?

13       THE WITNESS:  That Gartner is a widely

14   recognized --

15   Q  And reliable publication?

16   A  For the most part.

17   Q  Is Gartner an industry analyst report that ePlus

18   subscribes to?

19   A  We have.

20   Q  Have you personally reviewed Gartner research

21   reports and industry analyst reports?

22   A  I have.

23   Q  I'd like you to turn, please, to Plaintiff's

24   Exhibit 325.

25   A  I don't know that I have a 325.  Here it is.  It's

1319

1    out of order.  Okay.  I got it.

2    Q  It's also up on the screen for your reference if

3    you want to see a larger version there.

4    A  Okay.

5    Q  Does this appear, Mr. Farber, to be a Gartner

6    research report?

7    A  Yes.

8    Q  And is this the type of Gartner research report

9    that you have reviewed in the past?

10   A  Yes.

11   Q  What's the date of this particular Gartner

12   research report?

13   A  This is February 17, 2005.

14   Q  What is the title of this report?

15   A  Ariba/ePlus settlement could spark more patent

16   lawsuits.

17   Q  From reading that title, what do you understand

18   the subject matter of this particular report to be?

19   A  On the subject line, it's referring to a

20   settlement agreement that Ariba and ePlus had

21   pertaining to a certain number of our patents, and

22   Gartner, you know, is letting people know that it

23   could potentially result in some more litigation or

24   lawsuits.

25   Q  What patents were the subject of this patent

1320

1  infringement settlement referenced in the Gartner

2  report?

3  A  The same ones that are at issue here today.

4  Q  The three patents that are at issue in this case?

5  A  That's correct.

6  Q  All three of those were at issue in this Ariba

7  and ePlus litigation?

8  A  Yes, that's correct.

9  Q  What is the recommendation here at the second

10  sentence of the first page?

11  A  Starting with investigate, investigate the risk of

12  challenges to your products and whether others have

13  infringed on your patents.

14  Q  What do you understand that to mean?

15  A  They are giving advice, the research analysts --

16      MR. McDONALD:  Objection, Your Honor.  I

17  don't think the witness can interpret the report.

18      THE COURT:  Sustained.

19  Q  Let's turn to the next page of the document,

20  please.

21      THE COURT:  Ladies and gentlemen, this

22  document is admitted for a limited purpose.  Whether

23  or not Ariba and ePlus settled a lawsuit involving the

24  infringement of this case, I mean of the

25  patents-in-suit in this case, is not one of -- is

1321

1  admitted only for the purpose of whether -- for you to

2  to consider as evidence of whether Lawson knew about

3  ePlus and the patents-in-suit in the case in view of

4  the fact that one of the witnesses from Lawson

5  testified about reviewing the Gartner reports as a

6  regular proposition.

7      You may not conclude from this information

8  that because Ariba thought it might have infringed

9  ePlus' patents and reached a settlement of that matter

10  that Lawson infringes those same patents, but you can

11  consider the evidence of whether Lawson knew about

12  ePlus as a competitor and ePlus' patents, and also in

13  deciding on some of the as, I'll tell you later, some

14  of the defenses that have been offered in the case by

15  Lawson.  And those are the limited purposes.

16      Are there any other requests for limiting

17  instruction other than what I just gave?

18      MR. McDONALD:  No, Your Honor.  Thank you.

19      THE COURT:  All right.

20  Q  Mr. Farber, I'd like to direct your attention to

21  the bottom of the second page of this Gartner report.

22  Do you see that there are some recommendations listed

23  there in bullet points?

24  A  Yes.

25  Q  I want you to take a look in particular at the

1322

1  recommendations for ISVs.  Is ISV a term that's used

2  in the supply chain management industry?

3  A  It's used in the computer industry.

4  Q  What does it refer to?

5  A  It means independent software vendors.  Those

6  vendors that develop and install software.

7  Q  Is ePlus an ISV?

8  A  Yes.

9  Q  Is Lawson an ISV?

10  A  Yes.

11  Q  What recommendations is Gartner providing to

12  companies like ePlus and Lawson in this particular

13  Gartner research report?

14  A  What Gartner is recommending is to make sure that

15  your innovations are patented, which is the marking

16  that we talked about earlier, and then do an extensive

17  review of the functionality of your software against

18  patents that are known to be in dispute.

19      MR. McDONALD:  Your Honor, we don't need this

20  witness to read this document to us.  I object.

21      THE COURT:  I think that's enough.

22      MR. STRAPP:  I have no further ear questions.

23  Thank you for your time, Mr. Farber.

24      THE COURT:  Cross-examination.

25

1323

1      CROSS-EXAMINATION

2  BY MR. McDONALD:

3  Q  Good afternoon, Mr. Farber.

4      EPlus never gave Lawson any notice of these

5  patents directly before they sued them, did they?

6  A  No.

7  Q  And so the first time there's a direct

8  communication between ePlus and Lawson is when ePlus

9  filed a complaint and served that complaint on Lawson?

10  A  Yes, that's my understanding.  That's the way we

11  were instructed to do that.

12  Q  That was in May of 2009; is that correct?

13  A  I believe that's correct, yes.

14  Q  You talked at the beginning of your testimony

15  about some documents that you said put the patent

16  number out there in the public so that the public

17  would see you had these patents numbers.  Do you

18  remember that?

19  A  I said that we put the information out because it

20  was our understanding that that's how you have to

21  disseminate the patent, and we put it on documents

22  that are publicly available.

23  Q  And those documents that you picked as examples of

24  those publicly available documents, those are a couple

25  of exhibits that were put up on the computer monitors

1352

1   REDIRECT EXAMINATION

2   BY MR. STRAPP:

3   Q   I'm going to ask Lawson to put back up on the

4   screen the press release that was shown to you,

5   Mr. Farber.

6       Mr. Farber, what's the purpose of ePlus' press

7   releases generally?  Why does ePlus issue press

8   releases?

9   A   A press release is issued to, you know, let the

10  industry know what's going on at ePlus and what we

11  think are notable events.

12  Q   Do you see at the top of this document there's a

13  date, July 21, 2003?  Do you see that?

14  A   Yes.

15  Q   Right above it, it says "market wire."  What's

16  your understanding of market wire?  What does that

17  imply about where this was disseminated to?

18  A   Market wire is a public relations organization

19  that picks up will press releases and then

20  redistributes them on their own vehicles of

21  communication.

22  Q   So who would have been the target audience of a

23  press release about ePlus' patent and the subject

24  matter of the patent?

25  A   Well, it would have had a very broad distribution.

1353

                FARBER - REDIRECT   1353

1   Certainly, you know, to ISVs and certain customers

2   that look at the releases.  The financial world as

3   well.

4   Q   This press release specifically mentions one of

5   the patent numbers that's at issue in this case,

6   doesn't it?  The '172?

7   A   Yes.

8   Q   You were asked a few questions by Mr. McDonald

9   regarding marking.  Do you recall that?

10  A   Yes.

11  Q   Does ePlus mark any of its products or patent

12  literature that is disseminated publicly without

13  restriction?

14  A   Yes.

15  Q   Which particular --

16      MR. McDONALD:  Objection.  This is already

17  covered.

18      THE COURT:  Overruled.

19  Q   Which particular products or product literature

20  are marked with a patent that aren't restricted in any

21  way?

22  A   Sales brochures, sales presentations that are

23  provided at either a prospect's or industry conference

24  that we speak at.

25  Q   Trade shoes?

1354

                FARBER - REDIRECT   1354

1   A   Trade shoes.  Information that's, you know, widely

2   available and nonrestricted on our websites.

3   Q   For example, at an industry trade show, can anyone

4   walk up, take a product brochure and walk away?

5   A   Absolutely.

6   Q   Can anyone go to the ePlus website and see the

7   patent numbers marked there?

8   A   Yes.

9       MR. STRAPP:  No further questions.

10      THE COURT:  All right.  You may step down,

11  sir.

12      (The witness was excused from the witness

13  stand.)

