IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

*e*PLUS INC.,                                  )
                                               )
       Plaintiff,                           )        Civil Action No. 3:09-CV-620 (REP)
                                               )
       v.                                   )
                                               )
LAWSON SOFTWARE, INC.,                         )
                                               )
                                               )
                                               )
       Defendant.                           )


## PLAINTIFF *e*PLUS INC.'S BRIEF IN OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100

Scott L. Robertson (admitted *pro hac vice*)
Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000

Michael G. Strapp (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000

*Counsel for Plaintiff ePlus Inc.*

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................................................... 1

II. LEGAL STANDARDS .................................................................................. 1

    A.   Judgment As A Matter of Law ............................................................... 1

    B.   Motion Under Rule 50(b) Cannot Be Based Upon Grounds That Differ From Those In Rule 50(a) Motion ......................................................... 2

III. ARGUMENT ................................................................................................ 3

    A.   Overwhelming Evidence Supports The Jury's Infringement Verdict As To Configurations 3 And 5 .................................................................. 3

    B.   Overwhelming Evidence Also Establishes That Defendant Infringes The Method Claims Under A Joint Infringement Theory ......................... 6

        1.   *e*Plus Never "Dropped" Its Joint Infringement Contention ...................... 8

    C.   Overwhelming Evidence Supports The Jury's Verdict That Defendant Directly Infringes The System Claims ................................................. 9

    D.   Overwhelming Evidence Supports The Jury's Verdict That Lawson Indirectly Infringes ......................................................................... 11

    E.   Overwhelming Evidence Supports The Jury's Verdict That The Claims Are Valid ....................................................................................... 12

        1.   Applicable Legal Standards ................................................................ 12

        2.   Defendant Waived Its Contention Relating To Any Commercial RIMS System ................................................................................... 13

        3.   The References Defendant Relies On Are Not Clear And Convincing Evidence Of Any RIMS System That Was In Public Use Or On Sale ................................................................................ 14

        4.   The Patent Office Examiner Was Aware Of The RIMS System When He Allowed The Patents-in-Suit ............................................. 15

        5.   The RIMS System Lacked Critical Functionality .................................. 16

        6.   The IBM TV/2 Search Program Prior To August, 1994 ......................... 20

        7.   The TV/2 Search Program Lacked Critical Functionality ...................... 21

        8.   The Combination Of The RIMS System And The TV/2 Search Program Fails To Satisfy The Requirements Of The Claims ................. 23

        9.   The Patented Inventions Are Much More Than A "Combination" Of RIMS And TV/2 .......................................................................... 24

        10.  Secondary Considerations Support The Nonobviousness Of The Patented Inventions ......................................................................... 26

i

F.   Defendant Waived Its Indefiniteness Defense ........................................................27

G.   The Asserted Claims Recite Patentable Subject Matter .........................................30

IV.   CONCLUSION..............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Akamai Techs., Inc. v. Limelight Networks, Inc.,*
No. 2009-1372 (Fed. Cir. June 20, 2011) ................................................................. 8

*Atmel Corp. v. Information Storage Devices,*
198 F.3d 1374 (Fed. Cir. 1999) ............................................................................... 30

*BMC Res., Inc. v. Paymentech, L.P.,*
498 F.3d 1373 (Fed. Cir. 2007) ................................................................................. 6

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.,*
320 F.3d 1339 (Fed. Cir. 2003) ................................................................................. 2

*Bryant v. Aiken Reg'l Med. Ctrs., Inc.,*
333 F.3d 536 (4th Cir. 2003) ..................................................................................... 2

*Business Objects, S.A. v. Microstrategy, Inc.,*
393 F.3d 1366 (Fed. Cir. 2005) ............................................................................... 29

*Centillion Data Sys., LLC v. Qwest Comm. Int'l,*
631 F.3d 1279 (Fed. Cir. 2011) ................................................................................. 9

*Crocs., Inc. v. Int'l Trade Comm'n,*
598 F.3d 1294 Fed. Cir. 2010) ................................................................................ 23

*Duro-Last, Inc. v. Custom Seal, Inc.,*
321 F. 3d 1098 (Fed. Cir. 2003) ............................................................................... 3

*Electro Scientific Indus. v. General Scanning Inc.,*
247 F.3d 1341 (Fed. Cir. 2001) ............................................................................... 28

*Fantasy Sports Props. v. Sportsline.com, Inc.,*
287 F.3d 1108 (Fed. Cir. 2002) ................................................................................. 5

*Finisar Corp. v. DirecTVGroup, Inc.,*
523 F.3d 1323 (Fed. Cir. 2008) ............................................................................... 29

*Finjan, Inc. v. Secure Computing Corp.,*
626 F.3d 1197 (Fed. Cir. 2010) ................................................................................. 5

*Gentron Corp. v. Saint-Gobain Corp.,*
572 F.3d 1371 (Fed. Cir. 2009) ................................................................................. 2

*Global-Tech Applicances, Inc. v. SEB S.A.,*
536 U.S. __, 2011 WL 2119109 (2011) ................................................................. 12

*Graham v. John Deer Co.,*
383 U.S. 1 (1966) .................................................................................................... 13

*Green Edge Enter., LLC v. Rubber Mulch, LLC,*
620 F.3d 1287 (Fed. Cir. 2010) ............................................................................... 30

iii

*Hilgraeve Corp. v. Symantec Corp.,*
   265 F.3d 1336 (Fed. Cir. 2001) .................................................................. 5

*In re Geiger,*
   815 F.2d 686 (Fed. Cir. 1987) .................................................................. 13

*In re GPAC Inc.,*
   57 F.3d 1573 (Fed. Cir. 1995) .............................................................. 13, 27

*Johnson v. MBNA Am. Bank, NA,*
   357 F.3d 426 (4th Cir. 2004) .................................................................... 2

*Junker v. Eddings,*
   396 F.3d 1359 (Fed. Cir. 2005) ................................................................ 28

*Kinzenbaw v. Deere & Co.,*
   741 F.2d 383 (Fed. Cir. 1984) .............................................................. 3, 14

*KSR Int'l Co. v. Teleflex,*
   550 U.S. 398 (2007) .......................................................................... 13, 26

*Livingston Chem., Inc. v. Permviro Sys., Inc.,*
   1992 WL 274024 (4th Cir. Dec. 21, 1992) .................................................. 3

*Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopedics, Inc.,*
   976 F.2d 1559 (Fed. Cir. 1992) ................................................................ 13

*Muniauction, Inc. v. Thomson Corp.,*
   532 F.3d 1318 (Fed. Cir. 2008) ................................................................. 6

*Novo Nordisk A/S v. Becton Dickinson & Co.,*
   304 F.3d 1216 (Fed. Cir. 2002) ................................................................ 27

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.,*
   520 F.3d 1358 (Fed. Cir. 2008) ................................................................ 13

*Power-One, Inc. v. Artesyn Techs., Inc.,*
   599 F.3d 1343 (Fed. Cir. 2010) ................................................................. 2

*S. Atl. P'ship of Tenn. v. Riese,*
   284 F.3d 518 (4th Cir. 2002) .................................................................... 1

*Sjolund v. Musland,*
   847 F.2d 1573 (Fed. Cir. 1988) ................................................................. 2

*Stratoflex v. Aeroquip Corp.,*
   713 F.2d 1530 (Fed. Cir. 1998) ............................................................... 13

*United Techs. Corp. v. Chromalloy Gas Turbine Corp.,*
   189 F.3d 1338 (Fed. Cir. 1999) ............................................................... 27

*Vulcan Eng'g Co., Inc. v. Fata Aluminum, Inc.,*
   278 F.3d 1366 (Fed. Cir. 2002) .......................................................... 13, 27

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.,*
   721 F.2d 1540 (Fed. Cir. 1983) ............................................................... 26

**Statutes**

35 U.S.C. § 103.................................................................................................................. 12, 14

**Other Authorities**

9B Wright & Miller, Federal Practice and Procedure § 2537 (3d ed. 2011) .................................. 3

**Rules**

Fed. R. Civ. P 50................................................................................................................ passim

## I.      INTRODUCTION

As the Court recognized, Defendant's invalidity case was "weak."  Dkt. No. 734 at 10.

The jury agreed.  It found all of the asserted claims valid over each reference or combination

relied upon by Defendant.  That verdict is supported by substantial evidence.  As Defendant's

expert conceded, the RIMS system did not include two or more catalogs and, based on that

deficiency, that system can't satisfy the other claim elements that all require multiple catalogs as

a prerequisite.  Because TV/2 was simply a search program, the combination of RIMS and TV/2

does not overcome these deficiencies.  Further, the invention was more than simply a

combination of RIMS and TV/2.

