# EXHIBIT A

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF VIRGINIA
 3                 RICHMOND DIVISION
 4
 5   ---------------------------------------
                                  :
 6   ePLUS, INC.         :  Civil Action No.
                         :  3:09CV620
 7   vs.                 :
                         :
 8   LAWSON SOFTWARE, INC.      :  January 4, 2011
                         :
 9   ---------------------------------------
10
11        COMPLETE TRANSCRIPT OF THE JURY TRIAL
12        BEFORE THE HONORABLE ROBERT E. PAYNE
13        UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24        Peppy Peterson, RPR
          Official Court Reporter
25        United States District Court
```

**Page 2**

```
 1   APPEARANCES:  (cont'g)
 2   Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
 3   Troutman Sanders Building
     1001 Haxall Point
 4   Richmond, Virginia  23219
 5   Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
 6   William D. Schultz, Esquire
     Merchant & Gould, PC
 7   80 South Eighth Street
     Suite 3200
 8   Minneapolis, Minnesota  55402
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              P R O C E E D I N G S
 2
 3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
 4   Incorporated versus Lawson Software, Incorporated.  Mr. Scott
 5   L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr.
 6   Michael G. Strapp, and Mr. David Young represent the plaintiff.
 7        Mr. Daniel W. McDonald, Dabney J. Carr, IV, Ms.
 8   Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
 9   the defendant.  Are counsel ready to proceed?
10        MR. ROBERTSON:  Yes, Your Honor, plaintiff is.
11        MR. McDONALD:  Yes, Your Honor.  Thank you.
12        THE COURT:  All right.  Good morning, ladies and
13   gentlemen.  On behalf of the Court and counsel and the parties,
14   I'd like to thank you for your participation this morning in
15   one of the most important civic duties that citizens of our
16   country have.
17        We are a society which has chosen to rule itself in
18   accord with the rule of law, and we have taken in our
19   Constitution and our laws measures to make sure that we have an
20   effective legal system by which people can resolve their
21   disputes in court rather than in the streets, and if we did not
22   have the service of jurors to make the sacrifices that jurors
23   are called upon to do so, then our system of justice that is
24   administered in accord with our Constitution and our statutes
25   could not exist.
```

**Page 4**

```
 1        And so what you are called upon to do is a public
 2   duty of the highest order which, of course, all of us know
 3   entail sacrifices for you and for your families and for your
 4   employers and imposes burdens upon you beyond that of the
 5   ordinary responsibilities that you have which are already
 6   significant, and all of us know that.
 7        This case involves a dispute over patents.  There
 8   are -- the plaintiff here is ePlus, Incorporated, or Inc., and
 9   ePlus, whose lawyers are sitting over here, has some patents
10   that are issued by the United States Patent Office, a process
11   that is sanctioned and approved by the Constitution of the
12   country and the laws of the nation, and the patents all are
13   long-numbered.
14        They have six figures, and, in fact, I expect most of
15   us would like to earn incomes in accord with the size of the
16   numbers of these patents, but they are referred to by three
17   small digits, the last three digits of the patent.  I don't
18   know that any of you know anything about these patents, but I
19   want to let you know and understand what these patents are.
20        There's a patent number 6023683 which is called the
21   '683 patent.  There's patent number 6055516 or the '516 patent.
22   There's patent number 6505172 or the '172 patent.  Sometimes,
23   patents may be referred to, instead of using these short
24   numbers, '516 or '683 as the patents-in-suit.  That's just a
25   term that lawyers sometimes use to talk about the patents that
```

229

Momyer - Direct                    229

1   value-added systems.  What that really would do is it would
2   establish a good business relationship, partnership between
3   ourselves and our customers, and in many ways kind of lock that
4   customer in to doing business with Fisher.
5       We would do things like provide a customized invoice,
6   provide for remote order entry capabilities where the customer
7   themselves could enter the order, and these kind of things
8   would allow the customer to, in many ways, become more
9   efficient in their day-to-day operations as well as to reduce
10  their costs of operation.
11  Q   And do you understand one of the objectives then was to
12  promote the sale of Fisher product through these value-added
13  features you've mentioned?
14  A   Absolutely.
15  Q   Generally the goal of any business?
16  A   That's right.
17  Q   Now, you mentioned, I think, in one of your value-added
18  features that there was this inventory management aspect; do
19  you recall?
20  A   I didn't mention that.
21  Q   Okay, I'm sorry.  Did you have any value-added feature
22  that involved inventory management?
23  A   Yes, that was a value-added -- we did find a good tool to
24  allow us to get involved in a good relationship with our
25  customers, and what we do -- and we actually did this before we

230

Momyer - Direct                    230

1   had a system to manage it.
2       We would put inventory, Fisher owned inventory at our
3   customers' site to allow them to -- and get those products and
4   use those products that are in the inventory for their daily
5   use, and that would allow them to very quickly have access to
6   inventory and not have to wait a day or so until the ordered
7   item would be delivered from a Fisher distribution center.
8   Q   I'd like to shift of focus, if we could, on how we got to
9   the inventions that are the patents-in-suit, the ones in issue
10  here, Plaintiff's Exhibit 1, 2, and 3 and what led up to the
11  inventors, yourself, as well as the other inventors that we
12  identified in the patent solving some of the problems that
13  needed to be solved.  Are you capable of doing that with me?
14  A   Sure.
15  Q   You mentioned this inventory management system where you
16  kept actual Fisher inventory at customers' sites.  Is that
17  Fisher-owned inventory?
18  A   Yes.  We actually -- initially it was Fisher-owned
19  inventory, but the system we developed actually would allow us
20  to manage the customers' inventory as well.
21  Q   What was that inventory management system called?
22  A   RIMS, R-I-M-S.
23  Q   And what did RIMS stand for, sir?
24  A   Requisition inventory management system.
25  Q   Just at a high level, can you tell me what RIMS could do?

231

Momyer - Direct                    231

1   A   Sure.  The -- basically the RIMS system would keep track
2   of the inventory that was in the stockroom.  That inventory
3   could be both customer-owned or Fisher-owned and could keep
4   track of who pulled the product out, and would also -- keeping
5   track of the inventory, also determine if the inventory,
6   specific product had to be restocked.
7       So there was a component of the system that would allow us
8   to, based upon the order point and reorder quantity, would
9   actually reorder and transmit orders to Fisher to refill,
10  refill the stockroom for the products and how much was needed
11  in them.
12  Q   Did you help develop the RIMS system?
13  A   Yes, I did.
14  Q   When did you work on that RIMS system?
15  A   1989 would be probably when we started.  I think we had
16  our first installation around 1981.
17  Q   Did that RIMS system that you've generally described at a
18  high level go through various iterations or versions?
19  A   Oh, sure.  The first version that was put out there really
20  handled -- only handled recording of requisitions without
21  dealing with the inventory management.
22  Q   Let me just stop you there and say, approximately how many
23  iterations or variations did the system go through?
24  A   Dozens if not more than that.  The Fisher RIMS system was
25  in existence from 1991 all the way through until I left in

232

Momyer - Direct                    232

1   2003, and there were many iterations of that, and primarily
2   those iterations were based upon some unique requirements the
3   customer had or some business initiative that Fisher wanted to
4   undertake in the area of inventory control and inventory
5   management at a customer's site.
6   Q   Could you open to Plaintiff's Exhibit Number 10 that's in
7   your notebook, and I'd ask you if you could identify that
8   document for me.
9   A   That is a patent for a just-in-time requisition inventory
10  management system.
11  Q   Just-in-time requisition and inventory management system;
12  is that right?
13  A   That's correct.
14  Q   What does just in time mean in the context of that
15  invention?
16  A   If you think about what we were trying to do, tried to
17  explain a little bit when I talked about the invention itself,
18  the RIMS system, it is providing product to the customer when
19  they need it.
20      A very typical scenario would be a chemist who is doing
21  some research may need a reagent or a test tube, and it's very
22  critical they have it right away, so by putting inventory at
23  the customer's site, this would allow them to have inventory
24  just in time, just when they need it.  It is a value added to
25  our customers.

233

Momyer - Direct                              233

1   Q   So this just in time has often been referred to as JIT?

2   A   JIT, yes.

3   Q   This ability to replenish product quickly, was that

4   something desirable on Fisher's part in order to service their

5   customers?

6   A   Absolutely.  Once again, it was value both to Fisher as

7   well as their customer.  As a result, I think it created a good

8   relationship, a good business partnership.

9   Q   On Plaintiff's Exhibit Number 10, this patent involving

10  just-in-time requisition and inventory management system, is

11  that something that you -- subject matter associated with this

12  commercial system you were discussing known as RIMS?

13  A   Yes.

14  Q   And I understood you to say that there were multiple

15  variations and iterations of RIMS; is that right?

16  A   That's correct.

17  Q   Are all those variations described in this patent, this

18  '989 patent, Plaintiff's Exhibit Number 10?

19  A   No.

20  Q   Let me just go back.  I should have done this earlier.

21  Are you one of the named inventors on this patent as well?

22  A   Yes, I am, number two.

23  Q   And there's also a Mr. James Johnson named on this '989

24  patent, Plaintiff's Exhibit Number 10; do you see that?

25  A   Yes, I do.

234

Momyer - Direct                              234

1   Q   Do you know just from memory whether or not Mr. Johnson is

2   also a named inventor on Plaintiff's Exhibit Number 1, 2, and

3   3, the three patents issued in this case?

4   A   Yes, he is.

5   Q   I want to focus a little bit briefly on this RIMS system

6   and its functionality that you were talking to.  You mentioned

7   in the prior non-computerized world where someone would have to

8   pick up the phone and call in, there was a customer service

9   representative or a CSR.

10  A   That's correct.

11  Q   Was the CSR required in this RIMS system you are talking

12  about that Fisher utilized?

13  A   Yes, it was.  The RIMS system was entirely dependent upon

14  an on-site customer service rep to operate.

15  Q   What was the responsibility of that customer service

16  representative or CSR?

17  A   Twofold.  To manage the stockroom, or -- as well as take

18  the requisitions that the customers had for the, primarily for

19  the inventory that was in the stockroom.

20  Q   And what happened if one of the customers needed some

21  just-in-time inventory with this RIMS system?  How would that

22  work?

23  A   The customer would have to contact in some manner the

24  on-site customer service rep, and that contact would be

25  numerous ways.  They could make a phone call from the facility,

235

Momyer - Direct                              235

1   the customer facility.  They could come directly to the

2   customer service rep, or they could pass in the interoffice

3   mail a requisition form which would then come to the customer

4   service rep that way.

5   Q   When you say interoffice, we're not talking email or

6   something like that?

7   A   No, piece of paper.  Because in many cases what had to

8   happen was these requisitions would have to go through a level

9   of approval.  Any time you would take a requisition, in most

10  cases you're going to have to get some sign-off from some

11  supervisor along the way saying it's okay to buy this product.

12  Q   So in utilizing this RIMS system, there are number of

13  individuals who may need to be involved in the process

14  including the customer who wants to make the purchase, some

15  sort of intermediate approval, management, CSR, someone to fill

16  the item that's being desired; correct?

17  A   That's correct.  Now, that last step as far as picking the

18  product and delivering the product could be the same person.

19  Very often, it was with a customer service rep --

20  Q   Did Fisher charge its customers for this RIMS value-added

21  service you described?

22  A   It wasn't a for-sell product.  It was really a tool that

23  Fisher used to manage the on-site inventory.

24  Q   Did you ever try to sell this service to your customers?

25  A   No.  I will tell you it did provide some significant value

236

Momyer - Direct                              236

1   to our customers, and that would be in a couple ways.  One is

2   the cost of ownership would be eliminated for the customer, so

3   if it's Fisher-owned inventory sitting there, the customer is

4   not going to have to pay any kind -- any taxes for that

5   inventory sitting around in a crib.  They don't have to pay for

6   it until they used it.  That's one; cost of ownership goes

7   down.

8       Secondly -- and often what would happen would be there

9   would be the ability for the customer to reallocate a person

10  who was taking orders at their site, procurement person, or

11  even reallocating a crib attendant to another job.  These are

12  Fisher personnel, Fisher paid for them.

13  Q   It had some benefits obviously therefor.  Did it have some

14  problems, some issues associated with it?

15  A   Yeah.  There would have been some problems with it.

16  Typically, if we take a look at the requisition itself coming

17  in, there often, if we had to seek approval on a req, it came

18  in from someone and we didn't know if that person had approved

19  req, we --

20  Q   Req?

21  A   Requisition.

22  Q   Okay, thank you.

23  A   We would have to -- very often a req, requisition would

24  come in with a piece of paper saying, give me a test tube, and,

25  of course, there are many types of test tubes.  So what the

237

Momyer - Direct                    237

1   customer service person would have to do is they'd have to
2   discern what particular test tube had been requested.  So
3   either they do that by contacting the requester back, or they
4   would pull the catalog down, take a look at it, try and do some
5   research and contact the requester back.
6   Q   Let me stop you there and ask you this question:  You
7   talked about this customer services representative.  Could the
8   customer actually, the end user, person who wanted the test
9   tube, could they use the RIMS system themselves?
10  A   No.  It was a system that was fairly specific to a
11  customer service or Fisher personnel would use, there was
12  nomenclature on the screen that was unique to Fisher.  There
13  was also some information that were on the screen that we
14  really wouldn't want our customers to see, like costs of the
15  product, so it was a system that we did not choose to expose to
16  our customers.
17  Q   So the end user, the customer, had no capability to use
18  this requisition inventory management system by his or herself?
19  A   No.
20  Q   If, though, a customer or this end user who wanted to
21  obtain product made a request, or however it was, by telephone
22  call or by sending interoffice envelope, what would happen next
23  in this process using the RIMS?
24  A   We got into a little bit of it.  The customer service rep
25  would have to identify what the specific product was and really

238

Momyer - Direct                    238

1   get it down, identification down to a Fisher product number,
2   catalog number.
3       That is the only way that the RIMS system was set up to
4   operate, to identify products.  You needed a Fisher part number
5   to input to start the process going.
6       THE COURT:  So I'm ordering from you, I call and tell
7   you, Mr. Momyer, I'd like to have such-and-such.  You talk to
8   me and tell me -- you are the CSR.  You tell me, well, that's
9   product number, our product such-and-such and such-and-such,
10  and you put it down, and you are using RIMS, I don't have it;
11  is that right?
12      THE WITNESS:  That's correct.
13  Q   You talked about the product number.  Are we talking about
14  Fisher product or other supplier product?
15  A   We're only talking about Fisher products at that time.
16  The RIMS system only dealt with -- primarily dealt with Fisher
17  products and Fisher products that Fisher purchased.
18  Q   And so if I wanted a specific product, did I need to know
19  the Fisher part number in order to be able to look up and find
20  out whether that was either available in inventory at the
21  customer site or perhaps back at some Fisher warehouse?
22  A   Yes.  The starting point for the whole process as far as
23  entering a requisition into the RIMS system was identify who
24  you were, and typically this would have been account number,
25  and then who the customer was, and then identify the product,

239

Momyer - Direct                    239

1   and by the product identification, I think what you could put
2   in was the Fisher product number.
3   Q   Is that what you could enter in as a lookup feature for
4   the RIMS system?
5   A   Yes.
6       THE COURT:  Excuse me, Mr. Robertson.  I think we
7   need to change court reporters here.
8
9       (Recess taken.)

240

1   BY MR. ROBERTSON:
2   Q   I may have lost track.  If the customer called up
3   the CSR and has specific requests and the CSR was
4   unfamiliar with their precise part or part numbers
5   associated with that request, what would that CSR have
6   to do?
7   A   They'd have to do some research on the request.
8   Normally that research would involve accessing the
9   hard copy catalog.
10  Q   So the CSR himself or herself would look through
11  catalog and try and identify whatever product was the
12  customer was receiving; is that right?
13  A   Yeah.  The catalog would be organized in such a
14  way that there would be some access to the taxonomy of
15  the catalog.  So, for example, if it was a beaker.
16  Start looking in glassware.  And there are indexes in
17  the back saying beakers are on page 200 to 250.  And
18  they'd start looking at that.  And they'd start
19  getting some information from that.
20      Probably if it was very unspecific, then they'd
21  get to a certain point and they'd have to contact the
22  requester back again and try to get some additional
23  information.
24  Q   You mentioned this catalog, this paper catalog,
25  that they had thousands or tens of thousands.

241

1   A  Hundreds of thousands.

2   Q  Now, the RIM system on its database, did it

3   contain every part number for every product that

4   Fisher offered?

5   A  The only parts that were in the RIMS inventory

6   database were those parts that the RIMS system was

7   managing in inventory.  Those are the only parts.

8   Q  So if I was a customer and I didn't have in the

9   on-site inventory the Fisher-owned product, and I

10  wanted to obtain a part that wasn't already in that

11  database, could I use the RIMS system or not?

12  A  Yes, you could use the RIMS system.

13  Q  How would I do that?

14  A  The RIMS system had the ability to communicate to

15  the Fisher host for obtaining information on products.

16  When we talked about the first step in entering the

17  req, a time req, in RIMS was to enter the pin number

18  and the Fisher part number.

19     Once that was entered, hit the enter key, there

20  would be a series of business logic that would take

21  place in the system.  It would do a look-up first to

22  see if that product was a product that was local in

23  the inventory.  If it didn't find it there, then it

24  would proceed to connect up to the host.

25     Once again, it's leaving the local system,

242

1   systematically leaving it, and going up and talking to

2   some programs that are on a host, which would do

3   product validation, do some inventory sourcing, and

4   pricing, and return that information back.

5   Q  Let me see if I understand this because you made

6   reference to a few terms.  I just want to make sure

7   we're clear on what they mean.

8     So if at the customer location where the

9   Fisher-owned inventory is and the information, the

10  part number, is not on a database there, the RIMS

11  system had the ability to go back to -- and I think

12  you referred to it as a host or host computer?

13  A  Yes.

14  Q  Was that a mainframe system at Fisher?

15  A  Yes, it was a mainframe system.  When we were

16  talking earlier, it's the same system that our

17  customer service reps would have had.  These customer

18  service centers would have been taking the calls at

19  the call center and entering the orders into --

20  Q  On the host computer, was that Fisher product as

21  well?

22  A  Yes, it was Fisher product only.

23  Q  Well, where --

24  A  It would be Fisher products that Fisher would buy.

25  Q  And that Fisher would sell to its customers as a

243

1   distributor?

2   A  Yes.

3     THE COURT:  Did Fisher make anything?

4     THE WITNESS:  Yes, about a third of the

5   products that it sold it manufactured.

6     THE COURT:  And it bought two-thirds of the

7   other products it sold from other people and kept them

8   in inventory or had some arrangement to get it to

9   them?

10    THE WITNESS:  That's correct.

11  Q  What is this mainframe or host computer you

12  described, sir?

13  A  Well --

14  Q  The one specifically we're talking about used in

15  this RIMS system back in the late '80s and early

16  '90's?

17  A  It would have been an IBM computer running an NBS

18  operating system.  I don't know if that helps or not.

19  Q  Well, but was it able to communicate with a local

20  computer or something located --

21  A  Absolutely.  We talked about it.  There was a

22  dataline between the RIMS computer and this mainframe.

23  And that dataline allowed for the interaction,

24  electronic interaction, between two computers.

25     You basically -- the program would say, I need to

244

1   get information from the mainframe.  And there would

2   be a transaction that would be shipped across the

3   dataline up to the mainframe, which would, for

4   example, say, Validate this product.  We had passed a

5   block of data in this transaction across a dataline,

6   and in that would be the product number.  And then

7   we'd call -- we would initiate the product validation

8   routine, which we'd then say, Here's the product.  Go

9   look it up on the databases that are sitting on the

10  mainframe.

11  Q  If the customer is requesting a product that was

12  available, Fisher product inventory at its site, what

13  would happen in that instance?

14  A  The second step in the process is to source it,

15  and if it was a product that was not local, it was

16  product that was stored within one of the Fisher's

17  warehouses, there would be a request for availability

18  transaction.

19     It would be sent from the RIMS system, which is

20  running local at the customer site over this dataline

21  to the mainframe.  And it would initiate a program

22  which is availability program, which it would say,

23  Here's this product.  Go out and find where that

24  product may be in any one of the Fisher distribution

25  centers which would be across the United States.

249

1  to the host since the host was doing the sourcing of
2  the product.
3      And then from that point on Fisher's procurement
4  would purchase the product for the customer and ship
5  it to the customer site.
6  Q   I'd like to break that down if I could.  There's a
7  lot of information there.  Could the CSR then try and
8  order these non-catalog items using the RIMS system,
9  could he or she do that directly?
10 A   No.
11 Q   You mentioned you'd have to send this order to
12 procurement in order to obtain that.  How is that
13 process done?
14 A   What really happened was that there would be a
15 form that would pop in the RIMS system which would be
16 requesting the customer service rep to fill out some
17 information that would identify that product.
18 Remember, the product was not a Fisher catalog item.
19 So the Fisher part number doesn't work anymore.  So
20 they had to fill out things like here's the vendor.
21 Here's what I think the vendor part number is.  Here's
22 a description of that part.  And some other additional
23 information that would help identify that product to a
24 procurement person at Fisher.
25     So they'd fill that form out and submit it.  And

250

1  by submitting it, it would then move that transaction
2  from the local computer up to the mainframe.  And
3  basically all that would happen at the mainframe would
4  be it would print out at the procurement office a
5  piece of paper saying this customer is requesting you
6  to buy this for them.
7  Q   So this form, it's an electronic form, some
8  information would be entered.  Was there any way to
9  use that form to do some search capabilities for that
10 item?
11 A   No.  All it is is a fill-in-the-blanks form.
12 Q   There would be some effort to make the description
13 as to what the item might be, that would be
14 electronically transmitted to this procurement
15 individual?
16 A   Yes.
17 Q   And then he would make an effort to try and see
18 where they might be able to locate this product; is
19 that right?
20 A   Yes.  In that case, they actually would be doing
21 some sourcing.
22     THE COURT:  Did the next question come to be:
23 Did you need to arrive at a way to do things better?
24 Is that the next question, Mr. Robertson?
25     MR. ROBERTSON:  Yes, sir.

251

1      THE COURT:  And then the next question is:
2  And what did you do to do that?  Is that right?
3  Q   I would like to ask you a few questions about some
4  of the problems that were associated with the RIMS
5  system, just generally a high view, and then what were
6  some of the things you tried to do to solve those
7  problems.
8  A   Okay.  If you'd recall the problems that we were
9  seeing where first of all our customer was soliciting
10 information involving our customer service rep in
11 helping identify products, find a product, source of
12 product, and identify the product.  We were spending a
13 lot of time and effort in that research.
14     So there's a lot of inefficiencies that were in
15 play there, as well as the customer, in some cases,
16 even though the customer service person did their best
17 effort to try and discern what product it was,
18 sometimes they really missed.  It wasn't exactly what
19 the customer wanted.
20     So identifying the product and the entry of the
21 product by the customer service person seemed to be an
22 issue that we needed to resolve.  So we went about
23 that task.  The problem was, we felt, was try and
24 engage our customers to the process of giving them the
25 information in their hands, to allow them to identify

252

1  the product, source of product, and then
2  systematically submit that request.
3  Q   Do you know whether or not Fisher ever applied for
4  a trademark with respect to this RIMS system?
5  A   I believe it did.
6  Q   Let me show you what's been marked as Defendant's
7  Exhibit No. 61.  It's in your notebook there.  And ask
8  you if you have seen this document before?
9  A   Which document is that?
10 Q   It's Defendant's Exhibit No. 61.  It's towards the
11 back.
12 A   I see it.  I've got it.
13 Q   Have you ever seen this document before?
14 A   Yes, I have.
15 Q   Is this a technical document describing the
16 capabilities of the Fisher RIMS system?
17 A   I would consider this a marketing document that we
18 would use to introduce the high level features of the
19 product.
20 Q   Are the specifics of the features of the product
21 that you have been describing and testifying to today,
22 are they set forth in detail in this marketing
23 document?
24 A   Not in detail.
25 Q   Do you know whether this document was used by

253

1  technical people in utilizing the RIMS system you have
2  been discussing?
3  A  No.  No, it would not have been.
4  Q  Do you know whether or not, if you want to just
5  peruse the document, whether it's actually discussing
6  all the features of the RIMS system?  I can direct you
7  to the page that ends 598, for example.
8  A  Some of them features were in the RIMS system.
9  Many of them were put in various releases of the
10  product.  Some of the features were not actually
11  employed.
12  Q  When you say not actually employed, you mean never
13  employed by the RIMS system?
14  A  No.
15  Q  When you say no, you mean that statement I just
16  made was correct?
17  A  That's correct.  The statement you made is
18  correct.  We never did those.  I think we had some
19  aspirations to do them, but we never pulled them off.
20  Q  So could you just give me an example, if you
21  would?
22  A  Under requisition management features, four down,
23  "Allows flexible remote requisitioning by formatted
24  screen," we really never provide for remote
25  requisitioning in the system.

254

1  Q  Anything else?
2  A  The third point down in that requisition
3  management features, that's really kind of a bold
4  statement there.  We did not interface all types of
5  purchases.  We did have some interfaces.  As I can
6  recall we had two interfaces that we developed, but it
7  wasn't all types.  So it was somewhat restrictive.
8     Under "Inventory Control Features," if you take a
9  look at "Utilizes customized bar codes and labels to
10  expedite your receiving process," that feature was
11  talked about but never implemented.
12     And then finally under "System Customization
13  Features," we did utilize some file transfers, but we
14  never got to the point we used EDI.
15  Q  Was the RIMS system then, the RIMS system that
16  Fisher created, and I think I understood you to say
17  went through many iterations, was that ever made
18  publicly available, the technical information?
19  A  No.
20  Q  If I wanted to learn more about the RIMS system in
21  the early '90s, would I have been able to do so?
22  A  If you were an employee of Fisher.
23  Q  Was it maintained proprietary and confidential to
24  Fisher?
25  A  Yes.

255

1  Q  Could anybody obtain copies of the RIMS software
2  in the 1990s?
3  A  No.
4  Q  Did you need a password to get into the RIMS
5  software?
6  A  Yes, you had to log into the system.
7  Q  Were there product manuals associated with the
8  RIMS software?
9  A  There were operating manuals, but they were
10  exclusively for use of the Fisher personnel.
11  Q  Were they maintained proprietary to Fisher and
12  confidential?
13  A  Yes.
14  Q  Could Fisher's customers get copies of those
15  manuals?
16  A  They shouldn't have.
17  Q  Were they identified as being confidential to
18  Fisher?
19  A  Yes.
20     MR. ROBERTSON:  Your Honor, I'm about to get
21  into the electronic sourcing system and problems that
22  were solved.  If I could ask your indulgence, Your
23  Honor, I could seriously use a short biological break.
24     THE COURT:  I think all these people over
25  here have been here for a long time, and they could

256

1  use a break a little longer than that, couldn't you?
2  They have been at it a long time.  And if you're going
3  to start a new area of inquiry, we'll go with that.
4     So, ladies and gentlemen, if you will give
5  your notebooks to Mr. Neal with your names on them so
6  he can return them to you tomorrow, then you can go
7  home and relax.
8     Please don't discuss the case with anyone.
9  If someone wants to know what it's about and you feel
10  like you understand what it's about, you still can't
11  talk to them.  You just blame me and tell them that I
12  said you are not allowed to do that.  And then you'll
13  be free to do whatever you want to do tonight.  And
14  we'll see you at 9:00 o'clock in the morning.
15     Mr. Compher, are you able to get here all
16  right without getting up at 4 a.m.?
17     A JUROR:  Yes.
18     THE COURT:  We'll have some coffee and bagels
19  here for you tomorrow.  Thank you very much for your
20  careful attention.  You're excused.
21     (The jury has exited the courtroom.)
22     THE COURT:  How much longer do you think you
23  have of this witness?
24     MR. ROBERTSON:  About an hour and 15 minutes
25  to an hour and a half, Your Honor.

258

```
1          IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
2                    RICHMOND DIVISION
3      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                        :
4    ePLUS, INC.,                       :
                                        :
5         Plaintiff,     :
                         :  Civil Action
6    v.                  :  No. 3:09CV620
     LAWSON SOFTWARE, INC.,             :
7                        :  January 5, 2011
          Defendant.     :
8      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:
9
10
11       COMPLETE TRANSCRIPT OF JURY TRIAL
         BEFORE THE HONORABLE ROBERT E. PAYNE
12     UNITED STATES DISTRICT JUDGE, AND A JURY
13
14
15   APPEARANCES:
16   Scott L. Robertson, Esq.
     Jennifer A. Albert, Esq.
17   Michael T. Strapp, Esq.
     David M. Young, Esq.
18   GOODWIN PROCTOR
     901 New York Avenue, NW
19   Washington, D.C.  20001
20   Craig T. Merritt, Esq.
     CHRISTIAN & BARTON
21   909 E. Main Street, Suite 1200
     Richmond, VA  23219-3095
22
         Counsel for the plaintiff ePlus
23
24
25       DIANE J. DAFFRON, RPR
         OFFICIAL COURT REPORTER
         UNITED STATES DISTRICT COURT
```

259

```
1    APPEARANCES:  (Continuing)
2    Daniel W. McDonald, Esq.
     Kirstin L. Stoll-DeBell, Esq.
3    William D. Schultz, Esq.
     MERCHANT & GOULD
4    3200 IDS Center
     80 South Eighth Street
5    Minneapolis, MN  55402-2215
6    Dabney J. Carr, IV, Esq.
     TROUTMAN SANDERS
7    Troutman Sanders Building
     1001 Haxall Point
8    P.O. Box 1122
     Richmond, VA  23218-1122
9
         Counsel for the defendant Lawson Software.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

260

```
1        (The proceedings in this matter commenced at
2    9:30 a.m.)
3        THE CLERK:  Civil Action No. 3:09CV00620,
4    ePlus, Incorporated v. Lawson Software, Incorporated.
5    Mr. Scott L. Robertson, Mr. Craig T. Merritt,
6    Ms. Jennifer Albert, Mr. Michael T. Strapp, and
7    Mr. David Young represent the plaintiff.
8        Mr. Daniel W. McDonald, Mr. Dabney J. Carr,
9    IV, Ms. Kirstin Stoll-DeBell, and Mr. William D.
10   Schultz represent the department.
11   Are counsel ready to proceed?
12       MR. ROBERTSON:  Yes, Your Honor.
13       MR. McDONALD:  Yes, Your Honor.
14       THE COURT:  All right.  Good morning, ladies
15   and gentlemen.
16       THE JURY:  Good morning.
17       THE COURT:  All right, Mr. Robertson, you may
18   resume your examination of the witness.
19       MR. ROBERTSON:  Thank you, Your Honor.
20       THE COURT:  And I remind you, sir, you're
21   under the same oath which you took yesterday.
22       THE WITNESS:  Yes, sir.
23   BY MR. ROBERTSON:  (Continuing)
24   Q  MR. Momyer, we spent a good deal of time yesterday
25   discussing this RIMS system which you were named
```

261

```
1    inventor along with Mr. Johnson.  Do you recall that?
2    A  Yes, I do.
3    Q  I'd like to move on now to this electronic
4    sourcing system and method, the inventions that are
5    subject of the patents that are at issue here if we
6    could.  All right?
7    A  Okay.
8    Q  Tab 1 in your witness notebook, I believe it's
9    Plaintiff's Exhibit No. 1, if you could go to column
10   1.
11       THE COURT:  That's also in your small book
12   there if you need to.
13   Q  And tab 2.  Thank you.
14   So we're on column 1 now of the '683 patent,
15   Exhibit No. 1.  Now, suggestion was made yesterday
16   that the Patent Office was unaware of the RIMS patent.
17   Did you disclose the RIMS patent to the Patent Office?
18   A  Yes, I believe so.
19       MR. McDONALD:  Objection, Your Honor.  This
20   is going to the validity issue.  Again, I thought we
21   were going to stick with infringement.
22       THE COURT:  Isn't it?
23       MR. ROBERTSON:  No, Your Honor.
24       THE COURT:  Why does it have to do with
25   infringement?
```

262

1    MR. ROBERTSON:  Because there's going to be
2  discussion as to scope of the claims and how they are
3  to be applied to the accused product.  And one of the
4  embodiments that was raised was this RIMS embodiment,
5  and I want to go and discuss in the claims whether
6  they are limited to that RIMS embodiment or whether
7  they are broader than that RIMS embodiment.  It was
8  raised during the opening statement as to whether RIMS
9  was the essential component of the claims.  So how the
10  claims are to be applied to the accused system depends
11  on how they are to be understood in the specification
12  of the patent itself.
13    THE COURT:  It's in the patent, isn't it?
14    MR. ROBERTSON:  Well, the -- I mean --
15    THE COURT:  What kind of testimony is this?
16  It sounds to me like expert testimony.
17    MR. ROBERTSON:  I just want to ask the
18  witness --
19    THE COURT:  Look, what you want to ask the
20  witness is one thing.  He's objected to the question
21  as invalidity.  Is it or not?
22    MR. ROBERTSON:  It's not, Your Honor.
23    THE COURT:  You heard his argument, Mr.
24  McDonald.  What do you say?
25    MR. McDONALD:  I think he can talk to him

263

1  about RIMS and the difference between RIMS and the
2  claims.  That's fine.  But I don't see what the
3  disclosures to the Patent Office at this point in the
4  trial, why we need to go into that.
5    MR. ROBERTSON:  Let me ask it this way.
6  Q  Was RIMS one of the embodiments that we're
7  disclosed in the patent for requisition and purchasing
8  module?
9  A  Yes.
10  Q  Do you know whether or not in your review of the
11  specification --
12    THE COURT:  Wait a minute.  Are you saying
13  was RIMS disclosed as an embodiment of the patent, of
14  the invention?  Is that what your question was?
15    MR. ROBERTSON:  No.  I'm saying, Your
16  Honor --
17    THE COURT:  If that's the case, then this
18  case -- we don't have a case, do we?
19    MR. ROBERTSON:  No, Your Honor.
20    THE COURT:  Then ask the question a different
21  way.
22    BY MR. ROBERTSON:
23  Q  Was RIMS identified as one of a requisition
24  purchasing system that could be used as part of an
25  embodiment of the invention that you Mr. Kinross,

264

1  Mr. Johnson, and Mr. Melly invented?
2  A  Yes.
3  Q  Did you identify in the patent whether or not
4  there were some problems associated with the RIMS
5  requisition and purchasing system for use in the
6  patent?
7  A  Yes, we did identify several.
8  Q  Let me direct you, if I can, to the bottom of
9  column 1.  First, before I do that, at the top of
10  column 1, starting at about line 10 through line 16,
11  could we just -- is this the RIMS patent that we have
12  identified that you're one of the inventors, the '989?
13  A  That wording is pulled out of '683, yes.  '989 is
14  the RIMS patent.
15  Q  So it's saying here that there were a number of
16  known requisition and purchasing systems, is that
17  right, including this Fisher RIMS system?
18  A  Yes.
19  Q  Now, if you will look down at the bottom of column
20  1 starting at about line 60, going over to column 2
21  around line 2, what are you representing there to the
22  Patent Office with respect to these requisition and
23  purchasing systems which include the Fisher RIMS
24  system?
25  A  It identifies that there's some shortcomings to

265

1  the requisition purchasing systems, including RIMS,
2  for the ability to have a catalog be able to search
3  multiple catalogs and then move that information into
4  the requisition purchasing system.
5  Q  Are there any other problems that have been
6  identified with these requisition and purchasing
7  systems including RIMS in this section of the patent?
8  A  Yes.  As you look down column 2, maybe line 10,
9  computer systems for searching vendor catalogs are
10  limited, and only one such vendor catalog is
11  accessible to the user at any given time.  They were
12  also limited in they can only create a particular
13  vendor catalog database.
14  Q  You have to go a little slower, Mr. Momyer.
15  A  Sorry.  They were also limited in that they can
16  only create an order within the particular vendor
17  catalog database.  They cannot source items to be
18  requisitioned from a database containing multiple
19  catalogs or interact with the requisition purchasing
20  system or create a purchase order or orders including
21  the items located from the sourcing operation.
22  Q  Now, you discussed this RIMS system throughout out
23  the patent.  Let me ask you to go to column 4 at the
24  top.  Did you indicate to the Patent Office that this
25  RIMS system was necessary to your electronic sourcing

266

1    patent?
2    A  I think it's preferably but not necessarily in the
3    Fisher RIMS system is what it says in column 4.
4    Q  There's also a discussion here about a Technical
5    Viewer 2 Search Program called TV/2.  Do you see that
6    as well?
7    A  Yes.
8    Q  Are you familiar with that program?
9    A  Yes.
10   Q  It indicates in your patent that that was a
11   program that was available from IBM?
12   A  That's correct.
13   Q  Does it indicate that that program was necessary
14   to your invention?
15   A  The wording says preferably but not necessarily in
16   the Technical Viewer 2 Search Program.
17   Q  Let me direct you if I could to column 6 of the
18   patent beginning at about line 34 going down to about
19   line 39.
20   A  Column 6?
21   Q  Yes, sir.
22   A  Line 44?
23   Q  34.
24   A  34.  Okay.
25   Q  You state here the following description

267

1    illustrates the use of the Fisher RIMS as a
2    requisition purchasing system and the TV/2 search
3    program as a search program; however, it will be
4    understood that the present invention is not limited
5    to such system or program.  Do you see that?
6    A  Yes, I do.
7    Q  Is that consistent with your understanding as to
8    what you disclosed in your patent?
9    A  Yes.
10   Q  Well, so you used the Fisher RIMS system to
11   describe certain features of functionality in your
12   patent.  Was it necessary to your patent to use the
13   Fisher RIMS system?
14   A  No, it was not.
15   Q  You also use the TV/2 search program to describe
16   certain capabilities and functionalities in your
17   patent.  Was it necessary for your patent, for your
18   electronic sourcing patent?
19   A  No, it was not.
20   Q  Can I just -- I put a juror notebook over on your
21   witness stand that the jury has, and in it starting at
22   tab 2 are the three patents that are at issue here.
23   And you'll see there are yellow tabs where the claims
24   appear.  And I'd like you to just briefly take a
25   moment to go through any of those claims and tell us

268

1    if any of those claims recite --
2    A  Excuse me?
3    Q  I'd like you to go through the yellow claims that
4    are tabbed in this notebook.  There are 12 of them.
5    You could quickly do it or if you know it from memory,
6    perhaps you could just tell us.  Do you know if within
7    any of those claims that the inventors, yourself,
8    specifically claimed TV/2 as a search program for
9    searching the catalogs or the RIMS requisition and
10   purchasing order system as constituting the means for
11   building requisitions and means for generating
12   purchase orders?
13   A  I'll look at the -- actually look at it.  I don't
14   trust my memory on that.
15        THE COURT:  You can take a look at it for a
16   minute.
17        While he's doing that are, ladies and
18   gentlemen, if you'll look at, just take PX1 as an
19   example, and turn to the first yellow tab.  That
20   begins a description of what are called claims.  Now,
21   if you'll look back one page, that's column 24, near
22   the bottom, the lines are numbered in the middle, and
23   you've got line 60 there.  Do you see that?  And right
24   above that it says, "We claim."  Do you see that?  The
25   "we claim" is where this case is all focused.  This is

269

1    what is claimed to be the things that follow.  We
2    claim are the things that are claimed to be the
3    inventions.  The things that the Patent Office put the
4    boundaries around by agreeing to these elements in
5    these claims and by saying they are patentable.
6        So I just want you to know that even though
7    you start on column 25 with paragraph 3 where Claim
8    Three is highlighted, it all starts before that have
9    where it states "We claim."
10        So you read "We claim:  (1)  An electronic
11   sourcing system comprising," etc.  Well, that's not at
12   issue in this case.  So then you go to, "We claim" and
13   then read 3.  What do we claim?  "We claim an
14   electronic sourcing system comprising," and then all
15   of those elements follow.  And then when you get to
16   Claim 26 down at the bottom right-hand corner of that
17   page, it's, "We claim a method comprising the steps
18   of" and you do that every time you go to another
19   numbered claim, such as those that were issue 28.  And
20   that's all on this patent, isn't it, Mr. Robertson?
21        MR. ROBERTSON:  Yes, sir.
22        THE COURT:  Okay.  And then you follow the
23   same methodology in any patent.  Pardon me.  You can
24   go ahead now.
25        Have you read the patents?

282

1     disclosure, for all three patents is substantially
2     similar or almost identical.  I'm willing to stipulate
3     that that's way case.  If you want to just take a
4     minutes to confirm that for yourself, I'm happy to do
5     it.
6          Is that your understanding as well?
7     A  Yes.
8     Q  So just generally now disclosing this
9     cross-references capability, can you tell us what that
10    was with regard to your invention?
11    A  Well, if you would select a product, the system
12    would have the ability to provide for a matching item
13    and allow the end user requisitioner to make a
14    decision to resource product based upon the
15    cross-referencing that appeared.  It's a like item,
16    it's a similar product, you have the opportunity to go
17    out and resource this.
18         THE COURT:  So you could get Band-Aids, for
19    example, if you wanted to buy Band-Aids, and you go to
20    vendor A, which is Johnson & Johnson, and vendor C,
21    which is CVS, and D, which is Rite-Aid, you can
22    display the same kind of Band-Aid.  And then you can
23    compare the price and say, Well, I want the one from
24    Johnson & Johnson because even though Rite-Aid is
25    cheaper, there are more of them in a package, or for

283

1     whatever reason?
2          THE WITNESS:  That's correct.
3          THE COURT:  The cross-reference feature is
4     what allows you to make that comparison?
5          THE WITNESS:  That's correct.
6          THE COURT:  All right.
7     BY MR. ROBERTSON:
8     Q  Was that capability considered to be a valuable
9     attribute?
10    A  I think it was an important part of comparison
11    shopping, that you need that.
12    Q  You mentioned this team was working on this in the
13    '93-'94 time period.  Can you tell me how often did
14    you meet during that time?
15    A  Well, myself and Jim Johnson and Bob Kinross would
16    have met daily, if not hourly.  My office was next to
17    theirs and we were constantly discussing the
18    development.
19    Q  Do you know how much of the team members' time
20    during this period was devoted to this project?
21    A  Jim Johnson and Bob Kinross' were pretty much
22    100 percent of their time was devoted to that.  Mine,
23    I did have some other responsibility.  So I had a
24    little bit less.  Maybe 75 percent.
25    Q  So starting now with -- you have arrived at these

284

1     concepts that you want to include in this electronic
2     sourcing system invention.  Can you tell the jury some
3     of the steps that you went through to develop the
4     invention?  I'd just like you to start at a level, if
5     you could, of the design because I don't want to get
6     into the specifics of the modification, for example,
7     of TV/2 or RIMS, which will be for Mr. Johnson to talk
8     about.
9     A  Okay.  The development would have followed the
10    normal path as many software development projects.
11    There was a gathering of requirements and stating
12    those requirements.  And then following the
13    requirements, a development of a specification as to
14    how things should work at a high level and then more
15    detailed level designs as far as individual programs
16    and how they should work.
17    Q  What is this requirements?  Is it a document?
18    A  Yes.
19    Q  Can you just briefly describe it for us?  What's
20    the nature of this requirements document?
21    A  It defines the problem and it defines the approach
22    to solving the problem.
23    Q  Then you mentioned the design specifications.  Is
24    that where you get into the drill down --
25    A  Yes.  You take the results of the requirements

285

1     saying this is what you need to do, and then you would
2     apply a more technical level as far as how you would
3     go about doing it programmatically.
4     Q  Did the team encounter any difficulties along the
5     way in the development of these inventions?
6     A  Yes.
7     Q  Can you tell us what some of those were?
8     A  Well, on the Technical Viewer side, we encountered
9     quite a few problems as far as the performance, and it
10    had to deal with some redesign of how we were going
11    about some things.
12         There were some missing requirements that we had
13    to put in place.  I think we encountered some issues
14    as far as how we were going about interfacing between
15    the requisition management piece and the electronic --
16    the sourcing program.  There were issues on dealing
17    with that.
18         And I think just on how we would connect and
19    communicate out to the various suppliers was also kind
20    of a challenge as to the approach we would take to do
21    that, as well as how we would handle the unbundling of
22    the requisition creating multiple P.O.s and keeping
23    track of those multiple P.O.s and then tying that back
24    to the requisition.  There were a lot of issues that
25    we even encountered.

286

1    Q  You mentioned this TV/2 program that you
2    identified in your patent as being available from IBM.
3    At some point did you have to hire an outside
4    subcontractor to work with you with respect to that
5    TV/2 program?
6    A  Yes.
7    Q  We're going to get into that in a minute, but was
8    that outside subcontractor IBM?
9    A  Yes, it was.
10   Q  Did you give IBM the requirements for your
11   electronic sourcing system?
12   A  Yes.
13   Q  Let me direct you, if I could, to figure 1B in the
14   patent. This is the '683 patent I'll use, but it's
15   the same figure in all three patents.
16       THE COURT:  What figure?
17       MR. ROBERTSON:  1B, Your Honor.
18   BY MR. ROBERTSON:
19   Q  Do you recognize this figure from your patent,
20   sir?
21   A  Yes.
22   Q  What is this attempting to illustrate?
23   A  This is the high level diagram.  It would reflect
24   a representation of a client's server, a
25   representation of our system, our architectural

287

1    system.
2    Q  When you say "client's server," are you talking
3    about some kind of networked embodiment?
4    A  Yes.
5    Q  Can you explain what you mean by "client server"
6    then more specifically for the jury?
7    A  Sure.  A client server fairly simply is that parts
8    of the system will run on two different processors, at
9    least two different processors.  In this case, the
10   local computer as well as the server.  And the
11   interaction between the client and server is kind of
12   what makes up the system.
13   Q  So you mentioned the local computer, which is
14   identified here with a number 220.  Do you see that?
15   A  Yes.
16   Q  You have identified the server, which is
17   identified here as 200.  Do you see that?
18   A  Yes.
19   Q  And there's also a host computer, 210?
20   A  Yes.
21   Q  Can you tell us the difference between these local
22   computers, the host computers, and the server in
23   context of your invention?
24   A  Well, the host computer would be the computer that
25   would be at the suppliers/distributors site, and it's

288

1    where we would be getting information whenever we
2    would source the product.
3        We would go there to get the price of a product as
4    well as its availability and would also ultimately
5    turn around an submit an order whenever the
6    requisition had turned into an approved requisition to
7    become a P.O.
8    Q  And the host computer?
9    A  We would pass information to the host computer to
10   build the order.  Basically, the local computer in
11   this case would be passing a sales order to the host
12   computer, which would turn that into a purchase order.
13   Q  So you have described in general terms some of the
14   functionality that you needed for this electronic
15   sourcing system invention?
16   A  Yes.
17   Q  I sort of wanted to go to, using this figure,
18   whichever box controls certain functionality that you
19   described.  Can we do that?
20   A  Sure.
21   Q  Let me just specifically ask you which box
22   controls or which is supposed to --
23       THE COURT:  Mr. Robertson, you asked him to
24   define something that he didn't define.  Explain the
25   rest of what you were talking about.  You got off the

289

1    track.  Where is the local computer?
2        THE WITNESS:  The local computer would be the
3    computer in this case that is running the components
4    off to the left, the shell, the graphical user
5    interface, and the requisition purchasing program.
6        THE COURT:  Is that usually in the buyer's
7    facility?  Is it a buyer's computer?  Is it your
8    company's computer?
9        THE WITNESS:  No.
10       THE COURT:  You stated the host computer was
11   the suppliers.
12       THE WITNESS:  Yes.  This would be the
13   customer's, the customer using this.  It could be the
14   customer's purchasing department, but it could be a
15   researcher at the customer's facility as well.
16       THE COURT:  But it's not in your facility,
17   and it's not at the distributor's.  The server is
18   where?
19       THE WITNESS:  The server is the local, it's
20   the customer.
21       THE COURT:  So the server is the customer?
22       THE WITNESS:  Yes.
23   BY MR. ROBERTSON:
24   Q  Does the server have access to catalog databases?
25   A  Yes.  If we take a look, that's where the catalog

290

1  database is actually stored.

2  Q  There's a box here identified as a graphical user

3  interface, 254.  What is that, sir?

4  A  The user interface being, of course, what an

5  individual -- how they would interact with the

6  application.  And graphical being it has both text and

7  images on it.

8     So today we think of the normal application at a

9  Web environment.  When you bring up a program, what

10  you see and what you're interacting with would be a

11  graphical user interface.

12  Q  Can you give us an example of one currently

13  available that illustrates your point?

14  A  Google.  You go to Google and bring up the initial

15  search screen on Google, that would be user interface.

16      THE COURT:  The screen on Google that says

17  "famous football players of 1902," where you type that

18  in, and then you hit search.  You're saying the user

19  interface is the page that presents that?

20      THE WITNESS:  That's correct.  And the

21  initial screen.  When you bring up Google, that is the

22  user interface.  So when you enter the search

23  information, you're entering that search information

24  into a user interface.  The results you get back is

25  also a graphical user interface.  So it's really

291

1  what's displayed out to the user and what they

2  interact with.

3  Q  What is box 252, shell?

4  A  The shell program is -- it's an application that

5  allows the system to direct the search program and

6  kind of give it directions on what to do.  It's an

7  API, application program interface, into the search

8  program.  So it instructs the search program what

9  catalogs that you're searching.  It will control the

10  hit list that comes back as far as what you selected,

11  and actually ultimately will control what's been

12  selected and move off into a list of items that's

13  selected that get passed to the requisition.

14  Q  Who had responsibility for creating that

15  functionality on your team?

16  A  It was Bob Kinross' area.

17  Q  I'll let Mr. Kinross describe what we need to do

18  there.

19     Which box in this figure 1B controls the ability

20  to search the multiple catalogs?

21  A  Actually, the graphical user interface would talk

22  to the shell, and the shell program would instruct the

23  search program on what to do.

24  Q  And where is the search program identified?

25  A  That's right on the server side.

292

1  Q  What box?

2  A  200.

3  Q  The search program?

4  A  Yes.  250 is the search program.  I'm sorry.  I

5  thought you said what box was it on.

6  Q  Why do you need all four of these functionalities

7  in order to search multiple catalogs?

8  A  Well, the search program in and of itself doesn't

9  really do what we needed to do.  And that's one reason

10  why we needed to develop a shell to control the search

11  program to fulfill the requirements that we needed for

12  searching.

13  Q  Is there a box identified in this figure 1B that

14  illustrates how you have the ability to determine

15  whether an item that you were selecting was available

16  in the vendor's inventory?

17  A  It would be on the 260, work in process

18  requisition.

19  Q  Did the host computer have the ability to provide

20  information with respect to vendor availability?

21  A  Yeah, you would start with a work in progress

22  requisition, go to requisition purchasing program,

23  back up to the host program.  The flow would be work

24  in process, requisition, past the requisition

25  purchasing program and say, Here's a list of programs.

293

1  The sourcing of the item would occur in 240 and

2  communicate up to the host, 210.

3  Q  If we could just for a moment remove all the color

4  from figure 1B.  And I'd like you to tell us in the

5  development of your electronic sourcing system

6  inventions, which of these boxes had to be created or

7  modified from the existing RIMS system or the TV/2

8  program?

9  A  Okay.  The shell program actually had to be

10  developed.  We had to make some modifications to that.

11  We had no graphical user interface at all for any of

12  the RIMS system or started off as kind of a base code

13  for that.  There was no work in process, obviously,

14  since we weren't pulling anything from a catalog.

15      There were pretty substantial changes to the

16  requisition and purchasing program.  I'm talking about

17  the whole work flow, in that place, as well as

18  handling the multi line, multi P.O. requisition.

19      There would have been changes to the search

20  program.  We had to make a catalog database.  There

21  were changes that were made to that as well.  And

22  complete requisitions would have been different and

23  change would have had to have been made to that.

24      The other area I think we probably should -- the

25  communication between the local computer and the host

294

1  computer would have been changed as well to allow us
2  to talk to the host, and the format to which we talked
3  to the host would have changed.
4  Q  As far as your invention, you wouldn't need to
5  reinvent what a keyboard was for a computer, did you?
6  A  No.
7  Q  You didn't need to reinvent what a printer was for
8  your invention, correct?
9  A  That's correct.
10  Q  You could use those tools as part of your overall
11  invention, correct?
12  A  That's correct.
13  Q  You didn't need to reinvent the computer in order
14  to do your invention, correct?
15  A  That is correct.
16  Q  Let me direct you, if I could, to figure 1A, which
17  is another embodiment disclosed in the patent.  Are
18  you familiar with this figure?
19  A  Yes.
20  Q  You talked before about this networked environment
21  in figure 1B.  What is being illustrated in figure 1A?
22  A  This is where actually all of the system is
23  running on, well, two levels.  One is at the local
24  computer level.  And the other is at the host level.
25  Q  I'm sorry.  I didn't hear what you said.

295

1  A  The local and host level.
2  Q  Okay.  Now --
3     THE COURT:  I don't know that anybody really
4  understood what was being said there.  Perhaps you two
5  because you know so much about this.
6     Start over again.
7     MR. ROBERTSON:  Sure.
8  Q  Can you explain how this is a different
9  environment -- let me just finish the question so it's
10  not garbled on the record.  How it's a different
11  environment from the environment that is depicted in
12  networked environment in figure 1B?
13  A  Sure.  If we could go back to 1B real quick and
14  take a look.  There are three pieces here within this
15  architecture.  There's a local computer, which in this
16  environment housed the programs, the requisition
17  purchasing program, the shell program, the overall
18  user interface.  And the server side, which composed
19  the search program, the databases, both the
20  requisition databases, a complete requisition of the
21  catalog base, as well as the host computer.  So there
22  are really three pieces to that.
23     And if we go to 1A, we've eliminated the server
24  piece of that.  So the databases, the application or
25  requisition application, and the shell, and the search

296

1  program actually exist on one processor, one machine.
2  And that's in the local computer.  And it talks to the
3  host computer.
4     So we've taken out the server.  Basically, it's no
5  longer a client server.  It's now a two-tier
6  architecture.
7  Q  When you say you have taken out the server, is
8  this software operating on that local computer?
9  A  Yes.
10  Q  It still can be connected to a host computer and
11  host databases, correct?
12  A  That's correct.
13  Q  What are they again?  Can you refresh us on that?
14  A  The host computer would be in, in our system, would
15  be the supplier or distributor's computer.  That's the
16  one we're asking for price availability and order
17  placement.
18  Q  In this embodiment, this configuration, can you
19  tell us what functionality needed to be modified or
20  revised or reprogrammed or invented from scratch?
21  A  Sure.  Let's first go to the top of the databases
22  themselves.  And this is really based upon using the
23  RIMS system as the starting point for the development.
24  Q  Let me just stop you there.  There is a number 40
25  there that says RIMS with two arrows pointing there.

297

1  Do you see that?
2  A  Yes.
3  Q  Now, when you discuss what needed to be modified,
4  I'd like to you do it in context of whether or not the
5  RIMS 40 that's described there needed to be modified
6  revised reprogrammed or changed in any way?
7  A  All right.  Let's start at the top.  42A42B42C the
8  databases.  Requisition database would have had to
9  have changed because we have to start carrying the
10  vendor, the vendor information.  In the RIMS system,
11  we only had a single vendor, and that was Fisher.
12     In the inventory databases, that really included
13  inventory as well as the product information.  The
14  part master would have changed there as well.
15     Customer specific databases would not have
16  changed.  Do I need to explain what that is?
17  Q  Yes.  Why don't you identify what kind of
18  information is in that database.
19  A  That information would allow us to kind of tailor
20  the input of a customer.  If they want to start
21  capturing information on the requisition, for example,
22  if they wanted to capture their reqs. by a department
23  number, accounting code, that would allow us to
24  customize their input to allow them to enter that
25  information.  We do validation against that.  So it's

298

1    the customer specific data.
2        So on the top level, the databases --
3    Q   Let me just top you there.  Was that a service
4    that you just provided that would assist the customers
5    in how they did their own process work flow?
6    A   Yes.
7    Q   Is that part of any of the claims you have seen in
8    your invention?
9    A   No.
10   Q   All right.  Thank you.
11   A   No.
12   Q   You can go forward.
13   A   On the bottom level, 44C, requisition maintenance
14   would also change since we were adding the multiple
15   lines to it.  The ability to add vendor information.
16   We have that whole work flow we talked about is being
17   put in place.  And the process of dealing with the
18   multiple P.O.s from multiple requisition lines to
19   generate multiple P.O.s, there would have been a
20   change there.
21       Inventory sourcing would have changed because it
22   would have -- now we're talking to multiple vendors
23   and sourcing out to them.  So that communication would
24   have changed, as well as the content.  The change
25   itself would change.

299

1        Req. order are all part of the requisition
2    process.  That would have changed as well.  Customer
3    variable data, that ties back to that customer
4    specific database.  That's the information that's
5    pulled out from there.  That is the changes for the
6    RIMS system.
7        And within the search area, obviously, we talked
8    about it previously.  The shell program would change.
9    There's a lot of information.  I think Mr. Kinross
10   will probably go into the details of what's changed
11   there.  And the catalog database would have changed as
12   well.  And I think we'll go into details there in the
13   Technical Viewer.  Actually, some things changed there
14   as well.
15   Q   And Mr. Kinross can address that?
16   A   Yeah.  Do you want me to get into that?
17   Q   Not at that level, no.  Thank you, sir.
18       Now, with respect to this TV/2 from IBM, how did
19   Fisher-Scientific and your group get introduced to
20   IBM?
21   A   Well, IBM was a strong partner of Fisher.  We had
22   done business with IBM for a long period of time,
23   purchasing their hardware and software.  Fisher was a
24   large enough installation to have an on-site account
25   rep who was on site several times a week.

300

1    Q   Did IBM provide some business software solutions
2    that were used by Fisher-Scientific?
3    A   Well, yes.  Actually, they provided some internal
4    software.  Obviously, we bought their hardware, but
5    their operating system.  Transaction processor was
6    called CICS.  We purchased off of them.  The database
7    management system, DB2, we purchased off of them.  I
8    think we were running some of their inventory
9    warehousing system.
10   Q   When you were trying to identify some sort of
11   search capability or search program or document viewer
12   for your electronic sourcing system, did somebody on
13   your team conduct any investigation to see what might
14   be available out there?
15   A   Bob Kinross was given the responsibility for
16   identifying possible search program candidates.
17   Q   Do you know whether he identified more than just
18   TV/2?
19   A   He did.  He had several programs that he had
20   identified.
21   Q   At some point in time the decision came to meet
22   with people at IBM concerning this TV/2; is that
23   right?
24   A   Let me explain one of the reasons that we would
25   have selected TV/2.  It was kind of a criteria.  A

301

1    couple of things that are important.
2        One, the operating environment that we were
3    running at that time was -- it was an OS/2 operating
4    environment.
5    Q   It was a what?
6    A   It was an OS/2 operating environment.
7    Q   OS stands for operating system?
8    A   Yes.
9    Q   Was that an IBM product?
10   A   It was an IBM product.  And TV/2 was built to work
11   within that operating environment.  The second thing,
12   and probably the most important, was that of all the
13   search programs that Bob had done investigation on,
14   the Technical Viewer product was the one that would
15   allow changes to the modifications.  You can customize
16   it.  Most of the other versions were kind of out of
17   the box.  It is what you get.  What you get is what
18   you see.  And you didn't have any ability to change
19   it.
20       We needed to customize it because we wanted to
21   provide interface into this new procurement system we
22   were developing.
23   Q   There came a time when you met with people at IBM
24   with respect to this TV/2 program?
25   A   Yes.

306

1    Q  Have you looked for that requirements document?

2    A  Yes, I have.

3    Q  Have you been able to find it?

4    A  No.

5    Q  Were you able to take documents with you when you

6    left Fisher-Scientific?

7    A  No, I was not.

8    Q  But at some point in time you entered into an

9    agreement with IBM for this electronic catalog

10   project; is that correct?

11   A  Yes.

12   Q  Can you take a look at Plaintiff's Exhibit No. 25

13   that's in your book?  Do you recognize that document?

14   A  Yes.

15   Q  What is it?

16   A  That is a statement of work.

17   Q  What's a statement of work?

18   A  A statement of work is a narrative as to what is

19   involved in carrying out the instructions that would

20   have been interpreted from the requirements document.

21        THE COURT:  It's a statement of work that IBM

22   was supposed to do?

23        THE WITNESS:  That's correct.

24   Q  Did IBM work with Fisher personnel in

25   accomplishing the tasks that are set forth in the

307

1    statement of work?

2    A  Absolutely.

3    Q  It's dated March 16, 1994.  Do you see that?

4    A  Yes.

5    Q  Is that sort of consistent with your understanding

6    about the time period this project got underway?

7    A  Yes.

8    Q  Why don't you take a look at the second to the

9    last page.  And you see there's a -- let me just for

10   the record say it's page 21 of 22 in this document.

11        THE COURT:  Mine only has 19.  What's the

12   last page?

13        MR. ROBERTSON:  The last page of the

14   document --

15        THE COURT:  What's the Bates number?

16        MR. ROBERTSON:  It ends with 305, Your Honor.

17        THE COURT:  Well, I do have a 305.  And then

18   I have a 306.  But there's no page -- yes, there's

19   page 21 of 22, but that looks like it's an exhibit

20   page, not a page of the document.

21        Anyway, it's the page that ends 305.  Have

22   you got that, sir?

23        THE WITNESS:  Yes.

24   BY MR. ROBERTSON:

25   Q  Was this statement of work executed by

308

1    Fisher-Scientific and IBM?

2    A  Yes.

3    Q  Does it indicate how much money Fisher-Scientific

4    was going to be charged?

5    A  Yes, it does.

6    Q  How much is that?

7    A  $620,000.

8    Q  If you will take a look at the page that ends with

9    the Bates No. 287.

10        THE COURT:  The third page of the whole

11   exhibit?

12        MR. ROBERTSON:  Yes, sir.

13   A  Okay.

14   Q  Under "project scope," do you see the No. 1

15   development of a pilot and comprehensive electronic

16   sourcing catalog using IBM Technical Viewer/2, TV/2;

17   do you see that?

18   A  Yes.

19   Q  There are certain exceptions that are noted there.

20   Do you see that?

21   A  Yes, I do.

22   Q  One is for subset searches.  Do you see that?

23   A  Yes.

24   Q  Where does it indicate whether TV/2 has that

25   ability or doesn't have that ability at the time of

309

1    this document?

2    A  It says it's not currently available.

3    Q  Were subset searches a necessary aspect of the

4    electronic sourcing system invention you had?

5    A  Yes.  Does everyone know what a subset search is?

6        THE COURT:  I don't think anybody does.

7    Q  Can you explain what a subset search is?

8        THE COURT:  I mean, the jury or me.  I'm sure

9    you-all know.  Tell us what it is.

10   A  It's the ability to refine a search.  So you do an

11   initial search.  You get a list back that you have

12   found.  It's quite long.  And you want to go in and

13   refine it.  So, for example, in a laboratory supply

14   example, you might say, Give me all the beakers, and

15   you get a thousand beakers back.  And now you want to

16   refine that list, and you say, Well, give me all the

17   150 milliter beakers.  And then that will go through

18   that subset that was returned and do a search against

19   that.

20   Q  Is that an important aspect of --

21   A  I think it's critical --

22   Q  Let me just finish the question.  Was that an

23   important aspect of your invention?

24   A  Yes.

25   Q  And it says here that one of the exceptions TV/2

310

1  can't do is Boolean logic services.  They are not
2  currently available in current releases of TV/2; do
3  you see that?
4     A  Yes.
5     Q  What's a Boolean logic search?
6     A  It's and/or logic.  So if you want to combine your
7  search criteria, you can say, an example we gave, Give
8  me search for beakers and 150 milliter, and that would
9  then take those two and combine them together, and
10  you'd get a more refined search.  Or, or would be,
11  Give me everything that says beaker and everything
12  that has 150 milliter.  So it includes everything.
13    Q  Would that be a helpful attribute for electronic
14  sourcing system?
15    A  I think it seems pretty obvious it would be.
16    Q  Let me ask you to go to the page that ends with
17  the Bates label, and I'm looking at the EPS label
18  there.
19        THE COURT:  What are you saying?
20        MR. ROBERTSON:  I'm trying to get on the
21  right page of the hymnal, Your Honor.
22        THE COURT:  Why don't you get there and then
23  tell us where you are.  Don't tell us how you get
24  there, which is a bad habit that I have.
25        MR. ROBERTSON:  Okay.

311

1  BY MR. ROBERTSON:
2     Q  Why don't you go to the page that ends with the
3  Bates label 5092292, the lower right-hand side.  Do
4  you see that?
5        THE COURT:  Revised 3-8-94 at the top,
6  Mr. Robertson?
7        MR. ROBERTSON:  Yes, sir.
8     A  Got it.
9     Q  Now, I want to focus on deliverable materials.  Do
10  you see that?
11    A  Yes.
12    Q  It says under topic 1.5, The following items will
13  be delivered to Fisher on your statement of work.  Do
14  you see that?
15        THE COURT:  Wait a minute.  The page on the
16  screen isn't the same that you're talking about.
17  There you go.
18    A  Yeah, I see that.
19    Q  Okay.  Now, there's a 1.5.1 type 1 materials.  Do
20  you see that?
21    A  Yes.
22    Q  And none are being delivered to Fisher-Scientific;
23  do you see that?
24    A  Yes.
25    Q  Now, there's a heading 1.5.2, type 1A materials;

312

1  do you see that?
2     A  Yes.
3     Q  And underneath that is listed three bullet points.
4  Could you just read those for the jury, please?
5     A  "Electronic sourcing demonstration program.
6  Electronic sourcing pilot program.  Electronic
7  sourcing comprehensive program."
8     Q  And turn to the next page at the top.  First
9  paragraph states, Type 1A materials are those created
10  during the project as derivative works of databases
11  owned by Fisher including ownership of copyright.  IBM
12  will deliver one copy of these materials to Fisher and
13  Fisher shall own the materials including ownership of
14  copyright in the derivative work."  Do you see that?
15    A  Yes.
16    Q  Who had ownership then of the type 1A materials
17  under the statement of work?
18    A  Looks to be Fisher.
19    Q  Is that your understanding?
20    A  Yes.
21    Q  The third paragraph in this statement of work
22  begins, "For a period of two years," do you see that?
23    A  Yes, I do.
24    Q  Just read it for the record.  It says, "For a
25  period of two years following the earlier of (A)

313

1  completion of this statement of work, or (B)
2  September 30, 1996, IBM will not assign the following
3  employees:  Harry Alexander, Jim Gomola, Pam Jenkins
4  and Al Rolland to provide electronic catalog
5  application development services to the following
6  organizations," and I'll stop there.  Do you see that?
7     A  Yes.
8     Q  What did you understand this restriction to
9  entail?
10    A  That those employees of IBM couldn't work on any
11  electronic catalog project.
12    Q  And they identify Baxter Health Care, Curtin
13  Matheson or VWR Scientific.  Do you see that?
14    A  Yes.
15    Q  Who were they?
16    A  They would have been competitors of Fisher at that
17  time.
18    Q  It goes on to say nor were these individuals
19  communicate during that period the key features of the
20  overall design of type 1A materials to any of those
21  three firms or to persons performing electronic
22  catalog application development services for any of
23  those three firms; do you see that?
24    A  Yes.
25    Q  Why did Fisher-Scientific want that provision in

330

1  because you can't have any testimony about -- in a patent case
2  that somehow doesn't relate to the invention in a general
3  sense. That's not the focus. There needs to be a focus that's
4  much more tailored here.
5      I think that the objection is well taken as to the
6  cross-examination because he didn't get into that, but you can
7  call him back and put him on in your case and ask him anything
8  you want to ask him about this. You can establish it, and I'll
9  give you all a chance to brief if they object. They know it's
10  coming in. They can file a brief, and I can look at it, but I
11  don't think -- his direct examination wasn't such that it
12  animates or opens the door to the issue that you're getting to.
13  All right. Are we we're ready for the jury now?
14
15          (Jury in.)
16
17      THE COURT: Go get the witness, please. Thank you,
18  ladies and gentlemen. Sorry to inconvenience you. The
19  objection is sustained. Go ahead.
20      MR. McDONALD: Thank you, Your Honor.
21  Q  Mr. Momyer, with respect to the application that led to
22  all three patents in this suit, you did sign an oath saying
23  that you had reviewed that application and understood it;
24  correct?
25  A  That's correct.

331

1  Q  And you said specifically that you had read and understood
2  the claims; correct?
3  A  Yes, I did.
4  Q  So I'd like to talk about what you say you created and
5  what your understanding is as to what was the system that's
6  described in these patents. Now, isn't it true that these
7  three patents, these all relate to electronic sourcing; right?
8  A  That's correct.
9  Q  And they are all essentially a requisition and purchasing
10  system that, for example, can be the RIMS system set up to
11  communicate with a catalog database and search engine such as
12  the IBM Technical Viewer 2 product?
13  A  I think we have to qualify that. In the examples given
14  would be the RIMS system after significant modification and the
15  TV/2 system application after modification.
16  Q  Do you recall giving a deposition in this case in December
17  of 2009?
18  A  Yes, I do.
19  Q  And you were sworn to tell the truth at that deposition;
20  correct?
21  A  Yes.
22  Q  And you did, didn't you?
23  A  Yes.
24      MR. McDONALD: One moment. Can I hand up the
25  deposition, Your Honor?

332

1      THE COURT: Page and line?
2  Q  Mr. Momyer, could you turn to page 65, beginning at line
3  22, please, of your December 9, 2009, deposition.
4  A  65, and which line?
5  Q  Line 22. Do you see there where the question states, do
6  you have an understanding that the electronic sourcing patents
7  are essentially a requisition and purchasing system that, for
8  example, can be a RIMS system that is set up to communicate
9  with a catalog database and a search engine such as the IBM
10  Technical Viewer 2 product? Do you see that question?
11  A  Yes.
12  Q  After the objection and it was read back, you answered
13  that question yes; right?
14  A  Yes, I did say -- I did say yes.
15  Q  Thank you.
16  A  One thing I wanted to question, Mr. McDonald --
17      MR. McDONALD: Well, I don't think we have a question
18  pending right now. May I continue Your Honor?
19      THE COURT: If you want to explain your answer, you
20  lawyer will have a chance on redirect to do that.
21      THE WITNESS: Okay.
22      THE COURT: Unless you need to explain something.
23  You seemed like you were adding something.
24      THE WITNESS: I was.
25      THE COURT: I think maybe we'll let Mr. Robertson

333

1  deal with that on redirect.
2      THE WITNESS: Okay.
3  Q  Now, with respect to the RIMS system, Mr. Momyer, that was
4  described in a patent application in April of '93; correct?
5  A  Yes.
6  Q  If you need some help on that, I believe it's Plaintiff's
7  Exhibit Number 10 in your notebook that ePlus gave you. That's
8  the RIMS patent. The filing day was April 2nd, '93, for the
9  RIMS patent.
10  A  Yes.
11  Q  So at least whatever features the RIMS patent had as of
12  that April '93 date, it's fair to say that those features are
13  pretty -- that description is a pretty comprehensive
14  description of RIMS as it existed in April of '93?
15  A  There were some things that weren't developed that were in
16  the patent.
17  Q  But they were described in the patent as something you
18  were going to develop?
19  A  They were described as being in the patent but not that we
20  were going to develop. They were things that as of '93, as
21  of -- really have never been developed yet.
22  Q  You at least describe some functionality that you had
23  conceived of at that time; right?
24  A  Yes.
25  Q  That's more than a year before the August '94 filing date

334

1 on the patents involved in suit here; right?

2 A   Yes.

3 Q   Before April of '93, is it true that the RIMS system could

4 search for items using a catalog search?

5 A   The search would be significantly different than the

6 search in electronic sourcing.

7 Q   Well, you are not saying that with respect to the claims,

8 are you?  I'm just asking you, didn't the RIMS system have

9 searching by part or catalog number?

10 A   It did look up by part.

11 Q   Didn't it have searching by part or catalog number in it?

12 A   I guess you need to define what you mean by search.

13 Q   Didn't you, in your own patent, because you were one of

14 the inventors --

15 A   Search in that case would be a product lookup.

16 Q   Let me finish my question, please.  As one of the

17 inventors who also signed off on the RIMS system, isn't it true

18 that you describe that search by part number as a search, not

19 just a lookup; right?

20 A   It did say that, yes.

21 Q   Your application said that; right?

22 A   Yes.

23     THE COURT:  Is there some difference between a search

24 and a lookup?

25     THE WITNESS:  Yes.

335

1 Q   If we turn to the exhibit tab ten, the RIMS '989 patent,

2 if we go to figure three of that patent.

3 A   Which patent are you in?

4 Q   Exhibit 10 which is the RIMS patent.

5     THE COURT:  The RIMS patent which you have in front

6 of you, and he wants to go to figure three which is on the page

7 that has 1899 at the bottom of the right-hand corner.

8     THE WITNESS:  I see it.

9     MR. McDONALD:  If you can blow up the top four boxes

10 on that page, please.

11 Q   So didn't you say there in box 202 that one of the steps

12 here of the process after the customer service representative,

13 or CSR, enters the stock number, and that gets entered into the

14 requisition item table, that the local computer searches the

15 parts master table for a stock number?

16 A   It searches the part master table, yes.

17 Q   Part master table, I'm sorry.  So you did describe that as

18 being a search within the part master specifically in RIMS;

19 right?

20 A   Correct.

21 Q   That was a search for matching items; right?

22 A   It was a search for specific item.

23 Q   An item that matched the part number you put in; right?

24 A   Yes.  An exact match.

25 Q   Okay.  Now, was that parts master in the RIMS system,

336

1 would you consider that a catalog?

2 A   No.

3     THE COURT:  Was the parts master a catalog, is that

4 your question?

5     MR. McDONALD:  That's right.

6 Q   What was the parts master in the RIMS system?

7 A   It had -- if you recall, it was only the local inventory

8 records, and it really had everything that I recall except a

9 vendor.  It did not have a vendor in it since Fisher was a

10 single vendor.

11 Q   So with respect to the distinction between the RIMS patent

12 or product and what you were describing as your invention for

13 the patents in this case, they both had searching, but the RIMS

14 system didn't search catalogs specifically; is that fair?

15 A   Searched parts -- one searched parts lists and the other

16 searched a catalog.

17     THE COURT:  One searched a parts list?

18     THE WITNESS:  Part master table is what it is.

19 Q   Parts master table, another term for that that you just

20 used is a parts list; is that right?

21 A   Yes.

22 Q   Is that also sometimes called an item master?

23 A   Yes, it could be.

24 Q   As the sort of list a customer compiles themselves; right?

25 A   The customer compiles.

337

1 Q   Well, doesn't the customer typically select the products

2 to go on an item master or parts master?

3 A   When they are building up their item master.

4 Q   One item after another, the people deciding which items

5 get on that parts master or items master is the customer;

6 right?

7 A   Yes, using the system of whatever system you are using.

8     THE COURT:  If the customer is doing the selection,

9 it's the customer, but if I do it and I'm not the customer,

10 then I'm the one making it up; is that right or wrong, or does

11 it always have to go through the customer?

12     THE WITNESS:  No, it doesn't have to go through the

13 customer.

14 Q   The purposes of a parts master or item master is to track

15 the inventory of an individual customer; correct?

16 A   Yes.  That's one of purposes of it, is to hold inventory

17 information.  It also helps identify the product and give you

18 some information about the product.

19 Q   It would be -- the purpose of that information in a parts

20 master or an item master would be to give enough information to

21 help reorder products for that customer for their inventory; is

22 that fair?

23 A   Yes, or do -- the item master could have a list price in

24 it as well.

25 Q   Is it typical -- you are familiar with catalogs that are

342

1  it. The second question is equally objectionable.  It is
2  sustained.
3  Q   Would you agree --
4       THE COURT:  I gave the definition of catalog, what it
5  means in this case, and that's the only one that's counts.
6  Whether it's right or wrong, it's the one that counts, so he
7  can't give definitions of catalog.  He can any other witness
8  give a definition of catalog, and I don't know why it wasn't
9  objected to begin with, but now that it has been, it is
10  sustained.
11      And I'm going to tell you to disregard his testimony
12  about what his opinion is on catalog as to either one of those
13  questions, because the definition you are bound by, ladies and
14  gentlemen, is the glossary of terms that is in your book which
15  is the claim construction given by the Court.  All right.
16  Q   Now, Mr. Momyer, did you understand that the invention as
17  claimed in the patents involved in this suit involved building
18  requisitions?
19  A   Yes.  That was one of the claims.
20  Q   One of the elements of claims?
21  A   Yes.
22  Q   I understand we're giving shorthand, that there are other
23  words other than requisition, but one the words used was the
24  word requisition; right?
25  A   (Indicating affirmatively.)

343

1  Q   Now, isn't it true that wasn't really a change from the
2  old RIMS system, the idea of generating requisitions in terms
3  of getting to the patents involved in this suit?
4       THE COURT:  Wait a minute.  That question was all
5  right until you add the prepositional phrase that you tacked on
6  at the end, so do it over again.
7       MR. McDONALD:  All right.
8       THE COURT:  Then it became a different issue.
9  Listen, are we going to pay attention to the questions over
10  there, folks, get with it?  Let's go.
11  Q   Mr. Momyer, would you agree that the RIMS system, the old
12  RIMS system that predates the patents here, that could build
13  requisitions?
14  A   For a single source.
15  Q   Well, we'll get to the source issue in a moment, okay, but
16  can just you answer --
17      THE COURT:  The answer is yes for a single source; is
18  that right?
19      THE WITNESS:  Yes.
20  Q   Isn't it true that the RIMS system had in it the data that
21  would relate to products that came from third-party vendors
22  other than Fisher?
23  A   You would always order products through Fisher.  So those
24  third-party products would have been purchased through Fisher.
25  Q   So those third-party products were -- there was a

344

1  third-party source for those products that Fisher acquired them
2  from; right?
3  A   Third party being parts that weren't in the Fisher parts
4  master.
5  Q   With that definition, are you agreeing with me then that
6  the RIMS system did allow Fisher to source products from
7  third-party sources?
8  A   No.
9  Q   So where did Fisher get those other products from?
10  A   The RIMS system lodges source from Fisher.  The Fisher
11  host system would determine where you would buy those products
12  from.
13      THE COURT:  You are using the word "you" in your
14  answer.  I understood from your testimony earlier that it was
15  the Fisher customer representative who had access to the
16  catalog.  Is that the "you" you are talking about, or are you
17  talking about some other "you"?
18      THE WITNESS:  I apologize.  I wasn't sure where I
19  used the word "you."
20      THE COURT:  You said you would source it.  I thought
21  -- the customer rep was the one doing the sourcing, wasn't he?
22      THE WITNESS:  Yes.
23      THE COURT:  I would call you.  You are the customer
24  rep.  You say -- I say, I want a beaker.
25      THE WITNESS:  Yes.

345

1       THE COURT:  Then you do the sourcing.  I don't do the
2  sourcing as your customer; is that right?
3       THE WITNESS:  That's correct.  Someone at Fisher,
4  either a customer service rep or someone in the procurement
5  area of Fisher would do the sourcing of the product.
6       THE COURT:  I think that you all are using this
7  indefinite pronoun "you," and I think -- it's hard enough to
8  follow, for the jury and me to follow the testimony on this
9  technical matter without you all being -- even when you are
10  being precise, but when you are being imprecise about what you
11  mean, it confuses the issues, and I think it's better if you
12  all try to be very specific in your questioning and not do
13  indefinite pronouns like "you."
14      MR. McDONALD:  Let me try it a little differently,
15  Your Honor, see if I can eliminate that problem.
16  Q   Is it fair to say that in the preferred embodiment
17  described in the patents-in-suit, you described a requisition
18  module from the old Fisher RIMS system?
19  A   Yes.  So that was the preferred embodiment for
20  requisitions in the patents-in-suit; right?
21      THE COURT:  You mean that -- your question actually
22  was, was that one of the things disclosed in the preferred
23  embodiment, not was it the preferred embodiment, and you
24  converted it just now.  I don't think you intended to, but --
25      MR. McDONALD:  Can we turn to figure 1A of the '683

350

1  referring to short forms, and short form generally means that's
2  the abbreviation I use -- I mean when I'm referring to this
3  particular term, but if you don't use that particular
4  abbreviation, then you're not doing the same thing.  You're not
5  referring to it.  So let's kind of get with the program here.
6      MR. McDONALD:  Well, I can show you --
7      THE COURT:  Mr. Robertson, I don't want to be in the
8  position of doing what you should be doing.  Get on the program
9  and do it.  This is something that's important to the jury to
10  understand, and Mr. Momyer is not a lawyer either, so we're
11  dealing with legal issues or legal abbreviation formats, and
12  let's get going.
13      So the question he wants to know is, is that RIMS, as
14  you use it in 40, are you using that on figure 1A, the same
15  term you are using up in the front on column one, when you use,
16  quote, Fisher RIMS, close quote?  Is it the same or different?
17      THE WITNESS:  It's different.
18  Q  Could you turn to column four of the '683 patent at lines
19  one through three, please.
20      THE COURT:  Line what?
21      MR. McDONALD:  One through three.
22      THE COURT:  Begins electronic sourcing?
23      MR. McDONALD:  Yes.
24      THE COURT:  System also includes a
25  requisition/purchasing system 40, preferably but not

351

1  necessarily the Fisher RIMS system, and a search program that
2  is capable of searching through large volumes of information
3  quickly and accurately; is that what you are talking about?
4      MR. McDONALD:  That's what I'm talking about.
5  Q  That sentence, the first half of it describes the system
6  40 as preferably but not necessarily the Fisher RIMS system;
7  right, Mr. Momyer?
8      MR. ROBERTSON:  Objection, Your Honor.  That
9  mischaracterizes what's disclosed there.
10      THE COURT:  He's just reading.
11      MR. ROBERTSON:  It says, includes the
12  requisition/purchasing system 40, and then says, preferably but
13  not necessarily the Fisher RIMS system.
14      THE COURT:  That's what he just said.  I think that's
15  as far as he went.
16      MR. ROBERTSON:  I think he said -- I thought the
17  record will reflect he said 40 was the Fisher RIMS system.  If
18  I misunderstood, then I withdraw the objection and apologize.
19      THE COURT:  So the document says what it says, I
20  think, is the answer to that.  We don't need to have him agree
21  that the document says what it says.  Let's go.
22  Q  It does use that phrase Fisher RIMS that was in quotes
23  back in column one talking about the RIMS system describing the
24  patent application for RIMS; correct?
25  A  It does use the same words, yes.

352

1  Q  Are you aware, Mr. Momyer, of anyplace in the patent, the
2  '683 patent where you specifically say, actually the preferred
3  embodiment I'm talking about is a modified version of that RIMS
4  system that's in the patent application for the RIMS system?
5      THE COURT:  Can I see you up here please, gentlemen?
6  Put the white noise on.
7
8      (Discussion at sidebar as follows:)
9
10      THE COURT:  It says electronic sourcing also includes
11  a requisition/purchasing system 40.  Then it says, preferably
12  but not necessarily the Fisher RIMS system.  That's the same
13  thing he said, and you're not impeaching him by asking him what
14  you are asking him because you are trying to convert it into
15  the fact that he's equating the two, and, in fact, the very
16  language of the text you are talking about does not equate the
17  two.  It says it's preferable but not necessary, so I am -- you
18  keep -- and the problem is in a case that's technical, if you
19  ask questions or confuse the jury, it's a problem.
20      You need to be aware of that and don't make
21  objections about what is the wrong objection.  You had a valid
22  objection.  You just didn't make the right one.  Pay attention
23  to what's happening.  I know you've been in this case and tried
24  this case three times, but this is a new case.  That's this
25  one.  Listen to what's going on here.  I don't want the jury

353

1  confused.
2
3      (End of sidebar discussion.)
4
5  Q  Now, is it true -- I'd like to move to the issue of
6  generating purchase orders, Mr. Momyer; all right?
7  A  Okay.
8  Q  Now, in the old RIMS patent, that describes that the local
9  computer in the RIMS system can create purchase orders;
10  correct?
11  A  The local -- no.  The local computer cannot create
12  purchase orders.
13      THE COURT:  In the RIMS patent; is that what the
14  question was?
15      MR. McDONALD:  That's right.
16      THE COURT:  In the RIMS patent or system, the local
17  computer cannot generate purchase orders; is that what you are
18  saying?
19      THE WITNESS:  That's correct.
20  Q  Could you turn now in Exhibit 10, the RIMS '989 patent, to
21  column 17.
22  A  Okay, '989.
23      THE COURT:  What is it, sir?
24      THE WITNESS:  Which exhibit is that?
25      MR. McDONALD:  Exhibit 10.

**354**

1  THE COURT: It's the original RIMS patent on ten, and
2  what page and line and so forth?
3  MR. McDONALD: Column 17. I believe that's page 23.
4  If you go to the sentence beginning -- paragraph beginning at
5  line 35 of column 17. Blow up that paragraph, please.
6  THE COURT: In either event, Mr. McDonald, is that
7  the paragraph?
8  MR. McDONALD: Yes.
9  THE COURT: How far do you want to go?
10  MR. McDONALD: The full paragraph, to about line 42.
11  Q  It's also up on the screen, Mr. Momyer. It might be a
12  little bigger print on the screen.
13  A  I see that.
14  Q  Okay. Now, do you see in the second sentence of the
15  paragraph, as described in the diagram, figures 5A and 5B, for
16  items of product types 01, 03, and 04, local computer 40 uses
17  purchase order build program 112 to create a purchase order
18  between the customer and the distributor from the data in the
19  requisition header and item tables. Do you see that?
20  A  2A? Yes, I see that. It's --
21  THE COURT: Your only question was, do you see it.
22  You answered that yes, so if you have another question --
23  THE WITNESS: Okay, sorry.
24  Q  So the local computer would create a purchase order
25  between the customer and the distributor from data; correct?

**355**

1  A  No. It would pass data up to a host program which are
2  figure 2B, number 120 purchase order. That's what would build
3  the purchase order.
4  Q  So this sentence that I just made it sound like it's
5  the local computer --
6  THE COURT: Wait a minute now. You're not
7  testifying.
8  A  I understand that. I understand how that reads, but it's
9  a transaction -- purchase order build program initiates the
10  purchase order program.
11  Q  Okay.
12  A  Which is on the host and builds on the host.
13  Q  So we're talking about the RIMS system now; correct?
14  A  Correct.
15  Q  The RIMS system includes both the local computer and a
16  host computer; right?
17  A  The invention does say that, yes.
18  Q  So the RIMS system, as a whole, generates purchase orders;
19  correct?
20  MR. ROBERTSON: Object to the form of the question,
21  Your Honor.
22  THE COURT: What do you say?
23  MR. McDONALD: I think it's a good form.
24  THE COURT: You all really helped me with that one.
25  MR. ROBERTSON: Well --

**356**

1  THE COURT: What's objectionable to the form?
2  MR. ROBERTSON: As a whole? I don't understand what
3  that means, the RIMS invention as a whole.
4  THE COURT: Is your objection then it's ambiguous?
5  MR. ROBERTSON: Yes, sir.
6  THE COURT: Sustained.
7  Q  Mr. Momyer, would you agree that the RIMS system, which
8  includes both the local computer and a host computer, generates
9  purchase orders?
10  A  Yes.
11  Q  And the sentence talks about product types 01, 03, and 04;
12  do you see that?
13  A  Yes.
14  Q  And do you know what those types are?
15  A  Yes, I do.
16  Q  What are they?
17  A  If product type 01 is a customer-owned inventory, that's
18  locally represented, stored locally.
19  Q  Okay.
20  A  On a customer's site.  03 is a product type which is a
21  product that's stored, would be stored within one of Fisher's
22  warehouses, and 04 would be a product that would be -- an off
23  catalog product that would be sourced from another vendor.
24  Q  Would be sourced from a third party; correct?
25  A  Yes.

**357**

1  Q  In fact, if you turn to column six of the '989 patent,
2  Exhibit 10, which is page 17 of Exhibit 10.
3  A  Column six?
4  Q  Yes.
5  A  What are the lines again?
6  Q  I haven't given lines yet. We have column six, page 17 of
7  Exhibit 10. I want to help you get there first.
8  A  I got it.
9  Q  Okay. Then you see there there's a table that actually
10  begins at the bottom of column five and continues at the top of
11  column six; correct?
12  A  Correct.
13  Q  And the product types 01 and 02 are defined at the bottom
14  of column five; correct?
15  A  Yes.
16  Q  And then the other product types, 03, 04, 05, and 06,
17  they're all at the top of column six; right?
18  A  Yes.
19  MR. McDONALD: Could you blow up the column six
20  portion of that table, please.
21  Q  So it has those types 03 and 04 that we were just talking
22  about; correct?
23  A  Yes.
24  Q  So 04, third-party item the distributor orders, that's
25  what you were just talking about in terms of sourcing; correct?

366

1   cross-reference back to a Fisher part number.

2   Q   So in that situation, it could be a part number from a

3   third-party source that would then be converted to a Fisher

4   part number?

5   A   No.  I don't think we -- I don't think it could be third

6   party.  I'm not sure.

7   Q   How about we get back to the RIMS patent, Plaintiff's

8   Exhibit 10, and can we turn to page 31 of Exhibit 10.

9   Actually, let's go all the way to page 30, because there's a

10  heading we can start with.  Page 30 of the RIMS patent,

11  Exhibit 10.

12      MR. ROBERTSON:  Mr. McDonald, you mean column three?

13      MR. McDONALD:  Page 30 of the document.

14  A   Column 31, 32?

15  Q   That's exactly right.  At the bottom there, I just wanted

16  to get the heading of this section here that begins at the

17  bottom.  The heading is cross-referencing; do you see that?

18  A   Yes, I do.

19  Q   So then there's a discussion of cross-referencing that

20  goes on from, beginning at the bottom of column 31 of the RIMS

21  patent; right?

22  A   Yes.

23  Q   So if we continue, that discussion of cross-referencing

24  continues on to column 33 as well; right?

25  A   Yes.  Yes.  And 34.

367

1       Now, you see on column 33, there's a paragraph beginning

2   at line 15.

3       MR. McDONALD:  Will you blow that paragraph up,

4   please.  It's on page 31.

5       THE COURT:  The next table?

6       MR. McDONALD:  Right.

7       THE COURT:  Host computer ten; is that what you are

8   talking about?

9       MR. McDONALD:  Yes.

10  Q   Now, this is a section talking about that table that can

11  match up the parts that are equivalents; right Mr. Momyer?

12  A   Yes.

13  Q   In that paragraph, it talks about -- down to about line

14  30 --

15  A   Yes.

16  Q   -- there's a line representing a requisition for 1000250

17  which is, in parentheses, Corning's part number for the beaker.

18  A   Yes.

19  Q   And it says, a match will be found in the vendor

20  cross-reference file in host database 20, and that item

21  converted --

22  A   To the Fisher number.

23  Q   Yes, to the Fisher number.  So it starts as another

24  vendor's number, and it's converted to the Fisher number; is

25  that right?

368

1   A   Yes.

2   Q   Now, is it true -- I'd like to go to the issue now of just

3   how the invention came about where you started from the RIMS

4   system we've been talking about and got to the system described

5   in the patents in this suit.

6       Is it true that back in the 1992 time frame, you would,

7   from time to time, visit installations that had the RIMS

8   system?

9   A   That's correct.

10  Q   And at those installations, sometimes would you see that

11  the computer operator operating the RIMS system would also have

12  in their office or at their station a bookshelf of paper

13  catalogs from other vendors?

14  A   By operator, you are speaking of Fisher customer service?

15  Q   Yes.  The person sitting at the computer operating the

16  RIMS system; right?

17  A   They would typically have a collection of catalogs.

18      THE COURT:  The installations that you are visiting,

19  are they Fisher offices or some other place?

20      THE WITNESS:  These would be customer sites, customer

21  sites where the RIMS system would be installed.

22      THE COURT:  Do you have a customer representative on

23  site, Fisher employee that's running that system?

24      THE WITNESS:  That's correct.

25  Q   So in that situation, when you visited back in the '92

369

1   time frame, that user of the system, the representative, would

2   have paper catalogs from other vendors?

3   A   Correct.

4   Q   These would be pretty big catalogs; right?

5   A   Yes.

6   Q   Did it come up at that point that people wanted to get

7   those paper catalogs in an electronic form but also usable

8   through the RIMS system?

9   A   I can't say that it did come up.  It was something that --

10      THE COURT:  In 1992?  That's

11  what you said.  You started us off with whether he visited

12  installations in 1992.

13      MR. McDONALD:  Right.

14      THE COURT:  In 1992, did people raise that with you?

15      THE WITNESS:  May have talked about it --

16      THE COURT:  If you remember, then say yes or no.  If

17  you don't remember --

18      THE WITNESS:  I don't remember.  At this time, I

19  don't remember having that conversation --

20      THE COURT:  All right.

21      THE WITNESS:  -- with customer service persons.

22  Q   Well, whether you actually talked to them or not, would

23  you agree at least that one of the motivations for developing

24  the system described in the patents-in-suit is that customers

25  were asking Fisher to also manage inventory of products from

374

1   capability.

2   Q   But could a text search a list of selected topics?

3   A   I guess I'm not sure what you mean by selected topics.

4   Q   Do you know what that means in the context of the TV/2

5   system?

6   A   No.

7   Q   Would you agree at the time that you filed the patents

8   involved in this suit there was known to be able to search a

9   single catalog on a CD-ROM?

10      THE COURT:  That what was known?

11      MR. McDONALD:  That it was known in the field of

12  purchasing and requisition systems to be able to search a

13  single CD-ROM with a catalog on it.

14      MR. ROBERTSON:  Your Honor, again, this is outside

15  the scope of my direct.

16      THE COURT:  I don't remember him asking anything

17  about that on his direct, Mr. McDonald.

18      MR. McDONALD:  Fair enough.  I'll withdraw it.

19  Q   Can we turn to the '683 patent now, Plaintiff's Exhibit 1,

20  and turn to figure 1A which is the third page, I believe.

21  A   Okay.

22  Q   Now, on that picture, figure 1A, this is in the '683

23  patent in this suit; right, Mr. Momyer?

24  A   Yes.

25  Q   You have shown here the catalog database number 36 kind of

375

1   in the middle of the page there.  Do you see that?

2   A   Yes.

3   Q   That was something that didn't exist in the RIMS system;

4   right?

5   A   Correct.

6   Q   Now, what database did exist in the RIMS system was a

7   parts master or item master; right?

8   A   As well as inventory tables.  You are talking about the

9   inventory database?

10  Q   Talking about the parts master.

11  A   There was a parts master.

12  Q   Which box was the parts master?

13  A   It would have been included in that grouping called

14  inventory databases.

15  Q   So that's 42B up above?

16  A   Yes.

17  Q   So parts master was over there, and so it's -- certainly

18  in your picture here, you were not depicting the parts master

19  should be part of the catalog database; right?

20  A   Yes.

21  Q   And the Fisher product list, that was in the host

22  database; correct?

23  A   Yes.

24  Q   And so would that be in this picture represented by what's

25  in host databases box number 11 in the upper right corner?

376

1   A   Yes.

2   Q   So, again, there are even that list of Fisher products in

3   the host database, you were showing it in your patent as not

4   part of the catalog databases; right?

5   A   Yes.

6   Q   And the reason for is that is that catalog database had a

7   different purpose and function than those other databases?

8   A   Yes.  It was to -- yes.  It would have had a different

9   purpose and function.

10  Q   What would be the difference in purpose and function?

11  A   Well, one, it would allow you to place an order for a

12  specific part.  The catalog database in itself would not -- you

13  could pull the information from the catalog.  You can go and do

14  validation of that part against both the local part master and

15  then up against the host.

16      Another benefit or purpose would be inventory control,

17  inventory management.  The product information at that level,

18  that information wouldn't be in the catalog database but would

19  be in the part master.

20  Q   Earlier you testified about some subset searching

21  capability; do you recall that?

22  A   Yes.

23  Q   Is that something different from what the patents-in-suit

24  describe when they talk about selecting catalogs to search, or

25  is that the same thing?

377

1       MR. ROBERTSON:  Your Honor, we're getting into the

2   Court's claim construction here, so I object as calling for a

3   legal opinion.

4       MR. McDONALD:  Maybe I can tie it specifically to an

5   embodiment in the patent, Your Honor, and avoid that issue.

6       THE COURT:  All right.

7       MR. McDONALD:  Give me a moment, please.

8   Q   Mr. Momyer, can you turn in the '683 patent to column

9   nine.  If you look at the bottom part of column nine beginning

10  at about line 52.

11      THE COURT:  When multiple catalogs?

12      MR. McDONALD:  Yes.

13      THE COURT:  Where are you going, how far down?

14      MR. McDONALD:  Basically to the end of that column.

15  We might have to continue up to ten, but I think we can cover

16  it with what's at the bottom of column nine.

17  Q   So do you have that again, Mr. Momyer?  Bigger print on

18  the screen there if that helps you.

19  A   Thank you.  Yes, I do.  I have it.

20  Q   This part of your patent, the '683 patent, talks about an

21  option where when multiple catalogs are in the catalog

22  database, there's a function that allows for selecting catalogs

23  to be searched; right?

24  A   Yes.

25  Q   So the idea here is you don't have to select all the

378

1 catalogs?

2 A  That's correct.

3 Q  Is this something that's different from that search within

4 a search that you said you were working on with IBM?

5 A  I'm not certain.  I'd refer that to Mr. Kinross.

6 Q  You don't know one way or the other?

7 A  Yeah.  I think I can't give you a good answer on that.

8 Q  But at least you understand the idea here is that these

9 are pretty big catalogs, and it might streamline the search if

10 you can, in effect, eliminate some of the catalogs; right?

11 A  Yes.

12 Q  I'd like to turn finally now to that RIMS brochure,

13 Defendant's Exhibit 61.

14        THE CLERK:  Defendant's 61?

15        MR. McDONALD:  Yes.

16 Q  Mr. Momyer, I think you said you had seen this brochure

17 before.  Can you tell me the circumstances which you had seen

18 it?

19 A  I saw it on several occasions.  I know it was developed by

20 our internal IT organization, and it was developed to be handed

21 out at trade shows to -- as well as to give information to our

22 customers on the high level feature of RIMS and what it could

23 do for the customer.

24 Q  Was it, in fact, distributed?

25 A  I believe it was.  I'm not -- don't know for a fact at

379

1 that point, but I believe it was.

2 Q  I think you referred to IT?

3 A  Information technology.  That's the software development

4 group.

5 Q  Are those the people that were actually the ones that had

6 worked on developing the RIMS system?

7 A  It would have been a different group within the IT

8 organization.  It would have been like the documentation group,

9 the group that was develop documentation, doing training.

10 Q  Is it your understanding that this brochure was developed

11 in conjunction with people who knew what RIMS did?

12 A  Yes.

13 Q  And did you ever tell anybody that there was anything in

14 this brochure that you thought was inaccurate?

15 A  Yes.

16 Q  When did you do that?

17 A  I think -- what was put out was -- everything that was on

18 the brochure at the time we intended to do, and some things

19 didn't occur.  Many of the things were developed, but, yes, I

20 did tell them, and we went ahead and put the product out in

21 anticipation of getting to -- getting these things done.

22        THE COURT:  Are you saying there's some things in

23 this brochure that are wrong?

24        THE WITNESS:  Yeah.  I pointed a couple of those

25 things out.

380

1 Q  If you turn to page four of Defendant's Exhibit 61.

2 A  Yeah.

3 Q  You pointed some things out yesterday, I believe, that

4 were inaccurate, and I just want to clarify here that under

5 requisition management features, if we can blow up the left

6 column there with the side bullet points, please.

7        THE COURT:  On page 0598; is that what you are

8 talking about?

9        MR. McDONALD:  Yes, Your Honor.

10 Q  Of these five bullet points, yesterday, I believe it was

11 numbers three and four that you said weren't accurate in whole

12 or in part; is that fair?

13 A  Yeah, just to kind of redo that, the bullet point three,

14 as I said, we did develop some interfaces, but they weren't a

15 significant number of interfaces.  There were a couple of

16 interfaces we developed, and the second one, bullet point 4,

17 was -- to the best of my knowledge, we never developed a remote

18 requisitioning thing.  You could follow that up and ask Jim

19 Johnson later, but I don't recall us doing any of that.

20 Q  But the company distributed this with respect to

21 interfacing, though, because even though you didn't technically

22 have already built an interface with, quote, all types of

23 purchasing systems, did you think it was reasonable to convey

24 that you could?

25 A  I think if we had done it, we would have had to develop a

381

1 customized interface.

2 Q  It was something you knew you could do?

3 A  Yes.

4 Q  One of the things you didn't say was wrong was that first

5 bullet point that says consolidates all supplier activity

6 including third-party and administrative purchases; right?

7 A  That's correct.

8 Q  Now, if we go two more pages to page six --

9        MR. McDONALD:  Now, if you could blow up the image

10 below the big black box there where it says a system that's

11 easy to use and then the paragraph right to the right of that,

12 please.

13 Q  Now, in this part of this RIMS brochure, I'll give you a

14 chance to look at it.  Isn't it true that the brochure

15 indicated that customers of the RIMS system now could either

16 use a customer service representative or they could enter

17 requisitions or purchase orders remotely through the people in

18 their organization who would be using the product?

19 A  I see that.

20 Q  The computer system itself, it doesn't actually know who

21 is sitting at the keyboard; right?  That could be anybody.

22 A  Well, other than the fact -- it couldn't be anybody.  It

23 would have to be someone who would have had a password and a

24 log-in ID to log in.

25 Q  But that could be an employee of the customer as well as

390

1    A  I don't think -- oh, today.  I think someone else
2    brought it.  I didn't bring it directly to your
3    attention.
4    Q  And do you know whether or not it was the
5    stenographer from Merchant & Gould that was present to
6    record your deposition?
7    A  No.
8        THE COURT:  You mean they had their own court
9    reporter?
10       MR. ROBERTSON:  Well, the one they had
11   retained, Your Honor.
12       THE COURT:  Well, that's an independent
13   person they retained.  It's not somebody who works for
14   them.
15       MR. ROBERTSON:  I understand.
16   BY MR. ROBERTSON:
17   Q  What's the difference between a search in the RIMS
18   system, which I understood you to say was a lookup,
19   and a search in the electronic sourcing system that is
20   the subject of the patents that are at issue here?
21   A  Well, there's a significant difference.  The
22   search in RIMS system is a word-for-word exact match
23   or it is a character-for-character match, and if any
24   of that is not present, it fails the match and it
25   isn't found.

391

1        A search in the catalog is more of a text search
2    that searches for -- it's really based upon the
3    criteria that you give as the search criteria.
4        MR. McDONALD:  I object to this because I
5    think we're getting into this issue of search under
6    the claims and catalog under the claims.
7        THE COURT:  Well, search has been construed.
8        MR. ROBERTSON:  No, it's not, Your Honor.
9        THE COURT:  Just a minute.  Means for
10   searching is in the '683, Claim Three, and '172, Claim
11   One, is that what you're asking about?
12       MR. ROBERTSON:  No, sir.  Mr. McDonald asked
13   if the search in the RIMS patent was the same as the
14   search in the electronic sourcing patent.  The witness
15   said there's a difference, but he wasn't permitted to
16   say that the difference is.  I'm just asking him what
17   is the difference.
18       MR. McDONALD:  I don't believe I was given a
19   chance to ask that question.
20       MR. ROBERTSON:  Let me ask it another way,
21   Your Honor.
22       THE COURT:  Yes, I think you should.
23   BY MR. ROBERTSON:
24   Q  Did the RIMS system include a search program?
25   A  No, it did not.

392

1    Q  I'd like you to go and look at table 1 in
2    Plaintiff's Exhibit No. 10, which is this '989 patent
3    which you're the inventor, and there were a number of
4    product types there.  And you testified about product
5    types 5 and 6.
6        Let me direct you to column 11 of the '989 patent
7    starting at about line 25 down to about line 31 under
8    the heading "sourcing."  Actually, let me apologize.
9    Let's just go back and identify what product types 05
10   and 06 are in table 1 in column 6.
11   A  Do you want me to --
12   Q  Yeah, if you would just read it for the jury,
13   please?
14   A  Product type 05, third-party item which CSR or
15   customer orders.  Product type 06, customer-owned item
16   located in customer warehouse at or next customer
17   site.
18   Q  And you referred us to column 11 in the '989
19   patent beginning at about line 14 about product type
20   05?
21   A  Yes.
22   Q  Now, I'd like to direct you back down to this
23   column with the heading that says "sourcing."  Can you
24   read that to the jury, sir?
25   A  The whole --

393

1    Q  Yes.  The first paragraph.  I'm sorry.  From line
2    26 to looks to be about 31.
3    A  After all of the items for a requisition have been
4    entered, the next step is that of sourcing the
5    requisition.  Sourcing the requisition is the process
6    of determining what inventory will be used to fill the
7    requisition.  Pricing is also performed in this step
8    when it's called for.  Example, except for all product
9    types -- for all product types except for 05 and 06.
10   Q  Except for 05 and 06.  Is that consistent or
11   inconsistent with what you told Mr. McDonald?
12   A  I don't remember what I told Mr. McDonald.
13   Q  That's a fair question.  Is it consistent with
14   your understanding as to how product types 05 and 06,
15   the sourcing could happen except for those two -- let
16   me rephrase that.  That was a horrible question.  Is
17   this section that you read consistent with your
18   understanding as to how the RIMS system operated?
19   A  Yes.
20   Q  Let me direct you to column 18 of the '989 patent
21   in Plaintiff's Exhibit No. 10 starting at about line
22   51 and going down to line 54.  And if you could read
23   that, please, for the jury.
24   A  After the purchase order data block is described
25   in step 338 is transmitted to host computer over the

394

1  data link described above local computer 40 waits for
2  a response from the host as shown in block 340.
3  Q  What if anything does that have to do with
4  generating P.O. orders, if anything?
5  A  Well, that's the process that RIMS was using to
6  transmit information to the host to the build the
7  P.O.s.  So all of the items that were on a requisition
8  would have been put in a data block along with the
9  affinity of the customer and passed up to the host
10  computer, which would then proceed to build a purchase
11  order.
12  Q  Was it your understanding that the RIMS system
13  operated by having the host generate the purchase
14  order?
15  A  Yes.
16  Q  Can you go to column 31?
17        THE COURT:  Why don't you stop a minute.
18  While we're here, pull the thing up.  You see these
19  after the purchase order data block described in step,
20  and then there's a number 338, and is transmitted to
21  host computer, and then there is the number 10, and it
22  continues, and there are numbers interspersed there.
23  What those numbers are references back to a particular
24  figure that are being talked about.  In this instance
25  there are references back to figure 8.  And it is a

395

1  way to say the data block is described in step 338 if
2  you go back and look at the figure 5A, and it says a
3  host computer is -- has got those lines to it and has
4  the number 10 if you go back and look at figure 5A.
5  So all of those numbers when you are reading them, if
6  you want to cross-reference back to the drawings, you
7  can do that, but if you just want to read them, you
8  just don't read -- you just don't pay any attention to
9  the numbers unless you're going back to check them.
10  Is that a fair statement?
11        MR. ROBERTSON:  Yes.  And thank you for that,
12  Your Honor.
13        THE COURT:  Excuse me.  Go ahead.
14  BY MR. ROBERTSON:
15  Q  The figure 5A that's referenced here you were
16  asked about on cross-examination, correct?
17  A  5A?
18  Q  Yes.  If you want to go to it, it's at page 11 of
19  42 in the patent and it ends with Bates No. 904.  I
20  think it was characterized as a flow chart?
21  A  Yes, I have it.
22  Q  So that section that we were just reading from is
23  referencing that figure; is that right?
24  A  Yes.
25  Q  Now, on to column 31.  On this topic of

396

1  cross-referencing, I think you informed us that that
2  section goes over to actually the bottom of column 34;
3  is that right?
4  A  Yes.
5  Q  Could the RIMS system use a cross-reference table
6  to take a requisition item say from a Fisher product
7  to identify a similar item from another vendor than
8  could then requisition from that vendor?
9  A  No.
10        MR. ROBERTSON:  Thank you.  I have no further
11  questions.  Actually, I'm sorry.  I misspoke.  One
12  last question.
13  Q  If I can take you to the '683 patent, figure 1A.
14  You were asked some questions about figure 1A and
15  figure 1B, do you recall that?
16  A  Yes.
17  Q  Are these two different embodiments that were
18  disclosed in your patent?
19  A  Yes.
20  Q  Is your invention confined to either to figure 1A?
21        MR. McDONALD:  Objection, Your Honor.  This
22  goes to his understanding of the scope of the claims.
23        MR. ROBERTSON:  He was asked about figure 1A.
24  I'm just asking if this is an embodiment.  I didn't
25  ask him anything about a claim.

397

1        THE COURT:  Yes, you are.
2        MR. ROBERTSON:  I'm just asking if this is an
3  embodiment of his invention.
4        THE COURT:  These two.
5        MR. ROBERTSON:  Well --
6        THE COURT:  It's two different embodiments.
7  BY MR. ROBERTSON:
8  Q  Let me start with figure 1A.  Is figure 1A one
9  embodiment of your invention?
10  A  Yes.
11  Q  Is figure 1B another embodiment of your invention?
12  A  Yes.
13  Q  Are these merely preferred embodiments?
14  A  Yes.
15  Q  Do you have an understanding whether or not your
16  inventions are confined to either of those
17  embodiments.  Do you have an understanding?
18  A  Yes.
19        MR. McDONALD:  Objection, Your Honor.
20        THE COURT:  Overruled.
21  Q  What's your understanding?
22  A  My understanding is there are other embodiments.
23        MR. ROBERTSON:  Thank you.
24        THE COURT:  All right.  You're going to be
25  required, Mr. Momyer, to come back here and testify

402

1    briefly, sir?
2    A  Well, the first thing I did was convert some of
3    their systems to CICS.  One was a cash application
4    system that was used in accounting for paying bills.
5    Another was an order entry system that interacted with
6    customer service representatives to take orders over
7    the phone.
8    Q  What is your educational background?
9    A  I have a bachelor's degree from the University of
10   Pittsburgh, major economics, with a minor in computer
11   science.
12   Q  When did you receive those degrees, sir?
13   A  In 1974.
14   Q  Since 1974 until your retirement, have you been
15   spending your entire professional career in the
16   computer field?
17   A  Yes.
18   Q  You were involved, as I said, in this electronic
19   sourcing invention.  Were you also involved in a
20   project working with IBM during that period of time?
21   A  Yes.
22   Q  Mr. Momyer testified sort of the overview of what
23   was involved with respect to that, but did you have
24   personal contact with the IBM people?
25   A  Yes.

403

1    Q  Are you familiar with a program known as TV/2?
2    A  Yes.
3    Q  Did you have any role in identifying TV/2 as a
4    potential program that could be used in the protocol
5    type development of the inventions that resulted in
6    the patents that you have been awarded?
7    A  Yes.
8    Q  What did you do, sir?
9    A  I was charged with researching programs that were
10   essentially search engines for documents.  Fisher had
11   a large catalog and the industry was tending to put
12   catalogs on CD ROMS, and we wanted to have entry in
13   that field.  So I researched a number of search
14   programs.  Bard being one of them.  SteBo being one
15   other.  Millennium Software and Prism being others
16   that we looked at.
17   Q  Did you ultimately come to the decision along with
18   the other team members that the IBM TV/2 search
19   program might be most suited for adapting to your
20   inventions?
21   A  Yes, we did.
22   Q  Can you tell me just generally did the IBM TV/2
23   search program need to be modified, revised,
24   reprogrammed or have aspects of it created from
25   scratch in any way?

404

1    A  Yes.
2    Q  Were you involved in that, sir?
3    A  Yes, I was.
4    Q  We'll talk about some of those modifications or
5    changes that needed to happen in a minute, but at a
6    high level can you us tell us, if you can give me a
7    list, say, of some of the things that needed to happen
8    with this TV/2 program that you were personally
9    involved in?
10   A  Well, the first was the ability to have multiple
11   catalogs in the system.  We felt that was a very
12   unique requirement that we had that would enable the
13   end user to select and deselect catalogs to be
14   searched.
15   Q  Can we just run through the list first maybe of
16   everything you might recall that needed to be modified
17   with respect to TV/2, then we'll come back and go at
18   it in a little greater detail?
19   A  The catalogs, there was a footer bar that we
20   needed to provide for easy navigation through the
21   system.  Among the features of the footer bar were
22   creating an order list and being able to view the
23   order list, being able to accept the order.
24        We also needed specialized search functions that
25   would customize the search for electronic commerce,

405

1    basically.  That being search by part number, search
2    by keyword with Boolean logic including "and" and
3    "ors" so that you wouldn't get unnecessary results in
4    the hit list that would be created by the search.
5    Q  Let me just stop you there because you used a
6    couple of teams.  I want to make sure I understand
7    what you were referring to.  You said search by
8    keyword.  What did you mean by "keyword."
9        MR. McDONALD:  Your Honor, I'm going to
10   object.  I don't think this is really tied to the
11   infringement issue or the claims of the patent at this
12   point.
13       MR. ROBERTSON:  Your Honor, I'm just asking
14   the witness what modifications need to be made to
15   TV/2.  What did he do in order to create the
16   invention.  I'm not asking him at all about claim
17   constructions.  I haven't raised a single claim term
18   yet.
19       THE COURT:  He didn't say that.  He said it
20   didn't have anything to do with infringement.  It's
21   not relevant is his objection, I think.  Isn't that
22   your objection?
23       MR. McDONALD:  That's correct, Your Honor.
24       THE COURT:  Why is it relevant?
25       MR. ROBERTSON:  It's relevant, Your Honor, to

406

1    the scope of the claims as to what the inventors

2    invented and when they invented it, just as Mr. Momyer

3    testified this morning.

4        THE COURT:  The fact that he testified to it

5    doesn't make it relevant.  It wasn't objected to in

6    that testimony and I didn't have an opportunity to

7    address that.  Now I do.  You're asking him to explain

8    terms within the term "specialized search function"

9    that he did.  Is this what you're talking about?

10       MR. ROBERTSON:  I'm asking him to explain how

11    TV/2 needed to be modified in order to be able to

12    provide the functionality of the invention, Your

13    Honor.

14       THE COURT:  How about this particular comment

15    about specialized search?

16       MR. ROBERTSON:  Well, I can rephrase that

17    question.

18       THE COURT:  I'm just asking you.  I'm trying

19    to figure out what it is first.  You're talking about

20    a specialized search function of some kind?

21       THE WITNESS:  Yes.

22       THE COURT:  Objection overruled.

23    BY MR. ROBERTSON:

24    Q   What did you mean by that, sir?

25    A   What did I mean by "specialized search function"?

407

1    Q   I don't know if you completed your answer.  I

2    was asking you about --

3       THE COURT:  You asked him.  It got

4    interrupted, but the objection was to what keyword

5    meant.  So that objection is overruled.

6       What does "keyword" mean?

7       THE WITNESS:  Keyword is any word that would

8    be found in the document.  So you're basically saying

9    "find ovens" and the search would go out and find

10    everywhere there was an occurrence of ovens in the

11    document.

12    Q   Is that an Aspect of your invention?

13    A   Yes.

14    Q   Was TV/2 able to do that when you first met with

15    IBM?

16    A   Technical Viewer was able to do a search, a

17    keyword search.  It's the other searches that were for

18    specific items like part number, vendor, bulletins,

19    page number that Technical Viewer wasn't able to do.

20    Q   One of the things you mentioned was that there

21    were ways you needed to develop multiple catalogs in

22    TV/2, do you recall that?

23    A   Yes.

24       THE COURT:  Are we now finished with the list

25    of things that he did to change TV/2 or modify it or

408

1    recreate parts of it in order to come to the invention

2    reflected in the patent?

3       MR. ROBERTSON:  No, Your Honor.  Thank you.

4       THE COURT:  Then go on back to that list.

5       MR. ROBERTSON:  Thank you, sir.

6    BY MR. ROBERTSON:

7    Q   Did you also have anything to do with creating a

8    catalog database?

9    A   Yes.

10    Q   Now, Fisher-Scientific -- well, let me complete

11    the list.  Your Honor is exactly right.

12      Did you also have anything to do with the ability

13    to search product catalogs?

14    A   Yes.

15    Q   Well, do you recall you mentioned this need to

16    create a footer bar; is that right?

17    A   Correct.

18    Q   Did you have anything to do with creating what's

19    known as a shell program that's disclosed in your

20    invention?

21    A   Yes.

22    Q   Did the TV/2 program need to be modified in order

23    to create order lists within a shell?

24    A   Yes.

25    Q   Did you have anything to do with modifying the

409

1    TV/2 to create interfaces to update catalogs in EDI

2    transactions?

3    A   Yes.

4    Q   Let's start with that are last one first.  What's

5    an EDI transaction?

6    A   EDI stands for electronic data interchange.

7    Q   What does that mean?

8    A   It's a way to interact with separate companies

9    without human intervention.  It's computer-to-computer

10    interactions that operate on a standard which is set

11    by the X12 Committee, which is a United States

12    standards setting body.

13    Q   Do they have to have a common language to talk to

14    each other?

15    A   Well, they called it common transaction sets,

16    which could be viewed as a language, but it's more of

17    a structure that enables computers to understand

18    messages between companies.

19    Q   So they can communicate data?

20    A   Yes.

21    Q   Were you involved in assisting to modify the TV/2

22    program with respect to that?

23    A   We wrote programs that would take the EDI

24    transaction, the price/sales catalog, and update

25    vendors' catalogs based on information provided in

410

1    those transaction sets.

2    Q  When you say "we," who are you referring to?

3    A  Me and my staff.

4    Q  I mentioned this need to customize TV/2 to create

5    order lists in the shell.  What's a shell?

6    A  The shell was a program that used Technical Viewer

7    API to change how Technical Viewer functioned.

8    Q  You used the term API.  What's an "API"?

9    A  API stands for Application Programming Interface.

10   It is a series of commands used to effect how a piece

11   of software will operate.

12   Q  So the Technical Viewer 2 had this API interface

13   you're referring to.  Could it communicate in the

14   context of your invention with this shell program you

15   had without modification?

16   A  The API was used in the shell program to effect

17   changes in Technical Viewer.

18   Q  So you had to develop the shell program in order

19   to communicate to TV/2?

20   A  Yes.

21   Q  And who had primary responsibility for that shell

22   program?

23   A  The primary responsibility for documenting the

24   requirements of the shell program were mine as far as

25   the functionality concerned.  The actual programming

411

1    of the shell was an IBM responsibility.

2    Q  You also indicated that you needed to create this

3    footer bar to work within the shell.  Do you recall

4    that?

5    A  Yes.

6    Q  Tell us the purpose of the footer bar within the

7    shell program?

8    A  The footer bar --

9        MR. McDONALD:  It's irrelevant, Your Honor.

10   The footer bar isn't at issue in this case.

11       THE COURT:  Is it?

12       MR. ROBERTSON:  Yes, it is, Your Honor.  It

13   has functionality in the system that you're going to

14   hear from experts about that demonstrate infringement.

15       THE COURT:  Overruled.

16   BY MR. ROBERTSON:

17   Q  What's the purpose of the footer bar?

18   A  The footer bar was a series of icons at the bottom

19   of a screen that would assist the end user in

20   navigating through the system with ease.  It consisted

21   of a catalog selection button, an order list button, a

22   forward and backward button, a cancel button, and a

23   help button.

24   Q  It was a way to navigate through the program when

25   you were performing the functionality of your

412

1    invention?

2    A  Correct.

3    Q  Now, you mentioned also this catalog database.  Do

4    you recall that?

5    A  Yes.

6    Q  Fisher-Scientific had a very large paper catalog.

7    A  Yes, they did.  It was at least 2000 pages.

8    Q  With tens of thousands of items offered by various

9    vendors that Fisher distributed?

10   A  Correct.

11   Q  It also included Fisher products, correct?

12   A  It did, yes.

13   Q  Were you asked to provide that paper catalog to

14   IBM so they could adapt it into a catalog database?

15   A  Well, it was more than that.  We were asked to

16   provide the catalog in an electronic format to help

17   them in creating the catalog database.

18   Q  So just so I'm clear, did you have a

19   responsibility for giving an electronic catalog of

20   Fisher-Scientific, not a paper catalog that would then

21   need to be scanned and included into it?  Was that

22   part of your responsibility?

23   A  Yes.  It was an electronic version of the paper

24   catalog, and it was used by SteBo to actually create

25   pages of the paper catalog.

413

1        THE COURT:  You used SteBo to prepare the

2    pages or you said "used by SteBo."  How did you take

3    the paper catalog and convert it into an electronic

4    version that you ultimately gave to IBM?

5        THE WITNESS:  Okay.  We had a creative

6    services department within Fisher who was responsible

7    for creating the paper catalog.  And what they would

8    do is take paper in the way they wanted the catalog to

9    look and send it to SteBo.  SteBo would input that

10   into their system in an electronic format to create

11   pages that could be sent to the publisher.

12       In the process of that, SteBo now had this

13   catalog in electronic format, and we used that to give

14   to IBM to produce the catalog database.

15   Q  So IBM didn't have a paper catalog.  They had an

16   electronic catalog from one of your vendors, SteBo,

17   which you produced to them in order for them to

18   utilize it in this electronic sourcing project that

19   you were working on with them as a subcontractor; is

20   that right?

21   A  Correct.

22   Q  Did they ever receive a paper catalog?

23   A  Yes.

24   Q  Were they having difficulties with converting it?

25   A  I wouldn't categorize it as difficulty.  It was

414

1   generally agreed that an electronic format was

2   preferable because SteBo used a tagging language to

3   describe the catalog.  Technical Viewer used a tagging

4   language to describe its pages.  And I was able to get

5   the definition of the tags from SteBo and provide it

6   to IBM so that they could basically write a program to

7   take the tags that were in the SteBo catalog and

8   convert them to the IBM Technical Viewer format.

9   Q   What were these tags used for?

10  A   Tags in both systems were essentially used to

11  describe how the data should look.

12  Q   Did the tags need to be modified in order to

13  recognize and understand the electronic SteBo catalog

14  that you provided to IBM?

15  A   Well, it was more like a one for one substitution

16  of tags.  So a tag, for instance, that said "bold" in

17  SteBo might be "BL," and in Technical Viewer it might

18  be "BD."  So you had to substitute "BL" for "BD."

19  Q   So you had to reconcile those?

20  A   Yes.

21  Q   Let me ask you, you have had an opportunity to

22  look at the statement of work with IBM; is that right?

23  A   Correct.

24  Q   I want to go to an attachment to that statement of

25  work.  If you would turn, please, sir, in your

415

1   notebook, if you have it there, Plaintiff's Exhibit

2   No. 38.

3   A   Under DX?

4   Q   I'm sorry.  It should be under PX-38. do you have

5   that.

6        THE COURT:  There is no PX-38.  There's DX-1,

7   DX-107, DX-230, DX-111, and DX-30.  That's all there

8   is in this notebook.

9        Hand that big book up there, please.  What is

10  it in?  Is it in Momyer's notebook?

11       MR. ROBERTSON:  Yes, sir.

12       THE COURT:  We've got it.  Don't be doing

13  that.  Get back there.

14       Turn to PX-38 there, would you, please?

15       THE WITNESS:  Okay.

16       THE COURT:  PX what?

17       MR. ROBERTSON:  PX-38.

18       THE COURT:  All right.  Thank you.

19  BY MR. ROBERTSON:

20  Q   If I could refer you to the back of that document,

21  there is a Bates number that ends 4053.  It's entitled

22  "Fisher IBM Master Schedule Plan."  Do you recall

23  that?

24  A   Yes.

25  Q   Did this master schedule plan have any name that

416

1   you associated with it that you and the inventors and

2   the IBM people refer to it as?  Are you familiar with

3   the therm Gantt chart?

4   A   Yes, Gantt chart.

5   Q   Did you refer to this?

6   A   This would be a Gantt chart, yes.

7   Q   What's your understanding of what a Gantt chart

8   is?  I believe it's G-A-N-T-T.

9   A   It's a chart showing the tasks that are required

10  for some development and the length of time that those

11  tasks would take.  Also the dependencies of the task.

12  Typically, the ones that are first are required before

13  you can complete the others.

14  Q   And I just want to make sure we understand.  I'd

15  like you to orient us with this document, if we could.

16  So let me ask you some questions about its

17  organization.

18       First, there's several headings.  Do you see that

19  at the very top?

20  A   The legend?

21  Q   Yes.  It says IV and SOW?

22  A   Yes.

23  Q   SOW you understood to be statement of work?

24  A   Yes.

25  Q   Then there's a task name, correct?

417

1   A   Correct.

2   Q   And then there's a heading for the purpose of the

3   task; is that right?

4   A   Correct.

5   Q   And then there's a heading that says RESP.  What

6   did you understand that to mean?

7   A   Who was responsible for that task.

8   Q   In fact, at the top of the document does it say

9   RESP is responsible for document?

10  A   Yes, it does.

11  Q   Then there's a column that says DEL.  Do you see

12  that?

13  A   Yes.

14  Q   Is there a definition of what DEL means?

15  A   Yes, it says "deliverable."

16  Q   There's also a column that says "depends."  Do you

17  see that?

18  A   Depends, correct.

19  Q   Then there's a reading called "Fisher"?

20  A   Correct.

21  Q   What was the purpose of that heading, do you know?

22  A   Well, it looks like it was specifying the number

23  of hours that particular task would take.

24  Q   Next to that is a series of letters that starts S,

25  then O, then N, then D, etc.  Do you see that?

442

1    Q   At the time was the RIMS system built on OS/2 IBM

2    operating system?

3        MR. ROBERTSON:  Your Honor, I didn't ask

4    anything about the RIMS system.

5        THE COURT:  Mr. McDonald, it seems to me

6    that's beyond the scope of the direct examination.

7        MR. McDONALD:  I guess we can come back to

8    that, Your Honor.

9    BY MR. McDONALD:

10   Q   Now, with the IBM system as it existed when you

11   started working with them regarding TV/2, did it have

12   the capability of putting technical publications on a

13   single CD ROM?

14   A   Yes.

15   Q   Technical publications could include things like

16   bulletins and catalogs, right?

17   A   The only thing that they mentioned as far as what

18   they used Technical Viewer for was a parts catalog in

19   Europe for a car company.  And the Manassas people

20   indicated that they worked with the U.S. Navy on their

21   documents but didn't specify what documents the Navy

22   was using it for.

23   Q   Did you work with someone from IBM named Pam Eng?

24   A   Yes, Pam Jenkins at the time, but I think she's

25   been married and changed her name.

443

1    Q   She was working on this project from the IBM side;

2    is that right?

3    A   Correct.

4    Q   Chuck DeNaris, is that also a name that's familiar

5    to you?

6    A   Yes, he was the salesman from IBM.

7    Q   So you interacted with him on this project?

8    A   He attended the meetings and yes.

9    Q   The IBM system could do a word search, correct?

10   A   Correct, which we termed keyword search.

11   Q   But that was already in existence before you

12   started talking to IBM about the TV/2, right?

13   A   That was part of the Technical Viewer, yes.

14   Q   Then you choose the TV/2 system because of its

15   features and because you didn't want to reinvent the

16   wheel, right?

17   A   Correct.  The prospect of writing a search engine

18   when others we are available on the market really

19   didn't make sense to us to rewrite something that

20   already existed if it performed up to our

21   specifications.

22       MR. McDONALD:  I have no further questions.

23   Thank you.

24       THE COURT:  Any redirect?

25

444

1        REDIRECT EXAMINATION

2    BY MR. ROBERTSON:

3    Q   With respect to this multiple catalog capability

4    on TV/2, did TV/2 have the capacity to have multiple

5    catalog data right off the shelf?

6    A   No, I don't believe it did.

7    Q   Did you have to do anything or assist in any way

8    to modify TV/2 in order to be able to accommodate that

9    size of data volume that would be involved in such a

10   performance?

11   A   Yes.  There were two aspects of that.  One was to

12   create the functionality of the catalog icon which

13   would open one or more catalogs to be searched or

14   close catalogs if you didn't want that particular one

15   searched.

16       And also Fisher had a requirement that the system

17   would not be useful if you didn't provide a

18   three-second response time back to the end user when

19   it was searching catalogs.  And my understanding is

20   there was a problem with Technical Viewer once the

21   entire Fisher catalog was loaded onto the system in

22   obtaining a three-second response time.  So a

23   different indexing mechanism had to be developed to

24   facilitate that requirement.

25   Q   What was the indexing mechanism called?

KINROSS - REDIRECT        445

1    A   It was called Super Index.

2    Q   Were you involved at all on that project?

3    A   Not -- well, only from the standpoint of it being

4    a requirement of Fisher for Technical Viewer to

5    achieve a three-second response time.  But as far as

6    designing the Super Index and coding it, no, that was

7    Technical Viewer that was responsible for that.

8    Q   So IBM was responsible for making that

9    modification?

10   A   Yes.

11   Q   Were they made to make the TV/2 program more

12   responsive in accordance with your requirement?

13   A   Yes.

14   Q   Was that necessary in order to accommodate the

15   volume of catalog data?

16   A   Yes.

17   Q   Did you indicate that you had problems with this

18   response time simply with just one catalog loaded on

19   TV/2?

20   A   I didn't.  IBM indicated there was a problem and

21   they wouldn't deliver the catalog until it was fixed.

22   So --

23   Q   So they went about fixing it to your

24   specifications?

25   A   Yes.

450

Johnson - Direct                    450

1    13 years.

2    Q   And what area of the company did you work at in Fisher

3    Scientific?

4    A   In the information technology group.

5    Q   Just briefly, could you tell me some of the positions you

6    held while you were at Fisher during the period of time from

7    1986 to 1998?

8    A   Sure. I started there as a programmer analyst. I worked

9    my way up to project leader, ultimately became a supervisor and

10   manager of product development.

11   Q   And you are one of the named inventors on the three

12   patents in suit here, the patents that are at issue, the '683,

13   '516, and '172 is how we've been referring to; is that right?

14   A   Yes.

15   Q   And did you work on that project with both Mr. Momyer and

16   Mr. Kinross?

17   A   Yes.

18   Q   Mr. Momyer has testified yesterday and today to sort of

19   the big overview of the picture of the development of the

20   inventions in your electronic sourcing system. What I'd like

21   to focus on today with you is what, if any, necessary

22   modifications, revisions, reprogramming, or new things needed

23   to be done in order to modify the RIMS system into what became

24   the subject matter of the these patents, the electronic

25   sourcing system.

451

Johnson - Direct                    451

1        So at a high view for now, could you just identify the

2    areas that you were involved in that project?

3    A   The areas I was involved in was to reengineer the programs

4    basically to be able to build a graphic user interface that the

5    end user could use. We also modified the requisitioning

6    portion of the system to be able to handle multiple products

7    from various vendors.

8        In addition to that, we also allowed for that single

9    requisition to be broken up into multiple purchase orders by A

10   vendor. We also built the interface actually over to the

11   electronic catalog as well.

12   Q   I'm sorry, I didn't hear your last answer. You built the

13   interface to the electronic catalogs?

14   A   There was an interface we built to be able to pass

15   information from the requisitioning system over to the

16   electronic catalog system, yes.

17   Q   What about the issue of inventory availability, did you

18   have to do anything to modify the RIMS system in order to have

19   that functionality in the inventions of your electronic

20   sourcing system?

21   A   Yeah. Basically we used, tapped into a technology for EDI

22   to be able to go out to a vendor and get some pricing and

23   availability as well.

24   Q   What about, did you have any involvement in any of the

25   business logic necessary for the functionality of the

452

Johnson - Direct                    452

1    electronic sourcing system and any modification that had to

2    occur with RIMS?

3    A   The business logic, yeah, we had to actually strip -- the

4    RIMS system had character-based application which we called a

5    green screen at the time. That all had to be torn out of the

6    code, and we had to modularize the business code in order to be

7    able to interface with the new graphical user interface.

8    Q   We have now what I think are six separate topics. If we

9    could go through them one by one and tell me in the simplest

10   terms as possible, what is it, in fact, you had responsibility

11   for doing with these revisions, modifications, reprogramming,

12   or creating from scratch some of these things.

13       So let's start with you indicated this construction of a

14   graphical user interface, and we've heard that term before.

15   Tell us what you understand that term to mean.

16   A   Graphical user interface is basically the interface that

17   the end user sees when interacting with the system.

18       At that time, most of the systems, especially the

19   mainframe systems, were character-based, so they started at the

20   left-hand corner and would go to the bottom right hand of the

21   corner, and it would display characters, numbers, dashes,

22   colons, things of that nature. Very encryptic.

23       So in order for us to be able to allow for an end user,

24   like a researcher or lab technician, to use the system, we

25   wanted to generate or create a graphical representation of what

453

Johnson - Direct                    453

1    they would be doing, selecting products, placing orders,

2    selecting information to select the type of orders, that kind

3    of thing. So we built this graphical user interface to be able

4    to make it easier, essentially, for the user to use.

5    Q   Would this graphical user interface make it easier for the

6    user of your invention in the electronic sourcing system to

7    utilize its features and functionality?

8    A   Yes.

9    Q   The RIMS technology, did it have a graphical user

10   interface?

11   A   No.

12   Q   Did it have this clunky character-based interface you were

13   talking about?

14   A   Yeah. As I said, it was a character-based application.

15   It was originally designed for a Fisher Scientific CSR to

16   utilize, so it required a large number of hours to train this

17   person on how to use it. There were abbreviations in there,

18   things like, for example, if we wanted them to enter a stock

19   number, the title of the field was STKNO. If we wanted them to

20   enter a particular product type, it was just characters, PT.

21   So unless you understood what that meant, you wouldn't know

22   what to enter into that system.

23   Q   Are you familiar with the term green screen?

24   A   Yes.

25   Q   What is a green screen?

454

Johnson - Direct                    454

1    A    And old mainframe terminology where the characters on the
2    screen are basically green.
3    Q    Did the RIMS have a green screen technology?
4    A    Yes.
5    Q    I'm sorry?
6    A    Yes.
7    Q    And were you involved in programming and creating this
8    graphical user interface for the electronic sourcing system?
9    A    Yes.  I was involved in providing all the requirements to
10   the people that worked for me to develop it, yes.
11   Q    Did you supervise those people?
12   A    Yes.
13   Q    You also mentioned you had to design the interface for
14   communication between the requisitioning and purchasing program
15   and the catalog database.  Could you tell me what that entailed
16   and why that was necessary?
17   A    Well, it was necessary because the initial idea was to
18   supply a system that would allow us to do a complete supply
19   chain management end to end, be able to select products,
20   process the requisition, and ultimately generate a purchase
21   order.
22        In order to do that, we needed to connect the
23   requisitioning management system to this electronic catalog, so
24   we built some APIs, which are application program interfaces,
25   that had a two-way communication channel basically between the

455

Johnson - Direct                    455

1    requisition management system and the cataloging system so we
2    could pass data back and forth without losing any information.
3    Q    Did you have that interface in the RIMS system, or did
4    that have to be created?
5    A    No, that was not in the RIMS system.  That had to be
6    created.
7    Q    Why is that?
8    A    It wasn't there.
9    Q    Why --
10        THE COURT:  You asked for it.
11   Q    Let me see if I can rephrase the question.  Why did you
12   feel that it was necessary?
13   A    Well, it was necessary because in order for us to provide
14   a complete shopping experience without frustrating the user, we
15   wanted to seamlessly able to process the information they
16   were selecting in the catalog into the requisition without them
17   having to look at a catalog, go over to the requisition system,
18   type it in, go back to the catalog, look for another product,
19   write it down, go over to the requisition system and type it
20   in.  We wanted a seamless interface so the user just had to
21   point and click and push a button, and all that data would flow
22   automatically.
23   Q    The way you described the difficulty you were trying to
24   overcome, did the RIMS system even have that kind of primitive
25   technology?

456

Johnson - Direct                    456

1    A    As far as communicating with a catalog?
2    Q    Yes.
3    A    No.
4    Q    You also mentioned something about splitting the
5    presentation layer, I believe, from the business logic.  Do you
6    recall that?
7    A    Yes.
8    Q    What was that?
9    A    RIMS was designed as a very traditional, what I'll call
10   CICS COBOL mainframe system.
11   Q    You have to stop there, and we're going to say again,
12   we're going --
13   A    Keep it high level.  I'm sorry.  I get technical
14   sometimes.
15        THE COURT:  It's okay, but it would be better you all
16   don't talk while each other are talking.  You can be technical
17   all you want to.
18   Q    You mentioned CICS COBOL.  I think I interrupted you, so
19   why don't you finish your answer.  What is CICS COBOL?
20   A    COBOL is a common business oriented language.  It's a
21   program language we used to develop the original RIMS system.
22        CICS is a transaction processor which allows COBOL
23   programs to run in that environment.  It's a very traditional
24   system, very geared towards businesses that want to process a
25   lot of data very quickly.

457

Johnson - Direct                    457

1    Q    And so did you need to be able to have that, to modify
2    that capability from RIMS to your electronic sourcing system
3    inventions in order to have that capability of transferring and
4    moving around a lot of data?
5    A    Well, I mean, what you asked me is what did we do to the
6    business logic to remove the presentation layer.  What we
7    needed to do was we needed to basically reengineer those
8    programs so they no longer worked with the green screens that I
9    mentioned earlier.
10        Those green screens were ripped out of those programs, and
11   we converted those programs into basically what we now call
12   business object that all it did was manage the business logic.
13   Then we built the interfaces to the graphical user interface
14   so, in short, the GUI could interface to the business logic.
15   Q    Was that an important aspect for making your invention
16   user-friendly and functional?
17   A    Yeah.  It was pretty much a requirement.
18   Q    And just so I'm clear, that wasn't available or present in
19   the RIMS system?
20   A    No.
21   Q    You also, I think, mentioned that you had to modify
22   requisition coding; is that correct?
23   A    Yes.  We -- at the time, the RIMS system could only
24   communicate to the Fisher mainframe, Fisher being Fisher
25   Scientific.  The programs were primarily sourcing those

458

Johnson - Direct                    458

1  products all to Fisher, so it was one requisition and

2  ultimately one requisition that was sent to the Fisher

3  mainframe as an order.  So basically we changed those programs

4  to be able to accept, in the requisitioning process, the

5  ability to add multiple products from different vendors to a

6  single requisition.

7      Q   In modifying this requisition coding, did it also address

8  any issues involving the purchase orders from these

9  requisitions?

10  A   Yes.  As an end result, once the requisition was created,

11  the user could say, yes, I want this order, go ahead and place

12  it.  The system would then take that requisition and by vendor

13  create multiple purchase orders with the products associated to

14  that vendor.

15  Q   You also mentioned this purchase order creation capability

16  that you needed to do.  Can you tell me how that changed from

17  the prior RIMS system, if at all, to -- for purposes of your

18  invention?

19  A   Well, as I said earlier, RIMS could only communicate to

20  the Fisher mainframe, so the order was actually created through

21  the Fisher mainframe system.  So in the electronic sourcing

22  system, what we needed to do was to be able to create purchase

23  orders that could be sent out to vendors through one of a

24  couple of different mechanisms to get the purchase order over

25  to the appropriate vendor.

459

Johnson - Direct                    459

1  Q   When you say sent out, that could be sent out from a local

2  computer where an individual was using your electronic sourcing

3  invention to make a request for an item from multiple vendors?

4  A   It was a computer that was located at the customer

5  location, yes.

6  Q   The end user could utilize the electronic sourcing system

7  in order to accomplish the goals of your invention; is that

8  right?

9  A   Yes.  They would be working on a work station

10  theoretically in their laboratory or in their office

11  communicating to a server located on the network.

12  Q   And that server on the network would have information

13  available to transmit that contained information about products

14  that were available?

15  A   That's where the business logic resided, yes.

16  Q   You also mentioned this inventory availability issue that

17  had to be addressed with respect to modifying or revising,

18  reprogramming the RIMS system in order to achieve the goals of

19  your electronic sourcing system.  Do you recall that?

20  A   Yes.

21  Q   What did that entail?

22  A   End users, in other words, for them to make a good

23  decision as to whether or not to make a purchase, they want to

24  know pricing and availability, how much is it going to cost

25  them and am I going to get the product shipped, or is it going

460

460

1  to go on backorder.  In order to do that, we introduced a

2  technology of EDI to be able to generate -- back then what it

3  was called was a request for quote, to be able to send to a

4  vendor to say, can you give me the information about this

5  product, do you have it in stock, and how much is it going to

6  cost me.

7      So that request for quote would be responded to by the

8  vendor with a response to request for quote that would give us

9  that information.

10  Q   Now, RIMS had some inventory availability capability with

11  regard to Fisher products; is that right?

12  A   Yes, it did.

13  Q   Did RIMS have this inventory availability capability you

14  just described with regard to multiple vendors?

15  A   No.

16      MR. ROBERTSON:  That's all I have.  Please answer

17  whatever questions Mr. McDonald may have.

18      MR. McDONALD:  I take it, Your Honor, you want to

19  keep us rolling, rolling, rolling.

20      THE COURT:  I don't think you have many questions, do

21  you?  He hasn't been on but about 15 minutes or so.

22      MR. McDONALD:  That's true.

23      THE COURT:  I don't see how you are going to go

24  beyond that, but if we do, we'll see where we are in

25  15 minutes.

461

461

1          CROSS-EXAMINATION

2  BY MR. McDONALD:

3  Q   Mr. Johnson, I'd like to talk about the graphical

4  interface user issue.  You were describing, I think, the steps

5  you took to get an actual physical embodiment of the product

6  put together in your answers; right?

7  A   That's what we did to build the system, yes.

8  Q   I'd like to talk to you about the system as it existed

9  when you actually filed the patents in this suit; okay?

10  A   Okay.

11  Q   The patents, if you have Exhibit 1 before you, that was

12  filed August 10th of 1994; correct?

13      MR. ROBERTSON:  Your Honor, I'm going to object.

14  This is outside the scope of my direct.

15      THE COURT:  I don't know if it is or isn't yet.

16  Let's wait until we get a question that deals with the

17  graphical user interface system first.  That's what he wants to

18  talk about.  There may be an objection, Mr. Johnson, so don't

19  answer the question.  We'll see if there's an objection and

20  ruling.

21      THE WITNESS:  Okay.

22      THE COURT:  So as of -- you are talking as of

23  August 10, 1994, what?

24  Q   So on that date, that's when you filed the patent

25  applications in this case; correct?

515

```
1          IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                    RICHMOND DIVISION
3       - - - - - - - - - - - - - - - - -
                                        :
4       ePLUS, INC.,                    :
                                        :
5              Plaintiff,      :
          v.                   : Civil Action
6                              : No. 3:09CV620
        LAWSON SOFTWARE, INC.,          :
7                              : January 6, 2011
               Defendant.      :
8       - - - - - - - - - - - - - - - - - :
9
10
11         COMPLETE TRANSCRIPT OF JURY TRIAL
          BEFORE THE HONORABLE ROBERT E. PAYNE
12        UNITED STATES DISTRICT JUDGE, AND A JURY
13
14
15      APPEARANCES:
16      Scott L. Robertson, Esq.
        Jennifer A. Albert, Esq.
17      Michael T. Strapp, Esq.
        David M. Young, Esq.
18      GOODWIN PROCTOR
        901 New York Avenue, NW
19      Washington, D.C.  20001
20      Craig T. Merritt, Esq.
        CHRISTIAN & BARTON
21      909 E. Main Street, Suite 1200
        Richmond, VA  23219-3095
22
            Counsel for the plaintiff ePlus
23
24
25         DIANE J. DAFFRON, RPR
           OFFICIAL COURT REPORTER
           UNITED STATES DISTRICT COURT
```

516

```
1       APPEARANCES:  (Continuing)
2       Daniel W. McDonald, Esq.
        Kirstin L. Stoll-DeBell, Esq.
3       William D. Schultz, Esq.
        MERCHANT & GOULD
4       3200 IDS Center
        80 South Eighth Street
5       Minneapolis, MN  55402-2215
6       Dabney J. Carr, IV, Esq.
        TROUTMAN SANDERS
7       Troutman Sanders Building
        1001 Haxall Point
8       P.O. Box 1122
        Richmond, VA  23218-1122
9
            Counsel for the defendant Lawson Software.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

517

```
1          (The proceedings in this matter commenced at
2       9:20 a.m.)
3          THE CLERK:  Civil Action No. 3:09CV00620,
4       ePlus, Incorporated v. Lawson Software, Incorporated.
5       Mr. Scott L. Robertson, Mr. Craig T. Merritt,
6       Ms. Jennifer A. Albert, Mr. Michael T. Strapp, and Mr.
7       David M. Young represent the plaintiff.
8          Mr. Daniel W. McDaniel, Mr. Dabney J. Carr,
9       IV, Ms. Kirstin L. Stoll-DeBell, and Mr. William D.
10      Schultz represent the defendant.
11         Are counsel ready to proceed?
12         MR. ROBERTSON:  Yes, Your Honor.
13         MR. McDONALD:  Yes, Your Honor.
14         THE COURT:  All right.  Thank you very much.
15         I apologize for keeping you-all waiting this
16      morning.  I had a mechanical malfunction that I needed
17      to attend to, and I'm not very mechanically oriented.
18         All right, Mr. Robertson.
19         Dr. Weaver, I remind you you're under the
20      same oath which you took yesterday.
21         THE WITNESS:  Yes, Your Honor.
22      BY MR. ROBERTSON:  (Continuing)
23      Q   Good morning, Dr. Weaver.
24      A   Good morning.
25      Q   If we could have Plaintiff's Exhibit No. 1 back up
```

518

```
1       on the screen again, the '683 patent, the cover page
2       here.
3          Dr. Weaver, the jurors have seen this exhibit now
4       several times and it's in their jury notebooks.  This
5       is at tab 2.  Can you just tell us what is the title
6       of the patent?
7       A   Electronic Sourcing System and Method.
8       Q   Has the Court defined the term "electronic
9       sourcing system"?
10      A   Yes, it has.
11      Q   What's your understanding as to what that
12      construction is?
13      A   In the glossary of claim terms, the "electronic
14      sourcing system" has been defined by the Court to be
15      an electronic system for use by a prospective buyer to
16      locate and find items to purchase from sources,
17      suppliers or vendors.
18      Q   What is your understanding of what a source is,
19      sir?
20      A   A source would be a vendor or a manufacturer or a
21      distributor.
22      Q   In the Court's construction of the claim term
23      "catalog" or "product catalog," how does the Court
24      define what a vendor can be?
25      A   The vendor, in the Court's construction, a vendor
```

559

1    A  We sure will.

2    Q  The next element of Claim Three, which is

3    color-coded blue and has this means for building a

4    requisition using data relating to selected matching

5    items and their associated sources, what's your

6    understanding as to what a requisition is?

7    A  The requisition is the formal list of items that

8    you wish to purchase.

9    Q  Moving on to the next element of Claim Three,

10   which is yellow in your illustration.  It says, A

11   means for processing the requisition to generate one

12   or more purchase orders for the selected matching

13   items.  You mention the term "purchase order" when you

14   were discussing requisitions.  How does a purchase

15   order differ from a requisition?

16   A  The requisition is the list of things you want.  A

17   purchase order is the contract vehicle for buying.  So

18   when I have a purchase order and I send it to a

19   company, this is the legal document that says I want

20   to buy the item or items on this purchase order.

21       Requisition is your total list of things you'd

22   like to buy.  Purchase orders go to individual

23   companies.

24   Q  When you're providing your understanding of the

25   definitions and the meanings of these terms, is that

560

1    the same understanding as a person of ordinary skill

2    in the art at the time?

3    A  Yes.

4    Q  So how would the fifth element of Claim Three be

5    satisfied?

6    A  We would have to see a requisition module that can

7    take the formal requisition, which could have many

8    items from many vendors, and then turn that into one

9    or more purchase orders.  And, typically, you have all

10   the items from one vendor on one purchase order if you

11   can do it.  If they are present.

12   Q  Moving on to the sixth and last element of Claim

13   Three, which you have color-coded brown.  That element

14   recites means for converting data relating to a

15   selected matching item and an associated source to

16   data relating to an item and a different source.  How

17   are we to understand that claim element?

18   A  So if I have a list of items and for some

19   reason -- let's say I want to do comparison shopping

20   or say that the item that I want, I've checked the

21   inventory, and it's not available.  So there has to be

22   a converting means whereby I can look for similar

23   items, and this is all computer assisted.  I can find

24   similar items that I might choose instead of the one

25   that I had initially inquired about.

561

1        MR. McDONALD:  Your Honor, I'm going to

2    object to this question about this.  This is a

3    means-plus-function clause and he's asking him what it

4    means.  It should be done in the context of the --

5        THE COURT:  I was just looking at page 2 of

6    the glossary.  I think that's been defined over there.

7        MR. ROBERTSON:  I was just going to ask him

8    to go to that page.

9        THE COURT:  Don't be having him give his own

10   constructions, please, before you ask him to go to the

11   ones that have been construed.

12   BY MR. ROBERTSON:

13   Q  If you go to page 2 of the Court's glossary, Dr.

14   Weaver.

15   A  Yes.

16   Q  What's the function that's being defined here on

17   the means for converting data for this claim element?

18   A  The function of this element is converting data

19   related to a selected matching item and an associated

20   source.

21   Q  According to the Court, how can this function be

22   accomplished?  By what structure?

23   A  The corresponding structures, materials or acts of

24   this element are disclosed as one or more non-catalog

25   databases identifying cross-referenced items,

562

1    identical items, or generally equivalent items; one or

2    more cross-reference tables or file identifying

3    cross-referenced items, identical items, or generally

4    equivalent items; one or more codes corresponding to

5    cross-referenced items, identical items or generally

6    equivalent items; and their equivalents.

7    Q  In that definition there are non-catalog databases

8    identifying cross-referenced items, identical items or

9    generally equivalent items, cross-reference tables or

10   files and one or more codes.

11       As a computer scientist, can you tell us what your

12   understanding as a person of ordinary skill in the art

13   would understand those three terms to mean?

14   A  Sure.  So a non-catalog database is a file that is

15   not part of the physical structure of the database

16   system.  So it's an external file.

17       In this context, it's identifying the

18   cross-referenced items.  So, for instance, we might

19   have a vendor -- think of a file that has records.

20   Think of that as a row in a table.  We might have one

21   vendor's part number and a second vendor's part number

22   in that row.  And if this is in a cross-reference

23   index that indicates in this context that those two

24   part numbers are identical or generally equivalent --

25   let's see.  What was the next one?  Okay.

563

1    Cross-reference tables or files.  So this is a larger
2    structure, but it contains that same type of
3    information.  Vendor part No. 1 is equivalent to this
4    other vendor part No. 2.
5        And by equivalent, I mean identical or generally
6    equivalent.
7        And then by codes, this means that there is an
8    understood structure, understood by the computer and
9    perhaps by the human inputting these codes as to what
10   the codes mean.  So in one case --
11       MR. McDONALD:  Your Honor, I'm going to
12   object.  I don't think his interpretation of codes is
13   in his report.
14   BY MR. ROBERTSON:
15   Q  Doctor, did you do analysis of whether or not the
16   Lawson system employs codes for performing this
17   cross-referencing capability or this means for
18   converting data as the Court has construed the claim?
19   A  Yes, it does.
20   Q  What type of codes?
21   A  That particular code is called a UNSPSC code,
22   United Nations Standard Products and Services Codes.
23   Q  We're going to come back to that, but could you
24   just briefly explain to the jury what type of code
25   that is.

564

1        THE COURT:  Why don't you tell me where it is
2    here because that's what the objection is.
3        MR. McDONALD:  He's talking about UNSPSC
4    codes, Your Honor.  I will agree that's in there.
5        THE COURT:  The objection is withdrawn.
6        MR. ROBERTSON:  Thank you.
7    Q  In examining this kind of cross-referencing or
8    converting capability, is it described in the patent?
9    A  Yes.
10   Q  Why don't we use the '683 patent, if we can, and
11   go to column 16.  That's tab 2 in the juror
12   notebook specifically at about lines 19 through 27.
13   What's the example being given here as how this
14   cross-referencing or converting process for finding
15   identical or generally equivalent items can be
16   accomplished?
17   A  The general idea here is that a particular part
18   number has been entered into this electronic sourcing
19   system and that particular part number is not
20   available, but the cross-referencing system using the
21   cross-reference index finds that another vendor's part
22   number is the same or generally equivalent, and it
23   substitutes the second part number for the first.
24   Q  Why don't we go to a different claim now, Claim 26
25   of the '683 patent.  And I want to focus on this last

565

1    element.  This determining whether selected matching
2    items is available in inventory.  Can you tell us how
3    the patent describes that process?
4    A  When the customer service representative who is
5    using the system does a search for an item, one of the
6    functions that is supported here is inquiring about
7    what quantity of those items is available in the
8    inventory database.  And so if you inquire and you get
9    back a quantity of zero or if you get back a quantity
10   that's less than the number you want, you know that
11   those items are not available in inventory.
12   Q  You indicated there could be a CSR.  That's a
13   customer service representative.  Does it have to be
14   in the patent?
15   A  No, that's just an example.
16   Q  The claim itself doesn't recite whoever the user
17   is, does it?
18   A  No.
19   Q  I'd like to talk a little bit now about sort of a
20   general overview of the Lawson accused systems and
21   methods that you have examined as part of your
22   analysis.  Would that be all right?
23   A  Sure.
24   Q  Do we have a demonstrative that you have prepared
25   as to what you consider the procurement system in the

566

1    various modules to be?
2    A  We do.
3    Q  Now, this was prepared at your direction?
4    A  Yes.
5    Q  What are you intending to illustrate here, sir?
6    A  I'm trying to show the various modules and
7    components that are in the Lawson system, and I've
8    tried to map them by color to the claims of the '683,
9    Claim 26.
10   Q  By the way, Doctor, is your touch screen working?
11   A  Yes.
12   Q  So you might want to, if you need to, you can
13   utilize that capability.
14   A  I can use my pointer.
15   Q  All right.  So I'm sorry.  I interrupted you.  You
16   have got a catalog database icon there.  Do you see
17   that?
18   A  Right here.  So this is the set of catalogs in
19   electronic form.
20   Q  Actually is that the user sitting at the computer?
21   Do you see the catalog database?
22   A  Yes.
23   Q  Where?
24   A  You're talking about this one.
25   Q  Yes, sir.

567

1    A  Yeah, okay.  So the catalog database is the
2    electronic form of the catalogs all put together so
3    that they can be searched.  That is the catalog
4    database.
5    Q  Does the Lawson procurement system include a
6    database in its inventory control module?
7    A  Yes, it does.
8    Q  Can supplier product catalog be loaded into that
9    control module?
10   A  Yes, we'll see that.
11   Q  What's the selection icon?
12   A  Of all the catalogs that are in the database, the
13   user interface provides a way to select one or more
14   that are going to be searched.
15   Q  Now, you have all of these modules I see here
16   within a gray box.  What are you trying to illustrate
17   there?
18   A  The gray box is the Lawson system.
19   Q  And these are the various components?
20   A  These are components, modules.
21   Q  There's an icon there for searching for matching
22   items.  Do you see that?
23   A  Yes.
24   Q  What did you intend to illustrate there?
25   A  Using the user interface, one engages a search

568

1    program and gives it a search query or initiates a
2    search using a characteristic of a drop down menu.
3    And the search engine then engages and returns items
4    that match the query.
5    Q  Did you examine a Lawson software program that
6    permits a user of a Lawson system to perform that
7    functionality?
8    A  Yes, the requisitioning system does that.
9    Q  You have building a requisition icon here.  Do you
10   see that?
11   A  Yes.
12   Q  Please explain what you're intending to illustrate
13   there?
14   A  So in the Lawson system you build a shopping cart,
15   then you add and delete items from it until you're
16   satisfied with it.  And then you do a checkout from
17   the Lawson system.  And that engages the requisition
18   system and builds the requisition of all the items
19   that you want to order.
20   Q  Are you familiar with the term "a shopping cart"?
21   A  Yes.
22   Q  Is that consistent with your understanding of
23   building a requisition?
24   A  Well, it's not the requisition.  It's the data
25   structure that can be modified.  You can add and

569

1    delete to it.  So in computer terminology, we call
2    this a cache, a C-A-C-H-E.  So it's a data structure
3    that holds data, and then it's going to be transferred
4    to the requisition module, and then it's in the requisition
5    module that the requisition is created.
6    Q  All right.  Thank you for that correction.  So is
7    it consistent with an order list?
8    A  The order list is the shopping cart and that's
9    what becomes the requisition.
10   Q  Did the Court define what an order list is in its
11   glossary of claim terms?
12   A  Yes.  A list of desired catalog items.
13   Q  Did you apply that construction in doing your
14   infringement analysis?
15   A  Absolutely.
16   Q  Next you have an icon for generating purchase
17   orders.  Do you see that as part of the overview of
18   the Lawson procurement system?
19   A  Yes.
20   Q  Can you explain that process here?
21   A  So we've got our requisition.  This is our formal
22   list of the things we want to buy.  It might have one
23   item.  It might have a hundred items.  The items might
24   be from one vendor or they might be from 100 vendors.
25   Whatever that requisition says, the purchase order

570

1    module takes that requisition and typically pulls out
2    all of the requisition items that are going to be
3    ordered from a single vendor and creates a purchase
4    order for that vendor.  Then it pulls all the items
5    that go to another vendor and creates a separate
6    purchase order for the second vendor and so on until
7    all the items in the requisition have appeared in some
8    purchase order.
9    Q  Did you do analysis of any Lawson software program
10   or module that performs that functionality?
11   A  Yes, we're going to see that, and it's going to be
12   the Lawson P.O. 100 program.  Their purchase order
13   program that converts a requisition into one or more
14   purchase orders.
15   Q  Now, you've illustrated a number of arrows between
16   these various software programs or modules that you've
17   identified as part of the overall Lawson infringing
18   system.  What are you intending to indicate by those
19   arrows?
20   A  Well, the arrows with the single head indicate
21   unit directional information flow.  The arrows that
22   are double-headed indicate bidirectional data flow
23   back and forth.
24      So, for instance, the arrow here between selection
25   and searching, you use that user interface to engage

703

1    as to whether that's a multiple catalog availability
2    or a single catalog?
3    A  Well, as we just saw when we did our Punchout
4    Staples and Dell, those were two completely separate
5    catalogs on separate websites run by different people.
6    So those are unquestionably separate catalogs.
7    Q  Do you have an understanding about whether the
8    '683 patent, for example, requires catalogs to be
9    searched simultaneously?
10   A  It does not.
11   Q  Did the Court in any of its claim constructions
12   have that requirement?
13   A  No, that's not in the claim construction.
14   Q  Does the Lawson system have the capability of
15   enabling you to select search first a product catalog
16   and then subsequently select a search in another
17   product catalog?
18   A  Yes.
19   Q  Do you see that in any of your demonstrations?
20   A  Yes, we did.  The Bush or Basyx.
21   Q  In the demonstration in Punchout, did we see that
22   ability to select those product catalogs?
23   A  Yes, we did because we saw that in Dell and in
24   Staples.
25   Q  Why don't we talk a little bit about searching for

704

1    selected product catalogs using the Lawson keyword
2    index?
3           THE COURT:  Excuse me.  Before you do that,
4    are you saying in your view item master is not a
5    single catalog but is a multiple catalog because it
6    has imported into it all number of parts of other
7    catalogs?
8           THE WITNESS:  Well, let me just be clear.
9           THE COURT:  Yes.
10          THE WITNESS:  If the item master is built by
11   importing multiple vendor catalogs, then in my opinion
12   is that database contains multiple vendor catalogs.
13          THE COURT:  But what if it is built by
14   importing part of multiple catalogs, parts of
15   catalogs?
16          THE WITNESS:  In my opinion, it's still
17   multiple catalogs.
18          THE COURT:  I just want to know -- and it's
19   because in those instances you think it's a function
20   of importation?
21          THE WITNESS:  Yes, sir.
22          THE COURT:  All right.
23   BY MR. ROBERTSON:
24   Q  Does the Lawson system have the capability of
25   importing multiple vendor catalogs?

705

1    A  Yes.  We saw that in the documentation with the PO
2    536 program.
3    Q  Did you see representation that Lawson said they
4    could import multiple catalogs?
5    A  Yes, we did.
6    Q  So I did want to address this searching the
7    selected product catalogs using Lawson's keyword
8    search.  You're familiar with that?
9    A  Yes.
10   Q  Are you familiar with Lawson's contention that it
11   searches the entire item master and therefore the
12   Lawson systems don't, and its search engine, does not
13   search only selected portions of catalogs, but rather
14   the entire item master?
15   A  I'm aware of that, but I disagree with that.
16   Q  Why do you disagree with that?
17   A  Because the way that the system is built it uses a
18   search index.  If you think about building a complex
19   system, you would never build it such that you had to
20   search through every single item in order to match a
21   search query.  It would take forever if the database
22   was of any size.  So that's not the way relational
23   databases get built.
24       Instead there's a search index, and so like the
25   index of a book, you have keywords, and they point to

706

1    where in the database those items reside.
2        So if I do a keyword search for Dell, I look it up
3    in the index, and that tells me where the Dell items
4    are, and I only look at those.
5    Q  Do you have any demonstratives that you prepared
6    to help illustrate this point?
7    A  I do.
8    Q  Could we go to 09 at page 15.  Okay.  Here you
9    have a definition of an index from Webster's New World
10   Computer Dictionary.  What significance here should we
11   be focused on as you talk about this computer search
12   index that's being utilized?
13   A  This part here.  When searching or sorting the
14   database, the program uses the index rather than the
15   full database.  Such operations are faster than sorts
16   or searches performed on the actual database.
17   Q  As a computer scientist, is using an index in
18   order to search a relational database something that
19   is utilized in order to make those faster searches?
20   A  Absolutely.
21   Q  Do you know how the Lawson's system search index
22   is created?
23   A  Yes.
24   Q  What is that?
25   A  There's a process by which keywords are defined

707

1  that are going to become searchable.  So there's a
2  keyword search setup program that you run, and then
3  after you've defined what keywords are going to be
4  searchable and you've got your database loaded, and
5  the item master is now full of data, you run the
6  keyword search load program.  That builds the index.
7      And now until you have changed the database, you
8  have got an index into all the searchable keywords
9  that -- all of the keywords that were chosen to be
10  searchable.
11  Q  Are some of those keywords like item description,
12  item number, classification code that you've been
13  addressing already?
14  A  Yes, they are.
15  Q  Which database tables is the search index built?
16  A  I'm sorry.  Say that again.
17  Q  Sure.  From which database tables is the search
18  index built?
19  A  The item master.  Well, and the vendor item table,
20  too.
21  Q  Once the user has selected the field of the item
22  data that are to be searchable, what is the next step
23  in building this index?
24  A  So after you have chosen your keywords, you have
25  to load them all, and then you -- the computer system,

708

1  the keyword search load program, builds this index
2  that is search engine then uses thereafter.
3  Q  Can you take a look at Plaintiff's Exhibit
4  No. 136.  It's in Volume III.  It's entitled,
5  "Requisition Self Service 8.1, 9.0."
6  A  Yes.
7  Q  What is this exhibit, if you know?
8  A  This is a training program for requisition self
9  service.  This particular one is a copy of what a
10  human trainer would be using in terms of slides and
11  notes.  So if you're familiar with Microsoft
12  PowerPoint, it has a notes feature.  So here is the
13  slide itself, and below it are the notes.  So if I
14  were a trainer training you as an RSS class, I would
15  be showing you this picture up here, and then this
16  would be my reminder text of what I wanted to tell you
17  about the slide that I'm showing you.  Instead of
18  having an audio recording, you've got words.
19  Q  Is this a presentation that Lawson gives to train
20  its customers?
21  A  Yes.
22  Q  Why don't we go to page 3 of the document, if we
23  could.  It's Bates label is 687.
24  A  Right.
25  Q  What would you like us to focus on here?

709

1  A  The first two paragraphs.  You can search the
2  catalog, which will search for items in your item
3  master or vendor items.  It also allows you to search
4  for keywords for up to 29 fields based on your set up.
5  You can also search based on categories which can use
6  the UNSPSC code categories.  And I think we've heard
7  the rest of that before.
8  Q  We've gone over that.  Let me direct you then to
9  page 12 of the document.  Is this a Lawson keyword
10  search setup proposal?
11  A  Well, this is the training guide and --
12  Q  This is teaching the customers how to set up the
13  keywords?
14  A  Yes, it is.
15  Q  What's the next page?
16  A  Keyword search load.
17  Q  What is that?
18  A  So that was the second program that you have to
19  run.  The first one, the keyword search set up, this
20  is where you choose which of the 29 different fields
21  will become searchable.  So after you have got them
22  chosen, and you've got your item master database
23  loaded, then you run the keyword search load, and it
24  builds the index.
25  Q  Then if you will turn to page 29.  There's a slide

710

1  there that says "creating a requisition by searching
2  the catalog"?
3  A  Yes.
4  Q  What's being depicted there?
5  A  So this is something that we have seen.  When I
6  did the catagory search and picked items and built a
7  requisition.  So it says down here, When using the
8  search catalog task, you enter the value you want to
9  look for in the search field.  As soon as you type in
10  the third letter, the system begins searching for the
11  matching keywords and displays the result as a drop
12  down list.
13      Keywords exist because you enable certain fields
14  as searchable in this IC00.5 program and run IC800 to
15  build keywords from these fields.
16      So that's the setup and load.  IC800 is the
17  keyword load.
18  Q  So what if anything do the pages of this document
19  have with respect to your understanding of how the
20  Lawson system or whether the Lawson system uses a
21  search index to conduct its searches?
22  A  Well, it absolutely does such that it need not
23  search the entire database.  That's what keyword setup
24  is about and how a keyword load turns that into an
25  actual index.

711

1  Q  So once you have enabled the keyword terms and you
2  built the search index, how does the Lawson search
3  engine conduct a search of the item data in the
4  database?
5  A  So if I type in a word into a text box, say Dell,
6  and engage the search engine, it goes to the search
7  index.  It looks up Dell.  It finds records in the
8  database that match the keyword Dell.  And then it
9  extracts that data from the database and presents that
10  to me on the screen.
11  Q  Do you have a demonstrative you prepared to try
12  and illustrate how this search index operates?
13  A  I do.
14  Q  What's being illustrated here, sir?
15  A  Okay.  So up here at the top we have the text box,
16  which is the search query.  I don't know where that
17  popping is coming from.
18      THE COURT:  That's because you, like some
19  witnesses, but not all, articulate your P's in a
20  particular way at a particular length from the
21  microphone, and there isn't anything that we've been
22  able to do about it.  And it's not your fault.  It's a
23  function of the way things are.
24      THE WITNESS:  Thank you, Your Honor.
25      THE COURT:  It's annoying, but --

712

1      THE WITNESS:  I would have worried about that
2  all night.
3      THE COURT:  Well, don't.
4      MR. McDONALD:  As long as he doesn't use the
5  T sound for the rest of the testimony, it's fine.
6      THE COURT:  No, it's a P, generally.
7  Does this have an exhibit number?
8      MR. ROBERTSON:  No, Your Honor.  It's simply
9  demonstrative.
10      THE COURT:  All right.
11  A  So we have our keywords at the top, our query
12  text, and for this example I want to look for the
13  keywords Dell and monitor.  We'll assume that we have
14  enabled at least two fields, two keyword fields to be
15  searchable.  One of them would be a user-defined field
16  for the manufacturer.  We haven't actually talked
17  about user defined fields yet, but this is part of the
18  Lawson product.  So a user defined field or
19  manufacturer has been determined to be searchable.  It
20  has been declared to be searchable.  And a second
21  field, the item description, which is one of the
22  fields, one of the 29 fields supported by Lawson, that
23  one has also been declared to be searchable.
24      Now, after I do the search load and I build my
25  index, then what I have is for each of the entries in

713

1  the user-defined field for manufacturer, like Dell or
2  Hewlett-Packard or Gateway, for each of those I have
3  pointers into the database that tell me where I will
4  find a record, a product, in which the Dell keyword
5  was located in the user-defined field for
6  manufacturer.
7      Likewise, for the item description fields, if I've
8  got a database that contains keywords like keyboard
9  and mouse and monitor, every time a descriptive term
10  is found that is searchable for item description like
11  keyboard, in this database there are pointers from the
12  index into the database that say where that item is
13  found.
14      So the way this then works is when I put in Dell
15  and monitor, the search engine goes to the search
16  index, finds the keyword Dell, finds all of the places
17  that the keyword Dell would appear in the database.
18  In this case its locations are 10, 20, 25, 26, 27 and
19  28.
20      Then it would look for the next keyword in the
21  query box.  That's monitor.  It would look up all of
22  the places in the database where monitor appears as
23  keyword.  And that's 15, 16, 17, 19, 20, 21, 22, 23,
24  25 and 27.
25      Then having found where the records containing the

714

1  keyword Dell are located and where the records
2  containing the keyword monitor are located, then we do
3  the intersection of those.  That is, from those two
4  lists of numbers, we find where the numbers are
5  exactly the same.
6      So in my example here, 25 and 27 are the database
7  records that contain both the keywords Dell and
8  monitor.
9      So I go fetch records 25 and 27.  And that's what
10  I display to the user.  So I don't search the whole
11  database.  I just the index to search selected parts.
12      THE COURT:  Mr. Robertson, what is this
13  testimony related to?  We had that at the beginning.
14  Now we've had a lot of testimony, and I'm confused a
15  little bit, and the jury may be, about what exactly
16  this line relates to.  Does it have to do with whether
17  there's a search of a single catalog or not?  Is that
18  what we're still on?
19      MR. ROBERTSON:  No, Your Honor.  There are
20  some claims that say you have to search portions of
21  the database or search among the selected catalogs.
22  And so in order to search portions of the database,
23  you need a search index.  Lawson contends that the
24  index is -- that the search searches the entire
25  database all the time.  So, therefore, they can't

741

```
1           IN THE UNITED STATES DISTRICT COURT
2          FOR THE EASTERN DISTRICT OF VIRGINIA
3                     RICHMOND DIVISION
4
5    --------------------------------------
6    ePLUS, INC.          :  Civil Action No.
                          :  3:09CV620
7    vs.                  :
                          :
8    LAWSON SOFTWARE, INC.      :  January 7, 2011
                          :
9    --------------------------------------
10
11        COMPLETE TRANSCRIPT OF THE JURY TRIAL
12        BEFORE THE HONORABLE ROBERT E. PAYNE
13      UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24        Peppy Peterson, RPR
          Official Court Reporter
25      United States District Court
```

742

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

743

```
                 P R O C E E D I N G S
1
2
3        THE CLERK:  Civil action number 3:09CV620, ePlus,
4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr.
6    Michael G. Strapp, and Mr. David Young represent the plaintiff.
7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
9    the defendant.  Are counsel ready to proceed?
10       MR. ROBERTSON:  Yes, Your Honor.
11       MR. McDONALD:  Yes, sir.
12       THE COURT:  Good morning.  Good morning, ladies and
13   gentlemen.  I was informed by the clerk that you all needed to
14   know the procedure for asking questions, and if you have
15   questions, it's all right.
16       I think the best way to do this is for you to write
17   your question out and then send it up to Mr. Neal, and he'll
18   give it to me, because there's some kind of questions that,
19   perhaps, are better -- I will tell you immediately, I can't
20   answer that or we can't get into that.
21       Others -- and I found this to be the case most of the
22   time.  Other questions are very helpful to the lawyers to have,
23   because if you have -- you are the ones who have to decide the
24   case, and if you have a question, they need to know it and need
25   to work out a way to get the information to you through their
```

744

```
1    questions.
2        So if you feel like you have a question, you can
3    write them out, send them to me, and I'll take them and look at
4    them.  Unless it's something that I can't allow, we'll work out
5    a way to get you the information that you need.
6        You all look like you're not as drained as you were
7    when you left yesterday afternoon.  I feel the same way, so
8    let's get a fresh start.  Let's go ahead, Mr. Robertson.
9        MR. ROBERTSON:  Thank you, Your Honor.  Good morning.
10
11          ALFRED C. WEAVER,
12   a witness, called by the plaintiff, having been previously
13   duly sworn, testified as follows:
14          DIRECT EXAMINATION
15   BY MR. ROBERTSON:  (resuming)
16   Q   Good morning, Dr. Weaver.
17   A   Good morning, Mr. Robertson.
18   Q   I'd like to start out looking at Plaintiff's Exhibit
19   Number 219, if I could, sir, in binder number five.  Before we
20   get there, I have a few preliminary questions.
21       Do you know whether or not Lawson provides services to its
22   customers to assist them in importing vendor catalog data into
23   its item master?
24   A   Yes, I do.  There was witness testimony to that from the
25   customers.
```

933

1    THE COURT:  Okay.  Are you about ready to get
2    back to where we were, sir?
3    MR. GREER:  Yes, sir.
4    THE COURT:  When you're ready, plunk your
5    magic button.
6    (The video deposition of Jeffrey P. Frank is
7    resumed.)
8    THE COURT:  Looks like they are still working
9    on the other matter.  So do you have another witness?
10   MR. ROBERTSON:  Yes, Your Honor.  I do have
11   the Excel Spreadsheet was sent to Lawson on
12   December 31 containing the excerpts of the Frank
13   deposition that were to be played.  The ones that
14   are --
15   THE COURT:  Well, give it to them.  They are
16   working on it.
17   MR. ROBERTSON:  If they are working on it,
18   fine, Your Honor.  We don't need to delay and retain
19   the jury.
20   THE COURT:  No, we're not going to hold the
21   jury up for this.  We're moving right along.
22   MS. ALBERT:  EPlus would call Hannah Raleigh.
23   THE COURT:  Where is Ms. Raleigh?
24   MS. ALBERT:  I understood she was here in
25   person.

934

1    THE COURT:  Who is she?
2    MS. ALBERT:  She's an employee from Lawson.
3    THE COURT:  Okay.
4    MS. ALBERT:  Your Honor, if I could just have
5    a brief moment.  We have some exhibit binders for
6    Ms. Raleigh and the Court.
7    THE COURT:  You're going to trust
8    Mr. Robertson to handle that?
9    MR. ROBERTSON:  We're all in trouble then.
10   THE COURT:  Here he comes.  Oh, no.
11   MS. ALBERT:  It's not quite as daunting as it
12   might appear.  There are just a couple of voluminous
13   documents.  I think there are two binders total.
14   THE COURT:  I wonder if your cap and trade
15   bill would include deductions for paper killing for
16   law firms.  Tree killing.
17   Is that for me?  Thank you for my present.
18   Thank you, sir.
19   All right.
20   HANNAH RALEIGH, called by the Plaintiff, first
21   being duly sworn, testified as follows:
22
23   DIRECT EXAMINATION
24   BY MS. ALBERT:
25   Q    Would you state your full name for the record,

935

1    please?
2    A    Hannah Edmundson Austin Raleigh.
3    Q    You are currently employed by Lawson with its
4    professional services organization; is that correct?
5    A    That's correct.
6    THE COURT:  Can you hear all right, ladies
7    and gentlemen?
8    THE JURY:  Yes.
9    THE COURT:  If you have any problems, let us
10   know.
11   MS. ALBERT:  I have a little bit of a hoarse
12   voice.
13   THE COURT:  No, I was talking about the
14   witness.
15   BY MS. ALBERT:
16   Q    Your current position at Lawson is one of practice
17   director; is that correct?
18   A    That's correct.
19   Q    And your responsibilities as practice director are
20   to oversee customer implementations of Lawson's
21   products at new customers and significant
22   implementations of current customers in the eastern
23   region of the United States; is that correct?
24   A    That's right.
25   Q    And your responsibilities as practice director

936

RALEIGH - DIRECT       936

1    include overseeing customer implementations of
2    Lawson's procurement products; is that correct?
3    A    That's correct.
4    Q    Now, Lawson's Professional Services Organization
5    has roughly 1500 employees worldwide; is that correct?
6    A    That's roughly correct, sure.
7    Q    Isn't it true that 90 percent or more of Lawson's
8    customers engage Lawson Professional Services at some
9    time for some form of assistance over the course of
10   their relationship with Lawson?
11   A    Yes, over the course of their full use of the
12   products, yes.
13   Q    Now, among the different types of services
14   provided by Lawson's Professional Services
15   Organization to Lawson's customers, those services
16   would include training services; is that correct?
17   A    Absolutely.
18   Q    And Lawson's Professional Services Organization
19   also provides services that are referred to as project
20   management services to Lawson's customers; is that
21   correct?
22   A    Yes, we do.
23   Q    Lawson's Professional Services Organization also
24   services that are referred to as implementation
25   consulting services; is that correct?

937

RALEIGH - DIRECT       937

1    A  That's correct.

2    Q  And Lawson's Professional Services Organization

3    also provides services that are referred to as upgrade

4    consulting services; is that correct?

5    A  That's correct.

6    Q  And those upgrade services would involve assisting

7    the clients with upgrading from one version of a

8    Lawson system to the next released version of that

9    system; is that correct?

10   A  That's correct.

11   Q  Lawson's Professional Services Organization also

12   provides technical development services to customers

13   such as interface development and customization

14   development services; is that correct?

15   A  We do at times, yes.

16   Q  Lawson's Professional Services Organization also

17   offers services to Lawson's customers that are

18   referred to as learning services; is that correct?

19   A  That's true.

20   Q  Among the learning services that Lawson's

21   Professional Services Organization provides to

22   Lawson's customers would be public instructor led

23   training in one of Lawson's offices or on site

24   instructor led training for a specific customer at

25   their site; is that correct?

938

RALEIGH - DIRECT       938

1    A  Sure.

2        MS. ALBERT:  Mike, if you would, could we

3    have Plaintiff's Exhibit 202.

4    Q  And, Ms. Raleigh, that is in Volume I of your

5    binders.

6        THE COURT:  Before you go anywhere, what was

7    the exhibit number for that Frank deposition?  You're

8    going to have to put it in the record because the

9    court reporter wasn't taking it down.  Just look it up

10   and tell me later.

11       Go ahead, Ms. Albert.

12   Q  Do you have Plaintiff's Exhibit 202?

13   A  I do.

14   Q  Is Plaintiff's Exhibit 202 a catalog of online

15   courses that Lawson offers to its customers?

16   A  Yeah.  It's a catalog that was published at a

17   certain point in time, but yes.

18   Q  Can you turn, please, to page 5 of this exhibit,

19   and the Bates number on that page ends with 4027?

20   A  I'm there.

21   Q  Do you see at the top of the page there's a course

22   entitled inventory control 8.1/9.0 X?

23   A  I do.

24   Q  And Lawson offers this two-day course entitled

25   Inventory Control 8.1/9.0 X that provides its

939

RALEIGH - DIRECT       939

1    customers with -- and I'm reading from the first line

2    there.  Instructions on the key setup components and

3    processing functionality of the inventory control

4    application; is that correct?

5    A  That's correct.

6    Q  And among the training included in that course

7    would be, in following along with the second sentence,

8    instructions on the key setup components and

9    processing functionality -- excuse me, instructions

10   concerning how to set up the item master associated

11   with the inventory control application; is that

12   correct?

13   A  Yes, that's right.

14   Q  Turn to page 6 of that exhibit, please.  Do you

15   see on that page there's a course entitled,

16   Requisition Self Service 8.1-9.0?

17   A  Yes.

18   Q  Lawson also offers a course entitled, Requisition

19   Self Service 8.1/9.0, which introduces major features

20   of requisition self service such as requisition

21   approvals, receiving, and the shopping experience

22   which includes searching the catalog for items, using

23   shopping lists, ordering specials or services, and

24   ordering by categories; is that correct?

25   A  Yes.

940

RALEIGH - DIRECT       940

1    Q  In this course, Lawson enables its customers to

2    have an experience using an actual Lawson training

3    system that would have the requisition self service

4    application installed; is that correct?

5    A  Yes.

6    Q  I believe I'm done with that document.

7    A  Okay.

8    Q  Lawson's Professional Services Organization also

9    provides services to Lawson's customers that consist

10   of installing the Lawson software on the customers'

11   hardware; is that correct?

12   A  Yes.

13   Q  And you previously mentioned that Lawson provides

14   implementation services to its customers.  Do you

15   recall that?

16   A  Yes.

17   Q  Among the implementation services that Lawson

18   provides to its customers, those services would

19   include assistance with designing the configuration of

20   the Lawson software to meet the customer's business

21   requirements; is that correct?

22   A  Yes.

23   Q  Also included among the implementation services

24   that Lawson would provide to its customers would be

25   assisting the customer with developing test scripts

941

RALEIGH - DIRECT     941

1  and assisting the customer with testing the software

2  on that equipment; is that correct?

3  A  Yes, we assist with customer with all the aspects

4  of implementing the software and those would be

5  included.

6  Q  Among the aspects included with implementation

7  would be all aspects up to and including bringing a

8  system live into actual production operation; is that

9  correct?

10 A  That's right.

11 Q  Lawson also provides -- when a customer's system

12 goes live, that means it's actually operational and in

13 an actual production environment to perform the

14 procurement process; is that correct?

15 A  We hope so, yes.

16 Q  Now, also included among the services that Lawson

17 would provide to its customers, Lawson can provide

18 hosting services or Lawson physically hosts the

19 customer's system in space that Lawson owns if the

20 customer so desires; is that correct?

21 A  We can.

22 Q  And Lawson also provides services to its customers

23 to support converting existing systems and conversion

24 of data from those existing systems into the proper

25 format for importation into a Lawson system; is that

942

RALEIGH - DIRECT     942

1  correct?

2  A  Yes.  All of our customers are importing from a

3  previous system, so yes.

4       THE COURT:  Excuse me just a minute.  I don't

5  know that any of us over here know what hosting means.

6  The way it's been explained sort of leads me to the

7  impression that Lawson has everything on its computer

8  system, but if I'm the customer, I can be in Timbuktu

9  and just use my computer, and I go through you to get

10 what I want.  Is that basically right or wrong?

11      THE WITNESS:  The only clarification I would

12 make to that is that the system is actually still the

13 customer's system.  So it is their system.  It is

14 physically housed in a Lawson-owned or leased

15 facility.  Obviously, we take care of keeping the

16 lights on and the electricity and those of things, but

17 the system can be accessed, you're correct, from

18 Timbuktu or anywhere else in the world using Internet

19 protocols.

20 Q  And Lawson will assist its customer with

21 implementing those systems that it hosts in its own

22 facilities among other services; is that correct?

23 A  Yes.  It makes no difference where that hardware

24 lives.

25 Q  Lawson also provides workshops to educate its

943

RALEIGH - DIRECT     943

1  customers on data migration requirements and data

2  mapping to put this data that's imported from a prior

3  system into a Lawson system; is that correct?

4  A  That's right.

5  Q  And Lawson Software includes within the software

6  import and export utilities that can be utilized for

7  this data conversion process; is that correct?

8  A  That's correct.

9  Q  As part of the data conversion effort, Lawson's

10 Professional Services Organization will actually

11 convert item master data from a client's preexisting

12 system to a format for use in the Lawson procurement

13 system; is that correct?

14 A  Yes.  When requested to help them with that, yes.

15 Q  Have you actually been involved in implementation

16 projects where the customer has so requested Lawson to

17 perform data conversion efforts?

18 A  Yes, I have been involved in some projects where

19 the customer needed assistance from the Lawson team to

20 do various elements of that conversion process.

21 Sometimes some steps and sometimes other systems, but

22 certainly I've been involved in projects where we

23 participate in that process.

24      MS. ALBERT:  Mike, if we could have

25 Plaintiff's Exhibit 216.  And, Ms. Raleigh, that's in

944

RALEIGH - DIRECT     944

1  Volume II of your binders.

2  Q  Are you there?

3  A  I'm here.

4  Q  Ms. Raleigh, is this a copy of Lawson's statement

5  of work for system implementation it performed for the

6  Public Health Trust Jackson Health System?

7  A  Yes, it is.

8  Q  And you were Lawson's practice director that

9  oversees the implementation of Lawson's system for

10 this client; is that correct?

11 A  That's correct.

12 Q  And Lawson received the award of the contract for

13 this particular implementation project; is that

14 correct?

15 A  That's right.

16      MS. ALBERT:  Mike, if you could turn to page

17 15 of the exhibit and the Bates number on that page

18 ends with 5374.

19 Q  Do you see the heading on that page entitled "Data

20 migration and conversion scope"?

21 A  I do.

22 Q  Below that there's an item, 3.5.1 that refers to

23 master file and configuration table value builds, do

24 you see that?

25 A  I do.

945

RALEIGH - DIRECT        945

1   Q  And the text below that indicates that the data to
2   be converted will be identified during the design
3   phase.  The Lawson functional consultants will provide
4   assistance with data mapping support, data loading
5   support, and executing uploads via Lawson add-ins tool
6   to build the required master files and
7   configuration/setup table values.  Do you see that?
8   A  I do.
9   Q  And the Lawson professional consultants did
10  actually provide this assistance to Jackson Health
11  System as indicated in the statement of work; is that
12  correct?
13  A  We did.
14  Q  And in the second paragraph below that, the second
15  sentence of that paragraph, indicates that the
16  customer will have access to Lawson's conversion
17  manuals and file layouts.  Do you see that?
18  A  I do.
19  Q  Did Lawson actually provide the customer Jackson
20  with the Lawson conversion manuals and file layout as
21  indicated in the statement of work?
22  A  We did.  I want to clarify that this entire
23  section does refer to all of the aspects of the
24  implementation, not purely the procurement
25  implementation.  So our involvement over the course of

946

RALEIGH - DIRECT        946

1   the project may have, you know, been different
2   depending on which part of the system we were building
3   at the time.  So there could be differences, but yes.
4   Q  But this particular implementation project did
5   include the procurement modules; is that correct?
6   A  It did.
7   Q  Continuing on with that second sentence in the
8   second paragraph, it indicates that conversion work
9   session will be conducted to review the Lawson's
10  standard conversion programs and conversion process.
11  Do you see that?
12  A  I do.
13  Q  And Lawson did provide that conversion work
14  session to review the Lawson standard conversion
15  programs and conversion process for Jackson, correct?
16  A  Absolutely.
17  Q  Can you turn to page 16 of the exhibit and the
18  Bates number on that page ends with 375.
19  A  Yes, I'm there.
20  Q  That's table on this page entitled
21  "Responsibilities for master file and configuration
22  table value builds," do you see that?
23  A  I do.
24  Q  The table on this page relates to which party is
25  going to have responsibility for particular tasks

947

RALEIGH - DIRECT        947

1   during the implementation project; is that correct?
2   A  That's right.
3   Q  The second task in the table indicates that Lawson
4   would be responsibility to provide cross functional
5   workshops to define the data migration process and
6   mapping required for Jackson.  Lawson did actually
7   provide such a cross functional workshop to define the
8   data migration process and mapping for Jackson Health
9   System, didn't it?
10  A  We did.
11  Q  And the next activity below that in the table
12  relates to migration strategy and process description.
13  Do you see that?
14  A  I do.
15  Q  And Lawson also provided Jackson Health System
16  with migration strategy and process description,
17  correct?
18  A  We did.
19  Q  And if you proceed down, I believe it's the sixth
20  task in the chart, it's identified as training and
21  data migration tools.  Do you see that?
22  A  Yeah, I do.
23  Q  And the Lawson personnel delivered standard
24  training and education courses relating to data
25  migration tools to Jackson personnel; isn't that true?

948

RALEIGH - DIRECT        948

1   A  We did.  I would probably refer to it more as
2   knowledge transfer than standard training or
3   education.  It was less formal than it maybe sounds
4   here, but we did help them understand those tools.
5   Q  And the last task on that page is identified as
6   test load sample data, do you see that?
7   A  I do.
8   Q  It indicates that the client would be responsible
9   for providing sample data and then Lawson is
10  responsible for executing the load of the test data.
11  Lawson, in fact, executed the load of the test data
12  for Jackson in connection with this project; is that
13  correct?
14  A  Yes, we did.
15  Q  Can you turn to the next page of the exhibit.
16  That Bates No. on that page ends with 376?
17  A  I'm there.
18  Q  The first task on this page is identified as
19  production data load.  Do you see that?
20  A  I do.
21  Q  And the table indicates that Lawson was
22  responsible for executing the load of the test data
23  for Jackson.  Lawson did in fact, load the production
24  data for Jackson in connection with this
25  implementation project, correct?

949

RALEIGH - DIRECT        949

1   A  We did.  I believe we did.

2   Q  And continuing down the page.  Lawson also

3   conducted a full migration system test for Jackson in

4   connection with this project; is that correct?

5   A  We did.

6   Q  And Lawson was also responsible for the live data

7   migration for Jackson system, correct?

8   A  We were.

9   Q  If you look down below that table on the same page

10  there's another table, table 3.5.1.1.1, do you see

11  that?

12  A  I do.

13  Q  And the title on that table is master file in

14  configuration table value build and scope; do you see

15  that?

16  A  I do.

17  Q  And the table on this page identifies the master

18  files and configuration tables that were included

19  within the scope of the implementation project that

20  Lawson conducted for Jackson; is that correct?

21  A  Yes.

22  Q  So the data conversions that were included within

23  the scope of the project that Lawson performed for

24  Jackson included the vendor master, the item master

25  and the vendor catalog; is that correct?

950

RALEIGH - DIRECT        950

1   A  I would agree with the vendor master and the item

2   master, but if you note, there's a bolded Lawson

3   response next to the vendor catalog specification.

4   I'll also note that the system that was being convert

5   from was Eclipsys, right?  So the terminology used

6   here to describe the data is really more relevant to

7   the system from which the data was coming.

8       But if you note the Lawson response related to

9   catalog, vendor catalog, it's really more that that is

10  purely item master data.  So we really included the

11  item master data that they may be referring to based

12  on Eclipsys' terminology of the vendor catalog.

13  Q  If lawson provided a response to Jackson here that

14  said catalog information is a part of Lawson's item

15  master, it wouldn't be converted as part of conversion

16  item No. 22 above; is that correct?

17  A  Based on the definition of catalog information

18  that, I believe, was related to Eclipsys' definition

19  of vendor catalog information.

20  Q  But Lawson told Jackson that the vendor catalog

21  data in Jackson's prior system would be included as

22  part of the data that would be converted in connection

23  with this project, right?

24  A  Right.  Essentially, we told them that is

25  item master data, so it would be included under item 2

951

RALEIGH - DIRECT        951

1   there for item master.

2   Q  Lawson also provides maintenance and support

3   services to its customers; is that correct?

4   A  We do.

5       MS. ALBERT:  Mike, if you could, could you

6   put up Plaintiff's Exhibit 208.

7   Q  And, Ms. Raleigh, that's in Volume I of your

8   binders.

9   A  I'm there.

10  Q  Plaintiff's Exhibit 208, this is a handbook that

11  Lawson publishes to its customers to tell them about

12  the types of support services that Lawson offers; is

13  that correct?

14  A  That's correct.

15  Q  Could you go to page 17 of the exhibit, and the

16  Bates number on that page ends with 050?

17  A  I'm there.

18  Q  Now, with reference to the chart on that page, it

19  shows that Lawson has four different levels of support

20  services; is that correct?

21  A  That's correct.

22  Q  There's a bronze level of support service.

23  There's a base maintenance support level; is that

24  accurate?

25  A  That's accurate.

952

RALEIGH - DIRECT        952

1   Q  There's a silver level of support services.

2   That's an enhanced level of support; is that correct?

3   A  That's right.

4   Q  And then there's a gold level of support services

5   that's entitled, Application Management; is that

6   accurate?

7   A  It incorporates Application Management in addition

8   to others, yes.

9   Q  Well, as we're proceeding up this chart, for each

10  successive level of support, Lawson would provide all

11  of the support at the level beneath that level plus

12  the additional support listed for the level that it

13  relates to; is that accurate?

14  A  That's accurate.

15  Q  Then there's a top level of support entitled,

16  Platinum that relates to hosted solutions; is that

17  correct?

18  A  That's right.

19  Q  So some services that would fall within the base

20  or bronze level of maintenance services that Lawson's

21  provides to its customers would include providing them

22  with upgrades to licensed products; is that accurate?

23  A  That's true.

24  Q  The enhanced level of support service that Lawson

25  provides to its customers at the silver level of

990

```
 1         IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF VIRGINIA
 3               RICHMOND DIVISION
 4
 5   --------------------------------------
                            :
 6   ePLUS, INC.            :  Civil Action No.
                            :  3:09CV620
 7   vs.                    :
                            :
 8   LAWSON SOFTWARE, INC.  :  January 11, 2011
                            :
 9   --------------------------------------
10
11      COMPLETE TRANSCRIPT OF THE JURY TRIAL
12       BEFORE THE HONORABLE ROBERT E. PAYNE
13      UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C. 20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia 23219-3095
     Counsel for the plaintiff
23
24       Peppy Peterson, RPR
         Official Court Reporter
25      United States District Court
```

991

```
 1   APPEARANCES:  (cont'g)
 2   Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
 3   Troutman Sanders Building
     1001 Haxall Point
 4   Richmond, Virginia 23219
 5   Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
 6   William D. Schultz, Esquire
     Merchant & Gould, PC
 7   80 South Eighth Street
     Suite 3200
 8   Minneapolis, Minnesota 55402
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

992

```
               P R O C E E D I N G S
 1
 2
 3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
 4   Incorporated versus Lawson Software, Incorporated.  Mr. Scott
 5   L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr.
 6   Michael G. Strapp, and Mr. David Young represent the plaintiff.
 7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
 8   Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
 9   the defendant.  Are counsel ready to proceed?
10        MR. ROBERTSON:  Plaintiff is, Your Honor.
11        MR. McDONALD:  Yes, we are, Your Honor.
12        THE COURT:  What did you all need to talk about?
13        MS. STOLL-DeBELL:  We actually resolved it, Your
14   Honor, between the time we that mentioned --
15        THE COURT:  Tell them to bring the jury in.  What do
16   we have this morning?
17        MR. ROBERTSON:  The first witness we're calling this
18   morning is Mr. Keith Lohkamp, Your Honor.  He's a Lawson
19   employee.  I have a number of binders associated with the
20   witnesses this morning.  I want to make sure my paralegal --
21   oh.
22
23        (Jury in.)
24
25        THE COURT:  Good morning, ladies and gentlemen.  All
```

993

```
 1   right, we have a witness.  Next witness.
 2        MR. ROBERTSON:  Mr. Keith Lohkamp.
 3        THE COURT:  All right, Keith Lohkamp.
 4
 5          KEITH LOHKAMP,
 6   a witness, called by the plaintiff, having been first duly
 7   sworn, testified as follows:
 8        DIRECT EXAMINATION
 9   BY MR. ROBERTSON:
10   Q   Good morning, Mr. Lohkamp.
11   A   Good morning.
12   Q   Mr. Lohkamp, you are a Lawson Software employee; correct?
13   A   Yes, I am.
14   Q   And you are a product strategist for supply chain
15   management; correct?
16   A   Yes.
17        THE COURT:  Can we get the witness to spell his last.
18   Q   Can you please spell your last name, sir, for the record.
19   A   It's L-o-h-k-a-m-p.
20   Q   Can you explain to the jury essentially what supply chain
21   management is?
22   A   Supply chain management involves the procurement of goods
23   and services and the management of the inventory related to
24   managing those goods.  It also includes, can include the sell
25   side, so selling those goods and services as well.
```

1154

Lohkamp - Redirect                    1154

Dale Christopherson.

2       THE COURT:  How long is this going to take?

3       MR. ROBERTSON:  Your Honor, I'm trying to cut it back

4  considerably.  I think I'd be less than 45 minutes.

5       THE COURT:  Mr. Niemeyer, how long is his examination

6  going to be?

7       MR. ROBERTSON:  Less than an hour.

8       THE COURT:  Let's go.  There was a lot of stuff that

9  that could have been excised from that.

10       MR. ROBERTSON:  I tried to limit it, Your Honor, but

11  both parties get to cross-designate, so...

12       THE COURT:  611 is in effect in full force.

13

14       DALE CHRISTOPHERSON,

15  a witness, called by the plaintiff, having been first duly

16  sworn, testified as follows:

17

18       MR. ROBERTSON:  May I proceed, Your Honor?

19       THE COURT:  Please.

20

21       DIRECT EXAMINATION

22  BY MR. ROBERTSON:

23  Q  Will you state your full name for the record, sir?

24  A  Dale Arnold Christopherson.

25  Q  And you are currently the director of development at

1155

1  Lawson Software; correct?

2  A  That's correct.

3  Q  Then in your role as the director of development, you have

4  responsibilities for these software modules that we've been

5  talking about, Lawson requisition self-service, Lawson

6  procurement punchout, Lawson purchase order, Lawson

7  requisitions, Lawson inventory control, and Lawson EDI;

8  correct?

9  A  Those are some of the many that I do have under my

10  control, yes.

11  Q  You are familiar also with the Lawson system foundation;

12  is that right?

13  A  Depends on how deep you want to go into it, but, yes, I am

14  familiar with it at some length.

15  Q  You were asked in your deposition whether Lawson system

16  foundation is a technology layer that sits below these current

17  applications we've been talking about.  Do you recall that?

18  A  I certainly do.

19  Q  You said it was?

20  A  Yes, it was and still is.

21  Q  And so isn't it true now that all customers of Lawson are

22  required to license the Lawson system foundation in order to

23  use the current version of the Lawson applications?

24  A  That's correct.

25  Q  And in this procurement version nine plus, any version

1156

1  nine plus you have to do that; isn't that right?

2  A  In nine plus?

3  Q  Any version nine and above?

4  A  Oh, any version nine and above, that's correct.

5  Q  There are several versions of this software we've been

6  talking about; correct?

7  A  Yes, there are.

8  Q  And there's a separate license fee associated with Lawson

9  system foundation; is that correct?

10  A  That's correct.

11  Q  Now, there's been a lot of discussion about these vendor

12  catalogs.  A customer can import a vendor catalog into the item

13  master of the Lawson system; isn't that right?

14  A  They can go basically through a three-step process, yes.

15  Q  And you are aware also of this UNSPSC we've been talking

16  about?

17  A  I certainly am.

18  Q  So isn't it true that you can use the UNSPSC to find items

19  from different vendors that were all cross-referenced using the

20  same product category?

21  A  Let me think about what you are really saying there.

22  Could you restate that?

23  Q  Sure.  Isn't it true that a user of the Lawson system that

24  has this UNSPSC capability can find items from different

25  vendors that were all cross-referenced to the same product

1157

1  category?

2  A  That's correct, yes.

3  Q  The shopping cart in Lawson requisition self-service can

4  be dynamically built from results of conducting searches in the

5  item master; isn't that right?

6  A  That is correct.

7  Q  And it's also true that the shopping cart can also be

8  dynamically built using the results of searches in the vendor

9  punchout catalogs; right?

10  A  That is also correct.

11  Q  And when the user clicks a checkout in the items in your

12  shopping cart, they are moved into the requisition system, and

13  an actual requisition is created; isn't that right?

14  A  I would actually define that slightly different.

15  Q  All right.  Do you recall giving a deposition in this

16  case?

17  A  I certainly do.

18  Q  And you were under oath?

19  A  Uh-huh.

20  Q  I believe you have your deposition transcript.  It should

21  be in the first volume.

22  A  Yep.

23  Q  Could you go to page 77?  Excuse me.  I misspoke.  177.

24  A  177?

25  Q  Yes, sir.

1158

1  A  Okay.  I'm not there yet.

2  Q  Okay, take your time.

3  A  Okay, 177.

4  Q  Starting at about line 18?

5  A  Starting with question, and then on the right-hand screen?

6  Q  Let me read the question for you.

7     Question:  And then on the right-hand screen in the card,

8  here you have four items that have been included in your

9  shopping cart.  What happens to that when you click checkout?

10    Your answer:  When you click checkout, then it would move

11  that information into the requisition system and actually

12  create a requisition.

13    Did you give that answer to that question at that time?

14  A  I certainly did.

15  Q  Okay.  Thank you.  Once a requisition is approved, the

16  requisition is released and then transferred to the purchase

17  order system; correct?

18  A  That's correct, after it's been approved.

19  Q  Talking just now about procurement punchout, when users

20  have filled their shopping carts, virtually speaking, and

21  checked out from the vendor website using the Lawson

22  procurement punchout, the chosen items and their prices are

23  returned to the Lawson server and a requisition is created

24  using the Lawson requisition self-service application; correct?

25  A  Can you state that again?  The second half of it basically

1159

1  is where I lost you.  ^you check out at the customer, not the

2  customer but the vendor site and then it was at that point

3  where I got lost.

4  Q  Let me start over.  Let's hear the whole question.  When

5  users have filled their shopping carts, virtually speaking, and

6  checked out from the vendor website using Lawson procurement

7  punchout, the chosen items and their price are then returned to

8  the Lawson server, and a requisition is created using the

9  Lawson requisition self-service application; correct?

10  A  That's correct.

11  Q  Isn't it true that the current version of the Lawson

12  procurement punchout includes the capability to punch out to

13  multi-vendor catalogs?

14  A  That's correct.

15  Q  One of those examples of a site that you can go that is a

16  multi-catalog vendor -- excuse me, multi-vendor catalog, is

17  SciQuest; correct?

18  A  That's correct.

19  Q  Another example of a multi-vendor catalog site that's

20  available for the punchout procurement is an organization known

21  as GHX; correct?

22  A  That is correct.

23  Q  That stands for Global Healthcare Exchange?

24  A  That's correct.

25  Q  And Global Healthcare Exchange that provides this

1160

1  multi-vendor catalog capability is a punchout trading partner

2  of Lawson; correct?

3  A  That's correct.  They are on the list, yes.

4  Q  It's an accurate statement to say that if Lawson could not

5  market a requisition module, it could not effectively compete

6  in the supply chain management product market?

7  A  I would say that that would be an accurate statement, yes.

8  Q  It's also accurate to say if Lawson could not offer a

9  purchase order module, Lawson could not effectively compete in

10  the supply chain management product market?

11  A  That would also be correct.

12  Q  You've heard a lot of talk about the implementation and

13  installation services that Lawson offers.  I just want to be

14  clear that Lawson will provide implementation services to

15  assist its customers with importing vendor catalog data into

16  the item master.

17  A  I didn't hear a question in that, sir.

18  Q  Let me restate it then.  Perhaps I misspoke.  Is it true

19  that Lawson provides implementation services to assist its

20  customers with importing vendor catalog data into the item

21  master?

22  A  If the customer so chooses and wants that service, yes, we

23  do.

24  Q  So for most situations where a customer licenses the

25  supply chain management suite or the procurement modules we've

1161

1  been talking about in supply chain management, Lawson

2  professional services is going to provide the actual

3  installation and implementation services for that system;

4  correct?

5  A  That's correct, yes.

6  Q  All existing Lawson customers today are under maintenance

7  contracts with Lawson; correct?

8  A  That's correct.

9  Q  So all of the supply chain -- excuse me.  All of the

10  supply -- let me restate that.  All of the S3 procurement

11  products that are under contract today with Lawson customers,

12  they have maintenance contracts; is that right?

13  A  Could you restate that?

14  Q  Yeah.  I'm sorry.  It was a bad question.  With respect to

15  the Lawson S3 procurement product that's at issue here, any

16  customer that has that product is under an existing maintenance

17  contract?

18  A  That's correct.

19  Q  There's been a lot of talk about this RFP process, and I

20  don't want to go through it again in detail, certainly, but

21  there is a standard set of answers for those common questions

22  that customers have about the S3 procurement product; correct?

23  A  That is correct, yes.

24  Q  I think if you'll look in your book to Exhibit 117.

25  A  Okay.

1188

```
 1         IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF VIRGINIA
 3               RICHMOND DIVISION
 4
 5    --------------------------------------
 6    ePLUS, INC.           :  Civil Action No.
                            :  3:09CV620
 7    vs.                   :
                            :
 8    LAWSON SOFTWARE, INC.  :   January 12, 2011
                            :
 9    --------------------------------------
10
11        COMPLETE TRANSCRIPT OF THE JURY TRIAL
12          BEFORE THE HONORABLE ROBERT E. PAYNE
13       UNITED STATES DISTRICT JUDGE, AND A JURY
14
      APPEARANCES:
15
      Scott L. Robertson, Esquire
16    Michael G. Strapp, Esquire
      Jennifer A. Albert, Esquire
17    David M. Young, Esquire
      Goodwin Procter, LLP
18    901 New York Avenue NW
      Suite 900
19    Washington, D.C.  20001
20    Craig T. Merritt, Esquire
      Christian & Barton, LLP
21    909 East Main Street
      Suite 1200
22    Richmond, Virginia  23219-3095
      Counsel for the plaintiff
23
24        Peppy Peterson, RPR
          Official Court Reporter
25        United States District Court
```

1189

```
 1    APPEARANCES:  (cont'g)
 2    Dabney J. Carr, IV, Esquire
      Troutman Sanders, LLP
 3    Troutman Sanders Building
      1001 Haxall Point
 4    Richmond, Virginia  23219
 5    Daniel W. McDonald, Esquire
      Kirstin L. Stoll-DeBell, Esquire
 6    William D. Schultz, Esquire
      Merchant & Gould, PC
 7    80 South Eighth Street
      Suite 3200
 8    Minneapolis, Minnesota  55402
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1190

```
 1              P R O C E E D I N G S
 2
 3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
 4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
 5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr.
 6    Michael G. Strapp represent the plaintiff.
 7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
 8    Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
 9    the defendant.  Are counsel ready to proceed?
10        MR. ROBERTSON:  Plaintiff is, Your Honor.
11        MR. McDONALD:  Yes, Your Honor.
12        THE COURT:  All right.  You said you wanted to see me
13    before the jury comes in.
14        MR. McDONALD:  Yeah, there's basically three issues
15    we wanted to raise.
16        THE COURT:  The court reporters always can hear
17    better if you come to the lectern.
18        MR. McDONALD:  There's basically three issues that we
19    wanted to raise this morning.  One is our third witness in our
20    case that we start today is Ms. Raleigh.
21        THE COURT:  Third witness in what?
22        MR. McDONALD:  In our case when we start presenting
23    our case today.  We have Mr. Richard Lawson first, Mr.
24    Christopherson second, and then Hannah Raleigh was supposed to
25    come back and be third today.
```

1191

```
 1        She was supposed to be back last night from New York,
 2    and New York is getting hammered real bad by this blizzard.
 3    She's trying to get another flight, but her flight is not going
 4    to get her here until after the trial day is over today.  So
 5    we've been trying to work something out with ePlus about what
 6    we would do next because we haven't disclosed any exhibits or
 7    anything for the next witness.
 8        THE COURT:  Just call the next witness, the expert or
 9    whoever you've got here.  There's no magic to the order of
10    putting people on.
11        MR. McDONALD:  The next witness we would have
12    actually here is Mr. Lohkamp, calling him back.
13        THE COURT:  Good.
14        MR. McDONALD:  That's fine.  They haven't had a
15    chance to get ready for their cross-examination.
16        THE COURT:  They'll be ready.  They knew basically
17    what you were going to do anyway.  They're not going to do it
18    on your cross-examination; they were going to do redirect, so
19    we're going to reverse things.
20        MR. McDONALD:  We do have a deposition of Ms.
21    O'Loughlin on the RIMS prior art issue that we can move up in
22    the order.
23        THE COURT:  Is that carefully edited to eliminate the
24    trash?
25        MR. McDONALD:  That's being worked on as we speak,
```

2011.01.12 Trial Transcript Day 6  1/12/2011  3:47:00 PM

1244

1 and placed into the keyword detail table.  For each item, there
2 is a corresponding keyword and an origin field.
3 Q   And what database tables are indexed by the keyword detail
4 table?
5 A   My understanding is that at minimum, the ITEMMAST,
6 POITEMVEN, and ITEMLOC tables.
7 Q   In the context of this source code, what is the purpose of
8 having an index like the keyword detail table?
9 A   It's common practice to create an index to -- an
10 optimization to increase the speed of the search and to
11 eliminate to need to search the whole collection of data when
12 you can condense it to an index that you can search more
13 rapidly.
14 Q   Can you explain how the item vendor table or the POITEMVEN
15 table is used in the implementation of a keyword search in the
16 source code?
17 A   After the search is performed against the keyword tables
18 and item information is being retrieved, corresponding vendor
19 information for the items is retrieved from the POITEMVEN
20 table.
21 Q   Do the records in the item vendor or POITEMVEN table link
22 in any way to the records in the item master or ITEMMAST table?
23 A   Yes, they do.  They contain a field which holds the item
24 number for a given item in the ITEMMAST table.
25 Q   Have you prepared a demonstrative to help you explain how

1245

1 the information in these two tables can be related?
2 A   Yes, I have.
3     MS. ALBERT:  Mike, can we have slide 68, please.
4 Q   Is this the demonstrative that you prepared?
5 A   Yes, it is.
6 Q   Now, using your demonstrative, would you please explain
7 how records in the item vendor or POITEMVEN table can be
8 related to records in the item master table or ITEMMAST table?
9 A   Yes.  So within the ITEMMAST table, or the item master
10 table, there is a field called ITITEM which holds the item
11 number for that item.  That item number uniquely identifies the
12 item within the ITEMMAST table.
13    The PO item vendor table then can -- given record within
14 that table can refer to an item within the ITEMMAST table using
15 that unique number.  It's what's known as a key field in the
16 ITEMMAST table.  Within the POITEMVEN table, there's a field
17 called PIV item which holds that number, and, therefore, if you
18 want to, for a given item in the POITEMVEN table, you can point
19 back to a specific unique item in the ITEMMAST.
20     MS. ALBERT:  Mike, could we go back to slide 24,
21 please.
22 Q   Now, going back to your demonstrative on keyword search
23 query execution, can you explain how the keyword search
24 functionality is implemented in the Lawson system source code?
25 A   Yes.  So after the user enters a search term in the

1246

1 browser and hits the search button, the search term is conveyed
2 as part of a request to the server side components which causes
3 the Lawson 4GL COBOL program called RQIC to be executed.  The
4 RQIC program ultimately performs a search of the keyword detail
5 table for occurrences of that term that have been previously
6 indexed.
7     Any matching records from the keyword detail table are
8 then used to find the corresponding items in the ITEMMAST table
9 and data gets gathered from the PO and ITEMLOC tables.  All of
10 those results are formatted as XML and ultimately returned to
11 the item web browser and formatted as a search word.
12 Q   When the search code searches the keyword tables to locate
13 the keywords that the user typed in, does the source code
14 search the item master table at all?
15 A   No, it does not.  It only searches the keyword detail
16 table and the associated keyword tables.
17 Q   Now, I'd like to turn to the functionality for the adding
18 items to a shopping cart and building a requisition.  Does the
19 source code of the Lawson system implement functionality that
20 allows a user to select desired items for requisition from a
21 list of results returned from either this category or keyword
22 search that you discussed?
23 A   Yes, it implements a shopping cart functionality whereby
24 the user can indicate that an item from a search result should
25 be added to the shopping cart.  Items can be added and removed

1247

1 until checkout operation is performed.  Similar to the way you
2 shop on Amazon or another web business.
3 Q   Now, what, if any, database tables are involved in this
4 shopping cart functionality?
5 A   There are three.  Two of them are prefixed with the term
6 REQ.  One is called REQHEADER and the other is called REQLINE.
7 The third is called PO interface which we mentioned before,
8 POITERFAC.
9 Q   And what information is stored in that REQLINE table
10 that's relevant to the shopping cart functionality?
11 A   The REQLINE table holds the individual line items
12 representing items that were selected to be added to the
13 shopping cart.
14 Q   Does this REQLINE table also contain a status field?
15 A   Yes, it does.  In addition to the item information, it
16 contains a status which can indicate that the item is either --
17 while in the shopping cart, it's in a state called unreleased.
18 Q   What does that mean?
19 A   It means that it is part of a shopping cart and not yet
20 part of a requisition.
21 Q   And is there another status that can be indicated in this
22 status field in addition to the unreleased status that you
23 mentioned?
24 A   Yes.  So I'd just say both the REQLINE and REQHEADER table
25 that I mentioned which are involved in this contain a status

1356

1 objection, Your Honor, and their cross designation.
2     THE COURT: All right. It's in without
3 objection. How do you deal with that now? You have
4 let it in without objection.
5     MR. ROBERTSON: No, Your Honor. I don't know
6 if we objected or not. Our objection might have been
7 overruled.
8     THE COURT: Well, then you better check that
9 out, too, because if it's overruled, that's a
10 different issue. If you didn't open the door, they
11 did.
12     MR. ROBERTSON: I will look into that, Your
13 Honor.
14     THE COURT: Yes.
15     MR. ROBERTSON: With respect to this issue
16 about the published by a vendor, we have collected a
17 number of documentation that involved both the Markman
18 hearing the subsequent motion in limine we had with
19 respect to proffering new constructions of any claim
20 terms outside of the Court's construction, the
21 discussions we had at the final pretrial conference.
22     THE COURT: Have you tabbed them?
23     MR. ROBERTSON: It's tabbed and highlighted,
24 Your Honor.
25     THE COURT: So I can read it fairly quickly.

1357

1     MR. ROBERTSON: I've provided it to Mr.
2 McDonald.
3     MR. McDONALD: I thought you asked us to try
4 to get together and agree on a joint appendix of these
5 materials.
6     THE COURT: I thought that's what this it
7 was.
8     MR. ROBERTSON: He has it.
9     THE COURT: He may want to add to them.
10 That's the point.
11     MR. McDONALD: We should be able to work it
12 out over lunch.
13     THE COURT: I'm sure you can. But if you
14 work it out early, then I can look at it.
15     MR. ROBERTSON: Your Honor, I think when we
16 return from lunch, I'll just confirm with my
17 colleagues, there's just some issues we need to take
18 up with respect to some exhibits that were to the
19 Frank videotape deposition that was played, and then
20 there are about four or five stipulations I'd like to
21 read into the record.
22     THE COURT: I didn't know about the Frank
23 deposition. What are you talking about?
24     MR. STRAPP: Your Honor, we just wanted to
25 identify for the record the exhibits that were

1358

1 referenced during the playing of the Frank deposition.
2     THE COURT: All right. You mean they were
3 used and admitted in the depositions. You just want
4 to put the trial exhibit numbers on there?
5     MR. STRAPP: Correct, Your Honor.
6     THE COURT: Okay. You-all can work that out.
7 And then you're going to rest. Is that it?
8     MR. ROBERTSON: Yes, I believe so, Your
9 Honor.
10     THE COURT: What do you mean?
11     MR. ROBERTSON: I don't have any other live
12 witnesses.
13     THE COURT: I was waiting for rest of the
14 answer. Okay. We'll take an hour for lunch.
15     (Luncheon recess taken.)

1359

1     THE COURT: The jury reports that they'd like to work
2 both Saturday and Monday. You're really not sure, are you, Mr.
3 Strapp?
4     The jury doesn't want to work -- they said they don't
5 want to work either day, so I think we'll not work on Monday.
6     MR. ROBERTSON: Is it a unanimous decision, Your
7 Honor?
8     MR. McDONALD: Can we poll the jury?
9     THE COURT: I didn't poll them -- I didn't ask them
10 either.
11     COURT SECURITY OFFICER: It was the majority.
12     THE COURT: Okay. You want to make your Rule 50
13 motion.
14     MR. McDONALD: I've been replaced for this one. Ms.
15 Hughey will be arguing.
16     THE COURT: All right.
17     MS. HUGHEY: Thank you, Your Honor. Lawson
18 respectfully moves this Court for judgment as a matter of law
19 under Rule 50 of the Federal Rules of Civil Procedure. ePlus
20 has been fully heard on the issue of infringement, and a
21 reasonable jury does not have a legally sufficient evidentiary
22 basis for find for ePlus on this issue.
23     The testimony and documents introduced at trial
24 demonstrate that Lawson did not directly or indirectly infringe
25 asserted claims three, 26, 28, or 29 of the '683 patent, claims

1360

1   one, two, six, nine, 21, 22, or 29 of the '516 patent, or claim
2   one of the '172 patent.  For this reason, Lawson requests the
3   Court resolve the issue of infringement against ePlus in this
4   case.
5       With respect to direct infringement, ePlus has not
6   proven that Lawson directly infringes the asserted claims.
7   During trial, Dr. Weaver provided his infringement opinion on
8   five Lawson accused systems:  Inventory control, purchase order
9   and requisitions, also referred to as S3 procurement, RSS
10  combined with S3 procurement, punchout combined with S3 and RSS
11  procurement, EDI combined with S3 procurement and all modules
12  combined.
13      ePlus has not proven that it is more likely than not
14  that Lawson has made, used, offered to sell, or sold the
15  inventions defined in the asserted claims.  A reasonable jury
16  does not have a legally sufficient evidentiary basis to find
17  otherwise.
18      With respect to the asserted systems claim three of
19  the '683 patents, claims one, two, six, nine, 21, 22, or 29 of
20  the '516 patent and claim one of 172 patent, ePlus has not
21  proven that Lawson's accused products have any of the required
22  elements.  ePlus's expert, Dr. Weaver's testimony was
23  conclusory, unsupported, and insufficient to meet ePlus's
24  burden to prove that Lawson's accused systems have these
25  required elements.

1361

1       ePlus also has not proven that Lawson practices all
2   of the steps required by method claims 26, 28, and 29 of the
3   '683 patent.  At trial, ePlus did not even accuse Lawson of
4   performing all of the steps of these method claims.  Indeed,
5   when questioned, Dr. Weaver never opined that Lawson performed
6   the step of maintaining at least two product catalogs on the
7   database containing data related to items associated with the
8   respective sources, selecting the product catalogs to search,
9   or searching for matching items among the selected product
10  catalogs.
11      Thus, the jury does not have a legally sufficient
12  basis to find for ePlus on the issue of direct infringement of
13  the method claims, and this Court should grant judgment as a
14  matter of law that Lawson does not directly infringe any of the
15  method claims.
16      With respect to indirect infringement, ePlus has also
17  not proven that Lawson indirectly infringes the asserted
18  claims.  A reasonable jury does not have a legally sufficient
19  evidentiary basis to find otherwise.  First, liability for
20  indirect infringement, either contributory or induced
21  infringement, requires proof of direct infringement.
22      ePlus has failed to prove that any third party,
23  either customers, vendor, or other, directly infringed any of
24  the claims in suit.  Thus, a reasonable jury does not have a
25  legally sufficient evidentiary basis to find indirect

1362

1   infringement.
2       Second, ePlus has not proven that the legal
3   requirements of indirect infringement have been met.  Among
4   other things, both contributory and induced infringement
5   require intent, an element ePlus has failed to prove.
6   Contributory infringement requires proof that the accused
7   infringer offers a component of a patented machine knowing the
8   same to be especially made or especially adapted for use in
9   infringement of such patent and not a stable article or
10  commodity of commerce suitable for substantial non-infringing
11  use.
12      The Federal Circuit has instructed that for this
13  requirement to be met, plaintiff must show the defendant knew
14  that the combination for which its components were especially
15  made was both patented and infringing.
16      For induced infringement, a patentee must demonstrate
17  that the accused infringer's actual or constructive notice of
18  the patent and its intent to induce infringement of the patent
19  requires culpable conduct, namely that the alleged infringer's
20  actions induced infringing acts and that he knew or should have
21  known his actions would induce actual infringement.
22      Legal requirements for contributory and induced
23  infringement have not been met in this case.  There is no
24  evidence that Lawson knew of the patents before the lawsuit was
25  filed in May of 2009, let alone had the intent required for the

1363

1   contributory or induced infringement.  Further, there is no
2   evidence that Lawson should have known of ePlus's patents.
3       Dr. Weaver's opinion on the issue of induced
4   infringement is totally irrelevant.  Not only is it conclusory,
5   he did not consider the knowledge issue at all.  The same is
6   true with respect to contributory infringement.  With respect
7   to the accused punchout system, the jury does not have a
8   legally sufficient evidentiary basis to find for ePlus on the
9   issue of infringement.
10      Lawson did not practice all of the claimed method
11  steps with respect to the punchout product, and Lawson's system
12  does not meet all of the required system limitations with
13  respect to the punchout product.  This Court should grant
14  judgment as a matter of law that the punchout system does not
15  infringe any of the asserted claims.
16      First, with respect to method claim 26, 28, and 29 of
17  the '683 patent, there has been no showing that any one party
18  performs every single one of the claimed method steps for the
19  punchout products.
20      There is no dispute that ePlus relies on the actions
21  of customers and third-party vendors in its argument that the
22  claim limitations are met with respect to this product.  For
23  example, ePlus argues the step of maintaining at least two
24  product catalogs on a database containing data related to items
25  associated with the respective sources is met by external

1364

1     vendor catalog, not Lawson.

2         Likewise, Dr. Weaver never asserted Lawson practiced

3     the step of determining whether a selected matching item is

4     available in inventory; instead, merely opining in a conclusory

5     fashion that punchout allows the step to happen while admitting

6     that Lawson did not have any idea what was available in the

7     inventory of the third-party vendors, and with respect to

8     searching for matching items, ePlus argues a user searches on a

9     vendor's website using a vendor search engine, which, again, is

10    a step that Lawson does not practice.

11        The systems claims are likewise deficient.  Claim

12    three of the '683 patent and claims one, two, six, nine, 21,

13    22, and 29 of the '516 patent all require multiple catalogs.

14    Dr. Weaver opined that these claims were infringed by the

15    punchout product because punchout allows users to have access

16    to external vender catalogs, not Lawson catalogs.

17        Claim one of '172 patent is also a system claim which

18    requires a database containing data relating to items

19    associated with at least two vendors maintained so that

20    selected portions of the database may be searched separately.

21    Dr. Weaver opined that this limitation was met by the separate

22    databases of the external punchout site, but there is no

23    dispute that Lawson has not maintained separate databases of

24    the external punchout sites.  Those external vendor catalogs

25    are maintained by the vendor.

1365

1        ePlus cannot rely on the doctrine of joint

2     infringement to resolve the issue of direct infringement as it

3     has failed to show that Lawson has the required control over

4     the third parties or that Lawson performs the remaining steps.

5        In a situation in which more than one party is

6     required to perform the steps of a claimed method, there is no

7     infringement unless one party exercises control or direction

8     over the entire process such that every step is attributable to

9     the controlling party.

10       The same requirement for direction and control

11    applies to the system claims as well.  Lawson does not exercise

12    control or direction over any third party, suppliers, vendors,

13    distributors, manufacturers, or others who sell items to

14    Lawson's customers.  Likewise, Lawson exercises no control over

15    its customers.  Lawson does not have an agency relationship

16    with any party that performs any of the remaining steps from

17    the system or method claims.

18       While Lawson may reach an agreement with certain

19    vendors to allow them to provide services to its clients --

20      THE COURT:  What's the difference, Ms. Hughey,

21    between joint infringement and induced infringement in this

22    case in this record?  I know conceptually what the difference

23    is, but is there really any difference in this case between

24    those two?

25      MS. HUGHEY:  With respect to joint infringement,

1366

1     that's related to direct infringement.  Under direct

2     infringement, one party has to actively engage in every single

3     step or method claim.  If, however, a party has an agency

4     relationship with another, in certain limited circumstances,

5     the Court has allowed that to be a direct infringement.

6        For indirect infringement to occur, there must be at

7     least one direct infringer.  That is to say that someone must

8     be practicing the steps.

9      THE COURT:  Are you saying joint infringement doesn't

10    apply to indirect infringement?

11      MS. HUGHEY:  In theory you could have two parties

12    engaging in joint infringement and a third party guilty of --

13      THE COURT:  But on this record, is there any theory

14    of joint infringement that exists as to indirect infringement?

15    Any basis any jury could find that?

16      MS. HUGHEY:  I don't believe so, Your Honor, no.

17      THE COURT:  Why?

18      MS. HUGHEY:  On this record, there's no -- on this

19    record, ePlus could not prove joint infringement because it

20    hasn't demonstrated that there is an agency relationship

21    between Lawson and any third party.

22      THE COURT:  I thought you said, though, that that

23    made it direct infringement.

24      MS. HUGHEY:  That's right.  Joint infringement is

25    direct infringement.

1367

1      THE COURT:  I understand, but I also asked you,

2     because some of the instructions you all tendered suggested

3     that joint infringement an application in the indirect

4     infringement context.  Are you contending that or not?

5      MS. HUGHEY:  I don't believe that we're contending

6     that the joint infringement is the same thing as indirect

7     infringement or that it has applicability to indirect

8     infringement.  It's possible that --

9      THE COURT:  So the joint infringement doesn't -- do

10    you understand it doesn't even apply to indirect infringement?

11      MS. HUGHEY:  I think it could apply to indirect --

12      THE COURT:  On the facts of this case.

13      MS. HUGHEY:  Correct, Your Honor.  Correct.  As I was

14    saying, Lawson does not control that vendor or contractually

15    obligate them to do anything.  Likewise, Lawson does not have

16    control over what its customers do, as they act for their own

17    benefit and under their own control.  Because there is no

18    single direct infringer, there can be no indirect infringement

19    either.

20      THE COURT:  All right.

21      MS. HUGHEY:  I have two more points, Your Honor.

22    Unless you have a question?  With respect to the unaccused

23    systems, Lawson has provided no basis for a reasonable jury to

24    find for ePlus with respect to certain unaccused systems.

25      THE COURT:  If it's not accused, what do I care?  I

1368

1 don't need to rule on an unaccused system.

2       MS. HUGHEY:  They were potentially accused in the

3 pretrial order, but then during trial, it became clear they

4 were no longer accused.  I am not sure ePlus would actually

5 oppose this part of the motion.

6       THE COURT:  What are you talking about, unaccused?

7 Looking for the approvals on the purchasing agent?

8       MS. HUGHEY:  I'm sorry, Your Honor.  Certain systems

9 -- I think you remember that Dr. Weaver accused five systems of

10 infringing, and then he went through claim by claim, but he did

11 not accuse every system of accusing every claim.

12       THE COURT:  You don't need judgment on any system

13 that they don't have any evidence on.  Is there anything else?

14       MS. HUGHEY:  One final thing.  I don't believe that

15 ePlus is asserting the doctrine of equivalents infringement,

16 but I'd like to make a record here that we move for judgment as

17 a matter of law to the extent that they would suggest

18 otherwise.

19       MR. ROBERTSON:  We will stipulate we haven't made the

20 doctrine of equivalents argument with respect to the

21 infringement.

22       MS. HUGHEY:  That's all I have, Your Honor.  We'd be

23 willing to brief any of these issues further.

24       THE COURT:  Thank you.

25       MR. ROBERTSON:  Thank you, Your Honor.  I'm sure you

1369

1 can appreciate that just like Your Honor, I've heard those

2 arguments for the first time right now, so let me see if I can

3 try and track them for you and answer any questions you might

4 specifically have.

5       We think we brought forth ample evidence of both

6 direct infringement and induced infringement --

7       THE COURT:  Do you take the view that joint

8 infringement applies in the indirect infringement claim?

9       MR. ROBERTSON:  I think there can be a joint

10 infringement scenario in which Lawson aids, assists, abets,

11 encourages their customers to indirectly -- to induce

12 infringement, and that would be a situation, Your Honor, for

13 example, if Your Honor concludes --

14       THE COURT:  What is the difference between that and

15 contributory infringement then?  I think it's very confusing to

16 the jury to have this joint infringement issue in the case in

17 the indirect infringement issue, and I don't even understand

18 how it would apply on the facts of the case anyway.

19       But forget about the facts of the case.  Is there any

20 case that holds joint infringement applies in indirect

21 infringement charges?

22       MR. ROBERTSON:  I haven't seen one specifically, Your

23 Honor.

24       THE COURT:  I haven't either.  Never heard of it.

25       MR. ROBERTSON:  But, you know, if you want to ask me

1370

1 theoretically can that be the case, absolutely.  Do you want me

2 give you a scenario in the facts of this case in which it could

3 be occurring, I'm happy to do so.

4       THE COURT:  What is your theory?  Are you pressing

5 joint infringement in the indirect infringement context?  If

6 you aren't, I don't need to hear anything further about it, and

7 since it's such a rare animal, even if it's not in the extant

8 one or ever was, just fish or cut bait.

9       MR. ROBERTSON:  Your Honor, this joint infringement

10 position is a defense that Lawson is taking because they are

11 arguing that they don't have control or direction over their

12 punchout partners.  Now, I think we marshalled the substantial

13 evidence that showed that is not the case, but how could an

14 indirect or induced infringement scenario --

15       THE COURT:  They don't direct claims like that.  Do

16 you claim there is a joint infringement under the indirect

17 infringement case you are presenting?  I think that you don't.

18 I think, in fact, then -- they may say, well, even if its

19 joint infringement, you are saying we don't have control, but

20 in the first instance it's you who presses the point, so do you

21 or do you not have a joint infringement claim under your theory

22 of indirect infringement, or are you going to give it a mercy

23 killing?

24       MR. ROBERTSON:  Your Honor, I don't want to give it a

25 mercy killing because it shouldn't be killed, and let me

1371

1 explain why that's the case.  Let me give you a scenario with

2 where there can be an induced infringement in a joint

3 infringement -- direct infringement case.  You have --

4       THE COURT:  Huh-uh.  I didn't ask about direct.

5       MR. ROBERTSON:  Yes, we are pressing an indirect

6 infringement that could involve joint infringement, direct

7 infringement.

8       THE COURT:  What is that?

9       MR. ROBERTSON:  What is it?

10       THE COURT:  Yes.

11       MR. ROBERTSON:  It is inducing someone, perhaps more

12 than one party, to actually commit the direct infringement.

13       THE COURT:  Why isn't that induced infringement?

14       MR. ROBERTSON:  It is --

15       THE COURT:  -- under indirect infringement, and why

16 isn't it then joint infringement under direct infringement?

17       MR. ROBERTSON:  I agree with Ms. Hughey that joint

18 infringement is a direct infringement theory.

19       THE COURT:  That's all I'm asking you.

20       MR. ROBERTSON:  Okay.  Then I'm sorry.  I

21 misapprehended Your Honor's question, but Ms. Hughey and I

22 agree joint infringement is direct infringement.

23       THE COURT:  The instructions that both of you

24 tendered did not distinguish, and some of the arguments that

25 were being made suggested to me that you were pressing a theory

1372

1  of which I was unaware, and now that we've gotten

2  straight, what's the joint infringement theory under the direct

3  infringement claims?  In this case on this record.

4       MR. ROBERTSON:  Well, joint infringement sometimes is

5  called divided infringement when a defendant wants to say that

6  they are not directly controlling the actions of another, and

7  the way I understood Ms. Hughey's argument to be is they say,

8  we really don't know what these punchout trading partners are

9  doing that we have.  Once you go to their website, it's all up

10  to them.  So the evidence turns on whether or not there's

11  direction and control with respect to what's been proffered so

12  far before the Court.

13       THE COURT:  Direction and control of whom?

14       MR. ROBERTSON:  The third party punchout partners,

15  Your Honor, their trading partners that they either have

16  informal agreements with or formal agreements with in which

17  they -- I think one of the intentions of the formal agreements

18  is we're going to do this jointly.  We're going to make a joint

19  effort, combine our products.

20       I asked Mr. Lohkamp, do you do that for the mutual

21  benefit of both companies.  He said absolutely.  We heard

22  evidence that the Lawson system controls the punchout process,

23  that they provide the protocols.  Mr. Lohkamp even called it

24  the handshake that lets you get there.  Dr. Weaver testified

25  you can't -- you don't even leave the Lawson system, and when

1373

1  you go to the website, there was that special URL that showed

2  you had never left the Lawson system, that you are not at a

3  commercial website.  You are at a website that has been

4  especially prepared for Lawson's customers using the

5  procurement punchout.

6       The customer has to say to Lawson, we want you to set

7  this up.  We'll tell you who our punchout partners are.  Lawson

8  then goes out, they either contract with them, or they make an

9  arrangement if the protocols work, and we actually demonstrated

10  the punchout process.

11       So the argument becomes, boils down to this:  Well,

12  when you finally punched out, but you never left the Lawson

13  system, you then can search content provided by the supplier,

14  for example.  But, of course, that's exactly why the whole

15  arrangement was set up, for their joint effort and mutual

16  benefit.

17       So we think, quite frankly, Your Honor -- there's a

18  recent decision called Akamai that came down from the Federal

19  Circuit perhaps two weeks ago, and it was a situation of joint

20  infringement, and we think if there were ever a situation that

21  joint infringement applied through a factual scenario, it is

22  this case.  This case is the poster child for joint

23  infringement because of the relationship that Lawson has with

24  its punchout trading partners.

25       You will remember, even when we were looking at the

1374

1  demonstration that Dr. Weaver did a punchout, to go out and get

2  the data and retrieve it, it still was branded with Lawson.

3  You were framed within a Lawson website, and as Dr. Weaver

4  said, you never left.

5       So you can't even do the punchout process without the

6  Lawson software.  That's the first step.  And then once you do

7  do it, you are there, and you are retrieving the data, and you

8  are putting it in your requisition, and you are building your

9  purchase order just as the claims described.

10       So that, Your Honor, I think is the only scenario in

11  which I would think the joint infringement could arise at all

12  if you even needed to go there, and I think in our papers we

13  would argue first that this is not a situation of joint

14  infringement, but even if it were, that it's been satisfied by

15  the evidence that's been presented here.

16       And so how do you induce that direct infringement

17  which I think we're in agreement is joint infringement?  Lawson

18  induces it by first providing the functionality in its punchout

19  software to do that.  Second, it induces it by providing their

20  customers with the guides, the implementation, the

21  installation, the services.  They provide all of that kind of

22  evidence is evidence that they are abetting and assisting.

23       So we think that the facts of this case, particularly

24  Dr. Weaver who went through, you will recall, that eight-step

25  protocol you need to do in order to set up this communication

1375

1  links, and no one has ever denied or challenged the fact that

2  it's Lawson that sets up this communication protocol and

3  permits this process to happen, and Mr. Lohkamp even conceded,

4  you can't do it without the Lawson procurement software.

5       So when you do that, you are inducing the direct

6  infringement by the customers performing those steps of the

7  method claims when they do, and we select catalogs

8  which Dr. Weaver showed in his demonstration.  They search

9  those catalogs, they match items, they build a requisition, and

10  they build and generate the purchase order.

11       THE COURT:  Thank you.

12       MR. ROBERTSON:  He showed how to do it both from an

13  internal catalog database and -- which Lawson can set up in the

14  customer's software, and an external catalog database which is

15  the punchout.

16       THE COURT:  Thank you.  Is there -- is this record

17  now complete on the issue of willful infringement?

18       MR. ROBERTSON:  Of what, sir?

19       THE COURT:  Is the record complete on willful

20  infringement?

21       MR. ROBERTSON:  I do not believe so.  I thought we

22  were going to reserve some of those things.

23       THE COURT:  What are you going to do and when are you

24  going to do it?

25       MR. ROBERTSON:  Well, I thought we had bifurcated

1376

1 willful infringement.  I contemplated that Your Honor might

2 want to have a short hearing, perhaps a half a day, as to

3 evidence on that.

4     THE COURT:  Could we use Monday or Saturday?

5     MR. McDONALD:  Let me go back and --

6     THE COURT:  Do you really have a case of willful

7 infringement here?

8     MR. ROBERTSON:  I think one of the things, Your

9 Honor -- certainly didn't contemplate that I was going to have

10 to put on evidence in this portion of the case because I agreed

11 to bifurcate that, but let me address that specifically.

12 Number one, Lawson --

13     THE COURT:  The point is, if you haven't -- when are

14 you going to put on the evidence of willful infringement, and

15 basically what is it going to be if it's not already in?  The

16 question is, what did you do?  Did you decide to put in what

17 you had and let me decide it?  We never did decide whether we

18 were going to have a hearing.  I was going to have to decide

19 the issue, but we never did decide how we were going to do it

20 unless my memory fails.

21     MR. ROBERTSON:  Your Honor --

22     THE COURT:  Do you have additional evidence on

23 willfulness that isn't in the record at this time?  That's all

24 I want to know.

25     MR. ROBERTSON:  Let me think.  I think there's

1377

1 evidence that Lawson had an opinion of counsel that it obtained

2 early on and refused to turn over that opinion and stood on the

3 privilege.  While there is not an adverse inference the jury

4 can draw --

5     THE COURT:  The jury doesn't draw that.  I'm drawing

6 it.

7     MR. ROBERTSON:  Well, I think if the Court wasn't

8 aware, there was an opinion early on that was given --

9     THE COURT:  Didn't you all agree I did willfulness?

10 Isn't that what you agreed?

11     MR. ROBERTSON:  Yes, sir.

12     THE COURT:  All right.  I wanted to make sure --

13     MR. ROBERTSON:  In addition to the evidence that

14 there's been nothing done by Lawson since they've been put on

15 notice of this lawsuit in May 2009, no redesign, no good

16 faith effort --

17     THE COURT:  Mr. Robertson, I'm not asking you to

18 argue.  I'm asking do you have any other evidence that you

19 haven't put on.  You tell me about willfulness.  You tell me

20 that there's an opinion of counsel that they declined to

21 produce and stood on the privilege.  Can the finder of fact

22 draw from that an inference of willfulness?

23     MR. ROBERTSON:  I think the finder of fact can

24 consider that in the totality of the circumstances which is the

25 test for willfulness.

1378

1     THE COURT:  Do you have any case that says that?

2     MR. ROBERTSON:  Your Honor, I'll have to go and

3 check.  One of my colleagues reminded me of a case that I have

4 not actually read and I don't want to represent to the Court.

5     THE COURT:  It's a good thing not to argue a case you

6 haven't read.

7     MR. ROBERTSON:  I didn't want to do that.

8     THE COURT:  Unless you want me to decide on the bases

9 of the cases I have read.

10     MR. ROBERTSON:  No, Your Honor.  In fairness, I came

11 here today to try and prepare to argue this.  I was not

12 thinking in terms of the representation of the Court what the

13 willfulness case should be.

14     I think you've heard some evidence that under the

15 totality of the circumstances, you could consider as being

16 evidence that would warrant a conclusion of willful

17 infringement.  I think there would be some additional evidence.

18 Right now what comes to mind--

19     THE COURT:  We'll deal with that later.  Thank you.

20     MR. ROBERTSON:  Do you need to hear any --

21     THE COURT:  No, thank you.  The motion did not relate

22 to willfulness, so I'm not going to deal with it.  I was just

23 asking you a question while you were standing up there.

24     MR. ROBERTSON:  Thank you.

25     MS. HUGHEY:  Your Honor, if I may, with respect to

1379

1 the issue of joint infringement, ePlus's counsel suggested that

2 it was a defense, and that's not the case.  ePlus always has

3 the burden of proof on the issue of infringement, and it can

4 pursue that burden of proof either through the direct

5 infringement --

6     THE COURT:  Ms. Hughey, what he said was, he's not

7 contending it's joint infringement, you are, saying that if it

8 was any kind of infringement it's joint infringement and you

9 win -- and he wins -- because you haven't any evidence of the

10 elements of it, I believe; is that right, Mr. Robertson, or did

11 I miss it?

12     MR. ROBERTSON:  My argument, Your Honor, was whether

13 it's direct infringement just by Lawson committing all the

14 steps or having the system, or whether it's joint infringement,

15 we win either way.

16     THE COURT:  I understand that, but what you said was

17 we don't think it's joint infringement, but even if it is, we

18 win.  The predicate of that sentence is, we don't think it's

19 joint infringement, and that's what I am trying to ascertain.

20     You said it was they who injected that question, the

21 defendants injected that issue in, and you don't think it's

22 joint infringement, but even if it is, you win.  Is that your

23 position or not?

24     MR. ROBERTSON:  That's our position, Your Honor.

25     THE COURT:  Okay, thank you very much.  Now you know

1380

1 the framework.

2 MS. HUGHEY:  Okay.  Well, with respect to that then,

3 if ePlus is not asserting joint infringement as a method to

4 prove infringement, then I think it's going to be easy --

5 THE COURT:  Then you are not asserting that this is

6 any joint infringement issue for me to decide; is that right?

7 MS. HUGHEY:  I'm moving for judgment as a matter of

8 law --

9 THE COURT:  No, you are not asserting that there's a

10 joint infringement issue for me to decide; right?

11 MR. ROBERTSON:  Who are you pointing to, Your Honor;

12 me?

13 THE COURT:  Ms. Hughey.

14 MS. HUGHEY:  ePlus has the burden of proof on

15 infringement.

16 THE COURT:  I understand that, but you need to answer

17 the question that I asked.  You are the one who got up here and

18 argued it.  He says he doesn't content that it's joint

19 infringement, but even if there is, he wins.

20 Now, I understand your argument to be that if there's

21 any infringement that's been available to go to a jury, it is

22 joint infringement and you win because the elements haven't

23 been made out for joint infringement.  That was your argument

24 as I understand it, wasn't it?  Wasn't it your argument?

25 MS. HUGHEY:  Yes, both there is no direct

1381

1 infringement by Lawson alone, and there is also no direct

2 infringement by Lawson combined with another party through a

3 doctrine called joint infringement.  That's what I'm saying,

4 Your Honor.

5 THE COURT:  But you also are saying if they have

6 proved any infringement, directly, direct infringement, it's

7 joint, and you don't -- and you don't infringe jointly because

8 they haven't made out the elements of a joint infringement

9 claim in a direct infringement context; right?

10 MS. HUGHEY:  I don't think I said that they proved

11 infringement in any context, Your Honor.

12 THE COURT:  I didn't say that they had.  Listen

13 tight, as John Wayne used to say, soldier.  If -- you are

14 saying, we don't think that there's any infringement at all.

15 MS. HUGHEY:  Yes.

16 THE COURT:  But if they've proved any kind of

17 infringement, then the best it could be is joint infringement,

18 and even if that's what they're going for, they lose because

19 they haven't put out the evidence, they haven't made out the

20 elements of that.  Isn't that what you are saying?

21 MS. HUGHEY:  That's fair, Your Honor, yes.  With

22 respect to the issue of joint infringement, counsel references

23 this Akamai case, and I can give you the cite.  It's a very

24 recent case.  It doesn't have the F Reporter yet.  2010, U.S.

25 App. LEXIS 25825.  That's a recent Federal Circuit case.

1382

1 With respect to that case, what the Federal Circuit

2 found was that there was no joint infringement because the

3 accused infringer did not perform all of the steps of the

4 accused claims, and there was no evidence that the accused

5 infringer's customers performed the remaining steps as agents

6 of the accused infringer.

7 In that case, the patents related to a system and

8 method for allowing a content provider to outsource the storage

9 and delivery of discrete portions of its website content.

10 THE COURT:  Let me ask you something.  Since he's

11 saying, he's not arguing there's any joint infringement, why

12 are you bringing to me an issue of joint infringement in the

13 first place?  Why don't you just say, he has agreed there's no

14 issue of joint infringement, and so we don't have to discuss

15 that any further?  In other words, I have cornered the fox in

16 his den.  And he has folded.

17 MS. HUGHEY:  Your Honor, I would like to say that I

18 have cornered the fox in his den, and he has folded.

19 THE COURT:  Thank you.

20 MR. ROBERTSON:  Your Honor, can I respond to that?

21 THE COURT:  Don't get out of the den, and it's her

22 motion, so she gets the last word.  Don't try to get out of the

23 den.

24 MR. ROBERTSON:  We're only talking about this

25 punchout scenario here.

1383

1 THE COURT:  No, no.  That's like -- you just folded

2 over here.

3 MR. ROBERTSON:  Your Honor --

4 THE COURT:  Not only did you fold, you induced her to

5 quit.

6 MR. ROBERTSON:  But the joint infringement context

7 didn't come out in the initial opening argument outside of the

8 context of what the third party punchout partners did.

9 Now, did they do anything?  Yeah, they provided the

10 catalog content, and they'll let you search a site and it all

11 comes back to Lawson.  So there are two steps that they have to

12 perform.

13 Now, they can even be inducing those steps by the

14 facts that I already have adduced to the Court.  They can be

15 inducing those parties to do it, or they can be doing under

16 their direction or control.  So as I say, Your Honor, I think

17 we win on alternative theories of --

18 THE COURT:  But you didn't have that theory, and you

19 told me you didn't have the joint infringement theory under the

20 direct infringement --

21 MR. ROBERTSON:  I don't think we need to -- first of

22 all, I want to make clear we're talking -- I was talking only

23 about punchout, because these are method claims that are

24 performed by the customers when Lawson provides them with

25 features and functionality, the five software --

1384

1   THE COURT:  You are through.  You don't have any

2   joint infringement claim under anything.  That's what you told

3   me, and that's it.  Sit down.  Have a seat.  That's it.  I

4   mean, there's a limit to what I have, what I can deal with here

5   and what is allowed, and you just transcended it by saying

6   that.  I don't have to rule on that now.  It's already been

7   dealt with by way of a concession as to the Rule 50 motion,

8   there is -- and there is no doctrine of equivalents claim

9   notwithstanding what some of the instructions that were

10  tendered say.

11      So to the extent the doctrine of equivalents is

12  asserted on any claim, the motion for judgment as a matter of

13  law is granted, but I believe they said they don't have the

14  claim, so the rest of the issue is whether there is, as to any

15  of the patents, claims of the patents-in-suit, a reasonable

16  basis for a reasonable jury to find patent infringement, and

17  there is under theories of both direct and indirect

18  infringement, and the motion for relief under Rule 50 is

19  denied.  All right?  Are we ready for the jury?

20      No?  Yeah.  You have to rest in front of a jury.

21  Read the stipulations, and let's go.

22      MR. ROBERTSON:  We have these exhibits in binders.

23  We're bringing the stipulations, and then I'll be ready.

24      THE COURT:  First witness then is whom, Mr. McDonald?

25      MR. McDONALD:  Mr. Lawson will be our first witness,

1385

1   Your Honor.  I just want to clarify, I think -- we know you

2   wanted to get the transcripts on the Markman rulings and

3   things, and I'm not sure when you actually want to hear that.

4   I don't know they are ready yet.

5       THE COURT:  You did get together and what?  I'm

6   having trouble hearing you.

7       MR. McDONALD:  I'm sorry.  The parties did get

8   together over the lunch hour and combined the pages that they

9   thought were appropriate to provide to the Court.  I don't

10  think the Court's actually got a copy of the combined version

11  of that.  I think they are working on it, so obviously we don't

12  have it at this point.

13      I just wanted to give a heads-up, because I wasn't

14  sure when Your Honor wanted to address that issue.  Obviously,

15  you have to read the materials --

16      THE COURT:  When do I have to address it?

17      MR. McDONALD:  It's actually going to come off to

18  some extent with respect to Mr. Christopherson's testimony, so

19  it won't be too long.

20      THE COURT:  Is he the second witness?

21      MR. McDONALD:  Yes.

22      THE COURT:  Do you have a joint version that I can

23  have?

24      MR. McDONALD:  Let me check, Your Honor, if I may.  I

25  see some bodies moving at this point, Your Honor.  I think

1386

1   they're working on it.  I don't know that it's ready yet, but

2   I'll let you know.

3       THE COURT:  Go back there and talk to them and find

4   out.

5       MR. McDONALD:  I'm told it could be ready in ten

6   minutes, Your Honor.  I think that might be a little

7   aggressive.

8       THE COURT:  I haven't got what I need to rule, so I

9   don't think it's a good idea to rule.  Can we have the

10  witness --

11      MR. STRAPP:  Your Honor, a few housekeeping matters.

12  For the record, during the Frank deposition video, the exhibits

13  that were referenced by Mr. Frank were Plaintiff's Exhibits

14  150, 153, 154, 155, 156, 157, 173, and 129, and the excerpted

15  portions of the deposition transcript itself are Plaintiff's

16  Exhibit 517 --

17      THE COURT:  My copy of it doesn't have an exhibit

18  number on it.

19      MR. STRAPP:  That's correct, Your Honor.

20      THE COURT:  517.

21      MR. STRAPP:  That's correct.  And Your Honor --

22      THE COURT:  You need to make sure you get one.

23      MR. STRAPP:  There were a couple of typographical

24  errors on the transcripts of the depositions of Ms. Oliver and

25  Mr. Matias.  By agreement of the parties, those have been

1387

1   corrected, and we have corrected versions of those deposition

2   transcripts to hand up to Your Honor.

3       THE COURT:  Let me have them.  You have to hand the

4   clerk the originals.

5       MR. STRAPP:  This is -- Ms. Oliver's corrected

6   transcript is Plaintiff's Exhibit 518 replacing the original

7   Plaintiff's Exhibit 518.  I'm sorry.  Plaintiff's Exhibit 520

8   this is the corrected version of Mr. Matias's deposition

9   transcript.

10      THE COURT:  Let's do this:  Let's call 518-A -- get

11  that back and mark it.  Mr. Neal, mark 518 518-A and 520, the

12  one he just handed you 520-A, and that will be the corrected

13  versions.  All right, folks, that way we will get them

14  straight.

15      MR. STRAPP:  Your Honor, with respect to one of the

16  Frank exhibits that was referenced, you will recall that there

17  was an issue that came while it was being played.  Although

18  that exhibit had never been objected to during court, Lawson

19  suggested that they now did have an objection to part of the

20  document, and they're asking it be redacted.

21      I've agreed that the parties can meet and confer with

22  that as soon as we have a minute after the day is over in

23  court, but we haven't resolved that issue yet.

24      THE COURT:  I appreciate your confidence in my

25  memory, but I don't remember, so I'll let you all deal with

1490

```
1        IN THE UNITED STATES DISTRICT COURT
2       FOR THE EASTERN DISTRICT OF VIRGINIA
3               RICHMOND DIVISION
4
5    ----------------------------------
6    ePLUS, INC.            :  Civil Action No.
                            :  3:09CV620
7    vs.                    :
                            :
8    LAWSON SOFTWARE, INC.  :   January 13, 2011
                            :
9    ----------------------------------
10
11      COMPLETE TRANSCRIPT OF THE JURY TRIAL
12       BEFORE THE HONORABLE ROBERT E. PAYNE
13    UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C. 20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia 23219-3095
     Counsel for the plaintiff
23
24        Peppy Peterson, RPR
            Official Court Reporter
25        United States District Court
```

1491

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia 23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota 55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1492

```
                 P R O C E E D I N G S
1
2
3        THE CLERK:  Civil action number 3:09CV620, ePlus,
4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
6    Mr. Michael G. Strapp represent the plaintiff.
7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
9    the defendant.  Are counsel ready to proceed?
10       MR. ROBERTSON:  Plaintiff is, Your Honor.  Thank you.
11       MR. McDONALD:  Yes, Your Honor.  Thank you.
12       THE COURT:  Do you need to see me about something
13   before the jury comes in?
14       MR. ROBERTSON:  Yes, Your Honor.  You had asked us to
15   take a look at those appendices with respect to our motion on
16   this implementation on a customer-by-customer basis.
17       THE COURT:  Yeah.
18       MR. ROBERTSON:  We have done that, and the reason I
19   raised it, Your Honor, is one of the witnesses that's going to
20   be called this morning is Ms. Hannah Raleigh.  You may recall
21   she testified once already.  She is involved with Lawson
22   Professional Services that has to do -- that has responsibility
23   for implementation of the Lawson software products, and we're
24   concerned that she's going to be getting into areas in and
25   presenting testimony that Lawson is going to contend are
```

1493

```
1    defenses to infringement later that are directly implicated by
2    that interrogatory number 24.
3        What I have provided Your Honor with is the
4    appendices that were referenced in the answers to the
5    interrogatories, the transcript from the March 26th hearing,
6    telephonic hearing on the motion to compel, and the relevant
7    citations to the transcript where this issue came up, and I do
8    want to continue to press the motion, Your Honor.
9        We do think that the answers, even with the
10   appendices, were nowhere near what was called for and what Your
11   Honor directed Lawson to do in response to that.
12       If I might just, Your Honor, you may recall that
13   these appendices that are being referenced were provided to
14   ePlus three months before the motion to compel was presented,
15   and the appendices do not respond to the interrogatory as
16   represented by counsel for Lawson.
17       Indeed, if you look at some of the appendices, for
18   example --
19       THE COURT:  Is A appendix A?
20       MR. ROBERTSON:  Yes, sir.  Under the tab December 23,
21   2009, response to interrogatory number -- yeah, A is one.
22       THE COURT:  March 26th is the first tab, the
23   transcript, and then there's an A behind that.  Is that
24   appendix A or not?
25       MR. ROBERTSON:  I believe appendix A, Your Honor, is
```

2011.01.13 Trial Transcript Day 7  1/13/2011  3:01:00 PM

1630

1  requisitioning and workflow approval leading to faster
2  order cycle times, increased standardization and
3  reduced costs, correct?
4  A  That is correct.
5  Q  That's one of the benefits of having this kind of
6  procurement software over the old fashioned
7  paper-based procurement process, right?
8  A  That's correct.
9  Q  Like every invention, you want it to be doing to
10  do something fast, better cheaper?
11     MS. STOLL-DeBELL:  Objection, Your Honor.
12     THE COURT:  Sort of.
13     MR. ROBERTSON:  I'll withdraw the question,
14  Your Honor.
15     THE COURT:  Yes, I think so.
16  Q  Turn to the next page, sir.
17  A  Sure.
18  Q  You see the representation there under Lawson
19  Procurement Punchout?  You can seamlessly browse from
20  Lawson's requisition self service to vendor websites.
21  Do you see that?
22  A  Yes.
23  Q  That's an accurate statement, right?
24  A  Yes.
25  Q  Seamlessly, right?

1631

1  A  You have to define what seamlessly means.
2  Q  This is your document.  Do you have an
3  understanding of what "seamlessly" means?
4  A  It's not my document, sir.
5  Q  Well, it's a Lawson document.  Lawson was
6  representing that the process is seamless, right?
7  A  Well, we know --
8  Q  Lawson was representing that --
9     THE COURT:  You know, it would have just been
10  sufficient to have left the question where it was
11  because he already answered it was seamless and then
12  you get into it.
13     MR. ROBERTSON:  I'll move on, Your Honor.
14  BY MR. ROBERTSON:
15  Q  When the Lawson system punches out to the Punchout
16  creating the partner's catalog, you remain connected
17  to the Lawson system; is that right?
18  A  Say that again.
19  Q  Yes.  When the Lawson system punches out to the
20  Punchout creating the partner's catalog, you remain
21  connected to the Lawson system, correct?
22  A  Correct.
23  Q  Let's take a look at the page that ends with Bates
24  label 261, if we could.
25     So here's the representation of this RSS Punchout

1632

1  process flow.  Do you see that?
2  A  I see it, yes.
3  Q  So this is saying how we're going to navigate
4  through this process to build our shopping cart and
5  then pull it back as a requisition and make purchase
6  orders; isn't that right?
7  A  Give me a chance to review it.
8  Q  Sure.
9  A  Okay.  At a very high level, yes.
10  Q  So at this high level, Lawson is representing that
11  the first step is that Lawson requesters use this RSS
12  screen to punch out to external vendors, correct?
13  A  That is correct.
14  Q  So then the Lawson requester is presented to the
15  externals vendor's website to search and add items to
16  the vendor's shopping cast.  The shopping cart is
17  being checked out and submitted, right?
18  A  That's correct.
19  Q  Then the shopping cart contents are returned back
20  to Lawson RSS, right?
21  A  Right.
22  Q  Then the requester checks out their RSS shopping
23  cart and requisition is sent for approval, right?
24  A  Correct.
25  Q  Once the requisition is approved, the purchase

1633

1  order, the PO there, is created by PO 100.  That's
2  accurate, right?
3  A  That's correct.
4  Q  Then the purchase order can be sent to the vendor
5  using the Lawson EDI module, right?
6  A  It can be, yes.
7  Q  When the Lawson system was doing that, you
8  remained connected to the Lawson system at all times;
9  isn't that right, sir?  Didn't you testify to that in
10  your deposition?
11  A  It's connected, yes.
12  Q  You were asked about page 265, sir.  If you could
13  turn to that.  Now, there's some questions about where
14  the software was running on this in this Punchout
15  demonstration.  Let me just ask you, this was a joint
16  presentation by Lawson and Trinity Information
17  Systems, right?
18  A  Correct.
19  Q  So it's operating, as you can tell, I think you
20  pointed to it, sir, the URL address is Trinity Health
21  Organization, right?
22  A  That is correct.
23  Q  But after where it says TrinityHealth.org/, it
24  says "Lawson/portal," right?
25  A  It does say that, yes.

1718

Lohkamp - Direct                    1718

1  really with those vendors, official relationship, so the
2  purposes of having the contract was to make it a formalized
3  process for bringing new supported punchout partners on as well
4  as to set up the ground rules of how we were going to work
5  together and set the expectations with that vendor with the
6  goal of being able to support our customers who were interested
7  in punching out using procurement punchout to that vendor
8  website. So the contract helps us kind of establish the
9  expectations and how we were going to work together to support
10 our mutual customers.
11 Q   Is it possible to use Lawson's punchout product to punch
12 out to a vendor website if the vendor is not a supported vendor
13 by Lawson?
14 A   Yes.
15 Q   Is it possible for Lawson's customers to connect to
16 punchout vendors' websites without using Lawson's punchout
17 product?
18       MR. ROBERTSON: Objection, Your Honor, vague and
19 ambiguous. Is this just using the internet to go to a website
20 or using a Lawson product?
21       MS. STOLL-DeBELL: I can ask a better question, Your
22 Honor. I'll withdraw that.
23       THE COURT: All right.
24 Q   Is it possible to use an internet browser to connect to a
25 punchout vendor's website?

1720

1720

1  to connect to a customer specific private StaplesLink.com
2  website; is that correct?
3       MR. ROBERTSON: Objection, relevancy, Your Honor.
4  We're talking about using a Lawson product, not using the
5  simple internet browser. This has nothing relevant to the
6  accused systems.
7       THE COURT: I'm inclined to agree with him, Ms.
8  Stoll-DeBell. I was trying to see what the difference was, but
9  I think the objection is sustained.
10       MS. STOLL-DeBELL: I think that's all the questions I
11 have for right now.
12       THE COURT: Any cross-examination?
13
14            CROSS-EXAMINATION
15 BY MR. ROBERTSON:
16 Q   Good afternoon, Mr. Lohkamp.
17 A   Good afternoon.
18 Q   I understand you have these punchout trading partners that
19 you have contracts with and punchout trading partners that you
20 don't have contracts with; right?
21 A   Correct.
22 Q   But other than not having, for example, a defined contact,
23 I think that's what you said; that was one of the benefits of
24 having a contract?
25 A   That was one of the benefits, yes.

1719

Lohkamp - Direct                    1719

1       MR. ROBERTSON: Objection, Your Honor, relevancy.
2       MS. STOLL-DeBELL: Your Honor, I think it goes --
3       THE COURT: Why does that have anything to do with
4  this case?
5       MS. STOLL-DeBELL: I think it goes to the
6  relationship and connection between Lawson and the punchout
7  vendor and how the punchout vendor's website works.
8       THE COURT: They are different websites. The
9  testimony he gave earlier, or somebody gave, was if you go on
10 the internet, you get one website. If you go through the
11 punchout you get another, I think. Isn't that right? Ask him.
12 I think -- if you go through the internet to get to what was --
13 a website of somebody who is your punchout partner, you get the
14 internet site or not, the regular site?
15       THE WITNESS: For certain vendors, for example, like
16 StaplesLink.com, you can go directly to StaplesLink.com versus
17 going through punchout through a browser.
18       THE COURT: But if you go through the punchout, it's
19 a different website; isn't it?
20       THE WITNESS: You would be logged in to -- it would
21 be the same website. You'd be logged into StaplesLink.com.
22       THE COURT: So it's true for some of them but not for
23 all of them.
24       THE WITNESS: I am not familiar with all of them.
25 Q   So with StaplesLink.com, you can use an internet browser

1721

Lohkamp - Cross                     1721

1  Q   So we're all clear on this, it doesn't matter for a
2  contract punchout trading partner of Lawson's or noncontract
3  trading partner of Lawson's, the technology never changes;
4  right?
5  A   That's correct.
6  Q   And isn't it true that the vast majority of Lawson's
7  punchout trading partners are noncontractual; right?
8  A   Yes.
9  Q   And but yet you work with these noncontractual punchout
10 partners to the mutual benefit of both companies just like you
11 do with your contractual partners; right?
12 A   No.
13 Q   So, I see. Because there's a contract, you have a mutual
14 benefit, and because you don't have a contract, there's no
15 mutual benefit?
16 A   I thought I understood you to say they work with them the
17 same way.
18 Q   I'm wondering -- it doesn't matter whether you have a
19 contract or don't have a contract. It's still mutually
20 beneficial to both Lawson and its punchout trading partners to
21 have that relationship; right?
22 A   Yes.
23       MR. ROBERTSON: That's all I have, Your Honor. Thank
24 you.
25       THE COURT: Any redirect?

1789

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE EASTERN DISTRICT OF VIRGINIA
 3                RICHMOND DIVISION
 4
 5   -------------------------------------
 6   ePLUS, INC.          : Civil Action No.
                          : 3:09CV620
 7   vs.                  :
                          :
 8   LAWSON SOFTWARE, INC.    : January 14, 2011
                          :
 9   -------------------------------------
10
11       COMPLETE TRANSCRIPT OF THE JURY TRIAL
12        BEFORE THE HONORABLE ROBERT E. PAYNE
13     UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C. 20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia 23219-3095
     Counsel for the plaintiff
23
24        Peppy Peterson, RPR
            Official Court Reporter
25         United States District Court
```

1790

```
 1   APPEARANCES: (cont'g)
 2   Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
 3   Troutman Sanders Building
     1001 Haxall Point
 4   Richmond, Virginia 23219
 5   Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
 6   William D. Schultz, Esquire
     Merchant & Gould, PC
 7   80 South Eighth Street
     Suite 3200
 8   Minneapolis, Minnesota 55402
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1791

```
 1              P R O C E E D I N G S
 2
 3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
 4   Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
 5   L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
 6   Mr. Michael G. Strapp represent the plaintiff.
 7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
 8   Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
 9   the defendant.  Are counsel ready to proceed?
10        MR. ROBERTSON:  Plaintiff is, Your Honor.
11        MR. McDONALD:  Yes, we are.
12        THE COURT:  All right.  Ladies and gentlemen, I'm
13   pleased to report to you my unofficial survey that the economy
14   is recovered.  For the first time in 40 years of trading at the
15   Westhampton Bakery, I had to wait 20 to 30 minutes even to get
16   served, and this the lowest period of the year for that bakery,
17   they tell me.  So I just wanted you to know, but I told them I
18   was waiting because I had promised you would get your donuts
19   and I don't want to be guilty.
20        Dr. Shamos, I saw him earlier.  Dr. Shamos, I remind
21   you -- everybody is renaming you, aren't they?
22        THE WITNESS:  We'll see.
23        THE COURT:  I remind you you are under the same oath
24   you took yesterday, sir.
25        THE WITNESS:  Yes, sir.
```

1792

```
 1        THE COURT:  Thank you.
 2
 3        MICHAEL I. SHAMOS,
 4   a witness, called by the defendant, having been previously
 5   duly sworn, testified as follows:
 6        DIRECT EXAMINATION
 7   BY MR. McDONALD:  (resuming)
 8   Q   Good morning, Dr. Shamos.  How are you?
 9   A   Good morning.  I'm good.
10   Q   I would like to pick up where we left off, if I got it
11   right anyway here this morning, with this slide showing some of
12   the elements of claim one of the '516 patent on this slide that
13   you put together.  Can you walk us through --
14        THE COURT:  Mr. McDonald, excuse me.  Just for
15   orientation purposes, when we left off, you had said that you
16   were going through each claim one by one to show, and that's
17   what you are doing.
18        MR. McDONALD:  Thank you, yes.
19        THE COURT:  I said it's a good time to take a break,
20   so that's what we'll be doing now, is hearing Dr. Shamos's
21   opinion on each claim that's at issue.
22   Q   We have the 12 claims.  We're going to take them one at a
23   time; right, Dr. Shamos?
24   A   Yes.
25   Q   Okay.  So let's start here with what you have on your
```

1925

1    THE COURT:  Do you have a copy of his report
2    for him?
3    MR. ROBERTSON:  Yes, sir.
4    THE COURT:  What paragraph?
5    MR. ROBERTSON:  Paragraph 134, on page 40.
6    THE COURT:  Page 40, paragraph 134, Dr.
7    Shamos, is what he's going to ask you about.
8    BY MR. ROBERTSON:
9    Q  You indicate here that as a hypothetical
10   proposition, it's possible in a sense to avoid
11   searching an entire database each time by creating
12   indexes that allow particular records containing
13   specific data to be located quickly.  Did you say that
14   in that your report?
15   A  Yes, it says "in a sense."
16   Q  Thank you.  You also said in this regard, a
17   database index is similar to the index of a book which
18   makes it unnecessary to scan the entire book to locate
19   the occurrence of a word each time a search is
20   performed, correct?
21   A  Yes.
22   Q  With respect to the Punchout functionality and
23   Punchout procurement, you understand that when the
24   customer is using that functionality with the
25   requisition self service module, they're operating

1926

1    within the Lawson system during the entire process,
2    correct?
3    A  No.
4    Q  So if there were testimony in the record with
5    respect to that, that that is the case, would that
6    change your opinion?
7    MR. McDONALD:  Objection.  He wasn't able to
8    hear the testimony.
9    THE COURT:  That's a proper question.  It's
10   the functional equivalent of a hypothetical.  That's
11   all right.
12   A  I'm an open-minded guy.  If whoever said that
13   would explain what he meant by it, it's possible he
14   might change my mind, but merely hearing such
15   testimony exists doesn't change my mind.
16   Q  You're aware that it's Lawson who creates the
17   communication protocols with its Punchout trading
18   partners, correct?
19   A  Okay.  As a general proposition, in order
20   to connect to --
21   Q  As a general proposition, do you agree with that?
22   Yes or no?
23   A  Repeat it then.
24   Q  It's Lawson that creates the communication
25   protocols used in the Punchout procurement process?

1927

1    A  The phrase I'm having trouble with is
2    "communication protocols."
3    THE COURT:  You do not know what they are?
4    THE WITNESS:  I know what they are.
5    THE COURT:  Do you not know what he means?
6    THE WITNESS:  I think I know what he means,
7    but I think it's different from what he said.
8    BY MR. ROBERTSON:
9    Q  What do you understand communication protocols to
10   mean?
11   A  Well, you can't create communication protocols
12   over the Internet.  You have to use standardized
13   communication protocols.
14   If what you mean is Lawson's facility have the
15   ability to connect to the vendors so that you can
16   search the vendor's website, the answer is yes.
17   Q  And law also creates those protocols to return the
18   data from a vendor for inclusion into a requisition
19   and then a purchase order; isn't that right?
20   A  I'll have a lot easier time if we don't use the
21   word "protocols."  Just say mechanism and I'll agree
22   with you.
23   Q  Well, Lawson creates that mechanism?
24   A  Yes.
25   Q  Are you familiar with the term handshake used in

1928

1    that context?
2    A  Yes.
3    Q  Lawson creates that handshake, right?
4    A  Lawson implements part of that handshake, yes.
5    Q  If there were testimony in this case that Lawson,
6    in fact, creates that handshake, would that affect
7    your opinions in any way?
8    A  No, because I understand how handshakes work and
9    it's a two-way street.  The vendor has to do certain
10   things, too, as part of the handshake.
11   Q  Isn't it true in this Punchout process, selecting
12   checkout on the shopping cart releases the requisition
13   to the next stage of process?  And checkout saves
14   items to the cart to the requisition lines, and it
15   goes into the requisition to the next processing
16   stage?
17   A  Yes.
18   Q  So the shopping cart then is not the same as the
19   final requisition, correct?
20   A  I haven't opined on that.  I haven't looked at it.
21   THE COURT:  You say you haven't looked at it?
22   THE WITNESS:  I haven't looked at that.  I
23   haven't considered it.
24   Q  You were asked some questions about some of these
25   means-plus-function claim constructions.  Do you

1997

1  A  Yes.

2  Q  How many hours does that involve?

3  A  Not -- I don't know.  Maybe five or ten hours.  I'm

4  guessing.  I don't know.

5  Q  How much are you getting paid; do you know?

6  A  $200.

7      MR. McDONALD:  No further questions.

8      THE COURT:  We need to take a little recess here, I

9  think.  We'll take a 20-minute recess.

10

11      (Jury out.)

12

13      THE COURT:  Okay, we'll take a 20-minute recess.

14

15      (Recess taken.)

16

17

18

19

20

21

22

23

24

25

1998

1      (The jury is out.)

2      THE COURT:  Okay.  How much more of this do

3  we have?  Thirty minutes of this witness, but what's

4  this 20-minute video and an hour-plus video?  Why do

5  we have over an hour of a video?  You remember what I

6  told you about these videos.

7      MR. SCHULTZ:  Yes, Your Honor.  The 20-minute

8  video is a video related to the Fisher RIMS system

9  related to the priority of it.  And that's the

10  20-minute video.  Then there's a video that is Laurene

11  McEneny, and that is related to an entire system, the

12  PO Writer System.  That video was originally two hours

13  and 20 minutes.  The parties worked together and cut

14  that down to an hour and a half, approximately.

15      THE COURT:  You might be able to cut it down

16  more over the weekend.

17      MR. SCHULTZ:  Yes, Your Honor.

18      THE COURT:  About 30 minutes.  That's about

19  all a jury can take of that.  If it was NCIS or

20  Housewives of Atlanta or whatever it is, they can

21  handle something like that, but you can't take more

22  than an hour and a half of this stuff.  It's a hard

23  dose.

24      You have a witness over here.  She knows what

25  she's talking about, and she relates, and they can

1999

1  handle that.

2      All right.  Get them, please.

3      What are you doing with this witness?  What's

4  the purpose of this testimony?

5      MR. McDONALD:  It's to show that the TV/2

6  system is prior art.

7      THE COURT:  It's anticipation.

8      MR. McDONALD:  It's part of the obviousness

9  determination.

10      THE COURT:  Obviousness, excuse me.  But we

11  never did tell them that we were moving.  I was trying

12  to figure out what you were doing and I thought I knew

13  what this was.

14      MR. McDONALD:  You did say something about

15  that.  I thought that was the segue.

16      THE COURT:  Yeah, but I didn't say now is the

17  time, Charlie.  Okay.

18      (The jury is present.)

19      THE COURT:  All right.  Ladies and gentlemen,

20  I told you that they were about ready to move into

21  invalidity, and they have been with this lady.  They

22  do have two of the inventors that are coming back.  Is

23  that right?

24      MR. McDONALD:  I think we'll keep it to two.

25  Maybe three, but probably two.

2000

1      THE COURT:  Whatever.  They have inventors,

2  and it may have to do with infringement and

3  invalidity, but now they have moved into invalidity.

4  And what they are trying to do is -- that makes it

5  sound like they flunked.  I don't mean do that.  I'm

6  not making any comment.

7      The general topic is the issue of

8  obviousness, which I think was talked about in the

9  video, and I'll tell you more about it.  But that's

10  what they're doing.  And we'll try to tell you as they

11  move from one to another kind of topic they are

12  addressing.  Nobody will be arguing it, but at least

13  it will help you focus on what the point is.

14      So we're now moving into obviousness with

15  this witness, Ms. Eng.  Okay.

16      This is your cross-examination.

17      MR. ROBERTSON:  Thank you, Your Honor.

18

19  CROSS-EXAMINATION

20  BY MR. ROBERTSON:

21  Q  Nice to see you again, Ms. Eng.

22  A  You, too.

23  Q  I understand that you were a consultant for Lawson

24  in this case?

25  A  Yes.

2001

1  Q  You indicated that you had spent five to ten
2  hours.  That was preparing for today's testimony?
3  A  Reading the material and stuff, yes.
4  Q  But you spent more time in the case than that,
5  right?  You were deposed back in May, I believe, of
6  last year?
7  A  When I saw you?
8  Q  Yes.
9  A  Yes.
10  Q  You were also a paid consultant in a trial with
11  SAP, right?
12  A  Yes.
13  Q  That was about what, four years ago now?  2006 or
14  so?
15  A  Was it?  Okay.
16  Q  It's difficult to remember back to just --
17      THE COURT:  She tried to block it out.
18      THE WITNESS:  Yes.
19  Q  It's difficult to remember just back four years,
20  nevermind what we've been talking about here 18 years
21  ago, right?
22  A  Well, that I did every day.  The trial was just --
23  Q  You'd agree with me, though, that TV/2 was not
24  commercially available back in 1995, right?
25  A  I think it was available from like '91, and then I

2002

1  think it was discontinued in '94 or something.  '95
2  maybe.
3  Q  You recall testifying under oath in the SAP trial?
4  A  No.  I mean I remember testifying, yes.
5      MR. McDONALD:  Your Honor, I don't think this
6  is impeachment.  She's not denying that it wasn't on
7  sale in '95.
8      MR. ROBERTSON:  Let me --
9      THE COURT:  Well, there was a different
10  question, so I think it's a relevant approach.  It
11  depends on what the testimony was, doesn't it?  The
12  answer was different than the question.  Fairly
13  significantly.  So let's see.
14      MR. ROBERTSON:  May I hand the witness a
15  notebook?
16  BY MR. ROBERTSON:
17  Q  In the 1994-95 period, when you were working with
18  Fisher right before, I think, you left in January of
19  '95 --
20  A  Yeah, I did.
21  Q  -- fisher was the first customer really to use
22  TV/2 in a production environment; isn't that right?
23  A  As far as I know in the U.S.
24  Q  Did any other customers to your knowledge ever use
25  TV/2 in a production environment?

2003

1  A  I'm not sure about Volvo.
2  Q  Volvo was this demonstration that was happening
3  over in the U.K.?
4  A  In the U.K.
5  Q  You weren't involved in that, were you?
6  A  I was not, no.
7  Q  We're going to have to not talk over each other.
8  So just wait until I finish my question, then I'd
9  appreciate your answer.
10      So it was written by people in the development lab
11  in the U.K., right?
12  A  Yes.
13      THE COURT:  What was written?
14      MR. ROBERTSON:  This TV/2 program.
15  A  Yes.
16  Q  Okay.  And so it wasn't commercially available as
17  far as you know, right, at that period?
18  A  What do you mean by commercially available?
19  Q  This program, this development lab program, they
20  were working on in the U.K.
21  A  I mean, you couldn't go to a Best Buy and buy it,
22  but you could get it through an IBM group.
23  Q  Let me ask you if you'll look -- there's a tab in
24  your book that has your SAP testimony.
25  A  Okay.

2004

1  Q  I'd like to direct you to page 1296.
2  A  Where do I see the page numbers?
3  Q  They should be in the upper right-hand corner.
4      THE COURT:  There's a little fold on the
5  squares on the pages.  An in the upper right-hand
6  corner of each one of those little quarters is the
7  page number, Ms. Eng.  And at the bottom is page
8  numbers, and this one is on page 16.
9      THE WITNESS:  Right.
10      THE COURT:  Go ahead.
11  Q  Do you see at page 1295 the question was asked:
12  Was TV/2 a final release IBM product?  You answered:
13  No, I don't think so.  I think Fisher was the first
14  customer really to use it in a production environment.
15  I had asked you that.
16  A  Okay.
17  Q  That's the time period we're in now.
18  A  Uh-huh.
19  Q  Was TV/2 an off-the-shelf product?
20  A  Like I said, they couldn't go to Best Buy and buy
21  it.  It had to be packaged with service.
22  Q  So the question was asked:  So was it commercially
23  available as far as you know?  Do you see that?
24  A  Right.
25  Q  Let me finish my -- and the answer there was:  No,

2005

1    not as far as I know.  Correct?  Yes or no?  That's
2    what it says?
3    A   That's what it says there, yes.
4    Q   Okay.  Thank you.
5        As far as you know, no one after Fisher ever used
6    it in a commercial production environment, correct?
7    A   I left so I do not know.
8    Q   As you sit here even today, you don't know whether
9    anybody ever used it after Fisher in a commercial
10   production environment, right?
11   A   I do not know.
12   Q   Before working with Fisher, though, you were not
13   aware of any other instance in which IBM integrated
14   Technical Viewer 2 with a product to read large
15   amounts of data; isn't that right?
16   A   Before Fisher?
17   Q   Yes.
18   A   Correct.
19   Q   Did I understand you to say that TV/2 didn't have
20   a database, right?
21   A   It didn't have a relational database.
22   Q   It was a search program, wasn't it?
23   A   TV/2 was -- that was one of the capabilities.
24   Q   You worked on this project with Fisher, do I
25   understand, from sometime in the middle of 1993 until

2006

1    when you left in 1995?
2    A   Well, I left in -- I probably didn't work any in
3    '95, but, yes, through '94.
4    Q   So approximately about a year and a half?
5    A   Or a year and -- not quite a year and a half
6    probably.
7    Q   A little less than a year and a half?
8    A   Yeah.
9    Q   And the TV/2 that was integrated with Fisher, it
10   went through serious significant modifications over
11   that year and a half, wouldn't that be fair to say?
12   A   I know they did add some features to make it
13   work -- have better performance.
14   Q   But you did a lot of things during that period of
15   time on the project, correct?
16   A   What do you mean by a lot of things?
17   Q   You had to do a lot of modifications to bring this
18   project to a conclusion eventually?
19   A   Well, we changed a lot of the process to try to do
20   it more efficiently, yes.
21   Q   So, for example, you worked on a conversion tool.
22   Do you remember that testimony in SAP?
23   A   Yes.
24   Q   That was an important aspect of coming up with a
25   commercial or production prototype, correct?

2007

1    A   I think that the conversion tool was just for the
2    Fisher data, to take it from their electronic version
3    to the TV/2.
4    Q   But you had to develop that; is that right?
5    A   Yes.
6    Q   You actually worked a lot on creating some new
7    tags, didn't you, that needed to be programmed in
8    order to be able to read some of the data?  That was
9    part of your job?
10   A   Can you refresh my -- did I say something about
11   new tags?
12   Q   Didn't you work on tags during this project?
13   A   We put the tags in, yeah.  The way the generalized
14   markup language works, you would put in there -- a tag
15   was like a part number or paragraph or a table.
16   Q   Did you actually have to create a new type of
17   markup language, GML, as part of this project?
18   A   No, I think that was already --
19   Q   This conversion tool you talked about for this
20   project, IBM never made that tool publicly available
21   to anybody else; isn't that right?
22   A   I'm sorry.  Can you repeat that?
23   Q   Sure.  This conversion tool you just mentioned,
24   IBM never made that publicly available to anybody else
25   other than Fisher; is that right?

2008

1    A   Not to my knowledge.
2    Q   Fisher contracted IBM to assist them in this
3    project, right?
4    A   To come up with a solution, yes.
5    Q   Well, it contracted you to work with them?
6    A   Right.
7    Q   When they came with to you and presented you with
8    this project, correct?
9    A   Correct.
10   Q   And are you aware that Fisher paid IBM $620,000
11   for this?
12   A   I saw that in here.
13   Q   Did you know that at the time?
14   A   I don't remember.  Probably.  I think I've seen
15   those documents before.
16   Q   This Technical Viewer had proprietary tagging; is
17   that right?
18   A   It had a proprietary database.  Probably some of
19   the tags were not like the standard.  We used the
20   standard way to do it, but they probably had our own
21   tags, yes.
22   Q   Did you modify those tags to be able to
23   formulate -- to be able to work in this project?
24       MR. McDONALD:  Objection to the form of the
25   question, Your Honor.

2009

1      MR. ROBERTSON:  Let me rephrase.

2  BY MR. ROBERTSON:

3  Q  Did the tags have to be modified for this project?

4  A  I don't remember.

5  Q  Why don't you take a look then, if you could, Ms.

6  Eng, at again your SAP testimony at page 1270.

7      THE COURT:  The way this is usually done is

8  to ask the question that you want to ask, and then

9  say, You testified to such and such, and you were

10  asked such and such, and said such and such; is that

11  right?  Does that refresh your memory?  And if it

12  doesn't refresh her memory and if she answers, you

13  know.  If it doesn't refresh her memory, then the

14  document can't be introduced into evidence.

15      Do you want to try using it the standard way?

16      MR. ROBERTSON:  I'll try that, Your Honor.

17  BY MR. ROBERTSON:

18  Q  I think you indicated that you used GML or

19  generalized markup language for tags for the

20  information in this project, correct?

21  A  We did.

22  Q  There were also other specific TV/2 tags that were

23  used to cull out and identify specific information

24  that needed to be created as part of this project,

25  correct?

2010

1  A  Right, and those were there, though.  They were

2  the ones that let you select the parts data or the

3  table.

4  Q  Do you remember working on a project that involved

5  a shell?

6  A  Yes.

7  Q  And the shell had to be created as part of the

8  presentation to make use of what's known as an

9  application program interface?

10  A  The shell was just like the menu like in the Volvo

11  pictures we saw.  And then the API was the interface

12  between the programs.

13  Q  Put you had to create a shell for this project

14  with Fisher-Scientific, correct?

15  A  We did because they wanted to have specific things

16  there.

17  Q  Those TV/2 tags weren't publicly available in

18  1994; is that right?

19  A  That's right.

20  Q  In fact, isn't it the case that those TV/2 tags

21  have never become available even to this day, right?

22  A  Not that I know of.  I mean, you would need TV/2

23  to use them.

24  Q  Did IBM ever make the TV/2 API publicly known or

25  made available?

2011

1  A  I don't know that.

2      THE COURT:  What did you say?

3      THE WITNESS:  I don't know.

4  Q  Did you give it to Fisher and nobody else?

5  A  I'm sorry.  I didn't hear you.

6  Q  Did you give it to Fisher and nobody else?

7      MR. McDONALD:  Objection.

8      THE COURT:  Overruled.

9  Q  I asked you did it ever become publicly known.

10  Let me ask you now, did you give it to Fisher and

11  nobody else?

12  A  There was a specific API for Fisher, yes.

13  Q  Did you ever give the TV/2 API to anybody else

14  besides Fisher?

15  A  Not that I know of, no.

16  Q  And the API is necessary for this project, right?

17  A  If you want to integrate it with another system.

18  Q  Did you also work on a compiler as part of the

19  project?

20  A  We used a compiler as part of the project.

21  Q  That had to be created as part of this project as

22  well; isn't that right?  Did you testify about that at

23  the SAP trial?

24  A  The compiler was already there.

25  Q  But you had to make special what are called .inf

2012

1  files?

2  A  Well, we had .inf files, but I think what we had

3  to do is we added some features, and I think it talks

4  about in that one document, too.  We added some

5  features to make it faster.

6  Q  As part of the Fisher --

7  A  As part of the Fisher.

8  Q  As part of the Fisher-Scientific project?

9  A  Yes.

10  Q  And you needed those .inf files for multiple

11  catalogs; isn't that right?

12  A  Yes.

13  Q  I'm sorry.  I didn't hear you.

14  A  Yes.

15  Q  Thank you.

16      Even after you had these .inf files containing

17  data that was given to you, you still had problems

18  searching them, didn't you?

19  A  Well, it depended on the size of the file.

20  Q  The bigger the file, the slower the search?

21  A  Yes.

22  Q  There were certain requirements as part of this

23  project in order to be able to get search results back

24  quickly, correct?

25      MR. McDONALD:  Objection, Your Honor.

2013

1    There's no relevance as to how fast the system is

2    working.

3         MR. ROBERTSON:  I'm just asking how T/V2 was

4    modified for this project.

5         THE COURT:  Overruled.  She said it was

6    modified for the project.  The question is:  How was

7    it modified?  He's going through the parts of it to

8    see how they were modified.

9         MR. McDONALD:  Well, i it's modified in a way

10   that only relates to speed, there's no speed that's at

11   issue in this case.  So it's irrelevant for that

12   reason.

13        MR. ROBERTSON:  I think it's very relevant.

14   It was a year and a half long project, Your Honor.  A

15   lot of things had to happen.

16        THE COURT:  It depends the speed.  It depends

17   on a lot of things.  Overruled.

18   BY MR. ROBERTSON:

19   Q   You also had to complete a super index for the

20   project, correct?

21   A   That was related to making it faster.

22   Q   Did you work on the super index?

23   A   I mean, I talked to the people.  I don't think I

24   wrote that, no.

25   Q   But you know that had to be created in order to

2014

1    make the search faster?

2    A   To make the search faster, yes.

3    Q   And that was because there was so much data in a

4    catalog like the Fisher-Scientific catalog, right?

5    A   Correct.

6    Q   You mentioned that you did a lot of scanning

7    initially in the first few weeks of the project.  Did

8    I understand that right?

9    A   Yeah.

10   Q   But at some point in time Fisher-Scientific gave

11   you the catalog in an electronic format, is that

12   right, as part of the project?

13   A   Yes.

14   Q   And you could not have built this system to use a

15   Fisher catalog unless you had something like the super

16   index to make the search faster, right?

17   A   Can you repeat that again?

18   Q   Sure.  Could you have built this system for use

19   with the catalog like Fisher without using something

20   like this super index?

21   A   Could we have built it?  We could have built it,

22   the system, but it wouldn't be very usable.

23   Q   And that would be because these searches would be

24   so slow, it would be quicker to just look in the paper

25   catalog, wouldn't it?

2015

1    A   Probably.

2    Q   Those APIs we talked about with the TV/2, they

3    were not publicly available in 1994, correct?

4    A   They were specific for Fisher.  They were just for

5    Fisher.

6    Q   Well, you were asked to look at Plaintiff's

7    Exhibit No. 38, which I think is in either book, and

8    you directed us to this --

9         THE COURT:  In the book you have got, it's

10   back near the back.

11        THE WITNESS:  Thank you.

12   Q   I think you directed us to this Fisher/IBM master

13   schedule plan, do you see that?

14   A   Yes.

15   Q   Can you go to that page that ends with 53 there?

16        THE COURT:  What page?

17        MR. ROBERTSON:  Sorry.  It ends 053.  It's

18   page 18 of 23, I think.

19   BY MR. ROBERTSON:

20   Q   These are all the tasks that needed to be done for

21   the original pilot.  And then what was the second

22   phase of the project?

23   A   The first was demo, the second was the pilot, and

24   the third was the comprehensive.

25   Q   The comprehensive was supposed to be a working

2016

1    prototype?

2    A   No, it was everything done.

3    Q   So this project, did you start right at this

4    project from the beginning?

5    A   Me?

6    Q   Yes.

7    A   Well, I was still on maternity leave when they

8    first started, but when I came back I started.

9    Q   When approximately was that?

10   A   Probably --

11   Q   Nine months backward?

12   A   No.  I had him in April, and I was supposed to be

13   off for six months, but I did not stay off for six

14   months.  So it was a little bit before that.

15   Q   Sometime in the summer then?

16   A   End of the summer or in September.

17   Q   I'd like to you to just look at some of the things

18   here generally.  First, let me ask you, have you heard

19   the expression Gantt chart?

20   A   Yes.

21   Q   Would you consider this to be a Gantt chart?

22   A   Yes.

23   Q   On this chart, there's a number of tasks that

24   start out with a column that has an ID number, and it

25   goes right through down to -- I'm going through pages

2025

1    MR. ROBERTSON:  An electronic Fisher catalog.

2    THE COURT:  So you remember such a thing?

3    THE WITNESS:  I don't exactly remember if we

4  got anything from SteBo.

5  BY MR. ROBERTSON:

6    Q  But you do recall getting an electronic version of

7  the Fisher catalog?

8    A  Yes.  We did not have to scan anymore, yes.

9    Q  Did I understand you to say in response to my

10  first question that you think you got it in two

11  separate submissions?

12    A  I thought we had the image data separately and we

13  had to go back and match it.

14    Q  That was one of the things you needed to do for

15  this project?

16    A  Well, we had to tag everything.

17    Q  And you were involved in that, right?

18    A  Yeah, at different times.

19    Q  Is that the next task, 25, convert and tag Fisher

20  electronic text data?

21    A  I guess so.

22    Q  Well, I don't want you to guess.  Do you know or

23  don't you know?

24    A  Do I know if I exactly worked on 25, I don't know,

25  but I did during the project do tagging for them.

2026

1    Q  Then you had to deliver a demonstration of the ESP

2  system to Fisher representatives; is that right?

3    A  Yes, that's correct.

4    Q  Then the next thing you had to do was build this

5  pilot electronic sourcing system, correct?

6    A  Correct.

7    Q  No. 39 was a Fisher task about the interface ESP

8  with existing Fisher systems, correct?  Do you see

9  that, No. 39?

10    A  Yes.

11    Q  And that had to be done as part of the project?

12    A  To interface with their inventory management, yes.

13    Q  And you had to also verify, convert and process

14  and author Fisher data as part of the project,

15  correct?

16    A  Correct.  That's the same thing we had for the

17  sample, just more data.

18    Q  More data?

19    A  Yeah.

20    Q  Let me just go through this very quickly then.  So

21  No. 52, you had to build, test and demonstrate the

22  pilot ESP system, correct?

23    A  Yes.

24    Q  You had to provide copies and field test pilot for

25  the ESP system that's No. 58?

2027

1    A  Yes.

2    Q  Then you had to start building a comprehensive

3  electronic sourcing program system?

4    A  Right.

5    Q  As part of that, Fisher provided you with more

6  electronic text and image data for this comprehensive

7  system?

8    A  Right.  The way it worked was the demo was a small

9  number of pages, and the pilot was more pages, and the

10  comprehensive was full.

11    Q  Was it the entire catalog at that point?

12    A  I think so.

13    Q  Then No. 74 was the build test and demonstrate the

14  comprehensive system, right?

15    A  Right.

16    THE COURT:  While he's looking for something,

17  this part of Exhibit 38 you're looking for starts with

18  11/11 and ends with 7 something.  The 11/11 is what

19  year?

20    THE WITNESS:  That would be '93.

21    THE COURT:  Look at the front of the

22  document.  The first page.  It's dated February of

23  '94.

24    THE WITNESS:  Right, but there are several

25  versions of the same thing in there.  Every time we

2028

1  came up with a new version, we put a new date.  That

2  wasn't the initial date.  That was the date of this

3  version because you'll see another one that says March

4  something.

5    THE COURT:  March.

6    THE WITNESS:  So as you see, the 11/11 tasks

7  are completed in this one because this is like a

8  snapshot of February.

9    THE COURT:  So it started in 11/11/93, and it

10  was supposed to end in July of '95?

11    THE WITNESS:  '94.

12    THE COURT:  But it wasn't finish when you

13  left in January of '95, whatever the schedule may have

14  been?

15    THE WITNESS:  Right.

16    THE COURT:  Okay.  Pardon me for the

17  interruption.

18    THE WITNESS:  No problem.

19  BY MR. ROBERTSON:

20    Q  Okay.  You were asked some questions about some of

21  these brochures --

22    A  Uh-huh.

23    Q  -- that IBM had on this TV/2?

24    A  Correct.

25    Q  Let me direct you to Defendant's Exhibit No. 107.

2029

1  This is what I think you referred to as the brochure.
2  A  Right.
3  Q  Just confirm for me that this doesn't have a date
4  on it.
5  A  It doesn't have a date on it.
6  Q  You weren't involved in the preparation of this
7  document, correct?
8  A  I was not.
9  Q  Why don't you take a look at the document that's
10  Defendant's Exhibit No. 230.  You were asked questions
11  about that; is that right?
12  A  Yes.
13  Q  You'd agree that this general information manual
14  does not provide enough information for anybody as to
15  how to integrate a TV/2 search engine with an
16  electronic catalog, correct?
17  A  It does not.  It's just general information.
18  Q  And none of those TV/2 special tags are described
19  in the marketing brochure; is that right?
20  A  Correct.
21  Q  Neither of these two documents disclose markup
22  language that would be used in any kind of project
23  like the electronic sourcing project that IBM did with
24  Fisher, correct?
25  A  No, there's no tags in here.

2030

1  Q  And there's no description of these .inf files in
2  any of these documents that were necessary for the
3  project?
4  A  Not in these two documents.
5  Q  There's no description in either of those two
6  about this super index that needed to be developed in
7  order to do quick searches in either of those two
8  documents?
9  A  Not in these documents.
10  THE COURT:  These documents, are you talking
11  about Defendant's 107 and 230?
12  THE WITNESS:  I don't know what number.  It
13  was the one with the picture on the front that he just
14  asked me to look at before this.  It wasn't in that
15  one either.
16  THE COURT:  Okay.
17  Q  There's no technical description in this general
18  information manual as to those things as well.  That
19  was Defendant's Exhibit No. 230, right?
20  A  There's no technical information, no.
21  Q  This wasn't intended to show somebody how to
22  construct a system like the electronic sourcing system
23  project, correct?
24  A  No, that was something else.  This was just the
25  general information for if you're looking at it.

2031

1  Q  That something else was documentation that was
2  part of the electronic sourcing project, correct?
3  A  Well, no, it came with TV/2.
4  Q  I thought I understood you to say that TV/2 wasn't
5  in commercial production until the electronic sourcing
6  project with Fisher; isn't that right?
7  A  If commercial means you can buy it off the shelf,
8  no, but it was available to use in a service.
9  Q  We haven't seen any of those documents, have we,
10  that you're referring to?
11  A  They are not here, no.
12  Q  You're aware that IBM has never claimed to be an
13  inventor of these patents that are in suit, right?
14  A  I'm not aware --
15  MR. McDONALD:  Objection, Your Honor.  Beyond
16  the scope.  Irrelevant.
17  MR. ROBERTSON:  I don't think it's beyond the
18  scope, Your Honor.  I think --
19  THE COURT:  Well, I'm not sure what relevance
20  it has.  Sustained.
21  MR. ROBERTSON:  Thank you.  That's all I
22  have, Ms. Eng.
23
24
25

2032

1  REDIRECT EXAMINATION
2  BY MR. McDONALD:
3  Q  Ms. Eng, do you have the transcript that's first
4  tab in that binder that Mr. Robertson gave you from
5  your testimony in 2006?
6  A  Yes.
7  Q  Can you turn back to that page 1296 that
8  Mr. Robertson directed you to?
9  THE COURT:  Are you going to do it right?
10  You have to do it right, too.  All of you do.
11  MR. McDONALD:  I hope so.
12  THE COURT:  Just pointing her to a deposition
13  and reading it in doesn't get the job done.  It can't
14  come in that way.  That isn't how you do it.
15  Q  Ms. Eng, in the year 1992, was the TV/2 system
16  being offered for sale by IBM?
17  MR. ROBERTSON:  Objection, Your Honor.  This
18  was asked on direct examination.  It's just going over
19  prior testimony.
20  THE COURT:  Well, I think there was some
21  confusion engendered as a result of your last question
22  and he's trying to straighten it out.
23  THE WITNESS:  I can answer?
24  THE COURT:  Yes.  Sorry.
25  A  It was available for people to use as a service

2047

```
1         IN THE UNITED STATES DISTRICT COURT
2          FOR THE EASTERN DISTRICT OF VIRGINIA
3                   RICHMOND DIVISION
4
5    ---------------------------------
6    ePLUS, INC.          : Civil Action No.
                          : 3:09CV620
7    vs.                  :
                          :
8    LAWSON SOFTWARE, INC.   : January 18, 2011
                          :
9    ---------------------------------
10
11       COMPLETE TRANSCRIPT OF THE JURY TRIAL
12       BEFORE THE HONORABLE ROBERT E. PAYNE
13    UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C. 20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24       Peppy Peterson, RPR
            Official Court Reporter
25       United States District Court
```

2048

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2049

```
              P R O C E E D I N G S
1
2
3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
6    Mr. Michael G. Strapp represent the plaintiff.
7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin L. Stoll-DeBell, Mr. William D. Schultz represent the
9    defendants.  Are counsel ready to proceed?
10       MR. ROBERTSON:  Yes, Your Honor.
11       MR. McDONALD:  We are, Your Honor.
12       THE COURT:  All right.  What is this all about?
13       MR. ROBERTSON:  Your Honor, good morning.
14       THE COURT:  Morning.
15       MR. ROBERTSON:  Last night at 6:00 p.m., plaintiff
16   received a package of something like almost 170 demonstrative
17   graphics that the defendant intends to introduce, apparently,
18   with the testimony of Dr. Shamos.
19       As a practical matter, Your Honor, I think last week
20   the defendant represented that they would wrap their case up in
21   two days.  Going through 170 slides is just going to be
22   impossible to try to get through just as an initial matter
23   before we even get to the issue that we have with respect to
24   170 slides being presented to the jury.
25       THE COURT:  Why are these exchanges being made now?
```

2050

```
1    I thought demonstrative exhibits were supposed to have been
2    exchanged before the trial.  Isn't that what the pretrial order
3    says?
4        MR. ROBERTSON:  I'm not certain the pretrial order
5    says that or not.  We did have an agreement among the parties
6    that we would present demonstratives at 6:00 p.m. the night
7    before a witness was to go on, but the sheer volume --
8        THE COURT:  Did I say grace over that?
9        MR. ROBERTSON:  I'm sorry, sir?
10       THE COURT:  Did somebody present that to me?
11       MR. ROBERTSON:  I don't know that it was presented to
12   you, Your Honor.
13       THE COURT:  You see what happens?  I would never have
14   allowed that if I knew that was what was going on.  Never in a
15   million years would I have allowed it.  I've never allowed it,
16   and the reason I don't allow it is because of this kind of
17   problem.
18       MR. ROBERTSON:  There had been a rule of reason
19   applied to it, Your Honor, where the demonstratives were fairly
20   limited in scope.  For example, Dr. Weaver, I think we had
21   about 30 of which 24 were simply the claims or the -- you'll
22   recall the infringement charts where we were checking off the
23   boxes.
24       The problem we have now is we believe that these
25   slides substantively violate several of the Court's orders with
```

2011.01.18 Trial Transcript Day 9  1/18/2011  11:06:00 PM

2127

1    MR. ROBERTSON:  Objection.  How would he know?

2    THE COURT:  Your objection is to lack of foundation?

3    MR. ROBERTSON:  Yes, sir.

4    THE COURT:  Sustained.

5  Q   When you first started talking to IBM about using the TV/2

6  system, the first time you saw that, did the TV/2 system have a

7  graphical user interface?

8  A   Yes.

9    MR. McDONALD:  I have no further questions.  Thank

10  you.

11    THE COURT:  Ladies and gentlemen, we'll take the

12  morning recess for 20 minutes.  Go ahead and take your pads

13  with you.

14

15    (Jury out.)

16

17    THE COURT:  We'll be in recess.

18

19    (Recess taken.)

20

21

22

23

24

25

2128

1    (The jury is present.)

2    THE COURT:  Cross-examination.

3

4    CROSS-EXAMINATION

5  BY MR. ROBERTSON:

6  Q   Good morning, Mr. Momyer.

7  A   Good morning.

8    MR. ROBERTSON:  I'd like you to put the '683

9  patent up, Exhibit No. 1, specifically column 1

10  starting at line 10 going down to about line 17.

11  Q   You recognize this as the '683 patent, you're

12  patent?

13  A   Yes.

14  Q   I'm sorry?

15  A   Yes.

16  Q   Did you disclose in your patent and the Patent

17  Office that there were a number of known --

18    THE COURT:  Can you speak up, please.

19    MR. ROBERTSON:  Sure, Your Honor.  I'm sorry.

20  Q   Did you disclose to the Patent Office in your

21  patent that there are a number of known

22  requisition/purchasing systems that manage and process

23  requisitions and purchase orders, one such system is

24  the Fisher-Scientific Requisition and Inventory

25  Management System, Fisher RIMS, described in United

MOMYER - CROSS     2129

1  States No. 5,712,989 filed April 2, 1993, and assigned

2  to the Fisher-Scientific Company of Pittsburgh,

3  Pennsylvania, the disclosure of which is incorporated

4  herein by reference; do you see that?

5  A   Yes, I do.

6  Q   Did you make that representation to the Patent

7  Office?

8  A   Yes.

9  Q   Why did you do that, sir?

10  A   Well, RIMS was an inventory control purchasing

11  requisition system, and we actually would use the

12  basis for RIMS to build the component for the

13  electronic sourcing application.

14  Q   So did you want them to be aware that such a

15  system existed out there?

16  A   Yes.

17  Q   Can you go down to about line 35?  Just the first

18  two lines.  There's a statement in your patent that

19  says, Other requisition/purchasing systems can be

20  grouped broadly into four classes; do you see that?

21  A   Yes.

22  Q   Just generally, if you would just refer to your

23  patent, did you go on to describe for the Patent

24  Office what those four classes of requisition

25  purchasing systems were?

MOMYER - CROSS     2130

1  A   Yes.  We did describe some other types of

2  requisition purchasing systems.

3  Q   If you would go down to line 60, down to about

4  line 64.  You then represented to the Patent Office

5  that none of these known requisition/purchasing

6  systems, including Fisher RIMS, however, provides a

7  capability for a user readily to search for and locate

8  information about the products that may be

9  requisitioned and ordered in connection with the

10  requisition/purchasing system; do you see that?

11  A   Yes.

12  Q   When you made that statement to the Patent Office,

13  did you consider it to be truthful?

14  A   Yes.

15  Q   Do you consider it to be truthful to this day?

16  A   Yes.

17  Q   You were also asked about the ability for a user

18  to request information about products and create

19  orders that can be saved, printed or, in some cases,

20  facsimiled directly to a vendor; do you recall that?

21  A   Yes, I did.

22  Q   When you print or facsimile directly to a vendor,

23  are you working within the electronic sourcing system

24  patent that you've described and claimed in your

25  patents?

2135

MOMYER - CROSS     2135

1   purchasing system for inclusion in a requisition
2   generated by the system?  Would you consider that to
3   be an advantage of your invention?
4   A   Yes, I would.
5   Q   Did the RIMS system have that capability?
6   A   No, it did not.
7   Q   You also represented to the Patent Office that it
8   would by further desirable to provide an electronic
9   sourcing system that's capable of creating an order
10  list including items located as the result of a
11  catalog database search, and then transferring that
12  order list of desired items to a requisitioning and
13  purchasing system for inclusion of the catalog items
14  as entries in a requisition generated by the system.
15  Do you see that?
16  A   Yes.
17  Q   Did you consider that to be an advantage at the
18  time when you applied for your patent?
19  A   Yes.
20  Q   Do you consider that to be the same or different
21  from the capability of the RIMS system?
22  A   Well, RIMS, obviously, didn't have a catalog.  So
23  it really couldn't pull results of a search back into
24  an order list.  So, yes, it's something that RIMS did
25  not have.

2136

MOMYER - CROSS     2136

1   Q   Did you consider one of the advantages of your
2   invention to be that it could generate multiple
3   purchase orders for multiple vendors from a single
4   requisition?
5   A   Yes, I do.
6   Q   Did the RIMS system have that capability?
7   A   No.
8   Q   Was there any means for selecting product catalogs
9   to search disclosed in the RIMS '989 patent?
10  A   No.
11  Q   You were ask some questions about how many
12  versions the RIMS system went through when it was
13  being used by the customer service representatives.
14  Do you know as you sit here today how many versions
15  there were?
16  A   No, I can't say.  There are quite a few.
17  Q   Can you give us your best estimate?
18  A   Thirty, 40 versions.
19  Q   You were directed to your deposition with respect
20  to when the RIMS development wrapped up.  Do you
21  recall that?
22  A   Yes.
23  Q   And at the time you indicated, I thought I
24  understood, you wanted to follow-up on your answer
25  with respect to that when you were directed to your

2137

MOMYER - CROSS     2137

1   testimony.
2   A   Yes.
3   Q   Can you tell us what was it that you had in mind?
4   A   All right.  Okay.  What I was addressing, that was
5   in an earlier deposition, was that the first release
6   of RIMS was wrapped up around 1991.  There were many
7   subsequent releases of RIMS that occurred after that
8   up until I left Fisher in 2003.  We continually
9   modified and upgraded the RIMS system.
10  Q   Do you have a memory specifically in that
11  deposition as to whether or not you were asked a
12  question as to the ongoing development of the Fisher
13  RIMS system?
14  A   I really don't recall.
15  Q   Why don't you then go to page 99 of that
16  deposition transcript.  That was the --
17      MR. McDONALD:  Objection, Your Honor.  He
18  just said he doesn't recall.
19      MR. ROBERTSON:  I'm going to fresh his
20  recollection.
21      THE COURT:  Overruled.
22  Q   Can you go to the September 16, 2004 deposition
23  you have in your book?
24  A   All right.
25  Q   Specifically, if you'd go to the bottom of page 99

2138

MOMYER - CROSS     2138

1   starting at about line 20.  If you could read over to
2   the top of page 100.
3   A   Page --
4   Q   99 starting at line 20 at the bottom.
5   A   Okay.
6   Q   And going over.
7   A   Sorry, Mr. Robertson.  I'm having trouble with the
8   page.  93, 94 to 97, 98 to what?
9       MR. ROBERTSON:  99, starting at line 20.  It
10  says, Question:  Welcome back.
11  A   99, line 20, yes, I see that.
12  Q   Why don't you read that over to page 100 down
13  through line 9.  Just read it to yourself, sir.
14  A   How far did you want me to read?
15  Q   Down to line 9.
16  A   Okay.
17  Q   Now, you were asked a question concerning when the
18  RIMS product was complete.  Do you see that shortly
19  after the luncheon break?
20  A   Yes.
21  Q   Does that fresh your recollection now as to what
22  you told the attorney under oath in your testimony as
23  to when the RIMS system was completed?
24  A   Yes.
25  Q   What does it refresh your recollection to be and

2139

MOMYER - CROSS      2139

1  what did you indicate there?
2  A  Pretty much what I just said.  We continue
3  developing RIMS up until I left Fisher.
4        MR. McDONALD:  Your Honor, I don't know what
5  he's referring to at this point, but I think the
6  question and answer should just be red.
7        MR. ROBERTSON:  I'm happy to do that, Your
8  Honor.
9        THE COURT:  He asked if it refreshed his
10  recollection, and he said yes.  What was the
11  recollection that was refreshed?  He's entitled to
12  answer how it was refreshed.  And if you'd like to
13  read the question and answer, both of you, go ahead.
14  BY MR. ROBERTSON:
15  Q  Well, I thought you had answered the question, but
16  I understood you to say it refreshed your
17  recollection.  So what recollection was refreshed by
18  referring to this testimony that you gave under oath?
19  A  My recollection was that the RIMS system was an
20  evolutionary system that continued to be developed
21  over a period of time up to and through 2000, 2003.
22  Q  Is it your testimony there under oath consistent
23  with your recollection now?
24  A  Yes.
25  Q  Can we just go to the RIMS patent?  The RIMS

2140

MOMYER - CROSS      2140

1  system is mentioned multiple times in your patent; is
2  that right?
3  A  Yes, it is.
4  Q  I've got just a graphic here of your '683 patent.
5  If we could just go along.  Do you know how many times
6  RIMS is mentioned in this patent?
7  A  No, I don't.
8  Q  I've indicated here in red in each instance that
9  the RIMS system or the RIMS features or capabilities
10  are described or as modified.  If we could just scan
11  through this.  This is column 1 and 2, there's 3 and
12  4, 5 and 6, 7 and 8, 10, columns 11 and 12, 13, 14,
13  15, 16, 18.  All right.  Would it surprise you, sir,
14  if you disclosed RIMS functionality and feature in
15  your patent more than 55 times in your patent
16  application?
17  A  No.
18  Q  You weren't trying to mislead the Patent Office by
19  withholding descriptions of what the RIMS capability
20  was, were you?
21  A  No, I wasn't.
22  Q  Can you tell us whether or not you think you fully
23  disclosed the features and capability and the
24  revisions and modifications that were necessary in
25  order to come up with your electronic sourcing

2141

MOMYER - CROSS      2141

1  invention?
2  A  Yes, to the best of my understanding we did.
3  Q  I want to talk to you a little bit about
4  cross-referencing in the RIMS system.  Do you recall
5  being directed to sections in the RIMS patent?
6  A  Yes, I do.
7  Q  In your electronic -- well, let me ask you this
8  basic question.  Is the cross-referencing, as
9  identified in the RIMS patent, the same
10  cross-referencing as utilized in your invention of the
11  electronic sourcing system?
12  A  No, it's not.
13  Q  Can you tell us how it's different?
14  A  The cross reference in the RIMS system was
15  intended to be a means to do a look-up from a
16  competitor or vendor's catalog number, part number,
17  over to Fisher, and always convert it to that.  The
18  cross referencing in the electronic sourcing was much
19  broader in that it didn't specifically cross reference
20  you to any specific Fisher part number.  It wasn't
21  tied back to a specific Fisher part number.
22  Q  Let me ask you this about the RIMS system.  If you
23  were able to identify a part number, for example, of
24  your competitor, was the RIMS system then able to
25  source it from that vendor?

2142

MOMYER - CROSS      2142

1  A  In the RIMS system?
2  Q  Yes.
3  A  It would identify the part number.  Which part
4  number?
5  Q  The part number of the competitor.
6  A  No, it would always -- in the RIMS system, you
7  would always translate back to the Fisher part number.
8  Q  So in other words, you were trying to cross
9  reference to a part number so you could then find a
10  corresponding Fisher product to sell to the customer;
11  is that right?
12  A  That's correct.
13  Q  In your electronic sourcing system, does the
14  customer, the user, have the ability using the cross
15  reference table to purchase the actual item from one
16  vendor, another vendor, or multiple vendors?
17        MR. McDONALD:  Objection, Your Honor.  The
18  cross-reference table was a term that the Court has
19  used in its claim constructions, and I think it's
20  unclear here because there's nothing in that
21  definition that is specific to which part it's being
22  converted to.
23        MR. ROBERTSON:  I'll rephrase the question.
24  Q  Did the electronic sourcing system have the
25  capability to identify the same or similar products

2143

MOMYER - CROSS      2143

1   from multiple vendors, your invention?
2   A   Yes.
3   Q   Could you then source it from those multiple
4   vendors?
5   A   Yes.
6   Q   Could you then purchase it from those multiple
7   vendors?
8   A   Yes.
9   Q   Did the RIMS system have that capability at any
10  time, way, shape or form?
11  A   No.
12  Q   Did you consider that to be one of the advantages
13  of your electronic sourcing invention?
14  A   Yes.
15  Q   Can we go to I think it's Plaintiff's Exhibit
16  No. 10, which is the '989 patent. It's at the very
17  back of Volume II, Mr. Momyer.
18  A   Okay.
19      MR. ROBERTSON:  If you could blow up the --
20  we're going to the page that ends with 910.
21  Q   The lower right-hand corner, the lowest number
22  there.
23  A   Right.  Okay.
24  Q   There's a table there that you were asked some
25  questions about --

2144

MOMYER - CROSS      2144

1       MR. ROBERTSON:  If you could put them
2   together, please.
3   Q   -- about 05 and 06 product types.  Do you see
4   that?
5   A   Yes.
6   Q   This customer owned item located in customer
7   warehouse at or near customer site.
8   A   Yes.
9   Q   Tracking that item in the inventory of the
10  customer, is that a service that Fisher was providing
11  for its customers?
12  A   Yes, it was.
13  Q   Using the RIMS system, could I use that product
14  type to, within the system, order product from a third
15  party vendor?
16  A   No.
17  Q   Is there any type 7 product identified in that
18  table?
19  A   No, there's not.
20  Q   Was there a product type 7 in your electronic
21  sourcing patent?
22      MR. McDONALD:  Objection, Your Honor.  It's
23  outside the scope of direct and also the claims have
24  nothing to do with the product type 07.
25      MR. ROBERTSON:  Your Honor, the question was

2145

MOMYER - CROSS      2145

1   asked about product type 05, 06.  I want to now point
2   out that product type 07 in this electronic sourcing
3   patent is third party vendor items that are part of
4   the system differentiating the RIMS patent, which he
5   was asked questions about in the electronic sourcing
6   patent.
7       MR. McDONALD:  It's not in the claim, Your
8   Honor.  That's why we object to it.
9       MR. ROBERTSON:  Multiple catalogs are in the
10  claims, Your Honor, and there were multiple vendor
11  catalogs, vendors, supplier, manufacturer.  And that's
12  what type 07 products are.
13      MR. McDONALD:  That's not what type 07
14  products are.
15      THE COURT:  I tell you what, why don't you
16  ask him, and on redirect you can deal with it.
17      What are type 07 products, Mr. --
18      MR. ROBERTSON:  Let me just so if I can find
19  it so we can reference.
20  BY MR. ROBERTSON:
21  Q   If we can go to appendix 1 of the '683 patent?
22      THE COURT:  Figure 1?
23      MR. ROBERTSON:  Appendix 1, Your Honor.  Let
24  me direct you to that.
25  Q   It's on the page that has column 19.  Do you see

2146

MOMYER - CROSS      2146

1   in there this is a requisition header?
2   A   Yes.
3   Q   In the lower left-hand side there's a reference to
4   vendor.  Do you see that?
5   A   Yes.
6   Q   The Fisher RIMS System didn't have that vendor as
7   part of a requisition system; is that right?
8   A   That's correct.
9   Q   Can we go back to that Fisher RIMS patent at table
10  1, column 37?  It was PX 10.  Table 1 there in the
11  RIMS patent, PX 10, is an order header information.
12  Are you with me?
13  A   Yes.
14  Q   Is a vendor identified anywhere in that order
15  header information for that requisition?
16  A   In table 1?
17  Q   Yes.
18  A   No.
19  Q   You'd agree with me by the time that you were
20  applying for this -- let me ask you this.  But when
21  you were applying for the patent application that led
22  to the patents that are at issue here in August of
23  1994, there was a RIMS system in operation, correct?
24  A   Yes.
25  Q   Notwithstanding that, did Fisher devote

2147

MOMYER - CROSS     2147

1   significant resources to develop the electronic
2   sourcing system?
3   A   Yes.
4   Q   Did they devote personnel to it?
5   A   Yes.
6   Q   Including yourself, Mr. Kinross, Mr. Johnson and
7   Mr. Melly?
8   A   Yes.
9   Q   Did they devote considerable financial resources
10  to developing the electronic sourcing system?
11  A   Yes.
12  Q   Did they subcontract with IBM and pay them a
13  considerable amount of money to work with you for more
14  than a year and a half to develop the electronic
15  sourcing system?
16      MR. McDONALD:  Objection, Your Honor.  It's
17  related to commercial embodiment, not the scope of the
18  claims and the filing.  So it's irrelevant.
19      MR. ROBERTSON:  It's part of the invention
20  story.  It's part of the development of this
21  invention.
22      THE COURT:  Sustained.
23  Q   Let me ask you this.  If the RIMS patent could do
24  everything that the electronic sourcing patent could
25  do, why would the company go and expend that effort to

2148

MOMYER - CROSS     2148

1   come up with this new patent and apply for patent and
2   pay all that money if that was the case to get a
3   patent from the Patent Office?
4       MR. McDONALD:  Objection.  Lack of
5   foundation.
6       THE COURT:  Overruled.
7   A   I don't know why it would invest that if RIMS
8   could do all of that.
9       MR. ROBERTSON:  Thank you.  I have no further
10  questions.
11      THE COURT:  Redirect?
12      MR. McDONALD:  Yes, please.
13
14      REDIRECT EXAMINATION
15  BY MR. McDONALD:
16  Q   If we could go back to the '683 patent, please,
17  Exhibit 1.  Go back to column 2.
18      THE COURT:  He needs to get the book first.
19  A   Which column?
20  Q   Column 2.
21  A   Okay.
22  Q   Now, in column 2 --
23      MR. McDONALD:  Could we put that up on the
24  screen?  We have to have switch the systems, I guess.
25  If we could blow up column 2.

2149

BY MR. McDONALD:

2   Q   You were asked some questions in this area by
3   Mr. Robertson.  I just want to clarify.  You were
4   saying that all these statements in this column were
5   truthful in your belief, correct?
6   A   Yes.
7   Q   If we go to line 18 there, beginning with the
8   known.  Excuse me, line 8.  I'm sorry.  Line 8,
9   beginning with the sentence, "The known computer
10  systems for searching vendor catalogs are limited in
11  that only one such vendor catalog is accessible to a
12  user at any given time."  Do you see that sentence?
13  A   Yes.
14  Q   Wasn't it true that the TV/2 system was a known
15  computer system for searching vendor catalogs that
16  wasn't limited to just searching one vendor catalog at
17  a given time?
18      MR. ROBERTSON:  Objection, lacks foundation.
19      THE COURT:  Overruled.
20  A   I thought I mentioned I didn't believe that the
21  TV/2, one, could search multiple documents and, two,
22  when it was presented to us had the ability to search
23  a catalog.
24  Q   You didn't think TV/2 could search a catalog?
25  A   No.

2150

1       MR. ROBERTSON:  Objection.
2       MR. McDONALD:  I'll rephrase that.
3   Q   It was your understanding when you started working
4   with IBM that the TV/2 system could not search a
5   catalog?
6   A   Search a document.
7   Q   That's a different question, Mr. Momyer.  My
8   question is when you started working with IBM, didn't
9   you know that the TV/2 system was fully capable of
10  searching catalogs?
11  A   No, not to the requirements that we needed it to.
12  Q   You knew it could search catalogs, though, right?
13  A   It could search a document.  If you want to
14  consider a catalog a document, then --
15  Q   Wasn't that exactly the sort of document that the
16  TV/2 system was designed to work with was a catalog?
17  A   That's not what was presented to us.
18  Q   Do you remember -- did IBM ever communicate to you
19  in your experience that the TV/2 system was actually
20  designed to work with documents specifically including
21  parts catalogs?
22  A   We actually went there with the intent of -- that
23  was a requirement for us to be able --
24  Q   I have a different question for you.  My question
25  is:  Did IBM, anybody from IBM, ever communicate to

2151

1    you that the TV/2 system was capable of searching
2    parts catalogs?
3    A   I'm sure it came up during the discussions when I
4    was at the meeting as far as being able to search a
5    document, a list of products, and find some keywords,
6    find some products.
7    Q   In fact, isn't it true that the TV/2 system was
8    specifically designed to work with a CD ROM that could
9    have multiple catalogs on it?
10   A   I don't recall that.
11   Q   All right.  So when you said this statement here
12   was truthful, you're saying basically as far as you
13   know without really knowing the details about the TV/2
14   system, is that what meant by that?
15        MR. ROBERTSON:  I object to the form of that
16   question.
17        THE COURT:  Sustained.
18   BY MR. McDONALD:
19   Q   Let's go to the next sentence.  They are also
20   limited in that they can only create an order within
21   the particular vendor catalog database.  Do you see
22   that sentence?
23   A   Yes.
24   Q   Did you understand, was there any limitation on
25   the TV/2's system ability to communicate with the RIMS

2152

1    system regarding multiple catalogs from multiple
2    vendors?
3    A   Well, my understanding, I didn't think the TV/2
4    system as it was presented to us could handle multiple
5    catalogs and could not search multiple catalogs.  That
6    was my understanding.  That's the reason we did the
7    development that we did.
8    Q   In the next sentence then, do you see where it
9    says, They cannot source items to be requisitioned
10   from a database containing multiple catalogs, which is
11   what we have already been talking about, or interact
12   with a requisition purchasing system, such as Fisher
13   RIMS, to create a purchase order or orders including
14   the items located from that sourcing operation?  Do
15   you see that part of the sentence beginning with the
16   word "interact," Mr. Momyer?
17   A   Yes, I do.
18   Q   Wasn't it true that when Fisher started working
19   with IBM, the TV/2 system was already capable of
20   interacting with a requisition purchasing system such
21   as the Fisher RIMS System to create a purchase order
22   or orders including the items located from that
23   sourcing operation?
24   A   Once again, I'm probably not the best person to
25   ask this because I don't recall that being brought up.

2153

1    I really don't.
2    Q   You do recall that the TV/2 system was designed to
3    integrate with order entry inventory management
4    systems, don't you?
5    A   No, I don't.  I know it had an interface
6    capability, but no, I don't recall that.
7    Q   Let's go back to Defendant's Exhibit 107.  And go
8    to the last page of Defendant's Exhibit 107.  This is
9    the Technical Viewer/2 brochure.
10        And the third bullet point on the left, if we
11   could blow that one specifically up.
12        MR. ROBERTSON:  Your Honor, I object.
13   There's no foundation this witness even recalled this
14   at the time, and he testified that he didn't recall it
15   except that he was shown it later on at some point
16   during the enforcement actions in this case.
17        MR. McDONALD:  The third bullet point, it's
18   specific to this language in column 2.
19        MR. ROBERTSON:  It's outside the scope of my
20   direct.  I didn't ask the witness any questions about
21   this document.
22        MR. McDONALD:  He asked him about whether
23   there were systems that could interact with the
24   requisition purchasing system that he knew of.
25        MR. ROBERTSON:  I asked if that statement was

2154

1    truthful, not anything about this document.
2        THE COURT:  Objection is sustained.
3    BY MR. McDONALD:
4    Q   Let's go back to column 2 of the '683 patent and
5    pick up where we left off there.  I think that would
6    be at column 2, line 18.  The next sentence.
7        You were asked about this sentence that says, Thus
8    it would be desirable to provide an electronic
9    sourcing system that provides a means for transferring
10   information between a requisition purchasing system
11   that may use the results of a search of product
12   information and a means for searching large volumes of
13   product information such as would be included in a
14   vendor product catalog or catalogs, right, Mr. Momyer?
15   A   Yes.
16   Q   Isn't it true that the TV/2 system was already a
17   system that provided a means for transferring
18   information between a requisition purchasing system
19   that may use the results of a search of product
20   information and a means for searching large volumes of
21   products' information such as would be included in a
22   vendor product catalog or catalogs?
23   A   It did have a means for transferring information.
24   That's the reason that we selected it is that we could
25   take advantage of that and customize it to meet our

2155

1    requirements.

2    Q  And TV/2 also had the means for searching through

3    large volumes of product information, right?

4    A  To an extent.  There were some changes we had to

5    make to allow us to have multiple catalogs.

6    Q  That was one of the features that the TV/2 system

7    touted by IBM to Fisher, specifically the feature of

8    searching large volumes of product information?

9        MR. ROBERTSON:  Objection.  Lacks foundation.

10   It calls for hearsay as well.

11       THE COURT:  Overruled.

12   A  They did say they could search large volumes of

13   information, yes.

14   Q  Let's go to the next sentence.  I think we have

15   already covered this one, Mr. Momyer, in a little

16   different form, but let's just take a look at it here.

17   Do you see this sentence, also one Mr. Robertson asked

18   you about, "It would also be desirable to provide an

19   electronic sourcing system that is capable of

20   searching a database containing at least two vendor

21   product catalogs for product information."  Do you see

22   that?

23   A  Yes, I do.

24   Q  Isn't it true that the TV/2 system already had the

25   capability of searching a database containing at least

2156

1    two vendor product catalogs for product information

2    before Fisher even started working with IBM?

3    A  Not that I understood.  That's some of the reason

4    we did the development we did, to allow us to provide

5    for multiple catalogs.

6    Q  Do you know one way or the other whether the TV/2

7    system had that capability?

8        MR. ROBERTSON:  Objection.

9        THE COURT:  He use answered it.  He said it

10   did not to his knowledge.

11       MR. McDONALD:  I just want to clarify.

12       THE COURT:  I want you to move on.  He

13   answered.  Let's go on.

14   Q  Let's go to the next sentence.  I think this is

15   basically repetitive of what we have already talked

16   about.  So we won't go through this one in detail.

17   Let's go to the next sentence after this.

18       You were also asked about this one regarding an

19   order list, right, Mr. Momyer?

20   A  Yes.

21   Q  Isn't it true that the TV/2 system as it existed

22   when Fisher started working with IBM had the

23   capability of generating a shopping list that could be

24   transferred to an order system?

25   A  I think we've gone through this.  I don't recall

2157

1    that being a capability of the system.

2    Q  Well, could you refer to -- could we refer to the

3    brochure, PX 107?  I'll just ask you if this refreshes

4    your recollection, Mr. Momyer.  The third page of

5    Exhibit 107, that third paragraph.

6    A  DX?

7    Q  107.  Does reviewing that paragraph refresh your

8    recollection as to whether or not the IBM TV/2 system

9    had the capability of creating a shopping list?

10   A  This is the same document I said I did not see.

11   And the last time I recall seeing it -- the first I

12   recall seeing it was 2004 when we had the first case.

13   Q  I'm just asking if it refreshes your recollection.

14   If it doesn't, it doesn't.

15   A  No.

16   Q  Now, you were asked whether the patents mention

17   the RIMS system.  The patents involved in this suit,

18   the three alleged to be infringed here.  Do your three

19   patents-in-suit also mention the TV/2 system several

20   times?

21   A  I believe it does.

22   Q  But in addition to that, the TV/2 system was

23   specifically disclosed to the Patent Office as

24   publications and listed on the cover page of the

25   patent in addition to being listed in the patent

2158

1    itself, right?

2        MR. ROBERTSON:  Objection.  This was asked on

3    direct examination.

4        THE COURT:  Already been there and he didn't

5    go into it.  Exceeds the scope of cross.  Sustained.

6    BY MR. McDONALD:

7    Q  I think you were asked about the RIMS patent.

8    Could we turn to the RIMS patent, please, Plaintiff's

9    Exhibit 10?  If we could turn to column 37.

10   A  Column 37.  All right.

11   Q  There's that first table, No. 1, order header

12   information.  Do you see that?

13   A  Yes.

14   Q  I want to make sure I have the right chart here,

15   Mr. Momyer.  I want to just verify.  But you were

16   asked whether a particular table did or did not

17   include a reference to a vendor.  Do you recall that?

18   A  Yes.

19   Q  And that was in the RIMS patent, right?

20   A  Yes.

21   Q  Is this the right table that I've got here?

22   A  This is the one that we talked about, yes.

23       MR. McDONALD:  Could we back out to the full

24   page, column 37 and 38, and look at the table

25   immediately to the right of table 1, please.  And blow

2175

KINROSS - DIRECT    2175

1  Viewer.

2  Q  Did IBM do that through that process that you just

3  described?

4  A  Did they do it?  They tried to do it.  I don't

5  think they were completely successful.

6  Q  It was their job as part of the project, though,

7  to do that conversion?

8  A  Yes.  And what their programs couldn't do, they do

9  manually.

10  Q  So one way or the other they got it into their

11  system?

12  A  Yes.

13  Q  Ands that's part of what Fisher paid them for,

14  correct?

15  A  Right.

16  Q  And IBM system as it existed when Fisher

17  first started working with IBM, it did have the

18  ability to do keyword searches, right?

19  A  Correct.

20  Q  It had the ability to search a document, a

21  complete document, or a list of selected topics,

22  right?

23  A  I don't think the list of selected topics was part

24  of it.

25  Q  Could you turn to Defendant's Exhibit 105, please,

2176

KINROSS - DIRECT    2176

1  to the seventh page of the document, please?

2  A  All right.  These aren't numbered the same way.

3  Q  The lower corner --

4  A  Mine is numbered 230.

5  Q  Do you have an IBM Technical Viewer/2 Manual?

6  A  Yeah, it's numbered DX 230 in my book.

7  Q  Just turn to the seventh page of that document

8  where it has the heading features of IBM Technical

9  Viewer/2 just down seven pages.

10       THE COURT:  The even numbered pages are

11  missing out of my copy.  What are you on?  Seven?  I

12  have seven, but I don't have the even numbered pages.

13       MR. McDONALD:  This is Exhibit DX 105.  You

14  say you're missing some pages, Your Honor?

15       THE COURT:  Mine goes from 3 to 5 to 7 to 9.

16       MR. McDONALD:  Okay.  This is actually the

17  document that's filed with the Patent Office.  It had

18  missing pages from the document.  I think there's

19  another version of it.

20  BY MR. McDONALD:

21  Q  Exhibit 230 is the complete version.  Do you have

22  that, Mr. Kinross?

23  A  Yes.

24  Q  So let's turn to the page --

25       THE COURT:  What volume is 230 in?

2177

KINROSS - DIRECT    2177

1       MR. McDONALD:  It should be in the same

2  volume as 107.

3  Q  Mr. Kinross, have you seen that version that we

4  were first looking at there that was actually missing

5  some of the pages of this technical bulletin?

6       THE COURT:  Do you have a document called 230

7  over there?

8       THE WITNESS:  Yes, I do.

9       MR. McDONALD:  You don't have 230?

10       THE WITNESS:  I very 230.

11       THE COURT:  Well, it's more important you

12  have it than I have it.

13       THE WITNESS:  It has blank pages in it.  Page

14  18 is completely blank.

15       THE COURT:  He doesn't have a complete copy.

16       MR. McDONALD:  I think he said he just has

17  some blank pages because it has both sides copied and

18  includes some of those missing pages from the other

19  one.

20  BY MR. McDONALD:

21  Q  If you could turn to the 12th page of that

22  document, Mr. Kinross.

23  A  Page 12 is just the IBM Technical Viewer general

24  information cover.

25  Q  What's the number in the lower right corner on

2178

KINROSS - DIRECT    2178

1  page 1 of the document?

2  A  The lower right, G0000012.

3  Q  Can you turn to G23, please?  Now, if we blow up

4  the search capability here, about the third one down.

5  A  Yes.

6  Q  This is the 1991 IBM document, right, Mr. Kinross?

7  Do you see that in the lower left part of that same

8  page?

9  A  Yes.

10  Q  So we have now blown up this search function here

11  where it talks about "A search facility that can

12  locate every occurrence of a word or phrase in either

13  the current topic, a list of selected topics, the

14  complete document, or another document."  Do you see

15  that sentence?

16  A  Yes.

17  Q  Now, isn't it true that the IBM Technical Viewer/2

18  product had that search facility as described there

19  before Fisher started working with IBM?

20  A  I can't say I saw a list of selected topics in the

21  Technical Viewer search program that I looked at

22  initially.

23  Q  Were you looking for that ability to search

24  selected topics initially?

25  A  Yes.

2179

KINROSS - DIRECT      2179

1   Q  What did you actually see?

2   A  Well, when you brought Technical Viewer up, it

3   would have the content that could be searched.  If you

4   did a search, it would search that content.

5   Q  Did it give you a menu of things you could search

6   through such as part catalogs or other types of

7   documents?

8   A  No.

9   Q  Did you ever see a demo of the Volvo parts system?

10  A  No, I didn't.  There are other things in this

11  manual that in my opinion did not exist in the product

12  as well.

13  Q  If we go farther down in the same page, do you see

14  near the bottom of the page it talks about Windows?

15  A  Yes, sir.

16  Q  That's a graphic user interface, correct, as used

17  there?

18  A  Right.

19  Q  Did the IBM Technical Viewer/2 as you first saw it

20  have that Windows graphical user interface?

21  A  Well, Windows to me is the windows we all know

22  from Microsoft which IBM also had as its OS/2 version.

23  So a Window would -- my definition of this is just a

24  portion of the screen that can be manipulated,

25  resized, just like Windows is today.

2181

KINROSS - DIRECT      2181

1       THE CLERK:  They are going to go downstairs.

2       THE COURT:  Just leave your notebooks with

3   Mr. Neal.  He'll watch them for you.

4       (The jury is exiting the courtroom.)

5       THE COURT:  When is Mr. Gounaris due up?

6       MR. McDONALD:  After Mr. Kinross.

7       THE COURT:  Be ready to argue this motion

8   then when we come back from lunch.

9       All right.  We'll be in recess for one hour.

10      (Luncheon recess taken.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2180

KINROSS - DIRECT      2180

1   Q  You'd consider that a graphical user interface,

2   right?

3   A  Yes.

4   Q  Isn't true that the TV/2 system could search

5   either data on a CD ROM or data saved on the hard

6   drive of the TV/2 computer system?

7   A  Yes.

8   Q  That was before Fisher started working with IBM

9   that the TV/2 had that capability, right?

10  A  It was just a matter of where the data was placed.

11  Q  So you're agreeing with me that it had that

12  capability?

13  A  Yes, I'm agreeing with you.

14  Q  It's IBM that actually programmed the search

15  engine capability for TV/2, not anybody from Fisher,

16  right?

17  A  Yes, IBM programmed the search in Technical

18  Viewer, right.

19      THE COURT:  How much longer do you with the

20  witness, Mr. McDonald?

21      MR. McDONALD:  I'd say maybe about a half

22  hour, Your Honor.

23      THE COURT:  I think this is a good place to

24  break for lunch.

25      They're going out today.

2182

2182

1       THE COURT:  All right.  I'm going to tell you all

2   something that lawyers ought to know.

3       MR. ROBERTSON:  I apologize for interrupting, but

4   this witness is involved in the relationship at IBM.

5       THE COURT:  Excuse me, sir.  We have a motion that we

6   need to deal with, but he didn't...

7

8       (Witness out.)

9

10      THE COURT:  The jury wants to know when this case is

11  going to be over with.  We've got one juror who is working two

12  jobs.  Do you see why I want you to focus on getting this stuff

13  in and streamlined and cut this nonsense out?  They don't make

14  the money you make, and if you're not careful, you lose people

15  after awhile.  All of you.  Okay.

16      Gounaris, is that how you pronounce it?

17      MR. SCHULTZ:  Yes.

18      THE COURT:  I got your motion, I got the response.

19  Do you want to say anything?

20      MR. ROBERTSON:  Yes, Your Honor.  I'm sure you've

21  seen the brief.  I'm sure you've seen the overlap with respect

22  to the exhibits.  There is only one additional exhibit that's

23  been identified.

24      The argument is made that they have to prove

25  invalidity by clear and convincing evidence, but that doesn't

2207

Kinross - Direct                    2207

1    Q   Is it your understanding that's an accurate description of
2    the RIMS system as it indicated in '89 that it had that
3    feature?
4    A   Yes.
5    Q   The second point, realtime pricing and availability, do
6    you see that?
7    A   Yes.
8    Q   Is it your understanding that the RIMS system, in '89,
9    also had that feature?
10   A   Well, yes, but all of this is just Fisher's system, just
11   Fisher.
12   Q   Okay.  And then we already talked about number three;
13   right?
14   A   Yes.
15   Q   So let's go to number four, product cross-reference.  Do
16   you see that one?
17   A   Yes.
18   Q   Did the RIMS system, as it existed in '89, have that
19   product cross-reference feature?
20   A   It had a way to reference competitors' numbers to Fisher
21   numbers, yes.
22   Q   So that would be a similar or equivalent product?  It
23   would have a Fisher number and a competitor number; is that
24   what you are talking about?
25   A   Yes.

2208

Kinross - Direct                    2208

1    Q   Then there's another bullet point about all based on
2    knowing the part number and entering it into the system for
3    verification, i.e., no search capability; do you see that?
4    A   Yes.
5    Q   Now, it is true that in the RIMS system in '89, it could
6    search via part number; right?
7    A   If you want to characterize that as a search.  We think
8    that's a part lookup.  It's a full key lookup, so if you have
9    to identify the part number, you needed to know the entire part
10   number key.
11   Q   But is it true that in the RIMS patent itself, it does
12   refer to looking up a part number as a search?
13   A   I don't know.  It probably does if you have that
14   information, but the definition of searching changed over time.
15   You search a database by giving it a key.  That's where that --
16   that's where that terminology came from.
17   Q   So, I'm not sure now.  Are you agreeing or disagreeing
18   that the RIMS system patent application that's incorporated
19   into the patents involved in this lawsuit actually refers to a
20   part number search or part number lookup as a search?
21   A   I think the RIMS patent does refer to a part number lookup
22   as a search.
23        THE COURT:  He didn't ask you about the patent.  He
24   asked you about the patent application.  Do you know what was
25   in the patent application?

2209

Kinross - Direct                    2209

1    A   No.
2        THE COURT:  Be careful what you are asking.  People
3    can get confused, you know.
4    Q   The RIMS patent refers to a part lookup as a search;
5    right.
6    A   If you say so.  I'm not an expert on the RIMS patent.  I
7    never read it in its entirety, so I think --
8        THE COURT:  You don't know; is that your answer?
9        THE WITNESS:  I think in my deposition we did read
10   portions of it, Mr. McDonald.
11       THE COURT:  Is that where you saw it?
12       THE WITNESS:  Yes.
13       THE COURT:  Let's go.
14   Q   Scroll down on this page.  In 1993 now, is this the entry
15   that really relates to the patents involved in this lawsuit?
16   A   Yes.
17   Q   Develop TV/2 interface; right?
18   A   Correct.
19   Q   It says, features, two things:  One, multiple catalogs
20   searched; two, integration with requisition, right?
21   A   Yes.
22   Q   That's really what the invention in this case is about;
23   right?
24       MR. ROBERTSON:  Objection.  Invention in the case is
25   what the claims are that are asserted here, not some general

2210

Kinross - Direct                    2210

1    idea of what the invention is.
2        THE COURT:  Sustained.
3    Q   Mr. Kinross, would you agree that with the development of
4    the TV/2 interface, the features added to the RIMS system were,
5    one, ability to search multiple catalogs, and two, integrating
6    that searching with the requisition system?
7    A   I think it was more than that.
8    Q   Would you agree that it includes those two things?
9    A   Yes, I would agree.
10   Q   Would you agree those are the only two things you listed
11   here on the timeline as features of that TV/2 interface
12   development in 1993?
13   A   Yes.
14   Q   And then in 1994, there's a reference on this timeline to
15   the graphical end user interface for requisitioning; right?
16   A   Yes.
17   Q   The TV/2 system we already talked about, that had its own
18   graphic user interface; right?
19   A   Yes.
20   Q   The RIMS did not have it yet, is that right, as of 1994?
21   A   1994 is when we developed it.  We recognized the
22   requirement for it early on, and 1994 was the year that we
23   developed it.
24   Q   Now, there aren't any graphical user interfaces actually
25   shown in the patents-in-suit, are there?

2243

Gounaris - Direct                          2243

1  demonstration, and comprehensive.

2       THE COURT:  Right, but he's not going through those.

3  He's going through what preceded those, as I understand it.

4       MR. SCHULTZ:  That's exactly correct, Your Honor.

5       THE COURT:  Objection is overruled.

6

7       (End of sidebar discussion.)

8

9       THE COURT:  All right.  Go ahead.

10 Q   Mr. Gounaris, you were talking about a demonstration

11 system.  What was the demonstration system that you saw?

12 A   It was a type of mockup --

13      MR. ROBERTSON:  Can we have a time frame, Your Honor?

14      THE COURT:  Summer 1993; right?

15      THE WITNESS:  Yes.  It was a mockup.  It was the way

16 to be able to show the business executives what this might look

17 like as it was being developed.  It was just to take something

18 that conceptual and give it a physical look and feel.

19      THE COURT:  What is a mockup?

20      THE WITNESS:  Mockup is kind of a -- it was some

21 samples of different screens and how they would interact with

22 one another so you get a sense of how a user might sit down in

23 front of the electronic catalog and use it, but it wasn't a

24 fully developed system.  It was just very limited function.

25      THE COURT:  Mr. Schultz, remember what you are

2244

Gounaris - Direct                          2244

1  talking about.  You ask him whether he saw the TV/2 operate.

2  He said, yeah.  When?  Summer of '93.  What was it?  This demo,

3  and he just said in response to that what?  It wasn't fully

4  developed.  So he didn't see the TV/2 operate.  So now I

5  want -- you know, that's why I ask you all to be careful about

6  what you are doing.  Okay.

7  Q   When you say it wasn't fully developed, were you talking

8  about the TV/2 plus RIMS system?

9       MR. ROBERTSON:  Objection, leading.

10 A   No, I was --

11      THE COURT:  What were you talking about, is the

12 proper question, that wasn't fully developed.

13 A   I was talking about the entire system wasn't fully

14 developed.  It was just a small subset of the electronic

15 catalog system just to give it a mockup.

16 Q   I want you to focus just on TV/2.  Was the TV/2 system in

17 operation when you saw the demonstration in the summer of 1993?

18      MR. ROBERTSON:  Let me object as vague and ambiguous

19 as the TV/2 system.  This is part of a project here, and went

20 through several --

21      THE COURT:  I'm going to sustain it.  You need more

22 specificity of his testimony.  Otherwise, I wouldn't do that.

23 We've got something that we don't know what it is, and we need

24 to get it defined properly.  So either do it or move on.

25 Q   Mr. Gounaris, if we could bring up Exhibit 230 again,

2245

Gounaris - Direct                          2245

1  please, and go to page 12 of that document.

2  A   Page 12 of this same document?

3       THE COURT:  Why don't we try it this way:  I can

4  strike it if I need to and tell him to disregard it.

5       What did you see in operation?  He's described a

6  mockup and a mockup with some screens.  That's what he said so

7  far.  What did you see in the summer of '92 that was this

8  demonstration other than those two screens?  Anything else?

9       THE WITNESS:  We demonstrated for Frank and for a few

10 executives from Fisher what the system would look like, so

11 there were pictures, there were simulations of what was in the

12 catalogs, so it gave you the look and feel of the catalog.

13      THE COURT:  So you saw simulations of something that

14 was in a catalog, saw pictures, and you saw mockups on the

15 screen.

16      THE WITNESS:  Text, pictures.  It looked similar to

17 what the physical catalog looked like only on an electronic

18 form, so you would get a sense of what an electronic version of

19 a paper catalog would look like and how somebody might go

20 through an order process.  It was very simple and limited in

21 terms of its capability but gave them a feel for here's what

22 this system would be like.

23      THE COURT:  Now, Mr. Schultz, that doesn't sound to

24 me like what he saw was the TV/2 in operation.  What he saw was

25 a mockup of the TV/2 in operation using some fairly basic

2246

Gounaris - Direct                          2246

1  tools.  Isn't that where we are, and if that's right, then Mr.

2  Robertson's objection I should have sustained.

3       MR. SCHULTZ:  Mr. Gounaris --

4       THE COURT:  That's where we are.

5       MR. ROBERTSON:  I would move to strike the question

6  and answer, Your Honor.

7       THE COURT:  I think that's right.  We've tried and

8  tried and tried, and it isn't there, so I sustain his

9  objection.  Just disregard the testimony about this preliminary

10 demonstration, ladies and gentlemen.  It's not pertinent to the

11 case.

12 Q   Mr. Gounaris, if you'd take a look at Exhibit 230.  I'd

13 like you to refer to the Bates number at the bottom, G0000023.

14 A   Okay.

15 Q   Did the TV/2 system, as of 1993, have the functionality

16 described on this page?

17      MR. ROBERTSON:  I object, Your Honor.  Ms. Eng

18 testified at length about this page, so this is cumulative.

19      MR. McDONALD:  I'm talking about 1993, and Mr.

20 Gounaris is in a specific role with respect to --

21      THE COURT:  What difference does that make if Ms.

22 Eng's testified to it?

23      MR. SCHULTZ:  Because Mr. Gounaris is the person

24 actually providing the information --

25      THE COURT:  The better answer is, Ms. Eng wasn't

2272

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                    RICHMOND DIVISION
3    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                     :
4    ePLUS, INC.,             :
                                     :
5          Plaintiff,   :
                                     :  Civil Action
6      v.                     :  No. 3:09CV620
                                     :
   LAWSON SOFTWARE, INC.,  :
7                                  :  January 19, 2011
          Defendant.   :
8    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:
9
        COMPLETE TRANSCRIPT OF JURY TRIAL
10       BEFORE THE HONORABLE ROBERT E. PAYNE
       UNITED STATES DISTRICT JUDGE, AND A JURY
11
12
13
14   APPEARANCES:
15   Scott L. Robertson, Esq.
     Jennifer A. Albert, Esq.
16   Michael T. Strapp, Esq.
     GOODWIN PROCTOR
17   901 New York Avenue, NW
     Washington, D.C.  20001
18
19   Craig T. Merritt, Esq.
     CHRISTIAN & BARTON
20   909 E. Main Street, Suite 1200
     Richmond, VA  23219-3095
21
        Counsel for the plaintiff ePlus
22
23
24       DIANE J. DAFFRON, RPR
         OFFICIAL COURT REPORTER
25     UNITED STATES DISTRICT COURT
```

2273

```
1    APPEARANCES:  (Continuing)
2    Daniel W. McDonald, Esq.
     Kirstin L. Stoll-DeBell, Esq.
3    William D. Schultz, Esq.
     Rachel C. Hughey, Esq.
4    MERCHANT & GOULD
     3200 IDS Center
5    80 South Eighth Street
     Minneapolis, MN  55402-2215
6
7    Dabney J. Carr, IV, Esq.
     TROUTMAN SANDERS
8    Troutman Sanders Building
     1001 Haxall Point
9    P.O. Box 1122
     Richmond, VA  23218-1122
10
        Counsel for the defendant Lawson Software.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2274

```
1        (The proceedings in this matter commenced at
2    9:00 a.m.)
3        THE CLERK:  Civil Action No. 3:09CV00620.
4    EPlus, Incorporated v. Lawson Software, Incorporated.
5        Mr. Scott L. Robertson, Mr. Craig T. Merritt,
6    Ms. Jennifer A. Albert, and Mr. Michael T. Strapp
7    represent the plaintiff.  Mr. Daniel W. McDaniel,
8    Mr. Dabney J. Carr, IV, Ms. Kirstin L. Stoll-DeBell,
9    Mr. William D. Schultz, and Ms. Rachel C. Hughey
10   represent the defendant.
11       Are counsel ready to proceed?
12       MR. ROBERTSON:  The plaintiff is, Your Honor.
13       MR. McDONALD:  Yes, Your Honor, we are.
14       THE COURT:  Good morning, ladies and
15   gentlemen.  We're going to resume the Laurene McEneny
16   show, which appears at this hour only once.  It's
17   under the sponsorship of Lawson Software, Inc. through
18   the cooperation of the plaintiff.  And then we're
19   going to have some testimony.
20       I may, I'm told, have to deal with a motion
21   after this.  So I don't know.  We may have to take a
22   recess, but we'll see what we're doing.
23       I think what the lawyers have been doing is
24   trying to work out ways to continually, as they have
25   gone on, make the trial more efficient and reduce the
```

2275

```
1    amount of time, your time, that has to be consumed in
2    the process.  That takes a lot of hard work, and
3    sometimes there's, as you can imagine, friction that
4    develops in the decisional process that has to be
5    resolved by yours truly.  And it's better if we don't
6    expose you to all that because, I have to tell you, it
7    sometimes confuses me, and you don't need to be
8    visited with all that.  So we'll see.
9        All right.  Are you ready to play.
10       MS. HUGHEY:  Yes, Your Honor.
11       THE COURT:  All right.  All systems go.
12       MS. HUGHEY:  Yes.
13       THE COURT:  All right.
14       (The video of Laurene McEneny is resumed
15   playing at this time.)
16       THE COURT:  Is it through?
17       MS. HUGHEY:  Yes, Your Honor.  We'd like to
18   submit Exhibit 403, which is the testimony of
19   Ms. McEneny, into evidence.
20       THE COURT:  Into evidence, 403?
21       MS. HUGHEY:  Yes.
22       THE COURT:  All right.  It's been admitted.
23   All right.
24       (Defendant's Exhibit 403 is admitted into
25   evidence.)
```

2424

1    Q   How is it that you know the TV/2 was available in 1991,
2    Dr. Shamos?
3    A   I used to work with IBM.  I'm familiar with IBM policies.
4        MR. ROBERTSON:  That's not in his expert report, Your
5    Honor.
6        MR. McDONALD:  I didn't need to ask this question.
7    He's the one that asked for the foundation.
8        THE COURT:  It's part of his testimony.  It's
9    supposed to be in his report if that's the basis of how he knew
10   it was on sale.  It's supposed to be in his report.  Strike
11   that testimony, ladies and gentlemen.
12   Q   With respect to what you referred to to prepare your
13   report and what's in your report, Dr. Shamos, can you zero in
14   on those materials and tell us whether or not there's anything
15   in those materials that gave you a reason to understand that
16   the TV/2 materials were available in 1991?
17   A   Yes.  The materials are dated 1991, and they make
18   reference to TV/2 in the present tense.  Technical Viewer/2 is
19   an electronic documentation program.
20       MR. ROBERTSON:  Objection, Your Honor.  You can't
21   draw that inference simply because it makes reference to it in
22   the present tense in the marketplace in 1991.
23       MR. McDONALD:  I think Mr. Robertson is practicing
24   his closing argument at this time.  I don't think that's an
25   objection.

2425

1        THE COURT:  Wait a minute.
2        MR. ROBERTSON:  There's no foundation, Your Honor,
3    just from reading a date on a document that was on sale or in
4    public use.
5        THE COURT:  Well, I think it is inferable from the
6    testimony for the jury to make, and you can argue whether it's
7    significant or not.  Overruled.
8        MR. McDONALD:  I think we already got an answer to
9    the question.
10       THE COURT:  He did.
11   Q   Why don't you go on to the next bullet point, Dr. Shamos,
12   and explain to us what you're trying to convey with that one.
13   A   Yes.  The TV/2 system, well, fundamentally, its purpose
14   was to combine some fairly new technologies at the time,
15   including data on CD-ROMs, and to create a generalized
16   searching program that allowed you to search by keyword or
17   topic through catalogs that were embodied in CD-ROMs, and the
18   catalogs could also be stored on hard disk.
19   Q   What's hard disk?
20   A   Hard disk is -- the easiest way to understand is the
21   permanent disk that's installed in your computer like your PC
22   or laptop that retains information even when the machine is
23   turned off.  But it normally is not separately removable from
24   the machine the way a CD would be.
25   Q   Why don't you move to your third bullet point and explain

2426

1    what you wanted to convey with that one.
2    A   Yes.  TV/2 taught expressly combining a multi catalog
3    search system, namely TV/2, with parts ordering and inventory
4    management system.
5    Q   And what is your last -- can you explain your last point
6    on this particular slide, please?
7    A   Yes.  The conclusion there is that the applicants in this
8    case didn't invent multi catalog searching.
9    Q   Did you put together a slide regarding the combination of
10   RIMS and TV/2?
11   A   Yes.
12   Q   Can we turn to slide 22, please.  Is this at least one of
13   the slides you prepared regarding combining the RIMS and TV/2
14   systems, Dr. Shamos?
15   A   Well, it's one of them.
16   Q   Okay.  Why don't you go ahead and walk us through this
17   particular slide point by point, and, again, pause between each
18   bullet here so we have time to follow up with any questions.
19   A   Okay.  Well, RIMS was an inventory management and parts
20   ordering system as described in the '989 patent.
21   Q   Go on to the next one.
22   A   TV/2 was a multiple catalog searching system as described
23   in the IBM TV/2 literature.
24   Q   Okay.  What is your third point?
25   A   RIMS had -- well, RIMS had all the elements of the

2427

1    asserted claims except maybe those involving two or more
2    catalogs or equivalent phrases that are used in the patent such
3    as collection of catalogs, but since TV/2 had that, the
4    combination of RIMS plus TV/2 had all the elements of the
5    asserted claims, and, therefore, would render them obvious.
6    Q   Is that under how you applied the Court's construction of
7    catalogs in this case?
8    A   Yes.
9    Q   Did you use the same approach when you looked at the
10   application of the Court's construction of catalogs for
11   purposes of evaluating infringement as you did for purposes of
12   invalidity?
13   A   Yes.  I think that everybody in the case tried to apply
14   the Court's construction.  I think the parties have different
15   ideas about how the Court's construction applies to these
16   systems.
17       MR. ROBERTSON:  Objection, Your Honor.  I don't know
18   how this witness knows what my idea or ePlus's idea is about
19   the Court's construction.
20       THE COURT:  I think that's -- that question has been
21   answered.  Let's go ahead.
22   Q   What are you trying to convey about the last bullet point
23   on this slide, Dr. Shamos?
24   A   Fundamentally that because of the principle that the claim
25   terms must be construed the same way for infringement and for

---

**2504**

1  A  Yes, DX-117.

2  Q  Did you look at whether or not the J-CON system also was

3  in existence before the patents-in-suit were filed that met any

4  of the needs in the marketplace at that time?

5  A  Yes.

6  Q  What was your conclusion about the J-CON system?

7  A  That the J-CON system met numerous of the allegedly unmet

8  needs.  In fact, apparently, all of them.

9  Q  Did you look at any particular J-CON documents as part of

10  your analysis of the J-CON system?

11  A  Yes.  There was a huge J-CON manual, I think called volume

12  one.  It was over a thousand pages long.

13  Q  Can we put up the first page of Defendant's Exhibit 96,

14  please.

15  A  That's it.

16  Q  That's page one of that thing; is that right, Dr. Shamos?

17  A  Yes.

18  Q  What did you determine from reviewing the J-CON manual

19  about the features of that system that would be relevant to

20  whether or not that system met the market needs that were in

21  existence back in the early '90s?

22      MR. ROBERTSON:  Your Honor, I'm going to object.  It

23  calls for a narrative.  That's a pretty wide-open question

24  there.

25      THE COURT:  Do you want him to lead?

---

**2505**

1      MR. ROBERTSON:  Well, I'd like him to ask --

2      THE WITNESS:  I'm not going to give a narrative.

3  I'll answer in one sentence.

4      THE COURT:  I think you already did.  You said it met

5  all the --

6      THE WITNESS:  Correct.

7      THE COURT:  I think the question was what were the

8  unfelt needs, though.  Is that right?

9      MR. McDONALD:  Yes.

10      THE COURT:  It met all the unfelt needs, but what

11  were the unfelt needs that you think it melt -- met.  Oh,

12  goodness, too late in the day -- and the J-CON that is.

13      THE WITNESS:  Yes.

14      THE COURT:  Identify very briefly the needs.

15  Q  Did you do a slide about that, about the J-CON system?

16  A  Yes.

17  Q  Let's go to slide 14.  Is this a summary of what you

18  viewed as relevant to features of the J-CON system that would

19  be relevant to the marketplace needs back in the early '90s?

20  A  Okay.  Wait.  The answer is yes, and those are some of the

21  features of J-CON.  But with respect to the unmet needs that

22  were alleged by ePlus, those were in their interrogatory

23  responses, and I can just go down and list the needs that they

24  believed were unmet, and I can show that they were met by

25  J-CON.

---

**2506**

1  Q  Can you walk us through this and tell us what features you

2  saw when you looked at Defendant's Exhibit 96 about the J-CON

3  system?

4  A  J-CON maintained multiple catalogs, allowed you to do

5  product searches among the multiple catalogs.  It enabled you

6  to create requisitions from the hit results that you got from

7  the catalogs.  You could then generate multiple purchase orders

8  from a single requisition.  You could do inventory checking and

9  also cross-referencing.  You could convert a catalog number

10  from one vendor to that of another vendor.

11  Q  Thank you.  Can we go back to the PO Writer issue.  Well,

12  actually, let's do this:  Let's go back to slide number 90.  I

13  want to make sure we have something clear here.

14      You mentioned that the, something about the structure in

15  these claims, claim elements corresponded to the structure in

16  the corresponding elements of claim three of the '683 patent.

17  I want to be clear, though.  Was the function the same in these

18  two elements as it was in the '683 patent or not?

19  A  I thought that there was an agreement that the means were

20  to be treated identically.  There may have been slight

21  differences in the wording of the function.  I don't recall.

22  Q  Well, did you look at the Court's construction of the

23  function of those two means elements of claim one of the '172

24  patent?

25  A  Oh, yes.  But for the purposes of testifying here today,

---

**2507**

1  there's no substantial difference.

2  Q  If we can turn to slide number 147.  Dr. Shamos, can you

3  tell us what you wanted to convey here with your slide number

4  147?

5  A  Yes.  There's a dispute in this case as to whether the

6  Lawson system has catalogs at all, or if it does have catalogs,

7  whether it has more than one catalog, and the plaintiff has

8  asserted for purposes of infringement --

9      MR. ROBERTSON:  Objection, Your Honor,

10  characterization of what the plaintiff has asserted here.

11      MR. McDONALD:  Why don't you stick -- I'll try to

12  keep a shorter leash here, Your Honor.

13  Q  Dr. Shamos, can you walk through your analysis here in

14  slide 147, one bullet point at a time and try to stay on those

15  particular bullet points, please?

16  A  Sure.  Well, you already know from my previous two hours

17  of testimony that all of certain claims are obvious in light of

18  RIMS plus TV/2.

19  Q  Okay.  Take us to the next element?

20  A  The only claim elements missing from RIMS, or even

21  allegedly missing from RIMS, are at least two catalogs, a

22  collection of catalogs, et cetera.

23      MR. ROBERTSON:  Objection, Your Honor.  I don't know

24  who he's characterizing as alleging is missing from RIMS,

25  because if he's alleging it's ePlus, that's not an accurate

## 2520

1 of this re-examination, you'd have to have it in context and
2 have it have some meaning.
3      I still think on balance it has no relevance
4 whatsoever to the willfulness issue, and we briefed that
5 earlier, and Your Honor, in its ruling, indicated it wasn't
6 relevant even to willfulness.  So that is a variable that
7 could --
8      THE COURT:  Which opinion was that?
9      MR. ROBERTSON:  One of your motions in limine.
10     THE COURT:  Is it verbal --
11     MR. ROBERTSON:  No, it was a written order.
12     THE COURT:  Then you need to tell me by docket number
13 what it is at some point.  So anyway, you want to put on --
14 what are you going to put on on willfulness, Mr. Robertson?
15 What witnesses are you going to put on?
16     MR. McDONALD:  I would call Mr. Farber on
17 re-examination, perhaps Mr. Manbec, and I would probably
18 cross-examine a Lawson witness or two, but that would likely be
19 it.  But, Your Honor, I would like to be able to consult with
20 my colleagues this evening and come back.
21     THE COURT:  I understand, but, you know, it's good to
22 get some idea so I can be thinking, too.  How about you?  What
23 do you see the number of witnesses being for you, Mr. McDonald?
24     MR. McDONALD:  I think it would be some witness to
25 get into re-examination.  I think that would be Dr. Shamos.

## 2521

1 That was covered in his report, and Mr. Lipscomb was our
2 rebuttal to Mr. Manbec.
3      I'm not sure that the Court's exclusion, though, was
4 dependent on this issue.  I think it was independent of any
5 issues here.  I think they are both out, as I understand it.
6      THE COURT:  What is his name?
7      MR. McDONALD:  Ernest Lipscomb, L-i-p-s-c-o-m-b.  I
8 believe I got that right.
9      THE COURT:  I have to tell you, I don't remember
10 exactly how I handled the re-examination issue, and since the
11 time that I handled it, you all have agreed willfulness will be
12 tried by the Court, and that may, in fact, affect what evidence
13 can come in.
14     Depending upon -- my recollection is I considered the
15 willful -- the re-examination to be of marginal relevance to
16 the issues here except willfulness and that 403 kept it all out
17 because it would be very hard for the jury to segregate all
18 that out, and after that, you all agreed to have the case tried
19 to the Court, the willfulness case tried to the Court.  So I
20 don't know exactly where we stand, but that's sort of where my
21 general recollection is.
22     MR. ROBERTSON:  Your Honor, the willfulness issues
23 was fully briefed in the context of re-examinations, and I've
24 been handed, I believe it's Document 375 was Your Honor's order
25 on July 26th of 2010.  While you are talking about this perhaps

## 2522

1 hearing that we might have, there are these issues of
2 patentability and indefiniteness that I just brought to your
3 attention.
4      I think as pure issues of laws, there is no real
5 facts in dispute.  Whether it's patentable or not, you have to
6 focus on the claim and the specifics.  Those are not in
7 dispute.  With respect to the indefiniteness, you have to focus
8 on the claim and the specifics.  Those are not in dispute.
9      THE COURT:  You take the view that patentability and
10 indefiniteness are legal -- you take the view that
11 patentability and indefiniteness are legal questions, that no
12 fact issues need to be considered as respects those; is that
13 right?
14     MR. ROBERTSON:  I think the parties are in agreement
15 on that.
16     THE COURT:  Are you in agreement?
17     MR. McDONALD:  I believe there aren't any disputed
18 facts, Your Honor.  I think there are factual underpinnings to
19 those determinations, but I don't think the actual facts are in
20 dispute.
21     THE COURT:  There are no papers filed at this time,
22 are there?
23     MR. McDONALD:  No.
24     THE COURT:  Has the Federal Circuit decided a case
25 since Bilski?

## 2523

1      MR. ROBERTSON:  Your Honor --
2      THE COURT:  I know there were some cases that were
3 sort of put on hold up there, I thought, waiting for Bilski,
4 but I don't know whether they've been decided or whether they
5 just sent them back in view of Bilski or what happened.
6      MR. ROBERTSON:  I don't know the answer to that
7 question, Your Honor.  I don't know if -- I follow them fairly
8 closely, and I haven't seen anything come out.  I maybe defer
9 to Mr. McDonald.
10     THE COURT:  You all are going to have to brief those
11 issues.
12     MR. ROBERTSON:  We can do that, Your Honor.
13     THE COURT:  You might sit down and decide on a
14 briefing schedule, 10:00 a.m., 5:00 p.m., 9:00 a.m., those
15 kinds of scheduled.
16     MR. ROBERTSON:  Your Honor, one other issue I do want
17 to raise.  Mr. -- I had Dr. Weaver here to call in rebuttal on
18 some of these issues that don't have to deal with prior art,
19 these anticipation and obviousness.  He did have to -- he was
20 going to address written description which is another section
21 112 issue.
22     That is a fact question as we all have identified in
23 the pretrial order.  I just want to make -- Mr. McDonald
24 represented to me that he was not going to be asking Dr. Shamos
25 any questions with respect to written description.  I think it

2532

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
2                  RICHMOND DIVISION

3     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                    :
4     ePLUS, INC.,                  :
                                    :
5            Plaintiff,    :  Civil Action
      v.                   :  No. 3:09CV620
6                          :
      LAWSON SOFTWARE, INC.,  :
7                          :  January 20, 2011
             Defendant.    :
8     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

9
           COMPLETE TRANSCRIPT OF JURY TRIAL
10         BEFORE THE HONORABLE ROBERT E. PAYNE
           UNITED STATES DISTRICT JUDGE, AND A JURY
11
12
13
14    APPEARANCES:
15    Scott L. Robertson, Esq.
      Jennifer A. Albert, Esq.
16    Michael T. Strapp, Esq.
      GOODWIN PROCTOR
17    901 New York Avenue, NW
      Washington, D.C.  20001
18
19    Craig T. Merritt, Esq.
      CHRISTIAN & BARTON
20    909 E. Main Street, Suite 1200
      Richmond, VA  23219-3095
21
           Counsel for the plaintiff ePlus
22
23
24         DIANE J. DAFFRON, RPR
           OFFICIAL COURT REPORTER
25         UNITED STATES DISTRICT COURT

2533

1     APPEARANCES:  (Continuing)
2     Daniel W. McDonald, Esq.
      Kirstin L. Stoll-DeBell, Esq.
3     William D. Schultz, Esq.
      Rachel C. Hughey, Esq.
4     MERCHANT & GOULD
      3200 IDS Center
5     80 South Eighth Street
      Minneapolis, MN  55402-2215
6
7     Dabney J. Carr, IV, Esq.
      TROUTMAN SANDERS
8     Troutman Sanders Building
      1001 Haxall Point
9     P.O. Box 1122
      Richmond, VA  23218-1122
10
           Counsel for the defendant Lawson Software.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2534

1          (The proceedings in this matter commenced at
2     9:15 a.m.)
3          (The jury is not present.)
4          THE CLERK:  Civil Action No. 3:09CV00620,
5     ePlus, Incorporated v. Lawson Software, Incorporated.
6          Mr. Scott L. Robertson, Mr. Craig T. Merritt,
7     Ms. Jennifer A. Albert, and Mr. Michael G. Strapp
8     represent the plaintiff.  Mr. Daniel W. McDaniel,
9     Mr. Dabney J. Carr, IV, Ms. Kirstin L. Stoll-DeBell,
10    Mr. William D. Schultz, and Ms. Rachel C. Hughey
11    represent the defendant.
12         Are counsel ready to proceed?
13         MR. ROBERTSON:  Yes, Your Honor.
14         MR. McDONALD:  Yes, Your Honor.
15         THE COURT:  What do you need to see me about?
16         MR. McDONALD:  I think we worked out all the
17    issues on the Hilliard slides.  I think the only thing
18    that was outstanding was these jury questions.
19         MR. ROBERTSON:  There is also --
20         THE COURT:  I don't need the jury questions,
21    to deal with them now.
22         MR. ROBERTSON:  All right.
23         THE COURT:  Oh, the questions raised by the
24    jury.  Oh, yes.  What do you want to do about the
25    questions?  Where is that thing that was submitted

2535

1     yesterday?  Court Exhibit 4.
2          Are P.O. Writer and J-CON patented, if so,
3     when?  Didn't Dr. Staats say that it was within a
4     year?
5          Basically, what he said is for them to
6     remember.  So was the J-CON system only used for
7     automotive purposes and couldn't be used, all that big
8     long text is something he testified to or didn't, and
9     they'll have to remember that testimony.  And you-all
10    will address it in argument; is that right?
11         MR. McDONALD:  I think that's fair, Your
12    Honor.
13         MR. ROBERTSON:  Your Honor, I think the real
14    response, what I would suggest, Your Honor, is that
15    just you need not concern yourself with it.  Whether
16    the J-CON system addressed auto parts or medical
17    systems, the J-CON system is not prior art in this
18    case, and that's why they don't need to consider it.
19    Dr. Shamos didn't over any opinions with respect to it
20    and I think this is just ripe for confusion if we say
21    it had some significance.
22         The same thing with were P.O. Writer and
23    J-CON patented.  That's evidence of some confusion on
24    the part of the jury.  First of all, they need not
25    concern themselves with whether J-CON or P.O. Writer

2544

1    you offer it in this courtroom?

2        MR. McDONALD:  Objection, Your Honor, asked

3    and answered.

4        THE COURT:  Sustained.

5    Q  Did you --

6        THE COURT:  It doesn't make any difference

7    what he's testified to elsewhere, ladies and

8    gentlemen.  It's only what is testified to here that

9    is important.

10       MR. ROBERTSON:  Thank you, Your Honor.

11   BY MR. ROBERTSON:

12   Q  You offered zero opinions that J-CON anticipated

13   any of the 12 claims at issue in this case here,

14   correct?

15   A  In this room.

16   Q  You offered zero opinions that J-CON in

17   combination with any other prior art reference

18   invalidates the claims in this courtroom, right?

19   A  Right.

20   Q  You are the only Lawson expert testifying on

21   invalidity opinions, right?

22   A  I believe so.

23   Q  You don't know of any other Lawson expert on

24   invalidity, do you?

25   A  No.

2545

1    Q  So as far as the jury is concerned with regard to

2    the testimony on J-CON, they can forget about that for

3    any purposes of an element by element, claim by claim

4    analysis for anticipation and obviousness, right?

5    A  I don't know if it's my place to say what the jury

6    can forget about.

7    Q  But you didn't give them any opinions that it

8    invalidates any claims, right?

9    A  Not in this courtroom.

10       THE COURT:  Well, you didn't give the jury

11   any, Dr. Shamos, so it had to be in this courtroom.

12   So the answer to that is no.

13       THE WITNESS:  Correct.

14   Q  And let me ask you this:  You put up --

15       MR. ROBERTSON:  Can you put up just the cover

16   page of Defendant's Exhibit No. 96, please.

17   Q  Now, you showed this J-CON manual, Volume I, cover

18   page, correct?

19   A  Yes.

20   Q  That's the only thing you offered to the jury when

21   you brought up J-CON, this cover page that has the

22   title of the manual, and that's it, right?

23   A  No, I had a slide with the bullet points about

24   J-CON.

25   Q  I'm talking about this exhibit, Defendant's

2546

1    Exhibit 96.  This is what, I think, was represented by

2    Mr. McDonald that had thousands of pages.  I'll accept

3    that representation.  This is the only page of

4    Defendant's Exhibit 96 that you showed to the jury;

5    isn't that right?

6    A  Yes.

7    Q  You didn't discuss a single substantive page in

8    this manual that contains thousands of pages, right?

9    A  I think I testified that it had over a thousand

10   pages, not thousands.  No, that's the only page that

11   was shown.

12   Q  With respect to P.O. Writer that was discussed,

13   similarly you offered zero opinions that P.O. Writer

14   rendered obvious any claim at issue here, correct?

15   A  In this courtroom.

16   Q  And you offered zero opinions that P.O. Writer

17   anticipates any element or any claim of the patents

18   that are asserted here, correct?

19   A  In this courtroom.

20   Q  So you know of no other invalidity expert who's

21   going to offer opinions on P.O. Writer, do you?

22   A  No.

23   Q  Let's talk a little bit about RIMS now, if we can.

24   You reviewed the inventor's deposition testimony in

25   preparation for your expert report, correct?

2547

1    A  Yes.

2    Q  And you're aware that the RIMS system starting

3    perhaps in the late '80s all the way up until the year

4    2000 went through many iterations, correct, many

5    different versions?

6    A  Yes.

7    Q  Which version are you relying on when you are

8    rendering your opinions?

9    A  That described in the '989 patent.

10   Q  So it's only confined to the '989 patent, right?

11   You're not relying on and you didn't offer any

12   testimony with respect to any versions that were in

13   commercial use between the late '90s and 1994, for

14   example, right?

15   A  I don't have personal knowledge, but there was

16   testimony that the '989 patent fairly described the

17   actual RIMS system as it was distributed.

18   Q  There was also testimony from the inventors in

19   their deposition that many of the functionalities in

20   the '989 patent were never implemented.  Do you recall

21   reviewing that?

22   A  Yes.

23   Q  So what you're relying on when you offer your

24   opinions, though, is just the '989 patent; isn't that

25   right?

2548

1    A  No.

2    Q  Did you point to any other versions or produce any

3    other documentation of the technical nature of the

4    RIMS system as being used between 1989 and 2000?

5    A  No, I didn't personally, because, as I said, I

6    don't have personal knowledge of the RIMS system as

7    distributed.

8    Q  It would be fair to say that the inventors had

9    personal knowledge of the RIMS system because they

10   worked with it, right?

11   A  I don't know what knowledge they had.  I know what

12   they said.

13   Q  Well, you know that Mr. Momyer and Mr. Johnson are

14   actually inventors of the '989 patent, correct?

15   A  Yes.

16   Q  So it would be fair to say that Mr. Momyer and

17   Mr. Johnson are in a better position than you to

18   understand what's in that patent, correct?

19   A  I wouldn't say that.  I think they might be in a

20   better position to know what systems were actually

21   distributed, but I can read the patent as well as they

22   can.

23   Q  So you know better than the inventors with respect

24   to the '989 patent?

25   A  Anybody can read the patent.  The patent says what

2549

1    it says.

2    Q  So with respect to the evidence you presented,

3    though, did you present anything outside of the '989

4    patent to support your opinions?

5    A  Not in this courtroom.

6    Q  Let's talk about the TV/2 search program for a

7    minute, if we can.  Do you recall talking about that

8    system?

9    A  Yes.

10   Q  In preparing your report, nowhere in your report

11   do you ever indicate that you saw a TV/2 search

12   program in operation, correct?

13   A  Correct.

14   Q  Nowhere in your report did you say that you ever

15   reviewed any TV/2 source code, correct?

16   A  Correct.

17   Q  Nowhere in your report did you indicate that you

18   ever saw any user guides with respect to TV/2?

19   A  Well, it depends on what a user guide is, but I

20   revealed in my report exactly what TV/2 documents I

21   looked at.  Whether you want to characterize the

22   general information manual as a user guide or not is

23   up to you.

24   Q  You never saw any demonstrations of the TV/2,

25   correct?

2550

1    A  Correct.

2    Q  You never saw the Fisher prototype that was

3    created as part of the electronic sourcing project

4    that Fisher did with IBM?

5    A  Correct.

6    Q  You didn't see any technical documents with

7    respect to the electronic sourcing project that IBM

8    did with Fisher-Scientific, correct?

9    A  Correct.

10   Q  You never --

11       THE COURT:  Wait a minute.

12       THE WITNESS:  I don't think that's actually

13   correct.  I think there were some proposal documents

14   or some technical descriptions, proposals, between IBM

15   and Fisher that I looked at, I think.

16   Q  It was a contract, a statement of work?

17   A  Yes.

18   Q  That was where they had to do almost a year and a

19   half of work to come up with a working prototype for

20   this system; isn't that right?  That's what you're

21   talking about?

22   A  Yes.

23   Q  You know a gentleman by the name of Mr. Charles

24   Gounaris or are you aware of him?

25   A  I'm aware of him.  I don't know him.

2551

1    Q  You reviewed his deposition in preparation for

2    your testimony, correct?

3    A  Yes.

4    Q  And you're also aware of a young woman named

5    Pamela Eng?

6    A  I've heard the name.  I don't know her.

7    Q  You reviewed her deposition in preparation for

8    your report, correct?

9    A  Yes.

10   Q  Are you aware that Mr. Gounaris and Ms. Eng are

11   also paid witnesses for Lawson?

12   A  I think I may have seen the name Gounaris on a

13   schedule of witnesses that were going to testify.  I

14   don't recall Eng.

15   Q  Well, did you make any effort to speak to

16   Mr. Gounaris or Ms. Eng about their knowledge of the

17   TV/2?

18   A  No.

19   Q  So it's fair to say you don't rely on some actual

20   operating TV/2 system in your report because you never

21   saw it, right?  You just have two documents that

22   you're relying on; isn't that right?

23   A  Yes.

24       THE COURT:  Which question do you want him to

25   answer?

2556

1  any misapprehension as to what was being disclosed as
2  part of what RIMS functionality was necessary to be
3  modified in order to come up with the inventions of
4  the electronic sourcing patent, correct?
5  A  Well, the examiner didn't consider it as prior
6  art.  The examiner considered it for what it said
7  about the RIMS system.
8  Q  Well, the examiner has access to be able to go and
9  look at any patent, doesn't he, that's available in
10  the Patent Office?
11  A  Yes.
12  Q  And if the inventors repeatedly throughout all 28
13  columns of the patent described what they thought the
14  RIMS system disclosed, he wasn't under any illusions
15  as to what they were representing, was he?
16  A  He was under an illusion.
17  Q  Oh, I see.  So you know what the examiner was
18  thinking when he was reviewing the RIMS patent?
19  A  Yes, I do because I read the file history.  I read
20  what he said.
21  Q  You didn't offer any opinions in direct testimony
22  with respect to the file history and what the examiner
23  said, did you, sir?
24  A  No, but you're asking me about it now.
25  Q  So the answer to my question is no, you didn't

2557

1  offer any opinions with respect to the file history,
2  correct?
3  A  That's right.
4        MR. ROBERTSON:  Could we go back and look at
5  Claim Three again.
6  Q  Now, you understand that for purposes of both
7  infringement and invalidity you need to consider the
8  claim as a whole; is that right?
9  A  Yes.
10  Q  And just using this claim as an example, this has
11  six elements, I think, we've already confirmed, right?
12  A  Yes.
13  Q  And the preamble of the electronic sourcing system
14  is also an element of the claim the Court has
15  construed, right?
16  A  Yes.
17  Q  So when we go through this on an element by
18  element basis, you're familiar with the term what's
19  called an antecedent basis?
20  A  Yes.
21  Q  So let's look at the first element.  The first
22  element says that the electronic sourcing system has
23  to have at least two product catalogs.  I just want to
24  zero in on that.  Right?
25  A  Yes.

2558

1  Q  The next element says that this electronic
2  sourcing system has to have a means for selecting the
3  product catalogs, right?
4  A  Yes.
5  Q  So the product catalogs that are being referred to
6  in this second element are the product catalogs that
7  were identified in the first element, right?
8  A  Yes.
9  Q  Next element says you have to have a means for
10  searching for matching items among the selected
11  product catalogs.  Do you see that?
12  A  Yes.
13  Q  The selected product catalogs that were being
14  referred here are the product catalogs that were
15  selected with the means in the second element, right?
16  A  Yes.
17  Q  The fourth element says you have to have a means
18  for building a requisition using data relating to
19  selected matching items and their associated sources.
20  Do you see that?
21  A  Yes.
22  Q  The selected matching items here are the selected
23  matching items that had been searched for in the
24  selected product catalogs, right?
25  A  Maybe.

2559

1  Q  Excuse me?
2  A  Maybe.
3  Q  All right.  And the means for processing the
4  requisition to generate one or more purchase orders
5  for the selected matching items refers to the selected
6  matching items in the element above, right?
7  A  Yes.
8  Q  And then, finally, the means for converting data
9  relating to selected matching item and then associated
10  source to data relating to an item in a different
11  source, those selected matching items are the ones
12  that were placed on the purchase order in the element
13  above, correct?
14  A  Maybe.
15  Q  And the sources that are being referred here refer
16  back to the element three, which are the selected
17  matching items and their associated sources, right?
18  A  Maybe.
19  Q  So we're talking about multiple sources there,
20  right?
21  A  Yes.
22  Q  So if I don't have product catalogs in the prior
23  art system, I can't satisfy any of these elements, can
24  I?
25  A  When you say the prior art system --

2560

1    Q  Any prior art system.  If I don't have a prior art
2    system that has at least two product catalogs, then
3    since all these elements in some part can or may
4    depend on the one above, I can't satisfy any of these
5    elements, isn't that right, since they all depend on
6    the one above them?  Can you answer that question
7    fairly yes or no?
8    A  Let me think about it.  Yes.
9    Q  All right.  So if a prior art system doesn't have
10   catalogs, it doesn't satisfy any of these elements,
11   right?
12   A  That's right.
13   Q  So when you said the RIMS system, you considered
14   for your purposes that it had all the elements of the
15   claim except two or more catalogs; is that right?
16   A  Yes.
17   Q  But that's wrong now in consideration of the fact
18   that if it doesn't have two product catalogs, it can't
19   satisfy all the rest of these elements; isn't that
20   right?  Isn't that what you just said?
21   A  It's right if you add the two product catalogs.
22   Q  But if you don't have the two product catalogs
23   which you assumed for purposes of your RIMS opinion,
24   you don't satisfy any of the elements of the claim?
25   A  That's right.

2561

1    Q  And that would be true on any claim that has this
2    antecedent basis where there is an element that
3    includes a catalog and then there are other claims
4    that would require the antecedent basis of a catalog;
5    isn't that right?
6        MR. McDONALD:  I object to the form, Your
7    Honor.  I think that's confusing.
8        MR. ROBERTSON:  I'll rephrase.  I think it
9    was, too.
10   Q  If there's a requirement of a catalog and then
11   there's a subsequent element that relies on the fact
12   that a catalog is in the claim, it couldn't satisfy
13   that element, right?
14   A  Right.
15   Q  Isn't it true that the TV/2 reference does not
16   disclose or suggest at least two catalogs a generally
17   equivalent item from a different source said
18   requisition module working in combination with said
19   catalog searching module to determine multiple sources
20   for said item?
21   A  I wasn't expecting the question to be that long.
22   Can you repeat that?
23   Q  The TV/2 reference does not disclose or suggest at
24   least two catalogs including a generally equivalent
25   item from a different source said requisition module

2562

1    working in combination with said catalog searching
2    module to determine multiple sources for an item,
3    correct?
4    A  Well, it certainly doesn't have all of that, no.
5    Q  And the TV/2 reference doesn't disclose or suggest
6    that the determination system including a cross
7    reference table matching an identification code from a
8    first located item with a second identification code
9    from a second located item, right?
10   A  Right.
11   Q  And you would agree, wouldn't you, that there had
12   to be an interface created between the TV/2 search
13   programs and the RIMS system for an electronic
14   sourcing system; is that right?
15   A  Well, what I agree with is to integrate the two,
16   one would have to create an interface, yes.
17   Q  And you would agree also that additional search
18   capabilities were added to the TV/2 search program for
19   the Fisher electronic sourcing system; isn't that
20   right?
21   A  That's my understanding.
22   Q  Is it your understanding that TV/2 search program
23   could not do Boolean search functionalities when IBM
24   presented it to Fisher-Scientific?
25       MR. McDONALD:  Objection, Your Honor.

2563

1    Boolean search isn't one of the claims.  It's
2    irrelevant.
3        MR. ROBERTSON:  I think search capability is
4    and Boolean search capability is in the accused
5    products and in the commercial embodiment.  So I think
6    it does have relevance.
7        MR. McDONALD:  This is what I'm talking
8    about, Your Honor.  He's trying to match up things
9    that have nothing to do with the claim by talking
10   about Boolean searching.  The issue is searching.
11       THE COURT:  Why isn't that right?
12       MR. ROBERTSON:  I think Boolean searching is
13   a form of searching, Your Honor.
14       THE COURT:  So what?
15       MR. ROBERTSON:  I'll move on, Your Honor.
16       THE COURT:  I sustain the objection.
17   BY MR. ROBERTSON:
18   Q  Now, you're aware that when IBM met with
19   Fisher-Scientific, they presented this TV/2 product as
20   a potential product to use in the electronic sourcing
21   project, correct?
22   A  Yes.
23   Q  And thereafter they entered into a contract and
24   began working together, correct?
25   A  Yes.

2564

1   Q   And you're aware that Fisher committed significant

2   resources to the project, correct?

3   A   Yes, I think anybody would regard the expenditure

4   as significant.

5   Q   So they committed not only the expenditures, but

6   they also committed human resources? That is, there

7   were the four inventors, two of which were full-time

8   on the project for a year and a half.  You're aware of

9   that, right?

10   A   I don't recall who was full time and who wasn't,

11   but they did commit human resources.

12   Q   And they also had IBM commit significant

13   resources; isn't that right?

14   A   Yes.

15   Q   And the project lasted a considerable time and you

16   have seen that statement of work where there were over

17   81 tasks that needed to be completed, correct?

18       MR. McDONALD:  Objection, Your Honor.  I

19   don't see what relevance this has with anything.  How

20   long it took to put the product together has nothing

21   to do with it.

22       THE COURT:  Overruled.

23   Q   Correct?

24   A   I need you to repeat the question.

25   Q   Sure.  There was a statement of work I think that

2565

1   you referenced before that had a number of tasks that

2   needed to be accomplished in order to complete the

3   electronic sourcing project that led to a prototype

4   for what is claimed in the inventions in this case,

5   correct?

6   A   Yes, I saw that.

7   Q   And you also saw that Fisher-Scientific committed

8   more than $600,000 in cash to the project, correct?

9   A   Yes.

10   Q   And I don't know if I asked this already, but

11   you're aware that it took some substantial time,

12   perhaps as much as a year and a half?

13   A   Yes.

14   Q   Well, why isn't it when Fisher walked in IBM

15   didn't say, You know, you don't need to do that.

16   Here's a brochure.  It's right here.  There's the

17   invention.

18   A   Because IBM likes to charge money for services.

19   Q   So you think they just did this whole thing as a

20   charade for a year and a half working with

21   Fisher-Scientific just to be able to charge money for

22   their services?

23   A   It wasn't a charade.  What Fisher needed was a

24   commercial product that would serve its needs.  The

25   commercial product is different from what's claimed in

2566

1   the patent.  It has much more.

2   Q   How do you know?  You have never even seen the

3   commercial product.

4   A   But I've read the description of work.

5   Q   But you didn't know what the actual commercial

6   product was, right?

7   A   As I said, I read the description of work, and

8   what IBM and Fisher did together was a lot more than

9   is claimed in the patents.

10   Q   Let me ask you to take a look at what is

11   Exhibit 4.  Plaintiff's Exhibit 4.  Do you have that?

12   A   Yes.  Well, it looks like a file history.

13   Q   It's the file history for the '683 patent.  Can

14   you confirm that?

15   A   Not at this resolution.

16   Q   Well, it's in your notebook, I believe.

17       THE COURT:  In that big notebook there in

18   front of you, is that what you're talking about?

19       MR. ROBERTSON:  Yes, sir.

20       THE COURT:  Maybe it's easier to do that

21   because I see his problem.

22       It's Plaintiff's Exhibit 4?

23       MR. ROBERTSON:  Yes, sir.

24       THE COURT:  Do you have it, sir?

25       THE WITNESS:  Well, I have what's marked as

2567

1   PX 4, but it doesn't begin with the same cover page

2   that's on the screen.

3   BY MR. ROBERTSON:

4   Q   Why don't we just focus on what's in front of you

5   if you can for now, and maybe I can direct you to a

6   page that we're going to be focusing on.  You did say

7   you considered this for purposes of your report,

8   right?

9   A   Yes.

10       THE COURT:  Which file history, the '683?

11       MR. ROBERTSON:  Yes, sir.

12   Q   If you'd go to -- do you see the lower right-hand

13   corner there's a number of pages that are called Bates

14   numbers.  You're familiar with that term, right?

15   A   Yes.

16   Q   Actually, go to the page that starts with 721.  Do

17   you see that?  Actually, if you start before that,

18   there's a page 720.  It says office action summary?

19   A   Yes.

20   Q   If you'd turn to the next page -- actually, yes,

21   can you explain to the jury what an office action is,

22   sir, if you know?

23   A   I know.

24   Q   What is it?

25   A   During the prosecution of a patent, there's

2568

1   correspondence that takes place between the Patent
2   Office and the applicant.  The applicants will file an
3   application and the office reviews it.  And if they
4   reject any claims or if they allow any claims, they do
5   so by providing a document back to the applicant.
6   It's called an office action in which the nature of
7   the action is stated and an explanation is given by
8   the examiner for why he did what he did.
9   Q   Here under heading No. 4 it says the disclosure is
10  objected to because of the following informalities; do
11  you see that?
12  A   Yes.
13  Q   The disclosure, that's what's contained in the
14  application when the applicants first filed the patent
15  describing what they believe their invention is,
16  right?
17  A   Yes.
18  Q   That becomes the specification of the patent if
19  the patent issues?
20  A   Correct.
21  Q   And it indicates here that the applicant must
22  update some things.  Do you see that?
23  A   Yes.
24  Q   One of the things it says, the application data on
25  page 12 with the current status of each of the

2569

1   referenced applications, e.g. now abandoned or now
2   patent number, question mark, or which is abandoned,
3   and now a serial number, symbol, question mark, etc.,
4   correct?
5   A   Yes.
6   Q   Why don't we go to page 575 of the document.  Do
7   you see here at the bottom of the page, in fact,
8   there's a reference to an application number?  Do you
9   see it?  It's a little difficult to read, but it's in
10  the lower left-hand corner.
11  A   Yes.
12  Q   That application number has been crossed out and
13  there the examiner has now written United States
14  Patent No. 5,712,989.  Do you see that?
15  A   Yes.
16  Q   So the examiner has appreciated that what was now
17  being fully described was the actual '989 RIMS patent
18  that it issued, correct?
19  A   Well, what happened was that during the
20  prosecution of the '683 patent, the '989 patent
21  issued, and the examiner required the applicants to
22  amend the specification to replace the word
23  "application" with the patent number that was
24  subsequently granted.
25  Q   So there we have actually appreciation by the

2570

1   examiner that he understands that this is now the '989
2   patent, right?
3   A   No, he knew it was a patent.
4   Q   That's why he put it in there, right?
5   A   Yes.
6   Q   Now, I think you agreed with me earlier that when
7   you are going to apply for a patent or when you're
8   looking a patent for purposes of infringement or
9   invalidity you need to look at it and read it as a
10  whole, correct?
11  A   I'm sorry.  Could you say it again?
12  Q   Yeah.  You need to view the claim as a whole, not
13  its little pieces, right?
14  A   I didn't think it was phrased that way in your
15  original question, but, yes, you evaluate the claim as
16  a whole for invalidity purposes.
17  Q   So you can't say, for example, if there's an
18  element that says in determining whether there's a
19  selected matching item available in inventory, you
20  just can't go and focus on a prior art reference and
21  say, Well, there is a discussion of inventory.  So
22  that element is satisfied.  You have to read it in the
23  context of the entire claim; isn't that right?
24  A   Yes.
25      THE COURT:  Is your question you have to read

2571

1   the prior art in context of the entire claim of the
2   patent-in-suit?  Is that your question?
3       MR. ROBERTSON:  I think that's right, Your
4   Honor.
5       THE COURT:  You didn't make the antecedent
6   noun clear.
7       MR. ROBERTSON:  I'm sorry.  Let me see if I
8   can.
9   Q   You have to consider whether the prior art
10  satisfies that claim element when you look at the
11  claim and consider it in its entirety; isn't that
12  right?
13  A   For obviousness purposes, you must consider the
14  claim as a whole.
15  Q   For anticipation purposes don't you need to
16  consider the claim as a whole, as well?
17  A   I don't think so.
18      MR. ROBERTSON:  Can we look at slide 27, if
19  we could.
20  Q   This is what you relied on when you said RIMS
21  search for items in multiple sources; do you see that?
22  A   Yes.
23  Q   And you had certain little excerpts from the '989
24  patent.  Do you see that?
25  A   Yes.

2588

1   Q   You said that the item master didn't satisfy the
2   catalog because the data was modified, could be
3   modified or had to be modified in some way, right?
4   A   I gave many reasons.
5   Q   Is that one?
6   A   That was one.
7   Q   And the customer could delete information, so
8   that's why it didn't satisfy the Court's definition?
9   A   I don't think I said it that way.
10   Q   I think you said that -- well, let me ask you
11   this.  Didn't you indicate that it doesn't satisfy the
12   Court's construction if only a partial items were
13   entered into the item master?
14        MR. McDONALD:  Your Honor, I think we're back
15   on the infringement part of the case, and I think it's
16   getting awfully confusing.  I object.  It's outside
17   the scope of my direct examination.
18        THE COURT:  I thought that's what we were
19   doing.  Why are you doing this?  Are you trying to
20   establish that he said one thing in infringement and
21   another in invalidity and that's why you're asking
22   about infringement?
23        MR. ROBERTSON:  Yes, sir.
24        THE COURT:  Well, then the objection is
25   overruled.  You can do that, if you can do it.

2589

1   BY MR. ROBERTSON:
2   Q   Didn't you indicate for purposes of infringement
3   that if the item master didn't contain the entire
4   catalog, it didn't satisfy the Court's construction as
5   published by a vendor?
6   A   No.
7   Q   Did you say even if a customer loads all item data
8   from a published vendor, if it only comes from one
9   place, that it doesn't mean it's a catalog within the
10   Court's construction?
11   A   I don't think I said that.
12   Q   Let me start back -- I don't think I asked you
13   this question.  You had some slides and you were asked
14   about some bullet points.  One of the bullet points
15   was about the catalog at issue.  Let me ask you this:
16   Isn't it true you said that you had to look at where
17   the data in the item master comes from because the
18   item master starts out empty when the system is
19   installed.  Do you recall that?
20   A   Yes.
21   Q   The TV/2 starts out empty, doesn't it?
22   A   Well, the TV/2 system as delivered by IBM starts
23   out empty.
24   Q   Didn't you give an opinion with respect to
25   infringement that in order to satisfy the Court's

2590

1   construction published by a vendor - excuse me - of
2   published by a vendor, that's right, it has to be
3   carefully handpicked by a customer who decides what to
4   import?
5   A   No.  That's confusing and wrong.  I don't know
6   what that means.
7   Q   You said it wouldn't satisfy the claim if it were
8   carefully handpicked by a customer and the customer
9   decided what to import into the item master, correct?
10   A   Yeah.  We had a discussion about how much of a
11   catalog would you have to import for it to remain a
12   catalog, and at what point wouldn't it be a catalog
13   anymore.
14   Q   But your opinion was that if a customer decides
15   what to import into an item master, that doesn't
16   constitute a catalog, correct?
17   A   It may not.
18   Q   You didn't offer any opinions with respect to
19   invalidity as to whether a decision was made to import
20   some data into this TV/2 and RIMS combination you had,
21   whether that would constitute a catalog, didn't you?
22   A   But many times during my testimony I said under
23   the plaintiff's theory of infringement --
24   Q   I'm not talking about the plaintiff's theory of
25   infringement.  I'm talking about what you say was

2591

1   required under the Court's construction for published
2   by a vendor, not our theory.  We don't have a theory.
3   We're following the claim construction.  I want to
4   know what you said satisfied the claims.  You said if
5   the customer only imported some of the data, it didn't
6   constitute a catalog, correct?
7   A   Yes.
8   Q   You didn't offer any opinions with respect to that
9   on this TV/2 and RIMS invalidity argument, did you?
10   A   But in TV/2 --
11        THE COURT:  Yes or no?  Did you offer those
12   opinions?
13        THE WITNESS:  Yes.
14        MR. ROBERTSON:  I guess the record will speak
15   for itself on that.
16   BY MR. ROBERTSON:
17   Q   Did you indicate in your opinions on validity that
18   the TV/2 brochure disclosed searching for catalogs,
19   correct?
20   A   Searching in catalogs, yes.
21   Q   Didn't you indicate that the search was how the
22   TV/2 can select the catalog to search?
23   A   I'm sorry?
24   Q   Didn't you indicate that the TV/2 brochure taught
25   that you can select a catalog to search by searching

2620

Farber - Direct                    2620

1   some testimony about the ePlus/Ariba license agreement; do you
2   recall that?
3   A   Yes.
4   Q   Has ePlus ever licensed the three patents that are at
5   issue in this case to any other companies?
6   A   Yes.
7   Q   What other companies has ePlus licensed the patents to?
8   A   We've licensed the patents to companies such as SAP,
9   SciQuest, Verian, Perfect Commerce.
10  Q   And approximately how much revenue has ePlus received for
11  licensing the three patents that are in suit in this case?
12  A   Close to 58 million.
13  Q   Do you see in front of you, Mr. Farber, is that a complete
14  list of the licensees for ePlus's patents-in-suit?
15  A   Yes, it is.
16  Q   Has ePlus ever licensed the patents-in-suit to anyone else
17  besides these five companies?
18  A   There was a patent license granted to a company called
19  ProcureNet which is the company -- or piece of the company that
20  ePlus had acquired.
21  Q   And that was back in what time frame?
22  A   It was around the acquisition, about ten years or so ago.
23  Q   Would you consider each of the five companies listed here,
24  Ariba, SAP, Perfect Commerce, Verian, and SciQuest to be
25  competitors of ePlus?

2621

Farber - Direct                    2621

1   A   Yes.  They are direct competitors.
2   Q   And competitors in the e-procurement software industry?
3   A   That's correct.
4   Q   What about ProcureNet, are they a competitor of ePlus?
5   A   No, ProcureNet is not a competitor.
6   Q   Listed here you have the five license agreements for the
7   companies ePlus considers as competitors to the e-procurement
8   software industry?
9   A   That's correct.
10  Q   Are you personally familiar with license agreements, the
11  five license agreements that you've described?
12  A   I am.
13  Q   How do you have any familiarity with these agreements?
14  A   I was directly responsible and involved in the negotiation
15  and the finalization of these agreements.
16  Q   For each five of the agreements?
17  A   Correct.
18  Q   Mr. Farber, you have a notebook in front of you.  Could
19  you please turn to Plaintiff's Exhibit 43.
20  A   Okay.
21  Q   Do you recognize the document in front of you?
22  A   Yes.
23  Q   What is this document here?
24  A   This is the license and settlement agreement between Ariba
25  and ePlus.

2622

Farber - Direct                    2622

1       MR. STRAPP:  Can you blow up the first paragraph
2   there, please.
3   Q   When was this particular agreement entered into between
4   ePlus and Ariba?
5   A   February 12th, 2005.
6   Q   Mr. Farber, can you turn, please, to section F of the
7   agreement.  That's on page four of the license, bottom of the
8   page, paragraph 11.  It's got the Bates number on the bottom
9   right 600.
10  A   600?
11  Q   It's up on your screen as well.
12      THE COURT:  May I see counsel for just a minute.
13
14      (Discussion at sidebar as follows:)
15
16      THE COURT:  I'm a little bit confused about using
17  these exhibits.  Mr. McDonald, do you want the exhibits in?
18      MR. McDONALD:  We had opposed their admission at one
19  point, Your Honor, but you said they could come in.  We would
20  stipulate to what he's already testified about the cumulative
21  numbers.  I think he could probably get through it without
22  having to go through these things.
23      THE COURT:  Why do we need to have the documents in
24  if they'll agree to the amounts?
25      MR. STRAPP:  I wanted to show that each one of the

2623

Farber - Direct                    2623

1   licenses were for the same three patents that are in suit in
2   this case and that each of these companies are the competitors.
3   I mean, maybe I can do that without showing the documents.
4       MR. McDONALD:  I've seen them all.  They all are the
5   three patents-in-suit.
6       THE COURT:  I'm sure if he knows that, he'll testify
7   to it.  Then we don't have to get into any discussion of that.
8       MR. McDONALD:  That would certainly be what we'd
9   appreciate, Your Honor.
10      MR. STRAPP:  All right, so we'll do it without
11  showing them the documents.
12      THE COURT:  Then we don't have to get into -- the
13  reason I ask this is because if you want to show that they were
14  the product of settlements, I need to give the jury some
15  instructions about it.
16      In other words, if you want to discount their
17  effectiveness by examining on -- that they came out of
18  litigation, there are different lawyers that approach that
19  issue differently about whether they want to get into that or
20  not.  Certainly you can get into it, and you can have the
21  exhibits in that event, but if you're not going to approach
22  it that way --
23      MR. McDONALD:  Well, I think he's already identified
24  them as settlement and license agreements.  That's what they're
25  all called, and if he just has him establish that they are in

2624

Farber - Direct                2624

1    settlements of litigation, I don't know that --
2        THE COURT:  That's sufficient for you?
3        MR. McDONALD:  Yeah.
4        THE COURT:  Then let's do it that way, and don't use
5    the documents.
6
7        (End of sidebar discussion.)
8
9    Q   Mr. Farber, we were talking about the ePlus/Ariba license
10   agreement.  Can you tell me specifically what was exchanged or
11   what was licensed as part of that agreement between ePlus and
12   Ariba?  Let's start first with Ariba.  What did Ariba license,
13   if anything, to ePlus as part of that agreement?
14   A   What Ariba licensed to ePlus is the ability for ePlus to
15   utilize its patents.
16   Q   So Ariba licensed its own patents to ePlus as part of this
17   license agreement?
18   A   That's correct.
19       THE COURT:  When you say its patents, you mean the
20   right to use Ariba's patents?
21       THE WITNESS:  That's correct.
22       THE COURT:  All right, go ahead.
23   Q   What did ePlus license to Ariba?
24   A   Conversely, we had provided the rights for Ariba to
25   utilize our patents.

2625

Farber - Direct                2625

1        THE COURT:  The patents-in-suit?
2        THE WITNESS:  Correct, the patents-in-suit.
3    Q   That is the '683, the '172, and '516 patents?
4    A   Correct, the same ones we're talking about.
5    Q   Did Ariba agree to pay any amount of money for this
6    license agreement?
7    A   Yes.
8    Q   How much was that?
9    A   I believe it was -- let me go to that, refresh my memory
10   exactly, but it was 37 million.
11   Q   $37 million?
12   A   Correct.
13   Q   So in sum then, Ariba granted a license to ePlus for its
14   patents, paid ePlus $37 million, and in exchange, Ariba
15   licensed the three patents that are in suit in this case; is
16   that correct?
17   A   That's correct.
18   Q   Now, you had mentioned there were four other license
19   agreements that ePlus has entered into with its competitors.
20   What was the next one in time after Ariba?  What was the next
21   license that ePlus granted?
22   A   The next one would be SAP.
23   Q   And do you recall approximately what time frame that was?
24   A   Let me try to find an agreement.
25   Q   In your binder, it's at Plaintiff's Exhibit 318.

2626

Farber - Direct                2626

1    A   Okay.  It was -- looks like it was finalized
2    December 11th, 2006.
3    Q   Who is SAP?
4    A   SAP is a large company that some of the products that they
5    offer competed with our solutions.
6    Q   And I didn't get a chance to ask you, but who is Ariba?
7    A   Same.  Ariba was a large company that competed with ePlus
8    in the market.
9    Q   Can you describe for me what was licensed as part of the
10   ePlus/SAP license agreement?
11   A   We had provided, in a similar fashion as we had done for
12   Ariba, we provided them the ability to utilize the three
13   patents that are in suit here.  We granted them a license to
14   utilize those patents.
15   Q   And what did SAP give to ePlus in exchange for a right to
16   use the three patents that are in suit in this case?
17   A   I have to just refresh my memory if they had
18   cross-granted --
19   Q   Let me direct your attention to section four of the
20   agreement.
21   A   Okay.
22   Q   4.1?
23   A   Yeah, what this is is that in exchange for the grant by
24   ePlus to the three patents-in-suit, SAP paid ePlus 17 and a
25   half million dollars.

2627

Farber - Direct                2627

1    Q   $17.5 million?
2    A   That's correct.
3    Q   We've talked about the Ariba and SAP license agreements.
4    I think you mentioned that there were three additional
5    agreements.  Can you just refresh my memory what those three
6    agreements are?
7    A   Sure.  There was Verian, it was Perfect Commerce, and
8    SciQuest.
9    Q   Let's start with Perfect Commerce.  If you could turn to
10   Plaintiff's Exhibit 317 in your binder.
11   A   Okay.
12   Q   When did ePlus enter into a license agreement with Perfect
13   Commerce?
14   A   That would be August 28, 2009.
15   Q   Who is Perfect Commerce?
16   A   Perfect Commerce is a company that competes with ePlus.
17   Q   And, again, can you describe for us what the subject
18   matter was that was licensed as part of this ePlus/Perfect
19   Commerce license agreement?
20   A   Specifically associated with the three patents that are in
21   suit here.
22   Q   ePlus licensed the three patents-in-suit to Perfect
23   Commerce?
24   A   That's correct.
25   Q   So that Perfect Commerce could use, sell, make, or offer

2628

Farber - Direct                                    2628

1    products that incorporated the technology in those three
2    patents?
3    A   Yes, that's correct.
4    Q   And how much money, if any, did Perfect Commerce pay for
5    the right to have a license to the ePlus patents?
6    A   Let me just make sure.
7    Q   Let me direct your attention to Exhibit A to the Perfect
8    Commerce --
9    A   I have it.
10   Q   -- agreement.
11   A   In exchange for the patents, they paid $750,000.
12   Q   Well, as the negotiator for ePlus, why was ePlus willing
13   to accept $750,000 from Perfect Commerce if ePlus -- if SAP and
14   Ariba had agreed to pay millions of dollars more?
15        MR. McDONALD:  I object to this, Your Honor.  We
16   tried getting into the details, but there was claims of
17   privilege, so we weren't able to inquire into all the whys and
18   wherefores of these settlements.  I don't think it's
19   appropriate to go into them now, and also cumulative.
20        THE COURT:  It isn't cumulative, I don't think, but
21   if in fact you claimed a privilege and foreclosed their inquiry
22   in depositions, then you can't inquire into it because that's
23   not been allowed.
24        MR. STRAPP:  Your Honor, I was not present when
25   privilege was claimed --

2629

Farber - Direct                                    2629

1         THE COURT:  You read the deposition, I take it, in
2    preparation.
3         MR. STRAPP:  I did read that deposition, and I
4    believe that we didn't make a claim of privilege with
5    respect to --
6         THE COURT:  You did?
7         MR. STRAPP:  We did not with respect to this
8    particular agreement.
9         THE COURT:  Mr. McDonald.
10        MR. McDONALD:  I'm looking for it.
11        THE COURT:  If they did, if you did, your objection
12   is well-taken.  If they did not, your objection is not
13   well-taken.
14        MR. McDONALD:  What we're able to find at this point,
15   Your Honor, is at pages 416 to 417 of Mr. Farber's testimony
16   regarding the SAP agreement, he was asked, how did you come up
17   with a settlement number in the case, and his answer was, I
18   used my counsel to determine what they thought was fair, et
19   cetera, and then we got into some privilege issues there.
20   This relates to the Perfect Commerce
21   agreement.  They did the same thing.  No?
22        MR. McDONALD:  Nothing specific to Perfect Commerce,
23   Your Honor.
24        THE COURT:  All right.  Objection overruled.
25   Q   Mr. Farber, let me ask you that question again.  Why was

2630

Farber - Direct                                    2630

1    it that ePlus agreed to license the patents to Perfect Commerce
2    for $750,000 if Ariba had paid 37 million and SAP had paid 17
3    and a half million for the patents?
4    A   Well, I mean, quite simply --
5         MR. McDONALD:  I object, Your Honor, because I think
6    he worked SAP into that question, and that is the one we were
7    able to find --
8         MR. STRAPP:  Your Honor, I'm asking about Perfect
9    Commerce and why ePlus, the --
10        THE COURT:  Why don't you reframe your question.
11        MR. STRAPP:  Sure.
12   Q   Mr. Farber, why was it that ePlus accepted $750,000 for a
13   license, to grant a license to Perfect Commerce if Ariba was
14   willing to pay $37 million for a license?
15   A   Well, they were a much, much smaller company for starters.
16   Secondly, we had the opportunity during the negotiation to
17   actually physically go to their location and audit their
18   financials, and, you know, we had some significant concerns of
19   them being a going concern, that they would actually stay in
20   business over time, and we took an amicable agreement, you
21   know, and considered this to be a fair settlement agreement
22   based upon what their situation was at the time as a business.
23   Q   And Perfect Commerce, again, that was a company that
24   competed in the e-procurement software industry?
25   A   That's correct.

2631

Farber - Direct                                    2631

1    Q   I think you mentioned that ePlus also granted a license to
2    SciQuest; is that right?
3    A   That is correct.
4    Q   Can you turn to Plaintiff's Exhibit 319 in your notebook,
5    please.
6    A   Okay.
7    Q   When did ePlus enter into a license agreement with
8    SciQuest?
9    A   That's August 19th of 2009.
10   Q   And what was the subject matter that was granted by ePlus
11   to SciQuest as part of this license agreement?
12   A   This, again, is the licensing of the three
13   patents-in-suit.
14   Q   The three patents in this suit?
15   A   Yes, the '683, the '516, and '172 patent.
16   Q   And what, if anything, did SciQuest give to ePlus in
17   exchange for a license to the three patents, same patents that
18   are in suit in this case?
19   A   Let me check here.  In exchange for the licenses that were
20   granted by ePlus, SciQuest paid us $2.4 million.
21   Q   And the last, I think the last license you mentioned was
22   with a company called Verian; is that right?
23   A   Yes, that's correct.
24   Q   Who is Verian?
25   A   Verian was also and also is a competitor of ePlus in the

2632

Farber - Direct                        2632

1   market.
2   Q   And let's just take a look quickly at that license
3   agreement.  That's at Plaintiff's Exhibit 320?
4   A   Yes.
5   Q   When did ePlus enter into a license agreement with Verian?
6   A   July 7th, 2009.
7   Q   What did ePlus grant to Verian as part of this license
8   agreement?
9   A   The same as the other licenses.  We granted the three
10  patents that have been in suit here.
11  Q   And can you tell me what, if anything, Verian agreed to
12  pay ePlus for a right to use the patented technology?
13  A   Sure.  They had an initial payment of $500,000.
14  Q   Was there any other arrangement between the two companies
15  for their licenses?
16  A   Yeah.  We had settled on -- they were also a small
17  company, similarly to Perfect, but we saw them more as an
18  ongoing concern, and we agreed to associate a royalty so that
19  when they exceeded $15 million within a calendar year, that we
20  would receive two and a half percent of those revenues.
21  Q   What was the reason that you felt like that was a fair and
22  reasonable license arrangement with Verian, this royalty
23  provision?
24  A   Why did we think it was fair?
25  Q   Yeah.

2633

Farber - Direct                        2633

1   A   Well, I think it was fair to both parties.  I mean, we
2   weren't necessarily looking to, you know, press a thumb on them
3   and put them out of business.  You know, we did see them as
4   staying in business.
5       They didn't have the funds to pay what we thought, you
6   know, the patents were worth at that time, but, you know, we
7   gave them an opportunity.  As they grew, then, you know, there
8   was a percentage associated as a royalty to the patents.
9   Q   Mr. Farber, has there been any recognition in the supply
10  chain industry for the products that ePlus sells that
11  incorporated the patented technology?
12  A   Yes.  Yes.
13  Q   What kind of recognition?
14  A   There's been industry awards, industry reports.
15  Q   And have you or your customers been recognized for any
16  specific benefits or specific recognition for the Procure+ or
17  Content+ products?
18  A   Yeah.  Well, one of our clients recently was just awarded
19  what's called Pros to Know which is a supply chain.  We
20  actually nominated one of our clients --
21      THE COURT:  What's it called, sir?
22      THE WITNESS:  Supply chain.
23      THE COURT:  No.
24      THE WITNESS:  Oh, pros, as in professionals, to know.
25      THE COURT:  Right, t-o, and then k-n-o-w.

2634

Farber - Direct                        2634

1       THE WITNESS:  That's correct.
2       THE COURT:  And that is an award?
3       THE WITNESS:  It's a recognition award, and it's this
4   publication, an organization that evaluates submissions and
5   looks at how individuals or companies are using solutions.
6       THE COURT:  Excuse me.
7       MR. McDONALD:  Thank you, Your Honor.  I think the
8   sequence that we had talked about was that they first need to
9   lay a foundation and show a connection to the patented
10  inventions before they go into any detail about any of these
11  awards that might be for a corporation as a whole, things like
12  that, so I object to the question unless there's some
13  connection specifically to the claimed invention.
14  Q   Mr. Farber, do you recall when you were here earlier in
15  this case you talked about Procure+ and Content+?
16  A   I do.
17  Q   Are those products that are developed and sold by ePlus?
18  A   Yes.
19  Q   Are those products that ePlus believes incorporates the
20  patented technology?
21  A   Yes.
22      MR. McDONALD:  Objection, Your Honor, lack of
23  foundation.  This witness isn't qualified to testify as to the
24  scope of the claims or whether the products are covered by
25  that.  In fact, we tried to inquire into that in deposition and

2635

Farber - Direct                        2635

1   weren't able to.
2       THE COURT:  You shut it down in deposition?
3       MR. STRAPP:  I never shut them down in depositions on
4   that particular issue that I can recall.
5       MR. McDONALD:  He indicated he wasn't able to do the
6   analysis, that the lawyers had to do it, and he couldn't.
7   That's what I mean by that.
8       MR. STRAPP:  Let me maybe --
9       THE COURT:  He's not asserting -- what he's doing
10  is -- what he contends, he understands the claims -- I mean the
11  patents to be practiced in his own products; is that right?
12      MR. STRAPP:  That's correct.
13      THE COURT:  He's qualified to testify to that.
14      MR. McDONALD:  I think we need to lay a foundation,
15  because he did say in the deposition he had to turn that over
16  to the lawyers, Your Honor, he couldn't do it himself.
17      MR. STRAPP:  He's talking about --
18      THE COURT:  Did he or not?  Did he do that?
19      MR. ROBERTSON:  Your Honor, I was at the deposition,
20  and I don't recall that at all.
21      THE COURT:  Go over there and look at the deposition
22  transcript.  If you did that, maybe it's quitting time,
23  Lucille.
24      MR. STRAPP:  I'll move on to a different area.
25      MR. ROBERTSON:  Wait a minute.

2636

Farber - Direct                    2636

1    MR. McDONALD:  Page 396, Your Honor, he said, I don't
2  try to interpret everything back to our patented claims because
3  I'm not a lawyer, and I don't, you know, know all the legal
4  aspects of it.
5    MR. ROBERTSON:  Could we have the question --
6    MR. STRAPP:  Your Honor, let me read the question
7  there.  That question was, what information did you learn about
8  the functionality of Lawson's product line from going to their
9  website.
10    It has absolutely nothing to do with the ePlus
11  products.  So I think -- if there's no deposition testimony
12  that Mr. McDonald is referring to, we should be permitted to go
13  forward.
14    MR. McDONALD:  He was saying there, I'm not a lawyer
15  and I don't understand the legal aspects of interpretation.
16  He's saying he's not qualified to do this construction
17  approach.  We didn't ask the question over and over again once
18  he made the record of that.
19    THE COURT:  That was a different question.
20  Overruled.  It's not even related to this one except very
21  marginally.  This witness can testify that as far as he's
22  concerned, the patents -- the products that he sells, that he's
23  talking about, practice something, do or do not use the patents.
24    MR. McDONALD:  I also object.  He hasn't laid any
25  foundation that he's used the Court's claim constructions or

2637

Farber - Direct                    2637

1  anything for purposes of that.  His personal understanding
2  would not establish the nexus necessary.
3    THE COURT:  He's the guy that runs the company.
4  Q  Mr. Farber, could you please state again, which of the two
5  products you are referring to that, in your understanding,
6  practice the patented technology of the patents-in-suit?
7  A  It's Procure+ and Content+.
8  Q  And those were the products that we saw during your
9  testimony earlier that are marked with the patent numbers on
10  the front of the brochures?
11    THE COURT:  Did he sell that.
12  Q  Okay.  Does ePlus sell Procure+ and Content+?
13  A  Yes, we do.
14  Q  And has ePlus received any industry recognition or awards
15  for Procure+ and Content+?
16  A  Yes, we have.
17  Q  Can you describe what some of those industry recognitions
18  and industry awards are.
19  A  So the one that I was just previously describing from
20  supply chain was a Pros to Know, submission that we put in for
21  one of our clients which was Unicco.  They are a janitorial
22  facility management company, and we put them in for their use
23  of our solutions and how they use our solutions within their
24  environment and the benefits that they've derived from that.
25  Q  And have you been recognized for your -- have Procure+ and

2638

Farber - Direct                    2638

1  Content+ been recognized by any publications in the supply
2  chain industry?
3  A  Yes.
4  Q  Can you give me some examples?
5  A  They were recognized by, I believe, iSource magazine and
6  also I think we received some prior awards by supply chain,
7  and, you know, we had awards that even go back to the
8  ProcureNet days.  The United States government gave us an award
9  that's called the Hammer Award --
10    MR. McDONALD:  Your Honor, he's talking about
11  ProcureNet now.  There's no foundation.
12    THE COURT:  That is a different issue.
13    MR. STRAPP:  Thank you, Your Honor.  I have no
14  further questions.
15    THE COURT:  I told you, ladies and gentlemen, you're
16  not going to be concerned with money at the end of the case.
17  This is being offered because it has -- this evidence that he's
18  just testified to is being offered because it's pertinent to
19  one of the issues that are called secondary considerations that
20  I'll tell you about later, but as a general proposition, in
21  response to a claim that a patent is obvious in view of the
22  prior art, the patentee can introduce evidence showing, among
23  others things, that there has been commercial success of the
24  patent, and that's something that you can take into account in
25  deciding invalidity, and that's why this evidence is coming in

2639

2639

1  on this topic.
2
3    CROSS-EXAMINATION
4  BY MR. McDONALD:
5  Q  Good morning Mr. Farber.  Good afternoon.
6  A  It's close.
7  Q  You mentioned ProcureNet.  They were the company that was
8  the spinoff from Fisher that took these patents as part of that
9  spinoff; is that right?
10    MR. STRAPP:  Objection.  Lack of foundation, beyond
11  the scope of the direct.
12    THE COURT:  I think he testified to it earlier.
13    MR. STRAPP:  He didn't mention Fisher, I don't think,
14  at all.
15    THE COURT:  Not with you, but in the earlier part of
16  his testimony.
17  A  Well, what I testified to was that ePlus acquired the
18  assets of ProcureNet.
19  Q  Those assets included the three patents in this case;
20  correct?
21  A  That's correct.
22  Q  And you've testified today about the money that was made
23  in connection with these patents; right?
24  A  From the licensing perspective, yes.
25  Q  And ProcureNet, did they, as I understood it, use the

2676

Hilliard - Direct                    2676

1   vendors from whom that buyer wants to purchase, and then to
2   turn those requisitions into one or more purchase orders where
3   the items on the requisition -- and you only send one
4   purchase order to each vendor.  You wouldn't send a purchase
5   order to a vendor that doesn't sell the item or from whom you
6   don't want to buy the items.  So where the purchase orders pick
7   up the association of vendors from the requisition and
8   translate that into the purchase order.
9        The PO Writer system is simply a form-filling system.
10  It's designed for the purchasing agent, someone in the
11  purchasing department of the company to make the determination
12  of who the vendor or supplier will be, not the buyer, not the
13  one who specifies.  So at every step along the way in that
14  system, even if the buyer indicates a preferred vendor, or even
15  if the item comes out of a catalog selected by the buyer and
16  that catalog is associated with a vendor, by the time that item
17  gets into the requisition, the vendor association is lost.
18       The purchasing agent has to reenter the vendor, and then
19  once again, once the requisition is completed, it's the
20  purchasing agent, not the requisition, that determines what
21  supplier the purchase order goes to.  So it doesn't satisfy
22  almost all of the claims because it looses that connection
23  between the selection of the buyer who wanted to pick out
24  vendors that he knows and is comfortable with and the ultimate
25  purchase.

2677

Hilliard - Direct                    2677

1   Q   Now, I want to turn to the RIMS system, if you could.  Did
2   you review the Johnson '989 patent relating to the RIMS system
3   that's relied upon by Lawson for its invalidity positions?
4   A   Yes, I did.
5   Q   And you indicated that you had reviewed the testimony of
6   the Fisher Scientific inventors relating to the RIMS system?
7   A   I have.
8   Q   Did you review Ms. Eng's trial testimony from the prior
9   trial between ePlus and SAP concerning the work that IBM did
10  for Fisher Scientific?
11  A   Yes.
12  Q   Did you review Ms. Eng's deposition testimony in this
13  case?
14  A   Yes, I did -- deposition testimony, yes.
15  Q   Did you review Mr. Gounaris's 's trial testimony from the
16  prior trial between ePlus and SAP concerning IBM's work for
17  Fisher Scientific?
18  A   I was actually in attendance for both Ms. Eng's and Mr.
19  Gounaris's testimony, so I was there, and I've also reviewed
20  their testimony since.
21  Q   Now, does the description of the system in the '989 patent
22  serve to substantiate the details of any particular commercial
23  version of the Fisher RIMS system that was allegedly publicly
24  used prior to August of 1994?
25  A   According to the testimony of the inventors in their

2678

Hilliard - Direct                    2678

1   depositions and in the prior trial, no, it does not.  There are
2   features and functions that are described in the '989 patent
3   that were never implemented in the RIMS system, and there are
4   RIMS system features and functions that were added that were
5   not described in the '989 patent, and that this evolved over
6   time.  There were several versions of RIMS that evolved over a
7   period of time starting prior to 1994 and continuing beyond
8   1994.
9   Q   Did Lawson provide any evidence of any Fisher Scientific
10  customer who had a RIMS system installed having all the
11  features described in the '989 patent?
12  A   No.
13  Q   Let's turn now to the functionality of the RIMS system as
14  described in that '989 patent, and can you just describe at a
15  high level the functionality of that system?
16  A   Yes.  The RIMS system, as described in the '989 patent, is
17  a seller's system.  It's not a buyer's system like the
18  patents-in-suit, so it's operated by a customer service
19  representative who is an employee of Fisher.
20       When it's installed at a Fisher customer, according to the
21  inventors, a Fisher customer service representative operates
22  the Fisher RIMS system and takes requests from buyers who work
23  for the customer and enter it into the system, but -- and then
24  the system determines where the items that that customer wants
25  are.  They could be in a local, what's called just-in-time

2679

Hilliard - Direct                    2679

1   inventory, they could be at a distributor, the Fisher
2   distributor's inventory, the corporate inventory.  They could
3   be something that Fisher is going to purchase from an outside
4   vendor and then deliver and resell to the buyer.
5        So it creates a requisition, and it completes that
6   transaction, all done by the Fisher CSR, and it delivers the
7   item and manages the inventory.  RIMS stand for requisition and
8   inventory management system, and that's what it is.  It's a
9   requisition and inventory management system that works from the
10  seller's standpoint.  It's a seller's system.
11  Q   Now, so you indicated that the distributor's customer
12  service representative was the user of the RIMS system.  How is
13  that relevant to your analysis as to whether the RIMS system is
14  an electronic sourcing system as required by the system claims
15  at issue here?
16  A   Well, we have a construction that I have referred to and
17  understood as to what an electronic sourcing system is, and
18  it's a buyer's system.
19       MS. ALBERT:  Can we put the juror's glossary of claim
20  terms up on the screen.
21  Q   And if you look about the middle of the page, has the
22  Court construed the term electronic sourcing system?
23  A   Yes, it has.
24  Q   What is the Court's construction of that claim term?
25  A   It's an electronic system for use by a prospective buyer

2680

Hilliard - Direct                    2680

1   to locate and find items to purchase, to purchase from sources,
2   suppliers, or vendors, and in this case, I believe sources,
3   suppliers, and vendors are synonymous.
4   Q    And how is it relevant to the issue of whether the RIMS
5   system satisfies the claim requirement of an electronic
6   sourcing system, of whether or not the user of the system is
7   the distributor's customer service representative?
8   A    The RIMS system is a seller's system.  It's not for use by
9   the prospective buyer.  It's for use by the Fisher customer
10  service representative or CSR.
11  Q    Could the RIMS system be used to purchase goods from
12  multiple different sources, suppliers, or distributors?
13  A    No.  Only from Fisher.
14  Q    Now, did the RIMS system have a database?
15  A    Yes.
16  Q    Did it have a database with records of items?
17  A    Yes.
18  Q    Do you have an opinion as to whether or not that database
19  constitutes a database with multiple vendor catalogs?
20  A    I do have an opinion, yes.
21  Q    What is your opinion?
22  A    It does not.
23  Q    Why not?
24  A    It is not -- the items have no vendor or source
25  association with them as a catalog item would, because all of

2681

Hilliard - Direct                    2681

1   the items in it are Fisher items that are going to be sold.
2   There's no need for association of a vendor or a source because
3   all items requisitioned through the RIMS system are sold to the
4   customer from Fisher.
5   Q    Can we verify that there is no source related information
6   in the item database by reference to the '989 patent?
7   A    Yes.
8   Q    Could we see DX-7 at table Roman numeral vi, and that's at
9   column 39.  Could you blow up there on the left-hand corner
10  table vi.  What is illustrated in this table vi?
11  A    This illustrates what's called the part master which is
12  the listing of all of the items in the Fisher RIMS database,
13  and the vendor or supplier is nowhere listed there.  If you
14  look at -- I've looked at every single item in the part master,
15  and the vendor supplier isn't there.  It's irrelevant because
16  the vendor is always Fisher.
17  Q    Now, do you see down in the middle of the table there's a
18  reference to an MFG part NBR which I interpret to mean
19  manufacturer part number?  Do you see that?
20  A    Yes, I do.
21  Q    Would that constitute vendor or source-related data?
22  A    No.  That's reference information.  With the Fisher RIMS
23  system, the customer never buys from the manufacturer.  The
24  customer always buys from Fisher.  This is an indication for
25  Fisher, perhaps, where they source the item that they will

2682

Hilliard - Direct                    2682

1   ultimately sell to the buyer, but it is not where the customer
2   buys the item.
3   Q    Was there any way to select product catalogs to search
4   within the RIMS system?
5   A    Well, the RIMS system doesn't have catalogs, but even if
6   you were to construe its parts master to be a catalog, and I
7   wouldn't construe it that way because it doesn't have -- the
8   items aren't related to vendors, but even if you were to
9   construe it that way, it would only have one, so you can't
10  select which one you want from multiple, because it would only
11  have one.
12  Q    Did the RIMS system include a search program?
13  A    No.
14  Q    Is the presence or absence of a search program relevant to
15  any claims at issue here?
16  A    Several of the claims.
17        MS. ALBERT:  Mike, could we see the jurors' claim
18  term glossary at page four.
19  Q    In the middle of that glossary, there's a claim element,
20  means for searching for matching items among the selected
21  product catalogs; do you see that?
22  A    I do.
23  Q    And what structures has the Court defined would satisfy
24  that claim limitation?
25  A    Well, it says the materials X of this element are

2683

Hilliard - Direct                    2683

1   disclosed as search programs and modules operating on a
2   computer system with access to the given database and their
3   equivalents, and then it cites the columns and rows within the
4   patent where those corresponding structures, materials, or acts
5   are referenced.
6   Q    So if the RIMS system as described in the '989 patent does
7   not have a search program, would that system satisfy this claim
8   requirement?
9   A    It would -- for that reason alone, it wouldn't satisfy the
10  claim element.  It also wouldn't because it can't search among
11  selected catalogs because you can't select a catalog.
12  Q    And this particular claim element, what claim is it
13  relevant to?
14  A    '683, claim three.
15        MS. ALBERT:  And, Mike, if we can continue to look
16  down further on the claim glossary, down below that, there's
17  another element, means for searching for matching items that
18  match the entered product information in the selected portions
19  of the database, and that element comes from the '172 patent,
20  claim one.
21  Q    Do you see that, Mr. Hilliard?
22  A    I do.
23  Q    What structures has the Court defined as being requied in
24  order to satisfy this claim requirement?
25  A    Once again, there's reference to the columns and rows

2684

Hilliard - Direct                    2684

1   within the '172 patent that identify the specific corresponding

2   structures, materials, or acts.

3       Q   And what is the text of the Court's definition there?

4       A   The corresponding structures, materials, or acts of this

5   element is disclosed as search programs and modules operating

6   on a computer system with access to data in a database or other

7   file system and their equivalents.  And as I say, it refers to

8   the specific places within the '172.

9       Q   So if the RIMS patent as described in the '989 patent does

10   not have any description of a search program, would that system

11   in the '989 patent satisfy this claim requirement?

12      A   No.

13      Q   Could the RIMS system at the customer's facility build a

14   requisition from data relating to selected matching items found

15   in conducting searches of vendor catalogs and their associated

16   sources?

17      A   No, it can't do that for a number of reasons.  There are

18   no catalogs, you can't select a catalog, you can't search --

19   without a search, there are no matching items and so forth.

20      THE COURT:  Ms. Albert, how much longer do you have

21   with this witness?

22      MS. ALBERT:  I probably have another area.

23      THE COURT:  Well, I think probably we ought to take

24   lunch.  Their lunches are here, so take your notebooks with

25   you, please.

2685

Hilliard - Direct                    2685

1

2                   (Jury out.)

3

4       THE COURT:  How many witnesses do you have after this

5   witness, Mr. Robertson?

6       MR. ROBERTSON:  This is our last witness, Your Honor.

7       THE COURT:  Thank you.  We'll have the lunch recess

8   for an hour.

9

10                  (Luncheon recess.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2686

1       (The jury is present.)

2   BY MS. ALBERT:  (Continuing)

3       Q   Mr. Hilliard, before the lunch break, we were

4   talking about the functionality of the RIMS system for

5   building a requisition, and I had asked -- I guess

6   I'll just ask you again.  Could the RIMS system at the

7   customer's facility build a requisition from data

8   relating to selected matching items found in searching

9   vendor catalogs and their associated sources?

10      A   No, it couldn't.

11      Q   Why not?

12      A   Because there's no catalog.  There's no selection

13   of catalogs.  Even if you were to interpret the parts

14   file to be a catalog, there would only be one.

15   There's no search of the catalog.  Just a part number

16   look-up.  So there would be no search results to build

17   the requisition from.

18      Q   The RIMS system did build a requisition, though;

19   isn't that right?

20      A   Yes, it did.

21      MS. ALBERT:  Now, can we take a look at this

22   requisition that's built in the RIMS system.  Can we

23   look at DX 7 at table Roman numeral 3, column 37.  And

24   could you blow up, yes.

25      Q   What's illustrated in this table III?

2687

1       A   This is a requisition screen from the RIMS system.

2       Q   I'm sorry.  Go ahead.

3       A   It shows the account number, which is a

4   department, and line items.

5       Q   Now, do the line items that are listed in that

6   requisition include information relating to the

7   sources from which the item are to be procured?

8       A   No, there's no source information.  There's only

9   one source in the Fisher RIMS system.

10      Q   Why didn't the requisition built by the RIMS

11   system need to include vendor information?

12      A   There's only one vendor.

13      Q   Does the electronic sourcing system of the ePlus

14   patents require that the requisition line items have

15   associated source or vendor information?

16      A   Yes.

17      Q   Why is that necessary?

18      A   Well, because in the patents-in-suit they call for

19   the ability of the buyer to go through catalogs and to

20   select the sources from which he or she wants to buy.

21   And so the requisition needs to reflect the sources

22   that are selected or vendors - source and vendor I'm

23   using interchangeably - that the buyer has selected.

24      Q   Then does the system take that requisition and

25   need to be able to generate purchase orders using the

2688

1   data in that requisition?
2   A   Yes.  The '683 patent, Claim Three, and many of
3   the other claims all talk about generating multiple
4   purchase orders from the requisition, and the reason
5   for multiple purchase orders is that the individual
6   line items in the requisition are each associated with
7   vendors, and you have to have a separate purchase
8   order for reach vendor.
9   Q   So is it necessary to the functionality of being
10  able to process that requisition to generate purchase
11  orders, is it necessary to have requisitions with
12  associated vendor information?
13  A   Yes, otherwise you wouldn't know what vendors to
14  issue the purchase orders to.  Or the system wouldn't
15  know, pardon me.
16  Q   Did the RIMS system generate a purchase order from
17  a requisition?
18  A   The RIMS system generated a purchase order block
19  at the RIMS system, which is the on-site system
20  operated by the Fisher customer service rep or CSR,
21  and that purchase order block then went to the Fisher
22  warehouse where a purchase order could conceivably be
23  generated, but it would be generated with manual
24  intervention.
25  Q   Can we look at some figures in the '989 patent

2689

1   that concern this purchase order functionality?  And
2   if we could look at DX 7 at figure 5A.
3       Can you explain, Mr. Hilliard, what happens in the
4   system after the CSR accepts the requisition and when
5   you reach the decision block labeled 332 there?
6   A   Yes.  Can we blow up this section?  Yes, a
7   decision block shows that -- the diamond refers to a
8   decision.  So there's a question as to whether the
9   item on the requisition is of type 1, 3 or 4.
10      MR. McDONALD:  Your Honor, I object.  This is
11  outside the scope of Mr. Hilliard's report.
12      MS. ALBERT:  Your Honor --
13      THE COURT:  I don't have Mr. Hilliard's
14  report here.  Does somebody have it for me so I can
15  see where it is?
16      MS. ALBERT:  Your Honor, Mr. Hilliard was
17  questioned at length about this figure in the course
18  of his deposition, and we have a stipulation with Mr.
19  McDonald that the experts can testify concerning
20  opinions that were elicited from them in the course of
21  the deposition.
22      MR. McDONALD:  We have talked about that.
23  That's not the case.  That was for the initial --
24      THE COURT:  I didn't hear you.  Talk about it
25  and what?  We have talked about it and what?

2690

1       MR. McDONALD:  That the deposition -- if it's
2   not in the report.  That's the question.  Moreover,
3   Mr. Hilliard is a rebuttal expert.  As a rebuttal, he
4   wasn't allowed to have another rebuttal report in the
5   form of his deposition.  That was something that was
6   discussed by the parties -- the party that had the
7   burden of proof with the first expert report, but you
8   have already ruled that we have to have them in the
9   reports anyway.
10      MS. ALBERT:  Now we're backtracking on a
11  stipulation that Mr. McDonald provided to us earlier
12  in the case.
13      THE COURT:  I remember this coming up.
14      MS. ALBERT:  I believe it came up in the
15  course of another hearing with Your Honor where Mr.
16  McDonald did stipulate.
17      THE COURT:  Go to my desk, please, and bring
18  me the transcript that is -- it may be in your office.
19  It's the transcript of the August 10 hearing that I'm
20  using for the opinion.
21      MS. ALBERT:  I think we might have a copy.
22      MR. McDONALD:  This actually came up in the
23  hearing yesterday morning, the issue of whether the
24  experts' deposition could be used to supplement their
25  reports, and I think you ruled that we couldn't rely

2691

1   on the deposition testimony.
2       THE COURT:  There was nobody talking about a
3   stipulation that you had agreed to do that yesterday
4   morning.  I'm not quite sure exactly how it came up,
5   but I gathered that as to Dr. Hilliard there's a
6   stipulation, and I didn't understand there was as to
7   Dr. Shamos.
8       MS. ALBERT:  This came up in the course of
9   the August 10 hearing before Your Honor, and if I can
10  refer you to page 3, starting at line 24, Mr. Merritt
11  said, "as a consequence the" --
12      THE COURT:  Let me read it.
13      MS. ALBERT:  Okay.
14      THE COURT:  Look at 4, page 4, line 13 to the
15  bottom.
16      MR. McDONALD:  That shows that actually
17  Mr. --
18      THE COURT:  And in addition to that, it's
19  that last line, 24, and carrying over to the top of
20  page 5, number 4, that was involved yesterday morning.
21  It wasn't in the report to begin with, the original
22  report.  That was what this was.  And the same rule
23  would apply here.
24      If there's a deficiency in the original
25  report such as there was with respect to what we were

2692

1  talking about yesterday with Dr. Shamos, then the same
2  rule applies here.  But if the stipulation is that all
3  he's doing is -- if he's testifying to some point that
4  was in his original report but that was augmented
5  because he was rebutting whatever Dr. Shamos did, then
6  that would be the situation that would be covered by
7  the stipulation.
8       MR. McDONALD:  Here's the situation.  That
9  only goes to the expert that did the first round of
10  reports because Dr. Shamos went first.  Mr. Hilliard
11  then rebutted him.  Then the issue was:  Does
12  Mr. Shamos do another report or can we just rely on
13  his deposition.  There was no issue that the second
14  expert after already rebutting the first expert would
15  also rebut him at his deposition.  So Mr. Hilliard as
16  the second expert, there was no stipulation regarding
17  the second expert.
18       THE COURT:  You said that a lot better than I
19  did.
20       MS. ALBERT:  Your Honor, Mr. Hilliard treated
21  the issue of purchase order generation at length in
22  his report.
23       THE COURT:  Just give me the report and let
24  me see it.  The challenge is it isn't in his report.
25       MR. ROBERTSON:  I believe it's in the binder

2693

1  you have, Your Honor.
2       THE COURT:  Page?
3       MS. ALBERT:  Page 30 at paragraph 72.
4       THE COURT:  What is the supplemental?
5       MS. ALBERT:  Is the objection that Mr.
6  McDonald is raising is that this specific figure was
7  not referenced in his report?
8       MR. McDONALD:  That's right.
9       MS. ALBERT:  I think he discusses the
10  functionality of this figure at length in his report.
11       THE COURT:  Let me see the paragraph and page
12  you're talking about.
13       MS. ALBERT:  I'm referring to paragraph 72 as
14  one paragraph.
15       THE COURT:  Hold on.  I can't read but one at
16  a time.  You-all are all smarter than I am.  I can
17  only do it one at a time.
18       MS. ALBERT:  Then I would also refer Your
19  Honor to paragraphs 81 through 83.
20       MR. McDONALD:  Your Honor, could we have the
21  figure removed from the screen while you're reading?
22       THE COURT:  Sure.
23       MS. ALBERT:  Specifically, with reference to
24  paragraph 82, the quotations from the patent that are
25  referenced in that paragraph are specifically directed

2694

1  to figure 5A.
2       THE COURT:  Figure 5A is the one he's
3  testifying about?
4       MS. ALBERT:  That's correct, Your Honor.
5       THE COURT:  Well --
6       MR. McDONALD:  That's actual in figure 5B,
7  Your Honor.
8       THE COURT:  Ms. Albert, is it 5A or 5B?
9       MS. ALBERT:  I think 5B is a continuation of
10  figure 5A.  These specific quotations might be.
11       THE COURT:  All right.  Anything else?
12       MS. ALBERT:  That's all I connote at this
13  current time.
14       THE COURT:  This is the hour of decision.
15       All right.  Anything else, Mr. McDonald?
16       MR. McDONALD:  No, Your Honor.
17       THE COURT:  It looks to me like in paragraphs
18  81 through 83 and in 72, he is covering in fair detail
19  the very topic he's addressing now.  And while he may
20  not have cited a specific figure in his report, he's
21  doing everything but citing the figure in his report.
22  So I overrule the objection to the testimony.
23       MS. ALBERT:  Thank you, Your Honor.
24  BY MS. ALBERT:
25  Q  So I think the pending question was could you

2695

1  explain what happens in the RIMS system after the CSR
2  accepts a requisition and at the point where you reach
3  the decision block 332?
4  A  Yes.  The diamond-shaped block indicates that
5  there's a logic decision that's made by the Fisher
6  RIMS system to determine whether the item that's being
7  requisitioned is a type 1 item, which is a
8  distributor-owned item that's located at the Just In
9  Time location at the customer's site, a type 3 item,
10  which is a distributor-owned item that's located at
11  the warehouse, or a type 4 item, which is an item that
12  the distributor buys and resells to the customer.
13       If so, the system creates a purchase order data
14  block, as I mentioned in response to your prior
15  question, over here on the right.  And if not, the
16  system generates what's called a customer internal
17  P.O., although that internal P.O. is really not a
18  purchase order.  It's a material transfer request.
19  Q  What's the difference between a material transfer
20  request and a purchase order?
21  A  In a purchase order something is going to be
22  purchased as is the case with the type 1, 3 or 4.  The
23  other types that are active are the 5 and 6.  Five
24  being an item that's not handled by the system and 6
25  being a -- so I'm going to ignore 5 for a moment.  Six

2696

1    being a customer-owed item that's located at the Just
2    In Time warehouse at the customer's location.
3        Now, in the case of that type 6, since it's a
4    customer-owned item, there is no purchase.  The
5    customer doesn't need to purchase that item because
6    the customer already owns that item.  So this is
7    really a material transfer, not a purchase.  Although,
8    there's a reason, I believe, why it's called that in
9    this patent.
10   Q   Does this diagram show the RIMS system generating
11   multiple purchase orders from a single requisition?
12   A   No, it does not.  It shows on the right-hand side
13   a purchase order block, which is sent to the host
14   system, and the left-hand side the initiation of
15   basically a material transfer that transfers the
16   customer's own inventory from one department to
17   another.  No purchase or sale occurs.
18   Q   Now, I want to turn to the converting
19   functionality that's required by some of the claims.
20   Is there any description in the '989 patent of using
21   the RIMS system to convert a selected matching item
22   associated with one vendor to another item from a
23   different vendor by means of cross referencing
24   functionality?
25   A   No, there isn't.

2697

1    Q   What about the cross reference tables at the
2    Fisher mainframe computer.  Would those satisfy the
3    claim requirements?
4    A   No, they don't.  The cross reference tables are
5    basically a table that's in there for the purpose of
6    allowing Fisher to supply a Fisher item in place of an
7    item that has a competitor's product number.  There's
8    no alternative vendor.  The only vendor to the
9    customer is Fisher.  So you can't -- the system
10   doesn't provide for the conversion of an item from one
11   vendor to another vendor because -- to include the
12   item of another vendor because it's all one vendor.
13       MS. ALBERT:  Mike, could we take a look at
14   Claim Three of the '683 patent?
15   Q   You see at the bottom there there's this claim
16   element means for converting data relating to a
17   selected matching item and an associated source to
18   data relating to an item in a different source?  Do
19   you see that?
20   A   Yes.
21   Q   Has the Court construed the meaning of the term
22   "selected matching item"?
23   A   Yes, it has.
24   Q   Do you know what that construction is?
25   A   A selected matching item is an item that is the

2698

1    result of -- that's found as a result of a search,
2    something that the patent refers to as a hit.
3        MR. McDONALD:  Your Honor, I object.  The
4    Court has defined the term "matching item," and you
5    did want use the word "hit."
6    Q   Why don't we look at the Court's construction.
7        MS. ALBERT:  I want to go back, Mike, to the
8    first page, and I want to blow up the second to the
9    last item there; selected matching items.
10   Q   What's the Court's construction for selected
11   matching items?
12   A   These are requisition items.
13   Q   So could we go back to Claim Three for a moment,
14   please?  So with respect to this means for converting
15   data requirement, does that relate to requisition
16   items and an associated source?
17   A   No, there's no associated source.  There's only
18   one source.  There's only one vendor.  And there's no
19   different source because, once again, there's only one
20   vendor.
21   Q   So would the RIMS system satisfy that claim
22   requirement?
23   A   No.
24   Q   We saw earlier the requisitions that are actually
25   built by the RIMS system.  Did those requisitions

2699

1    contain associated source related information?
2    A   No, they did not.
3    Q   Did the RIMS system employ a catalog selection
4    protocol where the system can select a subset of a
5    collection of catalogs where the subset has a catalog
6    of a first vendor and a catalog of either a second
7    competing vendor or a manufacturer?
8    A   No, it did not.
9    Q   Why not?
10   A   There's no catalog.  And even if you were to
11   interpret the product list as being a catalog, there
12   would only be one.  So you can't select from one.
13   There's only one vendor.
14   Q   Now, with reference to this catalog selection
15   protocol, could we take a look at Claim One of the
16   '516 patent?  Is this catalog selection protocol
17   requirement relevant to Claim One of the '516 patent?
18   A   Yes.  The fourth element in the '516 patent is a
19   catalog selection protocol.
20   Q   And you said that in your opinion, the RIMS system
21   does not employ such a protocol?
22   A   There's nothing in the RIMS system anywhere in the
23   '989 patent that even approaches anything like that.
24   Q   Could we take a look at Claim 29 of the '516
25   patent?

2700

1      Is the catalog selection protocol requirement
2    relevant to Claim 29?
3    A   Yes, it is.  Once again, it's the fourth element.
4    The fourth, yeah, element.
5    Q   Now, with respect to inventory capability, could
6    the RIMS system determine the availability of a
7    selected matching item in inventory?
8    A   As I understand it, inventory refers to a third
9    party vendor's inventory.  And there's nothing in the
10   RIMS system --
11       MR. McDONALD:  Objection, Your Honor.  The
12   term "inventory" is not construed by the Court as
13   limited to third party inventory.
14       MS. ALBERT:  Can I take a look at Claim 26 of
15   the '683 patent?
16       THE COURT:  Is "inventory" a construed term?
17       MS. ALBERT:  No, it wasn't.  So I think he
18   could give his opinion from the perspective of a
19   person of ordinary skill in the art, how a person of
20   ordinary skill in the art from review of the ePlus
21   patent specification would understand the meaning of
22   that term as it's used in the claim with reference to
23   the claim as a whole.
24       MR. McDONALD:  Well, if they wanted a special
25   meaning, Your Honor, that's what they should have

2701

1    asked you to give it.  The word "inventory" has a
2    meaning.  If he wants to say what "inventory" means as
3    he would understand it or one of ordinary skill,
4    that's one thing.  But to say it's a specific party's
5    inventory, well, that's adding additional words to it,
6    and that's a whole different thing.  He shouldn't be
7    allowed do that.
8        MS. ALBERT:  Maybe I can just walk him
9    through the claim.
10       THE COURT:  Maybe that would be a better
11   approach.
12   BY MS. ALBERT:
13   Q   Now, do you see this inventory functionality
14   referenced in the last element of Claim 26?
15   A   Yes.
16   Q   Do we also see a reference to a selected matching
17   item?
18   A   Yes.
19   Q   Earlier we referred to the Court's claim term
20   glossary and its construction of "selected matching
21   item."  What was that construction?
22   A   A selected matching item is an item in a
23   requisition.
24   Q   Does that selected matching item refer back then
25   to the fourth element in the claim that relates to

2702

1    building a requisition using data relating to selected
2    matching items and their associated sources?
3    A   Yes, at this time does.
4    Q   And what are the sources that are associated with
5    those selected matching items in the requisition?
6    A   Those sources are the catalogs of vendors from
7    whom the customer -- multiple vendors from whom the
8    customer is potentially going to buy.
9    Q   Did the RIMS system have catalogs associated with
10   vendors?
11   A   No.
12   Q   Did the RIMS system build a requisition using data
13   relating to selected matching items and their
14   associated sources?
15   A   No.
16   Q   So do you have an understanding then that the
17   selected matching item relates back to the vendor
18   product catalogs if you follow back through the claim?
19   A   I think that's quite clear.
20   Q   The '989 patent does use the term "sourcing," is
21   that right?
22   A   Yes, it does.  And it defines it right in the
23   description.
24   Q   How is the reference to sourcing used in
25   connection with the '989 patent?

2703

1    A   It's used in an entirely different way than
2    sourcing is used in the patents-in-suit.  The
3    patents-in-suit are customer purchase purchasing
4    systems.  The '989 is a buyer, a selling system.
5    Sourcing is defined right in the '989 patent.
6        MR. McDONALD:  Your Honor, I object.  He's
7    referred to the RIMS patent as opposed to the
8    patent-in-suit.  I think it's already been shown the
9    RIMS patent is part of the patents-in-suit, and he's
10   using a definition from the RIMS patent as part of the
11   patents-in-suit as if it's not part of the
12   patents-in-suit.  I object to his interpretation.
13       THE COURT:  I think that's one of your
14   arguments, but I'm not sure that's been definitively
15   determined.  So I think he's entitled to say what he
16   has to say on the topic.  Objection is overruled.
17       MS. ALBERT:  Thank you, Your Honor.
18       THE COURT:  But you better start over again
19   with the question.  You still have your objection to
20   it, Mr. McDonald.
21   BY MS. ALBERT:
22   Q   How is the term "sourcing" used in connection with
23   the RIMS system described in the '989 patent?
24   A   There's a section on sourcing in the '989 patent
25   beginning on in column 11.  And the first paragraph

2704

1   shows a definition of sourcing.  Sourcing the
2   requisition is the process of determining what
3   inventory will be used to fill requisition.
4       And in the case of the '989 patent, this
5   definition of "sourcing" is different than the
6   definition of "sourcing" in the patents-in-suit, and
7   the reason it's different is because the '989 patent
8   is a seller's system and the patents-in-suit is a
9   buyer's system.  So you can't look at the word in the
10  two patents and say they mean the same thing or the
11  combination of patents-in-suit versus the '989 because
12  sourcing is clearly defined differently in the '989
13  than sourcing is used in the connotation of an
14  electronic sourcing system.
15  Q  Now, Mr. Hilliard, do you have a slide that
16  summarizes what you consider to be the major
17  differences between the RIMS system and the electronic
18  sourcing system of the asserted claims?
19  A  Yes.
20     MS. ALBERT:  Could we have slide 51 from
21  slide deck 93.
22  Q  What have you summarized here?
23  A  This is basically a summary of the characteristics
24  of the Fisher or of the RIMS system, the requisition
25  and inventory management system.  And in summarizing

2705

1   it, would you like me to go through the bullet points?
2   Q  Yes.  So does this slide set forth what you
3   consider to be the differences between the RIMS system
4   and the '989 patent and the requirements of the claims
5   of the patents-in-suit?
6   A  Yes.
7   Q  Could you briefly summarize what you consider to
8   be those distinctions?
9   A  Yes.  The patents-in-suit describe an electronic
10  sourcing system.  Sourcing being defined as
11  purchasing.  Whereas, the RIMS system is an inventory
12  management system.  There are no product catalogs in
13  the RIMS system.  And even if you were to interpret,
14  as I've said before, the product list as a catalog, it
15  would be a single catalog rather than multiple.
16     You can't select product catalogs to search
17  because at most, and I don't agree with that
18  interpretation, but at months, if you took that
19  interpretation, there would be one.
20     There's no search capability in RIMS.  RIMS has
21  strictly a product lookup by product number.  And then
22  there's no cross-reference table that links like items
23  from multiple vendors because in RIMS there's only one
24  vendor.  And there's no means of processing a
25  requisition to generate one or more purchase orders

2706

1   for the selected matching items because there are no
2   selected matching items for all the preceding reasons.
3   Q  Now, let's turn to the TV/2 search program.
4   A  Okay.
5   Q  Does Lawson contend that the TV/2 search program
6   fully anticipates any of the patent claims?
7   A  I don't believe so, no.
8   Q  Did the inventors disclose brochures relating to
9   the TV/2 search program to the Patent Office for
10  consideration during the prosecution of the
11  application which led to the patents-in-suit?
12  A  Yes.
13  Q  Can we confirm that by looking at one of the
14  patents?  Let's take a look at PX 1 on the cover page
15  under "other publications."  Do you see some
16  documentation relating to the TV/2 search program
17  there?
18  A  Yes, there's the item referred to as a general
19  information manual, which does have a date, and then
20  there's an item referred to as a product information
21  brochure.
22     When I used to work for computer companies, that's
23  what we called a product slick or a product brief, and
24  that one is undated.
25  Q  Let's take a look, if we could, at the general

2707

1   information manual that was disclosed to the Patent
2   Office.  I think that's DX 105.
3       Did you review this IBM general information
4   manual?
5   A  Yes, I did.
6   Q  Does it provide a sufficient description of the
7   TV/2 search program such as a person of ordinary skill
8   in the art would be able to make and use that search
9   program?
10  A  No, it's only about six or seven pages long.
11  Eight, I believe, including a blank page.  And it
12  doesn't have any detail in it at all.  Although it's
13  referred to as a manual, it's really more of a
14  brochure.  There's no descriptive information that
15  would allow someone who was looking at it to
16  understand how the TV/2 system was built or works.
17  Nothing that would enable one of ordinary skill in the
18  art to create a similar product or even to use this
19  product if they had it.  There's no technical detail
20  whatsoever.
21  Q  Did you review any deposition testimony of the IBM
22  witnesses concerning the level of technical detail
23  contained in this general information manual?
24  A  I did.
25  Q  Who testified about that?

2708

1   A  I believe both Mr. Gounaris and Ms. Eng testified
2   that it really was more of a marketing --
3        MR. McDONALD:  Objection, Your Honor.  I
4   don't think he should be characterizing people's
5   testimonial.
6        MS. ALBERT:  This was in the deposition
7   testimony that he reviewed to form the basis of his
8   opinions.
9        THE COURT:  Well, then I think you need to
10  make that clear.  He can consider these things as the
11  basis of his opinion, but Mr. Gounaris and Ms. Eng
12  testified at trial, and what Mr. McDonald is pointing
13  out is that it sounds like he's saying what they
14  testified to at trial.  And whatever they said at
15  trial, they said, and the jury will remember, but if
16  there's literature that he considered in forming his
17  opinion that's of the type that an expert ordinarily
18  considers, which all of you have used the depositions
19  to do in this case, then he can say that he relied on
20  that in reaching his judgment.  Do you see the
21  difference?
22        MS. ALBERT:  Yes.  I believe my original
23  question was directed specifically to the deposition
24  testimony and not to any trial testimony.
25        THE COURT:  It may have been.

2709

1   BY MS. ALBERT:
2   Q  Did you --
3        THE COURT:  So the objection is overruled,
4   but just in order that you'll straighten out that
5   which Mr. McDonald and I messed up, will you do it
6   over again?  Maybe I'll just take the blame.  It
7   wasn't him.
8   BY MS. ALBERT:
9   Q  Did you review any deposition testimony from any
10  IBM witnesses in formulating your opinions with
11  respect to the teachings of the IBM documentation?
12  A  I did.
13  Q  Is that deposition testimony the type that an
14  expert would reasonably rely upon in formulating
15  opinions as far as teachings of alleged prior art
16  documentation?
17  A  Well, it's something that I would consider and be
18  part of what I would rely on.  I also, since I develop
19  documentation of this type, I would also rely on my
20  own knowledge of this type of documentation, but
21  certainly I considered that, and I considered it to be
22  important, and I found that it concurred -- that their
23  characterization of it concurred with my own judgment,
24  that this was not a technical document or nothing that
25  would give enough detail that would be enabling to one

2710

1   of ordinary skill in the art.
2   Q  Let's take a look at the other IBM document that
3   the inventors disclosed to the Patent Office.  Could
4   we take a look at DX 107.
5       Did you review this IBM TV/2 brochure in
6   formulating your opinions?
7   A  Yes.  I did.
8   Q  Does this TV/2 brochure provide sufficient
9   description of the TV/2 search program such that a
10  person of ordinary skill in the art would be able to
11  make and use that search program?
12  A  No.  This is, as I stated in my deposition and in
13  my report, this is basically a marketing piece that
14  has bullet points that are largely puff or appear to
15  be largely puff and really provide no technical detail
16  and certainly don't provide any information that would
17  allow one of ordinary skill to make or use a technical
18  viewer or a search product like TV/2 purports to be.
19  Q  What type of documentation would a person of
20  ordinary skill in the art need to make a system that
21  would implement the TV/2 search program?
22  A  A technical design manual, a user's manual,
23  perhaps product coding, listings of the code, and
24  technical manuals, basically, is what it would take
25  for one of ordinary skill in the art and neither of

2711

1   these items fit that characterization.
2   Q  Have you reviewed any evidence that would
3   substantiate whether or not IBM had ever had a
4   commercial version of the TV/2 search program prior to
5   IBM's work with the inventors on the electronic
6   sourcing system project?
7   A  There was no evidence at all to that effect.
8   Q  Now, can you describe at a high level the nature
9   of this Technical Viewer/2 search program?
10  A  Yes.  It's a piece of software that allows the
11  user or buyer to search through electronic information
12  to find information that's included in that electronic
13  document and to view the items that were found as a
14  result of the search.
15  Q  Was TV/2 an electronic sourcing system?
16  A  No.
17  Q  Why not?
18  A  It doesn't have any of the characteristics of an
19  electronic sourcing system.  There's no -- well, can
20  we put up the construction?
21  Q  Well, sure.
22        MS. ALBERT:  Can we look at the glossary of
23  claim terms.  Blow up that middle one, electronic
24  sourcing system.
25  Q  So what characteristics are missing from the TV/2

2712

1   program that are required in order to constitute an
2   electronic sourcing system?
3   A  An ability to complete the process described in
4   that description.  You can find items, but there is no
5   purchasing capability from sources, suppliers or
6   vendors.  There's nothing relating to sources,
7   suppliers or vendors at all in the TV/2 system.
8   Q  Did the TV/2 program prior to 1994 include any
9   product catalogs in its database?
10  A  No, it didn't come with a database.
11  Q  Did TV/2 prior to August of 1994 have multiple
12  product catalogs?
13  A  No.
14  Q  Was there any capability using TV/2 to search for
15  items and build a requisition using those search
16  results?
17  A  No, there's no requisition logic in TV/2 at all.
18  It's simply a search and display engine.
19  Q  Could we take a look at DX 107, and the Bates
20  number on the page I would like to refer you to is
21  G33.
22      MS. ALBERT:  Could we blow up the left-hand
23  column there?
24  Q  Under some of the possibilities, we see some
25  potential uses include -- and about three bullet

2713

1   points down there's a reference to integrating parts
2   catalogs with dealers' computer systems such as order
3   entry, inventory management and customer records.
4   Does that describe how to use search results to build
5   a parts list which could be sent to a parts ordering
6   system?
7   A  No, it just says this is a possibility and a
8   potential use.  It doesn't say that the TV/2 system
9   has this capability, and, in fact, it didn't have that
10  capability.
11  Q  Do you have a slide illustrating the deficiencies
12  of the TV/2 program as related to the requirements of
13  the ePlus patent claims?
14  A  Yes.
15      MS. ALBERT:  Could we take a look at slide 75
16  in slide deck 93?
17  Q  Could you summarize your analysis of the
18  deficiencies of the TV/2 program as applied to the
19  claims?
20  A  Yes.  It's not a corresponding system as we have
21  just discussed.  It's simply a search program.  It
22  does not have multiple product catalogs.  It doesn't
23  even have one product catalog.  It has no requisition
24  capability and no ability to generate purchase orders.
25  Q  Now, was TV/2 modified in order to be integrated

2714

1   into the electronic sourcing system of
2   Fisher-Scientific?
3   A  Yes.  Fisher engaged IBM to undertake a project to
4   modify TV/2 to work with software Fisher was
5   developing that ultimately became something called
6   Supplylink or Cornerstone.  And that involved
7   significant modifications to TV/2, which both
8   Mr. Gounaris and Ms. Eng described in their deposition
9   testimony and in their trial testimony in the SAP
10  trial.
11  Q  Now, I would like to turn to your opinions with
12  respect to each of the asserted claims and Lawson's
13  contentions regarding the RIMS system as disclosed in
14  the '989 patent and the combination of the RIMS system
15  in the '989 patent and the TV/2 search engine.
16      Have you prepared some slides -- well, have you
17  prepared a slide that summarizes some of your opinions
18  with respect to the combination of the RIMS and TV/2
19  systems?
20  A  Yes.
21  Q  Will you take a look at slide 107 in slide deck
22  93?  So can you summarize your opinions with regard to
23  the deficiencies in the combination of the RIMS and
24  TV/2 programs as related to the requirements of the
25  patent claims?

2715

1   A  Yes, I've tried to take requirements -- in most
2   cases, these requirements relate to multiple claims,
3   but neither system was an electronic sourcing system.
4   Neither system had multiple product catalogs.  In
5   fact, it would be my opinion that neither system had
6   even a single product catalog.
7       Neither system had a means for selecting product
8   catalogs to search.  Neither system had a means for
9   generating an order list that includes at least one
10  matching item selected by said means for searching
11  since there was no means for searching product
12  catalogs.
13      Neither system built requisitions using data
14  related to selected matching items and their
15  associated sources.
16      Neither system generated purchase orders from the
17  requisitions that used selected matching items and
18  their associated sources.
19      Neither system had the ability to determine
20  whether a selected matching item was available in the
21  inventory of the catalog vendor from whom the buyer
22  wanted to purchase.
23      Neither system had the capability to convert data
24  relating to a selected matching item from one source
25  to a comparable or equivalent selected matching item

2716

1    and a different source since the TV/2 system had no
2    sources at all, and the only source in the RIMS system
3    was Fisher itself.
4       Q  Now, you mentioned these modifications that were
5    made during the electronic sourcing system project.
6    What modifications do you understand had to be made to
7    the prior RIMS system as it existed prior to the work
8    on this electronic sourcing system project to render
9    it useful and to have the functionality required by
10   the electronic sourcing system of the patent?
11      A  Well, I've relied on the deposition testimony of
12   the inventors who were involved in the project.  And
13   the description that they gave of what had to be done
14   I wouldn't even call modifications.
15      They, essentially, tore the RIMS system limb from
16   limb and reused some code, but, essentially, it was a
17   whole new development.  They had to develop -- since
18   the RIMS system was a seller oriented system --
19      MR. McDONALD:  I object.  I think we're very
20   vague here as to the timing of whether any of these
21   changes even relate to the claims in the case.  I
22   think it's irrelevant.
23      MS. ALBERT:  I think my question specifically
24   said the RIMS system as it existed prior to the
25   inventors' work on the electronic sourcing system of

2717

1    the patented inventions, and I tied it to the
2    modifications that had to be made in order to meet the
3    requirements of the patent claims.
4       MR. McDONALD:  He's talking about changing
5    code, and I don't know what time his answer related
6    to.  I couldn't tell whether he said the code was
7    changing.  So I think maybe it's the answer I'm
8    objecting to more than the question.
9       THE COURT:  The question is specific as to
10   time.  It started with the process and it existed
11   before the combining process occurred in the project
12   of IBM.  Is that what your timing was?
13      MS. ALBERT:  That's what my timing was.
14      THE COURT:  Is that what you're answer is?
15      THE WITNESS:  I believe --
16      THE COURT:  It was when the project started
17   and they made a lot of modifications to it.  Is that
18   what you're saying?  In fact, you said it wasn't even
19   modifications.  They took what was there at that time
20   and tore it limb from limb or something like that.
21      THE WITNESS:  Well, it's what I would
22   characterize tearing it limb from limb, Your Honor.
23      THE COURT:  What?
24      THE WITNESS:  I would characterize it as
25   tearing it limb from limb.  It's virtually a new

2718

1    product development rather than a modification in my
2    view, Your Honor, and I can explain why.
3       THE COURT:  But "it's" in that sentence means
4    what came out of the project?
5       THE WITNESS:  That's correct.
6    BY MS. ALBERT:
7       Q  So what modifications had to be made to the RIMS
8    system as it existed prior to that project in order
9    to come up with the electronic sourcing system of the
10   patented inventions?
11      A  There are a raft of them.  First of all, the RIMS
12   system, because it was a seller's system, was oriented
13   toward use by the Fisher CSR.  They had to put on a
14   user interface that was oriented to a customer's use
15   because the system that they were trying to build was
16   an electronic sourcing system for use by a buyer.  So
17   it's a whole new user interface.
18      Secondly, they had to do an interface to the
19   search engine.  They choose TV/2.  And that was a very
20   significant interface.
21      They had to change the database.  They had to make
22   a wholesale change in the database because previously
23   the database was a database of items.
24      MR. McDONALD:  Your Honor, I don't know what
25   he's talking about here because a type of database

2719

1    isn't specified in any of the claims.  For the witness
2    to be talking about changes in the database type is
3    not related to the patented invention, which is what
4    the question was about.
5       MS. ALBERT:  Well, I think if you would have
6    allowed Mr. Hilliard to continue, he would have tied
7    it to the claim limitations, the changes in the
8    database.
9    BY MS. ALBERT:
10      Q  Were they specific changes made in the databases
11   of the RIMS system as it existed prior to the
12   inventors' work on the electronic sourcing system
13   project that are specifically tied to some of the
14   claim limitations at issue here?
15      A  Yes.
16      Q  What changes were those?
17      A  The RIMS system was oriented for keeping inventory
18   of Fisher inventory and customer-owned inventory.  The
19   database that was required for the electronic sourcing
20   system was a catalog database of multiple catalogs
21   with the items in the multiple catalogs associated
22   with multiple vendors.  So that, according to the
23   inventors, was a major change to the database.  A
24   wholesale change to the database.  And it was done
25   specifically to satisfy the need to access multiple

2720

1    catalogs associated with items associated with
2    vendors.
3    Q   Do you know if there are any changes made to the
4    requisitions databases of the RIMS system as it
5    existed prior to the electronic sourcing system
6    project in order to accommodate the need to have
7    requisitions having line items with associated source
8    information?
9    A   Yes, absolutely.  The inventors say, and it's
10   clear from just the difference in functionality, that
11   they had to interface to the TV/2 system to get the
12   items that the TV/2 system found as a result of the
13   search, the matching items, and then to put them into
14   a requisition where previously the requisition was for
15   only one source, now the requisition had to be for
16   multiple sources because the search algorithm
17   searching the catalogs was going to turn up items from
18   multiple sources.
19       So they had to do that interface and then change
20   the requisition to have multiple sources.  They then
21   had to change the system or add the capability of
22   generating multiple purchase orders from the
23   requisition, and they had -- which wasn't in there
24   before.  They had to add the conversion capability to
25   be able to convert the items from one vendor to

2721

1    comparable items from another vendor.  And they had to
2    add the inventory checking to check the vendor's
3    inventory for the inventory of the items that were the
4    result of the selected catalog searches being catalogs
5    of third-party vendors.
6        So with all of those modifications and additions,
7    according to the inventors, they were able to reuse
8    some of the existing RIMS code, but a change of that
9    magnitude, any computer professional will tell you
10   that that's a rewrite.
11   Q   Now, were any changes necessary to the TV/2
12   program as it existed prior to IBM's work on the
13   Fisher-Scientific project in order to render it
14   capable of performing the functions required for the
15   electronic sourcing system of the claimed inventions?
16   A   Yes, according to the deposition testimony of
17   Mr. Gounaris and Ms. Eng, IBM took over a year and
18   devoted at least ten people to a project to do
19   modifications that included interfacing two ways to
20   the sourcing system.  To receive information from the
21   sourcing system and to after doing the search to be
22   able to feed back the information to the sourcing
23   system, they had to change the search algorithms so it
24   could search sections of the database.
25       Let me give you an example.  If, for insurance,

2722

1    the vendor was Radio Shack and you were looking for an
2    FM radio.  The way the TV/2 system worked, it would
3    turn up all references to Radio Shack because the term
4    "radio" appears as part of the vendor name.  So they
5    had to be able to do the tagging so that they could
6    search just the product descriptions and find radio
7    there rather than finding all instances of radio in
8    the electronic catalog.
9        And then they had to create the order list that
10   would then be fed back to the sourcing system, the
11   electronic sourcing team.
12   Q   Do you have some slides that illustrate your
13   opinions with respect to each specific claim as they
14   relate to Lawson's contentions concerning the RIMS and
15   TV/2 systems?
16   A   Yes, I do.
17       MS. ALBERT:  Could we have slide 1 in slide
18   deck 256, please?
19   Q   Now, do you have an opinion, Mr. Hilliard, as to
20   whether or not the RIMS system as described in the
21   '989 patent anticipates Claim Three of the '683
22   patent?
23   A   Yes, it does not.
24   Q   Why not?
25   A   It fails the basic description of Claim Three of

2723

1    being an electronic sourcing system as we've
2    discussed.  It's for use by a seller, not by a buyer,
3    for example.  And then every single element of that
4    claim it fails.  It doesn't have two product catalogs.
5    It has no means of searching the product catalogs it
6    doesn't have.  It has no means of -- pardon me.  It
7    has no means of selecting from the product catalogs it
8    doesn't have.
9        It has no means of searching from the product
10   catalogs it couldn't select.  It has no means of
11   building a requisition coming from the selected
12   catalogs -- from the search of the selected catalogs
13   because it can't select catalogs and search them.
14       It has no means for processing the requisition to
15   generate one or more purchase orders for the selected
16   matching items.  It couldn't generate multiple
17   purchase orders.  And it had no means of converting an
18   item from one vendor to items from another vendor
19   because it only referred to the one vendor, that being
20   Fisher.
21   Q   Do you have an opinion as to whether or not the
22   combination of the RIMS system as described in the
23   '989 patent in combination with the TV/2 program
24   renders Claim Three obvious?
25   A   Yes, I do.

2724

1  Q  What is your opinion?

2  A  It doesn't.

3  Q  Why not?

4  A  Basically, TV/2 doesn't bring anything to the

5  table as described in the brochures and RIMS as

6  described in the '989.  As we saw, in order to produce

7  an electronic sourcing system, you had to take the

8  RIMS as described in the '989 patent and tear it limb

9  from limb, virtually rewrite it.  And then TV/2

10  doesn't -- so if you took RIMS as it was and just

11  added TV/2 to it, it really doesn't bring anything to

12  the party.  Neither one is an electronic sourcing

13  system.

14      Neither one has two product catalogs.  Neither one

15  has a means of selecting from the two product

16  catalogs.  Neither one has a means of searching for

17  selected matching items among the selected product

18  catalogs, and so on.

19      I'm repeating myself, but basically the addition

20  of TV/2 to the RIMS system as described in the '989

21  patent brings nothing new to the table.  The addition

22  is no better than the RIMS system alone.

23  Q  Let's turn to your opinions with respect to claim

24  26 of the '683 patent.  Can we have slide 2?

25      Do you have an opinion as to whether or not the

2725

1  RIMS system as described in the '989 patent

2  anticipates that claim?

3  A  It doesn't.

4  Q  Why not?

5  A  Let's look at the RIMS system as described in the

6  '989 patent first.  It didn't have two product

7  catalogs, so there was no means of maintaining two

8  product catalogs.  Because there weren't multiple

9  product catalogs, you couldn't select product catalogs

10  to search.  There's no search for matching items.

11  There's no building of a requisition from the items

12  found as a result of searching the selected catalogs

13  because there's no searching, and there's no selected

14  catalogs.

15      And there's no processing of the requisition to

16  generate one or more purchase orders for the selected

17  matching items because the RIMS system as described in

18  the '989 patent couldn't do multiple purchase orders

19  to multiple vendors.  And there's no way -- there's no

20  capability in the RIMS system, that's something that

21  had to be added to the RIMS system as described in the

22  '989 patent, to give it the ability to search the

23  inventory of the items found as a result of the search

24  of the matching items in the catalog because, of the

25  selected catalog, because there aren't selected

2726

1  catalogs to search.

2      So it fails on all of the elements of the Claim 26

3  method claim.

4  Q  Do you have an opinion as to whether or not the

5  combination of the RIMS and TV/2 systems would have

6  rendered Claim 26 obvious?

7  A  Yes.  It doesn't.

8  Q  Why not?

9  A  Once again, TV/2 doesn't bring anything to the

10  table when what we're talking about is bringing it to

11  the RIMS system as described in the '989 patent.  The

12  search capability, it can't search matching items from

13  selected catalogs because there are no catalogs and no

14  selected catalogs.  There certainly aren't multiple

15  catalogs to select from.

16      So just having the search and viewing capability

17  that's inherent or claimed to be inherent in TV/2

18  doesn't add anything to the capability of a

19  combination to meet any of the elements in this claim.

20  Q  Let's turn to Claim 28 of the '683 patent.  Now,

21  this claim, the first five elements are the same as

22  the first five elements of Claim 26; is that right?

23  A  That's correct.

24  Q  So let's focus on converting data relating to a

25  selected matching item and an associated source to

2727

1  data relating to an item in a different source.  Let

2  me step back.

3      Is your opinion with respect to the first five

4  elements of Claim 28, would that be the same as your

5  opinion with respect to the first five elements of

6  Claim 26 with respect to whether or not the RIMS

7  system as described in the '989 patent would

8  anticipate those claim requirements?

9  A  Yes.

10  Q  What's your opinion?

11  A  My opinion is the same.  Those first five

12  elements, the RIMS system as described in the '989,

13  doesn't meet any of those first five elements.

14  Q  So turning to the last element of that claim, does

15  the RIMS system as described in the '989 patent

16  satisfy that claim element?

17  A  The keywords are different source.  There is no

18  different source in the RIMS system.  There's only one

19  source that the customer can buy from, and that's

20  Fisher.  So it fails to meet that element as well.

21  Q  What about the combination of RIMS and TV/2?  Does

22  that combination render Claim 28 obvious?

23  A  No.  TV/2 doesn't add anything to any of the

24  elements.

25  Q  Let's turn to Claim 29 of the '683 patent.  Are

2728

1  the first six elements of Claim 29 the same as the
2  elements of Claim 28?
3  A  Yes.  And the last element is the same as the last
4  element in Claim 26.  29 is basically a combination of
5  26 and 28.  So it doesn't meet 26, it doesn't meet 28,
6  and it doesn't meet 29.
7  Q  What about the combination of the RIMS and TV/2
8  systems?  Would that combination have rendered Claim
9  29 obvious?
10  A  No.
11  Q  Let's turn to the claims of the '516 patent.  Do
12  you have an opinion as to whether or not the RIMS
13  system as described in the '989 patent anticipates
14  Claim One of the '516 patent?
15  A  It does not.
16  Q  Why not?
17  A  Well, first of all, the RIMS system is not an
18  electronic sourcing system, as I've said before.  It's
19  a seller's system, not a buyer's system, among other
20  things.  There's no collection of catalogs in the RIMS
21  system.  There's no predetermined criteria associated
22  with the selection of catalogs since there's no
23  selection of catalogs.
24     There's no second criteria in the RIMS system for
25  items.  The RIMS system allows just a parts lookup

2729

1  by -- not even -- a part lookup by part number.  It's
2  not a search based on a criteria.  There's no catalog
3  selection protocol by this description or any other
4  because there aren't catalogs to select from.  And
5  there's no search program relying on the selection
6  criteria because it doesn't have the ability to have
7  those selection criteria for searching, and there's no
8  search algorithm.
9  Q  What about the combination of the RIMS and TV/2
10  systems, would that combination render Claim One
11  obvious?
12  A  No.  TV/2 fails all the same elements.  It has
13  no -- it's not a sourcing system.  There's no
14  collection of catalogs.  There are no criteria built
15  into it.  There's no catalog selection protocol.  It
16  does have a search program, but the search program as
17  the TV/2 system is described in these two brochures
18  doesn't do this search relying on a second set of
19  criteria to select specific items from a catalog
20  selection using a catalog selection protocol it
21  doesn't have.
22  Q  Let's turn to Claim Two of the '516 patent.  And
23  all the elements are the same in Claim Two as Claim
24  One with the exception of the last element; is that
25  correct?

2730

1  A  That's correct.
2  Q  And so would your opinion with regard to those
3  first six elements of Claim Two be the same for Claim
4  Two as for Claim One with respect to whether or not
5  the RIMS system as described in the '989 patent
6  anticipates those claim requirements?
7  A  Yes.  My opinion with regard to those elements is
8  the same.
9  Q  What about with respect to this last element,
10  catalogs comprising stored collection of catalogs are
11  stored in separate databases, does the RIMS system as
12  describe in the '989 patent satisfy that claim
13  requirement?
14  A  No, the RIMS system doesn't have multiple
15  catalogs.  So regardless of how many databases it has,
16  it doesn't store separate catalogs in separate
17  databases.
18  Q  What about the combination of RIMS and TV/2, would
19  that combination render the claim obvious?
20  A  It wouldn't in the case of the first six elements
21  for the same reason as for Claim One, and there are no
22  catalogs or separate databases in the TV/2 system
23  either.
24  Q  Now, let's refer to Claim Six of the '516 patent.
25  The first six elements of Claim Six are the same as

2731

1  the elements of Claim One; is that correct?
2  A  Yes.
3  Q  So would your opinion with regard to those
4  elements be the same for Claim Six as it was for Claim
5  One with respect to the issue of whether or not the
6  RIMS system as described in the '989 patent satisfies
7  those claim requirements?
8  A  Yes.
9  Q  And what is your opinion?
10  A  It doesn't.
11  Q  Then with regard to the last element of Claim Six,
12  said second set of predetermined criteria include at
13  least one of a catalog number and item textual
14  information.  Does the RIMS system as described in the
15  '989 patent satisfy that requirement?
16  A  There's no catalog number and there's no -- it has
17  textual information, but it can't use that textual
18  information as criteria.  So no, it doesn't.  It
19  doesn't satisfy that element either.
20  Q  Would the combination of the RIMS and TV/2 systems
21  rendered Claim Six obvious?
22  A  No, once again, TV/2 brings nothing to the party
23  here.  It doesn't add anything to the failure of the
24  RIMS system to meet the elements.
25  Q  Let's turn to Claim 9 of the '516 patent.  In your

2732

1   opinion, does the RIMS system as described in the '989
2   patent satisfy all of the requirements of Claim 9?
3   A   No.
4   Q   Why not?
5   A   It's not an electronic sourcing system because,
6   among other things, it's used by the seller, not the
7   buyer.  There's no collection of catalog items where
8   catalog items have to be associated with vendors
9   stored in electronic format.  So there's not an
10  identifiable -- an identification code associated with
11  an item in the first catalog since there's no first
12  catalog.  And there's no identification code for an
13  item in the second catalog for the same reason.
14      There's only one vendor, so there's no ability to
15  select an identification code of the first and second
16  catalogs because there aren't first and second
17  catalogs where one provides the other or one leads to
18  the other.  It doesn't do that.
19  Q   Does the combination of the RIMS and TV/2 system
20  render Claim 9 obvious?
21  A   No, TV/2 doesn't add anything here either.  The
22  search and display capability of TV/2 as described in
23  the two publications doesn't relate to any of these
24  elements.
25  Q   Can you turn to Claim 21 of the '516 patent?

2733

1       In your opinion, does the RIMS system as described
2   in the '989 patent satisfy all the requirements of
3   Claim 21?
4   A   No.
5   Q   Why not?
6   A   Well, as we've discussed or as I've pointed out,
7   it's not an electronic sourcing system.  It does have
8   a requisition module, which includes data fields.  And
9   user generated -- if the user generated criteria is a
10  part number, and only if the user generated criteria
11  is a part number, then it could satisfy the second
12  item here, which is actually the first limitation, the
13  first element, because electronic sourcing system is
14  sort of the caption for the whole thing.
15      So I've given that the benefit of the doubt since
16  the criteria conceivably could be a part number.  But
17  there's no catalog collection searching module.
18  There's no catalog selection criteria to select less
19  than the entire collection of catalogs because there's
20  no collection of catalogs.  There's no multiple
21  purchase order generation.  There's no equivalent
22  items from one catalog to another catalog.
23      There's no general equivalency from one catalog to
24  another because there aren't multiple catalogs.  And
25  there's no determination of a cross-reference table

2734

1   that would provide an equivalency of an item in one
2   catalog to a second identification code in a second
3   located item in the other.  It fails that one as well.
4   Q   For purposes of your anticipation analysis, would
5   you have to find that the RIMS system satisfied each
6   and every one of the claim requirements in order to
7   find that claim anticipated by that prior art system?
8   A   That's my understanding.  If any one element of a
9   claim is missing, then there's no -- then the system
10  that's claimed to anticipate it doesn't.  In order to
11  anticipate a claim, a prior art system must anticipate
12  every element of the claim.
13      So the fact that in this case the RIMS system
14  arguably if you called the product number a user
15  generated criteria satisfies one element of the claim,
16  even with that the RIMS system doesn't satisfy all the
17  elements of the claim, and, therefore, the RIMS system
18  doesn't anticipate the claim.
19  Q   For purposes of your opinions with respect to
20  obviousness, would you have had to find that the
21  combination of the RIMS and TV/2 system satisfied each
22  and every requirement of the claim in order to render
23  an opinion that that claim was obvious based upon that
24  combination?
25  A   Yes.  The RIMS system as described in the '989

2735

1   patent and the TV/2 system as described in the two
2   brochures, assuming those brochures are accurate,
3   which is also something we don't know.
4   Q   What is your opinion with respect to whether or
5   not the combination of the RIMS system as described in
6   the '989 patent and the TV/2 system as described in
7   the two brochures renders Claim 21 obvious?
8   A   Instead of anticipating every element of that
9   claim, it at most anticipates one element.  And since
10  that's all that it arguably anticipates, even in the
11  combination, the combination doesn't anticipate the
12  claim.
13  Q   Let's look at Claim 22, if we could.  And that
14  claim has all of the same elements as Claim 21 but
15  adds an additional element at the end, said
16  determination system includes an identical
17  identification code for each of said located items.
18  Does the RIMS system as described in the '989 patent
19  satisfy that claim requirement?
20  A   Well, since there's no determination system from
21  the prior element, as I've discussed, then there's no
22  -- the determination system can't include something.
23  So, no, it doesn't satisfy that final element either.
24  Q   So what is your opinion with respect to whether or
25  not the RIMS system anticipates Claim 22?

2736

1    A  It doesn't.

2    Q  Would the addition of TV/2 to the RIMS system cure

3    the deficiencies of the RIMS systems with respect to

4    Claim 22?

5    A  No.  TV/2 as described in the two brochures, even

6    if it performs as described there, adds nothing.

7    Q  So what is your opinion as to whether or not the

8    combination of RIMS and TV/2 renders Claim 22 obvious?

9    A  It does not.

10   Q  Let's turn, if we could, to Claim 29.  Do you have

11   an opinion as to whether or not the RIMS system as

12   described in the '989 patent fully satisfies all of

13   the requirements of Claim 29?

14   A  It doesn't.  I have an opinion and it doesn't.

15   Q  Why not?

16   A  It doesn't satisfy any of the elements of Claim

17   29.  RIMS is not an electronic sourcing system.

18   There's no collection of catalogs.  There's no

19   predetermined criteria associated with the collection

20   of catalogs.  There's no second set of predetermined

21   criteria associated with the items in the catalogs

22   because there aren't catalogs.  There's no catalog

23   selection protocol in this description or any other.

24   And then there's no search program relying on the

25   criteria because there aren't the criteria in the

2737

1    cross-reference table.  Since there's only one vendor,

2    there's no cross reference that provides the ability

3    to link a vendor catalog item with another catalog

4    item from a different vendor or different

5    predetermined third party.

6    Q  Would the addition of TV/2 to the RIMS system cure

7    the deficiencies of the RIMS system with respect to

8    Claim 29?

9    A  No.

10   Q  And so do you have an opinion as to whether or not

11   the combination of the RIMS and TV/2 systems renders

12   Claim 29 obvious?

13   A  It doesn't.

14   Q  Let's look now at the final claim, Claim One of

15   the '172 patent.  With reference to the '172 patent,

16   in your opinion, does the RIMS system satisfy all of

17   the requirements of Claim One of the '172 patent?

18   A  No, it doesn't satisfy any of them.

19   Q  Why not?

20   A  It's not an electronic sourcing system.  Now, this

21   is the claim that doesn't refer to catalogs.  It just

22   refers to a database.  But the database in the RIMS

23   system is not a database containing items associated

24   with at least two vendors because the RIMS system only

25   has one vendor and that's Fisher.  It doesn't have a

2738

1    search capability of any sort because it only has the

2    parts number lookup.

3        It doesn't have a means of entering product

4    information that at least partially describes one

5    desired item.  All that can be entered is a product

6    number, and a product number doesn't describe an item.

7        It doesn't have a means for searching for matching

8    items that match the entered product information.

9    There's no means for searching whatsoever.

10       It doesn't have a means for generating an order

11   list that includes at least one matching item.

12   Selected to said means of searching, there's no said

13   means of searching.

14       There's no means of building a requisition that

15   uses the data obtained from the database related to

16   the selection of selected matching items on the order

17   list for all the reasons above.  And there's no means

18   for processing the requisition to generate purchase

19   orders for the matching items.

20       So it fails all the criteria.  There are no

21   matching items.  So even if it were to generate

22   purchase orders, which it doesn't, it wouldn't do it

23   in this case.

24   Q  Does the combination of RIMS and TV/2 render Claim

25   One of the '172 patent obvious?

2739

1    A  In order to render Claim One of the '172 patent

2    obvious, it would have to satisfy all of the elements

3    of the '172, Claim One.  And because there are no

4    catalogs in this case, conceivably in this case TV/2

5    does bring something to the party.  It does bring the

6    ability to support portions of the database

7    separately.

8        It does bring a means for entering product

9    information that partially describes an item.  You can

10   put a description in, and it can search on the

11   description.

12       And it does provides a means for searching for

13   matching items that match the product information.  So

14   it does in fact, the combination, satisfy three of the

15   elements, but it doesn't bring anything to the

16   combination with regard to satisfying the other

17   elements.

18       So in order for the combination to anticipate the

19   claim, we'd have to have a checkmark on every single

20   one of these, not just three of them, which we don't.

21   Q  Mr. Hilliard, did you also consider other evidence

22   that would show that the patented inventions were

23   innovative?

24   A  Yes.

25   Q  What other evidence did you consider in forming

2740

1   your opinions?

2   A   Well, I considered the fact that it was considered

3   to be an innovative invention by the industry.  There

4   was an industry research and evaluation group known as

5   the Aberdeen Group that ranked it very high.  And then

6   the Internet and Electronic Commerce Conference, which

7   is an industry organization that provides awards, gave

8   it an award shortly after it was developed as a

9   Supplylink or Cornerstone product, that it was above

10  the capabilities of comparable -- of other systems

11  that attempt to do the same thing.  And also it's been

12  licensed by other vendors.

13       So all of those put together are really sort of

14  additional indications that it's an innovative

15  invention.

16       MS. ALBERT:  Thank you, Mr. Hilliard.  I have

17  no furthest questions.

18       THE COURT:  I think Mr. McDonald may have

19  more than five mints or so.  So I think it will be a

20  good time to take the afternoon recess.

21       Just take your books with you if you would,

22  please.

23       (The jury is exiting the courtroom.)

24       THE COURT:  How long do you think you're

25  going to take?

2741

1        MR. McDONALD:  About an hour, Your Honor.

2        THE COURT:  And your redirect will be very

3   brief?

4        MS. ALBERT:  Yes, Your Honor.

5        THE COURT:  All right.  We'll take a

6   20-minutes recess.

7        Excuse me.  I have been gifted with a

8   temporary restraining order application, and in order

9   that I can tell those people when I can hear them, I

10  need to understand a little bit about how long you

11  think we'll take tomorrow with the arguments.

12       I'm going to give you first priority.  I

13  think I may give them first priority if they are not

14  going to be very long, but I thought I'd find out from

15  you-all first since you have been here longest.

16       What is your estimate of the arguments on the

17  motions for JMOL?

18       MR. McDONALD:  Can you give us a moment to

19  talk amongst ourselves, so to speak, and I could talk

20  with Mr. Robertson, so we can figure that out?

21       MR. ROBERTSON:  I didn't hear the last

22  question you asked?

23       THE COURT:  The length of the arguments on

24  the JMOL.  Does anybody really think I can grant a

25  JMOL in this case?

2742

1        MR. ROBERTSON:  Hope springs eternal, Your

2   Honor.

3        THE COURT:  I know it springs eternal, but

4   sometimes reality has got to grab a hold of the back

5   of your neck and shake it.

6        MR. ROBERTSON:  Let me just suggest, Your

7   Honor, I think there are some issues that have now

8   fallen by the wayside.

9        THE COURT:  Yes, I think there are.  There's

10  no question about it.

11       MR. ROBERTSON:  I think it can be granted in

12  part and denied in part.  And we think we can make

13  some headway.  My suggestion would be, we have have

14  two, it would be 45 minutes each.  So that's an hour

15  and a half total.

16       MR. McDONALD:  I don't think it should be

17  more than that.  It may be a little less that that,

18  that part of it.

19       Jury instructions, I guess, an hour and a

20  half.

21       THE COURT:  Have you all looked at the jury

22  instructions?

23       MR. ROBERTSON:  Yes, we have, Your Honor.

24       THE COURT:  Are we far off the mark?

25       MR. McDONALD:  I think we maybe can count on

2743

1   one hand the number of issues we might have to

2   resolve.  Five.

3        THE COURT:  Depending on the number of

4   fingers.

5        MR. McDONALD:  Five.  I'll be specific.

6        MR. ROBERTSON:  I think we're down to five or

7   so.

8        THE COURT:  All right.  I'll decide how to

9   approach then.  You-all probably wouldn't object to a

10  little sleeping in time tomorrow, would you?

11       MR. ROBERTSON:  Not at all, Your Honor.

12       THE COURT:  All right.  Thank you.

13       (Recess taken.)

14

15

16

17

18

19

20

21

22

23

24

25

2748

```
1    Not in the way that's described in the patents-in-suit.
2    Q    You are adding a little more to my question.
3    A    I'm sorry.  I was intending to qualify that with a further
4    explanation.
5    Q    I'm just asking, did your work in the '80s on procurement
6    systems, that could search for items?
7    A    Many of the systems had the ability to search -- to enter
8    criteria and search for items that met those criteria, yeah.
9    Q    That was for the purpose of purchasing the products,
10   finding a product to purchase; correct?
11   A    No.  In most cases, that was for the development of a
12   sales order for selling their own products.  Most of them did
13   not have that capability in the procurement area for searching
14   for products to buy.  It was searching among their own database
15   of products that they sold.
16   Q    So did you, in the '80s, work on any systems that were
17   computerized systems to help one of your clients buy things?
18   A    Almost all of the systems had purchasing capability, but
19   they didn't have the ability to search for the items to buy.
20   Q    Did you work on any systems in the '80s that could search
21   for items to buy?
22   A    There may have been a few, but I don't recall off the top
23   of my head.
24   Q    Now, for purposes of your analysis for this case, you used
25   the perspective of one of ordinary skill as you described it
```

2749

```
1    earlier; correct?
2    A    Yes.
3    Q    That would be someone with a computer science type of
4    degree and one or two years of experience; correct?
5    A    Yes.
6    Q    And so when you reviewed the documents in the case, did
7    you review them from that standpoint?
8    A    Yes.
9    Q    Can we turn to the TV/2 brochure, Defendant's Exhibit 107.
10   This is one of the documents you reviewed --
11        THE COURT:  Excuse me.  My machine is going crazy.
12   Does everybody else have a good machine?
13        THE CLERK:  Hit the screen one time and see --
14        THE COURT:  I'm going to hit it real hard in a
15   minute.
16        THE CLERK:  We had problems during the recess, but we
17   straightened them out.
18
19        (Discussion off the record.)
20
21        THE COURT:  As long the jury -- you are okay?  I'll
22   do without, and you go ahead, and --
23        THE CLERK:  Do you want me to get IT up here now?
24   Q    Do you see there the first page of that Technical Viewer/2
25   brochure?
```

2750

```
1    A    Yes.
2    Q    If I understood your testimony today, you were saying that
3    the TV/2 system didn't have catalogs; is that right?
4    A    There were no catalogs delivered as part of the TV/2
5    system or promoted as being delivered as part of it.  That's my
6    understanding, yes.
7    Q    If we go to the second page of this brochure, see if we
8    can blow up that picture near the bottom of the page.  It's got
9    a picture of the TV/2 system on a computer here; is that your
10   understanding?
11   A    Yes.
12   Q    And there's a CD to the left of the computer in the
13   picture; is that right?
14   A    Yes.
15   Q    That's the CD that would have catalogs and technical
16   manuals and things like that; is that your understanding?
17   A    That's my understanding, that it's an exemplary CD that
18   could contain information that the TV/2 system could view and
19   search.
20   Q    So you would agree that one of ordinary skill in the art
21   would understand from reviewing these materials that the point
22   of the system, even though it might be sold without the
23   catalogs loaded on them, is you'd get a CD or catalog data on a
24   computer and load it into the system; right?
25   A    Well, this also shows that there is a computer there, and
```

2751

```
1    the brochure clearly states that it doesn't come with a
2    computer, that there's a prerequisite that the buyer has to
3    have, so it's a piece of software.  It's not a CD or a
4    computer, it's a piece of software, and that certainly
5    indicates and it indicates in the brochure that it's used to
6    read data that can be input into it through a CD, yes.
7    Q    So you would agree that this brochure does teach or
8    suggest to that person with the computer science degree and a
9    couple of years of experience that you take that TV/2 software,
10   load it on a computer, and put a catalog on a CD into the
11   system?  That would at least be one way to use it; right?
12   A    It says that's one of the possibilities, yes.
13   Q    So your testimony about TV/2 not having catalogs, you are
14   just saying when you buy the system from IBM, it's not going to
15   come with your own personal catalogs that you would select to
16   load on; right?
17   A    That's what I'm saying, yes.
18   Q    Okay.  But you do understand that the materials regarding
19   the TV/2 system would teach or suggest to one of ordinary skill
20   in the art that they could use that system with one or two or
21   more CDs of catalogs depending on what their needs are; right?
22   A    This is an undated brochure, number one.  We don't know
23   when it was published.  Number two, it certainly indicates that
24   it has that capability, but we know that it didn't have the
25   capability of doing the catalogs that were necessary for the
```

2752

1  electronic sourcing system because that was the subject of a
2  contract between IBM and Fisher to develop that.
3  Q   Well, please listen to my questions and just answer my
4  questions.  Your lawyer will have a chance to ask you some more
5  questions and clarify things if necessary, but I just want to
6  see if we at least agree on one thing which is that one of
7  ordinary skill, seeing these TV/2 materials, would understand
8  that the TV/2 system could be used with multiple electronic
9  catalogs?
10  A   It says in the brochure, whenever this brochure came out
11  in whatever version it refers to, that that's one of the
12  possibilities that it could be adapted to do, yes, and that's
13  my understanding.
14  Q   Did you use that understanding in your analysis?
15  A   Yes.
16  Q   You do agree that the TV/2 system is prior art to the
17  patents-in-suit?
18  A   What TV/2 system?
19      MS. ALBERT:  Calls for a legal conclusion.  I don't
20  know that he's competent to say what is prior art or not.
21      THE COURT:  You can ask him what he considered as
22  prior art.  Whether it is or isn't is a matter the jury will be
23  instructed on as a matter of law.
24      MR. McDONALD:  Can we go to Mr. Hilliard's slide
25  number four, please.

2753

1  Q   This is one of the slides you prepared for your testimony;
2  right, Mr. Hilliard?
3  A   Yes.
4  Q   The heading on your slide is prior art system, TV/2;
5  right?
6  A   Yes.
7  Q   You considered the TV/2 system to be a prior art system;
8  right?
9  A   Well, I probably should have titled that claimed or
10  alleged prior art systems.  It was my understanding that it was
11  Lawson's contention that TV/2 was prior art, so I was dealing
12  with that.  I didn't put the full title.
13  Q   You haven't been shy about disagreeing with Lawson's
14  contentions where you thought that was appropriate, have you?
15  A   No, sir.
16  Q   So this slide, you created this slide, and you chose to
17  label it prior art systems TV/2 yourself; right?
18  A   I told you what I meant by that, but, yes.
19  Q   Let me just understand, though.  Are you disagreeing that
20  the system -- if we can be specific, the system as described in
21  the TV/2 brochure, Defendant's Exhibit 107, that describes as
22  prior art TV/2 system?
23      MS. ALBERT:  Asked and answered and calls for a legal
24  conclusion.
25      MR. McDONALD:  Clarify what he's talking about.

2754

1      THE COURT:  Can you just ask him the question of
2  whether he considered this as prior art.  Whether it is or is
3  not a matter that the jury will be instructed on.  They then
4  will determine it.  The issue is whether he considered it to be
5  prior art as of whatever time you are talking about.
6  Q   Mr. Hilliard, did you consider the TV/2 system as
7  described in the brochure, Defendant's Exhibit 107, to be prior
8  art?
9  A   Exhibit 107 has no date, so I can't -- I don't know
10  whether Exhibit 107 would be considered prior art or not from
11  that standpoint, and I don't know whether what's described in
12  the brochure -- in the general terms, it's described as what
13  TV/2 actually did or what the brochure was intending to portray
14  it could do.
15      Brochures, as one of -- from the point of view of one
16  of ordinary skill in the art, one knows that brochures often
17  describe not only existing capabilities but future capabilities
18  of products, so the combination of this being a marketing
19  product brief, is what I would call it, and not knowing its
20  date, I can't say.  I had to look at it and analyze whether if
21  it were prior art, whether it would anticipate the claims, but
22  I can't say what it is or isn't.
23  Q   For purposes of your analysis, you did not personally make
24  a conclusion one way or the other as to whether the system
25  described in the brochure, Defendant's Exhibit 107, was prior

2755

1  art?  Yes or no?
2  A   Whether the system described in the brochure -- the
3  description is so vague and uncertain that I couldn't make that
4  determination.
5      THE COURT:  I think he said he assumed for the
6  purposes of his analysis that it was prior art because he had
7  to address that question, but he made no judgment whether, in
8  fact, it was.  Is that what you are saying?
9      THE WITNESS:  Yes, sir.  Yes, Your Honor.
10  Q   If we can turn to slide number two of Mr. Hilliard's
11  slides.  This is another slide you prepared; right, Mr.
12  Hilliard?
13  A   Yes.
14  Q   This one is entitled prior art systems RIMS; correct?
15  A   Yes.
16  Q   For purposes of your analysis, did you assume the RIMS
17  system, as depicted in the '989 RIMS patent, is prior art?
18  A   I assumed that the RIMS system as described in the '989
19  patent was of -- I don't know that I'm able to make the legal
20  judgment, but I assumed that it was available since it was
21  disclosed and referenced in the patents, that it was prior and
22  that it was as described in the '989.
23  Q   You understand also that one form that something can be
24  prior art is if it's on sale more than one year before the
25  filing date on the patent?

2764

1  to benefit people who buy products?
2  A   It was intended primarily to benefit Fisher because it was
3  a Fisher system.  If you look in the '989 patent, for example,
4  and this doesn't necessarily -- what's described here doesn't
5  necessarily conform to the '989 patent according to the
6  inventors, but if you look at the '989 patent, there is a
7  section on cross-referencing, and it basically says that the
8  purpose of cross-referencing is to supply customers with Fisher
9  products even though they might give the customer service rep a
10  competing product, a competing vendor's product.
11  Q   Let's stick with this brochure, Mr. Hilliard, all right?
12  Would you agree that one of ordinary skill reading this
13  brochure in this particular bullet point would understand that
14  this means that this Fisher RIMS system could cross-reference
15  the customer's stock numbers with all of that customer's
16  supplier numbers?
17  A   I would understand that it means that the system was
18  claimed at some point to have that capability at some point in
19  time, yes.
20  Q   So would you agree, at least in part, that the RIMS
21  system, as described in this April 1993 brochure, at least in
22  part is a buyer's system?
23       MS. ALBERT:  Object to the form of the question to
24  the characterization of the brochure being April 1993 since
25  the brochure is undated.

2765

1       MR. McDONALD:  I think I've already shown it, Your
2  Honor, from the document dated April '93, and in the official
3  trademark file history it refers specifically to a specimen of
4  use, and this is the specimen of use.
5       THE COURT:  It doesn't -- it's not a dated specimen
6  of use.
7       MR. McDONALD:  But it was submitted to the Trademark
8  Office with the date stamp April 30, 1993, so we know it's no
9  later than that.
10       THE COURT:  Well, that's a different question.
11  Sustained.
12  Q   Would you agree with me, Mr. Hilliard, that the system
13  described in this brochure that's part of the RIMS trademark
14  application describes a system that, at least in part, is for
15  the benefit of buyers?
16  A   That's a different question -- you asked me before whether
17  I would agree it's a buyer's system, and I would not agree it's
18  a buyer's system.  It's a seller's system.  It did provide some
19  benefits to buyers of Fisher products, but it is not a buyer's
20  system which was the question that you asked me previously.
21  Q   Take them one question at a time.  And if we blow back up
22  to this page here, the entirety of this page two of the
23  brochure, aren't all of the features listed on this page
24  intended to communicate the benefit of the RIMS system to
25  somebody who buys products?

2766

1  A   Yes.  They are intended to communicate potential benefits
2  to the buyer to allow Fisher to put this system into their
3  premise along with the Fisher customer sales rep to operate it.
4  Q   Isn't it true that the features of the Fisher RIMS system
5  were developed to provide Fisher Scientific's customers with
6  flexibility and customization for requisitions, purchasing, and
7  inventory control?
8  A   I wouldn't agree with that characterization, no.
9  Q   Can we turn to the next page of the brochure, please.  Can
10  you blow up that paragraph below the keyboard.
11       Do you see the sentence there in the brochure,
12  Mr. Hilliard where it says, the exclusive features of Fisher
13  RIMS were developed to provide Fisher Scientific's valued
14  customers with maximum flexibility and system customization for
15  requisitions, purchasing, and inventory control.  Do you see
16  that?
17  A   I see where it says that.  That's certainly a sales claim.
18  To me, that's like saying, I'm from the IRS, I'm here to help
19  you.
20  Q   This is a document from Fisher; right?
21  A   Yes.
22  Q   This is from the 1993 time frame; right?
23  A   Yes, and they certainly would like their customers to
24  believe that, I'm quite sure.
25  Q   Are you disputing what's in that statement?

2767

1  A   Pardon?
2  Q   Are you disputing what's highlighted up on the screen
3  right now?
4  A   I'm not disputing that the RIMS system, some RIMS system
5  could provide some benefits to buyers, but that wasn't its
6  purpose.  I just -- and I'm -- the testimony of the inventors
7  certainly indicated to me that this was not the principal
8  reason why the features were developed.  The features were
9  developed so that Fisher could sell more of its products to its
10  customers rather than having its customers buy from
11  competitors.
12  Q   But would you agree that at least one purpose of the
13  system, as it existed in April of '93 as described in this
14  brochure, was to benefit customers?
15       MS. ALBERT:  Asked and answered, Your Honor.
16       THE COURT:  Sustained.
17  Q   Let's go -- isn't it true that Fisher told its customers
18  that the people in the customers's organization could enter
19  requisitions and purchase orders using -- using the Fisher RIMS
20  system, that the customer could, in fact, enter requisitions
21  and purchase orders?
22       MS. ALBERT:  Object to the form.  I don't know how he
23  could know what Fisher told its customers.
24       MR. McDONALD:  He's reviewed the documents in the
25  case.

2768

1    THE COURT:  You mean that document or what?
2    MR. McDONALD:  I was asking the question generally to
3  start with here.
4    THE COURT:  Objection sustained.
5    MR. McDONALD:  Can we go another five pages into the
6  brochure here.  Can we blow up the paragraph at the bottom of
7  the page.
8  Q  Do you see there, Mr. Hilliard, in the paragraph that
9  begins with the word, a Fisher customer service representative?
10  A  I see that.
11  Q  So it talks about a Fisher customer service
12  representative; right?
13  A  Yes.
14  Q  Then the next sentence after that, it says, your
15  requisition or purchase order can be entered remotely by the
16  people in your organization who will be using the product, or
17  your Fisher CSR can enter it directly into the Fisher RIMS PC.
18  Either way, you'll get complete reports on every transaction;
19  do you see that?
20  A  I see where it says that, but you've left out the
21  remainder of the first sentence.
22  Q  We can highlight that if you'd like, but as I understand
23  this, would you agree what's being described in this April '93
24  brochure is both the customer service representative and the
25  customer's own people can use the RIMS system?

2769

1  A  I agree that it says that in the brochure, but according
2  to the inventors, it never worked that way, and certainly the
3  system described in the '989 patent doesn't work that way.
4  Q  Go to the next page of the brochure, please.  If you
5  highlight the column on the bottom left.
6    Now, in this section, it's referring to the color-coded
7  paths in the schematic diagram above; do you see that?
8  A  Yes, I see that, yes.
9  Q  And it says following that, you can get a sense of how
10  smoothly and efficiently Fisher RIMS handles purchases of
11  various types; do you see that?
12  A  Yes.
13  Q  It lists three types under that; correct?
14  A  Yes.
15  Q  One is Fisher products, one is third-party purchases
16  delivered from a Fisher warehouse, and the third is third-party
17  purchases delivered direct; do you see that?
18  A  Yes.
19  Q  Do you have any reason to dispute the accuracy of this
20  representation in this brochure that was provided to the
21  trademark office?
22  A  I don't know what system this refers to in that there's no
23  tying this brochure to the '989 patent specifically, at least
24  according to the inventors, but if you were to look at the '989
25  patent, the '989 patent describes all three of these

2770

1  options, and all three of these options in the '989 patent
2  result in a sale from Fisher to the customer, no direct sales
3  from a third-party vendor to the customer regardless of whether
4  it's delivered direct on a drop shipment or delivered from a
5  warehouse.
6    In all three of those instances as described in the '989
7  patent, the sale is from Fisher to the customer.  There is no
8  option in the '989 patent for a sale direct from a third party
9  to a customer.  So I don't dispute that they promoted this.  I
10  don't dispute that the description in the '989 patent covers
11  this, but this does not imply any vendor to the customer other
12  than Fisher.  And that's described right in the description of
13  the '989.
14  Q  Do you have an understanding that Fisher gets about
15  two-thirds of its products actually from other sources?
16  A  I don't know what percentage, but they don't
17  manufacture -- my understanding is they don't manufacture
18  necessarily all of the products that they warehouse and sell.
19  Q  So they act for some products as a middleman for other
20  sources; right?
21  A  By a middleman, you mean buy and resell?
22  Q  Yes.
23  A  Yes, they buy and resell.
24  Q  And sometimes they'll actually have the products delivered
25  directly from who they are buying from directly to the

2771

1  customer; right?
2  A  Yes, but the ones they buy from bill them for the product,
3  and then they bill the customer.  So the sale goes from Fisher
4  to the customer.  There is no direct from third party
5  to the customer.  There's only one vendor to the customer, and
6  that's Fisher.
7  Q  Can you put up the Court's definition of electronic
8  sourcing system, please.
9    You have that definition up on the screen now,
10  Mr. Hilliard?
11  A  Yes.
12  Q  Would you agree that the Fisher RIMS system described in
13  the brochure from April of '93 that we were just going through
14  is an electronic system for use by a prospective buyer to
15  locate and find items to purchase from sources, suppliers, or
16  vendors?
17  A  No.
18  Q  You don't agree that the brochure, if it's an accurate
19  description, if we can accept it as accurate, that it meets
20  that description, Mr. Hilliard?
21    MS. ALBERT:  Object to the form.  I think
22  Mr. Hilliard already testified that he does not accept it as
23  accurate.
24    THE COURT:  He's already answered the question.  He
25  said, no, he doesn't.

2772

1    MR. McDONALD: But I'd like him to at least tell me
2    whether or not he would agree that if the brochure is accurate,
3    that it meets the Court's definition of electronic sourcing
4    system. I think I'm entitled to know that.
5    MS. ALBERT: Same objection.
6    THE COURT: He already answered that. He said, no,
7    it doesn't. Assuming it's accurate, he said, no, it doesn't.
8    THE WITNESS: Even assuming it's accurate, no, it
9    doesn't.
10    THE COURT: I think he said that.
11    Q  With the respect to the RIMS system as described now in
12    the '989 patent, Mr. Hilliard, I'd like to but the brochure
13    aside now and talk about the patent.
14    A  Okay.
15    Q  In your analysis, you took into account the Court's
16    definition of catalogs; correct?
17    A  Yes.
18    Q  And is it your opinion that there are no databases in the
19    RIMS system that meet the Court's definition of catalog?
20    A  That's correct, because the databases in the RIMS system
21    do not have any relation to multiple vendors. The items aren't
22    related to a vendor. There's nothing in the item file that
23    indicates vendor, and there's only one vendor, not multiple.
24    Q  So is it your opinion that if a given part master or item
25    master does not have an indication of who the vendor is within

2773

1    that master, it's not a catalog?
2    A  That's my understanding of the Court's construction, yes.
3    Q  And your understanding is that the parts master is a list
4    of items that are kept in the customer's inventory; is that
5    right?
6    A  It's a -- the part master is a list of items that are kept
7    in the inventory that Fisher manages. The inventory that
8    Fisher manages, according to the '989 patent are of five
9    different types; types one, three, four, five, and six. Some
10    of those, I think -- four of those five types -- there's a type
11    two mentioned also, but it's not used. So four of the five
12    types are owned by Fisher, and -- pardon me. Three of the five
13    types are owned by Fisher. One of the five types is owned by
14    customer, and then the fifth are items that are not -- that the
15    RIMS system is not used to acquired. I can go type by type
16    number with you if you'd like.
17    Q  That's all right. Let me ask you ask it this way: Would
18    you agree that the databases in the RIMS '989 patent system
19    relate to items that are already owned by either the customer
20    or the distributor?
21    A  Yes. Pardon me. There are items listed in the database
22    that may not be in stock in either customer or the
23    distributor's inventory, so it might -- at any given point in
24    time might not be owned by one or the other.
25    Q  For those, would those be items the customer would want to

2774

1    keep track of even though on a given day they might not have
2    them in inventory? Is that the sort of thing you are talking
3    about?
4    A  They are items Fisher wants to keep track of in order to
5    manage their customer account.
6    Q  Would you agree that the RIMS system, as described in the
7    '989 patent, has cross-reference tables?
8    A  Yes.
9    Q  Those cross-reference tables include information from
10    multiple vendors, don't they?
11    A  Their cross-reference tables include product numbers from
12    multiple vendors.
13    Q  That would be information from multiple vendors; right?
14    A  They are product numbers related to multiple vendor
15    products. I guess you could say it that way.
16    Q  Do you consider those cross-reference tables in the Fisher
17    '989 patent to be catalogs since they have information from
18    vendors?
19    A  No. Because they don't indicate a vendor from which the
20    customer is going to purchase product, and, in fact, if you
21    look at the bottom of column 34, you'll see what those
22    cross-reference tables are used for. They're used so that the
23    Fisher customer sales rep can supply a Fisher product instead
24    of a competing vendor product.
25    Q  Do you think the purpose of the table relates to whether

2775

1    it's a catalog or not?
2    A  The catalog has to refer to the vendor for whom the -- who
3    is going to sell the product to the customer.
4    Q  I just want to get clarified, though. When you looked at
5    applying the Court's definition of catalog in this case, did
6    you look at the purpose of the database you were looking at as
7    an important consideration in deciding whether or not a given
8    database is a catalog?
9    A  You know, I apologize for trying to answer your question
10    by giving you another reason why -- you asked me whether I
11    agreed with one reason, and I tried to explain another reason.
12    I apologize for doing that. I'm sorry.
13    What I'm saying is that the Court's construction requires
14    that the catalog information needs to be related to sources or
15    vendors from which the customer is going to buy product. In
16    this case, that other vendor information doesn't relate to
17    sources or vendors from whom the customer is going to buy
18    product. It relates to just a cross-reference to the other
19    vendor's product number.
20    THE COURT: In that answer, when you said, in this
21    case, did you mean in the '989 patent or the RIMS system, or
22    what did you mean?
23    THE WITNESS: In the RIMS system.
24    THE COURT: Okay.
25    THE WITNESS: I'm sorry, Your Honor.

2776

1  Q   The RIMS system also, as described in the '989 patent,
2  also includes a host database; correct?
3  A   Yes.
4  Q   That host database, what sort of item information is kept
5  in the host database in the Fisher RIMS system as described in
6  the '989 patent?
7  A   Information about the items that the host distributor --
8  the distributor, which is Fisher, which owns the host computer
9  sells to its customers.
10  Q   Is that a catalog as the Court construed it?
11  A   No, because it -- there is only one vendor.  It doesn't
12  provide information.  At least as I understand it, it doesn't
13  provide information about vendors from which the customer is
14  going to buy product.  The customer only buys product from
15  Fisher.
16  Q   Would you agree that that host database at least includes
17  information that originates from Fisher as a vendor or
18  distributor?
19  A   Yes, it includes database that originates from Fisher,
20  yes.
21  Q   And includes information about products such as an item
22  number and description and things like that; right?
23  A   Yes.
24  Q   And it's an organized collection of data, isn't it?
25  A   Yes.

2777

1  Q   But it's not a catalog; right?
2  A   No.
3  Q   Did ePlus ask you to do any analysis of the infringement
4  issues in this case?
5  A   No.
6  Q   Did you describe the systems in the patents in the suit as
7  systems that would be operated by the buyer as opposed to a
8  seller like Fisher?
9  A   I'm sorry.  I didn't follow your question.
10  Q   I'm sorry.  Maybe -- I just remember you saying something
11  about a buyer system versus a seller system when you were
12  comparing the RIMS and the patents-in-suit, so maybe we'll
13  start by, can you explain to me whether or not the systems
14  described in the patents-in-suit, did you consider those buyer
15  systems or seller systems?
16  A   I would consider those buyer systems because they are
17  operated -- because they empower the buyer to select the
18  vendors from whom he or she is going to buy product.
19  Q   Okay.  And then the Fisher system as described in the '989
20  RIMS patent, did you consider that a seller system?
21  A   I considered that a seller system because as described in
22  the '989 patent, the operator of that system is a Fisher
23  employee, the Fisher CSR.
24  Q   Customer service representative; right?
25  A   Yes.

2778

1  Q   So if the system has the customer service representative,
2  then you would consider that to be a buyer-focused system?
3  A   If a system is operated by a CSR -- well, that wouldn't
4  necessarily be the only criteria, but certainly when you look
5  at the system as described in the '989 patent, which is
6  operated by a seller, the Fisher CSR, not by the buyer who --
7  when you look at the fact that it's operated by the seller
8  along with all the other description, it's clear that it's a --
9  the system as described in the '989 is a seller's system, not a
10  buyer's system.
11  Q   Isn't it true that under your analysis, the system
12  described in the patents-in-suit would also be seller systems
13  in the preferred embodiment described in these patents?
14  A   The --
15      MS. ALBERT:  I'm sorry, I missed the question.  Can
16  you repeat it, please?
17  Q   Let me just go right to it.  Can you turn to the patent
18  number '683, Exhibit 1, and column three.  If you go down to
19  line 48 to 56, please, of column three.  Now, we've moved away
20  from the RIMS patent now, and now we're involved in one of the
21  patents involved in the lawsuit; correct?
22  A   Yes.
23  Q   It's your understanding all the patents in the lawsuit
24  have essentially the same detailed description of the
25  invention; right?

2779

1  A   Very similar.  It varies a bit from patent to patent.
2  Q   And you see here the very first paragraph under the
3  heading detailed description of the invention?
4  A   Yes.
5  Q   First line says, figures 1A and 1B show preferred
6  embodiments of the electronic sourcing system five of the
7  present invention.  Do you see that?
8  A   Yes.
9  Q   The next sentence, as shown in figure 1A, a local
10  computer, which is preferably located at or near a customer
11  SITE and the site of just-in-time, or JIT, inventory is
12  preferably used by an on-site customer service representative
13  dedicated to a customer to assist that customer in
14  requisitioning items needed.  Do you see that language?
15  A   I do.
16  Q   So isn't it true that, at least in the preferred format of
17  the use of the system described in the patents-in-suit, they
18  would be used with the customer service representative just
19  like the RIMS system?
20      MS. ALBERT:  Object to the form of the question.  It
21  suggests that that's the only preferred embodiment described in
22  the patent.
23      THE COURT:  I think you asked specifically about the
24  preferred embodiment.
25      MS. ALBERT:  He said that was the preferred

2780

1    embodiment.  There are multiple preferred embodiments.
2        THE COURT:  You mean it should be a preferred
3    embodiment.
4        MS. ALBERT:  Correct, Your Honor.
5        THE COURT:  Sustained.
6    Q    Would you agree, Mr. Hilliard, that as shown on the
7    language up on the screen here, a preferred embodiment of the
8    system described in the patents-in-suit is to have that system
9    used by an on-site customer service representative just like
10   the RIMS system described in the '989 patent?
11   A    Well, this is an introductory paragraph to quite a long
12   detailed description of the invention, and it does say that,
13   but as you go through the rest of the detailed description, it
14   gives options even in that preferred embodiment where the buyer
15   is empowered to do the catalog selection and the search and the
16   requisition building and so forth.
17       So, yes, it says that, but that doesn't characterize the
18   whole of the preferred embodiment if you go through and read
19   the entire detailed description.
20   Q    Are you aware of any language in the patent which actually
21   says it's preferable to have the customer operate the system
22   themselves?
23   A    I think I can find that, yes.  Well, that says that's part
24   of a preferred environment, that is an option within the
25   preferred environment, yes.

2781

1    Q    I'm asking whether there's any indication that that's
2    actually a preferred way to do things.
3    A    I believe I can find that in the patent, yes.
4    Q    Okay.  Would you go ahead and show me what you are talking
5    about.
6        THE WITNESS:  May take me a moment.
7    Q    How long do you think it will take you, because I'll
8    withdraw --
9        THE COURT:  The answer would be about an hour and a
10   half then.  You talk about rising on the bait.
11       MR. McDONALD:  Threw myself a curve ball there.  I'll
12   withdraw the question.
13       THE WITNESS:  I don't think it would take -- a few
14   moments.
15       THE COURT:  If he wants to withdraw it, he can
16   withdraw it.  It's his question.  He can pull it any time he
17   wants to.  Do you want him to look or pull?
18       MR. McDONALD:  I think we're going to go on.
19       THE COURT:  Abandon your ship.
20   Q    You would agree that the TV/2 system did have a way to
21   allow a user to select certain topics to search?
22   A    Based on the lack of specificity of both of the brochures
23   that were produced, combined with the recollection of the two
24   IBM employees that were involved and the amount of effort on
25   IBM's part that was required to allow it to do that, no, I

2782

1    wouldn't necessarily agree that it had that capability.
2        I would agree that it could be as was shown with over a
3    year of effort by ten IBM employees, it could be made to have
4    that capability, but I don't agree that as delivered it had
5    that capability, and certainly the brochures, the DX-105 and
6    107 aren't specific enough to corroborate that it had that
7    capability.
8    Q    Can we turn to the Technical Viewer/2 general information
9    manual, DX-105, to page seven, please.  Can you blow up the
10   section entitled search.
11       Do you have up on the screen now, Mr. Hilliard, a
12   description of the features of IBM Technical Viewer/2 with
13   respect to search; correct?
14   A    Yes.
15   Q    This indicates that TV/2 had a search facility that can
16   locate every occurrence of a word or phrase in either the
17   current topic, a list of selected topics, the complete
18   document, or another document; correct?
19   A    That's what the brochure claims, yes.
20   Q    Now, is it -- for purposes of your analysis, did you
21   assume that was true in the IBM system as it existed back in
22   1992 or not?
23   A    I didn't find this to be convincing.  I found this to be a
24   marketing -- I looked at it from the point of view of one of
25   ordinary skill in the art, and I would look at it as a

2783

1    marketing claim, and when I combined that with the actual
2    knowledge of what happened when IBM was contracted to deliver
3    TV/2 with that capability, I didn't consider that to be
4    accurate, no.
5    Q    Would you agree that the people that were working at IBM
6    in the early '90s on the TV/2 product would know more about
7    what it could do than you do?
8    A    Most likely.
9    Q    Would you agree that the TV/2 product, as of the 1992,
10   early 1993 time frame had the ability to create a shopping list
11   of products and pass that list to another application?
12   A    I would agree that it was claimed to have that, although
13   my reading of the depositions of the IBM employees who were
14   involved in this during that time frame said that developing
15   that shopping list capability was one of the tasks that they
16   undertook as part of their contract with Fisher.
17       So it would seem to me that it didn't have that capability
18   despite the fact that it was claimed.
19   Q    Do you understand that the TV/2 product had in the '92,
20   early '93 time frame something called an application program
21   interface?
22   A    Yes.
23   Q    What is your understanding as to what the purpose of that
24   is?
25   A    Application programming interface, often called an API, is

2784

1  a component of a system that allows it to interface to related

2  applications so that it can pass data back and forth.

3  Q   Is it your understanding that part of that project that

4  Fisher asked IBM to do was to help customize the interface

5  specific to the Fisher system?

6  A   Yes.

7  Q   Now, in your testimony, you basically, I think you said

8  more than once the TV/2 system didn't bring anything to the

9  table; did I get that right?

10  A   With respect to the elements of the claims I said that,

11  yes.  I didn't say that just in general, but if you looked at

12  it in the context of the claims and the elements of the claims,

13  it didn't bring anything to the table that would enable the

14  combination to meet the claims, and, therefore, rendering a

15  combination an obvious way of meeting the claims.

16  Q   When Fisher paid IBM about $600,000 to do this work, do

17  you have an understanding as to whether IBM brought anything to

18  the table in exchange for getting that money?

19  A   Well, after the 600 -- after the $600,000, yes, but the

20  TV/2 system as it was deliverable prior to the contract with

21  Fisher, no.

22  Q   What is your you understanding as to what IBM actually

23  delivered with that?

24  A   They delivered a revised version of TV/2 that had, after

25  ten individuals worked for over a year for, I think you said

2785

1  $600,000, a version of TV/2 that had interfaces to the

2  electronic sourcing system, had the ability to search

3  individual portions based on tags, it had a data loading

4  capability, and it had an order list capability, that all of

5  those things were developed onto the TV/2 system, not as it's

6  described in the 105 and 107, but after that $600,000, one-year

7  plus project was complete.

8  Q   Would you agree that one of ordinary skill reading the

9  Technical Viewer/2 brochure would think it would be obvious to

10  combine a system like the RIMS system described in the '989

11  patent with a searching system like the TV/2 system?

12  A   No.

13  Q   Well --

14  A   Well, for what purpose?

15  Q   For the purposes described in the TV/2 brochure.

16  A   No, because the RIMS system -- to combine the -- the RIMS

17  system was a requisition and inventory management system.  The

18  TV/2 is a search and viewer system.  The -- there's nothing in

19  the brochure that suggests combining it with a requisition and

20  inventory management system.

21     I mean, I'd have to look at the purpose, but it doesn't

22  seem obvious to me from the point of view of one of ordinary

23  skill in the art that it would be an obvious thing to combine

24  for the purposes described in that brochure in either of the

25  two brochures.

2786

1  Q   Can we turn to the TV/2 brochure, Defendant's Exhibit 107,

2  please.  Go to the fourth page of that document.  Blow up the

3  column on the left, and specifically let's blow up the third

4  bullet point.  And maybe I should -- I don't know if you can

5  read the fine print there.  Let's blow up the whole left column

6  so we can see the context.  This is a part of the TV/2 brochure

7  that's talking about potential uses; correct?

8  A   Yes.

9  Q   And the third one is, integrating parts catalogs with

10  dealers' computer systems such as order entry, inventory

11  management, and customer records; right?

12  A   Yes.

13  Q   Wouldn't you agree, Mr. Hilliard, that someone with a

14  computer science degree and one or two years of experience in

15  working with computer procurement systems reading this bullet

16  point in the TV/2 brochure would understand that it would be a

17  good idea to combine the TV/2 system with an inventory

18  management system like the RIMS system to get the features

19  discussed in this brochure?

20  A   What features are you referring to?

21  Q   Any of the features that the brochure highlights as

22  benefits of the TV/2 system?

23  A   I don't see a feature.

24  Q   Well, we've already gone through that brochure, haven't

25  we, a little bit, Mr. Hilliard?  You know the brochure talks

2787

1  about some potential benefits of the TV/2 system, don't you?

2  A   It talks about -- features are different than benefits.  I

3  didn't see any features described.

4  Q   I'll rephrase the question.

5  A   It talks about potential benefits as -- I don't recall it

6  talking about features.

7  Q   Let's talk about benefits then.  Would you agree that one

8  of ordinary skill in the art, seeing this paragraph about

9  integrating parts catalogs, would agree that if they had a RIMS

10  system, an inventory management system like RIMS, and they

11  wanted to get the benefits described in this brochure, that it

12  would be an obvious thing to combine a TV/2 system with the

13  RIMS system?

14  A   If one had a RIMS system, would it -- well, the only

15  company that had a RIMS system was Fisher, and it wasn't

16  obvious -- Fisher didn't sell the RIMS system to competitors or

17  to customers.  They installed the RIMS system in their

18  customers' site.

19  Q   I wasn't asking about selling, Mr. Hilliard.  I had a very

20  specific question.

21  A   You're saying if someone had a RIMS system.  So the only

22  one who had a RIMS system was Fisher.

23  Q   All right.

24  A   Okay.

25  Q   But let's make sure we're clear.  I'm talking about one of

2788

1 ordinary skill in the art who knew about the RIMS system and
2 was looking at this brochure. Wouldn't they read this and say
3 it's an obvious thing to combine that RIMS system with the TV/2
4 system?
5 A They might look at that and say that it's a possibility to
6 do that. I'm not sure that you'd look at it and say it was
7 obvious to do that. You'd have to -- obvious for what purpose?
8 It's not clear to me for what purpose it would be -- I mean, if
9 you give me a purpose, I can say, well, would it be obvious for
10 that purpose.
11 Q Mr. Hilliard, based on all your investigation for purposes
12 of this case, do you have an understanding as to what the
13 benefits of the TV/2 system were as they were described in the
14 TV/2 literature?
15 A I understand that the claimed benefits are the ability to
16 search and view databases or data on CDs or so forth.
17 Q Things likes catalog that are large volumes of data;
18 right?
19 A Such as that, right.
20 Q And could include images and things likes that?
21 A Yes.
22 Q Using that as the benefits of the TV/2 system, isn't it
23 true that one of ordinary skill back in 1993, April of '93, if
24 they knew about the RIMS system in the '989 patent, they saw
25 this TV/2 brochure, it would be obvious to them, to get the

2789

1 benefits of the TV/2 system, incorporated with that RIMS system
2 by combining the two things together?
3 A I'd love to be able to answer your question, but I'm not
4 sure what benefits you are talking about. The benefits have to
5 be in relation to something, and so -- it's difficult for me to
6 respond to your question -- if you could lay out what benefits
7 we're talking about, I could perhaps answer the question, but
8 in terms of just to combine two systems because they're
9 potentially combinable, unless you know what purpose you would
10 want to do it for, for some purposes it might be obvious for
11 for others it wouldn't.
12 THE COURT: I think we've been through this already
13 once.
14 MR. McDONALD: I was ready to move on.
15 THE COURT: Are you ready? About how close are you?
16 MR. McDONALD: I'm very, very close. In fact, I
17 think I may stop right here.
18 MS. ALBERT: I just have a couple redirect questions,
19 Your Honor.
20 THE COURT: Do you know the most fundamental flaw in
21 redirect?
22 MS. ALBERT: What's that?
23 THE COURT: Opening doors. The most common error
24 made.
25 MS. ALBERT: I understand, Your Honor.

2790

1 THE COURT: Or at least the most common error I made.
2
3 REDIRECT EXAMINATION
4 BY MS. ALBERT:
5 Q Mr. Hilliard, you were directed to this DX-62 that
6 includes the Fisher RIMS brochure at page 32 of DX-62.
7 A Yes.
8 Q Does that brochure provide any details for how the RIMS
9 system is supposed to perform the features that are touted in
10 that brochure?
11 A No. No, no detail at all.
12 Q Does the brochure change -- does the description of the
13 system included in the brochure change any of your opinions as
14 to the functionality that the RIMS system had in the 1993 to
15 1994 time frame?
16 A No, no, it doesn't, because the inventors said that it was
17 not an accurate description of the RIMS system.
18 Q Does the description of the RIMS system included in the
19 brochure change any of your conclusions about whether the RIMS
20 system satisfied any of the elements of the asserted claims?
21 A No.
22 Q Now, you were referenced to the description in the patent
23 of one of the preferred embodiments, and I want to refer to
24 PX-1.
25 You were referenced to the embodiment where the customer

Hilliard - Redirect 2791

1 service representative is a user of the system, and you
2 indicated that there was another embodiment described where the
3 customer end user is the user of the system. Could I direct
4 your attention to column 16 of PX-1.
5 A Okay.
6 Q And if you look --
7 A 15 did you say?
8 Q Column 16.
9 A 16, okay.
10 Q And if you refer to the paragraph starting at line 40, do
11 you see the first sentence of that paragraph says, in some
12 embodiments, a customer end user or a customer purchasing
13 employee operating REQI program 44A of the Fisher RIMS system
14 40 may also operate TV/2 search program? Do you see that?
15 A Yes.
16 Q Is that the beginning of the description that you
17 referenced that refers to the customer end user being able to
18 use the electronic sourcing systems of the claims?
19 A That's one of them, yes.
20 Q Now, directing your attention to DX-107, the TV/2
21 marketing brochure, and going back to that page four that Mr.
22 McDonald referenced, from a review of the bullet that Mr.
23 McDonald referred you to about integrating parts catalogs with
24 dealers' computer systems such as order entry, inventory
25 management, and customer records, would it be obvious based on

2792

Hilliard - Redirect                 2792

1   that description in this brochure to combine the RIMS system as

2   described in the '989 patent with the TV/2 program as it

3   existed prior to 1994 to implement a system having the elements

4   of any of the patent claims at issue here?

5   A   No.  For that purpose, it wouldn't be obvious.

6       MS. ALBERT:  Thank you.  No further questions.

7       THE COURT:  Can he be excused permanently?

8       MR. ROBERTSON:  Yes, Your Honor.

9       MR. McDONALD:  Yes, Your Honor.

10      THE COURT:  All right.  Thank you, Mr. Hilliard, for

11  being with us and giving us your evidence.

12      MR. ROBERTSON:  Plaintiff rests, Your Honor.

13      THE COURT:  Plaintiff rests.  Ladies and gentlemen,

14  the evidence in this case is now closed.  What does that mean

15  to us now?  I have to do some things with the lawyers tomorrow.

16  It probably will take three to four hours to finish that

17  process.

18      It seems to me that it would maybe be a better --

19  because I have found that in this case my estimates have not

20  always been as good as I thought they would be.  I think it

21  might be a better use of your time for you to take off

22  tomorrow, come back Monday.  They'll be ready to argue the

23  case.  They'll start off Monday morning, argue the case.  I'll

24  give you the instructions, and then you can retire to

25  deliberate.

2793

1       I think that in the overall scheme of things, your

2   time will be better served by allowing us to do what we need to

3   do tomorrow.  So if you will just be here at nine o'clock on

4   Monday morning, we'll take -- we'll finish up the case.  All

5   the evidence is now in.  Have a nice weekend.  Remember not to

6   discuss the matter with anybody.  I don't want you -- and don't

7   go out and try to build any procurement systems or anything

8   like that.  Just leave your books.  Mr. Neal will take care of

9   them.  Thank you.  Drive carefully.

10

11      (Jury out.)

12

13      THE COURT:  All right, our task for tomorrow is to

14  hear the arguments on JMOL and to -- JMOLs, and to make sure we

15  have the jury instructions and the verdict forms correct.  I

16  estimate that if we get started about 9 o'clock, that we can be

17  finished, and I have told the people for the preliminary

18  injunction, temporary restraining order to be here, and I'll

19  start with them at two o'clock.  So I figure by noon we ought

20  to be out of here.  I certainly hope so.

21      MS. HUGHEY:  Your Honor, before we close out the day,

22  I, just for the record, would like to move for judgment as a

23  matter of law on the issue of invalidity now that the plaintiff

24  has been fully heard, just to preserve the issue.  I understand

25  we're going to argue tomorrow.  Would that be all right?

2794

1       THE COURT:  All right, you've made your motion.  We

2   need -- also, I have to clean up what to do about Court

3   Exhibit 4 which was that last question that we got, and I need

4   to give a proper instruction on this opinion of counsel

5   question as well.  I told you that I'm going to do, but I need

6   to -- I haven't put it into the jury question -- I mean the

7   jury instructions, and then -- I will.  Somebody sent back an

8   instruction.  Who did that?

9       MR. ROBERTSON:  That was the plaintiff, Your Honor.

10  Here's what --

11      THE COURT:  Do you have an instruction gremlin back

12  at the hotel, or is that you?

13      MR. ROBERTSON:  No, Your Honor, but I might make a

14  suggestion.  If those slides that I found objectionable that,

15  in my view, suggested that Court somehow through the

16  construction for the means plus function claims was suggesting

17  a combination between TV/2 and RIMS was appropriate, if those

18  slides aren't used in the closing arguments, then I think

19  putting any undue emphasis, even with a curative instruction,

20  would do more harm than that would be.  So if I can agreement from

21  Mr. McDonald that those slides wouldn't be used in closing,

22  then I think the problem would be solved.

23      MR. McDONALD:  I have to know exactly what he is

24  talking about.

25      MR. ROBERTSON:  They were the slides that

2795

1   incorporated the Court's construction that were used by Dr.

2   Shamos on his obviousness opinions, and I think the suggestion

3   was being made, because the Judge was looking in some instances

4   at TV/2 as performing a search function among other structures,

5   that the implication was left that that would therefore warrant

6   the jurors concluding that TV/2 and RIMS would be combined by

7   cloaking it in the guise of the Court's construction.

8       We thought that was just inappropriate, so I wanted a

9   curative instruction.  Your Honor actually suggested that I

10  prepare one for you.  So that was actually the genesis of that.

11      THE COURT:  I said if you wanted one.  I wasn't out

12  fishing trolling for a free hit.

13      MR. ROBERTSON:  I made a proposal that would permit

14  that Your Honor would not have to address that if I can get Mr.

15  McDonald's agreement.

16      THE COURT:  Why don't you look at it and look --

17      MR. McDONALD:  I'll look at it overnight and talk to

18  Mr. Robertson first thing in the morning and see if we can work

19  that out earlier.

20      THE COURT:  Okay.  Nine o'clock.  Now, let me ask you

21  something, are you all using demonstratives in your closing

22  arguments?

23      MR. ROBERTSON:  Yes, Your Honor, plaintiff is.

24      MR. McDONALD:  I'm sorry, what was the question?

25      THE COURT:  Are you going to use demonstratives in

2797

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE EASTERN DISTRICT OF VIRGINIA
 3               RICHMOND DIVISION
 4
 5   ------------------------------------
                                        :
 6   ePLUS, INC.          :  Civil Action No.
                          :  3:09CV620
 7   vs.                  :
                          :
 8   LAWSON SOFTWARE, INC.      :  January 21, 2011
                               :
 9   ------------------------------------
10
11      COMPLETE TRANSCRIPT OF THE JURY TRIAL
12       BEFORE THE HONORABLE ROBERT E. PAYNE
13     UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24       Peppy Peterson, RPR
          Official Court Reporter
25       United States District Court
```

2798

```
 1   APPEARANCES:  (cont'g)
 2   Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
 3   Troutman Sanders Building
     1001 Haxall Point
 4   Richmond, Virginia  23219
 5   Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
 6   William D. Schultz, Esquire
     Merchant & Gould, PC
 7   80 South Eighth Street
     Suite 3200
 8   Minneapolis, Minnesota  55402
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2799

```
 1              P R O C E E D I N G S
 2
 3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
 4   Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
 5   L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
 6   Mr. Michael G. Strapp represent the plaintiffs.
 7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
 8   Kirstin L. Stoll-DeBell, Mr. William D. Schultz, and Ms. Rachel
 9   Hughey represent the defendant.  Are counsel ready to proceed?
10        MR. ROBERTSON:  Yes, Your Honor.
11        MR. McDONALD:  Yes, Your Honor.
12        THE COURT:  All right.  We'll take plaintiff's JMOL
13   motion first.
14        MR. ROBERTSON:  Good morning, Your Honor.
15        THE COURT:  Good morning.
16        MR. ROBERTSON:  I'm going to be arguing plaintiff's
17   judgment as a matter of law with respect to infringement, and
18   Ms. Albert will be addressing plaintiff's judgment as a matter
19   of law with respect to the invalidity issues.
20        Your Honor, Rule 50 provides that judgment as a
21   matter of law may be granted when a reasonable jury would not
22   have a legally sufficient evidentiary basis to find for the
23   party Lawson on that issue.  ePlus moves for JMOL that Lawson
24   infringes all the asserted claims of the patents-in-suit, both
25   directly and indirectly, both through inducement of
```

2800

```
 1   infringement and contributory infringement.
 2        I'm not going to go through all the asserted claims,
 3   Your Honor.  I know Your Honor is familiar with them, and that
 4   would just take up too much time, and I know we're pressed for
 5   time here this morning with the Court's schedule this
 6   afternoon, but let me hit a high point, first start off by
 7   saying, we contend that the defendants non-infringement case in
 8   this proceeding has been really based on misdirection, that
 9   they have ignored the Court's claim construction with respect
10   to catalog.  They rewrote the provision for published by a
11   vendor to suit their manufactured non-infringement positions.
12        It required the Court, I think midcourse through this
13   case, to issue the instruction with respect to published by a
14   vendor to bring some clarity to what the Court intended when it
15   gave its instruction with respect to what a catalog is.
16        It did not mean, as the defendant contended, that the
17   item data associated with the catalog could not be selected --
18   or had to be selected by the customer or modified or deleted or
19   reformatted or be an entire catalog.  That was never intended
20   by the Court, and its revised published-by-a-vendor
21   construction made that clear, and I think the arguments made on
22   that, the non-infringement arguments that were based on that
23   have no sound footing in the record on this case.
24        We believe that the best evidence in this case has
25   come from, indeed, Lawson's own witnesses and documents.  Mr.
```

2841

1 Isn't Lawson doing it then?

2 MS. HUGHEY: If Lawson is hosting the system, that

3 doesn't mean that Lawson is practicing the method step of

4 selecting product catalogs to search. That's not what Lawson

5 is doing. Method steps -- for direct infringement of a method

6 claim, it means that a party must perform every single step of

7 the method.

8 In this case, there's not even an allegation that

9 Lawson performs the steps of selecting the product catalogs to

10 search. There's not even an allegation that Lawson performs

11 the step of searching for matching items among the selected

12 product catalogs.

13 That allegation was made of Lawson's customers.

14 There's no evidence on the record that Lawson does those

15 things, nor was an allegation made that that would be an

16 infringement.

17 THE COURT: All right. Thank you.

18 MS. HUGHEY: Yes, Your Honor, just one final point

19 that was raised in our brief, but I'd like to raise it here at

20 oral argument. ePlus's expert, Dr. Weaver, was extremely

21 conclusory with respect to the infringement allegations made at

22 trial.

23 THE COURT: You say his testimony was conclusory?

24 MS. HUGHEY: Yes, Your Honor.

25 THE COURT: Can you put that one back in the barn?

2842

1 Anybody who testified as long as he did, it's hard to say it

2 was conclusory. I think the Federal Circuit would laugh me out

3 of the courthouse if I did that.

4 MS. HUGHEY: No, Your Honor, actually what the

5 Federal Circuit has said -- specifically the means plus

6 function limitations, the Federal Circuit itself has said, to

7 establish infringement of a means plus function claim, quote,

8 it is insufficient for the patent-holder to present testimony

9 based only on a functional, not structural analysis.

10 Based on this requirement, the Court has repeatedly

11 either granted summary judgment, granted judgment as a matter

12 of law, or reversed District Courts that allowed the

13 infringement verdict to stand when the expert merely made

14 conclusory statements that the function was performed or that

15 the structure element was met without any statement of where

16 the structure was in the accused products, and I'll give you

17 two examples.

18 For the means for selecting a products catalog to

19 search, claim three of the '683 patent, Dr. Weaver opined as

20 follows, quote: This is Mr. Robertson. In each of these

21 scenarios, all five systems, do they provide the means for

22 selecting a product catalog to search? Answer: Yes.

23 That is the extent of Dr. Weaver's testimony on that

24 element. Now, there is not just a mere, well, it's not really

25 in dispute, so let's just get it out there. Whether these

2843

1 claim elements were met is a disputed issue in this case. Dr.

2 Shamos specifically said with respect to the means for

3 selecting product catalogs to search, there is not even

4 remotely any structure in the Lawson accused systems that

5 correspond to this element.

6 So what I'm telling you is that specifically with

7 respect to the means plus function claims, when the only

8 statement of infringement was, yes, that's met, that is

9 insufficient as a matter of law for this to be sent to the

10 jury. ePlus does not have a basis to find for infringement on

11 these claims.

12 THE COURT: All right.

13 MS. HUGHEY: The same issue permeates the system

14 claims, but I wanted to point out the method claims because the

15 Federal Circuit has been so clear that you cannot just make a

16 conclusory statement, you must point out the structure.

17 THE COURT: All right. Thank you. She just served

18 you up an air ball. Take a swing at it and tell me why she is

19 not right on Dr. Weaver's testimony on means plus function.

20 MR. ROBERTSON: Well, Dr. Weaver said he faithfully

21 applied the Court's construction, and the Court's construction

22 identified what the structures were that performed the

23 function. Dr. Weaver introduced --

24 THE COURT: Yes, but did he say what the structures

25 were on the Lawson side? The point she's making, you have to

2844

1 say what the structures were in the --

2 MR. ROBERTSON: He did when he went through all the

3 modules and he talked about the guides that talked about the

4 purchase order module, the requisition module, the search

5 program, the order list, the user interface. All those were

6 the structures that the Court defined as performing the various

7 functions. So he went through that first in great detail as to

8 what all those modules were and --

9 THE COURT: That's all I need. I think that's

10 correct. He didn't in response to that particular question,

11 but the hour or so that preceded that conclusion question dealt

12 with that, I believe, so I don't need to hear any more.

13 What about this capability thing? These cases she's

14 talking about seems to say -- the copy from Lexus is fouled up.

15 It doesn't have in it -- it's got -- I don't know how it did

16 it, but it begins at one part, what is set out below in another

17 column, and it's almost as if -- one time I had a defendant on

18 the stand when I was a prosecutor, and I showed him a copy of

19 his confession, and his excuse for why the conviction wasn't

20 right was that the computer -- that the copier had changed the

21 text of his confession, and I didn't find that very persuasive.

22 Now, for the first time, I find that a computer may

23 be capable of doing that, so I'm going to get a new copy of the

24 case and see if I can get it right, read the right part of it.

25 And I'm not saying anybody did anything funny. I'm saying that

2849

1    THE COURT: Is that what the case holds? That's what

2    this case holds -- that's what this case about the travel

3    candle holds, that, in fact, there was no evidence that the

4    travel candle was used in the infringing way.

5    MR. ROBERTSON: There's amble evidence in this case

6    that it's used in the infringing way, both from Mr.

7    Christopherson and --

8    THE COURT: Here's the bottom line. I'm the finder

9    of the fact. I would clearly find that there is infringement

10   of everything that Dr. Weaver said, that each system infringed

11   each claim for the reasons he stated. There isn't any question

12   that I would do that.

13   But I'm not the finder of the fact. So under these

14   facts, under the evidence in this case, don't I have to let the

15   jury decide that case and then come back at the end of the day

16   and see whether that's right? So what I'm inclined to do is

17   reserve judgment on this motion, because I will tell you -- I

18   personally am having real trouble deciding why there's any

19   defense to infringement at all.

20   MR. ROBERTSON: I understand.

21   THE COURT: But I believe that I do have to let the

22   case go to the jury subject to my ability to control that, and

23   I'm going to take this motion under advisement, deny the motion

24   of no infringement by Lawson, keep your motion under

25   advisement.

2850

1    MR. ROBERTSON: I understand, Your Honor. Thank you.

2    THE COURT: All right, now, invalidity. I believe

3    that -- Ms. Hughey, are you doing that one, too?

4    MS. HUGHEY: I am, Your Honor, and I promise to be

5    much slower this time.

6    THE COURT: Because if you don't, you're going to get

7    knee-capped but not buy me.

8    Let's see. Is this a good place for the court

9    reporters to switch and for us to take a little recess?

10

11   (Recess taken.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2851

1    THE COURT: All right.

2    MS. HUGHEY: Hello, Your Honor. May it

3    please the Court. Lawson moves for judgment as a

4    matter of law on the issue of invalidity because a

5    reasonable jury does not have a reasonable evidentiary

6    basis to find for ePlus on the issue.

7    At trial documents demonstrated and witnesses

8    testified --

9    THE COURT: Now, there are three grounds of

10   invalidity. One is anticipation.

11   MS. HUGHEY: Correct.

12   THE COURT: One is obviousness.

13   MS. HUGHEY: Correct.

14   THE COURT: And the other is written

15   description.

16   MS. HUGHEY: No, Your Honor, Lawson is not

17   asserting written description.

18   THE COURT: That was there at one time.

19   MS. HUGHEY: Correct.

20   THE COURT: That's no longer there. So I

21   don't need to deal with that one.

22   MS. HUGHEY: Correct.

23   THE COURT: So you have anticipation and

24   obviousness.

25   MS. HUGHEY: Correct, Your Honor. At trial

2852

1    the documents demonstrated and the witnesses testified

2    regarding the features and functionality of the prior

3    art RIMS system disclosed in the '989 patent.

4    THE COURT: Let's take the anticipation.

5    What is it that anticipates?

6    MS. HUGHEY: The RIMS system alone

7    anticipates every single claim of the patents-in-suit.

8    THE COURT: All right.

9    MS. HUGHEY: In combination, the RIMS system

10   and the TV/2 product render every single one of the

11   claims of the patents-in-suit obvious.

12   Dr. Shamos went through every single claim

13   and explained both the anticipation and obviousness

14   analysis. The evidence at trial further demonstrated

15   that both systems are prior art.

16   The combination of RIMS plus TV/2 renders

17   every single asserted claim of the patents-in-suit

18   obvious. The preferred embodiment disclosed in the

19   patents is the combination of RIMS plus TV/2 and the

20   Court's construction is consistent with that.

21   The TV/2 literature specifically says to

22   combine TV/2 with the parts ordering system and

23   inventory management system. The RIMS system

24   disclosed in the '989 patent was a part ordering and

25   inventory management system.

2853

1     The patents-in-suit do no more than combine
2  the RIMS system with TV/2.  This is an obvious
3  combination that renders the claims invalid.
4     In addition, there are no secondary
5  considerations of non-obviousness.
6     THE COURT:  There aren't any?
7     MS. HUGHEY:  There are not any.
8     THE COURT:  I thought we had evidence on it.
9     MS. HUGHEY:  I think that ePlus attempted to
10  provide some evidence about commercial success of its
11  commercial products, but there's no evidence that the
12  commercial products are claimed by the
13  patents-in-suit.
14     THE COURT:  Well, Mr. Farber testified that
15  they were yesterday afternoon, didn't he?
16     MS. HUGHEY:  Mr. Farber is not a technical
17  expert.  He said it was his opinion they were covered
18  by the patents-in-suit, but no evidence has come in
19  regarding the features and functionality of ePlus'
20  commercial products.
21     THE COURT:  In your evidence, didn't you
22  introduce evidence that or didn't -- I don't know who.
23  Let me back away from that.
24     MS. HUGHEY:  Yes, Your Honor.
25     THE COURT:  There's some brochures about

2854

1  these e -- is it eContent and --
2     MR. ROBERTSON:  Content+ and Procure+.
3     THE COURT:  They put the patent down there on
4  the bottom of the thing.
5     MS. HUGHEY:  The fact that ePlus marks its
6  product with a patent does not mean that the product
7  is actually covered by the patents-in-suit.
8     THE COURT:  I know that, but isn't that
9  evidence that it is?
10     MS. HUGHEY:  No, Your Honor, because even if
11  ePlus' products --
12     THE COURT:  Just so I understand, you have to
13  have a technical expert come in and say the
14  products -- what are they again?  Content+ --
15     MS. HUGHEY:  Content+ and Procure+.
16     THE COURT:  Procure+ practiced the patent.
17  Don't you have to have an expert come in and say that?
18     MS. HUGHEY:  I'm not sure that you need to
19  have an expert, Your Honor, but you have to have some
20  disclosure of the functionality because commercial
21  success requires --
22     THE COURT:  How do you prove disclosure of
23  the functionality?  What do you mean by that?
24     MS. HUGHEY:  They would have to have some
25  disclosure about what their product actually is.

2855

1  There's nothing in the record.  The fact is for
2  commercial success to be relevant, it has to be
3  relevant to the patented features.  And because
4  there's no evidence in the record, we have no idea.
5     Even if Procure+ and Content+ were covered by the
6  patents-in-suit, and let me be clear, there's no
7  evidence on that point, even if that were the case,
8  there's no evidence that any commercial success was
9  related to the patented features.
10     Moreover, there's actually no evidence of
11  commercial success in this case at all.  So even if
12  ePlus' products are covered by the patents.
13     THE COURT:  What do you mean by that?
14     MS. HUGHEY:  The only evidence that came in
15  was --
16     THE COURT:  When you make statements like
17  that, you kind of leave me floating around.  So it's
18  okay for you to say that, and then say, Let me explain
19  why I say that.  Because those are fairly conclusory
20  statements on which to base some kind of motion.
21     MS. HUGHEY:  Absolutely, Your Honor.
22     THE COURT:  Or judgment as a matter of law.
23     MS. HUGHEY:  Absolutely.  The evidence that
24  came in at trial with respect to Content+ and
25  Procure+, let's call them the ePlus products, was that

2856

1  those divisions were not commercially successful.
2  Those products never made money.
3     I believe that on the stand Dr. Farber may
4  have said, We won some awards.  We had some praise.
5  But no documents came in suggesting that that was
6  related to any of the features or functionality
7  related to the commercial products, let alone that
8  that was tied back to the claimed features and
9  functionality of the patents-in-suit.
10     And more importantly, Your Honor, evidence of
11  commercial success, the secondary considerations,
12  would only be relevant if there were for some reason
13  no motivation to combine the prior art references.  In
14  this case what we have is an explicit motivation to
15  combine the TV/2 system and the RIMS system.  For that
16  reason, these secondary considerations of
17  non-obviousness don't apply.
18     THE COURT:  Well, you were at one point
19  making the argument in your papers, I think it was at
20  summary judgment, that you can't count the income that
21  came to ePlus from the settlements as evidence of
22  commercial success.  Are you still taking that
23  position?
24     MS. HUGHEY:  That's absolutely correct.
25     THE COURT:  Aren't those things paid up

2925

1   THE COURT:  Was it Kinross and Momyer?

2   MS. STOLL-DeBELL:  No, I think it was Momyer

3   and Johnson that were on the '989.  Then you had Mr.

4   Kinross added to the patents-in-suit, and someone else

5   whose name escapes me.

6   THE COURT:  Melly.

7   MS. STOLL-DeBELL:  So for 102(e) to not apply

8   this case, they would have to show that it was only

9   Momyer and Johnson that invented all of the asserted

10   claims in this case, and I think to the extent there

11   is any testimony on this at all, Mr. Kinross was

12   involved.

13   And the addition of Mr. Kinross makes it a

14   different inventive entity for 102(e), and so

15   therefore we can use that in this case.

16   THE COURT:  All right.  Okay.

17   MS. STOLL-DeBELL:  Thank you.

18   THE COURT:  I understand your argument.

19   MS. STOLL-DeBELL:  Thank you.

20   MS. HUGHEY:  Very briefly, Your Honor, just

21   to address some of the issues that Ms. Albert raised

22   with respect to the judgment as a matter of law issue.

23   She's seeking judgment as a matter of law of

24   no written description, enablement, claims that aren't

25   in the case anymore.  And the Court has -- I think you

2926

1   recognized when I wanted to move for judgment as a

2   matter of law on unasserted claims that might not

3   cover certain products, you said, If it's not in

4   dispute, if they aren't contending it, there's no

5   judgment as a matter of law.

6   That's the same exact thing here.  There are

7   lots of defenses that Lawson could have raised but did

8   not.

9   THE COURT:  The difference, I think here,

10   is -- I'm trying to recall that point.  The difference

11   is that here you actually went into the trial pursuant

12   to the final pretrial order on these issues, and they

13   were issues as to which you had the burden of proof,

14   and you had to offer evidence on, and, if you didn't,

15   you lose as a matter of law because you didn't offer

16   any proof on them, not because they were abandoned

17   before the case went to the jury.

18   I have to tell you, I don't remember what

19   you're talking about.  Can you help me a little bit

20   more?

21   MS. HUGHEY:  Yes, Your Honor.  So ePlus has

22   accused the (unintelligible).

23   THE COURT:  What?

24   MS. HUGHEY:  The products.  The EDI.  The

25   five accused systems of infringing.  And the pretrial

2927

1   order, it was all systems accused of infringing, all

2   claims.

3   When Dr. Weaver was on the stand, he was very

4   specific; 2, 3 and 5.  And so at the end, I said,

5   Well, for those, 1 and 4, that aren't accused of

6   infringing anymore even though they were through the

7   beginning of trial, and they must have been abandoned,

8   I'd like judgment as a matter of law.

9   MR. ROBERTSON:  Mr. Momyer define the

10   systems.  In fact, those are the only five systems

11   that are at issue here.

12   THE COURT:  But that's not the argument that

13   she's making.  Let her finish.

14   MR. ROBERTSON:  I'm sorry.

15   MS. HUGHEY:  The point is, Your Honor said

16   that, well, if they didn't assert infringement on all

17   those systems, there's no need to grant judgment as a

18   matter of law, which makes sense to me because they

19   didn't prove that they weren't --

20   THE COURT:  But you're saying they came into

21   the case just like you did.

22   MS. HUGHEY:  Correct.

23   THE COURT:  They were asserting a theory of

24   infringement.  I should have granted judgments as a

25   matter of law on those infringements.

2928

1   MS. HUGHEY:  I actually agreed with Your

2   Honor at that time that it didn't make sense.

3   THE COURT:  I know that if you were wrong and

4   I was wrong, we ought to straighten it out.

5   MS. HUGHEY:  Yes, that's right.  I suppose

6   the point is, Your Honor, I don't believe that ePlus

7   is entitled to judgment as a matter of law on written

8   description or enablement because those aren't defense

9   that we even raised at trial; however, if it's Your

10   Honor's position that a defense that was at some point

11   in the case and not dropped before trial can then have

12   a judgment as a matter of law granted against it, then

13   the same should apply to Lawson and we're entitled to

14   judgment as a matter of law on all those other claims.

15   THE COURT:  I think you're right about that.

16   MS. HUGHEY:  Okay.  To make that record

17   clear.

18   The second point, Ms. Albert raised the 112,

19   paragraph 6, and paragraph 2 on 101, issues of law.

20   The enablement issue of law and statutory subject

21   matter issue of law.

22   I agree with Ms. Albert.  That's an issue for

23   the Court to decide.  Lawson moved for summary

24   judgment on those pure issues of law.

25   THE COURT:  And I denied it.

2929

1    MS. HUGHEY:  That summary judgment was

2  denied.  It's my understanding that that issue is now

3  preserved for appeal and that Your Honor doesn't have

4  to rerule on it, but just to make the record clear,

5  Lawson again moves for judgment as a matter of law on

6  the 112, paragraph 6, and 101 claims.

7    THE COURT:  How can you do that?

8    MS. HUGHEY:  Your Honor --

9    THE COURT:  You didn't try them.

10    MS. HUGHEY:  We did not try them.

11    THE COURT:  You relied for better or for

12  worse on the summary judgment decision.

13    MS. HUGHEY:  Correct.

14    THE COURT:  And your appeal point is that the

15  Court erred in failing to grant summary judgment.

16    MS. HUGHEY:  Correct, Your Honor.

17    THE COURT:  That's where the matter stays.

18  There's no judgment to be obtained on that at this

19  juncture, I don't think.

20    Now that was with respect to what issue?

21    MS. HUGHEY:  112, paragraph 2 and 6,

22  enablement issue, and the 101 statutory subject matter

23  issue.

24    THE COURT:  You mean the patentability issue?

25    MS. HUGHEY:  Correct, Your Honor.

2930

1    THE COURT:  112, six and what?

2    MS. HUGHEY:  Paragraph 2 and paragraph 6.

3    THE COURT:  And 2 is indefiniteness, right?

4    MS. HUGHEY:  That is indefiniteness, Your

5  Honor.

6    THE COURT:  And 6 is enablement, right?

7    MS. HUGHEY:  I'm sorry, Your Honor.  The 112,

8  paragraph 2, is --

9    THE COURT:  You-all quit using patent terms.

10  I don't have the statutes up here, and I don't have

11  them committed to memory like you-all do.  And I have

12  so much else going on up here, that I need to know

13  what you're talking about.  I use the short form

14  references to trigger my memory.

15    MS. HUGHEY:  I'm sorry, Your Honor.  I'm just

16  trying to make sure I'm very clear.  112, paragraph 2

17  and paragraph 6.

18    THE COURT:  Let's take 112, paragraph 2.

19  What are you talking about?  What is that one?

20    MS. HUGHEY:  Indefiniteness.  I'm sorry, Your

21  Honor.  I was having a moment.  112, paragraph 2 is

22  indefiniteness.

23    THE COURT:  And six is what?

24    MS. HUGHEY:  Also indefiniteness.  They go

25  together.

2931

1    THE COURT:  All right.  And those have

2  already been decided in the motion for summary

3  judgment, right?

4    MS. HUGHEY:  Correct.

5    THE COURT:  So I don't need to address those.

6    MS. HUGHEY:  That's any understanding.

7    THE COURT:  And then the 101 is the issue of

8  patentability, which is the subject matter or, i.e.,

9  the Bilski issue, and I erred as a matter of law in

10  failing to grant the summary judgment on that, right?

11    MS. HUGHEY:  Correct.

12    THE COURT:  And that's where it lies because

13  it never came into trial one way or the other?

14    MS. HUGHEY:  Correct.

15    THE COURT:  I don't need to deal with that

16  either.

17    MS. HUGHEY:  Okay.  And I think the issues

18  have been fully raised, but just for the record I

19  disagree with Ms. Albert.  Dr. Shamos explained every

20  element.

21    THE COURT:  You disagree with Ms. Albert on

22  general principles on everything she said.

23    MS. HUGHEY:  Correct, Your Honor.

24    If you have any questions, I'm happy to

25  answer them.

2932

1    THE COURT:  Thank you.  I don't.

2    All right.  I've got an injunction, and it's

3  a sealed hearing, so you can't come in, at 2 o'clock.

4  It shouldn't take half an hour.  And I'll see you-all

5  at about 2:30 for instructions.

6    MR. ROBERTSON:  Your Honor, could I just --

7    THE COURT:  The court reporter may kill you

8  or me, I'm not sure.  I'm going to send her to you

9  first.

10    MR. ROBERTSON:  Just one thing to tell the

11  Court.  EPlus withdraws its claim for willful

12  infringement.

13    THE COURT:  Then it's taken care of.  Thank

14  you.  We'll be in recess.

15    (Luncheon recess taken.)

16

17

18

19

20

21

22

23

24

25

2011.01.24 Trial Transcript Day 13  1/24/2011  2:45:00 PM

3078

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF VIRGINIA
 3                 RICHMOND DIVISION
 4
 5    -------------------------------------
 6    ePLUS, INC.          :  Civil Action No.
                            :  3:09CV620
 7    vs.                   :
                            :
 8    LAWSON SOFTWARE, INC. :   January 24, 2011
                            :
 9    -------------------------------------
10
11        COMPLETE TRANSCRIPT OF THE JURY TRIAL
12          BEFORE THE HONORABLE ROBERT E. PAYNE
13       UNITED STATES DISTRICT JUDGE, AND A JURY
14
      APPEARANCES:
15
      Scott L. Robertson, Esquire
16    Michael G. Strapp, Esquire
      David M. Young, Esquire
17    Goodwin Procter, LLP
      901 New York Avenue NW
18    Suite 900
      Washington, D.C.  20001
19
      Craig T. Merritt, Esquire
20    Christian & Barton, LLP
      909 East Main Street
21    Suite 1200
      Richmond, Virginia  23219-3095
22    Counsel for the plaintiff
23
24        Peppy Peterson, RPR
             Official Court Reporter
25           United States District Court
```

3079

```
 1    APPEARANCES:  (cont'g)
 2    Dabney J. Carr, IV, Esquire
      Troutman Sanders, LLP
 3    Troutman Sanders Building
      1001 Haxall Point
 4    Richmond, Virginia  23219
 5    Daniel W. McDonald, Esquire
      Kirstin L. Stoll-DeBell, Esquire
 6    William D. Schultz, Esquire
      Merchant & Gould, PC
 7    80 South Eighth Street
      Suite 3200
 8    Minneapolis, Minnesota  55402
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3080

```
 1                  P R O C E E D I N G S
 2
 3         THE CLERK:  Civil action number 3:09CV00620, ePlus,
 4    Incorporated versus Lawson Software, Incorporated.  Mr. Scott
 5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
 6    Mr. Michael G. Strapp represent the plaintiff.
 7         Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
 8    Kirstin L. Stoll-DeBell, Mr. William D. Schultz represent the
 9    defendant.  Are counsel ready to proceed?
10         MR. ROBERTSON:  Yes, Your Honor.
11         MR. McDONALD:  Yes, Your Honor.
12         THE COURT:  All right.  I was very sorry to hear
13    about Ms. Albert's father passing away.  You all both wrote
14    letters about it.  I don't see the point in bringing that to
15    the attention the jury.  Do either one of you?
16         In the old days, when people didn't do what they were
17    supposed to do, they got keelhauled.  I'm about ready to
18    institute that procedure here.  It's time for the jury to get
19    going, and I've had to read all this stuff now.  I told you
20    what to do about this verdict form, and it was pretty easy, and
21    it's unnecessary to go through all this stuff.
22         Now, apparently we're going to have to revise it
23    anyway because -- and some of the instructions.  What
24    instructions have to be revised because Lawson is not
25    contending that the RIMS brochure is prior art?  Which one is
```

3081

```
 1    arguing?
 2         MR. YOUNG:  Your Honor, David Young for ePlus.  It's
 3    instruction 3-A that was submitted to the Court over the
 4    weekend.  It lists as I think reference number three, RIMS
 5    brochure, and that would have to come out now because it
 6    appears that Lawson does not have that as an anticipated
 7    reference on its own verdict form.
 8         THE COURT:  Is that right?
 9         MR. McDONALD:  Yes, that's right, Your Honor.
10         THE COURT:  So I suppose I need to tell the jury
11    simply to disregard any testimony about the RIMS brochure as
12    prior art.
13         MR. McDONALD:  No, it not anticipatory prior art
14    meaning it's not all by itself anticipating a claim.  We're
15    still using it for obviousness and support for the on sale, the
16    RIMS as prior art and 102(a) and (b), but the brochure, all by
17    itself, we're not contending is an anticipating reference, but
18    it would be used to support number one in the instruction which
19    is the Fisher RIMS system as prior art.
20         THE COURT:  What do you mean, to be used to support?
21    If you're going to use it --
22         MR. McDONALD:  It's evidence of the Fisher RIMS
23    system as it was being sold and --
24         THE COURT:  Well, if it's evidence of it, it comes
25    out of 39, too, because you're not contending that it is
```

3122

1  got back information that it was temporarily out of stock,
2  please check back soon.  Clearly, using the Lawson system,
3  using that punchout capability, there was the capability of
4  determining whether a selected matching item was available in
5  inventory.
6       That functionality is also available with the systems
7  that use the EDI or electronic data interchange capability.
8  Dr. Weaver showed you, if we're using the electronic data
9  interchange module, the purchase order goes to a vendor, and
10  the vendor can reply and the purchase order responds as to
11  whether that item is available in inventory, for example,
12  whether or not the item was backordered.  During his
13  demonstration, he showed you a situation in which that
14  happened, and you'll be able to look at that when you're in
15  your deliberations.
16      Let's talk a little bit about this punchout
17  capability.  As you know, there's a punchout application that
18  Lawson includes that is accused of infringement in one of the
19  five configurations.  Dr. Weaver's demonstration of the
20  punchout capability showed how a punchout user can determine
21  whether an item is available in inventory, and it showed how
22  Lawson creates, communicates, and controls the punchout trading
23  partner websites that an S3 user punches out to.
24      You don't punch out to Dell.com, for example, when
25  you are doing that.  You punch out to a specially created Dell

3123

1  punchout website that Lawson has worked with Dell in order to
2  set up the communication protocols in order to do that.
3       For example, we can look at the next slide.  Here
4  you'll see, and the testimony was that Lawson, when you use
5  this punchout capability, you are always within the Lawson
6  system and that this is not, notwithstanding we are looking at
7  products that are available from the Dell catalog, this is a
8  special Dell website for this, and Dr. Weaver pointed out that
9  you can tell that from what's called the URL address.
10      You are at the Lawson server.corpnet.lawson.com when
11  you are there looking at these Dell products.  Lawson
12  established that, Lawson created that, Lawson designed it, and
13  Lawson set up all of the necessary architectures and
14  communication protocols in order to do that.
15      You even heard from Mr. Lohkamp, the product
16  strategist, about how Lawson enters into agreements with its
17  punchout trading partners to develop that connection.  He also
18  explained how the punchout partners pay Lawson to configure and
19  test and set up the connection.  He said those contracts were
20  mutually beneficial.
21      Now, he also said he had a number of relationships
22  with punchout trading partners that were not contractual, but
23  when I asked him, were they mutually beneficial as well to both
24  Lawson and to the trading partners, he said, yes.
25      If I can just talk to you a little bit about the

3124

1  punchout architecture to show you Lawson keeps a bear hug
2  around this entire process, if we can go to the punchout
3  architecture slide.
4       This was one of the Lawson documents.  It's the
5  procurement punchout guide, I believe, Plaintiff's Exhibit
6  Number 211.  Dr. Weaver testified as to the eight steps that
7  are necessary in order to do the punchout process.  These eight
8  steps are set up by Lawson in order to provide this
9  functionality through a user of the punchout system.
10      I'm not going to go through all eight, but that
11  exhibit is back in evidence, and it demonstrates clearly that
12  Lawson is the one that has created, designed, and instituted
13  this entire process to provide that architecture to the user of
14  the system in order to perform the search, the selection, and
15  retrieval of the information necessary to then fill out a
16  requisition and build the purchase orders.
17      Indeed, I thought it was very interesting.  The term
18  that Mr. Lohkamp used is that they have to create the handshake
19  with their punchout trading partners in order to do that.  Each
20  of these steps is controlled by Lawson, and Lawson controls the
21  authorization process, and Lawson establishes the connection,
22  and Lawson retrieves the information in order to complete the
23  entire purchase process.
24      It was Mr. Lohkamp who also confirmed that Lawson
25  provides the assistance to its customers including manuals,

3125

1  training services, and implementation services all to help them
2  configure the procurement punchout with its partners.  Indeed,
3  the user of the Lawson system tells Lawson what punchout
4  trading partners they want available to their system, and then
5  Lawson will indeed to do that, and then they charge for that
6  service.
7       May I have the next slide, 43.  Indeed, I asked
8  Mr. Christopherson, when the Lawson system punches out to the
9  punchout creating the partner's catalog, you remain connected
10  to the Lawson system; correct?  Correct.
11      I'd like to talk to you a little bit now about what's
12  call indirect infringement, some of these issues about inducing
13  and contributory infringement.  Indirect infringement, like
14  direct infringement, is still infringement, and ePlus, we
15  believe, has shown through the testimony, again, of Lawson's
16  own witnesses and its own documents that Lawson infringes the
17  claims of the patent both directly and indirectly.
18      The Court will instruct you that Lawson may directly
19  infringe the patents even if they believe in good faith what
20  they are doing is not infringement of any of the patents.  The
21  Court will also explain to you the law concerning indirect
22  infringement.  In a nutshell, ePlus asserts that Lawson has
23  both induced and contributed to the infringement of ePlus's
24  patents.
25      So what does that mean?  Well, to show induced