# Exhibit B

PUBLIC COPY

2009-1372, -1380, -1416, -1417

IN THE

# UNITED STATES COURT OF APPEALS

### FOR THE FEDERAL CIRCUIT

AKAMAI TECHNOLOGIES, INC.,

*Plaintiff-Appellant,*

and

THE MASSACHUSETTS INSTITUTE OF TECHNOLOGY,

*Plaintiff-Appellant,*

v.

LIMELIGHT NETWORKS, INC.,

*Defendant-Cross Appellant.*

**Appeals from the United States District Court for the District of Massachusetts in case nos. 06-CV-11109 and 06-CV-11585, Judge Rya W. Zobel.**

## PRINCIPAL BRIEF FOR PLAINTIFF-APPELLANT AKAMAI TECHNOLOGIES, INC. ON REHEARING EN BANC

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

JUN 20 2011

JAN HORBALY
CLERK

*Of Counsel:*

ROBERT S. FRANK, JR.
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110

*Attorney for Plaintiff-Appellant
The Massachusetts Institute of Technology*

DONALD R. DUNNER
KARA F. STOLL
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

JENNIFER S. SWAN
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, LLP
3300 Hillview Avenue
Palo Alto, CA 94304-1203
(650) 849-6676

*Attorneys for Plaintiff-Appellant
Akamai Technologies, Inc.*

June 20, 2011

## CERTIFICATE OF INTEREST

Counsel for Akamai Technologies, Inc. certifies the following:

1.      The full name of every party or amicus represented by Counsel is:

            Akamai Technologies, Inc.

2.      The name of the real party in interest represented by me is:

            None

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

            None

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

Donald R. Dunner
Kara F. Stoll
Elizabeth D. Ferrill
Finnegan, Henderson,
  Farabow, Garrett & Dunner, LLP
901 New York Avenue, NW
Washington, DC  20001
Telephone: (202) 408-4000

Jennifer Swan
Finnegan, Henderson,
  Farabow, Garrett & Dunner, LLP
3300 Hillview Ave.
Palo Alto, CA  94304

Robert S. Frank, Jr.
Carlos J. Perez-Albuerne
Choate, Hall & Stewart LLP
Two International Place
Boston, MA  02110

Sarah Chapin Columbia
McDermott, Will & Emery LLP
28 State Street
Boston, MA  02109-1775

Respectfully submitted,

Date: June 20, 2011

*Kara F. Stoll*

Kara F. Stoll
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC  20001
(202) 408-4000

*Attorney for Plaintiff-Appellant*
*Akamai Technologies, Inc.*

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................. iii

STATEMENT OF RELATED CASES ................................................................ ix

I.     RESPONSE TO THE EN BANC QUESTION ........................................... 1

II.    PRELIMINARY STATEMENT ................................................................. 3

III.   FACTS ....................................................................................................... 7

IV.    ARGUMENT ............................................................................................. 7

A.     There Is No Basis to Restrict Infringement of a Method Claim to
       the Conduct of a Single Actor................................................................. 7

       1.     This Court Erred by Adopting a Single-Actor Rule for
              Assessing Joint Liability for Infringement .................................... 7

       2.     The Statute Also Does Not Support a Single Entity Rule ................. 15

B.     Common Law Principles of Tort Law Regarding Joint Liability
       Should Apply to Patent Infringement .................................................... 18

       1.     When One Party Directs or Controls Another Party's
              Performance of a Method Step, the Other Party's
              Performance of That Step Should Be Attributed to the
              Directing or Controlling Party ...................................................... 20

       2.     Joint Actors Should Be Liable When Acting in Concert ................... 23

       3.     Even Independent Actors Are Liable If They Knew of the
              Combined Conduct ....................................................................... 28

C.     A Flexible Approach to Joint Liability Is Consistent with Supreme
       Court Policy .......................................................................................... 30

D.     Applying the Common Law of Torts to Cases of Joint
       Infringement Will Not Subvert the Statutory Scheme of Indirect
       Infringement........................................................................................... 31

i

E.    Precluding Application of the Common Law Principles of Joint Liability Makes Method Claims Unfairly Vulnerable to Loopholes in the Law ........................................................................................ 33

F.    Liability Will Typically Extend to Those Carrying Out Steps of the Claimed Method, but Should Not Extend to "Innocent" Actors ................. 37

    1.    "Innocent" Actors ................................................................... 37

    2.    Joint and Several Liability ..................................................... 38

G.    Akamai Should Prevail Under Each of the Above Common Law Doctrines of Joint Liability .......................................................... 42

    1.    Akamai's Inventive Method .................................................. 43

    2.    Limelight and Its Customers Perform All of the Steps of the Method Claimed in the '703 Patent ....................................... 46

    3.    The Jury Verdict of Infringement Under the "Direction or Control" Test ......................................................................... 48

    4.    The Jury Properly Found Liability Under *BMC Resources's* Flexible "Direction or Control" Test ..................................... 49

    5.    Limelight's Activities in Concert with Its Customers Subject Limelight to Liability for Joint Infringement ........................ 51

    6.    The Contractual Relationship Between Limelight and Content Providers Makes Limelight Liable for Direct Infringement ........................................................................ 52

    7.    Limelight Knew of the Customer's Conduct and Is Thus Liable ..................................................................................... 54

V.    CONCLUSION ............................................................................. 55

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aeroglide Corp. v. Zeh,*
   301 F.2d 420 (2d Cir. 1962) ................................................................................ 24

*Akamai Technologies Inc. v. Limelight Networks, Inc.,*
   629 F.3d 1311 (Fed. Cir. 2010) ................................................................... passim

*Aro Manufacturing Co. v. Convertible Top Replacement Co.,*
   365 U.S. 336 (1961) ............................................................................................ 12

*Bayer AG v. Housey Pharmaceuticals, Inc.,*
   340 F.3d 1367 (Fed. Cir. 2003) .......................................................................... 15

*Bilski v. Kappos,*
   130 S. Ct. 3218 (2010) ........................................................................................ 30

*BMC Resources, Inc. v. Paymentech, L.P.,*
   498 F.3d 1373 (Fed. Cir. 2007) .................................................................. passim

*Canton Bio-Medical, Inc. v. Integrated Liner Technologies, Inc.,*
   216 F.3d 1367 (Fed. Cir. 2000) ..................................................................... 9, 10

*Carbice Corp. of America v. American Patents Development Corp.,*
   283 U.S. 27 (1931) .............................................................................................. 19

*Centillion Data Systems LLC v. Qwest Communications International, Inc.,*
   631 F.3d 1279 (Fed. Cir. 2011) .......................................................................... 39

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.,*
   424 F.3d 1293 (Fed. Cir. 2005) ............................................................... 10, 11, 12

*Dowagiac Manufacturing Co. v. Minnesota Moline Plow Co.,*
   235 U.S. 641 (1915) ............................................................................................ 19

*Dynacore Holdings Corp. v. U.S. Phillips Corp.,*
   363 F.3d 1263 (Fed. Cir. 2004) .......................................................................... 12

*E.I. duPont De Nemours & Co. v. Monsanto Co.,*
   903 F. Supp. 680 (D. Del. 1995), *aff'd without op.*, 92 F.3d 1208 (Fed
   Cir. 1996) ............................................................................................ 27

*eBay Inc. v. MercExchange, L.L.C.,*
   547 U.S. 388 (2006) ................................................................. 19, 31

*Embrex, Inc., v. Service Engineering Corp.,*
   216 F.3d 1343 (Fed. Cir. 2000) ................................................ 40

*Engle v. Dinehart,*
   213 F.3d 639 (5th Cir. 2000) ................................................... 19

*Evident Corp. v. Church & Dwight Co.,*
   399 F.3d 1310 (Fed. Cir. 2005) ......................................... 27, 28

*Faroudja Laboratories, Inc. v. Dwin Electronics, Inc,*
   No. 97-20010 SW, 1999 WL 111788 (N.D. Cal. Feb. 24, 1999) .... 13, 14, 26, 27

*Free Standing Stuffer, Inc. v. Holly Development Co.,*
   187 U.S.P.Q. 323 (N.D. Ill. 1974) ......................................... 27

*Fromson v. Advance Offset Plate, Inc.,*
   720 F.2d 1565 (Fed. Cir. 1983) ......................................... 10, 11

*General Foods Corp. v. Studiengesellschaft Kohle mbH,*
   972 F.2d 1272 (Fed. Cir. 1992) ............................................ 9, 10

*Gershwin Publishing Corp. v. Columbia Artists Management, Inc.,*
   443 F.2d 1159 (2d Cir. 1971) ............................................... 20, 22

*Global-Tech Appliances, Inc. v. SEB S.A.,*
   563 U.S. ___ (May 31, 2011) ................................................ 10, 19

*Golden Hour Data Systems, Inc. v. emsCharts, Inc.,*
   614 F.3d 1367 (Fed. Cir. 2010) ........................................... 33, 36

*Halliburton v. Honolulu Oil Corp.,*
   98 F.2d 436 (9th Cir. 1938), *rev'd on validity grounds*, 306 U.S. 550
   (1939) ............................................................................................ 17

*In re Air Crash Disaster,*
   210 F. Supp. 2d 570 (E.D. Pa. 2002) ................................... 18

iv

*In re Hassan*,
   Bankruptcy No. 04-20332-7, 2010 WL 5348770 (Bankr. D. Kan. Dec.
   21, 2010)............................................................................................................ 24

*Isogon Corp. v. Amdahl Corp.*,
   No. 97 Civ. 6219(SAS), 1997 WL 759435 (S.D.N.Y. Dec. 10, 1997) ............. 41

*Jackson v. Nagle*,
   47 F. 703 (N.D. Cal. 1891)................................................................................ 17

*Joy Technologies, Inc. v. Flakt, Inc.*,
   6 F.3d 770 (Fed. Cir. 1993)............................................................................... 10

*Kar Kraft Engineering v. Shelby*,
   No. 06-14034, 2007 WL 1544397 (E.D. Mich. May 25, 2007) ........................ 42

*Kellogg v. Payne*,
   21 Iowa 575 (1866) ........................................................................................... 21

*Kennecott Copper Corp. v. McDonell*,
   413 P.2d 749 (Ariz. 1966).................................................................................. 37

*KSR International Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007) .......................................................................................... 30

*Lorillard v. Pons*,
   434 U.S. 575 (1978) ........................................................................................... 18

*Lucent Technologics, Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009)......................................................................... 42

*McKesson Technologies, Inc. v. Epic Systems Corp.*,
   No. 2010-1291 (Fed. Cir. Apr. 12, 2011) ................................................... passim

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) ........................................................................................... 19

*Metal Film Co. v. Metlon Corp.*,
   316 F. Supp. 96 (S.D.N.Y. 1970)................................................... 12, 13, 26, 27

*Micro Chemical, Inc. v. Great Plains Chemical Co.*,
   No. 88-Z-499, 1997 U.S. Dist LEXIS 23653 (D. Colo. Nov. 19, 1997),
   *aff'd in part and remanded in part*, 194 F.3d 1250 (Fed. Cir. 1999) .......... 39, 40

