# PX-318

PX-0318

## PATENT LICENSE AND SETTLEMENT AGREEMENT

This Patent License and Settlement Agreement (the "Agreement") is made effective as of this 11th day of December, 2006 (the "Effective Date"), among SAP America, Inc., a Delaware corporation, SAP AG, a German corporation and the parent of SAP America, Inc. and ePlus inc. a Delaware corporation.

Recitals

A. On April 18, 2005, ePlus filed a lawsuit asserting claims of infringement against SAP AG and SAP America under U.S. Patent Nos. 6,023,683; 6,055,516; and 6,505,172 in the action of *ePlus inc. v. SAP America, Inc. and SAP AG*, Civil Action No. 3:05CV281 (JRS), pending as of the Effective Date in the United States District Court for the Eastern District of Virginia (the "Litigation").

B. SAP has denied any liability for the asserted claims of infringement. ePlus has denied SAP's counterclaims.

C. The Parties desire to settle the Litigation and all disputes between them pursuant to the terms of this Patent License and Settlement Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and of the terms and conditions of this Agreement, ePlus and SAP (singularly referred to herein as a "Party" and jointly as the "Parties") hereby agree as follows:

## 1. DEFINITIONS

1.1    "Affiliate" means, with respect to a Party, an Entity which on or after the Effective Date directly or indirectly controls, is controlled by or is under common control with such Party, whether through the ownership of securities, as a result of contract or otherwise, it being understood that the ownership of securities or other instruments representing fifty percent (50%) or more of the outstanding voting power of a particular Entity shall constitute control for purposes of this definition.

1.2    "Change of Control" means: (a) the direct or indirect acquisition (except for transactions described in clause (b) of this paragraph below), whether in one or a series of transactions by any Entity or related Entities of (i) ownership, beneficial or otherwise, of issued and outstanding shares of capital stock of a Party, the result of which acquisition is that such Entity or such group possesses 50% or more of the combined voting power of all then-issued and outstanding capital stock of such Party, or (ii) the power to elect, appoint, or cause the election or appointment of at least a majority of the members of the board of directors (or such other governing body that exercises a similar level of control over such Entity in the event a Party or any successor Entity is not a corporation); or (b) a merger, consolidation or other reorganization

Patent License Agreement                                                                                          Page 1

or recapitalization of a Party with an Entity or a direct or indirect subsidiary of such Entity, provided that the result of such merger, consolidation or other reorganization or recapitalization, whether in one or a series of related transactions, is that the holders of the outstanding voting stock of such Party immediately prior to such consummation do not possess, whether directly or indirectly, immediately after the consummation of such transaction, in excess of 50% of the combined voting power of all then-issued and outstanding stock of the merged, consolidated, reorganized or recapitalized Entity, its direct or indirect parent, or the surviving Entity of such transaction.

1.3    "Entity" means any individual, trust, corporation, partnership, joint venture, limited liability company, association, unincorporated organization or other legal or governmental entity.

1.4    "ePlus" means ePlus inc.

1.5    "ePlus Covered Products" means (i) those software products and services commercially offered by ePlus and its Affiliates as of the Effective Date and listed in Exhibit D and updates or error corrections to the same that may be made available by ePlus or its Affiliates without separate charge to their customers who purchase software maintenance services; and (ii) those software products and services commercially offered by ePlus or any of its Affiliates within the following fields of use: enterprise cost management, asset management, integrated procurement and asset management, invoice presentment and payment, accounts payable, financing, leasing, lease process automation, spend management, supplier enablement, electronic procurement and order management, contract management, sourcing, supply chain management (SCM), customer relationship management (CRM), product catalog content management, document management and value-added reseller (VAR)/reselling technology.

1.6    "ePlus Patents" means (i) all patents issued anywhere in the world to ePlus or an Affiliate of ePlus as of the Effective Date, and all patent applications (including provisional and non-provisional applications) filed by or on behalf of ePlus or an Affiliate of ePlus anywhere in the world as of the Effective Date or having a priority filing date anywhere in the world on or before five (5) years after the Effective Date, including but not limited to those patents and patent applications listed in Exhibit C; (ii) all U.S. or foreign patents or patent applications that now or in the future claim priority to any of the patents and patent applications recited in clause (i); (iii) all divisional, continuation, continuation-in-part, re-issue, substitute, reexamination, renewal, extension, CPA and RCE applications and patents based on any of the patents or patent applications recited in clauses (i) or (ii); (iv) any patents which may be granted anywhere in the world on any of the applications recited in clauses (i), (ii), or (iii); and (v) any other patents that are now or at any time may be owned (in full or partially) or exclusively licensed by ePlus or an Affiliate of ePlus, or with respect to which ePlus or an Affiliate of ePlus has the right to grant licenses or covenants not to sue within the scope of the licenses granted by ePlus in Section 2.1 of this Agreement, and having a priority filing date anywhere in the world on or before five (5) years after the Effective Date.

1.7    "Foundry Products" means products manufactured by SAP or its Affiliate for or on behalf of a specific third party, using designs or specifications received in a substantially

CONFIDENTIAL                                                                                    ePLUS0940778

completed form from that third party, for resale or re-license to or on behalf of that third party for its commercialization of such products, except in the case in which

(i) SAP or its Affiliate owns the design or specification of such service or product and the service or product is not specifically designed for commercial exploitation substantially only by such third party; or

(ii) such design or specification resulted from a bona fide joint development or joint participation between SAP or its Affiliate and such third party, including but not limited to a standards body or community organization and the resulting products, services or components provided by SAP or its Affiliate meet the definition of Licensed Products as set forth herein.

