# EXHIBIT 1

1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2         FOR THE EASTERN DISTRICT OF VIRGINIA
 3                 RICHMOND DIVISION
 4
 5  ---------------------------------------
 6  ePLUS, INC.            :  Civil Action No.
                           :  3:09CV620
 7  vs.                    :
                           :
 8  LAWSON SOFTWARE, INC.  :  January 4, 2011
                           :
 9  ---------------------------------------
10
11      COMPLETE TRANSCRIPT OF THE JURY TRIAL
12      BEFORE THE HONORABLE ROBERT E. PAYNE
13   UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24       Peppy Peterson, RPR
         Official Court Reporter
25     United States District Court
```

2

```
 1  APPEARANCES:  (cont'g)
 2  Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
 3  Troutman Sanders Building
     1001 Haxall Point
 4  Richmond, Virginia  23219
 5  Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
 6  William D. Schultz, Esquire
     Merchant & Gould, PC
 7  80 South Eighth Street
     Suite 3200
 8  Minneapolis, Minnesota  55402
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

P R O C E E D I N G S

THE CLERK:  Civil action number 3:09CV00620, ePlus, Incorporated versus Lawson Software, Incorporated.  Mr. Scott L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr. Michael G. Strapp, and Mr. David Young represent the plaintiff.  Mr. Daniel W. McDonald, Dabney J. Carr, IV, Ms. Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent the defendant.  Are counsel ready to proceed?

MR. ROBERTSON:  Yes, Your Honor, plaintiff is.

MR. McDONALD:  Yes, Your Honor.  Thank you.

THE COURT:  All right.  Good morning, ladies and gentlemen.  On behalf of the Court and counsel and the parties, I'd like to thank you for your participation this morning in one of the most important civic duties that citizens of our country have.

We are a society which has chosen to rule itself in accord with the rule of law, and we have taken in our Constitution and our laws measures to make sure that we have an effective legal system by which people can resolve their disputes in court rather than in the streets, and if we did not have the service of jurors to make the sacrifices that jurors are called upon to do so, then our system of justice that is administered in accord with our Constitution and our statutes could not exist.

4

And so what you are called upon to do is a public duty of the highest order which, of course, all of us know entail sacrifices for you and for your families and for your employers and imposes burdens upon you beyond that of the ordinary responsibilities that you have which are already significant, and all of us know that.

This case involves a dispute over patents.  There are -- the plaintiff here is ePlus, Incorporated, or Inc., and ePlus, whose lawyers are sitting over here, has some patents that are issued by the United States Patent Office, a process that is sanctioned and approved by the Constitution of the country and the laws of the nation, and the patents all are long-numbered.

They have six figures, and, in fact, I expect most of us would like to earn incomes in accord with the size of the numbers of these patents, but they are referred to by three small digits, the last three digits of the patent.  I don't know that any of you know anything about these patents, but I want to let you know and understand what these patents are.

There's a patent number 6023683 which is called the '683 patent.  There's patent number 6055516 or the '516 patent.  There's patent number 6505172 or the '172 patent.  Sometimes, patents may be referred to, instead of using these short numbers, '516 or '683 as the patents-in-suit.  That's just a term that lawyers sometimes use to talk about the patents that

193

193

1 you that the RIMS system was on sale way back in 1992, well
2 over one year before the August '94 filing date for the patents
3 in this case. Clearly RIMS is prior art.
4 You'll also hear the testimony and see the documents
5 that the 1991 date on them, at least one of them from IBM, that
6 showed the TV/2 was also prior art and on sale in '92 at least,
7 over a year before August of '94.
8 So we have these two prior art things that are added
9 together, and you heard the counsel for ePlus talking about,
10 well, how could the Patent Office show what was going on.
11 We'll show you that what happened here, because the patents,
12 the body of the patents talk about the RIMS system and the TV/2
13 system. That's clear, and that's one of the reasons why we say
14 the inventors admit it's a combination.
15 You'll see that the TV/2 literature shows up on the
16 cover pages of the patents as references cited. I wonder,
17 Bill, can we go to the first page of the Exhibit 1 of the '683
18 patent, please, and blow up in the right column where it says
19 other publications. You see this is -- on every one of the
20 three patents in the case is something similar where they list
21 what these references cited, these Technical Viewer 2
22 documents, and they got under covers of the patents because the
23 Fisher people, when they filed these patents and pursued them,
24 filed a special list to the Patent Office identifying all the
25 prior art to make sure that the examiner saw the prior art.

195

195

1 So what's pretty clear from all of that is the Patent
2 Office didn't consider it and realized the RIMS system was
3 actually prior art. Nobody from Fisher ever told the Patent
4 Office that the RIMS system was on sale more than a year before
5 the filing date of the patent. That didn't even come up, and
6 so when they talk about how could the examiner make 79 mistakes
7 with 79 claims, well, really there's only one thing that went
8 wrong here, and it wasn't the examiner's fault.
9 He was never given that list with any RIMS brochures
10 or RIMS information on it identifying it as prior art so he
11 could initial it. So there's only one thing that went wrong
12 here, and that's the Fisher people didn't disclose the proper
13 information the right way to make sure it was considered by the
14 Patent Office.
15 So when you hear all the facts, you'll see that all
16 those facts together do show that these patents, all three of
17 them, are just obvious and, therefore, invalid.
18 Now, there's some other prior art which you'll hear
19 about like the J-CON system and P.O. Writer. We'll hear some
20 testimony from people that know about that system. I'm not
21 going to spend much more time. You'll have plenty of time to
22 hear all the details about that, but there's other prior art
23 that also shows why all 12 of the claims in the patents
24 that are asserted by ePlus are invalid.
25 We'll show you how every one of the elements of each

194

194

1 Then the examiner initials that list. He actually
2 puts his initials next to each item, and then all that stuff
3 winds up on the patents. So the TV/2, it's described in the
4 body of the patent, sure, but it was also properly disclosed as
5 prior art, and so it properly winds up on the cover of the
6 patent, so it's real clear.
7 There's a real clear system here to make sure that
8 stuff is considered as prior art by the Patent Office, but if
9 you go back to the big version of the patent -- you'll have
10 these patents in your materials, of course -- you won't see
11 anywhere on that list of references cited any brochures or
12 literature about the RIMS systems, and you won't see any
13 mention in that list -- if you can blow up the patent list,
14 actually over two columns there -- but the RIMS patent is
15 number 5712989.
16 The numbers are gradually going up here, 305199, so,
17 Bill, could you go to the next column and pick it up from
18 there? So there's the other patents, and you can see they skip
19 right over that number I just mentioned, 5712989. That's the
20 RIMS patent. That RIMS patent and the RIMS literature did not
21 make it on the list. It's not in the list the Fisher people
22 gave to the Patent Office. It's not on any list that the
23 examiner initialed as prior art he considered, and it didn't
24 make it on the patents either as references cited and
25 considered by the Patent Office.

196

196

1 one of those claims is found either in the TV/2 system or the
2 RIMS system, and, of course, you've already seen some of the
3 literature that you'll see again during the case about how the
4 TV/2 literature said it obvious to combine it with another
5 system, and we'll show that the RIMS system was just the sort
6 of system that was designed to be combined with.
7 Now, ePlus might get into some testimony about what
8 they did and what's not in the RIMS system. You need to listen
9 to that very carefully, because if they talk about differences
10 that don't show up in the claims, they don't matter. They have
11 to show why the claims are valid. We want to show that they
12 are invalid, but if they're going to respond to that, they're
13 going to have to show you why their claims are something that's
14 not obvious and different from the combination of RIMS and
15 TV/2, not that they have some other bells and whistles here
16 that aren't mentioned in the claims. So be careful and listen
17 for that.
18 They're not going to be able to show you anything in
19 the claims themselves that are different from what's in the
20 RIMS or the TV/2 disclosures.
21 Again, you'll hear from our expert, Dr. Shamos, who
22 also is going to be speaking about infringement to show you why
23 the claims are invalid as well. So we have one expert that's
24 going to go through it from both sides. ePlus has two experts.
25 They have one on infringement, Dr. Weaver, and then Mr.

257

1       THE COURT:  More?

2       MR. ROBERTSON:  Yes, sir.  I'm about to get

3   into the inventions and the developments and the

4   problems.

5       THE COURT:  Let's use the evening to see if

6   you can't hone your examination a little bit.

7       MR. ROBERTSON:  All right, sir.

8       THE COURT:  Are you familiar with the

9   television program Raw Hide?

10       MR. ROBERTSON:  I recall it, sir.

11       THE COURT:  Do you know what the theme is?

12       MR. ROBERTSON:  No, sir.

13       THE COURT:  Rolling, rolling, rolling.  Get

14   those doggies moving.  Raw hide.  All right.

15       You can leave whatever you want to leave in

16   here if you'd like to.

17       All right.  We'll see you.  Be combat ready

18   at nine o'clock.  If you have something you need to

19   take up, you let us know before that.  Thank you.

20   We'll be in adjournment.

21

22       (The proceedings were adjourned at 5:12 p.m.)

23

24

25

990

```
1           IN THE UNITED STATES DISTRICT COURT
2          FOR THE EASTERN DISTRICT OF VIRGINIA
3                    RICHMOND DIVISION
4
5    -----------------------------------
6    ePLUS, INC.          : Civil Action No.
                          :  3:09CV620
7    vs.                  :
                          :
8    LAWSON SOFTWARE, INC.    :  January 11, 2011
                          :
9    -----------------------------------
10
11       COMPLETE TRANSCRIPT OF THE JURY TRIAL
12        BEFORE THE HONORABLE ROBERT E. PAYNE
13     UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C. 20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia 23219-3095
     Counsel for the plaintiff
23
24       Peppy Peterson, RPR
         Official Court Reporter
25       United States District Court
```

991

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

992

```
1                 P R O C E E D I N G S
2
3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
4    Incorporated versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr.
6    Michael G. Strapp, and Mr. David Young represent the plaintiff.
7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
9    the defendant.  Are counsel ready to proceed?
10       MR. ROBERTSON:  Plaintiff is, Your Honor.
11       MR. McDONALD:  Yes, we are, Your Honor.
12       THE COURT:  What did you all need to talk about?
13       MS. STOLL-DeBELL:  We actually resolved it, Your
14   Honor, between the time we that mentioned --
15       THE COURT:  Tell them to bring the jury in.  What do
16   we have this morning?
17       MR. ROBERTSON:  The first witness we're calling this
18   morning is Mr. Keith Lohkamp, Your Honor.  He's a Lawson
19   employee.  I have a number of binders associated with the
20   witnesses this morning.  I want to make sure my paralegal --
21   oh.
22
23          (Jury in.)
24
25       THE COURT:  Good morning, ladies and gentlemen.  All
```

993

```
1    right, we have a witness.  Next witness.
2        MR. ROBERTSON:  Mr. Keith Lohkamp.
3        THE COURT:  All right, Keith Lohkamp.
4
5           KEITH LOHKAMP,
6    a witness, called by the plaintiff, having been first duly
7    sworn, testified as follows:
8           DIRECT EXAMINATION
9    BY MR. ROBERTSON:
10   Q   Good morning, Mr. Lohkamp.
11   A   Good morning.
12   Q   Mr. Lohkamp, you are a Lawson Software employee; correct?
13   A   Yes, I am.
14   Q   And you are a product strategist for supply chain
15   management; correct?
16   A   Yes.
17       THE COURT:  Can we get the witness to spell his last.
18   Q   Can you please spell your last name, sir, for the record.
19   A   It's L-o-h-k-a-m-p.
20   Q   Can you explain to the jury essentially what supply chain
21   management is?
22   A   Supply chain management involves the procurement of goods
23   and services and the management of the inventory related to
24   managing those goods.  It also includes, can include the sell
25   side, so selling those goods and services as well.
```

2011.01.11 Trial Transcript Day 5  1/11/2011  3:46:00 PM

1062

LOHKAMP - DIRECT     1062

1  order form that modifies a statement of work for
2  Community Medical Centers.
3  Q  What's a change order form modifying statement of
4  work?  Does that mean the statement of work has been
5  modified in some way?
6  A  Yeah.  My understanding of what a change order
7  form is someone is requesting a change to the services
8  we provide.
9  Q  What is the next document in that binder?
10  A  It's PX 501 L.  And it's a statement of work for
11  Deaconess Health System.
12  Q  Can you go to the next one?
13  A  The next one is PX 501 M, and it's the master
14  terms and conditions, Lawson Software and user
15  agreement.
16  Q  What's the next document?
17  A  That's the last one in this binder.  Should I go
18  to the next binder?
19  Q  All right.  Sorry, sir.  What's the first document
20  in there?
21  A  In this first binder?
22  Q  No, in the second binder.
23  A  I haven't got that.  Sorry.  It's PX 501 N.  And
24  the first page is a sales and use tax certification of
25  exemption.

1063

LOHKAMP - DIRECT     1063

1  Q  What's the next page?
2  A  The next page is a services turnover document.
3  Q  Okay.  Next page?
4  A  It's a services order form for Holland Hospital.
5  Q  What's the exhibit number for that one, sir?
6  A  This one is PX 501 N.
7  Q  Services order form, is that the order form for
8  the services that Lawson is going to be providing to
9  Holland Hospital?
10  A  Yes, it is.
11  Q  What's the next document, sir?
12  A  The next document is PX 501 R, and it states,
13  "Server sizing estimate for Owensboro Medical Health
14  System."
15  Q  Can you turn to the page where it indicates it's
16  going to be a contract for services provided?
17  A  The next page is "What is a server sizing
18  estimate?"
19  Q  What about the next page?
20  A  "Parameters overview."  It's still part of the
21  sizing.
22  Q  Next page, sir?
23  A  "Proposed architecture."
24      THE COURT:  Interesting, but not useful.
25  What are we doing?  These exhibits are in.

1064

LOHKAMP - DIRECT     1064

1      MR. ROBERTSON:  Well, Your Honor, I'd like to
2  offer what we had discussed before was is a Federal
3  Rule of Evidence 1006 summary of the documentation.
4  We've provided it to the defendant, and I believe with
5  one modification it was not objected to.  It's
6  Plaintiff's Exhibit 516.
7      THE COURT:  Any objections to Plaintiff's
8  Exhibit 516?
9      MS. STOLL-DeBELL:  No, Your Honor.
10      THE COURT:  What is it?
11      MR. ROBERTSON:  What is it?  I'm sorry, Your
12  Honor?
13      THE COURT:  Summary of what?
14      MR. ROBERTSON:  Of these contracts and what,
15  in fact, the software applications and modules that
16  were licensed, the involvement and the implementation
17  of those, and the various customers and information
18  detailing what the implementation was and what the
19  particular applications or modules that were
20  licensed.
21      THE COURT:  And there's no objection to PX
22  516.  It's admitted.
23      (Plaintiff's Exhibit 516 is admitted into
24  evidence.)
25      THE COURT:  And all of the PX 501s are

1065

LOHKAMP - DIRECT     1065

1  admitted, aren't they?
2      All right.  Let's go.
3  BY MR. ROBERTSON:
4  Q  I'd like to talk to you, sir, a little bit about
5  some industry analyst reports and publications that
6  you review as part of your job as product strategist.
7  All right?
8      So in your role as a product strategist, you have
9  had occasion to review industry analyst reports; is
10  that right?
11  A  That is correct.
12  Q  Among the industry analyst reports you review on
13  occasion is Gartner, correct?
14  A  Correct.
15  Q  And you also review industry analyst reports from
16  Aberdeen; is that right?
17  A  Yes, I do.
18  Q  These are industry analyst reports that often
19  refer to products that were within your
20  responsibilities at the company including procurement,
21  right?
22  A  Yes.
23  Q  And you have also reviewed industry analyst
24  reports from Forester; is that right?
25  A  Yes, I have.

1066

LOHKAMP - DIRECT     1066

1  Q  Particularly, in the procurement area; is that

2  correct?

3  A  Yes, I have.

4  Q  And for procurement industry, you have also looked

5  at analyst reports from AMR; is that right?

6  A  Yes.

7  Q  And you have also looked at analyst reports from

8  an outfit known as VDC; is that right?

9  A  That's correct.

10  Q  And Lawson reviews and sometimes relies on the

11  information provided in those industry analyst reports

12  for making its own internal decision; isn't that

13  right?

14  A  Yes, we sometimes lavish those into our planning.

15  Q  Isn't it true that you provide information

16  concerning Lawson's products including procurement

17  products in the supply chain management industry to

18  those analyst reports?

19  A  Yes, I do.

20  Q  And part of your duties as a product strategist

21  for Lawson is to speak with these industry analysts

22  about the procurement solutions like S3 offered by

23  Lawson; isn't that right?

24  A  Yes, it is.

25  Q  And among the industry analysts that you speak

1067

LOHKAMP - DIRECT     1067

1  with in your role as a product strategist is Garter,

2  correct?

3  A  Yes.

4  Q  And Forester?

5  A  Yes.

6  Q  Aberdeen?

7  A  Yes, Aberdeen.

8  Q  VDC?

9  A  Yes.

10  Q  AMR?

11  A  Yes.

12  Q  And you use these industry analyst reports to

13  provide Lawson with intelligence with respect to

14  market trends; isn't that right?

15  A  Some of the reports I do use for that.

16  Q  What are the ones you find most reliable, sir?

17  A  Gartner is one of the more reliable ones.

18  Q  And you have a personal subscription to one of

19  more of these publications; isn't that right?

20  A  I have a personal subscription to AMR, but then it

21  converted into Gartner when they were purchased.

22  Q  But the ones you use most are Gartner and

23  Forester; isn't that right?

24  A  Gartner, Forester and AMR.

25  Q  Now, outside of these industry analyst reports,

1068

LOHKAMP - DIRECT     1068

1  you also keep abreast of trends and developments in

2  the supply chain management industry, right?

3  A  I try to.

4  Q  So if there are any mainstream periodicals or news

5  services that are discussing the procurement sphere,

6  for example, you try to pay attention to those as part

7  of your job responsibilities?

8  A  I certainly pay attention to certain publications.

9  Q  What would those be outside of the analyst reports

10  we've talked about?

11  A  I follow Health Care Purchasing News, Materials

12  Management and Health Care.  I also get emails from IT

13  Toolbox.  I also get emails from Supply Chain

14  Management Review.  So those are some of the key

15  publications I look at.

16  Q  How about just general news publications,

17  newspapers, that kind of thing?  If they have articles

18  of interest involving electronic procurement, do you

19  keep abreast press of them?

20  A  If I see the articles, I would read them.

21  Q  Let's talk a little bit now about your knowledge

22  of ePlus, if we can.

23  A  Okay.

24  Q  Isn't it true that you knew of ePlus prior to the

25  filing of this lawsuit?

1069

LOHKAMP - DIRECT     1069

1  A  Yes, I did.

2  Q  And you initially became aware of ePlus at a

3  health association conference in 2003; isn't that

4  right?

5  A  Yes.

6  Q  Is that one of those conferences you were talking

7  about before where various companies go and have

8  booths in order to display the software solutions that

9  they have?

10  A  That was an industry conference where they did

11  have booths set up for vendors.

12  Q  You saw that ePlus had a booth set up there; is

13  that right?

14  A  Yes, I did.

15  Q  And you visited that booth; isn't that right, sir?

16  A  I did stop by that booth.

17  Q  And you recall that ePlus was exhibiting product

18  offerings in procurement relating to catalogs; isn't

19  that right.

20  A  Yes, I recall they had software related to

21  catalogs.

22  Q  And it's also true that you're aware of ePlus

23  prior to the filing of this law suit by their listing

24  in the Forester e-Procurement Wave; isn't that right?

25  A  I didn't recall seeing that, and I went back and

1186

1186

1    truly apologize, and maybe you'll get another judge to handle

2    the rest of the case.

3         MR. McDONALD:  I'm not sure I picked up all that --

4         THE COURT:  I'm asking if you said something and I

5    forgot what it was, because I actually don't remember you

6    saying anything.

7         MR. McDONALD:  You didn't miss a thing.  We haven't

8    formulated our position, Your Honor.  I have a couple concerns,

9    though, I can flag and maybe give --

10        THE COURT:  That would be helpful to talk about it.

11        MR. McDONALD:  Well, this language about "by a

12   vendor" means at some point in time.  I think the "by a vendor"

13   for one thing was pretty much agreed to at the Markman hearing,

14   what it did mean, and do inject the concept in time, of time

15   into a phrase like "by a vendor" could create some confusion, I

16   think, do more harm than good, actually.  We would probably

17   object to that, but I haven't finalized my position.

18        THE COURT:  But I think it's quite clear from the

19   specification that it's an antecedent event to the use of the

20   invention no matter how you cut it.

21        MR. McDONALD:  I just think --

22        THE COURT:  I understand what you are saying.  Think

23   about it and see what you --

24        MR. McDONALD:  The other concern I have is anything

25   we do with that, because our experts who have given opinions

1187

1187

1    relating to claim construction, I'm concerned that if we now

2    move the ball on what the claims mean, what is the implication

3    of that for the testimony that's already been given, the

4    testimony that's yet to come that the Court repeatedly says has

5    to be limited to what's in the expert reports, there were prior

6    decisions by the Court relating to prior art exclusions and

7    things like that.  I think there's many implications of making

8    any changes here, so I'm concerned about that.

9         THE COURT:  I think -- I'm not sure there are a

10   lot -- that is not a claim construction answer.  That's an

11   instruction, and the fact of the matter is that it is not at

12   all unusual for Courts to give revised claim constructions

13   during the trial.

14        In fact, for a good while, it was common to give the

15   claim construction only as part of the instructions.  Now, I've

16   never done that just because I didn't want to put myself

17   through that agony, but that's what happens sometimes, and in

18   that event, experts have to take their positions -- take out

19   their position and see what happens.  So we'll see.

20        MR. McDONALD:  In this case, the experts were allowed

21   to give their reports after the Court's Markman ruling, so I

22   think that really changes the dynamic.

23        THE COURT:  Okay.  Anything else?  Thank you.  We'll

24   see you all tomorrow at nine o'clock.

25             (Court adjourned.)

1188

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF VIRGINIA
 3              RICHMOND DIVISION
 4
 5   ---------------------------------------
 6   ePLUS, INC.          :  Civil Action No.
                          :  3:09CV620
 7   vs.                  :
                          :
 8   LAWSON SOFTWARE, INC.    :  January 12, 2011
                          :
 9   ---------------------------------------
10
11      COMPLETE TRANSCRIPT OF THE JURY TRIAL
12       BEFORE THE HONORABLE ROBERT E. PAYNE
13    UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24      Peppy Peterson, RPR
          Official Court Reporter
25      United States District Court
```

1189

```
 1   APPEARANCES:  (cont'g)
 2   Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
 3   Troutman Sanders Building
     1001 Haxall Point
 4   Richmond, Virginia  23219
 5   Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
 6   William D. Schultz, Esquire
     Merchant & Gould, PC
 7   80 South Eighth Street
     Suite 3200
 8   Minneapolis, Minnesota  55402
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1190

```
 1              P R O C E E D I N G S
 2
 3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
 4   Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
 5   L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr.
 6   Michael G. Strapp represent the plaintiff.
 7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
 8   Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
 9   the defendant.  Are counsel ready to proceed?
10        MR. ROBERTSON:  Plaintiff is, Your Honor.
11        MR. McDONALD:  Yes, Your Honor.
12        THE COURT:  All right.  You said you wanted to see me
13   before the jury comes in.
14        MR. McDONALD:  Yeah, there's basically three issues
15   we wanted to raise.
16        THE COURT:  The court reporters always can hear
17   better if you come to the lectern.
18        MR. McDONALD:  There's basically three issues that we
19   wanted to raise this morning.  One is our third witness in our
20   case that we start today is Ms. Raleigh.
21        THE COURT:  Third witness in what?
22        MR. McDONALD:  In our case when we start presenting
23   our case today.  We have Mr. Richard Lawson first, Mr.
24   Christopherson second, and then Hannah Raleigh was supposed to
25   come back and be third today.
```

1191

```
 1        She was supposed to be back last night from New York,
 2   and New York is getting hammered real bad by this blizzard.
 3   She's trying to get another flight, but her flight is not going
 4   to get her here until after the trial day is over today.  So
 5   we've been trying to work something out with ePlus about what
 6   we would do next because we haven't disclosed any exhibits or
 7   anything for the next witness.
 8        THE COURT:  Just call the next witness, the expert or
 9   whoever you've got here.  There's no magic to the order of
10   putting people on.
11        MR. McDONALD:  The next witness we would have
12   actually here is Mr. Lohkamp, calling him back.
13        THE COURT:  Good.
14        MR. McDONALD:  That's fine.  They haven't had a
15   chance to get ready for their cross-examination.
16        THE COURT:  They'll be ready.  They knew basically
17   what you were going to do anyway.  They're not going to do it
18   on your cross-examination; they were going to do redirect, so
19   we're going to reverse things.
20        MR. McDONALD:  We do have a deposition of Ms.
21   O'Loughlin on the RIMS prior art issue that we can move up in
22   the order.
23        THE COURT:  Is that carefully edited to eliminate the
24   trash?
25        MR. McDONALD:  That's being worked on as we speak,
```

1304

1   case anymore, Your Honor.

2       MR. STRAPP:  Marking goes to constructive

3   knowledge of the patents, which is relevant to the

4   issue we just discussed.

5       MR. McDONALD:  It is not relevant to notice

6   to Lawson. It's just general public marking.  That is

7   not appropriate.

8       MR. STRAPP:  Your Honor, the witness will

9   testify that the various products are marked, and we

10  have testimony from Lawson witnesses that they have

11  seen those products at trade shows back as far as

12  2003.  That information is relevant to knowledge.

13      MR. McDONALD:  The Lawson people have already

14  testified.  They never testified to that.

15      THE COURT:  I think one of them testified

16  that he went to a trade show and looked at their

17  products.

18      MR. McDONALD:  He said he saw the booth, but

19  they never saw the products or any patent markings.

20      THE COURT:  He says there's no foundation

21  because you haven't established that they actually

22  looked at the products that have the marking.

23      MR. STRAPP:  Your Honor, first of all,

24  circumstantial evidence is relevant to indirect

25  infringement.

1305

1       Secondly, we believe there is direct evidence

2   that we have established through Mr. Lohkamp's

3   testimony.

4       And third, under the case law --

5       THE COURT:  Evidence of what?

6       MR. STRAPP:  That Lawson employees knew of

7   ePlus, that they have seen ePlus --

8       THE COURT:  Somebody said they knew about

9   ePlus, but that's not the point.  The point is did

10  they see these patents or these products that had the

11  notice of the patent on them.

12      MR. McDONALD:  Mr. Lohkamp's testimony about

13  seeing ePlus at the trade show was in 2003 before he

14  even worked for Lawson.  So there's no evidence that a

15  Lawson employee saw that.

16      MR. STRAPP:  Your Honor, there's evidence

17  that Lawson has known of ePlus.  There's

18  circumstantial evidence at least that Lawson knows

19  that ePlus competes in this particular marketplace.

20  EPlus marks its website, its software, and under the

21  case law, marking is evidence of constructive

22  knowledge of the patents, which can be relevant to

23  indirect infringement.

24      THE COURT:  Yes, it is.  But do you

25  understand the concept of linkage, foundation?

1306

1       MR. STRAPP:  Yes, Your Honor.

2       THE COURT:  Well, do you have it?

3       MR. STRAPP:  We have testimony from Lawson

4   employees that they have known of ePlus.  We have

5   testimony from a Lawson employee that he attended a

6   trade show in which ePlus had set up a booth

7   demonstrating --

8       THE COURT:  But he says that's before he even

9   was an ePlus employee.  Is that right?

10      MR. McDONALD:  Lawson.

11      THE COURT:  I mean a Lawson employee.  Is

12  that right?

13      MR. STRAPP:  I don't know the answer to that

14  one way or the other, Judge.

15      THE COURT:  Isn't that something you need to

16  know to establish the foundation.

17      MR. STRAPP:  Well, Your Honor, I believe

18  under the case law, even if we don't have direct

19  evidence, circumstantial evidence is sufficient to at

20  least go to the jury so that they can consider whether

21  or not there is sufficient evidence for the indirect

22  infringement claim.

23      THE COURT:  All right.  Anything else?

24      MR. McDONALD:  No, Your Honor.

25      THE COURT:  Objection overruled.  The

1307

1   exhibits and testimony right now is admitted for the

2   limited purpose of whether or not Lawson may have

3   knowledge of ePlus and their patents.  EPlus as a

4   competitor and their patents.

5   BY MR. STRAPP:

6   Q  Mr. Farber, can you just tell me briefly what this

7   document is?

8   A  Sure.  This is a document, which I believe

9   describes at a high level a little bit about the

10  functionality and features of the Procure Plus

11  product.

12  Q  Can I direct your attention to the bottom

13  right-hand corner of the first page of this document?

14  A  Yes.

15  Q  Do you see there a list of U.S. patent numbers?

16  A  I do.

17  Q  Do you recognize any of those patents numbers as

18  patents that are at issue in this case?

19  A  Yes.

20  Q  Are those the first three patents listed there?

21  A  Yes, they are.

22  Q  Can you explain to me why it is that ePlus has

23  decided to mark this particular Procure Plus brochure

24  with the three patents numbers that are at issue in

25  this case?

1308

1  A  Well, it's my understanding from working with our
2  counsel that when you have a patents marking, it is a
3  necessity, and it's a form of providing general notice
4  to the industry that you have patents.
5      So we mark things that are publicly disseminated.
6  Q  Let me ask you to turn to Plaintiff's Exhibit 417,
7  please.  What is this document, Mr. Farber?
8      MR. McDONALD:  For the record, I have the
9  exact same objections.  I think I know what you're
10  going to say, but I just want to make sure you know I
11  have the same objections to this one.
12      THE COURT:  Are these the same kind of
13  documents, it's just another kind of product?
14      MR. STRAPP:  Correct.  We've discussed --
15      THE COURT:  Is that what it is?
16      MR. McDONALD:  Yes, it is, Your Honor, and I
17  guess you did have a limiting instruction.  So I'd at
18  least request the same limiting instruction.
19      THE COURT:  Well, this Exhibit 417 and this
20  testimony is, again, limited to -- for you to consider
21  as evidence respecting whether Lawson is on notice of
22  ePlus as a competitor and its patents that are at
23  issue in this case.  That's the only purpose that this
24  is admitted to.
25  BY MR. STRAPP:

1309

1  Q  Mr. Farber, this is Plaintiff's Exhibit 417?
2  A  It's a similar document and brochure that shows up
3  in written form and on the website that relates to our
4  product information management solutions.
5  Q  Which product specifically does this relate to?
6  A  Catalog and Content Plus.
7  Q  Can you take a look at the bottom right-hand
8  corner of this document, please?
9  A  Yes.
10  Q  Do you see there a list of U.S. patent numbers?
11  A  I do.
12  Q  Do you see the same three U.S. patent numbers
13  listed first there that we had discussed with respect
14  to Plaintiff's Exhibit 443?
15  A  Yes.
16  Q  I'm sorry, 448.
17      Are these the three patents that are at issue in
18  this lawsuit?
19  A  Yes, that's the '683, the '516, and the '172
20  patent.
21  Q  What types of additional documents or other
22  documents, if any, does ePlus mark with '683, '516 and
23  '172 patents?
24  A  We mark the products themselves so that when
25  people utilize the system, they see the patents as

1310

1  soon as they login.  Anybody that goes to our website
2  sees markings at numerous locations on our website.
3  Our printed materials, our documentation, information
4  that we hand out at things like trade shows are also
5  marked.  So it's basically we try to mark everything
6  that's publicly disseminated.
7  Q  Since when has ePlus marked its products and its
8  literature?
9  A  I think that was since 2002, if I'm not mistaken.
10  Q  What types of customers does ePlus target for
11  these Procure Plus and Content Plus products?
12  A  In terms of who we try to attract and sell to, I
13  would say the mid market.
14  Q  What do you mean by "mid market"?
15  A  Well, similar type customers that Lawson, you
16  know, talked about earlier in the week.  You know,
17  they're not necessarily the largest.  They're not
18  necessarily the smallest.  They fall within a range.
19  It can be, you know, a company that may be in revenue,
20  does, you know, 50 million to 2 1/2 billion.  That's a
21  very wide range, but that's what's considered mid
22  market in industry terms.
23  Q  Do you know whether or not ePlus competes with
24  Lawson for sales of its e-Procurement software?
25  A  Yes.

1311

1  Q  How do you know that ePlus competes with Lawson?
2  A  Well, I know through personal conversations that I
3  have with prospects and meetings that I attend, sales
4  meetings with my sales executives or account
5  representatives that are meeting with prospects to try
6  to sell them a solution.
7  Q  Any other ways that you know?
8  A  Yeah.  That's one way.  Other ways, through emails
9  at times that you, know, these prospects would send to
10  my sales organizations that I get copied on.  And
11  sometimes in situations where you're on a conference
12  call, you know, with a lot of vendors, you know, and
13  the prospect that's looking to buy a solution would
14  generally ask some general questions so that, you
15  know, they give the benefit to all the vendors to hear
16  the answer.
17      And sometimes there may be occasion to hear of a
18  competitor situation that way as well.
19  Q  Like the Lawson employees we've heard testimony
20  from, do you also pay attention to industry analyst
21  reports?
22  A  I do.
23  Q  Can you please turn to Plaintiff's Exhibit 463.
24  A  463?
25  Q  That's correct.

1316

1    the RFP process from Lawson consistent with your

2    understanding of how the RFP process works for

3    e-Procurement software?

4    A  Yes, I believe so.

5    Q  When ePlus receives an RFP, does ePlus itself

6    draft a response and ensure that the response that it

7    gives to the RFP is accurate?

8    A  Yes, ePlus would draft the response, yes.

9    Q  In addition to industry analyst reports, what

10   other types of media or publications do you follow to

11   try to keep abreast of trends or developments in the

12   e-Procurement industry?

13   A  In addition, to analysts reports?

14   Q  Correct.

15   A  There's a lot of sources.  You know, we do --

16   besides the reports, you get to have briefings with

17   the analysts.  We actually sit down and they disclose

18   some information to you about competition.  There's

19   times where we follow -- not times.  We do follow a

20   number of different trade magazines.  There's web

21   based information such as blogs that are written now

22   in this discipline of procurement sourcing and catalog

23   management.

24      There's the competitors websites that we looked at

25   very often to see what the competitors are doing and

1317

1    try to gain insight based on whatever public

2    information is available to help us position our

3    products and solutions.

4    Q  Do you know whether in these types of publications

5    you've been discussing there's ever been any mention

6    of ePlus or its patents?

7    A  Yes.

8    Q  What are you referring to specifically?

9    A  There have been authors that have written things

10   on blogs, on websites.  There have been newspaper

11   articles, trade magazines widely published --

12      MR. McDONALD:  Your Honor, we already went

13   through these issues as to foundations for some

14   exhibit that's been excluded.  Now he's talking about

15   the same thing.  That has been excluded.

16      THE COURT:  It sounds to me like it.

17      MR. STRAPP:  Your Honor, I wasn't planning to

18   go into any detail about these exhibits or show them,

19   obviously.  I was just asking about his personal

20   knowledge as the president of ePlus, what does he do

21   to keep abreast of industry developments.

22      THE COURT:  What's that got to do with

23   anything in the case?

24      MR. STRAPP:  It's relevant to understanding

25   how the marketplace works and how people in the

1318

1    industry, including the president of ePlus keeps track

2    of what's going on in the industry.

3       THE COURT:  Objection sustained.

4    BY MR. STRAPP:

5    Q  All right.  Mr. Farber, you heard some testimony

6    that individuals at Lawson consider publications from

7    Gartner, I think that's an industry analyst, to be

8    some of the most reliable industry publications.  Is

9    that consistent with your understanding as well?

10   A  That's what they said, yes.

11      THE COURT:  The question is:  Is it

12   consistent with your understanding?

13      THE WITNESS:  That Gartner is a widely

14   recognized --

15   Q  And reliable publication?

16   A  For the most part.

17   Q  Is Gartner an industry analyst report that ePlus

18   subscribes to?

19   A  We have.

20   Q  Have you personally reviewed Gartner research

21   reports and industry analyst reports?

22   A  I have.

23   Q  I'd like you to turn, please, to Plaintiff's

24   Exhibit 325.

25   A  I don't know that I have a 325.  Here it is.  It's

1319

1    out of order.  Okay.  I got it.

2    Q  It's also up on the screen for your reference if

3    you want to see a larger version there.

4    A  Okay.

5    Q  Does this appear, Mr. Farber, to be a Gartner

6    research report?

7    A  Yes.

8    Q  And is this the type of Gartner research report

9    that you have reviewed in the past?

10   A  Yes.

11   Q  What's the date of this particular Gartner

12   research report?

13   A  This is February 17, 2005.

14   Q  What is the title of this report?

15   A  Ariba/ePlus settlement could spark more patent

16   lawsuits.

17   Q  From reading that title, what do you understand

18   the subject matter of this particular report to be?

19   A  On the subject line, it's referring to a

20   settlement agreement that Ariba and ePlus had

21   pertaining to a certain number of our patents, and

22   Gartner, you know, is letting people know that it

23   could potentially result in some more litigation or

24   lawsuits.

25   Q  What patents were the subject of this patent

1320

1 infringement settlement referenced in the Gartner
2 report?
3 A  The same ones that are at issue here today.
4 Q  The three patents that are at issue in this case?
5 A  That's correct.
6 Q  All three of those were at issue in this Ariba
7 and ePlus litigation?
8 A  Yes, that's correct.
9 Q  What is the recommendation here at the second
10 sentence of the first page?
11 A  Starting with investigate, investigate the risk of
12 challenges to your products and whether others have
13 infringed on your patents.
14 Q  What do you understand that to mean?
15 A  They are giving advice, the research analysts --
16    MR. McDONALD:  Objection, Your Honor.  I
17 don't think the witness can interpret the report.
18    THE COURT:  Sustained.
19 Q  Let's turn to the next page of the document,
20 please.
21    THE COURT:  Ladies and gentlemen, this
22 document is admitted for a limited purpose.  Whether
23 or not Ariba and ePlus settled a lawsuit involving the
24 infringement of this case, I mean of the
25 patents-in-suit in this case, is not one of -- is

1321

1 admitted only for the purpose of whether -- for you to
2 to consider as evidence of whether Lawson knew about
3 ePlus and the patents-in-suit in the case in view of
4 the fact that one of the witnesses from Lawson
5 testified about reviewing the Gartner reports as a
6 regular proposition.
7    You may not conclude from this information
8 that because Ariba thought it might have infringed
9 ePlus' patents and reached a settlement of that matter
10 that Lawson infringes those same patents, but you can
11 consider the evidence of whether Lawson knew about
12 ePlus as a competitor and ePlus' patents, and also in
13 deciding on some of the as, I'll tell you later, some
14 of the defenses that have been offered in the case by
15 Lawson.  And those are the limited purposes.
16    Are there any other requests for limiting
17 instruction other than what I just gave?
18    MR. McDONALD:  No, Your Honor.  Thank you.
19    THE COURT:  All right.
20 Q  Mr. Farber, I'd like to direct your attention to
21 the bottom of the second page of this Gartner report.
22 Do you see that there are some recommendations listed
23 there in bullet points?
24 A  Yes.
25 Q  I want you to take a look in particular at the

1322

1 recommendations for ISVs.  Is ISV a term that's used
2 in the supply chain management industry?
3 A  It's used in the computer industry.
4 Q  What does it refer to?
5 A  It means independent software vendors.  Those
6 vendors that develop and install software.
7 Q  Is ePlus an ISV?
8 A  Yes.
9 Q  Is Lawson an ISV?
10 A  Yes.
11 Q  What recommendations is Gartner providing to
12 companies like ePlus and Lawson in this particular
13 Gartner research report?
14 A  What Gartner is recommending is to make sure that
15 your innovations are patented, which is the marking
16 that we talked about earlier, and then do an extensive
17 review of the functionality of your software against
18 patents that are known to be in dispute.
19    MR. McDONALD:  Your Honor, we don't need this
20 witness to read this document to us.  I object.
21    THE COURT:  I think that's enough.
22    MR. STRAPP:  I have no further ear questions.
23 Thank you for your time, Mr. Farber.
24    THE COURT:  Cross-examination.
25

1323

1    CROSS-EXAMINATION
2 BY MR. McDONALD:
3 Q  Good afternoon, Mr. Farber.
4    EPlus never gave Lawson any notice of these
5 patents directly before they sued them, did they?
6 A  No.
7 Q  And so the first time there's a direct
8 communication between ePlus and Lawson is when ePlus
9 filed a complaint and served that complaint on Lawson?
10 A  Yes, that's my understanding.  That's the way we
11 were instructed to do that.
12 Q  That was in May of 2009; is that correct?
13 A  I believe that's correct, yes.
14 Q  You talked at the beginning of your testimony
15 about some documents that you said put the patent
16 number out there in the public so that the public
17 would see you had these patents numbers.  Do you
18 remember that?
19 A  I said that we put the information out because it
20 was our understanding that that's how you have to
21 disseminate the patent, and we put it on documents
22 that are publicly available.
23 Q  And those documents that you picked as examples of
24 those publicly available documents, those are a couple
25 of exhibits that were put up on the computer monitors

1488

1   And there's also a case called SEB from the Federal

2   Circuit which has to do with the standard of intent

3   for the inducement infringement, which I understand

4   also includes a reckless disregard for the patent.

