# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                      RICHMOND DIVISION

 4

 5     ---------------------------------------
                                            :
 6     ePLUS, INC.                          :    Civil Action No.
                                            :    3:09CV620
 7     vs.                                  :
                                            :
 8     LAWSON SOFTWARE, INC.                :    January 4, 2011
                                            :
 9     ---------------------------------------

10

11          COMPLETE TRANSCRIPT OF THE JURY TRIAL

12         BEFORE THE HONORABLE ROBERT E. PAYNE

13       UNITED STATES DISTRICT JUDGE, AND A JURY

14   APPEARANCES:

15   Scott L. Robertson, Esquire
     Michael G. Strapp, Esquire
16   Jennifer A. Albert, Esquire
     David M. Young, Esquire
17   Goodwin Procter, LLP
     901 New York Avenue NW
18   Suite 900
     Washington, D.C.  20001
19

20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23

24              Peppy Peterson, RPR
              Official Court Reporter
25          United States District Court
```

Momyer - Cross

1    Q    If we turn to the exhibit tab ten, the RIMS '989 patent,

2    if we go to figure three of that patent.

3    A    Which patent are you in?

4    Q    Exhibit 10 which is the RIMS patent.

5           THE COURT:  The RIMS patent which you have in front

6    of you, and he wants to go to figure three which is on the page

7    that has 1899 at the bottom of the right-hand corner.

8           THE WITNESS:  I see it.

9           MR. McDONALD:  If you can blow up the top four boxes

10   on that page, please.

11   Q    So didn't you say there in box 202 that one of the steps

12   here of the process after the customer service representative,

13   or CSR, enters the stock number, and that gets entered into the

14   requisition item table, that the local computer searches the

15   parts master table for a stock number?

16   A    It searches the part master table, yes.

17   Q    Part master table, I'm sorry.  So you did describe that as

18   being a search within the part master specifically in RIMS;

19   right?

20   A    Correct.

21   Q    That was a search for matching items; right?

22   A    It was a search for specific item.

23   Q    An item that matched the part number you put in; right?

24   A    Yes.  An exact match.

25   Q    Okay.  Now, was that parts master in the RIMS system,

Momyer - Cross

1    would you consider that a catalog?

2    A    No.

3           THE COURT:  Was the parts master a catalog, is that

4    your question?

5           MR. McDONALD:  That's right.

6    Q    What was the parts master in the RIMS system?

7    A    It had -- if you recall, it was only the local inventory

8    records, and it really had everything that I recall except a

9    vendor.  It did not have a vendor in it since Fisher was a

10   single vendor.

11   Q    So with respect to the distinction between the RIMS patent

12   or product and what you were describing as your invention for

13   the patents in this case, they both had searching, but the RIMS

14   system didn't search catalogs specifically; is that fair?

15   A    Searched parts -- one searched parts lists and the other

16   searched a catalog.

17          THE COURT:  One searched a parts list?

18          THE WITNESS:  Part master table is what it is.

19   Q    Parts master table, another term for that that you just

20   used is a parts list; is that right?

21   A    Yes.

22   Q    Is that also sometimes called an item master?

23   A    Yes, it could be.

24   Q    As the sort of list a customer compiles themselves; right?

25   A    The customer compiles?

Momyer - Cross

1    Q    Well, doesn't the customer typically select the products

2    to go on an item master or parts master?

3    A    When they are building up their item master.

4    Q    One item after another, the people deciding which items

5    get on that parts master or items master is the customer;

6    right?

7    A    Yes, using the system of whatever system you are using.

8         THE COURT:  If the customer is doing the selection,

9    it's the customer, but if I do it and I'm not the customer,

10   then I'm the one making it up; is that right or wrong, or does

11   it always have to go through the customer?

12        THE WITNESS:  No, it doesn't have to go through the

13   customer.

14   Q    The purposes of a parts master or item master is to track

15   the inventory of an individual customer; correct?

16   A    Yes.  That's one of purposes of it, is to hold inventory

17   information.  It also helps identify the product and give you

18   some information about the product.

19   Q    It would be -- the purpose of that information in a parts

20   master or an item master would be to give enough information to

21   help reorder products for that customer for their inventory; is

22   that fair?

23   A    Yes, or do -- the item master could have a list price in

24   it as well.

25   Q    Is it typical -- you are familiar with catalogs that are

WEAVER - DIRECT                    564

1          THE COURT:  Why don't you tell me where it is

2    here because that's what the objection is.

3          MR. McDONALD:  He's talking about UNSPSC

4    codes, Your Honor.  I will agree that's in there.

5          THE COURT:  The objection is withdrawn.

6          MR. ROBERTSON:  Thank you.

7    Q    In examining this kind of cross-referencing or

8    converting capability, is it described in the patent?

9    A    Yes.

10   Q    Why don't we use the '683 patent, if we can, and

11   go to column 16.  That's at tab 2 in the juror

12   notebook specifically at about lines 19 through 27.

13   What's the example being given here as how this

14   cross-referencing or converting process for finding

15   identical or generally equivalent items can be

16   accomplished?

17   A    The general idea here is that a particular part

18   number has been entered into this electronic sourcing

19   system and that particular part number is not

20   available, but the cross-referencing system using the

21   cross-reference index finds that another vendor's part

22   number is the same or generally equivalent, and it

23   substitutes the second part number for the first.

24   Q    Why don't we go to a different claim now, Claim 26

25   of the '683 patent.  And I want to focus on this last

1          The basic transaction for all EDI purchasing is the

2    electronic purchase order.  With electronic purchase orders,

3    EDI users can order materials from vendors electronically.

4    After receiving a purchase order, the vendor returns a detailed

5    purchase order acknowledgment to the client.  This

6    acknowledgment summarizes the information on the purchase order

7    and validates the order's authenticity.

8    Q     What, if any, relevance does that have to your opinions,

9    Doctor?

10   A     Well, what we are going to see is that every purchase

11   order that goes out through EDI, called a PO 850 transaction,

12   EDI 850 transaction is going to generate a response, the

13   purchase order acknowledgment which is EDI 855, and that's

14   where there is the opportunity for the supplier to tell the

15   customer whether or not the order can be filled and whether or

16   not the items that are being ordered are available in

17   inventory.

18   Q     This availability in inventory, is that of relevance to

19   the claims that are being asserted here?

20   A     Yes, it is.

21   Q     There's a heading called using internet email to issue

22   purchase orders?

23   A     Right.

24   Q     How does Lawson indicate this process works?

25   A     So this first paragraph under that heading says, purchase

1  shopping cart, and delete the other one.  So continue.

2     Okay, now stop.  So now I have both notebook computers in

3  the Lawson shopping cart, and I'm going to go up here to this X

4  and delete the ThinkPad.  Continue.

5     And like all good software, it asks me, do you really want

6  to delete that, and I say, yes.  Okay.  Stop.  So at this

7  point, I have done the UNSPSC code, found two generally

8  equivalent notebook computers, chose one, added it to the

9  shopping cart, added the other one to the shopping cart,

10  deleted the first one.

11     So I've been able to convert one item from one source, the

12  ThinkPad from Office Max, into an equivalent item from another

13  source, the Dell Inspiron here, and having done that, I'm now

14  going to go back and pick another category and find another

15  item to add so that I'll have multiple items in my shopping

16  cart.

17     Okay, so I'm backed out -- because I did that drop-down

18  menu to categories, I'm back at the highest level, the segment

19  level.  So continue.  Scroll down.  Stop.  So this time my

20  segment level is laboratory and measuring and observing and

21  testing equipment.  Continue.  Stop.  My family, again, there's

22  only two here, laboratory and scientific equipment, or

23  measuring or observing, or testing instruments and accessories.

24  Continue.

25     So I pick at my family, laboratory and scientific

1   Q      Did we see the ability to select those product catalogs to
2   search?
3   A      We did that through the categories.
4   Q      Tell me what two product catalogs we saw?
5   A      Office Max and Baxter Healthcare.
6   Q      Did we also see Dell and Diablo?
7   A      Yeah, that's right, we did.
8   Q      And was there an ability to select the product catalogs?
9   A      Yes, we did it through the categories.
10  Q      Was there an ability to search for matching items in those
11  product catalogs?
12  A      We did that.
13  Q      How did we do that?
14  A      We put in the -- we did the category search by marching
15  through the UNSPSC codes, picking a commodity and then picking
16  items.
17  Q      Once you had selected those items from the office, from
18  the shopping cart, were you able to put them into a
19  requisition?
20  A      Yes.
21  Q      And did you -- were you able, from that requisition, after
22  you got the appropriate approvals which are not part of the
23  claims of the -- elements of claim, excuse me, were you able to
24  generate one or more purchase orders from that requisition?
25  A      Yes, we did.

1    Q    And were you able, using the UNSPSC, to find items that

2    were similar, generally equivalent?

3    A    Yes, I converted that ThinkPad into a Dell.

4    Q    Thank you.   Doctor, I'd like you to take a look at

5    Plaintiff's Exhibit 280, and can you identify what this

6    document is?

7    A    This is the Lawson Software response to Presbyterian

8    Healthcare Services.

9    Q    So this is another one of those responses to an RFP?

10   A    That's correct.

11   Q    And what is it dated?

12   A    March 22nd, 2005.

13   Q    And if you could take a look at the page that begins with

14   barcode 196, if you would, sir.   And here -- which has a Bates

15   number that ends 848.

16   A    Yes, I'm there.

17   Q    And here Presbyterian Hospital, in this -- here Lawson, in

18   this response to the request for proposal from the Presbyterian

19   Healthcare Services, is ask asking about requisitioning

20   capability from Lawson; is that right?

21   A    Yes.   That's exactly what it says.

22   Q    And it says in the requisitioning capability, it's asking

23   to describe your ordering tools for various types of items,

24   stock, nonstock, and non-catalogs; do you see that?

25   A    Mike, it is below there.   There it is.

1   where in the database those items reside.

2        So if I do a keyword search for Dell, I look it up

3   in the index, and that tells me where the Dell items

4   are, and I only look at those.

5   Q    Do you have any demonstratives that you prepared

6   to help illustrate this point?

7   A    I do.

8   Q    Could we go to 09 at page 15.  Okay.  Here you

9   have a definition of an index from Webster's New World

10  Computer Dictionary.  What significance here should we

11  be focused on as you talk about this computer search

12  index that's being utilized?

13  A    This part here.  When searching or sorting the

14  database, the program uses the index rather than the

15  full database.  Such operations are faster than sorts

16  or searches performed on the actual database.

17  Q    As a computer scientist, is using an index in

18  order to search a relational database something that

19  is utilized in order to make those faster searches?

20  A    Absolutely.

21  Q    Do you know how the Lawson's system search index

22  is created?

23  A    Yes.

24  Q    What is that?

25  A    There's a process by which keywords are defined

WEAVER - DIRECT

1   that are going to become searchable.  So there's a

2   keyword search setup program that you run, and then

3   after you've defined what keywords are going to be

4   searchable and you've got your database loaded, and

5   the item master is now full of data, you run the

6   keyword search load program.  That builds the index.

7       And now until you have changed the database, you

8   have got an index into all the searchable keywords

9   that -- all of the keywords that were chosen to be

10  searchable.

11  Q   Are some of those keywords like item description,

12  item number, classification code that you've been

13  addressing already?

14  A   Yes, they are.

15  Q   Which database tables is the search index built?

16  A   I'm sorry.  Say that again.

17  Q   Sure.  From which database tables is the search

18  index built?

19  A   The item master.  Well, and the vendor item table,

20  too.

21  Q   Once the user has selected the field of the item

22  data that are to be searchable, what is the next step

23  in building this index?

24  A   So after you have chosen your keywords, you have

25  to load them all, and then you -- the computer system,

1   but at a high level, can you tell us generally what is

2   going on here directed to this type of claim and what

3   the elements are doing here with the sort of overall

4   essence of what this claim is?

5   A    Okay.  So there's a collection of catalogs.

6   There's a first set of predetermined criteria.

7   Q    That's tricky word.  At least it sounds tricky.

8   What is it?

9   A    The things that that could be are many of the

10  items that -- yeah.  Many of the things that we've

11  already mentioned like item number, manufacturer

12  number, vendor number, vendor name, description of the

13  product, UNSPSC classification code.

14  Q    These are all criteria that can be used for

15  searching that are determined ahead of time?

16  A    Yes.  And then there is a second set of those

17  criteria, and the content of that set could be the

18  same as the content of the first set.

19       Then there's a catalog selection protocol whereby

20  you use the first predetermined criteria to select

21  less than all of the catalogs.  And then you use the

22  second predetermined criteria to search within that

23  subset in order to find matching items.

24  Q    So let me see if I understand then.  What we're

25  doing here is search refinement.  That is, we can

1   Q   It's been represented to me it's very short.

2   Would you like me to proceed, Your Honor.  It's

3   Plaintiff's Exhibit 364 is the video and Plaintiff's

4   Exhibit 363 are the corresponding hard copy screen

5   shots.

6   A   Stop.

7   Q   Dr. Weaver --

8   A   Are you ready?

9   Q   Maybe we should make an effort not to stop as much

10  so we can have more of a narrative if the Court would

11  permit.

12          THE COURT:  Whatever he wants to do.  I think

13  he was waiting for you to do a question.

14  Q   Can we proceed with the demonstration?

15  A   We can.  All right.

16  Q   Can you preview it for the jury and tell us what

17  we're going to see here?

18  A   Yes, we're going to see searching for the first

19  criteria of Dell.  And then from those catalogs, we'll

20  see that there are multiple vendors for Dell.  And

21  then we'll refine the search with a Dimension 8100,

22  and we'll find that there are multiple vendors for a

23  more specific search inquiry, and that satisfies the

24  elements of Claim One of the '516.

25          THE COURT:  What are the exhibit numbers?

1   new system or just install a new system.

2       So they'll do whatever the customer needs to get a new

3   system up and running.  And Lawson will even host the entire

4   system for the customer, that is provide the hardware and

5   software and then train the customers about how to use the

6   Lawson system even if it's running at the Lawson site.

7   Q   So when you say host the system, that is the customer

8   doesn't have to actually have the software implemented on its

9   computer servers; Lawson will have it loaded there, and the

10  customer can go to the Lawson system and use it?

11  A   That's right.  Yeah.  The customer doesn't have to

12  actually have any of the hardware or software.  All of that can

13  be run from Lawson-owned and managed and maintained computers.

14  Q   So when Lawson is hosting that software, is it performing

15  the method claims that are at issue?

16  A   Yes, it is.

17  Q   Doctor, when Lawson sells a system that has those core

18  procurement modules you identified, inventory control,

19  requisitions, and purchase order, and the prerequisite modules

20  you identified being the Lawson System Foundation and process

21  flow -- can you put up those two -- yellow and blue box, and

22  there are at least two vendor catalogs either loaded, or

23  through the Punchout system available in the databases, does

24  that system have any substantial non-infringing use?

25  A   No.  The suite is intended for one purpose, and that's to

1    do the kind of procurement that we've been discussing now for

2    more than a day.

3    Q    And then when Lawson sells a system that has each of these

4    foundation and these three core modules that make up an

5    infringing system, plus the requisition self-service

6    application on top of that which makes it more user-friendly as

7    I think you identified --

8    A    Right.

9    Q    -- and there are loaded at least two vendor catalogs,

10    either external or combined with an internal -- let me rephrase

11    that.  Let me start over.

12        When you have this requisition self-service loaded on top

13    of these core modules to make it more user-friendly, and when

14    you have available to you either at least two internal catalogs

15    or an internal catalog and at least one external catalog that

16    can be accessed, does that system have any substantial

17    non-infringing use?

18    A    No.

19    Q    We have those three core procurement modules, the

20    requisition self-service and the Punchout procurement

21    application, and available to us at least two product catalogs,

22    does that system have any substantial non-infringing use?

23    A    No.

24    Q    If you would just again for me, I'd like to just confirm

25    the three different scenarios that you have given opinions on

Weaver - Direct

1   and you're doing it because I prompted you to try to expedite

2   things, but in this instance, I think that it's important the

3   jury understand each one, so go ahead and do it --

4           MR. ROBERTSON:  All right, thank you.

5           THE COURT:  -- the old-fashioned way.

6           MR. ROBERTSON:  I'll do that Your Honor.

7   Q    We're back to claim three, Dr. Weaver --

8           THE COURT:  What I meant, ladies and gentlemen, is I

9   suggested to the lawyers that they move right along, and

10  they've been trying to do that, and I think in this instance,

11  them adhering to my instruction to move along resulted in some

12  short forms that Mr. McDonald objects to, and the objection is

13  well-taken.  So it's not his fault, so he'll start again on

14  this issue.

15  Q    So, Doctor, let's break this down if we can into the four

16  accused Lawson systems.  System one I'll call the core system

17  which has the blue block -- the yellow block and the blue

18  block; okay?  And system two, let's add the RSS.  System three,

19  let's add Punchout procurement.

20          THE COURT:  Now, wait a minute.  Is that the core

21  plus RSS plus the Punchout procurement?

22          MR. ROBERTSON:  Yes.

23          THE COURT:  Or is it just core plus Punchout?

24          MR. ROBERTSON:  No, you need the requisition

25  self-service.  That's why it's sitting on top of that, Your

Weaver - Direct

