# GOODWIN | PROCTER

Scott L. Robertson
202.346.4331
SRobertson@
goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
901 New York Avenue NW
Washington, DC 20001
T: 202.346.4000
F: 202.346.4444

July 1, 2011

**VIA EMAIL**

Daniel McDonald
Merchant & Gould P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, MN 55402-2215

Re: *ePlus, inc. v. Lawson Software, Inc.*
    **Civil Action No. 3:09cv620 (REP)**

Dear Dan:

This is in response to your letter dated June 28, 2011.

We would have thought that if Lawson was sincere with respect to its offers to produce actual evidence (instead of just self-serving attorney argument) with regard to its alleged "design-around" product Requisition Center (RQC), it would have been willing to provide documents and other information establishing the *bona fides* that the product was not infringing. Unfortunately, instead, you have offered a highly inconvenient approach apparently intended to increase the costs and delay resolution of this issue.

Simply viewing a demonstration of RQC, as you know, can reveal very little. Moreover, an opportunity to briefly review source code, without the ability to study or compare it to the RSS source code — which has long been in the possession of ePlus's counsel (and continues to be) in a secure manner — will simply handicap any meaningful analysis. In sum, there is no reason that Lawson cannot provide us with a copy of the RQC source code in a similar manner that the RSS source code has been, and remains, in our possession. Moreover, I understand that Lawson internally refers to RQC as "Version 9.0.1.0.1." As you know, the jury found Version 9.0.1 to infringe. This software source code "patch" therefore could be easily produced.

Further, Lawson's representations concerning the functionality of RQC are just that: representations. ePlus has long since learned not to take on faith such bald statements. Thus, without "hard evidence" (*i.e.*, technical documentation, design specifications, source code, *etc.*) we cannot rely on these at face value. Even if we did, however, it is our view that they are "distinctions without a difference." I am not, however, going to get into a debate with you as to the merits of those purported "differences" until we have real evidence with respect to them. In other words, I have no intention of providing advisory opinions in response to Lawson's

Daniel McDonald
July 1, 2011
Page 2

representations. If I did, they would only morph again, as they already have without any prompting.

As for your representations with respect to the District Court's lack of "jurisdiction" to police its own orders (including ordering discovery in a contempt proceeding), such authority is so basic as to require no citation. Nevertheless, I refer you to the footnote below.[1]

Further, as you are well aware, the Federal Circuit recently spoke to civil contempt motions of an injunction in its decision in *TiVo, Inc. v. Echostar Corp.*, 2011 WL 1486162 (Fed. Cir., April 20, 2011) *("TiVo")*. In that case, the district court ordered the adjudicated infringer to produce discovery prior to civil contempt proceedings (prior to that the infringer voluntarily produced its source code.) The Federal Circuit took no issue with these clearly inherent powers of an Article III judge.

Indeed, *N.W. Controls, Inc. v. Outboard Marine Corp.*, which you cite in your letter, and is cited by *800 Adept*, expressly holds that "in order to determine whether its order is being obeyed, a court has the right to inquire whether there has been any disobedience thereof." 349 F.Supp. 1254, 1256 (D. Del. 1972). To the extent you suggest that a pending Motion for Contempt is required to vest the Court with the jurisdictional power to order discovery, you are simply wrong.

---

[1] *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("It has long been understood that 'certain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'[...] For this reason, 'Courts of justice are *universally acknowledged* to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and *submission to their lawful mandates.*' [...] These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'") (emphasis added); *Spallone v. U.S.*, 493 U.S. 265, 276 (1990) (in selecting means to enforce consent judgment, district court is entitled to rely on axiomatic principle that courts have inherent power to enforce compliance with lawful orders through civil contempt). And the Courts of Appeals have consistently held that district courts have considerable discretion in interpreting and applying their own injunctive decrees. *See, e.g., JTH Tax, Inc. v. H & R Block Eastern Tax Servs., Inc.*, 359 F.3d 699, 705 (4th Cir. 2004); *Alabama Nursing Home Assn v. Harris*, 617 F.2d 385, 388 (5th Cir. 1980). This principle is longstanding and well established, as reflected in a prominent treatise writer's summary of the case law: 'The court granting the injunction is necessarily invested with large discretion in enforcing obedience to its mandate, and . . . courts of appellate powers are exceedingly averse to interfering with the exercise of such judgment and discretion.' 2 J. High, Law of Injunctions § 1458, pp. 1467-1468 (4th ed. 1905).

Daniel McDonald
July 1, 2011
Page 3

Furthermore, the *800 Adept* case has been abrogated by *TiVo*, which expressly overruled *KSM Fastening Systems*, upon which *800 Adept* relies. *800 Adept* found that discovery was not appropriate because the case was "not amenable to summary contempt proceedings." 2007 WL 2412900 at *2. But the threshold determination of whether summary contempt proceedings are appropriate was the first step in the two-step procedure that *TiVo* eliminated. 2011 WL 1486162, at *6. To the extent the first *KSM* step was ever a threshold requirement for discovery in contempt proceedings, and it was not, that requirement was eliminated when the two-step procedure was itself eliminated.

The unreported *Syndia* case, also cited in your letter, is inapposite. The court rejected a back-door request for technical discovery regarding defendant's modification to infringing products, under the guise of a post-judgment accounting, where the Motion for Permanent Injunction had not yet issued. Discovery aimed a the issue of contempt was premature in the absence of an injunction. *Syndia's* reference to *KSM* merely recites the standard for *instituting* contempt proceedings (since overruled), and does not articulate a standard or procedure regarding discovery leading to a Motion for Contempt.

