# EXHIBIT C

515

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    RICHMOND DIVISION
 3      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                    :
 4      ePLUS, INC.,                :
                                    :
 5          Plaintiff,     :
        v.                  : Civil Action
 6                          : No. 3:09CV620
        LAWSON SOFTWARE, INC.,      :
 7                          : January 6, 2011
            Defendant.     :
 8      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:
 9
10
11          COMPLETE TRANSCRIPT OF JURY TRIAL
          BEFORE THE HONORABLE ROBERT E. PAYNE
12        UNITED STATES DISTRICT JUDGE, AND A JURY
13
14
15      APPEARANCES:
16      Scott L. Robertson, Esq.
        Jennifer A. Albert, Esq.
17      Michael T. Strapp, Esq.
        David M. Young, Esq.
18      GOODWIN PROCTOR
        901 New York Avenue, NW
19      Washington, D.C.  20001
20      Craig T. Merritt, Esq.
        CHRISTIAN & BARTON
21      909 E. Main Street, Suite 1200
        Richmond, VA   23219-3095
22
            Counsel for the plaintiff ePlus
23
24
25          DIANE J. DAFFRON, RPR
            OFFICIAL COURT REPORTER
            UNITED STATES DISTRICT COURT
```

516

```
 1      APPEARANCES:  (Continuing)
 2      Daniel W. McDonald, Esq.
        Kirstin L. Stoll-DeBell, Esq.
 3      William D. Schultz, Esq.
        MERCHANT & GOULD
 4      3200 IDS Center
        80 South Eighth Street
 5      Minneapolis, MN   55402-2215
 6      Dabney J. Carr, IV, Esq.
        TROUTMAN SANDERS
 7      Troutman Sanders Building
        1001 Haxall Point
 8      P.O. Box 1122
        Richmond, VA   23218-1122
 9
            Counsel for the defendant Lawson Software.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

517

```
 1          (The proceedings in this matter commenced at
 2      9:20 a.m.)
 3          THE CLERK:  Civil Action No. 3:09CV00620,
 4      ePlus, Incorporated v. Lawson Software, Incorporated.
 5      Mr. Scott L. Robertson, Mr. Craig T. Merritt,
 6      Ms. Jennifer A. Albert, Mr. Michael T. Strapp, and Mr.
 7      David M. Young represent the plaintiff.
 8          Mr. Daniel W. McDaniel, Mr. Dabney J. Carr,
 9      IV, Ms. Kirstin L. Stoll-DeBell, and Mr. William D.
10      Schultz represent the defendant.
11          Are counsel ready to proceed?
12          MR. ROBERTSON:  Yes, Your Honor.
13          MR. McDONALD:  Yes, Your Honor.
14          THE COURT:  All right.  Thank you very much.
15          I apologize for keeping you-all waiting this
16      morning.  I had a mechanical malfunction that I needed
17      to attend to, and I'm not very mechanically oriented.
18          All right, Mr. Robertson.
19          Dr. Weaver, I remind you you're under the
20      same oath which you took yesterday.
21          THE WITNESS:  Yes, Your Honor.
22      BY MR. ROBERTSON:  (Continuing)
23      Q   Good morning, Dr. Weaver.
24      A   Good morning.
25      Q   If we could have Plaintiff's Exhibit No. 1 back up
```

518

```
 1      on the screen again, the '683 patent, the cover page
 2      here.
 3          Dr. Weaver, the jurors have seen this exhibit now
 4      several times and it's in their jury notebooks.  This
 5      is at tab 2.  Can you just tell us what is the title
 6      of the patent?
 7      A   Electronic Sourcing System and Method.
 8      Q   Has the Court defined the term "electronic
 9      sourcing system"?
10      A   Yes, it has.
11      Q   What's your understanding as to what that
12      construction is?
13      A   In the glossary of claim terms, the "electronic
14      sourcing system" has been defined by the Court to be
15      an electronic system for use by a prospective buyer to
16      locate and find items to purchase from sources,
17      suppliers or vendors.
18      Q   What is your understanding of what a source is,
19      sir?
20      A   A source would be a vendor or a manufacturer or a
21      distributor.
22      Q   In the Court's construction of the claim term
23      "catalog" or "product catalog," how does the Court
24      define what a vendor can be?
25      A   The vendor, in the Court's construction, a vendor
```

575

1   the '70s, but the overall components of this system,

2   they haven't been available since the '70s, have they?

3   A  I don't think so.

4   Q  And you can take known technology and combine it

5   to come up with something new and useful; is that

6   right, Doctor?

7   A  Sure.

8   Q  The converting icon, I think you talked a little

9   bit about this, but in the Lawson system, how do they

10  perform this functionality of the conversion to find

11  similar, identical or generally equivalent items?

12  A  I mentioned these UNSPSC codes.  So I'll explain

13  later in detail what they mean, but the gist of it is

14  that by using an 8-digit code, you are drilling down

15  to what's going to be called the commodity level of

16  information.  And if multiple items have this same

17  8-digit code, then by the definition of the code they

18  are generally equivalent and substitutable.

19      So the Lawson system uses this UNSPSC code in

20  order to accomplish that task.

21  Q  So now that you have discussed sort of the overall

22  functionality of the system in general terms and how

23  it can perform it, you identified various software

24  programs or modules that Lawson offers to do that

25  functionality.  Can they be configured in various

576

1   ways?

2   A  Yes.  Certain modules are required and certain

3   modules are optional.

4   Q  Did you prepare a demonstrative to show how these

5   various Lawson procurement S3 modules can be -- these

6   components can build to an infringing system?

7   A  Yes, I have several demonstratives that build on

8   each other to illustrate how the software modules

9   build on each other.

10  Q  Let's go to the first demonstrative you have.  And

11  this one is entitled "Lawson's electronic sourcing

12  systems."  And you have a yellow box there.  What is

13  that?

14  A  So as the name suggests, the platform technology

15  foundation contains the modules that have to be in a

16  functioning Lawson system.

17      Two of those are the Lawson system foundation,

18  which is, again, a set of common computer implemented

19  activities that every software module is going to

20  need.  For instance, communication with other modules.

21      The process flow is a module that controls and

22  directs the approval process.  So when a requisition

23  comes in, typically a manager approves it, and that

24  approval process is done by the process flow module.

25      So these two are required for all of the S3

577

1   procurement systems.

2   Q  In your analysis and review of the documents and

3   the deposition testimony, did you make a determination

4   that these foundational software modules were required

5   as part of the Lawson infringing system?

6   A  Yes, in the documentation that I read it was very

7   clear that the Lawson system foundation, LSF, had to

8   be installed before you could install the modules of

9   the S3 procurement system.  Likewise, the process flow

10  had to be there as well.

11  Q  In your report, you called the Lawson system

12  foundation a prerequisite module.  What did you mean

13  by that?

14  A  The LSF must be there before you can load the

15  modules that are the procurement suite.

16  Q  In order to purchase the procurement suite

17  license, the procurement suite, does a customer of

18  Lawson have to license this Lawson system foundation

19  and process flow?

20  A  That's what the documentation says.

21  Q  Well, I think you touched on the process flow

22  already, but let's take a look, if we can, at the

23  Lawson requisition self service installation guide,

24  which is PX 131.  It's in binder 3, Dr. Weaver.

25      Is this document is entitled, "Lawson requisitions

578

1   Self Service Installation Guide."  Did you review this

2   as part of your preparation for your expert report?

3   A  Yes, I did.

4   Q  So what is this document?

5   A  This document explains to the customer how they

6   should go about installing this requisition self

7   service module.  We're going to call it the RSS.

8   Q  If we could go to bar code 4.  It's item 4 of this

9   document.  There's a box entitled, "System

10  Requirements" there.  Do you see that?

11  A  I do.

12  Q  Where is the information relevant to the Lawson

13  system foundation here?

14  A  It says that the following software and hardware

15  requirements must be met before you install the

16  product.  And then in the table below, the first row

17  says, "Lawson system foundation."

18  Q  Okay.  So before you can install Lawson's

19  requisition self service, one of the requirement

20  components is the Lawson system foundation; is that

21  right?

22  A  That's what this says.

23      MR. McDONALD:  Your Honor, I object.  It's a

24  little unclear at this point because requisition self

25  service is a different module from the ones we were

611

1  Q  Can we go to barcode -- page 70 in this document.  If I
2  can find it myself.  The Bates number ends with 318.
3        MR. McDONALD:  Your Honor, I hate to interrupt.  Our
4  Exhibit 112 ends at page 64 of the 301.
5        MR. ROBERTSON:  Mr. McDonald, what page does it end
6  in?
7        MR. McDONALD:  My version ends at page 64.
8  Q  So we were at page 70 in Plaintiff's Exhibit 112 at the
9  Bates label that ended 318.  And you just referenced this item
10  master, and in this document, this Lawson document says what is
11  an item master.  What does Lawson tell us as to how it defines
12  an item master?
13  A  In the first sentence it says, an item master is a file
14  which holds information about an item regardless of where that
15  item is used.
16  Q  So what, if any, relevance does that have to the opinions
17  you're going to be offering in this case?
18  A  Well, it confirms that the item master is going to be
19  utilized by requisitions and by purchase orders and that it is
20  the central repository where most of the vendor data lies.
21  Q  And can this item master data store both stock and
22  nonstock items?
23  A  Yes, both.
24  Q  By nonstock items, what do you mean by that?
25  A  Those are items that would be ordered from an external

612

1  vendor.
2  Q  What information about the items is maintained in the item
3  master?
4  A  So that would be things like item number, the item
5  description, the unit of measure, the cost, the vendor name,
6  and other attributes that the user can define.  So there's a
7  set of things that must be there like vendor name and cost and
8  unit of measure, and there's also, as we're going to see later,
9  there's some user defined fields so the user can put in
10  information that the user thinks is important about the
11  particular item.
12  Q  Did it also have commodity and classifications codes?
13  A  Oh, that's right, it can.  There's special place for
14  UNSPSC codes, and there's programs to load that information.
15  Q  Refresh the jury, if you would again, on what a commodity
16  classification code is at a high level, if you would?
17  A  Yes.  So using these UNSPSC codes, these are eight-digit
18  codes.  When you use all eight digits, it is a classification
19  for items that are generally equivalent or substitutable.  So
20  it's a way of finding similar items.
21  Q  So this various data points, data information that you
22  just identified, item number and item description and unit of
23  measure and pricing, are all those -- that type of data and
24  information consistent or inconsistent with the Court's
25  construction of an associated -- or, excuse me, organized

613

1  collection of items and associated information including
2  various things?
3  A  Consistent.
4        MR. McDONALD:  I object to the characterization of
5  the Court's construction.
6        THE COURT:  I didn't hear the last part.
7        MR. McDONALD:  Maybe it would be helpful just to put
8  up the construction itself.
9        THE COURT:  All right.
10        MR. ROBERTSON:  Sure.  Do you have glossary terms?
11  The jury has them.
12        THE COURT:  The jury has them in the notebook.
13  Q  So let me --
14        THE COURT:  What he objected to is you abbreviated
15  the term.  Isn't that what your objection was?
16        MR. McDONALD:  That is correct, Your Honor.
17        MR. ROBERTSON:  I misunderstand.  Let me go back
18  then.
19        THE COURT:  That's all he's objecting to.
20        MR. ROBERTSON:  Thank you for the clarification, Your
21  Honor.
22  Q  There's a catalog definition; correct?
23  A  Yes.
24  Q  You have it, and the jury has it.  And it says it's an
25  organized collection of items and associated information

614

1  published by a vendor which includes suppliers, manufacturers,
2  and distributors which preferably includes, and then there's a
3  number of specified things, part number, price, catalog number,
4  vendor name, vendor ID, a textual description of the item, and
5  images of or relating to the item.  Do you understand that
6  that's the Court's construction?
7  A  Yes, I do.
8  Q  Is that consistent or inconsistent with the various item
9  data that can be included in the item master?
10  A  Consistent.
11  Q  The vendor cost information, is that contained in the
12  vendor item table in a purchase order module?
13  A  Yes.
14  Q  Are we going to see that at some point?
15  A  Yes.
16  Q  If we can, in the same exhibit, going back to barcode page
17  46, Bates label 294?
18        THE COURT:  Excuse me just a minute.  Are you saying
19  that in your view, item master fits the defined term catalog?
20        THE WITNESS:  Yes, along with the vendor item table.
21        THE COURT:  You mean you have to have the vendor item
22  table and the item master for it to be a catalog?
23        THE WITNESS:  Yes, sir.
24  Q  Let me have PX-108 again.  Let me just ask you a question,
25  Doctor, about this.  Is a vendor associated with the item data

627

1   training.

2   Q   Can you turn to the page that is barcoded 18 which ends

3   with a Bates label 491, and there is a heading there called

4   prerequisite applications setup.  Why is this significant to

5   your opinions?

6   A   As it says, before you can use the Lawson requisitions

7   self service application, you must set up other Lawson

8   applications.  The prerequisite applications affect the way

9   processing occurs in the Lawson requisitions self-service

10  application.  So as I showed in my demonstrative, this sits on

11  top of our modules.

12  Q   I want to turn to the next page and that first bullet

13  point.

14  A   Before you can create requisitions, you must set up the

15  requisitions application including requester's requesting

16  locations and approval codes if used.

17  Q   Why don't we turn to page 22 of the document, ends with a

18  Bates label 495.  There's a heading called setting up the

19  purchase order application?

20  A   At the top.

21  Q   What did you consider on this page, if anything, when you

22  were doing your analysis?

23  A   The very first sentence.  Before you can use the

24  application, this is the purchase order application --

25      THE COURT:  That doesn't say that.  It says "before

628

1   you use," not "before you can use."

2       THE WITNESS:  Thank you, Your Honor.  Before you use

3   the application, you must define purchase order vendors and

4   locations.

5   Q   What, if any, significance did that have to your opinions?

6   A   That the purchase order and requisition self service have

7   to work together, that PO has to be present before RSS can

8   work.

9   Q   Let me also take you back to page 21 of the document which

10  ends 494.  That is entitled setting up the inventory control

11  application?

12  A   Right.

13  Q   What, if any, significance on this page for your opinions,

14  Doctor, would you like to point out to the jury?

15  A   The first sentence.  Before you set up the requisitions

16  application, you must set up the inventory control application.

17  Q   Thank you.  Is that consistent with your understanding in

18  the diagram that you put together to illustrate?

19  A   Yes, it is.

20  Q   Can we go to page 27 which ends with Bates label 500?

21  This page is entitled defining categories optional; do you see

22  that?

23  A   I do.

24  Q   They are describing or discussing the UNSPSC.  Do you see

25  that?

629

1   A   Yes.

2   Q   What, if any, significance does that have with respect to

3   the requisition self server module?

4   A   So these first four paragraphs explain the purpose, and

5   then down below are instructions on how to do this.  The

6   categories task is designed to use UNSPSC, United Nations

7   Standards Products and Services Codes.  Categories let you

8   search for items by category.

9       After you import UNSPSC codes, you can assign them to

10  items using item master.  IC 11.1 is one of these programs.

11  The codes have four levels:  Segment, family, class, and

12  commodity.  These levels create an item hierarchy and let you

13  search each level for items in the item master file.  These

14  codes are attached to items on IC 11.  That's the item master.

15      After you define categories, you can click on a category

16  top level to open the segment tree to the product, family,

17  class, commodity, branches, and items.  You select items at any

18  of the levels.

19  Q   Okay.  Is this the same kind of UNSPSC classification

20  codes that can be used to do the converting as defined by the

21  Court that we saw before in, I believe it was the inventory

22  control module?

23  A   Yes, they are.

24  Q   So then this is available functionality as part of the

25  requisitions self-service application as well?

630

1   A   Right.  This is part of RSS.

2   Q   Let me direct you, if I could, Dr. Weaver, to Plaintiff's

3   Exhibit Number 109 which is in volume two.  Have you seen this

4   document before?

5   A   Yes, I have.

6   Q   What is it?

7   A   This document is entitled S3 EDI for supply chain

8   management.  This was reviewed during the depositions of the

9   Lawson personnel.

10  Q   Let me go to page Bates labeled five of this document that

11  ends -- excuse me, barcode five that ends with the Bates label

12  618.  It's entitled Lawson S3 EDI for supply chain management.

13  Do you know what the S3 product is?

14  A   Sure.  It's the Lawson procurement suite.

15  Q   Can you define that with respect to the modules that

16  you've identified in your diagram?

17  A   Yes; requisitions, purchase order, and inventory control.

18  Q   What significance is in this particular page of

19  Plaintiff's Exhibit 109?

20  A   The first paragraph explaining what this does.  It links,

21  or rather it says links your enterprise to its trading partners

22  to electronically send transactions such as purchase orders,

23  price/catalogs, and invoices electronically.

24  Q   So using this application, can you receive electronically

25  transmitted catalogs from suppliers?

635

1  A  Yes.

2  Q  And I'm not going to go through it again because we read

3  them at one point, but the jury has them in their glossary.

4  And, of course, all the other elements need to be there as

5  well.  Are we going to be seeing, as we walk through this

6  demonstration, the existence of these other elements that you

7  described?

8  A  Yes.

9  Q  Why don't you go ahead.

10  A  All right.  So Mike is going to play this movie, and

11  you'll see there are some waits involved in here, but that's

12  just because it's recording exactly what was seen.

13  Q  Stop here for a second and let me ask you a question here.

14  There's a box in the lower right-hand corner.  Is that part of

15  the Lawson system or not part of the Lawson system?

16  A  That was part of the system provided, and it's part of the

17  realtime capturing software, so you can -- what's showing --

18  can you see this?  So what you are seeing right now is a clock

19  that says we're 12.4 seconds into the movie, and then there's a

20  button that if you were on the real laptop, you could click it

21  and it would toggle from pause to play to pause to play.  We've

22  chosen just to let it play.

23  Q  If we wanted to --

24     MR. McDONALD:  Your Honor, could I get a

25  clarification on which exhibit, and is there a paper version of

636

1  this one so we know what you are using?

2     MR. ROBERTSON:  It's going to be Plaintiff's

3  Exhibit 376 is the video, and Plaintiff's Exhibit 374 would be

4  the hard copy paper capture of the screen shots.

5  Q  So we're clear, this is like the video playback?  We can

6  do the stop, forward, reverse by using these tools if we need

7  to go back at any time?

8  A  Well, these tools are for the original capture.  Mike and

9  I are going to do it manually.  I'm going to say stop and

10  continue and probably say go back.

11  Q  We may have to go back because it moves quickly sometimes?

12  A  Sometimes it's too quick, and sometimes it's too slow.

13  Right now we're going to start with a go back, so go back to

14  the beginning.

15     All right, so as the laptop screen exists, first I'm going

16  to bring up the browser.  I'm going to use Internet Explorer,

17  so here we go.  Stop.  Now, again, I'm just going to tell you,

18  you're going to see some times when not much is happening, but

19  this is just a true-to-life recording of exactly what was on

20  the screen at the time.

21     Okay, so in your ordinary Internet Explorer browser, I've

22  clicked on the favorites tab, and one of the favorites that

23  I've saved is the Lawson portal.

24  Q  Is this an example of the drop-down menu you were talking

25  about earlier?

637

1  A  Sure.  Exactly.  So I'm going to go down and click on

2  Lawson portal.  Continue.  Now, this is one of those waits.

3  Okay.  We get to the Lawson log-in screen.  So we put in the

4  user name and password and then click on log in.  This will be

5  one of those longer waits.  You can see the time clicking away

6  in the bottom right-hand corner.

7     Stop.  So now we are at the Lawson home page, and if you

8  are familiar with browsers, you see up here, there is the URL

9  that we're using.  LSF server, that's Lawson server foundation,

10  that's what we talked about before.  Server.corpnet.lawson.com.

11  So we're looking at the portal.

12  Q  All right, you used the term URL.  Can you explain to the

13  jurors what you mean by that?

14  A  Falling back into my vernacular.  Universal resource

15  locator, so commonly called a web address.  Okay, so we can

16  continue.  Top.  Stop.  That was stop, not top.  Here's another

17  one of those drop-down menus.  So on the left-hand side, I have

18  a menu.  One of the top level choices was requisition self

19  service.  So I'm going into the RSS module, and I'm picking one

20  of the activities that is there.  This is one of the

21  capabilities.  All right, so I'm going to click on the shopping

22  selection.  Continue.

23     Stop.  So, now we come to the shopping screen.  Again, if

24  you look up here at the top, you will see there are some

25  choices that can be made.  These are, again, top levels of what

638

1  will be drop-down menus.  I'm going to go click on this

2  find/shop, and that's going to give me additional choices.

3  Continue.

4     Stop.  So here are the choices.  I can search the

5  catalogs, I can do a Punchout.  I'm going to do that later.

6  Down there at the bottom are categories.  So I'm going to go

7  down and click on categories, because I want to do a category

8  search.  Continue.

9     Stop.  Now, remember with the UNSPSC codes, we said that

10  there were four levels:  Segment, family, class, and commodity.

11  So what is showing here in the category tab, the category

12  window, is the first three of a small set of these top level

13  categories, these segment categories.  So, remember, there

14  could have been a hundred of them, 00 to 99, but here, for

15  clarity, everyone exchanges those digits for names so that they

16  have -- they make sense to humans.

17     So my top choice there, live plant and animal material and

18  accessories and supplies, that's one of the segment codes.

19  Now, I don't know what code it is, 23, 99, I don't know.  It

20  doesn't matter.  It is representative of what is in this very

21  broad segment.  So I'm going to scroll down and show you the

22  others, and then I'm going to come back and pick one in the

23  middle.  Continue.  See, we only had about six there.  Stop.

24  Q  Let me ask you a question about that then.  There are only

25  six here to illustrate the functionality of it.  Does the

639

1    Lawson requisition self service you are using here have the
2    capability to have more?
3    A    Absolutely.
4    Q    How many could it have?
5    A    It could be a hundred different segments.  Each of those
6    segments could have a hundred families.  They could each have a
7    hundred classes.  They could each have a hundred commodities.
8    Q    I noticed you clicked on one of these segments?
9    A    The one I clicked there in the middle is communications
10   and computer equipment and peripherals and components and
11   supplies.  So you can see how broad a category that segment
12   name represents.  So what we're going to do now is drill down
13   to become finer-grained.
14        So having clicked on that top level segment -- continue --
15   stop.  So underneath the segment is the family.  Now, here we
16   show that there's very little data in the system we were
17   provided.  Whereas there could be a hundred different family
18   names, there's only one.  So due to the paucity of data here,
19   I'm going to click the only possibility I've got.
20        All right, so I've done the segment.  This is the family.
21   I'm going to click on the family name, hardware and
22   accessories.  Continue.
23        Stop.  So now we're down to the class.  There could have
24   been a hundred classes, but, again, because there's so little
25   data here, there's only two.  So as I look at the class, I have

640

1    a choice of computers or monitors and displays.  So I'm going
2    to go for computers.  Continue.
3        Stop.  Now I'm down to the commodity level.  The
4    commodities, there should be a lot of them, but because of the
5    paucity of data here, we have only one commodity category,
6    notebook computers.  So I'll click the only choice I've got,
7    and then that will list the actual item data that is underneath
8    the notebook computers commodity code.  Continue.
9        Stop.  So now we see all of the items in the database that
10   have the UNSPSC code for notebook computers, and there's only
11   two, okay?  Small database.
12   Q    So I understand, for the segments, there could have been
13   thousands, for families there have been --
14   A    Hundreds.
15   Q    Hundreds.  What is the next level?
16   A    So you start with segment.
17   Q    Class?
18   A    Could be a hundred.  Then family -- each of those segments
19   could have a hundred, and then each of those families could
20   have a hundred classes, and each of the classes could have a
21   hundred commodities.
22   Q    Those commodities, you could have thousands of items?
23   A    Right.  Once you get down to the commodity level, you have
24   unlimited number of items that map to that code.  Here we have
25   two.  Okay, it's going to do the job, though.

641

1        All right, so I'm going to look at these two computers.
2    You can see the first line item there is an IBM ThinkPad, and
3    it has an item number of 6001.  The one below it is a Dell
4    Inspiron 8000.  The one below that is 6020.  So I'm going to
5    go click on the item number, and that's going to get us a
6    description of this item.
7    Q    Before you do that, Doctor, does it have unit measure
8    category?
9    A    Right.  Under UOM, you see each.
10   Q    Does it have cost information?
11   A    Under cost, the ThinkPad is 2,500.  The Dell is 2,000.
12   Q    Does it have description of the item?
13   A    It has a description, IBM ThinkPad T20 or Dell Inspiron
14   8000 with Intel Pentium processors.
15   Q    You indicated it had an item number?
16   A    There is an item number.
17   Q    And it even provides for the Intel Pentium or the Dell
18   Inspiron, the manufacturer?
19   A    I just covered up the description.  Yeah.  So not only do
20   we have in this case the name of the computer, Dell Inspiron
21   8000, we also have a little more descriptive information, that
22   it's an Intel Pentium III processor.
23        Okay.  We'll continue.  Oh, and stop.  I should also note
24   while we're here that over here is the Dell shopping cart, and
25   it's obviously empty.  It's supposed to be empty --

642

1    Q    I think you misspoke.  I think you said the Dell shopping
2    cart.
3    A    I misspoke.  This is the Lawson shopping cart right here
4    where it says my cart.  And so as I select items, they will
5    show up in the shopping cart, but we'll see that.  All right,
6    so now I'm READY to drill down on the ThinkPad.  Continue.
7        So I click on that item number.  Stop.  And this retrieves
8    the data in the item master and vendor item table database and
9    tells me about the item.  So we have an item number, we have a
10   description, a unit of measure, a cost.
11        We have a source vendor ID, 118, and a source vendor name,
12   Office Max.  So from observing this information that is
13   produced, I know that this IBM ThinkPad has a vendor source of
14   Office Max.
15   Q    Let me stop and ask a question, Doctor.  There's a box
16   there that says image not available.  Does this RSS application
17   have the ability to load images of the items offered for sale?
18   A    It does, and the documentation encourages one to do so.
19   But, again, because of the paucity of data, we didn't have any
20   item images in the data we were given.
21   Q    This is how it was provided to us; it could have been
22   provided with an image, because the software permits you to do
23   that?
24   A    Right.  It could have been chock-full of images, but it
25   wasn't.  Okay, so I'm going to scroll down and up so you see

643

1  all of the information that was presented to me as the user of
2  the RSS system, and then we'll go back and look at the other
3  Dell computer.  So continue.  So now I'm going to add that to
4  the cart.
5      Stop.  So here in the Lawson shopping cart, I have my IBM
6  ThinkPad T20, item number 6001; quantity, one; unit of measure,
7  each; cost, $2,500.  So I'm going to park this item in the
8  shopping cart, but then I'm going to go back and look at the
9  equivalent items, equivalent in that they had the same UNSPSC
10  code.
11     All right, so we'll continue, and I'll click on this back
12  button over here.  So here -- stop.  Here is that second line
13  item as we saw before, the Dell Inspiron.  So I'm clicking on
14  its item number, and we'll drill down on that and see what
15  information is provided there.  Continue.
16     Stop.  So similarly to what we saw before, this is the
17  other machine.  It's an item -- I wiped it out.  Item 6020, a
18  Dell Inspiron 8000 with Pentium III processor, a unit of
19  measure each, and a cost of 2,000.  But it has a source vendor,
20  ID code of 124, and a source vendor name of Diablo.
21     So the first computer, the ThinkPad was coming from the
22  Office Max catalog.  This is coming from the Diablo catalog.
23  So I stare at that, and I think which of these machines is a
24  better choice for me.  I'm cheap, so I'm going to go with this
25  one.  So I will add this one to the shopping cart, Lawson

644

1  shopping cart, and delete the other one.  So continue.
2      Okay, now stop.  So now I have both notebook computers in
3  the Lawson shopping cart, and I'm going to go up here to this X
4  and delete the ThinkPad.  Continue.
5      And like all good software, it asks me, do you really want
6  to delete that, and I say, yes.  Okay.  Stop.  So at this
7  point, I have done the UNSPSC code, found two generally
8  equivalent notebook computers, chose one, added it to the
9  shopping cart, added the other one to the shopping cart,
10  deleted the first one.
11     So I've been able to convert one item from one source, the
12  ThinkPad from Office Max, into an equivalent item from another
13  source, the Dell Inspiron here, and having done that, I'm now
14  going to go back and pick another category and find another
15  item to add so that I'll have multiple items in my shopping
16  cart.
17     Okay, so I'm backed out -- because I did that drop-down
18  menu to categories, I'm back at the highest level, the segment
19  level.  So continue.  Scroll down.  Stop.  So this time my
20  segment level is laboratory and measuring and observing and
21  testing equipment.  Continue.  Stop.  My family, again, there's
22  only two here, laboratory and scientific equipment, or
23  measuring or observing, or testing instruments and accessories.
24  Continue.
25     So I pick at my family, laboratory and scientific

645

1  equipment.  Stop.  Oh, I might also note that the hierarchy
2  tree is being kept for me up here at the top.  Here's my
3  segment level, here's my family level.  As soon as I click here
4  on my class level, it will appear here and so on.
5      All right, so I'm about to click on laboratory,
6  environmental conditioning equipment for my third category.
7  Continue.
8      Stop.  Okay, now, again, we're down to commodities.  There
9  could be a hundred of these, but there's not.  There's just
10  one.  There's one commodity called glove boxes.  So when I
11  click on this, I will see all the items in the item master
12  database and the vendor item table that have been encoded with
13  the UNSPSC code for glove boxes.  Continue.
14     Stop.  Once again, the database is small, so there's only
15  two entries under the commodity heading.  Both of these are
16  boxes of sterile surgical gloves, so I'm going to pick one and
17  add that to my Lawson shopping cart.  Continue.  I'm going to
18  look at it first.  Smart shopper.
19     Stop.  All right.  So I just did a drill-down as I did
20  with the computers.  So you see we have an item number, 1036,
21  we have a description, gloves, sterile surgical, size seven.  A
22  unit of measure.  Here it's case, cost, 400 bucks, source
23  vendor.  The ID number is 117, and the source vendor name is
24  Baxter Healthcare.
25     Continue.  So scroll down and back up, and add that to my

646

1  shopping cart.  So here it is, gloves at the top, Dell computer
2  at the bottom.  Now stop.  I have finished shopping, so I have
3  the information from the database now in the shopping cart.  My
4  next goal is to create a requisition.  Then I'll need to get
5  that approved, and then I'll need to get that turned into
6  purchase orders.
7      So since the gloves and the Dell came from different
8  vendors, I will need two POs, one to each of those vendors, so
9  I'm going to click on checkout.  Continue.  All right, saved.
10     Stop.  So it gives it a number, 911.  So when I come into
11  this system next, I'm going to come in as a manager, and I'm
12  going to look for this order 911 that is existing in the
13  system.  I'm going to find it among all other orders, and then
14  I'm going to get it approved.  All right, continue.  Status
15  needs approval.
16     All right, back to the portal home page, and now I'm going
17  to come in as a manager.  Here are some requisitions, but 911
18  is not among them.  Stop.  Here is the requisition 911, and
19  that's the one I need to have approved.  Continue.
20     Stop.  So here we pull up the requisition, you see right
21  there, and we have the two line items, the Dell Inspiron and
22  the case of gloves.  So I've logged in now as the manager when
23  I clicked on manager, and so here are the actions I can take:
24  Approve, reject, or unrelease, so I'm going to approve these.
25  Continue.

703

1  as to whether that's a multiple catalog availability

2  or a single catalog?

3  A  Well, as we just saw when we did our Punchout

4  Staples and Dell, those were two completely separate

5  catalogs on separate websites run by different people.

6  So those are unquestionably separate catalogs.

7  Q  Do you have an understanding about whether the

8  '683 patent, for example, requires catalogs to be

9  searched simultaneously?

10  A  It does not.

11  Q  Did the Court in any of its claim constructions

12  have that requirement?

13  A  No, that's not in the claim construction.

14  Q  Does the Lawson system have the capability of

15  enabling you to select search first a product catalog

16  and then subsequently select a search in another

17  product catalog?

18  A  Yes.

19  Q  Do you see that in any of your demonstrations?

20  A  Yes, we did.  The Bush or Basyx.

21  Q  In the demonstration in Punchout, did we see that

22  ability to select those product catalogs?

23  A  Yes, we did because we saw that in Dell and in

24  Staples.

25  Q  Why don't we talk a little bit about searching for

704

1  selected product catalogs using the Lawson keyword

2  index?

3      THE COURT:  Excuse me.  Before you do that,

4  are you saying in your view item master is not a

5  single catalog but is a multiple catalog because it

6  has imported into it all number of parts of other

7  catalogs?

8      THE WITNESS:  Well, let me just be clear.

9      THE COURT:  Yes.

10      THE WITNESS:  If the item master is built by

11  importing multiple vendor catalogs, then in my opinion

12  is that database contains multiple vendor catalogs.

13      THE COURT:  But what if it is built by

14  importing part of multiple catalogs, parts of

15  catalogs?

16      THE WITNESS:  In my opinion, it's still

17  multiple catalogs.

18      THE COURT:  I just want to know -- and it's

19  because in those instances you think it's a function

20  of importation?

21      THE WITNESS:  Yes, sir.

22      THE COURT:  All right.

23  BY MR. ROBERTSON:

24  Q  Does the Lawson system have the capability of

25  importing multiple vendor catalogs?

705

1  A  Yes.  We saw that in the documentation with the PO

2  536 program.

3  Q  Did you see representation that Lawson said they

4  could import multiple catalogs?

5  A  Yes, we did.

6  Q  So I did want to address this searching the

7  selected product catalogs using Lawson's keyword

8  search.  You're familiar with that?

9  A  Yes.

10  Q  Are you familiar with Lawson's contention that it

11  searches the entire item master and therefore the

12  Lawson systems don't, and its search engine, does not

13  search only selected portions of catalogs, but rather

14  the entire item master?

15  A  I'm aware of that, but I disagree with that.

16  Q  Why do you disagree with that?

17  A  Because the way that the system is built it uses a

18  search index.  If you think about building a complex

19  system, you would never build it such that you had to

20  search through every single item in order to match a

21  search query.  It would take forever if the database

22  was of any size.  So that's not the way relational

23  databases get built.

24      Instead there's a search index, and so like the

25  index of a book, you have keywords, and they point to

706

1  where in the database those items reside.

2      So if I do a keyword search for Dell, I look it up

3  in the index, and that tells me where the Dell items

4  are, and I only look at those.

5  Q  Do you have any demonstratives that you prepared

6  to help illustrate this point?

7  A  I do.

8  Q  Could we go to 09 at page 15.  Okay.  Here you

9  have a definition of an index from Webster's New World

10  Computer Dictionary.  What significance here should we

11  be focused on as you talk about this computer search

12  index that's being utilized?

13  A  This part here.  When searching or sorting the

14  database, the program uses the index rather than the

15  full database.  Such operations are faster than sorts

16  or searches performed on the actual database.

17  Q  As a computer scientist, is using an index in

18  order to search a relational database something that

19  is utilized in order to make those faster searches?

20  A  Absolutely.

21  Q  Do you know how the Lawson's system search index

22  is created?

23  A  Yes.

24  Q  What is that?

25  A  There's a process by which keywords are defined

707

1  that are going to become searchable.  So there's a
2  keyword search setup program that you run, and then
3  after you've defined what keywords are going to be
4  searchable and you've got your database loaded, and
5  the item master is now full of data, you run the
6  keyword search load program.  That builds the index.
7      And now until you have changed the database, you
8  have got an index into all the searchable keywords
9  that -- all of the keywords that were chosen to be
10  searchable.
11  Q  Are some of those keywords like item description,
12  item number, classification code that you've been
13  addressing already?
14  A  Yes, they are.
15  Q  Which database tables is the search index built?
16  A  I'm sorry.  Say that again.
17  Q  Sure.  From which database tables is the search
18  index built?
19  A  The item master.  Well, and the vendor item table,
20  too.
21  Q  Once the user has selected the field of the item
22  data that are to be searchable, what is the next step
23  in building this index?
24  A  So after you have chosen your keywords, you have
25  to load them all, and then you -- the computer system,

708

1  the keyword search load program, builds this index
2  that is search engine then uses thereafter.
3  Q  Can you take a look at Plaintiff's Exhibit
4  No. 136.  It's in Volume III.  It's entitled,
5  "Requisition Self Service 8.1, 9.0."
6  A  Yes.
7  Q  What is this exhibit, if you know?
8  A  This is a training program for requisition self
9  service.  This particular one is a copy of what a
10  human trainer would be using in terms of slides and
11  notes.  So if you're familiar with Microsoft
12  PowerPoint, it has a notes feature.  So here is the
13  slide itself, and below it are the notes.  So if I
14  were a trainer training you as an RSS class, I would
15  be showing you this picture up here, and then this
16  would be my reminder text of what I wanted to tell you
17  about the slide that I'm showing you.  Instead of
18  having an audio recording, you've got words.
19  Q  Is this a presentation that Lawson gives to train
20  its customers?
21  A  Yes.
22  Q  Why don't we go to page 3 of the document, if we
23  could.  It's Bates label is 687.
24  A  Right.
25  Q  What would you like us to focus on here?

709

1  A  The first two paragraphs.  You can search the
2  catalog, which will search for items in your item
3  master or vendor items.  It also allows you to search
4  for keywords for up to 29 fields based on your set up.
5  You can also search based on categories which can use
6  the UNSPSC code categories.  And I think we've heard
7  the rest of that before.
8  Q  We've gone over that.  Let me direct you then to
9  page 12 of the document.  Is this a Lawson keyword
10  search setup proposal?
11  A  Well, this is the training guide and --
12  Q  This is teaching the customers how to set up the
13  keywords?
14  A  Yes, it is.
15  Q  What's the next page?
16  A  Keyword search load.
17  Q  What is that?
18  A  So that was the second program that you have to
19  run.  The first one, the keyword search set up, this
20  is where you choose which of the 29 different fields
21  will become searchable.  So after you have got them
22  chosen, and you've got your item master database
23  loaded, then you run the keyword search load, and it
24  builds the index.
25  Q  Then if you will turn to page 29.  There's a slide

710

1  there that says "creating a requisition by searching
2  the catalog"?
3  A  Yes.
4  Q  What's being depicted there?
5  A  So this is something that we have seen.  When I
6  did the catagory search and picked items and built a
7  requisition.  So it says down here, When using the
8  search catalog task, you enter the value you want to
9  look for in the search field.  As soon as you type in
10  the third letter, the system begins searching for the
11  matching keywords and displays the result as a drop
12  down list.
13      Keywords exist because you enable certain fields
14  as searchable in this IC00.5 program and run IC800 to
15  build keywords from these fields.
16      So that's the setup and load.  IC800 is the
17  keyword load.
18  Q  So what if anything do the pages of this document
19  have with respect to your understanding of how the
20  Lawson system or whether the Lawson system uses a
21  search index to conduct its searches?
22  A  Well, it absolutely does such that it need not
23  search the entire database.  That's what keyword setup
24  is about and how a keyword load turns that into an
25  actual index.

