**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

|                          |     |                          |
|--------------------------|-----|--------------------------|
| ePLUS INC.,              | )   |                          |
|                          | )   |                          |
|    Plaintiff, | )   |                          |
|                          | )   |                          |
|    v.     | )   | Case No. 3:09CV620 (REP) |
|                          | )   |                          |
| LAWSON SOFTWARE, INC.,   | )   |                          |
|                          | )   |                          |
|                          | )   |                          |
|    Defendant. | )   |                          |

**DEFENDANT LAWSON SOFTWARE, INC.'S REPLY BRIEF IN SUPPORT OF ITS
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

## <u>TABLE OF CONTENTS</u>

I.   **SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE JURY'S VERDICT THAT THE ASSERTED CLAIMS ARE INFRINGED**...........................1

    A.   **The Punchout Systems 3 and 5 Do Not Infringe**...................................1

        1.   Reliance on Functionality from Other Systems Will Not Cure ePlus's Failure to Identify a Single Actor Who Performs (or Is Even Capable of Performing) All of the Steps of the Method Claims.......................................................1

        2.   ePlus Did Not Prove that Anyone Actually Performed All Steps of Any of the Method Claims.........................................4

        3.   Substantial Evidence Does Not Support the Verdict that the Punchout Configurations Infringe the System Claims.................6

        4.   Joint Infringement Cannot Be Used to Support the Punchout Verdict .......................................................................7

    B.   **Lawson Did Not Waive Its JMOL Arguments with Respect Claim 1 of the '172 Patent**...................................................9

    C.   **There is No Substantial Evidence to Support a Verdict of Indirect Infringement**..............................................................9

II.  **SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE JURY'S VERDICT THAT THE CLAIMS ARE VALID**..............................................10

    A.   **Lawson Did NOT Waive Its Argument that JMOL of Invalidity Should Be Granted Based on the Combination of the RIMS System and TV/2**.........................................................10

    B.   **The Prohibition on Using Commonly-Owned Prior Art in an Obviousness Combination Does Not Apply to the '989 Patent**.......................11

    C.   **The Claims Are Obvious Based on the Combination of RIMS + TV/2, and No Substantial Evidence Showed Otherwise**...................11

        1.   The Combination of RIMS and TV/2 Teaches All of the Elements of Claims.................................................................12

        2.   The Modifications Made to RIMS and TV/2 to Create the Commercial Embodiment of the Patents-in-Suit Do Not Impact the Invalidity Analysis .................................................16

  **F.**  **Lawson Has Not Waived the Issue of Indefiniteness** .........................................19

  **G.**  **The Asserted Claims Do Not Recite Patentable Subject Matter** ....................20

**III.** **CONCLUSION** ...........................................................................................................20

## I.   SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE JURY'S VERDICT THAT THE ASSERTED CLAIMS ARE INFRINGED

### A.   The Punchout Systems 3 and 5 Do Not Infringe

1.   Reliance on Functionality from Other Systems Will Not Cure ePlus's Failure to Identify a Single Actor Who Performs (or Is Even Capable of Performing) All of the Steps of the Method Claims

The jury did not have a legally sufficient basis to find that the Punchout configurations

(Systems 3 and 5) infringe method claims 26, 28, and 29 of the '683 patent, at least because no

single party performs every step of the claimed methods, even according to ePlus's expert:

| Claim Steps of Method Claims (Claims 26, 28, and 29 of the '683 Patent) | Who Performs? | Cite to Dr. Weaver |
|---|---|---|
| "maintaining at least two products catalogs on a database containing data relating to items associated with the respective sources;" (claims 26, 28, & 29) | **Punchout vendor** (on vendor's system) | Tr. 573:22-23; 605:20-25, 606:19-21, 616:18-21; 618:24-619:5. |
| "selecting the product catalogs to search;" (claims 26, 28, & 29) | **Customer** (on customer's Lawson system) | Tr. 605:11-22; 659:1-12. |
| "searching for matching items among the selected product catalogs;" (claims 26, 28, & 29) | **Customer** (on vendor's system) | Tr. 878:11-13; 662:21-663:5. |
| "building a requisition using data relating to selected matching items and their associated source(s);" (claims 26, 28, & 29) | **Customer** (on customer's Lawson system) | Tr. 664:18-665:1; 665:14-22. |
| "processing the requisition to generate one or more purchase orders for the selected matching items;" (claims 26, 28, & 29) | **Customer** (on customer's Lawson system) | Tr. 606:1-5. |
| "determining whether a selected matching item is available in inventory." (26 and 29) | **Punchout:** **Punchout vendor** (on vendor's system) | Tr. 573:3-9; 879:17-24. |
|  | **EDI:** **Vendor** | Tr. 604:12-17. |
| "converting data relating to a selected matching item and an associated source to data relating to an item and a different source." (28 and 29) | **Customer** (on customer's Lawson system) | Tr. 644:2-16; at 652:10-653:3. |

This is insufficient as a matter of law unless ePlus can also prove the additional requirements of

joint infringement.  (Dkt. 760 at 10; *infra* at 10)  Recognizing this problem, ePlus resorts to

arguing that there was "substantial evidence to support the jury's verdict that a user of the

infringing systems performs each step . . . **without employing the Punchout functionality**."

