# EXHIBIT A

1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF VIRGINIA

3                       RICHMOND DIVISION

4

5      ------------------------------------
                                          :
6      ePLUS, INC.                        :    Civil Action No.
                                          :    3:09CV620
7      vs.                                :
                                          :
8      LAWSON SOFTWARE, INC.              :    January 4, 2011
                                          :
9      ------------------------------------

10

11             COMPLETE TRANSCRIPT OF THE JURY TRIAL

12           BEFORE THE HONORABLE ROBERT E. PAYNE

13          UNITED STATES DISTRICT JUDGE, AND A JURY

14     APPEARANCES:

15
       Scott L. Robertson, Esquire
16     Michael G. Strapp, Esquire
       Jennifer A. Albert, Esquire
17     David M. Young, Esquire
       Goodwin Procter, LLP
18     901 New York Avenue NW
       Suite 900
19     Washington, D.C.   20001

20     Craig T. Merritt, Esquire
       Christian & Barton, LLP
21     909 East Main Street
       Suite 1200
22     Richmond, Virginia   23219-3095
       Counsel for the plaintiff

23

24               Peppy Peterson, RPR
                 Official Court Reporter
25            United States District Court

Marion - Cross

1    relevant to the lack of competition with Lawson.

2              MR. ROBERTSON:   I didn't ask her if she was aware

3    whether ePlus competed with Lawson.

4              THE COURT:   You asked her about profitability.   When

5    you open the door to something -- I don't know why she

6    testified, to tell you the truth, at least now, but when you

7    ask a question like that, you open the door.   He's entitled to

8    say something about it on his side if he wants to.   Overruled.

9    Go ahead.   Do it again.

10             MR. McDONALD:   Okay.

11   Q    Do you recall back in the February/March 2009 time frame

12   you put together a disclosure to the SEC which wrote down the

13   value of the procurement division of Mr. Farber's business

14   because of declining revenues?

15   A    Yes.

16   Q    And you had to disclose truthfully to the SEC the reasons

17   for those declining revenues in this procurement division;

18   correct?

19   A    I don't recall the exact reasons.

20   Q    Do you recall --

21             THE COURT:   That wasn't his question.   His question

22   was, did you have to tell the SEC the truth about what you

23   said?

24             THE WITNESS:   Of course.

25   Q    And if the reason for the decline in sales were happening

Momyer - Direct

1   A    Sure.  The -- basically the RIMS system would keep track

2   of the inventory that was in the stockroom.  That inventory

3   could be both customer-owned or Fisher-owned and could keep

4   track of who pulled the product out, and would also -- keeping

5   track of the inventory, also determine if the inventory,

6   specific product had to be restocked.

7        So there was a component of the system that would allow us

8   to, based upon the order point and reorder quantity, would

9   actually reorder and transmit orders to Fisher to refill,

10   refill the stockroom for the products and how much was needed

11   in them.

12   Q    Did you help develop the RIMS system?

13   A    Yes, I did.

14   Q    When did you work on that RIMS system?

15   A    1989 would be probably when we started.  I think we had

16   our first installation around 1981.

17   Q    Did that RIMS system that you've generally described at a

18   high level go through various iterations or versions?

19   A    Oh, sure.  The first version that was put out there really

20   handled -- only handled recording of requisitions without

21   dealing with the inventory management.

22   Q    Let me just stop you there and say, approximately how many

23   iterations or variations did the system go through?

24   A    Dozens if not more than that.  The Fisher RIMS system was

25   in existence from 1991 all the way through until I left in

Momyer - Direct

1    2003, and there were many iterations of that, and primarily

2    those iterations were based upon some unique requirements the

3    customer had or some business initiative that Fisher wanted to

4    undertake in the area of inventory control and inventory

5    management at a customer's site.

6    Q    Could you open to Plaintiff's Exhibit Number 10 that's in

7    your notebook, and I'd ask you if you could identify that

8    document for me.

9    A    That is a patent for a just-in-time requisition inventory

10   management system.

11   Q    Just-in-time requisition and inventory management system;

12   is that right?

13   A    That's correct.

14   Q    What does just in time mean in the context of that

15   invention?

16   A    If you think about what we were trying to do, tried to

17   explain a little bit when I talked about the invention itself,

18   the RIMS system, it is providing product to the customer when

19   they need it.

20        A very typical scenario would be a chemist who is doing

21   some research may need a reagent or a test tube, and it's very

22   critical they have it right away, so by putting inventory at

23   the customer's site, this would allow them to have inventory

24   just in time, just when they need it.  It is a value added to

25   our customers.

Momyer - Direct

1    get it down, identification down to a Fisher product number,

2    catalog number.

3         That is the only way that the RIMS system was set up to

4    operate, to identify products.  You needed a Fisher part number

5    to input to start the process going.

6         THE COURT:  So I'm ordering from you, I call and tell

7    you, Mr. Momyer, I'd like to have such-and-such.  You talk to

8    me and tell me -- you are the CSR.  You tell me, well, that's

9    product number, our product such-and-such and such-and-such,

10   and you put it down, and you are using RIMS, I don't have it;

11   is that right?

12        THE WITNESS:  That's correct.

13   Q    You talked about the product number.  Are we talking about

14   Fisher product or other supplier product?

15   A    We're only talking about Fisher products at that time.

16   The RIMS system only dealt with -- primarily dealt with Fisher

17   products and Fisher products that Fisher purchased.

18   Q    And so if I wanted a specific product, did I need to know

19   the Fisher part number in order to be able to look up and find

20   out whether that was either available in inventory at the

21   customer site or perhaps back at some Fisher warehouse?

22   A    Yes.  The starting point for the whole process as far as

23   entering a requisition into the RIMS system was identify who

24   you were, and typically this would have been account number,

25   and then who the customer was, and then identify the product,

Momyer - Direct

239

1   and by the product identification, I think what you could put

2   in was the Fisher product number.

3   Q     Is that what you could enter in as a lookup feature for

4   the RIMS system?

5   A     Yes.

6              THE COURT:   Excuse me, Mr. Robertson.   I think we

7   need to change court reporters here.

8

9              (Recess taken.)

1  distributor?

2  A    Yes.

3           THE COURT:  Did Fisher make anything?

4           THE WITNESS:  Yes, about a third of the

5  products that it sold it manufactured.

6           THE COURT:  And it bought two-thirds of the

7  other products it sold from other people and kept them

8  in inventory or had some arrangement to get it to

9  them?

10          THE WITNESS:  That's correct.

11 Q    What is this mainframe or host computer you

12 described, sir?

13 A    Well --

14 Q    The one specifically we're talking about used in

15 this RIMS system back in the late '80s and early

16 '90's?

17 A    It would have been an IBM computer running an NBS

18 operating system.  I don't know if that helps or not.

19 Q    Well, but was it able to communicate with a local

20 computer or something located --

21 A    Absolutely.  We talked about it.  There was a

22 dataline between the RIMS computer and this mainframe.

23 And that dataline allowed for the interaction,

24 electronic interaction, between two computers.

25          You basically -- the program would say, I need to

MOMYER - DIRECT                                        264

1    Mr. Johnson, and Mr. Melly invented?

2    A    Yes.

3    Q    Did you identify in the patent whether or not

4    there were some problems associated with the RIMS

5    requisition and purchasing system for use in the

6    patent?

7    A    Yes, we did identify several.

8    Q    Let me direct you, if I can, to the bottom of

9    column 1.  First, before I do that, at the top of

10   column 1, starting at about line 10 through line 16,

11   could we just -- is this the RIMS patent that we have

12   identified that you're one of the inventors, the '989?

13   A    That wording is pulled out of '683, yes.  '989 is

14   the RIMS patent.

15   Q    So it's saying here that there were a number of

16   known requisition and purchasing systems, is that

17   right, including this Fisher RIMS system?

18   A    Yes.

19   Q    Now, if you will look down at the bottom of column

20   1 starting at about line 60, going over to column 2

21   around line 2, what are you representing there to the

22   Patent Office with respect to these requisition and

23   purchasing systems which include the Fisher RIMS

24   system?

25   A    It identifies that there's some shortcomings to

1   the requisition purchasing systems, including RIMS,

2   for the ability to have a catalog be able to search

3   multiple catalogs and then move that information into

4   the requisition purchasing system.

5   Q   Are there any other problems that have been

6   identified with these requisition and purchasing

7   systems including RIMS in this section of the patent?

8   A   Yes.  As you look down column 2, maybe line 10,

9   computer systems for searching vendor catalogs are

10  limited, and only one such vendor catalog is

11  accessible to the user at any given time.  They were

12  also limited in they can only create a particular

13  vendor catalog database.

14  Q   You have to go a little slower, Mr. Momyer.

15  A   Sorry.  They were also limited in that they can

16  only create an order within the particular vendor

17  catalog database.  They cannot source items to be

18  requisitioned from a database containing multiple

19  catalogs or interact with the requisition purchasing

20  system or create a purchase order or orders including

21  the items located from the sourcing operation.

22  Q   Now, you discussed this RIMS system throughout out

23  the patent.  Let me ask you to go to column 4 at the

24  top.  Did you indicate to the Patent Office that this

25  RIMS system was necessary to your electronic sourcing

1   patent?

2   A    I think it's preferably but not necessarily in the

3   Fisher RIMS system is what it says in column 4.

4   Q    There's also a discussion here about a Technical

5   Viewer 2 Search Program called TV/2.  Do you see that

6   as well?

7   A    Yes.

8   Q    Are you familiar with that program?

9   A    Yes.

10  Q    It indicates in your patent that that was a

11  program that was available from IBM?

12  A    That's correct.

13  Q    Does it indicate that that program was necessary

14  to your invention?

15  A    The wording says preferably but not necessarily in

16  the Technical Viewer 2 Search Program.

17  Q    Let me direct you if I could to column 6 of the

18  patent beginning at about line 34 going down to about

19  line 39.

20  A    Column 6?

21  Q    Yes, sir.

22  A    Line 44?

23  Q    34.

24  A    34.  Okay.

25  Q    You state here the following description

1   illustrates the use of the Fisher RIMS as a

2   requisition purchasing system and the TV/2 search

3   program as a search program; however, it will be

4   understood that the present invention is not limited

5   to such system or program.  Do you see that?

6   A    Yes, I do.

7   Q    Is that consistent with your understanding as to

8   what you disclosed in your patent?

9   A    Yes.

10  Q    Well, so you used the Fisher RIMS system to

11  describe certain features of functionality in your

12  patent.  Was it necessary to your patent to use the

13  Fisher RIMS system?

14  A    No, it was not.

15  Q    You also use the TV/2 search program to describe

16  certain capabilities and functionalities in your

17  patent.  Was it necessary for your patent, for your

18  electronic sourcing patent?

19  A    No, it was not.

20  Q    Can I just -- I put a juror notebook over on your

21  witness stand that the jury has, and in it starting at

22  tab 2 are the three patents that are at issue here.

23  And you'll see there are yellow tabs where the claims

24  appear.  And I'd like you to just briefly take a

25  moment to go through any of those claims and tell us

Momyer - Cross

1   Q     That's got nothing to do with any of the claims asserted

2   in this case, does it?

3   A     I don't -- other than how the catalogs display.

4   Q     None of the claims talk about a catalog being displayed,

5   do they?

6         THE COURT:  Mr. Robertson, is the interface involved

7   in the case, in the claims that are at issue?

8         MR. ROBERTSON:  We would say, Your Honor.  In fact,

9   in the exhibit, it's how you have means for selecting prior

10  catalogs to search and means for searching for matching items.

11  That is the interface in which you are making these decisions.

12        THE COURT:  So you are contending it's an

13  infringement issue.

14        MR. ROBERTSON:  Yes, sir.

15        THE COURT:  All right.

16  Q     Mr. Momyer, you have claim three in front of you.  Is it

17  your understanding that any elements of that claim require a

18  graphical user interface?

19  A     Actually, I think probably means for selecting product,

20  means for searching for matching, means for building a req

21  would require a graphical user interface, and means for

22  processing the req, those all would be coming up to the screen.

23  Q     So the old way of doing it before graphic user interface

24  was a text format where it basically just has words and

25  characters on it; correct?

Momyer - Cross

1    A    That's correct.

2    Q    And are you saying then if somebody does the things

3    described by claim three using that old text-based format, they

4    don't infringe?

5              MR. ROBERTSON:   Objection, Your Honor.

6              THE COURT:   So what's the objection?

7              MR. ROBERTSON:   Objection is he's calling for a legal

8    conclusion and the witness is not an attorney.   I don't think

9    he can make an assessment of infringement.

10             THE COURT:   I'm having trouble understanding you.

11             MR. ROBERTSON:   Yes, Your Honor.   The objection is

12   that it calls for a legal opinion from a lay witness, and I

13   think, therefore, it's improper.

14             THE COURT:   Doesn't it call for --

15             MR. McDONALD:   I can rephrase the question, Your

16   Honor.

17             THE COURT:   Objection to the form of the question is

18   sustained.

19   Q    Mr. Momyer, as one of the listed inventors on these

20   patents, do you consider your invention as claimed in your

21   patents to require a graphic user interface?

22   A    It requires what the graphic user interface does.

23   Q    Not the question, Mr. Momyer.   Does it a require a graphic

24   user face or would one come within the scope of your invention

25   as you understand it even if they performed all these functions

Momyer - Cross

1    deal with that on redirect.

2              THE WITNESS:   Okay.

3    Q    Now, with respect to the RIMS system, Mr. Momyer, that was

4    described in a patent application in April of '93; correct?

5    A    Yes.

6    Q    If you need some help on that, I believe it's Plaintiff's

7    Exhibit Number 10 in your notebook that ePlus gave you.  That's

8    the RIMS patent.  The filing day was April 2nd, '93, for the

9    RIMS patent?

10   A    Yes.

11   Q    So at least whatever features the RIMS patent had as of

12   that April '93 date, it's fair to say that those features are

13   pretty -- that description is a pretty comprehensive

14   description of RIMS as it existed in April of '93?

15   A    There were some things that weren't developed that were in

16   the patent.

17   Q    But they were described in the patent as something you

18   were going to develop?

19   A    They were described as being in the patent but not that we

20   were going to develop.  They were things that as of '93, as

21   of -- really have never been developed yet.

22   Q    You at least describe some functionality that you had

23   conceived of at that time; right?

24   A    Yes.

25   Q    That's more than a year before the August '94 filing date

Momyer - Cross

1    on the patents involved in suit here; right?

2    A    Yes.

3    Q    Before April of '93, is it true that the RIMS system could

4    search for items using a catalog search?

5    A    The search would be significantly different than the

6    search in electronic sourcing.

7    Q    Well, you are not saying that with respect to the claims,

8    are you?  I'm just asking you, didn't the RIMS system have

9    searching by part or catalog number?

10   A    It did look up by part.

11   Q    Didn't it have searching by part or catalog number in it?

12   A    I guess you need to define what you mean by search.

13   Q    Didn't you, in your own patent, because you were one of

14   the inventors --

15   A    Search in that case would be a product lookup.

16   Q    Let me finish my question, please.  As one of the

17   inventors who also signed off on the RIMS system, isn't it true

18   that you describe that search by part number as a search, not

19   just a lookup; right?

20   A    It did say that, yes.

21   Q    Your application said that; right?

22   A    Yes.

23             THE COURT:  Is there some difference between a search

24   and a lookup?

25             THE WITNESS:  Yes.

Momyer - Cross

1   Q    If we turn to the exhibit tab ten, the RIMS '989 patent,

2   if we go to figure three of that patent.

3   A    Which patent are you in?

4   Q    Exhibit 10 which is the RIMS patent.

5          THE COURT:  The RIMS patent which you have in front

6   of you, and he wants to go to figure three which is on the page

7   that has 1899 at the bottom of the right-hand corner.

8          THE WITNESS:  I see it.

9          MR. McDONALD:  If you can blow up the top four boxes

10  on that page, please.

11  Q    So didn't you say there in box 202 that one of the steps

12  here of the process after the customer service representative,

13  or CSR, enters the stock number, and that gets entered into the

14  requisition item table, that the local computer searches the

15  parts master table for a stock number?

16  A    It searches the part master table, yes.

17  Q    Part master table, I'm sorry.  So you did describe that as

18  being a search within the part master specifically in RIMS;

19  right?

20  A    Correct.

21  Q    That was a search for matching items; right?

22  A    It was a search for specific item.

23  Q    An item that matched the part number you put in; right?

24  A    Yes.  An exact match.

25  Q    Okay.  Now, was that parts master in the RIMS system,

1    would you consider that a catalog?

2    A    No.

3              THE COURT:   Was the parts master a catalog, is that

4    your question?

5              MR. McDONALD:   That's right.

6    Q    What was the parts master in the RIMS system?

7    A    It had -- if you recall, it was only the local inventory

8    records, and it really had everything that I recall except a

9    vendor.  It did not have a vendor in it since Fisher was a

10   single vendor.

11   Q    So with respect to the distinction between the RIMS patent

12   or product and what you were describing as your invention for

13   the patents in this case, they both had searching, but the RIMS

14   system didn't search catalogs specifically; is that fair?

15   A    Searched parts -- one searched parts lists and the other

16   searched a catalog.

17             THE COURT:   One searched a parts list?

18             THE WITNESS:   Part master table is what it is.

19   Q    Parts master table, another term for that that you just

20   used is a parts list; is that right?

21   A    Yes.

22   Q    Is that also sometimes called an item master?

23   A    Yes, it could be.

24   Q    As the sort of list a customer compiles themselves; right?

25   A    The customer compiles?

Momyer - Cross

1   Q    Well, doesn't the customer typically select the products

2   to go on an item master or parts master?

3   A    When they are building up their item master.

4   Q    One item after another, the people deciding which items

5   get on that parts master or items master is the customer;

6   right?

7   A    Yes, using the system of whatever system you are using.

8             THE COURT:  If the customer is doing the selection,

9   it's the customer, but if I do it and I'm not the customer,

10  then I'm the one making it up; is that right or wrong, or does

11  it always have to go through the customer?

12            THE WITNESS:  No, it doesn't have to go through the

13  customer.

14  Q    The purposes of a parts master or item master is to track

15  the inventory of an individual customer; correct?

16  A    Yes.  That's one of purposes of it, is to hold inventory

17  information.  It also helps identify the product and give you

18  some information about the product.

19  Q    It would be -- the purpose of that information in a parts

20  master or an item master would be to give enough information to

21  help reorder products for that customer for their inventory; is

22  that fair?

23  A    Yes, or do -- the item master could have a list price in

24  it as well.

25  Q    Is it typical -- you are familiar with catalogs that are

1    published by vendors, manufacturers, suppliers, folks like

2    that; correct?

