**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| *e*PLUS INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 3:09-CV-620 (REP)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LAWSON SOFTWARE, INC.,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF *e*PLUS INC.'S BRIEF IN SUPPORT OF ITS MOTION TO SHOW CAUSE
WHY LAWSON SOFTWARE, INC. SHOULD NOT BE HELD
IN CONTEMPT OF THE COURT'S PERMANENT INJUNCTION
AND REQUEST FOR EXPEDITED BRIEFING**

Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100

Scott L. Robertson (admitted *pro hac vice)*
Jennifer A. Albert (admitted *pro hac vice)*
David M. Young (VSB#35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone: (202) 346-4000

Michael G. Strapp (admitted *pro hac vice)*
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone: (617) 570-1000

*Attorneys for Plaintiff, ePlus Inc.*

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ....................................................................................................7

     A.    The Permanent Injunction And Defendant's Unsuccessful Attempts To Stay The Injunction ...................................................................................7

     B.    The Introduction Of RQC ...........................................................................9

     C.    Defendant Explains The Features Of RQC To Its Customers .............................10

     D.    Defendant Waived The Attorney-Client Privilege By Disclosing Legal Advice To Its Customers Regarding Infringement ....................................12

     E.    Defendant's Refusal To Provide Information About RQC ..................................14

III.    LEGAL STANDARD ..........................................................................................17

IV.    ARGUMENT ......................................................................................................19

     A.    Purported Changes To The Process of Creating Requisitions Do Not Render Systems With RQC More Than Colorably Different From The Infringing Systems .................................................................................21

     B.    Purported Changes To Punchout When Used With RQC Do Not Make The Systems More Than Colorably Different From The Infringing Systems ...................................................................................................23

     C.    The Allegedly Modified Systems Continue To Have The Capability To Convert Data Relating To A Selected Matching Item And An Associated Source To An Item And A Different Source ....................................24

V.     REQUEST FOR EXPEDITED BRIEFING, A STATUS CONFERENCE AND DISCOVERY ..............................................................................................26

VI.    CONCLUSION ...................................................................................................27

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Tivo v. Echostar*,
    646 F.3d 869 (Fed. Cir. 2011) ..................................................................................... 17, 18, 26

**Rules**

Rule 30(b)(6) ......................................................................................................................... 27

## I.      INTRODUCTION

Plaintiff *e*Plus Inc. ("*e*Plus") respectfully submits this brief in support of its motion that the Court enter an order requiring Defendant Lawson Software, Inc. ("Defendant") to show cause why it should not be held in contempt for violating the permanent injunction entered in this action.

A jury of this Court, after a three-week trial in January 2011, returned a verdict of infringement against the Defendant.  Dkt. No. 600.  Specifically, the jury determined that Defendant's Configuration 2 (Core S3 Procurement + RSS), Configuration 3 (Core S3 Procurement + RSS + Punchout), and Configuration 5 (Core S3 Procurement + RSS + Punchout + EDI) infringe *e*Plus's patents.  In May 2011, this Court entered an order enjoining Defendant from continuing its infringing activity.  Dkt. No. 729.  Defendant moved both this Court and the Federal Circuit to stay the injunction; both motions were denied.  Dkt. No. 735; Clements Decl., Ex. 21 (Order, Case No. 2011-1396, July 14, 2011).  Notwithstanding the orders of this Court and the Federal Circuit, Defendant continues to infringe the *e*Plus patents in violation of the express terms of the injunction.

At the injunction hearing in late March of this year, Defendant's counsel and its Executive Vice President (Mr. Dean Hager) argued to the Court that irreparable harm would befall Defendant and its customers if a permanent injunction were to be entered.  Mr. Hager, for example, testified that it would take many months and hundreds of thousands of dollars for Defendant's customers to replace Requisitions Self-Service ("RSS"), one of the applications in the infringing system configurations, with a different application:

Q:  Mr. Hager, from your experience, do you have an idea of how much it would cost, for example, a hospital to make that change away from RSS?

A:  . . . .  [I]f I were to take the simplest implementation of our RSS and pull it out and put something else in . . . the simplest would be three months, but I think on

> average for our hospitals, I bet you [it] would . . . be closer to nine months because of the complexities of the hospital.
>
> Q:  You gave me the time. . . .  I think the question is actually going to the monetary cost.
>
> A:  Yeah, that's going to run somewhere north of 300,000, 3- to 500,000 probably for that length of time.  Maybe up to 750,000 on average.  Some will be greater than a million.

Hearing Tr. (Dkt. Nos. 697-700, Mar. 25, 2011) at 262:21-263:11.

Defendant's counsel also represented to the Court that no "easy fix" was possible, and that the injunction would have a "devastating" impact on his client:

> Defendant's customers "can't simply just stop using our product and switch to another one tomorrow.  That takes months, even years, to qualify the products to make sure they work so they don't cause products with supplying operations and things like that.  *It literally takes years for a customer to switch to a different product.  So that would be a devastating thing.*"  Id. at 21:1-8.

And, on several other occasions during the injunction proceedings, Defendant's counsel represented to the Court that the injunction would cause irreparable harm to Defendant and its customers.  *See, e.g.,* Hearing Tr. (Apr. 4, 2011) at 75:17-19 ("We have shown that it's going to hurt existing customers.  We have systems right now that sometimes take years to implement."). Apparently, according to Defendant now, these concerns were vastly exaggerated if the claims about RQC are to be believed.

Actions taken by Defendant after the injunction proceedings are in direct conflict with the assertions made by its representatives in the proceedings before this Court.  For example, Defendant pronounced to its customers, even before the Court entered the injunction, that it had "created" a purportedly "new" and "redesigned" software application called Requisition Center ("RQC").  Defendant alleged that RQC was a "replacement" for RSS, and that it could be downloaded for free by its customers in 20 minutes.  In response to questions from its customers, Defendant suggested — in sharp contrast to the representations it had made to the Court — that

2

the download and installation of RQC would be "fast and easy to do with a minimal impact on your organization."  Clements Decl., Ex. 30 (RQC 638) at RQC 638.

Defendant's customers have agreed that the installation and implementation of RQC is quite simple.  The message board for the "Lawson Software Community," noted recently that one Lawson agent had "installed RQC for several clients [and] all indications thus far indicate a transparent change for the users.  It is a minimal impact install."  Clements Decl., Ex. 49 (LawsonGuru.Blog:  Update on Alleged Patent Infringement).  On a discussion site for Healthcare Supply Chain Professionals, another individual noted that "Lawson's Requisition Center product contains all of the same functionality as the existing RSS with a few small enhancements. . . .  The upgrade to the new version is very simple…"  Clements Decl., Ex. 50 (LinkedIn:  Healthcare Supply Chain Professionals).

