# EXHIBIT 2

### Page 1

```
        IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF VIRGINIA
                 RICHMOND DIVISION
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                 :
ePLUS, INC.,                     :
                                 :
          Plaintiff,             :
     v.                          :  Civil Action
                                 :  No. 3:09CV620
LAWSON SOFTWARE, INC.,           :
                                 :  March 25, 2011
          Defendant.             :
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

                DAILY COPY

     COMPLETE TRANSCRIPT OF EVIDENTIARY HEARING
        BEFORE THE HONORABLE ROBERT E. PAYNE
             UNITED STATES DISTRICT JUDGE

APPEARANCES:
    Scott L. Robertson, Esq.
    Jennifer A. Albert, Esq.
    Michael T. Strapp, Esq.
    GOODWIN PROCTOR
    901 New York Avenue, NW
    Washington, D.C.  20001

    Craig T. Merritt, Esq.
    CHRISTIAN & BARTON
    909 E. Main Street, Suite 1200
    Richmond, VA  23219-3095
        Counsel for the plaintiff ePlus

             DIANE J. DAFFRON, RPR
             OFFICIAL COURT REPORTER
           UNITED STATES DISTRICT COURT
```

### Page 2

```
APPEARANCES: (Continuing)
    Daniel W. McDonald, Esq.
    Kirstin L. Stoll-DeBell, Esq.
    William D. Schultz, Esq.
    MERCHANT & GOULD
    3200 IDS Center
    80 South Eighth Street
    Minneapolis, MN  55402-2215

    Dabney J. Carr, IV, Esq.
    TROUTMAN SANDERS
    Troutman Sanders Building
    1001 Haxall Point
    P.O. Box 1122
    Richmond, VA  23218-1122

        Counsel for the defendant Lawson.
```

### Page 3

(The proceedings in this matter commenced at 9:30 a.m.)

THE CLERK: Civil Action No. 3:09CV620, ePlus, Incorporated v. Lawson Software, Incorporated. Mr. Scott L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr. Michael G. Strapp represent the plaintiff. Mr. Daniel W. McDonald, Mr. Dabney J. Carr IV, Ms. Kirstin L. Stoll-DeBell, Mr. William D. Schultz, and Ms. Rachel C. Huey represent the defendant.

Are counsel ready to proceed?

MR. ROBERTSON: The plaintiff is, Your Honor.

MR. McDONALD: Lawson is as well, Your Honor.

THE COURT: All right. This is the evidentiary hearing on the issue of an injunction. Is there another firm coming into this case for you-all?

MR. McDONALD: The Finnegan firm is involved, Your Honor, but they are not going to be participating in this hearing. They are going to be involved with the appeal primarily, but they wanted to have access to the documents.

THE COURT: Oh, okay. Mr. Robertson.

### Page 4

MR. ROBERTSON: Good morning, Your Honor. If I might, I just have a few brief opening remarks to just sort of put some of the issues in context and then preview for the Court or highlight some of the topics that are going to be addressed today by Mr. Farber's testimony, if that's permissible.

THE COURT: All right.

MR. ROBERTSON: First, we are here to discuss the supplemental evidence, testimony and documentation that have been provided to the Court and exchanged by the parties since the trial ended that we believe will support the Court's discretion to grant an injunction in this case to prevent the ongoing infringement of ePlus' patents.

We certainly don't want to be here today, and I know the Court doesn't want to retry the case, or reargue a number of the issues involving hotly contested issues that are before the Court.

That said, there will be some additional details concerning evidence that did come out that we think would be important for the Court to consider.

I'd just like to highlight Section 154 of the Patent Act. Your Honor, the only right conferred upon a patent owner under the Patent Statute is the right

## Page 261

Hager - Redirect                                             261

1  THE WITNESS: They don't at the beginning.
2  THE COURT: After you ask the questions, you could
3  find out if it was RSS, for example, couldn't you?
4  THE WITNESS: We could.
5  THE COURT: And then you could say to the customer,
6  sorry, we can't do that?
7  THE WITNESS: We could once we've narrowed it down to
8  RSS.
9  THE COURT: But you have to go through all that.
10  THE WITNESS: We would, yes.
11  Q  Would you be able to narrow it down that way while you're
12  still on the phone with the customer in all instances, or
13  sometimes, or what?
14  A  Sometimes it would be while we're on the phone. Other
15  times it would likely be weeks and potentially months.
16  Q  Why is that?
17  A  Because it's a very complex system. Sometimes defects,
18  whether they're intermittent or what have you, you have to
19  really dig in there and try to identify what the root cause is.
20  We have many calls in our call center that have been open for
21  months because we haven't been able to identify the location of
22  the issue. That's pretty common in the software industry.
23  MR. McDONALD: Any other questions that you have on
24  that, Your Honor?
25  Q  You were asked about the cost increase for your customers

