**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | | |
|---|---|---|
| ePLUS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:09CV620 (REP) |
| | ) | |
| LAWSON SOFTWARE, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT LAWSON SOFTWARE, INC.'S OPPOSITION TO EPLUS'S MOTION
TO SHOW CAUSE WHY LAWSON SHOULD NOT BE HELD IN CONTEMPT OF THE
COURT'S PERMANENT INJUNCTION ORDER**

i

## TABLE OF CONTENTS

I.      INTRODUCTION...............................................................................................1

II.     THE LAW ENCOURAGES COMPANIES TO "DESIGN AROUND"
        PATENTED INVENTIONS ..............................................................................3

III.    CONTEMPT PROCEEDINGS REGADING REDESIGNED RQC
        CONFIGURATIONS ARE IMPROPER ........................................................6

        A.      The Redesigned RQC Configurations are Much More Than
                Colorably Different from the Infringing RSS Configurations.................6

                1.      Lawson REMOVED the "Order List" Functionality from
                        Infringing Configuration No. 2......................................................7

                2.      The Removal of the Order List is a Significant Change.............12

        B.      The Redesigned Configuration No. 2 Lacks an "Order List" and
                Therefore Does Not Infringe Claim 1 of the '172 Patent .....................14

IV.     THIS COURT SHOULD *NOT* INITIATE CONTEMPT
        PROCEEDINGS AGAINST LAWSON FOR MAKING AND
        SELLING THE REDESIGNED PUNCHOUT CONFIGURATION
        NOS. 3 AND 5.................................................................................................14

        A.      The Redesigned Configuration Nos. 3 and 5 Do Not Have "Means
                for Generating an Order List . . . ." As Required by Claim 1 of the
                '172 Patent ............................................................................................14

        B.      The Redesigned Configuration Nos. 3 and 5 Do Also Not Have
                "Means for Converting . . ." as Required by Claim 3 of the '683
                Patent and Are Not Capable of Performing the Converting Step
                Required by Claims 28 and 29 of the '683 Patent .................................15

                1.      The Redesigned Configuration Nos. 3 and 5 are More Than
                        Colorably Different from the Infringing Configuration Nos.
                        3 and 5..........................................................................................15

                2.      The Redesigned Configurations Nos. 3 and 5 Do Not
                        Infringe Claims 3, 26, and 29 of the '683 Patent.......................19

        C.      Redesigned Configuration Nos. 3 and 5 Do Not Have "Means for
                Building a Requisition Using Data Relating to Selected Matching
                Items and Their Associated Source(s)" or the Corresponding
                Method Step As Required by Claims 3, 26, 28, and 29 of the '683
                Patent........................................................................................................20

1.   The Redesigned Configuration Nos. 3 and 5 are More Than Colorably Different from the Infringing Configuration Nos. 3 and 5 ...................................................................................20

2.   The Redesigned Configuration Nos. 3 and 5 Do Not Infringe Claims 3, 26, 28, and 29 of the '683 Patent .................................25

V.   **LAWSON SHOULD NOT BE HELD IN CONTEMPT FOR EXPLAINING THE SCOPE OF THE INJUNCTION ORDER TO ITS CUSTOMERS** ...................................................................................25

VI.   **LAWSON HAS NOT WAIVED ITS ATTORNEY CLIENT PRIVILEGE** ...................................................................................27

VII.   **LAWSON HAS PROVIDED ePLUS ABUNDANT INFORMATION REGARDING ITS RQC PRODUCT.** ..........................................28

VIII.   **CONCLUSION** ...................................................................................30

## I.     INTRODUCTION

Since entry of the infringement verdict, Lawson has invested hundreds of man-hours redesigning the product configurations found to infringe.[1]  The focus of the redesign has been RSS, which is not part of the non-infringing configurations but was found to infringe at least one claim in all three infringing configurations.  Lawson began deploying redesigned Configuration Nos. 2, 3, and 5 (which have a new product called RQC instead of RSS) on May 18, 2011.

ePlus's contempt motion begins with a demonstrably false statement.  It says that Lawson did not inform the Court that it had a "'design around' in plan during the injunction proceedings." (Dkt. 799 at 3).  Not only did Lawson tell this Court and ePlus that it was working on a redesign, it made this fact known *well before* this Court entered its Injunction Order on May 23, 2011.  *See* 3/30/3011 Injunction Opp. at 19 (Dkt. 705); 4/4/2011 Hearing Transcript at 79:20-80:8 (Ex. 1); 5/6/2011 McDonald Letter to Robertson re RQC Redesign (Ex. 2) (copy served on Judge Payne); 5/18/2011 McDonald Letter to Robertson re RQC Redesign (Ex. 3) (copy served on Judge Payne).  **Indeed, this Court relied on the existence of the RQC design around to grant the injunction!**  (Injunction Order at 42 and 42 n.10 (Dkt. 728) (citations omitted).)

Lawson's redesigned RSS Configurations Nos. 2, 3, and 5, which Lawson proactively disclosed to the Court and ePlus before they were finished, are far more than colorably different than the infringing configurations.  Specifically, Lawson removed several features that were central to ePlus's proof of infringement of the following four claimed elements:

| Claim element: | Feature(s) Found Infringing: | Removed? |
|---|---|---|
| (1) "means for generating an order list . . ." as required by claim 1 of the '172 patent; | Config. Nos. 2, 3, and 5: RSS's intermediate holding area known as the "shopping cart" | **YES.** <br> --------------- <br> Items are moved directly from search |

---

[1]  *See, e.g.,* Declaration of Dale Christopherson; Declaration of Todd Dooner.

| Claim element: | Feature(s) Found Infringing: | Removed? |
|---|---|---|
| | | results to the requisition. |
| (2) "means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source" and similar method step as required by claims 3, 28 and 29 of the '683 patent; | <u>Config. Nos. 3 and 5</u>: RSS's ability to search by 8-digit UNSPSC commodity code | **YES.** <br> -------------- <br> Disabled search by commodity code. RQC does not display/show commodity codes. |
| (3) "means for building a requisition that uses data obtained from said database relating to selected matching items on said order list" as required by claim 3 of the '683 patent and the capability of performing a similar method step as required by claims 26, 28, and 29 of the '683 patent; and | <u>Config. Nos. 3 and 5</u>: The ability to include items from multiple punchout vendor catalogs on a single requisition and/or item(s) from a punchout vendor catalog on the same requisition with item(s) from internal item master catalog. | **YES.** <br> -------------- <br> Requisitions must be separate for each punchout vendor and item master vendors. |
| (4) "means for processing said requisition to generate purchase orders for said selected matching items" and the capability of performing a similar method step as required by claims 26, 28, and 29 of the '683 patent. | <u>Config. Nos. 3 and 5</u>: The ability to generate purchase orders to multiple punchout vendors from a single requisition and/or the ability to generate a purchase order to an item master vendor and a purchase order to a punchout vendor from a single requisition | **YES.** <br> -------------- <br> Requisitions must be separate for punchout vendors and item master vendors. Users cannot generate multiple purchase orders to multiple punchout vendors from a single requisition. |

As shown below, ePlus's arguments are fundamentally different from the ones advanced at trial, which is proof positive that contempt proceedings are inappropriate. Moreover, ePlus's arguments are contrary to positions it took at trial and before the US Patent Office. Features it has repeatedly touted as central to its invention suddenly become insignificant in view of Lawson's redesign efforts. ePlus fails to provide any significant element by element claim analysis, and instead resorts to vague marketing puffery about functionality as its evidence. While such statements may appear relevant, they are not because ePlus's patents do not claim

functions.  They claim structures and methods, which have been removed from the redesigned Configuration Nos. 2, 3, and 5.

