# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| *e*PLUS, INC., | **)** | |
| | **)** | |
| | **)** | Civil Action No. 3:09-cv-620 |
| Plaintiff, | **)** | |
| | **)** | |
| v. | **)** | |
| | **)** | |
| LAWSON SOFTWARE, INC. | **)** | |
| | **)** | |
| | **)** | |
| Defendant. | **)** | |

**DECLARATION OF DEFENDANT'S EXPERT
MICHAEL I. SHAMOS, PH.D, J.D. CONCERNING
LAWSON'S NON-INFRINGING DESIGN AROUND**

I, Michael Ian Shamos, declare as follows under penalty of perjury:

## BACKGROUND

1.      I previously testified at trial in this case as an expert for Defendant Lawson Software, Inc. ("Lawson").

2.      The jury found that Lawson's Configuration No. 2 infringed only claim 1 of the '172 Patent and that Lawson's Configuration Nos. 3 and 5 infringed only claim 1 of the ''172 Patent and claims 3, 26, 28 and 29 of the '683 Patent (collectively, the "Infringed Claims").  The jury found no other configurations to infringe, including Lawson's core procurement system. The Court adopted the jury's findings in denying both parties' post-trial motions.

3.      Configuration No. 2 comprised Lawson's Core S3 Procurement System (Lawson System Foundation ("LSF")/Process Flow, in combination with Inventory Control, Requisition, and Purchase Order Modules) and Requisition Self-Service or "RSS."[1]

4.      Configuration No. 3 comprised Lawson's Core S3 Procurement System (Lawson System Foundation ("LSF")/Process Flow, in combination with Inventory Control, Requisition, and Purchase Order Modules), Requisition Self-Service or "RSS," and Punchout.

5.      Configuration No. 5 comprised Lawson's Core S3 Procurement System (Lawson System Foundation ("LSF")/Process Flow, in combination with Inventory Control, Requisition, and Purchase Order Modules) Requisition Self-Service or "RSS," Punchout and Electronic Data Interchange, or "EDI."

6.      That is, Configuration No. 3 comprised Configuration No. 2 plus Punchout and Configuration No. 5 comprised Configuration No. 2 plus Punchout and EDI.  Collectively, the Configurations the jury found to be infringing will be referred to as the "Infringing Configurations."

7.      With respect to the Infringed Claims, there is no material difference between Configuration No. 3 and Configuration No. 5.  That is, adding EDI to Core S3, RSS and

---

[1] These definitions of the infringing configurations are taken verbatim from the jury's verdict form.

1

Punchout does not create any additional basis for infringement of the Infringed Claims not already present in Configuration No. 3.

8.      I have been asked to assume, for purposes of this Declaration, that the jury's finding of infringement was correct.

9.      The Court entered a permanent injunction enjoining further infringement involving the Infringing Configurations.

10.     Lawson has modified the Infringing Configurations (via a "Design Around" yielding the "Modified Configurations") in response to the jury findings and injunction.

11.     I have been asked by counsel for Lawson to respond to Plaintiff's allegations that (1) the Modified Configurations are *not* more than colorably different from the Infringing Configurations and (2) the Modified Configurations infringe the Infringed Claims.  I have also been asked to provide rebuttal to the "Declaration of Alfred C. Weaver, Ph.D. in Support of Plaintiff's Motion to Show Cause Why Defendant Should Not be Held in Contempt of the Court's Permanent Injunction," dated September 5, 2011 (the "Weaver Declaration") and the "Declaration of Patrick Niemeyer Regarding Lawson' Software Inc.'s Requisition Center," dated September 9, 2011 (the "Niemeyer Declaration").  Both the Weaver Declaration and the Niemeyer Declaration were attached as exhibits to  "Plaintiff *e*Plus Inc.'s Brief In Support Of Its Motion To Show Cause Why Lawson Software, Inc. Should Not Be Held In Contempt Of The Court's Permanent Injunction And Request For Expedited Briefing," Docket No, 799.

12.     In connection with preparing this Declaration, I have reviewed the materials listed herein, those listed in Exhibit A, and those listed in my previous expert reports.

## SUMMARY OF OPINIONS

13.     In my opinion, for the reasons given in this Declaration, the Modified Configurations are more than colorably different from the Infringing Configurations and the Modified Configurations do not infringe the Infringed Claims because at least one required element or step of each of the Infringed Claims is missing from the Modified Configurations as

argued by ePlus at trial.  The modifications are significant and have yielded configurations that are non-infringing.

## THE MODIFIED CONFIGURATIONS

14.     In this section I describe the modifications Lawson has made to avoid infringement based on ePlus's infringement contentions at trial and the Court's claim constructions.  Relevant screen shots taken during actual execution of the Lawson software are included in Exhibit B and set forth below.

### Redesign No. 1 – Removal of the Order List

15. This redesign relates to claim 1 of the '172 patent.  Lawson's Modified Configurations do not employ a means for generating an intermediate "order list" as required by the claim 1 of the '172 patent.  Rather, Lawson removed that element by sending products directly from the search results to a requisition, which was the functionality employed by the prior art.  Unlike the claim or the Infringing Configurations, the Modified Configurations have a means for generating a requisition, but not for creating an order list.  Dr. Weaver relied on the order list feature of the Infringing Configurations to show infringement.  By eliminating the "order list" generating means as described by Dr. Weaver, Lawson's Modified Configurations are more than colorably different from the configurations found to infringe[2].  Further, the Modified Configurations do not infringe claim 1 of the '172 patent because "means for generating an order list" is an element required by the claim that is not present in the Modified Configurations.

16. ePlus contends that the Modified Configurations merely embody different nomenclature for elements that ePlus alleges are still present.  This is incorrect.  Unlike the

---

[2] I understand that if a required claim element present in configuration A is removed to yield configuration B not containing that claim element, then configuration B is certainly more than colorably different from configuration A.

SHAMOS DECLARATION                                                    CASE NO.3:09cv620

Infringing Configurations, the Modified Configurations lack a means for generating an order list. The screen area previously reserved for the order list (as ePlus argued before the jury – the "shopping cart" or "My Cart") in the Configurations found to be infringing has been replaced by a view of the requisition as it is being created.  The user interface called "Requisition Lines" in the Modified Configurations simply displays the contents of the requisition.  It cannot display the contents of a separate order list because there is no separate order list.  The Modified Configurations eliminate the intermediate element of the "My Cart" component in the Infringing Configurations, which the jury found to display an order list.  In the Infringing Configurations, no requisition entries were made until items were selected to populate a requisition when the user clicked the "SAVE" button.  The "My Cart" list and requisition were distinct, as are the requisition and order list elements of claim 1.   By contrast, there is no order list at all in the Modified Configurations.

17. At trial, ePlus argued that Lawson's Configuration Nos. 2, 3, and 5 infringed claim 1 of the '172 patent, which requires, among other elements:

> means for generating an order list that includes at least one matching item selected by said means for searching;
>
> means for building a requisition that uses data obtained from said database relating to selected matching items on said order list . . . .

