# EXHIBIT 5

Docket No.: EPL-002REX1
(PATENT)

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| |
|---|
| In re Reexamination of: |
| U.S. Patent 6,505,172 |
| |
| Control No.: 95/000,487 |
| |
| Filed: August 21, 2009 |
| |
| For:   ELECTRONIC SOURCING SYSTEM |

Confirmation No.: 8473

Art Unit: 3992

Examiner: J. R. Pokrzywa

## RESPONSE TO NON-FINAL OFFICE ACTION

MS *Inter Partes* Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Dear Sir:


     *Inter Partes* reexamination of U.S. Patent 6,505,172 was ordered October 23, 2009. Concurrently with the Order, an Office Action rejecting claims 1-5 was issued by the Office.  The Patent Owner submits the following arguments demonstrating patentability of claims 1-5 of U.S. Patent 6,505,172 in response to the Office Action dated October 23, 2009.

## REMARKS

U.S. Patent 6,505,172 issued with claims 1-5, each of which are under reexamination. The third party requester asserted seven grounds of rejection. The Patent Owner asserts that each ground of rejection proposed by the third party requester is deficient and fails to render any of claims 1-5 unpatentable. The Examiner has adopted the rejections proposed in Grounds 1, 2, 4 and 7. As the Examiner has not adopted the rejections proposed in Grounds 3, 5 and 6, these proposed rejections are not addressed in this response. The Examiner raises two additional grounds of rejection - Grounds 8 and 9. For the reasons set forth below, the rejections asserted in Grounds 1, 2, 4 and 7-9 are deficient. The Patent Owner therefore requests that the asserted rejections be reconsidered and withdrawn for at least the reasons set forth below.

## I.      THE BROADEST REASONABLE INTERPRETATION OF CLAIMS 1-5

Analysis of claims 1-5 of the '172 Patent requires a proper interpretation of several claim terms. Brooks L. Hilliard, an expert in the general field of computerized systems and the specific field of electronic sourcing systems, has considered the rejections set forth in the Office Action and has offered his opinions with respect to the bases for the rejections in the attached declaration. (Attached as Exhibit 1.) Mr. Hilliard sets forth the broadest reasonable interpretation of several of the claim terms as such terms would have been interpreted by one of ordinary skill in the art. *See* Hilliard Decl. ¶ 43. The broadest reasonable interpretation of several claim terms are set forth below.

- **Electronic Sourcing System:** An electronic system for use by a prospective buyer to locate and find items to purchase from sources, suppliers, or vendors. *See* Hilliard Decl. ¶ 43.B.

- **Requisition:** a formal request to purchase something. *See* Hilliard Decl. ¶ 43.C.

- **Purchase Order:** a commission or instruction to buy something. *See* Hilliard Decl. ¶ 43.D.

- **Source:** when used as a noun, a supplier, vendor or distributor of products or services. *See* Hilliard Decl. ¶ 43.E.

Control No. 95/000,487                                   3                          Docket No.: EPL-002REX1
Response dated 1/25/10
Patent Owner Reply to Office Action of October 23, 2009

The claims further include several elements that use the term "means" and define the

function of the element.  These elements should be construed under 35 U.S.C. § 112, sixth

paragraph, to include structure in the patent specification corresponding to the function and their

structural equivalents.  The means-plus-function elements of the claim with their appropriate

constructions are set forth below.  (*See* Hilliard Decl. ¶ 48).

**Claim 1:**         **means for entering product information that at least partially describes at least one desired item**

    **Function:**     entering product information that at least partially describes at least one desired item.

    **Exemplary corresponding structure, material and acts:**  a computer which is programmed with special-purpose software modules to execute an algorithm which includes the step of receiving certain fields of entered information (*e.g.*, catalog number, part number, partial text, etc.) to at least partially describe at least one desired item, and structural equivalents thereof.  *See, e.g.*, '172 Patent, Col. 5:24-Col. 6:27; Col. 7:66-Col. 8:37; Col. 8: 45-62; Col. 12: 6-28; FIGS. 1-2; Appendix VII.

**Claim 1:**         **means for searching for matching items that match the entered product information in the selected portions of the database**

    **Function:**     searching for matching items that match the entered product information in the selected portions of the database.

    **Exemplary corresponding structure, material and acts:**  a computer which is programmed with special-purpose software modules including a search engine module to execute an algorithm which includes the steps of: (1) receiving the entered product information relating to item(s) to be searched; (2) communicating the entered product information to a search engine module; (3) querying certain fields of the item data to locate item records in the selected portions of the database matching the entered product information; and (4) outputting a hit list of items matching the entered product information; and structural equivalents thereof.  *See, e.g.*, '172 Patent, Col. 4:10-14; Col. 6:4-27; Col. 7:66-Col. 8:37; Col. 8:45-Col. 10:21; Col. 12:6-41; Figs. 1A, 1B; 1C, 2; Appendix III, Appendix VII.

**Claim 1:**         **means for generating an order list that includes at least one matching item selected by said means for searching**

    **Function:**     generating an order list that includes at least one matching item selected by a search engine program.

**Exemplary corresponding structure, material and acts:**  a computer which is programmed with special-purpose software modules to execute an algorithm which includes the steps of:  (1) displaying a hit list of results of a search corresponding to items matching the entered product information; (2) selecting one or more matching items from the hit list for inclusion in an order list; and (3) generating an order list containing data relating to the selected matching items; and structural equivalents thereof.  *See, e.g.*, '172 Patent, Col. 9: 51-Col. 10:44; Col. 10:66-Col. 12:2; Col. 12:42-57; Col. 17:55-Col. 18:10; Col. 18:43-50; Appendix III; Appendix VI; FIGS. 1A, 1B, 1C.

**Claim 1:**     **means for building a requisition that uses data obtained from said database relating to selected matching items on said order list.**

**Function:**     building a requisition that uses data obtained from a database relating to selected matching items on an order list.

**Exemplary corresponding structure, material and acts:**  a computer which is programmed with special-purpose software modules including a requisition module to execute an algorithm which includes the steps of:  (1) transferring data relating to selected matching items included on an order list to a requisition program; and (2) building a requisition using data relating to the selected matching items on the order list to populate certain fields on a requisition form; and structural equivalents thereof.  *See, e.g.*, '172 Patent, Col 1:15-40; Col. 10:22-44; Col. 12:52- Col. 14:14; Appendix I, Appendix II, Appendix VI, Appendix VIII, Appendix IX; FIGS. 1-3.

**Claim 1:**     **means for processing said requisition to generate purchase orders for selected matching items**

**Function:**     processing the requisition to generate purchase orders for selected matching items.

**Exemplary corresponding structure material and acts:**  a computer which is programmed with special-purpose software modules including a purchasing module to execute an algorithm which includes the steps of: (1) accepting the requisition; (2) generating purchase orders based on the data included in the requisition related to the selected matching items on the order list and based on predetermined rules relating to the user's preference (*e.g.*, one purchase order to each distinct supplier referenced in the requisition); and structural equivalents thereof.  *See, e.g.*, '172 Patent, Col. 1:15-40; Col. 10:53-65; Col. 15:39-Col. 16:4; Col. 18:6-16; Col. 18:54-67; FIGS. 1-3.

**Claim 2:**     **means for searching the database for segments of data relating to items associated with a vendor that contain vendor items that match the product information for said at least one desired item.**

**Function:**    searching the database for segments of data relating to items associated with a vendor that contain vendor items that match the product information for at least one item.

**Exemplary corresponding structure, material and acts:**  a computer which is programmed with special-purpose software modules including a search engine module to execute the steps of: (1) querying certain fields of the item data to locate item records in the selected portions of the database having segments of data matching the entered product information; and (2) outputting at least one matching item associated with a vendor; and structural equivalents thereof.  *See, e.g.*, '172 Patent, Col. 5:66-Col. 6:27; Col. 8:7-37; Col. 9:7-54; Col. 10:66-Col. 11:31; Col. 12:6-33; Col. 18:43-49; Appendices III-V, Appendix VII; FIGS. 1-2.

**Claim 2:**       **means for generating a hit list of such vendor segments.**

**Function:**    generating a hit list of vendor segments.

**Exemplary corresponding structure, material and acts:**  a computer which is programmed with special-purpose software modules to execute an algorithm which includes the steps of: (1) querying certain fields of the item data to locate item records in the selected portions of the database having segments of data matching the entered product information; and (2) outputting a hit list (*i.e.*, a list of segments of data that include a match to the designated search criteria) of at least one matching item associated with a vendor; and (3) displaying a hit list screen which includes at least one vendor item having segment(s) of data matching the entered product information; and structural equivalents thereof.  *See, e.g.*, '172 Patent, Col. 5:66-Col. 6:27; Col. 8:7-37; Col. 9:7-54; Col. 10:66-Col. 11:31; Col. 12:6-33; Col. 18:43-49; Appendices III-V, Appendix VII; FIGS. 1-2.

**Claim 2:**       **means for selectively viewing the vendor segments identified for said hit list.**

**Function:**    selectively viewing the vendor segments identified for the hit list.

**Exemplary corresponding structure, material and acts:**  a computer which is programmed with special-purpose software modules to execute an algorithm which includes the steps of: (1) displaying a hit list screen which includes segments of data for items associated with vendors that match the entered product information; and (2) selecting one or more of such segments of data to view in greater detail; and structural equivalents thereof.  *See, e.g.*, '172 Patent, Col. 5:66-Col. 6:27; Col. 8:7-37; Col. 9:7-54; Col. 10:66-Col. 11:31; Col. 12:6-41; Col. 18:43-49; Appendices III-V, Appendix VII; FIGS. 1-2.

**Claim 2:**       **means for selecting desired items from a vendor segment identified by said hit list.**

**Function:**      selecting desired items from a vendor segment identified by the hit list.

**Exemplary corresponding structure, material and acts:**  a computer which is programmed with special-purpose software modules to execute an algorithm which includes the step of  transferring data relating to selected vendor segments included on a hit list to a requisition program; and structural equivalents thereof.  *See, e.g.*, '172 Patent, Col. 1:15-40; Col. 10:22-44; Col. 12:52-Col. 14:14; Appendix I; Appendix II; Appendix VI; Appendix VIII; Appendix IX; FIGS. 1-3.

**Claim 4:**      **means for determining the applicable price of a selected matching item.**

**Function:**      determining the applicable price of a selected matching item.

**Exemplary corresponding structure, material and acts:**  a computer which is programmed with special-purpose software modules to execute an algorithm which includes the steps of:  (1) searching a database with data relating to the applicable prices of items offered for sale by a supplier/vendor to determine the applicable price of a selected matching item offered for sale by the supplier/vendor; and (2) receiving data communicated back from the database relating to the applicable price of a selected matching item offered for sale by the supplier/vendor; and structural equivalents thereof.  *See, e.g.*, '172 Patent, Col. 4:15-30; Col. 5:1-13; Col. 14:14-Col. 15:27; Col. 16:16-44; Col. 17:56-62; Col. 18:32-42; Col. 18:49-55; Appendices II, VIII, IX; X; FIGS. 1 and 3.

**Claim 5:**      **means for determining whether a selected matching item is available in inventory.**

**Function:**      determining whether a selected matching item is available in inventory.

**Exemplary corresponding structure, material and acts:**  a computer which is programmed with special-purpose software modules to execute an algorithm which includes the steps of:  (1) searching a database with data relating to the availability of items in a supplier's/vendor's inventory to determine the availability of a selected matching item in the supplier's/vendor's inventory; and (2) receiving data communicated back from the inventory database relating to the availability of a selected matching item in the supplier's/vendor's inventory; and structural equivalents thereof.  *See, e.g.,* '172 Patent, Col 4:15-30; Col. 5:1-13; Col. 14:14-Col. 15:27; Col. 16:16-44; Col. 17:56-62; Col. 18: 32-42; Col. 18: 49-55; Appendices II, VIII, IX; X; FIGS. 1 and 3.

For the reasons discussed below, the rejections adopted in the Office Action fail to properly consider the broadest reasonable interpretation of the claims terms as set forth above.

## II.   SEVERAL APPLIED REFERENCES FAIL TO QUALIFY AS PRINTED PUBLICATIONS

### A.   Requirements of a Printed Publication

"Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' bar under 35 U.S.C. § 102(b)."  *In re Hall*, 781 F.2d 897, 898-99, 228 U.S.P.Q. 453, 455 (Fed. Cir. 1986).  "A given reference is 'publicly accessible' [only] upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the art exercising reasonable diligence, can locate it."  *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1378, 78 U.S.P.Q.2d 1684, 1687 (Fed. Cir. 2006); *see also In re Cronyn*, 890 F.2d 1158, 1159-60, 13 U.S.P.Q.2d 1070, 1072-73 (Fed. Cir. 1989); *Preemption Devices, Inc. v. Minnesota Mining & Mfg. Co.*, 732 F.2d 903, 221 U.S.P.Q. 841 (Fed. Cir. 1984); *see also* M.P.E.P. § 2128 (8th Ed., Rev. 6, 2007).

The burden of proof on the question of whether the applied references are printed publications rests on the examiner.  *In re Hall*, 781 F.2d at 899, 228 U.S.P.Q. at 455 ("The *proponent of the publication bar* must show that prior to the critical date the reference was sufficiently accessible, at least to the public interested in the art . . . .") (emphasis added).  Thus, the initial burden of establishing that a reference was "publicly accessible" so as to constitute a prior art printed publication lies with the examiner.  *Id.*  Where the examiner has merely relied on the Requester's allegations and speculation, the examiner fails to establish public accessibility.  *See Ex parte Natale*, 11 U.S.P.Q.2d 1222, 1226 (Bd. Pat. App. & Int. 1989).

The essential requisites for a "printed publication" under 35 U.S.C. § 102 are that the document be: (1) a *work of public character* intended for general use; and (2) *within reach of the relevant public (i.e., persons of ordinary skill in the relevant art).*

It is well-settled that in order for a work to be one of a "public character," "the work must be intended and employed for the communication of ideas to persons in general, as distinguished from particular individuals.  Private communications, even if printed, do not fall

within this description, whether designed for the use of single persons or of a few restricted groups
or persons.  In other words, the work must have been actually published in such a manner that
anyone who chooses may avail himself of the information it contains."  *See* 1 W. Robinson, *The
Law of Patents* §§ 325-326 at 446-48 (1890).

     Where a work could have been located only by one having been informed of its
existence, and not by means of customary research aids available at the relevant time, the
probability of knowledge of the work by the relevant public is virtually nil and, as a result, such a
work cannot constitute a "printed publication" under the patent laws.  *See SRI Int'l Inc. v. Internet
Security Sys. Inc.*, 511 F.3d 1186, 85 U.S.P.Q.2d 1489 (Fed. Cir. 2008) (posting of paper on
electronic FTP server insufficient to demonstrate public accessibility absent an index, catalogue or
other tools for customary and meaningful research); *In re Cronyn*, 890 F.2d at 1159-60, 13 U.S.P.Q.
at 1071-72 (although copies of theses were filed in the main college library and were indexed by
author's name, the theses did not constitute "printed publications," because they were not
reasonably accessible to the public since the only research aid available to locate them was the
author's name which bears no relationship to the subject matters of the theses); *Preemption Devices*,
732 F.2d at 906, 221 U.S.P.Q. at 843 (the dissemination of only six copies of article at issue was
insufficient to render such article a "printed publication"); *In re Bayer*, 568 F.2d 1357, 1360-62, 196
U.S.P.Q. 670, 673-675 (C.C.P.A. 1978) (graduate thesis deposited in university library but
uncatalogued was not a "printed publication" within meaning of 35 U.S.C. § 102 since the thesis
could only have been located in the library by one having been informed of its existence by the
author or the faculty dissertation committee, and not by means of the customary research aids
available).

     Moreover, documents disseminated under conditions of confidentiality or to a closed
group are not "printed publications" under § 102 because they are not accessible to the relevant
public.  *See, e.g.*, *Garrett Corp. v. United States.*, 422 F.2d 874 (Cl. Ct. 1970) (distribution of 80
copies of report within government agencies to government personnel does not constitute
publication); *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 936-37, 15 U.S.P.Q.2d
1321, 1324-25 (Fed. Cir. 1990) (government documents including legend "reproduction or further

dissemination is not authorized...not for public release" could not constitute "printed publications" for use as prior art); *IMX, Inc. v. Lendingtree, LLC*, 405 F. Supp.2d 479, 491 (D. Del. 2005) (a user manual for a software program and computer system did not constitute prior art because it was designated "Highly Confidential" and there was no proof that it was sufficiently accessible to the public to constitute a "printed publication"); *Aspex Eyewear, Inc. v. Revolution Eyewear, Inc.*, No. CV99-1623LGB(BQRX), 2001 WL 34852696 (C.D. Cal. Jun. 4, 2001) (drawing made at meeting not printed publication as no evidence that non-participants had seen drawing and, despite lack of confidentiality agreement, author expected meeting participants to refrain from disclosing ideas and drawing to those in the relevant industry); *Allied Tube and Conduit Corp. v. John Maneely Co.*, 125 F. Supp.2d 987, 990 (D. Ariz. 2000) (letter and price list both stamped confidential sent to 20-30 distributors was not accessible to the interested public); *Aluminum Co. of Am. v. Reynolds Metals Co.*, 14 U.S.P.Q. 1170 (N.D. Ill. 1989) (distribution of 33 copies of progress letter to Navy with export control notice was not publicly accessible because letter was treated by recipients as confidential); *Mead Digital Systems, Inc. v. A.B. Dick Co.*, 521 F. Supp. 164, 182, 213 U.S.P.Q. 328, 341-42 (S.D. Ohio 1981) (unclassified report distributed under confidential cover to persons and organization in the relevant field was not publicly accessible), *aff'd on other grounds,* 723 F.2d 455, 221 U.S.P.Q. 1035 (6th. Cir. 1983); *de Graffenried v. United States*, 20 Ct. Cl. 458, 16 U.S.P.Q.2d 1321 (Cl. Ct. 1990) (unclassified report available only to registered users of the Defense Technical Information Center (DTIC) was not printed publication where document was shown to only be available through the cumbersome request procedures of the DTIC); *In re George*, 2 U.S.P.Q.2d 1880 (Bd. Pat. App. & Int. 1987) (research reports released only to research institute's members were not printed publications because members were aware of institute's policy of confidentiality, even though the policy was not specifically stated in writing).

B.     Failure to Show Applied References Qualify as Printed Publications

The Examiner has failed to establish that several of the cited manuals were "publicly accessible" such that the manuals qualify as printed publications under 35 U.S.C. § 102. There is no evidence that the J-CON Manual, P.O. Writer Plus Guided Tour Manual or the Gateway 2000/MRO Manual were publicly disseminated or made available to the extent that persons of ordinary skill in

the art exercising reasonable diligence could locate them.  The authors of these manuals did nothing to make these manuals works of a "public character."  Rather, these manuals were designed for the use of a restricted group, *i.e.* those who licensed the associated computer software.  *See* Hilliard Decl., ¶ 36; *see also In re Hall*, 781 F.2d at 899, 228 U.S.P.Q. at 455 ("The probative value of routine business practice to show the performance of a specific act has long been recognized.").

The authors of the J-CON Manual, the P.O. Writer Manual and the Gateway 2000/MRO Manual did not act to disseminate or otherwise make these manuals available.  Instead, the evidence shows that they acted to maintain these manuals as confidential and restricted access to them.

In the only case of which Patent Owner is aware that directly addresses whether manuals for a software system qualify as printed publications, the court held that absent any proof in the record that the manual was sufficiently accessible to the public, the manual was not a printed publication.  *IMX, Inc. v. Lendingtree, LLC.*, 405 F. Supp.2d 479, 491 (D. Del. 2005).  This case is directly on point.  There is no evidence in the record of this reexamination proceeding that the cited manuals were sufficiently accessible to the public.

As discussed in detail below, the J-CON Manual, the P.O. Writer Plus Guided Tour Manual and the Gateway 2000 MRO Manual relied upon by the Examiner do not qualify as "printed publications" under 35 U.S.C. §§ 102 and 301.  These references are thus not available as the basis of a rejection in this reexamination proceeding.

## III.   THE ASSERTED GROUNDS OF REJECTION FAIL TO RENDER CLAIMS UNPATENTABLE

### A.   Ground #1 – Doyle Fails to Anticipate Claims 1-5

Claims 1-5 stand rejected under 35 U.S.C. § 102(e) as allegedly anticipated by U.S. Patent 5,694,551 issued to Doyle *et al.* (the "Doyle Patent").  Claims 1-5 are directed to an electronic sourcing system.  Doyle does not teach or suggest *items associated with at least two vendors* and does not teach or suggest *means for processing* a *requisition to generate purchase orders* as set forth by claim 1.  For at least these reasons, the Doyle Patent does not anticipate Claims 1-5.

The Doyle Patent relates to a data processing network to handle aspects of customer orders that are channeled to a central supplier and filled by departments of the central supplier or by outside vendors, as determined by the central supplier.  The central computer at the central supplier's location handles the data processing requirements for customer orders, routes those orders to appropriate departments within the central supplier or to outside vendors, handles the delivery of the ordered products to the customers, handles all aspects of invoicing and payment and performs customer assistance functions.  The central supplier's computer system, rather than the customer's computer system, processes requisition item information and segregates that information into an order to be fulfilled by the central supplier or by individual vendors.  *See, e.g.*, Col. 3:59-Col. 4:20.  Thus, the system described in the Doyle Patent is not an electronic sourcing system at all, as required by claim 1 of the '172 patent because the central supplier, rather than the customer, makes all sourcing determinations for a customer's requirements.  *See* Hilliard Decl. ¶ 54.

Moreover, there is no teaching or suggestion of the ability of the customer to search a database for items associated with multiple vendors or to select particular vendors to source desired items.  Using the system disclosed in the Doyle Patent, the central computer at the central supplier's facility receives requisitions created on the customer's computer, rather than (as claimed in the '172 patent) providing means by which customers use the database to search for matching items of multiple suppliers, generate an order list, build a requisition and process the requisition to generate purchase orders to different suppliers.  The Doyle Patent instead discloses a system that would operate such that once the customer submits a requisition to the central supplier, the customer is out of the loop.  The customer has no capability to decide from which vendor he wishes to purchase a desired product, in contrast to the claimed inventions of the '172 Patent.  Moreover, the system disclosed in the Doyle Patent only includes a single item catalog 136 accessible to a customer and that item catalog 136 does not include an indication of multiple sources from which items may be sourced.  The sourcing determinations cannot be made by the customer, but rather must be performed by the central computer at the central supplier's facility.  *See, e.g.*, Doyle Patent, Col. 5:21-36, Hilliard Decl. ¶55.

