# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| *e*PLUS INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | Civil Action No. 3:09-CV-620 (REP) |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LAWSON SOFTWARE, INC.,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF *e*PLUS INC.'S REPLY IN SUPPORT OF ITS MOTION TO SHOW CAUSE WHY LAWSON SOFTWARE, INC. SHOULD NOT BE HELD IN CONTEMPT OF THE COURT'S PERMANENT INJUNCTION

Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100

Scott L. Robertson (admitted *pro hac vice)*
Jennifer A. Albert (admitted *pro hac vice)*
David M. Young (VSB#35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone: (202) 346-4000

Michael G. Strapp (admitted *pro hac vice)*
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone: (617) 570-1000

*Attorneys for Plaintiff, ePlus Inc.*

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ...........................................................................................1

II.  ARGUMENT ..................................................................................................5

   A.   Purported Changes To The Shopping Cart Do Not Render Systems With
        RQC More Than Colorably Different From The Infringing Systems ....................5

   B.   Systems With RQC Continue To Have The Capability To Generate
        Multiple Purchase Orders From A Single Requisition ............................................9

   C.   The Allegedly Modified Systems Continue To Have The Capability To
        Convert Data Relating To A Selected Matching Item And An Associated
        Source To An Item And A Different Source ..........................................................11

   D.   Defendant Has Violated The Injunction Order By Encouraging Its
        Customers To Continue To Use The Infringing Systems ......................................13

   E.   *e*Plus Intends To Seek Discovery Concerning Defendant's Waiver Of The
        Attorney-Client Privilege.....................................................................................14

III. CONCLUSION.............................................................................................17

## I.     INTRODUCTION

Plaintiff *e*Plus Inc. ("*e*Plus") respectfully submits this reply in support of its motion that the Court enter an order requiring Defendant Lawson Software, Inc. ("Defendant") to show cause why it should not be held in contempt for violating the permanent injunction entered in this action.

On September 15, 2011, the Court asked Defendant to attempt to harmonize its representations that it would suffer "irreparable harm" and that "devastating" consequences would befall Defendant and its customers if a permanent injunction were entered with Defendant's statements to its customers that it had a simple and quick "design around" that was a "replacement" for RSS, and that could be downloaded for free in 20 minutes.  The Court informed Defendant that it wanted to "know and understand exactly where along the way Lawson's product was when various statements were made to the Court about how much time it would take, how expensive it would be to deal with the consequences of an injunction in the event of infringement.  I want that developed.  I want to see what that record is."  Clements Reply Decl., Ex. 2 (Conf. Tr., Dkt. No. 805, Sept. 15, 2011) at 22:19-25.

In its opposition, Defendant does not even attempt to bridge the vast gap between the statements it made under oath to the Court, and the documents, videos, and seminars Defendant provided to its customers.  Instead, in a single sentence buried on page 27 of its 30-page opposition, Defendant now claims that its "statements about the time and effort to implement entirely new procurement systems from third party vendors were not directed to its own redesign efforts."  Opp. at 27.  Defendant's attempt to explain away the statements it made under oath to the Court fails because ***during the injunction proceedings*** Defendant was already developing ***its own alleged*** "design around."  *See* Christopherson Decl. (Dkt. No. 804-9) at ¶ 27 (development of RQC began on February 8, 2011).  The testimony and attorney argument Defendant offered

regarding the effort involved in implementing systems from ***third party vendors*** was irrelevant and misleading since Defendant already knew at the injunction hearing that it planned to offer ***its own*** free, downloadable alleged "design around" application.  If so, why did it not inform the Court?

Defendant's counsel had a duty of candor to this tribunal to tell the Court, ***before, during, or after the injunction proceedings***, that it had allegedly developed a simple and quick "design around" that purportedly would alleviate ***any*** harm to it and its customers.  Instead, nearly two months after development work on RQC had already begun, Defendant represented to this Court that an injunction would have "***a direct and significant adverse effect on the public***."  Def.'s Mot. for Stay of Permanent Inj. (Dkt. No. 643, Mar. 28, 2011) at 18 (emphasis added).

