1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
2                  RICHMOND DIVISION

3    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                       :
4    ePLUS, INC.,                      :
                                       :
5                    Plaintiff,        :
     v.                                :   Civil Action
6                                      :   No. 3:09CV620
     LAWSON SOFTWARE, INC.,            :
7                                      :   November 8, 2011
                     Defendant.        :
8    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

9

10

11       COMPLETE TRANSCRIPT OF STATUS CONFERENCE
          BEFORE THE HONORABLE ROBERT E. PAYNE
12             UNITED STATES DISTRICT JUDGE

13

14

15

16   APPEARANCES:

17   Craig T. Merritt, Esq.
     CHRISTIAN & BARTON
18   909 E. Main Street, Suite 1200
     Richmond, VA   23219-3095
19
     Scott L. Robertson, Esq.
20   Jennifer A. Albert, Esq.
     GOODWIN PROCTOR
21   901 New York Avenue, NW
     Washington, D.C.   20001
22
          Counsel for the plaintiff ePlus
23

24
               DIANE J. DAFFRON, RPR
25             OFFICIAL COURT REPORTER
             UNITED STATES DISTRICT COURT

1       APPEARANCES:   (Continuing)

2       Dabney J. Carr, IV, Esq.
        TROUTMAN SANDERS
3       Troutman Sanders Building
        1001 Haxall Point
4       P.O. Box 1122
        Richmond, VA   23218-1122
5
        Josh Krevitt, Esq.
6       Daniel J. Thomasch, Esq.
        GIBSON, DUNN & CRUTCHER
7       200 Park Avenue
        New York, NY   10166
8
        Jason Charn-Jieh Lo, Esq.
9       Gibson, Dunn & Crutcher
        333 S. Grand Avenue
10      Los Angeles, CA   90071

11              Counsel for the defendant Lawson Software

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (The proceedings in this matter commenced
 2      at 11:00 a.m.)

