# EXHIBIT 7

258

```
 1        IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
 2               RICHMOND DIVISION
 3     - - - - - - - - - - - - - - - - -
                                    :
 4    ePLUS, INC.,                  :
                                    :
 5          Plaintiff,    :
       v.                 : Civil Action
 6                        : No. 3:09CV620
      LAWSON SOFTWARE, INC.,        :
 7                        : January 5, 2011
            Defendant.   :
 8     - - - - - - - - - - - - - - - - -:
 9
10
11        COMPLETE TRANSCRIPT OF JURY TRIAL
         BEFORE THE HONORABLE ROBERT E. PAYNE
12      UNITED STATES DISTRICT JUDGE, AND A JURY
13
14
15    APPEARANCES:
16    Scott L. Robertson, Esq.
      Jennifer A. Albert, Esq.
17    Michael T. Strapp, Esq.
      David M. Young, Esq.
18    GOODWIN PROCTOR
      901 New York Avenue, NW
19    Washington, D.C.  20001
20    Craig T. Merritt, Esq.
      CHRISTIAN & BARTON
21    909 E. Main Street, Suite 1200
      Richmond, VA   23219-3095
22
          Counsel for the plaintiff ePlus
23
24
         DIANE J. DAFFRON, RPR
25       OFFICIAL COURT REPORTER
         UNITED STATES DISTRICT COURT
```

259

```
 1    APPEARANCES:  (Continuing)
 2    Daniel W. McDonald, Esq.
      Kirstin L. Stoll-DeBell, Esq.
 3    William D. Schultz, Esq.
      MERCHANT & GOULD
 4    3200 IDS Center
      80 South Eighth Street
 5    Minneapolis, MN   55402-2215
 6    Dabney J. Carr, IV, Esq.
      TROUTMAN SANDERS
 7    Troutman Sanders Building
      1001 Haxall Point
 8    P.O. Box 1122
      Richmond, VA   23218-1122
 9
          Counsel for the defendant Lawson Software.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

260

```
 1        (The proceedings in this matter commenced at
 2    9:30 a.m.)
 3        THE CLERK:  Civil Action No. 3:09CV00620,
 4    ePlus, Incorporated v. Lawson Software, Incorporated.
 5    Mr. Scott L. Robertson, Mr. Craig T. Merritt,
 6    Ms. Jennifer Albert, Mr. Michael T. Strapp, and
 7    Mr. David Young represent the plaintiff.
 8        Mr. Daniel W. McDonald, Mr. Dabney J. Carr,
 9    IV, Ms. Kirstin Stoll-DeBell, and Mr. William D.
10    Schultz represent the department.
11    Are counsel ready to proceed?
12        MR. ROBERTSON:  Yes, Your Honor.
13        MR. McDONALD:  Yes, Your Honor.
14        THE COURT:  All right.  Good morning, ladies
15    and gentlemen.
16        THE JURY:  Good morning.
17        THE COURT:  All right, Mr. Robertson, you may
18    resume your examination of the witness.
19        MR. ROBERTSON:  Thank you, Your Honor.
20        THE COURT:  And I remind you, sir, you're
21    under the same oath which you took yesterday.
22        THE WITNESS:  Yes, sir.
23    BY MR. ROBERTSON:
24    Q   MR. Momyer, we spent a good deal of time yesterday
25    discussing this RIMS system which you were named
```

261

```
 1    inventor along with Mr. Johnson.  Do you recall that?
 2    A   Yes, I do.
 3    Q   I'd like to move on now to this electronic
 4    sourcing system and method, the inventions that are
 5    subject of the patents that are at issue here if we
 6    could.  All right?
 7    A   Okay.
 8    Q   Tab 1 in your witness notebook, I believe it's
 9    Plaintiff's Exhibit No. 1, if you could go to column
10    1.
11        THE COURT:  That's also in your small book
12    there if you need to.
13    Q   And tab 2.  Thank you.
14    So we're on column 1 now of the '683 patent,
15    Exhibit No. 1.  Now, suggestion was made yesterday
16    that the Patent Office was unaware of the RIMS patent.
17    Did you disclose the RIMS patent to the Patent Office?
18    A   Yes, I believe so.
19        MR. McDONALD:  Objection, Your Honor.  This
20    is going to the validity issue.  Again, I thought we
21    were going to stick with infringement.
22        THE COURT:  Isn't it?
23        MR. ROBERTSON:  No, Your Honor.
24        THE COURT:  Why does it have to do with
25    infringement?
```

502

Weaver - Direct                      502

1  and then wait for them to come back with bids, accept one, send

2  out a purchase order, and then see whether or not you got the

3  equipment that you wanted.  I know there was one time where I

4  ordered equipment and never was available, so I didn't get what

5  I wanted.

6  Q  Was this process time-consuming?

7  A  Very.

8  Q  Was it costly for you?

9  A  Oh, yes.  Costly in time and costly in personnel.

10 Q  Was it efficient?

11 A  No.

12 Q  Can you tell us -- you've had an opportunity to read

13 through all the three patents-in-suit in some detail; is that

14 right?

15 A  I have.

16 Q  You've studied the background of the invention?

17 A  I have.

18 Q  And the summary of the inventions?

19 A  Yes.

20 Q  And you've looked at the description of the drawings?

21 A  Yes.

22 Q  And you've read the detailed description of the invention

23 which is some 20 or so columns?

24 A  I have.

25 Q  And you've read the claims that are involved in this case;

504

Weaver - Direct                      504

1  terms in their binders, in their book which I believe is at

2  tab --

3      THE COURT:  Tab six.

4      MR. ROBERTSON:  Thank you, Your Honor.

5  Q  Let me ask, in rendering the opinions you're going to give

6  with respect to the infringement, did you apply the Court's

7  claim construction or some other claim construction?

8  A  I used the Court's claim construction.

9  Q  Did you attempt to faithfully use that claim construction

10 when you were looking at the functionality and capability of

11 Lawson's software?

12 A  Yes, I did.

13 Q  Did you come up with any of your own constructions

14 contrary to the Court?

15 A  No.

16 Q  So just back to the basic subject matter, at a high level

17 of these patents that were issued, what do you consider the

18 benefits to be realized by the inventions over this procurement

19 process that you have described?

20 A  Well, by computerizing the process, by making the catalogs

21 electronic, by being able to search them electronically, by

22 being able to create requisitions and purchase orders, you

23 reduce the economic friction in an electronic commerce system.

24 You make it more efficient, you make it more time-conserving,

25 and you save money.

503

Weaver - Direct                      503

1  correct?

2  A  Correct.

3  Q  And understand that there are 12 representative claims

4  that are at issue in the three patents that are Plaintiff's

5  Exhibit Numbers 1, 2, and 3?

6  A  I do.

7  Q  So you reviewed the '683 patent, the '516 patent, and the

8  '172 patent; correct?

9  A  I have.

10 Q  So you feel you have an understanding, having worked

11 with these patents and been involved in these for the last six

12 years, with respect to the subject matter and what's disclosed

13 and what is claimed?

14 A  I do.

15 Q  Did you also have an opportunity to review the Court's

16 construction of certain claim terms that were in dispute among

17 the parties?

18 A  Yes.

19 Q  And you received a copy of that?

20 A  Yes.

21 Q  Do you have -- you are holding a piece of paper in your

22 hand.  Is that the glossary of terms that has been -- is that

23 the glossary of terms?

24 A  Yes, it is.

25 Q  Just so you are informed, the jurors have that glossary of

505

Weaver - Direct                      505

1  Q  How about the ability to search multiple vendors at the

2  same time?

3  A  Oh, of course.  Searching multiple catalogs gives you the

4  ability to cross compare, to comparison shop.

5  Q  What about the requisitioning and ordering module that

6  permits you to go -- to do multiple requisitions from items

7  from multiple vendors and then issue multiple purchase orders?

8  Do you see any benefits to that?

9  A  If you go back to the example that I had where I had to

10 get requisitions issued to each vendor and then a purchase

11 order had to go individually to each vendor, that's a lot of

12 time and effort.  So the ability to put everything you want on

13 one purchase requisition electronically and then have the

14 computer system break that requisition up into however many

15 purchase orders are appropriate, typically one purchase order

16 per vendor with however many orders from the requisition,

17 that's a real benefit.

18 Q  The patents also discuss ability to gain approvals for

19 requisitions in order to have the process flow go smoothly and

20 quickly and more efficiently?

21 A  Yes, they do.

22 Q  Are there aspects of the inventions generally that relate

23 to determining whether there's an item available in the

24 vendor's inventory?

25 A  Oh, yes.  We're going to see that in the patent claims.

506

Weaver - Direct          506

1   Q   That is an important aspect of the invention in your view?

2   A   Yes, it is.

3   Q   Dr. Weaver, in determining and preparing your expert

4   reports in this case, and in preparing the opinions that you're

5   going to be offering, did you consider what a person of

6   ordinary skill in the art would be in the subject matter of

7   these patents?

8   A   Yes, I did.

9   Q   Why did you do that?

10  A   Well, it's required that the patents be seen from the lens

11  of this hypothetical person of ordinary skill in the art.

12  That's a person who can read and understand the patents and

13  implement whatever is there.

14  Q   Now, this person of ordinary skill in the art from which

15  we have to view these patents at issue and the claims that

16  we're going to be talking about, is this a real person or a

17  hypothetical construct?

18  A   It's a hypothetical construct.

19  Q   And when you look at and try to determine who this person

20  of ordinary skill in the art would be, what time frame were you

21  looking at?

22  A   Well, that has to be -- in the case of these patents, that

23  would have to be 1993 to 1994, during the period of the

24  invention.

25  Q   And is that when the patents were conceived and then

507

Weaver - Direct          507

1   reduced to practice?

2   A   Correct.

3   Q   And you are familiar that the filing date of this patent,

4   these patents has what's called a priority date back to 1994?

5   A   Yes.

6   Q   Can you tell the jury what you understand that term to

7   mean, a priority date?

8   A   That means that the protection of the patents that we'll

9   talk about later, what the claims mean, goes back to that date,

10  the filing date.

11  Q   So in undertaking your study of these patents to determine

12  who this hypothetical person of ordinary skill in the art would

13  be for purposes of viewing the context, the historical context

14  where these patents were, did you come to any conclusions?

15  A   I did.

16  Q   And can you tell us what your opinion is as to who this

17  hypothetical person of ordinary skill in the art would be for

18  these ePlus patents?

19  A   So based on my experience, this person would be a college

20  graduate with a degree in computer science or something

21  related, like electrical engineering, and would have a year or

22  two of practical experience with writing software and

23  understanding the flow of information that is necessary for the

24  purchase of goods and services.

25  Q   And did you apply that person to the opinions you're going

508

Weaver - Direct          508

1   to be offering in this case both on the issue of infringement

2   and on the issue of validity?

3   A   Yes, I did.

4   Q   Did you have an opportunity to review who the hypothetical

5   person of ordinary skill in the art would be under Lawson's

6   expert's perspective?

7   A   Yes, and it's similar.

8       MR. ROBERTSON:  Mr. McDonald, do you want to agree on

9   that if we can at this point?

10      MR. McDONALD:  I thought we already did.

11      MR. ROBERTSON:  All right.

12      THE COURT:  I thought you stipulated that, haven't

13  you?

14      The person of ordinary skill in the art, ladies and

15  gentlemen, is something you'll hear from these experts, and

16  it's been explained what it is, and there'll be instructions

17  for you later, but that person is a person, the parties

18  agree -- excuse me -- who is a college graduate with a degree

19  in computer science or electrical engineering or like studies

20  with a year or so of experience writing software and

21  understanding -- and who understands the procurement process,

22  electronic procurement process; is that right, counsel?

23      MS. STOLL-DeBELL:  I think it's close enough, Your

24  Honor.

25      THE COURT:  Good enough for government work.

509

Weaver - Direct          509

1       MS. STOLL-DeBELL:  I think so.

2   Q   Let me ask you this:  Are you familiar with that person

3   of that level of skill and knowledge during the time period we're

4   discussing?

5   A   Yes.  I was teaching people like that.

6   Q   In the 1993 time frame?

7   A   Right, 1993, 1994, yes.

8   Q   Did you work on any projects during that period for any

9   companies in which the subject, type of subject matter of this

10  might involve persons who had similar experience and education?

11  A   Right.  So I mentioned this research project.  There was

12  this company call Epcom that wanted to build an electronic

13  distributorship, and so they came to my research group, and the

14  person I hired to work on this was two years out of the

15  computer science bachelor's degree, and she and I worked on the

16  design of this system whereby there was an electronic catalog,

17  and a consumer using the internet could look at the catalog and

18  could order from it and kind of a rudimentary inventory

19  management.

20  Q   Why don't we go to Plaintiff's Exhibit Number 1.

21      THE COURT:  Are you going to get into infringement

22  opinions now?

23      MR. ROBERTSON:  I'm going to get into a little bit

24  more about high level overview, and then I'm going to start

25  looking at specific claims, Your Honor, within a few pages.

514

```
 1        (Court adjourned.)
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

515

```
 1          IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
 2                  RICHMOND DIVISION
 3   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                               :
 4   ePLUS, INC.,              :
                               :
 5          Plaintiff,    :
        v.               : Civil Action
 6                       : No. 3:09CV620
     LAWSON SOFTWARE, INC.,    :
 7                       : January 6, 2011
            Defendant.   :
 8   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:
 9
10
11       COMPLETE TRANSCRIPT OF JURY TRIAL
        BEFORE THE HONORABLE ROBERT E. PAYNE
12     UNITED STATES DISTRICT JUDGE, AND A JURY
13
14
15   APPEARANCES:
16   Scott L. Robertson, Esq.
     Jennifer A. Albert, Esq.
17   Michael T. Strapp, Esq.
     David M. Young, Esq.
18   GOODWIN PROCTOR
     901 New York Avenue, NW
19   Washington, D.C.  20001
20   Craig T. Merritt, Esq.
     CHRISTIAN & BARTON
21   909 E. Main Street, Suite 1200
     Richmond, VA  23219-3095
22
        Counsel for the plaintiff ePlus
23
24
25       DIANE J. DAFFRON, RPR
         OFFICIAL COURT REPORTER
         UNITED STATES DISTRICT COURT
```

516

```
 1   APPEARANCES:  (Continuing)
 2   Daniel W. McDonald, Esq.
     Kirstin L. Stoll-DeBell, Esq.
 3   William D. Schultz, Esq.
     MERCHANT & GOULD
 4   3200 IDS Center
     80 South Eighth Street
 5   Minneapolis, MN  55402-2215
 6   Dabney J. Carr, IV, Esq.
     TROUTMAN SANDERS
 7   Troutman Sanders Building
     1001 Haxall Point
 8   P.O. Box 1122
     Richmond, VA  23218-1122
 9
        Counsel for the defendant Lawson Software.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

517

```
 1       (The proceedings in this matter commenced at
 2   9:20 a.m.)
 3       THE CLERK:  Civil Action No. 3:09CV00620,
 4   ePlus, Incorporated v. Lawson Software, Incorporated.
 5   Mr. Scott L. Robertson, Mr. Craig T. Merritt,
 6   Ms. Jennifer A. Albert, Mr. Michael T. Strapp, and Mr.
 7   David M. Young represent the plaintiff.
 8       Mr. Daniel W. McDaniel, Mr. Dabney J. Carr,
 9   IV, Ms. Kirstin L. Stoll-DeBell, and Mr. William D.
10   Schultz represent the defendant.
11       Are counsel ready to proceed?
12       MR. ROBERTSON:  Yes, Your Honor.
13       MR. McDONALD:  Yes, Your Honor.
14       THE COURT:  All right.  Thank you very much.
15       I apologize for keeping you-all waiting this
16   morning.  I had a mechanical malfunction that I needed
17   to attend to, and I'm not very mechanically oriented.
18       All right, Mr. Robertson.
19       Dr. Weaver, I remind you you're under the
20   same oath which you took yesterday.
21       THE WITNESS:  Yes, Your Honor.
22   BY MR. ROBERTSON:  (Continuing)
23   Q   Good morning, Dr. Weaver.
24   A   Good morning.
25   Q   If we could have Plaintiff's Exhibit No. 1 back up
```

518

