**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | | |
|---|---|---|
| ePLUS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:09CV620 (REP) |
| | ) | |
| LAWSON SOFTWARE, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |


**DEFENDANT LAWSON SOFTWARE, INC.'S MEMORANDUM
IN SUPPORT OF MOTION TO EXCLUDE IMPROPER OPINIONS AND
ARGUMENTS FROM EPLUS'S EXPERTS AT THE CONTEMPT
HEARING**

Josh A. Krevitt (admitted *pro hac vice*)
Daniel J. Thomasch (admitted *pro hac vice*)
Jason C. Lo (admitted *pro hac vice*)
jkrevitt@gibsondunn.com
dthomasch@gibsondunn.com
jlo@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

*Attorneys for Defendant Lawson Software, Inc.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................................1

ARGUMENT ............................................................................................................5

I.    Pursuant to *TiVo,* ePlus's Expert Witnesses May Not Testify Regarding Features Of The Adjudged-Infringing Products That Remain Unmodified And Were Not Alleged To Be Infringing ....................................................................................5

      A.    Shopping Cart Cookie File And CartObject Data Structures .........................7

      B.    Error Handling Protocols ...........................................................................14

      C.    Punchout Access to Multi-vendor Catalogs ...............................................16

II.    ePlus Cannot Rely On Theories of Infringement That It Alleged, But Did Not Prove, At The Underlying Trial .............................................................................17

III.    ePlus Should Not be Permitted to Advance Infringement Theories That Rely on Claim Constructions Inconsistent with the Court's Prior Constructions ............................20

      A.    ePlus's Current Argument Relating To RQC's UNSPSC Search Capability Conflicts With The Courts Claim Construction ...........................................20

      B.    This Court Never Held That A Requisition Must Be "Finalized" In Order To Fulfill The "Means To Build A Requisition" Claim Limitation.................................22

CONCLUSION ........................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*TiVo Inc. v. Echostar Corp.*,
    646 F.3d 869 (Fed. Cir. 2011) ...........................................................................passim

## INTRODUCTION

At the merits trial, ePlus advanced a number of different infringement allegations, some but not all of which were accepted by the jury, which found three of the five accused configurations to infringe claim one of the '172 patent, and two of the five accused configurations to infringe claims of the '683 patent.  In particular, Plaintiff focused on three features of Lawson's RSS product to prove that RSS, in conjunction with other integrated components in the five configurations at issue, infringed the patents-in-suit.  Following the jury's verdict, Lawson eliminated or significantly modified all three features in the design of its RQC product.  Those modifications are reflected in the software code, are not subject to reasonable factual dispute, and clearly depart from the infringement theories that ePlus proved at trial.  Faced with the reality and the significance of Lawson's modifications, ePlus has fashioned a contempt case on themes that are irrelevant under the Federal Circuit's controlling decision in *TiVo v. Echostar*, and the testimony of ePlus's expert witnesses in support of those theories is thus inadmissible at the contempt proceeding.  Specifically at issue on this motion is the intended testimony of Plaintiffs' expert witnesses concerning:

(i) unmodified features of the adjudged infringing products that were not even alleged to be infringing at the merits trial, including the "Shopping Cart Cookie File," the "CartObject," error handling protocols, and Punchout access to so-called "multi-catalog vendors;"

(ii) unmodified features of the infringing configuration that were alleged but not proven to be infringing at the merits trial, including Item Master; and

(iii) modified features of the redesigned product, such as UNSPSC codes and

Punchout, that ePlus asserts to be infringing by the use of claim constructions that

effectively rewrites the claim construction ruling entered by this Court.

*TiVo* makes clear that none of this is permissible.

Whether RQC, on the whole, infringes any claims of the patents-in-suit, is not at issue in this contempt proceeding, although ePlus is free to pursue such theories in a new infringement suit. Here, the focus must be far more specific: *TiVo* makes entirely clear that a contempt proceeding is limited to the consideration of modifications made to the adjudged infringing products -- specifically, whether those modifications are more than colorably different from the adjudged infringing product and, only if they are not, whether the changed features continue to infringe the previously-asserted patent claims. The expert witness reports and deposition testimony of Dr. Weaver and Mr. Niemeyer have a very different scope, reflecting a pervasive misapplication of the *TiVo* test. Many of the flaws in the testimony of Dr. Weaver and Mr. Niemeyer are best addressed through objections at trial, and Lawson will proceed accordingly.[1] In several instances, however, the disparity between what *TiVo* mandates and what Dr. Weaver and Mr. Niemeyer have done is so great as to make a pretrial order prohibiting such testimony appropriate, particularly given the limited duration of the scheduled hearing. Specifically, Lawson seeks a pretrial ruling with respect to the following areas of testimony in which Dr. Weaver and/or Mr. Niemeyer offer opinions directly at odds with the Federal Circuit's defined framework for the adjudication of contempt allegations.

First, Dr. Weaver repeatedly told the jury that in RSS "[t]he order list is the shopping cart," which he described as a data structure that served as the basis for "building a requisition."

---

[1] These additional bases for objection include overlapping testimony of Dr. Weaver and Mr. Niemeyer, testimony reflecting opinions or the bases for opinions that are not disclosed in the expert reports, and opinions on matters beyond the expertise of the witness.

