DABNEY J. CARR IV
804.697.1238 telephone
804.698.5119 facsimile
dabney.carr@troutmansanders.com

# TROUTMAN SANDERS

TROUTMAN SANDERS LLP
Attorneys at Law
Troutman Sanders Building
1001 Haxall Point
P.O. Box 1122 (23218-1122)
Richmond, Virginia  23219
804.697.1200 telephone
troutmansanders.com

January 19, 2010

**BY MESSENGER**

Fernando Galindo, Clerk
United States District Court for the
Eastern District of Virginia
Spottswood W. Robinson, III and
Robert R. Merhige, Jr.
Federal Courthouse - Room 3000
701 East Broad Street
Richmond, Virginia  23219

     Re:   **ePlus, Inc. v. Lawson Software, Inc.**
           **Civil Action No. 3:09cv620**

Dear Mr. Galindo:

    I enclose defendant Lawson Software, Inc.'s Responsive Claim Construction Brief for filing under seal in the above matter.  By copy of this letter, I am delivering copies of this brief to Judge Payne and to opposing counsel.

    Thank you for your attention to this matter.  With kind regards, I am

                 Sincerely,

                 Dabney Carr

Enclosure
1898067v1
cc:   The Honorable Robert E. Payne - w/e - BY MESSENGER
       Counsel of Record - w/e - BY E-MAIL

**EXHIBIT**
tabbies
1

ATLANTA   CHICAGO   HONG KONG   LONDON   NEW YORK   NEWARK   NORFOLK   ORANGE COUNTY
RALEIGH   RICHMOND   SAN DIEGO   SHANGHAI   TYSONS CORNER   VIRGINIA BEACH   WASHINGTON, DC

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| *e*PLUS, INC., | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 3:09cv620 |
| | ) |
| LAWSON SOFTWARE, INC. | )   **FILED UNDER SEAL** |
| | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT LAWSON SOFTWARE, INC.'S
RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I.  Introduction ........................................................................................................... 1

II. Lawson's Proposed Definitions Should be Adopted. ........................................... 2

    A.    The Grant of ePlus's Unopposed Motion to Vacate the *SAP Markman* Order as Part of a Settlement Does Nothing to Vindicate ePlus's Constructions or its Attack on the Means-Plus-Function Definitions of that Order. .............................. 2

    B.    Contrary to ePlus's Contentions, the Case Law Requires that Means-Plus-Function Clauses be Construed Using the Structure Actually Disclosed in the Specification and Clearly Linked to the Function. ................................................... 3

    C.    Lawson's Proposed Constructions for the Means-Plus-Function Phrases are Correct ................................................................................................................... 10

        1.    Means for building a requisition using data relating to selected matching items and their associated source(s) .......................................................... 10

        2.    Means for building a requisition that uses data obtained from said database relating to selected matching items on said order list ................................ 10

        3.    Means for entering product information that at least partially describes at least one desired item ........................................................................................ 10

        4.    Means for generating an order list that includes at least one matching item selected by said means for searching ......................................................... 10

        5.    Means for searching for matching items in the database ........................... 11

        6.    Means for searching for matching items that match the entered product information in the selected portions of the database ................................... 11

        7.    Means for searching for matching items among the selected product catalogs ................................................................................................... 11

        8.    Means for selecting the product catalogs to search ................................... 13

        9.    Means for processing the requisition to generate one or more purchase orders for the selected matching items ...................................................... 14

        10.    Means for processing said requisition to generate purchase orders for said selected matching items ........................................................................... 14

        11.    Means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source .......... 14

i

12. A multiple purchase order generation module, said purchase order generation module creating multiple purchase orders from a single requisition created with said user generated criteria and said search-module criteria ....................................................................................................16

D. "Catalog" and Other Disputed Terms should be Construed because Claim Scope is an Issue of Law and Construction will Aid the Jury. ..........................................16

1. Catalog / Product catalog ........................................................................18

2. Converting data relating to a selected matching item . . . to an item and a different source ...............................................................................21

3. Matching items.........................................................................................23

4. Selected matching items ..........................................................................23

5. Electronic sourcing system ......................................................................24

6. Subset........................................................................................................25

7. Searching for matching items among the selected product catalogs ..........26

8. Order list ....................................................................................................26

9. Protocol .....................................................................................................26

10. Cross-reference table ...............................................................................26

III. Conclusion ....................................................................................................................27

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
324 F.3d 1313 (Fed. Cir. 2003)..................................................................................21

*C.R. Bard, Inc. v. M3 Sys., Inc.,*
157 F.3d 1340 (Fed. Cir. 1998).................................................................................24

*Catalina Mktg Int'l, Inc. v. Coolsavings.com, Inc.,*
289 F.3d 801 (Fed. Cir. 2002).................................................................................25

*Computer Docking Station Corp. v. Dell, Inc.,*
519 F.3d 1366 (Fed. Cir. 2008)................................................................................24

*Default Proof Credit Card Systems, Inc. v. Home Depot U.S.A., Inc.,*
412 F.3d 1291 (Fed. Cir. 2005)............................................................................3, 14

*E-Pass Techs., Inc. v. 3Com Corp.,*
473 F.3d 1213 (Fed. Cir. 2007)................................................................................22

*Fantasy Sports Props. Inc. v. Sportsline.com, Inc.,*
287 F.3d 1108 (Fed. Cir. 2002).........................................................................19, 20

*Finisar Corp. v. DirectTV Group, Inc.,*
523 F.3d 1323 (Fed. Cir. 2008)..........................................................................14, 15

*Harris Corp. v. Ericsson Inc.,*
417 F.3d 1241 (Fed. Cir. 2005)........................................................................5, 6, 7

*In re Morris,*
127 F.3d 1048 (Fed. Cir. 1997)................................................................................21

*Kahn v. Gen. Motors Corp.,*
135 F.3d 1472 (Fed. Cir. 1998).................................................................................3

*Markman v. Westview Instruments, Inc.,*
52 F.3d 967 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996) ....................................16

*Micro Chemical, Inc. v. Great Plains Chem. Co.,*
194 F.3d 1250 (Fed. Cir. 1997)..................................................................................5

*Netscape Communications Corp. v. ValueClick, Inc.,*
No. 09-cv-225, 2009 WL 3422918 (E.D. Va. Oct. 22, 2009).............................17

*On Demand Mach. Corp. v. Ingram Indus.,*
442 F.3d 1331 (Fed. Cir. 2006)............................................................................................24

