IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| *e*PLUS INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:09-CV-620 (REP) |
| | ) | |
| v. | ) | |
| | ) | |
| LAWSON SOFTWARE, INC., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF SRIKANTH K. REDDY IN SUPPORT OF *e*PLUS INC.'S
OPPOSITION TO LAWSON'S MOTION TO STRIKE THE EXPERT OPINIONS OF
DR. KEITH UGONE**

I, Srikanth K. Reddy, declare as follows:

1.     I am an associate at Goodwin Procter LLP, counsel for Plaintiff *e*Plus Inc.

("*e*Plus") in this proceeding.  I submit this declaration in support of *e*Plus Inc.'s Opposition to

Lawson's Motion to Strike the Expert Opinions of Dr. Keith Ugone.

2.     I have personal knowledge of the facts stated herein and, if called as a witness,

could and would testify competently hereto.

3.     Attached as Exhibit 1 is a true and accurate copy of *Broadcom Corp. v.

Qualcomm Inc.*, Case No 05-cv-467, slip op. at 22-27 (N.D. Cal. Aug. 28, 2008)

4.     Attached as Exhibit 2 is a true and accurate copy of excerpts from the transcript of

the phone conference held in this matter on August 10, 2010 (Dkt. No.409).

5.      Attached as Exhibit 3 is a true and accurate copy of excerpts from the transcript of the Evidentiary Hearing held in this matter on March 25, 2010 (Dkt. No.637).

6.      Attached as Exhibit 4 is a true and accurate copy of excerpts from the confidential transcript of the deposition of Kurt Reasoner, dated January 9, 2012 (filed under seal).

7.      Attached as Exhibit 5 is a true and accurate copy of excerpts from the confidential transcript of the deposition of Dale Christopherson, dated October 19, 2009 (filed under seal).

8.      Attached as Exhibit 6 is a true and accurate copy of a confidential document produced by Defendant in this matter under Bates numbers RQC2115799 through RQC2115832 (filed under seal).

9.      Attached as Exhibit 7 is a true and accurate copy of Defendant Lawson Software, Inc.'s Rule 26 Supplemental Disclosure Concerning Injunctive Relief and Evidentiary Hearing, dated February 14, 2012.

10.     Attached as Exhibit 8 is a true and accurate copy of the confidential Exhibit 10 to the transcript of the deposition of Keith R. Ugone, Ph.D., dated February 20, 2012 (filed under seal).

I declare under penalty of perjury that the foregoing is true and correct.  Executed at Boston, Massachusetts, this 22th day of February, 2012.

Srikanth K. Reddy

# EXHIBIT 1

Case 3:08-cv-00620-RFB  Document 919  Filed 02/22/12  Page 4 of 46 PageID# 29975
Case 8:05-cv-00467-JVS-RNB  Document 1313  Filed 08/28/08  Page 1 of 30  Page ID
#:3515

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| BROADCOM CORPORATION , | CASE NO: SACV 05-467 JVS(RNBx) |
| Plaintiff, | ORDER RE |
|  | MOTION FOR CONTEMPT |
| v. |  |
| QUALCOMM INCORPORATED, |  |
| Defendant. |  |

On May 13, 2008, upon Application by Broadcom Corporation ("Broadcom"), the Court ordered Qualcomm Incorporated ("Qualcomm") to show cause why it should not be held in contempt for failing to comply with portions of the Permanent Injunction, entered December 31, 2007, as amended by the Court's subsequent orders.  (Docket Nos. 995, 1072, 1183.)[1]  Specifically, the Court directed Qualcomm to show cause why it should not be held in contempt for failing

---

[1] Unless otherwise indicated, all references herein to the Permanent Injunction are to the Second Amended and Restated Permanent Injunction, entered March 11, 2008, Docket No. 1183.

1

Case 3:08-cv-00620-RER Document 919 Filed 02/22/13 Page 5 of 46 PageID# 29976
Case 8:05-cv-00467-JVS-RNB Document 1313 Filed 08/28/08 Page 2 of 30 Page ID
#:3516

1   to comply with the '686 injunction,[2] the '010 injunction,[3] and the reporting

2   requirements. (Order Granting in Part and Denying in Part Broadcom

3   Corporation's Application for Order to Show Cause re Contempt of Permanent

4   Injunction, §§ I-III, VIII.) The Court also ordered limited discovery.

5

6       Having considered the parties' further briefing and oral argument, the Court

7   now enters its ruling, granting the Motion in part, denying the Motion in part, and

8   ordering further proceedings.

9

10  I.    Legal Standards.

11

12      The parties are in agreement concerning the basic principles which govern

13  this Motion, and they need be recited only briefly.

14

15      The Ninth Circuit has summarized this Circuit's law of contempt in In re

16  Dual-Deck Video Cassette Recorder Antitrust Litigation, 10 F.3d 693, 95 (9th Cir.

17  1993):

18      Civil contempt in this context consists of a party's <u>disobedience to a specific</u>

19      <u>and definite court order by failure to take all reasonable steps within the</u>

20      <u>party's power to comply.</u> The contempt need not be willful, and there is no

21      good faith exception to the requirement of obedience to a court order. But a

22      person should not be held in contempt if his action appears to be based on a

23      good faith and reasonable interpretation of the [court's order]. <u>Substantial</u>

24      <u>compliance</u> with the court order is a defense to civil contempt, and <u>is not</u>

25  ─────────────────

26      [2]U.S. Patent No. 6,847,686.

27      [3]U.S. Patent No. 6,389,010.

28                                    2

Case 3:08-cv-00620-RFB- Document 919 Filed 02/22/13 Page 6 of 46 PageID# 29977
Case 8:05-cv-00467-JVS-RNB Document 1513 Filed 08/28/08 Page 3 of 30 Page ID
#:3517

vitiated by a few technical violations where every reasonable effort has been made to comply.

(Internal citations and quotation marks deleted; emphasis supplied.)  Having initiated this proceeding, Broadcom bears the burden of proving contempt by clear and convincing evidence. Id.; KSM Fastening Systems, Inc. v. H.A. Jones Co., Inc., 776 F.2d 1522, 1524 (Fed. Cir. 1985).

Substantive principles of patent law also come into play, particularly the doctrine of implied license.  A patentee who has been fully compensated for the infringer's wrongful conduct has, as a matter of law, granted a license for continued use:

A patentee, in demanding and receiving full compensation for the wrongful use of his invention in devices made and sold by a manufacturer adopts the sales as though made by himself, and therefore necessarily licenses the use of the devices, and frees them from the monopoly of the patent. This license continues during the life of the machine; it does not end when repairs become necessary.

Union Tool Co. v. Wilson, 259 U.S. 107, 113 (1922) (emphasis supplied); King Instrument Corp. v. Otari Corp., 814 F.2d 1560, 1564 (Fed. Cir. 1987).

II.    The '686 Patent.

    A.  Scope of the '686 Injunction.

The jury found that Qualcomm infringed the '686 patent, and awarded

3

Case 3:08-cv-00620-RER  Document 919  Filed 02/22/12  Page 7 of 46 PageID# 29978
Case 8:05-cv-00467-JVS-RNB  Document 1313  Filed 08/28/08  Page 4 of 30  Page ID
#:3518

$11,187,194 in damages.  Certain of the infringing products could be used on
WCDMA networks, certain could be used on CDMA 1x/EV-DO ("CDMA")
networks.  In crafting the '686 injunction, the Court carefully considered the
differences between the market for chips in both environments, including
competition and the availability of competitive alternatives.  (Memorandum of
Decision re Injunctive Relief, p. 19, Docket No. 996 ["Injunction Memo"].)  Those
considerations caused the Court to adopt a sunset provision for CDMA uses but not
WCDMA uses.  The Court stayed the Injunction for CDMA uses:

> PROVIDED, . . . that with respect to '686 Infringing Products (i)  capable of
> operating on a CDMA2000 1xEV-DO network, (ii) which were on sale in or
> imported into the United States on or before May 29, 2007,[4] and (iii) with
> regard only to existing or prior customers of '686 Infringing Products as of
> May 29, 2007 (which status shall be determined separately with respect to
> each '686 Infringing Product), the injunction against activities listed in
> paragraphs (a) and (b) above shall be stayed until January 31, 2009, so long
> as:
>
> (a)     Qualcomm pays to Broadcom an ongoing royalty, consisting of 6% of
> all revenues received by Qualcomm for sales occurring after May 29, 2007
> of '686 Infringing Products that are sold in or imported into the United
> States;

---

[4]Footnote 1 in original: With respect to each '686, '317, and '010 Infringing Product,
such Infringing Product shall deemed to have been sold or imported into the United States if the
sale resulted in an intermediate delivery outside the United States for purposes of manufacture,
modification, incorporation into another device, or for like purposes, so long as the ultimate
purpose of the transaction was for sale or importation of the Infringing Product into the United
States.

Case 3:08-cv-00620-RER Document 919 Filed 02/22/12 Page 8 of 46 PageID# 29979
Case 8:05-cv-00467-JVS-RNB Document 1313 Filed 08/28/08 Page 5 of 30 Page ID
#:3519

1    (Permanent Injunction, § I, Proviso.)  Broadcom asserts that Qualcomm has

2    violated the inunction in multiple contexts with regard to its sale and other

3    practices surrounding chips for WCDMA, for convenience "WCDMA sales."

