Reasoner, Kurt  1/9/2012  12:00:00 AM

**1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE EASTERN DISTRICT OF VIRGINIA
3          Richmond Division
4    ------------------------x
5    ePLUS INC.,        )
6        Plaintiff,  )  Civil Action No.
7        v.          )  3:09-CV-620 (JRS)
8    LAWSON SOFTWARE, INC.,   )
9        Defendant.  )
10   ------------------------x
11
12          CONFIDENTIAL
13      Videotaped Deposition of
14   PROVIDENCE HEALTH & SERVICES,
15   By and Through its Corporate Designee,
16      KURT REASONER
17      Renton, Washington
18      Monday, January 9, 2012
19      9:08 a.m.
20   Job No.: 16589
21   Pages: 1 - 151
22   Reported by: Julie R. Head, CRR, RPR, CCR

**2**

1      Videotaped deposition of KURT REASONER, held at
2    the offices of:
3
4
5      Distribution Operations Center
6      1801 Lind Avenue Southwest
7      Renton, Washington 98057
8      (425) 525-3095
9
10
11
12
13      Pursuant to agreement, before Julie R. Head,
14   Certified Court Reporter in and for the State of
15   Washington.
16
17
18
19
20
21
22

**3**

1      A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFF:
3      JAMES D. CLEMENTS, ESQUIRE
4      Goodwin Procter LLP
5      53 State Street
6      Boston, Massachusetts 02109
7      (617) 570-1000
8
9    ON BEHALF OF THE DEFENDANT:
10      SARAH E. SIMMONS, ESQUIRE
11      Gibson, Dunn & Crutcher LLP
12      2100 McKinney Avenue
13      Suite 1100
14      Dallas, Texas 75201
15      (214) 698-3100
16
17
18
19
20
21
22

**4**

1      A P P E A R A N C E S   C O N T I N U E D
2      ON BEHALF OF PROVIDENCE HEALTH & SERVICES
3      AND THE WITNESS:
4        JOHN A. GOLDMARK
5        Davis Wright Tremaine LLP
6        1201 Third Avenue
7        Suite 2200
8        Seattle, Washington 98101
9        (206) 622-3150
10
11    ALSO PRESENT:
12        CODY MALONE, Videographer
13
14
15
16
17
18
19
20
21
22

Reasoner, Kurt  1/9/2012  12:00:00 AM

---

**5**

```
 1              C O N T E N T S
 2    EXAMINATION OF KURT REASONER          PAGE
 3       Mr. Clements                8
 4
 5
 6              E X H I B I T S
 7       (Attached to transcript)
 8    REASONER DEPOSITION EXHIBIT          PAGE
 9    Exhibit 1  11/18/11 Letter to Custodian of    12
10       Record, Providence Health &
11       Services, from James D. Clements,
12       Plus Enclosures
13    Exhibit 2  5/27/11 Lawson Document, Subject:    34
14       Immediate Replacement of
15       Requisitions Self Service
16       Software Products Required.
17       (S3 Product IDs: SIP, SIPP, SIPSU),
18       RQC0000732 - 0000734
19    Exhibit 3  9/19/11 Declaration of Kurt Reasoner   62
20    Exhibit 4  Exhibit A to Declaration of Kurt    64
21       Reasoner
22
```

**6**

```
 1         E X H I B I T S   C O N T I N U E D
 2    REASONER DEPOSITION EXHIBIT          PAGE
 3    Exhibit 5  Exhibit B to Declaration of Kurt    66
 4       Reasoner
 5    Exhibit 6  9/15/11 8:49 PM E-mail Chain to    108
 6       Keith Lohkamp, et al., from Kurt
 7       Reasoner, Subject: FW: RSS
 8       Replacement Cost Estimate,
 9       Plus Attachment, PROV004 - 007
10    Exhibit 7  9/16/11 7:52 AM E-mail Chain to    116
11       Kurt Reasoner, et al., from Dan
12       Azevedo, Subject:
13       RE: RSS Replacement Cost Estimate,
14       PROV008 - 009
15    Exhibit 8  2/14/11 Declaration of Kurt    132
16       Reasoner
17    Exhibit 9  5/27/11 10:42 AM E-mail to Joe    139
18       Thornton from Kurt Reasoner,
19       Subject: Catholic Health
20       Initiatives and Providence Health
21       (for customer review).doc, Plus
22       Attachment, PROV043 - 045
```

**7**

```
 1           RENTON, WASHINGTON;  JANUARY 9, 2012
 2           9:08 A.M.
 3           --oOo--
 4
 5           THE VIDEOGRAPHER:  Good morning.  We were now
 6    on the record.
 7           My name is Cody Malone.  I'm the videographer
 8    for YOM Reporters for Planet Depos this morning.  Here
 9    begins Volume 1, media unit number one, in the
10    deposition testimony of Mr. Kurt Reasoner in the matter
11    of ePlus, Incorporated, versus Lawson Software,
12    Incorporated, in the United States District Court,
13    Eastern District of Virginia.  Case number 3:09-CV-620,
14    JRS.
15           Today is Monday, the 9th day of January, 2012.
16    The time on the video monitor is now 9:09 a.m.
17           This deposition is taking place at 1801 Lind
18    Avenue Southwest, in Seattle, Washington.
19           We'd ask counsel, at this time, to please
20    voice-identify yourselves for the record and state whom
21    you represent.
22           MR. CLEMENTS:  This is Jimmy Clements
```

**8**

```
 1    representing the plaintiff ePlus.
 2           MR. GOLDMARK:  I'm John Goldmark representing
 3    Providence Health & Services, which is not a party, and
 4    the deponent Kurt Reasoner.  And, for the record, we are
 5    in Renton, Washington, not Seattle.
 6           THE VIDEOGRAPHER:  We are, thank you.
 7           MS. SIMMONS:  This is Sarah Simmons
 8    representing Lawson Software, Inc., from Gibson, Dunn &
 9    Crutcher.
10           THE VIDEOGRAPHER:  Okay.  Thank you.
11           Our court reporter today is Julie Head, also
12    of YOM Reporters for Planet Depos.
13           We'd ask that you please swear in the witness
14    and proceed.
15           KURT REASONER,
16    sworn as a witness by the Certified Court Reporter,
17       testified as follows:
18           EXAMINATION
19    BY MR. CLEMENTS:
20    Q.  Mr. Reasoner, could you state your full name
21    for the record, please.
22    A.  My full name is Kurt Winfield Reasoner.
```

9

1   Q.  Who is your employer?

2   A.  My employer is Providence Health & Services.

3   Q.  And what is your current position?

4   A.  My current position is system director over

5   enterprise applications.

6   Q.  And what is the scope of responsibilities

7   with that position?

8   A.  That position is responsible for applications

9   that are centrally supported and run across our entire

10  company, sometimes referred to as enterprise, and that

11  includes Lawson Software, which we internally brand as

12  ProvConnect -- you'll see reference to that -- and,

13  also, other applications such as our messaging services,

14  e-mail, instant messaging, other collaboration tools,

15  videoconferencing, telephone conferencing, and then,

16  also, our technology back office service management

17  tool, so our help desk, our problem management, change

18  management system that is supporting our IT organization

19  across Providence.

20  Q.  Okay.  Great.

21      Could you provide your home and work address,

22  please.

10

1   A.  My home address is -- I just moved -- 571

2   Mountain View Lane, Issaquah, Washington 98027.  And my

3   work address, here, is 1801 Lind Avenue Southwest,

4   Renton, Washington 98059, I believe.

5   Q.  Okay.  Thank you.

6       Mr. Reasoner, have you ever been deposed

7   before?

8   A.  I have not.

9   Q.  Have you ever attended a deposition before?

10  A.  I have not.

11  Q.  Okay.  Well, I'm just going to go over just a

12  few of the ground rules --

13  A.  Okay.

14  Q.  -- make you familiar.

15      Over the course of the deposition, I'm going

16  to be referring to a number of documents that I'll refer

17  to as exhibits, and I'll be asking you questions about

18  them.  I need your responses to my questions, not only

19  with regard to documents, but just in general, to be

20  oral, because the court reporter is documenting

21  everything we say, doesn't record any sort of nod of the

22  head.

11

1   A.  Okay.

2   Q.  If you don't understand a question, say

3   something; otherwise, I'll assume that you understood

4   the question.

5   A.  Okay.

6   Q.  Sometimes your attorney, here, Mr. Goldmark,

7   will object to a question, or maybe Ms. Simmons but

8   unless your attorney instructs you not to answer, you

9   must answer the question.

10  A.  Okay.

11  Q.  Do you understand that you are providing

12  testimony on behalf of Providence Health & Services as

13  if itself were sitting in the chair and giving

14  testimony?

15  A.  I do.

16  Q.  Okay.  And do you refer to it normally as just

17  Providence or Providence Health or PH&S?

18  A.  All of the above.  I -- I think it would be

19  okay if we referred to it in this setting, here, as just

20  Providence.

21  Q.  Okay.  We'll do that.  That will make it a

22  little bit easier.

12

1       Court reporter, could you please mark this

2   document as Reasoner Exhibit No. 1.

3       (Deposition Exhibit 1 was marked for

4       identification.)

5   Q.  (BY MR. CLEMENTS:)  Mr. Reasoner, I'm handing

6   you what has been marked as Exhibit No. 1.  If you

7   would, just take a moment to peruse it, look it over.

8   A.  Okay.

9   Q.  For the record, this is a correspondence

10  letter that was sent from me to Providence, attaching

11  two subpoenas to Providence.

12  A.  Okay.

13  Q.  Okay.  Do you -- Do you recognize this

14  document?

15  A.  I do.

16  Q.  So, you've seen it before?

17  A.  I have.

18  Q.  And do you understand this to be two subpoenas

19  that were served on Providence by the company I

20  represent, the plaintiff ePlus?

21  A.  Yes, I do.

22  Q.  Okay.  Could you turn to page nine of the

Reasoner, Kurt  1/9/2012  12:00:00 AM

13

1    first schedule in the document.
2         A.   Okay.
3         Q.   And you'll see, its heading entitled
4    Schedule A, Deposition Topics, and there's paragraphs
5    one through seven, correct?
6         A.   Yes.
7         Q.   Okay.  Do you understand that you are here to
8    testify with regard to these topics?
9         A.   Yes, I am; however, I believe that some of
10   these topics, there was a separate agreement on what we
11   would be discussing today.
12        Q.   Okay.
13             I don't remember what he's referring to.  Can
14   you refresh my memory?
15             MR. GOLDMARK:  Yeah, Jimmy, he is probably
16   referring to the e-mail I sent you -- I suppose this is
17   Friday, January 6th -- just confirming the topics that
18   we agreed to for the scope of the deposition.
19             MR. CLEMENTS:  Were there any topics that you
20   had said that Providence would not testify to or that
21   Mr. Reasoner would not testify to?
22             MR. GOLDMARK:  Yeah, the -- the general scope

14

1    of the topics we agreed to provide Mr. Reasoner as a
2    deponent on were essentially one through topics -- let's
3    see -- through four.  And I believe many of the
4    questions that you have are subsumed within those
5    topics.
6             MR. CLEMENTS:  Okay.  Well, we'll go through
7    this deposition and we'll see if we run into any
8    problems.
9             MR. GOLDMARK:  Did you receive that -- the
10   e-mail I sent on January -- or January 6th?  At noon.
11   To you.  I copied Reddy, Srikanth.
12             MR. CLEMENTS:  I -- I don't have it with me.
13             MR. GOLDMARK:  Well, I can just -- For the
14   record, I can read into --
15             MR. CLEMENTS:  Okay.  Go ahead.
16             MR. GOLDMARK:  This says -- This is an e-mail
17   from myself to James Clements, dated January 6th, 2012.
18   sent at 12 p.m.  It was sent to James Clements and
19   copied to Reddy, Srikanth and myself.  Subject is
20   January 9 deposition of Providence witness.  It says,
21   "Thanks for letting me know, Jimmy.  This confirms my
22   agreement with you and Srikanth that the deposition will

15

1    be limited to three hours in length and on the following
2    topics:  Number one, the cost of implementing RQC as
3    reflected in the September 19, 2011 Reasoner
4    Declaration, i.e., Subpoena Schedule A, Topic No. 4;
5    number two, Providence's implementation of RQC, i.e.,
6    subpoena, Schedule A, Topic No. 3; and, three,
7    communications with Lawson regarding the RQC
8    implementation process, i.e., this generally covers
9    topic numbers one and two of the subpoena, Schedule A.
10   I look forward to seeing you on Monday.  Best regards,
11   John."
12             MR. CLEMENTS:  Okay.  Well, like I said, we
13   can -- we can deal with that as it comes up.  We'll go
14   ahead and proceed with the deposition.
15             Just to summarize, did you say it was topics
16   one through four in your correspondence is what you had
17   said?
18             MR. GOLDMARK:  That's correct.
19             MR. CLEMENTS:  Okay.  All right.  Well, let's
20   go ahead and proceed.
21        Q.   (BY MR. CLEMENTS:)  So, Mr. Reasoner, your
22   understanding, at least, is that you are here to testify

16

1    with regard to topics one through four of this subpoena?
2         A.   That is correct.
3         Q.   And are you prepared to testify on
4    Providence's behalf with respect to these topics?
5         A.   I believe I am.
6             MR. GOLDMARK:  And just -- Just for the
7    record -- follow up on that -- I -- I think you'll find
8    out during the deposition, Jimmy, that topics number
9    five and six and seven, particularly topics five and six
10   that Mr. Reasoner has knowledge of, as well, and -- and
11   Topic No. 7, we specifically objected to and it's --
12   it's not -- it's not a topic that we agreed to provide a
13   deponent on.
14             MR. CLEMENTS:  Okay.  All right.  Well,
15   thanks, John.
16             MR. GOLDMARK:  Yeah.
17             MR. CLEMENTS:  Let's keep going.
18        Q.   (BY MR. CLEMENTS:)  Mr. Reasoner, what did you
19   do to prepare to testify concerning topics one through
20   seven?
21        A.   I reviewed my e-mail box for relevant
22   communications, both sent and received, and I reviewed

17

1   some of our internal documents for the project of
2   implementing the RQC application.  And I talked to my
3   application technology director, Dan Azevedo, who is
4   referred in some of the e-mails, as well as Shawna
5   Osborn, who was our lead analyst in charge of deploying
6   RQC.
7        In addition, I did speak with our internal
8   counsel and then, subsequently, John, here, as our
9   external counsel.
10       Q.  But among the Providence personnel that you
11  spoke to, it was only Mr. Azevedo and Mrs. Osborn?
12       A.  Correct.
13       Q.  Okay.  And I understand that you are
14  represented by Mr. Goldmark today; is that correct?
15       A.  That is correct.
16       Q.  Is there any reason, at all, why you feel you
17  cannot testify fully and accurately today?
18       A.  No, there's no reason why I shouldn't be able
19  to.
20       Q.  Are you on any medication?
21       A.  I am not on any medication.
22       Q.  Okay.  Well, we'll -- This is going to be a

18

1   relatively short deposition.  We'll try to get through
2   as quickly as we can.
3        A.  Okay.
4        Q.  You can ask for a break, if you need one.
5        A.  Okay.
6        Q.  But only thing I'd ask, if there's a question
7   pending at that time, that you go ahead and answer the
8   question --
9        A.  Okay.
10       Q.  -- before we take a break.
11       Do you have any questions about the procedures
12  today?
13       A.  No, not yet.
14       Q.  Okay.  Great.  So we can get into the meat of
15  it.
16       A.  Okay.
17       Q.  Mr. Reasoner, does Providence currently
18  license any software applications from Lawson?
19       A.  Does Lawson license applications from Lawson?
20       Q.  I'm sorry, does Providence currently license
21  any software applications from Lawson?
22       A.  We pay for licenses from Lawson, if that is

19

1   the question.
2        Q.  That is the question.
3        A.  Okay.  Yes.
4        It's not a trick question.
5        A.  Okay.
6        Q.  It's just laying foundation.
7        A.  Thank you.  Yes, we do.
8        Q.  And could you tell me which applications?
9        A.  We license -- We have a license with Lawson.
10  The -- what is commonly referred to as the S3
11  application, which is the ERP tool Lawson has developed
12  and delivered for a multitude of back office services.
13       There are also other adjunct applications that
14  you might not consider to be part of S3, so there are --
15  there are a few other applications, as well.
16       Q.  Okay.  So, you have S3 and then some other
17  applications?
18       A.  Yes.
19       Q.  And do you know what those other applications
20  are?
21       A.  I would be hard-pressed to list them all
22  accurately, but they're things like Lawson Business

20

1   Intelligence, Lawson Mobile Supply Chain Management,
2   there might be some technology tools that help run the
3   IBM system.  I -- I don't have, off the top of my head,
4   an -- an exhaustive, complete list.
5        Q.  Okay.  But among procurement-related software
6   applications, can you tell me which specific
7   applications Providence licenses from Lawson?
8        A.  The Mobile Supply Chain Management tool, the
9   Lawson Procurement tool, that is all part of S3, and,
10  let's see, we use Process Flow.  I think that's part of
11  S3, though.  I believe it to be.  I can't think of
12  anything else, off the top of my head, that we -- that
13  relate specifically to procurement and are licensed
14  through Lawson.
15       Q.  Can you tell me if there are any specific
16  applications or modules within the S3 Procurement tool
17  that is included in the license that Providence has from
18  Lawson?
19       A.  The specific tools within S3.
20       Q.  Yes.  You mentioned S3 Procurement tool.
21       A.  Yes.  So, there is a -- a purchasing tool,
22  there is an AP module that is related to procurement,

21

1    there is an inventory tool, there's a receiving tool.  I

2    believe those to be it.

