**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | | |
|---|---|---|
| ePLUS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:09CV620 (REP) |
| | ) | |
| LAWSON SOFTWARE, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT LAWSON SOFTWARE, INC.'S REPLY**
**MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE IMPROPER**
**OPINIONS AND ARGUMENTS FROM EPLUS'S EXPERTS AT THE**
**CONTEMPT HEARING**

Josh A. Krevitt (admitted *pro hac vice*)
Daniel J. Thomasch (admitted *pro hac vice*)
Jason C. Lo (admitted *pro hac vice*)
jkrevitt@gibsondunn.com
dthomasch@gibsondunn.com
jlo@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone:  (212) 351-4000
Facsimile:  (212) 351-4035

*Attorneys for Defendant Lawson Software, Inc.*

## TABLE OF CONTENTS

Page

I.      Introduction ........................................................................................................... 1

II.     ePlus's Falsely Characterizes Its Attempt to Inject New Infringement Theories
        As an Effort to Rebut Lawson's Theories........................................................... 4

        A.      ePlus Concedes That It Never Accused The Shopping Cart Cookie
                File, Cartobject, Or Error Handling Protocol Of Satisfying Any Claim
                Limitation................................................................................................. 4

        B.      ePlus Has Not Provided The Court With Any Acceptable Reason To
                Deviate From The Express Mandates Set Forth In *TiVo* ....................... 5

        C.      ePlus Never Alleged That Multi-Vendor Punchout Sites Satisfied The
                "At Least Two Product Catalogs" Claim Limitation ............................... 7

III.    ePlus Cannot Rely On Theories Of Infringement That It Alleged, But Did Not
        Prove, At The Underlying Trial ......................................................................... 10

IV.     Dr. Weaver And Mr. Niemeyer Must Not Be Permitted To Re-Litigate
        Whether A Cross-Reference Table Satisfies The "Converting Data"
        Limitation........................................................................................................... 13

V.      ePlus Should Not Be Permitted To Manufacture A New Term – "Requisition
        In Progress" – In Order To Avoid The Import Of The Court's Claim
        Construction....................................................................................................... 15

VI.     Conclusion ......................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Applied Medical Resources Corp. v. United States Surgical Corp.*,
   448 F.3d 1324 (Fed. Cir. 2006) ............................................................................. 15

*TiVo, Inc. v. Echostar Corp.*,
   646 F.3d 869 (Fed. Cir. 2011) ................................................................. 1, 2, 5, 7, 10

## I.      Introduction

Lawson's motion to limit the trial testimony of Dr. Weaver and Mr. Niemeyer is predicated almost entirely on one case, *TiVo, Inc. v. Echostar Corp.*, 646 F.3d 869 (Fed. Cir. 2011), which articulates the procedures that govern contempt proceedings. *TiVo* makes absolutely clear that the subject matter of a contempt proceeding is confined to "those elements of the adjudged infringing products that the patentee previously contended, and proved, satisfy specific limitations of the asserted claims." *Id.* at 882.  That single proposition applies here and compels the exclusion of testimony from ePlus's expert witnesses, as follows:

- ePlus did not previously contend that the "Shopping Cart Cookie File" present in RSS infringed any element of the asserted claims, and may not now offer testimony from Dr. Weaver or Mr. Niemeyer in regard to that feature in the RQC product;

- ePlus did not previously contend that the "CartObject" present in RSS infringed any element of the asserted claims, and may not now offer testimony from Dr. Weaver or Mr. Niemeyer in regard to that feature in the RQC product;

- ePlus did not previously contend that error handling protocols present in RSS infringed any element of the asserted claims, and may not now offer testimony from Dr. Weaver or Mr. Niemeyer in regard to that feature in the RQC product;

- ePlus did not previously prove that Item Master comprises at least two product catalogs in RSS and may not now offer the testimony of Dr. Weaver and Mr. Niemeyer to that effect in regard to RQC.

The predicates for the first three bullet points above are not disputed in ePlus's opposition brief; ePlus does dispute the predicate for the fourth bullet point, but the jury verdict form shows that ePlus is wrong in that regard.  In all four of the above points, the conclusion asserted by Lawson necessarily follows from the stated predicate, pursuant to the holding of *TiVo*.  The issues are straightforward, and ePlus's attempts to circumvent *TiVo* should be rejected before the contempt hearing begins, so that the governing framework for the hearing is clear to all counsel.