14      MR. ROBERTSON:  Your Honor, we have a few

15  housekeeping matters to take care of, a few

16  stipulations to read into the record.  If you'd like,

17  I can do that now.

18      THE COURT:  The lunches are here.  I think

19  I'll let you-all clean up and get things straightened

20  out.  We'll take one hour for lunch.  You can take

21  your notebooks with you.

22      (The jury is out.)

23      THE COURT:  Do you have something,

24  Mr. Robertson, you wanted to give me that I had asked

25  for or something and I told you to do it after the

1355

1   examination at the break?

2       MR. ROBERTSON:  Yes, sir.  Two thinks, Your

3   Honor.  The first issue had to do with this deposition

4   destination of that was Kristy Oliver.

5       THE COURT:  And the issue there was whether

6   Lawson had designated that part of it on item No. 18,

7   page 29, as a fairness designation or whether you had

8   designated it.

9       MR. ROBERTSON:  Yes, sir, and we have the

10  answer to that question.

11      THE COURT:  And the answer is?

12      MR. ROBERTSON:  It was Lawson.  And let me

13  direct you to where you can find it.

14      THE COURT:  Do you all agree?

15      MR. SCHULTZ:  Yes.

16      THE COURT:  All right.

17      MR. McDONALD:  It was ePlus' counsel that

18  asked it during the actual taking of the deposition,

19  but we at Lawson actually designated it for the

20  reading.

21      THE COURT:  All right.  The fact that ePlus

22  asked it but didn't offer it doesn't change the

23  fundamental issue, and that is who opened the door at

24  the trial.  So this doesn't open the door.

25      MR. McDONALD:  We put it in without their

1488

1  And there's also a case called SEB from the Federal

2  Circuit which has to do with the standard of intent

3  for the inducement infringement, which I understand

4  also includes a reckless disregard for the patent.

5      THE COURT:  I want you to give Ms. Haggard

6  the citations for those two cases, plus --

7      MR. ROBERTSON:  Let me be candid with the

8  Court.

9      THE COURT:  What is it?

10     MR. McDONALD:  Akamai.

11     THE COURT:  Alkamai?

12     MR. ROBERTSON:  Alkamai is how it's

13  pronounced.

14     THE COURT:  I can't pronounce it.  All right.

15  I want you to give her the cites, so I make sure I've

16  read those while I'm working on the instructions.

17     MR. ROBERTSON:  The Supreme Court has granted

18  a writ of certiorari with respect to this SAB case I

19  just referenced.  But the Federal Circuit just came

20  down with a case I think in the last week that said

21  that the pendency of a writ of certiorari has no

22  impact whatsoever on what the state of the law is.

23     THE COURT:  Why did the Federal Circuit feel

24  compelled to decide that?  I think that's been the law

25  forever.

1489

1      MR. ROBERTSON:  I think it was because one of

2  the litigants made the argument.

3      THE COURT:  I understood that to be the case

4  for as long as I've been practicing law.

5      MR. ROBERTSON:  All right.  Thank you, Your

6  Honor.

7      THE COURT:  All right.  Thank you all very

8  much.  Give the citations to her tonight so she can

9  print those out for me.  Give her the books and we'll

10  be ready to go.

11     Thank you very much.

12

13     (The proceedings were adjourned at 5:34 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1490

```
 1          IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF VIRGINIA
 3                  RICHMOND DIVISION
 4
 5   ----------------------------------
 6   ePLUS, INC.          : Civil Action No.
                          : 3:09CV620
 7   vs.                  :
                          :
 8   LAWSON SOFTWARE, INC.    : January 13, 2011
                          :
 9   ----------------------------------
10
11       COMPLETE TRANSCRIPT OF THE JURY TRIAL
12       BEFORE THE HONORABLE ROBERT E. PAYNE
13    UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C. 20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia 23219-3095
     Counsel for the plaintiff
23
24       Peppy Peterson, RPR
             Official Court Reporter
25       United States District Court
```

1491

```
 1   APPEARANCES:  (cont'g)
 2   Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
 3   Troutman Sanders Building
     1001 Haxall Point
 4   Richmond, Virginia 23219
 5   Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
 6   William D. Schultz, Esquire
     Merchant & Gould, PC
 7   80 South Eighth Street
     Suite 3200
 8   Minneapolis, Minnesota 55402
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1492

```
 1              P R O C E E D I N G S
 2
 3        THE CLERK:  Civil action number 3:09CV620, ePlus,
 4   Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
 5   L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
 6   Mr. Michael G. Strapp represent the plaintiff.
 7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
 8   Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
 9   the defendant.  Are counsel ready to proceed?
10        MR. ROBERTSON:  Plaintiff is, Your Honor.  Thank you.
11        MR. McDONALD:  Yes, Your Honor.  Thank you.
12        THE COURT:  Do you need to see me about something
13   before the jury comes in?
14        MR. ROBERTSON:  Yes, Your Honor.  You had asked us to
15   take a look at those appendices with respect to our motion on
16   this implementation on a customer-by-customer basis.
17        THE COURT:  Yeah.
18        MR. ROBERTSON:  We have done that, and the reason I
19   raised it, Your Honor, is one of the witnesses that's going to
20   be called this morning is Ms. Hannah Raleigh.  You may recall
21   she testified once already.  She is involved with Lawson
22   Professional Services that has to do -- that has responsibility
23   for implementation of the Lawson software products, and we're
24   concerned that she's going to be getting into areas in and
25   presenting testimony that Lawson is going to contend are
```

1493