As to Defendant's JMOL on infringement, that too should be denied.  There was

overwhelming evidence supporting the jury's verdict that Defendant infringed the claims both

directly and indirectly without regard to joint infringement.  Moreover, Defendant cannot avoid

liability for the infringement of the claimed methods simply by contracting out steps of the

processes to its Punchout Trading Partners.  Under common law principles of vicarious liability,

which apply to the tort of patent infringement, when two or more parties act in concert to

perform the claimed method, they are each jointly and severally liable for direct infringement.  A

reasonable jury, weighing the evidence, would have had more than a substantial basis to find that

Defendant directed and controlled each step of the processes performed by its accused systems.

## II.     LEGAL STANDARDS

### A.      Judgment As A Matter of Law

"A district court should grant a Rule 50(b) motion only if the court determines, without

weighing the evidence or considering the credibility of the witnesses, that substantial evidence

does not support the jury's findings." *S. Atl. P'ship of Tenn. v. Riese*, 284 F.3d 518, 532 (4th Cir.

2002). "[T]he question is whether a jury, viewing the evidence in the light most favorable to [the

prevailing party], 'could have properly reached the conclusion reached by this jury…If

reasonable minds could differ about the result in this case, [the court] must affirm the jury's verdict." *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543 (4th Cir. 2003). *See also Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004).[1]

Here, the district court should deny Defendant's JMOL because, not only was there substantial evidence to support the jury's verdict, but the evidence in *e*Plus's favor was overwhelming and included evidence from Defendant's own witnesses and documents. Indeed, no reasonable jury could have found in Defendant's favor. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1352 (Fed. Cir. 2010) (affirming denial of JMOL of invalidity where reasonable jury could find that the patent was not obvious); *Gentron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371, 1382 (Fed. Cir. 2009) (affirming denial of JMOL of invalidity where testimony of plaintiff's expert "provided substantial evidence that a person of ordinary skill in the art would not have expected the results of the [claimed] combination"); *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1350 (Fed. Cir. 2003) (affirming denial of JMOL; "[In] scrutinizing the evidence for support for the jury's findings, [the Court] must draw all reasonable inferences in favor of the nonmoving party [and] must disregard all evidence favorable to the moving party that the jury was not required to believe.").

## B.    Motion Under Rule 50(b) Cannot Be Based Upon Grounds That Differ From Those In Rule 50(a) Motion

A renewed motion for JMOL under Rule 50(b), like the similar motion made under Rule 50(a) before submission of the case to the jury, must state the grounds on which it is made. Since the post-submission motion is nothing more than a renewal of the earlier motion made at the close of the evidence, the movant cannot assert a ground that was not included in the earlier

---

[1] "The denial of [JMOL] is a procedural issue not unique to patent law, and thus we must apply the law of the regional circuit where the appeal from the district court would normally lie." *Sjolund v. Musland*, 847 F.2d 1573, 1576 (Fed. Cir. 1988). Here, the controlling law is that of the Fourth Circuit.

motion. *See* 9B Wright & Miller, Federal Practice and Procedure § 2537 (3d ed. 2011). "The requirement of a proper [Rule 50(a)] motion as foundation for a motion for [JMOL] under Fed. R. Civ. P. 50(b) is not a mere technicality; it serves vitally important interests in the fair conduct of litigation." *Livingston Chem., Inc. v. Permviro Sys., Inc.*, 1992 WL 274024 at *5 (4th Cir. Dec. 21, 1992). "Without a proper [Rule 50(a) motion], the opposing party is deprived of an opportunity to respond before the jury, thus infringing its Seventh Amendment rights." *Id.* It is therefore impermissible for a district court to reexamine a jury's verdict and enter JMOL on grounds not raised in the pre-verdict JMOL. *Id. See also Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F. 3d 1098, 1107 (Fed. Cir. 2003) (pre-verdict JMOL on anticipation not sufficient to support post-verdict JMOL on obviousness); *Kinzenbaw v. Deere & Co.*, 741 F.2d 383, 387 (Fed. Cir. 1984) (pre-verdict JMOL on obviousness based on prior art did not support a post-verdict JMOL of invalidity due to prior public knowledge or use). As discussed below, Defendant has waived its right to challenge the verdict on several issues not raised in its Rule 50(a) motion.

## III.   ARGUMENT

### A.   Overwhelming Evidence Supports The Jury's Infringement Verdict As To Configurations 3 And 5

Defendant contends that the jury did not have a legally sufficient basis to find that System Configurations 3 and 5 infringe the asserted method claims. Defendant's underlying premise that the claims were satisfied solely by the Punchout functionality is incorrect. Configurations 3 and 5 also include the Core S3 Procurement System (with Lawson System Foundation ("LSF"), Process Flow, Inventory Control, Requisition and Purchase Order modules), and Requisition Self-Service ("RSS"). Configuration Number 5 also includes the Electronic Data Interchange ("EDI") component. *See* Jury Verdict Form (Dkt. No. 600); Judgment (Dkt. No. 8).

There was substantial evidence that a single party (either Defendant when it tests or demonstrates its systems or its customer) performs each step of the method claims. Users of systems that include the Core S3 Procurement System can "maintain[] at least two product catalogs ... relating to items associated with the respective sources."[2] Defendant's own witnesses and documents confirmed that multiple vendor catalogs are loaded into the item master of the Core System. *See* Dkt. No. 756 at 8-10 (and cited evidence). Additionally, Defendant's customers testified that they maintain thousands of supplier catalogs within the item master. *Id.* at 9-10 (and cited evidence). The user interface included in each system configuration enables a user to "select[] the product catalogs [from those in the item master] to search." *Id.* at 11 (and cited evidence).

Further, the jury saw and heard irrefutable evidence that a system user can "search[] for matching items among the selected [item master] product catalogs" by a number of criteria, including vendor, manufacturer, catalog number, and partial item description. *See* Dkt. No. 756 at 11-12 (and cited evidence). This search capability is provided through the Requisitions module, which is common to all five configurations.

Defendant also conceded that a user of each system configuration can "build a requisition using data relating to selected matching items and their associated sources." This capability is provided through the Requisitions module of the Core System. *See id.* at 13 (and cited

---

[2] Contrary to Defendant's contention, there was substantial evidence that Defendant itself performs the methods. Defendant's witnesses conceded that Defendant uses its systems when it demonstrates those systems to customers or conducts training. Frank Dep. (PX-517) at 74:22-75:21 (Defendant uses demonstration laptops to show customers how its products work); Frank Dep. 50:21-51:21 (Defendant uses webinars to show the features and functionality of its products); Tr. 937:16-940:7 (Raleigh) (describing different training courses provided by Defendant); PX-136 (RSS training session provided by Defendant). (To the extent exhibits cited herein were cited in support of *e*Plus's Renewed Motion for Judgment as a Matter of Law (Dkt. Nos. 755-56), they are not being resubmitted with this brief. Cited excerpts from the trial transcript are attached as Ex. A.)

evidence). Further, a user of each system configuration can "process the requisition to generate one or more purchase orders." Purchase orders are generated using the Purchase Order module of the Core System. *See* Dkt. No. 756 at 13-14 (and cited evidence).

Defendant's own witnesses and documents confirmed that the UNSPSC classification coding schema employed by RSS (included in Configurations 2, 3 and 5) allows the system user to cross-reference or convert an item associated with a first source to another similar, generally equivalent or identical item from a different source. *See* Dkt. No. 756 at 14-15 (and cited evidence).

Finally, the infringing systems permit the user to "determin[e] whether a selected matching item is available in inventory." It was undisputed that the Purchase Order Acknowledgement Report generated by the EDI module provides this capability. *See* Dkt. No. 756 at 15-16 (and cited evidence). Thus, there is substantial evidence to support the jury's verdict that a user of the infringing systems performs each step of the claimed methods and can do so without employing the Punchout functionality.[3]

---

[3] Contrary to Defendant's contention that "[s]howing a capability is not enough" to prove infringement of the method claims, a product or process accused of infringing a patent infringes if it is reasonably capable of satisfying the claim elements, even if it may also be capable of operating in a way that does not infringe. *See, e.g., Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010); *Fantasy Sports Props. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118-19 (Fed. Cir. 2002); *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001). The Court instructed the jury accordingly. *See* Jury Instr. 25. There was also substantial evidence from which a jury could reasonably conclude that a user of the accused system (either Defendant or its customer) performs each step of the claimed methods. *See, e.g.,* Frank Dep. (PX-517) at 74:22-75:21; 76:7-14 (Defendant demonstrates its systems and their functionality to its customers); Oliver Dep. (PX 518-A) at 17:4-18:3, 19:8-20:7, 87:2-88:3 (Blount's system includes multiple vendor catalogs, a user can search catalogs, create requisitions from search results and generate purchase orders from requisitions); Matias Dep. (PX 520-A) at 25:18-26:20 (describing use of Lawson system at Robert Wood Johnson Hospital); 28:12-28:21; 29:20-30:15; 32:17-35:5 (describing search function used to build requisitions, generating purchase orders and how system receives Purchase Order acknowledgments via EDI).