*Microsoft Corp. v. i4i Limited Partnership,*
    563 U.S. ___ (June 9, 2011) ..................................................................... 16

*Mobil Oil Corp. v. Filtrol Corp.,*
    501 F.2d 282 (9th Cir. 1974) .......................................................... 13, 14

*Moleculon Res. Corp. v. CBS, Inc.,*
    793 F.2d 1261 (Fed. Cir. 1986) ............................................................... 42

*Muniauction, Inc. v. Thomson Corp.,*
    532 F.3d 1318 (Fed Cir. 2008) ......................................... 8, 9, 50, 51, 53

*New Jersey Patent Co. v. Schaeffer,*
    159 F. 171 (E.D. Pa. 1908), *aff'd* 178 F. 276 (3d Cir. 1909) ..................... passim

*NTP, Inc. v. Research in Motion,*
    418 F.3d 1282 (Fed. Cir. 2005) .............................................. 9, 16, 18

*On Demand Machine Corp. v. Ingram Industries, Inc.,*
    442 F.3d 1331 (Fed. Cir. 2006) ............................................................... 26

*Peerless Equipment Co. v W. H. Miner, Inc.,*
    93 F.2d 98 (7th Cir. 1937) ........................................... 16, 29, 30, 55

*Pfaff v. Wells Electronics, Inc.,*
    525 U.S. 55 (1998) ...................................................................................... 31

*Shields v. Halliburton Co.,*
    493 F. Supp. 1376 (W.D. La. 1980) ................................... 12, 13, 26, 27

*Sony Corp. of America v. Universal City Studios, Inc.,*
    464 U.S. 417 (1984) ............................................................................ 19, 20

*Southeastern Greyhound Lines v. Callahan,*
    13 So.2d 660 (Ala. 1943) ......................................................................... 29

*Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.,*
    647 F.2d 200 (D.C. Cir. 1981) ................................................................. 41

*Stadia Oil & Uranium Co. v. Wheelis,*
    251 F.2d 269 (10th Cir. 1957) ................................................................. 29

*Taylor v. Conti*,
177 A.2d 670 (Conn. 1962) ........................................................ 25

*Temple v. Synthes Corp.*,
498 U.S. 5 (1990) ........................................................... 40, 41

*Thomson-Houston Electric Co. v. Ohio Brass Co.*,
80 F. 712 (6th Cir. 1897) .................................................... 33, 34, 38

*Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*,
520 U.S. 17 (1997) ..................................................... 9, 10, 16, 18

*Watson v. Kentucky & Indiana Bridge & Railroad Co.*,
126 S.W. 146 (Ky.), *modified* 129 S.W. 341 (Ky. 1910) .................... 29, 38

## STATUTES

1 U.S.C. § 1 ................................................................ 15

35 U.S.C. § 251 ............................................................ 36

35 U.S.C. § 271(a) ....................................................... passim

35 U.S.C. § 271(b) ............................................... 19, 31, 32, 55

35 U.S.C. § 271(c) ...................................................... 31, 32

35 U.S.C. § 305 ............................................................ 36

## OTHER AUTHORITIES

American Heritage College Dictionary (3d ed. 1997) ......................... 15

Dan B. Dobbs, *The Law of Torts* (West Group 2000) ......................... 23

Fed. R. Civ. P. 19 ...................................................... 41, 42

Fed. R. Civ. P. 65 ........................................................ 28

MPEP § 1412.03 (8th ed., rev. 8, July 2010) .............................. 36

MPEP § 2250 (8th ed., rev. 8, July 2010) ................................. 36

Restatement (Second) of Agency § 212 ............................... 20, 21, 22

Restatement (Second) of Agency § 220 ................................................................ 21

Restatement (Second) of Torts, § 870 ................................................................. 21

Restatement (Second) of Torts § 875 ................................................................. 19

Restatement (Second) of Torts, § 876 ................................................. 19, 21, 23, 24

Restatement (Second) of Torts, § 877 ........................................................ 19, 21, 22

Restatement (Second) of Torts, § 878 ................................................................. 19

Restatement (Second) of Torts, § 879 ................................................................. 19

Tonya M. Gray, *Contract Clauses Offer Protection in Infringement Suits*,
   In-House Texas, vol. 25, no. 41 (Jan. 11, 2010) ................................................ 33

W. Page Keeton et al., Prosser & Keeton on Torts, § 46 (5th ed. 1984) ............... 23

William C. Robinson, *The Law of Patents for Useful Inventions*,
   §904 (1890) ....................................................................................... 17

Wright, Miller & Kane, 7 *Fed. Practice and Procedure Civil 3d* § 1614 ........ 38, 42

## <u>STATEMENT OF RELATED CASES</u>

No appeal in or from these Civil Action Case Nos. 06-CV-11109 and 06-CV-11585 was previously before this or any other appellate court.

On April 20, 2011, the Court granted Akamai's request for rehearing en banc. (*See* Order of April 20, 2011, Granting En Banc Review, Case Nos. 2009-1372, -1380, -1416, -1417.)  On May 26, 2011, the Court granted rehearing en banc in *McKesson Technologies, Inc. v. Epic Systems Corp.*, 2011 WL 1365548 (Fed. Cir. 2011) ("*McKesson*").  (*See* Order of May 26, 2011, Granting En Banc Review, Case No. 2009-1291.)  Both cases involve issues of joint infringement. Accordingly, the *McKesson* case may be affected by this appeal.

## I.    RESPONSE TO THE EN BANC QUESTION

This Court has requested answers to the following question:  If separate entities each perform separate steps of a method claim, under what circumstances would that claim be directly infringed and to what extent would each of the parties be liable?

Akamai answers as follows:  A method claim is directly infringed when every step of the claim is practiced in the United States, whether by a single entity or by entities whose actions combine to perform all the steps of the claim.

As this Court has already held, principles of vicarious liability allow acts of one party in the performance of a step or steps of a method claim to be attributed to another.  The most common type of vicarious liability is based on the principles of respondeat superior, or agency law.  In such a situation, the agent's (servant's) acts are attributed to the principal (master) such that the parties can be seen as acting as a single entity.  This is not, however, the *only* kind of vicarious liability.  Rather, there are at least three other common law doctrines of vicarious liability that may apply in patent cases.

First, as this Court has already held in *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1381 (Fed. Cir. 2007), if one party "directs or controls" another to perform a step or steps of a method claim, those steps may be attributed to the directing or controlling party as if it performed them itself.  This doctrine

1

prevents a potential infringer from immunizing itself from infringement by performing nearly all the steps of a method claim while directing or controlling the performance of the remaining steps by another. Under common law principles of torts, it makes no difference whether the directed or controlled party is acting as an "agent" of the other for this doctrine to apply. Although the party that was directed or controlled may not be liable, the party that exercises "direction or control" over the entire process such that every step is attributable to the directing or controlling party is liable.

Second, again applying common law principles of torts, performance of the steps of a method claim by two or more parties acting in concert should make such parties jointly and severally liable for direct infringement. As expressly defined in the Restatement (Second) of Torts, parties are acting in concert when they act in accordance with an implied or express agreement to cooperate in a particular line of conduct. This doctrine applies whenever the parties act in concert to perform the steps that constitute a method claim, whether they are partners, part of a joint enterprise, or have a contractual relationship. Each circumstance is a recognized form of vicarious liability in which all are liable for the acts of each other committed as part of their expressly or tacitly agreed-upon activity.

Finally, under common law principles of torts, even if one party is unaware that it is carrying out certain steps of a patented method, the other party possessing

2

either actual or constructive knowledge that all the steps that constitute the patented method are indeed being carried out should be held liable for patent infringement.  In such circumstances, the "innocent" party without such knowledge but who is merely carrying out certain steps in isolation would not be held liable.

These standards, adopted from common law, are flexible enough to accommodate situations where multiple parties infringe a patented method, but narrow enough to avoid liability for a truly innocent party who, without knowledge of the overall method, performs some steps of a claim.  There is no basis under precedent, the language of the Patent Act, or the policies underlying the Patent Act, for ignoring these common law principles of torts and restricting infringement of a method claim to the conduct of a single actor, and there is certainly no support for limiting liability for joint direct infringement to a narrow, rigid agency or contractual relationship.

## II.   PRELIMINARY STATEMENT

A method claim is directly infringed under 35 U.S.C. § 271(a) when all of the steps of a method are performed.  The fundamental error of law committed by the Panel in the instant case stems from this Court's misplaced insertion of a "single entity" requirement into § 271(a).  While it is well established under this Court's precedent that a method claim can only be directly infringed when all the steps of the method are performed, there is no basis in this Court's precedent, or

3

the policy underlying the Patent Act, to restrict infringement of a method claim to only a single actor. (*See* § IV.A.1, *infra*.) It is this misreading of § 271(a) that led to the Panel's requirement of an agency or contractual relationship—a rule that dramatically restricts liability for infringement and threatens the value of untold numbers of issued patents.

Indeed, it contravenes the goals of the Patent Act to immunize a party from infringement of a patent claim if that party performs only some of the steps and has another party perform the other step or steps. It is equally problematic to allow two or more parties to avoid liability for infringement if those parties come together and agree explicitly or implicitly to perform the steps of a patented method. Rather, principles of vicarious liability allow acts of one party in performance of a step or steps of a method claim to be attributed to another in a variety of scenarios.

Without a doubt, the most common type of vicarious liability is based on the principles of respondeat superior, or agency law. This, however, is not the *only* kind of vicarious liability. For example, as this Court has already held, if one party "directs or controls" another to perform a step or steps of a method claim, those steps may be attributed to the directing or controlling party. At the very least, a flexible fact-based "direction or control" test, as initially set forth in *BMC Resources,* as opposed to a rigid agency or contractual relationship test, should

4

apply.  (*See* § IV.B.1, *infra*.)  There is simply no basis for reading a "direction or control" test as necessarily requiring an agency relationship or a contract between the parties in order to impose liability.  Further, the focus of a flexible fact-based "direction or control" test should be on both direction as well as control—the standard should not be converted into a control-only test.

Additionally, there is no basis under precedent, the Patent Act, or the policies underlying the Patent Act for restricting liability for direct infringement of a method claim to only those circumstances where one actor dominates another.  Those who act in concert, partners, and joint enterprisers are all vicariously liable for the acts of each other committed as part of their expressly or tacitly agreed-upon activity.  The Restatement (Second) of Torts, this Court's precedent, and numerous pre-1952 cases all acknowledge this type of liability.  Accordingly, and consistent with tort law principles, parties who act in concert to carry out the steps that constitute a patented method should be jointly liable.

Finally, consistent with principles of tort law, an independent actor is liable for direct infringement if that actor knows that its actions may be combined with another's, and such conduct results in tortious injury.  Applying this basic principle, numerous courts have imposed liability on a defendant in situations where the actions of independent parties have combined together to commit a tort, reasoning that the defendant knew of the combined conduct.  This Court should

apply this common law tort doctrine to patent infringement, which is itself a tort. Moreover, this doctrine is particularly attractive because an "innocent" infringer, without knowledge of the steps performed by the other party, would not be liable for infringement.