1.8    "Licensed Combination" means any of the following:

(a)  the combination of (i) an SAP Offering or a part thereof with (ii) another SAP Offering, or a part thereof, or a part of an SAP Offering referenced in clause (i) above, even if the SAP Offerings are purchased at different times and through different channels or the combination is created by or for the end user or by one of SAP's or its Affiliate's distribution channels; or

(b)  a combination of an SAP Offering or a part thereof that provides functionality other than solely Search Engine Functionality with a product or service of a third party or part thereof, if such combination would not infringe an ePlus Patent, whether directly or through inducement of or contribution to infringement, but for the inclusion or use of such SAP Offering or part thereof in such combination.

For the purposes of clarification, a Licensed Combination may be formed by the invocation from an application of services contained in or offered by an SAP Offering, rather than the actual combination of code.

1.9    "Licensed Process" means any process or method claimed in any of the ePlus Patents unexpired and in force.

1.10    "Licensed Products" means (i) any SAP Offering, (ii) any derivative works, modifications, configurations, customizations, or extensions of any SAP Offering lawfully created by an SAP Authorized Developer, SAP Vendor, or SAP Customer if such derivative work, modification, configuration, customization or extension would not infringe an ePlus Patent, whether directly or through inducement of or contribution to infringement, but for its being based on the SAP Offering from which it was derived, modified, configured, customized or extended, (iii) any Licensed Combination, and (iv) any product, service or technology of a third party to the extent that it or a combination of it with an SAP Offering utilizes or invokes functions, features, services or technology, including but not limited to enterprise services, contained in or available from or through any SAP Offering, or to the extent it is developed in conformance to a specification specifically licensed by SAP or its Affiliate to such third party if such third party product, service or technology would not infringe an ePlus Patent, whether directly or through inducement of or contribution to infringement, but for its use of functions,

CONFIDENTIAL                                                                                    ePLUS0940779

features, services or technology contained in or available from or through the SAP Offering or but for its development in conformance to a specification specifically licensed by SAP or its Affiliate to such third party; provided, however, that in no event shall "Licensed Products" include any Foundry Products.

    1.11   "<u>SAP</u>" means, collectively, SAP AG and SAP America, Inc.

    1.12   "<u>SAP Authorized Developer</u>" means any SAP Customer or any SAP Vendor authorized by SAP or an Affiliate of SAP in writing to create any Licensed Product or any derivative work or modification of any Licensed Product.

    1.13   "<u>SAP Customer</u>" means any direct or indirect customer of SAP or any Affiliate of SAP, including but not limited to end users of any Licensed Product.

    1.14   "<u>SAP Offering</u>" means any past, present or future software or hardware product, service, technology, specification, or platform, including but not limited to SRM, ERP, CRM and mySAP Business Suite products, that is sold, licensed, offered, imported, or provided by SAP or an Affiliate of SAP and that in the absence of this Agreement would infringe, whether directly or through inducement of or contribution to infringement by another, at least one claim of an ePlus Patent.

    1.15   "<u>SAP Patents</u>" means any patents owned anywhere in the world by SAP or an Affiliate of SAP at any time on or before five (5) years after the Effective Date and with respect to which SAP has the right to grant the covenant not to sue set forth in Section 2.4 below.

    1.16   "<u>SAP Vendor</u>" means any third party authorized by SAP to license or resell, install, configure and/or customize any SAP Offering, including system integrators, resellers, connector vendors, value added resellers, OEMs and partners.

    1.17   "<u>Search Engine Functionality</u>" means the capability to seek a particular file or specific data through comparison or calculation that matches some identified pattern. For purposes of this Agreement, the Parties agree that the portions of SAP's TREX software module that provide such functionality as of the Effective Date provide solely Search Engine Functionality.

## 2. GRANT OF LICENSES AND COVENANT NOT TO SUE

    2.1   <u>Grant</u>.  Subject to payment of the amount required in Section 4.1 below, ePlus hereby grants to SAP and its Affiliates, SAP Vendors, SAP Customers (whether direct or indirect) and SAP Authorized Developers, an irrevocable, non-royalty bearing, fully paid-up, non-exclusive, worldwide license, without the right to sublicense, under the ePlus Patents to practice, design, make, have made, operate, have operated, use, sell, license, offer to sell or license, and import Licensed Products and to practice any Licensed Process.  Further, and subject to payment of the amount required in Section 4.1 below, ePlus hereby grants an irrevocable, non-royalty bearing, nonexclusive worldwide license under the ePlus Patents, without the right to sublicense, to any supplier or provider to SAP or any Affiliate of SAP to make, have made, use, sell, license, offer

CONFIDENTIAL                             ePLUS0940780

PX0318, Page 4 of 25

to sell or license, or import any component, part or portion of a Licensed Product for or on behalf of SAP or its Affiliate and to practice any Licensed Process involved in the manufacture or use of such component, part or portion of a Licensed Product for or on behalf of SAP or its Affiliate. The licenses granted in this Section extend to activities that would otherwise be deemed indirect infringement as further described in 35 USC Section 271. Other than the payments called for pursuant to Section 4 of this Agreement, no royalties or additional payments of any kind shall be required in order to maintain this Agreement in full force.

If a third party making products under have-made rights transfers such products to any person or entity other than SAP, an Affiliate of SAP, an SAP Vendor, an SAP Authorized Developer, or supplier or provider to SAP or an Affiliate of SAP, those products will not be considered to be Licensed Products and will not be within the scope of the license rights set forth in this Section 2.1.

2.2  Duration.  The licenses set forth above will extend to the full end of the term of the last to expire of the ePlus Patents.

2.3  No Other Licenses.  SAP has no right and agrees not to transfer any of the rights set forth in Section 2.1 except as permitted in Section 7.11 below.  Except as expressly set forth in Section 2.1, no license or other right is granted herein by ePlus to SAP or any third party, directly or by implication, estoppel or otherwise, and no such license or other right will arise from the consummation of this Agreement or from any acts, statements or dealings leading to such consummation.  However, SAP and its Affiliates shall be entitled to assert that any ePlus Patent is licensed or that ePlus or its Affiliates, successors or assigns is otherwise barred or estopped from asserting an ePlus Patent based on activities not arising from this Agreement as an affirmative defense or counterclaim to any claim relating to the ePlus Patents brought by ePlus or any other Entity.  ePlus has no obligation hereunder to furnish or disclose to SAP any technical or other information or computer programs.