5        THE COURT:  I want you to give Ms. Haggard

6   the citations for those two cases, plus --

7        MR. ROBERTSON:  Let me be candid with the

8   Court.

9        THE COURT:  What is it?

10       MR. McDONALD:  Akamai.

11       THE COURT:  Alkamai?

12       MR. ROBERTSON:  Alkamai is how it's

13   pronounced.

14       THE COURT:  I can't pronounce it.  All right.

15   I want you to give her the cites, so I make sure I've

16   read those while I'm working on the instructions.

17       MR. ROBERTSON:  The Supreme Court has granted

18   a writ of certiorari with respect to this SAB case I

19   just referenced.  But the Federal Circuit just came

20   down with a case I think in the last week that said

21   that the pendency of a writ of certiorari has no

22   impact whatsoever on what the state of the law is.

23       THE COURT:  Why did the Federal Circuit feel

24   compelled to decide that?  I think that's been the law

25   forever.

1489

1        MR. ROBERTSON:  I think it was because one of

2   the litigants made the argument.

3        THE COURT:  I understood that to be the case

4   for as long as I've been practicing law.

5        MR. ROBERTSON:  All right.  Thank you, Your

6   Honor.

7        THE COURT:  All right.  Thank you all very

8   much.  Give the citations to her tonight so she can

9   print those out for me.  Give her the books and we'll

10   be ready to go.

11       Thank you very much.

12

13       (The proceedings were adjourned at 5:34 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1490

```
1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE EASTERN DISTRICT OF VIRGINIA
3          RICHMOND DIVISION
4
5  ---------------------------------
6  ePLUS, INC.        : Civil Action No.
                      : 3:09CV620
7  vs.               :
8  LAWSON SOFTWARE, INC.   : January 13, 2011
                      :
9  ---------------------------------
10
11    COMPLETE TRANSCRIPT OF THE JURY TRIAL
12    BEFORE THE HONORABLE ROBERT E. PAYNE
13  UNITED STATES DISTRICT JUDGE, AND A JURY
14
    APPEARANCES:
15
    Scott L. Robertson, Esquire
16  Michael G. Strapp, Esquire
    Jennifer A. Albert, Esquire
17  David M. Young, Esquire
    Goodwin Procter, LLP
18  901 New York Avenue NW
    Suite 900
19  Washington, D.C.  20001
20  Craig T. Merritt, Esquire
    Christian & Barton, LLP
21  909 East Main Street
    Suite 1200
22  Richmond, Virginia  23219-3095
    Counsel for the plaintiff
23
24      Peppy Peterson, RPR
        Official Court Reporter
25    United States District Court
```

1491

```
1   APPEARANCES:  (cont'g)
2   Dabney J. Carr, IV, Esquire
    Troutman Sanders, LLP
3   Troutman Sanders Building
    1001 Haxall Point
4   Richmond, Virginia  23219
5   Daniel W. McDonald, Esquire
    Kirstin A. Stoll-DeBell, Esquire
6   William D. Schultz, Esquire
    Merchant & Gould, PC
7   80 South Eighth Street
    Suite 3200
8   Minneapolis, Minnesota  55402
```

1492

```
1          P R O C E E D I N G S
2
3       THE CLERK:  Civil action number 3:09CV620, ePlus,
4  Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5  L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
6  Mr. Michael G. Strapp represent the plaintiff.
7       Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8  Kirstin A. Stoll-DeBell, and Mr. William D. Schultz represent
9  the defendant.  Are counsel ready to proceed?
10      MR. ROBERTSON:  Plaintiff is, Your Honor.  Thank you.
11      MR. McDONALD:  Yes, Your Honor.  Thank you.
12      THE COURT:  Do you need to see me about something
13 before the jury comes in?
14      MR. ROBERTSON:  Yes, Your Honor.  You had asked us to
15 take a look at those appendices with respect to our motion on
16 this implementation on a customer-by-customer basis.
17      THE COURT:  Yeah.
18      MR. ROBERTSON:  We have done that, and the reason I
19 raised it, Your Honor, is one of the witnesses that's going to
20 be called this morning is Ms. Hannah Raleigh.  You may recall
21 she testified once already.  She is involved with Lawson
22 Professional Services that has to do -- that has responsibility
23 for implementation of the Lawson software products, and we're
24 concerned that she's going to be getting into areas in and
25 presenting testimony that Lawson is going to contend are
```

1493

```
1  defenses to infringement later that are directly implicated by
2  that interrogatory number 24.
3       What I have provided Your Honor with is the
4  appendices that were referenced in the answers to the
5  interrogatories, the transcript from the March 26th hearing,
6  telephonic hearing on the motion to compel, and the relevant
7  citations to the transcript where this issue came up, and I do
8  want to continue to press the motion, Your Honor.
9       We do think that the answers, even with the
10 appendices, were nowhere near what was called for and what Your
11 Honor directed Lawson to do in response to that.
12      If I might just, Your Honor, you may recall that
13 these appendices that are being referenced were provided to
14 ePlus three months before the motion to compel was presented,
15 and the appendices do not respond to the interrogatory as
16 represented by counsel for Lawson.
17      Indeed, if you look at some of the appendices, for
18 example --
19      THE COURT:  Is A appendix A?
20      MR. ROBERTSON:  Yes, sir.  Under the tab December 23,
21 2009, response to interrogatory number -- yeah, A is one.
22      THE COURT:  March 26th is the first tab, the
23 transcript, and then there's an A behind that.  Is that
24 appendix A or not?
25      MR. ROBERTSON:  I believe appendix A, Your Honor, is
```

1566

CHRISTOPHERSON - DIRECT    1566

1  THE COURT:  Can you tell?
2  THE WITNESS:  I can tell.
3  THE COURT:  Now the next question is how do
4  you tell because that's the foundational question.
5  Q  How do you tell?
6  A  How do you tell?  When we open up a window, which
7  is what's occurred here, when you have selected, in
8  this case I believe it's Staples link, a brand new web
9  page is opened up.  And there's a frame put on that.
10  That frame is much like a picture frame.  In this
11  case, really closer to a digital picture frame.
12    So the outside of the frame looks like the frames
13  in any of the pictures here.  You can put a label on
14  that frame.  The label is Lawson.  We happen to put
15  our logo, our brand, always with Punchout since we've
16  come out with that product always in the upper
17  left-hand corner.
18    Everything below that is the picture.  So we have
19  created the frame, but we don't care what happens
20  inside of that picture.  At that point everything
21  below that is being run by and controlled by the
22  vendor.
23  Q  Okay.  So in this slide you can see there's a list
24  of categories?
25  A  Yes.

1568

CHRISTOPHERSON - DIRECT    1568

1  THE COURT:  In view of what you said earlier,
2  whose software is providing the whole page?
3  THE WITNESS:  The whole page, Your Honor, is
4  actually being constructed by two parties.  You've got
5  the very -- actually, three parties.  You've got in
6  this case Internet Explorer is done by Microsoft.
7  That's creating the blue bar and the borders around
8  it.  Right below that is Lawson.  So you have the
9  Lawson logo.  All we're putting up is an image of that
10  and it enters blank space.
11  THE COURT:  Whose software is being used to
12  enable me to view this?
13  THE WITNESS:  To enable you to view it?  It
14  would be Microsoft.  It's Internet Explorer in this
15  particular example.  That's the browser that's being
16  used.
17  THE COURT:  That's not what I'm asking.
18  THE WITNESS:  Sir, I didn't understand then.
19  THE COURT:  Do I have to have one of the
20  Lawson systems in order to see what's on this screen?
21  THE WITNESS:  To use Punchout, yes.
22  THE COURT:  All right.  Now I understand.
23  Thank you.
24  THE WITNESS:  It would help maybe, Your
25  Honor -- Punchout is what opens up --

1567

CHRISTOPHERSON - DIRECT    1567

1  Q  Are you saying that that is controlled by the
2  vendor?
3  A  Correct.
4  Q  And not Lawson?
5  A  Correct.
6  Q  We can go to the next page.  And within the
7  picture frame, do you see results of a search?
8  A  What I see is they have drilled down into the
9  catagory further.
10  Q  Is it the vendors software that's providing that
11  drill down of catagory?
12  A  Yes.
13  Q  And not Lawson?
14  A  Correct.
15  Q  Okay.  If we can go to the page ending in 1269.
16  It's a couple pages ahead.  What is this showing?
17  A  In this case, they have selected some paper.  And
18  you can start seeing the item description, more
19  information about that particular product.
20  Q  Is it the vendor software that's providing that
21  item description and additional detail regarding that
22  product?
23  A  Yes.
24  Q  And not Lawson?
25  A  Correct.

1569

CHRISTOPHERSON - DIRECT    1569

1  MR. ROBERTSON:  Your Honor, I just object.
2  The question has been answered.
3  THE WITNESS:  Okay.
4  THE COURT:  You may have objected to my
5  question.
6  MS. STOLL-DeBELL:  I think he did actually.
7  BY MS. STOLL-DeBELL:
8  Q  Okay.  Are there some of these Punchout vendor
9  websites that customers can go to without using
10  Punchout?
11  A  Can you say that again?
12  Q  Yes.  So, for example, Staples link, is that one
13  of the Punchout vendors that can be used with Lawson's
14  Punchout product?
15  A  Yes, it is.
16  Q  Okay.  Can a customer use Stapleslink.com without
17  having the Punchout product?
18  A  I do not know.
19  MR. ROBERTSON:  No objection.
20  Q  I think we're done with that line of questioning
21  so I'm going to transition again for you.
22  A  Sure.
23  Q  While you take a drink.
24  A  That's okay.  Go ahead.
25  Q  When did you first learn about ePlus' patents?

1570

CHRISTOPHERSON - DIRECT     1570

1   A  May 10, 2009.
2   Q  Is that when you first learned about the law suit
3   that ePlus had filed against Lawson?
4   A  Yes.
5   Q  What did you do when you learned that ePlus had
6   filed suit against Lawson for patent infringement?
7   A  What I first did was I got the three patents and
8   reviewed those, read those.
9   Q  What did you think when you finished reading those
10  patents?
11       MR. ROBERTSON:  Objection, Your Honor.  This
12  is calling for a legal conclusion and it's --
13       THE COURT:  I'm sorry?
14       MR. ROBERTSON:  It's calling for a legal
15  conclusion, Your Honor, and it's not relevant.
16       THE COURT:  What did he think?  Is that the
17  question?
18       MS. STOLL-DeBELL:  Yes, what did he think.
19       MR. ROBERTSON:  It's a little vague and
20  ambiguous, too.
21       THE COURT:  Well, I think maybe that's the
22  right objection.  Sustained.
23       We have to have a more precise question to
24  understand whether it's objectionable or not.
25       MS. STOLL-DeBELL:  Okay.

1571

CHRISTOPHERSON - DIRECT     1571

1   BY MS. STOLL-DeBELL:
2   Q  After reading the patents, did you think Lawson
3   had a problem with these patents?
4       MR. ROBERTSON:  Objection.  That's an
5   important question and that's leading.
6       THE COURT:  Well, it is.  Sustained.
7   BY MS. STOLL-DeBELL:
8   Q  What was your first reaction after reading the
9   patents?
10      MR. ROBERTSON:  Objection, vague and
11  ambiguous.
12      MS. STOLL-DeBELL:  Your Honor, I'm trying --
13      THE COURT:  I guess my basic inquiry here is
14  why is it that what he thinks is relevant?  To what
15  issue does it go that this jury has to decide?  That's
16  the question.  So just name the issue that it goes to.
17      MS. STOLL-DeBELL:  It goes to the intent
18  element of indirect infringement.  And Mr. Robertson
19  actually asked Mr. Christopherson about this same
20  topic when he put him on the stand in his case.  And
21  so it goes to that.
22      MR. ROBERTSON:  I didn't ask him anything
23  about what he thought or his reaction or anything.  I
24  just asked him if he was aware that a lawsuit was
25  filed and if he had notice since that date.

1572

CHRISTOPHERSON - DIRECT     1572

1       THE COURT:  What he thought is the irrelevant
2   to this case except with respect to the intent element
3   of indirect infringement; is that right?
4       MS. STOLL-DeBELL:  Yes.
5       THE COURT:  This information can be
6   considered by you, ladies and gentlemen, only in
7   deciding whether or not a certain element of in
8   direction infringement has been met, and that is
9   whether there was an intent to have an infringement.
10  And so you can consider it for that purpose and that
11  purpose alone.  And I'll give you some more
12  instructions later about what indirect infringement
13  is.
14      But for your purposes, you can just keynote
15  this testimony of what his reaction was goes to the
16  intent to indirectly infringe or to have indirect
17  infringement.  Excuse me.  Go ahead.
18  Q  Can you go ahead and answer the question?
19  A  Can you restate the question.  It's been awhile.
20  Q  Sure.  After you read the patents, what was your
21  first reaction?
22  A  My first reaction was that it didn't appear as
23  though we were actually doing that, the three patents.
24  Q  Why did you think it didn't appear that you were
25  doing what was in the three patents?

1573

CHRISTOPHERSON - DIRECT     1573

1       MR. ROBERTSON:  Your Honor, now I'm going to
2   object.  This calls for a legal conclusion and an
3   expert opinion.
4       MS. STOLL-DeBELL:  Your Honor, it doesn't.
5   I'm asking him what he thought.  I'm not asking him
6   for his opinion.  I'm not asking him about the claims.
7       THE COURT:  When you asked him what he
8   thought, why isn't that asking him for an opinion?
9       MS. STOLL-DeBELL:  Well, I suppose it is a
10  lay opinion on some level, but Mr. Robertson asked him
11  what Lawson as a company did after this lawsuit was
12  filed.  And Mr. Christopherson was involved in that,
13  and I'm just trying to inquire further into the issue
14  of Lawson's intent.
15      THE COURT:  What he said was he didn't think
16  that Lawson practiced the patent.  That's what his
17  reaction was.
18      MS. STOLL-DeBELL:  Yes.
19      THE COURT:  And you want to know why he
20  thought that?
21      MS. STOLL-DeBELL:  Yes.
22      THE COURT:  You can consider that for the
23  same limited purpose, ladies and gentlemen.
24  BY MS. STOLL-DeBELL:
25  Q  Why did you think that Lawson was doing something

1574

CHRISTOPHERSON - DIRECT     1574

1    different than what was in the patents?

2    A   Keep in mind, this is the first initial look at

3    the patents.  Some of the key things I was noticing

4    were catalogs and what I was going back to was the

5    state of where catalogs were back in the mid '90s or

6    around the time the patents were filed.  And in

7    looking at screens, for instance, and they were

8    mentioning page numbers from catalogs.  Very much like

9    a printed catalog except they turned it into an

10   electronic form.  That was the first thing.

11   Q   Why did you think that was different from what

12   Lawson was doing?

13         MR. ROBERTSON:  Objection, Your Honor.

14   There's a claim construction in this case with respect

15   to catalog, and now we're asking the lay witness to

16   opine on what his understanding of a catalog is.  It

17   doesn't have any relevancy to this case.

18         THE COURT:  You're getting into expert

19   testimony, and he wasn't qualified as an expert, and

20   what you're doing is you're offering it without a

21   report or anything.  And he's involved in in-house

22   development of the systems and knows about them, and

23   he can be qualified as a person who's an expert, but

24   he wasn't.

25         MS. STOLL-DeBELL:  Your Honor, first of all,

1575

CHRISTOPHERSON - DIRECT     1575

1    he's just testifying in his capacity as an employee

2    for Lawson.  So I don't think there was a requirement

3    for him to do an expert report.

4         THE COURT:  If he's giving expert testimony,

5    if he' testifying as an expert for Lawson, he has to

6    give a report.  I don't care whether he's an employee

7    or not.

8         MS. STOLL-DeBELL:  He wasn't professionally

9    retained to give expert testimony.

10         THE COURT:  You can't have an employee

11   professionally retained or otherwise give expert

12   testimony without a report.

13         MS. STOLL-DeBELL:  Okay.  I don't think it

14   matters because I don't think I'm asking him for

15   expert testimony.  I want to -- I think it goes to the

16   intent --

17         THE COURT:  You're just asking him whether he

18   thought Lawson did something different.

19         MS. STOLL-DeBELL:  Yes, were they different.

20         THE COURT:  Okay.  Why don't you ask him

21   that?

22   BY MS. STOLL-DeBELL:

23   Q   Did you think Lawson was doing something different

24   than the patents?

25   A   Yes.

1576

CHRISTOPHERSON - DIRECT     1576

1    Q   Did you have a meeting with your team members

2    regarding the lawsuit?

3    A   Yes.

4    Q   Did they agree with you?

5         MR. ROBERTSON:  Objection, Your Honor.

6         MS. STOLL-DeBELL:  Let me ask a better

7    question.

8         THE COURT:  Yes.  She's going to ask a

9    different question.

10   BY MS. STOLL-DeBELL:

11   Q   Did they agree with you that what Lawson was doing

12   was different than the patents?

13         MR. ROBERTSON:  Objection, Your Honor.  It

14   still calls for a legal conclusion, and it's

15   inappropriate expert testimony, and it's hearsay.

16         THE COURT:  It's sustained as hearsay.  It's

17   offered for the truth of the matter.  So it doesn't

18   have any nonhearsay use.

19   BY MS. STOLL-DeBELL:

20   Q   Was it your recommendation that Lawson not make

21   any changes --

22         THE COURT:  What did you do after this?  Ask

23   him.  Let him testify.

24   Q   What did you do after you read the patents?

25   A   I'll provided recommendation that in my belief, my

1577

CHRISTOPHERSON - DIRECT     1577

1    reading, we weren't doing that patent, first, and that

2    they didn't need to do any changes with the software

3    that was currently available.

4         MS. STOLL-DeBELL:  I have no further

5    questions right now, Your Honor.

6         THE COURT:  All right.  Cross-examination.

7

8    CROSS-EXAMINATION

9    BY MR. ROBERTSON:

10   Q   Let's start with that last topic first if we

11   could, Mr. Christopherson.

12   A   Sure.

13   Q   You did something else, didn't you, sir, besides

14   making the recommendation that no changes would be

15   made to the software?

16   A   I'm not sure what you're referring to, sir.

17   Q   Lawson went out and sought a legal opinion with

18   respect to these patents, didn't they, sir?

19         MS. STOLL-DeBELL:  Objection, Your Honor.  I

20   don't think it's appropriate to get into whether we

21   got an opinion or not.  It's not relevant.

22         MR. ROBERTSON:  It goes to the whole intent

23   issue, Your Honor, under the Broadcomm v. Qualcomm

24   case.

25         MS. STOLL-DeBELL:  Your Honor, it goes to

1578

1 jury instructions that you're going to give, and I
2 think there's a disputed issue of law here on that
3 point.  And I think the law is clear that we don't
4 have to get into it.  It's just not relevant.  We
5 shouldn't be getting into this.  We have no duty to go
6 get an opinion.  And so he shouldn't be getting into
7 this.  It's prejudicial.
8     MR. ROBERTSON:  The door was opened, Your
9 Honor, when they asked him what he did and steps he
10 took.  And under the Broadcom v. Qualcomm case, if he
11 sought a legal opinion then failed to disclose it,
12 that can go to the intent issue, and that's what I
13 want to ask him.
14     MS. STOLL-DeBELL:  I was going to say I asked
15 him what he thought and what he did.  I did not ask
16 him about any communications he had with any of
17 Lawson's attorneys outside or inside.  I was merely
18 asking him what he personally thought and what he did.
19 So it's outside the scope as well.
20     THE COURT:  Well, I don't think it is.  I
21 think it's fair cross-examination.
22     Just answer the question yes or no because
23 I'm going to have to take it question by question.  I
24 think what he did, whether he got a legal opinion, can
25 be considered depending on what the answer is.  If his

1579

1 answer was no, he didn't, then I'll tell the jury one
2 thing.  If the answer is yes, then I have to tell the
3 jury something else.
4     So the objection is overruled.  You may
5 answer the question whether you sought a legal opinion
6 respecting whether your products infringed.
7     MR. ROBERTSON:  Well, actually, I don't know
8 what the legal opinion says and whether it was
9 infringement, Your Honor, or was some other basis.
10     THE COURT:  All right.  You can ask your own
11 question.  Did you seek a legal opinion of any kind,
12 whatever?
13     MR. ROBERTSON:  Yes.
14 BY MR. ROBERTSON:
15 Q  I don't want to know the content of that because
16 that was privileged; however, the fact is you didn't
17 turn it over in discovery to ePlus; isn't that right?
18     MS. STOLL-DeBELL:  Objection, Your Honor.
19 That's really not relevant and it's outside the scope
20 of my direct examination and --
21     THE COURT:  I'm waiting to hear what you have
22 to say.  I thought you were conferring with Mr.
23 McDonald about what you were going to say.  And so I
24 just held everything in abeyance until you finished
25 your remarks.

1580

1     MS. STOLL-DeBELL:  So I think the objection
2 is outside the scope of my direct, not relevant,
3 prejudicial.
4     THE COURT:  Why is it relevant?
5     MR. ROBERTSON:  It's relevant --
6     THE COURT:  What case?
7     MR. ROBERTSON:  Broadcom v. Qualcomm, Your
8 Honor.  In that case, the accused infringers --
9     THE COURT:  I'll tell you what we'll do.
10 I'll deal with this at a recess.  You can have the
11 right to come back into this area.
12     MR. ROBERTSON:  All right.  Thank you, Your
13 Honor.
14     THE COURT:  You don't have that case with
15 you, do you?
16     MR. ROBERTSON:  We actually have a brief on
17 it, Your Honor, that we can probably produce to you
18 during the lunch break.
19     MS. STOLL-DeBELL:  We've got some case law to
20 support our position, too, Your Honor, and we'll get
21 that for you, too.
22     THE COURT:  All right.
23 BY MR. ROBERTSON:
24 Q  Mr. Christopherson, just refresh me again, you are
25 director of development for the S3 application?

1581

1 A  Yes.
2 Q  How long have you had that position?
3 A  I've had this current position since December 1,
4 2008.
5 Q  But you have been with the company since 1997 as I
6 understand it?
7 A  Yes, that's correct.
8 Q  You're aware since you have been the company's
9 designated person on a number of infringement issues
10 and testified, I think, for two days in this case in
11 depositions that ePlus is accusing Lawson of
12 infringing with this S3 procurement product going back
13 to 2003; is that right?
14 A  That's my understanding, yes.
15 Q  You were here yesterday when I read the
16 stipulations the stipulated facts to the jury that we
17 understand the current version of this S3 procurement
18 product is Version 9, right?
19 A  That's correct.
20 Q  But you're also familiar there was a Version 8?
21 A  Are you referring to 803?
22 Q  Yes, 8.0.3.  Thank you.
23 A  Yes.
24 Q  So it's true that in this procurement version
25 8.0.3, I understood you to say there were three ways,

1786

1 instructions that we think will be appropriate.

2      THE COURT:  Several?  How about one good one?

3      MS. STOLL-DeBELL:  One with many facets, Your

4 Honor.

5      THE COURT:  Listen, I'm going to make you sit

6 on the jury.  I think every lawyer ought to have to

7 sit on a jury and ought to have to listen to these

8 instructions and try to figure out what do they mean.

9 Because if you read them from the jury's standpoint,

10 particularly these model instructions in the patent

11 area, what they're doing is -- nobody has really made

12 a real good effort to simplify them yet.

13      Judge Spencer did better in SAP in

14 simplifying the instructions than almost anybody I've

15 ever seen, but there have with some legal changes

16 since that time that prohibit me from adopting them

17 full scale.

18      All right.  That takes care of them.  I'm not

19 real hopeful that you're going to get your evidence or

20 I don't think you ought to be hopeful that you're

21 going to get that evidence in, Mr. Robertson, because

22 it seems to me it invites the jury to speculate and

23 it's a problem, I think.

24      MR. ROBERTSON:  I understand, Your Honor.

25 We're also concerned about prejudice given the fact we

1787

1 proffered that in good faith when it came up with the

2 witness that he had a lay opinion as to his intent.  I

3 thought it was relevant then because his lay opinion

4 as to the intent I didn't think was very persuasive,

5 but if you go get a legal opinion on these issues that

6 obviously involve the patents, and then you make the

7 conscious decision not to disclose it, I think that's

8 part of the circumstantial evidence they can consider.

9      I understand Your Honor's ruling.

10      THE COURT:  I haven't rules.

11      MR. ROBERTSON:  I understand Your Honor's

12 suggestion which way you might rule, but you're going

13 to be fair and read the papers.

14      THE COURT:  I thought maybe if I gave you all

15 some insight into where I was right now since we're on

16 the fly that your arguments might be better informed

17 in the morning, just as my thinking will be better

18 informed if I read what you-all tendered for me to

19 read.

20      Thank you so much for the overnight present.

21 I appreciate it.

22

23      (The proceedings were adjourned at 5:26 p.m.)

24

25

1788

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2047

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE EASTERN DISTRICT OF VIRGINIA
 3              RICHMOND DIVISION
 4
 5   -------------------------------------
 6   ePLUS, INC.         : Civil Action No.
                         : 3:09CV620
 7   vs.                 :
                         :
 8   LAWSON SOFTWARE, INC.    :  January 18, 2011
                         :
 9   -------------------------------------
10
11       COMPLETE TRANSCRIPT OF THE JURY TRIAL
12        BEFORE THE HONORABLE ROBERT E. PAYNE
13     UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24       Peppy Peterson, RPR
          Official Court Reporter
25       United States District Court
```

2048

```
 1   APPEARANCES:  (cont'g)
 2   Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
 3   Troutman Sanders Building
     1001 Haxall Point
 4   Richmond, Virginia  23219
 5   Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
 6   William D. Schultz, Esquire
     Merchant & Gould, PC
 7   80 South Eighth Street
     Suite 3200
 8   Minneapolis, Minnesota  55402
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2049

```
 1              P R O C E E D I N G S
 2
 3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
 4   Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
 5   L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
 6   Mr. Michael G. Strapp represent the plaintiff.
 7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
 8   Kirstin L. Stoll-DeBell, Mr. William D. Schultz represent the
 9   defendants.  Are counsel ready to proceed?
10        MR. ROBERTSON:  Yes, Your Honor.
11        MR. McDONALD:  We are, Your Honor.
12        THE COURT:  All right.  What is this all about?
13        MR. ROBERTSON:  Your Honor, good morning.
14        THE COURT:  Morning.
15        MR. ROBERTSON:  Last night at 6:00 p.m., plaintiff
16   received a package of something like almost 170 demonstrative
17   graphics that the defendant intends to introduce, apparently,
18   with the testimony of Dr. Shamos.
19        As a practical matter, Your Honor, I think last week
20   the defendant represented that they would wrap their case up in
21   two days.  Going through 170 slides is just going to be
22   impossible to try to get through just as an initial matter
23   before we even get to the issue that we have with respect to
24   170 slides being presented to the jury.
25        THE COURT:  Why are these exchanges being made now?
```

2050

```
 1   I thought demonstrative exhibits were supposed to have been
 2   exchanged before the trial.  Isn't that what the pretrial order
 3   says?
 4        MR. ROBERTSON:  I'm not certain the pretrial order
 5   says that or not.  We did have an agreement among the parties
 6   that we would present demonstratives at 6:00 p.m. the night
 7   before a witness was to go on, but the sheer volume --
 8        THE COURT:  Did I say grace over that?
 9        MR. ROBERTSON:  I'm sorry, sir?
10        THE COURT:  Did somebody present that to me?
11        MR. ROBERTSON:  I don't know that it was presented to
12   you, Your Honor.
13        THE COURT:  You see what happens?  I would never have
14   allowed that if I knew that was what was going on.  Never in a
15   million years would I have allowed it.  I've never allowed it,
16   and the reason I don't allow it is because of this kind of
17   problem.
18        MR. ROBERTSON:  There had been a rule of reason
19   applied to it, Your Honor, where the demonstratives were fairly
20   limited in scope.  For example, Dr. Weaver, I think we had
21   about 30 of which 24 were simply the claims or the -- you'll
22   recall the infringement charts where we were checking off the
23   boxes.
24        The problem we have now is we believe that these
25   slides substantively violate several of the Court's orders with
```

2139

MOMYER - CROSS      2139

1   what did you indicate there?

2   A   Pretty much what I just said.  We continue

3   developing RIMS up until I left Fisher.

4        MR. McDONALD:  Your Honor, I don't know what

5   he's referring to at this point, but I think the

6   question and answer should just be red.

7        MR. ROBERTSON:  I'm happy to do that, Your

8   Honor.

9        THE COURT:  He asked if it refreshed his

10  recollection, and he said yes.  What was the

11  recollection that was refreshed?  He's entitled to

12  answer how it was refreshed.  And if you'd like to

13  read the question and answer, both of you, go ahead.

14  BY MR. ROBERTSON:

15  Q   Well, I thought you had answered the question, but

16  I understood you to say it refreshed your

17  recollection.  So what recollection was refreshed by

18  referring to this testimony that you gave under oath?

19  A   My recollection was that the RIMS system was an

20  evolutionary system that continued to be developed

21  over a period of time up to and through 2000, 2003.

22  Q   Is it your testimony there under oath consistent

23  with your recollection now?

24  A   Yes.

25  Q   Can we just go to the RIMS patent?  The RIMS

2140

MOMYER - CROSS      2140

1   system is mentioned multiple times in your patent; is

2   that right?

3   A   Yes, it is.

4   Q   I've got just a graphic here of your '683 patent.

5   If we could just go along.  Do you know how many times

6   RIMS is mentioned in this patent?

7   A   No, I don't.

8   Q   I've indicated here in red in each instance that

9   the RIMS system or the RIMS features or capabilities

10  are described or as modified.  If we could just scan

11  through this.  This is column 1 and 2, there's 3 and

12  4, 5 and 6, 7 and 8, 10, columns 11 and 12, 13, 14,

13  15, 16, 18.  All right.  Would it surprise you, sir,

14  if you disclosed RIMS functionality and feature in

15  your patent more than 55 times in your patent

16  application?

17  A   No.

18  Q   You weren't trying to mislead the Patent Office by

19  withholding descriptions of what the RIMS capability

20  was, were you?

21  A   No, I wasn't.

22  Q   Can you tell us whether or not you think you fully

23  disclosed the features and capability and the

24  revisions and modifications that were necessary in

25  order to come up with your electronic sourcing

2141

MOMYER - CROSS      2141

1   invention?

2   A   Yes, to the best of my understanding we did.

3   Q   I want to talk to you a little bit about

4   cross-referencing in the RIMS system.  Do you recall

5   being directed to sections in the RIMS patent?

6   A   Yes, I do.

7   Q   In your electronic -- well, let me ask you this

8   basic question.  Is the cross-referencing, as

9   identified in the RIMS patent, the same

10  cross-referencing as utilized in your invention of the

11  electronic sourcing system?

12  A   No, it's not.

13  Q   Can you tell us how it's different?

14  A   The cross reference in the RIMS system was

15  intended to be a means to do a look-up from a

16  competitor or vendor's catalog number, part number,

17  over to Fisher, and always convert it to that.  The

18  cross referencing in the electronic sourcing was much

19  broader in that it didn't specifically cross reference

20  you to any specific Fisher part number.  It wasn't

21  tied back to a specific Fisher part number.

22  Q   Let me ask you this about the RIMS system.  If you

23  were able to identify a part number, for example, of

24  your competitor, was the RIMS system then able to

25  source it from that vendor?

2142

MOMYER - CROSS      2142

1   A   In the RIMS system?

2   Q   Yes.

3   A   It would identify the part number.  Which part

4   number?

5   Q   The part number of the competitor.

6   A   No, it would always -- in the RIMS system, you

7   would always translate back to the Fisher part number.

8   Q   So in other words, you were trying to cross

9   reference to a part number so you could then find a

10  corresponding Fisher product to sell to the customer;

11  is that right?

12  A   That's correct.

13  Q   In your electronic sourcing system, does the

14  customer, the user, have the ability using the cross

15  reference table to purchase the actual item from one

16  vendor, another vendor, or multiple vendors?

17       MR. McDONALD:  Objection, Your Honor.  The

18  cross-reference table was a term that the Court has

19  used in its claim constructions, and I think it's

20  unclear here because there's nothing in that

21  definition that is specific to which part it's being

22  converted to.

23       MR. ROBERTSON:  I'll rephrase the question.

24  Q   Did the electronic sourcing system have the

25  capability to identify the same or similar products

2211

Kinross - Direct                 2211

1    MR. ROBERTSON:  Objection, Your Honor.  This has been
2    gone over in direct examination already.
3    MR. McDONALD:  I'm trying to tie it into this
4    timeline, Your Honor.  Now that we have some clarity on the
5    timing of everything, I think it's helpful to put it in the
6    context.
7    MR. ROBERTSON:  Same timeline.
8    THE COURT:  It seems to me like we're plowing old
9    ground, Mr. McDonald, and remember what I told you before we
10   started today?  Let's go ahead.
11   Q   I'd like to now turn, Mr. Kinross, to how much demand
12   there was for the system.  We can take this off the screen
13   now -- for the system that corresponds to the patents that have
14   been asserted in this case.
15       Now, the SupplyLink was the brand name used for the system
16   described in the three patents in this case; right?
17   A   Yes.
18   Q   Is it true that only a small portion of RIMS customers
19   ever adopted the SupplyLink system to use with RIMS?
20   A   Well, I think the system would have replaced RIMS, not
21   been used with RIMS.
22   Q   Well, did some portion of RIMS customers adopt the
23   SupplyLink system to use with RIMS?
24   A   Well, no.  If you are getting SupplyLink, you don't need
25   RIMS anymore.

2212

Kinross - Direct                 2212

1    Q   Turning to the patents-in-suit, the patents-in-suit are
2    referred to as the RIMS system, RIMS in a number of places;
3    right?
4    A   Yes.
5    Q   Are there any places in any of the three patents-in-suit
6    where the RIMS system is specifically identified as prior art?
7    A   I couldn't tell you.  If I'd have to do a search to see
8    prior art.
9    Q   You would agree that no documents related to the RIMS
10   system are identified on the cover pages of any of the three
11   patents-in-suit as a reference cited, wouldn't you?
12   MR. ROBERTSON:  Objection, Your Honor.  I mean, I
13   don't even know the relevancy of that question, but I don't
14   know how he could possibly have that in his memory.
15   MR. McDONALD:  We can refer to the patents if you
16   need to, Mr. Kinross, if you don't know the answer.
17   MR. ROBERTSON:  We have a stipulation, Your Honor,
18   that the '989 is incorporated by reference in the patents.
19   MR. McDONALD:  That's not what we're talking about.
20   That stipulation has nothing do with my question.
21   THE COURT:  You asked what was disclosed.
22   MR. McDONALD:  Disclosed as a reference cited on the
23   cover of these patents as part of the information disclosure
24   process.
25   THE COURT:  Whether it was disclosed on the cover or

2213

Kinross - Direct                 2213

1    disclosed in the text doesn't make any difference.
2    MR. McDONALD:  Well, it makes a difference if that
3    one is prior art and the other one isn't.
4    THE COURT:  Depends.
5    MR. McDONALD:  Well, the information in the
6    disclosure statement is where --
7    THE COURT:  I'm not going to get into that.  Reframe
8    your question.
9    Q   Would you agree with me that there are --
10   THE COURT:  You've got a showing -- do you want me to
11   show you how to do it?  You ask him, do you know what the prior
12   art references are on the patent, and if he says, yes, then you
13   say, okay, did they include that.  If he says no, then you show
14   him the patent.
15       That's how you do it.  He's told you three times he
16   does not remember everything in these patents or the other
17   ones, so just ask him the right way, and we will get going.
18   I'm going to put an end to it if we don't get going.
19   MR. McDONALD:  I'm about wrapped up anyway, Your
20   Honor, but I'll --
21   THE COURT:  All right.  Do it the right way.
22   Q   Mr. Kinross, could we go ahead and just put Plaintiff's
23   Exhibit 1, the '683 patent, up on the screen so you'll know
24   what we're talking about.
25       Go to the first page there, the part references cited --

2214

Kinross - Direct                 2214

1    there's a section, do you see in the lower left of what's blown
2    up on the screen, Mr. Kinross, the words references cited?
3    A   Yes, I see that.
4    Q   And over on the right side -- let's leave that up the way
5    you had it, Bill -- there's a list of patents.  That list of
6    patents doesn't include the RIMS patent.  That's number
7    5712989; correct?
8    THE COURT:  You mean under references cited?
9    MR. McDONALD:  Yeah, under the U.S. patents
10   documents, references cited.
11   Q   It does not include 5719 -- excuse me, 5712989; correct?
12   MR. ROBERTSON:  For the record, Your Honor, let me
13   pose a relevancy objection.
14   THE COURT:  I think it's fairly obvious from reading
15   the patents whether it's in there or not, but let's go.  Let's
16   get to it.
17   A   I don't see it under references cited, no.
18   Q   Then there's a few entries under the title other
19   publications on this page; right, Mr. Kinross?  Right side
20   there?
21   A   Yes.
22   Q   And there's no reference to any RIMS publications there;
23   correct?
24   A   That's correct.
25   Q   If we go to the next page of the document, please, the

2271

1    lot.  It tends to happen more in criminal cases than

2    others.

3            All right.  Is there anything else?  Thank

4    you very much.