```
 1    Honor.
 2              THE COURT:  I just want you to make sure your
 3    question is right.  I think I know the answer, but I think the
 4    question needs to be clarified.  System three is the core plus
 5    the RSS plus the Punchout.
 6              MR. ROBERTSON:  Yes, sir.
 7              THE COURT:  Right?
 8              MR. ROBERTSON:  Right.
 9              THE COURT:  And system four?
10              MR. ROBERTSON:  We'll call that the plus the
11    electronic data interchange module.
12              THE COURT:  So it's the core, which is the yellow and
13    the blue, plus the EDI; is that what you are saying, or are you
14    saying something else?
15              MR. ROBERTSON:  Well, that actually -- we should do
16    the core plus just EDI.
17              THE COURT:  That's what the testimony has been so
18    far.
19    Q    Then you actually could also have, I would think, the
20    system five, would you agree with me, Doctor, that has all five
21    of these boxes?
22    A    Yes, you could.
23    Q    Let's go back to claim one of -- excuse me, claim three of
24    the '683 patent.  Doctor, for indirect infringement, once we
25    get to it, I'm just going to ask you for all these elements,
```

Weaver - Direct

1    that both of these are method claims?

2    A    That's correct.

3    Q    And both of these have -- the first five elements are

4    identical?

5    A    They are.

6    Q    Now, earlier you said the direct infringement, I

7    understood your opinion to be, would be by the customers

8    performing the steps of this method claim as well as Lawson

9    when it hosts a system that can perform the steps of these

10   claims; is that right?

11   A    That's correct.

12   Q    So do you have an opinion as to whether or not customers

13   can perform the step of maintaining at least two product

14   catalogs on a database containing data relating to items

15   associated with the respective sources?

16   A    Yes, all of the systems do that.

17   Q    Okay, all five?

18   A    All five.

19   Q    Now, the same for claim 28, do you have an opinion as to

20   whether or not customers, using all five of the systems as they

21   are configured and defined, can select or -- can perform the

22   steps of selecting product catalogs to search?

23   A    Yes, they can.

24   Q    Now, that would be the same for both claim 26 and 28?

25   A    Yes, it's the same.

Weaver - Direct

1   Q    All right.  The next step in these method claims is

2   searching for matching items among the selected product

3   catalogs.  Do you see that?

4   A    I do.

5   Q    That's for both claim 26 and claim 28?

6   A    Correct.

7   Q    We see the ability to search for matching items among the

8   selected product catalogs in evidence you offered?

9   A    Yes.  We saw it in the demonstrations.

10   Q    Did we see it in documentation?

11   A    Certainly.

12   Q    That would be for both claims?

13   A    For both claims.

14   Q    Does all five of the accused Lawson systems have the

15   ability to, capability of building a requisition using data

16   relating to selected matching items and their associated

17   sources?

18   A    Yes.

19   Q    Can the customers perform that step with all five

20   configurations that we've defined?

21   A    Yes.

22   Q    The next step is processing requisition to generate one or

23   more purchase orders for the selected matching items.  Did we

24   see that that step could be performed in the demonstrations?

25   A    We saw it in the demonstrations.

1   number from said predetermined third party.

2       Do configurations 2, 3 and 5 satisfy that claim

3   element?

4   A    They do using the UNSPSC codes.

5   Q    Do you have an opinion as to whether or not Lawson

6   induces infringement of its customers by providing an

7   electronic sourcing system that's capable of doing all

8   of these elements of Claim 29?

9   A    My opinion is that they do.

10  Q    Earlier I asked you whether or not these five

11  configurations in the manner that they are configured

12  as we've defined them had any kind of substantial

13  non-infringing use if they had at least two product

14  catalogs available to them.  Do you recall that?

15  A    I recall the question.

16  Q    With respect to indirect infringement as to all

17  the claims you have just identified for any of the

18  configurations that are the subject of indirect

19  infringement, do you have an opinion as to whether or

20  not Lawson would contribute to infringement if those

21  systems as configured had no substantial

22  non-infringing use?

23  A    I didn't understand the question.

24  Q    Sure.  Let me go back.  Earlier you went through

25  this issue of whether or not there was a substantial

WEAVER - DIRECT                    837

1    non-infringing use for the various configurations

2    we've talked about here.  Here we have five separate

3    configurations.  And I asked you whether or not if a

4    configuration had at least two product catalogs, would

5    it have any substantial non-infringing use.

6    A    And I said it would not have.

7    Q    So if it did not have a substantial non-infringing

8    use and had at least two catalogs for a system, do you

9    have an opinion as to whether or not based on that

10   Lawson would be contributing to infringement for the

11   same claims that you have identified here for each

12   configuration?

13   A    It would.

14          MR. ROBERTSON:   Thank you, Doctor.  I have

15   nothing further.

16

17      CROSS-EXAMINATION

18   BY MR. McDONALD:

19   Q    I was going to say good morning, but now I'll say

20   good afternoon.

21   A    Good afternoon, Mr. McDonald.

22   Q    Now, you would agree, wouldn't you, that for all

23   the claims that are at issue in this case, they all

24   claim a combination of parts?

25   A    They do.

1   lamp demonstration?

2   A    In order to show the richer, fuller ability to

3   search categories.

4            THE COURT:  Did you add it or did the Lawson

5   people add it?

6            THE WITNESS:  My understanding from the

7   attorneys is that they engaged a Lawson -- I don't

8   know if it was an employee or a consultant, and this

9   Lawson person assisted them with adding data.

10           THE COURT:  And you didn't put it on?

11           THE WITNESS:  I didn't do it.

12  Q    The Lawson person assisted who?

13           THE COURT:  Some consultant hired by the

14  lawyers who put it on, I think is what he's saying,

15  and he didn't actually put it on.

16  BY MR. McDONALD:

17  Q    Is it your understanding that any search you could

18  do on the Lawson item master product description for

19  any keyword search in itself could generate another

20  catalog?

21  A    Yes, pretty much.

22  Q    So if you had searched for the word "blue," you

23  get back results from the Lawson item master that

24  would be the catalog of blue things?

25  A    Yes.

1   Q    Or things with the word "blue" in their

2   description?

3   A    It would.

4   Q    If I searched for the number 5, it would generate

5   a list of all the things that had a number 5 in the

6   description?

7   A    It would.

8   Q    In your opinion, each one of them is a separate

9   catalog; is that right?

10  A    Yes.

11  Q    So is there really any limit to the number of

12  catalogs in the Lawson item master the way you looked

13  at it?

14  A    No.

15  Q    You are familiar with testimony from customers of

16  Lawson in this case; is that right?

17  A    I read some depositions, yes.

18  Q    Isn't it true that those customers have just a

19  handful, less than 10 items on average, that they get

20  from each vendor loaded into their item master?

21  A    No, sir.

22          THE COURT:  You mean people that were

23  deposed?

24          MR. McDONALD:  People that were deposed,

25  that's right.  They have not testified yet in this

WEAVER - CROSS                    875

1   have.  But you had just gotten started, and I wanted

2   to follow-up with what he was saying.

3   BY MR. McDONALD:

4   Q   You do understand, don't you, Dr. Weaver, that

5   Lawson doesn't dictate what vendors make available to

6   customers when they are a Punchout partner?

7   A   I think that's right.

8   Q   All those websites you mentioned yesterday from

9   Staples, that Stapleslink.com, Lawson has no control

10  over that website, correct?

11  A   Oh, goodness, that's not true.  Lawson has immense

12  control over that website.

13  Q   Tell me about the control Lawson has over

14  Stapleslink.com.

15  A   When the Lawson customer clicks on that -- which

16  one did you say.  Staples?

17          THE COURT:  Stapleslink.com; is that right?

18          MR. McDONALD:  That's right.

19  A   When the customer clicks on that Staples icon,

20  then Lawson sets up a special connection with the

21  Staples link, and it exchanges authentication

22  information.  It issues that Punchout setup request.

23  It waits for the servlet on the Stapleslink.com

24  website to send back the Punchout setup response that

25  includes the URL to which Lawson is supposed to

1   controlling the website itself.  Do you understand

2   that distinction?

3   A   Well, the control of the website, as I've just

4   explained, is a shared responsibility because the

5   servlet, which is part of Staples, is returning a URL

6   to Lawson saying where should we redirect the user's

7   browser.

8   Q   When I have --

9          THE COURT:  Excuse me, Mr. McDonald.  Are you

10  asking him who has control over putting on the Staples

11  link website whatever is on the website?

12         MR. McDONALD:  That's where I was going.

13         THE COURT:  Well, that's different than

14  whether there's control because control has a

15  component of it in the interrelated nature of things,

16  according to him, that I think is distracting from the

17  purpose.

18         What you want to know is:  Who is it that

19  puts products on the Staples link website, right?

20         MR. McDONALD:  Let's try that.

21         THE COURT:  Try that and see if you like it

22  and go from there and see if you can find another one

23  you like.

24  BY MR. McDONALD:

25  Q   With the Stapleslink.com website, who is in charge

WEAVER - CROSS                    878

1   of loading up a list of products on that website?

2   A   Staples is in charge of the content displayed on

3   the website.

4   Q   Does Lawson have any say in what content Staples

5   displays at that website?

6   A   I don't know.

7   Q   If I understood you right, when a customer uses

8   that Stapleslink.com Punchout, can they do a search

9   for products at the Stapleslink.com website?

10  A   Yes.

11  Q   Whose responsible for putting together the

12  computer stuff that you need to do a search at the

13  Stapleslink.com website?

14  A   The search on the stapleslink.com website uses the

15  Staples search engine.

16  Q   How do you know that?

17  A   Because that's the way these systems work.

18  Q   Have you ever done anything to check it out?

19  A   Well, I know how the protocols operate.  And once

20  you're redirected to that site, now you're working in

21  that environment at Staples.

22  Q   My question is did you do anything for your

23  $160,000 to check that out?

24  A   No.

25  Q   Did I understand right for this case you did talk

1    testified earlier about a database, and then I asked him a

2    question, and the question is, the item master plus the item

3    table plus the item question mark equals a database, and that

4    really wasn't what he said, but it was close.

5            Will you recite, sir, what you said was the database

6    in response to the question we were talking about earlier?

7            THE WITNESS:  Yes, Your Honor.  The database is the

8    item master, the vendor table, and the item location table.

9            THE COURT:  Item location table is the other question

10   mark.  All right.

11           MR. ROBERTSON:  Can I ask you what database is that,

12   Dr. Weaver?

13           THE COURT:  That's fine.  You can ask that question.

14   Then Mr. McDonald, since he's the one that started it all

15   anyway, can have a shot at it, too.

16           THE WITNESS:  That's the Lawson database.

17           MR. ROBERTSON:  Thank you.

18           THE COURT:  Mr. McDonald, do you want to ask him

19   anything?

20           MR. McDONALD:  Nothing else, Your Honor.

21           THE COURT:  All right, Dr. Weaver, you're excused

22   subject to the recall we talked about a little while ago.

23           THE WITNESS:  Thank you, Your Honor.  Thanks to the

24   jury.

25           THE COURT:  All right, your next witness, please,

Lohkamp - Direct

1   requisitions, and purchase order; right?

2   A    Yes.

3   Q    There's something within the inventory control module

4   known as the item master; isn't that right?

5   A    Yes.

6   Q    And the item master is a list of products within the

7   inventory module; correct?

8   A    Yes, a list of products within the inventory control.

9   Q    So a user of this supply chain management software

10  solution we've been talking about -- can we call it S3 solution

11  for short?  Are you comfortable with that?

12  A    Yes.

13  Q    This S3 software solution offered by Lawson can have an

14  item master, a list of goods that are available from various

15  suppliers; isn't that right?

16  A    Yes.  It's a list of goods that the customers want to

17  purchase.  They can come from various sources.

18  Q    And so for each item in the item master, you have a number

19  of data fields associated with that item; isn't that right?

20  A    Yes.

21  Q    So you can have a stock unit of measure, for example?

22  A    Yes.

23  Q    You can have manufacturer information?

24  A    Yes.

25  Q    Manufacturer name?

1   that up to one user --

2         THE COURT:  Okay.  Excuse me.  Go ahead.

3   Q   All right.  So I'm clear on this, this requisition

4   self-service application differs from the requisition module in

5   it's more of a widespread application that can be used by

6   multiple users as opposed to the requisitions module in which

7   typically the requisitions department is authorized to make

8   purchases and not all these other employees?

9   A   Requisition self-service is designed to be available

10  through a web browser and available to more people.

11  Q   Now, you call some of these things modules and some of

12  these things applications, but really that's terminology you

13  just use in the way you market it; isn't that right?

14  A   It's terminology from the marketing, how we market and

15  sell it.

16  Q   It's still software; right?

17  A   Still software, yes.

18  Q   One of the things you can do with this requisition

19  self-service application is you can click on a drop-down menu

20  for find/shop to specify to search a catalog; isn't that right?

21  A   It's a find/shop search catalog.

22  Q   Requisition self-service has that capability; right?

23  A   Yes, it has that drop-down menu.

24  Q   And a user can also input keywords into a search box in

25  this requisition self-service application and the user

Lohkamp - Direct

1    interface to locate products; isn't that right?

2    A    Yes, they can.

3    Q    You have some familiarity with a standard known as the

4    universal standard products and services classification code,

5    also known as the UNSPSC code; correct?

6    A    Yes.

7    Q    And the UNSPSC code can be assigned to items in the Lawson

8    procurement suite and used in a way to navigate in this

9    requisition self-service application we've been talking about;

10   isn't that right?

11   A    Yes.

12   Q    And so this -- actually where is the UNSPSC load for

13   inputting that data?  How do you do that?

14   A    For importing the UNSPSC code?

15   Q    Classification codes.

16   A    Okay.  So all the commodity structure, so all the codes

17   and the hierarchy are loaded into inventory control.

18   Q    Inventory control module has the capability to load that

19   as offered; right?

20   A    Yes.

21   Q    So out of the box, inventory control module, one of these

22   core modules that make up this S3 product we've talking about

23   has that capability to get those UNSPSC classification codes

24   right into it; right?

25   A    Yes.

Lohkamp - Direct

1   long-standing relationships with; right?

2   A     Right.  Others have been supported for a number of years.

3         THE COURT:  Excuse me just a second.  Earlier I

4   thought you said, and I'm not suggesting that you said anything

5   deliberately at odds or even maybe not at odds at all, so I'm

6   asking the question.

7         I thought you said that the customers, Lawson's

8   customers had to execute the contracts with the trading

9   partners, the punchout partners, and then you just said that

10  Lawson has contracts with the trading, punchout trading

11  partners.  Are there two different contracts that are involved?

12        THE WITNESS:  Yes, sir.  There are two different

13  contracts that are involved.

14        THE COURT:  What does the contract between Lawson and

15  the punchout partner, basically what does it arrange for?

16        THE WITNESS:  It arranged for the testing of the

17  communication between procurement punchout and the vendor's

18  maintained website.  We make sure there's really the handshake

19  so that if a customer wants to use our software with that third

20  party, we'll test it to make sure that it works and that when

21  they check out, that the items they've selected were able to

22  bring them back into our software, and so it covers that

23  initial testing and then ongoing maintenance of that.

24        THE COURT:  And then the customer's contract with the

25  punchout partner, what generally does it cover?

1    in it about ePlus?

2    A    Yes, I did.

3    Q    Did it?

4    A    Not that I could find.

5    Q    I'm going to move onto another topic.

6    Mr. Robertson asked you about your knowledge of ePlus

7    when you first learned about them.   When did you first

8    learn about ePlus' patents?

9    A    When this lawsuit was filed.

10   Q    So as part of your earlier knowledge, you did not

11   know that they owned patents?

12   A    That's correct.

13   Q    I'm going to ask you some questions about some of

14   the accused products in this case, the core modules

15   and also RSS.   Let's start by talking about RSS.   When

16   you select search catalog in RSS, what does it

17   actually search?

18   A    It's searching the Lawson item master.

19   Q    Who selects the items that are included within

20   Lawson's item master?

21            MR. ROBERTSON:   Objection, Your Honor

22   relevancy.

23            MS. STOLL-DeBELL:   Your Honor, it goes to

24   infringement.

25            MR. ROBERTSON:   It has nothing to do with the

                        LOHKAMP - CROSS              1084

1    BY MS. STOLL-DeBELL:

2    Q    You probably need me to ask my question again?

3    A    Yes, please.

4    Q    I'll do the best I can.

5         Who selects the items that are included in item

6    master?

7              MR. ROBERTSON:  Can I have a running

8    objection to this line of questioning because I just

9    don't want to keep interrupting?

10             THE COURT:  It's the same one I just

11   overruled.  So you obviously have that.  She's just

12   repeating the question that she had.  Go ahead.

13             And running objections to questions are not

14   good things because nobody knows where the running

15   stops.  So if you have an objection to a question, you

16   have to raise it, but on this one, you've already

17   raised it.

18             So who in your understanding selects the

19   items to be put in the item master?

20             THE WITNESS:  The customer selects the items

21   to be put in the item master.

22   Q    Why doesn't Lawson select the items that go into

23   the item master?

24   A    Because we don't know what our customers purchase,

25   and we don't have visibility into the items they have

LOHKAMP - CROSS                    1085

1   on contract or want to purchase.

2   Q   What's the purpose of item master?

3   A   The purpose of the item master is to create a list

4   of goods and services that our customers are typically

5   going to want to purchase or maintain in inventory.

6   And so the goal is to be able to make that list

7   available to their employees.

8   Q   Is it possible for a customer to decide to include

9   every item a vendor sells in the item master?

10          MR. ROBERTSON:  Objection.  It calls for

11  speculation, Your Honor.

12          THE COURT:  Well, if he knows.

13          Do you know that?

14          THE WITNESS:  Yes, I do know that.

15          THE COURT:  All right.

16  A   It is possible, but our customers typically --

17          THE COURT:  All she asked is:  Is it

18  possible?

19  A   Yes, it's possible.

20  Q   Have you ever seen one of your customers or are

21  you aware of a situation where one of your customers

22  decided to include every single item a vendor sells in

23  their item master?

24  A   I'm not aware of that situation.

25  Q   Do you encourage customers to include all the

1    items that a vendor sells in item master?

2    A    No, we do not.

3    Q    Why?

4    A    Because our customers are usually buying our