As to my recollection of Mr. Hager's testimony during the injunction hearing, he stated as follows:

> Q: Mr. Hager from your experience, do you have an idea of how much it would cost, for example, a hospital to make that change away from RSS?
>
> A: I do have some experience with that, yes.
>
> Q: Based on your experience, what would you believe to be the likely cost to a hospital for that change?
>
> A: For a hospital, the hospital – very large hospitals I think would be more expensive than some of the non-hospital RSS customers we have, so if I were to take the simplest implementation of our RSS and pull it out and put something else in, you know, probably the simplest would be three months, but I think on average for our hospitals, I bet you would it probably be closer to nine months because of the complexities of the hospital.
>
> Q: You gave me the time. I was asking – maybe you were thinking of time cost, but I think the question is actually going to the monetary cost.

Daniel McDonald
July 1, 2011
Page 4

> A: Yeah, that's going to run somewhere north of 300,000, 3- to 500,000 probably for that length of time. Maybe up to 750,000 on average. Some will be greater than a million.

Inj. Tr. 262:17-263:11. There was no distinction by Mr. Hager that this was a "non-Lawson" solution, or simply a Lawson "bug fix," as is now suggested. Further, if such a Lawson solution was contemplated — a few weeks before it was purportedly implemented — one would have thought it would have been brought to the District Court's attention in some detail when considering the issue of irreparable harm during the evidentiary hearing.

Accordingly, we would ask you to reconsider the requests in my June 16 letter and produce the documents and information to us so that we might resolve this difference of opinion in a timely manner. Nevertheless, even if you are unwilling, we are willing to incur the expense and inconvenience to travel to Minnesota for a demonstration of the RQC system, as you propose. We do not want this, however, to be a "fool's errand."

Given the absence of detailed, publicly-available information about RQC, and your refusal to provide any of the documents we have requested, it would be impossible for us to adequately educate ourselves in preparation for such a demonstration using the information currently in our possession. As a requirement of our agreeing to bring an attorney and an expert to Minnesota, we ask — at a minimum — that you produce any documentation and training materials that Lawson has publicly provided to its users to explain the RQC design-around, how the new functionality differs from the old functionality, how the new or modified screens work, how the new functionality affects workflow, how to accomplish old tasks in new ways, and what old tasks cannot be accomplished with the new system (if any). This is needed so we can understand the demonstration and perform our own independent inquiry.

Moreover, your letter does not provide any specifics about the demonstration you propose, such as what exactly we will be able to observe, how the system will be set up, what data will be available, and whether we will be able to do our own testing. We propose a two-step inspection:

> 1) first, you will demonstrate to us those aspects of the system that you contend have been modified such that the configuration no longer infringes; and
>
> 2) we will then have an opportunity to do our own testing of the system.

For our inspection, we will need a fully-functional demonstration system with an executable version of the current releases for Lawson's Core S3 Procurement System (Lawson System Foundation, Process Flow, Inventory Control, Requisitions, Purchase Order modules) as integrated with Requisition Center, Procurement Punchout and EDI. The demonstration system

Daniel McDonald
July 1, 2011
Page 5

should include the same demonstration data as included in PX-402 and should have at least the same two Punchout connections enabled as were enabled for PX-402 (e.g., Staples and Dell). The demonstration system should have screen capture software loaded thereon to enable us to capture any tests we run. We also request that Lawson provide us with any instructions needed for operation of the demonstration laptop.

With respect to inspection of Lawson's source code, our source code expert, Mr. Niemeyer, is unable to travel to Minnesota due to scheduling conflicts. Counsel for ePlus, alone, are unable to analyze the source code without his assistance. As you know, it took Mr. Niemeyer weeks to analyze Lawson's source and it is unrealistic to believe that even with a much narrower scope of inquiry, and his existing knowledge, he could complete a review in a one- or two-day on-site inspection. Accordingly, we ask that you produce the relevant source code to us and allow Mr. Niemeyer to inspect it. To address your concerns about the security of the source code, while allowing us to conduct an expeditious review of the source code, we propose the following:

> 1) Lawson will produce an encrypted disc containing a very limited subset of the source code as follows: (a) file comparison output showing comparisons of each module that Lawson contends was modified as part of the supposed workaround with the version of that module that was part of the infringing system; (b) each module that was modified or added as part of the supposed workaround; and (c) each module that was removed as part of the supposed workaround;
>
> 2) Lawson will also include on the disc source code control system control files, project files and log files showing the checkout/modification/checkin history of each project that was part of the implementation of Lawson's supposed workaround; and
>
> 3) Lawson will allow Mr. Niemeyer to view the contents of the encrypted disc on a computer at his home, provided he does not make any copies of the contents of the disc (other than temporary copies incident to the operation of editing and searching tools he uses to analyze the source code).

Production of the limited source code subset would be without prejudice to our right to seek production of additional source code if Mr. Niemeyer determines it is necessary to complete his review. We believe this proposal represents a practical compromise that will allow us to conduct a review while addressing Lawson's concerns.

Daniel McDonald
July 1, 2011
Page 6

As I understand, the demonstration is currently scheduled to go forward this coming Friday at 9 am on July 8.

Sincerely,

Scott L. Robertson

cc: The Honorable Robert E. Payne
U.S. District Judge