711

1   Q   So once you have enabled the keyword terms and you
2   built the search index, how does the Lawson search
3   engine conduct a search of the item data in the
4   database?
5   A   So if I type in a word into a text box, say Dell,
6   and engage the search engine, it goes to the search
7   index.  It looks up Dell.  It finds records in the
8   database that match the keyword Dell.  And then it
9   extracts that data from the database and presents that
10   to me on the screen.
11   Q   Do you have a demonstrative you prepared to try
12   and illustrate how this search index operates?
13   A   I do.
14   Q   What's being illustrated here, sir?
15   A   Okay.  So up here at the top we have the text box,
16   which is the search query.  I don't know where that
17   popping is coming from.
18       THE COURT:  That's because you, like some
19   witnesses, but not all, articulate your P's in a
20   particular way at a particular length from the
21   microphone, and there isn't anything that we've been
22   able to do about it.  And it's not your fault.  It's a
23   function of the way things are.
24       THE WITNESS:  Thank you, Your Honor.
25       THE COURT:  It's annoying, but --

712

1       THE WITNESS:  I would have worried about that
2   all night.
3       THE COURT:  Well, don't.
4       MR. McDONALD:  As long as he doesn't use the
5   T sound for the rest of the testimony, it's fine.
6       THE COURT:  No, it's a P, generally.
7   Does this have an exhibit number?
8       MR. ROBERTSON:  No, Your Honor.  It's simply
9   demonstrative.
10       THE COURT:  All right.
11   A   So we have our keywords at the top, our query
12   text, and for this example I want to look for the
13   keywords Dell and monitor.  We'll assume that we have
14   enabled at least two fields, two keyword fields to be
15   searchable.  One of them would be a user-defined field
16   for the manufacturer.  We haven't actually talked
17   about user defined fields yet, but this is part of the
18   Lawson product.  So a user defined field or
19   manufacturer has been determined to be searchable.  It
20   has been declared to be searchable.  And a second
21   field, the item description, which is one of the
22   fields, one of the 29 fields supported by Lawson, that
23   one has also been declared to be searchable.
24       Now, after I do the search load and I build my
25   index, then what I have is for each of the entries in

713

1   the user-defined field for manufacturer, like Dell or
2   Hewlett-Packard or Gateway, for each of those I have
3   pointers into the database that tell me where I will
4   find a record, a product, in which the Dell keyword
5   was located in the user-defined field for
6   manufacturer.
7       Likewise, for the item description fields, if I've
8   got a database that contains keywords like keyboard
9   and mouse and monitor, every time a descriptive term
10   is found that is searchable for item description like
11   keyboard, in this database there are pointers from the
12   index into the database that say where that item is
13   found.
14       So the way this then works is when I put in Dell
15   and monitor, the search engine goes to the search
16   index, finds the keyword Dell, finds all of the places
17   that the keyword Dell would appear in the database.
18   In this case its locations are 10, 20, 25, 26, 27 and
19   28.
20       Then it would look for the next keyword in the
21   query box.  That's monitor.  It would look up all of
22   the places in the database where monitor appears as
23   keyword.  And that's 15, 16, 17, 19, 20, 21, 22, 23,
24   25 and 27.
25       Then having found where the records containing the

714

1   keyword Dell are located and where the records
2   containing the keyword monitor are located, then we do
3   the intersection of those.  That is, from those two
4   lists of numbers, we find where the numbers are
5   exactly the same.
6       So in my example here, 25 and 27 are the database
7   records that contain both the keywords Dell and
8   monitor.
9       So I go fetch records 25 and 27.  And that's what
10   I display to the user.  So I don't search the whole
11   database.  I just the index to search selected parts.
12       THE COURT:  Mr. Robertson, what is this
13   testimony related to?  We had that at the beginning.
14   Now we've had a lot of testimony, and I'm confused a
15   little bit, and the jury may be, about what exactly
16   this line relates to.  Does it have to do with whether
17   there's a search of a single catalog or not?  Is that
18   what we're still on?
19       MR. ROBERTSON:  No, Your Honor.  There are
20   some claims that say you have to search portions of
21   the database or search among the selected catalogs.
22   And so in order to search portions of the database,
23   you need a search index.  Lawson contends that the
24   index is -- that the search searches the entire
25   database all the time.  So, therefore, they can't

723

1  start out with broad categories and narrow our search
2  in order to arrive at the object of what we want to
3  purchase, for example, in this configuration of
4  electronic sourcing system; is that right?
5  A  Right.  So an example would be if my first
6  predetermined criteria was Dell, I could select a
7  subset of the catalogs that contain an item from Dell,
8  and if my second criteria was Dimension 8100, which is
9  a particular Dell model, I could look within those
10  catalogs for those items that are Dell Dimension
11  8100s.
12  Q  Are there some of the catalog selection protocols
13  described there?  What is your understanding of what a
14  catalog selection protocol is?  First of all, the
15  Court has defined what a protocol is.  So let's just
16  that your definition.  Do you recall what that is?
17  A  For protocol?
18  Q  Yes.  It's on the first page.
19  A  A procedure.
20  Q  So let's call a catalog selection procedure, if
21  you will, since that is the Court's definition, and
22  can you tell us your understanding of that element?
23  What is it?
24  A  So there's a user interface that allows me to
25  input a criteria that's going to select less than all

724

1  of the catalogs.
2  Q  There was criteria we talked about.  It could be
3  the first set of criteria.  These attributes we've
4  been talking about such as vendor name and
5  manufacturer number, vendor number, textural
6  description?
7  A  Right.  All of those I mentioned as examples of a
8  first set of predetermined criteria.
9  Q  Then you can use that second set of criteria that
10  include those in the first set that then refine the
11  search?
12  A  Correct.
13  Q  This last element is search program.  Search
14  program relying on said second set of criteria to
15  select specific items from the catalogs for said
16  catalogs determined from the catalog selection
17  protocol.  What is going on there?
18  A  So you need a search program that uses that second
19  criteria in order to find specific items within the
20  catalogs that were sub selected by your choice of the
21  first criteria.
22  Q  Do you have a demonstration to illustrate whether
23  or not the Lawson system performs in a manner that is
24  implicated by Claim One of the '516 patent?
25  A  Yes.

725

1  Q  It's been represented to me it's very short.
2  Would you like me to proceed, Your Honor.  It's
3  Plaintiff's Exhibit 364 is the video and Plaintiff's
4  Exhibit 363 are the corresponding hard copy screen
5  shots.
6  A  Stop.
7  Q  Dr. Weaver --
8  A  Are you ready?
9  Q  Maybe we should make an effort not to stop as much
10  so we can have more of a narrative if the Court would
11  permit.
12      THE COURT:  Whatever he wants to do.  I think
13  he was waiting for you to do a question.
14  Q  Can we proceed with the demonstration?
15  A  We can.  All right.
16  Q  Can you preview it for the jury and tell us what
17  we're going to see here?
18  A  Yes, we're going to see searching for the first
19  criteria of Dell.  And then from those catalogs, we'll
20  see that there are multiple vendors for Dell.  And
21  then we'll refine the search with a Dimension 8100,
22  and we'll find that there are multiple vendors for a
23  more specific search inquiry, and that satisfies the
24  elements of Claim One of the '516.
25      THE COURT:  What are the exhibit numbers?

726

1      MR. ROBERTSON:  364 is the video and 363 are
2  the hard copies.
3  A  Let's go.  Pick the browser.  Pick the favorite.
4  Pick the portal.
5  Q  Don't go so fast, Doctor, that we lose the import
6  of the point you're trying to make?
7  A  I have contradictory instructions.
8  Q  I apologize.
9  A  This part you have seen before.  So no problem.
10  We're waiting for the portal to load.  Okay.  We're
11  there.  Some requisition self service, shopping, and
12  from our drop down menu we'll now pick search catalog.
13  Stop.
14    So here is the query text box into which I am
15  going to put the first predetermined criteria.
16  Continue.
17      THE COURT:  Excuse me.  What do you
18  understand the catalog that's being searched in the
19  drop down when it says "search catalog"?
20      THE WITNESS:  Well, in this case --
21      THE COURT:  Where is it going to search?
22      THE WITNESS:  In this case it's searching the
23  database of item master and vendor table and, this
24  contains all the catalogs that are in the internal
25  database.

2011.01.06 Trial Transcript Day 3  1/6/2011  3:03:00 PM

739

1       MR. ROBERTSON:  I don't know who he's going

2   to question about it.

3       THE COURT:  I'm sure he's going to question

4   Dr. Weaver based on what he said.  Not because I'm

5   prescient or anything.

6       MR. ROBERTSON:  I guess I don't have an

7   objection to that.

8       THE COURT:  Well, good then.  We solved

9   something.

10      Raise the blinds so that in the morning it

11  will be open.

12      All right.  I think that's everything.  And

13  you don't expect to finish tomorrow, is that right,

14  Mr. Robertson?  You don't expect to finish tomorrow,

15  is that what your situation is?

16      MR. ROBERTSON:  I do not, sir.  I expect Mr.

17  McDonald might have a half an hour or 45 minutes of

18  cross-examination.

19      THE COURT:  If you ask your questions bullet

20  points, 30 minutes is plenty.  Once you get beyond

21  that, the expert bets you is generally what happens.

22      All right.  Okay.  So we're not going on

23  Monday.  You're going back on Tuesday.  Thank you very

24  much.  Hope you feel better, all of you.  Don't bring

25  anything else up here.

740

1

2       (The proceedings were adjourned at 5:15 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

741

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE EASTERN DISTRICT OF VIRGINIA
 3              RICHMOND DIVISION
 4
 5   --------------------------------------
 6   ePLUS, INC.          : Civil Action No.
                          : 3:09CV620
 7   vs.                  :
                          :
 8   LAWSON SOFTWARE, INC.     :  January 7, 2011
                          :
 9   --------------------------------------
10
11       COMPLETE TRANSCRIPT OF THE JURY TRIAL
12       BEFORE THE HONORABLE ROBERT E. PAYNE
13     UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24       Peppy Peterson, RPR
          Official Court Reporter
25      United States District Court
```

742

```
 1   APPEARANCES:  (cont'g)
 2   Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
 3   Troutman Sanders Building
     1001 Haxall Point
 4   Richmond, Virginia  23219
 5   Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
 6   William D. Schultz, Esquire
     Merchant & Gould, PC
 7   80 South Eighth Street
     Suite 3200
 8   Minneapolis, Minnesota  55402
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

743

```
 1            P R O C E E D I N G S
 2
 3        THE CLERK:  Civil action number 3:09CV620, ePlus,
 4   Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
 5   L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr.
 6   Michael G. Strapp, and Mr. David Young represent the plaintiff.
 7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
 8   Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
 9   the defendant.  Are counsel ready to proceed?
10        MR. ROBERTSON:  Yes, Your Honor.
11        MR. McDONALD:  Yes, sir.
12        THE COURT:  Good morning.  Good morning, ladies and
13   gentlemen.  I was informed by the clerk that you all needed to
14   know the procedure for asking questions, and if you have
15   questions, it's all right.
16        I think the best way to do this is for you to write
17   your question out and then send it up to Mr. Neal, and he'll
18   give it to me, because there's some kind of questions that,
19   perhaps, are better -- I will tell you immediately, I can't
20   answer that or we can't get into that.
21        Others -- and I found this to be the case most of the
22   time.  Other questions are very helpful to the lawyers to have,
23   because if you have -- you are the ones who have to decide the
24   case, and if you have a question, they need to know it and need
25   to work out a way to get the information to you through their
```

744

```
 1   questions.
 2        So if you feel like you have a question, you can
 3   write them out, send them to me, and I'll take them and look at
 4   them.  Unless it's something that I can't allow, we'll work out
 5   a way to get you the information that you need.
 6        You all look like you're not as drained as you were
 7   when you left yesterday afternoon.  I feel the same way, so
 8   let's get a fresh start.  Let's go ahead, Mr. Robertson.
 9        MR. ROBERTSON:  Thank you, Your Honor.  Good morning.
10
11            ALFRED C. WEAVER,
12   a witness, called by the plaintiff, having been previously
13   duly sworn, testified as follows:
14            DIRECT EXAMINATION
15   BY MR. ROBERTSON:  (resuming)
16   Q   Good morning, Dr. Weaver.
17   A   Good morning, Mr. Robertson.
18   Q   I'd like to start out looking at Plaintiff's Exhibit
19   Number 219, if I could, sir, in binder number five.  Before we
20   get there, I have a few preliminary questions.
21        Do you know whether or not Lawson provides services to its
22   customers to assist them in importing vendor catalog data into
23   its item master?
24   A   Yes, I do.  There was witness testimony to that from the
25   customers.
```

757

1    A  I do.
2    Q  Let's turn to the next page.  These are, again, activities
3    and responsibilities for particular tasks that need to be
4    accomplished in order to perform this statement of work for the
5    Deaconess Health System; is that right?
6    A  That's right.
7    Q  What, of significance, would you like to point out here?
8    A  So at the top, data migration workshops are a Lawson
9    responsibility, and the description over on the right says that
10   the workshops will define the data migration process and the
11   mapping required.
12       And then two down from that, the task or the activity is
13   transform data.  That's a Lawson responsibility, and a
14   description is that the legacy data is transformed into the new
15   database structure.  And there at the bottom of the page is
16   live migration.  That's a Lawson task, and the description is
17   live data migration.
18       So that's taking the real production data in the
19   non-Lawson system and legacy system and moving that into the
20   Lawson system to make a production system, one that's up and
21   running.
22   Q  So when you say production system, you've now taken the
23   old data, including catalog data, migrated over to the new item
24   master in the Lawson system, and then assisted the customer in
25   getting that up and functional?

758

1    A  Yes, to make it fully operational.
2    Q  Can we go to page ten of the document.  Again, there's a
3    number of what are called interface activities; do you see that
4    on the chart blow there?
5    A  Yes, I do.
6    Q  What, if anything, does this have for significance for
7    your opinions?
8    A  So these are the activities that are going to be necessary
9    to integrate the system.  By integrate, we mean integrate the
10   procurement suite with the financial and accounting information
11   or with the financial and accounting software that's part of
12   the Lawson system.
13       So focusing on the activities that are of relevance to us,
14   in the fourth line we have, technical design doc,
15   documentation.  That's the responsibility of Lawson.  Two below
16   that, the activity is develop, and the description or -- excuse
17   me -- yeah, it is the description over on the right-hand
18   column.  Lawson will develop the interfaces defined in the
19   scope.  Below that unit test, and below that deliver.  Both the
20   unit test and deliver are Lawson responsibilities.
21   Q  Doctor, that's all I have with respect to that document.
22   So I'd like to talk to you briefly about this procurement
23   Punchout application and who performs the installation and
24   implementation of that module.  Are you familiar with that,
25   sir?

759

1    A  I am.
2    Q  I want to direct you to binder one.  So my first question
3    is, who typically performs that installation and implementation
4    of a system that utilizes the procurement Punchout?
5    A  That would be Lawson.
6    Q  Did you review any Lawson testimony with respect to that?
7    A  Yes, I did.  The Lawson witnesses said that it was very
8    common for the Lawson personnel to implement the procurement
9    Punchout system.
10   Q  Have you reviewed any documents that would confirm that?
11   A  Yes, I have.
12   Q  Why don't you take a look at Plaintiff's Exhibit
13   Number 103.  Have you seen this document before?
14   A  Yes, I have.
15   Q  And what is it?
16   A  So this is a list of frequently asked questions -- that's
17   the FAQ -- with regard to procurement Punchout, and this was
18   written by a Lawson employee.
19   Q  And can you turn to page -- let me -- prefatory question.
20   So a Lawson employee is putting together a document that
21   proposes frequently asked questions during this procurement
22   Punchout functionality you described?
23   A  The idea here is Lawson knows what questions are
24   frequently asked, so they prepare a list of questions and
25   answers so that they can easily disseminate answers to

760

1    frequently asked questions.
2    Q  Why don't you turn to page six of this document.  So the
3    questions that are being formed here are by Lawson that they
4    feel are typical or that are frequently asked by their
5    customers?
6    A  That's right.
7    Q  What is the question Lawson identifies is frequently asked
8    at the top of page six?
9    A  The top question is, who typically performs the
10   installation, and the answer is Lawson Professional Services.
11   Q  Thank you, sir.  That's all I have with respect to that
12   document.
13       Doctor, you had another demonstration that you wanted to
14   show, and in this demonstration, is this the demonstration in
15   which we were able to, with the assistance of a Lawson
16   employee, load additional item data to be able to show fuller,
17   more robust functionality?
18   A  Yes, it is.
19   Q  This is Plaintiff's Exhibit Number 380, and the hard copy
20   screen shots would be Plaintiff's Exhibit Number 379.  So would
21   you please explain to the jury what's going on in this capture
22   of a process operating on the Lawson demonstration system?
23   A  Sure.  We'll just play this, and I'll narrate it as we go.
24   Q  If you need to stop at any appropriate point, fine.  If
25   you want to skip over some of the things that are not at issue

761

1  in the case, like the approval process or work process flow,

2  that's fine.

3  A  Okay.  All right, Mike, let's begin.  We launch the

4  browser and go to the portal.  We've seen the login before.

5  We're at the home page, and we'll go to requisition

6  self-service and choose shopping.  Find/shop tab, and from that

7  drop-down menu we choose the categories.  You saw these

8  high-level segment categories before.

9      Stop.  This time, you will notice there are more of them,

10  and that's because additional data was loaded in this version

11  of the demonstration.

12     Okay, in the middle of that list is lighting and

13  electrical accessories and supplies, so I'll scroll down the

14  list and go back and choose that high level segment category.

15  Continue.

16     So here's our second level, lamps and light bulbs; our

17  third level, lamps; and our fourth level, which is the

18  commodity, that is halogen lamps.  So stop.  So now we have a

19  list of all the items in the database that are halogen lamps.

20  Continue.

21     We scroll through the list, choose one, and this is a

22  lamp -- stop.  This is a lamp.  So that we can remember what it

23  is, it's a 120-watt halogen lamp, and it's available from the

24  vendor ^Granger.  Continue.  Add that to my shopping cart.  Go

25  back.  Scroll through the list, choose another lamp, drill down

762

1  on that, stop.

2      And so that we can tell the difference, this one is a

3  150-watt lamp.  So I've done some comparison shopping here.  I

4  have searched by categories.  I found a number of lamps which

5  are generally equivalent.  I chose one, a 120-watt one, and now

6  I change my mind, and I'm going to choose the 150-watt lamp.

7      Notice that this is available from a different vendor.

8  This one is from ^Gexpro.  Continue.  So I add it to my

9  shopping cart.  There it is at the top, and I delete the

10  120-watt lamp at the bottom of the shopping cart.

11     So I'll go back to the drop-down menu, and now I'll do

12  Punchout.  I'll punch out to Dell.

13  Q  Let me just stop you there.  You went to an internal

14  catalog database?

15  A  The first halogen lamps that we saw were all in the

16  internal database.

17  Q  And now you're going to an external catalog database?

18  A  This is the external catalog at the special Dell site.

19  Q  So the Lawson system has the ability to both search the

20  internal catalog database and add items to a requisition, and

21  then it can also, in the same process, punch out and go to an

22  external catalog database in order to search a catalog and

23  retrieve items?

24  A  That's right.

25  Q  Is that what you are illustrating?

763

1  A  That's what we're illustrating here.  Okay, so continue.

2  So we punch out to Dell, go full screen and shop by brand.  So

3  at the Dell site, we'll see a list of brands, of products that

4  they carry, and it's a long list.

5      We'll just quickly scroll through some of it, and we'll

6  shop by Kensington brand.  So here are some Kensington

7  products.  I'll look for carrying cases.  So I want a case for

8  my laptop.  I'll scroll through these, look at a second page,

9  choose this one, a counterbalance laptop roller.  Stop.

10  Q  Let me ask you this, Dr. Weaver, while you stopped:  Are

11  we actually at the Dell commercially available website?

12  A  No.  This is the special Dell site that's been created for

13  this customer.

14     THE COURT:  Dell or Kensington?

15     THE WITNESS:  Dell is the site, and Kensington is the

16  brand of carrying case that Dell is selling.

17     THE COURT:  Dell sells Dell and others including

18  Kensington, and they are on this site.

19     THE WITNESS:  Dell sells, of course, many items and

20  many brands, but they are all on the Dell site, yes.

21  Q  How do we know that this is the Dell site?  I see it also

22  has the Lawson logo at the top.  What are we seeing here that

23  tells us we're not at the Dell commercially available site but

24  rather some site that Lawson is making available to the

25  customer?

764

1  A  When we look at that URL, universal resource locator web

2  address at the top, we start at the

3  lsfserver.corpnet.lawson.com.

4  Q  LSF, does that stand for Lawson System Foundation server?

5  A  Yes, it does.

6  Q  That's the foundational software that's necessary to have

7  this S3 procurement software run on top of?

8  A  Right.  That was the bottom yellow block in my

9  demonstrative.  Then as we look to the right of that, we see

10  we're being redirected to this special website which is

11  signin.dell.com/dellogin/port.  I'm sorry, that was portal,

12  /login.ASPX.  So this is running software that loads this Dell

13  site.

14     So we have now gone to the Kensington counterbalance

15  laptop roller, but in looking at the catalog description, it

16  says, temporarily out of stock, please check back soon.  So I

17  need my cases sooner than that, so I'm going to get a different

18  laptop case.  So, continue.

19     So I'll go up to rollers.  So in the special Dell site,

20  I'm looking at roller cases.  Here is one from Case Logic, so I

21  drill down on that.  Stop.  So now I have the description, I

22  have the manufacturer part number, I have the Dell part number,

23  I have the UNSPSC code that I used, and now that I look at the

24  information on availability, it says usually ships within

25  24 hours.  So this case is available in inventory as opposed to

765

1   the previous one that was not.  So this case is satisfactory,
2   so I'll choose this one.  So continue.
3       I'll add it to my Dell shopping cart.  So here's that
4   description.  I'll change the quantity to three.  I'll create
5   the order, and I'll do the trade compliance.  Continue.  So
6   here we have the verify and submit.  So there is my case,
7   quantity three.  That's all right, so I'll submit the order.
8       Stop.  So now that I've submitted that order, I have
9   checked out of the Dell site, and here in my Lawson shopping
10  cart I have three roller cases and one incandescent halogen
11  lamp.  Continue.  So I'm going to check out.  I guess I'm going
12  to look at the lamp again.  Okay.
13      So here is the detail on the lamp, and -- stop.  If you
14  will recall, this one came from Gexpro.  Continue, and I'll
15  look at the detail on the laptop cases.  So there's my rolling
16  laptop case, and this comes from the Punchout site, from Dell
17  computer.
18      All right.  So I'm satisfied with this, so I check out,
19  and now this is saving the Lawson shopping cart into temporary
20  storage where I can turn it into a requisition and then into a
21  purchase order.  So back to the portal.  You've seen the
22  approval before.  I find my requisition number 940.  There's my
23  halogen lamp and my three roller cases, so I approve that.
24  Then I'll run that PO 100 program.
25      I give it a job description, I fill in this required

766

1   information.  Don't need the filters.  Now we'll submit this
2   job.  The job name RQ 940 is running.  I go to the print
3   manager, I get the requisition -- the purchase order and --
4   stop.
5       Here at the top of the purchase order we have the
6   information on the buyer, Metropolis Medical Center.  Continue.
7       Stop.  So here is our roller laptop case, quantity three
8   coming from Dell Computer, purchase order released.  Continue.
9   Stop.  And so here then is our second item, the incandescent
10  halogen lamp.  It's coming from Gexpro, quantity one, PO
11  released, and the report is complete, two purchase orders
12  created.  That's the end.
13  Q   Doctor, in this process in which you searched among
14  product catalogs and an internal catalog database, and you went
15  to an external catalog database at the Lawson Punchout partner
16  Dell, at any time, have you left the Lawson system while doing
17  that?
18  A   Never.
19  Q   Now, Doctor, you talked a little bit about the UNSPSC
20  classification coding yesterday for finding items of general
21  equivalents that could be substituted for each other; you are
22  familiar with that?
23  A   Yes.
24  Q   I don't want to go through the whole segment and family
25  and class and commodity code again, but I do want to ask you --

767

1   you may have touched on this yesterday, but is there a module
2   that Lawson provides that permits you to -- a program that
3   permits you to automatically upload that UNSPSC classification
4   schema?
5   A   Yes, there is.
6   Q   What inventory module -- excuse me.  What module does that
7   come with?
8   A   Inventory control.
9   Q   Is that one of the core modules that you have to have in
10  order to do this procurement process?
11  A   Right.  It's one of the three in my blue box.
12  Q   Does Lawson tell the customers where it can obtain these
13  codes?
14  A   Yes.  It tells you the website to go to.
15  Q   And does Lawson have a program in that inventory control
16  where you can automatically download those?
17  A   Yes, it does.
18  Q   I'd like you -- well, let me as you this:  Have you
19  reviewed documents explaining how these UNSPSC codes work in
20  the procurement process?
21  A   I certainly have.
22  Q   Could I ask you to go to Plaintiff's Exhibit Number 11
23  which is in volume one?  Now, at the top of this, there's an
24  organization called Grenada Research; do you see that?
25  A   I do.

768

1   Q   Is that associated with Lawson in any way?
2   A   No.
3   Q   So this is some independent third party who is going to
4   tells us about using UNSPSC coding?
5   A   That's right.
6   Q   It's called a white paper.  What's a white paper, if you
7   know?
8   A   A white paper is a statement of position, so it's what you
9   know or what you think about a subject.  It's intended to
10  educate.
11  Q   Underneath there, there's a -- what does it say as to
12  these UNSPSC codes?
13  A   So the white -- the topic of the white paper is why coding
14  and classifying products is critical to success in electronic
15  commerce.
16  Q   Can you go to page five of this exhibit.  There's a
17  heading right in the middle called, for finding and purchasing;
18  do you see that?
19  A   I do.
20  Q   There's a table that says, classifying products and
21  services supports procurement activities; do you see that?
22  A   I do.
23  Q   Do you agree with that statement?
24  A   Yes.
25  Q   And there is a pros and cons.  Do you see that?

769

1   A  I do.

2   Q  What is one of the pros that Grenada Research identifies

3   here?

4   A  So the first one, enables buyers and employee

5   requisitioners to find all suppliers of a given category.

6   Q  Is there a con?

7   A  Yes.  Requires up-front effort to apply codes, can be done

8   by third party.

9   Q  And have you seen -- is this the Lawson that says its

10  customers will provides that service?

11  A  Yes.

12  Q  Underneath that table, there is a heading called product

13  discovery?

14  A  Yes.

15  Q  What, if any, significance does this have to your opinions

16  with respect to how the UNSPSC assists buyers and

17  requisitioners to find suppliers in a given category?

18  A  The first two sentences are relevant.  A common naming

19  conventional allows computer systems to automatically list

20  similar products under a single category.  When a person is

21  searching for the category, he or she finds precisely the

22  things being discovered and nothing else.

23  Q  Can you turn to page ten of the document which ends with a

24  Bates label 041.  And there's a heading called unique item

25  codes for schema modifications and multi-language uses.

770

1   A  Yes.

2   Q  And at the end, I don't want to have to go through this

3   entire paragraph -- the jury is going to have this in the jury

4   room -- but what, of significance, in that paragraph would you

5   like to point out?

6   A  In the fourth paragraph, it's the last sentence which

7   says, in effect, unique numbers allow cross-referencing to

8   assure consistency.

9   Q  Is cross-referencing relevant in this case?

10  A  Yes.  That's a term in the patent.

11  Q  Is it a term that the Court's described in its glossary of

12  terms?

13  A  Yes, it is.

14  Q  Why don't you go to that if you could for a second.  Cross

15  reference table, do you see the Court defined that?

16  A  It's the third one down.

17  Q  It says, the Court's construction is a table that links

18  vendor items determined to be equivalent between two or more

19  different vendors.  Do you see that?

20  A  I do.

21  Q  Does this UNSPSC hierarchical schema permit the

22  cross-referencing capability the Judge has defined there?

23  A  Yes, it does.

24  Q  Turn to page 13 of the document for now, and just I want

25  to focus on that hierarchy.  Is this -- this has the segment,

771

1   the family, the class, and the commodity for office equipment

2   going down to pen refills.  Is this the same kind of example

3   you gave yesterday with how, in effect, this eight-digit coding

4   can drill down to get you to a specific product that you want?

5   A  Yes, it is.  The example we used yesterday went down to

6   black pens.  This was a different class, so it ends up with a

7   different commodity, but it's the same schema.

8   Q  Why don't you go, then, to page 12 on this exhibit, and if

9   we could, just the chart.  So, again, this is describing the

10  levels of the UNSPSC -- actually, this even has one additional

11  level down there.  Do you see this business function?

12  A  Yes.

13  Q  What does it say by the time you get down to the commodity

14  level, that last level?  What does it say with regard to what

15  you can now do with this tool in order to identify product or

16  service?  How does it characterize it?

17  A  What it says, by the time you've gotten down to the

18  commodity level, you have found a group of substitutable

19  products or services, and we just saw that with the halogen

20  lamps.

21  Q  Doctor, your opinion, if the parts are substitutable,

22  would they be similar or generally equivalent?

23  A  Yes, they would.

24  Q  Thank you, Doctor.  That is all I have with respect to

25  that document.

772

1   THE COURT:  Is that 111 or 11?

2   MR. ROBERTSON:  11, sir.  I may have misspoken.

3   THE COURT:  No, I didn't write it down.

4   Q  Doctor, I'd like to talk to you a little bit now about

5   what's known as indirect infringement.  You are familiar with

6   that concept?

7   A  Yes.

8   Q  You understand that ePlus is also accusing Lawson of

9   inducing infringement of the patent claims in this case by

10  encouraging, aiding, abetting, or assisting its customers to

11  directly infringe the method claims at issue in this case?

12  A  Yes, I understand.

13  Q  What evidence have you reviewed with respect to whether or

14  not Lawson does, in fact, encourage, assist, urge, aid, or abet

15  its customers to use the Lawson systems in a manner that are

16  covered by ePlus's claims?

17  A  Well, we saw yesterday that there were training courses

18  that were being offered.  We looked at one which was the notes

19  for a training session, but there are live training sessions,

20  there are archived on-line training sessions that you can play

21  back.  There are live training sessions that are using an

22  interactive tool so that you can watch a training session and

23  participate in it.

24  We know from testimony of both the Lawson witnesses and

25  their customers that Lawson provides consulting services to

781

1   another one.  We just saw that in the Punchout.  You can also
2   do that with the internal catalogs, and you can search by
3   keywords like Dell, or you can search by categories like we did
4   as we marched through the UNSPSC codes.
5   Q   So does Lawson also indirectly infringe that by
6   encouraging its customers to do the same?
7   A   Yes.
8   Q   Do you have an opinion as to whether or not Lawson systems
9   include a means for searching for matching items among the
10  selected product catalogs?
11  A   Yes, they do, and we saw that when I used the search
12  engine.
13  Q   And did they indirectly infringe that claim element by
14  assisting their customers to do the same?
15  A   Yes.
16  Q   The search engine you talked about, you also gave some
17  evidence with respect to the search index; is that right?
18  A   That's right.
19  Q   We'll come back to that later in the context of some of
20  the other claims.  The search engine, though, just to refresh
21  the jury was for what purpose?
22  A   This is to find the matching items.
23  Q   Do you have an opinion as to whether or not Lawson accused
24  systems include means for building a requisition using data
25  relating to selected matching items and their associated

782

1   sources?
2   A   They do.  We saw that in my, three of my demos and in
3   their documentation.
4   Q   The Court defined matching items as search results.  Is
5   that consistent with your opinion?
6   A   Yes, it is.
7   Q   Does Lawson encourage its customers to directly infringe
8   that claim by using the systems?
9   A   They do, and we had that list of evidence like training
10  courses and help sites and Lawson employees going to the
11  customer site to help them build or maintain their system.
12  Q   Do you have an opinion as to whether or not the accused
13  Lawson systems have a capability of processing the requisition
14  to generate one or more purchase orders for the selected
15  matching items?
16  A   We saw that in my demo and in the system
17  documentation.
18  Q   The Judge has defined selected matching items as
19  requisition items.  Is that -- is your opinion consistent with
20  that?
21  A   Yes, it is.
22  Q   Does Lawson indirectly infringe -- meet this claim element
23  by encouraging its customers to do the same by providing them
24  with these systems?
25  A   Yes.

783

1   Q   Do you have an opinion, Doctor, as to whether or not the
2   accused Lawson systems satisfied the claim element means for
3   converting data relating to a selected matching item and an
4   associated source to data relating to an item in a different
5   source?
6   A   Yes, and we saw that when we did the category search using
7   the UNSPSC codes.  And we also know this is made possible by
8   that IC 516 program that loads UNSPSC codes into the item
9   master.
10  Q   And this capability, is that provided to their customers?
11  A   Yes.
12  Q   And that is in the core IC module you mentioned?
13  A   Yes.
14  Q   And were there any demonstrations you put on for the jury
15  to show how you could use that UNSPSC classification code to
16  find generally equivalent items?
17  A   Yes.  We just did that with the halogen lamps.
18  Q   So what is your opinion now -- I'm sorry.  Did we see any
19  evidence with respect to whether or not Lawson encourages or
20  urges its customers to use the Lawson system to perform that
21  cross-referencing capability or conversion capability?
22  A   Yes.  We saw that in the training documents.
23  Q   The Judge has defined converting data related to a
24  selected matching item and an associated source to an item in a
25  different source.  Do you see that?

784

1   A   Yes.  That's the second one on the glossary.
2   Q   Can you read for me what the Judge's definition is?
3   A   Substituting data related to a selected matching item and
4   an associated source to data relating to an item and a
5   different source.
6   Q   And in your opinion, does the Lawson system satisfy the
7   Judge's definition of that claim element?
8   A   It does, and we just saw that with the halogen lamp from
9   Granger and substituting the halogen lamp from Gexpro.
10  Q   So, Doctor, what is your opinion with respect to whether
11  Lawson infringes claim three both directly and indirectly?
12  A   I believe they do.
13  Q   Next claim at issue here, which is the claim 26, this is
14  the method comprising those steps.  Again, the direct
15  infringement here, or the accused direct infringement here for
16  performing this method step is the customers performing these
17  steps by using the Lawson system.  Do you understand that?
18  A   I do.
19  Q   And you also mentioned this instance where Lawson may host
20  a system for customers to use at the Lawson site.  Do you see
21  that?
22  A   Yes.
23  Q   So I want to go through this relatively quickly in the
24  sense that these claim elements match up to the system claims
25  that we just went through with the exception that we have this

785

1   new element, the last element, determining whether a selected

2   matching item is available in inventory.  So just very quickly,

3   Doctor, does Lawson --

4        MR. McDONALD:  Your Honor, I object to the

5   characterization since these terms were not construed as means

6   plus function because they are system claims, so they aren't

7   similar.

8        MR. ROBERTSON:  I'll go through it in a little bit

9   more deliberate fashion.

10  Q   Does the Lawson system permit a customer to perform the

11  following steps:  Maintain at least two product catalogs on the

12  database containing data relating to items associated with the

13  respective sources?

14  A   Yes.

15  Q   Select the product catalogs to search?

16  A   Yes.

17  Q   Search for matching items among the selected product

18  catalogs?

19  A   Yes.

20  Q   For matching items, did you apply the Judge's

21  construction?

22  A   I did.

23  Q   For product catalogs, did you apply the Judge's

24  construction?

25  A   I did.

786

1   Q   Does the Lawson system permit or provide the ability to

2   build a requisition using data related to selected matching

3   items and their associated sources?

4   A   Yes.

5   Q   Did we see that?

6   A   Yes.

7   Q   Did you perform the steps of this method claim when you

8   did the demonstration?

9   A   I did.

10  Q   Does the Lawson accused system provide the ability,

11  capability of processing the requisition to generate one or

12  more purchase orders for the selected matching items?

13  A   Yes, we saw that.

14  Q   Does the Lawson system in operation permit, or is it

15  capable of determining whether a selected matching item is

16  available in inventory?

17  A   Yes.  We saw that with the case, with the laptop cases

18  today, and yesterday we saw it with the desk.  I wanted a first

19  desk but it was back ordered, so I got a second desk that was

20  available in inventory.  And the same with the printer

21  yesterday.  I chose a first printer.  It was not available.  It

22  was out of stock, so I got a second printer.

23  Q   So, in your demonstrations that you provided for the jury,

24  you were able to show that the system was capable of doing all

25  these steps?

787

1   A   I was.

2   Q   How can you satisfy -- can you also satisfy this inventory

3   determination by using the EDI module?

4   A   We mentioned yesterday there was this EDI 855 message, the

5   purchase order acknowledgment, so after the purchase order 850

6   message goes out, the PO 855, purchase order acknowledgment

7   comes backs, and it tells whether or not the vendor can fulfill

8   the order, and it can also contain information like whether the

9   product that you are trying to order is backordered or out of

10  stock.

11  Q   Do you have an opinion with respect to the activities of

12  Lawson to encourage assist, aid, abet, and urge its customers

13  to use the Lawson systems in the manners claimed in claim 26?

14  A   Yes.

15  Q   So would that constitute indirect infringement of all

16  these elements?

17  A   It would.

18  Q   Dr. Weaver, let's take a look at claim 28, if we could.

19  Now, again, this is a method claim, so we're talking about the

20  customers and Lawson when it hosts an infringing system, so --

21  and with respect to this claim, these elements are

22  substantially identical with respect to claim 26 except the

23  last step has to do with converting data relating to selected

24  matching items and associated source to data relating to an

25  item in a different source.  Do you see that?

788

1   A   Yes.

2   Q   Whereas claim 26 had to do with this inventory

3   availability capability; correct?

4   A   Correct.

5   Q   So with respect to the first five elements, would your

6   opinion be the same with respect to whether those elements are

7   being practiced by the customers when they perform these steps

8   or by Lawson when it hosts the system?

9   A   Yes.

10  Q   We can check those boxes off.  Again, did we see you

11  actually performing those steps when you did your

12  demonstrations?

13  A   Yes.  That was the UNSPSC codes.

14  Q   Well, that's the last element --

15  A   You are talking about these first five.

16  Q   Yes.

17  A   I demonstrated all of these.

18  Q   So this last element about converting data which we've

19  already given the jury the Judge's definition of substituting

20  data related to a selected matching item and the associated

21  source to data relating to an item in a different source,

22  applying that definition, does Lawson directly infringe this

23  claim?

24  A   Yes.

25  Q   And do the customers perform the steps of this claim when

789

1   they use the system with that capability?

2   A   Yes.

3   Q   Go to claim 29. This is a dependent claim; correct,

4   Doctor?

5   A   Yes, it is.

6   Q   So this dependent claim has to have all the steps that you

7   just indicated were present in claim 28 plus the additional

8   step of determining whether selective matching items available

9   in inventory; do you see that?

10   A   I do.

11   Q   What is your opinion with respect to direct infringement

12   and indirect infringement as to this dependent claim 29?

13   A   I believe that Lawson is a direct infringer and an

14   indirect infringer. We just saw with claim 28 that we went all

15   the way through the converting process, and in the demo that I

16   just showed you, we did both the conversion with the UNSPSC

17   codes, and then we did the determination of whether or not it

18   was available in inventory when we did the laptop roller cases.

19   Q   And by providing this capability to its customers, is

20   Lawson encouraging aiding, abetting, or assisting them in

21   performing this step?

22   A   Yes.

23   Q   Let's go to claim one of the '172, if we can, please.

24   That's also an electronic sourcing system.

25        THE COURT: That's tab four in your books, ladies and

790

1   gentlemen.