(Opp. at 5 (emphasis added))  ePlus argues:

- it does not need to rely on the punchout vendor's external catalogs because the Punchout configurations include RSS, which includes the Item Master database, which satisfies the step of maintaining multiple catalogs;
- it does not need to rely on the punchout vendor's search engine for searching for matching items step, because RSS allowed a user to select catalogs to search and search selected catalogs; and
- it does not need to rely on the punchout vendor's inventory check for System 5 because EDI also checks inventory through purchase order confirmations.

This effort fails.  RSS certainly fails to salvage the jury's findings as to the '683 claims, as the jury found that the RSS configuration [No. 2] did not infringe those claims.  More importantly, as to all the claims, these new ePlus arguments are inconsistent with ePlus's own expert testimony—Dr. Weaver relied ***solely*** on the punchout vendor catalogs, which he referred to as the "external catalogs," and the punchout vendor's website to explain why Systems 3 and 5 infringe the elements of these claims that correspond to the bullet points above.  (Weaver, Tr. 605:20-25, 606:19-21, 616:7-21, 618:24-619:5, 661:7-20, 573:22-23)

        a)     <u>Lawson's RSS Software Did Not Include Two or More Catalogs as Defined by this Court</u>

ePlus relies on RSS functionality, namely the Item Master database, to support the verdict that the Punchout configurations maintain "at least two products catalogs."  However, as discussed in detail in Lawson's Opposition to ePlus's JMOL motion (Dkt. 771 at 12-16) the Item Master database does not meet the requirement of two or more catalogs as defined by this Court.[1]

---

[1]      Contrary to ePlus's contention, none of Lawson's customers testified that they maintain multiple catalogs within their Item Master database.  Bill Yuhasz testified that his Item Master had items associated with 10,000 *vendors*, not "10,000 vendor catalogs" as ePlus claims.  (Tr. 1707:20-23)  Indeed, he testified that his Lawson system did *not* have product catalogs, and that was why Novant was looking to replace Lawson's software with a competitor's product.  (Tr. 1692:15-23)  Lawson's other customers similarly did not testify that they have multiple product catalogs.  (Oliver, PX-518A at 17:4-6; Matias, PX-520A at 19:9-13).  The only witness to testify that Item Master constituted multiple catalogs was ePlus's expert, Dr. Weaver.  His testimony about what constitutes multiple catalogs was so broad as to at least lack credibility for a reasonable juror, if not completely defy logic.  (Weaver, Tr. 870:17-871:14 (a keyword search for "blue" would be selecting the blue catalog); *compare* Shamos, Tr. 1738:5-10, 1747:1-1756:17)

Lawson's Item Master database is a customer-specific, single list of items (and associated information) that a customer might want to buy.  (Lohkamp, Tr. 1000:6-17)  The prior art RIMS system included a database, called "Parts Master," that also was a customer-specific, single list of items (and associated information) that a customer might want to buy.  (Momyer, Tr. 2109:25-2111:5)  Dr. Shamos testified that Item Master was essentially the same as the RIMS Parts Master.  (Tr. 2427:22-2428:11; 2508:21-2509:25)  Inventor Momyer testified that that the prior art RIMS Parts Master was *different from* the catalogs required by the claims.  (Momyer, Tr. 335:15-337:24)  The inescapable conclusion is that the Item Master, like the RIMS Parts Master, is not multiple catalogs required by the claims.

There was insufficient evidence for a jury to conclude that the Item Master database constituted two or more catalogs as defined by the Court.  Relying on the RSS functionality thus does not cure the problem of divided infringement for configurations 3 and 5.

   b) <u>Lawson's RSS Software Did Not Permit Selecting Catalogs for Searching</u>

ePlus relies on RSS functionality to prove that the Punchout configurations satisfied the claimed steps of "selecting catalogs to search" and "searching for matching items among selected product catalogs."  As discussed in detail in Lawson's Opposition to ePlus's JMOL motion (Dkt. 771 at 16-20), none of the testimony or exhibits cited by ePlus proves that Lawson's Core Procurement or RSS software permitted a user to select catalogs to search and searched *only* selected catalogs.

For RSS, ePlus argued that a user could select catalogs within the Item Master database to search by doing a keyword search.  (Weaver, Tr. 925:5-16)  Dr. Weaver testified when such a keyword search is done, the software searches an index "***rather than the full database***", because such searches are "***faster than*** sorts or searches performed on the ***actual database***."  (Tr. 706:13-

3

16 (emphasis added), 925:5-16)  There is no testimony that Lawson's system searches portions of the ***actual database***, let alone portions of that database that have already been selected. Moreover, Dr. Weaver testified that the index as a whole, not mere selected portions of the index, are searched.  (Tr. 706-707)  Thus, there is no Lawson database or index that has only selected portions searched.  Moreover, while the index may represent information in the whole Item Master database, it is not selected catalogs from the database and never represents information in only selected catalogs, whether or not the database is wrongly considered to be multiple catalogs.  This evidence demonstrates only that the index for the entire Item Master may be searched using various criteria, which is insufficient to show infringement.

   c) <u>EDI Purchase Order Confirmation/Inventory Check Comes from a Vendor, and thus Does not Fill the Infringement Gap.</u>

  ePlus relies on the EDI functionality, namely the purchase order confirmation, to support the verdict that Punchout System 5 infringes claims 26 and 29.  However, this does not solve the divided infringement problem because it is the third party vendor (not Lawson or the customer) who determines inventory availability in an EDI 855 PO acknowledgment.  (Weaver, Tr. 604:12-17 ("The purchase order acknowledgment which is EDI 855, and that's where there is the opportunity **for the supplier to tell the customer** whether or not the order can be filled and whether or not the items that are being ordered are available in inventory." (emphasis added))

   2. <u>ePlus Did Not Prove that Anyone Actually Performed All Steps of Any of the Method Claims</u>

  ePlus argues that there was substantial evidence that Lawson itself performs the claimed method steps when it demonstrates its software to customers or conducts training.  (Opp. at 4 n.2.)  ePlus cites testimony from two Lawson fact witnesses, neither of whom stated that Lawson performs any of the method steps, let alone all of the method steps.  The slides (PX-136) cited by ePlus do not suggest or show, for example, any inventory checking steps (either through

4

punchout or EDI 855) and do not suggest or show converting, or substituting one item for another item using a UNSPSC commodity code search.  Thus, these slides do not show actual performance of *all* of the method steps, as is necessary to prove infringement.