3    A    Yes, I am.

4    Q    Now, is it fair to say typically one of those published

5    catalogs is going to have a significantly longer description of

6    the products than an item master or parts master?

7                MR. ROBERTSON:  Your Honor, I object.  This is

8    outside the scope of my direct examination.

9                MR. McDONALD:  We talked a lot about the RIMS system.

10               THE COURT:  I know you are, but I don't think he --

11   among the things he questioned about, I don't think he was

12   questioned about how they made up catalogs, how vendors made up

13   catalogs.

14               MR. McDONALD:  I'm looking for the distinction in

15   terms of what his invention is starting from the RIMS patent --

16               THE COURT:  I'm not dealing with theory.  I'm dealing

17   with a question, and the objection to the question is

18   sustained.  You may be able to get at it another way, but that

19   particular question is objectionable.

20   Q    So is it true that the patents involved in this suit

21   involve ability to search multiple product catalogs?

22   A    Yes.

23   Q    That's a key part of the invention; right?

24   A    Yes, it is.

25   Q    And that's a distinction from what the RIMS system had; is

Momyer - Cross

1    that right?

2    A    That is a distinction, yes.

3    Q    So that RIMS parts master isn't the same thing as the

4    catalogs you had in mind as the invention for these patents in

5    this suit; right?

6    A    I don't think so.  For me, no they aren't the same.

7    Q    Again, the parts master, that's the same sort of thing as

8    an item master; correct?

9    A    Yes.

10   Q    Now, that RIMS system, it also had another database I

11   think you mentioned at the host which would be the distributor;

12   right?

13   A    Yes.

14   Q    And the way you guys used it, that would be at Fisher;

15   right?

16   A    Yes.

17   Q    Now, at that host database, did that database have a list

18   of products that Fisher sold?

19   A    Yes.

20   Q    Now, I think you mentioned about a third of Fisher's

21   products were made by Fisher, and two-thirds came from other

22   places; is that right?

23   A    Yes, but they still -- lists were still parts that Fisher

24   sold.

25   Q    Okay, fair enough, but Fisher was a distributor.  They

Momyer - Cross

1   would acquire the product from another source, a manufacturer,

2   for example; correct?

3   A    Correct.

4   Q    Then they would turn around and then, in effect, resell

5   that product to the Fisher customers; is that how that worked?

6   A    That's correct.

7   Q    So that Fisher catalog had items that were actually made

8   by Fisher as well; correct?

9   A    That's correct.

10  Q    And then products made by somebody else that Fisher

11  resold; right?

12  A    Which is typical distributor operation.

13  Q    Now, did you consider that database at the host in the

14  RIMS system to be multiple catalogs published by vendors?

15  A    No.  It was a single parts table.

16  Q    Okay.  Did you consider it to be a single catalog

17  published by Fisher as a vendor?

18  A    Once again, I didn't, wouldn't consider it a catalog

19  because I have -- in my mind, a catalog involves some larger

20  textual description as well as some image or picture that

21  represents, gives further meaning to the product.

22  Q    It is the reason why you have that description of a

23  catalog in your mind, because that additional information helps

24  people select the products in the catalog to buy?

25  A    That's right.

1          THE COURT:  What's objectionable to the form?

2          MR. ROBERTSON:  As a whole?  I don't understand what

3   that means, the RIMS invention as a whole.

4          THE COURT:  Is your objection then it's ambiguous?

5          MR. ROBERTSON:  Yes, sir.

6          THE COURT:  Sustained.

7   Q    Mr. Momyer, would you agree that the RIMS system, which

8   includes both the local computer and a host computer, generates

9   purchase orders?

10  A    Yes.

11  Q    And the sentence talks about product types 01, 03, and 04;

12  do you see that?

13  A    Yes.

14  Q    And do you know what those types are?

15  A    Yes, I do.

16  Q    What are they?

17  A    If product type 01 is a customer-owned inventory, that's

18  locally represented, stored locally.

19  Q    Okay.

20  A    On a customer's site.  03 is a product type which is a

21  product that's stored, would be stored within one of Fisher's

22  warehouses, and 04 would be a product that would be -- an off

23  catalog product that would be sourced from another vendor.

24  Q    Would be sourced from a third party; correct?

25  A    Yes.

Momyer - Cross

1   capability.

2   Q    But could a text search a list of selected topics?

3   A    I guess I'm not sure what you mean by selected topics.

4   Q    Do you know what that means in the context of the TV/2

5   system?

6   A    No.

7   Q    Would you agree at the time that you filed the patents

8   involved in this suit there was known to be able to search a

9   single catalog on a CD-ROM?

10           THE COURT:  That what was known?

11           MR. McDONALD:  That it was known in the field of

12  purchasing and requisition systems to be able to search a

13  single CD-ROM with a catalog on it.

14           MR. ROBERTSON:  Your Honor, again, this is outside

15  the scope of my direct.

16           THE COURT:  I don't remember him asking anything

17  about that on his direct, Mr. McDonald.

18           MR. McDONALD:  Fair enough.  I'll withdraw it.

19  Q    Can we turn to the '683 patent now, Plaintiff's Exhibit 1,

20  and turn to figure 1A which is the third page, I believe.

21  A    Okay.

22  Q    Now, on that picture, figure 1A, this is in the '683

23  patent in this suit; right, Mr. Momyer?

24  A    Yes.

25  Q    You have shown here the catalog database number 36 kind of

1   in the middle of the page there.   Do you see that?

2   A     Yes.

3   Q     That was something that didn't exist in the RIMS system;

4   right?

5   A     Correct.

6   Q     Now, what database did exist in the RIMS system was a

7   parts master or item master; right?

8   A     As well as inventory tables.   You are talking about the

9   inventory database?

10  Q     Talking about the parts master.

11  A     There was a parts master.

12  Q     Which box was the parts master?

13  A     It would have been included in that grouping called

14  inventory databases.

15  Q     So that's 42B up above?

16  A     Yes.

17  Q     So parts master was over there, and so it's -- certainly

18  in your picture here, you were not depicting the parts master

19  should be part of the catalog database; right?

20  A     Yes.

21  Q     And the Fisher product list, that was in the host

22  database; correct?

23  A     Yes.

24  Q     And so would that be in this picture represented by what's

25  in host databases box number 11 in the upper right corner?

Momyer - Cross

1   A    Yes.

2   Q    So, again, there are even that list of Fisher products in

3   the host database, you were showing it in your patent as not

4   part of the catalog databases; right?

5   A    Yes.

6   Q    And the reason for is that is that catalog database had a

7   different purpose and function than those other databases?

8   A    Yes.  It was to -- yes.  It would have had a different

9   purpose and function.

10  Q    What would be the difference in purpose and function?

11  A    Well, one, it would allow you to place an order for a

12  specific part.  The catalog database in itself would not -- you

13  could pull the information from the catalog.  You can go and do

14  validation of that part against both the local part master and

15  then up against the host.

16       Another benefit or purpose would be inventory control,

17  inventory management.  The product information at that level,

18  that information wouldn't be in the catalog database but would

19  be in the part master.

20  Q    Earlier you testified about some subset searching

21  capability; do you recall that?

22  A    Yes.

23  Q    Is that something different from what the patents-in-suit

24  describe when they talk about selecting catalogs to search, or

25  is that the same thing?

Momyer - Cross

1    customized interface.

2    Q    It was something you knew you could do?

3    A    Yes.

4    Q    One of the things you didn't say was wrong was that first

5    bullet point that says consolidates all supplier activity

6    including third-party and administrative purchases; right?

7    A    That's correct.

8    Q    Now, if we go two more pages to page six --

9            MR. McDONALD:  Now, if you could blow up the image

10   below the big black box there where it says a system that's

11   easy to use and then the paragraph right to the right of that,

12   please.

13   Q    Now, in this part of this RIMS brochure, I'll give you a

14   chance to look at it.  Isn't it true that the brochure

15   indicated that customers of the RIMS system now could either

16   use a customer service representative or they could enter

17   requisitions or purchase orders remotely through the people in

18   their organization who would be using the product?

19   A    I see that.

20   Q    The computer system itself, it doesn't actually know who

21   is sitting at the keyboard; right?  That could be anybody.

22   A    Well, other than the fact -- it couldn't be anybody.  It

23   would have to be someone who would have had a password and a

24   log-in ID to log in.

25   Q    But that could be an employee of the customer as well as

Momyer - Cross

1   the customer service representative; right?

2              MR. ROBERTSON:  Your Honor, calls for speculation.

3              THE COURT:  Overruled.

4   Q    Is that what this is communicating?

5   A    I don't know of any instance that a customer was

6   interacting with RIMS.  Doesn't mean it didn't happen.  I just

7   don't recall any instance of that happening.

8   Q    Now, is it true that the brochure -- if you turn to page

9   ending in 603, I think that's page seven?

10             THE COURT:  What about it?

11             MR. McDONALD:  I'm trying to get it up on the screen

12  here.

13  Q    This is a page that has a heading, simplified information

14  flow, clear audit trail.  Is that the page you have?

15  A    Yes.

16  Q    This is -- if we could blow up that left column below the

17  black box.  You didn't mention yesterday that there was any

18  inaccuracies in this section, did you?

19  A    No, I did not.

20  Q    And in this section, doesn't it indicate that the Fisher

21  RIMS handles purchases of various types including Fisher

22  products, third-party purchases delivered from a Fisher

23  warehouse, third-party purchases delivered direct, and then if

24  we can blow up the next column over, administrative purchases

25  which Fisher RIMS initiates for the supplier to ship and

1    A    Yes.

2    Q    Were you involved in that, sir?

3    A    Yes, I was.

4    Q    We'll talk about some of those modifications or

5    changes that needed to happen in a minute, but at a

6    high level can you us tell us, if you can give me a

7    list, say, of some of the things that needed to happen

8    with this TV/2 program that you were personally

9    involved in?

10   A    Well, the first was the ability to have multiple

11   catalogs in the system.  We felt that was a very

12   unique requirement that we had that would enable the

13   end user to select and deselect catalogs to be

14   searched.

15   Q    Can we just run through the list first maybe of

16   everything you might recall that needed to be modified

17   with respect to TV/2, then we'll come back and go at

18   it in a little greater detail?

19   A    The catalogs, there was a footer bar that we

20   needed to provide for easy navigation through the

21   system.  Among the features of the footer bar were

22   creating an order list and being able to view the

23   order list, being able to accept the order.

24        We also needed specialized search functions that

25   would customize the search for electronic commerce,

1   basically.  That being search by part number, search

2   by keyword with Boolean logic including "and" and

3   "ors" so that you wouldn't get unnecessary results in

4   the hit list that would be created by the search.

5   Q    Let me just stop you there because you used a

6   couple of teams.  I want to make sure I understand

7   what you were referring to.  You said search by

8   keyword.  What did you mean by "keyword."

9            MR. McDONALD:  Your Honor, I'm going to

10  object.  I don't think this is really tied to the

11  infringement issue or the claims of the patent at this

12  point.

13           MR. ROBERTSON:  Your Honor, I'm just asking

14  the witness what modifications need to be made to

15  TV/2.  What did he do in order to create the

16  invention.  I'm not asking him at all about claim

17  constructions.  I haven't raised a single claim term

18  yet.

19           THE COURT:  He didn't say that.  He said it

20  didn't have anything to do with infringement.  It's

21  not relevant is his objection, I think.  Isn't that

22  your objection?

23           MR. McDONALD:  That's correct, Your Honor.

24           THE COURT:  Why is it relevant?

25           MR. ROBERTSON:  It's relevant, Your Honor, to

1    the scope of the claims as to what the inventors

2    invented and when they invented it, just as Mr. Momyer

3    testified this morning.

4              THE COURT:  The fact that he testified to it

5    doesn't make it relevant.  It wasn't objected to in

6    that testimony and I didn't have an opportunity to

7    address that.  Now I do.  You're asking him to explain

8    terms within the term "specialized search function"

9    that he did.  Is this what you're talking about?

10             MR. ROBERTSON:  I'm asking him to explain how

11   TV/2 needed to be modified in order to be able to

12   provide the functionality of the invention, Your

13   Honor.

14             THE COURT:  How about this particular comment

15   about specialized search?

16             MR. ROBERTSON:  Well, I can rephrase that

17   question.

18             THE COURT:  I'm just asking you.  I'm trying

19   to figure out what it is first.  You're talking about

20   a specialized search function of some kind?

21             THE WITNESS:  Yes.

22             THE COURT:  Objection overruled.

23   BY MR. ROBERTSON:

24   Q    What did you mean by that, sir?

25   A    What did I mean by "specialized search function"?

MOMYER - REDIRECT                    407

1   Q   I don't know if you completed your answer.  I

2   was asking you about --

3           THE COURT:  You asked him.  It got

4   interrupted, but the objection was to what keyword

5   meant.  So that objection is overruled.

6           What does "keyword" mean?

7           THE WITNESS:  Keyword is any word that would

8   be found in the document.  So you're basically saying

9   "find ovens" and the search would go out and find

10  everywhere there was an occurrence of ovens in the

11  document.

12  Q   Is that an Aspect of your invention?

13  A   Yes.

14  Q   Was TV/2 able to do that when you first met with

15  IBM?

16  A   Technical Viewer was able to do a search, a

17  keyword search.  It's the other searches that were for

18  specific items like part number, vendor, bulletins,

19  page number that Technical Viewer wasn't able to do.

20  Q   One of the things you mentioned was that there

21  were ways you needed to develop multiple catalogs in

22  TV/2, do you recall that?

23  A   Yes.

24          THE COURT:  Are we now finished with the list

25  of things that he did to change TV/2 or modify it or

1   recreate parts of it in order to come to the invention

2   reflected in the patent?

3          MR. ROBERTSON:  No, Your Honor.  Thank you.

4          THE COURT:  Then go on back to that list.

5          MR. ROBERTSON:  Thank you, sir.

6   BY MR. ROBERTSON:

7   Q   Did you also have anything to do with creating a

8   catalog database?

9   A   Yes.

10  Q   Now, Fisher-Scientific -- well, let me complete

11  the list.  Your Honor is exactly right.

12      Did you also have anything to do with the ability

13  to search product catalogs?

14  A   Yes.

15  Q   Well, do you recall you mentioned this need to

16  create a footer bar; is that right?

17  A   Correct.

18  Q   Did you have anything to do with creating what's

19  known as a shell program that's disclosed in your

20  invention?

21  A   Yes.

22  Q   Did the TV/2 program need to be modified in order

23  to create order lists within a shell?

24  A   Yes.

25  Q   Did you have anything to do with modifying the

1   TV/2 to create interfaces to update catalogs in EDI

2   transactions?

3   A    Yes.

4   Q    Let's start with that are last one first.  What's

5   an EDI transaction?

6   A    EDI stands for electronic data interchange.

7   Q    What does that mean?

8   A    It's a way to interact with separate companies

9   without human intervention.  It's computer-to-computer

10  interactions that operate on a standard which is set

11  by the X12 Committee, which is a United States

12  standards setting body.

13  Q    Do they have to have a common language to talk to

14  each other?

15  A    Well, they called it common transaction sets,

16  which could be viewed as a language, but it's more of

17  a structure that enables computers to understand

18  messages between companies.

19  Q    So they can communicate data?

20  A    Yes.

21  Q    Were you involved in assisting to modify the TV/2

22  program with respect to that?

23  A    We wrote programs that would take the EDI

24  transaction, the price/sales catalog, and update

25  vendors' catalogs based on information provided in

1   those transaction sets.

2   Q   When you say "we," who are you referring to?

3   A   Me and my staff.

4   Q   I mentioned this need to customize TV/2 to create

5   order lists in the shell.  What's a shell?

6   A   The shell was a program that used Technical Viewer

7   API to change how Technical Viewer functioned.

8   Q   You used the term API.  What's an "API"?

9   A   API stands for Application Programming Interface.

10  It is a series of commands used to effect how a piece

11  of software will operate.

12  Q   So the Technical Viewer 2 had this API interface

13  you're referring to.  Could it communicate in the

14  context of your invention with this shell program you

15  had without modification?

16  A   The API was used in the shell program to effect

17  changes in Technical Viewer.

18  Q   So you had to develop the shell program in order

19  to communicate to TV/2?

20  A   Yes.

21  Q   And who had primary responsibility for that shell

22  program?

23  A   The primary responsibility for documenting the

24  requirements of the shell program were mine as far as

25  the functionality concerned.  The actual programming

1   of the shell was an IBM responsibility.

2   Q    You also indicated that you needed to create this

3   footer bar to work within the shell.  Do you recall

4   that?

5   A    Yes.

6   Q    Tell us the purpose of the footer bar within the

7   shell program?

8   A    The footer bar --

9            MR. McDONALD:  It's irrelevant, Your Honor.

10  The footer bar isn't at issue in this case.

11           THE COURT:  Is it?

12           MR. ROBERTSON:  Yes, it is, Your Honor.  It

13  has functionality in the system that you're going to

14  hear from experts about that demonstrate infringement.

15           THE COURT:  Overruled.

16  BY MR. ROBERTSON:

17  Q    What's the purpose of the footer bar?

18  A    The footer bar was a series of icons at the bottom

19  of a screen that would assist the end user in

20  navigating through the system with ease.  It consisted

21  of a catalog selection button, an order list button, a

22  forward and backward button, a cancel button, and a

23  help button.

24  Q    It was a way to navigate through the program when

25  you were performing the functionality of your

1   invention?

2   A    Correct.

3   Q    Now, you mentioned also this catalog database.   Do

4   you recall that?

5   A    Yes.

6   Q    Fisher-Scientific had a very large paper catalog.

7   A    Yes, they did.   It was at least 2000 pages.

8   Q    With tens of thousands of items offered by various

9   vendors that Fisher distributed?

10  A    Correct.

11  Q    It also included Fisher products, correct?

12  A    It did, yes.

13  Q    Were you asked to provide that paper catalog to

14  IBM so they could adapt it into a catalog database?

15  A    Well, it was more than that.   We were asked to

16  provide the catalog in an electronic format to help

17  them in creating the catalog database.

18  Q    So just so I'm clear, did you have a

19  responsibility for giving an electronic catalog of

20  Fisher-Scientific, not a paper catalog that would then

21  need to be scanned and included into it?   Was that

22  part of your responsibility?

23  A    Yes.   It was an electronic version of the paper

24  catalog, and it was used by SteBo to actually create

25  pages of the paper catalog.

1          THE COURT:  You used SteBo to prepare the

2     pages or you said "used by SteBo."  How did you take

3     the paper catalog and convert it into an electronic

4     version that you ultimately gave to IBM?

5          THE WITNESS:  Okay.  We had a creative

6     services department within Fisher who was responsible

7     for creating the paper catalog.  And what they would

8     do is take paper in the way they wanted the catalog to

9     look and send it to SteBo.  SteBo would input that

10    into their system in an electronic format to create

11    pages that could be sent to the publisher.