If Lawson had a simple and quick "design around" in plan during the injunction proceedings, it was incumbent upon them to bring this to the attention of the District Court. They did not.  If this solution remediated any harm to Defendant or its customers, they should have informed the Court.  Again, they did not.

Instead, Defendant argued to the Court that it would take Defendant's customers "many months to several years to install, implement and deploy new procurement software," and that an injunction that prohibited Defendant from servicing the infringing systems would "cause substantial harm to third parties, such as Lawson's customers, many of whom are hospitals, healthcare organizations and schools, and will indirectly harm the patients and students who are served by these customers."  Def.'s Opp. to Mot. for Inj. (Dkt. 705) at 23, 26.

After much negotiation with counsel for Defendant, a review of publicly available marketing material and a review of those portions of the RQC application that Defendant has

chosen to share with *e*Plus's counsel and experts, *e*Plus has concluded that the "new" RQC

software when used in the Lawson procurement systems does not render the systems materially

different in their functionality.  The differences between RQC and RSS are purely cosmetic —

primarily mere changes in nomenclature.  Even though Defendant's counsel has alleged

otherwise in correspondence, a live demonstration of a system incorporating the RQC software

(albeit compromised with inadequate data), the RQC user manuals, and the RQC source code

reveal that functionally systems including the RQC application are no different than the

infringing system configurations.  Just like the infringement defense, it is more "smoke and

mirrors."

     Indeed, Defendant has acknowledged as much to its customers:

- Dean Hager, the Executive Vice President of Defendant's S3 business, has informed Defendant's customers that RQC includes "100% of the functionality" required by RSS users. Clements Decl., Ex. 43 (RQC 742) (transcript attached to Clements Decl. as Ex. 44).  Mr. Hager has also assured Defendant's customers that there is "going to be no degradation going from RSS to Requisition Center."  Clements Decl., Ex. 45 (RQC 743) (transcript attached to Clements Decl. as Ex. 46).

- Keith Lohkamp, Defendant's Product Strategist for Supply Chain Management, has explained to Defendant's customers that RQC, like RSS, is a "web-based requisition solution" that has all the features that were "the reasons" Defendant's customers "use[d] Requisitions Self-Service in the past."  Clements Decl., Ex. 45 (RQC 743). According to Mr. Lohkamp, those features include the ability to search for selected matching items, build requisitions using data related to selected matching items, and process the requisitions to generate purchase orders. *Id.*

- Tellingly, Mr. Lohkamp has acknowledged that RQC has the same "look and feel" as RSS.  Clements Decl., Ex. 45 (RQC 743).

     Importantly, Defendant did not attempt to redesign, or develop anew, any of the other

modules that make up the infringing systems, such as the modules that make up Core S3

Procurement or EDI.  The only application in the infringing systems Defendant even purported

to modify was the RSS application.  In fact, Defendant concedes that other than the superficial

changes it made to RSS, no other components of the infringing systems have been modified.  As

4

Mr. Hager has acknowledged, the infringing system configurations include "no database changes and there are no required upgrades to any other application or technology in your configuration." Clements Decl., Ex. 43 (RQC 742).  Mr. Hager has also emphasized to Defendant's customers that the system configurations including RQC require "no upgrades to any other component" of the infringing system configurations with RSS.  Clements Decl., Ex. 45 (RQC 743).

Although Defendant has not made any modifications to modules in the infringing system configurations except for RSS, and even though RQC has "100% of the functionality" required by RSS users and RQC has the same "look and feel" as RSS, Defendant now claims that the substitution of RQC for RSS in the infringing system configurations somehow means that Defendant no longer infringes the *e*Plus patents.

In particular, Defendant has alleged that RQC is different than RSS because:

(1) Defendant has added a self-serving disclaimer screen message which appears when an RQC user selects to Punchout to a particular Lawson Punchout Partner site;

(2) Defendant has made certain nomenclature changes (*i.e.*, mere word changes on the screen display) to certain buttons and screen labels in RQC;

(3) RQC does not have the "shopping cart" feature of RSS;

(4) RQC does not permit users to combine selected Punchout items with items selected from the internal catalog database in a single requisition; and

(5) the commodity level of the UNSPSC coding system has allegedly been disabled in RQC.  *See, e.g.,* Clements Decl., Ex. 13 (Letter from D. McDonald to S. Robertson dated 6/10/11); Clements Decl., Ex. 34 (RQC 709) at RQC 711.

In fact, none of these purported changes make systems with RQC even colorably different than the infringing system configurations.  As detailed below, and in the supporting

expert declarations of Dr. Alfred Weaver and Mr. Patrick Niemeyer, the same infringing functionality is present in systems incorporating RQC, and RSS and RQC are indistinguishable in every relevant aspect.  Moreover, it appears that some of the changes touted by Defendant have either never been implemented in RQC or can easily be disabled by Defendant's customers.

For example, Defendant's claim that the "shopping cart" has been eliminated in RQC is belied by the fact that user guides and manuals for RQC still suggest that the "shopping cart" feature is available in RQC.  *See, e.g.,* Clements Decl., Ex. 41 (RQC 741) (transcript attached to Clements Decl. as Ex. 42); Clements Decl., Ex. 47 (Excerpt from Readme File within RQC Source Code, RQC 744); Clements Decl., Ex. 29 (RQC 384) at RQC 395.  Indeed, in its video training course on RQC (Clements Decl., Ex. 41, RQC 741), Lawson repeatedly referred to the newly minted "Requisition Lines" as the "cart":

- "The new button starts a new requisition from where you are, so if *the cart* is empty, the requisition header is deleted."

- "The release button saves items to the database, empties *the cart*, and submits the requisition for approval, if approvals are needed."

- "You can then select the items to add to *the cart*, by clicking add all, or selecting specific items and using the add function, or add selected button."

- "You can also delete an item from *the cart*, review errors, as discussed in the previous slide."

- "You can use the Add, Add All, or Add/Select functions to add items to *your cart*. Once items are moved to *the cart* you can modify the lines."