## Page 262

Hager - Redirect                                             262

1  that have RSS if they had to make a change; do you recall that?
2  A  Yes.
3  Q  Do you have an estimate as to how much it would cost
4  your -- let's take a hospital, how much money it would actually
5  cost them to make a change or not?
6  MR. ROBERTSON: Objection, lack of foundation, Your
7  Honor, and I think it's outside the scope of my cross-examine.
8  THE COURT: I think it's within the scope of your
9  cross-examination. I don't know whether he -- I think he's
10  asking a foundational question, that is whether he knows or has
11  any basis to know what the cost is.
12  MR. ROBERTSON: Also, certainly there was no
13  documentation produced in the supplemental period with respect
14  to the cost issue.
15  MR. McDONALD: But he asked about it, so I thought we
16  should flush that out. I'll ask the foundational question.
17  Q  Mr. Hager, from your experience, do you have an idea of
18  how much it would cost, for example, a hospital to make that
19  change away from RSS?
20  A  I do have some experience with that, yes.
21  Q  Based on your experience, what would you believe to be the
22  likely cost to a hospital for that change?
23  A  For a hospital, the hospital -- very large hospitals I
24  think would be more expensive than some of the non-hospital RSS
25  customers we have, so if I were to take the simplest

## Page 263

Hager - Redirect                                             263

1  implementation of our RSS and pull it out and put something
2  else in, you know, probably the simplest would be three months,
3  but I think on average for our hospitals, I bet you would it
4  probably be closer to nine months because of the complexities
5  of the hospital.
6  Q  You gave me the time. I was actually asking -- maybe you
7  were thinking of time cost, but I think the question is
8  actually going to the monetary cost.
9  A  Yeah, that's going to run somewhere north of 300,000, 3-
10  to 500,000 probably for that length of time. Maybe up to
11  750,000 on average. Some will be greater than a million.
12  THE COURT: Does it cost that much to put RSS in?
13  THE WITNESS: Some of our projects -- again, we put
14  RSS in in conjunction with everything else, but it's so tied
15  into the work flow approvals, and our work flow approvals are
16  based off everything that happens in RSS, so pulling RSS out
17  means you are rebuilding all those work flow approvals to go
18  with whatever new tool you are bringing in, and that's really
19  where the complication comes. I wish it didn't take this long,
20  but it does.
21  Q  And finally, Mr. Robertson asked you about the advantages
22  of selling the full suite, and I want to clarify, if the
23  customer already has an SAP ERP suite, for example, do you have
24  an advantage over ePlus in selling to a customer like that
25  that's looking for eProcurement?

## Page 264

Hager - Redirect                                             264

1  A  No. As a matter of fact, a disadvantage, because our RSS
2  and Punchout won't work with an SAP suite. We wouldn't even
3  attempt to make that sell.
4  Q  So when is it that Lawson would have actually have some
5  advantage for offering the full suite that Mr. Robertson was
6  asking about?
7  MR. ROBERTSON: Your Honor, I didn't ask -- I asked
8  him about whether or not having that full suite put my client
9  at a disadvantage.
10  THE COURT: Sustained.
11  Q  So in that situation then, can you explain what type of
12  customer would be the customer --
13  THE COURT: What situation?
14  Q  Where Lawson would have that advantage or ePlus would have
15  the disadvantage to Lawson, what specific market situation
16  might that be?
17  A  As was mentioned, when we're selling the entire integrated
18  suite, it's obviously because the customer wants a fully
19  integrated suite, so that would become our competitive
20  advantage. I should also mention that, you know, our RSS --
21  MR. ROBERTSON: Objection, Your Honor. He's
22  responded to the question.
23  THE COURT: Sustained.
24  THE WITNESS: Actually, it's a follow-on to the --
25  THE COURT: No, that's enough.

2011.03.25 Hearing - Injunctive Relief  3/25/2011  8:54:00 AM

```
                                                                289
                                 289
 1   here to the public interest has been greatly exaggerated.  What
 2   we have in the record are two declarations from two hospital
 3   workers who essentially say that this is basically a monetary
 4   inconvenience and would be, you know, disruptive, but nobody
 5   says -- the Court, I think, explored during examination its
 6   questions of the witness that, you know, the sky is going to
 7   fall here, and so that's all we have with respect to that other
 8   than attorney argument.
 9            And there are other ways to handle this, Your Honor.
10            THE COURT:  You have Mr. Hager's testimony.
11            MR. ROBERTSON:  And he was basically addressing,
12   first of all, the money that might be involved, and there are
13   indemnifications provisions that Lawson has.  It's chosen to
14   build its business upon a foundation of infringement.  It can't
15   turn around and say, we shouldn't be enjoined now because we've
16   been too effective infringers, and the case law says that as
17   well.  But there are options for Your Honor, one of which is
18   what's been phrased the sunset provision which means the
19   injunction could enter, but the Court could say it's not going
20   to be effective with perhaps the hospitals for 90 days,
21   something along those lines such that they can, with as minimal
22   disruption as possible, replace the infringing software.
23            THE COURT:  Yes, I understand.
24            MR. ROBERTSON:  So we'll be addressing that in the
25   briefing as well.  Thank you.


                                                                290
                                 290
 1            MR. McDONALD:  Your Honor, I'm not sure where we're
 2   at.  I've been asked to point out, in my self interest as well,
 3   we have a 7:20 flight.  Is it something that's going to end
 4   soon, or do you want us --
 5            THE COURT:  Goodbye.  I'm thinking about a slight
 6   moving of the date of the hearing because of the length of what
 7   you all have done on this one, but I won't do it, so go catch
 8   your plane.
 9            MR. McDONALD:  Thank you, Your Honor.
10            THE COURT:  All right.
11
12            (End of proceedings.)
13
14
15            We certify that the foregoing is a correct transcript
16   from the record of proceedings in the above-entitled matter.
17
18
19       /s/                  _____
         P. E. Peterson, RPR           Date
20
21
         /s/                  _____
22       Diane J. Daffron, RPR          Date
23
24
25
```