## II.   THE LAW ENCOURAGES COMPANIES TO "DESIGN AROUND" PATENTED INVENTIONS

"[L]egitimate design-around efforts should **always** be encouraged as a path to spur further innovation."  *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 2011 U.S. App. 8142 at *27 (Fed. Cir. April 20, 2011) (emphasis added); *Westvaco Corp. v. International Paper Co.*, 991 F.2d 735, 745, 26 U.S.P.Q.2D (BNA) 1353, 1361 (Fed. Cir. 1993) (holding that patent law encourages competitors to design around existing patents); *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538 (Fed. Cir. 1991) ("Designing or inventing around patents to make new inventions is encouraged.") ; *State Indus. Inc. v. A.O. Smith Corp., 751 F.2d 1226, 1236* (Fed. Cir. 1985) ((explaining that *designing* around existing patents promotes competition to the benefit of consumers).

The Federal Circuit recently issued an *en banc* decision that changed the standard used to determine whether a party may be held in contempt for selling a product that was designed around a patent.  *TiVo*, 646 F.3d 869, 2011 U.S. App. 8142 (Fed. Cir. April 20, 2011).  Under the new standard, the party seeking to enforce the injunction must prove *both that:*

> 1.   The newly accused product is **not** more than colorably different from the product found to infringe; ***and***

> 2.   If there are ***no*** more than colorable differences, the modified device continues to infringe each and every element of the claims.

*Id.* at *25-28.  The Federal Circuit rejected the infringement-based understanding of the colorably different test, holding instead that "the contempt analysis ***must* focus initially on the differences between the features relied upon to establish infringement and the modified features of the newly accused products**.*"  Id.* at *25 (emphasis added).

3

> Specifically, one should focus on those elements of the adjudged infringing products that the patentee previously contended, **and proved**, satisfy specific limitations of the asserted claims. **Where one or more of those elements previously found to infringe has been modified, or removed, the court must make an inquiry into whether that modification is significant**. If those differences between the old and new elements are significant, the newly accused product as a whole shall be deemed more than colorably different from the adjudged infringing one, and the inquiry into whether the newly accused product actually infringes is irrelevant.  Contempt is then inappropriate.

*Id.* at *26-27 (emphasis added).

The patentee bears the burden of proving violation of the injunction by clear and convincing evidence, a burden that applies to both whether the re-designed product is colorably different and whether, if not colorably different, the redesigned product infringes.

In *TiVo*, the patented technology allowed television users to simultaneously record and play ("time-shift") television broadcasts using what is commonly known as a digital video recorder ("DVR").  A DVR allows users to fast-forward, rewind, pause, and replay a live television program while it is playing on the television set.  The jury found that both of EchoStar's accused DVRs infringed both the hardware and software claims in TiVo's patents.  In 2006, the district court entered a permanent injunction requiring, among other things, that EchoStar stop making, using, offering to sell, and selling the DVRs that had been found infringing by the jury.  *Id.* at *52-53.  The injunction was stayed pending appeal,[2] but ultimately went into effect in 2008.  While the injunction was stayed, EchoStar began working on a design around of infringing DVRs.  Specifically, it redesigned the infringing DVR software.  The infringing "start code detection" feature parsed the data stream for codes that designated the start of each video frame and indexed those codes to allow the system to precisely locate and access a required frame from the data stream whenever needed, such as during rewind and fast forward

---

[2]      In the first appeal of the jury verdict in *TiVo*, the Federal Circuit affirmed the jury's finding of infringement as to the software claims, but reversed the finding of infringement as to the hardware claims.

operations by the user.  In its redesigned software, EchoStar replaced the "start code detection" feature with a new feature that used average frame rate statistics to estimate the location of a given video frame (the "statistical estimation" feature).  The district court found that EchoStar's modified DVRs continued to use another feature called "PID filtering" and EchoStar had conceded that PID filtering performs a type of parsing.  The district court then concluded, relying on the PID filters, that EchoStar's modified DVRs continued to infringe the software claims and held EchoStar in contempt.

The Federal Circuit reversed this finding of contempt because "TiVo **never unequivocally** alleged prior to the contempt stage that the PID filter met [the parsing] claim limitation. That was a new allegation." Also:

> [T]he district court found no need to evaluate the newly designed statistical estimation feature to determine whether it was significantly different from the start code detection feature, the feature that had been previously alleged by TiVo to meet the parsing claim limitation, and whether the replaced feature continued to meet the parsing limitation of the software claims. Our holding today requires that those issues be determined on remand **because the statistical estimation feature is the replacement for a feature that had been previously alleged to be infringing**. As noted, the district court's determination that the modified devices are in fact infringing would be irrelevant to the question whether the injunction has been violated if the differences between the two features at issue are indeed significant, thus rendering the new devices more than colorably different from the original ones. It is also possible that, in a new infringement proceeding, a fact finder could conclude that the PID filter in EchoStar's redesigned device meets the "parsing" limitation and that the devices continue to infringe the asserted claims, **but that should not be decided in a contempt proceeding**.

*Id.* at *30-31 (emphasis added).  Indeed, because infringement is an issue for a "fact finder," adjudication of the issue in a contempt proceeding has implications for Lawson's right to a jury trial and thus should not be undertaken lightly.

Thus, the Federal Circuit requires that the following analysis be performed to determine whether Lawson should be held in contempt:



As detailed below, this Court should deny ePlus's motion for Lawson to show cause why it should not be held in contempt because ePlus cannot show that Lawson's redesigned Configuration Nos. 2, 3, and 5 are merely colorably different from the infringing Configuration Nos. 2, 3, and 5.  Indeed, ePlus's motion is completely based on contentions entirely different from the ones ePlus relied on at trial to prove infringement.  At a minimum, ePlus should be denied adjudication of the infringement issue without a separate lawsuit, to preserve Lawson's right to a separate trial on the fact issue of infringement.