18. The Court construed the term "order list" to mean "a list of desired catalog items." The Court construed the means for generating an order list element as having the following function and structure:

- Function: generating an order list that includes at least one search result selected by said means for searching

- Structure: user interface operating on a computer through which a user may select from results from a search program or a search program that generates an order

list of matching items, and their equivalents. See e.g., '172 Patent at 4:6-6:28;

7:66-8:13; 9:55-12:28; 18:23-50; Appendix VI, FIGS. 1-2 (describing local

computer 20, graphical interface 254, search program 50, interface 60, TV/2 and

search program 250).

19. At trial, ePlus's expert argued that "order list" for Configurations 2, 3, and 5 was the

RSS "shopping cart".  (Trial Trans. at 815:23-25; 817:23-818:5).

```
23  Q   Which Lawson application did we see that had the
24  capability of providing an order list?
25  A   The shopping cart.  So the RSS module.
```

(Dr. Weaver Testimony, Trial Trans. at 815:23-25.)

```
23  Q   Do configurations 2, 3 and 5 have means for
24  generating an order list that includes at least one
25  matching item selected by said means for searching?
1   A   They do.
2   Q   Is it that RSS module that provides that order
3   list or shopping cart as you referred to it?
4   A   Yes, the RSS is where the shopping cart
5   functionality resides.
```

(Dr. Weaver Testimony, Trial Trans. at 817:23-818:5.)

20. Dr. Weaver testified that the RSS shopping cart is different than a requisition.

Weaver Expert Report on Infringement, dated 5/5/2010 at p.85.  He stated "the order list is the

shopping cart and that's what becomes the requisition."  (Trial Trans. at 569:8-9.)  In response to

the question "Is [a shopping cart] consistent with your understanding of building a requisition,"

Dr. Weaver testified, "Well, it's not the requisition… [the order list] is going to be transferred to

the requisition module."  (Trial Tr. at 568:22-569:5); *see also* (Trial Trans. at 568:14-19.)  Figure 1C of the '172 patent confirms that the requisition is different from the order list.



(Fig. 1C, color added to show distinction between Requisition and Order List.)

21. I have read the Federal Circuit's decision in *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, ** (Fed. Cir. April 20, 2011).  That opinion holds that the district court must also look to the relevant prior art, if any is available, to determine if the modification merely employs or combines elements already known in the prior art in a manner that would have been obvious to a person of ordinary skill in the art at the time the modification was made.  I have considered the prior art both in the context of the admissions made by ePlus at trial as well as the admissions made by ePlus during the reexaminations of its patents.

22. ePlus's invalidity expert, Brooks Hilliard, testified expressly that an order list is different from a requisition:

- "Rather, the P.O. WRITER system can start with building a requisition or building a purchase order (without even building a requisition). If the user starts with a requisition, from the search results generated in that process, the system builds a requisition, not an order list."  Hilliard Expert Report, dated 6/9/2010, at p. 58 (regarding '172 claim 1).

- "Nor does the system disclosed in the King Patent perform the intermediate step of generating an order list that includes at least one matching item selected by said means for searching. Any search results obtained from the

searches in the Public Catalog or Private Catalog are entered directly onto the requisition." Hilliard Expert Report, dated 6/9/2010, at p. 115 (regarding '172 claim 1).

In the Modified Configurations, selected search results are entered directly onto the requisition, just as in the King Patent, which Mr. Hilliard and ePlus distinguished from '172 claim 1 for that very reason.

23. Similarly, during the pending reexamination of the '172 patent, to distinguish the prior art ePlus has argued that the order list is different from the requisition, and the corresponding structures for generating each are also different:

- "Additionally, the system described in the '989 Patent did not include any means for generating an order list prior to the generation of a requisition.  The system did not perform this function at all.  Rather, the only document it generated was a requisition."  Reexam Control No. 95/000,487 ('172 Patent), Appeal Brief dated 4/25/2011 at p. 14.

- "However, the Examiner contends that the PNR of the SABRE system satisfies both the order list and requisition claim elements.  Since the Examiner failed to conduct a proper means-plus-function construction of the claims, he overlooked the distinction between an order list and a requisition and the structures disclosed in the patent for building each."  Reexam Control No. 95/000,487 ('172 Patent), Appeal Brief dated 4/25/2011 at p. 17.

- "Further, the P.O. Writer Plus Guided Tour Manual fails to disclose an intermediate step of creating an order list between a database search and building a requisition as required by claim 1. Rather, the P.O. Writer Plus system can start with building a requisition or building a purchase order (without even building a requisition). If the user starts with a requisition, from the search results generated in that process, the system builds a requisition. Once the requisition is completed, a user backs out to the Main Menu and invokes the Requisition Interface module to convert the requisition to a purchase order and then backs out yet again to the Main Menu to invoke the Create P.O. module to actually create a purchase order. See P.O. Writer Plus Guided Tour Manual at 140, 142, 149-150. At no time is an order list generated." Reexam Control No. 95/000,487 ('172 Patent), Patent Owner Reply dated 1/25/2010 at p. 29.

- "It should be noted that the claim inescapably describes the "order list" and the "requisition" as different and separate items.  According to the claim, the order list is the document the customer's system builds from selecting items that were returned as results of a search query that matched the entered product information. The order list is then transferred to a requisition module to build a requisition using the data on the order list. . .Since the Examiner failed to conduct a proper

7

means-plus-function construction of the claims, he overlooked the distinction
between an order list and a requisition."  Reexam Control No. 95/000,487 ('172
Patent), Patent Owner Reply dated 1/25/2010 at p. 23.

24. Lawson has modified the system in the new Requisition Center ("RQC") application
that replaced the Requisitions Self-Service ("RSS") application so that it does not produce an
order list.  In RQC, what ePlus claims is the order list is just a screen area that displays the
requisition itself, not a means for generating the shopping cart that Dr. Weaver said was an order list.

### ANALYSIS OF RSS APPLICATION IN INFRINGING CONFIGURATIONS REGARDING THE ORDER LIST ELEMENT

25. In RSS, Lawson's old system, a user could perform a catalog search to locate items
using various criteria, including keywords.  In the parlance of the '172 Patent, the items returned
during the search are referred to as "matching items."  The user could then select from the
matching items certain items to be moved to an order list located on the right-hand side of the
screen, which was called the "shopping cart," and labeled "My Cart" in the RSS software.  Once
an order list was created, the user could select items from the order list to be added to a
requisition.

26. The old process is illustrated by various screen shots below.  RSS Screenshot No. 1,
shown below, illustrates the RSS search page, which includes a search panel at the left and a
"My Cart" panel at the right.  Initially, the "My Cart" panel, which Dr. Weaver testified at trial
constitutes the order list, is empty.  The user has entered the search term "NEEDLE" in the
Search box in the left-hand panel that includes a query for "NEEDLE".



Ex. B - RSS Screenshot No. 1 (Full screenshot in Exhibit B)

SHAMOS DECLARATION                                              CASE NO.3:09cv620

27. RSS Screenshot No. 2, shown below, shows the result of the search.  The left-hand panel has been populated with items responsive to the search query for "NEEDLE" (the "matching items").  Because the user has not yet selected any matching items, the order list ("My Cart") on the right-side is still empty.