The Doyle Patent fails to anticipate claim 1 of the '172 Patent because the Doyle Patent is not an "electronic sourcing system" as required by claim 1. A prospective customer has no capability to determine the source from among multiple sources for a desired item. Rather, all customer requirements (as expressed in a completed requisition) are sent to a single central supplier. Moreover, the Doyle Patent fails to disclose or suggest a database containing data related to items "associated with at lest two vendors" or any "means for processing a requisition to generate purchase orders" as recited by claim 1. *See* Hilliard Decl. ¶ 56.

The item catalog 136 which is accessible by the customer does not include item data "associated with at least two vendors;" there is no indication of multiple sources from which desired items may be sourced. Rather, all requisitions are routed to the central computer at the central supplier. Doyle Patent, Col. 5:21-36. Thus, the customer may only source items from a single source, the central supplier. The customer has no capability to comparison shop among items offered by multiple suppliers as is the case with the systems of the claimed inventions (even in those cases where, using the systems described in the Doyle Patent, the requisitioned items are ultimately purchased from a vendor other than the central supplier, the comparisons associated with such a decision are made by the central supplier's computer, not the customer). The Doyle Patent thus teaches away from the systems of the claimed inventions. *See* Hilliard Decl. ¶ 57.

The customer's system in the Doyle Patent entirely lacks any "means for processing [a] requisition to generate purchase orders for [] selected matching items," as required by claim 1. The customer's requisition is routed to the central computer at the central supplier's location. The central supplier determines how to fulfill the requisition rather than the customer. The electronic sourcing system of the patent claims requires that the customer's system include the claimed functionality — not a supplier's system. The computer at the central supplier's location sorts the data from the customer's requisition into purchase orders for either internal departments within the central supplier or issues purchase orders to appropriate outside vendors. *See, e.g.,* Doyle Patent, Col. 6:35-59; Hilliard Decl. ¶ 58.

Claims 2-5 similarly are not anticipated by the Doyle Patent since each of these claims includes all of the elements of claim 1 and since the Doyle Patent fails to meet every element of claim 1.

Moreover, with respect to claim 2, the Doyle Patent does not disclose or suggest an electronic sourcing system wherein the means for searching for matching items includes means for searching the database for "segments of data relating to items associated with a vendor" or "means for generating a hit list of such vendor segments" as recited by claim 2 and, therefore, does not anticipate claim 2 for those additional reasons.  As set forth above, the customer's item catalog 136 does not include information concerning vendors associated with the items since all requisitions are routed to the central supplier who makes the sourcing determination.  There are no "vendor segments" that are generated as a result of the customer's search for items.  *See* Hilliard Decl. ¶ 60.

In addition, the Doyle Patent fails to disclose or suggest "means for determining whether a selected matching item is available in inventory" as recited in claim 5 and, thus, the Doyle Patent fails to anticipate claim 5 for this additional reason.  The customer's system had no capability of determining a source for a desired item.  Nor was there any means for determining whether a selected matching item was available in a particular vendor's inventory.  All sourcing determinations were conducted by the central supplier.  *See* Hilliard Decl. ¶ 61

For at least the above reasons, the Doyle Patent fails to anticipate claims 1-5.  The Patent Owner therefore requests that the rejection of Ground # 1 be withdrawn.

B.      Ground # 2 – Claims 1 and 3-5 Are Patentable Over the '989 Patent

Claims 1 and 3-5 stand rejected under 35 U.S.C. § 102(e) as being anticipated by U.S. Patent 5,712,989 (the "'989 Patent").

1.      The '989 Patent Is Unavailable As Prior Art Under 35 U.S.C. § 102(e)

Initially, as the Examiner has acknowledged, the inventors of the '989 Patent are also inventors of the patent under reexamination.  James M. Johnson and Douglas A. Momyer are the

inventors of the invention of the '989 Patent. James M. Johnson and Douglas A. Momyer together with Robert P. Kinross and Francis J. Melly are the inventors of the '172 patent. In fact, the disclosure of the '989 Patent is incorporated by reference in the '172 patent. '172 Patent, col. 1, ll. 18-23. Where a prior disclosure is attributed to the patentee, the reference is no longer applicable as prior art. M.P.E.P. § 716.10. As the disclosure of the '989 Patent is attributed to inventors of the '172 patent, the invention disclosed by the '989 Patent is not an invention by another as required by 35 U.S.C. § 102(e).

Moreover, a rejection under 35 U.S.C. § 102(e) may be overcome by an unequivocal declaration that the patentee conceived that which is disclosed in the prior patent and suggests the invention claimed in the later patent. *See* M.P.E.P. § 716.10 (citing *In re DeBaum*, 687 F.2d 459, 463, 214 U.S.P.Q. 933, 936 (C.C.P.A. 1982)). The question of whether a prior patent disclosure may be attributed to the inventors of a later filed patent typically arises in circumstances where subject matter is disclosed, but not claimed, in a patent application filed jointly by inventor "S" and another and subsequently claimed in a patent filed by inventor "S." In this circumstance, a rejection under 35 U.S.C. § 102(e) may be overcome by an unequivocal declaration by inventor "S" under 37 C.F.R. § 1.132 that inventor "S" conceived or invented the subject matter disclosed in the earlier patent. This is required under circumstances where it is not clear whether the subject matter claimed in the latter patent application was invented by "S" or the other joint inventor of the earlier patent. However, in the present circumstance, it is clear from the '989 Patent itself that the subject matter disclosed therein was not made by another, but rather was made James M. Johnson and Douglas A. Momyer, who are inventors of the '172 patent. For this reason, the '989 Patent is not available for use as prior art against the instant patent. *See De Graffenried v. U.S..*, 16 U.S.P.Q. 2d 1321 (Cl. Ct. 1990).

Notwithstanding that it is clear that there was no inventor in addition to inventors of the '172 patent who contributed to the invention of the '989 Patent, the Examiner asserts: "This rejection under 35 U.S.C. 102(e) might be overcome either by a showing under 37 CFR 1.132 that any invention disclosed but not claimed in the reference was derived from the inventor of this application." In compliance with the Examiner's suggestion, submitted with this response are the

Declarations of inventors Douglas A. Momyer ("Momyer Decl." attached as Exhibit 2) and James M. Johnson ("Johnson Decl." attached as Exhibit 3). Mr. Momyer and Mr. Johnson unequivocally state that they conceived and invented the subject matter disclosed in the '989 Patent. Momyer Decl. ¶ 5, Johnson Decl. ¶5. Accordingly, the subject matter of the '989 Patent relied upon in this rejection was invented by the inventors of the '172 patent. The '989 Patent is, thus, not available as prior art against the '172 patent under 35 U.S.C. § 102(e).

Moreover, the Patent Owner sets forth below elements of the claimed inventions that are not taught or suggested by the '989 Patent. The deficiencies of the '989 Patent cannot be overcome, however, in a subsequent rejection under 35 U.S.C. § 103. At the time the invention of the '172 patent was made, the invention of the '172 patent and the invention of the '989 Patent both were either owned by or subject to an obligation of assignment to the same entity, Fisher Scientific Company. Momyer Decl. ¶ 6; Johnson Decl. ¶ 6. Accordingly, the '989 Patent cannot be used as prior art under 35 U.S.C. § 103.

### 2.        The '989 Patent Fails to Anticipate Claims 1 or 3-5

The '989 Patent does not teach each element of claims 1 or 3-5. The '989 Patent describes a system for replenishing and managing a customer's JIT inventory. It discloses a hierarchy of distribution centers wherein there is a Distributor site and a customer site. The system includes two computers; a host computer located at the Distributor site and a local computer used by a Customer Service Representative ("CSR") for the Distributor at the customer's facility. The two computers are linked in a network. The Distributor has the customer's inventory at the Distributor site and also has co-located inventory at the customer's site. The CSR can search a local database that contains records of the items currently stored in the local JIT inventory at the customer's facility and can generate a requisition on the local computer. If the item is available in the local inventory, then the CSR will source that item from the local inventory and update the local inventory record. If the item is not available in the inventory located at the customer's facility, the local computer can communicate to the host computer and transmit a request to transfer the item

from the Distributor's facility to the customer location and will update both inventory records for the inventory at the Distributor's site and at the customer's site.  *See* Hilliard Decl. ¶ 64.

        It is important to note that although the system described in the '989 Patent has databases associated with the local and host computer, these databases are not the same as the vendor catalog databases described and claimed in the '172 patent.  There is no concept of multiple vendors in the system described in the '989 Patent.  All items are sourced by the Distributor.  There was no need to reference multiple vendors in the database 50 at the local computer since the data related to the customer's inventory and the sole source from which the customer could requisition items to replenish the inventory was the single Distributor.  '989 Patent, Col. 17: 35-42.  Nor does a CSR at the local computer ever make a selection of databases or vendor catalogs to search from a choice of multiple vendor databases or catalogs.  The CSR at the local computer can only search the local database 50 and the user of the host computer can only search the host computer's database 20.  The database 50 was not maintained in a manner that selected portions could be searched separately.  The only search that can be performed is a part number lookup.  '989 Patent, Col. 8:29-32; Col. 8:40-51.  The local system at the customer's facility can build a requisition, but only to requisition items from the local inventory.  If the item is not available in the local inventory, then a transfer request is generated to transfer the item either from (a) the Distributor's local inventory 52 or (b) the inventory at the Distributor's Warehouse 30.  '989 Patent, Col. 13:48-53.  This is not the same as sending a purchase order to purchase an item.  In many cases, the items are being sourced out of inventory already owned by the customer, so no purchase occurs.  If the customer does not have the desired item in its own inventory and the Distributor does not have sufficient quantities of the item at its local inventory 52 or warehouse facility 30, the Distributor's host system (rather than the local system at the customer's facility) can be used to generate a purchase order to an outside vendor 37 or 38, but this purchase order would be invisible to the customer and would never correspond to the requisition unless there was no item availability at all in all three of the following locations:  (a) the customer's local inventory 54, (b) the Distributor's local inventory 52, and (c) the Distributor's central warehouse 30.  Importantly, in the event a purchase order is ultimately generated, it is

generated at the host computer and the sourcing determination is made by the Distributor, not by the customer, in contrast to the requirements of claim 1 of the '172 patent.  *See* Hilliard Decl. ¶ 65.

For these reasons, the '989 Patent is not an "electronic sourcing system" as required by the claims of the '172 Patent.  The system described in the '989 Patent did not enable a prospective buyer to locate and find goods to purchase from different vendors or sources or to compare product offerings of different vendors or sources to make purchasing decisions.  The item records retained in the RIMS database did not include any associated source-related information.  '989 Patent, Table VI.  The customer did not make any sourcing decisions.  All products were obtained from a single Distributor.  Thus, the '989 Patent teaches away from the electronic sourcing systems of the claimed inventions.  *See* Hilliard Decl. ¶ 66.

With respect to claim 1 of the '172 Patent, the '989 Patent fails to disclose or suggest "a database containing data relating to items associated with at least two vendors" as required.  There is no source–related information in the RIMS database as there is only one source for the items – the Distributor.  *See* '989 Patent, Table VI;  Hilliard Decl. ¶ 67.

Moreover, in the system disclosed in the '989 Patent, there was no way to select portions of the local database 50 to search separately, as required by claim 1.  The RIMS system at the local computer could only perform a part number lookup.  '989 Patent, Col. 8:29-32; Col. 8:40-51.  *See* Hilliard Decl. ¶ 68.

The system described in the '989 Patent also fails to anticipate claim 1 because it does not include a "means for processing [a] requisition to generate purchase orders for selected matching items."  The local computer at the customer's facility does not process requisitions to generate any purchase orders at all.  The system only has the capability to request items from inventory which are either located locally at 54 or 52 or located at the Distributor's central warehouse 30.  The Distributor's host system (not the local system at the customer's facility) only generates purchase orders to document transfers from Distributor-owned inventory to customer-owned inventory, or to replenish an inventory in the event that the quantity on hand for that item

drops below its replenishment point. '989 Patent, Col 17:17-48; Col 19:12-29; Col. 27:16-28.
Again, in such instances, it is the Distributor's host system (not the system at the customer's
facility) that generates such purchase orders, and it is the Distributor, not the customer (in contrast
to the claimed inventions), who makes the determination of the source from which to obtain the
items. *See* Hilliard Decl. ¶ 69.

It should be noted that the '989 Patent references the generation of purchase orders under
other circumstances than these, but this is either done:  (a) outside the RIMS system:

> *"For items of product type 05, the CSR may order the item for the
> Customer.  These orders are not placed or filled using the system of
> the present invention... either the proposed purchase order record is
> uploaded into the customer's computer for processing or a
> document is printed at local printer 43 for signature and action by
> the customer's purchasing agent or the CSR confirms that the order
> has been placed with the designated vendor by some other means"
> "by any conventional means," "The Distributor's purchasing
> department will then verify that order (e.g., verifies that the pricing
> is correct) and generate a purchase order to that vendor.*  **Col.
> 11:12-27; Col. 19:24-53.**

(b) with what the '989 Patent refers to as an "internal purchase order, which is not really a purchase
transaction at all, but rather is an intra-company accounting transaction (*see* Col. 18:4-15), or (c)
under circumstances where the vendor is not associated with the item and has to be entered
manually by the user of the Distributor's host system (rather than a user of the system at the
customer's facility):

> *"If the product type is 04, the purchase order data block will also
> include the vendor number (VENDOR NBR) and vendor catalog
> number (VENDOR CAT NBR) entered into the Requisition Item
> Table from Non-Catalog Information data screen 80."  Col. 18:43-
> 46.  "If the product type is 04, host computer 10 verifies the vendor
> part number.  If the part number is found, host computer 10
> executes the order in step 366 by generating a proposed purchase
> order to the vendor and creates a data block including a status code
> of 'B' (Backordered) for transmission to local computer 40.  The
> Distributor's purchasing department will then verify that order (e.g.,
> verifies that the pricing is correct) and generate a purchase order to*

> *that vendor.  If, during verification, host computer 10 does not find*
> *the vendor part number, host computer 10 also creates a part*
> *number in the host database 20 when it creates the proposed*
> *purchase order to the vendor.  The Distributor's purchasing*
> *department then verifies the information in the part record and*
> *issues the purchase order to the vendor as described above."  Col.*
> *19:38-52.*

Importantly, in the last scenario, it is again the Distributor's host computer 10 which generates the purchase order rather than the RIMS system located at the customer's facility.  Moreover, the Distributor and not the customer determines the source from which to procure the item.  This is in contrast to an electronic sourcing system of the '172 patent claims which requires that a prospective customer's own system be capable of searching an item database of items associated with multiple vendors, building an order list from selected matching items found in the database searches, building a requisition from the data on the order list and generating multiple purchase orders from the requisition. *See* Hilliard Decl. ¶ 70.

Because the '989 Patent fails to satisfy each and every element of claim 1 of the '172 Patent, it follows that it also fails to satisfy each and every element of claims 3-5 which all depend from claim 1.  Therefore, the '989 Patent cannot anticipate claims 3-5.

Additionally, with respect to claim 3, contrary to the Examiner's contention, the local computer could only conduct a part number lookup of the records in the local database 50.  '989 Patent, Col. 8:29-32; Col. 8:40-51.  There was no way to enter any sort of partial or full textual description of an item and conduct a search of database 50 for items that matched the entered information.  The text cited by the Examiner (Col. 8:24-61) supports the conclusion that the system has no means for entering a textual description of item information.  There is no discussion in the cited text of any "means for entering product information [that] fully describes at least one desired item."  As a result, the '989 Patent fails to anticipate claim 3 for this additional reason.  *See* Hilliard Decl. ¶ 72.

The '989 Patent also fails to disclose or suggest any means for the customer to determine the applicable price of a selected matching item from a vendor or supplier as required by claim 4

since the customer does not have access to a database of items associated with multiple vendors. Although it is true that the '989 Patent references pricing in multiple places, in each and every one of those references, the pricing determinations were conducted at the Distributor's host computer and only related to the Distributor's prices for the Distributor's items. *See, e.g.,* '989 Patent, Col. 12:42-52. There are no references anywhere in the '989 Patent to any means for a system used by the prospective customer to determine the applicable pricing for items selected from multiple vendors. Thus, as with claim 3, the '989 Patent fails to anticipate claim 4 for this additional reason. *See* Hilliard Decl. ¶ 73.

Moreover, the '989 Patent fails to disclose or suggest any means for a customer to determine whether an item is available in any third party supplier's inventory. The customer only has access to information about its own local JIT inventory, Distributor's local (JIT) inventory and the inventory at the Distributor's Warehouse(s). '989 Patent, Col. 3:18-21; Col. 8: 62-Col. 9:11; Col. 14:48-56; Col. 15: l-4; Col. 16: 41-50; Col. 18: 40-Col. 19:6. Nor could the Distributor's host computer determine the availability of an item in another supplier's inventory. It only determined whether an item was available in its own inventory. '989 Patent, Col. 12:17-41. Therefore, the '989 Patent fails to anticipate claim 5 for this additional reason. *See* Hilliard Decl. ¶ 74

### 3.    Conclusion

For the above reasons, the '989 Patent is not available as prior art against the claims of the '172 patent under 35 U.S.C. § 102(e). Nor is it available as prior art under 35 U.S.C. § 103. Further, the '989 Patent fails to anticipate claims 1 or 3-5 of the '172 patent. Accordingly, the Patent Owner requests that the rejections of Ground #2 be withdrawn.

### C.    Ground # 4 – The SABRE Practical Guide Fails to Anticipate Claims 1-5

Claims 1-5 stand rejected under 35 U.S.C. § 102(b) as being anticipated by "A Practical Guide to SABRE Reservations and Ticketing" by Jeanne Semer-Purzycki (the "SABRE Practical Guide"). The SABRE Practical Guide fails to anticipate claims 1-5 for at least the following reasons.

As an initial matter, the SABRE system, as described in the SABRE Practical Guide is a system that maintains information on available airline flights and hotel rooms. This system was a precursor to Internet-based reservation systems which allowed travel agents and other travel professionals to search for available flights and rooms. SABRE still serves as the backend to many web-based reservation systems for these services. Applying the proper claim interpretation, the SABRE system does not permit the creation of "requisitions" nor of "purchase orders." These terms are simply not applicable to the functionality provided by SABRE. Ascribing the plain meaning to these claim terms in view of the specification and what was known to the person of ordinary skill in the art at the time of the invention, the SABRE Practical Guide necessarily fails to teach each and every element of claims 1-5. Hilliard Decl. ¶ 76.

In point of fact, the Examiner's contention that the SABRE Practical Guide anticipates claims 1-5 of the '172 patent is contradicted by page 2 of the SABRE Practical Guide itself. The SABRE Practical Guide describes SABRE not as a sourcing system like the patented invention, but rather it states "The two main functions of SABRE are as a storage device, and a communication device." Further on the same page, it describes what the SABRE system provides: "SABRE offers information and reservation capabilities." This is a wholly different function from the catalog selection and search, requisition building, purchase order generation and other capabilities in claims 1-5 of the '172 patent. Therefore, for this reason alone, the SABRE Practical Guide fails to anticipate claims 1-5 of the '172 patent. Hilliard Decl. ¶ 77.

With regard to claim 1, that claim requires "a database containing data relating to items associated with at least two vendors maintained so that selected portions of the database may be searched separately." The SABRE Practical Guide does not teach or suggest such a database.

Although the SABRE system does maintain a database of items associated with at least two vendors, this database is not maintained in such a way that selected portions may be searched separately. In attempting to show that such a selective search can be performed with SABRE, the Examiner relies on Ch. 4 of the SABRE Practical Guide which describes, among other things, a primary availability display and a carrier specific availability display. In the primary availability

display, the operator inputs a query string that specifies the date, the two airports in order of flight, and departure time. If the operator wants to limit the query to a single carrier's availability, additional characters are appended to the end of the query string identifying the particular carrier, *e.g.,* UA for United Airlines. Therefore, in the first option described in the SABRE Practical Guide, the user is performing a carrier generic query, that is, the user is not selecting a portion of the database to search separately but is by default searching all the database without making any selection. The second method allows the user to perform a carrier specific query. While it is true that p. 51 of the SABRE Practical Guide states, "At the end of Chapter 4, you will be able to: Request specific carrier availability by specifying one or more airlines in the availability entry…," in the pages following this description, including the discussion and exercises, there is no discussion of selecting portions of the database to search. Hilliard Decl. ¶ 79.

Since the SABRE Practical Guide fails to disclose maintaining a database in a manner so that selected portions of the database may be searched separately, it follows that it also fails to disclose any means for searching for matching items that match the entered product information "in the selected portions of the database" as required by claim 1. Hilliard Decl. ¶ 80.

Moreover, the SABRE Practical Guide also fails to disclose any "means for generating an order list that includes at least one matching item selected by [the] means for searching." With respect to this element of claim 1, the Examiner relies upon the Passenger Name Record (PNR) generated by the SABRE system. The Examiner thus equates the PNR to an order list recited in claim 1. Hilliard Decl. ¶ 81.

The PNR of SABRE is not equivalent to an order list for several reasons. As described in the SABRE Practical Guide, the PNR contains information about a passenger's reservation (*see* p. 8 of the SABRE Practical Guide) and is used by the SABRE system to "book" an itinerary from a carrier. Further, the PNR is provided to the carrier to make a reservation thereby encumbering the carrier's "inventory," while an "order list" as used in the patent claims is not provided to a source. It is a document internal to the purchasing organization that is used to build a requisition -- which is also internal to the purchasing organization. Unlike an "order list" as used in claim 1, the PNR is

not just an internal SABRE document; it interacts with the "source" (*i.e.*, the carrier's system) to reserve airline seats.  Thus, the SABRE Practical Guide fails to anticipate this element of claim 1.  Hilliard Decl. ¶ 82.