Furthermore, only seven weeks before it made RQC generally available to its customers, Defendant misled the Court again when it claimed that "if customers were forced to replace their current RSS systems [i]t would cause at least ***an increase in operational expenses*** in these types of hospitals, and more than likely would also cause ***employee complications within the hospitals***, ***morale issues of potential loss of jobs***, ***and*** I think a hospital would say that it would ***interrupt their quality of care***.  Def.'s Proposed Findings of Fact and Conclusions of Law (Dkt. No. 706, Mar. 30, 2011) at 21 (emphasis added).

Defendant's failure to offer a credible explanation for its testimony and statements to this Court regarding the "devastating" harm that would result from an injunction is only one critical problem with Defendant's opposition.  Equally important is Defendant's failure to explain how systems with RQC can be more than colorably different than the infringing systems when it repeatedly told its customers that RQC has "100% of the functionality" required by RSS users

2

and the same "look and feel" as RSS.  Clements Decl. (Dkt. No. 799-11, Sept. 9, 2011), Ex. 45 (RQC 743).

Defendant knew when it introduced RQC to its customers that its statements regarding the functionality and performance of the "design around" would be closely scrutinized by *e*Plus. It is simply not credible for Defendant to argue that its statements about the functionality of systems with RQC were ***merely*** "[g]eneral marketing statements about the strength of the new product [and] are of no relevance to whether or not the *TiVo* standard for contempt is met here." Opp. at 27.  In truth, the representations Defendant made to its customers about RQC are powerful evidence that systems with RQC are not more than colorably different than the infringing systems and that contempt proceedings are appropriate.  Once again, Defendant wants to "run away" from its own documents.

Thus, like Defendant's half-hearted attempts to explain away the representations it made to this Court and the statements it made to its customers, the three technical arguments that Defendant advances to show colorable differences between systems with RQC and the infringing systems are also unavailing.[1]

First, Defendant suggests that because RQC allegedly no longer has the RSS "shopping cart," systems with RQC are more than colorably different than the infringing systems.  As an initial matter, Defendant's claim that the "shopping cart" has been eliminated in RQC is belied by the fact that user guides and manuals for RQC still suggest that the "shopping cart" feature is available in RQC.  *See* Opening Br. at 6.  Defendant's characterization of these user guides and

---

[1] Defendant has apparently withdrawn additional arguments it previously raised in correspondence regarding purported differences between systems with RQC and the infringing systems.  *See, e.g.,* Clements Decl. (Dkt. No. 799-11, Sept. 9, 2011), Ex. 13 (Letter from D. McDonald to S. Robertson dated 6/10/11) at 14 (asserting that new pop-up window in Punchout with disclaimer message that could be disabled by users was evidence that systems with RQC did not infringe the *e*Plus patents).

manuals as "marketing puffery" is unconvincing. *See* Opp. at 13.  Moreover, even if Defendant

has relabeled the "shopping cart" user interface feature as "Requisition Lines" in RQC, the user

interface for the order list remains and the evidence demonstrates that systems with the RQC

application still employ the same process to create requisitions using order lists as those system

configurations the jury found infringing.

Second, Defendant claims that systems with RQC are more than colorably different than

the infringing systems because Defendant has purportedly modified RSS to enable the categories

search functionality to drill down through the UNSPSC code hierarchy tree to the third level, the

class level, rather than to the fourth level, the commodity level.  This too is an insignificant

modification and does not make systems having RQC more than colorably different than those

system configurations found infringing.  Indeed, this modification is an archetypal obvious

modification that the Federal Circuit has stated will not constitute a colorable difference.  *See*

*Tivo Inc. v. Echostar Corp.*, 646 F.3d 869, 882-883 (Fed. Cir. 2011) (holding that a "***nonobvious***

***modification*** may well result in a finding of more than a colorable difference") (emphasis

added).

Third, Defendant argues that systems with RQC are more than colorably different than

the infringing systems because requisitions must be separate for punchout items and item master

vendor items.  This argument fails because, even if true, it is irrelevant.  Defendant concedes that

systems with RQC still allow a user to conduct searches of vendor catalogs in the item master,

place two different items offered by two different vendors into a single requisition, and generate

multiple purchase orders from a single requisition, satisfying claim 1 of the '172 Patent.  *See*

Opp. at 24 ("it is possible to generate multiple purchase orders from a single requisition, if all of

the items come from Item Master").[2]  While Defendant suggests that Dr. Weaver never testified

about this feature of the infringing systems at trial, the trial record reveals that Dr. Weaver

demonstrated this exact functionality to the jury.  *See* Weaver Decl. (Dkt. No. 799-1, Sept. 9,

2011) at ¶ 40 n.4; *see also* PX-374, PX-376, Clements Reply Decl., Ex. 1 (Trial Tr., Dkt. Nos.