 3

 4              THE CLERK:  Civil Action No. 3:09CV00620,
 5      ePlus, Incorporated v. Lawson Software, Incorporated.
 6              Will counsel please state their names for
 7      record and identify the parties they represent.
 8              MR. MERRITT:  Craig Merritt on behalf of the
 9      plaintiff, ePlus.  Mr. Robertson and Ms. Albert are
10      with me.  And Mr. Farber, Your Honor, whom you have
11      met before.
12              MR. CARR:  Judge, Dabney Carr from Troutman
13      Sanders on behalf of Lawson Software.  May I introduce
14      Josh Krevitt --
15              MR. KREVITT:  Good morning, Your Honor.
16              MR. CARR:  -- Dan Thomasch and Jason Lo, all
17      with the firm of Gibson Dunn.
18              THE COURT:  All right.
19              Good morning, ladies and gentlemen.
20              MR. MERRITT:  Good morning, Your Honor.
21              THE COURT:  How are you, Mr. Merritt?
22              MR. MERRITT:  I'm fine.  I hope you're well.
23              Your Honor, as we understand it, in a couple
24      of recent telephone conferences, counsel for the
25      parties were assigned a very specific task, and that
```

 1    task was to envision how this contempt proceeding

 2    should play out, and then to advise the Court as to

 3    what they believe the appropriate structure is for

 4    moving through the contempt proceeding, what the

 5    procedural incident should be, and what the schedule

 6    for that should be.

 7            So, as we understand it, our primary task

 8    today is to get a schedule set for the evidentiary

 9    hearing and to set some deadlines and cutoffs for

10    events that we know will need to take place prior to

11    and probably immediately following that hearing.

12            The Court has received various submissions,

13    solicited or unsolicited, from the parties on a whole

14    range of issues including discovery and privilege.  We

15    do not understand our task today to be the resolution

16    of everything that might require resolution, but

17    simply today to set up the procedural structure in

18    which we're going to move forward.

19            I think that will be helpful in the long run

20    rather than letting disputes drive the schedule, but

21    set a schedule, and then within that schedule figure

22    out how we're going to resolve the matters that need

23    to be resolved.

24            Otherwise, if we let problems drive the

25    setting of the schedule, I fear this will never

1    happen.

2           Your Honor, you have the submissions of the

3    parties that were given to you yesterday afternoon by

4    4:00 o'clock.  I sat down with them late last night

5    and again this morning.  I'm not sure we have helped

6    Your Honor as much as we could.

7           I know that you have some concepts about how

8    things might move forward.  And looking at them this

9    morning, I made an effort from the standpoint of just

10   having a structure in which to discuss this to prepare

11   a proposed scheduling order with blanks in it.

12          I sent that to Mr. Carr this morning at 9:45.

13   I understand from speaking with counsel for Lawson

14   that that they object to me handing that up.  I think

15   it would be helpful to hand it up to the Court as an

16   effort to just identify the issues, some of the events

17   that have to happen.  We have no ownership over a

18   final result, but we think it would at least inform a

19   discussion.

20          So with the Court's permission, this has been

21   provided this morning to opposing counsel, I would

22   like to hand that up.

23          THE COURT:  Is there an objection?

24          MR. THOMASCH:  Your Honor, there's no

25   objection to handing it up.  We want to make clear

6

1    that this is not a negotiated order or format.  We

2    don't think it fully captures the issues, but we're

3    happy to have it handed up.

4              THE COURT:  All right.  Thank you.

5              MR. MERRITT:  Your Honor, you'll see the form

6    and format of this is probably somewhat familiar.  It

7    simply identifies dates that are yet to be set and

8    events.  It does not purport to be every event that we

9    may need to address, but hopefully it's a starting

10   point.

11             In thinking about the things that have to be

12   resolved this morning before we can fill in those

13   blanks, we have tried to come up with a list, and

14   these are the items that we believe require some

15   resolution this morning.

16             First of all, and this is just as an aside,

17   and perhaps this has already happened, we don't

18   believe the real party in interest on the defense side

19   at this point in the case is Lawson anymore.  We know

20   that in the federal circuit proceedings Infor and

21   Golden Gate Capital, which acquired Lawson, are

22   appearing as the real parties in interest.  Just as a

23   matter of cleaning up the docket, we don't know if any

24   further submissions or disclosures are needed in that

25   regard.

7

1        THE COURT:  Lawson has been acquired?

2        MR. MERRITT:  I believe it has, but I will

3   not speak for Lawson.  I know that in their filings

4   with the federal circuit we are now seeing Infor and

5   Golden Gate identified as the real parties.

6        THE COURT:  Rather than Lawson?

7        MR. MERRITT:  Yes, sir, rather than Lawson.

8   And that simply may require some procedural docket

9   cleanup.

10            Second, in the submissions that were made to

11   the Court yesterday afternoon at 4:00 o'clock, there

12   was a suggestion in Lawson's submission that ePlus

13   does not want the Federal Rules of Evidence to apply

14   to these proceedings.  Clearly, they must apply.  We

15   have no interest in having evidence that should be

16   excluded under the federal rules become the basis for

17   any of Your Honor's findings.  So there may be

18   questions about the timing or manner of the submission

19   of evidence, but we acknowledge that the Federal Rules

20   of Evidence control whatever procedure goes forward.

21   So we don't think there's a dispute about that and

22   that's a strawman argument.

23            The third point that appears to be in dispute

24   is how many hearings.  You have the parties'

25   submissions on the Tivo case.  We appear to be in

8

1    agreement on the substantive requirements of Tivo.  It

2    is a two-part test.  One that has to do with colorable

3    variant, the other which has to do with infringement.

4           EPlus's position on that is that a single

5    hearing is perfectly sufficient to encompass whatever

6    evidence the Court needs to hear on those two elements

7    and to make that submission.

8           We understand Lawson or the defendants to be

9    saying that it wants to break the Tivo elements up and

10   have two separate hearings on the two separate

11   elements.  We think it's unnecessary.  This court

12   resolves highly complex matters that involve multiple

13   elements all the time in a single hearing.  And in

14   this case, the two elements in Tivo are factually

15   related.  So the idea that we would put in some

16   evidence and then have an expert opine on one element

17   and then stop and come back on a later date based on

18   the finding on that element and then have a second

19   resolution is an extremely unweldy and costly way to

20   proceed.  And we would object to proceeding in

21   multiple hearings.

22          We do think the matter of remedy requires

23   probably a separate proceeding should the Court find

24   contempt, but we do think a single hearing would be

25   sufficient to accomplish what needs to be done by the

1    parties.

2           We also believe that there is probably some

3    guidance we could receive from the Court this morning

4    on the use of experts in these proceedings.  At this

5    point ePlus has made disclosures already in this

6    contempt proceeding from Mr. Niemeyer and Dr. Weaver.

7    We would like the opportunity to supplement those

8    before the hearing based on the review of materials

9    produced in discovery, and we think that needs to be

10   built into the schedule.

11          We have received from Lawson a disclosure

12   from Dr. Shamos.  We understand that Lawson proposes

13   to have an additional expert named Dr. Goldberg weigh

14   in on this proceeding.  All we would ask in that

15   regard is that, as we have, the one expert per

16   discipline rule be imposed on the parties.  As you

17   recall, Mr. Niemeyer --

18          THE COURT:  Niemeyer does source code?

19          MR. MERRITT:  He does source code.  Weaver

20   does a higher level infringement analysis.  If

21   Goldberg is simply going to cover the same ground as

22   Shamos, we would like to tease that out today and find

23   out if that's what Lawson is proposing.  If he is not

24   or if he's otherwise permitted over our objection to

25   testify, we would appreciate an early disclosure from

1   Mr. Goldberg.

2         They have our disclosures subject to any

3   supplementation.  This is Lawson's software, Lawson's

4   expert.  They have full access to anything they need

5   to characterize their own product and to offer an

6   expert opinion on it, and we would like Goldberg to go

7   ahead and make the same type of disclosure that our

8   experts have already made in substance.

9         So there's a timing issue there on when we

10  get to see, if Mr. Goldberg is permitted, what he has

11  to say, and we think that should be soon.

12        We also have the issue of the permissibility,

13  and if so, the scope of any discovery that Lawson will

14  be able to take of ePlus.  As Your Honor knows,

15  questions were raised about the ability of Lawson in

16  light of the existing orders to serve discovery at

17  all.  We have heard what you had to say on the

18  conference calls and we are reading your comments as

19  permitting some discovery by Lawson of ePlus.

20        We are concerned about the scope of the

21  discovery that's currently been served.  For example,

22  there is discovery asking us to compare the Lawson RQC

23  products with products that are being marketed by

24  ePlus.  How that informs -- it was excluded at trial.

25  And how that informs the issues that you have before

1    you now is a mystery to us.

2         So we have some things like that that we are

3    going to seek the Court's guidance on in terms of the

4    scope of permissible discovery.  And then to the

5    extent Lawson is permitted to serve some discovery, we

6    would like a fair and reasonable opportunity to

7    respond to that.

8         We're only going to be getting Lawson's final

9    discovery they tell us, as of this morning,

10   November 21.  It's a lot of material.  I don't know if

11   you saw. Mr. Thomasch's letter to the Court this

12   morning.  It's a rather lengthy, single-spaced letter

13   in which he gives Your Honor a status report on the

14   production.  It continues.  It is very substantial.

15   There are literally thousands of documents that are

16   identified as privileged.

17        So once that finally lands, we will need time

18   to actually process it and to make a meaningful

19   response to discovery, and certainly it can't be

20   simultaneous with theirs because we just need some

21   time to review what's actually produced to us

22   ultimately.

23        Finally, with regard to the order I've handed

24   up, there's one thing I failed to include.  In

25   paragraph 7, we suggest that 10 days or whatever Your

1    Honor orders prior to commencement of the evidentiary

2    hearing that the parties change witness lists.  We

3    should have added exhibits to that as well.

4         So, again, what I've handed up is not

5    proposed to be final.  We understand that it is

6    submitted by ePlus only, but we're hoping that perhaps

7    we can have a discussion today that works through

8    scheduling and cutoffs and not immediately go off into

9    the weeds about unresolved discovery or privilege

10    matters or four hours from now we're still going to be

11    trying to set dates.  Our view is if we can get some

12    dates set, figure out what the schedule is going to

13    be, then within that schedule we can determine how to

14    resolve these contested issues.  Thank you.

15         MR. KREVITT:  Good morning, Your Honor.

16         THE COURT:  Good morning.

17         MR. KREVITT:  Josh Krevitt.

18         First, I should begin by asking if the Court

19    has any issues given the submissions that have been

20    made that the Court would like us to address.  Any

21    questions in light of the submissions made on either

22    Tivo or the schedule?  I want to make sure that our

23    presentations are most helpful to the Court today.  So

24    if there is --

25         THE COURT:  Well, I have some questions to

1   ask you-all, but we're just talking about an agenda

2   now.

3            MR. KREVITT:  Okay.

4            THE COURT:  They won't be long.  We're not

5   going to be here long, I don't think.

6            MR. KREVITT:  Very well, Your Honor.

7            THE COURT:  Do you have any objections to the

8   approach that Mr. Merritt outlined?

9            MR. KREVITT:  Well, just a few quick points,

10  Your Honor.  I think some of the issues that Mr.

11  Merritt outlined actually are not in dispute.  For

12  example, he raised the expert Mr. Goldberg that we

13  have disclosed to the other side.  We understand, Your

14  Honor, Your Honor's rules, and as a practical matter

15  we're not going to have two experts saying to same

16  thing.  There's no reason to do that.  We have no

17  intention to do that.

18            Mr. Merritt said that ePlus would like a

19  disclosure from Mr. Goldberg.  We, of course, intend

20  to do that.

21            THE COURT:  We'll set a schedule on all that.

22            MR. KREVITT:  Yes.  And obviously we'll

23  comply with that schedule.

24            We are pleased to hear Mr. Merritt confirm

25  what should not be in dispute, that the Rules of

1    Evidence govern this proceeding.  That, of course, is

2    our proceeding.  Mr. Thomasch is going to address some

3    scheduling issues, and I think it will be clear to the

4    Court why we have some concerns with respect to the

5    application of the Rules of Evidence in particular,

6    Your Honor.  In the submission that ePlus has made and

7    repeatedly in calls with us, ePlus has suggested that

8    they should be permitted after the hearing to submit

9    deposition testimony not introduced at the hearing,

10   summarize that deposition testimony, and submit

11   documents after the hearing.

12           There is, in our view, Your Honor, and this,

13   I think, will be the subject of some discussion today,

14   no way to reconcile such an approach with the Federal

15   Rules of Evidence.  It is simply prohibited by the

16   Rules of Evidence.

17           THE COURT:  No, I don't think it is, but I

18   don't like to proceed that way, but I don't think it's

19   prohibited in a proceeding.  You can schedule those

20   things to come in any way you want to as long as

21   everybody has an opportunity to deal with the

22   evidentiary constraints that apply to them.

23           We're not going to get hung up on that.

24           MR. KREVITT:  It may be that as a practical

25   matter it doesn't matter in this case, but I'm

1    referring to, of course, the rules that relate to

2    under what circumstances can deposition testimony be

3    used.  And in turning on the availability of a

4    witness, for example.  Those are the types of rules to

5    which I'm referring, but it may be that that's not the

6    procedure Your Honor is prepared to proceed with.  We

7    certainly think it makes no sense.

8             THE COURT:  Well, I think we're talking in a

9    vacuum.  Let's wait until we get there.

10            MR. KREVITT:  Okay.  Very well, Your Honor.

11            THE COURT:  Do you have any items that you

12   need to add to the agenda?

13            MR. KREVITT:  Well, we do, Your Honor.  One

14   thing I wanted to note, Mr. Merritt suggested that the

15   remedies portion of this hearing should be bifurcated.

16   We're going to want to address that.  We oppose that.

17   We think --

18            THE COURT:  That's the same issue.  I'm

19   talking about whether you have any additional issues.

20            MR. KREVITT:  I see, Your Honor.  I was

21   responding to -- very well.  I'll turn it to Mr.

22   Thomasch if we have additional issues we'd like to add

23   to the agenda at this time.

24            MR. THOMASCH:  Good morning.  Dan Thomasch.

25            THE COURT:  Good morning.

1           MR. THOMASCH:  I don't want to address the

2    substance of them.  So there are very few additional

3    issues.

4           Mr. Merritt said he doesn't want the disputes

5    to drive the schedule.  We certainly agree with that,

6    but we do believe that we need to have some

7    understanding of what's going to happen between now

8    and the hearing in order to be able to pick a

9    reasonable hearing date.  And one of the issues will

10   involve the extent of deposition testimony.

11          I don't want to argue the point, but I do

12   want to flag to the Court that there is an issue with

13   Lawson having received a 30(b)(6) notice that has 22

14   separate categories, some of which we don't know

15   whether some even apply to this case, but the extent

16   of that list could require a very large number of

17   witnesses together with additional witnesses they have

18   told us they want, and it will be difficult to figure

19   out how we're going to do the scheduling without

20   having some idea whether there are any parameters on

21   the amount of discovery that can be taken.

22          We've got the documents effectively behind

23   us.

24          THE COURT:  Not according to your letter.

25          MR. THOMASCH:  Very close to having the

1   documents.   There is an issue that I do want to

2   discuss on that, and that is simply the format of the

3   production because if the format is done pursuant to

4   the Federal Rules of Civil Procedure, 34(A)(1)(a), we

5   will be complete within three days.   And that will be,

6   from our side, a blessing.   And we want to just make

7   sure that we don't wind up in a similar conversation

8   about depositions without having at least gotten some

9   guidance from Your Honor because I do believe that the

10  problem with the documents is that when the parties

11  were before the Court on September 15 of this year in

12  a telephone proceeding, there was discovery that was

13  going to be served, but it hadn't yet been served, and

14  there was an instruction not to make objections and

15  give them what they want.   And we have done everything

16  to try to honor that instruction, but it probably did

17  get us in a situation where we had to overproduce to

18  be responsive to what they asked for, and it's led to

19  over 2 million pages of documents.

20          As we are about to finish up that production,

21  and we've withdrawn our request to not have to do so,

22  I just don't want the same problem to develop on

23  depositions.   And so I would like to raise that

24  problem with Your Honor today just as a practical

25  matter, not down to the weeds of which witness on

1   which topics.  I'm not looking for that, but I do want

2   to just have an understanding of, in a sense, the

3   scope.

4           Thank you, Your Honor.

5           THE COURT:  All right.  The first thing that

6   I need to understand from you-all has to do with what

7   you're arguing about Tivo.  It looks to me like you

8   are in basic agreement and yet there are some apparent

9   subtle distinctions that appear to be raised by

10  Lawson's papers.  I don't know exactly what Lawson

11  means by the allegedly modified language in its

12  discussion of the allegedly modified language in Tivo.

13  It seemed to agree with ePlus.  And you say that you

14  don't really mean to say that the Court has to

15  evaluate even those features that the defendant has

16  not modified.

17          Then in a discussion on proof of infringement

18  you say when elements of a product are integrally

19  related as is common in software cases, it may be that

20  a modified feature causes an unmodified feature to no

21  longer meet a claim limitation.

22          Now, you all of a sudden in that simple

23  sentence appear to change the whole construct of what

24  the arrangement via hearing contemplated by Tivo

25  means.  Frankly, I find it hard to believe how you're

1    going to have a modification that is just a slight