```
 1   on the screen again, the '683 patent, the cover page
 2   here.
 3       Dr. Weaver, the jurors have seen this exhibit now
 4   several times and it's in their jury notebooks.  This
 5   is at tab 2.  Can you just tell us what is the title
 6   of the patent?
 7   A   Electronic Sourcing System and Method.
 8   Q   Has the Court defined the term "electronic
 9   sourcing system"?
10   A   Yes, it has.
11   Q   What's your understanding as to what that
12   construction is?
13   A   In the glossary of claim terms, the "electronic
14   sourcing system" has been defined by the Court to be
15   an electronic system for use by a prospective buyer to
16   locate and find items to purchase from sources,
17   suppliers or vendors.
18   Q   What is your understanding of what a source is,
19   sir?
20   A   A source would be a vendor or a manufacturer or a
21   distributor.
22   Q   In the Court's construction of the claim term
23   "catalog" or "product catalog," how does the Court
24   define what a vendor can be?
25   A   The vendor, in the Court's construction, a vendor
```

559

1  A  We sure will.

2  Q  The next element of Claim Three, which is

3  color-coded blue and has this means for building a

4  requisition using data relating to selected matching

5  items and their associated sources, what's your

6  understanding as to what a requisition is?

7  A  The requisition is the formal list of items that

8  you wish to purchase.

9  Q  Moving on to the next element of Claim Three,

10  which is yellow in your illustration.  It says, A

11  means for processing the requisition to generate one

12  or more purchase orders for the selected matching

13  items.  You mention the term "purchase order" when you

14  were discussing requisitions.  How does a purchase

15  order differ from a requisition?

16  A  The requisition is the list of things you want.  A

17  purchase order is the contract vehicle for buying.  So

18  when I have a purchase order and I send it to a

19  company, this is the legal document that says I want

20  to buy the item or items on this purchase order.

21     Requisition is your total list of things you'd

22  like to buy.  Purchase orders go to individual

23  companies.

24  Q  When you're providing your understanding of the

25  definitions and the meanings of these terms, is that

560

1  the same understanding as a person of ordinary skill

2  in the art at the time?

3  A  Yes.

4  Q  So how would the fifth element of Claim Three be

5  satisfied?

6  A  We would have to see a requisition module that can

7  take the formal requisition, which could have many

8  items from many vendors, and then turn that into one

9  or more purchase orders.  And, typically, you have all

10  the items from one vendor on one purchase order if you

11  can do it.  If they are present.

12  Q  Moving on to the sixth and last element of Claim

13  Three, which you have color-coded brown.  That element

14  recites means for converting data relating to a

15  selected matching item and an associated source to

16  data relating to an item and a different source.  How

17  are we to understand that claim element?

18  A  So if I have a list of items and for some

19  reason -- let's say I want to do comparison shopping

20  or say that the item that I want, I've checked the

21  inventory, and it's not available.  So there has to be

22  a converting means whereby I can look for similar

23  items, and this is all computer assisted.  I can find

24  similar items that I might choose instead of the one

25  that I had initially inquired about.

561

1     MR. McDONALD:  Your Honor, I'm going to

2  object to this question about this.  This is a

3  means-plus-function clause and he's asking him what it

4  means.  It should be done in the context of the --

5     THE COURT:  I was just looking at page 2 of

6  the glossary.  I think that's been defined over there.

7     MR. ROBERTSON:  I was just going to ask him

8  to go to that page.

9     THE COURT:  Don't be having him give his own

10  constructions, please, before you ask him to go to the

11  ones that have been construed.

12  BY MR. ROBERTSON:

13  Q  If you go to page 2 of the Court's glossary, Dr.

14  Weaver.

15  A  Yes.

16  Q  What's the function that's being defined here on

17  the means for converting data for this claim element?

18  A  The function of this element is converting data

19  related to a selected matching item and an associated

20  source.

21  Q  According to the Court, how can this function be

22  accomplished?  By what structure?

23  A  The corresponding structures, materials or acts of

24  this element are disclosed as one or more non-catalog

25  databases identifying cross-referenced items,

562

1  identical items, or generally equivalent items; one or

2  more cross-reference tables or file identifying

3  cross-referenced items, identical items, or generally

4  equivalent items; one or more codes corresponding to

5  cross-referenced items, identical items or generally

6  equivalent items; and their equivalents.

7  Q  In that definition there are non-catalog databases

8  identifying cross-referenced items, identical items or

9  generally equivalent items, cross-reference tables or

10  files and one or more codes.

11     As a computer scientist, can you tell us what your

12  understanding as a person of ordinary skill in the art

13  would understand those three terms to mean?

14  A  Sure.  So a non-catalog database is a file that is

15  not part of the physical structure of the database

16  system.  So it's an external file.

17     In this context, it's identifying the

18  cross-referenced items.  So, for instance, we might

19  have a vendor -- think of a file that has records.

20  Think of that as a row in a table.  We might have one

21  vendor's part number and a second vendor's part number

22  in that row.  And if this is in a cross-reference

23  index that indicates in this context that those two

24  part numbers are identical or generally equivalent --

25  let's see.  What was the next one?  Okay.

567

1    A  Yeah, okay.  So the catalog database is the
2    electronic form of the catalogs all put together so
3    that they can be searched.  That is the catalog
4    database.
5    Q  Does the Lawson procurement system include a
6    database in its inventory control module?
7    A  Yes, it does.
8    Q  Can supplier product catalog be loaded into that
9    control module?
10   A  Yes, we'll see that.
11   Q  What's the selection icon?
12   A  Of all the catalogs that are in the database, the
13   user interface provides a way to select one or more
14   that are going to be searched.
15   Q  Now, you have all of these modules I see here
16   within a gray box.  What are you trying to illustrate
17   there?
18   A  The gray box is the Lawson system.
19   Q  And these are the various components?
20   A  These are components, modules.
21   Q  There's an icon there for searching for matching
22   items.  Do you see that?
23   A  Yes.
24   Q  What did you intend to illustrate there?
25   A  Using the user interface, one engages a search

568

1    program and gives it a search query or initiates a
2    search using a characteristic of a drop down menu.
3    And the search engine then engages and returns items
4    that match the query.
5    Q  Did you examine a Lawson software program that
6    permits a user of a Lawson system to perform that
7    functionality?
8    A  Yes, the requisitioning system does that.
9    Q  You have building a requisition icon here.  Do you
10   see that?
11   A  Yes.
12   Q  Please explain what you're intending to illustrate
13   there?
14   A  So in the Lawson system you build a shopping cart,
15   then you add and delete items from it until you're
16   satisfied with it.  And then you do a checkout from
17   the Lawson system.  And that engages the requisition
18   system and builds the requisition of all the items
19   that you want to order.
20   Q  Are you familiar with the term "a shopping cart"?
21   A  Yes.
22   Q  Is that consistent with your understanding of
23   building a requisition?
24   A  Well, it's not the requisition.  It's the data
25   structure that can be modified.  You can add and

569

1    delete to it.  So in computer terminology, we call
2    this a cache, a C-A-C-H-E.  So it's a data structure
3    that holds data, and then it's going to be transferred
4    to the requisition module, and it's in the requisition
5    module that the requisition is created.
6    Q  All right.  Thank you for that correction.  So is
7    it consistent with an order list?
8    A  The order list is the shopping cart and that's
9    what becomes the requisition.
10   Q  Did the Court define what an order list is in its
11   glossary of claim terms?
12   A  Yes.  A list of desired catalog items.
13   Q  Did you apply that construction in doing your
14   infringement analysis?
15   A  Absolutely.
16   Q  Next you have an icon for generating purchase
17   orders.  Do you see that as part of the overview of
18   the Lawson procurement system?
19   A  Yes.
20   Q  Can you explain that process here?
21   A  So we've got our requisition.  This is our formal
22   list of the things we want to buy.  It might have one
23   item.  It might have a hundred items.  The items might
24   be from one vendor or they might be from 100 vendors.
25   Whatever that requisition says, the purchase order

570

1    module takes that requisition and typically pulls out
2    all of the requisition items that are going to be
3    ordered from a single vendor and creates a purchase
4    order for that vendor.  Then it pulls all the items
5    that go to another vendor and creates a separate
6    purchase order for the second vendor and so on until
7    all the items in the requisition have appeared in some
8    purchase order.
9    Q  Did you do analysis of any Lawson software program
10   or module that performs that functionality?
11   A  Yes, we're going to see that, and it's going to be
12   the Lawson P.O. 100 program.  Their purchase order
13   program that converts a requisition into one or more
14   purchase orders.
15   Q  Now, you've illustrated a number of arrows between
16   these various software programs or modules that you've
17   identified as part of the overall Lawson infringing
18   system.  What are you intending to indicate by those
19   arrows?
20   A  Well, the arrows with the single head indicate
21   unit directional information flow.  The arrows that
22   are double-headed indicate bidirectional data flow
23   back and forth.
24        So, for instance, the arrow here between selection
25   and searching, you use that user interface to engage

615

1  or items in the item master?

2      THE COURT REPORTER:  I'm sorry, could you say that

3  again, please.

4      THE COURT:  I agree.  Thank you.

5  Q   Is a vendor associated with the item data for items in the

6  item master?

7  A   It is.  The item number in the item master file serves as

8  a link to an entry in the vendor item table that identifies the

9  vendor.  So once you have the item number, you have a link to

10  the description in the item master, all the fields that

11  describe the item, and that link also gets you the name of the

12  vendor and the vendor price agreement data out of the vendor

13  item table.

14      THE COURT:  Is the item master and the vendor item

15  table, in your view, the only aspect of the Lawson systems that

16  are accused that meets the definition of catalog?

17      THE WITNESS:  Yes, Your Honor.

18      THE COURT:  All right.

19  Q   So together, the item master with the data that you

20  identified along with this vendor item table that identifies

21  the vendor together, it's your view that that constitutes a

22  catalog under the Court's construction?

23  A   That's correct.

24  Q   We also have this Punchout procurement system; correct?

25  A   We do.

616

1  Q   And you indicated there's this specialized website that

2  Lawson works with its Punchout partners to create such that

3  users of the Lawson system that have the Punchout procurement

4  module can go out to these special websites and purchase items;

5  is that right?

6  A   Yes.

7  Q   Do you have an opinion as to whether the catalog data

8  available at these Punchout partners that Lawson utilizes also

9  meets the definition of the Court's claim term catalog?

10  A   I believe they do, yes.

11  Q   We'll be coming back to that; is that right?

12  A   I'm sure we will.

13      THE COURT:  Then your opinion of what in the Lawson

14  system infringes is not confined only to -- excuse me.  Your

15  opinion of what in the Lawson system meets the Court's

16  definition of catalog is not confined to the item master plus

17  the vendor item table?

18      THE WITNESS:  You are correct, Your Honor.  The item

19  master and vendor item table would be an instance of a catalog

20  within the Lawson system.  These Punchout catalogs are

21  external.  They are an additional instance of catalogs.

22  Q   Okay.  Why don't we go then to page 46 of Plaintiff's

23  Exhibit 112, and there's a heading there that says, what are

24  UNSPSC codes.  You referenced those several times, so why don't

25  we see what Lawson has to say with respect to these codes.

617

1  A   So we've talked about these at a high level.  It's really

2  time now to define them.  So in these first two paragraphs of

3  this document, Lawson has incorporated the usage of UNSPSC

4  codes which is a standardized way of categorizing items that

5  people use in commerce.

6      The UNSPSC codes were developed by the United Nations in

7  association with Dunn & Bradstreet.  The codes have four

8  levels:  Segment, family, class, and commodity.  These levels

9  create an item hierarchy and allows the user to search, for

10  each level, for items in the item master file.

11  Q   So there's an example here of this segment, family, class,

12  and commodity and a description using that.  Can you tell us

13  then, so how do you employ these four levels to identify a

14  specific item?

15  A   Sure.  So in this UNSPSC classification code, the four

16  levels, segment, family, class, and commodity, are each

17  represented by a two-digit number.  So for the segment, for

18  example, the encodings could be 00 through 99.  Each of those,

19  or most of those anyway, have been predefined to be a market

20  segment, segment meaning a large grouping of items, products,

21  and services.

22      If the encoding is 44, then you can see from the table

23  that's the general segment of office equipment.  So if you did

24  a search for 44000000, you would be looking at items in office

25  equipment.

618

1      Now, that's a lot of items.  So it's hierarchical.  If you

2  add the family designation, two digits there, 00 to 99, you

3  narrow it down.  So if the code is 4410, you've narrowed it

4  from office equipment to office machines.  If the code is 4411,

5  you've narrowed it within office equipment down to computer

6  supplies.

7      So now let's take the example 4412 under office equipment.

8  We're now narrowing it to office supplies, but we can become

9  more specific by adding more digits.  So if I add the two-digit

10  class, if I added 15, then I'm talking about the type of office

11  supplies that are mailing supplies; if the code is 16, writing

12  implements.  So if my code so far is 441216, I'm talking about

13  writing implements.

14      If I go down to the commodity level, the full eight

15  digits, I get to a finer-grained description of items.  So if

16  that commodity code is 01, it's mechanical pencils, 02 is

17  stylus pens, 03 is black pens.  So if I wanted to search for

18  black pens, I could put in the code 44121603, and what I would

19  get back is a listing of all of the black pens in the item

20  master database from all the vendors that have put item data

21  there.

22  Q   Now --

23      THE COURT:  Put item data where?

24      THE WITNESS:  That using vendor catalog load program

25  provided by Lawson, catalog items from the vendor has been put

739

1       MR. ROBERTSON:  I don't know who he's going

2   to question about it.

3       THE COURT:  I'm sure he's going to question

4   Dr. Weaver based on what he said.  Not because I'm

5   prescient or anything.

6       MR. ROBERTSON:  I guess I don't have an

7   objection to that.

8       THE COURT:  Well, good then.  We solved

9   something.

10      Raise the blinds so that in the morning it

11  will be open.

12      All right.  I think that's everything.  And

13  you don't expect to finish tomorrow, is that right,

14  Mr. Robertson?  You don't expect to finish tomorrow,

15  is that what your situation is?

16      MR. ROBERTSON:  I do not, sir.  I expect Mr.

17  McDonald might have a half an hour or 45 minutes of

18  cross-examination.

19      THE COURT:  If you ask your questions bullet

20  points, 30 minutes is plenty.  Once you get beyond

21  that, the expert bets you is generally what happens.

22      All right.  Okay.  So we're not going on

23  Monday.  You're going back on Tuesday.  Thank you very

24  much.  Hope you feel better, all of you.  Don't bring

25  anything else up here.

740

1

2       (The proceedings were adjourned at 5:15 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1188

```
1         IN THE UNITED STATES DISTRICT COURT
2        FOR THE EASTERN DISTRICT OF VIRGINIA
3               RICHMOND DIVISION
4
5    ---------------------------------
6    ePLUS, INC.          : Civil Action No.
                          :
7    vs.                  :  3:09CV620
                          :
8    LAWSON SOFTWARE, INC.     :  January 12, 2011
                          :
9    ---------------------------------
10
11      COMPLETE TRANSCRIPT OF THE JURY TRIAL
12       BEFORE THE HONORABLE ROBERT E. PAYNE
13    UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24       Peppy Peterson, RPR
         Official Court Reporter
25      United States District Court
```

1189

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1190

```
1           P R O C E E D I N G S
2
3       THE CLERK:  Civil action number 3:09CV00620, ePlus,
4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr.
6    Michael G. Strapp represent the plaintiff.
7       Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
9    the defendant.  Are counsel ready to proceed?
10      MR. ROBERTSON:  Plaintiff is, Your Honor.
11      MR. McDONALD:  Yes, Your Honor.
12      THE COURT:  All right.  You said you wanted to see me
13   before the jury comes in.
14      MR. McDONALD:  Yeah, there's basically three issues
15   we wanted to raise.
16      THE COURT:  The court reporters always can hear
17   better if you come to the lectern.
18      MR. McDONALD:  There's basically three issues that we
19   wanted to raise this morning.  One is our third witness in our
20   case that we start today is Ms. Raleigh.
21      THE COURT:  Third witness in what?
22      MR. McDONALD:  In our case when we start presenting
23   our case today.  We have Mr. Richard Lawson first, Mr.
24   Christopherson second, and then Hannah Raleigh was supposed to
25   come back and be third today.
```

1191

```
1       She was supposed to be back last night from New York,
2    and New York is getting hammered real bad by this blizzard.
3    She's trying to get another flight, but her flight is not going
4    to get her here until after the trial day is over today.  So
5    we've been trying to work something out with ePlus about what
6    we would do next because we haven't disclosed any exhibits or
7    anything for the next witness.
8       THE COURT:  Just call the next witness, the expert or
9    whoever you've got here.  There's no magic to the order of
10   putting people on.
11      MR. McDONALD:  The next witness we would have
12   actually here is Mr. Lohkamp, calling him back.
13      THE COURT:  Good.
14      MR. McDONALD:  That's fine.  They haven't had a
15   chance to get ready for their cross-examination.
16      THE COURT:  They'll be ready.  They knew basically
17   what you were going to do anyway.  They're not going to do it
18   on your cross-examination; they were going to do redirect, so
19   we're going to reverse things.
20      MR. McDONALD:  We do have a deposition of Ms.
21   O'Loughlin on the RIMS prior art issue that we can move up in
22   the order.
23      THE COURT:  Is that carefully edited to eliminate the
24   trash?
25      MR. McDONALD:  That's being worked on as we speak,
```

1468

1 back to me with "published" first meaning, to issue
2 (printed or otherwise reproduced textual or graphic
3 material) for sale, and (2) to make publicly or
4 generally known.  Those are the first two.  And then
5 there's a third one, to issue newspapers, books, etc
6 and then fourth is to have one's work published.
7       And that's very typical of these other
8 definitions.
9       THE COURT:  American Heritage, 4th edition,
10 says, No. 1, To prepare an issue (printed material).
11 For public distribution or sale.  (2)  To bring to the
12 public attention, announce.
13       The Merriam Webster New Edition says, "To
14 make generally known, announce publicly."  Second one,
15 "To produce or release literature, information,
16 musical scores or sometimes recordings or art for sale
17 to the public."
18       The Pocket Oxford American Dictionary, did
19 y'all bring these with you or did you stimulate
20 business --
21       MR. McDONALD:  This was stimulated in
22 Richmond, Virginia, local economy, Your Honor.
23       THE COURT:  The first one is "Prepare and
24 issue a book, newspaper, piece of music for public
25 sale, print something."  (2)  "Print something in a

1469

1 book, newspaper or journal as to make it generally
2 known."  (3)  "Formally announce to read an edict or a
3 marriage ban."
4       MR. McDONALD:  That last one, I don't think
5 we're using that last one about marriage.
6       THE COURT:  I don't think that works, but
7 basically I think the way I've defined "published"
8 catches these, doesn't it?
9       MR. McDONALD:  The problem I have, Your
10 Honor, that I don't think it does is when you've got
11 to make generally known, I think that should be
12 publicly to be consistent with these as well as Dr.
13 Weaver and the experts.  So I would change the word
14 "generally" to "publicly."  And then we've got that
15 phrase "or to disclose," which doesn't have any sort
16 of a public or sale related aspect to it.
17       So I would say that should be eliminated
18 entirely from it.  I think it's very accurate to say
19 "published" simply means to make publicly known.
20       THE COURT:  I'll take those dictionaries, and
21 I'll give you back yours, but I'll just take all of
22 them and look at them and frame something.  I think
23 "disclosed" needs to be in there, but I'm not sure.
24       MR. ROBERTSON:  Your Honor, may I address
25 this "publicly" now a new term has been injected?  I

1470

1 think generally known was in several of the
2 dictionaries that you indicated.  I think that's more
3 appropriate.
4       Remember, "published" still has to be read in
5 context of the patent, and we're talking about
6 electronic data here.  So when you take electronic
7 data, and you put it in a vendor catalog database,
8 you're not making something publicly known, you're
9 just taking that data that has been made generally
10 known or disclosed by the vendor, and then you're
11 loading it into the database.
12       Now, who does that loading or how it's
13 modified in any way is not relevant to "generally
14 known" or "disclose."
15       Publicly now would suddenly become another
16 non-infringement gotcha that we've been talking about.
17       THE COURT:  Well, go ahead, Mr. McDonald.
18       MR. McDONALD:  Okay.
19       THE COURT:  Anything else?
20       MR. McDONALD:  Your Honor, just to be clear
21 as well, speaking of gotchas, as Mr. Robertson said,
22 basically, he's the one that's trying to turn this
23 into a gotcha.  I'm fine going to the jury on a fair
24 and ordinary meaning.  He's the one who is trying to
25 say, "I can't even present evidence anymore on these

1471

1 issues of how the accused database, the item master,
2 came into being."
3       These are clearly facts that are relevant
4 here.  What if the vendor was the one who had selected
5 the desired items and added the information and
6 deleted the items and modified?  Obviously, that would
7 be relevant.  So the fact that somebody else does it
8 is also relevant to the converse.
9       And so he's the one that's trying to do the
10 gotcha here and preclude us from even being able to
11 present our case to the jury here by saying none of
12 this evidence that Lawson wants to present is even
13 relevant here.  That's where the gotcha is coming in.
14 So Mr. Robertson is the one who keeps saying we
15 shouldn't use these claim constructions --
16       THE COURT:  Why should this come in into
17 evidence?  You want to argue that it's not a catalog
18 because the customer of Lawson in the instance where
19 it's using a legacy system, for example, has pulled
20 from a bunch of catalogs things that it put together,
21 and you flipped it into the system when you into the
22 Lawson system.  And somehow that information doesn't
23 constitute information that's published by a vendor
24 merely because it's gone through a relocation.
25       And that's not what the claim construction

1472

1 says. And that's not a fair reading of the patent.
2 So maybe he's right that none of this comes in, that
3 to the extent it is relevant, it's only marginally
4 relevant, and it's too confusing to the jury to have
5 to sort through all of this who put the material into
6 the system, the structure that you all have
7 constructed, that is the Lawson system.
8     MR. McDONALD: But we're talking about the
9 item master as being the thing that's being accused as
10 being multiple catalogs, Your Honor, and I think as a
11 fact matter, we should be able to show that doesn't
12 satisfy this definition. The definition starts off by
13 talking about an organized collection. That's the
14 noun here. And then it goes on to say that's why it
15 has to be published by a vendor. And that's very
16 consistent with the patent. Any other way is
17 inconsistent.
18     THE COURT: I'm going to tell you now that
19 you're not free to argue simply that -- you just
20 argued that the only thing that's covered by the claim
21 construction is a Sears catalog that is put into the
22 system. And if that's what your theory is, you lose.
23 And I'm going to find that you lose as a matter of law
24 because that isn't what it's all about.
25     And I think if that's what you're trying to

1473

1 do, then I think the answer is that Rule 403 keeps
2 that whole line of evidence out. If that's what
3 you're thinking, forget it, because it ain't going to
4 happen. If you argue that in front of the jury, I'm
5 going to tell the jury that that isn't permissible and
6 I'll sustain a motion to strike it because it never
7 was intended to do that.
8     We may not have done the best job of claim
9 construction here. I don't know. But in any event,
10 whatever is going to happen is that we're not going to
11 convert this into something that it wasn't and is not
12 reasonably intended.
13     MR. McDONALD: You have that Markman
14 transcript, and if you take a look at that, you'll see
15 that I was definitely talking about the issue that we
16 have to have a definition that's consistent with the
17 patent and consistent with the ordinary meaning of
18 catalog that will exclude something like a shopping
19 list or a list of products somebody buys instead of
20 something somebody sells. That was all on the table
21 at the Markman.
22     And if we go too far the other way with the
23 definition, Your Honor, I think we start grabbing
24 things within the catalog definition that would not be
25 considered within the ordinary meaning. It would be

1474

1 inconsistent --
2     THE COURT: Everything that your customers
3 look for is something that a vendor sells because what
4 happens is when they use your system, your customer
5 goes to buy it from the vendor who is selling it to
6 them, and a requisition is made, a purchase order is
7 made, and it goes to the vendor, and that's a typical
8 sale, isn't it? It's a sale purchase. That's what it
9 is.
10     MR. McDONALD: The point is what's a catalog
11 and what's not. That's what I'm talking about, and
12 the shopping list is not a catalog. If I come up with
13 a list of requisition items that I want to buy, that's
14 not a catalog. That's not how these patents use that.
15 They call them requisitions. They call them purchase
16 orders. They call them something different from a
17 catalog. And that's my concern that if we go too far
18 on reconstructing the construction, that it's going to
19 lead the jury to --
20     THE COURT: You reconstruing the
21 construction, I think. So anyway I think what I'm
22 going to do is instruct the jury. And the question
23 then is: On what the ordinary meaning is, do you know
24 of any case that says the Court can't instruct them on
25 what the ordinary meaning is?

1475

1     MR. McDONALD: I'm not sure. We'll have to
2 look for that, Your Honor. I'm not aware of any
3 case at this point.
4     THE COURT: I don't know why it wouldn't be
5 appropriate if there's a dispute about it. And you're
6 offering Defendant's 371. I assume you did it in good
7 faith believing that it was appropriate to do that.
8 So I think I'm going to give it. I'm going to look at
9 these definitions, if you don't mind loaning me your
10 books for the evening.
11     Now, the real issue is: Can you ask these
12 questions? Why is it that this approach as shown in
13 item information changes, which I think Mr. Robertson
14 just read into the record in its entirety in the first
15 three blocks, I don't know that you read the last
16 three -- the last block. It says, "Customer loads new
17 info into Lawson database." And then it goes to item
18 location, item master, and vendor item. I think
19 that's now the whole thing is in the record.
20     But what difference does it make about
21 whether the vendor changes the information to the new
22 electronic format?
23     MR. McDONALD: Because we're showing the
24 distance between when this thing actually was anything
25 that even resembles a catalog at the vendor end and

1490