Jan 5, 2011 Trial Tr. at 568-69.  In its RQC design-around product, Lawson eliminated the shopping cart feature ("My Cart") and fundamentally changed the flow of information about selected items, such that information on error-free items that the user selects for purchase is conveyed to the requisition database <u>prior</u> to being reflected on the user interface.  Thus, the later-received information reflected on the user interface is not an intermediate list, nor is it used to build a requisition, as the infringed claim of the '172 patent requires; instead, it merely displays the contents of the requisition after the requisition already has been updated.  In response, Dr. Weaver and Mr. Niemeyer now cite to two allegedly infringing data structures in RQC, which they identify as the "Shopping Cart Cookie File" and the "CartObject."  Both structures were present in RSS, but neither was identified by either Dr. Weaver or Mr. Niemeyer at the first trial.  Moreover, neither the "Shopping Cart Cookie File" nor the "CartObject" was modified in the development of the RQC product.  Both reasons independently compel exclusion of all testimony regarding the "Shopping Cart Cookie File" and/or the "CartObject" under the *TiVo* framework.  Similarly, Dr. Weaver seeks to testify in this proceeding about the manner in which errors in selected items are processed in RQC, and how RQC/Punchout users can access "multi-catalog vendors," but neither of those topics was ever the subject of testimony at the merits trial, and neither of those characteristics of RQC materially differs from RSS.  Again, *TiVo* does not permit theories of infringement that were available but unused at the merits trial to serve as a predicate for contempt.

    <u>Second</u>, Dr. Weaver asserts in his expert report that Item Master infringes the claims of the '683 patent, despite the fact, as he admitted in his deposition, that there is no evidence that compels the conclusion that the jury found Item Master to contain features that were infringing. *TiVo* requires unambiguous clarity in fashioning the predicate for a contempt proceeding:  Only

"those elements of the adjudged infringing products that were previously contended, and proved, [to] satisfy specific limitations of the asserted claims" are properly the focus of a contempt proceeding. *TiVo Inc. v. Echostar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011). As shown below, Item Master flatly fails that test.

<u>Third</u>, at trial, Dr. Weaver showed the jury that the use of Punchout in conjunction with RSS allowed a user to search multiple catalogs, place items from one or more Punchout vendors (or combine items selected from Item Master and Punchout vendors) on a single requisition, and generate one or more purchase orders from a single requisition. In its RQC design-around, Lawson eliminated the capacity to use Punchout in that multi-faceted fashion. That is not in dispute. Similarly, at trial, Dr. Weaver provided the jury with multiple demonstrations of how drilling down to the fourth level UNSPSC code (*i.e.*, the commodity class of the Categories hierarchy tree) allowed the user to practice the "converting" step of the '683 patent. In its RQC design-around, Lawson eliminated that capacity to search at the commodity class. That is not in dispute. Nevertheless, in attempting to allege that neither the limitations placed on the use of Punchout in RQC nor the elimination of a categories search functionality that utilized the fourth level of UNSPSC codes renders the redesign product non-infringing, Dr. Weaver advances multiple infringement opinions that depend on claim constructions contrary to those previously entered by the Court. As counsel for ePlus has repeatedly asserted throughout these proceedings, such prior claim constructions remain binding on the parties in this action. Accordingly, Dr. Weaver may not ignore them in crafting new infringement theories.

**ARGUMENT**

**I.     Pursuant to *TiVo*, ePlus's Expert Witnesses May Not Testify Regarding Features Of The Adjudged-Infringing Products That Remain Unmodified And Were Not Alleged To Be Infringing**

The overwhelming majority of Dr. Weaver's and Mr. Niemeyer's expert reports are improper and must be excluded because they state new theories of infringement that ePlus had the opportunity to – but did not – raise at the underlying proceedings. That is, to demonstrate contempt, Dr. Weaver and Mr. Niemeyer repeatedly stray away from the *modifications* Lawson has made to the adjudged-infringing software, and instead focus on features ePlus *knew about* at the underlying proceeding, deliberately chose *not to include in their expert reports* in the underlying proceedings, deliberately chose *not to testify* about at the underlying trial, and which they contend *remain unchanged* in RQC.

ePlus's attempt to raise these theories for the first time in contempt proceedings cannot be harmonized either with the standards set forth in *TiVo*, or with basic notions of fundamental fairness. Indeed, ePlus is now doing the very thing it has argued vehemently cannot be permitted: pursuing a new trial on issues of infringement with respect to unchanged features of Lawson's product. Oct. 28, 2011 Hearing Tr. at 15 ("[Counsel for ePlus]: We want it to be efficient. We want it to be quick. I'm concerned that Lawson wants to turn this into a retrial of the case based on our discussions."); Oct. 28, 2011 Hearing Tr. at 15. ("[Counsel for ePlus]: This is not a new infringement trial. And I don't think the Court ever contemplated that and I don't think the case law contemplates that.").

As this Court is aware, *TiVo* set forth a two-part test for how courts must resolve an allegation that a party enjoined from infringing a patent claim should be held in contempt for making or selling a redesigned version of the product found to infringe. The "party seeking to

enforce [an] injunction must prove *both* [i] that the newly accused product is *not more than colorably different* from the product found to infringe and [ii] that the newly accused product *actually infringes*." *TiVo*, 646 F.3d at 882 (emphases added).  Both aspects of the test relate to what was both alleged and proved at the merits trial.  First, the colorability test must focus "on those aspects of the accused product that were previously *alleged to be, and were a basis for, the prior finding of infringement*, and the *modified features* of the newly accused product." *Id.* at 882 (emphasis added).  "Specifically, one should focus on those elements of the adjudged infringing products that the patentee *previously contended, and proved*, satisfy specific limitations of the asserted claims." *Id.* at 882 (emphasis added).  Second, the infringement analysis requires the trial court "to evaluate *the modified elements of* the newly accused product against the asserted claim, on a limitation by limitation basis, to ensure that each limitation continues to be met." *Id.* at 883 (emphasis added).