*Praxair, Inc. v. ATMI, Inc.,*
543 F.3d 1306 (Fed. Cir. 2008)............................................................................................17

*SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.,*
242 F.3d 1337 (Fed. Cir. 2001)............................................................................................18

*Toro v. White Consol. Indus., Inc.,*
199 F.3d 1295 (Fed. Cir. 1999)............................................................................................13

*WMS Gaming, Inc. v. Int'l Game Tech.,*
184 F.3d 1339 (Fed. Cir. 1999)..............................................................................................4

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,*
442 F.3d 1322 (Fed. Cir. 2006)............................................................................................21

## STATUTES

35 U.S.C. § 112 ¶ 6................................................................................................................3

## MISCELLANEOUS

Manual of Patent Examining Procedure § 2100 (8th ed.)....................................................21

## I.    Introduction

In addressing the means-plus-function terms, ePlus's analysis includes several fundamental flaws.  ePlus fails to show how its proposed corresponding structures are disclosed in the specification or clearly linked to the functions.  ePlus relies on undisclosed structures, misapplying and defying case law that precludes such a practice.  ePlus also improperly relies on structures that it says *could have been* created by those skilled in the art, even though the case law shows that only structure disclosed in the specification *in fact* should be used.  ePlus relies on disclosures of the RIMS '989 patent incorporated by reference, despite case law that clearly prohibits that practice for means-plus-function terms.

Moreover, contrary to ePlus's portrayal, the decision to vacate the *SAP Markman* ruling was the uncontested result of an unopposed motion integral to settling the *SAP* case.  The order vacating the *Markman* Order may eliminate the estoppel effect of that Order, but it by no means vindicates ePlus's flawed proposed constructions of the means-plus-function clauses.

ePlus asserts that several of the other terms and phrases at issue need no construction by this Court and the jury should be left to invoke their ordinary meaning.  However, the differences between the Lawson and ePlus proposed definitions show that leaving the issue to the jury will improperly delegate a legal issue—claim construction—to the fact finder.  Moreover, the intrinsic record shows that ePlus's proposed definitions of "catalog" and other claim terms are affirmatively inconsistent with the specification.  Lawson's proposed constructions correctly capture the invention disclosed in the patents and the meaning of the terms as used in the claims, specification, and file history.

II.     **Lawson's Proposed Definitions Should be Adopted.**

A.     **The Grant of ePlus's Unopposed Motion to Vacate the *SAP Markman* Order as Part of a Settlement Does Nothing to Vindicate ePlus's Constructions or its Attack on the Means-Plus-Function Definitions of that Order.**

Lawson's proposed constructions of the means-plus-function clauses are generally aligned with Judge Spencer's *Markman* decision in *SAP*. While that decision is not binding here, it was the result of extensive, hotly-contested briefing and oral argument, worthy of some consideration, and well-grounded in the intrinsic record and applicable law. ePlus obviously understands it has an uphill battle in proposing definitions of the means-plus-function clauses far broader than those found by Judge Spencer in the *SAP Markman* Order. ePlus goes much too far, however, in asserting Judge Spencer wound up agreeing with ePlus.

The *SAP* court vacated the claim construction order and summary judgment decision pursuant to a settlement of that case. ePlus implies that this decision to vacate vindicated ePlus's positions on the merits, stating Judge Spencer vacated the decision "in response to ePlus's motion wherein it demonstrated that his *Markman* ruling with respect to the disputed means-plus function elements was in error as shown by the evidence at trial." (ePlus Br. at 17.)

ePlus's motion to vacate the claim construction decision was unopposed by SAP. SAP did not oppose it because ePlus filed the self-serving motion as part of its settlement with SAP. Indeed, SAP expressly agreed not to oppose the motion to vacate in the parties' settlement agreement.[1] SAP thus had no reason to challenge ePlus's arguments, and would have breached the settlement if it did. Moreover, the Order does not include any changes to the claim constructions, nor does it enter constructions advocated by ePlus. It simply vacates the Order in

---

[1] Paragraph 3.8 of the ePlus/SAP settlement agreement states in its entirety: "Claim Construction Order. In the event that ePlus files a motion with the Court to vacate its claim construction order, SAP acknowledges and agrees that it will not oppose such motion." (Ex. A.)

2

light of the "UNOPPOSED" motion to vacate. (Young Exs. 12, 14.) ePlus did not obtain a

reasoned decision from the court adopting its claim constructions. Instead, it won a collusive,

unopposed motion to vacate that included no claim constructions, warranting far less

consideration than the original *Markman* Order.

ePlus's motion to vacate was filled with errors. For example, ePlus's memorandum

repeatedly urged that the *Markman* Order should be vacated because the Court did not rely on

the disclosure of the RIMS '989 patent, incorporated by reference in the patents in suit, to

provide the corresponding structure to the means-plus-function claims under 35 U.S.C. § 112 ¶

6.[2] (*See* Young Ex. 12 at 9-11.) However, as Lawson showed in its opening brief, a disclosure

incorporated by reference *cannot* provide corresponding structure under 35 U.S.C. § 112 ¶ 6.

*Default Proof Credit Card Systems, Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1301 (Fed.

Cir. 2005). ePlus's effort to use its own self-serving, unopposed memorandum supporting the

motion to vacate as some sort of proof that Judge Spencer eventually "came around" and adopted

ePlus's constructions is wholly unsupported by the facts and law and should be rejected. The

original decision remains of value and supports Lawson's proposed constructions.

**B.      Contrary to ePlus's Contentions, the Case Law Requires that Means-Plus-Function Clauses be Construed Using the Structure Actually Disclosed in the Specification and Clearly Linked to the Function.**

Lawson's opening brief showed that section 112 ¶ 6 dictates that a means-plus-function

clause must be construed to cover the structure disclosed in the specification. Moreover, the

disclosed structure relied upon must be clearly linked or associated with the claimed function, as

such linkage "is the quid pro quo for the convenience of employing §112 ¶6." *Kahn v. Gen.*

*Motors Corp.*, 135 F.3d 1472, 1476 (Fed. Cir. 1998).

---

[2] U.S. Patent No. 5,712,989 ("the '989 patent") is attached to Lawson's Opening Brief as Exhibit D.

ePlus seeks to evade these basic requirements by arguing that the corresponding structure must be a special purpose computer programmed to perform the disclosed algorithm. ePlus implies that computer-based claims are an exception to the express statutory and case law requirements and asks the court to ignore the physical structure actually disclosed in the specification. However, even ePlus's cases show that the physical structure disclosed must be used to construe means-plus-function clauses and should not be ignored.