4    Thus the first question is the effect of the Injunction on WCDMA sales.

5

6        Broadcom takes the position that the Injunction provides no sunset

7    protection for WCDMA sales subsequent to December 31, 2007, the date of the

8    Injunction.  Qualcomm does not directly dispute this, but takes a different and

9    expansive view on the theory that subparagraph (a) requires it to pay a sunset

10   royalty on all "'686 Infringing Products," including WCDMA Infringing Products,

11   in order to avail itself of the CDMA sunset provision.  But Qualcomm does not

12   stop there:  It argues that having paid a royalty on such WCDMA Infringing

13   Products, it is entitled to the benefit of an implied license.  Qualcomm's reading is

14   mistaken for several reasons.

15

16       Had the Court intended to grant a sunset provision for WCDMA Infringing

17   Products, it would have done so directly and expressly.  Clearly, the sunset

18   provision, as quoted above, is for CDMA chips only.  Moreover, Qualcomm's

19   reading is directly contrary to the Court's express rationale for not adopting a

20   sunset provision for WCDMA products: The Court intended to free Broadcom

21   from head-to-head competition with Qualcomm using Broadcom's patented

22   technology.  Thus the Court enjoined sales of those '686 chips in the market where

23   Qualcomm and Broadcom compete.  (Injunction Memo, pp. 17-19.)

24

25       In the full context of '686 injunction, it is plain that the royalty provision

26   refers to "Infringing '686 Products" which meet the further requirement that they

27   serve CDMA networks.  Qualcomm enjoys neither the right nor does it have the

28   obligation to pay a royalty on WCDMA products sold after May 29, 2007.

5

Case 3:08-cv-00620-RFB  Document 919  Filed 02/22/12  Page 9 of 46 PageID# 29980
Case 8:05-cv-00467-JVS-RNB  Document 1313  Filed 08/28/08  Page 6 of 30  Page ID
#:3520

1  Qualcomm is ordered to revise and resubmit the April 14, 2008 royalty report

2  accordingly.

4          At oral argument, Qualcomm asserted that during the meet-and-confer

5  process leading to a motion to clarify the original Injunction, Broadcom had

6  conceded that upon payment of royalties on WCDMA sales during the period

7  between the jury's verdict, May 29, 2007, and the entry of the Injunction,

8  December 31, 2007 (the "Window"), Qualcomm would have the right to support

9  such WCDMA sales.  Broadcom denied such agreement, and none is memorialized

10  in the pleadings or otherwise.  However, both parties asserted that their views were

11  reflected in the subsequent briefing on the motion for clarification (Docket No.

12  1049).  The Court invited limited additional letter briefs on the issue.

13

14          The original Injunction contained no express discussion of Qualcomm's

15  right to support infringing chips.  Among the clarifications adopted in the

16  Amended and Restated Permanent Injunction, entered February 5, 2008 (Docket

17  No. 1072), was a new Section VI entitled "Permissible Technical Support":

18          Nothing is this Amended and Restated Permanent Injunction shall prohibit

19          the Qualcomm Parties from providing service or technical support, including

20          without limitation software debugging, for a '686, '317, or '010 Infringing

21          Product for which Broadcom has been compensated under the jury's Verdict

22          or for which Qualcomm is obligated to and makes a timely royalty payments

23          in accordance with the sunset provisions in Section I, II, and III, supra. [5]

24

25

26          [5]The provision in the currently operative Second Amended and Restated Permanent
   Injunction is identical except for insertion of the word "Second" in the first line.  (Permanent
27  Injunction, § VI, Docket No. 1183.)

Case 3:09-cv-00620-REP Document 919 Filed 02/22/12 Page 10 of 46 PageID# 29981
Case 8:05-cv-00467-JVS-RNB Document 1313 Filed 08/28/08 Page 7 of 30 Page ID
#:3521

(Amended and Restated Permanent Injunction, Section VI; emphasis supplied.)
Qualcomm argues that because it was obligated to pay royalties on WCDMA chip
sales during the Window, the new provision permits it to support those chips. But
that is the flaw. As discussed above, no such royalty obligation exists. Moreover,
during the briefing on the motion for clarification, Qualcomm realized that the
above formulation would potentially leave some infringing chip sales without
support: "Qualcomm opposes Broadcom's proposed modification because the
wording suggests there may be a subset of Qualcomm production that are not
entitled to technical support." (Qualcomm Corporation's Opposition to
Broadcom's Newly Proposed Modification to the Court's Injunction, p. 12.) The
language which Broadcom had proposed is substantially similar to the language
which the Court adopted.[6] At oral argument, the most favorable gloss Qualcomm
could put on the provision was that it "doesn't speak to WCDMA one way or
another." (Transcript, July 21, 2008, p. 41 ["Tr."].)

Admittedly, the Court's ruling leaves a lacuna in the relief granted under the
'686 Patent. The jury awarded damages through the date of verdict, May 29, 2007;
the Court enjoined sales of WCDMA Infringing Products on December 31, 2007.
Neither form of relief addresses sales for WCDMA Infringing Products during the
Window. However, such sales were clearly infringing, and by virtue of the verdict,
Qualcomm was on notice. The Court leaves to Broadcom whether and how this
lacuna should be filled. It declines to put that choice in Qualcomm's hands to

---

[6]Broadcom proposed:

> Nothing in this Permanent Injunction shall prohibit the Qualcomm Parties from
> providing service or technical support for any Infringing Product for which
> Qualcomm has paid damages or for which Qualcomm has paid or intends to pay a
> royalty as permitted by this Injunction.

(Broadcom Corporation's Proposed Clarifications to the Court's Permanent Injunction, p. 6.)

Case 3:09-cv-00620-REP-RNB Document 919 Filed 02/22/12 Page 11 of 46 PageID# 29982
Case 3:05-cv-00468-JVS-RNB Document 1313 Filed 08/28/08 Page 8 of 30 Page ID
#:3522

1 | make a unilateral decision.

2

3 |      Obviously, Qualcomm could not have been on notice of the Court's

4 | Injunction between the date of verdict and the entry of the Injunction. Thus, for

5 | contempt purposes, the Court evaluates its conduct with regard to WCDMA

6 | Infringing Products subsequent to December 31, 2007.

7

8 |      B.  <u>Qualcomm's Activities in Contempt of the '686 Injunction.</u>

9

10 |      The Court enjoined Qualcomm from:

11

12 |     making, using, importing, selling, and/or offering to sell in the United States

13 | the MSM6275, MSM6280, MSM6550, MSM6800, MSM7200, MSM7500,

14 | and MSM7600 baseband chips, or any device not more than colorably

15 | different therefrom (collectively, the "'686 Infringing Products"), or any

16 | device that includes any '686 Infringing Product (including, without

17 | limitation, cellular telephone handsets, Form Factor Accurate ("FFA")

18 | devices, and Subscriber Unit Reference ("SURF") devices);

19 | (Permanent Injunction, § I(a).) In their showings on this Motion, the parties parse

20 | each of these activities.

21

22 |      Qualcomm offers two basic defenses for its conduct with regard to WCDMA

23 | sales after December 31, 2007. First, a portion of its activities were carried out

24 | under its agreement with Verizon. The parties have agreed that such activities

25 | carried out under the license which Broadcom granted to Verizon are not

26 | infringing. (Joint Stipulation Regarding Licensing Agreement and Order Thereon,

27 | Feb. 5, 2008, Docket No. 1002.) Second, by virtue of its payment of (1) damages

28 |

8

Case 3:09-cv-00620-REP   Document 919   Filed 02/22/12   Page 12 of 46 PageID# 29983
Case 8:05-cv-00467-JVS-RNB   Document 1313   Filed 08/28/08   Page 9 of 30   Page ID
#:3523

through May 29, 2007 under the verdict, and (2) its payment of royalties from the date of the verdict through March 31, 2008, and a purported continuing obligation to pay royalties, Qualcomm contends that it has an implied license.  For the reasons stated above, the Court rejects the second component of the implied license defense.  Qualcomm is entitled to an implied license only with respect to WCDMA sales for which damages were assessed under the verdict.

The Court now considers the list of activities specifically challenged by Broadcom.

1. Sales Prior to December 31, 2007.

Qualcomm concedes that sales of WCDMA Infringing Products were made in the Window which were subsequently imported into the United States.  The Court finds no contempt, because, by definition Qualcomm was not on notice of the Permanent Injunction.

Additionally, the Court finds that sales of WCDMA Infringing Products for Verizon products are permitted under the Permanent Injunction, and do not constitute a contempt.[7]

2. Customer Support.

The analysis breaks into three parts.

---

[7]The same is true with regard to support and all other activities covered by the Verizon Agreement which would otherwise amount to actionable infringement.  For that reason, the Court will not discuss those activities in the balance of the Order unless otherwise relevant.

9

Case 3:09-cv-00620-REB  Document 919  Filed 02/22/12  Page 13 of 46 PageID# 29984
Case 8:05-cv-00467-JVS-RNB  Document 1313  Filed 08/28/08  Page 10 of 30  Page ID
#:3524

First, with respect to sales of WCDMA Infringing Products for which damages were awarded under the verdict, Qualcomm is entitled to provide those specific customers  on-going support with respect to those specific purchases. King Instrument Corp., 814 F.2d at 1564.  The Court refers to these and other activities and uses permitted by virtue of the verdict as "Licensed Activities."

Second, the Court finds no contempt for support provided in the Window for WCDMA Infringing Products sold during the Window.

Third, the Court finds that Qualcomm violated the '686 injunction when it provided support after December 31, 2007 for WCDMA Infringing Products, except for Licensed Activities.  On the present record, the Court cannot define the full extent of such violations.