3       Q.  Are you aware of whether Providence licenses

4    application called Lawson System Foundation?

5       A.  Yes.

6       Q.  And the answer is they do license Lawson

7    System Foundation?

8       A.  They do -- They do license Lawson System

9    Foundation.

10      Q.  What about Inventory Control?

11      A.  That is probably part of the overall -- when I

12   said inventory system, it would have included that, yes.

13      Q.  Okay.  What about a module called

14   Requisitions?

15      A.  Yes.  Requisition Self-Service, yes.

16      Q.  Just to be precise, here --

17      A.  Okay.

18      Q.  -- Requisition Self-Service, as I understand

19   it, is a separate application from what was known as a

20   requisitions module.  Do you understand that difference?

21      A.  I don't tend to think of them that way, but --

22   Yes, I'm -- They are different, yes.

22

1       Q.  Okay.  So, Providence licenses a requisitions

2    module --

3       A.  Yes.

4       Q.  -- from Lawson?

5       A.  Yes, we do.

6       Q.  Okay.  Does Providence license the purchase

7    order module from Lawson?

8       A.  Yes.

9       Q.  Does Providence license the EDI module from

10   Lawson?

11      A.  Yes.

12      Q.  What about Procurement Punchout?

13      A.  We do not.

14      Q.  Does Providence license a Requisitions

15   Self-Service application from Lawson?

16      A.  We did.

17      Q.  Does Providence currently license a

18   Requisition Self-Service application from Lawson?

19      A.  No.  We've turned that off.

20      Q.  And when did that license terminate?

21      A.  At the end of October.

22      Q.  Does that mean that that is -- Is the end of

23

1    October when Providence turned off, as you say,

2    Requisition Self-Service or was that when the -- the

3    license itself actually expired?

4       A.  We turned off that Requisition Self-Service

5    functionality to all of our users.

6       Q.  Okay.  Well, I'll come back to that later.

7           And does Providence license a Requisition

8    Center application --

9       A.  Yeah.

10      Q.  -- from Lawson?

11      A.  Yes, we do.

12      Q.  So, what I have right now, as the current list

13   of procurement-related software applications that

14   Providence currently licenses from Lawson, is Lawson

15   System Foundation, Process Flow, Inventory Control,

16   Requisitions, Purchase Order, EDI, and Requisition

17   Center; is that correct?

18      A.  That's correct.

19      Q.  Okay.  Thanks.

20      A.  Um-hum.

21      Q.  So, apart from the Requisition Self-Service

22   application, which you said that Providence stopped

24

1    using at end of October, has Providence added or dropped

2    any procurement-related Lawson Software applications in

3    the past year?

4       A.  Any -- Could you please just restate the

5    question?

6       Q.  Yes.  Has Providence added or dropped any

7    procurement-related Lawson applications in the past

8    year?

9       A.  In the past year.

10      Q.  Putting aside Requisition Self-Service.

11      A.  Okay.  No.

12      Q.  What about Requisition Center?  When did

13   Providence begin licensing Requisition Center

14   application?

15      A.  I'm sorry, that is an add-that happened in, I

16   believe, May.

17      Q.  Do you know what date in May that --

18      A.  No.

19      Q.  -- Providence began licensing the Requisition

20   Center application?

21      A.  Not specifically.

22      Q.  But, to your knowledge, apart from Requisition

---

**25**

1    Center and Requisition Self-Service, Providence has not
2    added or dropped any procurement-related Lawson
3    applications in the past year?
4       A.   Correct.
5       Q.   And what about the past five years?
6       A.   Past five years.  Well, in the past five
7    years, we've probably added some applications.  I don't
8    remember the exact date that we added mobile supply
9    chain management.  That might have been within a
10   five-year time period.
11      Q.   Okay.  Is there any other applications aside
12   from mobile supply chain management that you remember
13   being added in the last five years?
14           MR. GOLDMARK:  I'm going to object just to
15   note for the record that this goes substantially beyond
16   the applicable time period of the deposition topics.
17           THE WITNESS:  Could you rephrase the question
18   again, please.
19      Q.   (BY MR. CLEMENTS:)  So, my understanding is,
20   from your testimony, that sometime within the five --
21   last five years, you believe Providence added mobile
22   supply chain management application, correct?

---

**26**

1       A.   Yes.
2       Q.   And I just want to follow up if there were any
3    other applications aside from that that Providence had
4    added or dropped during the last five years.
5       A.   Any -- Any procurement applications?  Or any
6    Lawson applications?
7       Q.   Yeah, let me clarify that.  Any
8    procurement-related Lawson applications.
9       A.   I -- I can't -- I don't think so.  I can't say
10   definitively -- I just don't -- I don't -- I would have
11   to go back through a fair amount of detail to see that
12   we might have added or dropped, particularly if we were
13   talking about small pieces.  So, I can't think of
14   anything major that we would have added or dropped.
15      Q.   Okay.  So, going back to your earlier
16   testimony, I understand you stated that Providence
17   turned off Requisition Self-Service at the end of
18   October of last year; is that correct?
19      A.   That's correct.
20      Q.   Does the Requisition Self-Service application
21   still reside on any Providence servers or other
22   computers as of today?

---

**27**

1       A.   I don't know.
2       Q.   Has any effort been made by Providence to
3    determine whether or not Requisition Self-Service
4    application still resides on any Providence servers or
5    other computers?
6       A.   Not that I'm aware of.
7       Q.   Do you believe it was Providence's obligation
8    to uninstall Requisition Self-Service application
9    pursuant to the court's injunction order in the ePlus v
10   Lawson litigation?
11      A.   Could you say that again, please.
12      Q.   Do you think that Providence had an obligation
13   to uninstall the Requisition Self-Service application
14   pursuant to the injunction order against Lawson
15   Software?
16      A.   I don't -- I don't know that -- I don't know
17   that we were required to remove it.  We were required to
18   stop using it.
19      Q.   Okay.  But, to your knowledge, there has been
20   no effort made by Providence to uninstall the
21   Requisition -- excuse me.  Let me start over.
22           To your knowledge, there's been no effort by

---

**28**

1    Providence to uninstall the Requisition Self-Service
2    application from Providence's servers?
3       A.   I don't know of a project that specifically
4    would go to all of our different environments and ensure
5    that it has been removed.
6       Q.   Are you aware of any servers or other
7    computers at Providence in which the Requisition
8    Self-Service application has been removed?
9       A.   I can't say that I am.
10      Q.   Has Lawson ever inquired from Providence
11   whether it has removed the Requisition Self-Service
12   application from its system?
13      A.   I don't recall any specific communication or
14   requests to me asking that.
15      Q.   And is there anyone else at Providence who
16   might have received that inquiry from Lawson?
17      A.   Yes.
18      Q.   Who would that be?
19      A.   Dan Azevedo.
20      Q.   And, to your knowledge, did Lawson make any
21   inquiry of Mr. Azevedo as to whether or not Providence
22   had removed the Requisition Self-Service application

---

Reasoner, Kurt  1/9/2012  12:00:00 AM

29

1   from its system?
2       A.  I don't know.
3       Q.  Mr. Reasoner, does Providence pay license fees
4   for the procurement-related applications that it
5   licenses from Lawson?
6       A.  Say that again.
7       Q.  Well, let me just -- If we can reach an
8   understanding.  When I refer to the procurement-related
9   applications, you describe them as the S3 Procurement
10  tool.
11      A.  Correct.
12      Q.  So, I'm going to refer to them as S3
13  Procurement, if that works for you.
14      A.  Okay.  It does.
15      Q.  Does Providence pay license fees for the S3
16  Procurement tool that it licenses from Lawson?
17      A.  Yes.
18      Q.  And how are those license fees structured?
19      A.  Our license fees with Lawson are based on a --
20  a revenue model, a net revenue model, so the fee
21  originally paid covered a full use and is unrestricted,
22  so it's not by seat or anything such as that.  And

30

1   depending on our revenue number, we may, from time to
2   time, have to pay Lawson additional licensing depending
3   on the growth of our company.
4       Q.  Okay.  So, let me make sure that -- that I
5   understand this accurately.  So, there's some sort of
6   flat fee that Providence pays to Lawson for S3
7   Procurement that applies to an unrestricted number of
8   users, correct?
9       A.  Correct.
10      Q.  And then, above and beyond that, if
11  Providence's net revenue should exceed a certain amount,
12  then there's an additional amount that's paid on the
13  license?
14      A.  That's correct.
15      Q.  Okay.  Does Providence pay a separate license
16  fee for each application within the S3 Procurement tool?
17      A.  No.
18      Q.  Does Providence pay a single license fee for
19  the entire S3 Procurement suite?
20      A.  It does.
21      Q.  And does that license cover each of the
22  applications that we discussed previously relating to S3

31

1   Procurement?
2       A.  Yes, it does.
3       Q.  Is Providence required to make recuring
4   payments on these licenses -- Let me start over.
5       Is Providence required to make recurring
6   payments on the S3 Procurement license, periodically?
7       A.  Can you please define for me what you mean by
8   license?
9       Q.  There -- Do you understand there to be some
10  type of contractual agreement between Lawson and
11  Providence that provides Providence the legal right to
12  use the Lawson S3 Procurement suite?
13      A.  Yes, there is.
14      Q.  And Providence pays some fee associated with
15  that to Lawson for that use?
16      A.  Yes.  So, I refer to that as an annual
17  maintenance fee.
18      Q.  So, the -- the fee that we discussed before
19  that was based on the net revenue model and having
20  unrestricted use was an annual maintenance fee?
21      A.  No.
22      Q.  That was not an annual maintenance fee.

32

1       A.  It was not.  It -- And is not.  It is a
2   license payment.  It's a one-time payment.
3       Q.  I see.  So, going back to the license fee,
4   there is a one-time fee that you pay that's a flat fee,
5   correct?
6       A.  Correct.
7       Q.  And then, periodically, you may pay additional
8   amounts on that license based on the net revenue of
9   Providence?
10      A.  Correct.
11      Q.  How often do these recurring payments based on
12  the net revenue occur?
13      A.  In my time with Providence, it has occurred
14  only one time.
15      Q.  How often is the net revenue measured for
16  purposes of determining whether or not an additional
17  amount needs to be paid on the license?
18      A.  Annually.
19      Q.  So, would Providence pay an additional amount
20  annually to Lawson for the license fee, assuming that
21  their net revenue exceeded the amount stated in the
22  license agreement?

33

1    A.  I'm sorry, say that again.
2    Q.  If Providence's net revenue exceeded the
3    amount stated in the license agreement --
4    A.  Yes.
5    Q.  -- then would Providence be obligated to pay
6    each year the additional amount in accordance with the
7    license agreement?
8    A.  Any time, annually, that Providence's net
9    revenue exceeds the contractual requirements of that net
10    revenue amount, we are obligated to pay an additional
11    licensing fee --
12    Q.  Okay.  Thanks.
13    A.  -- to -- to cover that.
14    Q.  Okay.  So, now -- You said that Providence has
15    only once paid the additional amount based on net
16    revenue for the license fee, correct?
17    A.  That's correct.
18    Q.  When did that payment occur?
19    A.  In 2006.  And the actual payment may have been
20    made in 2007.
21    Q.  Does the license agreement for S3 Procurement
22    between Providence and Lawson ever expire?

34

1    A.  No.
2    To be clear, as long as we continue to pay
3    annual maintenance.
4    Q.  Okay.  Thank you.
5    A.  Can we just take a quick little break, here?
6    The sound that you're hearing --
7    THE VIDEOGRAPHER:  Oh, one moment, please.
8    We'll go off the record briefly.  The time is 9:43.,
9    (Off the record at 9:43 a.m.)
10    (Back on the record at 9:43 a.m.)
11    THE VIDEOGRAPHER:  Okay.  We are back on the
12    record.  The time is 9:43.  Please proceed.
13    MR. CLEMENTS:  Court reporter, could you
14    please mark this document as Reasoner Exhibit No. 2.
15    (Deposition Exhibit 2 was marked for
16    identification.)
17    Q.  (BY MR. CLEMENTS:)  Mr. Reasoner, the court
18    reporter has just handed you what has been marked as
19    Reasoner Exhibit No. 2.  Again, please just take a
20    moment to peruse it.
21    For the record, this document has the header
22    subject:  Immediate replacement of Requisition

35

1    Self-Service software products required. (S3 Product
2    IDs:  SIP, SIPP, SIPSU), and it's dated May 27th, 2011.
3    It bears Bates label RQC000732 (sic)to RQC0000738.
4    MR. GOLDMARK:  Jimmy, I got a bunch of blank
5    pages, here, at the end of my Exhibit 2.
6    MR. CLEMENTS:  Well, that's unfortunate.
7    MR. GOLDMARK:  I only go up to 734.
8    THE WITNESS:  That is true for me, as well.
9    MS. SIMMONS:  I have --
10    MR. CLEMENTS:  Okay.  Well, I will represent
11    that 735 through 738 is a copy of the injunction order
12    from the litigation.  I don't intend to ask questions
13    about that.  So, I apologize for that.
14    MR. GOLDMARK:  That's fine.
15    And, Jimmy, would you be referring to, then,
16    what's I think is the tail end of Exhibit 1, is the
17    injunctive order?  When you say that's the missing
18    portion of Exhibit 2, is that the same as the injunctive
19    order, the last --
20    MR. CLEMENTS:  Yeah.  That's correct.
21    Pages --
22    MR. GOLDMARK:  -- the last pages of Exhibit 1?

36

1    MR. CLEMENTS:  Exactly.  That's the last one,
2    two, three -- it looks like the last four pages of
3    Exhibit 1.
4    I don't know why that did not print out.
5    So, just to clarify for the record, what we're
6    actually looking at is actually Bates labeled RQC0000732
7    through RQC0000734.
8    Q.  (BY MR. CLEMENTS:)  Mr. Reasoner, have you seen
9    this document before?
10    A.  Yes, I have seen this before.
11    Q.  When did you first see it?
12    A.  On or about May 27th.
13    Q.  And did Providence receive a copy of this
14    document from Lawson?
15    A.  Yes.
16    Q.  They received a copy from Lawson on or about
17    May 27th, 2011?
18    A.  Correct.
19    Q.  What is your understanding regarding the
20    purpose of this document?
21    A.  To inform us as a user of Lawson software the
22    ruling by the court, explaining to us that we needed to

**37**

1  prepare to stop using RSS in that there was a
2  replacement solution called RQC.
3  Q.  If you could, please turn to the next page,
4  Bates label RQC0000733, and you note that, after the
5  first paragraph, there is a subheading, bold face,
6  stating, "Court ruling as of May 23rd, 2011."  You see
7  that?
8  A.  I do.
9  Q.  And then, if you go down to the next line, it
10  states, "A copy of the court's order is appended to this
11  letter and here is the summary."  And if we skip down to
12  the second bullet, it states, "Lawson must immediately
13  and permanently stop selling and servicing S3 solutions
14  used in conjunction with RSS, the M3 e-Procurement
15  System (USA only)."  Do you see that?
16  A.  I do.
17  Q.  Do you understand this statement to mean that
18  Lawson would no longer be able to service the Lawson
19  system used by Providence as existed on May 23rd, 2011?
20  A.  Can you say that again, please?
21  Q.  Do you understand this statement that I just
22  read here to mean that Lawson would no longer be able to

**38**

1  service the Lawson system used by Providence as it
2  existed on May 23rd, 2011?
3  A.  I'm sorry, I'm not -- I'm not -- Do I
4  understand that Lawson could no longer service the S3
5  application as a result -- is -- is
6  Q.  Well, let's back up for a moment.
7  A.  Yes.  Yes.
8  Q.  So, as of May 23rd, 2011, was Providence still
9  using an S3 Procurement system that incorporated the
10  Requisition Self-Service application?
11  A.  Yes, we were.
12  Q.  Okay.  So, based on the fact that Providence
13  was using an S3 Procurement system that incorporated
14  Requisition Self-Service, is it your understanding,
15  based on the statement Lawson made in this memo to its
16  customers, that it would no longer be able to service
17  the system used by Providence as it existed on the date
18  of this document?
19  A.  There is -- That was not my understanding.
20  Q.  Can you tell me what your understanding was?
21  A.  That we had until November 2011 to transition,
22  which is what this letter is encouraging us to do.