*TiVo* similarly compels a rejection of ePlus's attempt to redefine claim elements that were the subject of this Court's previous *Markman* ruling.

- Dr. Weaver seeks to testify that the sharply limited Categories search function in RQC infringes the "converting" element of the assorted claims of the '683 patent. His opinion is advanced without regard to whether that modified feature satisfies the function of the "means-plus-function" element of "converting." Interpreting "converting" in that manner is contrary to this Court's claim construction ruling;

- Dr. Weaver's intended testimony about a so-called "requisition-in-progress" finds no support whatsoever in the Court's prior claim construction ruling or the evidence offered at the merits trial.

New infringement theories such as those fashioned by Dr. Weaver are, of course, available to ePlus in a new infringement proceeding, "but that should not be decided in a contempt proceeding." *Id*. at 884. Indeed, the very issue in *TiVo* concerned the patentee's attempt to construct a new infringement theory around a feature of the redesigned product (the PID filter) that was present in both the adjudged infringing and accused configurations, and which had not previously been accused of infringement. *Id.* at 883. The Federal Circuit rejected the patentee's new theory as inapplicable in the context of a contempt proceeding. *Id.* at 884. The situation here is the same; the same result should apply.

In regard to the '172 patent, ePlus fundamentally mischaracterizes the relevant change from RSS to RQC as "fiddling around with a feature that was not accused," Opp'n at 1, and, on the basis of that mischaracterization, ePlus asserts repeatedly that Dr. Weaver and Mr. Niemeyer must be permitted to rebut Lawson's assertions, whether or not those alleged assertions are relevant under *TiVo*. Opp'n at 3-10. ePlus is wrong on the facts, as RQC utilizes an entirely different "means for building a requisition" than did RSS. But, that does not matter to the instant motion. If, as ePlus argues, the RQC modification at issue concerns "a feature that was not accused" at the merits trial, then Lawson's witnesses' testimony about that unchanged feature

2

should be excluded from evidence, leaving nothing in that regard to rebut.  But, of course, that is not the case, and ePlus's desire to introduce expert testimony about unchanged features of RSS cannot be justified as rebuttal, or otherwise.

The tone and language of ePlus's brief betrays its own recognition of the weakness of its position:  Invectives not evidence take center stage in ePlus's opposition memorandum.  The Court need look no further than the *first three pages* of ePlus's memorandum to find the following terms of desperation employed by ePlus to characterize Lawson's position:

- absurd

- concocted

- deliberate distortion

- deliberately ignores

- distorts

- equally disingenuous

- flagrantly false

- frivolousness

- sham

- simply incomprehensible

- tit-for-tat

Lawson's arguments are none of the above; they begin and end with *TiVo*.  In November, the parties briefed the procedures that the Federal Circuit spelled out in *TiVo* for the conduct of a contempt proceeding.  In its motion to limit the testimony of Dr. Weaver and Mr. Niemeyer, Lawson did nothing more than apply the clearly stated principles of *TiVo* to this case, specifically to the opinions of Dr. Weaver and Mr. Niemeyer, as reflected in their respective

3

expert reports and deposition testimony.  A serious opposition was called for if Lawson's brief misapplied *TiVo* in any way:  the absence of such an opposition speaks louder than the "shouting-on-paper" approach taken by ePlus.

## II. *e*Plus's Falsely Characterizes Its Attempt to Inject New Infringement Theories As an Effort to Rebut Lawson's Theories

### A. ePlus Concedes That It Never Accused The Shopping Cart Cookie File, Cartobject, Or Error Handling Protocol Of Satisfying Any Claim Limitation

Dr. Weaver's and Mr. Niemeyer's opinions as to the Shopping Cart Cookie File, CartObject, and Error Handling, are excludable based on the following rationale:  ePlus is relying on "features ePlus knew about at the underlying proceedings, . . . chose not to testify about at the underlying trial, and which they contend remain unchanged in RQC."  Opening Br. at 5.