```
 1   defenses to infringement later that are directly implicated by
 2   that interrogatory number 24.
 3        What I have provided Your Honor with is the
 4   appendices that were referenced in the answers to the
 5   interrogatories, the transcript from the March 26th hearing,
 6   telephonic hearing on the motion to compel, and the relevant
 7   citations to the transcript where this issue came up, and I do
 8   want to continue to press the motion, Your Honor.
 9        We do think that the answers, even with the
10   appendices, were nowhere near what was called for and what Your
11   Honor directed Lawson to do in response to that.
12        If I might just, Your Honor, you may recall that
13   these appendices that are being referenced were provided to
14   ePlus three months before the motion to compel was presented,
15   and the appendices do not respond to the interrogatory as
16   represented by counsel for Lawson.
17        Indeed, if you look at some of the appendices, for
18   example --
19        THE COURT:  Is A appendix A?
20        MR. ROBERTSON:  Yes, sir.  Under the tab December 23,
21   2009, response to interrogatory number -- yeah, A is one.
22        THE COURT:  March 26th is the first tab, the
23   transcript, and then there's an A behind that.  Is that
24   appendix A or not?
25        MR. ROBERTSON:  I believe appendix A, Your Honor, is
```

1506

1  should I try this, should I not try this, I'm having some
2  issues here, can you help us out, and we'll take a look at
3  that.  Those are always phone calls or site visits, sometimes
4  they come up and see us.
5  Q  I'm going to ask you a couple of questions about Lawson
6  generally.
7  A  Sure.
8  Q  What kinds of products does Lawson sell?
9  A  Software and then services to help service that software
10  and then clearly the maintenance.
11  Q  Does Lawson sell computer systems?
12  A  No, it does not.
13  Q  Does Lawson sell any kind of computer hardware?
14  A  No, it does not.
15  Q  I'm going to ask you a few questions about Lawson system
16  foundation.
17  A  Sure.
18  Q  At a high level, what is LSF?
19  A  Lawson system foundation, it is a basis for the 4GL,
20  Lawson 4GL applications such as purchase order, requisitions or
21  RQ, and inventory control.  They need that in order to operate,
22  but not only do they need it to operate it, they need it in
23  order to actually be compiled.
24      The programming language by itself my developers actually
25  work in is an extension of COBOL but doesn't always necessarily

1507

1  look like COBOL.  The program files, when you look at it, is
2  completely dispersed through a variety of things, and LSF pulls
3  it all together into an actual COBOL program.  We don't
4  actually see that.  That's a machine that does that.
5  Q  Other than -- are Lawson software modules other than the
6  accused products in this case also hosted on top of LSF?
7  A  That is correct.
8  Q  Can you give me a few examples of modules that are hosted
9  on LSF other than the accused products in this case?
10  A  When I talked about the financial suite and the HR suite
11  --
12      THE COURT:  Why are we getting into this?  It's hard
13  enough to follow this technical material without getting into
14  something that isn't an issue.  Let's just stay with what's at
15  issue and get right to the point, okay?  That doesn't make any
16  difference what else is hosted.
17      MS. STOLL-DeBELL:  Well, I think it goes to the fact
18  that LSF -- what are the accused products and that LSF works
19  with things other that.
20      MR. ROBERTSON:  I'll stipulate that LSF works with
21  the other products as long as you stipulate it works with the
22  accused products.
23      MS. STOLL-DeBELL:  I think we do.
24      THE COURT:  Do you or not?
25      MS. STOLL-DeBELL:  We do.

1508

1      THE COURT:  Okay, done.  Now we don't need to talk
2  about anything else.  Stay with the accused products.
3  Q  I'm going to ask you, or I'm going to turn now to the item
4  master database --
5  A  Sure.
6  Q  -- and ask you some questions about that.
7  A  Uh-huh.
8  Q  When Lawson sells its software to its customers, is there
9  any item data in the item master database?
10  A  No, there's not.
11  Q  Why does Lawson sell it that way, with no item data in it?
12  A  Essentially we don't know what the customers are going to
13  want to have in the database.  It's configurable in a variety
14  of ways.
15      THE COURT:  Essentially, you don't know; that's the
16  answer.  Keep the question and the answer -- and the best way
17  to keep an examination moving is for you to take control of the
18  questions and not be -- we don't need a general dissertation of
19  things.  We need to have the questions asked and answered.
20  Q  Would item master work if it included only items from a
21  single vendor?
22  A  Yes.
23  Q  Would item master work if it included only items that were
24  already owned by the customer?
25  A  Yes.

1509

1  Q  Can item master be stored in a local database at the
2  customer's location?
3  A  Yes, it may.
4  Q  Can item master include item records for items owned by
5  the customer?
6  A  Yes.
7  Q  Can item master records include a customer's part number?
8  A  Yes, it can.
9  Q  Can item master records include the manufacturer or
10  supplier's catalog or part number?
11  A  Yes.
12  Q  Do item master records include a default unit of measure?
13  A  Yes, it does.
14  Q  Do item master records include an item description?
15  A  Yes, it does.
16  Q  Do item master records include the quantity of items
17  available in the customer-owned inventory?
18  A  For stock items, yes.
19  Q  Do item master records include price?
20  A  Yes.
21      MS. STOLL-DeBELL:  If we can go to PX-361.
22      MR. ROBERTSON:  Your Honor, I'm going to object.
23  This is a demonstrative that Dr. Weaver did that was never
24  introduced.  This witness -- so it's not in evidence.
25      THE COURT:  Could I see it?

1566

CHRISTOPHERSON - DIRECT     1566

1   THE COURT:  Can you tell?

2   THE WITNESS:  I can tell.

3   THE COURT:  Now the next question is how do

4   you tell because that's the foundational question.

5   Q   How do you tell?

6   A   How do you tell?  When we open up a window, which

7   is what's occurred here, when you have selected, in

8   this case I believe it's Staples link, a brand new web

9   page is opened up.  And there's a frame put on that.

10  That frame is much like a picture frame.  In this

11  case, really closer to a digital picture frame.

12     So the outside of the frame looks like the frames

13  in any of the pictures here.  You can put a label on

14  that frame.  The label is Lawson.  We happen to put

15  our logo, our brand, always with Punchout since we've

16  come out with that product always in the upper

17  left-hand corner.

18     Everything below that is the picture.  So we have

19  created the frame, but we don't care what happens

20  inside of that picture.  At that point everything

21  below that is being run by and controlled by the

22  vendor.

23  Q   Okay.  So in this slide you can see there's a list

24  of categories?

25  A   Yes.

1567

CHRISTOPHERSON - DIRECT     1567

1   Q   Are you saying that that is controlled by the

2   vendor?

3   A   Correct.

4   Q   And not Lawson?

5   A   Correct.

6   Q   We can go to the next page.  And within the

7   picture frame, do you see results of a search?

8   A   What I see is they have drilled down into the

9   catagory further.

10  Q   Is it the vendors software that's providing that

11  drill down of catagory?

12  A   Yes.

13  Q   And not Lawson?

14  A   Correct.

15  Q   Okay.  If we can go to the page ending in 1269.

16  It's a couple pages ahead.  What is this showing?

17  A   In this case, they have selected some paper.  And

18  you can start seeing the item description, more

19  information about that particular product.

20  Q   Is it the vendor software that's providing that

21  item description and additional detail regarding that

22  product?

23  A   Yes.

24  Q   And not Lawson?

25  A   Correct.

1568

CHRISTOPHERSON - DIRECT     1568

1   THE COURT:  In view of what you said earlier,

2   whose software is providing the whole page?

3   THE WITNESS:  The whole page, Your Honor, is

4   actually being constructed by two parties.  You've got

5   the very -- actually, three parties.  You've got in

6   this case Internet Explorer is done by Microsoft.

7   That's creating the blue bar and the borders around

8   it.  Right below that is Lawson.  So you have the

9   Lawson logo.  All we're putting up is an image of that

10  and it enters blank space.

11     THE COURT:  Whose software is being used to

12  enable me to view this?

13     THE WITNESS:  To enable you to view it?  It

14  would be Microsoft.  It's Internet Explorer in this

15  particular example.  That's the browser that's being

16  used.

17     THE COURT:  That's not what I'm asking.

18     THE WITNESS:  Sir, I didn't understand then.

19     THE COURT:  Do I have to have one of the

20  Lawson systems in order to see what's on this screen?

21     THE WITNESS:  To use Punchout, yes.

22     THE COURT:  All right.  Now I understand.

23  Thank you.

24     THE WITNESS:  It would help maybe, Your

25  Honor -- Punchout is what opens up --

1569

CHRISTOPHERSON - DIRECT     1569

1   MR. ROBERTSON:  Your Honor, I just object.

2   The question has been answered.

3   THE WITNESS:  Okay.

4   THE COURT:  You may have objected to my

5   question.

6   MS. STOLL-DeBELL:  I think he did actually.

7   BY MS. STOLL-DeBELL:

8   Q   Okay.  Are there some of these Punchout vendor

9   websites that customers can go to without using

10  Punchout?

11  A   Can you say that again?

12  Q   Yes.  So, for example, Staples link, is that one

13  of the Punchout vendors that can be used with Lawson's

14  Punchout product?

15  A   Yes, it is.

16  Q   Okay.  Can a customer use Stapleslink.com without

17  having the Punchout product?

18  A   I do not know.

19     MR. ROBERTSON:  No objection.

20  Q   I think we're done with that line of questioning

21  so I'm going to transition again just for you.

22  A   Sure.

23  Q   While you take a drink.

24  A   That's okay.  Go ahead.

25  Q   When did you first learn about ePlus' patents?

1570

CHRISTOPHERSON - DIRECT    1570

1  A  May 10, 2009.
2  Q  Is that when you first learned about the law suit
3  that ePlus had filed against Lawson?
4  A  Yes.
5  Q  What did you do when you learned that ePlus had
6  filed suit against Lawson for patent infringement?
7  A  What I first did was I got the three patents and
8  reviewed those, read those.
9  Q  What did you think when you finished reading those
10  patents?
11        MR. ROBERTSON:  Objection, Your Honor.  This
12  is calling for a legal conclusion and it's --
13        THE COURT:  I'm sorry?
14        MR. ROBERTSON:  It's calling for a legal