**B.     Overwhelming Evidence Also Establishes That Defendant Infringes The Method Claims Under A Joint Infringement Theory**

Although direct infringement generally requires that a single party perform every step of a claimed method, a defendant cannot "avoid liability for direct infringement by having someone else carry out one or more of the claimed steps on its behalf," or "simply by contracting out steps of a patented process to another entity." *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1379, 1381 (Fed. Cir. 2007). Rather, "the law imposes vicarious liability on a party for the acts of another in circumstances showing that the liable party controlled the conduct of the acting party." *Id.* at 1379. Infringement in such circumstances turns on whether the accused infringer "sufficiently controls or directs other parties... such that [it] can be said to have performed every step of the asserted claims." *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008). "[T]he control or direction standard is satisfied in situations where the law would traditionally hold the accused direct infringer vicariously liable for the acts committed by another party that are required to complete performance of a claimed method." *Id.* at 1330.

As discussed above, there was substantial evidence from which a reasonable jury could find that Defendant directly infringes the method claims using System Configurations 3 and 5 even without employing Punchout. Moreover, when the Punchout capabilities are employed to access the catalogs of Defendant's Punchout Trading Partners, Defendant directs or controls each step of the claimed methods and, therefore, directly infringes the claims.

First, Defendant's Punchout application cannot be used without having installed Defendant's Core S3 Procurement System and its RSS application. *See* Dkt. No. 756 at 16 (and cited evidence). Second, when the S3 Procurement System invokes Punchout, the user remains connected to and within Defendant's system at all times. *See id.* at 16-17 (and cited evidence).

Using Punchout, the user can select (via the RSS user interface) to have the system connect to a special vendor catalog created for the user by Defendant's Punchout Trading Partner. Defendant's Punchout application provides the communications protocols for this process and Defendant provides services to connect the system to this catalog. *Id.* at 17 (and cited evidence). As was demonstrated, searches for items can be performed by system users. Users can also determine whether suppliers have a selected matching item in inventory. *See* PX-368; PX-379. Selected items are returned to the RSS Shopping Cart for building a requisition and generating purchase orders. Dkt. No. 756 at 17 (and cited evidence).

Defendant provides its Punchout Trading Partners with the specifications it requires to establish the necessary communications to enable item data to be transmitted to RSS. *Id.* Further, *e*Plus's expert testified extensively, and without objection, to Defendant's direction and control of each step of the claimed methods performed using Configurations 3 and 5. *Id.*

The jury also heard testimony regarding contracts that Defendant enters into with its Punchout Trading Partners in order to facilitate the required communication protocols and interfaces between Defendant's Systems and the vendor catalogs. *Id.* Pursuant to these agreements, Defendant installs Punchout, configures and implements the system and tests the communications. *See id.* at 17-18 (and cited evidence). Thus, Defendant directs and controls implementation of the entire system thereby enabling users of such system (either Defendant or its customers) to perform each step of the claimed methods.[4]

---

[4] As Defendant's counsel has recently argued to the Federal Circuit:

> If one party "directs or controls" another to perform a step or steps of a method claim, those steps may be attributed to the directing or controlling party as if it performed them itself.

> Applying common law principles of torts, performance of the steps of a method claim by two or more parties acting in concert should make such parties jointly and severally liable for direct infringement. As expressly defined in the

### 1.    *e*Plus Never "Dropped" Its Joint Infringement Contention

Defendant contends that because the jury was not given an instruction on joint infringement, its verdict that Defendant directly infringes claims 26, 28 and 29 cannot be supported. Brf. at 10. This is incorrect. As set forth above, the jury's verdict can be sustained without reliance upon joint infringement. Moreover, the jury had overwhelming evidence of Defendant's direction and control over its Punchout Trading Partners more than satisfying the required proof for joint infringement.[5] Additionally, *e*Plus's counsel argued joint infringement in

---

Restatement (Second) of Torts, parties are acting in concert when they act in accordance with an implied or express agreement to cooperate in a particular line of conduct. ***This doctrine applies whenever the parties act in concert to perform the steps that constitute a method claim, whether they are partners, part of a joint enterprise, or have a contractual relationship.*** Each circumstance is a recognized form of vicarious liability in which all are liable for the acts of each other committed as part of their expressly or tacitly agreed-upon activity.

****

There is no basis under precedent, the language of the Patent Act, or the policies underlying the Patent Act, for ignoring these common law principles of torts and restricting infringement of a method claim to the conduct of a single actor, and there is certainly no support for limiting liability for joint direct infringement to a narrow, rigid agency or contractual relationship.

Principal Brief for Plaintiff-Appellant Akamai Technologies, Inc. on Rehearing En Banc at 2-3, *Akamai Techs., Inc. v. Limelight Networks, Inc.*, No. 2009-1372 (Fed. Cir. June 20, 2011) (emphasis added) (Ex. B hereto).

[5] Nor did *e*Plus drop its joint infringement contention in response to Defendant's JMOL. Defendant omits supplying the Court with numerous statements wherein *e*Plus's counsel argued joint infringement during the ***same*** discussion. *See, e.g.*, Tr. 1369:25-1370:3; 1372:14-1375:15 ("if there were ever a situation that joint infringement applied ..., it is this case. ***This case is the poster child for joint infringement...***"); Tr. 1379:12-15 ("whether it's direct infringement just by Lawson committing all the steps of having the system, or whether it's joint infringement, we win either way."). Further, *e*Plus's counsel elicited evidence during Defendant's case-in-chief, and following Defendant's JMOL, tending to establish Defendant's direction and control over the processes. *See, e.g.*, Tr. 1631:19-22; 1633:7-11 (Christopherson) ("Q: When the Lawson system punches out to the Punchout... partner's catalog, you remain connected to the Lawson system, correct? A: Correct."). *See also* Tr. 1630:18-24; 1633:7-11 (Christopherson); Tr. 1720:18-1721:22 (Lohkamp) (describing Defendant's relationships with its Punchout Trading Partners); Tr. 1927:17-24 (Shamos) (Defendant provides Punchout communications protocols).

closing.  *See, e.g.,* Tr. 3124:19-23 ("Each of these steps is controlled by Lawson ... [it] controls the authorization process... establishes the connection ... retrieves the information ... to complete the entire purchase process."); 3122:16-3125:6.  That the Court did not give the jury the specific joint infringement instruction requested by *e*Plus (to which Defendant objected) did not preclude the jury from finding direct infringement based on joint infringement.  "Joint infringement is direct infringement," as Defendant's counsel conceded.  Tr. 1365:25-1366:25.  The jury was instructed on direct infringement.  Jury. Instr. 24.

### C.    Overwhelming Evidence Supports The Jury's Verdict That Defendant Directly Infringes The System Claims

The jury found that Defendant's System Configuration Nos. 2, 3 and 5 directly infringe claim 1 of the '172 Patent and that System Configuration Nos. 3 and 5 directly infringe claim 3 of the '683 Patent.  This verdict is supported by overwhelming evidence.

Because each of the infringing configurations includes the Core S3 Procurement System and the RSS application, the jury's verdict is sustainable without regard to the additional functionality provided by Punchout.  Nor is there any dispute that Defendant and its customers put the entire systems into use, which is all that is required to infringe the system claims.  *See Centillion Data Sys., LLC v. Qwest Comm. Int'l*, 631 F.3d 1279, 1285 (Fed. Cir. 2011).[6]

As set forth above with respect to claim 28, the irrefutable evidence from Defendant's witnesses and its documents established that multiple vendor catalogs are maintained in the item master of the Core S3 Procurement system as required by claim 3 of the '683 Patent.  It was also

---

[6] Defendant makes and sells the LSF, Process Flow, Inventory Control, Requisitions, Purchase Order modules and the RSS, Punchout and EDI applications comprising Configurations 2, 3 and 5.  Defendant installs this software on its customers' systems, imports vendor catalogs into those systems and implements fully-functional systems for its customers.  Tr. 936:23-937:1; 940:13-941:15 (Raleigh) (Defendant's services include all aspects of bringing a system live and into actual production); Tr. 941:22-942:3; 942:25-951:1 (Raleigh) (Defendant loads vendor catalog data into customers' systems).  These activities constitute "making" the infringing systems and are acts of direct infringement.

undisputed that each of the five system configurations includes a user interface for "selecting the product catalogs to search," as required by claim 3, and for "entering product information" that "partially describes" a desired item, as required by claim 1.