Each of the above circumstances is a recognized form of vicarious liability. In all of these situations, it is uncontroversial that liability for patent infringement under § 271(a) should apply. These doctrines of vicarious liability, based on common law tort principles and supported by precedent, provide a sensible, workable standard for patent infringement under § 271(a) and are consistent with the Supreme Court's preference for flexible fact-based standards that avoid bright-line rules. The doctrines are consistent with the language of the statute and afford inventors a meaningful right to exclude. Further, the proposed test for joint infringement is broad enough to encompass the "direction or control" test set forth in *BMC Resources*, but is not so narrow as to restrict liability where it otherwise should apply.

In this case, Limelight was the mastermind behind the performance of the accused method. Limelight developed the accused process and provided detailed instructions and a contract to direct its customers to perform those few steps of the claimed process that it did not perform. Specifically, according to Limelight's process, Limelight performed all of the steps of asserted claim 34 except the

6

"tagging" step and all of the steps of asserted claims 19-21 except the "tagging" and "serving" steps.  As the Panel recognized, Limelight's contract explicitly set forth that the customer would perform tagging and serving steps and, in exchange, Limelight would provide a service guarantee (with that service requiring the performance of the remaining steps of the claim).  Given Limelight's role in developing, performing, and orchestrating the performance of the accused method, this Court should reinstate the jury verdict of joint infringement, which was properly decided under the "direction or control" standard announced in *BMC Resources.*

## III.   FACTS

Given that the en banc Court has asked the parties to address a specific legal question, Akamai will forego the conventional statement of facts at this point in the brief.  Akamai will instead provide a detailed statement of facts below when applying the broad principles involved to the facts in this case.  (*See* § IV.G., *infra.*)

## IV.   ARGUMENT

### A.   There Is No Basis to Restrict Infringement of a Method Claim to the Conduct of a Single Actor

#### 1.   This Court Erred by Adopting a Single-Actor Rule for Assessing Joint Liability for Infringement

The genesis of the rigid test applied by the *Akamai* Panel can be found in certain language from this Court's decision in *BMC Resources*, which is the first in

7

a recent line of cases where this Court sought to expand on the proper framework for deciding joint infringement questions. In *BMC Resources*, this Court explained that liability for joint infringement can be imposed where one party has sufficient "direction or control" over the performance of the claimed method. 498 F.3d at 1380-81. Although *BMC Resources* also discussed how principles of equity do not allow a "mastermind" to avoid infringement, *id.* at 1381, decisions subsequent to *BMC Resources* progressively narrowed and limited the applicable test, until finally, in *Akamai*, the Federal Circuit announced that to establish joint infringement under § 271(a), there must exist either a strict agency relationship or a contractual relationship between the parties. *Akamai Techs. Inc. v. Limelight Networks, Inc.*, 629 F.3d 1311, 1320 (Fed. Cir. 2010) ("This court therefore holds as a matter of Federal Circuit law that there can only be joint infringement when there is an agency relationship between the parties who perform the method steps or when one party is contractually obligated to the other to perform the steps.").

This Court's erroneous progression toward the agency or contract standard as the sole means for establishing joint infringement, however, is based primarily on the mistaken view that only a single entity can infringe a method claim. For example, in *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed Cir. 2008), the Court stated that:

> In *BMC Resources*, this court clarified the proper standard for whether a method claim is directly infringed by the combined actions of

8

multiple parties. The court's analysis was founded on the proposition that direct infringement requires a single party to perform every step of a claimed method. 498 F.3d at 1380 (concluding that this requirement derived directly from 35 U.S.C. § 271(a)); *see also NTP, Inc. v. Research in Motion*, 418 F.3d 1282, 1317-18 (Fed. Cir. 2005).[1]

*Muniauction*, 532 F.3d at 1329.

Similarly, subsequent cases, including *Akamai* and *McKesson Technologies, Inc. v. Epic Systems Corp.*, 2010-1291 (Fed. Cir. Apr. 12, 2011), have all reiterated and relied on this single entity rule. *Akamai*, 629 F.3d at 1318 ("It is well settled that direct infringement requires a single party to perform every step of a claimed method.") (citing *BMC Res.*, 498 F.3d at 1378-79; *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997)); *McKesson*, No. 2010-1291, slip op. at 6 ("A method claim is directly infringed only if each step of the claimed method is performed by a single party.") (citing *BMC Res.*, 498 F.3d at 1378-79)).

All of these cases cite to each other and to *BMC Resources*. Yet, neither *BMC Resources* nor any of the authorities cited therein provides legal support for the assertion that a method claim can only be directly infringed by a single entity. Indeed, there is not a single decision from this Court or the Supreme Court, including *Warner-Jenkinson; Canton Bio-Medical, Inc. v. Integrated Liner Technologies, Inc.*, 216 F.3d 1367 (Fed. Cir. 2000); *General Foods Corp. v.*

---

[1] *NTP* discusses the all elements rule for infringement. It does not, however, provide any analysis or state that "direct infringement requires a single party."

*Studiengesellschaft Kohle mbH*, 972 F.2d 1272 (Fed. Cir. 1992*); Joy Technologies, Inc. v. Flakt, Inc.*, 6 F.3d 770 (Fed. Cir. 1993); *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565 (Fed. Cir. 1983); and *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005), all relied on by *BMC Resources*, that provides a sound, reasoned basis for the single entity restriction the Court has imposed on § 271(a).

In *Warner-Jenkinson*, the Supreme Court, in the context of clarifying the doctrine of equivalents, held that "[e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." 520 U.S. at 29. Similarly, *Canton Bio-Medical*, 216 F.3d at 1370, and *General Foods*, 972 F.2d at 1274, merely note that each and every element of a method claim must be practiced to constitute infringement. None of these cases, however, describes the parties **who** must practice each element.[2] Likewise, *Joy Technologies*, 6 F.3d at 773, referencing § 271(a), notes that "[t]he making, using, or selling of a patented invention is the usual meaning of the expression 'direct infringement.'" Accordingly, although these cases suggest **what** constitutes direct infringement of a method claim—that is, the practice of

_____

[2] In fact, in a recent case, the Supreme Court noted that "[d]irect infringement has long been understood to *require no more than* the unauthorized use of a patented invention." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. ___, slip op. at 5 n.2 (May 31, 2011) (emphasis added).

10

each and every step of a claimed method—not one of these cases addresses the issue of *who* must practice the steps.

*BMC Resources* further cites *Fromson* and *Cross Medical*. A careful inspection of these cases, however, demonstrates that the single entity rule was not the basis for the holding in either case. *Fromson* turned on the proper construction of the claim term "reaction." 720 F.2d at 1571. Because the claim term was construed improperly, the court reversed and remanded the case to the district court. *Id. BMC Resources* relied on a statement in the "Background" section of the *Fromson* opinion: "Because the claims include the application of a diazo coating or other light sensitive layer and because Advance's customers, not Advance, applied the diazo coating, Advance cannot be liable for direct infringement with respect to those plates but could be liable for contributory infringement." *Id.* at 1568. Indeed, the statement on its face appears contradictory. In any event, there is no reasoned analysis in *Fromson* supporting the existence of the single entity rule.

Similarly, in *Cross Medical*, Cross Medical had asserted that Medtronic infringed claims to an apparatus because the Medtronic apparatus was capable of being operated in an infringing manner by the physicians in an operating room. 424 F.3d at 1310. Cross Medical argued that Medtronic was liable for direct infringement because of its interactions with the physicians in the operating room.

11

*Id.* at 1311.  Although the Court noted in rejecting Medtronic's argument that the physicians in the operating room were not "agents" of Medtronic, *id.*, there was no reasoned analysis on this point.  The decision did not hold that direct infringement is limited to one person.[3]

Moreover, far from supporting the single entity rule, the district court cases cited in *BMC Resources* actually support the proposition that two actors can directly infringe a claim.  For example, *BMC Resources* cites *Shields v. Halliburton Co.*, 493 F.Supp. 1376 (W.D. La. 1980).  In *Shields*, the court found that the combined actions of the parties (Halliburton and Brown & Root) jointly infringed:

> When infringement results from the ***participation and combined action of several parties***, they are all ***joint infringers and jointly liable*** for patent infringement.  *New Jersey Patent Co. v. Schaeffer*, 159 F. 171 (E.D. Pa.1908), aff'd 178 F. 276 (3rd Cir. 1909).  Infringement of a patented process or method ***cannot*** be avoided by having another perform one step of the process or method.  *Metal Film Company v. Milton* [sic *Metlon*] *Corporation*, 316 F. Supp. 96 (S.D.N.Y. 1970).

*Shields*, 493 F. Supp. at 1389 (emphases added).

---

[3] Similarly, caselaw such as *Dynacore Holdings Corp. v. U.S. Phillips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004) (cited in *BMC Resources*), and *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 366-67 (1961) (cited in *McKesson*), which note that inducement or contributory infringement requires a showing of direct infringement, do not discuss a single entity requirement for direct infringement.

Further, *New Jersey Patent* and *Metal Film*, the cases cited in *Shields*, certainly allow for direct infringement by two or more parties. In *New Jersey Patent*, the district court noted that "[w]here an infringement of a patent is brought about by **concert of action** between a defendant and complainants' licensee, all engaged directly and intentionally become joint infringers." 159 F. at 173 (emphasis added). In *Metal Film*, contracting out a step of a method claim did not preclude liability for the "mastermind": "That defendants choose to have the vacuum metallizing, which was a conventional step (used, for example, in producing the Prindle laminated yarn), done by outside suppliers does not mitigate their infringement of the overall process." 316 F. Supp. at 110 n.12. It was apparently the discussion in *Shields*, *New Jersey Patent*, and *Metal Film* that led to the statement in *BMC Resources* that one party cannot simply contract out a step of a method claim to avoid liability for infringement. *BMC Res.*, 498 F.3d at 1381 (citing *Shields*, 493 F. Supp. at 1389). This important aspect of the *BMC Resources* analysis was stripped out by subsequent Federal Circuit cases.

Two other district court opinions cited in *BMC Resources*, including *Faroudja Laboratories, Inc. v. Dwin Electronics, Inc*, No. 97-20010 SW, 1999 WL 111788 (N.D. Cal. Feb. 24, 1999), and *Mobil Oil Corp. v. Filtrol Corp.*, 501 F.2d 282 (9th Cir. 1974), also did not rely on a single entity rule. While *Faroudja* found no direct infringement when different parties performed different steps of a method

13

claim, it did so because there was not a significant enough relationship between the parties. 1999 WL 111788 at *6-7. *Faroudja*, however, expressly noted that courts have found direct infringement where two or more actors worked together to infringe a patent. *Id*. at *5 ("It is true that several district courts have found a party liable for direct infringement of a process patent even where the various steps included in the patent are performed by distinct entities. However, these cases indicate that some connection between the different entities justified that finding."). *Mobil Oil* also stated that joint infringement cannot be found in situations where two actors perform steps but have *no* connection, but it does *not* say that joint infringement can never be found. 501 F.2d at 291-92. In *Mobil Oil*, the combined actions of the defendants did not complete all of the method steps (i.e., neither completed a washing step of the claim) and, accordingly, it was the failure of anyone to perform a claim step that resulted in no liability. *Id*.