2.4  Covenant Not to Sue.  SAP covenants not to sue ePlus or any of its Affiliates at any time for any claim that ePlus' or any of its Affiliates' manufacture, use, sale, offer for sale, lease, importation, distribution or other transfer of an ePlus Covered Product on or before five (5) years after the Effective Date constitutes direct infringement, indirect infringement, contributory infringement, or inducement of infringement of any SAP Patents. SAP further covenants and agrees to indemnify and hold ePlus and each of its Affiliates harmless from any and all costs, attorneys' fees, damages, or other fees it incurs or that are assessed in the event of an actual or threatened patent infringement suit or claim made by SAP or any of its Affiliates on or before five (5) years after the Effective Date against ePlus or any of its Affiliates alleging that the manufacture, use, sale, offer for sale, lease, importation, distribution or other transfer by ePlus or its Affiliate of an ePlus Covered Product constitutes direct, indirect, contributory, or inducement of infringement of any SAP Patent.  In the event such a suit or claim is pursued by SAP or its Affiliate through trial and verdict, and there is a final adjudication, after exhaustion of any appeals that may be taken, that such suit or claim was in violation of the covenant not to sue of this Section 2.4, then the amount to be paid to ePlus or its Affiliate by SAP under this provision shall be double ePlus' or its Affiliate's actual costs, attorneys' fees, damages, and other fees it incurs.  The covenants set forth in this Section 2.4 are personal to ePlus and its Affiliates and are

Patent License Agreement                                                                                                    Page 5

CONFIDENTIAL                                                                                                     ePLUS0940781

nontransferable and nonassignable, and shall not extend to any successor-in-interest or assignee of ePlus, and shall automatically terminate upon any Change of Control of ePlus.

2.5 <u>Spinoff of Business by SAP</u>.  In the event that SAP elects to spin off to an Entity (a "Spin Off Entity") any part of its business to which one or more ePlus Patents relate, whether or not such Entity is an Affiliate of SAP, then (i) the license rights granted by ePlus in Section 2.1 shall continue to apply to such Spin Off Entity and its Affiliates, Authorized Developers, Customers and Vendors with respect to products that would qualify as Licensed Products if the spin off had not occurred, and (ii) if SAP transfers any of the SAP Patents to the Spin Off Entity, SAP shall, in connection with the transfer of such SAP Patents to the Spin Off Entity, obligate the Spin Off Entity in writing to abide by the covenant not to sue set forth in Section 2.4 with respect to the SAP Patents transferred to the Spin Off Entity.

## 3.   RELEASES, RE-EXAMINATIONS, DISMISSAL OF LITIGATION

3.1 <u>ePlus Releases</u>.  ePlus, on behalf of itself and its Affiliates and their respective successors and assigns, irrevocably releases, acquits and forever discharges SAP and its Affiliates and their respective officers, directors, employees, agents, predecessors, successors, assigns, representatives, and attorneys, and its and their respective customers, users, suppliers and vendors (collectively, "SAP Releasees"), in each case from any and all claims or liabilities of any kind and nature, at law, in equity, or otherwise, known and unknown, suspected and unsuspected, disclosed and undisclosed, relating in any way to actions taken before the Effective Date by the SAP Releasees in connection with the Litigation or the ePlus Patents; provided however that nothing contained within this release shall be deemed to release SAP from any of its duties or obligations set forth under this Agreement.  In addition, ePlus, on behalf of itself and its Affiliates and their respective successors and assigns, irrevocably releases, acquits and forever discharges SAP Authorized Developers, SAP Customers, SAP Indemnitees, and SAP Vendors and their respective officers, directors, employees, agents, predecessors, successors, assigns, representatives, and attorneys, and its and their respective customers, users, suppliers and vendors, in each case from any and all claims or liabilities of any kind and nature, at law, in equity, or otherwise, known and unknown, suspected and unsuspected, disclosed and undisclosed, relating in any way to actions taken or activities performed prior to the Effective Date which would have been licensed pursuant to Section 2.1 of this Agreement had this Agreement been in effect at the time such actions were taken or activities performed.

3.2 <u>SAP Releases</u>.  SAP, on behalf of itself and its Affiliates and their respective successors and assigns, irrevocably releases, acquits and forever discharges ePlus and its Affiliates and their respective officers, directors, employees, agents, predecessors, successors, assigns, representatives, and attorneys (collectively, the "ePlus Releasees"), from any and all claims or liabilities of any kind and nature, at law, in equity, or otherwise, known and unknown, suspected and unsuspected, disclosed and undisclosed, relating in any way to actions taken before the Effective Date by the ePlus Releasees in connection with the Litigation or the ePlus Patents; provided however that nothing contained in this Section 3.2 shall be deemed to release ePlus or any of its Affiliates from any of its duties or obligations set forth under this Agreement.

CONFIDENTIAL                                                                      ePLUS0940782

3.3  General Releases.  The releases by ePlus and SAP in this Agreement include an express, informed, knowing and voluntary waiver and relinquishment to the fullest extent permitted by law.  In this connection, the Parties acknowledge that they may have sustained damages, losses, costs or expenses which are presently unknown and unsuspected and that such damages, losses, costs or expenses as may have been sustained may give rise to additional damages, losses, costs or expenses in the future.  The Parties hereto further acknowledge that they have negotiated this Agreement taking into account presently unsuspected and unknown claims, counterclaims, causes of action, damages, losses, costs and expenses arising from or relating to the Litigation, the ePlus Patents and the relationship between the Parties, and the Parties hereto voluntarily and with full knowledge of its significance, expressly waive and relinquish any and all rights they may have under any state or federal statute, rule or common law principle, in law or equity, relating to limitations on general releases.