5

6        (The proceedings were adjourned at 5:30 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2272

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2               RICHMOND DIVISION
 3   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                    :
 4   ePLUS, INC.,                   :
                                    :
 5          Plaintiff,   :
     v.                   : Civil Action
 6                        : No. 3:09CV620
     LAWSON SOFTWARE, INC.,         :
 7                        : January 19, 2011
            Defendant.   :
 8   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:
 9
        COMPLETE TRANSCRIPT OF JURY TRIAL
10       BEFORE THE HONORABLE ROBERT E. PAYNE
        UNITED STATES DISTRICT JUDGE, AND A JURY
11
12
13
14   APPEARANCES:
15   Scott L. Robertson, Esq.
     Jennifer A. Albert, Esq.
16   Michael T. Strapp, Esq.
     GOODWIN PROCTOR
17   901 New York Avenue, NW
     Washington, D.C.  20001
18
19   Craig T. Merritt, Esq.
     CHRISTIAN & BARTON
20   909 E. Main Street, Suite 1200
     Richmond, VA  23219-3095
21
        Counsel for the plaintiff ePlus
22
23
24       DIANE J. DAFFRON, RPR
        OFFICIAL COURT REPORTER
25       UNITED STATES DISTRICT COURT
```

2273

```
 1   APPEARANCES:  (Continuing)
 2   Daniel W. McDonald, Esq.
     Kirstin L. Stoll-DeBell, Esq.
 3   William D. Schultz, Esq.
     Rachel C. Hughey, Esq.
 4   MERCHANT & GOULD
     3200 IDS Center
 5   80 South Eighth Street
     Minneapolis, MN  55402-2215
 6
 7   Dabney J. Carr, IV, Esq.
     TROUTMAN SANDERS
 8   Troutman Sanders Building
     1001 Haxall Point
 9   P.O. Box 1122
     Richmond, VA  23218-1122
10
        Counsel for the defendant Lawson Software.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2274

```
 1      (The proceedings in this matter commenced at
 2   9:00 a.m.)
 3      THE CLERK:  Civil Action No. 3:09CV00620.
 4   EPlus, Incorporated v. Lawson Software, Incorporated.
 5      Mr. Scott L. Robertson, Mr. Craig T. Merritt,
 6   Ms. Jennifer A. Albert, and Mr. Michael T. Strapp
 7   represent the plaintiff.  Mr. Daniel W. McDaniel,
 8   Mr. Dabney J. Carr, IV, Ms. Kirstin L. Stoll-DeBell,
 9   Mr. William D. Schultz, and Ms. Rachel C. Hughey
10   represent the defendant.
11      Are counsel ready to proceed?
12      MR. ROBERTSON:  The plaintiff is, Your Honor.
13      MR. McDONALD:  Yes, Your Honor, we are.
14      THE COURT:  Good morning, ladies and
15   gentlemen.  We're going to resume the Laurene McEneny
16   show, which appears at this hour only once.  It's
17   under the sponsorship of Lawson Software, Inc. through
18   the cooperation of the plaintiff.  And then we're
19   going to have some testimony.
20      I may, I'm told, have to deal with a motion
21   after this.  So I don't know.  We may have to take a
22   recess, but we'll see what we're doing.
23      I think what the lawyers have been doing is
24   trying to work out ways to continually, as they have
25   gone on, make the trial more efficient and reduce the
```

2275

```
 1   amount of time, your time, that has to be consumed in
 2   the process.  That takes a lot of hard work, and
 3   sometimes there's, as you can imagine, friction that
 4   develops in the decisional process that has to be
 5   resolved by yours truly.  And it's better if we don't
 6   expose you to all that because, I have to tell you, it
 7   sometimes confuses me, and you don't need to be
 8   visited with all that.  So we'll see.
 9      All right.  Are you ready to play.
10      MS. HUGHEY:  Yes, Your Honor.
11      THE COURT:  All right.  All systems go.
12      MS. HUGHEY:  Yes.
13      THE COURT:  All right.
14      (The video of Laurene McEneny is resumed
15   playing at this time.)
16      THE COURT:  Is it through?
17      MS. HUGHEY:  Yes, Your Honor.  We'd like to
18   submit Exhibit 403, which is the testimony of
19   Ms. McEneny, into evidence.
20      THE COURT:  Into evidence, 403?
21      MS. HUGHEY:  Yes.
22      THE COURT:  All right.  It's been admitted.
23   All right.
24      (Defendant's Exhibit 403 is admitted into
25   evidence.)
```

2280

1  discuss because what's happening now with Dr. Shamos,
2  he's presenting detailed, element by element, claim by
3  claim obviousness analysis that he never disclosed in
4  his expert report.  We raised this yesterday.
5       There's one paragraph that Dr. Shamos has
6  about combining J-CON with this P.O. Writer system for
7  obviousness.  There are no longer any anticipation
8  claims with respect J-CON for Dr. Staats.
9       So our objection, we'd like to raise with the
10  Court, and it's going to take away some time with the
11  jury, but it's very important because these slides for
12  the first time are what they have given us are what
13  they contend is a claim by claim, element by element
14  obviousness argument.
15       THE COURT:  Are you saying we need what
16  Shamos is going to testify to before Staats testifies?
17       THE COURT:  I would say yes because, Your
18  Honor, if Dr. Staats -- if Dr. Shamos, and there's
19  only one paragraph on obviousness, and there's no
20  analysis, then Dr. Staats' testimony is completely
21  untethered to any kind of relevance as the Dr. Shamos'
22  opinions as Your Honor has already ruled.  We can't
23  have some witness come in here testifying to all those
24  things without an expert tying it together and
25  connecting the dots, and that's exactly what's going

2281

1  to happen.
2       Someone has to connect the dots, but it can't
3  be with Dr. Staats because he didn't do an expert
4  report.  The only person that did an expert report on
5  this combination of J-CON and P.O. Writer is Dr.
6  Shamos, and it's in one paragraph.
7       THE COURT:  I'm going to excuse the jury.
8       (The sidebar conference has concluded.)
9       THE COURT:  I need to take something up
10  further with them, and I don't think you need any more
11  white noise.  You talk about something that will
12  destroy your harmony and your waa, that's it.
13       (The jury is exiting the courtroom.)
14       THE COURT:  I gather that this issue that you
15  were raising, Mr. Robertson, is embodied in the email
16  chain that I got today.  Somehow there's a connection
17  between what Dr. Staats is going to testify to and the
18  Dr. Shamos issue.
19       As I understand your point, just so I get the
20  issue framed, you're objecting to Dr. Staats
21  testifying because he would be testifying to matters
22  that have no relevance in the case and that would be
23  prejudicial and confusing to the jury because there is
24  no expert that is going to link the factual matters
25  that he's testifying to back to an obviousness opinion

2282

1  by Dr. Shamus.  Is that basically the framework we're
2  operating in?
3       MR. ROBERTSON:  That's the essence of it,
4  Your Honor.
5       THE COURT:  Where is Dr. Shamos's obviousness
6  opinion that you say is the end of it all?
7       MR. ROBERTSON:  Your Honor, if I might hand
8  it up to the Court.
9       THE COURT:  I have his report up here.
10       MR. ROBERTSON:  Well, I've got the excerpt
11  for you Your, Honor.
12       THE COURT:  All right.  This is an excerpt
13  from Dr. Shamos' invalidity report.
14       MR. ROBERTSON:  If I can focus you in on
15  paragraph 236.  He actually has two paragraphs in its
16  entirety in his report that talk about the combination
17  of this J-CON reference, which Dr. Staats is going to
18  testify about in P.O. Writer, which we just heard.
19  235 is simply an introductory paragraph.
20       THE COURT:  You say there's no anticipation
21  issue now.
22       MR. ROBERTSON:  No, it's been conceded by the
23  defendant that they are not offering J-CON for any
24  anticipation theory.
25       Now, you'll recall that that's all that Dr.

2283

1  Staats did in his expert report.
2       THE COURT:  Dr. Shamos?
3       MR. ROBERTSON:  Excuse me, I misspoke.  Dr.
4  Shamos.  And there were claim charts on anticipation
5  and what they this did was identify what they thought
6  the elements were going to show, but they didn't show
7  in what way there was going to be any combination of
8  those elements.
9       There was a long claim chart where they said
10  this is disclosed in J-CON or this is disclosed in
11  P.O. Writer, but we're talking about some 10 claims
12  and 56 elements and nowhere is there any explanation
13  in any obviousness chart because, quite frankly, it
14  was conceded that Dr. Shamos did no obviousness
15  charts, notwithstanding the Court's scheduling order
16  that it issued earlier in the case --
17       THE COURT:  You're saying 236 is the only
18  place where he deals with obviousness and J-CON?
19       MR. ROBERTSON:  And P.O. Writer.
20       THE COURT:  Both or either?
21       MR. ROBERTSON:  Well, together.  He's saying
22  that together J-CON and P.O. Writer render the claims
23  obvious.
24       And I think we pointed out to the Court that
25  there needs to be some sort of reasoned analysis.  In

2284

1  fact, if I could just go to the KSR case, which is the

2  Supreme Court's most --

3       THE COURT:  Wait a minute.  I just need to

4  refresh my memory on 236.  He starts off with a clause

5  that says, "To the extent that J-CON and/or P.O.

6  Writer are not deemed to anticipate any asserted

7  claim," and now we don't have any anticipation issue.

8       MR. ROBERTSON:  That's correct.

9       THE COURT:  "It is my opinion that such claim

10  would have been obvious in view of the combination.

11  The same reason for making the previous two

12  combinations apply to combining the J-CON system as

13  described in the J-CON manual with P.O. Writer Plus as

14  described in the P.O. Writer Plus manual."

15       Well, I don't understand what previous two

16  combinations.

17       MR. ROBERTSON:  He actually had a combination

18  on J-CON plus Dworkin and RIMS plus Dworkin.  They are

19  coming different references.

20       I would suggest, Your Honor, that those

21  paragraphs are as conclusory as this one, although

22  there's more than simply one paragraph.  But, again,

23  there's no claim chart.  There's no claim by claim,

24  element by element explanation.

25       THE COURT:  Wait just a minute.  The P.O.

2285

1  Writer Plus Version 10 system provided the

2  multi-vendor capability demanded by the industry at

3  and before the time of the invention.

4       So that's why he puts in -- that's his reason

5  for including P.O. Writer 2 as an obviousness

6  component.

7       The J-CON system included features that one

8  of ordinary skill in the art would have been motivated

9  to use with the P.O. Writer including additional

10  details about performing a cross referencing data

11  relating to an item on requisition to determine an

12  alternate source for the same source -- an alternate

13  source for the same item and/or an acceptable

14  substitute for the item initially selected.  And

15  that's why he says you would add J-CON to P.O. Writer,

16  right?

17       MR. ROBERTSON:  Yes, Your Honor.

18       THE COURT:  So he's given those two reasons.

19       MR. ROBERTSON:  That's right.

20       THE COURT:  And he can testify to those two

21  reasons.

22       MR. ROBERTSON:  I perfectly agree.  If that's

23  the extent, if that's the confines of his testimony

24  because that's what he put in his report, I will

25  cross-examine him on that, but we were talking about

2286

1  10 claims that were represented are invalidated and 56

2  separate elements.  And that's the sum total of his

3  analysis.  And that's inadequate under the case law

4  including the Supreme Court's pronouncement on

5  obviousness in its most recent opportunity to address

6  that issue.

7       And if I just might --

8       THE COURT:  That's on KSR?

9       MR. ROBERTSON:  Yes, sir.

10       THE COURT:  I mean in KSR.

11       MR. ROBERTSON:  And the citation for that is

12  550 U.S. 398.

13       THE COURT:  Do you have a copy of it here for

14  me?

15       All right.  What page?

16       MR. ROBERTSON:  It's page 12, I think, of the

17  actual Westlaw printout.  It starts at, I think, about

18  418 of the actual decision.

19       THE COURT:  Okay.

20       MR. ROBERTSON:  A sentence that begins,

21  "Often it will be necessary for a court to look to

22  interrelated teachings of multiple patents, the

23  effects of demands known to the design community or

24  present in the marketplace, and the background

25  knowledge possessed by a person having ordinary skill

2287

1  in the art all in order to determine whether there was

2  an apparent reason to combine the known elements,"

3  but that's elements, "in a fashion claimed by the

4  patent at issue.  To facilitate review, this analysis

5  should be made explicit."

6       It goes on to cite in this Federal Circuit

7  case that says, "Rejections on obviousness grounds

8  cannot be sustained by mere conclusory statements.

9  Instead there must be some articulated reasoning with

10  some rational underpinnings to support the legal

11  conclusion of obviousness."

12       We also cited to Your Honor the Innogenetics

13  v. Abbott Labs case, which is a post KSR case from the

14  Federal Circuit, and the citation there is 512 F.3d

15  1363 at 1373, and that's a 2,000 case.

16       There it was dealing with an expert's

17  obviousness conclusions, and it said for each of the

18  claims you analyze for obviousness, defendant's expert

19  merely lists a number of prior art references and then

20  concludes with the stock phrase to one skilled in the

21  art it would have been obvious to perform these

22  particular steps in the claim.

23       Again, it goes on to quote KSR.  There must

24  be some articulated reasoning with some rational

25  underpinning to support the legal conclusion of

2288

1  obviousness.

2       I'm skipping down now, Your Honor.  It's not

3  credible to think that a lay jury could examine the

4  prior art that the defendant cited as prior art or any

5  of the other references and determine on its own

6  whether there were differences among them and the

7  patent at issue.  Such vague testimony would not have

8  been helpful to a lay jury avoiding the pitfalls of

9  hindsight that belie the determination of obviousness.

10       THE COURT:  Do you have a copy of that case?

11       MR. ROBERTSON:  I do not, Your Honor.  It was

12  cited in the brief, but I can get it for you in short

13  order.

14       THE COURT:  We can get it.  It's quicker back

15  there.

16       MR. ROBERTSON:  So the problem we have now,

17  Your Honor, is we were presented on Monday night with

18  22 slides that conduct an obviousness analysis of

19  J-CON and P.O. Writer on a claim by claim, element by

20  element basis.  We think that was improper under the

21  law.  We think it was improper under the Court's

22  scheduling order.  Were think it's contrary to both

23  the spirit and letter of your ruling on the second

24  supplemental statement.

25       And we think on that basis to have Mr. Staats

2289

1  or Dr. Staats testify about this J-CON system in

2  detail leaving the impression with the jury that it's

3  now going to be all tied together, all these elements,

4  by Dr. Shamos when he should be limited to this single

5  paragraph that he has listed in his expert report

6  would be improper.

7       THE COURT:  All right.

8       MR. ROBERTSON:  To anticipate what I think my

9  opposing counsel is going to say --

10       THE COURT:  Let them say it.

11       MR. ROBERTSON:  All right.  Let me address it

12  when --

13       THE COURT:  They may fall into the bear trap

14  that you laid.

15       MR. ROBERTSON:  All right.  Thank you, Your

16  Honor.  I would just say, Your Honor, there are some

17  slides that we have issues with with respect to this

18  that we think trespass onto the Court's claim

19  constructions.

20       THE COURT:  We'll deal with those later.

21       MR. ROBERTSON:  Yes.  Thank you, Your Honor.

22       THE COURT:  All right.  Ms. Stoll-DeBell,

23  what I want you to do is show me where in Dr. Shamos'

24  opinion he does the analysis required by KSR, Kahn and

25  Innogenetics.  Where in the report, not the slides,

2290

1  but where in the report, where does he do it?

2       MS. STOLL-DEBELL:  He does his claim by claim

3  analysis for each of those elements in his Exhibit 3

4  claim chart.  And, Your Honor, you'll recall that --

5       THE COURT:  Is that this big thing?

6       MS. STOLL-DEBELL:  Yes, but it will say J-CON

7  plus P.O. Writer on it.  They were separated out.

8       THE COURT:  Let me get this straight now.  It

9  is not done anywhere textually in this report, is that

10  correct or not correct, other than in 236?

11       MS. STOLL-DEBELL:  That's not correct.

12       THE COURT:  Where is it?  Start with that.  I

13  thought that I dealt with this once before, but I

14  think I may have erred.

15       MS. STOLL-DEBELL:  You did.  We spent over an

16  hour.

17       THE COURT:  I need to know in the report

18  where is it that he does what these cases require him

19  to do?  Because I agree that it is -- if he can't do

20  it, I don't think that Dr. Staats can come in and

21  testify because I think that, while it is conceptually

22  relevant, is confusing to the jury and, further, it

23  interjects all kinds of prejudice if there's nobody to

24  link it together because of the reasons explained in

25  Innogenetics.

2291

1       Give me the pages of his report where he says

2  that.

3       MS. STOLL-DEBELL:  Okay.  Your Honor --

4       THE COURT:  Is that in the --

5       MS. STOLL-DEBELL:  So his report is set up,

6  it's set up in this way.  He first goes through and

7  describes all of the prior art references he's going

8  to rely on including P.O. Writer.

9       THE COURT:  I'm not going to hear this.

10  We're going to do it paragraph by paragraph so I can

11  see what you're talking about.  So I need to get the

12  report in front of me, if you'll excuse me.

13       He gave me experts.  Okay.  I've got the

14  whole report here now.  Thank you.

15       MS. STOLL-DEBELL:  Do you also have Exhibit 3

16  for P.O. Writer and J-CON?

17       THE COURT:  Is that this big thing that they

18  presented?

19       MS. STOLL-DEBELL:  It is, but I have, I

20  think, a more user friendly version of it that we

21  handed up yesterday.

22       THE COURT:  Can I have it?

23       MS. STOLL-DEBELL:  Yes, sir.

24       THE COURT:  Do I have one?  You say you

25  handed it up yesterday.  What did you hand up?

2292

1    MS. STOLL-DeBELL:  Mr. McDonald did.

2    THE COURT:  What did you hand up?

3    MS. STOLL-DeBELL:  This.

4    THE COURT:  Okay.  Take yours back then.

5    This is all the slides.  Come here and look and tell

6    me where.  This is what Mr. McDonald gave me

7    yesterday.  You tell me what you're talking about and

8    find it for me, then I'll have what you have.

9    That's Exhibit H to what?

10    MS. STOLL-DeBELL:  It was to their motion to

11    enforce prior court orders that we dealt with on

12    December 30.

13    THE COURT:  All right.  Now, show me in the

14    text of Shamos' invalidity report where it is that he

15    talks about the combination of J-CON and P.O. Writer

16    and obviousness.

17    MS. STOLL-DeBELL:  We looked at the one

18    paragraph where he talked about the combination, and

19    what I think Mr. Robertson is saying is you also have

20    to do an element by element analysis of where those

21    references teach each claim.

22    The element by element analysis occurs in a

23    number of places in Dr. Shamos' report.  For P.O.

24    Writer, it starts at paragraph 180, which is on page

25    54, and goes to paragraph --

2293

1    THE COURT:  I have to find it.  180 has been

2    stricken.

3    MS. STOLL-DeBELL:  Okay.  181.  This is his

4    element by element analysis or talking about what it

5    is that P.O. Writer discloses.  He has a similar

6    section for J-CON.

7    THE COURT:  181.  Is that it?

8    MS. STOLL-DeBELL:  Through 185.  I'm sorry.

9    185 includes the reexam, Your Honor.  So 184.

10    THE COURT:  Well, now, the way I read this, I

11    don't see that he's discussing any claim by claim,

12    element by element combination of P.O. Writer and

13    J-CON.  He's just discussing generally what P.O.

14    Writer Plus permitted.

15    MS. STOLL-DeBELL:  That's true, and he has a

16    similar discussion for J-CON.

17    THE COURT:  Where is that?

18    MS. STOLL-DeBELL:  J-CON starts at -- the

19    section starts at paragraph 195, but I think you want

20    to look at paragraph 196 on page 59.

21    THE COURT:  196, the J-CON?

22    MS. STOLL-DeBELL:  Yes.  And that goes

23    through the next couple of pages.

24    THE COURT:  Paragraph 196 through where?  200

25    or 201?

2294

1    MS. STOLL-DeBELL:  201.

2    THE COURT:  All right.  Now, the way I read

3    this -- I've read this before.  The way I read this,

4    this describes the J-CON system alone and nothing in

5    combination with P.O. Writer.  Is that right or wrong?

6    MS. STOLL-DeBELL:  That's right.  That

7    section is J-CON.

8    THE COURT:  It doesn't discuss any

9    combination and how it would be obvious, right?

10    MS. STOLL-DeBELL:  Right.  That happened at

11    the paragraph you looked at earlier.

12    THE COURT:  236?

13    MS. STOLL-DeBELL:  Yes.

14    THE COURT:  Okay.  So that happened at 236?

15    MS. STOLL-DeBELL:  Yes.

16    THE COURT:  Okay.

17    MS. STOLL-DeBELL:  Then he also did a claim

18    by claim, element by element analysis where he cited

19    to each of the trial exhibits to show where each of

20    those shows each claim element.

21    THE COURT:  Wait a minute.  And that's, you

22    say, Exhibit H?

23    MS. STOLL-DeBELL:  Yes.  Which was -- and it

24    was Exhibit H, Your Honor.

25    THE COURT:  Wait a minute.  This says

2295

1    invalidity analysis of Johnson, et al. what am I

2    talking about?  What part of Exhibit H do you want me

3    on?  I've got it.

4    MS. STOLL-DeBELL:  I think maybe I gave you

5    the wrong one, Your Honor.

6    THE COURT:  My guess is that there are other

7    patents on other pages of this.  I don't know.  Let me

8    look.  What I have is Johnson, and I don't see

9    anything for --

10    MS. STOLL-DeBELL:  Look at page 2, Your

11    Honor.

12    THE COURT:  Yes.

13    MS. STOLL-DeBELL:  Your Honor, I think it

14    might be easier if we're looking at the same document.

15    THE COURT:  I am.  I thought.

16    MS. STOLL-DeBELL:  I handed you up an

17    identical copy of what I have.

18    THE COURT:  Have you given that to,

19    Mr. Robertson?

20    MS. STOLL-DeBELL:  It's the same thing only

21    it has trial exhibits copied on there so we know which

22    trial exhibits.

23    THE COURT:  All right.  Give Mr. Robertson a

24    copy so he knows what you're talking about.

25    MS. STOLL-DeBELL:  Okay.  Some do you have

2296

1    this, Your Honor?

2         THE COURT:  I have what you have handed me.

3    It's got your handwriting or somebody, P.O.

4    Writer/J-CON on the top of it?

5         MS. STOLL-DeBELL:  Yes, that's correct.  So

6    this is the portion of Exhibit 3 that related to his

7    disclosure on P.O. Writer and J-CON.

8         THE COURT:  Well, the first one says, in the

9    first column, says invalidity of Johnson, et al.

10        MS. STOLL-DeBELL:  That's because Johnson was

11   the first named inventor on the patents-in-suit.  So

12   if you look down, it says '683, '516 and '172 patents.

13        THE COURT:  Then it has paragraph two.  What

14   does that relate to?

15        MS. STOLL-DeBELL:  This is a key to the color

16   coding within this chart.  So the actual claim by

17   claim analysis starts at the -- really at the top of

18   page 2, Your Honor.

19        So column A is the actual claims, asserted

20   claims in this case.

21        THE COURT:  Let's see.  Wait a minute.  In

22   key No. 5 he says -- no, it's 6.  A cell with light

23   yellow shading indicates a claim that's not asserted

24   to be anticipated by the reference in its column but

25   is obvious.

2297

1         MS. STOLL-DeBELL:  So, Your Honor, at his

2    deposition he explained to ePlus, and they asked him

3    questions about how to understand this claim chart.

4    In fact, it went on for six pages at his deposition.

5    And he explained it as this:  This Exhibit 3 tells you

6    where to go for a reference to see where that claim

7    element is disclosed.

8         If it is shaded green, that means the

9    reference explicitly teaches that element.  If it is

10   shaded yellow, the reference does not explicitly teach

11   that element, but it would be obvious in light of that

12   reference alone.

13        So it's a different kind of obviousness than

14   obviousness under 103, and he explained this at

15   length.

16        THE COURT:  I don't see where he says in this

17   claim chart element by element the combination of

18   J-CON and P.O. Writer makes it obvious as opposed to

19   it's obvious for some other reason.  Can you show me

20   that so I can get started looking at it?

21        MS. STOLL-DeBELL:  He says that in his

22   report, Your Honor.

23        THE COURT:  He doesn't.

24        MS. STOLL-DeBELL:  He does.

25        THE COURT:  Let me say this.  If your theory

2298

1    is that it's adequately disclosed by 236, then I was

2    wrong.  It is not because it's conclusory.  If I

3    thought you were telling me that, and I didn't

4    understand, I remember the argument we had on this was

5    that if you read these things carefully, these charts

6    carefully, you can find the combination.  Now you're

7    telling me you can't find the combination.

8         Unless you can tell me that you can find the

9    combination of J-CON and P.O. Writer applied on an

10   element by element basis claim by claim in this

11   exhibit that you have got, I've got trouble.  So let's

12   go.  Because the text doesn't do it.

13        Now, tell me how or where the actual report

14   does it.

15        MS. STOLL-DeBELL:  Well, I think I'm not

16   understanding what you're asking or you're not

17   understanding what I'm saying because I think it's a

18   combination of everything together.

19        THE COURT:  No.  That's what I'm saying.  I

20   am saying this:  You can't combine it all together and

21   make it read the way you want it to read the way he

22   should have written it in the beginning.

23        So, for example, I don't think you can take,

24   Here's J-CON, here's this P.O. Writer, and without an

25   explanation of why the two combine, then say that

2299

1    paragraph 236 does the job.

2         So I'm asking you now to tell me where in the

3    exhibit you just handed me, which is Exhibit H to that

4    motion that we had and has been annotated now with

5    P.O. Writer and J-CON at the top in handwriting, where

6    does he do that in this document?  If he does, then I

7    think the problem is solved.  If he doesn't, I have

8    another issue.

9         So where does he do it?

10        MS. STOLL-DeBELL:  Well, if you look at the

11   claim charts, and let's go to page 3.

12        THE COURT:  All right.  Page 3.

13        MS. STOLL-DeBELL:  This is just an example

14   because it's the same throughout.  We're looking at

15   element 1A.  If you see row 17, Your Honor.

16        THE COURT:  Wait a minute.  17?

17        MS. STOLL-DeBELL:  Yes.

18        THE COURT:  Is what follows below the 17, is

19   that where you want me to look?

20        MS. STOLL-DeBELL:  It's above it.  So the

21   number 17 is at the bottom of that row.

22        THE COURT:  I don't know what you mean by

23   row, but there's a number 17, and above it in the far

24   left-hand column is the number 13.  Is that the

25   boundary of what you want me to look at?

2300

1      MS. STOLL-DeBELL:  Yes, sir.
2      THE COURT:  All right.  Now, asserted claim
3  is --
4      MS. STOLL-DeBELL:  Claim One of the '172.
5  And you can see that that claim element is a database
6  containing data relating to items associated with at
7  least two vendors.  That the actual claim element.
8      THE COURT:  That's the claim.  All right.
9      MS. STOLL-DeBELL:  Column B is just short
10  form to tell you where you're at.  So it's the first
11  element of Claim One of the '172 element 1A.  Then we
12  can go to column K.  So --
13      THE COURT:  Wait a minute.  Column J is P.O.
14  Writer per interrogatory responses and something.  I
15  don't know what.
16      MS. STOLL-DeBELL:  Well, he basically copied
17  the citations we had in our interrogatory responses.
18  You can skip over that column.
19      THE COURT:  So column J doesn't have anything
20  to do with this?
21      MS. STOLL-DeBELL:  I think it's relevant
22  disclosure, but I don't think we need to get into it
23  now.  It's not relevant to what we're doing now.
24      THE COURT:  In column K, he gives an opinion
25  re --

2301

1      MS. STOLL-DeBELL:  P.O. Writer.  And he cites
2  to the various documents, in this case it's DX 17, to
3  show where P.O. Writer teaches this element.
4      THE COURT:  All right.
5      MS. STOLL-DeBELL:  Then skip column R and go
6  to column S.
7      THE COURT:  S is his opinion re:  J-CON.
8      MS. STOLL-DeBELL:  Yes.
9      THE COURT:  Okay.
10      MS. STOLL-DeBELL:  And in this column you can
11  see he has quotes from the J-CON manual about where
12  J-CON teaches this element.
13      THE COURT:  Yes.
14      MS. STOLL-DeBELL:  He does this for every
15  element, which I agree, is required by KSR.  You must
16  say where in each reference you're using in your
17  obviousness combination that reference teaches these
18  claim elements.
19      THE COURT:  But nowhere does he explain in
20  this chart how the combination renders the matter
21  obvious.  He does explain, according to you, and he
22  does this -- it's a funny way of saying things and
23  doing things, but it perhaps can be read to say that
24  P.O. Writer, standing alone, it helps render it
25  obvious.  But, you see, the problem is he's really --

2302

1  this chart is built around anticipation, right?
2      MS. STOLL-DeBELL:  No.
3      THE COURT:  Yes.
4      MS. STOLL-DeBELL:  No.
5      THE COURT:  And then he says -- this is the
6  argument you made before.  You told me to do this, and
7  I kind of understood it then.  You said you take the
8  chart, and it was anticipation, and then if you read
9  the text of 236 it says to the extent it's not
10  anticipated, it's obvious, and you say it's the same.
11  Then as to a single reference, I can understand that
12  perhaps that's one way to read this.  Are you
13  following me?
14      MS. STOLL-DeBELL:  I am, and I think that --
15      THE COURT:  That's what you just told me,
16  right?
17      MS. STOLL-DeBELL:  I told you earlier, yes.
18  There is obviousness for a single reference in this
19  chart.  There's obviousness for a combination of
20  references and there's anticipation.
21      THE COURT:  Where is the obviousness for the
22  combination of J-CON and P.O. Writer in this chart?
23      MS. STOLL-DeBELL:  This chart, all it does is
24  say where each reference teaches each claim element.
25  Then you go back to the report.

2303

1      THE COURT:  Which report?  Where?
2      MS. STOLL-DeBELL:  To his report.
3      THE COURT:  What paragraph?
4      MS. STOLL-DeBELL:  Well, let's look at
5  paragraph 104.  That's where he says, My Exhibit 3 is
6  an invalidity chart.  And it deals with anticipation
7  and obviousness.  And he also explained this to
8  Ms. Albert in his deposition.  You have to read them
9  together, Your Honor.
10      THE COURT:  Do you have to read them
11  together, but nowhere do I see where the combination
12  is explained.  That's what I'm trying to get to.
13      MS. STOLL-DeBELL:  So there are two parts you
14  have to show for obviousness.
15      THE COURT:  And I don't want to have any
16  general sentence or statement.  I want it he says in
17  paragraph such and such sentence such and such that
18  there is this combination analysis that's made for
19  these two things.  Where does he say that?
20      MS. STOLL-DeBELL:  We go back to 236.  But
21  what I'm saying, Your Honor, for obviousness you have
22  to have two things, right?  You have to have an
23  element by element analysis to show that somewhere
24  within your combination of references they teach all
25  of the elements of the claim.  That's what

2304

1  Mr. Robertson was saying with KSR.  That's what the
2  claim chart does.
3      Then you also have to show for obviousness
4  that there is a reason to combine them together.
5  That's what paragraph 236 does.
6      THE COURT:  But the predicate is that there
7  are two elements that are combined, and he doesn't say
8  that in the chart that I see.
9      MS. STOLL-DeBELL:  No, he says that in
10  paragraph 236.  He says all of the elements for both
11  references are taught in Exhibit 3.  And I would
12  combine them for these reasons.
13      THE COURT:  Where?
14      MS. STOLL-DeBELL:  236.
15      THE COURT:  I'm trying to get there.  Okay.
16  All right.  Okay.  Excuse me.
17      It is my opinion that such claim would have
18  been obvious in view of the combination of J-CON with
19  P.O. Writer, right?
20      MS. STOLL-DeBELL:  Yes.
21      THE COURT:  Where does he say the reasons?
22  The only thing that I see that remotely resembles
23  reasons in 236 is -- that's a conclusion that he just
24  stated.  The reasons sentence is as follows:  The same
25  reasons for making the previous two combinations

2305

1  apply.  Now, what are the previous two combinations?
2      MS. STOLL-DeBELL:  So we have to go to -- he
3  talks about RIMS plus Dworkin.  That's the first of
4  the two, that starts at paragraph 65.
5      THE COURT:  What's the next one?
6      MS. STOLL-DeBELL:  I'm sorry.  Page 65, Your
7  Honor.
8      The second combination is J-CON plus Dworkin,
9  and that starts at paragraph 230 on page 67.  So --
10      THE COURT:  Page what?
11      MS. STOLL-DeBELL:  Page 67, paragraph 230.
12  In both of those he explains that all of the claims he
13  believes are obvious as shown in Exhibits 3 and 4.
14      So, for example, I'm reading paragraph 230 of
15  page 67.  And then he goes on to explain his reasons.
16  EPlus contends that J-CON is a single source system.
17  P.O. Writer is a multiple source system.  Or he says
18  that with J-CON and Dworkin.
19      THE COURT:  But he's not going to testify
20  about it.
21      MS. STOLL-DeBELL:  He's not.
22      THE COURT:  About RIMS plus Dworkin.
23      MS. STOLL-DeBELL:  He's not actually.
24      THE COURT:  Where are the imported reasons
25  then?  Help me with -- let's take what begins on page

2306

1  65 with the combination of RIMS plus Dworkin, 940.
2  Where is the reason?
3      MS. STOLL-DeBELL:  Well, so the reasons start
4  at paragraph 225 on page 66.  But, Your Honor, I'll
5  tell you that Dr. Shamos, as far as his reasons for
6  combining J-CON and P.O. Writer, he looks at what he
7  says in paragraph 236 for that.  And then he will rely
8  on what he says in this claim chart for the element by
9  element analysis.
10      So I don't intend to have him get up and talk
11  about RIMS plus Dworkin or --
12      THE COURT:  But he can't even do -- so you're
13  not -- you're taking that sentencing out of the
14  equation then?
15      MS. STOLL-DeBELL:  Yes, because I don't think
16  we need it.  I think he's got a reason why he would
17  combine J-CON and P.O. Writer in paragraph 236 and
18  that's what he'll testify to.
19      THE COURT:  I'm not talking about that.
20  You're taking out the sentences, out of 36, that the
21  same reasons for making the previous two combinations
22  applies to combining J-CON system as described in the
23  J-CON system with P.O. Writer Plus V 10 as described
24  in the P.O. Writer Plus manual.  You're taking all of
25  that out.

2307

1      MS. STOLL-DeBELL:  I'm taking all of that out
2  except to the extent that they say his opinions on
3  element by element are shown in Exhibits 3 and 4.
4      THE COURT:  Where is Exhibit 3 and 4?
5      MS. STOLL-DeBELL:  Exhibit 3 is this claim
6  chart we just looked at.  That's Exhibit 3.
7      THE COURT:  Okay.  What's 4?
8      MS. STOLL-DeBELL:  Four is just a shorter --
9  a shorter version of this.
10      THE COURT:  Of 3?
11      MS. STOLL-DeBELL:  Yes.  It doesn't get into
12  the actual citations.
13      THE COURT:  Okay.
14      MS. STOLL-DeBELL:  I don't think we need to
15  look at Exhibit 4.
16      THE COURT:  Then that takes us back to
17  whether this claim chart that he did shows a
18  combination.
19      MS. STOLL-DeBELL:  I agree.
20      THE COURT:  Where does he show a combination?
21      MS. STOLL-DeBELL:  It shows where each
22  reference teaches each element.  The reason to combine
23  those references are in paragraph 236 of his report.
24      THE COURT:  And the reason is, "It is my
25  opinion that such claim would have been obvious in

2308

1  view of the combination of J-CON with P.O. Writer," is
2  that right?
3       MS. STOLL-DeBELL:  Plus it goes on to say,
4  The P.O. Writer system provided a multiple vendor
5  capability demanded by the industry at and before the
6  time of the invention.  J-CON included features that
7  one of ordinary skill in the art would be motivated to
8  use with the P.O. Writer system including additional
9  details about performing cross referencing of data
10  relating to an item or requisition to determine an
11  alternative source for the same item and/or an
12  acceptable substitute for the item initially selected.
13       THE COURT:  Where does he talk about the
14  Exhibits 3 and 4 in this paragraph?
15       MS. STOLL-DeBELL:  I think he mistakenly did
16  not refer to Exhibit 3 in this paragraph, Your Honor,
17  so far that I would refer back up to the two earlier
18  combinations, paragraph 224 and 230, where he says his
19  obviousness opinions are shown in Exhibit 3, which is
20  the one we're talking about here.
21       THE COURT:  What paragraph?
22       MS. STOLL-DeBELL:  Paragraph 224.
23       The second to last line of paragraph 224 on
24  page 65, he says the combination teaches all of the
25  elements of the asserted claims.  And then if you go

2309

1  on to page 66, first line, As shown in Exhibits 3 and
2  4.
3       THE COURT:  Exhibits 3 -- I mean, 4 is
4  nothing but something less than 3?
5       MS. STOLL-DeBELL:  Yes.
6       THE COURT:  So I don't need to pay attention
7  to it.
8       MS. STOLL-DeBELL:  No.  Then he does the same
9  thing again at paragraph 230.  He says the combination
10  teaches all of the elements.  I'm at page 67,
11  paragraph 230, THE fourth line down.  The combination
12  teaches all the elements of the asserted claims as
13  shown in Exhibit 3.
14       THE COURT:  Okay.
15       MS. STOLL-DeBELL:  I mean he should have said
16  that again for J-CON and P.O. Writer, but he did refer
17  back up.  So he was maybe being shorter than what he
18  should have been.  But the bottom line is the
19  combination is taught in Exhibit 3.
20       THE COURT:  All right.
21       MS. STOLL-DeBELL:  Which is the claim chart
22  in front of you.  Also, Your Honor, at paragraph 104
23  of his report, which is on page 27 -- actually, I'm
24  sorry.  It's paragraph 102 at page 26.
25       THE COURT:  104 says to the extent that any

2310

1  reference.
2       MS. STOLL-DeBELL:  I meant to direct you to
3  paragraph 102, page 26.  I'm sorry.
4       THE COURT:  102.
5       MS. STOLL-DeBELL:  This is talking about what
6  Exhibit 3 is, which is the claim chart that you looked
7  at.
8       Exhibit 3 is an integral part of his report
9  and contains a claim chart demonstrating the
10  invalidity of each asserted claim.
11       Exhibit 3 is a spreadsheet in which the rows
12  are claim elements and steps and columns are prior art
13  references.  A cell corresponding to an element and a
14  reference contains text if the element is disclosed in
15  the reference or is obvious in light of the reference.
16  The color coding is explained.
17       THE COURT:  All right.  Anything else?
18       MS. STOLL-DeBELL:  Yes.  In his deposition,
19  he explained this in detail.  They asked him.  "Are
20  you asserting the combination of J-CON and P.O.
21  Writer?"
22       He answered:  Yes.
23       Ms. Albert went through -- she printed up her
24  version of that Exhibit 3 and he went through and he
25  explained exactly what it meant, and that it did, in

2311

1  fact, show both anticipation and obviousness.  And
2  walked her through exactly how it was and how the
3  combinations worked and how they tied back to his
4  report.
5       THE COURT:  What does that do?  Because he's
6  to do this in perspective of his report, not in his
7  deposition.  Do you understand?
8       I think maybe you-all have lost sight of
9  something.  In 1993, the federal rules were amended.
10  They were amended to prohibit just this sort of
11  gamesmanship that's going on here.  They were amended
12  to say that an expert must put in his report all of
13  the things that he's going to rely on, the statement
14  of reasons, and it must be complete.
15       The very idea, if you look at the history of
16  it, was to allow me as the receiver of the report to
17  decide, Well, I'm happy to just rely on this
18  deposition if I want to because it's got everything in
19  it.  And the other reason was that the expert cannot
20  go beyond what was in that report.  And if he steps
21  one foot outside that boundary, he cannot testify to
22  that issue.  And you all seem to have the view that
23  these rule changes don't mean anything.
24       And this expert is -- this is the amazing
25  thing to he me about the way this guy has done his

2312

1   report is that he's a lawyer and practiced patent law.