5    system to put a limited set of items, the ones that

6    they have on contract, the ones that they want to

7    drive standardized purchasing against.

8    Q    When you say "standardized purchasing," can you

9    tell the jury -- describe what you mean by that.

10   A    What I mean by that is our customers are looking

11   to implement our systems to typically drive savings in

12   what they are buying.  So they want to make available

13   to their employees only a limited set of options of

14   things to purchase, and they want to make sure it's

15   got their negotiated price from their vendor.

16   Q    Is there any benefit to a customer including an

17   item in the item master that they don't want to

18   purchase?

19   A    No.

20   Q    Are there detriments to doing that?

21   A    The detriment is that they have to then maintain

22   that on an ongoing basis.

23   Q    Does that take time?

24   A    It does take time.

25   Q    Does it cost money to do that?

LOHKAMP - CROSS                    1087

1   A    It costs money of the people who need to maintain

2   it.

3            THE COURT:  You have to maintain -- what you

4   do you mean by maintaining?  Suppose I have a catalog

5   page that I've put together with item master, and I

6   put in everything that I want to put in, but I also

7   put in that this person sells toilet tissue.  Are you

8   telling me it costs money to keep that item in the

9   system on my list?

10           THE WITNESS:  It costs money -- the time to

11  initially load it.

12           THE COURT:  To load what?  One item?

13           THE WITNESS:  To load that one line item.

14  Just the time it takes to load that.  And then if the

15  item changes, you need to update that, the time it

16  takes to update.

17           THE COURT:  If I don't use it, it doesn't

18  cost me.  If I don't want to update it, I don't have

19  to incur any time to correct it then; is that right?

20           THE WITNESS:  That's correct, if you don't

21  want to change it at all.

22           THE COURT:  So if I put something in there by

23  accident, it's not going to cost me extra to keep it

24  in there.

25           THE WITNESS:  No, sir.

LOHKAMP - CROSS                1088

1    THE COURT:  Unless I want to follow it, and

2    if it changes, then I have to put in a new number or

3    item number or something else; is that what you're

4    saying?

5        THE WITNESS:  Yes.  If you need to maintain

6    it, it takes the time to change it.  If you need to

7    update it, for example.  But if you don't ever want to

8    change it, there's no additional cost.

9        THE COURT:  But the maintenance that you're

10   talking about is the keeping track of the item number

11   if it changes?

12       THE WITNESS:  It could be keeping track of

13   the item number.  It could be a change to the price if

14   it changes.  It could be getting an update that's no

15   longer available for sale.  The model changes.

16       THE COURT:  All right.  Thank you.

17   BY MS. STOLL-DeBELL:

18   Q    Is this updating and maintaining process typically

19   done on a large group of items at one time?

20   A    It really depends upon the particular product and

21   situation.

22   Q    You were asked questions about PO 536?

23   A    Yes.

24   Q    What is that again?

25   A    It's a vendor agreement load program.

Lohkamp - Cross

1    Q    How is that different than RSS?

2    A    It's different than RSS in that customers wouldn't have to

3    maintain their another -- wouldn't have to load those items in

4    their item master.

5    Q    Does Lawson control the content or functionality of a

6    punchout vendor's website?

7    A    No, we do not.

8    Q    If Lawson doesn't control the punchout vendor's website,

9    why does Lawson have contracts with the punchout vendor?

10   A    We have contracts with the punchout vendor so we can

11   accomplish that testing to insure that handshake of the

12   messaging so that when our customers use punchout, they are

13   able to log in, and then when they're done using the vendor's

14   website, able to get the data back from the shopping cart of

15   the things they want to order.

16   Q    Okay.  Can you explain what that handshake is for us,

17   please?

18   A    Well, it's we -- we kind of refer to it as a cXML message,

19   but it's an electronic formatted document that is sent to the

20   vendor's website with certain information.  First transaction

21   sends their login credentials and basically helps authenticate

22   the user, and then at the end, when the user is done using the

23   vendor website and decided to purchase something, then the

24   vendor website creates a message that we're waiting to receive

25   an electronic message that has the details of the cart, and

Lohkamp - Cross

1132

1   then we bring that into RSS.

2   Q    Okay.  So to make sure I understood this, a cXML message

3   is sent from Lawson's punchout software to the vendor's

4   website?

5   A    Yes.

6   Q    And that contains this handshake you've been talking

7   about?

8   A    Yes.  Contains the login credentials.

9   Q    And what are the login credentials?

10  A    It's a user name and password, an agreed-upon way for

11  the -- for our customers to access the vendor's website.

12  Q    Does Lawson select the user name or password that's sent

13  in this cXML message?

14  A    No, we do not.

15  Q    Who does that?

16  A    The customer in combination with the vendor.

17  Q    So is all that you're doing is requiring that that login

18  credential be sent in a certain format?

19          MR. ROBERTSON:  Objection, Your Honor, to the form of

20  the question; leading.

21          THE COURT:  Sustained.  Let him testify.

22  Q    What does Lawson require with regard to the login

23  credentials?

24  A    It may vary from vendor site to vendor site, but it

25  usually includes a URL which is the website address for the

Lohkamp - Cross

1    where the vendor website is, and then it's usually an

2    identifier to identify the customer to the vendor, and then

3    usually a sort of what's called a shared secret which is

4    essentially the password, and then any other user identifier to

5    help identify who is logging in.

6    Q    And does Lawson control the URL that's part of that?

7    A    No, we do not.

8    Q    Do you care what that URL is?

9    A    No, we don't.

10   Q    So does Lawson control the identifier?

11   A    No.

12   Q    Do you care what it is?

13   A    No.

14   Q    Does Lawson control the shared secret?

15   A    No, we do not.

16   Q    Do you care what it is?

17   A    No.

18   Q    So that takes care of the handshake then?

19   A    The vendor website responds back with another XML message

20   saying that, yes, they've logged in, so it confirms that we've

21   logged in.

22   Q    What happens on the Lawson side of the system?

23   A    On the Lawson side of the system, we're -- our software is

24   waiting to hear back from the vendor website when the user is

25   done using that vendor website.

Lohkamp - Cross

1  Q    Then I think you talked about receiving details of the
2  cart back from the vendor website?
3  A    Yes.
4  Q    Can you explain to us what that's all about?
5  A    When the customer has decided what they wanted to purchase
6  and they go through a checkout process, instead of the order
7  being placed on the website, the vendor website then creates an
8  XML message.  It's an electronic document that gives us all the
9  details of what was in the shopping cart, and we're waiting to
10 receive that information so we can pass that back into
11 requisition self-service.
12 Q    Where does it go once it's received by requisition
13 self-service?
14 A    Once it's received by requisition self-service, it gets
15 put into the shopping ^ cart in requisition self-service
16 requisition lines.
17 Q    Does Lawson control the content of that XML message that
18 the vendor's website sends back?
19 A    No.
20 Q    I think you said that Lawson's system waits around after
21 the customer has accessed and gained access to the vendor's
22 website?
23 A    Yes.  It's waiting for a message back.
24 Q    While it's waiting for a message back, does it have any
25 control over what the customer is actually doing at the vendor

Lohkamp - Cross

1    website?

2    A    No, it does not.

3    Q    So does it control any searching functionality that

4    happens at the vendor website?

5    A    No, it does not.

6    Q    Does it control how the items are displayed at the vendor

7    website?

8    A    No, it does not.

9    Q    Does it control any kind of inventory checking that may

10   happen at the vendor website?

11   A    No, it does not.

12   Q    Does it dictate what kind of searching functionality

13   happens at the vendor's website?

14   A    No, it does not.

15        THE COURT:  I think that's sufficient to have asked

16   the question, which you did at the beginning, that Lawson, in

17   his view, doesn't control the function or content of the

18   punchout vendor's website or the communication in establishing

19   it, and you don't need to go through every component of it to

20   do it.

21        Once you have the whole, established the principle of

22   the whole, then you don't need to go in and add up each word in

23   the sentence.  So let's go on to something else.

24        MR. STOLL-DeBELL:  Okay, Your Honor.

25   Q    I want to talk to you about the contract that you have

1    between Lawson and the punchout vendors, and I'm going to ask

2    you to pull up PX-190 which is an exhibit you looked at earlier

3    today.

4              MS. STOLL-DeBELL:  And, Bill, if you can maybe

5    highlight first the top half of that.

6    A    Okay.

7    Q    What is this document, Mr. Lohkamp?

8    A    This is a procurement punchout partner agreement with

9    Global Healthcare Exchange.

10   Q    Is this similar to the form contract that Lawson enters

11   into with some of its punchout vendors?

12   A    Yes, it is.

13   Q    Is it identical to the form contract that Lawson enters

14   into with some of its punchout vendors?

15   A    It is nearly identical.  I think the difference is maybe

16   in the particular term or the partner fee.

17   Q    Is that something that sometimes changes?

18   A    It can change if it's negotiated with that specific

19   partner.

20   Q    What kind of changes have you seen with that fee?

21   A    In some cases, we've reduced it to a lower amount.  Some

22   cases, we've waived it.

23   Q    Let's go to the second page of this document, please, and

24   if you can blow up paragraph 3.3 for me.  Can you see that, Mr.

25   Lohkamp?

Lohkamp - Cross                                                    1137

1    A    Yes, I can.

2    Q    The first sentence says, each party shall contract for its

3    own products and services directly with customers.  Did I read

4    that correctly?

5    A    Yes, you did.

6    Q    What does that mean?

7    A    That means that each party, so Lawson and a punchout

8    partner, they contract directly with the customer.  So our

9    customer would buy our software from us, and then the punchout

10   partner would establish whatever business relationship they

11   might have with our customer to purchase goods or services.

12   Q    Okay.  So is that consistent with what you were saying

13   earlier, that Lawson does not control any of the functionality

14   or content of a punchout vendor's website.

15             MR. ROBERTSON:  Objection; leading.

16             THE COURT:  Sustained.

17   Q    Let's look at the, I think it's the second sentence in

18   this paragraph.  Starts out, unless otherwise agreed in

19   writing, each party shall bear no obligation to the customer

20   whatsoever with respect to products or services of the other

21   party.  Do you see that?

22   A    Yes, I see that.

23   Q    What does that mean?

24   A    That means that unless we spelled out something that we

25   were going to do together in an agreement, we don't have --

1  there's nothing else we've agreed to.  There's no obligation.

2  Q    Are you aware of any other agreements that Lawson has

3  entered into with any other punchout vendors that would relate

4  to this paragraph?

5  A    All of our punchout agreements, to my knowledge, would

6  have this paragraph.

7  Q    Okay.  And so are there any other agreements with punchout

8  vendors other than this form agreement that we're looking at

9  here?

10 A    The only other one I'm aware of is we had a referral

11 agreement with SciQuest at one point.

12 Q    Let's look at paragraph four.

13       MS. STOLL-DeBELL:  You can blow that up, Bill,

14 please.

15 Q    The first sentence there says, partner agrees that it

16 will, at least ten days prior to any change in its website or

17 interface that would affect a Lawson product, provide Lawson

18 with notice of such changes, written notice of such changes.

19 What does that mean?

20 A    That means that if the vendor may change their website in

21 such a way that punchout no longer would work, then they need

22 to notify us so that we could see if we can make, you know,

23 make any changes to address that.

24 Q    What kind of change would they make that would make

25 punchout no longer work?

Lohkamp - Cross                                                    1139

1    A    I can't think of an example of it.  It's just in there

2    just in case they make a change.

3    Q    Let's use Dell, for example.  If one of Lawson's customers

4    punches out to Dell's website and then buys products from

5    Dell's website, does Lawson make any money for any of the

6    products that the customer would purchase from Dell's punchout

7    site?

8             MR. ROBERTSON:  Objection; relevancy.

9             THE COURT:  Well, I think it probably is not

10   relevant, but she's following up on an irrelevant question

11   asked by somebody else in the courtroom, and I think that given

12   the circumstances, it's all right for her to establish how

13   irrelevant it was.

14            MS. STOLL-DeBELL:  Thank you, Your Honor.

15   Q    So do you understand the question?

16   A    Yes.

17   Q    Okay.

18   A    No, Lawson does not make any money off that purchase.

19   Q    How does Lawson make money off of punchout?

20   A    We make money off of punchout from the license fee for the

21   punchout software and the ongoing maintenance and then any

22   services that we provide to help implement the software.

23   Q    Why does Lawson call these punchout vendors punchout

24   trading partners?

25   A    We call them trading partners because that's an industry

1   term that's used to describe a third party that you're doing

2   business with.  So when we use the word trading partners, our

3   customer is going to recognize that as a third party they might

4   be doing business with.

5   Q    When a Lawson customer punches out to a punchout vendor's

6   website, whose software is actually doing the searching at that

7   vendor website?

8   A    The vendor's website is doing the searching.

9   Q    Does Lawson's RSS software have a search engine?

10  A    Yes, it does.

11  Q    Does that search engine ever do any searching on a

12  punchout vendor's website?

13  A    No, it does not.

14  Q    For punchout to work, does a punchout vendor need to be a

15  supported punchout trading partner?

16  A    No, it does not.

17  Q    I think you testified that some of the punchout vendors

18  have contracted with Lawson and some do not; is that correct?

19  A    That is correct.

20  Q    How many of the punchout vendors have contracts with

21  Lawson?

22  A    It's about four or five.

23  Q    Can you give me some examples of punchout vendors that do

24  not have contracts with Lawson?

25  A    Yes.  Dell, Office Depot, McKesson, Hewlett-Packard, IBM,

1   term that's used to describe a third party that you're doing

2   business with.  So when we use the word trading partners, our

3   customer is going to recognize that as a third party they might

4   be doing business with.

5   Q    When a Lawson customer punches out to a punchout vendor's

6   website, whose software is actually doing the searching at that

7   vendor website?

8   A    The vendor's website is doing the searching.

9   Q    Does Lawson's RSS software have a search engine?

10  A    Yes, it does.

11  Q    Does that search engine ever do any searching on a

12  punchout vendor's website?

13  A    No, it does not.

14  Q    For punchout to work, does a punchout vendor need to be a

15  supported punchout trading partner?

16  A    No, it does not.

17  Q    I think you testified that some of the punchout vendors

18  have contracted with Lawson and some do not; is that correct?

19  A    That is correct.

20  Q    How many of the punchout vendors have contracts with

21  Lawson?

22  A    It's about four or five.

23  Q    Can you give me some examples of punchout vendors that do

24  not have contracts with Lawson?

25  A    Yes.  Dell, Office Depot, McKesson, Hewlett-Packard, IBM,

1365

1        ePlus cannot rely on the doctrine of joint

2    infringement to resolve the issue of direct infringement as it

3    has failed to show that Lawson has the required control over

4    the third parties or that Lawson performs the remaining steps.

5        In a situation in which more than one party is

6    required to perform the steps of a claimed method, there is no

7    infringement unless one party exercises control or direction

8    over the entire process such that every step is attributable to

9    the controlling party.

10       The same requirement for direction and control

11   applies to the system claims as well.  Lawson does not exercise

12   control or direction over any third party, suppliers, vendors,

13   distributors, manufacturers, or others who sell items to

14   Lawson's customers.  Likewise, Lawson exercises no control over

15   its customers.  Lawson does not have an agency relationship

16   with any party that performs any of the remaining steps from

17   the system or method claims.

18       While Lawson may reach an agreement with certain

19   vendors to allow them to provide services to its clients --

20       THE COURT:  What's the difference, Ms. Hughey,

21   between joint infringement and induced infringement in this

22   case on this record?  I know conceptually what the difference

23   is, but is there really any difference in this case between

24   those two?

25       MS. HUGHEY:  With respect to joint infringement,

1379

1    the issue of joint infringement, ePlus's counsel suggested that

2    it was a defense, and that's not the case.  ePlus always has

3    the burden of proof on the issue of infringement, and it can

4    pursue that burden of proof either through the direct

5    infringement --

6          THE COURT:  Ms. Hughey, what he said was, he's not

7    contending it's joint infringement, you are, saying that if it

8    was any kind of infringement it's joint infringement and you

9    win -- and he wins -- because you haven't any evidence of the

10   elements of it, I believe; is that right, Mr. Robertson, or did

11   I miss it?

12         MR. ROBERTSON:  My argument, Your Honor, was whether

13   it's direct infringement just by Lawson committing all the

14   steps or having the system, or whether it's joint infringement,

15   we win either way.

16         THE COURT:  I understand that, but what you said was

17   we don't think it's joint infringement, but even if it is, we

18   win.  The predicate of that sentence is, we don't think it's

19   joint infringement, and that's what I am trying to ascertain.

20         You said it was they who injected that question, the

21   defendants injected that issue in, and you don't think it's

22   joint infringement, but even if it is, you win.  Is that your

23   position or not?

24         MR. ROBERTSON:  That's our position, Your Honor.

25         THE COURT:  Okay, thank you very much.  Now you know

1382

1    With respect to that case, what the Federal Circuit

2    found was that there was no joint infringement because the

3    accused infringer did not perform all of the steps of the

4    accused claims, and there was no evidence that the accused

5    infringer's customers performed the remaining steps as agents

6    of the accused infringer.

7         In that case, the patents related to a system and

8    method for allowing a content provider to outsource the storage

9    and delivery of discrete portions of its website content.

10        THE COURT:  Let me ask you something.  Since he's

11   saying, he's not arguing there's any joint infringement, why

12   are you bringing to me an issue of joint infringement in the

13   first place?  Why don't you just say, he has agreed there's no

14   issue of joint infringement, and so we don't have to discuss

15   that any further?  In other words, I have cornered the fox in

16   his den.  And he has folded.

17        MS. HUGHEY:  Your Honor, I would like to say that I

18   have cornered the fox in his den, and he has folded.

19        THE COURT:  Thank you.

20        MR. ROBERTSON:  Your Honor, can I respond to that?

21        THE COURT:  Don't get out of the den, and it's her

22   motion, so she gets the last word.  Don't try to get out of the

23   den.

24        MR. ROBERTSON:  We're only talking about this

25   punchout scenario here.