2   Q   Now, this also starts out with a preamble, an electronic

3   sourcing system comprising; do you see that?

4   A   Yes.

5   Q   Did you apply the same definition that the Court gave for

6   that?

7   A   I did.

8   Q   Both for direct and indirect infringement?

9   A   Yes.

10   Q   This is a system claim, so this involves the system or the

11   product we're talking about here; is that right?

12   A   That's right.

13   Q   By providing a system capable of performing all of the

14   structures disclosed here, do you have an opinion, first, as to

15   whether or not Lawson provides a database containing data

16   relating to items associated with at least two vendors

17   maintained so that selected portions of the database may be

18   searched separately?

19        MR. McDONALD: Object to the form of the question,

20   Your Honor. He said something about capable of performing some

21   structures or something. I think it's ambiguous as to what

22   that means.

23        THE COURT: I don't see structures in there.

24        MR. ROBERTSON: I will rephrase the question, Your

25   Honor.

791

1   Q   Does the Lawson system, as -- is the Lawson system capable

2   of providing a database containing data relating to items

3   associated with at least two vendors maintained so that

4   selected portions of the database may be searched separately?

5        MR. McDONALD: I object to the form of the question,

6   Your Honor. The element doesn't say capable of. It says a

7   database.

8        THE COURT: He's objected to the form of the

9   question.

10        MR. ROBERTSON: The law is, Your Honor, all they have

11   to do is provide a system that's capable of doing that. So I

12   think the objection is not well-taken.

13        THE COURT: Anything else?

14        MR. McDONALD: There's a distinction I'm making

15   between the database versus function. Capable of performing a

16   function is one thing. Having a database is another.

17        THE COURT: I think they're two different questions.

18   I think the first question is, does it have a database. If it

19   doesn't, then you have to say something else. Your objection

20   is sustained to the form of the question.

21   Q   Does the Lawson system have a database containing data

22   relating to items associated with at least two vendors

23   maintained so that selected portions of the database maybe

24   searched separately?

25   A   Yes. We saw the database in the item master and the

792

1   vendor item table, and selecting portions of the database to be

2   searched separately was done by the search index.

3   Q   Have we seen examples where Lawson has implemented

4   scenarios in which they have provided vendor data for their

5   customers?

6   A   Yes.

7   Q   Have we seen examples where they do what you identified as

8   data migration of the customer's catalog data to the new Lawson

9   system?

10   A   We saw that in the statement of work.

11   Q   Is the Lawson system capable of containing data relating

12   to items associated with at least two vendors maintained so

13   that selected portions of the database may be searched

14   separately?

15   A   Yes.

16   Q   Did Lawson assist, aid, abet, or encourage its customers

17   to maintain a database that would satisfy the first claim

18   element?

19   A   Yes.

20   Q   These next five elements are means-plus-function claim

21   elements. You are familiar with that?

22   A   I am.

23   Q   The Court's construed these claim elements. You've

24   reviewed those constructions; is that right?

25   A   Yes.

797

1     let's go through direct infringement first and identify which
2     system infringes which claim.
3     A   Okay.
4     Q   And in each of these system configurations, do you have an
5     opinion as to whether or not all five satisfy the preamble that
6     they are electronic sourcing systems as defined by the Judge?
7     A   Yes, all five.
8     Q   In each of these configurations, does Lawson provide an
9     accused system, all five system that's capable of having at
10    least two product catalogs containing data related to items and
11    items associated with respect to sources?
12    A   Yes.
13    Q   In each of these scenarios, does all five systems, do they
14    provide the means for selecting a product catalog to search?
15    A   Yes.
16    Q   In each of these systems, do they provide means for
17    searching for matching items among the selected product
18    catalogs?
19    A   Yes.
20    Q   In each of these systems, have we seen evidence that shows
21    that they have the means for building a requisition using data
22    relating to selected matching item and their associated
23    sources?
24    A   Yes.
25    Q   In each of these five system that we've identified, does

798

1     it have the means for processing the requisition to generate
2     one or more purchase orders for the selected matching items?
3     A   Yes.
4     Q   Which of the five systems have we seen have the ability
5     for converting data relating to a selected matching item and
6     associated source to data relating to an item and a different
7     source?
8     A   The ones that contain the requisition self-service module.
9     Q   So if it had the requisition self-service module, that
10    would be able to satisfy this last claim element?
11    A   Yes.
12    Q   So that would be system, two, three, four, and five as we
13    defined them; is that right?
14    A   That's what my diagram says, yes.
15    Q   For each of these elements, does Lawson encourage, aid,
16    abet, or assist their customers to satisfy them?
17    A   Yes.
18    Q   These two product catalogs, have we seen instances where
19    Lawson will make catalogs available, multiple catalogs
20    available to their customers either through external, Punchout
21    catalogs, or internal catalog databases?
22    A   Yes, we have.
23    Q   Let's go to claim 26 if we can.  Let's do that.  If we can
24    put claim 26 next to claim 28, put those side by side.  They're
25    a little difficult to read, but can you confirm for me, Doctor,

799

1     that both of these are method claims?
2     A   That's correct.
3     Q   And both of these have -- the first five elements are
4     identical?
5     A   They are.
6     Q   Now, earlier you said the direct infringement, I
7     understood your opinion to be, would be by the customers
8     performing the steps of this method claim as well as Lawson
9     when it hosts a system that can perform the steps of these
10    claims; is that right?
11    A   That's correct.
12    Q   So do you have an opinion as to whether or not customers
13    can perform the step of maintaining at least two product
14    catalogs on a database containing data relating to items
15    associated with the respective sources?
16    A   Yes, all of the systems do that.
17    Q   Okay, all five?
18    A   All five.
19    Q   Now, the same for claim 28, do you have an opinion as to
20    whether or not customers, using all five of the systems as they
21    are configured and defined, can select or -- can perform the
22    steps of selecting product catalogs to search?
23    A   Yes, they can.
24    Q   Now, that would be the same for both claim 26 and 28?
25    A   Yes, it's the same.

800

1     Q   All right.  The next step in these method claims is
2     searching for matching items among the selected product
3     catalogs.  Do you see that?
4     A   I do.
5     Q   That's for both claim 26 and claim 28?
6     A   Correct.
7     Q   We see the ability to search for matching items among the
8     selected product catalogs in evidence you offered?
9     A   Yes.  We saw it in the demonstrations.
10    Q   Did we see it in documentation?
11    A   Certainly.
12    Q   That would be for both claims?
13    A   For both claims.
14    Q   Does all five of the accused Lawson systems have the
15    ability to, capability of building a requisition using data
16    relating to selected matching items and their associated
17    sources?
18    A   Yes.
19    Q   Can the customers perform that step with all five
20    configurations that we've defined?
21    A   Yes.
22    Q   The next step is processing requisition to generate one or
23    more purchase orders for the selected matching items.  Did we
24    see that step could be performed in the demonstrations?
25    A   We saw it in the demonstrations.

801

1  Q  Can that be performed for all five of their configurations
2  as we've defined them?
3  A  Yes, it can.
4  Q  Is there indirect infringement of that as well?
5  A  Yes.
6  Q  That would be for both claim 26 and claim 28?
7  A  Correct.
8  Q  Is that because the step there --
9  A  Because it's identical.
10  Q  Now, the next and last step in claim 26 is determining
11  whether a selected matching item is available in inventory.
12  Which of the five configurations of these accused Lawson
13  systems has the capability of performing that step?
14  A  It's, it would be the system that we called system three
15  which was Punchout, requisition self-service, the procurement
16  modules, and the platform; system four, which was the EDI
17  module on top of the procurement system on top of the platform;
18  and system five, which had Punchout, requisition self-service,
19  electronic data interchange, the procurement modules, and the
20  platform.
21  Q  Do you have an opinion as to whether or not Lawson
22  indirectly infringes that claim as well?
23  A  Yes, I believe they do.
24  Q  How do they do that?
25  A  By providing those training courses, that assistance,

802

1  those manuals, online training, professional services.
2  Q  The last element of claim 28, is this converting-data
3  element that had to do with the ability to find a selected
4  matching item and an associated source and relating it to data
5  relating to an item in a different source; do you see that?
6  A  I do.
7  Q  What systems, in your opinion, satisfy that claim element?
8  A  The ones containing the requisition self-service module
9  which would be two, three, and five.
10  Q  Does four have a requisition self-service module?
11  A  No.
12    THE COURT:  Four is core plus EDI.
13    MR. ROBERTSON:  I apologize.
14  Q  All right.  Do you have an opinion as to whether or not
15  they indirectly infringe claim 28 in the same manner they
16  infringe claim 26?
17  A  Yes.
18    THE COURT:  And is the answer that they do or they
19  don't?
20    THE WITNESS:  The answer is that they do.
21    MR. ROBERTSON:  Thank you, Your Honor.
22  Q  Claim 29, this was that dependent claim that depends from
23  claim 28; correct?
24  A  Correct.
25  Q  So in order to infringe claim 29, you have to satisfy all

803

1  of the elements of the method claim of claim 28 in order to
2  infringe claim 29; is that right?
3  A  Right.
4  Q  So you have to be able to perform that converting-data
5  step to find items associated with one source and items
6  associated with another source; correct?
7  A  Right.
8  Q  Then to infringe this claim, you'd also be able to have to
9  take that system and have a step of determining whether a
10  selected matching item is available in inventory; is that
11  correct?
12  A  Correct.
13  Q  Which of the systems, as we've identified them, would
14  infringe or directly infringe claim 29?
15  A  Three and five.
16  Q  Why is that?
17  A  Because they contain the Punchout module that lets us
18  check inventory externally, the requisition self-service that
19  allows us to do the conversion using those UNSPSC codes, and
20  system five also had the EDI module which was the purchase
21  order and purchase order acknowledgment exchange.
22  Q  And does Lawson indirectly infringe claim 29 by assisting,
23  aiding, abetting, encouraging its customers to perform this
24  method step?
25  A  Yes.

804

1  Q  And do they also indirectly -- actually, strike that.  I
2  think we're done with claim 29.  Why don't we go to claim one
3  of the '172 patent.  Again, this is an electronic sourcing
4  system.  Do you see that?
5  A  Yes.
6  Q  Now, it also uses the term comprising as all these claims
7  have used.  Would you just refresh the jury as to what your
8  understanding is of the term comprising?
9  A  Comprising means including but not limited to.
10  Q  So we're going to have to have all of these elements, but
11  we could have additional elements, and that would make it
12  non-infringing; is that right?  All the elements here are
13  satisfied?
14  A  Correct.
15  Q  So, for example, in your demonstrations, there was some
16  steps in which you had to seek certain approvals from managers
17  or technical people in order to be able to complete the
18  requisition and purchase order process?
19  A  Right, but that's irrelevant to this claim.
20    THE COURT:  Your opinion, they infringe all five
21  systems or infringement -- if there's infringement, the mere
22  fact that there is the process of going to the managers, et
23  cetera, doesn't change the fact that they infringe if you
24  conclude there's infringement, and that is the way --
25    THE WITNESS:  Yes, it is.

817

WEAVER - DIRECT        817

1  containing data relating to items associated with at
2  least two vendors maintained so that selected portions
3  of the database may be searched separately?
4  A  Yes, they do.
5  Q  And in your opinion by the acts that we have
6  described does Lawson satisfy that element for
7  indirect infringement?
8  A  Yes.
9  Q  Do configurations 2, 3 and 5 have means for
10  entering product information that at least partially
11  describes at least one desired item?
12  A  Yes, 2, 3 and 5, they do.
13  Q  Do 2, 3 and 5 satisfy the element of means for
14  searching for matching items that matched the entered
15  product information in the selected portions of the
16  database?
17  A  They do.
18  Q  How did we see that?
19  A  Because of the user interface that we saw in the
20  requisition self service.
21  Q  And we saw that in your demonstrations?
22  A  Sure, we did.
23  Q  Do configurations 2, 3 and 5 have means for
24  generating an order list that includes at least one
25  matching item selected by said means for searching?

819

WEAVER - DIRECT        819

1  these remaining elements are indirectly infringed by
2  Lawson by providing those services?
3  A  My opinion is that they do.
4  Q  Why don't we go to the claims of the '516 patent.
5  And that's behind tab 3 in the jurors' notebook.  The
6  first claim we're going to talk about there is Claim
7  One.  And, again, the preamble says it's an electronic
8  sourcing system.  Do you see that?
9  A  Yes.
10  Q  And the Court has defined that.  It's the same for
11  Claim One, for example, of the '172 patent.  Is it
12  your opinion that all five configurations that are
13  accused here are electronic sourcing systems as the
14  Court has defined them?
15  A  Yes.
16  Q  This electronic sourcing system also comprises a
17  collection of catalogs of items stored in electronic
18  format.  Do all five configurations, as we have
19  defined them, satisfy that claim element?
20  A  Right, all five contain multiple internal
21  catalogs, and when you add Punchout, you can add
22  external catalogs as well.
23  Q  Do all five configurations of these accused Lawson
24  systems as we've defined them satisfy the claim
25  element of having a first set of predetermined

818

WEAVER - DIRECT        818

1  A  They do.
2  Q  Is it that RSS module that provides that order
3  list or shopping cart as you referred to it?
4  A  Yes, the RSS is where the shopping cart
5  functionality resides.
6  Q  Do configurations 2, 3 and 5 of the accused Lawson
7  systems have a means for building a requisition that
8  uses data obtained from said database related to
9  selected matching items on said order list?
10  A  They do.
11  Q  Do configurations 2, 3 and 5 have a means for
12  processing said requisition to generate purchase
13  orders for said selected matching items?
14  A  They do.  We saw that in the demo.
15  Q  The searching that's the subject of the means for
16  searching which permits you to search a database,
17  selected portions of a database, what evidence did we
18  see that that was present?
19  A  That was the search index that selected only --
20  that searched only selected portions of the database.
21  Q  Now, if Lawson provides such an electronic
22  sourcing system to its customers and assists them in
23  implementation, maintenance, servicing and all the
24  training materials, guides, manuals, online services,
25  etc., do you have an opinion as to whether or not all

820

WEAVER - DIRECT        820

1  criteria associated with said collection of catalogs?
2  A  Yes, they do.
3  Q  What evidence do we see for that?
4  A  We saw in my demonstration that you could enter an
5  item number, or vendor item, manufacturer number.  You
6  have a text box in the user interface that allowed
7  that.
8  Q  Do all five configurations of the accused Lawson
9  systems as we've defined them a second set of
10  predetermined criteria associated with items from each
11  of said catalogs?
12  A  Yes, they do.
13  Q  How do they do that?
14  A  Again, that's the text box.
15  Q  Do all five configurations have a catalog
16  selection protocol, said catalog selection protocol
17  relying on said first set of predetermined criteria to
18  select less than said entire collection of catalogs,
19  including a matching vendor identification code with a
20  subset of said collection of catalogs wherein said
21  subset of catalogs includes both a vendor catalog from
22  a predetermined vendor and a second catalog from a
23  predetermined third party that's one of a manufacturer
24  and a competing vendor, said predetermined third party
25  selling items corresponding to items in said vendor

821

WEAVER - DIRECT        821

1   catalog?

2   A  That's a mouthful, isn't it?  The answer is yes.

3   And we saw that yesterday when I did the demonstration

4   where I first searched for Dell and got back items

5   that included Dell as one of these keywords.  So that

6   was my first predetermined criteria.

7       And then I added a second predetermined criteria,

8   the Dimension 8100, and that narrowed the search down

9   to just two items, but they were from different

10  vendors, Dell and Diablo.  So one of them was a

11  competing vendor.  Dell is a manufacturer.  Dell is a

12  competing vendor.

13      So, yes, we've seen evidence that these systems

14  that we're talking about directly infringe the fourth

15  element of Claim One.

16  Q  The last element of Claim One of the '516 patent

17  is a search program.  Said search program relying on

18  said second set of criteria to select specific items

19  from said catalogs determined from said catalog

20  selection protocol.  Did I read that correctly?

21  A  I think so.  Again, we saw that yesterday in the

22  demonstration where Dimension 8100 was the second set

23  of predetermined criteria.

24  Q  Did you use that second set of predetermined

25  criteria to conduct the search?

822

WEAVER - DIRECT        822

1   A  Yes, I did.

2   Q  So do all five configurations of the accused

3   systems as we've defined them satisfy all of the

4   elements of Claim One of the '516 patent?

5   A  Yes, they do.

6   Q  If Lawson offers all five of those configurations,

7   manufacturers, sells or imports, do they directly

8   infringe this claim?

9   A  Yes, they would.

10  Q  And in the same manner, if they provide such a

11  system to their customers and then induce them to use

12  that system by the evidence that you've offered of

13  assisting, aiding, abetting, encouraging, etc.,

14  through all the various services and implementation

15  and educational services they provide, what is your

16  opinion with respect to whether or not Lawson

17  indirectly infringes Claim One?

18  A  I believe they do.

19  Q  So they would satisfy all of the elements if they

20  provided a system that had this capability and then

21  performed those acts that would constitute inducement?

22  A  Yes.

23  Q  Let's look at Claim Two of the '516 patent, which

24  is a dependent claim.  Do you understand that?

25  A  Sure.  It depends from Claim One.

823

WEAVER - DIRECT        823

1   Q  So we have to satisfy all the elements of Claim

2   One, which you just indicated for all five

3   configurations is infringing.

4       Claim Two talks about having catalogs stored in

5   separate databases.  Do you see that?

6   A  I do.

7   Q  How would the configurations as we've defined them

8   satisfy this separate database requirement?

9   A  These would be external databases that are

10  accessible through the Punchout module.

11  Q  Could they be a Punchout external plus Lawson

12  internal catalogs?

13  A  Of course.

14  Q  So if it requires Punchout, only configurations 3

15  and 5, as we've defined them, have Punchout; is that

16  right?

17  A  That's my diagram, yes.

18  Q  So your opinions with respect to Claim Two, I'd

19  like you to confine them to just configurations 3 and

20  5 that have the Punchout application.  Okay?

21  A  Right.

22  Q  Does Lawson configurations 3 and 5 satisfy the

23  claim cited in Claim Two of an electronic sourcing

24  system as recited in Claim One wherein catalogs

25  comprised of said collection of catalogs are stored in

824

WEAVER - DIRECT        824

1   separate databases?

2   A  Yes, we saw that in the Punchout to Dell and

3   Staples.

4   Q  Do they indirectly infringe in the same manner

5   that you have been describing?

6   A  Yes.

7   Q  Let's go to Claim Six if we can.  Again, Claim Six

8   is a dependent claim that depends on Claim One.  So

9   all the elements of Claim One need to be satisfied,

10  and you have already rendered an opinion that that is

11  present.

12      Claim Six recites an electronic sourcing system as

13  recited in Claim One where it said second set of a

14  predetermined criteria includes at least one of a

15  catalog number and an item textual information.  Do

16  you see that?

17  A  I do.

18  Q  Do configurations 3 and 5 including -- excuse me.

19  Let me step back.  What configurations satisfy Claim

20  Six that has at least one of the catalogs -- excuse

21  me -- wherein said set of predetermined criteria

22  includes at least one of the catalog number and item

23  textual information?

24  A  All five.

25  Q  Does Lawson indirectly infringe in your opinion in

825

WEAVER - DIRECT        825

1   the same manner you have been describing?
2   A   Yes.
3   Q   Let's look at Claim Nine if we could.  Claim Nine
4   is an independent claim, is that right, Doctor?
5   A   It is.
6   Q   Again, it has the an electronic sourcing system
7   comprising.  Is that in your view the same electronic
8   sourcing system that the Court has defined?
9   A   It is.
10  Q   Which of the configurations has a collection of
11  catalog items stored in electronic format?
12  A   All five have this first element.
13  Q   Which of the configurations have a first
14  identification code associated with a first term in a
15  first catalog?
16  A   First item in a first catalog.  That's all five.
17  Q   Okay.  This last element has a second
18  identification code associated with a second item in a
19  second catalog.  Said first item and said second item
20  being generally equivalent and wherein a selection of
21  one identification code from one of said first and
22  second catalogs provides the other identification code
23  from the other of said catalogs.
24      MR. McDONALD:  Your Honor, I object.  I think
25  for this claim we're just talking about all the

827

WEAVER - DIRECT        827

1       MR. ROBERTSON:  Let me do it this way, if I
2   could.
3   BY MR. ROBERTSON:
4   Q   Doctor, this last element of Claim Nine, let's
5   focus on that.  A second identification code
6   associated with a second item in a second catalog said
7   first item and said second item being generally
8   equivalent and wherein a selection of one
9   identification code from one of said first and second
10  catalogs provides the other identification code from
11  the other of said catalogs, what configurations have
12  we seen that can satisfy this claim element of Claim
13  Nine?
14  A   That one needs the catagory searched, which I
15  demonstrated with the UNSPSC codes, and that's
16  implemented by the requisition self service module.
17  And as we have defined them, that's configurations 2,
18  3 and 5.
19  Q   Just configurations 2, 3 and 5 have the ability to
20  do that UNSPSC capability in order to satisfy this
21  claim element?
22  A   That's correct.
23  Q   Let's just focus on configurations 2, 3 and 5 for
24  purposes of this claim.
25      THE COURT:  The objection to the question,

826

WEAVER - DIRECT        826

1   systems except one.  So I did rather the questions
2   were phrased in that context.
3       MR. ROBERTSON:  I think when he answers the
4   question, we can find out which configurations satisfy
5   this element and therefore that will identify the
6   configurations that are infringed.
7       MR. McDONALD:  The prior ones he's already
8   used all the systems.  I was a little slow in reacting
9   there.
10      THE COURT:  Which ones do you say are charged
11  with infringement in the complaint of Claim Nine.
12      MR. McDONALD:  All except No. 1.  Systems 2
13  through 5 are accused of infringing Claim Nine, as I
14  understand it.
15      THE COURT:  Is that right or is it wrong?
16      MR. ROBERTSON:  I don't have it committed
17  right to my memory right now.
18      Your Honor, let me rephrase it.
19      THE COURT:  But you have to go back and
20  rephrase all of them if he's right.
21      You-all know which ones allegedly are
22  infringed.  He says that all five infringe it, but
23  whether he accused them of that in the complaint, I
24  don't know.  I don't have it in front of me.
25      Do you have it over there, somebody?

828

WEAVER - DIRECT        828

1   though, I think, has been cured.  When he said all
2   five satisfy element one and satisfy element two, then
3   per force that includes 2, 3 and 5.  So he's answered
4   the questions, but the bottom line is that only the
5   configurations 2, 3 and 5 are charged to infringe
6   directly or indirectly Claim Nine; is that right?
7       THE WITNESS:  That's right, sir.
8       THE COURT:  Was that your opinion, sir?
9       THE WITNESS:  Yes, sir, it is.
10      THE COURT:  All right.  Now, what about
11  indirect?
12  BY MR. ROBERTSON:
13  Q   By Lawson making, using, selling, offering for
14  sale or importing electronic sourcing system that's
15  capable of performing all of these elements and by
16  encouraging, aiding, assisting and abetting their
17  customers to use that same system through all of the
18  various evidence you have offered as to providing
19  manuals and guides and online services and training
20  and implementation and servicing, do you have an
21  opinion as to whether all of the elements of Claim
22  Nine are satisfied and Lawson indirectly infringes
23  that claim?
24      THE COURT:  As to which systems?
25      MR. ROBERTSON:  Two, 3 and 5.

829

WEAVER - DIRECT     829

1  A  Yes, I do.

2  Q  What is the opinion?

3  A  I believe that they indirectly infringe for

4  configurations 2, 3 and 5.

5  Q  Okay.  Let's focus on Claim 21 if we can for a

6  minute, of the '516.  Let me focus on the last element

7  first, if I could.

8      The last element says, Wherein said determination

9  system includes a cross-reference table matching an

10  identification code from a first located item with a

11  second identification code from a second located item.

12  Do you see that?

13  A  I do.

14  Q  So this element requires a cross-reference table.

15  Do you see that?

16  A  I do.

17  Q  What software application or module of Lawson is

18  required in order to do this cross-reference table

19  matching?

20  A  That's requisition self service.

21  Q  So, therefore, that would include configurations

22  2, 3 and 5; is that right?

23  A  That's right.

24  Q  So focusing only on configurations 2, 3 and 5 for

25  the purposes of Claim 21, is your opinion that

830

WEAVER - DIRECT     830

1  those configurations comprise an electronic sourcing

2  system?

3  A  Yes, it is.

4  Q  Do those configurations have a requisition module

5  including data fields, user generated criteria entered

6  into at least one of said data fields to generate at

7  least partial criteria corresponding to a desired

8  item?

9  A  They do.  The requisition module has data fields

10  like the name of the requester.  And the user

11  generated criteria could be things like the vendor

12  number, vendor name, item number, manufacturer number.

13  Q  Do the configurations 2, 3 and 5 have a catalog

14  collection searching module, said searching module

15  including a collection of catalogs of items stored in

16  an electronic format, a catalog collection criteria

17  used to select less than the entire collection, said

18  searching module being used to generate additional

19  search module criteria for said data fields of said

20  requisition module?

21  A  They do.  And we saw that when I did a search for

22  Dell, and that returned items, and I drilled down on

23  the items.  And the item page produced the -- what's

24  the proper name for it?  Yeah, to generate additional

25  search module criteria.

831

WEAVER - DIRECT     831

1      So in the item description, there were things like

2  that cost, and the unit of measure, and the vendor

3  name, and I could have used those items like vendor

4  name as the additional search criteria.

5  Q  Do configurations 2, 3 and five have a multiple

6  purchase order generation module, said purchase order

7  generation module creating multiple purchase orders

8  from a single requisition created with said user

9  generated criteria and said search module criteria?

10  A  Yes, they do, and we saw that in three of my

11  demos.

12  Q  Do configurations 2, 3 and 5 of the accused Lawson

13  systems satisfy the element wherein each of at least

14  two catalogs include a generally equivalent item from

15  a different source of said requisition module working

16  in combination with said catalog searching module to

17  determine multiple sources for said item?

18  A  They do, and we saw that in my first demo where I

19  looked for -- I used the UNSPSC codes to look for

20  notebook computers and found two different computers

21  from two different vendors.

22  Q  Do configurations 2, 3 and 5 satisfy the element

23  wherein said multiple sources is limited by said

24  catalog searching module providing a match according

25  to said user generated criteria, said search module

832

WEAVER - DIRECT     832

1  criteria in a determination system that located items

2  are generally equivalent?

3  A  They do.  And, again, we saw that in my first demo

4  using the UNSPSC codes to drill down to notebook

5  computers, and we found the IBM ThinkPad and the Dell

6  notebook.

7  Q  Do configurations 2, 3 and 5 satisfy the claim

8  element wherein said determination system includes a

9  cross-reference table matching identification codes

10  from a first located item with a second identification

11  code from a second located item?

12      THE COURT:  He's already answered that.  He

13  answered that.  That's what you started with.  You

14  started with six, and you did 1, 2, 3, 4 and 5

15  elements.

16      Is your answer yes or no?

17      THE WITNESS:  The answer is yes.

18  Q  Do you have an opinion as to whether or not Lawson

19  indirectly infringes Claim 21 by inducing infringement

20  by all of the activities that we've previously

21  described by offering a system that's capable of

22  performing these claim elements?

23  A  My opinion is that they do.

24  Q  Would that be for all the elements?

25  A  It would.

833

WEAVER - DIRECT     833

1    Q  Can we go to Claim 22?  Claim 22, again, is one of
2    these dependent claims which depends on Claim 21,
3    which adds the additional limitation wherein said
4    determination system includes an identical
5    identification code for each of said located items.
6    Do you have an opinion as to whether or not the
7    configurations of the accused Lawson systems 2, 3 and
8    5 satisfy that claim element?
9    A  My opinion is that they do.  We saw that twice.
10   Once in the demonstration where we drilled down to
11   notebook computers and this morning where we drilled
12   down to halogen lamps.  The UNSPSC codes were
13   identical for the two notebook computers and identical
14   for the two halogen lamps.
15       THE COURT:  Which of the configurations are
16   we talking about; 2, 3 and 5?
17       THE WITNESS:  Two, 3 and 5.
18   BY MR. ROBERTSON:
19   Q  Why don't we go to Claim 29 of the '516.
20   Actually, I'm reminded I may have overlooked indirect
21   infringement on this one.  Does Lawson indirectly
22   infringe Claim 22 in the same manner that you have
23   been describing, for example, as they indirectly
24   infringe Claim 21?
25   A  Yes.

834

WEAVER - DIRECT     834

1    Q  Okay.  Thank you.
2        Claim 29 recites an electronic sourcing system.
3    I'd like you to focus only on configurations 2, 3 and
4    5 for purposes of this claim.
5        Are configurations 2, 3 and 5 an electronic
6    sourcing system in your opinion as the Court has
7    defined it?
8    A  They are.
9    Q  Do configurations 2, 3 and 5 have a collection of
10   catalogs of items stored in electronic format?
11   A  They do.
12   Q  Do configurations 2, 3 and 5 have a first set of
13   predetermined criteria associated with said collection
14   of catalogs?
15   A  They do.
16   Q  Do configurations 2, 3 and 5 have a second set of
17   predetermined criteria associated with items from each
18   of said catalogs?
19   A  They do.
20   Q  Do configurations 2, 3 and 5 have a catalog
21   selection protocol, said catalog selection protocol
22   relying on said first set of predetermined criteria to
23   select less than said entire collection of catalogs
24   and including matching a vendor identification code
25   with a subset of said collection of catalogs wherein

835

WEAVER - DIRECT     835

1    said subset of catalogs includes both a vendor catalog
2    from a predetermined vendor and a second catalog from
3    a predetermined third party?
4    A  Yes, they do.  We saw that in my demo for the
5    notebook computers.
6    Q  The Court has defined "subset" in its glossary.
7    What has the Court defined "subset" to be?
8    A  Less than all of a set.
9    Q  Did you apply that construction in rendering your
10   opinions?
11   A  I did.
12   Q  Next element of Claim 29 of the '516 recites a
13   search program, said search program relying on said
14   second set of criteria to select specific items from
15   said catalogs determined from said catalog selection
16   protocol.  Do you see that?
17   A  I do.
18   Q  Do you have an opinion as to whether or not
19   configurations 2, 3 and 5 satisfy that claim element?
20   A  They do.  We saw that in my demonstration
21   searching for Dell as the first predetermined criteria
22   and the Dimension 8100 as the second.
23   Q  The last element of Claim 29 recites the
24   cross-reference table linking a vendor item catalog
25   number from said vendor catalog with an item catalog

836

WEAVER - DIRECT     836

1    number from said predetermined third party.
2        Do configurations 2, 3 and 5 satisfy that claim
3    element?
4    A  They do using the UNSPSC codes.
5    Q  Do you have an opinion as to whether or not Lawson
6    induces infringement of its customers by providing an
7    electronic sourcing system that's capable of doing all
8    of these elements of Claim 29?
9    A  My opinion is that they do.
10   Q  Earlier I asked you whether or not these five
11   configurations in the manner that they are configured
12   as we've defined them had any kind of substantial
13   non-infringing use if they had at least two product
14   catalogs available to them.  Do you recall that?
15   A  I recall the question.
16   Q  With respect to indirect infringement as to all
17   the claims you have just identified for any of the
18   configurations that are the subject of indirect
19   infringement, do you have an opinion as to whether or
20   not Lawson would contribute to infringement if those
21   systems as configured had no substantial
22   non-infringing use?
23   A  I didn't understand the question.
24   Q  Sure.  Let me go back.  Earlier you went through
25   this issue of whether or not there was a substantial

937

RALEIGH - DIRECT        937

1   A  That's correct.

2   Q  And Lawson's Professional Services Organization

3   also provides services that are referred to as upgrade

4   consulting services; is that correct?

5   A  That's correct.

6   Q  And those upgrade services would involve assisting

7   the clients with upgrading from one version of a

8   Lawson system to the next released version of that

9   system; is that correct?

10  A  That's correct.

11  Q  Lawson's Professional Services Organization also

12  provides technical development services to customers

13  such as interface development and customization

14  development services; is that correct?

15  A  We do at times, yes.

16  Q  Lawson's Professional Services Organization also

17  offers services to Lawson's customers that are

18  referred to as learning services; is that correct?

19  A  That's true.

20  Q  Among the learning services that Lawson's

21  Professional Services Organization provides to

22  Lawson's customers would be public instructor led

23  training in one of Lawson's offices or on site

24  instructor led training for a specific customer at

25  their site; is that correct?

938

RALEIGH - DIRECT        938

1   A  Sure.

2       MS. ALBERT:  Mike, if you would, could we

3   have Plaintiff's Exhibit 202.

4   Q  And, Ms. Raleigh, that is in Volume I of your

5   binders.

6       THE COURT:  Before you go anywhere, what was

7   the exhibit number for that Frank deposition?  You're

8   going to have to put it in the record because the

9   court reporter wasn't taking it down.  Just look it up

10  and tell me later.

11      Go ahead, Ms. Albert.

12  Q  Do you have Plaintiff's Exhibit 202?

13  A  I do.

14  Q  Is Plaintiff's Exhibit 202 a catalog of online

15  courses that Lawson offers to its customers?

16  A  Yeah.  It's a catalog that was published at a

17  certain point in time, but yes.

18  Q  Can you turn, please, to page 5 of that exhibit,

19  and the Bates number on that page ends with 4027?

20  A  I'm there.

21  Q  Do you see at the top of the page there's a course

22  entitled inventory control 8.1/9.0 X?

23  A  I do.

24  Q  And Lawson offers this two-day course entitled

25  Inventory Control 8.1/9.0 X that provides its

939

RALEIGH - DIRECT        939

1   customers with -- and I'm reading from the first line

2   there.  Instructions on the key setup components and

3   processing functionality of the inventory control

4   application; is that correct?

5   A  That's correct.

6   Q  And among the training included in that course

7   would be, in following along with the second sentence,

8   instructions on the key setup components and

9   processing functionality -- excuse me, instructions

10  concerning how to set up the item master associated

11  with the inventory control application; is that

12  correct?

13  A  Yes, that's right.

14  Q  Turn to page 6 of that exhibit, please.  Do you

15  see on that page there's a course entitled,

16  Requisition Self Service 8.1-9.0?

17  A  Yes.

18  Q  Lawson also offers a course entitled, Requisition

19  Self Service 8.1/9.0, which introduces major features

20  of requisition self service such as requisition

21  approvals, receiving, and the shopping experience

22  which includes searching the catalog for items, using

23  shopping lists, ordering specials or services, and

24  ordering by categories; is that correct?

25  A  Yes.

940

RALEIGH - DIRECT        940

1   Q  In this course, Lawson enables its customers to

2   have an experience using an actual Lawson training

3   system that would have the requisition self service

4   application installed; is that correct?

5   A  Yes.

6   Q  I believe I'm done with that document.

7   A  Okay.

8   Q  Lawson's Professional Services Organization also

9   provides services to Lawson's customers that consist

10  of installing the Lawson software on the customers'

11  hardware; is that correct?

12  A  Yes.

13  Q  And you previously mentioned that Lawson provides

14  implementation services to its customers.  Do you

15  recall that?

16  A  Yes.

17  Q  Among the implementation services that Lawson

18  provides to its customers, those services would

19  include assistance with designing the configuration of

20  the Lawson software to meet the customer's business

21  requirements; is that correct?

22  A  Yes.

23  Q  Also included among the implementation services

24  that Lawson would provide to its customers would be

25  assisting the customer with developing test scripts

965

1   it.
2       You can call the lady back.  Just disregard
3   the answer for now.  You can call her back and put her
4   on in your case if you want to, but right now we're
5   talking about what she asked.  So the objection is
6   sustained.
7   BY MR. SCHULTZ:
8   Q   During your direct examination with Ms. Albert,
9   she talked about converting data?
10  A   Yes.
11  Q   What is your understanding with respect to
12  conversion of data into the item master in terms of
13  who does it?
14      MS. ALBERT:  Objection, ambiguous.  I asked
15  specifically about one implementation for Jackson.
16      THE COURT:  I think you asked who did the
17  conversion, and that's fair game for him to ask
18  further about that.
19      MS. ALBERT:  I think his question was
20  broader.
21      THE COURT:  It is.
22      MS. ALBERT:  Than just this Jackson.
23      THE COURT:  It is, but have you heard about
24  that camel that will sticks his nose under the tent?
25  Okay.

966

1   BY MR. SCHULTZ:
2   Q   Ms.  Raleigh, do you remember the question?  Maybe
3   I'll just ask it again.
4   A   If you could.
5   Q   In a conversion of legacy information into the
6   item master information, who's in charge of doing the
7   data conversion?
8   A   Those responsibilities are typically shared
9   between Lawson and the customer.  There are a variety
10  of steps in the overall process, and some of those
11  steps, certainly the education on how to get the data
12  formatted into the right file format, and how to use
13  the tools that will load it, those are almost always
14  responsibilities that Lawson will take because the
15  customer wouldn't know how to do it if it weren't for
16  our assistance.
17      THE COURT:  Didn't you answer this question
18  in answering about the tables on 16, what was Lawson's
19  and what was the customer's responsibility?
20      THE WITNESS:  For the scope of this
21  implementation, I did.
22      THE COURT:  That's what he's talking about
23  now.
24  Q   Who selected the data?
25  A   The customer.

967

1   Q   I'd like to turn you now to table 3.5, which is on
2   page 17 of the document.  If you'd look down on the
3   table, it's Bates number ending in 5376.
4   A   I'm there.
5       THE COURT:  Is that master file and
6   configuration table value building and scope.
7       MR. SCHULTZ:  That is exactly it, Your Honor.
8   BY MR. SCHULTZ:
9   Q   Do you recall testifying to this table earlier?
10  A   I do.
11  Q   And you had some discussion regarding Eclipsys.
12  Who is Eclipsys?
13  A   Eclipsys is the vendor of the legacy software.  So
14  it's the software that Jackson was using that we
15  replaced.
16  Q   What was your involvement with this RFP and
17  statement of work process with Jackson?
18  A   Ultimately, I was the person who oversaw the
19  execution of the work, but I participated at various
20  points along the way throughout the RFP and the
21  creation of the SOW.
22  Q   In this table, there are some terms that are used
23  under file.  One of them is vendor master, one is
24  item master, one is vendor catalog.  Whose terms are
25  those?

968

1   A   Those would be Jackson's terms.
2   Q   Have they any relation to the Lawson system?
3   A   No, not in this context here, no.
4   Q   You also, if you'll look under the vendor catalog,
5   which is item 3, you mentioned earlier that there's a
6   Lawson response in bold letters?
7   A   Correct.
8   Q   Could you explain why there's a Lawson response in
9   bold letters in paragraph 3?
10  A   So you have to understand that the Public Health
11  Trust of Miami is a government institution.  So they
12  have very strict laws about the way that they request
13  for proposals and the way that they write contracts
14  with their vendors.  So under the scope of that,
15  certain portions of the information provided here came
16  from Jackson.
17      So the first several columns of this table would
18  have only come from Jackson because only Jackson would
19  have known what systems they used, what data there
20  was, what they needed to get into our system.
21      Lawson's responsibility would be to respond to
22  those, right, in terms of how are we going to
23  accommodate those requests or those business needs, if
24  you will, that Jackson has articulated here.
25      So in this particular situation, it was Lawson --

989

989

1    the afternoon on Tuesday, it looks like.  If not, you

2    may be kicking off on Wednesday morning, it depends.