Absent from ePlus's brief is a citation to Dr. Weaver on this point.  ***Dr. Weaver never testified that Lawson performs the method steps by demonstrating its software to its customers.***  Dr. Weaver made only a conclusory statement that Lawson (as opposed to its customers) directly infringed the method claims in the case of that fraction of Lawson customers who have Lawson host software applications for them.  (Tr. 775:3-16)  Even in that small minority of cases, Lawson does not perform the steps of the method claims when it hosts—the customer is the one who uses the software to search for items, build requisitions, and generate purchase orders.  (Weaver, Tr. 775:3-16; Raleigh, Tr. 942:11-13)

Moreover, the jury was properly instructed that "[d]irect infringement of a method claim results if a single actor **performs** all of the steps of that claim."  (Tr. 3253:23-24)  The "reasonably capable" jury instruction cited by ePlus does not change this fundamental principle.  Rather, it typically addresses the situation where an accused product is capable of operating in an infringing mode and a non-infringing mode.  As the jury instructions provided:  "an accused system or method may be found to infringe if it is reasonably capable of satisfying the claim elements or limitations *even though the system or method may also be capable of non-infringing modes of operation*."  (Tr. 3254:23-3255:8)  This instruction does not relieve ePlus of the burden to prove that someone ***performed*** the method in an infringing mode.

ePlus did not meet its burden to prove that someone actually performed the method steps as is evidenced by its inability to cite any evidence in its JMOL opposition brief demonstrating that all steps were *actually* practiced.  There was no evidence to support the jury's verdict that

5

any of Lawson's product configurations either directly or indirectly infringed any of the method claims.

        3.     <u>Substantial Evidence Does Not Support the Verdict that the Punchout Configurations Infringe the System Claims</u>

            a)     <u>Reliance on other Functionality Will Not Cure ePlus's Failure to Identify a Single System with All Elements of the System Claims</u>

The jury did not have a legally sufficient basis to find that Lawson directly infringes claim 3 of the '683 patent and claim 1 of the '172 patent with the punchout configurations (systems 3 and 5) because even according to ePlus's expert, Lawson does not make or use every element of the claimed system. Specifically, Lawson did not make or use the external punchout catalogs or the search engine for searching them on the vendor's punchout website.

ePlus argues that the verdict is sustainable without regard to the additional functionality provided by the punchout vendors. (Opp. at 9.) These arguments fail for the same reasons described above. The Item Master database used by the RSS products does not meet the Court's definition of catalog, let alone multiple product catalogs as required by claim 3. Similarly, neither Core Procurement nor RSS included a means for selecting product catalogs to search and then means for searching within the selected product catalogs as required by claim 3. There was no evidence that Lawson directly infringed this claim.

ePlus's argument regarding claim 1 of the '172 patent suffers from similar problems. ePlus relied upon the punchout vendor's system to prove multiple elements of this claim, including the "means for searching for matching items that match the entered product information in the selected portions of the database." This Court interpreted the function of the means for searching as: "***searching*** for matching items that match the entered product information ***in the selected portions of the database***." (Dkt. 204 at 49 (emphasis added)) As described above with regard to the method claims, there is no testimony that Lawson's Core

Procurement or RSS software searches **portions of** the actual Item Master database, let alone portions of that database that have already been selected.  There is no Lawson database which has "selected portions" searched.  As with the method claims, relying on functionality from the Core Procurement or RSS software does not demonstrate infringement of system claims 1 and 3.

b)   Lawson Does Not Use The Entire Claimed System

Lawson does not directly infringe the system claims 1 and 3 because it does not use the entire claimed invention.  To "use" the system, Lawson must put the entire claimed invention into service, i.e., control the system and obtain a benefit from it.  *Centillion v. Qwest*, 631 F.3d 1279, 1286 (Fed. Cir. 2011).  In *Centillion*, the court found that although the defendant made the back-end processing elements, it never "used" the entire claimed system because it never put into service the personal computer data processing means that were located at its customer's location. *Id.*  Similarly, Lawson does not put into service the features at the punchout vendor's website. Even when it installs and implements its punchout software for its customers, Lawson does <u>not</u>: 1) create the punchout vendor's catalog database; 2) provide the punchout vendor's search engine; or 3) provide the software that runs the punchout vendor's website.  (*See, e.g.*, Tr. 605:14-606:5; 878:11-13)  As such, Lawson does not put into use the entire claimed system as is required for it to directly infringe system claims 3 of the '683 patent and 1 of the '172 patent.