12          In the process of that, SteBo now had this

13    catalog in electronic format, and we used that to give

14    to IBM to produce the catalog database.

15    Q    So IBM didn't have a paper catalog.  They had an

16    electronic catalog from one of your vendors, SteBo,

17    which you produced to them in order for them to

18    utilize it in this electronic sourcing project that

19    you were working on with them as a subcontractor; is

20    that right?

21    A    Correct.

22    Q    Did they ever receive a paper catalog?

23    A    Yes.

24    Q    Were they having difficulties with converting it?

25    A    I wouldn't categorize it as difficulty.  It was

1  generally agreed that an electronic format was

2  preferable because SteBo used a tagging language to

3  describe the catalog.  Technical Viewer used a tagging

4  language to describe its pages.  And I was able to get

5  the definition of the tags from SteBo and provide it

6  to IBM so that they could basically write a program to

7  take the tags that were in the SteBo catalog and

8  convert them to the IBM Technical Viewer format.

9  Q    What were these tags used for?

10  A    Tags in both systems were essentially used to

11  describe how the data should look.

12  Q    Did the tags need to be modified in order to

13  recognize and understand the electronic SteBo catalog

14  that you provided to IBM?

15  A    Well, it was more like a one for one substitution

16  of tags.  So a tag, for instance, that said "bold" in

17  SteBo might be "BL," and in Technical Viewer it might

18  be "BD."  So you had to substitute "BL" for "BD."

19  Q    So you had to reconcile those?

20  A    Yes.

21  Q    Let me ask you, you have had an opportunity to

22  look at the statement of work with IBM; is that right?

23  A    Correct.

24  Q    I want to go to an attachment to that statement of

25  work.  If you would turn, please, sir, in your

1    project took to accomplish all of these tasks that

2    were identified in Exhibit No. 38, this Gantt chart?

3    Your memory might be sufficient unless you want to

4    confirm with the document.

5    A    Well, with the Gantt chart, it goes from October

6    back to -- October to October.  So it took about a

7    year.

8    Q    Were you involved in the project that entire time?

9    A    Yes.

10   Q    And you have identified those things that you were

11   involved in, I believe, that were necessary

12   modifications to adapt this TV/2 for this pilot and

13   comprehensive program; is that right?

14   A    Yes.

15   Q    At some point in time when you met with the IBM

16   people, did they ever provide you with any marketing

17   literature with respect to the IBM Technical Viewer 2?

18   A    Yes.

19   Q    Do you have Defendant's Exhibit 107 in your book?

20            THE COURT:  It's in that small book there,

21   Mr. Kinross.

22            THE WITNESS:  All right.  I'm looking at it.

23   Q    Have you seen this document before?

24   A    Yes.

25   Q    Did you ever obtain a copy of this document?

1   A    Yes.

2   Q    Who gave it to you?

3   A    It came on the Technical Viewer CD that was

4   provided with the product.

5   Q    When you applied for a patent, did you provide

6   this document to your patent attorney so it could be

7   given to the Patent Office?

8   A    Yes.

9   Q    Let me just take you to Plaintiff's Exhibit No. 1,

10  which is the '683 patent, which is in all the jurors

11  books.

12          MR. McDONALD:  I'll object as outside the

13  scope of infringement at this point.

14          THE COURT:  I don't know what he's going to

15  do yet.  There's not a question yet.  So I can't rule.

16  Or if I ruled, it would be subject to a serious error

17  since I don't know what I'm ruling on.

18          Get combat ready.  Don't answer the question

19  because apparently there's going to be an objection.

20  So let's wait and see what it is.  Ask the question

21  and let's go.

22  BY MR. ROBERTSON:

23  Q    Can you go to the cover page of the '683 patent?

24  A    Yes.

25  Q    Do you see the heading "other publications"?

427

1    argument.   The objection is sustained.

2              MR. ROBERTSON:  Your Honor, with that, I have

3    no further questions of this witness.

4              THE COURT:  All right.  Mr. McDonald.

5              MR. McDONALD:  Thank you, Your Honor.

6         CROSS-EXAMINATION

7    BY MR. McDONALD:

8    Q   Mr. Kinross, did you mention there in the last few

9    minutes something about a CD, I think you said, from

10   IBM?  Did I hear that right?

11   A   Correct.

12   Q   What was that?

13   A   It was the Technical Viewer CD that was provided

14   to be able to load the Technical Viewer onto a

15   computer.

16   Q   When did you get that?

17   A   I don't recall the exact date I got it.  I'm

18   sure that --

19             THE COURT:  Do you recall a year?

20             THE WITNESS:  Yes, 1994.

21   BY MR. McDONALD:

22   Q   I think you mentioned that Fisher was around that

23   time it began working with IBM working towards getting

24   its catalog on a CD ROM.  Did I hear that right?

25   A   No.  What I said was the industry was tending

KINROSS - CROSS                    437

1        MR. ROBERTSON:  I object.  That's outside the

2   scope.

3        THE COURT:  I think this was.

4        MR. McDONALD:  Well, he brought customer

5   service representative --

6        THE COURT:  I know, but not every answer

7   generates an opening of the door.  I sustain the

8   objection.

9   BY MR. McDONALD:

10  Q    Let's go back to --

11       THE COURT:  Just kind of go around with what

12  he was doing there on direct.

13       MR. McDONALD:  Okay.

14  Q    Let's talk now about the TV/2 system, Mr. Kinross,

15  at the time you started talking to IBM.  Now, there

16  was such a system that was available from IBM the day

17  you started talking to them about searching, right?

18  A    There was what?

19  Q    A TV/2 system.

20  A    There was a TV/2 system, yes.

21  Q    And that system already had an application program

22  and interface on it, right?

23  A    My understanding is that it came with a sample

24  program that showed the use of the API, correct.

25  Q    Was it your understanding specifically that the

1   electronic sourcing system and any modification that had to

2   occur with RIMS?

3   A    The business logic, yeah, we had to actually strip -- the

4   RIMS system had character-based application which we called a

5   green screen at the time.  That all had to be torn out of the

6   code, and we had to modularize the business code in order to be

7   able to interface with the new graphical user interface.

8   Q    We have now what I think are six separate topics.  If we

9   could go through them one by one and tell me in the simplest

10  terms as possible, what is it, in fact, you had responsibility

11  for doing with these revisions, modifications, reprogramming,

12  or creating from scratch some of these things.

13       So let's start with you indicated this construction of a

14  graphical user interface, and we've heard that term before.

15  Tell us what you understand that term to mean.

16  A    Graphical user interface is basically the interface that

17  the end user sees when interacting with the system.

18       At that time, most of the systems, especially the

19  mainframe systems, were character-based, so they started at the

20  left-hand corner and would go to the bottom right hand of the

21  corner, and it would display characters, numbers, dashes,

22  colons, things of that nature.  Very encryptic.

23       So in order for us to be able to allow for an end user,

24  like a researcher or lab technician, to use the system, we

25  wanted to generate or create a graphical representation of what

Johnson - Direct

453

1    they would be doing, selecting products, placing orders,

2    selecting information to select the type of orders, that kind

3    of thing.  So we built this graphical user interface to be able

4    to make it easier, essentially, for the user to use.

5    Q    Would this graphical user interface make it easier for the

6    user of your invention in the electronic sourcing system to

7    utilize its features and functionality?

8    A    Yes.

9    Q    The RIMS technology, did it have a graphical user

10   interface?

11   A    No.

12   Q    Did it have this clunky character-based interface you were

13   talking about?

14   A    Yeah.  As I said, it was a character-based application.

15   It was originally designed for a Fisher Scientific CSR to

16   utilize, so it required a large number of hours to train this

17   person on how to use it.  There were abbreviations in there,

18   things like, for example, if we wanted them to enter a stock

19   number, the title of the field was STKNO.  If we wanted them to

20   enter a particular product type, it was just characters, PT.

21   So unless you understood what that meant, you wouldn't know

22   what to enter into that system.

23   Q    Are you familiar with the term green screen?

24   A    Yes.

25   Q    What is a green screen?

Johnson - Direct

1    A    And old mainframe terminology where the characters on the

2    screen are basically green.

3    Q    Did the RIMS have a green screen technology?

4    A    Yes.

5    Q    I'm sorry?

6    A    Yes.

7    Q    And were you involved in programming and creating this

8    graphical user interface for the electronic sourcing system?

9    A    Yes.  I was involved in providing all the requirements to

10   the people that worked for me to develop it, yes.

11   Q    Did you supervise those people?

12   A    Yes.

13   Q    You also mentioned you had to design the interface for

14   communication between the requisitioning and purchasing program

15   and the catalog database.  Could you tell me what that entailed

16   and why that was necessary?

17   A    Well, it was necessary because the initial idea was to

18   supply a system that would allow us to do a complete supply

19   chain management end to end, be able to select products,

20   process the requisition, and ultimately generate a purchase

21   order.

22        In order to do that, we needed to connect the

23   requisitioning management system to this electronic catalog, so

24   we built some APIs, which are application program interfaces,

25   that had a two-way communication channel basically between the

Johnson - Direct

1   requisition management system and the cataloging system so we

2   could pass data back and forth without losing any information.

3   Q    Did you have that interface in the RIMS system, or did

4   that have to be created?

5   A    No, that was not in the RIMS system.   That had to be

6   created.

7   Q    Why is that?

8   A    It wasn't there.

9   Q    Why --

10              THE COURT:   You asked for it.

11  Q    Let me see if I can rephrase the question.   Why did you

12  feel that it was necessary?

13  A    Well, it was necessary because in order for us to provide

14  a complete shopping experience without frustrating the user, we

15  wanted to seamlessly be able to process the information they

16  were selecting in the catalog into the requisition without them

17  having to look at a catalog, go over to the requisition system,

18  type it in, go back to the catalog, look for another product,

19  write it down, go over to the requisition system and type it

20  in.  We wanted a seamless interface so the user just had to

21  point and click and push a button, and all that data would flow

22  automatically.

23  Q    The way you described the difficulty you were trying to

24  overcome, did the RIMS system even have that kind of primitive

25  technology?

1    A    As far as communicating with a catalog?

2    Q    Yes.

3    A    No.

4    Q    You also mentioned something about splitting the

5    presentation layer, I believe, from the business logic.  Do you

6    recall that?

7    A    Yes.

8    Q    What was that?

9    A    RIMS was designed as a very traditional, what I'll call

10   CICS COBOL mainframe system.

11   Q    You have to stop there, and we're going to say again,

12   we're going --

13   A    Keep it high level.  I'm sorry.  I get technical

14   sometimes.

15              THE COURT:  It's okay, but it would be better you all

16   don't talk while each other are talking.  You can be technical

17   all you want to.

18   Q    You mentioned CICS COBOL.  I think I interrupted you, so

19   why don't you finish your answer.  What is CICS COBOL?

20   A    COBOL is a common business oriented language.  It's a

21   program language we used to develop the original RIMS system.

22        CICS is a transaction processor which allows COBOL

23   programs to run in that environment.  It's a very traditional

24   system, very geared towards businesses that want to process a

25   lot of data very quickly.

Johnson - Direct

1   Q    And so did you need to be able to have that, to modify

2   that capability from RIMS to your electronic sourcing system

3   inventions in order to have that capability of transferring and

4   moving around a lot of data?

5   A    Well, I mean, what you asked me is what did we do to the

6   business logic to remove the presentation layer.  What we

7   needed to do was we needed to basically reengineer those

8   programs so they no longer worked with the green screens that I

9   mentioned earlier.

10       Those green screens were ripped out of those programs, and

11  we converted those programs into basically what we now call

12  business object that all it did was manage the business logic.

13  Then we built the interfaces to the graphical user interface

14  so, in short, the GUI could interface to the business logic.

15  Q    Was that an important aspect for making your invention

16  user-friendly and functional?

17  A    Yeah.  It was pretty much a requirement.

18  Q    And just so I'm clear, that wasn't available or present in

19  the RIMS system?

20  A    No.

21  Q    You also, I think, mentioned that you had to modify

22  requisition coding; is that correct?

23  A    Yes.  We -- at the time, the RIMS system could only

24  communicate to the Fisher mainframe, Fisher being Fisher

25  Scientific.  The programs were primarily sourcing those

458

1    products all to Fisher, so it was one requisition and

2    ultimately one requisition that was sent to the Fisher

3    mainframe as an order.  So basically we changed those programs

4    to be able to accept, in the requisitioning process, the

5    ability to add multiple products from different vendors to a

6    single requisition.

7    Q    In modifying this requisition coding, did it also address

8    any issues involving the purchase orders from these

9    requisitions?

10   A    Yes.  As an end result, once the requisition was created,

11   the user could say, yes, I want this order, go ahead and place

12   it.  The system would then take that requisition and by vendor

13   create multiple purchase orders with the products associated to

14   that vendor.

15   Q    You also mentioned this purchase order creation capability

16   that you needed to do.  Can you tell me how that changed from

17   the prior RIMS system, if at all, to -- for purposes of your

18   invention?

19   A    Well, as I said earlier, RIMS could only communicate to

20   the Fisher mainframe, so the order was actually created through

21   the Fisher mainframe system.  So in the electronic sourcing

22   system, what we needed to do was to be able to create purchase

23   orders that could be sent out to vendors through one of a

24   couple of different mechanisms to get the purchase order over

25   to the appropriate vendor.

Johnson - Direct

1   Q    When you say sent out, that could be sent out from a local

2   computer where an individual was using your electronic sourcing

3   invention to make a request for an item from multiple vendors?

4   A    It was a computer that was located at the customer

5   location, yes.

6   Q    The end user could utilize the electronic sourcing system

7   in order to accomplish the goals of your invention; is that

8   right?

9   A    Yes.  They would be working on a work station

10   theoretically in their laboratory or in their office

11   communicating to a server located on the network.

12   Q    And that server on the network would have information

13   available to transmit that contained information about products

14   that were available?

15   A    That's where the business logic resided, yes.

16   Q    You also mentioned this inventory availability issue that

17   had to be addressed with respect to modifying or revising,

18   reprogramming the RIMS system in order to achieve the goals of

19   your electronic sourcing system.  Do you recall that?

20   A    Yes.

21   Q    What did that entail?

22   A    End users, in other words, for them to make a good

23   decision as to whether or not to make a purchase, they want to

24   know pricing and availability, how much is it going to cost

25   them and am I going to get the product shipped, or is it going

1   to go on backorder.  In order to do that, we introduced a

2   technology of EDI to be able to generate -- back then what it

3   was called was a request for quote, to be able to send to a

4   vendor to say, can you give me the information about this

5   product, do you have it in stock, and how much is it going to

6   cost me.

7        So that request for quote would be responded to by the

8   vendor with a response to request for quote that would give us

9   that information.

10  Q    Now, RIMS had some inventory availability capability with

11  regard to Fisher products; is that right?

12  A    Yes, it did.

13  Q    Did RIMS have this inventory availability capability you

14  just described with regard to multiple vendors?

15  A    No.

16       MR. ROBERTSON:  That's all I have.  Please answer

17  whatever questions Mr. McDonald may have.

18       MR. McDONALD:  I take it, Your Honor, you want to

19  keep us rolling, rolling, rolling.

20       THE COURT:  I don't think you have many questions, do

21  you?  He hasn't been on but about 15 minutes or so.

22       MR. McDONALD:  That's true.

23       THE COURT:  I don't see how you are going to go

24  beyond that, but if we do, we'll see where we are in

25  15 minutes.

1   A    It's the only representation that we put in, I believe.

2   Q    Finally, I think you mentioned that the RIMS system did

3   not communicate with the catalog.  Did I understand that right?

4   A    That's correct.

5   Q    The RIMS system did have a parts master; right?

6   A    It had a part master, yes.

7   Q    You didn't consider that a catalog, though, for purposes

8   of your answer; is that right?

9   A    No.

10  Q    So when you say no, you are agreeing with me?

11  A    I did not consider that a catalog.

12  Q    Thanks for fixing the question.  Also the RIMS system had

13  a host database with Fisher products on it as well; right?

14  A    It had -- yes.

15  Q    And when you answered that question about RIMS not

16  communicating with a catalog, did you consider that Fisher

17  database of items to be a catalog or not?

18  A    No.

19            MR. McDONALD:  No further questions.  Thank you, Your

20  Honor.

21

22                    REDIRECT EXAMINATION

23  BY MR. ROBERTSON:

24  Q    Mr. Johnson, do you have the '683 patent in front of you?

25  It's Plaintiff's Exhibit Number 1.  You testified about this

477

1   A    Yes.  254 is in this figure.

2   Q    There was a question about disclosure of database changes,

3   and I want to see if I could direct you to column 10 of the

4   '683 patent starting at about line 55 through line 64.   Starts

5   out, by contrast?

6   A    Yes.

7   Q    States there, by contrast, an item selected from the

8   Fairmont catalog would be transferred to Fisher RIMS system 40

9   with the vendor number of Fairmont and would be recognized

10  during inventory sourcing as either a type 07 product that

11  distributor orders from Fairmont or as a type 05 item that

12  customer orders from Fairmont as an administrative purchase.

13       Do you know what type 07 products were?

14  A    You know what?  I'm drawing a blank on seven.

15  Q    Let me see if I can have one moment.  Maybe I can find it

16  for you.  Is the Fairmont distributor a third-party distributor

17  of products?

18  A    I'm sorry, where are you?

19  Q    Back at that section talking about Fairmont distributor of

20  vendor product, it says, type 07 product that distributor

21  orders from Fairmont?

22  A    Where are you?

23  Q    I'm sorry, back at column ten, line 55, through down about

24  60.

25  A    Okay.

Johnson - Redirect

1   Q      What does it indicate a type 07 product is?

2   A      That's what I'm having a hard time recollecting.

3   Q      It says that distributor orders from Fairmont in

4   parentheses right after it.   Do you see that?

5   A      Yes.

6   Q      Fairmont is not Fisher, is it?

7   A      No.

8   Q      So is that another vendor that's making product available?

9   A      That's another vendor that we wanted to put into the

10  catalog, yes, and we did want to be able to process purchase

11  orders to them.

12  Q      So for those third-party vendors such as this Fairmont

13  type 07 product, were database or program changes necessary to

14  RIMS to accommodate that type of third-party product?

15  A      Were database changes required, yes.

16  Q      Were they made?

17  A      Yes.

18          MR. ROBERTSON:   Thank you.   That's all I have.

19          THE COURT:   Do you need him back?

20          MR. McDONALD:   Yes, Your Honor.

21          THE COURT:   Mr. Johnson, they're going to need you

22  back for another part of the case, so there's no need for you

23  to stay here in Richmond as much as we'd like to have you.   But

24  you'll have to come back, and you'll be excused temporarily if

25  you agree to come back.   They'll give you notice and get you

1  selection and determination as to what it might want

2  to purchase?