- "If you must order more than a quantity of 1 you can tab forward to the quantity field, make your change and press Enter to add the item to *the cart* or press Shift+Tab to move back to the Add button and press it again to add the item to the requisition."

*e*Plus filed this lawsuit more than two years ago in an effort to obtain a meaningful remedy against Defendant's infringing activity.  After extensive litigation, this Court entered a permanent injunction that was undisturbed by the Federal Circuit.  A reasonable assessment of

6

the available facts powerfully indicates that Defendant is not complying with this Court's injunction.  Accordingly, *e*Plus respectfully requests (1) an order requiring Defendant to show cause why it should not be held in contempt and sanctioned for its deliberate disobedience of the permanent injunction; (2) expedited briefing for the instant motion; (3) a status conference to determine the parameters of a proper inquiry into Defendant's violation of the injunction; and (4) discovery concerning the development, functionality and infringing elements of RQC.

## II.    BACKGROUND

### A.    The Permanent Injunction And Defendant's Unsuccessful Attempts To Stay The Injunction

On May 23, 2011, the Court permanently enjoined Defendant from making, using, selling, offering to sell or servicing the software product configurations that infringe *e*Plus's patents:  Configuration 2 (Core S3 Procurement + RSS); Configuration 3 (Core S3 Procurement + RSS + Punchout); and Configuration 5 (Core S3 Procurement + RSS + Punchout + EDI).[1] Order (Dkt. No. 729, May 23, 2011) at 2-3.  Graphical representations of the infringing system configurations are reproduced below.



_____

[1] Pursuant to the Parties' Stipulation With Respect To M3 Infringement, *e*Plus also proved that Defendant's M3 e-Procurement Software infringes claims 3, 26, 28, and 29 of the '683 Patent,



In particular, Defendant was enjoined from making, using, selling, offering to sell, installing, implementing, designing, configuring, consulting, upgrading, maintaining, supporting, training or servicing in any way Configurations 2, 3 and 5, M3 e-Procurement, and ***any colorable variations thereof*** (collectively, "the Infringing Products and Services").  *Id.* at 2.  The Court also enjoined Defendant from circulating, publishing or disseminating within the United States any literature or information that encourages the use, sale or importation of any of the Infringing Products and Services and from aiding and abetting, actively inducing, or in any way

and claim 1 of the '172 Patent.  *See* Revised Am. Final Pretrial Order (Dkt. No. 481, Sept. 24,

contributing to the making, use, sale or importation of any of the Infringing Products and Services within the United States.  *Id.* at 3.

On May 24, 2011, the day after the Court entered its permanent injunction, the Court denied Defendant's motion for a stay of the permanent injunction.  Order (Dkt. No. 735, May 24, 2011).  That very same day, Defendant filed in the Federal Circuit Court of Appeals an "emergency" motion for a stay, pending appeal, of the permanent injunction.  Clements Decl., Ex. 10 (Def.'s Emergency Mot. for Stay Pending Appeal of Inj., May 24, 2011).  Defendant also requested an immediate stay of the injunction pending disposition of its motion for a stay.  *Id.* at 4.  Defendant's request for an immediate stay of the injunction was denied by the Federal Circuit on May 25, 2011.  Clements Decl., Ex. 11 (Order, Case No. 2011-1396, May 25, 2011).  Defendant's motion for a stay, pending appeal, of the permanent injunction was also rejected by the Federal Circuit on July 14, 2011.  Clements Decl., Ex. 21 (Order, Case No. 2011-1396, July 14, 2011).

### B.     The Introduction Of RQC

Defendant claims it began developing RQC "well in advance" of the Court's May, 23, 2011 Injunction Order so that it would be fully operational by the time the Order was entered.  Clements Decl., Ex. 43 (RQC 742).  As Mr. Hager informed Defendant's customers shortly after the permanent injunction, we "have been working for many months on developing this replacement solution so that just in case . . . this situation happened, [RQC would be] generally available today."  Clements Decl., Ex. 45 (RQC 743).  Indeed, on May 18, 2011, more than a week before the Court's even entered the permanent injunction, Lawson made RQC available to its customers.  *See* Clements Decl., Ex. 9 (Letter from D. McDonald to S. Robertson dated

2011) at 4-5.

5/18/11); Clements Decl., Ex. 35 (RQC 722).  Yet despite the fact that the "development" was "in the works" for months, it never informed the Court.

At the time it introduced RQC, Lawson explained that RQC included "web-based requisitioning" and that it would work with "Procurement Punchout and Procurement." Clements Decl., Ex. 35 (RQC 722); *see also* Clements Decl., Ex. 34 (RQC 709) at RQC 710.

Less than a week after the entry of the permanent injunction, Defendant published a "Requisition Center Installation Guide," "Requisition Center User Guide," "Requisition Center Overview," and "Requisition Center Release Notes."  *See* Clements Decl., Ex. 27 (RQC 364), Ex. 29 (RQC 384), Ex. 33 (RQC 695), and Ex. 28 (RQC 380).  Defendant explained in the RQC Release Notes that RQC "lets you create requests with demand on stock and demand on vendors, and process, view and modify requisitions."  Clements Decl., Ex. 28 (RQC 380) at RQC 383.  In the RQC User Guide, Defendant explained how to "search for items in the Item Master," "search for items by category" using "imported UNSPSC codes or user-defined UNSPSC codes," access through Punchout "external vendors' websites, shop for items and return selections to a Lawson requisition," create and, if necessary, "edit requisitions," and "approve or reject requisitions." Clements Decl., Ex. 29 (RQC 384) at RQC 406, 407, 417, and 425.

### C.  Defendant Explains The Features Of RQC To Its Customers

On June 3, 2011, Defendant provided its customers a presentation entitled "Introducing Lawson Requisition Center."  *See* Clements Decl., Ex. 31 (RQC 656).  Lawson explained in the presentation that it would take "20 minutes or less to download RQC."  *Id.* at RQC 661.  In a training session for Defendant's customers, Mr. Hager explained that "the installation is very straightforward . . . and also the migration from RSS configuration to RQC many of those happen automatically.  So all in, we believe for downloading, installing, and much if not all of the configuration, that that's typically going to be within a day's time."  Clements Decl., Ex. 45

(RQC 743).  Mr. Hager noted that most of Defendant's customers would "end up doing" the installation and migration of RQC "on your own once you see how straightforward it is."  *Id.*  Furthermore, Mr. Hager informed Defendant's customers that "users shouldn't require more than an hour or two of training . . . and quite frankly many of them won't even require that."  *Id.*  All of this, of course, in stark contrast to his testimony under oath to this Court.