## III.    CONTEMPT PROCEEDINGS REGADING REDESIGNED RQC CONFIGURATIONS ARE IMPROPER

### A.    The Redesigned RQC Configurations are Much More Than Colorably Different from the Infringing RSS Configurations

Lawson's removal of the order list, when compared to ePlus's contentions at trial and the claims at issue, is a fundamental change that removes the core of ePlus's infringement case, and thus renders the new RQC configurations more than colorably different than infringing RSS Configurations.[3]  ePlus ignores the claim language and fails to apply the Federal Circuit's requirement that contempt be analyzed based on the infringement claims ePlus made at trial. Contempt is inappropriate here because Lawson removed several of the very features ePlus

---

[3]  *See, e.g.,* Declaration of Dr. Michael Shamos; Christopherson Decl.; and Dooner Decl.

relied on at trial as necessary to infringement.  At trial, ePlus alleged that the intermediate

holding area between the search results and the requisition, which was called the "shopping

cart," met the requirement for an order list in claim 1 of the '172 patent.  Because Lawson has

removed that order list, Lawson should not face a contempt proceeding.

      1.    <u>Lawson REMOVED the "Order List" Functionality from Infringing
Configuration No. 2</u>

The jury found that Accused Configuration No. 2 (S3 Procurement + RSS) infringed *only*

claim 1 of the '172 Patent.  (Dkt. No. 600.)  Claim 1 of the '172 patent includes several elements

that directly or indirectly require an order list, as shown by the highlighting below:

> 1.    An electronic sourcing system comprising:
> . . .
> means for searching for matching items that match the entered product
> information in the selected portions of the database;
> **means for generating an order list that includes at least one matching item
> selected by said means for searching;**
> means for building a requisition that uses data obtained from said database
> relating to selected matching items on said order list; and
> means for processing said requisition to generate purchase orders for said selected
> matching items.

When it redesigned infringing Configuration No. 2, Lawson focused on removing the

shopping cart generating structure that ePlus had relied on to prove that Configuration No. 2

infringed the "means for generating an order list" element (highlighted in red above) of claim 1.

At trial, ePlus, through its expert Dr. Weaver, asserted one and only one ground for satisfying

this order list element in the RSS configurations -- the RSS shopping cart:

> 23   Q   Which Lawson application did we see that had the
> 24   capability of providing an order list?
> 25   A   The shopping cart.  So the RSS module.

(TT at 815:23-25.)  Dr. Weaver clearly relied solely on the RSS shopping cart to satisfy the

"means for generating an order list " element of claim 1 of the '172 patent:

```
23 │ Q   Do configurations 2, 3 and 5 have means for
24 │ generating an order list that includes at least one
25 │ matching item selected by said means for searching?

 1 │ A   They do.
 2 │ Q   Is it that RSS module that provides that order
 3 │ list or shopping cart as you referred to it?
 4 │ A   Yes, the RSS is where the shopping cart
 5 │ functionality resides.
```

(TT at 817:23-818:5.)

Lawson removed the shopping cart functionality from its redesigned Configuration No. 2, which combines the new RQC product with Lawson's Core S3 Procurement System.[4]  Instead, RQC uses a "direct-to-requisition" technology, which transfers information about desired products from a search results list ***directly to a requisition***, bypassing the intermediate step of temporarily storing items in a shopping cart.



ePlus argues that Lawson has not removed the shopping cart functionality, but rather

---

[4] ePlus complains that Lawson did not change any aspects of the "Core S3 Procurement System," which includes Lawson System Foundation ('LSF'), Process Flow, and Inventory Control, Requisition, and Purchase Order Modules.  Because these modules, even combined, do not infringe, the fact that Lawson left them unchanged clarifies the strength of Lawson's redesign.  The common denominator between Configuration No. 2, which was found to infringe claim 1, and Configuration No. 1, which ePlus did not even assert infringed claim 1, is the RSS application.  Therefore, Lawson redesigned RSS.  Because there is no dispute that Lawson made no significant changes to those modules, Lawson effectively eliminated any issue that it may have reintroduced functionality in these undisturbed modules that were removed from RQC.

simply made "cosmetic changes" by changing the name "shopping cart" to "requisition lines." ePlus's argument relies on several flawed premises.

First, the record is clear that the "order list" element <u>must</u> be different from the requisition element. For example, the Court's Markman Order defined "order list" means and the "requisition" means to have different structures. (Dkt. No. 204 at 11-14, 50-51.)

Consistent with the Court's constructions and the claim language, the patent specification, prosecution history, and testimony at trial all show that the means for generating an order list and means for building a requisition are distinct. Dr. Weaver also opined that the RSS shopping cart was different than a requisition. He stated "the order list is the shopping cart and that's what becomes the requisition." (TT at 569:8-9.) In response to the question "Is [a shopping cart] consistent with your understanding of building a requisition," Dr. Weaver clarified, "Well, it's not the requisition… [the order list] is going to be transferred to the requisition module." (TT at 568:22-569:5.) He explained the difference between a shopping cart and a requisition:

```
14    A   So in the Lawson system you build a shopping cart,
15    then you add and delete items from it until you're
16    satisfied with it.  And then you do a checkout from
17    the Lawson system.  And that engages the requisition
18    system and builds the requisition of all the items
19    that you want to order.
```

(TT at 568:14-19.)

Second, the actual operation of Lawson's RQC product shows that, unlike RSS, the right side of the screen is the requisition. So for example, when an item (e.g. "1017 Needle") is added from the search results (left side of the split screen) to the right side of the screen in RQC, the item is simultaneously added to requisition module (RQ10.1) as shown below:



**RQC:**
Item No. 1017 is selected from search results and "Needle 27G X ½" is added to "Requisition Lines"



**RQC:**
Item No. 1017 has been added to "My Cart"



**RQC:**
Item No. 1017 has been added to the requisition in RQ10.1

*See* Shamos Decl. at ¶¶ 35-37 (Ex. C).  With RSS, by contrast, when an item was added from the search results (left side) to the shopping cart (right side), it was *not* added to the requisition module as shown below:



**RSS:**
Item No. 1017 is selected from search results and "Needle 27G X ½" is added to "My Cart"



**RSS:**
Item No. 1017 has been added to "My Cart"



RSS: Item No. 1017 has not been added to the requisition in RQ10.1

*See* Shamos Decl. at ¶¶ 28-30 (Ex. B).  Lawson made several source code changes to remove the shopping cart functionality from RSS as described in the Declaration of Todd Dooner (Ex. 1 and 2) (Ex. 4 (password list)).

ePlus also argues that Lawson has not removed the shopping cart because some of its statements to customers about the RQC product have continued to refer to the right side of the screen as "the cart."[5]  (Dkt. 799 at 6).  What the right side of the screen is called is irrelevant – what *is relevant* is that functionality that Dr. Weaver relied on to prove infringement has been removed.  Thus, Lawson is *not* in contempt of the Court's injunction order.