Ex. B - RSS Screenshot No. 2 (Full screenshot in Exhibit B)

28. RSS Screenshot No. 3, shown below, shows what happens when the user has selected the first matching item to be added to the order list.  A confirmation that the system is adding "NEEDLE 27G x 1/2is shown at the center of the screen.



Ex. B - RSS Screenshot No. 3 (Full screenshot in Exhibit B)

29. RSS Screenshot No. 4, shown below, shows the result of adding an item to the order list.  "NEEDLE 27G x 1/2" has been added to the order list ("My Cart").



Ex. B - RSS Screenshot No. 4 (Full screenshot in Exhibit B)

30. Even though a matching item has been selected for inclusion in the order list, it has not yet been entered into a requisition, which is managed by RQ10.1 in the Requisition module of the software.  This is shown below on RSS Screenshot No. 5, where the screen from requisition module RQ10.1 shows that requisition 894 is blank.



Ex. B - RSS Screenshot No. 5 (Full screenshot in Exhibit B)

31. With RSS, the user must initiate an extra mandatory step to move an item from the order list to a requisition in RQ10.1.  The user moves an item from the order list to the requisition by clicking "SAVE" button as shown in RSS Screenshot No. 4 above.  After the

SAVE button is clicked, the "NEEDLE 27G x 1/2" will be added to the requisition module RQ10.1.

<strong>ANALYSIS OF THE RQC APPLICATION USED IN ITHE MODIFIED<br>CONFIGURATION WITH RESPECT TO THE ORDER LIST GENERATING MEANS</strong>

32. In the RQC product, by contrast, Lawson removed the feature found to be an order list and any means for generating such an order list.  An item selected from the search list is sent directly to the requisition from RQ10.1.  By moving a selected item directly from the search results to the requisition, the RQC product skips the intermediate step of creating an order list, and no order list is created at all.  Rather than operating as an intermediate step that would lead to a requisition, which was employed by the "My Cart" feature of the RSS program, the display to the right of the new RQC program mirrors the requisition that has already been created.  This is illustrated by a sequence of screen shots shown below.  RQC Screenshot No. 1 illustrates a new RQC split screen.  The left panel contains drop-down menus, one of which allows the user to initiate a "Search Catalog" function.  The right-hand panel shows the contents of the current requisition.



Ex. C - RQC Screenshot No. 1 (Full screenshot in Exhibit C)

33. RQC Screenshot No. 2, shown below, illustrates what happens when the user enters the keyword "needle" to search the catalog.

SHAMOS DECLARATION                                                                        CASE NO.3:09cv620



Ex. C - RQC Screenshot No. 2 (Full screenshot in Exhibit C)

34. RQC Screenshot No. 3, shown below, shows the list of matching items corresponding to the "NEEDLE" search. The requisition, shown in the right-hand panel, is empty.



Ex. C - RQC Screenshot No. 3 (Full screenshot in Exhibit C)

35. RQC Screenshot No. 4, shown below, illustrates what happens when the user clicks the "Add" box next to item 1017 to add an item to the requisition on the right side of the screen. A confirming message appears that reads, "Adding – NEEDLE 27G X 1/2."



Ex. C - RQC Screenshot No. 4 (Full screenshot in Exhibit C)

36. RQC Screenshot No. 5 shows the right-hand panel shows that the needle has been added to the requisition.



Ex. C - RQC Screenshot No. 5 (Full screenshot in Exhibit C)

37. If the user elects to view the entire requisition at this point in time, he or she will be able to confirm that item 1017 has indeed been added to the requisition as shown in RQC Screenshot No. 6, shown below.

13



Ex. C - RQC Screenshot No. 6 (Full screenshot in Exhibit C)

38. When an item is removed from the requisition shown in the right side of the split screen, the item is also removed for the same requisition shown in RQ10.1, which confirms that the right side of the screen is the same thing as the RQ10.1 requisition.

39. RQC does not produce an order list, which is a significant change, and all Modified Configurations lack a "means for generating an order list that includes at least one matching item selected by said means for searching," which is the third element of '172 claim 1. Because RQC has replaced RSS in all of the Modified Configurations, the Modified Configurations do not incorporate a "means for generating an order list." These changes are directly related to the elements of claim 1 of the '172 patent, and omit an element. RQC is therefore more than colorably different from the RSS program. Additionally, because the RQC product does not have a required element of '172 claim 1, the Modified Configuration do not infringe '172 claim 1.

40. Claim 1 of the '172 patent is the only claim found to be infringed by Configuration No. 2, which lacks the Punchout functionality. Therefore, the changes outlined above are sufficient to show that Modified Configurations corresponding to Configuration No. 2, with RQC replacing RSS, are more than colorably different and thus non-infringing.

## Redesign No. 2 – Removal of the "Means for Converting"

41. This redesign relates to claims 3, 28, and 29 of the '683 patent.

42. Claim 3 of the '683 Patent requires a "means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source." The

Court construed the structure corresponding to this means as "one or more non-catalog databases identifying cross-referenced items, identical items, or generally equivalent items; one or more cross-reference tables or file identifying cross-referenced items, identical items or generally equivalent items; one or more codes corresponding to cross-referenced items, identical items or generally equivalent items; and their equivalents." That is, the "converting" must be between an item and another item that is "identical" or "generally equivalent."

43. Claim 28 (and its dependent, claim 29) of the '683 Patent recite the step of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source." This is the function performed by the "means for converting" of '683 claim 3.

44. A UNSPSC code is a ten-digit code that forms part of a hierarchy of objects. UNSPSC codes are described in the production document ePlus0948927-45, "Using the UNSPSC United Nations Standard Products and Services Codes." Commonly, only the first eight digits are used. The eight digits are separated into four pairs of digits. Each pair further refines the hierarchy. The first two digits specify a "segment," which is an aggregation of families of products for analytical purposes. The next two specify a "family, which is a "commonly recognized group of inter-related commodity categories." The third pair specifies a class, which is a "group of commodities sharing a common use or function." The fourth pair, digits 7 and 8, specifies a commodity, which the standard defines as a "group of substitutable products or services."

45. The UNSPSC document cited above gives an example. Segment 44 is for "office equipment, accessories and supplies." Within segment 44, family 12 is for "office supplies." Within family 12, class 19 is for "ink and lead refills." Within class 19, commodity 01 is for "India ink," commodity 02 is for "lead refills" and commodity 03 is for "pen refills." Therefore a UNSPSC code of 44-12-19-03 is for pen refills.

46. Plaintiff's expert Dr. Weaver testified at trial that this "means for converting" and the converting method steps for Configuration Nos. 2, 3, and 5 were met by the capability of RSS to

process UNSPSC codes by allowing a user to do a category search for items that have the same commodity code (the lowest level of the UNSPSC codes) and then allowing a user to substitute one matching item for another matching item from the results of this category search.  Weaver Expert Report on Infringement, dated 5/5/2010 at p.79 ("When a user drills down to the lowest and most specific level in the hierarchy, the user is able to retrieve items that are generally equivalent or substantially similar from the product catalogs."); Weaver Expert Report on Infringement, dated 5/5/2010 at p.82); (Trial Transcript 575:8-20; 622:10-21; 761:3-762:10; 771:24-772:23; 784:2-9).  Specifically, he testified:  "When you use all eight digits, it is a classification for items that are generally equivalent or substitutable. So it's a way of finding similar items."  (Trial Transcript at 612:18-20).