The next element of claim 1 recites "means for building a requisition that uses data obtained from said database relating to selected matching items on said order list."  It should be noted that the claim inescapably describes the "order list" and the "requisition" as different and separate items.  According to the claim, the order list is the document the customer's system builds from selecting items that were returned as results of a search query that matched the entered product information.  The order list is then transferred to a requisition module to build a requisition using the data on the order list.  There is no disclosure in the SABRE Practical Guide that corresponds to the structure described in the specification relating to this claim element.  However, the Examiner equates the PNR to both of them.  Since the Examiner failed to conduct a proper means-plus-function construction of the claims, he overlooked the distinction between an order list and a requisition.  The SABRE system as described in the SABRE Practical Guide thus fails to satisfy this element of claim 1.  Hilliard Decl. ¶ 83.

Further, in equating the "requisition" of claim 1 to the PNR, the Examiner overlooks the conflict between the internal nature of a requisition as understood by a person of ordinary skill in the art and the fact that the PNR interacts with the "source," or airline carrier, to reserve airline seats.  As stated above with respect to the order list, requisitions, as used in the claimed inventions, are internal documents, used only by the purchasing organization.  Thus, the SABRE Practical Guide fails to disclose this element of claim 1.  Hilliard Decl. ¶ 84.

The next limitation of claim 1 recites "means for processing said requisition to generate purchase orders for said selected matching items."  The SABRE Practical Guide also fails to teach or suggest this claim element.

In connection with this claim element, the Examiner relies on the disclosure at p. 16 of the SABRE Practical Guide where the E (End Record) Key is discussed.  In describing the E Key,

the SABRE Practical Guide states, "This key is the letter *E* on the keyboard. The travel agent always must end a PNR after it has been completed. Ending a record transmits the PNR directly to American Airlines' central computer for permanent storage." The Examiner's characterization of this as "generating one or more purchase orders" is completely inaccurate. This step in the process conducted by the SABRE system is merely finalizing the reservation in the airline's computer system. It is in no way analogous to processing a requisition to generate a purchase order. Specifically, the SABRE system cannot (a) "process the requisition" because there is no requisition to be processed or (b) "generate purchase orders" because the finalized PNR is not a purchase order as it does not possess the characteristics of a purchase order as that term is most broadly construed from the perspective of a person of ordinary skill in the art. In particular, the purpose of a PNR is defined as "storage of all required and pertinent information related to a passenger's reservation" (*see* pages 7-8 of the SABRE Practical Guide), *i.e.*, not the initiation of a purchase transaction since, unlike a purchase order, it does not obligate the passenger to buy the reserved items (*e.g.,* flights) and does not obligate the airline to sell the flights at an agreed upon price. Specifically, a "Completed PNR" contains only "ticketing instructions (who is ticketing and when ticket is being issued)" (*see* pages 10-11 of the SABRE Practical Guide) but does not commit to the ticket purchase because: (a) the pricing is not firm (*i.e.*, The "Guaranteed Fare Rule" states that "the passenger is charged and is guaranteed the airfare that is in effect on the date of the ticket purchase and issue" *See* page 256 of the SABRE Practical Guide), (b) the airline only holds the reservation described in the PNR for a limited period of time, after which it cancels the reservation unilaterally if the passenger has not ticketed it (*i.e.*, the PNR includes a ticketing date, after which the reservation is invalidated.). (*See* pages 27-28 of the SABRE Practical Guide), and (c) the PNR is only a reservation that the passenger may reject by simply failing to complete the purchase of the ticket for the reserved itinerary (*i.e.*, the payment arrangements are stored in a PNR "notes" field that is not transmitted to the airline, giving the airline no method of collecting in the event that ticketing is not completed by the expiration date.). (*See* pages 103-105 of the SABRE Practical Guide). Because the claimed element is not included in the SABRE system, the SABRE Practical Guide fails to disclose each element of claim 1. Hilliard Decl. ¶ 86.

Because the SABRE system as described in the SABRE Practical Guide fails to disclose each element of claim 1 for all of the reasons discussed above, it also cannot satisfy each element of claims 2-5 which include all of the elements of claim 1.

Additionally, with respect to claim 2, since the PNR generated by the SABRE system is not the claimed "order list" for the reasons discussed above (nor does the SABRE system generate any other list-like document), it follows that the SABRE system described in the SABRE Practical Guide fails to satisfy the requirement that "the means for generating an order list comprises means for selecting desired items from a vendor segment identified by said hit list" as recited in claim 2. Hilliard Decl. ¶ 88.

With respect to claim 4, as discussed above, the PNR is only a reservation of an itinerary with no lasting commitment on the part of the prospective flyer. The customer need not purchase a ticket for the flight referenced in the PNR and the SABRE system need not honor the quoted price if and when a ticket is purchased. The reason why the SABRE system makes no price commitment is because the customer has made no purchasing commitment. The actual price the customer must pay if he decides to use the reservation to buy a ticket is not determined until such time as the flight is actually ticketed and, if and when it does occur, the decision is made outside the SABRE system. Thus, the PNR does not display the price at which a ticket may be purchased. Hilliard Decl. ¶ 89.

Claim 5 recites the additional element of a "means for determining whether a selected matching item is available in inventory."

To be certain, availability is determined in the SABRE system - this is an essential precursor to making a travel reservation. However, unlike the system of claim 5, in the SABRE system, availability is determined at the time of the first catalog look-up. In the SABRE system, when the look up is performed, available flights are displayed, an available itinerary is selected and the reservation is finalized. If we are to follow the analogy made by the Examiner between the SABRE system and the system of claim 5, availability is not done in connection with building a requisition because this is all done before the PNR is ended - the step that the Examiner equated to

building a requisition.  This underscores the fundamental difference between computerized reservations systems like SABRE and a requisition/purchase order based electronic sourcing system of the claimed invention.  In the context of the former, timing is of paramount performance. Therefore, availability must be determined before flights or reservations are offered.  The customer then selects and reserves his/her itinerary and this reservation is memorialized in a PNR.  The PNR is premised upon availability.  It is a record of an itinerary that has been reserved.  In the latter, products are selected from conducting searches of vendor catalogs, and included on an order list, a requisition is prepared from the selected products on the order list.  The inventory check may be done for the source of goods on the requisition, and purchases are not necessarily premised on inventory availability.  Thus, the SABRE Practical Guide does not discloses each element of claim 5.  Hilliard Decl. ¶ 91.

For at least the above reasons, the SABRE Practical Guide fails to anticipate claims 1-5. Accordingly, the Patent Owner requests that the rejections of Ground #4 be withdrawn.

D.    Ground # 7 – Claims 1-5 Are Patentable Over P.O. Writer Plus Guided Tour Manual

Claims 1-5 stand rejected under 35 U.S.C. § 102(b) as allegedly being anticipated by the P.O. Writer Plus Guided Tour Manual.

1.    P.O. Writer Plus Guided Tour Manual Not Publicly Accessible

The P.O. Writer Plus Guided Tour Manual was not sufficiently accessible to the public to qualify as a printed publication under 35 U.S.C. §§ 102 or 301.  The P.O. Writer Plus Guided Tour Manual is thus not available as prior art to form the basis of this rejection.

The Examiner has failed to provide a satisfactory showing that the P.O. Writer Plus Guided Tour Manual qualifies as a "printed publication."  The P.O. Writer Plus Guided Tour Manual was only provided to licensees of American Tech., Inc. (also known as "PurchasingNet") when they licensed the P.O. Writer Plus software.

Control No. 95/000,487                                          27                              Docket No.: EPL-002REX1
Response dated 1/25/10
Patent Owner Reply to Office Action of October 23, 2009

In the matter of *ePlus, Inc. v. SAP America, Inc. and SAP AG*, Civil Action No. 3:05CV281 (E.D.Va.), the P.O. Writer Plus software and associated Manuals were asserted to invalidate the claim of a related patent of the Patent Owner. Evidence of record in that litigation demonstrates that the P.O. Writer Plus Guided Tour Manual does not qualify as a printed publication.

In the course of the *ePlus, Inc. v. SAP America, Inc.* litigation, Laurene Fielder, the co-founder of PurchasingNet, the maker and seller of the P.O. Writer Plus software and associated Manuals, candidly acknowledged at trial that PurchasingNet sought to maintain all details of the functionality of the P.O. Writer Plus system as strictly confidential. For example, Ms. Fielder testified:

> When the customer decided they wanted to buy, then we would send them a password sheet. They would key in the password and it would open up the files. If they didn't buy, then the agreement that we signed with them said they would delete our files and would return our software to us. And that was our standard practice.

Trial Transcript at 2061:15-2062:10 (Fielder Direct) (attached as Exhibit 4). *See also* Trial Transcript at 2084:18-2085:6 (Ms. Fielder testified that the P.O. Writer Plus user manuals were also licensed for customer's internal use only) (attached as Exhibit 5). According to Ms. Fielder, PurchasingNet also took various precautionary measures to protect against any unauthorized access to the P.O. Writer Plus manuals:

> We didn't put these on the aisle for people to take. They were basically maintained in the booth. But we would take them down at night. We wouldn't leave them so the competition could get our detailed user manuals. **We would lock them up.**

Trial Transcript at 2091:11-23 (Fielder Direct) (attached as Exhibit 6) (emphasis added). Each license agreement for each version of the P.O. Writer Plus product included an explicit provision prohibiting the disclosure or copying of the software as well as the User's Manuals.

Client acknowledges the proprietary nature of P.O. WRITER PLUS and

>    ***agrees not to make copies of P.O. WRITER PLUS software or User's
>    Manuals.*** Client is aware that American Tech, Inc. will vigorously prosecute
>    anyone who makes unauthorized copies of its software and User's Manuals,
>    and client will be responsible for all loss of profits and costs of prosecution in
>    the event of such duplication.

Sample P.O. Writer Plus License Agreement ¶ 4 (emphasis added) (DX 651 at POWriter_0000003
*et seq.*) (attached as Exhibit 7).  Because the P.O. Writer Plus licensees were under an obligation to
keep the information contained in the P.O. Writer Plus Manual confidential, the manuals were not
publicly accessible and cannot qualify as "printed publication" prior art.

        The distribution of manuals restricted to licensees of a software system does not make
the manuals publicly accessible for the reasons set forth above.  Further, as discussed above, the
obligation of the licensees to keep the P.O. Writer Guided Tour Manual confidential is specifically
designed to keep the document from dissemination to the interested parties that comprise those of
ordinary skill in the art.  Thus, the P.O. Writer Plus Guided Tour Manual was not within reach of
those of ordinary skill in the art.

        For at least these reasons, P.O. Writer Plus Guided Tour Manual was not disseminated to
the extent that persons interested and ordinarily skilled in the art, exercising reasonable diligence,
could locate it.  The P.O. Writer Plus Guided Tour Manual is, thus, not a "printed publication" as
that term is used in 35 U.S.C. §§ 102 and 301 and is not available as prior art against claims 1-5.

        2.      The P.O. Writer Plus Guided Tour Manual Fails to Anticipate Claims 1-5

        In addition to the inaccessibility of the P.O. Writer Plus Guided Tour Manual to persons
of ordinary skill in the art, this reference does not anticipate claims 1-5.  As an initial matter, the
P.O. Writer Plus system was not an "electronic sourcing system" as defined in the '172 patent
specification and claims.  Rather, it was just what its name would imply, a software package that
could be used to produce purchase orders (*i.e.*, "P.O.s").  However, this P.O. writing capability
lacked nearly all of the other functionality recited in claims 1-5 of the '172 patent.  In particular, it
could not be used by a prospective buyer to perform the entire process (as described and claimed in
the patent) of (a) searching for and finding goods in vendor product catalogs such that the goods are

associated with a source or vendor, (b)  building a requisition which includes items and their associated sources found in the searches, (c) using that requisition as the basis for issuing a purchase order incorporating the goods and their sources (*i.e.*, the matching items) found as a result of the database searches, (d) determining applicable pricing, and (e) determining whether the goods are available in the inventory of the prospective supplier, as described in more detail in the following paragraphs.  Hilliard Decl. ¶ 93.

For example, in the P.O. Writer Plus system, the system user did have the capability to select to purchase an item from any vendor, but this did not include the capability to ensure that the selected vendor was associated with the selected item in the item database.  *See* P.O. Writer Plus Guided Tour Manual at 22 ("You can now buy this item from Best Buy, Bayless or any other vendor you would like to select.").  Hilliard Decl. ¶ 94.

Importantly, with respect to claim 1, the P.O. Writer Plus Guided Tour Manual does not disclose a database containing data relating to items "associated with at least two vendors."  Vendor data is not associated with item records.  Although items may be associated with a Catalog ID and that Catalog ID may be by vendor, it is not necessary to set up a Catalog ID by vendor.  *See* P.O. Writer Plus Guided Tour Manual at 7 ("All of these fields are optional" including the Catalog ID field, which is notably shown as unfilled in the included illustration.).  Hilliard Decl. ¶ 95.

Further, the P.O. Writer Plus Guided Tour Manual fails to disclose an intermediate step of creating an order list between a database search and building a requisition as required by claim 1.  Rather, the P.O. Writer Plus system can start with building a requisition or building a purchase order (without even building a requisition).  If the user starts with a requisition, from the search results generated in that process, the system builds a requisition.  Once the requisition is completed, a user backs out to the Main Menu and invokes the Requisition Interface module to convert the requisition to a purchase order and then backs out yet again to the Main Menu to invoke the Create P.O. module to actually create a purchase order.  *See* P.O. Writer Plus Guided Tour Manual at 140, 142, 149-150.  At no time is an order list generated.  Hilliard Decl. ¶ 96.

Control No. 95/000,487                                      30                            Docket No.: EPL-002REX1
Response dated 1/25/10
Patent Owner Reply to Office Action of October 23, 2009

The text cited by the Examiner (page 47) does not relate to a process of generating an order list to be used for building a requisition, but rather relates to building a Purchase Order without the intermediate step of building a requisition.  ("You can move these items to the P.O. screen - Press F7").  Hilliard Decl. ¶ 97.

Nor does the P.O. Writer Plus Guided Tour Manual describe a system wherein a requisition is built "that uses data obtained from said database relating to selected matching items on said order list" as recited in claim 1.  As set forth above, the P.O. Writer Plus system does not include any means for generating an order list.  Hilliard Decl. ¶ 98.

Similarly, since there are no means for generating an order list that includes selected matching items, and thus the P.O. Writer Plus system did not build a requisition using data relating to selected matching items on an order list, it follows that the P.O. Writer Plus system did not include any means for processing the requisition to generate purchase orders for the selected matching items on the order list.  Hilliard Decl. ¶ 99.

In considering this claim element, the Examiner relies on pp. 149-153 of the P.O. Writer Plus Guided Tour Manual describing how to convert requisitions into purchase orders.  Although the P.O. Writer Plus Guided Tour Manual does describe a process for converting requisitions into purchase orders, a careful reading of the section relied upon by the Examiner reveals that, in direct contrast to the system of claim 1, the source of the product is not determined by some source associated with the item found in the searching process, as recited in the patent claim.  Rather, it is determined at the time of the P.O. creation.  That is, as shown on p. 151, it is clear that the requisition in the P.O. Writer Plus system does not include source data.  See below:

> *Selection Number 3 allows you to consolidate or split Requisitions…  The Requisition you created with 2 line items is displayed on the REQUISITION CONSOLIDATION/SPLITTING screen.*
>
> *We can now select a vendor reach item or we can have the system do it for us!  The system will select the vendor based on the last P.O. for a given item.*

This is the only place in the P.O. Writer Plus Guided Tour Manual that describes how the source information is incorporated into the P.O., and it provides only two options (*i.e.*, by a user selection at this point in time, or by reference to the previous time a P.O. was issued for the same item), neither of which includes any reference to source information from the requisition.  Hilliard Decl. ¶ 100.

The above passage underscores a fundamental difference between the P.O. Writer Plus system and that of claim 1 — namely that in the former, sources for requisitioned products are selected by the person creating the P.O. or by the system automatically at the request of the person creating the P.O., while in the latter, the source data for selected items is included first in the catalog data, then on the order list and then in the requisition.  Therefore, based on this fundamental distinction, the P.O. Writer Plus Guided Tour Manual does not disclose each element of claim 1. Hilliard Decl. ¶ 101.

Claims 2-5 similarly are not satisfied by the P.O. Writer Plus Guided Tour Manual since each of these claims includes all of the elements of claim 1, and since the P.O. Writer Plus Guided Tour Manual fails to satisfy every element of claim 1.

With respect to claim 2, the P.O. Writer Plus Guided Tour Manual does not disclose or suggest an electronic sourcing system wherein the means for searching for matching items includes means for searching a database for "segments of data relating to items associated with a vendor," "means for generating a hit list of such vendor segments" or "means for selectively viewing the vendor segments identified for said hit list" as recited by claim 2.  As discussed above, item records in the P.O. Writer Plus system are not associated with a vendor.  Moreover, as discussed above, nowhere does the P.O. Writer Plus Guided Tour Manual disclose a means for using results of a database search to generate a "hit list" of vendor segments or "means for selecting desired items from a vendor segment identified by said hit list" in the P.O. Writer Plus system.  There are no vendor segments disclosed as recited by claim 2.  Therefore, the PO Writer Plus Guided Tour Manual does not disclose each element of claim 2 for these additional reasons.  Hilliard Decl. ¶ 103.

With respect to claim 4, the item records in the Item Master file in the P.O. Writer Plus system did not include any price-related information nor does the P.O. Writer Plus Guided Tour Manual describe any other means for determining the applicable price from a vendor for a selected matching item. The Examiner relies on a price analysis using prior purchase orders. *See* P.O. Writer Plus Guided Tour Manual at 71. This is nothing like the process required by claim 4 of the '172 patent, which discloses a process of searching a database to determine the applicable price for an item to be requisitioned. A person of ordinary skill in the art would certainly understand that buyers issue P.O.s for never-before purchased items all the time and previous purchase prices frequently go out of date, so it is common that the price paid for an item in the past (if the item had been purchased previously) would have no relationship to the vendor's applicable price at the time when a new P.O. is issued. Moreover, reference to a past purchase history is not the same means for performing the claimed function as described in the patent specification and, thus, it does not satisfy the means-plus-function limitation and, therefore, cannot satisfy claim 4. Hilliard Decl. ¶ 104.

Claim 5 recites the system of claim 1 which additionally includes a "means for determining whether a selected matching item is available in inventory."

In rejecting this claim, the Examiner has relied on the description of the Inventory Module at pp. 102-103 of the P.O. Writer Plus Guided Tour Manual. This module permits users to obtain up-to-date inventory information for the user's own internal inventory. This includes showing inventory on hand and any outstanding P.O.s for inventoried items. However, unlike the system of claim 5, the inventory module in the P.O. Writer Plus System is completely unrelated to the process of requisitioning and ordering goods, other than to the extent that it enables automatic generating of Re-order Analysis (but, notably, neither pp. 102-103 nor anything anywhere in the P.O. Writer Plus Guided Tour Manual disclose any process by which such an analysis is used to create an order list or requisition for a customer order to be fulfilled out of the available inventory). For all of these reasons, in addition to those previously provided, claim 5 is not anticipated by the P.O. Writer Plus Guided Tour Manual. Hilliard Decl. ¶ 106.

Moreover, claim 5 requires that the system have the capability of determining whether a selected matching item is available in the vendor's inventory, so that the prospective customer may purchase it. The inventory module of the P.O. Writer Plus system only determined the inventory levels of the customer's own internal inventory. There is no description whatsoever in the P.O. Writer Plus Guided Tour Manual of searching a database to determine whether a particular vendor has the item in inventory. Thus, the P.O. Writer Plus Guided Tour Manual cannot satisfy the elements of claim 5. Hilliard Decl. ¶ 107.

### 3.      Conclusion

The P.O. Writer Plus Guided Tour Manual was not publicly accessible to those of ordinary skill in the art and, thus, fails to qualify as a printed publication under 35 U.S.C. §§ 102 and 301. This reference is thus unavailable as a basis for rejection in this reexamination proceeding. Further, for the reasons discussed above, the P.O. Writer Plus Guided Tour Manual fails to anticipate claims 1-5. Accordingly, the Patent Owner requests that the rejection of Ground #7 be withdrawn.

### E.      Ground #8 – Claims 1-5 Are Patentable Over the J-CON Manual

Claims 1-5 stand rejected under 35 U.S.C. §102(b) as allegedly anticipated by Volume I of the Cooperative Computing Inc. manual dated April 1994, referred to herein as the "J-CON Manual."

### 1.      The J-CON Manual Was Not Publicly Accessible

The Examiner has failed to make a showing that the J-CON Manual qualifies as a "printed publication." There is no indication that the J-CON Manual was ever sold, distributed, or otherwise made available to the public. Rather, it appears that the J-CON Manual was provided by Creative Computing, Inc. ("CCI") to customers only when they licensed a J-CON system. The accessibility of the J-CON Manual was also at issue in the *ePlus, Inc. v. SAP America, Inc.* litigation. Evidence in that litigation demonstrates that the J-CON Manual was not publicly accessible to those of ordinary skill in the art. Dr. Preston Staats, creator and maker of the J-CON

system, testified under oath that CCI licensed the hardware, software and manuals for the J-CON system as a package. The manuals were never publicly distributed. Trial Transcript at 1779:10-1780:4 (attached as Exhibit 8). The licensees were under an obligation to keep the information contained in the J-CON software and J-CON Manual confidential. *Id.*

It is the normal custom and practice of software developers not to release manuals or system documentation to anyone other than licensed users and, even then, nearly every contract for commercial software states that the documentation is proprietary to the licensor, cannot be disclosed to anyone outside of the licensee's company and must be destroyed or returned to the licensor upon termination of the license or termination of use. Hilliard Decl., ¶39. The distribution of manuals restricted to licensees of a software system does not make the manuals publicly accessible for the reasons set forth above. Distribution of the J-CON Manuals to interested persons of ordinary skill in the art, such as other computer science professionals, was specifically precluded. Thus, the J-CON Manuals were not within reach of those in the computer science field with practical programming experience (*i.e.*, one of ordinary skill in the art).