644-696, Jan. 4-27, 2011) at 634:7-653:3 (system demonstration where two purchase orders

generated from requisition, one to Baxter Healthcare for surgical gloves and a second to Diablo

for a Dell Inspiron computer).

In short, systems with RQC are not more than colorably different than the infringing

systems and contempt proceedings are appropriate.  Indeed, Defendant admitted as much when it

touted the fact that RQC has "100% of the functionality" required by RSS users and has the same

"look and feel" as RSS.  Clements Decl. (Dkt. No. 799-11, Sept. 9, 2011), Ex. 45 (RQC 743).

The Court should decline Defendant's invitation to ignore the admissions Defendant made to its

customers.  *e*Plus respectfully requests that the Court enter an order requiring Defendant to show

cause why it should not be held in contempt and sanctioned for its deliberate disobedience of the

permanent injunction.

## II.    ARGUMENT

### A.    Purported Changes To The Shopping Cart Do Not Render Systems With RQC More Than Colorably Different From The Infringing Systems

There is no dispute that Defendant changed the names on its user interface to remove all

references to the "shopping cart" and related terminology like "order" and "checkout."  Nor

should there be any dispute that these changes do not save Defendant from contempt.  They are

shallow, insubstantial and transparent.  And while Dr. Shamos asserts that Defendant is not

---

[2]  Although Defendant suggests otherwise in its opposition, claims 3, 26, 28 and 29 of the '683
Patent, unlike claim 1 of the '172 Patent, only require that the system be capable of generating
one or more purchase orders from a requisition.

relying on "nomenclature" as a basis for claiming that RQC is more than colorably different from RSS, Shamos Decl. (Dkt. No. 804-11, Sept. 19, 2011) at ¶ 75, Defendant has not made any other changes to the order list features or functionality of the infringing systems that would make systems with RQC more than colorably different from the infringing systems.

Defendant contends in its opposition that it has eliminated the "means for generating an order list." But the Court construed the structure for the "means for generating an order list" element simply to be "a user interface operating on a computer through which a user may select from results from a search program." Mem. Op. (Dkt. No. 204, Apr. 30, 2010) at 50. The RQC application, like the RSS application, has a user interface through which a user may select items from results of searches to be added. In the RSS application the user interface was labeled "My Cart," and in the RQC application the user interface is now relabeled "Requisition Lines." The functionality, however, remains unchanged. "Legerdemain" does not equate to a "colorable difference."

The nomenclature change in RQC, therefore, is irrelevant, because the order list present in RSS and in RQC includes the code and data structures for maintaining and displaying a list of items selected by users prior to checking out, and the same code and data structures are used in both the RSS "Shopping Cart" and the RQC "Requisition Lines." Mr. Niemeyer, who reviewed the RSS and RQC source code, explained that when a user clicks "ADD" to select an item or items from the search results, the same function is used in RSS and in RQC to add the selected items to the order list. Niemeyer Decl. (Dkt. No. 799-10, Sept. 9, 2011) at ¶¶ 35-38. Mr. Niemeyer also explained that the "*same data structures that held the order list in RSS still exist in RQC and still hold the data selected by the user to be added*," and that in RQC,

"[i]nformation about desired products from a search are transferred to the same data structures as were transferred to in RSS." *Id.* at ¶ 10 (emphasis added).

None of this is challenged by Defendant. While Dr. Shamos generally disputes the continued existence of the order list, Dr. Shamos never bothered to review either the RSS or RQC source code, so he cannot refute Mr. Niemeyer's findings. Nor do any of Defendant's other declarants dispute Mr. Niemeyer's findings. Mr. Christopherson does not claim to be familiar with the relevant source code, and while Mr. Dooner attaches source code as exhibits, he does not discuss ***any*** of it specifically or explain how any of it supports his opinion, or refutes Mr. Niemeyer's analysis.