2    modification that doesn't constitute an infringement.

3    The cases that I've looked at suggest that hasn't

4    happened so far.  But as is so often the case, the

5    decision suggests there's something there when often

6    there's not.

7            So do you agree that we're only going to be

8    dealing with the features that are modified which

9    you-all identified as three in number?

10           MR. KREVITT:  Well, a few points, Your Honor.

11           THE COURT:  That's a yes or no question.

12           MR. KREVITT:  It had a premise in it.

13           THE COURT:  You identified three.  You're

14   bound by what your predecessors did.  You can't change

15   that.  That's what started this whole thing off.

16   There was an exchange of letters, the likes of which

17   probably ought to be in the Ripley Museum, but there

18   was a deluge from Merchant & Gould that I was kind of

19   surprised to see.  When all it really boiled down to

20   is there were three points it looked like you were

21   changing.

22           And as I see the hearing, we're going to look

23   at those three issues, the three things you say were

24   changed.  Do you agree with that or not?

25           MR. KREVITT:  Yes, Your Honor.  But to just

1  refine it slightly, Your Honor.  There were three

2  categories of changes.  There were three areas that

3  were changed.  There wasn't just three changes, for

4  example, to lines of source code.  There were three

5  areas of the product that we have changed.  We have no

6  intention, Your Honor, of arguing on behalf of

7  different categories of changes.  So we're very much,

8  I believe, Your Honor, on the same page.  It's just

9  the nomenclature of three changes, there may be many

10  changes that were necessary to put into effect those

11  three categories of changes, but yes, we have served

12  an interrogatory which we have submitted to Your

13  Honor.  I don't know if Your Honor has had a chance to

14  look at that.  It goes through those three categories

15  of changes, if you will.  Three areas of changes in

16  substantial detail.  ePlus has that.

17         I don't think that there will be a dispute at

18  that level of the scope of the proceeding.  We agree

19  it's those three on which this proceeding will focus.

20         THE COURT:  All right.

21         MR. KREVITT:  I'm sorry, Your Honor?

22         THE COURT:  I just said all right.  Excuse

23  me.  I have a cold and I'm having trouble talking.  Go

24  ahead.

25         MR. KREVITT:  Well, Your Honor, the Tivo

1   case, we all agree, is in some sense the beginning and

2   the end of how we think about this analysis, and there

3   have been a few cases, a couple, the nCUBE case and

4   the *Petter Investment* case, that both parties have

5   addressed and have explained at least what we believe

6   the significance of those cases is.

7        But if I may just back up a little bit, and I

8   do not intend to argue the Tivo issue.  I know Your

9   Honor has read the papers.  That's very clear from

10  Your Honor's comments.  But I do think this is

11  important, Your Honor.  The Tivo case, we all agree,

12  sets forth two steps.  Whether the products, the new

13  product, is more than colorably different than the old

14  product.  And that's a product to product comparison.

15  You look at the new product.  You compare it to the

16  old product.

17       THE COURT:  No, it's a modification by

18  modification.

19       MR. KREVITT:  I'm sorry, Your Honor.  You're

20  exactly right.

21       THE COURT:  It isn't a product comparison.

22  It's modification by modification.  You take what it

23  is that was accused and charged and tried and

24  determined to be infringing, then you look at that

25  feature and say, Is there a colorable difference?

1          Aren't you in agreement with that?

2          MR. KREVITT:  To some extent, Your Honor, for

3     the following reason.  You're quite right.  When I say

4     "product to product," I didn't mean the whole product

5     to the whole product.  I was speaking somewhat in

6     shorthand there, Your Honor.

7          What you do is you look at the new product,

8     you identify the modifications, and you ask, ePlus

9     must prove by clear and convincing the Court must

10    determine, but one asks looking at the modifications

11    of the new product and comparing that to the old

12    product, does that make the new product more than

13    colorably different.  Does the modification make the

14    product significantly enough different from the old

15    product based on the modification?  I completely agree

16    with Your Honor on that point.  And if so, of course,

17    if the modification does render the new product more

18    than colorably different from the old product, we go

19    home.  There can be no contempt.

20          Even if, Your Honor, and of course this is a

21    general discussion, we don't believe there's any

22    infringement, but even if the new product infringes,

23    there can be no contempt.  At that point the federal

24    circuit makes clear, I don't know there's any question

25    on this, the inquiry ends if ePlus cannot prove by

1  clear and convincing evidence that the new product as
2  modified is not more than colorably different, excuse
3  me, fails to satisfy its burden of proving that the
4  new product as modified is not more than colorably
5  different than the old product.   That's the first
6  step.   And it's that comparison of the modified
7  product to the old product that I meant, Your Honor,
8  when I said that the first step compares product to
9  product.   That's all I meant.   Just at a general level
10  it compares the new product as modified, focusing on
11  the modifications, to the old product.   And that's the
12  first step.   The colorable difference step.
13         If ePlus is able to prove by clear and
14  convincing evidence --
15         THE COURT:   You are again saying "product."
16  You're not saying "modification."
17         MR. KREVITT:   The modifications of the new
18  product, Your Honor.   The modifications of the new
19  product.   That's what the Court focuses on.   You're
20  exactly right.   We don't dispute that.   And Tivo says
21  at one point that you focus on those features that
22  were at issue in the case.
23         And just to give some very simple examples,
24  Your Honor, of what that means.   If you had a patent
25  on a motor, a plaintiff could sue a car manufacturer

1    and say that this car model infringes the patent

2    because the motor within that car infringes.   The car

3    company is enjoined.   They lose the case.   There is an

4    injunction in place.   The car company then makes all

5    kinds of modifications to the car.   Changes the

6    windshield wipers, and the tires, and the ignition,

7    and the radio, but doesn't change the engine.   What

8    Tivo says is we ignore all those other changes, and

9    that's common sense.   Those aren't modifications that

10   are relevant to the patent issues in this case.   We

11   focus instead on the modifications that are relevant

12   to the patent issues in this case.   Those were the

13   modifications to the engine.

14          We then compare the modified engine to the

15   old engine, the infringing engine, and if those are

16   not more than colorably different, we move on to the

17   next stage of the analysis.   If they are more than

18   colorably different, then, of course, the contempt is

19   inappropriate.   It doesn't mean the new motor doesn't

20   infringe.   It just means that the plaintiff has to

21   bring a new lawsuit.

22          Contempt is inappropriate.   That's the

23   threshold inquiry.   It's inappropriate for that

24   finding to be made in a contempt context.

25          That's what I mean by product to product.   So

1    that Your Honor doesn't think that I'm trying to

2    change that analysis, I mean modified product to old

3    product.  But that's not a patent analysis.  That

4    comes in the second stage.

5            So let's say ePlus is able to meet its burden

6    on the first element and convince Your Honor, we

7    obviously think they will not be able to, but they are

8    able to convince Your Honor by clear and convincing

9    evidence that the new Lawson product, as modified,

10   focusing on the modified features, is not more than

11   colorably different.  It's pretty much the same, let's

12   say.  Then we move to the second stage of the Tivo

13   analysis, which relates to infringement, of course.

14   And at that stage, that stage ePlus must prove by

15   clear and convincing evidence that the new product

16   infringes the patent.

17           I don't think there's any dispute on that

18   inquiry, but I want to address, Your Honor, the

19   comment that Your Honor made just a moment ago because

20   it is a suggestion that is urged in virtually every

21   submission that ePlus makes.

22           THE COURT:  What date was the en banc

23   decision in Tivo?

24           MR. ROBERTSON:  April 20, 2011.

25           THE COURT:  Was there a writ filed to the

1   Supreme Court on it?

2        MR. ROBERTSON:  I do not believe so, Your

3   Honor.

4        MR. KREVITT:  I don't believe so, Your Honor,

5   but we can confirm that.  We have copies of Tivo for

6   the Court.

7        THE COURT:  I've got it.

8        MR. KREVITT:  Okay.  So far I think what I

9   have said is unobjectionable.  It's straight out of

10  Tivo.  As Your Honor said, the parties are generally

11  in agreement at this point.  But the reason the

12  briefing took place in the first instance, Your Honor,

13  was the conference that we had with the Court on

14  October 28.  And Mr. Robertson at that point

15  articulated a principle of law that they have now

16  backed away from as a principle of law but are urging

17  as what I would say is a practical matter.

18        If they win on the colorably differences

19  test, then come on.  Of course they're going to win on

20  the infringement test.  And it's similarly, Your

21  Honor, it's why I want to address it, to the comment

22  that Your Honor made a moment ago, which is it seems

23  that if the modified product is not more than

24  colorably different than the old product, that is to

25  say if they are pretty much the same, let's say, then

1   how can it be that the new product won't infringe when

2   the old product did infringe?  And I would say two

3   things on that, Your Honor.

4           THE COURT:  Any case that explains that?

5           MR. KREVITT:  I think Tivo explains it, Your

6   Honor.  The answers is no case --

7           THE COURT:  Nobody has decided that since

8   Tivo?

9           MR. KREVITT:  Well, implicitly it's been

10  addressed.  So let me mention that in a moment, Your

11  Honor.

12          The reason this is such an important point

13  is, and it's why I took the focus back a little bit,

14  is Tivo tells us that the first inquiry, the

15  colorability differences question, focuses on modified

16  product to old product.  That's that product by

17  product, modified product to old product comparison

18  that I was discussing a moment ago.

19          The second inquiry is a patent analysis.  But

20  Tivo also tells us that people should be encouraged,

21  and this is a general rule in patent law, to design

22  around.  The patent has limited scope.  All patent

23  claims do.  And as a defendant, I'm entitled to change

24  my product so that your injunction won't prevent me

25  from selling a product.  That's encouraged by Tivo.

1    Tivo specifically says people should be encouraged to
2    design around.
3          So what you have is a situation where a
4    defendant is enjoined, and it studies the patent
5    claims, and it thinks to itself, What is the least
6    significant change I can make because I don't want to
7    wholesale change my product that will clearly take me
8    out of infringement?  I don't want to infringe.  I
9    don't want to violate the Court's injunction.  What
10   changes can I make that will not affect my product?
11   My product will still be as good, maybe it will take a
12   hidden function out.  Maybe it will be better.  But
13   what changes can I make so that I do not infringe this
14   patent?  And I'd like to make as few of those changes
15   as possible.
16         And it's what happened in this case, Your
17   Honor.  So engineers sit down, and they study the
18   patent claims, and they study the old product, and
19   they look at why they infringed or were found to be
20   infringing, and they look at the scope of the patent
21   claims, and they say, Okay, let's change X to Y.
22   Let's make this change.
23         And the good thing about this change is (1)
24   It will render our product not infringing, and (2) it
25   won't really change the functionality for our

1    customers.  So we get to still have a product, but we
2    do not infringe.  That's exactly what Tivo says we
3    should be doing as a defendant.
4         And to give Your Honor an example of that,
5    just a very simple example, and I've given the
6    guidance Your Honor provided when we started this
7    briefing on Tivo, I'm trying for the moment not to
8    argue this case, but if you had a patent, for example,
9    on an eyedrop, and the patent claim required a pH of
10   no more than 7, let's say.  That's the patent claim.
11   And you are found to infringe.  And you have an
12   injunction.  And now as a defendant I still want to
13   sell eyedrops.  So what to I do?  I raise my pH.  I'm
14   now outside the scope of the patent.  I raise it to
15   7.1.  I'm now outside the scope of the claim because
16   my claim, the claim at issue, said no more than 7.
17        The first inquiry, Your Honor, would look at
18   compare the products, the modified product, the 7.1 pH
19   to the 7 pH.  And it might be reasonable for the Court
20   under those circumstances to conclude, Come on.
21   That's not more than a colorable difference.
22   Increasing the pH by .01.  That's not more than a
23   colorable difference.  But it does not infringe.  So
24   what would happen in that situation, Your Honor, is
25   you would move from the first inquiry, which the

1    defendant would lose in that circumstance, in my

2    hypothetical, to the second inquiry, and the defendant

3    clearly wins.

4         You could have a -- we were thinking about

5    simple examples.  You could have a patent claim on the

6    number of dimples on a golf ball.  400 dimples on a

7    golf ball.  No more than 400.  And we're found to

8    infringe.  So we come out with a product that's 410

9    dimples on a golf ball.

10        You compare those two in the first inquiry,

11   it's reasonable for a court to say, That is not more

12   than colorable.  Those are really similar.

13        THE COURT:  I understand that might be the

14   issue in some cases, but there's no claim construction

15   at issue in three changes of this product, and that's

16   what I'm having trouble with.  I just think that's for

17   another day.

18        MR. KREVITT:  I don't disagree, Your Honor.

19        THE COURT:  I'm going to decide all that at

20   one hearing.  You're not proposing to have two

21   different hearings on it, are you?

22        MR. KREVITT:  Well, Your Honor, we're

23   proposing to discuss that with the Court for the

24   following reason.

25        THE COURT:  Do you want two different

1   hearings?

2           MR. KREVITT:  This is what we would like,

3   Your Honor, or what we were going to suggest to Your

4   Honor.  We are very concerned, very concerned, and

5   this discussion is why.  That ePlus is attempting to

6   conflate those inquiries and is trying to say if we

7   win on the colorability, infringement can be assumed.

8   That's what Mr. Robertson said at the hearing.

9           THE COURT:  Well, it's reasonable to

10  interpret what he said on the phone that way in one of

11  the sentences that he articulated, but there are other

12  places where he went on and tried to do it the other

13  way.

14          MR. KREVITT:  Your Honor, we're referring

15  also to ePlus's expert reports.

16          THE COURT:  But their brief acknowledges I

17  think you-all are now in agreement with what it

18  requires, what Tivo requires.

19          MR. KREVITT:  Yes, Your Honor, and no.  Their

20  brief acknowledges that there is a two-step inquiry.

21  For sure they can no longer dispute that.  Tivo makes

22  that plain as day, but they go on to say, well, all

23  right.  The law is that there's a two-step inquiry.

24  It's real hard to believe that if we win this

25  colorability, that there's going to be infringement.

1           THE COURT:  They're just arguing that that's

2    usually what happens because there are very limited

3    circumstances when the second phase isn't satisfied by

4    the same proofs that satisfy the first phase.  And it

5    may or may not be.  I don't know.  But the point is

6    why do we have to have two hearings?

7           We deal with cases all the time that have

8    three or four different elements and components in

9    both jury trials and bench trials, and we find a way

10   to handle that by putting on all the evidence, and

11   then deciding what the case is all about.  So I don't

12   understand why we have to have two hearings.

13          MR. KREVITT:  I don't know that we need two

14   hearings, Your Honor, but let me just respond to what

15   Your Honor said.

16          First, the parties cite two post-Tivo cases.

17   It is not true, as has been suggested to the Court,

18   it is not true that it followed the colorability

19   analysis led to an infringement finding.  In one of

20   those cases, the *Petter Investment* case, the Court

21   specifically said that there is a -- after finding

22   that there were not more than -- excuse me, that there

23   were more than colorable differences, also said it

24   would have to find infringement, and that there was no

25   infringement, and in the *nCUBE* case, the other case

1    cited by the parties, the Court stated its, I think

2    the words were, present inclination to find not more

3    than colorable differences.  That is to say the

4    plaintiff would have won that issue, but said further

5    proceedings on infringement are necessary.

6         I mention that, Your Honor, only because the

7    suggestion has been made, which I thought I heard in

8    Your Honor's comment, that these other cases have

9    somehow found when you win on the colorability, you

10   win on the infringement.  No case has done that, Your

11   Honor.  That's not what's happened.

12        THE COURT:  That's what they said.  That was

13   their point, I think.  Whether they are right or wrong

14   on the case will depend on what their case actually

15   says, not on what they say the case says.

16        MR. KREVITT:  I agree with that, Your Honor.

17        THE COURT:  So I don't want to have two

18   hearings.

19        MR. KREVITT:  Well, Your Honor --

20        THE COURT:  What about --

21        MR. KREVITT:  What we were suggesting was,

22   whether it be two hearings or one hearing, that there

23   be a portion that's devoted to the first inquiry and a

24   portion devoted to the second inquiry.  And we

25   thought, Your Honor, that that would lead to

1    substantial efficiencies insofar as there are issues

2    in the second inquiry relating to the patent; claim

3    construction issues, certain expert testimony on

4    patent infringement questions.  Whether the Court has

5    a court expert to provide assistance to the Court,

6    that's been an issue addressed, that would chiefly

7    relate to the second inquiry.

8              But I've heard Your Honor, and we're happy to

9    consider ways to structure the hearing, but it was our

10   view that for efficiency and because most consistent

11   with Tivo that we should first, whether separate

12   hearings or one hearing, first address the first

13   inquiry, and then separately address the second

14   inquiry.

15             Similar to Your Honor's ruling, as I

16   understand it, at trial that when validity was being

17   discussed, the expert shouldn't be discussing

18   infringement, and vice versa.  That's what we were

19   suggesting, Your Honor, that there be a portion

20   devoted to the first inquiry where we discuss and

21   present evidence to Your Honor regarding the

22   colorability question, and then whether separated by

23   time, meaning we'd take a break or we don't take a

24   break, a portion of the hearing that is devoted to the

25   second inquiry, the patent infringement part.

1          THE COURT:  Doesn't that in part depend on
2    how the evidence is presented by the expert's