```
1         IN THE UNITED STATES DISTRICT COURT
2         FOR THE EASTERN DISTRICT OF VIRGINIA
3                  RICHMOND DIVISION
4
5    ----------------------------------
6    ePLUS, INC.              : Civil Action No.
                              : 3:09CV620
7    vs.                      :
                              :
8    LAWSON SOFTWARE, INC.    : January 13, 2011
                              :
9    ----------------------------------
10
11       COMPLETE TRANSCRIPT OF THE JURY TRIAL
12        BEFORE THE HONORABLE ROBERT E. PAYNE
13     UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C. 20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia 23219-3095
     Counsel for the plaintiff
23
24       Peppy Peterson, RPR
          Official Court Reporter
25       United States District Court
```

1491

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia 23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota 55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1492

```
1            P R O C E E D I N G S
2
3        THE CLERK:  Civil action number 3:09CV620, ePlus,
4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
6    Mr. Michael G. Strapp represent the plaintiff.
7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
9    the defendant.  Are counsel ready to proceed?
10       MR. ROBERTSON:  Plaintiff is, Your Honor.  Thank you.
11       MR. McDONALD:  Yes, Your Honor.  Thank you.
12       THE COURT:  Do you need to see me about something
13   before the jury comes in?
14       MR. ROBERTSON:  Yes, Your Honor.  You had asked us to
15   take a look at those appendices with respect to our motion on
16   this implementation on a customer-by-customer basis.
17       THE COURT:  Yeah.
18       MR. ROBERTSON:  We have done that, and the reason I
19   raised it, Your Honor, is one of the witnesses that's going to
20   be called this morning is Ms. Hannah Raleigh.  You may recall
21   she testified once already.  She is involved with Lawson
22   Professional Services that has to do -- that has responsibility
23   for implementation of the Lawson software products, and we're
24   concerned that she's going to be getting into areas in and
25   presenting testimony that Lawson is going to contend are
```

1493