Both prongs of the *TiVo* test are confined to an examination of the features of the accused products that previously were *actually accused of infringement*, and the changes made to those specific features.  Indeed, the district court's opinion in *TiVo* was vacated by the Federal Circuit for violating this very principle.  In *TiVo*, plaintiff alleged at trial that a "start code detection feature" satisfied a relevant claim limitation requiring "parsing" of data. *TiVo*, 646 F.3d at 883. In its redesign efforts, the defendant removed the start code detection feature and replaced it with a "statistical estimation feature." *Id.*  Nevertheless, the district court found defendant to be in contempt because another feature of its product, a "PID filter," satisfied the "parsing" limitation of the asserted claims. *Id.*  But because the plaintiff had "never *unequivocally* alleged prior to the contempt stage that the PID filter met that claim limitation," it was inappropriate to find contempt based on this feature. *TiVo*, 646 F.3d at 883-84 (emphasis added).  The Federal Circuit

6

noted that "[i]t is possible that, *in a new infringement proceeding*, a fact finder could find that the PID filter … meets the "parsing" limitation …, *but that should not be decided in a contempt proceeding*." *TiVo*, 646 F.3d at 884 (emphases added).  The Federal Circuit could not be clearer that a patentee cannot base contempt claims on features which were *present* in the adjudged-infringing product, but which the patentee *failed* to unequivocally identify as infringing at the merits trial.

As detailed below, in several highly significant aspects, the opinions expressed by ePlus's experts Mr. Niemeyer and Dr. Weaver are unabashedly outside the bounds of the TiVo test, and therefore should be excluded.

### A.    Shopping Cart Cookie File And CartObject Data Structures

Claim 1 of the '172 patent recites a limitation of "means for generating an order list that includes at least one matching item selected by said means for searching."  The Claim also recites a limitation of "means for *building a requisition* that uses data obtained from said database relating to selected matching items *on said order list*."  (Emphases added.)  As required by the plain meaning of the Claim, as well as this Court's construction, ePlus acknowledged at trial that selected items are first added to an order list and subsequently are used to build a requisition.[2]

In the underlying proceedings, ePlus advanced only one theory as to why the accused configurations satisfied the "order list" claim limitation:  the shopping cart *user interface* in RSS. Jan. 7, 2011 Trial Tr. at 815:23-25 ("Q.  Which Lawson application did we see that had the capability of providing an order list?  A. The shopping cart.  So the RSS module.").  An

---

[2]  When asked whether "[a shopping cart is] consistent with your understanding of building a requisition," Dr. Weaver testified, "Well, it's not the requisition . . . [the order list is] going to be transferred to the requisition module, and it's in the requisition module that the requisition is created." Jan. 6, 2011 Trial Tr. at 568-69.

exemplar of the shopping cart user interface accused of infringement in the underlying trial is reproduced as Exhibit 1.

Indeed, as recently as September 2011, ePlus confirmed to this Court that it had relied on the shopping cart user interface to meet the "order list" claim limitation at trial.  Mot. To Show Cause (Dkt. No. 799) at 21; Reply to Mot. To Show Cause (Dkt. No. 808) at 6 ("But the Court construed the structure for the 'means for generating an order list' element simply to be '*a user interface* operating on a computer through which a user may select from results from a search program.'  The RQC application, like the RSS application, has *a user interface* through which a user may select items from results of searches to be added.") (emphases added and citation omitted).

At the upcoming contempt proceedings, Lawson intends to demonstrate that it has eliminated altogether the shopping cart which ePlus accused of meeting the "order list" claim limitation; that this elimination renders RQC more than colorably different from RSS; and that this elimination also renders RQC non-infringing as to Claim 1 of the '172 patent.  As the Court is aware, the My Cart feature in RSS served as a temporary stopping point -- <u>after</u> the user's selection of a desired item and <u>before</u> the item is placed in the requisition database.  As Mr. Niemeyer confirmed at his recent deposition:

> Q.  Yes.  Assume that we're talking about RSS, and that the user has selected an item from the left-hand side of the screen, clicked on the Add Item link, and added that item to the My Cart that shows up on the right-hand side of the user screen.  Do you have that in mind?
>
> A.  Yes.

Q.  Assuming the user has done nothing else other than add the item into the My

Cart, has that item been transferred to the Requisition Database in RSS?

A.  It has not been placed into the Requisition Database yet, no.

Niemeyer Feb. 8, 2012 Tr. at 66:8-20.  Additional user action was required to transfer

information from the My Cart / Order List to the requisition database.

By contrast, in RQC, a user-selected item is immediately and automatically sent to the

requisition database.  This will be shown at the hearing to be beyond dispute.  Indeed, at his

recent deposition, Dr. Weaver acknowledged as much with respect to the selection of error-free

items:

Q.  In RQC, when do selected items make their way into the Requisition

Database?