For example, ePlus cites *WMS Gaming* to support its argument. In *WMS Gaming*, the parties *stipulated* that the corresponding structure for the function recited by the means-plus-function clause at issue was a "microprocessor, or computer, to control the operation of the slot machine, including the operation of the machine in the assignment of numbers to reel stop positions." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1347 (Fed. Cir. 1999). Thus, what physical structure to include with the algorithm was not an issue. Furthermore, the court agreed with WMS, the accused infringer, that the district court construed the corresponding structure too broadly. *Id.* at 1348. The Federal Circuit held that the structure was not just *any* processor programmed with any algorithm for performing the recited function, but rather had to be a microprocessor programmed to perform the complete six-step algorithm disclosed in the specification and linked to the recited function. *Id.* Thus, *WMS Gaming* is consistent with Lawson's emphasis on finding the complete structure in the specification at issue clearly associated with the recited function. *WMS Gaming* does not support ePlus's assertion that the structure for every computer-implemented means-plus-function clause is a special purpose computer programmed to perform a disclosed algorithm. The case supports Lawson's position that means-plus-function clauses are limited to the specific structure and algorithm disclosed and clearly linked to the recited function.

4

ePlus also cites *Micro Chemical, Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258-59 (Fed. Cir. 1997). (ePlus Br. at 6, 19.)  The *Micro Chemical* case is quite consistent, however, with the requirement that the corresponding structure must be in the specification and clearly linked to the function.  There, the district court erred by limiting a "weighing means" function to require "sequential and cumulative weighing." *Id.*  Once the proper function was identified, the Federal Circuit found disclosure in the specification clearly linking a weight scale to that function: "weigh means, for example, may comprise weight scale means . . . ." *Id.*  The case does not authorize a court to ignore disclosed structure linked to a recited function.

ePlus also implies that *Harris* allows the court to ignore the specific disclosed structure for computer-implemented means-plus-function elements, arguing that in *Harris* "the proper construction was simply a two-step process for performing the recited function." (ePlus Br. at 19-20.)  *Harris* actually contradicts ePlus's argument.  Indeed, ePlus takes the same position that was rejected in *Harris*.  In *Harris*, the patentee argued that *WMS Gaming* "only establishes that the corresponding structure of a computer-implemented function must include those features of the algorithm that are necessary to the performance of the recited function - not that every detail of the specification's algorithm is a limitation on the claimed invention" and that the two-step process is "merely an optional feature of the invention, an example of how to implement the claimed function." *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1249 (Fed. Cir. 2005).  The Federal Circuit disagreed, explaining that "*WMS Gaming* restricts computer-implemented means-plus-function terms to the algorithm *disclosed in the specification*." *Id.* at 1253 (emphasis added).  The court adopted the narrower construction.  What ePlus called "simply a two-step process" in *Harris* is not so simple:

> We hold that the corresponding structure for the "time domain processing means" is a
> microprocessor programmed to carry out a two-step algorithm in which the processor

5

calculates generally nondiscrete estimates and then selects the discrete value closest to each estimate.  Specifically, the patent discloses, as corresponding structure, a processor 37, "advantageously comprised of a pair of processors – a support processor (SUPP) [37A] and a fast array processor (FAP) [37B,]" shown in Figure 4 and described at col. 11, l. 37 – col. 12, l. 32, which is programmed to carry out the disclosed "data recovery algorithm" illustrated in Figures 8A, 8B, and 9 and described at col. 7, l. 18 – col. 8, l. 38; col. 13 l. 45 – col. 14 l. 20; and col. 15, l. 2 – col. 16 l. 11.  Processor 37A carries out the first part of the algorithm: calculating the effect of the medium and applying it to the received symbols.  '338 patent, col. 15, ll. 2-6.  Processor 37B "examines the . . . estimates and compares these codes with those corresponding to the code values capable of being transmitted."  *Id.* col. 15, ll. 13-17.  Thus, each processor performs one of these steps.

*Id.* at 1254.  A comparison of this holding with Lawson's and ePlus's proposed constructions demonstrates that Lawson is consistent with *Harris* and ePlus is not.  *Harris* undermines ePlus's assertion that its means-plus-function clauses should be broadly construed to cover any special purpose computer programmed to perform the "necessary" algorithm.  *Harris* strongly supports Lawson's approach, which construes the clauses as limited to the *specific* processor or other structure recited to perform the function, and the *complete* recited algorithm performed using such structure and *linked* to that function.  The issue is not whether one or the other approach is "simple" or "complicated."  Section 112 ¶ 6 must be followed, whether the patentee chose to disclose a complex or simple structure as the structure corresponding to the recited function.

ePlus repeatedly asserts that the Lawson/*SAP* court's constructions for means-plus-function terms 1, 2, 3, 5, 6, 7, and 8 are wrong because they require the recited means execute on a "local computer" while the patents in suit disclose "a networked embodiment of the invention that is not limited to execution on a local computer."  (ePlus Br. at 17-18; *see also id.* at 21, 23, 25, 27-29.)  This criticism, however, is based on a misinterpretation of the constructions.  The constructions do not require that all functions be performed on a local computer.  Instead, they state that the recited function is *initiated* from a local computer.  (*See* Lawson Appendix constructions for terms 1, 2, 3, 5, 6, 7 ("software means *initiated from* requisition/purchasing

6

system (40 or 240) running on local computer (20 or 220)"), term 8 ("Software *initiated from*

catalog search program (50 or 250) running on local computer (20 or 220)").) This accurately

depicts the disclosed structure. In the local as well as network embodiments disclosed in the

patent, the functions are *initiated* at the local computer. In the networked embodiment shown in

Fig. 1B, "Each CSR [Customer Service Representative] has a local computer 220 . . . . Local

computer 220 is provided with programs including requisition/purchasing system 240, Shell

program 252 and a graphic user interface 254." ('683 patent, 17:17-20. *See also id.* 17:28-31

(order list created by entering catalog numbers in graphic user interface, which is at the local

computer).)[3]

    ePlus cites testimony regarding the networked environment. Such testimony is extrinsic

evidence which cannot overcome the intrinsic evidence. In any event, the cited testimony

confirms that in the networked environment the users "enter the information locally." (ePlus Br.

at 22 n.24.) Thus, the Lawson/*SAP* constructions fully encompass the network embodiment

disclosed in the patents.

    ePlus also argues that the Lawson/*SAP* means-plus-function constructions are wrong

because they limit the claims to communication between the requisition and searching programs

using the DDE communication protocol. According to the inventors, the DDE ("dynamic data

exchange") protocol was the logical protocol to use for these communications because it was the

best way for two programs on a PC using OS2 or Windows operating systems to exchange data:

    Q. So with respect to the role that you described here, I think the first thing you
    mentioned was that Fisher was involved in selecting the interface technique; is that
    accurate?