Because Qualcomm's interpretation of the '686 sunset provision is not reasonable, the Court finds by clear and convincing evidence that its support activities after December 31, 2007, other than Licensed Activities, constitute contempt.

3. Employee Use of Paid-For WCDMA Phones.

The same three-part analysis applied to customer support, above, is equally applicable to Qualcomm employee use of WCDMA phones.

On the present record, the Court cannot define the full extent of such violations subsequent to December 31, 2007.

Because Qualcomm's interpretation of the '686 sunset provision is not

10

Case 3:08-cv-00620-RFB Document 919 Filed 02/22/12 Page 14 of 46 PageID# 29985
Case 8:05-cv-00467-JVS-RNB Document 1313 Filed 08/28/08 Page 11 of 30 Page ID
#:3525

1  reasonable, the Court finds by clear and convincing evidence that its employee use
2  of WCDMA phones after December 1, 2007, other than Licensed Activities,
3  constitutes contempt.

4

5      4.  Selling WCDMA SURFs.

6

7      Qualcomm concedes that after the Injunction it sold a SURF with a socket,
8  or socket SURF, that could accommodate one of the WCDMA Infringing Products,
9  but argues that the unit was shipped with an empty socket.  (Qualcomm Memo, p.
10  16.)  The SURF is not the patented product, nor is it component of a patented
11  product–i.e., the broadband chip.  The Court thus finds that Qualcomm is correct
12  when it argues that the provisions of 35 U.S.C. § 271(f) are inapplicable.[8]

13      This conduct does not constitute contempt.
14

15      Next, the Court considers whether Qualcomm has complied with the
16  remaining generic portions of the Injunction.[9]

17

18      1.  Making.

19

20      The Court is satisfied that all manufacturing activities for broadband chips
21  take place outside the United States, and thus the activity is not covered by the
22  Permanent Injunction.  (Permanent Injunction, § IV.)

23

24

---

25      [8]This assumes that Broadcom asserted a Section 271(f) claim for the '686 Patent.  (See
   Tr. 75.)
26
27      [9]"[M]aking, using, importing, selling, and/or offering to sell in the United States."
   (Permanent Injunction, ¶ 1(a).)
28

1    Qualcomm asserts that all manufacture of SURFs or FFAs containing

2    WCDMA Infringing Products has been carried out directly or indirectly as part of

3    the Verizon arrangement.  It does acknowledge other manufacturing which it

4    asserts is outside the Injunction: including a "socketed SURF" (MSM7200A);

5    versions of the MSM 6290 with the texture engine ("TE") function disabled or the

6    fuse blown; and MSM 7225 chips with the TE function disabled.

7

8    The Court finds no violation of the Injunction.

9

10    2.  Chip Use.

11

12    Qualcomm asserts that it has used chips for testing only to support Verizon,

13    to support its development of TE-disabled design-around chips,[10] or for uses of

14    chips with the video fuse blown.

15

16    Use of chips in third-party devices is subject to the three-part analysis

17    discussed above.  On the present record, the Court cannot define the full extent of

18    such violations subsequent to December 31, 2007.

19    Qualcomm asserts that it prohibits the use of SURFs/FFAs unless permitted

20    under the Verizon arrangment in a use exclusively for Verizon's benefit.

21

22    3.  Importing.

23

24    Qualcomm asserts that it has imported WCDMA Infringing Products only

25    for four purposes: (1) to modify on importation to render non-infringing by

26    _____

27    [10]See discussion of design-arounds in Section VI.A, infra.

28                                    12

Case 3:09-cv-00620-REP  Document 919  Filed 02/22/12  Page 16 of 46 PageID# 29987
Case 8:05-cv-00467-JVS-RNB  Document 1313  Filed 08/28/08  Page 13 of 30  Page ID
#:3527

disabling the TE function; (2) to modify on importation to render non-infringing by blowing the video fuse; (3) for destruction upon importation; and (4) for Verizon activities.  All of these uses are permitted under the Permanent Injunction. (Permanent Injunction, §§ V, VII.)[11]

Qualcomm has outlined its screening procedures for shipments coming via courier and freight forwarder to ensure importation only for a permitted purpose. The Court finds that those procedures are reasonable and constitute substantial compliance.

Broadcom has not shown by clear and convincing evidence that Qualcomm's importation activities constitute a contempt.

4. Selling.

*Broadband Chips.*

Qualcomm admits that it has sold WCDMA Infringing Products in 2008 in violation of the Permanent Injunction.  (Qualcomm Memo, pp. 27-28.)  The parties describe these sales differently, but they amount to slightly more than 1000 chips, of three different models, made to four customers.[12]  Qualcomm asserts that the chips were samples, and that it received revenue for only two sales ($18,508.65.)

---

[11]"Nothing is this Second Amended and Restated Permanent Injunction shall prohibit the Qualcomm Parties from importing into the United States any '686 Infringing Product, '317 Infringing Product, or '010 Infringing Product solely for the purpose of engaging in design, development, or testing so as to eliminate infringement and/or effecting modification to eliminate infringement."  (Permanent Injunction, § V.)

[12]Qualcomm describes fourteen shipments (Qualcomm Memo, p. 28); Broadcom describes seven shipments (Broadcom Opp., p. 7).

13

Case 3:09-cv-00620-REP Document 919 Filed 02/22/12 Page 17 of 46 PageID# 29988
Case 8:05-cv-00467-JVS-RNB Document 1313 Filed 08/28/08 Page 14 of 30 Page ID
#:3528

1    Qualcomm explains that certain customers with research, but not

2  manufacturing, facilities in the United States were taken off "hold" which allowed

3  WCDMA Infringing Products to be sold and shipped to them.  Qualcomm

4  contends that it has modified its shipment compliance procedures in light of this

5  error.  In its reply, Qualcomm also points to the remedial steps it has taken to

6  procure the return of these chips or assurances that chips from foreign sales will

7  not be imported for use in the United States.  (Qualcomm Reply, p. 2.)

8

9    The Court finds substantial compliance in light of the remedial steps taken to

10 resolve the initial internal systems defect and the efforts to secure return of the

11 chips.  In the overall analysis, the number of chips is inconsequential, particularly

12 when spread over four customers and several types of chips.

13    *SURFs/FFAs.*

14

15    Broadcom asserts that since December 31, 2007, Qualcomm has sold over

16 2,000 SURFs/FFAs in models MSM 6290, MSM7225, MSM7600, and MSM7601.

17 The combination of Darin Tripi's deposition testimony and declaration provide a

18 sufficient explanation with regard to the first two products.  He testified that none

19 of the MSM6290 and MSM7225 products could be used for video encoding.  (Ex.

20 18, pp. 47-48, 51, 142-147 [Tripi ].)  Similarly, the MSM7601 product cannot be

21 used for video encoding.  (Roy Decl., ¶ 13.)  The remaining device, the MSM7600,

22 was sold to Research in Motion whose only customer is Verizon.  (Ex. 7, p. 28

23 [Roy].)

24

25    Broadcom has not offered clear and convincing evidence of contempt.

26

27    5. <u>Offering to Sell.</u>

28                                        14

Case 3:09-cv-00620-REP Document 919 Filed 02/22/12 Page 18 of 46 PageID# 29989
Case 8:05-cv-00467-JVS-RNB Document 1313 Filed 08/28/08 Page 15 of 30 Page ID
#:3529

Qualcomm describes a compliance program for issuing quotations for WCDMA Infringing Products only through foreign regional offices for delivery to customers outside the United States.  However, Qualcomm concedes that some quotations issued after December 31, 2007 were sent to United States addresses. (Qualcomm Memo, p. 30.)

Through discovery, Broadcom has documented that such offers were made to LG International America, Samsung Electronic America, Kyocera Wireless, Motorola, Inc., Novatel Wireless, Palm, Inc., and AnyData Corporation. (Broadcom Opp., pp. 9-11.)  The number of offers and quoted volumes convinces the Court that Qualcomm failed to take all reasonable steps to comply with the Injunction against "offering to sell in the United States."  (Permanent Injunction,  § I(a).)

The Court finds that these offers are likely contempts in violation of the Permanent Injunction.  The Court finds that it is sufficient that the offers were made in the United States.  Wesley Jessen Corp. v. Bausch & Lomb, Inc. 256 F.Supp. 2d 228, 233-34 (D. Del. 2003); SEB, S.A. v. Montgomery Ward & Co., Inc., 412 F.Supp. 2d 336 341-43 (S.D. N.Y. 2006).  This result is implicitly consistent with the Federal Circuit's treatment of the issue in Rotec Industries, Inc. v. Mitsubishi Corp., 215 F.3d 1246, 1258 (Fed. Cir. 2000) (Newman, J., concurring).

Qualcomm official Leonard Territo ("Territo") was unclear at deposition whether actual sales had resulted from any of these offers.  However, in his declaration, Territo asserts that Qualcomm's shipment histories indicate that no

Case 3:09-cv-00620-REP   Document 919   Filed 02/22/12   Page 19 of 46 PageID# 29990
Case 8:05-cv-00467-JVS-RNB   Document 1313   Filed 08/28/08   Page 16 of 30   Page ID
#:3530

1    shipments were made to the United States in response to any of the quotes.[13]

2    (Territo Decl., ¶ 7.)

4        Qualcomm apparently offered to produce the purchase orders related to the

5    quotations, but then declined to do so.  Before coming to a final conclusion on the

6    legal and factual issues raised by the offers, the Court believes further discovery

7    should be made to Broadcom.  The Court orders production of all such purchase

8    orders.