**39**

1  Q.  So, are you referring to the next statement?
2  A.  Yes, I am.
3  Q.  And, for the record, it says, "For customers
4  who provide only healthcare patient services who first
5  licensed RSS before January 27th, 2011, Lawson may
6  continue to service, support these customers until
7  November 22nd, 2011."  Is that correct?
8  A.  That's correct.
9  Q.  So, your understanding was that Lawson --
10  Excuse me.  Let me start over.
11  Was it your understanding that Lawson would no
12  longer be able to service the Lawson system used by
13  Providence as existed on May 23rd, 2011, after
14  November 22nd, 2011?
15  A.  That is -- That was -- is and was my
16  understanding.
17  Q.  Okay.  Thanks for the clarification.
18  Now, as I understood your earlier testimony,
19  Mr. Reasoner, you stated that Providence paid an
20  up-front license fee for an S3 Procurement license that
21  included the Requisition Self-Service application,
22  correct?

**40**

1  A.  Correct.
2  Q.  And, as of this date, Lawson is no longer able
3  to service that system as it existed; is that correct?
4  A.  That's correct.
5  Q.  Did Lawson offer Providence any reduction or
6  reimbursement of its license fee to compensate for the
7  removal of support for the Requisition Self-Service
8  application?
9  A.  Please say that again.
10  Q.  Did -- Did they offer us -- Just say it again.
11  Q.  Any reduction in the license fee that
12  Providence had paid for the S3 Procurement suite or any
13  reimbursement to compensate for the fact that they
14  were -- had to remove support for systems incorporating
15  the Requisition Self-Service application?
16  MR. GOLDMARK:  I'm going to object to form.
17  It's a compound question and confusing.  And I'm also
18  just going to object.  I think that sort of continues
19  and expands upon a line of questioning that's far
20  outside the scope of the noted deposition topics for
21  which he's a deponent.  Specifically, you're asking a
22  whole bunch about specific fee arrangements that's

Reasoner, Kurt  1/9/2012  12:00:00 AM

41

1    nowhere within any of the notice topics.

2        Q. (BY MR. CLEMENTS:)  Now, unless he tells you

3    not to answer, you can go ahead and answer to the best

4    of your knowledge.

5        A. Okay.  I don't recall any notification from

6    Lawson or offer to reduce the license fee that we paid,

7    historically, because we were moving off of RSS.

8        Q. So, just to follow up to that, were there any

9    discussions that took place between Providence and

10   Lawson regarding any sort of reduction in its license

11   fees as a result of the removal of support for

12   Requisition Self-Service?

13       A. No.

14       Q. Were there any discussions that took place

15   within Providence itself regarding a potential reduction

16   in license fee that it had paid based on Lawson's

17   removal of support for Requisition Self-Service?

18       A. No.

19       Q. So, at no time did Providence consider that it

20   was owed any sort of reduction in its license fee as a

21   result of Lawson's removal of support for Requisition

22   Self-Service?

43

1    things incorporated.  It's -- It includes many things.

2        Q. Can you provide an overview of the types of

3    maintenance services that Lawson provides in accordance

4    with the agreement?

5        A. Sure.  We have access to Lawson resources

6    should there be any issues.  They provide updates and

7    enhancements to the whole S3 application.  If we have a

8    critical incident where the application is down, they're

9    available to us to help bring that back up so that we

10   can continue operations.

11       Q. Okay.  And similar to the license fee that we

12   discussed, does Providence pay a single maintenance fee

13   for the entire S3 Procurement suite?

14       A. We pay a one-time fee, annually, for

15   maintenance based on the various components that we own.

16       Q. So, just to understand you correctly, there is

17   a one-time fee paid annually for maintenance that covers

18   the entire range of applications that Providence

19   licenses from Lawson?

20       A. That's correct.

21       Q. Okay.  Thank you.

22       Can you tell me when the last maintenance

42

1        A. Not that I can recall specifically.

2        Q. Okay.

3        Mr. Reasoner, I think you referenced earlier

4    that Providence contracts Lawson to receive maintenance

5    services related to the S3 Procurement suite; is that

6    correct?

7        A. Yes.  Yes.

8        Q. And what is the substance of the agreement

9    between Lawson and Providence regarding the provision of

10   maintenance services?

11       A. That's a pretty complex question.

12       Q. Okay.  Well, let me try to be more specific.

13   What maintenance services is Lawson obligated to provide

14   Providence in accordance with this agreement?

15       A. Can I talk to my legal counsel?

16       Q. I would prefer that you go ahead and answer

17   the pending question.

18       A. I can't answer the question.  The question is

19   very complex.

20       Q. Okay.

21       A. It's -- In our arrangement with Lawson, in the

22   maintenance support that they give us, there are many

44

1    payment was made by Providence to Lawson?

2        A. Our maintenance payments are due on May 30th

3    of every year.

4        Q. Did Lawson offer Providence any reduction in

5    its maintenance fees to compensate for the removal of

6    support for Requisition Self-Service?

7        A. I --

8        MR. GOLDMARK:  Objection.  Asked and answered.

9        MR. CLEMENTS:  Counsel, I think my earlier

10   question related specifically to license fees.  Now, I'm

11   following up on maintenance fees.

12       THE WITNESS:  None that I can recall.

13       Q. (BY MR. CLEMENTS:)  And did any discussions

14   take place within Providence regarding a potential

15   reduction in the amounts -- excuse me.  Start over.

16       Did any discussions take place within

17   Providence regarding a potential reduction in the amount

18   of maintenance fees paid to Lawson?

19       A. None that I'm aware of.

20       Q. Are there any other agreements between Lawson

21   and Providence related to the S3 Procurement suite,

22   aside from the license agreement and the maintenance

Reasoner, Kurt  1/9/2012  12:00:00 AM

45

1    agreement that we discussed?

2        A.  I'm sorry, can you restate that?

3        Q.  Well, we discussed a license agreement that

4    related to the S3 Procurement suite, correct?

5        A.  Correct.

6        Q.  And we discussed an agreement for maintenance

7    services, correct?

8        A.  Correct.

9        Q.  And are there any other agreements between

10   Lawson and Providence that relate to services performed

11   with regard to the S3 Procurement suite?

12       A.  There are many agreements that we signed with

13   Lawson for specific services, so I'm not sure how to

14   answer your question.

15           Any time we engage a Lawson professional

16   services person, there is a -- an agreement that is

17   signed.

18       Q.  The agreements you're referencing here refer

19   to specific tasks that Providence asked Lawson to

20   perform?

21       A.  Yes.

22       Q.  Okay.

46

1        A.  That's one example of types of agreements.

2        Q.  Putting those aside, are there any other

3    agreements besides the license agreement and the

4    maintenance agreement that you're aware of between

5    Lawson and Providence?

6        A.  None that I can think of that would be

7    relevant to the procurement application.

8        Q.  Okay.  I don't know if we already covered

9    this, so I'll go ahead and ask it again.

10           Mr. Reasoner, is the Lawson Requisition Center

11   application currently implemented at Providence?

12       A.  Yes, it is.

13       Q.  And has it been implemented in a production

14   capacity?

15       A.  Yes, it has.

16       Q.  And when was the production implementation of

17   Requisition Center at Providence completed?

18       A.  Can I refer to my notes?

19       Q.  Yes.

20           MR. GOLDMARK:  And when you find it,

21   Mr. Reasoner, why don't you let Counsel know the Bates

22   stamp document you're referring to to refresh your

47

1    recollection.  These are documents that have been

2    produced to ePlus.

3            THE WITNESS:  Yes, I'm looking at the project

4    task list and looking for the date.  I believe

5    September 27th, 2011.

6        Q.  (BY MR. CLEMENTS:)  Okay.  So, as of --

7        A.  I also looked at our -- just as requested,

8    here -- at a specific final communication that went out

9    to all of our users on the 27th, notifying them that

10   Requisition Self-Service was now moving to RQC.

11       Q.  So, as of September 27th, 2011, the Lawson

12   Requisition Center application was put in a production

13   capacity at Providence?

14       A.  Correct.

15       Q.  Is the Requisition Center application

16   currently used to create and approve all requisitions at

17   Providence?

18       A.  Not all.

19       Q.  How are any other requisitions created and

20   approved at Providence?

21       A.  There's multiple ways.  Some are done without

22   Requisitions, some are done with the manual system,

48

1    depending upon what they are.

2        Q.  When you refer to a manual system, do you mean

3    a paper-based requisition system?

4        A.  I wouldn't call it paper-based.  It's kind of

5    an Outlook form tool.  Generally done for capital

6    requisitions.

7        Q.  Putting aside this Outlook form tool that you

8    described, are there any other software applications

9    used at Providence currently to create or approve

10   requisitions?

11       A.  None that I'm aware of.

12       Q.  Could you estimate what percentage of all

13   requisitions created at Providence Requisition Center is

14   used for currently?

15       A.  Excluding those that were capital?

16       Q.  No.  Including those.  So, out of the entire

17   set of requisitions that currently get created and

18   approved, what percentage does Requisition Center

19   account for?

20       A.  I can't answer that specifically.  I would --

21   I would say it is a very high percentage.

22       Q.  More than half?

49

1    A.   Oh, way more than half.

2    Q.   Are any requisitions still created or

3    processed through Requisition Self-Service?

4    A.   No.

5    Q.   And what is the basis for your knowledge?

6    A.   We have turned off Requisition Self-Service.

7    Q.   Was there any implementation of Requisition

8    Center that was performed at Providence prior to the

9    implementation that was done for production?

10   A.   I'm sorry, say the first part again.

11   Q.   Was there any sort of implementation of

12   Requisition Center, such as a test implementation, that

13   was performed at Providence prior to the implementation

14   of Requisition Center in a production capacity?

15   A.   In a production capacity?  No.

16   Q.   Maybe I'm not clear, here.

17       Prior to putting it into a production

18   capacity, was there any other type of implementation of

19   Requisition Center that was performed at Providence?

20   A.   Yes.

21   Q.   What was the purpose of this implementation?

22   A.   To test and validate its functionality in our

50

1    environment.

2    Q.   When was this implementation begun?

3    A.   In June.

4    Q.   When was it completed?

5    A.   On September 27th.

6    Q.   Okay.  Now I'm a little bit confused.  So, do

7    I understand correctly that the test implementation of

8    the Requisition Center application and the production

9    implementation of Requisition Center application both

10   completed on the same date, September 27th, 2011?

11   A.   No.  They were not.

12   Q.   When was the test implementation of

13   Requisition Center completed?

14   A.   I have to refer to my --

15   Q.   Okay.

16   A.   And, again, I'm looking at the task list that

17   was submitted as documentation.

18       Jimmy, if you would, please just refer --

19   repeat the question, now.

20   Q.   When was the test implementation of

21   Requisition Center completed at Providence?

22   A.   I would say, based on this schedule, that it

51

1    was completed in September -- at some point in time in

2    September of 2011.

3    Q.   Okay.  But aside from this test implementation

4    that was completed September 2011, and the actual

5    production implementation which I understand was

6    completed on September 27th, 2011, there were no other

7    implementations of Requisition Center performed at

8    Providence?

9    A.   No.

10   Q.   Okay.  When did Providence first learn that

11   Lawson was designing or had designed a new application

12   called Requisition Center?

13   A.   In May of 2011.

14       MR. GOLDMARK:  Jimmy, we've been going for

15   almost -- almost an hour now.  Is now maybe a good time

16   to take just a -- brief break?

17       MR. CLEMENTS:  Yeah.  I wanted to push through

18   as much as possible, but if you need a break now, five

19   minutes, you want to do that now?

20       MR. GOLDMARK:  It might be -- If you want to

21   keep going, that's great.

22       MR. CLEMENTS:  I was thinking maybe go for,

52

1    like, an hour and a half and then take one break and

2    then try to just do one more session, but if you want to

3    take a break now --

4        MR. GOLDMARK:  If Kurt's good, I'm good.

5        THE WITNESS:  I'm good.

6        MR. CLEMENTS:  Yeah.  Okay.  Let's keep going,

7    then.

8        THE WITNESS:  Thank you.

9    Q.   (BY MR. CLEMENTS:)  So, let me look back at the

10   last question, here.

11       So, Providence first learned that Lawson was

12   designing -- or had designed a new application called

13   Requisition Center in May of 2011, correct?

14   A.   Correct.

15   Q.   And how was it that Providence first learned

16   of the Requisition Center application?

17   A.   I was informed by some Lawson personnel that

18   happened to be here on site.

19   Q.   Do you remember the date?

20   A.   It was either May 25th or May 26th.

21   Q.   Who were the Lawson personnel that were here?

22   A.   Keith Lohkamp was here, as well as Darcy

Reasoner, Kurt  1/9/2012  12:00:00 AM



**53**

1    Snyder and our Lawson executive, and other Lawson
2    personnel.
3        Q.  So, prior to May 25th, 2011, Providence had no
4    knowledge that Lawson was designing an application
5    called Requisition Center?
6        A.  Not to my knowledge.
7        Q.  Was Providence ever provided with a
8    demonstration of the Requisition Center application?
9        A.  Yes.
10       Q.  Can you describe the circumstances of that
11   demonstration?
12       A.  I believe the first demonstration was, again,
13   on those dates, May 25th or 26th.  The circumstances of
14   that demonstration was the simple convenience of the
15   fact that I was hosting a -- a sort of user group
16   meeting here, in Renton, and other Lawson users that are
17   large, multi-entity healthcare organizations attend --
18   it's a networking group.  We had a demonstration at that
19   point.
20       Q.  Was this a live demonstration of the
21   Requisition Center application?
22       A.  I did not see the demo myself.  I know that it

**54**

1    occurred, so I can't answer that question as to whether
2    or not it was live.  It was a demo, so --
3        Q.  But just to confirm it -- When you say
4    demonstration, it means they were actually seeing the
5    application itself being used versus just a static
6    PowerPoint presentation?
7        A.  You know, I can't -- I don't know for sure.  I
8    really don't know.  I didn't see it.  So, I don't know,
9    was it bits and parts.  It may have been a combination
10   of both.
11       Q.  Did you yourself ever see a demonstration of
12   the Requisition Center application?
13       A.  No, I did not.
14       Q.  Do you know if Providence itself was able to
15   use the Requisition Center application during the time
16   of May 25th and May 26th, whenever this user group took
17   place here at Providence?
18       A.  I'm sorry, say that again.
19       Q.  So, there was some user group session that
20   took place --
21       A.  Yes.
22       Q.  -- at Providence on either May 25th or

**55**

1    May 26th, correct?
2        A.  Correct.
3        Q.  And was Providence itself able to use the
4    Requisition Center application during that time?
5        A.  No.
6        Q.  Are you aware of any other demonstrations of
7    the Requisition Center application that were provided to
8    Providence before it implemented the application?
9        A.  Other demonstrations?  Yes, there were.
10       Q.  And when did those take place?
11       A.  I can't -- I don't know specific dates.
12       Q.  Do you know how many demonstrations there
13   were?
14       A.  Specifically, no.  Probably less than five.
15   But I know that we did demos for our user base across
16   all of our regions.
17       Q.  So, these demonstrations that you're referring
18   to are demonstrations that were done internally within
19   Providence?
20       A.  Done within Providence as part of the project
21   to deploy Requisition Center.
22       Q.  Were these -- excuse me.  Let me start over.

**56**

1        Were these demonstrations performed by
2    Providence personnel?
3        A.  No.  I don't believe so.
4        Q.  Who provided these demonstrations?
5        A.  Lawson personnel.
6        Q.  Just to confirm, you said that you never
7    actually yourself saw any of these demonstrations?
8        A.  I did not.
9        Q.  When was Requisition Center first installed at
10   Providence?
11       A.  It looks like June 27th is when we completed
12   that step in our deployment process.
13       Q.  And that's June 27th, 2011?
14       A.  Correct.
15       Q.  Do you know how long the download took?
16   Excuse me, let me back up.
17       How did Providence obtain the Requisition
18   Center application?
19       A.  We typically go to the Lawson site and -- and
20   download the application.
21       Q.  And do you know how long that download took?
22       A.  I don't know specifically.

Reasoner, Kurt  1/9/2012  12:00:00 AM



57

1    Q.  Do you have an idea of how long it took?

2    A.  Generally, those downloads don't take too

3    long.  I don't know.