The truth of this premise can be easily tested.  The transcript of the underlying trial proceedings is part of the record in the case, and all ePlus needed to do to overcome the exclusion of the opinions at issue was to cite to *any* part of that transcript in which either Dr. Weaver or Mr. Niemeyer uttered the phrases "Shopping Cart Cookie File," "CartObject," or "Error Handling" and accused those features of satisfying any element of the '172 patent.  ePlus submitted twenty pages of opposition argument, devoid of even a single citation to the trial transcript reflecting such testimony.[1]

To the contrary, ePlus openly *admits* that it did not put forth these contentions at trial. According to ePlus, "[t]he particulars of what internal data structure holds the order list *were not important* to ePlus's infringement argument at trial and whether there is one internal data structure or multiple internal data structures *is irrelevant*."  Opp'n at 7 (emphasis added).  At

---

[1]   That ePlus's infringement expert never uttered words such as "Shopping Cart Cookie File" at the underlying trial is hardly surprising.  As Dr. Weaver testified under oath, he "did not know at that time [of trial] the name Shopping Cart Cookie File."  Weaver Feb. 9, 2012 Tr. at 119:6-10.

trial, ePlus was entitled to limit its case to that it considered important and relevant, but contentions it chose *not* to advance, and product features it chose not to accuse cannot form the basis of a subsequent contempt proceeding.  The only inquiry is whether ePlus actually alleged, and proved, that a particular feature satisfied any claim limitation.

The *TiVo* decision makes clear that where, as here, a patentee did not accuse a feature of the adjudged-infringing product to satisfy a claim limitation, it may not do so for the first time in a contempt proceeding.  *See TiVo, Inc. v. Echostar Corp.*, 646 F.3d 869, 882-83 (Fed. Cir. 2011).  The rule that a contempt finding cannot be based on a previously-unaccused feature or functionality is not, as ePlus would have it, a mere nuisance.  Instead, it is an essential procedural safeguard that reflects the extraordinary nature of contempt proceedings.  As the Federal Circuit recognized, "contempt 'is a severe remedy, and should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct.'"[2]  *TiVo*, 646 F.3d at 881-82.

**B.     ePlus Has Not Provided The Court With Any Acceptable Reason To Deviate From The Express Mandates Set Forth In *TiVo***

Undeterred by the governing legal principal or the relevant factual circumstances, ePlus invites this Court to permit its expert witnesses to render opinions that previously unaccused features cause the newly-accused products to satisfy certain claim limitations.  Doing so would constitute legal error, and that error cannot be justified on the grounds that it is somehow necessary to permit ePlus to "rebut" the alleged arguments made by Lawson.

Moreover, this rationale is based on a mischaracterization of Lawson's contentions.  For example, ePlus suggests that Lawson placed the Shopping Cart Cookie File, the CartObject, or Error Handling at issue in the "Declarations of Messrs. Christopherson and Dooner submitted to

---

[2]  It is for the same reason that "[t]he patentee bears the burden of proving violation of the injunction by clear and convincing evidence, a burden that applies to both infringement and colorable differences."  *TiVo*, 646 F.3d at 883.

the Court in opposition to ePlus's motion for an order to show cause why Lawson should not be held in contempt, and in Lawson's Supplemental Response to Interrogatory No. 5." Opp'n at 7-8. ePlus bears the burden of proof in this case, and must be able to justify the presentations in its case-in-chief without regard to what Lawson's witnesses *might* say.

This is particularly the case here, because Lawson can affirmatively represent that its defense of this case will *not* rely on the Shopping Cart Cookie File, CartObject, or Error Handling structures and features of RSS and RQC. At the upcoming proceedings, Lawson's contention will be that it "removed the *shopping cart functionality* [alleged to infringe at trial] and require[s] that any product selected under the Find/Shop results would go directly to the requisition, therefore bypassing the intermediate step of a *shopping cart.*" Supp. Response to Rog. 5 at 12. Lawson intends to demonstrate the nature of these changes, the significance of these changes, and the non-infringement impact of these changes, *without any reliance on* a Shopping Cart Cookie File, a CartObject, or Error Handling.

ePlus also suggests that the Court must ignore the mandate of *TiVo* because ePlus is merely responding to Lawson's suggestions that it no longer infringes the asserted claims, as RQC bypasses "a temporary or intermediate list" and instead "add[s] or modif[ies] items in the Requisition Database." Opp'n at 8. But this is nothing more than a bootstrap argument insofar as it suggests that ePlus must be able to use any and all means to demonstrate that the newly-accused products have a "temporary or intermediate list," *even* if that proof rests solely on features *present but not accused* in the adjudged-infringing product.