15  conclusion, Your Honor, and it's not relevant.
16        THE COURT:  What did he think?  Is that the
17  question?
18        MS. STOLL-DeBELL:  Yes, what did he think.
19        MR. ROBERTSON:  It's a little vague and
20  ambiguous, too.
21        THE COURT:  Well, I think maybe that's the
22  right objection.  Sustained.
23        We have to have a more precise question to
24  understand whether it's objectionable or not.
25        MS. STOLL-DeBELL:  Okay.

1571

CHRISTOPHERSON - DIRECT    1571

1  BY MS. STOLL-DeBELL:
2  Q  After reading the patents, did you think Lawson
3  had a problem with these patents?
4        MR. ROBERTSON:  Objection.  That's an
5  important question and that's leading.
6        THE COURT:  Well, it is.  Sustained.
7  BY MS. STOLL-DeBELL:
8  Q  What was your first reaction after reading the
9  patents?
10        MR. ROBERTSON:  Objection, vague and
11  ambiguous.
12        MS. STOLL-DeBELL:  Your Honor, I'm trying --
13        THE COURT:  I guess my basic inquiry here is
14  why is it that what he thinks is relevant?  To what
15  issue does it go that this jury has to decide?  That's
16  the question.  So just name the issue that it goes to.
17        MS. STOLL-DeBELL:  It goes to the intent
18  element of indirect infringement.  And Mr. Robertson
19  actually asked Mr. Christopherson about this same
20  topic when he put him on the stand in his case.  And
21  so it goes to that.
22        MR. ROBERTSON:  I didn't ask him anything
23  about what he thought or his reaction or anything.  I
24  just asked him if he was aware that a lawsuit was
25  filed and if he had notice since that date.

1572

CHRISTOPHERSON - DIRECT    1572

1        THE COURT:  What he thought is the irrelevant
2  to this case except with respect to the intent element
3  of indirect infringement; is that right?
4        MS. STOLL-DeBELL:  Yes.
5        THE COURT:  This information can be
6  considered by you, ladies and gentlemen, only in
7  deciding whether or not a certain element of in
8  direction infringement has been met, and that is
9  whether there was an intent to have an infringement.
10  And so you can consider it for that purpose and that
11  purpose alone.  And I'll give you some more
12  instructions later about what indirect infringement
13  is.
14        But for your purposes, you can just keynote
15  this testimony of what his reaction was goes to the
16  intent to indirectly infringe or to have indirect
17  infringement.  Excuse me.  Go ahead.
18  Q  Can you go ahead and answer the question?
19  A  Can you restate the question.  It's been awhile.
20  Q  Sure.  After you read the patents, what was your
21  first reaction?
22  A  My first reaction was that it didn't appear as
23  though we were actually doing that, the three patents.
24  Q  Why did you think it didn't appear that you were
25  doing what was in the three patents?

1573

CHRISTOPHERSON - DIRECT    1573

1        MR. ROBERTSON:  Your Honor, now I'm going to
2  object.  This calls for a legal conclusion and an
3  expert opinion.
4        MS. STOLL-DeBELL:  Your Honor, it doesn't.
5  I'm asking him what he thought.  I'm not asking him
6  for his opinion.  I'm not asking him about the claims.
7        THE COURT:  When you asked him what he
8  thought, why isn't that asking him for an opinion?
9        MS. STOLL-DeBELL:  Well, I suppose it is a
10  lay opinion on some level, but Mr. Robertson asked him
11  what Lawson as a company did after this lawsuit was
12  filed.  And Mr. Christopherson was involved in that,
13  and I'm just trying to inquire further into the issue
14  of Lawson's intent.
15        THE COURT:  What he said was he didn't think
16  that Lawson practiced the patent.  That's what his
17  reaction was.
18        MS. STOLL-DeBELL:  Yes.
19        THE COURT:  And you want to know why he
20  thought that?
21        MS. STOLL-DeBELL:  Yes.
22        THE COURT:  You can consider that for the
23  same limited purpose, ladies and gentlemen.
24  BY MS. STOLL-DeBELL:
25  Q  Why did you think that Lawson was doing something

1574

CHRISTOPHERSON - DIRECT     1574

1   different than what was in the patents?

2   A   Keep in mind, this is the first initial look at

3   the patents.  Some of the key things I was noticing

4   were catalogs and what I was going back to was the

5   state of where catalogs were back in the mid '90s or

6   around the time the patents were filed.  And in

7   looking at screens, for instance, and they were

8   mentioning page numbers from catalogs.  Very much like

9   a printed catalog except they turned it into an

10  electronic form.  That was the first thing.

11  Q   Why did you think that was different from what

12  Lawson was doing?

13      MR. ROBERTSON:  Objection, Your Honor.

14  There's a claim construction in this case with respect

15  to catalog, and now we're asking the lay witness to

16  opine on what his understanding of a catalog is.  It

17  doesn't have any relevancy to this case.

18      THE COURT:  You're getting into expert

19  testimony, and he wasn't qualified as an expert, and

20  what you're doing is you're offering it without a

21  report or anything.  And he's involved in in-house

22  development of the systems and knows about them, and

23  he can be qualified as a person who's an expert, but

24  he wasn't.

25      MS. STOLL-DeBELL:  Your Honor, first of all,

1575

CHRISTOPHERSON - DIRECT     1575

1   he's just testifying in his capacity as an employee

2   for Lawson.  So I don't think there was a requirement

3   for him to do an expert report.

4       THE COURT:  If he's giving expert testimony,

5   if he' testifying as an expert for Lawson, he has to

6   give a report.  I don't care whether he's an employee

7   or not.

8       MS. STOLL-DeBELL:  He wasn't professionally

9   retained to give expert testimony.

10      THE COURT:  You can't have an employee

11  professionally retained or otherwise give expert

12  testimony without a report.

13      MS. STOLL-DeBELL:  Okay.  I don't think it

14  matters because I don't think I'm asking him for

15  expert testimony.  I want to -- I think it goes to the

16  intent --

17      THE COURT:  You're just asking him whether he

18  thought Lawson did something different.

19      MS. STOLL-DeBELL:  Yes, were they different.

20      THE COURT:  Okay.  Why don't you ask him

21  that?

22  BY MS. STOLL-DeBELL:

23  Q   Did you think Lawson was doing something different

24  than the patents?

25  A   Yes.

1576

CHRISTOPHERSON - DIRECT     1576

1   Q   Did you have a meeting with your team members

2   regarding the lawsuit?

3   A   Yes.

4   Q   Did they agree with you?

5       MR. ROBERTSON:  Objection, Your Honor.

6       MS. STOLL-DeBELL:  Let me ask a better

7   question.

8       THE COURT:  Yes.  She's going to ask a

9   different question.

10  BY MS. STOLL-DeBELL:

11  Q   Did they agree with you that what Lawson was doing

12  was different than the patents?

13      MR. ROBERTSON:  Objection, Your Honor.  It

14  still calls for a legal conclusion, and it's

15  inappropriate expert testimony, and it's hearsay.

16      THE COURT:  It's sustained as hearsay.  It's

17  offered for the truth of the matter.  So it doesn't

18  have any nonhearsay use.

19  BY MS. STOLL-DeBELL:

20  Q   Was it your recommendation that Lawson not make

21  any changes --

22      THE COURT:  What did you do after this?  Ask

23  him.  Let him testify.

24  Q   What did you do after you read the patents?

25  A   I'll provided recommendation that in my belief, my

1577

CHRISTOPHERSON - DIRECT     1577

1   reading, we weren't doing that patent, first, and that

2   they didn't need to do any changes with the software

3   that was currently available.

4       MS. STOLL-DeBELL:  I have no further

5   questions right now, Your Honor.

6       THE COURT:  All right.  Cross-examination.

7

8   CROSS-EXAMINATION

9   BY MR. ROBERTSON:

10  Q   Let's start with that last topic first if we

11  could, Mr. Christopherson.

12  A   Sure.

13  Q   You did something else, didn't you, sir, besides

14  making the recommendation that no changes would be

15  made to the software?

16  A   I'm not sure what you're referring to, sir.

17  Q   Lawson went out and sought a legal opinion with

18  respect to these patents, didn't they, sir?

19      MS. STOLL-DeBELL:  Objection, Your Honor.  I

20  don't think it's appropriate to get into whether we

21  got an opinion or not.  It's not relevant.

22      MR. ROBERTSON:  It goes to the whole intent

23  issue, Your Honor, under the Broadcomm v. Qualcomm

24  case.

25      MS. STOLL-DeBELL:  Your Honor, it goes to

1786

1 instructions that we think will be appropriate.

2 THE COURT:  Several?  How about one good one?

3 MS. STOLL-DeBELL:  One with many facets, Your

4 Honor.

5 THE COURT:  Listen, I'm going to make you sit

6 on the jury.  I think every lawyer ought to have to

7 sit on a jury and ought to have to listen to these

8 instructions and try to figure out what do they mean.

9 Because if you read them from the jury's standpoint,

10 particularly these model instructions in the patent

11 area, what they're doing is -- nobody has really made

12 a real good effort to simplify them yet.

13 Judge Spencer did better in SAP in

14 simplifying the instructions than almost anybody I've

15 ever seen, but there have with some legal changes

16 since that time that prohibit me from adopting them

17 full scale.

18 All right.  That takes care of them.  I'm not

19 real hopeful that you're going to get your evidence or

20 I don't think you ought to be hopeful that you're

21 going to get that evidence in, Mr. Robertson, because

22 it seems to me it invites the jury to speculate and

23 it's a problem, I think.

24 MR. ROBERTSON:  I understand, Your Honor.

25 We're also concerned about prejudice given the fact we

1787

1 proffered that in good faith when it came up with the

2 witness that he had a lay opinion as to his intent.  I

3 thought it was relevant then because his lay opinion

4 as to the intent I didn't think was very persuasive,

5 but if you go get a legal opinion on these issues that

6 obviously involve the patents, and then you make the

7 conscious decision not to disclose it, I think that's

8 part of the circumstantial evidence they can consider.

9 I understand Your Honor's ruling.

10 THE COURT:  I haven't rules.

11 MR. ROBERTSON:  I understand Your Honor's

12 suggestion which way you might rule, but you're going

13 to be fair and read the papers.

14 THE COURT:  I thought maybe if I gave you all

15 some insight into where I was right now since we're on

16 the fly that your arguments might be better informed

17 in the morning, just as my thinking will be better

18 informed if I read what you-all tendered for me to

19 read.

20 Thank you so much for the overnight present.

21 I appreciate it.

22

23 (The proceedings were adjourned at 5:26 p.m.)

24

25

1788

2797