Further, it was undisputed that each of the five configurations includes a search program and modules to search for matching items "among the selected product catalogs" as required by claim 3 and "in the selected portions of the database" as required by claim 1. As Defendant's documents revealed, the S3 Procurement System employs a search index to lookup the locations of item records in the item master and vendor item tables of the item master database that match the input search query. Therefore, the system does not search the entire item master database each time a search query is executed, but instead, searches selected portions of the database or selected catalogs. *See* Dkt. No. 756 at 11-12 (and cited evidence).[7]

Moreover, Defendant's own witnesses and documents confirmed that each of Configuration Nos. 2, 3 and 5 includes a user interface through which a user may select from results of a search conducted by a search program to generate an order list of matching items as required by claim 1 of the '172 Patent. The Shopping Cart within RSS is an order list where users can add or delete selected items found in searches before a requisition is created. PX-98 (RSS User Guide) at L0045506 ("[t]he icons and buttons that display in the cart let you view line

---

[7] Contrary to Defendant's contention (Brf. at 6-8), Dr. Weaver did not testify that the "searching" element of claim 1 was satisfied solely by searching the index. Rather, the index is a tool used by the search program to search the database. The search index, like an index to a book, contains pointers to locations in the database where item records matching the input search query can be found. The search program then retrieves the item records corresponding to these locations from the database. The search is not completed until the item records are retrieved from the database. Tr. 705:10-711:10 (Weaver) ("So if I type a word into a text box, say Dell, and engage the search engine, it goes to the search index. It looks up Dell. It finds records in the database that match the keyword Dell. And then it extracts that data from the database and presents that to me on the screen."). *e*Plus notes that Defendant did not make any argument in its Rule 50(a) JMOL that claim 1 was not infringed based on the search index and, therefore, it waived this contention. *See* Dkt. No. 574; *see also* Tr. 1359:17-1384:19.

information and make changes ... Checkout-Saves items in the cart to be requisition lines and moves the requisition to the next processing stage (for example, releases the requisition)"); Tr. 1157:3-1158:18 (Christopherson) (the shopping cart in RSS is dynamically built from results of searches of item master, when a user clicks checkout, the items in shopping cart are moved into the Requisitions system to create a requisition); PX-376. *See also* Tr. 568:20-569:15 (Weaver); Tr. 1246:17-1247:2 (Niemeyer).

As set forth above, each system configuration includes the Requisitions module of the Core System that builds a requisition relating to selected matching items. Further, each system configuration includes the Purchase Order module that processes that requisition to generate purchase orders for selected matching items. And, as discussed above, each system that includes RSS (Configurations 2, 3 and 5) has the capability of using the UNSPSC classification coding schema to cross-reference or convert a selected matching item and its associated source to another similar, generally equivalent or identical item from another source as required by claim 3.[8]

> ### D.   Overwhelming Evidence Supports The Jury's Verdict That Lawson Indirectly Infringes

As set forth in *e*Plus's brief in support of its renewed JMOL (Dkt. No. 756 at 25-29), the evidence at trial overwhelmingly demonstrated that Defendant actively induces its customers' direct infringement by selling and offering to sell the accused systems with the intent that its

---

[8] Contrary to Defendant's contention, the jury did not have to rely solely upon Dr. Weaver's testimony to support its finding that Defendant's systems infringe claim 3 of the '683 Patent and claim 1 of the '172 Patent. There was substantial evidence from Defendant's own witnesses, documents and the system demonstrations to support the verdict, as demonstrated above. Nor was Dr. Weaver's testimony "conclusory." Dr. Weaver testified as to the bases for his opinions on Defendant's infringement for nearly two full trial days reviewing dozens of Defendant's documents and conducting numerous demonstrations of the infringing systems. As the Court noted, "Can you put that one back in the barn? Anybody who testified as long as he did, it's hard to say it was conclusory." Tr. 2841:18-2842:3.

customers use those systems in an infringing manner.  Moreover, Defendant installs the software on its customers' systems, configures and implements the infringing systems and provides services to its customers to maintain the systems.  Further, Defendant provides instructions and training to its customers on how to use the systems in an infringing manner, and on how to install and configure the systems.  *See id.* (and cited evidence).

The jury also saw and heard considerable evidence that Defendant had the requisite intent to induce infringement.  Defendant has known of the patents since no later than the filing of the Complaint and, since that time, it has not ceased its infringement, modified its infringing products to avoid infringement, or provided any different instructions to its customers as to how they may avoid infringement.  Defendant continued to aid and abet its customer's infringing uses of the systems even after learning of *e*Plus's patents.  *See id.* at 27-29 (and cited evidence).  In addition, the jury heard evidence to establish that the patents were widely publicized within the industry, that Defendant knew of *e*Plus as a competitor and that *e*Plus marked its patented products.  *See id.* at 27 (and cited evidence).  Further, Defendant did not proffer an advice of counsel defense.  Thus, under the applicable standard for intent, Defendant had actual knowledge of the patents or would be deemed "willfully blind" to their existence even before the filing of the Complaint.  *See Global-Tech Appliances, Inc. v. SEB S.A.*, 536 U.S. __, 2011 WL 2119109 (2011).  Further, contrary to Defendant's contention (Brf. at 9), the Court's instruction was not inconsistent with *Global-Tech*.  *See* Dkt. No. 767 at 3-4, 7-16.

**E.    Overwhelming Evidence Supports The Jury's Verdict That The Claims Are Valid**

**1.    Applicable Legal Standards**

A patent may be obtained only if the subject matter of the invention would not have been obvious at the time of the invention.  35 U.S.C. § 103 (a).  In determining whether the claimed inventions are obvious these factors must be considered:  (1) the scope and content of the prior

art, (2) the differences between each claim and the prior art; (3) the level of ordinary skill in the art at the time the invention was made; and (4) additional secondary considerations that indicate that the invention was not obvious.  *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

When attempting to combine alleged prior art references, there must have been something in the prior art as a whole to suggest the desirability, and therefore the obviousness, of making the combination.  *See, e.g.*, *In re Geiger*, 815 F.2d 686 (Fed. Cir. 1987).  This requirement — known as the "teaching-suggestion-or-motivation to combine" test — remains one test for analyzing obviousness following *KSR Int'l Co. v. Teleflex*, 550 U.S. 398 (2007).  *See, e.g., Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364-65 (Fed. Cir. 2008).

Secondary considerations, where present, must be considered by the court.  *See Stratoflex v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983).  Licenses of the patents to third parties are relevant *indicia* of nonobviousness.  *In re GPAC Inc.*, 57 F.3d 1573 (Fed. Cir. 1995); *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopedics, Inc.*, 976 F.2d 1559, 1575 (Fed. Cir. 1992).  Additionally, evidence of long felt, unmet need is evidence of nonobviousness, as is industry recognition in the form of awards or praise.  *Vulcan Eng'g Co., Inc. v. Fata Aluminum, Inc.*, 278 F.3d 1366, 1373 (Fed. Cir. 2002).

### 2.    Defendant Waived Its Contention Relating To Any Commercial RIMS System

The only basis of alleged invalidity raised by Defendant in its Rule 50(a) JMOL was obviousness based upon the combination of the "prior art RIMS system disclosed in the '989 patent and the prior art TV/2 product."  *See* Dkt. No. 575 at 14; *see also* Tr. 2851:25-2852:3.  Defendant did not contend that any commercially available RIMS system in combination with

TV/2 was a basis for its JMOL.[9]  Thus, this basis for Defendant's Rule 50(b) JMOL has been

waived.  *See, e.g., Kinzenbaw,* 741 F.2d at 387 (a pre-verdict JMOL on obviousness based upon

prior art did not support a post-verdict JMOL of invalidity due to prior public knowledge or use).

> **3.    The References Defendant Relies On Are Not Clear
> And Convincing Evidence Of Any RIMS System That
> Was In Public Use Or On Sale**

Defendant has failed to present any evidence, much less clear and convincing evidence,

establishing that any specific version of the RIMS system was in public use or on sale before the

August 10, 1994 priority date of the patents-in-suit.[10]  The RIMS system underwent numerous

modifications over time.  Tr. 231:14-232:5; 233:14-16; 2136:11-2139:24 (Momyer).  Nor can

Defendant rely on the system as described in the '989 Patent (DX-7) to substantiate functionality

of an alleged commercial RIMS system.  According to the inventors, some of the functionality

described in the '989 Patent ***was never*** implemented in any commercial RIMS system.  Tr.