As can be seen from the foregoing discussion, not one of the cases cited by *BMC Resources* provided a reasoned analysis as to why only a single actor can infringe a method claim. Some of the cases cited in the opinion were cited for the recitation of the all elements rule, others merely restated the single entity rule without supporting reasoning, and others actually supported the opposite proposition, i.e., that more than one entity can infringe a method claim.

### 2.    The Statute Also Does Not Support a Single Entity Rule

It is not surprising that none of the above cases provides a sufficient basis for limiting infringement of a method claim to only a single actor, as the statute plainly does not require such an outcome. Section 271(a) of the 1952 Patent Act imposes liability on "whoever . . . uses . . . any patented invention." There is nothing in this language to suggest that "whoever" refers to a single entity when applied to method claims. Rather, according to common dictionary definitions, "whoever" in § 271(a) means "[w]hatever person or *persons*." *See* American Heritage College Dictionary 1540 (3d ed. 1997) (emphasis added). "Dictionaries of the English language provide the ordinary meaning of words used in statutes." *Bayer AG v. Housey Pharms., Inc.*, 340 F.3d 1367, 1371 (Fed. Cir. 2003). Moreover, 1 U.S.C. § 1 states: "In determining the meaning of any Act of Congress, unless the context indicates otherwise—words importing the singular include and apply to several persons, parties or things . . . ." Accordingly, consistent with the plain meaning and as indicated by Congress in 1 U.S.C. § 1, "whoever" in § 271(a) means person *or* persons.

Further, this interpretation of the Patent Act is supported by the authority existing *before* the passage of the Patent Act in 1952, and the Supreme Court has explained that the Act preserved pre-codification infringement principles: "In the context of infringement, we have already held that pre-1952 precedent survived the

passage of the 1952 Act." *Warner-Jenkinson*, 520 U.S. at 26. "Section 271(a) was merely a codification of the common law of infringement that had developed up to the time of passage of the 1952 Patent Act. It was not meant to change the law of infringement." *NTP*, 418 F.3d at 1319; *see also Microsoft Corp. v. i4i Limited Partnership*, 563 U.S. ___, slip. op. at 8-9 (June 9, 2011) (looking to pre-1952 precedent to assess common law presumption of validity at time of enactment).

In *Peerless Equipment Co. v W. H. Miner, Inc.*, 93 F.2d 98 (7th Cir. 1937), the Seventh Circuit considered whether a manufacturer could escape liability for infringing a process claim by enlisting its customer to complete the final step. The patent was for a process for making train gears, which required as one of the steps "successively compressing the mechanism to flatten down said protruding portion to increase the area of surface contact of said last-named faces." *Id.* at 102 n.2. The manufacturer did not perform this last step, but instead left it to its customers to complete. *Id.* at 105. The court upheld a finding of infringement because the manufacturer passed the nearly finished gears on to the customer "with the knowledge that the railroads will put them to use and thereby flatten the crown, thus completing the final step of the process." *Id.* Likewise, *New Jersey Patent*, discussed above, illustrates the existence of joint infringement prior to passage of the Patent Act. There, the court specifically stated that "[w]here an infringement of a patent is brought about by concert of action between a defendant and

16

complainants' licensee, all engaged directly and intentionally become joint infringers." 159 F. at 173.

Similarly, in *Halliburton v. Honolulu Oil Corp.*, 98 F.2d 436, 440 (9th Cir. 1938), *rev'd on validity grounds*, 306 U.S. 550 (1939), the court held in connection with a process patent that two defendants were jointly liable as infringers: "We find that the Honolulu Oil Corporation participated *jointly* in infringement in using the process on the wells drilled by it. We hold that there was infringement of the process by the Honolulu Oil Corporation as well as by appellee M. O. Johnston Oil Field Service Corporation." (Emphasis added.)

And, in *Jackson v. Nagle*, 47 F. 703, 704 (N.D. Cal. 1891), the court held two defendants jointly liable for infringing patents, one of which was a method patent, where one defendant performed "a portion of the [infringing] work" and the "other portions" of the infringing work were performed by the other defendant. For this reason, the court found that "the respondents must be treated and held as joint infringers." *Id.*; *see also* William C. Robinson, *The Law of Patents for Useful Inventions*, § 904 (1890) ("To use in part with intent that others shall complete the operation, . . . is likewise an infringement.").

These cases did not restrict infringement to a single entity or to parties with an agency or contractual relationship, but instead used a broad, flexible approach to determine whether the specific actions by the parties were sufficient to assess

17

liability for joint infringement.  As mentioned above, the adoption of the 1952

Patent Act did not extinguish the viability of the pre-1952 precedents concerning

§ 271(a), but merely constituted "a codification of the common law of

infringement" that had previously existed.  *Warner-Jenkinson*, 520 U.S. at 26;

*NTP*, 418 F.3d at 1319; *see also Lorillard v. Pons*, 434 U.S. 575, 580 (1978)

("Congress is presumed to be aware of an administrative or judicial interpretation

of a statute and to adopt that interpretation when it re-enacts a statute without

change."); *In re Air Crash Disaster*, 210 F. Supp. 2d 570, 575 (E.D. Pa.

2002)("[W]hen Congress amends an existing statute, a court must presume that

any part of the statute left intact reflects Congress' intent to preserve the prevailing

judicial interpretation of that portion.").  Indeed, if Congress meant to abrogate the

common law precedent concerning joint infringement when it enacted the 1952

Patent Act, it would have said so expressly. There is nothing in either the language

of the statute or the legislative history, however, that supports such an abrogation

of precedent.  Accordingly, there is no basis in either the statute or the precedent

for a single entity test for establishing joint infringement.

### B.     Common Law Principles of Tort Law Regarding Joint Liability Should Apply to Patent Infringement

Without support for limiting direct infringement to a single entity, the

question becomes one of how to define the relationships between two or more

parties that would be sufficient to find direct infringement.  Given that patent

infringement is a tort, it is logical to examine tort law for guidance. *See Dowagiac Mfg. Co. v. Minn. Moline Plow Co.*, 235 U.S. 641, 648 (1915) (holding that patent infringement was a "tortious taking"); *Carbice Corp. of Am. v. Am. Patents Dev. Corp.*, 283 U.S. 27, 33 (1931) ("Infringement, whether direct or contributory, is essentially a tort, and implies invasion of some right of the patentee.").[4] This Court has already applied common law principles of tort law by relying on vicarious liability in developing the "direction or control" test. *See*, *e.g., BMC Res.*, 498 F.3d at 1379 (citing *Engle v. Dinehart*, 213 F.3d 639 (5th Cir. 2000) (unpublished decision)). This Court erred, however, in limiting the doctrines applicable to liability for joint infringement to an agency or contractual relationship.

Indeed, it has long been recognized under common law tort principles that agency liability is not the *sole* basis for holding joint tortfeasors liable. Over time, common law courts have developed a series of distinct but overlapping bases for joint and vicarious liability. *See* Restatement (Second) of Torts §§ 875-879 (1979). These rules work together to establish liability in a variety of "circumstances in which it is just to hold one individual accountable for the actions

---

[4] The Supreme Court has looked to common law principles in other cases, including *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), (determining the appropriate standard for injunctions in patent cases), and in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) (examining declaratory judgment law). Similarly, in *Global-Tech*, 563 U.S. ___, slip op. at 10, the Supreme Court looked to well-established principles of criminal law when examining the issue of knowledge required under 35 U.S.C. § 271(b).

of another" in harming another party's interests. *See, e.g., Sony Corp. of Am v. Universal City Studios, Inc.*, 464 U.S. 417, 435 (1984). There are at least three such bases that should apply to patent infringement under § 271(a).

> **1.    When One Party Directs or Controls Another Party's Performance of a Method Step, the Other Party's Performance of That Step Should Be Attributed to the Directing or Controlling Party**

First, as this Court has already held in *BMC Resources*, if one party "control[s] or direct[s] [the performance of] each step of the patented process," those steps may be attributed to the directing or controlling party. *BMC Res.*, 498 F.3d at 1380-81. It should make no difference whether the directed or controlled party is acting as an "agent" of the other within the formal requirements of agency law. *See, e.g., Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) ("This court attached no special significance to the technical classification of the Green-Jalen relationship."). It has long been recognized that agency liability is not the basis for holding joint tortfeasors liable when one acts pursuant to the instructions of the other and performance of the very thing that was directed causes harm. Moreover, there is no basis for limiting the "direction or control" test to simply one of "control" as the Panel did here.

The concept of "direction" is expressly addressed by § 212 of the

Restatement (Second) of Agency (1958).[5] This section notes that "[a] person is

subject to liability for the consequences of another's conduct which results from

his *directions* as he would be for his own personal conduct if, with knowledge of

the conditions, he intends the conduct, or if he intends its consequences, unless the

one directing or the one acting has a privilege or immunity not available to the

other." *Id.* (emphasis added).  However, as the comment to this section notes,

"[t]he rule stated in this Section is *not dependent upon the law of agency* but

results from the general rule, stated in the Restatement of Torts, that one causing

and intending an act or result is as responsible as if he had personally performed

the act or produced the result. *See* the Restatement (Second) of Torts, §§ 870, 876,

877.  If one intends a particular result to follow from his conduct and the result

follows, it is immaterial that the particular way in which it is accomplished was

unintended."  Restatement (Second) Agency § 212, *cmt. a* (emphasis added); *see*

*also Kellogg v. Payne*, 21 Iowa 575 at *2 (1866) ("[I]f a person employ another,

although by express and independent contract, to erect a nuisance, or do any other

work directly or necessarily injurious to a third person, he will be liable to such

third person for damages resulting from the nuisance, or work.  But this liability

---

[5] *BMC Resources*, which also addressed the concept of control, cited to a different section of the Restatement (Second) of Agency, specifically, § 220, which notes that even for "control," the evidence of "control needed to establish the relation of master and servant may be *very attenuated*." (emphasis added).

21

rests upon the idea that he is a co-trespasser, by reason of his directing or participating in the work done, and not on the principle of respondeat superior."); *Gershwin*, 443 F.2d at 1162 ("Although vicarious liability was initially predicated upon the agency doctrine of respondeat superior, this court recently held that even in the absence of an employer-employee relationship one may be vicariously liable if he has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities."(citation omitted)).