3.4  Re-Examination of ePlus Patents.  SAP agrees that neither it nor any of its Affiliates, representatives or agents shall directly or indirectly file, induce or encourage the filing of a request for reexamination of any of the ePlus Patents with any Patent and Trademark Office or aid, assist or participate in any reexamination or other patent office proceeding contesting the validity or patentability of such ePlus Patents, or file any documentation in any reexamination or other patent office proceeding involving any of the ePlus Patents.

3.5  Litigation Against ePlus Patents.  Neither SAP, nor any of its Affiliates, representatives or agents will initiate, induce, encourage, voluntarily join, participate, or finance, either directly or indirectly, any litigation or other claim or court proceeding against ePlus, or any successor or assign of ePlus, arising from, pertaining to, or related to the validity or enforceability of any claim of any of the ePlus Patents, except as required by court order.

3.6  Dismissal of the Litigation With Prejudice.  Within five (5) business days after receipt by ePlus of the "Settlement Payment" set forth in Section 4 below, the Parties shall cause their respective attorneys to file with the United States District Court for the Eastern District of Virginia a fully executed Proposed Stipulation and Order of Dismissal with Prejudice in the form attached hereto as Exhibit B, with each side to bear its own fees and costs arising from or related to the Litigation.

3.7  Additional Documents.  Each Party shall execute all such further and additional documents as may be necessary or desirable to carry out the provisions of this Section 3.

3.8  Claim Construction Order.  In the event that ePlus files a motion with the Court to vacate its claim construction order, SAP acknowledges and agrees that it will not oppose such motion.

CONFIDENTIAL                                                                                            ePLUS0940783

PX0318, Page 7 of 25

## 4. FEES

4.1    Settlement Payment.  In full consideration of the releases, licenses and other rights granted herein, SAP AG shall, within thirty (30) to sixty (60) days following execution of this Agreement (in accordance with the provisions of Section 4.4 below), pay to ePlus the amount of seventeen million five hundred thousand United States dollars (US$17,500,000) (the "Settlement Payment") via wire transfer to the following account:

| | |
|---|---|
| Name of Bank: | Wachovia Bank NA |
| ABA #: | 031201467 |
| Account Name: | ePlus, Inc. |
| Account Number: | 2014159396552 |

4.2  Fees and Costs.  Each Party to this Agreement shall bear its own fees and costs, including attorneys' fees, incurred in connection with the negotiation and drafting of this Agreement and in connection with any and all disputes between the Parties related to the Litigation.

4.3  Rights Subject to Payment of Settlement Payment.  The rights and benefits accruing to SAP, its Affiliates, SAP Vendors, SAP Customers and SAP Authorized Developers under this Agreement, including but not limited to the rights and licenses in Sections 2.1, 3.1, and 3.6, shall be subject in all respects to the payment in full by SAP to ePlus of the Settlement Payment.

4.4  Income Taxes.  Income taxes on the Settlement Payment will be borne solely by ePlus. The Parties shall cooperate with each other and promptly execute and submit all documents required by the German government (the "Tax Exemption Documents") to apply for an exemption from any requirement on the part of SAP to withhold income or corporation tax or a similar tax from the Settlement Payment to ePlus under this Agreement (an "Exemption"). SAP will pay to ePlus the Settlement Payment on the earlier of (i) five (5) business days after receipt of a certificate evidencing the Exemption from the appropriate German tax authority (an "Exemption Certificate"), and (ii) sixty (60) days following execution of this Agreement, in accordance with the following. The Parties shall use their best efforts to prepare and submit the Tax Exemption Documents so as to obtain an Exemption Certificate in sufficient time to enable SAP to pay to ePlus the Settlement Payment without withholding within thirty (30) days following execution of this Agreement. In the event, however, that the Parties are unable to obtain an Exemption Certificate from the appropriate German tax authority in sufficient time to enable SAP to pay to ePlus the Settlement Payment without withholding within sixty (60) days following execution of this Agreement, then SAP shall gross up the amount of the Settlement Payment to an amount such that the payment to ePlus, net of any income or corporation tax or a similar tax that SAP is required under German law to withhold from such grossed up Settlement Payment, is equal to seventeen million five hundred thousand United States dollars (US$17,500,000), and shall pay such amount to ePlus on or before sixty (60) days following execution of this Agreement. In that event, ePlus shall, promptly upon issuance of an Exemption Certificate by the appropriate German tax authority, apply for a refund of the amount withheld by SAP and paid to the German government, and shall, immediately upon receipt of any such refund, forward the full amount of the refund to SAP.

CONFIDENTIAL                                                                                          ePLUS0940784

4.5 <u>Other Taxes</u>.  All taxes or customs duties on the Settlement Payment except income or corporation taxes will be borne by SAP.

4.6 <u>Nonrefundability</u>.  In no event shall the Settlement Payment be recoverable, refundable or refunded, directly or indirectly, for any reason whatsoever.  Without limiting the foregoing, the Settlement Payment defined in Section 4.1 shall be nonrefundable regardless of the outcome of any proceeding involving the validity, patentability or enforceability of any of the ePlus Patents.

## 5. REPRESENTATIONS AND WARRANTIES

5.1 <u>Mutual Representations and Warranties</u>.  Each Party represents and warrants, solely to and for the benefit of the others, that:

(a)  it has the full right, power and authority to enter into this Agreement and perform its obligations hereunder and, in the case of ePlus, to grant the licenses set forth in Section 2.1 above;

(b)  its performance of this Agreement shall not conflict with or result in a breach or violation of any of the terms or provisions or constitute a default under any other agreement by which it is bound or to which its assets are subject; and

(c)  when executed and delivered, this Agreement shall constitute a legal, valid and binding obligation enforceable against it in accordance with its terms.