2   My goodness.  How could he not know all this?

3      MS. STOLL-DeBELL:  Your Honor, I don't think

4   he's stepping outside of his report.  I think every

5   single slide, especially after I've gone through with

6   ePlus for hours yesterday, is a verbatim quote from

7   his report.

8      THE COURT:  I want to hear from ePlus now.  I

9   want to get to the basis of this.

10     MS. STOLL-DeBELL:  All he did in his

11  deposition is explain what that chart shoes.

12     THE COURT:  All right.  Let's take Exhibit 3,

13  which you've got a copied of now.  And by the way, I

14  want this marked as an exhibit for the decisional

15  process.  So make sure I do that.

16     MR. ROBERTSON:  For purposes of this, Your

17  Honor, may I actually hand you the color-coded one?

18     THE COURT:  Is that the one you just handed

19  me last week with the report?

20     MR. ROBERTSON:  Yes.  Then you have it.

21     THE COURT:  A long spreadsheet?

22     MR. ROBERTSON:  Yes, sir.

23     THE COURT:  Exhibit B?

24     MR. ROBERTSON:  Yes.

25     MS. STOLL-DeBELL:  Can we have a copy.

2313

1      THE COURT:  You have a copy of it.  I don't

2   know whether you have it there.

3      MS. STOLL-DeBELL:  Not his color-coded.

4      MR. ROBERTSON:  So it was just represented to

5   you that --

6      THE COURT:  Let's take the paragraph that

7   she's talking about.

8      MR. ROBERTSON:  Which paragraph would that

9   be, Your Honor?

10     THE COURT:  It's on page 3.  She said that I

11  can add on page 3, Exhibit 3, Shamos opinion re P.O.

12  Writer, plus Shamos' opinion -- well, it's not the

13  same.  This isn't the same thing that she gave me.

14     MR. ROBERTSON:  That's the chart that was

15  given to us with Dr. Shamos' report, and it was

16  color-coded a Ms. Stoll-DeBell just indicated.

17     THE COURT:  Do you have this thing she handed

18  out to me, P.O. Writer/J-CON?  Did you give him a

19  copy, Ms. Stoll-DeBell?

20     MS. STOLL-DeBELL:  I did, Your Honor.  The

21  only difference is the little boxes I added in with

22  the trial exhibit numbers because when it was created,

23  we didn't have trial exhibits.  So that's the only

24  thing I did to this.

25     THE COURT:  But the point is does he have it

2314

1   in front of him?

2      MR. ROBERTSON:  I think I may.  I'm trying to

3   get oriented.  Is this it?

4      MS. STOLL-DeBELL:  Yes.

5      THE COURT:  All right.  If you turn to page 3

6   of that report, that exhibit, it deals with the '172

7   patent and the one.  And it says, "Shamos opinion P.O.

8   Writer" and "Shamos opinion re J-CON."

9      MR. ROBERTSON:  Yes, Your Honor.

10     THE COURT:  Okay.  Now, she acknowledges that

11  that chart does not combine P.O. Writer and J-CON.

12     MR. ROBERTSON:  Yes.

13     THE COURT:  It doesn't do it.  But she says

14  it is done by 236.  How is it done by 236?  It is

15  done, she says, in two ways.  The first sentence says

16  to the extent it's not deemed to anticipate it is my

17  opinion that such claim would have been obvious in

18  view of the combination of J-CON and P.O. Writer.

19     And then the reasons he gives are the same

20  reason for making the previous two combinations apply

21  to combining the J-CON system as described in the

22  J-CON manual with P.O. Writer Plus V 10 as described

23  in the P.O. Writer Plus manual.

24     And that, she says, really refers back to

25  Exhibits 3 and 4 and the paragraphs that deal with the

2315

1   combination of RIMS and Dworkin and J-CON and Dworkin.

2   And they show a combination.  And he incorporated the

3   same reasoning by reference.  Therefore, the

4   information has been presented as to the combination.

5      Now, why isn't that show?  That's your

6   argument, isn't it, Ms. Stoll-DeBell?

7      MS. STOLL-DeBELL:  Yes.

8      THE COURT:  Okay.

9      MR. ROBERTSON:  For several reasons, Your

10  Honor.  First, with respect to the combinations of

11  RIMS and Dworkin, I don't even know how we could apply

12  the combinations of J-CON and P.O. Writer.  They are

13  two separate complete difference references to try and

14  say that something shows something and something

15  different shows something else.  I can't even follow.

16  But it doesn't do it on a claim by claim basis.  It's

17  very conclusory.

18     In fact, if you look back at the combinations

19  he has for RIMS and Dworkin, and for I believe it was

20  J-CON and Dworkin, it's almost equally as conclusory

21  as the representation with the combination of J-CON

22  and P.O. Writer.

23     He doesn't go through all the separate claims

24  that are at issue.  He doesn't go through all the

25  separate elements.  And what they want to do is they

2316

1   want to go to this Exhibit 3, which was an
2   anticipation chart because it was color-coded.  And
3   you'll see green is indicated as being anticipation.
4   And almost every single one -- in fact, for P.O.
5   Writer and J-CON every single representation is in
6   green, that it's anticipated.
7       So what they want to do is say we can just
8   put those together.  But how are we, ePlus, to know
9   which element from J-CON you're combining with which
10  element from P.O. Writer?
11      In fact, I would suggest, Your Honor, that
12  the number of permutations that could be combined for
13  that are almost infinite because I have no idea what
14  they are relying on and what they're not.
15      But what's most revealing, Your Honor, is
16  that they were able to do it over the weekend when
17  they made 22 slides that they now want to do on a
18  claim by claim and element basis for J-CON and P.O.
19  Writer.
20      If they could do it this past weekend, why
21  couldn't they do it months ago when Dr. Shamos had to
22  do his report, months ago when the Court ordered the
23  second supplemental, and months ago when the Court
24  said the scheduling order required them to do the
25  analysis on a claim by claim basis?

2317

1       So then to come up with it now, I would
2   suggest to Your Honor, is just complete surprise and a
3   litigation by ambush that we now have to deal with and
4   try and figure out for the first time how I'm supposed
5   to cross-examine on these things.
6       THE COURT:  Are you basically moving under
7   Rule 37 for preclusion of the evidence for failure to
8   comply with the requirement that they provide this
9   ahead of time at trial?  I mean, ahead of time in
10  response to the second supplemental?
11      MR. ROBERTSON:  These new --
12      THE COURT:  Is that your theory?
13      MR. ROBERTSON:  Yes, sir, that's part of our
14  theory.
15      THE COURT:  What's the other part of it?
16      MR. ROBERTSON:  The other part of the theory
17  is they had an obligation under the final pretrial
18  order to focus in on what the facts were going to be,
19  present it to the Court --
20      THE COURT:  What part of the final pretrial
21  order did they disobey?
22      MR. ROBERTSON:  I think they had to identify
23  what the triable issues were, and they had to identify
24  what they were going to rely on for those triable
25  issues, and they incorporated, I believe, the expert

2318

1   report.
2       We should have been entitled to rely on a
3   representation that this was going to be anticipation,
4   and if you were going to do obviousness --
5       THE COURT:  This meaning what was the
6   original iteration?  The document from which Exhibit 3
7   was taken.
8       MR. ROBERTSON:  Yes, sir.
9       THE COURT:  Or the original Exhibit 3 to the
10  report of Dr. Shamos.
11      MR. ROBERTSON:  Yes.
12      And, specifically, we're seeking exclusion of
13  those -- I'm sorry.  It also specifically, Your Honor,
14  since we're introducing these slides or they are
15  attempting to introduce these slides, this is rife
16  with mischief for presenting evidence that is, I
17  think, outside of the Court's rulings and would just
18  create undo confusion.
19      THE COURT:  Rife with mischief really is a
20  way of saying that there is a potential for other
21  prejudice, but you don't really know what it is.  So I
22  can't rule on that basis.  You don't make decisions on
23  sanctions for exclusion on that kind of apprehension.
24  That just wouldn't be right.  So let's don't do that.
25  Don't invite the error.

2319

1       MR. ROBERTSON:  Understood.  Let me just
2   suggest, I suppose the paragraphs that are in there in
3   their conclusory fashion were disclosed to us and
4   could perhaps be the subject of cross-examination of
5   Dr. Shamos on specifically the only thing he said
6   without reference to these exhibits.
7       I think I understood that Exhibit 4 they are
8   not referencing because if you look at Exhibit 4, all
9   the opinions were anticipation opinions and not
10  obviousness opinions.
11      So if this is excluded and only --
12      THE COURT:  This meaning --
13      MR. ROBERTSON:  This meaning Exhibit 3 where
14  they purport to have this detailed analysis for
15  invalidity.
16      THE COURT:  They're not offering Exhibit 3.
17  That was Exhibit 3 to the report.
18      MR. ROBERTSON:  But they are offering now the
19  analysis that was an anticipation analysis.
20      THE COURT:  What they are saying is that what
21  he's going to testify is shown there in the claim
22  by claim basis which has been explained as an
23  obviousness argument by reading paragraph 236 in
24  conjunction with that and by considering the
25  incorporated parts of the RIMS Dworkin combo and the

2320

1    J-CON Dworkin combo that's incorporated in 236.

2    That's what they are offering.

3        MR. ROBERTSON:  But there was never any

4    disclosure as to which elements of RIMS or which

5    elements of Dworkin or which elements of P.O. Writer

6    or which elements of J-CON were going to be combined.

7        THE COURT:  You're just basically revisiting

8    the ruling that I made week, aren't you?  Not last

9    week.  It seems like a year and a half ago.

10       MS. STOLL-DeBELL:  December 30.

11       THE COURT:  It was the end of the year.  It

12    was your New Year's present.  Isn't that what we're

13    doing now?  And you're doing it in perspective of the

14    fact that I have a better understanding of all of what

15    it's about now that it's been narrowed down in the

16    fashion it's been narrowed down?  Is that really where

17    we are?

18       MR. ROBERTSON:  Sir --

19       THE COURT:  Yes or no?

20       MR. ROBERTSON:  Yes, in this sense, though.

21    It has been perfectly focused now by the fact they

22    came forward with these slides that were not revealed

23    to us before would show how inadequate their

24    disclosures were before and what they really were

25    trying to do here.  That was my suspicion back then.

2321

1    I think the Court had some apprehension.  I don't

2    think the issue was perfectly focused because it

3    hadn't occurred, but now it's occurring right before

4    us.

5       THE COURT:  It's occurring meaning?

6       MR. ROBERTSON:  That they are offering now

7    these new opinions in combinations that were not

8    disclosed in the report.  So I think Rule 37 most

9    certainly is an appropriate vehicle for dealing with

10    this issue at this time.

11       THE COURT:  Any other reasons that have

12    besides what you have just said?

13       MR. ROBERTSON:  Well, other than the fact

14    that I would think even the paragraphs that they would

15    like to rely on, for example 236, don't satisfy the

16    standard that the Supreme Court requires in the KSR

17    case or that the Federal Circuit has now reemphasized

18    in the Innogenetics case that I gave you.

19       And I might just say, Your Honor, to the

20    extent now they are relying on these --

21       THE COURT:  What page of Innogenetics were

22    you relying on?

23       MR. ROBERTSON:  It's 1373, Your Honor.

24       THE COURT:  It's near the end of the opinion?

25       MR. ROBERTSON:  I believe so.  I just

2322

1    have an excerpt in front of me.

2       THE COURT:  Does it have -- I think they are

3    entitled to know, and I'd like to know, too, does it

4    have a headnotes so we can all make an easy jump

5    there?

6       MR. ROBERTSON:  I just have an excerpt from

7    it.

8       THE COURT:  Ms. Haggard has given me pages 15

9    and 16 of the report.  Maybe that's what you're

10    talking about.  Read me what yours starts with.

11       MR. ROBERTSON:  The District Court did not

12    err in finding the defendant's expert report on the

13    alleged obviousness of the asserted claims of the

14    patent at issue was deficient for purposes of

15    disclosure under Rule 26.

16       THE COURT:  All right.  Hold on.  Well, I

17    think I see.  Invalidity obviousness starts on page 12

18    of the printout.  And that would be on page --

19       MS. STOLL-DeBELL:  Your Honor --

20       THE COURT:  1372.  And now I need -- what

21    you're reading from is Dr. Patterson's testimony

22    headnote 15?  And then it says, "The District Court

23    did not err in finding that Dr. Patterson's report on

24    the alleged obviousness of the '704 patent was

25    deficient for purposes of disclosure under Rule 26."

2323

1       MS. STOLL-DeBELL:  Your Honor, I'm not sure

2    what you're looking at.  We don't have a copy.

3       MR. ROBERTSON:  Your Honor, I don't even have

4    a copy of the case.  I have a copy of an excerpt that

5    I had from a memo that was prepared, which I was

6    quoting from, but it's at that --

7       THE COURT:  That's where I was starting.

8    Now, excuse me, Ms. Stoll-DeBell.  What would

9    you like to say because you-all were talking over

10    behind Mr. Robertson and while he and I were talking,

11    and I didn't hear.

12       MS. STOLL-DeBELL:  I apologize for that.

13    I don't have a copy of what you're looking

14    at.

15       THE COURT:  Why do you need a copy of any law

16    when it's cited?

17       MS. STOLL-DeBELL:  I would like to be able to

18    respond to it.

19       THE COURT:  You do?

20       MS. STOLL-DeBELL:  I do, yes.

21       THE COURT:  Does anybody have a copy for her?

22       MR. ROBERTSON:  It is the Innogenetics case.

23       THE COURT:  And the text, just so you won't

24    have to go through the agony I went through -- are you

25    going to print her a copy?

2324

1    MS. HAGGARD: Yes.

2    THE COURT: Is there a way to print only page

3    12? I know that you can do that, but that's what he's

4    talking about is page 12 through 14 because that then

5    picks up with the anticipation issue.

6    MS. STOLL-DeBELL: Yeah. Maybe we should

7    print another page.

8    MS. HAGGARD: I'll put that on top.

9    MS. STOLL-DeBELL: Thank you.

10   THE COURT: Ms. Haggard's hourly fee is very

11   significant, and the Lexus time is very valuable.

12   Okay. Let's go. Where does the quote that

13   you were relying on end, Mr. Robertson?

14   MR. ROBERTSON: I'm sorry, Your Honor. I

15   didn't hear you.

16   THE COURT: Where was the quote in

17   Innogenetics that you were relying on, where does it

18   end? What's the concluding paragraph or sentence?

19   MR. ROBERTSON: I think the important parts

20   of it, for example, are after where the Federal

21   Circuit finds the District Court did not err in

22   finding that the report was deficient for purposes of

23   disclosure goes on to say for each of the claims he

24   analyzes for obviousness, it's referring to the expert

25   there, merely lists the number of prior art references

2325

1    and then concludes with the stock phrase to one

2    skilled in the art, it would have been obvious to have

3    performed the -- and this was the genotyping methods

4    of the claims at issue.

5    There must be some articulated reason with

6    some rational underpinning to support the legal

7    conclusions of obviousness.

8    Nowhere does, again this is the defendant's

9    expert, state how or why a person of ordinary skill in

10   the art could have found the claims of the

11   patents-in-suit obvious in light of some combination

12   of those particular references. It goes on to say, As

13   the District Court found, it is not credible to think

14   that a lay jury could examine the prior art that

15   defendant cited as prior art or any of the other

16   references and determine on its own whether there are

17   differences among them and the patents at issue.

18   Such vague testimony would not have been

19   helpful to a lay jury in averting the pitfalls of

20   hindsight that belie a determination of obviousness.

21   THE COURT: You took some liberties with the

22   quotation, but not in any material way. You left out

23   the specifics and put in like the patent at issue is

24   the '704 patent, and a person ordinarily skilled in

25   the art was the text instead of person of ordinary

2326

1    skill in the art, but it doesn't change the meaning.

2    MR. ROBERTSON: I apologize, Your Honor. I

3    just have an excerpt.

4    THE COURT: I understand, and I'm not

5    criticizing you. I'm trying to save Ms. Stoll-DeBell

6    some time so she can get on with life.

7    What's that fellow from BP who said he just

8    wants his life back? I now for the first time can

9    appreciate how he felt.

10   MR. ROBERTSON: I would again rely on the

11   Supreme Court's most recent pronouncement which

12   indicates --

13   THE COURT: Which is KSR?

14   MR. ROBERTSON: Yes, sir. And this is at

15   page 418 of the decision. I think it's at page 1741

16   of the Supreme Court Reporter.

17   It's necessary for a court, and I'm

18   paraphrasing here, to look at the interrelated

19   teachings, demand of the design community, the

20   background of a person having ordinary skill in the

21   art in order to determine whether there's an apparent

22   reason to combine the known elements in the fashion

23   claimed by the patent at issue. To facilitate this

24   review, analysis should be made explicit.

25   And I would suggest, Your Honor, that the

2327

1    Court required that explicit analysis both in its

2    initial scheduling order when it required an element

3    by element, claim by claim analysis, and it required

4    it again in the second supplemental statement. And it

5    clearly, I think, the evidence that this could have

6    been done is the fact that over the weekend we now

7    have these element by element, claim by claim --

8    THE COURT: Can I see what you're talking

9    about, the 22 slides, so that I can compare them to

10   the charts that I have here? That's the argument

11   you're making and inveighing me to do. So I think I

12   need to see what you're looking at.

13   You said 22 slides. I want the 22 that

14   you're talking about. I don't want the list. I want

15   the slides. And I want to know -- that's more than

16   22.

17   MR. ROBERTSON: The red flags are the 22,

18   Your Honor.

19   THE COURT: Well, here, I've got this. This

20   is what I've got. Is this what you handed up

21   yesterday? You tell me what pages they are in here.

22   I've got this thing.

23   MS. STOLL-DeBELL: Do you have the slides

24   from yesterday?

25   THE COURT: I have what he gave me. It goes

2328

1  through 165. That's what he just handed up to me.
2      MS. STOLL-DeBELL: Because we deleted a lot,
3  Your Honor. You'll see big red X's. Those are the
4  ones we deleted. We put red X's through so the
5  numbers wouldn't change.
6      THE COURT: All right. Would you like to
7  tell me where to look for the first one?
8      MR. ROBERTSON: Yes, Your Honor. For the
9  first time we're seeing here representation to Claim
10  One of the '516.
11      THE COURT: Give me the page number in the
12  lower right-hand corner.
13      MR. ROBERTSON: I'm sorry, sir. 99.
14      THE COURT: Okay.
15      MR. ROBERTSON: Do you see what he's doing?
16      THE COURT: Wait a minute. On Exhibit 3, Ms.
17  Stoll-DeBell, he says, "Refer to DX 141, P.O. Writer,
18  Exhibit 3, cell 34." Is that this Exhibit 3 that I've
19  got here?
20      MS. STOLL-DeBELL: Yes, Your Honor.
21      THE COURT: Where is cell 34? Is that that
22  numbered column the left?
23      MS. STOLL-DeBELL: Yes.
24      THE COURT: Hold on. That is 34. Okay.
25      MS. STOLL-DeBELL: So K 34 is on --

2329

1      THE COURT: Page 6?
2      MS. STOLL-DeBELL: Yes.
3      THE COURT: I need to look at Shamos' opinion
4  re P.O. Writer in column K, Shamos opinion re J-CON in
5  column S.
6      MS. STOLL-DeBELL: Just to make the record
7  clear, Your Honor, that red box, we're not going to
8  show the jury. That's directions to Mr. McDonald to
9  actually get into that DX141 and show that page.
10      THE COURT: That's fine, but it helps me to
11  understand it.
12      All right. Using that as an example, what's
13  wrong?
14      MR. ROBERTSON: Your Honor, I've just been
15  handed this for the first time. I haven't even been
16  able to open the page to it.
17      THE COURT: You think you got it after I did?
18      MS. STOLL-DeBELL: No, I think that we gave
19  them yesterday morning slides that had cites to
20  exactly the cells in Exhibit 3 for each specific
21  paragraph on each slide.
22      THE COURT: Do you have now this abridged
23  version that she handed me? It starts off with '516,
24  Claim One, page 99. And he's basically saying, Take a
25  look at Exhibit 3, and under P.O. Writer, the text of

2330

1  this slide is the same as the text of the first column
2  under K. P.O. Writer is an electronic system for use
3  by a prospective buyer to locate and find items,
4  sources, suppliers or vendors.
5      Then under J-CON, column S, it says, Part
6  finder. I have to find part finder. Oh, here it is.
7  Part finder is an electronic system for use by a
8  prospective buyer to locate and find items from
9  sources, suppliers or vendors based on -- that's what
10  page 99 says. And there's no text.
11      MS. STOLL-DeBELL: Your Honor, that J-CON
12  comes from cell S 34 on the same page you're looking
13  at.
14      THE COURT: I don't see it. It doesn't say
15  that.
16      MS. STOLL-DeBELL: It's the second paragraph.
17  So you're looking at S 34, and the second paragraph
18  says, Retail. Locating items is disclosed at L012360.
19  Then it has that exact quote in it, and it cites to
20  that same Bates number.
21      THE COURT: All right.
22      MS. STOLL-DeBELL: It's actually an exact
23  quote out of Exhibit 3. That's all this slide is.
24      THE COURT: I understand. Actually, it's not
25  an exact quote. It begins with the part finder part

2331

1  under retail, not with locating.
2      MS. STOLL-DeBELL: That's true.
3      THE COURT: Okay. Now I've got it.
4      So you had this a long time ago. This
5  information. The same information that is on 99 you
6  had a long time ago, she says. And if you look at
7  claim -- if you look at K, column K and column S you
8  did have a long time ago whenever you got his
9  report that had Exhibit 3 in it, didn't you?
10      MR. ROBERTSON: Your Honor, I'm trying -- I
11  apologize. I'm trying to find where we are on P.O.
12  Writer. This is column 34. There was no --
13      THE COURT: You should be on page 6.
14      MR. ROBERTSON: I am on page 6.
15      THE COURT: If you look under column K, the
16  reference to P.O. Writer at the bottom of the slide,
17  page 99, is a direct quote from the first entry under
18  column K, Shamos opinion re P.O. Writer.
19      Then if you go over to column S under Shamos
20  opinion re J-CON in the second paragraph "(Retail),"
21  beginning with the second sentence, "PartFinder" is a
22  direct quote from that column. So you had these two
23  quotes on Exhibit 3.
24      MR. ROBERTSON: I had this anticipation
25  chart, Your Honor, that says this element was going to

2332

1  be anticipated, yes.  No one ever said here's how
2  we're going to combine these two.
3      If we're just doing it for one, there are an
4  infinite number of combinations.
5      THE COURT:  We have need to do it for one so
6  I can understand.  Remember how far ahead you-all are
7  and also will be of me.  I'm behind.  And I don't have
8  the capacity of Silky Sullivan.  You don't even know
9  who that is, do you?
10     I've gone to page 6 of the original of
11  Exhibit 3 and it is in green.  And green is what?
12  What's the color code for green?
13     MR. ROBERTSON:  Invalidity, Your Honor.
14  Anticipation.
15     THE COURT:  Wait a minute.  I thought senior
16  judges could get out of this kind of work.
17     "A cell with light green shading indicates a
18  claim element that is anticipated by the reference in
19  its column (possibly also asserted to be obvious)."
20     MS. STOLL-DeBELL:  That's right.
21     THE COURT:  Okay.  So you had all this.
22     MR. ROBERTSON:  Your Honor, if you look at
23  this chart, all of them are color green.  So all of
24  them are possibly obvious.  But, again, it doesn't
25  tell us on a claim by claim, element by element basis

2333

1  which ones they are going to select and which ones
2  they are not.
3      So the selection was made for the first time
4  for these slides.  That's the first time it was
5  revealed to us in all these things because remember --
6      THE COURT:  So you're claiming surprise and
7  prejudice?
8      MR. ROBERTSON:  Yes, sir, because --
9      THE COURT:  You're relying on the Southern
10  States test or do you have another test you want me to
11  apply?
12     MR. ROBERTSON:  Yes, sir.  That's the test
13  I'd like you to apply.  I could not discern from this
14  color-coded chart which combination was going to be
15  presented at any time.
16     THE COURT:  Okay.  Anything else?
17     MR. ROBERTSON:  No, sir.
18     THE COURT:  Smart as you are, you could
19  figure that out, couldn't you?
20     MR. ROBERTSON:  No, sir.  Not with that
21  number of elements.  At one point, Your Honor, I had
22  to tell them they had to get down to seven references.
23  We were dealing with dozens at this point.
24     I can't tell until -- in fact, I was
25  surprised to see it for the first time on the weekend.

2334

1      THE COURT:  I shouldn't have said that.  I
2  invited that barrage.
3      All right.  This is going to be the end of
4  it.  I'm going to have to decide now.
5      Okay, Ms. Stoll-DeBell.
6      MS. STOLL-DeBELL:  Let me start off by saying
7  that every slide that we intend to use, we did cut
8  them down substantially, but every slide goes exactly
9  right back to this Exhibit 3.
10     THE COURT:  What?  I lost --
11     MS. STOLL-DeBELL:  Every slide that we intend
12  to use today with J-CON and P.O. Writer goes exactly
13  back to Exhibit 3, just like you saw that slide 99.
14  We have checked it, doublechecked it, triplechecked
15  it.  We're not going to say anything other than what's
16  in here.  We're not going to go to a document other
17  than what's in here, and we're not even going to go to
18  a quote in a document that's not in here.
19     THE COURT:  Thank you.
20     MS. STOLL-DeBELL:  So they have had all of
21  this information.  They didn't even raise this issue
22  until about two weeks ago, Your Honor, and they did so
23  in the guise of a motion to enforce prior Court
24  orders.
25     There was no prior Court order on this.  You

2335

1  never precluded this before.  And you can look at
2  their bench brief, Your Honor, that they filed this
3  week, and there's a chart here I'm happy to hand it
4  up.  They said we can rely on J-CON and P.O. Writer.
5  If they thought it wasn't sufficient, they could have
6  filed a motion for summary judgment.  They could have
7  filed a motion to preclude.  In fact, they filed
8  countless numbers of motions to preclude us to do
9  things, and this was not one of them.
10     THE COURT:  I think --
11     MS. STOLL-DeBELL:  The day before Dr. Shamos
12  is supposed to go on the stand all of a sudden we
13  can't make an argument we've disclosed all along.  It
14  was in our second supplemental invalidity contentions.
15  I can give you the pages for that.  So that's why it
16  wasn't part of a prior Court order.
17     This is ambush.  It's ambush to show up on
18  the day that our expert supposed to go on the stand
19  and say we didn't properly disclose something.
20     THE COURT:  They made this same argument back
21  awhile ago, and I think one of the reasons that I made
22  the decision on December 30, and I didn't identify any
23  Court order was involved, according to you.
24  That's what I think you said, right?
25     MS. STOLL-DeBELL:  That's right, Your Honor.

2336

1   There was no Court order precluding it.  They never
2   asked you to preclude it.
3       THE COURT:  Not to preclude it, but to do
4   something.  He says that the Court order to do
5   something was to do this pursuant to the second
6   supplemental -- the order that required the second
7   supplemental -- supplement to the interrogatory, which
8   had to do with outlining all your references and
9   claims by claim analysis.
10      MS. STOLL-DeBELL:  And we did at pages 104 to
11   page 120 of our second supplemental invalidity
12   contentions, we set forth element by element analysis
13   of J-CON plus P.O. Writer.  So we did do that.  We
14   disclosed it to them long ago.
15      THE COURT:  Where is that?
16      MS. STOLL-DeBELL:  The second supplemental
17   invalidity contentions.
18      THE COURT:  What are the paragraphs that
19   you're referring to?
20      MS. STOLL-DeBELL:  I don't think we actually
21   have a copy of it.  I can cite pages to it Your Honor.
22   I could show you on the computer.  I don't think they
23   contest that we disclosed J-CON plus P.O. Writer in
24   our second supplemental invalidity contentions.
25      THE COURT:  No, I don't think they contest

2337

1   that.  I think they contest you didn't do what you
2   were supposed to do, the element by element that
3   you're doing now.
4       MS. STOLL-DeBELL:  If they contested that,
5   they should have raised it long ago.
6       THE COURT:  They did raise it on December 30.
7       MS. STOLL-DeBELL:  In the guise of a motion
8   to enforce a Court order.  That was a
9   misrepresentation.  There was never a Court order that
10   said we shouldn't be able to raise this combination.
11      THE COURT:  That's true.  That isn't what the
12   issue was.  The issue is that you didn't disclose the
13   combination adequately in anything that you did.
14      Where are those supplemental interrogatory
15   answers?  Have they got them?  Did the gentleman back
16   there for ePlus, did he come up with them?
17      MR. ROBERTSON:  Your Honor may recall that
18   they are circumscribed by what was in Dr. Shamos'
19   report.  That Dr. Shamos couldn't testify unless it
20   was in the second supplemental, but he doesn't have
21   any of that analysis in the second supplemental.
22      THE COURT:  Can I have the page?
23      MS. STOLL-DeBELL:  Page 104, I believe, Your
24   Honor.  I don't have a copy in front of me, but that's
25   what I believe where J-CON plus P.O. Writer starts.

2338

1       Did you find page 104, Your Honor?
2       THE COURT:  Yes.
3       MS. STOLL-DeBELL:  Okay.
4       THE COURT:  All right.
5       MS. STOLL-DeBELL:  And it goes to page 120
6   for J-CON plus P.O. Writer.
7       THE COURT:  All right, Mr. Robertson, doesn't
8   this go on a claim by claim basis?
9       MR. ROBERTSON:  I'm sorry?
10      THE COURT:  Doesn't this go on a claim by
11   claim basis?
12      MR. ROBERTSON:  It does, but Dr. Shamos
13   disclaimed these interrogatory answers in his report
14   and said he didn't rely on that, and that he had his
15   own opinions, and that's what we relied on.  And the
16   Court's ruling was he was confined to his report as it
17   was circumscribed from the second supplemental.
18      This is not in Dr. Shamos' report.  And we
19   also mention, Your Honor, the scheduling order also
20   required there be this element by element, claim by
21   claim basis.
22      MS. STOLL-DeBELL:  I'm not saying we're using
23   the second supplemental for Dr. Shamos.  He has his
24   report and he's going to use his report.  I'm merely
25   saying we disclosed J-CON plus P.O. Writer in the

2339

1   second supplemental as we were required to do, and
2   then Dr. Shamos has his own opinion on J-CON and P.O.
3   Writer.
4       There was not a Court order precluding us
5   from raising J-CON plus P.O. Writer.
6       THE COURT:  Thank you.
7       MR. ROBERTSON:  I'm not suggesting --
8       THE COURT:  Just a minute.  Are you through?
9       MS. STOLL-DeBELL:  I think so.  Other than to
10   just say, again, he did say the how and why to do the
11   combination in that paragraph 236.  I think it's
12   sufficient enough to let it go to the jury, Your
13   Honor.
14      THE COURT:  Okay.  I understand.  Now, the
15   question I have for Mr. Robertson.  What is your
16   motion?  What is your request and what is the ground
17   for it?
18      If you proceed under Rule 37 for violating a
19   Court order, you have to identify the Court order.  If
20   you proceed under Rule 37, the failing to make a
21   disclosure, you have to tell me that's what it is.
22      If you're not, and you said you were going
23   under Rule 37, and you wanted me to apply the
24   rationale of Rule 37, that analysis was based on
25   Rambus v. Infineon, which has to do with failure to

2340

1  make disclosures and the test to be used for failure
2  to make disclosure.
3     I guess what you're saying now is that we
4  ordered expert reports, and the expert reports had to
5  have claim by claim analysis in order to satisfy the
6  Supreme Court and Fourth Circuit opinions on
7  obviousness, and they didn't do it. So they didn't
8  make an adequate disclosure until just the other day,
9  and you were surprised, and you're prejudiced, and,
10  therefore, that's what I should be doing under Rule 37
11  or is it something else?
12     MR. ROBERTSON: Yes, sir. Your scheduling
13  order specifically stated that we had to comply with
14  Federal Rules of Civil Procedure with respect to
15  expert disclosures, and what they needed to contain,
16  and how there should not be any surprise with respect
17  to that. And I think we have been surprised by the
18  fact that now Dr. Shamos is going to be testifying
19  about things that weren't disclosed.
20     THE COURT: How have you been surprised if
21  you knew the answers, if you knew what he was going to
22  do in the interrogatory answers?
23     MR. ROBERTSON: Because he did not rely on
24  the interrogatory answers. In fact, he actually
25  disclaims the interrogatory answers in his report, and

2341

1  he didn't say, I'm incorporating the second
2  supplemental statement and the analysis in there in my
3  report.
4     He said, I'm giving you new claim charts, and
5  I'm giving you these paragraphs, and that's going to
6  be the basis of my testimony. And now what they want
7  to do is fall back on something that they actually
8  indicated that they weren't going to rely on.
9     If Dr. Shamos --
10     THE COURT: You mean the expert indicated he
11  wasn't going to rely on, i.e., the interrogatory
12  answers?
13     MR. ROBERTSON: Excuse me, sir?
14     THE COURT: I.e., the interrogatory answers?
15     MR. ROBERTSON: Yes, sir. He said he had his
16  own opinions.
17     THE COURT: All right.
18     MS. STOLL-DeBELL: Your Honor, could I just
19  point out one little thing. He did not disclaim the
20  interrogatory answers. He said he adopted the
21  citations.
22     Paragraph 3 of his report, 103, page 26.
23     THE COURT: What?
24     MS. STOLL-DeBELL: Dr. Shamos --
25     THE COURT: Where?

2342

1     MS. STOLL-DeBELL: Shamos' report.
2     THE COURT: What paragraph?
3     MS. STOLL-DeBELL: Page 26, paragraph 103.
4  It starts at the very bottom of page 26. And this is
5  those columns, Your Honor, J and R that we sort of
6  skipped over.
7     THE COURT: I understand.
8     MS. STOLL-DeBELL: He says, I adopt the prior
9  art citations from Lawson's interrogatories. I adopt
10  them.
11     THE COURT: The prior art. He says, Exhibit
12  3 also contains matters from Lawson's interrogatories
13  concerning invalidity, which are included in columns
14  that are distinct from my opinions. I adopt the prior
15  art citations from Lawson's interrogatories, but I do
16  not necessarily adopt the opinions expressed in the
17  interrogatories concerning which claims are invalid in
18  the light of which references.
19     On that issue, I have expressed my own
20  opinion in columns containing the heading beginning
21  Shamos opinion.
22     MS. STOLL-DeBELL: That's right. He doesn't
23  necessarily adopt them, but he doesn't say he
24  disclaims them either, Your Honor. And for the most
25  part those citations are very similar if not identical

2343

1  to what we had in our second supplemental.
2     THE COURT: All right. Thank you.
3     MS. STOLL-DeBELL: Thank you.
4     MR. ROBERTSON: I just have one last point.
5     THE COURT: You have the burden to carry the
6  proof on the motion. So you can have the last word,
7  but this is the last word.
8     MR. ROBERTSON: Yes, Your Honor.
9     Just last night Ms. Stoll-DeBell emailed us
10  and told us that they would not be relying on any the
11  columns that were in the report that contained the
12  interrogatory answers.
13     THE COURT: All right. Before me is a motion
14  to foreclose the testimony of Dr. Shamos in its
15  entirety on the issue of obviousness that arises from
16  the combination of the J-CON and the P.O. Writer. The
17  ground for that request is the violation of the
18  scheduling order, which requires claim by claim
19  analysis of any obviousness as well as the
20  requirements of the federal rules which requires the
21  expert to state fully the grounds of the opinion, the
22  reasons therefore, and the materials cited in respect
23  thereof, and as those rules would be applied under the
24  instruction of the Supreme Court of the United States
25  in KSR and of the Federal Circuit in Innogenetics and

2344

1    Kahn.
2         And the requested relief is to preclude Dr.
3    Shamos from testifying at all on the invalidity of
4    J-CON Plus in combination with P.O. Writer.  Is that
5    the basic relief you seek?
6         MR. ROBERTSON:  Yes, Your Honor.  I would
7    just make one point.  The same analysis would apply
8    both to TV/2 and RIMS.
9         THE COURT:  We're not arguing TV/2 and RIMS.
10        MR. ROBERTSON:  All right.  And also --
11        THE COURT:  That's not here and you're not
12   going to bootstrap it.  And it's not before me.  I
13   haven't been through -- I don't know how long we've
14   been sitting here.  Over an hour and a half.  Don't be
15   doing that anymore.  Sit down.
16        MR. ROBERTSON:  Your Honor, I just want to
17   say, well, to the extent that they haven't presented
18   that analysis, Dr. Staats' fact testimony --
19        THE COURT:  I'm dealing with something else.
20   I'm talking about Dr. Shamos' report.
21        MR. ROBERTSON:  Yes.  That's the relief, Your
22   Honor.
23        THE COURT:  All right.  At the beginning of
24   the argument, ePlus' counsel said that it would be
25   sufficient if Dr. Shamos were confined to the text of

2345

1    paragraph 236, and then said but that paragraph
2    basically doesn't comply with KSR requirements or
3    Innogenetics requirements as well.
4         The response of ePlus is that in response to
5    the order requiring it to answer second supplemental
6    interrogatories, it provided interrogatory answers
7    that go from page 104 to 120 that outline the
8    combination of J-CON and P.O. Writer.  And that is
9    correct.  Lawson did, in fact, do that.
10        However, in his report Dr. Shamos said that
11   his claim chart, Exhibit 3, also contains matters from
12   Lawson's interrogatories concerning invalidity which
13   are included in columns that are distinct from my
14   opinions.  I adopt the prior art citations from
15   Lawson's interrogatories, but I do not necessarily
16   adopt the opinions expressed in the interrogatories
17   concerning which claims are valid in light of which
18   references.  On that issue, I have expressed my own
19   opinion in columns containing headings beginning
20   Shamos opinion.
21        Therefore, the interrogatory answers really
22   do not play into this analysis because the challenge
23   is to a report that does not show the combination of
24   J-CON and P.O. Writer.  And that is the first issue
25   that I have to decide.