```
 1            THE COURT:  No, no.  That's like -- you just folded
 2   over here.
 3            MR. ROBERTSON:  Your Honor --
 4            THE COURT:  Not only did you fold, you induced her to
 5   quit.
 6            MR. ROBERTSON:  But the joint infringement context
 7   didn't come out in the initial opening argument outside of the
 8   context of what the third party punchout partners did.
 9            Now, did they do anything?  Yeah, they provided the
10   catalog content, and they'll let you search a site and it all
11   comes back to Lawson.  So there are two steps that they have to
12   perform.
13            Now, they can even be inducing those steps by the
14   facts that I already have adduced to the Court.  They can be
15   inducing those parties to do it, or they can be doing under
16   their direction or control.  So as I say, Your Honor, I think
17   we win on alternative theories of --
18            THE COURT:  But you didn't have that theory, and you
19   told me you didn't have the joint infringement theory under the
20   direct infringement --
21            MR. ROBERTSON:  I don't think we need to -- first of
22   all, I want to make clear we're talking -- I was talking only
23   about punchout, because there are method claims that are
24   performed by the customers when Lawson provides them with
25   features and functionality, the five software --
```

1   THE COURT:  You are through.  You don't have any

2   joint infringement claim under anything.  That's what you told

3   me, and that's it.  Sit down.  Have a seat.  That's it.  I

4   mean, there's a limit to what I have, what I can deal with here

5   and what is allowed, and you just transcended it by saying

6   that.  I don't have to rule on that now.  It's already been

7   dealt with by way of a concession as to the Rule 50 motion,

8   there is -- and there is no doctrine of equivalents claim

9   notwithstanding what some of the instructions that were

10  tendered say.

11      So to the extent the doctrine of equivalents is

12  asserted on any claim, the motion for judgment as a matter of

13  law is granted, but I believe they said they don't have the

14  claim, so the rest of the issue is whether there is, as to any

15  of the patents, claims of the patents-in-suit, a reasonable

16  basis for a reasonable jury to find patent infringement, and

17  there is under theories of both direct and indirect

18  infringement, and the motion for relief under Rule 50 is

19  denied.  All right?  Are we ready for the jury?

20      No?  Yeah.  You have to rest in front of a jury.

21  Read the stipulations, and let's go.

22      MR. ROBERTSON:  We have these exhibits in binders.

23  We're bringing the stipulations, and then I'll be ready.

24      THE COURT:  First witness then is whom, Mr. McDonald?

25      MR. McDONALD:  Mr. Lawson will be our first witness,

1    weight as you choose or none if you choose which is an

2    instruction I'll tell you about later.  Do you want to ask him

3    what his opinion is?

4              MS. STOLL-DeBELL:  Yes.

5    Q    Using the definition the Court just gave for published by

6    a vendor, is the customer's item master database ever published

7    by a vendor?

8    A    If you looked at the entire --

9              THE COURT:  I think the answer is yes or no to start

10   with, and then if she wants you to explain it, she can, but the

11   jury will understand your opinion better if you preface it by

12   giving them the guidepost from which to make the assessment if

13   there's any further explanation she asks you for.  Yes or no?

14             THE WITNESS:  No.

15             THE COURT:  Do you want to ask him to explain that?

16             MS. STOLL-DeBELL:  Yes.

17   Q    Please explain your no answer.

18   A    Sure.  Looking at the screen that we were just talking

19   about, item number, a vendor could not have published that

20   because they never had access to it.  That's from the customer.

21   Tracked, that's another one where the vendors would love to

22   have the customers have everything in stock.  That comes at a

23   cost to the customer, and they don't want to do that.  They may

24   have items that are low turnover, they only use maybe once or

25   twice a year.

1     There's many other fields that are in the item master.
2  We've talked about some of them.  You know, catalog number, the
3  vendor's part number or its number, the manufacturer number,
4  clearly those came from the -- the manufacturer came from the
5  manufacturer, and the vendor number came from the vendor, and
6  those were in their catalogs at some point in time.  The
7  description generally --
8           THE COURT:  Those did come from a vendor?
9           THE WITNESS:  What did come from --
10          THE COURT:  Those that you just testified to --
11          THE WITNESS:  Did come from the vender, but --
12          THE COURT:  So they were published by a vendor?
13          THE WITNESS:  Those particular items, right.
14          THE COURT:  Thank you.
15          THE WITNESS:  Where I was differentiating, she was
16  saying the item master, that, in itself, all the fields were
17  not, and that's why I was really struggling with the yes or no,
18  Your Honor.
19          THE COURT:  I know, but the jury have a right to
20  understand what people's opinions are before they start talking
21  about them.
22          THE WITNESS:  I appreciate that.
23          THE COURT:  Then they understand what they're being
24  told.
25  Q    Do a lot of fields come from the customer in item master?

Christopherson - Direct                                                   1527

1    A    Most of the fields.

2              MR. ROBERTSON:  Object to the form of the question;

3    vague, ambiguous as to a lot of fields.

4    Q    Do most of the fields in item master come from the

5    customer?

6              MR. ROBERTSON:  Same objection, Your Honor.  I mean,

7    if we want to be specific, there's hundred of fields.

8    Q    Mr. Christopherson, are there hundreds of fields in item

9    master?

10   A    No, there's not.

11   Q    How many fields are in item master?

12   A    I don't recall, but there's under 100.

13             THE COURT:  So there are a lot, I mean between 0 and

14   100?

15             THE WITNESS:  Yes, Your Honor.

16             THE COURT:  Is it closer to a hundred than it is to

17   zero, or close to zero than it is to a hundred?

18             THE WITNESS:  It's probably pretty close to 50

19   roughly.

20             THE COURT:  So there are 50.  You can handle that on

21   cross-examination, Mr. Robertson.  Overruled.

22             MR. ROBERTSON:  Thank you, Your Honor.

23   Q    Would you say a majority of those 50 come from the

24   customer?

25   A    I would say from the customer it is clearly a majority.

1   court, and the objection has been overruled, and I'm going to

2   allow questioning, but, Mr. Robertson is not going to stand up

3   and object to every question about this particular

4   demonstrative exhibit because it would then interrupt the flow

5   of your hearing and understanding, but his objection is

6   preserved under the terms previously articulated yesterday, Mr.

7   Robertson.

8           MR. ROBERTSON:   Thank you, sir.

9   Q    Okay, Mr. Christopherson, can you see that?

10  A    Yes, I can.

11  Q    Does this describe essentially a three-step process for

12  loading item information into the customer's Lawson database?

13  A    Yes, it does.

14  Q    What is the first step?  Does it have a nickname that you

15  use to identify this first step?

16  A    Sure.  In fact, all three steps, collectively we just call

17  that the ETL process, and that's very standard within the

18  computer industry.

19  Q    E stand for?

20  A    E stands for extraction.

21  Q    What does T stand for?

22  A    Transformation or transform.

23  Q    And what about L?

24  A    Load.

25  Q    Let's talk about the extraction step.  Where is that shown

Christopherson - Direct                                              1533

1    on this demonstrative?

2    A    Very first step.

3    Q    And you can actually maybe even touch it and put a little

4    arrow maybe.

5              THE CLERK:  What is the number of this exhibit?

6              THE COURT:  It's not.  It's a demonstrative.

7              THE CLERK:  Thank you.

8    Q    Tell us how the extraction step works.

9    A    The extraction step, basically that's the vendor.  The

10   customer will ask for the items that they want or maybe the

11   entire catalog.  That catalog is generally today going to be

12   housed in a database at the vendor's site.  Could also be a CD

13   or DVD.

14        They need to get that data from the vendor's system

15   extracted into some form, email message or a flat file -- when

16   I say flat file, I mean CSV file -- and send that over to the

17   customer.

18   Q    And then the next step is the transformation step?

19   A    Transformation, correct.

20   Q    Is that shown in the middle box of this slide?

21   A    That's correct.  That's this one.

22   Q    Looks like there are sort of four sub steps that are a

23   part of that?

24   A    Correct.

25   Q    Okay.  What is the first sub step that is part of the

Christopherson - Direct

1  transformation process?

2  A    So you get the file from the vendor, and now you're going

3  to go through and select what do you really want in your item

4  master.  Just because you negotiated prices on a hundred items,

5  you may not want actually the hundred loaded.  You may only

6  want 80.  Maybe it's 99.  Maybe it's all 100.  Or the vendor

7  sent you the entire catalog, and you may not want to load that

8  entire catalog.  You go through and select what you want out of

9  that, identify those that you really want to keep and continue

10  on.

11  Q    Do you encourage your customers to select all of the items

12  that a vendor may send as part of the extraction step?

13          MR. ROBERTSON:  Objection, lacks foundation.

14          MS. STOLL-DeBELL:  It doesn't, Your Honor.  I think

15  he already testified at length actually about all of his

16  customer interactions as part of his job.

17          THE COURT:  Well, are you asking him has he ever, or

18  are you asking has any of Lawson's sales force ever?

19          MS. STOLL-DeBELL:  I'm asking him.  Does he encourage

20  customers.

21          THE COURT:  And what relevance is that?

22          MS. STOLL-DeBELL:  I think he works with Lawson's

23  customers.

24          THE COURT:  I know that.

25          MS. STOLL-DeBELL:  Okay, and so it goes to whether

1    elaborate on it, and then Ms. Stoll-DeBell, if she wants more

2    information, will ask you another question on that or another

3    topic; okay?

4              THE WITNESS:  Yes, sir.

5    Q    Is Lawson's policy to instruct its customers to only load

6    the item information for those items that it's going to

7    actually use or purchase?

8    A    Yes.

9    Q    The second sub step on this demonstrative says, adding

10   additional item information.  What additional item information

11   can be added in this step?

12   A    The item number that the customer would be using, that's

13   one.  Whether or not there's going to be tracking, if there's

14   stock or nonstock items, what its inventory levels might be,

15   additional user fields that exist, UNSPSC codes, other category

16   codes.

17   Q    What about, are there classification fields within the

18   item master database?

19   A    Correct.

20   Q    What classification fields are there?

21   A    The classification fields, I'm not sure now which

22   classification fields you are talking about.

23   Q    Are there inventory classifications fields?

24   A    Yes.

25   Q    Are there purchasing classifications fields?

Christopherson - Direct

1   A   Correct.

2   Q   Are those Lawson-specific fields?

3   A   Yes.

4   Q   That do not come from a vendor?

5   A   Correct, they do not.

6   Q   Are there any other Lawson-specific fields that you can

7   think of right now that would be added as part of this step?

8   A   There's also some user numerical fields.

9   Q   The next sub step says, deletes item information?

10   A   Correct.

11   Q   What item information is deleted here?

12   A   It may be the entire line item meaning I don't want that

13   item at all.  It may be, for instance, they may have sent

14   photos.  The customer may not want photos loaded into the

15   system.  That requires space and band width.  They may delete

16   that.

17   Q   The last sub step that's listed on this slide is modifies

18   item information.  What item information is modified?

19   A   Frequently it's the item description.

20   Q   And is it modified as you described earlier to get a

21   standardized description name?

22          MR. ROBERTSON:  Objection to the characterization of

23   the witness's testimony.

24          THE COURT:  I don't think he said that.

25   Q   Why is it modified?

Christopherson - Direct

1   A    It's modified for usually two purposes.  One, if the

2   description is greater than 30 characters, the field only holds

3   30 characters, and you want to have something that reasonably

4   describes the item that your users would know is the item that

5   you are trying to purchase or requisition on.

6        But also what we'll have, as I said earlier, is many of

7   the institutions or the customers will actually come up with

8   standard terminology for the items to help -- they can do

9   searches quicker, and it helps their employees as they move

10  around in the organization.

11  Q    What about price, is that a modified information?

12  A    The price is typically going to come from --

13            THE COURT:  Yes or no?

14            THE WITNESS:  It's not modified, no.

15  Q    Can it be modified?

16            MR. ROBERTSON:  Objection, Your Honor.  The witness

17  has answered the question, no, it's not modified.  I think it's

18  an improper question.

19            MS. STOLL-DeBELL:  I asked can it be.

20            MR. ROBERTSON:  What is the relevance then, Your

21  Honor?

22            THE COURT:  If it's not ever, whether it can be or

23  not seems to me to be irrelevant.  Sustained.

24  Q    Mr. Christopherson, is it ever modified?

25            MR. ROBERTSON:  Objection, Your Honor.

Christopherson - Direct

1541

1    THE COURT:  Wait a minute.  I've got to deal with a

2  contempt problem here.  I'm in contempt.  I forgot to put that

3  thing --

4    MS. STOLL-DeBELL:  I thought you were going to say

5  I'm in contempt, Your Honor.  I was a little worried there for

6  a minute.

7    THE COURT:  All right.  Sorry.  Nobody can be

8  listening and paying attention to what you're doing while I was

9  in contempt which is why I keep these things out of the

10  courtroom.  I'm terribly sorry.

11    Ask your question again.  Don't answer, please, sir,

12  because there's obviously going to be an objection.  Now with

13  my contempt purged, let's go ahead.

14    MS. STOLL-DeBELL:  Let me back up and ask this a

15  different way.

16    THE WITNESS:  Sure.

17  Q    The price information that is put into the item master

18  database, is that a public list price that the vendor sells the

19  item for?

20    MR. ROBERTSON:  Objection, relevancy.

21    MS. STOLL-DeBELL:  Your Honor, this goes to, again,

22  whether the information in item master is published by a

23  vendor, whether this price field specifically is generally

24  available or not.

25    THE COURT:  How does he know that?  That's something

1   that this record testified -- the testimony on this record is

2   that whatever prices are set are between the vendor and the

3   Lawson customer, and it may be sometimes they are and sometimes

4   they aren't, depending upon what goes on is the testimony.  So

5   how can he know that?  I don't understand how he can even

6   answer the question because he's got how many, 300, 400

7   customers?

8                MS. STOLL-DeBELL:  More than that.  May I lay a

9   foundation?

10               THE COURT:  More than that, okay, I'm sorry.  I

11  didn't mean to diminish the size of the company's business, but

12  how many?  Thousands of customers?

13  Q    How many customers does Lawson have for these products?

14  A    For these specific products, I couldn't give you a firm

15  answer on that.

16               THE COURT:  It's so many he doesn't even know, and

17  you are asking him to say what happens in situations -- how do

18  you turn these things off?  Consign it to the office, please.

19  Third contempt yields a prison sentence.  I am sorry.

20  Sustained.

21  Q    After this information is transformed, it looks like the

22  next step says, customer loads new info into the Lawson

23  database?

24               MR. ROBERTSON:  Objection.  It's leading, Your Honor.

25               THE COURT:  She just describing what's on the slide.

Christopherson - Direct

1   She didn't get a question out yet.  Okay, now ask the question

2   again.

3   Q    Is the last step on this slide to load new information

4   into the Lawson database?

5   A    Yes.

6   Q    And is the information that is loaded into the Lawson

7   database the information that was just transformed as we talked

8   about earlier?

9   A    Yes.

10  Q    And it looks like there are three different tables on this

11  demonstrative?

12  A    Correct.

13  Q    Why are there three separate tables there?

14  A    Those are the three tables that data is commonly loaded

15  into.  Depending on what else they are adding, it may go into

16  some additional tables.

17  Q    So is it fair to say that even after the information is

18  transformed, that it is then divided up and sent to different

19  tables within the Lawson database?

20  A    Correct.

21  Q    After this information is extracted, transformed, and

22  loaded, is it different than the information that was received

23  from the vendor?

24         MR. ROBERTSON:  Objection, Your Honor, relevancy.

25         MS. STOLL-DeBELL:  Your Honor, it goes to whether

CHRISTOPHERSON - DIRECT                1557

1    THE COURT:  All right.  And the question was?

2    MS. STOLL-DeBELL:  The question was, Do

3 UNSPSC codes identify generally equivalent items.  I

4 don't think it calls for an expert opinion.  I'm just

5 asking him a fact about whether these codes categorize

6 generally equivalent items.  It's not an expert

7 opinion.

8    THE COURT:  It's a lay opinion.  So you're

9 asking him whether in his opinion that's what they do?

10   MS. STOLL-DeBELL:  Yes.

11   THE COURT:  Why is his opinion relevant?

12   MS. STOLL-DeBELL:  Because he works with the

13 software.  The software uses these codes.  And so he

14 can talk about what the codes do.

15   THE COURT:  You can ask him his opinion as a

16 lay person what it does.  It's up to the jury to

17 decide what weight to give to the opinion.

18   MS. STOLL-DeBELL:  Okay.

19 BY MS. STOLL-DeBELL:

20 Q   Do you understand or do you want me to ask it

21 again?

22 A   Will you ask the question again?  I think it's a

23 yes or no.

24 Q   Okay.  It might be.  In your lay opinion, do

25 UNSPSC codes identify generally equivalent items?

CHRISTOPHERSON - DIRECT          1558

1  A    No.

2  Q    Why not?

3  A    They are structured in a way that it's much like a

4  grocery store, if you would.  It kind of identifies

5  the aisle that you first are headed down.  You're

6  heading down perhaps the produce aisle.  And that's at

7  the top level, maybe even the first two digits or the

8  first four digits, and as your get further down, let's

9  take produce, for example.  Maybe you're over in the

10  vegetable area and eventually you end up with the

11  tomatoes.

12      When you get down to the fourth level, the

13  tomatoes, maybe they are the same.  Maybe they are not

14  equivalent, the same.  But there's other examples of

15  codes.

16          THE COURT:  You mean it identifies Roma

17  tomatoes and Hanover tomatoes and Fairfield tomatoes,

18  and they are not generally equivalent; is that what

19  you're saying?

20          THE WITNESS:  They may not be, Your Honor.

21          THE COURT:  Okay.

22  BY MS. STOLL-DeBELL:

23  Q    Mr. Christopherson, do you have an example of a

24  UNSPSC code that we can show the jury to put this in

25  some context?

CHRISTOPHERSON - DIRECT                    1569

1       MR. ROBERTSON:  Your Honor, I just object.

2   The question has been answered.

3       THE WITNESS:  Okay.

4       THE COURT:  You may have objected to my

5   question.

6       MS. STOLL-DeBELL:  I think he did actually.

7   BY MS. STOLL-DeBELL:

8   Q   Okay.  Are there some of these Punchout vendor

9   websites that customers can go to without using

10  Punchout?

11  A   Can you say that again?

12  Q   Yes.  So, for example, Staples link, is that one

13  of the Punchout vendors that can be used with Lawson's

14  Punchout product?

15  A   Yes, it is.

16  Q   Okay.  Can a customer use Stapleslink.com without

17  having the Punchout product?

18  A   I do not know.

19      MR. ROBERTSON:  No objection.

20  Q   I think we're done with that line of questioning

21  so I'm going to transition again for you.

22  A   Sure.

23  Q   While you take a drink.

24  A   That's okay.  Go ahead.

25  Q   When did you first learn about ePlus' patents?

CHRISTOPHERSON - DIRECT          1570

1   A    May 10, 2009.

2   Q    Is that when you first learned about the law suit

3   that ePlus had filed against Lawson?

4   A    Yes.

5   Q    What did you do when you learned that ePlus had

6   filed suit against Lawson for patent infringement?

7   A    What I first did was I got the three patents and

8   reviewed those, read those.

9   Q    What did you think when you finished reading those

10  patents?

11          MR. ROBERTSON:  Objection, Your Honor.  This

12  is calling for a legal conclusion and it's --

13          THE COURT:  I'm sorry?

14          MR. ROBERTSON:  It's calling for a legal

15  conclusion, Your Honor, and it's not relevant.

16          THE COURT:  What did he think?  Is that the