3          My wife criticizes me substantially for

4    checking out the NOAA weather and other weather items

5    like the Weather Channel, and she accuses me of being

6    an old man with nothing to do because I do that, but

7    there are times when it comes into play.  And I saw

8    that there is a very significant snowstorm supposed to

9    hit the Midwest, and I don't want you-all to go home

10   over the weekend and get trapped there.

11         So be advised that being trapped in the snow

12   is not a sufficient excuse not to start the trial.

13   Mr. Carr will be ready to go.

14         And I am not, I want you to know, being paid

15   by any merchant in town to keep you-all here.

16         All right.  Thank you very much.  Have a nice

17   weekend.  Get some rest.

18         (The proceedings were adjourned at 5:17 p.m.)

19

20

21

22

23

24

25

990

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF VIRGINIA
 3                RICHMOND DIVISION
 4
 5   --------------------------------------
 6   ePLUS, INC.         : Civil Action No.
                          : 3:09CV620
 7   vs.                  :
 8   LAWSON SOFTWARE, INC.    : January 11, 2011
                          :
 9   --------------------------------------
10
11      COMPLETE TRANSCRIPT OF THE JURY TRIAL
12      BEFORE THE HONORABLE ROBERT E. PAYNE
13      UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24       Peppy Peterson, RPR
          Official Court Reporter
25       United States District Court
```

991

```
 1   APPEARANCES:  (cont'g)
 2   Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
 3   Troutman Sanders Building
     1001 Haxall Point
 4   Richmond, Virginia  23219
 5   Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
 6   William D. Schultz, Esquire
     Merchant & Gould, PC
 7   80 South Eighth Street
     Suite 3200
 8   Minneapolis, Minnesota  55402
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

992

```
 1                P R O C E E D I N G S
 2
 3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
 4   Incorporated versus Lawson Software, Incorporated.  Mr. Scott
 5   L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr.
 6   Michael G. Strapp, and Mr. David Young represent the plaintiff.
 7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
 8   Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
 9   the defendant.  Are counsel ready to proceed?
10        MR. ROBERTSON:  Plaintiff is, Your Honor.
11        MR. McDONALD:  Yes, we are, Your Honor.
12        THE COURT:  What did you all need to talk about?
13        MS. STOLL-DeBELL:  We actually resolved it, Your
14   Honor, between the time we that mentioned --
15        THE COURT:  Tell them to bring the jury in.  What do
16   we have this morning?
17        MR. ROBERTSON:  The first witness we're calling this
18   morning is Mr. Keith Lohkamp, Your Honor.  He's a Lawson
19   employee.  I have a number of binders associated with the
20   witnesses this morning.  I want to make sure my paralegal --
21   oh.
22
23          (Jury in.)
24
25        THE COURT:  Good morning, ladies and gentlemen.  All
```

993

```
 1   right, we have a witness.  Next witness.
 2        MR. ROBERTSON:  Mr. Keith Lohkamp.
 3        THE COURT:  All right, Keith Lohkamp.
 4
 5            KEITH LOHKAMP,
 6   a witness, called by the plaintiff, having been first duly
 7   sworn, testified as follows:
 8            DIRECT EXAMINATION
 9   BY MR. ROBERTSON:
10   Q   Good morning, Mr. Lohkamp.
11   A   Good morning.
12   Q   Mr. Lohkamp, you are a Lawson Software employee; correct?
13   A   Yes, I am.
14   Q   And you are a product strategist for supply chain
15   management; correct?
16   A   Yes.
17        THE COURT:  Can we get the witness to spell his last.
18   Q   Can you please spell your last name, sir, for the record.
19   A   It's L-o-h-k-a-m-p.
20   Q   Can you explain to the jury essentially what supply chain
21   management is?
22   A   Supply chain management involves the procurement of goods
23   and services and the management of the inventory related to
24   managing those goods.  It also includes, can include the sell
25   side, so selling those goods and services as well.
```

1010

1    A   Yes, for certain vendors.

2    Q   I'd like to talk to you a little bit about the

3    requisitions module if we could.

4    A   Okay.

5    Q   That's part of the core three modules we talked about for

6    the S3 procurement product; right?

7    A   Yes.

8    Q   Isn't it true that more often than not Lawson's customers

9    in the public sector have some sort of requisition module or

10   application they've acquired from Lawson?

11   A   I believe that's correct.

12   Q   Let's talk a little bit about requisition self-service for

13   a moment if we could, sir.  Would it be fair to say that the

14   requisition self-service application is intended to be

15   user-friendly?

16   A   That is the intent.

17   Q   That's one of its goals; right?

18   A   Yes.

19   Q   This requisition self-service application that Lawson

20   offers, that provides the ability of hundreds, perhaps even

21   thousands of individuals at a customer to have access to this

22   procurement capability at their desktop or laptop PC; correct?

23   A   Yes, for the requisitioning capability.

24   Q   Isn't it, in fact, how Lawson markets this requisition

25   self-service application, by saying, in effect, you can now

1011

1    distribute that capability to many of your employees to have

2    the ability to search for matching items, build requisitions,

3    and generate multiple purchase orders; correct?

4    A   We market it as a way for them to search those items and

5    create requisitions.

6    Q   And then you need the other modules in order to do the --

7    generate the requisition and purchase orders and complete the

8    transaction; correct?

9    A   Right.  You need the purchase order to generate the

10   purchase.

11       THE COURT:  Excuse me just a minute.  If a vendor

12   with whom the customer has a need to interact has a large list

13   of items, and each one of these people over here of these

14   tables, the lawyers, they are different customers or different

15   employees of the customer, could Mr. Carr, one of those people

16   over here, have one segment of the vendor items available to

17   him because he's in department A, and Mr. McDonald have another

18   segment of the same vendor's items but not the same ones

19   because he's in department B, et cetera?  Could that be done in

20   this system?

21       THE WITNESS:  In that example, we would load all the

22   items into the item master, and then certain departments, you

23   may restrict who has access to certain items in the item master

24   so that an individual in a particular department may not be

25   able to buy, say, computers, for example.  So you could set

1012

1    that up to one user --

2        THE COURT:  Okay.  Excuse me.  Go ahead.

3    Q   All right.  So I'm clear on this, this requisition

4    self-service application differs from the requisition module in

5    it's more of a widespread application that can be used by

6    multiple users as opposed to the requisitions module in which

7    typically the requisitions department is authorized to make

8    purchases and not all these other employees?

9    A   Requisition self-service is designed to be available

10   through a web browser and available to more people.

11   Q   Now, you call some of these things modules and some of

12   these things applications, but really that's terminology you

13   just use in the way you market it; isn't that right?

14   A   It's terminology from the marketing, how we market and

15   sell it.

16   Q   It's still software; right?

17   A   Still software, yes.

18   Q   One of the things you can do with this requisition

19   self-service application is you can click on a drop-down menu

20   for find/shop to specify to search a catalog; isn't that right?

21   A   It's a find/shop search catalog.

22   Q   Requisition self-service has that capability; right?

23   A   Yes, it has that drop-down menu.

24   Q   And a user can also input keywords into a search box in

25   this requisition self-service application and the user

1013

1    interface to locate products; isn't that right?

2    A   Yes, they can.

3    Q   You have some familiarity with a standard known as the

4    universal standard products and services classification code,

5    also known as the UNSPSC code; correct?

6    A   Yes.

7    Q   And the UNSPSC code can be assigned to items in the Lawson

8    procurement suite and used in a way to navigate this

9    requisition self-service application we've been talking about;

10   isn't that right?

11   A   Yes.

12   Q   And so this -- actually where is the UNSPSC load for

13   inputting that data?  How do you do that?

14   A   For importing the UNSPSC code?

15   Q   Classification codes.

16   A   Okay.  So all the commodity structure, so all the codes

17   and the hierarchy are loaded into inventory control.

18   Q   Inventory control module has the capability to load that

19   as offered; right?

20   A   Yes.

21   Q   So out of the box, inventory control module, one of these

22   core modules that make up this S3 product we've talking about

23   has that capability to get those UNSPSC classification codes

24   right into it; right?

25   A   Yes.

1154

Lohkamp - Redirect                    1154

Dale Christopherson.

2      THE COURT:  How long is this going to take?

3      MR. ROBERTSON:  Your Honor, I'm trying to cut it back

4  considerably.  I think I'd be less than 45 minutes.

5      THE COURT:  Mr. Niemeyer, how long is his examination

6  going to be?

7      MR. ROBERTSON:  Less than an hour.

8      THE COURT:  Let's go.  There was a lot of stuff that

9  that could have been excised from that.

10      MR. ROBERTSON:  I tried to limit it, Your Honor, but

11  both parties get to cross-designate, so...

12      THE COURT:  611 is in effect in full force.

13

14          DALE CHRISTOPHERSON,

15  a witness, called by the plaintiff, having been first duly

16  sworn, testified as follows:

17

18      MR. ROBERTSON:  May I proceed, Your Honor?

19      THE COURT:  Please.

20

21          DIRECT EXAMINATION

22  BY MR. ROBERTSON:

23  Q  Will you state your full name for the record, sir?

24  A  Dale Arnold Christopherson.

25  Q  And you are currently the director of development at

1155

1  Lawson Software; correct?

2  A  That's correct.

3  Q  Then in your role as the director of development, you have

4  responsibilities for these software modules that we've been

5  talking about, Lawson requisition self-service, Lawson

6  procurement punchout, Lawson purchase order, Lawson

7  requisitions, Lawson inventory control, and Lawson EDI;

8  correct?

9  A  Those are some of the many that I do have under my

10  control, yes.

11  Q  You are familiar also with the Lawson system foundation;

12  is that right?

13  A  Depends on how deep you want to go into it, but, yes, I am

14  familiar with it at some length.

15  Q  You were asked in your deposition whether Lawson system

16  foundation is a technology layer that sits below these current

17  applications we've been talking about.  Do you recall that?

18  A  I certainly do.

19  Q  You said it was?

20  A  Yes, it was and still is.

21  Q  And so isn't it true now that all customers of Lawson are

22  required to license the Lawson system foundation in order to

23  use the current version of the Lawson applications?

24  A  That's correct.

25  Q  And in this procurement version nine plus, any version

1156

1  nine plus you have to do that; isn't that right?

2  A  In nine plus?

3  Q  Any version nine and above?

4  A  Oh, any version nine and above, that's correct.

5  Q  There are several versions of this software we've been

6  talking about; correct?

7  A  Yes, there are.

8  Q  And there's a separate license fee associated with Lawson

9  system foundation; is that correct?

10  A  That's correct.

11  Q  Now, there's been a lot of discussion about these vendor

12  catalogs.  A customer can import a vendor catalog into the item

13  master of the Lawson system; isn't that right?

14  A  They can go basically through a three-step process, yes.

15  Q  And you are aware also of this UNSPSC we've been talking

16  about?

17  A  I certainly am.

18  Q  So isn't it true that you can use the UNSPSC to find items

19  from different vendors that were all cross-referenced using the

20  same product category?

21  A  Let me think about what you are really saying there.

22  Could you restate that?

23  Q  Sure.  Isn't it true that a user of the Lawson system that

24  has this UNSPSC capability can find items from different

25  vendors that were all cross-referenced to the same product

1157

1  category?

2  A  That's correct, yes.

3  Q  The shopping cart in Lawson requisition self-service can

4  be dynamically built from results of conducting searches in the

5  item master; isn't that right?

6  A  That is correct.

7  Q  And it's also true that the shopping cart can also be

8  dynamically built using the results of searches in the vendor

9  punchout catalogs; right?

10  A  That is also correct.

11  Q  And when the user clicks a checkout in the items in your

12  shopping cart, they are moved into the requisition system, and

13  an actual requisition is created; isn't that right?

14  A  I would actually define that slightly different.

15  Q  All right.  Do you recall giving a deposition in this

16  case?

17  A  I certainly do.

18  Q  And you were under oath?

19  A  Uh-huh.

20  Q  I believe you have your deposition transcript.  It should

21  be in the first volume.

22  A  Yep.

23  Q  Could you go to page 77?  Excuse me.  I misspoke.  177.

24  A  177?

25  Q  Yes, sir.

1158

1  A   Okay.  I'm not there yet.

2  Q   Okay, take your time.

3  A   Okay, 177.

4  Q   Starting at about line 18?

5  A   Starting with question, and then on the right-hand screen?

6  Q   Let me read the question for you.

7      Question:  And then on the right-hand screen in the card,

8  here you have four items that have been included in your

9  shopping cart.  What happens to that when you click checkout?

10     Your answer:  When you click checkout, then it would move

11 that information into the requisition system and actually

12 create a requisition.

13     Did you give that answer to that question at that time?

14 A   I certainly did.

15 Q   Okay.  Thank you.  Once a requisition is approved, the

16 requisition is released and then transferred to the purchase

17 order system; correct?

18 A   That's correct, after it's been approved.

19 Q   Talking just now about procurement punchout, when users

20 have filled their shopping carts, virtually speaking, and

21 checked out from the vendor website using the Lawson

22 procurement punchout, the chosen items and their prices are

23 returned to the Lawson server and a requisition is created

24 using the Lawson requisition self-service application; correct?

25 A   Can you state that again?  The second half of it basically

1159

1  is where I lost you.  ^you check out at the customer, not the

2  customer but the vendor site and then it was at that point

3  where I got lost.

4  Q   Let me start over.  Let's hear the whole question.  When

5  users have filled their shopping carts, virtually speaking, and

6  checked out from the vendor website using Lawson procurement

7  punchout, the chosen items and their price are then returned to

8  the Lawson server, and a requisition is created using the

9  Lawson requisition self-service application; correct?

10 A   That's correct.

11 Q   Isn't it true that the current version of the Lawson

12 procurement punchout includes the capability to punch out to

13 multi-vendor catalogs?

14 A   That's correct.

15 Q   One of those examples of a site that you can go that is a

16 multi-catalog vendor -- excuse me, multi-vendor catalog, is

17 SciQuest; correct?

18 A   That's correct.

19 Q   Another example of a multi-vendor catalog site that's

20 available for the punchout procurement is an organization known

21 as GHX; correct?

22 A   That is correct.

23 Q   That stands for Global Healthcare Exchange?

24 A   That's correct.

25 Q   And Global Healthcare Exchange that provides this

1160

1  multi-vendor catalog capability is a punchout trading partner

2  of Lawson; correct?

3  A   That's correct.  They are on the list, yes.

4  Q   It's an accurate statement to say that if Lawson could not

5  market a requisition module, it could not effectively compete

6  in the supply chain management product market?

7  A   I would say that that would be an accurate statement, yes.

8  Q   It's also accurate to say if Lawson could not offer a

9  purchase order module, Lawson could not effectively compete in

10 the supply chain management product market?

11 A   That would also be correct.

12 Q   You've heard a lot of talk about the implementation and

13 installation services that Lawson offers.  I just want to be

14 clear that Lawson will provide implementation services to

15 assist its customers with importing vendor catalog data into

16 the item master.

17 A   I didn't hear a question in that, sir.

18 Q   Let me restate it then.  Perhaps I misspoke.  Is it true

19 that Lawson provides implementation services to assist its

20 customers with importing vendor catalog data into the item

21 master?

22 A   If the customer so chooses and wants that service, yes, we

23 do.

24 Q   So for most situations where a customer licenses the

25 supply chain management suite or the procurement modules we've

1161

1  been talking about in supply chain management, Lawson

2  professional services is going to provide the actual

3  installation and implementation services for that system;

4  correct?

5  A   That's correct, yes.

6  Q   All existing Lawson customers today are under maintenance

7  contracts with Lawson; correct?

8  A   That's correct.

9  Q   So all of the supply chain -- excuse me.  All of the

10 supply -- let me restate that.  All of the S3 procurement

11 products that are under contract today with Lawson customers,

12 they have maintenance contracts; is that right?

13 A   Could you restate that?

14 Q   Yeah.  I'm sorry.  It was a bad question.  With respect to

15 the Lawson S3 procurement product that's at issue here, any

16 customer that has that product is under an existing maintenance

17 contract?

18 A   That's correct.

19 Q   There's been a lot of talk about this RFP process, and I

20 don't want to go through it again in detail, certainly, but

21 there is a standard set of answers for those common questions

22 that customers have about the S3 procurement product; correct?

23 A   That is correct, yes.

24 Q   I think if you'll look in your book to Exhibit 117.

25 A   Okay.

1186

1186

1   truly apologize, and maybe you'll get another judge to handle

2   the rest of the case.

3        MR. McDONALD:  I'm not sure I picked up all that --

4        THE COURT:  I'm asking if you said something and I

5   forgot what it was, because I actually don't remember you

6   saying anything.

7        MR. McDONALD:  You didn't miss a thing.  We haven't

8   formulated our position, Your Honor.  I have a couple concerns,

9   though, I can flag and maybe give --

10        THE COURT:  That would be helpful to talk about it.

11        MR. McDONALD:  Well, this language about "by a

12   vendor" means at some point in time.  I think the "by a vendor"

13   for one thing was pretty much agreed to at the Markman hearing,

14   what it did mean, and do inject the concept in time, of time

15   into a phrase like "by a vendor" could create some confusion, I

16   think, do more harm than good, actually.  We would probably

17   object to that, but I haven't finalized my position.

18        THE COURT:  But I think it's quite clear from the

19   specification that it's an antecedent event to the use of the

20   invention no matter how you cut it.

21        MR. McDONALD:  I just think --

22        THE COURT:  I understand what you are saying.  Think

23   about it and see what you --

24        MR. McDONALD:  The other concern I have is anything

25   we do with that, because our experts who have given opinions

1187

1187

1   relating to claim construction, I'm concerned that if we now

2   move the ball on what the claims mean, what is the implication

3   of that for the testimony that's already been given, the

4   testimony that's yet to come that the Court repeatedly says has

5   to be limited to what's in the expert reports, there were prior

6   decisions by the Court relating to prior art exclusions and

7   things like that.  I think there's many implications of making

8   any changes here, so I'm concerned about that.

9        THE COURT:  I think -- I'm not sure there are a

10   lot -- that is not a claim construction answer.  That's an

11   instruction, and the fact of the matter is that it is not at

12   all unusual for Courts to give revised claim constructions

13   during the trial.

14        In fact, for a good while, it was common to give the

15   claim construction only as part of the instructions.  Now, I've

16   never done that just because I didn't want to put myself

17   through that agony, but that's what happens sometimes, and in

18   that event, experts have to take their positions -- take out

19   their position and see what happens.  So we'll see.

20        MR. McDONALD:  In this case, the experts were allowed

21   to give their reports after the Court's Markman ruling, so I

22   think that really changes the dynamic.

23        THE COURT:  Okay.  Anything else?  Thank you.  We'll

24   see you all tomorrow at nine o'clock.

25        (Court adjourned.)

1188

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE EASTERN DISTRICT OF VIRGINIA
3               RICHMOND DIVISION
4
5    ---------------------------------------
                                    :
6    ePLUS, INC.            :  Civil Action No.
                           :  3:09CV620
7    vs.                    :
                           :
8    LAWSON SOFTWARE, INC.     :   January 12, 2011
                           :
9    ---------------------------------------
10
11        COMPLETE TRANSCRIPT OF THE JURY TRIAL
12       BEFORE THE HONORABLE ROBERT E. PAYNE
13    UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24        Peppy Peterson, RPR
          Official Court Reporter
25        United States District Court
```

1189

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1190

```
1              P R O C E E D I N G S
2
3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr.
6    Michael G. Strapp represent the plaintiff.
7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
9    the defendant.  Are counsel ready to proceed?
10       MR. ROBERTSON:  Plaintiff is, Your Honor.
11       MR. McDONALD:  Yes, Your Honor.
12       THE COURT:  All right.  You said you wanted to see me
13   before the jury comes in.
14       MR. McDONALD:  Yeah, there's basically three issues
15   we wanted to raise.
16       THE COURT:  The court reporters always can hear
17   better if you come to the lectern.
18       MR. McDONALD:  There's basically three issues that we
19   wanted to raise this morning.  One is our third witness in our
20   case that we start today is Ms. Raleigh.
21       THE COURT:  Third witness in what?
22       MR. McDONALD:  In our case when we start presenting
23   our case today.  We have Mr. Richard Lawson first, Mr.
24   Christopherson second, and then Hannah Raleigh was supposed to
25   come back and be third today.
```

1191