4.   Joint Infringement Cannot Be Used to Support the Punchout Verdict

Recognizing that it has a problem of divided infringement with respect to Punchout Systems 3 and 5, ePlus again tries to resurrect its claim of joint infringement.  However, ePlus waived joint infringement.  Regardless of whether ePlus conceded the issue in response to Lawson's oral JMOL motion or not, ePlus clearly waived it by not pursuing a jury instruction on the issue.  In the Fourth Circuit, a party must timely object to a jury instruction to preserve the

issue. *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1350-51 (Fed. Cir. 2000) (citing *Rice v. Community Health Ass'n*, 203 F.3d 283, 286 (4th Cir. 2000)). ePlus argues that a jury instruction was not needed because joint infringement is direct infringement. Not true. While joint infringement is classified as direct (as opposed to indirect) infringement, it is not the same thing as direct infringement. It occurs in situations where the actions of multiple parties combine to perform all steps or elements of a claim **and one party exercises "control and direction" over the entire process or system such that every step or element is attributable to the controlling party.** *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1324 (Fed. Cir. 2008) (emphasis added). There was no jury instruction on joint infringement as necessary for the jury to find it.

Moreover, to prevail on joint infringement, ePlus needed to prove that Lawson exercised control and direction **over the claim elements that were provided by the third party vendor**, namely the external catalog databases (for the catalog claim limitations) and search engines used on the punchout sites (for the searching for matching items claim limitations). ePlus argues that Lawson controls the ***connection*** between Lawson's punchout software and the punchout vendor's website. (Opp. at 8-9) This does not prove that Lawson controls those aspects that *specifically* relate to the claim elements not provided by Lawson. Whether an entity controls the program that connects to a vendor is a very different question from whether that entity controls the vendor on the other end of the connection. Similarly, agreeing on a message format, especially when that format is an industry standard, does not mean one party controls whether another party provides certain content, uses multiple catalogs, selection protocols, or search functionality. (Lohkamp, Tr. 1132:2-1135:14). Thus, ePlus failed to show that Lawson has control over whether third party vendors or others provide the required claim elements.

8

### B.     Lawson Did Not Waive Its JMOL Arguments with Respect Claim 1 of the '172 Patent

Lawson did not waive its argument that claim 1 of the '172 patent was not infringed based on the search index.  (Opp. at 10 n.7)  Lawson filed a written brief that supplemented its earlier JMOL motion, wherein it argued that the RSS System 2 does not infringe claim 1 because it does not allow selected portions of Item Master to be selectively searched and that although a index is used, the index does not limit the universe of things being searched.  (Dkt. 589 at 5-7).

### C.     There is No Substantial Evidence to Support a Verdict of Indirect Infringement

ePlus also failed to prove that Lawson had the specific intent that is required for indirect infringement.  Contributory infringement requires proof that the accused infringer "knew that the combination for which its components were especially made was both patented and infringing'".  *Cross Medical v. Medtronic*, 424 F.3d 1293, 1312 (Fed. Cir. 2005).  The Supreme Court recently announced that inducement requires knowledge of the patent that is infringed, and further requires "knowledge that the induced acts constitute patent infringement."  *Global-Tech Appliances v. SEB S.A.*, _ U.S. _, 2011 U.S. LEXIS 4022, at *20-21 (Sup. Ct. May 31, 2011).

The decisions in *Cross Medical* and *SEB* show that, as a matter of law, Lawson cannot be liable for induced or contributory infringement because it did not know about the patents before this lawsuit was filed.  While *SEB* indicates that knowledge can be demonstrated through willful blindness, ePlus does not cite any evidence that would present a plausible basis to infer willful blindness, which would require at a minimum that "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact."  *Id.* at *26-27.  ePlus did not allege, let alone present any evidence to show, that Lawson took any deliberate actions to avoid learning of ePlus's patents.  The only arguments ePlus makes in its opposition brief are that: 1) its patents were publicized in the

industry, 2) ePlus marked its products with its patent numbers, and 3) Lawson chose to claim privilege on its opinions of counsel.  (Opp. at 12)  The first two arguments are not even actions taken by Lawson and the last one happened *after* the lawsuit was filed.  None of these demonstrate any deliberate action taken *by Lawson* to avoid learning of ePlus's patents.

Even after this lawsuit was filed, the only evidence at trial demonstrated that Lawson reasonably believed there was no infringement.  Lawson's Director of Product Development testified he believed Lawson was doing something different than the patents.  (Christopherson, Tr. 1575:23-1577:3)  Lawson developed its products years before it was sued, without any knowledge of the functionality or structure of the ePlus products or patents.  Absolutely no evidence showed the contrary, nor were these facts even disputed.  Moreover, Lawson reasonably defended itself at trial and argued that its products did not infringe, demonstrating to the jury that it did not believe that its products infringed ePlus's patents.  Further, ePlus dropped its willfulness claim after trial, at least implicitly acknowledging that the evidence could not support a finding that Lawson intended to infringe.

## II.   SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE JURY'S VERDICT THAT THE CLAIMS ARE VALID

### A.   Lawson Did NOT Waive Its Argument that JMOL of Invalidity Should Be Granted Based on the Combination of the RIMS System and TV/2

Throughout this lawsuit, Lawson has asserted the RIMS System is prior art under multiple sections of 35 U.S.C. §102.  First, the RIMS System is described in U.S. Patent No. the '989 patent, which is prior art under §102(e).  Second, the RIMS System as described in the '989 patent was known and used before the invention date, which makes it prior art under §102(a).  Third, the RIMS system as described in the '989 patent was on sale and in public use more than one year before the filing date of the patents-in-suit, which makes it prior art under §102(b).  (Dkt. 480 at 21-22 ¶¶ 26-31)  During trial, Lawson orally moved for JMOL on invalidity based

on "the features and functionality of the prior art RIMS *system* disclosed in the '989 patent."