3  A   So when we use the Punchout capability, some of

4  these vendors support the capability of reporting

5  whether the item that you want is available in

6  inventory.  And so we can see in what's called the

7  Punchout response, we see on a web page displayed in

8  the Lawson system whether or not the item is available

9  in inventory.

10      And if we're using the electronic data interchange

11 module, the purchase order goes to a vendor, and the

12 vendor can reply, and the purchase order responds as

13 to whether that item is available in inventory.

14 Q   So you have this software module within the Lawson

15 system about determining availability and inventory.

16 Do you see that?

17 A   Right here, yes.

18 Q   I think you may have touched on it, but can you

19 tell us the ways in which this accused Lawson system

20 can satisfy the element of determining the

21 availability of inventory within its accused system?

22 A   Yes.  So using the Punchout system, I can look

23 into the external catalog of a vendor.  And if this

24 vendor supports this capability, I can determine

25 whether the item I want to order is available in

1      The basic transaction for all EDI purchasing is the

2   electronic purchase order.  With electronic purchase orders,

3   EDI users can order materials from vendors electronically.

4   After receiving a purchase order, the vendor returns a detailed

5   purchase order acknowledgment to the client.  This

6   acknowledgment summarizes the information on the purchase order

7   and validates the order's authenticity.

8   Q    What, if any, relevance does that have to your opinions,

9   Doctor?

10  A    Well, what we are going to see is that every purchase

11  order that goes out through EDI, called a PO 850 transaction,

12  EDI 850 transaction is going to generate a response, the

13  purchase order acknowledgment which is EDI 855, and that's

14  where there is the opportunity for the supplier to tell the

15  customer whether or not the order can be filled and whether or

16  not the items that are being ordered are available in

17  inventory.

18  Q    This availability in inventory, is that of relevance to

19  the claims that are being asserted here?

20  A    Yes, it is.

21  Q    There's a heading called using internet email to issue

22  purchase orders?

23  A    Right.

24  Q    How does Lawson indicate this process works?

25  A    So this first paragraph under that heading says, purchase

1  orders can be issued to vendors using internet email.  This

2  kind of issue method is possible by using Lawson procurement

3  Punchout or another third-party tool that's capable of email

4  delivery.  With Lawson procurement Punchout, you also need

5  Lawson requisition self service to get the PO dispatcher or

6  sweeper.

7  Q    So is that consistent with your diagram earlier in which

8  you need requisition self service to support the Punchout

9  capability?

10  A    That's correct.

11  Q    Is there a description on this page of Plaintiff's Exhibit

12  Number 108 that explains how the procurement Punchout

13  application works?

14  A    Yes, it's the next paragraph below.  So Lawson procurement

15  Punchout lets users of Lawson requisition self service order

16  supplies from a specific vendor's website.  With Lawson

17  procurement Punchout, a vendor page is linked to a shopping

18  icon, called a Punchout, on the Lawson requisition self service

19  home page.

20      When the user chooses a specified vendor, that vendor's

21  website catalog appears.  From this catalog, Lawson requisition

22  self service users can choose items to order.  By separate

23  agreement between the customer and the vendor, the vendor

24  displays the customer's special cost information for catalog

25  items and can limit the catalog items that are displayed.

1    When users have filled their shopping carts and checked

2  out from the vendor website, the chosen items and their cost

3  are returned to the Lawson server where a requisition is

4  created using the Lawson requisition self service application.

5  A purchase order is then created from the requisition.

6    After the requisition is interfaced into the purchase

7  order application, the Lawson procurement Punchout enables the

8  transmission of purchase order documentation back to the vendor

9  so that the vendor can fill the order.

10  Q    Now, you talked about this Punchout capability a little

11  bit before, but, again, just since that was a lot of

12  information to take in, can you give us a high overview of what

13  is actually the functionality that's going on here --

14  A    Yes.

15  Q    -- that's being performed by the Lawson procurement

16  Punchout module?

17  A    Right.  So we had that complicated diagram that we

18  essentially skipped, but what it was documenting was the data

19  transfers.  So when the Lawson system punches out to this

20  special vendor website that has been created for this

21  particular customer, it first has to have a handshake.  By that

22  I mean that information is transmitted in both directions where

23  the Lawson application and the vendor website authenticate each

24  other so that they know that they are valid.  So they exchange

25  some secret information.  That's how they authenticate.

1    Q    And you indicated there's this specialized website that

2    Lawson works with its Punchout partners to create such that

3    users of the Lawson system that have the Punchout procurement

4    module can go out to these special websites and purchase items;

5    is that right?

6    A    Yes.

7    Q    Do you have an opinion as to whether the catalog data

8    available at these Punchout partners that Lawson utilizes also

9    meets the definition of the Court's claim term catalog?

10   A    I believe they do, yes.

11   Q    We'll be coming back to that; is that right?

12   A    I'm sure we will.

13           THE COURT:  Then your opinion of what in the Lawson

14   system infringes is not confined only to -- excuse me.  Your

15   opinion of what in the Lawson system meets the Court's

16   definition of catalog is not confined to the item master plus

17   the vendor item table?

18           THE WITNESS:  You are correct, Your Honor.  The item

19   master and vendor item table would be an instance of a catalog

20   within the Lawson system.  These Punchout catalogs are

21   external.  They are an additional instance of catalogs.

22   Q    Okay.  Why don't we go then to page 46 of Plaintiff's

23   Exhibit 112, and there's a heading there that says, what are

24   UNSPSC codes.  You referenced those several times, so why don't

25   we see what Lawson has to say with respect to these codes.

1      Now, that's a lot of items.  So it's hierarchical.  If you
2  add the family designation, two digits there, 00 to 99, you
3  narrow it down.  So if the code is 4410, you've narrowed it
4  from office equipment to office machines.  If the code is 4411,
5  you've narrowed it within office equipment down to computer
6  supplies.
7      So now let's take the example 4412 under office equipment.
8  We're now narrowing it to office supplies, but we can become
9  more specific by adding more digits.  So if I add the two-digit
10  class, if I added 15, then I'm talking about the type of office
11  supplies that are mailing supplies; if the code is 16, writing
12  implements.  So if my code so far is 441216, I'm talking about
13  writing implements.
14      If I go down to the commodity level, the full eight
15  digits, I get to a finer-grained description of items.  So if
16  that commodity code is 01, it's mechanical pencils, 02 is black
17  stylus pens, 03 is black pens.  So if I wanted to search for
18  black pens, I could put in the code 44121603, and what I would
19  get back is a listing of all of the black pens in the item
20  master database from all the vendors that have put item data
21  there.
22  Q   Now --
23          THE COURT:  Put item data where?
24          THE WITNESS:  That using vendor catalog load program
25  provided by Lawson, catalog items from the vendor has been put

1     into the item master and the vendor item table.

2            THE COURT:  Are those the Punchout catalogs you

3     talked about?

4            THE WITNESS:  No, sir.  Punchout catalogs remain

5     external.  This is -- as a setup to using the Lawson system, if

6     I, as a customer, want to do business with Staples, I, as the

7     customer, make a deal with Staples, and Staples has a vendor

8     price agreement.  I can load the vendor catalogs, Staples

9     catalog and the vendor price agreement, and that populates the

10    data in the item master and the vendor item table.  So now I

11    have an internal catalog.

12           THE COURT:  In the Lawson system.

13           THE WITNESS:  In the Lawson system.

14           THE COURT:  Is that in the item master?

15           THE WITNESS:  Yes, sir, item master and vendor item

16    table.

17           THE COURT:  Suppose all you really need from

18    Staples -- you don't need the computers and you don't need the

19    printers and all of that.  What you really need are the office

20    supplies.  Can you just load the office supplies of the Staples

21    catalog into the Lawson system?

22           THE WITNESS:  So in your agreement with Staples, your

23    agreement might say, I am only buying office supplies, and so

24    the specialized catalog that Staples provides to you only

25    contains office supply information.

1    shopping cart, and delete the other one.  So continue.

2         Okay, now stop.  So now I have both notebook computers in

3    the Lawson shopping cart, and I'm going to go up here to this X

4    and delete the ThinkPad.  Continue.

5         And like all good software, it asks me, do you really want

6    to delete that, and I say, yes.  Okay.  Stop.  So at this

7    point, I have done the UNSPSC code, found two generally

8    equivalent notebook computers, chose one, added it to the

9    shopping cart, added the other one to the shopping cart,

10   deleted the first one.

11        So I've been able to convert one item from one source, the

12   ThinkPad from Office Max, into an equivalent item from another

13   source, the Dell Inspiron here, and having done that, I'm now

14   going to go back and pick another category and find another

15   item to add so that I'll have multiple items in my shopping

16   cart.

17        Okay, so I'm backed out -- because I did that drop-down

18   menu to categories, I'm back at the highest level, the segment

19   level.  So continue.  Scroll down.  Stop.  So this time my

20   segment level is laboratory and measuring and observing and

21   testing equipment.  Continue.  Stop.  My family, again, there's

22   only two here, laboratory and scientific equipment, or

23   measuring or observing, or testing instruments and accessories.

24   Continue.

25        So I pick at my family, laboratory and scientific

1   Q     Did we see the ability to select those product catalogs to

2   search?

3   A     We did that through the categories.

4   Q     Tell me what two product catalogs we saw?

5   A     Office Max and Baxter Healthcare.

6   Q     Did we also see Dell and Diablo?

7   A     Yeah, that's right, we did.

8   Q     And was there an ability to select the product catalogs?

9   A     Yes, we did it through the categories.

10  Q     Was there an ability to search for matching items in those

11  product catalogs?

12  A     We did that.

13  Q     How did we do that?

14  A     We put in the -- we did the category search by marching

15  through the UNSPSC codes, picking a commodity and then picking

16  items.

17  Q     Once you had selected those items from the office, from

18  the shopping cart, were you able to put them into a

19  requisition?

20  A     Yes.

21  Q     And did you -- were you able, from that requisition, after

22  you got the appropriate approvals which are not part of the

23  claims of the -- elements of claim, excuse me, were you able to

24  generate one or more purchase orders from that requisition?

25  A     Yes, we did.

1    Q    And were you able, using the UNSPSC, to find items that

2    were similar, generally equivalent?

3    A    Yes, I converted that ThinkPad into a Dell.

4    Q    Thank you.  Doctor, I'd like you to take a look at

5    Plaintiff's Exhibit 280, and can you identify what this

6    document is?

7    A    This is the Lawson Software response to Presbyterian

8    Healthcare Services.

9    Q    So this is another one of those responses to an RFP?

10   A    That's correct.

11   Q    And what is it dated?

12   A    March 22nd, 2005.

13   Q    And if you could take a look at the page that begins with

14   barcode 196, if you would, sir.  And here -- which has a Bates

15   number that ends 848.

16   A    Yes, I'm there.

17   Q    And here Presbyterian Hospital, in this -- here Lawson, in

18   this response to the request for proposal from the Presbyterian

19   Healthcare Services, is ask asking about requisitioning

20   capability from Lawson; is that right?

21   A    Yes.  That's exactly what it says.

22   Q    And it says in the requisitioning capability, it's asking

23   to describe your ordering tools for various types of items,

24   stock, nonstock, and non-catalogs; do you see that?

25   A    Mike, it is below there.  There it is.

1    So this document is explaining technically what's going to

2    go on when we do the Punchout, when we go on the external

3    vendor catalog.  When we do the memo, of course, you'll see the

4    interactions, but this is explaining the information flow, and

5    that turns out to be important for the claims that we're

6    talking about.

7         Okay, so it begins, as you are going to see, the user

8    clicks on a Punchout vendor icon in RSS.  So the user is

9    sitting at the requisition self service and will have a series

10   of icons like Staples or Office Max or Dell, and the user is

11   going to click on one of those, and that's going to initiate

12   this Punchout session.

13        So now we'll go to step two.  RSS sends, and this is --

14   what you see here, Punchoutsetuprequest, all one word.  So that

15   is a computer function that's being called.

16   Q    When you say RSS --

17   A    Requisition self service.  So it makes this function call

18   and sends a Punchoutsetuprequest to the vendor for

19   authorization.  So this is an outbound communication from

20   Lawson -- so let's, for convenience, let's just name an

21   external vendor.  Let's say Dell.

22        So it's going to send a message to the external vendor,

23   Dell, and it's going to have information in there that nobody

24   but Lawson and Dell would know, and that's how it's going to

25   authenticate, or authorize in this case, and you can see this

1   Dell computer are merely identifying each other.  The user has

2   not really done anything but one mouse click on let's say the

3   Dell icon.

4           In our computer parlance, the two computers are

5   setting up a communication path.  That's all that's happened.

6   Q    At this stage?

7   A    So far.  All right, step four, so, we mentioned the

8   universal resource locator, the URL.  That's the web address of

9   a computer.  This is why this technical detail is important.

10  When the Lawson system contacts the external servlet, part of

11  the code design is that the servlet sends back to Lawson the

12  address, the URL, and embeds it in the Punchoutsetupresponse,

13  and that is how Lawson knows where to redirect the user so that

14  the user finds the specific customized catalog that that vendor

15  has created by agreement with the user.

16          So the web address is provided by, in this case Dell, so

17  it's not www.dell.com.  It's something special, and we're going

18  to see that.  So that URL comes back in this

19  Punchoutsetupresponse, and then the Lawson system is going to

20  redirect to there.  And we're going to see that happen.

21          THE COURT:  When you say Lawson is doing it, do you

22  mean Lawson system?

23          THE WITNESS:  I do, sir.

24          THE COURT:  So if I'm using the Lawson system where

25  you just said Lawson does it, it's the Lawson system that's

1  doing it when I punch that one button that you told me you

2  punched a minute ago.

3          THE WITNESS:  Yes, sir, that is exactly right.

4          THE COURT:  But it doesn't have to be somebody

5  sitting in Lawson's office, or it can be me or --

6          THE WITNESS:  No, sir.  It's not you or me.  After

7  that first click, everything I've talked about is just

8  computers talking to each other, and this whole experience

9  takes microseconds.  Milliseconds.  It's really fast.  (Making

10  noise) and that information is exchanged.

11          Step five, new shopping window opens.  Okay, now

12  that's easy to understand.  So a window is going to open, and

13  it's connected to this special external vendor site.  We're

14  saying Dell.  And so now you start shopping.  That's you, the

15  user.  You're doing shopping at the special Dell website.  You

16  pick some items, you put them in the Dell shopping cart, you

17  click checkout.  That part is easy to understand.

18          THE COURT:  Well, now you say I'm connected to the

19  vendor site.  Am I just looking in the vendor's catalog at this

20  point in time, or am I doing something else?

21          THE WITNESS:  You are looking at a special catalog,

22  one that was designed by Dell for whoever you, the customer,

23  are, and you are shopping within that catalog.  So now you

24  check out.

25  Q    Let me ask you then, Doctor, you, the user, are using the

1    Lawson requisition self service?

2    A    I realize that can be ambiguous.  So I, the human user,

3    using the Lawson system, have connected to the external special

4    Dell site.  I have shopped.  I have put some items in the Dell

5    shopping cart.  I have clicked on the Dell checkout.

6    Q    I want to stop you there because this is a little

7    confusing when you say special Dell website.  This is not the

8    Dell website that I can just open a browser and go to and shop

9    from my home computer.  What is this special Dell website you

10   are referring to here?

11   A    It is a website that Dell has created for this customer,

12   and its address is that URL I showed you in step four.

13   Q    But let me ask you, to get to this special website you've

14   been talking about, what software are we using to do that?

15   A    This is the Lawson software.  It's redirecting me to this

16   special site.

17   Q    When you do this demonstration that is going to illustrate

18   this Punchout capability of this requisition self service, are

19   we going to be able to see that we're not just at the

20   commercially available Internet Explorer website of Dell but

21   we're at some sort of specialized website that has been set up,

22   directed, and controlled in some way by Lawson?

23   A    That's right.  That's why I wanted -- that's why this

24   technical detail is necessary, so that we can see and observe

25   and interpret that in the demonstration.

1    Q    I didn't mean to interrupt.  I'm sorry.

2    A    That's fine.  So we check out, me, the human user.  I

3    check out.  Step six, vendor, so that's Dell, sends the

4    shopping cart content in a special message, this Punchout order

5    request.  So we had a Punchoutsetuprequest and a setup

6    response.  Now we have an order request.

7         So Dell is sending the content of the shopping cart back

8    to Lawson in this message, the Punchout order request.

9    Symmetrically to the servlet running over on the Dell side is a

10   servlet running on the Lawson side.  So that servlet picks up

11   this document, this Punchout order request from where it's

12   temporarily cached, just temporarily stored.

13   Q    Before we move on, Doctor, can you tell us who specifies

14   the format for the data that's come back to Lawson?

15   A    Lawson controls all of this, and we have documents that

16   show what those formats are.

17   Q    Sorry to interrupt.

18   A    So the order comes back into the Lawson system.  The

19   shopping session ends, and your special window closes.  Now you

20   will be visibly back in the Lawson system.  We've never really

21   left it, but you'll be back from the Dell side to the Lawson

22   side.

23        Step seven.  So the shopping session ended.  So detecting

24   that, RSS submits a request to the Punchout servlet to retrieve

25   the cached shopping cart content.  So that's go get that order

1   request document and pull it into the Lawson system.

2   Q      Where did that directive come from?

3   A      All of this, all of this code, all of these directions,

4   all of these formats are provided by Lawson.  They are in the

5   documents.  The code is given to the external vendors and a

6   partnership is created.  So all of this stuff that is quite

7   technical just appears miraculously to work.

8   Q      Have you seen documentation where Lawson actually calls

9   these vendors Punchout partners?

10  A      Yes.

11  Q      Will we see some of that?

12  A      Yes, I hope so.

13  Q      Thank you.

14  A      So this is the next-to-the-last step.  So we go on to step

15  eight.  Requisition self service creates a Lawson requisition

16  from this retrieved content.  So the shopping cart was returned

17  in the order request document.  That was cached or saved.  Now

18  it's been retrieved, and Lawson requisition creates -- the

19  requisition software module creates a requisition for whatever

20  it was I bought, ordered at Dell.

21      Okay, so that's the technical side of what we're going to

22  see in the demonstration.

23  Q      Thank you for that.  I brought that all up in the context

24  of Plaintiff's Exhibit Number 280 that was offering that

25  Punchout capability that was the response to the Presbyterian

WEAVER - DIRECT                    706

1   where in the database those items reside.

2       So if I do a keyword search for Dell, I look it up

3   in the index, and that tells me where the Dell items

4   are, and I only look at those.

5   Q   Do you have any demonstratives that you prepared

6   to help illustrate this point?