Defendant explained to its customers that RQC includes "***100% of the functionality***" required by RSS customers and that the introduction of RQC entailed "no database changes" in the applications in the infringing system configurations and "no required upgrades to any other application or technology."  Clements Decl., Ex. 43 (RQC 742) (emphasis added).  According to Mr. Hager, the "three principles" governing the design of RQC were to ensure that "there was no degradation, that you did get the enhanced functionality and that we minimized all disruption."  Clements Decl., Ex. 45 (RQC 743).  For example, Defendant explained how RQC users, just like RSS users, can "search [the] item master to find item[s] to add to requisition[s]," create requisitions, release requisitions and generate purchase orders.  Clements Decl., Ex. 39 (RQC 740) (transcript attached to Clements Decl. as Ex. 40).  Likewise, in a marketing brochure, Defendant explained how users of S3 Procurement Systems with RQC and Punchout can:

> search the item master and choose from an approved selection of items at negotiated prices; connect to an external vendor-maintained web site to browse and select items to add to a requisition; electronically route requisitions to the right approvers for each request without the need for manual administration; [and] consolidate multiple types of products and services into a single requisition.

Clements Decl., Ex. 32 (RQC 691) at RQC 691.  Defendant also noted that "key features and benefits" of RQC include the ability of users of RQC to "create a single requisition . . . Lawson Procurement can then automatically generate multiple purchase orders from that requisition," and to "conduct advanced searches, using key-word and autocomplete capabilities."  *Id.* at 692.

11

In early June 2011, Defendant also provided RQC online training sessions to its customers.  Clements Decl., Ex. 41 (RQC 741) (transcript attached to Clements Decl. as Ex. 42).  In these training sessions, Defendant explained that RQC, like RSS, has "multiple search capabilities," including keyword search functionality for searches in "the catalogue, with searches for items in your item master" and category search functionality "which can use the UNSPSC code categories."  *Id.*  Defendant explained how the UNSPSC codes in RQC "provide designated categories for items" and that "a UNSPSC code has four levels: segment, family, class, and commodity."  *Id.*  Defendant emphasized to its customers that they "must add all four codes to an item," including commodity level codes.  *Id.*

In the same training session, Defendant explained to its customers that RQC "still lets users use the Punchout feature."  *Id.*  If an RQC user clicks on a "vendor icon[] to shop on their website," the user receives "a notification that you are leaving Requisition Center and accessing the vendor website.  After you first get this notification, you get a message that you can select not to show disclaimer."  *Id.*  After checking out of the vendor site, the item or items selected will be brought back to the users' "requisition lines," but those requisition lines "cannot mix Punchout items with non-Punchout items."  *Id.*

### D.    Defendant Waived The Attorney-Client Privilege By Disclosing Legal Advice To Its Customers Regarding Infringement

On May 27, 2011, Harry Debes, Defendant's CEO at the time, sent letters to Defendant's customers of RSS enclosing copies of the permanent injunction.  *See* Clements Decl., Ex. 38 (RQC 732).  Although the permanent injunction prohibited Defendant from "circulating, publishing or disseminating . . . any literature or information that encourages the use . . of any of the Infringing Products and Services," ***Mr. Debes advised Defendant's customers that they "may continue to use" the "M3 e-Procurement product" and the "RSS product."***  *See* Order

(Dkt. No. 729, May 23, 2011) at 3-4; Clements Decl., Ex. 36 (RQC 724) at RQC 725 and Ex. 38 (RQC 732) at RQC 733.  Thus, only four days after the permanent injunction issued, Defendant had violated the injunction by advising and encouraging its customers to continue using the Infringing Products and Services.  *See* Order (Dkt. No. 729, May 23, 2011) at 3.

Soon after Mr. Debes encouraged Defendant's customers to use the Infringing Products and Services in violation of the permanent injunction, Mr. Hager reinforced Mr. Debes' message, encouraging Defendant's customers, in a video posted on Defendant's website, to use the Infringing Products and Services.  Mr. Hager stated, in no uncertain terms, that "***all Lawson customers have the rights to use the software you purchased from Lawson.  You may continue to use the system, as is.***"  Clements Decl., Ex. 43 (RQC 742).  Indeed, Mr. Hager incorrectly advised Defendant's customers that "you, as customers, are not infringing on anything.  You can continue to run the solutions…"  Clements Decl., Ex. 45 (RQC 743).[2]  Mr. Hager also misleadingly advised Defendant's customers that Defendant would be permitted to continue servicing their infringing product configurations so long as the customers downloaded (but did not even actually install or implement) RQC.  He stated:

> download Requisition Center right away.  There's no reason not to, over 100 customers already have, with zero reported issues, to the download itself.  Takes about 20 minutes.  At that point in time, our configuration records, here at Lawson, then indicate that Requisition Center is part of your configuration, and that is really the thing that is needed in order to avoid any disruption of service in complying with the court order.

*Id.*

---

[2] Since the jury verdict found that Defendant induced and contributed to its customers' direct infringement, the jury necessarily found that the customers' use of the Lawson systems infringed the *e*Plus patents.

### E.   Defendant's Refusal To Provide Information About RQC

Defendant's positions concerning the functionality of RQC have shifted over time.  On May 6, 2011, and June 10, 2011, Defendant's counsel sent *e*Plus letters with counsel's representations about certain features of the RQC product.  In the May 6 letter, Defendant's counsel claimed that the forthcoming introduction of RQC meant that Defendant would no longer infringe claim 1 of the '172 patent.  Clements Decl., Ex. 8 (Letter from D. McDonald to S. Robertson dated 5/6/11).  In its June 10 letter, Defendant suggested that because it had introduced RQC, Defendant did not infringe ***any*** of the five claims the jury had determined were infringed.  Clements Decl., Ex. 13 (Letter from D. McDonald to S. Robertson dated 6/10/11).  Defendant's counsel made these unsupported and inconsistent representations without providing *e*Plus with a copy of the RQC software, a copy of the RQC source code, or even a single RQC document.  Instead, Defendant asked *e*Plus to accept its counsel's representations about the purportedly non-infringing RQC product as "hard evidence."  *See* Clements Decl., Ex. 12 (Letter from D. McDonald to the Court dated 6/2/11) at 2.