Alternatively, ePlus argues that even if Lawson did remove the shopping cart functionality, the requisition on the right side of the RQC screen is "not finalized" and thus is an "order list" that "does not become a final requisition until the 'Release' button (previously labeled 'Checkout') is clicked."  (Dkt. 799 at 22.)  This argument is also flawed because it fails to recognize, as Dr. Weaver did at trial, that the claims require two lists: a requisition and an order list.  ePlus's claims that RQC's requisition list looks like an order list is thus misleading.  That is not the issue.  The issue is whether RQC has *both* an order list *and* a requisition; it clearly does not.

ePlus has previously admitted before the U.S. Patent Office that the claimed "order list" is different from an incomplete (non-finalized) requisition.  For example, ePlus argued the P.O. Writer prior art was different on that basis:

---

[5] Lawson has been selling RSS with its "cart" for more than a decade.  It is not surprising that there have been a few instances where Lawson employees, out of habit, have called the right side of the RQC search screen the "cart."

Further, the P.O. Writer Plus Guided Tour Manual fails to disclose an **intermediate step of creating an order list between a database search and building a requisition as required by claim 1**. Rather, the P.O. Writer Plus system can start with building a requisition or building a purchase order (without even building a requisition). **If the user starts with a requisition, from the search results generated in that process, the system builds a requisition. Once the requisition is completed,** a user backs out to the Main Menu and invokes the Requisition Interface module to convert the requisition to a purchase order and then backs out yet again to the Main Menu to invoke the Create P.O. module to actually create a purchase order. See P.O. Writer Plus Guided Tour Manual at 140, 142, 149-150. **At no time is an order list generated.**

Reexam Control No. 95/000,487 ('172 Patent), Patent Owner Reply dated 1/25/2010 at p. 29

(emphasis added) (Ex. 5).

ePlus further admitted that the order list must be generated *prior to* the generation of the

requisition, confirming they are two separate things:

> [T]he system described in the '989 Patent did **not** include any means for generating an order list **prior to the generation of a requisition**. The system did not perform this function at all. Rather, the only document it generated was a requisition.

*Id.*, Appeal Brief dated 4/25/2011 at p. 14 (emphasis added) (Ex. 5).

At an absolute minimum, ePlus's effort to collapse a requisition together with an order

list is a new argument that was not made during trial, and thus, under *TiVo*, cannot be raised on

contempt. In particular, ePlus cannot assert new infringement arguments on the issue of whether

the redesigned product is more than colorably different from the infringing product. *TiVo,* 646

F.3d 869, 2011 U.S. App. 8142, at *26-27.

As such, Lawson has removed the feature that ePlus relied on to prove that Configuration

No. 2 infringes claim 1 of the '172 patent.

2.      The Removal of the Order List is a Significant Change

As instructed by the Federal Circuit, if an element previously found to infringe has been

removed, the Court must make an inquiry into whether that modification is significant.

12

> The significance of the differences between the two products is much dependent on the nature of the products at issue. **The court must also look to the relevant prior art**, if any is available, to determine if the modification merely employs or combines elements already known in the prior art in a manner that would have been obvious to a person of ordinary skill in the art at the time the modification was made.

*TiVo,* 646 F.3d 869, 2011 U.S. App. 8142, at *26-27 (emphasis added). Here the removal of the order list element is significant because ePlus relied on the means for generating an order list element to distinguish claim 1 of the '172 patent from the relevant prior art as discussed above and as set forth in the Declaration of Michael Shamos. Thus, the order list element of claim 1 is the point of novelty for this claim (at least according to ePlus) and Lawson's removal of the order list feature from its redesigned product must be considered significant.

ePlus cites generalized marketing materials from Lawson as proof that eliminating the order list is not substantial. Such general statements about functionality have no relevance to the significance of the changes that Lawson made to RQC. Nothing in *TiVo* suggests that they are relevant. The marketing puffery relates to functionality, but patent claims do not claim function. They claim structure. Functional claiming is not permitted. The fact is that at least one complete element of claim 1 of the 172 patent is gone. That element was one ePlus repeatedly relied on to argue the validity of its claims. Those patent claim-specific statements, not general marketing puffery, are what matters to the inquiry here.

Moreover, the difference between RSS and RQC is significant because RQC's direct-to-requisition process is similar to the process utilized by Lawson's RQ module (not to be confused with the new RQC module) in non-infringing Configuration No. 1, where the selected products were sent directly from the search results to the requisition. Indeed, ePlus did not accuse Configuration 1 of infringing claim 1 of the '172 patent *because* the RQ module does not use a shopping cart. (Weaver Dep. at 218:9-219:15 (Ex. 6).) In essence, RQC has gone back to the

13

old, non-infringing way of doing things.  As such, this change is significant and the redesigned Configuration No. 2 (with RQC) is more than colorably different from the infringing Configuration No. 2 (with RSS).  ePlus should be pleased that its patented technology is not the subject of Lawson's redesign.  Its desire to initiate contempt proceedings is motivated more by its insatiable desire for vengeance than the merit of the claim.

**B.      The Redesigned Configuration No. 2 Lacks an "Order List" and Therefore Does Not Infringe Claim 1 of the '172 Patent**

As described above, the Redesigned Configuration No. 2, which combines RQC with Lawson's Core S3 Procurement System, does not have a "means for generating an order list," which is a necessary element of claim 1 of the '172 patent.  Although RQC does have the capability for displaying a non-finalized requisition on the right-side of the screen, ePlus has previously admitted that such a requisition is not an order list.  (Dr. Weaver, TT at 568:22-569:5.)  Thus, the redesigned Configuration No. 2 does not infringe claim 1 of the '172 patent. *See, e.g.,* '172 Patent Reexam, Patent Owner Reply dated 1/25/2010 at p. 29; Appeal Brief dated 4/25/2011 at p. 14 (Ex. 5).  This argument by ePlus is completely new for a reason: it is contrary to the file history of the '172 patent.

**IV.     THIS COURT SHOULD *NOT* INITIATE CONTEMPT PROCEEDINGS AGAINST LAWSON FOR MAKING AND SELLING THE REDESIGNED PUNCHOUT CONFIGURATION NOS. 3 AND 5**

**A.      The Redesigned Configuration Nos. 3 and 5 Do Not Have "Means for Generating an Order List . . . ." As Required by Claim 1 of the '172 Patent**

ePlus also relied on the shopping cart in RSS to prove infringement of the "means for generating an order list…." in Configuration No. 3 (Core S3 Procurement + RSS + Punchout) and Configuration No. 5 (Core S3 Procurement + RSS + Punchout + EDI):

```
23  Q   Do configurations 2, 3 and 5 have means for
24  generating an order list that includes at least one
25  matching item selected by said means for searching?
1   A   They do.
2   Q   Is it that RSS module that provides that order
3   list or shopping cart as you referred to it?
4   A   Yes, the RSS is where the shopping cart
5   functionality resides.
```

(Dr. Weaver Direct, TT at 817:23-818:5.)  Thus, for the same reasons described above with

regard to Configuration No. 2, redesigned Configuration Nos. 3 and 5 (with RQC instead of

RSS) are more than colorably different from the infringing Configuration Nos. 3 and 5 and

initiation of contempt proceedings is inappropriate.