47. RQC, which has replaced RSS, has been modified so that it can search using only the first six digits of a UNSPSC code.

48. The screenshots in Exhibit D show the RSS category searching that allows a user to search down to a commodity level.  In the example set forth in Exhibit D, the user can select between "SURGICAL MASK, CLASSICAL" and "SURGICAL MASK, NURSE."   The screenshots in Exhibit E show the RQC category searching.  In the example set forth in Exhibit E, the user cannot drill down to the commodity level, and is left with the "SURGICAL MASK" results as well as "SHOE COVERS, ELASTIC TOP."  Surgical masks and shoe covers share the same 6 level UNSPSC code, but cannot be considered equivalent, substantially similar, or substitutable.  The screenshots set forth in Exhibit E and below show the removal of the fourth category level from the RQC product:



Ex. E - RQC Screenshot No. 5 (Full screenshot in Exhibit E)

SHAMOS DECLARATION                                                                                    CASE NO.3:09cv620

49. Users may enter eight digits into the Inventory Control module, but the software does not allow users to search for items with the same 8-digit commodity code or base any matching decisions on the last two digits.  Even assuming, as Dr. Weaver did, that an eight-digit UNSPSC code designates generally equivalent items, a six-digit UNSPSC code does not, and ePlus does not seem to contend otherwise.  Code 44-12-19 includes both India ink and lead refills.  A purchaser looking for pencil lead would not be satisfied with liquid ink and would not find those products identical or generally equivalent.

50. The removal of the fourth level (seventh and eighth digits) of the UNSPSC code in the RQC product makes the modification, which is significant, more than colorably different than the RSS product the jury found infringed.  ePlus relied exclusively on the eight digit code at trial.  That means for converting element and all converting steps have been eliminated.

51. The RQC product does not infringe claim 3 of the '683 patent.  RQC lacks a "means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source," having the structure construed by the Court.  Because RQC has replaced RSS in all of the Modified Configurations, and RQC removed the ability to search to the commodity level, the Modified Configurations do not incorporate this means and therefore do not infringe claim 3 of the '683 patent.  Furthermore, just as claim 3 does not infringe based on the removal of the commodity level, the Modified Configurations do not perform the "converting" step of '683 claims 28 and 29 and therefore do not infringe those claims.

52. I am informed that Plaintiff has argued that through the use of Punchout it is possible to search for eight-digit UNSPSC codes at sites other than Lawson (for example at the website of Dell Computer, Inc.) and that such longer codes might constitute the required "means for converting."  I observe that no such argument was made either at trial or in any of Plaintiff's expert reports.  Furthermore, such an off-site use of UNSPSC codes does not conform to the Court's construction for this means element.  First, ePlus has not shown that any such off-site capability is part of any Infringing Configuration.  Second, ePlus has not shown that any such off-site capability is a "non-catalog database," as required by the Court's construction for this

means.  Third, ePlus has not shown that any such off-site capability performs the function given in the Court's construction, namely "converting data relating to a selected matching item and an associated source to data relating to an item and a different source."  In particular, the use of an eight-digit code at a Punchout site does not perform the functgion of converting data relating to a "different source."

53. The lack of a means for converting or converting step is sufficient to show a more than colorable difference with respect to the configurations found to infringe claims 3, 28, and 29 of the '683 patent, versus the Modified Configurations.  As shown below, there are additional substantial differences between the Modified Configurations and the configurations found to infringe these claims which show no infringement and more than colorable differences for more reasons.

<u>**Redesign 3 – Removal of Ability to Include Items from**</u>
<u>**Multiple Punchout Vendors on a Single Requisition**</u>

54. This aspect of the redesign analysis relates to Configurations 3 and 5 and claims 3, 26, 28, and 29 of the '683 patent.

55. Independent claim 3 of the '683 Patent requires "at least two product catalogs containing data relating to items associated with the respective sources," a "means for building a requisition using data relating to selected matching items and their associated source(s)" and a "means for processing the requisition to generate one or more purchase orders for the selected matching items."

56. Independent claims 26 and 28 of the '683 Patent include the steps of "maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources," "building a requisition using data relating to selected matching items and their associated source(s)," and "processing the requisition to generate one or more purchase orders for the selected matching items."

57. Claim 29 of the '683 Patent depends from claim 28.  Therefore, if claim 28 is not infringed by any Lawson configuration, neither is claim 29.

58. I will refer to '683 claims 3, 26, 28 and 29 as the "two-source claims" because each requires the ability to generate a requisition containing items from at least two sources, as contended at trial by Plaintiff's experts Brooks Hilliard and Alfred Weaver.  (Trial Transcript at 551:14-552:3; 762:17-24; 2687:24-2688:8).

59. The jury found that Configuration No. 2 (with RSS) did *not* infringe the two-source claims, but that when Punchout was added (as in Configurations 3 and 5) there was infringement of these claims.  This is significant because ePlus cannot now argue that the two sources come from the Item Master, which was the only item database used by Configuration No. 2.  The jury's infringement finding implicitly requires that there be a second source for items from somewhere other than the Item Master, such as vendor products available through Punchout.

60. RQC is significantly different from RSS because in RQC no requisition can contain items from both Item Master and any Punchout vendor.  Furthermore, in RQC (unlike RSS), no requisition can contain items from two different Punchout vendors.  Therefore, it is no longer possible to generate a requisition containing items from at least two sources based on the Court's claim constructions and the jury findings as adopted by the Court.

61. This is demonstrated by the screenshots shown below.  In RQC, when the user has added item 1017 with the manufacturer code BD to a requisition (which is an item from Item Master) and attempts to access Punchout to search for an item from a different source, the software provides the message, "Punchout items must be on a separate requisition."  RQC will not even allow the user to access Punchout at this juncture.  Screen shots that show the restriction on accessing Punchout in such a circumstance at included in Exhibit F.  Screenshot 6 of Exhibit F, depicted below, shows the restriction on the user from attempting to go to a Punchout vendor once an item from the Item List is on the requisition.



SHAMOS DECLARATION                                                      CASE NO.3:09cv620

Ex. F - RQC Screenshot No. 6 (Full screenshot in Exhibit F)

62. If the user clears the current requisition such that the new requisition is empty, the system will allow the user to access a Punchout site to search for items. That is shown in Exhibit F (screenshots 7-8 – clearing of prior requisition and creation of new requisition with no items) and Exhibit G (Punchout session with new requisition that contains no items from Item Master).

63. Exhibit G illustrates the restrictions that disallow a user from selecting an item from a Punchout vendor and then seeking to requisition an item on the Item Master. The user may start a Punchout session once the requisition is clear. The user selects Dell as the Punchout vendor. A screen message appears informing the user that it is leaving the company website.



Ex. G - RQC Screenshot No. 3 (Full screenshot in Exhibit G)

64. Screenshots 4-5 of Exhibit G illustrate the process of searching at Dell's website and the selection of an item (an Optiplex minitower).

65. Screenshots 6-7 show the user returning to RQC with the selected item appearing on the Lawson requisition.

66. The RQC system will prevent the user from requisitioning a product from the Item Master on the same requisition. Screenshots 8-9 of Exhibit G show the user cannot place items from the Item Master on the same requisition as items from a Punchout vendor. This is a significant change.