For at least these reasons, the Examiner has failed to make a showing that the J-CON Manual was made publicly available to the extent that persons interested and ordinarily skilled in the art, exercising reasonable diligence, could locate it. The J-CON Manual is, thus, not a "printed publication" as that term is used in 35 U.S.C. §§ 102 and 301 and is not available as prior art against claims 1-5.

2.      The J-CON Manual Fails to Anticipate Claims 1-5

In addition to the unavailability of the J-CON Manual as prior art, this reference fails to anticipate claims 1-5. As a threshold issue, the J-CON system would be understood by a person of ordinary skill in the art to be designed for use as a "point of sale" system in retail establishments to permit employees of those establishments to assist customers to find automotive parts from a catalog of the retailer's available parts rather than as an "electronic sourcing system" as defined in the '172 patent specification and claims. With the J-CON system, once one or more parts are found in the catalog, the system is used to generate a ticket for picking the parts from the retailer's

inventory and to supply information describing the selected parts at the point-of-sale to permit consummation of the transaction.  Hilliard Decl. ¶ 110.

The systems embodied in claims 1-5 are for use in an organization that acquires supplies through the requisition and purchase order process.  These systems automate what was previously a multi-step, manually-dependent process.  These systems exist primarily for the benefit of the entity seeking to purchase products, that is, the purchaser.  Hilliard Decl. ¶ 111.

In contrast, the J-CON system is intended for retailer, or seller, applications.  The J-CON system assists retailers in helping customers to find a desired part to buy from the retailer.  While a particular retailer may stock parts from many different manufacturers, the retailer is selling only those parts in its own inventory to the customer, not parts of other retailers.  Thus, there is only a single source in the J-CON system – the retailer using the system.  Moreover, requisitions and purchase orders are not part of the process – these are unique to institutional purchasers.  In contrast to the system described in claim 1, the J-CON system is intended to benefit and be used by the seller.  Hilliard Decl. ¶ 112.

The buyer-seller distinction between the systems of claims 1-5 and the J-CON system is not merely abstract.  These distinctions are manifestly obvious when the language of the claims, according them the claim constructions set forth above, is compared to the disclosure of the J-CON Manual.  Hilliard Decl. ¶ 113.

Regarding the first limitation of claim 1, the J-CON Manual fails to disclose or even suggest a database containing data relating to "items associated with at least two vendors."

In discussing this claim element, the Examiner relies on Ch. 3, Sec. 5, Page 1 of the J-CON Manual.  This section of the J-CON Manual does in fact refer to a product catalog.  *See* below:

> *PartFinder, JobFinder, and InterChange are optional catalog products that can help you quickly find the parts your customers need.*

> ### *PartFinder is J-CON's electronic parts catalog.  Use it with Point-of-Sale (POS) to look-up the parts a customer wants and put them on the ticket.*

Even a cursory review of the J-CON Manual reveals that it contemplates only a single product catalog – the electronic parts catalog of the retailer using the J-CON system.  There is nothing in the J-CON Manual disclosing the use of item data associated with at least two vendors. The sole vendor is the retail business owning and using the J-CON system.  Hilliard Decl. ¶ 116.

As discussed above, the J-CON system allows employees to find automotive parts for customers and to supply information corresponding to selected parts to a point-of-sale (POS) terminal so that the retailer may complete the transaction with the customer.  The catalog includes the products that are available for purchase from the retailer – to use the language of the claims, there is only one vendor.  The fact that the J-CON system uses item data for items from a single vendor whereas claim 1 recites "items associated with at least two vendors…" is a significant distinction.  Users of the J-CON system have no reason to provide their customers with access to catalogs from other vendors or sources.  Rather, the J-CON system is intended to facilitate the exact opposite, that is, purchases from a single source, *i.e.,* the retailer user of the J-CON system.  This is in direct contrast to the system embodied in claim 1 where items associated with at least two vendors are maintained in the database so that, among other things, the prospective purchaser may compare product offerings and prices from more than one vendor.  Simply put, the system of claim 1 does not favor any single source, while that of the J-CON system is designed to benefit only a single source.  Therefore, the J-CON Manual fails to disclose the elements of this claim because it does not teach the claim feature of a database containing data relating to items associated with at least two vendors – in fact, its disclosure teaches away from this feature because it is designed for single source purchasing.  Hilliard Decl. ¶ 117.

Moreover, there is no "means for generating an order list that includes at least one matching item selected by said means for searching."  The documents generated by the J-CON system are a pick ticket and a receipt.  The customer has no means to generate an order list using the results of a Part Finder search.  Hilliard Decl. ¶ 118.

Further, with respect to claim 1, the J-CON Manual fails to disclose or suggest any "means for building a requisition that uses data obtained from said database relating to selected matching items on said order list."

In discussing this element, the Examiner relies on the disclosure at Ch. 3, Sec. 2, p. 4 of the J-CON Manual which states, "At Selection, choose one: Enter the number for the part you want. When you finish selecting parts, press <Order Screen> to return to POS." The table above this cited portion of the J-CON Manual shows a parts list with part names, part numbers, quantity available, and prices. This disclosure appears to be describing how parts are selected for purchase. This ticket is then forwarded to the POS application so that the selected parts can be purchased. It may also be forwarded to the person picking the parts from the retailer's inventory if the cashier does not retrieve them directly. This ticket does not meet the definition of a requisition which is a formal request to purchase something that is prepared and used only by a prospective purchaser. As described above with reference to the SABRE system, requisitions would be understood by persons of ordinary skill in the art to be customers' internal documents used to transmit requirements from a user to a purchasing department for approval of a desired purchase, not documents that are communicated to vendors. This is distinctly different from the "pick tickets," which are created on the vendor's computer system and used only by the vendor, as described in the J-CON Manual. With the J-CON system, after the creation of the ticket, the only remaining step to complete the sales transaction is for the customer to tender payment. Nowhere in the J-CON system is a requisition built. The Examiner appears to be construing "requisition" to cover the ticket that is generated in the J-CON System. Hilliard Decl. ¶ 120.

In the world of commercial sourcing of goods – the application for which the system of the patented inventions is targeted – products are not purchased directly by those employees, groups, and/or divisions desiring them. These organizations (*e.g.*, businesses, governmental entities, not-for-profit organizations, etc.) use requisitions and purchase orders to complete transactions so that the institutions can maintain control over what is purchased and exercise their purchasing power to obtain goods at competitive prices. Requisitions are used as an initiating document to begin the sourcing process. More significantly, as a formal request for the product, the

requisition alone does not indicate to a seller an intention and commitment to purchase. In fact, as explained above, requisitions are nearly always prepared for internal use only. This is the meaning of "requisition" as it would be understood by a person of ordinary skill in this art based upon its use in the patent specification. It is not the normal or customary procedure for suppliers to see requisitions. The only indication a supplier would get regarding items being sourced would be the purchase order that constitutes the commitment to purchase an item. Hilliard Decl. ¶ 121.

The process of purchasing something from a retailer, as with the J-CON system, is wholly inconsistent with the notion of "sourcing" (*i.e.*, determining who will supply the product) because the determination of the supplier occurs prior to the item selection, as soon as the prospective buyer enters the retail establishment. Simply put, a means for building requisitions (in the context described in claim 1) does not make sense for a retail system like J-CON and, correspondingly, is not once mentioned as a part of the system described in the J-CON Manual. Requisitions have a specific meaning in the context of commercial sourcing as described in '172 patent's specification and the documents that the specification incorporates by reference, and understood by persons of ordinary skill in the art. This meaning is wholly inconsistent with walking into a retail store and purchasing goods at that store. Therefore, for this reason as well, the J-CON Manual fails to disclose the elements of claim 1. Hilliard Decl. ¶ 122.

Regarding the next limitation of claim 1, the J-CON Manual fails to disclose or even suggest means for "processing said requisition to generate purchase orders for said selected matching items."

As discussed above, requisitions are not generated in the J-CON system. Therefore, there can be no "means for processing [the] requisition to generate purchase orders for [the] selected matching items" in the J-CON system. In discussing this element, the Examiner has relied upon Ch. 4, Sections 3 and 4 which disclose methods for generating purchase orders in the J-CON system. However, these are not purchase orders created as a result of the catalog search process involving a retail customer, as disclosed in the prior elements of claim 1 and referenced by the Examiner with regard to those elements (*i.e.*, Ch. 3 of the J-CON Manual). These are purchase orders created by

the retailer itself to replenish its own retail inventory so that it will have product on hand to fulfill the needs of its retail customers.  Thus, when applying the broadest reasonable constructions available to the person of ordinary skill in the art, given what is disclosed in the patent specification, the purchase orders generated in the J-CON system are distinctly different from the purchase orders in the system of claim 1 because they do not result from the process of building a requisition.  In both systems, a purchase order is an order from a specific buyer to a specific supplier contractually requesting the purchase of certain goods at certain prices, but the buyers are different and the processes are different.  If the purchase order creation of the J-CON system were analogous to the system of claim 1, the buyer would have to be the J-CON retailer's customer and the purchase order would be generated by that customer's system processing a requisition – that is, the purchase order creation would be a part of the entire methodology which starts with a customer's system maintaining a database of items associated with multiple vendors, the customer's system searching for desired items in selected portions of the database, selecting items found in those searches, and building a requisition.  In contrast, the way the J-CON system actually operates, the buyer is the retailer itself (not the customer) and the purchase orders are created purely based on the retailer's inventory levels, either automatically by the system or manually by an operator of the system.  At no point in using the J-CON system are purchase orders created based on processing a requisition. Unlike the system of claim 1, the customer purchase process with the J-CON system does not rely on purchase orders.  The Examiner is mixing the J-CON process for restocking the retailer's supply of goods with the J-CON process for selling goods to customers via a point-of-sale terminal in a hindsight-based attempt to meet the claim limitations – an attempt that still falls short.  Therefore, for this reason as well, the J-CON Manual fails to disclose the elements of claim 1.  Hilliard Decl. ¶ 124.

Claims 2-5 similarly are not satisfied by the system disclosed in the J-CON Manual since each of those claims includes all of the elements of claim 1, and since the J-CON Manual fails to disclose several elements of claim 1.

In addition, with respect to claim 2, the J-CON Manual does not disclose any means for searching an item database that includes "means for searching the database for segments of data

relating to items associated with a vendor that contain vendor items that match the product information for said at least one desired item," "means for generating a hit list for such vendor segments," or "means for selectively viewing the vendor segments identified for said hit list," as recited in claim 2. The results generated in a Part Finder search do not include associated vendor information. The only vendor from whom the customer may purchase the automotive parts is the retailer. Hilliard Decl. ¶ 126.

Claim 5 recites the additional limitation of "means for determining whether a selected matching item is available in inventory."

In discussing this claim, the Examiner relies upon Ch. 3, Section 2, pages 6 and 10 of the J-CON Manual which describe looking up and displaying the available quantity of an item in the retailer's internal inventory. As a preliminary matter, the section relied upon by the Examiner, that is Ch. 3, describes the PartFinder application. That is the portion of the J-CON system that helps employees look-up and find parts for customers. On p. 6, it states that AVL is the quantity available. If the quantity is less than one, PartFinder looks for a replacement part. Alternatively, PartFinder can tell you if the part is in the Warehouse stock or if it must be special ordered. This portion of the J-CON Manual is separate and distinct from the portion describing the generation of purchase orders, which as discussed above, are generated to replenish inventory for the retailer – not in response to customer orders. In the language of claim 5, generating a requisition is a precursor to the step of "determining whether a selected matching item is available in inventory." Thus, it is clear to me, that while the J-CON Manual describes the J-CON system as determining whether a selected item is in the retailer's inventory, it does so only in the context of customer look-ups, and not as part of any requisition process. There is no requisition in the J-CON system. In rejecting this claim, the Examiner appears to be picking features out of the J-CON Manual in hindsight to reconstruct the system of claim 5 without regard for the context of these features or whether their combination anticipates these features as they are recited by the claims. Therefore, for this reason as well, the J-CON Manual fails to disclose the elements of claim 5. Hilliard Decl. ¶ 128.

Moreover, the inventory feature of the J-CON system had no functionality to enable it to determine the availability of an item in a third-party vendor's inventory. The only inventory examined was the retailer's own inventory. Thus, the inventory feature of the J-CON system fails to satisfy claim 5. Claim 5 requires the ability to determine the availability of an item in a supplier's inventory. Hilliard Decl. ¶ 129.

### 3.      Conclusion

The J-CON Manual was not publicly accessible to those of ordinary skill in the art and, thus, fails to qualify as a printed publication under 35 U.S.C. §§ 102 and 301. This reference is thus unavailable as basis for rejection in this reexamination proceeding. Further, for the reasons discussed above, the J-CON Manual fails to anticipate claims 1-5. Accordingly, the Patent Owner requests that the rejection of Ground #8 be withdrawn.

### F.      Ground #9 – Claims 1-5 Are Patentable Over the Gateway 2000/MRO Manual

Claims 1-5 stand rejected under 35 U.S.C. §102(b) as allegedly anticipated by the Gateway 2000/MRO Manual.

### 1.      The Gateway 2000/MRO Manual Was Not Publicly Accessible

The Examiner has failed to make a showing that the Gateway 2000/MRO Manual qualifies as a "printed publication." To the contrary, the Gateway 2000 license agreement included an explicit prohibition against any public disclosure of information concerning the Gateway 2000 computer program or any materials relating to the Gateway 2000 computer program, including the associated manuals as set forth below:

> Proprietary Information. LICENSEE understands and agrees that the Program constitutes confidential and proprietary information of LICENSOR. **LICENSEE agrees to maintain the Program in strict confidence and agrees not to duplicate or otherwise reproduce the Program in whole or in part or any materials relating thereto except as provided herein.** LICENSEE agrees to take all reasonable steps to insure that no unauthorized persons shall have access to the Program and that all authorized person having access to the Program shall refrain from any disclosure, duplication or reproduction.

TSA Gateway 2000 License Agreement with Aramco Services at Schedule A, Section 6 (emphasis added) (DX 175 TSA_0000289 *et seq.*) (attached as Exhibit 8).

Moreover, the Gateway 2000/MRO Manual itself also includes an explicit prohibition of any copying, reproduction or dissemination of the manual.

> This product contains proprietary information which is protected by copyright. ***No part of this product may be copied, reproduced, translated or transcribed (other than for backup purposes) without the prior written consent of Technical Services Associates Inc.***

Gateway 2000/MRO Manual, Title Page (emphasis added). As the Gateway 2000/MRO licensees were under an express contractual obligation to keep the information contained in the Gateway 2000/MRO Manual confidential, there is no showing that such manuals were publicly accessible.

For at least these reasons, the Examiner has failed to make a showing that the Gateway 2000/MRO Manual was made publicly available to the extent that persons interested and ordinarily skilled in the art, exercising reasonable diligence, could locate it. The Gateway 2000/MRO Manual is, thus, not a "printed publication" as that term is used in 35 U.S.C. § 102 and is not available as prior art against claims 1-5.

2.     The Gateway 2000/MRO Manual Fails to Anticipate Claims 1-5

In addition to the lack of public accessibility of the Gateway 2000/MRO reference rendering it unavailable as prior art, the reference further fails to anticipate claims 1-5. First, the Gateway 2000/MRO Manual describes a form filler program facilitating a user's manual requisition and order process. Importantly, it is not an "electronic sourcing system" as such term would be understood by a person of ordinary skill in the art reviewing the '172 patent's specification. Specifically, it could not be used by a prospective buyer to perform the entire sourcing process (as described in the patent) of (a) locating and finding goods associated with particular vendors in order to generate hit lists and build a requisition for the selected goods, (b) using that requisition as the basis for issuing purchase orders incorporating the goods and their sources (*i.e.*, the selected matching items) found as a result of database searches, (c) determining vendors' applicable pricing,

and (d) determining whether the selected goods are available in the inventory of the prospective

supplier, as described in more detail below.  Hilliard Decl. ¶ 131.

While the purported "catalogs" described in the Gateway 2000/MRO Manual

superficially make reference to a "supplier," in actuality, the data relating to items in such purported

"catalogs" are not "associated with at least two vendors."  The term "supplier," as used in the

Gateway system is a descriptive attribute associated with each of the items that has no relationship

to the "supplier" that will actually be the source (*i.e.,* the vendor) of supply for a desired item.

Thus, the "catalogs" of the Gateway system are a list of items, each of which has some attributes,

one of which is an attribute called "supplier" that has no relationship to what the actual supplier

(*i.e.,* vendor) will really be.  In addition, this "supplier" can be modified for purposes of

requisitioning as discussed below.  Hilliard Decl. ¶ 132.

The Gateway 2000/MRO Manual further fails to disclose each element of claim 1

because there is no description of a "means for building a requisition that uses data obtained from

said database relating to selected matching items on said order list" as required.

The Examiner relies on two portions of the Gateway 2000/MRO Manual as purportedly

disclosing this claim element.  The first, p. 4-17, deals with requisitions for stock items.  Sources are

not relevant to requisitions for stock items because these, by definition, are items that are kept in

stock and don't need to be ordered via vendor catalogs.  Moreover, the Gateway 2000/MRO system

does not allow them to be ordered via vendor catalogs, since the catalog ordering is an entirely

different process.  *See* Gateway 2000/MRO Manual, pp. 4-18 through 4-19.  Hilliard Decl. ¶ 134.

The second portion relied upon is the sample requisition form at p. 4-33.  Although this

requisition form has a portion labeled "vendor" there is no vendor information on the form.

Moreover, nowhere else on this requisition is there an indication of associated sources for the

selected matching items included on a requisition.  Additionally, there is no suggestion in the

requisition section of the Gateway 2000/MRO Manual that vendors are selected.  The teaching of p.

4-33 is merely a form with no description.  In addition, the Gateway 2000/MRO Manual describes

that purchase orders can be created at least in part from requisitions.  However, as confirmed by the Gateway 2000/MRO Manual, it is at the purchase order creation step that a vendor is associated with an item, rather than at earlier steps in the process, as is required by claim 1.

> ***The vendor ID must be included as the purchase order is being entered.  Enter the vendor ID code and press "Enter".  The vendor's name, address and contact/phone number will be displayed.*** *See* Gateway 2000/MRO Manual at p. 6-8, Hilliard Decl. ¶ 135.

In addition, if one looks further in the Gateway 2000/MRO Manual to the chapter dealing with Vendors, it is confirmed that this information is added at the time of the P.O. 's creation, that is, Chapter 8.

> ***Enter the Vendor ID number.  The vendor ID is the locally assigned control number used to identify, each vendor in the system.  This is the number that will be entered on the PO entry screen when selecting a vendor.*** *See* Gateway 2000/MRO Manual at p. 8-2, Hilliard Decl. ¶ 136.

These passages make it clear that the vendor is manually selected at the time of the P.O. creation which confirms that the vendor associated with an item is not selected at the requisition stage by a user of the Gateway 2000/MRO system, nor is the vendor determined based on the vendor associated with an item in the database, as required by claim 1.  Therefore, in addition to the reasons articulated above, because the Gateway 2000/MRO Manual does not teach the means for "building a requisition that uses data obtained from said database related to said selected matching items on said order list," the Gateway 2000/MRO Manual fails to disclose the elements of claim 1. Hilliard Decl. ¶ 137.

Regarding the next element of claim 1, "means for processing [the] requisition to generate purchase orders for the selected items," the Gateway 2000/MRO Manual fails to disclose or even suggest this feature.

In discussing this claim element, the Examiner relies on p. 6-3 of the Gateway 2000/MRO Manual.  This section describes the process for creating purchase orders.  The Gateway 2000/MRO Manual does in fact state that purchase orders can be created by importing data from a

requisition.  Thus, (as with the P.O. Writer Plus system), the only way to associate a vendor with a P.O. in the Gateway 2000/MRO system, is for the person creating the P.O. to enter sources for the requisitioned products manually during the P.O. entry process.  But in the system of claim 1, the source data is included in the requisitioning step based on the source or vendor associated with the item in the item database.  Therefore, in addition to the reasons articulated above, based on this fundamental distinction, the Gateway 2000/MRO Manual fails to satisfy the elements of claim 1. Hilliard Decl. ¶ 139.

Claims 2-5 similarly are not satisfied by the Gateway 2000/MRO Manual since each of these claims includes all of the elements of claim 1, and since the Gateway 2000/MRO Manual fails to satisfy every element of claim 1.

With respect to claim 2, the Gateway 2000/MRO Manual fails to disclose a system wherein the means for searching for matching items includes means for searching a database for "segments of data relating to items associated with a vendor," "means for generating a hit list of such vendor segments" or "means for selectively viewing the vendor segments identified for said hit list" as recited by claim 2.  As discussed above, the items in the database are not associated with the vendor from whom the item will be procured.  Hilliard Decl. ¶ 141.

With respect to claim 5's requirement that the electronic sourcing system include a "means for determining whether a selected matching item is available in inventory," the Gateway 2000/MRO system was also deficient.  The Gateway 2000/MRO Manual fails to disclose or even suggest this feature.  Hilliard Decl. ¶ 142.

In rejecting this claim, the Examiner again relies on the description of stock ordering in the Gateway 2000/MRO Manual.  However, the system described in this portion of the reference is not checking the availability of an item in a vendor's inventory, it is checking whether an item has been previously entered into the database.  If not, the user is able to enter it.

*"If a stock item is not on file, the message "item not found" will be displayed, and the message "Item not on file, add new item now (Y/N)" will be displayed.  Enter "Y" to add*

> *the item now.  A stock item window will be entered for adding the new stock item. See*
> Gateway 2000/MRO Manual at p. 4-17, Hilliard Decl. ¶ 143.