Instead, quite remarkably, Defendant argues that the use of the same data structures in RQC and RSS to hold the order list "is of no significance" and is "irrelevant." Shamos Decl. (Dkt. No. 804-11, Sept. 19, 2011) at ¶ 94. Dr. Shamos, for example, argues that there is no mention in the infringed claims or their constructions of any "data structure." *Id.* Of course, a list ***is*** a data structure. There is no dispute that the data structure that held the order list in RSS also holds the exact same data in RQC, whatever Defendant now wants to call it. Nor is there any dispute that the function that creates that order list and the user interface *e*Plus relied on to prove infringement are unchanged, other than through nomenclature changes. The order list and the "means for generating an order list" are still present in RQC, and have not been removed.

Although the same data structures and code implement the order list functionality in RSS and in RQC, Defendant claims that systems with RQC are more than colorably different than the infringing systems because it has merged an unaccused feature, the "SAVE" button, into the process of adding items to the order list. The "SAVE" button in RSS allows a user to save an unfinished order list, for example when going to lunch or going home, and come back to it later.

In RQC, the "SAVE" button was removed from the shopping screen, and items are "saved" automatically as they are added to the order list.  Niemeyer Decl. (Dkt. No. 799-10, Sept. 9, 2011) at ¶¶ 35-41.  But *e*Plus never relied on this "SAVE" functionality to prove infringement. In fact, there is absolutely no trial testimony by any witness for either side about the "SAVE" function.

Instead, the witnesses for both sides agreed that requisitions are generated by RSS from order lists not when a "SAVE" occurs, but when the user clicks "CHECKOUT" (now labeled "RELEASE") and the checkout code changes the status of the selected items from "unreleased" to "released."  Specifically, Defendant's witness Mr. Christopherson testified that "[w]hen you click checkout, then it would move [four items that have been included in your shopping cart] into the requisition system and actually create a requisition."  Clements Reply Decl., Ex. 1 (Trial Tr., Dkt. No. 644-696, Jan. 4-27, 2011) at 1157:15-16, 1158:6-14.  Mr. Niemeyer testified that the status field in the REQLINE and REQHEADER records indicate when the data is part of a shopping cart and when it is part of a requisition, *id.* at 1247:9-1248:8 ("unreleased is the status used while the items are in the shopping cart, and released . . . indicates that they are now part of the requisition"), and that it is the "CHECKOUT" function that updates the status from "unreleased" to "released."  *Id.* at 1249:20-1250:5.

Again, Mr. Niemeyer's Declaration establishes that none of this processing was changed in RQC in any way.  The "CHECKOUT" button was renamed "RELEASE," but it still invokes the same functions, which invokes the change in status to "released."  Niemeyer Decl. (Dkt. No. 799-10, Sept. 9, 2011) at ¶¶ 42-46.  None of this is in dispute.  Neither Dr. Shamos nor Messrs. Christopherson or Dooner identified any changes to "CHECKOUT" processing.  Requisitions are created in RQC the same way they were created in RSS:  during "CHECKOUT" (now

"RELEASE") processing, unreleased requisition lines previously entered by the user into the order list are released for processing by the Requisitions module.

### B. Systems With RQC Continue To Have The Capability To Generate Multiple Purchase Orders From A Single Requisition

Defendant claims to have modified the infringing systems so that Punchout items are placed on a separate requisition from items selected by searching the vendor catalogs stored in the item master database.[3]  Importantly, however, the modified systems are still capable of processing a requisition to generate one or more purchase orders for the selected matching items. Indeed, Defendant does not dispute that systems with RQC can still generate multiple purchase orders from a single requisition.  Opp. at 24 ("[I]t is possible to generate multiple purchase orders from a single requisition, if all of the items come from the item master.")  Thus, the modification Defendant has introduced when using Punchout is insignificant and does not alter the infringing functionality in any way.

Although Defendant acknowledges that systems with RQC are capable of generating multiple purchase orders from a single requisition, Defendant argues that *e*Plus cannot rely on this functionality to prove infringement or to show that the modifications Defendant has made are insignificant.