3    testimony?  Because in some instances there is overlap
4    between the information that you need to make a
5    colorability finding and the information you need to
6    make an infringement finding or non-infringement
7    finding.  And I have no idea at this stage what that
8    evidence is going to be.
9          MR. KREVITT:  It may be, Your Honor.  In
10   those circumstances, similar to other circumstances in
11   which a Court says we're addressing issue A and not
12   issue B.  And to the extent there's overlap, an
13   expert, of course, is allowed to address that when
14   covering issue A.
15         THE COURT:  What about the real party in
16   interest.  Who is that?
17         MR. KREVITT:  Well, if I may, Your Honor,
18   before answering that question there's a -- well, let
19   me answer that so I don't keep the Court in suspense.
20   I need to get to the bottom of that, Your Honor.  I do
21   believe that Lawson has been purchased by Infor, just
22   as Mr. Merritt said.  We were not involved in that
23   transaction at all.  I just need to make sure, as a
24   corporate matter, where that is, if it's final, and if
25   so, we'll take care of whatever we need to take care

1  of.

2          THE COURT:  Are you handling the appeal?

3          MR. KREVITT:  No, sir.

4          THE COURT:  Who is?

5          MR. KREVITT:  Another law firm Finnegan,

6  Henderson, Your Honor, is chiefly responsible for that

7  appeal.

8          THE COURT:  You-all can figure that out.

9          MR. KREVITT:  And we'll report back to both

10  ePlus and the Court.

11          The point I wanted to address, though, is a

12  different bifurcation that has been suggested by ePlus

13  for the first time in their submission to the Court

14  yesterday afternoon, which is that the remedies

15  portion of this proceeding somehow be split off.

16          The parties have already proceeded with

17  discovery on all issues, including remedies issues.

18  They served a notice asking for the deposition of our

19  chief financial officer.  They have complained we

20  haven't produced enough financial information.  The

21  parties are clearly proceeding dealing with remedies

22  issues.

23          We see no reason, Your Honor, that the

24  remedies issue shouldn't be dealt with at one time

25  with these proceedings.

1           THE COURT:  All right.

2           MR. KREVITT:  Does the Court have any other

3    questions on the Tivo issues, Your Honor?

4           THE COURT:  No.  Thank you.

5           MR. KREVITT:  Thank you, Your Honor.

6           THE COURT:  We are all in agreement that the

7    Federal Rules of Evidence apply.  I do not want

8    separate hearings on the questions called for decision

9    in the contempt component of the case.

10          Why is it appropriate to separate, Mr.

11   Merritt, in your judgment the remedies part from the

12   contempt liability part?  Why is that a good idea?

13          MR. MERRITT:  Your Honor, we do think that

14   there are probably some reasonable efficiencies to be

15   gained by doing that.  We're trying to keep the

16   determination of contempt within a reasonably short,

17   straightforward hearing.  We understand we have the

18   burden of clear and convincing evidence on that.

19          The outcome is not preordained.  There is a

20   possibility, although we don't think that will be the

21   outcome, that the Court could find that Lawson is not

22   in contempt.

23          THE COURT:  What remedies are you asking for?

24          MR. MERRITT:  Your Honor, the U.S. district

25   courts have a broad range of remedial powers in

1    contempt proceedings.  I have heard the gentleman,

2    whose portrait on the wall to your left and to my

3    right, address that on a few occasions.

4            We think they range from the imposition of

5    fines and penalties to some determination of damages

6    that ePlus may have suffered or some determination of

7    gains that Lawson has reaped during the period of

8    contempt.

9            THE COURT:  You mean as in an accounting or

10   something?

11           MR. MERRITT:  It is possible.  I'll tell you

12   in all candor that we have not come to a final

13   conclusion on how we want to approach remedies should

14   contempt be found.  We have not even seen internal

15   documents yet from Lawson that would suggest what the

16   answer is to any of those questions.

17           THE COURT:  Were you talking about separating

18   the discovery?

19           MR. MERRITT:  No, sir.  We would want to get

20   the discovery done, but it would simply allow us,

21   depending on the Court's determination of whether in

22   fact there is contempt, then to step back, depending

23   on Your Honor's findings, to try to shape the remedy

24   to fit whatever the Court finds.

25           So it would also give us the advantage of

1    having whatever order Your Honor enters in hand and
2    then try to find a remedy or remedies that are the
3    best fit for whatever findings you reach.
4         We think that's easier to do with a little
5    space between the hearings than to try to do on the
6    fly in anticipation of how you might rule on the
7    contempt.  We just think overall that would probably
8    simplify matters and tease apart some things that
9    would otherwise be very --
10        THE COURT:  How do you see it happening?
11   There would be an evidentiary hearing that would cover
12   all the issues and the rest of it would be briefed?
13   Or you would have two different hearings, one on
14   liability and one on remedies?  What are you talking
15   about?
16        MR. MERRITT:  Your Honor, in all candor, we
17   have not fully formed our thoughts on what the second
18   proceeding would look like if you find contempt.  We
19   know you have a broad range of remedies.  We know they
20   would be driven by whatever is in your order.  And we
21   would want to do it with as much speed and efficiency
22   as possible.
23        We might make written submissions to the
24   Court.  We might have a brief evidentiary hearing.
25   Again, we don't have a specific proposal on that at

1    this time, but we would want to do it efficiently and

2    with minimal waste of time.

3            THE COURT:  All right.

4            MR. ROBERTSON:  Your Honor, if I might just

5    briefly address that point because I may have some

6    information that would be of help to the Court.

7            We've asked interrogatories with respect to

8    these systems that they now claim they have designed

9    around.  We were directed to documentation, an Excel

10   spreadsheet, which from our review appears that there

11   have been something in excess of $60 million generated

12   from sales of what they're claiming the design-around

13   product to be.

14           Quite frankly, I don't understand the Excel

15   spreadsheet as it is presented to us as being

16   responsive.  I'll need to ask some witness with regard

17   to that.  We're also going to be exploring with Lawson

18   to see if we can get agreement to get a narrative

19   answer to that so I can at least have some parameters

20   to present to the Court in order to be able to fashion

21   a remedy for any contempt sanction.

22           The case law is, as Mr. Merritt suggested,

23   quite -- gives the district court quite broad

24   discretion to do that.  Even sanctions per day to put

25   them in compliance with the injunction.

 1          We think they have not been in compliance

 2     with the injunction since the day it issued, and

 3     that's evidence we're going to present.  But there's

 4     also expenses and attorneys' fees associated with the

 5     contempt proceedings that Your Honor might imagine

 6     have not been insubstantial to date in pursuing our

 7     remedies since the injunction issued back in May of

 8     this year.

 9          I do have some other issues I'd like to

10     address that Mr. Krevitt raised, but I can do that now

11     or I can do that, you know --

12          THE COURT:  Well, I'm trying to figure out

13     when to have the hearing and how much time to allocate

14     to it.  And the construct of it, whether bifurcated or

15     not, seems to me to be something that's a threshold

16     issue in that area.

17          How would you see the remedy phase being

18     tried if it were bifurcated?

19          MR. ROBERTSON:  Two issues, Your Honor.

20     Well, obviously, we don't consider -- we do consider

21     in our briefing suggested to Your Honor that there are

22     two threshold issues we're going to have to establish;

23     whether there's a colorable variant, and then if it

24     infringes.

25          I think Mr. Merritt put it quite well when he

1    said, Those two issues, and I think the Court

2    acknowledged as much, are obviously tied together.  If

3    the changes are superficial, if they're cosmetic, if

4    they're insubstantial or if they're relevant, then the

5    next breath out of the expert's mouth is going to be

6    when I ask him, Okay, given that fact, does it still

7    satisfy the claim element that's at issue?  Does this

8    modified version still satisfy that?

9            And he's going to say whatever he says.  And

10   I'm going to say, How does it do that?

11           So I think the Court is exactly right.  It's

12   not efficient to have two proceedings because it's

13   going to inexorably flow from the answer of that first

14   question is my view, but we don't want to invite

15   error, and we understand that we can't conflate those

16   two issues.

17           But the fact is, Your Honor, with respect to

18   the bifurcation of remedies, I think we believe that

19   once the Court finds contempt, and we believe the

20   Court will find contempt, there may never be a second

21   phase to this because I think we'll probably be

22   resolving the case at that point.  But if there is, we

23   think we'll probably need expert testimony with regard

24   to what the appropriate remedies will be.  And that

25   will probably involve an economist or somebody along

those lines.  And they will need to look at the

information, information I don't even have in my

hands.

        THE COURT:  How long is all that going to

take to get accomplished?

        MR. ROBERTSON:  I think we can probably do

that hearing in a day.

        THE COURT:  No, but how long from the time of

the finding of contempt would it be before we would

have a hearing on the remedy?

        MR. ROBERTSON:  Your Honor, we're going to be

working towards identifying the information, but as

Your Honor heard this morning, there's a letter from

Mr. Thomasch saying that I'm going to get some 800,000

documents, and I still won't even know the exact date

when I'm going to get those.

        There was a suggestion it might be

November 21.  I need to follow-up with respect to

these interrogatories as to the revenues generated

from this alleged design-around product.

        Remember, we're talking about system claims

here.  They keep referring to RQC and RSS, but there

were three configurations that were found to infringe

that involve far more that just RSS and RQC.

        So we're not stopping and then saying let's

1    have another phase of discovery.  We're going to

2    continue to work and try and identify the information

3    necessary for the remedies phase of this, but I think

4    it would be most efficient and would all be well

5    served if we have a hearing on the contempt, determine

6    whether there's contempt, and then a short period

7    after, perhaps a week, two weeks, whenever the Court

8    rules on this, that we could come in and have a

9    one-day hearing on what the appropriate sanctions

10   would be.

11          Perhaps we don't even need a hearing.  It

12   might be that we could submit it on the papers because

13   what the attorneys' fees are going to be, what the

14   expenses were involved, and perhaps we could even

15   agree on what the revenues are associated with the

16   still infringing product are, and the Court can

17   fashion it based on what the case law suggests.

18          So that's something I want to work out, but

19   we think actually that would be most efficient and

20   conserve the parties' resources.

21          THE COURT:  I'm having trouble, honestly,

22   figuring out how that saves anybody anything.  You're

23   going to be doing the discovery on what the quantums

24   of damage are and what the predicate for a remedy may

25   be while you're getting ready for this trial.

45

1        Then you want to delay the actual

2   presentation of that information that comes from that

3   process until after the trial.  But if you're going to

4   have an expert, you're going to need an expert to

5   testify about it.  You're going to need the expert to

6   say what they're going to say and give it to them so

7   they can take a look at it.  And if they want to have

8   a responsive expert, do that.  And I just don't

9   understand how we're saving anything.  In fact, I fear

10  we're building complications into the matter.

11       MR. ROBERTSON:  Well, I'm fearful we're

12  building additional expense into the matter because

13  the Court has broad discretion.  You may not even need

14  an expert testimony with respect to that.

15       THE COURT:  I can't possibly go through the

16  issue of determining somebody's profits and asking

17  them to disgorge it or have an accounting without

18  having evidence on it, can I?  How can that be?

19       MR. ROBERTSON:  Your Honor, I think if that's

20  the remedy you choose, I think the Court has broad

21  discretion.  Just impose a civil fine with respect to

22  each instance of the violation of the injunction.  I

23  mean, every sale of this alleged design-around is an

24  infringing act.

25       THE COURT:  The fine goes to whom?  The

1    federal government?

2            MR. ROBERTSON:  No, it would go to my client.

3    That's who would receive --

4            THE COURT:  Fines usually don't go over to

5    you, do they?  I thought they went to the coffers of

6    the court.  I'd be glad to have it if there's

7    infringement, and we have a well-heeled defendant, I'd

8    be glad to augment the budget of the court, but I

9    don't think that's what you're talking about.  I think

10   you're looking for something that goes in your pocket.

11           MR. ROBERTSON:  The case law, I think, is

12   quite broad in the discretion the Court has in how to

13   fashion the remedy.  And Mr. Merritt is exactly right.

14   Without having the information yet from Lawson, it has

15   been difficult for us presently to determine what the

16   appropriate remedy would be.

17           THE COURT:  Without having what information?

18           MR. ROBERTSON:  The information available

19   from Lawson.

20           THE COURT:  Like what information are you

21   speaking of?

22           MR. ROBERTSON:  Well, for example, the sales

23   associated with the alleged design-around product.

24           THE COURT:  They will provide you that as of

25   the end of October now.

1          MR. ROBERTSON:  I'm sorry, Your Honor.  I

2     didn't hear you.

3          THE COURT:  Why can't they provide you that

4     now, at least as of what the end of October is.

5     They'll know that.  Surely they keep their sales up to

6     speed.

7          MR. ROBERTSON:  You mean by the end of

8     November, Your Honor?  I'm sorry.  You suggested the

9     end of October.

10         THE COURT:  I just was picking an arbitrary

11    time and saying that they know now what their sales

12    were as of the end of October, and they can do the

13    same thing as of the end of November or at some point

14    in time they'll know that, and they usually know it

15    fairly soon after the end of the month or whatever

16    their accounting period is.  I don't know what that

17    is.

18         MR. ROBERTSON:  That may be an appropriate

19    parameter.  It might be the expense involved in coming

20    up with design-around.  As Your Honor may recall,

21    there's maintenance and service.  It's not just the

22    sales of this RQC product, remember, because there are

23    three infringing configurations.  So it's sales and

24    maintenance and all that.

25         So I think the answer to Your Honor's

1   question is yes, they should be able to identify that

2   for us fairly soon, although we were on a telephonic

3   hearing before Your Honor on October 28, 11 days ago,

4   and we were told there was only going to be 30,000

5   more pages of documents, and this morning we have a

6   letter to the Court saying there were going to be

7   800,000 more pages.  And I was on the phone last

8   evening with counsel for Lawson and they indicated

9   that they think they can get it to us by November 21,

10  but they're not certain.

11          So trying to pin this down and find out when

12  we're actually going to get the information has been

13  most difficult, Your Honor.  And that all feeds off of

14  when can we possibly do this hearing.

15          Your Honor asked who's handling the appeal on

16  behalf of Lawson in the federal circuit.  Well, they

17  have another law firm, but we're handling the appeal

18  for ePlus in the federal circuit.  So we have our

19  hands full.

20          The suggestion that was made was if we can

21  pick a hearing date that's reasonable and work the

22  schedule back off of that, I think we would pin some

23  things down and move this forward.  If the Court is

24  inclined to have a hearing that includes a remedies

25  phase, and thinks that's most efficient, then I will

1  stand down on that, but I just need the information in

2  order to be able to process it.

3           THE COURT:  Yes, you do.

4           MR. ROBERTSON:  Thank you.

5           MR. THOMASCH:  Your Honor, I just want to

6  make clear that we certainly oppose the attempt to

7  bifurcate the remedy.  We feel very strongly that that

8  should take place with the liability proceeding.

9           THE COURT:  Why?  Why are you so opposed to

10 that approach?

11          MR. THOMASCH:  There are a number of reasons,

12 Your Honor.  As a practical matter, what we don't want

13 is a situation in which there's a finding of contempt,

14 which is a very serious thing to be found in contempt

15 of court.  We are not in contempt.  And we are very

16 confidant about how this is going to come out.  But

17 that possibility until the case is tried is that any

18 resolution is possible.  We don't want the possibility

19 of being held in contempt, and then the unspecified

20 claim against us that no one would know from a doing

21 business point of view what is the threat against us

22 at this time.

23          If that's going to happen, you started this

24 out by asking the plaintiff's counsel, What remedy do

25 you seek?  That is the very reason we don't want

1   bifurcation.  We would like to know what that remedy

2   is.  We still don't know it.  Of course, they're going

3   to have an expert, but we don't know who it is.

4           They haven't disclosed to us an expert.

5   While they tell us that we're late with expert

6   disclosure, they have never mentioned an expert, but

7   we know they're going to have one.

8           THE COURT:  You mean on damages?

9           MR. THOMASCH:  On damages.  There's no order

10   of bifurcation.  There's no default position that, of

11   course, we'll bifurcate liability and damages.  The

12   presumption is this case will be done all at once.

13           We raised the issue of whether or not in

14   light of Tivo's strict two-step process could we split

15   that.  We have lost that request.  We are not going to

16   split that.  But there has never been a request to

17   split liability and damages until today.

18           So if expert witnesses were due to be

19   disclosed, they should have done that.  They have

20   asked us enormous amounts of information relevant to

21   damages, and we have provided it.  We have spent a

22   great deal time and money giving them information.

23           They have noticed for deposition our CFO.  We

24   have 30(b)(6) deposition topics that ask us about our

25   profits, our revenues.

1    THE COURT:  Don't you know by the end of --

2  does your client keep a relatively current log of its

3  sales and know what its profit figures are on an

4  ongoing basis?

5    MR. THOMASCH:  Your Honor, while I have not

6  asked my client that question in the crush of the

7  other work that we have done, I think it is reasonable

8  for the Court to assume that at least sales figures

9  are known to the company relatively promptly.  I think

10  that's certainly a fair assumption.  I have not

11  checked on it, and I don't know whether there's some