```
1    defenses to infringement later that are directly implicated by
2    that interrogatory number 24.
3        What I have provided Your Honor with is the
4    appendices that were referenced in the answers to the
5    interrogatories, the transcript from the March 26th hearing,
6    telephonic hearing on the motion to compel, and the relevant
7    citations to the transcript where this issue came up, and I do
8    want to continue to press the motion, Your Honor.
9        We do think that the answers, even with the
10   appendices, were nowhere near what was called for and what Your
11   Honor directed Lawson to do in response to that.
12       If I might just, Your Honor, you may recall that
13   these appendices that are being referenced were provided to
14   ePlus three months before the motion to compel was presented,
15   and the appendices do not respond to the interrogatory as
16   represented by counsel for Lawson.
17       Indeed, if you look at some of the appendices, for
18   example --
19       THE COURT:  Is A appendix A?
20       MR. ROBERTSON:  Yes, sir.  Under the tab December 23,
21   2009, response to interrogatory number -- yeah, A is one.
22       THE COURT:  March 26th is the first tab, the
23   transcript, and then there's an A behind that.  Is that
24   appendix A or not?
25       MR. ROBERTSON:  I believe appendix A, Your Honor, is
```

1518

1    MS. STOLL-DeBELL:  I don't know, Bill, if you can

2  highlight that item column.

3    Q   Can you tell us what that is, Mr. Christopherson?

4    A   We've been referring to that's kind of the Lawson item

5  number or the customer part number.

6    Q   Is that something that -- well, who creates that item

7  number?

8    A   The customer does.

9    Q   Does it ever come from the vendor?

10   A   No, it does not.

11   Q   Let's go on to the next column.  It has a heading

12  description?

13   A   Uh-huh.

14   Q   What is that?

15   A   That's what we've been referring to as the item

16  description.

17   Q   And then what is the column, the next column over?  I

18  think it says tracked.  Can you explain what that is?

19   A   Yes.  That has to do with if -- well, in the item master,

20  we have two types of items.  We have those that we don't keep

21  in stock, what we call nonstock items.  Those are items that

22  when we need them, we always have to go purchase them.

23    Then we have our stock items and whether or not we're

24  tracking the stock of those items, thus tracked, and that has

25  to do with tracking that order and -- not the order, but rather

1519

1  the inventory and making sure that we're always going to have

2  enough on hand.

3    This particular case, you've got medical instruments.  You

4  want to make sure that -- you got someone going into surgery,

5  you've got the equipment, the supplies that you need for that

6  surgery before that surgery actually starts or the medical

7  procedure.

8    Q   Where does the tracking information come from?

9    A   Tracking information, that's housed within inventory

10  control or IC.

11   Q   The screen shot we're looking at here, where did the item

12  description information come from?

13   A   The item description can come from the customer.

14  Generally they'll put it in terms that they understand.  In

15  particular, a lot of the hospitals will have terms that are

16  very similar between hospitals, between locations.

17    Take nurses today are very short-supplied within the US,

18  and as a result, it's quite often that nurses are having to go

19  from hospital to hospital even in different companies.  They'll

20  work different shifts different places.  They need to know

21  basically standardized ways of the way things are being

22  identified.

23   Q   Is this a typical list of items that you see in an item

24  master database?

25   A   For medical unit, yes.  This would be some of the items

1520

1  that you may see.

2    Q   What kinds of items do you see here?

3    A   Clearly, I've got some, looks like -- it's a little bit

4  fuzzy in mine also, Your Honor, so --

5    MS. STOLL-DeBELL:  Bill, could we blow up some of

6  those maybe, blow up that description column or somehow make

7  those bigger and easier to see?

8    Q   Is that better?

9    A   Sure.  It looks like there's some sort of a surgical tape

10  dispenser, different amounts on each one of those, ten or

11  20 yards, some strips.  Those are probably Band-Aids, or we

12  might refer to them as Band-Aids, but obviously they don't in

13  this case.  Some needles, varying lengths.

14   Q   Looks like maybe shoe covers?

15   A   Yes, some shoe covers down there, some surgical masks,

16  there's some gloves, there's a gown, there's a scalpel, another

17  type of tape.  There's some syringes.  So a wide selection of

18  things, some related, some not related.  The shunt, probably

19  not related to the shoe covers, for instance.

20   Q   Is item master organized by related items?

21   A   You know, if you look at this, you've got items numbers

22  going 1,007, -8, -9, -10, -11, -12, and it's -- I haven't

23  looked at them all, but they appear to be almost in

24  alphabetical order.  I see now where 1,026 is not there, but as

25  I said --

1521

1    THE COURT:  What was the question?

2    MS. STOLL-DeBELL:  The question was, is item master

3  organized by related items.

4    THE COURT:  Yes or no?

5    THE WITNESS:  No, it's not.

6    Q   Are items in item master organized by vendor?

7    A   No, they are not.

8    Q   Why not?

9    A   Vendor doesn't come into the item master or the ITEMMAST

10  table at all.

11   Q   Is this customer's item master database ever published by

12  a vendor?

13   A   Can you say that again?

14   Q   Is a customer's item master database ever published by a

15  vendor?

16    MR. ROBERTSON:  Objection, Your Honor, calls for

17  legal conclusion.

18    MS. STOLL-DeBELL:  It does not, Your Honor.  I'm

19  asking him to use the ordinary meanings of these terms.  They

20  are not claim terms.  I'm just asking for his understanding

21  based upon his experience working at Lawson and working with

22  these products.

23    MR. ROBERTSON:  Your Honor knows that there's a

24  dispute with respect to this, and there's a --

25    THE COURT:  Maybe we need to tell the jury what the

1522

1 ordinary claim term is -- I mean what the ordinary meaning is,

2 and he needs to explain what he understands the ordinary

3 meaning is.  Or maybe I need to do it.  Are you finished, Mrs.

4 Stoll-DeBell?

5     MS. STOLL-DeBELL:  We can ask Mr. Christopher --

6     THE COURT:  He doesn't define what the ordinary

7 meaning is, does he?  He defines what his meaning is.  So I

8 define -- should I go ahead and tell the jury what the ordinary

9 meaning is now if that's what the question is?

10     MS. STOLL-DeBELL:  Your Honor, I think it's

11 appropriate to let him answer with his understanding.  He works

12 with these products every day.  He works with customers.  He

13 already laid his foundation for that, and I'm just asking --

14     THE COURT:  If he gives the definition of what his

15 understanding is but it's not what the usual meaning is, it's

16 not the same.  Then it confuses the jury, doesn't it?

17     MS. STOLL-DeBELL:  I think it's up to the jury to

18 decide what the ordinary meaning is, and we've already heard

19 testimony from the witnesses what their understanding of that

20 ordinary meaning is, and now we're going to ask Mr.

21 Christopherson what my understanding is.  And I believe it's

22 up to the jury to ultimately decide what that is.

23     THE COURT:  Who testified to that?

24     MS. STOLL-DeBELL:  Dr. Weaver.

25     THE COURT:  No.  He didn't testify what published by

1523

1 a vendor meant.

2     MS. STOLL-DeBELL:  I believe he did, Your Honor.

3     THE COURT:  He was asked a different question.  I'm

4 going to tell the jury what the definition is.  That's enough.

5 Published by a vendor is used in the definition of the claim

6 term catalog, product catalog.  Published simply means to make

7 generally known.  Published by a vendor simply means that at

8 some point in time, a vendor, such as a supplier, a

9 manufacturer, a distributor has made generally known or has

10 disclosed an organized collection of items or associated

11 information, preferably but not necessarily including a part

12 number, price, catalog number, vendor name, vendor ID, textual

13 description of the item and images relating to the item.

14 That's what the general meaning of the term is.  I'll have that

15 in writing for you.

16 Q   Okay, Mr. Christopherson, using that definition of

17 published by a vendor, I'm going to ask my question again and

18 ask that you answer it using that definition.

19     THE COURT:  You are going to ask him for his opinion;

20 is that what you are doing?

21     MS. STOLL-DeBELL:  I don't think it's an opinion, but

22 if it is, it's a lay opinion based upon his experience and what

23 he's seen and what he does in his job.

24     MR. ROBERTSON:  Your Honor, I think it's still

25 calling for a legal conclusion from a lay witness, so I would

1524

1 object on that.  This gentleman's supplied no report, no

2 Rule 26 disclosure.  I think it's inappropriate.

3     THE COURT:  Well, it is his opinion, I think; isn't

4 it?

5     MS. STOLL-DeBELL:  I think it's a fact.

6     THE COURT:  It can't be a fact.  It's his opinion as

7 to what the facts are; right?

8     MS. STOLL-DeBELL:  It's using the definition he --

9     THE COURT:  Do you want it in as an opinion, because

10 I'll let it in.

11     MS. STOLL-DeBELL:  Yes, then.

12     THE COURT:  It's not going to come in just as a fact.

13 It's his opinion.

14     MS. STOLL-DeBELL:  Then, yes.

15     THE COURT:  There are two kinds of people who can

16 give opinions.  One are experts.  He's not qualified as an

17 expert, so he's not giving an opinion as an expert.

18     Lay people, such as you and me, can give opinions

19 about matters as well.  They can do that if it will help you

20 decide a fact that is in issue or if it will help you

21 understand the evidence and if it is based reasonably on their

22 perception.

23     It is up to you to decide whether, in listening to

24 the testimony, his opinion on this matter is based reasonably

25 on his perception, and if you -- and you can give it such

1525

1 weight as you choose or none if you choose which is an

2 instruction I'll tell you about later.  Do you want to ask him

3 what his opinion is?

4     MS. STOLL-DeBELL:  Yes.

5 Q   Using the definition the Court just gave for published by

6 a vendor, is the customer's item master database ever published

7 by a vendor?

8 A   If you looked at the entire --

9     THE COURT:  I think the answer is yes or no to start

10 with, and then if she wants you to explain it, she can, but the

11 jury will understand your opinion better if you preface it by

12 giving them the guidepost from which to make the assessment if

13 there's any further explanation she asks you for.  Yes or no?

14     THE WITNESS:  No.

15     THE COURT:  Do you want to ask him to explain that?

16     MS. STOLL-DeBELL:  Yes.

17 Q   Please explain your no answer.

18 A   Sure.  Looking at the screen that we were just talking

19 about, item number, a vendor could not have published that

20 because they never had access to it.  That's from the customer.

21 Tracked, that's another one where the vendors would love to

22 have the customers have everything in stock.  That comes at a

23 cost to the customer, and they don't want to do that.  They may

24 have items that are low turnover, they only use maybe once or

25 twice a year.

1526

1    There's many other fields that are in the item master.

2    We've talked about some of them.  You know, catalog number, the

3    vendor's part number or its number, the manufacturer number,

4    clearly those came from the -- the manufacturer came from the

5    manufacturer, and the vendor number came from the vendor, and

6    those were in their catalogs at some point in time.  The

7    description generally --

8        THE COURT:  Those did come from a vendor?

9        THE WITNESS:  What did come from --

10       THE COURT:  Those that you just testified to --

11       THE WITNESS:  Did come from the vender, but --

12       THE COURT:  So they were published by a vendor?

13       THE WITNESS:  Those particular items, right.

14       THE COURT:  Thank you.

15       THE WITNESS:  Where I was differentiating, she was

16   saying the item master, that, in itself, all the fields were

17   not, and that's why I was really struggling with the yes or no,

18   Your Honor.

19       THE COURT:  I know, but the jury have a right to

20   understand what people's opinions are before they start talking

21   about them.

22       THE WITNESS:  I appreciate that.

23       THE COURT:  Then they understand what they're being

24   told.

25   Q    Do a lot of fields come from the customer in item master?

1527

1    A    Most of the fields.

2        MR. ROBERTSON:  Object to the form of the question;

3    vague, ambiguous as to a lot of fields.

4    Q    Do most of the fields in item master come from the

5    customer?

6        MR. ROBERTSON:  Same objection, Your Honor.  I mean,

7    if we want to be specific, there's hundred of fields.

8    Q    Mr. Christopherson, are there hundreds of fields in item

9    master?

10   A    No, there's not.

11   Q    How many fields are in item master?

12   A    I don't recall, but there's under 100.

13       THE COURT:  So there are a lot, I mean between 0 and

14   100?

15       THE WITNESS:  Yes, Your Honor.

16       THE COURT:  Is it closer to a hundred than it is to

17   zero, or close to zero than it is to a hundred?

18       THE WITNESS:  It's probably pretty close to 50

19   roughly.

20       THE COURT:  So there are 50.  You can handle that on

21   cross-examination, Mr. Robertson.  Overruled.

22       MR. ROBERTSON:  Thank you, Your Honor.

23   Q    Would you say a majority of those 50 come from the

24   customer?

25   A    I would say from the customer it is clearly a majority.

1528

1    Q    Do Lawson's customers maintain the item master database in

2    private?

3    A    Yes.

4        MR. ROBERTSON:  Objection, relevancy, Your Honor.

5        MS. STOLL-DeBELL:  Your Honor, it goes to --

6        THE COURT:  What does that have to do with anything?

7        MS. STOLL-DeBELL:  It goes to whether it's

8    published by a vendor, whether it meets your definition --

9        THE COURT:  No, I don't think so.  Objection

10   sustained.  Disregard the answer, please.

11       MS. STOLL-DeBELL:  Can we go to, Bill, PX-363, and

12   I'm going to want to see page that ends in 942297.

13       MR. ROBERTSON:  I'm sorry, Ms. Stoll-DeBell, what

14   page?

15       THE COURT:  What exhibit are we on?

16       THE CLERK:  363.

17       MS. STOLL-DeBELL:  Actually I need to get you a

18   better page.

19   Q    Let's go to the page ending in 942297.

20       THE COURT:  297, the last three digits?

21       MS. STOLL-DeBELL:  Yes.

22   Q    What is this, Mr. Christopherson?

23   A    That is the login screen to get into the Lawson system

24   requiring a user name and a password.

25   Q    So when a customer or when anyone wants to use Lawson

1529

1    software, do they need to have a user name and password?

2        MR. ROBERTSON:  Objection, Your Honor, relevancy.

3        MS. STOLL-DeBELL:  It goes to his opinion, support

4    for his opinion as to whether item master is -- meets the

5    definition of catalog as defined --

6        THE COURT:  I don't understand why, the fact that

7    somebody needs a password to get in and use it.

8        MS. STOLL-DeBELL:  I think it goes to whether item

9    master is made generally known or not.

10       THE COURT:  The issue is not whether item master is

11   made generally known.  It's whether the things that are listed

12   in item master are made generally known, isn't it?

13       MS. STOLL-DeBELL:  Well, I think --

14       THE COURT:  The issue is what's in the item master,

15   not whether item master is made generally known as I understand

16   the way you all have tried the case, so objection sustained.

17   Q    For a user to gain access to see what information is in

18   item master, do they need to use login credentials as shown on

19   this screen?

20       MR. ROBERTSON:  Same objection, Your Honor.

21       THE COURT:  It may be admissible for a different

22   purpose.  Besides that, Dr. Weaver has already testified about

23   putting in the user name that says Lawson, and then he said, we

24   put in our password.  So it may be appropriate, but it's not

25   appropriate for -- the previous question wasn't.  All right,

1530

1    overruled.

2    Q    Do you need me to ask that again?

3    A    Yes, please.

4    Q    In order for a user or anyone to gain access and see what

5    information is in the item master database, do they need to

6    enter a user name and password?

7    A    Yes, at a minimum.

8    Q    Okay, I'm going to change topics slightly,

9    Mr. Christopherson, and I want to talk about how item

10   information is loaded into the customer's Lawson databases.

11   Are there different ways that item information can be loaded

12   into the item master database?

13   A    Yes, there are.

14   Q    What are those different ways at a high level?

15   A    You start with the most basic which would be just key in

16   the items.  Someone such as a buyer for an organization working

17   in the purchasing department could just sit in inventory

18   screens and just type in all the required fields.  That would

19   be the easiest way, particularly if you are just entering in

20   one or two items.

21   Q    So is it safe to call that a manual entry of item

22   information?

23   A    Sure.

24   Q    Are there tools that Lawson offers that can be used to

25   import information into the database?

1531

1    A    Absolutely.  There's a PO 536.

2    Q    Are there third-party tools that can used --

3        THE COURT:  PO or field?

4        THE WITNESS:  PO 536.

5        THE COURT:  And that is a what?

6        THE WITNESS:  We've referred to it as, I think, about

7    three different ways so far in court, but it's a way to load

8    vendor agreements was one it's been called, a catalog load, I

9    think or something very similar to that.

10       THE COURT:  All right.

11       THE WITNESS:  Kind of a couple different names.

12   Q    Are there third-party party tools that can be used to load

13   item information into the item master database?

14   A    Sure.  You could use the SQL tools -- structure query

15   language is what SQL stands for -- provided by the database

16   providers, so Oracle or IBM for DB-2, for instance.

17   Q    Did you create a demonstrative exhibit that will help

18   explain the process that's used to load item information into

19   the item master database?

20   A    Yes, I did.

21       MS. STOLL-DeBELL:  Bill, can we put that up, please.

22       MR. ROBERTSON:  I'm just going object for the record

23   on this.  This is the demonstrative we talked about yesterday.

24   I understand the Court's ruling.

25       THE COURT:  Yes, I've already dealt with this out of

1532

1    court, and the objection has been overruled, and I'm going to

2    allow questioning, but, Mr. Robertson is not going to stand up

3    and object to every question about this particular

4    demonstrative exhibit because it would then interrupt the flow

5    of your hearing and understanding, but his objection is

6    preserved under the terms previously articulated yesterday, Mr.

7    Robertson.

8        MR. ROBERTSON:  Thank you, sir.

9    Q    Okay, Mr. Christopherson, can you see that?

10   A    Yes, I can.

11   Q    Does this describe essentially a three-step process for

12   loading item information into the customer's Lawson database?