A.  Selected item, as in an Add, goes first to the Shopping Cart Cookie file.  *If it is

*error-free, it's written into the Requisitions Database,* marked as an unreleased

state, and as a server-client interaction, the Load function causes the Cart Object

in JavaScript to be loaded from the Shopping Cart Cookie file and displayed on

the right-hand side of the screen.

Weaver Feb. 9, 2012 Tr. at 136:7-16 (emphasis added).  Of course, the user display screen

continues to display information about selected items, but in RQC, the list of items seen by the

user is the list of items in the *requisition database*, and not a temporary list of items that are not

yet in the requisition database, as was the case in RSS.  Accordingly, the new RQC software no

longer meets the limitations of claim 1 of the '172 patent.

No doubt anticipating this defense, ePlus's experts have hastily abandoned their original theory of infringement and manufactured a new theory based on the existence of a Shopping Cart Cookie File and a CartObject, two structures present in both RSS and RQC.

The Court, presumably, is not familiar with the details of the Shopping Cart Cookie File or the CartObject from the testimony at trial, because neither phrase was mentioned in the underlying case.  By way of background, the CartObject is not a user interface at all; instead, it is *a storage file that contains data not understandable by humans*.  As ePlus's own expert explains it, the CartObject is a "Javascript Object."  Niemeyer Report ¶ 49; Niemeyer Feb. 8, 2012 Tr. at 124:20-125:1.  It is a file structure utilized by the Lawson software, but is never directly accessed by a Lawson customer.  Indeed, the typical Lawson customer likely does not even know about the existence of the CartObject.

ePlus's expert was well-aware of the CartObject in the underlying proceedings:

Q.    At the time that you prepared your initial expert report in the underlying proceedings, and I believe that's in the May 2010 time frame, were you already aware of the Cart Object that is now described in the contempt report?

A.    I'm sure I was.

Niemeyer Feb. 8, 2012 Tr. at 137:3-8.  Yet neither Dr. Weaver nor Mr. Niemeyer uttered the word "CartObject" in their expert reports or in their testimony in the underlying trial.

And as ePlus's own experts concede, the CartObject remains unchanged between RSS and RQC.

Q    Did the Cart Object, as used in RSS, change in RQC?

A    No.

Weaver Feb. 9, 2012 Tr. at 256:7-9.

10

In short, ePlus's experts are attempting to inject into these contempt proceedings a feature that existed in the adjudge-infringing systems, that ePlus was aware of at the underlying trial, and that ePlus deliberately chose not to accuse of meeting a claim limitation.  This is clearly improper.[3]

Like the CartObject, the Shopping Cart Cookie File is not a user interface at all.  Instead, it, too, is a storage file that contains data not understandable by humans.  (A copy of the contents of one such file is attached as Exhibit 2.)

But the Shopping Cart Cookie File is even more remote from the infringement theory advanced by ePlus at trial.  Although the CartObject is at least stored on the same computer as the RSS user interface ePlus accused of infringement at trial, the Shopping Cart Cookie File typically is stored on a server computer remote from the user of the RSS program.  There is no evidence that the typical RSS or RQC user even is aware of the existence of this storage file or would even know on which computer to look in order to search for the Shopping Cart Cookie File (though as explained below, Mr. Niemeyer certainly was aware of this fact in the underlying proceedings).

According to ePlus's own experts, the adjudged-infringing product (*i.e.*, Lawson software Configurations Nos. 2, 3 and 5, all containing RSS) utilized the Shopping Cart Cookie File.  Niemeyer Report ¶ 48 ("The temporary or intermediate list in RSS was referred to by Defendant as the 'Shopping Cart Cookie File,' which is stored on the server side and is separate from the Requisition Database."); Niemeyer Feb. 8, 2012 Tr. at 103:17-19 ("Q.  And you understand that there was a Shopping Cart Cookie file in RSS, correct?  A.  Yes."); Weaver Reply Report ¶ 37

---

[3]   At trial, Dr. Weaver referred to the shopping cart itself as a "cache," which he defined as a "data structure that holds data, and then it's going to be transferred to the requisitions module."  Jan. 6, 2011 Trial Tr. at 568:20-569:5.  At no point did Dr. Weaver testify that there were additional data structures apart from, or underlying, the shopping cart, as he now says is the case with respect to both the Shopping Cart Cookie File and the CartObject.

("*Both the Infringing Configurations and the RQC Configurations include* the CartObject, the *Shopping Cart Cookie file* and the requisitions database . . . .") (emphases added).

Not only was the Shopping Cart Cookie File present in RSS, but ePlus was aware of the existence of the Shopping Cart Cookie File in the adjudged-infringing software at the time of the underlying trial.  ePlus's expert Mr. Niemeyer has confirmed that he already was aware of the Shopping Cart Cookie File no later than the time he submitted his expert report in May 2010 – more than six months before the merits trial.  Niemeyer Feb. 8, 2012 Tr. at 136:9-13 (Q.  [I]n May 2010 were you aware of the Shopping Cart Cookie File which is described in your contempt report?  A.  At the time I prepared my initial expert report, yes.").

Nevertheless, the phrase "Shopping Cart Cookie File" does not appear anywhere in either Mr. Niemeyer or Dr. Weaver's expert reports in the underlying proceedings, nor does it appear anywhere in the transcripts of the trial proceedings in January 2011.  As Mr. Niemeyer volunteered in his deposition, he failed to mention the Shopping Cart Cookie File because he did not deem it "salient":

> Q.  You would agree there's no mention of the Shopping Cart Cookie file in the expert report that you prepared in the underlying trial, correct?
>
> A.  That's correct.  I included things that I thought were important to support the report and excluded things I did not think were salient.