---

[3] U.S. Patent No. 6,023,683 ("the '683 patent") is attached as Exhibit A to Lawson's Opening
Brief, U.S. Patent No. 6,505,172 ("the '172 patent") is attached as Exhibit B to Lawson's
Opening Brief, and U.S. Patent No. 6,055,516 ("the '516 patent") is attached as Exhibit C to
Lawson's Opening Brief.

A. Yes.

Q. What technique did Fisher select?

A. We selected the dynamic data exchange technique.

Q. What other options were available to you?

A. The other options available were using a database to effect data transfer and the use of sockets to effect a data transfer.

\*\*\*\*

Q. Dynamic data exchange was the preferred method of interfacing if you're on a PC using OS2 or Windows?

A. Yes.

(Ex. D (Kinross Depo.) at 133:10-21, 136:4-7.)  The DDE protocols are the only protocols linked in the patents to the data transfers between the requisition/ purchasing system and the shell program or search program.  The patents disclose only the DDE protocol as the protocol used for this transfer.  As illustrated in Figure 2, the link between the Requisition/Management system 110 and search program 50 is provided by an interface 60:



Fig. 1C also shows interface 60, here connecting Shell program 52 and program 44A, part of the

RIMS requisition system 44:



"As shown in FIGS. 1C and 2, interface 60 is also a part of electronic sourcing interface system

5. Interface 60 communicates shared data between requisition/purchasing system 40 and search

program 50. Interface 60 is preferably based upon the dynamic data exchange ('DDE') protocol

provided by OS/2 operating system 32." ('683 patent, 5:18-23.)  While the patent says the DDE

protocol is preferred, it discloses no alternative protocol for interface 60.

The other communications protocols cited by ePlus are mentioned in the specification,

but they are found with CICS application 34, wholly within the requisition system 40.  (*See* '683

patent, Fig. 1A.)  Those CICS protocols promote program execution *within* the requisition

system, but do not facilitate and are not linked to data transfer in interface 60 *between* the

requisition system and the search program or its associated shell:

- "XCTL 74 is a protocol *within CICS application* 34 that directs the execution of a program, as would readily be understood by one of ordinary skill in the art." ('683 patent, 6:45-46 (emphasis added).)

- "LINK 82 is a protocol *within CICS application 32* that directs the execution of a program, as would readily be understood by one of ordinary skill in the art." ('683 patent, 6:53-56 (emphasis added).)

In all disclosed embodiments the interface is "based on" the DDE protocol. DDE, not XCTL or LINK, is the only protocol that is disclosed to transfer data between the requisition and search/shell programs, a required aspect of a number of the claimed functions. The XCTL and LINK protocols were not even identified in inventor testimony as alternatives to the DDE protocol.

Whether or not "a skilled artisan would have appreciated" other communication protocols *could have been* used for communication between the requisition and search systems is irrelevant. The fact is that none of them *are* linked to the recited functions, and those protocols are used for very different purposes. Indeed, ePlus seems to agree, as it does not cite XCTL or LINK as alternative protocols in *its* constructions.

## C.   Lawson's Proposed Constructions for the Means-Plus-Function Phrases are Correct.

The above sections address ePlus's arguments that are common to virtually all of the means-plus-function phrases. Below Lawson addresses other issues specific to individual or groups of the means-plus-function clauses.

1. Means for building a requisition using data relating to selected matching items and their associated source(s)
2. Means for building a requisition that uses data obtained from said database relating to selected matching items on said order list
3. Means for entering product information that at least partially describes at least one desired item
4. Means for generating an order list that includes at least one matching item selected by said means for searching

ePlus's proposed constructions of these clauses are all subject to the common flaws discussed above. ePlus's constructions do not recite the specific corresponding hardware

10

disclosed in the specification, fail to recognize the disclosure of a local computer to at least initiate the functions, and fail to include the complete algorithms clearly linked to the functions in the specification. (*See, e.g.*, '683 patent, 6:54 – 8:39 (disclosing creating a requisition and stating "The first step in creating a requisition . . . ."); *see also* Lawson Br. at 9-14.)

5.    Means for searching for matching items in the database
6.    Means for searching for matching items that match the entered product information in the selected portions of the database
7.    Means for searching for matching items among the selected product catalogs

Lawson moved the *SAP* Order's concatenation step to these means-for-searching clauses from the clauses involving selecting catalogs to search. Lawson's opening brief explains why this makes sense. The change generally does not broaden or narrow the claims as a whole, since it simply moves the structure from one clause to another. Lawson submits it is simply more accurate to place that structure with searching.

The patent specification discloses that concatenating the selected catalogs is part of *searching*, occurring *after* the user *selects* the catalogs to be searched. Means-plus-function terms 5, 6, and 7 involve searching, and thus recite a concatenating step. ePlus argues that the *Ariba* court found to the contrary. (ePlus Br. at 24.) The *Ariba* court's construction does not support ePlus, however. The *Ariba* court concluded that simple selection of a portion of catalogs does not require concatenation. (Lawson Br. Ex. E at 12.) This decision was outside the context of construction under section 112 ¶ 6. Consistent with *Ariba*, Lawson does not argue that the method requires concatenation, merely that the means-plus-function clauses should be construed to cover the structure disclosed for and linked to searching, including concatenation.

Lawson also agrees that there can be more than one catalog database. ('683 patent, FIG. 1B, 17:55-64.) In such cases, it is still possible to concatenate catalogs within a database. (*Id.*

11

17:60-64 & 18:32-39 (catalog databases disclosed as containing at least two catalogs with no prohibition on concatenating across two databases).)  Contrary to ePlus's assertions, there is no structure or method disclosed that would preclude concatenating catalogs.