10       6.  Technical Support.

12       Qualcomm indicates that it has responded to more than 54,000 requests for

13   technical support in the past year with regard to Infringing WCDMA Products, but

14   that such response have been limited to Verizon and "downstream customers" who

     purchased the relevant chips prior to December 31, 2007.

16       For reasons discussed above, support for WCDMA Infringing Products sold

17   during the Window and rendered after December 31, 2007 violates the Permanent

18   Injunction, and constitutes a contempt.  On the present record, the Court cannot

19   assess the extent of the violations.

21   III.   The '010 Patent.

23       A.  Sunset Royalty Payments.

25       [13]Given the high standard of proof on the present motion, the Court accepts Territo's
     declaration, and declines too parse to finely whether Territo as Qualcomm's rule 30(b)(6)
26   designee took a different position or whether his declaration simply filled in incomplete
     knowledge.  See Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp., 441 F. Supp. 2d
27   695, 723 & n. 17 (M.D. Pa. 2006).

28                                              16

Case 3:09-cv-00620-REP   Document 919   Filed 02/22/12   Page 20 of 46 PageID# 29991
Case 8:05-cv-00467-JVS-RNB   Document 1313   Filed 08/28/08   Page 17 of 30   Page ID
#:3531

In the Permanent Injunction, the Court provides a sunset royalty for use of Q-Chat technology under the '010 Patent:

> PROVIDED . . . that with respect to '010 Infringing Products (i) which were on sale in or imported into the United States on or before May 29, 2007,[14] and (ii) with regard only to existing or prior customers of '010 Infringing Products as of May 29, 2007 (which status shall be determined separately with respect to each '010 Infringing Product), the injunction against activities listed in paragraphs (a) and (b) above shall be stayed until January 31, 2009, so long as:
>
> (a)    Qualcomm pays to Broadcom an ongoing royalty, consisting of 15% of all revenues received by Qualcomm for sales occurring after May 29, 2007 of '010 Infringing Products, including revenues received from pre- and post-commercialization development fees and licenses, that are sold in, or imported into, or licensed in the United States.

(Permanent Injunction, § III, Proviso.)  This provision evolved in several respects from the original Injunction issued on December 31, 2007.  First, the Court effectively limited the sunset provision to Q-Chat Version 3.0 by restricting it to "versions of software which had been delivered, accepted, and paid for as of May 29, 2007." (Id., p. 8, n. 7, quoted below in footnote 14.)  Second, the Court clarified the types of revenues subject to the royalty payment to include "pre- and post-commercialization development fees and licenses." (Id., §III, Proviso (a).)

----

[14] Footnote 7 in original:  With respect to software encompassed within the '010 Infringing Products, this sunset provision shall be limited to versions of software which had been delivered, accepted, and paid for as of May 29, 2007.

Case 3:09-cv-00620-REP   Document 919   Filed 02/22/12   Page 21 of 46 PageID# 29992
Case 8:05-cv-00467-JVS-RNB   Document 1313   Filed 08/28/08   Page 18 of 30   Page ID
#:3532

1    Qualcomm claims that it is not required to avail itself of the '010 sunset

2    provision, contends that it has not done so, and has made no royalty payments.

3

4    For the reasons set forth below, the Court finds by clear and convincing

5    evidence that Qualcomm is in contempt.

6

7    As Broadcom documents, Qualcomm has received more than $93 million in

8    Q-Chat-related payments from Sprint since the date of the verdict.  (Broadcom

9    Opp., pp. 33-36; Ex. 24.)

10

11    Qualcomm's principal defense is that Broadcom received full compensation

12    under the verdict, and thus is not entitled to further compensation in view of the

13    implied license conferred.  King Instrument Corp., 814 F.2d at 1564.  The Court

14    disagrees.   Broadcom could not have presented evidence of future revenues which

15    did not then exist prior to commercialization.  Some of the post-commercialization

16    services were not contracted for until after the entry of the Injunction on December

17    31, 2007.  (Ex. 75.)  Tellingly, even as of the date of recent discovery which the

18    Court allowed on this Motion, Qualcomm officials could still not predict the future

19    revenue flow under the Sprint agreement.  (Ex. 52, p. 52 [Vrechek].)  The present

20    situation is simply not akin to supplying spare parts for repair.  King Instrument

      Corp., 814 F.2d at 1564.

21

22    Qualcomm argues that there has been no sale since the verdict, so that the

23    royalty provision does not come into play.  Given the Court's revisions to the '010

24    royalty provision to include "revenues received from pre- and post-

25    commercialization development fees and licenses," this linguistic gamut fails.

26    Moreover, the language in footnote 7 to the sunset provision would, under

27    Qualcomm's logic, render the sunset provision a complete nullity from the outset.

28                                      18

B. <u>Versions 3.1 and 3.2.</u>

The record indicates that Qualcomm has received $17 million in fees from Sprint in connection with follow-on versions. The Permanent Injunction explicitly allows Qualcomm to engage in design-around activities. (Permanent Injunction, § V.) The record does not establish by clear and convincing evidence that Qualcomm has done anything more than permitted activities. (<u>See</u> Ex. 52, pp. 22, 24 [Vrechek].)

While it may be frustrating to Broadcom to be denied the particulars of Qualcomm's Q-Chat design-around efforts (Broadcom Opp., p. 34), the Court agrees with Qualcomm that it has no burden to prove that it is not infringing with its Version 3.1 and 3.2 efforts.

IV. <u>Inventory Adjustments.</u>[15]

In its April 14, 2008 initial royalty report, Qualcomm made a one-time $4.6 million so-called inventory adjustment to eliminate double-counting. Such double-counting could result if a product included in Broadcom's damage calculation were counted a second time when subsequently imported into the United States. Broadcom challenges the calculation in several particulars.

Qualcomm queried two of its largest customers who responded that their inventory lag between sale and importation was 6 weeks and 5.2 weeks.

---

[15]While the Court agrees in theory with the notion of an inventory adjustment to avoid double counting, the preferable course would have been to air the issue with the Court and Broadcom before Qualcomm made a unilateral determination that it was entitled to a reduction in the initial royalty payment.

19

Case 3:09-cv-00620-REP   Document 919   Filed 02/22/12   Page 23 of 46 PageID# 29994
Case 8:05-cv-00467-JVS-RNB   Document 1313   Filed 08/28/08   Page 20 of 30   Page ID
#:3534

1    Broadcom points out that Samsung, another major customer, reported an inventory

2    lag of 3.2 weeks, although Qualcomm excluded Samsung in its analysis because its

3    response was deemed incomplete.  Broadcom also points to testimony of

4    Qualcomm personnel that its inventory analysis would not meet audit standards.

5    On this record, the Court cannot say that the use of 5.2 weeks was unreasonable.

6

7          Broadcom also objects that the adjustment was not tied to chips for which

8    the jury actually awarded damages.  Qualcomm's assertion that this would require

9    "some sort of a magic tracer" is colorful, but off the mark.  (Qualcomm Br., p. 44.)

10    Broadcom points to three chips used in the inventory adjustment–the MSM6500,

11    MSM 6550A, and MSM6800A–which did not figure in Broadcom's damages, but

12    which nevertheless form a major part of the adjustment calculation.  (See Ex. 78.)

13    Broadcom also notes that sales to customers not included in the damage award

14    were nevertheless included in the adjustment.  (Broadcom Opp., p. 50.)  The Court

15    believes that substantial improvement in the calculation can be achieved even if

16    one accepts that the adjustment is at best an estimate.

17          Within thirty days, Qualcomm is ordered to submit a revised inventory

18    adjustment calculation which is based only on chips included in the damage award

19    which were sold to customers included in the damage award.  Any challenge to the

20    revised calculation may be brought by motion within thirty days of service of the

21    revised calculation.

22

23    V.    Identification of Sunset Customers.

24

25          In crafting the sunset provisions in the Permanent Injunction, the Court gave

26    weight to the reliance Qualcomm's existing customers had placed on the

27    availability of Qualcomm's products, particularly in the CDMA environment.  For

28    

Case 3:09-cv-00620-REP   Document 919   Filed 02/22/12   Page 24 of 46 PageID# 29995
Case 8:05-cv-00467-JVS-RNB   Document 1313   Filed 08/28/08   Page 21 of 30   Page ID
#:3535

1   that reason, the Court crafted the sunset provisions to serve only the needs of that

2   set of customers.  For example, for the '686 Patent, the Court limited sunset sales

3   "to existing or prior customers of '686 Infringing Products as of May 29, 2007

4   (which status shall be determined separately with respect to each '686 Infringing

5   Product)."  (Permanent Injunction, § I, Proviso; see id., p.3 n. 1.)  Broadcom

6   contends that Qualcomm has failed to take sufficient measures to ensure sunset

7   sales only to permitted customers.

8

9       The Court cannot say that the steps taken by Qualcomm were not reasonable

10   or do not constitute substantial compliance with the customer set limitation.  The

11   Court finds that it is reasonable to aggregate affiliates, reasonable to make a

12   determination on the basis of chip model rather than individual chips, and

13   reasonable to treat the ship/billing date as the date of sale for purposes of the

14   Permanent Injunction.

15

16       The Court cannot fault Qualcomm for taking iterative steps when it

17   concluded that its initial customer identifications contained a loophole.  Any

18   shortcomings in the language of the "intent letters" solicited from customers must

19   be weighed against the fact that all customers were supplied a copy of the

20   Permanent Injunction.  (Permanent Injunction, § VIII.)

21       Broadcom has failed to offer clear and convincing evidence of contempt

22   with respect to sunset customer limitations.[16]

23

24

25

26

27

28

---

[16]Broadcom also asserts that certain revenues were not reported in the April 14, 2008
royalty reports. (Broadcom Opp., pp. 45-47.) The Court finds Qualcomm's explanation
satisfactory. (Qualcomm Reply, pp. 25-27.) In any event, this does not rise to clear and
convincing evidence of evasion of Qualcomm's royalty obligations.