4    Q.  Less than an hour?

5    A.  Less than an hour.

6    Q.  Less than half an hour?

7    A.  I don't know.

8    Q.  Did Providence experience any unexpected

9    difficulties during the installation of the Requisition

10   Center application?

11   A.  I don't know.

12   Q.  But you're not aware of any difficulties that

13   Providence experienced during the installation of

14   Requisition Center?

15   A.  We were able to download it and load it into a

16   test environment within the time constraints of our

17   project plan.

18   Q.  And going back to what you said earlier, if I

19   remember correctly, you said that Providence began the

20   Requisition Center implementation sometime in June 2011?

21   A.  That's correct.

22   Q.  And was that June 27th, 2011?

58

1    A.  No.

2    Q.  When did the implementation begin?

3    A.  The -- The implementation started in early

4    June -- Can you define what you mean by implementation?

5    Q.  So, you stated that, on June 27th, Requisition

6    Center application was downloaded from Lawson's website;

7    is that correct?

8    A.  Yes.

9    Q.  And then there was some process that took

10   place subsequent to that to actually put this

11   application into operation at Providence, right?

12   A.  Yes.

13   Q.  I would refer to that process as the

14   implementation.

15   A.  Okay.  So, before we download any application,

16   there's processes up front that occur first.  So, we

17   have to, amongst other things, create an environment.

18   We need to put a project plan together; we need to

19   identify who the people are that would be working on the

20   project; there needs to be some approval of the project,

21   any resources assigned to work on it.  So, those things

22   would happen.  So, when I say the project started in

59

1    early June, I'm referring to those steps.

2    Q.  I would agree with that, that that would also

3    encompass by implementations.

4    A.  Yes.

5    Q.  So, thanks.

6    And did you put a specific date on that or

7    just early June?

8    A.  It's early June.  I don't know the exact date

9    that -- that we said -- that we started it.

10   Q.  And going back to your earlier testimony, I

11   think you said the implementation was completed on

12   September 27th, 2011; is that correct?

13   A.  That's correct.

14   Q.  Okay.  Are you aware of any unexpected

15   difficulties that Providence experienced during the

16   implementation of Requisition Center?

17   A.  There were difficulties and challenges in

18   implementing, yes.

19   Q.  Can you give me an idea of what some of those

20   challenges were?

21   A.  I know that there were problems with the code

22   that had to be worked through.  I don't know the

60

1    specifics of that.

2    Q.  Can you explain what you mean by problems with

3    the code?

4    A.  It -- The application didn't work as our

5    business users needed it to, in -- in certain steps in

6    the process.  So, we would be working with Lawson to

7    resolve those identified issues as we went through the

8    testing phase.

9    Q.  And just to be clear, does that mean that the

10   application was non-functional in these aspects?

11   A.  If you define non-functional as not meeting

12   every business need, the answer to that question is yes.

13   If you define non-functional as a piece, a step, a part

14   of didn't work, then I would say no.  Parts of it --

15   Overall, it was working.  There was a problem with a

16   specific step or a -- a form, a page.

17   Q.  But were these problems that Providence

18   experienced -- would you describe them as bugs in the

19   code?

20   A.  Yes.

21   Q.  And do you know about how much time was spent

22   resolving these problems?

Reasoner, Kurt  1/9/2012  12:00:00 AM



61

1     A.  Between the time of the download and the time

2  of the go-live, there were -- that was all part of it,

3  and we -- I would also point out that we still are not

4  completely satisfied.  We still have outstanding issues

5  that we are continuing to remediate, to this day.  So,

6  in one regard, I would say we're not done.

7     Q.  Can you give an estimate of how many man-hours

8  have been spent resolving these difficulties?

9     A.  I really can't.  I don't know.

10    Q.  And do you have any estimate as to when you

11  expect that the remaining problems that Providence has

12  with the Requisition Center application will be

13  resolved?

14    A.  I hope soon, but I don't know specifically.

15    Q.  Is Lawson providing assistance to Providence

16  with these problems?

17    A.  Yes, they are.

18    Q.  Okay.  I think this is a good opportunity to

19  take a break if -- if you want.

20    A.  Okay.

21      MR. CLEMENTS:  That works for everybody, say

22  five minutes --

62

1     THE WITNESS:  Sounds good.

2     MR. CLEMENTS:  -- come back.

3     THE VIDEOGRAPHER:  Please stand by.

4     As we go off the record, then, this is the end

5  of media unit number one in Mr. Reasoner's

6  video-recorded testimony.  The time is 10:23.,

7     (Off the record at 10:23 a.m.)

8     (Back on the record at 10:39 a.m.)

9     THE VIDEOGRAPHER:  We go back on the record

10  now.  This is the beginning of media unit number two.

11  The time is 10:39.,

12     Please proceed.

13     MR. CLEMENTS:  Court reporter, could you

14  please mark this document as Reasoner Exhibit No. 3, I

15  think we're up to.

16  John.

17     MR. GOLDMARK:  Thank you.

18     MR. CLEMENTS:  Hopefully no printing issues on

19  this one.

20     (Deposition Exhibit 3 was marked for

21     identification.)

22    Q.  (BY MR. CLEMENTS:)  Okay.  Mr. Reasoner, you've

63

1  been handed what's been marked as Reasoner Exhibit

2  No. 3.  Please take a moment to peruse it.  Let me know

3  when you're finished.

4     For the record, this document is entitled

5  Declaration of Kurt Reasoner, and it's docket number

6  804-6 from ePlus v Lawson Software, case number

7  3:09-cv-00620.,

8    A.  Yes.

9    Q.  Okay.  Have you seen this document before?

10    A.  I have.

11    Q.  And you note on the second page signed and

12  dated September 19th, 2011, correct?

13    A.  Correct.

14    Q.  And is that your signature, Mr. Reasoner?

15    A.  Yes, it is.

16    Q.  And is this document a signed declaration that

17  you submitted in support of Lawson, and it's a

18  litigation with ePlus?

19    A.  Yes.

20    Q.  Can you tell me what the purpose of this

21  declaration is?

22    A.  The purpose of this, as it states, was a

64

1  summary of the statement of what we're -- we were in the

2  process of doing, a statement as to the estimated

3  internal costs that Providence would incur to replace

4  RSS.

5    Q.  Are the statements made in this declaration

6  true and accurate to the best of your knowledge?

7    A.  Yes.

8    Q.  All right.  And if you would turn to paragraph

9  four of the declaration.  And you'll see, there, it

10  states, "Attached hereto as Exhibit A is a true and

11  correct summary of the estimated internal costs that

12  Providence would likely have to incur to replace the RSS

13  product."  Do you see that?

14    A.  Yes, I do.

15    Q.  Okay.

16     Court reporter, would you please mark that

17  document as Reasoner Exhibit No. 4.

18     (Deposition Exhibit 4 was marked for

19     identification.)

20    Q.  (BY MR. CLEMENTS:)  Would you take a moment to

21  peruse that.

22     For the record, this document is entitled RSS

Reasoner, Kurt  1/9/2012  12:00:00 AM

---

65

1    Replacement Application Implementation and it is Exhibit
2    A to the Reasoner declaration that is Reasoner Exhibit
3    No. 3.
4           MR. GOLDMARK:  Jimmy, and I -- I might add
5    that this -- just to note for the record that this
6    Deposition Exhibit 4, which is Exhibit A to the Reasoner
7    declaration, has been filed under seal and I understand
8    it was produced and marked as confidential.
9           MR. CLEMENTS:  Okay.
10   Q.  (BY MR. CLEMENTS:)  Have you had a chance to
11   look --
12   A.  I have, yes.
13   Q.  -- it over, Mr. Reasoner?
14   A.  Thank you.
15   Q.  And you've seen this document before?
16   A.  I have.
17   Q.  And is this the Exhibit A that's referenced by
18   the statement that I just read from your declaration?
19   A.  Yes, it is.
20   Q.  And does this document accurately reflect the
21   estimated internal costs that Providence would incur to
22   replace the RSS product with a product from a vendor

---

66

1    other than Lawson?
2    A.  Yes.
3    Q.  Okay.  Now, if we could turn back to the
4    declaration and look at paragraph seven.  And you'll
5    see, there, it states, "Attached hereto as Exhibit B is
6    a true and accurate summary of the estimated internal
7    costs that Providence will likely incur during the phase
8    of implementing the RQC product."  Do you see that?
9    A.  I do.
10   Q.  Okay.
11   Court reporter, could you please mark this
12   document as Reasoner Exhibit No. 5.
13   (Deposition Exhibit 5 was marked for
14   identification.)
15   Q.  (BY MR. CLEMENTS:)  And you're being handed
16   what's been marked as Reasoner Exhibit No. 5.  Again,
17   take a moment to look at it.
18   For the record, the document is entitled RQC
19   Implementation.  It's Exhibit B to the declaration of
20   Kurt Reasoner that is Reasoner Exhibit No. 3 and, as
21   with Exhibit A, it's also been filed under seal and is
22   confidential.

---

67

1    Are you finished --
2    A.  Yes.
3    Q.  -- looking at it?
4    Okay.  Have you seen this document before?
5    A.  Yes, I have.
6    Q.  And does it appear to be Exhibit B referenced
7    by the statement I just read from your declaration?
8    A.  Yes, it does.
9    Q.  And does this document accurately reflect the
10   estimated internal costs that Providence would incur to
11   implement the Requisition Center application?
12   A.  It's a -- an approximate, yes -- an
13   approximation, yes.
14   Q.  An approximation of how much it would cost
15   Providence to implement Requisition Center?
16   A.  Correct.
17   Q.  Okay.  Mr. Reasoner, can you explain to me how
18   these two cost estimates as reflected in Exhibits A and
19   B of your declaration, which is Reasoner Exhibits 4 and
20   5, were prepared?
21   A.  Were prepared?  Yes.
22   I called my technical director, Dan Azevedo,

---

68

1    and asked him to pull together some estimates for our
2    conversation on both of those two topics:  One, what was
3    it going to cost to us implement RQC; and, then, two,
4    what would it cost us to completely replace RSS with a
5    non-law -- non-Lawson application.
6    Q.  So, did Mr. Azevedo -- and correct me if I'm
7    stating his name --
8    A.  That's correct.
9    Q.  -- wrong, okay.  Did Mr. Azevedo prepare these
10   estimates?
11   A.  Yes, he did.
12   Q.  Did you yourself oversee the preparation of
13   these estimates?
14   A.  I reviewed the estimates.
15   Q.  And was it your intent, in reviewing these
16   estimates, to ensure that they were as accurate as
17   possible?
18   A.  Correct.
19   Q.  Do you know how much time was spent by
20   Mr. Azevedo and any other Providence personnel in
21   preparing these estimates?
22   A.  I don't know the specific amount of time that

---

Reasoner, Kurt  1/9/2012  12:00:00 AM

69

1  Dan spent.  I would say he probably spent a couple
2  hours.  And I don't believe anyone else --
3      Q.  So, he spent two hours, total, between the two
4  or two hours for each one?
5      A.  I would say probably two hours between the
6  two.
7      Q.  And, to your knowledge, nobody else was
8  involved in the preparation?
9      A.  That's correct.
10     Q.  And how much time did you spend reviewing the
11  estimates?
12     A.  I spent 30 minutes.
13     Q.  And did anyone else at Providence review the
14  estimated cost?
15     A.  No.
16     Q.  Were any assumptions made in the
17  preparation -- Oh, sorry.
18     A.  Can I just -- So, I reviewed them for 30
19  minutes and then Dan and I did have a conversation.  So,
20  I'm not including follow-on conversations after the
21  preparation and review.
22     Q.  I see.

70

1      So, how many follow-on conversations did you
2  have with Mr. Azevedo?
3      A.  I think we had two and I would characterize
4  those as probably 30 minutes a piece.  So, another hour.
5      Q.  Okay.  So, one-hour conversation between you
6  and Mr. Azevedo regarding the estimates.
7      A.  For both.
8      Q.  Plus the 30 minutes that you spent reviewing
9  them?
10     A.  Correct.
11     Q.  Okay.  So, were any assumptions made in the
12  preparation of these estimates?
13     A.  Yes.
14     Q.  Can you tell me what those assumptions were?
15     A.  They're listed in the document.  Which one
16  would you like me to start with?
17     Q.  How about we start with Exhibit A.
18     A.  Okay.
19     Q.  And just to be clear, that's Reasoner
20  Exhibit 4 -- excuse me -- yeah, Reasoner Exhibit 4.
21     A.  So, the listed assumptions were a six-month
22  duration followed by a two-month go-live support for a

71

1  total of eight months in an implementation of a
2  completely separate requisition automated system.  The
3  benefit rate that is applied to the salary costs is
4  33 percent.  That is an internal standard percentage
5  that we use for all of our estimates.
6      And then Dan made estimates on the level of
7  effort by position, and those are -- that effort is
8  listed in the column called level of effort.  So, when
9  you see a one, those are -- those efforts are done in
10  relation to a full-time equivalent.  So, one is a
11  full-time FTE for the duration of the time of the
12  implementation.  He has also assumed a average salary
13  cost and applied that to each of the roles and then
14  calculated the estimated cost.
15     Q.  Okay.  So, as I understand the assumptions as
16  you lay them out, the first one was the six-month
17  duration followed by the two-month go-live support for a
18  total duration of eight months, correct?
19     A.  Correct.
20     Q.  Second one was the benefit rate, which is
21  labeled, here, as the FB rate as 0.33, correct?
22     A.  Correct.

72

1      Q.  The third was the level of effort, which is
2  the second column of the spreadsheet, correct?
3      A.  Correct.
4      Q.  And then the fourth is the estimated cost per
5  hour; is that one of the assumptions?
6      A.  Yes.
7      Q.  Okay.  And, so, there were those four
8  assumptions made?
9      A.  Yes.
10     Q.  And am I missing anything?
11     A.  Just a nuance to the calculation, the total
12  hours are based on 173.33 hours per month I believe is
13  the number.  I can --
14     Q.  That's fine.
15     A.  Okay.
16     Q.  Okay.  And, so, going back to the first
17  assumption, the six-month duration.
18     A.  Um-hum.
19     Q.  Well, actually, it's a total duration of eight
20  months.  What was the basis for that assumption?
21     A.  Based on his experience as an IT professional,
22  our experience in -- in implementing software, we're

Reasoner, Kurt  1/9/2012  12:00:00 AM

73

1  estimating that it would be a six-month implementation

2  project to deploy a new tool.

3      Q.  Has Providence performed previous

4  implementations that were similar in scope and

5  complexity to this potential implementation of a

6  replacement application for a Requisition Self-Service?

7      A.  Yes.

8      Q.  And these implementations required

9  approximately eight months to complete?

10      A.  Different time lines for different tool sets.

11  We estimate, for this one, that it would be about a

12  six-month project.

13      Q.  Okay.

14      A.  Assuming fully dedicated staff in each of the

15  regions, each of the facilities, and -- and our

16  dedicated staff and those sorts of broad assumptions

17  that you assume while implementing a new tool.

18      Q.  And can you estimate how many of these

19  implementations that you've been involved with at

20  Providence?

21      A.  In my time here.  Let's see, 27 hospitals, so

22  27 different deployments of the S3 application, 27

74

1  deployments of intranet tools, 27 deployments of mobile

2  supply chain management, 27 deployments of Lawson

3  Business Intelligence, 27 deployments of various

4  upgrades to Exchange Server for our e-mail system, 27

5  deployments of a Linc -- Linc is our messaging service

6  and conferencing tool -- and probably other smaller

7  ones, as well.

8      Q.  So, is it fair to say that you have pretty

9  substantial experience with doing these types of

10  implementations?

11      A.  I would -- I would think that that would be

12  true.

13      Q.  I would agree.

14      Okay.  Well, going on to the next assumption,

15  the FB rate, which I think you stated was the benefit

16  rate; is that correct?

17      A.  Yes.

18      Q.  Can you explain what that means?

19      A.  So, as an employee, you're paid a salary and

20  then Providence pays, of course, taxes, federal taxes,

21  and then there's, also, benefits that every employee

22  receives -- medical, dental, eye, those sorts of things.

75

1  That encompasses all of that cost to Providence on top

2  of the actual salary rate.

3      Q.  I see.

4      So, as I understand it, if, say, for instance,

5  an employee made a hundred thousand dollars a year --

6      A.  Right.

7      Q.  -- the actual cost to Providence for that

8  employee would -- based on this assumption of .33, would

9  actually be $300,000 per year?

10      A.  No.  It would be 133,000.

11      Q.  I see.

12      A.  Yes.

13      Q.  Okay.  So, it's multiply whatever the salary

14  is by 1.33?

15      A.  Correct.

16      Q.  I see.  Okay.  Thanks.

17      And just to confirm, you said that 0.33 is

18  always the number that you use for the assumption on the

19  benefit rate?