ePlus's suggestion is all the more unsupported because it would lead this Court to take the very action that the Federal Circuit rebuked in *TiVo*. In the *TiVo* contempt proceedings, the

6

plaintiff convinced the District Court to find contempt based on a feature that was not previously accused of meeting a claim limitation:

> TiVo alleged, and the district court looked to, *a different feature of EchoStar's modified devices*, viz., the PID filter, as meeting the parsing limitation of the software claims. Although the parties disputed their prior positions on whether the PID filter performs "parsing," *TiVo never unequivocally alleged prior to the contempt stage that the PID filter met that claim limitation. That was a new allegation.*

*TiVo*, 646 F.3d at 883 (emphasis added). In vacating the District Court's finding of contempt, the Federal Circuit explicitly noted that an allegation that a previously-unaccused feature infringes the asserted claims must be made in the context of a new trial: "It is also possible that, *in a new infringement proceeding*, a fact finder could conclude that the PID filter in EchoStar's redesigned device meets the 'parsing' limitation and that the devices continue to infringe the asserted claims, *but that should not be decided in a contempt proceeding*." *TiVo*, 646 at 884 (emphasis added).

Contempt proceedings are confined to "those elements of the adjudged infringing products that the patentee *previously contended, and proved*, satisfy specific limitations of the asserted claims." *TiVo*, 646 F.3d at 882 (emphasis added). Thus, to demonstrate contempt of the Court's Injunction, ePlus must meet its clear and convincing burden by focusing only on the feature(s) that ePlus "unequivocally alleged prior to the contempt stage" of satisfying the relevant claim limitations. *Id.* at 883. ePlus cannot rely on features that were not previously accused of infringement under the guise of responding to Lawson's arguments.

### C.   ePlus Never Alleged That Multi-Vendor Punchout Sites Satisfied The "At Least Two Product Catalogs" Claim Limitation

In its opening papers, Lawson set forth a simple contention: at the underlying trial, ePlus never alleged that a Punchout site that offers items from more than one vendor constitutes more than one "catalog," as the Court has construed that term. Opening Br. at 16-17. If Lawson's

7

contention were incorrect, ePlus could have simply cited to a portion of the closing arguments in which ePlus's counsel argued to the jury that the limitation was satisfied by the existence of such Punchout sites. ePlus failed to do so because no such argument was made.

Instead of demonstrating that it contended that certain Punchout sites contained more than one catalog, ePlus attacks Lawson for "playing word games." According to ePlus, it is improper to distinguish between a "multi-vendor catalog" site and "multi-catalog" Punchout sites. In taking this position, ePlus posits that a site that contains multiple vendors must, by definition, contain multiple catalogs.

Even in a plain-English sense, of course, the order in which words appear in a phrase matters. A *multi-vendor* catalog is a catalog that contains items from more than one vendor. A *multi-catalog* site is a site that includes a variety of catalogs which a user may select and search.

ePlus's position not only flies in the face of common sense, but also the Court's claim construction. As the Court's claim construction makes clear, the concepts of "vendor" and "catalog" are related, but distinct. In particular, the Court's construction provides that a catalog is "an organized collection of items and associated information, *published by a vendor* (which includes suppliers, manufacturers, and distributors." *Markman* Order at 11 (emphasis added). Under the Court's construction, the "catalog" limitation is not satisfied by the mere fact that a structure contains a collection of items and associated information *from* a *vendor*. Instead, the collection of items and associated information must be "*published* by a vendor."