```
1           IN THE UNITED STATES DISTRICT COURT
2          FOR THE EASTERN DISTRICT OF VIRGINIA
3                    RICHMOND DIVISION
4
5     --------------------------------------
                                          :
6     ePLUS, INC.          :  Civil Action No.
                           :  3:09CV620
7     vs.                  :
                           :
8     LAWSON SOFTWARE, INC.      :  January 21, 2011
                                 :
9     --------------------------------------
10
11        COMPLETE TRANSCRIPT OF THE JURY TRIAL
12        BEFORE THE HONORABLE ROBERT E. PAYNE
13      UNITED STATES DISTRICT JUDGE, AND A JURY
14
      APPEARANCES:
15
      Scott L. Robertson, Esquire
16    Michael G. Strapp, Esquire
      Jennifer A. Albert, Esquire
17    David M. Young, Esquire
      Goodwin Procter, LLP
18    901 New York Avenue NW
      Suite 900
19    Washington, D.C.  20001
20    Craig T. Merritt, Esquire
      Christian & Barton, LLP
21    909 East Main Street
      Suite 1200
22    Richmond, Virginia  23219-3095
      Counsel for the plaintiff
23
24        Peppy Peterson, RPR
           Official Court Reporter
25        United States District Court
```

2798

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2799

```
            P R O C E E D I N G S
1
2
3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
6    Mr. Michael G. Strapp represent the plaintiffs.
7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin L. Stoll-DeBell, Mr. William D. Schultz, and Ms. Rachel
9    Hughey represent the defendant.  Are counsel ready to proceed?
10       MR. ROBERTSON:  Yes, Your Honor.
11       MR. McDONALD:  Yes, Your Honor.
12       THE COURT:  All right.  We'll take plaintiff's JMOL
13   motion first.
14       MR. ROBERTSON:  Good morning, Your Honor.
15       THE COURT:  Good morning.
16       MR. ROBERTSON:  I'm going to be arguing plaintiff's
17   judgment as a matter of law with respect to infringement, and
18   Ms. Albert will be addressing plaintiff's judgment as a matter
19   of law with respect to the invalidity issues.
20       Your Honor, Rule 50 provides that judgment as a
21   matter of law may be granted when a reasonable jury would not
22   have a legally sufficient evidentiary basis to find for the
23   party Lawson on that issue.  ePlus moves for JMOL that Lawson
24   infringes all the asserted claims of the patents-in-suit, both
25   directly and indirectly, both through inducement of
```

2800