380:1-19; 333:3-21 (Momyer).

Further, Defendant has presented no evidence to establish that the version of the RIMS

system described in the marketing brochure (DX-62) is the same version of the system described

in the '989 Patent.  To be sure, Defendant has proffered no evidence to indicate when any

version of the RIMS system, as described in the brochure, was in public use or on sale, if ever.

---

[9] Defendant's expert relied solely upon the RIMS system as disclosed in the '989 Patent for his
opinions.  Tr. 2547:2-2548:7; 2549:2-5 (Shamos).

[10] As Defendant concedes, the '989 Patent cannot be considered a printed publication prior to its
issuance on January 27, 1998 because it was still a pending patent application until that date and
was maintained as confidential by the PTO.  Dkt. No. 480, Def's Factual Contentions, ¶¶ 30-31;
Jury Instr. 37.  Thus, the '989 Patent itself, as alleged prior art only under Section 102(e), cannot
be used as part of a combination under Section 103 to invalidate the claims of the '172 Patent
because the subject matter of the '989 Patent and the '172 Patent were, at the time the inventions
of the '172 Patent were made (*i.e.*, at least as of August 10, 1994), owned by the same person or
subject to an obligation of assignment to the same person – Fisher Scientific.  *See* 35 U.S.C. §
103(c)(1); DX-7 (showing Fisher Scientific as assignee); PX-4 at *e*PLUS 0703663-68
(certification establishing right of Fisher Scientific as assignee to take action).

Tr. 233:14-19; 252:3-254:14 (Momyer) (features described in brochure were never implemented in any commercial system). Since the brochure is not dated, it is unclear to which, if any, of the many system versions it relates. Nor does the brochure serve to corroborate any date for commercial release of the system described in the '989 Patent. Defendant has no justification for using the combined disclosures of the brochure and the '989 Patent as evidence of the functionality of any particular version of the RIMS system that was on sale or in commercial use.[11]

### 4. The Patent Office Examiner Was Aware Of The RIMS System When He Allowed The Patents-in-Suit

Defendant contends that the PTO Examiner who examined the application which led to the patents-in-suit was unaware of the Fisher RIMS system and the '989 Patent when examining the patents and allowing the claims. The evidence is to the contrary. First, the '989 Patent was expressly incorporated by reference into the specification of the patents. *See* PX-1 at Col. 1:10-16. There, the inventors expressly acknowledged, "There are a number of known requisition/purchasing systems… [o]ne such system *is the Fisher Scientific Requisition and Inventory Management System (Fisher RIMS), described in co-pending patent application Serial No. 08/042,168,* …, the disclosure of which is incorporated herein by reference." Moreover, the patent specification references the Fisher RIMS system *over 50 times*. *See generally* PX-1. *See also* Tr. 263:23-264:2; 264:8-18; 266:17-267:14; 2128:18-2129:16; 2139:25-2140:21 (Momyer) (RIMS system mentioned 55 times in specification).

In addition, events that occurred during prosecution confirm the Examiner was aware of the Fisher RIMS system and the co-pending '989 patent application. *See* PX-4 at ePLUS

---

[11] Further, the RIMS brochure would not enable a person of ordinary skill in the art to make and use any system. It is just advertising puffery. It does not include a detailed description of how to implement the RIMS system. Tr. 2790:5-21 (Hilliard).

0703721, ¶¶ 2, 2.1; ePLUS 0703564, ePLUS 0703720-24, ePLUS 0703575; Tr. 2566:10-2570:5 (Shamos). Thus, there is substantial evidence to support a conclusion that the Examiner was aware of the '989 Patent and the RIMS system when he allowed the patent claims.

### 5. The RIMS System Lacked Critical Functionality

The RIMS system was a system for replenishing and managing a customer's inventory on a just-in-time basis. Tr. 229:21-231:11 (Momyer); DX-7 at Abstract; Col. 1:66-Col. 2:27. It had limited capabilities and lacked functionality critical to the asserted patents.

The RIMS system was not an "electronic sourcing system." It did not enable a prospective buyer to locate and find goods to purchase from different sources. It was not used by a "prospective buyer." Rather, it was used by a customer service representative ("CSR") for the Distributor. *See* Tr. 234:5-235:19, 237:6-19, 368:22-24 (Momyer) (RIMS system was operated by a Fisher CSR); Tr. 2678:13-2680:13; 2765:12-2767:11; 2777:19-2778:10 (Hilliard) (RIMS system is operated by the seller, it is not a buyer's system); DX-7 at Col. 2:62-67 ("local computer 40 used by a [CSR] at or near the customer site").

Unlike the patented systems, the item records in the RIMS databases do not relate to products being offered for sale to the customer by third-party vendors. Rather, they relate to items that are already owned by either the customer or the Distributor, and items that the Distributor may replenish for the customer. *See* DX-7 at Col. 4:23-31; Tr. 241:2-7; 374:19-375:15 (Momyer) (RIMS did not have catalogs, only lists of parts in inventory).

There was no concept of multiple vendors in the RIMS system. All items were sourced by the single Distributor. Thus, there was no need to reference multiple vendors in the RIMS database. DX-7 at Col. 17:35-42; Col. 39, Table VI (no vendor field in parts master). *See also* Tr. 335:25-336:10 (Momyer) (RIMS part master doesn't include vendor data); Tr. 2680:14-2682:2 (Hilliard) (no source-related data in RIMS part master table).

Because the RIMS system is a sole-source system, it did not include "at least two product catalogs containing data relating to items associated with respective sources." Tr. 2680:14-2682:2 (Hilliard) ("the items have no vendor or source association with them as a catalog item would, because ... [t]here's no need ... all items requisitioned through the RIMS system are sold to the customer from Fisher"); Tr. 2143:24-2144:19 (Momyer) (no third-party products in RIMS system); Tr. 343:20-344:12; 345:1-5 (Momyer) (all products requisitioned using RIMS were sourced by Fisher). Indeed, Defendant's expert conceded that the RIMS system did not have vendor catalogs. Tr. 2426:24-2427:5; 2507:19-22 (Shamos). He also conceded that RIMS does not satisfy the other claim elements that require multiple catalogs as a prerequisite. Tr. 2557:6-2560:25 (Shamos).[12]

Nor was the database in the RIMS system maintained in a manner such that selected portions could be searched separately. First, there was no search program. Tr. 391:24-25 (Momyer); Tr. 2682:12-2684:12 (Hilliard). The system could only perform a "part number" lookup. DX-7 at Col. 8:29-32; Col. 8:40-51. *See also* Tr. 334:3-25; 390:17-391:3 (Momyer) (part number lookup not same as a search); Tr. 2208:5-22 (Kinross). The CSR could not make a selection of catalogs to search from among multiple vendor catalogs. RIMS did not have "catalogs." Tr. 2136:8-10 (Momyer); Tr. 2682:3-11 (Hilliard).

Further, the requisitions built by the RIMS system were not built "using data relating to selected matching items and their associated source(s)." They did not include any source-related data. *See* DX-7 at Col. 37, Table III. There was no need because all items were sourced by the

---

[12] Similarly, because the item data in the database was not associated with any source and was obtained from a single-source, the RIMS system fails to satisfy claim 1 of the '172 Patent. Tr. 2737:14-2738:23 (Hilliard) ("the database in the RIMS system is not a database containing items associated with at least two vendors because the RIMS system has one vendor and that's Fisher.").

Distributor.  Tr. 2684:13-19; 2686:3-2688:15 (Hilliard) ("Q: [D]o the line items that are listed in that requisition include information relating to the sources from which the item[s] are to be procured?  A:  No, there's no source information ... There's only one vendor.").

If an item is available in the customer's local inventory 54, then a requisition data block is transmitted by the RIMS system to the Distributor's host computer.  DX-7 at Col. 11:60-61; Col. 14:7-28; FIGS. 5A, 5B; Tr. 353:5-19; 354:3-355:3 (Momyer); Tr. 2688:16-2689:9; 2694:24-2696:17 (Hilliard).  This is not the same as sending a purchase order to an outside vendor.  No purchase occurs.  There is a material transfer.  *See* Tr. 2695:19-2696:9 (Hilliard) ("since it's a customer-owned item, there is no purchase.  The customer doesn't need to purchase that item because the customer already owns that item.").  If the customer does not have the desired item in its own inventory and the Distributor does not have sufficient quantities of the item at its local inventory or warehouse facility, the Distributor's host system (rather than the RIMS system) could be used to generate a purchase order to an outside vendor, but this purchase order would be invisible to the customer and would use data other than that on the original requisition from RIMS.  *See* DX-7 at Col. 17:35-42, FIGS. 5A, 5B; Tr. 353:5-19; 393:20-394:15 (Momyer) (RIMS system did not generate purchase orders); Tr. 2688:16-2689:9; 2694:25-2696:17 (Hilliard)  (RIMS system transmitted data block to Fisher's host computer where Fisher personnel manually generate a purchase order).  Moreover, in this circumstance, the sourcing determination is made by the Distributor, not by the customer, as required by the asserted claims. *Id.*  Further, the  host computer could not generate multiple purchase orders from a single requisition.  Tr. 2136:1-7 (Momyer); Tr. 458:7-459:15 (Johnson).