In addition to § 212, the Restatement (Second) Torts, § 877(a) further supports Akamai's position that "direction or control" need not amount to an agency or contractual relationship. This section states that for harm resulting to a third person from the tortious conduct of another, one is subject to liability if he "orders" the conduct. The Restatement also makes clear that "one who accomplishes a particular consequence is as responsible for it when accomplished through directions to another as when accomplished by himself." *Id.* at *cmt. a.* This section, however, also makes abundantly clear that an agency relationship is not necessary to impose liability, specifically emphasizing that such imputation is "independent of" and not limited to the master-servant relationship. *Id.* Thus, at the very least, this Court should return to the more flexible "direction or control" standard set forth in *BMC Resources* and supported by the caselaw and the Restatements.

22

## 2. Joint Actors Should Be Liable When Acting in Concert

In addition, joint actors should be liable when they act in concert to perform the steps that constitute a method claim.  There is no basis under precedent, the Patent Act, or the policies underlying the Patent Act, for restricting principles of vicarious liability to only those circumstances where one actor dominates another as described above. (*See* § IV.B.1, *supra*.)  "Respondeat superior is *not* the only kind of vicarious liability . . . those who act in concert, partners, and joint enterprisers are all vicariously liable for the acts of each other committed as part of their expressly or tacitly agreed-upon activity."  Dan B. Dobbs, *The Law of Torts*, (West Group 2000) (emphasis added).

As noted in the Restatement (Second) of Torts, § 876(a), a person is subject to liability when he or she "does a tortious act in concert with the other or pursuant to a common design."  *See also* W. Page Keeton et al., Prosser & Keeton on Torts, § 46, at 322 (5th ed. 1984) ("The original meaning of a 'joint tort' was that of vicarious liability for concerted actions.  All persons who acted in concert to commit a trespass, in pursuance of a common design, were held liable for the entire result.").  As defined in the comments section to this provision:

> Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result.  The agreement need not be expressed in words and may be implied and understood to exist from the conduct itself.  Whenever two or more persons commit tortious acts in concert,

> each becomes subject to liability for the acts of the others, as well as for his own acts.  The theory of the early common law was that there was a mutual agency of each to act for the others, which made all liable for the tortious acts of any one.

*See* Restatement (Second) of Torts, § 876(a), *cmt. a*.[6]

Persons or entities who commit torts acting in concert are jointly liable.  *Id.* Moreover, the independent acts of each party in themselves need not be tortious standing alone.  While comment c to § 876(a) states that "it is essential that the conduct of the actor be in itself tortious," the comment goes on to explain that an actor "who innocently, rightfully and carefully does an act that has the effect of furthering the tortious conduct or cooperating in the tortious design of another" is not liable.  *Id.*  Thus, this comment merely explains that innocent actors are not liable.  It does not mean that each party in a concerted action must itself perform a tort.  This is supported by case law.

For example, in *Aeroglide Corp. v. Zeh*, 301 F.2d 420, 422 (2d Cir. 1962), the Second Circuit imposed joint liability on the individual participants of a strict liability tort—conversion—where the tort involved the combined participation and

---

[6] Although § 876(a) contains the caveat that "[t]he Institute takes no position on whether the rules stated in this Section [§ 876] are applicable when the conduct of either the actor or the other is free from intent to do harm or negligence but involves strict liability for the resulting harm," the comment to this caveat makes clear that this relates to cases involving "liability for the escape of animals and abnormally dangerous conduct for which there is strict liability." Restatement (Second) of Torts, *cmt. f*; *In re Hassan*, Bankruptcy No. 04-20332-7, 2010 WL 5348770, at *12 n.34 (Bankr. D. Kan. Dec. 21, 2010). (noting that the caveat is limited to the escape of animals and dangerous conduct, and does not implicate nondangerous strict liability torts such as conversion).

action of the defendants and where the actions of each individual defendant, viewed alone, were likely not tortious. Further, in *Taylor v. Conti*, 177 A.2d 670, 672 (Conn. 1962), the court imposed liability where the harm to plaintiff would likely not have occurred without ***both*** defendants' actions. In that case, the defendant property owner had contracted with the defendant independent contractor to perform grading work and soil removal to improve his land. *Id.* at 671. This work resulted in silt and soil erosion on plaintiff's property for which both defendants were held liable. *Id.* at 672. The relationship between defendant property owner and defendant independent contractor did not appear to be an agency relationship at least in part due to the fact that defendant was using the removed soil for "its [own] purposes" independent of the defendant property owner. *Id.*

Thus, by applying these common law principles from tort law, one can formulate a test that applies in the context of joint infringement whereby infringement may be found if two or more parties act in concert to carry out the steps of a patented method. This test provides a sensible workable standard for patent infringement, and is consistent with both the common law and the U.S. Supreme Court's preference for flexible fact-based standards that avoid bright-line rules. (*See* § IV.G., *infra*.)

25

There is ample support for this test in patent cases.  For example, in *On Demand Machine Corp. v. Ingram Industries, Inc.*, 442 F.3d 1331, 1345 (Fed. Cir. 2006), this Court agreed with a jury instruction that direct infringement occurs when participants work together in concert to perform the steps of a patented method.  The jury instruction stated:

> It is not necessary for the acts that constitute infringement to be performed by one person or entity. When infringement results from the participation and combined action(s) of more than one person or entity, they are all joint infringers and jointly liable for patent infringement. Infringement of a patented process or method cannot be avoided by having another perform one step of the process or method. Where the infringement is the result of the participation and combined action(s) of one or more persons or entities, they are joint infringers and are jointly liable for the infringement.

*Id.* at 1344-45.  This Court explained that it could "discern no flaw in this instruction as a statement of law."  *Id.* at 1345; *see also McKesson*, No. 2010-1291, slip op. at 11-12. (Newman J., dissenting).

Although *BMC Resources* dismissed this language in *On Demand* as dicta, this test was also applied in *Shields*, 493 F. Supp. at 1389, and *Metal Film,* 316 F. Supp. at 110 n.12, both discussed above.  (See § IV.A.1, *supra*.)  Likewise, as discussed above, in *New Jersey Patent*, 159 F. at 173, the court noted that "[w]here an infringement of a patent is brought about by ***concert of action*** between a defendant and complainants' licensee, all engaged directly and intentionally become joint infringers."  Similarly, in *Faroudja*, 1999 U.S. WL 111788, at * 5-6,

26

also discussed above, the district court examined several divided infringement fact patterns from previous cases, including *E.I. duPont De Nemours & Co. v. Monsanto Co.*, 903 F. Supp. 680, 735 (D. Del. 1995), *aff'd without op.*, 92 F.3d 1208 (Fed Cir. 1996); *Shields*, 493 F. Supp. at 1389; *Free Standing Stuffer, Inc. v. Holly Development Co.*, 187 U.S.P.Q. 323, 333 (N.D. Ill. 1974); and *Metal Film*, 316 F. Supp. at 110, and noted that "each demonstrate that the entities found to directly infringe patented processes ***worked in concert*** with other entities to complete the process of infringement." (Emphasis added.) These fact patterns included having someone perform a step (*Monsanto*), instructing another to perform a step (*Free Standing Stuffer*), contracting out a step (*Shields*), and arranging with an outside supplier to perform a step (*Metal Film*). *BMC Resources* itself recognized that "[a] party cannot avoid infringement . . . simply by contracting out steps of a patented process to another entity." 498 F.3d at 1381 (citing *Shields*, 493 F. Supp. at 1389).

Other examples exist under the patent law where parties acting in concert have been held jointly and severably liable for the actions of the other. For example, in *Evident Corp. v. Church & Dwight Co.*, 399 F.3d 1310 (Fed. Cir. 2005), this Court faced the question of how to apportion an attorney-fee award in a case involving inequitable conduct. Applying the "common law principle of mutual agency," this Court explained that a "partnership, or every member thereof,

27

is liable for torts committed by one of the members acting in the scope of the firm business." *Id.* at 1316. Thus, while acknowledging that inequitable conduct is not a tort, the Court held that the "principle of joint responsibility equally applies to Peroxydent and its partners." *Id.* "Because of the close, intertwined relationship between the Peroxydent partners, the Evident shareholders, and the inventors of the '782 patent, Peroxydent cannot be said to be innocent of the underlying inequitable conduct." *Id.* Further, Fed. R. Civ. P. 65(d)(2)(C) specifically includes "persons who are in active concert or participation" as parties to be bound by an injunction.

Accordingly, and consistent with principles of tort law, Akamai asserts that joint action by parties "acting in concert" to carry out the steps that constitute a patented method should make such parties jointly liable.

### 3. Even Independent Actors Are Liable If They Knew of the Combined Conduct

Finally, liability should attach where two parties together perform all the steps of a patented method even if one of the parties is *unaware* that the other party has carried out such steps. For example, one party might knowingly (either actually or constructively) carry out four of the five steps that constitute a method patent, and then cause its customers to unknowingly carry out the remaining step. In this circumstance, the party who knowingly carried out the four steps would be liable for infringement—even if the "innocent" customer carrying out the fifth step would avoid liability.

28

Such a circumstance is analogous, for example, to a scenario where one actor, while carefully driving a car, causes harm to someone as a result of an unknown defect caused by the negligence of a third party, such as the car's owner. *See S.E. Greyhound Lines v. Callahan*, 13 So.2d 660, 663 (Ala. 1943). In that situation, only the owner is liable, even though its acts alone would not have injured the plaintiff. *See id.* Similarly, where a railroad company caused a gas leak, and an individual lit a match, causing grave harm to others, the court recognized that the individual's liability turned on whether he knew of the gas leak, and the railroad was liable even if the individual was not. *See Watson v. Ky. & Ind. Bridge & R.R. Co.*, 126 S.W. 146, 150 (Ky.), *modified* 129 S.W. 341 (Ky. 1910). Additionally, the Tenth Circuit held some but not all defendants liable in a securities case where a joint actor who had approached the plaintiffs, and whose actions were necessary to the tort, was actually "a victim of the scheme rather than a knowing participant in it," and thus not liable. *See Stadia Oil & Uranium Co. v. Wheelis*, 251 F.2d 269, 276 (10th Cir. 1957).

Perhaps the most applicable fact pattern to the issue before this en banc Court is that of *Peerless*, 93 F.2d at 98. There, the Seventh Circuit considered whether a manufacturer could escape liability for infringing a process claim by enlisting its customer to complete the final step. As discussed above, the patent was for a process for making train gears, in which the manufacturer did not

29

perform this last step, but instead left it to its customers to complete. *Id.* at 105. The court upheld a finding of infringement because the manufacturer passed the nearly finished gears on to the customer "with the knowledge that the railroads will put them to use and thereby flatten the crown, thus completing the final step of the process." *Id.* Under this fact pattern, Akamai submits that the manufacturer would be directly liable for patent infringement while the customers performing the last steps would not.

### C.   A Flexible Approach to Joint Liability Is Consistent with Supreme Court Policy

Each of the above three circumstances is based on common law rules for joint liability and provides a sensible, workable standard for patent infringement. Further, these common law tort principles are consistent with the U.S. Supreme Court's preference for flexible fact-based standards that avoid bright-line rules, as well as the Court's preference for applying common law doctrines applicable to other areas of the law to patent law.