5.2 <u>Representations and Warranties of ePlus</u>.  ePlus represents and warrants to SAP that:

(a)  ePlus has not granted and will not grant any license or right in the ePlus Patents that interferes or conflicts with any of the rights granted in Section 2.1 of this Agreement, and will take no action or omit to take any action that would prevent or hinder the exercise of the license rights granted in Section 2.1 of this Agreement and that ePlus will bind any of its Affiliates or successors or assigns to the same obligation;

(b)  ePlus has as of the Effective Date and throughout the term of this Agreement will continue to have all rights in the ePlus Patents necessary to allow SAP, its Affiliates, and their SAP Customers, SAP Vendors, SAP Authorized Developers and providers to SAP to exercise the license rights granted in Section 2.1 of this Agreement without any restriction or charge; and

(c)  ePlus and its Affiliates and successors and assigns, shall indemnify, defend and hold harmless SAP, its Affiliates and their successors and assigns, in the event of an actual or threatened claim of patent infringement under any of the ePlus Patents made by ePlus or any of its Affiliates against any Entity (including but not limited to SAP or its Affiliates) licensed pursuant to Section 2.1 above.  In the event such a claim is pursued by ePlus or its Affiliate through trial and verdict, and there is a final adjudication, after exhaustion of any appeals that may be taken, that such Entity was covered by the license granted pursuant to Section 2.1 with respect to such claim, then the amount to be paid to SAP or its Affiliate by ePlus or its Affiliate

Patent License Agreement                                                                              Page 9

CONFIDENTIAL

ePLUS0940785

under this provision shall be double SAP's or its Affiliate's actual costs, attorneys' fees, damages, and other fees it incurs.

5.3 General Disclaimer. EXCEPT AS EXPRESSLY SET FORTH IN SECTIONS 5.1 AND 5.2, THE EPLUS PATENTS ARE LICENSED "AS IS" WITHOUT WARRANTY OF ANY KIND, AND EACH PARTY HEREBY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS, IMPLIED, AND STATUTORY, INCLUDING BUT NOT LIMITED TO ALL IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE.

5.4 Additional Disclaimers. Without limiting the generality of Section 5.3, ePlus makes no express or implied warranty (a) as to the validity, enforceability or scope of any ePlus Patent, or (b) that any product or service made, used, sold, offered for sale or imported or otherwise transferred under any license granted in this Agreement is or will be free from infringement of any rights of third parties.

# 6. GENERAL

6.1 Entire Agreement. This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all promises or understandings made prior to or contemporaneously herewith with respect to such subject matter.

6.2 Severability. In the event that any provision of this Agreement is deemed invalid, unenforceable or void by a final, non-appealable judgment of a court of competent jurisdiction in a proceeding initiated by a third party, the remainder of this Agreement shall be interpreted to the extent possible to effect the overall intention of the Parties at the Effective Date.

6.3 Multiple Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument.

6.4 Modification. This Agreement may not be amended, modified or altered in any way, except in a writing identified as such and signed by all Parties hereto.

6.5 Confidentiality. From and after the Effective Date, neither Party shall disclose the terms of this Agreement without the prior written consent of the other Party, except that a Party may make any of the following disclosures without prior written consent of the other Party:

(a)     to any governmental or regulatory body including any stock exchanges having jurisdiction and/or regulatory obligations specifically requiring such disclosure;

(b)     in response to a valid subpoena or as otherwise may be required by law;

(c)     for the purposes of disclosure in connection with the Securities Exchange Act of 1934, as amended, the Securities Act of 1933, as amended, and any other reports filed with the Securities and Exchange Commission, or any other filings, reports or disclosures that may be required under applicable laws or regulations; provided that before such disclosure (i) the Party

CONFIDENTIAL                                                                                          ePLUS0940786

making the disclosure shall use its best efforts to redact portions of this Agreement to the extent permitted by applicable law and regulations; and (ii) the disclosing Party shall provide the other Party with an opportunity to review and comment on the proposed redacted disclosure. To the extent one Party makes a disclosure of terms of this Agreement in accordance with this clause (c), the other Party shall be free to disclose the same terms of this Agreement in its own filings, reports or disclosures that may be required under applicable laws or regulations. The Parties agree that, in the event a Party includes only a summary of this Agreement in a filing, report or disclosure required under applicable laws or regulations, as opposed to the language of the Agreement itself, such Party shall, unless otherwise agreed by the Parties, use a summary in substantially the form set forth in Exhibit E hereto;

     (d)    to a Party's accountants, legal counsel, tax advisors and other financial and legal advisors, subject to obligations of confidentiality and/or privilege;

     (e)    as required during the course of litigation and subject to protective order; provided, however, that any production under a protective order would be protected under an "Attorney Eyes Only" or higher confidentiality designation; and

     (f)    in confidence, in connection with a proposed merger, acquisition or similar transaction.

    6.6  Publicity.  Neither Party will issue a press release or any other announcement regarding this Agreement or the relationship contemplated herein unless both Parties consent in advance to any proposed release in writing. Nor will either Party disclose any term of this Agreement for purposes of promotion, or offer for sale, of any product or service of a Party to a third party. The Parties shall direct their representatives not to make any disclosures of the terms of this Agreement except as permitted herein. Notwithstanding the foregoing, upon inquiry either Party may state that "ePlus and SAP have entered into a patent license and settlement agreement."