2346

1    It is said by Lawson that the report does in
2    fact cover the combination in paragraph 236.  In
3    paragraph 236, Dr. Shamos, under a general heading
4    called the combination of J-CON and P.O. Writer
5    renders the asserted claims obvious, says as follows.
6    235 is the paragraph.  It is my opinion that J-CON
7    anticipates all asserted claims.  It is also my
8    opinion that P.O. Writer anticipates all of the
9    asserted claims.
10        In paragraph 236, he says, To the extent that
11   J-CON and/or P.O. Writer are not deemed to anticipate
12   any asserted claim, it is my opinion that such claim
13   would have been obvious in view of the combination of
14   J-CON with P.O. Writer.  The same reasons for making
15   the previous two combinations, that is his assertion
16   that the RIMS patent and the Dworkin patent, and the
17   J-CON and the Dworkin patent taken together, apply to
18   combining the J-CON system as described in the J-CON
19   manual with P.O. Writer Plus V 10 as described in the
20   P.O. Writer manual.
21        The P.O. Writer Plus V 10 system provided the
22   multi-vendor capability demanded by the industry at
23   the time and before the time of the invention.  The
24   J-CON system included features that one of ordinary
25   skill in the art would have been motivated to use with

2347

1    the P.O. Writer system including additional details
2    about performing a cross referencing of data relating
3    to an item on a requisition to determine an
4    alternative source for the same item and/or an
5    acceptable substitute for the item initially selected.
6         It is asserted by Lawson that Dr. Shamos
7    omitted from his report the citations to Exhibits 3
8    and 4 from that paragraph.  And Exhibits 3 and 4 to
9    his report do not appear there.  Four is an
10   anticipation chart and 3 is a claim chart that
11   includes all of what is in 4.  Three is a matter that
12   has been argued here today.
13        Now, it is argued then that if one goes back
14   to page 54, paragraph 181, where Dr. Shamos recites
15   P.O. Writer Plus V10, that he recites what P.O. Writer
16   has in paragraphs 181 through 184.  He does do that,
17   but he does not show any combination there.
18        It is also said that if one goes to page 65
19   where he discusses the combination of the RIMS patent
20   plus Dworkin 940 rendering the claims obvious, that he
21   has explained in 223, 224, 225 and 226 how to combine
22   those two as well as one sentence from 227.  Much of
23   what he has said in 227 is -- I guess 228.  Much of
24   227 has been stricken.
25        He has also said that the combination of

2348

1  J-CON plus Dworkin 940 renders the asserted claims
2  obvious in Dr. Shamos' report, and he discusses that
3  in 229 through 234.
4      And that brings us to his discussion of the
5  combination of J-CON and P.O. Writer.  And the test
6  here must be understood in view of the decisions of
7  the Supreme Court in KSR and others.
8      There the Court says that it will be
9  necessary for a court to look to interrelated
10 teachings of multiple patents, the effects of demands
11 known to the design community, or present in the
12 marketplace, and the background knowledge possessed by
13 a person having ordinary skill in the art all in order
14 to determine whether there was an apparent reason to
15 combine the known elements in the fashion claimed by
16 the patent at issue.  To facilitate review, this
17 analysis should be made explicit.
18     Then citing Kahn with approval, the Court
19 cites that part of Kahn which says rejections on
20 obviousness grounds cannot be sustained by mere
21 conclusory statements.  Instead, there must be some
22 articulated reasonings with some rational underpinning
23 to support the legal conclusions of obviousness.
24     The Federal Circuit has since KSR decided
25 Innogenetics, I-n-n-o-g-e-n-e-t-i-c-s, Innogenetics v.

2349

1  Abbott Laboratories, there the Court held, the
2  District Court held, that an expert's report on
3  obviousness asserted claims was deficient for purposes
4  of the disclosure under Rule 26 for each of the claims
5  that he analyzes for obviousness.  Dr. Patterson
6  merely lists, said the Court, a number of prior art
7  references and then concludes with the stock phrase
8  "To one skilled in the art, it would have been obvious
9  to perform the genotyping methods in the claims that
10 were at issue there of that patent that was at issue."
11     The Court went on to say that there must be
12 some articulated reasoning with some rational
13 underpinning to support the legal conclusion of
14 obviousness citing Kahn and KSR.  Again, it cites KSR
15 or Kahn requiring the analysis to be made specific.
16 And then to give guidance about what should be done,
17 the Court says, nowhere does Dr. Patterson state how
18 or why a person of ordinary skill in the art would
19 have found the claims of the '704 patent obvious in
20 light of some combination of those particular
21 references.
22     "As the District Court found, it is not
23 credible to think that a lay jury could examine the
24 Cha application, the Resnick patent that defendant
25 cited as prior art or any of the other references and

2350

1  determine on its own whether there were differences
2  among them and the '704 patent.  Such vague testimony
3  would not have been helpful to a lay jury in avoiding
4  the pitfalls of hindsight that belie a determination
5  of obviousness."
6      It is that measure of the disclosure
7  obligation that is to be applied to the adequacy of
8  the report here.  This matter was brought to the
9  attention of the Court on December 30, and I denied
10 the motion to enforce prior Court orders.  That was
11 the vehicle for presenting this issue to the Court.
12 And at the time I had some concern about the adequacy
13 of the Shamos report, but as I understood the
14 arguments being made to me, and they were really made
15 in that brief and then on the telephone, I erred on
16 the side of allowing this matter to go forward to see
17 where crystallization could occur and whether or not
18 the parties could sort this out.  And that
19 crystallization has gone forward, and it has resulted
20 in the filing the night before last of a number of
21 slides wherein the element by element analysis that is
22 required has been proffered as an outline to be aided
23 by Dr. Shamos' testimony.
24     In that element, first, I need at this point
25 to say that if one goes back and looks at Exhibit 3

2351

1  and reads through it carefully, one sees and it is
2  admitted in the argument that nowhere in the chart,
3  Exhibit 3, under Shamos opinions does Dr. Shamos
4  combine the J-CON and the P.O. Writer at all.  He just
5  doesn't do it in the claim by claim analysis.  It
6  doesn't say any combination.
7      We are left to at that point to use
8  paragraph 236.  And the bottom line is that 236 does
9  not satisfy the requirements of KSR or Innogenetics.
10 It is a conclusory opinion about obviousness.  It
11 incorporates or purports to incorporate by reference
12 or it does incorporate by reference the reasons given
13 for explaining to other patents that would be obvious,
14 that's RIMS plus Dworkin and J-CON plus Dworkin,
15 without in any way explaining how those reasons apply
16 to this scenario.
17     And you can go back and read the discussion
18 of Dworkin plus J-CON and Dworkin plus RIMS, and you
19 cannot see how to make the combination analysis that
20 is suggested by the incorporation by reference
21 sentence.  It just simply can't be done.  So the
22 incorporation by reference does not carry the day.
23     That then leaves the next sentence.  The P.O.
24 Writer plus V10 system provided the multi-vendor
25 capability demanded by the industry at and before the

2352

1  time of the invention.  The J-CON system included
2  features that one of ordinary skill in the art would
3  have been motivated to use with the P.O. Writer
4  system, including additional details about performing
5  a cross referencing of data relating to an item on a
6  requisition to determine an alternative source with
7  the same item and/or an acceptable substitute for the
8  item initially selected.
9       That description is inadequate to the day as
10  required by KRS as supplemented by Innogenetics.  And
11  it's explicit teaching and command harkening back to
12  the Kahn decision about the need to articulate how and
13  why a person of ordinary skilled in the art would have
14  found the claim of the '704 patent obvious in light of
15  some combination of those particular references.
16       It is possible, I suppose, to allow Dr.
17  Shamos to testify the P.O. Writer sentence that
18  is the last sentence of paragraph 236.  However, that
19  is in such conclusory form that, like the District
20  Court in Innogenetics, it is not credible to think
21  that a lay jury could examine that text and reach any
22  conclusion on its own.
23       So the motion then has to be tested.  This is
24  a failure disclose after extensive opportunity to do
25  so the actual details of the opinion required by those

2353

1  cases as well as by the actual articulation of Rule
2  26, which requires the expert to state in full all of
3  the opinions and all the reasons therefore, and in a
4  combination opinion there has to be a combination
5  explained in the way that Innogenetics and KSR
6  require.
7       And so the question is:  Can his testimony
8  then be excluded?  The test to be applied here is the
9  Southern States test according to the plaintiff.  And
10  that test has its Genesis in the decision called
11  Rambus v. Infineon.
12       Failure adequately to disclose under Rule
13  26(c) is excused by two exceptions.  Does anybody
14  have --
15       Do you have a current Federal Rules down at
16  your desk?
17       MS. HAGGARD:  No, but I can go grab one.
18       THE COURT:  Mine is blocked by all these
19  documents and I can't reach it.  I can't even move the
20  file.
21       Have you got one?  That's it.  Rule 37(c)
22  says if a party fails to provide information or
23  identify witnesses as required by Rule 26(a) or (e),
24  the party is not allowed to use that information or
25  witness to supply evidence on a motion in a hearing or

2354

1  at a trial unless the failure was substantially
2  justified or is harmless.  The sanctions that are
3  permitted are outlined.
4       That same basic framework animated the
5  Southern States.  The first test is was the party
6  surprised about the testimony?  The answer to that is
7  yes and no.  EPlus has known for some time about the
8  combination theory of J-CON plus P.O. Writer.  But the
9  it has not been on notice of exactly what Lawson was
10  going to say about how that combination occurred until
11  these slides were presented a couple of nights ago.
12  And even now they are being narrowed down.  So I think
13  it's fair to say the surprise component augers in
14  favor of ePlus.
15       The nature of the surprise is particularly
16  important given the Supreme Court's and Federal
17  Circuit's recent articulations of the need for
18  specificity on combination testimony and obviousness.
19       The next test is the ability of the party to
20  cure that surprise.  Given the convoluted nature of
21  Dr. Shamos' reasoning, and it's almost impossible to
22  expect the opposing party to have anticipated exactly
23  what was going to be delivered to it today or last
24  night or night before last, I guess it was, I'm sorry,
25  and to cure the surprise by effective

2355

1  cross-examination.  And that's what has to be done
2  here.  That's the cure.  Plus the need to have its own
3  expert reassess all of the testimony now being offered
4  in the form that it's now being offered in order to
5  adjust to the surprise.
6       And that would be a method that conceptually
7  could be available to cure, but to do that would allow
8  this testimony, if presented, by Dr. Shamos to disrupt
9  the trial.  And I don't really have any good
10  explanation on the record for failure to sort this out
11  in the way that they were going to use it at trial.
12       I've told the parties from the beginning they
13  needed to sort this out specifically.  And I on
14  numerous occasions said the consequence can be
15  exclusion, and you need to be aware of all that and
16  tried to give the parties an opportunity to make sure
17  they understood what the consequence were.  And so I
18  don't find the explanation for the failure to disclose
19  what should have been disclosed adequate.  And the
20  importance of the testimony, it's the lynchpin of the
21  J-CON, P.O. Writer obviousness argument, and so it's
22  critical, and it's important to both sides, obviously.
23       Applying all those tests, I find that there
24  has been a failure to disclose as required, and the
25  sanctions are imposing of attorneys' fees, inform the

2356

1    jury of the failure are other sanctions including any
2    of the others listed in 37(D)(2)(a) 1 through 6 and
3    (B)(2)(a) 1 through 6, directing that matters embraced
4    in the order or other designated facts be taken as
5    established for purposes of the action as the
6    prevailing party claims, prohibiting the disobedient
7    party from supporting or opposing designated claims of
8    defenses or from introducing designated matters in
9    evidence, striking pleadings in whole or in part,
10   staying further proceedings until the order is obeyed,
11   dismissing the action or proceeding in whole or in
12   part, rendering a default judgment against the
13   disobedient party.  I believe that's the right
14   reference, (a) 1 through 6.
15         So the remedy here is, the only practical
16   remedy given the situation, is to preclude the
17   testimony of Dr. Shamos on the issue of combination of
18   J-CON and P.O. Writer.  The motion to that extent is
19   granted.
20         Now, you said there's something else about
21   Dr. Staats.
22         MR. ROBERTSON:  Yes, Your Honor.  Can I refer
23   you back to Dr. Shamos' report beginning at page 68?
24         THE COURT:  Well, let me ask you this
25   fundamental question.  Can an invalidity or

2357

1    combination ever be sustained on the basis of fact
2    testimony only?
3          MR. ROBERTSON:  I don't believe it can, Your
4    Honor.
5          THE COURT:  Is there a case that holds that?
6          MR. ROBERTSON:  I think the cases that -- let
7    me just refer you, if I can, to, I think, Proveris
8    Scientific Corp. v. Innovasystems, 536 F.3d 1256,
9    1257.
10         THE COURT:  Cite it again.
11         MR. ROBERTSON:  It's Proveris --
12         THE COURT:  Just the case.
13         MR. ROBERTSON:  536 F.3d 1256, 1257, Federal
14   Circuit, 2008.  Expert testimony is required to
15   establish invalidity where the subject matter is
16   sufficiently complex to fall beyond the grasp of an
17   ordinary layperson.  That's a parenthetical that's
18   coming out of that case.
19         Also I can cite Koito Manufacturing Co. v.
20   Turn-Key-Tech, 381 F.3d 1142 at page 1152, that's
21   Federal Circuit, 2004.  We hold that the defendant
22   needed explanatory testimony or other evidence to
23   compare the prior art, the patent at issue, given that
24   the prior art reference was a technical document.
25         So we would suggest, Your Honor, that in the

2358

1    context of this case with the complexity and the
2    nature of the technology here, this kind of testimony
3    needs to be tethered to expert testimony for the jury
4    to actually be able to apprehend, understand, and do
5    the appropriate analysis.
6          And so with respect to Dr. Staats, it's been
7    conceded that he has -- that they are offering no
8    anticipation opinions with respect to him.  They do
9    have a combination of J-CON and Dworkin, which Your
10   Honor has already referred to.
11         In the same exact analysis that the Court has
12   just done with respect to J-CON and P.O. Writer, if it
13   was followed, it's equally as conclusory.
14         In fact, if I could just direct the Court to
15   one paragraph at page 68 of Dr. Shamos' report.
16         This point at page 68 of Dr. Shamos' report.
17         THE COURT:  Are you bringing this up for the
18   first time?
19         MR. ROBERTSON:  No, sir.
20         THE COURT:  What is it that you think we
21   can -- you just keep going and going and going.
22   Ultimately, there was a precursor motion as to which I
23   probably didn't do the right thing, and I'm trying to
24   cure it, but I don't remember any objection to Staats
25   on J-CON and Dworkin.

2359

1          MS. STOLL-DeBELL:  We don't intend to have
2    Dr. Shamos talk about J-CON plus Dworkin.
3          THE COURT:  He's not going to talk about it
4    so why are you talking about it?
5          MR. ROBERTSON:  Well, then Dr. Staats doesn't
6    need to testify because if Dr. Shamos isn't going to
7    talk about J-CON and Dworkin, then there's no basis to
8    have Dr. Staats testify about J-CON because it then
9    has no relevance to this case because it would be
10   completely untethered to expert testimony.
11         To address that point, Your Honor, we did
12   raise this precise J-CON plus Dworkin issue in the
13   brief that we filed back on -- that we had the
14   argument on December 30.  That's what the argument
15   became focused on.  It became focused on P.O. Writer
16   and J-CON because of the slides we received this
17   weekend.  But in respect to the J-CON plus Dworkin --
18         THE COURT:  They are not offering that.
19         MR. ROBERTSON:  All right.  Then Dr. Staats
20   shouldn't be permitted to testify.
21         THE COURT:  Why?  Ms. What's-Her-Name was
22   allowed to testify.
23         MR. ROBERTSON:  Ms. McEneny?
24         THE COURT:  The Laurene McEneny show.
25         MR. ROBERTSON:  They are contending --

**2368**

1  talking about an average jury.  This is hard.  I mean,
2  I spent I don't know how many hours trying to
3  understand this stuff, and I have to go back and read.
4  It's like reading the rules of the Supreme Court of
5  Virginia.  I wouldn't think about filing a brief there
6  without reading those rules every time.
7       Well, every time that I have to deal with
8  this I have to go back and check these patents and
9  some of the basics on them just so I understand them.
10  What do you think the jury is going to do?
11       Let me hear Mr. Robertson.
12       MS. STOLL-DeBELL:  I think that's a separate
13  issue.
14       THE COURT:  No, it isn't.  Because it's the
15  scope of what he's going to testify to.
16       MS. STOLL-DeBELL:  I think for sure he ought
17  to be able to testify about the factual predicate
18  underlying those three paragraphs.
19       THE COURT:  I understand.
20       How much more of this do I have to deal with?
21  You know what?  This has now taken up half of this
22  day.  I don't understand.  I'm going to tell you
23  something.  What you have done is convinced me beyond
24  question that the next people who come in here to try
25  a patent case are going to be on a leash that Ripley

**2369**

1  is not going to believe, and they're going to do it
2  without disrupting and tearing up the life of juries.
3       These people do not make the kind of money
4  that you all make, and they had a right to have
5  you-all prepared and have it over with so that I don't
6  have to interrupt their day taking half their day
7  doing this.
8       If I had known this, I could have let them
9  not come in until 1 o'clock.  I don't understand what
10  you-all think.
11       MR. ROBERTSON:  I apologize, Your Honor.  We
12  received 167 slides.  We met for hours yesterday.
13  They would only reduce them to 107.  We still have
14  these problems.
15       Now your ruling has just taken out at least
16  26 more, and I think there are some others.  I don't
17  want to have to go through them with the Court either,
18  but this is what we've been presented with.
19       If you want me to deal with them as they come
20  up during the trial, I can also do that, but that
21  would also be disruptive.
22       THE COURT:  What I want you to do is to solve
23  it by agreement.
24       MR. ROBERTSON:  We will do that.
25       THE COURT:  I want you to have solved this

**2370**

1  stuff.  You should done it months ago.
2       MR. ROBERTSON:  I just got the slides Monday
3  night, Your Honor.  I'm sorry.
4       THE COURT:  That's because you-all made a
5  side deal that puts you at that risk.  You should have
6  never made that side deal.  Otherwise, the rule is
7  exhibits that's aren't done at the pretrial conference
8  don't come in, and that includes demonstrative
9  exhibits.  So you-all made a side deal that made all
10  this possible.  You didn't run it by me.  You didn't
11  check anything with anybody.  It's not allowed.
12  Here's what happens because you do it.  Because we're
13  in the process of having to solve these problems.  And
14  every time you get up, you come up with something
15  else.
16       Now, address the question of Dr. Staats.
17       MR. ROBERTSON:  I would not have a problem
18  with Dr. Shamos testifying as to these three
19  paragraphs that have been cited.
20       THE COURT:  That's not an issue.  Dr. Staats,
21  can he testify to the facts that Shamos would use in
22  there?
23       MR. ROBERTSON:  I don't think he needs to or
24  has to.  In fact, I think it would be nothing more
25  than confusing and cause undue delay and would be

**2371**

1  misleading.  It's represented to me this morning that
2  Dr. Staats would be testifying on direct examination
3  for an hour and a half to an hour and three-quarters,
4  and I would at least have an hour of cross-examination
5  for what?  To establish that he had some system that
6  did something that is no longer relevant to any issue
7  of invalidity in this case, obviousness or
8  anticipation.
9       THE COURT:  They say that his testimony is
10  relevant to obviousness.  That because the J-CON
11  system -- you heard her.
12       MR. ROBERTSON:  There's no --
13       THE COURT:  Why do you make a statement like
14  that?
15       MR. ROBERTSON:  There's no expert opinion in
16  this case anymore, Your Honor, that has anything to do
17  with obviousness.  So he can't take the stand --
18       THE COURT:  There's no expert opinion
19  about --
20       MR. ROBERTSON:  About J-CON for anticipation
21  or obviousness.
22       THE COURT:  But there is about RIMS and TV/2.
23       MR. ROBERTSON:  And they can present Dr.
24  Shamos with respect to RIMS and TV/2.
25       THE COURT:  What they're saying is that the

2408

1   A   Well, I think there's a document that's variously been
2   called the brochure and the general information manual.  I
3   think it was in the brochure.
4   Q   What are you referring to in your second bullet point
5   here?
6   A   The second bullet point refers to the RIMS system that was
7   the subject of the '989 patent.  That was a parts ordering and
8   inventory management system.
9   Q   Now, was the -- is RIMS, is that one of the things you
10  called a prior art reference?
11  A   Yes.
12  Q   What is your third point there?
13  A   Well, the patents don't do any more than follow the
14  instructions in the TV/2 literature which is to combine a parts
15  ordering and inventory management system with TV/2.
16  Q   In the bullet point here, you have the word or the letters
17  RIMS, R-I-M-S, rather than parts ordering system; right?
18  A   Yes.
19  Q   Does the literature specifically say to combine the TV/2
20  system with the RIMS system, that brochure?
21  A   Well, the TV/2 -- no.  The brochure didn't mention RIMS by
22  name.  It said parts ordering and inventory management system.
23  Q   So why is it that you concluded from that that that taught
24  combining the TV/2 system specifically with the RIMS system?
25  A   Because of the second bullet point which is that RIMS is a

2409

1   parts ordering and inventory management system.
2   Q   Can you explain to us what you meant by that last bullet
3   point on this?
4   A   Yes.  So once there is an expressed teaching or
5   prescription in the literature to do something, even if it's
6   never been done before, it's still obvious to do it because one
7   is taught to do it, and that's what the TV/2 literature said to
8   do, is take this wonderful product that we have at IBM, and you
9   can use it with a parts ordering and inventory management
10  system.
11  Q   As part of your analysis in this case with respect to the
12  invalidity issues, did you review the file histories of the
13  patents?
14  A   Yes, I did.
15  Q   Did that, those file histories include any information
16  regarding disclosures made to the Patent Office about prior
17  art?
18  A   Yes.
19  Q   In your review of the file histories, did you see anything
20  that showed that the RIMS system was disclosed to the Patent
21  Office as prior art to the patents involved in this case?
22          MR. ROBERTSON:  Objection, Your Honor.  That calls
23  for a legal conclusion.
24          MR. McDONALD:  It's either in the file or it's not.
25  It's not a legal conclusion whether it was disclosed.

2410

1           THE COURT:  That is a different question.  Was the
2   existence of the patent disclosed -- for RIMS disclosed to the
3   Patent Office in the file history.
4           MR. McDONALD:  That wasn't my question.  My question
5   --
6           THE COURT:  That is the question.
7           MR. McDONALD:  -- disclosed as prior art to the
8   Patent Office.  That's what my question is.
9           MR. ROBERTSON:  Well, then, I think he'd be
10  testifying as a patent attorney, not as a -- I think he was
11  qualified as an expert in electronic commerce.
12          THE COURT:  I don't think -- I think he can testify
13  whether there was anything that was -- whether the file history
14  disclosed the existence of the RIMS or the TV/2 system.  What
15  was prior art, he can't give that opinion if you are asking
16  that question.  I think it's not proper.
17          If you want to ask him whether under the places where
18  it says prior art the RIMS patent was disclosed, you can ask
19  that, too, but that's a different question than the one you
20  just asked.
21  Q   Dr. Shamos, with respect to the portions of the file
22  histories of the patents in this case that specifically
23  identify prior art references, okay, can we talk about that for
24  a moment?
25  A   Yes.

2411

1   Q   Was there any literature regarding the RIMS system that
2   was disclosed and identified as prior art?
3   A   No.
4   Q   Was there any literature disclosing the TV/2 system as
5   prior art?
6   A   Yes.
7   Q   And if we go to the Plaintiff's Exhibit 1, please, the
8   '683 patent, and to the first page under other publications,
9   the top third of the page there, do you see that blown up on
10  the screen right now, Dr. Shamos?
11  A   Yes.
12  Q   Now, did you actually see in the file histories
13  specifically of this patent, the '683 patent, a list that
14  specifically identified the two IBM Technical Viewer/2
15  documents listed here as prior art?
16  A   Yes.
17  Q   This list, at least this part of it shown up on the
18  screen, doesn't have any reference to the RIMS system; right?
19  A   No.
20  Q   Did you review the list of publications disclosed on all
21  three of the patents-in-suit as part of your analysis?
22  A   Yes.
23  Q   Did you see any references at all in those three lists for
24  the three patents-in-suit to any literature regarding the RIMS
25  system?

2412

1  A  No.

2  Q  Did you, as part of your analysis in this case, look in

3  general at the landscape regarding electronic sourcing systems

4  in existence in the early 1990s?

5  A  Yes.

6  Q  Did you prepare a slide regarding that as well?

7  A  Yes.

8     MR. McDONALD:  Can we turn to slide six, please.

9  Q  Dr. Shamos, is this slide six here up on the screen right

10  now, is that the slide you prepared regarding electronic

11  sourcing systems as of the early 1990s?

12  A  Yes.

13  Q  When you said early 1990s, can you tell me exactly what

14  time frame you were zeroing in on?

15  A  Yes, the period of 1993 and before.

16  Q  Why did you zero in on that particular time frame?

17  A  Because the critical date with respect to these patents

18  occurred --

19     MR. ROBERTSON:  Objection, Your Honor.  Again, he's

20  testifying to legal objections that are not within the scope of

21  what he's been qualified as an expert for.

22     MR. McDONALD:  Well, I think this is helpful to the

23  jury to understand what the critical date is, Your Honor.  I

24  don't think there's any dispute.

25     THE COURT:  We'll instruct the injury on that, won't

2413

1  I?

2     MR. McDONALD:  Yeah, I think you will.  I want to

3  make sure the jury knows that this witness is using the same

4  date you're going to instruct them.

5     MR. ROBERTSON:  He doesn't have to opine -- do you

6  want to make a representation as to what you consider the

7  critical date to be?

8  Q  For purposes of your analysis, Dr. Shamos, what did you

9  consider to be the critical date?

10  A  August of 1993.

11  Q  How did you come up with that date?

12  A  One year before the filing of the patent.

13  Q  So why don't you tell us what we were trying to explain

14  here in this first bullet point on the slide that's up on the

15  screen right now?

16  A  Yes.  Well, one of the earliest commercial uses of

17  computers was to do parts ordering and electronic sourcing.

18  Over the decades, the systems became more sophisticated, and by

19  the early 1990s, there are at least three prior art

20  references that were prior art systems that were in existence;

21  RIMS, which we've talked about, a system called PO Writer, and

22  another system called J-CON, all of which performed electronic

23  sourcing.

24  Q  When you use the phrase electronic sourcing system here,

25  did you do that familiar with the Court's construction of that

2414

1  term for this case?

2  A  Yes.

3  Q  Did you use that Court's construction?

4  A  I did.

5  Q  So what are you talking about here with respect to the

6  second bullet point on this slide?

7  A  Well, because the prior art included electronic sourcing

8  systems, the applicants for these patents did not invent

9  electronic sourcing systems.

10  Q  What was the significant of that to your analysis?

11  A  I don't know that it had significance other than it

12  appears as though plaintiffs are claiming that they did invent

13  electronic sourcing system.

14     MR. ROBERTSON:  Objection, Your Honor.  Move to

15  strike.

16     THE COURT:  Why is that?

17     MR. ROBERTSON:  He's telling us what he thinks the

18  inventors are appearing to disclose?  How can he possibly know

19  that?

20     MR. McDONALD:  I don't think that's what he said.  I

21  think he was explaining why he thought that was important.  I

22  don't think he said it that way.

23     THE COURT:  He came pretty close.  The jury can pay

24  attention and can understand what to do with that or not.

25  Overruled.

2415

1  Q  Dr. Shamos, as part of your analysis here, did you review

2  any disclosures regarding the RIMS system in any detail?

3  A  Yes.

4  Q  What did you review about the RIMS system?

5  A  Well, primarily, I reviewed -- there was some product

6  brochures, and I reviewed the '989 patent.

7     THE COURT:  The what patent?

8     THE WITNESS:  '989.  Johnson '989.

9  Q  When was the Johnson '989 patent filed approximately?

10  A  Well, it was in 1993/1994 range.

11     MR. McDONALD:  Can we put up the '989 patent.  I

12  believe it's Plaintiff's Exhibit 10.  If we can blow up the top

13  third of that page.

14  Q  Does this -- this is a copy of that '989 patent you said

15  you looked at in some detail; right, Dr. Shamos?

16  A  Yes.

17  Q  Is there some information on this page here that would

18  indicate when that application was filed?

19  A  Yes.  It's here.

20  Q  When was --

21  A  Opposite number 22.  April 2nd, 1993.

22  Q  As part of your review of the '989 patent, was there any

23  indication that after that date of April of 1993, any additions

24  or changes to the specification of that application were made

25  before the patent issued in January of '98?

2528

1    THE COURT:  He actually ended up coming pretty close,
2  but for awhile I was beginning to think we were all going to
3  become grayer than we are.
4    MR. ROBERTSON:  Well, the reason I think I can
5  streamline it some more is because J-CON is no longer prior
6  art, and we're going to be asking for instruction on that
7  because I think there is some confusion just from the jury's
8  question.  J-CON is no longer being offered for any purposes of
9  invalidity --
10    THE COURT:  If you want instructions, I want you all
11  to get me the instructions and get them to the other side in
12  plenty of time for me to think about.
13    MR. ROBERTSON:  It might just be a matter of removing
14  the items listed or identified as the prior art in there.  I
15  think PO Writer is no longer prior art for purposes of
16  invalidity or for any reason, so it's a matter -- that will
17  help me streamline my presentation of Mr. Hilliard.
18    THE COURT:  Okay.  All right.  Is there anything else
19  that any of you -- I know you don't want to, but I've got life
20  that I've got to sort out for the next several weeks.  So
21  you'll finish tomorrow?
22    MR. ROBERTSON:  I'm fairly -- yes.
23    THE COURT:  He may have some redirect, of course, of
24  Dr. Shamos.  So that's Thursday.  And then you're going --
25  we're going to have to deal with the instructions.  I don't see

2529

1  that would be a particularly long process, but I need to tell
2  the jury what to do about the case and with their lives, and I
3  don't want them sitting around while we're talking about
4  instructions if we're going to have a lot to say about
5  instructions.
6    So I'd like you to take a look at the instructions
7  tonight and tell me if you have any major questions about them.
8  Because one of the alternatives is to let the jury have Friday
9  off and we do the -- and then we have argument on Monday.  How
10  long do you have for closing argument, Mr. Robertson, your
11  opening and your rebuttal would you say?  You've done this,
12  this is the third time, so I'm sure you have refined it so you
13  can probably get it all said in two or three sentences.
14    MR. ROBERTSON:  Not if the past is prologued, Your
15  Honor.
16    THE COURT:  How long do you anticipate?
17    MR. ROBERTSON:  Certainly less than an hour and a
18  half.  I think more like an hour and 15 minutes, and that's
19  what I'm going to be shooting on.  I haven't -- we're working
20  on it.  I haven't actually rehearsed it yet, but I will
21  certainly be doing that.
22    I suppose if we have the weekend, I'll have more time
23  to try to get it focused and razor-sharp.  Just off topic, we
24  do have certain motions for judgment as a matter of law.
25    THE COURT:  That's the next question.  I'm going to

2530

1  ask Mr. McDonald, how long do you see your closing argument?
2  You do have to respond to the infringement, and you have to
3  deal with the question of invalidity.
4    MR. McDONALD:  I'm thinking around an hour and a
5  half.
6    THE COURT:  Okay.  That's not too bad.  Now, the next
7  question, how are we going to do -- we have a motion for
8  judgment as a matter of law on infringement by the plaintiff.
9  We have no motions at this time by the defendant.
10    Do you foresee making a motion for judgment as a
11  matter of law on any issue, Mr. McDonald?  If so, what do you
12  anticipate and how long do you think it will take me to hear
13  you?
14    MR. McDONALD:  We did bring a motion on the
15  infringement issue at the close of the plaintiff's case, Your
16  Honor.  I think we'd bring a renewed motion on both
17  infringement and invalidity before the case goes to the jury.
18    MR. ROBERTSON:  We, of course, have the JMOL of
19  infringement, and then we'd have a JMOL of no invalidity at the
20  conclusion of their case.
21    My suggestion might be, since Your Honor is setting,
22  perhaps, Friday aside for the discussion of the jury issues,
23  that maybe we can have all those arguments -- that we can
24  reserve, just as we did today, on our motion at the conclusion
25  of their infringement rebuttal and have them all at the same

2531

1  time.
2    THE COURT:  I'm inclined to think that might be the
3  best thing to do from the standpoint of actually getting this
4  case wrapped up.  So I'll tell this to the jury tomorrow
5  morning, and we'll go from there.  All right.
6    Oh, who's got the verdict forms?  I would like to
7  look at them.  You all had them.
8    MR. McDONALD:  We received a copy, I think, sometime
9  during the course of the day today.  We'd like a chance to look
10  at it --
11    THE COURT:  I would, too.  That's all I'm saying.
12  All right.  Thank you all.  We'll be in adjournment.
13    THE CLERK:  Judge, for your information, you only
14  have 25 criminals hearings next week, and I think 11 pretrials.
15  So you're in pretty good shape.
16
17    (Discussion off the record.)
18    (Court adjourned.)
19
20
21
22
23
24
25

2532

```
1          IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
2                    RICHMOND DIVISION
3      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                  :
4      ePLUS, INC.,               :
                                  :
5              Plaintiff,  :   Civil Action
       v.                   :   No. 3:09CV620
6                           :
       LAWSON SOFTWARE, INC.,   :
7                           :   January 20, 2011
               Defendant.   :
8      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:
9
           COMPLETE TRANSCRIPT OF JURY TRIAL
10        BEFORE THE HONORABLE ROBERT E. PAYNE
          UNITED STATES DISTRICT JUDGE, AND A JURY
11
12
13
14     APPEARANCES:
15     Scott L. Robertson, Esq.
       Jennifer A. Albert, Esq.
16     Michael T. Strapp, Esq.
       GOODWIN PROCTOR
17     901 New York Avenue, NW
       Washington, D.C.  20001
18
19     Craig T. Merritt, Esq.
       CHRISTIAN & BARTON
20     909 E. Main Street, Suite 1200
       Richmond, VA  23219-3095
21
           Counsel for the plaintiff ePlus
22
23
24         DIANE J. DAFFRON, RPR
             OFFICIAL COURT REPORTER
25         UNITED STATES DISTRICT COURT
```

2533

```
1      APPEARANCES:  (Continuing)
2      Daniel W. McDonald, Esq.
       Kirstin L. Stoll-DeBell, Esq.
3      William D. Schultz, Esq.
       Rachel C. Hughey, Esq.
4      MERCHANT & GOULD
       3200 IDS Center
5      80 South Eighth Street
       Minneapolis, MN  55402-2215
6
7      Dabney J. Carr, IV, Esq.
       TROUTMAN SANDERS
8      Troutman Sanders Building
       1001 Haxall Point
9      P.O. Box 1122
       Richmond, VA  23218-1122
10
           Counsel for the defendant Lawson Software.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2534

```
1          (The proceedings in this matter commenced at
2      9:15 a.m.)
3          (The jury is not present.)
4          THE CLERK:  Civil Action No. 3:09CV00620,
5      ePlus, Incorporated v. Lawson Software, Incorporated.
6          Mr. Scott L. Robertson, Mr. Craig T. Merritt,
7      Ms. Jennifer A. Albert, and Mr. Michael G. Strapp
8      represent the plaintiff.  Mr. Daniel W. McDaniel,
9      Mr. Dabney J. Carr, IV, Ms. Kirstin L. Stoll-DeBell,
10     Mr. William D. Schultz, and Ms. Rachel C. Hughey
11     represent the defendant.
12         Are counsel ready to proceed?
13         MR. ROBERTSON:  Yes, Your Honor.
14         MR. McDONALD:  Yes, Your Honor.
15         THE COURT:  What do you need to see me about?
16         MR. McDONALD:  I think we worked out all the
17     issues on the Hilliard slides.  I think the only thing
18     that was outstanding was these jury questions.
19         MR. ROBERTSON:  There is also --
20         THE COURT:  I don't need the jury questions,
21     to deal with them now.
22         MR. ROBERTSON:  All right.
23         THE COURT:  Oh, the questions raised by the
24     jury.  Oh, yes.  What do you want to do about the
25     questions?  Where is that thing that was submitted
```

2535