17  question?

18          MS. STOLL-DeBELL:  Yes, what did he think.

19          MR. ROBERTSON:  It's a little vague and

20  ambiguous, too.

21          THE COURT:  Well, I think maybe that's the

22  right objection.  Sustained.

23          We have to have a more precise question to

24  understand whether it's objectionable or not.

25          MS. STOLL-DeBELL:  Okay.

CHRISTOPHERSON - DIRECT                    1572

1      THE COURT: What he thought is the irrelevant

2   to this case except with respect to the intent element

3   of indirect infringement; is that right?

4      MS. STOLL-DeBELL: Yes.

5      THE COURT: This information can be

6   considered by you, ladies and gentlemen, only in

7   deciding whether or not a certain element of in

8   direction infringement has been met, and that is

9   whether there was an intent to have an infringement.

10  And so you can consider it for that purpose and that

11  purpose alone. And I'll give you some more

12  instructions later about what indirect infringement

13  is.

14      But for your purposes, you can just keynote

15  this testimony of what his reaction was goes to the

16  intent to indirectly infringe or to have indirect

17  infringement. Excuse me. Go ahead.

18  Q   Can you go ahead and answer the question?

19  A   Can you restate the question. It's been awhile.

20  Q   Sure. After you read the patents, what was your

21  first reaction?

22  A   My first reaction was that it didn't appear as

23  though we were actually doing that, the three patents.

24  Q   Why did you think it didn't appear that you were

25  doing what was in the three patents?

CHRISTOPHERSON - DIRECT          1573

1      MR. ROBERTSON:  Your Honor, now I'm going to

2  object.  This calls for a legal conclusion and an

3  expert opinion.

4      MS. STOLL-DeBELL:  Your Honor, it doesn't.

5  I'm asking him what he thought.  I'm not asking him

6  for his opinion.  I'm not asking him about the claims.

7      THE COURT:  When you asked him what he

8  thought, why isn't that asking him for an opinion?

9      MS. STOLL-DeBELL:  Well, I suppose it is a

10 lay opinion on some level, but Mr. Robertson asked him

11 what Lawson as a company did after this lawsuit was

12 filed.  And Mr. Christopherson was involved in that,

13 and I'm just trying to inquire further into the issue

14 of Lawson's intent.

15     THE COURT:  What he said was he didn't think

16 that Lawson practiced the patent.  That's what his

17 reaction was.

18     MS. STOLL-DeBELL:  Yes.

19     THE COURT:  And you want to know why he

20 thought that?

21     MS. STOLL-DeBELL:  Yes.

22     THE COURT:  You can consider that for the

23 same limited purpose, ladies and gentlemen.

24 BY MS. STOLL-DeBELL:

25 Q   Why did you think that Lawson was doing something

CHRISTOPHERSON - DIRECT          1574

1   different than what was in the patents?

2   A    Keep in mind, this is the first initial look at

3   the patents.  Some of the key things I was noticing

4   were catalogs and what I was going back to was the

5   state of where catalogs were back in the mid '90s or

6   around the time the patents were filed.  And in

7   looking at screens, for instance, and they were

8   mentioning page numbers from catalogs.  Very much like

9   a printed catalog except they turned it into an

10  electronic form.  That was the first thing.

11  Q    Why did you think that was different from what

12  Lawson was doing?

13         MR. ROBERTSON:  Objection, Your Honor.

14  There's a claim construction in this case with respect

15  to catalog, and now we're asking the lay witness to

16  opine on what his understanding of a catalog is.  It

17  doesn't have any relevancy to this case.

18         THE COURT:  You're getting into expert

19  testimony, and he wasn't qualified as an expert, and

20  what you're doing is you're offering it without a

21  report or anything.  And he's involved in in-house

22  development of the systems and knows about them, and

23  he can be qualified as a person who's an expert, but

24  he wasn't.

25         MS. STOLL-DeBELL:  Your Honor, first of all,

1   he's just testifying in his capacity as an employee

2   for Lawson.  So I don't think there was a requirement

3   for him to do an expert report.

4              THE COURT:  If he's giving expert testimony,

5   if he' testifying as an expert for Lawson, he has to

6   give a report.  I don't care whether he's an employee

7   or not.

8              MS. STOLL-DeBELL:  He wasn't professionally

9   retained to give expert testimony.

10             THE COURT:  You can't have an employee

11  professionally retained or otherwise give expert

12  testimony without a report.

13             MS. STOLL-DeBELL:  Okay.  I don't think it

14  matters because I don't think I'm asking him for

15  expert testimony.  I want to -- I think it goes to the

16  intent --

17             THE COURT:  You're just asking him whether he

18  thought Lawson did something different.

19             MS. STOLL-DeBELL:  Yes, were they different.

20             THE COURT:  Okay.  Why don't you ask him

21  that?

22  BY MS. STOLL-DeBELL:

23  Q   Did you think Lawson was doing something different

24  than the patents?

25  A   Yes.

CHRISTOPHERSON - DIRECT                    1576

1  Q    Did you have a meeting with your team members

2  regarding the lawsuit?

3  A    Yes.

4  Q    Did they agree with you?

5          MR. ROBERTSON:  Objection, Your Honor.

6          MS. STOLL-DeBELL:  Let me ask a better

7  question.

8          THE COURT:  Yes.  She's going to ask a

9  different question.

10  BY MS. STOLL-DeBELL:

11  Q    Did they agree with you that what Lawson was doing

12  was different than the patents?

13          MR. ROBERTSON:  Objection, Your Honor.  It

14  still calls for a legal conclusion, and it's

15  inappropriate expert testimony, and it's hearsay.

16          THE COURT:  It's sustained as hearsay.  It's

17  offered for the truth of the matter.  So it doesn't

18  have any nonhearsay use.

19  BY MS. STOLL-DeBELL:

20  Q    Was it your recommendation that Lawson not make

21  any changes --

22          THE COURT:  What did you do after this?  Ask

23  him.  Let him testify.

24  Q    What did you do after you read the patents?

25  A    I'll provided recommendation that in my belief, my

1   reading, we weren't doing that patent, first, and that

2   they didn't need to do any changes with the software

3   that was currently available.

4          MS. STOLL-DeBELL:  I have no further

5   questions right now, Your Honor.

6          THE COURT:  All right.  Cross-examination.

7

8   CROSS-EXAMINATION

9   BY MR. ROBERTSON:

10  Q   Let's start with that last topic first if we

11  could, Mr. Christopherson.

12  A   Sure.

13  Q   You did something else, didn't you, sir, besides

14  making the recommendation that no changes would be

15  made to the software?

16  A   I'm not sure what you're referring to, sir.

17  Q   Lawson went out and sought a legal opinion with

18  respect to these patents, didn't they, sir?

19         MS. STOLL-DeBELL:  Objection, Your Honor.  I

20  don't think it's appropriate to get into whether we

21  got an opinion or not.  It's not relevant.

22         MR. ROBERTSON:  It goes to the whole intent

23  issue, Your Honor, under the *Broadcomm v. Qualcomm*

24  case.

25         MS. STOLL-DeBELL:  Your Honor, it goes to

CHRISTOPHER - CROSS                1621

1   Q    And it's making it generally known to the

2   customer, right?

3   A    It's making it known to that customer, yes.

4   Q    You can load lots of catalog item data in this

5   item master, can't you, sir?

6   A    Define "lots."

7   Q    For example, Mr. Matias testified, he's from

8   Robert Wood Johnson that he had 36,000 items in his

9   item master, right?

10  A    That's correct.

11  Q    From 3,000 vendors.  You were in the courtroom

12  when that testimony was played?

13  A    I don't recall the exact numbers.

14  Q    It was thousands?

15  A    Yes.

16  Q    And the Lawson procurement system has that ability

17  to load thousands of items from thousands of vendors,

18  right?

19  A    Thousands of items from thousands of vendors?

20  Q    Yes.

21  A    So you're going to be saying tens of millions?

22  Q    Well, it can have at least we know from the record

23  36,000 items can be loaded into it from 3,000 or so

24  vendors, right?

25  A    Cumulative, yes.

CHRISTOPHER - CROSS                    1622

1    Q    Do you know what upper limit there is on the

2    number of items?

3    A    It would depend on the field length of the item

4    number that Lawson has, and I don't recall what that

5    was, but that's in one of the previous slides, I

6    believe, that we looked at.   It may have been.

7    Q    Could it be more than 100,000 items?

8    A    Could be.

9    Q    Could it be more than 10,000 separate vendors?

10   A    Yes.

11   Q    And Lawson's procurement system, even it's core

12   procurement system out of the box, has that

13   capability, right?

14   A    Correct.

15   Q    You were asked whether or not Lawson sells

16   computers, right?

17   A    Correct.

18   Q    But you do sell services, right, sir?

19   A    Correct, services for the software that we sell.

20   Q    And services for the software that's at issue in

21   this case, right?

22   A    Correct.

23   Q    And one of the services you sell is you implement

24   the software modules and applications that are accused

25   in this case on the servers, the computers of your

Yuhasz - Direct

1  what is this document?

2  A    This was an initial document to describe a business need

3  for better supply chain functionality.

4  Q    Why was Novant looking for better supply chain

5  functionality?

6  A    We were -- with our growth and a lot of -- our customers

7  surveys were getting us information, giving us feedback that it

8  was difficult to use the current system, finding the correct

9  product was difficult.

10        Our number of return products was growing because

11  customers were saying they couldn't find the right product,

12  they were ordering the wrong product or ordering it in the

13  wrong amount, and so we felt we needed to explore other options

14  for our ordering process.

15  Q    What did you do as a result of the customer data that you

16  received?

17  A    We did another request for proposal to search for a better

18  option that we felt had product catalogs, had a more robust

19  search capability, you know, that would be more user-friendly,

20  and things of that nature.

21  Q    Were these feature that the Lawson system, as it was

22  installed at Novant, did not provide?

23  A    Yes.

24  Q    What happened as a result of the request for proposal

25  process?

Yuhasz - Direct

1  that's not a claim term.

2          THE COURT:  You can ask him his understanding.

3          MR. SCHULTZ:  Yes.

4  Q    Mr. Yuhasz, your understanding with respect to the UNSPSC

5  codes, does the Lawson system installed by Novant have the

6  ability to locate an equivalent item?

7  A    No.

8  Q    Why not?

9  A    In more of a clinical setting, it is difficult to

10 determine equivalent items.  We would rely on a clinical

11 specialist to tell us that, two different syringes from

12 different manufacturers or even gauze or even hand sanitizer is

13 an equivalent product.

14         THE COURT:  Wait a minute.  Clinical, you mean

15 doctors?

16         THE WITNESS:  Physicians, nurses, yes, sir.

17         THE COURT:  Medical people.

18         THE WITNESS:  Medical people.

19         THE COURT:  So you don't think it operates that way

20 because you want the doctors and the nurses to be making that

21 decision, not to have a computer make it.

22         THE WITNESS:  Yes.

23         THE COURT:  Okay, thank you.

24 Q    Do you have an example of a situation where the UNSPSC

25 codes would not work for finding matching equivalent items?

Yuhasz - Cross

1   isn't that correct?

2   A    Yes.

3   Q    Novant has a maintenance agreement with Lawson for the

4   requisition self-service software; isn't that correct?

5   A    Yes.

6   Q    And isn't it true that that maintenance agreement also

7   allows Novant to receive ongoing upgrades to its software?

8   A    Yes.

9   Q    Lawson also provides Novant with an online library of

10  educational materials regarding its procurement package?

11  A    Yes.

12  Q    Including specific product guides, for example?

13  A    Yes.

14  Q    Is it true that Novant currently has about 70,000 to

15  80,000 active items in its item master database?

16  A    Yes.

17  Q    And those are all available for ordering through

18  requisition self-service?

19  A    Yes.

20  Q    And isn't it correct that those 70,000 to 80,000 items are

21  associated with approximately 10,000 different vendors; is that

22  correct?

23  A    Yes.   In rough numbers.

24  Q    And each of those items, those items have textual

25  descriptions, correct, in the item master?

Yuhasz - Cross

1    particular items; correct?  We've discussed that?

2    A    Yes.

3    Q    Isn't it true that Lawson requisition self-service, the

4    application that's used at Novant, has the capability of using

5    those UNSPSC codes?

6    A    Capability exists, not used.

7              THE COURT:  You say it exists but you don't use it?

8              THE WITNESS:  Yes, sir.

9    Q    Isn't it true that by searching for items using a UNSPSC

10   code in Lawson requisition self-service, that if a user at

11   Novant was to use that capability, it could find items from

12   multiple vendors with a particular UNSPSC code?

13             MR. SCHULTZ:  Objection, foundation.  He said he

14   doesn't use it.

15             MR. STRAPP:  Your Honor, we've been talking about the

16   capability of the Lawson system.  The door was opened on

17   direct.

18             THE COURT:  It's on cross-examination.  I think he

19   can answer that.

20   A    Could you repeat the question.

21   Q    Sure.

22             THE COURT:  If you did use it is the question.  You

23   may ask that.

24   Q    If a user at Novant was using Lawson requisition

25   self-service searching for an item by using a UNSPSC code, that

Shamos - Direct

1    revolves around the concept of the catalog and whether the

2    Lawson system uses a catalog or multiple catalogs, collection

3    of catalogs, and whether those -- there are such things as

4    separately searchable portions of those catalogs.

5    Q     And so how does the catalogs issue relate to your

6    conclusions?

7    A     The, I think, 11 out of the 12 claims, asserted claims

8    require catalogs, and I used the construction that was

9    propounded by the Court for the word catalog and didn't find

10   catalogs in the Lawson system.

11   Q     When you say Lawson system, we've had a number of initials

12   and things thrown around in the case, so let's make sure we're

13   on the same page.  Can you tell me what system or systems you

14   looked at from Lawson to do your analysis?

15   A     I looked at everything that Dr. Weaver accused of

16   infringement, S3, RSS, punchout.  There was an earlier system

17   in the case that I also looked at that I understand is no

18   longer in the case.

19   Q     Now, with respect to S3 procurement, are you familiar with

20   the names of some modules that comprise that S3 procurement

21   suite?

22   A     I don't know their literal names.  I know functionally

23   what they do.

24   Q     What functionally do the S3 procurement suite modules do?

25   A     Well, there's a search function that enables somebody to

SHAMOS - DIRECT                    1747

1  Q    Can you tell me --

2         MR. McDONALD:   Can we go to slide No. 6,

3  please?  Put that up.

4  Q    Dr. Shamos, you put this slide together as well,

5  correct?

6  A    Yes.

7  Q    Does this slide up on the screen right now, is

8  this displaying your No. 1 reason for non-infringement

9  in this case?

10  A    It is.   There are many reasons.   There are two

11  reasons that I think cover a huge fraction of the

12  claims, and we'll go through those two first, and then

13  later on when we get into the individual claims, I'll

14  be able to give the other reasons.

15  Q    So what's reason No. 1 of your reasons for

16  non-infringement?

17  A    Well, reason No. 1 is 11 out of the 12 claims

18  require a catalog or catalogs.   And because Lawson's

19  products don't have a catalog, they can't satisfy the

20  requirements of at least 11 of the 12 claims.

21  Q    Why in your opinion do 11 of the 12 claims -- I'll

22  withdraw that.

23         Why in your opinion do Lawson's systems not

24  infringe those 11 claims that you're talking about in

25  some?

SHAMOS - DIRECT                    1748

1   A    Because 11 of those 12 claims require two or more

2   catalogs and unless you have two or more catalogs, you

3   can't infringe those claims.

4   Q    Do you know whether or not Dr. Weaver agrees with

5   you that that infringement would turn on whether or

6   not 11 of those 12 claims have multiple catalogs?

7   A    Well, my recollection from his report is his

8   opinion is that they do have catalogs.

9   Q    Do you understand he would agree with the

10  principal, though, that if the Lawson systems did not

11  have multiple catalogs, 11 of the 12 claims would not

12  be infringed?

13  A    He should agree with it.  I don't know.

14          MR. ROBERTSON:  Objection.

15          THE COURT:  Sustained.

16  BY MR. McDONALD:

17  Q    Why don't we go to slide No. 8, please.

18       Do you see up on the screen, Dr. Shamos, this is

19  another slide that you prepared, correct?

20  A    Yes.

21  Q    Well, what are you depicting here in this slide?

22  A    I'm just reiterating the Court's -- literally the

23  Court's construction of the term "catalog."

24  Q    How did you use this Court construction of the

25  term "catalog" in your an analysis?

SHAMOS - DIRECT                    1749

1   A   Well, I looked at item master and I tried to

2   determine whether item master satisfied the Court's

3   construction.  And I concluded that it didn't.  And so

4   therefore it doesn't have a catalog.

5   Q   So when doing that analysis, did you use the Court

6   construction as set forth here on this slide?

7   A   It's a basic prerequisite of the analysis.

8   Q   If we could go to the next slide that you put

9   together, please.  I think this one is not objected

10  to.

11      So here in this next slide, No. 9, Dr. Shamos, can

12  you summarize your reasons why the Lawson system does

13  not have a catalog?

14  A   Yes.  Right now we're --

15  Q   I'll walk you through this step by step here and

16  we'll stick with the question and answer format.

17  A   Yes.

18  Q   I'll start by saying can you give me a summary of

19  why in your opinion the Lawson systems do not have a

20  catalog as the Court has defined that term?

21  A   Well, I think we should just go back to the

22  previous slide and go look through the Court's

23  construction.

24      They are certainly an organized collection of

25  items and associated information in item master.  So

1    that prong of the construction would be satisfied.

2    But that information is not published by a vendor,

3    either a supplier, manufacturer or distributor.   It's

4    carefully handpicked by a customer.   A customer

5    decides what to import into that item master database,

6    and it doesn't constitute a catalog or even multiple

7    catalogs.

8    Q   What is your understanding as to what an item

9    master does in the Lawson systems?

10   A   Item master, I think, is intended to represent the

11   universe of items that an employee of a corporation is

12   able to buy regardless of what the source may be.

13   Q   What's your understanding as to what sort of

14   information is in the item master in the Lawson

15   systems?

16   A   It has information about items.   It would have

17   their name, it would have a catalog number, it may

18   have an identification of who's selling the item, an

19   identification of who manufactured the item.   It has

20   information about any special pricing terms that are

21   available to this particular customer because of

22   contracts that they may have entered into with

23   suppliers, and other information that the user of the

24   system finds useful to associate with particular

25   items.

1   Q   Can you summarize for me the differences between

2   the Lawson systems item master and catalogs as the

3   Court construed it?

4   A   Well, a catalog is a compendium of information

5   about the things that a vendor is offering for sale.

6           THE COURT:  I've defined what a catalog is

7   and that's the end of it.  Whether anybody agrees with

8   it, that's the catalog definition.

9           MR. McDONALD:  Sure.

10          THE COURT:  We're not going to have him

11  defining the catalogs.  I've told you-all that before.

12          MR. McDONALD:  That wasn't my intent.

13          THE COURT:  Well, he did.  He started off

14  defining it.  So let's don't have it.  And I don't

15  really want to have to deal with this problem, Mr.

16  McDonald.  He can testify, but I don't want to have to

17  be constantly monitoring whether there's compliance

18  with the requirement that the terms are those defined

19  by the Court.

20  BY MR. McDONALD:

21  Q   Do you have an understanding as to whether or not

22  the item master in the Lawson systems includes

23  information about a customer's inventory of a given

24  item?

25  A   Yes.

SHAMOS - DIRECT                    1752

1   Q    What sort of information does the item master have

2   about a customer's inventory of a given item?

3   A    One piece of information is quantity on hand.

4   Another piece of information that be where the item

5   can be found, where the inventory is physically

6   located.

7   Q    When you say where it can be found or located, are

8   you talking about where at the customer's premises it

9   could be located or something else?

10  A    It may be that -- well, the customer is typically