```
1        She was supposed to be back last night from New York,
2    and New York is getting hammered real bad by this blizzard.
3    She's trying to get another flight, but her flight is not going
4    to get her here until after the trial day is over today.  So
5    we've been trying to work something out with ePlus about what
6    we would do next because we haven't disclosed any exhibits or
7    anything for the next witness.
8        THE COURT:  Just call the next witness, the expert or
9    whoever you've got here.  There's no magic to the order of
10   putting people on.
11       MR. McDONALD:  The next witness we would have
12   actually here is Mr. Lohkamp, calling him back.
13       THE COURT:  Good.
14       MR. McDONALD:  That's fine.  They haven't had a
15   chance to get ready for their cross-examination.
16       THE COURT:  They'll be ready.  They knew basically
17   what you were going to do anyway.  They're not going to do it
18   on your cross-examination; they were going to do redirect, so
19   we're going to reverse things.
20       MR. McDONALD:  We do have a deposition of Ms.
21   O'Loughlin on the RIMS prior art issue that we can move up in
22   the order.
23       THE COURT:  Is that carefully edited to eliminate the
24   trash?
25       MR. McDONALD:  That's being worked on as we speak,
```

1232

1   A   In general, sure.  It's a remote computer.

2   Q   Using this demonstrative, would you explain the source

3   code architecture of Lawson's system and the components you've

4   illustrated in your demonstrative?

5   A   Yes.  The portion on the left labeled client, contains

6   components that run in the user's web browser.  Some items

7   labeled there are JavaScript which I mentioned earlier is a

8   programming language that executes within the browser.  HTML

9   are the actual pages that display the information.

10       The right portion on the right labeled service side are

11  the components that run on the server.  There is a Java -- box

12  labeled Java web application.  That's essentially a web server

13  that feeds the data to the web browser.

14       Below that, the area labeled Lawson transaction manager

15  and Lawson 4GL COBOL comprise what I would call the business

16  logic of the application and contains the Lawson 4GL COBOL

17  code.  The transaction manager and supporting features are also

18  -- my understanding is they are termed by Lawson as Lawson

19  system foundation.  So it's sort of the back end portion of

20  that.

21       There's the database indicated there which contains the

22  data for the application, and the final box up on the right

23  labeled MCI is just an alternate mechanism for the Java

24  components to talk to the database.

25  Q   Now, you discussed in your demonstrative that there are

1233

1   both Lawson web-based applications and Lawson 4GL applications

2   within the Lawson system.  Could you describe at a high level

3   the kinds of functionality that are implemented in the system

4   using the 4GL application?

5   A   Yes, the Lawson 4GL COBOL code implements the feature of

6   the S3 system including requisition, inventory control, and

7   purchase order.

8   Q   Could you describe at a high level the functionality

9   implemented in the system using the web-based applications?

10  A   The web-based components including the Java web, or Java

11  application server and the components that run the browser

12  together comprise a web-based interface to that Lawson 4GL

13  functionality.  They are sort of an overlay or an add-on that

14  provides that browser-based access to those components.

15  Q   What are some examples of the Lawson web-based

16  applications that you studied?

17  A   I believe Lawson calls the system the requisition

18  self-service component, and I believe they also called it --

19  refer to their punchout component as a web-based component.

20  Q   Now, you also mentioned this Lawson system foundation.

21  Could you briefly explain why the Lawson system foundation is

22  important to the functioning of the Lawson system?

23  A   Yes.  So the Lawson system foundation, inasmuch as it

24  contains the transaction manager, is responsible for running

25  the Lawson 4GL COBOL programs.  It is a runtime environment or

1234

1   a container of sorts that holds that code, determines what's

2   running at what time, and moves the data into and out of it.

3   It's required to run those applications.

4   Q   Could you describe at a high level what the functionality

5   is with respect to the Lawson transaction manager?

6   A   Yes.  The Lawson transaction manager would be the key

7   component there that actually runs the COBOL programs for the

8   requisition, inventory control, and purchase order

9   applications.

10  Q   And how does the Lawson transaction manager execute the

11  4GL applications, or what does it do?

12  A   Well, so as I tried to describe, it determines which

13  programs are running at what time.  It moves data into and out

14  of the associated working storage structures, and it collects

15  the results.  It may also intermediate access to the database,

16  provide access to the database.

17  Q   And you talked about this DB thin API.  First of all, what

18  is an API?

19  A   The term API, the acronym API stands for application

20  programmer interface, and it is just a collection of functions

21  or utilities, features which can be used by the programmer.

22  Q   And what do you mean by the term DB thin?

23  A   In this case, it is a database API which just means it's a

24  collection of features that allow the Java code to talk to the

25  database.  The term thin to me implies that is it a streamlined

1235

1   or otherwise not complex mechanism.  It's a delegating

2   mechanism that delegates to another layer.

3   Q   What do you mean by delegate?

4   A   So it's sort of a thin wrapper around some more

5   complicated functionality.  It passes off requests to another

6   layer for additional processing.

7   Q   Now, you've shown in your demonstrative that the system

8   has a database associated with it.  Have you prepared another

9   demonstrative to help you explain the database that's used by

10  the system?

11  A   Yes, I have.

12       MS. ALBERT:  Mike, if we could, could we have slide

13  number 85, please.

14  Q   Is this a demonstrative that you prepared to illustrate

15  the database?

16  A   Yes, it is.

17  Q   Could you describe at a high level the nature of the

18  database?

19  A   Yes.  So it is what's known as a relational database.

20  Lawson refers to this database as the item master database.

21  The database contains numerous tables.  Tables within a

22  database, you can roughly analogize to files in a filing

23  cabinet.  They may contain different types of information.

24       There are a number of actual tables from the Lawson item

25  master database illustrated here.  The one that I'll mention, a

1236

1  key table is the ITEMMAST table on the left of this diagram
2  which contains information about items that can be
3  requisitioned within the system, and from -- another table that
4  I'll point out is the POITEMVEN which contains vendor
5  information pertaining to specific items within the ITEMMAST
6  table.
7      Q   You mentioned this term relational database.  What is a
8  relational database?
9      A   The term relational just means that a piece of data within
10  the database can refer to or point to another piece of data in
11  various ways.
12     Q   Would you explain the difference between when you say the
13  item master database and when you are referring to this item
14  master or ITEMMAST table?
15     A   Yes.  So the ITEMMAST table is a specific table within the
16  database.  More generally, Lawson documentation refers to the
17  database as a whole or collectively as the item master
18  database, presumably drawing its name from that key table.
19         THE COURT:  The ITEMMAST table has what in it?
20         THE WITNESS:  It consequence /TAEUPBS information
21  about items which can be requisitioned.
22     Q   What are some of the types of information about the items
23  that are contained in that table?
24     A   It contains an item number for the item, a textual
25  description of the item, and other information about the item.

1237

1      Q   Now, you have a few other tables illustrated on your
2  demonstrative.  Could you provide us with a high level
3  description of the purpose of the table that's listed R-E-Q
4  header or REQHEADER?
5      A   Yes.  The abbreviation R-E-Q is short for requisition, so
6  this is the requisition header table, and it is involved in
7  both shopping cart and requisition functionality.
8      Q   And then you have another table that is referred to as P-O
9  inter F-A-C, POINTERFAC.  What is the purpose behind that
10  table?
11     A   The POINTERFAC table is involved in making requisitions
12  available to the purchase order system.  It's kind of an
13  intermediator.
14     Q   And I believe you talked about the POITEMVEN table.  You
15  have another table shown that's labeled KWDDETAIL.  Can you
16  explain at a high level the purpose of that table?
17     A   Yes.  Here the acronym, the abbreviation KWD stands for
18  keyword, so it would be keyword detail table, and it is an
19  index used in keyword searches.
20     Q   Now, we referenced this requisition self-service
21  application earlier.  Can you explain to the jury from a source
22  code perspective what the requisition self-service application
23  is?
24     A   Yes.  So, it is a -- as I described, it is a web-based
25  interface to the Lawson purchase order, requisition, and

1238

1  inventory control systems.
2      Q   And is that a more -- can you say whether or not that's a
3  more user-friendly interface?
4      A   Certainly, yes.  It's the main reason for adding a
5  web-based interface to an application, is to provide increased
6  or ease of use and flexibility.
7      Q   Could you explain from a source code perspective what
8  Lawson's procurement punchout application is?
9      A   Yes.  So procurement punchout is a feature of the -- which
10  runs in the context of the requisition self-service application
11  that allows a user to connect to a remote Lawson partner vendor
12  site, perform -- well, it communicates with the site.
13         The Lawson system communicates with the site over a secure
14  communications channel, performs a handshake using a protocol
15  known at cXML is which is a business standard for this type of
16  communication.  It allows the user to perform certain shopping
17  operations on the partner site, the vendor site, and ultimately
18  to have those shopping results returned to the Lawson system
19  for incorporation into their shopping cart.
20     Q   I'd like to turn now to the category search functionality
21  that you studied.  Does the source code of Lawson system
22  implement functionality that allows a user to search for items
23  by category?
24     A   Yes, it does.  There is an option from the find/shop menu,
25  the requisition self-service that brings up a category search

1239

1  screen.
2      Q   What, if any, database tables does the source code use to
3  conduct this category search functionality?
4      A   There are two.  One is called IC item code, ICITEMCODE,
5  and the other is the previously mentioned ITEMMAST table.
6      Q   Do both of those tables belong to that same item master
7  database that you described earlier?
8      A   Yes, they do.
9      Q   What information is contained within that ICITEMCODE table
10  that would be relevant to searching by category?
11     A   The ICITEMCODE table contains the textual description of
12  the levels of the UNSPSC hierarchy and the corresponding codes
13  that are assigned to those levels.
14     Q   And what information does the item master table store that
15  is relevant to searching by category?
16     A   The item master table contains -- in addition to the item
17  descriptions, contains the corresponding UNSPSC codes
18  indicating where they belonged in that hierarchy.
19     Q   When the category selection is chosen by a user from that
20  find/shop menu, what is the first thing that happens in the
21  source code?
22     A   When a user chooses to bring up a category search screen,
23  a request is made from the user's web browser to the back end
24  of the Lawson system.  Specifically Lawson calls this kind of
25  request a data request, and it is -- it is handled by the --

1240

1  passed from the Java code to the -- using the DB thin API that
2  I mentioned previously and results in a search of the
3  ICITEMCODE table for the top levels of the UNSPSC hierarchy.
4      Those top level initial part of the drill-down are
5  returned to the -- formatted as XML and returned to the
6  client's web browser where it's presented to the user to make
7  their initial choice.
8  Q   After the system retrieves these top level categories from
9  the database, would you explain what happens in the source code
10  as the user navigates the available hierarchy of categories?
11  A  Yes. So the process is very similar to that of retrieving
12  those initial top level categories with the exception that as
13  the user chooses levels in the browser, the corresponding
14  UNSPSC codes are conveyed with the request to the back end
15  system, and the ICITEMCODE table is searched to find the
16  corresponding levels, the children or the child levels
17  underneath the selected level.  That information is returned
18  and then formatted for the user.  In this fashion they can
19  drill down, expanding from the parent to the child.
20  Q   When the user finds his desired category --
21      THE COURT:  Excuse me.  The parent is the larger and
22  the child just means the more specific; is that right?
23      THE WITNESS:  Yes.  If you imagine like a family
24  tree, there is a parent, and the children kind of branch out
25  and grandchildren branch out from there.  That's what I meant

1241

1  in terms of that hierarchy.
2  Q   Once the user finds his desired category and chooses to
3  view the items that belong to that category, will you explain
4  what happens in the source code to cause the items that belong
5  to that category to be displayed?
6  A  Yes. So when the user selects the items link, the UNSPSC
7  codes for that particular level of the hierarchy are packaged
8  up as part of a request.  In this case, it is what's known as a
9  transaction request.  It's passed from the user's browser to
10  the back end, the server component of the Lawson system.
11      This results in a Lawson 4GL COBOL program called RQIB
12  being executed which searches the ITEMMAST table for items
13  which have the corresponding UNSPSC codes.  The resulting item
14  information is then formatted as XML and returned to the
15  client's web browser where it is formatted as a search result
16  list.
17  Q   Now, Mr. Niemeyer, I'd like to turn to the keyword search
18  functionality in the Lawson system that you studied.  Does the
19  source code of Lawson system implement functionality that
20  allows a user to search by a keyword?
21  A  Yes.  The user may choose search catalog option from the
22  find/shop menu of the requisition self-service application
23  which brings up a keyword search screen with a field in which
24  the user can enter one or more search terms.  That screen has
25  some additional functionality, advanced search functionality

1242

1  which allows the user to limit the search, the scope of the
2  search to Lawson certain origin fields and optionally provide
3  what it's called an exclusion term.
4  Q   What do you mean by an origin field?
5  A  It determines where in the information associated with an
6  item the term is located.  So there are multiple tables which
7  can relate to a given item within the ITEMMAST table, and
8  different textual and numeric information may be found in those
9  tables.  They named those different locations as origin fields,
10  and the user can limit the search if they wish.
11  Q   Can you give us an example of an origin field?
12  A  Well, so the primary description within the ITEMMAST
13  table, there's a field for the description, is the particular
14  origin field.  There is also a vendor description in the
15  POITEMVEN table.  That is another example of an origin field.
16  Q   Have you prepared a demonstrative to help explain how the
17  keyword search functionality is implemented in the source code?
18  A  Yes, I have.
19      MS. ALBERT:  Mike, could we have slide 24, please.
20  Q   Is this the demonstrative that you prepared?
21  A  Yes, it is.
22  Q   What, if any, database tables are involved in this keyword
23  search functionality?
24  A  Well, there are seven depicted here, but the four that I
25  would describe as first are the keyword tables at the bottom.

1243

1  These are prefixed with the KWD abbreviation, and they are
2  keyword synonym, keyword master, keyword detail, and keyword
3  setup.  These tables comprise an index of the available search
4  terms, and there are three tables above, ITEMMAST which I
5  previously mentioned, POITEMVEN, and a table called ITEMLOC,
6  I-T-E-M-L-O-C, are used after the search is performed to
7  retrieve the item information.
8  Q   And do all of these tables belong to that item master
9  database that you illustrated earlier?
10  A  Yes, they do.
11  Q   What data is contained or what is the keyword detail
12  table?
13  A  Keyword detail table is the key index of search terms, and
14  it relates a specific search term which has been found to the
15  origin field in which it was located and the item number of the
16  item in which it was found.
17  Q   And what types of data is contained in that table?
18  A  Well, as I said, there's an item number, a keyword, and an
19  origin field.
20  Q   Would you please explain briefly how the functionality to
21  build the keyword detail table is implemented in the source
22  code?
23  A  So my understanding is when the system is set up
24  initially, users determine which origin fields are to be
25  enabled for search, and the terms are gathered from the data

1244

1  and placed into the keyword detail table.  For each item, there
2  is a corresponding keyword and an origin field.
3      Q   And what database tables are indexed by the keyword detail
4  table?
5      A   My understanding is that at minimum, the ITEMMAST,
6  POITEMMAST, and ITEMLOC tables.
7      Q   In the context of this source code, what is the purpose of
8  having an index like the keyword detail table?
9      A   It's common practice to create an index to -- an
10  optimization to increase the speed of the search and to
11  eliminate to need to search the whole collection of data when
12  you can condense it to an index that you can search more
13  rapidly.
14      Q   Can you explain how the item vendor table or the POITEMMVEN
15  table is used in the implementation of a keyword search in the
16  source code?
17      A   After the search is performed against the keyword tables
18  and item information is being retrieved, corresponding vendor
19  information for the items is retrieved from the POITEMMVEN
20  table.
21      Q   Do the records in the item vendor or POITEMMVEN table link
22  in any way to the records in the item master or ITEMMAST table?
23      A   Yes, they do.  They contain a field which holds the item
24  number for a given item in the ITEMMAST table.
25      Q   Have you prepared a demonstrative to help you explain how

1245

1  the information in these two tables can be related?
2      A   Yes, I have.
3          MS. ALBERT:  Mike, can we have slide 68, please.
4      Q   Is this the demonstrative that you prepared?
5      A   Yes, it is.
6      Q   Now, using your demonstrative, would you please explain
7  how records in the item vendor or POITEMMVEN table can be
8  related to records in the item master table or ITEMMAST table?
9      A   Yes.  So within the ITEMMAST table, or the item master
10  table, there is a field called ITITEM which holds the item
11  number for that item.  That item number uniquely identifies the
12  item within the ITEMMAST table.
13          The PO item vendor table then can -- given record within
14  that table can refer to an item within the ITEMMAST table using
15  that unique number.  It's what's known as a key field in the
16  ITEMMAST table.  Within the POITEMMVEN table, there's a field
17  called PIV item which holds that number, and, therefore, if you
18  want to, for a given item in the POITEMMVEN table, you can point
19  back to a specific unique item in the ITEMMAST.
20          MS. ALBERT:  Mike, could we go back to slide 24,
21  please.
22      Q   Now, going back to your demonstrative on keyword search
23  query execution, can you explain how the keyword search
24  functionality is implemented in the Lawson system source code?
25      A   Yes.  So after the user enters a search term in the

1246

1  browser and hits the search button, the search term is conveyed
2  as part of a request to the server side components which causes
3  the Lawson 4GL COBOL program called RQIC to be executed.  The
4  RQIC program ultimately performs a search of the keyword detail
5  table for occurrences of that term that have been previously
6  indexed.
7          Any matching records from the keyword detail table are
8  then used to find the corresponding items in the ITEMMAST table
9  and data gets gathered from the PO and ITEMLOC tables.  All of
10  those results are formatted as XML and ultimately returned to
11  the item web browser and formatted as a search word.
12      Q   When the search code searches the keyword tables to locate
13  the keywords that the user typed in, does the source code
14  search the item master table at all?
15      A   No, it does not.  It only searches the keyword detail
16  table and the associated keyword tables.
17      Q   Now, I'd like to turn to the functionality for the adding
18  items to a shopping cart and building a requisition.  Does the
19  source code of the Lawson system implement functionality that
20  allows a user to select desired items for requisition from a
21  list of results returned from either this category or keyword
22  search that you discussed?
23      A   Yes, it implements a shopping cart functionality whereby
24  the user can indicate that an item from a search result should
25  be added to the shopping cart.  Items can be added and removed

1247

1  until checkout operation is performed.  Similar to the way you
2  shop on Amazon or another web business.
3      Q   Now, what, if any, database tables are involved in this
4  shopping cart functionality?
5      A   There are three.  Two of them are prefixed with the term
6  REQ.  One is called REQHEADER and the other is called REQLINE.
7  The third is called PO interface which we mentioned before,
8  POITERFAC.
9      Q   And what information is stored in that REQLINE table
10  that's relevant to the shopping cart functionality?
11      A   The REQLINE table holds the individual line items
12  representing items that were selected to be added to the
13  shopping cart.
14      Q   Does this REQLINE table also contain a status field?
15      A   Yes, it does.  In addition to the item information, it
16  contains a status which can indicate that the item is either --
17  while in the shopping cart, it's in a state called unreleased.
18      Q   What does that mean?
19      A   It means that it is part of a shopping cart and not yet
20  part of a requisition.
21      Q   And is there another status that can be indicated in this
22  status field in addition to the unreleased status that you
23  mentioned?
24      A   Yes.  So I'd just say both the REQLINE and REQHEADER table
25  that I mentioned which are involved in this contain a status

1364

1    vendor catalog, not Lawson.

2         Likewise, Dr. Weaver never asserted Lawson practiced

3    the step of determining whether a selected matching item is

4    available in inventory; instead, merely opining in a conclusory

5    fashion that punchout allows the step to happen while admitting

6    that Lawson did not have any idea what was available in the

7    inventory of the third-party vendors, and with respect to

8    searching for matching items, ePlus argues a user searches on a

9    vendor's website using a vendor search engine, which, again, is

10   a step that Lawson does not practice.

11        The systems claims are likewise deficient.  Claim

12   three of the '683 patent and claims one, two, six, nine, 21,

13   22, and 29 of the '516 patent all require multiple catalogs.

14   Dr. Weaver opined that these claims were infringed by the

15   punchout product because punchout allows users to have access

16   to external vender catalogs, not Lawson catalogs.

17        Claim one of '172 patent is also a system claim which

18   requires a database containing data relating to items

19   associated with at least two vendors maintained so that

20   selected portions of the database may be searched separately.

21   Dr. Weaver opined that this limitation was met by the separate

22   databases of the external punchout site, but there is no

23   dispute that Lawson has not maintained separate databases of

24   the external punchout sites.  Those external vendor catalogs

25   are maintained by the vendor.

1365

1         ePlus cannot rely on the doctrine of joint

2    infringement to resolve the issue of direct infringement as it

3    has failed to show that Lawson has the required control over

4    the third parties or that Lawson performs the remaining steps.

5         In a situation in which more than one party is

6    required to perform the steps of a claimed method, there is no

7    infringement unless one party exercises control or direction

8    over the entire process such that every step is attributable to

9    the controlling party.

10        The same requirement for direction and control

11   applies to the system claims as well.  Lawson does not exercise

12   control or direction over any third party, suppliers, vendors,

13   distributors, manufacturers, or others who sell items to

14   Lawson's customers.  Likewise, Lawson exercises no control over

15   its customers.  Lawson does not have an agency relationship

16   with any party that performs any of the remaining steps from

17   the system or method claims.

18        While Lawson may reach an agreement with certain

19   vendors to allow them to provide services to its clients --

20        THE COURT:  What's the difference, Ms. Hughey,

21   between joint infringement and induced infringement in this

22   case in this record?  I know conceptually what the difference

23   is, but is there really any difference in this case between

24   those two?

25        MS. HUGHEY:  With respect to joint infringement,

1366

1    that's related to direct infringement.  Under direct

2    infringement, one party has to actively engage in every single

3    step or method claim.  If, however, a party has an agency

4    relationship with another, in certain limited circumstances,

5    the Court has allowed that to be a direct infringement.

6         For indirect infringement to occur, there must be at

7    least one direct infringer.  That is to say that someone must

8    be practicing the steps.

9         THE COURT:  Are you saying joint infringement doesn't

10   apply to indirect infringement?

11        MS. HUGHEY:  In theory you could have two parties

12   engaging in joint infringement and a third party guilty of --

13        THE COURT:  But on this record, is there any theory

14   of joint infringement that exists as to indirect infringement?

15   Any basis any jury could find that?

16        MS. HUGHEY:  I don't believe so, Your Honor, no.

17        THE COURT:  Why?

18        MS. HUGHEY:  On this record, there's no -- on this

19   record, ePlus could not prove joint infringement because it

20   hasn't demonstrated the existence of an agency relationship

21   between Lawson and any third party.

22        THE COURT:  I thought you said, though, that that

23   made it direct infringement.

24        MS. HUGHEY:  That's right.  Joint infringement is

25   direct infringement.

1367

1         THE COURT:  I understand, but I also asked you,

2    because some of the instructions you all tendered suggested

3    that joint infringement an application in the indirect

4    infringement context.  Are you contending that or not?

5         MS. HUGHEY:  I don't believe that we're contending

6    that the joint infringement is the same thing as indirect

7    infringement or that it has applicability to indirect

8    infringement.  It's possible that --

9         THE COURT:  So the joint infringement doesn't -- do

10   you understand it doesn't even apply to indirect infringement?

11        MS. HUGHEY:  I think it could apply to indirect --

12        THE COURT:  On the facts of this case.

13        MS. HUGHEY:  Correct, Your Honor.  Correct.  As I was

14   saying, Lawson does not control that vendor or contractually

15   obligate them to do anything.  Likewise, Lawson does not have

16   control over what its customers do, as they act for their own

17   benefit and under their own control.  Because there is no

18   single direct infringer, there can be no indirect infringement

19   either.

20        THE COURT:  All right.

21        MS. HUGHEY:  I have two more points, Your Honor.

22   Unless you have a question?  With respect to the unaccused

23   systems, Lawson has provided no basis for a reasonable jury to

24   find for ePlus with respect to certain unaccused systems.

25        THE COURT:  If it's not accused, what do I care?  I

1368

1 don't need to rule on an unaccused system.
2     MS. HUGHEY:  They were potentially accused in the
3 pretrial order, but then during trial, it became clear they
4 were no longer accused.  I am not sure ePlus would actually
5 oppose this part of the motion.
6     THE COURT:  What are you talking about, unaccused?
7 Looking for the approvals on the purchasing agent?
8     MS. HUGHEY:  I'm sorry, Your Honor.  Certain systems
9 -- I think you remember that Dr. Weaver accused five systems of
10 infringing, and then he went through claim by claim, but he did
11 not accuse every system of accusing every claim.
12     THE COURT:  You don't need judgment on any system
13 that they don't have any evidence on.  Is there anything else?
14     MS. HUGHEY:  One final thing.  I don't believe that
15 ePlus is asserting the doctrine of equivalents infringement,
16 but I'd like to make a record here that we move for judgment as
17 a matter of law to the extent that they would suggest
18 otherwise.
19     MR. ROBERTSON:  We will stipulate we haven't made the
20 doctrine of equivalents argument with respect to the
21 infringement.
22     MS. HUGHEY:  That's all I have, Your Honor.  We'd be
23 willing to brief any of these issues further.
24     THE COURT:  Thank you.
25     MR. ROBERTSON:  Thank you, Your Honor.  I'm sure you

1369

1 can appreciate that just like Your Honor, I've heard those
2 arguments for the first time right now, so let me see if I can
3 try and track them for you and answer any questions you might
4 specifically have.
5     We think we brought forth ample evidence of both
6 direct infringement and induced infringement --
7     THE COURT:  Do you take the view that joint
8 infringement applies in the indirect infringement claim?
9     MR. ROBERTSON:  I think there can be a joint
10 infringement scenario in which Lawson aids, assists, abets,
11 encourages their customers to indirectly -- to induce
12 infringement, and that would be a situation, Your Honor, for
13 example, if Your Honor concludes --
14     THE COURT:  What is the difference between that and
15 contributory infringement then?  I think it's very confusing to
16 the jury to have this joint infringement issue in the case in
17 the indirect infringement issue, and I don't even understand
18 how it would apply on the facts of the case anyway.
19     But forget about the facts of the case.  Is there any
20 case that holds joint infringement applies in indirect
21 infringement charges?
22     MR. ROBERTSON:  I haven't seen one specifically, Your
23 Honor.
24     THE COURT:  I haven't either.  Never heard of it.
25     MR. ROBERTSON:  But, you know, if you want to ask me

1370

1 theoretically can that be the case, absolutely.  Do you want me
2 give you a scenario in the facts of this case in which it could
3 be occurring, I'm happy to do so.
4     THE COURT:  What is your theory?  Are you pressing
5 joint infringement in the indirect infringement context?  If
6 you aren't, I don't need to hear anything further about it, and
7 since it's such a rare animal, even if it's not in the extant
8 one or ever was, just fish or cut bait.
9     MR. ROBERTSON:  Your Honor, this joint infringement
10 position is a defense that Lawson is taking because they are
11 arguing that they don't have control or direction over their
12 punchout partners.  Now, I think we marshalled the substantial
13 evidence that showed that is not the case, but how could an
14 indirect or induced infringement scenario --
15     THE COURT:  They don't direct claims like that.  Do
16 you claim there is a joint infringement under the indirect
17 infringement case you are presenting?  I think that you don't.
18 I think, in fact, then -- they may say, well, even if its
19 joint infringement, you are saying we don't have control, but
20 in the first instance it's you who presses the point, so do you
21 or do you not have a joint infringement claim under your theory
22 of indirect infringement, are you going to give it a mercy
23 killing?
24     MR. ROBERTSON:  Your Honor, I don't want to give it a
25 mercy killing because it shouldn't be killed, and let me

1371

1 explain why that's the case.  Let me give you a scenario with
2 where there can be an induced infringement in a joint
3 infringement -- direct infringement case.  You have --
4     THE COURT:  Huh-uh.  I didn't ask about direct.
5     MR. ROBERTSON:  Yes, we are pressing an indirect
6 infringement that could involve joint infringement, direct
7 infringement.
8     THE COURT:  What is that?
9     MR. ROBERTSON:  What is it?
10     THE COURT:  Yes.
11     MR. ROBERTSON:  It is inducing someone, perhaps more
12 than one party, to actually commit the direct infringement.
13     THE COURT:  Why isn't that induced infringement?
14     MR. ROBERTSON:  It is --
15     THE COURT:  -- under indirect infringement, and why
16 isn't it then joint infringement under direct infringement?
17     MR. ROBERTSON:  I agree with Ms. Hughey that joint
18 infringement is a direct infringement theory.
19     THE COURT:  That's all I'm asking you.
20     MR. ROBERTSON:  Okay.  Then I'm sorry.  I
21 misapprehended Your Honor's question, but Ms. Hughey and I
22 agree joint infringement is direct infringement.
23     THE COURT:  The instructions that both of you
24 tendered did not distinguish, and some of the arguments that
25 were being made suggested to me that you were pressing a theory

1372

1 of which I was unaware, and now that we've gotten

2 straight, what's the joint infringement theory under the direct

3 infringement claims?  In this case on this record.

4 　　MR. ROBERTSON:  Well, joint infringement sometimes is

5 called divided infringement when a defendant wants to say that

6 they are not directly controlling the actions of another, and

7 the way I understood Ms. Hughey's argument to be is they say,

8 we really don't know what these punchout trading partners are

9 doing that we have.  Once you go to their website, it's all up

10 to them.  So the evidence turns on whether or not there's

11 direction and control with respect to what's been proffered so

12 far before the Court.

13 　　THE COURT:  Direction and control of whom?

14 　　MR. ROBERTSON:  The third party punchout partners,

15 Your Honor, their trading partners that they either have

16 informal agreements with or formal agreements with in which

17 they -- I think one of the intentions of the formal agreements

18 is we're going to do this jointly.  We're going to make a joint

19 effort, combine our products.

20 　　I asked Mr. Lohkamp, do you do that for the mutual

21 benefit of both companies.  He said absolutely.  We heard

22 evidence that the Lawson system controls the punchout process,

23 that they provide the protocols.  Mr. Lohkamp even called it

24 the handshake that lets you get there.  Dr. Weaver testified

25 you can't -- you don't even leave the Lawson system, and when

1373

1 you go to the website, there was that special URL that showed

2 you had never left the Lawson system, that you are not at a

3 commercial website.  You are at a website that has been

4 especially prepared for Lawson's customers using the

5 procurement punchout.

6 　　The customer has to say to Lawson, we want you to set

7 this up.  We'll tell you who our punchout partners are.  Lawson

8 then goes out, they either contract with them, or they make an

9 arrangement if the protocols work, and we actually demonstrated

10 the punchout process.

11 　　So the argument becomes, boils down to this:  Well,

12 when you finally punched out, but you never left the Lawson

13 system, you then can search content provided by the supplier,

14 for example.  But, of course, that's exactly why the whole

15 arrangement was set up, for their joint effort and mutual

16 benefit.

17 　　So we think, quite frankly, Your Honor -- there's a

18 recent decision called Akamai that came down from the Federal

19 Circuit perhaps two weeks ago, and it was a situation of joint

20 infringement, and we think if there were ever a situation that

21 joint infringement applied through a factual scenario, it is

22 this case.  This case is the poster child for joint

23 infringement because of the relationship that Lawson has with

24 its punchout trading partners.

25 　　You will remember, even when we were looking at the

1374

1 demonstration that Dr. Weaver did a punchout, to go out and get

2 the data and retrieve it, it still was branded with Lawson.

3 You were framed within a Lawson website, and as Dr. Weaver

4 said, you never left.

5 　　So you can't even do the punchout process without the

6 Lawson software.  That's the first step.  And then once you do

7 do it, you are there, and you are retrieving the data, and you

8 are putting it in your requisition, and you are building your

9 purchase order just as the claims described.

10 　　So that, Your Honor, I think is the only scenario in

11 which I would think the joint infringement could arise at all

12 if you even needed to go there, and I think in our papers we

13 would argue first that this is not a situation of joint

14 infringement, but even if it were, that it's been satisfied by

15 the evidence that's been presented here.

16 　　And so how do you induce that direct infringement

17 which I think we're in agreement is joint infringement?  Lawson

18 induces it by first providing the functionality in its punchout

19 software to do that.  Second, it induces it by providing their

20 customers with the guides, the implementation, the

21 installation, the services.  They provide all of that kind of

22 evidence is evidence that they are abetting and assisting.

23 　　So we think that the facts of this case, particularly

24 Dr. Weaver who went through, you will recall, that eight-step

25 protocol you need to do in order to set up this communication

1375

1 links, and no one has ever denied or challenged the fact that

2 it's Lawson that sets up this communication protocol and

3 permits this process to happen, and Mr. Lohkamp even conceded,

4 you can't do it without the Lawson procurement software.

5 　　So when you do that, you are inducing the direct

6 infringement by the customers performing those steps of the

7 method claims when they go through and they select catalogs

8 which Dr. Weaver showed in his demonstration.  They search

9 those catalogs, they match items, they build a requisition, and

10 they build and generate the purchase order.

11 　　THE COURT:  Thank you.

12 　　MR. ROBERTSON:  He showed how to do it both from an

13 internal catalog database and -- which Lawson can set up in the

14 customer's software, and an external catalog database which is

15 the punchout.

16 　　THE COURT:  Thank you.  Is there -- is this record

17 now complete on the issue of willful infringement?

18 　　MR. ROBERTSON:  Of what, sir?

19 　　THE COURT:  Is the record complete on willful

20 infringement?

21 　　MR. ROBERTSON:  I do not believe so.  I thought we

22 were going to reserve some of those things.

23 　　THE COURT:  What are you going to do and when are you

24 going to do it?

25 　　MR. ROBERTSON:  Well, I thought we had bifurcated

1376

1   willful infringement.  I contemplated that Your Honor might

2   want to have a short hearing, perhaps a half a day, as to

3   evidence on that.

4       THE COURT:  Could we use Monday or Saturday?

5       MR. McDONALD:  Let me go back and --

6       THE COURT:  Do you really have a case of willful

7   infringement here?

8       MR. ROBERTSON:  I think one of the things, Your

9   Honor -- certainly didn't contemplate that I was going to have

10  to put on evidence in this portion of the case because I agreed

11  to bifurcate that, but let me address that specifically.

12  Number one, Lawson --

13      THE COURT:  The point is, if you haven't -- when are

14  you going to put on the evidence of willful infringement, and

15  basically what is it going to be if it's not already in?  The

16  question is, what did you do?  Did you decide to put in what

17  you had and let me decide it?  We never did decide whether we

18  were going to have a hearing.  I was going to have to decide

19  the issue, but we never did decide how we were going to do it

20  unless my memory fails.

21      MR. ROBERTSON:  Your Honor --

22      THE COURT:  Do you have additional evidence on

23  willfulness that isn't in the record at this time?  That's all

24  I want to know.

25      MR. ROBERTSON:  Let me think.  I think there's

1377

1   evidence that Lawson had an opinion of counsel that it obtained

2   early on and refused to turn over that opinion and stood on the

3   privilege.  While there is not an adverse inference the jury

4   can draw --

5       THE COURT:  The jury doesn't draw that.  I'm drawing

6   it.

7       MR. ROBERTSON:  Well, I think if the Court wasn't

8   aware, there was an opinion early on that was given --

9       THE COURT:  Didn't you all agree I did willfulness?

10  Isn't that what you agreed?

11      MR. ROBERTSON:  Yes, sir.

12      THE COURT:  All right.  I wanted to make sure --

13      MR. ROBERTSON:  In addition to the evidence that

14  there's been nothing done by Lawson since they've been put on

15  notice of this lawsuit in May 2009, no redesign, no good

16  faith effort --

17      THE COURT:  Mr. Robertson, I'm not asking you to

18  argue.  I'm asking do you have any other evidence that you

19  haven't put on.  You tell me about willfulness.  You tell me

20  that there's an opinion of counsel that they declined to

21  produce and stood on the privilege.  Can the finder of fact

22  draw from that an inference of willfulness?

23      MR. ROBERTSON:  I think the finder of fact can

24  consider that in the totality of the circumstances which is the

25  test for willfulness.

1378

1       THE COURT:  Do you have any case that says that?

2      MR. ROBERTSON:  Your Honor, I'll have to go and

3   check.  One of my colleagues reminded me of a case that I have

4   not actually read and I don't want to represent to the Court.

5       THE COURT:  It's a good thing not to argue a case you

6   haven't read.

7       MR. ROBERTSON:  I didn't want to do that.

8       THE COURT:  Unless you want me to decide on the bases

9   of the cases I have read.

10      MR. ROBERTSON:  No, Your Honor.  In fairness, I came

11  here today to try and prepare to argue this.  I was not

12  thinking in terms of the representation of the Court what the

13  willfulness case should be.

14      I think you've heard some evidence that under the

15  totality of the circumstances, you could consider as being

16  evidence that would warrant a conclusion of willful

17  infringement.  I think there would be some additional evidence.

18  Right now what comes to mind--

19      THE COURT:  We'll deal with that later.  Thank you.

20      MR. ROBERTSON:  Do you need to hear any --

21      THE COURT:  No, thank you.  The motion did not relate

22  to willfulness, so I'm not going to deal with it.  I was just

23  asking you a question while you were standing up there.

24      MR. ROBERTSON:  Thank you.

25      MS. HUGHEY:  Your Honor, if I may, with respect to

1379

1   the issue of joint infringement, ePlus's counsel suggested that

2   it was a defense, and that's not the case.  ePlus always has

3   the burden of proof on the issue of infringement, and it can

4   pursue that burden of proof either through the direct

5   infringement --

6       THE COURT:  Ms. Hughey, what she said was, he's not

7   contending it's joint infringement, you are, saying that if it

8   was any kind of infringement it's joint infringement and you

9   win -- and he wins -- because you haven't any evidence of the

10  elements of it, I believe; is that right, Mr. Robertson, or did

11  I miss it?

12      MR. ROBERTSON:  My argument, Your Honor, was whether

13  it's direct infringement just by Lawson committing all the

14  steps or having the system, or whether it's joint infringement,

15  we win either way.

16      THE COURT:  I understand that, but what you said was

17  we don't think it's joint infringement, but even if it is, we

18  win.  The predicate of that sentence is, we don't think it's

19  joint infringement, and that's what I am trying to ascertain.

20      You said it was they who injected that question, the

21  defendants injected that issue in, and you don't think it's

22  joint infringement, but even if it is, you win.  Is that your

23  position or not?

24      MR. ROBERTSON:  That's our position, Your Honor.

25      THE COURT:  Okay, thank you very much.  Now you know

1468

1  back to me with "published" first meaning, to issue
2  (printed or otherwise reproduced textual or graphic
3  material) for sale, and (2) to make publicly or
4  generally known.  Those are the first two.  And then
5  there's a third one, to issue newspapers, books, etc
6  and then fourth is to have one's work published.
7       And that's very typical of these other
8  definitions.
9       THE COURT:  American Heritage, 4th edition,
10  says, No. 1, To prepare an issue (printed material).
11  For public distribution or sale.  (2) To bring to the
12  public attention, announce.
13       The Merriam Webster New Edition says, "To
14  make generally known, announce publicly."  Second one,
15  "To produce or release literature, information,
16  musical scores or sometimes recordings or art for sale
17  to the public."
18       The Pocket Oxford American Dictionary, did
19  y'all bring these with you or did you stimulate
20  business --
21       MR. McDONALD:  This was stimulated in
22  Richmond, Virginia, local economy, Your Honor.
23       THE COURT:  The first one is "Prepare and
24  issue a book, newspaper, piece of music for public
25  sale, print something."  (2)  "Print something in a

1469

1  book, newspaper or journal as to make it generally
2  known."  (3)  "Formally announce to read an edict or a
3  marriage ban."
4       MR. McDONALD:  That last one, I don't think
5  we're using that last one about marriage.
6       THE COURT:  I don't think that works, but
7  basically I think the way I've defined "published"
8  catches these, doesn't it?
9       MR. McDONALD:  The problem I have, Your
10  Honor, that I don't think it does is when you've got
11  to make generally known, I think that should be
12  publicly to be consistent with these as well as Dr.
13  Weaver and the experts.  So I would change the word
14  "generally" to "publicly."  And then we've got that
15  phrase "or to disclose," which doesn't have any sort
16  of a public or sale related aspect to it.
17       So I would say that should be eliminated
18  entirely from it.  I think it's very accurate to say
19  "published" simply means to make publicly known.
20       THE COURT:  I'll take those dictionaries, and
21  I'll give you back yours, but I'll just take all of
22  them and look at them and frame something.  I think
23  "disclosed" needs to be in there, but I'm not sure.
24       MR. ROBERTSON:  Your Honor, may I address
25  this "publicly" now a new term has been injected?  I

1470

1  think generally known was in several of the
2  dictionaries that you indicated.  I think that's more
3  appropriate.
4       Remember, "published" still has to be read in
5  context of the patent, and we're talking about
6  electronic data here.  So when you take electronic
7  data, and you put it in a vendor catalog database,
8  you're not making something publicly known, you're
9  just taking that data that has been made generally
10  known or disclosed by the vendor, and then you're
11  loading it into the database.
12       Now, who does that loading or how it's
13  modified in any way is not relevant to "generally
14  known" or "disclose."
15       Publicly now would suddenly become another
16  non-infringement gotcha that we've been talking about.
17       THE COURT:  Well, go ahead, Mr. McDonald.
18       MR. McDONALD:  Okay.
19       THE COURT:  Anything else?
20       MR. McDONALD:  Your Honor, just to be clear
21  as well, speaking of gotchas, as Mr. Robertson said,
22  basically, he's the one that's trying to turn this
23  into a gotcha.  I'm fine going to the jury on a fair
24  and ordinary meaning.  He's the one who is trying to
25  say, "I can't even present evidence anymore on these

1471

1  issues of how the accused database, the item master,
2  came into being."
3       These are clearly facts that are relevant
4  here.  What if the vendor was the one who had selected
5  the desired items and added the information and
6  deleted the items and modified?  Obviously, that would
7  be relevant.  So the fact that somebody else does it
8  is also relevant to the converse.
9       And so he's the one that's trying to do the
10  gotcha here and preclude us from even being able to
11  present our case to the jury here by saying none of
12  this evidence that Lawson wants to present is even
13  relevant here.  That's where the gotcha is coming in.
14  So Mr. Robertson is the one who keeps saying we
15  shouldn't use these claim constructions --
16       THE COURT:  Why should this come in into
17  evidence?  You want to argue that it's not a catalog
18  because the customer of Lawson in the instance where
19  it's using a legacy system, for example, has pulled
20  from a bunch of catalogs things that it put together,
21  and you flipped it into the system when you into the
22  Lawson system.  And somehow that information doesn't
23  constitute information that's published by a vendor
24  merely because it's gone through a relocation.
25       And that's not what the claim construction

1472

1   says.  And that's not a fair reading of the patent.

2   So maybe he's right that none of this comes in, that

3   to the extent it is relevant, it's only marginally

4   relevant, and it's too confusing to the jury to have

5   to sort through all of this who put the material into

6   the system, the structure that you all have

7   constructed, that is the Lawson system.

8        MR. McDONALD:  But we're talking about the

9   item master as being the thing that's being accused as

10  being multiple catalogs, Your Honor, and I think as a

11  fact matter, we should be able to show that doesn't

12  satisfy this definition.  The definition starts off by

13  talking about an organized collection.  That's the

14  noun here.  And then it goes on to say that's why it

15  has to be published by a vendor.  And that's very

16  consistent with the patent.  Any other way is

17  inconsistent.

18       THE COURT:  I'm going to tell you now that

19  you're not free to argue simply that -- you just

20  argued that the only thing that's covered by the claim

21  construction is a Sears catalog that is put into the

22  system.  And if that's what your theory is, you lose.

23  And I'm going to find that you lose as a matter of law

24  because that isn't what it's all about.

25       And I think if that's what you're trying to

1473

1   do, then I think the answer is that Rule 403 keeps

2   that whole line of evidence out.  If that's what

3   you're thinking, forget it, because it ain't going to

4   happen.  If you argue that in front of the jury, I'm

5   going to tell the jury that that isn't permissible and

6   I'll sustain a motion to strike it because it never

7   was intended to do that.

8        We may not have done the best job of claim

9   construction here.  I don't know.  But in any event,

10  whatever is going to happen is that we're not going to

11  convert this into something that it wasn't and is not

12  reasonably intended.

13       MR. McDONALD:  You have that Markman

14  transcript, and if you take a look at that, you'll see

15  that I was definitely talking about the issue that we

16  have to have a definition that's consistent with the

17  patent and consistent with the ordinary meaning of

18  catalog that will exclude something like a shopping

19  list or a list of products somebody buys instead of

20  something somebody sells.  That was all on the table

21  at the Markman.

22       And if we go too far the other way with the

23  definition, Your Honor, I think we start grabbing

24  things within the catalog definition that would not be

25  considered within the ordinary meaning.  It would be

1474

1   inconsistent --

2        THE COURT:  Everything that your customers

3   look for is something that a vendor sells because what

4   happens is when they use your system, your customer

5   goes to buy it from the vendor who is selling it to

6   them, and a requisition is made, a purchase order is

7   made, and it goes to the vendor, and that's a typical

8   sale, isn't it?  It's a sale purchase.  That's what it

9   is.

10       MR. McDONALD:  The point is what's a catalog

11  and what's not.  That's what I'm talking about, and

12  the shopping list is not a catalog.  If I come up with

13  a list of requisition items that I want to buy, that's

14  not a catalog.  That's not how these patents use that.

15  They call them requisitions.  They call them purchase

16  orders.  They call them something different from a

17  catalog.  And that's my concern that if we go too far

18  on reconstructing the construction, that it's going to

19  lead the jury to --

20       THE COURT:  You reconstruing the

21  construction, I think.  So anyway I think what I'm

22  going to do is instruct the jury.  And the question

23  then is:  On what the ordinary meaning is, do you know

24  of any case that says the Court can't instruct them on

25  what the ordinary meaning is?

1475

1        MR. McDONALD:  I'm not sure.  We'll have to

2   look for that, Your Honor.  I'm not aware of any

3   case at this point.

4        THE COURT:  I don't know why it wouldn't be

5   appropriate if there's a dispute about it.  And you're

6   offering Defendant's 371.  I assume you did it in good

7   faith believing that it was appropriate to do that.

8   So I think I'm going to give it.  I'm going to look at

9   these definitions, if you don't mind loaning me your

10  books for the evening.

11       Now, the real issue is:  Can you ask these

12  questions?  Why is it that this approach as shown in

13  item information changes, which I think Mr. Robertson

14  just read into the record in its entirety in the first

15  three blocks, I don't know that you read the last

16  three -- the last block.  It says, "Customer loads new

17  info into Lawson database."  And then it goes to item

18  location, item master, and vendor item.  I think

19  that's now the whole thing is in the record.

20       But what difference does it make about

21  whether the vendor changes the information to the new

22  electronic format?

23       MR. McDONALD:  Because we're showing the

24  distance between when this thing actually was anything

25  that even resembles a catalog at the vendor end and

1488

1  And there's also a case called SEB from the Federal

2  Circuit which has to do with the standard of intent

3  for the inducement infringement, which I understand

4  also includes a reckless disregard for the patent.

5      THE COURT:  I want you to give Ms. Haggard

6  the citations for those two cases, plus --

7      MR. ROBERTSON:  Let me be candid with the

8  Court.

9      THE COURT:  What is it?

10     MR. McDONALD:  Akamai.

11     THE COURT:  Alkamai?

12     MR. ROBERTSON:  Alkamai is how it's

13  pronounced.

14     THE COURT:  I can't pronounce it.  All right.

15  I want you to give her the cites, so I make sure I've

16  read those while I'm working on the instructions.

17     MR. ROBERTSON:  The Supreme Court has granted

18  a writ of certiorari with respect to this SAB case I

19  just referenced.  But the Federal Circuit just came

20  down with a case I think in the last week that said

21  that the pendency of a writ of certiorari has no

22  impact whatsoever on what the state of the law is.

23     THE COURT:  Why did the Federal Circuit feel

24  compelled to decide that?  I think that's been the law

25  forever.

1489

1      MR. ROBERTSON:  I think it was because one of

2  the litigants made the argument.

3      THE COURT:  I understood that to be the case

4  for as long as I've been practicing law.

5      MR. ROBERTSON:  All right.  Thank you, Your

6  Honor.

7      THE COURT:  All right.  Thank you all very

8  much.  Give the citations to her tonight so she can

9  print those out for me.  Give her the books and we'll

10  be ready to go.

11     Thank you very much.

12

13     (The proceedings were adjourned at 5:34 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1490

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE EASTERN DISTRICT OF VIRGINIA
3                RICHMOND DIVISION
4
5    --------------------------------------
6    ePLUS, INC.              : Civil Action No.
                              : 3:09CV620
7    vs.
8    LAWSON SOFTWARE, INC.     : January 13, 2011
                              :
9    --------------------------------------
10
11      COMPLETE TRANSCRIPT OF THE JURY TRIAL
12      BEFORE THE HONORABLE ROBERT E. PAYNE
13    UNITED STATES DISTRICT JUDGE, AND A JURY
14
    APPEARANCES:
15
    Scott L. Robertson, Esquire
16  Michael G. Strapp, Esquire
    Jennifer A. Albert, Esquire
17  David M. Young, Esquire
    Goodwin Procter, LLP
18  901 New York Avenue NW
    Suite 900
19  Washington, D.C.  20001
20  Craig T. Merritt, Esquire
    Christian & Barton, LLP
21  909 East Main Street
    Suite 1200
22  Richmond, Virginia  23219-3095
    Counsel for the plaintiff
23
24      Peppy Peterson, RPR
          Official Court Reporter
25      United States District Court
```

1491

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1492

```
              P R O C E E D I N G S
1
2
3        THE CLERK:  Civil action number 3:09CV620, ePlus,
4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
6    Mr. Michael G. Strapp represent the plaintiff.
7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin Stoll-DeBell, and Mr. William D. Schultz represent
9    the defendant.  Are counsel ready to proceed?
10       MR. ROBERTSON:  Plaintiff is, Your Honor.  Thank you.
11       MR. McDONALD:  Yes, Your Honor.  Thank you.
12       THE COURT:  Do you need to see me about something
13   before the jury comes in?
14       MR. ROBERTSON:  Yes, Your Honor.  You had asked us to
15   take a look at those appendices with respect to our motion on
16   this implementation on a customer-by-customer basis.
17       THE COURT:  Yeah.
18       MR. ROBERTSON:  We have done that, and the reason I
19   raised it, Your Honor, is one of the witnesses that's going to
20   be called this morning is Ms. Hannah Raleigh.  You may recall
21   she testified once already.  She is involved with Lawson
22   Professional Services that has to do -- that has responsibility
23   for implementation of the Lawson software products, and we're
24   concerned that she's going to be getting into areas in and
25   presenting testimony that Lawson is going to contend are
```

1493

```
1    defenses to infringement later that are directly implicated by
2    that interrogatory number 24.
3        What I have provided Your Honor with is the
4    appendices that were referenced in the answers to the
5    interrogatories, the transcript from the March 26th hearing,
6    telephonic hearing on the motion to compel, and the relevant
7    citations to the transcript where this issue came up, and I do
8    want to continue to press the motion, Your Honor.
9        We do think that the answers, even with the
10   appendices, were nowhere near what was called for and what Your
11   Honor directed Lawson to do in response to that.
12       If I might just, Your Honor, you may recall that
13   these appendices that are being referenced were provided to
14   ePlus three months before the motion to compel was presented,
15   and the appendices do not respond to the interrogatory as
16   represented by counsel for Lawson.
17       Indeed, if you look at some of the appendices, for
18   example --
19       THE COURT:  Is A appendix A?
20       MR. ROBERTSON:  Yes, sir.  Under the tab December 23,
21   2009, response to interrogatory number -- yeah, A is one.
22       THE COURT:  March 26th is the first tab, the
23   transcript, and then there's an A behind that.  Is that
24   appendix A or not?
25       MR. ROBERTSON:  I believe appendix A, Your Honor, is
```

1506

1  should I try this, should I not try this, I'm having some
2  issues here, can you help us out, and we'll take a look at
3  that.  Those are always phone calls or site visits, sometimes
4  they come up and see us.
5  Q  I'm going to ask you a couple of questions about Lawson
6  generally.
7  A  Sure.
8  Q  What kinds of products does Lawson sell?
9  A  Software and then services to help service that software
10  and then clearly the maintenance.
11  Q  Does Lawson sell computer systems?
12  A  No, it does not.
13  Q  Does Lawson sell any kind of computer hardware?
14  A  No, it does not.
15  Q  I'm going to ask you a few questions about Lawson system
16  foundation.
17  A  Sure.
18  Q  At a high level, what is LSF?
19  A  Lawson system foundation, it is a basis for the 4GL,
20  Lawson 4GL applications such as purchase order, requisitions or
21  RQ, and inventory control.  They need that in order to operate,
22  but not only do they need it to operate it, they need it in
23  order to actually be compiled.
24      The programming language by itself my developers actually
25  work in is an extension of COBOL but doesn't always necessarily

1507

1  look like COBOL.  The program files, when you look at it, is
2  completely dispersed through a variety of things, and LSF pulls
3  it all together into an actual COBOL program.  We don't
4  actually use that.  That's a machine that does that.
5  Q  Other than -- are Lawson software modules other than the
6  accused products in this case also hosted on top of LSF?
7  A  That is correct.
8  Q  Can you give me a few examples of modules that are hosted
9  on LSF other than the accused products in this case?
10  A  When I talked about the financial suite and the HR suite
11  --
12      THE COURT:  Why are we getting into this?  It's hard
13  enough to follow this technical material without getting into
14  something that isn't an issue.  Let's just stay with what's at
15  issue and get right to the point, okay?  That doesn't make any
16  difference what else is hosted.
17      MS. STOLL-DeBELL:  Well, I think it goes to the fact
18  that LSF -- what are the accused products and that LSF works
19  with things other that.
20      MR. ROBERTSON:  I'll stipulate that LSF works with
21  the other products as long as you stipulate it works with the
22  accused products.
23      MS. STOLL-DeBELL:  I think we do.
24      THE COURT:  Do you or not?
25      MS. STOLL-DeBELL:  We do.

1508

1      THE COURT:  Okay, done.  Now we don't need to talk
2  about anything else.  Stay with the accused products.
3  Q  I'm going to ask you, or I'm going to turn now to the item
4  master database --
5  A  Sure.
6  Q  -- and ask you some questions about that.
7  A  Uh-huh.
8  Q  When Lawson sells its software to its customers, is there
9  any item data in the item master database?
10  A  No, there's not.
11  Q  Why does Lawson sell it that way, with no item data in it?
12  A  Essentially we don't know what the customers are going to
13  want to have in the database.  It's configurable in a variety
14  of ways.
15      THE COURT:  Essentially, you don't know; that's the
16  answer.  Keep the question and the answer -- and the best way
17  to keep an examination moving is for you to take control of the
18  questions and not be -- we don't need a general dissertation of
19  things.  We need to have the questions asked and answered.
20  Q  Would item master work if it included only items from a
21  single vendor?
22  A  Yes.
23  Q  Would item master work if it included only items that were
24  already owned by the customer?
25  A  Yes.

1509

1  Q  Can item master be stored in a local database at the
2  customer's location?
3  A  Yes, it may.
4  Q  Can item master include item records for items owned by
5  the customer?
6  A  Yes.
7  Q  Can item master records include a customer's part number?
8  A  Yes, it can.
9  Q  Can item master records include the manufacturer or
10  supplier's catalog or part number?
11  A  Yes.
12  Q  Do item master records include a default unit of measure?
13  A  Yes, it does.
14  Q  Do item master records include an item description?
15  A  Yes, it does.
16  Q  Do item master records include the quantity of items
17  available in the customer-owned inventory?
18  A  For stock items, yes.
19  Q  Do item master records include price?
20  A  Yes.
21      MS. STOLL-DeBELL:  If we can go to PX-361.
22      MR. ROBERTSON:  Your Honor, I'm going to object.
23  This is a demonstrative that Dr. Weaver did that was never
24  introduced.  This witness -- so it's not in evidence.
25      THE COURT:  Could I see it?

1526

1	There's many other fields that are in the item master.
2	We've talked about some of them.  You know, catalog number, the
3	vendor's part number or its number, the manufacturer number,
4	clearly those came from the -- the manufacturer came from the
5	manufacturer, and the vendor number came from the vendor, and
6	those were in their catalogs at some point in time.  The
7	description generally --
8	THE COURT:  Those did come from a vendor?
9	THE WITNESS:  What did come from --
10	THE COURT:  Those that you just testified to --
11	THE WITNESS:  Did come from the vender, but --
12	THE COURT:  So they were published by a vendor?
13	THE WITNESS:  Those particular items, right.
14	THE COURT:  Thank you.
15	THE WITNESS:  Where I was differentiating, she was
16	saying the item master, that, in itself, all the fields were
17	not, and that's why I was really struggling with the yes or no,
18	Your Honor.
19	THE COURT:  I know, but the jury have a right to
20	understand what people's opinions are before they start talking
21	about them.
22	THE WITNESS:  I appreciate that.
23	THE COURT:  Then they understand what they're being
24	told.
25	Q	Do a lot of fields come from the customer in item master?

1527

1	A	Most of the fields.
2	MR. ROBERTSON:  Object to the form of the question;
3	vague, ambiguous as to a lot of fields.
4	Q	Do most of the fields in item master come from the
5	customer?
6	MR. ROBERTSON:  Same objection, Your Honor.  I mean,
7	if we want to be specific, there's hundred of fields.
8	Q	Mr. Christopherson, are there hundreds of fields in item
9	master?
10	A	No, there's not.
11	Q	How many fields are in item master?
12	A	I don't recall, but there's under 100.
13	THE COURT:  So there are a lot, I mean between 0 and
14	100?
15	THE WITNESS:  Yes, Your Honor.
16	THE COURT:  Is it closer to a hundred than it is to
17	zero, or close to zero than it is to a hundred?
18	THE WITNESS:  It's probably pretty close to 50
19	roughly.
20	THE COURT:  So there are 50.  You can handle that on
21	cross-examination, Mr. Robertson.  Overruled.
22	MR. ROBERTSON:  Thank you, Your Honor.
23	Q	Would you say a majority of those 50 come from the
24	customer?
25	A	I would say from the customer it is clearly a majority.