Lawson's written JMOL brief similarly relied on "the prior art RIMS *system* disclosed in the

'989 patent." (Dkt. 575 at 14)(emphasis added)  This was sufficient for Lawson to preserve its

right to renew its JMOL motion of invalidity based on the RIMS System as prior art under

§§102(a), (b), and (e).  Indeed, in its opposition to Lawson's JMOL motion, ePlus recognized

that Lawson's JMOL motion relied on all three bases of prior art.  (Albert, Tr. 2866:7-14)

### B.  The Prohibition on Using Commonly-Owned Prior Art in an Obviousness Combination Does Not Apply to the '989 Patent

ePlus argues that the '989 patent cannot be used as part of a combination under 35 U.S.C.

§103 to render claim 1 of the '172 patent obvious because the '989 patent and the '172 patent

were commonly owned when the invention was made.  (Opp. at 14 n.10.)  ePlus should be

precluded from making this argument because it did not disclose it in response to Lawson's

contention interrogatories.  (*See* Dkt. 586 & 586-1)  ePlus's validity expert gave validity

opinions in his expert report and at trial that claim 1 of the '172 patent was not invalid based on

the combination the '989 patent and TV/2.  He never asserted that they were not combinable.

In any event, the prohibition of § 103(c)(1) does not apply to the '989 patent.  It provides:

> **Subject matter** developed by another person, which qualifies as prior art **only under one or more of subsections (e), (f), and (g) of section 102** of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the claimed invention was made, owned by the same person or subject to an obligation of assignment to the same person.

(emphasis added).  As described in the preceding section, the subject matter of the '989 patent,

which is the RIMS system, qualifies as prior art under §§102(a) and (b) in addition to §102(e).

Thus, §103(c)(1) does not prohibit the '989 patent from being used in combination with other

prior art to render claim 1 of the '172 patent invalid.

### C.  The Claims Are Obvious Based on the Combination of RIMS + TV/2, and No Substantial Evidence Showed Otherwise

1. <u>The Combination of RIMS and TV/2 Teaches All of the Elements of Claims</u>

ePlus argues that the RIMS and TV/2 lacked critical functionality.  However, Lawson's JMOL motion focuses on *the combination* of these two systems, which *when combined*, included all of the elements of the claims (such as claim 1 of the '172 patent shown below):

| Claim Elements | Taught by (at least): | Evidence Citations: |
|---|---|---|
| 1. An electronic sourcing system comprising: | **RIMS** | <ul><li>The '989 patent discloses two item databases that included items a customer might want to buy: host database 20 and local database 50. (Col. 3:16-4:3; col. 4:23-44)</li><li>As of April 1993, the commercial RIMS system included both databases.  (Momyer, Tr. 333:22-334:6; 339:10-340:12; 374:25-376:1; 2117:23-2118:23; Johnson, Tr. 471:2-18)</li><li>The '989 patent teaches sourcing requisitions from a customer's inventory, a distributor's inventory, and a third party vendor's inventory. (Col. 5:20-6:15)</li><li>As of April 1993, RIMS had the ability to source items from the customer's inventory or Fisher's inventory.  (DX-402); (Kinross, Tr. 2206:22-2207:4)</li><li>The '989 patent databases included items with source-related information, such as product type, for multiple sources (distributor and vendors). ('989 patent, col. 5-6)</li><li>The items in the host database included items manufactured by Fisher and items manufactured by third parties and resold by Fisher.  (Momyer, Tr. 243:3-9, 339:17-24)</li></ul> |
| a database containing data relating to items associated with at least two vendors maintained so that selected portions of the database may be searched separately | **TV/2** | ePlus's Expert conceded that TV/2 included this element.  (Hilliard, Tr. 2739:1-17) |
| means for entering product information that at least partially describes at least one desired item | **TV/2** | ePlus's Expert conceded that TV/2 included this element.  (Hilliard, Tr. 2739:1-17) |
| means for searching for | **TV/2** | ePlus's Expert conceded that TV/2 included this |

| Claim Elements | Taught by (at least): | Evidence Citations: |
|---|---|---|
| matching items that match the entered product information in the selected portions of the database | | element.  (Hilliard, Tr. 2739:1-17) |
| means for generating an order list that includes at least one matching item selected by said means for searching | TV/2 | TV/2 had a user interface through which a user could select from results from a search program to generate a "shopping list" of desired items.  This shopping list could be transferred to a parts ordering system, like RIMS.  (TV/2 General Information Manual at 2 (DX-231); DX-107 at G32-33) |
| means for building a requisition that uses data obtained from said database relating to selected matching items on said order list; and | RIMS | • The '989 patent discloses the ability to build a requisition based on a search for items by part number.  ('989 patent, col. 8:40-9:15)<br>• As of April 1993, RIMS had the ability to create a requisition using the results of a part number lookup.  (Momyer, Tr. 238:18-239:5) |
| means for processing said requisition to generate purchase orders for said selected matching items. | RIMS | • The '989 patent discloses the ability to generate a purchase order to Fisher *and* an "internal purchase order" from a single requisition.  ('989 patent, cols. 17:35-52, 18:4-15, Fig. 5A)<br>• According to the '989 patent, an "internal purchase order" records an internal transfer of funds from the department requisitioning a product to the purchasing department that owned the product being purchased by the requisitioning department.  *See id.*<br>• As of April 1993, RIMS had the ability to generate purchase orders from the customer to Fisher and internal purchase orders.  (Momyer, Tr. 356:7-10;2115:22-2116:11) |