7   A   I do.

8   Q   Could we go to 09 at page 15.  Okay.  Here you

9   have a definition of an index from Webster's New World

10  Computer Dictionary.  What significance here should we

11  be focused on as you talk about this computer search

12  index that's being utilized?

13  A   This part here.  When searching or sorting the

14  database, the program uses the index rather than the

15  full database.  Such operations are faster than sorts

16  or searches performed on the actual database.

17  Q   As a computer scientist, is using an index in

18  order to search a relational database something that

19  is utilized in order to make those faster searches?

20  A   Absolutely.

21  Q   Do you know how the Lawson's system search index

22  is created?

23  A   Yes.

24  Q   What is that?

25  A   There's a process by which keywords are defined

1   that are going to become searchable.  So there's a

2   keyword search setup program that you run, and then

3   after you've defined what keywords are going to be

4   searchable and you've got your database loaded, and

5   the item master is now full of data, you run the

6   keyword search load program.  That builds the index.

7        And now until you have changed the database, you

8   have got an index into all the searchable keywords

9   that -- all of the keywords that were chosen to be

10  searchable.

11  Q    Are some of those keywords like item description,

12  item number, classification code that you've been

13  addressing already?

14  A    Yes, they are.

15  Q    Which database tables is the search index built?

16  A    I'm sorry.  Say that again.

17  Q    Sure.  From which database tables is the search

18  index built?

19  A    The item master.  Well, and the vendor item table,

20  too.

21  Q    Once the user has selected the field of the item

22  data that are to be searchable, what is the next step

23  in building this index?

24  A    So after you have chosen your keywords, you have

25  to load them all, and then you -- the computer system,

Weaver - Direct

1    new system or just install a new system.

2         So they'll do whatever the customer needs to get a new

3    system up and running.  And Lawson will even host the entire

4    system for the customer, that is provide the hardware and

5    software and then train the customers about how to use the

6    Lawson system even if it's running at the Lawson site.

7    Q    So when you say host the system, that is the customer

8    doesn't have to actually have the software implemented on its

9    computer servers; Lawson will have it loaded there, and the

10   customer can go to the Lawson system and use it?

11   A    That's right.  Yeah.  The customer doesn't have to

12   actually have any of the hardware or software.  All of that can

13   be run from Lawson-owned and managed and maintained computers.

14   Q    So when Lawson is hosting that software, is it performing

15   the method claims that are at issue?

16   A    Yes, it is.

17   Q    Doctor, when Lawson sells a system that has those core

18   procurement modules you identified, inventory control,

19   requisitions, and purchase order, and the prerequisite modules

20   you identified being the Lawson System Foundation and process

21   flow -- can you put up those two -- yellow and blue box, and

22   there are at least two vendor catalogs either loaded, or

23   through the Punchout system available in the databases, does

24   that system have any substantial non-infringing use?

25   A    No.  The suite is intended for one purpose, and that's to

WEAVER - CROSS                    870

1   lamp demonstration?

2   A   In order to show the richer, fuller ability to

3   search categories.

4           THE COURT:  Did you add it or did the Lawson

5   people add it?

6           THE WITNESS:  My understanding from the

7   attorneys is that they engaged a Lawson -- I don't

8   know if it was an employee or a consultant, and this

9   Lawson person assisted them with adding data.

10          THE COURT:  And you didn't put it on?

11          THE WITNESS:  I didn't do it.

12  Q   The Lawson person assisted who?

13          THE COURT:  Some consultant hired by the

14  lawyers who put it on, I think is what he's saying,

15  and he didn't actually put it on.

16  BY MR. McDONALD:

17  Q   Is it your understanding that any search you could

18  do on the Lawson item master product description for

19  any keyword search in itself could generate another

20  catalog?

21  A   Yes, pretty much.

22  Q   So if you had searched for the word "blue," you

23  get back results from the Lawson item master that

24  would be the catalog of blue things?

25  A   Yes.

1   Q    Or things with the word "blue" in their

2   description?

3   A    It would.

4   Q    If I searched for the number 5, it would generate

5   a list of all the things that had a number 5 in the

6   description?

7   A    It would.

8   Q    In your opinion, each one of them is a separate

9   catalog; is that right?

10  A    Yes.

11  Q    So is there really any limit to the number of

12  catalogs in the Lawson item master the way you looked

13  at it?

14  A    No.

15  Q    You are familiar with testimony from customers of

16  Lawson in this case; is that right?

17  A    I read some depositions, yes.

18  Q    Isn't it true that those customers have just a

19  handful, less than 10 items on average, that they get

20  from each vendor loaded into their item master?

21  A    No, sir.

22          THE COURT:  You mean people that were

23  deposed?

24          MR. McDONALD:  People that were deposed,

25  that's right.  They have not testified yet in this

1  of loading up a list of products on that website?

2  A    Staples is in charge of the content displayed on

3  the website.

4  Q    Does Lawson have any say in what content Staples

5  displays at that website?

6  A    I don't know.

7  Q    If I understood you right, when a customer uses

8  that Stapleslink.com Punchout, can they do a search

9  for products at the Stapleslink.com website?

10 A    Yes.

11 Q    Whose responsible for putting together the

12 computer stuff that you need to do a search at the

13 Stapleslink.com website?

14 A    The search on the stapleslink.com website uses the

15 Staples search engine.

16 Q    How do you know that?

17 A    Because that's the way these systems work.

18 Q    Have you ever done anything to check it out?

19 A    Well, I know how the protocols operate.  And once

20 you're redirected to that site, now you're working in

21 that environment at Staples.

22 Q    My question is did you do anything for your

23 $160,000 to check that out?

24 A    No.

25 Q    Did I understand right for this case you did talk

WEAVER - CROSS                          879

1   to a source code expert, right?

2   A   I did.

3   Q   Because you thought that was pretty important to

4   understand the source code and how that operated

5   behind the scenes in the Lawson system, right?

6   A   Yes.

7   Q   You didn't check that out for the Punchout

8   partners that do the actual searching and display the

9   actual data that you showed us in those demonstrations

10  yesterday, right?

11  A   I never made an issue of it, so no.  There's no

12  need to check it out.

13  Q   I think in your demo of the Punchout websites

14  yesterday you were also going through the issue of

15  availability of inventory; is that correct?

16  A   Correct.

17  Q   Is it true that in your examples the Staples and

18  the Dell, not Lawson, would have control over checking

19  out the inventory?

20  A   That's true, the information comes from the

21  Punchout partner.

22  Q   Lawson has no idea what Dell or Staples has in

23  inventory, right?

24  A   Probably not.

25  Q   And you understand that for purposes of the claims

1    testified earlier about a database, and then I asked him a

2    question, and the question is, the item master plus the item

3    table plus the item question mark equals a database, and that

4    really wasn't what he said, but it was close.

5            Will you recite, sir, what you said was the database

6    in response to the question we were talking about earlier?

7            THE WITNESS:  Yes, Your Honor.  The database is the

8    item master, the vendor table, and the item location table.

9            THE COURT:  Item location table is the other question

10   mark.  All right.

11           MR. ROBERTSON:  Can I ask you what database is that,

12   Dr. Weaver?

13           THE COURT:  That's fine.  You can ask that question.

14   Then Mr. McDonald, since he's the one that started it all

15   anyway, can have a shot at it, too.

16           THE WITNESS:  That's the Lawson database.

17           MR. ROBERTSON:  Thank you.

18           THE COURT:  Mr. McDonald, do you want to ask him

19   anything?

20           MR. McDONALD:  Nothing else, Your Honor.

21           THE COURT:  All right, Dr. Weaver, you're excused

22   subject to the recall we talked about a little while ago.

23           THE WITNESS:  Thank you, Your Honor.  Thanks to the

24   jury.

25           THE COURT:  All right, your next witness, please,

1  correct?

2  A    Yes.  All of our customers are importing from a

3  previous system, so yes.

4          THE COURT:  Excuse me just a minute.  I don't

5  know that any of us over here know what hosting means.

6  The way it's been explained sort of leads me to the

7  impression that Lawson has everything on its computer

8  system, but if I'm the customer, I can be in Timbuktu

9  and just use my computer, and I go through you to get

10  what I want.  Is that basically right or wrong?

11          THE WITNESS:  The only clarification I would

12  make to that is that the system is actually still the

13  customer's system.  So it is their system.  It is

14  physically housed in a Lawson-owned or leased

15  facility.  Obviously, we take care of keeping the

16  lights on and the electricity and those of things, but

17  the system can be accessed, you're correct, from

18  Timbuktu or anywhere else in the world using Internet

19  protocols.

20  Q    And Lawson will assist its customer with

21  implementing those systems that it hosts in its own

22  facilities among other services; is that correct?

23  A    Yes.  It makes no difference where that hardware

24  lives.

25  Q    Lawson also provides workshops to educate its

Lohkamp - Direct

1   requisitions, and purchase order; right?

2   A    Yes.

3   Q    There's something within the inventory control module

4   known as the item master; isn't that right?

5   A    Yes.

6   Q    And the item master is a list of products within the

7   inventory module; correct?

8   A    Yes, a list of products within the inventory control.

9   Q    So a user of this supply chain management software

10  solution we've been talking about -- can we call it S3 solution

11  for short?  Are you comfortable with that?

12  A    Yes.

13  Q    This S3 software solution offered by Lawson can have an

14  item master, a list of goods that are available from various

15  suppliers; isn't that right?

16  A    Yes.  It's a list of goods that the customers want to

17  purchase.  They can come from various sources.

18  Q    And so for each item in the item master, you have a number

19  of data fields associated with that item; isn't that right?

20  A    Yes.

21  Q    So you can have a stock unit of measure, for example?

22  A    Yes.

23  Q    You can have manufacturer information?

24  A    Yes.

25  Q    Manufacturer name?

1   then we bring that into RSS.

2   Q    Okay.  So to make sure I understood this, a cXML message

3   is sent from Lawson's punchout software to the vendor's

4   website?

5   A    Yes.

6   Q    And that contains this handshake you've been talking

7   about?

8   A    Yes.  Contains the login credentials.

9   Q    And what are the login credentials?

10  A    It's a user name and password, an agreed-upon way for

11  the -- for our customers to access the vendor's website.

12  Q    Does Lawson select the user name or password that's sent

13  in this cXML message?

14  A    No, we do not.

15  Q    Who does that?

16  A    The customer in combination with the vendor.

17  Q    So is all that you're doing is requiring that that login

18  credential be sent in a certain format?

19       MR. ROBERTSON:  Objection, Your Honor, to the form of

20  the question; leading.

21       THE COURT:  Sustained.  Let him testify.

22  Q    What does Lawson require with regard to the login

23  credentials?

24  A    It may vary from vendor site to vendor site, but it

25  usually includes a URL which is the website address for the

1   where the vendor website is, and then it's usually an

2   identifier to identify the customer to the vendor, and then

3   usually a sort of what's called a shared secret which is

4   essentially the password, and then any other user identifier to

5   help identify who is logging in.

6   Q    And does Lawson control the URL that's part of that?

7   A    No, we do not.

8   Q    Do you care what that URL is?

9   A    No, we don't.

10  Q    So does Lawson control the identifier?

11  A    No.

12  Q    Do you care what it is?

13  A    No.

14  Q    Does Lawson control the shared secret?

15  A    No, we do not.

16  Q    Do you care what it is?

17  A    No.

18  Q    So that takes care of the handshake then?

19  A    The vendor website responds back with another XML message

20  saying that, yes, they've logged in, so it confirms that we've

21  logged in.

22  Q    What happens on the Lawson side of the system?

23  A    On the Lawson side of the system, we're -- our software is

24  waiting to hear back from the vendor website when the user is

25  done using that vendor website.

Lohkamp - Cross

1   Q    Then I think you talked about receiving details of the

2   cart back from the vendor website?

3   A    Yes.

4   Q    Can you explain to us what that's all about?

5   A    When the customer has decided what they wanted to purchase

6   and they go through a checkout process, instead of the order

7   being placed on the website, the vendor website then creates an

8   XML message.  It's an electronic document that gives us all the

9   details of what was in the shopping cart, and we're waiting to

10  receive that information so we can pass that back into

11  requisition self-service.

12  Q    Where does it go once it's received by requisition

13  self-service?

14  A    Once it's received by requisition self-service, it gets

15  put into the shopping ^ cart in requisition self-service

16  requisition lines.

17  Q    Does Lawson control the content of that XML message that

18  the vendor's website sends back?

19  A    No.

20  Q    I think you said that Lawson's system waits around after

21  the customer has accessed and gained access to the vendor's

22  website?

23  A    Yes.  It's waiting for a message back.

24  Q    While it's waiting for a message back, does it have any

25  control over what the customer is actually doing at the vendor

Lohkamp - Cross

1   website?

2   A     No, it does not.

3   Q     So does it control any searching functionality that

4   happens at the vendor website?

5   A     No, it does not.

6   Q     Does it control how the items are displayed at the vendor

7   website?

8   A     No, it does not.

9   Q     Does it control any kind of inventory checking that may

10  happen at the vendor website?

11  A     No, it does not.

12  Q     Does it dictate what kind of searching functionality

13  happens at the vendor's website?

14  A     No, it does not.

15        THE COURT:  I think that's sufficient to have asked

16  the question, which you did at the beginning, that Lawson, in

17  his view, doesn't control the function or content of the

18  punchout vendor's website or the communication in establishing

19  it, and you don't need to go through every component of it to

20  do it.

21        Once you have the whole, established the principle of

22  the whole, then you don't need to go in and add up each word in

23  the sentence.  So let's go on to something else.

24        MR. STOLL-DeBELL:  Okay, Your Honor.

25  Q     I want to talk to you about the contract that you have

CHRISTOPHERSON - DIRECT          1572

1    THE COURT:  What he thought is the irrelevant

2    to this case except with respect to the intent element

3    of indirect infringement; is that right?

4    MS. STOLL-DeBELL:  Yes.

5    THE COURT:  This information can be

6    considered by you, ladies and gentlemen, only in

7    deciding whether or not a certain element of in

8    direction infringement has been met, and that is

9    whether there was an intent to have an infringement.

10   And so you can consider it for that purpose and that

11   purpose alone.  And I'll give you some more

12   instructions later about what indirect infringement

13   is.

14        But for your purposes, you can just keynote

15   this testimony of what his reaction was goes to the

16   intent to indirectly infringe or to have indirect

17   infringement.  Excuse me.  Go ahead.

18   Q    Can you go ahead and answer the question?

19   A    Can you restate the question.  It's been awhile.

20   Q    Sure.  After you read the patents, what was your

21   first reaction?

22   A    My first reaction was that it didn't appear as

23   though we were actually doing that, the three patents.

24   Q    Why did you think it didn't appear that you were

25   doing what was in the three patents?

CHRISTOPHERSON - DIRECT                    1573

1      MR. ROBERTSON:  Your Honor, now I'm going to

2  object.  This calls for a legal conclusion and an

3  expert opinion.

4      MS. STOLL-DeBELL:  Your Honor, it doesn't.

5  I'm asking him what he thought.  I'm not asking him

6  for his opinion.  I'm not asking him about the claims.

7      THE COURT:  When you asked him what he

8  thought, why isn't that asking him for an opinion?

9      MS. STOLL-DeBELL:  Well, I suppose it is a

10  lay opinion on some level, but Mr. Robertson asked him

11  what Lawson as a company did after this lawsuit was

12  filed.  And Mr. Christopherson was involved in that,

13  and I'm just trying to inquire further into the issue

14  of Lawson's intent.

15      THE COURT:  What he said was he didn't think

16  that Lawson practiced the patent.  That's what his

17  reaction was.

18      MS. STOLL-DeBELL:  Yes.

19      THE COURT:  And you want to know why he

20  thought that?

21      MS. STOLL-DeBELL:  Yes.

22      THE COURT:  You can consider that for the

23  same limited purpose, ladies and gentlemen.

24  BY MS. STOLL-DeBELL:

25  Q   Why did you think that Lawson was doing something

CHRISTOPHERSON - DIRECT                    1574

1  different than what was in the patents?

2  A    Keep in mind, this is the first initial look at

3  the patents.  Some of the key things I was noticing

4  were catalogs and what I was going back to was the

5  state of where catalogs were back in the mid '90s or

6  around the time the patents were filed.  And in

7  looking at screens, for instance, and they were

8  mentioning page numbers from catalogs.  Very much like

9  a printed catalog except they turned it into an

10  electronic form.  That was the first thing.

11  Q    Why did you think that was different from what

12  Lawson was doing?

13          MR. ROBERTSON:  Objection, Your Honor.

14  There's a claim construction in this case with respect

15  to catalog, and now we're asking the lay witness to

16  opine on what his understanding of a catalog is.  It

17  doesn't have any relevancy to this case.

18          THE COURT:  You're getting into expert

19  testimony, and he wasn't qualified as an expert, and

20  what you're doing is you're offering it without a

21  report or anything.  And he's involved in in-house

22  development of the systems and knows about them, and

23  he can be qualified as a person who's an expert, but

24  he wasn't.

25          MS. STOLL-DeBELL:  Your Honor, first of all,

CHRISTOPHERSON - DIRECT          1575

1   he's just testifying in his capacity as an employee

2   for Lawson.  So I don't think there was a requirement

3   for him to do an expert report.

4            THE COURT:  If he's giving expert testimony,

5   if he' testifying as an expert for Lawson, he has to

6   give a report.  I don't care whether he's an employee

7   or not.

8            MS. STOLL-DeBELL:  He wasn't professionally

9   retained to give expert testimony.

10           THE COURT:  You can't have an employee

11  professionally retained or otherwise give expert

12  testimony without a report.

13           MS. STOLL-DeBELL:  Okay.  I don't think it

14  matters because I don't think I'm asking him for

15  expert testimony.  I want to -- I think it goes to the

16  intent --

17           THE COURT:  You're just asking him whether he

18  thought Lawson did something different.

19           MS. STOLL-DeBELL:  Yes, were they different.

20           THE COURT:  Okay.  Why don't you ask him

21  that?

22  BY MS. STOLL-DeBELL:

23  Q    Did you think Lawson was doing something different

24  than the patents?

25  A    Yes.

CHRISTOPHERSON - DIRECT                1576

1   Q   Did you have a meeting with your team members

2   regarding the lawsuit?

3   A   Yes.

4   Q   Did they agree with you?

5           MR. ROBERTSON:  Objection, Your Honor.

6           MS. STOLL-DeBELL:  Let me ask a better

7   question.

8           THE COURT:  Yes.  She's going to ask a

9   different question.

10  BY MS. STOLL-DeBELL:

11  Q   Did they agree with you that what Lawson was doing

12  was different than the patents?

13          MR. ROBERTSON:  Objection, Your Honor.  It

14  still calls for a legal conclusion, and it's

15  inappropriate expert testimony, and it's hearsay.