On June 16, 2011, *e*Plus requested that Defendant provide RQC documents and source code and a laptop loaded with the RQC software.  Clements Decl., Ex. 14 (Letter from S. Robertson to D. McDonald dated 6/16/11).  *e*Plus also sought additional information about RQC in written questions attached to its June 16 letter.  *Id.*  Defendant did not respond to *e*Plus's June 16 letter, so *e*Plus sent a follow-up letter on June 24, 2011, reiterating its request for actual evidence about RQC.  Clements Decl., Ex. 15 (Letter from S. Robertson to D. McDonald dated 6/24/11).  On June 28, 2011, Defendant rejected *e*Plus's requests for information about RQC, claiming that *e*Plus's requests go "far beyond what is reasonable and necessary for *e*Plus to understand the operation of the RQC product."  Clements Decl., Ex. 16 (Letter from D.

McDonald to S. Robertson dated 6/28/11) at 1.  Defendant instead invited *e*Plus "to come to St. Paul to view the [RQC] source code and/or product demonstrations."  *Id.* at 3.

In response to Defendant's "invitation" to view the RQC software, *e*Plus explained in a July 1, 2011 letter that a limited opportunity to review a prepared demonstration of RQC and portions of the RQC source code would "handicap any meaningful analysis."  Clements Decl., Ex. 17 (Letter from S. Robertson to D. McDonald dated 7/1/11) at 1.  *e*Plus accordingly reiterated its request for a copy of the RQC source code and for the documents and information it had requested in its June 16, 2011 letter.  *Id.* at 4-5.  *e*Plus also requested that if a demonstration of the RQC software were made available at Defendant's headquarters in St. Paul, that the demonstration be set up on a fully-functional system that would include the same demonstration data included in the demonstration system used at trial (PX-402).  *Id.*

On July 6, 2011, Defendant finally agreed to provide *e*Plus with some of the RQC documents and source code that *e*Plus had requested on June 16, 2011.  Clements Decl., Ex. 14 (Letter from D. McDonald to S. Robertson dated 7/6/11) at 1-2.  Defendant, however, refused to produce much of the information *e*Plus had requested because, in its view, the information was not "necessary to assess the functionality of Lawson's RQC product."  *Id.* at 2.  With respect to the RQC demonstration, Defendant represented that it would make available a system that would include "an executable version of the current releases" of Defendant's software with the "same data used with the RQC configuration when it is demonstrated by Lawson in the normal course of business."  *Id.*

On July 13 and 14, 2011, nearly two months after Defendant had made RQC generally available to its customers, Defendant finally produced to *e*Plus a limited subset of RQC documents and source code.  *See* Clements Decl., Ex. 19 (Letter from W. Schultz to S. Robertson

dated 7/13/11) and Ex. 20 (Letter from W. Schultz to M. Strapp dated 7/14/11).  Upon review of

the RQC documents and source code, however, *e*Plus noted several deficiencies with the

information Defendant had provided.  For example, in an August 10, 2011 letter, *e*Plus explained

that the RQC source code produced by Defendant did not contain crucial files which *e*Plus

needed to assess the changes that Defendant claimed to have made to avoid infringement.

Clements Decl., Ex. 22 (Letter from J. Albert to W. Schultz dated 8/10/11).  On August 12,

2011, Defendant finally agreed to provide *e*Plus with additional critical RQC source code files,

and it produced those files later the same day.  *See* Clements Decl., Ex. 23 (Email from W.

Schultz to J. Albert dated 8/12/11).  Pursuant to the parties' agreement, *e*Plus provided its expert,

Patrick Niemeyer, with a copy of the RQC source code files.  A declaration of Mr. Niemeyer

regarding the RQC source code files is attached hereto as Exhibit B.

On August 22, 2011, *e*Plus counsel and *e*Plus's technical expert, Alfred Weaver,

reviewed a demonstration of a system including the RQC application at Defendant's

headquarters.  Notwithstanding *e*Plus's written requests on July 1, 2011 and August 5, 2011 for a

demonstration system loaded with the same demonstration data included at trial in PX-402, the

demonstration system that *e*Plus was provided lacked sufficient data to fully test the functionality

of the system.  Clements Decl., Ex. 24 (Letter from J. Albert to W. Schultz dated 9/9/11).  For

example, most of the internal catalog data items stored in the Item Master were not associated

with UNSPSC codes.  *Id.*  During the demonstration, *e*Plus asked Defendant to fix the problem

by entering UNSPSC codes for specific items identified by *e*Plus during the demonstration.  *Id*.

Although there were hundreds of employees at Defendant's headquarters who could have

performed this task, Defendant inexplicably refused to add the requested information to the

demonstration system.  *Id.*

*e*Plus also learned at the demonstration that Defendant's counsel had incorrectly represented to *e*Plus counsel and *e*Plus's expert that remote access to the demonstration system over the Internet was impossible and that, instead, counsel and Dr. Weaver would need to travel to St. Paul, Minnesota to view the demonstration live. *Id.* Only after arriving at Defendant's headquarters, did *e*Plus learn that the demonstration was available remotely through an Internet conferencing system called WebEx, and that one of Defendant's attorneys, Ms. Stoll De-Bell, would be participating in the demonstration via WebEx. *Id.* *e*Plus was substantially inconvenienced and was forced to bear unnecessary travel expenses because of Defendant's refusal to make the demonstration system available via WebEx to *e*Plus. *Id.*

Although the demonstration system made available to *e*Plus was lacking the data *e*Plus had requested, Dr. Weaver was still able to observe during the demonstration, that systems including RQC are not more than colorably different than the infringing systems having RSS in all relevant respects. After reviewing the demonstration system and the RQC documentation and source code, Dr. Weaver prepared an expert declaration concerning these systems. Dr. Weaver's declaration is attached hereto as Exhibit A.

## III.   LEGAL STANDARD

In *Tivo v. Echostar*, 646 F.3d 869 (Fed. Cir. 2011) (*en banc*), the Federal Circuit revamped the legal standard governing contempt proceedings when an adjudicated infringer claims that it has redesigned an infringing product. The Federal Circuit explained that, as a threshold matter, district courts have broad discretion to hold contempt proceedings, and may do so upon receipt of "a detailed accusation from the injured party setting forth the alleged facts constituting the contempt." *Id.* at 881. In *Tivo*, the Federal Circuit determined that the district court had not abused its discretion when it initiated contempt proceedings based upon an allegation by plaintiff, after review of the modified source code for the infringing software, that

the modified software "was not more than colorably different from the original one, and thus that

[defendant] was in violation of the infringement provision of the permanent injunction." *Id.*

  With respect to the district court's contempt finding in *Tivo*, the Federal Circuit first

considered and rejected the infringer's arguments that "contempt is improper where the

defendant engaged in diligent, good faith efforts to comply with the injunction and had an

objectively reasonable basis to believe that it was in compliance." *Id.* at 880 (internal quotations

omitted). The Court explained, "[w]e have made it clear that, under Supreme Court precedent, a

lack of intent to violate an injunction alone cannot save an infringer from a finding of contempt. .