**B.**      **The Redesigned Configuration Nos. 3 and 5 Do Also Not Have "Means for Converting . . ." as Required by Claim 3 of the '683 Patent and Are Not Capable of Performing the Converting Step Required by Claims 28 and 29 of the '683 Patent**

1.      The Redesigned Configuration Nos. 3 and 5 are More Than Colorably Different from the Infringing Configuration Nos. 3 and 5

a)      Lawson Removed the "Means for Converting" and "Converting" Functionality from Infringing Configuration Nos. 3 and 5

Claim 3 of the '683 patent recites the following means:

means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source.

Claims 28 and 29 similarly require a step of: "converting data relating to a selected matching

item and an associated source to data relating to an item and a different source."

At trial, ePlus asserted that this converting step of claims 28 and 29 and the function and

structure for the converting means of claim 3 were provided by the "commodity level of

information" of the 8-digit UNSPSC codes within the RSS module.  *See, e.g.,* (Trial Transcript at

575:8-20.)  Dr. Weaver testified that the UNSPSC code system is hierarchical and comprises

two-character numerical values for each of a segment, family, class, and commodity code.  (TT at 575:8-20; 617:6-618:21.)  The commodity level classification, the most specific, is described as a "group of substitutable products or services."  (PTX 11 p. 12 (Ex. 7); TT at 617:6-618:21.)  Dr. Weaver testified the converting claim elements were specifically satisfied by the capability **to search for products having the same 8-digit commodity code**, because these products were, by definition, generally equivalent and substitutable:

```
24   Q    Turn to page 13 of the document for now, and just I want
25   to focus on that hierarchy.  Is this -- this has the segment,
 1   the family, the class, and the commodity for office equipment
 2   going down to pen refills.  Is this the same kind of example
 3   you gave yesterday with how, in effect, this eight-digit coding
 4   can drill down to get you to a specific product that you want?
 5   A    Yes, it is.  The example we used yesterday went down to
 6   black pens.  This was a different class, so it ends up with a
 7   different commodity, but it's the same schema.
 8   Q    Why don't you go, then, to page 12 on this exhibit, and if
 9   we could, just the chart.  So, again, this is describing the
10   levels of the UNSPSC -- actually, this even has one additional
11   level down there.  Do you see this business function?
12   A    Yes.
13   Q    What does it say by the time you get down to the commodity
14   level, that last level?  What does it say with regard to what
15   you can now do with this tool in order to identify product or
16   service?  How does it characterize it?
17   A    What it says, by the time you've gotten down to the
18   commodity level, you have found a group of substitutable
19   products or services, and we just saw that with the halogen
20   lamps.
21   Q    Doctor, your opinion, if the parts are substitutable,
22   would they be similar or generally equivalent?
23   A    Yes, they would.
```

(TT at 771:24-772:23.)  Further, Dr. Weaver made clear he was relying on the ability to search by 8-digit commodity codes as used **specifically in the RSS module:**

```
1    Q    Do you have an opinion, Doctor, as to whether or not the
2    accused Lawson systems satisfied the claim element means for
3    converting data relating to a selected matching item and an
4    associated source to data relating to an item in a different
5    source?
6    A    Yes, and we saw that when we did the category search using
7    the UNSPSC codes.  And we also know this is made possible by
8    that IC 516 program that loads UNSPSC codes into the item
9    master.
4    Q    Which of the five systems have we seen have the ability
5    for converting data relating to a selected matching item and
6    associated source to data relating to an item and a different
7    source?
8    A    The ones that contain the requisition self-service module.
9    Q    So if it had the requisition self-service module, that
10   would be able to satisfy this last claim element?
11   A    Yes.
```

(TT at 783:1-11.)

In redesigning its infringing products, Lawson removed the ability to search by commodity (UNSPSC) codes from the redesigned Configuration Nos. 3 and 5, which combine the new RQC product with Lawson's Core S3 Procurement System and Punchout.  Instead, RQC allows searches *only* to the level of the 6-digit "class" code as shown in the screenshot below:



See Shamos Decl. at ¶ 48 (*see also* exs. D-E).  Thus, customers cannot do a category search to identify products that have the same 8-digit commodity code.

ePlus does not dispute that Lawson removed the lowest level commodity code search functionality in RQC.  Rather, it argues that Lawson's IC module still includes the ability to store

17

the 8-digit commodity codes in Item Master. ePlus has never before alleged that storing UNSPSC codes in the IC module's Item Master, *by itself*, satisfies the converting claim elements. Indeed, ePlus did not even accuse Lawson's Core S3 Procurement system (which includes the IC module and UNSPSC codes) of infringing the converting claims. (Weaver Dep. at 231:1-233:6 (Ex. 6).) Rather, as shown above, ePlus asserted infringement by **RSS's ability to search** for items by the 8-digit commodity code. This capability has been removed.

ePlus also argues that because the UNSPSC system is a hierarchy, a user searching by the 6-digit class code will be able to find all of the products with all of the commodity codes that fall within the class code. This is irrelevant and inaccurate. It is irrelevant because ePlus did not make this argument at trial and so cannot be allowed to do so for the first time in a contempt proceeding. *TiVo,* 646 F.3d 869, 2011 U.S. App. 8142, at *26-27. It is inaccurate because searching for the class code a broader search is necessarily different than searching for a commodity code – only the commodity code is defined as having substitutable products. Further, RQC does not display the commodity codes at all and thus it is impossible to tell which items are associated with which commodity codes.

As such, Lawson has removed the feature that ePlus relied on to prove that Configuration Nos. 3 and 5 infringe claims 3, 28, and 29 of the '683 patent. ePlus provides no proof whatsoever of any infringement of the method claims 26, 28m and 29 of the '683 patent. Especially because using the six digit code to search for equivalent items makes no sense, ePlus cannot rely on mere allegations to support infringement—it must supply concrete proof. This vacuum of evidence further demonstrates the futility and unfairness of a contempt proceeding.

        b)     <u>The Removal of the Converting Functionality is a Significant Change</u>

The removal of the ability to search by 8-digit commodity codes, which ePlus relied on

18

exclusively to prove infringement of the converting means and step, creates a significant difference between the infringing Configuration Nos. 3 and 5 and the redesigned Configuration Nos. 3 and 5 because these converting elements were the point of novelty for claims 3, 28, and 29 of the '683 patent.  Indeed, the Patent Office required that the converting elements be added during the original prosecution of the '683 patent to obtain allowance of claims 3, 28, and 29.

Specifically, the Patent Office found that prior art of record taught all of the elements claim 3 and 28 except the means for converting or converting steps.  [6](('683 File History, 6/1/98 Office Action at 3) (Ex. 8).  The Patent Office indicated it would allow these claims only if they were amended to include the converting element.  *See id.*  In response, claims 3 and 28, and 29 were amended to include the converting element and thereafter allowed to issue.  ('683 File History, Response to Second Office Action, dated May 26, 1998 at pp. 2-3, 8) (Ex. 9).

ePlus's reliance on marketing puffery on this element is irrelevant and misleading.  There is no evidence that any of the marketing statements cited by ePlus have anything to do with converting by UNSPSC code.  The evidence that matters is specific to the claim elements and patent file history, and demonstrates unequivocally that omission of the 8-digit UNSPSC code search option is more than colorable.