SHAMOS DECLARATION                                                                    CASE NO.3:09cv620



Ex. G - RQC Screenshot No. 9 (Full screenshot in Exhibit G)

67.  Not only does the system prevent a user from accessing a Punchout vendor website if there are Lawson Item Master items in the requisition, the system also prevents a user from accessing a second Punchout vendor site if there are items from the first Punchout vendor's site within the requisition.  Exhibit H shows the restrictions placed on a user who attempts to requisition items from two Punchout vendors on a single requisition.  Here, the user has attempted to visit a different Punchout vendor but has received the message, "Each punchout vendor must be on a separate requisition."  The user at this juncture is prevented from visiting another Punchout vendor while any item from a different vendor remains on the requisition.



Ex. H - RQC Screenshot No. 8 (Full screenshot in Exhibit H)

SHAMOS DECLARATION                                                      CASE NO.3:09cv620

68. It is therefore not possible in RQC with Punchout (Modified Configurations 3 and 5) to generate a requisition containing items from at least two sources from two punchout providers. The modifications to the RSS product to prevent such action makes the RQC product more than colorably different from the RSS product as ePlus argued infringement at trial.  That modification is significant.  Additionally, Modified Configurations 3 and 5 do not infringe any of the two-source claims because the combination of RQC and Punchout cannot function as a two source system as required by the claims.

69. I am informed that Plaintiff contends that it is possible to search for items from more than one vendor in Lawson's Item Master database and, using RQC, to generate separate requisitions for selected items of two different vendors.  Plaintiff further contends that even this Modified Configuration still contains the '683 claim 3 elements listed above and performs the steps of '683 claims 26, 28 and 29 and therefore infringes those claims.

70. However, to the extent such a contention is correct, it was also possible in the old Configuration No. 2 using RSS *without* Punchout or EDI.  Yet Configuration No. 2 was only found by the jury to infringe '172 claim 1 and *not* to infringe any '683 claims.  Thus, Plaintiff's logic is inconsistent with the jury's non-infringement findings regarding Configuration No. 2, as adopted by the Court.  Therefore, there is no basis at this time for Plaintiff to assert that RQC, the modified RSS, infringes any '683 claims.

## REBUTTAL TO THE WEAVER DECLARATION

71. The listing in paragraph 16 of the Weaver Declaration, purporting to enumerate the changes made by Lawson to yield the Modified Configurations, is incomplete.  In particular, Dr. Weaver has failed to mention the very changes that render the Modified Configurations non-infringing.  Specifically, he omits discussion of the following:

a)      RQC has no order list.  Therefore, the Modified Configurations do not have the "means for generating an order list" of '172 claim 1.

b)    RQC does not allow a requisition to be created that contains items from Item Master and a Punchout vendor or more than one Punchout vendor.  Therefore, the Modified Configurations do not have the "means for building a requisition using data relating to selected matching items and their associated source(s)" of '683 claim 3 and do not perform the step of "building a requisition using data relating to selected matching items and their associated source(s)" of '683 claims 26, 28 or 29.

c)    RQC does not utilize more than six digits of a UNSPSC code.  Therefore, the Modified Configurations do not have the "means for converting data related to a selected matching item and an associated source to data relating to an item and a different source" of '683 claim 3 and do not perform the step of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source" of '683 claims 28 and 29.

72. These changes were disclosed to ePlus weeks ago, and I understand Dr. Weaver even saw a demonstration of them that correspond to the screen shots provided herewith before he provided his declaration.  Because Dr. Weaver has not considered all of the changes made by Lawson, his opinions concerning colorable differences are deficient.  Further, Dr. Weaver's conclusions in paragraph 17 of the Weaver Declaration are incorrect.

73. In Section VIII.A, Dr. Weaver asserts that the changes made by Lawson are "cosmetic and unrelated to the features that established infringement."  First, Dr. Weaver's opinion on this issue is defective because he has ignored critical changes that avoid infringement.  Second, the changes he labels as "cosmetic" are themselves unrelated to any claim language and are unrelated to Plaintiff's infringement case.

74. In paragraph 19, Dr. Weaver refers to the process of assigning an "order number." He says that "Defendant simply changed the window to call the "order number" a "requisition number,"  First, his statement is false.  The window referred to contains a requisition and nothing else.  Therefore, adding a "requisition number" to the window is truthful and appropriate.  Second, there is absolutely no language in the Infringed Claims that is drawn to an "order

23

number" or the assignment of an "order number." Therefore, the name by which a number may be called and the existence of such a number have no relation to infringement.

75. In paragraph 20, Dr. Weaver asserts that Defendant modified the RSS user interface screens to 're-label' the "My Cart" portion of the screen as 'Requisition Lines'." First, neither Lawson nor I rely on the nomenclature as a basis for concluding that the RQC product is more than colorably different and does not infringe the claims at issue. Further, the jury apparently found that the Lawson shopping cart in the RSS module was an order list, and that items from the cart could be moved to a requisition, which is a separate list of items. In the Modified Configurations, the construct claimed by Dr. Weaver to constitute the shopping cart is the requisition. Items in the supposed shopping cart cannot be moved elsewhere. Therefore, it is truthful and appropriate to label the "My Cart" portion of the screen as "Requisition Lines." Furthermore, there is absolutely no language in the Infringed Claims that is drawn to a shopping cart or the labeling on a shopping cart. Therefore, Dr. Weaver's opinion concerning such labeling bears no relation to infringement.

76. In paragraph 21, Dr. Weaver asserts that "the documentation and tests on the RQC demonstration system indicate that the system's order list functionality remains unchanged. Although Defendant represents that this is 'direct to requisition' functionality, that is a misnomer. The so-called 'Requisition Lines' serve the same function as the Cart. There is no change in functionality." This statement is false in every respect. RQC has no "order list" functionality at all. Selected items located in the search are indeed sent directly to a requisition, so "direct to requisition" is truthful and not a misnomer. Contrary to Dr. Weaver's assertion, there is a critical change in functionality because the order list has been eliminated completely. Dr. Weaver has not pointed to any elements of the Modified Configurations that correspond to the "means for generating an order list" and the "means for building a requisition" elements of '172 claim 1. He is unable to do so because one or the other element is missing. If Dr. Weaver asserts that what is now called the "order list" is really a requisition in disguise, then there is no "means for building a requisition." If Dr. Weaver's position is that what is now called the

requisition is really the order list, then there is no "means for generating an order list."  He cannot have it both ways.  Notably, Dr. Weaver makes no reference to any claim language in paragraph 21, but speaks vaguely of "functionality."  Under the *TiVo Inc. v. EchoStar Corp.* decision, the court must assess the re-designed product against the claims as construed at the trial.  Dr. Weaver does not comply with that requirement.