In addition to the above-noted distinction of failing to determine whether a selected matching item is in a vendor's inventory, as discussed above, this portion deals with stock ordering. Stock ordering is not based on ordering from vendor catalogs – the type of ordering in the Gateway 2000/MRO system most analogous to claims 1-5.  Also, this step in the Gateway 2000/MRO system that the Examiner has incorrectly analogized to claim 5, is performed prior to creating a requisition, not after.  Just above the portion relied upon by the Examiner, still on page 4-17, the reference states, "You can select an item from the list by positioning the lightbar to a desired item and pressing the enter key.  The stock item will be moved into your requisition."  In contrast, in the system of claim 5, "determining whether a selected matching item is available in inventory" occurs after the order list is created — there must be a matching item found in a search of the database that was selected for inclusion on the order list.  Moreover, as best understood, inventory checking functionality is not included in the portion of the Gateway 2000/MRO Manual that deals with catalog look-up orders.  For this reason, claim 5 is not satisfied by the Gateway 2000/MRO Manual. Hilliard Decl. ¶ 144.

### 3.      Conclusion

The Gateway 2000/MRO Manual was not publicly accessible to those of ordinary skill in the art and, thus, fails to qualify as a printed publication under 35 U.S.C. §§ 102 and 301.  This reference is thus unavailable as a basis for rejection in this reexamination proceeding.  Further, for the reasons discussed above, the Gateway 2000/MRO Manual fails to anticipate claims 1-5. Accordingly, the Patent Owner requests that the rejection of Ground #9 be withdrawn.

Control No. 95/000,487                                    47                         Docket No.: EPL-002REX1
Response dated 1/25/10
Patent Owner Reply to Office Action of October 23, 2009

## IV.   CONCLUSION

The Patent Owner has set forth above why several of the applied references, the '989

Patent, the P.O. Writer Plus Guided Tour Manual, the J-CON Manual and the Gateway 2000/MRO

Manual, fail to qualify as prior art references under 35 U.S.C. §§ 102 and 301.  For these reasons,

the rejections of Grounds 2 and 7-9 are in error and must be withdrawn.  Further, for the reasons set

forth above, none of the applied references teaches or suggests each element of any of the claims of

the '172 Patent.  The Patent Owner has identified errors in each of the rejections of Grounds 1, 2, 4

and 7-9.  Accordingly, the Patent Owner requests that the rejections of claims 1-5 of the '172 Patent

be reconsidered and withdrawn.


Dated:  January 25, 2010                          Respectfully submitted,


                                                  By /Thomas J. Scott, Jr./
                                                  Thomas J. Scott, Jr.
                                                     Registration No.: 27,836
                                                  GOODWIN PROCTER LLP
                                                  901 New York Avenue, NW
                                                  Washington, DC  20001
                                                  (202) 346-4000
                                                  Attorney for Patent Owner

Docket No.: EPL-002REX1

(PATENT)

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Reexamination of:

U.S. Patent 6,505,172

Application No.: 95/000,487

Filed: August 21, 2009

For: ELECTRONIC SOURCING SYSTEM

Confirmation No.: 8473

Art Unit: 3992

Examiner: J. R. Pokrzywa

## APPEAL BRIEF

MS Appeal Brief - Patents
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

ePlus, Inc. ("ePlus" or "Patent Owner") filed a Notice of Appeal in this case on February 11, 2011. This Brief is in furtherance of that Notice of Appeal. The Requester did not file a cross appeal. This brief is filed within two months of the expiration of the time for the Requester to file a cross appeal.

The fees required under 37 C.F.R. § 41.20(b)(2) are dealt with in the accompanying TRANSMITTAL OF APPEAL BRIEF. The discussion in this brief is arranged under the following headings as required by 37 C.F.R. § 41.67 and M.P.E.P. § 2675:

    I.       Real Party In Interest

    II.     Related Appeals and Interferences

    III.    Status of Claims

    IV.    Status of Amendments

    V.     Summary of Claimed Subject Matter

    VI.    Issues to be Reviewed on Appeal

    VII.   Argument

           Claims Appendix

           Evidence Appendix

           Related Proceedings Appendix

           Certificate of Service

Control No.: 95/000,487                              i                          Docket No.: EPL-002REX1
Appeal Brief under 37 C.F.R. § 41.67

## TABLE OF CONTENTS

                                                                                                    **Page**

I.      REAL PARTY IN INTEREST ................................................................................................1

II.     RELATED APPEALS AND INTERFERENCES ...............................................................1

III.    STATUS OF CLAIMS ...........................................................................................................1

        A.      Total Number of Claims under Reexamination ...............................................1

        B.      Current Status of Claims .......................................................................................1

        C.      Claims On Appeal ...................................................................................................1

IV.     STATUS OF AMENDMENTS .............................................................................................2

V.      SUMMARY OF CLAIMED SUBJECT MATTER.............................................................2

VI.     ISSUES TO BE REVIEWED ON APPEAL ........................................................................3

VII.    ARGUMENT ...........................................................................................................................4

        A.      The Broadest Reasonable Interpretation of Claims 1-5 ...................................4

        B.      Failure to Establish Manuals Constitute Printed Publications ........................5

        C.      Requirements of 35 U.S.C. § 102 .........................................................................8

        D.      Ground #1 – Doyle Fails to Anticipate Claims 1-5.............................................8

        E.      Ground # 2 – Claims 1 and 3-5 Are Patentable Over the '989 Patent ...........10

                1.      The '989 Patent Fails To Present a Substantial New Question of Patentability ........ 10

                2.      The '989 Patent Not Prior Art .................................................... 11

                3.      The '989 Patent Fails to Anticipate Claims 1 or 3-5.................. 12

                4.      Conclusion ..................................................................................... 16

        F.      Ground # 4 – The SABRE Guide Fails to Anticipate Claims 1-5....................16

        G.      Ground # 7 – Claims 1-5 Are Patentable Over P.O. Writer Manual.....................19

                1.      P.O. Writer Manual Was Not Publicly Accessible ...................... 19

                2.      The P.O. Writer Manual Fails to Anticipate Claims 1-5............. 20

                3.      Conclusion ..................................................................................... 23

        H.      Ground #8 – Claims 1-5 Are Patentable Over the J-CON Manual .....................23

                1.      The J-CON Manual Was Not Publicly Accessible ...................... 23

                2.      The J-CON Manual Fails to Anticipate Claims 1-5..................... 23

                3.      Conclusion ..................................................................................... 27

        I.      Ground #9 – Claims 1-5 Are Patentable Over the Gateway Manual .....................27

                1.      The Gateway Manual Was Not Publicly Accessible ................... 28

                2.      The Gateway Manual Fails to Anticipate Claims 1-5................. 28

Control No.: 95/000,487            ii            Docket No.: EPL-002REX1
Appeal Brief under 37 C.F.R. § 41.67

      3.      Conclusion ................................................................................................ 30

J.      CONCLUSION ....................................................................................................30

Control No.: 95/000,487                    1                    Docket No.: EPL-002REX1
Appeal Brief under 37 C.F.R. § 41.67

## I.      REAL PARTY IN INTEREST

The real party in interest for this appeal is: *e*Plus, Inc.

## II.     RELATED APPEALS AND INTERFERENCES

U.S. Patent No. 6,505,172 (the "'172 Patent"), the patent under reexamination, is before the U.S. District Court, Eastern District of Virginia, in *ePlus, Inc. v. Lawson Software, Inc.*, Civil Action No. 3:09CV-620. This patent was also the subject of *ePlus, Inc. v. Ariba, Inc.*, Civil Action No. 1:04-cv-612 (E.D. Va.). Two related patents, U.S. Patent Nos. 6,023,683 (the "'683 Patent") and 6,055,516 (the "'516 Patent") were at issue in the above litigations and also in *ePlus, Inc. v. SAP America, Inc and SAP AG*, Civil Action No. 3:05-cv-281 (E.D. Va.).

In the *Lawson Software* litigation, the jury returned a verdict finding that claim 1 is not anticipated or rendered obvious by prior art including U.S. Patent 5,712,989. In addition, the jury found that the Requester Lawson Software infringes claim 1. The Court's Order regarding claim construction and the jury verdict form are attached in the Related Proceedings Appendix.

In the *Ariba* litigation, after a two-week trial on liability issues, the jury returned a verdict finding Ariba to have willfully infringed all of the patent claims at issue, including claims 1 and 5 of the '172 Patent. The jury also found the patent claims to be not invalid based on the prior art Ariba asserted. Ariba ultimately took a license to the *e*Plus Patent, including the '172 Patent, for a payment of $37M. The Court's Order regarding claim construction and the jury verdict form are attached in the Related Proceedings Appendix.

The related '683 Patent is subject to reexamination proceedings 90/008,104 and 90/011,066. An Appeal in reexamination control no. 90/008,104 was noticed on March 6, 2009 and was fully briefed. An Oral Hearing was held October 20, 2010. There has been no decision in this appeal. A response to the initial Office Action in reexamination 90/011,066 was filed on April 11, 2011.

The related '516 Patent is subject to reexamination proceeding 90/009,636. *e*Plus filed a response to the initial Office Action on September 8, 2010.

## III.    STATUS OF CLAIMS

### A.      Total Number of Claims under Reexamination

U.S. Patent 6,505,172 issued January 7, 2003, with 5 claims. On October 23, 2009, the Examiner ordered reexamination of claims 1-5. On July 8, 2010, the Examiner issued a final rejection of claims 1-5.

### B.      Current Status of Claims

1.      Claims under reexamination:  1-5.

2.      Claims rejected:  1-5.

### C.      Claims On Appeal

The claims on appeal are claims 1-5.

## IV.  STATUS OF AMENDMENTS

*e*Plus has not made any amendments to claims 1-5, nor has *e*Plus added any new claims.  Claims 1-5 remain as issued in U.S. Patent 6,505,172.

## V.  SUMMARY OF CLAIMED SUBJECT MATTER

The claimed inventions relate to electronic sourcing systems.  An electronic sourcing system, according to the patent, is an electronic system for use by a prospective buyer to locate and find items to purchase from sources, *i.e.*, suppliers, vendors or distributors.  The electronic sourcing systems automate internal corporate purchasing processes, resulting in enormous savings in time and expense.  Corporate customer users may search for items for sale from multiple vendors, generate an order list from matching items found in searches, and build a requisition from data relating to selected matching items on the order list. The system then generates electronic purchase orders to each different supplier for approved requisitions. *See, e.g.*, '172 Patent, Col. 3:7-29.

Prior to the inventions in the patent, procuring products for large corporations could involve several manual, paper-based operations coupled with awkward automated electronic processes.  *See, e.g.*, '172 Patent, Col. 1:16- Col. 2:22.  A company might be able to access a system to type information into an electronic requisition form or submit an electronic order from hard-copy catalogs.  *See id.* at Col. 1:41-64. Alternatively, a company might be able to view items from a single electronic catalog stored on a compact disc.  *See id.* at Col. 2:8-17.  However, these systems provided only limited improvements to the traditional paper-based corporate procurement processes.

The inventors of the '172 Patent recognized that significant efficiencies could be realized by enabling users to generate one or more purchase orders from a requisition without human intervention and to make purchase decisions based on product comparison between offerings of multiple vendors.  Claim 1 embodies this technological advance.  Claim 1 is the sole independent claim and is set forth in the Claims Appendix.

The specification teaches this system in detail.  A catalog database is comprised of at least two vendor product catalogs.  '172 Patent, Col. 4, ll. 41-43.  The electronic sourcing system includes means for entering product information that at least partially describes at least one desired item.  As disclosed, a computer is programmed with special-purpose software modules to execute an algorithm which includes the step of receiving certain fields of entered information (*e.g.*, catalog number, part number, partial text, etc.) to at least partially describe at least one desired item.  *See, e.g.,* '172 Patent, Col. 5:24-Col. 6:27; Col. 7:66-Col. 8:37; Col. 8:  45-62; Col. 12:  6-28; FIGS. 1-2; Appendix VII.

The system further includes means for searching for matching items that match the entered product information in the selected portions of the database.  As disclosed, software modules execute an algorithm which includes the steps of:  (1) receiving the entered product information relating to item(s) to be searched; (2) communicating the entered product information to a search engine module; (3) querying certain fields of

Control No.: 95/000,487                                3                          Docket No.: EPL-002REX1
Appeal Brief under 37 C.F.R. § 41.67

the item data to locate item records in the selected portions of the database matching the entered product
information; and (4) outputting a hit list of items matching the entered product information. *See, e.g.*, '172
Patent, Col. 4:10-14; Col. 6:4-27; Col. 7:66-Col. 8:37; Col. 8:45-Col. 10:21; Col. 12:6-41; Figs. 1A, 1B; 1C,
2; Appendix VII.

Additionally, the system includes means for generating an order list that includes at least one
matching item selected by a search module.  The specification discloses that special-purpose software
modules execute an algorithm which includes the steps of: (1) displaying a hit list of results of a search
corresponding to items matching the entered product information; (2) selecting one or more matching items
from the hit list for inclusion in an order list; and (3) generating an order list containing data relating to the
selected matching items. *See, e.g.*, '172 Patent, Col. 9: 51-Col. 10:44; Col. 10:66-Col. 12:2; Col. 12:42-57;
Col. 17:55-Col. 18:10; Col. 18:43-50; Appendix III; Appendix VI; FIGS. 1A, 1B, 1C.

The system also includes means for building a requisition that uses data obtained from a database
relating to selected matching items on the order list.  As disclosed, a requisition module executes an algorithm
which includes the steps of: (1) transferring data relating to selected matching items included on an order list
to a requisition program; and (2) building a requisition using data relating to the selected matching items on
the order list to populate certain fields on a requisition form. *See, e.g.*, '172 Patent, Col 1:15-40; Col. 10:22-
44; Col. 12:52- Col. 14:14; Appendix I, Appendix II, Appendix VI, Appendix VIII, Appendix IX; FIGS. 1-3.

## VI.    ISSUES TO BE REVIEWED ON APPEAL

In the Right of Appeal Notice, the Examiner maintains the following rejections:

(a)    Claims 1-5 are allegedly anticipated under 35 U.S.C. § 102(e) by the Doyle '551 Patent;

(b)    Claims 1 and 3-5 are allegedly anticipated under 35 U.S.C. § 102(e) by the Johnson '989
Patent.;

(c)    Claims 1-5 are allegedly anticipated under 35 U.S.C. § 102(b) by "A Practical Guide to
SABRE Reservations and Ticketing" authored by Jeanne Semer-Purzycki (the "SABRE Guide");

(d)    Claims 1-5 are allegedly anticipated under 35 U.S.C. § 102(b) by "P.O. Writer Plus Guided
Tour Version 10.0," from American Tech, Inc. (the "P.O. Writer Manual");

(e)    Claims 1-5 are allegedly anticipated under 35 U.S.C. § 102(b) by Vol. I of the J-CON
Manual; and

(f)    Claims 1-5 are allegedly anticipated under 35 U.S.C. § 102(b) by "Gateway 2000/MRO
Version Manual," from Technical Service Associates (the "Gateway Manual").

*e*Plus appeals each of these rejections.

Control No.: 95/000,487            4            Docket No.: EPL-002REX1
Appeal Brief under 37 C.F.R. § 41.67

## VII.     ARGUMENT

### A.     The Broadest Reasonable Interpretation of Claims 1-5

During reexamination although the Office gives claims their broadest reasonable construction consistent with the specification, In *re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1364, 70 U.S.P.Q.2d 1827, 1830 (Fed. Cir. 2004), the claim language should be read in light of the specification as it would be interpreted by one of ordinary skill in the art. *In re Cortright*, 165 F.3d 1353, 1358, 49 U.S.P.Q.2d 1464, 1467 (Fed. Cir. 1999). This proposition does not give the PTO an unfettered license to interpret claims to embrace anything remotely related to the claimed invention. Rather, the claims must be read in light of the teachings of the underlying patent. *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260, 94 U.S.P.Q 2d 1640, 1644 (Fed. Cir. 2010). The Examiner asserts, however, that the claim interpretations provided by *e*Plus are not the broadest reasonable interpretations of the claim terms. ACP at 10. The Examiner points to no errors in *e*Plus' proposed constructions, but simply presents broader interpretations of several claim terms. The Examiner fails to establish how these broader interpretations are reasonable or consistent with the specification and the claims.

Moreover, the Examiner has failed to take into account that the claims are written in means-plus-function format and must be interpreted pursuant to 35 U.S.C. § 112, ¶ 6. Thus, to construe such claim terms, the Examiner must: (a) define the function of the element; (b) identify the structure(s) in the patent specification corresponding to the function; and (c) define the claim element to mean the structures disclosed in the patent specification and their structural equivalents.

For example, the Examiner unreasonably interprets the claim term "order list" as an "ordered list" showing the results of a search. ACP at 29, 36-37 and 41. Claim 1 sets forth both a means for searching and a means for generating an order list. These are distinct claim elements. The specification clearly distinguishes between the display of the results of a search (labeled a "hit list") (Col. 9:40-54), and an order list which is a list of items selected from those in the hit list of search results (Col. 10:22-40). Thus, the Examiner's analysis of the systems described in the SABRE Guide, the J-CON Manual and the Gateway Manual is flawed because he has equated a hit list of search results with the claimed order list which is an interpretation that is inconsistent with the patent specification and claims, as properly construed under 35 U.S.C. § 112, ¶ 6. *e*Plus submits that the appropriate constructions consistent with the specification, claims and § 112, ¶ 6 are as set forth in its February 19, 2010 Response.

Moreover, the Examiner has conflated the terms "requisition" and "purchase order" and appears to interpret them to mean the same thing. This is not a reasonable interpretation given the specification and the claims. The patent clearly discloses two separate processes generating two separate documents – a requisition and a purchase order – the purchase order(s) being generated from the data in the requisition. The specification explains the process of conducting searches for matching items in the supplier catalogs in the

database (Col. 9:33-Col. 10:21), generating an order list from selected ones of the matching items found in the searches (*See, e.g.*, App. III (hit list) compared to App. VI (order list), *See also* Col. 10:22-Col. 12:2 (describing creation of order list by selection of items on hit list)), and then building a requisition using the data in the order list together with certain requisition header and other information (App. VIII and IX; Col. 12:52-Col. 15:27 (items on Order List transmitted to Requisition Program to build requisition)).  The user can then accept or reject the line items in the requisition. Col. 15:28-38.  Thus, the specification makes clear that the requisition is the company's internal document which serves as a "formal request to purchase something." *That request can be accepted or rejected.*  Once a requisition has been accepted, the system's purchase order generation module converts the requisition into one or more purchase orders, as represented by step 114 in FIG. 3. Col. 15:39-53.  Purchase orders are then transmitted to the associated suppliers.  Thus, the specification distinguishes between a request internal to the purchasing organization to purchase something (the requisition) and the formal contractual agreement to purchase something which is sent from the purchaser to the supplier (the purchase order).

 In fact, in the original prosecution of Appln. Ser. No. 09/532,557, this exact point was made to distinguish the applied art.  In an Amendment filed July 25, 2001, the applicants distinguished requisitions from purchase orders as follows:

> A requisition and a purchase order are terms of art and refer to a listing of required items and an order to purchase one or more items.  While the requisition may specify possible and preferred vendors/suppliers for each item listed, the purchase order is addressed to a single vendor/supplier.  The requisition identifies needed items and candidate vendor/suppliers and the purchase order authorizes a single vendor/supplier to provide one or more items, usually at a pre-determined price.  As commonly used by those skilled in the art, requisition and purchase order are not one and the same.  The requisition only identifies needed items but the purchase order authorizes a vendor/supplier to supply an item or items to satisfy a need.  Thus, a requisition, as used by those skilled in the art, potentially lists items from the same/different categories and different vendors/suppliers for each item.

 In response to this Amendment, the application was allowed.  Each claim under appeal requires both a "requisition" and "purchase orders," a "means for building a requisition," and a "means for processing said requisition to generate purchase orders."  To interpret the claim term "requisition" as an "order" would render the separate claim term, system functionality and structures relating to "purchase orders" meaningless.  Accordingly, a person of ordinary skill in the art would readily distinguish a "requisition" from a "purchase order" in the context of the specification and claims.

## B. Failure to Establish Manuals Constitute Printed Publications

 "Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' bar under 35 U.S.C. § 102(b)." *In re Hall*, 781 F.2d 897, 898-99, 228 U.S.P.Q. 453, 455 (Fed. Cir. 1986).  "A given reference is 'publicly accessible' [only] upon a satisfactory showing that such document

has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the art exercising reasonable diligence, can locate it." *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1378, 78 U.S.P.Q.2d 1684, 1687 (Fed. Cir. 2006); *See also In re Cronyn*, 890 F.2d 1158, 1159-60, 13 U.S.P.Q.2d 1070, 1072-73 (Fed. Cir. 1989); *Preemption Devices, Inc. v. Minnesota Mining & Mfg. Co.*, 732 F.2d 903, 221 U.S.P.Q. 841 (Fed. Cir. 1984); M.P.E.P. § 2128 (8th Ed., Rev. 6, 2007).

The essential requisites for a "printed publication" under 35 U.S.C. § 102 are that the document be: (1) *a work of public character* intended for general use; and (2) *within reach of the relevant public (i.e., persons of ordinary skill in the relevant art).* It is well-settled that in order for a work to be one of a "public character," "the work must be intended and employed for the communication of ideas to *persons in general,* as distinguished from particular individuals. *Private communications, even if printed, do not fall within this description*, whether designed for the use of single persons or of a few restricted groups or persons. In other words, the work must have been actually published in such a manner that anyone who chooses may avail himself of the information it contains." *See* 1 W. Robinson, *The Law of Patents* §§ 325-326 at 446-48 (1890) (emphasis added).

Where a work could have been located only by one having been informed of its existence, and not by means of customary research aids available at the relevant time, the probability of knowledge of the work by the relevant public is virtually nil and, as a result, such a work cannot constitute a "printed publication" under the patent laws. *See SRI Int'l Inc. v. Internet Security Sys. Inc.*, 511 F.3d 1186, 85 U.S.P.Q.2d 1489 (Fed. Cir. 2008) (posting of paper on electronic FTP server insufficient to demonstrate public accessibility absent an index, catalogue or other tools for customary and meaningful research); *In re Cronyn*, 890 F.2d at 1159-60, 13 U.S.P.Q.2d at 1071-72 (although copies of theses were filed in the main college library and were indexed by author's name, the theses did not constitute "printed publications," because they were not reasonably accessible to the public since the only research aid available to locate them was the author's name which bears no relationship to the subject matters of the theses); *Preemption Devices*, 732 F.2d at 906, 221 U.S.P.Q. at 843 (the dissemination of only six copies of article at issue was insufficient to render such article a "printed publication"); *In re Bayer*, 568 F.2d 1357, 1360-62, 196 U.S.P.Q. 670, 673-675 (C.C.P.A. 1978) (graduate thesis deposited in university library but uncatalogued was not a "printed publication" since the thesis could only have been located by one having been informed of its existence by the author or the faculty dissertation committee, and not by means of the customary research aids available).