First, Defendant claims that Dr. Weaver never demonstrated this functionality at trial. Opp. at 21.  In fact, Dr. Weaver specifically demonstrated to the jury how Defendant's infringing

---

[3] More precisely, Mr. Christopherson indicates that when Defendant initially made RQC generally available to its customers on May 18, 2011, Punchout items *could still* be placed on the same requisition as items selected from the item master database.  According to Mr. Christopherson, it was not until June 9, 2011 that Defendant "restricted the functionality that had been in the RSS product, for example with respect to limiting purchase orders with punchout." Christopherson Decl. (Dkt. No. 804-9, Sept. 19, 2011) at ¶ 32.  Thus, even Defendant admits that at least from May 23, 2011, when the Court entered the permanent injunction, through June 9, 2011, when it "restricted the functionality that had been in the RSS product," Defendant was explicitly violating the terms of the injunction.

systems can generate multiple purchase orders from a single requisition.  Dr. Weaver showed how a user of the infringing systems can conduct searches of the vendor catalogs in the item master database and place two different items offered by two different vendors into a single requisition.  Dr. Weaver then demonstrated to the jury exactly how the infringing systems process the requisition to generate one or more purchase orders as required by the claims.  *See* Weaver Decl. (Dkt. No. 799-1, Sept. 9, 2011) at ¶ 40 n.4; *see also* PX-374, PX-376, Clements Reply Decl., Ex. 1 (Trial Tr., Dkt. Nos. 644-696, Jan. 4-27, 2011) at 634:7-653:3 (system demonstration where two purchase orders generated from requisition, one to Baxter Healthcare for surgical gloves and a second to Diablo for a Dell Inspiron computer).  By Defendant's own admission, the systems with RQC have this exact same functionality.

Second, Defendant incorrectly argues that the capability to combine Punchout items with items from the item master database on a single requisition was the reason that the jury determined that Configuration Nos. 3 and 5, but not Configuration No. 2, infringed the asserted '683 Patent claims.  Opp. at 21.  In truth, nowhere did the jury make any such finding.  *See* Jury Verdict (Dkt. No. 600, Jan. 27, 2011).  The jury was not asked, and did not offer, any explanation for their verdict of infringement of Configuration Nos. 3 and 5, or their verdict of no infringement by Configuration No. 2 of the asserted '683 Patent claims.  How can Defendant possibly claim to know exactly what the jury was thinking or how it determined that certain configurations were found to infringe *e*Plus's patents and other configurations did not?  There are a myriad of plausible interpretations of the jury's verdict, and Defendant's contention that it, and only it, knows the true rationale behind the decisions of each member of the jury is absurd.

**C.    The Allegedly Modified Systems Continue To Have The Capability To Convert Data Relating To A Selected Matching Item And An Associated Source To An Item And A Different Source**

At trial, *e*Plus proved that Defendant's infringing systems meet the "converting data" elements of claims 3, 28 and 29 of the '683 Patent by demonstrating how RSS includes functionality that permits a user to conduct a category search using UNSPSC codes.  For example, as Defendant notes in its opposition, Dr. Weaver was asked whether the accused systems "satisfied the claim element means for converting data."  Clements Reply Decl. Ex. 1 (Trial Tr., Dkt. No. 644-696, Jan. 4-27, 2011) at 783:1-5; *see* Opp. at 17.  He answered, "Yes, and we saw that when we did the category search using the UNSPSC codes."  Clements Reply Decl. Ex. 1 (Trial Tr., Dkt. No. 644-696, Jan. 4-27, 2011) at 783:6-7.

Tellingly, Defendant admits in its opposition that the same category search feature available in the infringing systems is also available in systems including RQC.  Opp. at 17-18. Notwithstanding this admission, Defendant argues that that it has made a substantial change to systems with RQC because users of these systems can drill down through the UNSPSC code hierarchy tree to the third level, the class level, rather than to the fourth level, the commodity level.  In fact, this is an insignificant, obvious modification that does not make systems with RQC more than colorably different than the infringing systems.

As an initial matter, as *e*Plus noted in its opening brief, each item data record in systems including RQC is associated with or cross-referenced to a UNSPSC code in the item master database.  Because each product category in the category hierarchy tree has also been associated with (or cross-referenced to) a corresponding UNSPSC code, a user navigating down the product category hierarchy can click on a branch of that category hierarchy tree and can find all items that have been cross-referenced to the same UNSPSC code associated with that branch of the

category hierarchy tree.  Weaver Decl. (Dkt. No. 799-1, Sept. 9, 2011) at ¶ 38; Niemeyer Decl. (Dkt. No. 799-10, Sept. 9, 2011) at ¶ 29.