12  reason why it might be a quarterly number as opposed

13  to a monthly number, but I do think that there's a

14  reporting period, and at some point thereafter one

15  does know their sales.  And we will then give that

16  information.

17    There's no dispute.  We are not saying that

18  they can't have that information.  I do want to make

19  clear that this is an area in which the law is clear

20  that the purpose of a sanction in a patent

21  infringement injunction case, the purpose of a

22  sanction is primarily remedial.  So in that sense, the

23  harm --

24    THE COURT:  I thought it also was intended to

25  have a deterrent effect.  A general deterrence and a

1    specific deterrence.

2              MR. THOMASCH:  That has been mentioned in the

3    cases, but the Court has been clear that the primary

4    purpose is remedial.  If it is primarily remedial, not

5    exclusively, but primarily, then certainly we have a

6    right to know have they suffered any harm.  Are they

7    claiming, for instance, that they lost a single sale

8    that they would have made but that we made with the

9    RQC product and they should have gotten the money for

10   that?  That's a fair question for us to ask.  We have

11   asked them those questions already, and we've gotten

12   back the information about their sales are not

13   relevant to the injunction proceeding.

14             They have determined that right now they can

15   get information from us on finances and sales that go

16   only to the issue of damages, but they have taken the

17   position they don't have to give us that.

18             They haven't identified an expert.  Most

19   importantly, they haven't told us what remedy they

20   even seek.  There's a very big difference.  You don't

21   have to look at the evidence.

22             THE COURT:  They want an accounting of your

23   profits as a remedy.  They don't need to have an

24   expert focus on what sales they lost.  They just look

25   at your profits, right?

1    MR. THOMASCH:  You are correct, Your Honor,

2  but they have not mentioned the word "accounting"

3  until this hearing.  That's never been discussed.

4  There's no disclosure that they're going to point to

5  that says -- Tivo says that we should start this off

6  with a specific assertion of what's at issue.  We know

7  that they're alleging that we violated an infringement

8  order.

9    We have taken the burden of saying, Here are

10 the three groups of changes that are at issue in this

11 case on liability.  But they have to take the lead and

12 say, This is what we say is the remedy.  And then they

13 can take discovery if they say we're entitled to

14 recovery of your profits, Lawson.  If they want to

15 take that position, they can argue it, and then they

16 can find out whether the evidence supports them, but

17 they should have to tell us what they're after or we

18 don't know what the parameters of discovery are.  And

19 they have never told us that.

20    And we won't learn that if Your Honor were to

21 bifurcate this proceeding and put it off for some long

22 period of time.  That's not what we want.  We've been

23 forced to give discovery to them now at their request,

24 and we've done it.  We are going to continue to do it,

25 and we want to have all issues dealt with, including

1    damages.

2         I do want -- Your Honor asked me before, and

3    I had an oversight.  So if you'll forgive me one

4    digression.  You asked me if there were other issues.

5    I do want to bring to the Court's attention that there

6    is one other issue.  And that is -- and I apologize

7    for not raising it.  It was not tactical.  It was

8    mental.

9         THE COURT:  All right.

10        MR. THOMASCH:  On September 15, you indicated

11   that you wanted to hear two things.  One of those two

12   things related to the testimony that was given at the

13   injunction hearing.  We were not involved in the case

14   at that time, but a Mr. Dean Hagger testified for

15   Lawson at that.  He gave some testimony in that regard

16   about how long it would take and what cost would be

17   incurred if a client had to start over with a request

18   for a proposal and put a new system in.

19        THE COURT:  He did and the briefing post

20   trial was extensively directed to that issue.

21        MR. THOMASCH:  That is correct, Your Honor.

22   Now, you then mentioned in the conference on

23   September 15 that you wanted to hear a timeline and

24   evidence on that issue.  And if Your Honor wants to

25   hear that, we want to provide it to you.  And we want

1   a schedule to do so.

2           That is a separate issue from whether we have

3   violated the injunction.  You didn't accept that

4   testimony.  You rejected it.  You put an injunction in

5   place.  Whether we have abided by, as we are confident

6   we have, or violated, as they allege, the injunction,

7   it is not determined by the testimony that preceded

8   the injunction.

9           THE COURT:  No, but the remedy that they are

10  entitled to and the interest that the Court has in

11  enforcing its injunctions is informed if, in fact,

12  your client came in here and the lawyers for your

13  client came in here and made misrepresentations to the

14  Court about the length of time it would take to

15  accomplish this and the expense that it would.

16          I cannot tell you how much time was spent and

17  ink was spent in sorting through that issue alone in

18  deciding on the propriety, vel non, of an injunction.

19  While that doesn't have anything to do, I don't think,

20  with whether you violated the injunction, it certainly

21  does have something to do with, A, the remedy that

22  they want, and, B, what the Court thinks is an

23  appropriate sanction as to your client's conduct.

24          It is not the case that patent law divorces

25  the Court's concern for the enforcement and compliance

1   with its orders in some way that is different than any

2   other contempt proceeding.

3            The Supreme Court has told the federal

4   circuit many times recently, Patent law isn't

5   different than the rest of the world.  It is part of

6   the system by which we have chosen to regulate

7   ourselves.  And that applies with full force to the

8   assessment of what is an appropriate remedy in the

9   larger sense of the word for contempt.  And that's why

10  I said I wanted to hear that and know about it.

11           MR. THOMASCH:  I understand, Your Honor, and

12  I want to make very clear we're not asking you to

13  somehow ignore that issue that that's not patent law,

14  you shouldn't concern yourself with it.  To the

15  contrary, Your Honor.  You have an absolute right to

16  make sure that you're satisfied with the candor of

17  counsel and the truthfulness of witnesses in hearings

18  that come before you, and you have a concern that

19  you've raised.

20           This is not the time to argue that concern.

21  I believe that there were miscommunications.  I

22  believe that there was a discussion on one issue that

23  has been turned into a discussion of another.  You

24  said on the phone there may be an explanation for

25  this.  On October 28, you said, "There may be an

1    explanation.  I want to hear it."  We want to provide

2    it.  We want to do that and we're prepared to do that.

3         We don't need to have two months of discovery

4    on that issue.  We're prepared to do that at Your

5    Honor's convenience.  We want to find out what Your

6    Honor would like.  We want to address those issues

7    head on.  We're not running from them.  I'm bringing

8    them up.  But if, for instance, you want to hear that

9    in connection with the contempt proceeding because I

10   do believe it's separate, but I think it's important,

11   but if you want to hear it at the same time, it does,

12   of course, extend the subject matter that's going to

13   be at issue at the contempt proceeding.  And I don't

14   believe you can shoehorn everything into a period of

15   two or three days as we add on more and more topics.

16        Are they going to allege --

17        THE COURT:  Doesn't that argue for

18   bifurcation of a remedy proceeding?

19        MR. THOMASCH:  No.  I think we need to

20   have -- I think we need to do things at once, and we

21   need to take the amount of time that's necessary to do

22   them, but we shouldn't have an uncertain claim of harm

23   against us, an uncertain request for relief against

24   us.  We should know what it is.  We should be able to

25   see the expert.

58

1          THE COURT:  How are you harmed in that

2    fashion?

3          MR. THOMASCH:  I think it's very much harmed.

4    I think you heard it out of the mouth of plaintiff's

5    counsel when he said, If you give us a ruling on

6    liability, you may never need to have a hearing

7    because we'll resolve the case.  In other words, I

8    will have a big stick to hold over you.  I will have

9    leverage on you because I will have the threat of who

10   knows what we might ask for.

11         I want to know what they're going to ask for

12   now.  If they say they've been harmed, I'd like to

13   know what the harm is.  If they're asking us for

14   evidence, I think I have a right to get the evidence

15   from them.  And then this court can sort it out all

16   out.

17         We're not saying they don't get it.  Indeed I

18   want a hearing on that issue.  If that issue is going

19   to depend on things like lost sales, well, then for

20   goodness sake, we are going to need witnesses.  We

21   don't do that on after-the-fact submissions and

22   summaries.  We do that on testimony.

23         They suggested just a moment ago, Your Honor,

24   unless I misheard them, they suggested that it's

25   possible that they could do a damage phase, a remedy

1    phase, without calling witnesses.  And I certainly

2    object to that process.

3         If there is going to be evidence upon which

4    the Court fashions a remedy, the evidence should come

5    out in open court, be subject to cross-examination.

6    We should have the right to put on countervailing

7    evidence.  These are disputed facts, and they should

8    come before the Court.  But right now we don't even

9    know what the dispute is because they have never

10   mentioned the remedy they want, and they have never

11   disclosed the expert that they're going to use to try

12   to get that remedy, and that's unfair to us.

13        And we shouldn't be in a situation like that,

14   particularly when they have asked us and we have given

15   them discovery on the very issue.  We're not complete,

16   but we produced a lot of documents on that issue.  We

17   will continue to produce whatever Your Honor requires

18   us to do.

19        If, for instance, you want going forward

20   sales, we will give them going forward sales.  So on

21   that, on the issue of bifurcation, we are against it.

22        On the issue of Mr. Hagger, the other issue

23   that has come up from time to time is that when the

24   RQC component of the configurations was being sent to

25   customers, when the design-around was being

1    implemented, there was a conference between

2    Mr. Hagger, who read a script that was given to him to

3    his customers.  There is a statement in there I think

4    taken very much out of context, but a statement in

5    there that this plaintiffs have taken issue with, and

6    there are some writings in this case in which they

7    suggest that that in and of itself was a violation of

8    your injunction and puts us in contempt under an

9    aiding and abetting theory.

10              I disagree with it.  If they want to argue it

11   we want to meet it head on and put proof on that

12   issue.  But as I stand here today, I can tell Your

13   Honor in all honesty I have read the briefing, I have

14   read every inch of the briefing, and I do not

15   understand whether they think that's an issue for the

16   hearing or not, and until we know what the issues for

17   the hearing are --

18              THE COURT:  What issue are you talking about?

19              MR. THOMASCH:  The issue is whether or not we

20   committed an aiding and abetting violation of the

21   injunction.

22              THE COURT:  You mean aided and abetted the

23   customers?

24              MR. THOMASCH:  Yes, whether we aided and

25   abetted the customers and whether they were direct

1    infringers and whether they infringed because of

2    something we did.  That has been suggested.

3          On the other hand, when Your Honor asked for

4    briefs, they said the only issue on the liability side

5    were the three changes.  I'm glad if it's only the

6    three changes, but if they're going to add other

7    things, I want to know about it before Your Honor sets

8    a date and a schedule.

9          THE COURT:  What does that mean?  I translate

10   that into, what do you want me to do?

11         MR. THOMASCH:  Your Honor, I would actually

12   appreciate it if you would ask the plaintiff's counsel

13   whether or not there is any basis for an alleged

14   violation -- alleged contempt of the injunction other

15   than the fact that the three groups of changes we made

16   they say are only colorable and are still infringing.

17   Is that all we're talking about?  Are there other

18   grounds on which they say we have violated your

19   injunction?

20         That's a basic notice question.  I think we

21   only have those three, but in other letters they have

22   raised other issues, and I would like to get them off

23   the table.

24         THE COURT:  What did you start this case

25   with?  Was it a motion for an order to show cause?  Is

1    that what it was?

2             MR. ROBERTSON:  Yes, Your Honor, I think

3    that's how we styled it.

4             THE COURT:  All right.

5             MR. THOMASCH:  Thank you, Your Honor.

6             THE COURT:  Well, I think we've made some

7    headway.  I think it's a mistake to bifurcate this

8    hearing.  I'd like to wrap it all up at the same time,

9    and if it's necessary, to stage the evidence in

10   different ways because of considerations of liability

11   and remedy.  We can face that later, but we ought to

12   plan on not doing that at this time.  And what we'll

13   have is one hearing that will deal with both the

14   liability for contempt and the issue of damages.  And

15   we ought to have the discovery that is to be

16   accomplished accomplished as to both of those.

17            Now, let's see.  The disclosure you're

18   talking about for Niemeyer and Weaver, are they the

19   affidavits that were attached to the motion?  Is that

20   what you're talking about?

21            MR. ROBERTSON:  Yes, Your Honor, and

22   obviously we'd like to supplement --

23            THE COURT:  I understand, but that's what

24   you're talking about as a disclosure?

25            MR. ROBERTSON:  Yes.

1          THE COURT:  And then Dr. Shamos was the

2    affidavit that you tendered in response; is that

3    right?

4          MR. THOMASCH:  That is correct.  We would,

5    however, be dramatically reducing the scope of Dr.

6    Shamos' in our new report because our principal expert

7    will be Dr. Goldberg, and we don't want overlap.  So

8    we do need to constrict what we disclose.

9          THE COURT:  What's Goldberg going to testify

10   about?

11         MR. THOMASCH:  Dr. Goldberg will testify

12   about both issues.  And he is a code expert.  And

13   that's really one of the reasons for this.  So if the

14   Court has any questions about how this was actually

15   effectuated in the software code, he is immanently

16   qualified to deal with that issue.  So we will deal

17   with the changes and why they are more than colorable.

18   We will also deal with the fact that the changed

19   componentry no longer infringes the claims of the

20   patent.

21         THE COURT:  Then you're going to withdraw

22   Shamos' report entirely because he hasn't anything to

23   say on that topic that won't overlap, I can tell you

24   that, just from having heard him testify and read his

25   report.  I've read his previous reports at great

1   length.

2           MR. THOMASCH:  I understand completely

3   that --

4           THE COURT:  I believe you ought to stay with

5   Shamos and get your code person in.  I think you filed

6   an expert here and that's Shamos.  That's your man.

7   You've got him on record.  You don't like his

8   testimony now and you can't have him be designated

9   part for the liability issue of contempt -- I mean,

10  pardon me, of substance, and then a part for code.

11  They have a code expert, a source code expert, and a

12  general infringement expert.  And if Goldberg is going

13  to do that, both of those things for you, then you

14  withdraw -- are you proposing to withdraw Shamos

15  entirely?

16          MR. THOMASCH:  If that is necessary, we will

17  withdraw Shamos entirely.  Your Honor, I just want to

18  make clear a couple of points.  One, it is not a

19  dissatisfaction with Dr. Shamos' testimony.  You said

20  we don't like his testimony.  With all due respect,

21  Your Honor, that's not true.

22          His testimony at the first trial was not

23  accepted by the jury in all respects.  I do note that

24  there was one very significant configuration --

25          THE COURT:  It was accepted by some.

1          MR. THOMASCH:  It was accepted in part.  It
2     was rejected in part by the split verdict.  I
3     understand that.  But the testimony that our expert
4     will give, just say our expert without regard to name,
5     the testimony our expert will give is completely
6     different than the testimony given at trial because
7     the testimony will involve -- every aspect of the
8     testimony will involve the RQC product, which was not
9     at issue.
10          THE COURT:  But you have already put Shamos
11    out on the field to play that game.  That's exactly
12    what you put him out there for.
13          MR. THOMASCH:  Your Honor, you are correct,
14    and -- you are correct.  I want to the start there.
15    But this came up very quickly in a motion for an order
16    to show cause as to why we shouldn't be held in
17    contempt, which is a complete reversal of the burden
18    of proof.  But that's what was done.  And before our
19    brief in opposition even went in, there was a
20    conference call with Your Honor on the 15th.  We
21    hadn't even put in our brief in opposition to the
22    request for an order to show cause.  And during that
23    conference call, you on your own volition said, "I
24    assume you're going to have expert testimony."  And
25    Mr. Schultz said, "Yes, Your Honor."  And you said,

1    "Who?"  And he said, "Dr. Shamos."

2         At that time it was not even clear that there

3    was going to be a contempt proceeding.  The question

4    was whether there would be one.  Dr. Shamos was the

5    expert who was familiar with the system.  He was the

6    only man in town that we could have used at that time.

7    And now we have come in, we have looked at the issues,

8    and, frankly, Your Honor, we want the best possible

9    evidence for you.  And we think that code evidence may

10   be something the Court wants to hear.  And

11   Dr. Goldberg is our code expert.

12        And if we have to use him exclusively, we

13   will use him exclusively.  I will represent to the

14   Court we have no intention of having Dr. Shamos

15   testify to anything that Dr. Gold testifies to.  None.

16        There is overlap between Niemeyer and Weaver.

17   I can show you places in the two expert declarations

18   where they make the same statement and they say the

19   same exhibit.  Identical testimony in both affidavits

20   on their part.  We haven't raised that because we

21   assume that at trial they will not be able to do that,

22   but their disclosure are duplicate in several

23   respects.  But we are not going to be duplicative.  We

24   are not.  But we have to start with a code expert and

25   that's Dr. Goldberg, and we don't want to have Dr.

1   Shamos infringe on anything.

2          THE COURT:  When are you going to have

3   Goldberg submit his report?

4          MR. THOMASCH:  We actually were hoping to

5   have a schedule for that today.  We also thought that

6   that would encompass the scheduling for the expert

7   witness that we know they want on damages.

8          THE COURT:  You need to get your Goldberg out

9   now so everybody knows what he's got to say if you've

10  had him do the work.  You've got Weaver, and you've

11  got Niemeyer, and you've got Shamos on file, and