13   A    Yes, it does.

14   Q    What is the first step?  Does it have a nickname that you

15   use to identify this first step?

16   A    Sure.  In fact, all three steps, collectively we just call

17   that the ETL process, and that's very standard within the

18   computer industry.

19   Q    E stand for?

20   A    E stands for extraction.

21   Q    What does T stand for?

22   A    Transformation or transform.

23   Q    And what about L?

24   A    Load.

25   Q    Let's talk about the extraction step.  Where is that shown

1533

1    on this demonstrative?

2    A    Very first step.

3    Q    And you can actually maybe even touch it and put a little

4    arrow maybe.

5        THE CLERK:  What is the number of this exhibit?

6        THE COURT:  It's not.  It's a demonstrative.

7        THE CLERK:  Thank you.

8    Q    Tell us how the extraction step works.

9    A    The extraction step, basically that's the vendor.  The

10   customer will ask for the items that many want or maybe the

11   entire catalog.  That catalog is generally today going to be

12   housed in a database at the vendor's site.  Could also be a CD

13   or DVD.

14       They need to get that data from the vendor's system

15   extracted into some form, email message or a flat file -- when

16   I say flat file, I mean CSV file -- and send that over to the

17   customer.

18   Q    And then the next step is the transformation step?

19   A    Transformation, correct.

20   Q    Is that shown in the middle box of this slide?

21   A    That's correct.  This this one.

22   Q    Looks like there are sort of four sub steps that are a

23   part of that?

24   A    Correct.

25   Q    Okay.  What is the first sub step that is part of the

1534

1  transformation process?

2  A   So you get the file from the vendor, and now you're going

3  to go through and select what do you really want in your item

4  master.  Just because you negotiated prices on a hundred items,

5  you may not want actually the hundred loaded.  You may only

6  want 80.  Maybe it's 99.  Maybe it's all 100.  Or the vendor

7  sent you the entire catalog, and you may not want to load that

8  entire catalog.  You go through and select what you want out of

9  that, identify those that you really want to keep and continue

10  on.

11  Q   Do you encourage your customers to select all of the items

12  that a vendor may send as part of the extraction step?

13       MR. ROBERTSON:  Objection, lacks foundation.

14       MS. STOLL-DeBELL:  It doesn't, Your Honor.  I think

15  he already testified at length actually about all of his

16  customer interactions as part of his job.

17       THE COURT:  Well, are you asking him has he ever, or

18  are you asking any of Lawson's sales force ever?

19       MS. STOLL-DeBELL:  I'm asking him.  Does he encourage

20  customers.

21       THE COURT:  And what relevance is that?

22       MS. STOLL-DeBELL:  I think he works with Lawson's

23  customers.

24       THE COURT:  I know that.

25       MS. STOLL-DeBELL:  Okay, and so it goes to whether

1535

1  the item master database is -- meets the definition of catalog

2  as set forth by the Court.

3       THE COURT:  So it's offered -- is what his practice

4  is offered to whether or not Lawson's product meets the

5  definition?

6       MS. STOLL-DeBELL:  Yes, and how Lawson talks with its

7  customers and how it instructs its customers to use --

8       THE COURT:  He said he hadn't got a foundation.  You

9  asked him to testify about his own personal practice, and it's

10  not -- it's of marginal relevance, but it's confusing and

11  leaves open the door to a lot of other responses that will

12  just, that would delay the trial, confuse the jury, and make a

13  difficult situation for the jury already more difficult.  So

14  I'm going to sustain the objection for lack of foundation.

15  Q   Mr. Christopherson, are you familiar in your job with

16  Lawson's practices and its instructions to its customers on how

17  to load item information into the item master database?

18       MR. ROBERTSON:  Objection, Your Honor.

19       THE COURT:  The question is -- what is your objection

20  to that question?

21       MR. ROBERTSON:  Relevancy.

22       THE COURT:  It's what he does.  Overruled.  She's

23  trying to lay the foundation to which you objected, I think.

24       MS. STOLL-DeBELL:  Yes, Your Honor.

25  A   Yes, I am.

1536

1  Q   So you are familiar with Lawson's policies?

2  A   Correct.

3  Q   Is it Lawson's policy to encourage customers to load all

4  of the item information they receive from a vendor into the

5  item master database?

6       MR. ROBERTSON:  Objection, relevancy, Your Honor.

7       THE COURT:  Overruled.

8  A   No, it's not.

9  Q   What does Lawson encourage its customers to do?

10  A   When a customer comes up with that sort of an idea, myself

11  personally and actually other members of my team, because it's

12  not always me interacting with the customers, but obviously

13  I've got --

14       THE COURT:  That disqualifies the answer because he's

15  now -- he was asked, and the answer is nonresponsive.  He was

16  asked about whether there's a policy and is there a policy.  If

17  he does it, that doesn't make it a policy, and the fact that

18  maybe one or two other people may do it doesn't make it a

19  policy.

20       A policy is something that's adopted by the company,

21  and either they have the policy or they don't have the policy,

22  or -- and then if you've got another issue, you can get into

23  that, but policies -- he's disqualified himself from answering

24  that question with the policy because he said it's based on his

25  practice.

1537

1  Q   Mr. Christopherson, are you aware of the policy that

2  Lawson has regarding selecting item information to load into

3  the item master database?

4  A   Yes.

5  Q   Can you answer the question about what is that policy?

6       THE COURT:  Just what is the policy.

7  A   The policy is that we will first ask the customer why do

8  you want to do that.  We want to establish what the

9  requirements are.  Inevitably what we find out --

10       THE COURT:  No.  You're going to have to take hold of

11  the examination, because we have -- this kind of testimony,

12  self-starting, rambling testimony creates all kinds of

13  problems, and we're in a question that has been objected to,

14  Mrs. Stoll-DeBell, and he was asked about the policy.

15       He said what the policy was, and then he goes on and

16  gives a lot of other information, and that isn't responsive to

17  the question, and it doesn't give Mr. -- and the reason for all

18  this is that Mr. Robertson, your opponent, has the right to

19  object to a question, and if the witness is self-animating

20  everything, he doesn't have that opportunity and we have to

21  move to strike the testimony, and then we have to ask the jury

22  to do the difficult thing and disregard that which has been

23  said.  So let's get hold of it.

24       Now, Mr. Christopherson, listen to the question.  You

25  answer the question.  Just answer the question.  Don't

1538

1  elaborate on it, and then Ms. Stoll-DeBell, if she wants more
2  information, will ask you another question on that or another
3  topic; okay?
4       THE WITNESS:  Yes, sir.
5  Q  Is Lawson's policy to instruct its customers to only load
6  the item information for those items that it's going to
7  actually use or purchase?
8  A  Yes.
9  Q  The second sub step on this demonstrative says, adding
10  additional item information.  What additional item information
11  can be added in this step?
12  A  The item number that the customer would be using, that's
13  one.  Whether or not there's going to be tracking, if there's
14  stock or nonstock items, what its inventory levels might be,
15  additional user fields that exist, UNSPSC codes, other category
16  codes.
17  Q  What about, are there classification fields within the
18  item master database?
19  A  Correct.
20  Q  What classification fields are there?
21  A  The classification fields, I'm not sure now which
22  classification fields you are talking about.
23  Q  Are there inventory classifications fields?
24  A  Yes.
25  Q  Are there purchasing classifications fields?

1539

1  A  Correct.
2  Q  Are those Lawson-specific fields?
3  A  Yes.
4  Q  That do not come from a vendor?
5  A  Correct, they do not.
6  Q  Are there any other Lawson-specific fields that you can
7  think of right now that would be added as part of this step?
8  A  There's also some user numerical fields.
9  Q  The next sub step says, deletes item information?
10  A  Correct.
11  Q  What item information is deleted here?
12  A  It may be the entire line item meaning I don't want that
13  item at all.  It may be, for instance, they may have sent
14  photos.  The customer may not want photos loaded into the
15  system.  That requires space and band width.  They may delete
16  that.
17  Q  The last sub step that's listed on this slide is modifies
18  item information.  What item information is modified?
19  A  Frequently it's the item description.
20  Q  And is it modified as you described earlier to get a
21  standardized description name?
22       MR. ROBERTSON:  Objection to the characterization of
23  the witness's testimony.
24       THE COURT:  I don't think he said that.
25  Q  Why is it modified?

1540

1  A  It's modified for usually two purposes.  One, if the
2  description is greater than 30 characters, the field only holds
3  30 characters, and you want to have something that reasonably
4  describes the item that your users would know is the item that
5  you are trying to purchase or requisition on.
6       But also what we'll have, as I said earlier, is many of
7  the institutions or the customers will actually come up with
8  standard terminology for the items to help -- they can do
9  searches quicker, and it helps their employees as they move
10  around in the organization.
11  Q  What about price, is that a modified information?
12  A  The price is typically going to come from --
13       THE COURT:  Yes or no?
14       THE WITNESS:  It's not modified, no.
15  Q  Can it be modified?
16       MR. ROBERTSON:  Objection, Your Honor.  The witness
17  has answered the question, no, it's not modified.  I think it's
18  an improper question.
19       MS. STOLL-DeBELL:  I asked can it be.
20       MR. ROBERTSON:  What is the relevance then, Your
21  Honor?
22       THE COURT:  If it's not ever, whether it can be or
23  not seems to be irrelevant.  Sustained.
24  Q  Mr. Christopherson, is it ever modified?
25       MR. ROBERTSON:  Objection, Your Honor.

1541

1       THE COURT:  Wait a minute.  I've got to deal with a
2  contempt problem here.  I'm in contempt.  I forgot to put that
3  thing --
4       MS. STOLL-DeBELL:  I thought you were going to say
5  I'm in contempt, Your Honor.  I was a little worried there for
6  a minute.
7       THE COURT:  All right.  Sorry.  Nobody can be
8  listening and paying attention to what you're doing while I was
9  in contempt which is why I keep these things out of the
10  courtroom.  I'm terribly sorry.
11       Ask your question again.  Don't answer, please, sir,
12  because there's obviously going to be an objection.  Now with
13  my contempt purged, let's go ahead.
14       MS. STOLL-DeBELL:  Let me back up and ask this a
15  different way.
16       THE WITNESS:  Sure.
17  Q  The price information that is put into the item master
18  database, is that a public list price that the vendor sells the
19  item for?
20       MR. ROBERTSON:  Objection, relevancy.
21       MS. STOLL-DeBELL:  Your Honor, this goes to, again,
22  whether the information in item master is published by a
23  vendor, whether this price field specifically is generally
24  available or not.
25       THE COURT:  How does he know that?  That's something

1542

1  that this record testified -- the testimony on this record is
2  that whatever prices are set are between the vendor and the
3  Lawson customer, and it may be sometimes they are and sometimes
4  they aren't, depending upon what goes on is the testimony.  So
5  how can he know that?  I don't understand how he can even
6  answer the question because he's got how many, 300, 400
7  customers?
8        MS. STOLL-DeBELL:  More than that.  May I lay a
9  foundation?
10       THE COURT:  More than that, okay, I'm sorry.  I
11  didn't mean to diminish the size of the company's business, but
12  how many?  Thousands of customers?
13  Q   How many customers does Lawson have for these products?
14  A   For these specific products, I couldn't give you a firm
15  answer on that.
16       THE COURT:  It's so many he doesn't even know, and
17  you are asking him to say what happens in situations -- how do
18  you turn these things off?  Consign it to the office, please.
19  Third contempt yields a prison sentence.  I am sorry.
20  Sustained.
21  Q   After this information is transformed, it looks like the
22  next step says, customer loads new info into the Lawson
23  database?
24       MR. ROBERTSON:  Objection.  It's leading, Your Honor.
25       THE COURT:  She just describing what's on the slide.

1543

1  She didn't get a question out yet.  Okay, now ask the question
2  again.
3  Q   Is the last step on this slide to load new information
4  into the Lawson database?
5  A   Yes.
6  Q   And is the information that is loaded into the Lawson
7  database the information that was just transformed as we talked
8  about earlier?
9  A   Yes.
10  Q   And it looks like there are three different tables on this
11  demonstrative?
12  A   Correct.
13  Q   Why are there three separate tables there?
14  A   Those are the three tables that data is commonly loaded
15  into.  Depending on what else they are adding, it may go into
16  some additional tables.
17  Q   So is it fair to say that even after the information is
18  transformed, that it is then divided up and sent to different
19  tables within the Lawson database?
20  A   Correct.
21  Q   After this information is extracted, transformed, and
22  loaded, is it different than the information that was received
23  from the vendor?
24       MR. ROBERTSON:  Objection, Your Honor, relevancy.
25       MS. STOLL-DeBELL:  Your Honor, it goes to whether

1544

1  it's generally known and whether item master --
2        THE COURT:  Whether what's generally known?
3        MS. STOLL-DeBELL:  The information in item master as
4  it has been loaded in.
5        THE COURT:  Whether the contents of item master are
6  generally known doesn't have anything to do with this case.
7  It's whether the information that goes into item master is
8  generally known whether we're litigating, I think.  Objection
9  sustained.  It's confusing in addition to the extent it has
10  marginal relevance.
11  Q   We're going to switch topics.
12  A   Okay.
13  Q   Mr. Christopherson, have you watched the recorded
14  demonstrations that Dr. Weaver did showing the functionality of
15  Lawson's accused software?
16  A   Yes.
17  Q   Let's pull up PX-363.
18       MR. ROBERTSON:  I'm going object to this line of
19  questioning if we're going to be commenting -- we're going to
20  have a witness comment on the demonstrations that an expert has
21  performed.  It's inappropriate lay witness testimony.
22       THE COURT:  It seems to me like maybe it offends the
23  lay witness provision, depending upon what it is, because the
24  lay witness provision explicitly says that you can't garb lay
25  witness opinion in -- I mean expert opinion in lay witness garb

1545

1  and get it in that way.
2        Otherwise, if he's testifying on the same subjects as
3  Dr. Weaver was testifying about, then he'd be giving expert
4  testimony, and he does not qualify.  He hasn't qualified as an
5  expert or given a report.  Why isn't it improper lay testimony?
6        MS. STOLL-DeBELL:  Because I'm simply going to ask
7  him questions about what the software does.  I am not going to
8  ask him to apply the function of the software to the claims in
9  this case.  I am merely going to go in and ask questions about
10  the demonstrations that Dr. Weaver did and how Lawson software
11  works.
12       THE COURT:  Using that exhibit.
13       MS. STOLL-DeBELL:  Yes.
14       THE COURT:  All right.
15       MR. ROBERTSON:  I still press the objection, Your
16  Honor, because I think it's improper for this witness to be
17  testifying as to what Dr. Weaver presented as an expert witness
18  in his demonstrative.
19       THE COURT:  Why don't we take it question by question
20  and see.  Now, before we get too far removed on the previous
21  question, your question -- from the previous question.  Your
22  question was, what was his opinion as to whether or not the
23  information, when it got finished with ETL, was different from
24  when it started ETL; is that right?
25       MS. STOLL-DeBELL:  Yes.

1786

1   instructions that we think will be appropriate.

2     THE COURT:  Several?  How about one good one?

3     MS. STOLL-DeBELL:  One with many facets, Your

4   Honor.

5     THE COURT:  Listen, I'm going to make you sit

6   on the jury.  I think every lawyer ought to have to

7   sit on a jury and ought to have to listen to these

8   instructions and try to figure out what do they mean.

9   Because if you read them from the jury's standpoint,

10   particularly these model instructions in the patent

11   area, what they're doing is -- nobody has really made

12   a real good effort to simplify them yet.

13     Judge Spencer did better in SAP in

14   simplifying the instructions than almost anybody I've

15   ever seen, but there have with some legal changes

16   since that time that prohibit me from adopting them

17   full scale.

18     All right.  That takes care of them.  I'm not

19   real hopeful that you're going to get your evidence or

20   I don't think you ought to be hopeful that you're

21   going to get that evidence in, Mr. Robertson, because

22   it seems to me it invites the jury to speculate and

23   it's a problem, I think.

24     MR. ROBERTSON:  I understand, Your Honor.

25   We're also concerned about prejudice given the fact we

1787

1   proffered that in good faith when it came up with the

2   witness that he had a lay opinion as to his intent.  I

3   thought it was relevant then because his lay opinion

4   as to the intent I didn't think was very persuasive,

5   but if you go get a legal opinion on these issues that

6   obviously involve the patents, and then you make the

7   conscious decision not to disclose it, I think that's

8   part of the circumstantial evidence they can consider.

9     I understand Your Honor's ruling.

10     THE COURT:  I haven't rules.

11     MR. ROBERTSON:  I understand Your Honor's

12   suggestion which way you might rule, but you're going

13   to be fair and read the papers.

14     THE COURT:  I thought maybe if I gave you all

15   some insight into where I was right now since we're on

16   the fly that your arguments might be better informed

17   in the morning, just as my thinking will be better

18   informed if I read what you-all tendered for me to

19   read.

20     Thank you so much for the overnight present.

21   I appreciate it.

22

23     (The proceedings were adjourned at 5:26 p.m.)

24

25

1788

1789

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE EASTERN DISTRICT OF VIRGINIA
3               RICHMOND DIVISION
4
5    ---------------------------------
6    ePLUS, INC.          : Civil Action No.
                          : 3:09CV620
7    vs.                  :
                          :
8    LAWSON SOFTWARE, INC.    : January 14, 2011
                          :
9    ---------------------------------
10
11      COMPLETE TRANSCRIPT OF THE JURY TRIAL
12        BEFORE THE HONORABLE ROBERT E. PAYNE
13    UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001
20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23
24      Peppy Peterson, RPR
        Official Court Reporter
25      United States District Court
```