Niemeyer Feb. 8, 2012 Tr. at 111:21-112:4.

And Dr. Weaver surely could not have suggested to the jury in the underlying trial that the Shopping Cart Cookie File met any claim limitation – he did not even know the name of the file at trial.

> Q.  Did you know what it was called?

12

A.  I did not know at that time the name Shopping Cart Cookie file.

Q.  Had you ever heard that phrase?

A.  Not at the time of trial."

Weaver Feb. 9, 2012 Tr. at 119:6-10.

Moreover, the role of the Shopping Cart Cookie File remains "identical" from RSS to RQC, according to ePlus's own experts.  Niemeyer Feb. 8, 2012 Tr. at 105:5-13 ("Q.  Well, my original question to you was whether the functions of the Shopping Cart Cookie file changed from RSS to RQC.  And your response was they are substantially identical.  And I just want to figure out why you qualified it by saying substantially.  A.  Let me put it this way.  The role of the Shopping Cart Cookie file *is identical* in RSS and RQC.") (emphasis added);  Niemeyer Reply Report ¶ 28 ("The roles of the Shopping Cart Cookie File are the same in RSS and RQC.").

It is worth noting that ePlus does not rely on the Shopping Cart Cookie File and the CartObject as an ancillary part of their analysis or as a rebuttal to any alleged arguments made by Lawson Software.  In their Initial Reports, Dr. Weaver and Mr. Niemeyer, collectively, use the phrase Shopping Cart Cookie File and CartObject no fewer than 48 times and in no fewer than 23 paragraphs.  Niemeyer Report ¶¶ 48 – 53, 55 – 69, 71; Weaver Report ¶ 67.  This trend is continued in their Reply Reports, where Dr. Weaver and Mr. Niemeyer use the phrase Shopping Cart Cookie File no fewer than 55 times and in 32 paragraphs.  Niemeyer Reply Report ¶¶ 7, 10 – 11, 14 – 15, 18, 20, 24 – 32, 37, 39 – 40, 42, 44, 47 – 48, 50 – 51, 53 – 57; Weaver Reply Report ¶¶ 28 and 37.

Based on the testimony and the written statements of ePlus's own experts, the Shopping Cart Cookie File and the CartObject existed in RSS, were known by ePlus's experts, were not

13

accused of meeting any claim limitation, and remain unmodified in RQC.  For the same reason

that the Federal Circuit prohibited consideration of the PID filter in *TiVo*, this Court should

preclude any testimony about the Shopping Cart Cookie File and the CartObject in these

contempt proceedings.

**B.      Error Handling Protocols**

The references to the Shopping Cart Cookie File and the CartObject are not the only – or

even most egregious – example of ePlus's efforts to inject new theories of infringement into

these contempt proceedings in an effort to find an "order list" where none exists.  As noted

above, and as the Court will recall, ePlus argued at trial that the My Cart in RSS satisfied the

"order list" claim limitation.  ePlus did so by demonstrating the addition and deletion of various

selected items from the My Cart.

But in these contempt proceedings, ePlus is attempting to argue that the user interface

serves as an "order list" not when the user is using it in the normal course of business, but only in

the *anomalous situation in which the user encounters a system error*:

> In my Initial Report, I showed that the Shopping Cart Cookie File and CartObject
>
> provide a place to store items that users selected, *but that have errors that must be*
>
> *corrected*.  Initial Report ¶¶ 62–70.  When this happens, the Shopping Cart
>
> Cookie File, CartObject and Requisition Lines window will not reflect the
>
> contents of the Requisition Database.  *This refutes Defendant's entire theory that*
>
> *there is no intermediate list, and therefore, no order list.*

Niemeyer Reply Report ¶ 47 (emphases added).

This is an incredible departure from the theory of infringement advanced below.  Again,

the *TiVo* analysis must focus on features that the patentee contended and proved were infringing

14

at the merits trial.  Dr. Weaver provided the jury with demonstrations to show the creation of an order list in RSS -- not once did he demonstrate the selection of an item as to which there was an error, requiring correction.  That unaddressed situation cannot now be the centerpiece of a contempt proceeding.

The error handling protocols of the adjudged-infringing products were, of course, known to Mr. Niemeyer at the time of the underlying trial.  Niemeyer Feb. 8, 2012 Tr. at 169-70.  But neither Dr. Weaver nor Mr. Niemeyer made any mention of RSS error-handling protocols to the jury:

> Q.  Did you discuss in your testimony at the first trial how errors were processed
> in RSS?
>
> A.  No.

Weaver Feb. 9, 2012 Tr. at 125:6-8; Niemeyer Feb. 8, 2012 Tr. at 176:22-177:3.