The *SAP* and Lawson proposed definitions all include the step of "searching local RIMS databases." ePlus argues "nowhere in the patent specification does it describe the search engine program searching RIMS databases." (ePlus Br. at 23, 27-28.)  But this argument is misdirected.  The *SAP*/Lawson constructions do not require that the *search program* search the RIMS databases.  Rather, as shown below, the disclosed searching structure recites *RIMS* searching the RIMS databases, and then passing control to the search program (TV/2) to search catalog databases.  As shown below, the patent describes starting searches with the RIMS system, and if necessary using the search program:

> The entire process of listing, sourcing and ordering products using Fisher RIMS system 40 can be completed without any reference to a search program 50. As described herein, however, limited fields on specific items can be transmitted from Requisition Item Table 46 to search program 50, and more completed fields of the same or different items can be received from the search program 50 into a Requisition Item Table 46. . . .
> The user can next enter desired items and quantities for the requisition. Each desired item may be identified by entering its distributor catalog or part number, if known, in the field below the STOCK NBR label on the appropriate line in Requisition Item Table 46 shown on Requisition management data screen 110. . . . . Once the user has entered such information at least partially describing a desired item on Requisition Management data screen 110, he or she may wish to initiate a search of catalog database 36 to find all the part numbers contained in catalog database 36 that match the part number entered or other information on Requisition Management screen 110.

('683 patent, 7:36 – 8:8; '172 patent, 7:66 – 8:13.)

Lawson's proposed construction recognizes that the searching structure disclosed in the specification includes structure that allows the RIMS system to initiate searches of its own databases prior to passing control to the search program.  The search described relates to placing an item on a requisition using RIMS and then, if desired, searching for all items in a catalog

database that match the part criteria of the item already on a requisition. (*Id.*) There is no searching among selected product catalogs within the RIMS system, but rather the catalog searching is performed at the search program. The search program structure selects and concatenates catalogs, and prioritizes search criteria, as included in Lawson's proposed constructions. The other excerpt ePlus cites describes a portion of the operation of the shell program and the search program. ('683 patent, 8:40 – 10:20; '172 patent, 8:45 – 10:21.) ePlus's definitions are flawed because they leave out steps of how the search program actually operates that are disclosed in columns 9-10 of the patents and clearly linked to searching.

        8.    <u>Means for selecting the product catalogs to search</u>

ePlus argues that this clause does not require selection of "two or more catalogs" to search. The sections of the specification that ePlus cites in support of its proposed construction do not, however, support its argument that a single catalog can be searched. ('683 patent, 8:8-26 & 9:19-34 (entering the letter "s" refers to selecting an item, not a catalog), 9:52 – 10:20 (refers to multiple catalogs, not a single catalog).) Lawson showed how this is the proper construction in the context of the claim as a whole. It is also consistent with what the patent calls an "important feature of the invention," involving searching a "catalog database of items," which is contrasted with "known prior art CD-ROM catalog systems . . . in which the information used to create the purchase order is limited to that contained in the product catalog of a single vendor." ('683 patent, 15:50-58.) *See Toro v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1301 (Fed. Cir. 1999) (claims properly narrowed to include structure "important to the invention").

ePlus also asserts that "It is inappropriate to incorporate a hardware-based element into a construction that calls for the procedures executed by the software." (ePlus Br. at 21.) However,

as shown above, if (as here) the specification *discloses* hardware corresponding to the function, then a means-plus-function clause must be construed *using* that structure.

9. Means for processing the requisition to generate one or more purchase orders for the selected matching items

10. Means for processing said requisition to generate purchase orders for said selected matching items

11. Means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source

Lawson showed that there is no corresponding structure for means-plus-function terms 9-11. ePlus, implicitly acknowledging the weak disclosure in the patents in suit, cites disclosure of the '989 patent, incorporated by reference, to provide the otherwise-missing structure. While incorporation by reference is appropriate for non-section 112 ¶ 6 clauses (as indicated in *In Re Fouche* cited by ePlus), a corresponding structure cannot be incorporated by reference for purposes of section 112 ¶ 6. *Default Proof Credit Card Systems*, 412 F.3d at 1301.

ePlus asserts that means-plus-function claims should be "liberally construed to encompass any description sufficient to allow a skilled artisan to program a computer to perform the applicable function." (ePlus Br. at 19.) Lawson finds no authority for "liberally construing" these clauses, and this loaded phrase provides no assistance to the construction process. Moreover, even the cases ePlus cites make it clear that the patent must provide adequate disclosure, such as "a mathematical formula, in prose, . . . , or as a flow chart," to support a section 112 ¶ 6 clause, including enough of the algorithm to provide the necessary structure. *Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008). Here, no such formula, prose, or chart is disclosed to show how to generate multiple purchase orders or convert data relating to items.

The evidence cited by ePlus in support of its proposed construction for the purchase-order clauses and presumably relied upon in prior decisions describes the *result* of generating a

purchase order, but not the algorithm for *how* it is generated.  ('683 patent, 15:20-54.)  This section cites step 114, called "Purchase Orders," but a mere functional box in a drawing and a description of its end result does not disclose an algorithm for how to carry out the function. This function cannot be left inside a black box, for the specification emphasizes, "It is an important feature of the present invention that . . . the resulting requisition [is] then divided into one or more purchase orders."  (*Id.*)  If the feature is so important, it is not too much to ask that the patent disclose how it is performed.

Similarly, the parts of the specification cited by ePlus do not support ePlus's proposed construction of "means for converting . . . ."  They do not provide the structure missing from this element.  The excerpts cited by ePlus ('683 patent, 4:60 – 5:8) describe the contents of host pricing and inventory databases, but are not linked in the specification to the function of converting as required by section 112 ¶ 6.

ePlus claims there are "numerous references to the means used for converting data." (ePlus Br. at 26.)  It cites the purported support for this assertion in footnote 33.  Although the cited excerpts are alleged to refer to a "converting process," that phrase is not used in any of the cited sections.  ('683 patent, 14:35-45, 16:8-32, 16:54-62.)  ePlus must support its assertions with more than incorrect cites and conclusory claims of "numerous" references.

The '683 patent, 16:19-32, describes a process of "substitution," which supports Lawson's proposed construction of the non-means-plus function step of "converting data relating to a selected matching item . . . to an item and a different source" discussed below.  Thus, if the patents disclose any structure at all for converting, at a minimum the structure should at least include cross-reference tables and the recited substitution process using such tables.  ('683

patent, 10:43-52, 16:19-32.)  If the Court finds structure corresponding to converting means, it

must at least include the tables and a substitution as required in *SAP*.