21

Case 3:09-cv-00620-REP   Document 919   Filed 02/22/12   Page 25 of 46 PageID# 29996
Case 8:05-cv-00467-JVS-RNB   Document 1313   Filed 08/28/08   Page 22 of 30   Page ID
#:3536

1  VI.   Remedies.

2

3       In a contempt proceeding, the Court has the power to fashion appropriate

4  sanctions.  Lasar v. Ford Motor Co., 399 F.3d 1101, 1118 (9th Cir. 2005).

5

6       A.  Enjoining the xxx1 Design-Around Chips.

7

8       Broadcom contends that by virtue of its activities in contempt, Qualcomm

9  got an unfair "head-start" in the development of its xxx1 design-around chip with

10 disabled TE function.  For this, Broadcom urges the Court to enjoin sale of the

11 chips for a period of six months.  The Court declines to do so.

12

13      In the context of developing design-arounds for its products, Qualcomm is

14 entitled to undertake activities which would otherwise violate the Permanent

15 Injunction and amount to actionable continuing infringement:

16      Nothing is this Second Amended and Restated Permanent Injunction shall

17      prohibit the Qualcomm Parties from engaging in the design, development, or

18      testing of any product or service which does not infringe the '686 Patent, the

19      '317 Patent, and/or the '010 Patent.  Nothing is this Second Amended and

20      Restated Permanent Injunction shall prohibit the Qualcomm Parties from

21      engaging in modification of any '686 Infringing Product, '317 Infringing

22      Product, or '010 Infringing Product so as to eliminate infringement, nor

23      from engaging in design, development, or testing for said purpose.  Nothing

24      in this Second Amended and Restated Permanent Injunction shall prohibit

25      the Qualcomm Parties from importing into the United States any '686

26      Infringing Product, '317 Infringing Product, or '010 Infringing Product

27      solely for the purpose of engaging in design, development, or testing so as to

28                                   22

<u>eliminate infringement and/or effecting modification to eliminate</u>
<u>infringement</u>.

(Permanent Injunction, § V; emphasis supplied.)  Thus, the use of WCDMA Infringing Products is permitted as part of the design-around efforts.  The Court does not believe that Broadcom has established by clear and convincing evidence that Qualcomm has used unfair means in developing its xxx1 chips.  The objection that Qualcomm may have used WCDMA Infringing Products after Qualcomm developed an initial design ignores the fact that there is substantial testing required at subsequent stages leading to introduction of a successful commercial product.  (Peron Reply Decl., ¶¶ 7-10.)  Moreover, the use of the WCDMA Infringing Products was not for developing the infringing TE function, but to develop a chip that would operate with that function <u>disabled</u>.  The result is a product which <u>lacks</u> the patented feature.

Even assuming that Qualcomm used unfair means to develop a non-infringing design-around, the Court would have some reluctance to enjoin a product which does not infringe.  The Court does not find Broadcom's analogy to trade secret law convincing.  (Broadcom Opp., pp 32-33.)  As noted, the Court finds that the predicate for this theory is lacking, and to the extent that the Court has found other contempts with regard to the '686 Patent, they do not warrant this remedy.

At oral argument, Broadcom stressed that its goal had been to secure an unfettered market opportunity, not monetary relief in the form of royalties for prospective sales of infringing WCDMA chips.  (Tr. 20-21.)  The most direct way to preserve that opportunity was to enjoin the sales of WCDMA chip after December 31, 2007, which is what the Court did.  Whatever may be said for post-

23

Case 3:09-cv-00620-REP Document 919 Filed 02/22/12 Page 27 of 46 PageID# 29998
Case 8:05-cv-00467-JVS-RNB Document 1313 Filed 08/28/08 Page 24 of 30 Page ID
#:3538

1   Injunction support for infringing sales of WCDMA chips made in the Window,

2   those were sale which by definition were lost. The Court believes that support of

3   chips already sold had a secondary effect on Broadcom's ability to compete, and

4   now even that support must cease. With regard to testing, it is hard to see how

5   competition from the xxx1 chips, even if unfairly accelerated, had a significant

6   effect where the Broadcom chip had the TE function and the xxx1 had none. The

7   xxx1 chips cannot supply the patented, competitively advantageous function

8   which Broadcom offers.

9

10      B.  <u>'010 Patent Payment.</u>

11

12      Of the contempts which the Court has found, the failure to pay the '010 sun

    set royalty is the most egregious. As Broadcom contended at oral argument,
13
    payment, even with interest, merely requires Qualcomm to do what is should have
14
    done in the first place. (Tr. 24.) The Court agrees that there was more than a
15
    "failure to pay": so long a Qualcomm did not pay the royalty it was using
16
    technoloy it had no right to use. In formulating a remedy, the Court finds the
17
    district court's approach in <u>Brine, Inc. v. STX, L.L.C.</u>, 367 F.Supp. 2d 61, 71 (D.
18
    Mass. 2005), instructive. There the court was searching for the appropriate
19
    punishment for a second infringement violation of its injunction, and concluded
20
    that gross profit was an appropriate measure. The court considered awarding net
21
    profits from the infringing activities, but concluded that gross profits were a better
22
    measure for two reasons:

23

24          1. As is recognized in other areas of the law, there are evidentiary

25          difficulties inherent in calculating net profit (i.e. profit after all expenses,

26          depreciation and tax). Given such uncertainty, there is increased risk that the

27          plaintiff will not be made whole. <u>In a contempt proceeding, the need to</u>

28                                      24

Case 3:09-cv-00620-REP   Document 919   Filed 02/22/12   Page 28 of 46 PageID# 29999
Case 8:05-cv-00467-JVS-RNB   Document 1313   Filed 08/28/08   Page 25 of 30   Page ID
#:3539

1  ensure that the plaintiff is fully compensated and that the defendant is

2  deterred, is acute.

3

4  2.  While an award of gross profit may overcompensate [the plaintiff] Brine,

5  it will do so in an amount which bears a direct relationship to the degree of

6  infringement: the more X2+s that were sold, the greater the award. As such,

7  a sanction in the amount of gross profit from the sales of the X2+ provides a

8  natural means of imposing a penalty that is proportionate to the severity of

9  the contempt.[17]

10

11  (Id. at 71; citation deleted; emphasis supplied.)  One could argue that contempt

12  here is different, in that Qualcomm did not engage in infringing conduct but simply

13  failed to pay.  But so long a Qualcomm failed to pay it was in fact infringing.

14  Moreover,  the Court regards the egregiousness of the conduct here of similar

15  caliber to the contempt in Brine.[18]

16  Within thirty days, Qualcomm shall render under oath an accounting of all

17  post-verdict Q-Chat payments related to Version 3.0 received from Sprint from

18  May 29, 2007 through the date of this order and present calculation of its gross

19  profit on such revenues.  (Permanent Injunction, § VIII.)  With respect to North

20

21

22  [17]In view of this monetary award which can be measured with respect to the conduct in
contempt, the Court deletes from this Order provisions in its Tentative Minute Order imposing a
23  surcharge on the award of attorney's fees.  (Tentative Minute Order re Motion for Contempt, p.
18 ("The Court imposes a fifty percent surcharge on the award of attorney's fees and costs by
24  way of monetary sanction for Qualcomm's contempts.  The Court has no convenient way to
assess the economic impact of Qualcomm's contempts, and a measure based on attorney's fees
25  and costs is at least related to the burdens which Broadcom undertook by initiating this
proceeding.").)

26

27  [18]Disgorgement of Qualcomm's unjust gain is not punitive; it merely transfers that gain
to the party harmed by its conduct.

28  25

Case 3:09-cv-00620-REP Document 919 Filed 02/22/12 Page 29 of 46 PageID# 30000
Case 8:05-cv-00467-JVS-RNB Document 1313 Filed 08/28/08 Page 26 of 30 Page ID
#:3540

American Exclusivity payments, Qualcomm shall make a proration to include that portion of the payments reasonably attributable to the United States and shall state the basis for the proration. Within the same thirty days, Qualcomm shall pay Broadcom the calculated gross profits. The amount shown in the accounting shall be paid without regard to any challenge of the accuracy of the accounting; any such dispute shall be resolved by the Court, but shall not delay payment.[19] The payment shall satisfy Qualcomm's royalty obligation under the '010 sunset provision through the date of this Order.

Should Qualcomm fail to make the accounting and payment as provided in this Order, the sunset provision for the '010 Patent shall automatically lapse, and shall only be reinstated upon further application to the Court by Qualcomm.

C. Suspension of Sunset Provisions.

The Court declines to suspend the sunset provisions for the '686 and '317 Patents.[20] Such a course would ignore the public interest aspects which figured prominently in the Court's decision to adopt sunset provisions in the first place. (Injunction Memo, pp. 8-9, 17-18.) With regard to the '010, the Court has set suspension as the penalty for failure to comply with royalty obligations ordered here.