20      A.  Yes.

21      Q.  And what's the basis for that assumption?

22      A.  Our finance department is -- has said this is

76

1  a good approximation to use when budgeting for projects.

2      Q.  And that's been proven to be a pretty accurate

3  estimate of the benefit rate?

4      A.  It's one that they have accepted and -- and

5  have endorsed, so that's what we use.

6      Q.  Okay.  All right.  So, moving on to the third

7  assumption we discussed, which is the level of effort,

8  column two, can you explain what the basis for that

9  assumption was?

10      A.  Yes.  So, these are professional estimates,

11  judgements, of how much time for each role we would

12  expect to spend on such a deployment.

13      Q.  Okay.  So, maybe we should back up a moment.

14      So, under the first heading, entitled Role --

15  you see that?

16      A.  Yes.

17      Q.  And there's a list of about 15 or 20 items

18  underneath that.  I don't know if all of those are

19  supposed to be attributed to that heading because

20  there's not lines on this spreadsheet --

21      A.  Yes.

22      Q.  -- because it's been printed, but at least the

**77**

1  first several items -- project manager, lead analyst,
2  application director -- can you explain what those line
3  items represent?
4  A.  Sure.  So, the project manager is a resource
5  who is responsible for setting up the project, setting
6  up the timeline, really coordinating all of the
7  deployment activities.  So, I think most people probably
8  understand what a project manager does to some degree.
9  That's that role.  And we believe that this person would
10  be -- in such a scenario, would be 100 percent dedicated
11  to doing that work.  So, meaning we wouldn't -- they
12  wouldn't be doing another project at the same time.
13  Okay.
14          Many times, that's what happens in Providence,
15  is a -- a person may -- a project manager may be
16  expected to manage multiple projects.  In this case,
17  we're saying they would be singly dedicated to just
18  this.
19  Q.  Okay.
20  A.  Then there's always a lead analyst.
21  Typically, this is someone out of my organization.  And
22  they take the lead for helping the project manager

**78**

1  develop and coordinate the overall project plan and
2  coordinating within the team -- in this case, the Lawson
3  team -- to coordinate the deployment.
4  Q.  Okay.
5  A.  Then there is the application director.  I
6  have two application directors.  One of the application
7  directors is responsible for procurement and finance and
8  this is estimating her approximate level of effort.  So,
9  in this case, over a six-month period of time, I would
10  expect her to probably spend about 40 percent of her
11  time working specifically on this supposed project.  The
12  technical director is, in fact, Dan Azevedo, and I would
13  expect him to spend about a quarter of his time
14  coordinating the technical aspects of this supposed
15  deployment.
16          And then the application administrator is a
17  person that works for Dan, so this is a person who is
18  responsible for creating these various development
19  environments, test environments, and those sorts of
20  things, and downloading the application, making sure
21  that it is set up right.
22          In this case, they would be spending time -- I

**79**

1  don't know -- We -- We have no idea, here, what the tool
2  might be -- is it a Unix-based tool, which is what our
3  Lawson tool is, or would it be something else -- what
4  database does it, how is -- how does it interact with
5  our Web, those sorts of things.  But this person would
6  be working on those things, and, in this case, we
7  estimated that that person would be -- probably
8  50 percent of the total time would be spent -- of their
9  time, of their available time, 50 percent would be spent
10  on the project.
11  Q.  Okay.
12  A.  Okay.
13          Does that answer your question or would you
14  like me to keep going or --
15  Q.  Yeah.  If you don't mind, keep going, at least
16  until the point that you understand that -- that --
17  whatever it is that's supposed to be included under the
18  heading Role ends.
19  A.  Okay.  Sure.
20          So, then, also, we have additional application
21  analysts -- in this case, two additional resources that
22  would be full time, dedicated to the implementation

**80**

1  project, deployment project.  That's that number there.
2  And then, I do apologize, had I known, I would have
3  maybe put lines on here for you, but -- So, the
4  regional -- So, there's a line under there.
5          Regional user testing, that is an estimate of
6  20 hours for approximately 35 different users.
7  Providence has facilities that, geographically, are from
8  Southern California to Anchorage, Alaska, to Missoula,
9  Montana.  These people cover that wide, geographical
10  space and support their different facilities across
11  Providence.  So, approximately 35 different testers
12  would spend approximately 20 hours testing any such new
13  application.
14          Then dropping down, there is a single line
15  here, trainer and documentation specialist.  This is the
16  person who would begin to look at the application and
17  start to create training material and documenting the
18  flow of any new -- of -- of this new application.  And
19  then there is, also, a -- And, so, that -- that person
20  comes from a -- different part of our organization.
21  There's, also, a communications person that comes from a
22  different part of our organization, and we're estimating



81

1  192 hours of time creating communication document --
2  communication documents that go out to -- not only our
3  testing users, but, then, all users of this supposed
4  tool.
5       Okay?
6    Q.  Okay.
7    A.  Then we have -- All of our projects at
8  Providence have a steering committee that oversee the
9  project.  So, this is listed here as governance and this
10  is an expected approximately ten different participants
11  from across the various facilities in that they would
12  spend, over the course of eight months, probably 32
13  hours.  The project manager, typically, and the
14  application director, typically, report to that steering
15  committee and -- really just give status on the
16  project and -- and -- you know, they'll talk about many
17  different things, challenges, barriers, problems, and
18  report that to the governance committee.
19    Q.  So, the ten participants listed here would not
20  include any of the roles that we have up above?
21    A.  No.
22    Q.  All right.

82

1    A.  These would be -- These would be our business
2  users that are, as we call them, out in the field,
3  trying to get supplies to surgical units so that
4  patients are taken care of.
5    Q.  Okay.
6    A.  Then we have a DBA support.  So, a database
7  administrator -- is what DBA stands for -- would spend
8  approximately 240 hours working on setting up the
9  database structure of this new -- new tool.  And, again,
10  these are simply estimates of what we think might
11  happen.  We don't know what the database tool would be,
12  so we're just kind of assuming that it would be a common
13  one that -- that Providence typically uses.
14    Q.  Okay.  So, just to follow up on that, then,
15  that is to mean that if it were a database that
16  Providence was unfamiliar with, then this figure on the
17  total hours you would expect to be higher than what's
18  listed here?
19    A.  Yes.  Much higher.
20    Q.  And when you say much higher, would be twice
21  as much or three times as much?
22    A.  It could be, yes, to both of those.  I -- I

83

1  really wouldn't venture a guess.
2    Q.  Okay.  All right.  Yeah, if you don't mind
3  to -- to continue.
4    A.  Sure.
5       Excuse me.  Hold on one second --
6    Q.  Yeah.
7    A.  -- before I --
8    Q.  No problem.
9    A.  The coffee in our cafe can be a little strong
10  at times.
11       Excuse me.
12       All right.  The next item here was server
13  engineer support.  This is a technical position.  This
14  is the person who would oversee -- or be a part of the
15  hardware acquisition -- so, the server itself -- see its
16  installation, would set up the server based on the
17  specifications of the application and the operating
18  system of that server.  And, again, this is a estimate
19  of what we think they would spend.  This estimate is
20  based on that it would probably be a tool that we are
21  somewhat familiar with, and just as you described
22  earlier, if it was something that we were completely

84

1  unfamiliar with, it -- it would take a lot longer,
2  and -- and would, in fact, be somewhat problematic
3  because we do try to standardize our -- our various
4  environments for all of the applications that run across
5  Providence.
6    Q.  Okay.
7    A.  Okay.
8       Account management -- So, this is the team
9  within Providence that, as a new application comes in,
10  you have to set up access, so every user of this new
11  tool, proposed new tool, would have to be given access
12  to it, and that's part of their account setup.  So,
13  there's a separate team that does that setup.  And, so,
14  they would have to go to those identified users of this
15  new tool and set up their -- add that to their profile
16  so that they would have access.
17    Q.  And the portion, here, that's in
18  parentheses -- customizations, enhancements, interfaces,
19  integration -- does that roll into that account
20  management?
21    A.  No, it does not.
22       So, the next one down is development and then

Reasoner, Kurt  1/9/2012  12:00:00 AM

85

1　the -- what -- what I believe Dan was trying to do,
2　here, is just articulate -- So, there is a line under
3　account management, user setup, and then development,
4　which is, really, those three lines -- development is
5　320 hours.
6　　　Q.  Yeah, I see.
7　　　A.  Okay.  And, so, he's simply articulated what
8　types of development activity that is.  So, any
9　customizations.  So, if this new tool didn't meet its
10　out-of-the-box delivery of functionality, didn't meet
11　our business needs, we might have to customize part of
12　it.  If we had to somehow enhance some specific form
13　or -- You know, we have developers that do that
14　activity.  Again, we've simply estimated 320 hours.
15　That's a professional estimate.
16　　　Q.  Is that number based on any past experience?
17　　　A.  Dan has -- Dan Azevedo has been in information
18　technology for probably 35 plus years, has worked at a
19　couple of different large healthcare organizations.
20　This is his guess.  So, it is based on our experience
21　internally, his experience more broadly.
22　　　Q.  Okay.

86

1　　　A.  Okay.
2　　　Then we have training and technical support.
3　This -- I apologize.  This gets a little bit confusing,
4　I admit.
5　　　So, training and technical support, you have
6　$9,000 over there.  They're saying -- What we're trying
7　to articulate, here, is there are two specialists that
8　would go to some sort of training that would be provided
9　by the -- by the deliverer of the application and
10　they're estimating two people at $2,500 for the training
11　class, so that's 5,000, plus an estimated 2,000 in
12　travel and lodging and those sorts of things, which is
13　how you come up with the 9,000.
14　　　Q.  So, the two people that get sent are internal
15　Providence personnel that would then become Providence's
16　technical support to its employees?
17　　　A.  Yes.
18　　　Q.  Okay.
19　　　A.  Yes.
20　　　Then on to the next page, you see training and
21　application analyst.  So, three analysts that would
22　attend training and travel.  And so, you get to the

87

1　13,500-dollar number.
2　　　Q.  Okay.
3　　　A.  And then, below that, are two separate lines.
4　HW stands for hardware, SW stand for software, and, so,
5　there is a production environment of hardware and
6　software.  This software, here, is referring to the
7　software that runs the server, not the application
8　software, to be clear.
9　　　So, one of the things that this does not show
10　is I have no idea what the cost of this other
11　application would be and it's not listed.  We were just
12　simply trying to come up with an estimate of what would
13　the implementation be.
14　　　Q.  And if I understand this correctly, does this
15　mean that you could not use servers that Providence
16　already has in place to run this -- this additional
17　application?
18　　　A.  No.  We -- A new application would require new
19　servers.
20　　　Q.  And is that an issue of compatibility or
21　capacity or --
22　　　A.  Capacity.  We don't have excess capacities

88

1　readily available.
2　　　Q.  I see.
3　　　But -- Let's say, for instance, you remove the
4　Requisition Self-Service application.  Would that open
5　up capacity that could then be used for this other
6　application?
7　　　A.  I don't believe so, because Requisition
8　Self-Service sits on a server that supports all of RSS,
9　and I'm quite confident that we would have to have a
10　separate server -- I don't believe that we would be able
11　to put that in -- It would not be our desire to put that
12　in and I don't think, technically, that would be
13　advisable.
14　　　Q.  Okay.  So, then, you would have to obtain --
15　　　A.  Hardware and software.
16　　　Q.  And, I'm sorry, maybe I didn't understand
17　this, but the difference between the server for
18　production and the server for development?  What is that
19　difference?
20　　　A.  So, servers specifically focused on production
21　support -- on the production environment of users using
22　it in the production environment.  So, they're using it

Reasoner, Kurt  1/9/2012  12:00:00 AM



89

1  live.  That is separate, always, from our development
2  environments that might include development of perhaps
3  enhancements or those sorts of things or even testing or
4  training.  Those are other development environments
5  and -- and sub-environments, if you will.
6  Q.  Okay.  And, I'm sorry, to go back to this line
7  of the training, that application analyst.
8  A.  Yes.
9  Q.  Could you explain what the purpose of the
10  application analyst is?
11  A.  The application analyst is similar to -- and I
12  would say -- So, we have three.  This does relate up
13  above where there's a lead analyst and two application
14  analysts.  This is their training and travel.
15  Thank you.
16  Q.  I see.
17  Okay.
18  So, now, going to the total hours column.
19  A.  Yes.
20  Q.  I think we already discussed sort of where are
21  those assumptions for the level of effort required for
22  the roles -- the six roles at the top, correct?

90

1  A.  Yes.
2  Q.  But, below that, where there's no level of
3  effort included in this spreadsheet, can you explain
4  what the basis of the assumption was for the total hours
5  required for these other tasks?
6  A.  Again, as I was talking about some of these
7  others down here, they are our -- It's just our
8  professional estimate at how many hours would be spent.
9  In the case of the regional user testing, he showed
10  where he came up with 70 -- 700 hours.  It's 20 hours
11  for the -- times 35 people.
12  Q.  So, would this be based on your experience,
13  for instance, of how much time was required on regional
14  user testing for other implementations that Providence
15  has done?
16  A.  Yes.
17  Q.  Okay.  And then, to go on to the fourth
18  column, estimated costs per hour --
19  A.  Yes.
20  Q.  -- would you explain what the basis for that
21  assumption was?
22  A.  Yes.

91

1  So, in the case of the project manager, that
2  is an internal -- We have a project management office.
3  That is approximately what we pay for any project
4  manager that is assigned to a project.  So, they will
5  charge their time to a project, and it's -- it's
6  generally around $60 an hour.  For some people, it might
7  be a little bit more; for others, it might be a little
8  bit less.  We don't know who the project manager would
9  be, so we're just going with an average.
10  Q.  I see.
11  So, going back to what you said earlier, it
12  sounds like you've done probably hundreds of these
13  implementations?
14  A.  Um-hum.
15  Q.  And is it always the same team that's listed
16  here under the -- role heading that gets put
17  together for these implementations?
18  A.  The same roles, yes.  Typically the same
19  roles.  There may be a few others depending on what it
20  is, but you're always going to have a project manager.
21  In the case of ERP, we'll always have a lead analyst
22  that's kind of the lead.  This is the -- This is the top

92

1  person that's really overseeing the deployment.  We'll
2  always have a application director, the technical
3  director will always be involved.  You'll always have an
4  application administrator.  We'll always -- Depending on
5  the size and complexity, we'll have additional
6  application analysts involved and -- and you will always
7  have regional user -- regional testers, you'll always
8  have training specialists, you'll always have someone
9  from communications, you will always have someone in
10  some sort of steering committee capacity, you will
11  always have a DBA, you'll always have a server engineer,
12  regardless of whether or not you're using a preexisting
13  system or something new in terms of hardware.
14  So, these are roles.  These are activities
15  that are always going to happen:  Account management,
16  developers, training, and so on down the line.
17  Q.  And, so, for the -- for these different roles
18  that -- that are included on this implementation --
19  let's take the project manager, for instance -- so, is
20  it true that Providence has a certain number of
21  employees that are qualified to serve as a project
22  manager on these implementations?

Reasoner, Kurt  1/9/2012  12:00:00 AM

93

1  A. Yes. We have a project management office that
2  has a number of project managers.
3  Q. Okay. And then, as I understand your
4  explan -- explanation for the estimated cost per hour.
5  the $60 per hour that's estimated is sort of an average
6  of what would be charged by all these different project
7  managers if they were to take the lead on this
8  implementation?
9  A. Yes. And that also assumes that there is a
10  project manager internal to Providence that is
11  available. If not, that $60 an hour goes up
12  substantially and can be upwards of 190 to 250 dollars
13  an hour, if I have to go external.
14  Q. So, this is roughly three to four times the
15  rate that you would be charged to use internal --
16  A. Yes.
17  Q. -- Providence personnel?
18  A. Yes.
19  Q. And would that same factor of three to four
20  times apply to all the roles listed here?
21  A. I would say probably so. I don't know that it
22  would -- It would not apply to the application director

94

1  or the technical director, because we wouldn't outsource
2  that role.
3  Q. Okay.
4  A. I mean, those are management roles.
5  The others, we have, from time to time, had to
6  purchase external to Providence.
7  Q. Okay. And for the others, it would -- for the
8  remaining roles which would be project manager, lead
9  analyst, application administrator, application analyst,
10  if Providence were to have to contract an outside person
11  to do one of those roles, it would be three to four
12  times what's listed as the costs per hour here?
13  A. Absolutely.
14  Q. Okay. And just to make sure I understand the
15  spreadsheet correctly, the column for estimated total,
16  which is the fifth header --
17  A. Yes.
18  Q. -- in the spreadsheet, so, was that column
19  obtained by multiplying figures in column three and
20  four?
21  A. Times the FB rate.
22  Q. Times the FB rate. I see.