The divergence between ePlus's position now and the Court's claim construction is more than a semantic one. To take the most basic example, one can search a collection of 10 items, each of which is offered by a different vendor. Under the Court's claim construction, that entire collection may constitute one catalog if it (*i.e.*, the collection) is *published* by a vendor. Under

ePlus's newly-proffered construction, *each* of those *individual* items constitutes a separate catalog because it is offered by a different vendor.  By equating an item from a vendor with a catalog, ePlus reads out significant requirements imposed by the Court's construction, including the requirement that a catalog must constitute an "organized collection" of items and be "published" by a vendor.  At the underlying trial, ePlus presented no evidence that in the case of a Punchout site that includes items from more than one vendor, the items offered by *each* vendor satisfied the requirements of a "catalog" set forth in the Court's construction.  Having failed to do so at the trial, ePlus cannot allege this new infringement theory now in the context of a contempt proceeding.

ePlus also represents to the Court that it *did* make the contention that those Punchout sites are multi-catalog sites, citing to separate testimony excerpts.  Opp'n at 11.  But that testimony does not support ePlus's position.  To begin with, ePlus mischaracterizes much of the testimony.  In the cited portion of Mr. Christopherson's testimony, for example, he is answering a question about whether "the current version of the Lawson procurement punchout includes the capability to punch out to *multi-vendor* catalogs?"  Trial Tr. at 1159: 11-14 (emphasis added).  Likewise, in the cited portion of Dr. Weaver's testimony, Dr. Weaver testifies that certain companies "provide *multiple vendor* catalogs."[3]  Trial Tr. at 772-13 – 773:11 (emphasis added).  No testimony was offered by Mr. Christopherson, or is cited by ePlus, concerning "multi-catalog" sites.

In the underlying trial, ePlus never contended that a Punchout site that offers items from more than one vendor satisfies the "at least two product catalogs" claim limitations, nor did it offer that items from each vendor on a Punchout site constitute a "catalog" in accordance with

---

[3]  The remaining testimony and exhibits cited to fare no better.  They consist of little more than *layperson* statements characterizing certain documents or databases as "catalogs."  None of these statements constitute a contention by ePlus that the sites at issue contain more than one catalog, and none of these statements come close to providing information sufficient to determine whether the Court's construction of "catalogs" has been satisfied.

the Court's claim construction.  Under the clear mandate of *TiVo*, ePlus cannot raise those contentions now in an effort to argue that Lawson is in contempt of the Court's Injunction.

## III.   ePlus Cannot Rely On Theories Of Infringement That It Alleged, But Did Not Prove, At The Underlying Trial

In arguing that Item Master alone satisfies the "at least two product catalogs" claim limitation of the '683 patent, ePlus is not only re-trying an issue that the underlying jury rejected, it effectively asks the Court to grant summary judgment in ePlus's favor during these contempt proceedings.

ePlus does not, and cannot, dispute the plain language or *TiVo*, which requires the parties and the Court to focus only on "those aspects of the accused product that were previously alleged to be, *and were the basis for*, the prior finding of infringement."  *TiVo*, 646 F.3d at 882 (emphasis added).  Instead, ePlus's primary argument is that if the Court were to follow the plain guidance of *TiVo*, an unfair result would follow:  *TiVo* would provide "a free-pass whenever the patentee presents evidence at trial that the infringer satisfies a claim element in more than one way."  Opp'n at 12.

Not only is ePlus's rationale an insufficient reason to ignore the plain mandate of *TiVo*, it is also based on an entirely false dichotomy.  A patentee can always avoid the "free-pass" problem posited by ePlus if it creates a verdict form that specifically asks the jury which of the alternative theories of infringement it credited in reaching its verdict.  In that situation, there would be no question in a post-contempt proceeding which aspects of the accused product "were the basis for [] the prior finding of infringement."  *TiVo*, 646 F.3d at 882.

Indeed, it is not only *possible* to ask a jury which of the alternative infringement theories it chose to credit, but in this case, ePlus *in fact did* ask the jury which of the alternative infringement theories it chose to credit.  For claims 3 and 28 of the '683 patent, the jury was

asked to issue two separate infringement findings, one for a configuration that included Item Master alone, and the other for a configuration that included Punchout in addition to Item Master.  As reflected below, the jury dutifully fulfilled its obligation and found that a system containing only Item Master does not infringe the asserted claims of the '683 patent.

Configuration No. 2:  Core S3 Procurement System (Lawson System Foundation ("LSF")/Process Flow, in combination with Inventory Control, Requisition, and Purchase Order Modules) and Requisition Self-Service or "RSS"

'683 Patent, claim 3:       YES _____      NO ___✓___

'683 Patent, claim 28:     YES _____      NO ___✓___

On the other hand, the jury found that the addition of Punchout to an identical software configuration renders it infringing.