```
1    infringement and contributory infringement.
2        I'm not going to go through all the asserted claims,
3    Your Honor.  I know Your Honor is familiar with them, and that
4    would just take up too much time, and I know we're pressed for
5    time here this morning with the Court's schedule this
6    afternoon, but let me hit a high point, first start off by
7    saying, we contend that the defendants non-infringement case in
8    this proceeding has been really based on misdirection, that
9    they have ignored the Court's claim construction with respect
10   to catalog.  They rewrote the provision for published by a
11   vendor to suit their manufactured non-infringement positions.
12       It required the Court, I think midcourse through this
13   case, to issue the instruction with respect to published by a
14   vendor to bring some clarity to what the Court intended when it
15   gave its instruction with respect to what a catalog is.
16       It did not mean, as the defendant contended, that the
17   item data associated with the catalog could not be selected --
18   or had to be selected by the customer or modified or deleted or
19   reformatted or be an entire catalog.  That was never intended
20   by the Court, and its revised published-by-a-vendor
21   construction made that clear, and I think the arguments made on
22   that, the non-infringement arguments that were based on that
23   have no sound footing in the record on this case.
24       We believe that the best evidence in this case has
25   come from, indeed, Lawson's own witnesses and documents.  Mr.
```

2965

1     THE COURT: Moving to 26, there is an objection
2  there. I thought you all worked out a lot of stuff.
3  Substantial progress you made -- who was it that represented
4  there was substantial progress going on? You don't have to
5  answer that question. You plead guilty?
6     MR. MERRITT: I do. I was sent down the hall to
7  check. I was assured, and they looked like they were working.
8     THE COURT: All right, 26.
9
10     (Discussion off the record.)
11
12     THE COURT: Okay, 26.
13     MR. ROBERTSON: Let me raise one issue, and then I'll
14  let Lawson raise the other issues. The things that are struck
15  here about -- I'm sorry, I'm down about --
16     THE COURT: Let's go to about the eighth line down,
17  acts that constitute.
18     MS. STOLL-DeBELL: So, Your Honor, with that, I think
19  the Federal Circuit held in DSU Medical Corporation that intent
20  for indirect infringement requires an intent to cause the
21  actual infringement, not the acts that constitute infringement.
22     THE COURT: What is the difference?
23     MS. STOLL-DeBELL: You'd have to actually know about
24  a patent and intend to cause the infringement as opposed to
25  intend to just cause something that you don't know is an

2966

1  infringement.
2     So I just took out the acts that constitute, because
3  that is the holding of the DSU Medical Corp. It was actually
4  an en banc decision from the Federal Circuit to resolve a
5  conflict in their law, and they held exactly that, that the
6  intent is to cause --
7     THE COURT: That's what the next clause says. It
8  says -- you are not reading the whole thing. You are just
9  editing out something. Cause the acts that constitute direct
10  infringement, comma, that Lawson knew of the patent and Lawson
11  knew or should have known that its actions would lead to actual
12  infringement. I mean, that seems to me to do --
13     MS. STOLL-DeBELL: I'll withdraw that redline.
14     THE COURT: Okay.
15     MS. STOLL-DeBELL: I'll put my horse back in the
16  barn, Your Honor.
17     THE COURT: That's a good thing to do. A good
18  horsewoman knows when to stable a mount.
19     All right, now, do you want to add the underscored
20  part here in your suggestion, Ms. Stoll-DeBell?
21     MS. STOLL-DeBELL: Yes, sir.
22     MR. ROBERTSON: I mean this appears argumentative to
23  me, Your Honor, and I don't know. Is there a case that says
24  this that you want to rely on?
25     MS. STOLL-DeBELL: I think to start off, they are

2967

1  relying on this SEB case, Your Honor, which is an outlier case
2  talking about deliberate indifference. The facts of that case
3  are very different than what we are talking about here.
4     In that case, the defendant actually copied the
5  patentee's product. They sent it to their manufacturer, and
6  they copied every feature of it. Then they went and had a
7  patent infringement -- or an opinion done, and they didn't tell
8  the patent attorney that they had copied the patentee's
9  product.
10     And in that case, the Federal Circuit found that they
11  had acted with reckless disregard for the patent rights by
12  copying the product and then having a search done and not
13  telling their patent attorney that they copped it. In that
14  case, the Federal Circuit found that they basically did know
15  about the patent in that case because of those bad acts.
16     We don't have those facts here, Your Honor, and I
17  think this reckless disregard standard is confusing. As Mr.
18  Robertson noted, the Supreme Court has granted cert on that
19  case, and I just don't think it's good law, and I don't think
20  it makes sense to put it in this case.
21     MR. ROBERTSON: Your Honor, it is the Federal
22  Circuit's most recent pronouncement on this case. They didn't
23  announce the standard based on the facts. They announced the
24  standard can be reckless disregard, and I did raise this with
25  Your Honor before. A case that's on certiori is still the law

2968

1  of the land until and -- if and until the Supreme Court
2  overturns it.
3     MS. STOLL-DeBELL: It is one case, Your Honor,
4  talking about --
5     THE COURT: Excuse me. Reckless disregard has always
6  been -- as far as I know, the concept of willful blindness,
7  deliberate indifference, all of those meld together and are
8  components that typically, in the law of intent, have been
9  considered -- have been appropriately considered as factors in
10  the analysis.
11     MS. STOLL-DeBELL: Your Honor, that may be true, but
12  it doesn't fit the facts of this case. We don't have any
13  copying here. In fact, as you know, Lawson has been selling
14  these products since the 1980s. There's just no facts that are
15  even anywhere close to the facts that they looked at in the SEB
16  case that would support instructing the jury on reckless
17  disregard here.
18     THE COURT: This case says, this Court has made
19  clear, however, that inducement requires a showing of specific
20  intent to encourage another's infringement. As other Courts
21  have observed, specific intent in the civil context is not so
22  narrow as to allow an accused wrongdoer to actively disregard a
23  known risk that an element of the offense exists.
24     And isn't that -- this Court notes that the Supreme
25  Court has indicated, in a different civil context, that

2011.01.21 Trial Transcript Day 12   1/21/2011   8:22:00 PM

3049

1      MR. ROBERTSON: I apologize. I will get that

2   to you.

3      THE COURT: Get it to him, and we'll deal

4   with that.

5      All right. Now, we have a verdict form. So

6   we're going to take a break.

7

8      (Recess taken.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3050

1      THE COURT: All right. Do we have the verdict forms?

2   I've got my copy. Are you all in agreement on these forms?

3      MR. CARR: Your Honor, we have a few changes to the,

4   I guess it's ePlus's second revised proposed verdict form, some

5   of which we are in agreement on and some of which we are not.

6   Do you have it in front of you?

7      THE COURT: Yes.

8      MR. CARR: Looking where it says configuration number

9   one, core S3 procurement system, do you see that?

10      THE COURT: Yes.

11      MR. CARR: What we are in agreement on in that

12   description is that the words at least should come out, and the

13   reason for that is because it would otherwise be duplicative

14   because some of the later configurations have at least those

15   three things. So we're in agreement on that.

16      We believe that the words Lawson system foundation,

17   LSF/process flow, should also come out, because those modules

18   are not accused of infringing and that if it reads just

19   inventory control requisition and purchase order modules, that

20   is simpler and more straightforward for the jury, and that's

21   the way it ought to read.

22      EPlus disagrees with that. One concern we have is

23   that if the jury were to find against Lawson, and we are

24   talking about an injunction in a month or six weeks or whenever

25   it is, or we're talking about damages if that were to get

3051

1   reversed, we don't want that Lawson system foundation and

2   process flow included on the verdict form to indicate that in

3   any way they should be included in an injunction or damages.

4      THE COURT: Why wouldn't they be if they infringed?

5   The Lawson system foundation/process flow has been defined to

6   be the inventory control, requisition, and purchase order

7   modules.

8      MR. CARR: That's incorrect, Your Honor. Those are

9   the foundations upon which those three modules, IC, RQ, and PO

10   set. That is the LSF and process flow are the foundation below

11   those modules which Dr. Weaver has not asserted infringe, and I

12   don't think there's any disagreement with that.

13      MR. ROBERTSON: No, there is disagreement about that.

14      THE COURT: Give me that yellow chart. Give me that

15   slide that he testified from.

16      MR. ROBERTSON: We might not have it -- I don't know

17   that we have that here. The testimony was, Your Honor, that

18   the core technology, for example, inventory control,

19   requisition, and purchase order are necessary to run on top of

20   Lawson system foundation and process flow. It's undisputed.

21   Even Lawson's witnesses testified you can't run those three

22   modules without having it on LSF and process flow, and that's

23   part of the infringing configurations. That's how the

24   testimony came in through Dr. Weaver in each instance.

25   Remember that bill always started out --

3052

1      THE COURT: Basically what you're talking about is

2   the Lawson system foundation process flow operating with

3   inventory control, requisition, and purchase order modules;

4   right?

5      MR. ROBERTSON: That's right. That's an infringing

6   configuration. Now, let me just -- I did talk --

7      THE COURT: Why can't we put operating with and be

8   done with it.

9      MR. CARR: That's fine with us, Your Honor, but Mr.

10   Robertson was going to say something.

11      MR. ROBERTSON: I want to make a representation that

12   the Lawson system foundation and process flow can operate with

13   other Lawson software solutions, and we're not looking to

14   enjoin Lawson system foundation and process flow when it's

15   operating with those other modules if it's not operating in an

16   infringing configuration. Remember, you can put a lot of

17   different modules on that foundation.

18      THE COURT: Won't, after a comma, flow, comma,

19   operating with inventory control, requisition, and purchase

20   order.

21      MR. ROBERTSON: Just so that there's --

22      THE COURT: Won't that do it?

23      MR. ROBERTSON: That should do it.

24      THE COURT: Do you agree?

25      MR. CARR: Yes, Your Honor, but I did want Mr.

3053

1   Robertson to say what he said so later on there's no

2   misunderstanding about it.

3       THE COURT:  Yes, I can understand why you wanted that

4   said.

5       MR. CARR:  That way, you would have to make that same

6   change on configuration two, add operating, take out at least.

7       THE COURT:  Wait a minute, take out least, and

8   everybody's in agreement with that?

9       MR. ROBERTSON:  Yes, sir.

10      MR. CARR:  Add operating before the word with.  And

11  you'd have to do the same thing for each of the configurations

12  that are listed.

13      THE COURT:  This is a little confusing.  Operating

14  with inventory control, requisition, and purchase order

15  modules, and RSS; right?

16      MR. CARR:  Well, the core three procurement system

17  would be inside the parentheses.  The core three is just

18  Lawson's system foundation, LSF/process flow, operating with

19  inventory control, requisition, purchase order in parentheses.

20      THE COURT:  What about the phrase I'm talking about

21  in configuration two?  It's with requisition service.  It

22  should be and requisition service; is that right?

23      MR. ROBERTSON:  Yes, sir.

24      MR. CARR:  That's fine.

25      THE COURT:  Won't that solve the problem?

3054

1       MR. ROBERTSON:  Yes, sir.

2       THE COURT:  All right.  We've got that taken care of.

3       MR. CARR:  The same on configuration number three.

4       THE COURT:  At least comes out.

5       MR. ROBERTSON:  Yes.  And then the with changed to

6   and again.

7       THE COURT:  And punchout -- yeah, and requisition

8   service and punchout; right?

9       MR. ROBERTSON:  Yes.

10      THE COURT:  Four?

11      MR. CARR:  Same changes for four.

12      THE COURT:  Wait a minute.  Using the word operating,

13  does that eliminate the whole question of capability?

14      MR. ROBERTSON:  That's a good point, Your Honor.

15      THE COURT:  Or does it confuse to say -- maybe it's

16  just better to take operating out and just have with.

17      MR. ROBERTSON:  I think that's right.

18      MR. CARR:  We are back to where we were.  We didn't

19  think that it should be -- that you should mention Lawson

20  system foundation or LSF or process flow at all unless you had

21  operating with it.

22      THE COURT:  Well, that's because you take the view --

23      MR. ROBERTSON:  How about in combination with?

24      MR. CARR:  That's fine.

25      THE COURT:  In combination with.

3055

1       MR. CARR:  So in combination with instead of

2   operating with throughout.

3       THE COURT:  Yes.

4       MR. CARR:  Your Honor, would you like us to just,

5   once we're through all this, just send you another one?

6       THE COURT:  I just want to make sure I've got, I know

7   what we're doing here.  I'm going to let you add to the

8   mechanics on it.  In combination with on this one.  That brings

9   us to five.  Do we do the same thing?

10      MR. CARR:  Yes, Your Honor.

11      THE COURT:  Take out at least.  Just to follow

12  grammatical structure, if you go back to the one dealing with

13  configuration three, it should be after modules, it should be

14  comma, instead of and, and then you pick up with and punchout.

15  And then the same thing so you don't -- I think it can be

16  confusing, and you put and electronic data interchange in

17  number four, and then you come down to number five, and you say

18  purchase order modules, comma, requisition service or RSS,

19  comma, punchout, and electronic interchange, data interchange,

20  all right, and then we've -- then that's it, isn't it?

21      MR. CARR:  Then we have invalidity.

22      THE COURT:  No, I mean on the infringement.

23      MR. CARR:  Yes, that's it.

24      THE COURT:  Okay.

25      MR. CARR:  On the invalidity, we simplified this one.

3056

1   We still have one area of disagreement.  We're just going to

2   have one question, so amending number one, we'll just cut out

3   -- it won't have the number one.  It will say, do you find that

4   Lawson has proven by clear and convincing evidence that any of

5   the following claims are invalid, and then it's going to list

6   the patents and the claims with the yes and no just as it was

7   done in the infringement questions.  I will stop there, and

8   then there's more.

9       THE COURT:  All right, okay.  So that would take care

10  of yes and no of each one.

11      MR. CARR:  Right.

12      THE COURT:  You all disagree with that, you say?

13      MR. CARR:  No, we agree with that part.  The part

14  that we're in disagreement is this:  ePlus wants after each

15  claim what they have here on the verdict form, if you answered

16  yes, list the prior art references that you have found

17  invalidates the claim, and as you noted the other day, you

18  didn't think that was appropriate, and we agree and just don't

19  think it should be on the verdict form.

20      THE COURT:  Why is that on the verdict form?

21      MR. ROBERTSON:  Well, for two reasons, Your Honor.

22  One, in fairness, we've had to break out all the infringing

23  configurations so the jury has with specificity, can say which

24  claim applies to which configuration.  We'd like to know which

25  prior art would apply to invalidate which claim, and here why:

2011.01.21 Trial Transcript Day 12   1/21/2011  8:22:00 PM

3077

1      arguments, Your Honor?

2             THE COURT:  We told the jury to come back at 9:00.

3      So you're going to get those instructions over here by -- I

4      need them by four o'clock tomorrow afternoon.  So if that lets

5      you sleep a little later, have at it.  Does that take care of

6      everything?  I don't intend to clean up night.

7

8             (Court adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3078