Since there was no source-related data in the requisitions built by RIMS, the RIMS system did not include any means for "converting data relating to a selected matching item on an

associated source to data relating to an item an a different source." Tr. 395:25:396:9 (Momyer) (RIMS system could not cross-reference from a Fisher item to another item from a different vendor); Tr. 2696:18-2699:2 (Hilliard).

Additionally, the RIMS system had no means for determining whether any "selected matching item" is available in a vendor's inventory. The RIMS system could determine whether an item was available in the local JIT inventory. It could not determine whether the item was available in the Distributor Warehouse or in a third-party supplier's inventory. *See* Tr. 459:16-460:15 (Johnson) ("Q: Did RIMS have this inventory availability capability ... with regard to multiple vendors?  A:  No."); Tr. 2700:5-2703:5; 2703:22-2704:14 (Hilliard).

Additionally, there is no disclosure whatsoever in the '989 Patent or the RIMS brochure of any "means for generating an order list." The system only built a requisition.  DX-7 at Col. 10:38-8; Tr. 2737:14-2738:23 (Hilliard).

As set forth above, since there was no "collection of catalogs" in the RIMS system, there was no "catalog selection protocol enabling the selection of less than the entire set of catalogs." Nor did the RIMS system enable the selection of "specific items from said [subset of] catalogs determined from said catalog selection protocol."  Tr. 2728:11-2729:8 (Hilliard).  Additionally, the RIMS system did not store a collection of catalogs in separate databases.  It had a single database 50.  Tr. 2729:22-2730:17 (Hilliard) ("it doesn't store separate catalogs in separate databases.").

Nor does the RIMS system include functionality such that a "selection of [either a first identification code associated with a first item in a first catalog or a second identification code associated with a second item in a second catalog] provides the other identification code from the other of said catalogs."  There is only one database of items available to the CSR.  The items in

19

the database are JIT items sourced from a single Distributor.  Therefore, since there is no second catalog, there is no "second identification code associated with a second item in a second catalog."  Tr. 2731:25-2732:18 (Hilliard) ("there's not an ... identification code associated with an item in the first catalog since there's no first catalog.  And there's no identification code for an item in the second catalog for the same reason.").

Moreover, the RIMS system did not have "at least two catalogs [that] include a generally equivalent item from a different source."  The RIMS system was a sole-source system.  Since there is no "catalog collection searching module," and only one source of items, there is no capability for a requisition module to "work[ ] in combination with [the] catalog searching module to determine multiple sources for [an] item" either.  Tr. 2732:25-2734:18 (Hilliard).

### 6.    The IBM TV/2 Search Program Prior To August, 1994

Defendant contends that the IBM TV/2 search program, as described in the IBM TV/2 General Information Manual (DX-230) and an undated TV/2 brochure (DX-107), was a system in public use or on sale before August 10, 1994.[13]

The TV/2 brochures amount to little more than advertising copy discussing the supposed features of a document viewer product at a superficial level.  There are no details that would enable a person of ordinary skill in the art to build any system whatsoever.  Tr. 2706:25-2707:20; 2709:9-2711:1; 2712:19-2713:10 (Hilliard).  *See also* Tr. 2029:9-2030:25 (Eng) (characterizing the "TV/2 General Information Manual" as being "high level" and "just for evaluation").

Additionally, there is no evidence to corroborate that the TV/2 search program was known or used by others prior to August 10, 1994.  With respect to the undated brochure (DX-

---

[13] Both the "TV/2 General Information Manual" (DX-230) and the "TV/2 brochure" (DX-107) were disclosed to the PTO during prosecution of the patents-in-suit.  The PTO Examiner specifically considered these references and allowed the patent claims over these references. PX-1, References Cited, Other Publications; PX-2, References Cited, Other Publications; PX-3, References Cited, Other Publications.

107), there is no way to determine whether it describes features of the TV/2 product that existed before or after August, 1994. Moreover, testimony from former IBM employees suggests that the TV/2 search program was not commercially available until after August, 1994. Tr. 2243:10-2244:6; 2245:3-2246:2 (Gounaris) (TV/2 wasn't fully developed in summer of 1993 when IBM first met with Fisher); Tr. 2002:17-23; 2004:11-2005:3; 2005:12-18 (Eng) (the version of TV/2 built for Fisher's electronic sourcing system was the first commercial version of TV/2).

### 7.    The TV/2 Search Program Lacked Critical Functionality

The TV/2 search program lacked critical functionality required by the patent claims. First, TV/2 is not an electronic sourcing system. Tr. 2711:15-2712:7 (Hilliard). Moreover, there was no dispute that TV/2 did not maintain any product catalogs, or have a database containing items associated with at least two sources. Tr. 2589:12-23 (Shamos) (TV/2 was not delivered with catalogs); Tr. 2749:24-2752:2 (Hilliard); Tr. 444:3-6 (Kinross) (TV/2, as it existed before IBM's work with Fisher, did not have multiple product catalogs). TV/2 was a search program only. *See* DX-230 at G0000020.[14]  Nor did TV/2 have any means for "selecting the product catalogs to search." Tr. 2723:21-2724:22 (Hilliard) (neither RIMS nor TV/2 has two product catalogs or a means of selecting from among two product catalogs).

TV/2 could not "search[] for matching items among the selected product catalogs." The search functionality required by the claims could not be performed by TV/2 prior to IBM's work under contract for Fisher Scientific. *See* Tr. 2006:9-2007:15; 2009:5-2015:1 (Eng) (describing modifications made to TV/2 for Fisher's system); Tr. 308:8-310:15 (Momyer) (TV/2 couldn't do subset searches or Boolean logic searches); Tr. 2149:14-2150:17; 2151:7-10; 2151:24-2152:7;

---

[14] Contrary to Defendant's representation (Brf. at 17), Mr. Hilliard did not admit that TV/2 was designed to search multiple catalogs. Mr. Hilliard's testimony at the page cited was that "when you buy the system from IBM, it's not going to come with ... catalogs" Tr. 2751:13-17. *See also* Tr. 2750:2-2752:2 (Hilliard). Nor did Mr. Hilliard opine that TV/2 satisfied claim 1 of the '172 Patent as Defendant suggests. Tr. 2738:24-2739:20 (Hilliard).

2155:24-2156:5 (Momyer) (TV/2 could not search a catalog prior to IBM's work with Fisher); Tr. 2175:20-24; 2178:17-2179:8 (Kinross) (TV/2 did not have capability to search a list of selected topics when Fisher first began working with IBM).

The TV/2 brochures also do not disclose a system which "build[s] a requisition." Defendant contends that this functionality is described in the excerpt "You can also create a 'shopping list' just by selecting items and passing that list to another application. For example, you might select parts to be ordered from the exploded drawing in a parts catalogue. The parts list could then be sent directly to your parts ordering system." Brf. at 19-20. However, this superficial suggestion is in no way sufficient to enable (or even disclose the possibility of) the requisition limitation to a person of ordinary skill. The reference to a shopping list specifically states that the requisition creation would be done by "passing [the shopping] list to another application" rather than using TV/2 to perform this function. Tr. 2783:9-2784:6 (Hilliard) (shopping list capability had to be developed by IBM as part of its contract with Fisher); Tr. 403:22-405:8; 407:14-414:20 (Kinross) (TV/2 modified as part of IBM's work for Fisher by creating shell program needed to build order lists); Tr. 2010:4-16 (Eng) (created shell program as part of IBM contract with Fisher); Tr. 454:13-456:3 (Johnson) (interface built to pass data from TV/2 to the requisition/purchasing program); Tr. 2010:24-2011:17; 2015:2-5; 2026:7-11 (Eng) (interface built to integrate TV/2 with Fisher's requisition/purchasing system).

Because TV/2 could not build a requisition, it did not "process[] the requisition to generate one or more purchase orders for the selected matching items." The suggestion to send a "shopping list" to a "parts ordering system" confirms that the TV/2 search program lacked such capability. Tr. 2712:14-2713:10 (Hilliard). Moreover, a person of ordinary skill in the art would not understand a shopping list to be a purchase order. A shopping list is a list of desired items

22

which you may, or may not, decide to purchase.  A purchase order is a commitment to purchase.