The Supreme Court's preference for flexible standards is well known and is illustrated by a number of its recent decisions. In *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 415 (2007), for example, the Supreme Court rejected a rigid approach of using solely a "TSM test" for determining obviousness, noting that it may be a test for determining obviousness, but it was not the only test. *See also Bilski v. Kappos*, 130 S. Ct. 3218, 3225-26 (2010) (rejecting bright-line machine or

30

transformation test for determining patentable subject matter); *eBay*, 547 U.S. at

392-93 (rejecting the Federal Circuit's bright-line grant of permanent injunctions

when validity and infringement have been found); *Pfaff v. Wells Elecs., Inc.*, 525

U.S. 55, 65-66 (1998) (rejecting a bright-line rule that an invention cannot be "on

sale" unless and until it is reduced to practice).

### D.   Applying the Common Law of Torts to Cases of Joint Infringement Will Not Subvert the Statutory Scheme of Indirect Infringement

*BMC Resources* and other cases suggest that establishing joint or

collaborative direct infringement under § 271(a) would subvert the statutory

scheme of indirect infringement under §§ 271(b) and (c), which require knowledge

and/or intent for liability:  "[A] patentee would rarely, if ever, need to bring a claim

for indirect infringement."  *BMC Res.*, 498 F.3d at 1381.  This is simply not

correct.

That two parties jointly directly infringe a method claim (i.e., each performs

different steps of the method) does not subvert induced or contributory

infringement.  A manufacturer or vendor of a machine designed to carry out a

patented method would still need to be sued for indirect infringement under

§§ 271(b) and/or (c) if the manufacturer or vendor does not itself practice the

method. But, for there even to be the possibility of indirect infringement, there

must *first* be a direct infringement.  Because indirect infringement requires a

threshold showing of direct infringement under current law, a patentee that cannot establish that a single entity directly infringes a claim cannot bring an action for indirect infringement.

Thus, rather than subvert the statutory scheme, the Court's requirement that each step of a claim be performed by a single entity or on its behalf to find direct infringement actually precludes a patentee in some cases from ever being able to prevail on a claim under §§ 271(b) or (c). This was amply demonstrated in the *McKesson* case. There, the patent owner accused the defendant of inducing two other parties, a doctor and a patient, to jointly perform the steps of a method claim. The defendant, however, could not be held liable for inducement because there was no direct infringement under the rigid test adopted in *Akamai*. This unjust result, that a patent can never be infringed in a situation such as this, cannot be correct and demonstrates the error of a single entity requirement of § 271(a). *See McKesson*, No. 2010-1291, slip op. at 6 (Newman, J., dissenting) ("A patent that can never be infringed is not a patent in the definition of the law, for a patent that cannot be infringed does not have the 'right to exclude.' This court's elimination of infringement, by creating a new but far-reaching restriction is inappropriate.")

In sum, that two parties jointly directly infringe a method claim (i.e., each performing different steps of the method) does not subvert induced or contributory infringement.

E.   **Precluding Application of the Common Law Principles of Joint Liability Makes Method Claims Unfairly Vulnerable to Loopholes in the Law**

Patents are often the result of a significant investment of money, resources, innovation, and research.  Unduly restricting joint infringers to only those who have a master-servant agency or contractual relationship effectively defeats the value of many multi-participant patent claims and renders all method claims vulnerable to loopholes in the protection of such inventions.  Indeed, recent articles directed to in-house counsel provide specific instructions on how to structure language of contracts "so that no mastermind exists" in order to avoid infringement liability.  Tonya M. Gray, *Contract Clauses Offer Protection in Infringement Suits*, In-House Texas, vol.25, no.41 (Jan. 11, 2010).  Likewise, companies have "formed a strategic partnership, enabled their two [products] to work together, and collaborated to sell the two [products] as a unit" and yet were not liable for infringement of a method claim even though, together, their two products performed every element of the method claim.  *See Golden Hour Data Sys., Inc. v. emsCharts, Inc.*, 614 F.3d 1367, 1380-81 (Fed. Cir. 2010).

As aptly stated by the Sixth Circuit in *Thomson-Houston Electric Co. v. Ohio Brass Co.*:

> From the earliest times, all who take part in a trespass, either by actual participation therein or by aiding and abetting it, have been held to be jointly and severally liable for the injury inflicted. There must be some concert of action between him who does the injury and him who

33

> is charged with aiding and abetting, before the latter can be held
> liable. When that is present, however, the joint liability of both the
> principal and the accomplice has been invariably enforced. If this
> healthful rule is not to apply to trespass upon patent property, then,
> indeed, the protection which is promised by the constitution and laws
> of the United States to inventors is a poor sham.

80 F. 712, 721 (6th Cir. 1897).  As also noted by Judge Newman, "[a] patent that

cannot be enforced on any theory of infringement, is not a statutory patent right.  It

is a cynical, and expensive, delusion to encourage innovators to develop new

interactive procedures, only to find that the courts will not recognize the patent

because the participants are independent entities." *McKesson*, No. 2010-1291, slip

op. at 17 (Newman J., dissenting).  These considerations are particularly important

in the Internet Age where many genuine process inventions will involve the

combined actions of two or more computer devices controlled by two or more

persons.

This is exactly the case with the invention at issue here, embodied in

Akamai's '703 patent.  As explained in the '703 patent specification, one novel and

advantageous aspect of Akamai's invention (and the one to which several claims at

issue in the '703 patent are directed) is having a first entity (the Content Provider)

provide the web-page base document to an end user, while a second entity provides

other objects in the web page to the end user.  As claimed in the '703 patent, it is

this very shared responsibility that is core to this particular aspect of the invention,

a point emphasized in the patent's specification (*See, e.g.*, A267 col.2 ll.17-22

34

("There remains a significant need in the art to provide a decentralized hosting solution that . . . enables the Content Provider to maintain control over its content" while still providing unlimited, cost-effective global delivery of the Provider's content while addressing the other deficiencies in the prior art).)[7] As evidenced by Limelight's use of Akamai's invention, the jury's infringement verdict, and the $40 million damages award in this case, it cannot be reasonably disputed that the claimed process constitutes a useful and innovative process. Given the purpose of the patent laws, there is no reason for not protecting inventions of this type. "[T]his is a case of new technology adapted to public benefit—an advance supported by patent policy. Today's holding, and the few recent cases on which it builds, have the curious effect of removing from patent eligibility the burgeoning body of interactive computer-managed advances." *McKesson*, No. 2010-1291, slip op. at 17 (Newman J., dissenting).

Further, and contrary to the suggestion of the Panel, creative claim drafting does not provide a solution to the problem. *Akamai*, 629 F.3d at 1321-22. There is no reason why the viability of a novel and unobvious patent should depend solely on whether the claim drafter had the foresight to draft claims to cover solely one direct infringer. In fact, requiring such wordsmithing by the claim drafter is

---

[7] While Akamai does have other related process patents based on the same specification, this should not prevent Akamai from having proper protection for the multi-participant aspect of its invention.

35

inconsistent with the patentee's obligation to clearly claim the invention and exalts form over substance. It should not be adopted by this Court.

Moreover, cases like *Golden Hour* demonstrate that even if claims are drafted in the "correct" manner, such that they do not require the participation of multiple entities, the issue of joint infringement can still arise. In *Golden Hour*, the defendants created a strategic partnership to perform the claimed steps. 614 F.3d at 1380-81. Thus, joint infringement arises in many cases even though the claims might have been drafted consistent with the Court's advice to use "proper" claim drafting. *See, e.g., Akamai*, 629 F.3d at 1322.

Nor is it a solution to this problem to suggest that holders of affected patents could seek reissue or reexamination. A reexamination or reissue to "correct" a multi-party claim would certainly be looked upon by the PTO as a broadening request on the grounds that it broadens the scope of a claim from one that no party infringed to one that at least one party infringed. As such, for reexaminations, single-party claims could not be sought at all and, for reissues, such claims could only be sought within two years of issuance. *See* 35 U.S.C. § 251; 35 U.S.C. § 305; MPEP §§ 1412.03(I), 2250 at 2200-76 (8th ed., rev. 8, July 2010). Thus, this remedy would not be available to most patentees. As set forth above, the most effective remedy is to apply a fact-based flexible standard supported—as has been

36

explained above —by the statute, by common law tort principles, and by precedent.

**F.      Liability Will Typically Extend to Those Carrying Out Steps of the Claimed Method, but Should Not Extend to "Innocent" Actors**

Under common law tort rules, liability will typically extend to those who direct or control the performance of the method, act in concert, or knowingly combine their acts with another to carry out the steps of a claimed method.  As explained below, however, these rules should not extend to "innocent" actors.

**1.      "Innocent" Actors**

A party that exercises "direction or control" over the entire process such that every step is attributable to the directing or controlling party is liable.  *BMC Res.*, 498 F.3d at 1380-81.  But this does not mean that the directed or controlled party, who may have acted innocently and unknowingly in performing a single step of a claimed process, is necessarily liable.

Likewise, as described above, an independent actor is liable if that party knows that its actions may be combined with another's, and such conduct results in tortious harm.  But, under this common law doctrine, courts have typically exonerated an innocent actor.  For example, in *Kennecott Copper Corp. v. McDonell*, 413 P.2d 749, 753 (Ariz. 1966), the court exonerated a construction company for faulty construction where another party had "not only supplied the

plans and specifications but also actively supervised" the construction, and the court held the latter party liable for the injury caused by the acts of the construction company.  Similarly, in *Watson*, 126 S.W. at 150, discussed above, the court held that the railroad may be liable even if the individual were found to escape liability.

Therefore, an innocent infringer, such as an Internet user who performs one step of a claim, not knowing that the other steps are being performed by someone else, would not be liable under a direction-or-control theory, an acting-in-concert theory or a knowingly-combine-to-perform-the steps theory.  Thus, there is no risk that a truly innocent infringer would be liable for patent infringement under the tests proposed by Akamai.

### 2.  Joint and Several Liability

"A suit for infringement may be analogized to other tort actions; all infringers are jointly and severally liable."  Wright, Miller & Kane, 7 *Fed. Practice and Procedure Civil 3d* § 1614 & n.45 (citing *Thomson-Houston*, 80 F. at 721("An infringement of a patent is a tort analogous to trespass or trespass on the case. From the earliest time, all who take part in a trespass, either by actual participation therein or by aiding and abetting it, have been held to be jointly and severally liable for the injury inflicted.")).  Thus, where courts normally apply joint and several liability, such liability should similarly apply in situations where two or more parties infringe a method claim, e.g., where two parties act in concert.

38

Accordingly, there will be situations where consumers may be technically liable for patent infringement, but only where the consumer directed or controlled the performance of the method, acted in concert with another, or knew that its actions may be combined with another's, and such conduct results in tortious harm.   In such situations, however, these consumers could hardly be deemed "innocent."