    6.7  Notices.  Any notices given hereunder shall be in writing, will reference this Patent License Agreement and will be deemed given when: (i) delivered personally; (ii) when sent by confirmed telex or facsimile; (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one (1) day after deposit with a commercial overnight carrier, with written verification of receipt. All communications will be sent to the addresses set forth below or such other addresses as may be designated by a Party by giving written notice to the other Party pursuant to this Section 6.7:

**Notices to ePlus:**

    ePlus inc.
    13595 Dulles Technology Drive
    Herndon, VA  20171-3413
    Attention:  Erica S. Stoecker, General Counsel
    Fax:  (703) 984-8720

**With a copy to:**

CONFIDENTIAL         ePLUS0940787

PX0318, Page 11 of 25

Scott L. Robertson
Hunton & Williams, LLP
1900 K Street, N.W.
Washington, D.C. 20006-1109
Fax: (202) 778-2201

**Notices to SAP:**

SAP Labs, LLC
3421 Hillview Avenue
Palo Alto, CA 94304
Attention: Chief Intellectual Property Officer
Fax: (650) 849-4344

**With a copy to:**

SAP AG
Neurottstraße 16
69190 Walldorf
Germany
Attention: Intellectual Property Counsel
Fax: +49 6227 7 42060

6.8 <u>Non-Waiver</u>. The waiver of any breach of any provision of this Agreement shall not be deemed to be a waiver of any other breach of the same or any other provision of this Agreement.

6.9 <u>Non-Agency</u>. Nothing contained in this Agreement or the performance thereof is intended to or shall be construed to create any relationship of agency, partnership or joint venture between or among the Parties.

6.10 <u>Enforcing ePlus Patents</u>. Nothing in this Agreement shall be construed as an agreement by ePlus to bring actions or suits against third parties for infringement of the ePlus Patents, or conferring any right to SAP or its Affiliates to bring actions or suits against third parties for infringement of the ePlus Patents.

6.11 <u>Assignment</u>. Neither Party may assign this Agreement without the prior written consent of the other Party, which the other Party may grant or deny in its sole discretion, except that either Party may assign this Agreement without the other Party's written consent and subject to the provisions of Section 2.4, in connection with a Change of Control of such Party. The assigning Party shall give the other Party written notice of such assignment within thirty (30) days after consummation of such Change of Control. Any attempted or purported assignment or delegation by a Party in violation of this Section 6.11 shall be null and void. Subject to the foregoing, this Agreement shall be binding upon, and shall inure to the benefit of, the Parties and their respective successors and permitted assigns. For the avoidance of doubt, the licenses granted herein shall run with the ePlus Patents irrespective of future transfers, assignments, or licenses of such ePlus Patents. Nothing in this provision shall restrict or prevent ePlus from

Patent License Agreement                                                          Page 12

transferring, assigning or licensing any of the ePlus Patents without prior written notice or consent of SAP, but subject to the rights and licenses granted hereunder. ePlus agrees, however, to provide SAP with notice of any transfer or assignment of any ePlus Patent.

6.12 <u>Governing Law</u>. This Agreement will be governed by and construed in accordance with the internal laws of the State of Delaware.

6.13 <u>Continuing Jurisdiction</u>. The Parties agree that the U.S. District Court for the Eastern District of Virginia (Richmond Division) shall retain continuing jurisdiction over the enforcement of this Agreement.

6.14 <u>Cumulation</u>. All rights and remedies enumerated in this Agreement will be cumulative and none will exclude any other right or remedy permitted herein or by law.

6.15 <u>Representation by Counsel</u>. Each of the Parties acknowledges that it has been represented by counsel in connection with the negotiation, drafting and execution of this Agreement. The language used in this Agreement shall be deemed to be language chosen by all Parties to express their mutual intent, and no rule of strict construction against any Party shall be applied to any term or provision hereof.

6.16 <u>Captions</u>. The captions to the sections or subsections of this Agreement are solely for the convenience of the Parties, are not a part of this Agreement, and shall not be used for the interpretation of, or determination of the validity of, this Agreement or any provision hereof.

6.17 <u>Bankruptcy</u>. ePlus acknowledges that all rights and licenses granted by it under or pursuant to this Agreement are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>"), licenses of rights to "intellectual property" as defined under Section 101(35A) of the Bankruptcy Code. ePlus acknowledges that if it, as a debtor in possession or a trustee-in-bankruptcy in a case under the Bankruptcy Code, rejects this Agreement, SAP may elect to retain its license rights under this Agreement as provided in Section 365(n) of the Bankruptcy Code. Each Party irrevocably waives all arguments and defenses arising under 11 U.S.C. 365(c)(1) or successor provisions to the effect that applicable law excuses the Party, other than the debtor, from accepting performance from or rendering performance to an entity other than the debtor or debtor in possession as a basis for opposing assumption of the Agreement by the other Party in a case under Chapter 11 of the Bankruptcy Code to the extent that such consent is required under 11 U.S.C. § 365(c)(1) or any successor statute. Any Change of Control resulting from any such bankruptcy proceeding shall remain subject to Section 6.11 above

*[remainder of this page intentionally left blank]*

CONFIDENTIAL

PX0318, Page 13 of 25

IN WITNESS WHEREOF, each of the Parties hereto has caused this Agreement to be executed through its duly authorized representative below.

**SAP AG**                                          **ePlus inc.**

By:_____          By: _Phillip Nat_____

Printed Name:_____          Printed Name: _Phillip G. Norton_

Title:_____          Title: _CEO_____


**SAP AG**

By:_____

Printed Name:_____

Title:_____


**SAP America**

By:_____

Printed Name:_____

Title:_____


Patent License Agreement                                          Page 14

CONFIDENTIAL                                          ePLUS0940790

PX0318, Page 14 of 25

**Exhibit A**
**ePlus Affiliates as of the Effective Date**

ePlus Systems, inc.
ePlus Content Services, inc.
ePlus Document Systems, inc.
ePlus Technology, inc.
ePlus Canada Company
eManaged Solutions, inc.
ePlus Capital, inc.
ePlus Government, inc.
ePlus Government Services, inc.
ePlus Group, inc.
ePlus Iceland, inc.
ePlus Information Holdings, inc.
ePlus Jamaica, inc.
ePlus Leasing, S.A. de C.V.