```
1      yesterday?  Court Exhibit 4.
2          Are P.O. Writer and J-CON patented, if so,
3      when?  Didn't Dr. Staats say that it was within a
4      year?
5          Basically, what he said is for them to
6      remember.  So was the J-CON system only used for
7      automotive purposes and couldn't be used, all that big
8      long text is something he testified to or didn't, and
9      they'll have to remember that testimony.  And you-all
10     will address it in argument; is that right?
11         MR. McDONALD:  I think that's fair, Your
12     Honor.
13         MR. ROBERTSON:  Your Honor, I think the real
14     response, what I would suggest, Your Honor, is that
15     just you need not concern yourself with it.  Whether
16     the J-CON system addressed auto parts or medical
17     systems, the J-CON system is not prior art in this
18     case, and that's why they don't need to consider it.
19     Dr. Shamos didn't over any opinions with respect to it
20     and I think this is just ripe for confusion if we say
21     it had some significance.
22         The same thing with were P.O. Writer and
23     J-CON patented.  That's evidence of some confusion on
24     the part of the jury.  First of all, they need not
25     concern themselves with whether J-CON or P.O. Writer
```

2568

1  correspondence that takes place between the Patent
2  Office and the applicant.  The applicants will file an
3  application and the office reviews it.  And if they
4  reject any claims or if they allow any claims, they do
5  so by providing a document back to the applicant.
6  It's called an office action in which the nature of
7  the action is stated and an explanation is given by
8  the examiner for why he did what he did.
9  Q  Here under heading No. 4 it says the disclosure is
10  objected to because of the following informalities; do
11  you see that?
12  A  Yes.
13  Q  The disclosure, that's what's contained in the
14  application when the applicants first filed the patent
15  describing what they believe their invention is,
16  right?
17  A  Yes.
18  Q  That becomes the specification of the patent if
19  the patent issues?
20  A  Correct.
21  Q  And it indicates here that the applicant must
22  update some things.  Do you see that?
23  A  Yes.
24  Q  One of the things it says, the application data on
25  page 12 with the current status of each of the

2569

1  referenced applications, e.g. now abandoned or now
2  patent number, question mark, or which is abandoned,
3  and now a serial number, symbol, question mark, etc.,
4  correct?
5  A  Yes.
6  Q  Why don't we go to page 575 of the document.  Do
7  you see here at the bottom of the page, in fact,
8  there's a reference to an application number?  Do you
9  see it?  It's a little difficult to read, but it's in
10  the lower left-hand corner.
11  A  Yes.
12  Q  That application number has been crossed out and
13  there the examiner has now written United States
14  Patent No. 5,712,989.  Do you see that?
15  A  Yes.
16  Q  So the examiner has appreciated that what was now
17  being fully described was the actual '989 RIMS patent
18  that it issued, correct?
19  A  Well, what happened was that during the
20  prosecution of the '683 patent, the '989 patent
21  issued, and the examiner required the applicants to
22  amend the specification to replace the word
23  "application" with the patent number that was
24  subsequently granted.
25  Q  So there we have actually appreciation by the

2570

1  examiner that he understands that this is now the '989
2  patent, right?
3  A  No, he knew it was a patent.
4  Q  That's why he put it in there, right?
5  A  Yes.
6  Q  Now, I think you agreed with me earlier that when
7  you are going to apply for a patent or when you're
8  looking a patent for purposes of infringement or
9  invalidity you need to look at it and read it as a
10  whole, correct?
11  A  I'm sorry.  Could you say it again?
12  Q  Yeah.  You need to view the claim as a whole, not
13  its little pieces, right?
14  A  I didn't think it was phrased that way in your
15  original question, but, yes, you evaluate the claim as
16  a whole for invalidity purposes.
17  Q  So you can't say, for example, if there's an
18  element that says in determining whether there's a
19  selected matching item available in inventory, you
20  just can't go and focus on a prior art reference and
21  say, Well, there is a discussion of inventory.  So
22  that element is satisfied.  You have to read it in the
23  context of the entire claim; isn't that right?
24  A  Yes.
25    THE COURT:  Is your question you have to read

2571

1  the prior art in context of the entire claim of the
2  patent-in-suit?  Is that your question?
3    MR. ROBERTSON:  I think that's right, Your
4  Honor.
5    THE COURT:  You didn't make the antecedent
6  noun clear.
7    MR. ROBERTSON:  I'm sorry.  Let me see if I
8  can.
9  Q  You have to consider whether the prior art
10  satisfies that claim element when you look at the
11  claim and consider it in its entirety; isn't that
12  right?
13  A  For obviousness purposes, you must consider the
14  claim as a whole.
15  Q  For anticipation purposes don't you need to
16  consider the claim as a whole, as well?
17  A  I don't think so.
18    MR. ROBERTSON:  Can we look at slide 27, if
19  we could.
20  Q  This is what you relied on when you said RIMS
21  search for items in multiple sources; do you see that?
22  A  Yes.
23  Q  And you had certain little excerpts from the '989
24  patent.  Do you see that?
25  A  Yes.

2596

1    Q  So this is from the '683 patent, but this is in

2    all the patents-in-suit; is that right, Dr. Shamos?

3    A  Yes.

4    Q  Can you tell us what being described here in the

5    '683 patent at column 18?

6    A  Well, what's being described is the generation of

7    one or more purchase orders.

8    Q  That first item there, what is that?  It says, "An

9    order from the customer to the supplier, an

10   administrative purchase."

11   A  Well, that seems to contradict what we were

12   talking about before about what an administrative

13   purchase is because that doesn't look internal.

14       THE COURT:  Well, it can't be internal

15   according to the construction.

16   Q  Well, if we look at --

17       THE COURT:  Can it?

18       MR. McDONALD:  Yes, it can.  Well, let me

19   walk through this.

20       THE COURT:  Are you trying to make a point

21   here that when a company owns something in inventory,

22   and it's paid for it, and one department has it but

23   another department wants it, and there's a bookkeeping

24   entry to reallocate funds within the company, that you

25   have a vending going on; is that the point?

2597

1        MR. McDONALD:  That's sourcing, Your Honor.

2        THE COURT:  Well, I'll let the jury decide

3    whether it is or not, I guess, but --

4    BY MR. McDONALD:

5    Q  You just testified that the whole RIMS

6    specification is incorporated by reference into the

7    patents in this suit, correct?

8    A  Yes.

9    Q  And in the RIMS patent, doesn't it specifically

10   say that those customer internal transactions are

11   called purchase orders?

12       MR. ROBERTSON:  Objection, leading.

13       THE COURT:  Let him testify.  That's enough.

14   Q  All right.  So does --

15       THE COURT:  Sustained.

16   Q  Does the RIMS specification describe the internal

17   customer transaction?

18   A  Yes, we went through this in discussing figure 5,

19   which has the decision block when processing a

20   requisition looking at the different type codes and

21   deciding whether to issue an internal purchase order

22   or not an internal purchase order.

23   Q  That was from that figure 5A of the RIMS patent,

24   correct?

25   A  Yes.

2598

1        MR. McDONALD:  Can we put figure 5A back up,

2    please, from the '989 patent.

3    BY MR. McDONALD:

4    Q  So for purposes of the RIMS disclosure that's

5    incorporated into the patents-in-suit, is there

6    anything from figure 5A that indicates what that

7    internal customer transaction is actually called?

8    A  Well, it says -- it refers to block 334,

9    customer internal P.O.

10   Q  What does P.O. stand for?

11   A  Purchase order.

12       MR. McDONALD:  Well, can we go to column 17

13   of the '989 patent.  Could you blow up a section from

14   lines 35 to 43, please.

15   BY MR. McDONALD:

16   Q  I think you were asked some questions about

17   whether the system generates the purchase orders in

18   those figures 5A and 5B or not.  I'd like to direct

19   your attention to this paragraph, Dr. Shamos.  Can you

20   tell us what this paragraph of the RIMS patent is

21   explaining about that purchase order building process?

22   A  Yes, it's describing what happens, for example,

23   for items of product types 1, 3 and 4.  It creates a

24   purchase order between the customer and the

25   distributor.

2599

1    Q  Does it refer to figures 5A and 5B to support that

2    statement or not?

3    A  Yes.

4    Q  What does it indicate in terms of what system uses

5    the purchase order build program?  Was it that local

6    computer?

7        THE COURT:  Let him testify.

8    A  Well, it says for items of product types 01, 03

9    and 04, local computer 40 uses purchase order build

10   program 112 to create a purchase order.

11   Q  If we go to figure 2A of the '989 patent --

12       MR. ROBERTSON:  Objection, outside the scope.

13   I didn't ask anything about figure 2A.

14       MR. McDONALD:  It's referred to in this

15   paragraph that refers to 5A.

16       THE COURT:  Well, that doesn't make it

17   something that was a topic of his examination.

18   Sustained.

19   BY MR. McDONALD:

20   Q  Let's turn now to the patent, the file history,

21   Exhibit 4, that Mr. Robertson was asking you about.

22   He was asking you about whether or not -- well, let's

23   talk about the issue of whether or not there was a

24   disclosure to the Patent Office that any aspect of the

25   RIMS system was actually prior art.  Did you look at

2600

1  the file history, Exhibit 4, to determine whether or

2  not the RIMS system was actually disclosed as prior

3  art?

4  A  Yes.

5  Q  What did you conclude about that?

6  A  It wasn't.

7  Q  What's the basis for that conclusion?

8      MR. ROBERTSON:  Objection.  This calls for

9  legal conclusions.

10     MR. McDONALD:  He's asked the exact same

11  questions.  I want to get a chance for him to explain

12  his reasoning.

13     MR. ROBERTSON:  I didn't ask --

14     THE COURT:  He didn't ask him the reasoning.

15  He volunteered that.  Mr. Robertson opposed it.

16     MR. McDONALD:  Well, the exact issue was is

17  the RIMS system disclosed as prior art.

18     THE COURT:  I ruled.  It's over.  I'm not

19  going to have you testifying about the law.

20  BY MR. McDONALD:

21  Q  Dr. Shamos, is there any documentation in the file

22  history of Plaintiff's Exhibit 4, the '683 file

23  history, that goes specifically to the issue of

24  disclosing prior art to the Patent Office?

25     MR. ROBERTSON:  Objection, Your Honor.  It's

2601

1  the same question asked in a way --

2      MR. McDONALD:  This is a fact.  I'm not

3  asking him for an opinion.  This is a fact.

4      THE COURT:  It's the same.  It's another way

5  of doing the same thing, I think.  There may be a

6  question you can ask.  I'm not going to get into

7  asking it, but that isn't the one.

8  BY MR. McDONALD:

9  Q  Dr. Shamos, is there -- I think you were asked

10  about whether the TV/2 documentation was considered by

11  the Patent Office, correct?

12  A  Yes.

13  Q  Now, is there something in the file history of the

14  '683 patent that would indicate how it was that the

15  TV/2 publications were disclosed to the Patent Office?

16     MR. ROBERTSON:  I'm going to object, Your

17  Honor, because now we're just going over the direct

18  examination again.  This was already asked in direct

19  and I didn't raise this issue again in my

20  cross-examination.  I just asked him where the '989

21  was referenced in the file history and the

22  specification.

23     MR. McDONALD:  You did ask him about the

24  TV/2.

25     THE COURT:  Yeah, but not that.  You're

2602

1  really retreading.  You're repeating basically what

2  you said on direct examination, and that isn't what

3  redirect is about.  So let's go on to something that

4  he actually asked about.

5      MR. McDONALD:  Okay.

6  BY MR. McDONALD:

7  Q  Can we go to the office action in the file

8  history?  Turn to page, I think it would be about 182.

9      MR. McDONALD:  Could you blow that up, Bill.

10  The number ending with 3720.

11     THE COURT:  Do you want to blow the number up

12  or the picture up?

13     MR. McDONALD:  I just want to help Dr.

14  Shamos --

15     THE WITNESS:  I have it.

16  BY MR. McDONALD:

17  Q  So this is the same office action you were asked

18  about earlier, correct?

19  A  Yes.

20     MR. McDONALD:  Can we go to the two pages

21  later, please.  Its part of this office action.

22     THE COURT:  Can you blow that up?  Can you

23  read that, Dr. Shamos?

24     THE WITNESS:  Well, I'm reading from the

25  original document.

2603

1      THE COURT:  All right.  Well, the jury is

2  being asked to look at it here, and I can't read it,

3  and I don't see how they can read it.  So if you can

4  blow it up, let's get to where you want to go.  Where

5  are you going?

6      MR. McDONALD:  Paragraph No. 7 here from the

7  office action.

8      MR. ROBERTSON:  I'm going to object, Your

9  Honor.  I didn't ask anything about this page or

10  paragraph 7.

11     MR. McDONALD:  Well, he was asking about this

12  in the context of the disclosure of the RIMS prior

13  art.  I'd like to go to that exact same issue.  They

14  are part of the same document and talk about that

15  issue of disclosure of RIMS as prior art.

16     MR. ROBERTSON:  The only reason I sited this

17  office action was to show --

18     THE COURT:  Come up here, please.

19     (The following sidebar conference is begun.)

20     THE COURT:  Is it your view of the law that

21  if something is disclosed in the text of the patent

22  that it can't be considered as prior art unless it is

23  listed somewhere else in the patent as prior art?  Is

24  that what you say the law is?

25     MR. McDONALD:  I think the law is just

2616

1     THE COURT:  All right.  Mr. Robertson.

2     MR. ROBERTSON:  Thank you, Your Honor.  I'm just

3  reserving for the record, as I understand we are arguing

4  tomorrow, Your Honor, ePlus moves for judgment as a matter of

5  law under Federal Rule of Civil Procedure 50, that all of the

6  asserted claims, '683, '516, and '172 patents are valid.

7     As Rule 50 provides, a judgment as a matter of law

8  may be granted when a reasonable jury would not have a legally

9  sufficient evidentiary basis to find for the nonmoving party on

10  that issue.  Thank you.

11     THE COURT:  You are just moving against validity.

12     MR. ROBERTSON:  On that issue.  As we had previously

13  put into the record, that judgment as a matter of law should be granted on

14  infringement, and we had also preserved that for the time

15  period that Your Honor specified you wanted to have oral

16  argument which I understand to be tomorrow, and I did confer --

17     THE COURT:  You're not moving now after he's finished

18  on that?

19     MR. ROBERTSON:  I would like to renew that, yes, Your

20  Honor.

21     THE COURT:  I just want procedurally to know what I'm

22  doing.  That's all.

23     MR. ROBERTSON:  I understand.

24     THE COURT:  All right.

25     MS. HUGHEY:  Thank you, Your Honor.  For the record,

2617

1  Lawson opposes ePlus's judgment as a matter of law on

2  invalidity.  This Court should deny ePlus's motion for judgment

3  as a matter of law because a reasonable jury has more than a

4  legally sufficient evidentiary basis to find for Lawson on the

5  issue of invalidity of the asserted claims.

6     At trial, documents demonstrated, witnesses testified

7  regarding the features and functionality of the prior art.  Dr.

8  Shamos went through every single claim --

9     THE COURT:  I'm going to hear the arguments tomorrow.

10     MS. HUGHEY:  Okay.  For these reasons, Lawson opposes

11  ePlus's judgment as a matter of law, and to the extent that

12  ePlus has renewed a judgment as a matter of law on the issue of

13  infringement, we also oppose that, and, once again, renew our

14  own motion.

15     THE COURT:  Your motion on infringement?

16     MS. HUGHEY:  Yes.

17     THE COURT:  All right.  Are we ready then --

18     MR. ROBERTSON:  One other issue, I don't know if the

19  Court wants to now inform the jury we're moving to a new phase

20  of the trial for rebuttal.

21     THE COURT:  Yes.  And you are rebutting on both

22  infringement and invalidity.  Are you going to -- are you going

23  to offer any evidence -- I mean, you have the right of rebuttal

24  on infringement and invalidity.  Are you rebutting both or one?

25     MR. ROBERTSON:  Just one, Your Honor, the invalidity.

2618

1     THE COURT:  Are we ready for the jury?

2

3     (Jury in.)

4

5     THE COURT:  Has anybody filed briefs on these JMOLs?

6  Somebody mentioned it, and I just haven't checked.  Mr. Neal,

7  do you have a pad?

8     Now, ladies and gentlemen, you've been hearing

9  testimony in the case of -- Lawson's side on the issue of

10  infringement and also on the affirmative defenses of

11  invalidity, and now it's time for ePlus to respond to the

12  invalidity points that were made by Lawson in its case, and

13  that's what this next part of the trial will be.

14     Just so you understand, that is also the last part of

15  the trial except for the closing arguments and your

16  deliberative process.

17     Just for your information, for those of you who have

18  been on juries before, I know that you know that sometimes the

19  jury decides the question of what's to be done if they return a

20  verdict of one kind or another, either infringement or not,

21  whatever, what happens then.

22     In this case, what happens after you return your

23  verdict does not involve you.  It is a matter that the Court

24  will be taking care of, so your last responsibility will be to

25  hear this evidence today and then to hear the closing arguments

2619

1  and the instructions and deliberate and decide on the basic

2  issues of patent infringement and patent validity.  Once you

3  return the verdict on those, then the rest of what happens, if

4  anything, is for the Court to decide.  Is that satisfactory;

5  counsel?

6     MR. ROBERTSON:  Yes.  Thank you, Your Honor.

7     THE COURT:  All right, Mr. Strapp, are you taking

8  over now?

9     MR. STRAPP:  Yes.  Your Honor, ePlus calls as its

10  next witness Mr. Ken Farber.

11

12     KENNETH FARBER,

13  a witness, called by the plaintiff, having been first duly

14  sworn, testified as follows:

15     DIRECT EXAMINATION

16  BY MR. STRAPP:

17  Q   Could you please state your name again for the record.

18  A   Kenneth Farber.

19  Q   And just to refresh everyone's memories, can you please

20  describe your present employment.

21  A   Sure.  I'm the president of ePlus Systems and content

22  services.

23  Q   How long have you been in that position?

24  A   Ten years.

25  Q   Mr. Farber, last time you were on the stand, you offered

2620

Farber - Direct                          2620

1  some testimony about the ePlus/Ariba license agreement; do you
2  recall that?
3  A  Yes.
4  Q  Has ePlus ever licensed the three patents that are at
5  issue in this case to any other companies?
6  A  Yes.
7  Q  What other companies has ePlus licensed the patents to?
8  A  We've licensed the patents to companies such as SAP,
9  SciQuest, Verian, Perfect Commerce.
10  Q  And approximately how much revenue has ePlus received for
11  licensing the three patents that are in suit in this case?
12  A  Close to 58 million.
13  Q  Do you see in front of you, Mr. Farber, is that a complete
14  list of the licensees for ePlus's patents-in-suit?
15  A  Yes, it is.
16  Q  Has ePlus ever licensed the patents-in-suit to anyone else
17  besides these five companies?
18  A  There was a patent license granted to a company called
19  ProcureNet which is the company -- or piece of the company that
20  ePlus had acquired.
21  Q  And that was back in what time frame?
22  A  It was around the acquisition, about ten years or so ago.
23  Q  Would you consider each of the five companies listed here,
24  Ariba, SAP, Perfect Commerce, Verian, and SciQuest to be
25  competitors of ePlus?

2621

Farber - Direct                          2621

1  A  Yes.  They are direct competitors.
2  Q  And competitors in the e-procurement software industry?
3  A  That's correct.
4  Q  What about ProcureNet, are they a competitor of ePlus?
5  A  No, ProcureNet is not a competitor.
6  Q  Listed here you have the five license agreements for the
7  companies ePlus considers as competitors to the e-procurement
8  software industry?
9  A  That's correct.
10  Q  Are you personally familiar with license agreements, the
11  five license agreements that you've described?
12  A  I am.
13  Q  How do you have any familiarity with these agreements?
14  A  I was directly responsible and involved in the negotiation
15  and the finalization of these agreements.
16  Q  For each five of the agreements?
17  A  Correct.
18  Q  Mr. Farber, you have a notebook in front of you.  Could
19  you please turn to Plaintiff's Exhibit 43.
20  A  Okay.
21  Q  Do you recognize the document in front of you?
22  A  Yes.
23  Q  What is this document here?
24  A  This is the license and settlement agreement between Ariba
25  and ePlus.

2622

Farber - Direct                          2622

1      MR. STRAPP:  Can you blow up the first paragraph
2  there, please.
3  Q  When was this particular agreement entered into between
4  ePlus and Ariba?
5  A  February 12th, 2005.
6  Q  Mr. Farber, can you turn, please, to section F of the
7  agreement.  That's on page four of the license, bottom of the
8  page, paragraph 11.  It's got the Bates number on the bottom
9  right 600.
10  A  600?
11  Q  It's up on your screen as well.
12      THE COURT:  May I see counsel for just a minute.
13
14      (Discussion at sidebar as follows:)
15
16      THE COURT:  I'm a little bit confused about using
17  these exhibits.  Mr. McDonald, do you want the exhibits in?
18      MR. McDONALD:  We had opposed their admission at one
19  point, Your Honor, but you said they could come in.  We would
20  stipulate to what he's already testified about the cumulative
21  numbers.  I think he could probably get through it without
22  having to go through these things.
23      THE COURT:  Why do we need to have the documents in
24  if they'll agree to the amounts?
25      MR. STRAPP:  I wanted to show that each one of the

2623

Farber - Direct                          2623

1  licenses were for the same three patents that are in suit in
2  this case and that each of these companies are the competitors.
3  I mean, maybe I can do that without showing the documents.
4      MR. McDONALD:  I've seen them all.  They all are the
5  three patents-in-suit.
6      THE COURT:  I'm sure if he knows that, he'll testify
7  to it.  Then we don't have to get into any discussion of that.
8      MR. McDONALD:  That would certainly be what we'd
9  appreciate, Your Honor.
10      MR. STRAPP:  All right, so we'll do it without
11  showing them the documents.
12      THE COURT:  Then we don't have to get into -- the
13  reason I ask this is because if you want to show that they were
14  the product of settlements, I need to give the jury some
15  instructions about it.
16      In other words, if you want to discount their
17  effectiveness by examining on -- that they came out of
18  litigation, there are different lawyers that approach that
19  issue differently about whether they want to get into that or
20  not.  Certainly you can get into it, and you can have the
21  exhibits in that event, but if you're not going to approach
22  it that way --
23      MR. McDONALD:  Well, I think he's already identified
24  them as settlement and license agreements.  That's what they're
25  all called, and if he just has him establish that they are in

Farber - Direct                    2624

1    settlements of litigation, I don't know that --
2         THE COURT:  That's sufficient for you?
3         MR. McDONALD:  Yeah.
4         THE COURT:  Then let's do it that way, and don't use
5    the documents.
6
7         (End of sidebar discussion.)
8
9    Q   Mr. Farber, we were talking about the ePlus/Ariba license
10   agreement.  Can you tell me specifically what was exchanged or
11   what was licensed as part of that agreement between ePlus and
12   Ariba?  Let's start first with Ariba.  What did Ariba license,
13   if anything, to ePlus as part of that agreement?
14   A   What Ariba licensed to ePlus is the ability for ePlus to
15   utilize its patents.
16   Q   So Ariba licensed its own patents to ePlus as part of this
17   license agreement?
18   A   That's correct.
19        THE COURT:  When you say its patents, you mean the
20   right to use Ariba's patents?
21        THE WITNESS:  That's correct.
22        THE COURT:  All right, go ahead.
23   Q   What did ePlus license to Ariba?
24   A   Conversely, we had provided the rights for Ariba to
25   utilize our patents.

Farber - Direct                    2625

1         THE COURT:  The patents-in-suit?
2         THE WITNESS:  Correct, the patents-in-suit.
3    Q   That is the '683, the '172, and '516 patents?
4    A   Correct, the same ones we're talking about.
5    Q   Did Ariba agree to pay any amount of money for this
6    license agreement?
7    A   Yes.
8    Q   How much was that?
9    A   I believe it was -- let me go to that, refresh my memory
10   exactly, but it was 37 million.
11   Q   $37 million?
12   A   Correct.
13   Q   So in sum then, Ariba granted a license to ePlus for its
14   patents, paid ePlus $37 million, and in exchange, Ariba
15   licensed the three patents that are in suit in this case; is
16   that correct?
17   A   That's correct.
18   Q   Now, you had mentioned there were four other license
19   agreements that ePlus has entered into with its competitors.
20   What was the next one in time after Ariba?  What was the next
21   license that ePlus granted?
22   A   The next one would be SAP.
23   Q   And do you recall approximately what time frame that was?
24   A   Let me try to find an agreement.
25   Q   In your binder, it's at Plaintiff's Exhibit 318.

Farber - Direct                    2626

1    A   Okay.  It was -- looks like it was finalized
2    December 11th, 2006.
3    Q   Who is SAP?
4    A   SAP is a large company that some of the products that they
5    offer competed with our solutions.
6    Q   And I didn't get a chance to ask you, but who is Ariba?
7    A   Same.  Ariba was a large company that competed with ePlus
8    in the market.
9    Q   Can you describe for me what was licensed as part of the
10   ePlus/SAP license agreement?
11   A   We had provided, in a similar fashion as we had done for
12   Ariba, we provided them the ability to utilize the three
13   patents that are in suit here.  We granted them a license to
14   utilize those patents.
15   Q   And what did SAP give to ePlus in exchange for a right to
16   use the three patents that are in suit in this case?
17   A   I have to just refresh my memory if they had
18   cross-granted --
19   Q   Let me direct your attention to section four of the
20   agreement.
21   A   Okay.
22   Q   4.1?
23   A   Yeah, what this is is that in exchange for the grant by
24   ePlus to the three patents-in-suit, SAP paid ePlus 17 and a
25   half million dollars.

Farber - Direct                    2627

1    Q   $17.5 million?
2    A   That's correct.
3    Q   We've talked about the Ariba and SAP license agreements.
4    I think you mentioned that there were three additional
5    agreements.  Can you just refresh my memory what those three
6    agreements are?
7    A   Sure.  There was Verian, it was Perfect Commerce, and
8    SciQuest.
9    Q   Let's start with Perfect Commerce.  If you could turn to
10   Plaintiff's Exhibit 317 in your binder.
11   A   Okay.
12   Q   When did ePlus enter into a license agreement with Perfect
13   Commerce?
14   A   That would be August 28, 2009.
15   Q   Who is Perfect Commerce?
16   A   Perfect Commerce is a company that competes with ePlus.
17   Q   And, again, can you describe for us what the subject
18   matter was that was licensed as part of this ePlus/Perfect
19   Commerce license agreement?
20   A   Specifically associated with the three patents that are in
21   suit here.
22   Q   ePlus licensed the three patents-in-suit to Perfect
23   Commerce?
24   A   That's correct.
25   Q   So that Perfect Commerce could use, sell, make, or offer

**2628**

Farber - Direct                    2628

1  products that incorporated the technology in those three
2  patents?
3  Q   Yes, that's correct.
4  Q   And how much money, if any, did Perfect Commerce pay for
5  the right to have a license to the ePlus patents?
6  A   Let me just make sure.
7  Q   Let me direct your attention to Exhibit A to the Perfect
8  Commerce --
9  A   I have it.
10  Q   -- agreement.
11  A   In exchange for the patents, they paid $750,000.
12  Q   Well, as the negotiator for ePlus, why was ePlus willing
13  to accept $750,000 from Perfect Commerce if ePlus -- if SAP and
14  Ariba had agreed to pay millions of dollars more?
15      MR. McDONALD:  I object to this, Your Honor.  We
16  tried getting into the details, but there was claims of
17  privilege, so we weren't able to inquire into all the whys and
18  wherefores of these settlements.  I don't think it's
19  appropriate to go into them now, and also cumulative.
20      THE COURT:  It isn't cumulative, I don't think, but
21  if in fact you claimed a privilege and foreclosed their inquiry
22  in depositions, then you can't inquire into it because that's
23  not been allowed.
24      MR. STRAPP:  Your Honor, I was not present when
25  privilege was claimed --

**2629**

Farber - Direct                    2629

1      THE COURT:  You read the deposition, I take it, in
2  preparation.
3      MR. STRAPP:  I did read that deposition, and I
4  believe that we didn't make a claim of privilege with
5  respect to --
6      THE COURT:  You did?
7      MR. STRAPP:  We did not with respect to this
8  particular agreement.
9      THE COURT:  Mr. McDonald.
10      MR. McDONALD:  I'm looking for it.
11      THE COURT:  If they did, if you did, your objection
12  is well-taken.  If they did not, your objection is not
13  well-taken.
14      MR. McDONALD:  What we're able to find at this point,
15  Your Honor, is at pages 416 to 417 of Mr. Farber's testimony
16  regarding the SAP agreement, he was asked, how did you come up
17  with a settlement number in the case, and his answer was, I
18  used my counsel to determine what they thought was fair, et
19  cetera, and then we got into some privilege issues there.
20      This relates to the Perfect Commerce
21  agreement.  They did the same thing.  No?
22      MR. McDONALD:  Nothing specific to Perfect Commerce,
23  Your Honor.
24      THE COURT:  All right.  Objection overruled.
25  Q   Mr. Farber, let me ask you that question again.  Why was

**2630**

Farber - Direct                    2630

1  it that ePlus agreed to license the patents to Perfect Commerce
2  for $750,000 if Ariba had paid 37 million and SAP had paid 17
3  and a half million for the patents?
4  A   Well, I mean, quite simply --
5      MR. McDONALD:  I object, Your Honor, because I think
6  he worked SAP into that question, and that is the one we were
7  able to find --
8      MR. STRAPP:  Your Honor, I'm asking about Perfect
9  Commerce and why ePlus, the --
10      THE COURT:  Why don't you reframe your question.
11      MR. STRAPP:  Sure.
12  Q   Mr. Farber, why was it that ePlus accepted $750,000 for a
13  license, to grant a license to Perfect Commerce if Ariba was
14  willing to pay $37 million for a license?
15  A   Well, they were a much, much smaller company for starters.
16  Secondly, we had the opportunity during the negotiation to
17  actually physically go to their location and audit their
18  financials, and, you know, we had some significant concerns of
19  them being a going concern, that they would actually stay in
20  business over time, and we tried to come to an amicable agreement, you
21  know, and considered this to be a fair settlement agreement
22  based upon what their situation was at the time as a business.
23  Q   And Perfect Commerce, again, that was a company that
24  competed in the e-procurement software industry?
25  A   That's correct.

**2631**

Farber - Direct                    2631

1  Q   I think you mentioned that ePlus also granted a license to
2  SciQuest; is that right?
3  A   That is correct.
4  Q   Can you turn to Plaintiff's Exhibit 319 in your notebook,
5  please.
6  A   Okay.
7  Q   When did ePlus enter into a license agreement with
8  SciQuest?
9  A   That's August 19th of 2009.
10  Q   And what was the subject matter that was granted by ePlus
11  to SciQuest as part of this license agreement?
12  A   This, again, is the licensing of the three
13  patents-in-suit.
14  Q   The three patents in this suit?
15  A   Yes, the '683, the '516, and '172 patent.
16  Q   And what, if anything, did SciQuest give to ePlus in
17  exchange for a license to the three patents, same patents that
18  are in suit in this case?
19  A   Let me check here.  In exchange for the licenses that were
20  granted by ePlus, SciQuest paid us $2.4 million.
21  Q   And the last, I think the last license you mentioned was
22  with a company called Verian; is that right?
23  A   Yes, that's correct.
24  Q   Who is Verian?
25  A   Verian was also and also is a competitor of ePlus in the

2632

Farber - Direct                    2632

1  market.
2  Q   And let's just take a look quickly at that license
3  agreement.  That's at Plaintiff's Exhibit 320?
4  A   Yes.
5  Q   When did ePlus enter into a license agreement with Verian?
6  A   July 7th, 2009.
7  Q   What did ePlus grant to Verian as part of this license
8  agreement?
9  A   The same as the other licenses.  We granted the three
10  patents that have been in suit here.
11  Q   And can you tell me what, if anything, Verian agreed to
12  pay ePlus for a right to use the patented technology?
13  A   Sure.  They had an initial payment of $500,000.
14  Q   Was there any other arrangement between the two companies
15  for their licenses?
16  A   Yeah.  We had settled on -- they were also a small
17  company, similarly to Perfect, but we saw them more as an
18  ongoing concern, and we agreed to associate a royalty so that
19  when they exceeded $15 million within a calendar year, that we
20  would receive two and a half percent of those revenues.
21  Q   What was the reason that you felt like that was a fair and
22  reasonable license arrangement with Verian, this royalty
23  provision?
24  A   Why did we think it was fair?
25  Q   Yeah.

2633

Farber - Direct                    2633

1  A   Well, I think it was fair to both parties.  I mean, we
2  weren't necessarily looking to, you know, press a thumb on them
3  and put them out of business.  You know, we did see them as
4  staying in business.
5     They didn't have the funds to pay what we thought, you
6  know, the patents were worth at that time, but, you know, we
7  gave them an opportunity.  As they grew, then, you know, there
8  was a percentage associated as a royalty to the patents.
9  Q   Mr. Farber, has there been any recognition in the supply
10  chain industry for the products that ePlus sells that
11  incorporated the patented technology?
12  A   Yes.  Yes.
13  Q   What kind of recognition?
14  A   There's been industry awards, industry reports.
15  Q   And have you or your customers been recognized for any
16  specific benefits or specific recognition for the Procure+ or
17  Content+ products?
18  A   Yeah.  Well, one of our clients recently was just awarded
19  what's called Pros to Know which is a supply chain.  We
20  actually nominated one of our clients --
21  THE COURT:  What's it called, sir?
22  THE WITNESS:  Supply chain.
23  THE COURT:  No.
24  THE WITNESS:  Oh, pros, as in professionals, to know.
25  THE COURT:  Right, t-o, and then k-n-o-w.

2634

Farber - Direct                    2634

1  THE WITNESS:  That's correct.
2  THE COURT:  And that is an award?
3  THE WITNESS:  It's a recognition award, and it's this
4  publication, an organization that evaluates submissions and
5  looks at how individuals or companies are using solutions.
6  THE COURT:  Excuse me.
7  MR. McDONALD:  Thank you, Your Honor.  I think the
8  sequence that we had talked about was that they first need to
9  lay a foundation and show a connection to the patented
10  inventions before they go into any detail about any of these
11  awards that might be for a corporation as a whole, things like
12  that, so I object to the question unless there's some
13  connection specifically to the claimed invention.
14  Q   Mr. Farber, do you recall when you were here earlier in
15  this case you talked about Procure+ and Content+?
16  A   I do.
17  Q   Are those products that are developed and sold by ePlus?
18  A   Yes.
19  Q   Are those products that ePlus believes incorporates the
20  patented technology?
21  A   Yes.
22  MR. McDONALD:  Objection, Your Honor, lack of
23  foundation.  This witness isn't qualified to testify as to the
24  scope of the claims or whether the products are covered by
25  that.  In fact, we tried to inquire into that in deposition and

2635

Farber - Direct                    2635

1  weren't able to.
2  THE COURT:  You shut it down in deposition?
3  MR. STRAPP:  I never shut them down in depositions on
4  that particular issue that I can recall.
5  MR. McDONALD:  He indicated he wasn't able to do the
6  analysis, that the lawyers had to do it, and he couldn't.
7  That's what I mean by that.
8  MR. STRAPP:  Let me maybe --
9  THE COURT:  He's not asserting -- what he's doing
10  is -- what he contends, he understands the claims -- I mean the
11  patents to be practiced in his own products; is that right?
12  MR. STRAPP:  That's correct.
13  THE COURT:  He's qualified to testify to that.
14  MR. McDONALD:  I think we need to lay a foundation,
15  because he did say in the deposition he had to turn that over
16  to the lawyers, Your Honor, he couldn't do it himself.
17  MR. STRAPP:  He's talking about --
18  THE COURT:  Did he or not?  Did he do that?
19  MR. ROBERTSON:  Your Honor, I was at the deposition,
20  and I don't recall that at all.
21  THE COURT:  Go over there and look at the deposition
22  transcript.  If you did that, maybe it's quitting time,
23  Lucille.
24  MR. STRAPP:  I'll move on to a different area.
25  MR. ROBERTSON:  Wait a minute.

2636

Farber - Direct                    2636

1    MR. McDONALD: Page 396, Your Honor, he said, I don't
2    try to interpret everything back to our patented claims because
3    I'm not a lawyer, and I don't, you know, know all the legal
4    aspects of it.
5        MR. ROBERTSON: Could we have the question --
6        MR. STRAPP: Your Honor, let me read the question
7    there. That question was, what information did you learn about
8    the functionality of Lawson's product line from going to their
9    website.
10       It has absolutely nothing to do with the ePlus
11   products. So I think -- if there's no deposition testimony
12   that Mr. McDonald is referring to, we should be permitted to go
13   forward.
14       MR. McDONALD: He was saying there, I'm not a lawyer
15   and I don't understand the legal aspects of interpretation.
16   He's saying he's not qualified to do this construction
17   approach. We didn't ask the question over and over again once
18   he made the record of that.
19       THE COURT: That was a different question.
20   Overruled. It's not even related to this one except very
21   marginally. This witness can testify that as far as he's
22   concerned, the patents -- the products that he sells, that he's
23   talking about, something, do or do not use the patents.
24       MR. McDONALD: I also object. He hasn't laid any
25   foundation that he's used the Court's claim constructions or

2638

Farber - Direct                    2638

1    Content+ been recognized by any publications in the supply
2    chain industry?
3    A   Yes.
4    Q   Can you give me some examples?
5    A   They were recognized by, I believe, iSource magazine and
6    also I think we received some prior awards by supply chain,
7    and, you know, we had awards that even go back to the
8    ProcureNet days. The United States government gave us an award
9    that's called the Hammer Award --
10       MR. McDONALD: Your Honor, he's talking about
11   ProcureNet now. There's no foundation.
12       THE COURT: That is a different issue.
13       MR. STRAPP: Thank you, Your Honor. I have no
14   further questions.
15       THE COURT: I told you, ladies and gentlemen, you're
16   not going to be concerned with money at the end of the case.
17   This is being offered because it has -- this evidence that he's
18   just testified to is being offered because it's pertinent to
19   one of the issues that are called secondary considerations that
20   I'll tell you about later, but as a general proposition, in
21   response to a claim that a patent is obvious in view of the
22   prior art, the patentee can introduce evidence showing, among
23   others things, that there has been commercial success of the
24   patent, and that's something that you can take into account in
25   deciding invalidity, and that's why this evidence is coming in

2637

Farber - Direct                    2637

1    anything for purposes of that. His personal understanding
2    would not establish the nexus necessary.
3        THE COURT: He's the guy that runs the company.
4    Q   Mr. Farber, could you please state again, which of the two
5    products you are referring to that, in your understanding,
6    practice the patented technology of the patents-in-suit?
7    A   It's Procure+ and Content+.
8    Q   And those were the products that we saw during your
9    testimony earlier that are marked with the patent numbers on
10   the front of the brochures?
11       THE COURT: Did he sell that.
12   Q   Okay. Does ePlus sell Procure+ and Content+?
13   A   Yes, we do.
14   Q   And has ePlus received any industry recognition or awards
15   for Procure+ and Content+?
16   A   Yes, we have.
17   Q   Can you describe what some of those industry recognitions
18   and industry awards are.
19   A   So the one that I was just previously describing from
20   supply chain was a Pros to Know, submission that we put in for
21   one of our clients which was Unicco. They are a janitorial
22   facility management company, and we put them in for their use
23   of our solutions and how they use our solutions within their
24   environment and the benefits that they've derived from that.
25   Q   And have you been recognized for your -- have Procure+ and

2639

2639

1    on this topic.
2
3        CROSS-EXAMINATION
4    BY MR. McDONALD:
5    Q   Good morning Mr. Farber. Good afternoon.
6    A   It's close.
7    Q   You mentioned ProcureNet. They were the company that was
8    the spinoff from Fisher that took these patents as part of that
9    spinoff; is that right?
10       MR. STRAPP: Objection. Lack of foundation, beyond
11   the scope of the direct.
12       THE COURT: I think he testified to it earlier.
13       MR. STRAPP: He didn't mention Fisher, I don't think,
14   at all.
15       THE COURT: Not with you, but in the earlier part of
16   his testimony.
17   A   Well, what I testified to was that ePlus acquired the
18   assets of ProcureNet.
19   Q   Those assets included the three patents in this case;
20   correct?
21   A   That's correct.
22   Q   And you've testified today about the money that was made
23   in connection with these patents; right?
24   A   From the licensing perspective, yes.
25   Q   And ProcureNet, did they, as I understood it, use the

2640

1  patented technology?

2  A  Yes.

3  Q  ProcureNet didn't make, did not make money on these

4  patents, did they?

5  A  I don't know.  I wasn't involved in the financials of the

6  company at that time.  I do know that they did license a number

7  of different companies and used it internally.

8  Q  You were an executive of ProcureNet, weren't you?

9  A  For just under a year, yes.

10  Q  You were senior vice president of business development?

11  A  That's correct.

12  Q  Isn't it true that in the years leading up to the sale of

13  the patents from ProcureNet to ePlus, that ProcureNet lost tens

14  of millions of dollars?

15  A  I don't believe it was tens of millions.  I don't know for

16  sure.

17      MR. McDONALD:  May I approach, Your Honor, with

18  Plaintiff's Exhibit 16?  It was a Plaintiff's Exhibit.  They

19  withdrew it, but it's Plaintiff's Exhibit 16.

20      THE COURT:  If they withdrew it

21      MR. STRAPP:  Your Honor, I object to this.

22      MR. McDONALD:  I'm using it for impeachment.

23      MR. STRAPP:  He hasn't established he's impeaching

24  any particular testimony.

25      MR. McDONALD:  Or refresh his recollection.

2641

1      THE COURT:  He said he didn't know.  I guess I have

2  this question:  You objected to anything about ProcureNet, Mr.

3  McDonald.  Now you are asking about it.  Why, when I sustained

4  your objection, are we going into the topic of what went on at

5  ProcureNet?

6      MR. McDONALD:  Well, I asked -- had an objection on a

7  specific question on the foundational issue.  We've laid the

8  foundation.  I just wanted to make sure we went through the

9  right process.  I wasn't saying he couldn't talk about it at

10  all, just like I have for the other one, to lay the foundation

11  first, but...

12      THE COURT:  That objection really wasn't foundation.

13  It was that you couldn't get into ProcureNet at all.

14      MR. McDONALD:  That was my intent with raising the

15  objection, Your Honor, was a foundational objection.

16      THE COURT:  It may have been your intent.  It wasn't

17  articulated as that, but he's -- I don't understand you letting

18  it go on so long.

19      MR. STRAPP:  Your Honor, I object to any line of

20  questioning --

21      THE COURT:  Why?  After I said something about it,

22  you decide to object?

23      MR. STRAPP:  No.  Specifically with respect to this

24  exhibit and also to the line of questioning generally, but on

25  the exhibit specifically, Your Honor, he's putting it in for

2642

1  impeachment purposes, he said, but he's not impeaching the

2  witness on any particular testimony.

3      MR. McDONALD:  I was going to use it, actually, to

4  refresh his recollection.  I corrected that because he said --

5      THE COURT:  Why is what ProcureNet made relevant to

6  this case?

7      MR. McDONALD:  Well, as I understand, the relevance

8  of the licensing revenues that had to do with the financial

9  success of the patents.  I'm trying to establish that there was

10  another side to the financial aspects of these patents where

11  they lost a lot of money.

12      THE COURT:  How do we know that the loss came from

13  the patents as opposed to something else?

14      MR. McDONALD:  That's what ProcureNet was selling,

15  was the products --

16      THE COURT:  That's not in the record.

17      MR. McDONALD:  I thought Mr. Farber had said that,

18  but we can clarify that.  That's what the assets of ProcureNet

19  were and what they were selling were these products from

20  Fisher --

21      THE COURT:  What he said was that they acquired the

22  patents from ProcureNet.  He didn't say that was the only asset

23  they had.

24      MR. STRAPP:  Your Honor, in fact, he testified

25  earlier that --

2643

1      THE COURT:  Get down to the basic point.  What does

2  what ProcureNet did with it have anything to do with this case?

3  How does it show commercial success?  That's the issue.  How is

4  it relevant to show commercial success or lack thereof?

5      MR. McDONALD:  It's relevant because they lost tens

6  of millions of dollars selling the products that are

7  purportedly covered by the patents.

8      MR. STRAPP:  Your Honor, that's just Mr. McDonald

9  testifying.  There's been no evidence at all --

10      THE COURT:  The jury knows and has been told that

11  doesn't make any difference.  I think he can ask -- look at the

12  document and see if any -- point him -- don't -- just point him

13  to it without talking about it.

14  Q  Could you go to the page, Mr. Farber -- actually it's two

15  pages -- in the lower left corner, the number ePlus 0228410 to

16  8411.

17      MR. STRAPP:  Mr. McDonald, is there a date on this

18  document?

19  A  You mean on the lower right you are saying?

20  Q  Yes, that's where the numbers are.  This was the form S-1

21  filing.  I don't know that that I see the date on the front.  I

22  think it's either 2000 or 2001.

23      THE WITNESS:  Okay.

24  Q  Does seeing that --

25      THE COURT:  Were you there then?

2644

1       THE WITNESS:  I'm sorry?

2       THE COURT:  Were you with that company then?

3       THE WITNESS:  Not for all the years represented but

4   just for the one year.

5   Q   At the time of this, in the years 2001, at the time of the

6   effort by ProcureNet to go public when they filed this S-1

7   form, you were working with them at that time; right?

8       MR. STRAPP:  Your Honor, the purpose that Mr.

9   McDonald is asking the question is talking about historical

10  financials of the company for time period when Mr. Farber

11  wasn't even there.

12      THE COURT:  Wait until you get a question that deals

13  with that, and then get vertical with your objection.  You

14  can't object to everything that you think he might come out

15  with.  You have to give some time to Mr. Farber so he can --

16  you have to hear the question, then object, frame a reason, and

17  object to it at that time.  Then I have something to rule on.

18      Otherwise, I'm striking a whole area of inquiry on

19  the speculative approach that maybe he might not be, Mr.

20  McDonald is not taking.  Let's go.  You looked at those

21  pages.  Does looking at those pages refresh your recollection

22  about what, Mr. McDonald?

23      MR. McDONALD:  About the finances and the losses of

24  ProcureNet at the time it sought to become a public company.

25      THE WITNESS:  I have vague recollection.  I can't

2645

1   contest to how the numbers were created and the statements --

2       THE COURT:  That isn't the question.  The question

3   is, does it refresh your own personal recollection of what the

4   situation was.

5       THE WITNESS:  No, not particularly.

6       THE COURT:  All right, it doesn't.

7   Q   At the time ProcureNet was seeking to go public,

8   Mr. Farber, you were an executive of the company; is that

9   correct?

10  A   I was senior vice president of business development, yes.

11  Q   You were involved in the process of creating the

12  application to the Securities and Exchange Commission to go

13  public; right?

14  A   I wasn't really involved in it, no.

15  Q   You were identified in the papers filed with the secretary

16  as one of the executives of the company; correct?

17  A   I was named as one of the executives, yes.

18      THE COURT:  Move on to something else.  He doesn't

19  know anything about that.

20  Q   You were involved in the process -- when ProcureNet sold

21  assets to ePlus, you then began working for ePlus at that

22  point; right?

23  A   That's correct.  Yes.

24  Q   After ePlus acquired the patents, you were involved in a

25  valuation of those patents; correct?

2646

1   A   Can you repeat that?  I'm sorry.

2   Q   After ePlus acquired the patents and you were with ePlus,

3   you were involved in a valuation the three patents involved in

4   this suit; correct?

5   A   I don't believe I was, no.

6   Q   You were designated in this case as a witness to testify

7   about the valuations of the patents involving the ePlus

8   company; is that fair?

9   A   One of the elements that I was deposed for, sure.

10  Q   So the company picked you as the witness to testify about

11  valuations of the patents that ePlus was aware of; correct?

12  A   Yes, of what occurred, sure.

13  Q   As part of that testimony, you gave testimony about a

14  valuation of the patents that ePlus did after it acquired them

15  from ProcureNet; right?

16  A   I vaguely recall that, sure.

17  Q   And in that, at that time when ePlus acquired those three

18  patents, it did a fair market value of those patents, didn't

19  it?

20  A   That's what the agreement says, sure.

21  Q   When you say that's what the agreement says, what are you

22  talking about?

23  A   Well, if you'd like to go further in my deposition, I

24  think I explained, you know, what I thought had occurred at

25  that time.

2647

1   Q   Well, I'm just asking, you did a valuation.  That's not an

2   agreement.  You're talking about -- you did a valuation after

3   you acquired the patents --

4       THE COURT:  He didn't do the valuation.  He was

5   designated in the course of discovery to testify about

6   valuation by ePlus, apparently.  Part of what a witness who is

7   so designated has an obligation to do is, whether he has

8   personal knowledge about it or not, is go back and look at

9   company records and see what he can put together on a requested

10  subject.

11      One of the requested subjects was, what valuation was

12  put on the patents when they were acquired by ePlus from

13  ProcureNet, and that's what you are asking about, and that's

14  what he's talking about, not what he personally knew at that

15  time or knows now.  It's something he did to check some things

16  out.  Get to the bottom line.

17  Q   Isn't it true, Mr. Farber, that at that time, it was

18  estimated by ePlus management that the fair market value of all

19  of the patents involved in this suit was $12,000?

20  A   Yes, that's how they recorded it in the agreement.

21      MR. McDONALD:  I have no further -- let me turn to

22  another issue.

23  Q   SciQuest is one the licensees; correct?

24  A   Yes.

25  Q   And SciQuest, is that the company that was actually

2648

1  working together with Lawson, as you understood it, with
2  respect to Cleveland Clinic Foundation?
3  A   Well, I think we heard here it was Cleveland Clinic, yes.
4  Q   You are aware, though, that from time to time, Lawson had
5  a situation where if they couldn't provide certain services to
6  their customers, that their products weren't capable, they
7  would team up with SciQuest to do so?
8  A   For health care.  There were specific instances they
9  worked with SciQuest to try to win a business.
10  Q   That was a situation where Lawson's system was already in
11  place at that customer with the requisitioning and purchasing
12  systems; correct?
13       MR. STRAPP:  Objection.
14       THE COURT:  You shifted and got an indefinite pronoun
15  that was single-person specific to an answer that, in fact, was
16  generic.  So ask the question again.  What you mean is, what
17  was going on in Cleveland Clinic at the time.
18  Q   Well, is Cleveland Clinic the one that you are aware of
19  specifically, or --
20       MR. STRAPP:  Objection, Your Honor.  This is beyond
21  the scope of my direct exam.
22       THE COURT:  Well, you did raise SciQuest, and I think
23  he's trying to -- I assume you're trying to get into why
24  SciQuest got the purchase price that it got of $2.4 million.
25  Is that what you are asking?

2649

1       MR. McDONALD:  Yeah, to show their products are
2  actually different from the Lawson products.  That's not
3       THE COURT:  That's a different issue.  That's not
4  part of what -- his objection on that is sustained if -- I
5  thought you were trying to get to why they cut them a deal.
6  That's a purpose of legitimate inquiry, but whether they had
7  the same or similar products is not subject to something he
8  testified to, so move on.
9  Q   Your understanding is SciQuest specifically markets making
10  a variety of catalogs available to customers; is that right?
11  A   No.  My understanding of SciQuest is they provide
12  procurement, and they provide search mechanisms, and they also
13  have a business that revolves around supplying a health care
14  catalog to anybody in addition to the procurement content
15  solutions.
16  Q   So you understand, SciQuest specifically does have a
17  product including making available to customers multiple
18  catalogs?
19  A   I don't know -- I've never looked at their catalog --
20       THE COURT:  Before or after the license, or when are
21  we talking about?
22       MR. McDONALD:  Either time, either before or after.
23  Just what's their product.
24  A   I don't know what's physically in their catalog, because
25  my dealing with them and in their -- the patents that are in

2650

1  suit have nothing to do with the catalog that they provided to
2  customers.
3  Q   Let me turn to a different issue here.  You are in charge
4  of the specific division at ePlus that sells software for
5  procurement; is that right?
6  A   Yes.
7  Q   And that division is less than two percent of the overall
8  revenues of the company; correct?
9  A   Absolutely correct.
10  Q   And you've been in charge of that division ever since the
11  acquisition of the patents?
12  A   That, amongst others, sure.
13  Q   And it's true that your division has never been
14  profitable; is that right?
15  A   Well, it depends it how you look at it and how things are
16  journaled.
17  Q   Isn't it true -- do you have your deposition --
18       THE COURT:  How things are what?
19       THE WITNESS:  Journaled.
20       THE COURT:  Accounting-wise.
21       THE WITNESS:  Accounting-wise, yes.
22  Q   The way ePlus has decided to take account for the profits
23  and losses of your division, isn't it true your division has
24  never been profitable?
25  A   Excluding licensing fees, we have not had a profit on the

2651

1  individual products.
2  Q   In fact, you are losing money; is that right?
3  A   As a company, no.  As a division, we have a slight loss
4  annually, yes.
5  Q   In fact, just a few weeks before ePlus sued Lawson, your
6  division had a $4 million write-down in its valuation because
7  of its declining sales; right?
8  A   No.  I think Elaine Marion tried to describe this as
9  goodwill, and it was an allocation that was put in and I don't
10  know the calculations of how goodwill gets calculated.
11  Q   You do know that the goodwill valuation was reduced from
12  over $4 million to zero for your company in early 2009; right?
13  A   I don't.  She would have been the best to testify.
14  Q   So we can rely on what she said about that issue?
15  A   If that's what she said, that's her testimony.
16  Q   Is it true that all the licenses you've talked about in
17  this case were in situations where ePlus had sued someone and
18  the litigation was ongoing?
19       MR. STRAPP:  Objection, Your Honor.  Could we
20  approach for a moment?
21       THE COURT:  I thought we did.
22       MR. STRAPP:  I thought during the sidebar Mr.
23  McDonald said he wasn't going to get into this.
24       MR. McDONALD:  All I said --
25       THE COURT:  No, he said he was going to get into it,

2652

1    and this was the way he was going to get into it, I understood.

2         THE WITNESS:  Okay.  Repeat the question, I'm sorry.

3    Q    Mr. Farber, isn't it true that all the licenses you've

4    talked about were involving companies ePlus had sued; is that

5    right?

6    A    Yes, that's correct.

7    Q    And all of those agreements were settlements of those

8    lawsuits; correct?

9    A    Correct.

10   Q    So the parties hadn't finalized -- there was no final

11   decisions in those cases; correct?

12   A    I don't understand what you mean.

13        MR. McDONALD:  I'll withdraw the question.

14        THE COURT:  Let's don't get into that.  I'm going to

15   tell the jury about -- I think that's getting further than you

16   need to get.

17   Q    EPlus has dozens and dozens of competitors in the software

18   procurement area; right?

19   A    We have competitors, sure.

20        THE COURT:  The question he's getting at is how many.

21   Why don't you try again, and you ask him if he knows how many

22   competitors he has in that area.

23   Q    Isn't it true that you have dozens and dozens of

24   competitors, Mr. Farber, in the software procurement area?

25   A    I don't know if it's dozens and dozens, but I think it's

2653

1    fair to say there's a large number of them.  Probably more than

2    ten.

3         MR. McDONALD:  I have no further questions.

4         THE COURT:  All right, ladies and gentlemen, you've

5    heard some evidence about the licenses that were done --

6    achieved after litigation began about patent infringement

7    between the companies and ePlus.

8         That was admitted solely for the purpose of allowing

9    you to understand the context of where the licenses came from,

10   and they'll argue about that later, but the fact that those

11   companies settled their litigation is not something that you

12   can consider in deciding whether there's infringement or

13   invalidity here at all.  That's just -- it can be considered

14   for the limited purpose of assessing this concept of commercial

15   success.  All right?

16

17            REDIRECT EXAMINATION

18   BY MR. STRAPP:

19   Q    Mr. Farber, you were testifying about the valuation of the

20   patents; do you recall that?

21   A    Yes.

22   Q    And you mentioned there was a $12,000 valuation of the

23   patents.  Was that back at the time that ePlus acquired

24   ProcureNet assets and the patents in ProcureNet?

25   A    Yeah, that's correct.

Farber - Redirect            2654

1    Q    And did that $12,000 valuation turn out to be accurate?

2    A    No.

3    Q    How so?

4    A    Well, there were a number of things -- let me try to

5    explain it this way:  Well, first of all, if it was valued at

6    $12,000, we obviously were able to license almost $60 million

7    worth of the patents.  So somebody, you know, really estimated

8    incorrectly.  So I think ePlus made a very good assessment of

9    its own value in the acquisition, but --

10   Q    Let me ask you this:  Do you have any knowledge about how

11   that valuation was actually done?

12   A    I do.

13   Q    How do you know how this valuation was done?

14   A    When I spoke to the principals that were involved in the

15   valuation on both sides --

16        MR. McDONALD:  Your Honor, this is outside the scope.

17   He didn't get into these things.

18        THE COURT:  In fact, he was kept from going into it

19   because he said he wasn't involved in it, and in addition to

20   that, his answer is hearsay.

21        MR. STRAPP:  Your Honor, he was asked about whether

22   or not --

23        THE COURT:  Hearsay.  Who was asked what.  Doesn't

24   count in dealing with hearsay.

25        MR. STRAPP:  We're not offering it for the truth of

Farber - Redirect            2655

1    the matter of whether or not it was a $12,000 valuation was

2    accurate.

3         THE COURT:  What's the non-hearsay purpose?

4         MR. STRAPP:  The process involved in coming up with

5    the valuation.

6         MR. McDONALD:  He knows the process because somebody

7    told him, so it's still hearsay.

8         THE COURT:  But if he's offering it for a non-hearsay

9    purpose, then the non-hearsay purpose has to be relevant and

10   has to be judged by Rule 403 as well.  Why is it relevant?

11        MR. STRAPP:  It's relevant because it shows why the

12   number $12,000 was come up with.

13        THE COURT:  That's for the truth of the matter.

14   Thank you.  That's what I thought it was relevant for.  All

15   right.  Let's move right on.  Objection sustained.

16   Q    Mr. Farber, you mentioned that the valuation turned out to

17   be inaccurate in the sense that you received almost $60 million

18   in license revenue.  Was it inaccurate in any other way besides

19   that?

20   A    I'm not sure I understand.

21   Q    Has the patents brought any other value beyond the

22   $60 million to ePlus?

23        MR. McDONALD:  Objection, beyond the scope, Your

24   Honor.

25        THE COURT:  Overruled.

2796

2796

1    your closing arguments.

2         MR. McDONALD:  I would expect that.

3         THE COURT:  I don't want any problems on Monday

4    morning, so I want you all to show those demonstratives to each

5    other.  Are they ready now?

6         MR. ROBERTSON:  I would suggest we schedule a meeting

7    sometime together Sunday and iron it all out.

8         MR. McDONALD:  I think we can try to come up with a

9    time to exchange, maybe Sunday morning, 9:00 a.m.

10        THE COURT:  All right.  That's fine.  Okay.  That's

11   it then, is it?  All right.  We'll be in adjournment.

12

13        (Court adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25

2797