11  going to have information about how much of that

12  particular item he has on hand on his premises.  He

13  generally doesn't know how much a vendor would have

14  available.

15  Q    Are you familiar with how the item descriptions

16  are created for purposes of the item master?

17  A    Not in detail.  There's a field in item master

18  that allows for a description of a product.  Those

19  descriptions can be imported from files provided by

20  vendors or they can be hand created by the customer.

21  Q    Have you seen some documents in this case relating

22  to Lawson where they refer to features of the Lawson

23  systems in terms of being able to load vendor catalog

24  data and the like?

25  A    Yes.

SHAMOS - DIRECT                    1753

1   Q    Given that those documents do use the term

2   "catalogs," why is it that you concluded that that

3   wouldn't indicate that the item master has multiple

4   catalogs?

5              MR. ROBERTSON:  Objection to the form of that

6   question, Your Honor.

7              THE COURT:  What is objectionable about the

8   form?  That different documents have different reasons

9   or that he can't testify to it or what?

10             MR. ROBERTSON:  He can't testify and

11  characterize what those documents mean and whether

12  they do doesn't mean they comply with the Court's

13  claim construction because they use the term

14  "catalog."

15             THE COURT:  So the objection to the form of

16  the question is that he doesn't have any basis for

17  knowing what the author of a particular document

18  meant.  Is that right, Mr. Robertson?

19             MR. ROBERTSON:  Yes.  Thank you for

20  articulating that for me, sir.

21             THE COURT:  What's your response to that, Mr.

22  McDonald?

23             MR. McDONALD:  I don't think my question was

24  asking what the author of the documents meant.  I was

25  asking basically for how he incorporated his analysis

SHAMOS - DIRECT                1754

1    of those documents into his conclusions for this case.

2         THE COURT:   I think that's correct, but I

3    think that's a different way of asking the same

4    question.   It's sustained.

5    BY MR. McDONALD:

6    Q   Do you have an understanding, Dr. Shamos, based on

7    your review of the materials in this case as to how

8    the item master is created in the Lawson systems?

9    A   Yes.

10   Q   What's your understanding?

11   A   When the Lawson software is delivered or installed

12   at a customer, the item master is empty.   It has no

13   items in it.   It has to be populated with items by the

14   customer.   Sometimes with the assistance of Lawson.

15   The sources of information that the customer may use

16   to populate the item master database is completely up

17   to the customer.

18       In some cases, they begin with electronic files

19   that are available from vendors and they pick and

20   choose those items from the vendors that they would

21   like to incorporate.

22       Because the format of item master does not conform

23   to the format of any known vendor's information

24   system, data has to be plucked out and it has to be

25   changed in format so that it can be entered into item

SHAMOS - DIRECT                    1755

1   master.

2   Q   When you say "plucked," I think that was the word

3   you used, what do you mean by that?

4   A   Selected.

5           MR. ROBERTSON:  Can I just have a continuing

6   objection to this line of questioning pursuant to the

7   Court's earlier ruling?

8           THE COURT:  Yes.

9           MR. ROBERTSON:  Thank you, sir.

10  BY MR. McDONALD:

11  Q   How did you get that understanding as to how the

12  item master is created, Dr. Shamos?

13  A   From reading the deposition testimony.

14  Q   I think I forgot to follow-up on the question.  I

15  think you used the word plucked, and I just want to

16  clarify.  What did you mean by plucking in the context

17  of the item master?

18  A   It's in general impossible to import everything

19  from an external file into item master.  The reason is

20  that item master has a very particular structure

21  that's set up by Lawson that may not have room for or

22  even field names for everything that might be in that

23  external file.  So somebody has to make a decision as

24  to what pieces of information from the external file

25  are going to be imported into item master.  And that's

SHAMOS - DIRECT                    1756

1    what I meant by plucking.  It's really selecting.

2            THE COURT:  All right.  The way to deal with

3    that is to answer that I meant by "plucking,"

4    selecting, without all of the other material, Dr.

5    Shamos, because then you aren't answering the question

6    that was asked.  And the lawyer on the other side

7    doesn't even have an opportunity to object except to

8    strike the answer.  And then we have confusion.  So

9    please confine your answers to the question that's

10   asked and only the question that's asked.

11           THE WITNESS:  I understand, Your Honor.

12           THE COURT:  Okay.

13   BY MR. McDONALD:

14   Q   So this catalog issue in the item master not being

15   multiple catalogs, that deals with 11 of the 12

16   asserted claims, right?

17   A   Yes.

18   Q   Now, let's turn to the 12th claim.

19           MR. McDONALD:  Could we go to slide No. 12,

20   please.

21   Q   Did you also put this slide together, Dr. Shamos?

22   A   Yes.

23   Q   Is this slide relating to that 12th claim?

24   A   Yes.

25   Q   Can you summarize for us why in your opinion that

1   Dr. Weaver says the Lawson system selects catalogs to

2   search?

3   A    I couldn't make any sense out of it.   There's a

4   keyword search function and it's --

5   Q    When you say "keyword search function," what are

6   you talking about right now?

7   A    So, for example, if I wanted to --

8   Q    I'm just saying what system?

9   A    S3.

10  Q    The Lawson system?

11  A    The Lawson system yes.

12  Q    So you're talking about the keyword search in the

13  Lawson system, right?

14  A    Yes.

15  Q    I'm sorry.  Go ahead.

16  A    If a keyword appears in a record in the item

17  master database, then it can be retrieved using

18  keyword search.  If, for example, and I think this has

19  something to do with the example in Dr. Weaver's

20  report, suppose when I was entering the description of

21  an item I happen to also put the manufacturer's name

22  in there like Dell, for example, for a computer

23  manufacturer.  So instead of just saying and X3D

24  computer, I put Dell X3D.

25        And then later on someone went and searched for

SHAMOS - DIRECT                    1768

1   the keyword "Dell," then that particular record would
2   be retrieved.  But that describes what's retrieved.
3   It doesn't describe what gets searched.  What gets
4   searched is all of item master.
5   Q   So is it your understanding that these claims
6   require that you select the catalogs to search and
7   then search them?
8   A   Well, the claims do require that.  The selecting
9   step is just the selecting step, but then the search
10  is then restricted to those catalogs that are
11  selected.
12  Q   In the Lawson keyword search, does it not have
13  that process then, is that what you're saying, of
14  selecting catalogs to search and then searching them?
15  A   That's correct.  There's only item master.
16  Q   Now, if we could return to Claim One of the '172
17  patent.  I think I might have overlooked it.  There
18  was a second reason.  That one claim, that doesn't
19  explicitedly use the word "catalogs," at least another
20  reason it doesn't infringe in your opinion other than
21  the one you already described; is that correct?
22  A   I think so.
23  Q   Could we turn to slide No. 13, please?  Did you
24  also put together this slide Dr. Shamos?
25  A   Yes.

Shamos - Direct

1   A   Yes.

2   Q   What was your conclusion about that?

3   A   The purpose of indexing is to speed up a search.  It

4   doesn't limit the universe of things that you're searching.

5   Q   Well, there was -- if you use as an example, a typical

6   book might have an index in the back, and you want to look up a

7   word in the index of the book.  Aren't you just searching the

8   index and not the whole book in that case?

9   A   I think it depends on what you mean by search.  Let's

10   suppose I have a book that has a thorough index, that every

11   word in the book occurs somewhere in the index, and if I'm

12   looking for the presence or absence of a word in that book, I

13   know that I can determine that by looking in the index, because

14   if it's not in the index, it's not in the book.

15       However, the index is making a statement about the entire

16   book.  I haven't restricted it to, does the word occur in the

17   first chapter.  It's still the entire book, and so the purpose

18   of an index is to let me know quickly whether or not something

19   is in a particular database or a particular database file.

20       It doesn't narrow down where you are looking.  You're

21   still looking over the entire database.  So indexing is just --

22   it's a way of making the search more efficient.  People who --

23   I've heard of people who actually maintain their pantry with

24   food items in alphabetical order so they can go very quickly

25   and see if they have something in the pantry, but they still

1    whether or not the Lawson accused system satisfies that element

2    of claim nine?

3    A    Yes.  In order for there to be a second identification

4    code, there has to be a second catalog, and even if there's one

5    catalog, there weren't two catalogs in S3.  So that element

6    can't be present.

7    Q    Is there some language in this element about the second

8    item being, quote, generally equivalent?

9    A    Yes.

10   Q    Do you have an opinion as to whether in the Lawson system,

11   the Lawson systems accused here, satisfy that part of that

12   element?

13   A    There's no notion in the Lawson systems of general

14   equivalents.  There's no way to ask the system for a generally

15   equivalent item.

16   Q    Do you have an understanding as to what aspect of the

17   Lawson system is dependent in this case to satisfy that part of

18   that element?

19   A    Only from expert reports.

20   Q    Let's go to slide 30 then, if we can turn to that, Bill.

21   Dr. Weaver, did you look at --

22              MR. ROBERTSON:  Dr. Weaver?

23   A    I am Shamos.

24              MR. McDONALD:  I made it this far today.

25   Q    Dr. Shamos, did you look at all at the issue of whether or

Shamos - Direct

1   not in the Lawson system the use of the UNSPSC codes would

2   satisfy any claim elements of any of the asserted claims in

3   this case relating to generally equivalent items?

4   A    Did I look at that?

5   Q    What was your conclusion about that?

6   A    That it doesn't.

7   Q    Why not?

8   A    So, the UNSPSC code is a generally accepted international

9   coding to categorize products.  There's a big difference

10  between desks and chairs, and so if you gave a code to desks,

11  you could immediately tell that something was a desk and it

12  wasn't a chair.  And it happens to be hierarchically organized.

13       That is, it has different levels, so you can get to office

14  furniture, and then within office furniture you could have

15  desks, and then within desks you can desks with drawers or

16  without drawers, et cetera.

17       The Lawson software does provide the ability for a

18  customer to enter UNSPSC codes into the item master database if

19  he wants to do that, and sometimes it's useful for people who

20  are ordering things to know what the UNSPSC code is associated

21  with a particular item, but those UNSPSC codes are not used for

22  the purpose of determining whether things are generally

23  equivalent.

24       There's no automatic conversion.  I can't go and say, if

25  you're out of stock of this product, please give me another one

Shamos - Direct

1   that has the same UNSPSC code.  So there's no converting that's

2   going on.  There's no matching that goes on with respect to

3   UNSPSC codes even though they may be physically present in the

4   database.

5   Q     You have here, and this is another slide we have up on the

6   screen that you prepared; is that right?

7   A     Yes.

8   Q     On the last point there, what's the last bullet point?

9   Can you explain what you meant by that?

10  A     It's only within RSS, not the totality of the systems that

11  are accused.  It's only RSS that allows even searching of the

12  UNSPSC code.

13  Q     Can we turn to the next slide, please, 31.

14  A     Yes.

15  Q     Is this another slide you put together, Dr. Shamos?

16  A     Well, I put it together, but literally it's copied out of

17  a white paper that was published explaining what UNSPSC codes

18  are.  So I didn't write the words that are on the slide except

19  for the title.

20              THE COURT:  In other words, you made the slide.

21              THE WITNESS:  I made the slide.  I had an electronic

22  copy of that white paper.  I had it on the screen.  I used a

23  photo editor, and I did a screen capture and then cropped it

24  down and stuck it on the slide directly out of that UNSPSC

25  white paper.

Shamos - Direct

1    of the searches that Dr. Weaver had performed regarding the

2    word Dell?

3    A    Yes.

4    Q    Could we pop up Plaintiff's Exhibit 363, please.  Do you

5    recall looking at some shots of the screens of a -- I guess I

6    might have misstated that.  I don't know that Dr. Weaver

7    performed it or somebody else performed it for him, but this

8    was from Dr. Weaver's materials.  Do you remember seeing

9    snapshots as he progressed through some clicking through the

10   Lawson systems accused here?

11   A    Yes.

12         MR. McDONALD:  Okay.  Can we go up to -- I think it

13   would be page 31 of which slide, Bill.

14   Q    Do you recall, Dr. Shamos, seeing -- there was -- there

15   you go.  Seeing in the search here a snapshot showing somebody

16   putting in a search term?

17   A    Yes.

18   Q    And is this what we have highlighted up on the screen

19   here?  Is that a portion of a Lawson screen where you could do

20   a search?

21   A    Yes.

22         MR. McDONALD:  And actually, Bill, can we grab that

23   so we can get the blue part, too.

24   Q    Can you tell by looking at this, Dr. Shamos, which module

25   of the Lawson system we're in?

Shamos - Direct

1    A    We're in the search module.

2    Q    I'm just going to underline something here.  I see a

3    reference to RSS.  Does that mean we're talking about that

4    requisition self-service module here?

5    A    I think so.

6    Q    Now, can you point at where you type in the search term

7    that you want to search here on the screen?

8    A    It's in that search bar.

9    Q    There's some reference down below that -- I'm going to put

10   a parenthesis around that -- to search all fields; do you see

11   that?

12   A    Yes.

13   Q    There's a checkmark in that box; do you see that?

14   A    Yes.

15   Q    What does that mean?

16   A    A record in item master has a number of fields associated

17   with it; for example, description of product, inventory load

18   product, manufacturer's part number of product, things like

19   that.  And what that checkmark is saying is I want to look for

20   the word Dell in every field in the table.

21   Q    Is one of the fields you can look at vendor?

22   A    No.

23   Q    So you can search lots of fields here, but you can't

24   search for a vendor here; correct?

25   A    There's a list over on the right.  If I didn't check

1843

Shamos - Direct

1   search all fields, then I would go over to the right and check

2   the fields that I wanted to search.  And so that's a list of

3   them, and vendor isn't there.

4           MR. McDONALD:  Can we go to the next page of this

5   exhibit, please, maybe blow up the left half of that page.

6   Q    What is your understanding of what's on this page of this

7   demonstration, Dr. Shamos?

8   A    Well, this was the result of the processing of the search.

9   This is the hit list, and actually I think this makes it very

10  clear.  If you look at the -- starting with the second column

11  that says quantity -- actually start with the third column that

12  says item and then description and then UOM, which is unit of

13  measure --

14          THE COURT:  Are you using the first example there,

15  Dr. Shamos, first thing on the hit list?

16          THE WITNESS:  I was actually referring to the entire

17  rectangle that's at the bottom that has a set of headings at

18  the top.  One says, add to cart and then quantity and then item

19  description, unit of measure.

20          THE COURT:  Can we blow up that first level there.

21          THE WITNESS:  Yeah, blow up the first level with the

22  first set of hits.

23          THE COURT:  Can you read that a little bit better,

24  ladies and gentlemen?

25          THE WITNESS:  This is the first hit among search

1844

Shamos - Direct

1  results, and what's shown up at the top after add to cart and

2  quantity, those are things it's asking the user to subsequently

3  enter.

4       So if I want to buy one or more of this particular

5  item, I would put -- I would click in there, and a checkmark

6  would appear, and then I could specify in the quantity field

7  how many of them I wanted.  But let's look at what the actual

8  results of the hit are.  Under the description field, it says

9  Dell, comma, Dimension 8100.

10      What that means is that whoever put the description

11 of that computer into the database decided that they wanted to

12 put in the string Dell because they want to identify it was a

13 Dell computer.  But if you look at what the field is, the field

14 isn't a vendor field.  The field is a description field.  You

15 can put anything you want in there.

16      When you do a search for where Dell appears, it may

17 be that if the customer was really meticulous and they very

18 carefully put a vendor -- sorry, manufacturer for every one of

19 the items in the database, then you could retrieve all of the

20 items that were from Dell.  But you still had to search all of

21 item master in order to do it.  It's not restricting the search

22 to selected portions.  It's searching the whole database.

23 Q   So if we move on then, go through the -- can we go to page

24 34 of this Exhibit 363, Bill.  I just wanted to show, this is

25 the same search results, I believe, Dr. Shamos, but they've

Shamos - Direct

1   moved this scroll bar down so you can see the last two items

2   that were returned from the results.

3   A    Yes.

4   Q    So we got a total of six items on this Dell search.   Does

5   that ring a bell?

6   A    That sounds right.

7   Q    So now if we go up to page -- so this is just searching

8   the word Dell, we got back six items that had the word Dell in

9   the description line basically; right?

10  A    Yes.

11  Q    Now, can we jump ahead to page 48 of 363?  So we've still

12  got that search result up on this slide, but now if we go to I

13  think the next slide or next page, 49, this is capturing -- you

14  can see in the upper left corner, they are in the middle of

15  typing in some additional words into that word search, and

16  they've now added a comma after the word Dell and starting to

17  type Dimension; do you see that?

18  A    Yes.

19  Q    Jump up just two more slides up to page 51.  So this was

20  the part of the demonstration where the word search had Dell

21  comma Dimension 8100; correct, Dr. Shamos?

22  A    Yes.

23  Q    And what does it mean below that to have what I'm putting

24  in parentheses here, search all fields?

25  A    The same thing as it meant before.  It means look at every

1846

1   field in item master to see if it contains the string Dell

2   comma Dimension 8100.

3   Q     So what actually happens in the Lawson system when the

4   user types in that search, Dell comma Dimension 8100?

5   A     Searches the whole database.  And, in fact, it's clear

6   from the way the user put in that search that the user had some

7   very specific understanding of how elements are coded into this

8   database.

9   Q     Why --

10  A     If I were looking for a Dell Dimension, I would never put

11  a comma after the word Dell.

12  Q     What do you think that implies here, that the person doing

13  this demonstration put a comma after the Dell?

14  A     It means he knew how the database was structured, and he

15  knew whoever put in the manufacturer name put a comma after the

16  manufacturer name.

17  Q     Let me put --

18  A     Because if you search for Dell Dimension without a comma,

19  you probably wouldn't get any hits.

20  Q     And I've put a very crude arrow there down by the

21  description column for the first of the two items returned

22  here.  Do you see that?

23  A     Yes.

24  Q     And then the description there, can you me whether or not

25  there's a comma after the Dell?

1847

1   A    Yes, it is.  That's why this was a responsive hit.

2   Q    So if the user had put in the word Dell Dimension 8100

3   without a comma, do we know whether or not we would have got

4   these results back?

5   A    I don't know, because I don't know if there any fields

6   that happen to be coded that way, but we certainly wouldn't

7   retrieve these items that were retrieved.

8   Q    So is what's shown on the screen right now, was that

9   search of Dimension 8100 just in a portion of the item master

10  that had Dell products or not?

11  A    No.  It's the whole item master.

12           MR. McDONALD:  Okay, take that one off.  Can we turn

13  to page 52 now of Dr. Shamos's slides.

14  Q    So, Dr. Shamos, I think we touched on this yesterday, but

15  I want to come back to it now that we've gone through that

16  demo, that set of demo slides.