1528

1	Q	Do Lawson's customers maintain the item master database in
2	private?
3	A	Yes.
4	MR. ROBERTSON:  Objection, relevancy, Your Honor.
5	MS. STOLL-DEBELL:  Your Honor, it goes to --
6	THE COURT:  What does that have to do with anything?
7	MS. STOLL-DEBELL:  It goes to whether it's
8	published by a vendor, whether it meets your definition --
9	THE COURT:  No, I don't think so.  Objection
10	sustained.  Disregard the answer, please.
11	MS. STOLL-DEBELL:  Can we go to, Bill, PX-363, and
12	I'm going to want to see page that ends in 942297.
13	MR. ROBERTSON:  I'm sorry, Ms. Stoll-DeBell, what
14	page?
15	THE COURT:  What exhibit are we on?
16	THE CLERK:  363.
17	MS. STOLL-DEBELL:  Actually I need to get you a
18	better page.
19	Q	Let's go to the page ending in 942297.
20	THE COURT:  297, the last three digits?
21	MS. STOLL-DEBELL:  Yes.
22	Q	What is this, Mr. Christopherson?
23	A	That is the login screen to get into the Lawson system
24	requiring a user name and a password.
25	Q	So when a customer or when anyone wants to use Lawson

1529

1	software, do they need to have a user name and password?
2	MR. ROBERTSON:  Objection, Your Honor, relevancy.
3	MS. STOLL-DEBELL:  It goes to his opinion, support
4	for his opinion as to whether item master is -- meets the
5	definition of catalog as defined --
6	THE COURT:  I don't understand why, the fact that
7	somebody needs a password to get in and use it.
8	MS. STOLL-DEBELL:  I think it goes to whether item
9	master is made generally known or not.
10	THE COURT:  The issue is not whether item master is
11	made generally known.  It's whether the things that are listed
12	in item master are made generally known, isn't it?
13	MS. STOLL-DEBELL:  Well, I think --
14	THE COURT:  The issue is what's in the item master,
15	not whether item master is made generally known as I understand
16	the way you all have tried the case, so objection sustained.
17	Q	For a user to gain access to see what information is in
18	item master, do they need to use login credentials as shown on
19	this screen?
20	MR. ROBERTSON:  Same objection, Your Honor.
21	THE COURT:  It may be admissible for a different
22	purpose.  Besides that, Dr. Weaver has already testified about
23	putting in the user name that says Lawson, and then he said, we
24	put in our password.  So it may be appropriate, but it's not
25	appropriate for -- the previous question wasn't.  All right,

1554

CHRISTOPHERSON - DIRECT     1554

1  That's not a proper relevant line of questioning.
2      MS. STOLL-DeBELL:  I'm asking him to comment
3  on how the software works.
4      THE COURT:  Your asking him to comment on
5  what another witness did.  So what's the difference
6  between asking him -- can I ask another witness does
7  he believe the other witness was telling the truth?  I
8  can't ask that, can I?
9      MS. STOLL-DeBELL:  No.
10     THE COURT:  If you're testifying, I can't ask
11  you do you believe that witness A was telling the
12  truth, can I?
13     MS. STOLL-DeBELL:  No, but I think this is
14  different because we're talking about Lawson's accused
15  software in this case.  And Mr. Christopherson does
16  know how that software works.  He's worked with it for
17  nine years.  So I'm asking him about that.
18     THE COURT:  No, you're asking him about what
19  somebody else did.
20     MS. STOLL-DeBELL:  Your Honor, I'm asking him
21  about what he saw Dr. Weaver do with the software he
22  works with.
23     THE COURT:  I know.  Your asking him to
24  comment on Dr. Weaver's testimony, right?
25     MS. STOLL-DeBELL:  What he saw the software

1555

CHRISTOPHERSON - DIRECT     1555

1  do.  What he saw Dr. Weaver do with the software in
2  this case.
3      THE COURT:  Objection sustained.  Please
4  disregard the answer.  One witness can't comment upon
5  what another witness has testified to in that fashion.
6  BY MS. STOLL-DeBELL:
7  Q  I'm going to ask you some questions about UNSPSC
8  codes.  Okay?
9  A  Okay.
10 Q  Are UNSPSC codes used to categorize similar
11 products for use with different kinds of analysis?
12     MR. ROBERTSON:  Objection.  Lack of
13 foundation.
14     MS. STOLL-DeBELL:  I can lay a foundation.
15     THE COURT:  All right.
16 BY MS. STOLL-DeBELL:
17 Q  Do you know what UNSPSC codes are?
18 A  Yes.
19 Q  Do you work with them as part of your work for
20 Lawson software?
21 A  Yes.
22 Q  Does Lawson Software have the capability of using
23 UNSPSC codes?
24 A  Yes.
25 Q  Are UNSPSC codes used in Lawson Software to

1556

CHRISTOPHERSON - DIRECT     1556

1  categorize similar products to be used for different
2  kinds of analysis?
3  A  Yes.
4  Q  Do they help companies analyze spending patterns?
5  A  Yes.
6  Q  Do UNSPSC codes identify generally equivalent
7  items?
8      MR. ROBERTSON:  Objection, Your Honor.  I
9  think that calls for an opinion, and it also intrudes
10 on an opinion with respect to infringement issues.  So
11 it calls for a legal conclusion.
12     THE COURT:  It calls for expert opinion, did
13 you say, or legal conclusion or what?
14     MR. ROBERTSON:  It calls for an expert
15 opinion.
16     THE COURT:  Your voice dropped off right
17 there at the end and I didn't hear it.
18     MR. ROBERTSON:  I apologize, Your Honor.
19 Yes, it's seeking a legal opinion from this witness
20 and it calls for a legal conclusion in this case.
21     THE COURT:  A legal opinion?  Why is it a
22 legal opinion?
23     MR. ROBERTSON:  Excuse me.  I misspoke.  It
24 calls for an expert opinion, Your Honor, and it seeks
25 a legal conclusion.

1557

CHRISTOPHERSON - DIRECT     1557

1      THE COURT:  All right.  And the question was?
2      MS. STOLL-DeBELL:  The question was, Do
3  UNSPSC codes identify generally equivalent items.  I
4  don't think it calls for an expert opinion.  I'm just
5  asking him a fact about whether these codes categorize
6  generally equivalent items.  It's not an expert
7  opinion.
8      THE COURT:  It's a lay opinion.  So you're
9  asking him whether in his opinion that's what they do?
10     MS. STOLL-DeBELL:  Yes.
11     THE COURT:  Why is his opinion relevant?
12     MS. STOLL-DeBELL:  Because he works with the
13 software.  The software uses these codes.  And so he
14 can talk about what the codes do.
15     THE COURT:  You can ask him his opinion as a
16 lay person what it does.  It's up to the jury to
17 decide what weight to give to the opinion.
18     MS. STOLL-DeBELL:  Okay.
19 BY MS. STOLL-DeBELL:
20 Q  Do you understand or do you want me to ask it
21 again?
22 A  Will you ask the question again?  I think it's a
23 yes or no.
24 Q  Okay.  It might be.  In your lay opinion, do
25 UNSPSC codes identify generally equivalent items?

1558

CHRISTOPHERSON - DIRECT 1558

1 A No.

2 Q Why not?

3 A They are structured in a way that it's much like a

4 grocery store, if you would. It kind of identifies

5 the aisle that you first are headed down. You're

6 heading down perhaps the produce aisle. And that's at

7 the top level, maybe even the first two digits or the

8 first four digits, and as your get further down, let's

9 take produce, for example. Maybe you're in the

10 vegetable area and eventually you end up with the

11 tomatoes.

12 When you get down to the fourth level, the

13 tomatoes, maybe they are the same. Maybe they are not

14 equivalent, the same. But there's other examples of

15 codes.

16 THE COURT: You mean it identifies Roma

17 tomatoes and Hanover tomatoes and Fairfield tomatoes,

18 and they are not generally equivalent; is that what

19 you're saying?

20 THE WITNESS: They may not be, Your Honor.

21 THE COURT: Okay.

22 BY MS. STOLL-DeBELL:

23 Q Mr. Christopherson, do you have an example of a

24 UNSPSC code that we can show the jury to put this in

25 some context?

1559

CHRISTOPHERSON - DIRECT 1559

1 A Yes, I do.

2 MS. STOLL-DeBELL: Bill, can you pull up

3 Plaintiff's Exhibit 32. And can you go to page ending

4 in 0105.

5 THE COURT: Now you are getting him to give

6 expert testimony on UNSPSC codes. You're asking him a

7 lot of other questions about it other than what was

8 the basis for his opinion.

9 This is what I think. I don't think it does

10 generally equivalent because he thinks tomatoes aren't

11 the same. That's his business. That's his opinion.

12 But now you're moving into another area, and I think

13 this is what Mr. Robertson's objection may have been

14 to. And if that's what it is --

15 MS. STOLL-DeBELL: We don't know if there's a

16 UNSPSC for tomatoes. I have no idea if there is, if

17 that's what the level is.

18 THE COURT: He knows that.

19 MS. STOLL-DeBELL: So I'm asking him, this is

20 just a list of codes, actual codes, and what they are.

21 I'm just going to pull it up and ask him to answer the

22 question in the context of a real code with a real

23 description as opposed to tomatoes.

24 THE COURT: I think we've gone as far as we

25 need to go. He's given the basis for his opinion, his

1560

CHRISTOPHERSON - DIRECT 1560

1 lay opinion, otherwise he's getting into expert

2 opinion. So let's just go ahead and do something

3 else. He wasn't identified as an expert. He hasn't

4 done a report on those codes. So let's go.

5 BY MS. STOLL-DeBELL:

6 Q Okay. I'm going to ask you some questions about

7 Punchout.

8 A Okay.

9 Q And I'm going to ask that you put up PX 101.

10 Actually, can you go to page ending in 1265. What is

11 this? What does this show?

12 A This shows RSS running and they have selected the

13 Punchout options.

14 THE COURT: I think the more basic question

15 is: What's the whole exhibit? Is this something that

16 Lawson produced?

17 MS. STOLL-DeBELL: Yes.

18 THE COURT: Mr. Christopherson, is this a

19 document Lawson generated?

20 THE WITNESS: It's actually a joint one

21 between Mr. Lohkamp and then also one of our

22 customers. A power point.

23 THE COURT: A presentation?

24 THE WITNESS: Yes.

25 THE COURT: In that presentation on that page

1561

CHRISTOPHERSON - DIRECT 1561

1 what's going on?

2 THE WITNESS: On that particular one, they

3 are showing a Punchout running or they are starting

4 the Punchout application inside of the RSS.

5 BY MS. STOLL-DeBELL:

6 Q So in this screen shot here, we're looking at

7 Lawson Software actually running this page; is that

8 correct?

9 A Can we highlight the top because it's a bit fuzzy?

10 I would actually like to see the URL.

11 Based on that, that's actually the -- the key is

12 you get the Trinity Health Organization. So that

13 would be actually the customer's website that the

14 screen shot is taken from.

15 Q Okay. Is the screen shot of Lawson's RSS

16 software?

17 A Yes.

18 Q Is it showing the Punchout icons that you can

19 select as part of Lawson's Punchout product?

20 A At that particular customer site, yes.

21 THE COURT: At what did you say?

22 THE WITNESS: At that customer site, yes.

23 THE COURT: Okay.

24 BY MS. STOLL-DeBELL:

25 Q And then there's that red box that says select the

1590

1  Q  Does that refresh your recollection that this new
2  functionality was added with respect to 8.0.3 when
3  this release note came out?
4  A  This reflects -- it does help refresh my memory
5  about these particular release notes, yes.
6      THE COURT:  That wasn't the question.  The
7  question was:  Does it refresh your recollection that
8  the new functionality has been added to electronically
9  load a vendor file which contains vendor item, unit of
10  measure, and unit of price information into the
11  purchase order application?  Does it refresh your
12  recollection on that point?
13     THE WITNESS:  Yes, it does.
14     THE COURT:  All right.  And did it?
15     THE WITNESS:  Did it do what?
16     THE COURT:  Did it do what it said in that
17  first sentence that you've been talking about?
18     THE WITNESS:  Yes, it did, Your Honor.
19     THE COURT:  All right.  Let's go.
20  BY MR. ROBERTSON:
21  Q  The next bullet point says, Item 3 identifies how
22  a Lawson item number should be created when adding the
23  catalog item to the item master.  Do you see that?
24  A  Yes.
25  Q  Those are the terms you used, the catalog item,

1591

1  isn't that right, when you made this new release note
2  for Version 8.0.3?
3  A  That's a term that was used by the technical
4  writer.
5  Q  You're not trying to run away from "catalog," are
6  you, sir?
7  A  No.  You did ask me "did you use that term," and I
8  did not use that term.
9  Q  I'm sorry.  It was an indefinite pronoun.  Did
10  Lawson use "catalog item" when it did these release
11  notes?
12  A  Yes, it did.
13  Q  On this import process?
14  A  Yes.
15  Q  It's the vendor that are provides the item catalog
16  in a CSV format; is that right?
17  A  That's correct.
18  Q  The vendor discloses or makes known that item
19  information in that CSV format, correct?
20  A  Discloses to whom?
21  Q  The customer.
22  A  To the customer, yes.
23  Q  And Lawson in this vendor import agreement process
24  calls that vendor information "item catalog
25  information," right?

1592

1  A  That's correct.
2  Q  And you would agree with me that that item catalog
3  information disclosed by the vendor or the supplier
4  through a vendor agreement import process ends up in
5  the item master, correct?
6  A  Say that again.
7  Q  Yes.  The vendor or the supplier who provides this
8  item catalog information to the customer can be
9  imported through this process we're talking about
10  here, this vendor agreement import, into the item
11  master?
12     MS. STOLL-DeBELL:  Objection to form of the
13  question.  It's unclear.
14     MR. ROBERTSON:  I'll rephrase, Your Honor.
15     THE COURT:  All right.
16     MS. STOLL-DeBELL:  I think he talked about a
17  supplier being loaded in.
18     MR. ROBERTSON:  I'll rephrase the question.
19  BY MR. ROBERTSON:
20  Q  The vendor that has provided the catalog item
21  information in a CSV format ends up through this
22  process in the item master; isn't that right?
23     MS. STOLL-DeBELL:  Objection.  The vendor --
24  the question is unclear.
25     THE COURT:  Are you asking whether the vendor

1593

1  ends up in the item master?
2      MR. ROBERTSON:  No.
3      THE COURT:  That's what her objection is and
4  I think it's well taken.
5      MR. ROBERTSON:  Let me rephrase then.
6      THE COURT:  It's the item that ends up there,
7  I think.
8  BY MR. ROBERTSON:
9  Q  The vendor provides the item catalog information
10  that ends up in the item master; isn't that right?
11  A  That is some of the information that ends up
12  there.
13  Q  Why don't you take a look at this vendor import
14  price agreement again.  Let me see if I can refresh
15  your recollection on the process.  If you would look
16  at the page that ends 428.
17  A  Sorry about that.  I was in the wrong document.
18  Q  That's all right.  Take your time.  Do you see
19  that page is entitled, Vendor agreement import?
20  A  That's correct.
21  Q  And in the first box, it says, Vendor provides
22  item catalog in CSV format.  Do you see that?
23  A  That's correct.
24     MS. STOLL-DeBELL:  Your Honor, he hasn't
25  asked him if this refreshes his recollection, and the

1594

1  witness has already testified that he hasn't seen this
2  document before.
3      MR. ROBERTSON:  I was just about to ask that
4  question since I just directed him to it.
5      THE COURT:  All he said is that's what it
6  says.
7      MS. STOLL-DeBELL:  He should ask him that
8  before he reads from the document then ask the
9  witness to testify.
10     MR. ROBERTSON:  I had to use the document to
11 refresh the witness' recollection.
12     THE COURT:  Yes, you can.  Objection to that
13 part of the process is overruled.
14 BY MR. ROBERTSON:
15 Q  So it says here --
16     THE COURT:  Just ask him.
17 Q  Does this refresh your recollection that the
18 vendor provides item catalog in CSV format?
19 A  Yes.
20 Q  When you were talking about your ETL process, one
21 of the things you talked about was an extraction.  Do
22 you recall that?
23 A  Correct.
24 Q  You said you could have a CD or a DVD and you even
25 said a flat file, and that's when you identified the

1595

1  term CSV, correct?
2  A  Yes.
3  Q  Can you tell the jury again what a CSV file is?
4  A  CSV is basically a comma separated values.
5      THE COURT:  C-o-m-m-a?
6      THE WITNESS:  Yes.
7  Q  And those values that are being separated is data
8  with respect to the catalog item; isn't that right?
9  A  It starts out that way, yes.
10 Q  And that was disclosed or made known to the
11 customer by the vendor, right?
12 A  Correct.
13 Q  And in this page that we're looking at here now,
14 428, you'll see that there is a series of arrows
15 pointing to other boxes, and at the very end there's a
16 database, I believe.
17    Would you agree with me that that's what's being
18 characterized there?
19 A  Some sort of a data repository, yes.
20 Q  In there, it says, Create item master vendor item
21 records, do you see that?
22 A  Correct.
23 Q  So this through this chart, Lawson is showing a
24 customer how this vendor item catalog information that
25 it disclosed or made generally known ends up in this

1596

1  database that is creating the item master and
2  containing vendor item records, correct?
3  A  At a very high level, yes.
4  Q  And in this imported file, which is this comma
5  separated value format, there are certain required
6  fields, correct?
7  A  That's correct.
8  Q  One of the required fields is a vendor item
9  number; isn't that right, sir?
10 A  Correct.
11 Q  And one of the required fields is a vendor item
12 description, correct?
13 A  Correct.
14 Q  And one of the required fields is a unit of
15 measure; isn't that right?
16 A  Correct.
17 Q  And one of the required fields is a unit price;
18 isn't that right?
19 A  Correct.
20 Q  If you turn to the page that ends 431, there are a
21 number of fields there.  Are you comfortable now with
22 this exhibit that it is describing the vendor import
23 price agreements at a very high level?
24 A  It appears to be, yes.
25     MR. ROBERTSON:  Your Honor, then I would move

1597

1  admission of this document.
2      THE COURT:  Any objection?
3      MS. STOLL-DeBELL:  No.
4      THE COURT:  All right.  It's admitted as
5  what?
6      MR. ROBERTSON:  I think it's Plaintiff's
7  Exhibit No. 521.
8      THE CLERK:  521?
9      MR. ROBERTSON:  Yes, sir.
10     (Plaintiff's Exhibit No. 521 is admitted into
11 evidence.)
12 BY MR. ROBERTSON:
13 Q  If you will turn to the page -- actually, why
14 don't we, now that it's admitted, let's go back and
15 take a look at that page I was talking about, which
16 ends with the Bates label 428.
17 A  Okay.
18 Q  So we've agreed that this item catalog information
19 is disclosed or made known by a vendor.  That's the
20 first box.  And I understood you to agree with me that
21 this sort of barrel-shaped thing at the bottom, that's
22 a database, correct?
23 A  Correct.
24 Q  So you go through phase 1 where the Lawson
25 Software reads the CSV file from the vendor to create

1598

1    a vendor agreement, correct?

2    A  That's correct.

3    Q  And we go through this phase 2, mark or unmark a

4    subset of vendor items for inclusion in the vendor

5    agreement, right?

6    A  That's correct.

7    Q  If it's a new item, it goes over and it's

8    indicated as yes to phase 3, import marked vendor

9    items for inclusion on vendor agreement, correct?

10   A  That's correct.

11   Q  And then it ends up in the item master there where

12   it says, Create item master vendor item records,

13   right?

14   A  That's correct.

15   Q  Let's go to the page we talked about that has

16   required fields which ends at 430.

17   A  Ends at 430?

18   Q  The Bates label that ends with 430, sir.  Now,

19   it's talking about what actually was imported in that

20   file, right?  I asked you about whether these were

21   required fields.

22   A  It could.  I've not seen this before, so give me a

23   chance to look at it.  You've obviously had that

24   chance.

25   Q  That's fair.

1599

1    A  Yes.  Okay.

2    Q  Just confirm for us that you agreed with me when I

3    asked you whether all four of these things were

4    required fields, correct?

5    A  Correct.

6    Q  If you turn to the next page, there's additional

7    fields, isn't there?

8    A  That's correct.

9    Q  One of the fields in this importing vendor

10   catalogs into the item master is, in No. 2, a vendor

11   item description.  Do you see that?

12   A  Correct.

13   Q  And it's described as the vendor's item

14   description, right?

15   A  That is correct.

16   Q  That is who disclosed or made generally known that

17   description, right?

18   A  That's correct.

19   Q  The next one is a vendor item number.  Do you see

20   that, number 3?

21   A  Uh-huh.

22   Q  It's the vendor identification code for the item;

23   isn't that right?

24   A  That's correct.

25   Q  The vendor made generally known or disclosed that

1600

1    information when it provided this catalog data,

2    correct?

3    A  That's correct.

4    Q  The next one is UOM, do you see that, sir?

5    A  Correct.  Yes, I do.

6    Q  That's the unit of measure, right?

7    A  That is, yes.

8    Q  That's one of the required things the vendor had

9    to do, right?

10   A  Yes.

11   Q  The next one is the item cost.  Do you see that?

12   A  Yes, I do.

13   Q  That's also one of those required things that the

14   vendor had to make known or generally available to the

15   customer in order for this to be loaded into the item

16   master, correct?

17   A  Correct.

18   Q  The next one is a Lawson item number, okay?  Do

19   you see that?

20   A  Yes.

21   Q  So now Lawson can create its own item number for

22   that, right?

23   A  Correct.

24   Q  But you can also have a field for a universal

25   product code, correct?

1601

1    A  Correct.

2    Q  You can also have a field for stock-keeping units;

3    isn't that right?

4    A  Correct.

5    Q  Go down to No. 12.  Do you see there they have

6    manufacturer item number?

7    A  Yes, I do.

8    Q  That's also information the vendor can provide

9    that can then be imported into the item master,

10   correct?

11   A  That's correct.

12   Q  And talked a little about these UNSPSC codes?

13   A  Correct.

14   Q  No. 16 talks about the -- actually, let me

15   rephrase.  You're familiar with that UNSPSC code,

16   right?

17   A  Right.

18   Q  It's a hierarchy to drill down to try and identify

19   products, correct?

20   A  Correct.

21   Q  And yesterday I asked you if that could be used in

22   order for cross-referencing products, and I think you

23   agreed with me.  Do you mean that?

24   A  That was not yesterday.  Two days ago, but yes.

25   Q  Okay.  Sorry.  They're starting to blur together.

1602

1 I appreciate that.

2 It also has a field for the UNSPSC family.  Do you

3 see that?

4 A  Correct.

5 Q  Now, if you turn to the next page.  There's a

6 black box around those four required fields there.  Do

7 you see that?

8 A  Correct.

9 Q  So what's being emphasized here is this black box.

10 These are the required fields, but all these other

11 fields are available, right?

12 A  Fair.  We don't understand the content, but that

13 appears to be it, yes.

14 Q  But these are the fields that are available in

15 this import process; isn't that right?

16 A  These are the fields that are available?

17 Q  That can be filled with catalog item data?

18 A  These are for the fields, yes.

19 Q  Why don't you turn to the next page.

20 THE COURT:  Wait a minute.  Is everything

21 listed on that page an available field?

22 THE WITNESS:  Correct.

23 THE COURT:  Including the four that are

24 bracketed.

25 THE WITNESS:  Yes.

1603

1 BY MR. ROBERTSON:

2 Q  I think you said earlier when we were talking

3 about -- I think I made an objection as to what fields

4 we were talking about.

5 A  Sure.

6 Q  And the Court asked the question:  Are they

7 between 0 and 100?

8 A  Right.

9 Q  These are the fields we're talking about, right?

10 A  Absolutely.

11 Q  Well, the next page that's now ending with 433

12 also has a field that can be completed for UNSPSC

13 class, right?

14 A  Correct.

15 Q  And then the next field that can be completed is

16 for UNSPSC commodity, right?

17 A  That's correct.

18 Q  If you drop down a little bit, there's a number of

19 user defined alpha fields.  Do you see that?  That's

20 on 24 through 28 are user defined alpha fields,

21 correct?

22 A  Uh-huh.

23 Q  If you look over, it says, This is a client

24 defined alphanumeric field.  Do you see that?

25 A  Yes, I do.

1604

1 Q  So alphanumeric means you can use the alphabet to

2 describe something or identify it or you can use

3 numbers, right?

4 A  Correct.

5 Q  You can use both?

6 A  Correct.

7 Q  There are at least five available user defined

8 fields for that purpose isn't that right?

9 A  For alphanumeric, yes.

10 Q  One of the things I can put in that field, isn't

11 it, sir, is the vendor name?

12 A  You could put the vendor name there, yes.

13 Q  If I put the vendor name in there, I come search

14 in the Lawson system by vendor name; is that right?

15 A  You're searching for the alpha field.

16 Q  If I'm searching in that alpha field, and it has

17 the vendor name, I could search by vendor name,

18 correct?

19 A  You would get back those entries, yes.

20 Q  Those vendors?

21 A  Yes.

22 Q  That I put in that user defined field?

23 A  Correct.

24 Q  Could you just go to the page that ends with 437.

25 That actually is identifying this vendor price

1605

1 agreement import system as PO 536, which you indicated

2 was the catalog load, right?

3 A  Correct.

4 Q  Why don't you go to the second to last page of

5 what is now Plaintiff's Exhibit 521.

6 A  Bates number on that?  477?

7 Q  477, yes, it is.

8 A  Okay.

9 Q  Do you see there's referenced at the bottom --

10 actually, I'm sorry.  Let me just start over and lay a

11 better foundation.  This is a screen shot; is that

12 right?

13 A  Yes.

14 Q  And it's at a web address, an URL, of

15 HTTP://support.lawson.com, correct?

16 A  That's correct.

17 Q  That's a Lawson website?

18 A  Yes.

19 Q  And we're looking here at a page on the Lawson

20 website for customer support?

21 A  That's correct.

22 Q  And one of the things it says here under chapter

23 6, Importing vendor price agreements, are you with me?

24 A  Importing -- okay.  Got it.  Yes.  Chapter 6, yes,

25 Importing vendor price agreements.

1606

1  Q  And it states underneath there, "With more
2  business being conducted electronically, you," and you
3  understand you to be the customer, right?
4  A  Correct.
5  Q  "You may have a need to load vendor information in
6  your Lawson application.  The vendor agreement import
7  process lets you automatically load vendor pricing
8  information and create item master and purchase order
9  vendor item records," do you see that?
10  A  Right.
11  Q  That's an accurate statement, correct?
12  A  That's correct.
13  Q  The heading below that says, Purchase order 8.0.3
14  release notes.  Do you recall we talked about those
15  release notes earlier?
16  A  Yes.
17      MR. ROBERTSON:  Your Honor, I'd like to move
18  those release notes as Plaintiff's Exhibit 522.
19      THE COURT:  Any objection?
20      MS. STOLL-DeBELL:  No, Your Honor.
21      THE COURT:  It's admitted.
22      (Plaintiff's Exhibit No. 522 is admitted into
23  evidence.)
24  BY MR. ROBERTSON:
25  Q  It's states under that heading, Purchase order

1607

1  release notes, 8.03, purchase order release notes 1,
2  8.0.3, purchase order release notes.  Let me focus on
3  what I want to get here.
4      This document contains release notes for the
5  purchase order application for 8.0.3, 28.0.3, purchase
6  order, purchase notes, purpose order release notes,
7  vendor catalog load, correct?
8  A  Correct.
9  Q  Now, there's another way for the item master to
10  get vendor catalog data into the -- excuse me.
11  There's another procedure that Lawson employs to get
12  catalog data into the item master, isn't there?
13  A  Correct.
14  Q  One of those processes is an EDI transaction;
15  isn't that right?
16  A  You're talking about which transaction type?
17  Q  EDI 832?
18  A  Correct.
19  Q  So you know if a Lawson customer, for example, has
20  that EDI Lawson module available to it as part of its
21  procurement process, it can use that EDI 832
22  transaction, right?
23  A  832 transaction gets it to the front door, yes.
24  Q  And getting in through the front door in order to
25  get into that item master, you can get a price catalog

1608

1  file; isn't that right?
2  A  You do get a file, yes.
3  Q  It's a catalog file, isn't it, sir?
4  A  Correct, yes.
5  Q  All right.  And that price catalog file can
6  contain data such as the vendors item description,
7  correct?
8  A  Correct.
9  Q  Vendor identifier?
10  A  Correct.
11  Q  The price?
12  A  Correct.
13  Q  The unit of measure?
14  A  Correct.
15  Q  And the vendor's catalog number, correct?
16  A  Correct.
17  Q  And the vendor can send the user the vendor price
18  agreement import program, this vendor catalog we've
19  been talking about, in a CSV file that contains a
20  catalog of all the items the vendor can sell the user;
21  isn't that right?
22  A  It could.
23  Q  Do you have any doubt about that?
24  A  I have no doubt that they can do it, yes.
25  Q  In fact, customers who have the EDI module that

1609

1  you sell use that EDI 832 to import catalog data,
2  don't they?  You are familiar with that?
3  A  Yes, I am.  Which catalog data are you referring
4  to?  The whole catalog?
5  Q  Well, it can be the whole catalog, can't it?
6  A  It could be the whole catalog.
7  Q  And it could be part of the catalog, right?
8  A  Correct.
9  Q  So it could be the entirety of the catalog or some
10  subset of the catalog, right?
11  A  Right.
12  Q  The customer having this EDI 832 module has the
13  capability of importing an entire vendor catalog into
14  the item master, right?
15  A  It has that capability as you're defining it, yes.
16      MS. STOLL-DeBELL:  I'm going to object.  It's
17  outside the scope of direct.
18      THE COURT:  Overruled.
19      MS. STOLL-DeBELL:  Your Honor, I didn't even
20  get into EDI at all.
21      MR. ROBERTSON:  She asked him about the
22  manners and the way the data was imported.
23      THE COURT:  He testified as to three manners
24  of getting data in, and now he's testifying to a
25  fourth that you didn't ask him about, but the opening

1610

1 of the three opens the door to the fourth, and the
2 fourth includes the EDI. So I think the questioning
3 line is well taken.
4 BY MR. ROBERTSON:
5 Q All right, sir. In this EDI 832 process, you can
6 also get catalog items that give, among other
7 information, the cost of the item and the date on
8 which that cost becomes effective, right?
9 A Correct.
10 Q An then the vendor price agreement import program
11 can take that information and put it into the user's
12 purchasing database, correct?
13 A Correct.
14 Q This 832 catalog sales catalog import, that
15 transaction can be set up to provide for customary and
16 established business and industry practice relative to
17 furnishing or requesting the price of goods or
18 services in the form of a catalog; isn't that right,
19 sir?
20 A That is one of the purposes of 832, yes.
21 Q And that would also include the item
22 identification?
23 A Yes.
24 Q And the product item description?
25 A Yes.

1611

1 MR. ROBERTSON: Your Honor, I'd like to show
2 the witness another document, if I could.
3 Q This is a Lawson document; is that right, sir.
4 A Yes.
5 Q And you recognize this, sir?
6 A I do not.
7 MS. STOLL-DeBELL: Your Honor, I'm going to
8 object. These are all Lawson documents. They were
9 produced during discovery. They should have been on
10 the exhibit list and --
11 THE COURT: He can cross-examine from things
12 that aren't on the exhibit list, but he can't get them
13 into evidence unless you agree.
14 MS. STOLL-DeBELL: Your Honor, I think he can
15 use them for impeachment, but this isn't impeachment
16 testimony. He's asking about documents that should
17 have been on the exhibit list, and they're not.
18 THE COURT: That doesn't have anything to do
19 with whether it's impeachment or not. The correct way
20 to do it is ask him a question first. Don't be
21 getting the document in. Ask him the question. Then
22 ask him an impeaching question if you've got one.
23 BY MR. ROBERTSON:
24 Q Would you agree --
25 MS. STOLL-DeBELL: These are new exhibits.

1612

1 THE COURT: They are not new exhibits because
2 they haven't been admitted, and he erred in handing
3 out the document before he asked the question.
4 MR. ROBERTSON: I apologize, Your Honor.
5 THE COURT: So turn the document over.
6 Forget about the document, Mr. Christopherson. And
7 he's going to ask you a question, and then we may go
8 somewhere, but who knows.
9 As my colleague Judge Williams says, let's
10 abide that event. All right.
11 BY MR. ROBERTSON:
12 Q This EDI 832 price and sales catalog process for
13 importing catalog data, that would provide us with
14 item identification information and product and item
15 description, right?
16 A Correct.
17 Q And I may have asked this already, but it also can
18 provide you with a unit of measure?
19 THE COURT: You asked him all those before.
20 MR. ROBERTSON: I don't think I asked him
21 with respect to EDI, but I asked him with respect to
22 the other import process.
23 Q You could have unit of measure through this EDI
24 transaction process?
25 A Right.

1613

1 Q And you could have the price, too?
2 A Correct.
3 Q All right. That's fine. That's all I have with
4 respect to that.
5 THE COURT: See, the document never came in.
6 BY MR. ROBERTSON:
7 Q Now, are you familiar with the PO 25 vendor
8 catalog load changes?
9 A No.
10 Q Well, do you agree that the vendor catalog load
11 process automatically loads item and vendor item
12 information into the Lawson system?
13 A Say that again.
14 Q That the vendor catalog load process automatically
15 loads item and vendor item information into the Lawson
16 system? Do you agree or disagree with that statement?
17 MS. STOLL-DeBELL: Your Honor, I object. I'm
18 not sure what he's talking about. He just said he
19 wasn't familiar with it. So I don't know if he's
20 moved on.
21 THE COURT: He said he wasn't familiar with
22 something else, and then he changed the question and
23 asked something else.
24 MS. STOLL-DeBELL: Okay.
25 BY MR. ROBERTSON:

1630

```
 1   requisitioning and workflow approval leading to faster
 2   order cycle times, increased standardization and
 3   reduced costs, correct?
 4   A   That is correct.
 5   Q   That's one of the benefits of having this kind of
 6   procurement software over the old fashioned
 7   paper-based procurement process, right?
 8   A   That's correct.
 9   Q   Like every invention, you want it to be doing to
10   do something fast, better cheaper?
11       MS. STOLL-DeBELL:  Objection, Your Honor.
12       THE COURT:  Sort of.
13       MR. ROBERTSON:  I'll withdraw the question,
14   Your Honor.
15       THE COURT:  Yes, I think so.
16   Q   Turn to the next page, sir.
17   A   Sure.
18   Q   You see the representation there under Lawson
19   Procurement Punchout?  You can seamlessly browse from
20   Lawson's requisition self service to vendor websites.
21   Do you see that?
22   A   Yes.
23   Q   That's an accurate statement, right?
24   A   Yes.
25   Q   Seamlessly, right?
```

1631

```
 1   A   You have to define what seamlessly means.
 2   Q   This is your document.  Do you have an
 3   understanding of what "seamlessly" means?
 4   A   It's not my document, sir.
 5   Q   Well, it's a Lawson document.  Lawson was
 6   representing that the process is seamless, right?
 7   A   Well, we know --
 8   Q   Lawson was representing that --
 9       THE COURT:  You know, it would have just been
10   sufficient to have left the question where it was
11   because he already answered it was seamless and then
12   you get into it.
13       MR. ROBERTSON:  I'll move on, Your Honor.
14   BY MR. ROBERTSON:
15   Q   When the Lawson system punches out to the Punchout
16   creating the partner's catalog, you remain connected
17   to the Lawson system; is that right?
18   A   Say that again.
19   Q   Yes.  When the Lawson system punches out to the
20   Punchout creating the partner's catalog, you remain
21   connected to the Lawson system, correct?
22   A   Correct.
23   Q   Let's take a look at the page that ends with Bates
24   label 261, if we could.
25       So here's the representation of this RSS Punchout
```

1632

```
 1   process flow.  Do you see that?
 2   A   I see it, yes.
 3   Q   So this is saying how we're going to navigate
 4   through this process to build our shopping cart and
 5   then pull it back as a requisition and make purchase
 6   orders; isn't that right?
 7   A   Give me a chance to review it.
 8   Q   Sure.
 9   A   Okay.  At a very high level, yes.
10   Q   So at this high level, Lawson is representing that
11   the first step is that Lawson requesters use this RSS
12   screen to punch out to external vendors, correct?
13   A   That is correct.
14   Q   So then the Lawson requester is presented to the
15   externals vendor's website to search and add items to
16   the vendor's shopping cast.  The shopping cart is
17   being checked out and submitted, right?
18   A   That's correct.
19   Q   Then the shopping cart contents are returned back
20   to Lawson RSS, right?
21   A   Right.
22   Q   Then the requester checks out their RSS shopping
23   cart and requisition is sent for approval, right?
24   A   Correct.
25   Q   Once the requisition is approved, the purchase
```

1633

```
 1   order, the PO there, is created by PO 100.  That's
 2   accurate, right?
 3   A   That's correct.
 4   Q   Then the purchase order can be sent to the vendor
 5   using the Lawson EDI module, right?
 6   A   It can be, yes.
 7   Q   When the Lawson system was doing that, you
 8   remained connected to the Lawson system at all times;
 9   isn't that right, sir?  Didn't you testify to that in
10   your deposition?
11   A   It's connected, yes.
12   Q   You were asked about page 265, sir.  If you could
13   turn to that.  Now, there's some questions about where
14   the software was running on this in this Punchout
15   demonstration.  Let me just ask you, this was a joint
16   presentation by Lawson and Trinity Information
17   Systems, right?
18   A   Correct.
19   Q   So it's operating, as you can tell, I think you
20   pointed to it, sir, the URL address is Trinity Health
21   Organization, right?
22   A   That is correct.
23   Q   But after where it says TrinityHealth.org/, it
24   says "Lawson/portal," right?
25   A   It does say that, yes.
```

1702

1    THE WITNESS:  Yes, sir.

2  Q   When was the latest upgrade that Lawson provided to

3  Novant?

4  A   The upgrade was to the 9.01 release.

5  Q   And when was that?

6  A   I think it was 2009.

7  Q   And Novant installed that upgrade?

8  A   Yes.

9  Q   We mentioned the UNSPSC codes before, the UNSPSC codes as

10  you phrased them.  Does Novant use the UNSPSC codes in its

11  Lawson system?

12  A   We have them loaded in the data set up in the item master.

13  Q   In the item master using the Lawson system, does the

14  UNSPSC code, does that enable a user to locate an equivalent

15  item?

16    MR. STRAPP:  Objection, foundation.

17    THE COURT:  He can testify about what he thinks his

18  does, but he can't testify about what all the rest of them do.

19    MR. STRAPP:  Your Honor, I also object that it calls

20  for a legal conclusion as well.

21    THE COURT:  How?

22    MR. STRAPP:  It's asking for an expert opinion

23  regarding a claim in the claim construction terms, term of

24  equivalents.

25    MR. SCHULTZ:  There is no equivalents -- Your Honor,

1703

1  that's not a claim term.