The same is true for the other asserted claims.  RIMS provided the capabilities of an electronic sourcing system that could build requisitions based on a search for items in a database, generate purchase orders from a requisition, convert generally equivalent items, and check inventory availability.  TV/2 provided the capability to search multiple electronic catalogs stored in a database, a user interface to select items from the results of a search, and then transfer the desired items to a parts ordering system like RIMS.  The preferred embodiment of the patents was a combination of RIMS and TV/2.  (Momyer, Tr. 264:19-267:19; PX-1, 4:1-9)

ePlus tries to counter this evidence by arguing RIMS was a "single source system." Not true. RIMS could be used to locate items to buy from multiple sources: 1) distributor (Fisher); 2) other suppliers and distributors; and 3) third party distributors (vendors 37 and 38). ('989 patent, 3:18-28, 3:32-37, 3:62-4:3; Shamos, Tr. 2428:12-2430:6 (slide 27)) ePlus argues that RIMS did not have catalogs or a database that could be separately searchable. But TV/2 did include both of these elements. (TV/2 Manual at 6 (DX-230) (TV/2 could search parts catalogs); Hilliard, Tr. 2739:1-17 (could separately search portions of the database))

ePlus argues that RIMS had to be used by a customer service representative (CSR). Not true. The RIMS brochure said that RIMS could be used by a CSR or by the customer. (Momyer, Tr. 381:13-382:7). Mr. Momyer admitted that a customer could have used the RIMS system. (*Id.*) In any event, using a CSR *is* use "by a prospective buyer" for purposes of ePlus's patents. The preferred embodiment of the patents-in-suit were used by a customer service representative ('683 patent, col. 3:50-55), acting for a buyer, so this does not distinguish the claims over RIMS.

ePlus argues that RIMS did not build requisitions using data related to selected matching items *and their associated sources*, because RIMS did not include "any source-related data." (Opp. at 17) Not true. As shown from Table III of the '989 patent, the RIMS requisition included two kinds of source-related data: product type and cross-reference number.



In the instance where the stock number is found in the local database 50, the display of data screen 68 is then updated in step 212 by displaying: the default unit of measure (in the UM field); the product type (in the PT field); the cross-reference number, if any (in the XREF field); the list price of the item, if the product type is 06 (in the UNIT PRICE field); a text description of the item (in the DESC field); the quantity of the item available in the JIT facility 51 as Customer-owned inventory 54, product type (06, or as Distributor-owned inventory 52, product type 01 (in the QTY AVAIL field); a description of the location of the item in the relevant stockroom or warehouse (in the LOC field); and a code identifying the relevant warehouse (in the WHSE field).

('989 patent, 9:35-48)

14

The cross-reference number could include the customer's part number, *or a vendor's part number from whom the distributor will order the part, or a competitor's part number*.  ('989 patent, 31:60-32:9)  This is source-related information.  Contrary to ePlus's contention, the '989 patent expressly teaches using this source-related cross-reference number to "convert" items:

> The next table host computer **10** searches contains the
> Distributor catalog numbers. Thus, if the data block contains
> a line representing a requisition for 02 540K, it will be
> recognized and host computer **10** will proceed to sourcing
> **306** and pricing **308**. If, however, the data block contains a
> line representing a requisition for 1000 250 (Corning's part
> number for the beaker), a match will be found in the vendor
> cross reference file in host database **20** and that item
> converted to 02 540K for sourcing **306** and pricing **308**.
> When a data block is transmitted in step **312** back to local
> computer **40** to update the Requisition Item Table, it will
> contain 02 540K for the relevant line number and that

('989 patent, 33:15-26)  Likewise, the '989 patent expressly teaches determining availability in the distributor's inventory.  (*Id.* 9:42-46 ("displaying: . . . the quantity of item available in . . . Distributor-owned inventory"))

ePlus argues that TV/2 was not sold with catalogs, it did not search for matching items among selected product catalogs, and it did not build requisitions or generate purchase orders.  (Opp. at 22-23)  Regardless of whether or not TV/2 was sold with catalogs, the TV/2 General Information Manual (DX-231) and Brochure (DX-107) expressly teach that TV/2 may be used to search electronic catalogs.  They even picture the system with data-bearing CDs.  (TV/2 Manual at 6 (DX-230); DX-107 at 2)  Although the TV/2 Brochure (DX-107) was undated, the testimony was undisputed that this brochure was given to Fisher *before* the patents-in-suit were filed, that it was given to Fisher in 1993, and was given to Fisher without any obligation to keep it secret or confidential.  (Kinross, Tr. 424:23-425:8, 427:8-20, 2167:11-2169:4)  Likewise, the 1991 TV/2 manual disclosed using TV/2 to search selected topics and documents.  (DX-230 at 5)  This is all the claims require.  The remaining two elements (requisitions and purchase orders) were included as part of RIMS.