16          THE COURT:  It's sustained as hearsay.  It's

17  offered for the truth of the matter.  So it doesn't

18  have any nonhearsay use.

19  BY MS. STOLL-DeBELL:

20  Q   Was it your recommendation that Lawson not make

21  any changes --

22          THE COURT:  What did you do after this?  Ask

23  him.  Let him testify.

24  Q   What did you do after you read the patents?

25  A   I'll provided recommendation that in my belief, my

CHRISTOPHERSON - DIRECT          1577

1   reading, we weren't doing that patent, first, and that

2   they didn't need to do any changes with the software

3   that was currently available.

4          MS. STOLL-DeBELL:  I have no further

5   questions right now, Your Honor.

6          THE COURT:  All right.  Cross-examination.

7

8       CROSS-EXAMINATION

9   BY MR. ROBERTSON:

10  Q   Let's start with that last topic first if we

11  could, Mr. Christopherson.

12  A   Sure.

13  Q   You did something else, didn't you, sir, besides

14  making the recommendation that no changes would be

15  made to the software?

16  A   I'm not sure what you're referring to, sir.

17  Q   Lawson went out and sought a legal opinion with

18  respect to these patents, didn't they, sir?

19         MS. STOLL-DeBELL:  Objection, Your Honor.  I

20  don't think it's appropriate to get into whether we

21  got an opinion or not.  It's not relevant.

22         MR. ROBERTSON:  It goes to the whole intent

23  issue, Your Honor, under the *Broadcomm v. Qualcomm*

24  case.

25         MS. STOLL-DeBELL:  Your Honor, it goes to

Yuhasz - Direct

1   what is this document?

2   A    This was an initial document to describe a business need

3   for better supply chain functionality.

4   Q    Why was Novant looking for better supply chain

5   functionality?

6   A    We were -- with our growth and a lot of -- our customers

7   surveys were getting us information, giving us feedback that it

8   was difficult to use the current system, finding the correct

9   product was difficult.

10         Our number of return products was growing because

11   customers were saying they couldn't find the right product,

12   they were ordering the wrong product or ordering it in the

13   wrong amount, and so we felt we needed to explore other options

14   for our ordering process.

15   Q    What did you do as a result of the customer data that you

16   received?

17   A    We did another request for proposal to search for a better

18   option that we felt had product catalogs, had a more robust

19   search capability, you know, that would be more user-friendly,

20   and things of that nature.

21   Q    Were these feature that the Lawson system, as it was

22   installed at Novant, did not provide?

23   A    Yes.

24   Q    What happened as a result of the request for proposal

25   process?

Yuhasz - Cross

1    isn't that correct?

2    A    Yes.

3    Q    Novant has a maintenance agreement with Lawson for the

4    requisition self-service software; isn't that correct?

5    A    Yes.

6    Q    And isn't it true that that maintenance agreement also

7    allows Novant to receive ongoing upgrades to its software?

8    A    Yes.

9    Q    Lawson also provides Novant with an online library of

10   educational materials regarding its procurement package?

11   A    Yes.

12   Q    Including specific product guides, for example?

13   A    Yes.

14   Q    Is it true that Novant currently has about 70,000 to

15   80,000 active items in its item master database?

16   A    Yes.

17   Q    And those are all available for ordering through

18   requisition self-service?

19   A    Yes.

20   Q    And isn't it correct that those 70,000 to 80,000 items are

21   associated with approximately 10,000 different vendors; is that

22   correct?

23   A    Yes.  In rough numbers.

24   Q    And each of those items, those items have textual

25   descriptions, correct, in the item master?

Shamos - Direct

1    revolves around the concept of the catalog and whether the

2    Lawson system uses a catalog or multiple catalogs, collection

3    of catalogs, and whether those -- there are such things as

4    separately searchable portions of those catalogs.

5    Q    And so how does the catalogs issue relate to your

6    conclusions?

7    A    The, I think, 11 out of the 12 claims, asserted claims

8    require catalogs, and I used the construction that was

9    propounded by the Court for the word catalog and didn't find

10   catalogs in the Lawson system.

11   Q    When you say Lawson system, we've had a number of initials

12   and things thrown around in the case, so let's make sure we're

13   on the same page.  Can you tell me what system or systems you

14   looked at from Lawson to do your analysis?

15   A    I looked at everything that Dr. Weaver accused of

16   infringement, S3, RSS, punchout.  There was an earlier system

17   in the case that I also looked at that I understand is no

18   longer in the case.

19   Q    Now, with respect to S3 procurement, are you familiar with

20   the names of some modules that comprise that S3 procurement

21   suite?

22   A    I don't know their literal names.  I know functionally

23   what they do.

24   Q    What functionally do the S3 procurement suite modules do?

25   A    Well, there's a search function that enables somebody to

SHAMOS - DIRECT                    1747

1   Q    Can you tell me --

2          MR. McDONALD:  Can we go to slide No. 6,

3   please?  Put that up.

4   Q    Dr. Shamos, you put this slide together as well,

5   correct?

6   A    Yes.

7   Q    Does this slide up on the screen right now, is

8   this displaying your No. 1 reason for non-infringement

9   in this case?

10  A    It is.  There are many reasons.  There are two

11  reasons that I think cover a huge fraction of the

12  claims, and we'll go through those two first, and then

13  later on when we get into the individual claims, I'll

14  be able to give the other reasons.

15  Q    So what's reason No. 1 of your reasons for

16  non-infringement?

17  A    Well, reason No. 1 is 11 out of the 12 claims

18  require a catalog or catalogs.  And because Lawson's

19  products don't have a catalog, they can't satisfy the

20  requirements of at least 11 of the 12 claims.

21  Q    Why in your opinion do 11 of the 12 claims -- I'll

22  withdraw that.

23         Why in your opinion do Lawson's systems not

24  infringe those 11 claims that you're talking about in

25  some?

1  A   Because 11 of those 12 claims require two or more

2  catalogs and unless you have two or more catalogs, you

3  can't infringe those claims.

4  Q   Do you know whether or not Dr. Weaver agrees with

5  you that that infringement would turn on whether or

6  not 11 of those 12 claims have multiple catalogs?

7  A   Well, my recollection from his report is his

8  opinion is that they do have catalogs.

9  Q   Do you understand he would agree with the

10 principal, though, that if the Lawson systems did not

11 have multiple catalogs, 11 of the 12 claims would not

12 be infringed?

13 A   He should agree with it.  I don't know.

14         MR. ROBERTSON:  Objection.

15         THE COURT:  Sustained.

16 BY MR. McDONALD:

17 Q   Why don't we go to slide No. 8, please.

18     Do you see up on the screen, Dr. Shamos, this is

19 another slide that you prepared, correct?

20 A   Yes.

21 Q   Well, what are you depicting here in this slide?

22 A   I'm just reiterating the Court's -- literally the

23 Court's construction of the term "catalog."

24 Q   How did you use this Court construction of the

25 term "catalog" in your an analysis?

SHAMOS - DIRECT                    1749

1   A   Well, I looked at item master and I tried to

2   determine whether item master satisfied the Court's

3   construction.  And I concluded that it didn't.  And so

4   therefore it doesn't have a catalog.

5   Q   So when doing that analysis, did you use the Court

6   construction as set forth here on this slide?

7   A   It's a basic prerequisite of the analysis.

8   Q   If we could go to the next slide that you put

9   together, please.  I think this one is not objected

10  to.

11      So here in this next slide, No. 9, Dr. Shamos, can

12  you summarize your reasons why the Lawson system does

13  not have a catalog?

14  A   Yes.  Right now we're --

15  Q   I'll walk you through this step by step here and

16  we'll stick with the question and answer format.

17  A   Yes.

18  Q   I'll start by saying can you give me a summary of

19  why in your opinion the Lawson systems do not have a

20  catalog as the Court has defined that term?

21  A   Well, I think we should just go back to the

22  previous slide and go look through the Court's

23  construction.

24      They are certainly an organized collection of

25  items and associated information in item master.  So

SHAMOS - DIRECT                    1750

1   that prong of the construction would be satisfied.

2   But that information is not published by a vendor,

3   either a supplier, manufacturer or distributor.   It's

4   carefully handpicked by a customer.   A customer

5   decides what to import into that item master database,

6   and it doesn't constitute a catalog or even multiple

7   catalogs.

8   Q    What is your understanding as to what an item

9   master does in the Lawson systems?

10  A    Item master, I think, is intended to represent the

11  universe of items that an employee of a corporation is

12  able to buy regardless of what the source may be.

13  Q    What's your understanding as to what sort of

14  information is in the item master in the Lawson

15  systems?

16  A    It has information about items.   It would have

17  their name, it would have a catalog number, it may

18  have an identification of who's selling the item, an

19  identification of who manufactured the item.   It has

20  information about any special pricing terms that are

21  available to this particular customer because of

22  contracts that they may have entered into with

23  suppliers, and other information that the user of the

24  system finds useful to associate with particular

25  items.

SHAMOS - DIRECT                     1751

1   Q   Can you summarize for me the differences between

2   the Lawson systems item master and catalogs as the

3   Court construed it?

4   A   Well, a catalog is a compendium of information

5   about the things that a vendor is offering for sale.

6           THE COURT:  I've defined what a catalog is

7   and that's the end of it.  Whether anybody agrees with

8   it, that's the catalog definition.

9           MR. McDONALD:  Sure.

10           THE COURT:  We're not going to have him

11   defining the catalogs.  I've told you-all that before.

12           MR. McDONALD:  That wasn't my intent.

13           THE COURT:  Well, he did.  He started off

14   defining it.  So let's don't have it.  And I don't

15   really want to have to deal with this problem, Mr.

16   McDonald.  He can testify, but I don't want to have to

17   be constantly monitoring whether there's compliance

18   with the requirement that the terms are those defined

19   by the Court.

20   BY MR. McDONALD:

21   Q   Do you have an understanding as to whether or not

22   the item master in the Lawson systems includes

23   information about a customer's inventory of a given

24   item?

25   A   Yes.

1  Q    What sort of information does the item master have

2  about a customer's inventory of a given item?

3  A    One piece of information is quantity on hand.

4  Another piece of information that be where the item

5  can be found, where the inventory is physically

6  located.

7  Q    When you say where it can be found or located, are

8  you talking about where at the customer's premises it

9  could be located or something else?

10  A    It may be that -- well, the customer is typically

11  going to have information about how much of that

12  particular item he has on hand on his premises.  He

13  generally doesn't know how much a vendor would have

14  available.

15  Q    Are you familiar with how the item descriptions

16  are created for purposes of the item master?

17  A    Not in detail.  There's a field in item master

18  that allows for a description of a product.  Those

19  descriptions can be imported from files provided by

20  vendors or they can be hand created by the customer.

21  Q    Have you seen some documents in this case relating

22  to Lawson where they refer to features of the Lawson

23  systems in terms of being able to load vendor catalog

24  data and the like?

25  A    Yes.

1  Q   Given that those documents do use the term

2  "catalogs," why is it that you concluded that that

3  wouldn't indicate that the item master has multiple

4  catalogs?

5       MR. ROBERTSON:  Objection to the form of that

6  question, Your Honor.

7       THE COURT:  What is objectionable about the

8  form?  That different documents have different reasons

9  or that he can't testify to it or what?

10      MR. ROBERTSON:  He can't testify and

11 characterize what those documents mean and whether

12 they do doesn't mean they comply with the Court's

13 claim construction because they use the term

14 "catalog."

15      THE COURT:  So the objection to the form of

16 the question is that he doesn't have any basis for

17 knowing what the author of a particular document

18 meant.  Is that right, Mr. Robertson?

19      MR. ROBERTSON:  Yes.  Thank you for

20 articulating that for me, sir.

21      THE COURT:  What's your response to that, Mr.

22 McDonald?

23      MR. McDONALD:  I don't think my question was

24 asking what the author of the documents meant.  I was

25 asking basically for how he incorporated his analysis

SHAMOS - DIRECT                1754

1   of those documents into his conclusions for this case.

2            THE COURT:  I think that's correct, but I

3   think that's a different way of asking the same

4   question.  It's sustained.

5   BY MR. McDONALD:

6   Q   Do you have an understanding, Dr. Shamos, based on

7   your review of the materials in this case as to how

8   the item master is created in the Lawson systems?

9   A   Yes.

10  Q   What's your understanding?

11  A   When the Lawson software is delivered or installed

12  at a customer, the item master is empty.  It has no

13  items in it.  It has to be populated with items by the

14  customer.  Sometimes with the assistance of Lawson.

15  The sources of information that the customer may use

16  to populate the item master database is completely up

17  to the customer.

18       In some cases, they begin with electronic files

19  that are available from vendors and they pick and

20  choose those items from the vendors that they would

21  like to incorporate.

22       Because the format of item master does not conform

23  to the format of any known vendor's information

24  system, data has to be plucked out and it has to be

25  changed in format so that it can be entered into item

SHAMOS - DIRECT                    1755

1   master.

2   Q   When you say "plucked," I think that was the word

3   you used, what do you mean by that?

4   A   Selected.

5           MR. ROBERTSON:  Can I just have a continuing

6   objection to this line of questioning pursuant to the

7   Court's earlier ruling?

8           THE COURT:  Yes.

9           MR. ROBERTSON:  Thank you, sir.

10  BY MR. McDONALD:

11  Q   How did you get that understanding as to how the

12  item master is created, Dr. Shamos?

13  A   From reading the deposition testimony.

14  Q   I think I forgot to follow-up on the question.  I

15  think you used the word plucked, and I just want to

16  clarify.  What did you mean by plucking in the context

17  of the item master?

18  A   It's in general impossible to import everything

19  from an external file into item master.  The reason is

20  that item master has a very particular structure

21  that's set up by Lawson that may not have room for or

22  even field names for everything that might be in that

23  external file.  So somebody has to make a decision as

24  to what pieces of information from the external file

25  are going to be imported into item master.  And that's

SHAMOS - DIRECT                    1756

1   what I meant by plucking.  It's really selecting.

2          THE COURT:  All right.  The way to deal with

3   that is to answer that I meant by "plucking,"

4   selecting, without all of the other material, Dr.

5   Shamos, because then you aren't answering the question

6   that was asked.  And the lawyer on the other side

7   doesn't even have an opportunity to object except to

8   strike the answer.  And then we have confusion.  So

9   please confine your answers to the question that's

10  asked and only the question that's asked.

11         THE WITNESS:  I understand, Your Honor.

12         THE COURT:  Okay.

13  BY MR. McDONALD:

14  Q   So this catalog issue in the item master not being

15  multiple catalogs, that deals with 11 of the 12

16  asserted claims, right?

17  A   Yes.

18  Q   Now, let's turn to the 12th claim.

19         MR. McDONALD:  Could we go to slide No. 12,

20  please.

21  Q   Did you also put this slide together, Dr. Shamos?

22  A   Yes.

23  Q   Is this slide relating to that 12th claim?

24  A   Yes.

25  Q   Can you summarize for us why in your opinion that

Momyer - Direct

1  question, and how long did you work on the RIMS development

2  effort, and you said several years?  Then the question, through

3  1993?  And then your answer, early, we pretty much wrapped up

4  the RIMS system early '90s.  You were asked, can you be more

5  specific than early '90s, and you answered '91; correct?

6  A    Correct.

7  Q    Thank you.

8  A    Can I respond to that?

9  Q    Well, I'll ask you some more questions about that, all

10 right?

11 A    The --

12 Q    Mr. Momyer, you've answered the question.  I'll ask you

13 more questions about it, all right?

14         THE COURT:  Mr. Momyer, Mr. Robertson will have a

15 chance to ask you questions about that segment, and you can

16 explain it then.

17         THE WITNESS:  Thank you.

18 Q    Would you agree that Fisher customers started using a RIMS

19 system as described in the '989 patent by late 1992?

20 A    I know we talked about.  Those dates are kind of fuzzy to

21 me, and I think I might have -- in the '92/'93 time frame is

22 when we would have had customers using it.

23 Q    Well, the difference between '92 and '93 could be kind of

24 important here, so I'll ask you, Mr. Momyer, would you agree

25 that 1992, late '92 was actually when the RIMS system, as

1   described in the patent, was actually being first sold to

2   customers?

3   A    First of all, it wasn't being sold.  We didn't sell the

4   RIMS system.

5   Q    You talked about used at customers' facilities; right?

6   A    Used at customer facilities.  It wasn't sold.  It wasn't

7   something we sold.

8   Q    Well, you got a trademark on the RIMS trademark; you

9   understand that, don't you?

10  A    Yes.

11  Q    And that's something that you have to get only if you are

12  using it in commerce; right?

13          MR. ROBERTSON:  Objection, lacks foundation.

14          THE COURT:  Do you know about getting a trademark?

15          THE WITNESS:  I know what a trademark is.

16  Q    Isn't it true --

17          THE COURT:  He's twice now said they were using it,

18  that people were using it, it wasn't being sold.

19  Q    Mr. Momyer, wasn't the RIMS system, though, part of the

20  sales pitch to Fisher's customers at the time that if you buy

21  products from Fisher, we'll provide to you the RIMS system as

22  part of our services?

23  A    It was definitely a tool that was used to help Fisher

24  perform its duties better at a customer's location and,

25  therefore, convince the customer that they should continue to

Momyer -  Direct

1          MR. McDONALD:  No, it's not.  It's not in the claims.

2          THE COURT:  What?

3          MR. McDONALD:  The issue of whose inventory you are

4    checking is not in any of the claims in this case.  It is not

5    an important issue.

6          MR. ROBERTSON:  In the patent, you are checking

7    multiple catalog inventory of suppliers.  That's what's going

8    on here.  The testimony has been in the RIMS systems, you are

9    checking Fisher inventory.

10          MR. McDONALD:  We have no testimony from Mr. Weaver

11   or anybody else that said that checking inventory had to be

12   specific to any particular type of source.

13          THE COURT:  We'll deal with that --

14          MR. McDONALD:  -- limited to checking inventory.

15          THE COURT:  We'll deal with that later.  Overruled.

16   Q    Would you agree, Mr. Momyer, that the RIMS system, at

17   least as of April of '93, was a system that did check

18   inventory?

19   A    It checked local inventory it was managing and Fisher

20   inventory at its distribution centers.

21   Q    And that local inventory could include stockroom inventory

22   for the customer; correct?

23   A    It could include both customer and Fisher-owned inventory,

24   yes.

25   Q    And the RIMS system included a parts master, like an item

Momyer  -  Direct

1    master; right?

2    A    Yes.

3    Q    That was the RIMS as it existed in April of 1993?

4    A    It would have had that.

5    Q    That's a system where the customer could select the

6    products that might come from various sources such as Fisher

7    and specifically select the products that they were going to

8    keep in inventory and keep track of on that parts master;

9    correct?