. . We are thus bound by Supreme Court precedent to reject EchoStar's good faith arguments

and its reliance upon opinions of counsel." *Id.*

  Next, the Federal Circuit explained that once contempt proceedings are initiated, "the

party seeking to enforce the injunction must prove both that the newly accused product is not

more than colorably different from the product found to infringe and that the newly accused

product actually infringes." *Id.* at 882. In conducting this analysis, the Federal Circuit instructed

courts to "focus initially on the differences between the features relied upon to establish

infringement and the modified features of the newly accused products," or put differently, "those

elements of the adjudged infringing products that the patentee previously contended, and proved,

satisfy specific limitations of the asserted claims." *Id.*

  To determine whether a relevant feature in a redesigned product is more than colorably

different from a corresponding feature in the infringing product, courts should first determine

whether the feature "has been modified, or removed." *Id.* If the feature was modified, the court

must then "make an inquiry into whether that modification is significant." *Id.* Only if the

district court concludes that "differences between the old and new elements are significant" can

the newly accused product be "deemed more than colorably different from the adjudged infringing one." *Id.*  Thus, "the primary question on contempt should be whether the newly accused product is so different from the product previously found to infringe that it raises 'a fair ground of doubt as to the wrongfulness of the defendant's conduct.'" *Id.* (quoting *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)).

If the relevant features in the infringing product have not been modified or removed in the redesigned product, or if the changes to the relevant features in the redesigned product do not make them more than colorably different from the comparable features in the infringing product, the district court must next determine whether the redesigned product infringes the relevant claims. *Id.* at 883.  "In making this infringement evaluation, out of fairness, the district court is bound by any prior claim construction that it had performed in the case." *Id.*

The party moving for contempt has the "burden of proving violation of the injunction by clear and convincing evidence, a burden that applies to both infringement and colorable differences." *Id.*  The "district court may seek expert testimony in making the determination" of whether the party who has instituted the contempt proceedings has met its burden to prove contempt. *Id.*

## IV.   ARGUMENT

Defendant concedes that it has made no changes to the Core S3 Procurement System or EDI portions of the infringing systems of Configurations 2, 3 and 5.  Further, Defendant acknowledges it has not made any changes to any of the system databases of Configurations 2, 3 and 5.  Defendant has also admitted that RQC, the only product it contends is "redesigned," actually contains all of the same functionality of RSS and even has the same "look and feel" as RSS.  Defendant even acknowledges that RQC is, in almost every respect, identical to RSS. Defendant, for example, acknowledges that just like RSS, RQC includes the capability of

searching internal and external catalogs using keywords, searching for items using the drill-down categories search functionality, and connecting to external catalogs using Punchout.  *See, e.g.,* Clements Decl., Ex. 39 (RQC 740) and Ex. 32 (RQC 691) at RQC 691-692.

Notwithstanding these critical concessions, Defendant suggests that it should not be held in contempt because of a few cosmetic and superficial changes that it made to RSS to create RQC.  Specifically, Defendant contends that:

(a)     it has changed the process of creating requisitions because RQC "immediately creates and saves requisition lines as items are selected," the user interface screen of RQC was changed to relabel the "My Cart" section of the screen as "Requisition Lines," the Checkout button on the user interface screen was relabeled as "Release," and what was previously referred to as an "Order" has been re-named as a "Requisition";

(b)     RQC places "items ordered through punchout ... on a separate requisition from items from the item master," and, when using Punchout, Defendant has placed a "disclaimer regarding use of the vendor's site" and removed the Lawson logo that previously appeared when a user punched out to a Lawson Punchout Partner site;

(c)     and RQC "supports drill down within Categories to the Class level, not the Commodity level."

*See* Clements Decl., Ex. 34 (RQC 709).

But Defendant's decision to swap out RSS with an almost identical product cannot help it avoid infringement of the *e*Plus patents.  Dispositively, none of the purported "changes" to RQC renders the system configurations having RQC even colorably different from those having RSS. As set forth herein and in the expert declarations of Dr. Weaver and Mr. Niemeyer, the changes that Defendant claims to have made to RSS are cosmetic changes that do not change, in any significant way, the underlying infringing functionality of Defendant's systems.  Defendant's willful violation of the permanent injunction should not go unpunished.  *e*Plus respectfully requests that the Court order Defendant to show cause why it should not be held in contempt for violating the injunction.

20

**A.** **Purported Changes To The Process of Creating Requisitions Do Not Render Systems With RQC More Than Colorably Different From The Infringing Systems**

The purported changes made to RSS with respect to the process of creating requisitions are purely cosmetic and are unrelated to the features that established infringement of claim 1 of the '172 Patent.  For example, Defendant suggests it has changed the process of assigning an order number to a requisition.  In fact, the only change made in RQC is superficial:  Defendant has simply changed the window to call the "order number" a "requisition number."  Notwithstanding this purely simple "word switch," a number is still assigned when using RQC in the same manner as with the prior version of RSS.  Ex. A (Weaver Decl.) at ¶¶ 19-20; Ex. B (Niemeyer Decl.) at ¶¶ 37-39.  Similarly, although Defendant has simply modified the RSS user interface screens to "re-label" the "My Cart" portion of the screen as "Requisition Lines," the data is added to the "Requisition Lines" using exactly the same process as was previously used to add items to the Cart (*i.e.*, by clicking the "ADD" buttons next to an item in a search results listing).  *Id.*  Indeed, in many instances in the relevant documentation, Defendant still refers to the "Requisition Lines" portion of the user interface as the Shopping Cart.  *See, e.g.*, Ex. A (Weaver Decl.) at ¶ 20; Clements Decl., Ex. 25 (RQC 1) at RQC 14 and Ex. 41 (RQC 741).  A name change is not a colorable difference.