2. <u>The Redesigned Configurations Nos. 3 and 5 Do Not Infringe Claims 3, 26, and 29 of the '683 Patent</u>

As a result of the changes described above, the Redesigned Configuration Nos. 3 and 5 do not have the features ePlus relied on at trial to show a converting means, which is a necessary element of claims 3, 26, and 29 of the '683 patent, and so no longer infringe those claims, precluding a finding of contempt.

---

[6] Claim 3 of the '683 patent was numbered claim 81 during prosecution and 28 of the '683 patent was numbered claim 110 during prosecution.

19

**C.    Redesigned Configuration Nos. 3 and 5 Do Not Have "Means for Building a Requisition Using Data Relating to Selected Matching Items and Their Associated Source(s)" or the Corresponding Method Step As Required by Claims 3, 26, 28, and 29 of the '683 Patent**

**1.    The Redesigned Configuration Nos. 3 and 5 are More Than Colorably Different from the Infringing Configuration Nos. 3 and 5**

**a)    Lawson Removed the Capability to Include Items from Multiple Punchout Vendors and/or Item Master on a Single Requisition and to Generate Multiple Purchase Orders to Multiple Punchout Vendors from a Single Requisition**

Claim 3 of the '683 patent recites a system including the following element:

> means for building a requisition using data relating to selected matching items and their associated source(s);

> means for processing the requisition to generate one or more purchase orders for the selected matching items;

Claims 26, 28, and 29 all require the similar method steps.  For Punchout Configuration Nos. 3

and 5, Dr. Weaver testified that this means for building a requisition was met by the "ability to

buy various items from various vendors and place them on a single requisition":

```
14   Q   This ability to buy various items from various
15   vendors and place them on a single requisition, is
16   that included in any of the claim elements that you
17   have examined?
18   A   Yes, it is.
19   Q   Can you give us just an example.  Can I look at
20   Claim Three of the '683 patent?
21   A   Sure.
22   Q   Tell us where that particular feature is.
23   A   Sure.  That is being color-coded in blue.  Means
24   for building a requisition using data related to
25   selected matching items and their associated sources.

1    Q   So we could have a requisition with matching items
2    from more than one source; is that right?
3    A   That's right.
```

(TT at 551:14-552:3.)  Moreover, to prove that the Punchout Configurations 3 and 5 met this element, Dr. Weaver testified that the Lawson system can "in the same process" both search an internal catalog database and add items to a requisition, and with Punchout go to an external catalog database to search and retrieve items:

```
17   Q   And now you're going to an external catalog database?
18   A   This is the external catalog at the special Dell site.
19   Q   So the Lawson system has the ability to both search the
20   internal catalog database and add items to a requisition, and
21   then it can also, in the same process, punch out and go to an
22   external catalog database in order to search a catalog and
23   retrieve items?
24   A   That's right.
```

(TT at 762:17-24.)  In fact, the only testimony Dr. Weaver gave regarding this element relies on the systems' "ability to buy various items from various vendors, including the internal catalog database, and place them on a **single** requisition."  (TT at 550:3-551:18.)

Redesigned Configuration Nos. 3 and 5 (include RQC instead of RSS) exclude the capability of building a single requisition from items selected **both** from the Item Master database **and** items selected from a punchout vendor catalog.  If a customer attempts to place a requisition with items from both the Item Master and one or more Punchout vendors, they will receive an error notification similar to the following:



*See* Shamos Decl. at ¶¶ 60-61 (Ex. F).  Thus, no **single** requisition is capable of including items from both the internal Item Master and another Punchout vendor.  In this regard, RQC builds

requisitions filled from the internal Item Master in the same manner as the non-infringing

Lawson configuration nos. 1 and 4, which do not have Punchout.

Similarly, RQC prevents a customer from including items from two different punchout

vendors on a single requisition.  If a customer tries to do this, he or she will receive the error:



*See* Shamos Decl. at ¶¶ 66 (*see also* exs. G-H).  ePlus does not dispute these facts.  Rather it

argues that with RQC a customer may still place multiple items from multiple vendors on a

single requisition **if all of the items come from Item Master.**  However, accused Configuration

No. 2 (Core + RSS) had this same capability, yet the jury found that Configuration No. 2 did *not*

infringe claim 3 of the '683 patent.  Moreover, accused Configuration No. 1 *also* had the ability

to build a requisition with items from Item Master that came from multiple vendors, yet ePlus

did not accuse these configurations of infringing these claims.  ePlus's argument fails because it

is inconsistent with the jury verdict.  At a minimum, it is a fundamentally different argument

from the one that led to the jury's findings, making contempt proceedings inappropriate.

Similarly, ePlus's validity expert, Brooks Hilliard, testified that the "means for

processing the requisition to generate one or more purchase orders for the selected matching

items" of claim 3 of the '683 patent is the ability to generate multiple purchase orders to multiple

vendors from a single requisition:

```
24   Q   Then does the system take that requisition and
25       need to be able to generate purchase orders using the
```

22

```
1   data in that requisition?
2   A   Yes.  The '683 patent, Claim Three, and many of
3   the other claims all talk about generating multiple
4   purchase orders from the requisition, and the reason
5   for multiple purchase orders is that the individual
6   line items in the requisition are each associated with
7   vendors, and you have to have a separate purchase
8   order for reach vendor.
```

(TT at 2687:24-2688:8 ("reach vendor" in line 8 should read "each vendor".)  Likewise, in

ePlus's infringement case, Dr. Weaver testified that Lawson's accused Configuration Nos. 3 and

5 (Punchout configurations) met these claim limitations because they generated two purchase

orders to two different vendors from a single requisition.  (TT at 697:1-698:2.)

Claims 26, 28, and 29 of the '683 patent all require the similar step of:  "processing the

requisition to generate one or more purchase orders for the selected matching items . . . ."  Mr.

Hilliard testified that the prior art RIMS system did not anticipate claim 26 of the '683 patent, in

part, because RIMS "couldn't do multiple purchase orders to multiple vendors."

```
23   Q   Let's turn to your opinions with respect to claim
24   26 of the '683 patent.  Can we have slide 2?
25       Do you have an opinion as to whether or not the
 1   RIMS system as described in the '989 patent
 2   anticipates that claim?
 3   A   It doesn't.
 4   Q   Why not?
 5   A   Let's look at the RIMS system as described in the
 6   '989 patent first.  It didn't have two product
```

```
15        And there's no processing of the requisition to
16   generate one or more purchase orders for the selected
17   matching items because the RIMS system as described in
18   the '989 patent couldn't do multiple purchase orders
19   to multiple vendors.  And there's no way -- there's no
```

(TT at 2724:23-2726:19); *see also* TT at 697:1-698:2 (Dr. Weaver testifying that Punchout

Configurations generated two purchase orders to two vendors from a single requisition).)