77. In paragraph 22, Dr. Weaver quotes from Lawson's Requisition Center Training Course for the proposition that "Shopping can include one of the following: searching for items through your internal catalog … shopping through UNSPSC categories, or using a punchout feature (to the vendor catalog) to find items."  This statement does not bear on infringement, and in paragraph 22 Dr. Weaver does not even insist that it does.  He never relates the statement to any claim language or claim constructions, but appears to be arguing that the ability to use UNSPSC "categories" means that the "means for converting" of '683 claim 3 is still present.  It is not.  In UNSPSC, a "category" is indicated by the first six digits of a code.  Items sharing the first six digits are not "cross-referenced items, identical items, or generally equivalent items." Instead, they are a family of items and do not satisfy the Court's construction of the structure of the "means for converting," which requires "one or more non-catalog databases identifying cross-referenced items, identical items, or generally equivalent items; one or more cross-reference tables or file identifying cross-referenced items, identical items or generally equivalent items; one or more codes corresponding to cross-referenced items, identical items or generally equivalent items; and their equivalents."  Dr. Weaver has not even attempted to relate the shortened UNSPSC codes to the claim language as construed.

78. Paragraphs 23-26 are occupied with a discussion of the fact that items entered on a requisition can be modified until the requisition is finalized, or "released."  He then attempts to equate a requisition that has not been finalized to an "order list," and a requisition that has been finalized to a "requisition."  I am advised that since ePlus did not make that contention at trial, it is thus not relevant for this proceeding.  Also, that contention is directly contradictory to the

avowed position that ePlus took during the pending reexamination of the '172 patent, as shown by ePlus's statements in the reexamination quoted above.

79. If Dr. Weaver were correct that an unfinalized requisition is an order list and a final requisition is a requisition, then '172 claim 1 would read on prior art ordering systems and would be invalid.  All prior art ordering systems with which I am familiar (including the Johnson '989 Patent, the King patent, the RIMS system, the P.O. Writer system, SABRE systems, and others) treated requisitions as drafts until they were finalized.  Merely doing so does not create a non-existent distinction between an "order list" and a "requisition."

80. Even if Dr. Weaver is right that an unfinalized requisition is an order list and a final requisition is a requisition, he is still unable to show that the Modified Configurations are infringing.  Claim 1 of the '172 Patent requires both a "means for generating an order list" and a separate "means for building a requisition."  Under Dr. Weaver's theory of finalization, which calls an unfinalized requisition an order list, there is no "means for building a requisition" in the Modified Configurations because the requisition has already been built at the time it is finalized.

81. In Section VIII.B (paragraphs 27-32), Dr. Weaver points to the Lawson disclaimer screen that informs a user of the Punchout feature that he is "about to connect directly to and access" the website of a Punchout partner.  Lawson does not assert that this disclaimer avoids infringement or, indeed, that it has any relevance to infringement.  Therefore, Dr. Weaver's observations and opinions concerning this disclaimer have no bearing on Plaintiff's Motion.

82. Dr. Weaver has ignored Lawson's demonstration of another change that avoid infringement, despite having seen it demonstrated.  In RQC Lawson has disabled the "two source" function.  Specifically, a user is prevented from, not merely warned against, generating a requisition containing items from Item Master and a Punchout vendor or more than one Punchout vendor.

83. The statements in paragraphs 28, 29 and 31 of the Weaver Declaration are incorrect. It is not true that "items from a punchout shopping session continue to be returned to the Lawson system's order list (*e.g.*, Requisition Lines list), just as with the infringing systems having RSS,"

as alleged in paragraph 28.  No such items are returned at all if the requisition is already populated with an item from Item Master or an item from a different Punchout vendor.  Thus, RQC does not operate as RSS did.  For the same reason, it is not true, as alleged in paragraph 29, that "all of the steps of the Punchout process that existed when the Punchout application was used with RSS remain unchanged when Punchout is used with RQC."  It is likewise not true, as alleged in paragraph 31, that "The systems' punchout functionality remains unchanged."  RQC has been changed to be non-infringing.

84. To the extent that Dr. Weaver's opinions are based on the foregoing erroneous statements of fact, they are defective.  I further note that in Section VIII.B, Dr. Weaver has not made reference to any claim language and has not shown in any way why he considers the Modified Configurations to be infringing aside from his blanket but incorrect statement that no "functionality" has been altered.[3]

85. Section VIII.C (paragraphs 33-34) is not supportive of Plaintiff's Motion.  Dr. Weaver asserts that "The Allegedly Modified System Continues To Have The Capability of Generating One or More Purchase Orders From a Single Requisition."  The capability to generate one or more purchase orders from a requisition was present in the Core S3 Procurement system without RSS and without Punchout, which was presented to the jury as Configuration 1.  The jury nevertheless found that Configuration 1 did not infringe any of the Asserted Claims, and the Court adopted these findings.  The jury *only* found Configurations 2, 3 and 5 (RSS with Punchout) were infringing.  The jury did not find any configuration with RSS but without Punchout to be infringing.  Dr. Weaver's logic is thus flawed because its assumptions are inconsistent with the jury verdict and judgment.  My analysis, in contrast, embraces the jury's findings.

86. The demonstration referred to by Dr. Weaver in paragraph 33 establishes only that RQC alone, without Punchout, has the ability to generate one or more purchase orders from a

---

[3] In an apparatus claim, e.g. '172 claim 1, even if it were true that no functionality were changed, that would still not imply infringement because the Plaintiff must still show that all the claimed apparatus elements are present, not simply that the modified device has the same "functionality."

requisition.  That does not render the Modified Configurations (which in that restricted case correspond to a configuration that the jury did not find infringing and/or ePlus did not accuse of infringing) to be infringing.  In RQC with Punchout, it is not possible to generate more than one purchase order from a requisition if Punchout is used for the simple reason that if the Punchout feature is used, a requisition cannot contain items from more than one Punchout vendor, so only one purchase order can be issued for a given source.

87. In footnote 2 to paragraph 33, Dr. Weaver admits that "the purchase order generation capability for the RQC demonstration system was disabled with respect to requisitions for items selected from Punchout shopping sessions," as I have stated.  He goes on, however, to state that "we were able to generate multiple purchase orders from a single requisition with respect to items selected from conducting searches of the catalogs stored in the item master."  However, that capability existed in RSS without Punchout; the jury did not find any such configuration to be infringing.  Further, that capability existed in Core S3 Procurement (IC + RQ + PO); ePlus did not accuse this product of infringing these claims.  Again, Dr. Weaver's analysis assumes facts inconsistent with the verdict and judgment.

88. Section VIII.D (paragraphs 35-40) is devoted to a discussion of UNSPSC codes based on an incorrect recitation of facts.  In paragraph 35, Dr. Weaver states, incorrectly and without offering any basis, that "Disabling the system's capability to drill down to the commodity level does not disable the system's capability to "convert[] data relating to a selected matching item and an associated source to data relating to an item and a different source.'"  Such converting is not possible given the Court's construction of the "means for converting" discussed above.

89. In paragraph 36, Dr. Weaver states that "the demonstrations that we were able to conduct confirmed that a user can convert a selected matching requisition item (*e.g.*, surgical tape) to a different surgical tape item using the UNSPSC cross-referencing capability of the system."  This statement is incorrect.  The fact that two items are both surgical tape cannot be determined from the displayed UNSPSC code.  It is necessary to look at the names of the two items, i.e. "surgical tape," to make such a determination.  ePlus has never contended that the

28

converting elements and steps are met simply by having a search yield products having similar names.