Moreover, documents disseminated under conditions of confidentiality or to a closed group are not "printed publications" under § 102 because they are not accessible to the relevant public. *See, e.g., Garrett Corp. v. United States*, 422 F.2d 874 (Cl. Ct. 1970) (distribution of 80 copies of report to government personnel within government agencies does not constitute publication); *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 936-37, 15 U.S.P.Q.2d 1321, 1324-25 (Fed. Cir. 1990) (government documents

including legend "reproduction or further dissemination is not authorized...not for public release" could not constitute "printed publications" for use as prior art); *IMX, Inc. v. Lendingtree, LLC*, 405 F. Supp.2d 479, 491 (D. Del. 2005) (a user manual for a software program and computer system did not constitute prior art because it was designated "Highly Confidential" and there was no proof that it was sufficiently accessible to the public to constitute a "printed publication"); *Aspex Eyewear, Inc. v. Revolution Eyewear, Inc.*, 2001 WL 34852696 (C.D. Cal. Jun. 4, 2001) (drawing made at meeting not printed publication as no evidence that non-participants had *Seen* drawing and, despite lack of confidentiality agreement, author expected meeting participants to refrain from disclosing ideas and drawing to those in the relevant industry); *Allied Tube and Conduit Corp. v. John Maneely Co.*, 125 F. Supp.2d 987, 990 (D. Ariz. 2000) (letter and price list both stamped confidential sent to 20-30 distributors was not accessible to the interested public); *Aluminum Co. of Am. v. Reynolds Metals Co.*, 14 U.S.P.Q. 1170 (N.D. Ill. 1989) (distribution of 33 copies of progress letter to Navy with export control notice was not publicly accessible because letter was treated by recipients as confidential); *Mead Digital Systems, Inc. v. A.B. Dick Co.*, 521 F. Supp. 164, 182, 213 U.S.P.Q. 328, 341-42 (S.D. Ohio 1981) (unclassified report distributed under confidential cover to persons and organization in the relevant field was not publicly accessible), *aff'd on other grounds*, 723 F.2d 455, 221 U.S.P.Q. 1035 (6th. Cir. 1983); *de Graffenried v. United States*, 16 U.S.P.Q.2d 1321 (Cl. Ct. 1990) (unclassified report available only to registered users of the Defense Technical Information Center was not printed publication where document was shown to only be available through the cumbersome request procedures of the DTIC); *In re George*, 2 U.S.P.Q.2d 1880 (Bd. Pat. App. & Int. 1987) (research reports released only to research institute's members were not printed publications because members were aware of institute's policy of confidentiality, even though the policy was not specifically stated in writing).

The burden of proof on the question of whether the applied references are printed publications rests on the examiner. *In re Hall*, 781 F.2d at 899, 228 U.S.P.Q. at 455 ("The **proponent of the publication bar** must show that prior to the critical date the reference was sufficiently accessible, at least to the public interested in the art . . . .") (emphasis added). Where the examiner, as here,  has merely relied on the Requester's allegations and speculation, the examiner fails to satisfy his burden. *See Ex parte Natale*, 11 U.S.P.Q.2d 1222, 1226 (Bd. Pat. App. & Int. 1989). Moreover, the evidence of record from witnesses of the companies authoring the manuals at issue actually establishes that dissemination of the manuals was restricted to a limited group, and the manuals at issue were maintained as confidential.

The Examiner asserts that each of the J-CON Manual, the P.O. Writer Manual, and the Gateway Manual were distributed to the portion of the public concerned with the art.. ACP at 16.  Those of skill in the art, however, are not the licensees of the software, but rather the competitors that developed products in the relevant field.  Hilliard Decl., ¶ 21.  (One of skill in the art is an experienced programmer with an understanding of supply chain management and procurement..)  Moreover, the licensees were required to

Control No.: 95/000,487                          8                          Docket No.: EPL-002REX1
Appeal Brief under 37 C.F.R. § 41.67

maintain the manuals as confidential and the authors restricted access to them precisely to prohibit their
distribution to the portion of the public concerned with the art, *i.e.* their competitors. *See, e.g.* Deposition of
Laurene McEneny, at 146:22-152:25, 193:2-195:3 (June 10, 2010) (concerning limited access to the P.O.
Writer Manuals) (Evi. App. Ex. 10) *See also* Response to Office Action dated 2/19/10 and evidence cited
therein.

In the only case of which *e*Plus is aware that directly addresses whether manuals for a software
system qualify as printed publications, the court held that absent any proof in the record that the manual was
sufficiently accessible to the public, the manual was not a printed publication. *IMX, Inc. v. Lendingtree,
LLC.*, 405 F. Supp.2d 479, 491 (D. Del. 2005). That case is directly on point. There is no evidence in the
record that the cited manuals were accessible to the relevant public.

As discussed in detail below, the J-CON Manual, the P.O. Writer Manual and the Gateway Manual
relied upon by the Examiner do not qualify as "printed publications" under 35 U.S.C. §§ 102 and 301. *e*Plus
requests that the rejections based on these manuals be withdrawn.

C.      **Requirements of 35 U.S.C. § 102**

To prove a patent claim invalid based upon an anticipatory printed publication under 35 U.S.C. § 102,
"*every element and limitation* of the claimed invention must be found in a single prior art reference,
*arranged as in the claim.*" *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001) (emphasis added). *See also
PIN/NIP Inc. v. Platte Chem. Co.*, 304 F3d 1235, 1243 (Fed. Cir. 2002); *Advanced Display Sys. Inc. v. Kent
State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2002). Accordingly, "'[a] claim is anticipated only if each and
every element as set forth in the claim is found, either expressly or inherently described, in a single prior art
reference.'" M.P.E.P. § 2131 (quoting *Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631, 2
U.S.P.Q.2d 1051, 1053 (Fed. Cir. 1987)). Moreover, in the context of a means-plus-function claim, the
allegedly invalidating prior art first must disclose the recited function identically. *Transclean Corp. v.
Bridgewood Services*, 290 F.3d 1364, 1372, 62 U.S.P.Q.2d 1865 (Fed. Cir. 2002). Second, the prior art
reference must disclose not simply a means for achieving the desired function, but rather the *particular
structure* recited in the patent specification corresponding to that function, or an equivalent structure. *In re
Mott*, 557 F.2d 266, 269, 194 U.S.P.Q. 305, 307 (C.C.P.A. 1977).

D.      **Ground #1 – Doyle Fails to Anticipate Claims 1-5**

The Examiner has rejected claims 1-5 under 35 U.S.C. § 102(e) as allegedly anticipated by U.S.
Patent 5,694,551 issued to Doyle et al. (the "Doyle Patent"). The Doyle Patent does not teach or suggest a
database of *items associated with at least two vendors* or *means for generating an order list*, or *means for
processing a requisition to generate purchase orders* as required by claim 1. For at least these reasons, the
Doyle Patent does not anticipate claims 1-5.

The Doyle Patent relates to a data processing network to handle customer requisitions that are then channeled to a central supplier and filled by departments of the central supplier or by outside vendors, as determined by the central supplier. The central computer at the central supplier's location handles the data processing requirements for customer requisitions rather than the customer's system, routes those requisitions to appropriate departments within the central supplier or issues orders to outside vendors, handles the delivery of the ordered products to the customers, handles all aspects of invoicing and payment and performs customer assistance functions. Col. 3:59-Col. 4:20.

Thus, the system described in the Doyle Patent is not an electronic sourcing system at all, as required by claim 1 of the '172 patent because the central supplier, rather than the customer, makes all sourcing determinations for a customer's requirements. A prospective customer has no capability to determine the source from among multiple sources for a desired item. Rather, all customer requirements (as expressed in a completed requisition) are sent to a single central supplier.

Moreover, the Doyle Patent fails to disclose or suggest a database containing data related to items "associated with at lest two vendors." There is no teaching or suggestion of the ability of the customer's system to search a database for items associated with multiple vendors or to select particular vendors to source desired items. The items in the database are not associated with any vendors. The customer has no capability to decide from which vendor he wishes to purchase a desired product, in contrast to the claimed inventions of the '172 Patent. The sourcing determinations cannot be made by the customer, but rather must be performed by the central computer at the central supplier's facility. *See, e.g.*, Col. 5:21-36.

There is no disclosure whatsoever in the Doyle Patent of any means for generating an order list that includes matching items found in conducting searches of the database such that an order list is generated prior to a requisition. The system in the Doyle Patent only has the capability to build requisitions. Thus, the Doyle Patent's system neither performs the recited function of generating an order list nor includes structure that corresponds to the structure disclosed in the patent specification for performing the recited function.

Moreover, the customer's system in the Doyle Patent entirely lacks any "means for processing [a] requisition to generate purchase orders for [] selected matching items," as required by claim 1. Instead, the customer's requisition is routed to the central computer at the central supplier's location. The central supplier determines how to fulfill the requisition rather than the customer. The electronic sourcing system of the patent claims requires that the customer's system include the claimed purchase order generation functionality ─ not a different system, located at a supplier's facility. The computer at the central supplier's location sorts the data from the customer's requisition into purchase orders for either internal departments within the central supplier or issues purchase orders to appropriate outside vendors. *See, e.g.*, Col. 6:35-59. This simply does not satisfy the "means for processing requisition to generate purchase orders" pursuant to 35 U.S.C. § 112, ¶ 6.

Control No.: 95/000,487                           10                    Docket No.: EPL-002REX1
Appeal Brief under 37 C.F.R. § 41.67

Claims 2-5 similarly are not anticipated by the Doyle Patent since each of these claims includes all of the elements of claim 1 and since the Doyle Patent fails to disclose every element of claim 1.

Moreover, with respect to claim 2, the Doyle Patent does not disclose or suggest an electronic sourcing system wherein the means for searching for matching items includes means for searching the database for "segments of data relating to items associated with a vendor" or "means for generating a hit list of such vendor segments" as recited by claim 2. As set forth above, the customer's item catalog 136 does not include information concerning vendors associated with the items since all requisitions are routed to the central supplier who makes the sourcing determination. There are no "vendor segments" that are generated as a result of the customer's search for items. Thus, the Doyle Patent fails to anticipate claim 2 for these additional reasons.

In addition, the Doyle Patent fails to disclose or suggest "means for determining whether a selected matching item is available in inventory" as recited in claim 5 and, thus, the Doyle Patent fails to anticipate claim 5 for this additional reason. The customer's system had no capability of determining a source for a desired item. Nor was there any means for determining whether a selected matching item was available in a particular vendor's inventory. All sourcing determinations were conducted by the central supplier. The system in the Doyle Patent does not perform the claimed function and is entirely lacking the structures disclosed in the patent specification that perform the claimed function.

For at least the above reasons, the Doyle Patent fails to anticipate claims 1-5. *e*Plus therefore requests that the rejection of Ground # 1 be withdrawn.

**E.      Ground # 2 – Claims 1 and 3-5 Are Patentable Over the '989 Patent**

Claims 1 and 3-5 stand rejected under 35 U.S.C. § 102(e) as allegedly being anticipated by U.S. Patent 5,712,989 (the "'989 Patent").

**1.      The '989 Patent Fails To Present a Substantial New Question of Patentability**

Contrary to the Examiner's contentions, the prosecution file history of the original parent application to the '172 Patent, Appln. Ser. No. 08/288,577, and the application for the '172 Patent, Appln. Ser. No. 09/532,557, show that the original Examiner was clearly aware of the '989 Patent and nevertheless allowed the claims of the '172 Patent.

First, the '989 Patent was expressly incorporated by reference into the specification of the '172 Patent. Col. 1:15-23. The inventors also expressly acknowledged: "There are a number of known requisition/purchasing systems … [o]ne system is the Fisher Scientific Requisition and Inventory management System (Fisher RIMS), described in co-pending patent application Serial No. 08/042,168, filed Apr. 2, 1993, issued as U.S. Pat. No. 5,712,989 on Jan. 28, 1998, …, the disclosure of which is incorporated herein by reference." *See also* '172 Patent, Col. 6:46-49 ("Requisitioning on Fisher RIMS system 40 in context of the electronic sourcing system 5 of the present invention is illustrated in pertinent part in Fig. 3

(and is fully described in U.S. patent No. 5,712,989)." Moreover, the '172 Patent specification references the Fisher RIMS system some 49 times.

In addition, the original Examiner noted that several systems referred to in the specification (including Fisher RIMS) were commercial systems and reminded the applicants of the need to refer to such systems with proper trademark usage. *See* Office Action dated 5/26/98 in Ser. No. 08/288,577 at ¶¶ 2, 2.1; *See also* Office Action dated 4/25/01 in Appln. Ser. No. 09/532,597 at ¶¶ 2, 2.1. Moreover, the Examiner also reminded applicants that they needed to update their references to the pending '989 patent application to reflect the fact that a patent had issued. *Id* at ¶ 4. In response, Applicants updated the reference and informed the Examiner that the '989 Patent had issued. *See* Resp. to O.A. at 2, Ser. No. 08/288,577 (9/14/98); Resp. to O.A. at 5, Ser. No. 09/532,557 (7/25/01). In addition, during prosecution of the '172 Patent application, the Examiner considered double patenting issues, but did not contend that there were double patenting issues with respect to the '989 Patent. *See* Office Action dated 4/25/01 in Ser. No. 09/532,577 at ¶¶ 5-5.5. Applicants submitted a terminal disclaimer to overcome the rejection. Further, when the '989 Patent issued in January 1998, it was classified in Class/Subclass 705/28 at the PTO. (Class 395 was abolished and patents in class 395 are now included in Class 705.). The Search Notes of the original Examiner for the parent application and for the application which issued as the '172 Patent indicate that he conducted searches in Class/Subclass 705/28 four times after the '989 Patent issued. *See* Search Notes for Appln. Ser. No. 08/288,577 indicating Examiner Cosimano searched Class 705 on 5/26/98 and on 11/14/98, after the '989 Patent was issued on 1/27/98. Examiner Cosimano again searched Class 705 on 4/25/01 and 3/27/02 in connection with the examination of Appln. Ser. No. 09/532,557. All references that are in the Examiner's field of search are deemed to have been considered by the Examiner. *See Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1571 (Fed. Cir. 1986); M.P.E.P. § 717.05. Thus, the original Examiner was aware of the '989 Patent when allowing the claims of the '172 Patent and the '989 Patent fails to raise a substantial new question of patentability.

## 2.     The '989 Patent Not Prior Art

James M. Johnson and Douglas A. Momyer are the inventors of the subject matter disclosed and claimed in the '989 Patent. (Evi. App. Exs. 2 and 3). James M. Johnson and Douglas A. Momyer together with Robert P. Kinross and Francis J. Melly are the inventors of the subject matter disclosed and claimed in U.S. Patent 6,505,172 at issue in this proceeding. The Examiner improperly attempts to use the inventors' own inventive efforts against them. However, 35 U.S.C. § 102(e) states: "A person shall be entitled to a patent unless –. . . . (e) the invention was described in . . . (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent . . . ." (emphasis added). Thus, the use of the '989 Patent to demonstrate an alleged lack of novelty of claims 1 and 3-5 is improper.

Control No.: 95/000,487                                    12                              Docket No.: EPL-002REX1
Appeal Brief under 37 C.F.R. § 41.67

ePlus maintains that the disclosure of the '989 Patent does not anticipate claims 1 and 3-5 for the
reasons set forth in the 2/14/10 Response.  There are  numerous differences between the requisition and
inventory management system invented by Messrs. Johnson and Momyer (disclosed in the '989 Patent) and
the electronic sourcing system invented by Messrs. Johnson, Momyer, Kinross and Melly (disclosed and
claimed in the '172 Patent).  ePlus's position is consistent; the invention disclosed in the '989 Patent is
different from the invention of claims 1 and 3-5 of the '172 Patent.

         The Examiner, in the ACP, improperly sets forth such an unreasonably broad interpretation of claims
1 and 3-5 so as to eliminate the distinct features that define the patented electronic sourcing system of the
'172 Patent.  Based on this unreasonably broad interpretation, the Examiner asserts that the disclosure of the
'989 Patent anticipates claims 1 and 3-5.  When claims 1 and 3-5 are interpreted in such an unreasonably
broad manner as to eliminate the contributions of Messrs. Kinross and Melly, the '989 Patent ceases to be
available as prior art under 35 U.S.C. § 102(e), because the invention, as defined by the improper
interpretation, is not an invention by another as required by 35 U.S.C. § 102(e) because, if the Examiner were
correct, the invention of the '989 Patent would be the same as disclosed and claimed in the '172 Patent.

         Moreover, the Examiner's citation to M.P.E.P. § 2136.05 is inapposite.  ACP at 7.  The rule in this
Section applies where the first filed application by inventor X discloses but does not claim a joint invention
that is subsequently claimed in the second filed application filed by inventors X & Y.  This is not the current
situation.  In the current situation, the earlier patent *does not* disclose a joint invention disclosed in the later
patent.  In such a situation, if it is demonstrated that claims in the later patent are invented by only the
inventors of the earlier patent, then the earlier patent cannot be applied to anticipate such claims under 35
U.S.C. § 102(e).  The disclosure of the earlier patent is not an invention by another as required by 35 U.S.C. §
102(e).

         For the above reasons, the Examiner must either recognize the differences between the disclosure of
the '989 Patent and claims 1 and 3-5 of the '172 Patent based upon a proper interpretation of the claim terms,
or improperly read the '172 Patent claims so broadly as to eliminate the inventive contribution of Messrs.
Kinross and Melly.  If the former, the '989 Patent does not anticipate claims 1 and 3-5 of the '989 Patent
because there are numerous differences between the claimed inventions and the system described in the '989
Patent.  If the latter, claims 1 and 3-5 of the '172 patent and the '989 Patent disclosure would be both directed
to subject matter invented only by Messrs. Johnson and Momyer and described in the '989 Patent and a
rejection under 35 U.S.C. § 102(e) is inappropriate as the '989 Patent would not be an invention by another.

         **3.       The '989 Patent Fails to Anticipate Claims 1 or 3-5**

         The '989 Patent does not teach each element of claims 1 or 3-5.  The '989 Patent describes a system
for replenishing and managing a customer's JIT inventory.  It discloses a hierarchy of distribution centers
wherein there is a Distributor site and a customer site.  There is a host computer located at the Distributor site

and a local computer used by a Customer Service Representative ("CSR") for the Distributor at the customer's facility. The two computers are linked in a network. The Distributor has the customer's inventory at the Distributor site and also has co-located inventory at the customer's site. The CSR can search a local database that contains records of the items currently stored in the local JIT inventory at the customer's facility and can generate a requisition on the local computer. If the item is available in the local inventory, then the CSR will source that item from the local inventory and update the local inventory record. If the item is not available in the inventory located at the customer's facility, the local computer can communicate to the host computer and transmit a request to transfer the item from the Distributor's facility to the customer location and will update both inventory records for the inventory at the Distributor's site and at the customer's site.

Although the system described in the '989 Patent has databases associated with the local and host computers, these databases are not the same as the database described and claimed in the '172 patent. There is no concept of multiple vendors in the system described in the '989 Patent. All items are sourced by the Distributor. There was no need to reference multiple vendors in the database 50 since the data related to the customer's inventory and the sole source from which the customer could requisition items to replenish the inventory was the single Distributor. Col. 17: 35-42. Further, local database 50 was not maintained in a manner such that selected portions could be searched separately. The only way to find an item was to conduct a part number lookup in the database. The system of the '989 Patent did not include a search program at all. Col. 8:29-32; Col. 8:40-51. The local system can build a requisition, but only to requisition items from the local inventory. If the item is not available in the local inventory, then a transfer request is generated to transfer the item either from (a) the Distributor's local inventory 52 or (b) the inventory at the Distributor's Warehouse 30. Col. 13:48-53. This is not the same as sending a purchase order to a supplier purchase an item. In many cases, the items are being sourced out of inventory already owned by the customer, so no purchase occurs. If the customer does not have the desired item in its own inventory and the Distributor does not have sufficient quantities of the item at its local inventory 52 or warehouse facility 30, the Distributor's host system (rather than the local system at the customer's facility) can be used to generate a purchase order to an outside vendor 37 or 38, but this purchase order would be invisible to the customer and would never be generated from the requisition built by the local RIMS system unless there was no item availability at all in all three of the following locations: (a) the customer's local inventory 54, (b) the Distributor's local inventory 52, and (c) the Distributor's central warehouse 30. Importantly, in the event a purchase order is ultimately generated, it is generated at the host computer and the sourcing determination is made by the Distributor, not by the customer, in contrast to the requirements of claim 1 of the '172 patent.

For these reasons, the '989 Patent is not an "electronic sourcing system" as required by the claims of the '172 Patent. The system described in the '989 Patent did not enable a prospective buyer to locate and find goods to purchase from different vendors or to compare product offerings of different vendors to make

Control No.: 95/000,487                14                Docket No.: EPL-002REX1
Appeal Brief under 37 C.F.R. § 41.67

purchasing decisions. The item records retained in the RIMS database did not include any associated vendor-related information. *See* Table VI. The customer did not make any sourcing decisions. There was no need. All products were obtained from a single Distributor. Thus, the '989 Patent teaches away from the multi-vendor electronic sourcing systems of the claimed inventions.

With respect to claim 1 of the '172 Patent, the '989 Patent fails to disclose or suggest "a database containing data relating to items associated with at least two vendors" as required. There is no source–related information in the RIMS database as there is only one source for the items – the Distributor. *See* Table VI.

Moreover, in the system disclosed in the '989 Patent, there was no way to select portions of the local database 50 to search separately, as required by claim 1. The RIMS system at the local computer could only perform a part number lookup. Col. 8:29-32; Col. 8:40-51. There was no search program as disclosed in the '172 Patent. A search program is required to satisfy the "means for searching" in accordance with 35 U.S.C. § 112, ¶ 6.