Defendant suggests in its brief that *e*Plus cannot rely on this functionality in systems with RQC to prove infringement because it never argued at trial that this is the functionality that meets the "converting data" elements.  Opp. at 18.  In fact, as Defendant is forced to acknowledge, the capability of determining whether different items are associated with the same UNSPSC code is exactly the functionality that *e*Plus relied upon at trial to prove that the infringing systems meet the "converting data" claim elements.  *See* Opp. at 16-17.[4]

Defendant also suggests in its opposition that the modifications it has purportedly made to systems with RQC are significant in light of the ongoing reexamination proceedings.  This argument is simply the latest in a fruitless, serial attempt by Defendant to inject into this litigation the non-final, satellite proceedings before the USPTO.  At every stage of the litigation, Defendant's attempt has been appropriately thwarted by the Court.  Most recently, in denying Defendant's motion for a new trial, the Court explained that it "has given reasons on several

---

[4] Defendant's argument that a user will not be able to locate items with the same commodity classification code in systems with RQC because "it is impossible to tell which items are associated with which commodity codes" fares no better.  Opp. at 18.  Indeed, it is undermined by Defendant's own documents and the RQC demonstration system, which reveal that the system still has the capability of associating commodity codes with each item in the item master. *See, e.g.,* Clements Decl. (Dkt. No. 799-11, Sept. 9, 2011), Ex. 26 (RQC 47) at RQC 92 (indicating that "Lawson has incorporated the usage of UNSPSC codes which is a standardized way of categorizing items that people use in commerce. . . . ***The codes have four levels***: segment, family, class, ***and commodity***.  ***These levels create an item hierarchy and allows the user to search for each level for items in the Item Master file.***) (emphasis added) and RQC 109-110 (explaining how to load UNSPSC codes and attach them to item records); Weaver Decl. (Dkt. No. 799-1, Sept. 9, 2011) at ¶ 37 n.3 (noting that Dr. Weaver verified, through the RQC demonstration system, that all four UNSPSC code segments – including the commodity level of the Categories search functionality – continue to be loaded into the item master database for each item).

occasions why such evidence was rejected.  ***No more ink will be spilled over the topic***."  Mem. Op. Denying Def.'s Mot. for New Trial (Dkt. No. 787, Aug. 12, 2011) at 21 (emphasis added).

### D.    Defendant Has Violated The Injunction Order By Encouraging Its Customers To Continue To Use The Infringing Systems

Defendant ironically violated the permanent injunction in the very same notice in which it informed its customers of the injunction order.  Although Defendant was unequivocally enjoined from encouraging its customers to use the infringing systems, Mr. Debes, Defendant's CEO at the time, advised Defendant's customers that they "may continue to use" the infringing systems.  *See* Order (Dkt. No. 729, May 23, 2011) at 3-4; Clements Decl. (Dkt. No. 799-11, Sept. 9, 2011), Ex. 36 (RQC 724) at RQC 725 and Ex. 38 (RQC 732) at RQC 733.  Mr. Hager also encouraged Defendant's customers to continue to use the infringing systems.  Clements Decl. (Dkt. No. 799-11, Sept. 9, 2011), Ex. 43 (RQC 742) and Ex. 45 (RQC 743).

Defendant asks not to be found in contempt because it "merely informed its customers that the injunction order does not prohibit Lawson's customers from using the infringing software."  Opp. at 26.  But regardless of whether Defendant's customers are or are not permitted to use the infringing software, ***Defendant*** itself was enjoined from, "[a]iding and abetting, actively inducing, or in any way contributing to the making, use, sale or importation of any of the Infringing Products and Services within the United States."  Order (Dkt. No. 729, May 23, 2011) at 3-4.  Furthermore, the Court explained that the "injunction extends to the provision of any instruction, encouragement, installation, implementation, maintenance or support for any of the Infringing Products and Services."  *Id.* at 3.[5]  Because Defendant's CEO and Executive Vice

---

[5] Since the jury verdict found that Defendant induced and contributed to its customers' direct infringement, the jury necessarily found that the customers' use of the Lawson systems infringed the *e*Plus patents.  Accordingly, Mr. Hager's advice to Defendant's customers that "you, as customers, are not infringing on anything," is simply not true.  Clements Decl. (Dkt. No. 799-11, Sept. 9, 2011), Ex. 45 (RQC 743).