12  everybody knows kind of where they're coming from, you

13  need to get your code man out.  Can you have it by

14  next Monday, have his report out by then?

15         MR. THOMASCH:  Your Honor, I think --

16         THE COURT:  You need to get it on the record.

17         MR. THOMASCH:  I understand.  I do want to

18  note we've given them the disclosure of him and his

19  C.V. and his list of testimony in other cases.  We

20  have not given them a report.

21         THE COURT:  Disclosure under the rules, under

22  Rule 26, includes the report.

23         MR. THOMASCH:  Well, that's true, but what we

24  have by way of declarations is not a 26(b)(4)

25  Disclosure.  Be clear.  That's not what they have

1    given us so far.

2           THE COURT:  I thought he said that's what

3    they were relying on.

4           MR. THOMASCH:  They may be relying on it, but

5    I don't think they're representing it complies with

6    Rule 26(b)(4).

7           THE COURT:  It can be.  An expert's affidavit

8    can comply with Rule 26(a).  I've seen it plenty of

9    times.

10          Excuse me, Mr. Robertson.  I thought you just

11   told me you satisfied your expert report requirements

12   by the affidavits of what's his name, Weaver, and the

13   affidavit of Niemeyer.  Did I mishear you?

14          MR. ROBERTSON:  No, sir.  I said those were

15   disclosures, but I did say I want to supplement them.

16   I'm not even given 800,000 pages of documents until

17   two weeks from now, and I have to go through them.

18   So, obviously, I want my experts --

19          THE COURT:  But are you -- if we call that a

20   disclosure, it is your initial disclosure, right?

21          MR. ROBERTSON:  It is.

22          THE COURT:  Right?

23          MR. ROBERTSON:  Yes, sir, it was our

24   disclosure.

25          THE COURT:  It was intended under Rule 26 to

1    satisfy Rule 26?

2              MR. ROBERTSON:   It was --

3              THE COURT:   Right or not?

4              MR. ROBERTSON:   To be able to demonstrate to

5    the Court that a contempt proceeding was warranted.

6              THE COURT:   Was it intended to be a Rule 26

7    disclosure for experts?

8              MR. ROBERTSON:   Based on the information we

9    had at the time, absolutely.

10             THE COURT:   Are you saying that you really

11   want to do something else?

12             MR. ROBERTSON:   I'm saying, Your Honor, I

13   need to look at additional source code that's being

14   produced, additional documents, and have Dr. Weaver

15   and Mr. Niemeyer be able to take those into account.

16             I shouldn't be prejudiced because this

17   document production is --

18             THE COURT:   I understand that.  But what I'm

19   trying to get at is whether you are really at the

20   point where you're just going to have, basically, have

21   Weaver and Niemeyer submit what you call supplemental

22   reports, but they're really going to be fairly

23   significantly different reports.

24             MR. ROBERTSON:   I don't know, for example,

25   what Dr. Goldberg is going to say.  So, obviously, I

1   want Dr. Weaver and Mr. Niemeyer to be in position to

2   respond to what Dr. Goldberg is going to say.

3          THE COURT:  That's a different question.

4          MR. ROBERTSON:  Okay.  We've identified right

5   now why they think the alleged modifications are not

6   colorably different, and we would be supplementing and

7   embellishing those arguments as we process this

8   document production that we still await.

9          MR. THOMASCH:  Your Honor, we will make any

10  disclosure on any timing that you order.  So I don't

11  want this to be about scheduling.  Whatever date Your

12  Honor wants it, we will do it.

13         I do want to make two points very clearly

14  here.  The issue that they made a disclosure on was

15  whether there should be a hearing.  They have not

16  addressed the two levels of Tivo in their expert

17  disclosures yet.

18         If they were going to say to Your Honor we're

19  bound by those disclosures, we can supplement more

20  evidence, but the range of opinions is set.  But we

21  know that's not the case.  They are going --

22         THE COURT:  That isn't what I heard

23  Mr. Robertson just say.

24         MR. THOMASCH:  If there's an order to that

25  effect, we will be very pleased leaving Your Honor's

1   courtroom today.  I think that they want to add

2   opinions that relate to the two parts of the Tivo

3   test.  I'm just guessing that, but I think that's

4   probably the case.

5        But they said they should be able to respond

6   to Dr. Goldberg.  They do have a very heavy burden of

7   proof.  The first reports should come in from the

8   plaintiffs.  We should then put in oppositions, and if

9   necessary, they should put in a rebuttal.  But the

10  burden of proof is a very high burden, and it's a very

11  clear burden that in both stages it is on the

12  plaintiff.

13       So if they want to see our evidence first

14  before they put in their report, I don't have

15  scheduling problems.  I will go with any schedule, but

16  the order is important.  And the order is that the

17  party with the burden of proof goes first, and that's

18  them on all phases.

19       We will put in right away, if Your Honor

20  would like, a disclosure of an affidavit similar to

21  the affidavit that they have put in on Niemeyer and

22  Weaver.  We could do that by next Monday, if you want.

23       I think the practical reality, Your Honor, is

24  that we know that they are going to at some point put

25  in a more comprehensive set of opinions and evidence

1    from their experts that's going to be a true 26(b)

2    disclosure that relates to the two Tivo issues.  And

3    after they do that, we should respond in kind, and we

4    will do that on any schedule that Your Honor wants.

5    But if you want a preview, a first declaration, we

6    could do that right away, Your Honor.

7              I don't want to make this about timing

8    because we don't resist the timing.

9              THE COURT:  Thank you.

10             Well, what do you say about all that,

11   Mr. Robertson?  To a certain extent we kind of are

12   fencing here.  You've made a showing sufficient to

13   warrant the issuing of an order, but you say now

14   you've gotten a lot of documents, and your expert may

15   have a different view of things.  And if so, we ought

16   to set a schedule that allows that to happen, and then

17   they have to respond to it.  Isn't that what we

18   usually do?

19             MR. ROBERTSON:  I think the suggestion is

20   perfectly reasonable, Your Honor.  In fact, I'd like

21   to take up Mr. Thomasch on his suggestion.  What I'd

22   like to know from Mr. Goldberg initially is what he,

23   as the expert, contends are the three modifications.

24   We should at least have that pinned down.  Because, as

25   Your Honor observed, this correspondence that started

1    with Mr. McDonald back in early spring, the themes,

2    the theories of the modifications, have continued to

3    shift.  I mean, they have morphed.  They have

4    abandoned some.  They have adopted others.  And I have

5    seen internal documentation, Your Honor, back around

6    the time that they were trying to come up with these

7    alleged modifications as to what Lawson viewed the

8    three modifications to be.

9         So I haven't had it pinned down.  If they

10    want to make an initial proffer by Dr. Goldberg as to

11    what the three modifications are, and then we can

12    proceed with a response, they can proceed with their

13    30(b)(6), and then we'll reply.  We can do that in

14    preparation for the hearing.

15         It builds in some added time and costs, no

16    doubt, but, you know, I think this is a serious

17    matter, and we take it very seriously as well.  And we

18    think the integrity of a federal judge's order is at

19    issue here, and we want to do it right, such that when

20    we take this up on appeal we have a proper record.

21         MR. THOMASCH:  We agree with the seriousness

22    of the matter and we agree with having a proper

23    record.  There's no dispute there.

24         There is no dispute about what the three

25    areas of change are.  None.  The supplement to

74

1    interrogatory No. 5 is 32 pages in length.  I was

2    involved directly in its preparation.  I have read it.

3    It includes, to be reader friendly, it includes

4    virtually a preliminary statement in the front to

5    summarize it, and then it goes on to show the

6    specifics.

7           We have also given them the code for RQC and

8    a file that shows every code change line by line

9    between RQC and RSS that relates to the three changes.

10   And the narrative that we gave them cross-references

11   them.

12          I have it, Your Honor.  I'd be happy to hand

13   it up.  This is the basis for our claim that they are

14   more than colorably different.

15          THE COURT:  And you're not going to vary from

16   that?

17          MR. THOMASCH:  We are not going to vary from

18   that.  This is a report.  If Dr. Goldberg disagreed

19   with this, he wouldn't be our expert.  He's involved

20   in it.  Dr. Goldberg will testify consistent with the

21   supplement to interrogatory No. 5.  There has been no

22   change in the position of Lawson, at least on

23   September 15 when I started, starting with the Court's

24   hearing and --

25          THE COURT:  There were some changes,

1   Mr. Thomasch, in the letters that came my way, which I

2   would rather not have even had, but there were a lot

3   of changes.   I think in a political campaign, there

4   may have been some pejorative language attached to

5   them.

6           MR. THOMASCH:   Your Honor, we have attempted

7   to eliminate pejorative language, and attempted to try

8   and not have too many letters.   And I say that with

9   full recollection that I sent the Court a letter this

10  morning.   But I sent the Court a letter to withdraw a

11  motion, a request I previously made.   I felt I owed it

12  to the Court to do so.

13          But at any rate, the three changes are not in

14  dispute.   The significance of them and whether or not

15  they take the product out of being infringing, that is

16  in dispute, but we know what they are.   If Your Honor

17  wants --

18          THE COURT:   Just a minute.   Mr. Robertson,

19  you know that they're saying that the three changes

20  and the only changes they are ever going to contend

21  were made are in that answer to that interrogatory.

22  Are you willing to accept that as the starting point?

23          MR. ROBERTSON:   Yes, Your Honor.

24          THE COURT:   Then you have your people do

25  expert reports after they get the documents and look

1    at the full panoply of proofs.  Because your idea is
2    they ain't, right?
3              MR. ROBERTSON:  That's right.
4              THE COURT:  To quote the old boy.
5              MR. ROBERTSON:  I've got the interrogatory
6    answer.  I read it.  It is 32 pages long.  It was
7    crafted by lawyers, obviously, and it's all over the
8    map.  But if they're saying that's the four corners of
9    what they're going to be confined to, then I'll live
10   with that, and I'll address that with Dr. Goldberg.
11             THE COURT:  You understand, Mr. Thomasch,
12   that you can't step beyond that.  Not one step beyond
13   it.
14             MR. THOMASCH:  I understand, Your Honor.
15             THE COURT:  If you do, that will be the end
16   of it.
17             MR. THOMASCH:  I understand that.
18             THE COURT:  All right.  You know the
19   parameters then, Mr. Robertson.
20             MR. ROBERTSON:  Yes, Your Honor.
21             MR. THOMASCH:  With that in mind, Your Honor,
22   on any schedule that Your Honor chooses to set, we
23   believe that the appropriate pathway is for the
24   plaintiffs to put in their expert reports, for the
25   defendant to put in opposition reports, and for the

1  plaintiff, if necessary -- I don't think we should

2  have to go to rebuttal, but if they want a rebuttal,

3  put in a rebuttal.

4  THE COURT:  Well, I'm going to tell you I

5  don't want to hear anybody making an argument that,

6  Well, we thought that his deposition was the rebuttal

7  report.  We want to stay with the structure and the

8  structure is this:  You framed what you say are the

9  changes.

10  MR. THOMASCH:  Yes.

11  THE COURT:  They are going to do expert

12  reports.  You are going to do responses.  They are

13  going to do replies.  And you're not going beyond that

14  anywhere.

15  MR. THOMASCH:  Excellent.  That is precisely

16  what we would request.

17  THE COURT:  I think that's the best way to go

18  because that's what the rules generally require.

19  Now, what about -- I want to get a couple

20  things done.  We'll take lunch, and if we need to do

21  anything else after lunch, we'll do it.  But what

22  about the format of the reports, of the documents, Mr.

23  Robertson?  Mr. Thomasch has set forth his statement

24  of position in a letter.  What do you say about that?

25  Do you want something different or not?  That's not

1   been the format that you all have used in the past in

2   this case.

3          MR. ROBERTSON:  That's right, Your Honor.

4   There was a stipulation that was entered into between

5   the parties, and the Court entered it as an order, and

6   it required the documents be OCR readable.

7          THE COURT:  Was that in the main case or was

8   that -- was that an order entered in the case way

9   back?

10          MR. ROBERTSON:  Yes, it was a scheduling

11   order, Your Honor, that we assumed implies to all

12   proceedings.

13          Now, Mr. Thomasch has represented, and don't

14   let me misrepresent, but that he could get us the

15   documents by Wednesday in what's called the native

16   format or he could get them to us or they aspire to

17   get them to us in compliance with the stipulation by

18   November 21, I think was the suggestion.

19          THE COURT:  I think it was the 18th.

20          MR. ROBERTSON:  The problem with the native

21   format, Your Honor, is they're not Bates labeled.

22   They're more difficult to review.  And it's going to

23   be problematic down the road for us in a contempt

24   proceeding or during depositions if we have documents

25   that are not processed.

1    I'm willing to live with the November 21

2    representation if they're produced in the format that

3    --

4    THE COURT:   November 18 is what he said.

5    MR. ROBERTSON:   I'm sorry.   There was some

6    discussion yesterday.

7    THE COURT:   To complete production by Friday,

8    November 18.

9    MR. THOMASCH:   That is correct, Your Honor.

10   If we are for some reason compelled to do something

11   that goes way beyond what the federal rules require,

12   we just want this behind us.   There is no human

13   element involved here, Your Honor.   This is really a

14   question of bulk computing power, and our computers

15   are going seven days a week, 24 hours a day,

16   literally.

17   Now, the documents can be processed just as

18   easily or just as difficultly by plaintiff's counsel's

19   firm.   Mr. Robertson can take these documents and find

20   a vendor if he thinks this is somehow faster.

21   We are simply tired of being told that we're

22   taking too long when we have a team of 15 people who

23   work around the clock on this.

24   THE COURT:   You can do this by the 18th,

25   according to your letter.   He's willing to accept the

1   18th if you do it that way.  That's been the protocol

2   in the case.  And I think it's a reasonable protocol,

3   and it will ultimately save -- allow you both to get

4   about the business of using the documents if you do

5   take until the 18th to do it in the format that you

6   can get it done by the 18th.

7         MR. THOMASCH:  We're happy to do that.  I do

8   want to be clear that the 18th is a prediction that

9   requires us to say we are running at about 75- to

10  100,000 pages per day.  How many days will it take us

11  to do this?  We have once had the process shut down

12  because of file corruption.

13        There are factors in this that we can't be

14  certain of.  I actually think that we have a good

15  chance of being done a day earlier than that.  I am

16  worried about some notion that if it isn't done on

17  that date, it's because we're operating in bad faith.

18  That is not the case.  If it's not done by that date,

19  it's because the documents are so bulky that the

20  computer can't do all of the processing.

21        It's an unusual amount of processing.  It

22  goes way beyond what is normally done in a case.  And

23  right now we will have -- when this is finished on the

24  18th, I just want Your Honor to understand, we will

25  have spent more than $1 million, as I've tried to

1    figure this out, more than $1 million, and produced

2    more than 2.1 million pages of documents.  We will not

3    have received back one document, one page.  And

4    discovery obligations --

5              THE COURT:  That doesn't have anything to do

6    with the topic on the table right now.  We'll deal

7    with that topic in awhile.

8              MR. THOMASCH:  I understand.  It is always

9    easy to ask the other side to do more processing, do

10   it faster, do everything when you have no reciprocal

11   obligation.  That's the problem.  We're doing the best

12   we can.

13             If Your Honor wants us to continue with the

14   protocol of doing the full range of processing, not

15   limited to, but including making them searchable

16   through OCR, we will do that.  We're incurring a cost

17   to do that.  It's not insignificant.  We will incur

18   that.

19             And the reason we will do that is because we

20   are loathe to be seen as the party somehow trying to

21   avoid the documents or trying to delay the hearing.

22             We want to move to the merits.  That is our

23   goal.  And we will do what Your Honor has requested.

24             THE COURT:  Good.  The 18th.  If you have a

25   problem, I'm sure you'll figure out a way to solve it

1    or seek relief.  By the 18th in OCR format will be

2    what you'll do.  And I think that's what you all

3    basically agreed is the best way to do it.  All right.

4            Well, you've been reviewing documents,

5    haven't you, Mr. Robertson?  Do you have any ideas

6    about how many depositions you think you're going to

7    need?  And have you talked, you and Mr. Thomasch,

8    talked about that?

9            MR. ROBERTSON:  Yes, Your Honor.  I think

10   they've designated six individuals for the 30(b)(6).

11   Obviously, we don't think they're going to be full day

12   depositions.  Some of them are only on one or two

13   topics.  I want to take Mr. Hagger's deposition.

14           THE COURT:  As an individual?

15           MR. ROBERTSON:  As an individual.  I think he

16   may have been designated on one of the topics.  I'm

17   not certain.

18           Mr. Christopherson I anticipate taking, and

19   as I review the documents, there may be two or three

20   other individuals, but I have no interest in

21   belaboring this.  I want to focus like a laser beam on

22   the issues that were involved.

23           I think that Your Honor is exactly right.  We

24   believe the timeline is going to be very important.

25   We think there was testimony here that shows that they

1   knew before the injunction hearing that they were

2   going to claim a design-around, and we think the

3   evidence will show they didn't bring that to the

4   Court's attention when they were proffering testimony

5   that said they were going to be irreparably harmed and

6   damaged if an injunction was entered while at the same

7   time they had information that they thought they were

8   going to have a very simple and alleged cost-free

9   designed-around.

10          So we're going to bring that to the Court's

11   attention.   That's why I want Mr. Hagger and Mr.

12   Christopherson and others.

13          We have been reviewing the documents.   I

14   think I represented to the Court I've had to hire

15   outside counsel to try and do it as efficiently as

16   possible.

17          We are about three-quarters of the way

18   through the production right now, but we're going to

19   get an equal volume of production apparently on

20   November 18.   So it's going to take me some time to

21   process that information.

22          It's just mind-boggling to me, Your Honor,

23   that Lawson has produced double the volume of

24   documents in this contempt proceedings that they did

25   in the actual litigation.