1790

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402
```

1791

```
1                P R O C E E D I N G S
2
3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
6    Mr. Michael G. Strapp represent the plaintiff.
7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
9    the defendant.  Are counsel ready to proceed?
10       MR. ROBERTSON:  Plaintiff is, Your Honor.
11       MR. McDONALD:  Yes, we are.
12       THE COURT:  All right.  Ladies and gentlemen, I'm
13   pleased to report to you my unofficial survey that the economy
14   is recovered.  For the first time in 40 years of trading at the
15   Westhampton Bakery, I had to wait 20 to 30 minutes even to get
16   served, and this the lowest period of the year for that bakery,
17   they tell me.  So I just wanted you to know, but I told them I
18   was waiting because I had promised you would get your donuts
19   and I don't want to be guilty.
20       Dr. Shamos, I saw him earlier.  Dr. Shamos, I remind
21   you -- everybody is renaming you, aren't they?
22       THE WITNESS:  We'll see.
23       THE COURT:  I remind you you are under the same oath
24   you took yesterday, sir.
25       THE WITNESS:  Yes, sir.
```

1792

```
1        THE COURT:  Thank you.
2
3        MICHAEL I. SHAMOS,
4    a witness, called by the defendant, having been previously
5    duly sworn, testified as follows:
6            DIRECT EXAMINATION
7    BY MR. McDONALD:  (resuming)
8    Q   Good morning, Dr. Shamos.  How are you?
9    A   Good morning.  I'm good.
10   Q   I would like to pick up where we left off, if I got it
11   right anyway here this morning, with this slide showing some of
12   the elements of claim one of the '516 patent on this slide that
13   you put together.  Can you walk us through --
14       THE COURT:  Mr. McDonald, excuse me.  Just for
15   orientation purposes, when we left off, you had said that you
16   were going through each claim one by one to show, and that's
17   what you are doing.
18       MR. McDONALD:  Thank you, yes.
19       THE COURT:  I said it's a good time to take a break,
20   so that's what we'll be doing now, is hearing Dr. Shamos's
21   opinion on each claim that's at issue.
22   Q   We have the 12 claims.  We're going to take them one at a
23   time; right, Dr. Shamos?
24   A   Yes.
25   Q   Okay.  So let's start here with what you have on your
```

1793

1   slide, claim one of the '516 patent. Can you walk us through
2   your thought process as you put this slide together to explain
3   your opinion about that claim?
4   A   Yes. What I did here was I took each one of the asserted
5   claims. I think the text of each claim is present in its
6   entirety, and I splint them out element by element, and where I
7   had a comment relating to that element, I put it in blue.
8       So the first element of the '516, claim one, is a
9   collection of catalogs of items stored in an electronic format,
10  and as I explained yesterday, there certainly is no collection
11  of catalogs. So that element isn't present.
12  Q   Why don't we stop there for a moment, because I passed
13  over a slide yesterday, but I think we can come back to that
14  now today. If we can go to slide ten that talks about the
15  catalog issue. This is another slide you created; right, Dr.
16  Shamos?
17  A   Yes.
18  Q   So this relates to claim one of the '516 patent that we
19  started talking about today.
20      MR. ROBERTSON: Your Honor, I am going to object to
21  this slide. I apologize.
22      THE COURT: Wait a minute. Take the slide off,
23  please.
24      MR. ROBERTSON: The last bullet point, Your Honor, as
25  addressed before, it says item master not published by a

1794

1   vendor. This was something that Your Honor addressed with Mr.
2   Christopherson. That's not consistent with the Court's claim
3   construction. The item master doesn't have to be published by
4   a vendor. I think you took that up before.
5       THE COURT: This is his reason for doing it. We'll
6   deal with all of that later, I think.
7       MR. McDONALD: Your Honor, just to be clear --
8       THE COURT: Excuse me. I'm sorry. This is his
9   reason for his opinion, and I think he's entitled to give that.
10  Whether he's right or not, it's what you and Mr. McDonald will
11  have to argue to the jury.
12      MR. McDONALD: So you know, we tried to go through
13  all these slides last night, and I thought actually this one
14  had been approved by ePlus's attorneys, and I'm trying to only
15  go through the slides today we've already cleared up. So I
16  apologize for any glitches we have.
17      THE COURT: I don't know that there was a glitch.
18  Anyway, the objection is overruled, and you may proceed. Put
19  it back up, please, sir.
20  Q   So, Dr. Shamos, this was the slide you put together that
21  relates to the word catalog as defined by the Court in all the
22  various claims that use the word catalog; is that right?
23  A   Yes.
24  Q   So it's not just claim one of the '516 patent, right, that
25  we're talking about when we talk about catalogs?

1795

1   A   That's right. It's any time the word catalog is used.
2   Q   Okay. So why don't you take us a bullet point at a time
3   and a take a pause here, and maybe I can ask you a question
4   between each bullet point to tell us about your analysis here
5   of the catalogs issue in this case.
6   A   Okay. Well, we have to look at where the data in item
7   master comes from, because item master starts out empty when
8   the system is installed. The purpose for the system is to
9   allow a user at a particular company, particular licensee of
10  this software, to be able to select items that he wants to have
11  supplied to him, wants to order.
12  Q   Let me stop you there. Do you look at that as the same
13  purpose or a different purpose from a catalog as the Court has
14  defined it?
15  A   The purpose for a catalog is to allow somebody to know
16  what a vendor is offering, what their menu of selection is that
17  they can buy. That's the purpose of the catalog.
18  Q   Is that the purpose of the Lawson item master?
19  A   Yes.
20  Q   Is the purpose of the item master of the Lawson system to
21  show the products that a vendor is offering to sell?
22  A   No. It's to show the set of products that this company is
23  possibly interested in buying.
24  Q   So I'll let you continue then through the bullet points.
25  A   Yes. So, there are many different ways in which data can

1796

1   get into item master. One way is that vendors make available,
2   in an electronic form, the list of products that they offer.
3   The customer can then choose from among those products the ones
4   that it would like to load into item master. That's one way.
5       Another is it doesn't even have to start from a vendor.
6   It can be from databases that already exist at the customer.
7   The customer can decide to load those into item master.
8       Now, it's conceivable that somebody could take a vendor's
9   catalog and load absolutely everything that was in that catalog
10  that would fit into item master, into item master. In that
11  case, I wouldn't see any particular difference between the
12  vendor's catalog and item master. I don't have any evidence
13  that that ever occurred or ever does occur.
14  Q   In your report, I think when you were addressing this
15  issue, you talked in terms of a phonebook and an address book;
16  do you recall that?
17  A   Yes.
18  Q   Can you explain how that would relate here to your
19  analysis of the issue you were just talking about?
20  A   Yes. Well, I have an address book, as many people do. It
21  contains a list of people that I have a feeling that sometime
22  in the future I may want to contact or may want to call or may
23  want to write to, and one way to construct an address book is
24  to go through the phonebook, look up the phone numbers of the
25  people that you are familiar with, and you write those into

1797

1    your address book.
2        You can think of the phonebook as the phone company's
3    catalog.  It's the list of people that are available to be
4    called by that phone company.  But an address book is not the
5    same thing as that.  The address book is uniquely crafted by
6    me.  It's my selection of those people that are callable that
7    I'm interested in calling.
8    Q   Is it your understanding that under Dr. Weaver's analysis,
9    would he consider that address book in your example there a
10   catalog as the Court has defined it or not?
11   A   That's my understanding.
12   Q   What is your understanding?
13   A   Of his opinion.
14   Q   What is your understanding?
15   A   My recollection from --
16       THE COURT:  Just a minute.  He doesn't have any way
17   of answering what Dr. Weaver testified to in court, because he
18   doesn't know, he was excluded, and what he remembers of Dr.
19   Weaver's report isn't appropriate for examination because the
20   reports don't come into evidence.
21       It's only the testimony that comes into evidence, and
22   so I don't think either one of you need to be questioning what
23   the other expert did in his report.  Those reports are done for
24   purposes of giving opinions and having preliminary matters.
25   The only purpose of it here in court, of the report here in

1798

1    court is if an expert testifies beyond the scope of the report,
2    you need -- either one of you objects to it, to tell me what
3    the problem is, and I rule that he can't or can testify
4    depending upon whether the report covered that topic.
5        Otherwise, we're get -- what we're doing is actually
6    letting in the back door hearsay testimony about the other
7    person's report, and if the Doctor didn't testify to that in
8    court, and he doesn't have any way of knowing what Dr. Weaver
9    testified to, he can't be examined about that.  So let's don't
10   be asking him, anybody about the other expert's report or their
11   testimony because they don't know.
12   Q   In your --
13       THE COURT:  There's a way to frame questions that
14   deal with whatever was said, but that's up to you.  You know
15   how to do that.
16   Q   In your example, Dr. Shamos, regarding your personal
17   address book, if I understood right you are saying your address
18   book is not like a published phonebook?
19   A   That's right.
20   Q   Even though -- now, in your example, did some of the data
21   in your address book originate from the phone company's
22   published phonebook?
23   A   Yes.  That's where phone numbers come from.
24   Q   Does that change your answer as to whether your personal
25   address book is a published phonebook or not?

1799

1    A   No.
2    Q   Why don't you go ahead and continue with this slide.
3    A   Yes.  So the third bullet point, even if a customer loads
4    all item data from a published vendor catalog, that is if it
5    only comes from one place, that still doesn't mean it's a
6    catalog within the Court's construction.
7    Q   Why is that?
8    A   It was not emitted by a vendor.
9    Q   It was not?  I'm sorry?
10   A   It was not emitted, it was not distributed by a vendor.
11       THE COURT:  Just a minute.  The Court's construction
12   doesn't have anything to do with distributed by a vendor.  It
13   has published by a vendor.  That testimony -- what he just did
14   is give claim construction.
15       Let's keep it to the claim construction, please, the
16   questions, because it's hard enough for the jury to follow
17   technical issues in any patent case without having to undo what
18   has been done here.  So just, please, straighten it out.
19   Q   Maybe it would be useful, Dr. Shamos, if we just go to
20   slide ten, please.  This is some analysis that you did as to
21   why an item master in the Lawson system is different from the
22   catalog as defined by the Court; is that right?
23   A   Yes.
24   Q   Can you walk us through one bullet point at a time,
25   please, what you put together in this slide.

1800

1        MR. ROBERTSON:  Your Honor, can I just have a running
2    objection to that?  First, it calls for a narrative, but
3    secondly, this has to do with our earlier issue with respect --
4        THE COURT:  He's now explaining the basis for his
5    opinion.
6        MR. ROBERTSON:  I understand, Your Honor.
7        THE COURT:  Under certain parameters, he can do
8    that, but if he starts -- you understand the reason why I'm
9    concerned in this particular case, do you not?
10       MR. McDONALD:  I understand you want us --
11       THE COURT:  Let me see counsel up here for just a
12   minute.
13
14       (Discussion at sidebar as follows:)
15
16       THE COURT:  My concern is I have excluded a great
17   number of his opinions, and I don't -- unless the questions are
18   framed in a way that Mr. Robertson knows what is coming, then I
19   get confronted with the situation that I have to go back and
20   undo, and that creates confusion in the minds of the jury.  And
21   I believe the expert, just like Dr. Weaver did, has the
22   opportunity to explain his opinions, but I think other than
23   just turning him on and turning him loose, if you could keep a
24   handle on it, that will solve that problem.  Then if there is
25   an objection -- I mean, you've seen this big thing they've

1801

1  filed about what opinions are in and what aren't, and in this
2  particular case, I think we'll be better able to handle it
3  without having to undo anything, if, in fact, it needs undoing.
4  Do you see what my problem is here?
5       MR. McDONALD:  I do exactly, Your Honor.  I'm going
6  to give you a little context here.  That's one of the reasons
7  why we meticulously went through every slide that I'm going to
8  go through with ePlus's counsel before we got in here.  So
9  there's no surprises, at least on the slides, so it's really
10  going to guide things.  This slide, they've approved this
11  slide, and I'm not touching any slides today they haven't
12  already seen.
13       MR. ROBERTSON:  I understand --
14       THE COURT:  But you going to have to -- if, in fact,
15  there's an excursion in an answer you're going to have to stand
16  up and do something about it immediately.  It's impossible for
17  me to undo something once it's been said.  That said, I think
18  it's only fair that an expert have a chance reasonably to
19  explain his opinion.  That's just the way it's been done.
20       MR. ROBERTSON:  I appreciate that, Your Honor, but I
21  think his opinions still need to stay within the boundaries of
22  the Court's claim construction.  They have to be relevant to
23  the Court's claim construction, and they can't deviate from the
24  Court's claim construction.  So as long as -- I will be
25  objecting if he starts to suggest that your claim construction

1802

1  can be satisfied by his, as he just did, essentially rewriting
2  it to suit his opinions.
3       THE COURT:  You see, he got into distributed in his
4  answer.  You didn't ask him --
5       MR. McDONALD:  You said something about emitted or
6  something.
7       THE COURT:  That isn't distributed.
8       MR. McDONALD:  With the slides, I'm really trying to
9  get him to stick to his bullet points here --
10       THE COURT:  I know.  That's one of the reasons I'm
11  saying all this, is if you have control of it, it's easier.
12       MR. McDONALD:  I'll try to focus my questions a
13  little more, but I do have a concern if Mr. Robertson is going
14  to say, well, I know the slides, I'm going to keep objecting to
15  what's on the slides, because we had a lot of give-and-take
16  over what's in these slides.  I don't want him to come in after
17  we've already given up some things and say, okay, now that
18  you've given up your stuff, I'm going to take more away.  I
19  think if it's on the slides, we've already agreed to that.
20       THE COURT:  Mr. Robertson, he says basically you have
21  agreed that as to the things on the slides, the area of
22  testimony can be covered; is that true?
23       MR. ROBERTSON:  I've agreed that this slide can be
24  covered.  What I didn't like about the question, Your Honor, is
25  it was give us all the reasons why you are now going to say

1803

1  that these points here satisfy or don't satisfy the Court's
2  claims construction of catalog.
3       THE COURT:  I think he can do that point by point.
4       MR. McDONALD:  At least we have an agreement that as
5  to the slides themselves, we've already agreed.
6       THE COURT:  Have you?
7       MR. ROBERTSON:  Yes.
8       MR. McDONALD:  I'll just try to keep it real tied to
9  these slides, and that should keep us out of trouble.
10       THE COURT:  Thank you.
11
12       (End of sidebar discussion.)
13
14       THE COURT:  I thought this would make things go a
15  little better, I think.
16  Q  Dr. Shamos, I think we were on the first bullet point
17  here.  Had you finished talking specific about what the point
18  was you were making on that first bullet point on slide number
19  ten that's up on the screen right now?
20  A  I actually thought we were about to do bullet point number
21  four.
22  Q  That shows you how good my memory is.  Why don't we zero
23  in now on bullet point number four, item master is created by
24  the customer and includes this data.  Can you tell how that
25  specific point, sticking with that point, relates to your

1804

1  opinion in this case?
2  A  Yes.  Certainly there's information about an item that
3  comes from a vendor.  For example, typically the part number of
4  the vendor, the number you would use to specify what product it
5  is you'd like to order, that's created by the vendor.  That's
6  part of the vendor's data.
7       So some of the data that goes into item master does come
8  directly from a vendor.  There's other information that doesn't
9  come directly from a vendor.  For example, the way the customer
10  chooses to describe the product, the name of it, relates to the
11  terminology that happens to be used in that company.  It may
12  not be the same as the name of the product in the vendor's
13  catalog, but, undoubtedly, some of the data that's going to end
14  up in item master has come from the vendor originally.
15  However, it's the vender -- it's the customer that's doing the
16  selection of which pieces of data it chooses to include in item
17  master.
18  Q  You have another slide that goes into that issue in a
19  little more detail; right?
20  A  Yes.
21  Q  So for those reasons, your bottom line here is this is why
22  the Lawson item master is not a catalog as the Court has
23  defined that term?
24  A  That's right.
25  Q  Let's go to slide ten now.  I'm sorry.  Can you

1805

1  give me a few other examples of the sort of information that a
2  customer adds to the item master that would not come from a
3  vendor?
4  A   Yes.  The customer can add special pricing information, if
5  it gets a discount, it adds information about quantity on hand
6  that it may have in its own inventory.
7  Q   How about approval process, are you aware of whether
8  customers sometimes have information in there about approval
9  process?
10  MR. ROBERTSON:  Objection, relevancy.
11  MR. McDONALD:  It's just another example of the
12  things we've already been talking about.
13  THE COURT:  As I recall it, the software, from the
14  testimony that your witness has put on, there's a special way
15  to get the customer approval, and that's not being accused in
16  the case.
17  MR. McDONALD:  I'm talking actually about the
18  information in the item master that relates to the approval
19  process.
20  THE COURT:  I see.  All right.  Overruled.
21  A   I don't have a specific recollection of that.
22  Q   I think you already talked about the issue of special
23  pricing.  I think we covered that one, didn't we?
24  A   Yes.
25  Q   Let's move on then.  Do you have an understanding as to

1806

1  what ePlus contends is the number of catalogs that would be in
2  a typical Lawson item master or not?
3  MR. ROBERTSON:  Objection.  There's no contention by
4  ePlus to a typical number of catalogs that can be item
5  master.  There's no foundation for that.
6  MR. McDONALD:  If he doesn't, he doesn't.  I guess if
7  they're agreeing to that, I guess fine.
8  THE COURT:  It's not a contention, it's not relevant,
9  so I agree with that.  It's not been raised in anything that's
10  come up in the case yet, so I sustain the objection to it.
11  Q   So in your opinion, Dr. Shamos, is the item master in the
12  Lawson system published by anyone?
13  A   No.
14  Q   Let's pick up again and go back to slide 21, please.  So
15  we've talked about '516, claim one, element A so far.  Can we
16  now go to element B, please, and tell us your analysis specific
17  to element B of claim one of the '516 patent?
18  A   Yes.  Well, element B is a first set of predetermined
19  criteria associated with said collection of catalogs.  In
20  the patent, the first set of predetermined criteria are used
21  for selecting less than the entire collection of catalogs, and
22  it's not possible to do that in the S3 system, so there aren't
23  such a set of criteria.
24  THE COURT:  Excuse me just a minute.  Is it not
25  possible because there's no -- in your view, because there's no

1807

1  catalogs?
2  THE WITNESS:  No.
3  THE COURT:  Or is it not possible for some reason
4  independent of your view that there's no catalog?
5  THE WITNESS:  Let's assume hypothetically that item
6  master were a catalog, or even --
7  THE COURT:  Assume that it has catalogs in it.
8  THE WITNESS:  Let's assume that it has catalogs in it
9  hypothetically.
10  THE COURT:  Your first element is, it doesn't include
11  a collection of catalogs.  What I'm asking you is very simple.
12  Is your opinion on the second point based on the fact that
13  there's no collection of catalogs, or is it based on some
14  independent reason?
15  THE WITNESS:  It's independent, Your Honor.
16  THE COURT:  Good.  Go ahead and explain that then.
17  Thank you.  I just needed to understand that.  So it's the
18  second reason, all right.
19  Q   What is the additional reason you are talking about
20  specific to element B of claim one?
21  A   Because even if item master were considered to be a
22  collection of catalogs, there's no way of selecting less than
23  all of them.  There's no mechanism within S3 to do that.
24  Q   Why don't we go to the next slide, please.  Here you've
25  got the element that you have labeled C of claim one of the

1808

1  '516 patent; right, Dr. Shamos?
2  A   Yes.
3  Q   Can you explain to us the reason why you say that element
4  is not satisfied in the Lawson item master -- or the Lawson
5  system?
6  A   Yes.  The second set of predetermined criteria that really
7  are the searching criteria, what items would I like to find for
8  possible ordering, and there, the reason that element C is not
9  present, that ties in to element A which is if there's no
10  catalog, you can't have predetermined criteria for associated
11  with items from the catalog.
12  Q   So for this one, you say it's not satisfied because
13  there's no catalogs again?
14  A   That's right.
15  Q   Let's move to the next slide.  This goes to the fourth
16  element that you've labeled as D of claim one of the '516
17  patent; correct?
18  A   Yes.
19  Q   Now, this is kind of a longer element that you've got on
20  the slide that fits the black type on your slide; correct?
21  A   The black type is the remainder of the claim language for
22  element D.
23  Q   So can you summarize for us what your reasoning was
24  specific to this element?  I'm not asking you to read the whole
25  element unless it's absolutely necessary, but can you summarize

1817

1  whether or not the Lawson accused system satisfies that element
2  of claim nine?
3  A   Yes.  In order for there to be a second identification
4  code, there has to be a second catalog, and even if there's one
5  catalog, there weren't two catalogs in S3.  So that element
6  can't be present.
7  Q   Is there some language in this element about the second
8  item being, quote, generally equivalent?
9  A   Yes.
10  Q   Do you have an opinion as to whether in the Lawson system,
11  the Lawson systems accused here, satisfy that part of that
12  element?
13  A   There's no notion in the Lawson systems of general
14  equivalents.  There's no way to ask the system for a generally
15  equivalent item.
16  Q   Do you have an understanding as to what aspect of the
17  Lawson system is dependent in this case to satisfy that part of
18  that element?
19  A   Only from expert reports.
20  Q   Let's go to slide 30 then, if we can turn to that, Bill.
21  Dr. Weaver, did you look at --
22      MR. ROBERTSON:  Dr. Weaver?
23  A   I am Shamos.
24      MR. McDONALD:  I made it this far today.
25  Q   Dr. Shamos, did you look at all at the issue of whether or

1818

1  not in the Lawson system the use of the UNSPSC codes would
2  satisfy any claim elements of any of the asserted claims in
3  this case relating to generally equivalent items?
4  A   Did I look at that?
5  Q   What was your conclusion about that?
6  A   That it doesn't.
7  Q   Why not?
8  A   So, the UNSPSC code is a generally accepted international
9  coding to categorize products.  There's a big difference
10  between desks and chairs, and so if you gave a code to desks,
11  you could immediately tell that something was a desk and it
12  wasn't a chair.  And it happens to be hierarchically organized.
13      That is, it has different levels, so you can get to office
14  furniture, and then within office furniture you could have
15  desks, and then within desks you can desks with drawers or
16  without drawers, et cetera.
17      The Lawson software does provide the ability for a
18  customer to enter UNSPSC codes into the item master database if
19  he wants to do that, and sometimes it's useful for people who
20  are ordering things to know what the UNSPSC code is associated
21  with a particular item, but those UNSPSC codes are not used for
22  the purpose of determining whether things are generally
23  equivalent.
24      There's no automatic conversion.  I can't go and say, if
25  you're out of stock of this product, please give me another one

1819

1  that has the same UNSPSC code.  So there's no converting that's
2  going on.  There's no matching that goes on with respect to
3  UNSPSC codes even though they may be physically present in the
4  database.
5  Q   You have here, and this is another slide we have up on the
6  screen that you prepared; is that right?
7  A   Yes.
8  Q   On the last point there, what's the last bullet point?
9  Can you explain what you meant by that?
10  A   It's only within RSS, not the totality of the systems that
11  are accused.  It's only RSS that allows even searching of the
12  UNSPSC code.
13  Q   Can we turn to the next slide, please, 31.
14  A   Yes.
15  Q   Is this another slide you put together, Dr. Shamos?
16  A   Well, I put it together, but literally it's copied out of
17  a white paper that was published explaining what UNSPSC codes
18  are.  So I didn't write the words that are on the slide except
19  for the title.
20      THE COURT:  In other words, you made the slide.
21      THE WITNESS:  I made the slide.  I had an electronic
22  copy of that white paper.  I had it on the screen.  I used a
23  photo editor, and I did a screen capture and then cropped it
24  down and stuck it on the slide directly out of that UNSPSC
25  white paper.

1820

1  Q   Can you tell us in a nutshell, Dr. Shamos, what your main
2  point was for putting together this particular slide as it
3  relates to your testimony here?
4  A   Yes.  It was to show this eight-digit classification of
5  items and why it's hierarchical.  This is the UNSPSC
6  explanation of what these codes look like.  The code, as you
7  can see at the bottom where it says pen refills equals UNSPSC
8  classification 44-12-19-03.
9      The significance of those numbers, 12, 19, and 03, depend
10  on the fact that they are coming from 44.  So 44 is office
11  equipment, accessories, and supplies.  Within that, 12 is
12  office supplies.  Within 12, 19 is ink and led refills, and
13  within 19, 03 is pen refills.  And so what 44-12-19-03 tells
14  you is it's a pen refill.
15      It doesn't tell you what kind of pen, and so if I want to
16  buy a refill for my pen, it's going to have to have -- if
17  there's any UNSPSC classification at all, it's going to have to
18  have 44, 12, 19, 03, but I can't just buy any pen refill.  It
19  has to fit in that particular pen.  So these UNSPSC codes don't
20  describe substitutable or generally equivalent items.
21  Q   Can we turn to the next slide, please, number 32.  I think
22  you've essentially already covered the first three bullet
23  points on this slide?
24  A   Yes, we can go right to number four.
25  Q   What was your point with bullet point number four?

2045

ENG - REDIRECT          2045

1   and get these binders that you sent up here at the

2   very beginning, not now, because you-all are both

3   adopting a new mode, and I need the space to put in

4   the exhibits that you are using.

5        I'd like to say that I'd like to commend, and

6   it's obvious to me there's been some hard work put in

7   by the legal assistants in this case.  There have been

8   very few problems, and when there have been problems,

9   they have been solved immediately.  And you can't do

10  that unless you know what you're doing.

11       And the IT people, I think you-all have done

12  a fine job, too.  Of course, the lawyers.  I don't

13  mean to take anything away from you, but I remember

14  well who does most of the work.

15       MR. McDONALD:  Your Honor, just one more

16  thing with respect to that last video that Ms. Huey

17  would like to offer.

18       MS. HUGHEY:  I'd like to offer it as

19  Defendant's Exhibit 401.

20       THE COURT:  What is it?

21       MS. HUGHEY:  This is the transcript of what

22  was read in.  My understanding is that

23  Ms. O'Loughlin's deposition transcript was read in, I

24  believe, and it will be marked as an exhibit for the

25  record.

2046

ENG - REDIRECT          2046

1        THE COURT:  Any objections?  It's admitted.

2        THE CLERK:  What number is that?

3        THE COURT:  401.  Defendant's 401.

4        (Defendant's Exhibit 401 is admitted into

5   evidence.)

6        THE COURT:  All right.  Anything else anybody

7   has so we can get ready to go on Tuesday morning?

8        MR. McDONALD:  Nothing else, Your Honor, for

9   the defense.

10       THE COURT:  All right.

11       MR. ROBERTSON:  Sorry, Your Honor.  I didn't

12  hear you.

13       THE COURT:  I just want to know if there's

14  anything else so that we can solve it and get going

15  and actively out of the box at nine o'clock Tuesday

16  morning.

17       MR. ROBERTSON:  Nothing by the plaintiff.

18       THE COURT:  Okay.  That sounds good.  All

19  right.

20

21       (The proceedings were adjourned at 5:20 p.m.)

22

23

24

25

2532

```
1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
2                  RICHMOND DIVISION
3       _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                 :
4      ePLUS, INC.,              :
                                 :
5              Plaintiff,  :  Civil Action
       v.                   :  No. 3:09CV620
6                           :
       LAWSON SOFTWARE, INC.,    :
7                           :  January 20, 2011
               Defendant.   :
8       _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:
9
          COMPLETE TRANSCRIPT OF JURY TRIAL
10        BEFORE THE HONORABLE ROBERT E. PAYNE
          UNITED STATES DISTRICT JUDGE, AND A JURY
11
12
13
14     APPEARANCES:
15     Scott L. Robertson, Esq.
       Jennifer A. Albert, Esq.
16     Michael T. Strapp, Esq.
       GOODWIN PROCTOR
17     901 New York Avenue, NW
       Washington, D.C.  20001
18
19     Craig T. Merritt, Esq.
       CHRISTIAN & BARTON
20     909 E. Main Street, Suite 1200
       Richmond, VA  23219-3095
21
          Counsel for the plaintiff ePlus
22
23
24        DIANE J. DAFFRON, RPR
          OFFICIAL COURT REPORTER
25        UNITED STATES DISTRICT COURT
```

2533

```
1      APPEARANCES:  (Continuing)
2      Daniel W. McDonald, Esq.
       Kirstin L. Stoll-DeBell, Esq.
3      William D. Schultz, Esq.
       Rachel C. Hughey, Esq.
4      MERCHANT & GOULD
       3200 IDS Center
5      80 South Eighth Street
       Minneapolis, MN  55402-2215
6
7      Dabney J. Carr, IV, Esq.
       TROUTMAN SANDERS
8      Troutman Sanders Building
       1001 Haxall Point
9      P.O. Box 1122
       Richmond, VA  23218-1122
10
          Counsel for the defendant Lawson Software.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2534

```
1          (The proceedings in this matter commenced at
2      9:15 a.m.)
3          (The jury is not present.)
4          THE CLERK:  Civil Action No. 3:09CV00620,
5      ePlus, Incorporated v. Lawson Software, Incorporated.
6          Mr. Scott L. Robertson, Mr. Craig T. Merritt,
7      Ms. Jennifer A. Albert, and Mr. Michael G. Strapp
8      represent the plaintiff.  Mr. Daniel W. McDaniel,
9      Mr. Dabney J. Carr, IV, Ms. Kirstin L. Stoll-DeBell,
10     Mr. William D. Schultz, and Ms. Rachel C. Hughey
11     represent the defendant.
12         Are counsel ready to proceed?
13         MR. ROBERTSON:  Yes, Your Honor.
14         MR. McDONALD:  Yes, Your Honor.
15         THE COURT:  What do you need to see me about?
16         MR. McDONALD:  I think we worked out all the
17     issues on the Hilliard slides.  I think the only thing
18     that was outstanding was these jury questions.
19         MR. ROBERTSON:  There is also --
20         THE COURT:  I don't need the jury questions,
21     to deal with them now.
22         MR. ROBERTSON:  All right.
23         THE COURT:  Oh, the questions raised by the
24     jury.  Oh, yes.  What do you want to do about the
25     questions?  Where is that thing that was submitted
```

2535

```
1      yesterday?  Court Exhibit 4.
2          Are P.O. Writer and J-CON patented, if so,
3      when?  Didn't Dr. Staats say that it was within a
4      year?
5          Basically, what he said is for them to
6      remember.  So was the J-CON system only used for
7      automotive purposes and couldn't be used, all that big
8      long text is something he testified to or didn't, and
9      they'll have to remember that testimony.  And you-all
10     will address it in argument; is that right?
11         MR. McDONALD:  I think that's fair, Your
12     Honor.
13         MR. ROBERTSON:  Your Honor, I think the real
14     response, what I would suggest, Your Honor, is that
15     just you need not concern yourself with it.  Whether
16     the J-CON system addressed auto parts or medical
17     systems, the J-CON system is not prior art in this
18     case, and that's why they don't need to consider it.
19     Dr. Shamos didn't over any opinions with respect to it
20     and I think this is just ripe for confusion if we say
21     it had some significance.
22         The same thing with were P.O. Writer and
23     J-CON patented.  That's evidence of some confusion on
24     the part of the jury.  First of all, they need not
25     concern themselves with whether J-CON or P.O. Writer
```

2660

Hilliard - Direct                                    2660

1   retained as a consultant?

2   A   Certainly.  Most of the work I've done as a consultant is

3   work where I've been retained by a business that is looking

4   either to upgrade from an existing computer system to a newer

5   computer system to handle their business applications, or in

6   some cases where they were acquiring a system for the first

7   time, and I'm not talking necessarily about a PC and some

8   shrinkwrapped software, but these are the multi user systems

9   running tens of thousands up to millions of dollars for

10  the hardware, the software, and the implementation services.

11       I've also been retained on projects where there were

12  information technology issues or questions that the company

13  needed to have answered or resolved, sometimes with regard to

14  putting together requirements for IT personnel, sometimes

15  interviewing, helping them interview IT personnel, that sort of

16  thing.  But mostly on systems, acquisitions either for upgrades

17  or for systems.

18  Q   Have any of these consulting engagements involved systems

19  having procurement functionality?

20  A   Almost all of them.  Starting -- I actually started my

21  business, Business Automation, the consulting firm, in 1980

22  with the idea that the consulting services would be my primary

23  business.

24       I've done over 200 of the projects, and in the early 1980s

25  was before systems were called enterprise resource planning, or

2661

Hilliard - Direct                                    2661

1   NRP, but most of my clients were looking for systems that are

2   what today we would call these large ERP type systems where

3   they encompass the entire breadth of functionality that a

4   business would need.  In almost every case, procurement, the

5   purchasing was a part of the application, and in many of the

6   cases the key part.