Here again, ePlus's own experts allege that the method by which RQC checks for errors is no different from the method employed in RSS.  Niemeyer Reply Report ¶ 20 ("The save() function in RSS performed error checks on all the items in the Shopping Cart Cookie File, and copied all the items that passed the error checks into the REQLINE table in the Requisition Database."); ¶ 48 ("The architecture of the Shopping user interface is such that errors reported by the server-side code are reported in the My Cart [in RSS]/Requisition Lines [in RQC] window using a red icon.").[4]

---

[4]  As Lawson disclosed in its Supplemental Response to Interrogatory No. 5, because RQC implements a direct-to-requisition system, the frequency and the timing of error checking differs in RSS and RQC.  Suppl. Resp. to Rog No. 5 at 14-16.  But the manner in which the error checking occurs remains unaltered in RSS and RQC, and ePlus's new infringement contentions are centered on the fact that RQC performs error checking, and not one when that error checking occurs.  Niemeyer Report ¶ 63 ("The screen image below shows what happens when a user attempts to add a single item that has an error, in this case, having no cost information.").

Because error-handling protocol existed in RSS, and because ePlus chose not to accuse that feature of meeting any claim limitation in the underlying trial, ePlus should be precluded from making any mention of that feature in an effort to demonstrate that Lawson is in breach of the Court's Injunction Order.

### C.     Punchout Access to Multi-vendor Catalogs

Each asserted claim of the '683 patent includes a limitation of "at least two product catalogs."  In the underlying case, ePlus asserted only two theories of how these claim limitations were satisfied:  First, ePlus asserted that the Item Master catalog itself constituted at least two product catalogs; and second, ePlus asserted that each Punchout vendor site constituted a product Catalog, and that items selected from Item Master and Punchout searches, or multiple Punchout searches, could be grouped together on a single requisition.

Now, ePlus is injecting a third theory: that in instances where a single Punchout site includes items from one or more vendors, each such "multi-vendor Punchout site" constitutes two or more product catalogs, *i.e.*, "multi-catalog vendors."

There is no dispute that the existence of <u>multi-vendor</u> Punchout sites was known to ePlus during the underlying trial.  After all, ePlus *solicited testimony* from both ePlus and Lawson witnesses about certain Punchout sites contained products from two or more *vendors*. Dr. Weaver was careful to use the term "multiple vendor catalogs."  Jan. 7, 2011 Trial Tr. at 772-73.  Likewise, in cross-examination of Lawson's witnesses, ePlus's counsel characterized these also as "multi-vendor catalogs."  Jan. 11, 2011 Trial Tr. 1159-60.  But, "multi-vendor catalogs" and "multi-catalog vendors" are fundamentally different concepts. There was *no* testimony or allegation that searching a single Punchout site constituted a search of *two or more* catalogs. Indeed, at one point, ePlus's lead counsel, Scott Robertson, mistakenly characterized a Punchout

site as a "multi-catalog vendor" and quickly *corrected* himself:  "[ePLUS COUNSEL]: One of those examples of a site that you can go that is *multi-catalog vendor - excuse me, multi-vendor catalog*, is Sci Quest; correct?"  Jan. 11, 2011 Trial Tr. at 1159:15-17 (emphasis added).

In this proceeding, ePlus contends that, by its infringement verdict, the jury determined that "multi-vendor catalogs" accessible through a limited number of Punchout sites (including Sci Quest) are actually "multi-catalog vendors" that infringe the '683 patent.  Given that ePlus advanced no such allegation at trial, there is no basis for such a contention.  Having known about this subset of multi-vendor Punchout sites, and having failed to argue below that a single Punchout site with items from multiple vendors satisfied the "two product catalogs" claim limitation, ePlus is precluded from doing so in this contempt proceeding.

## II.    ePlus Cannot Rely On Theories of Infringement That It Alleged, But Did Not Prove, At The Underlying Trial

ePlus and its experts also must be precluded from relying on infringement contentions that it alleged, but which cannot be shown to have been proved, in the underlying proceedings. In particular, where ePlus advanced alternate theories of infringement, ePlus cannot simply *assume* that the jury accepted both alternates.  Instead, ePlus must only focus on those theories that it can demonstrate (by a clear and convincing standard) the jury *actually accepted*.

In the *TiVo v. Echostar* decision, the Federal Circuit made clear that contempt proceedings must focus not on any of the patentee's allegations in the underlying proceedings, but only on those allegations that the jury *accepted*.

The analysis must focus . . . on those aspects of the accused product that were previously alleged to be, *and were a basis for*, the prior finding of infringement, and the modified features of the newly accused product.  Specifically, one should focus on those elements of the adjudged infringing products that the patentee

17

previously contended, *and proved*, satisfy specific limitations of the asserted

claims.

*TiVo Inc. v. Echostar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011) (emphasis added).  At his recent

deposition, ePlus's expert Dr. Weaver confirmed his understanding that this language required

him to focus only on "that which fills both, [*i.e.*,] it was contended by the party, and proven to

the jury."  Weaver Feb. 9, 2012 Tr. at 105:6-9.

But despite acknowledging the plain mandate of *TiVo*, Dr. Weaver proceeds to ignore it

altogether.

This is particularly true in the case of the '683 patent.  As the Court will recall, every

asserted claim of the '683 patent includes a limitation of "at least two product catalogs."  At trial,

ePlus advanced two alternative theories of how this claim limitation might be met.  First, ePlus

argued that the Item Master database itself contains two or more catalogs.  As noted below, this

theory applied with equal force to Configuration No. 2 (which contains Item Master but not

Punchout), which the jury found to *not* infringe any claim of the '683 patent.  Second, ePlus

argued that the adjudged-infringing software's ability to utilize third-party Punchout sites

satisfied the claim limitation.  Weaver Feb. 9, 2012 Tr. at 125-27.  Configurations Nos. 3 and 5,

containing Punchout, were held to infringe claims of the '683 patent.  As ePlus's expert agrees,

in finding that the Lawson configurations infringed on the asserted claims of the '683 patent, the

jury could have credited either theory, or both:

Q.  And they could have found that Punchout fulfilled the maintaining at least two

product catalogs element of claim 28 in rendering their verdict on configuration

number 3, correct?