>    12.    A multiple purchase order generation module, said purchase order
>            generation module creating multiple purchase orders from a single
>            requisition created with said user generated criteria and said search-
>            module criteria

ePlus indicates that the word "module" shows this is not a means-plus-function clause.

ePlus did not consider the *Ranpak* case cited by Lawson, which says such a term fails to provide

enough structure to avoid 112 ¶ 6.  This is a means-plus-function element because "module"

does not provide structure for this claim element.  Lawson's proposed construction is not

inconsistent with the fact that other phrases such as "catalog collection searching module" or

"requisition module" are not means-plus-function terms because those complete phrases include

*additional* structure sufficient to take them outside the scope of section 112 ¶ 6.  (*See, e.g.*, '516

patent claim 21 (referring to structures including a "collection of catalogs of items stored in an

electronic format" and "data fields" as recited in those claim phrases).)  In contrast, here the

clause only describes functions.  ePlus fails to address *Ranpak* and thus its attack on Lawson's

construction fails.

**D.    "Catalog" and Other Disputed Terms should be Construed because Claim
       Scope is an Issue of Law and Construction will Aid the Jury.**

Claim construction is an issue of law.  *Markman v. Westview Instruments, Inc.*, 52 F.3d

967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  Failure to resolve legitimate disputes over

the meaning of terms by telling the jury that the terms have their plain and ordinary meaning

improperly delegates that legal issue to the fact finder.  It effectively leaves the lawyers to argue

before the jury over conflicting interpretations over the legal issue of claim scope.  It also

impairs post-trial review.  Thus, where the parties dispute the scope of a term, the court should resolve that dispute.

"The overarching goal of claim construction is to aid the jury's understanding of claim terms".  *See Netscape Communications Corp. v. ValueClick, Inc.,* No. 09-cv-225, 2009 WL 3422918, at *18, *20-21 n.15 (E.D. Va. Oct. 22, 2009).  In *Netscape,* the court rejected the argument that terms such as "file" and "computer readable medium" did not require construction because "the parties' disputes over these claim terms are 'fundamental' and 'reliance on the term[s'] 'ordinary meaning[s]' does not resolve the parties' dispute."  *Id.* (quoting *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* 521 F.3d 1351, 1360-63 (Fed. Cir. 2008)).

The same logic applies here.  Lawson's proposed constructions will be helpful to the jury. There are legal issues in dispute—namely the scope of the claims—that should be resolved by the court.  This is clear because when ePlus argues that a term should not be construed, it alternatively argues for a construction different from Lawson's.  Resolving the issues allows the jury to decide the disputed factual issues.  If there are no disputed facts, the case can be resolved on summary judgment.

Claim terms should not be limited just because they are used in the specification to describe the preferred embodiment.  However, the context of the patent may narrow a term that out of context may be broader.  This is particularly true for statements in the patent that are not merely part of a description of one embodiment, but rather a description of the invention as a whole.  For example, a term should be narrowed if the Summary of the Invention's description of the objects of the invention indicates a narrower scope.  *See Praxair, Inc. v. ATMI, Inc.,* 543 F.3d 1306 (Fed. Cir. 2008) (reversing the district court's broad construction of "flow restrictor" because the court failed to take into account the "fundamental object of the invention" as

disclosed in the patent specification). Moreover, even the detailed description may narrow a term if the description indicates a limitation on the invention itself rather than just one embodiment of it. *See SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341-45 (Fed. Cir. 2001) (explaining that "when the 'preferred embodiment' is described as the invention itself, the claims are not entitled to a broader scope than that embodiment" (citations omitted)).

      1.     Catalog / Product Catalog

ePlus argues for the purported ordinary meaning of "catalog," relying on a single section from the specification and a dictionary lacking the context of the patent.[4] Its definition starts with the phrase "an organized collection of items and associated information." It then lists information which the collection would "typically" include. Everything after the term "typically," however, is essentially meaningless, as none of it would be *required*. Far from helping the jury make decisions, such an open-ended word invites confusion and mischief. ePlus's definition of catalog thus only requires "an organized collection of items and associated information." Moreover, even if the "typically" information was required, this definition would include many things not ordinarily considered to be catalogs, such as purchase orders, packing lists, and shopping lists. Thus, it is not the "plain and ordinary" definition of catalog at all.

Of particular relevance to claim construction, ePlus's proposed construction of "catalog" contradicts the intrinsic record. The specifications and claims include references to items that are not catalogs such as "order list," "purchase orders," "cross-reference table," "requisition," and (from the RIMS patent) a "parts master." Yet ePlus would apparently argue that all of these

---

[4] Even the dictionary that ePlus relies on recognizes that "catalog" can have different meanings in different contexts, as definition 1b supports Lawson's proposed construction. (Ex. E ("A publication containing such a list [a mail-order catalogue].").)

clearly *non*-catalog lists are catalogs since they are "organized collections of items and associated information such as description, price, and stock number." (*See, e.g.*, '516 patent, claim 17 ("referring to a "non-catalog database containing a cross-reference table").) The Order List, for example, shown in Appendix VI (*see* '683 patent, 12:38-40) is such a *non*-catalog organized list, including part number, description, and price:

APPENDIX VI

| ITEMS SELECTED | | | |
| --- | --- | --- | --- |
| Part Number | Description | | List Price |
| 13246818F | ISOTEMP OVEN MDL818F 230 V | | 3495.00 |
| Help | Cancel | Delete   Delete All   Order | Description |

The specification clearly distinguishes these records from catalogs.  Catalogs are stored in catalog database 36, whereas these other item lists are stored in databases 42A-C and 11.  (*See* '683 patent, Fig. 1A; Ex. D (Kinross Depo.) at 176:19-24.)  One of ordinary skill reading the intrinsic record would conclude that a catalog is *not* an order list, purchase order, requisition, cross-reference table, or any of several other organized collections of items and associated information specified called something other than a catalog.  ePlus's proposed definition thus fails.

Lawson's proposed definition, in contrast, properly reconciles the various lists of items, and properly distinguishes "catalogs" from the non-catalog lists of items.  "A collection of text and images organized and published by a vendor, representing products sold by that vendor," is perfectly consistent with the use of "catalogs" throughout the patents, and also serves to distinguish catalogs from the other lists.  This definition should be adopted because it is the only one consistent with what a catalog is and is *not* in the specification. *See Fantasy Sports Props. Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1114 (Fed. Cir. 2002) (adopting narrower definition

19

of "bonus points" that distinguished actual football points in view of distinct use of "bonus points" and "football points" in specification).