D. Attorney's Fees.

---

[19] Upon appropriate application, the Court would consider allowing Broadcom to test the calculation by way of a Rule 30(b)(6) deposition and supporting request for production.

[20] U.S. Patent No. 6,657,317.

26

Case 3:09-cv-00620-REP   Document 919   Filed 02/22/12   Page 30 of 46 PageID# 30001
Case 8:05-cv-00467-JVS-RNB   Document 1313   Filed 08/28/08   Page 27 of 30   Page ID
#:3541

An award of attorney's fees is a customary remedy in favor of a party who has successfully mounted a contempt proceeding. <u>Perry v. O'Donnell</u>, 759 F.2d 702, 704 (9th Cir. 1985). If Broadcom prevailed on no other portions of its claims than those related to WCDMA Infringing Products after December 31, 2007 and the failure to pay '010 sunset royalties, it would be the substantial victor here.

The Court has no doubt that litigating this contempt proceeding has been a substantial expense for both sides. Qualcomm's attorney's fees are a penalty which it must bear. Qualcomm must also pay Broadcom's reasonable attorney's fees and expenses.

Within thirty days, Broadcom shall present its application for reasonable attorney's fees and costs. The application shall be in sufficient detail for the Court to make the usual lodestar analysis. <u>See</u> <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1029 (9th Cir. 1998). Within twenty days thereafter, Qualcomm may file any objections. Should the Court determine that a hearing would be useful, the Court will schedule one.

VII.   <u>Reporting Requirements.</u>

Under the Permanent Injunction, each sunset provision carries a similar reporting requirement. Qualcomm must provide "periodic reports from which Broadcom can assess the proper royalties owed, detailing at least the volume of, and revenue derived by Qualcomm from, any post-May 29, 2007 sales of" the relevant Infringing Products. (<u>E.g.</u> Permanent Injunction, § I, Proviso § (b).) The sunset provisions permit sales and require royalty payment only on sales made to customers as of May 29, 2007 for products which the customer purchased prior to that date. (<u>E.g.</u>, <u>id.</u>, § I, Proviso.) Without the latter information for sales, one

1   cannot determine whether Qualcomm is paying the "proper royalty."

2

3   In its April 14, 2008 report, Qualcomm did not provide detail by customer

4   and the chip purchased by the customer. Qualcomm did provide such detailed

5   information as part of the limited discovery allowed by the Court on this Motion.

6   (Order Granting in Part Broadcom's Application for Order to Show Cause re

7   Contempt of Permanent Injunction, ¶ 3(a)-(e); see Qualcomm Opening Br., p. 40.)

8

9   While the Court cannot say that Qualcomm's report constituted substantial

10   compliance, neither can it say that a contempt has been proved by clear and

11   convincing evidence. Henceforth, Qualcomm shall support is periodic royalty

12   reports with same level of detail subsequently provided for the April 14, 2008

13   report. With respect to the report for the second quarter of 2008, Qualcomm shall

14   provide such information within thirty days.

15   VIII.   <u>Conclusion.</u>

16

17   The Court finds that Broadcom has proven by clear and convincing evidence

18   that the following activities by Qualcomm constitute contempt:

19

20   • Customer support for WCDMA Infringing Products after December 31,

21   2007, except for Licensed Activities and Verizon support.

22

23   • Employee use of WCDMA phones after December 31, 2007, except for

24   Licensed Activities and Verizon support.

25

26   • Technical support rendered to WCDMA customers after December 31,

27   2007, except for Licensed Activities and Verizon support.

28

Case 3:09-cv-00620-REP   Document 919   Filed 02/22/12   Page 32 of 46 PageID# 30003
Case 8:05-cv-00467-JVS-RNB   Document 1313   Filed 08/28/08   Page 29 of 30   Page ID
#:3543

• Failure to pay sunset royalties under the '010 Patent.

Qualcomm is ordered to cease its contemptuous conduct with regard to the '686 injunction immediately if it has not already done so and to comply with this Order's provisions regarding the '010 Patent.

The Court reserves determination whether Qualcomm should be held in contempt for offering to sell WCDMA Infringing Products in the United States, pending production of invoices for purchases associated with such offers.

The Court orders Qualcomm to prepare a revision to the April 14, 2008 royalty statement within thirty days which:

• Eliminates payment of royalties of WCDMA Infringing Products.

• Includes a revised inventory adjustment limited to product sales covered by the verdict to customers covered by the verdict.

The Court orders Qualcomm to render an accounting of '010 sunset revenues and gross profits and to make the payment described in Section VI.B within thirty days. A failure to do so will result in an automatic lapse of the '010 sunset license.

Case 3:09-cv-00620-REP   Document 919   Filed 02/22/12   Page 33 of 46 PageID# 30004
Case 8:05-cv-00467-JVS-RNB   Document 1313   Filed 08/28/08   Page 30 of 30   Page ID
#:3544

1    The Court orders Broadcom to submit an application for attorney's fees and

2    costs in accordance with this Order within thirty days; Qualcomm may file any

3    objections within twenty days thereafter.

4

5    DATED:  August 28, 2008

6

7

8    JAMES V. SELNA
     UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                          30

# EXHIBIT 2

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF VIRGINA
 2                    Richmond Division

 3

 4

 5   ePlus, Inc.,

 6                      Plaintiff,

 7   versus                         309 CV 620

 8   Lawson Software, Inc.

 9                      Defendant

10

11

12

13           before:  HONORABLE ROBERT E. PAYNE
                Senior United States District Judge
14

15

16                   August 10, 2010
                    Richmond, Virginia
17

18

19                   Phone Conference

20

21

22               Gilbert F. Halasz, RMR
                  Official Court Reporter
23                 U. S. Courthouse
                    Richmond, Virginia
24                   (804) 916-2248

25
```

```
 1          it cited itself from the Joyner decision,
 2          nothing in either Daubert or the federal rules
 3          of evidence requires a District Court to admit
 4          opinion that is connected to existing data only
 5          by the ipse dixit of the expert.  Ipse dixit
 6          means that it is so because I say it is so.
 7          That same precept has been adopted in Pugh
 8          against Louisville Ladder, Incorporated in 361
 9          federal appendix, and citing a number of cases,
10          including Joyner, holding that the district
11          court discretion includes the discretion to
12          find that there is, citing Joyner, simply too
13          great an analytical gap between the data and
14          the opinion proffered in deciding whether or
15          not the proper evidence is of the ipse dixit
16          variety.  In fact, the two text parts in
17          footnote four of that case, Pugh, make quite
18          clear the relationship and the nexus between
19          them.
20               In Bright against American Household
21          Products the fourth circuit pointed out that
22          Daubert aims to prevent expert speculation.
23          And to my knowledge those are the fundamental
24          rules by which rule 702 is to be applied.
25               Now, I have studied the deposition
```

```
 1        testimony that was proffered, and I have
 2        studied the report of Dr. Mangum.  And I
 3        believe that there is a great difference
 4        between Mangum's report and the i4i, as
 5        Mr. McDonald pointed out.  There was a firm and
 6        fixed and rationally-based bench mark that was
 7        really unavailable in the i4i case.  Here the
 8        bench mark is really two litigation
 9        settlements.  For reasons which make -- I
10        understand that he articulated a reason, but I
11        never did -- I found it quite difficult to
12        understand.  Dr. Mangum just threw out the
13        other litigation-related settlements.  He just
14        picked the ones that had big numbers in them.
15            And the other three which he mentions in
16        his report he excludes from his analysis.  He
17        concludes that the Verian, the Sciquest and
18        Perfect Commerce agreements, which are also
19        settlements that were arrived at, Verian was
20        500,000 plus 2.5 percent running royalty on all
21        sales covered by the patents in suit in excess
22        of 15 million in a calendar year.  Sciquest was
23        a 2.4 million-dollar settlement.  Perfect
24        Commerce, according to him, was a lump sum
25        payment of $750,000.  And his basis for
```

1        throwing those out was not an economic basis.

2        His basis for throwing them out was a

3        conclusory ipse dixit pronouncement.  And it is

4        that he understood no discovery had occurred,

5        and it was that he understood that due to quick

6        settlements ePlus did not receive information

7        that would allow it to form an understanding as

8        to the amount of accused revenue for any of

9        these parties.  As a result, he says, the terms

10       of the agreements do not represent a complete

11       valuation of the specific use of the patents in

12       suit, but rather based on avoidance of

13       litigation.  He also -- he says the most that

14       can be said out of those is they provide

15       evidence of the willingness by ePlus to enter

16       into fixed payment and running royalty license

17       agreements.  So out of five possible settlement

18       agreements that he could have chosen to include

19       in his base he threw out for non economic

20       reasons the three lowest.

21           There is nothing that I know of that

22       permits an expert to pick and chose in

23       selecting the base in this fashion.

24           Now, the other thing is the base itself of

25       those that were selected are shaky under the