95

1  For each of these?
2  A. Correct.
3  Q. Okay. So, does that also apply even beyond
4  the roles, but to each of the line items on the
5  spreadsheet?
6  A. Yes. It does.
7  With the exception of the training costs down
8  at the bottom and the training of the application
9  analysts, those are training and travel costs. So, the
10  FB rate doesn't apply to that.
11  Q. Okay.
12  A. Or -- Or the hardware -- Or the production and
13  development environment, those -- those are separate,
14  obviously.
15  Q. Right. That's what I was going to ask. Okay.
16  And then, at the bottom of the spreadsheet,
17  there's a figure listed there, $857,504. You see that?
18  A. I do.
19  Q. And, so, that is the total cost that's
20  estimated to perform this implementation?
21  A. To perform the implementation, yes.
22  Q. So, this $857,504 is the total cost estimated

96

1  by Providence for replacing the Requisition Self-Service
2  application with software from a vendor other than
3  Lawson, correct?
4  A. That's correct.
5  Q. Okay. If we could, could we turn back to
6  paragraph four of Reasoner Exhibit 3, your declaration.
7  And if you look at the second sentence, paragraph four,
8  it states, "This does not take into consideration of
9  licensing and services cost of a third-party vendor."
10  Do you see that?
11  A. I do.
12  Q. Okay. So, the estimated cost in replacing the
13  Requisition Self-Service application, as reflected in
14  Exhibit A, does not include any licensing and services
15  costs associated with that software; is that correct?
16  A. That's correct.
17  Q. And would you expect Providence to incur both
18  licensing and service fees from a third-party vendor if
19  they were to replace the Requisition Self-Service
20  application with software from that vendor?
21  A. Absolutely.
22  Q. Do you have an idea of how much the license

97

1    fee would be for replacement application with similar
2    performance and capability as Requisition Self-Service?
3        A.  I -- I don't.  I don't.
4        Q.  Do you know how much -- Let me back up for a
5    moment.
6            You stated before that there is a license fee
7    that Providence paid for the S3 Procurement suite; is
8    that correct?
9        A.  That's correct.
10        Q.  Is there an amount of that license fee that's
11    allocated to the Requisition Self-Service application?
12        A.  Yes.
13        Q.  Do you know what that amount is?
14        A.  I don't.
15        Q.  Do you know, as a percentage, what it would
16    be?
17        A.  I don't.
18        Q.  You have an estimate?
19        A.  I really don't.
20            The original license agreement with Lawson was
21    done, one, before I started, but it was done in 1999.
22    So, it's rather dated.  I would have to go back and

99

1    similar performance and capability as Requisition
2    Self-Service?
3        A.  I don't.
4        Q.  Okay.  So, going back to -- to what we
5    discussed about the license fee, is there a certain
6    amount of that maintenance fee that's allocated to
7    service of the Requisition Self-Service application?
8        A.  I'm sorry, could you say that again.
9        Q.  Well, you -- you originally stated that there
10    was a certain portion of the license fee for S3
11    Procurement that was allocated to Requisition
12    Self-Service, correct?
13        A.  That's correct.
14        Q.  So, similarly, is there a portion of the
15    maintenance fee that's allocated to the Requisition
16    Self-Service --
17        A.  Yes.
18        Q.  -- application?
19        A.  Yes.
20        Q.  Do you know what that amount is?
21        A.  I don't.  Off the top of my head, I don't.
22        Q.  Do you have an estimate?

98

1    refer to our contract to answer that question, and I
2    didn't think that was part of this, so --
3        Q.  Okay.  Well, do you know how much the original
4    license fee that Providence paid for the S3 Procurement
5    suite was?
6        A.  Again, I -- I don't, because I didn't think it
7    was part of this request, so I didn't go back to review
8    that.
9        Q.  Okay.  And, so, you don't have any idea how
10    much it would cost for license fee for an application
11    like this?
12        A.  I -- I -- It would -- I don't.  I wouldn't
13    venture a guess under this circumstance, so --
14        Q.  Okay.  We talked before about an annual
15    maintenance fee that Providence pays for the S3
16    Procurement suite -- or, excuse me, let me start over.
17            We talked about an annual maintenance fee that
18    Providence pays for the entire set of applications that
19    it licenses from Lawson, correct?
20        A.  That's correct.
21        Q.  Okay.  Do you know how much you would expect
22    the annual service fee to be for an application with

100

1        A.  I don't.
2        Q.  Do you know how much the total maintenance fee
3    is that --
4        A.  Yes, I do.
5        Q.  What is that?
6        A.  That's just over a million dollars a year.
7        Q.  So, just to be clear, then, Providence pays
8    approximately one million per year for maintenance on
9    all the Lawson applications that it licenses?
10        A.  Correct.
11        Q.  Do you have an idea of what percentage of that
12    million dollars per year would be allocated to
13    Requisition Self-Service?
14        A.  No, I don't.
15            MR. GOLDMARK:  Asked and answered.
16        Q.  (BY MR. CLEMENTS:)  Do you have an estimate of
17    how many applications -- excuse me.  Let me back up.
18            Do you have an estimate of how many total
19    applications Providence licenses from Lawson?
20        A.  Again, I'm really sorry, but I did not think
21    that this was part of this, so I didn't review or
22    prepare for that.

Reasoner, Kurt  1/9/2012  12:00:00 AM

101

1  Q.  Okay.

2  A.  So, I can't answer it.  It's a complex

3  contract --

4  Q.  Yes.

5  A.  -- and there are a number of line items that

6  go into that maintenance payment, so I can't -- and I

7  would -- I would be ill-advised to guess.  I don't know.

8  Q.  But aside from putting the monetary amount

9  aside, do you have an idea of how many applications,

10  Lawson applications, that Providence has licensed?

11  A.  Yes, I do.  If I had the paper in front of me,

12  I could -- I could answer the question.  I don't.  I

13  didn't prepare for that.

14  Q.  Okay.  But regardless of the price -- excuse

15  me.  Let me start over.

16  Regardless of the precise amount of the

17  license and maintenance fees that would be associated

18  with the software application to replace Requisition

19  Self-Service, these fees would add some additional cost

20  to the amount that was estimated in Exhibit A as the

21  costs required to replace Requisition Self-Service with

22  a third-party application; is that correct?

102

1  MR. GOLDMARK:  Object to form.  Vague,

2  compound question.

3  THE WITNESS:  I -- I need you to be a little

4  more specific for me, because you're combining a number

5  of things.  So, I'm trying to understand what --

6  Q.  (BY MR. CLEMENTS:)  Yeah, let me see if I can

7  rephrase.

8  A.  If your question -- Earlier, you asked my

9  estimate, did it include license and ongoing support,

10  and I said, no, it does not.  If that's your question,

11  that is my answer.

12  Q.  So, yeah, just to follow up to that question,

13  the license and service fees from this third-party

14  vendor would be some additional amount that would be

15  added onto the estimate of $857,504 in Exhibit A?

16  A.  That is correct.

17  Q.  Okay.  Okay.  Can we look at paragraph five of

18  Reasoner Exhibit 3.  It's your declaration.  And, there,

19  it states, "Exhibit A also does not take into

20  consideration the opportunity costs related to the

21  project manager, lead analyst, application director,

22  technical director, application administrator,

FRE 611

103

1  application analyst, and the other employees who are

2  required to stop other projects to take on the

3  responsibilities to implement a new procurement

4  product."

5  You see that?

6  A.  I do.

7  Q.  So, in addition to not including any licensing

8  and service fees as we discussed, estimated cost as

9  shown in Exhibit A of your declaration wouldn't include

10  the opportunity cost incurred by Providence from

11  requiring its personnel to stop other projects and work

12  on the implementation; is that correct?

13  A.  That is correct.

14  Q.  And do you have any estimate of what these

15  opportunity costs would amount to?

16  A.  Again, it was my understanding before this

17  session that that was not going to be covered as part of

18  this deposition.  I don't have an estimate.

19  Q.  Do you have an idea of who the other employees

20  referenced in this statement here would refer to?

21  A.  Yes.  They are the employees -- They're the

22  various employees that make up those roles that we just

104

1  discussed in Exhibit B.

2  Q.  Okay.  So, your -- your statement, here,

3  references project manager, lead analyst, application

4  director, et cetera, right?

5  A.  Yes.

6  Q.  Then, at the end, it says, "and the other

7  employees."

8  A.  Yes.

9  Q.  So, were there additional employees in

10  addition to these roles that are listed here in your

11  statement?

12  A.  Yes.

13  Q.  And were those --

14  A.  And those are the other roles that I list in

15  the exhibit.  So, the -- the DBA, the server engineer,

16  the various people who make up the testing team.  All of

17  those roles -- the communication person.

18  Q.  Okay.  So, I think I understand now.

19  A.  Yeah.

20  Q.  And can you estimate the total number of

21  employees, then, that would be required to work on the

22  implementation?

Reasoner, Kurt  1/9/2012  12:00:00 AM

105

1    A.  I can't, because I don't know what specific

2    tool we're deploying.  So, again, we made estimates on

3    hours with not clearly understanding what the

4    application is or its complexity.

5        Q.  But based on this estimate -- Let me back up

6    for a moment.

7            Would the number of employees required be at

8    least the number that are set forth in Exhibit A of your

9    declaration?

10       A.  Yes.  And you could also derive the number

11   based on the hours.  It's -- It's the -- The key element

12   in that is the estimated hours.

13       Q.  Okay.

14           Now, I guess I'm a little confused, here,

15   because, as I understand your explanation in going back

16   to Reasoner Exhibit 4, which is Exhibit A to your

17   declaration, these were the costs that you expect to be

18   charged by internal Providence personnel to this

19   implementation project, correct?

20       A.  You're using the term charged.  That's only

21   true in the case of the project manager.  The others are

22   staff that are assigned.  So, those are their costs to

106

1    Providence.  My time, sitting here, is a cost to

2    Providence, right.

3        Q.  Right.

4        A.  So, same thing is true of all -- all of the

5    people listed here.  They are costs to Providence and

6    Providence has prioritized what they're doing -- and, in

7    this case, an implementation of a new self-service-type

8    procurement tool.  And, so, we've simply estimated who

9    would be involved in that implementation and what do

10   they cost Providence and how much time would they spend.

11       Q.  So, you -- This estimate, here, is accounting

12   for the value of time that the Providence personnel

13   would have to devote to the implementation project,

14   right?

15       A.  That's right.

16       Q.  And what I don't understand is how that

17   differs from the opportunity cost that you're referring

18   to in paragraph five.  Why --

19       A.  Sure.

20       Q.  -- do these numbers not reflect that

21   opportunity cost?

22       A.  Because I don't know what the opportunity

107

1    costs would be.  So, for example, the project manager,

2    were -- we typically -- all of our project managers are

3    a hundred percent busy a hundred percent of the time.

4    So, what project would that project manager be working

5    on if they weren't forced to work on this?  This is a --

6    If we had to replace and go out and buy a new

7    self-service-type tool for bringing supplies to the

8    necessary places within Providence hospitals, that

9    project manager would be doing a different project.  And

10   that project would add value.  I don't know what that

11   project is or would be.  It would be something.  And --

12   And, therefore, that's the missed opportunity.

13           So, it could be Providence -- If we had to do

14   this, we'd have to hire an outside project manager to do

15   this other project, whatever that project is, at two to

16   three hundred dollars an hour.  So, in that case, the

17   opportunity costs would be -- let's say it's 300 --

18   would be $240 an hour for the duration of this other

19   project, whatever it is.

20       Q.  Right.  That makes sense, the difference

21   between --

22       A.  Right.

108

1        Q.  -- what this value is of this role --

2        A.  Right.

3        Q.  -- in this implementation --

4        A.  Right.

5        Q.  -- versus what you'd have to pay to replace

6    that person on the other project.

7        A.  Right.

8        Q.  Okay.  I follow you.

9            And, again, regardless of the precise amount

10   of the opportunity costs, which I understand you can't

11   estimate, to Providence employees or to Providence, I

12   should say, associated with implementing this

13   replacement application, these opportunity costs would

14   be in addition to the $857,504 that's estimated here in

15   your Exhibit A to your declaration?

16       A.  Yes, they would be.

17       Q.  Okay.

18           What are we up to now, six?

19       THE REPORTER:  Yes.

20       MR. CLEMENTS:  Okay.  Court reporter, could

21   you please mark this document as Reasoner Exhibit No. 6.

22           (Deposition Exhibit 6 was marked for

Reasoner, Kurt  1/9/2012  12:00:00 AM

109

1      identification.)
2      MR. GOLDMARK:  Thanks.
3      Q.  (BY MR. CLEMENTS:)  Mr. Reasoner, the court
4      reporter is handing you what has been marked as Reasoner
5      Exhibit No. 6.  Please take a moment to look it over.
6      A.  Yes.
7      Q.  Let's see, here.
8      For the record, this document, an e-mail from
9      Kurt Reasoner to Keith Lohkamp, dated September 15th,
10     2011.  It's bearing Bates number PROV004 through
11     PROV007.
12     You guys have all the pages this time?
13     MR. GOLDMARK:  We do, thanks.
14     THE WITNESS:  Yep.
15     Q.  (BY MR. CLEMENTS:)  Okay.  Mr. Reasoner, do you
16     recognize this document?
17     A.  I do.
18     Q.  And does it appear to be an e-mail from you to
19     Keith Lohkamp on September 15th, 2011?
20     A.  Yes, it is.
21     Q.  And did you author this e-mail?
22     A.  I did.

110

1      Q.  Does this e-mail appear to include an
2      attachment entitled RSS RepImplementation.xlsx?
3      A.  Yes.
4      Q.  And if you turn to the next page, Bates number
5      PROV006.
6      A.  Yes.
7      Q.  Does this appear to be the attachments that's
8      referenced in the header of the e-mail?
9      A.  Yes.
10     Q.  Does this attachment appear to be the same
11     cost estimate for the replacement of Requisition
12     Self-Service that was attached to your declaration as
13     Exhibit A?
14     A.  I believe this was -- Was this not Exhibit B?
15     Was -- Am I confused?
16     Q.  I think you may be confused.
17     A.  Oh, yes, yes, you're correct.  It is Exhibit
18     A, the replacement of RSS with a different vendor
19     solution.
20     Q.  Okay.  And this is the same estimate?
21     A.  Yes, it is.
22     Q.  And, to confirm, the estimated total at the

111

1      bottom of the page is $857,504, which is the same figure
2      we saw on Reasoner Exhibit No. 4?
3      A.  Yes, it is.
4      Q.  Okay.  All right.  Could we turn back to the
5      first page of the e-mail.
6      A.  Yes.
7      Q.  And if you look about halfway down the
8      e-mail -- this is the top e-mail from you to
9      Mr. Lohkamp -- it states, "I think the cost would
10     actually be much higher than depicted here.  Costs used
11     are Providence internal cost.  I would say if we had to
12     deploy a brand new solution, we would be using vendor
13     expertise and, as such, the costs would be much higher."
14     You see that?
15     A.  I do.
16     Q.  And, so, do you believe the costs for
17     replacing Requisition Self-Service with an application
18     from another vendor would be much higher than $857,000?
19     A.  That is what I said here, yes.
20     Q.  And do you believe that to be true?
21     A.  I do.
22     Q.  And is your belief based on the expectation

112

1      that the hourly rates for an outside vendor would be
2      much higher than those reflected on the attached
3      estimate?
4      A.  Yes, which are -- are internal costs, yes.
5      Q.  And as we discussed before, that would be
6      roughly three to four times the estimated cost per hour
7      that's reflected --
8      A.  Yes.
9      Q.  -- on the estimate?
10     A.  Yes.
11     Q.  And can you tell me what your -- Excuse me.
12     Let me just back up for a moment.
13     So, if we wanted to estimate what a revised
14     figure would be for this implementation based on using a
15     third-party vendor's personnel, would it be a matter of
16     revising the estimated costs per hour numbers to reflect
17     three to four times more than what is shown here and
18     then adding the resulting numbers?
19     A.  In part, yes.
20     Q.  Is there anything else that would be needed?
21     A.  It would be nice to know what the application
22     is and its complexity to really come up with a solid

Reasoner, Kurt  1/9/2012  12:00:00 AM

113

1    estimate of -- of the level of effort.  So, I'm simply,

2    in that Exhibit A, estimating, uninformed of what is the

3    apple -- actual application, uninformed of its required

4    effort.  So, when I say six to eight months' deployment,

5    I'm uninformed of its actual required level of effort.

6    Q.  Does this estimate that you provided reflect a

7    conservative level of effort?

8    A.  I would say yes.

9    Q.  So, it's your expectation, if anything, that

10   the complexity would be more than what's reflected on

11   this estimate?