Configuration No. 3:  Core S3 Procurement System (Lawson System Foundation ("LSF")/Process Flow, in combination with Inventory Control, Requisition, and Purchase Order Modules), Requisition Self-Service or "RSS," and Punchout

'683 Patent, claim 3:       YES ___✓___      NO _____

'683 Patent, claim 26:     YES ___✓___      NO _____

'683 Patent, claim 28:     YES ___✓___      NO _____

'683 Patent, claim 29:     YES ___✓___      NO _____

Based on this clear finding by the jury, Lawson is not being given a free-pass by being permitted to change the adjudged-infringing configuration to be more like a configuration the jury specifically found to be non-infringing.  If anything, it is ePlus that seeks a free-pass by arguing that the Court should assume that the jury accepted both of its infringement theories, even though the jury explicitly did not do so.

11

ePlus further argues that the jury necessarily found that Item Master satisfied the "at least two product catalogs" claim limitation because ePlus purportedly relied upon Item Master to demonstrate that the adjudged-infringing products contained a "means for converting data" as that limitation appears in the asserted claims of the '683 patent.  But even if ePlus's premise is correct (i.e., that Item Master was used to demonstrate the "converting data" claim limitation), the conclusion ePlus draws from that premise (that the jury determined Item Master comprised *two or more* catalogs) simply does not follow.  Certainly, ePlus never asserted at trial that the "converting data" limitation must be performed on "two or more catalogs,"  and thus the use of Item Master to satisfy the "converting" element says nothing about whether Item Master is a *single* catalog, or "two or more" catalogs.

Not only is it *possible* that the jury did not find that Item Master constituted "at least two product catalogs," but there is compelling evidence that the jury in fact did *not* reach such a conclusion.  As noted above, the jury was asked to determine whether a Lawson software configuration that contained only Item Master infringed claims of the '683 patent, and it concluded that it did not.  Instead, the jury only found infringement as to those configurations in which a user could access both Item Master *and* Punchout.  ePlus's hypothesis that the jury concluded that Item Master satisfied the "at least two product catalogs" claim limitation would leave room for absolutely no explanation as to why the jury determined that Configuration No. 2 did not infringe the claims of the '683 patent.

Accordingly, ePlus's request that it be given the "benefit of the doubt" with respect to its Item Master argument is consistent neither with the "clear and convincing" burden of proof it bears in these proceedings, nor with the jury's explicit rejection of the Item Master argument in the underlying trial.

12

**IV.     Dr. Weaver And Mr. Niemeyer Must Not Be Permitted To Re-Litigate Whether A Cross-Reference Table Satisfies The "Converting Data" Limitation**

In construing the "converting data" claim limitations, the Court rejected ePlus's argument that the mere existence of a cross-reference table linking two items is sufficient to satisfy the limitations.  In so doing, it noted that the prosecution history supports "Lawson's assertion that converting requires substitution *with a suitable replacement*."  *Markman* Order at 30 (emphasis added).

The question before the Court is whether, under the Court's construction, the limitation is satisfied only by the identification of equivalent or identical items (*e.g.*, a GMC truck for a Ford truck), or whether a party in this proceeding can argue that *any* substitution of items (*e.g.*, a bicycle for a Ford truck) is sufficient.  Lawson takes the former position, while ePlus takes the latter position.

ePlus's argument relies exclusively on the notion that the "converting" claim limitations do not "require substitution of 'identical or equivalent items.'"  Opp'n at 16, 17.  Rather, ePlus argues that the "converting" claim limitations are satisfied anytime one item is substituted for another, even if the "substitute" item is neither identical nor equivalent.  *Id.*  ("The Court did not require that the substituted items had to be 'identical or equivalent items.'").  ePlus is incorrect.

But as Lawson already noted in its opening papers, ePlus's new theory of infringement contradicts the position its expert took at the underlying merits trial and the court's claim construction.  Opening Br. at 20-21.  Equally important, the position as articulated in ePlus's Opposition cannot be reconciled with the patentee's own description of the limitations.  As the Court noted in its claim construction order, *Markman* Order at 30, during the prosecution of the '683 Patent, the Applicants plainly described the converting claim elements as substituting identical or equivalent items:

13

> Applicants also have clarified those claims that contain the "means for converting" element or the "converting" step. Those claims properly refer to converting the "data relating to an item and a different source". This was one of the elements that the Examiner determined was not taught or suggested by the prior art (see item 7 of the second Office Action). Applicants believe that the new language more distinctly claims the invention where, for example, the identical selected matching item were to be ordered from a different source. The prior language, "corresponding item", could have been misunderstood. The amended language properly claims *identical matching items* from different sources, *as well as a suitable replacement* for the selected matching item."