```
1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE EASTERN DISTRICT OF VIRGINIA
3                    RICHMOND DIVISION
4
5   --------------------------------------
6   ePLUS, INC.          : Civil Action No.
                         : 3:09CV620
7   vs.                  :
                         :
8   LAWSON SOFTWARE, INC.    : January 24, 2011
                         :
9   --------------------------------------
10
11       COMPLETE TRANSCRIPT OF THE JURY TRIAL
12        BEFORE THE HONORABLE ROBERT E. PAYNE
13       UNITED STATES DISTRICT JUDGE, AND A JURY
14
    APPEARANCES:
15
    Scott L. Robertson, Esquire
16  Michael G. Strapp, Esquire
    David M. Young, Esquire
17  Goodwin Procter, LLP
    901 New York Avenue NW
18  Suite 900
    Washington, D.C. 20001
19
    Craig T. Merritt, Esquire
20  Christian & Barton, LLP
    909 East Main Street
21  Suite 1200
    Richmond, Virginia 23219-3095
22  Counsel for the plaintiff
23
24       Peppy Peterson, RPR
         Official Court Reporter
25       United States District Court
```

3079

```
1   APPEARANCES:  (cont'g)
2   Dabney J. Carr, IV, Esquire
    Troutman Sanders, LLP
3   Troutman Sanders Building
    1001 Haxall Point
4   Richmond, Virginia 23219
5   Daniel W. McDonald, Esquire
    Kirstin L. Stoll-DeBell, Esquire
6   William D. Schultz, Esquire
    Merchant & Gould, PC
7   80 South Eighth Street
    Suite 3200
8   Minneapolis, Minnesota 55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3080

```
1                 P R O C E E D I N G S
2
3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
4   Incorporated versus Lawson Software, Incorporated.  Mr. Scott
5   L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
6   Mr. Michael G. Strapp represent the plaintiff.
7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8   Kirstin L. Stoll-DeBell, Mr. William D. Schultz represent the
9   defendant.  Are counsel ready to proceed?
10       MR. ROBERTSON:  Yes, Your Honor.
11       MR. McDONALD:  Yes, Your Honor.
12       THE COURT:  All right.  I was very sorry to hear
13  about Ms. Albert's father passing away.  You all both wrote
14  letters about it.  I don't see the point in bringing that to
15  the attention the jury.  Do either one of you?
16       In the old days, when people didn't do what they were
17  supposed to do, they got keelhauled.  I'm about ready to
18  institute that procedure here.  It's time for the jury to get
19  going, and I've had to read all this stuff now.  I told you
20  what to do about this verdict form, and it was pretty easy, and
21  it's unnecessary to go through all this stuff.
22       Now, apparently we're going to have to revise it
23  anyway because -- and some of the instructions.  What
24  instructions have to be revised because Lawson is not
25  contending that the RIMS brochure is prior art?  Which one is
```

3081

```
1   arguing?
2        MR. YOUNG:  Your Honor, David Young for ePlus.  It's
3   instruction 3-A that was submitted to the Court over the
4   weekend.  It lists as I think reference number three, RIMS
5   brochure, and that would have to come out now because it
6   appears that Lawson does not have that as an anticipated
7   reference on its own verdict form.
8        THE COURT:  Is that right?
9        MR. McDONALD:  Yes, that's right, Your Honor.
10       THE COURT:  So I suppose I need to tell the jury
11  simply to disregard any testimony about the RIMS brochure as
12  prior art.
13       MR. McDONALD:  No, it not anticipatory prior art
14  meaning it's not all by itself anticipating a claim.  We're
15  still using it for obviousness and support for the on sale, the
16  RIMS as prior art and 102(a) and (b), but the brochure, all by
17  itself, we're not contending is an anticipating reference, but
18  it would be used to support number one in the instruction which
19  is the Fisher RIMS system as prior art.
20       THE COURT:  What do you mean, to be used to support?
21  If you're going to use it --
22       MR. McDONALD:  It's evidence of the Fisher RIMS
23  system as it was being sold and --
24       THE COURT:  Well, if it's evidence of it, it comes
25  out of 39, too, because you're not contending that it is
```