Neither TV/2 brochure references any capability of generating a purchase order from a

requisition.  Tr. 2714:21-2716:3 (Hilliard) (neither RIMS nor TV/2 generated purchase orders

from requisitions).

### 8.    The Combination Of The RIMS System And The TV/2 Search Program Fails To Satisfy The Requirements Of The Claims

The addition of the TV/2 search program to the system described in the '989 Patent, or

the system described in the RIMS brochure, as suggested by Defendant, would not cure the

underlying deficiencies in the RIMS system.  The combination of a search program (*i.e.*, TV/2)

with a single-source system (*i.e.*, RIMS) does not result in a system that meets each element of

even one of the patent claims.  Therefore, the references do not render the asserted claims

obvious.  *See Crocs., Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1308-09 (Fed. Cir. 2010)

(reversing  obviousness determination because none of the references taught one of the claim

limitations).

First, neither system was an "electronic sourcing system."  The RIMS system was not

used by a prospective buyer.  Rather, it was used by the Distributor's CSR.  Moreover, it could

not be used to locate and find items to purchase from multiple sources.  There was one source for

the items:  the Distributor.  The TV/2 search program had no item data, nor could it be used to

make purchases.  Thus, the combination of the two systems fails to satisfy this requirement.  *See*

Tr. 2714:21-2716:3 (Hilliard).

Second, because requisitions built by RIMS did not include catalog item data "and their

associated sources," as required by the claims, the combination of the RIMS system with the

TV/2 search program fails to cure these deficiencies.  *Id.*  Further, since the RIMS system did not

process a requisition to generate one or more purchase orders for selected matching items, and

TV/2 had no functionality to generate purchase orders at all, the combination fails to satisfy this requirement. *Id.* Nor did either system build a requisition from data on an order list. *Id.* at 2737:14-2739:20. And, neither system had the capability of generating multiple purchase orders from a single requisition. *Id.* at 2714:21-2716:3.

All of the asserted claims require a system having at least two product catalogs associated with different sources or item data associated with at least two vendors. Neither system had two catalogs, as Defendant's expert conceded. Tr. 2426:24-2427:5; 2507:19-22; 2557:6-2560:25 (Shamos) (RIMS did not have multiple catalogs); Tr. 2589:12-23 (Shamos) (no catalogs delivered with TV/2). Moreover, the claims of the '516 Patent all require that the two product catalogs include items that are generally equivalent. Neither the RIMS system nor the TV/2 search program included such functionality. Tr. 2733:1-2735:12 (Hilliard). The items in the RIMS database were associated with a single source only and the TV/2 program did not include any catalogs at all. Further, neither system had the capability of determining the availability of a selected matching item in a supplier's inventory. *Id.* at 2724:25-2726:19.

In addition, neither system had the functionality to convert a selected matching item and its associated source to another item associated with a different source. *Id.* at 2726:20-2727:24. Specifically, the requisitions built by the RIMS system did not include source-related information and there were no requisitions built by the TV/2 search program. Moreover, neither system employed a catalog selection protocol. *Id.* at 2728:11-2729:21.

### 9.    The Patented Inventions Are Much More Than A "Combination" Of RIMS And TV/2

Contrary to Defendant's suggestion that the patented inventions are just a straightforward combination of the RIMS system and TV/2 search program, the inventors of the patents-in-suit, as well as the IBM personnel who were hired by Fisher to work on the project, testified

otherwise.  The development effort for the patented system was an extensive one undertaken at substantial expense taking many months to accomplish.  Tr. 285:4-298:15 (Momyer) (describing modifications made to RIMS and TV/2 for use in patented systems); Tr. 306:12-308:7 (Momyer) (Fisher paid IBM $620,000 for its work); Tr. 2146:19-2147:11; 2147:23-2148:8 (Momyer) (Fisher devoted significant resources to the project notwithstanding that it already had RIMS system); Tr. 403:22-405:8; 407:14-414:20; 444:7-445:16 (Kinross) (describing numerous modifications made to TV/2); Tr. 450:18-457 (Johnson) (describing numerous modifications made to RIMS);  Tr. 2006:9-2007:15; 2009:5-2015:1; 2026:7-11 (Eng) (describing modifications made to TV/2); 2005:24-2006:8 (Eng) (she worked on Fisher project about a year and a half); Tr. 2562:17-21 (Shamos) (acknowledging that search capabilities had to be added to TV/2 for the patented systems); Tr. 2564:1-2565:13 (Shamos) (Fisher committed significant resources to project); Tr. 2716:4-18; 2718:7-2721:10 (Hilliard) (describing modifications to RIMS); Tr. 2721:11-2722:11 (Hilliard) (describing modifications to TV/2).

As described by the inventors, the modifications to the prior RIMS system and TV/2 search program included: (1) a redesign of the user interface for the requisition/purchasing system so that a customer-end user could use the system; (2) conversion of the system architecture to enable multiple requisitioners to use the system; (3) changes to the RIMS databases and development of new programming logic for various RIMS programs to recognize multiple suppliers and generate multiple purchase orders from a single requisition; and (4) enhancements to RIMS to add the capability to communicate over a network to multiple external suppliers for checking pricing and availability of items in the suppliers' inventories and to transmit purchase orders.  Tr. 285:4-298:25 (Momyer); Tr. 450:18-457:20 (Johnson).

In addition, the shell program was created for the user interface for TV/2, and additional functionality had to be added to TV/2 to enable searching of catalog databases which functionality did not exist prior to IBM's contract with Fisher.  Tr. 2011:25-2014:5; 2014:14-2015:1 (Eng) (TV/2 was enhanced to perform the required search functions); Tr. 2006:21-2007:15; 2009:5-2010:3 2025:6-25 (Eng) (TV/2 customized so that it could read catalog data); Tr. 2010:4-16 (Eng) (had to develop and write shell program); Tr. 2010:24-2011:17; 2015:2-5; 2026:7-11 (Eng) (needed to create the interface to integrate TV/2 with requisition/purchasing system).  *See also* Tr. 403:22-405:8; 407:14-414:20 (Kinross).

Even if combining some version of the prior RIMS system and the TV/2 search program was straightforward to the inventors (which it was not), substantial evidence established that such a combination would not have been obvious to one of ordinary skill in the art.  Tr. 2722:19-2739:20 (Hilliard).[15]  Defendant is simply employing an extreme form of hindsight reconstruction by improperly using the inventors' own disclosure against them.  *See W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed. Cir. 1983) ("the insidious effect of a hindsight syndrome [occurs] wherein that which only the inventor taught is used against its teacher"); *KSR*, 550 U.S. at 425 (use of hindsight reconstructions is improper).

**10.     Secondary Considerations Support The Nonobviousness Of The Patented Inventions**

Substantial evidence of secondary considerations of nonobviousness also supports the

---

[15] Defendant's reliance on a purported suggestion in the TV/2 brochure (DX-107) to integrate parts catalogs with order entry and inventory management systems as establishing a motivation to combine the RIMS and TV/2 systems is misplaced.  A person of ordinary skill in the art (POSITA) would not have been motivated to combine the prior systems based on such suggestion to achieve the patented systems.  Tr. 2791:20-2792:5 (Hilliard).  The TV/2 brochures do not contain sufficient description to even enable one to make and use TV/2.  Tr. 2706:25-2707:20; 2709:9-2711:1 (Hilliard).  Nor is there any discussion in the brochures of the numerous modifications needed to enable use of TV/2 in the patented systems.  Tr. 2029:9-2030:25 (Eng) (no description in TV/2 documents of how to integrate TV/2 with a catalog or the necessary modifications to TV/2).

jury's verdict. *ePlus* entered into multiple license agreements for the patents and earned nearly $60 million from such licensing. *See* PX-43 (Ariba); PX-317 (Perfect Commerce); PX-318 (SAP); PX-319 (SciQuest); PX-320 (Verian); Tr. 2621:18-2622:5, 2624:9-2628:11, 2629:25-2633:8 (Farber). These licenses are relevant indicia of the nonobviousness of the patents. *See In re GPAC.* In addition, Mr. Farber and Mr. Hilliard testified that *ePlus* and its predecessor, ProcureNet, received several industry awards for products embodying the patented technology. Tr. 2633:9-2634:5, 2637:14-2638:9 (Farber); Tr. 2739:25-2740:15 (Hilliard). Such industry recognition serves as strong evidence of nonobviousness. *See Vulcan Eng'g. Co.,* 278 F.3d at 1373 ("Appreciation by contemporaries skilled in the field of the invention is a useful indicator of whether the invention would have been obvious to such persons …").