Moreover, the idea of consumer infringers has always been a theoretical risk in patent law.  For example, a consumer who uses a patented product has always been potentially liable as a direct infringer under § 271(a).  *See, e.g., Centillion Data Sys. LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1285 (Fed. Cir. 2011) (finding the customer actions controlled the system as a whole, so that the customer was a direct infringer.)  But, as a practical matter, there has never been any real incentive for indiscriminately suing such consumers for patent infringement.  The potential of consumer liability—already present in the law—is simply not a sufficient justification for requiring a strict agency or contract test for imposing liability for patent infringement.

Further, there are ways to protect such consumers.  One way would be to analogize their conduct to that involved in cases concerning de minimis infringement.  While parties committing de minimis acts of infringement are subject to liability, some courts have protected such parties in the context of calculating damages.  For example, in *Micro Chemical, Inc. v. Great Plains*

39

*Chemical Co.*, No. 88-Z-499, 1997 U.S. Dist LEXIS 23653, at *4 (D. Colo. Nov. 19, 1997), *aff'd in part and remanded in part*, 194 F.3d 1250 (Fed. Cir. 1999), the defendants argued that any infringement was de minimis because, at the time the patent in question issued, only fifteen allegedly infringing machines were in use and these machines were converted to a noninfringing design within four to six months. *Id.* The court, however, rejected the defendants' argument, holding that "de minimis infringement *more properly relates to damages, and does not create an exception to liability*[;] [a]lthough defendants' . . . machines may have infringed Microchem's patent, damages determined at trial may be slight or non-existent." *Id.* (emphasis added).

Likewise, in his concurring opinion in *Embrex, Inc. v. Service Engineering Corp.*, 216 F.3d 1343, 1352-53 (Fed. Cir. 2000), Chief Judge Rader specifically stated that the Federal Circuit "has not tolerated the notion that a little infringement—de minimis infringement—is acceptable infringement or not infringement at all." According to Chief Judge Rader, § 271(a) "leaves no leeway to excuse infringement because the infringer only infringed a little." *Id.* at 1352. Instead, Chief Judge Rader explained that "the statute accommodates concerns about de minimis infringement in damages calculations." *Id.*

Moreover, a patent owner would not need to add such consumers to a lawsuit. The Supreme Court has explained that "[i]t has long been the rule that it is

40

not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990).  Similarly, the 1966 Advisory Committee Notes to Fed. R. Civ. P. 19(a), the rule governing joinder in the federal courts, state that "a tortfeasor with the usual 'joint-and-several' liability is merely a ***permissive party*** to an action against another with like liability." (Emphasis added.).  Under Fed. R. Civ. P. 19(a), "permissive parties" need not be added to the case.  This rule—that joint tortfeasors are permissive parties—has long been applied to patent cases.  For example, in *Isogon Corp. v. Amdahl Corp.*, No. 97 Civ. 6219(SAS), 1997 WL 759435, at *2-3 (S.D.N.Y. Dec. 10, 1997), the court held that direct infringer customers were not necessary parties under Rule 19 to a patent-infringement action against an inducer.  As the court explained, "the fact that a direct and indirect infringer [are] jointly liable for damages [does not] support the conclusion that a direct infringer is a necessary party to infringement claims against the indirect infringer." *Id.* at *3.

Likewise, in *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.*, 647 F.2d 200 (D.C. Cir. 1981), the court explained that it has been "long held that in patent, trademark, literary property, and copyright infringement cases, any member of the distribution chain can be sued as an alleged joint tortfeasor.  Since joint tortfeasors are jointly and severally liable, the victim of trademark infringement may sue as many or as few of the alleged wrongdoers as

he chooses; those left out of the lawsuit, commentary underscores, are not indispensable parties." *Id.* at 207 (citations omitted); *see also Kar Kraft Eng'g v. Shelby*, No. 06-14034, 2007 WL 1544397, at *3-4 (E.D. Mich. May 25, 2007) (rejecting argument that an alleged contributory trademark infringer was a necessary party under Rule 19); *see also* Wright, Miller & Kane, 7 *Fed. Practice and Procedure Civil* 3d § 1614 ("The question of who must be joined as defendants in patent, copyright, and trademark suits for infringement also is fairly easy to answer. A suit for infringement may be analogized to other tort actions; all infringers are jointly and severally liable. Thus, plaintiff may choose whom to sue and is not required to join all infringers in a single action." (footnote omitted)). Further, the Federal Circuit has ruled in a number of inducement cases where direct infringers were not parties. *See, e.g., Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317-18 (Fed. Cir. 2009); *Moleculon Res. Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986).

### G. Akamai Should Prevail Under Each of the Above Common Law Doctrines of Joint Liability

As set forth in extensive detail above, Akamai respectfully submits that the precedent, the statute, the policy underlying the Patent Act, and principles of fairness demonstrate that the Court should adopt a flexible standard based on principles of common law tort liability. There is simply no reason why a party who performs all steps of a method claim is liable, but parties who perform some

42

steps and (1) direct or control the performance of others; (2) act in concert with another to perform all the steps; *or* (3) knowingly combine their acts with those of another to perform all the steps should be able to avoid liability. Under this standard, there can be no reasonable question that Limelight should be held liable as a joint infringer, as will be shown below. It is first useful, however, to review briefly the facts at issue in this case.

### 1.      Akamai's Inventive Method

The '703 patent is directed to an improved method of delivering web page content. *Akamai*, 629 F.3d at 1315. A web page typically includes a "base document," which serves as an outline for the web page, and "embedded objects," such as images or videos, that fill the outline. (A269, col.5 ll.23-27.) Traditionally, the entirety of this web page, including both the page itself and embedded objects, was delivered by a single entity. (A17241; A274, col.15 ll.33-45; A274 col.16 ll.37-69.) As explained in the specification, one novel and advantageous aspect of Akamai's invention—and the one to which several asserted claims are directed—involves having a first entity (the "Content Provider") deliver the base document and perhaps some of the objects, while a second entity (the "Content Delivery Network" or "CDN") delivers other objects in the web page. (A267, col.2 ll.7-22.) The CDN delivers content for many Content Providers from locations close to Internet end-users, reducing demand from the Content Providers'

43

servers. *Akamai*, 629 F.3d at 1315.  This was a breakthrough in web content delivery, as it "provide[d] a scalable solution that could efficiently deliver large amounts of web content and handle flash crowds." *Id.*

As the '703 patent itself teaches, a novel aspect of this invention was that it relieved "Content Providers"—the first entities—from delivery of certain of their web page content, while still enabling them "to maintain control over" that content. (A267, col.2 ll.7-22).  Their web page content would be delivered by the CDN— the second entity—over a "global network" that was highly available and could scale to protect against "flash crowds" that might visit the first entity's web site. Thus, the '703 patent's specification emphasized the "joint" nature of the activities (of the first and second entities) that were contemplated by the inventors.  Asserted claims 19-21 claim this subject matter.

To make this system work, the inventors had to develop a method for Internet users to receive content from the CDN.  (A339:40.)  To this end, the claims at issue require that the embedded objects be "tagged" so that requests by end-user computers for the embedded objects are directed to the CDN.  (A269, col.6 ll.41-46.)  It is logical and consistent with the specification that the Content Provider (the customer) performs this step, as it is the customer who decides what content it wishes to be diverted from its website to the CDN.

44

At trial, Akamai asserted independent claims 19 and 34 and dependent claims 20-21 of the '703 patent.  Claim 34 recites (with the tagging step in italics):

> 34. A content delivery method, comprising:
> distributing a set of page objects across a network of content servers managed by a domain other than a content provider domain, wherein the network of content servers are organized into a set of regions;
>
> for a given page normally served from the content provider domain, *tagging at least some of the embedded objects of the page* so that requests for the objects resolve to the domain instead of the content provider domain;
>
> in response to a client request for an embedded object of the page:
>
> resolving the client request as a function of a location of the client machine making the request and current Internet traffic conditions to identify a given region; and
>
> returning to the client an IP address of a given one of the content servers within the given region that is likely to host the embedded object and that is not overloaded.

(A276, col.20 ll.32-52) (emphasis added.)

Asserted claim 19 also requires "tagging" (A276, col.19 l.12) and additionally recites the step of "serving [i.e., delivering] the given page from the content provider domain" (*id.* at ll.15-16).  Asserted claim 19 reads:

> 19. A content delivery service, comprising:
> replicating a set of page objects across a wide area network of content servers managed by a domain other than a content provider domain;
>
> for a given page normally served from the content provider domain, tagging the embedded objects of the page so that requests for the page objects resolve to the domain instead of the content provider domain;

responsive to a request for the given page received at the content provider domain, serving the given page from the content provider domain; and

serving at least one embedded object of the given page from a given content server in the domain instead of from the content provider domain.

(A276, col. 19 ll.6-20.)  Claims 20-21 depend from claim 19. (*Id.* at ll.21-30.)

## 2.   Limelight and Its Customers Perform All of the Steps of the Method Claimed in the '703 Patent

After Akamai had significant commercial success with the invention in the '703 patent, Limelight, Akamai's direct competitor, orchestrated a divided process that includes every step of the asserted claims of the '703 patent.  According to that process, Limelight performs almost all the steps of the asserted claims while its customers (following the directions provided by Limelight) perform the remaining one or two steps, including the steps of tagging (claims 19-21 and 34) and serving the page with the tag (claims 19-21).  *Akamai*, 629 F.3d at 1317.

Limelight and its customers also have a contractual relationship.  When Limelight's customers (the Content Providers) choose to use Limelight's services for delivery of a particular object, they are contractually obligated to perform the tagging and/or serving steps if they want Limelight's service guarantee.  (A587: 122; A17231; A17807-08.)  In addition, Limelight provides Content Providers with the specific virtual hostname tag ("xyz.vo.llnwd.net") that the Content Provider must use to tag the embedded objects and explicit instructions on how to

46

perform the claim steps that Limelight does not perform.  (A587: 122; A17220,

A17231; A17237; A17790.)  Limelight fully expects and desires that many

customers who sign Limelight's contract and receive Limelight's detailed

directions and a unique tag will, in fact, perform the missing claim steps because,

otherwise, Limelight will not get paid by those customers.  (A17803; A587,

122:19-22.)

As the *Akamai* Panel recognized, Limelight's contract with its customers

details the specific claim steps that are to be performed by the customer and the

overall result of their "divided process":

> This divided process is explicitly set forth in Limelight's standard
> customer contract, which states:
>
> Customer [i.e., content provider] shall be responsible for identifying
> via the then current [Limelight] process all [URLs] of the Customer
> Content to enable such Customer Content to be delivered by
> [Limelight]
>
> and
>
> Customer shall provide [Limelight] with all cooperation and
> information necessary for [Limelight] to implement the [Content
> Delivery Service].

*Akamai*, 629 F.3d at 1317.  The contract further contemplates that the Content

Provider must deliver (i.e., "serve") the web pages containing the tags when

requested by the user.  (A441-42:37-38.)  Otherwise, Limelight's network will not

"see" the user's request for content and will be unable to meet the contract's

service guarantee. (*Id.*) In this regard, the contract states:

> Service Interruptions caused by . . . failure of [Content Provider] origin server (equipment down, **not serving content** [*e.g.* pages], broken links or similar issues that would prevent the [Limelight] Service from working successfully, . . .) are ineligible for [Limelight's] availability guarantee compensation.