CONFIDENTIAL                                                                 ePLUS0940791

PX0318, Page 15 of 25

**Exhibit B**
**Proposed Stipulation and Order of Dismissal with Prejudice**

| | |
|---|---|
| *e*PLUS, INC., | ) |
| | ) |
| | )   CIVIL ACTION NO. 3:05cv281 (JRS) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SAP AMERICA, INC., | ) |
| and SAP AG, | ) |
| | ) |
| Defendants. | ) |

## STIPULATION AND ORDER OF DISMISSAL WITH PREJUDICE

The parties hereto, acting by and through counsel, do hereby stipulate that this action, including all claims, defenses and/or counterclaims brought, or which could have been brought, is hereby dismissed with prejudice pursuant to a Patent License and Settlement Agreement executed by the parties on _____. Each party shall bear its own attorneys' fees, expenses, and costs.

The Court shall retain jurisdiction to enforce the terms of the Patent License and Settlement Agreement.

CONFIDENTIAL                                                ePLUS0940792

PX0318, Page 16 of 25

**STIPULATED AND AGREED TO:**


Dated: _____

_____
Dabney J. Carr, IV, Esq.
Robert A. Angle, Esq.
TROUTMAN SANDERS LLP
Troutman Sanders Building
1001 Haxall Point
Richmond, Virginia 23219


Lloyd R. Day, Jr., Esq.
Robert M. Galvin, Esq.
DAY CASEBEER MADRID & BATCHELDER LLP
20300 Stevens Creek Blvd., Suite 400
Cupertino, CA 95014

Counsel for Defendants SAP America, Inc.
and SAP AG

CONFIDENTIAL                                                                                                             ePLUS0940793

Dated: _____

Maya M. Eckstein (VSB # 41413)
**HUNTON & WILLIAMS LLP**
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074

Scott L. Robertson
Jennifer A. Albert
Yisun Song (VSB #45881)
**HUNTON & WILLIAMS LLP**
1900 K Street, N.W.
Washington, DC  20006-1109
Telephone:  (202) 955-1500
Facsimile:  (202) 778-2201

Thomas J. Cawley (VSB # 04612)
David M. Young (VSB #35997)
**HUNTON & WILLIAMS LLP**
1751 Pinnacle Drive, Suite 1700
McLean, VA  22102
Telephone:  (703) 714-7400
Facsimile:  (703) 714-7410

Counsel for Plaintiff ePlus, inc.

**SO ORDERED:**

_____
United States District Judge

CONFIDENTIAL                                                              ePLUS0940794

**Exhibit C**
**List of ePlus Patents as of the Effective Date**

## ISSUED PATENTS

| Title | Patent Number | Country | Issue Date |
|---|---|---|---|
| Electronic Sourcing System and Method | 6,023,683 | U.S.A. | 2/8/2000 |
| Electronic Sourcing System and Method | 6,055,516 | U.S.A. | 4/25/2000 |
| Electronic Sourcing System and Method | 6,505,172 | U.S.A. | 1/7/2003 |
| Electronic Sourcing System and Method | 0697669 | Belgium | 6/19/2002 |
| Electronic Sourcing System and Method | 0697669 | Switzerland | 6/19/2002 |
| Electronic Sourcing System and Method | 0697669 | European Patent | 6/19/2002 |
| Electronic Sourcing System and Method | 01126215.1 | European Patent | |
| Electronic Sourcing System and Method | 0697669 | Spain | 6/19/2002 |
| Electronic Sourcing System and Method | 0697669 | France | 6/19/2002 |
| Electronic Sourcing System and Method | 0697669 | United Kingdom | 6/19/2002 |
| Electronic Sourcing System and Method | 0697669 | Italy | 6/19/2002 |
| Electronic Sourcing System and Method | 0697669 | Netherlands | 6/19/2002 |

CONFIDENTIAL                                                                           ePLUS0940795

PX0318, Page 19 of 25

## ISSUED PATENTS

| Title | Patent Number | Country | Issue Date |
|---|---|---|---|
| Information Translation Communication Protocol | 6,892,185 | U.S.A. | 5/10/2005 |
| Information Translation Communication Protocol | 7,047,211 | U.S.A. | 5/16/2006 |
| Network Image View Server Using Efficient Client Server Tiling and Caching Architecture | 6,182,127 | U.S.A. | 1/30/2001 |
| Network Image View Server Using Efficient Client Server Tiling and Caching Architecture | 6,510,459 | U.S.A. | 1/21/2003 |
| Network Image View Server Using Efficient Client Server Tiling and Caching Architecture | ZL98813575.2 | China | 8/11/2004 |
| Network Image View Server Using Efficient Client Server Tiling and Caching Architecture | HK1035239 | Hong Kong | 4/22/2005 |
| Network Image View Server Using Efficient Client Server Tiling and Caching Architecture | 225181 | Mexico | 12/13/2004 |

## PENDING PATENT APPLICATIONS

| Title | Patent Number | Country | Issue Date |
|---|---|---|---|
| Electronic Sourcing System | 204698/95 | Japan | 8/10/1995 |
| Electronic Sourcing System | 95305364.2 | Germany | 8/1/1995 |
| Electronic Sourcing System | 2,155,717 | Canada | 8/9/1995 |
| Hosted Information Management System and Method | 09/984,862 | U.S.A. | 10/31/2001 |