```
1          IN THE UNITED STATES DISTRICT COURT
2         FOR THE EASTERN DISTRICT OF VIRGINIA
3                   RICHMOND DIVISION
4
5    --------------------------------------
                                       :
6    ePLUS, INC.          : Civil Action No.
                          : 3:09CV620
7    vs.                  :
                          :
8    LAWSON SOFTWARE, INC.    :    January 21, 2011
                          :
9    --------------------------------------
10
11        COMPLETE TRANSCRIPT OF THE JURY TRIAL
12         BEFORE THE HONORABLE ROBERT E. PAYNE
13      UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24       Peppy Peterson, RPR
          Official Court Reporter
25       United States District Court
```

2798

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2799

```
1                    P R O C E E D I N G S
2
3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
6    Mr. Michael G. Strapp represent the plaintiffs.
7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin L. Stoll-DeBell, Mr. William D. Schultz, and Ms. Rachel
9    Hughey represent the defendant.  Are counsel ready to proceed?
10       MR. ROBERTSON:  Yes, Your Honor.
11       MR. McDONALD:  Yes, Your Honor.
12       THE COURT:  All right.  We'll take plaintiff's JMOL
13   motion first.
14       MR. ROBERTSON:  Good morning, Your Honor.
15       THE COURT:  Good morning.
16       MR. ROBERTSON:  I'm going to be arguing plaintiff's
17   judgment as a matter of law with respect to infringement, and
18   Ms. Albert will be addressing plaintiff's judgment as a matter
19   of law with respect to the invalidity issues.
20       Your Honor, Rule 50 provides that judgment as a
21   matter of law may be granted when a reasonable jury would not
22   have a legally sufficient evidentiary basis to find for the
23   party Lawson on that issue.  ePlus moves for JMOL that Lawson
24   infringes all the asserted claims of the patents-in-suit, both
25   directly and indirectly, both through inducement of
```

2800

```
1    infringement and contributory infringement.
2        I'm not going to go through all the asserted claims,
3    Your Honor.  I know Your Honor is familiar with them, and that
4    would just take up too much time, and I know we're pressed for
5    time here this morning with the Court's schedule this
6    afternoon, but let me hit a high point, first start off by
7    saying, we contend that the defendants non-infringement case in
8    this proceeding has been really based on misdirection, that
9    they have ignored the Court's claim construction with respect
10   to catalog.  They rewrote the provision for published by a
11   vendor to suit their manufactured non-infringement positions.
12       It required the Court, I think midcourse through this
13   case, to issue the instruction with respect to published by a
14   vendor to bring some clarity to what the Court intended when it
15   gave its instruction with respect to what a catalog is.
16       It did not mean, as the defendant contended, that the
17   item data associated with the catalog could not be selected --
18   or had to be selected by the customer or modified or deleted or
19   reformatted or be an entire catalog.  That was never intended
20   by the Court, and its revised published-by-a-vendor
21   construction made that clear, and I think the arguments made on
22   that, the non-infringement arguments that were based on that
23   have no sound footing in the record on this case.
24       We believe that the best evidence in this case has
25   come from, indeed, Lawson's own witnesses and documents.  Mr.
```

2917

1    section on which he relied relates only to the
2    information disclosure section, and that the prior law
3    governs because you're not proceeding in that fashion,
4    right?
5         MS. ALBERT:  That's correct.  We're saying
6    that it's fully acceptable to disclose a prior art
7    reference by virtue of citing it in the patent
8    specification itself, and the examiner is required to
9    consider it if it's cited anywhere in the patent
10   specification.
11        THE COURT:  All right.
12        MS. ALBERT:  Thank you.
13        THE COURT:  Mr. Schultz, I believe this is
14   your motion on this point.  You have the last right --
15   I hope that's not what we have is the last rites.  You
16   have the right of last reply.  Although let's make
17   this the last rite on this issue.
18        How about that?
19        MR. SCHULTZ:  Sure.
20        THE COURT:  She says, and it looks to me like
21   she's correct, in looking at the regulation you gave
22   me, the whole topic is information disclosure
23   statement, and throughout it in places even where you
24   didn't highlight it there's a lot of discussion that
25   what we're talking about is information disclosure

2918

1    statement.  She's not relying on the information
2    disclosure statement.  She agrees that if they were
3    relying on that, you would win.  But you don't, and
4    the prior law allows what's considered anywhere in the
5    patent.
6         Why isn't that right?
7         MR. SCHULTZ:  Two things, Your Honor.  In
8    1992, the patent law changed the way that the prior
9    art references were designed to be considered.  In
10   other words, for a prior art reference to actually be
11   considered by the patent examiner, it had to --
12        THE COURT:  Where does your authority say
13   that?
14        MR. SCHULTZ:  It's in 609.
15        THE COURT:  No, it isn't.
16        MR. SCHULTZ:  It's also in the CFR.  CFR
17   Sections 1.97 and 1.98.
18        THE COURT:  Is it in what you gave me?
19        MR. SCHULTZ:  It references those sections,
20   Your Honor.
21        THE COURT:  But you didn't give that to me.
22   I can't be charged with dealing with these arguments
23   that you have by sections you don't give me because I
24   have to read them.  Now, what you gave me deals only
25   with the disclosure statement.  And now you're saying

2919

1    there's some other provision of law.  Where is the law
2    that you're talking about, Mr. Schultz?  I don't have
3    it and I need to read it.
4         MR. SCHULTZ:  You don't have that, Your
5    Honor.  I did not submit that to you.
6         THE COURT:  Then I'm not going to consider
7    it.  I have to bring an end to this somewhere.
8         MR. SCHULTZ:  Your Honor, the other issue
9    with respect to this whole thing --
10        THE COURT:  Besides that, it's silly.  It's
11   utterly silly to suggest -- I mean, what is this?  A
12   rule for convenience for the patent examiners?  Is
13   that what this is?  These people can't read for some
14   reason.  They are told in spades if you can't figure
15   out that a prior art is involved with a '989, you
16   ought not have that job, for Lord's sake.  It's not
17   mentioned but 50 times in there.
18        That rule, it doesn't make any sense.  So I
19   can't believe that you're uncited provision of the law
20   changes the preexisting law that I have seen on it.
21        MR. SCHULTZ:  Well, two things, Your Honor.
22        THE COURT:  Do you have that law that you're
23   relying on that says this changes the world?  Let me
24   have it.
25        MS. STOLL-DeBELL:  I don't have it here.

2920

1         THE COURT:  Why wouldn't you think that was
2    the most important thing in the argument?
3         MR. SCHULTZ:  Because 609 cites to that law
4    and it describes what it is.
5         THE COURT:  You know what?  That an nickel
6    will get you a Coke.  I've got to see the real law.
7         MR. SCHULTZ:  Section 609 further describes
8    the public policy behind having the applicant actually
9    provide a separate list as opposed to including it in
10   the specification.  600-604 in 609 of the Manual of
11   Patent Examining Procedure goes through the public
12   policy behind that.
13        THE COURT:  What is the public policy?  To
14   make it easier for the patent examiner so he doesn't
15   have to think?
16        MR. SCHULTZ:  That is part of the public
17   policy, Your Honor.
18        THE COURT:  The public policy, seems to me --
19   where does it say that in what you cited?  Where does
20   it say that?
21        MR. SCHULTZ:  It's on page 600-104, left
22   column, and it's highlighted.
23        THE COURT:  Yeah, but it's talking about the
24   disclosure statement.  You have got to come to the
25   party, Mr. Schultz.  That text that you're citing

2965

1    THE COURT: Moving to 26, there is an objection
2    there. I thought you all worked out a lot of stuff.
3    Substantial progress you made -- who was it that represented
4    there was substantial progress going on? You don't have to
5    answer that question. You plead guilty?
6        MR. MERRITT: I do. I was sent down the hall to
7    check. I was assured, and they looked like they were working.
8        THE COURT: All right, 26.
9
10    (Discussion off the record.)
11
12        THE COURT: Okay, 26.
13        MR. ROBERTSON: Let me raise one issue, and then I'll
14    let Lawson raise the other issues. The things that are struck
15    here about -- I'm sorry, I'm down about --
16        THE COURT: Let's go to about the eighth line down,
17    acts that constitute.
18        MS. STOLL-DeBELL: So, Your Honor, with that, I think
19    the Federal Circuit held in DSU Medical Corporation that intent
20    for indirect infringement requires an intent to cause the
21    actual infringement, not the acts that constitute infringement.
22        THE COURT: What is the difference?
23        MS. STOLL-DeBELL: You'd have to actually know about
24    a patent and intend to cause the infringement as opposed to
25    intend to just cause something that you don't know is an

2966

1    infringement.
2        So I just took out the acts that constitute, because
3    that is the holding of the DSU Medical Corp. It was actually
4    an en banc decision from the Federal Circuit to resolve a
5    conflict in their law, and they held exactly that, that the
6    intent is to cause --
7        THE COURT: That's what the next clause says. It
8    says -- you are not reading the whole thing. You are just
9    editing out something. Cause the acts that constitute direct
10    infringement, comma, that Lawson knew of the patent and Lawson
11    knew or should have known that its actions would lead to actual
12    infringement. I mean, that seems to me to do --
13        MS. STOLL-DeBELL: I'll withdraw that redline.
14        THE COURT: Okay.
15        MS. STOLL-DeBELL: I'll put my horse back in the
16    barn, Your Honor.
17        THE COURT: That's a good thing to do. A good
18    horsewoman knows when to stable a mount.
19        All right, now, do you want to add the underscored
20    part here in your suggestion, Ms. Stoll-DeBell?
21        MS. STOLL-DeBELL: Yes, sir.
22        MR. ROBERTSON: I mean this appears argumentative to
23    me, Your Honor, and I don't know. Is there a case that says
24    this that you want to rely on?
25        MS. STOLL-DeBELL: I think to start off, they are

2967

1    relying on this SEB case, Your Honor, which is an outlier case
2    talking about deliberate indifference. The facts of that case
3    are very different than what we are talking about here.
4        In that case, the defendant actually copied the
5    patentee's product. They sent it to their manufacturer, and
6    they copied every feature of it. Then they went and had a
7    patent infringement -- or an opinion done, and they didn't tell
8    the patent attorney that they had copied the patentee's
9    product.
10        And in that case, the Federal Circuit found that they
11    had acted with reckless disregard for the patent rights by
12    copying the product and then having a search done and not
13    telling their patent attorney that they copped it. In that
14    case, the Federal Circuit found that they basically did know
15    about the patent in that case because of those bad acts.
16        We don't have those facts here, Your Honor, and I
17    think this reckless disregard standard is confusing. As Mr.
18    Robertson noted, the Supreme Court has granted cert on that
19    case, and I just don't think it's good law, and I don't think
20    it makes sense to put it in this case.
21        MR. ROBERTSON: Your Honor, it is the Federal
22    Circuit's most recent pronouncement on this case. They didn't
23    announce the standard based on the facts. They announced the
24    standard can be reckless disregard, and I did raise this with
25    Your Honor before. A case that's on certiori is still the law

2968

1    of the land until and -- if and until the Supreme Court
2    overturns it.
3        MS. STOLL-DeBELL: It is one case, Your Honor,
4    talking about --
5        THE COURT: Excuse me. Reckless disregard has always
6    been -- as far as I know, the concept of willful blindness,
7    deliberate indifference, all of those meld together and are
8    components that typically, in the law of intent, have been
9    considered -- have been appropriately considered as factors in
10    the analysis.
11        MS. STOLL-DeBELL: Your Honor, that may be true, but
12    it doesn't fit the facts of this case. We don't have any
13    copying here. In fact, as you know, Lawson has been selling
14    these products since the 1980s. There's just no facts that are
15    even anywhere close to the facts that they looked at in the SEB
16    case that would support instructing the jury on reckless
17    disregard here.
18        THE COURT: This case says, this Court has made
19    clear, however, that inducement requires a showing of specific
20    intent to encourage another's infringement. As other Courts
21    have observed, specific intent in the civil context is not so
22    narrow as to allow an accused wrongdoer to actively disregard a
23    known risk that an element of the offense exists.
24        And isn't that -- this Court notes that the Supreme
25    Court has indicated, in a different civil context, that

3005

1          THE COURT:  The evidence, and it's not
2    disputed as far as I know, is that from the time it
3    was developed until the time the application was filed
4    that it was changed, and it went through something
5    like 40 iterations.  And that's not disputed.  And
6    then in addition to that, the inventors testified that
7    there never was a system implemented at anytime that
8    did all of what was in that patent.
9          Now, is there any evidence to contradict
10   either one of those statements?
11         MR. McDONALD:  Well, that's very general
12   testimony, Your Honor.
13         THE COURT:  I understand that, but I'm asking
14   you general or specific, is there anything to respond
15   to that?
16         MR. McDONALD:  Well, I think that testimony
17   to some extent is contradicted by the RIMS brochure
18   that they distributed in the pubic.  They are in
19   conflict.  Their testimony to some extent is in
20   conflict with what the Fisher company was representing
21   publicly were the capabilities of that system.  So,
22   yes, there is a conflict in the evidence of that.
23         THE COURT:  And it comes from the Fisher
24   brochure.
25         MR. McDONALD:  Yes.  They testified that some

3006

1    of the features -- oh, we didn't do that.  Well, the
2    brochure represented that it does that.  So there's
3    a conflict right there.  Some of their testimony is in
4    conflict with the time line here.  And also I think
5    it's in conflict with just the logic here that if they
6    were really making a bunch of changes to the Fisher
7    RIMS system after April of '93, why do all the patents
8    in this suit filed not until August of '94 only rely
9    on that description that's one year and four months
10   old?  Why wouldn't they have given an undated
11   description using whatever version of RIMS had changed
12   between April of '93?
13         THE COURT:  There's no evidence in the case
14   that addressed that issue.
15         That's really a specialized topic about
16   whether you change what's in an application and update
17   it.
18         MR. McDONALD:  This is a new application.
19         THE COURT:  You proved that yourself.
20         All right.  Let me resolve this.  I'm going
21   to hold in abeyance ePlus' motions for JMOL on the
22   issue of invalidity on all scores on this.
23         I'm going to deny the motion of Lawson for
24   JMOL on the invalidity issues.  And I'm going to send
25   the invalidity issues to the jury.

3007

1    If I were deciding the case, I would find
2    that there is no clear and convincing evidence to
3    prove any component of validity, but there are factual
4    discrepancies that a jury needs to resolve.  And when
5    we have a complete record, a verdict comes out the
6    wrong way for somebody, I'm sure we'll have, for
7    ePlus, we'll have a motion on that.
8          If, as I expect, the jury returns a verdict
9    in favor of ePlus on these issues, then I won't have
10   to deal with the JMOL, but I have reserved it.
11         What do we do here with this instruction?
12   Let's get back to the instructions.
13         MS. STOLL-DeBELL:  Your Honor, we would ask
14   under Rule 37 that they be precluded from making this
15   argument that we can't assert obviousness for Claim
16   One of the '172 patent because they did not assert
17   that in their interrogatory responses.
18         THE COURT:  But you allowed them to put it
19   into the final pretrial order without objection, and I
20   have to show -- I don't apply the Rule 37 test to
21   something that's in that order, do I?
22         MS. STOLL-DeBELL:  Your Honor, that was their
23   portion of the pretrial order.  We had P.O. Writer
24   plus J-CON in the final pretrial, and we were still
25   precluded there.  Their section of the pretrial order,

3008

1    we had no control over it, and it was not a joint
2    section, and they didn't put it in their interrogatory
3    responses.
4          MS. ALBERT:  Your Honor, we did raise the
5    103(c)(1) issue in our opposition to Lawson's motion
6    for summary judgment of invalidity on obviousness back
7    whenever that was filed in June.
8          MS. STOLL-DeBELL:  That was after discovery
9    closed.  It didn't relieve them of their obligation to
10   disclose their theories in their contention
11   interrogatories.  We've been held very firmly to that
12   obligation in this case, and we have been precluded
13   from theories that we raised in the pretrial order,
14   and they should be held up to the same standard.
15         If that was their theory, it needed to go in
16   their interrogatories responses.  It wasn't there and
17   they should be precluded.
18         We went all the way through this trial, Your
19   Honor, and they didn't bring it up once.  It wasn't in
20   their jury instructions.  They asked their expert --
21         THE COURT:  I'll take care of that later if
22   it comes to pass that I need to pass that.
23         MS. ALBERT:  It would not have been in a jury
24   instruction because it's a pure matter of law.
25         THE COURT:  It's a matter of law anyway.

2011.01.21 Trial Transcript Day 12   1/21/2011  8:22:00 PM



3077

1    arguments, Your Honor?

2         THE COURT:  We told the jury to come back at 9:00.

3    So you're going to get those instructions over here by -- I

4    need them by four o'clock tomorrow afternoon.  So if that lets

5    you sleep a little later, have at it.  Does that take care of

6    everything?  I don't intend to clean up night.

7

8         (Court adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2011.01.24 Trial Transcript Day 13  1/24/2011  2:45:00 PM

---

3078

```
1         IN THE UNITED STATES DISTRICT COURT
2         FOR THE EASTERN DISTRICT OF VIRGINIA
3                    RICHMOND DIVISION
4
5    ---------------------------------------
6    ePLUS, INC.            :  Civil Action No.
                            :  3:09CV620
7    vs.                    :
                            :
8    LAWSON SOFTWARE, INC.  :  January 24, 2011
                            :
9    ---------------------------------------
10
11        COMPLETE TRANSCRIPT OF THE JURY TRIAL
12        BEFORE THE HONORABLE ROBERT E. PAYNE
13     UNITED STATES DISTRICT JUDGE, AND A JURY
14
      APPEARANCES:
15
      Scott L. Robertson, Esquire
16    Michael G. Strapp, Esquire
      David M. Young, Esquire
17    Goodwin Procter, LLP
      901 New York Avenue NW
18    Suite 900
      Washington, D.C.  20001
19
      Craig T. Merritt, Esquire
20    Christian & Barton, LLP
      909 East Main Street
21    Suite 1200
      Richmond, Virginia  23219-3095
22    Counsel for the plaintiff
23
24         Peppy Peterson, RPR
             Official Court Reporter
25          United States District Court
```

3079

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3080

```
1              P R O C E E D I N G S
2
3         THE CLERK:  Civil action number 3:09CV00620, ePlus,
4    Incorporated versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
6    Mr. Michael G. Strapp represent the plaintiff.
7         Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin L. Stoll-DeBell, Mr. William D. Schultz represent the
9    defendant.  Are counsel ready to proceed?
10        MR. ROBERTSON:  Yes, Your Honor.
11        MR. McDONALD:  Yes, Your Honor.
12        THE COURT:  All right.  I was very sorry to hear
13   about Ms. Albert's father passing away.  You all both wrote
14   letters about it.  I don't see the point in bringing that to
15   the attention the jury.  Do either one of you?
16        In the old days, when people didn't do what they were
17   supposed to do, they got keelhauled.  I'm about ready to
18   institute that procedure here.  It's time for the jury to get
19   going, and I've had to read all this stuff now.  I told you
20   what to do about this verdict form, and it was pretty easy, and
21   it's unnecessary to go through all this stuff.
22        Now, apparently we're going to have to revise it
23   anyway because -- and some of the instructions.  What
24   instructions have to be revised because Lawson is not
25   contending that the RIMS brochure is prior art?  Which one is
```

3081