17       With respect to claim one of the '172 patent, can you tell

18  us what your opinion is about element of A of that claim as

19  shown here on slide 52?

20  A    Yes.  The database is not maintained so that selected

21  portions can be searched separately.  The search is over the

22  entire database.  There are no portions of the database.

23  Furthermore, there's no way to select portions of the database.

24  Even if there did exist portions, they can't be selectively

25  selected, and you can't search item master by vendor.

1869

1  he thought.  They opened the door when they asked him
2  what Lawson did after they learned of the patents.
3       So the questions I asked about that were
4  simply responding to the questions that ePlus asked
5  him.
6            THE COURT:  All right.  Thank you.
7            MS. STOLL-DeBELL:  Thank you.
8            THE COURT:  In my judgment, there's a fairly
9  substantial disconnect in the basic law applying to
10  opinions of counsel and how they can be used and how
11  they can't be used, but the law, as it exists, is, I
12  think, fairly clear on some points.
13       And the question is whether if an accused
14  infringer obtains an opinion of counsel and doesn't
15  waive the attorney-client privilege, the plaintiff or
16  patentee can use that fact as part of the totality of
17  circumstances that may be considered in adjudicating
18  by the finder of fact of the intent component of
19  induced infringement.
20       There is no case on the point that either
21  parted has cited.  The case of *Broadcom* deals with the
22  failure to obtain an opinion of counsel.  The
23  Knorr-Bremse decision provides that no adverse
24  inference shall arise from invocation of the
25  attorney-client and/or work product privilege.

1870

1    I think to do what I am inveighed to do here
2 would, in essence, offend that principle because the
3 only helpful inference on the issue of intent to
4 induce infringement is to ask the jury to assume that
5 the unproduced opinion was unfavorable to the
6 patentee.
7    I perceive that the underlying principles of
8 the Federal Circuit's rules on failure to obtain an
9 opinion and the no adverse inference provision are an
10 intention, and it is appropriate to deal with evidence
11 in perspective of the rule that an instruction cannot
12 be given that implies a negative inference from the
13 assertion of the attorney-client privilege regarding
14 opinion of counsel.  Otherwise, firms would be
15 discouraged from obtaining an opinion of counsel
16 knowing that it would have to be disclosed.
17    Now, that said, I also believe that there is
18 some considerable illogic between the rules on failure
19 to obtain an opinion, which can be used, and obtaining
20 an opinion and not disclosing it and the adverse
21 inference instruction law that comes from *Knorr*.
22    The resolution of that question really is
23 appropriate for the Federal Circuit because its
24 guiding teaching here is that you can't put somebody
25 at prejudice because they obtain an opinion and don't

1871

1    disclose it.

2         I think that that's something the court is

3    going to have to visit, perhaps in this case, but in

4    this case I believe that the correct decision is to

5    preclude that evidence because it does invite the jury

6    to speculate even if it's considered in perspective or

7    with an instruction of the sort in *Broadcom* where the

8    judge balanced the failure to get an opinion with the

9    no adverse inference rule in the instruction.

10        So the motion to use the failure to disclose

11   the opinion of counsel is -- the motion to use that

12   evidence is denied.  And I'll give an instruction.

13        Right now I'm just going to tell them at an

14   appropriate point just to disregard the instruction.

15   And we'll argue the larger versions of the corrective

16   instruction at a later point in time in the charge

17   conference when we give the instructions as whole.

18        Is there anything else that we have left

19   here?

20        MR. McDONALD:  I don't believe so, Your

21   Honor.

22        THE COURT:  Okay.  All right.  How long did

23   we go?  Because I'd like to give you-all a little

24   respite.

25        MR. McDONALD:  Can we have until half past

Momyer - Direct

1          MR. McDONALD:  No, it's not.  It's not in the claims.

2          THE COURT:  What?

3          MR. McDONALD:  The issue of whose inventory you are

4    checking is not in any of the claims in this case.  It is not

5    an important issue.

6          MR. ROBERTSON:  In the patent, you are checking

7    multiple catalog inventory of suppliers.  That's what's going

8    on here.  The testimony has been in the RIMS systems, you are

9    checking Fisher inventory.

10         MR. McDONALD:  We have no testimony from Mr. Weaver

11   or anybody else that said that checking inventory had to be

12   specific to any particular type of source.

13         THE COURT:  We'll deal with that --

14         MR. McDONALD:  -- limited to checking inventory.

15         THE COURT:  We'll deal with that later.  Overruled.

16   Q    Would you agree, Mr. Momyer, that the RIMS system, at

17   least as of April of '93, was a system that did check

18   inventory?

19   A    It checked local inventory it was managing and Fisher

20   inventory at its distribution centers.

21   Q    And that local inventory could include stockroom inventory

22   for the customer; correct?

23   A    It could include both customer and Fisher-owned inventory,

24   yes.

25   Q    And the RIMS system included a parts master, like an item

Momyer -  Direct

1    master; right?

2    A    Yes.

3    Q    That was the RIMS as it existed in April of 1993?

4    A    It would have had that.

5    Q    That's a system where the customer could select the

6    products that might come from various sources such as Fisher

7    and specifically select the products that they were going to

8    keep in inventory and keep track of on that parts master;

9    correct?

10   A    They could really only order Fisher parts.  Is that what

11   you are asking?  For.  They did have the ability for

12   customer-owned inventory, but I think we established that the

13   customer-owned inventory, depending upon how it's replenished,

14   it could issue a req to be input into the customer's system to

15   place the order.

16   Q    I'm not sure that was actually my question, Mr. Momyer.

17   Let me try again.  Would you agree that the parts master in the

18   RIMS system, as it existed in April of '93, included products

19   that the customer would select to put on that list because

20   that's what they wanted to keep track of in inventory?

21   A    Customer would select?  Meaning what they wanted to put in

22   inventory?

23   Q    They would select the parts that went onto the parts

24   master; right?

25   A    Yes, they would select the part.  As far as the -- you

Momyer - Direct

1   mean -- they would go in, and we would ask them what products

2   do you want stored in your stockroom, and they would say these

3   parts we want to store in the stockroom, and then we would

4   enter those into the RIMS systems.  Almost exclusively they

5   were Fisher parts.

6   Q    That parts master would keep track of what was called

7   product type in the RIMS system; correct?

8   A    Yes, that's correct.

9   Q    And that product type could include products that were

10  third-party items which the CSR, customer service

11  representative, or the customer could order; right?

12  A    No.

13  C    Can you turn to column six of the '989 patent, please.

14        THE COURT:  What section is the '989 patent.

15        MR. McDONALD:  PX-10.

16  Q    That's the RIMS patent, Mr. Momyer, so I think you might

17  already have that in front of you there.

18        THE COURT:  Put it up.

19  A    I've got it.

20  Q    Column six, blow up that table at the top of column six.

21  Do you see, Mr. Momyer, this is a continuation of a table

22  listing the product types for the RIMS systems?

23  A    Yes.

24  Q    And you see there's a type 05?

25  A    Yes.

1   saying now inconsistent with that.  You made the assertion that

2   it is.  It may not be.  It depends on how you read things.

3   Q    Well, Mr. Kinross, is what you are saying consistent or

4   inconsistent with what's on the timeline here which indicates

5   in 1989 RIMS had multiple vendors cutting purchase orders to

6   multiple vendors from one requisition?

7          MR. ROBERTSON:  Object to the form of the question as

8   vague and ambiguous.

9          THE COURT:  Overruled.

10  A    I think that it cut one purchase order.  It's not saying

11  it's cutting multiple purchase orders here.  And that purchase

12  order was to Fisher.

13  Q    So you are saying that the phrase, quote, cutting purchase

14  orders to multiple vendors from one requisition is actually

15  referring to just one purchase order?

16  A    Yes.

17  Q    And in this timeline, doesn't it also indicate by 1991,

18  the RIMS system had third-party procurement?

19  A    Yes, it indicates third-party procurement.

20         THE COURT:  He didn't ask you whether it indicated.

21  He said whether the RIMS system did in 1991.  You changed from

22  shifting from what the document said to whether or not it, in

23  fact, did.

24  Q    Well, Mr. Kinross, your timeline does indicate that in

25  1991, the RIMS system had the feature third-party procurement;

2427

1   asserted claims except maybe those involving two or more

2   catalogs or equivalent phrases that are used in the patent such

3   as collection of catalogs, but since TV/2 had that, the

4   combination of RIMS plus TV/2 had all the elements of the

5   asserted claims, and, therefore, would render them obvious.

6   Q    Is that under how you applied the Court's construction of

7   catalogs in this case?

8   A    Yes.

9   Q    Did you use the same approach when you looked at the

10  application of the Court's construction of catalogs for

11  purposes of evaluating infringement as you did for purposes of

12  invalidity?

13  A    Yes.  I think that everybody in the case tried to apply

14  the Court's construction.  I think the parties have different

15  ideas about how the Court's construction applies to these

16  systems.

17          MR. ROBERTSON:  Objection, Your Honor.  I don't know

18  how this witness knows what my idea or ePlus's idea is about

19  the Court's construction.

20          THE COURT:  I think that's -- that question has been

21  answered.  Let's go ahead.

22  Q    What are you trying to convey about the last bullet point

23  on this slide, Dr. Shamos?

24  A    Fundamentally that because of the principle that the claim

25  terms must be construed the same way for infringement and for

Shamos - Direct

1   invalidity, if it turns out that Lawson item master meets the

2   Court's definition of catalog, then RIMS alone had all the

3   elements of the asserted claims.

4   Q    Why is it that RIMS alone would have all the elements of

5   the asserted claims with that assumption?

6   A    Because RIMS alone has a database that is, for all

7   practical purposes, identical to that of Lawson's system.   It

8   had a database that had information about items from multiple

9   sources.

10  Q    What was that database called in the RIMS system?

11  A    I think it was called parts master.

12  Q    Let's go to your slide number 25.  Did you look at the

13  issue of whether the RIMS system was a single source or

14  multiple source system, Dr. Shamos?

15  A    Yes.

16  Q    What did you conclude about that?

17  A    Well, that it's not a single source system.

18  Q    What was the basis for that conclusion?

19  A    There's a citation here from column two of the patent

20  that's explaining figures 4A through 4D, that they are flow

21  charts describing program employed by an embodiment of the

22  system of the present invention to source requisition JIT

23  inventory owned by either the distributor or the customer,

24  other inventory owned by the distributor, and inventory owned

25  by other vendors.  Those different inventories are the

Shamos - Direct

1    statement.  So I object to the characterization of what the

2    plaintiff's position is with our allegation with respect to

3    RIMS.

4              THE COURT:  I think there are more allegations than

5    that.  I think it's all right for you to ask him what he

6    understands the missing claims elements to be, to say without

7    characterizing what they've actually done in their assertions,

8    because he's entitled to his understanding of it, and then Mr.

9    Robertson can cross-examine him about any of that but without

10   binding Mr. Robertson to the allegations as understood by Dr.

11   Shamos.  So maybe try it again.  Disregard that testimony,

12   please, ladies and gentlemen.  Start again.

13   Q    In your analysis, Dr. Shamos, as you apply the Court's

14   construction of the term these two catalogs or collection of

15   catalogs and your RIMS plus TV/2 analysis, did you find the

16   catalogs to be in the RIMS system or the TV/2 system?

17   A    Catalogs are certainly in the TV/2 system because those

18   were published by a vendor, and they were distributed from the

19   vendor to the user of the TV/2 system.  So those met the

20   Court's construction of catalog.

21   Q    If we go to the third bullet point product here, what are

22   you trying to convey about the third bullet point in slide 147?

23   A    Lawson's item master has at least two catalogs and/or a

24   collection of catalogs, and so does RIMS parts master.

25   Q    Why do you say that?

Shamos - Direct

1   A    Because they are effectively the same thing.  You load

2   data about items from multiple vendors into a database, and you

3   search that database.  And so if Lawson has more than one

4   catalog, then so does parts master in RIMS.

5        THE COURT:  Are you saying -- I understood you to say

6   that item master in RIMS were the same thing.  Is that what you

7   intended to say?

8        THE WITNESS:  No, I didn't say they were the same

9   thing.  Item master is a data structure -- it's a database

10  schema that's used in the Lawson system.  Parts master is a

11  similar database structure that's in the RIMS system, but at a

12  higher level they do the same thing.  You load data from

13  multiple sources into one database in both item master and in

14  RIMS parts master.  So if the one has more than one catalog,

15  the other has more than one catalog.

16  Q    What is your understanding as to how the parts master is

17  actually created in the RIMS system?

18  A    There are a number of sources of inventory.  Some of them

19  are in the local JIT inventory.  Some of them are in the

20  distributor's inventory, and information about those

21  inventories is loaded into parts master.

22  Q    Is that information loaded in an item at a time

23  essentially or some other way?

24  A    It could be done an item at a time, but typically it's

25  done by importation of electronic files.

1    It's not happening as part of an electronic process?

2    A    There's a flow chart in figure 5.  That flow chart

3    can be implemented electronically.  It can be

4    implemented by computer.

5    Q    But when you go to order that product, you

6    understand, and what's disclosed in the patent you

7    called preferred embodiment, the CSR then goes and

8    actually contacts and obtains that product from the

9    vendor; isn't that right?

10   A    Well, that's one way of doing it, but when the

11   distributor receives an order for a part that he does

12   not have or does not stock, he goes and orders it.  He

13   can order it by having somebody pick up the phone or

14   he can order it through electronic data exchange or

15   whatever other interfaces he may have to its

16   suppliers.

17   Q    And that's not part of the electronic sourcing

18   system that's claimed in the '683 patent, is it?

19   That's all part of an electronic sourcing system, not

20   somebody stopping all of a sudden saying I'm going to

21   pick up the telephone and call a vendor and purchase

22   an item; isn't that right?

23   A    Well, I would agree that for the

24   means-plus-function claims, the means isn't a human

25   being.

3190

1    is how the patent talks about it.  The user gets to

2    select the catalogs to search, and then you can search

3    within the catalogs.  You search for particular items.

4         Dr. Weaver didn't show anything about the

5    Lawson system that does anything like that.  And, in

6    fact, if we look at Mr. Momyer's testimony about this

7    feature at 67B, he explains why you do it this way.

8    Well, there was explanation evidence in the case

9    anyway that explained you might want to let a user

10   pick particular catalogs to search because that will

11   make the search more efficient.  You don't have to

12   look through catalogs that you know are from companies

13   you don't want to buy from or don't have the stuff you

14   want.  That was the point.  And there's really nothing

15   like that in the Lawson system.

16        And instead Dr. Weaver had to go to a whole

17   different thing really to try to fit this square peg

18   in a round hole on selecting catalogs.

19        If we go to slide 68, this is from

20   Dr. Weaver's presentation in Exhibit 363.  This is

21   where he went -- if you can blow up the upper left

22   quadrant or so.

23        Remember, Dr. Weaver after he had done a

24   search just for Dell, he came back with six products

25   in the demo.  Then he tried to show you, Well, now

3191

1    what I'm going to do is a search within just those six

2    things just to get the Dimension 8100.  He was

3    suggesting to you he was just searching the six to get

4    two of the size, but what you see here is really what

5    was going on as he was searching the entire database

6    again.

7              Because up in the upper left corner there,

8    you see Dell, Dimension 8100.  And it says below that,

9    Search all fields.  And it's got that comma in it.

10   You might say why does it have that comma in there?

11   Well, if you look down here at the descriptions of the

12   products, those two particular products have Dell

13   comma space Dimension 8100 in the item description.

14   He was searching the whole database, but he wanted to

15   make sure he just got those two items, so he stuck a

16   comma in there.  That's what was going on there.

17             This is kind of like one of those Google

18   searches that you just put it in quotes.  It was an

19   exact search.  It wasn't narrowing the search to any

20   catalogs that the user selected.  This has nothing to

21   do with what the patent is talking about, the

22   patents-in-suit are talking about.

23             I'd like to turn now to the Punchout issue.

24   If we could go to slide 68.  About 11 percent of

25   Lawson's customers that have the basic requisition

1    burdens so much in our arguments, the lawyers did, if you need

2    to refresh your memory on what preponderance means for ePlus

3    and what clear convincing means for invalidity for Lawson, you

4    can look at 23.  That's for infringement.  Invalidity is dealt

5    with in another thing.  I'll tell you what that is later.

6              Now, infringement, of course, has to be based, as you

7    know and you've learned, on a claim-by-claim basis so that

8    there may be infringement of one claim and not another.  That's

9    something you're going to have to decide.

10             Now, when you are deciding infringement, you must

11   only compare Lawson's accused systems and methods to the claims

12   of the ePlus patents.  In deciding the issue of infringement,

13   you may not compare Lawson's accused systems and methods to

14   ePlus's commercial products and methods.  You don't compare

15   product to product.  You do the system that's accused, whether

16   it's a system or a method, against the claims of the patent.

17   So whether or not Lawson's products that they sell and ePlus's

18   products are the same or different is not a matter that you get

19   into.

20             A patent can be infringed directly or indirectly.

21   Direct infringement occurs if the accused system or method is

22   covered by one or more or all of the claims in the patent.

23   Direct infringement of a method claim results if a single actor

24   performs all of the steps of that claim.

25             What's indirect infringement?  Indirect infringement

1    results if the defendant, here, Lawson, induces another to

2    infringe a patent or contributes to the infringement of a

3    patent by another person.  I'm going to explain those two types

4    of infringement now.

5            Lawson would be liable for directly infringing

6    ePlus's patents if you find that ePlus has proven by a

7    preponderance of the evidence that Lawson itself has made,

8    used, offered to sell, sold, or imported into the United States

9    the invention defined in any claim of the patents.  Then that

10   claim has been infringed if they proved that by a preponderance

11   of the evidence.

12           Now, remember that someone can directly infringe a

13   patent without knowing that what they are doing is an

14   infringement of the patent.  You don't have to know you are

15   infringing the patent to infringe it.  You either do or you

16   don't.  So you can directly infringe a patent even though you

17   believe in good faith that what you are doing is not an

18   infringement of the patent.

19           The issue is does it or doesn't it, not what state of

20   mind the direct infringer had.  In every infringement analysis,

21   the language of the claims as well as the nature of the accused

22   system or method dictates whether infringement has occurred.

23   To infringe a claim that recites capability and not actual

24   operation, an accused system or method need only be capable of

25   operating in the described mode.  Thus, depending on the