2    THE COURT:  You can ask him his understanding.

3    MR. SCHULTZ:  Yes.

4  Q   Mr. Yuhasz, your understanding with respect to the UNSPSC

5  codes, does the Lawson system installed by Novant have the

6  ability to locate an equivalent item?

7  A   No.

8  Q   Why not?

9  A   In more of a clinical setting, it is difficult to

10  determine equivalent items.  We would rely on a clinical

11  specialist to tell us that, two different syringes from

12  different manufacturers or even gauze or even hand sanitizer is

13  an equivalent product.

14    THE COURT:  Wait a minute.  Clinical, you mean

15  doctors?

16    THE WITNESS:  Physicians, nurses, yes, sir.

17    THE COURT:  Medical people.

18    THE WITNESS:  Medical people.

19    THE COURT:  So you don't think it operates that way

20  because you want the doctors and the nurses to be making that

21  decision, not to have a computer make it.

22    THE WITNESS:  Yes.

23    THE COURT:  Okay, thank you.

24  Q   Do you have an example of a situation where the UNSPSC

25  codes would not work for finding matching equivalent items?

1704

1    THE COURT:  Mr. Schultz, on this situation, let's

2  move on.  That's just sort of topical specific in their

3  hospital because of their situation, and for good reason they

4  don't want anybody but doctors and nurses telling them what's

5  comparable or equivalent.  That's what he's talking about, so

6  that's not what we're dealing with this in this case.  Let's go

7  on.

8    MR. SCHULTZ:  Actually, Your Honor, that's all I've

9  got.

10    THE COURT:  Okay.

11    MR. SCHULTZ:  Thank you, Mr. Yuhasz.

12

13    CROSS-EXAMINATION

14  BY MR. STRAPP:

15  Q   Good afternoon, Mr. Yuhasz.

16  A   Afternoon.

17  Q   Could you please put Plaintiff's Exhibit 337 back on the

18  screen for a minute, and page three of the exhibit.  Now, we

19  were -- you were discussing just recently this proposal from

20  Lawson and SciQuest.  I want to be perfectly clear here.  This

21  is just a proposal from Lawson and SciQuest; correct?  This

22  isn't the system as actually implemented at Novant; isn't that

23  correct?

24  A   That's correct.

25  Q   And even in this depiction here, graphical proposal

Yuhasz - Cross                    1705

1  representation, the item master, the item data, that's Lawson's

2  in this depiction; correct?

3  A   That's correct.

4  Q   Let's talk about the products that are actually installed

5  at Novant.  Novant uses the Lawson inventory control module;

6  correct?

7  A   Yes.

8  Q   And Novant also uses the Lawson purchase order module;

9  correct?

10  A   Yes.

11  Q   And Novant uses RSS or requisition self-service; is that

12  correct?

13  A   Yes.

14  Q   And Novant has also licensed procurement punchout; is that

15  correct?

16  A   Yes.

17  Q   Novant's been using Lawson requisition self-service for

18  about five years; is that correct?

19  A   Yes.

20  Q   And prior to that, Lawson was using the requisitions

21  module; is that correct?

22  A   Yes.

23  Q   Isn't it true that Lawson provided personnel to assist

24  Novant with the initial implementation of requisition

25  self-service?

1706

Yuhasz - Cross                    1706

1    A   Yes.
2    Q   And that initial implementation took about four months;
3    isn't that correct?
4    A   I think that was -- I couldn't put an exact date on just
5    the requisition self-service because it is part of a larger
6    project.
7    Q   That larger project took approximately four months; is
8    that correct?
9    A   No, the larger project took more than that.
10   Q   How long did it take?
11   A   I'm not sure I can recollect at this moment.
12       THE COURT:  Don't guess.  It's okay.
13   Q   Isn't it true that during that initial implementation,
14   Lawson provided Novant with application consulting services?
15   A   Yes.
16   Q   And with technical consulting services?
17   A   Yes.
18   Q   And isn't it true that during that initial implementation
19   of requisition self-service, Lawson also provided Novant with
20   client site training?
21   A   For requisition self-service?
22   Q   Correct.
23   A   Yes.
24   Q   And Lawson personnel actually traveled to Novant to
25   provide some classroom training on requisition self-service;

1707

Yuhasz - Cross                    1707

1    isn't that correct?
2    A   Yes.
3    Q   Novant has a maintenance agreement with Lawson for the
4    requisition self-service software; isn't that correct?
5    A   Yes.
6    Q   And isn't it true that that maintenance agreement also
7    allows Novant to receive ongoing upgrades to its software?
8    A   Yes.
9    Q   Lawson also provides Novant with an online library of
10   educational materials regarding its procurement package?
11   A   Yes.
12   Q   Including specific product guides, for example?
13   A   Yes.
14   Q   Is it true that Novant currently has about 70,000 to
15   80,000 active items in its item master database?
16   A   Yes.
17   Q   And those are all available for ordering through
18   requisition self-service?
19   A   Yes.
20   Q   And isn't it correct that those 70,000 to 80,000 items are
21   associated with approximately 10,000 different vendors; is that
22   correct?
23   A   Yes.  In rough numbers.
24   Q   And each of those items, those items have textual
25   descriptions, correct, in the item master?

1708

Yuhasz - Cross                    1708

1    A   Yes.
2    Q   And those items also have part numbers sometimes; isn't
3    that correct?
4    A   Yes.
5    Q   And items will have vendor or manufacturer numbers;
6    correct?
7    A   Yes.
8    Q   And items sometimes have images associated with them;
9    correct?
10   A   Yes.
11   Q   Items have price information; is that right?
12   A   Yes.
13   Q   And items sometimes will have inventory availability;
14   correct?
15   A   Yes.
16   Q   Now, isn't it true that the manufacturer or the vendor
17   provides the contract price for the items in the item master?
18   A   Yes.
19   Q   And isn't it also true that the description of the items
20   in the item master are provided by the manufacturer or vendor?
21   A   Not without transformation by Novant personnel.
22   Q   You get the descriptions of the goods from the
23   manufacturers; right?
24   A   Yes.
25   Q   You understand UNSPSC to be a classification system for

1709

Yuhasz - Cross                    1709

1    particular items; correct?  We've discussed that?
2    A   Yes.
3    Q   Isn't it true that Lawson requisition self-service, the
4    application that's used at Novant, has the capability of using
5    those UNSPSC codes?
6    A   Capability exists, not used.
7        THE COURT:  You say it exists but you don't use it?
8        THE WITNESS:  Yes, sir.
9    Q   Isn't it true that by searching for items using a UNSPSC
10   code in Lawson requisition self-service, that if a user at
11   Novant was to use that capability, it could find items from
12   multiple vendors with a particular UNSPSC code?
13       MR. SCHULTZ:  Objection, foundation.  He said he
14   doesn't use it.
15       MR. STRAPP:  Your Honor, we've been talking about the
16   capability of the Lawson system.  The door was opened on
17   direct.
18       THE COURT:  It's on cross-examination.  I think he
19   can answer that.
20   A   Could you repeat the question.
21   Q   Sure.
22       THE COURT:  If you did use it is the question.  You
23   may ask that.
24   Q   If a user at Novant was using Lawson requisition
25   self-service searching for an item by using a UNSPSC code, that

1710

Yuhasz - Cross                1710

1  user could find items from multiple vendors with the same
2  UNSPSC code; isn't that correct?
3  A  Yes.
4  Q  You talked a little bit about a competition, an RFP
5  process at Lawson; do you recall that testimony?
6  A  Yes.
7  Q  And the RFP that was sent was for procure to pay solution;
8  correct?
9  A  Yes.
10  Q  By a procure to pay solution, Novant means an end-to-end
11  solution that starts all the way from requisitioning and goes
12  through payment; correct?
13  A  Yes.
14  Q  The Novant Health -- the RPF, that was issued around 2008;
15  is that correct?
16  A  Yes.
17  Q  And that RFP we saw was sent to Lawson; isn't that
18  correct, Lawson and SciQuest?
19  A  Yes.
20  Q  It was also sent to ePlus?
21  A  Yes.
22  Q  Isn't it true that Novant sought the same functionality
23  from ePlus that it sought from all the other vendors as part of
24  this process including Lawson and SciQuest?
25  A  Yes.

1711

1711

1  MR. STRAPP:  I have no further questions, Your Honor.
2  THE COURT:  Any redirect?
3
4  REDIRECT EXAMINATION
5  BY MR. SCHULTZ:
6  Q  Mr. Yuhasz, Mr. Strapp just asked you about the RFP
7  process.  Did either ePlus or Lawson win that RFP process?
8  A  No.
9  Q  Who did?
10  A  Ariba.
11  Q  And why?
12  MR. STRAPP:  Objection, Your Honor, relevancy.
13  THE COURT:  What difference does it make who won it?
14  MR. SCHULTZ:  It goes to the functionality that was
15  selected by Novant for fulfilling what they wanted out of their
16  RFP process.
17  MR. STRAPP:  Your Honor, the functionality -- what
18  Novant wanted is irrelevant.  What matters here is the
19  functionality that Lawson has in its accused system.
20  THE COURT:  It's marginally relevant, but it
21  introduces delay and confusion and opens up a lot of other
22  areas that we don't need to get into that really aren't
23  relevant, so sustained.
24  MR. SCHULTZ:  Mr. Yuhasz, thank you for your time.
25  THE COURT:  Can Mr. Yuhasz be permanently excused?

1712

1712

1  MR. STRAPP:  Yes, Your Honor.
2  MR. SCHULTZ:  Yes, Your Honor.
3  THE COURT:  Mr. Yuhasz, thank you for being here and
4  giving us your testimony, and you are released from your
5  obligation to be here.  Thank you, sir.
6  THE WITNESS:  Thank you.
7  THE COURT:  Next witness?
8  MS. STOLL-DeBELL:  Your Honor, we're calling Mr.
9  Keith Lohkamp back to the stand.
10
11  KEITH LOHKAMP,
12  a witness, called by the defendant, having been first duly
13  sworn, testified as follows:
14  DIRECT EXAMINATION
15  BY MS. STOLL-DeBELL:
16  Q  Mr. Lohkamp, do you have a college degree?
17  A  Yes, I do.
18  Q  When did you get your college degree?
19  A  In 1991.
20  Q  Where did you get it from?
21  A  Stanford University.
22  Q  And what kind of college degree did you get?
23  A  Bachelor's in international relations.
24  Q  Do you have an advanced degree?
25  A  Yes, I do.

1713

Lohkamp - Direct                1713

1  Q  Will you describe that for me, please.
2  A  Yes, I have an MBA from the Haas School of Business at UC
3  Berkeley.
4  Q  When did you get that?
5  A  I got that in 1996.
6  Q  When did you start working for Lawson?
7  A  May 2005.
8  Q  I think the other day you testified that you first learned
9  about ePlus when you saw them at a trade show in 2003?
10  A  Yes, that's correct.
11  Q  Is that correct?  But at that time, you were not working
12  for Lawson; isn't that correct?
13  A  That's correct.
14  Q  And then I believe that you testified you didn't hear
15  again of ePlus until 2008 in connection with a Cleveland Clinic
16  bid; is that correct?
17  MR. ROBERTSON:  Your Honor, I'm going to object.
18  This is cumulative.  We went through this all on the first day,
19  both on direct and cross-examination.
20  THE COURT:  Well, what do you say in response to
21  that, Ms. Stoll-DeBell?
22  MS. STOLL-DeBELL:  I'm trying to establish when he
23  was an employee for Lawson and compare that to when he heard
24  information about ePlus, and I will say this is the last
25  question on it as well, Your Honor.

1718

Lohkamp - Direct                              1718

1  really with those vendors, official relationship, so the
2  purposes of having the contract was to make it a formalized
3  process for bringing new supported punchout partners on as well
4  as to set up the ground rules of how we were going to work
5  together and set the expectations with that vendor with the
6  goal of being able to support our customers who were interested
7  in punching out using procurement punchout to that vendor
8  website. So the contract helps us kind of establish the
9  expectations and how we were going to work together to support
10 our mutual customers.
11 Q   Is it possible to use Lawson's punchout product to punch
12 out to a vendor website if the vendor is not a supported vendor
13 by Lawson?
14 A   Yes.
15 Q   Is it possible for Lawson's customers to connect to
16 punchout vendors' websites without using Lawson's punchout
17 product?
18     MR. ROBERTSON: Objection, Your Honor, vague and
19 ambiguous. Is this just using the internet to go to a website
20 or using a Lawson product?
21     MS. STOLL-DeBELL: I can ask a better question, Your
22 Honor. I'll withdraw that.
23     THE COURT: All right.
24 Q   Is it possible to use an internet browser to connect to a
25 punchout vendor's website?

1720

1720

1  to connect to a customer specific private StaplesLink.com
2  website; is that correct?
3      MR. ROBERTSON: Objection, relevancy, Your Honor.
4  We're talking about using a Lawson product, not using the
5  simple internet browser. This has nothing relevant to the
6  accused systems.
7      THE COURT: I'm inclined to agree with him, Ms.
8  Stoll-DeBell. I was trying to see what the difference was, but
9  I think the objection is sustained.
10     MS. STOLL-DeBELL: I think that's all the questions I
11 have for right now.
12     THE COURT: Any cross-examination?
13
14             CROSS-EXAMINATION
15 BY MR. ROBERTSON:
16 Q   Good afternoon, Mr. Lohkamp.
17 A   Good afternoon.
18 Q   I understand you have these punchout trading partners that
19 you have contracts with and punchout trading partners that you
20 don't have contracts with; right?
21 A   Correct.
22 Q   But other than not having, for example, a defined contact,
23 I think that's what you said; that was one of the benefits of
24 having a contract?
25 A   That was one of the benefits, yes.

1719

Lohkamp - Direct                              1719

1      MR. ROBERTSON: Objection, Your Honor, relevancy.
2      MS. STOLL-DeBELL: Your Honor, I think it goes --
3      THE COURT: Why does that have anything to do with
4  this case?
5      MS. STOLL-DeBELL: I think it goes to the
6  relationship and connection between Lawson and the punchout
7  vendor and how the punchout vendor's website works.
8      THE COURT: They are different websites. The
9  testimony he gave earlier, or somebody gave, was if you go on
10 the internet, you get one website. If you go through the
11 punchout you get another, I think. Isn't that right? Ask him.
12 I think -- if you go through the internet to get to what was --
13 a website of somebody who is your punchout partner, you get the
14 internet site or not, the regular site?
15     THE WITNESS: For certain vendors, for example, like
16 StaplesLink.com, you can go directly to StaplesLink.com versus
17 going through punchout through a browser.
18     THE COURT: But if you go through the punchout, it's
19 a different website; isn't it?
20     THE WITNESS: You would be logged in to -- it would
21 be the same website. You'd be logged into StaplesLink.com.
22     THE COURT: So it's true for some of them but not for
23 all of them.
24     THE WITNESS: I am not familiar with all of them.
25 Q   So with StaplesLink.com, you can use an internet browser

1721

Lohkamp - Cross                               1721

1  Q   So we're all clear on this, it doesn't matter for a
2  contract punchout trading partner of Lawson's or noncontract
3  trading partner of Lawson's, the technology never changes;
4  right?
5  A   That's correct.
6  Q   And isn't it true that the vast majority of Lawson's
7  punchout trading partners are noncontractual; right?
8  A   Yes.
9  Q   And but yet you work with these noncontractual punchout
10 partners to the mutual benefit of both companies just like you
11 do with your contractual partners; right?
12 A   No.
13 Q   So, I see. Because there's a contract, you have a mutual
14 benefit, and because you don't have a contract, there's no
15 mutual benefit?
16 A   I thought I understood you to say they work with them the
17 same way.
18 Q   I'm wondering -- it doesn't matter whether you have a
19 contract or don't have a contract. It's still mutually
20 beneficial to both Lawson and its punchout trading partners to
21 have that relationship; right?
22 A   Yes.
23     MR. ROBERTSON: That's all I have, Your Honor. Thank
24 you.
25     THE COURT: Any redirect?

1750

1 that prong of the construction would be satisfied.
2 But that information is not published by a vendor,
3 either a supplier, manufacturer or distributor. It's
4 carefully handpicked by a customer. A customer
5 decides what to import into that item master database,
6 and it doesn't constitute a catalog or even multiple
7 catalogs.
8 Q  What is your understanding as to what an item
9 master does in the Lawson systems?
10 A  Item master, I think, is intended to represent the
11 universe of items that an employee of a corporation is
12 able to buy regardless of what the source may be.
13 Q  What's your understanding as to what sort of
14 information is in the item master in the Lawson
15 systems?
16 A  It has information about items. It would have
17 their name, it would have a catalog number, it may
18 have an identification of who's selling the item, an
19 identification of who manufactured the item. It has
20 information about any special pricing terms that are
21 available to this particular customer because of
22 contracts that they may have entered into with
23 suppliers, and other information that the user of the
24 system finds useful to associate with particular
25 items.

1751

1 Q  Can you summarize for me the differences between
2 the Lawson systems item master and catalogs as the
3 Court construed it?
4 A  Well, a catalog is a compendium of information
5 about the things that a vendor is offering for sale.
6      THE COURT:  I've defined what a catalog is
7 and that's the end of it. Whether anybody agrees with
8 it, that's the catalog definition.
9      MR. McDONALD:  Sure.
10      THE COURT:  We're not going to have him
11 defining the catalogs. I've told you all that before.
12      MR. McDONALD:  That wasn't my intent.
13      THE COURT:  Well, he did. He started off
14 defining it. So let's don't have it. And I don't
15 really want to have to deal with this problem, Mr.
16 McDonald. He can testify, but I don't want to have to
17 be constantly monitoring whether there's compliance
18 with the requirement that the terms are those defined
19 by the Court.
20 BY MR. McDONALD:
21 Q  Do you have an understanding as to whether or not
22 the item master in the Lawson systems includes
23 information about a customer's inventory of a given
24 item?
25 A  Yes.

1752

1 Q  What sort of information does the item master have
2 about a customer's inventory of a given item?
3 A  One piece of information is quantity on hand.
4 Another piece of information that be where the item
5 can be found, where the inventory is physically
6 located.
7 Q  When you say where it can be found or located, are
8 you talking about where at the customer's premises it
9 could be located or something else?
10 A  It may be that -- well, the customer is typically
11 going to have information about how much of that
12 particular item he has on hand on his premises. He
13 generally doesn't know how much a vendor would have
14 available.
15 Q  Are you familiar with how the item descriptions
16 are created for purposes of the item master?
17 A  Not in detail. There's a field in item master
18 that allows for a description of a product. Those
19 descriptions can be imported from files provided by
20 vendors or they can be made created by the customer.
21 Q  Have you seen some documents in this case relating
22 to Lawson where they refer to features of the Lawson
23 systems in terms of being able to load vendor catalog
24 data and the like?
25 A  Yes.

1753

1 Q  Given that those documents do use the term
2 "catalogs," why is it that you concluded that that
3 wouldn't indicate that the item master has multiple
4 catalogs?
5      MR. ROBERTSON:  Objection to the form of that
6 question, Your Honor.
7      THE COURT:  What is objectionable about the
8 form?  That different documents have different reasons
9 or that he can't testify to it or what?
10      MR. ROBERTSON:  He can't testify and
11 characterize what those documents mean and whether
12 they do doesn't mean they comply with the Court's
13 claim construction because they use the term
14 "catalog."
15      THE COURT:  So the objection to the form of
16 the question is that he doesn't have any basis for
17 knowing what the author of a particular document
18 meant. Is that right, Mr. Robertson?
19      MR. ROBERTSON:  Yes. Thank you for
20 articulating that for me, sir.
21      THE COURT:  What's your response to that, Mr.
22 McDonald?
23      MR. McDONALD:  I don't think my question was
24 asking what the author of the documents meant. I was
25 asking basically for how he incorporated his analysis

1766

```
1   BY MR. McDONALD:
2   Q   Dr. Shamos, can we turn now to slide No. 17 here
3   and your reason No. 2 for non-infringement.  This is
4   another slide you prepared; is that correct?
5   A   Yes.
6   Q   What is your reason No. 2 for non-infringement?
7   A   Ten of the 12 claims require selecting catalogs to
8   search.  If there's no catalog, and certainly if
9   there's not more than one catalog, it's not possible
10  to select catalogs to search.
11  Q   Do you have and understanding from reading
12  Dr. Weaver's report as to what he is saying is how
13  Lawson system selects a catalog or catalogs to search?
14  A   I don't recall sitting here.
15  Q   All right.
16      THE COURT:  I didn't hear what you said.
17      THE WITNESS:  I don't recall sitting here.
18  I'm sure I read it.  I just can't spit it back out
19  now.
20  Q   Do you recall whether Dr. Weaver in his report
21  talked about a keyword search relating to selecting
22  catalogs to search for purposes of the claims in this
23  case?
24  A   I do recall that.
25  Q   What is your understanding as to the reason
```

1767

```
1   Dr. Weaver says the Lawson system selects catalogs to
2   search?
3   A   I couldn't make any sense out of it.  There's a
4   keyword search function and it's --
5   Q   When you say "keyword search function," what are
6   you talking about right now?
7   A   So, for example, if I wanted to --
8   Q   I'm just saying what system?
9   A   S3.
10  Q   The Lawson system?
11  A   The Lawson system yes.
12  Q   So you're talking about the keyword search in the
13  Lawson system, right?
14  A   Yes.
15  Q   I'm sorry.  Go ahead.
16  A   If a keyword appears in a record in the item
17  master database, then it can be retrieved using
18  keyword search.  If, for example, and I think this has
19  something to do with the example in Dr. Weaver's
20  report, suppose when I was entering the description of
21  an item I happen to also put the manufacturer's name
22  in there like Dell, for example, for a computer
23  manufacturer.  So instead of just saying and X3D
24  computer, I put Dell X3D.
25      And then later on someone went and searched for
```

1768

```
1   the keyword "Dell," then that particular record would
2   be retrieved.  But that describes what's retrieved.
3   It doesn't describe what gets searched.  What gets
4   searched is all of item master.
5   Q   So is it your understanding that these claims
6   require that you select the catalogs to search and
7   then search them?
8   A   Well, the claims do require that.  The selecting
9   step is just the selecting step, but then the search
10  is then restricted to those catalogs that are
11  selected.
12  Q   In the Lawson keyword search, does it not have
13  that process then, is that what you're saying, of
14  selecting catalogs to search and then searching them?
15  A   That's correct.  There's only item master.
16  Q   Now, if we could return to Claim One of the '172
17  patent.  I think I might have overlooked it.  There
18  was a second reason.  That one claim, that doesn't
19  explicitedly use the word "catalogs," at least another
20  reason it doesn't infringe in your opinion other than
21  the one you already described; is that correct?
22  A   I think so.
23  Q   Could we turn to slide No. 13, please?  Did you
24  also put together this slide Dr. Shamos?
25  A   Yes.
```

1769

```
1   Q   This relates to that 12th claim that does not
2   explicitly use the word "catalog," is that correct?
3   A   Yes.
4   Q   What are you trying to portray to us here in this
5   slide with respect to your analysis of why Claim One
6   of the '172 patent is not infringed?
7   A   One of the elements of that claim is means for
8   generating an order list.  And what I have after that
9   first bullet point, the function and structure.  The
10  function is taken from the Court's construction.
11  Structure, I took the first part of the Court's
12  construction.  I left off the specific examples of
13  structure that were in the construction.  But that's
14  because I don't think that's necessary on this
15  particular slide.
16      The question is:  If there can't be an order list,
17  then there certainly can't be a means for generating
18  an order list.
19      And the construction of order list is a list of
20  desired catalog items.  And if there's no catalog, you
21  can't have a list of desired catalog items.  You could
22  have a list of desired items.
23      MR. McDONALD:  Can we go to Plaintiff's
24  Exhibit No. 3?  Is that the '172 patent, Plaintiff's
25  Exhibit 3?
```

1786

1 instructions that we think will be appropriate.

2     THE COURT:  Several?  How about one good one?

3     MS. STOLL-DeBELL:  One with many facets, Your

4 Honor.

5     THE COURT:  Listen, I'm going to make you sit

6 on the jury.  I think every lawyer ought to have to

7 sit on a jury and ought to have to listen to these

8 instructions and try to figure out what do they mean.

9 Because if you read them from the jury's standpoint,

10 particularly these model instructions in the patent

11 area, what they're doing is -- nobody has really made

12 a real good effort to simplify them yet.

13     Judge Spencer did better in SAP in

14 simplifying the instructions than almost anybody I've

15 ever seen, but there have with some legal changes

16 since that time that prohibit me from adopting them

17 full scale.

18     All right.  That takes care of them.  I'm not

19 real hopeful that you're going to get your evidence or

20 I don't think you ought to be hopeful that you're

21 going to get that evidence in, Mr. Robertson, because

22 it seems to me it invites the jury to speculate and

23 it's a problem, I think.

24     MR. ROBERTSON:  I understand, Your Honor.

25 We're also concerned about prejudice given the fact we

1787

1 proffered that in good faith when it came up with the

2 witness that he had a lay opinion as to his intent.  I

3 thought it was relevant then because his lay opinion

4 as to the intent I didn't think was very persuasive,

5 but if you go get a legal opinion on these issues that

6 obviously involve the patents, and then you make the

7 conscious decision not to disclose it, I think that's

8 part of the circumstantial evidence they can consider.

9     I understand Your Honor's ruling.

10     THE COURT:  I haven't rules.

11     MR. ROBERTSON:  I understand Your Honor's

12 suggestion which way you might rule, but you're going

13 to be fair and read the papers.

14     THE COURT:  I thought maybe if I gave you all

15 some insight into where I was right now since we're on

16 the fly that your arguments might be better informed

17 in the morning, just as my thinking will be better

18 informed if I read what you-all tendered for me to

19 read.

20     Thank you so much for the overnight present.

21 I appreciate it.

22

23     (The proceedings were adjourned at 5:26 p.m.)

24

25

1788

---

1789

```
1          IN THE UNITED STATES DISTRICT COURT
2         FOR THE EASTERN DISTRICT OF VIRGINIA
3                  RICHMOND DIVISION
4
5    --------------------------------------
6    ePLUS, INC.          : Civil Action No.
                          : 3:09CV620
7    vs.                  :
                          :
8    LAWSON SOFTWARE, INC.    : January 14, 2011
                          :
9    --------------------------------------
10
11      COMPLETE TRANSCRIPT OF THE JURY TRIAL
12      BEFORE THE HONORABLE ROBERT E. PAYNE
13     UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24      Peppy Peterson, RPR
         Official Court Reporter
25     United States District Court
```

---

1790

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

1791

```
1              P R O C E E D I N G S
2
3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
6    Mr. Michael G. Strapp represent the plaintiff.
7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
9    the defendant.  Are counsel ready to proceed?
10       MR. ROBERTSON:  Plaintiff is, Your Honor.
11       MR. McDONALD:  Yes, we are.
12       THE COURT:  All right.  Ladies and gentlemen, I'm
13   pleased to report to you my unofficial survey that the economy
14   is recovered.  For the first time in 40 years of trading at the
15   Westhampton Bakery, I had to wait 20 to 30 minutes even to get
16   served, and this the lowest period of the year for that bakery,
17   they tell me.  So I just wanted you to know, but I told them I
18   was waiting because I had promised you would get your donuts
19   and I don't want to be guilty.
20       Dr. Shamos, I saw him earlier.  Dr. Shamos, I remind
21   you -- everybody is renaming you, aren't they?
22       THE WITNESS:  We'll see.
23       THE COURT:  I remind you you are under the same oath
24   you took yesterday, sir.
25       THE WITNESS:  Yes, sir.
```

---

1792

```
1        THE COURT:  Thank you.
2
3        MICHAEL I. SHAMOS,
4    a witness, called by the defendant, having been previously
5    duly sworn, testified as follows:
6        DIRECT EXAMINATION
7    BY MR. McDONALD:  (resuming)
8    Q   Good morning, Dr. Shamos.  How are you?
9    A   Good morning.  I'm good.
10   Q   I would like to pick up where we left off, if I got it
11   right anyway here this morning, with this slide showing some of
12   the elements of claim one of the '516 patent on this slide that
13   you put together.  Can you walk us through --
14       THE COURT:  Mr. McDonald, excuse me.  Just for
15   orientation purposes, when we left off, you had said that you
16   were going through each claim one by one to show, and that's
17   what you are doing.
18       MR. McDONALD:  Thank you, yes.
19       THE COURT:  I said it's a good time to take a break,
20   so that's what we'll be doing now, is hearing Dr. Shamos's
21   opinion on each claim that's at issue.
22   Q   We have the 12 claims.  We're going to take them one at a
23   time; right, Dr. Shamos?
24   A   Yes.
25   Q   Okay.  So let's start here with what you have on your
```

---

1817

1 whether or not the Lawson accused system satisfies that element
2 of claim nine?
3 A   Yes.  In order for there to be a second identification
4 code, there has to be a second catalog, and even if there's one
5 catalog, there weren't two catalogs in S3.  So that element
6 can't be present.
7 Q   Is there some language in this element about the second
8 item being, quote, generally equivalent?
9 A   Yes.
10 Q   Do you have an opinion as to whether in the Lawson system,
11 the Lawson systems accused here, satisfy that part of that
12 element?
13 A   There's no notion in the Lawson systems of general
14 equivalents.  There's no way to ask the system for a generally
15 equivalent item.
16 Q   Do you have an understanding as to what aspect of the
17 Lawson system is dependent in this case to satisfy that part of
18 that element?
19 A   Only from expert reports.
20 Q   Let's go to slide 30 then, if we can turn to that, Bill.
21 Dr. Weaver, did you look at --
22 MR. ROBERTSON:  Dr. Weaver?
23 A   I am Shamos.
24 MR. McDONALD:  I made it this far today.
25 Q   Dr. Shamos, did you look at all at the issue of whether or

1818

1 not in the Lawson system the use of the UNSPSC codes would
2 satisfy any claim elements of any of the asserted claims in
3 this case relating to generally equivalent items?
4 A   Did I look at that?
5 Q   What was your conclusion about that?
6 A   That it doesn't.
7 Q   Why not?
8 A   So, the UNSPSC code is a generally accepted international
9 coding to categorize products.  There's a big difference
10 between desks and chairs, and so if you gave a code to desks,
11 you could immediately tell that something was a desk and it
12 wasn't a chair.  And it happens to be hierarchically organized.
13 That is, it has different levels, so you can get to office
14 furniture, and then within office furniture you could have
15 desks, and then within desks you can desks with drawers or
16 without drawers, et cetera.
17 The Lawson software does provide the ability for a
18 customer to enter UNSPSC codes into the item master database if
19 he wants to do that, and sometimes it's useful for people who
20 are ordering things to know what the UNSPSC code is associated
21 with a particular item, but those UNSPSC codes are not used for
22 the purpose of determining whether things are generally
23 equivalent.
24 There's no automatic conversion.  I can't go and say, if
25 you're out of stock of this product, please give me another one

1819

1 that has the same UNSPSC code.  So there's no converting that's
2 going on.  There's no matching that goes on with respect to
3 UNSPSC codes even though they may be physically present in the
4 database.
5 Q   You have here, and this is another slide we have up on the
6 screen that you prepared; is that right?
7 A   Yes.
8 Q   On the last point there, what's the last bullet point?
9 Can you explain what you meant by that?
10 A   It's only within RSS, not the totality of the systems that
11 are accused.  It's only RSS that allows even searching of the
12 UNSPSC code.
13 Q   Can we turn to the next slide, please, 31.
14 A   Yes.
15 Q   Is this another slide you put together, Dr. Shamos?
16 A   Well, I put it together, but literally it's copied out of
17 a white paper that was published explaining what UNSPSC codes
18 are.  So I didn't write the words that are on the slide except
19 for the title.
20 THE COURT:  In other words, you made the slide.
21 THE WITNESS:  I made the slide.  I had an electronic
22 copy of that white paper.  I had it on the screen.  I used a
23 photo editor, and I did a screen capture and then cropped it
24 down and stuck it on the slide directly out of that UNSPSC
25 white paper.

1820

1 Q   Can you tell us in a nutshell, Dr. Shamos, what your main
2 point was for putting together this particular slide as it
3 relates to your testimony here?
4 A   Yes.  It was to show this eight-digit classification of
5 items and why it's hierarchical.  This is the UNSPSC
6 explanation of what these codes look like.  The code, as you
7 can see at the bottom where it says pen refills equals UNSPSC
8 classification 44-12-19-03.
9 The significance of those numbers, 12, 19, and 03, depend
10 on the fact that they are coming from 44.  So 44 is office
11 equipment, accessories, and supplies.  Within that, 12 is
12 office supplies.  Within 12, 19 is ink and led refills, and
13 within 19, 03 is pen refills.  And so 44-12-19-03 tells
14 you is it's a pen refill.
15 It doesn't tell you what kind of pen, and so if I want to
16 buy a refill for my pen, it's going to have to have -- if
17 there's any UNSPSC classification at all, it's going to have to
18 have 44, 12, 19, 03, but I can't just buy any pen refill.  It
19 has to fit in that particular pen.  So these UNSPSC codes don't
20 describe substitutable or generally equivalent items.
21 Q   Can we turn to the next slide, please, number 32.  I think
22 you've essentially already covered the first three bullet
23 points on this slide?
24 A   Yes, we can go right to number four.
25 Q   What was your point with bullet point number four?

1885

1   MR. ROBERTSON:  All right.
2   THE COURT:  Just remember, the witness is
3   here.  And I know zealous advocacy animates us all to
4   get enthusiastic about our causes, but remember the
5   concept of civility and politeness governs all court
6   proceedings.  And I'm not suggesting you weren't civil
7   and polite, but don't let it get out of hand.
8   MR. ROBERTSON:  Yes, sir.
9   BY MR. McDONALD:
10   Q  The next bullet point that you have here is when
11   Lawson software is installed, the item master is
12   empty.  Do you see that?
13   A  Well, in a second.
14   THE COURT:  Wait a minute.
15   Q  I apologize.  Do we have the slides.  Why don't we
16   do that?
17   THE COURT:  What system are we working with?
18   Your system?  So Mr. Neal can activate the ePlus side
19   of things.
20   Q  The second bullet point says, When the Lawson
21   software is installed, the item master is empty,
22   correct?
23   A  Yes.
24   Q  But you understand from your review of the
25   document that Lawson also provides services,

1886

1   implementation in which they will either migrate the
2   data from a legacy system to the new Lawson system or
3   they'll assist the customers in loading the item data,
4   correct?
5   A  Yes, I've testified to that.
6   Q  When the Court was construing "catalog," it was
7   referring to this collection of items and associated
8   information that is existing in electronic format in
9   the database, right?  You understood that in the
10   context of the patent?
11   A  I thought you just told me to take "database" out
12   of the claim.
13   Q  Well, I told you to take the single database out
14   of the claim, but you understand that that's where
15   this information, this electronic information, data,
16   resides, correct, in the Lawson system?  The item
17   master, the database, right?
18   A  Yes.
19   Q  The next bullet point you say is an item master
20   data is selected by inclusion by a customer.  Do you
21   see that?
22   A  Yes.
23   Q  And not a vendor.  Tell me where in the Court's
24   claim construction that the Judge has said that the
25   actual selection of the item data has to be made by

1887

1   anyone.
2   A  The catalog has to be published by a vendor.  If
3   the information is merely selected by a customer, it's
4   not published by a vendor.
5   Q  So you have your own construction of what
6   "published by a vendor" means?
7   A  No.
8   MR. McDONALD:  Objection, Your Honor.
9   THE COURT:  Overruled.
10   Q  Are you aware of the Court's construction?
11   A  Yes.
12   Q  The Court says "published by a vendor" simply
13   means that at some point in time a vendor, such as a
14   supplier, a manufacturer, or a distributor has made
15   generally known or has disclosed an organized
16   collection of items and associated information
17   preferably but not necessarily including all these
18   descriptions for the product.
19   MR. McDONALD:  Your Honor, I don't think he
20   read the very first sentence of the Court's
21   construction.
22   THE COURT:  I also don't think I said
23   anything about disclosed.  I don't know where you got
24   that.
25   MR. ROBERTSON:  I'm looking at what was

1888

1   handed out, Your Honor, I think.
2   THE COURT:  Well, that was what you-all got.
3   That isn't what I read.  What I read was published by
4   a vendor as used in the definition of the claim term
5   "catalog/product catalog."
6   "Published" simply means to make generally
7   known.  At one time I was thinking about "or to
8   disclose," but I didn't say that.  "Published by a
9   vendor" simply means that at some point in time a
10   vendor such as a supplier, a manufacturer or a
11   distributor has made generally known or has disclosed
12   an organized collection of items or associated
13   information preferably but not necessarily including a
14   part number, price, catalog number, vendor name,
15   vendor ID, a textual description of the item, and
16   images of or relating to the item.  And it should be
17   items and associated information, I think.  But that's
18   what I think I read.
19   MR. ROBERTSON:  I thought I was asking him
20   whether it just needs to be made generally known or
21   disclosed.  I think Your Honor said --
22   THE COURT:  I didn't say "disclosed."  I took
23   it out when I read it.  You've got a typographically
24   erroneous description.
25   MR. ROBERTSON:  All right, Your Honor.  I

2011.01.14 Trial Transcript Day 8  1/14/2011  2:58:00 PM

1893

1  catalog that was published by a vendor.
2  Q  Well, the item master doesn't have to be published
3  by the vendor, does it?  It's the collection of
4  information -- excuse me.  It's the organized
5  collection of items and associated information that's
6  published by a vendor, correct?
7  A  But that's what a catalog is.  The vendor
8  publishes the catalog.
9  Q  The vendor makes that organized collection of
10 items and associated information available to the
11 customer, right?
12 A  Yes, the vendor publishes the catalog.  I don't
13 think there's any doubt about that.
14 Q  Okay.  So that's all that's required of the claim
15 that the vendor publish the catalog?
16     THE COURT:  Is that a question?
17 Q  Isn't that correct?
18     MR. McDONALD:  Object to the form.
19     THE COURT:  Overruled.
20 A  No.  If there's to be a catalog in the Lawson
21 system, the catalog had to have been published by the
22 vendor.
23 Q  Fine.  So point to the language then in the
24 Court's construction of "catalog" that you rely on to
25 say that this organized collection of items and

1894

1  associated information has to be selected by the
2  customer, not somebody else.
3  A  It's not that it has to be selected by the
4  customer.  It is selected by the customer, therefore,
5  it's not an organized collection published by a
6  vendor.  I'm explaining why it doesn't meet the
7  Court's construction, not why it does.
8  Q  So what language are you relying on?
9  A  Published by a vendor.
10 Q  That's the only language you're relying on about
11 this organized collection of items and associated
12 information is that it's got to be published by a
13 vendor?
14 A  You just took me through that.  We went through
15 everything else in the Court's construction and found
16 it was satisfied except "published by a vendor."
17     THE COURT:  I think he's made his position
18 clear.  Whether you agree with it or not is a
19 different issue, but I think his position is clear.
20     MR. ROBERTSON:  I understand, Your Honor.
21 I'll move on.
22     THE COURT:  Let's move on.
23 Q  Does it matter then if the customer loads just
24 some of the item information?
25 A  Of course.  My personal address book was not

1895

1  published by the phone company even though it has
2  phone numbers of some people in it.
3  Q  Where in the Court's construction of "catalog"
4  does it say that you have to have all of the item
5  information included?
6  A  Well, I don't think that it says all.  I know it
7  doesn't say all, and I don't think you have to have
8  all.
9  Q  Where does it say you have to have most?
10 A  There's a matter of degree.
11 Q  Where does it say that in here?  It just says "a
12 collection of items and associated information."
13 A  Published by a vendor.  The question is:  What's
14 published by a vendor?
15 Q  And you interpret that as meaning you have to have
16 how much?
17 A  I don't know.  There's some point at which it's no
18 longer published by a vendor in the same sense that my
19 address book is not published by the phone company.
20 Q  If I have 50 percent of it, is that enough?
21 A  I don't know.
22 Q  75 percent?
23 A  I don't know.
24 Q  You know that the system, the Lawson system, is
25 capable of incorporating all of the item data from an

1896

1  electronically produced catalog from a vendor, right?
2  A  It may or may not be.  That may be true for some
3  catalogs.
4  Q  Did you make any investigation into that?
5  A  Well, I know what the structure of item master is.
6  And item master has fields, some of which are in
7  vendor catalogs and some of which are not in some
8  vendor catalogs.  And if there's a field in a vendor
9  catalog for which there's no place in item master, it
10 cannot be imported into item master.
11 Q  Does it have to import all the fields?
12 A  No.
13 Q  The Court's claim construction made clear that
14 some of the data about the item is just preferably but
15 not necessarily; isn't that right?
16 A  Correct.
17 Q  So it doesn't even have to include all the things
18 that the Court identifies in its construction, right?
19 A  I never assumed it did have to include those.
20 Q  But you have seen in the item master this kind of
21 data, haven't you?  Part number, price, catalog
22 number, vendor name, vendor ID, textual description of
23 the item?
24 A  Yes.
25 Q  Now, you know that a system or device that is

1901

1  Dell was inserted.
2  Q  That's where you're doing the keyword search.  I'm
3  talking about the user fields that are in the system.
4  You can actually enter into a user field a vendor
5  name, can't you, sir?
6  A  I think you can.  I'm not sure whether you can
7  search on that field, but you can enter it.
8  Q  So you don't know one way or the other whether you
9  can search once you have entered a vendor name in that
10  field?
11  A  In a use defined field, I don't know.
12  Q  Would it change your opinion if there was evidence
13  in the record that if you did enter the vendor name
14  into one of those user fields, you could search by
15  vendor?
16  A  No, because what you're postulating is the user
17  taking the system and making his own additions and
18  changes to it.
19  Q  The user of the Lawson system, according to you,
20  populates all the data in the item master; isn't that
21  right?
22  A  Yes, I think that's an important point.
23  Q  And if the user inserts a vendor name in one of
24  those user defined fields that it can use, then it
25  could search by vendor, couldn't it?