2.      The Modifications Made to RIMS and TV/2 to Create the Commercial
Embodiment of the Patents-in-Suit Do Not Impact the Invalidity Analysis

It is undisputed that there was a version of RIMS in use at customer locations in April

1993.  (Momyer, Tr. 231:14-232:5; Tr. 2087:18-2088:7; O'Loughlin at 2 (12:03-12:15), 3-4

(15:18-16:02), 9 (38:10-21) (Ex. DX-401)); DX-61 at 43 (RIMS Brochure dated 3/93))

However, ePlus argued that RIMS was modified after this date to create the commercial

embodiment of the patents-in-suit.  James Johnson, who was an inventor on the '989 patent and

the patents-in-suit, testified about the modifications that were made to RIMS: (1) built a graphic

user interface and removed the green screen interface of RIMS (Tr. 452:13-454:12); (2) built an

interface to be able to pass information back and forth from the requisitioning system over to the

electronic catalog system (Tr. 454:13-456:3); (3) added the ability to use EDI to go out to a

vendor and get pricing and availability (Tr. 459:16-460:15); (4) modified the requisitioning

portion to handle multiple products from various vendors (Tr. 457:21-458:6); and (5) added the

ability to break single requisition into multiple purchase orders by vendor (Tr. 458:7-459:16).

However, the first three changes do not relate to actual claim limitations.  With respect to the

fourth and fifth purported changes, the April 1993 RIMS system as taught in the '989 patent,

filed in April 1993, met and taught these features.

With regard to the first change, none of the infringed claims require a "graphic user

interface."  ePlus argued that the Court's interpretation of the corresponding structure for two

means elements of claim 1 of the '172 patent included graphic interface 254 (as described in the

patents) and its equivalents.  The fact that the listed structure *includes* such interfaces does not,

however, mean they were *required*.   There was testimony at trial that RIMS, as it existed in

April 1993, had a green screen interface that was similar to a graphic interface except that it had

only words and characters (as opposed to text and graphics).   (Momyer, Tr. 209:2-11, 321:23-

16

322:1)  Even if RIMS's text-based interface was not equivalent, it is undisputed that TV/2 had a graphic user interface *before* it was modified for the commercial embodiments of the patents in suit.  It would have been obvious to combine this feature with RIMS for the reasons described above and in Lawson's moving brief.

Regarding the second modification, none of the infringed claims specifically require an interface that bi-directionally transfers information back and forth from the requisition module to a catalog database.  With regard to claim 1 of the '172 patent, the only related requirement is set forth in this Court's Markman Order and it says the requisition module merely must have access to data in the database.  The other infringed claims have similar requirements.  It is undisputed that RIMS, as it existed in April 1993, had this feature.  (Momyer, Tr. 238:18-239:5)  Moreover, it is undisputed that TV/2 had an application programming interface (API) specifically for the purpose of transferring the results of its database searches to other programs.  (1991 TV/2 Manual at 2 (emphasis added); Kinross, Tr. 437:14-24)  Thus, this purported modification does not affect the invalidity analysis.

Regarding the third modification, none of the claims require EDI.  Claims 26 and 29 of the '683 patent include the step of "determining whether a selected matching item is available in inventory."  They do not specify whose inventory is checked.  It is undisputed that RIMS, as it existed in April 1993, had the ability to check availability of inventory in the customer's warehouse and Fisher's warehouses.  This modification is irrelevant to the issue of invalidity.

For the fourth modification, the inventors testified that they modified RIMS to handle a new product type (type 07) that was not disclosed in the '989 patent, added a vendor name field to the requisition database (not shown in the '989 patent), and added the ability for the local computer at the customer location (as opposed to Fisher's host computer) to send purchase

17

orders directly to third party vendors. (Johnson, Tr. 457:21-459:16, 477:2-478:17; Momyer, Tr. 2144:21-2146:8) But the claims do not require any of these modifications. They say nothing about specific product types or database fields and do not require that any claim elements be on a local computer versus a host computer. They do not require a local computer or a host computer.

Some of the claims require the ability to generate multiple purchase orders to multiple vendors from a single requisition. RIMS did this. It generated a purchase order to the customer purchasing department (the vendor from whom the item was being purchase) and a purchase order to Fisher. ('989 patent, 17:35-52, 18:4-15, Fig. 5A; Momyer, Tr. 356:7-10, 2115:22-2116:11) ePlus urges that internal orders are not purchase orders, but it cannot change the fact that its own patents in suit call such "internal to the customer" transfers "purchase orders:"

> sion by pressing function key F**6** ("ACCEPT"), would result
> in the generation of the following three purchase orders:
>   A. Line **002** would be ordered from on-site distributor-
>      owned inventory;
>   B. Line **004** would be ordered from on-site customer-
>      owned inventory (a transfer internal to the customer);
>      and
>   C. Lines **001** and **003** would be ordered, respectively,
>      from Distributor's "DEL and "EDC" warehouses.

ePlus also argues that two changes needed to be made to TV/2 to create the commercial embodiment of the patents-in-suit: (1) add specialized search functions, such as searches using Boolean logic; and (2) create a shell program that used TV/2 existing API to interface with RIMS. (Opp. at 26; Kinross, Tr. 404:15-414:20) These do not relate to the asserted claims.

Claim 1 of the '172 patent requires a means for searching for matching items, which was construed to require a search program with access to a database that searches for matching items in the selected portions of the database. Claims 3, 26, 28, and 29 of the '683 patent have a similar element. They do not require Boolean searching. Indeed, Mr. Hilliard admitted that

TV/2 included the means for searching element of claim 1 of the '172 patent. The first modification described by Mr. Kinross does not affect the validity of the infringed claims.

The specification of the patents-in-suit described a "shell program" that provided for bi-directional communication between a catalog database and a requisition module. However, none of the infringed claims require this shell program, which was created to specifically tailor TV/2's existing API to RIMS. (Kinross, Tr. 410:4-20) As described above, none of the claims even require an interface. This modification is not relevant to validity analysis of the infringed claims.