10   A    They could really only order Fisher parts.  Is that what

11   you are asking?  For.  They did have the ability for

12   customer-owned inventory, but I think we established that the

13   customer-owned inventory, depending upon how it's replenished,

14   it could issue a req to be input into the customer's system to

15   place the order.

16   Q    I'm not sure that was actually my question, Mr. Momyer.

17   Let me try again.  Would you agree that the parts master in the

18   RIMS system, as it existed in April of '93, included products

19   that the customer would select to put on that list because

20   that's what they wanted to keep track of in inventory?

21   A    Customer would select?  Meaning what they wanted to put in

22   inventory?

23   Q    They would select the parts that went onto the parts

24   master; right?

25   A    Yes, they would select the part.  As far as the -- you

1    mean -- they would go in, and we would ask them what products

2    do you want stored in your stockroom, and they would say these

3    parts we want to store in the stockroom, and then we would

4    enter those into the RIMS systems.  Almost exclusively they

5    were Fisher parts.

6    Q    That parts master would keep track of what was called

7    product type in the RIMS system; correct?

8    A    Yes, that's correct.

9    Q    And that product type could include products that were

10   third-party items which the CSR, customer service

11   representative, or the customer could order; right?

12   A    No.

13   Q    Can you turn to column six of the '989 patent, please.

14            THE COURT:  What section is the '989 patent.

15            MR. McDONALD:  PX-10.

16   Q    That's the RIMS patent, Mr. Momyer, so I think you might

17   already have that in front of you there.

18            THE COURT:  Put it up.

19   A    I've got it.

20   Q    Column six, blow up that table at the top of column six.

21   Do you see, Mr. Momyer, this is a continuation of a table

22   listing the product types for the RIMS systems?

23   A    Yes.

24   Q    And you see there's a type 05?

25   A    Yes.

Momyer - Direct

1  Q    That's called, or its description is third-party item

2  which CSR or customer orders; right?  Do you see that?

3  A    What that means is --

4  Q    First, do you see it?

5  A    I see it, yes.

6  Q    You agree there was a product type for that?

7  A    Yes.

8  Q    That's in addition to --

9       THE COURT:  What does it means?  I want to hear what

10 he's saying.  What does it mean?

11      THE WITNESS:  The product type 05 would be a product

12 that would be -- we consider customer-owned inventory, and it

13 would be a product that -- we were just keeping it in our

14 system for recordkeeping purposes, keeping track of the count

15 of inventory, how much was there, when it was issued, how much

16 was issued out.

17      But when it came time for the buyer to replenish

18 that, all the RIMS system would do would send a note saying

19 this amount of items needs to be reordered, and then we would

20 basically hand that over to the customer.  The customer would

21 enter that into their purchasing system to buy.

22      CSR, in some cases, the CSR would call up on behalf

23 of the customer and place that order.  It wouldn't be placed in

24 RIMS, though.  I think we pointed out earlier that that

25 particular product was very clearly only there for

 1    recordkeeping purposes.  I think there were several references

 2    in my prior testimony.

 3    Q    Okay.  So that is product type 05, and then product type

 4    06 is a customer-owned item located in a customer warehouse at

 5    or near the customer's site; correct?

 6    A    Yes.

 7    Q    So that is also something that's different from a product

 8    that was owned by the distributor such as Fisher; correct?

 9    A    No.  Yes, it is, but it's -- 06, most of our product type

10    06s were for customer-owned inventory.  Most of those were

11    products that Fisher had and the customer bought from Fisher.

12    When the inventory replenishing came to replenish that order,

13    the replenishment order went straight to Fisher.

14    Q    But there are situations separate from that where a

15    customer would actually replenish by generating an internal

16    purchase order; correct?

17    A    Those 06s, they are really two different replenishment

18    types for those 06s, multiple replenishment types.  The primary

19    ones would be it's a Fisher product or it's an 05, in which

20    case it would do same thing.  It would create a requisition

21    that would go through, create a paper, req, go buy this amount

22    and turn over to the customer, the customer would buy it.

23    Q    Isn't it true that for that product type 06, the RIMS

24    patent itself describes the document it created as a customer

25    internal purchase order?

Momyer - Direct

1    A    Yes.  But also, there's numerous places throughout that it

2    says product type requires that the RIMS system isn't

3    responsible for placing the purchase order.  Numerous places in

4    the patent.

5    Q    But you do agree -- I think you said the word yes before

6    you gave that explanation.  Wouldn't you agree that the patent,

7    the RIMS patent application that's incorporated by reference in

8    the patents-in-suit calls that document an internal customer

9    purchase order for that product type 06?

10             THE COURT:  Wait a minute.  You asked him about the

11   patent application, and the patent application, is that

12   incorporated in the patent?

13             MR. McDONALD:  Yes.  That's what that page shows on

14   that.

15   Q    And you said yes in answer to my question?

16   A    There is wording in the patent, I recall, that does call

17   it internal customer.

18   Q    And the RIMS system, as it existed in April of '93 when

19   that application for RIMS was filed, that can generate a

20   purchase order for the Fisher system and also that internal

21   customer purchase order for a type 06 product; right?

22   A    I understand what it said, but as I said, there's numerous

23   places in that patent that says that the RIMS system does not

24   place the purchase order.

25   Q    Let's talk about the places it does say that.  Let's turn

Momyer - Direct

1   to figure 5A of the '989 patent, Mr. Momyer.  Can we blow up

2   the boxes going from about the diamond 332 down to including

3   336, both left and right side.  This is a flow chart,

4   Mr. Momyer, from the RIMS patent; correct?

5   A    Yes.

6   Q    This is a flow chart that the patent says describes

7   programs employed by an embodiment of the system of the

8   invention to accept a source requisition; right?

9   A    Yes.

10  Q    So in this RIMS system, we see that diamond there where

11  the question is, is it a product type 01, 03, or 04; right?

12            MR. ROBERTSON:  Your Honor, I'm just going to object.

13  It's cumulative.  We went through this figure at length within

14  Mr. Momyer's direct testimony.  Cross-examination by Mr.

15  McDonald --

16            THE COURT:  Really have been through it a lot, Mr.

17  McDonald.  Even I remember it.

18            MR. McDONALD:  Well, I'll just try to wrap it up

19  maybe, Your Honor.

20            THE COURT:  Let's just move on.  Go on and ask

21  something else.  The record is clear on that.

22  Q    Now, is it true that the reason why there would be an

23  internal customer order generated is that for some companies,

24  there's actually an obligation for a requisitioner who is in

25  department A to pay stockroom management who is in another part

Momyer - Direct

1  of the company?

2          MR. ROBERTSON:  Objection, lacks foundation.

3          THE COURT:  What?

4          MR. ROBERTSON:  I think it lacks foundation.

5          THE COURT:  He can ask him if he knows it.

6  Overruled.

7  A    That was one of the things that it did keep track of, was

8  the ability to -- for an internal transfer of funds within that

9  customer from requisition department to the owning department.

10         THE COURT:  Within the same customer?

11         THE WITNESS:  Within the same customer.

12  Q    Would you agree that -- we'll go away from that topic now

13  and move on to some other things.  Would you agree that the

14  parts master in the RIMS system is not organized like a catalog

15  from the vendor?

16  A    Yes.  I don't think it is.

17  Q    How, if at all, is a parts master organized?

18  A    This particular parts master in RIMS?

19  Q    Yes.

20  A    The key to it is the Fisher part number, and then it has

21  data specific to that.  Primarily it's stock-keeping

22  information relating to the product.

23  Q    Is a parts master, is that basically organized in terms of

24  just the order the products get ordered into the parts master

25  list, that's how it's organized?

1   A    No.  It's -- they all, the products get entered.  The way

2   the system works is there's a key, which is the product number,

3   and that key -- if you enter the product number, it allows you

4   to specifically pull up all the detailed information about the

5   product.  So it's a keyed table.

6   Q    Now, the RIMS system include both a local computer and a

7   host computer; right?

8   A    Yes.

9        MR. ROBERTSON:  Object as to the RIMS system because

10  I think there's been testimony there's been dozens of

11  iterations, so I think it's vague and ambiguous what we're

12  taking about.

13       MR. McDONALD:  I can rephrase that.

14  Q    The RIMS system, as it existed in April of '93, had a

15  local computer and a host computer; right?

16  A    It had components that ran locally and a host, yes.

17  Q    At the host, was there a database there with a list of the

18  Fisher products as part of the RIMS system that existed in

19  April of '93?

20  A    I don't know if I'd consider that part of the RIMS system,

21  but there was a product file that was on the Fisher host which

22  had all the products that Fisher would buy.

23  Q    Okay.  Are you saying you don't agree that the Fisher

24  system included both the host system --

25  A    I have trouble in my mind separating where the RIMS system

Momyer - Direct

1   ends and the Fisher system, other Fisher systems pick up.  I

2   will agree that there's a product file that's on the host that

3   contains product information.

4   Q    All right.  Well, let's get at least on the same page in

5   terms of whether the RIMS system holds the host computer as

6   well.  Could you turn to the bottom of column two of

7   Plaintiff's Exhibit 10 still, the RIMS patent that was filed in

8   April of '93.

9        Do you see there under the first sentence under the

10   heading detailed description of the invention, it says, quote,

11   the requisition and inventory management system of the present

12   invention, which is shown in figure one, employs at least two

13   computers, a host computer 10 located at a distributor site and

14   a local computer 40 used by a customer service representative,

15   CSR --

16   A    I think --

17   Q    -- at or near the customer site and the site of JIT

18   inventory?

19   A    I think I already said that.

20   Q    So you would agree that the system in the RIMS application

21   described as the RIMS systems does include both a local and the

22   host computer?

23   A    Yes.

24   Q    Okay.  So at that host computer, then that Fisher

25   database, would you consider that to be a Fisher catalog?

MOMYER - CROSS                          2144

1        MR. ROBERTSON:  If you could put them

2   together, please.

3   Q    -- about 05 and 06 product types.  Do you see

4   that?

5   A    Yes.

6   Q    This customer owned item located in customer

7   warehouse at or near customer site.

8   A    Yes.

9   Q    Tracking that item in the inventory of the

10  customer, is that a service that Fisher was providing

11  for its customers?

12  A    Yes, it was.

13  Q    Using the RIMS system, could I use that product

14  type to, within the system, order product from a third

15  party vendor?

16  A    No.

17  Q    Is there any type 7 product identified in that

18  table?

19  A    No, there's not.

20  Q    Was there a product type 7 in your electronic

21  sourcing patent?

22        MR. McDONALD:  Objection, Your Honor.  It's

23  outside the scope of direct and also the claims have

24  nothing to do with the product type 07.

25        MR. ROBERTSON:  Your Honor, the question was

1  asked about product type 05, 06.  I want to now point

2  out that product type 07 in this electronic sourcing

3  patent is third party vendor items that are part of

4  the system differentiating the RIMS patent, which he

5  was asked questions about in the electronic sourcing

6  patent.

7          MR. McDONALD:  It's not in the claim, Your

8  Honor.  That's why we object to it.

9          MR. ROBERTSON:  Multiple catalogs are in the

10 claims, Your Honor, and there were multiple vendor

11 catalogs, vendors, supplier, manufacturer.  And that's

12 what type 07 products are.

13         MR. McDONALD:  That's not what type 07

14 products are.

15         THE COURT:  I tell you what, why don't you

16 ask him, and on redirect you can deal with it.

17         What are type 07 products, Mr. --

18         MR. ROBERTSON:  Let me just so if I can find

19 it so we can reference.

20 BY MR. ROBERTSON:

21 Q   If we can go to appendix 1 of the '683 patent?

22         THE COURT:  Figure 1?

23         MR. ROBERTSON:  Appendix 1, Your Honor.  Let

24 me direct you to that.

25 Q   It's on the page that has column 19.  Do you see

MOMYER - CROSS                               2146

1   in there this is a requisition header?

2   A    Yes.

3   Q    In the lower left-hand side there's a reference to

4   vendor.  Do you see that?

5   A    Yes.

6   Q    The Fisher RIMS System didn't have that vendor as

7   part of a requisition system; is that right?

8   A    That's correct.

9   Q    Can we go back to that Fisher RIMS patent at table

10  1, column 37?  It was PX 10.  Table 1 there in the

11  RIMS patent, PX 10, is an order header information.

12  Are you with me?

13  A    Yes.

14  Q    Is a vendor identified anywhere in that order

15  header information for that requisition?

16  A    In table 1?

17  Q    Yes.

18  A    No.

19  Q    You'd agree with me by the time that you were

20  applying for this -- let me ask you this.  But when

21  you were applying for the patent application that led

22  to the patents that are at issue here in August of

23  1994, there was a RIMS system in operation, correct?

24  A    Yes.

25  Q    Notwithstanding that, did Fisher devote

KINROSS - DIRECT                    2167

1   predated the invention that you filed your patents on

2   for this case?  Do you have Exhibit 107 before you?

3             THE COURT:  It's in one of those big books

4   there.  It's the one labeled -- what volume, is it?

5   It's Volume No. 1, and it's about the third or fourth

6   thing in.  Do you see it?  It has a tab on it that

7   says DX 107.

8             MR. LANGFORD:  He's got it.

9   A   This is the one that does not have a date,

10  correct?

11  Q   Correct.  But you agree, don't you, that that

12  brochure, that description of the IBM Technical

13  Viewer/2 product predated your invention that you

14  filed patents for?

15  A   I can't say yes or no to that.  I don't know when

16  this document was created.

17  Q   You still have, I believe, your December 2009

18  deposition before you, correct?

19  A   Yes.

20  Q   Can you turn to page 106?  Actually, I guess it

21  would start at the bottom of 105 at line 25.  Turn to

22  page 105 first?

23  A   All right.

24  Q   Do you see there there's a reference to the

25  exhibit that's an IBM publication about Technical

KINROSS - DIRECT                    2168

1   Viewer/2, and then the question at the bottom of page

2   105 beginning at line 25, "Is it your understanding

3   that Exhibit 8 of the description of this IBM

4   Technical Viewer/2 product that predated your

5   invention that you filed patents for?"  You answered

6   "Yes."  Right?

7   A    Well --

8          MR. ROBERTSON:  Your Honor, may I just

9   object?  Because there's another question in which the

10  witness clarifies his answer right then and there, I

11  think.

12         THE COURT:  Read it.

13  A    These documents --

14         THE COURT:  Read it, Mr. McDonald.

15         MR. McDONALD:  I don't have it right in front

16  of me, but the witness can read it.

17         THE COURT:  Can you read what follows, the

18  next thing it says, please, sir?

19         THE WITNESS:  Yeah.  "Had you seen this

20  brochure before you actually developed your

21  invention?"

22         "Answer:  I can't recall the exact time I saw

23  this brochure."

24         "Did you see it sometime before you filed

25  your patent?"

KINROSS - DIRECT                                2169

1          "I would say yes."

2          Do you want me to go on?

3    Q    I think that's enough.

4    A    That's what I recall.

5    Q    Now, is it true, Mr. Kinross, that at least

6    initially in IBM's work with Fisher on this project

7    leading to the patents in this suit, that IBM worked

8    from a paper catalog of Fisher?

9    A    My understanding of that is they had access to the

10   Fisher paper catalog as did hundreds of thousands of

11   other people in the United States.  We distributed

12   that freely to customers.  When we first met with IBM,

13   they had taken the first four pages of that catalog,

14   paper catalog, and re-created that in technical viewer

15   to show us how a search would operate on catalog

16   content.

17   Q    So this was just kind of a pilot demo just with

18   four pages?

19   A    Yes.

20   Q    But the four pages, was there an effort to

21   reproduce the pages just like they were in a those

22   four pages of the Fisher paper catalog; is that right?

23   A    Not exactly, no.  The pages in the Fisher paper

24   catalog had X number of products on them, each of

25   which became what technical viewer termed a topic.

1    happened.

2              THE COURT:  Okay.

3              THE WITNESS:  To the best of our recollection, this

4    is what we came up, and that is the genesis of this document.

5              THE COURT:  All right, thank you.

6              MR. McDONALD:  At this point, I'd like to mark this

7    as 402 and offer it into evidence.

8              MR. ROBERTSON:  No objection, Your Honor.

9              THE COURT:  What?

10             MR. ROBERTSON:  No objection.

11             THE COURT:  All right, Defendants's Exhibit 402.

12   Make sure you get this done, folks.  Make sure you get that in

13   the system as it exists today.

14             MR. McDONALD:  Well, we pretty much already talked

15   about the multiple vendors, part three under the 1989 bullet

16   point features; is that right, Mr. Kinross?

17   A    Yes.

18   Q    So let's hit a couple of other ones we haven't talked

19   about.  Up on the screen, this is a copy of that timeline you

20   were just referring to; right?

21   A    Yes.

22   Q    So the first feature indicated in the '89 version of RIMS

23   was multiple inventory sourcing, either customer location or

24   Fisher location, search for inventory.  Do you see that?

25   A    Yes.

Kinross - Direct

1   Q   Is it your understanding that's an accurate description of

2   the RIMS system as it indicated in '89 that it had that

3   feature?

4   A   Yes.

5   Q   The second point, realtime pricing and availability, do

6   you see that?

7   A   Yes.

8   Q   Is it your understanding that the RIMS system, in '89,

9   also had that feature?

10  A   Well, yes, but all of this is just Fisher's system, just

11  Fisher.

12  Q   Okay.  And then we already talked about number three;

13  right?

14  A   Yes.

15  Q   So let's go to number four, product cross-reference.  Do

16  you see that one?

17  A   Yes.

18  Q   Did the RIMS system, as it existed in '89, have that

19  product cross-reference feature?

20  A   It had a way to reference competitors' numbers to Fisher

21  numbers, yes.

22  Q   So that would be a similar or equivalent product?  It

23  would have a Fisher number and a competitor number; is that

24  what you are talking about?

25  A   Yes.

Shamos - Direct

1   asserted claims except maybe those involving two or more

2   catalogs or equivalent phrases that are used in the patent such

3   as collection of catalogs, but since TV/2 had that, the

4   combination of RIMS plus TV/2 had all the elements of the

5   asserted claims, and, therefore, would render them obvious.

6   Q    Is that under how you applied the Court's construction of

7   catalogs in this case?

8   A    Yes.

9   Q    Did you use the same approach when you looked at the

10  application of the Court's construction of catalogs for

11  purposes of evaluating infringement as you did for purposes of

12  invalidity?

13  A    Yes.  I think that everybody in the case tried to apply

14  the Court's construction.  I think the parties have different

15  ideas about how the Court's construction applies to these

16  systems.

17          MR. ROBERTSON:  Objection, Your Honor.  I don't know

18  how this witness knows what my idea or ePlus's idea is about

19  the Court's construction.