Defendant contends that there is no longer any order list functionality in RQC and that, instead, the system allegedly employs a "direct to requisition" process rather than using an order list (*e.g.*, shopping cart) to build a requisition.  The "direct to requisition" description is a misnomer.  Systems having the RQC application still employ the same process to create requisitions using order lists as those system configurations the jury found infringing.  The user still searches the catalog for items in the item master and can also search based on UNSPSC code categories.  Ex. A (Weaver Decl.) at ¶ 22; Ex. B (Niemeyer Decl.) at ¶¶ 29, 33-35; Clements

Decl., Ex. 41 (RQC 741) and Ex. 33 (RQC 695) at RQC 699 and 702.  Although selected items

from the results of searches are added to a screen labeled "Requisition Lines" in RQC instead of

a screen labeled "My Cart" in RSS, the Requisition Lines list is the order list of the *e*Plus patent

claims and has the same functionality as the Cart in RSS.  Ex. A (Weaver Decl.) at ¶ 23; Ex. B

(Niemeyer Decl.) at ¶¶ 36-41.  As with the Cart of RSS, an RQC user can continue to modify the

requisition-in-progress by adding items, deleting items and making other changes, such as to the

quantity of an item.  *See id.*; *see also* Ex. B. (Niemeyer Decl.) at ¶ 42-43; Clements Decl., Ex. 29

(RQC 384) at RQC 407.  The requisition is not finalized until the "Release" button (previously

labeled as the "Checkout" button) is clicked.  Clicking the "Release" button "releases the

requisition so that it can move to any remaining processing stages."  *Id.*; *see also* Ex. B.

(Niemeyer Decl.) at ¶ 45; Clements Decl., Ex. 39 (RQC 740) at 3:45-3:59 min.  In other words,

just as with RSS, the order list (either the Cart or Requisition Lines list) does not become a final

requisition until the "Release" button (previously labeled "Checkout") is clicked.  *Id.*  The

requisition can then proceed to further processing (*e.g.*, conversion to one or more purchase

orders).  *Id.*  This is the same functionality as existed in the systems found to be infringing, only

the screen and button labels have changed.  Ex. A (Weaver Decl.) at ¶ 24.  This is to be expected

since Defendant, by its own admission, has made no changes to the Requisitions or Purchase

Order modules, or the Requisition database.  *Id.*

Because items can continue to be added to the Requisition Lines list (*e.g.*, the order list)

in RQC, items can be deleted from the order list up until the Release button is clicked, and the

requisition header can be modified up until the Release button is clicked, the Requisition Lines

list clearly satisfies the order list element of claim 1 of the '172 Patent.  Defendant has made no

substantive changes to the order list functionality in RQC, but has instead merely changed the

nomenclature, and systems including the RQC application are therefore not more than colorably different from those system configurations having RSS that the Court has enjoined.  *Id.* at ¶ 25.

### B. Purported Changes To Punchout When Used With RQC Do Not Make The Systems More Than Colorably Different From The Infringing Systems

Defendant has inserted a "disclaimer" screen message which appears when an RQC user selects to punchout to a particular Lawson Punchout Partner site.  This disclaimer message states:  "You are now leaving your companies' Requisition Center website.  You are about to connect directly to and access: [insert name of Lawson Punchout Partner].  We do not maintain content on the site or control policies for the site.  Before providing personal information, or using or relying on any content at the site (including description, status or availability of products), you should always check site policies."  Although this "disclaimer" message appears when a punchout catalog is selected, there is a button to click so that the "disclaimer" will no longer display.  Ex. A (Weaver Decl.) at ¶ 27.

Notwithstanding this self-serving "disclaimer," the Punchout code used to connect the Lawson system to the Lawson Punchout Partner site has not been changed at all, as Defendant itself has acknowledged.  *See also* Ex. B (Niemeyer Decl.) at ¶¶ 49-50.  Moreover, items from a punchout shopping session continue to be returned to the Lawson system's order list (*e.g.*, Requisition Lines list), just as with the infringing systems having RSS.  *See* Ex. A (Weaver Decl.) at ¶ 28; Clements Decl., Ex. 25 (RQC 1) at RQC 1 and 8.  Furthermore, Defendant's disclaimer does not change the fact that a user remains connected to the Lawson system at all times when engaging in a punchout shopping session.  *See* Ex. A (Weaver Decl.) at ¶¶ 29-31; Ex. B. (Niemeyer Decl.) at ¶ 52.  Indeed, the screen displays readily indicate that the system is connected to the Lawson System Foundation server at all times.  *Id.* at ¶ 31 (screen display at Punchout catalog indicating URL https://lsfserver.corpnet.lawson.com).

The fact that Defendant has modified the infringing system configurations such that Punchout items are placed on a separate requisition from the items selected by searching the vendor catalogs stored in the item master is of no import.  *Id.* at ¶¶ 33-34.  As Defendant admits, there have been no code changes made to the Requisition and Purchase Order modules of the infringing systems.  *Id; see also* Ex. B (Niemeyer Decl.) at ¶¶ 49-50.  Thus, there is nothing to prevent a user from being able to process a requisition "to generate one or more purchase orders for the selected matching items" in a requisition thereby satisfying the requirements of claims 3, 26, 28 and 29 of the '683 Patent.  *Id.*  And, the systems maintain the capability to generate multiple purchase orders from a requisition as required by claim 1 of the '172 Patent.  *Id.*; *see also* Clements Decl., Ex. 32 (RQC 691) at RQC 692.  For example, a user of the infringing systems can conduct searches of the vendor catalogs in the Item Master using the Categories search functionality and can place two different items offered by two different vendors into a single requisition.  The system then processes the requisition to generate one or more purchase orders as required by the claims.  *See* Ex. A (Weaver Decl.) at ¶ 40 n.4; Ex. B (Niemeyer Decl.) at ¶ 48; Clements Decl., Ex. 1 (Trial Tr.) at 634:7-653:3 (demonstrating "converting" functionality of systems using Categories search), Ex. 7 (PX-376), and Ex. 6 (PX-374).  Accordingly, there are no more than colorable differences between the systems' functionality now and the systems found to be infringing.

### C.  The Allegedly Modified Systems Continue To Have The Capability To Convert Data Relating To A Selected Matching Item And An Associated Source To An Item And A Different Source

Defendant has purportedly modified RSS to enable the Categories search functionality to drill down through the UNSPSC commodity code hierarchy tree to the third level, the Class level, rather than to the fourth level, the Commodity level.  But this is an insignificant

modification and does not make systems having RQC more than colorably different than those system configurations found infringing.