As described above, the redesigned RQC product no longer allows products from

multiple punchout vendors to be placed on a single requisition, thus it cannot provide the ability

to issue multiple purchase orders to different Punchout vendors from a single requisition in the

Punchout configurations.  Although it is possible to generate multiple purchase orders from a

single requisition, if ALL of the items come from Item Master, Lawson's Core S3 Procurement

system also had this capability and it does not infringe any of the asserted claims in this case.

      b)     The Removal of the Single Requisition/Multiple Purchase Order
                 Functionality is a Significant Change

At trial, Dr. Weaver testified that the ability to put multiple items from multiple sources on a

single requisition and then generate multiple purchase orders therefrom was a "big deal":

```
                    WEAVER - DIRECT           551

1    sending requisitions to an individual vendor to get
2    quotes.  So it's a convenience and a time saver and a
3    cost saver if I can put all of the items that I want
4    to order on a single requisition.
5        And then in this case because it's computerized,
6    the purchase order module can look at the requisition
7    and look at that single requisition and divide it into
8    purchase orders automatically.  So the single
9    requisition is a big deal.
```

(TT at 551:1-9 (emphasis added).)  The inventors of the patents-in-suit also testified that the

ability to place multiple products from multiple vendors on single requisition and then generate

multiple purchase orders therefrom was something that distinguished the patents from the prior art RIMS system.  (TT at 281:5-16; 457:21-458:25.)  As such, removal of this feature from the redesigned Configuration Nos. 3 and 5 presents yet another significant change relative to the infringing elements of the RSS product.

ePlus's citation to marketing puffery has nothing to do with the significance of this feature.  Functionally, customers can order from different vendors through Punchout in RQC—they just can't put multiple vendors in a single requisition as claimed in ePlus's patent.  Thus, redesigned Configuration Nos. 3 and 5 are more than colorably different from infringing Configuration Nos. 3 and 5 and this Court should not initiate contempt proceedings.

        2.       <u>The Redesigned Configuration Nos. 3 and 5 Do Not Infringe Claims 3, 26, 28, and 29 of the '683 Patent</u>

As described above, the redesigned Configuration Nos. 3 and 5, which remove the ability for a user to place products from multiple vendors on a single requisitions cannot meet the requirement of Claims 3, 26, 28, and 29 of the '683 patent.  The redesigned Configuration Nos. 3 and 5 with RQC, therefore, do not infringe those claims.


**V.      <u>LAWSON SHOULD NOT BE HELD IN CONTEMPT FOR EXPLAINING THE SCOPE OF THE INJUNCTION ORDER TO ITS CUSTOMERS</u>**

The Supreme Court has cautioned that contempt "is a severe remedy, and should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct."  *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618, 5 S. Ct. 618, 28 L. Ed. 1106, 1885 Dec. Comm'r Pat. 295 (1885); *see also MAC Corp. of Am. v. Williams Patent Crusher & Pulverizer Co*., 767 F.2d 882, 885 (Fed. Cir. 1985) (citing *Cal. Artificial Stone Paving Co*., 113 U.S. at 618).

ePlus argues that Lawson statements, which explain the scope of the injunction order, violate the order because they "encourage its customers to continue using the infringing products and services."  Motion at 13.  Not true.  As shown below, Lawson merely informed its customers that the injunction order does not prohibit **Lawson's customers** from using the infringing software.  This is true, as ePlus has admitted.  (TT at 3410:22-3411:18.)

May 27, 2011

Subject:   Immediate replacement of Requisitions Self Service software products required.  (S3 Product IDs: SIP, SIPP, SIPSU)

**Executive Summary:**

- After a 24-month legal battle, Lawson has been ordered by the Federal District Court for the Eastern District of Virginia to immediately discontinue sales, support and services of our Requisitions Self Service software (RSS).*
- The court has not ordered our customers to stop using RSS, but Lawson is no longer permitted to provide support.
- You are receiving this notice because we believe that you have licensed RSS in conjunction with our S3 application.
- Lawson is appealing this decision, but in the mean time, Lawson must comply with the court order.
- We have developed a replacement solution, Lawson Requisition Center (RQC), which we believe to be superior to the existing RSS solution.
- We have also developed a straightforward and simple process by which you can download, install, configure, test and implement the replacement product beginning June 1, 2011.
- We urge you to undertake this process as quickly as possible and in this letter we explain how exactly you can make this happen.

Clements, Ex. 38 (highlighting added).  Lawson's statements actually **discouraged** its customers from continuing to use the infringing software by making it crystal clear that Lawson is prohibited from fixing it or supporting it.  *See also* Clements, Ex. 44 at 1 ("all Lawson customers have the right to *use* the software you purchased from Lawson.  You may continue to system [sic], as is. The court's ruling impacts Lawson's ability to *support* the infringing configuration, but it does not impact your right to run it." (emphasis in original)).  So, if the customers continue to use it, they do so at their own risk.  Or, as ePlus suggested at the injunction hearing, other companies could provide customer support.  Nevertheless, Lawson further **discouraged** its customers from continuing use of the infringing software by encouraging them to download the replacement product "**as quickly as possible**."  Clements, Ex. 38 at 1; Clements, Ex. 44 at 3

26

("urging" customers to get started on replacing RSS with redesigned RQC "right away"). There is nothing wrong with these statements.

Nor does ePlus's distorted retelling of the history have any bearing on the issues at hand. Lawson's statements about the extensive time and effort to implement entirely new procurement systems from third party vendors were not directed to its own redesign efforts, which at the time were still in development stages. There was nothing wrong with statements Lawson employees made in opposition to ePlus's injunction motion.[7] Nor is download time for the RQC product any proof of anything. General marketing statements about the strength of the new product are of no relevance to whether or not the *TiVo* standard for contempt is met here, and should neither penalize Lawson nor serve as a replacement for the detailed analysis required for contempt in patent cases.

## VI.     LAWSON HAS NOT WAIVED ITS ATTORNEY CLIENT PRIVILEGE

ePlus asserts that Lawson waived the attorney-client privilege by providing its customers with the Court's injunction decision (Doc. No. 729) and informing customers that "you may continue to use the M3 e-Procurement product as is, but until such time as the court overturns its current decision, we may not provide support or services to the M3 e-Procurement solution." (Ex. 36 at RQC72.) ePlus never explains what privilege was waived or how it was waived and does not offer any legal analysis of why such a result is proper, nor even cites a single statute, rule, or case in support of its claim. It is well-settled that perfunctory, unsupported, and undeveloped arguments of this sort are waived. *See, e.g.*, *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991). Nor does ePlus address the separate doctrine of work product.