90. In paragraph 38, Dr. Weaver makes essentially the following argument. He says that UNSPSC codes can be associated with items. Further, items that are equivalent will have the same UNSPSC code. He then concludes from these assertions that the "means for converting" is present. But this is not true. He ignores the fact that with a six-digit UNSPSC code, many non-equivalent items will be associated with a given code, and there is no way in general to determine whether any two items are equivalent. The fallacy of Dr. Weaver's argument can easily be seen this way: imagine that the number "1" has been associated with every item in Item Master. If a user searches for "1," then every item will be retrieved. Some of them may be equivalent but most will not be. The number "1" is of no assistance in locating equivalent items. Likewise, the six-digit UNSPSC code, which by definition includes within its scope non-equivalent items, cannot be used to determine if items are equivalent.

91. In paragraph 41, Dr. Weaver states that "the modifications made to RSS to arrive at the RQC application are no more than aesthetic or cosmetic modifications." That is incorrect. Dr. Weaver has ignored the substantive modifications and has not commented on them. He includes no discussion of the significant changes to the source code in RQC as compared to RSS, for example. He has chosen some modifications that even Lawson does not contend are substantive and branded them as "cosmetic." In no instance has Dr. Weaver measured the Modified Configurations accurately against the actual language of the Infringed Claims. Therefore, he has not established that the Modified Configurations fail to be more than colorably different from the Infringing Configurations.

## REBUTTAL TO THE NIEMEYER DECLARATION

92. Fundamentally, the Niemeyer Declaration repeats the same errors that are present in the Weaver Declaration. Further, at no point does Mr. Niemeyer even mention any claim

language and he makes no effort to compare the Modified Configurations with the Infringed Claims.

93. In paragraph 10(a), Mr. Niemeyer asserts that "Defendant did not remove the shopping cart from RQC, but merely renamed the shopping cart ("My Cart") as "Requisition Lines" on the shopping window."  He thus repeats the mistake made by Dr. Weaver on this point.  It is irrelevant whether ePlus cares to call the requisition a shopping cart or vice versa. The fact remains, and this is not disputed by Mr. Niemeyer, that the Modified Configurations do not contain both an order list and a requisition and thus cannot infringe '172 claim 1, which requires both a "means for generating an order list" and a "means for building a requisition." One or the other of these means is not present in RQC, independent of any nomenclature that may be applied to them.

94. In paragraph 10(b), Mr. Niemeyer asserts that "Defendant did not eliminate the order list.  The same data structures that held the order list in RSS still exist in RQC and still hold the data selected by the user to be added.  Again Defendant merely renamed the 'Order' number on the shopping window to 'Requisition' number, but the underlying data structures are the same." Even if this statement is taken to be true, it is of no import.  If Mr. Niemeyer is correct that the "order list" remains present in RQC (he is not correct), there is then no requisition in RQC.  If RQC is deemed to have a requisition, then it does not have an order list.  Neither Dr. Weaver nor Mr. Niemeyer even pretend to show how both an order list and a requisition might be present in the Modified Configurations (other than the argument, discredited above, that a non-final requisition is in fact an order list, contrary to the statements made by ePlus in the '172 reexamination).

95. In paragraph 10(c), Mr. Niemeyer asserts that "Information about desired products from a search are transferred to the same data structures as were transferred to in RSS."  Even if this statement is taken to be true, it is of no significance.  Nowhere is there mention in any of the Infringed Claims of any "data structure."  Furthermore, the Court's construction of the means elements of '172 claim 1 does not make reference to any "data structure."  It is irrelevant

whether RQC uses the same data structure as RSS for certain purposes provided that the resulting Modified Configurations become non-infringing.  They are non-infringing because RQC does not include both a means for generating an order list and a means for generating a requisition, as required by the Infringed Claims (claim 1 of the '172 patent).

96. In paragraph 18, Mr. Niemeyer states that "UNSPSC numbers can still be defined down to the commodity level."  By "defined," Mr. Niemeyer appears to mean "entered."  That statement is of no significance to infringement.  It does not matter whether a user can enter a UNSPSC code into a database.  What matters for infringement purposes is whether the Modified Configurations possess the "means for converting" of '683 claim 3 or perform the step of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source" of '683 claims 28 and 29.  The Modified Configurations do not do so because they have been rendered unable to search for or otherwise process the "commodity" portion (the 7th and 8th digits) of a UNSPSC code.  Therefore, there is no "means for converting" and the claimed "converting" steps are not performed, as explained above in connection with the discussion of Section VIII.D of the Weaver Declaration.

97. In paragraph 19, Mr. Niemeyer states that "The functions of the Requisitions module ("Requisitions") are the same.  Requisitions still allows users to request items from vendors for themselves or for their department."  These statements, even if true, are irrelevant.  The non-infringing Configuration 1 produced requisitions.  The fact that RQC allows the generation of requisitions does not render the Modified Configurations infringing.  In fact, the RQC product re-introduces the functionality of the Requisitions model that sent selected items directly to a requisition as opposed to an intermediate order list.  Mr. Niemeyer has conflated the concept of an order list and a requisition and seems to be asserting that the requisition and the order list are the same thing even though ePlus expressly stated in the '172 reexamination that they are not the same.

98. In paragraph 20, Mr. Niemeyer states that "The functions of the Requisitions module ("Requisitions") are the same.  Requisitions still allows users to request items from vendors for

themselves or for their department."  It is not true that the functions of RQC are the same as those of RSS.  The ability to produce a requisition containing items from Item Master and a Punchout vendor or two Punchout vendors has been removed.  Therefore the requisition functions are not the same.

99. In paragraph 21, Mr. Niemeyer states that "The RQC application serves the same purpose in the RQC Configurations as did RSS, namely to provide a more user-friendly overlay to the Inventory Control, Requisitions, and Purchase Order modules."  This statement, even if it were true, is irrelevant.  The "purpose" of an element does not matter if the functionality relied on to establish infringement is removed or modified in such a way to avoid infringement.  In fact, RQC serves a more limited purpose than RSS because the functions of RSS that were found by the jury to be infringing have been removed.

100.    In paragraph 22, Mr. Niemeyer states that "As with RSS, RQC still also allows users to search for items in the Item Master by keywords or by product categories, as defined by the UNSPSC, to locate desired items."  This statement is of no import.  There is no claim element or step that is infringed by a search capability for a "product category" or "keyword" unless the system performs the required function of converting data relating to selected matching items to items that are cross-referenced, identical or general equivalent..  RQC has been modified so that searching by commodity code is no longer possible.  This has removed the "means for converting," whose structure the Court construed as "one or more non-catalog databases identifying cross-referenced items, identical items, or generally equivalent items; one or more cross-reference tables or file identifying cross-referenced items, identical items or generally equivalent items; one or more codes corresponding to cross-referenced items, identical items or generally equivalent items; and their equivalents."  By eliminating the ability to search by commodity code, Lawson has made it impossible to search for generally equivalent items.

101.    In paragraph 23, Mr. Niemeyer states that "The S3 SCM suite still includes the Procurement Punchout application.  The Procurement Punchout application ("Procurement Punchout") in the RQC Configurations performs the same function."  This statement is not true.