Additionally, the system described in the '989 Patent did not include any means for generating an order list prior to the generation of a requisition. The system did not perform this function at all. Rather, the only document it generated was a requisition.

The system described in the '989 Patent also fails to anticipate claim 1 because it does not include a "means for processing [a] requisition to generate purchase orders for selected matching items." The local computer at the customer's facility does not process requisitions to generate any purchase orders at all. The system only has the capability to request items from inventory which are either located locally at 54 or 52 or located at the Distributor's central warehouse 30. The Distributor's host system (not the local system at the customer's facility) only generates purchase orders to document transfers from Distributor-owned inventory to customer-owned inventory, or to replenish an inventory in the event that the quantity on hand for that item drops below its replenishment point. Col 17:17-48; Col 19:12-29; Col. 27:16-28. Again, in such instances, it is the Distributor's host system (not the RIMS system at the customer's facility) that generates such purchase orders, and it is the Distributor, not the customer (in contrast to the claimed inventions), who makes the determination of the source from which to obtain the items.

It should be noted that the '989 Patent references the generation of purchase orders under other circumstances than these, but this is either done: (a) outside the RIMS system (Col. 11:12-27; Col. 19:24-53); (b) with what the '989 Patent refers to as an "internal purchase order, which is not really a purchase transaction at all, but rather is an intra-company accounting transaction (*See* Col. 18:4-15), or (c) under circumstances where the vendor is not associated with the item and has to be entered manually by the user of the Distributor's host system (rather than a user of the system at the customer's facility) (Col. 19:38-52).

Importantly, in the last scenario, it is again the Distributor's host computer 10 which generates the purchase order rather than the RIMS system located at the customer's facility. Moreover, the Distributor and

not the customer determines the source from which to procure the item. This is in contrast to an electronic sourcing system of the '172 patent claims which requires that a prospective customer's own system be capable of performing all of the functions of searching an item database of items associated with multiple vendors, building an order list from selected matching items found in the database searches, building a requisition from the data on the order list and generating multiple purchase orders from the requisition. Moreover, there is no disclosure anywhere in the '989 Patent of any capability either at the local computer or at the host computer of generating multiple purchase orders from a single requisition as required by claim 1. The disclosure of the '989 Patent is limited to a single line item requisition. Col. 17:63-65. And, "only one purchase order is generated for the requisition" at the host computer, Col. 17:65-Col. 18:3.

Because the '989 Patent fails to satisfy each and every element of claim 1 of the '172 Patent, it follows that it also fails to satisfy each and every element of claims 3-5 which all depend from claim 1.

Additionally, with respect to claim 3, contrary to the Examiner's contention, the local computer could only conduct a part number lookup of the records in the local database 50. Col. 8:29-32; Col. 8:40-51. There was no way to enter any sort of partial or full textual description of an item and conduct a search of database 50 for items that matched the entered information. The text cited by the Examiner (Col. 8:24-61) actually supports the conclusion that the system has no means for entering a textual description of item information. As a result, the '989 Patent fails to anticipate claim 3 for this additional reason.

The '989 Patent also fails to disclose or suggest any means for the customer to determine the applicable price of a selected matching item from a vendor or supplier as required by claim 4 since the customer does not have access to a database of items associated with multiple vendors. Although it is true that the '989 Patent references pricing in multiple places, in each of those references, the pricing determinations are conducted at the Distributor's host computer and only relate to the Distributor's prices for the Distributor's items. Col. 12:42-52. There are no references anywhere in the '989 Patent to any means for a system used by the prospective customer to determine the applicable pricing for items selected from multiple vendors. Thus, as with claim 3, the '989 Patent fails to anticipate claim 4 for this additional reason.

Moreover, the '989 Patent fails to disclose or suggest any means for a customer to determine whether an item is available in any third party vendor's inventory. The customer only has access to information about its own local JIT inventory, Distributor's local (JIT) inventory and the inventory at the Distributor's Warehouse(s). Col. 3:18-21; Col. 8: 62-Col. 9:11; Col. 14:48-56; Col. 15: 1-4; Col. 16: 41-50; Col. 18: 40-Col. 19:6. Nor could the Distributor's host computer determine the availability of an item in another vendor's inventory. It only determined whether an item was available in its own inventory. Col. 12:17-41. Therefore, the '989 Patent fails to anticipate claim 5 for this additional reason.

### 4.    Conclusion

For the above reasons, the '989 Patent is not available as prior art against the claims of the '172 patent under 35 U.S.C. § 102(e).  Further, the '989 Patent fails to anticipate claims 1 or 3-5 of the '172 patent.  Accordingly, *e*Plus requests that the rejection of Ground #2 be withdrawn.

### F.    Ground # 4 – The SABRE Guide Fails to Anticipate Claims 1-5

The Examiner has rejected claims 1-5 under 35 U.S.C. § 102(b) as allegedly being anticipated by "A Practical Guide to SABRE Reservations and Ticketing" by Jeanne Semer-Purzycki (the "SABRE Guide").  The SABRE Guide, fails to anticipate claims 1-5 for at least the following reasons.

As an initial matter, the SABRE system is a system that maintains information on available airline flights and hotel rooms.  Applying the proper claim interpretation, the SABRE system does not include any means for creating "requisitions" or "purchase orders."  These terms are simply not applicable to the functionality provided by SABRE.  The Examiner's contention that the SABRE Guide anticipates claims 1-5 of the '172 patent is contradicted by page 2 of the SABRE Guide itself.  The SABRE Guide describes SABRE not as a sourcing system like the patented invention, but rather it states "The two main functions of SABRE are as a storage device, and a communication device."  Further on the same page, it states:  "SABRE offers information and reservation capabilities."  This is a wholly different function from the database search, order list generating, requisition building, purchase order generation and other capabilities in claims 1-5 of the '172 patent.  Therefore, for this reason alone, the SABRE Guide fails to anticipate claims 1-5 of the '172 patent.

With regard to claim 1, the SABRE Guide fails to disclose any "means for generating an order list that includes at least one matching item selected by [the] means for searching."  The Examiner relies upon the Passenger Name Record (PNR) generated by the SABRE system and equates the PNR to an order list recited in claim 1.

The PNR of SABRE is not equivalent to an order list for several reasons.  The PNR contains information about a passenger's reservation (*see* p. 8 of the SABRE Guide) and is used by the SABRE system to "book" an itinerary from a carrier.  Further, the PNR is provided to the carrier to make a reservation thereby encumbering the carrier's "inventory," while an "order list" as used in the patent claims is not provided to a source.  It is a document internal to the purchasing organization that is used to build a requisition -- which is also internal to the purchasing organization.  Unlike an "order list," as used in claim 1, the PNR is not just an internal document; it interacts with the "source" (*i.e.*, the carrier's system) to reserve airline seats.  Thus, the SABRE Guide fails to anticipate this element of claim 1.

The next element of claim 1 recites "means for building a requisition that uses data obtained from said database relating to selected matching items on said order list."  It should be noted that the claim inescapably describes the "order list" and the "requisition" as different and separate items.  And, as disclosed

in the patent specification, different components are used to build each document. The order list is the document the search program and shell of the customer's system builds from selecting items that were returned as results of a search query that matched the entered product information. The order list is then transferred to a requisition module to build a requisition using the data on the order list. There is no disclosure in the SABRE Guide that corresponds to the structure described in the specification relating to this claim element. However, the Examiner contends that the PNR of the SABRE system satisfies both the order list and requisition claim elements. Since the Examiner failed to conduct a proper means-plus-function construction of the claims, he overlooked the distinction between an order list and a requisition and the structures disclosed in the patent for building each. The SABRE system thus fails to satisfy this element of claim 1.

Further, in equating the "requisition" of claim 1 to the PNR, the Examiner overlooks the conflict between the internal nature of a requisition, as would be understood by a person of ordinary skill in the art, and the fact that the PNR interacts with the "source," or airline carrier, to reserve airline seats. As stated above with respect to the order list, requisitions, as used in the claimed inventions, are internal documents, used only by the purchasing organization. Thus, the SABRE Guide fails to disclose this element of claim 1.

The SABRE Guide also fails to teach or suggest the "means for processing said requisition to generate purchase orders for said selected matching items." In connection with this claim element, the Examiner relies on the disclosure at p. 16 of the SABRE Guide where the E (End Record) Key is discussed. In describing the E Key, the Guide states, "This key is the letter E on the keyboard. The travel agent always must end a PNR after it has been completed. Ending a record transmits the PNR directly to American Airlines' central computer for permanent storage." The Examiner's characterization of this as "generating one or more purchase orders" is completely inaccurate. This step in the process conducted by the SABRE system is merely finalizing the reservation in the airline's computer system. It is in no way analogous to processing a requisition to generate a purchase order. Specifically, the SABRE system cannot (a) "process the requisition" because there is no requisition to be processed or (b) "generate purchase orders" because the finalized PNR is not a purchase order as it does not possess the characteristics of a purchase order as that term is reasonably construed from the perspective of a person of ordinary skill in the art and consistent with the patent specification and claims. In particular, the purpose of a PNR is defined as "storage of all required and pertinent information related to a passenger's reservation" (*see* pages 7-8 of the SABRE Guide), *i.e.*, not the initiation of a purchase transaction since, unlike a purchase order, the PNR does not obligate the passenger to buy the reserved items (*e.g.*, flights) and does not obligate the airline to sell the flights at an agreed upon price. Specifically, a "Completed PNR" contains only "ticketing instructions (who is ticketing and when ticket is being issued)" (*see* pages 10-11 of the SABRE Guide) but does not commit to the ticket purchase because: (a) the pricing is not firm (*i.e.*, the "Guaranteed Fare Rule" states that "the passenger is charged and

Control No.: 95/000,487                    18                    Docket No.: EPL-002REX1
Appeal Brief under 37 C.F.R. § 41.67

is guaranteed the airfare that is in effect on the date of the ticket purchase and issues" (*see* page 256 of the SABRE Guide), (b) the airline only holds the reservation described in the PNR for a limited period of time, after which it cancels the reservation unilaterally if the passenger has not ticketed it (*i.e.,* the PNR includes a ticketing date, after which the reservation is invalidated), (*see* pages 27-28 of the SABRE Guide), and (c) the PNR is only a reservation that the passenger may reject by simply failing to complete the purchase of the ticket for the reserved itinerary (*i.e.,* the payment arrangements are stored in a PNR "notes" field that is not transmitted to the airline, giving the airline no method of collecting in the event that ticketing is not completed by the expiration date)., (*see* pages 103-105 of the SABRE Guide). Further, even if the Examiner were correct that the PNR could be equated to each of the order list, requisition and purchase order of the '172 Patent claims, which it cannot be, the Examiner has failed to show any disclosure of any functionality to generate multiple purchase orders from a single PNR (alleged "requisition"), as required by the claims. Because the SABRE system does not perform the recited function and does not include the corresponding structure for the claim element, the SABRE system, as described in the SABRE Guide, fails to disclose each element of claim 1.

Because the SABRE system, as described in the SABRE Guide, fails to disclose each element of claim 1 for all of the reasons discussed above, it also cannot satisfy each element of claims 2-5 which include all of the elements of claim 1.

Additionally, with respect to claim 2, since the PNR generated by the SABRE system is not the claimed "order list" for the reasons discussed above (nor does the SABRE system generate any other list-like document), it follows that the system described in the SABRE Guide fails to satisfy the requirement that "the means for generating an order list comprises means for selecting desired items from a vendor segment identified by said hit list" as recited in claim 2.

With respect to claim 4, as discussed above, the PNR is only a reservation of an itinerary with no lasting commitment on the part of the prospective flyer. The customer need not purchase a ticket for the flight referenced in the PNR and the SABRE system need not honor the quoted price if and when a ticket is purchased. The reason why the SABRE system makes no price commitment is because the customer has made no purchasing commitment. The actual price the customer must pay if he decides to use the reservation to buy a ticket is not determined until such time as the flight is actually ticketed and, if and when it does occur, the decision is made outside the SABRE system. Thus, the PNR does not display the price at which a ticket may be purchased and the SABRE Guide fails to anticipate claim 4 for this additional reason.

Claim 5 recites the additional element of a "means for determining whether a selected matching item is available in inventory." To be certain, availability is determined in the SABRE system - this is an essential precursor to making a travel reservation. However, unlike the system of claim 5, in the SABRE system, availability is determined at the time of the first database look-up. In the SABRE system, when the look up is

performed, available flights are displayed, an available itinerary is selected and the reservation is finalized. If we are to follow the analogy made by the Examiner between the SABRE system and the system of claim 5, availability is not done in connection with building a requisition because this is all done before the PNR is ended - the step that the Examiner equated to building a requisition. This underscores the fundamental difference between computerized reservations systems like SABRE and a requisition/purchase order based electronic sourcing system of the claimed invention. In the context of the former, timing is of paramount performance. Therefore, availability must be determined before flights or reservations are offered. The customer then selects and reserves his/her itinerary and this reservation is memorialized in a PNR. The PNR is premised upon availability. It is a record of an itinerary that has been reserved. In the latter, products are selected from conducting searches of vendor catalogs in the database. They are then included on an order list, and a requisition is prepared from the selected products on the order list. The inventory check may be done for the source of goods on the requisition, and purchases are not necessarily premised on inventory availability. Thus, the SABRE Guide does not disclose each element of claim 5.

For at least the above reasons, the SABRE Guide fails to anticipate claims 1-5. Accordingly, *ePlus* requests that the rejections of Ground #4 be withdrawn.

### G.   Ground # 7 – Claims 1-5 Are Patentable Over P.O. Writer Manual

Claims 1-5 stand rejected under 35 U.S.C. § 102(b) as allegedly being anticipated by the P.O. Writer Plus Guided Tour Manual (the "P.O. Writer Manual").

#### 1.   P.O. Writer Manual Was Not Publicly Accessible

The Examiner has failed to make a satisfactory showing that the P.O. Writer Manual qualifies as a "printed publication" under 35 U.S.C. §§ 102 or 301. The P.O. Writer Manual was only provided to licensees of American Tech., Inc. (also known as "PurchasingNet") when they licensed the P.O. Writer Plus software.

In the matter of *ePlus, Inc. v. SAP America, Inc. and SAP AG*, Civil Action No. 3:05CV281 (E.D. Va.), the P.O. Writer Plus software and associated Manuals were asserted to invalidate the claims of a related patent. Evidence of record in that litigation demonstrates that the P.O. Writer Manual does not qualify as a printed publication. There, Laurene Fielder, the co-founder of PurchasingNet, the maker and seller of the P.O. Writer Plus software and associated Manuals, candidly acknowledged that PurchasingNet sought to maintain all details of the functionality of the P.O. Writer Plus system as strictly confidential. For example, Ms. Fielder testified:

> When the customer decided they wanted to buy, then we would send them a password sheet. They would key in the password and it would open up the files. If they didn't buy, then the agreement that we signed with them said they would delete our files and would return our software to us. And that was our standard practice.

Trial Transcript at 2061:15-2062:10 (Fielder Direct) (attached as Evi. App. Ex. 4). *See also* Trial Transcript at 2084:18-2085:6 (the P.O. Writer Plus user manuals were licensed for customer's internal use only) (Evi.

App. Ex. 5).  According to Ms. Fielder, PurchasingNet also took various precautionary measures to protect against any unauthorized access to the P.O. Writer Plus manuals:

> We didn't put these on the aisle for people to take.  They were basically maintained in the booth.  But we would take them down at night.  We wouldn't leave them so the competition could get our detailed user manuals.  ***We would lock them up***.

Trial Transcript at 2091:11-23 (Fielder Direct) (attached as Evi. App. Ex. 6) (emphasis added).  Each license agreement for each version of the P.O. Writer Plus product included an explicit provision prohibiting the disclosure or copying of the software as well as the User Manuals.

> Client acknowledges the proprietary nature of P.O. WRITER PLUS and ***agrees not to make copies of P.O. WRITER PLUS software or User's Manuals.***  Client is aware that American Tech, Inc. will vigorously prosecute anyone who makes unauthorized copies of its software and User's Manuals, and client will be responsible for all loss of profits and costs of prosecution in the event of such duplication.

Sample P.O. Writer Plus License Agreement ¶ 4 (emphasis added) (DX 651 at POWriter_0000003 et seq.) (attached as Evi. App. Ex. 7).  Because the P.O. Writer licensees were under an obligation to keep the information contained in the P.O. Writer Plus Manual confidential, the manuals were not publicly accessible.

Further, the obligation of the licensees to keep the P.O. Writer Manual confidential is specifically designed to keep the Manual from being disseminated to persons of ordinary skill in the art.  For at least these reasons, the P.O. Writer Manual is not a "printed publication" as that term is used in 35 U.S.C. §§ 102 and 301 and is not available as prior art against claims 1-5.

### 2.    The P.O. Writer Manual Fails to Anticipate Claims 1-5

In addition, the P.O. Writer Manual does not anticipate claims 1-5.  As an initial matter, the P.O. Writer Plus system was not an "electronic sourcing system" as defined in the '172 patent specification and claims.  Rather, it was just what its name would imply, a software package that could be used to produce purchase orders (*i.e.*, "P.O.s").  However, this P.O. system lacked nearly all of the other functionality recited in claims 1-5 of the '172 patent.  In particular, it could not be used by a prospective buyer to perform the entire process (as described and claimed in the patent) of (a) searching for and finding goods in vendor product catalogs in a database such that the goods are associated with a source or vendor, (b) generating an order list that includes selected matching items found in the searches, (c) building a requisition which includes items and their associated sources from an order list, (d) generating multiple purchase orders from the requisition that incorporates the goods and their sources (*i.e.*, the matching items) found as a result of the database searches, (d) determining applicable pricing, and (e) determining whether the goods are available in the inventory of the prospective vendor, as described in more detail in the following paragraphs.

Importantly, with respect to claim 1, the P.O. Writer Manual does not disclose a database containing data relating to items "associated with at least two vendors."  Vendor data is not associated with item records.  Although items may be associated with a Catalog ID and that Catalog ID may be by vendor, it is not

necessary to set up a Catalog ID by vendor. *See* P.O. Writer Manual at 7 ("All of these fields are optional" including the Catalog ID field, which is notably shown as unfilled in the included illustration). Further, the ultimate vendor for an item is not necessarily the Catalog ID vendor. McEneny Dep. (6/10/2010) at 48:18-51:12; 52:11-15 (Evi. App. Ex. 10).

Moreover, the P.O. Writer Manual fails to disclose an intermediate step of creating an order list between a database search and building a requisition as required by claim 1. Rather, the P.O. Writer system can start with building a requisition or building a purchase order (without even building a requisition). If the user starts with a requisition, from the search results generated in that process, the system builds a requisition. Once the requisition is completed, a user backs out to the Main Menu and invokes the Requisition Interface module to convert the requisition to a purchase order and then backs out yet again to the Main Menu to invoke the Create P.O. module to actually create a purchase order. *See* P.O. Writer Manual at 140, 142, 149-150. At no time is an order list generated. There is simply no disclosure that the system had this functionality nor any disclosure of any structure having such functionality. Ms. Fielder McEneny confirmed that the P.O. Writer system did not generate an order list from search results. A user could either build a requisition (if he had licensed the optional Purchase Requisitioning module) or fill out a purchase order form without first creating a requisition. McEneny Dep. (6/10/2010) at 63:11-66:2 (Evi. App. Evi. App. Ex. 10)The text cited by the Examiner (page 47) does not relate to a process of generating an order list to be used for building a requisition, but rather relates to building a Purchase Order without the intermediate step of building a requisition. ("You can move these items to the P.O. screen - Press F7").

Nor does the P.O. Writer Manual describe a system wherein a requisition is built "that uses data obtained from said database relating to selected matching items on said order list" as recited in claim 1. As set forth above, the P.O. Writer system does not include any means for generating an order list.. Therefore, since there are no means for generating an order list that includes selected matching items, it follows that the P.O. Writer system did not build a requisition using data relating to selected matching items on an order list. And it further follows that the P.O. Writer system did not include any means for processing such a requisition to generate purchase orders for the selected matching items on the order list.

In addition, the Examiner fails to cite any disclosure in the P.O. Writer Manual of any capability for generating multiple purchase orders from a single requisition, as required by claim 1.

Therefore, for all of these reasons, the P.O. Writer Manual fails to anticipate claim 1.

Claims 2-5 similarly are not satisfied by the P.O. Writer Manual since each of these claims includes all of the elements of claim 1, and since the P.O. Writer Manual fails to satisfy every element of claim 1.

Moreover, with respect to claim 2, the P.O. Writer Manual does not disclose or suggest an electronic sourcing system wherein the means for searching for matching items includes means for searching a database for "segments of data relating to items associated with a vendor," "means for generating a hit list of such

vendor segments" or "means for selectively viewing the vendor segments identified for said hit list" as recited by claim 2. Item records in the P.O. Writer system are not associated with a vendor. Moreover, nowhere does the P.O. Writer Manual disclose a means for using results of a database search to generate a "hit list" of vendor segments or "means for selecting desired items from a vendor segment identified by said hit list" in the P.O. Writer system. There are no vendor segments disclosed because the item data is not associated with any particular vendor. Ms. McEneny confirmed that item data returned as results of searching the database do not include only associated vendor. McEneny Dep. (6/10/2010) at 58:8-23; 62:7-18 (Evi App. Evi. App. Ex. 10). Therefore, the PO Writer Manual does not disclose each element of claim 2 for these additional reasons.

     With respect to claim 4, the item records in the Item Master file in the P.O. Writer system did not include any price-related information nor does the P.O. Writer Manual describe any other means for determining the applicable price from a vendor for a selected matching item. The Examiner relies on a price analysis using prior purchase orders. *See* P.O. Writer Manual at 71. This is nothing like system of claim 4 of the '172 patent, which requires a process of searching a database to determine the applicable price for an item to be requisitioned. A person of ordinary skill in the art would certainly understand that buyers issue P.O.s for never-before purchased items all the time and previous purchase prices frequently go out of date, so it is common that the price paid for an item in the past (if the item had been purchased previously) would have no relationship to the vendor's applicable price at the time when a new P.O. is issued. Moreover, reference to a past purchase history is not the same means for performing the claimed function as described in the patent specification and, thus, it does not satisfy the means-plus-function limitation and, therefore, cannot satisfy claim 4.