President specifically instructed and encouraged Defendant's customers to use the infringing systems, Defendant has violated the unambiguous terms of the permanent injunction and should be held in contempt.

### E.     *e*Plus Intends To Seek Discovery Concerning Defendant's Waiver Of The Attorney-Client Privilege

The Court has ruled that "Dr. Weaver and *e*Plus [should] have full and complete access in any way that they want . . . to be able to understand exactly how this system works, and how, if at all, it's different than the other systems.  And there are going to be no limitations on that . . . ." Clements Reply Decl., Ex. 2 (Conf. Tr., Sept. 15, 2011) at 12:21-25.  The Court has also warned Defendant not to respond to *e*Plus's discovery requests with "a bunch of objections to discovery."  *Id.* at 22:4-5.  The Court explained that:

> the last time I had to deal with the objections to discovery from Lawson . . . I didn't find them to be very compelling, and it was wasteful of my time to have to even deal with it, and it . . . slowed the process down.  I don't want to have to deal with that again, and I don't have time to deal with it. . . .  I do not expect to have any recurrence of . . . the kinds of objections I had to deal with last time.  I don't want that.

*Id.* at 22:5-17.

Pursuant to the Court's directive, *e*Plus served discovery on Defendant on September 18, 2011.  Defendant has agreed to provide *e*Plus with responses to its discovery requests no later than October 7, 2011.  Although the Court has instructed Defendant not to interpose unnecessary objections, Defendant has already indicated in its opposition that it intends to object to *e*Plus's discovery requests concerning the advice of counsel Defendant obtained regarding the jury verdict, the permanent injunction and Defendant's purported "design around."  Opp. at 27-28.

Defendant contends that it did not waive the attorney-client privilege because it simply disclosed the Court's public injunction order to its customers.  But several of Defendant's statements to its customers went well beyond the terms of the injunction order and included

advice that Defendant's employees, including Mr. Hager and Mr. Debes, must have obtained

from Defendant's counsel.  For example, Defendant informed its customers that:

- "All Lawson customers have the rights to use the software you purchased from Lawson.  You may continue to use the system, as is.  The court's ruling impacts Lawson's ability to support the infringing configuration, but it does not impact your right to run it."  Clements Decl. (Dkt. No. 799-11, Sept. 9, 2011), Ex. 43 (RQC 742) (Hager).

- "You, as customers, are not infringing on anything.  You can continue to run the solutions…"  Clements Decl. (Dkt. No. 799-11, Sept. 9, 2011), Ex. 45 (RQC 743) (Hager).

- "At Lawson we believe *e*Plus' patents are invalid."  Clements Decl. (Dkt. No. 799-11, Sept. 9, 2011), Ex. 38 (RQC 732) at RQC 732 (Debes).[6]

- "So essentially, Requisitions Self-Service is the core piece of the configuration that is found to infringe.  So if we change that piece, then the configuration, as long as we're encoding around the infringing pieces, then that configuration does not infringe."  Clements Decl. (Dkt. No. 799-11, Sept. 9, 2011), Ex. 45 (RQC 743) (Hager).

- "Well, fortunately, in the court case, the jury was very very specific to down the line in terms of what specific functionality of RSS was found to infringe.  And so, as a result, we were able to take that jury finding, and specifically, you know design around those specific points, in order to come up with RQC, which is why we're so confident that RQC is the right solution for customers and, of course as I've mentioned, as we were doing it, we decided to also add some things that our customers wanted in the process, so that you'd benefit in some way.  But uh, when we say RSS was found to infringe, its not the whole product of RSS, it was just very specific functionality."  *Id.*

- "Again, the press release that *e*Plus put out was designed to scare everybody.  So, therefore, a lot of products that can co-exist with RSS are listed because if RSS is present, then the configuration is prone to infringe.  So, therefore, there is no impact to any other product.  RSS was the least common denominator, and even more so than that, it was specific functionality within RSS that was the least common denominator, so with RQC, that functionality changes and, as a result, the entire configuration does not infringe.  So only this one moving part needs to change."  *Id.*

---

[6] This position is, of course, at odds with the jury's verdict and the final judgment which found all asserted claims valid.  Jury Verdict (Dkt. No. 600, Jan. 27, 2011); Judgment (Dkt. No. 736, May 25, 2011).