```
 1              THE COURT:  It is to me, too.
 2              MR. ROBERTSON:  And we only asked from
 3    January of this year forward.
 4              THE COURT:  So let's see.  Other than spleen
 5    venting, I heard eight deposition, you think.  Is that
 6    right?  And perhaps more depending on what it is that
 7    you find.
 8              MR. ROBERTSON:  I didn't include the expert
 9    depositions, Your Honor.  So I would estimate eight to
10    ten is where I stand right now.
11              MR. THOMASCH:  Your Honor --
12              THE COURT:  How about you?
13              MR. THOMASCH:  We don't know yet because
14    we've received no discovery.  So we haven't really had
15    a chance.  It really does depend on what their
16    documents show.
17              THE COURT:  I'm curious.  What do you want
18    from them that has anything to do with whether you are
19    in contempt?  I'm not sure I understand that.
20              MR. THOMASCH:  They have held themselves out
21    to the Court as a competitor of ours.  If they are, it
22    is very possible that internally they analyzed our
23    system.  It is very possible that they commented.
24    They may have memos in their files that suggest that,
25    Well, the new system does not allow you to use Item
```

1    Master and Punchout together.  That's a big deal.  I

2    think it's a big deal.  I think if they looked at it,

3    they would have thought it was a big deal, and they

4    might have written it down.  They might have talked to

5    one of our customers.  They might have asked about it.

6    They might have said, You shouldn't buy RQC.  It's an

7    inferior product.  It doesn't do certain things that

8    RSS used to.

9          I don't know what their documents will show,

10   but I do know that there are many places in which if

11   they have analyzed our product, I mean what we want to

12   know is, have they done any comparison?  If they have

13   done a comparison of the products, I'd like to know

14   what they internally thought about it when they

15   weren't in court.

16         So we want to get those.  And it depends on

17   what comes out of the discovery process.  So I don't

18   have a specific number of their witnesses.  It will be

19   fewer than the witnesses they seek from us.  I am

20   confident of that.

21         There will be some witnesses on damages in

22   all likelihood.  I do want to mention to Your Honor

23   that on September 15 you will recall, I believe, that

24   there was the hearing, and at that time discovery

25   requests had not been served.  And Mr. Robertson asked

1    if you wanted him to give them to you first.   And you

2    said no, that's all right.

3           One of the issues, there was the 30(b)(6)

4    depo.   And counsel for Lawson said that Mr. Robertson

5    should be limited to five categories.   Mr. Robertson

6    said, No, I shouldn't be so limited.   There's no

7    reason to limit me to five.   I have 10 to 12.

8           In fact, subsequently he served it, and it's

9    22 separate categories.   Twenty-two separate

10   categories covering a range of things that is

11   exceedingly broad.

12          We will need multiple witnesses.   We're not

13   objecting to that, but I do think on the fact witness

14   side, if the whole hearing is going to take two days,

15   which he says, I don't think that's enough time, but

16   if it's going to take two days, and that's with

17   everything, that's 16 hours or so, then we shouldn't

18   have 80 hours of depositions for 16 hours of

19   testimony.

20          And we would just request the Court instead

21   of trying to go through this -- I don't want to ask

22   Your Honor to go through this topic by topic.   We're

23   big boys.   We can work together and try to work

24   through that.   But if Your Honor were to say, for

25   instance, that each side may have up to 25 hours of

1    depositions in total from fact witnesses, then we
2    could work out a good way to get there.
3         I am worried that what we're going to see is
4    eight witnesses times seven hours.  He's already said
5    one witness he wants for two days.  We could get 50,
6    60, 70 hours of depositions, and I think that's
7    inappropriate.
8         So we would ask Your Honor just to put a fair
9    rule in place that applies to both parties, and then
10   let us work out together two things.  The number of
11   witnesses and scope of topics and the scheduling.  We
12   can do that, but we need guidance on is it unlimited
13   depositions because I don't want depositions to become
14   like documents did.
15        We're stunned at the amount of documents that
16   were produced.  Stunned.  But it was because we used
17   search terms that they gave us.  It's not worth going
18   through.  We're done that.  But let's not replicate
19   that error going forward.
20        THE COURT:  They told me your search terms
21   were even going to produce more.
22        MR. THOMASCH:  Your Honor, I can give you --
23        THE COURT:  I don't want to hear all that.
24   I'm sure there's another side of everything.
25        MR. THOMASCH:  That one has a factual answer,

1   which if Your Honor wanted, I could give, and we are

2   correct, but I don't need to go there.

3          THE COURT:  Well, I want you to have the kind

4   of discovery, the depositions, that you need to prove

5   the case.  They have a high burden.

6          MR. THOMASCH:  We absolutely agree, and we're

7   not asking for anything other than -- it is not

8   uncommon to suggest that there would be some limit on

9   the number of hours.  And that will cause the parties

10   to act more efficiently.

11          And I think 25 hours per side for fact

12   witnesses would suffice.  Experts are on top of that

13   and experts will be very important, but if they have a

14   different number, they may have a different number,

15   but I don't think it should be left open-ended.

16          THE COURT:  Why don't you-all talk about

17   that?

18          MR. THOMASCH:  We will we happy to talk about

19   it.

20          THE COURT:  What do you think a limit ought

21   to be, Mr. Robertson?

22          MR. ROBERTSON:  I think the limit ought to be

23   within reason.  I think 25 hours is certainly not

24   sufficient for the number of witnesses that I think.

25   I'm going to zero in.  I don't waste a lot of time in

1   depositions going around and getting people's

2   education from the second grade.  I'm going to get

3   focused on what the issues are that are important

4   here.  But right now without even seeing half the

5   document production, how can I possibly put a limit on

6   it other than to represent to the Court that I'll act

7   within reason and work with counsel to make it to be

8   the most efficient process possible?

9          THE COURT:  Well, I think you-all need to

10  start with some goals in mind.  And is it correct that

11  you did 22 different topics that are going to require

12  22 different witnesses?

13         MR. ROBERTSON:  No, Your Honor.  It's been

14  represented to me that for the 22 topics, there will

15  be six individuals.  And on many of them there's going

16  to be a three-hour deposition or less.  And I've

17  already agreed with counsel that I would do it

18  seriatim.  That is the witness comes in, we go through

19  their topics, exhaust them, they are dismissed, and we

20  start the next witness right then and there on the

21  next topics.

22         So I have no interest in moving through this

23  at a glacial pace.  I want to move this forward.  So

24  I'm going to focus on that, get them in, get them out,

25  and do it with the discussion of counsel at their

1    convenience.

2         THE COURT:  Well, what about the -- we're

3    going to take the lunch hour now because they're going

4    to close the cafeteria.  And the court reporter has

5    been at it for a good while.  And I'll come back and

6    I'll see you around 2 o'clock.

7         Actually, I'm not so sure.  I think maybe the

8    best thing to do is for you-all to talk a little bit

9    before we get back together at 3 o'clock, and then I

10   need to leave around 4 o'clock.  So we'll have another

11   hour to sort some of these things out.  But my

12   approach is first I do want to know about the real

13   party in interest.

14        Second, the Federal Rules of Evidence do

15   apply.  There will be one basic hearing.  The extent

16   to which, and that will include the question of

17   liability for contempt as well as a remedy, and the

18   discovery will be directed to both.

19        If I need to stage the receipt of evidence as

20   to remedy as opposed to contempt to give me a little

21   time to work on matters, we can do that, or to give

22   you all a little break to get your act sorted out, we

23   can work that out later.

24        We have worked out, I think, an approach to

25   experts.  You have identified in your answer to

1    interrogatory 32, is it?

2              MR. CARR:  Five.

3              THE COURT:  Thirty-five?

4              MR. CARR:  No, just five.  Number five.

5              THE COURT:  Number 5.  Of what the parameters

6    of your contention as to what the changes are, and

7    then discovery of experts will proceed in accord with

8    the protocol that Messrs. Niemeyer and Weaver or Drs.

9    Niemeyer and Weaver will go first, and Dr. Goldberg

10   and Shamos will go second.  There's not going to be

11   any overlap between those two.

12             Then any rebuttal reports will be after that.

13   And you work out a schedule on that.  Talk a little

14   bit more about the discovery, Lawson's discovery of

15   ePlus, and what the scope of that is.  I don't see

16   that there's a whole lot that needs to be done on that

17   front.

18             I do understand Mr. Thomasch is correct, that

19   if, in fact, there have been documents in which

20   admissions have been made or assessments have been

21   made, that certainly could have pertinence in testing

22   the validity of the plaintiff's theories.

23             With that said, we will go to lunch and I'll

24   see you back here at 3 o'clock.

25             (Recess taken from 1:00 p.m.to 3:00 p.m.)

1    THE COURT:  Have you gotten anywhere?

2    MR. MERRITT:  Well, Your Honor, we were

3  chatting primarily about order of operations starting

4  with a hearing, as you've indicated, a single omnibus

5  hearing on both the contempt side and on the sanctions

6  or remedies side, whatever you want to call it.  And

7  then trying to work back from that and determine all

8  of the work that would need to be done and to get it

9  compressed in the best schedule that we can.

10    We were working with a tentative schedule

11  based on a late February date, but that was with

12  absolutely no knowledge of what the Court's schedule

13  looks like or whether you wanted it a bit sooner or

14  whether that would work.

15    THE COURT:  Does that work for you-all?

16  You're the ones who have to do it.

17    MR. ROBERTSON:  Your Honor, we've had a very

18  candid exchange, and I think with cooperation it's

19  doable.  It's very compressed.  Absolutely.  Are there

20  going to be a lot of moving parts and need to be a

21  little bit of squeakiness in the joints?  I think yes,

22  but I think we can accommodate that given the

23  cooperation that we just had in our candid exchange.

24    MR. THOMASCH:  Your Honor, while it seems

25  more compressed than we had expected, I had made

1   representation to Mr. Merritt and Mr. Robertson that

2   we would try to let them pick the date as long as we

3   essentially had the same amount of time to do each of

4   the things we were obligated under, we would work with

5   their date.  If they have chosen that date, that offer

6   still stands.

7          I am slightly concerned about the squishiness

8   point because we do want things to proceed in the

9   right order, and we don't want, for instance, fact

10  discovery and expert discovery to overlap.  We want to

11  make sure that we finish one and we move to the next

12  so that we don't get into a lot of back and forth

13  that, well, new facts came out after the report.  But

14  we will work with their date.  That is fine by us.  No

15  objection.

16         THE COURT:  So what does that mean to

17  you-all?  March the 27th?

18         MR. MERRITT:  No, Your Honor.  We had talked

19  about February 27 through 29.

20         THE COURT:  All right.

21         MR. MERRITT:  Originally, I think from the

22  defense side there had been some talk about pushing it

23  into March.  We have a client who's been sitting here

24  with a jury verdict for close to a year and an

25  injunction for a significant amount of time, and we

1   just didn't feel we could push it out any further than

2   late February.

3         MR. THOMASCH:  We are not trying to slow it.

4   We will do that date.  We do not necessarily believe

5   that three days is enough time for the hearing, but

6   that really isn't the issue before us now.  The issue

7   is scheduling.  And, frankly, we'll work with half the

8   allotted time at the hearing, whatever Your Honor

9   sets.

10        THE COURT:  I'm just going to reserve -- I

11  don't know how long it's going to take at this point

12  because I really don't understand the dimensions of

13  the case, and I don't think you-all do, but I'll just

14  reserve that time.  And if it takes more time, it will

15  take it, but I start a very long antitrust case the

16  next week.

17        MR. MERRITT:  Your Honor, may I consult with

18  counsel for a moment?

19        THE COURT:  Sure.

20        MR. MERRITT:  Your Honor, this is what I was

21  asking counsel about, and I believe I can say we're in

22  agreement.  We had talked about some tentative interim

23  dates and cutoffs leading up to the hearing.  We would

24  like the opportunity, if the Court would give it to

25  us, to spend the next day or two coming up with a

1    joint submission for the Court on that.

2          THE COURT:  Yes, I think that's what you need

3    to do.

4          MR. MERRITT:  Yes, sir.

5          THE COURT:  I don't know the dimensions.

6    Somebody had raised -- the issue that's unresolved on

7    my schedule and concept is the Lawson discovery of

8    ePlus, the scope of that discovery, and I think both

9    of you had raised that as an issue.

10          MR. MERRITT:  Yes, sir.

11          THE COURT:  What have you done on that point?

12          MR. MERRITT:  Here is where I believe we are

13    on this, and then Lawson may want to speak to it as

14    well.  But the discovery served by your Lawson was

15    only served 12 days ago.  So our time to respond and

16    our time to object hasn't even arisen yet.

17          We have gone ahead and pushed our objections

18    ahead so that we would be able to get this in front of

19    the Court, if necessary.

20          We believe that some of it is too broad in

21    scope.  We would like the opportunity either with Your

22    Honor sometime shortly or with Judge Dohnal, if you

23    want to assign him to it, in the next few days to be

24    sure that we're clear on what the permissible scope of

25    the discovery is, and then we would propose to give a

1    timely answer to it under the rules, which would put

2    us 30 days from the day it was served.

3              THE COURT:  Have you given them your

4    objections yet?

5              MR. MERRITT:  They have our objections.

6              THE COURT:  When did they get them?

7              MR. MERRITT:  They got them last Friday.

8              MR. ROBERTSON:  They were due today, but we

9    moved it forward just so they would have it in advance

10   of this hearing.

11             THE COURT:  What is the discovery that's been

12   served?

13             MR. MERRITT:  Your Honor, I'm going to step

14   aside and let Mr. Robertson speak to that because he

15   has greater familiarity with it.

16             MR. KREVITT:  Your Honor, just a few quick

17   points on the discovery we served.  First, we did take

18   the opportunity during the break to discuss a

19   timetable within which to get the material from ePlus.

20   We have not yet resolved what they're going to

21   produce, and that we are going to confer further on

22   and hopefully resolve.

23             In our view, Your Honor, the discovery that

24   we served is narrowly tailored to the issues.  It may

25   be that there isn't a lot of material to produce.  It

1   may be that there is.  We just don't know yet.

2           THE COURT:  How many interrogatories did you

3   serve?

4           MR. THOMASCH:  Three interrogatories, Your

5   Honor, ten requests for production of documents, and

6   several 30(b)(6), six 30(b)(6), but three

7   interrogatories.

8           THE COURT:  All right.

9           MR. KREVITT:  That was all, Your Honor.

10          THE COURT:  You are going to talk about this

11  and get back to me with whatever your disputes are; is

12  that right?

13          MR. KREVITT:  Yes, we'd like to do that right

14  away, Your Honor, just given the time.  We believe we

15  need the material.  They have agreed to produce it to

16  you us by a certain amount of time.  We just need to

17  resolve if there are any disputes as to what they're

18  going to produce to us.

19          THE COURT:  You want me to deal with it now?

20          MR. ROBERTSON:  I'd like the opportunity to

21  meet and confer, and I think we can resolve a number

22  of the issues, and we don't need to take up the

23  Court's time.

24          MR. KREVITT:  I think it may be useful, Your

25  Honor, with the Court's indulgence, to get some

1    guidance.  We tried to meet and confer with this

2    yesterday.  Maybe there was too much going on and

3    ePlus wasn't in a position to do that.

4            THE COURT:  Have you got the discovery

5    requests and the objections?

6            MR. KREVITT:  Yes, we do, Your Honor.  I'm

7    going to turn it to my colleague Mr. Lo or Mr.

8    Thomasch.

9            THE COURT:  May I see a copy of it?

10           MR. KREVITT:  Yes, Your Honor.  We'll hand

11   that up right now, Your Honor.

12           THE COURT:  The discovery and the objections

13   to them.

14           MR. THOMASCH:  There's some highlighting on

15   this, Your Honor.  There is just minor highlighting on

16   it.  Is that all right?

17           THE COURT:  It's fine with me as long as you

18   didn't say anything ugly about Mr. Robertson.

19           MR. THOMASCH:  No, not at all, Your Honor.

20   The 30(b)(6) and the deposition I have to look for

21   the --

22           MR. ROBERTSON:  Your Honor, I have sets of

23   both parties' requests here bound.

24           MR. THOMASCH:  That would be great.  Thank

25   you.

1          THE COURT:  Are you going to give it to me?
2    I just want yours.
3          MR. ROBERTSON:  I might be able to direct you
4    to them.
5          THE COURT:  Just tell me which tab it is and
6    I can find it.
7          MR. ROBERTSON:  Sure, Your Honor.  It starts
8    at --
9          MR. THOMASCH:  It's D1, 2.
10          THE COURT:  Does that have the objections to
11   it, too?
12          MR. KREVITT:  May I approach, Your Honor?
13          THE COURT:  Let me have them all,
14   Mr. Creekmore, and I'll just have what you've got
15   there.
16          Give that to Mr. Creekmore and he'll give it
17   to me.
18          Thank you.
19          Let me have what you've got there.
20          MR. KREVITT:  Your Honor, what I'm handing up
21   is ePlus's objections to our request for production of
22   documents and ePlus's objections to our 30(b)(6)
23   deposition notice.  I have not yet put my hands on
24   ePlus's objections to our interrogatories.
25          MR. THOMASCH:  Here are the interrogatories.

1    THE COURT:  He's got them.  Mr. Creekmore has

2    got them.

3        MR. THOMASCH:  It would be tab --

4        THE COURT:  You're going to find the

5    objections.  All right.  Let's go to the document

6    requests.  Which is the objection to the document

7    request?  C?  D?  What?  What is your document

8    production request?  What tab?

9        MR. THOMASCH:  Your Honor, the tab in the

10   bound material for the document production is C2.

11   Those are our requests, Your Honor, in No. 10.

12       THE COURT:  Well, you'll have to do a

13   privilege log.  So I'm not going to deal with any of

14   that.

15       So they don't object to No. 1 except for the

16   privilege issue, which -- I don't know what it means,

17   object to the extent seeks information within Lawson's

18   possession.  I don't understand that.

19       MR. ROBERTSON:  Your Honor, if I might, the

20   only point to that was, obviously, we're waiting for

21   information from Lawson in order to be able to conduct

22   such an analysis, but if it's going to be done, it's

23   going to be done by the attorneys or our expert, which

24   we're going to disclose.

25       My client hasn't done an analysis of RQC.

1          THE COURT:  Then you answer that.

2          MR. ROBERTSON:  Then there will be no

3    responsive documents to produce.  I'm going to confirm

4    that, but I'm relatively confident that that's the

5    case.

6          THE COURT:  Well, Mr. Thomasch, it looks like

7    while there are fewer in number than usual, they are

8    fairly broad, all of them.

9          MR. THOMASCH:  Your Honor, I believe,

10   essentially, they seek to find what is it that ePlus

11   is basing its contentions on.  And I would just say

12   two things, Your Honor.

13         THE COURT:  One, obviously, ePlus has the

14   burden of proof, and indeed a heavy burden of proof.

15   So prior to initiating this proceeding, we assumed

16   that they had a basis and they made some analysis.

17   But, obviously, a document request never obligates a

18   party to create documents.

19         If they respond and say, We have no

20   documents, that's a response.  If they respond and

21   say, We have these five documents, but they're

22   privileged, they log them, and that's a response.

23   We're not asking them to do work, but if it's been

24   done, if they have analyzed our product, then we

25   believe we are entitled to this because it's directly

1    relevant to the issues, and it's certainly more narrow

2    than what was given to us.

3              MR. ROBERTSON:  And, Your Honor, we'll

4    provide that to the extent that we have those in our

5    possession and they're not privileged.  That's why I

6    think this entire inquiry is premature.

7              I don't think this is going to be

8    particularly burdensome in some respects because I'm

9    pretty confidant we don't have documents of that

10   nature.

11             We have given Your Honor declarations from

12   experts who have done analyses of discovery that was

13   provided to us informally, and we're going to be

14   supplementing that.  So there's not going to be any

15   hide the ball here.

16             I mean, documents, communications, and

17   analyses relating to the scope of the injunction in

18   this case, request No. 5, I mean, I would make the

19   argument that I don't even understand how that is

20   relevant.

21             The injunction is what the injunction is.  If

22   my client has any communication about the scope of the

23   injunction, it's from his counsel.

24             THE COURT:  What's that one involve, No. 5?

25             MR. THOMASCH:  I think 5, 6 and 8, Your

1  Honor, are all ones in which there is a question in

2  our mind as to whether or not ePlus has communicated

3  with any third parties about what can or cannot be

4  done about the RSS system or the RQC system.

5          Those are things that we're were just trying

6  to find out what have they said before.  Have they

7  said anything internally that is inconsistent with

8  what they're now saying externally?  And the answer is

9  it may be that there is nothing.  We fully understand

10  that the answer may be nothing, but we just want them

11  to say that.

12          THE COURT:  Anybody have anything to say

13  about 5, 6 and 8?

14          MR. ROBERTSON:  I don't think there's

15  anything that we're going to have responsive to it,

16  but I would question the relevancy of what does it

17  matter what we said?  I thought the inquiry that the

18  Court is going to conduct is are these modifications

19  colorably different, and were the representations made

20  to the Court truthful during the injunction hearing,

21  and the timeline involved.  That's what I thought we

22  were focusing on.

23          What we say to anybody about the injunction

24  in this case has no bearing on the issues before the

25  Court in these contempt proceedings.

1          MR. THOMASCH:  Your Honor, I would only note

2     that I don't know that the documents exist.  I'm not

3     suggesting they do, but if, for instance, they

4     approached one of our customers and said, In light of

5     the fact that they had to disable the ability to use

6     Item Master and Punchout together, having crippled

7     their own system in that way, you should consider

8     using an ePlus system.  If they made that statement,

9     it would be tremendously relevant.

10          Now, I don't know that they are in the