7   Q   What are a few of the companies that you consulted for?

8   A   I have consulted for companies all over the country,

9   Stewart Stamping in New York; Insilco Technologies in North

10  Carolina; Aircraft Gear Corporation, a supplier to Boeing in

11  the Phoenix area; Phoenix Transit, the bus company in the

12  Phoenix area; Schatz Industries in the Phoenix area; Atlas

13  Roofing in Alabama, manufactures roofing materials;

14  manufacturing companies in Idaho; Dowdy Aircraft in St. Louis;

15  a wide variety of companies, many of them in distribution and

16  manufacturing, although I've also worked for publishers such as

17  Taylor Publishing in Texas, New Times Publishing in Phoenix,

18  Arizona, worked for professional organizations, CPA firms,

19  medical practices, and so forth.  So a wide variety of

20  industries.

21  Q   Have you ever been qualified as an expert witness in the

22  field of computer systems and software in prior cases?

23  A   Yes.

24  Q   On how many occasions roughly?

25  A   I've been engaged in over a hundred engagements of this

2662

Hilliard - Direct                                    2662

1   type, information technology related cases.  Most of them

2   settle, of course, before they go to trial, and if they don't

3   go to trial, I don't get qualified, but I've been qualified in

4   both federal and state courts, and I believe four states around

5   the country and in five different federal courts from Arizona

6   and New Mexico to Virginia.

7        MR. McDONALD:  Your Honor, I think he's answered the

8   question on this point, and maybe we can go on to the next

9   question.

10  Q   Have you ever testified in a case involving a system

11  having procurement functionality?

12  A   Several, including one in New Mexico, and, of course, I

13  was involved as an expert in the ePlus v. SAP case here in

14  Virginia back a few years ago.

15  Q   Was that a patent case?

16  A   Yes, it was.

17  Q   Did that involve the same patents as the patents-in-suit

18  here?

19  A   Yes, it does.

20  Q   Have you written any books or had any articles published?

21  A   Both.  I wrote a book called Buying a Computer For Your

22  Growing Business, an Insider's Guide, which was published by

23  Dow Jones Irwin in 1984, and I've had various articles

24  published over the years on IT-related topics.

25       The most recent one was on computer forensics in a legal

2663

Hilliard - Direct                                    2663

1   magazine called For the Defense.

2   Q   Have you been retained for professional speaking

3   engagements?

4   A   Yes, I have.  I've been retained by a number of trade

5   associations and professional associations in the United

6   States, and recently I was retained to go to France to speak to

7   a group of IT-related expert witnesses in Paris.

8   Q   Based on your education and your 40 years of experience in

9   the area of computer technology, what do you consider to be

10  your fields of expertise?

11  A   My fields of expertise are the acquisition,

12  implementation, function, and issues related to usage of

13  business computer systems or computer systems used for business

14  applications including applications such as purchasing,

15  inventory management, sales, accounting, and so forth.

16       MS. ALBERT:  Your Honor, at this time I would offer

17  Mr. Hilliard as an expert in the area of the use of computer

18  systems for business functions including procurement and

19  related activities.

20       THE COURT:  Any objection?

21       MR. McDONALD:  No objection.

22       THE COURT:  He is so qualified as an expert in those

23  areas.

24  Q   Mr. Hilliard, were you retained by counsel for ePlus to

25  provide expert opinions concerning the issues of validity of

2664

Hilliard - Direct                    2664

1   the ePlus patents?

2   A   Yes.

3   Q   In the course of your engagement, have you reviewed and

4   responded to opinions that were rendered by Lawson's expert,

5   Dr. Shamos?

6   A   Yes.

7   Q   In general, what did you do to prepare your response to

8   Dr. Shamos's opinions?

9   A   Well, of course I read his opinions, and I reviewed all

10  the documents that he had referenced in his opinions.  I

11  also -- there are a large volume of documents that have been

12  produced in this case, and I've read through, I think, all of

13  those that relate to the validity of the patents.

14      I've also reviewed the testimony, the deposition testimony

15  of the inventors and those with knowledge of some of the

16  alleged prior art systems.  I've also reviewed testimony from

17  the SAP trial of those same individuals.

18  Q   Did you review the patents that are at issue here in the

19  file histories relating to their prosecution before the Patent

20  Office?

21  A   I did.  Both the patents at issue, and there are some

22  patents referenced that I reviewed in some detail.

23  Q   Did you review Dr. Shamos's expert report?

24  A   Yes, I did.

25  Q   Were you provided with an understanding of the applicable

2665

Hilliard - Direct                    2665

1   legal principles that govern your analyses?

2   A   Yes, I was.

3   Q   Did you have an opportunity to personally review and use

4   any of the alleged prior art systems?

5   A   Well, I have had experience with the PO Writer system

6   during the SAP trial.  SAP was able to produce a copy of that

7   software, and I was able to experiment with it, exercise it,

8   and determine how it functioned.  I did so prior to that trial,

9   and I also did so in court during that trial.

10  Q   Did you review file listings relating to the computer code

11  for that system?

12  A   I did.

13  Q   And do you recall any relevant information about the dates

14  that were included in those file listings?

15  A   Yes.  The dates included both dates preceding and dates

16  following August of 1994.

17      MR. McDONALD:  I'll object, Your Honor, as irrelevant

18  and confusing.  We haven't proffered any, and he's talking

19  about dates of things that weren't in evidence in this case.

20      MS. ALBERT:  I'll move on.

21      THE COURT:  I think he's just relating what he did

22  and his familiarity with the systems at issue.

23  Q   Did you have the opportunity to review the validity report

24  submitted by ePlus's other technical expert, Dr. Alfred Weaver?

25  A   Yes, I did.

2666

Hilliard - Direct                    2666

1   Q   Did you also have an opportunity to review the Court's

2   order concerning the construction of the key terms used in the

3   patent claims?

4   A   Yes.

5   Q   Did you take the Court's claim constructions into account

6   in rendering your opinions?

7   A   Yes.  They were a foundation.

8   Q   Now, turning to some of Lawson's contentions that are at

9   issue here, are you aware that Lawson has alleged that several

10  systems were in public use prior to the relevant August 1994

11  filing date of the ePlus patents?

12  A   I'm aware of that, yes.

13  Q   And what types of evidence do you consider to be relevant

14  to your analysis of this issue of public use?

15  A   My -- when I look at this, I have to look at what evidence

16  is there in documentary form primarily to determine whether the

17  dates of the document can corroborate that the allegedly in-use

18  system was in use and performing the functions that it's

19  claimed to perform, i.e., the functions in the claims before

20  August of 1994.

21      So I look for hard written documentation that has a dating

22  on it that shows that it existed prior to 1994.  I also

23  consider other evidence, but other evidence needs to be

24  corroborated, in my view, with documentary evidence.

25      MR. McDONALD:  Object, Your Honor, to the witness's

2667

Hilliard - Direct                    2667

1   explanation of corroborating.  His own personal standard isn't

2   appropriate or relevant here.

3       THE COURT:  What do you say?

4       MS. ALBERT:  It's relevant to his analysis of what he

5   considered for purposes of trying to determine and render

6   opinions on whether systems were allegedly in public use.

7       THE COURT:  I'll tell you about corroboration in

8   connection with the public use, and so I'll give you the

9   instruction, ladies and gentlemen.  He was just explaining why

10  it is that he confined his -- that he focused principally on

11  documentary evidence.

12  Q   Now, Mr. Hilliard, are you -- in rendering your opinions

13  concerning the validity of ePlus's patents, are you aware that

14  Lawson has alleged that each of the asserted claims at issue

15  here are invalid as being anticipated by the RIMS system as

16  described in the '989 patent?

17  A   I'm aware that's their contention, yes.

18  Q   Do you agree with those allegations?

19  A   No, I don't.

20  Q   Why do you disagree with that?

21      MR. McDONALD:  Your Honor, I don't think we went into

22  the anticipation of RIMS in terms of Dr. Shamos's opinion.  I

23  thought we already went into it --

24      THE COURT:  I lost what you were saying.

25      MR. McDONALD:  Dr. Shamos's testimony was focused on

2796

2796

1    your closing arguments.

2         MR. McDONALD:  I would expect that.

3         THE COURT:  I don't want any problems on Monday

4    morning, so I want you all to show those demonstratives to each

5    other.  Are they ready now?

6         MR. ROBERTSON:  I would suggest we schedule a meeting

7    sometime together Sunday and iron it all out.

8         MR. McDONALD:  I think we can try to come up with a

9    time to exchange, maybe Sunday morning, 9:00 a.m.

10        THE COURT:  All right.  That's fine.  Okay.  That's

11   it then, is it?  All right.  We'll be in adjournment.

12

13        (Court adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25

3078

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE EASTERN DISTRICT OF VIRGINIA
3                 RICHMOND DIVISION
4
5    --------------------------------------
6    ePLUS, INC.           :  Civil Action No.
                           :  3:09CV620
7    vs.                    :
                           :
8    LAWSON SOFTWARE, INC.   :  January 24, 2011
                           :
9    --------------------------------------
10
11        COMPLETE TRANSCRIPT OF THE JURY TRIAL
12        BEFORE THE HONORABLE ROBERT E. PAYNE
13        UNITED STATES DISTRICT JUDGE, AND A JURY
14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     David M. Young, Esquire
17   Goodwin Procter, LLP
     901 New York Avenue NW
18   Suite 900
     Washington, D.C.  20001
19
     Craig T. Merritt, Esquire
20   Christian & Barton, LLP
     909 East Main Street
21   Suite 1200
     Richmond, Virginia  23219-3095
22   Counsel for the plaintiff
23
24        Peppy Peterson, RPR
             Official Court Reporter
25          United States District Court
```

3079

```
1    APPEARANCES:  (cont'g)
2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219
5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3080

```
1              P R O C E E D I N G S
2
3        THE CLERK:  Civil action number 3:09CV00620, ePlus,
4    Incorporated versus Lawson Software, Incorporated.  Mr. Scott
5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and
6    Mr. Michael G. Strapp represent the plaintiff.
7        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8    Kirstin L. Stoll-DeBell, Mr. William D. Schultz represent the
9    defendant.  Are counsel ready to proceed?
10       MR. ROBERTSON:  Yes, Your Honor.
11       MR. McDONALD:  Yes, Your Honor.
12       THE COURT:  All right.  I was very sorry to hear
13   about Ms. Albert's father passing away.  You all both wrote
14   letters about it.  I don't see the point in bringing that to
15   the attention the jury.  Do either one of you?
16       In the old days, when people didn't do what they were
17   supposed to do, they got keelhauled.  I'm about ready to
18   institute that procedure here.  It's time for the jury to get
19   going, and I've had to read all this stuff now.  I told you
20   what to do about this verdict form, and it was pretty easy, and
21   it's unnecessary to go through all this stuff.
22       Now, apparently we're going to have to revise it
23   anyway because -- and some of the instructions.  What
24   instructions have to be revised because Lawson is not
25   contending that the RIMS brochure is prior art?  Which one is
```

3081

```
1    arguing?
2        MR. YOUNG:  Your Honor, David Young for ePlus.  It's
3    instruction 3-A that was submitted to the Court over the
4    weekend.  It lists as I think reference number three, RIMS
5    brochure, and that would have to come out now because it
6    appears that Lawson does not have that as an anticipated
7    reference on its own verdict form.
8        THE COURT:  Is that right?
9        MR. McDONALD:  Yes, that's right, Your Honor.
10       THE COURT:  So I suppose I need to tell the jury
11   simply to disregard any testimony about the RIMS brochure as
12   prior art.
13       MR. McDONALD:  No, it not anticipatory prior art
14   meaning it's not all by itself anticipating a claim.  We're
15   still using it for obviousness and support for the on sale, the
16   RIMS as prior art and 102(a) and (b), but the brochure, all by
17   itself, we're not contending is an anticipating reference, but
18   it would be used to support number one in the instruction which
19   is the Fisher RIMS system as prior art.
20       THE COURT:  What do you mean, to be used to support?
21   If you're going to use it --
22       MR. McDONALD:  It's evidence of the Fisher RIMS
23   system as it was being sold and --
24       THE COURT:  Well, if it's evidence of it, it comes
25   out of 39, too, because you're not contending that it is
```

3082

1 obvious.

2 MR. McDONALD: So we're saying it is a printed

3 publication and still in it's own right is prior art, but it

4 doesn't all by itself anticipate the claims. It can be used

5 for the obviousness defense. So it is a piece of prior art.

6 It just doesn't anticipate the claims all by itself.

7 THE COURT: Anything? Is that the only modification?

8 MR. YOUNG: Your Honor, it is listed on the Lawson

9 verdict form, so --

10 THE COURT: I'm talking about the instructions right

11 now. That's the only change in the instructions.

12 MR. YOUNG: Yes, yes.

13 THE COURT: I've prepared an instruction on

14 incorporation by reference that says incorporation by reference

15 is a phrase that allows a patent applicant to make another

16 document become part of the patent application in such a manner

17 that the incorporated document can be considered to be part of

18 the patent application just as if the incorporated document had

19 been fully set out in the patent application.

20 I believe that that is a slight modification from the

21 ePlus system -- I mean from the ePlus proposal because it got

22 into whether the examiner considered it and all of that, and

23 that's not necessary, but I think this instruction is accurate.

24 Does anyone disagree with that?

25 MR. McDONALD: We have no objection to that, Your

3083

1 Honor.

2 MR. YOUNG: We have no objection to it, Your Honor.

3 THE COURT: All right. I'll make that then -- where

4 should that go? Let's make it 30-B.

5 MR. YOUNG: I think that would be fine, Your Honor.

6 MR. McDONALD: I'm not sure it goes into the prior

7 art invalidity section, Your Honor. I think it's more about

8 what the patent is, so I would suggest it go earlier.

9 MR. YOUNG: Your Honor, I think it's directly

10 relevant to the prior art issues in the case given the context

11 in which --

12 THE COURT: Given your argument, it seems to me as if

13 it goes right where I put it. I've reviewed the verdict forms,

14 and I think the preferable verdict forms are as ePlus has put

15 them, but how does it have to be changed?

16 MR. YOUNG: I'm sorry, Your Honor. I didn't hear the

17 last point.

18 THE COURT: You said the verdict form had to be

19 changed. How does it have to be changed?

20 MR. YOUNG: I don't think the verdict form from our

21 proposal does need to be changed. It was the jury instruction

22 30-A that needed to be changed to eliminate the RIMS brochure.

23 Neither party's proposal for the verdict form last

24 night included the RIMS brochure as an anticipated reference,

25 so I don't think that aspect needs to be changed.

3084

1 THE COURT: All right, so your form has already made

2 that edit.

3 MR. YOUNG: Correct, and I believe Lawson's as well.

4 THE COURT: All right. Take all the certificate of

5 service and all of that stuff off of it, and we'll have a clean

6 form for the jury.

7 MR. YOUNG: I actually do have some copies of that.

8 THE COURT: Can I have it? I believe that the Lawson

9 form is -- ePlus form is somewhat cumbersome. The Lawson form

10 is confusing, and I think cumbersome is better than confusion.

11 These motions that have been filed, judgment as a

12 matter of law, that's what you argued the other day, right?

13 The motion on 103 is what you argued the other day.

14 MS. STOLL-DeBELL: Yes, sir.

15 THE COURT: I don't need to deal with that to get

16 ready for the jury. Are we ready for the jury?

17 MR. ROBERTSON: Yes, Your Honor.

18 MR. McDONALD: Yes, Your Honor.

19 THE COURT: All right.

20 MR. ROBERTSON: Just to be clear, Your Honor, I'll go

21 first and address the infringement issues, and then Mr.

22 McDonald goes and addresses both, his non-infringement

23 arguments and invalidity, and I have rebuttal. Is that your

24 understanding?

25 THE COURT: Yes. That's what we said.

3085

1 MR. McDONALD: May I ask how much time we should each

2 expect and how much he's reserving for rebuttal?

3 MR. ROBERTSON: I expect that my opening argument

4 will be approximately an hour long, and my rebuttal would be

5 about half an hour to 40 minutes. I'm going to try do this as

6 quickly and efficiently as I can.

7

8 (Jury in.)

9

10 THE COURT: Good morning ladies and gentlemen. Now

11 we've reached the point in the trial where all the evidence is

12 in, and the lawyers now have a chance to make their closing

13 arguments, and in those closing arguments, what they will be

14 doing is reciting to you what they think the evidence shows and

15 explaining to you what they think the evidence proves.

16 And they will try to explain to you why they think

17 you should return a verdict in favor of their respective

18 clients, and that's important because it will help you

19 understand each side of the case and the positions they are

20 taking and what you have to decide. But remember, what they

21 say in these closing arguments is not the evidence. The

22 evidence came from the things that have been admitted into

23 evidence which you will have back with you.