A.  Correct.

18

Q.  And they could have found that both did, correct?

A.  Yes.

Weaver Feb. 9, 2012 Tr. at 163:15-22.

But as ePlus's own expert further concedes, it is simply impossible to determine with certainty whether the jury credited both theories or only one of them (and if so, which one):

Q.  In that regard, I think you've established that you don't know what they found

to find configuration 3 infringing of the element of claim 28 that relates to

catalogs, correct?

A.  Correct.

Weaver Feb. 9, 2012 Tr. at 170:9-13.

Rather than acknowledge its inability to satisfy the standards set forth in *TiVo*, ePlus audaciously argues that not only is it not limited to those theories that it can demonstrate (by clear and convincing evidence) the jury actually accepted, but that it is entitled to *presume* that the jury accepted all theories that were advanced.  In particular, ePlus now argues that the existence of Item Master in any of Lawson's software configurations is sufficient to satisfy the "at least two product catalogs" claim limitation.  And in so doing, ePlus attempts to reverse the burden of proof by characterizing any effort by Lawson to hold ePlus to its proper burden as an "improper" attempt "to reargue the jury's and the Court's infringement determinations."  Weaver Reply Report ¶ 78 n.12.  That is simply not the case.

The issue for decision is whether a verdict on uncertain grounds satisfies the *TiVo* mandate that a contempt proceeding be limited to that which was "previously contended, and proved," to be infringing.  In a contempt proceeding, where plaintiff carries a heavy burden,

19

ambiguity is a complete defense.  Just as the contention must be "unequivocal" so must the prior

verdict be.  That is not the case here.

III.   **ePlus Should Not be Permitted to Advance Infringement Theories That Rely on Claim Constructions Inconsistent with the Court's Prior Constructions**

A.   **ePlus's Current Argument Relating To RQC's UNSPSC Search Capability Conflicts With The Courts Claim Construction**

Claims 3, 28 and 29 of the '683 patent include the limitation of "converting data relating

to a selected matching item and an associated source to an item and a different source."

At the *Markman* proceedings, ePlus sought a construction that a mere cross-referencing

of data would be sufficient to satisfy the "converting data" claim limitation:  "According to

ePlus, this term does not need construction, but, if construed, should mean: a process of cross-

referencing data relating to a selected matching item and an associated source to an item and a

different source."  *Markman* Order at 28.  Lawson argued that mere cross referencing was not

enough, and that the "converting" claim limitation must accomplish the task of finding a

substitute or equivalent item.  Thus, the Court observed that "[t]he most significant disagreement

between the parties is whether the term 'converting' means 'cross-referencing' or 'substituting.'"

*Markman* Order at 29.

The Court rejected both parties' proposed construction and construed the non-means-

plus-function term (in Claims 28 and 29) to mean "*substituting* data relating to a selected

matching item and an associated source to data relating to an item and a different source."

*Markman* Order at 31 (emphasis added).  While not accepting the entirety of Lawson's proposed

construction, the Court stated, "Lawson is correct that 'converting' requires *more than mere*

*'cross-referencing.'*"  *Markman* Order at 31 (emphasis added).  The Court was also persuaded by

prosecution history indicating that the claim language was meant to cover "identical matching

20

items from different sources, as well as a *suitable replacement* for the selected matching item."
*Markman* Order at 30 (emphasis in original).  The Court went on to clarify that "[c]ross-
referencing simply cannot accomplish conversion."  *Markman* Order at 31.  The Court construed
the means-plus-function element (in Claim 3) to perform the same function: "converting data
relating to a selected matching item and an associated source to data relating to an item and a
different source."  *Markman* Order at 48.

At trial, ePlus proved that searches at the fourth level of UNSPSC category codes met the
"converting" limitations of the '683 patent.  Lawson listened, heard and responded by
eliminating commodity level searching capacity.  As Dr. Weaver himself acknowledges, the
newly-accused software has been modified in such a way that it simply cannot perform the task
of finding identical or equivalent items:

> Q.      I just want for the sake of completeness, your point, if I understand it, is
> that drilling down to the third level in the category search in RQC satisfies this
> claim element because the product of the search at that level will identify cross-
> referenced items, correct?
>
> A.      Correct.
>
> Q.      You are not saying that they identify identical items, correct?
>
> A.      I am not saying that.
>
> Q.      And you're not stating that the product will be all generally equivalent
> items?
>
> A.      I am not stating that.

Weaver Feb. 9, 2012 Tr. at 240:9-21.

Rather than concede (as it should) that the newly-accused product has been significantly altered, and no longer infringes at least Claims 3, 28, and 29 of the '683 patent, ePlus has chosen to blatantly defy the Court's *Markman* ruling and argue that the newly-accused product infringes under a claim construction this Court previously rejected.  Specifically, Dr. Weaver and ePlus *again* argue that the mere cross-referencing of multiple items is enough to satisfy the claim limitation.