Lawson's definition is also dictated by the description of the invention (not just preferred embodiments) in the ePlus patents. All the objects of the invention refer back to searching catalogs, and in particular an object of the invention is to provide a system for "searching large volumes of product information such as would be included in a vendor product catalog." (*See* '683 patent, 2:61-63. *See also id.*, 3:3-9 (the Summary of the Invention states "[i]n accordance with the invention . . . the system includes a computer that maintains a catalog database of data including product information . . . relating to catalog items available from vendor product catalogs").) In the patents, every type of "catalog" listed is published by a vendor. ('683 patent, 4:47-60.)

ePlus criticizes Lawson's motives, but at least Lawson is consistent. ePlus now argues for a broad definition of catalog not limited to collections published by vendors, but it was more than happy to limit the scope of catalog to be source- or vendor-specific during the ongoing reexaminations when it needed to distinguish prior art (emphasis added):

- "The Examiner appears to have improperly construed 'multiple catalogs associated with respective source' as including a single catalog containing goods produced by more than one manufacturer, *even though the catalog is a single retailer's catalog*." (Ex. B (Response of May 29, 2008 in U.S. Reexamination No. 90/008,104 at 28-29).)
- "Moreover, there is no explicit disclosure in the relied upon portion of the reference of a catalog that *is associated with a particular source*." (Ex. C (Exhibit 4 to Appeal Brief in U.S. Reexamination No. 90/008,104 at 35 (37 C.F.R. § 1.132 Decl. of Brooks L. Hilliard)).)

In all these citations, ePlus argued that a "catalog" as used in the patents must be associated with a single source or vendor. These citations also show ePlus admitting that a single list with items from multiple vendors is not multiple catalogs.

20

ePlus seeks to have it both ways—a narrow definition to avoid the prior art, but a broad definition when asserting infringement. But claims do not blow with the wind. In litigation, they are construed the same or validity and infringement. *See, e.g., Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 324 F.3d 1313, 1330 (Fed. Cir. 2003). Even worse, ePlus advocated the narrower, vendor-specific definition of "catalog" at the Patent Office even though, unlike the court, the PTO must give terms their "broadest reasonable meaning" in evaluating patentability. Manual of Patent Examining Procedure § 2100 (8th ed.); *In re Morris*, 127 F.3d 1048, 1054-55 (Fed. Cir. 1997). ePlus fails to explain how its proffered construction before this court, not limited to particular vendors, is consistent with its PTO position that the broadest reasonable construction of "catalogs" still requires that a catalog must emanate from a "single retailer" or vendor.

Lawson's definition differs from the *SAP* definition. But it is no surprise that some claim construction issues may vary. *See Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326 (Fed. Cir. 2006) ("[T]he legal function of giving meaning to claim terms always takes place in the context of a specific accused infringing device or process."). The fact is that Lawson's proposed construction is totally consistent with organized collections of item information *not* called catalogs in the specifications, while ePlus's proposed definition is not.

      2.   <u>Converting data relating to a selected matching item . . . to an item and a different source</u>

The parties disagree about whether this term requires "substitution" or merely "cross-referencing." ePlus attacks Lawson's definition because, in the specification, catalog IDs differ between two entries in a cross-reference table. Lawson's proposed construction takes this into account, however, as "matched" encompasses either identical codes or paired codes placed in

21

conjunction with each other in a table to do a lookup. Thus, this attack on Lawson's definition fails.

This step is found in method claims 28 and 29, which recite discrete acts such as "selecting" catalogs to search and searching for matching items. In particular, the term at issue is a method step that requires action, namely "converting" certain data related to a "selected" matching item to certain other data. This requires that the item be selected *before* the converting takes place. *See E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) ("Substantively, because the language of most of the steps of its method claim refer to the completed results of the prior step, E-Pass must show that all of those steps were performed in order.").

The problem with ePlus's definition is that it fails to recognize this context. ePlus's citation to the specification does not describe action consistent with the claims. ePlus advocates the purported step of "cross-referencing." But this is really no step at all. ePlus's definition appears to cover a cross reference table which is not even being used for any action. Apparently, ePlus contends that the tables, even when unused, are "cross-referencing" data and thus "converting." Read in context of the method claims (claims 28 and 29 of the '683 patent), however, this approach makes no sense as it does not occur with after "selecting" a matching item.

Thus, converting cannot occur simply while a cross reference table passively exists. To convert, *something* must happen to the selected matching item data. That "something" is replacing the data relating to a "selected" item with data relating to another item. Converting thus requires substitution as described in the '989 patent, and not merely cross-referencing as ePlus asserts. (*See* '683 patent, 14:38-45 (referencing "change," which is analogous to

substitution, not cross-reference), 16:19-32 (Appendix X shows a change or substitution or one entry for another), 16:19-32 (describing a process of substitution).)

In addition, Lawson's proposed construction for "sourcing and pricing" is supported by the patents. ('683 patent, 10:43-54, 16:19-32.)

### 3.   Matching items

Lawson's proposed construction of "matching items"—"the results of a search of items matching a user-entered search criteria (i.e. "Hit List")"—is consistent with the sections of the specification cited by ePlus ('683 patent, claim 3, 9:34-42) and the sections of the specification relied on in Lawson's opening brief. ePlus's proposed definition is incorrect because it does not recognize that a user enters the search criteria. As the invention is described in the Summary of the Invention, information is "entered by a user, and utilized by a means for searching the database for catalog items matching that information . . . ." ('683 patent, 3:10-15.)

### 4.   Selected matching items

ePlus asserts that "selected matching items" has a plain and ordinary meaning. This purported plain and ordinary meaning has changed from the time ePlus proposed initial constructions ("items returned in search results *that satisfy search criteria and* are selected for inclusion on a *hit list* or in a requisition") and its claim construction brief ("items returned in search results that are selected for inclusion on an *order list* or in a requisition"). Lawson's proposed construction of "one or more items selected by a user in the search program from the list of 'matching items' for inclusion in an order list" is correct based on the intrinsic evidence cited in its opening brief. ePlus appears to be moving more towards Lawson's proposed construction, as it now acknowledges that the results are selected for inclusion on an order list instead of a hit list.

ePlus's updated construction is still incorrect because it improperly allows the results to be selected for inclusion on a requisition in addition to an order list, and because it is unlimited as to who selects the items. ePlus's citations support Lawson's proposed construction, not ePlus's. In the '683 patent claim 3, while the selected matching items are used to create a requisition, each such item is not required in this claim to be present on a requisition. Instead, the *selected* matching items are those chosen by the user from a Hit List (the "matching items") to be transmitted back to a requisition program on an Order List. In short, many are called, but few are chosen. The '172 patent claim 1 also supports Lawson's position that the selected matching items are placed on a generated order list and are selected by a user. ("means for generating an *order list* that *includes at least one matching item selected* by said means for searching; means for building a requisition that uses data obtained from said database relating to *said selected matching items on said order list*" (emphasis added)). And the '683 patent, 10:21-43, cited by ePlus, actually supports Lawson's construction and not ePlus's because it demonstrates that a user creates an order list of selected matching items. Consistent with this, the patent states that the requisition is not made from the list of selected matching items; rather, the requisition is made from "data obtained from said database relating to said selected matching items". (*See* '683 patent, 13:1-28.)