```
 1              THE COURT:  Do you think it does or not,
 2       Mr. Robertson?
 3              MR. ROBERTSON:  Your Honor, I am still,
 4       quite frankly, reacting to your ruling today,
 5       taking it all in and thinking through a lot of
 6       issues, and will be thinking about them in the
 7       next few days as we prepare to meet with you on
 8       Monday, August 16.  You know, I am just
 9       thinking out loud, Your Honor.  So let me --
10              THE COURT:  Well, here is a good idea.
11       Don't think out loud.  It is a good idea.
12              MR. ROBERTSON:  Okay.  I think I will
13       reflect.  I appreciate that, yes.
14              THE COURT:  All right.  Now, I am
15       considering that I dealt with these motions in
16       limine.  If you think otherwise, you have to
17       get them in front of me in some other way.
18              All right.  I think that is taken care of.
19              MR. ROBERTSON:  Thank you, sir.
20              THE COURT:  Thank you all very much.
21              MR. MERRITT:  Thank you, Your Honor.  Bye.
22
23       THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.
24                  Gilbert Frank Halasz, RMR
25                    Official Court Reporter
```

# EXHIBIT 3

2011.03.25 Hearing - Injunctive Relief  3/25/2011  8:54:00 AM

---

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
 2                  RICHMOND DIVISION

 3    - - - - - - - - - - - - - - - -

 4    ePLUS, INC.,          :
                            :
 5            Plaintiff,    :
                            :  Civil Action
 6        v.                :  No. 3:09CV620
                            :
 7    LAWSON SOFTWARE, INC., :  March 25, 2011
              Defendant.    :
 8    - - - - - - - - - - - - - - - -

 9

10            DAILY COPY

11

12    COMPLETE TRANSCRIPT OF EVIDENTIARY HEARING
      BEFORE THE HONORABLE ROBERT E. PAYNE
13        UNITED STATES DISTRICT JUDGE

14

15    APPEARANCES:
16    Scott L. Robertson, Esq.
      Jennifer A. Albert, Esq.
17    Michael T. Strapp, Esq.
      GOODWIN PROCTOR
18    901 New York Avenue, NW
      Washington, D.C.  20001
19
      Craig T. Merritt, Esq.
20    CHRISTIAN & BARTON
      909 E. Main Street, Suite 1200
21    Richmond, VA  23219-3095
22        Counsel for the plaintiff ePlus
23
              DIANE J. DAFFRON, RPR
24            OFFICIAL COURT REPORTER
              UNITED STATES DISTRICT COURT
25
```

**Page 2**

```
 1    APPEARANCES:  (Continuing)
 2    Daniel W. McDonald, Esq.
      Kirstin L. Stoll-DeBell, Esq.
 3    William D. Schultz, Esq.
      MERCHANT & GOULD
 4    3200 IDS Center
      80 South Eighth Street
 5    Minneapolis, MN  55402-2215
 6    Dabney J. Carr, IV, Esq.
      TROUTMAN SANDERS
 7    Troutman Sanders Building
      1001 Haxall Point
 8    P.O. Box 1122
      Richmond, VA  23218-1122
 9
          Counsel for the defendant Lawson.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1        (The proceedings in this matter commenced at
 2    9:30 a.m.)
 3
 4        THE CLERK:  Civil Action No. 3:09CV620,
 5    ePlus, Incorporated v. Lawson Software, Incorporated.
 6        Mr. Scott L. Robertson, Mr. Craig T. Merritt,
 7    Ms. Jennifer A. Albert, Mr. Michael G. Strapp
 8    represent the plaintiff.  Mr. Daniel W. McDonald,
 9    Mr. Dabney J. Carr IV, Ms. Kirstin L. Stoll-DeBell,
10    Mr. William D. Schultz, and Ms. Rachel C. Huey
11    represent the defendant.
12        Are counsel ready to proceed?
13        MR. ROBERTSON:  The plaintiff is, Your Honor.
14        MR. McDONALD:  Lawson is as well, Your Honor.
15        THE COURT:  All right.  This is the
16    evidentiary hearing on the issue of an injunction.
17        Is there another firm coming into this case
18    for you-all?
19        MR. McDONALD:  The Finnegan firm is involved,
20    Your Honor, but they are not going to be participating
21    in this hearing.  They are going to be involved with
22    the appeal primarily, but they wanted to have access
23    to the documents.
24        THE COURT:  Oh, okay.
25        Mr. Robertson.
```

**Page 4**

```
 1        MR. ROBERTSON:  Good morning, Your Honor.
 2        If I might, I just have a few brief opening
 3    remarks to just sort of put some of the issues in
 4    context and then preview for the Court or highlight
 5    some of the topics that are going to be addressed
 6    today by Mr. Farber's testimony, if that's
 7    permissible.
 8        THE COURT:  All right.
 9        MR. ROBERTSON:  First, we are here to discuss
10    the supplemental evidence, testimony and documentation
11    that have been provided to the Court and exchanged by
12    the parties since the trial ended that we believe will
13    support the Court's discretion to grant an injunction
14    in this case to prevent the ongoing infringement of
15    ePlus' patents.
16        We certainly don't want to be here today, and
17    I know the Court doesn't want to retry the case, or
18    reargue a number of the issues involving hotly
19    contested issues that are before the Court.
20        That said, there will be some additional
21    details concerning evidence that did come out that we
22    think would be important for the Court to consider.
23        I'd just like to highlight Section 154 of the
24    Patent Act.  Your Honor, the only right conferred upon
25    a patent owner under the Patent Statute is the right
```

---

2011.03.25 Hearing - Injunctive Relief  3/25/2011  8:54:00 AM

217

1   THE WITNESS:  Correct.
2   THE COURT:  Okay.  That's fine.
3   THE WITNESS:  But you need to carry the right
4   amount of stock, not overstock or understock,
5   otherwise you add far more cost to the health care
6   system than already exists.
7   THE COURT:  That's hard to do.
8   THE WITNESS:  It's very hard to do.
9   BY MR. McDONALD:
10   Q   So with respect to tracking, Mr. Hager --
11   THE COURT:  I just think you're overblowing
12   it.  You need to be accurate in what you're saying,
13   and it's important to know what actually takes place
14   as opposed to the inflated view of things that takes
15   place.  And if you sell an inflated view that I can't
16   buy, I'm just going reject the testimony in its
17   entirely because you let him get on the witness stand
18   and suggest that they can't conduct an operation
19   without this system and that the whole place will shut
20   down in the middle of an operation without this
21   system, and that isn't what's at stake here.
22   And if that's the way you're going to try to
23   sell the issue, then what I'm going to do is say I
24   just don't buy any of it.  And that's the risk you run
25   from overstating your case.

218

1   So try to confine it to what actually
2   happens.  That's what's important anyway.  And that's
3   really what he knows most about, I would assume.
4   MR. McDONALD:  Fair enough.
5   BY MR. McDONALD:
6   Q   Can we talk, Mr. Hager, about the tracking that
7   your system does for those medical supplies for
8   operations?  Can you walk us through how the Lawson
9   system is used to track, for example, the supplies
10   that are used for surgery in a hospital?
11   A   Again, at the beginning of the process is the
12   inventory management and inventory counting that is
13   done.  And that all gets loaded up into the system
14   where somebody looks at the system and determines in
15   what hospitals they need to have which materials
16   purchased, so that they have the adequate in stock
17   equipment.
18   And then they run those through the purchase and
19   were able to follow it through the process to the
20   loading dock, to the invoice matching, and ultimately
21   follow that device all the way into the operating
22   room.
23   Q   So your system actually tracks the inventory used
24   in surgery all the way into the operating room?
25   A   Correct.

219

1   Q   You indicated the amount of time it would take to
2   go to an alternative system.  Do you have an estimate
3   as to how long it would take a customer to actually
4   select and verify and implement a system that would
5   replace the Lawson eProcurement functionality?
6   A   It's entirely up to the customer as to how long it
7   would take to select, but from an implementation
8   perspective knowing how complex those implementations
9   are, and I don't believe it's overstating it to say it
10   would be nine months probably on average.
11   Q   Is that within the range Mr. Farber provided
12   today?
13   A   He provided 30 days to six months to potentially
14   longer.  Because of the very complex health care
15   organization we run, I believe it would fall in the
16   typically longer.
17   I do say that with some level of expertise.  We
18   have 277 requisition self service health care only
19   customers that represent 2500 different hospitals,
20   which is about a third of the hospitals in the United
21   States.  We do have a lot of experience.
22   THE COURT:  You have a lot of business and
23   you have a lot of infringement, according to the jury.
24   So the question I have to deal with is how to deal
25   with it.

220

1   THE WITNESS:  I understand.
2   THE COURT:  Now, if you're shut down and a
3   government agency comes in and finds that you're
4   committing fraud and shuts down all your operations to
5   do a search and seizure, how is somebody, for example,
6   who's using your system going to operate?  Do you know
7   that?
8   THE WITNESS:  On day one, they would simply
9   operate at risk.
10   THE COURT:  They would find a way is what
11   would happen.
12   THE WITNESS:  For money, yes, they would.
13   THE COURT:  Of course, it would.  Of course,
14   it would.
15   Now, suppose that we had a terrible
16   catastrophe that wiped out where you have most of your
17   support system.  Are the hospitals going to be able to
18   find somebody to help them straighten out and track
19   what's going on and be able to provide surgeries to
20   people; yes or no?
21   THE WITNESS:  There's always a way.
22   THE COURT:  There's a way.  The question is:
23   How much, right?
24   THE WITNESS:  Correct.
25   THE COURT:  And how much inconvenience?