12   A.  Most likely, yes.

13   Q.  And, as I understand your e-mail, do you

14   believe that Providence would be required to use a

15   third-party vendor's personnel to perform the

16   implementation?

17   A.  They would have to be involved because it

18   would be something that we would know nothing about.

19   Q.  And would those third-party vendor personnel

20   take each of the roles that's actually listed here in

21   this estimate as we discussed with the exception of -- I

22   think it was the application director and technical

114

1    director?

2    A.  Can you -- What was the first part of the

3    question, again?

4    Q.  So, understanding that Providence would need

5    the third-party vendor's personnel to perform the

6    implementation --

7    A.  Um-hum.

8    Q.  -- would they assume each of the roles that's

9    listed in this estimate, with the exception of the

10   application director and technical director?

11   A.  They wouldn't necessarily assume a one-to-one

12   relationship of those roles, because, in some cases, as

13   with the application analysts, I would want them to be

14   on the project, so they would still be there, because I

15   need them to learn and know the application so that we

16   can support it ongoing.  So, in this case, it would be a

17   duplication.

18   In -- In the case of the project manager, it

19   could be a scenario.  We -- We've had some scenarios

20   where there is a project manager from the vendor and our

21   internal project manager.  They might -- Our internal

22   project manager might not be 100 percent dedicated as is

115

1    depicted in my estimate, so they may be part time,

2    primarily help that vendor project manager navigate the

3    complexities of Providence.

4    So, it would be in addition to, at least, and

5    in some ways -- It would be in addition to, really,

6    probably most of the time.

7    Q.  Okay.  So, you would have each of the roles

8    listed here filled by Providence personnel, and then, in

9    addition to that, you would have third-party vendors

10   personnel filling at least some of these roles?

11   A.  Right.

12   Q.  I see.  Okay.

13   And as we discussed before, the amount that

14   would be required for these third-party personnel would

15   be additional costs above the $857,000 that's reflected

16   on this estimate?

17   A.  Yes.

18   MR. CLEMENTS:  Court reporter, could you

19   please -- excuse me.  Court reporter, could you please

20   mark this document as Reasoner Exhibit No. 7.

21   John.

22   MR. GOLDMARK:  Thank you.

116

1    (Deposition Exhibit 7 was marked for

2    identification.)

3    Q.  (BY MR. CLEMENTS.)  Mr. Reasoner, the court

4    reporter has just handed you what has been marked as

5    Reasoner Exhibit No. 7.  Can you please take a moment to

6    look at it.  For the record, this is an e-mail from Dan

7    Azevedo to Kurt Reasoner and Keith Lohkamp, bearing

8    Bates number PROV008, PROV009.

9    A.  Yes.

10   Q.  You recognize this document?

11   A.  I do.

12   Q.  Does it appear to be an e-mail from

13   Mr. Azevedo to you and Keith Lohkamp, dated

14   September 16th, 2011?

15   A.  Yes, it does.

16   Q.  And does this e-mail appear to be in response

17   to the e-mail from you that we just looked at?

18   A.  Yes.

19   Q.  Okay.  If you look at the first e-mail from

20   Mr. Azevedo, it states, "One other cost that I did not

21   include was the staff training time associated with such

22   a system."  And I'm going to skip the next sentence.

Reasoner, Kurt  1/9/2012  12:00:00 AM

117

1   And then it goes on, "PH&S has estimated 600 plus users
2   for requisition ordering today, so that would add 6,000
3   of training with an average cost of 30 per hour, and
4   that adds $180,000 to the estimate." You see that?
5   A.  Yes, I do.
6   Q.  And did you understand Mr. Azevedo's
7   statements to mean that the staff training time
8   referenced here was not reflected in the cost estimate
9   that you had provided to Mr. Lohkamp in your previous
10  e-mail?
11  A.  Yes.
12  Q.  And do you agree with Mr. Azevedo's estimate
13  that this training would add another $180,000 to the
14  total cost of replacing Requisition Self-Service?
15  A.  Yes.  It's an approximate, yes.
16  Q.  And if we go back to Reasoner Exhibit No. 4,
17  again.  Can you just explain to me how this staff
18  training differs from the training line items that are
19  listed on this estimate?
20  A.  Yes.
21  So, this training, here, is the technical
22  support training --

118

1   Q.  Okay.
2   A.  -- of the analysts that work on -- on -- on,
3   essentially, the team that supports our Lawson
4   application at this point in time.
5   This training, here, that Dan is referring to,
6   is all of our -- would be our current RSS users that
7   would have to go through some form of training.
8   Q.  I see.
9   And, so, to confirm, this 180,000-dollar
10  estimated costs would be in addition to the $857,504
11  that was estimated in your previous e-mail?
12  A.  Yes.
13  Q.  Okay.  Could we turn back to Reasoner Exhibit
14  No. 5, which was Exhibit B to your declaration.
15  A.  Okay.
16  Q.  And I want to just go over this estimate.
17  A.  Okay.
18  Q.  So, as we'd previously discussed, this
19  document accurately reflects the estimated internal
20  costs that Providence would incur to implement
21  Requisition Center; is that correct?
22  A.  Yes.

119

1   Q.  And, here, the first assumption is a
2   four-month duration followed by one-month go-live
3   support, correct?
4   A.  That's correct.
5   Q.  What was the basis for this assumption?
6   A.  The basis of this assumption was based on how
7   the project was going at the time that we put this
8   together.
9   Q.  And how far along were you in the
10  implementation when this estimate was determined?
11  A.  Well, this estimate was done in September, so
12  we were -- we were pretty far long.
13  Q.  So, based on the progress of the actual RQC
14  implementation at the time that Mr. Azevedo put together
15  this estimate, then you believe that this estimate
16  fairly reflects the cost of doing that implementation?
17  A.  Yes.
18  Q.  Did the actual implementation take five
19  months?
20  A.  I would say that we're not quite done yet in
21  that we're not in a reliable steady state.  We did go
22  live in five months.

120

1   Q.  So, would you consider the duration to be more
2   than five months?
3   A.  Yes.
4   Q.  Do you have any estimate on what the total
5   duration will be?
6   A.  Well, let me -- let me be clear on a couple
7   things.  So, the estimate, here, is estimating five
8   months with a number of different people that are
9   involved.  We were still working on outstanding issues
10  that don't involve as many people.  So, I just want to
11  be clear that we did go live within five months, and
12  we're still working through some issues that take up
13  fewer people's time but still some of these people's
14  time.  So, the lead analyst is still working on issues,
15  the application director is still overseeing that effort
16  and having conversations with Lawson, as is the
17  technical director and the application administrator.
18  Q.  So, would this additional work that's being
19  done after the go-live date --
20  A.  Right.
21  Q.  -- reflect additional costs that would go
22  above the $201,000 that's reflected on this estimate?

Reasoner, Kurt  1/9/2012  12:00:00 AM

121

1    A.  Yes.
2        Q.  Okay.  And you'll see here, under the header
3    Role, it appears that it's many of the same line items
4    that were listed in your estimate for the replacement
5    application implementation, correct?
6        A.  Correct.
7        Q.  Were the same assumptions made with respect to
8    these roles for this implementation?
9        A.  I'm sorry, say the question again.  Same
10   roles?  Yes --
11       Q.  Same assumption made for these roles as for
12   the replacement application implementation?
13       A.  Not -- Not the exact assumptions.
14       Q.  And what was different about these
15   assumptions?
16       A.  These assumptions are -- We knew a lot more
17   about the application and that it was a Lawson
18   application, so that changes some of the assumptions,
19   obviously.
20       Q.  Would you say that that makes the assumptions
21   more accurate than was reflected in Exhibit A of your
22   declaration?

122

1    A.  Yes.
2        Q.  Has Providence done any estimate of the actual
3    cost of implementing RQC since the go-live date?
4        A.  No.
5        Q.  So, no revision has been made to this estimate
6    since this was done?
7        A.  No.
8        Q.  Putting aside the additional costs that we
9    discussed regarding work that's been performed after the
10   go-live date, would you say that this estimate
11   accurately reflects the actual costs that were incurred
12   by Providence during the implementation?
13       A.  No, because we've spent more time.
14       Q.  So, even prior to the go-live date, you think
15   that this estimate actually underestimates the actual
16   cost to Providence of the implementation?
17       A.  Say that again.
18       Q.  I'm sorry.  That was poorly worded.
19           So, let me go back here and look and see.
20   You estimate the amount of time that was
21   required by Providence personnel for the RQC
22   implementation on this estimate, correct?

123

1    A.  Correct.
2        Q.  And, as I understand it, even prior to the
3    go-live date, Providence personnel have spent more time
4    on the implementation than is reflected on this
5    estimate?
6        A.  Prior to the go-live date, I would say this
7    estimate is probably close to what we've incurred.
8        Q.  I see.  So, prior to the go-live date, this
9    estimate is accurate.  The only thing that would be
10   added to it is the work that has occurred after the
11   go-live date?
12       A.  The post-go-live issue resolution work, yes.
13       Q.  Okay.
14           So, just to confirm that there's a figure at
15   the bottom of $201,070.  You see that?
16       A.  Correct.
17       Q.  And this is the total cost that was estimated
18   by Providence replacing Requisition Self-Service
19   application with the Requisition Center application,
20   correct?
21       A.  That's correct.
22       Q.  Okay.  Has Providence been required to pay any

124

1    license service or other fees for the implementation and
2    the use of the Requisition Center application?
3        A.  No.
4        Q.  We discussed before that there were certain
5    milestones in Providence's net revenue that would result
6    in an additional license payment being made to Lawson,
7    correct?
8        A.  Correct.
9        Q.  Okay.  Has that rate -- excuse me.  Let me
10   back up.
11           The amount that Providence has required --
12   Still not stating this very well.
13           Do you know what the rate is that Providence
14   is required to pay based on its net revenue?
15       A.  I don't know the number right at this moment.
16   I know of the number in how it's calculated.
17       Q.  Okay.  Has that number that reflects the
18   amount that Providence has to pay based on its net
19   revenue for its license from Lawson changed since the
20   implementation of Requisition Center?
21           MR. GOLDMARK:  I'm going to object just to the
22   same line of questioning that I did earlier, that it's

125

1  beyond the scope of the noted deposition topics, beyond
2  the scope of what the deponent is speaking on behalf of
3  Providence for, under Rule 30(b)(6).
4      THE WITNESS: Can you just restate? I'm
5  trying to understand -- I'm trying to understand what
6  you're -- what you're looking for. And what is the
7  question? The --
8      Q. (BY MR. CLEMENTS:) Okay. So, let's assume
9  that -- that -- just for the sake of assumption, that
10  Providence made a hundred million dollars in revenue
11  this year.
12     A. Okay.
13     Q. I have no idea what -- if that's accurate, and
14  maybe it's way low. I don't mean to insult Providence.
15  But assuming that were the case, is there some
16  percentage of that number that would be required to be
17  paid to Lawson for the license fee?
18     A. No. So, try and help you, here. The terms of
19  our arrangement with Lawson in terms of licensing fees
20  is a one-time payment, you buy the software and you are
21  entitled to its use and enjoyment as long as your
22  maintenance fees are paid annually, okay. And,

126

1  generally, for all applications, that is an unlimited
2  use, so I can have as many users as I like. There are a
3  couple of minor exceptions that apply to things that are
4  non-procurement.
5      If, in the course of Providence's ongoing
6  growth -- and we are an eight-billion-dollar-a-year
7  company, continuing to grow -- so, if we purchased or if
8  a new organization said we would like to join
9  Providence, that impact on our financial statement
10  changes our net revenue number, okay. In the contract
11  with Lawson, there is a target number, back in 1999,
12  when we signed the agreement, that changes. It is -- It
13  has a growth factor that's a part of it. That growth
14  factor grows, and if our -- Providence's growth exceeds
15  that target, then we owe an additional licensing fee.
16     So, your question of has that target changed
17  since we implemented RQC? Yes, it changes every single
18  month because there's a growth component to that target
19  level, if you will. Does that make sense?
20     Q. Yeah, that makes sense.
21     A. So, it's -- it's just an -- It's a way for us
22  to simplify -- and that's simplify is my term -- our

127

1  license arrangement. Instead of saying it's per user --
2  So, if we -- if a new hospital joined us, then I have 50
3  new users and I got to go license them, we don't do
4  that. We say a new organization has joined us and the
5  impact of that organization, if it exceeds this target,
6  I owe you additional licensing fee, and we don't specify
7  anything about that in terms of specifically what is
8  used. A new organization may join us and they may only
9  use the GL, as an example. It applies to all of the
10  Lawson application. So, in some cases, people win; some
11  cases, people lose.
12     Q. Okay. So, for the terms of this additional
13  license fee that is based on the growth rate --
14     A. Yes.
15     Q. -- have those terms changed since Providence
16  implemented Requisition Center?
17     A. Those terms have never changed since we signed
18  the contract in 1999.
19     Q. So, the same amount would be owed based on the
20  original terms now that Requisition Center has been
21  implemented as would have been owed if you still
22  employed the Requisition Self-Service application?

128

1      A. Can you restate that?
2      Q. So, assuming that -- assuming that Providence
3  actually reached that milestone of growth that required
4  them to pay some additional amount on their license fee,
5  the amount owed has not changed since switching over to
6  the Requisition Center application?
7      A. That is correct. There -- There is no impact
8  to that agreement because of Requisition Center.
9      Q. I see. Okay. Great. Thanks. Sorry --
10     A. That's all right.
11     Q. -- to make that so difficult.
12     And I think we may have covered this
13  already -- if so, I apologize -- but does Providence
14  continue to pay the same total maintenance fees every
15  year, now, that it paid prior to the replacement of
16  Requisition Self-Service with Requisition Center?
17     A. Yes.
18     Q. Okay. So, would it be accurate to state that
19  the portion of the maintenance fee that was previously
20  allocated to Requisition Self-Service is now allocated
21  to Requisition Center instead?
22     A. Yes.

129

1  Q.  And would the same be true for the license
2  fee?
3  A.  There was no license fee paid for Requisition
4  Center, so --
5  Q.  But if there was, would --
6  A.  I -- I don't -- I don't know.
7  Q.  Okay.
8  A.  I can't answer that question.
9  Q.  Okay.
10  All right.  Could we go back to paragraph
11  eight of your declaration, which is Reasoner Exhibit 3.
12  In here, it states, "Exhibit B also does not take into
13  consideration the opportunity costs --
14  A.  I'm sorry, hold on, one moment.
15  Q.  I'm sorry.
16  A.  I'm trying to catch up here, trying to keep
17  things somewhat organized.
18  Q.  Okay.
19  So, we're on -- on which one?
20  Q.  Paragraph eight.
21  A.  Of which exhibit?
22  Q.  Of Reasoner Exhibit 3 --

130

1  A.  Okay.  There it is.
2  Q.  -- which is your declaration.
3  A.  Okay.  Sorry.  Just -- Somewhat neurotic about
4  trying to keep on top.
5  Okay.
6  Q.  Okay.  So, looking at paragraph eight, it
7  states, "Exhibit B also does not take into consideration
8  the opportunity costs of the employees listed in the
9  document to take on other work," correct?
10  A.  And what line is this, again?  I'm sorry.
11  Q.  This is paragraph eight.
12  A.  Eight.
13  Q.  Exhibit B also does not take into
14  consideration the opportunity costs of the employees
15  listed in the document to take on other work.  You see
16  that?
17  A.  That is correct, yes.
18  Q.  Okay.  So, would the opportunity costs to
19  Providence of its employees being redirected from other
20  projects be the same as it was in reference to the RSS
21  replacement application?
22  A.  Yes, it would.

131

1  Q.  And, so, as we discussed before, with regard
2  to the RSS replacement application, the opportunity
3  costs to Providence would be in addition to the $201,000
4  that's listed as the estimate for the RQC
5  implementation --
6  A.  That is correct.
7  Q.  -- in your declaration?
8  Okay.  Mr. Reasoner, do you know whether
9  Lawson is obligated to indemnify Providence for expenses
10  incurred in replacing Lawson software in the event that
11  the software is found to infringe a third-party's
12  patents?
13  MR. GOLDMARK:  Objection.  Beyond the scope of
14  the listed deposition topics.
15  THE WITNESS:  I don't know.
16  Q.  (BY MR. CLEMENTS:)  Okay.  So, you're not aware
17  of any indemnification provision?
18  A.  I did not prepare for any such question, so I
19  don't know.
20  Q.  Okay.  But, to your knowledge, you're not
21  aware?
22  A.  I don't know.