Response to Second Office Action, Dated May 26, 1998, at 14 (emphasis added).

In developing RQC, Lawson removed the ability of users to search for items based on the commodity level codes; users are permitted only to search down to the class level. And there is no dispute that the results of a category search at the class level do *not* provide a list of only equivalent or identical items. It is this significant alteration that has forced ePlus to ignore both the Court's claim construction order, as well as the prosecution history, when it blatantly argues the claim limitation does not "require substitution of 'identical or equivalent items'…." Opp'n at 16.

ePlus also argues that the "Court construed the structure corresponding to the 'means for converting' limitation of claim 3" as requiring "one or more cross-reference tables." Opp'n at 16. Therefore, ePlus argues, "there was nothing improper about Dr. Weaver's reliance" on a cross-reference table "to identify cross-referenced items that could then be substituted for a previously-selected item." Opp'n at 17.

ePlus's argument is nothing more than a semantic sleight of hand. There is *no dispute* that Dr. Weaver will be permitted to identify what he alleges to be a cross-reference table in order to allege that *the corresponding structure* is present in the newly-accused products. Where the parties vehemently *disagree* is whether Dr. Weaver may argue that the mere identification of a corresponding structure (i.e., the *means*) is alone sufficient to satisfy the means-plus-*function*

14

limitation (ePlus's position), or whether Dr. Weaver must *also* explain how that corresponding structure performs the requisite *function* (Lawson's position).  ePlus's position that it may ignore the requisite function altogether violates a foundation of patent claim interpretation so basic that it hardly needs stating: a means plus function claim limitation is satisfied only if 1) the requisite corresponding structure is present, *and* 2) the corresponding structure *performs the requisite function.  See Applied Medical Resources Corp. v. United States Surgical Corp.*, 448 F.3d 1324, 1333 (Fed. Cir. 2006) ("Literal infringement of a means-plus-function claim limitation requires that the *relevant structure* in the accused device *perform the identical function recited in the claim*….") (emphases added).

Thus, although a cross-reference table identifying cross-referenced items can satisfy the corresponding structure, that corresponding structure must also perform the function of converting to a suitable replacement item.[4]

## V.     ePlus Should Not Be Permitted To Manufacture A New Term – "Requisition In Progress" – In Order To Avoid The Import Of The Court's Claim Construction

Rather than explain why it should be permitted to inject a new term – "requisition in progress" – into these proceedings, ePlus seeks to deflect attention away from its actions by making the vague assertion that Lawson is engaging in "gotcha" tactics.  Indeed, in responding to Lawson's serious accusation that ePlus has adopted "an impermissible construction of the term 'requisition,'" ePlus *never* cites to or quotes the Court's claim construction.  Opp'n at 17-19.

ePlus resorts to rhetoric because it does not wish to face the Court's claim construction and the nature of the newly-accused product.  Specifically, this Court construed the function of

---

[4]  Equally important, ePlus's argument cannot apply to claim 28 (or dependent claim 29).  The "converting data" limitation in those claims was not drafted in means plus function format, and the Court's construction of a corresponding structure with respect to claim 3 is completely irrelevant.

the "means for building a requisition" claim element as "building a requisition that uses data obtained from said database relating to selected matching items on said order list." *Markman* Order at 50. The corresponding structure is a "requisition module operating on a computer system having access to data in the database." *Id.* at 51.

The changes to Lawson's newly-accused RQC product are directly tied to specific elements of the Court's construction. In RQC, after a user performs a search and selects an item, that item is added immediately to the requisition database in the requisition module of RQC. Thus, the requisition is being "built" in the "requisition module" immediately after the user selects an item, entirely bypassing the step of using data related to items on what ePlus accused to be the "said order list" – the My Cart functionality.