3254

1   results if the defendant, here, Lawson, induces another to
2   infringe a patent or contributes to the infringement of a
3   patent by another person.  I'm going to explain those two types
4   of infringement now.
5       Lawson would be liable for directly infringing
6   ePlus's patents if you find that ePlus has proven by a
7   preponderance of the evidence that Lawson itself has made,
8   used, offered to sell, sold, or imported into the United States
9   the invention defined in any claim of the patents.  Then that
10  claim has been infringed if they proved that by a preponderance
11  of the evidence.
12      Now, remember that someone can directly infringe a
13  patent without knowing that what they are doing is an
14  infringement of the patent.  You don't have to know you are
15  infringing the patent to infringe it.  You either do or you
16  don't.  So you can directly infringe a patent even though you
17  believe in good faith that what you are doing is not an
18  infringement of the patent.
19      The issue is does it or doesn't it, not what state of
20  mind the direct infringer had.  In every infringement analysis,
21  the language of the claims as well as the nature of the accused
22  system or method dictates whether infringement has occurred.
23  To infringe a claim that recites capability and not actual
24  operation, an accused system or method need only be capable of
25  operating in the described mode.  Thus, depending on the

3255

1   claims, an accused system or method may be found to infringe if
2   it is reasonably capable of satisfying the claim elements or
3   limitations even though the system or method may also be
4   capable of non-infringing modes of operation.  The fact that a
5   product or process may operate in a manner that does not
6   infringe is not a defense to a claim of infringement against
7   Lawson if its system is also reasonably capable of operating in
8   a manner that satisfies the claim elements.
9       Now, Lawson -- I mean ePlus also alleges that Lawson
10  has actively induced other people to infringe the
11  patents-in-suit.  In particular, who are they alleged to have
12  induced?  The Lawson customers in this case.  That's what it's
13  about.
14      To show induced infringement, ePlus has to prove by a
15  preponderance of the evidence that someone, here, Lawson's
16  customers, have directly infringed the ePlus patents, and that
17  Lawson -- so they have to show that the customers directly
18  infringe.  And remember, it doesn't make any difference whether
19  the customers knew or didn't know that they were infringing,
20  because if you infringe, you infringe whether you know it or
21  not.  But they also, ePlus has to prove by a preponderance of
22  the evidence that Lawson has actively and knowingly aided and
23  abetted that direct infringement.
24      So here, in order to find that Lawson has induced
25  somebody else to infringe, you do have to consider Lawson's

3256

1   state of mind, i.e., that they actively and knowingly aided and
2   abetted the indirect infringement by their customers.  ePlus,
3   thus, must show that Lawson actually intended to cause the acts
4   that constitute infringement and that Lawson knew of the patent
5   and that Lawson knew or should have known that its actions
6   would lead to actual infringement.
7       Knowledge of the patent may be established by a
8   finding that Lawson had actual knowledge of the patent or that
9   Lawson deliberately disregarded a known risk that ePlus had a
10  protective patent.  Intent to cause the acts that constitute
11  direct infringement may be demonstrated by evidence of active
12  steps taken to encourage direct infringement such as
13  advertising an infringing user or instructing someone on how to
14  engage in the infringing use.
15      It is not necessary to show that Lawson has directly
16  infringed as long as you find that someone, here the Lawson
17  customers, directly infringed and that Lawson did the things
18  that I said constituted inducement.  If there's no direct
19  infringement by anyone, there can be no induced infringement,
20  and, of course, induced infringement must also be assessed on a
21  claim-by-claim basis.
22      Now, just to review that, what you're going to have
23  to do here is look and see if Lawson's systems, all or any of
24  them, actually infringed the patent when they were used by the
25  customers of Lawson.  Then you have to decide whether Lawson

3257

1   actively and knowingly helped -- that's called aiding and
2   abetting -- the direct infringement, and there was evidence
3   that you have to decide about who was involved in talking to
4   the customers, what they told the customers.  You consider all
5   of that as well, but remember that in order to prove by -- I
6   mean to prove induced infringement, ePlus has to show that
7   Lawson actually intended to cause the acts -- and I'm reviewing
8   this little part of the instructions -- that constitute
9   infringement, that Lawson knew of the patent and that Lawson
10  knew or should have known that its actions would lead to actual
11  infringement.  Pay attention to the rest of that instruction as
12  well, but I wanted to recapitulate for you that.
13      Now, there's another kind of indirect infringement
14  that's involved, and that's called contributory infringement.
15  ePlus also argues that Lawson is liable for this contributory
16  infringement by contributing to the direct infringement of
17  ePlus by third parties, again, the Lawson customers.
18      As with direct infringement, you have to determine
19  contributory infringement on a claim-by-claim basis.  Lawson is
20  liable for contributory infringement of a claim if ePlus proves
21  by a preponderance of the evidence, one, that Lawson sells,
22  offers to sells, or imports within the United States a
23  component of a Lawson system or apparatus for use in a process
24  during the time the patent is in force.
25      I don't think there's any issue here, is there, about

3298

1            (Jury in.)

2

3        THE COURT:  The jury has decided that it would like

4    to return home for the evening and then return in the morning

5    and deliberate.  What is your pleasure on the time to

6    deliberate?  Do you want to start at 9:00, start at 9:30?

7        Nine o'clock we'll be here and have stuff ready for

8    you, and you be ready and you can have -- you can take whatever

9    time you feel like you need to deliberate.  If you leave your

10   notebooks the way you usually do, Mr. Neal will take care of

11   them.  Thank you.  Drive carefully.

12

13           (Jury out.)

14

15       THE COURT:  Have all these transcripts and these

16   things -- you've got everything you need; right?

17       MR. STRAPP:  Yes.

18       MR. CARR:  I believe so.

19       THE COURT:  One thing I need for you all to do is to

20   see if there's anything that needs to be cleaned up that I need

21   to decide.  For example, they've got these motions that have

22   been filed yesterday -- this morning or yesterday.  I don't

23   know what -- by Lawson.

24       I need a briefing schedule on them and see what I'm

25   supposed to do, and that means you all need to get moving and

3299

1    decide how you want to proceed, little things like that so we

2    can get that sorted out.  I'd like to get all this done just as

3    soon as I can.

4        MR. ROBERTSON:  I'll call Mr. McDonald tomorrow once

5    he gets back to Minnesota.  I understand he's gone back.

6        THE COURT:  He's what?

7        MR. ROBERTSON:  I'll call Mr. McDonald tomorrow in

8    Minnesota.  I know he's traveling --

9        THE COURT:  He's in Minnesota?

10       MR. CARR:  He is leaving this evening, yes.

11       THE COURT:  Are you fully empowered?

12       MR. CARR:  Yes, sir.

13       MR. ROBERTSON:  I'll just --

14       THE COURT:  Does he understand that the juries have a

15   lot of questions sometimes?

16       MR. CARR:  He does.

17       THE COURT:  Okay.

18       MR. ROBERTSON:  I'll work out a briefing schedule,

19   Your Honor, and we'll take care of it in short order.  Maybe we

20   can decide some of things have been mooted by some of Your

21   Honor's rulings.

22       THE COURT:  They very well may have.  I don't know

23   the answer to that.  Some of them may not, but I want to make

24   sure we get it done.

25       MR. ROBERTSON:  Your Honor, I intend on having at

3300

1    least two attorneys here at all times so I can be reached by

2    phone.  I'm just right down here at the Hilton Garden Inn, so I

3    can be here in four minutes.

4        THE COURT:  Do you have to trade shoes or can you --

5        MR. ROBERTSON:  I come equipped.  I will be right

6    over here pronto, but we'll have somebody here at all times.

7        THE COURT:  That's fine.

8        MR. ROBERTSON:  All right.  Thank you.

9        THE COURT:  Now, is he coming back?  Mr. McDonald or

10   Ms. Stoll-DeBell?

11       MR. CARR:  As far as I know, he's not coming back.

12       THE COURT:  Well, then, I know not to schedule any

13   arguments, I guess, until I'm certain.  All right.  I guess

14   that solves it for now.  Thank you very much.  We'll be in

15   adjournment.

16

17           (Court adjourned.)

18

19

20

21

22

23

24

25