### F.    Defendant Waived Its Indefiniteness Defense

Defendant contends that claim 1 of the '172 Patent and claim 3 of the '683 Patent are invalid as indefinite. However, Defendant waived this issue; and to the extent it was not waived, substantial evidence supports a finding that the claims are not indefinite. Although Defendant indicated that definiteness was a triable issue in the Pretrial Order (Dkt. No. 480, Def's Triable Issues for Ct. ¶ 7), it failed to present any evidence on this defense at trial. Moreover, although Defendant moved for summary judgment that the "means for processing the requisition to generate" "purchase orders" claim terms were indefinite (Dkt. No. 240-1 at 24-26, Dkt. No. 340 at 9-10), the Court denied that motion (Dkt. No. 356), and Defendant failed to properly preserve that issue by renewing it at trial. Nor did Defendant present the issue in a pre-verdict JMOL. *See* Dkt. Nos. 45 and 46 (devoid of mention of indefiniteness defense); *Novo Nordisk A.S v. Becton Dickinson & Co.,* 304 F.3d 1216, 1221 (Fed. Cir. 2002) (denial of summary judgment on legal issue not reviewable where defendant failed to submit JMOL); *United Techs. Corp. v. Chromalloy Gas Turbine Corp.,* 189 F.3d 1338, 1344 (Fed. Cir. 1999) (denial of summary

judgment may be preserved only by renewing the issue at trial or submitting post-trial proposed conclusions of law). Defendant did neither.[16]

In its JMOL argument, in response to the Court's questioning, Defendant stated that the only bases for its JMOL were anticipation and obviousness. Tr. 2851:2-2852:3. Only in response to ePlus's JMOL did Defendant raise the issue. And, the Court correctly noted that there was no JMOL to be had on an issue Defendant did not try. Tr. 2928:18-2929:19.

This vague, conclusory "motion," presented only in opposition to ePlus's JMOL, is insufficient to preserve the issue. A party moving for JMOL must do more than assert that unspecified elements of unspecified claims are indefinite. *See Electro Scientific Indus. v. General Scanning Inc.*, 247 F.3d 1341, 1350 (Fed. Cir. 2001) (affirming denial of JMOL; "rather than setting out the particular elements of the [patent] and identifying the specific manner in which they are disclosed by the [prior art,] [defendant] just baldly asserts that the elements are disclosed either expressly or inherently. This is an insufficient showing."); *Junker v. Eddings*, 396 F.3d 1359, 1363-64 (Fed. Cir. 2005) (affirming denial of JMOL; general statements were inadequate to inform either plaintiff or the district court of defendant's challenges to validity).

To the extent the indefiniteness defense has not been waived, the Court found the structure described in the patent specification that performs the purchase order generation function to be "a purchase order generation module operating on a computer system having access to the requisition and its equivalents," Dkt. No. 204 at 47, 51, and relied upon the

---

[16] Defendant's brief fails to identify which terms within claims 1 and 3 it contends are allegedly indefinite. The only claim term that was the subject of its summary judgment motion was the "purchase order" term. However, on appeal Defendant now contends that the "means for converting" term of claim 3 is indefinite, a defense that it never raised on summary judgment, did not present at trial, did not raise in its Rule 50(a) motion, or present in post-trial conclusions of law. There can be no question that any indefiniteness defense Defendant had as to this claim term has been waived.

descriptions of various embodiments set forth in the specification. *Id.* at 47, 51.[17]  Thus, because there is structure disclosed in the specification corresponding to the claimed functions, the claim terms are not indefinite. *See, e.g., Finisar Corp. v. DirecTVGroup, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (an algorithm may be expressed in any terms understandable to one skilled in the art including as a mathematical formula, in prose, or in a flow chart); *Business Objects, S.A. v. Microstrategy, Inc.*, 393 F.3d 1366, 1373 (Fed. Cir. 2005) (affirming district court's construction of corresponding structure for a "query engine means" as the algorithm disclosed in various referenced passages of specification).

Further, in unrebutted testimony, *e*Plus's expert opined that a person of ordinary skill in the art (POSITA) would understand the "purchase order generating" claim terms to relate to a purchase order generation module specially programmed to perform the function of generating one or more purchase orders from the data in the requisition and he described how such person would understand when the claim term was satisfied.  He averred that a POSITA would understand that the first step for generating purchase orders from a requisition is that the system "accepts" the requisition.  PX-1 at Col. 15:20-26.  The next step is that the purchase order generation module generates purchase orders based on predetermined rules such as one purchase order to each distinct supplier referenced in the requisition. *Id.*, Col. 10:48-64; *see also* Dkt. No. 311, Ex. 30 ¶¶ 33-36; Tr. 559:9-560:11.[18]  Defendant failed to address this evidence either on

---

[17] Similarly, the district court found that the specification disclosed structures corresponding to the "means for converting" term of claim 3. *Id.* at 47-48.

[18] *e*Plus's expert also presented unrebutted testimony concerning how a POSITA would understand when the "means for converting" claim term, as construed by the Court, was satisfied.  Tr. 560:12:565:11 (describing converting algorithm based upon specification citations relied upon by the Court).

summary judgment or at trial.[19]

### G. The Asserted Claims Recite Patentable Subject Matter

The Court has already rejected Defendant's subject matter patentability defense. Dkt. No. 357. Moreover, Defendant offered no evidence at trial to support this defense and conceded that it "did not try" the issue. Tr. 2928:18-2929:19.[20] Defendant bears the burden of proving invalidity under Section 101 by clear and convincing evidence, and to the extent there are any factual issues underlying the legal issue of patentability, Defendant has failed to prove those facts during trial. Accordingly, for all the same reasons that the Court previously denied Defendant's motion for summary judgment, the Court should similarly deny Defendant's motion for judgment as a matter of law.

## IV.   CONCLUSION

Accordingly, for at least the foregoing reasons, *e*Plus respectfully requests that the Court deny Defendant's renewed motion for judgment as a matter of law.

---

[19] Because definiteness is a question of law with underlying factual determinations, as conceded by Defendant's counsel (Tr. 2522:18-20), testimony from experts may be relied upon to show what the specification would indicate to one skilled in the art about what is being claimed. *See, e.g., Green Edge Enter., LLC v. Rubber Mulch, LLC*, 620 F.3d 1287, 1299 (Fed. Cir. 2010); *Atmel Corp. v. Information Storage Devices*, 198 F.3d 1374, 1379-82 (Fed. Cir. 1999) (reversing summary judgment of indefiniteness; unrebutted expert testimony was sufficient to support proposition that POSITA would understand the structure recited in the specification corresponding to the claimed means).

[20] Defendant's "renewed" JMOL fails to note that the only claims subject to its Section 101 defense were claims 26, 28 and 29 of the '683 Patent and claims 1, 2, 6, 9 and 29 of the '516 Patent. *See* Dkt. 480, Def's Triable Issues For Court, ¶ 6.

Respectfully submitted,

July 5, 2011

_____/s/_____
David M. Young (VSB #35997)
Scott L. Robertson *(admitted pro hac vice)*
Jennifer A. Albert *(admitted pro hac vice)*
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444
dyoung@goodwinprocter.com
srobertson@goodwinprocter.com
jalbert@goodwinprocter.com

Craig T. Merritt (VSB #20281)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
Facsimile: (804) 697-4112
cmerritt@cblaw.com

Michael G. Strapp (*admitted pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
Facsimile:   (617) 523-1231
mstrapp@goodwinprocter.com

Attorneys for Plaintiff *e*Plus Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of July, 2011, I will electronically file the foregoing

**PLAINTIFF *e*PLUS INC.'S BRIEF IN OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

with the Clerk of Court using the CM/ECF system which will then send a notification of such

filing (NEF) via email to the following:

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Andrew Lagatta, *pro hac vice*
MERCHANT & GOULD
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 332-5300
Facsimile: 612) 332-9081
lawsonservice@merchantgould.com

Robert A. Angle, VSB#37691
Dabney J. Carr, IV, VSB #28679
TROUTMAN SANDERS LLP
P.O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1238
(804) 698-5119 (Fax)
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com

Donald R. Dunner, *pro hac vice*
Erika H. Arner, *pro hac vice*
FINNEGAN, HENDERSON, FARABOW, GARRETT
& DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, DC 20001
(202) 408-4000
(202) 408-4444

***Counsel for Defendant Lawson Software, Inc***

_____/s/_____
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444
dyoung@goodwinprocter.com

Counsel for Plaintiff *e*Plus Inc.