(A17807 (emphasis added).)

### 3. The Jury Verdict of Infringement Under the "Direction or Control" Test

In the district court, because some of the claim steps were performed by Limelight and some by its customers, Limelight argued it was not liable for direct infringement. After a three-week trial, the jury returned a verdict of infringement and awarded over $40 million in lost-profit damages. *(A93-99.)* The jury was properly instructed on the *BMC Resources* "direction or control" standard and heard evidence that Limelight: (1) creates, assigns, and provides the Content Provider a unique Limelight hostname or "tag"; (2) provides explicit step-by-step instructions to perform the tagging step; (3) offers technical assistance to help Content Providers with their performance of the claim step; and (4) contractually requires Content Providers to provide "cooperation and information" if they use Limelight's service. (A441-42: 37-38, A17807-08.)

Following the verdict, the district court (Judge Zobel) initially denied Limelight's JMOL motion, finding that "unlike in *BMC Resources*, here there was evidence that not only was there a contractual relationship between Limelight and

its customers, but that [Limelight] provided those customers with instructions explaining how to utilize its content delivery service." *Akamai,* 629 F.3d at 1318. Subsequently however, on Limelight's motion for reconsideration, the district court analogized the facts before it to those at issue in *Muniauction,* reversed its previous decision, and granted JMOL of noninfringement. *Id.*

### 4.     The Jury Properly Found Liability Under *BMC Resources's* Flexible "Direction or Control" Test

Under a flexible fact-based *BMC Resources* direction or control test, Limelight should be liable for infringing the method claims of the '703 patent, as the jury properly found. The question of direction or control is a factual one, the jury was properly instructed based on the *BMC Resources* "direction or control" standard, *see Akamai,* 629 F. 3d at 1317-18 & n.2, and substantial evidence supports the jury verdict. (*See* A396:35-36, A587:122-23, A17220, A17231, A17789-95, A17803, A17807-08 .)

The Panel's determination that the agreement between Limelight and its customers "calls for its customers to assign a unique hostname, requires content providers to perform certain claim steps if they choose to use Limelight's service, and provides instructions and technical assistance [by Limelight] for performing those steps," *Akamai,* 629 F.3d at 1321, is more than sufficient, as found by the jury, to establish joint liability under *BMC Resources. See Akamai,* 629 F.3d at 1317-18. Indeed, as discussed above, according to Limelight's contract and

49

detailed instructions provided to its customers, a customer who desires to have its particular content served by Limelight according to Limelight's service guarantee, is required by Limelight's process to tag (claims 19-21 and 34) and serve the page with the tag (claims 19-21) if the customer wishes to benefit from Limelight's service.

While the *Akamai* Panel emphasized that the contract does not "obligate" customers to perform the claim steps of tagging and serving in the sense of creating an agency relationship or a claim for breach of contract if those steps are not performed, the panel recognized that the contract "calls for [Limelight's] customers to assign a unique hostname, requires content providers to perform certain claim steps if they choose to use Limelight's service, and provides instructions and technical assistance [by Limelight] for performing those steps." *Akamai*, 629 F.3d at 1321. Moreover, it is only when a customer "choose[s] to use Limelight's service" that the steps of the accused method are performed and, thus, this is where the focus of the "direction or control" test should be, not on whether Limelight directs or controls its customers in some other abstract sense. In other words, the Court should focus on whether Limelight directs or controls the performance of the accused process. It is irrelevant that Limelight does not direct or control its customers in other senses. As this Court stated in both *BMC Resources* and *Muniaction*, a party is liable for joint infringement when it

50

"exercises 'control or direction' *over the entire process* such that every step is attributable to the controlling party." *Muniauction*, 532 F.3d at 1329 (emphasis added); *BMC Resources*, 498 F.3d at 1380 ("control or direct each step of the patented process"). The focus of the direction or control test should be on the claimed process, not whether there is a formal agency relationship between the parties.

Accordingly, the jury verdict of joint infringement should be upheld in this case even under the "direction or control" standard, and in fact, under any reasonable test that does not require a formal agency relationship.

### 5. Limelight's Activities in Concert with Its Customers Subject Limelight to Liability for Joint Infringement

In addition, under the "acting in concert" test, Limelight and its customers acted in accordance with an express agreement to perform the steps that constitute the asserted method claims of the '703 patent. As noted by the *Akamai* Panel, Limelight's contract with its customers details the specific claim steps that are to be performed and the overall result of their "divided process." *Akamai*, 629 F.3d at 1317.

Thus, there exists an agreement between the parties in which each party is aware of the other and both are deliberately engaged in a common plan or design, demonstrating that they are acting in concert. Further, their concerted actions result in the performance of the steps of the claimed method. Under these facts,

Limelight and its customers are acting in concert, and, accordingly, this Court should impose liability for joint infringement. The joint activity performed by Limelight and its Content Provider customers is precisely what is described in the '703 patent and recited in several of the asserted claims. Enforcing the jury's verdict—one that was supported by substantial evidence in any event—would preserve the value of Akamai's pioneering invention.

### 6. The Contractual Relationship Between Limelight and Content Providers Makes Limelight Liable for Direct Infringement

While "acting in concert" liability does not require a strict contractual obligation to perform the steps that constitute a method claim, such an obligation exists in this case and is strong evidence that Limelight and its customers were acting in concert. The contractual obligation is also strong evidence (in addition to the separate arguments presented above) that Limelight exercised "direction or control."

As noted above, Akamai recognizes that the Panel discounted the presence of Limelight's contract because, according to the Panel, the contract did not "obligate" Limelight's customers (the Content Providers) to perform the tagging and/or serving steps. *Akamai*, 629 F.3d at 1321. With due deference to the Panel, Akamai submits that the Panel misapprehended the significance of the contract involved in this case. More specifically, it is true that for customers who do not

52

choose to use the patented process, there is no contractual obligation. But for those customers who do choose to use Limelight's service (Akamai's patented process)—which are the only entities relevant to this appeal—the contract includes a binding obligation requiring the Content Providers to tag if Limelight's service guarantees are to be enforced. Indeed, the Panel ignored the fact that by entering into a contractual agreement, the Content Providers almost certainly intended to use Limelight's service.

From the outset, Limelight specified that, in order to perform the claimed method, the Content Provider, and not Limelight, would "be responsible for identifying . . . all [URLs] of the Customer Content." *Akamai*, 629 F.3d at 1317; (*cf.* A276 col.19 ll.12-14 ("tagging the embedded objects of the page so that requests for the page objects resolve to the domain instead of the Content Provider domain")). Moreover, Limelight allocates to the Content Provider the responsibility for serving the page. The Content Provider's consent to these responsibilities is evidenced by its execution of the contract and performance under its terms.

Respectfully, Akamai submits that the Panel's focus on the Content Providers' "independent discretion," *Akamai*, 629 F.3d at 1321, is misdirected because, under the terms of Limelight's contract, the Content Providers who use Limelight's service do not have discretion whether or not to tag (as was the case

53

for the bidders in *Muniauction*); they have discretion only with respect to which content they will tag.  In this manner, Limelight does not simply direct a particular result which may or may not satisfy the relevant claim limitations, but instead contractually imposes on the Content Providers who use Limelight's service the obligation to perform particular steps of the claimed method (tagging and/or serving) in such a way that infringement will result.

Further, that the Content Provider has some discretion with respect to which content it wants to tag is irrelevant because Akamai's patent claims are not limited by which types of content are tagged and/or served.  Rather, the claim elements are satisfied by the acts of tagging and/or serving themselves.  And Limelight, through the terms of its contract, has explicitly directed those who will perform the steps (the Content Provider who uses Limelight's service) and what these steps will be. *Id.*  This obligation is not only highly relevant to the acting in concert issue, but also fits squarely within the admonition in *BMC Resources* that "[a] party cannot avoid infringement, however, by contracting out steps of a patented process to another entity." *BMC Resources*, 498 F.3d at 1381.

### 7.   Limelight Knew of the Customer's Conduct and Is Thus Liable

Finally, even if the customers do have "independent discretion" to tag only the content they wish to divert to Limelight's servers, this should not absolve Limelight of any liability.  It cannot be disputed that Limelight knows that its

conduct will be combined with that of its customer to perform the method that constitutes the claimed invention. Limelight knows the steps that it takes and clearly knows that its customer is performing the tagging and serving steps because (1) the contract says that the customer will perform these steps; and (2) more importantly, it is only in this context that Limelight's process is used. Indeed, in many cases, Limelight only gets paid for content that is tagged by the customer— i.e., when Limelight's infringing process is actually used. Under this common law doctrine, it is irrelevant whether the customer knows the steps performed by Limelight, and in such a scenario, the customer is not liable. In this manner, this case is similar to *Peerless*, 93 F.2d at 98, and this Court should accordingly reinstate the jury verdict of joint infringement.

## V.   CONCLUSION

For all the reasons noted above, this Court should apply common law principles of torts and reinstate the jury verdict of infringement in this case. Should this Court adopt a new standard for the determination of joint infringement under either 35 U.S.C. §§ 271(a) or (b), Akamai respectfully submits that, at a minimum, this Court should remand for a new trial based on that standard.

55

Respectfully submitted,

Date: June 20, 2011

*Kara F. Stoll*

Donald R. Dunner
Kara F. Stoll
Finnegan, Henderson,
    Farabow, Garrett & Dunner, LLP
901 New York Avenue, NW
Washington, DC  20001
Telephone: (202) 408-4000

Jennifer S. Swan
Finnegan, Henderson,
    Farabow, Garrett & Dunner, LLP
3300 Hillview Ave.
Palo Alto, CA   94304

*Attorneys for Plaintiff-Appellant*
*Akamai Technologies, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2011, two true and correct copies of the foregoing

**Principal Brief for Plaintiff-Appellant Akamai Technologies, Inc. On**

**Rehearing En Banc** were served by the indicated means to the persons at the

addresses listed:

**Via Overnight Courier:**

Robert G. Krupka
Kirkland & Ellis LLP
777 South Figueroa Street, Suite 3700
Los Angeles, CA   90017

Robert S. Frank, Jr.
Choate, Hall & Stewart LLP
Two International Place
Boston, MA   02110

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing **Principal Brief For Plaintiff-Appellant**

**Akamai Technologies, Inc. On Rehearing En Banc** contains 13,693 words as

measured by the word processing software used to prepare this brief.

Respectfully submitted,

Date: June 20, 2011

*Kara F Stoll*

Donald R. Dunner
Kara F. Stoll
Finnegan, Henderson,
  Farabow, Garrett & Dunner, LLP
901 New York Avenue, NW
Washington, DC  20001
Telephone: (202) 408-4000

Jennifer S. Swan
Finnegan, Henderson,
  Farabow, Garrett & Dunner, LLP
3300 Hillview Ave.
Palo Alto, CA   94304