Patent License Agreement

Page 20

## PENDING PATENT APPLICATIONS

| Title | Patent Number | Country | Issue Date |
|---|---|---|---|
| Hosted Information Management System and Method | 2,361,245 | Canada | 11/2/2001 |
| Hosted Asset Procurement System and Method | 09/984,861 | U.S.A. | 10/31/2001 |
| Hosted Asset Procurement System and Method | 2,361,243 | Canada | 11/2/2001 |
| Information Translation Communication Protocol | 00943319.4 | European Patent Convention | 6/29/2000 |
| Information Translation Communication Protocol | 11/124,380 | U.S.A. | 5/9/2005 |
| Information Translation Communication Protocol | 11/395,253 | U.S.A. | 4/3/2006 |
| Method for Server-Less Office Architecture | 11/167,606 | U.S.A. | 6/28/2005 |
| Method for Server-Less Office Architecture | 94121588 | Taiwan | 6/28/2005 |
| Method for Server-Less Office Architecture | PCT/US2005/022652 | WIPO | 6/28/2005 |
| Network Image View Server Using Efficient Client-Server Tiling and Caching Architecture | 2,327,667 | Canada | 2/12/1998 |
| Network Image View Server Using Efficient Client-Server Tiling and Caching Architecture | 10/346,359 | U.S.A. | 1/17/2003 |
| Network Image View Server Using Efficient Client-Server Tiling and Caching Architecture | 137,815 | Israel | 8/10/2000 |

Patent License Agreement

CONFIDENTIAL

ePLUS0940797

# PENDING PATENT APPLICATIONS

| Title | Patent Number | Country | Issue Date |
|---|---|---|---|
| Network Image View Server Using Efficient Client-Server Tiling and Caching Architecture | P19815329-3 | Brazil | 2/12/1998 |
| Network Image View Server Using Efficient Client-Server Tiling and Caching Architecture | 200410059292.2 | China | 2/12/1998 |
| Network Image View Server Using Efficient Client-Server Tiling and Caching Architecture | 98906484.5 | European Patent Convention | 2/12/1998 |
| Network Image View Server Using Efficient Client-Server Tiling and Caching Architecture | 2000-531791 | Japan | 2/12/1998 |
| Network Image View Server Using Efficient Client-Server Tiling and Caching Architecture | 05105820.0 | Hong Kong | 7/11/2005 |
| System and Method for Creation and Maintenance of a Rich Content or Content-Centric Electronic Catalog | 10/705,923 | U.S.A. | 11/13/2003 |
| System and Method for eCatalog Supplier Portal | 11/116,426 | U.S.A. | 4/28/2005 |
| System and Method for eCatalog Supplier Portal | PCT/US2005/014651 | WIPO | 4/29/2005 |
| System and Method for eCatalog Supplier Portal | PCT/US2005/014651 | Canada | 4/29/2005 |
| System and Method for eCatalog Supplier Portal | 05745315.1 | European Patent Convention | 4/29/2005 |
| System and Method for eCatalog Supplier Portal | 94113202 | Taiwan | 4/26/2005 |

Patent License Agreement

CONFIDENTIAL

ePLUS0940798

PX0318, Page 22 of 25

## PENDING PATENT APPLICATIONS

| Title | Patent Number | Country | Issue Date |
|-------|---------------|---------|------------|
| System and Method for User Creation and Direction of a Rich-Content Life-Cycle | 94102650 | Taiwan | 1/28/2005 |
| System and Method for User Creation and Direction of a Rich-Content Life-Cycle | 11/062,631 | U.S.A. | 2/23/2005 |
| System and Method for User Creation and Direction of a Rich-Content Life-Cycle | PCT/US2005/005654 | WIPO | 2/23/2005 |
| System and Method for User Creation and Direction of a Rich-Content Life-Cycle | PCT/US2005/005654 | Canada | 2/23/2005 |
| System and Method for User Creation and Direction of a Rich-Content Life-Cycle | PCT/US2005/005654 | China | 2/23/2005 |
| System and Method for User Creation and Direction of a Rich-Content Life-Cycle | PCT/US2005/005654 | Japan | 2/23/2005 |
| System and Method for User Creation and Direction of a Rich-Content Life-Cycle | 05723514.5 | European Patent Convention | 2/23/2005 |
| System and Method for Network Collaboration Though Embedded Annotation and Rendering Instructions | 09/804,074 | U.S.A. | 3/13/2001 |
| System and Method for Network Collaboration Though Embedded Annotation and Rendering Instructions | 2,440,776 | Canada | 3/13/2002 |

CONFIDENTIAL                                                                           ePLUS0940799

PX0318, Page 23 of 25

**Exhibit D**
**ePlus Covered Products as of the Effective Date**

The current names for the products and services commercially offered by ePlus and its Affiliates as of the Effective Date follow. Subsequent versions of such listed products and services that satisfy the definition of ePlus Covered Products in Section 1.5 of this Agreement should be considered as included hereunder even though the names of such products and services may differ from the current names set forth below:

OneSource

Procure+

Content+

Manage+

Spend+

Lease+

Pay+

Contract+

Sourcing+

Finance+

Digital Paper

CONFIDENTIAL                                                    ePLUS0940800

PX0318, Page 24 of 25

**Exhibit E**
**Summary of the Agreement**

On December 11, 2006, ePlus inc. and SAP America, Inc. and its German parent, SAP AG (collectively, "SAP"), entered into a Patent License and Settlement Agreement (the "Agreement") to settle the existing patent litigation between the companies. Under the terms of the Agreement, ePlus will license to SAP ePlus' existing patents, together with those developed and/or acquired by ePlus within the next five years, in exchange for a one-time cash payment of $17,500,000, payable within 30 to 60 days of the date of the Agreement.  In addition, SAP has agreed not to pursue legal action against ePlus for patent infringement as to any of its current lines of business on any of SAP's patents for a period of five years.  The Agreement also provides for general releases, indemnification for its violation, and dismisses the existing litigation with prejudice.

CONFIDENTIAL                                                      ePLUS0940801

PX0318, Page 25 of 25