```
1    arguing?
2         MR. YOUNG:  Your Honor, David Young for ePlus.  It's
3    instruction 3-A that was submitted to the Court over the
4    weekend.  It lists as I think reference number three, RIMS
5    brochure, and that would have to come out now because it
6    appears that Lawson does not have that as an anticipated
7    reference on its own verdict form.
8         THE COURT:  Is that right?
9         MR. McDONALD:  Yes, that's right, Your Honor.
10        THE COURT:  So I suppose I need to tell the jury
11   simply to disregard any testimony about the RIMS brochure as
12   prior art.
13        MR. McDONALD:  No, it not anticipatory prior art
14   meaning it's not all by itself anticipating a claim.  We're
15   still using it for obviousness and support for the on sale, the
16   RIMS as prior art and 102(a) and (b), but the brochure, all by
17   itself, we're not contending is an anticipating reference, but
18   it would be used to support number one in the instruction which
19   is the Fisher RIMS system as prior art.
20        THE COURT:  What do you mean, to be used to support?
21   If you're going to use it --
22        MR. McDONALD:  It's evidence of the Fisher RIMS
23   system as it was being sold and --
24        THE COURT:  Well, if it's evidence of it, it comes
25   out of 39, too, because you're not contending that it is
```

3162

1   RIMS and TV/2 both out there.  Both going together.
2   Now, we showed you a little bit of additional prior
3   art as well to give you the context for the
4   marketplace and show that the needs in the market for
5   these types of products for purchasing and requisition
6   systems were already being met by some pretty old
7   systems.  That was those P.O. Writer and J-CON
8   systems.  And heard some testimony about both of those
9   things.
10          If we could go to the next slide, please.
11   This was one of Mr. Shamos' slides talking about that
12   P.O. Writer system.  That was Ms. McEneny who
13   testified what you saw in the video.  She talked about
14   the P.O. Writer system.  And Mr. Shamos gave some
15   examples of the features of this thing.  It was a
16   requisition and purchasing system that even allowed a
17   user to specify a catalog for searching.  And then
18   once you've picked a catalog like Bayless that's shown
19   in this page, then you could pick a particular part or
20   look for a part within that specific Bayless catalog.
21          So selecting catalogs to search, selecting
22   parts of the database to search, and then searching
23   them in a two-step process.
24          And if we go to the next slide.  Another one
25   of Mr. Shamos' slides here just to give an example of

3163

1   how this P.O. Writer documentation described that a
2   user could create a requisition.  Pick the part.  Now,
3   I put it on that requisition list.
4          THE COURT:  Why are we talking about P.O.
5   Writer?  Instruction 29 and 30A don't have that in
6   there at all.
7          MR. McDONALD:  This was to show the needs of
8   the marketplace were being met and goes to the
9   obviousness issue.
10          THE COURT:  It does not go as prior art, and
11   you're arguing it as prior art, and it's inconsistent
12   with what you said you want as prior art.  You can't
13   have that argument.  That's not right.
14          We've gone beyond that in this case.  Excuse
15   me.  Disregard that about the P.O. Writer.
16          MR. McDONALD:  All right.  Can we go back to
17   slide 43.  So these were the key parts of the IBM
18   literature that really show it's obvious to combine
19   this with RIMS.  So we've got all these features from
20   the RIMS system.  We've got all these features from
21   the TV/2 system.  Together they have all the elements
22   of the claims here.  So now the question is, is it
23   obvious to combine them?  The Judge will give you an
24   instruction on that, but that's the question for one
25   of ordinary skill in the art at the time August of '94

3164

1   when ePlus says they made this invention that they
2   filed for a patent on at that time.
3          So, clearly, you have this teaching in the
4   prior art before August of '94.  Anybody of ordinary
5   skill would understand you ought to connect the dots
6   here and combine the RIMS system and the TV/2 systems
7   together.
8          Go to the next slide, please.  So this is
9   what they look like when you put them together, in a
10   sense, at least that's a diagram.  Again, I think I
11   showed you this in my opening.  You have all those
12   RIMS components there.  Then you have that API in
13   green that connects that whole RIMS system to the IBM
14   TV/2 system that searches catalogs.
15          So you put all those things together, that's
16   one of ordinary skill in the art, was it obvious to do
17   that prior to August of '94 using all this prior art
18   that are existed even by August of '93?
19          You also heard the testimony from Ms. Eng
20   that this was exactly the goal of the whole project
21   here was to have that RIMS system work together with
22   electronic versions of these big paper catalogs.  And
23   she described the meticulous process of having to take
24   those paper catalog pages, get them loaded up into the
25   electronic form so all the information would we there,

3165

1   all the words would be there available on the
2   computer.
3          They talked about getting the images in the
4   system.  Even Mr. Kinross talked about getting
5   electronic versions of all the catalog pictures to IBM
6   so they could all load it up just like the catalogs
7   looked like.  That was the whole point.  Even the
8   patent itself talks that this is reality essence of
9   it.  If we can go to slide 45.  This is that part of
10   the patent, every one of them has this -- I believe
11   it's at the top of column 4 in the '683 patent.  The
12   electronic sourcing system 5.  That's what the patent
13   says over and over again.  That's what it's describing
14   as the invention.  After the previous paragraph just
15   talked about some basic things like a computer, a
16   keyboard and a printer.
17          It also includes a requisition and purchasing
18   system 40.  Preferably but not necessarily the Fisher
19   RIMS system, and a search program 50 that's capable of
20   searching through large volumes of information quickly
21   and accurately.  Preferably, but not necessarily, the
22   Technical Viewer/2 search program, TV/2, available
23   from IBM is used as that search program.
24          That's what you're putting together here.
25   Yes, it says "preferably," but, clearly, the idea here

3170

1    So he says no databases in the RIMS system.
2    meet the Court's definition of catalogs.  He says a
3    bunch of stuff like these experts do to spin it, but
4    the bottom line is he says RIMS doesn't have catalogs.
5    Parts master is not a catalog.  Item master, that's
6    not a catalog.
7        Even in the RIMS system, that big host system
8    of Fisher catalog products that they have on that post
9    database, well, that's a database in the RIMS system.
10   He says that that's not even a catalog.  So for him
11   nothing is a catalog.  Well, that just doesn't make
12   any sense.
13       I guess what he was trying to say about that
14   Fisher catalog is somehow, Well, that one doesn't
15   relate to a vendor.  That's what he tried to say about
16   that.  Again, does that make any sense at all?  The
17   Fisher database at the Fisher host computer selling
18   Fisher's products isn't a database relating to Fisher
19   as a supplier of products?  It was nonsense.
20       Then I confirmed for him at one point, did
21   ePlus ask you to do any analysis of the infringement
22   issues in this case?  Well, the answer was no.  Well,
23   what a surprise that is since he's Mr. No.
24       MR. ROBERTSON:  I'm going to object, Your
25   Honor.  There was a Court order that indicated who

3171

1    could testify about what issues, and --
2        THE COURT:  Sustained.  Just disregard that
3    argument, please.
4        MR. McDONALD:  There was no Court order on
5    that, Your Honor.
6        THE COURT:  There was a Court order saying
7    who could testify about what.
8        MR. McDONALD:  Yeah, but clearly they didn't
9    ask him to do an infringement analysis.  They had
10   every right to do that and they chose not to.  And
11   they chose not to.  I think I can establish that fact.
12       MR. ROBERTSON:  Because he was a validity
13   expert on that issue under the Court's order.
14       THE COURT:  I've dealt with it.  Just don't
15   pay any attention to that part of the argument, ladies
16   and gentlemen.  Strike it.
17       MR. McDONALD:  So what we've shown here is
18   that Fisher did not invent anything worthy of a
19   patent.  They didn't invent requisition and purchasing
20   systems.  They didn't invent searching multiple
21   catalogs.  They didn't invent putting those things
22   together.  They didn't invent the Internet, using a
23   system like that with the Internet.  They did not
24   invent EDI, electronic data interchange.  They did not
25   invent Windows.  They did not invent databases.  They

3172

1    did not invent indexing databases.
2        So the second question then is if the Patent
3    Office gave them these patents, why should you reach a
4    different result?  On this issue, you saw in that
5    video at the beginning of the case what happens when
6    the Patent Office reviews patent applications.  There
7    are people sitting in their offices at the Patent
8    Office, and they have these stacks of files there.
9    And they have a way to search at the Patent Office for
10   patents and prior art, but they rely largely on what
11   the applicants disclose to them.
12       You heard the inventors actually have an oath
13   they file where they have to disclose the prior art
14   they know about.  That's because the examiner, he or
15   she, is not in the marketplace.  They are at the
16   Patent Office.  They are not out there in the
17   marketplace, and they don't necessarily have access to
18   all the information.  And in fact, that's the case
19   here.  There's critical information that you have now
20   that the Patent Office didn't have.  You have a copy
21   of the RIMS brochure.  You have the evidence that the
22   RIMS system was on sale more than one year before the
23   filing date on these patents.
24       The Patent Office didn't have that.  It might
25   have mentioned the RIMS system many times in the

3173

1    patent, but there's no information presented to the
2    Patent Office that the RIMS system was on sale more
3    than a year before these patents were filed.
4        That's particularly telling here if you look
5    at 45D.  This is the part of this and all three
6    patents have something similar to the patents-in-suit.
7    This lists the publications involved here that were
8    disclosed and what the Patent Office did consider.
9    This is the start of the list on this page and we go
10   to the next page.
11       This is the rest of the publications
12   disclosed.  And there's a few publications on here
13   about various Fisher systems like Purchase Pro,
14   Lighting, Reliance, Stock Pro, but there are not any
15   publications regarding the RIMS system provided with
16   any of the patents.  So that's the information that
17   you have that the Patent Office did not have.
18       Now, people can choose to use the patent
19   system.  You heard about it in the video.  It's a
20   tradeoff.  If I want a patent, I have to make this
21   disclosure of the details of my invention, and then
22   it's published, and everybody can see that.  Well, not
23   every company out there wants to make that trade and
24   make that disclosure so that their competitors, for
25   example, can know what they're doing.  And that's a

3174

1  choice.  And that doesn't stop ePlus from going to the
2  Patent Office, but it is true and the Judge will
3  instruct you that even if a product isn't the subject
4  of a patent like TV/2, if it's on sale more than a
5  year before the filing date of the ePlus patent, it's
6  still prior art.  EPlus can't go get a patent on that
7  same thing.  So that's how it works.  So that's why
8  the Patent Office doesn't always have all the details
9  about what everybody is doing out there.
10      So that's why because you have this critical
11  information here in the courtroom that the Patent
12  Office didn't get why you should reach a different
13  conclusion than the Patent Office.  So that's why you
14  should decide that the claims are invalid.
15      Let's go down to question No. 3 about
16  infringement.  We made it pretty clear from the first
17  moment in this case that this issue came down to the
18  catalogs issue.
19      And if we could go to 45F.  Mr. Weaver at
20  least acknowledged that 11 of the 12 claims in this
21  case required not just one catalog, but multiple
22  catalogs in the Lawson system.  So if Lawson doesn't
23  have multiple catalogs, Lawson at least does not
24  infringe those 11 claims.  We're all on the same page
25  on that.  That's why we didn't waste your time on all

3175

1  these other deals in the case, why it really came down
2  to the catalogs.
3      And if we go to the slide 46, this was the
4  Court's definition of catalogs.  It has the term
5  published by a vendor in it, and the Court also has an
6  instruction for you on that.
7      And we showed you here, this is Exhibit 257,
8  it's a demonstrative, but it's nothing of the sort you
9  haven't seen before.  It's one of these big catalogs.
10  We don't get them in the mail so much anymore, but we
11  used to.  And something like this pretty clearly meets
12  that Court definition.  You can apply this pretty
13  well.  It's an organized collection.  You have got the
14  ladies clothes at the beginning.  Then it goes to kids
15  and boots and shoes and so on, product by product
16  organized.  It's about items.  Things Sears is selling
17  with associated information.  Published by Sears.
18  They are a seller, a distributor, whatever you want to
19  call it.  Includes things like a part number, price,
20  catalog number, vendor name.  Sears is on the front.
21  It may not be on every page, but certainly on the
22  front.
23      I don't know if it has a vendor ID, but this
24  list isn't something that's required that you have to
25  have all of these.  That's why it has the word

3176

1  preferably, right?  Then a textual description of
2  items and preferably, not necessarily, images of the
3  items.
4      So that meets the definition of a catalog
5  pretty well.  That holds up with your common sense.
6  And it's pretty consistent if we go to slide 48, I
7  think it is.  Even what the patent says about
8  catalogs.  This is a feature of the invention to have
9  multiple catalogs from different suppliers.  And it
10  gives these examples.  And I'll summarize it here, but
11  basically it talks about published by a vendor,
12  distributor, having the distributor's catalog numbers
13  for their listed products.  And also vendor
14  manufacturer part numbers.  Down at the bottom, line
15  52 there, it further contained catalogs published by
16  some of the vendor manufacturers.  Again having part
17  numbers and the like.
18      Then if you go down to about line 56.  It can
19  also contain catalogs published by outside suppliers,
20  other manufacturers, distributors listing their vendor
21  products different from those in the distributor
22  catalog.  So these are all these different published
23  things out there.
24      So if we go back to 46.  So that was the
25  Court's definition of "catalog."  Very consistent with

3177

1  what the patent says.  What about that last claim?
2  I'll just talk about that a little bit.  That 12th
3  claim.  That's Claim 1 of the '172 patent.
4      Now, that claim has a claim element that
5  refers to something called an order list.  So I want
6  to show you the Court's definition of that in slide
7  49.  So even that claim requires a means for
8  generating an order list, which is a list of desired
9  catalog items.  So here's where that concept of
10  catalog comes into play here.
11      And if we look at slide 49A, Dr. Weaver, his
12  analysis was entirely reliant on his opinion that the
13  Lawson system had catalogs in it.  And that even
14  included this claim.
15      And if we could go to the next slide here.
16  This was Dr. Weaver's testimony specific to that Claim
17  1 of the '172 patent.  It's kind of a long question
18  here, but what's being shown here is his opinion about
19  Lawson infringing that claim, and specifically the
20  part of that claim that refers to an order list, that
21  was based in part on his analysis concluding that the
22  desired items - do you remember that an order list is a
23  list of desired catalog items - included in results of
24  searches of product catalogs, and that's what he
25  called catalog items.  That's how he looked at it for

3238

1    evidence.  Now, corporations here are involved as parties in
2    the case, and, of course, corporations can act only through
3    natural people such as you and me as the agents or employees,
4    and in general any agent or employee of a corporation may bind
5    the corporation by his acts and declarations made while acting
6    within the scope of the authority delegated to the employee or
7    the agent and within the scope of those duties.
8            Now, the lawyers have made references to facts in
9    their arguments, and I have, on occasion, made references to
10   some of the evidence and facts in ruling on things here, on
11   objections that is.  If any reference to a fact that is made by
12   the Court or by the lawyers doesn't coincide with your own
13   recollection, remember, it is your recollection that controls,
14   not what they say and not what I say, because you are the
15   judges of the facts.
16           I told you earlier, too, that you are going to be
17   judging the credibility of witnesses.  That just means who do
18   you believe and how much of what they have to say do you
19   believe.  You bring to that skill the talent that you exercise
20   in everyday life.  There isn't a day that goes by that somebody
21   doesn't tell you something that you have to decide whether you
22   are going to believe or not.
23           Well, you probably do everything I'm going to mention
24   now, but if you don't, keep in mind that this is what you need
25   to do when you are assessing the credibility of the witness:

3239

1            Scrutinize the testimony that's given.  Consider the
2    circumstances under which each witness has testified.  Consider
3    every matter in evidence which tends to show whether a witness
4    is worthy of belief or not.  Consider each witness's
5    intelligence, motive, and state of mind and demeanor, the way
6    they act, and manner while on the stand.  Somebody tells you
7    something, you look at them, you listen to them, and you judge
8    by the way they act in part whether what they are saying is
9    right or not.
10           You can do that here, too.  Consider what the
11   witness's ability was to have observed the matters as to which
12   he or she has testified and whether the witness impresses you
13   as having an accurate recollection of the matters.  Consider
14   also any relation each witness may bear to either side of the
15   case.  Consider the manner in which the witness might be
16   affected by the verdict and the extent to which, if at all,
17   each witness is either supported or contradicted by other
18   evidence in the case, because you are to consider all the
19   evidence.
20           Remember that inconsistencies or discrepancies in the
21   testimony of a witness or between the testimony of different
22   witnesses may or may not cause you, the jury, to discredit such
23   testimony, but remember this:  When two or more people witness
24   an incident or transaction, they just simply may see it or hear
25   it differently, and innocent mis-recollection, like failure of

3240

1    recollection, isn't an uncommon experience.  And so in weighing
2    the effect of some discrepancy, always consider, does that
3    discrepancy pertain to a matter of importance or to some
4    unimportant detail?  And does that discrepancy result from
5    innocent error or from deliberate falsehood?
6            After making your own judgment, you're going to give
7    the testimony of each witness such credibility, if any, as you
8    may think it deserves.  That is up to you to do.
9            Something came up during the trial that I need to
10   sort out for you.  Several days ago, Mr. Christopherson
11   testified, and there was some testimony about whether Lawson
12   obtained an opinion of counsel of non-infringement or
13   invalidity on the patents.  I instruct you now that I have
14   excluded that testimony.  That issue is simply not pertinent to
15   the case.  It has nothing to do with the case, and I'm
16   instructing you to disregard whatever was said about the
17   intention or nonintention of counsel by Lawson.
18           Now, several times during the trial, the lawyers have
19   pulled out depositions and have asked a witness a question and
20   said, on such and such a date, didn't you say this after the
21   witness has said something here in court.
22           A deposition is a sworn statement made out of court
23   but under oath, but the testimony of a witness can be
24   discredited or impeached by showing that a witness made
25   statements earlier which are different or are inconsistent with

3241

1    what the witness testified to in court.
2            So if I come to court and I testify that a traffic
3    light was red, and that's my testimony, but at some earlier
4    time I've been deposed or I've written down something, and I
5    said the light was green, you can consider what I said before
6    in evaluating what I said here in deciding which is it that you
7    should accept.  There'll be lots of reasons why maybe people
8    give inconsistent statements, and you'll just have to sort that
9    out.
10           Now, this earlier inconsistent or contradictory
11   statement of a witness who is not a party -- that would be Ms.
12   Eng -- who are the nonparties who testified?  Actually Ms. Eng
13   is a consultant, isn't she?
14           Mr. Yuhasz, let's say that that was Mr. Yuhasz who
15   said the green light, red light, all right?  Well, in his case,
16   the only reason you can consider that outside testimony is to
17   decide whether to believe what he said in here, that is you
18   say, well, he said something inconsistent, so I'm not sure I
19   want to believe him, or it was inconsistent, but it's not a big
20   deal, so I'm going to go ahead and accept what he said in court
21   even though he did say something inconsistent.  In other words,
22   you can use it to evaluate his credibility.
23           It's your responsibility to do that.  Now, where a
24   party in the case, by -- and that's a corporation by its
25   witnesses, admits some fact or facts, then if that's knowingly

3254

1   results if the defendant, here, Lawson, induces another to

2   infringe a patent or contributes to the infringement of a

3   patent by another person.  I'm going to explain those two types

4   of infringement now.

5        Lawson would be liable for directly infringing

6   ePlus's patents if you find that ePlus has proven by a

7   preponderance of the evidence that Lawson itself has made,

8   used, offered to sell, sold, or imported into the United States

9   the invention defined in any claim of the patents.  Then that

10   claim has been infringed if they proved that by a preponderance

11   of the evidence.

12        Now, remember that someone can directly infringe a

13   patent without knowing that what they are doing is an

14   infringement of the patent.  You don't have to know you are

15   infringing the patent to infringe it.  You either do or you

16   don't.  So you can directly infringe a patent even though you

17   believe in good faith that what you are doing is not an

18   infringement of the patent.

19        The issue is does it or doesn't it, not what state of

20   mind the direct infringer had.  In every infringement analysis,

21   the language of the claims as well as the nature of the accused

22   system or method dictates whether infringement has occurred.

23   To infringe a claim that recites capability and not actual

24   operation, an accused system or method need only be capable of

25   operating in the described mode.  Thus, depending on the

3255

1   claims, an accused system or method may be found to infringe if

2   it is reasonably capable of satisfying the claim elements or

3   limitations even though the system or method may also be

4   capable of non-infringing modes of operation.  The fact that a

5   product or process may operate in a manner that does not

6   infringe is not a defense to a claim of infringement against

7   Lawson if its system is also reasonably capable of operating in

8   a manner that satisfies the claim elements.

9        Now, Lawson -- I mean ePlus also alleges that Lawson

10   has actively induced other people to infringe the

11   patents-in-suit.  In particular, who are they alleged to have

12   induced?  The Lawson customers in this case.  That's what it's

13   about.

14        To show induced infringement, ePlus has to prove by a

15   preponderance of the evidence that someone, here, Lawson's

16   customers, have directly infringed the ePlus patents, and that

17   Lawson -- so they have to show that the customers directly

18   infringe.  And remember, it doesn't make any difference whether

19   the customers knew or didn't know that they were infringing,

20   because if you infringe, you infringe whether you know it or

21   not.  But they also, ePlus has to prove by a preponderance of

22   the evidence that Lawson has actively and knowingly aided and

23   abetted that direct infringement.

24        So here, in order to find that Lawson has induced

25   somebody else to infringe, you do have to consider Lawson's

3256

1   state of mind, i.e., that they actively and knowingly aided and

2   abetted the indirect infringement by their customers.  ePlus,

3   thus, must show that Lawson actually intended to cause the acts

4   that constitute infringement and that Lawson knew of the patent

5   and that Lawson knew or should have known that its actions

6   would lead to actual infringement.

7        Knowledge of the patent may be established by a

8   finding that Lawson had actual knowledge of the patent or that

9   Lawson deliberately disregarded a known risk that ePlus had a

10   protective patent.  Intent to cause the acts that constitute

11   direct infringement may be demonstrated by evidence of active

12   steps taken to encourage direct infringement such as

13   advertising an infringing use or instructing someone on how to

14   engage in the infringing use.

15        It is not necessary to show that Lawson has directly

16   infringed as long as you find that someone, here the Lawson

17   customers, directly infringed and that Lawson did the things

18   that I said constituted inducement.  If there's no direct

19   infringement by anyone, there can be no induced infringement,

20   and, of course, induced infringement must also be assessed on a

21   claim-by-claim basis.

22        Now, just to review that, what you're going to have

23   to do here is look and see if Lawson's systems, all or any of

24   them, actually infringed the patent when they were used by the

25   customers of Lawson.  Then you have to decide whether Lawson

3257

1   actively and knowingly helped -- that's called aiding and

2   abetting -- the direct infringement, and there was evidence

3   that you have to decide about who was involved in talking to

4   the customers, what they told the customers.  You consider all

5   of that as well, but remember that in order to prove by -- I

6   mean to prove induced infringement, ePlus has to show that

7   Lawson actually intended to cause the acts -- and I'm reviewing

8   this little part of the instructions -- that constitute

9   infringement, that Lawson knew of the patent and that Lawson

10   knew or should have known that its actions would lead to actual

11   infringement.  Pay attention to the rest of that instruction as

12   well, but I wanted to recapitulate for you that.

13        Now, there's another kind of indirect infringement

14   that's involved, and that's called contributory infringement.

15   ePlus also argues that Lawson is liable for this contributory

16   infringement by contributing to the direct infringement of

17   ePlus by third parties, again, the Lawson customers.

18        As with direct infringement, you have to determine

19   contributory infringement on a claim-by-claim basis.  Lawson is

20   liable for contributory infringement of a claim if ePlus proves

21   by a preponderance of the evidence, one, that Lawson sells,

22   offers to sells, or imports within the United States a

23   component of a Lawson system or apparatus for use in a process

24   during the time the patent is in force.

25        I don't think there's any issue here, is there, about

3298

1          (Jury in.)

2

3          THE COURT:  The jury has decided that it would like

4   to return home for the evening and then return in the morning

5   and deliberate.  What is your pleasure on the time to

6   deliberate?  Do you want to start at 9:00, start at 9:30?

7          Nine o'clock we'll be here and have stuff ready for

8   you, and you be ready and you can have -- if you take whatever

9   time you feel like you need to deliberate.  If you leave your

10  notebooks the way you usually do, Mr. Neal will take care of

11  them.  Thank you.  Drive carefully.

12

13         (Jury out.)

14

15         THE COURT:  Have all these transcripts and these

16  things -- you've got everything you need; right?

17         MR. STRAPP:  Yes.

18         MR. CARR:  I believe so.

19         THE COURT:  One thing I need for you all to do is to

20  see if there's anything that needs to be cleaned up that I need

21  to decide.  For example, they've got these motions that have

22  been filed yesterday -- this morning or yesterday.  I don't

23  know what -- by Lawson.

24         I need a briefing schedule on them and see what I'm

25  supposed to do, and that means you all need to get moving and

3299

1   decide how you want to proceed, little things like that so we

2   can get that sorted out.  I'd like to get all this done just as

3   soon as I can.

4          MR. ROBERTSON:  I'll call Mr. McDonald tomorrow once

5   he gets back to Minnesota.  I understand he's gone back.

6          THE COURT:  He's what?

7          MR. ROBERTSON:  I'll call Mr. McDonald tomorrow in

8   Minnesota.  I know he's traveling --

9          THE COURT:  He's in Minnesota?

10         MR. CARR:  He is leaving this evening, yes.

11         THE COURT:  Are you fully empowered?

12         MR. CARR:  Yes, sir.

13         MR. ROBERTSON:  I'll just --

14         THE COURT:  Does he understand that the juries have a

15  lot of questions sometimes?

16         MR. CARR:  He does.

17         THE COURT:  Okay.

18         MR. ROBERTSON:  I'll work out a briefing schedule,

19  Your Honor, and we'll take care of it in short order.  Maybe we

20  can decide some of things have been mooted by some of Your

21  Honor's rulings.

22         THE COURT:  They very well may have.  I don't know

23  the answer to that.  Some of them may not, but I want to make

24  sure we get it done.

25         MR. ROBERTSON:  Your Honor, I intend on having at

3300

1   least two attorneys here at all times so I can be reached by

2   phone.  I'm just right down here at the Hilton Garden Inn, so I

3   can be here in four minutes.

4          THE COURT:  Do you have to trade shoes or can you --

5          MR. ROBERTSON:  I come equipped.  I will be right

6   over here pronto, but we'll have somebody here at all times.

7          THE COURT:  That's fine.

8          MR. ROBERTSON:  All right.  Thank you.

9          THE COURT:  Now, is he coming back?  Mr. McDonald or

10  Ms. Stoll-DeBell?

11         MR. CARR:  As far as I know, he's not coming back.

12         THE COURT:  Well, then, I know not to schedule any

13  arguments, I guess, until I'm certain.  All right.  I guess

14  that solves it for now.  Thank you very much.  We'll be in

15  adjournment.

16

17         (Court adjourned.)

18

19

20

21

22

23

24

25

3301

```
 1           IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                   RICHMOND DIVISION
 3      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                  :
 4    ePLUS, INC.,                :
                                  :
 5         Plaintiff,             :
      v.                          : Civil Action
 6                                : No. 3:09CV620
      LAWSON SOFTWARE, INC.,      :
 7                                : January 25, 2011
           Defendant.            :
 8      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:
 9
10
11         COMPLETE TRANSCRIPT OF JURY TRIAL
           BEFORE THE HONORABLE ROBERT E. PAYNE
12    UNITED STATES DISTRICT JUDGE, AND A JURY
13
14
15    APPEARANCES:
16    Scott L. Robertson, Esq.
      Michael T. Strapp, Esq.
17    GOODWIN PROCTOR
      901 New York Avenue, NW
18    Washington, D.C.  20001
19    Craig T. Merritt, Esq.
      CHRISTIAN & BARTON
20    909 E. Main Street, Suite 1200
      Richmond, VA  23219-3095
21
           Counsel for the plaintiff ePlus
22
23         DIANE J. DAFFRON, RPR
24         OFFICIAL COURT REPORTER
           UNITED STATES DISTRICT COURT
25
```

3302

```
 1    APPEARANCES:  (Continuing)
 2    Dabney J. Carr, IV, Esq.
      TROUTMAN SANDERS
 3    Troutman Sanders Building
      1001 Haxall Point
 4    P.O. Box 1122
      Richmond, VA  23218-1122
 5
           Counsel for the defendant Lawson Software.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3303

```
 1         (The proceedings in this matter commenced at
 2    9:09 a.m.)
 3
 4         THE CLERK:  Civil Action No. 3:09CV00620,
 5    ePlus, Incorporated v. Lawson Software, Incorporated.
 6    Mr. Scott L. Robertson, Mr. Craig T. Merritt, and
 7    Mr. Michael T. Strapp represent the plaintiff.
 8    Mr. Dabney J. Carr, IV represents the defendant.
 9    Are counsel ready to proceed?
10         MR. ROBERTSON:  Yes, Your Honor.
11         MR. McDONALD:  Yes, Your Honor.
12         THE COURT:  Good morning, ladies and
13    gentlemen.  The record reflects that all the jurors
14    are here assembled and they will return to their
15    deliberations.
16         Mr. Neal, have you given them menus?
17         THE CLERK:  Yes, sir, they've completed them.
18         THE COURT:  All right.  Thank you very much.
19    And we'll see you when you have a verdict.
20    Thank you.
21         (The jury resumes deliberation at 9:11 a.m.)
22         THE COURT:  All right.  We have this question
23    about the offer of proof now that the briefs are in.
24    Can I just decide that on the papers or does anybody
25    want argument on it?
```

3304

```
 1         MR. MERRITT:  Your Honor, we're happy to have
 2    it decided on the papers.  I think we've spilled about
 3    all the ink over it that can be spilled.
 4         MR. McDONALD:  That's fine with Lawson, Your
 5    Honor.
 6         THE COURT:  All right.  I'll just decide it
 7    on the papers.  And then you-all need to talk about a
 8    briefing schedule on that.  There were two motions
 9    that were filed yesterday.
10         MR. ROBERTSON:  JMOL, no invalidity, Your
11    Honor, and there's a Rule 37 motion filed by Lawson.
12         MR. CARR:  Yes, the Rule 37 motion has to do
13    with the Section 103(c)(1) issue.  We can work
14    something out.
15         THE COURT:  And you have a motion for what?
16         MR. ROBERTSON:  JMOL, no invalidity.
17         THE COURT:  No invalidity.
18         MR. CARR:  And we need to set a schedule for
19    us to respond to that.
20         THE COURT:  All right.  You all do that and
21    I'd like to go on and get this stuff done while it's
22    relatively fresh in my mind, if you don't mind.  So if
23    you could get an expedited, but an expedited, but a
24    schedule that's not a leisurely one, I would
25    appreciate it.
```

3305

1      MR. ROBERTSON:  Sure.

2      THE COURT:  All right.  Thank you very much.

3      MR. ROBERTSON:  Thank you.

4      THE COURT:  Not all of you have to wait here

5   all the time.

6      MR. ROBERTSON:  Your Honor, I think we've

7   worked it without Mr. Neal.

8      Mr. Neal, do you know when their lunch period

9   is?

10      THE COURT:  Generally, what time does lunch

11   come?

12      THE CLERK:  Between 12:30 and 1:00.

13      MR. ROBERTSON:  We'll check in with Mr. Neal.

14   He has our phone numbers, and we'll have somebody in

15   the conference room at all times.

16      THE CLERK:  I'm come find you.  You don't

17   have to check back.

18      THE COURT:  I've think it's better for you

19   just to call and tell them when the lunch period is.

20      MR. CARR:  That sounds fine.

21      THE COURT:  All right.  Thank you.

22      MR. ROBERTSON:  Thank you, Judge.

23      (Recess taken.)

24      (Court resumes session.  The jury is not

25   present.)

3306

1      THE COURT:  All right.  In Section II,

2   validity, (A) what are we supposed to use to define

3   "Fisher RIMS" in A?

4      Next question:  Since J-CON and P.O. Writer

5   aren't listed on our verdict sheet, are we to consider

6   them as prior art?  Isn't that what they were included

7   in the case for?

8      Next question:  Was P.O. Writer meant to be

9   considered as a competing, similar system or was that

10   evidence not to be included in deliberations?

11      Next question:  In jury instruction, Judge

12   Payne spoke of anticipation.  Two items combined are

13   not prior art.  So anticipation does not apply

14   anymore; is that correct?

15      Let's take the easy ones first at the back.

16   I propose to call them back in here and refer them to

17   the anticipation instructions and to remind them that

18   you can't combine two pieces of prior art for purposes

19   of anticipation, that it all has to be -- that you

20   have to consider whether there's anything in one

21   single prior reference, prior art reference.  And

22   anticipation is in the case but not in terms of the

23   combination, that the combination applies only to the

24   obviousness; is that right?

25      MR. ROBERTSON:  I think, Your Honor, there

3307

1   are two sentences from your instruction No. 31 that

2   would respond to this.  And they are:  To anticipate a

3   claim, each and every element in the claim must be

4   present in a single item of prior art.  Anticipation

5   cannot be established by combining two or more items

6   of prior art.

7      MR. CARR:  Your Honor, it occurs to me that

8   what they might be confused about is that there are

9   two references that are accused, that are offered to

10   be anticipatory, and I wondered if it might me helpful

11   to them to clarify to them because those are in the

12   instructions, those two references, and just to let

13   them know that they need to consider each separately.

14      I think that would be helpful to them to let

15   them know.  I think where they may be confused is they

16   have been given two references for anticipation and

17   they may be thinking of them together.

18      THE COURT:  That's possible.

19      MR. ROBERTSON:  Your Honor, the verdict form

20   breaks those down separately.  So the verdict form

21   takes care of that issue.

22      THE COURT:  Well, nonetheless, anything that

23   will help them is fine.

24      All right.  I think I know how to deal with

25   that one.

3308

1      Now, on P.O. Writer, the bottom line is that

2   they are out of the case, isn't it?  They are not to

3   be considered.

4      MR. CARR:  No, Your Honor.  P.O. Writer and

5   J-CON, if you will remember at the time of Dr. Shamos'

6   testimony, were being offered on the issue of

7   secondary considerations of non-obviousness on long

8   felt need.  As systems that were in the marketplace at

9   the relevant time that were meeting the needs of the

10   marketplace.  That was your ruling.

11      THE COURT:  I think I allowed the evidence to

12   come in for that purpose because it occurred after the

13   combination.  I don't think he testified about that.

14      MR. CARR:  Your Honor, yes, he did testify

15   about both of those systems on that point.

16      THE COURT:  What did he say?

17      MR. CARR:  What I would suggestion here if

18   you said they were offered on that point is that you

19   can tell the jury that they are not being offered as

20   prior art for either anticipation or obviousness as

21   long as you tell them that they are offered on

22   secretary considerations of non-obviousness on the

23   long felt need and meeting the needs of the

24   marketplace point.  That would be what I would

25   suggest.

3321

1   discussed in instruction No. 42 and the particular
2   paragraph two.
3        MR. MERRITT:  And it may be helpful, Your
4   Honor --
5        THE COURT:  And I'll read that all again.
6        MR. MERRITT:  It may be helpful to tell the
7   jury the only items that you may consider for any
8   purpose are correctly set forth in your verdict form.
9   The question seems to imply there may have been an
10  inadvertent admission from the form and to say it
11  positively may also help that.
12       THE COURT:  I think that's also in the
13  instructions.
14       Do you want to go check that transcript for
15  me?
16       MR. CARR:  Yes, Your Honor.
17       THE COURT:  What was the instruction on the
18  last one there, Mr. Merritt, again?
19       MR. CARR:  42?
20       THE COURT:  No, I'm sorry, the last question.
21       MR. ROBERTSON:  31.
22       THE COURT:  31.
23       MR. ROBERTSON:  Yes, there are two sentences
24  in there, Your Honor.
25       THE COURT:  Right.  I just need to make

3322

1   myself a note.
2        MR. MERRITT:  Your Honor --
3        THE COURT:  Hold on.  Let me just get there
4   and make sure I'm right about that.
5        MR. CARR:  The only point, Your Honor, that I
6   made is that I think it would be helpful to them to
7   clarify that they just need to consider each of those
8   separately and not together.
9        THE COURT:  What sentence were you talking
10  about?
11       MR. ROBERTSON:  The second full paragraph,
12  second sentence, "To anticipate a claim, each and
13  every element in the claim must be present in a single
14  item of prior art."
15       Next sentence, "Anticipation cannot be
16  established by combining two or more items of prior
17  art."
18       THE COURT:  Okay.  Now, so we need to take a
19  recess now for you-all to go check that transcript.
20       MR. MERRITT:  Mr. Honor, let me ask, given
21  the fact we seem to be in agreement on what works for
22  the J-CON and P.O. Writer, I think that was the
23  relevance of looking at Shamos.
24       So do we agree now?
25       MR. CARR:  That's fine, Your Honor.  I think

3323

1   that's a good way to leave it.
2        THE COURT:  All right.  Let's get the jury
3   back in here.
4        THE CLERK:  That question is Court Exhibit 5.
5        THE COURT:  You haven't marked it, have you?
6        THE CLERK:  No, sir.  I wanted to check the
7   record first to make sure I'm correct.
8        (The jury is present.)
9        THE COURT:  All right.  Ladies and gentlemen,
10  first, your first question is:  In section II,
11  validity (A) what are we supposed to use to define
12  "Fisher RIMS" in A?
13       Lawson asserts that what it refers to as the
14  Fisher RIMS system is prior art for purposes of
15  anticipation and obviousness.  It appears in both
16  those places.  Lawson must prove by clear and
17  convincing evidence what the Fisher RIMS system was
18  that it contends to be prior art by showing that some
19  version of Fisher RIMS had all the features and
20  functionality of the claims at issue on a claim by
21  claim basis.  That's where we start.
22       Now, ePlus contends that Lawson hasn't met
23  that burden.  That was their argument to you.  Their
24  argument was they didn't show any version of Fisher
25  RIMS had the functionality of the claims at issue on a

3324

1   claim by claim basis.
2        It is for you to decide whether Lawson has
3   met its burden by clear and convincing evidence.  In
4   other words, you decide whether Lawson has proved what
5   I outlined for you.  Does that help you?
6        THE JURY:  Yes.
7        THE COURT:  Okay.
8        The next question is:  Since J-CON and P.O.
9   Writer aren't listed on our verdict sheet, are we to
10  consider them as prior art?  Isn't that what they were
11  included in the case for?  Was P.O. Writer meant to be
12  considered as a competing, similar system or was that
13  evidence not to be included in deliberations?
14       There really are two parts of that, and for
15  that I would like to refer you to instruction 30,
16  which lists prior art for purposes of anticipation,
17  and to instruction 39, which lists the prior art
18  that's at issue for obviousness.
19       You will note that neither J-CON or P.O.
20  Writer is listed as prior art either for purposes of
21  anticipation or for purposes of obviousness.  That
22  means that you cannot consider either P.O. Writer or
23  J-CON or the combination thereof for purposes of
24  deciding anticipation or obviousness.
25       Are you with me so far?

3325

1    THE JURY: Yes.
2    THE COURT: Now, you asked is that evidence
3 in the case still? That is, that there existed
4 something called J-CON and P.O. Writer. And the
5 answer to that is I refer you to instruction 42. 42,
6 I told you, has certain factors which, if established,
7 may indicate that the invention would not have been
8 obvious. In other words, these are things that show
9 non-obviousness. None of those factors alone is
10 dispositive and you must consider the obviousness or
11 non-obviousness of this invention as a whole.
12    But if you'll look at No. 2 in that list,
13 there are six things or seven things, I think, in that
14 list. Yes. No. 2 says, Was there a long felt but
15 unresolved need for a solution to the problem facing
16 the inventors? The inventors meaning of the '683, the
17 '516, and the '172 patents, which was satisfied by the
18 claimed invention. And the evidence about that there
19 is a J-CON and there is a P.O. Writer was admitted for
20 you to consider in deciding whether or not you think
21 there was a long felt but unresolved need for a
22 solution to the problem facing the inventors in this
23 case, which was satisfied by the claimed invention.
24 In other words, that evidence is related and admitted
25 only for the purpose for you to consider in deciding

3326

1 the issue of non-obviousness as outlined in
2 instruction No. 42, which I can read it all over again
3 to you, but I think you can consider it yourselves
4 when you get back in the jury room.
5    I think we have now answered them as we
6 agreed; is that right, Mr. Robertson and Mr. Carr?
7    MR. CARR: Yes, Your Honor.
8    Do you have a second -- another question?
9    MR. ROBERTSON: Yes, Your Honor, I would like
10 to point out that all the factors need to be
11 considered --
12    THE COURT: All the what?
13    MR. ROBERTSON: All the factors need to be
14 considered under instruction 42 as you have given it.
15    THE COURT: Yes. I said I could read them
16 all, but they said they didn't want them read, they
17 could read them themselves.
18    MR. ROBERTSON: Understood. Thank you.
19    THE COURT: Now, in your last question, it
20 is, "In jury instructions, Judge Payne spoke of
21 anticipation: Two items combined are not prior art.
22 So anticipation does not apply anymore. Is this
23 correct?"
24    Let me refer to you instruction No. 31, which
25 deals with anticipation, and in the second paragraph

3327

1 there, it says, To anticipate a claim, each and every
2 element in the claim must be present in a single item
3 of prior art. A single item of prior art.
4 Anticipation cannot be established by combining two or
5 more items of prior art.
6    So are you with me there?
7    THE JURY: Yes.
8    THE COURT: Now, I'll point out to you that,
9 I've told you before, that in deciding obviousness,
10 you can consider combinations of prior art, but in
11 anticipation, you can't. To anticipate, everything
12 has to be in one piece of prior art. Okay? Does that
13 answer your questions?
14    THE JURY: Yes.
15    THE COURT: Any objections to the answers?
16    MR. CARR: No, Your Honor.
17    MR. ROBERTSON: No, Your Honor.
18    THE COURT: All right. Thank you very much.
19 You-all may retire to deliberate your verdict.
20    (The jury resumes their deliberations at
21    11:34 a.m.)
22    THE COURT: I guess they are working their
23 way through things. Their lunches haven't come yet,
24 have they?
25    MR. LANGFORD: No.

3328

1    THE COURT: Mr. Neal will tell you about
2 that. Thank you very much.
3    (Recess taken.)
4    (Court resumes at 2:15. The jury is not
5 present.)
6    THE COURT: Where is the question?
7    THE CLERK: I gave it to Ms. Haggard.
8    THE COURT: "Could we please have the trial
9 transcripts for Dr. Weaver, Dr. Shamos, Patrick
10 Niemeyer, and Brooks Hilliard?"
11    What do you think, gentlemen?
12    MR. CARR: I mentioned to Mr. Robertson
13 beforehand, it's fine with Lawson. It's up to the
14 judge whether you send transcripts back, but they've
15 asked for it, and they wanted it. And we think that's
16 what you ought to do, but we understand it's up to
17 you.
18    MR. ROBERTSON: We think, Your Honor, there's
19 a jury instruction on it with respect to the evidence.
20 And it's the jurors' recollections that should
21 control. We're going to get way down in the weeds if
22 we start trying to piece together all these
23 transcripts.
24    THE COURT: What?
25    MR. ROBERTSON: We think that they should

3337

1   everything so far?  Put a copy of that back up here so
2   I'll have it in case we need it.
3          MR. CARR:  Judge?
4          THE COURT:  Yes.
5          MR. CARR:  This does not need to go on the
6   record.  This is a point of personal preference.
7          (Off the record discussion.)
8          (Recess taken.)
9          (Court resumes session at 5:30 p.m.  The jury
10  is present.)
11         THE COURT:  All right.  Ladies and gentlemen,
12  you are through for the day and will come back
13  tomorrow.  When do you want to come back?  Is 9
14  o'clock all right?
15         THE JURY:  Yes.
16         THE COURT:  We'll see you at 9 o'clock
17  tomorrow.  Do you want your lunch brought to you or do
18  you want to get out of confinement?  You didn't
19  realize that serving on a jury is sort of like being
20  on lockdown, did you?  Because if you want lunch,
21  we'll have it brought to you, but if you want to get
22  out and go on your own --
23         THE JURY:  We can just bring lunch in.
24         THE COURT:  You want us to bring lunch?
25         THE JURY:  Yes, please.

3338

1          THE COURT:  All right.  We'll do it.  As hard
2   as you-all work, what we're asking you to do, that's
3   the least we can do for you.
4          Thank you.  Drive carefully.  Mr. Neal will
5   take care of your notebooks.  In fact, he'll just lock
6   the room up so you don't have to move things.
7          (The jury is leaving for the evening to
8   return tomorrow at 9:00.)
9          THE COURT:  Do you feel lonely, Mr. Carr?
10         MR. CARR:  I've got my little room in the
11  hallway.  People come by and see me in there and come
12  talk to me.
13         THE COURT:  You can get some billable hours.
14  We don't need to be on record for this.
15         (Off-the-record discussion.)
16         THE COURT:  See you in the morning at nine.
17         (The proceedings were adjourned at 5:32 p.m.)
18
19
20
21
22
23
24
25