```
 1    claims, an accused system or method may be found to infringe if

 2    it is reasonably capable of satisfying the claim elements or

 3    limitations even though the system or method may also be

 4    capable of non-infringing modes of operation.  The fact that a

 5    product or process may operate in a manner that does not

 6    infringe is not a defense to a claim of infringement against

 7    Lawson if its system is also reasonably capable of operating in

 8    a manner that satisfies the claim elements.

 9          Now, Lawson -- I mean ePlus also alleges that Lawson

10    has actively induced other people to infringe the

11    patents-in-suit.  In particular, who are they alleged to have

12    induced?  The Lawson customers in this case.  That's what it's

13    about.

14          To show induced infringement, ePlus has to prove by a

15    preponderance of the evidence that someone, here, Lawson's

16    customers, have directly infringed the ePlus patents, and that

17    Lawson -- so they have to show that the customers directly

18    infringe.  And remember, it doesn't make any difference whether

19    the customers knew or didn't know that they were infringing,

20    because if you infringe, you infringe whether you know it or

21    not.  But they also, ePlus has to prove by a preponderance of

22    the evidence that Lawson has actively and knowingly aided and

23    abetted that direct infringement.

24          So here, in order to find that Lawson has induced

25    somebody else to infringe, you do have to consider Lawson's
```

3295

1   instructions, and I will get the exhibits back to the

2   counsel.

3         THE COURT:  All right.  We'll be in recess.

4   There's nothing else we need to do now because we

5   don't have any willfulness trial; is that right?

6         MR. ROBERTSON:  That's right, Your Honor.

7         MR. McDONALD:  Yes, sir.

8         THE COURT:  Now that you've done this

9   exercise, do you think there's a reason why the chief

10  people of each side ought not go down and talk to --

11  who was it, Judge Dohnal or Judge Lauck?

12        MR. MERRITT:  Judge Dohnal.

13        THE COURT:  And talk to Judge Dohnal and see

14  if you can compromise?  Or do you still want to beat

15  heads against each other and give Mr. McDonald a

16  Mercedes and give Mr. Robertson a BMW?

17        MR. ROBERTSON:  I have a Ford 150 truck.

18        THE COURT:  You want a Ford 150?

19        THE CLERK:  He says he has one.

20        THE COURT:  You-all ought to think about that

21  and decide.  If I were you, I'd be trying to work out

22  a compromise that didn't result in a total wipeout.

23  It's particularly risky for Lawson.

24        All right.

25        (Recess taken.)