1902

1  A  If the proposition is that --
2  Q  Can you answer that question fairly yes or no?
3      THE COURT:  Just a minutes.  Listen to the
4  question he asked and answer that question.
5      THE WITNESS:  Okay.
6  A  Could you repeat it?
7  Q  Sure.  If the user who's populating the fields
8  with information, price, unit of measure, textual
9  description also uses one of these user created fields
10  and enters a vendor name, you could search by that
11  vendor name; isn't that right?
12  A  Yes.  You could search by that vendor name, but --
13  Q  That's fine.  You have answered the question.
14  Now, let me ask you this:  If I had two
15  catalogs -- just assume I have two catalogs in the
16  item database, the item master, a Home Depot catalog
17  and a Dell computer catalog, right?  And just assume
18  for purposes of my question that Home Depot is not
19  selling computers, all right?
20  A  Yes.
21  Q  If I type in a keyword "laptop," I'm not going to
22  get any catalog data from Home Depot, am I?
23  A  Not if they don't have any laptops.
24  Q  I'm going to get laptops from the Dell computer,
25  correct?

1903

1  A  Yes.
2  Q  So in that scenario by using the term "laptop,"
3  which only appears in the Dell catalog, I only
4  selected the Dell catalog to search; isn't that right?
5  A  No, that's false.  It looked over the whole
6  database.  It just happened because of the
7  circumstances you set up that there were no
8  responsive hits from the Home Depot catalog.
9  Q  So I got all the Dell items that corresponded to
10  that keyword laptop and none of the items in the home
11  Depot catalog, right?
12  A  Well, that's the output of the search, yes.  But
13  if Home Depot had had a laptop, then you would have
14  retrieved the laptop from the Home Depot catalog.
15  Q  Well, if I added a Hewlett-Packard catalog to my
16  catalog database with Home Depot, Dell, and now
17  Hewlett-Packard, and I searched for laptops, I would
18  get hits for Hewlett-Packard and Dell, right?
19  A  Yes.
20  Q  So the selection of the catalog was made by using
21  that keyword because I didn't get any Home Depo hits,
22  but I did get Dell and Hewlett-Packard, correct?
23  A  That's nonsense.  It makes no sense at all.  It's
24  a happenstance that one particular vendor doesn't sell
25  a thing.  So by asking for pens, for example, the fact

1904

1  that you don't get a vendor who doesn't sell pens
2  doesn't mean you have selected particular catalogs to
3  search.
4      There's structure in the software.  The software
5  does certain things.  In Lawson, it searches the
6  entire item master database.  It's fortuitous that a
7  particular vendor doesn't sell a particular thing.
8  That's not a means for selection.
9  Q  Why not?  It didn't come back from the Home Depot
10  catalog.
11  A  Because there was nothing responsive in there.  If
12  you search for an item that doesn't exist, you
13  certainly wouldn't be saying that you selected no
14  catalogs.
15  Q  No, but if I search for an item that does exist in
16  two catalogs that sell computers and I get results
17  from there, I've selected those two as a subset of the
18  three that are there?
19  A  You have not.
20  Q  All right.  You understand that the item master
21  can hold a hundred thousand items or more, correct?
22  A  Yes.
23  Q  And tens of thousands of vendors, correct?
24  A  Yes.
25  Q  And you would agree, wouldn't you, Dr. Shamos,

1913

1    independent company.  It's not the plaintiff or the
2    department, right?
3    A  It's not the plaintiff or the department.  I don't
4    know under whose auspices they created this report,
5    but it's neither of the parties in the case.
6    Q  In any event, you relied on it when you gave your
7    testimony about the capability of the UNSPSC, right?
8    A  Yes.
9    Q  Let's go to the page that ends with 036.  And
10   under the finding and purchasing, it says, A product
11   and service coding convention brings many benefits to
12   the purchasing function of the company, did I read
13   that correctly?
14   A  Yes.
15   Q  One of the pros is that table in the first box
16   says "enables buyers and employee requisitioners to
17   find all suppliers of a given catagory," correct?
18   A  It can.  If that functionality is built into the
19   system that's using the UNSPSC code, it can, yes.
20   Q  It does it by using the codes, right?
21   A  Well, if it has the capabilities to do that.
22   Q  And the Lawson accused software had the capability
23   of using these UNSPSC codes.  We just saw the fields.
24   A  Yes.
25   Q  I want you to look at the page of this white paper

1914

1    you relied on that ends with 042.  Do you see that at
2    the bottom?  It says UNSPSC is a hierarchal
3    classification having five fields.
4    A  Levels, it says.
5    Q  Excuse me.  Five levels, I apologize.  The levels
6    allow users to search products more precisely because
7    searches will be confined to logical categories and
8    eliminate irrelevant hits.  It allows managers to
9    perform expenditures analysis on categories that are
10   relevant to the company's situation.  Do you see that?
11   A  Yes.
12   Q  Now, you went through the segment level, the
13   family level, the class level, and the commodity
14   level, do you see that?
15   A  Yes.
16   Q  Under commodity, doesn't this white paper
17   represent that when you get to that level, you have a
18   group of substitutable products or services, correct?
19   A  Well, I think they say that, but it's clearly not
20   correct.
21   Q  Well, do you know that they have classifications
22   down to like, say, for specific white-out right down
23   to that level?
24   A  Well, I don't think you can.  There are only two
25   digits down at that level.

1915

1    Q  This is Plaintiff's Exhibit 32.
2        Why don't we move on while we're looking for that.
3    At least this white paper that you relied on
4    identifies those commodity levels, codes, as
5    substitutable products, correct?
6    A  Oh, it says that.
7    Q  Using your examples, if I went down and I got some
8    pen refills, couldn't I then look after I've used
9    those codes to find the search just by looking at it,
10   to find something that I considered to be generally
11   equivalent that I want to purchase?
12   A  You may or may not be able to do that.
13   Q  So in some instances I could do it, right?
14   A  Oh, yes.
15   Q  You'd agree with me, sir, that this Lawson
16   software is not something that you can buy at the
17   local Best Buy for software and load it onto your
18   computer, right?
19   A  I don't think so.  I'm expecting that it's
20   probably above their price point.
21   Q  And it sometimes takes months to implement this
22   software; isn't that right?
23   A  That sounds right.
24   Q  And it can cost tens of thousands, even hundreds
25   of thousands of dollars, right?

1916

1    A  That sounds right.
2        MR. McDONALD:  Objection.  We don't need to
3    get into the revenues for things, I think, and this
4    point to make whatever point he's trying to make.
5        THE COURT:  I'm not sure why that's relevant.
6        MR. ROBERTSON:  I'll move on, Your Honor.
7    BY MR. ROBERTSON:
8    Q  So you understand as part of your review of the
9    documents in this case in forming your opinions that
10   Lawson employees can be at a customer's facilities for
11   months to design, install, implement, configuration
12   and test the system for the customer, correct?
13   A  I don't think I was aware of the specific amount
14   of time that they would spend, but I was aware that
15   they do go to customer sites to assist with
16   implementation.
17   Q  In reviewing the documents in this case, you saw
18   manuals and guides that are provided to the customers
19   to an assist them in how to operate the software?
20   A  Yes.
21       MR. McDONALD:  Your Honor, I think this is
22   outside the scope of his testimony and his report.  It
23   really isn't an issue in dispute here.
24       MR. ROBERTSON:  We talked about induced
25   infringement, Your Honor.  I just wanted to ask some

1925

1    THE COURT:  Do you have a copy of his report

2  for him?

3    MR. ROBERTSON:  Yes, sir.

4    THE COURT:  What paragraph?

5    MR. ROBERTSON:  Paragraph 134, on page 40.

6    THE COURT:  Page 40, paragraph 134, Dr.

7  Shamos, is what he's going to ask you about.

8  BY MR. ROBERTSON:

9  Q  You indicate here that as a hypothetical

10  proposition, it's possible in a sense to avoid

11  searching an entire database each time by creating

12  indexes that allow particular records containing

13  specific data to be located quickly.  Did you say that

14  in that your report?

15  A  Yes, it says "in a sense."

16  Q  Thank you.  You also said in this regard, a

17  database index is similar to the index of a book which

18  makes it unnecessary to scan the entire book to locate

19  the occurrence of a word each time a search is

20  performed, correct?

21  A  Yes.

22  Q  With respect to the Punchout functionality and

23  Punchout procurement, you understand that when the

24  customer is using that functionality with the

25  requisition self service module, they're operating

1926

1  within the Lawson system during the entire process,

2  correct?

3  A  No.

4  Q  So if there were testimony in the record with

5  respect to that, that that is the case, would that

6  change your opinion?

7    MR. McDONALD:  Objection.  He wasn't able to

8  hear the testimony.

9    THE COURT:  That's a proper question.  It's

10  the functional equivalent of a hypothetical.  That's

11  all right.

12  A  I'm an open-minded guy.  If whoever said that

13  would explain what he meant by it, it's possible he

14  might change my mind, but merely hearing such

15  testimony exists doesn't change my mind.

16  Q  You're aware that it's Lawson who creates the

17  communication protocols with its Punchout trading

18  partners, correct?

19  A  Okay.  As a general proposition, in order

20  to connect to --

21  Q  As a general proposition, do you agree with that?

22  Yes or no?

23  A  Repeat it then.

24  Q  It's Lawson that creates the communication

25  protocols used in the Punchout procurement process?

1927

1  A  The phrase I'm having trouble with is

2  "communication protocols."

3    THE COURT:  You do not know what they are?

4    THE WITNESS:  I know what they are.

5    THE COURT:  Do you not know what he means?

6    THE WITNESS:  I think I know what he means,

7  but I think it's different from what he said.

8  BY MR. ROBERTSON:

9  Q  What do you understand communication protocols to

10  mean?

11  A  Well, you can't create communication protocols

12  over the Internet.  You have to use standardized

13  communication protocols.

14    If what you mean is Lawson's facility have the

15  ability to connect to the vendors so that you can

16  search the vendor's website, the answer is yes.

17  Q  And law also creates those protocols to return the

18  data from a vendor for inclusion into a requisition

19  and then a purchase order; isn't that right?

20  A  I'll have a lot easier time if we don't use the

21  word "protocols."  Just say mechanism and I'll agree

22  with you.

23  Q  Well, Lawson creates that mechanism?

24  A  Yes.

25  Q  Are you familiar with the term handshake used in

1928

1  that context?

2  A  Yes.

3  Q  Lawson creates that handshake, right?

4  A  Lawson implements part of that handshake, yes.

5  Q  If there were testimony in this case that Lawson,

6  in fact, creates that handshake, would that affect

7  your opinions in any way?

8  A  No, because I understand how handshakes work and

9  it's a two-way street.  The vendor has to do certain

10  things, too, as part of the handshake.

11  Q  Isn't it true in this Punchout process, selecting

12  checkout on the shopping cart releases the requisition

13  to the next stage of process?  And checkout saves

14  items to the cart to the requisition lines, and it

15  goes into the requisition to the next processing

16  stage?

17  A  Yes.

18  Q  So the shopping cart then is not the same as the

19  final requisition, correct?

20  A  I haven't opined on that.  I haven't looked at it.

21    THE COURT:  You say you haven't looked at it?

22    THE WITNESS:  I haven't looked at that.  I

23  haven't considered it.

24  Q  You were asked some questions about some of these

25  means-plus-function claim constructions.  Do you

1929

1  recall that?
2  A  Yes.
3  Q  Can we go to the page 5 of the glossary, the means
4  for selecting product catalogs to work?
5     You were asked about this particular claim element
6  in Claim Three of the '683 patent?
7  A  Yes.
8  Q  One of the structures the Court indicated there is
9  a user interface that allows the user to select a
10  catalog, do you see that?
11  A  Yes.
12  Q  If in one of those user defined fields, I had the
13  vendor name, the Lawson software presents a user
14  interface that would allow me to select that vendor in
15  that field, correct?
16  A  If you -- yes, in a sense.
17  Q  Thank you.  Also in this claim construction, the
18  Court indicated that the structure, corresponding
19  structure, is what's described, and at the end he
20  indicates "and their equivalents," do you see that?
21  A  Yes.
22  Q  You weren't asked by Mr. McDonald about the
23  equivalents, were you?
24  A  No.
25  Q  If you'll go to page 3, the means for generating

1930

1  an order list.  '172 patent, Claim One.
2     Now, for this means claim, the Court identified
3  the corresponding structure as being a user interface
4  operating on a computer through which a user may
5  select from results of a search program or a search
6  program that generates an order list of matching
7  items; is that right?
8  A  That was almost right.  I think you read one word
9  wrong.
10  Q  Let me start over then.  The Court identified the
11  corresponding structures that are disclosed as a user
12  interface operating on a computer through which a user
13  may select from results a search program or a search
14  program that generates an order list of matching
15  items?
16  A  You omitted a word that time.  I don't think it
17  really matters.
18  Q  Tell me which word I omitted.
19  A  "From."  Select from results from a search
20  program.  The second "from" was omitted.
21     THE COURT:  It probably was a typographical
22  error, isn't it?  I don't know.
23  Q  Well, in any event, the reason you say this can't
24  be satisfied is because you say catalogs aren't
25  present in the accused system, right?

1931

1  A  Well, no, the function isn't performed.  The
2  function has to -- first of all, there has to be a
3  means for searching, which we didn't have, and there
4  has to be a matching item selected by said means for
5  searching.
6     If you don't perform the function, it doesn't
7  matter what structure you have.
8  Q  Well, the Court construed means for searching for
9  matching items among the select product catalogs,
10  right?
11  A  Yes.
12  Q  While we're on that one still, Mr. McDonald didn't
13  ask you about any equivalents, did he?
14  A  In the interest of brevity, I don't think he asked
15  me about equivalents or any of the means-plus-function
16  elements.
17  Q  Let's go to means for searching for matching
18  items.  Now, it's your position that you can't search
19  for matching items among the selected product catalogs
20  because, first, you say there are no catalogs in the
21  item master, right?
22  A  That's one reason.
23  Q  Let's assume there are catalogs there.
24  A  Yes.
25  Q  Let's assume that the vendor identified the vendor

1932

1  name in one of those user defined fields.  I could
2  then select that catalog, I think you've indicated, by
3  using the vendor name, and then I could search in it,
4  couldn't I?
5  A  I did not indicate that, and you can't.
6  Q  Doesn't the Court indicate that the corresponding
7  structure here is a search program and modules
8  operating on a computer system with access to data in
9  a database or other file system, correct?
10  A  Yes, but you were talking about selected product
11  catalogs.
12  Q  I said assume that we have a vendor name and a
13  vendor field and we have selected that vendor name and
14  got results.
15  A  That's not selecting a vendor catalog.  That's
16  selecting a particular field in a database.
17  Q  Don't I get results from that is the catalog that
18  has that vendor name?
19  A  Well --
20  Q  Can you answer that fairly yes or no?  If I just
21  search using that vendor field that I've populated
22  with the vendor names, and I just want Dell, and I put
23  Dell computer in that vendor name, I'll get Dell
24  results, won't I?
25  A  Yes, you search the entire catalog to get Dell

2045

ENG - REDIRECT      2045

1   and get these binders that you sent up here at the

2   very beginning, not now, because you-all are both

3   adopting a new mode, and I need the space to put in

4   the exhibits that you are using.

5        I'd like to say that I'd like to commend, and

6   it's obvious to me there's been some hard work put in

7   by the legal assistants in this case.  There have been

8   very few problems, and when there have been problems,

9   they have been solved immediately.  And you can't do

10  that unless you know what you're doing.

11       And the IT people, I think you-all have done

12  a fine job, too.  Of course, the lawyers.  I don't

13  mean to take anything away from you, but I remember

14  well who does most of the work.

15       MR. McDONALD:  Your Honor, just one more

16  thing with respect to that last video that Ms. Huey

17  would like to offer.

18       MS. HUGHEY:  I'd like to offer it as

19  Defendant's Exhibit 401.

20       THE COURT:  What is it?

21       MS. HUGHEY:  This is the transcript of what

22  was read in.  My understanding is that

23  Ms. O'Loughlin's deposition transcript was read in, I

24  believe, and it will be marked as an exhibit for the

25  record.

2046

ENG - REDIRECT      2046

1        THE COURT:  Any objections?  It's admitted.

2        THE CLERK:  What number is that?

3        THE COURT:  401.  Defendant's 401.

4        (Defendant's Exhibit 401 is admitted into

5   evidence.)

6        THE COURT:  All right.  Anything else anybody

7   has so we can get ready to go on Tuesday morning?

8        MR. McDONALD:  Nothing else, Your Honor, for

9   the defense.

10       THE COURT:  All right.

11       MR. ROBERTSON:  Sorry, Your Honor.  I didn't

12  hear you.

13       THE COURT:  I just want to know if there's

14  anything else so that we can solve it and get going

15  and actively out of the box at nine o'clock Tuesday

16  morning.

17       MR. ROBERTSON:  Nothing by the plaintiff.

18       THE COURT:  Okay.  That sounds good.  All

19  right.

20

21       (The proceedings were adjourned at 5:20 p.m.)

22

23

24

25

2797

```
1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE EASTERN DISTRICT OF VIRGINIA
3                    RICHMOND DIVISION
4
5    --------------------------------------
6    ePLUS, INC.            :  Civil Action No.
                            :  3:09CV620
7    vs.                    :
                            :
8    LAWSON SOFTWARE, INC.  :  January 21, 2011
                            :
9    --------------------------------------
10
11        COMPLETE TRANSCRIPT OF THE JURY TRIAL
12          BEFORE THE HONORABLE ROBERT E. PAYNE
13       UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24        Peppy Peterson, RPR
             Official Court Reporter
25         United States District Court
```

2798

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2799

```
1                    P R O C E E D I N G S
2
3         THE CLERK:  Civil action number 3:09CV00620, ePlus,
4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
6    Mr. Michael G. Strapp represent the plaintiffs.
7         Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin L. Stoll-DeBell, Mr. William D. Schultz, and Ms. Rachel
9    Hughey represent the defendant.  Are counsel ready to proceed?
10        MR. ROBERTSON:  Yes, Your Honor.
11        MR. McDONALD:  Yes, Your Honor.
12        THE COURT:  All right.  We'll take plaintiff's JMOL
13   motion first.
14        MR. ROBERTSON:  Good morning, Your Honor.
15        THE COURT:  Good morning.
16        MR. ROBERTSON:  I'm going to be arguing plaintiff's
17   judgment as a matter of law with respect to infringement, and
18   Ms. Albert will be addressing plaintiff's judgment as a matter
19   of law with respect to the invalidity issues.
20        Your Honor, Rule 50 provides that judgment as a
21   matter of law may be granted when a reasonable jury would not
22   have a legally sufficient evidentiary basis to find for the
23   party Lawson on that issue.  ePlus moves for JMOL that Lawson
24   infringes all the asserted claims of the patents-in-suit, both
25   directly and indirectly, both through inducement of
```

2800

```
1    infringement and contributory infringement.
2         I'm not going to go through all the asserted claims,
3    Your Honor.  I know Your Honor is familiar with them, and that
4    would just take up too much time, and I know we're pressed for
5    time here this morning with the Court's schedule this
6    afternoon, but let me hit a high point, first start off by
7    saying, we contend that the defendants non-infringement case in
8    this proceeding has been really based on misdirection, that
9    they have ignored the Court's claim construction with respect
10   to catalog.  They rewrote the provision for published by a
11   vendor to suit their manufactured non-infringement positions.
12        It required the Court, I think midcourse through this
13   case, to issue the instruction with respect to published by a
14   vendor to bring some clarity to what the Court intended when it
15   gave its instruction with respect to what a catalog is.
16        It did not mean, as the defendant contended, that the
17   item data associated with the catalog could not be selected --
18   or had to be selected by the customer or modified or deleted or
19   reformatted or be an entire catalog.  That was never intended
20   by the Court, and its revised published-by-a-vendor
21   construction made that clear, and I think the arguments made on
22   that, the non-infringement arguments that were based on that
23   have no sound footing in the record on this case.
24        We believe that the best evidence in this case has
25   come from, indeed, Lawson's own witnesses and documents.  Mr.
```

2829

1   met, there is no infringement.

2       To answer your question, I do agree with ePlus's

3   position that capability allows for infringement. The second

4   question with respect to the specific issue of catalogs is that

5   here, there is no catalog. Like I said, both parties agree

6   that at some point data that's been drawn from a catalog, a

7   vendor catalog and changed is not a catalog.

8       THE COURT: But you don't even agree if I put my

9   whole catalog in, that I've got a catalog in the item master

10  vendor table.

11      MS. HUGHEY: I would agree that that would be an

12  infringement if that happened, but it does not, nor is it

13  capable of happening. That's my point.

14      THE COURT: Why isn't it capable of happening? In

15  fact, every witness that testified said it is, including Mr.

16  Christopherson. What he said was, in words of one syllable,

17  sure, that can done, but that isn't the way it's usually used.

18  That's what he said.

19      MS. HUGHEY: The evidence that was coming in was that

20  the item master -- all the evidence that came in about the item

21  master is that it is uniquely organized and created by a

22  customer, it does not look like a published catalog, it's a

23  private collection of personal items, has special price

24  information. These are not -- this is a not a catalog, a

25  vendor catalog like the Sears catalog. This is a grocery list.

2830

1       THE COURT: That isn't the question. Your witness

2   testified the -- that I could put one or more entire

3   catalogs into the item master if I wanted to depending on the

4   capacity of the item master I bought, and your position is that

5   even if I do that, the item master parts list, vendor item list

6   isn't a catalog, and I don't understand that at all.

7       MS. HUGHEY: Your Honor, the evidence that came into

8   this case is that the item master is like a grocery list, and

9   so, yes, people were saying in theory -- in context, they were

10  talking about what kind of information could be drawn in, but

11  in reality, all the evidence came in that item master is a

12  grocery list. It is not a catalog.

13      THE COURT: What about something -- you make it sound

14  like a grocery list that my wife goes to the store or sends me

15  to the store with a list of 20 items. There are hundreds of

16  thousands of items in most of these item masters, and they

17  came -- all that information came from vendors, and it was --

18  and the information -- your user transformed some of it, edited

19  some of it and moved some of it, gave some information that's

20  not in the catalog such as price because they worked out a

21  special deal, but what's in the catalog that is created

22  by the item master is the price, or what's in the item master,

23  whatever you want to call it, is the price, for example.

24      Now, I don't understand how you can have something

25  that's a hundred thousand items, or in many instances more than

2831

1   that, and 10,000 vendors and you don't have a catalog of what's

2   in there just because it came from multiple sources. That's

3   what you are saying. You're saying you can't -- you don't have

4   a catalog because it came from 10,000 different vendors or a

5   thousand.

6       MS. HUGHEY: No, that's not why it's not a catalog.

7   It's not a catalog because it doesn't meet the Court's

8   definition of catalog. The Court's definition of catalog

9   requires an organized collection of items and associated

10  information published by a vendor.

11      At no point was any of the information pulled from a

12  catalog and then transformed, as we've gone through in great

13  detail, and then put into the item master, also known as a

14  grocery list.

15      THE COURT: In fact, that's exactly what Mr.

16  Christopherson said did happen under the ETL process that he

17  testified to in connection with this exhibit, and the T in that

18  is transformation. That is exactly what he did.

19      MS. HUGHEY: The transformation is the whole point of

20  change. There is a -- everyone agrees that the Sears catalog

21  or the Montgomery Ward catalog is a catalog. It comes from

22  that point, it is -- it is changed and then put in the item

23  master like a grocery list. That is the T. That is what we're

24  talking about. It's not the same.

25      THE COURT: I don't understand why it isn't.

2832

1       MS. HUGHEY: It's not the same because it doesn't

2   meet the Court's definition of catalog. The Court's definition

3   of catalog is an organized collection of items and associated

4   information published by a vendor.

5       THE COURT: What is wrong with that? You can't just

6   cite the whole thing. You now need to tell me what part of the

7   definition it doesn't fit.

8       MS. HUGHEY: Yes. Specifically the published by a

9   vendor. It requires the items --

10      THE COURT: Why isn't it published by a vendor?

11      MS. HUGHEY: The items in the item master have never

12  been published by a vendor.

13      THE COURT: Of course they have. Where did they come

14  from in the first place?

15      MS. HUGHEY: There was a published vendor catalog.

16      THE COURT: And that was published by the vendor.

17      MS. HUGHEY: That was.

18      THE COURT: Then I go to the catalog, I look at it,

19  and then I have Remmington shotgun model 12 in there. Well, my

20  system won't take a Remmington shotgun model 12, so what I do

21  is I take that vendor information, and I transform it to RSG

22  and 12 so it will fit the number of characters.

23      All I've done is transformed the exact data, loaded

24  that into my system, and I have my own little catalog there.

25  If I want a AK-47 and a Berretta and a long gun, and I take

3077

1   arguments, Your Honor?

2        THE COURT:  We told the jury to come back at 9:00.

3   So you're going to get those instructions over here by -- I

4   need them by four o'clock tomorrow afternoon.  So if that lets

5   you sleep a little later, have at it.  Does that take care of

6   everything?  I don't intend to clean up night.

7

8        (Court adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3078

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE EASTERN DISTRICT OF VIRGINIA
 3                     RICHMOND DIVISION
 4
 5   ---------------------------------
 6   ePLUS, INC.           :  Civil Action No.
                           :  3:09CV620
 7   vs.                   :
                           :
 8   LAWSON SOFTWARE, INC.    :  January 24, 2011
                           :
 9   ---------------------------------
10
11       COMPLETE TRANSCRIPT OF THE JURY TRIAL
12         BEFORE THE HONORABLE ROBERT E. PAYNE
13       UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     David M. Young, Esquire
17   Goodwin Procter, LLP
     901 New York Avenue NW
18   Suite 900
     Washington, D.C.  20001
19
     Craig T. Merritt, Esquire
20   Christian & Barton, LLP
     909 East Main Street
21   Suite 1200
     Richmond, Virginia  23219-3095
22   Counsel for the plaintiff
23
24        Peppy Peterson, RPR
             Official Court Reporter
25          United States District Court
```

3079

```
 1   APPEARANCES:  (cont'g)
 2   Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
 3   Troutman Sanders Building
     1001 Haxall Point
 4   Richmond, Virginia  23219
 5   Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
 6   William D. Schultz, Esquire
     Merchant & Gould, PC
 7   80 South Eighth Street
     Suite 3200
 8   Minneapolis, Minnesota  55402
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3080

```
 1                  P R O C E E D I N G S
 2
 3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
 4   Incorporated versus Lawson Software, Incorporated.  Mr. Scott
 5   L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
 6   Mr. Michael G. Strapp represent the plaintiff.
 7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
 8   Kirstin L. Stoll-DeBell, Mr. William D. Schultz represent the
 9   defendant.  Are counsel ready to proceed?
10        MR. ROBERTSON:  Yes, Your Honor.
11        MR. McDONALD:  Yes, Your Honor.
12        THE COURT:  All right.  I was very sorry to hear
13   about Ms. Albert's father passing away.  You all both wrote
14   letters about it.  I don't see the point in bringing that to
15   the attention the jury.  Do either one of you?
16        In the old days, when people didn't do what they were
17   supposed to do, they got keelhauled.  I'm about ready to
18   institute that procedure here.  It's time for the jury to get
19   going, and I've had to read all this stuff now.  I told you
20   what to do about this verdict form, and it was pretty easy, and
21   it's unnecessary to go through all this stuff.
22        Now, apparently we're going to have to revise it
23   anyway because -- and some of the instructions.  What
24   instructions have to be revised because Lawson is not
25   contending that the RIMS brochure is prior art?  Which one is
```

3081

```
 1   arguing?
 2        MR. YOUNG:  Your Honor, David Young for ePlus.  It's
 3   instruction 3-A that was submitted to the Court over the
 4   weekend.  It lists as I think reference number three, RIMS
 5   brochure, and that would have to come out now because it
 6   appears that Lawson does not have that as an anticipated
 7   reference on its own verdict form.
 8        THE COURT:  Is that right?
 9        MR. McDONALD:  Yes, that's right, Your Honor.
10        THE COURT:  So I suppose I need to tell the jury
11   simply to disregard any testimony about the RIMS brochure as
12   prior art.
13        MR. McDONALD:  No, it not anticipatory prior art
14   meaning it's not all by itself anticipating a claim.  We're
15   still using it for obviousness and support for the on sale, the
16   RIMS as prior art and 102(a) and (b), but the brochure, all by
17   itself, we're not contending is an anticipating reference, but
18   it would be used to support number one in the instruction which
19   is the Fisher RIMS system as prior art.
20        THE COURT:  What do you mean, to be used to support?
21   If you're going to use it --
22        MR. McDONALD:  It's evidence of the Fisher RIMS
23   system as it was being sold and --
24        THE COURT:  Well, if it's evidence of it, it comes
25   out of 39, too, because you're not contending that it is
```

3122

1  got back information that it was temporarily out of stock,
2  please check back soon.  Clearly, using the Lawson system,
3  using that punchout capability, there was the capability of
4  determining whether a selected matching item was available in
5  inventory.
6      That functionality is also available with the systems
7  that use the EDI or electronic data interchange capability.
8  Dr. Weaver showed you, if we're using the electronic data
9  interchange module, the purchase order goes to a vendor, and
10  the vendor can reply and the purchase order responds as to
11  whether that item is available in inventory, for example,
12  whether or not the item was backordered.  During his
13  demonstration, he showed you a situation in which that
14  happened, and you'll be able to look at that when you're in
15  your deliberations.
16      Let's talk a little bit about this punchout
17  capability.  As you know, there's a punchout application that
18  Lawson includes that is accused of infringement in one of the
19  five configurations.  Dr. Weaver's demonstration of the
20  punchout capability showed how a punchout user can determine
21  whether an item is available in inventory, and it showed how
22  Lawson creates, communicates, and controls the punchout trading
23  partner websites that an S3 user punches out to.
24      You don't punch out to Dell.com, for example, when
25  you are doing that.  You punch out to a specially created Dell

3123

1  punchout website that Lawson has worked with Dell in order to
2  set up the communication protocols in order to do that.
3      For example, we can look at the next slide.  Here
4  you'll see, and the testimony was that Lawson, when you use
5  this punchout capability, you are always within the Lawson
6  system and that this is not, notwithstanding we are looking at
7  products that are available from the Dell catalog, this is a
8  special Dell website for this, and Dr. Weaver pointed out that
9  you can tell that from what's called the URL address.
10      You are at the Lawson server.corpnet.lawson.com when
11  you are there looking at these Dell products.  Lawson
12  established that, Lawson created that, Lawson designed it, and
13  Lawson set up all of the necessary architectures and
14  communication protocols in order to do that.
15      You even heard from Mr. Lohkamp, the product
16  strategist, about how Lawson enters into agreements with its
17  punchout trading partners to develop that connection.  He also
18  explained how the punchout partners pay Lawson to configure and
19  test and set up the connection.  He said those contracts were
20  mutually beneficial.
21      Now, he also said he had a number of relationships
22  with punchout trading partners that were not contractual, but
23  when I asked him, were they mutually beneficial as well to both
24  Lawson and to the trading partners, he said, yes.
25      If I can just talk to you a little bit about the

3124

1  punchout architecture to show you Lawson keeps a bear hug
2  around this entire process, if we can go to the punchout
3  architecture slide.
4      This was one of the Lawson documents.  It's the
5  procurement punchout guide, I believe, Plaintiff's Exhibit
6  Number 211.  Dr. Weaver testified as to the eight steps that
7  are necessary in order to do the punchout process.  These eight
8  steps are set up by Lawson in order to provide this
9  functionality through a user of the punchout system.
10      I'm not going to go through all eight, but that
11  exhibit is back in evidence, and it demonstrates clearly that
12  Lawson is the one that has created, designed, and instituted
13  this entire process to provide that architecture to the user of
14  the system in order to perform the search, the selection, and
15  retrieval of the information necessary to then fill out a
16  requisition and build the purchase orders.
17      Indeed, I thought it was very interesting.  The term
18  that Mr. Lohkamp used is that they have to create the handshake
19  with their punchout trading partners in order to do that.  Each
20  of these steps is controlled by Lawson, and Lawson controls the
21  authorization process, and Lawson establishes the connection,
22  and Lawson retrieves the information in order to complete the
23  entire purchase process.
24      It was Mr. Lohkamp who also confirmed that Lawson
25  provides the assistance to its customers including manuals,

3125

1  training services, and implementation services all to help them
2  configure the procurement punchout with its partners.  Indeed,
3  the user of the Lawson system tells Lawson what punchout
4  trading partners they want available to their system, and then
5  Lawson will indeed to do that, and then they charge for that
6  service.
7      May I have the next slide, 43.  Indeed, I asked
8  Mr. Christopherson, when the Lawson system punches out to the
9  punchout creating the partner's catalog, you remain connected
10  to the Lawson system; correct?  Correct.
11      I'd like to talk to you a little bit now about what's
12  call indirect infringement, some of these issues about inducing
13  and contributory infringement.  Indirect infringement, like
14  direct infringement, is still infringement, and ePlus, we
15  believe, has shown through the testimony, again, of Lawson's
16  own witnesses and its own documents that Lawson infringes the
17  claims of the patent both directly and indirectly.
18      The Court will instruct you that Lawson may directly
19  infringe the patents even if they believe in good faith what
20  they are doing is not infringement of any of the patents.  The
21  Court will also explain to you the law concerning indirect
22  infringement.  In a nutshell, ePlus asserts that Lawson has
23  both induced and contributed to the infringement of ePlus's
24  patents.
25      So what does that mean?  Well, to show induced

3298

1              (Jury in.)

2

3         THE COURT:  The jury has decided that it would like

4    to return home for the evening and then return in the morning

5    and deliberate.  What is your pleasure on the time to

6    deliberate?  Do you want to start at 9:00, start at 9:30?

7         Nine o'clock we'll be here and have stuff ready for

8    you, and you be ready and you can have -- you can take whatever

9    time you feel like you need to deliberate.  If you leave your

10   notebooks the way you usually do, Mr. Neal will take care of

11   them.  Thank you.  Drive carefully.

12

13             (Jury out.)

14

15        THE COURT:  Have all these transcripts and these

16   things -- you've got everything you need; right?

17        MR. STRAPP:  Yes.

18        MR. CARR:  I believe so.

19        THE COURT:  One thing I need for you all to do is to

20   see if there's anything that needs to be cleaned up that I need

21   to decide.  For example, they've got these motions that have

22   been filed yesterday -- this morning or yesterday.  I don't

23   know what -- by Lawson.

24        I need a briefing schedule on them and see what I'm

25   supposed to do, and that means you all need to get moving and

3299

1    decide how you want to proceed, little things like that so we

2    can get that sorted out.  I'd like to get all this done just as

3    soon as I can.

4         MR. ROBERTSON:  I'll call Mr. McDonald tomorrow once

5    he gets back to Minnesota.  I understand he's gone back.

6         THE COURT:  He's what?

7         MR. ROBERTSON:  I'll call Mr. McDonald tomorrow in

8    Minnesota.  I know he's traveling --

9         THE COURT:  He's in Minnesota?

10        MR. CARR:  He is leaving this evening, yes.

11        THE COURT:  Are you fully empowered?

12        MR. CARR:  Yes, sir.

13        MR. ROBERTSON:  I'll just --

14        THE COURT:  Does he understand that the juries have a

15   lot of questions sometimes?

16        MR. CARR:  He does.

17        THE COURT:  Okay.

18        MR. ROBERTSON:  I'll work out a briefing schedule,

19   Your Honor, and we'll take care of it in short order.  Maybe we

20   can decide some of things that have been mooted by some of Your

21   Honor's rulings.

22        THE COURT:  They very well may have.  I don't know

23   the answer to that.  Some of them may not, but I want to make

24   sure we get it done.

25        MR. ROBERTSON:  Your Honor, I intend on having at

3300

1    least two attorneys here at all times so I can be reached by

2    phone.  I'm just right down here at the Hilton Garden Inn, so I

3    can be here in four minutes.

4         THE COURT:  Do you have to trade shoes or can you --

5         MR. ROBERTSON:  I come equipped.  I will be right

6    over here pronto, but we'll have somebody here at all times.

7         THE COURT:  That's fine.

8         MR. ROBERTSON:  All right.  Thank you.

9         THE COURT:  Now, is he coming back?  Mr. McDonald or

10   Ms. Stoll-DeBell?

11        MR. CARR:  As far as I know, he's not coming back.

12        THE COURT:  Well, then, I know not to schedule any

13   arguments, I guess, until I'm certain.  All right.  I guess

14   that solves it for now.  Thank you very much.  We'll be in

15   adjournment.

16

17             (Court adjourned.)

18

19

20

21

22

23

24

25