Thus, none of the time, money, or work that went into making these modifications to RIMS and TV/2 to create the commercial embodiment of the patents-in-suit are relevant to whether a combination of the preexisting RIMS and TV/2 systems render the claims invalid.

### F.    Lawson Has Not Waived the Issue of Indefiniteness

While a denial of summary judgment is not generally appealable, a denial of summary judgment on a pure legal issue may be appealed after a final judgment at trial. *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1355 n.2 (Fed. Cir. 2009); *United Techs. Corp. v. Chromalloy Gas Turbine Corp.*, 189 F.3d 1338, 1344 (Fed. Cir. 1999). Definiteness is a pure issue of law. *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1344 (Fed. Cir. 2007). Indeed, at trial ePlus counsel told the Court with respect to definiteness, "The parties have agreed that they are pure issues of law for the Court." (Trial Tr. 2516:2-8; *see also* Trial Tr. 2522:4-20).

Lawson moved for summary judgment of indefiniteness, which this Court denied. (06/11/10 SJ Brief at 24-26; Doc. No. 356) The denial of Lawson's summary judgment of definiteness is preserved for appeal. Lawson also moved for judgment as a matter of law prior to the jury charge, which the Court also denied. (Trial Tr. 2929:4-23, 2929:19-20)

ePlus wrongly asserts that Lawson waived the issue of definiteness. It has not. The Court's denial of summary judgment fully preserved the issue for appeal. Further, there were no

fact issues in dispute and Lawson moved for judgment as a matter of law at the close of trial and renewed its motion after trial.  This Court can decide the issue of definiteness based on Lawson's judgment as a matter of law because there are no fact issues in dispute and it is a pure legal issue.  There was no requirement that Lawson "try" the issue to the jury.  There is no waiver.

On the merits, the basis for Lawson's motion for judgment as a matter of law is clear—claim 1 of the '172 patent and claim 3 of the '683 patent are invalid because they are indefinite as a matter of law.  (Doc No. 760 at 29-30)  ePlus offers no real defense to the contrary.

### G.     The Asserted Claims Do Not Recite Patentable Subject Matter

Section 101 patentability is a pure issue of law.  *In re Ferguson*, 558 F.3d 1359, 1363 (Fed. Cir. 2009).  Lawson moved for summary judgment on this, which the Court denied. (07/07/10 SJ Brief; Doc. No. 357)  Prior to the jury charge Lawson moved for judgment as a matter of law on the issue, which the Court also denied.  (Doc. No. 588; Trial Tr. 2928:18-2931:17, 2928:18-2931:17)  Contrary to ePlus's arguments, Lawson did not need to "try" the issue of patentable subject matter to the jury.  It is a pure legal  issue for the Court to decide. ePlus offers no substantive arguments in support of its assertion that the claims are not invalid.

## III.   CONCLUSION

For all of the foregoing reasons, as well as those described in Lawson's claim construction briefing and argument, Lawson's motion for summary judgment, and Lawson's initial motions for judgment as a matter of law, Lawson respectfully requests that this Court enter judgment as a matter of law in favor of Lawson on the issues of non-infringement and invalidity.

LAWSON SOFTWARE, INC.

By: _____/s/_____
          Of Counsel

Dabney J. Carr, IV, VSB #28679

Robert A. Angle, VSB #37691
**TROUTMAN SANDERS LLP**
P. O. Box 1122
Richmond, Virginia  23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com

Daniel McDonald (admitted *pro hac vice*)
William D. Schultz (admitted *pro hac vice*)
Rachel C. Hughey (admitted *pro hac vice*)
Andrew J. Lagatta (admitted *pro hac vice*)
Joshua P. Graham (admitted *pro hac vice*)
**MERCHANT & GOULD P.C.**
3200 IDS Center, 80 South Eighth Street,
Minneapolis, MN  55402
Telephone:  (612) 332-5300
Facsimile:  (612) 332-9081

Donald R. Dunner (admitted *pro hac vice*)
Erika H. Arner (admitted *pro hac vice*)
**FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 408-4000
Facsimile:  (202) 408-4400

*Counsel for Defendant Lawson Software, Inc.*

## CERTIFICATE OF SERVICE

I certify that on this 8th day of July, 2011, a true copy of the foregoing will be filed electronically with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Craig T. Merritt
Henry I. Willett, III
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
cmerritt@cblaw.com
hwillett@cblaw.com

James D. Clements
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, MA 02109-2881
jclements@goodwinprocter.com

Scott L. Robertson
Jennifer A. Albert
David M. Young (VSB No. 35997)
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001
srobertson@goodwinprocter.com
jalbert@goodwinprocter.com
dyoung@goodwinprocter.com

*Attorneys for Plaintiff*

                                            _____/s/_____
                                            Dabney J. Carr, IV (VSB No. 28679)
                                            Robert A. Angle (VSB No. 37691)
                                            Megan C. Rahman (VSB No. 42678)
                                            dabney.carr@troutmansanders.com
                                            robert.angle@troutmansanders.com
                                            megan.rahman@troutmansanders.com
                                            **TROUTMAN SANDERS LLP**
                                            1001 Haxall Point
                                            Richmond, VA 23219
                                            Telephone:  (804) 697-1200
                                            Facsimile:  (804) 697-1339
                                            *Counsel for Defendant Lawson Software, Inc.*