20          THE COURT:  I think that's -- that question has been

21  answered.  Let's go ahead.

22  Q    What are you trying to convey about the last bullet point

23  on this slide, Dr. Shamos?

24  A    Fundamentally that because of the principle that the claim

25  terms must be construed the same way for infringement and for

Shamos - Direct

1    invalidity, if it turns out that Lawson item master meets the

2    Court's definition of catalog, then RIMS alone had all the

3    elements of the asserted claims.

4    Q    Why is it that RIMS alone would have all the elements of

5    the asserted claims with that assumption?

6    A    Because RIMS alone has a database that is, for all

7    practical purposes, identical to that of Lawson's system.   It

8    had a database that had information about items from multiple

9    sources.

10   Q    What was that database called in the RIMS system?

11   A    I think it was called parts master.

12   Q    Let's go to your slide number 25.  Did you look at the

13   issue of whether the RIMS system was a single source or

14   multiple source system, Dr. Shamos?

15   A    Yes.

16   Q    What did you conclude about that?

17   A    Well, that it's not a single source system.

18   Q    What was the basis for that conclusion?

19   A    There's a citation here from column two of the patent

20   that's explaining figures 4A through 4D, that they are flow

21   charts describing program employed by an embodiment of the

22   system of the present invention to source requisition JIT

23   inventory owned by either the distributor or the customer,

24   other inventory owned by the distributor, and inventory owned

25   by other vendors.  Those different inventories are the

1    different sources.

2    Q    That term JIT, J-I-T, that's just-in-time inventory;

3    right?

4    A    Yes.

5    Q    We talked about that earlier today; right?

6    A    Yes.

7    Q    Can we turn to slide 27, please.  Did you have some other

8    analysis you did, Dr. Shamos, regarding whether or not the RIMS

9    system was a single source system or a multiple source system?

10   A    Yes.

11   Q    Is this slide 27 another slide you prepared on that topic?

12   A    Yes.

13   Q    Can you walk us through what you are trying to show us

14   here in slide 27, please?

15   A    Yes.  These are three paragraphs of column three of the

16   '989 patent, and I've highlighted in blue the part where

17   there's discussion of where the items are coming from.  So in

18   the first paragraph, there's reference to records for each

19   product regularly sold by the distributor.

20   Q    Is that what you have in the blue box there in the first

21   paragraph?

22   A    Yes.  Well, I read a little bit more than what was in the

23   blue box, but, yes.  Then in the second paragraph, there's

24   information in the database about similar catalog numbers of

25   other suppliers or distributors.  It would be necessary to have

Shamos - Direct

1   that or the cross-reference table wouldn't make any sense.

2       Then in the third citation, it says, post database 20 also

3   includes data regarding items from third party suppliers.  And

4   so we have the distributor, we have other suppliers'

5   distributors, and we have items from third-party suppliers, all

6   of which could be searched for in the RIMS database.

7   Q    Let's go ahead and go forward to slide 29, please.  As

8   part of your analysis of the RIMS system, did you look at the

9   issue of whether or not the RIMS system generates purchase

10  orders from requisitions?

11  A    Yes, I did.

12  Q    What did you conclude after reviewing the RIMS literature

13  about that issue?

14  A    I think it's clear from both the text and the figures of

15  the RIMS patent that it does those things.  There's reference

16  to accepting the requisition, and then there's another

17  reference shown in blue, create a purchase order, and then

18  furthermore, down in figure 2A at the bottom, there's a

19  requisition maintenance block, 108, over on the left, and that

20  is interacting with the build purchase order block, 112.  So

21  that shows building of a purchase order from a requisition.

22  Q    This excerpt that you have here above the figure, there's

23  reference there to figures 5A and 5B.  Do you see that?

24  A    Yes.

25  Q    What are figures 5A and 5B from that RIMS '989 patent?

Shamos - Direct

1   statement.  So I object to the characterization of what the

2   plaintiff's position is with our allegation with respect to

3   RIMS.

4        THE COURT:  I think there are more allegations than

5   that.  I think it's all right for you to ask him what he

6   understands the missing claims elements to be, to say without

7   characterizing what they've actually done in their assertions,

8   because he's entitled to his understanding of it, and then Mr.

9   Robertson can cross-examine him about any of that but without

10  binding Mr. Robertson to the allegations as understood by Dr.

11  Shamos.  So maybe try it again.  Disregard that testimony,

12  please, ladies and gentlemen.  Start again.

13  Q    In your analysis, Dr. Shamos, as you apply the Court's

14  construction of the term these two catalogs or collection of

15  catalogs and your RIMS plus TV/2 analysis, did you find the

16  catalogs to be in the RIMS system or the TV/2 system?

17  A    Catalogs are certainly in the TV/2 system because those

18  were published by a vendor, and they were distributed from the

19  vendor to the user of the TV/2 system.  So those met the

20  Court's construction of catalog.

21  Q    If we go to the third bullet point product here, what are

22  you trying to convey about the third bullet point in slide 147?

23  A    Lawson's item master has at least two catalogs and/or a

24  collection of catalogs, and so does RIMS parts master.

25  Q    Why do you say that?

1    A    Because they are effectively the same thing.  You load

2    data about items from multiple vendors into a database, and you

3    search that database.  And so if Lawson has more than one

4    catalog, then so does parts master in RIMS.

5              THE COURT:  Are you saying -- I understood you to say

6    that item master in RIMS were the same thing.  Is that what you

7    intended to say?

8              THE WITNESS:  No, I didn't say they were the same

9    thing.  Item master is a data structure -- it's a database

10   schema that's used in the Lawson system.  Parts master is a

11   similar database structure that's in the RIMS system, but at a

12   higher level they do the same thing.  You load data from

13   multiple sources into one database in both item master and in

14   RIMS parts master.  So if the one has more than one catalog,

15   the other has more than one catalog.

16   Q    What is your understanding as to how the parts master is

17   actually created in the RIMS system?

18   A    There are a number of sources of inventory.  Some of them

19   are in the local JIT inventory.  Some of them are in the

20   distributor's inventory, and information about those

21   inventories is loaded into parts master.

22   Q    Is that information loaded in an item at a time

23   essentially or some other way?

24   A    It could be done an item at a time, but typically it's

25   done by importation of electronic files.

1   another patentability issue other than the *Bilski* issue.

2          MR. ROBERTSON:  Indefiniteness, Your Honor.

3          THE COURT:  Indefiniteness is under section 112.

4          MR. ROBERTSON:  Yes, sir.

5          THE COURT:  Patentability is section 101.

6          MR. ROBERTSON:  Yes, sir.  They are raising both.

7   The parties have agreed that they are pure issues of law for

8   the Court.

9          THE COURT:  I understand that, but you earlier

10   discussed *Bilski*.  Then you discussed patentability, and you

11   came back full circle and said ultimately in your discussion

12   that the patentability question they were raising was *Bilski*,

13   and I just wanted to make sure there aren't two 101 issues,

14   because there's only one that's *Bilski*.

15          MR. ROBERTSON:  Maybe we are confusing things.

16   *Bilski* is a section 101 decision.  It's the most recent

17   pronouncement on it from the Supreme Court, so that is a 101

18   section.  There are not two 101 questions, Your Honor.

19          THE COURT:  That's what I just wanted to make sure.

20   Is there anything else you are looking to me to decide other

21   than that and willfulness?

22          MR. ROBERTSON:  Of course, there's the issue of

23   injunctive relief which we hope to be discussing at some point.

24          THE COURT:  I'm not going to do that until after the

25   jury determines where they go.  I think that would be kind of

1   hearing that we might have, there are these issues of

2   patentability and indefiniteness that I just brought to your

3   attention.

4           I think as pure issues of laws, there is no real

5   facts in dispute.  Whether it's patentable or not, you have to

6   focus on the claim and the specifics.  Those are not in

7   dispute.  With respect to the indefiniteness, you have to focus

8   on the claim and the specifics.  Those are not in dispute.

9           THE COURT:  You take the view that patentability and

10  indefiniteness are legal -- you take the view that

11  patentability and indefiniteness are legal questions, that no

12  fact issues need to be considered as respects those; is that

13  right?

14          MR. ROBERTSON:  I think the parties are in agreement

15  on that.

16          THE COURT:  Are you in agreement?

17          MR. McDONALD:  I believe there aren't any disputed

18  facts, Your Honor.  I think there are factual underpinnings to

19  those determinations, but I don't think the actual facts are in

20  dispute.

21          THE COURT:  There are no papers filed at this time,

22  are there?

23          MR. McDONALD:  No.

24          THE COURT:  Has the Federal Circuit decided a case

25  since *Bilski*?

1   A   In order to render Claim One of the '172 patent

2   obvious, it would have to satisfy all of the elements

3   of the '172, Claim One.  And because there are no

4   catalogs in this case, conceivably in this case TV/2

5   does bring something to the party.  It does bring the

6   ability to support portions of the database

7   separately.

8       It does bring a means for entering product

9   information that partially describes an item.  You can

10  put a description in, and it can search on the

11  description.

12      And it does provides a means for searching for

13  matching items that match the product information.  So

14  it does in fact, the combination, satisfy three of the

15  elements, but it doesn't bring anything to the

16  combination with regard to satisfying the other

17  elements.

18      So in order for the combination to anticipate the

19  claim, we'd have to have a checkmark on every single

20  one of these, not just three of them, which we don't.

21  Q   Mr. Hilliard, did you also consider other evidence

22  that would show that the patented inventions were

23  innovative?

24  A   Yes.

25  Q   What other evidence did you consider in forming

2866

1    in 2008.

2                    THE COURT:   What's the first name of that

3    case?

4                    MS. ALBERT:   Proveris, P-r-o-v-e-r-i-s.

5                    THE COURT:   All right.

6                    MS. ALBERT:   Now, turning to the issue of the

7    RIMS system.  As we heard Ms. Huey, the defendant

8    contend that some unidentified RIMS system was known

9    or used by others or on sale more than one year before

10   the filing date or in public use more than one year

11   before the filing date within the meaning of Section

12   102(a) and 102(b).

13                   The defendant also contends that the '989

14   patent is prior art under 35 U.S. Code Section 102(e).

15   And the defendant contends that, I guess, all of the

16   claims are fully anticipated based on those theories.

17                   No reasonable jury could find that any of the

18   asserted claims are anticipated by the '989 patent.

19   Furthermore, Lawson has introduced no evidence that

20   there was any knowledge or use by others of the RIMS

21   system as described in the '989 patent or any sales or

22   public use of the RIMS system as described in the '989

23   patent more than one year before the filing date of

24   the patents-in-suit.

25                   Lawson failed to establish that a system

2928

1          MS. HUGHEY:  I actually agreed with Your

2     Honor at that time that it didn't make sense.

3          THE COURT:  I know that if you were wrong and

4     I was wrong, we ought to straighten it out.

5          MS. HUGHEY:  Yes, that's right.  I suppose

6     the point is, Your Honor, I don't believe that ePlus

7     is entitled to judgment as a matter of law on written

8     description or enablement because those aren't defense

9     that we even raised at trial; however, if it's Your

10    Honor's position that a defense that was at some point

11    in the case and not dropped before trial can then have

12    a judgment as a matter of law granted against it, then

13    the same should apply to Lawson and we're entitled to

14    judgment as a matter of law on all those other claims.

15         THE COURT:  I think you're right about that.

16         MS. HUGHEY:  Okay.  To make that record

17    clear.

18         The second point, Ms. Albert raised the 112,

19    paragraph 6, and paragraph 2 on 101, issues of law.

20    The enablement issue of law and statutory subject

21    matter issue of law.

22         I agree with Ms. Albert.  That's an issue for

23    the Court to decide.  Lawson moved for summary

24    judgment on those pure issues of law.

25         THE COURT:  And I denied it.

2929

1          MS. HUGHEY:  That summary judgment was

2    denied.  It's my understanding that that issue is now

3    preserved for appeal and that Your Honor doesn't have

4    to rerule on it, but just to make the record clear,

5    Lawson again moves for judgment as a matter of law on

6    the 112, paragraph 6, and 101 claims.

7          THE COURT:  How can you do that?

8          MS. HUGHEY:  Your Honor --

9          THE COURT:  You didn't try them.

10         MS. HUGHEY:  We did not try them.

11         THE COURT:  You relied for better or for

12   worse on the summary judgment decision.

13         MS. HUGHEY:  Correct.

14         THE COURT:  And your appeal point is that the

15   Court erred in failing to grant summary judgment.

16         MS. HUGHEY:  Correct, Your Honor.

17         THE COURT:  That's where the matter stays.

18   There's no judgment to be obtained on that at this

19   juncture, I don't think.

20         Now that was with respect to what issue?

21         MS. HUGHEY:  112, paragraph 2 and 6,

22   enablement issue, and the 101 statutory subject matter

23   issue.

24         THE COURT:  You mean the patentability issue?

25         MS. HUGHEY:  Correct, Your Honor.

2930

1          THE COURT:  112, six and what?

2          MS. HUGHEY:  Paragraph 2 and paragraph 6.

3          THE COURT:  And 2 is indefiniteness, right?

4          MS. HUGHEY:  That is indefiniteness, Your

5     Honor.

6          THE COURT:  And 6 is enablement, right?

7          MS. HUGHEY:  I'm sorry, Your Honor.  The 112,

8     paragraph 2, is --

9          THE COURT:  You-all quit using patent terms.

10    I don't have the statutes up here, and I don't have

11    them committed to memory like you-all do.  And I have

12    so much else going on up here, that I need to know

13    what you're talking about.  I use the short form

14    references to trigger my memory.

15         MS. HUGHEY:  I'm sorry, Your Honor.  I'm just

16    trying to make sure I'm very clear.  112, paragraph 2

17    and paragraph 6.

18         THE COURT:  Let's take 112, paragraph 2.

19    What are you talking about?  What is that one?

20         MS. HUGHEY:  Indefiniteness.  I'm sorry, Your

21    Honor.  I was having a moment.  112, paragraph 2 is

22    indefiniteness.

23         THE COURT:  And six is what?

24         MS. HUGHEY:  Also indefiniteness.  They go

25    together.

2931

1        THE COURT:  All right.  And those have
2   already been decided in the motion for summary
3   judgment, right?
4        MS. HUGHEY:  Correct.
5        THE COURT:  So I don't need to address those.
6        MS. HUGHEY:  That's any understanding.
7        THE COURT:  And then the 101 is the issue of
8   patentability, which is the subject matter or, i.e.,
9   the Bilski issue, and I erred as a matter of law in
10  failing to grant the summary judgment on that, right?
11       MS. HUGHEY:  Correct.
12       THE COURT:  And that's where it lies because
13  it never came into trial one way or the other?
14       MS. HUGHEY:  Correct.
15       THE COURT:  I don't need to deal with that
16  either.
17       MS. HUGHEY:  Okay.  And I think the issues
18  have been fully raised, but just for the record I
19  disagree with Ms. Albert.  Dr. Shamos explained every
20  element.
21       THE COURT:  You disagree with Ms. Albert on
22  general principles on everything she said.
23       MS. HUGHEY:  Correct, Your Honor.
24       If you have any questions, I'm happy to
25  answer them.

1  burdens so much in our arguments, the lawyers did, if you need

2  to refresh your memory on what preponderance means for ePlus

3  and what clear convincing means for invalidity for Lawson, you

4  can look at 23.  That's for infringement.  Invalidity is dealt

5  with in another thing.  I'll tell you what that is later.

6  　　　　Now, infringement, of course, has to be based, as you

7  know and you've learned, on a claim-by-claim basis so that

8  there may be infringement of one claim and not another.  That's

9  something you're going to have to decide.

10  　　　　Now, when you are deciding infringement, you must

11  only compare Lawson's accused systems and methods to the claims

12  of the ePlus patents.  In deciding the issue of infringement,

13  you may not compare Lawson's accused systems and methods to

14  ePlus's commercial products and methods.  You don't compare

15  product to product.  You do the system that's accused, whether

16  it's a system or a method, against the claims of the patent.

17  So whether or not Lawson's products that they sell and ePlus's

18  products are the same or different is not a matter that you get

19  into.

20  　　　　A patent can be infringed directly or indirectly.

21  Direct infringement occurs if the accused system or method is

22  covered by one or more or all of the claims in the patent.

23  Direct infringement of a method claim results if a single actor

24  performs all of the steps of that claim.

25  　　　　What's indirect infringement?  Indirect infringement

1    results if the defendant, here, Lawson, induces another to

2    infringe a patent or contributes to the infringement of a

3    patent by another person.   I'm going to explain those two types

4    of infringement now.

5            Lawson would be liable for directly infringing

6    ePlus's patents if you find that ePlus has proven by a

7    preponderance of the evidence that Lawson itself has made,

8    used, offered to sell, sold, or imported into the United States

9    the invention defined in any claim of the patents.   Then that

10   claim has been infringed if they proved that by a preponderance

11   of the evidence.

12           Now, remember that someone can directly infringe a

13   patent without knowing that what they are doing is an

14   infringement of the patent.   You don't have to know you are

15   infringing the patent to infringe it.   You either do or you

16   don't.   So you can directly infringe a patent even though you

17   believe in good faith that what you are doing is not an

18   infringement of the patent.

19           The issue is does it or doesn't it, not what state of

20   mind the direct infringer had.   In every infringement analysis,

21   the language of the claims as well as the nature of the accused

22   system or method dictates whether infringement has occurred.

23   To infringe a claim that recites capability and not actual

24   operation, an accused system or method need only be capable of

25   operating in the described mode.   Thus, depending on the

1    claims, an accused system or method may be found to infringe if

2    it is reasonably capable of satisfying the claim elements or

3    limitations even though the system or method may also be

4    capable of non-infringing modes of operation.  The fact that a

5    product or process may operate in a manner that does not

6    infringe is not a defense to a claim of infringement against

7    Lawson if its system is also reasonably capable of operating in

8    a manner that satisfies the claim elements.

9           Now, Lawson -- I mean ePlus also alleges that Lawson

10   has actively induced other people to infringe the

11   patents-in-suit.  In particular, who are they alleged to have

12   induced?  The Lawson customers in this case.  That's what it's

13   about.

14          To show induced infringement, ePlus has to prove by a

15   preponderance of the evidence that someone, here, Lawson's

16   customers, have directly infringed the ePlus patents, and that

17   Lawson -- so they have to show that the customers directly

18   infringe.  And remember, it doesn't make any difference whether

19   the customers knew or didn't know that they were infringing,

20   because if you infringe, you infringe whether you know it or

21   not.  But they also, ePlus has to prove by a preponderance of

22   the evidence that Lawson has actively and knowingly aided and

23   abetted that direct infringement.

24          So here, in order to find that Lawson has induced

25   somebody else to infringe, you do have to consider Lawson's