As an initial matter, the system maintains the capability to associate UNSPSC codes with each item in the item master.  *See* Ex. A (Weaver Decl.) at ¶ 37; *see also* Clements Decl., Ex. 26 (RQC 47) at RQC 92.  Just as with the system configurations found to be infringing, systems which include RQC continue to have programs in the Inventory Control module to map each item data record in the Item Master to a UNSPSC code.  Similarly, categories in the Categories hierarchy tree are mapped to UNSPSC codes.

Because each item data record has been associated with (or cross-referenced to) a corresponding commodity classification code in the Item Master and, similarly, because each product category in the category hierarchy tree has also been associated with (or cross-referenced to) a corresponding commodity classification code, a user navigating down the product category hierarchy can click on a branch of that category hierarchy tree and can find all items that have been cross-referenced to the same commodity classification code associated with that branch of the category hierarchy tree.  Ex. A (Weaver Decl.) at ¶ 38; Ex. B (Niemeyer Decl.) at ¶ 29. Thus, disabling the system's capability to drill down to the commodity level does not disable the system's capability to "convert[] data relating to a selected matching item and an associated source to data relating to an item and a different source."  Ex. A (Weaver Decl.) at ¶ 35. Accordingly, system configurations with RQC, just like the adjudicated infringing system configurations, satisfy the requirements of claims 3, 28 and 29 of the '683 Patent, as defined by the Court.  *Id.*  In fact, the demonstration of the RQC software revealed that a user can convert a selected matching requisition item (*e.g.*, surgical tape) to a different surgical tape item using the UNSPSC cross-referencing capability of the system.  *Id.* at ¶ 36.  The Categories search

functionality in RQC, therefore, is no more than colorably different than the corresponding functionality in RSS.

In sum, RQC is nothing more than a "Potemkin Village" design in an effort to evade this Court's injunction and leave *e*Plus without any remedy for Defendant's infringement.

## V.   REQUEST FOR EXPEDITED BRIEFING, A STATUS CONFERENCE AND DISCOVERY

The information that *e*Plus has obtained about RQC, including the RQC source code, certain RQC documents, and a limited demonstration of systems including the RQC application, reveals that systems including the RQC application are not more than colorably different than the infringing systems including the RSS application, and that Defendant is thus in violation of the permanent injunction.  In *Tivo*, the Federal Circuit upheld the trial court's institution of contempt proceedings where the plaintiff, after review of the modified source code for the infringing software, alleged that the modified software "was not more than colorably different from the original one, and thus that [defendant] was in violation of the infringement provision of the permanent injunction."  646 F.3d at 881.  Like the plaintiff in *Tivo*, *e*Plus has reviewed the modified source code and has set forth herein specific, detailed allegations that RQC is not more than colorably different than RSS, and that Defendant is thus in violation of the permanent injunction.

Due to the nature of this motion, and specifically because it involves Defendant's ongoing violation of an equitable Court order, *e*Plus respectfully requests that the Court grant an order to expedite briefing.  All information necessary for Defendant to respond to this motion is in Defendant's possession and an expedited briefing schedule should not prejudice Defendant. The parties have conferred and Defendant has agreed to file its opposition to this motion on Monday, September 19.  *e*Plus would file a reply brief on Thursday, September 22.

*e*Plus also requests that the Court set a status conference at the earliest convenient date to determine the scope of a proper inquiry into Defendant's violation of the injunction.  Among other things, *e*Plus requests the opportunity to take discovery regarding Defendant's violation of the permanent injunction.  In particular, *e*Plus requests the opportunity to take one Rule 30(b)(6) deposition and perhaps two individual depositions, to depose any expert witnesses whose testimony or reports Defendant intends to rely upon, and to serve limited written discovery requests.  To the extent that the Court deems it necessary, *e*Plus also requests that the Court set an early hearing on this motion and a prompt determination of what civil sanctions are appropriate should Defendant be found in contempt.

## VI.    CONCLUSION

For the foregoing reasons, *e*Plus respectfully requests (1) an order expediting briefing for the instant motion; (2) an order requiring Defendant to show cause why it should not be held in contempt and sanctioned for its deliberate disobedience of the permanent injunction; (3) a status conference to determine the parameters of a proper inquiry into Defendant's violation of the injunction; and (4) limited discovery concerning the development, functionality and infringing elements of RQC.

Respectfully submitted,

September 9, 2011

_____ /s/ _____

David M. Young (VSB #35997)
Scott L. Robertson *(admitted pro hac vice)*
Jennifer A. Albert *(admitted pro hac vice)*
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:   (202) 346-4444
dyoung@goodwinprocter.com
srobertson@goodwinprocter.com
jalbert@goodwinprocter.com

Craig T. Merritt (VSB #20281)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
Facsimile: (804) 697-4112
cmerritt@cblaw.com

Michael G. Strapp *(admitted pro hac vice)*
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
Facsimile:   (617) 523-1231
mstrapp@goodwinprocter.com
Attorneys for Plaintiff *e*Plus Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of September, 2011, I will electronically file the foregoing

**BRIEF IN SUPPORT OF ITS MOTION TO SHOW CAUSE
WHY LAWSON SOFTWARE, INC. SHOULD NOT BE HELD
IN CONTEMPT OF THE COURT'S PERMANENT INJUNCTION
AND REQUEST FOR EXPEDITED BRIEFING**

with the Clerk of Court using the CM/ECF system which will then send a notification of such

filing (NEF) via email to the following:

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Andrew Lagatta, *pro hac vice*
MERCHANT & GOULD
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 332-5300
Facsimile: 612) 332-9081
lawsonservice@merchantgould.com

Donald R. Dunner, *pro hac vice*
Erika H. Arner, *pro hac vice*
FINNEGAN, HENDERSON, FARABOW, GARRETT
& DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, DC 20001
(202) 408-4000
(202) 408-4444
***Counsel for Defendant Lawson Software, Inc***

Robert A. Angle, VSB#37691
Dabney J. Carr, IV, VSB #28679
TROUTMAN SANDERS LLP
P.O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1238
(804) 698-5119 (Fax)
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com

_____/s/_____
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone: (202) 346-4000
Facsimile: (202) 346-4444
dyoung@goodwinprocter.com

Counsel for Plaintiff *e*Plus Inc.