Further, the suggestion that Lawson waived the attorney client privilege based on the

---

[7]     *See, e.g.,* Declaration of Kurt Reasoner (confirming the accuracy of statements made during the injunction evidentiary hearing).

above statement to customers is baseless on its face and unsupported by law.  The disclosure of

non-privileged facts does not constitute a waiver of attorney-client privilege.  Disclosure of the

Court's public injunction is a non-privileged fact that does not constitute a waiver.  Indeed, the

Court's public decision specifically requires Lawson to "notify all customers who have

purchased all or any of the Infringing Products and Services of the terms of this Order, and to

provide said customers with a copy of this Order."  (Doc. No. 729 at 4.)  Courts have found that

disclosure of much more than what ePlus points to in this case still does not constitute a waiver

of the attorney-client privilege.  *See, e.g.*, *Furminator, Inc. v. Kim Laube & Co., Inc.*, No. 08-

367, 2009 U.S. Dist. LEXIS 118930, at *4-6 (E.D. Mo. Dec. 21, 2009) (finding that disclosure of

general summary of legal opinions to third-party investors does not affect waiver of attorney

client privilege or work product privilege); *Aspex Eyewear, Inc. v. E'Lite Optik, Inc.*, No. 98-

2996, 2002 U.S. Dist. LEXIS 13118, at *11 (N.D. Tex. July 17, 2002) (finding no waiver where

summary of noninfringement opinions were disclosed to third-party customers).

## VII.  LAWSON HAS PROVIDED ePLUS ABUNDANT INFORMATION REGARDING ITS RQC PRODUCT.

ePlus contends that Lawson refused to provide it with information about RQC.  This is

incorrect and misrepresents the agreements between the parties.  Lawson has provided ample

information about RQC, including the following:

- March 30, 2011: Lawson informs ePlus and the Court that it was working on a design around.  (Dkt. 705 at 19); *see also* (4/4/11 Tran. at 79-80 (Ex. 1).)

- May 6, 2011:  Lawson sends a letter to ePlus with details about design around called Requisitions Center ("RQC").  Lawson offered to provide ePlus with supporting documents if ePlus desired.  ePlus did not respond. (Ex. 2).

- May 18, 2011:  Lawson sends a second letter to ePlus letting them know RQC is generally available.  Lawson offered to provide ePlus with supporting documents if ePlus desired.  ePlus did not respond. (Ex. 3).

- <u>June 10, 2011</u>:  Lawson sends a third letter to ePlus analyzing the changes of the RQC product as it related to the claims of the '683 patent. (Ex. 10).

- <u>June 16, 2011</u>:  For the first time, ePlus requests information about RQC.

- <u>June 28, 2011</u>:  Lawson agrees to produce documents that show the full functionality of the products.  Lawson further invites ePlus to view a demonstration of the RQC product in operation. (Ex. 11).

- <u>July 6, 2011</u>:  After several phone call discussions, the parties agree on a set of documents to produce, including RQC technical documents, such as user guides, installation guides and manuals, documents related to the functionality of the RQC product, videos and webinars related to the RQC product, PowerPoints that detailed the functionality of the RQC product, and the source code associated with the RQC product.  Additionally, Lawson agreed to operate a demonstration of the RQC product. (Ex. 12).

- <u>July 13-14, 2011</u>:  Lawson produced the agreed-upon documents and source code to ePlus. (Ex. 13).

- <u>August 10, 2011</u>:  ePlus informed Lawson that the source code produced did not contain certain files.  Lawson produced requested RQC source code files on August 12, 2011. (Ex. 14).

- <u>August 17, 2011</u>:  Lawson produces source code differences files requested by ePlus.

- <u>August 22, 2011</u>:  Lawson hosts live demonstration of RQC for ePlus.  The system was an actual demonstration system used by Lawson employees.

It is inaccurate and unfairly prejudicial for ePlus to now assert to this Court it did not receive all of the documents when it agreed to the production.  In fact, on July 1, 2011 ePlus sent a letter modifying its document requests.  (Ex. 15).  Thereafter, the parties spoke regarding the scope of the production and came to an agreement.  (Ex. 12).  ePlus attempts to misdirect the Court, stating Lawson waited "nearly two months after Lawson made the documents available to its customers.  (Dkt. 799 at 15.)  Again, ePlus ignores the fact that Lawson offered to provide additional information in its May 6 and June 10 letters, which ePlus ignored until June 16.  Moreover, ePlus fails to inform the Court about the parties' agreement to produce documents.

ePlus attempts to make Lawson appear obtrusive, when Lawson was working with ePlus to provide a reasonable amount of information since May.  Lawson continues to be agreeable to cooperate.  However, based on the information provided, the RQC product is more than colorably different than the products found infringed.  There is no basis for a fishing expedition. ePlus should not be allowed to take unlimited discovery when it already has the information needed to assess the functionality of the RQC product.

## VIII.   <u>CONCLUSION</u>

ePlus's motion papers contain virtually no element by element claim analysis.  They fail to note that ePlus relies on entirely new arguments for infringement, that contradict the positions it took at trial and before the Patent Office.  As shown above, Lawson's new configurations eliminate entire claim elements and the very structures ePlus relied on to assert infringement. Lawson's redesign is a textbook example of the right way to do it, and contempt proceedings are inappropriate.

LAWSON SOFTWARE, INC.

By____/s/_____
              Of Counsel

Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
Megan C. Rahman (VSB No. 42678)
<u>dabney.carr@troutmansanders.com</u>
<u>robert.angle@troutmansanders.com</u>
<u>megan.rahman@troutmansanders.com</u>
**TROUTMAN SANDERS LLP**
1001 Haxall Point, Richmond, VA 23219
Telephone:  (804) 697-1200
Facsimile:  (804) 697-1339

Daniel McDonald (admitted *pro hac vice*)
William D. Schultz (admitted *pro hac vice*)
Rachel C. Hughey (admitted *pro hac vice*)
Andrew J. Lagatta (admitted *pro hac vice*)
**MERCHANT & GOULD P.C.**
3200 IDS Center, 80 South Eighth Street,
Minneapolis, MN  55402
Telephone:  (612) 332-5300
Facsimile:  (612) 332-9081

Donald R. Dunner (admitted *pro hac vice*)
Erika H. Arner (admitted *pro hac vice*)
**FINNEGAN, HENDERSON, FARABOW,**
**GARRETT & DUNNER, L.L.P.**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 408-4000
Facsimile:  (202) 408-4400

*Counsel for Defendant Lawson Software, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 19th day of September, 2011, a true copy of the foregoing will be filed

electronically with the Clerk of Court using the CM/ECF system, which will send a notification

of such filing (NEF) to the following:

Craig T. Merritt
Henry I. Willett, III
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
cmerritt@cblaw.com
hwillett@cblaw.com

James D. Clements
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, MA 02109-2881
jclements@goodwinprocter.com

Scott L. Robertson
Jennifer A. Albert
David M. Young (VSB No. 35997)
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001
srobertson@goodwinprocter.com
jalbert@goodwinprocter.com
dyoung@goodwinprocter.com

*Attorneys for Plaintiff*

                    /s/
Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
Megan C. Rahman (VSB No. 42678)
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
megan.rahman@troutmansanders.com
**TROUTMAN SANDERS LLP**
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-1200
Facsimile: (804) 697-1339

*Counsel for Defendant Lawson Software, Inc.*