RQC does not allow a requisition to be created from two sources or vendors if one of the vendors is a Punchout vendor. Non-infringing Configuration 1 allowed a requisition to be created with items from two sources if all the items were from Item Master. RQC continues to allow this non-infringing mode of operation but has disabled the ability to create requisitions having items from a Punchout vendor and any other source.

102. Section V.B of the Niemeyer Declaration (paragraphs 24-26) deals with "General Software Architecture" but is irrelevant. The Infringed Claims do not recite any particular architecture as one of ordinary skill would understand that term, so it is immaterial whether the general architecture has been changed or not.

103. Section V.C of the Niemeyer Declaration (paragraphs 27-28) is likewise irrelevant. It relates to the server-side architecture of RQC. However, the Infringed Claims do not recite any architecture as one of ordinary skill would understand that term, so it does not matter whether any "architecture" has been modified.

104. Section V.D of the Niemeyer Declaration (paragraph 29-32) deals with "Category Search Functionality." In paragraph 30, Mr. Niemeyer concedes that "the user is only permitted to drill down to the third level in the [UNSPSC] hierarchy." However, that is a critical change because it makes it impossible for a user to search for generally equivalent items. Therefore, the fact that "all the code for performing searches at the fourth level and returning items to be displayed is still in both the portal and server-side source code" is irrelevant because Mr. Niemeyer admits that it has been disabled and therefore the former searching capability no longer exists.

105. Section V.E of the Niemeyer Declaration (paragraphs 33-34) deals with "Keyword Search." In paragraph 33, Mr. Niemeyer states, "As with RSS, the Keyword Search functionality of RQC allows the user to view a list of items matching search terms entered by the user." This capability was present in non-infringing Configuration 1. The ability to search a catalog by keyword long predates the Patents and of course is part and parcel of using a catalog. (Even the 1897 Sears Catalog had a keyword index.) Keyword search of Item Master

(Configuration 1) was found to be non-infringing.  Keyword search in RQC cannot be performed on both Item Master and a Punchout vendor's catalog or simultaneously on two Punchout vendors' catalogs.  Therefore the Keyword Search capability cannot be used to perform the step of "converting."

106.    Section V.F of the Niemeyer Declaration (paragraphs 35-41) deals with "Addition of Items to Shopping Cart."  Mr. Niemeyer asserts that the same code now used in RQC to create the requisition was used in RSS to create an order list.  This assertion is irrelevant because RQC no longer embodies both an order list and a requisition as RSS did.  It is irrelevant how various constructs in the source code are named, e.g., whether a data structure is called a "shopping cart" or not.  There is no claim in the Patents to naming conventions.  What matters is whether the Modified Configurations continue to infringe the Infringed Claims, and they do not.  Mr. Niemeyer has not provided any analysis comparing the Modified Configurations to any particular claim.

107.    Likewise, statements made in Section V.F to the effect that certain modifications involved only a small number of lines of source code are irrelevant.  What matters is not the extent of the changes but whether the infringing elements or steps have been removed.

108.    Section V.G of the Niemeyer Declaration (paragraphs 42-46) deals with "Requisition Creation."  Mr. Niemeyer states in Paragraph 43 that "The checkout() function invokes the same functionality as before."  This statement is irrelevant.  Mr. Niemeyer has ignored the fact that other code, not in the checkout() function itself, prevents RQC from infringing by restricting the requisition to contain only items from Item Master or from a single Punchout vendor, and not both.  That code is invoked even before the checkout() procedure is executed.

109.    Section V.H of the Niemeyer Declaration (paragraphs 47-48) deals with "Purchase Order Generation."  In paragraph 47, Mr. Niemeyer states that "there do not appear to be any changes to purchase order generation that would eliminate the ability to generate multiple purchase orders from a single requisition."  In paragraph 48, he states that "Defendant has not

inserted any code to prevent the Purchase Order Generation program (PO100) from generating multiple purchase orders when a requisition includes items from different vendors." This analysis is inconsistent with the verdict and judgment. RSS in Configuration 2 (in relation to the '683 claims), which allowed multiple purchase orders to be generated from a requisition all of whose entries came from Item Master, was found to be non-infringing. The jury found infringement only when Punchout was added. Lawson has restricted the content of requisitions in RQC so that a requisition cannot contain items from Item Master and a Punchout vendor or from more than one Punchout vendor. Because of this restriction, it was not necessary for Lawson to modify the purchase order generation module. In other words, Mr. Niemeyer in conducting his examination chose to look only in places where no changes would be expected or necessary and, finding no changes in those places, has pronounced RQC to perform in the same way. Had he looked where the actual changes were made, he would have found the infringing functions disabled.

110. Section V.I of the Niemeyer Declaration (paragraphs 49-51) deals with "Lawson Procurement Punchout." In paragraph 50, Mr. Niemeyer concedes that "Defendant now prevents users from mixing items selected during a Punchout session with items from other punchout vendors." That change, which Mr. Niemeyer trivializes, is critical. It renders the Modified Configurations equivalent to non-infringing Configuration 2 with respect to Item Master or a single Punchout vendor.

111. I note that nowhere in the Niemeyer Declaration does Mr. Niemeyer offer the opinion that the Modified Configurations infringe any Infringed Claim nor does he offer the opinion that the Modified Configurations are not more than colorably different from the Infringing Configurations.

## CONCLUSIONS

112.   The Modified Configurations are more than colorably different from the Infringing Configurations.

113.   None of the Modified Configurations infringes claim 1 of the '172 Patent.

114.   None of the Modified Configurations infringes claims 3, 26, 28 or 29 of the '683 Patent.

115.   Lawson's Design Around avoids infringing the Infringed Claims.

Executed on September 19, 2011, in Pittsburgh, PA.

Michael Ian Shamos, Ph.D., J.D.

36

**Exhibit A**
**Materials Considered**

Declaration Of Alfred C. Weaver, Ph.D. In Support Of Plaintiff's Motion To Show Cause Why Defendant Should Not Be Held In Contempt Of The Court's Permanent Injunction, and Exhibits thereto

Declaration Of Patrick Niemeyer Regarding Lawson Software, Inc.'s Requisition Center

Plaintiff *eP*lus Inc.'s Brief In Support Of Its Motion To Show Cause Why Lawson Software, Inc. Should Not Be Held In Contempt Of The Court's Permanent Injunction
And Request For Expedited Briefing

Plaintiff *eP*lus Inc.'s Motion To Show Cause Why Lawson Software, Inc. Should Not Be Held In Contempt Of The Court's Permanent Injunction And Request For Expedited Briefing

Presentation, "Dean_Hager ePlus_Message_2.0"

Presentation, "Dean Hager Introduces Lawson Requisition Center -20110603"

Reexamination history of '172 patent, Reexamination Control No. 95/000,487

Screen shots prepared in preparation for demonstration of RQC to ePlus, Inc.

*Tivo, Inc. v. Echostar, Inc.*, (Fed. Cir. April 20, 2011)(en banc)

Trial transcript of ePlus, Inc. v. Lawson Software, Inc.

Video of RQC demo conducted August 22, 2011

Video, "Requisition_Center"

Video, "RQC_Overview"