     Claim 5 recites the system of claim 1 which additionally includes a "means for determining whether a selected matching item is available in inventory." In rejecting this claim, the Examiner has relied on the description of the Inventory Module at pp. 102-103 of the P.O. Writer Manual. This module permits users to obtain up-to-date inventory information for ***the user's own internal inventory***. This includes showing inventory on hand and any outstanding P.O.s for inventoried items. However, unlike the system of claim 5, the inventory module in the P.O. Writer System is completely unrelated to the process of requisitioning and ordering goods, other than to the extent that it enables automatic generating of Re-order Analysis (but, notably, neither pp. 102-103 nor anything anywhere in the P.O. Writer Manual disclose any process by which such an analysis is used to create an order list or requisition for a customer order to be fulfilled out of the available inventory). For all of these reasons, in addition to those previously provided, claim 5 is not anticipated by the P.O. Writer Manual.

     Moreover, claim 5 requires that the system have the capability of determining whether a selected matching item is available in the vendor's inventory, so that the prospective customer may purchase it. The inventory module of the P.O. Writer system only determined the inventory levels of the customer's own

Control No.: 95/000,487                    23                    Docket No.: EPL-002REX1
Appeal Brief under 37 C.F.R. § 41.67

internal inventory.  There is no description whatsoever in the P.O. Writer Manual of searching a database to determine whether a particular vendor has the item in inventory.  Ms. Fielder McEneny confirmed that the system lacked this capability.  McEneny Dep. (6/10/2010) at 35:16-38:17; 181:10-13 (Evi. App. Ex. 10)Thus, the P.O. Writer Manual cannot satisfy the elements of claim 5.

### 3.        Conclusion

The P.O. Writer Manual was not publicly accessible to those of ordinary skill in the art and, thus, fails to qualify as a printed publication under 35 U.S.C. §§ 102 and 301.  Further, the P.O. Writer Manual fails to anticipate claims 1-5.  Accordingly, *e*Plus requests that the rejection of Ground #7 be withdrawn.

### H.        Ground #8 – Claims 1-5 Are Patentable Over the J-CON Manual

Claims 1-5 stand rejected under 35 U.S.C. §102(b) as allegedly anticipated by Volume I of the Cooperative Computing Inc. ("CCI") manual dated April 1994, referred to herein as the "J-CON Manual."

### 1.        The J-CON Manual Was Not Publicly Accessible

The Examiner has failed to make a showing that the J-CON Manual qualifies as a "printed publication."  There is no indication that the J-CON Manual was ever sold, distributed, or otherwise made available to the public.  Rather, it appears that the J-CON Manual was provided by CCI to customers only when they licensed a J-CON system.  The accessibility of the J-CON Manual was also at issue in the ePlus, Inc. v. SAP America, Inc. litigation.  Evidence in that litigation demonstrates that the J-CON Manual was not publicly accessible to those of ordinary skill in the art.  Dr. Preston Staats, creator and maker of the J-CON system, testified under oath that CCI licensed the hardware, software and manuals for the J-CON system as a package.  The manuals were never publicly distributed.  Trial Transcript at 1779:10-1780:4 (attached as Evi. App. Ex. 8).  The licensees were under an obligation to keep the information contained in the J-CON software and J-CON Manual confidential.  *Id.*  Distribution of the J-CON Manuals to interested persons of ordinary skill in the art, such as other computer science professionals, was specifically precluded.  Thus, the J-CON Manuals were not within reach of persons of ordinary skill in the art.

For at least these reasons, the J-CON Manual is not a "printed publication" as that term is used in 35 U.S.C. §§ 102 and 301 and is not available as prior art against claims 1-5.

### 2.        The J-CON Manual Fails to Anticipate Claims 1-5

In addition, the J-CON Manual fails to anticipate claims 1-5.  As a threshold issue, the J-CON system would be understood by a person of ordinary skill in the art to be designed for use as a "point of sale" system in retail establishments to permit employees of those establishments to find automotive parts from a catalog of the retailer's available parts rather than as an "electronic sourcing system" as defined in the '172 patent specification and claims.  With the J-CON system, once one or more parts are found in the catalog, the system is used to generate a ticket for picking the parts from the retailer's inventory and to supply information describing the selected parts at the point-of-sale terminal to consummate of the transaction.

Control No.: 95/000,487                    24                    Docket No.: EPL-002REX1
Appeal Brief under 37 C.F.R. § 41.67

The systems embodied in claims 1-5 are for use in an organization that acquires supplies through the requisition and purchase order process. These systems exist primarily for the benefit of the entity Seeking to purchase products, that is, the purchaser.

In contrast, the J-CON system is intended for retailer, or seller, applications. While a particular retailer may stock parts from many different manufacturers, the retailer is selling only those parts in its own inventory to the customer, not parts of other retailers. Thus, there is only a single source in the J-CON system – the retailer using the system. Moreover, requisitions and purchase orders are not part of the process – these are unique to institutional purchasers. The buyer-seller distinction between the systems of claims 1-5 and the J-CON system is not merely abstract. These distinctions are manifestly obvious when the language of the claims, according them the claim constructions set forth above, is compared to the disclosure of the J-CON Manual.

Regarding the first limitation of claim 1, the J-CON Manual fails to disclose or even suggest a database containing data relating to "items associated with at least two vendors." The Examiner relies on Ch. 3, Sec. 5, Page 1 of the J-CON Manual. While, this section of the J-CON Manual does in fact refer to a product catalog, even a cursory review of the J-CON Manual reveals that it contemplates only a single product catalog – the electronic parts catalog of the retailer using the J-CON system. There is nothing in the J-CON Manual disclosing the use of item data associated with at least two vendors. The sole vendor is the retail business owning and using the J-CON system.

The fact that the J-CON system uses item data for items from a single vendor whereas claim 1 recites "items associated with at least two vendors…" is a significant distinction. Users of the J-CON system have no reason to provide their customers with access to items from other vendors or sources. Rather, the J-CON system is intended to facilitate the exact opposite, that is, purchases from a single source, *i.e.*, the retailer user of the J CON system. This is in direct contrast to the system embodied in claim 1 where items associated with at least two vendors are maintained in the database so that, among other things, the prospective purchaser may compare product offerings and prices from more than one vendor. Simply put, the system of claim 1 does not favor any single source, while that of the J-CON system is designed to benefit only a single source. Therefore, the J-CON Manual fails to disclose a database containing data relating to items associated with at least two vendors – in fact, its disclosure teaches away from this feature because it is designed for single source purchasing.

Moreover, there is no "means for generating an order list that includes at least one matching item selected by said means for searching." The documents generated by the J-CON system are a pick ticket and a receipt. The customer has no means to generate an order list using the results of a Part Finder search.

Further, with respect to claim 1, the J-CON Manual fails to disclose or suggest any "means for building a requisition that uses data obtained from said database relating to selected matching items on said

order list." The Examiner relies on the disclosure at Ch. 3, Sec. 2, p. 4 of the J-CON Manual for creation of a ticket which states, "At Selection, choose one: Enter the number for the part you want. When you finish selecting parts, press <Order Screen> to return to POS." The table above this cited portion of the J-CON Manual shows a parts list with part names, part numbers, quantity available, and prices. This disclosure describes how parts are selected for purchase. This ticket is then forwarded to the POS application so that the selected parts can be purchased. It may also be forwarded to the person picking the parts from the retailer's inventory if the cashier does not retrieve them directly. This ticket does not meet the definition of a requisition which is a request to purchase something that is prepared and used only by a prospective purchaser. As described above with reference to the SABRE system, requisitions would be understood by persons of ordinary skill in the art to be customers' internal documents used to transmit requirements from a user to a purchasing department for approval of a desired purchase, not documents that are communicated to vendors. This is distinctly different from the "pick tickets," which are created on the vendor's computer system and used only by the vendor, as described in the J-CON Manual. With the J-CON system, after the creation of the ticket, the only remaining step to complete the sales transaction is for the customer to tender payment. Nowhere in the J-CON system is a requisition built.

In the world of commercial sourcing of goods – the application for which the system of the patented inventions is targeted – products are not purchased directly by those employees, groups, and/or divisions desiring them. These organizations use requisitions and purchase orders to complete transactions so that the institutions can maintain control over what is purchased and exercise their purchasing power to obtain goods at competitive prices. Requisitions are used as an initiating document to begin the sourcing process. More significantly, as a formal request for the product, the requisition alone does not indicate to a seller an intention and commitment to purchase. In fact, as explained above, requisitions are nearly always prepared for internal use only. This is the meaning of "requisition" as it would be understood by a person of ordinary skill in this art based upon its use in the patent specification. It is not the normal or customary procedure for suppliers to *see* requisitions. The only indication a supplier would get regarding items being sourced would be the purchase order that constitutes the commitment to purchase an item. Hilliard Dec., ¶¶ 43(B), (C), 121.

The process of purchasing something from a retailer, as with the J-CON system, is wholly inconsistent with the notion of "sourcing" (*i.e.*, determining who will supply the product) because the determination of the vendor or supplier occurs prior to the item selection, as soon as the prospective buyer enters the retail establishment. Simply put, a means for building requisitions (in the context described in claim 1) does not make sense for a retail system like J-CON and, correspondingly, is not once mentioned as a part of the system described in the J-CON Manual. Requisitions have a specific meaning in the context of commercial sourcing as described in '172 patent's specification, and as understood by persons of ordinary

skill in the art. This meaning is wholly inconsistent with walking into a retail store and purchasing goods at that store. Therefore, for this reason as well, the J CON Manual fails to disclose the elements of claim 1.

Regarding the next limitation of claim 1, the J-CON Manual fails to disclose or even suggest means for "processing said requisition to generate purchase orders for said selected matching items." As discussed above, requisitions are not generated in the J-CON system. Therefore, there can be no "means for processing [the] requisition to generate purchase orders for [the] selected matching items" in the J-CON system. The Examiner has relied upon Ch. 4, Sections 3 and 4 which disclose methods for generating purchase orders in the J-CON system. However, these are not purchase orders created as a result of the database search process involving a retail customer, as disclosed in the prior elements of claim 1 and referenced by the Examiner with regard to those elements (*i.e.*, Ch. 3 of the J-CON Manual). These are purchase orders created by the retailer itself to replenish its own retail inventory so that it will have product on hand to fulfill the needs of its retail customers. The purchase orders generated in the J-CON system are distinctly different from the purchase orders in the system of claim 1 because they do not result from the process of searching a database and building a requisition. If the purchase order creation of the J-CON system were analogous to the system of claim 1, the buyer would have to be the J-CON retailer's customer and the purchase order would be generated by that customer's system processing a requisition – that is, the purchase order creation would be a part of the entire methodology which starts with a customer's system maintaining a database of items associated with multiple vendors, the customer's system searching for desired items in selected portions of the database, selecting items found in those searches, and building a requisition. In contrast, the way the J CON system actually operates, purchase orders are created by the retailer purely based on the retailer's inventory levels, either automatically by the system or manually by an operator of the system. At no point in using the J-CON system are purchase orders created based on processing a requisition. Unlike the system of claim 1, the customer purchase process with the J-CON system does not rely on requisitions or purchase orders. The Examiner is mixing the J-CON process for restocking the retailer's supply of goods with the J CON process for selling goods to customers via a point-of-sale terminal in a hindsight-based attempt to meet the claim limitations – an attempt that still falls short. Moreover, the Examiner has failed to show any disclosure indicating that the J-CON system had the capability of generating multiple purchase orders from a single requisition as required by claim 1. Therefore, for this reason as well, the J-CON Manual fails to disclose the elements of claim 1.

Claims 2-5 similarly are not satisfied by the system disclosed in the J-CON Manual since each of those claims includes all of the elements of claim 1, and since the J-CON Manual fails to disclose several elements of claim 1.

In addition, with respect to claim 2, the J-CON Manual does not disclose any "means for searching the database for segments of data relating to items associated with a vendor that contain vendor items that

match the product information for said at least one desired item," "means for generating a hit list for such vendor segments," or "means for selectively viewing the vendor segments identified for said hit list," as recited in claim 2. The results generated in a Part Finder database search do not include associated vendor information. The only vendor from whom the customer may purchase the automotive parts is the retailer.

Claim 5 recites the additional limitation of "means for determining whether a selected matching item is available in inventory." In discussing this claim element, the Examiner relies upon Ch. 3, Section 2, pages 6 and 10 of the J-CON Manual which describe looking up and displaying the available quantity of an item in the retailer's internal inventory. As a preliminary matter, the section relied upon by the Examiner, that is Ch. 3, describes the PartFinder application. That is the portion of the J-CON system that helps employees look-up and find parts for customers. On p. 6, it states that AVL is the quantity available. If the quantity is less than one, PartFinder looks for a replacement part. Alternatively, PartFinder can tell you if the part is in the Warehouse stock or if it must be special ordered. This portion of the J-CON Manual is separate and distinct from the portion describing the generation of purchase orders, which as discussed above, are generated to replenish inventory for the retailer – not in response to customer requests. In the language of claim 5, generating a requisition is a precursor to the step of "determining whether a selected matching item is available in inventory." Thus, it is clear that while the J-CON Manual describes the J-CON system as determining whether a selected item is in the retailer's inventory, it does so only in the context of customer look-ups, and not as part of any requisition process. There is no requisition in the J-CON system. The Examiner appears to be picking features out of the J-CON Manual in hindsight to reconstruct the system of claim 5 without regard for the context of these features or whether their combination anticipates these features as they are recited by the claims and pursuant to 35 U.S.C. § 112, ¶ 6.

Moreover, the J-CON system had no functionality to enable it to determine the availability of an item in a third-party vendor's inventory. The only inventory examined was the retailer's own inventory. Thus, the inventory feature of the J-CON system fails to satisfy claim 5. Claim 5 requires the ability to determine the availability of an item in a supplier's inventory.

### 3.    Conclusion

The J-CON Manual was not publicly accessible to those of ordinary skill in the art and, thus, fails to qualify as a printed publication under 35 U.S.C. §§ 102 and 301. Further, for the reasons discussed above, the J-CON Manual fails to anticipate claims 1-5. Accordingly, *e*Plus requests that the rejection of Ground #8 be withdrawn.

### I.    Ground #9 – Claims 1-5 Are Patentable Over the Gateway Manual

The Examiner has also rejected claims 1-5 under 35 U.S.C. §102(b) as allegedly anticipated by the Gateway Manual. This rejection is similarly without merit.

Control No.: 95/000,487                   28                     Docket No.: EPL-002REX1
Appeal Brief under 37 C.F.R. § 41.67

### 1. The Gateway Manual Was Not Publicly Accessible

The Examiner has failed to make a showing that the Gateway Manual qualifies as a "printed publication." To the contrary, the Gateway 2000 license agreement included an explicit prohibition against any public disclosure of information concerning the Gateway 2000 computer program or any materials relating to the Gateway 2000 computer program, including the associated manuals as set forth below:

> Proprietary Information. LICENSEE understands and agrees that the Program constitutes confidential and proprietary information of LICENSOR. ***LICENSEE agrees to maintain the Program in strict confidence and agrees not to duplicate or otherwise reproduce the Program in whole or in part or any materials relating thereto except as provided herein.*** LICENSEE agrees to take all reasonable steps to insure that no unauthorized persons shall have access to the Program and that all authorized person having access to the Program shall refrain from any disclosure, duplication or reproduction.

TSA Gateway 2000 License Agreement with Aramco Services at Schedule A, Section 6 (emphasis added) (DX 175 TSA_0000289 et seq.) (attached as Evi. App. Ex. 9).

Moreover, the Gateway Manual itself also includes an explicit prohibition of any copying, reproduction or dissemination of the manual.

> This product contains proprietary information which is protected by copyright. ***No part of this product may be copied, reproduced, translated or transcribed (other than for backup purposes) without the prior written consent of Technical Services Associates Inc.***

Gateway Manual, Title Page (emphasis added). As the Gateway licensees were under an express contractual obligation to keep the information contained in the Gateway Manual confidential, there is no showing that such manuals were publicly accessible.

For at least these reasons, the Gateway Manual is not a "printed publication" as that term is used in 35 U.S.C. § 102 and is not available as prior art against claims 1-5.

### 2. The Gateway Manual Fails to Anticipate Claims 1-5

In addition, the Gateway Manual fails to anticipate claims 1-5. First, the Gateway Manual describes a form filler program facilitating a user's manual requisition and order process. Importantly, it is not an "electronic sourcing system" as such term would be understood by a person of ordinary skill in the art reviewing the '172 patent's specification. Specifically, it could not be used by a prospective buyer to perform the entire sourcing process (as described in the patent) of (a) locating and finding goods associated with particular vendors in order to generate order lists and build a requisition for the selected goods, (b) using that requisition as the basis for generating multiple purchase orders incorporating the goods and their sources (*i.e.*, the selected matching items) found as a result of database searches, (c) determining vendors' applicable pricing, and (d) determining whether the selected goods are available in the inventory of the prospective supplier, as described in more detail below.

While the purported "catalogs" described in the Gateway Manual superficially make reference to a "supplier," in actuality, the data relating to items in such purported "catalogs" are not "associated with at least

two vendors." The term "supplier," as used in the Gateway system is a descriptive attribute associated with each of the items that has no relationship to the "supplier" that will actually be the source (*i.e.*, the vendor) of supply for a desired item. Thus, the "catalogs" of the Gateway system are a list of items, each of which has some attributes, one of which is an attribute called "supplier" that has no relationship to what the actual supplier (*i.e.*, vendor) will really be. In addition, this "supplier" can be modified for purposes of requisitioning. Hilliard Dec., ¶ 132.

Nor is there any disclosure in the Gateway Manual of any means for generating an order list of matching items found in conducting searches. The system did not generate any order lists prior to requisitions.

The Gateway Manual further fails to anticipate claim 1 because there is no description of a "means for building a requisition that uses data obtained from said database relating to selected matching items on said order list" as required. Since the Gateway system did not generate any order lists, it necessarily follows that it cannot build a requisition using data from such nonexistent order list. The portions of the Manual relied upon by the Examiner are inapposite as they fail to disclose any preexisting order list from which a requisition is built. Moreover, p. 4-17 deals with creation of requisitions for stock items. Stock requisitions are not relevant to the patent claims. No purchase order is ever generated from such a requisition.

Regarding the next element of claim 1, "means for processing [the] requisition to generate purchase orders for the selected items," the Gateway Manual fails to disclose or even suggest this feature. While the Gateway Manual does in fact state that a purchase order can be created by importing data from a requisition, there is no disclosure of any capability to generate multiple purchase orders from a single requisition, as required by claim 1.

Claims 2-5 similarly are not satisfied by the Gateway Manual since each of these claims includes all of the elements of claim 1, and since the Gateway Manual fails to satisfy every element of claim 1.

With respect to claim 2, the Gateway Manual fails to disclose a system wherein the means for searching for matching items includes means for searching a database for "segments of data relating to items associated with a vendor," "means for generating a hit list of such vendor segments" or "means for selectively viewing the vendor segments identified for said hit list" as recited by claim 2. The items in the Gateway system database are not associated with the vendor from whom the item will be procured. Hilliard Dec., ¶¶ 132, 137.

With respect to claim 5's requirement that the electronic sourcing system include a "means for determining whether a selected matching item is available in inventory," the Gateway Manual fails to disclose or even suggest this feature.

In rejecting this claim element, the Examiner relies on the description of stock ordering in the Gateway Manual. However, the functionality described in this portion of the reference does not relate to

Control No.: 95/000,487                           30                    Docket No.: EPL-002REX1
Appeal Brief under 37 C.F.R. § 41.67

checking the availability of an item in a vendor's inventory; it is checking whether an item has been previously entered into the database. If not, the user is able to enter it. It has nothing to do with checking the availability of an item in a vendor's inventory. *See* Gateway Manual at p. 4-17.

In addition, this portion of the Manual deals with stock ordering. Stock ordering is not based on ordering from vendor catalogs – the type of ordering in the Gateway system most analogous to claims 1-5. Also, this function in the Gateway system that the Examiner has incorrectly analogized to claim 5, is performed prior to creating a requisition, not after. Just above the portion relied upon by the Examiner, still on page 4-17, the reference states, "You can select an item from the list by positioning the lightbar to a desired item and pressing the enter key. The stock item will be moved into your requisition." In contrast, in the system of claim 5, "determining whether a selected matching item is available in inventory" occurs after the order list is created — there must be a matching item found in a search of the database that was selected for inclusion on the order list. Moreover, inventory checking functionality is not included in the portion of the Gateway Manual that deals with catalog look-up orders. For this reason, claim 5 is not satisfied by the Gateway Manual.

### 3. Conclusion

The Gateway Manual was not publicly accessible to those of ordinary skill in the art and, thus, fails to qualify as a printed publication under 35 U.S.C. §§ 102 and 301. Further, for the reasons discussed above, the Gateway Manual fails to anticipate claims 1-5. Accordingly, *e*Plus requests that the rejection of Ground #9 be withdrawn.

### J.   CONCLUSION

The '989 Patent, the P.O. Writer Manual, the J-CON Manual and the Gateway Manual, fail to qualify as prior art under 35 U.S.C. §§ 102 and 301. For these reasons, the rejections of Grounds 2 and 7-9 are in error and must be withdrawn. Further, for the reasons set forth above, none of the applied references teaches or suggests each element of any of the claims of the '172 Patent. Accordingly, *e*Plus requests that the rejections of claims 1-5 of the '172 Patent be reconsidered and withdrawn.

Control No.: 95/000,487                           31                    Docket No.: EPL-002REX1
Appeal Brief under 37 C.F.R. § 41.67


Dated:  April 25, 2011                          Respectfully submitted,



                                                By /Thomas J. Scott, Jr./
                                                Thomas J. Scott, Jr.
                                                   Registration No.:  27,836
                                                GOODWIN PROCTER LLP
                                                901 New York Avenue, NW
                                                Washington, DC  20001
                                                (202) 346-4000
                                                Attorney for Appellant