These statements clearly transmit and disclose to Defendant's customers the legal advice that Defendant received from counsel regarding the jury's verdict, the injunction order and Defendant's purported "design around."

Defendant's ***voluntary*** disclosures of advice from counsel to its customers are, at a minimum, an implied waiver of the attorney-client privilege.  *See Hawkins v. Stables*, 148 F.3d 379, 384 n.4 (4th Cir. 1998) ("As a general rule, implied waiver occurs when the party claiming the privilege has made any disclosure of a confidential communication to any individual who is not embraced by the privilege.") (citations omitted).  But they went further.  And would constitute an express waiver of the privilege.

Indeed, under Fourth Circuit law, even a limited disclosure of privileged information constitutes waiver of the entire subject matter.  *See, e.g., id.* ("Furthermore, such a disclosure not only waives the privilege as to the specific information revealed, but also waives the privilege as to the subject matter of the disclosure."); *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) ("Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter."); *In re Martin Marietta Corp.*, 856 F.2d 619, 623 (4th Cir. 1988) ("The Fourth Circuit has not embraced the concept of limited waiver of the attorney-client privilege.") (internal quotations omitted); *In re Grand Jury Proceedings*, 727 F.2d 1352, 1356 (4th Cir. 1984) ("Nor is the loss of the privilege confined to the particular words used to express the communication's content but extends to the substance of a communication . . . .") (internal quotations omitted).

This is especially true in instances where, as here, the disclosure has been made strategically by the party claiming privilege for its own benefit.  *See, e.g., In re Visx, Inc.*, 18

Fed. Appx. 821, 824 (Fed. Cir. 2001) (finding attorney-client privilege waived on subject matter where party "ma[de] what amounted to a limited disclosure of the contents of attorney-client communications for strategic purposes").  Accordingly, Defendant should be obligated to disclose the legal opinions and the communications it had with counsel concerning the disclosures Defendant made to its customers regarding the verdict, the permanent injunction and Defendant's "design around" product.

**III.    CONCLUSION**

For the foregoing reasons, *e*Plus respectfully requests an order requiring Defendant to show cause why it should not be held in contempt and sanctioned for its deliberate disobedience of the permanent injunction under a proposed schedule to be submitted to the Court forthwith.

Respectfully submitted,

September 23, 2011

_____ /s/ _____
David M. Young (VSB #35997)
Scott L. Robertson *(admitted pro hac vice)*
Jennifer A. Albert *(admitted pro hac vice)*
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:   (202) 346-4444
dyoung@goodwinprocter.com
srobertson@goodwinprocter.com
jalbert@goodwinprocter.com

Craig T. Merritt (VSB #20281)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
Facsimile: (804) 697-4112
cmerritt@cblaw.com

Michael G. Strapp *(admitted pro hac vice)*
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
Facsimile:   (617) 523-1231
mstrapp@goodwinprocter.com
Attorneys for Plaintiff *e*Plus Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 23rd day of September, 2011, I will electronically file the foregoing

**PLAINTIFF *e*PLUS INC.'S REPLY IN SUPPORT OF ITS MOTION TO SHOW CAUSE
WHY LAWSON SOFTWARE, INC. SHOULD NOT BE HELD
IN CONTEMPT OF THE COURT'S PERMANENT INJUNCTION**

with the Clerk of Court using the CM/ECF system which will then send a notification of such

filing (NEF) via email to the following*:*

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Andrew Lagatta, *pro hac vice*
MERCHANT & GOULD
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 332-5300
Facsimile: 612) 332-9081
lawsonservice@merchantgould.com

Robert A. Angle, VSB#37691
Dabney J. Carr, IV, VSB #28679
TROUTMAN SANDERS LLP
P.O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1238
(804) 698-5119 (Fax)
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com

Donald R. Dunner, *pro hac vice*
Erika H. Arner, *pro hac vice*
FINNEGAN, HENDERSON, FARABOW, GARRETT
& DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, DC 20001
(202) 408-4000
(202) 408-4444
***Counsel for Defendant Lawson Software, Inc***

_____/s/_____
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444
dyoung@goodwinprocter.com

Counsel for Plaintiff *e*Plus Inc.