11    marketplace.  I don't know whether they are actually

12    trying to sell their product.  So if they're not

13    trying to sell their product --

14          THE COURT:  I've already held they are

15    competitors.

16          MR. THOMASCH:  Exactly.  It's because you

17    held that they are competitors, we want to see what

18    they're using in the competitive marketplace against

19    us because they could be saying our product is no

20    longer any good.

21          THE COURT:  I see.  I sustain the objections

22    to numbers 5, 6 and 8.  If you want to formulate

23    something that's much more narrow and hits where

24    you're heading, you can talk to them about that

25    because they are too broad.  A comparison between

1    ePlus's and Lawson's product doesn't have any role in

2    this assessment.

3              Is there anything else you want me to rule on

4    or can you work the rest of them out, Mr. Robertson?

5    Mr. Merritt?

6              MR. ROBERTSON:  Your Honor, again, I'm sorry.

7    I'm happy to revisit --

8              THE COURT:  You-all go see what you can work

9    out on the rest of them.

10             MR. ROBERTSON:  All right.  Thank you.

11             THE COURT:  All right.  Now, the

12   interrogatories.  Did you find the objections to the

13   interrogatories, somebody?

14             MR. ROBERTSON:  Yes, we filed them on Friday,

15   Your Honor.

16             THE COURT:  No, did you find them?

17             MR. ROBERTSON:  I'm sorry.  D3, Your Honor.

18             MR. THOMASCH:  D3.

19             THE COURT:  D3 are the objections to the

20   interrogatories.  And the interrogatories are where?

21   Oh, they are set out in the objection?

22             MR. ROBERTSON:  Yes, sir.

23             MR. THOMASCH:  Yes, there's just three of

24   them.

25             THE COURT:  Well, one is your contention.

1  It's a contention interrogatory.  What's wrong with

2  that?

3          MR. ROBERTSON:  Nothing, Your Honor, until I

4  process the information, the pages I don't have, I'm

5  going to answer that, but I'm going to be relying

6  again on my expert testimony to set forth --

7          THE COURT:  That's fine.  There's no

8  objection to it then.  You go on and answer it.  If

9  you need to reserve the right to answer a little bit

10  more, you can do that and supplement it.

11          MR. ROBERTSON:  I am going to want to

12  supplement it after I get through all this 800,000

13  pages.

14          THE COURT:  All right.  You have that

15  covered.

16          Number 2.  Well, that's pretty broad.

17          MR. THOMASCH:  It's essentially seeking a

18  claim chart, Your Honor, to say if you are alleging

19  that the RQC product infringes these previously

20  asserted claims of the product, provide a claim chart

21  that shows your contention in that regard.  That, I

22  would respectfully submit, is the most standard

23  request we could have --

24          THE COURT:  On the modification.

25          MR. THOMASCH:  Only on the modified elements.

1          THE COURT:  It really isn't limited that way.

2     I know you intended it that way, but it's not actually

3     limited that way, and so their answer down at the

4     bottom about subject to and without waiving any

5     objections and what they're going to do, I think, is

6     sufficient.  And if they answer within the last

7     sentence of the objection, that's fine.

8          Number 3.  There's nothing wrong with that,

9     is there?

10         MR. ROBERTSON:  No, Your Honor, but I have no

11    information yet.  You may recall from this morning, I

12    was identifying the fact that we asked for an

13    interrogatory with respect to revenues and that.  As

14    soon as I have that information and can process it --

15         THE COURT:  I think No. 3 is taken care of by

16    the last sentence of the objection, and you will be

17    able to work out the timing on that.

18         The issue on that one is the timing, not

19    substance of it, it seems to me.

20         Now, the objections to the 30(b)(6), is that

21    something I need to look at?  They gave six topics.

22    Do I need to do that or can you all work that out

23    yourselves?

24         MR. ROBERTSON:  Again, Your Honor, if we have

25    an opportunity to meet and confer.

1    THE COURT:  Is that all right with you?  Can

2 you all work that out?

3    MR. THOMASCH:  We'll work that out.

4    THE COURT:  All right.  Work it here.

5    The material is back.  So that takes care of

6 that.

7    I don't know that I'm going to need any

8 pretrial conference, so I'm not going to set one now.

9 I'll let you-all see how things go.

10    MR. ROBERTSON:  Your Honor, we do have a

11 discovery issue with respect to Lawson's responses

12 to --

13    THE COURT:  Well, is it ripe?

14    MR. ROBERTSON:  I believe it's as ripe as the

15 dispute we just had with -- I mean, it's overdue, if

16 that's your answer.

17    THE COURT:  Have they filed an objection to

18 it?

19    MR. ROBERTSON:  Our request to their

20 interrogatories.  And yes, it is ripe.  It's been

21 pending for more than a month.  And so I just would

22 like to resolve that as well.

23    THE COURT:  I'm saying, did they file an

24 objection to your interrogatory?

25    MR. ROBERTSON:  Yes.

1        THE COURT:  Have you all talked about that?

2   What interrogatory is it?

3        MR. ROBERTSON:  It's interrogatory No. 11.

4        THE COURT:  I handed that back.  I'm sorry.

5   I prematurely handed it back.  What tab is that, sir?

6        MR. ROBERTSON:  Your Honor, I might be able

7   to work this out.  We're seeking --

8        THE COURT:  Okay.

9        MR. ROBERTSON:  Profits and revenues

10  associated with this RQC product.  And I assume, based

11  on representations made earlier, that we'll get this

12  in some usable format that will assist us in answering

13  interrogatory No. 3 propounded to us.

14       THE COURT:  If you don't get it -- I'm sure

15  they've got it.

16       Now, let me tell you the problem that we had

17  the last time, Mr. Thomasch.  I don't know that you

18  have any background in this.

19       MR. THOMASCH:  I don't, but --

20       THE COURT:  But I remember it because it

21  consumed so much of my time and it led to difficulties

22  in the case.

23       Your client took the view that it didn't

24  record profits by certain products etc., etc., and

25  they didn't even give anything.  So your client, I can

1    tell you from what I ultimately did see, your client

2    did, in fact, keep a lot of information that may not

3    have been down to a particular sub code level, but it

4    was sufficient they should have answered the question

5    without all the hassle that preceded my ordering it to

6    be answered.

7           And I'm sure that with an injunction pending

8    and knowing that they could face an accounting if they

9    violated the injunction, they bound to have kept track

10   of how much money they made on the modified products,

11   but I don't want to be accused like one of my

12   colleagues, who has long since deceased, and I wasn't

13   a colleague then, of presuming that everybody knows

14   that the Prussians kept the marching orders from the

15   Franco-Prussian War, therefore, all Germans keep all

16   documents.  I'm not trying to get in that league, but

17   as a general proposition, I believe that I don't want

18   to have that fight again.  So I'm sure you'll be able

19   to work that out.

20          MR. THOMASCH:  I don't want any new fights,

21   Your Honor, and I certainly don't want any revisiting

22   of old fights.  I know from my representation of

23   accounting firms, companies keep revenues sometimes

24   different than profits.

25          THE COURT:  They certainly do.

1          MR. THOMASCH:  But we're going to find out

2     what we have and we are going to produce what we have.

3          THE COURT:  All right.

4          MR. THOMASCH:  Your Honor, the issues that we

5     broke on at precisely 2 o'clock, you had asked for a

6     goal without a firm deadline, but a goal with respect

7     to the aggregate amount of hours that we would be

8     producing fact witness depositions.  I had suggested

9     25 hours per side.  I don't think we'll need as much,

10    but I suggested that.

11         Mr. Robertson suggested he thought that was

12    inadequate.  You had said there should be a goal.  And

13    then we broke.  And I wonder if we could just see if

14    Your Honor had any further guidance to give us in that

15    regard.

16         THE COURT:  Well, they're going to need more

17    than you will need.

18         MR. THOMASCH:  I believe they will.

19         THE COURT:  So I think that's sufficient

20    guidance to give you, but I think that since they have

21    a heavy burden of proof, I'm inclined to err on the

22    side of giving them what they think they need.

23         MR. THOMASCH:  Thank you, Your Honor.

24         THE COURT:  And if you-all can't work that

25    out, then I'll work it out for you after you have some

1    more precise information about what the nature of the

2    fact discovery is going to be.

3                MR. THOMASCH:  Thank you, Your Honor.

4                THE COURT:  All right.  Anything else?

5                THE CLERK:  Your Honor, are you setting this

6    for the 27th through the 29th of February?

7                THE COURT:  March 1st.

8                THE CLERK:  March 1st?

9                THE COURT:  I'm reserving that time in case I

10   need it.  And there are other things that are going to

11   have to be moved.

12               THE CLERK:  Through March the 1st, you said?

13               THE COURT:  Right.

14               THE CLERK:  What time do you want to start on

15   Monday, Your Honor?

16               THE COURT:  9:30.

17               THE CLERK:  Thank you.

18               THE COURT:  All right.  Excuse me, Mr.

19   Merritt.

20               MR. MERRITT:  Your Honor, there's one matter

21   I think we agreed on when we first stood up, but

22   sometimes people walk away from something and hear

23   different things.  To the extent we can be as clear as

24   possible, I would like to try to address it.

25               We talked about the applicability of the

1    Federal Rules of Evidence.

2              THE COURT:  Right.

3              MR. MERRITT:  We readily agree that the

4    Federal Rules of Evidence will apply to any

5    evidentiary hearing that the Court holds.  Our

6    understanding is that one of the procedures that's

7    permitted under the federal rules not only of evidence

8    but of civil procedure is the use of adverse party

9    depositions.  Even if --

10             THE COURT:  Yes, it usually is without regard

11   to availability.

12             MR. MERRITT:  It could be used freely.  If

13   Mr. Carr is a 30(b)(6) witness for Lawson and he's

14   sitting right here in the room, we can still use his

15   deposition.

16             THE COURT:  I believe we had a -- was it this

17   case we had a fight over that or was it the DuPont

18   case?

19             MS. HOLLOMAN:  DuPont.

20             MR. MERRITT:  But certainly Rule 32(a)(3) is

21   about as clear as it could be on its face.

22             THE COURT:  It says for any purpose, I think.

23             MR. MERRITT:  Absolutely.  And it may be

24   that, particularly if we're constrained as to the

25   number of days and parties need to make some sort of

1    supplemental submission, as long as the Rules of

2    Evidence permit it, for example, deposition excerpt or

3    something like that, we want to be clear that we're

4    permitted, subject to the way Your Honor wants to take

5    evidence, to make a full submission to the record.

6           I have a suspicion that Lawson may have

7    heard, and I won't speak for them, that the only thing

8    this court wants to hear is what can be brought live

9    into this witness box and at the end of the hearing

10   we're just done and no further record can be made.

11   And we wouldn't like to be that boxed and that

12   constrained if we think we need to put in some more to

13   make a full record.

14          So I thought if there was a lack of agreement

15   or understanding on that, this would be a good time to

16   get that cleared.

17          THE COURT:  Mr. Thomasch.

18          MR. THOMASCH:  I appreciate Mr. Merritt

19   bringing that up.

20          We are, obviously, fundamentally in agreement

21   the Federal Rules of Procedure follow there.

22          Two things I want to note.  One, we will make

23   available any of the witnesses.  We'll bring them down

24   at my expense.  We would prefer to have the hearing.

25   We understand there are circumstances where they can

1    use testimony even though we have the witness here,

2    although we're not sure why that should be the case.

3    And we think it would be better to have you hear and

4    see the witnesses as opposed to working through paper

5    or film of the witnesses.  And we will make our

6    witnesses available.  We want you to hear our

7    witnesses.

8            The second point is that yes, the Federal

9    Rules of Evidence and the Federal Rules of Civil

10   Procedure do provide for circumstances under which

11   even an available witness's deposition testimony can

12   come into evidence.

13           They do not, however, provide for it to come

14   into evidence after the evidence is closed.  We will

15   have a hearing.  At some point in that hearing the

16   party with the burden of proof is going to say that

17   they rest.  And when they rest, I do believe --

18           THE COURT:  That carries consequences.

19           MR. THOMASCH:  That that carries

20   consequences.  And the evidence that they are going to

21   later argue about, and when they write findings of

22   facts and conclusions of law, it goes back to the

23   evidence that they put in.  Whether that's a

24   deposition or a live witness or a document.  And what

25   we don't want is to have a hearing and then after it's

1   done they keep suggesting, and they have said it point

2   blank in their papers, I'm not creating a parade of

3   horribles, they keep saying that they want to be able

4   to submit evidence that is not, as Mr. Robertson said,

5   constrained to the four corners of the hearing.

6           And, yes, we do want to constrain the

7   evidence that Your Honor rules on to the evidence that

8   came in at the contempt proceeding, whether that's a

9   properly admitted deposition, an exhibit or a live

10  witness.  And we will, however, make our witnesses

11  available live so that there's no problem.

12          And what we really don't think is that one

13  should say we have to distort the federal rules or the

14  normal processes because we only have a short period

15  for a hearing.  We should have the time that they need

16  to carry their heavy burden.  We are not trying to

17  cram them in a short schedule or extend them in a long

18  schedule.

19          We want to meet them on the battlefield, but

20  we want to have the fight in this courtroom.  We want

21  you to hear the evidence.  And we will bring our

22  witnesses here.  But we are against the notion of

23  post-hearing submissions of material that was not

24  introduced before they rested.

25          THE COURT:  Anything else on that point?

1          MR. MERRITT:  No, sir.  This may be much ado

2     about nothing.  We've talked about the process for

3     exchanging deposition designations in advance of the

4     hearing and counter-designations.

5          Our only point is if within the constraints

6     of a hearing that only lasts a couple of days, there

7     are some 30(b)(6) or party witnesses whose testimony

8     we might want to proffer to the record before we rest,

9     that we be permitted to do that.

10          THE COURT:  Before you rest?

11          MR. MERRITT:  Yes, sir.  We're not going to

12     close our case and then try to make a --

13          THE COURT:  All evidence will be presented at

14     the hearing.  And I don't want any after the hearing.

15     Then everybody -- there are consequences associated

16     with resting and whether you meet the burden, etc.,

17     but just beyond that, fundamental fairness dictates

18     that when you've had your shot, they know what target

19     you've hit, and they can decide to sit down and do

20     nothing if they want to or they can decide the scope

21     of what they want to put on.  So that requires that it

22     all be put in in accord with the rules.

23          If it comes in under the deposition

24     procedures that are spelled out in Rule 30, then so be

25     it or in interrogatory answers or requests for

1    admissions or whatever form they come in.  I do prefer

2    to have witnesses live.  That isn't always possible,

3    but it's preferable.  All right.

4          MR. MERRITT:  The only other thing I'm aware

5    of is we reasonably anticipate that during some of the

6    depositions we are going to be getting into questions

7    of attorney-client privilege and potential waiver.

8    Would you like us to bring those to Your Honor's

9    attention or would you like us to take those to Judge

10   Dohnal?  We just want to make sure we have a point of

11   contact for resolving those efficiently.

12         THE COURT:  Well, I don't know.  Judge Dohnal

13   is not going to be here past January 31.  I would

14   rather you see Judge Dohnal, but I don't think that I

15   have the right to forestall his ability to earn money.

16         If I need to send it to Judge Lauck, I'll

17   send it to Judge Lauck, but I'll be the principal

18   contact point or my chambers will be.

19         Now, with respect to privilege issue, since

20   waivers of privilege are significant and can have

21   significant ramifications, I prefer to see papers on

22   those, but --

23         MR. THOMASCH:  That was our request, Your

24   Honor, because I believe that if you go back to the

25   order to show cause briefing, this issue was already

1    pled.  I believe that the root of this issue was the

2    claim that by certain communications made to customers

3    about the injunction we somehow inherently waived the

4    privilege.  And while we disagree with that --

5            THE COURT:  You may have waived it?  I don't

6    know.  I know there's that issue, but I don't know

7    what it is.

8            MR. THOMASCH:  If that's the issue, then it

9    could be briefed.  What we wouldn't want for the very

10   reason you just said, it's so significant we don't

11   want that on the fly at a deposition if it could have

12   been anticipated ahead of time and done on papers.

13           THE COURT:  Sometimes it can be and sometimes

14   it can't be.

15           MR. THOMASCH:  If it could be.

16           THE COURT:  Now, it looks to me like the

17   privilege log doesn't have a lot of -- doesn't comply

18   with Judge Dohnal's directive to you-all in that in

19   many instances you don't -- that's docket No. 825.

20   Lawson didn't list the document by author and

21   recipient.

22           MR. THOMASCH:  There are certain documents,

23   Your Honor, that do not have an identified author or

24   recipient, that is correct.  Wherever there was, on

25   the log that was the amended log contains all of them,

1   and there should have been a legend, Your Honor, but

2   the names in red are attorneys.  And so that was to

3   make it easy for the Court and the parties to identify

4   who was a counsel.  Any red name is a lawyer and

5   wherever there was a recipient or a sender, but there

6   are some documents that themselves may contain legal

7   advice, but the author or recipient is not identified

8   on the document.

9          THE COURT:  I assume that if there's some

10  problem with the privilege log, you'll bring it to my

11  attention by proper motion.

12         MR. MERRITT:  Your Honor, we anticipate doing

13  that.  We have got the second iteration of the

14  privilege log.  This is it.

15         THE COURT:  I know.  I've got binders, too.

16         MR. MERRITT:  And it has numerous things that

17  we believe we'll need to be bringing to the Court's

18  attention just on whether the things even fall within

19  the scope of the privilege initially before we can get

20  to the question of waiver, and we'll try to bring that

21  to the Court's attention and frame it as properly as

22  we can.

23         THE COURT:  All right.

24         MR. THOMASCH:  May I make one observation

25  just to put things in slight context, Your Honor,

1   because we've looked at the log after it was

2   completed?   It includes, for instance, in red the

3   names of many attorneys in our firm who have nothing

4   whatsoever to do with this case.   It includes names of

5   attorneys we know of but who have nothing to do with

6   this case.

7          So we said, Well, how could that be?

8          Well, the answer to that is that the search

9   terms included a series of words such as infringe,

10  verdict, jury, and what happened was it brought into

11  the production documents out of the law department

12  that related to an entirely different patent

13  litigation that doesn't involve ePlus.   It involves

14  Lawson and another party.

15         It doesn't have anything to do with this, but

16  that was triggered by the search terms, and as a

17  result, it had a lawyer's name on it, it wound up

18  getting logged.

19         Those documents include all of the

20  communications with trial counsel for the entire

21  period after the trial.   It includes the lawyers at

22  Merchant & Gould.   It includes Mr. Carr.   It includes

23  those of us at this table.   It also includes

24  communications with Lawson's lawyers on cases that are

25  unrelated to this.

1      THE COURT:  Can you identify for them right

2  away the communications of that ilk so they won't

3  waste any time on that?

4      MR. THOMASCH:  We could certainly give them a

5  list of the names of people who have nothing to do

6  with this case.  Yes, that can easily be done.

7      THE COURT:  How about documents that don't

8  have anything to do with the case?  In other words,

9  that's an amendment to your privilege list.

10      MR. THOMASCH:  Yes, Your Honor.

11      THE COURT:  You put things on there that

12  don't belong on there because they don't have anything

13  to do with the case.  They may be privileged, but they

14  don't have anything to do with the case.

15      MR. THOMASCH:  You are correct, but it wasn't

16  that they don't belong on there.  It was the unusual

17  procedures that we employed here at the request of

18  ePlus had us bringing documents in by the occurrence

19  of a search term.

20      THE COURT:  They belong there because they

21  fit search criteria, but upon review they don't

22  belong.

23      MR. THOMASCH:  Correct.

24      THE COURT:  Well, uninvite them to the party

25  and tell them who you uninvited so they don't spend

1   any time accusing you of improper listing.  And I

2   don't want to spend any time on that either.

3            MR. THOMASCH:  Will do, Your Honor.

4            THE COURT:  All right.  You're going to give

5   me a proposed schedule in a few days, right?

6            MR. MERRITT:  Yes, sir.

7            THE COURT:  All right.  Anything else that we

8   can do today?

9            MR. THOMASCH:  Not for Lawson, Your Honor.

10           MR. KREVITT:  Actually, there is one thing,

11  Your Honor.

12           THE COURT:  Yes, sir.

13           MR. KREVITT:  A question was raised this

14  morning, Your Honor, regarding whether Lawson is the

15  real party in interest, Your Honor.

16           THE COURT:  Yes.

17           MR. KREVITT:  Your Honor may recall that

18  question.  And during the lunch break, I endeavored to

19  get to the bottom of that issue.  It is my

20  understanding, albeit imperfect just given the time

21  that I had, and we'll make sure this is right, that

22  Lawson is the correct party in interest.  It is the

23  real party in interest.  It is and remains a separate

24  entity and properly --

25           THE COURT:  It's a wholly owned subsidiary of

1    some other company?

2            MR. KREVITT:  I believe that's correct, Your

3    Honor, but it is a separate entity.

4            THE COURT:  And it's the same entity it was

5    when the proceedings began?

6            MR. KREVITT:  Correct, Your Honor.

7            THE COURT:  You'll verify that and let us

8    know?

9            MR. KREVITT:  Correct, Your Honor.

10           THE COURT:  You better tell the federal

11   circuit, too, because somebody is not singing the

12   right song.  It's really confusing when this gets up

13   there.  I have a feeling this will get up there no

14   matter what happens.

15           MR. KREVITT:  We'll see, Your Honor.  Thank

16   you very much for your time.

17           THE COURT:  Thank you.  We'll be in

18   adjournment.

19           I, Diane J. Daffron, certify that the

20   foregoing is a correct transcript from the record of

21   proceedings in the above-entitled matter.

22

23                      /s/
     _____    _____
24       DIANE J. DAFFRON, RPR, CCR         DATE

25