24 You'll have a computer back there that is set so that

25 you can run one piece of the evidence which was the

3174

1  choice.  And that doesn't stop ePlus from going to the
2  Patent Office, but it is true and the Judge will
3  instruct you that even if a product isn't the subject
4  of a patent like TV/2, if it's on sale more than a
5  year before the filing date of the ePlus patent, it's
6  still prior art.  EPlus can't go get a patent on that
7  same thing.  So that's how it works.  So that's why
8  the Patent Office doesn't always have all the details
9  about what everybody is doing out there.
10      So that's why because you have this critical
11  information here in the courtroom that the Patent
12  Office didn't get why you should reach a different
13  conclusion than the Patent Office.  So that's why you
14  should decide that the claims are invalid.
15      Let's go down to question No. 3 about
16  infringement.  We made it pretty clear from the first
17  moment in this case that this issue came down to the
18  catalogs issue.
19      And if we could go to 45F.  Mr. Weaver at
20  least acknowledged that 11 of the 12 claims in this
21  case required not just one catalog, but multiple
22  catalogs in the Lawson system.  So if Lawson doesn't
23  have multiple catalogs, Lawson at least does not
24  infringe those 11 claims.  We're all on the same page
25  on that.  That's why we didn't waste your time on all

3175

1  these other deals in the case, why it really came down
2  to the catalogs.
3      And if we go to the slide 46, this was the
4  Court's definition of catalogs.  It has the term
5  published by a vendor in it, and the Court also has an
6  instruction for you on that.
7      And we showed you here, this is Exhibit 257,
8  it's a demonstrative, but it's nothing of the sort you
9  haven't seen before.  It's one of these big catalogs.
10  We don't get them in the mail so much anymore, but we
11  used to.  And something like this pretty clearly meets
12  that Court definition.  You can apply this pretty
13  well.  It's an organized collection.  You have got the
14  ladies clothes at the beginning.  Then it goes to kids
15  and boots and shoes and so on, product by product
16  organized.  It's about items.  Things Sears is selling
17  with associated information.  Published by Sears.
18  They are a seller, a distributor, whatever you want to
19  call it.  Includes things like a part number, price,
20  catalog number, vendor name.  Sears is on the front.
21  It may not be on every page, but certainly on the
22  front.
23      I don't know if it has a vendor ID, but this
24  list isn't something that's required that you have to
25  have all of these.  That's why it has the word

3176

1  preferably, right?  Then a textual description of
2  items and preferably, not necessarily, images of the
3  items.
4      So that meets the definition of a catalog
5  pretty well.  That holds up with your common sense.
6  And it's pretty consistent if we go to slide 48, I
7  think it is.  Even what the patent says about
8  catalogs.  This is a feature of the invention to have
9  multiple catalogs from different suppliers.  And it
10  gives these examples.  And I'll summarize it here, but
11  basically it talks about published by a vendor,
12  distributor, having the distributor's catalog numbers
13  for their listed products.  And also vendor
14  manufacturer part numbers.  Down at the bottom, line
15  52 there, it further contained catalogs published by
16  some of the vendor manufacturers.  Again having part
17  numbers and the like.
18      Then if you go down to about line 56.  It can
19  also contain catalogs published by outside suppliers,
20  other manufacturers, distributors listing their vendor
21  products different from those in the distributor
22  catalog.  So these are all these different published
23  things out there.
24      So if we go back to 46.  So that was the
25  Court's definition of "catalog."  Very consistent with

3177

1  what the patent says.  What about that last claim?
2  I'll just talk about that a little bit.  That 12th
3  claim.  That's Claim 1 of the '172 patent.
4      Now, that claim has a claim element that
5  refers to something called an order list.  So I want
6  to show you the Court's definition of that in slide
7  49.  So even that claim requires a means for
8  generating an order list, which is a list of desired
9  catalog items.  So here's where that concept of
10  catalog comes into play here.
11      And if we look at slide 49A, Dr. Weaver, his
12  analysis was entirely reliant on his opinion that the
13  Lawson system had catalogs in it.  And that even
14  included this claim.
15      And if we could go to the next slide here.
16  This was Dr. Weaver's testimony specific to that Claim
17  1 of the '172 patent.  It's kind of a long question
18  here, but what's being shown here is his opinion about
19  Lawson infringing that claim, and specifically the
20  part of that claim that refers to an order list, that
21  was based in part on his analysis concluding that the
22  desired items - do you remember that an order list is a
23  list of desired catalog items - included in results of
24  searches of product catalogs, and that's what he
25  called catalog items.  That's how he looked at it for

3178

1   purposes of his analysis.  The items you get back from
2   product catalogs.  So he relied on his analysis
3   involving catalogs actually for all 12 of the claims.
4       So we showed you the testimony of Mr. Shamos,
5   though, that the Lawson system doesn't have catalogs
6   and therefore it doesn't infringe any of the 12
7   claims.  It's completely different from all that.  And
8   to illustrate what the Lawson system really is here,
9   I'm going to show you something.  This is from
10  Plaintiff's Exhibit 361, page 49 of that exhibit, page
11  2243.  The last four digits are 2243.  Do you remember
12  Mr. Weaver showed you some demonstrations.
13      This particular one he didn't talk about.  He
14  didn't present this one to you.  In fact, we talked
15  about it, and this has something called an active
16  items at requesting location list.  This is about the
17  closest thing in any of ePlus' materials of showing
18  you what an item master in the Lawson system actually
19  looks like.
20      It's this list of products.  At the far left
21  is an item number.  That's the number that the
22  customer assigns.  The first one is 1007, 1008, 1009.
23  The customer puts those in there in the order that the
24  customer enters those item numbers.  They have some
25  descriptions of the products there.  You see tape.

3179

1   Then it goes to steri strips.  I guess that's some
2   sort of a bandage, and so on.
3       These are these very short descriptions that
4   are only 30 characters or less.  So you can see how
5   abbreviated they are.  And you heard the testimony
6   that those are the things the customer comes up with.
7   And they're not trying to sell anything here.  They're
8   not trying to give you a big description to entice you
9   to buy anything.  They're just reminding themselves
10  which one that is because this is the thing they buy
11  over and over.
12      Over on the far right it talk about that
13  being tracked.  That's their inventory.  This is their
14  own personal inventory.  Yes, we track it.  Yes, we
15  monitor our inventory on this thing.  This is the
16  closest thing that ePlus had to show you what the item
17  master actually looks like.  And they have never
18  linked this or anything else to a published vendor
19  catalog.  It doesn't look like it, and it's from the
20  customer.  This is an organized collection of
21  information, yes, but it's the customer who organized
22  it.  The vendor never even sees this.
23      So how could the vendor publish this?  An
24  organized collection.  And that's what has to be
25  catalogs here.  It just doesn't look like a catalog as

3180

1   the Court has defined it.
2       So Dr. Weaver never showed either a single
3   vendor catalog that actually came from a vendor and
4   said, Oh, look.  Here's one of those vendor catalogs
5   that comes from somebody selling products to a Lawson
6   customer and compare that now to the item master.  Oh,
7   look, they look similar, don't they?  Dr. Weaver never
8   did that.
9       The reason he didn't do that is because he
10  wouldn't have been able to show that that comparison
11  would hold any water.
12      So they talk about what Dr. Weaver did do,
13  but it's what Dr. Weaver did not do that's the most
14  important thing here.
15      And they didn't do that even though they
16  picked four of our customers to give them information
17  about who our customers are.  They picked four of them
18  to depose and subpoena.  And you heard from -- I think
19  you heard from three of them in the case as it wound
20  up.  Mr. Yuhasz was live, Mr. Matias and Ms. Cimino.
21  Those are our customers that they picked.  They didn't
22  show you anything in those depositions or documents
23  that would show catalogs.
24      If we could go to slide No. 51.  Actually,
25  let's go to 52.  So Lawson doesn't infringe these

3181

1   patents because it doesn't have multiple catalogs.  It
2   doesn't have published catalogs.  It doesn't have
3   catalogs published by inventors.  We've got very basic
4   information.
5       The whole purpose of an item master is
6   different from the purpose of catalogs.  Catalogs are
7   from vendors to sell things.  The item master is to
8   track personal customer's private inventory.  Short
9   descriptions selected by the customers.  It's an
10  inventory list like a shopping list just trying to
11  keep track of what they've got in stock.  Also control
12  what their employees can buy.  That's a big thing here
13  in comparison and contrast to catalogs.
14      You heard Mr. Robertson talk about comparison
15  shopping.  That's the intent of these patents.  Let's
16  the employees go out there and maybe do some shopping
17  and things.  And that might be good in some
18  situations.  If some customers want to do that, that's
19  fine.  But for some companies, they would say, I don't
20  want my employees doing that.  I just want them to go
21  buy the pens.  I don't want them out there shopping
22  around looking for new pens that are different or more
23  expensive or whatever and wasting time on that.
24      The Lawson system is all about control.  The
25  patented system a all about empowerment of the

3182

1  customers. Two very different purposes here.
2        So let's go to the evidence now on the issue
3  of the catalogs. The testimony showed that Lawson
4  doesn't have catalogs.
5        Can we go to slide 53, I think it is. This
6  is Mr. Christopherson's testimony here. Using the
7  definition the Court just gave for published by a
8  vendor, is the customer's item master database ever
9  published by a vendor? The Judge said just answer it
10  yes or no. Mr. Christopherson then answered no. So
11  Lawson people showing that the item master is not a
12  catalog as the Court defined it. Customer testimony
13  is well.
14        If we go to 55. This is Mr. Yuhasz. He was
15  the customer that showed up in court here. He was
16  nice enough to do that from Novant. Is this data in
17  Novant item master generally known? No.
18        Is the item master data maintained as
19  private? Yes.
20        And the supporting differences here from the
21  published catalog. If we go to the next slide, 56.
22  Mr. Yuhasz actually explained that they already had
23  the Lawson system that's accused of infringement in
24  this case with the requisition and purchase order and
25  inventory control modules, but they were looking for

3183

1  the ability to have what he called a better option
2  that we felt had product catalogs. They wanted to be
3  able to search for more things.
4        They wanted something different from what
5  Lawson had. Were these features as the Lawson system
6  as it was installed at Novant did not provide? Yes.
7        Here's his testimony that he, having one of
8  the accused systems, didn't think it had product
9  catalogs. He was actually putting it out for bid. He
10  was willing to write another check for somebody else
11  to go in and add that capability. Well, there's some
12  real world market information for you that really
13  shows why the Lawson system doesn't have catalogs.
14        If we could go to the next slide. This is
15  the inventor testimony. They didn't talk about the
16  Lawson system, but they did talk about the parts
17  master that they acknowledge was like an item master.
18        This again relates to the have your cake and
19  eat it too, issue. So that parts master that has the
20  same sort of things like we have on the blow up here,
21  item part number, a short description, tracking and
22  inventory, that isn't the same thing as the catalogs
23  you had in mind as the invention for these
24  patents-in-suit, right? I don't think so. For me,
25  no, they aren't the same.

3184

1        Again, the parts master, that's the same sort
2  of thing as an item master, correct? Yes.
3        Mr. Momyer. If we go to the next slide.
4  Again, reinforcing that that RIMS system as of
5  April '93 had that parts master. That would not meet
6  the Court's definition of a catalog, Mr. Momyer's
7  testimony.
8        THE COURT: It says Mr. Kinross.
9        MR. McDONALD: I'm sorry. Is that Kinross?
10  You're right. It's Mr. Kinross. Thank you.
11        Then go to the next slide. So we're back to
12  Mr. Momyer again here. This is confirming that that
13  parts master in the RIMS system, that's parts that a
14  customer would select, just like in the Lawson item
15  master. That's what they would track for their
16  stockroom or inventory. Just like the Lawson item
17  master.
18        Go to the next slide. This is the third
19  inventor who testified, Mr. Johnson, now. Again
20  acknowledging the RIMS system had a parts master, but
21  he didn't think that it had a catalog, though.
22        Then if we go to the next slide. This is
23  Mr. Hilliard, their invalidity expert. Of course he's
24  Mr. No. This was an easy quote to find because
25  nothing was a catalog for him. But he acknowledged

3185

1  here with the Court's definition of catalogs that
2  there were no databases in the RIMS system that met
3  the Court's definition of catalogs.
4        So you have all of these Lawson witnesses,
5  all the inventors, even one of ePlus' experts
6  acknowledging that a parts master, which was just like
7  an item master, doesn't meet the definition even for
8  one catalog, let alone multiple catalogs.
9        So who was the only witness in this case who
10  said Lawson's item master was multiple catalogs? It
11  was Dr. Weaver. Dr. Weaver's approach, just about any
12  list of item information is not only a catalog, it's
13  actually multiple catalogs. That's incredible. It
14  defies common sense. And we went through that with
15  him in a couple of ways.
16        If we go to the slide 63. Remember, I asked
17  him, because he was saying that as long as the
18  information originated in some part from a vendor,
19  that meant the vendor actually published the organized
20  collection. I gave them that example if I had a
21  personal address book, and I was going to put a phone
22  number in it that came from a phone book, my address
23  book if it has one entry from a published phone
24  company's phone book, my address book has an entry in
25  it that originated from the phone book, right,

3186

1  Mr. Weaver? Correct.
2      But in that case, even if it's my personal
3  address book, I didn't publicly disseminate it. I
4  kept it in my own house. Would you consider that to
5  be a published phone book? Answer: Well, that data
6  came from a published phone book, so, yes.
7      So Dr. Weaver said the address book is the
8  same thing as a published phone book. It doesn't make
9  any sense. But it doesn't end there.
10     Can we go to the next slide, please. I went
11  on to talk to Dr. Weaver about how within the item
12  master -- he had to come up with a way to say this one
13  database was actually multiple catalogs. So he had to
14  be a little creative there. What he came up with is
15  this line of reasoning. So if you search for the word
16  "blue," you get back results from the Lawson item
17  master that would be the catalog of blue things
18  because when you search "blue," you're searching for
19  the item master description, right? Answer: Yes.
20     If I search for the number five, it would
21  generate a list of all the things that had a number
22  five in the description? It would.
23     In your opinion each one of these is a
24  separate catalog; is that right? Yes.
25     So is there really any limit to the number of

3187

1  catalogs in the Lawson item master the way you look at
2  it? No.
3      The Lawson item master has a limitless number
4  of catalogs according to Dr. Weaver. Mr. Hilliard,
5  though, would say a parts master, which is just like
6  an item master, has no catalogs at all. Having their
7  cake and eating it, too. That's what we have going
8  on.
9      And that's even established on this last
10  thing with Mr. Momyer's testimony. If we could go to
11  slide No. 65. We talked to Mr. Momyer about this part
12  of their patents-in-suit.
13     Go back to 65, please. Blow up the part
14  that's yellow. This is in the background section of
15  the patents. They acknowledge, Well, there are
16  computer systems out there capable of searching
17  databases containing a product catalog of a particular
18  vendor. For example, on CD-ROM.
19     But down here you see around line 10, Well,
20  those are limited, though, in that only one such
21  vendor catalog. That's one such vendor catalog is
22  accessible to a user at any given time.
23     So I asked Mr. Momyer about that since he's
24  one of the inventors of this thing. If we could go to
25  No. 66, please. I asked him about that section.

3188

1  Would the fact you could search that single CD-ROM for
2  products of a certain color, would that mean the
3  CD-ROM actually contains multiple catalogs depending
4  on what word you searched with? His answer was: To
5  me, the catalog would indicate the company you were
6  buying the product from, he went on to explain.
7      Bottom line. So it would be a single catalog.
8      So even though you could do keyword searches
9  and look up all sorts of different words within that
10  catalog, it's still as you understood it for purposes
11  of your patent a single catalog, right? Yes.
12     So here is Mr. Momyer applying a little
13  common sense by saying a catalog is a catalog. It's
14  not a limitless number of catalogs. But he's one of
15  the inventors here talking about a part of the patent,
16  so that's really important here.
17     I talked to Dr. Weaver a little more about
18  the item master. I think ePlus and their expert knew
19  that this catalog issue was pretty important from day
20  one in this case or certainly before trial. And that
21  the item master and whether it's catalogs is
22  important. So it's pretty striking, I think, wasn't
23  it, when we had slide 15 from his presentation which
24  is my slide No. 67? Do you remember he had these
25  blocks that he stacked up. I talked to him, and he

3189

1  said, Those system shown in those systems were a
2  complete and comprehensive infringing system. It had
3  everything that had to be infringing, including
4  multiple catalogs, right? Eleven of the 12 claims
5  specifically say multiple catalogs or collection of
6  the catalogs, at least two catalogs. Some variation
7  on it.
8      So the item master is the catalogs. Dr.
9  Weaver, where is the item master? Do you remember
10  that pause? Do you remember he was staring at that
11  screen for a long time? This was his own slide he
12  did. But he starred at it for a long time there
13  because he knew it wasn't there. And that's really
14  the story of their whole infringement case. It's just
15  not there.
16     I want to show you one more thing about
17  Dr. Weaver's analysis. This has to do with the
18  selecting catalogs or portions of the database to
19  search issue. That's not in all the claims here, but
20  I think it's important to illustrate.
21     67A, if we could go to that. This is the
22  part of the patent that actually talks about
23  selecting catalogs to search. You get a choice of
24  some catalogs. In the example here they have four.
25  It doesn't have to be these four, obviously, but this

3298

1            (Jury in.)

2

3        THE COURT:  The jury has decided that it would like

4    to return home for the evening and then return in the morning

5    and deliberate.  What is your pleasure on the time to

6    deliberate?  Do you want to start at 9:00, start at 9:30?

7        Nine o'clock we'll be here and have stuff ready for

8    you, and you be ready and you can have -- if you can take whatever

9    time you feel like you need to deliberate.  If you leave your

10   notebooks the way you usually do, Mr. Neal will take camed of

11   them.  Thank you.  Drive carefully.

12

13           (Jury out.)

14

15       THE COURT:  Have all these transcripts and these

16   things -- you've got everything you need; right?

17       MR. STRAPP:  Yes.

18       MR. CARR:  I believe so.

19       THE COURT:  One thing I need for you all to do is to

20   see if there's anything that needs to be cleaned up that I need

21   to decide.  For example, they've got these motions that have

22   been filed yesterday -- this morning or yesterday.  I don't

23   know what -- by Lawson.

24       I need a briefing schedule on them and see what I'm

25   supposed to do, and that means you all need to get moving and

3299

1    decide how you want to proceed, little things like that so we

2    can get that sorted out.  I'd like to get all this done just as

3    soon as I can.

4        MR. ROBERTSON:  I'll call Mr. McDonald tomorrow once

5    he gets back to Minnesota.  I understand he's gone back.

6        THE COURT:  He's what?

7        MR. ROBERTSON:  I'll call Mr. McDonald tomorrow in

8    Minnesota.  I know he's traveling --

9        THE COURT:  He's in Minnesota?

10       MR. CARR:  He is leaving this evening, yes.

11       THE COURT:  Are you fully empowered?

12       MR. CARR:  Yes, sir.

13       MR. ROBERTSON:  I'll just --

14       THE COURT:  Does he understand that the juries have a

15   lot of questions sometimes?

16       MR. CARR:  He does.

17       THE COURT:  Okay.

18       MR. ROBERTSON:  I'll work out a briefing schedule,

19   Your Honor, and we'll take care of it in short order.  Maybe we

20   can decide some of things have been mooted by some of Your

21   Honor's rulings.

22       THE COURT:  They very well may have.  I don't know

23   the answer to that.  Some of them may not, but I want to make

24   sure we get it done.

25       MR. ROBERTSON:  Your Honor, I intend on having at

3300

1    least two attorneys here at all times so I can be reached by

2    phone.  I'm just right down here at the Hilton Garden Inn, so I

3    can be here in four minutes.

4        THE COURT:  Do you have to trade shoes or can you --

5        MR. ROBERTSON:  I come equipped.  I will be right

6    over here pronto, but we'll have somebody here at all times.

7        THE COURT:  That's fine.

8        MR. ROBERTSON:  All right.  Thank you.

9        THE COURT:  Now, is he coming back?  Mr. McDonald or

10   Ms. Stoll-DeBell?

11       MR. CARR:  As far as I know, he's not coming back.

12       THE COURT:  Well, then, I know not to schedule any

13   arguments, I guess, until I'm certain.  All right.  I guess

14   that solves it for now.  Thank you very much.  We'll be in

15   adjournment.

16

17          (Court adjourned.)

18

19

20

21

22

23

24

25