> Q.      But they are cross-referenced, in your mind?
>
> A.      Yes.  And these are two more examples in this same paragraph.
>
> Q.      But is it the cross-referencing capability in each case that –
>
> A.      It is.
>
> Q.      -- you're using to satisfy the converting step?
>
> A.      Yes, it is.

Weaver Feb. 9, 2012 Tr. at 240:22-241:9.

As already noted, the Court already rejected ePlus's position when it held that "'converting' requires more than mere 'cross-referencing.'"  Markman Order at 31.  "Cross-referencing simply cannot accomplish conversion."  *Id.*  Dr. Weaver's assertion that cross-referencing alone satisfies the claim language simply does not follow with the Court's construction.  *TiVo* does not permit a patentee to reargue previously-rejected claim constructions: "In making this infringement evaluation, out of fairness, the district court is bound by any prior claim construction that it had performed in the case."  *TiVo* at 883.

### B.      This Court Never Held That A Requisition Must Be "Finalized" In Order To Fulfill The "Means To Build A Requisition" Claim Limitation

Similarly, ePlus has also adopted an impermissible construction of the term "requisition", a term whose meaning has never before been in dispute.  Dr. Weaver now argues that no

requisition exists until it is "final", which he claims occurs when a user clicks "Release." Weaver Report ¶ 81.  According to Dr. Weaver, prior to "Release," the data found in the Requisition Database is not a requisition, but a "requisition-in-progress." *Id.*  This is a new, and inventive theory, that finds no support whatsoever in the record of the merits trial.

At trial, it was undisputed that the data in the requisition database of RSS was the requisition.  In contrast, selected items in RQC are sent directly from the shopping screen to the requisition database of RQC; there is no intermediate order list.  To avoid the fact that items are written directly to a requisition in RQC, Dr. Weaver has manufactured an imagined distinction between a "requisition-in-progress" and a "requisition," in an attempt to argue that selected items in RQC are written to a "requisition-in-progress," not a "requisition," and that a "requisition-in-progress" can be considered to be an order list.  This is pure semantics:  A "requisition-in-progress" and a "requisition" populate the same data structure and consist of the same data; the only difference is ePlus's arbitrary division at a randomly chosen point in time.  ePlus's new definition-of-convenience cannot be the basis for infringement in this contempt proceeding because it fundamentally deviates from the infringement contentions made by ePlus the merits trial.

Because Dr. Weaver's new argument is not aligned with ePlus's prior arguments, Dr. Weaver's testimony should be excluded in this regard.

## CONCLUSION

The contempt hearing must focus on features of the adjudged infringing configurations that unequivocally were contended to infringe, and proved to infringe, the asserted claims of the '683 and '172 patents.  Accordingly, Lawson respectfully requests an order precluding expert testimony from Dr. Weaver and Mr. Niemeyer as to unchanged features of RSS (Shopping Cart

Cookie File, CartObject, error handling protocols and Punchout access to multi-vendor catalogs), and as to Item Master, which was alleged but not proven to infringe the claims of the '683 patent. Additionally Lawson requests an order precluding the same witnesses from testifying to infringement theories that depend on claim constructions at odds with this Court's existing claim construction order.

Respectfully submitted:

**LAWSON SOFTWARE, INC.**

By: _____/s/_____
            Of Counsel

Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
Megan C. Rahman (VSB No. 42678)
Timothy J. St. George (VSB No. 77349)
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
megan.rahman@troutmansanders.com
tim.stgeorge@troutmansanders.com
**TROUTMAN SANDERS LLP**
1001 Haxall Point
Richmond, VA 23219
Telephone:  (804) 697-1200
Facsimile:  (804) 697-1339

Josh A. Krevitt (admitted *pro hac vice*)
Daniel J. Thomasch (admitted *pro hac vice*)
Jason C. Lo (admitted *pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Daniel McDonald (admitted *pro hac vice*)
William D. Schultz (admitted *pro hac vice*)
Rachel C. Hughey (admitted *pro hac vice*)
Andrew J. Lagatta (admitted *pro hac vice*)
Joshua P. Graham (admitted *pro hac vice*)
**MERCHANT & GOULD P.C.**
3200 IDS Center, 80 South Eighth Street,
Minneapolis, MN  55402
Telephone:  (612) 332-5300
Facsimile:  (612) 332-9081

*Counsel for Defendant Lawson Software, Inc.*

25

## CERTIFICATE OF SERVICE

I certify that on this 15th day of February, 2012, a true copy of the foregoing was filed on

the Court's Electronic Case Filing system, which will send a notice of electronic filing to:

Craig T. Merritt
Henry I. Willett, III
Christian & Barton, LLP
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
cmerritt@cblaw.com
hwillett@cblaw.com

James D. Clements
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, MA 02109-2881
jclements@goodwinprocter.com

Scott L. Robertson
Jennifer A. Albert
David M. Young (VSB No. 35997)
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001
srobertson@goodwinprocter.com
jalbert@goodwinprocter.com
dyoung@goodwinprocter.com

*Attorneys for Plaintiff*

_____/s/_____
Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
Megan C. Rahman (VSB No. 42678)
Timothy J. St. George (VSB No. 77349)
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
megan.rahman@troutmansanders.com
tim.stgeorge@troutmansanders.com
**TROUTMAN SANDERS LLP**
1001 Haxall Point
Richmond, VA 23219
Telephone:  (804) 697-1200
Facsimile:  (804) 697-1339

*Counsel for Defendant Lawson Software, Inc.*