### 5. Electronic sourcing system

The law is clear—a preamble does not act as a claim limitation unless it states a necessary and defining aspect of the invention. *See Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1350 (Fed. Cir. 1998); *On Demand Mach. Corp. v. Ingram Indus.*, 442 F.3d 1331, 1343 (Fed. Cir. 2006)). In this case it does not, so the term need not be construed.

24

ePlus argues that the preamble provides antecedent basis for claim 3, and thus is a limitation. However, the preamble phrase "electronic sourcing system" does not provide antecedent basis for "respective sources" or "associated sources." A "source" and a "system" are two very different things. Thus, the case ePlus cites in support—*Catalina Mktg Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)—does not support its argument.

6.  Subset

This court should construe this term because it will resolve the disputed legal issue of the scope of the claim. Properly construed, the term provides another reason Lawson does not infringe—the Lawson products at issue do not provide a capability for selecting a subset of catalogs within a catalog database and searching those catalogs for selected items.

The term must be construed because, in the context of the patents, it does not include "all" the catalogs. By defining "subset" as "some or all" of the catalogs, ePlus effectively renders the claim language internally inconsistent or incoherent. (*See* '516 patent, claim 1.) ePlus claims a catalog selection protocol for selecting "less than said entire collection of catalogs." Yes that same clause also refers to the protocol matching a code to "a subset of said collection of catalogs." If the "subset" can include all catalogs, it must be something different from the "less than said entire collection of catalogs." Thus the protocol both involves (1) selecting less than the entire collection of catalogs, and (2) matching a code with a second collection, which could be some or all of the catalogs. This construction is confusing if not senseless.

ePlus does not address the fact that the patent specification states that a "subset" means less than all. ('516 patent, claims 1, 29; '683 patent, 5:66-67.) Any dictionary definition is irrelevant.

25

7.     Searching for matching items among the selected product catalogs

ePlus argues that Lawson's construction includes the unnecessary element of user entered search criteria.  However, the search must be according to some criteria, and the only criteria described in the patent is user-entered search criteria.  Additionally, the claim itself requires that the product catalogs be selected, which requires user entry to modify a search.[5]

8.     Order list

ePlus offers no construction of "order list."  Its criticisms of Lawson's proposed construction are misplaced.  Lawson's proposed construction—"a list of items derived from a list of selected matching items"—is consistent with the specification excerpts cited by ePlus.  ('683 patent, 12:34-37 ("the user may also add additional items to the Order List 48 being built in Shell 52 if desired, whether those additional items had been selected from the Hit List 47 or not").)  Lawson's construction does not require *all* items on the order list be on one hit list.  Other items can be added to the order list in the Shell program, as the term "derived from" demonstrates.

9.     Protocol

ePlus provides no reason why Lawson's proposed construction for "protocol" is not correct.  Instead, ePlus proposes that "protocol" requires no construction, or should be construed as one selected dictionary definition.  When viewed in the context of the intrinsic evidence, as shown in its opening brief, Lawson's proposed construction is correct.  (Lawson Br. at 28-29.)

10.     Cross-reference table

ePlus indicates that the phrase "cross-reference table" does not need construction; however, the phrase does not provide any context as to its use or meaning.  ePlus then suggests a

---

[5] ePlus is no longer asserting claim 31 of the '683 patent, so there is no reason to interpret the other term, "searching for matching items among the data relating to the items," listed under this section in Lawson's Opening Brief.

definition that is detached from the specification. ePlus's definition of a cross-reference table would encompass references internal to a single catalog or book, which is inconsistent with the term as it is used in the patents. Also, the patents use matched codes in table format that relate two equivalent items. ePlus argues that "determined by a vendor to be equivalent" is an unnecessary limitation. The patent (through incorporating the RIMS patent) recognizes that someone has to prepare the table and determine what is "equivalent." Without context to the subjective term "equivalent," what is cross-referenced in the table has no meaning. Lawson construes the term in the context of the intrinsic record.

## III.   Conclusion

ePlus proposes definitions of terms divorced from the patent specification. This is contrary to the Federal Circuit's well-established claim construction methodology, which requires that a claim be construed in the context of the intrinsic evidence. Lawson's constructions are based on the intrinsic evidence. With respect to the means-plus-function elements, as a matter of law the corresponding structure must be disclosed in the specification and linked to the function. ePlus's efforts to avoid the statutory requirements fall short. Lawson's constructions consistently and properly invoke the structures disclosed and linked to the function in the specification. Lawson's constructions should be adopted.

Dated:  January 19, 2010                    LAWSON SOFTWARE, INC.

By:  _____
Of Counsel

Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
**Troutman Sanders LLP**
1001 Haxall Point, Richmond, VA 23219
Telephone:  (804) 697-1200
Facsimile:  (804) 697-1339
*Counsel for Defendant Lawson Software, Inc.*

Daniel McDonald (admitted *pro hac vice*)
William D. Schultz (admitted *pro hac vice*)
Rachel C. Hughey (admitted *pro hac vice*)
Andrew J. Lagatta (admitted *pro hac vice*)
Joshua P. Graham (admitted *pro hac vice*)
**MERCHANT & GOULD P.C.**
3200 IDS Center, 80 South Eighth Street,
Minneapolis, MN  55402
Telephone:  (612) 332-5300
Facsimile:  (612) 332-9081

## CERTIFICATE OF SERVICE

I certify that on this 19th day of January, 2010, a true copy of the foregoing will be delivered by email to the following:

Craig T. Merritt
Henry I. Willett, III
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
cmerritt@cblaw.com
hwillett@cblaw.com

Scott L. Robertson
Jennifer A. Albert
David M. Young (VSB No. 35997)
Robert D. Spendlove (VSB No. 75468)
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001
srobertson@goodwinprocter.com
jalbert@goodwinprocter.com
dyoung@goodwinprocter.com
rspendlove@goodwinprocter.com

*Attorneys for Plaintiff*

James D. Clements
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, MA 02109-2881
jclements@goodwinprocter.com

Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
**Troutman Sanders LLP**
1001 Haxall Point
Richmond, VA 23219
Telephone:  (804) 697-1200
Facsimile:  (804) 697-1339
*Counsel for Defendant Lawson Software, Inc.*

29