2011.03.25 Hearing - Injunctive Relief  3/25/2011  8:54:00 AM

261

Hager - Redirect                    261

1    THE WITNESS: They don't at the beginning.
2    THE COURT: After you ask the questions, you could
3  find out if it was RSS, for example, couldn't you?
4    THE WITNESS: We could.
5    THE COURT: And then you could say to the customer,
6  sorry, we can't do that?
7    THE WITNESS: We could once we've narrowed it down to
8  RSS.
9    THE COURT: But you have to go through all that.
10   THE WITNESS: We would, yes.
11  Q   Would you be able to narrow it down that way while you're
12  still on the phone with the customer in all instances, or
13  sometimes, or what?
14  A   Sometimes it would be while we're on the phone.  Other
15  times it would likely be weeks and potentially months.
16  Q   Why is that?
17  A   Because it's a very complex system.  Sometimes defects,
18  whether they're intermittent or what have you, you have to
19  really dig in there and try to identify what the root cause is.
20  We have many calls in our call center that have been open for
21  months because we haven't been able to identify the location of
22  the issue.  That's pretty common in the software industry.
23   MR. McDONALD: Any other questions that you have on
24  that, Your Honor?
25  Q   You were asked about the cost increase for your customers

262

Hager - Redirect                    262

1  that have RSS if they had to make a change; do you recall that?
2  A   Yes.
3  Q   Do you have an estimate as to how much it would cost
4  your -- let's take a hospital, how much money it would actually
5  cost them to make a change or not?
6    MR. ROBERTSON: Objection, lack of foundation, Your
7  Honor, and I think it's outside the scope of my cross-examine.
8    THE COURT: I think it's within the scope of your
9  cross-examination.  I don't know whether he -- I think he's
10  asking a foundational question, that is whether he knows or has
11  any basis to know what the cost is.
12   MR. ROBERTSON: Also, certainly there was no
13  documentation produced in the supplemental period with respect
14  to the cost issue.
15   MR. McDONALD: But he asked about it, so I thought we
16  should flush that out.  I'll ask the foundational question.
17  Q   Mr. Hager, from your experience, do you have an idea of
18  how much it would cost, for example, a hospital to make that
19  change away from RSS?
20  A   I do have some experience with that, yes.
21  Q   Based on your experience, what would you believe to be the
22  likely cost to a hospital for that change?
23  A   For a hospital, the hospital -- very large hospitals I
24  think would be more expensive than some of the non-hospital RSS
25  customers we have, so if I were to take the simplest

263

Hager - Redirect                    263

1  implementation of our RSS and pull it out and put something
2  else in, you know, probably the simplest would be three months,
3  but I think on average for our hospitals, I bet you would it
4  probably be closer to nine months because of the complexities
5  of the hospital.
6  Q   You gave me the time.  I was actually asking -- maybe you
7  were thinking of time cost, but I think the question is
8  actually going to the monetary cost.
9  A   Yeah, that's going to run somewhere north of 300,000, 3-
10  to 500,000 probably for that length of time.  Maybe up to
11  750,000 on average.  Some will be greater than a million.
12   THE COURT: Does it cost that much to put RSS in?
13   THE WITNESS: Some of our projects -- again, we put
14  RSS in in conjunction with everything else, but it's so tied
15  into the work flow approvals, and our work flow approvals are
16  based off everything that happens in RSS, so pulling RSS out
17  means you are rebuilding all those work flow approvals to go
18  with whatever new tool you are bringing in, and that's really
19  where the complication comes.  I wish it didn't take this long,
20  but it does.
21  Q   And finally, Mr. Robertson asked you about the advantages
22  of selling the full suite, and I want to clarify, if the
23  customer already has an SAP ERP suite, for example, do you have
24  an advantage over ePlus in selling to a customer like that
25  that's looking for eProcurement?

264

Hager - Redirect                    264

1  A   No.  As a matter of fact, a disadvantage, because our RSS
2  and Punchout won't work with an SAP suite.  We wouldn't even
3  attempt to make that sell.
4  Q   So when is it that Lawson would have actually have some
5  advantage for offering the full suite that Mr. Robertson was
6  asking about?
7    MR. ROBERTSON: Your Honor, I didn't ask -- I asked
8  him about whether or not having that full suite put my client
9  at a disadvantage.
10   THE COURT: Sustained.
11  Q   So in that situation then, can you explain what type of
12  customer would be the customer --
13   THE COURT: What situation?
14  Q   Where Lawson would have that advantage or ePlus would have
15  the disadvantage to Lawson, what specific market situation
16  might that be?
17  A   As was mentioned, when we're selling the entire integrated
18  suite, it's obviously because the customer wants a fully
19  integrated suite, so that would become our competitive
20  advantage.  I should also mention that, you know, our RSS --
21   MR. ROBERTSON: Objection, Your Honor.  He's
22  responded to the question.
23   THE COURT: Sustained.
24   THE WITNESS: Actually, it's a follow-on to the --
25   THE COURT: No, that's enough.

289

289

1   here to the public interest has been greatly exaggerated.  What

2   we have in the record are two declarations from two hospital

3   workers who essentially say that this is basically a monetary

4   inconvenience and would be, you know, disruptive, but nobody

5   says -- the Court, I think, explored during examination its

6   questions of the witness that, you know, the sky is going to

7   fall here, and so that's all we have with respect to that other

8   than attorney argument.

9          And there are other ways to handle this, Your Honor.

10         THE COURT:  You have Mr. Hager's testimony.

11         MR. ROBERTSON:  And he was basically addressing,

12   first of all, the money that might be involved, and there are

13   indemnifications provisions that Lawson has.  It's chosen to

14   build its business upon a foundation of infringement.  It can't

15   turn around and say, we shouldn't be enjoined now because we've

16   been too effective infringers, and the case law says that as

17   well.  But there are options for Your Honor, one of which is

18   what's been phrased the sunset provision which means the

19   injunction could enter, but the Court could say it's not going

20   to be effective with perhaps the hospitals for 90 days,

21   something along those lines such that they can, with as minimal

22   disruption as possible, replace the infringing software.

23         THE COURT:  Yes, I understand.

24         MR. ROBERTSON:  So we'll be addressing that in the

25   briefing as well.  Thank you.

290

290

1          MR. McDONALD:  Your Honor, I'm not sure where we're

2   at.  I've been asked to point out, in my self interest as well,

3   we have a 7:20 flight.  Is it something that's going to end

4   soon, or do you want us --

5          THE COURT:  Goodbye.  I'm thinking about a slight

6   moving of the date of the hearing because of the length of what

7   you all have done on this one, but I won't do it, so go catch

8   your plane.

9          MR. McDONALD:  Thank you, Your Honor.

10         THE COURT:  All right.

11

12          (End of proceedings.)

13

14

15          We certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17

18

19         /s/                _____

           P. E. Peterson, RPR          Date

20

21

           /s/                _____

22   Diane J. Daffron, RPR          Date

23

24

25

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of February, 2012, I will electronically file the foregoing

**DECLARATION OF SRIKANTH K. REDDY AND EXHIBITS 1, 2 AND 3 IN SUPPORT OF ePLUS INC.'s OPPOSITION TO LAWSON'S MOTION TO STRIKE THE EXPERT OPINIONS OF DR. KEITH UGONE**

with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) via email to the following:

| | |
|---|---|
| Christopher Dean Dusseault, *pro hac vice*<br>Jason Lo, *pro hac vice*<br>Timothy P. Best, *pro hac vice*<br>GIBSON, DUNN & CRUTCHER LLP<br>333 S. Grand Avenue<br>Los Angeles, CA 90071<br>Telephone: (213) 229-7000<br>Facsimile: (213) 229-6659<br>CDusseault@gibsondunn.com<br>JLo@gibsondunn.com<br>TBest@gibsondunn.com<br>VAED-620ExternalServiceList@gibsondunn.com | Robert A. Angle, VSB#37691<br>Dabney J. Carr, IV, VSB #28679<br>Megan C. Rahman (VSB No. 42678)<br>Timothy J. St. George (VSB No. 77349)<br>TROUTMAN SANDERS LLP<br>P.O. Box 1122<br>Richmond, Virginia 23218-1122<br>Telephone: (804) 697-1238<br>Facsimile: (804) 698-5119<br>robert.angle@troutmansanders.com<br>dabney.carr@troutmansanders.com<br>megan.rahman@troutmansanders.com<br>tim.stgeorge@troutmansanders.com |
| Donald R. Dunner, *pro hac vice*<br>Erika H. Arner, *pro hac vice*<br>FINNEGAN, HENDERSON, FARABOW, GARRETT<br>& DUNNER, L.L.P.<br>901 New York Avenue, N.W.<br>Washington, DC 20001<br>Telephone: (202) 408-4000<br>Facsimile: (202) 408-4444<br>don.dunner@finnegan.com<br>erika.arner@finnegan.com<br>EXT-Lawson-FinneganCorrespondence@finnegan.com | Daniel J. Thomasch, *pro hac vice*<br>Josh A. Krevitt, *pro hac vice*<br>GIBSON, DUNN & CRUTCHER LLP<br>200 Park Avenue<br>New York, NY 10166<br>Telephone: (212) 351-4000<br>Facsimile: (212) 351-6200<br>DThomasch@gibsondunn.com<br>JKrevitt@gibsondunn.com<br>VAED-620ExternalServiceList@gibsondunn.com |
| | Sarah E. Simmons, *pro hac vice*<br>GIBSON, DUNN & CRUTCHER LLP<br>2100 McKinney Avenue , #1100<br>Dallas, TX 75201<br>Telephone: (214) 698-3100<br>Facsimile: (214) 571-2900<br>SSimmons@gibsondunn.com<br>VAED-620ExternalServiceList@gibsondunn.com<br><br>***Counsel for Defendant Lawson Software, Inc.*** |

_____
/s/
Paul W. Jacobs, II (VSB #16815)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
Facsimile: (804) 697-4112
pjacobs@cblaw.com

Counsel for Plaintiff *e*Plus Inc.