132

1  Q.  Were there any discussions at Providence
2  regarding the possibility that Lawson could be required
3  to indemnify Providence if it should have to replace
4  Requisition Self-Service application with software from
5  a third-party vendor?
6  MR. GOLDMARK:  Same objection.  Beyond the
7  scope of the noted deposition topics.
8  THE WITNESS:  Again, I don't know of any.
9  Q.  (BY MR. CLEMENTS:)  To your knowledge, was the
10  question of indemnification ever raised with Lawson?
11  A.  I don't know.  Not by me.
12  Q.  Not by you, okay.
13  All right.  I think I'm just about finished.
14  Can we just take a five-minute break and let me review
15  my notes and see if I have anything else?
16  A.  Sure.
17  MR. GOLDMARK:  Sounds good.
18  MR. CLEMENTS:  Okay.  Thanks.
19  THE VIDEOGRAPHER:  One moment.  As we go off
20  the record, the time is 12:06 p.m.
21  (Off the record at 12:06 p.m.)
22  (Deposition Exhibit 8 was marked for

Reasoner, Kurt  1/9/2012  12:00:00 AM

133

1    identification.)
2    (Back on the record at 12:16 p.m.)
3    THE VIDEOGRAPHER:  Okay.  We are back on
4    record.  The time is 12:17 p.m.  This is the beginning
5    of media unit number three.
6    Please proceed.
7    Q.  (BY MR. CLEMENTS)  Okay.  Mr. Reasoner, the
8    court reporter has handed you what has been marked as
9    Reasoner Exhibit No. 8.  Let me know when you've had a
10   chance to review it.
11   And, for the record, this is titled
12   Declaration of Kurt Reasoner.  It doesn't have a Bates
13   number.  It's dated February 14th, 2011.
14   MR. GOLDMARK:  Mr. Clement, do you intend to
15   ask subsequent questions about this declaration?  I'm
16   looking at the noted deposition topics and I don't see
17   how this comes anywhere near the color of scope of any
18   of the noted deposition topics, let alone the ones we
19   agreed upon.
20   MR. CLEMENTS:  I think it does concern the RQC
21   implementation because there are some factors in here
22   that are discussed about what the expected costs would

134

1    be and -- and problems that would be incurred in
2    replacing the RSS software, so I think that would be
3    covered by that.
4    MR. GOLDMARK:  So, we have here noted
5    deposition topic, the time frame says implementation of
6    RQC since May 23rd, 2011.
7    MR. CLEMENTS:  Can we just let your
8    objection -- I mean, we've got your objection on the
9    record.  Just for the sake of time, can we just go ahead
10   and ask questions?
11   MR. GOLDMARK:  Yes, we can.
12   The only further objection I would note is
13   that because this was not within the time frame noted in
14   the deposition topics, the deponent has not, to my
15   understanding, reviewed this declaration recently.  The
16   deponent is not prepared to speak on behalf of
17   Providence with respect to any of the substance of this
18   declaration.
19   MR. CLEMENTS:  Okay.  With those objections,
20   we'll proceed.
21   Q.  (BY MR. CLEMENTS)  Have you had a chance to
22   look at it, Mr. Reasoner?

135

1    A.  I have.
2    Q.  Okay.  And are you familiar with this
3    document?
4    A.  I can't say that I'm familiar with this
5    document.  I recognize it.
6    Q.  Okay.  You see it's signed and dated
7    February 14th, 2011?
8    A.  Yes.
9    Q.  And that's your signature?
10   A.  That is my signature.
11   Q.  And is this a document that you signed in
12   support of Lawson in its litigation with ePlus?
13   A.  Yes, it is.
14   Q.  Do you know what the purpose of this
15   declaration was?
16   A.  That being almost a year ago, I don't.
17   Q.  Okay.
18   A.  I -- I would have to sit here and read it to
19   tell you that.
20   Q.  Do you believe this declaration was prepared
21   for the purpose of describing the effect that an
22   injunction against the use of Requisition Self-Service

136

1    would have on Providence's operations?
2    A.  I do recognize that, yes.
3    Q.  Okay.  And are the statements made in this
4    declaration true and accurate to the best of your
5    knowledge?
6    A.  Yes.
7    Q.  All right.  If you could, turn to paragraph 15
8    of the declaration.  And if you actually look at the --
9    starting with the second sentence.
10   A.  Okay.
11   Q.  Are you there?
12   A.  Yes.
13   Q.  It says, "Additionally, being required to
14   adopt a replacement for RSS would adversely impact our
15   ability to place orders in a timely manner, our ability
16   to maintain inventory of items critical to patient care,
17   and the accuracy of our orders for supplies (e.g.,
18   ordering the wrong product or paying the wrong price).
19   Replacing Lawson RSS software would cause an increase in
20   our operational expenses, both in terms of personnel
21   hours dedicated to ordering a procurement, as well as
22   prices paid and order accuracy."  You see that?

Reasoner, Kurt  1/9/2012  12:00:00 AM

137

```
1      A.  Yes, I do.
2      Q.  These statements accurately reflect what you
3   believe would be the effect on Providence's operations
4   of an injunction against Requisition Self-Service?
5      A.  Yes.
6      Q.  And since replacing Requisition
7   Self-Service -- Let me start over.
8         Since replacing Requisitions Self-Service with
9   Requisition Center, has Providence suffered any adverse
10  impact on its ability to place orders in a timely
11  manner?
12     A.  Yes, because we have some outstanding issues,
13  so we have had problems.
14     Q.  All right.  Do these relate to the bug issues
15  that you explained earlier?
16     A.  Explained earlier, yes.
17     Q.  And since replacing Requisition Self-Service
18  with Requisition Center, has Providence suffered any
19  adverse impact on its ability to maintain inventory of
20  items critical to patient care?
21     A.  I'm sorry, say that again.
22     Q.  Since replacing Requisition Self-Service with
```

138

```
1   Requisition Center, has Providence suffered any adverse
2   impact on its ability to maintain the inventory of items
3   critical to patient care?
4      A.  I don't know the answer to that question.
5      Q.  Are you aware of any adverse impact on
6   maintaining inventory of items critical to patient care?
7      A.  I have not been made aware of any
8   specifically.
9      Q.  Okay.  Since replacing Requisition
10  Self-Service with Requisition Center, has Providence
11  suffered an adverse impact on the accuracy of its orders
12  for supplies?
13         MR. GOLDMARK:  Objection.  Calls for
14  speculation.
15         THE WITNESS:  Again, I don't know.  I don't
16  know specifically.
17     Q.  (BY MR. CLEMENTS:)  You're not aware of any?
18     A.  No one has said anything to me specifically.
19     Q.  Since replacing Requisition Self-Service with
20  Requisition Center, has Providence suffered an increase
21  in its operational expenses in terms of personnel hours
22  dedicated to ordering and procurement?
```

139

```
1      A.  Yes.
2         MR. GOLDMARK:  Objection.  Calls for
3   speculation.
4      Q.  (BY MR. CLEMENTS:)  Can you estimate how much
5   additional personnel hours have been dedicated to
6   ordering and procurement because of this switch?
7      A.  No.
8      Q.  Since replacing Requisition Self-Service with
9   Requisition Center, has Providence suffered an increase
10  in its operational expenses in terms of prices paid in
11  order accuracy?
12         MR. GOLDMARK:  Objection.  Calls for
13  speculation.
14         THE WITNESS:  Again, I don't know.
15     Q.  (BY MR. CLEMENTS:)  Okay.
16         Court reporter, could you please mark this
17  document as Reasoner Exhibit No. 9.
18         (Deposition Exhibit 9 was marked for
19         identification.)
20     Q.  (BY MR. CLEMENTS:)  For the record, this is
21  document -- this document is an e-mail from Kurt
22  Reasoner to Joe Thornton, dated May 27, 2011, bearing
```

140

```
1   Bates number PROV043 through PROV045.  Can you let me
2   know when you've had a chance to review it?
3      A.  Yes.
4      Q.  Okay.  And do you recognize this document?
5      A.  I do.
6      Q.  Does this appear to be an e-mail sent from you
7   to Joe Thornton on May 27th, 2011?
8      A.  Yes, it is.
9      Q.  Did you author this e-mail?
10     A.  Yes, I did.
11     Q.  And does this e-mail appear to include an
12  attachment entitled Catholic Health Initiatives and
13  Providence Health, Customer Review.doc?
14     A.  Yes.  Can I just -- There's a separate
15  document in here that --
16     Q.  That is just -- That was something that was
17  printed out by the services department in our firm, so
18  you can disregard it.  It's not part of the document.
19     A.  Okay.
20     Q.  I apologize if that's in there.
21     A.  No problem.
22     Q.  Okay.  So, could you please turn to -- to the
```

Reasoner, Kurt  1/9/2012  12:00:00 AM

141

1  document -- second page, the Bates number PROV044.
2      A.  Yes.
3      Q.  And does this appear to be the attachment
4  referenced in the header of your e-mail?
5      A.  Yes, it is.
6      Q.  And at the top of the document is the header
7  Requisition Center Customer Stories, correct?
8      A.  Correct.
9      Q.  Can you tell me what the purpose of this
10  attachment was?
11      A.  The purpose of this attachment was Lawson had
12  asked for my thoughts on Requisition Center so that they
13  could use it internally within their organization and
14  potentially with some customers as they contemplate
15  moving off of RSS.
16      Q.  And, so, were you asked by Lawson to approve
17  the statements that were made about Providence in this
18  document?
19      A.  I was asked to review this document.
20      Q.  Does this document reflect your review and
21  edits --
22      A.  Yes.

142

1      Q.  -- of your statements?  Okay.
2  I'd like you to go down to the -- look at the
3  fourth paragraph.  It states, "Lawson demonstrated a
4  real intent and commitment to make sure that our
5  investment in the Lawson Supply Chain suites stays
6  intact."  Do you see that?
7      A.  I do.
8      Q.  Was this statement made with regard to the
9  Requisition Center application?
10      A.  Yes.
11      Q.  Is that an accurate statement?
12      A.  Yes, it is.
13      Q.  And as of May 27th, 2011, what had Lawson done
14  that demonstrated to you their intent and commitment to
15  make sure Providence's investment in the Lawson Supply
16  Chain suite stays intact?
17      A.  They had revealed to me the plan to make
18  available to us Requisition Center as the court finding
19  had -- as the court ruling was that we, as a customer,
20  have to be off of RSS.
21      Q.  And is -- is this in reference to the May 25th
22  or May 26th meeting with Lawson that you mentioned?

143

1      A.  Yes.  Yes.
2      Q.  Okay.  And then, going on, it says, "From what
3  I've seen so far, I can see that there will be some
4  enhancements to the product."  You see that?
5      A.  Yes.
6      Q.  And the product being referred to, here, is
7  Requisition Center, correct?
8      A.  Correct.
9      Q.  And as of May 27th, 2011, what had you seen of
10  the Requisition Center application that evidenced
11  enhancements to the software?
12      A.  I don't remember specifically.  There were
13  certain pieces of functionality that we would -- we
14  wanted to see improved upon, and Lawson, in developing
15  Requisition Center, incorporated some of those
16  enhancements, and I don't recall, specifically, what
17  those enhancements were, but they were shared at the
18  time of this meeting.
19      Q.  Okay.  All right.  You can put that document
20  aside.
21      Just have a few more questions, here.
22      A.  Okay.

144

1      Q.  So, you talked about some of the difficulties
2  that Providence has had with regard to implementing
3  Requisition Center, correct?
4      A.  Yes.
5      Q.  And aside from the sort of bugs in the code
6  that you discussed, are there any other difficulties
7  that Providence has run into with implementing
8  Requisition Center?
9      A.  None that I can think of right now.
10      Q.  Have any Providence employees expressed any
11  difficulty in learning to use the Requisition Center
12  application?
13      A.  No.
14      Q.  Has Providence provided any training to its
15  employees on how to use Requisition Center?
16      A.  Yes, we have.
17      Q.  And how is that training provided?
18      A.  A number of different ways, and it depends on
19  the location in -- so, it -- Yes, we have and it -- it's
20  different methods by location.
21      Q.  This was training that was provided by
22  Providence personnel itself?

Reasoner, Kurt  1/9/2012  12:00:00 AM

145

| | |
|---|---|
| 1 | A.  Yes. |
| 2 | Q.  Okay.  Has Providence received any negative |
| 3 | feedback from any of its employees regarding Requisition |
| 4 | Center? |
| 5 | A.  I don't know. |
| 6 | Q.  But you're not aware of any negative feedback |
| 7 | from any employees? |
| 8 | A.  I'm not aware of any negative feedback. |
| 9 | Q.  Do you believe Providence's transition from |
| 10 | Requisition Self-Service to Requisition Center has |
| 11 | resulted in any degradation in performance of its |
| 12 | procurement software? |
| 13 | A.  Currently, yes, it has. |
| 14 | Q.  Is that because of the bug problems with the |
| 15 | code? |
| 16 | A.  Yes. |
| 17 | Q.  And putting aside the bug problems and |
| 18 | assuming they were fixed, do you believe that there |
| 19 | would be any resulting degradation in the performance of |
| 20 | Providence's procurement software? |
| 21 | A.  No. |
| 22 | Q.  None? |

146

| | |
|---|---|
| 1 | A.  I don't think so. |
| 2 | Q.  Okay. |
| 3 | That's all the questions I have. |
| 4 | MR. GOLDMARK:  I don't have any questions. |
| 5 | MS. SIMMONS:  No questions. |
| 6 | THE REPORTER:  Copy orders?  Before we go off. |
| 7 | MR. GOLDMARK:  Yes.  And we'd like to reserve |
| 8 | signature. |
| 9 | And, for the record, I know that, |
| 10 | Mr. Clements, a number of these documents we looked at |
| 11 | were confidential, subject to a protective order, so I |
| 12 | think some of the substance of his testimony we'd -- |
| 13 | we'd like to review to see if we can designate it as |
| 14 | confidential. |
| 15 | MR. CLEMENTS:  Okay.  That's fair. |
| 16 | THE WITNESS:  Okay. |
| 17 | MR. CLEMENTS:  All right. |
| 18 | MS. SIMMONS:  We'll order a copy. |
| 19 | MR. CLEMENTS:  Mr. Reasoner, thanks very much |
| 20 | for your time. |
| 21 | THE WITNESS:  Thank you. |
| 22 | MR. CLEMENTS:  Appreciate it. |

147

| | |
|---|---|
| 1 | THE WITNESS:  Okay. |
| 2 | THE VIDEOGRAPHER:  There being nothing |
| 3 | further, then, at this time, we'll go off the record. |
| 4 | This is the end media unit number three.  The |
| 5 | time is 12:30., |
| 6 | Thank you. |
| 7 | (Signature having not been waived, the |
| 8 | videotaped deposition of KURT REASONER was concluded |
| 9 | at 12:30 p.m.) |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

148

| | |
|---|---|
| 1 | ACKNOWLEDGMENT OF DEPONENT |
| 2 | I, KURT REASONER, do hereby acknowledge that I |
| 3 | have read and examined the foregoing testimony, and |
| 4 | the same is a true, correct and complete transcription |
| 5 | of the testimony given by me and any corrections |
| 6 | appear on the attached Errata sheet signed by me. |
| 7 | |
| 8 | |
| 9 | _____  _____ |
| 10 | (DATE)            (SIGNATURE) |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

149

```
1           REPORTER'S CERTIFICATE
2       I, JULIE R. HEAD, the undersigned Certified Court
3   Reporter, pursuant to RCW 5.28.010, authorized to
4   administer oaths and affirmations in and for the State
5   of Washington, do hereby certify:
6       That the sworn testimony and/or proceedings, a
7   transcript of which is attached, that the witness by me
8   was duly sworn to testify to the truth; that the sworn
9   testimony and/or proceedings were by me stenographically
10  recorded and transcribed under my supervision, to the best
11  of my ability; that the foregoing transcript contains a full,
12  true, and accurate record of all the sworn testimony and/or
13  proceedings given and occurring at the time and place stated
14  in the transcript; that I am in no way related to any party
15  to the matter, nor to any counsel, nor do I have any
16  financial interest in the event of the cause.
17      WITNESS MY HAND AND DIGITAL SIGNATURE THIS 11th day
18  of January, 2012.
19
20  _____
21  JULIE R. HEAD, CRR, RPR
22  Washington State Certified Court Reporter No. 3119
```

151

```
1        E R R A T A   S H E E T   C O N T I N U E D
2   IN RE:  ePlus, Inc. -v- Lawson Software, Inc.
3   RETURN BY: _____
4   PAGE   LINE   CORRECTION AND REASON
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  _____  _____
22    (DATE)      (SIGNATURE)
```

150

```
1        E R R A T A   S H E E T
2   IN RE:  ePlus, Inc. -v- Lawson Software, Inc.
3   RETURN BY: _____
4   PAGE   LINE   CORRECTION AND REASON
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  _____  _____
22    (DATE)      (SIGNATURE)
```