Realizing that RQC no longer uses the My Cart "order list" at issue in the underlying trial, ePlus now attempts to inject a new infringement theory by parsing what used to be one thing – a requisition – into two: a requisition in progress, and a requisition. Opp'n at 17-18. By manufacturing this artificial distinction, ePlus hopes to maintain an argument that both the means for building an order list and a means for building a requisition still exist in RQC. Under ePlus's view, the building of "requisition in progress" is actually the building of an order list, while the conversion of a "requisition in progress" to a requisition is the building of a requisition. Besides being incredibly confusing, ePlus's new distinction finds no support in the underlying trial record, in the claim language, or in the Court's claim construction.

Indeed, just recently, ePlus submitted a brief to the Court in which it specifically argued against drawing a distinction between the "means for building an order list" and the "means for building a requisition" based on whether the list is "complete." According to ePlus, "a construction which would require that the order list be entirely generated before the system

16

begins building a requisition" is inconsistent with both the Court's claim construction as well as "with the embodiments described in the '172 Patent…."  Dkt No. 885 at 12.  Despite this clear disavowal of the notion that the order list must be entirely generated before the system begins building a requisition, ePlus now proposes to make exactly that distinction through its expert Dr. Weaver.

ePlus also argues that Dr. Weaver's trial testimony is consistent with its position that items in the requisition database pre-release is an order list, not a requisition.  But the very quote ePlus uses to support this position actually supports Lawson's position that a requisition is being "built" when items are added to the requisition database.  As the Dr. Weaver quote ePlus uses in its Opposition Memorandum states, when you "do a checkout from the Lawson system . . . that engages the requisition system and builds the requisition of all the items that you want to order." Opp'n at 17.  In other words, based on Dr. Weaver's testimony, a requisition is built when the items are transferred to the requisition database.  This was made explicit by Dr. Weaver elsewhere in his trial testimony where he states that a requisition was created in RSS when the order list is "transferred to the requisition module."  Trial Tr. at 568-69.

ePlus also cites Mr. Niemeyer as distinguishing between "data in the requisition database that was an order list, and data in the requisition database that was a requisition."  However, as ePlus itself states in its Opposition Brief, Mr. Niemeyer is not ePlus's expert on infringement. Therefore, his interpretations of what constitutes an "order list" and what constitutes a "requisition" are improper and irrelevant.  Opp'n at 2 n.1 ("There is, as there was at trial, a clear delineation of the scope of ePlus's experts' opinions.  Dr. Weaver is offering opinions regarding colorable differences and infringement, and Mr. Niemeyer is offering opinions regarding the alleged changes to Lawson's source code, and the factual claims Lawson makes. . . ").

Dr. Weaver's position that the building of a "requisition in progress" can be distinguished from the building of a requisition is one that is driven solely by a desire to deny the reality of the more than colorable change to RQC, and to find infringement where none exists.  It has no support in the Court's claim construction or in the claim language, and should be rejected outright.

**VI.      Conclusion**

For the reasons set forth above, Lawson's motion should be granted in its entirety.


Respectfully submitted:

                                            LAWSON SOFTWARE, INC.

Date: February 24, 2012


                                            By: _____/s/_____

                                                  Jason C. Lo


Dabney J. Carr, IV, VSB #28679
Robert A. Angle, VSB #37691
**TROUTMAN SANDERS LLP**
P. O. Box 1122
Richmond, Virginia  23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com


Josh A. Krevitt (admitted pro hac vice)
Daniel J. Thomasch (admitted pro hac vice)
Jason C. Lo (admitted pro hac vice)
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

*Counsel for Defendant Lawson Software, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 24th day of February 2012, I have served the following:

**DEFENDANT LAWSON SOFTWARE, INC.'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE IMPROPER OPINIONS AND ARGUMENTS FROM EPLUS'S EXPERTS AT THE CONTEMPT HEARING**

on the following counsel of record as indicated via electronic mail:

Craig T. Meritt
Henry I. Willet, III
CHRISTIAN & BARTON, LLP
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
cmeritt@cblaw.com
hwillet@cblaw.com

James D. Clements
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, MA 02109-2881
jclements@goodwinprocter.com

Scott L. Robertson
Jennifer A. Albert
David M. Young (VSB No. 35997)
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001
srobertson@goodwinprocter.com
jalbert@goodwinprocter.com
dyoung@goodwinprocter.com

_____/s/_____
        Jason C. Lo
jlo@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 900071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

101243345.1