1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                     RICHMOND DIVISION

4

5      ---------------------------------------
                                          :
6      ePLUS, INC.                        :    Civil Action No.
                                          :    3:09CV620
7      vs.                                :
                                          :
8      LAWSON SOFTWARE, INC.,             :    February 29, 2012
                                          :
9      ---------------------------------------

10

11        COMPLETE TRANSCRIPT OF THE MOTIONS HEARING

12          BEFORE THE HONORABLE ROBERT E. PAYNE

13              UNITED STATES DISTRICT JUDGE

14

15     APPEARANCES:

16     Craig T. Merritt, Esquire
       Paul W. Jacobs, II, Esquire
17     Christian & Barton, LLP
       909 East Main Street
18     Suite 1200
       Richmond, Virginia  23219-3095
19
       Scott L. Robertson, Esquire
20     Jennifer A. Albert, Esquire
       Michael G. Strapp, Esquire
21     Goodwin Procter, LLP
       901 New York Avenue NW
22     Suite 900
       Washington, D.C.  20001
23     Counsel for the plaintiff

24
                     Peppy Peterson, RPR
25                  Official Court Reporter
                 United States District Court

```
 1    APPEARANCES:  (cont'g)

 2    Daniel J. Thomasch, Esquire
      Josh Krevitt, Esquire
 3    Gibson, Dunn & Crutcher, LLP
      200 Park Avenue
 4    New York, New York  10166

 5    Christopher D. Dusseault, Esquire
      Jason C. Lo, Esquire
 6    Gibson, Dunn & Crutcher, LLP
      333 South Grand Avenue
 7    46th Floor
      Los Angeles, California  90071
 8
      Dabney J. Carr, IV, Esquire
 9    Troutman Sanders, LLP
      1001 Haxall Point
10    Richmond, Virginia  23210
      Counsel for the defendant
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        P R O C E E D I N G S

2

3          THE CLERK:  Civil action number 3:09CV00620, ePlus,

4    Inc., versus Lawson Software, Inc.  Mr. Scott L. Robertson, Mr.

5    Craig T. Merritt, Ms. Jennifer A. Albert, Mr. Michael G.

6    Strapp, and Mr. Paul W. Jacobs, II, represent the plaintiff.

7          Mr. Jason C. Lo, Mr. Daniel Thomasch, Mr. Josh

8    Krevitt, Mr. Dabney J. Carr, IV, and Mr. Chris D. Dusseault

9    represent the defendant.  Are counsel ready to proceed?

10         MR. ROBERTSON:  Plaintiff is, Your Honor.

11         MR. THOMASCH:  Yes, Your Honor, for the defendant.

12         THE COURT:  All right.  Let's just take the ePlus,

13   the plaintiff's motions first.  All right.  The first one is

14   Mr. -- the plaintiff's motion to strike Mr. Putnam's testimony

15   about royalties.

16         MR. THOMASCH:  Your Honor, before we start, could we

17   be heard briefly, just a suggestion on the order?

18         THE COURT:  On what?

19         MR. THOMASCH:  A suggestion on the order.

20         THE COURT:  Sure.

21         MR. THOMASCH:  I just wondered whether or not the

22   Court would entertain the possibility of having the argument

23   first on the Weaver and Niemeyer.  If we were at trial, that's

24   the one that would come up first in the way of making the

25   objections, and one of the issues with Dr. Goldberg is there

1   gets to be back-and-forth about who is responding to who, and

2   if we did the orders in the motion -- in the order in which

3   they would come up in court, we would see sort of what the

4   plaintiff's case is and then what the response to the

5   plaintiff's case is.

6           THE COURT:  I think I'm going to cut through all

7   this.  I'm going to tell you something.  In reading these

8   reports, both of you have got to get your feet back on the

9   base.

10          I gave a claim construction, and no expert may say

11  one word that deviates from that claim construction, and the

12  consequence of doing that in this case is that the expert will

13  walk out that door, and here's why:  Because the competing

14  reports and the briefing you all have done have tried to

15  convert this into another infringement trial, and that isn't

16  what it is, and it's not going to happen.  And no expert is

17  going to -- if I'm wrong about the construction, I am wrong,

18  and what they will say is this:  If they're talking about the

19  claim construction, they will have the claim construction in

20  front of them.  They will not say one word that varies from

21  that, and they will say, this RQC doesn't fit that or does, if

22  we ever get to that point, because, and they will say it in

23  that order, that way, and the first time I hear one of them

24  putting in a term or a construct of any kind that is not what's

25  in the claim construction, the expert -- the consequence is

1    that expert is out of here.

2           You all have made, both of you, this into exactly

3    what it shouldn't be.  The first issue here is is it colorably

4    different, and we're going to try that issue first, and that's

5    all we're going to try first.  And if it's colorably different,

6    then we have a different question, but we are not going to mesh

7    these together.

8           This whole thing has gotten completely out of hand,

9    and it's gotten out of hand because the experts can't keep

10   their hands out of the Court's business, and it's gotten out of

11   hand because the lawyers can't keep the experts from keeping

12   their hands out of the Court's business.

13          Now, what I'm going to do -- I have to find that an

14   expert will help the Court in resolving a matter or an issue or

15   in understanding evidence, and I don't need the experts to help

16   me to do that if they're going to further obfuscate things and

17   make this trial into a convoluted mess to try to redo claim

18   construction or to twist the logical meaning of things, and

19   these experts are out of hand.

20          There's no reason for an expert to have a 400-,

21   500-page report.  There isn't any reason for that.  The simple

22   issue in this case at this stage is is it colorably different,

23   and if it is, that's one thing.  If it's not, that's the end of

24   it right there.  It goes no further as I read *TiVo*, nor your

25   briefing.  That is the end of it.  It's over.

1          That's the way we're going to try the case, so you're

2    going to get your experts ready to go that way and explain to

3    me first why it's colorably different and why it's not, in your

4    case, colorably different.  The battle of the experts has

5    turned this thing into something that it was never intended to

6    be.

7          We might as well just have had a whole other trial.

8    We might as well throw the first trial out the window and

9    disregard what the jury said and the jury did.  It may be that

10   I was wrong, but the experts have gotten this thing really out

11   of whack, and I don't care for it.

12         Do you have any opposition to the proposal that Mr.

13   Thomasch made about the order of proceeding this morning?

14         MR. MERRITT:  Your Honor, we're indifferent as to the

15   order in which we proceed.

16         THE COURT:  I don't mind proceeding that way, but I

17   want you to talk about Niemeyer, Weaver, Goldberg with what I

18   said in mind.  I just don't want -- and I understand now why

19   you think you all thought this was going to take eight or ten

20   days.

21         It's because -- it's not going to take eight or ten

22   days the way we're going to handle the experts now, so I don't

23   mind handling it that way, Mr. Thomasch, but I want you all to

24   understand that this farce that has been going on with these

25   expert reports are over.  They are not helpful to me.  They are

1  not.

2         I've read the *TiVo* case.  I understand, I think, what

3  it says.  I think I understand your-all's interpretations of

4  what needs to be done in the case in this case in order to deal

5  with *TiVo*, but the expert reports aren't helping me.  All they

6  are doing is confusing the issues and causing delay, and that

7  Rule 403 applies just as much in a bench trial as it does in

8  another trial, in a jury trial.

9         All right, I don't mind going -- do you want to do

10  Weaver?

11         MR. MERRITT:  Your Honor, the only thought I would

12  have on this is ePlus, being the plaintiff and having moved --

13  if we're going to start with the colorable difference

14  infringement issues, we might want to start with ePlus's

15  Goldberg motion.

16         THE COURT:  Start with Goldberg and then go with

17  Weaver if that's the way you all want to do that.  I don't care

18  which experts we do.  I just want to go ahead and get it done.

19         But I want you to tell the experts that they are --

20  they are bollixing up the works.  They're not helping me, and I

21  think that sometimes it's hard for lawyers to control the

22  experts, but they're going to find -- and if I were a firm, a

23  business that was paying an expert to do something, and the

24  expert came in here and walked out the door because they

25  couldn't pay attention to what the rules were, I wouldn't pay

1    the expert.  The expert would have lost his very purpose.

2         All right, let's go ahead with Goldberg.  Who is

3    going to do that?

4         MR. ROBERTSON:  That would be me, Your Honor.  Your

5    Honor, we have some slides that we hope will assist the Court

6    if I may hand up a copy for Your Honor and a copy for your law

7    clerk, Ms. Russo.  They're also going to be on the screen, but

8    I know how Your Honor prefers sometimes to have a hard copy.

9         THE COURT:  When my new glasses come in, it may be

10   better.

11        MR. ROBERTSON:  Thank you, Your Honor.  Good morning,

12   may it please the Court, if we could have the first slide.  I'm

13   very sensitive to what Your Honor was just saying with respect

14   to the issues of the reports, and we have endeavored to make

15   sure that Dr. Weaver's and Mr. Niemeyer's reports are

16   consistent with the Court's claim construction.

17        We have no intention and no desire to reargue claim

18   construction, and *TiVo* makes quite clear that that is not the

19   case, and, indeed, we briefed that.

20        What I have here are six bullet points, six

21   categories we believe that are Dr. Goldberg's improper opinions

22   or arguments.  I might even call them six buckets, Your Honor,

23   that I'm going to try to organize for you and show some

24   examples from the report.

25        As you know, we produced as part of our motion a

color-coded copy of Dr. Goldberg's report that has the
paragraphs that we think are offensive to the Court's prior
rulings in this case, that are the law of the case, and that
are inconsistent with the *TiVo* decision highlighted so that the
Court would have some ease of reference in doing that.

THE COURT:  Is that Exhibit 30?

MR. ROBERTSON:  I believe it was Exhibit 1 to the
opening report, Your Honor, but I have extra copies that I can
provide to the Court.  Exhibit 1 to the opening brief.
Exhibit 30 might be the report that was not color-coded.

THE COURT:  All right.

MR. ROBERTSON:  So, Your Honor, first, we think Dr.
Goldberg, a computer scientist, improperly offers opinions on
the law that are obviously the province of the Court.

THE COURT:  They say that he's not going to do that,
don't they, in their response papers to you?

MR. ROBERTSON:  I would hope that would be the case,
Your Honor.

THE COURT:  And I have just -- we're not going to
hear any law from him.

MR. KREVITT:  Your Honor, if I may, we can
short-circuit that.  Of course Dr. Goldberg will not be opining
on the law at all.

THE COURT:  And if he does, do you know what happens
to him after he does?

1           MR. KREVITT:  I do.  I assume the same thing will

2     happen to ePlus's expert who does precisely the same thing.

3           THE COURT:  The same rules apply to everybody.

4           MR. KREVITT:  Your Honor, the Court need not be

5     concerned that our expert will be offering any opinions on the

6     law.

7           THE COURT:  Does that take care of that point?

8           MR. ROBERTSON:  I think it does.  If I can just

9     briefly respond, is Dr. Weaver doesn't do anything of the sort,

10    Your Honor, other than to say that I understand what the

11    standard is in *TiVo*, and I need to apply that standard to the

12    facts on what a colorable difference is or what a colorable

13    difference is not.

14          Obviously, every expert needs to apply his opinions

15    to the facts and the legal standard that are before him, and

16    that's all that Dr. Weaver does when he says, here's the

17    standard, and I have to show that it's satisfied.

18          THE COURT:  I will assume that both of them have read

19    into the standard, and then I will decide whether their

20    evidence meets that standard or not.  I don't even need them to

21    tell me that what they're doing meets the standard.  It either

22    does or it doesn't on the merits of the case.

23          MR. ROBERTSON:  Understood, Your Honor.  The second

24    issue that we think is improper of Dr. Goldberg's report and

25    opinions is that he does offer claim constructions that are

1    inconsistent with the Court's *Markman* order and that are not

2    even relevant to some of the issues that need to be addressed

3    here.

4           The third issue that we have problems with is the

5    fact that Dr. Goldberg is rearguing infringement and invalidity

6    issues that were either settled at trial or were not subject to

7    modifications to the RQC product.  So this is important, Your

8    Honor, because I think you made perfectly clear at the

9    November 8th hearing we had on the standards of *TiVo* that we

10   were only going to deal with the three modifications, and we

11   were not going to go outside of those modifications.

12          So, for example -- let me just give you the one

13   egregious example that I think is out there, is there are

14   significant discussion of the item master in the infringing

15   configurations and whether that satisfies a multi-catalog

16   database.

17          Now, the item master wasn't modified, Your Honor, and

18   so, therefore, it should not even be the subject of any

19   opinions or reargument on non-infringement.

20          THE COURT:  Well, they say that you have -- what is

21   it -- Mr. Weaver has 30 references or 13 pages or something

22   like that to item master, and all that Dr. Goldberg is doing is

23   responding to it.  Ms. Russo -- excuse me one minute.

24          MR. ROBERTSON:  Your Honor, are you looking for the

25   color-coded copy?

```
 1            THE COURT:  That would be helpful to have, but I was
 2    looking for my file and my briefs on that point.  I think I
 3    mislaid them.  All right.  So what about it?  What about your
 4    fellow?
 5            MR. ROBERTSON:  Your Honor, I think what's important
 6    here is obviously ePlus bears the burden of proof by clear and
 7    convincing evidence to show that there are no colorable
 8    differences, and one of the things that Dr. Weaver is going to
 9    point out is what has not changed with respect to the
10    infringing configurations.
11            In other words, that -- the test under TiVo is
12    whether or not the change, if there is a change -- in fact,
13    when we get to the substance of this, we're going to point out
14    to the Court that we don't even think there have been
15    significant changes or changes at all with respect to the
16    source code, but what Dr. Weaver is going to say when he's
17    talking about whether there's been substantial changes is he's
18    going to point out what has not changed.  So with respect to
19    the item master, all Dr. Weaver is going to say is the item
20    master has not changed.  In fact, I had --
21            THE COURT:  Why did it take him 30 paragraphs to say
22    it?  What do you contend it is, 13 or 30?
23            MR. KREVITT:  Your Honor, it is 30.
24            THE COURT:  Why does it take 30 paragraphs for him to
25    say that?  You can say that in a minute.
```

1          MR. ROBERTSON:  He can say it in a minute, Your

2    Honor.  He was rebutting Dr. Goldberg's report which is 140

3    pages and some 300-plus paragraphs --

4          MR. KREVITT:  I hate to interrupt.

5          THE COURT:  Don't then.  That's a good thing to do.

6    We'll get to it.  You'll get your chance.

7          MR. ROBERTSON:  The issue was -- it came up is that

8    was the evidence upon which we relied to prove our

9    infringement.  The fact is, Your Honor --

10         THE COURT:  What was the evidence?

11         MR. ROBERTSON:  That the item master satisfied the

12   limitation of one or more product catalogs.  We did it out of

13   an abundance of caution, because Dr. Goldberg goes through at

14   length and argues that the item master is not a multi-catalog,

15   that it's not published by a vendor, all of the same

16   arguments --

17         THE COURT:  Is that one of the three things that was

18   listed -- that's changed when -- in November?

19         MR. ROBERTSON:  No.  So if Dr. Goldberg doesn't

20   testify about it, Dr. Weaver doesn't need to testify about it

21   other than to say it's not changed.  I put up a slide here,

22   Your Honor, number 39 of the Weaver slides.  I haven't handed

23   that up to Your Honor because we were focused on Goldberg, but

24   I just wanted to emphasize here that here's all the things that

25   no modifications have been made to, and if Dr. Weaver were to

1    say so in summary format, he'd say the only thing that's been

2    changed is RSS to RQC.  All these other components were part of

3    the infringing configurations.

4             THE COURT:  Then why do we need any evidence about

5    them at all?  If you all are both in agreement that there were

6    no changes, then -- and that the only changes were to RSS, then

7    that's the end of the whole matter.  We don't need to spend any

8    air time on that, do we?

9             MR. ROBERTSON:  I just think -- it wouldn't be a lot

10   of air time, but I think it's important to emphasize to the

11   Court that the changes are so insubstantial because the bulk of

12   what was the infringing configuration remains the same.

13            THE COURT:  Has Lawson -- do you see that Lawson

14   contends that there have been changes in any of these matters

15   here?

16            MR. ROBERTSON:  I think, in fact, they've conceded

17   that, Your Honor.

18            THE COURT:  Then why do we need to talk about it at

19   all?

20            MR. ROBERTSON:  We probably don't, Your Honor.

21            THE COURT:  All you need to do is to make your point

22   which is -- I guess what you're trying to say is that -- maybe

23   that's a wrong way to put it.  As I understand what you are

24   trying to say is that as evidence, that the real -- that there

25   has been no -- nothing but a slight change, a

1   less-than-colorable change has been made.  You can look at the

2   fact that of all of these items that were the components of the

3   infringement case, none of them have been changed at all, and

4   the focus, therefore, is upon RSS, and that alone is some

5   evidence that it is a change that is less than colorable; isn't

6   that your point?

7           MR. ROBERTSON:  Yes, sir.  That's the only point I

8   want to make.

9           THE COURT:  Then that can be made on the stipulated

10  record that there are no changes to these eight items:  The

11  foundation system, the process flow, the IC module, the PO

12  module, the requisitions model, the EDI, the item master, and

13  procurement punchout, and I think I saw Mr. Thomasch shaking

14  his head yes, that he agreed there had been no change -- they

15  were not contending there had been any changes to those.

16          MR. THOMASCH:  Absolutely, and our motion for Dr.

17  Weaver is predicated largely on this very point, and the issue

18  of responding to Dr. Goldberg is already coming up.  They

19  started this, and we agree with Your Honor, if it wasn't

20  changed, it shouldn't be in the trial.

21          MR. ROBERTSON:  We'll accept the stipulation, Your

22  Honor, but there was a lot of ink spilled on this item master

23  issue in Dr. Goldberg's report, and so --

24          THE COURT:  Now they're all gone.

25          MR. ROBERTSON:  Okay, good.

1          THE COURT:  We don't have to worry about them.

2          MR. THOMASCH:  May I address just very briefly so it

3    doesn't look like we've agreed to something?  There is not a

4    change in item master, and we're not talking about a change in

5    item master at all.  The only issue is one not for the

6    witnesses at all.

7          There is an issue for counsel and the Court, because

8    plaintiff has a burden under *TiVo* to show what was proved at

9    the first trial, and, of course, there was a very split verdict

10   about what was proved, particularly between configuration two

11   and three which I'll address in my argument, and there is an

12   issue that item master is relevant to as to whether or not the

13   statement that Mr. -- Dr. Weaver actually just says, I assumed

14   it was but I don't know if the jury accepted that.  And so we

15   do want to talk about what the verdict means, because *TiVo*

16   tells us what was contended and proved is the test.

17         THE COURT:  No.  What was contended and proved is

18   resolved by the jury's verdict, and that's all we're going to

19   deal with.  If it's been found to have infringed, we'll presume

20   the jury accepted the testimony of the person who proffered the

21   case for infringement.  That's enough, because otherwise what

22   you just said is, we're going to retry the case, and we are not

23   going to do that, Mr. Thomasch.  It's not happening.

24         MR. THOMASCH:  We don't want to retry the case at

25   all.

1          THE COURT:  That isn't what *TiVo* means I don't think,

2    and I've not seen a single case that says that's what *TiVo*

3    means.  I may be wrong about it, but I don't believe that's

4    what it means, and I don't believe it actually says that.

5          MR. THOMASCH:  I'd ask the Court to let me address it

6    in our argument --

7          THE COURT:  I'll deal with it.  You can deal --

8          MR. THOMASCH:  It is not a testimonial issue for the

9    expert, we agree.

10          MR. ROBERTSON:  Your Honor, this is another point I

11    want to make with respect to Dr. Goldberg, and that is not only

12    is he a computer scientist, but he also purports to be a

13    mind-reader and interprets what the jury found as far as what

14    the infringing configurations are and what the evidence is that

15    supports it, and I think that is a pointless and fruitless

16    exercise for us to try to go in and divine what they were

17    thinking.  The verdict is the verdict.  The system

18    configurations were the system configurations, and we are

19    focusing on what the modifications should be.

20          The other thing I wanted to address were Dr.

21    Goldberg's introducing new theories in evidence that weren't

22    disclosed in the Court-ordered response to interrogatory number

23    five, and I'll have some examples of that, but the Court made

24    very clear at the November 8th hearing that that circumscribed

25    the inquiry and it was to be nothing further than that.

1        THE COURT:  Why do we need to worry about that?  If

2    his foot goes off that base, the testimony he gives will be

3    stricken.  The objection to it will be sustained.

4        MR. ROBERTSON:  Then I will just be ready and nimble

5    to make my objection should he err into that territory.  The

6    fifth point I wanted to make, Your Honor, was that Dr. Goldberg

7    characterizes the other witnesses' testimony, Dr. Weaver and

8    Dr. Niemeyer.  I know from this Court's rulings that that's

9    just improper.

10        THE COURT:  That's not going to be allowed either,

11    and Mr. Thomasch's briefs say they're not going to do it, and

12    if he starts doing it, he can walk out the door, because life

13    is hard enough in matters such as this without having to have

14    him characterize somebody else's testimony.

15        MR. ROBERTSON:  The final point, Your Honor, is

16    that Dr. Goldberg --

17        THE COURT:  And I agree that, in fact, he does

18    characterize it, and, in fact, I've gone back and looked at

19    some of the testimony that he characterizes, and he actually

20    mischaracterized it, but I'm not quite so sure that you all

21    didn't do some of the same thing which is why I don't want to

22    have any of this in the case.

23        MR. ROBERTSON:  I understand, Your Honor.  And so the

24    final point is Dr. Goldberg actually relies on arguments made

25    in opening and closing, which are not evidence, in order to try

1    and characterize ePlus's position.

2              THE COURT:  And they say he's not going to do that,

3    and if he does, the objection will be sustained.  I don't want

4    to hear anything he's got to say about what the lawyers said.

5    It doesn't make any difference.

6              MR. KREVITT:  Would you like me to respond?

7              THE COURT:  When your time comes.

8              MR. KREVITT:  Okay.

9              MR. ROBERTSON:  Your Honor, so let me just give you

10   some examples of Dr. Goldberg's claim constructions that

11   deviate from the Court.  I won't belabor this because I've

12   heard the Court's ruling, but if we can go to slide six,

13   please.  Here's Dr. Goldberg --

14             THE COURT:  That's slide six in the package you

15   handed me?

16             MR. ROBERTSON:  Yes, sir.  It says, "Examples of Dr.

17   Goldberg's Improper Claim Constructions."  Let me focus on --

18   here's Dr. Goldberg's report at paragraph 330 and 331.  It

19   says, and I'm going to after the ellipses, "Because RQC does

20   not let users utilize more than one catalog in a given

21   requisition, it also cannot infringe."

22             THE COURT:  We don't need to hear that opinion of any

23   kind.  The first question we need to -- we don't get to that

24   until we get to the point that we find that there has been a

25   change that is more than colorable under *TiVo*; isn't that

1    correct?

2            MR. ROBERTSON:  I think that's right, but I don't

3    want to have this Court -- one of the issues here is -- one of

4    the alleged modifications is they have taken the requisition

5    process, and they have limited the ability to go -- to put a

6    punchout item with an item master item on a requisition, for

7    example, or they have limited the ability to put one punchout

8    item from one vendor with another punchout vendor item on the

9    same requisition and then generate multiple purchase orders.

10   That doesn't avoid infringement under the Court's claim

11   construction --

12           THE COURT:  Why do I need an expert to tell me that?

13           MR. ROBERTSON:  Because what Dr. Goldberg wants to

14   opine is that there's a new claim construction that he's come

15   up with and that you need to be able to do that ability.

16           THE COURT:  We're not going to do that.

17           MR. ROBERTSON:  That's fine, Your Honor.

18           THE COURT:  I'm not going to hear him do that.  I

19   don't need him to do that.  If he wants to say, I have looked

20   at this, that, and the other, and this does that, then he can

21   say, this does that, but that's the end of it.

22           Until he says in my -- if he then wants to render an

23   opinion on whether it's more than colorable, he can do that,

24   and I'm going to decide the more than colorable before I hear

25   any other evidence in the case.

1           This case is going to get bifurcated, and I'm going

2    to clean it up.  I have to clean it up that way simply for this

3    reason:  Your experts are out of hand, and his experts are out

4    of the hand.  They're all out of hand, and you all are trying

5    to retry the case, and I'm just not going to do that.

6           MR. ROBERTSON:  I certainly don't want to retry the

7    case, Your Honor.

8           THE COURT:  That's the first thing we're going to

9    try, is is it more than colorably different, and for the most

10   part, that can be decided by evidence that isn't technical.

11          If the perception of the changing person is that it's

12   making a change that is window-dressing or cosmetic, then that

13   person is bound by that view, I think, and that's the end of

14   it, but the first thing we're going to do is have the trial on

15   the issue of is it more than colorably different.

16          I'm going to stop the proceeding.  I'm then going to

17   make a decision, and if I make the decision that it's not more

18   than colorably different, as I read *TiVo*, this case is over

19   except as to what happens as a consequence of relief.  Isn't

20   that a correct procedure?

21          MR. ROBERTSON:  I think it is with one caveat, Your

22   Honor, and that's what I want.  This is why I'm up here.  Your

23   Honor, you're preaching to the choir here because we do want --

24          THE COURT:  What exception do you want to that?

25          MR. ROBERTSON:  The only issue is the colorable

1   difference inquiry needs to apply to this Court's claim

2   construction, not a different claim construction.

3           THE COURT:  I understand that, and they understand

4   that, I think, now.

5           MR. ROBERTSON:  Then the point has been made, Your

6   Honor.  I'm going to move on to the other issues, and I think

7   Your Honor has already made clear, if it's not been modified,

8   they're not going to be able to talk about it.

9           THE COURT:  That's what we focused all the discovery

10  in the case upon, was that there were several things they were

11  asked to specify what is it that are the modifications, and

12  they specified them, and we said, that's what the discovery is

13  going forward on.  Isn't that what happened?

14          MR. ROBERTSON:  Well, I hope so, Your Honor, but, you

15  know, I went through the depositions of the experts, and I

16  think it wasn't focused on that, and that's what concerns me.

17          THE COURT:  Well, as you were doing that, did you

18  then take comfort as you walked out of the deposition that they

19  have spilt a lot of time, effort, and ink on things that really

20  aren't going to be heard?

21          MR. ROBERTSON:  Now that I hear the Court, I have

22  much greater comfort, yes, Your Honor, but let me just go to

23  slide 12 if I could, for example.  Dr. Goldberg spends 11 pages

24  on some server-side code of this new RQC, and during his

25  deposition we asked him -- the next slide, if we could --

1    "You're not relying on any changes that were made to the

2    server-side code for any of your opinions related to the

3    purported modifications to the order list functionality, are

4    you?"

5         "That's correct."

6         So it's not relevant under *TiVo*.

7         THE COURT:  Why do I need to decide that all ahead of

8    time?  All you do is make the objection when it comes up, and

9    I'll sustain the objection, because if that's his answer,

10   that's the end of it, and guess what's going to happen to him?

11        He starts testifying to things like that that aren't

12   relevant that he admits in his deposition that he didn't do, he

13   can go out the door, because then we are wasting time and

14   confusing the record.

15        MR. ROBERTSON:  I just want to give Your Honor one

16   example of Dr. Goldberg's mischaracterizations of some of the

17   testimony which I think is improper, but I've heard Your

18   Honor's guidance on that.  If we could just go to slide 14,

19   this was what was included in Dr. Goldberg's report.  You can

20   see that through ellipses and through bracketed insertions, he

21   characterizes what Dr. Weaver testified at trial in order to

22   make, render an opinion.

23        If you'll turn to the next page, Your Honor, when you

24   see what's actually included, Dr. Weaver did raise these issues

25   at trial that they now say were not discussed and, therefore,

1   we can't address Dr. Goldberg's opinions.

2        I just think it's unfair, as you said, to

3   characterize testimony by leaving out some of the critical

4   parts of the testimony, but, again, I suppose I can reserve

5   that for cross-examination.

6        THE COURT:  Actually, they're not even going to be

7   thrill-seeker enough to ask him the question, because if he is

8   doing it, that is something that I've just ruled can't be done.

9        MR. ROBERTSON:  Fair enough, Your Honor.

10        THE COURT:  If for some reason he needs to rely on

11   something somebody actually -- that Dr. Weaver said at trial,

12   then he can rely on all of it, and put it right in front of him

13   and say that, but if he tries to -- if, during his testimony,

14   he wants to try to modify it and change it on the fly, he will

15   be excused because -- remember why the rules were changed a

16   long time ago.  Stop this nonsense, and we're not going to have

17   it now.

18        I'm sure now they know not to ask him those

19   questions.  You agree that the expert report doesn't come into

20   evidence anyway.  We're going to wait until we hear what he

21   actually says at trial.

22        MR. ROBERTSON:  I do agree.  You know, we would not

23   want the expert reports into evidence.

24        THE COURT:  No, they're not in.  They're hearsay.

25        MR. ROBERTSON:  I guess, Your Honor, the only point

1    is, if you recall, Dr. Weaver testified for almost three days,

2    and I don't want to be in a situation -- and the totality of

3    that evidence that the jury heard and made their verdict on, so

4    I don't want to be in a situation where Dr. Goldberg gets up

5    and quotes, you know, verbatim a large section --

6         THE COURT:  Now you've lost sight of another matter.

7    If he didn't put the verbatim text into his report, I now

8    having reviewed, then he starts talking about the verbatim

9    text, what has he done?

10        MR. ROBERTSON:  He has stepped out of Your Honor's

11   ruling on the scheduling order that he can't testify to

12   anything that's not in his expert report.

13        THE COURT:  Right.  So apply your craft and use it in

14   that fashion when it comes up if it comes up.

15        MR. ROBERTSON:  Your Honor, I really -- those are the

16   major categories.  I think I understand Your Honor's position

17   on all of those categories.  I think Your Honor has the report.

18   We tried to make it user-friendly with color-coding, and I

19   think Your Honor can make rulings on that.

20        I'm perfectly prepared to be a standup trial lawyer

21   on my feet if he deviates from those things.  There are some

22   specific claim construction issues that I think he has raised

23   in his report that deviate from Your Honor's claim

24   construction, but if he gets there, if he gets that foot off

25   that base --

1          THE COURT:  I can read those in the report.  If in

2     the report when I'm reviewing this his interpretation of a

3     claim differs from that which was expressed in the *Markman*

4     opinion, then that opinion is not going to be useful to me --

5          MR. ROBERTSON:  All right, thank you, Your Honor.

6     That's all I have.

7          THE COURT:  -- as the finder of the fact, and it

8     won't fit in the words of *Daubert* in any event.  I think that

9     we just need to -- what happens is this:  That when experts

10    deviate so widely and roam so broadly from the rules by which

11    they ought to be testifying, then the process of having the

12    reports, taking depositions on them, of rebutting them becomes

13    a very wasteful exercise, and nowhere is that more manifest

14    than in this case.

15         MR. ROBERTSON:  Thank you, Your Honor.

16         THE COURT:  Mr. Krevitt.

17         MR. KREVITT:  Good morning, Your Honor.  I have some

18    slides as well, Your Honor, which, in light of Your Honor's

19    guidance, I suspect we will not get through, but if I may hand

20    them up.  We had some technical difficulties, so I have two

21    copies --

22         THE COURT:  You had what?

23         MR. KREVITT:  We have technical difficulties, so we

24    have two forms, and you can choose the form you like, and the

25    other is for your clerk.  We also will have a copy for you.

1          Very quickly, Your Honor, I just want to address a

2     few points that Your Honor made, and at the outset, I want to

3     address what -- the comments that Your Honor has made to both

4     parties about the case being out of control, the experts being

5     out of hand, this being a runaway process, and all I can tell

6     you, Your Honor, is if I read ePlus's briefs, I would agree

7     with your honor.

8          If I read ePlus's briefs sitting in your shoes,

9     wearing your robe, I would think that Dr. Goldberg went off the

10    reservation, he rendered all new claim constructions, he's got

11    brand new theories.  None of it, sir, none of it is true.  I

12    would like to make one point.

13         If you turn not to my slides but to ePlus's slides,

14    slide number five, slide number five, which was handed up to

15    Your Honor, a copy of which was intended to be left with Your

16    Honor, is entitled "Dr. Goldberg's Improper Claim

17    Constructions," and it lists six.  The first five are false.

18    These are not claim constructions Dr. Goldberg offers.  You

19    will not find them in his expert report.  They are not true.

20         Every single heading in ePlus's brief, every single

21    heading in every one of ePlus's briefs begins with Lawson lied,

22    Lawson flagrantly had a falsehood, Lawson distorts, Lawson

23    violates every single court rule that this Court has ever

24    imposed, and none of it, sir, none of it is true.

25         THE COURT:  You'd be right much a thrill-seeker to do

1     that, would you?  You wouldn't get very far, would you?

2             MR. KREVITT:  I don't know, Your Honor.  That's the

3     concern I have, candidly, because when I sit --

4             THE COURT:  Mr. Krevitt, it isn't just the briefs

5     that have made this out of control.  The expert reports have

6     made it out of control.  They are really not helpful.

7             MR. KREVITT:  I understand.

8             THE COURT:  You've got a man, Goldberg, he may as

9     well be a lawyer the way he's arguing in his report.  That

10    doesn't help me.

11            MR. KREVITT:  I understand that, Your Honor.  I do.

12    I don't think the characterization -- obviously Your Honor read

13    the report, and Your Honor is entitled to Your Honor's view.

14    There are the two issues.  Your Honor laid them out perfectly

15    well, of course:  The colorability issue and then the

16    infringement to the extent we get there.

17            On the infringement issue, *TiVo* makes perfectly plain

18    that we look at what was alleged at trial, what did ePlus argue

19    constituted infringement, and then were the modifications

20    relating to those changes sufficient to render the product more

21    than colorably different.  You cannot do that analysis, Your

22    Honor, without looking at what happened at trial, what the

23    arguments were made.  Mr. Robertson doesn't want Dr. Goldberg

24    to be able to consider what Mr. Robertson argued to the jury.

25            THE COURT:  He's not going to.

1          MR. KREVITT:  I understand, Your Honor, but it is

2     critically important for the Court to understand, because *TiVo*

3     requires the Court to understand, what Mr. Robertson argued to

4     the jury.  That's what was contended and then understand

5     whether or not the changes that Lawson made rendered the

6     product, in light of those contentions by ePlus, more than

7     colorably different, and the reason I respectfully submit, Your

8     Honor, that Mr. Robertson doesn't want Mr. Robertson's comments

9     considered is because they are fundamentally inconsistent with

10    the positions being taken here, and I can demonstrate to Your

11    Honor, and if the Court will indulge me, I will give the Court

12    one example and walk the Court through that.

13          Before getting to that, I also wanted to address, and

14    I know Your Honor has made no ruling, and I'm not suggesting

15    Your Honor has made up Your Honor's mind on any of these

16    issues, but on our conference that we had on Thursday of last

17    week concerning the privilege issue and again this morning,

18    Your Honor raised the possibility that there will be documents

19    that suggest this was window-dressing, and, again, I'm not in

20    any way suggesting Your Honor has made up the Court's mind

21    before the Court hears the evidence on that.

22          There is -- it would be, in my view, impossible for

23    someone sitting in Your Honor's shoes not to have that view.

24    It is repeated in every single ePlus brief.  So take just the

25    Goldberg brief, just the Goldberg motion.  They filed a motion

1  to strike my expert.  I wrote an opposition explaining why my

2  expert should not be struck.  They then wrote a reply.

3        The first third of their reply does not even mention

4  Dr. Goldberg.  The name -- I want to be very clear.  The name

5  Goldberg does not appear on the first page, the second page,

6  not on the third or fourth.  It's the bottom of the fifth page

7  before you even see the name Goldberg.

8        Instead, what they do, Your Honor, as they have done

9  in every motion, is they cherry-pick out of documents, they

10  string together a story, they try to convey to Your Honor an

11  impression, and only then, having conveyed that impression, do

12  they purport to get to the merits.

13        I will tell Your Honor, I had a debate in thinking

14  about how to prepare for this argument.  I thought about it,

15  and, in fact, we prepared slides that went through every single

16  one of those, every one, and explained why they are false.  It

17  occurred to me that that's probably not how Your Honor would

18  want to spend the morning.

19        THE COURT:  You can do that at trial.

20        MR. KREVITT:  I understand.

21        THE COURT:  If they offer it at trial, you can do it

22  at trial.

23        MR. KREVITT:  But, Your Honor, the point is, we are

24  here arguing motions.  We are here arguing motions, and I am

25  addressing the arguments they are making that result,

1  contribute to the rulings Your Honor is rendering which is

2  reasonable.  So I chose just one, and the reason, if Your Honor

3  will indulge me, the reason I chose this is because it has come

4  up.

5              On page three --

6              THE COURT:  Of yours or theirs?

7              MR. KREVITT:  No, no, ePlus's reply brief, Your

8  Honor, and I have this in the slides that we handed up, Your

9  Honor, if I can find that slide.  This is slide 1711 of ours,

10  and it's page three of ePlus's motion to strike their -- their

11  reply brief in connection with their motion to strike.

12             Remember, we're talking about Goldberg ostensibly in

13  this brief.  We should be.  This is slide 1711, Your Honor.

14  It's -- I'm not certain why we have that page convention, but

15  we do.  It's about ten slides in.

16             THE COURT:  All right.  Well, I have it here.  Is

17  this the pig one?

18             MR. KREVITT:  Yes, Your Honor.

19             THE COURT:  Page three of their reply brief.

20             MR. KREVITT:  I wanted to point out what Lawson --

21  excuse me, what ePlus represents to the Court.  This is what

22  ePlus represents to the Court.  "After the injunction entered,

23  within two days, Lawson was acknowledging that most of the

24  changes they had suggested were lipstick on a pig."

25             That sounds bad to me.  That sounds like Lawson was

1   acknowledging that most of the changes they had suggested were

2   lipstick on a pig.  It's also false.  If you flip to the next

3   page, Your Honor --

4           THE COURT:  They cite Christopherson Exhibit 38.

5           MR. KREVITT:  Correct.

6           THE COURT:  Email from Bragstad to Anderson and

7   Hogan.

8           MR. KREVITT:  Correct, Your Honor.  I'm going to show

9   you that document.  If you'd flip to the next page, sir.

10          THE COURT:  Which page is this?

11          MR. KREVITT:  1712 of the slides.  So 1711, we just

12  put up the quote from ePlus's reply brief, and then I wanted to

13  put in the entire email here.  Your Honor, we left out the to

14  and from, and then there's some replies above it that are not

15  germane.  This has been submitted to the Court.

16          This is what the email actually says, and I submit to

17  Your Honor, it not only is inconsistent with what ePlus has

18  repeatedly represented to Your Honor.  This is not the first

19  time.  This was in the privilege motion, this has been

20  elsewhere.  This is in Weaver's expert report to demonstrate

21  purportedly that the changes were superficial, but if you

22  wouldn't mind, Your Honor, let's look at what the document

23  actually says.  This is from Dale Christopherson.

24          Quote, Nancy and Jim, I wanted to make sure that the

25  support leadership team was aware of the changes that RQC has

1  brought.  Besides some label/visual (or lipstick on a pig as

2  Dale so eloquently puts it) changes there were three functional

3  adjustments."

4          What Dale Christopherson is saying on the face of

5  this document, no spin, sir, is we had some changes, they were

6  visual and label, those are lipstick on a pig.  Aside from

7  those lipstick on a pig, though, we've got three functional

8  changes, and then, Your Honor, if you look at the three,

9  they're the changes that we're talking about in this

10  proceeding.

11          The first one, "Instead of using the shopping cart,

12  all shopping items are put directly into the requisition."  The

13  second, "You can no longer category search at the fourth level,

14  it has been limited to the third level."

15          As Your Honor knows from reading the papers, these

16  are critical issues in this case.  They are not lipstick on a

17  pig.  They were never characterized as lipstick on a pig.

18  Lawson never acknowledged that the changes it was making, let

19  alone most of the changes it was making, were lipstick on a

20  pig.

21          It is this repetition, with all due respect to ePlus

22  and its counsel, this miss -- serial recidivist

23  mischaracterizations of our documents that have created an

24  impression that Lawson made only window-dressing changes.

25          It started, Your Honor, with how this case was filed.

1    They didn't move for contempt.  They filed an order to show

2    cause as to why we shouldn't be found in contempt, and then

3    Your Honor, in September, before we had even filed an

4    opposition brief to the motion, Your Honor held a hearing, and

5    it was represented by ePlus's counsel that it was all

6    window-dressing, that the changes were superficial, that they

7    hadn't even been made.

8            It was also represented to Your Honor that

9    misrepresentations were made to the Court about whether there

10   was a design-around in the works, and Your Honor is familiar

11   with this issue.  There was a hearing, an evidentiary hearing.

12   The issue of the redesign did not come up, and in every paper,

13   ePlus has hammered this theme that somehow Lawson was deceptive

14   to the Court because we did not mention the design-around.

15           What has never been mentioned is that four days after

16   that hearing, long before your injunction, sir, Lawson did

17   mention the design-around.  Shortly thereafter, ePlus -- in a

18   brief to the Court, shortly thereafter, within days, ePlus

19   addressed the design-around.  Then Your Honor held closing

20   argument.

21           Long before the injunction, Lawson's counsel stood up

22   in this courtroom and talked about the design-around.  ePlus's

23   counsel, Mr. Robertson, stood up at this podium and talked

24   about the design-around.  May 6th, weeks before an injunction

25   was put in place in this case, Your Honor, Lawson sent a

1    detailed, lengthy letter not only identifying the design-around
2    but describing it, describing the very changes that we're here
3    to discuss.

4          Your Honor, aware of that, because Your Honor had
5    been informed of it repeatedly, addressed it in the injunction
6    order.  And so --

7          THE COURT:  Mr. Krevitt, that's why I told them I
8    wanted the timeline on their allegations, because I knew what
9    had been said, and I knew what had been written.  Let's don't
10   get into that.

11         MR. KREVITT:  That's fine, Your Honor.

12         THE COURT:  I haven't made up my mind about that.
13   All I said this morning was that if -- I think most of it can
14   be dealt with by what people themselves say, and if, in fact,
15   what they call it, it was cosmetic, but the predicate for that
16   is, if that's what they say.

17         We can't decide that kind of thing in a motion.  You
18   decide that by looking at what they said and listening to what
19   they say on the witness stand.

20         MR. KREVITT:  Could not agree more, Your Honor.  I
21   was addressing the first third of ePlus's brief that had
22   nothing to do with Mr. Goldberg.

23         Now, if I understood Your Honor, Your Honor intends
24   to proceed with a procedure in which we will address the
25   colorability issue first.

1          THE COURT:  Right, and that's all I want to hear
2     first.
3          MR. KREVITT:  And then the infringement to the extent
4     we need to do that.
5          THE COURT:  That's what I want to hear --
6          MR. KREVITT:  We think that makes perfect sense, Your
7     Honor, and the reason we think it makes perfect sense is
8     because repeatedly, and Mr. Weaver testified to this point,
9     repeatedly ePlus is making the argument that if it infringes or
10    it still infringes, the changes can't be colorable, and that
11    conflates the issues, it's wrong, Your Honor should, as Your
12    Honor intends to, address the colorability questions first.
13         There are three changes, Your Honor.  There were
14    three changes, and just so that we're all --
15         THE COURT:  Those are the ones we are talking about
16    in the interrogatory, or was it number five or whatever it was?
17         MR. KREVITT:  That's exactly right, Your Honor.  Your
18    Honor has provided very useful guidance on all these issues.  I
19    just want to briefly touch on a few points that were made in
20    your discussion with Mr. Robertson, and if there's any
21    additional questions, of course I'd be happy to address them,
22    but I don't know that it's necessary that I run through our
23    entire presentation here.
24         And the first point is, I want to just mention what
25    interrogatory five asked for, because it's now being used, we

1    believe, in a way that it was never intended, Your Honor never

2    addressed, and it certainly wasn't written this way.

3            Interrogatory five asked explicitly for changes to

4    the source code.  That's all it asked for.  That's the totality

5    of the interrogatory, identify the changes to the source code.

6    The first thing we did, by the way, Your Honor, is we provided

7    the new source code, and we provided a DIFF which identifies

8    every single change.

9            ePlus wasn't satisfied.  I'm not rearguing that

10   issue, but they weren't satisfied, and they insisted that we

11   provide a narrative describing the changes.  It's not enough to

12   provide the changes, they wanted a narrative, and that's fine.

13   This issue was addressed with the magistrate judge.  The

14   magistrate judge ordered Lawson to provide that narrative, and

15   Lawson did in very short order, a 32-page narrative that

16   describes in detail all of the source code changes.

17           And I want to say something to Your Honor in absolute

18   terms that is inconsistent with what ePlus represents to the

19   Court.  There is not a single change in source code, not one in

20   Mr. Goldberg's report that is not identified in interrogatory

21   five, not one.  The notion that he is relying on changes to

22   source code that were not in interrogatory number five is

23   simply and demonstrably false.  We can demonstrate that in any

24   way Your Honor wishes.  I assume that how this will play out --

25           THE COURT:  I would suggest that when you ask him a

1   question about it, that you have him have in hand -- if it's

2   called into question the ability to call precisely where it is,

3   in fact, identified.

4              MR. KREVITT:  Yes, we will do that, Your Honor.

5              THE COURT:  That will probably solve the problem.  If

6   there's no objection, there won't be an issue.  If there's an

7   objection, then you'll have a way to deal with it.

8              MR. KREVITT:  I understand, Your Honor, and I further

9   understand that, so I don't have to sit at this podium, stand

10  at this podium too long, that not responding to many of the

11  statements that Mr. Robertson made will not in any way be

12  deemed acquiescence on my part.

13             The one comment, though, I do want to respond to is

14  Your Honor and Mr. Robertson had a discussion about claim

15  construction and whether experts are permitted to offer new

16  claim constructions or not, and Your Honor's guidance was

17  perfectly clear on that score, and we had no intention of doing

18  so in any event.

19             THE COURT:  That's where I got the idea.

20             MR. KREVITT:  Then Your Honor discussed the notion of

21  bifurcating and that we're going to do the colorability

22  question first.  The colorability question, as *TiVo* says, you

23  compare the modified -- we had a discussion about this some

24  months ago, Your Honor.

25             You compare the modified features with the old

1    features.  That's the comparison you do, and Mr. Robertson

2    said, yes, of course, but you do that in light of the claim

3    construction, and the claim construction issues, Your Honor,

4    are relevant to infringement, of course.  It's the first step

5    of any infringement analysis, is construing the claims, and I

6    understand we're not going to be doing that in this proceeding,

7    but that's an infringement issue.  It isn't a colorability

8    issue.

9         Colorability looks at the new product and the old

10   product, and I'll give you just one example, Your Honor, which

11   is addressed in all these papers.  If Your Honor turns, please,

12   to slide 1716, one of the issues at trial, as Your Honor will

13   recall, was an element dealing with converting elements and --

14   items, from one item to another item, and Your Honor construed

15   this term, and ePlus argued that it was satisfied by this

16   particular coding system, the UNSPSC coding system down to the

17   fourth level.

18        This is a hierarchy, Your Honor may recall.  You

19   started office equipment, and then you go down to another level

20   of specificity and down to another level of specificity, and

21   there was testimony that at the fourth level, the commodity

22   level -- that's what it's referred to -- there's sufficient

23   suitability, sufficient equivalents, general equivalents that

24   it satisfies the converting element.

25        That was the argument that ePlus made at trial.  The

1    jury evidently accepted that argument because they found

2    infringement of the claims that had that element.

3          THE COURT:  That was the only proof that was offered;

4    is that your point as to that point?

5          MR. KREVITT:  That is my point, Your Honor, and so

6    what I want to just show you, so you can have a picture, we're

7    not talking just about these things in the abstract, although

8    this would be hardly informative, if you turn to slide 1721,

9    these are not in dispute, these changes.  You will see that

10   what Lawson did is it removed the fourth level.

11         By the way, the trial was the roadmap, just as it

12   should be.  Lawson went to trial, it won some things, it lost

13   some things, and it went back to the drawing board, and it made

14   changes to its product in light of what happened at trial.  All

15   the proof related to the fourth level, the commodity level.

16   Lawson said, we have to get rid of that.  That's one way to

17   design around, so they did.  They got rid of the fourth level.

18         There's no factual dispute on that, no factual

19   dispute that you cannot go to the fourth level.  That is simply

20   not possible.  The system can be reconfigured to go to the

21   fourth level, but as the system has been adjusted in RQC, you

22   cannot go to the fourth level.

23         It is our contention that that change is a

24   more-than-colorable change.  They may contend it isn't.  Your

25   Honor ultimately will call ball or strike on that question, but

1    that's the question, is changing from the fourth level, being

2    able to drill down to the fourth commodity level, is changing

3    that to only being able to drill down to the third commodity

4    level a more-than-colorable change.  In our view it is.

5           The fact that it may still infringe -- we strongly

6    contend it does not, but even if it did -- is irrelevant.  *TiVo*

7    answers that question.  Your Honor may recall from reading

8    *TiVo,* and this point surprised me when I first read *TiVo,* that

9    there really was no dispute that the new product, the

10   designed-around product still infringed.  Echostar conceded

11   that one element, the PID filter, still satisfied a claim

12   element.

13          The district court said, well, that's enough for

14   contempt.  The Federal Circuit, en banc, said, no, that's not

15   what TiVo had argued at trial.  It doesn't count.  It's not in

16   the game.  If it infringes, let them file a new case.  They can

17   bring a new case, they can prove infringement.  We can proceed

18   that way, but in the contempt, what you look at is what was

19   alleged unambiguously, unequivocally.  That's what *TiVo* says,

20   unequivocally alleged and what was proven to infringe -- they

21   proved that infringed, can't deny that -- and what was the

22   change.  We changed it.  We don't have that which they allege

23   to be infringing any longer.

24          So that's not a claim construction issue.  We're not

25   -- they're not permitted to come in and say, well, the third

1    level, if we look at claim construction, it's still in there,

2    it still might infringe.  A, that's not a colorability

3    question, and B, it's precluded by *TiVo*.

4            So we agree with Your Honor, but I wanted to address

5    this notion that in doing the colorability analysis, you

6    somehow bring in all of the infringement aspects, the claim

7    construction and the proof or argument that the new

8    design-around infringes.  Those have to be separate.  *TiVo*

9    makes that clear.

10           And this is a real concern to us, Your Honor, because

11   Dr. Weaver testified at his deposition that he concluded that

12   things were not more than colorably different because, in his

13   view, they still infringe.  It is exactly that conflation that

14   the Federal Circuit, en banc, said is improper, and Your Honor

15   has made that perfectly clear, too, but I wanted to address

16   that, because, again, I have this concern, based on the

17   arguments that have been made, that there will be an effort to

18   slop in the infringement aspects.

19           The only question is what did they prove

20   unequivocally infringed, what was changed, and is that

21   change more than colorably --

22           THE COURT:  Well, if you continue to sell exactly the

23   same thing that was judged to have infringed, that's contempt,

24   isn't it?

25           MR. KREVITT:  If we continue to sell exactly the same

1   thing that was adjudged to infringe, that is contempt.

2            THE COURT:  Right, and if it's not colorably

3   different, you are selling the same thing.

4            MR. KREVITT:  Correct.

5            THE COURT:  Okay.  That's what *TiVo* said.  You all

6   are making it more -- and if you think -- I don't read *TiVo* to

7   require this delving into the mind of the jury that you all

8   seem to want to do, and if you want to try -- and I'm not going

9   to do it.  If I'm wrong, I'm wrong.

10           If the Federal Circuit thinks you can do that, then

11  they can find a way to do it.  I have sort of tried to do that

12  over the years in trying to understand what decisions juries

13  have made.  I've never really been successful in doing it, and

14  I'm not going to take it on now, and if the Federal Circuit

15  thinks that's what my job is, they can tell me that after this

16  case is over, but I'm not doing it here.

17           That's out -- that door is closed as far as I'm

18  concerned.  I don't think that's what they ever asked us to do.

19           MR. KREVITT:  No one is asking you to do that, Your

20  Honor, but, or period, but I want to add one point, and it's

21  this:  What *TiVo* says is you look at what was unequivocally

22  alleged and what was unequivocally proven.

23           THE COURT:  Then you are going to have to show me in

24  the trial record what was unequivocally alleged and

25  unequivocally proved, and I have to see that.  I don't think

1    that's actually what *TiVo* says, but I want to go back and read

2    it.  I think it says alleged and reasonably proved, I believe.

3              MR. KREVITT:  I don't think --

4              THE COURT:  But anyway, I'll go back and read it, but

5    we're not going to try the case over again, Mr. Krevitt, and

6    you're trying to do that, and we're not going to do it.  That's

7    just not allowed, and if you want to litigate that to the

8    Federal Circuit, that's fine.  If I'm wrong, they'll tell me

9    I'm wrong.  That's all right with me.

10             But I don't believe that court created a construction

11   of contempt that requires us to go back and litigate everything

12   that was done at trial.  I don't think that happened.

13             MR. KREVITT:  Sir, we completely agree, and it's why

14   on, for example, the converting element, the going to the

15   fourth level, the commodity, we shouldn't be having a dispute

16   at all.  There is no question every demonstration that Dr.

17   Weaver offered on this point went to the fourth commodity

18   level.  We eliminated the fourth commodity level.  How is it

19   that we're having a fight on that issue?

20             THE COURT:  Then maybe you'll win.  I don't know.

21             MR. KREVITT:  I understand, Your Honor, but I want to

22   make clear, we are not the ones that are trying to relitigate.

23   If, however, they now try to convince Your Honor that

24   notwithstanding that argument, they're still able to make a

25   case that the third level somehow satisfies, we have to be able

1    to come in and explain to Your Honor why that makes no sense.

2            And the only issue with respect to divining the mind

3    of the jury -- nobody wants to do that.  Nobody wants to do

4    that, but we have a situation, sir, where you had two

5    configurations, configuration two and configuration three, and

6    configuration two was found not to infringe.  Configuration

7    three was found to infringe.  Same claim, same claims.  One not

8    infringed, one infringed.

9            With respect to configuration -- if Your Honor, if I

10   haven't worn out my welcome and Your Honor would turn to slide

11   1749, this goes to the item master issue.

12           THE COURT:  You didn't change the item master.

13           MR. KREVITT:  We did not, sir.  I can perhaps save

14   time --

15           THE COURT:  Why are you talking about it then if you

16   didn't change it?

17           MR. KREVITT:  Your Honor, if item master cannot be an

18   issue in this litigation, you need not turn to slide 1749.  It

19   was not changed, that is true.  We do not believe that it

20   should be the basis of any allegations in this case.

21           THE COURT:  I thought Mr. Robertson agreed with you.

22           MR. KREVITT:  Very well, Your Honor.  You're welcome

23   to turn to slide 1749, but unless Mr. Robertson disagrees with

24   that proposition, I need not make any argument on the subject.

25           THE COURT:  How do you see that -- you've said

1    several times that you think that *TiVo* requires that you

2    ascertain what was alleged at trial and proved at trial.  How

3    does one in a contempt proceeding ascertain that?

4              MR. KREVITT:  Well, that's a good question, Your

5    Honor.

6              THE COURT:  That's the question you're going to have

7    to answer because you keep -- that's the lynchpin of your

8    argument, so I need to understand how you do it.

9              MR. KREVITT:  I completely agree.  The way we do

10   that, Your Honor, the way we all do that -- I don't mean Lawson

11   in this instance -- is we look at what happened at trial.

12             THE COURT:  What do you mean, you look at what --

13             MR. KREVITT:  I'm going to explain, Your Honor.  You

14   do that, I think, in several ways.  One, you look at what proof

15   was put on, what did their experts say.  Their expert alleged

16   that this device infringes because of this reason, and the jury

17   bought that or the jury did not buy that.

18             We have to -- unfortunately, Your Honor, we have to

19   look at what happened at trial, because as Your Honor points

20   out, it constrains us.  We also look at, and I think Your Honor

21   did not accept this suggestion that I made earlier, I think

22   it's entirely reasonable, I think it's required to look at what

23   ePlus sat here and told the jury.

24             They made a contention to the jury, rule in our favor

25   because of X, and if the jury ruled in their favor, that then

1    is what was alleged and what was proved, and if the jury did

2    not rule in their favor --

3              THE COURT:  No, that was what was argued.  Everything

4    that's argued is not proved.

5              MR. KREVITT:  I'm sorry.  I assumed the jury in my

6    hypothetical -- I may not have said it -- accepted the

7    argument.  You are exactly right.  My point simply is, you look

8    at the trial record, you look at what arguments were made by

9    counsel, what proofs were offered by witnesses, chiefly experts

10   probably but not necessary --

11             THE COURT:  How do you do that?

12             MR. KREVITT:  How do we do that?  It's actually --

13             THE COURT:  How do you do something like that?  How

14   on Earth would any human being charged with that responsibility

15   do that?  Tell me how.  How do you want me to do it?  That's

16   what I'm asking.

17             MR. KREVITT:  Well, Your Honor, let's take an

18   example, the commodity level example.  I don't think there will

19   be any serious dispute -- there may be a dispute here today

20   when we're just arguing, but I think we will be able to make

21   very clear to Your Honor easily -- we put in just a few of the

22   slides that Dr. Weaver relied on the fourth commodity level to

23   prove infringement.

24             THE COURT:  All right.  But Dr. Shamos says something

25   else.  Now, how do I decide which one of those the jury chose,

1    particularly when there's such a mixed verdict as this?

2           MR. KREVITT:  On this one, Your Honor, it's easy,

3    because on this issue, the jury did find that the converting

4    element was satisfied for some claims.  In every instance that

5    it was satisfied, it was proved, it was alleged and proved in

6    only one way, and it is those claims that have that element

7    that are the subject of this contempt hearing.

8           THE COURT:  You'll going to have to put together

9    something that shows that.

10          MR. KREVITT:  I completely agree, Your Honor, and

11   that's what Dr. Goldberg was attempting to do.

12          THE COURT:  Well, he didn't do it.

13          MR. KREVITT:  I understand, Your Honor, and we'll

14   need to do a better job.  If it's also -- if I may again be a

15   thrill-seeker.

16          THE COURT:  I don't want Dr. Goldberg to do it.  I

17   don't want to hear Dr. Goldberg.  What happens is you do it.

18   You put together what it is that you say is the proof.

19          MR. KREVITT:  Exactly.

20          THE COURT:  You don't need an expert to do --

21          MR. KREVITT:  We agree, Your Honor, and that's what

22   Mr. Thomasch was trying to convey earlier.  We had put it in

23   there because, Your Honor -- and it's important to keep in mind

24   the sequence.  Dr. Weaver went first, Mr. Niemeyer went first,

25   Dr. Goldberg responded.

1          THE COURT:  See, you all have gotten everything all

2     bollixed up because you let the experts get out of hand.  You

3     have an expert doing something that you should be doing.

4          MR. KREVITT:  We agree, Your Honor.  We will

5     demonstrate to Your Honor --

6          THE COURT:  And it was Goldberg who started it,

7     wasn't it?

8          MR. KREVITT:  No, sir.

9          THE COURT:  I mean who started doing all this

10    cut-and-paste and fixing the record together.

11         MR. KREVITT:  No, sir.  No, sir.

12         THE COURT:  The way I read the reports it was.  I

13    know the order of things.

14         MR. KREVITT:  I understand, Your Honor, and I'm

15    answering the question you are asking.  The answer is no.

16         THE COURT:  Well, anyway, how do you do this?  Tell

17    me how mechanically -- what are you going to do and how are you

18    going to do what it is you say needs to be done?  I need to

19    understand how you're doing it.  What are you going to do?

20         MR. KREVITT:  Your Honor, I'd want to think about

21    this and consult with my colleagues, but I think, Your Honor,

22    we can do that in any number of ways.  We could do that -- we

23    will need to do that for Your Honor.  We can do that in

24    briefing before trial.  We had suggested, Your Honor, a long

25    time ago before trial to do exactly this.

1    ePlus objected to that.  Your Honor ultimately said

2    the Court didn't need briefing, and that's obviously the

3    Court's prerogative.  We think this issue -- and again --

4         THE COURT:  It doesn't help me for you all to go back

5    and point fingers.  You are now eight sentences away from the

6    basic question I asked you which is how do you do it.

7         MR. KREVITT:  I think, Your Honor, we would need to

8    present those issues to Your Honor.

9         THE COURT:  How?

10        MR. KREVITT:  We could do that in written

11   submissions, we can have an argument --

12        THE COURT:  I'm trying to be more basic than that.

13   What is it that I will see in a written submission?  I'm not

14   talking about what mechanism do we select.  We'll figure that

15   one out, but what is it that I'm going to see?

16        MR. KREVITT:  I apologize, Your Honor.  I

17   misunderstood.  What you will see is the arguments that were

18   made at trial on each of our three modifications.  So we will

19   prove to Your Honor, we will show Your Honor, and ePlus,

20   presumably, would have to do the same, for each modification we

21   made, what was alleged at trial.

22        We would show that with what the experts argued or

23   opined, what lawyers contended to the jury, with what documents

24   were shown, what demonstratives were shown, what was the basis

25   for the allegations, and what was the -- so what was alleged

1    and then what was proved.

2         I think for each modification we will need to go

3    change by change.  There's only three modifications, sir.  What

4    was alleged with respect -- what is the issues at trial that

5    that modification goes to, what was alleged, and why that

6    change -- what was ultimately proved --

7         THE COURT:  Before we leave, we'll set a schedule for

8    how to do that --

9         MR. KREVITT:  Very well, Your Honor.

10        THE COURT:  -- and when to do it, but you say you can

11   do it in writing.

12        MR. KREVITT:  Again, I'd --

13        THE COURT:  How else would you do it other than in a

14   paper?

15        MR. KREVITT:  I think we would do it sitting here

16   with Your Honor.  It very well may be that that would be

17   useful.

18        THE COURT:  Sitting here with me?

19        MR. KREVITT:  It likely would be that it would be

20   useful.

21        THE COURT:  I enjoy your company but not --

22        MR. KREVITT:  I'm reluctant to see what the opposite

23   would look like, but we can make a written submission, Your

24   Honor.  We can certainly confer with ePlus --

25        THE COURT:  Let me hear from Mr. Robertson.

 1           MR. KREVITT:  And then perhaps come here and walk

 2    Your Honor through those issues.  Thank you.

 3           THE COURT:  I need *TiVo*, and I bet we have six copies

 4    of it up here somewhere, or at least I've had several.

 5           All right.  Mr. Robertson, what do you think about

 6    the part of *TiVo* that says that you look at what was alleged

 7    and proved at trial in order to define the animal from which

 8    one measures a departure to see if it's colorably different?

 9    That's what you're saying, isn't it, Mr. Krevitt?

10           MR. KREVITT:  Yes, Your Honor.

11           THE COURT:  I don't think you answered -- the record

12    will reflect you weren't answering my question.  You were just

13    responding to my request that you address me because you were

14    in the middle of talking, so I don't want you to be on record

15    as having agreed to something without having agreed to it.

16           MR. KREVITT:  Thank you.

17           THE COURT:  You are saying that in order to define

18    the animal from which we make the starting point of the

19    analysis for colorability, that you do that by looking -- by

20    ferreting from the trial record that which was alleged and

21    proved; right?  And you said allegations, documents, testimony,

22    and I think your view would include argument of counsel; right?

23           MR. KREVITT:  Yes, Your Honor.  We'll, while we're

24    sitting, point out to the Court where in *TiVo* it says that, and

25    I would note this is done in collateral estoppel and res

1    judicata cases all the time, what was alleged and necessarily

2    proved.

3              THE COURT:  Well, it is, and there's a different way

4    that it's done there, and it's different from what you all are

5    saying.  You don't use a bunch of experts to come in and do

6    that.

7              MR. KREVITT:  Correct, Your Honor.  We agree, Your

8    Honor.

9              THE COURT:  All right.  That's why I said I don't

10   want any of that stuff in the expert reports to begin with.

11   All right, Mr. Robertson.  Now, do you agree that that is a

12   task that is required by *TiVo*?

13             MR. ROBERTSON:  No, Your Honor, I don't.  Let me read

14   the actual quote, because it leaves out an important predicate.

15   It says, the sentence starts out, the analysis -- let me stop

16   and tell you I'm at page 869 of the *TiVo* -- excuse me, 882 of

17   the *TiVo* decision.

18             It says, "The analysis must focus not on differences

19   between randomly chosen features of the product found to

20   infringe in the earlier infringement trial and the newly

21   accused product," and I'm skipping the case cite, "but on those

22   aspects" -- I think that's a very key word, Your Honor,

23   aspects, "of the accused product that were previously alleged

24   to be, and were the basis for, the prior finding of

25   infringement, and the modified features of the newly accused

1    product."

2            THE COURT:  Well, what's the difference between that

3    and what Mr. Krevitt says?

4            MR. ROBERTSON:  What I'm hearing Mr. Krevitt suggest

5    is that we are now going to have to parse through the trial

6    evidence and, in a sense, do exactly what Your Honor doesn't

7    want to do and what no post-*TiVo* case has held, that you have

8    to go through and try and determine exactly what the jury

9    accepted or didn't accept, an impossible task.

10           THE COURT:  What do you say is to be done then?

11           MR. ROBERTSON:  I think we focus on the three

12   modifications.  Everything that has not been modified is

13   assumed to still be there and satisfy the elements --

14           THE COURT:  What is that now?

15           MR. ROBERTSON:  Everything that is not modified, so,

16   for example, the item master is critical to establishing that

17   the new product still infringes, but if it hasn't changed, Your

18   Honor can make the assumption, if it hasn't changed it's still

19   satisfying the critical elements.

20           So we focus down on those colorable differences, and

21   what I think is important to note here is -- what we're all

22   skipping over is what is a colorable difference, and I have an

23   analogy for Your Honor.  It might not be perfect, but let me

24   try it out.

25           The colorable difference, as *TiVo* says, has to be

1    tied to the element that is in the claim as the Court has

2    construed.  The colorable difference is inextricably

3    intertwined with whether or not it satisfies the element and,

4    therefore, infringes.

5            So we do get to drill down, and we should focus on

6    the differences, and let me just use the slide that Mr. Krevitt

7    used with Your Honor.

8            THE COURT:  Which one?

9            MR. ROBERTSON:  It's on the screen.  It had to do

10   with the UNSPSC and the evidence that was presented at trial.

11           THE COURT:  Is that 16, Mr. Krevitt?

12           MR. ROBERTSON:  It's on your screen, Your Honor.

13           MR. KREVITT:  The slide with the change, Your Honor,

14   is 1721.  I had shown Your Honor two:  One, the original that

15   drilled down to the fourth level.  I believe Mr. Robertson

16   would like you to look at the one that shows the change.

17           THE COURT:  All right.

18           MR. ROBERTSON:  So, Your Honor, here's the argument

19   that's being made, and I actually learned this technical term

20   from Your Honor.  What's going on here is an ultimate gotcha.

21           We had a trial in which we had a product that

22   permitted the user to use this UNSPSC code to drill down the

23   four levels.  That's what the product did.  So, of course, we

24   put on that evidence, and, in fact, some of the '516 claims

25   that the jury did not find to be infringed had language in

1    there that said that when you did the conversion process or

2    when you substituted, you had to find a generally equivalent or

3    substitutable product.

4            The '683 claims just have means for converting.  So,

5    of course, we put on evidence.  We showed that you could go

6    down to the lowest level of the UNSPSC code and find a

7    generally equivalent product, because that was one of the claim

8    elements we needed to satisfy.

9            The Court's construction of the converting means on

10   the '683 does not require that.  But even more than that, Dr.

11   Weaver testified at trial that you could do this converting

12   process at any level, and we've actually cited that to you in

13   his reply report.

14           I'm not going to go into it now because I think we're

15   way down in the weeds, but if we have to retry this case on

16   what was said or not said or what I argued or didn't argue --

17           THE COURT:  I need you to back away -- how about

18   trying to take this thing in discrete pieces and approach it

19   without a bunch of tangential modifiers and tell me what you

20   think -- what page were you reading from?

21           MR. ROBERTSON:  882, I believe, Your Honor.  I think

22   the case is 646 and 689, and I was at 882.

23           THE COURT:  With "We have stated"?

24           MR. ROBERTSON:  It's the paragraph that starts, "The

25   primary question on contempt," and then the second full

1  sentence says, "The analysis must focus not on differences."

2  Are you with me there?

3          THE COURT:  Yes.

4          MR. ROBERTSON:  "Between randomly chosen features of

5  the product found to infringe in the earlier infringement trial

6  and the newly accused product but on those aspects of the

7  accused product that were previously alleged to be and were the

8  basis for the prior finding of infringement, and the modified

9  features of the newly accused product."

10         What I think is, when you're talking about aspects

11  with respect to the modifications, we're talking about an

12  aspect of RSS, for example, that allowed users to use the

13  UNSPSC to satisfy the claim element that was found to infringe.

14         THE COURT:  Wait a minute.  You focus on the next

15  sentence, though, don't you?  Is that right, Mr. Krevitt?

16  "Specifically, one should focus on those elements of the

17  adjudged infringing products that the patentee previously

18  contended, and proved, satisfy specific limitations of the

19  asserted."

20         MR. KREVITT:  That's right, Your Honor, and we have

21  slides, to the extent that would be helpful, that walk right

22  through this.  It's also consistent with the parties'

23  submissions to Your Honor some months ago on the *TiVo* question.

24         MR. ROBERTSON:  The key question there is, Your

25  Honor, what does elements mean, elements of the adjudged

1   infringing product.  One of the elements we alleged -- they

2   want to parse it and say the element means you have to go down

3   four levels, and you didn't have evidence on that.

4           Now, I think the premise of that is wrong, because we

5   did show you could convert at other levels other than the

6   fourth level, but it's the element of the accused product.

7   That was the ability to use codes to find similar, like

8   products or just substitute those products, and you can do that

9   at any level of the UNSPSC.  Certainly you can do it at the

10  third level which is what they tried to do.

11          The other aspects that they modified we don't even

12  think relate at all to the claims.  Certainly, they've said now

13  you can only put one vendor on a requisition and then issue a

14  purchase order, but the claim says you can generate one or more

15  purchase orders.  That's the Court's construction, one or more.

16          So to say that, you know, they have changed

17  something, but it still satisfies an element of the claim --

18          THE COURT:  Because it only gets one.

19          MR. ROBERTSON:  Right.  Actually, factually we think

20  that's not true.

21          THE COURT:  Leave that aside.  That's a diversion

22  tangent that I said that's not helpful in discussing.

23          MR. ROBERTSON:  Fine, Your Honor.  We did get in the

24  weeds a little bit here, Your Honor, and I just don't want to

25  leave the Court with the impression --

```
 1              THE COURT:  How do you see that we satisfy the

 2    requirement?

 3              MR. ROBERTSON:  I think what we'll do is we'll

 4    identify the elements that were accused, the ability to

 5    convert, the ability to build one or more -- build a

 6    requisition and generate one or more purchase orders.  Those

 7    are the elements that were at issue in the trial, and the

 8    new --

 9              THE COURT:  Okay.  So you identify the elements, and

10    then what?

11              MR. ROBERTSON:  And then we show that the new product

12    is not significantly different with respect to the other

13    product.  It's insubstantial --

14              THE COURT:  As to that element?

15              MR. ROBERTSON:  Yes, or irrelevant is what is -- I

16    think with respect to -- two of the three, we're going to

17    argue, truck entirely irrelevant to the Court's construction or

18    to an infringement analysis.  It's a distinction without a

19    difference as to two of the three.  With respect to the

20    UNSPSC --

21              THE COURT:  So because it's a distinction without a

22    difference, it can't be colorably different because it really

23    isn't different at all; is that your point?

24              MR. ROBERTSON:  Yes.  Your Honor, it has to be

25    grounded with respect to the claim element that's at issue.  We
```

1    can change a lot of things about a product, and the consumer

2    could even think this is a wildly different product.  I have a

3    Ford F150.  It's got the same chassis and wheelbase as a Ford

4    Explorer, and Ford, when they make them, they use the same, you

5    know, chassis to make both cars.  One is a truck, one is an

6    SUV.  Nobody would say that they're different.

7         If the patent, for example, covered the muffler

8    system, and they changed -- when they changed the car from a

9    truck to an SUV, they changed everything but not the patented

10   muffler system, would that be a colorable difference?  No,

11   because it relates nothing to what the patent involves.

12        Even if they change the muffler system and it said

13   you had to have three or more baffles in the muffler system,

14   and that was what the patented device was, and they changed it

15   -- and the accused device was four and they changed it back to

16   three, would that be a colorable difference?  No, because it

17   still would satisfy the claim.

18        It's a difference, but it's not a colorable

19   difference, because it's got to be grounded in the claim

20   element that was at issue in the trial, and that is what

21   informs whether it's a colorable difference or not.

22        THE COURT:  How do we do that?  You started off by

23   telling me.  How about just telling me how you do it.

24        MR. ROBERTSON:  How am I going to do it?

25        THE COURT:  How do we go about the process of -- he

1    says that you have to go look at what was put on at trial,

2    alleged and proved, about the element that is alleged not to be

3    more than colorably different or less than colorably different.

4    How do we identify that animal, and then how do we identify the

5    colorable difference or not in your view?

6          MR. ROBERTSON:  I think the allegation is that the

7    prior product satisfied this limitation that's at issue with

8    respect to the modification.  Just let's take the UNSPSC code

9    again.

10         THE COURT:  No, let's don't do that.  You just lost

11   me on the sentence, first sentence.  How is it that you're

12   going to go about doing it?  What he says is, you look at the

13   allegations, you look at the testimony, and you look at the

14   evidence, and you look at -- the documentary evidence, and you

15   look at the argument of counsel, and that's how you define the

16   animal that was proved at trial.  What do you say about that?

17         MR. ROBERTSON:  I think when you look at what was

18   alleged, what was alleged is that the adjudicated infringing

19   product satisfied an element that is implicated by the

20   modification, and the question becomes, on the newly accused

21   product, does it still satisfy that element, is it still there,

22   is it -- you know, has it not made any substantial -- the Court

23   talks about the substantiality of the change.

24         What the suggestion is here is, you know, if I got up

25   and made an argument that a different product satisfied it,

1   that argument now gets turned on me when I'm trying to say, you

2   know, this product still satisfies it.

3          Your Honor, the gotcha is we proved a case that was

4   before us.  RQC didn't exist at the time, so how could I prove

5   something that wasn't even in existence?  Now, the point is, is

6   RQC, now that it's in existence, different from that product as

7   far as the element goes that relates to the claim limitation

8   that's been modified, and I think we focus in on the

9   modification, and we do --

10          THE COURT:  How?

11          MR. ROBERTSON:  By looking at the differences.

12          THE COURT:  How do you prove what it was -- how do

13   you show what was it that infringed so you have the base

14   against which to measure whether it was colorably different?

15          MR. ROBERTSON:  Well, obviously the jury heard that

16   the claim limitation of converting means was satisfied in the

17   '683 patent, and they found that.

18          THE COURT:  You all are going to have to go back,

19   both of you, and do better than this.  It's just not working

20   right.

21          What do you see as the significance of this part of

22   *TiVo*:  "If those differences between the old and new elements

23   are significant, the newly accused product, as a whole, shall

24   be deemed more than colorably different from the adjudged

25   infringing one, and the inquiry into whether the newly accused

1    product actually infringes is irrelevant.  Contempt is then

2    inappropriate"?

3            So is the converse of that true?  The converse is, if

4    the differences between the old and new elements are

5    significant, the newly accused product -- if the differences

6    between the old and new elements are not significant, the newly

7    accused product, as a whole, shall be deemed less than

8    colorably different from the adjudged infringing one, and the

9    inquiry into whether the newly accused product actually

10   infringes is irrelevant.

11           Are both of those propositions true, in your view, is

12   the question I'm asking.

13           MR. ROBERTSON:  Well, Your Honor, I think they're, in

14   some aspects, not very helpful.

15           THE COURT:  No, but are they true?

16           MR. ROBERTSON:  Your Honor, I was trying to follow

17   where you were reading from.

18           THE COURT:  It's in the paragraph which you were

19   reading, headnote nine from the PDF version, page 882.  It is

20   near -- it is the next-to-the-last sentence, really, in that

21   headnote.

22           MR. ROBERTSON:  I'm following that, Your Honor.  I

23   think one of the key terms there are is it significant, and

24   Your Honor needs to look at it.  If you look at the very next

25   paragraph, the Court tries to give some guidance.

1      THE COURT:  I agree.  And let's assume I do that and

2  conclude that it is not significant.  As I read this sentence,

3  I don't ever get into the issue of infringement.  If it's

4  determined to be not colorably different, I don't look at

5  infringement any more than I do if it's determined to be

6  significantly different.  That's what this means to me.  Do you

7  agree with that or not?

8      MR. ROBERTSON:  Your Honor, I think I need to

9  disagree with that, and I'll tell you why; because I think what

10 *TiVo* really teaches is that you need to do the colorable

11 difference issue first, and then you need to find infringement.

12      I think it said that the two need to be separate, but

13 they're linked, and I think that once you found that the

14 changes are not significant, it almost inexorably follows, if

15 we're only addressing the modifications, that there will be

16 infringement.

17      THE COURT:  Where does it actually say what you just

18 said?

19      MR. ROBERTSON:  It's going to take me a minute to

20 find that, Your Honor.

21      MR. KREVITT:  Your Honor, may I be of assistance to

22 Mr. Robertson and point the Court to the portion of the

23 opinion?  So there is the paragraph that Your Honor was reading

24 from.  Then there was another paragraph.  If you skip that

25 paragraph, there's a paragraph that begins conversely, and this

1    tells the Court what the Court must do in the event there is a

2    finding of not more than colorably different, and it makes

3    clear that at that point an infringement inquiry is essential.

4            THE COURT:  How do you ever do anything -- if it's

5    just a slight difference, how do you ever come to the

6    conclusion it doesn't infringe?  How would that ever happen?  I

7    just think that's silly.  I think this whole approach is

8    designed to allow re-litigation of every issue in the case.  I

9    don't understand how you ever do it.

10           Do you know of any cases, Mr. Robertson, in which,

11   following *TiVo*, a court has made the analysis, found that there

12   is something that is not colorably different, and that it

13   doesn't infringe?  Has that happened?  It would help me maybe

14   to read that case.

15           MR. ROBERTSON:  Your Honor, we did provide briefing

16   on the *TiVo* matter back in, I think it was October, and we did

17   have, I think, four or five post-*TiVo* cases, and refresh me if

18   I'm wrong, but I don't think there is single case in which

19   there was a finding that there was no colorable difference that

20   was not infringement.

21           THE COURT:  I know.  I don't think there was then,

22   but has there been anything since then?

23           MR. ROBERTSON:  Your Honor, I can't represent to

24   you --

25           THE COURT:  I don't understand how it happens, to

1    tell you the truth, but anyway, we'll have to do what the Court

2    of Appeals says.

3            Why don't we take a recess, 20 minutes.  Then let's

4    see if we can't move this thing along.

5

6            (Recess taken.)

7

8            THE COURT:  All right, we need to figure out exactly

9    how to do this, how we're going to accomplish the mission that

10   we've been given reflected on 882 and 883 of *TiVo*.  I have real

11   difficulty understanding how, if something's not colorably

12   different, it won't infringe, and I'd like to know what other

13   courts have done to try to deal with that situation.

14           I know what it says in the opinion, but -- you know,

15   it says you evaluate the modified elements of the newly accused

16   product against the asserted claim on a

17   limitation-by-limitation basis to ensure that each limitation

18   continues to be met.

19           Well, I understand that, but what I don't understand

20   -- I understand what that says, but I don't understand how it

21   ever could be that each limitation would not be met if there

22   wasn't anything but a slight difference, and surely somebody

23   has come to grips with how to do that if it's been presented.

24   So I need suggestions from you all about how best to proceed.

25           But the first task is going to be to figure out how

1    we apply the first part of it, and that is how we define the

2    animal against which we measure the -- whether there is a

3    colorable difference in the first place, and we will proceed in

4    two phases to decide colorability and whether or not there's an

5    infringement if is it less than colorable.

6            MR. KREVITT:  Your Honor, may I respond very briefly

7    to provide an answer to the question the Court asked before the

8    break with respect to other cases post-*TiVo*?

9            THE COURT:  Yes.

10           MR. KREVITT:  It is our understanding from research

11   that the few cases post-*TiVo* to confront this question have not

12   gotten to the second issue, because they have found either that

13   the changes were, in fact, more than colorably different or the

14   case is resolved for some other reason, but we have not yet

15   found any case in which a court was confronted with the

16   question with which Your Honor is grappling, if you get past

17   that first part, it is not more than colorably different, and

18   you turn to the infringement situation.

19           THE COURT:  Well, I understand that's that part of

20   it, but how have they dealt with the first part of it as well.

21           MR. KREVITT:  We have a suggestion in that regard,

22   Your Honor, that we'd like to raise.

23           THE COURT:  What's that?

24           MR. KREVITT:  I wanted to make one other observation,

25   and it is what we discussed when we addressed *TiVo* some months

1    ago, and I wanted to give Your Honor an example that would

2    explain, I think, how you can have that situation.

3            THE COURT:  Come to the lectern so the court reporter

4    can hear you better, please.

5            MR. KREVITT:  Sorry, Your Honor.  Mr. Thomasch

6    forbade me from going back to the lectern.

7            THE COURT:  He did?

8            MR. KREVITT:  The examples --

9            THE COURT:  Does he feel like the local rules say

10   that you can speak from the table even though -- what did he

11   do, modify the local rule?

12           MR. KREVITT:  No, Your Honor, he was well-aware of

13   the local rule and assumed as a consequence I wouldn't be

14   speaking.

15           Your Honor, very quickly, the way you can have a

16   situation where you have a change that is not more than

17   colorably different and yet not infringing, there are many,

18   many situations where you can have that, and I would like to

19   very briefly explain that.

20           THE COURT:  We'll deal with that later.  I'm worried

21   about the construct for how we do the first part of the

22   analysis.  I thought you had a suggestion about that.

23           MR. KREVITT:  Incidentally, we believe all of our

24   changes are more than colorably different, so we won't get to

25   that --

1            THE COURT:  I understand.

2            MR. KREVITT:  If I may turn over to Mr. Thomasch, we

3    have a suggestion as to how to proceed with that issue, Your

4    Honor.

5            THE COURT:  All right, okay.

6            MR. THOMASCH:  Good morning, Your Honor.  Your Honor,

7    these are the issues that we actually started grappling with, I

8    think, at the November 8th hearing, and we are in complete

9    agreement.  I apologize to the extent that our expert went

10   beyond, because clearly he's in areas -- both experts are in

11   area that are the province of the Court, and we understand

12   that.

13           We were trying to respond, but, frankly, this is

14   refreshing news for us.  We had moved for bifurcation and had

15   lost that motion.  We're delighted with bifurcation --

16           THE COURT:  I'm talking about the bifurcation of the

17   presentation of the evidence.  I intend to be able -- I may be

18   able, at the end of the first one, to make a decision, but at

19   least we're going to segregate the presentation of the evidence

20   so that we're finished with the first task before we take on

21   the second one.  Then we won't have it lumped together.

22           You just say your peace as to the first one, the

23   first issue, whether it's colorably different, and then if I'm

24   able to find on that basis that it isn't or that it is, maybe

25   that decision can be made then, but in any event, we won't hear

1    the infringement evidence until the second component anyway.

2            MR. THOMASCH:  Understood, Your Honor, and that is

3    precisely what we think *TiVo* says.  There is --

4            THE COURT:  Which may follow -- the second component

5    may follow immediately on the heels of the first one.

6            MR. THOMASCH:  We also understand that, Your Honor.

7            THE COURT:  I don't want you to have your case

8    dragged out any further than it's necessary.  So what is your

9    suggestion about how to proceed?

10           MR. THOMASCH:  There is that predicate issue of what

11   are we even trying here, and it really is a function -- the

12   problem here is that there were 38 separate infringement

13   findings that were made by the jury at the merits trial.

14           27 of those were non-infringement, and 11 of them

15   were infringement.  There is a very mixed verdict here, and we

16   alluded to that with the differences between configuration two

17   and configuration three.

18           THE COURT:  And *TiVo* didn't really present that.

19           MR. KREVITT:  *TiVo* didn't present that.

20           THE COURT:  In fact, it didn't even present alternate

21   theories of infringement of any kind.

22           MR. KREVITT:  This is a much tougher case to deal

23   with than *TiVo*.  There is no doubt about it.  If *TiVo* offers us

24   guidance, I think it offers us guidance in a couple of areas.

25   I do think that the facts of *TiVo,* as opposed to the language

1    of the en banc court writing sort of generally in the air, are

2    actually much more helpful, because the facts of *TiVo* did

3    involve this PID filter and the question of whether that may

4    have infringed.

5           The plaintiffs have said, we think that we get some

6    sort of free pass if the jury verdict is ambiguous.  There are

7    no free passes in life, Your Honor.  If we are infringing, our

8    day will come, and we'll be held accountable for it.

9           The question is to distinguish between what's

10   properly dealt with in a contempt proceeding and what is

11   properly dealt with in a subsequent infringement action if they

12   allege the new product is infringing.

13          Mr. Robertson said, how do I do this when, at the

14   time I tried the first case, RQC didn't exist.  Well, that's

15   absolutely right.  RQC is a different product.  If RQC was the

16   same product, we would be in contempt.  It's a different

17   product.

18          Now we have to decide, is it really different or is

19   it just cosmetically different, and that is the key issue, and

20   *TiVo* says on that that you need to start with an understanding

21   of what happened at the first trial.  And there are cases,

22   there are situations where all courts have dealt with the issue

23   of what was previously dealt with in another case, because

24   where the verdict is ambiguous, it cannot be the predicate for

25   contempt.

1          That is our position.  If the verdict is ambiguous,

2    it doesn't give us a free ride, but it means that you have to

3    go back and squarely tee the issue up before another jury.

4          Where we're in contempt is when there's an

5    unambiguous verdict, and we flaunt it.  We have no right to do

6    that.  If we were told not to do something and we do it, we're

7    in contempt, but that's not what happened here, and the

8    differences in this verdict are real.  The difficulty --

9          THE COURT:  I'm looking at this stage now

10   mechanically how do we do what you think needs to be done,

11   because I don't think it's right that just -- I don't think --

12   I'm not sure the verdict is ambiguous.  I think there's a

13   difference between findings of non-infringement and findings of

14   infringement and findings of ambiguity.

15         The test we have right now, according to Mr. Krevitt,

16   is to find out what the allegations were, what the proofs were,

17   what the arguments were, and then make a measurement.  That's

18   what he says, so what is your suggestion about how we do that?

19         MR. KREVITT:  I think step one follows from *TiVo* at

20   page 881 where it says, "What is required for a district court

21   to hold a contempt proceeding is a detailed accusation from the

22   injured party setting forth the alleged facts constituting the

23   contempt."

24         So I think we start with a question of -- when I

25   approached this, I read *TiVo*, I said, the first issue is what

1    was proved at the first trial.  I think that there's a big

2    dispute about that, and the person to resolve that is Your

3    Honor.  It is not Dr. Goldberg, it is not Dr. Weaver, it is not

4    Dr. Niemeyer.

5         The lawyers can present to you in writing and can

6    appear back before you the issues of what was presented.  I

7    will tell you, Your Honor, and I don't know if you want to hear

8    really the motion, the specifics of the Weaver/Niemeyer motion,

9    but that is exactly what we were asking for.

10        We don't need to wait for Dr. Weaver to get on the

11   stand to talk about a shopping cart cookie file if the word

12   never appears at the first trial.  We said, that's not what the

13   first trial was about, we can't be in contempt on that, and we

14   wanted to present you that as a threshold issue.  And I think

15   that's what we have here.

16        We have threshold issues.  What do they think allows

17   them, if they prove their case, to be -- to put us in contempt.

18   And then we can say, no, you're not even actually allowed to go

19   down that road because that's not a road you took at trial, and

20   then the right person to resolve that is Your Honor, and you

21   can do that before there's an opening statement, you can do

22   that before the first witness is sworn in.  Witnesses will not

23   help Your Honor, not at all.

24        But the lawyers can help you.  The lawyers can help

25   you by looking at the transcript and looking at the jury

1    verdict form, and I will tell you, Your Honor, Mr. Krevitt

2    said, and he was completely right, that the chief engineer in

3    many respects for this redesign effort was Dr. Weaver.  Dr.

4    Weaver's testimony focused on certain things, and when the

5    redesign effort was underway, we tried to figure out, let's

6    look back at that testimony, let's see what he focused on,

7    let's change what was important to the plaintiff.

8            Now, maybe we didn't do it good enough.  I think we

9    did.  Maybe we didn't.  If we didn't, we are infringers, and

10   they can hold us liable for infringement.  But we're not in

11   contempt if we looked at what they said and we made changes and

12   the changes are more than colorable.  Then the case is over.

13           So we should look and see, what do they think their

14   case is, what do they say if they prove that's enough, and we

15   will come back, and I know there are --

16           THE COURT:  What are you suggesting we do, Mr.

17   Thomasch?  That's what I'd like to hear.  What are we going to

18   do?

19           MR. THOMASCH:  I think the plaintiff should first

20   submit a brief, Your Honor, consistent with *TiVo* at page 881.

21   I think the plaintiffs --

22           THE COURT:  Where is 881?  Where on 881 are you

23   talking?

24           MR. KREVITT:  In the second column, there's a

25   paragraph that begins, "We conclude that KSM's two-step inquiry

1    has been unworkable."  Then if you carry into that paragraph,

2    about halfway there's a sentence after the additive controls

3    quote that says what is required for a district court to hold a

4    contempt proceeding.

5              THE COURT:  Yes.

6              MR. KREVITT:  A detailed accusation from the injured

7    party setting forth the alleged facts constituting the

8    contempt, I think that would help -- if we could read into

9    that, then we could look at that and say, Your Honor, okay,

10   they say certain things are -- put us in contempt, and we say

11   that's not even an issue for trial because it relates to, for

12   instance, a feature that either was not mentioned at the first

13   trial, was not the subject of a contention, or was not proved

14   at the first trial.

15             That's an issue between us and the Court.  You sat

16   through the first trial.  We have a transcript.  We shouldn't

17   have a fight with witnesses about what happened at the first

18   trial, but that is what this has evolved into, and it's time to

19   take control of it and say, the Court will make those

20   decisions, let the parties come in an ordinarily fashion and

21   present to you what they think.

22             THE COURT:  So the first thing is for the plaintiff

23   to do what, do you all say?

24             MR. KREVITT:  To say what is it that they believe

25   that they proved at the first trial, the subject matter of

1    their infringement contentions, and then they do know precisely

2    what our modifications are.  That's the one thing we've

3    accomplished.  There's no dispute between the parties about the

4    three modifications at issue, so they should say, why is it

5    that those three modifications are not more than colorably

6    different.  And then we can come in to Your Honor, and we can

7    frame the issues for trial, because I think in just framing the

8    issues, we'll eliminate some of them.

9              Can I show you the practical problem that the split

10   verdict reaches in trying to figure out a redesign?

11             THE COURT:  Sure.

12             MR. THOMASCH:  I'd just like to go back for a second,

13   and I'm not rearguing anything.  It's a different perspective.

14   You've seen this slide before.  Mr. Krevitt showed it,

15   plaintiffs have it.

16             THE COURT:  I don't have anything numbered 19.

17             MR. THOMASCH:  No.  I can hand it up, Your Honor.

18             THE LAW CLERK:  It's 1749.

19             MR. THOMASCH:  Same slide.

20             THE COURT:  1749.  Okay.

21             MR. THOMASCH:  1749 is a demonstrative exhibit, and I

22   want -- the exhibit without the red box --

23             THE COURT:  Is this the one that was used at trial?

24             MR. THOMASCH:  This was used in the briefing by

25   plaintiffs.

1          MR. KREVITT:  Your Honor, this was actually a

2     demonstrative prepared by and used at trial by Dr. Weaver for

3     ePlus.

4          MR. THOMASCH:  Right, Dr. Weaver's --

5          MR. KREVITT:  With the one exception, I believe, Your

6     Honor, I'm sorry, the red box around the punchout on the top

7     right was added.

8          MR. THOMASCH:  This shows you the difference between

9     configuration two and configuration three.  The only difference

10    is the presence of punchout.

11         Now, the plaintiffs are arguing that they have proven

12    to the jury, because -- they went to the jury and they said,

13    item master is multiple catalogs.  They argued that.  It was

14    argued over and over and over again.  It was a collection of

15    catalogs, it was multiple catalogs, it was two or more

16    catalogs, even that it was -- Lawson, at times, argued it was

17    one or zero.

18         THE COURT:  You all argued that it was one.

19         MR. THOMASCH:  Correct, or it could be viewed as a

20    database that didn't qualify --

21         THE COURT:  Or that it wasn't a catalog at all.

22         MR. THOMASCH:  Exactly.  So that was a dispute.  So

23    the plaintiffs now say -- it's clear on the papers, I'm not

24    misquoting them.  They would now say, the jury has decided that

25    item master is two or more catalogs.

1           If item master is two or more catalogs, then -- and

2    if that has been proven, then the change to punchout does not

3    take us out of infringement.  It may be significant.  This is a

4    place where it is a degradation of the product, and you could

5    easily find it to be significant, but it would have

6    ramifications on the issue of infringement.

7           Now, when we were designing around, we had to figure

8    out, can you design around this issue.  Do we have to accept

9    the fact that the jury found two or more catalogs.  Well, if

10   you look, what if we got rid of procurement punchout

11   altogether, what if that was our redesign, our design was to

12   eliminate that feature?  We would have configuration number

13   two.  We would still have item master.

14          Item master is in configuration number two the same

15   way it's in configuration number three.  The only difference is

16   punchout.  They argued to the jury that item master alone was

17   sufficient for both two and three.  Now, they lost on two, but

18   they say they won on three.  It's the same evidence on the

19   same -- it's the exact same evidence.

20          I will tell you that you cannot -- you either can

21   only assume that it was punchout that did it, or you have to

22   say, I can't tell.  But this goes back to, for instance, in

23   collateral estoppel where there are alternative grounds for a

24   judgment, you cannot predicate collateral estoppel on one of

25   the two.  Something has to be necessarily decided.  It was not

1   necessary for the jury to find that item master was two

2   catalogs.  If the jury found that item master was one catalog,

3   every single verdict is correct.

4           They lost everything on the '516.  Why did they lose

5   on the '516?  It required a collection of catalogs.  They

6   argued that item master was a collection of catalogs.  The jury

7   rejected that.  They argued that it was two or more.  If it was

8   two or more, they would have won on configuration two.  They

9   lost.  They argued that it was two or more, but they also

10  argued that you can combine it with punchout, and that's what

11  configuration three was.

12          They said, if punchout gives you one catalog and item

13  master gives you one, you now have two or more.  That's what

14  they were arguing.  But we don't know what the jury found on

15  configuration three, and Dr. Weaver won't help us and Dr.

16  Goldberg won't help us.

17          I do think that the parties should put on paper what

18  they believe the significance of the first trial as a predicate

19  for a contempt proceeding is.  What was proven with sufficient

20  clarity that you can now use that as the predicate for

21  contempt.  They don't need to win this argument in order to go

22  sue us for infringement.  If they think we are infringing, they

23  can sue us for infringing.

24          Contempt is a much different deal, and, Your Honor,

25  you would have to go through a second phase proceeding on

1    infringement no matter what happened in the first phase for the

2    very simple reason, if we're going to follow *TiVo* -- I mean, it

3    is the law here -- *TiVo* says that the plaintiff has the burden

4    on both, and the burden on the plaintiff on both issues is by

5    clear and convincing evidence.

6         Your Honor charged the first jury on infringement.

7    You didn't charge pursuant to a clear and convincing evidence

8    standard.  The jury didn't find clear and convincing evidence,

9    so where there's been an allegation that was proven to the

10   jury, we've now modified it, they now have to come in, they

11   have to prove by clear and convincing evidence that the

12   modification is insubstantial.

13        If they fail, we go home.  If they win, then we look

14   at the second stage which is infringement, and they must prove

15   that by clear and convincing evidence.  Again, that does take

16   us back to the question in *TiVo*, the facts itself, where the

17   *TiVo* contempt was predicated on the PID filter, and the Court

18   said, yes, the PID filter was in the first product, it's in the

19   second product, and it appears to be infringing.

20        But that's not contempt, because it was un -- it was

21   not unequivocal that that was what the jury found.  It was not

22   unequivocally alleged that that was the basis for their

23   infringement.  If they did unequivocally allege it as a basis

24   for infringement -- it might be infringing, but the Court said

25   contempt is not the right forum, and that's really what's the

1   problem here.  They think you still infringe, so you're in

2   contempt.

3           THE COURT:  No, what they think is that you all

4   played it fast and loose, your client did, and made a few

5   cosmetic modifications, and, therefore, you are in contempt of

6   violating the injunction.

7           MR. THOMASCH:  And the question is, what makes

8   something a cosmetic modification or a real modification, and

9   constantly Mr. Robertson would tack back to, well, is it

10  infringing, is it infringing.  That's not the issue.  The issue

11  is did the product change, and I will tell you, sir --

12          THE COURT:  Did it change in a significant way.

13          MR. THOMASCH:  Yes, did it change in a significant

14  way.  It changed in a significant way if -- Dr. Weaver said at

15  the first trial it's a real benefit to be able to take punchout

16  and go to multiple different punchout sites --

17          THE COURT:  Do you understand what a "doing it this

18  way" does to the law of contempt?

19          MR. THOMASCH:  I think --

20          THE COURT:  It really turns contempt into a trial

21  greater than the trial itself and puts the Court in the

22  position of revisiting or, perhaps, overturning what it is that

23  a jury has done.

24          MR. THOMASCH:  No, you'll never overturn what a jury

25  did, because the only one that can overturn what a jury did is

1    the Federal Circuit --

2         THE COURT:  That's the same thing as second-guessing

3    the jury and saying the jury did this.  That has Seventh

4    Amendment implications.  That's what the problem with *TiVo* is

5    all about, is that it has Seventh Amendment implications, and

6    it didn't really discuss what that problem was.

7         MR. THOMASCH:  You are right on it.  That is exactly

8    it, but who is looking for the Seventh Amendment?  We are here.

9    We would like a jury trial.  If they're going to say that RQC,

10   which is different, infringes, then we want our Seventh

11   Amendment right.

12        THE COURT:  On the other hand, this formulation makes

13   it exceedingly expensive and difficult for a court to enforce

14   its orders, and where there is, for example, evidence that one

15   party says it will take months, maybe longer than a year to

16   effectuate any change that could be useful, and then they come

17   up with it in a matter of days, a court has got to be mindful

18   that the -- about how to keep its orders in place, and the

19   answer, I suppose, to that is, really what is a proper remedy

20   that will be sufficient to operate as a force to require the

21   person who has the injunction against them to obey the law in

22   the form of the injunction which means that really devolves

23   here, in this case, to whether disgorgement is a proper remedy

24   or what is a proper remedy.

25        MR. THOMASCH:  That does jump ahead and finds that

1   we've lost the merits, and I don't think you intend that and --

2          THE COURT:  I'm saying that's where maybe the battle

3   needs to be fought, on the issue of enforceability of the

4   injunction.

5          MR. THOMASCH:  The Court's orders have to be

6   respected, and we have respected the Court's orders.

7          THE COURT:  You've got to admit, Mr. Thomasch, and I

8   don't know what the facts are, but there's some interesting --

9   there's a problem created when someone says, it's going to take

10  months and hundreds of thousands of dollars, millions of

11  dollars to change something and then they come up with a change

12  in short order.

13         MR. THOMASCH:  Your Honor, may --

14         THE COURT:  I mean, it does create a reason to look

15  into the matter and see what's going on, I think.

16         MR. THOMASCH:  Your Honor, you've been told that time

17  and again, and now I understand that you believe it.  I have to

18  tell you, sir, that from our position, you have been misled,

19  and you misunderstand.

20         The facts are the facts.  The time that the

21  redevelopment project began was February, right after the jury

22  verdict in late January.  The redevelopment began then.  It

23  went from February to May 18th, and then there was a further

24  tweaking on June 9th.  That was the period of time.  It wasn't

25  a matter of a few days.

1          What was a few days was the coincidental fact that

2     after working for months on it, your injunction came out around

3     the same time.  Indeed, the redesign was made available --

4          THE COURT:  That may be the ultimate case, but it's

5     reason to look into what the situation is.  I don't just accept

6     at face value what they say or what you say.  Let's get on to

7     something else about how you actually do this.  I still don't

8     understand what it is you are saying needs to be done.

9          MR. THOMASCH:  I think that what needs to be done is

10    first -- I think that we differ as to what we believe was

11    contended and proved at the first trial.  I think the parties

12    have a reasonable difference.  I have a slide that tells you

13    what I think was proved, and I can pretty much guarantee Mr.

14    Robertson will stand up and say, that's too limited, I think I

15    proved more than that.

16         THE COURT:  What's that?  What slide?

17         MR. THOMASCH:  That would be slide 1903.

18         THE COURT:  What is that, because I don't have any

19    19 -- oh, I see.  All right.

20         MR. THOMASCH:  So 1902, for a second, was just --

21    this was where we were starting, Your Honor, and it's where you

22    started.  It is on *TiVo*, both aspects of the highlighting.  The

23    first says what was previously alleged to be and were the bases

24    for the prior finding.  The second one says what the patentee

25    previously contended and proved, and I do think it's a notice

1    issue.

2            If there's confusion about the verdict, we aren't in

3    enough notice that we can then be held in contempt for what we

4    do in response to the verdict.  There has to be clarity before

5    contempt.  That just -- that is a principle that I think is

6    bedrock here.

7            THE COURT:  I think there's no question about that.

8            MR. THOMASCH:  Well, Dr. Weaver testified, he

9    testified that he did not know what the jury found in regard to

10   catalogs under claim 28.  He was asked, "I think you've

11   established that you don't know what the jury found to find

12   configuration infringing of the element of claim 28 that

13   relates to catalogs; correct?"

14           "Correct."

15           He doesn't know, we don't know.  No one can know on

16   this, and the question then you have to decide -- it's a

17   threshold question before we start calling witnesses.  If there

18   is truly ambiguity, can we be in contempt in a situation of

19   ambiguity.

20           THE COURT:  I'm trying to get, Mr. Thomasch, to your

21   suggestion about precisely how we accomplish what it is that

22   you ask.

23           MR. THOMASCH:  Slide 1903 is step one, I believe.  I

24   believe -- this is our statement, and reserving the right to

25   revise it, I think plaintiffs should go first.  What were the

1    contentions that they made that they believe to be proved.  I

2    think that's what we have to lay out.  I've laid out what I

3    think they successfully tried at trial.

4              I think, number one, they tried to show that searches

5    done at the commodity level of the UNSPSC hierarchy tree,

6    that's level four, satisfied the converting element of claims

7    three, 28, 29 of the '683 patent.

8              Now, if they're going to come back and say, that

9    isn't what we've proved, we proved that any use of that -- of

10   it --

11             THE COURT:  Excuse me one second, though.  Where did

12   this come from?  You are reading from paragraph one on slide

13   1903.  Where did this come from?

14             MR. THOMASCH:  It comes from my reading of the trial

15   transcript.

16             THE COURT:  Okay, but I can't just take your reading

17   of the trial transcript as to what was proved.

18             MR. THOMASCH:  Of course not.  I think we need to

19   have a day in which the parties -- first the plaintiff tells

20   you what they think they proved.  They have to be able to tell

21   you what they think they proved unequivocally, or how can we be

22   in contempt?  So they should tell you that.

23             THE COURT:  Why is that their burden instead of being

24   something you should come forward with first as opposed to -- I

25   mean, I understand -- one of your points is, I think, that they

1   should be required to be -- now that they've had discovery on

2   this issue -- to be very specific about what they think is the

3   contemptuous conduct.

4             MR. THOMASCH:  Yes.

5             THE COURT:  And then why shouldn't you then be

6   required to say, well, that ain't so --

7             MR. THOMASCH:  I'll take that burden on.

8             THE COURT:  -- because here's what was proved at

9   trial?

10            MR. THOMASCH:  Yes.

11            THE COURT:  And then they say, that's not the way it

12  went at all, here's what it was.

13            MR. THOMASCH:  And then I think we should come back,

14  and you should question us about --

15            THE COURT:  Why isn't that construct the appropriate

16  one, or what's wrong with it?  I don't care.

17            MR. THOMASCH:  You will not find disagreement from

18  me, Your Honor.  That's why I had this slide.  I think that's

19  the starting place, and I believe that's exactly what we should

20  do starting with ePlus and then us, and then we come back and

21  you decide, and we will know what the framework is.

22            But I do believe that one of the issues is going to

23  be -- Your Honor, with all due respect, you say why would the

24  burden be on them.  The burden is on them, and --

25            THE COURT:  No, the burden is on them.  I'm talking

1  about the order of doing things.

2          MR. THOMASCH:  The order of doing things, the *TiVo*

3  case says what is required to hold a contempt is a detailed

4  accusation from the injured parties.  It starts with them.

5          THE COURT:  They do that, but why is the detail -- I

6  guess I'm asking it this way.  Maybe I'm not saying it right.

7  Why does the detailed accusation, why does that, why is that a

8  recitation of what was proved at trial as opposed to -- which

9  is what you are saying needs to be done -- instead of we see

10  that you did this, and because you did this, you offended the

11  verdict -- the component of the verdict reflected in finding

12  number 17.

13          MR. THOMASCH:  We could do it that way.

14          THE COURT:  But it seems to me, that's what you were

15  suggesting originally, and now it's got -- I'm just trying to

16  figure out what --

17          MR. THOMASCH:  There's sort of a double predicate for

18  the hearing.  First we have to decide what was decided in the

19  first trial, and secondly, we have to understand what our

20  modifications are, and then after that, they have to tell us

21  why those modifications are not good enough, and we respond.

22          Now, that's the first stage --

23          THE COURT:  Isn't the framework better served by

24  putting what the modifications are at the front end and why

25  they think they are wrong or why they think that you are

1  violating the injunction?

2         MR. THOMASCH:  Yes.

3         THE COURT:  Because then that sets the framework for

4  what was proved about those modifications which seems to me to

5  be what Mr. Krevitt was saying and what you were saying at one

6  point.

7         MR. THOMASCH:  I would go with exactly that, Your

8  Honor.  I think that's absolutely fine.  That would take you,

9  for instance -- slide 1922.  They would say, I believe, that if

10 they came forward, they would say your change is not enough.

11 You are in contempt, they would say, because whatever you did

12 in changing around the manner in which a requisition is built

13 doesn't account for the fact that the way our handling is

14 happening, the way shopping cart cookie files exist or the way

15 the cart object exists, they say in their reports and in their

16 briefs, that's good enough for infringement.

17        So they say, we're going to tell you that you're in

18 contempt because of these things, and if they say that, then we

19 could come back at the next proceeding and tell Your Honor,

20 which I could do today but I don't think today is quite the

21 right time, to say that wasn't at issue in the first trial, and

22 if it wasn't at issue in the first trial, it's just like

23 process flow.  If we didn't talk about it in the first trial,

24 it can't be the predicate for infringement at the second trial,

25 and we would tee up that issue.

1          THE COURT:  I think what Mr. Krevitt was saying was

2     that as to the issue that's teed up, you would then say not

3     what you just said but this is what the record shows on that

4     issue, and because this is what the record shows on that issue,

5     you're wrong.

6          MR. THOMASCH:  Yes.  And he then, as always, is more

7     eloquent than I am and articulated it better, but that is

8     right.  If they come in and they say, you're in contempt

9     because these features still exist in your product and that

10    puts you in contempt, we will come back, and we will address

11    why that's wrong, and we will show you the transcript cites to

12    say what was discussed and whether this was or was not

13    something on which you can predicate infringement.

14         THE COURT:  Let me hear Mr. Robertson in response to

15    your suggestion about how to proceed.  Thank you.

16         MR. THOMASCH:  Thank you, Your Honor.

17         THE COURT:  What do you say about that approach to

18    matters, Mr. Robertson?

19         MR. ROBERTSON:  It's entirely unworkable.  It is

20    unprecedented, and it would --

21         THE COURT:  Well, I'll tell you one thing.

22    Everything we're doing is unprecedented.  I've read the cases

23    you all gave me after *TiVo*, and there's nothing that I've seen

24    that is remotely like what we've got here, and if you think

25    they're different, help me, because I'm going to call that

1   judge, and I'm going to ask him if he'd be glad to come up and

2   sit as a visiting judge and sit right here and take care of

3   this thing.

4           MR. ROBERTSON:  Your Honor, let me just suggest --

5           THE COURT:  It's unworkable, and we stipulate all,

6   that it's unprecedented because nobody cited any precedent.

7           MR. ROBERTSON:  Well, we have cited, Your Honor.  I

8   think there was a footnote we had in the original brief that

9   suggested that many of these post-*TiVo* contempt proceedings

10  have been done in a very summary fashion even with just

11  attorney argument.

12          Others have been done -- I never saw one that went

13  more than two days, and I didn't see one that had a full

14  evidentiary hearing over a four-day period like this Court is

15  contemplating.

16          The difficulty with the approach --

17          THE COURT:  I have to say I haven't done the thorough

18  research that you've done, but I don't know what the charge was

19  like to begin with in those cases.

20          MR. ROBERTSON:  Let me just suggest --

21          THE COURT:  Or whether any of them had a mixed bag

22  verdict form like we have in this case.

23          MR. ROBERTSON:  Well --

24          THE COURT:  Do you know either one of those things?

25          MR. ROBERTSON:  I don't, Your Honor, but I will

1   certainly be looking at that very shortly.

2           THE COURT:  I'm sorry.

3           MR. ROBERTSON:  If we get in a situation where we are

4   trying to parse the evidence for a three-week trial and what

5   the witnesses said, and it's not just the witnesses because, of

6   course, there are documents, there were Lawson's witnesses,

7   there are experts, and already the problem we've had is we get

8   a suggestion that Dr. Weaver said X.

9           Well, Dr. Weaver also said Y.  Dr. Weaver was on the

10  witness stand for two days.  I cross-examined Mr.

11  Christopherson on the UNSPSC.  We put in documents with respect

12  to that, Lawson documents.  So what we find ourselves in here,

13  if this is what the suggestion is, that we have to show what

14  was proven to the jury, I would suggest an inherently

15  unknowable question --

16          THE COURT:  How do you deal with 882 of *TiVo*?  They

17  didn't write -- I don't think *TiVo* is a very workable decision.

18  I think it was a mistake to do what they did.  I think also the

19  Federal Circuit set the law in an en banc decision, and

20  district courts have to follow it, and so, too, do the lawyers

21  who practice there.  So how do we do that if we don't do what

22  Mr. Thomasch and Mr. Krevitt are saying?

23          MR. ROBERTSON:  I am suggesting, Your Honor, that --

24  what is proved is that the elements were satisfied by the

25  infringing product, and the elements that are satisfied have to

1    do with modifications.  Obviously, Mr. Thomasch represented to

2    you, or maybe it was perhaps Mr. Krevitt, that they used the

3    trial as a roadmap to how they would make these modifications

4    that they think are colorable differences.

5         So, obviously, they think they know what was proved,

6    but if we could just -- I want to make a point, Your Honor, and

7    I think it's important.

8         THE COURT:  But wait a minute.  See, now you're

9    getting the cart before the horse.  Let's go back to where we

10   were when you came up.  The first step he suggested was that

11   you, knowing what you know now, identified precisely what the

12   conduct is that creates the predicate for contempt, and then

13   they have to come in -- he said this was appropriate.  They

14   come in and say, well, that wasn't proved at trial, and they

15   cite why, and they cite what was proved at trial.  Then you

16   come back and have something to say.  That was the format I

17   think he suggested.  What do you say about that format?

18        MR. ROBERTSON:  Let me suggest, Your Honor, and I

19   know Your Honor has indicated you didn't think the expert

20   reports were that helpful, but that is exactly what happened in

21   the expert reports.  We came forward and said these

22   modifications are not colorable differences and here's why, and

23   they came back and said, no, they are colorable differences and

24   here's why, citing aspects of the trial testimony, and then we

25   came back and said, no, you're wrong, because Dr. Weaver just

1    didn't say that, he said all these other things.

2            I mean, they take a snippet of Dr. Weaver, and they

3    say, see, you went down to the fourth level on that.  It's not

4    just Dr. Weaver.  We put in our reports, for example, that I

5    asked Mr. Christopherson if you could use the UNSPSC code at

6    any level to satisfy the converting means.  Answer, yes.

7            So what we're going to have to do is marshal all the

8    evidence from a three-week trial on each of these elements and

9    put all back in front of Your Honor.  Your Honor dealt --

10           THE COURT:  Look, I didn't set this construct, Mr.

11   Robertson.  I don't think it's a good idea, but I believe that

12   I'm obligated to follow what the Federal Circuit set out no

13   matter how difficult it is, and now I'm trying to find out how

14   to do it.  How else would you do it?

15           MR. ROBERTSON:  I would focus on the modifications

16   and have the experts, who are persons of ordinary skill in the

17   art, presumably, address from that perspective whether or not

18   this is a significant difference in the art.  I mean, we have

19   people --

20           THE COURT:  In the art?

21           MR. ROBERTSON:  Well, in this particular --

22           THE COURT:  You have a whole motion opposing any such

23   discussion as that, if I remember correctly, discussing having

24   these people talk about the arts.

25           MR. ROBERTSON:  I mean, I think -- it's a term of

1  art, the person of ordinary skill in the art.  That is, you

2  have to look at a perspective of what this particular subject

3  matter is.  That's why we're calling source code experts or

4  computer scientists, and they can tell from -- even *TiVo* says

5  in the very next page that we were looking at that it turns --

6  it's going to turn, many of these inquiries, on the nature of

7  the accused product.

8       And so, for example, if we have a situation where all

9  they've done is modify the source code by putting a couple of

10 slashes in, the source code expert can say, that is really an

11 insignificant change.

12      Dr. Weaver can say, I testified before, and I can

13 show the Court testimony where I said you could do the

14 converting means at other than the fourth level, but if we have

15 to come in and retry this case by Lawson offering snippets of

16 Dr. Weaver's testimony, and then we have to come back with

17 counter snippets, we are just retrying the case all over again,

18 and that would be inappropriate.

19      Now, Mr. Thomasch tried to suggest to the Court that

20 the jury must have concluded, for example, that the

21 inventory -- excuse me, that the item master wasn't a catalog.

22 If I could show you, Your Honor, that assumption is just

23 demonstrably wrong, and so, therefore, for us to try and be

24 divining what the jury actually accepted -- for example, Your

25 Honor, there are lots of evidence.  We don't know whether the

1    jury accepted some of the evidence that we offered.  Obviously,

2    since they didn't find infringement on all the claims, they

3    must have rejected some evidence, and we don't know what

4    witness they found credible or not credible.

5         THE COURT:  Why don't you take the point he was

6    making with respect to 1749.  Would you put it up, please.

7         MR. ROBERTSON:  The suggestion is made, Your Honor,

8    that the item master, the jury could not have concluded that

9    the item master was a multiple catalog database, but if you

10   look at configuration number three, which has procurement

11   punchout, you may recall the inventory control module, which is

12   part of the core S3 procurement module, inventory control is

13   where the item master resides, and inventory control is where

14   you load the UNSPSC codes.

15        You don't code the punchout items in the punchout

16   module because those are outside vendors, as you'll recall.

17   You can't code them.

18        So the jury found that claims three and 28 of the

19   '683 patent infringe.  Those claims have the means for

20   converting element to it which is, the evidence showed, the

21   UNSPSC.

22        So, in other words, the jury must have concluded

23   using the UNSPSC, which only resides in this inventory control

24   module where the item master is, was multiple catalog database

25   because that's contained in the claim as well, two or more

1  catalogs.

2        So there's an equally reasonable inference that is

3  directly contrary to the representation Mr. Thomasch made, but

4  ultimately, how are we really going to know what the jury

5  resolved?  Indeed, Your Honor, you may recall there were some

6  issues with one of the jurors.  We don't know if they

7  compromised the verdict, if they -- if they -- possibly it is

8  inconsistent, so how are we supposed to ever know that?

9        THE COURT:  I guess Mr. Thomasch's point, if that's

10  the case, would be this from having heard him speak a moment

11  ago:  That being the case, how can there ever be a finding of

12  contempt since we don't really know, under the format that *TiVo*

13  sets out, since we don't know what was actually proved at trial

14  when you have a -- what do you call it -- an inconsistent

15  verdict or a verdict that looks to be at odds; isn't that what

16  you said?

17        MR. THOMASCH:  Yes, and also where, for instance, on

18  configuration three, the plaintiff went to the jury on three

19  alternative theories, whereas on configuration two, they only

20  allege that it was two -- that was what they said, item master

21  two, but on configuration three, they gave three alternatives.

22        I think you can understand why the jury could have

23  found one of the other two alternatives that allowed liability

24  on three and not on two.  But the bottom line is, if there is

25  not clarity in the verdict, there cannot be contempt.  There

1    could be another lawsuit but not contempt without clarify.

2           THE COURT:  He said it a lot better than I tried to

3    summarize his statement.

4           MR. ROBERTSON:  Your Honor, I think what we're doing

5    here is we're reading far too much into what the Federal

6    Circuit is saying in a decision that I agree with Your Honor is

7    not a model of clarity.

8           THE COURT:  It may not be, but it's the one we've got

9    to follow.

10          MR. ROBERTSON:  It depends then on what the word

11   "proved" means.

12          THE COURT:  Yes.

13          MR. ROBERTSON:  And, you know, that is a loaded word.

14   What we proved were certain claims were infringed by putting in

15   testimony and documents and having experts testify, and the

16   jury came to an ultimate conclusion.

17          You know, there are other aspects of *TiVo*, in fact,

18   which says previously alleged to be, and there were bases for

19   the prior finding of infringement.  The basis for the finding

20   of infringement --

21          THE COURT:  Where are you referring to?

22          MR. ROBERTSON:  I'm back on 882, again, Your Honor.

23          THE COURT:  Where?

24          MR. ROBERTSON:  It's the heading that has nine, ten,

25   and 11, and it's about halfway down.  I think I cited it.  It's

1    right after the additive controls cite.

2          In a sense, how can we ever know truly what the basis

3    was other than we put in a lot of evidence, the jury may have

4    accepted some, rejected others, and came to an ultimate

5    conclusion.

6          And then right after that, it just goes down to say,

7    focus on the elements -- I'm paraphrasing, Your Honor, but

8    where one or more of those elements previously found, and we're

9    talking about elements of -- the claim elements and the accused

10   products previously found to infringe has been modified -- and

11   that's what we're talking about here -- the Court must make

12   inquiry into whether the modification is significant, and I

13   think that's what we need to focus on.

14         But if we get into a he-said-she-said about what the

15   evidence really establishes when no one can know what evidence

16   was accepted and what evidence wasn't other than the ultimate

17   conclusion and what the basis of the jury's verdict, I think

18   we're just on a fool's errand that I think would force us to

19   just relitigate this case, and that can't be the upshot of

20   *TiVo*.

21         THE COURT:  I guess the real point to be made there

22   is if we take that approach, why isn't that simply requiring

23   you to prove an infringement case and contempt gets washed out

24   in any case of this kind where there's an alternative basis and

25   the verdict is -- there's a mixed verdict, some finding of

1    contempt -- I mean of infringement and some not?

2         MR. ROBERTSON:  If I'm understanding Your Honor's

3    question correctly, I think the one thing that happens is, as

4    we've discussed already, anything that hasn't been modified is

5    assumed to satisfy the claim elements.  So the benefit is we

6    get to zero in on those modifications and the particular

7    element it related to.  So it's a much narrower focus.

8         So if we're talking about, for example, the UNSPSC,

9    it only goes to essentially one element, the converting means,

10   and we can just zero in on that.  Some of the other changes we

11   think are not even relevant to the infringement inquiry, and as

12   we've suggested and as Your Honor has observed, we think

13   they're cosmetic or they're differences without a distinction.

14        THE COURT:  I didn't observe.  I said that's what you

15   said.

16        MR. ROBERTSON:  Well, yes, fine, Your Honor.  I

17   accept that.  That representation was made, and we do think

18   that they don't even apply to -- it's a difference, but it's

19   not a colorable difference, and I just want to make sure I

20   understood the Court earlier.

21        The colorable difference inquiry still has to be done

22   in the context of what the claim element is that's implicated

23   under Your Honor's claim construction.  That can't deviate.  So

24   it does get us almost to the promised land where the Court can

25   determine if there is a -- no colorable difference, is there an

1    infringement.

2           THE COURT:  Mr. Krevitt says that's not how you do

3    it, that you look at the product that was adjudged to be

4    infringing, and you find out if the difference was colorable or

5    not.

6           MR. ROBERTSON:  Let's assume --

7           THE COURT:  And that's all you do, is you don't go --

8    because, and I guess the underlying assumption for that is the

9    claim construction is built into the finding that it infringed,

10   and so you don't need to go through that.  You just look to see

11   if there's a difference.

12          MR. ROBERTSON:  Clearly you have to compare the

13   product found to infringe and the newly accused product in

14   determining whether or not that which is changed is colorably

15   different.

16          THE COURT:  Well, why isn't that all you do?  I think

17   that's what Mr. Krevitt was saying, and, frankly, it sounds to

18   me like that's what the Federal Circuit said.

19          MR. ROBERTSON:  I don't think I disagree with that,

20   Your Honor.

21          THE COURT:  You keep talking about the claim

22   construction then, and you need to look at colorably different

23   in terms of claim construction, and I don't understand why you

24   are saying that, because I would assume from what Mr. Krevitt

25   said and the Federal Circuit has said that the claim

1    construction is embedded in the finding of the infringement.

2    And then all you do is say, well, this infringed and here's

3    what the difference is.  The difference is just insignificant.

4             MR. ROBERTSON:  Well, I think it has to be done in

5    the context of whether, you know -- an infringement context,

6    and I think *TiVo* expressly says that.

7             THE COURT:  Why?

8             MR. ROBERTSON:  Well, because it says the contempt

9    analysis must focus initially on the differences between the

10   features relied upon to establish infringement and the modified

11   --

12            THE COURT:  Features relied upon, not the claim

13   construction.

14            MR. ROBERTSON:  Well, but to satisfy the

15   infringement, it necessarily involves the --

16            THE COURT:  I do not understand for the life of me

17   why you are arguing what you are arguing except that you said

18   it once and you just want to be right on it.  That's not a good

19   thing to do, and you don't usually do that, so I can't believe

20   that's the reason.

21            MR. ROBERTSON:  Let me try it another --

22            THE COURT:  Why would you argue something that's not

23   at all to your benefit to do?  You've got a finding of

24   infringement under Mr. Krevitt's approach embedded in the claim

25   construction.

1          MR. ROBERTSON:  I need to show that the new product

2     still satisfies the claim element under the colorable

3     differences test, and, you know, because -- let me approach it

4     a different way, Your Honor.  I apologize for not being too

5     clear.  What if we made lots of differences to this product

6     that had nothing to do at all with the claim that's at issue

7     here?

8          THE COURT:  We don't have that, though.  We only have

9     three.

10          MR. ROBERTSON:  Well, that's fine, but what if we

11     made differences that don't implicate the infringement?  I

12     mean, I can change a product a lot of different ways that have

13     nothing to do with the claim element.

14          THE COURT:  We're not at that point.

15          MR. ROBERTSON:  All right, so, you know, I guess the

16     question --

17          THE COURT:  Do you see in the back of his mind, or in

18     the basis of his argument, that's the predicate for his

19     argument, that you're trying to change the claim construction,

20     you see?

21          MR. ROBERTSON:  No, I --

22          THE COURT:  Yeah, it is.  That's part of what he

23     actually said.  That's why you want to focus on it, the issue

24     of claim construction, is because really you're trying to

25     change it, and that's part of what they say Dr. Weaver and Mr.

1    Niemeyer did if I've read the briefs correctly.

2         MR. ROBERTSON:  Your Honor, I have no interest in

3    changing the Court's claim construction one iota, and I'm not

4    going to do that in the context of this proceeding.  What I

5    need to do, though, is be able to show to the Court that it's

6    not a colorable difference because it still can do the

7    converting means, for example.

8         THE COURT:  All right.  We'll see.  So, anyway, we

9    have a problem that we need to solve.  If you all want to think

10   about it, I'll give you a couple, a little while to think about

11   it, but we're going to have to have a structure for how to do

12   *TiVo*.

13        None of the cases that you all cited to me about *TiVo*

14   have any of the problems presented by this case.  They didn't

15   have alternate theories that I can tell.  *TiVo* sure didn't.

16   They didn't have split verdicts in the sense that some

17   infringed, some did not, and there were not -- we have the

18   added sort of overlay or underlay to all of that that there

19   are -- we sent it to the jury on these configuration

20   structures, and the configurations -- there's one finding where

21   the configuration didn't infringe, and then with some of the

22   same components in it the configuration did infringe, and none

23   of the cases that I know of had that complication in it.

24        So we sort of need -- in order to be able to do what

25   is done with *TiVo*, to come up with an approach to how we're

 1    going to handle it, and you all tried the approach of dealing

 2    with it in your expert reports, and it got so complicated,

 3    bollixed up and fouled up that I don't think it's very useful

 4    to use that approach.

 5         And I don't like -- I don't think that *TiVo* is right

 6    in the way that it should approach the question of contempt.  I

 7    don't think it's right to say, go back and look at what was

 8    proved at trial, but that's what the Court said, and so somehow

 9    we're going to have to figure out how you do that.  And I need

10    some constructive thinking from you about how to do it, because

11    none of the other cases really had that kind of problem.  Each

12    one of them were fairly simple fact patterns and jury forms.

13         So we'll figure out how to do that.  What other

14    arguments do we have today?  We've dealt with the experts of

15    Goldberg and Niemeyer and Weaver.

16         MR. KREVITT:  Your Honor, the remaining motions

17    concern the damages issues.  There is -- ePlus has moved with

18    respect to Lawson's expert.  Lawson's damages expert is Putnam.

19         THE COURT:  Let's do Putnam then.

20         MR. MERRITT:  Good afternoon, Your Honor.

21         THE COURT:  Good afternoon.

22         MR. MERRITT:  As the Court is aware, ePlus has moved

23    to strike the testimony offered by Dr. Putnam that addresses

24    the award of a reasonable royalty as an appropriate sanction.

25    Everybody is so careful in these proceedings to make

1    appropriate disclaimers that I might as well join the train on

2    that.

3              THE COURT:  Join the train.

4              MR. MERRITT:  I will join the crowd to state the

5    obvious, and I believe it's already obvious to Your Honor.  The

6    arguments you're going to hear about Putnam and Dr. Ugone are

7    dealing with a subset of remedial issues.  There are a lot of

8    things that they don't bring their testimony to bear on like

9    attorneys' fees, enhanced damages, fines, or penalties.

10             They're really matters of law for the Court to

11   address and ultimately determine whether they are appropriate,

12   and today, what we're really focusing on is that subset of

13   economic issues that these gentlemen believe they have some

14   help to offer the Court on, and you have a range of those

15   between the two reports ranging from ePlus's lost profits to

16   Lawson's cost savings to Lawson's lost profits and to a

17   reasonable royalty.

18             This motion that I'm about to address just deals with

19   Dr. Putnam's offer of expert testimony on the reasonable

20   royalty issue.  I believe you'll get into some of the other

21   issues when the motion relating to Dr. Ugone is addressed.

22             Let me make an overall observation about what this

23   reasonable royalty testimony seems to be about and what it

24   seems to be trying to accomplish, and it really ties into a

25   legal argument that Lawson is offering.  That argument is

1    illustrated in two different places in their opposition brief.

2    I don't know, Your Honor, if you have that in front of you.

3                THE COURT:  I have all the briefs and the report.

4                MR. MERRITT:  If you don't want to have to turn to

5    the pages, I'll try to read these two citations as clearly as I

6    can, and hopefully you won't have to follow along.  I think

7    they are self-evident, but at page six of the memorandum in

8    opposition, Lawson makes this argument:  "This Court surely can

9    take note of the fact that ePlus represented in this very same

10   case that a royalty of five to six percent would compensate it

11   for the monetary loss of past patent infringement.

12               "A critical element of setting a reasonable royalty

13   is finding a rate that the patentholder would accept, and the

14   fact that ePlus sponsored the five to six percent rate,

15   regardless of its ultimate reliability, is, therefore, quite

16   informative."  That's at page six of the opposition memorandum.

17               To make sure the point is not lost, again at page 11

18   of the same memorandum near the bottom of the page, the same

19   argument is made.  First, there's sort of an obvious

20   concession.  "Lawson concedes that ePlus would be entitled to

21   fair compensation for harm it actually suffered as a result of

22   continued infringement.  Lawson merely maintains that the rate

23   ePlus previously represented to be fair compensation and that

24   the Court deemed to be inflated should at least be a

25   consideration in any remedy determination."

1          Now, there are a couple of interesting things about

2    that point.  Number one is, it is a lawyer argument.  It's

3    simply an argument that if ePlus has represented this in the

4    underlying infringement case, surely it is a proper thing for

5    the Court not to allow ePlus to do any better than that in this

6    contempt setting.

7          Neither of those references in the brief is hinged in

8    any way to any expert economic opinion.  That's simply an

9    advocacy position that Lawson is taking, that that's the right

10   thing for the Court to do, and as I understand it, translated

11   into plain English, what Lawson is trying to accomplish through

12   that argument, bolstering it through Dr. Putnam's testimony, is

13   that they want to stick ePlus in this proceeding with the

14   royalty payment that it advocated as sort of a firewall against

15   other more draconian contempt remedies.  That's the pretty

16   plain purpose of the enterprise here, and Dr. Putnam picks

17   right up on that theme.

18          Joe, if you could put up paragraph 154 of the Putnam

19   expert report.

20          THE COURT:  One-what?

21          MR. MERRITT:  154.

22          THE COURT:  All right.

23          MR. MERRITT:  Now, Your Honor, just to frame what you

24   are looking at here, paragraph 154 has been preceded by

25   23 pages of *Georgia-Pacific* analysis by Dr. Putnam, and now we

1    get to the conclusions of that *Georgia-Pacific* analysis in

2    paragraphs 154 and 155.

3            In paragraph 154, Dr. Putnam says this:  "It is

4    useful for present purposes to illustrate the level and scope

5    of remedies using Dr. Mangum's five percent royalty rate

6    acknowledging that this rate was excluded as unreliable and is

7    almost certainly too high."

8            Now here comes the punch line.  "But given that it

9    was offered by ePlus and that the errors in Dr. Mangum's

10   analysis would seem to overstate the royalty, it necessarily

11   follows that five percent is a conservative upper bound on the

12   royalty rate that ePlus would have charged Lawson had the

13   parties reached an agreement."

14           In other words, the critical conclusion that Dr.

15   Putnam is offering is in that second sentence.  It was offered

16   by ePlus, and the Court has found that if anything, it

17   overstated the royalty.  It has nothing to do with an economic

18   analysis of anything.  It is an attorney argument that could be

19   made without reference to Dr. Putnam whatsoever.

20           Now, in particular, what are the grounds for

21   excluding this kind of testimony?  First of all, the Court is

22   well familiar with the doctrines of law of the case and

23   judicial estoppel, and this Court is well aware that there have

24   been prior efforts, unsuccessful, to extract reasonable royalty

25   rate testimony from the record in this case.

1          The Court struck Dr. Mangum's opinion on that and

2     struck it, in large part, because it also struck as improper

3     the use of the five licenses that were previously negotiated

4     between ePlus and parties that it had sued, and this was

5     revisited once already back in your May 23rd opinion in

6     connection with the issuance of the injunction, and Your Honor

7     noted that when Lawson advocated at that point the use of a

8     reasonable royalty going forward, that it was improper for a

9     number of reasons that were listed in your memorandum opinion,

10    including this one, and I'm quoting now from your memorandum

11    opinion back on May 23rd.  We quoted it at the bottom of page

12    two and the top of page three of our memorandum in support, and

13    this is one of several reasons given.

14          "Lawson argues that because ePlus has arrived at

15    licenses with five other companies, the Court can use those

16    licenses to arrive at a going-forward royalty here.  That, of

17    course, is a passing-strange argument considering that Lawson's

18    successful motion to preclude Dr. Mangum's testimony was based

19    in large measure on the contention that those five licenses did

20    not permit an adequate basis upon which to calculate a

21    reasonable royalty.  Lawson does not explain how the Court

22    could turn around now and use those licenses to arrive at a

23    reasonable post-verdict running royalty."  Then it goes on to

24    further characterize the argument.

25          But the point has already been very clearly made one

1    time in this case that revisiting these licenses as a means of

2    trying to extract a reasonable royalty has been found by the

3    Court to be a futile exercise.  ePlus objected to it.  Until we

4    get further guidance from the Federal Circuit, it is the law of

5    the case, and there is no reason for any expert from either

6    party to be trying to tread those same licenses as a basis for

7    doing anything unless and until we're instructed otherwise.

8            Now, Dr. Putnam tries to straddle this.  He tries to

9    have it both ways.  If you look at his report at paragraph 115

10   through 119, and that's starting at page 58 of the Putnam

11   report and it continues over to page 61, in paragraph 115 at

12   the top of page 59, he starts by saying -- by embracing

13   basically what this Court did.

14           The Court found that Dr. Mangum's opinion was

15   unreliable, his proposed range of royalty rates too high, his

16   increase over the rates he actually found inadequately

17   supported.  He then agrees with the Court's criticisms, and

18   then after that proceeds to spend two pages and three lengthy

19   detailed footnotes talking about the very license agreements

20   that were excluded.

21           Now, that is having it both ways.  That is arguing

22   both sides of it.  That's saying, I understand the Court has

23   found these unreliable, but let me throw them into the air to

24   create sort of an atmosphere that they support the opinion I'm

25   really reaching which is just the lawyer argument.

1          Now, the law of the case could not be clearer on

2     this.  I've gone back and looked at the motions that Lawson

3     filed trying to strike these license opinions and, with

4     success, getting Dr. Mangum stricken.  There is no question

5     that they argued that these license agreements were not

6     helpful, not probative, and they did it for grounds that are

7     just as true today as they were then.

8          Nothing has changed in that regard.  The arguments

9     they made are still -- if they were viable then, they are just

10    as viable now, and it's very clear that this Court, based on

11    the passage that I read a few moments ago, relied on that

12    analysis and said that it was going to stick with that analysis

13    for purposes of this case.

14         So for reasons of law of the case alone, for reasons

15    of judicial estoppel alone, because Lawson clearly has switched

16    sides on this after persuading the Court of a certain set of

17    facts, that is that these licenses are of no benefit, is also

18    barred from now offering a royalty opinion from Dr. Putnam.

19         So first of all, you've got law of the case and

20    judicial estoppel, but there's a second, if you want to go past

21    those, independent and, I think, equally useful basis for

22    excluding Dr. Putnam, and that is that we have a rule of

23    evidence that requires reliability.

24         Now, Dr. Putnam has reported, as I mentioned in

25    23 pages of this report, to conduct a full-blown

1    *Georgia-Pacific* analysis.  I will certainly not walk you

2    through the weeds on everything that he does, but along the way

3    he references Dr. Mangum, corrects him, improves upon him, and

4    he also references and occasionally even embraces Dr. Green who

5    was also excluded by the Court.

6          But after 23 pages of this great labor to go back

7    through the *Georgia-Pacific* analysis, all that is brought forth

8    is what you've seen a few minutes ago, paragraphs 154 and 155.

9    There is no independently derived royalty rate from Dr. Putnam.

10          There is nothing in that regard.  There is simply a

11   long *Georgia-Pacific* analysis that suddenly defaults to an

12   argument that Lawson's attorneys could make without reference

13   to any economist.  That alone, that gap between this analysis

14   and the conclusions that are reached that have nothing to do

15   with the analysis makes this unreliable under Federal Rule of

16   Evidence 702.

17          I will tell the Court, we tried to understand and to

18   confirm at Dr. Putnam's deposition what he was driving at and

19   whether or not he really did have an opinion as to a reasonable

20   royalty.

21          Mr. Strapp took that deposition on the 22nd of

22   February up at Goodwin Procter's offices in D.C., and the

23   colloquy that he went through is on pages 129 through 131 of

24   that deposition.  A couple of questions are asked about do you

25   have a lower boundary, a lower boundary on your opinion.

1  You've told us that you think Mangum, who was excluded, set

2  some kind of an upper boundary.  Do you have a lower boundary.

3  He answers that he was not providing a lower boundary, and

4  there's no suggestion that there's a midpoint being provided

5  either.

6         But in response to the follow-up question, which is,

7  well, you're telling me then that your opinion is somewhere

8  between zero and five percent, Dr. Putnam offered four

9  different answers, four different answers to that question, and

10  they're at page 131 of the transcript.

11         Answer number one, well, the short answer is, no, I

12  don't think the number is zero.  So we know it's not zero.

13         Answer two, if you're asking me for a number de novo

14  sitting here, I don't think I could come up with one.

15         Well, that's kind of a redirection of the question.

16  The question is, are you going to offer the Court an opinion

17  somewhere between zero and five percent, and based on the work

18  you've been doing since November, do you have such an opinion.

19  No one was asking him to do anything de novo just sitting

20  there.  And he had none.  He offered none.

21         Third answer to the same question:  If the Court

22  posed that question to me and said, Dr. Putnam, do you think

23  that .1 percent is an appropriate compensation, I would say,

24  no, Your Honor, I think that while we can't determine an

25  exact number from the -- for example, from the prior

1    agreements, it's clear that .1 percent is not the right number.

2         So that's opinion number three.  We know it's not

3    zero, we've misdirected the question, and we know it's not

4    .1 percent.

5         Now here's answer number four where it really goes

6    off into the weeds.  It looks like the range is something like,

7    you know, somewhere between three and five, maybe two and a

8    half to five, something like that, so somewhere in the range of

9    two and a half -- I would say -- I think you're getting outside

10   the evidence, at least from prior agreements, but I haven't --

11   in other words, now I'm just making this up.  I wasn't asked to

12   figure out a lower bound, and so, you know, the point of it is,

13   I don't think that the lower bound is zero.

14        Now, two things about that.  Number one, I don't

15   understand how any court can set that answer about a reasonable

16   royalty rate beside Rule 702 of the Federal Rules of Evidence

17   and make a determination that that is any assistance to the

18   trier of fact or that it's an application of economic

19   principles and methods that is reliably related to the facts.

20   Not clear how the Court could do that based on that answer or

21   what this kind of testimony adds to anything.

22        But the other thing I'll mention, there's always a

23   nugget buried in these long, rambling answers, and I thought

24   this was a particular nugget.  I read it to you, but it's worth

25   repeating.  At page 131, lines 17 and 18, in the middle of that

1    long fourth answer I just read to you, Dr. Putnam said, I

2    wasn't asked to figure out a lower bound.  I wasn't asked to

3    figure out a lower bound.

4           Now, I can't recall any situation where an economic

5    expert has been asked to provide testimony on a rate who

6    doesn't come up with some version of a bell curve.  Here's a

7    number at which I have my highest degree of confidence, and

8    there's probably a plus or a minus around that number where I

9    have some degree of confidence but not as much, so here is my

10   range with an upper boundary, a lower boundary, and a number in

11   the middle in which I have the highest degree of confidence.

12   This gentleman was not asked to engage in that exercise.

13          Now, I don't know what that means about why he's

14   being used this way, but it seems, at least from our

15   standpoint, that this is a lawyer argument.  ePlus should be

16   stuck with its earlier five percent, ePlus should be stuck with

17   the fact that you found Mangum not credible and, therefore, you

18   shouldn't exceed it.  Those are points that can be made without

19   dressing it up with all these atmospherics that ultimately lead

20   to no conclusion at all, and for that reason, we believe Dr.

21   Putnam really doesn't need to offer opinions on the royalty.

22          He has some other opinions.  We have not objected to

23   those, but we think the royalty at this point should be out of

24   the case for law-of-the-case and judicial estoppel reasons and

25   also because this kind of testimony appears to us to be sort of

1    the attorneys are really arguing, and there's sort of this

2    atmosphere of *Georgia-Pacific* around it that never really leads

3    to any opinion at all.

4         THE COURT:  All right.

5         MR. DUSSEAULT:  Good afternoon, Your Honor.  For the

6    record, Chris Dusseault of Gibson Dunn.  Let me just begin with

7    the point that Mr. Merritt makes about the deposition testimony

8    because, frankly, I think it's a very unfair challenge that can

9    be dispensed with fairly easily.

10        What Mr. Merritt seems to be arguing is that when Dr.

11   Putnam testified that he was not intending to offer to the

12   Court an opinion about a lower bound and was then,

13   nevertheless, asked a series of questions about what the lower

14   bound would be, his answers are not reliable.  That's fine.

15   We're not offering opinions on the lower.

16        You, as the judge presiding over this case, do not

17   have to rule on whether a lower bound number is reliable.  That

18   is really just a distraction from what Dr. Putnam is doing.

19        Now, I do have, I think, a basic point of agreement

20   with Mr. Merritt that I think is an important starting point.

21   We absolutely believe that this Court can and should consider

22   in this proceeding that ePlus came to the Court and represented

23   that the way it can be justly compensated for infringement is a

24   five to six percent royalty.

25        I would agree that that point can be noticed by this

1    Court without expert testimony, and I believe that it should

2    be, and it could prove very, very important to this proceeding

3    for this reason, Your Honor, and this carries over a bit to the

4    Ugone motion as well.  ePlus is trying very, very carefully to

5    make sure that Your Honor doesn't hear about possible remedies

6    for contempt less than disgorgement of profits.

7          They've hired an expert who says he can do royalties,

8    he says he can do lost profit analyses, but all they want to

9    talk about is disgorgement, and why?  Because they haven't

10   shown that they have any lost profit, and because a reasonable

11   royalty, using a figure that they've already staked out, is

12   much lower than the money they hope to get here.

13         Now, we absolutely agree that that can be done

14   without expert testimony.  What we didn't know was whether Your

15   Honor would think that that was sufficient, so we offered

16   expert testimony on a very discrete issue that we believed

17   could be helpful to the Court, and it is this:  From an

18   economic perspective, looking at the information that's

19   available, does Dr. Putnam conclude, as the position taken by

20   ePlus would suggest through common sense, or you can call it

21   legal argument, that five percent is essentially an upper bound

22   of the royalty.

23         That's what we're offering the expert testimony for.

24   Now, if the Court doesn't need that and says, look, that's what

25   they asked for, I think you can take that as an upper bound --

1    because, remember, that's not a settlement offer, five percent,

2    that's not a compromise.  That's them coming in and saying,

3    this is what we're going to tell the jury is reasonable.

4            What we have done here is offer viable, reliable

5    expert testimony to confirm that, in fact, when you look at the

6    information that's available, five percent is an upper bound.

7            Now, ePlus argues, well, I've never a seen a case

8    where you don't offer a lower bound or you're just talking

9    about an upper bound.  This is an unusual context.  We are in a

10   contempt proceeding where, obviously and admittedly, one of the

11   purposes is to compensate ePlus if the Court finds that there

12   is contempt and the Court finds that there is enough evidence

13   before it to give some award, the Court will attempt to

14   compensate them.

15           So what Dr. Putnam undertakes is to analyze the

16   information and say, do I agree economically that based on all

17   the information I can see, competition between the parties,

18   what we know about licenses that are previously entered into,

19   and he goes through all the factors, do I agree that five

20   percent is an upward bound, and he concludes that he does.  We

21   believe that can be helpful to the Court.

22           I want to point out, ePlus has not moved to exclude

23   many of Dr. Putnam's other opinions, so he will be testifying

24   about the disgorgement theories that Dr. Ugone offers if he's

25   allowed to offer them.  He will be testifying about what profit

1    margins should and shouldn't be used and why the margins that

2    they try and use are inflated.

3            He will be here.  So this is not a matter where his

4    testimony is going to be avoided entirely, where there's a jury

5    that may get confused.  If Your Honor has questions about how

6    he comes to his upper bound, Your Honor certainly can ask it.

7    Your Honor could also say, I don't need expert testimony to

8    assist me in determining that when a litigant comes to me and

9    says five percent is sufficient, that that should be an upper

10   bound in a subsequent proceeding and I'm going to hold them to

11   that.  So that's what we're trying to do here.  I don't want

12   there to be any uncertainty about what we're trying to do.

13           Let's respond specifically to their challenges.

14   There are three, and none of them have merit.  One is that Dr.

15   Putnam's opinions are somehow barred by law of the case, and

16   the way they get to this is by defining what's the law of the

17   case as broadly as possible.  They basically say, you've ruled,

18   Your Honor, that there can't be a reasonable royalty opinion.

19           That isn't what the Court ruled, and I've spent a lot

20   of time in the last couple of weeks reading transcripts of

21   telephone conferences and of hearings and of orders, and that

22   isn't what the Court ruled.  What the Court ruled was two

23   different things.  The Court ruled that Dr. Russell Mangum did

24   not use a reliable methodology to arrive at a reasonable

25   royalty that met the requirements of the Federal Rules of

1    Evidence and *Daubert*, and, therefore, he was excluded.

2          The Court pointed out specific deficiencies in Dr.

3    Mangum's methodology, and importantly, for purposes here,

4    deficiencies that inflate the number; for example, arriving at

5    a two and a half to three and a half percent base royalty by

6    ignoring three of the five settlements because the numbers are

7    too small and then doubling that two and a half to three and a

8    half percent through pure ipsa dixit, really a sentence at the

9    end of the opinion saying I think it's five to six.

10         So Your Honor has ruled on that issue, but Your Honor

11   did not rule that no expert could come to better or more

12   reliable conclusions.  Certainly arguments were made that

13   settlement agreements were totally irrelevant.  Your Honor, in

14   your ruling, actually held that the current state of the law is

15   that they can be considered, albeit with limited probative

16   value.

17         We have tried to have Dr. Putnam fix certain issues,

18   and they say in their brief, their reply brief that Dr. Putnam

19   doesn't fix anything.  Just as one example, Dr. Putnam does,

20   for example, try and look at what would you see in individual

21   licenses if you tried to model a cross-licensing and the effect

22   of that.  He talks about that.  He does mention the other

23   settlement agreements.

24         So we're trying to resolve those issues, but the

25   Court didn't say no expert ever could get to a reasonable

1   royalty.  And I would just pose the question, if they didn't

2   want to avoid true compensatory damages and jump to

3   disgorgement, and they came in with a new expert trying a

4   better way, would they or even Your Honor be of the view that

5   they're barred from any attempt of doing that because of your

6   prior ruling, and I think not.

7          The other issue came up on the injunction proceeding,

8   and the argument that was made in the injunction proceeding

9   was, on the record before the Court, the Court can devise a

10  royalty that will impose going forward and in lieu of an

11  injunction.  That's not the issue we have here today at all.

12  Any compensatory award that will be based on this figure is in

13  addition to there's an injunction already in place, and Your

14  Honor certainly can continue that injunction.

15         And it's actually kind of ironic that they point to

16  that ruling, because Your Honor said, I can't do a royalty on

17  the record before me, and Lawson has not shown me how to do it,

18  but now that we come in with expert testimony in case Your

19  Honor is looking for more guidance on the issue, they say,

20  that's off the table, you can't do that.  So law of the case,

21  this is not a case where a legal issue has been resolved as far

22  as Dr. Putnam.

23         Similarly, judicial estoppel.  Their judicial

24  estoppel argument seems to focus on the argument that I

25  mentioned earlier, that settlement agreements are totally

1    irrelevant, but Your Honor did not accept that, and that's an

2    essential element of judicial estoppel, that the argument be

3    accepted.

4            Dr. Putnam was excluded -- excuse me, Dr. Mangum was

5    excluded, true, but that is not an issue that's now before the

6    Court.  That's not a judicial estoppel argument, and the

7    argument that the settlement points somehow gives rise to

8    judicial estoppel just doesn't hold up because of the Court's

9    ruling.

10           The final point, Your Honor, is on this *Daubert* and

11   702, and I have to say, I just think that the *Daubert* challenge

12   here is totally inappropriate in a couple of ways.  First of

13   all, it's based on a complete mischaracterization, almost

14   parody of what Dr. Putnam is doing, and they say in their

15   brief -- they devote about, a little less than two pages to

16   trying to strike Dr. Putnam under *Daubert* and say, well, he

17   just adopts all of Dr. Mangum's views.

18           That's not what he does at all.  What he does is say,

19   if you use Dr. Mangum's number, you use the fact that Dr.

20   Mangum has offered a number as an upper bound, and you then

21   test, through economic measures, whether that is, in fact, an

22   upper bound, can I provide helpful assistance to the Court, and

23   we believe that he does so, and we believe that he does

24   specifically address shortcomings of Dr. Mangum's analysis.

25           So I'll stop there, Your Honor.  The bottom line is

1   we don't believe the motion to strike has any merit.  It's

2   undisputed that Dr. Putnam will be testifying in the case.  He

3   will be offering damages opinions, and if Your Honor has any

4   questions about them, they're best raised in this type of

5   proceeding by hearing what he has to say and asking questions

6   of him.

7             THE COURT:  All right.  Thank you.  Mr. Merritt,

8   anything else?

9             MR. DUSSEAULT:  Well, Your Honor, the only

10  remaining motion is Dr. Ugone --

11            MR. MERRITT:  Your Honor, I do have a reply.

12            THE COURT:  Oh.

13            MR. MERRITT:  Your Honor, can I hand something up?

14            THE COURT:  Sure.

15            MR. MERRITT:  Before I turn to what I've handed up to

16  you, I'll just note that I believe I heard counsel say right at

17  the beginning of his argument that the fact that ePlus should

18  be stuck to the five percent rate is an argument that they can,

19  in fact, make without the benefit of economic testimony which

20  is, I think, one of our main points on the law of the case.

21            I hand up, Your Honor, a copy of a memorandum that

22  Lawson filed in support of its motion to exclude the settlement

23  agreements.  I'm sure it's one of the many thousands of data

24  points that have passed in this case that are long forgotten,

25  but I thought it to be very interesting, starting at page six

1    and on to page seven and following, where Lawson takes on the

2    specific problems with using litigation settlement agreements.

3         The headings sort of jump out.  A, the timing of the

4    litigation settlement agreements makes them irrelevant to this

5    case; B, the lump sum nature of the litigation settlement

6    agreements makes them irrelevant to ePlus's running royalty

7    awards; C, the facts underlying the litigation settlement

8    agreements are either unknown or so totally different from this

9    case to make them irrelevant; and D, there's no evidence

10   regarding the financial situation underlying the litigation

11   settlement agreements rendering them irrelevant.

12        Now, it's very difficult to understand how Lawson can

13   take the position that the Court did not look at, understand,

14   and ultimately accept these factual characterizations that

15   Lawson made when it was trying to keep the license agreements

16   out of the case, and, in fact, as I look at the Court's

17   memorandum opinion in this case that was issued January 27,

18   2011, in support of the striking of Dr. Mangum, at page five,

19   the Court says, "The core of Dr. Mangum's analysis became the

20   settlement agreements reached in two litigated cases, the

21   so-called Ariba and SAP agreements."

22        So there's no question where the Court was focusing

23   in terms of its understanding of what Lawson was complaining

24   about, and, in fact, when the Court excluded Dr. Mangum's

25   testimony, it's clear that a key part of its ruling was that

1   these agreements were unreliable.

2        At the top of page 14, there's a paragraph that

3   starts with the minimal probative value that can be

4   attributable to settlement agreements, et cetera, that

5   basically is a series of sentences that come almost directly

6   off the series of Lawson arguments I just identified from their

7   brief.  So the Court clearly relied on it.  Lawson won that

8   point, got those settlement agreements minimized, and was able

9   to take great advantage of that in the underlying case.

10        Now they're bringing them back in through an odd sort

11   of backdoor process, not as direct evidence of anything but as

12   sort of an atmospheric attempt to support what's really an

13   attorney argument.  I've already showed you paragraph 154 of

14   Dr. Putnam's opinion, but you get the same thing, if you could

15   put it up, at paragraph 119 where you get this sort of

16   simultaneous rejection and embracing of these settlement

17   agreements.

18        At paragraph 119, Dr. Putnam opines, "The license

19   evidence" -- of course, this is the very license evidence that

20   they were pouring cold water on -- "points to a royalty rate

21   less than five percent of sales for a one-way license."  Then

22   they switch.  "Given ePlus's prior representation that five

23   percent constitutes adequate compensation, I adopt that figure

24   as an upper bound on a reasonable royalty rate."

25        So the license evidence which they excluded is kind

1    of thrown in there, but then the real conclusion is a lawyer

2    argument that this is something ePlus previously represented,

3    and, therefore, you should stick them with it.  They do

4    precisely the same thing at paragraphs 154 and 155 at the very

5    end.  I showed you paragraph 154.  We can put up paragraph 155

6    where, again, this sort of half-embraced, half-rejected royalty

7    analysis is used as sort of a cover for the real opinion that I

8    showed earlier that's in 154, but, again, it goes back to

9    talking about these licenses that Lawson got tossed.

10           So I don't know quite what to make to that sort of

11   approach.  It's clear that this expert has no opinion on a

12   royalty.  It's clear that this expert is parroting precisely

13   almost verbatim positions that Lawson is taking in the brief,

14   but those aren't economic expert opinions, nor are they driven

15   by any economic analysis this expert has offered the Court.  We

16   believe it would be improper to let him offer an opinion on

17   this issue.

18           MR. DUSSEAULT:  Your Honor, may I correct one point

19   very briefly?

20           THE COURT:  Sure.

21           MR. DUSSEAULT:  Your Honor, I'm assuming that Mr.

22   Merritt didn't mean to suggest otherwise, but when he talks

23   about -- when he shows you this motion *in limine* and he talks

24   about licenses that Lawson got tossed, I'm assuming he's not

25   meaning to misrepresent that that motion was granted, because

1    actually the motion was denied as moot.

2              And in the Court's ruling on Mangum, which is what --

3    they're essentially saying, well, even if you didn't grant the

4    motion, you clearly adopted this argument that settlement

5    agreements are irrelevant.  Here's the direct quote, and it's

6    docket number 956 at page 13.  Quote, it is now, however,

7    well-settled that settlement agreements entered into in the

8    context of litigation may be considered, but they have minimal

9    probative value respecting the calculation of reasonable

10   royalties.

11             So the Court did not toss, to use his phrase, that

12   evidence.  The Court ultimately did not allow ePlus to present

13   damages evidence, but the record shows that that was a

14   discovery sanction for their improper discovery responses and

15   not in response to this argument.  And since it's an essential

16   element of judicial estoppel that the argument be accepted, it

17   simply doesn't apply.

18             THE COURT:  All right.

19             MR. MERRITT:  Your Honor, all I would ask, for the

20   completeness of the record, you were just read a paragraph in

21   your memorandum opinion at page 13.  The paragraph that follows

22   at the top of page 14 is where you address the arguments Lawson

23   made.

24             THE COURT:  Okay.  We'll take one hour for lunch, and

25   conclude -- all that's left is Ugone?

1          MR. DUSSEAULT:  That's correct.

2          THE COURT:  On the motions at this time.

3          MR. DUSSEAULT:  Yes.

4          THE COURT:  We'll resume at two o'clock.

5

6          (Luncheon recess.)

7

8          THE COURT:  This is Lawson's motion to strike expert

9     opinions.  How do you pronounce his name?

10         MR. DUSSEAULT:  Ugone.

11         THE COURT:  Ugone, okay.

12         MR. DUSSEAULT:  Yes, Your Honor, and I do have some

13    slides for this one, so I have one for you and the clerk, and,

14    Your Honor, you'll see that they're described as Ugone/Putnam

15    motions, although we didn't use any slides for Dr. Putnam.

16         THE COURT:  Do you all have a version of the Ugone

17    report that doesn't use these kinds of bindings?  They come

18    apart, and you can't really -- we don't need it now, but I'd

19    like to have it, maybe punch holes in it and send it over in a

20    notebook later on if you will.  All right.

21         MR. DUSSEAULT:  Thank you, Your Honor, good

22    afternoon.

23         THE COURT:  Good afternoon.

24         MR. DUSSEAULT:  Your Honor, you've obviously seen the

25    briefing on this motion.  One thing that now appears to be

1    undisputed is that in a contempt proceeding such as this one,

2    an award for past harm or past loss is and must be compensatory

3    in nature.  ePlus doesn't seem to dispute that.

4         There may be some dispute about what constitutes a

5    compensatory award, but they seem to accept that an award in a

6    contempt proceeding is intended to be compensatory in nature,

7    not punitive in nature, and that's for the backward-looking or

8    retroactive-looking aspect of the award.

9         THE COURT:  Well, how do you keep people from

10   violating injunctions if you're a court?

11        MR. DUSSEAULT:  Well, Your Honor, there are two ways

12   that you can do that.  With respect to the compensatory aspect

13   of the award, the case law is clear that there is some room to

14   enhance.  So what you see in the cases that use a reasonable

15   royalty, let's say, or a lost profits, they will sometimes

16   enhance that royalty.

17        This is what the *TiVo* court did.  It rejected

18   disgorgement, but it said, we'll do an award based on a

19   royalty, and we'll increase the royalty by 80 percent.  We'll

20   change it from 1.25 to 2.25.  So there is some element to take

21   a compensatory award and enhance it, but --

22        THE COURT:  What's different in this field than in

23   any other field of contempt once you find there's a contempt

24   that you can't, if you're the Court, take the action that's

25   appropriate that will get the -- make sure that the defendant

1  or the enjoined party is deterred from further misconduct by

2  taking away whatever benefit has been had by violating the

3  injunction, do you think?

4          MR. DUSSEAULT:  Well, Your Honor, I think the law is

5  clear, and I'm going to go through some of the cases, that

6  there are two aspects of the award that are available to the

7  Court.  There is the compensatory retroactive aspect that is

8  intended to compensate the harmed party for the wrong.

9          There is also a coercive element going forward, and

10  the Court absolutely does have the power to enter a coercive

11  remedy going forward, but the key essential element of that is

12  it must be something that the party against whom it's entered

13  can avoid by coming into compliance with the Court's order.

14          So you would, for example, have an ability to issue a

15  coercive award going forward that isn't truly compensatory and

16  say, if you find contempt, that Lawson, if you continue to

17  violate my order, this is the sanction that you will face, but

18  you can award that coercive sanction by coming into compliance.

19          THE COURT:  But all that does is permit a

20  recalcitrant person from -- it allows them to violate the

21  injunction on a going-forward basis, earn the money, have the

22  use of the money, and then face the risk of loss of the money

23  after litigation years down the road when you finally get

24  around to making another finding, and it seems to me that in

25  other areas, the courts are permitted to impose injunctions

1    that will -- that cannot be punitive, but they can get the

2    attention of businesspeople and have them learn once and for

3    all that when a court says to do something, you do it, and you

4    don't play cute with it.

5              MR. DUSSEAULT:  Yes, Your Honor.

6              THE COURT:  You all seem to be saying in your papers

7    that the Court doesn't have that power, and I don't read the

8    Federal Circuit's law that way.

9              MR. DUSSEAULT:  Well, Your Honor, maybe what would be

10   helpful would be to go through some of the cases which is what

11   I tried to do in the slides, because there certainly is a body

12   of case law that has allowed disgorgement of profits, but when

13   you look at those cases, the vast majority of the cases that

14   ePlus cites for that proposition, they all have a common trait

15   which is that disgorgement of profits is available in the

16   underlying lawsuit.

17             That's true in copyright, trademark, it was true in

18   the Patent Act at the time of the Leman case that disgorgement

19   was available as a remedy.

20             And there's a very obvious reason that you would

21   treat that differently.  I'll get into that as I make the

22   argument, Your Honor, but let me start with -- if we could do

23   slide 1802 -- just lay the foundation of some of this case law.

24             One of the real foundational basic cases here is

25   *United States v. United Mine Workers* of America which simply

1    states that where compensation is intended, a fine is imposed

2    payable to the complainant.  Such fine must, of course, be

3    based upon evidence of complaint's actual loss.

4            That's a starting point from the U.S. Supreme Court,

5    and we sort of jumped right into the case law, but I want to

6    make something clear to Your Honor.  Dr. Ugone makes no attempt

7    to establish ePlus's actual loss.  He ignores record evidence

8    about whether they have lost even a single sale

9    post-injunction.

10           They take the position, and it's clear from their

11   opposition brief, they quite proudly take the position that

12   they don't have to show actual loss.  They can get disgorgement

13   even if they've lost nothing.

14           The next case slide, 1803, Your Honor, is another

15   Supreme Court case, the *Bagwell* case, and here the Court --

16   this is a more recent case, 1994.  Here the Court says, "In the

17   instant case, neither any party nor any court of the

18   Commonwealth has suggested that the challenged fines are

19   compensatory.  At no point did the trial court attempt to

20   calibrate the fines to damages caused by the union's

21   contumacious activities or indicate that the fines were 'to

22   compensate the complainant for losses sustained.'"  So very

23   recent Supreme Court case endorsing the *Mine Workers* rule.

24           The Fourth Circuit has also followed this rule, and

25   that's the next slide, the *Carbon Fuel* case, and, again, what

1    it says is, "Civil contempt, on the one hand, is wholly

2    remedial, serves only the purpose of a party litigant, and is

3    intended to coerce compliance with an order of the court or to

4    compensate for losses or damages caused by noncompliance."

5         And, again, that's the two-fold element that we've

6    talked about, the coercive element that has to be something

7    going forward that the party can avoid with compliance and the

8    compensatory element which is backward-looking or retroactive.

9         We've included a second quote from *Carbon Fuel* as

10   well where they're talking about the problem with what the

11   Court did, and they say, "Had the fine been intended for the

12   benefit of the appellee by way of compensation for loss

13   sustained, it would have been made payable to the complainant

14   and would necessarily," necessarily, "have been based upon

15   evidence of complainant's actual loss.

16        And then they say basically that the party indicated

17   that it was willing to prove actual loss, but they didn't

18   actually do so, and, again, this is binding Fourth Circuit

19   precedent.

20        THE COURT:  Do you all believe that the Fourth

21   Circuit law governs the proceeding here?

22        MR. DUSSEAULT:  Fourth Circuit law on this issue, the

23   remedy that's available in a contempt proceeding, does, Your

24   Honor, and if you turn to the next slide, *Spindelfabrik*, it's a

25   Federal Circuit case making that point.

1          It says, "the Fourth Circuit, the decisions of which

2     on this issue we follow, has held that in a contempt

3     proceeding" -- excuse me, "has held that a contempt proceeding

4     is civil if the penalty is intended to coerce compliance with

5     an order of the court or to compensate for losses or damages

6     caused by noncompliance.

7          THE COURT:  Is disgorgement not a proper way to

8     coerce compliance?

9          MR. DUSSEAULT:  Going forward, Your Honor, it could

10    be.  Going forward, it could be, but the coercive -- and we

11    cite these cases in our brief.  The coercive element of the

12    sanction that's available in civil contempt has to be

13    future-looking.

14         THE COURT:  But you get one free pass under that

15    theory.  I don't believe that courts -- that when courts issue

16    injunctions, and if they find there is a violation, I don't

17    believe that this is a smack-on-the-hand situation.  It is a

18    serious thing to do that, or in the other instance, do we have

19    to turn this matter over to the U.S. Attorney and have them

20    bring a criminal contempt proceeding in order to get the

21    attention of these people.

22         MR. DUSSEAULT:  Your Honor, no one is suggesting for

23    a moment that it's a free pass or that it's something that can

24    be taken lightly.

25         I believe what the cases show is that the Court has

1    broad discretion with respect to the retroactive remedy, but

2    the remedy has to be compensatory in nature.  So there are

3    cases, for example, Your Honor, where you've found -- if you

4    find some kind of willful disregard, which, I think, is what

5    you're talking about.

6              You're not talking about a situation where Lawson

7    believes it's designed an effective workaround.  You wouldn't

8    actually want to discourage that at all.  You're talking about

9    a situation where they just willfully are disregarding the

10   Court's order.

11             THE COURT:  According to ePlus, that's precisely

12   what's happened.  I make no finding on that point, but they say

13   that that is exactly what's happened.  If they prove that, it

14   looks to me like you're not into the -- it looks to me like

15   you're into the need to coerce compliance, there being a

16   two-fold remedy.  One is to coerce compliance or to compensate

17   for losses, damages caused by noncompliance.  You have two

18   choices there.

19             MR. DUSSEAULT:  That's right, Your Honor, but the

20   coercive element has to be prospective.  It has to be

21   future-looking, and there has to be an opportunity for the

22   accused wrongdoer to eliminate the fine by coming into

23   compliance.

24             THE COURT:  But that then gives the wrongdoer a free

25   pass.

1          MR. DUSSEAULT:  Well, here's why it doesn't, Your

2     Honor, and I understand that would be concerning, but it is not

3     a free pass by any means.  The cases have held that the

4     compensatory award has to be tied to actual loss.  It doesn't

5     have to be only the amount of the actual loss.

6          Some cases have doubled it, some have tripled it.

7     Some have doubled the actual loss, some have tripled it.  You

8     could take a reasonable royalty, for example.  If ePlus had

9     proven a reasonable royalty in this case, or you take Dr.

10    Mangum's that he's offered, you could, within the case law,

11    take that and double or even treble it if you thought that the

12    facts and circumstances supported that.

13         THE COURT:  And wouldn't -- in this case, on the

14    facts, wouldn't Lawson just be glad to have that and write it

15    off as a cost of doing business and pocket about 27,

16    $25 million more if, in fact, there has been a violation?

17         MR. DUSSEAULT:  Well, Your Honor, I don't think so.

18    Again, it's interesting in that they certainly allege that it's

19    a bad faith violation that we didn't even think that it was a

20    valid change.  We certainly argue that it was a valid change,

21    and it's interesting to note that they provide only a

22    disgorgement option.  They don't provide a truly compensatory

23    option in the event that, let's say, Your Honor said, well,

24    this isn't necessarily something I want to discourage, I think

25    they did really try and comply.

1          They've given you no option other than the punitive

2     one, but the case law, Your Honor, again, the case law is what

3     it is in that it says that you have options.  There are

4     circumstances where attorneys' fees can be awarded.  There are

5     circumstances where doubling or trebling might be acceptable,

6     but the question is whether they can leap, under the case law,

7     from compensation.  Even though the remedy is compensatory,

8     they can move away from it and disregard it completely and go

9     right to disgorgement, and these cases that I've been walking

10    through, Your Honor, hold to the contrary.

11         The one I did really want to focus on is

12    *Spindelfabrik* which is a relatively recent 1990 case from the

13    Federal Circuit applying Fourth Circuit law and applying these

14    principles to the patent contempt context.  And you see the

15    highlighted language here, "Where compensation is intended, a

16    fine is imposed, payable to the complainant.  Such fine must,

17    of course, be based upon evidence of complainant's actual

18    loss."

19         And then you see the next slide from *Spindelfabrik*

20    also points out that in the case before the Court, the amount

21    of the fine was not based upon evidence of the actual loss,

22    and, therefore, constituted a punishment.

23         So there is a significant body of, we would submit,

24    binding Supreme Court and Fourth Circuit precedent for the

25    premise that an award in a civil contempt proceeding that is

1   retroactive in nature must be tied to actual loss.

2          Now, Your Honor is questioning that and saying why

3   does that make sense, and, again, it makes sense because I

4   don't believe that the slap-on-the-wrist analogy is at all

5   fair.  I think paying the reasonable royalty to compensate and

6   facing, let's say, a coercive sanction or perhaps a tightened

7   injunction going forward or an injunction that has additional

8   terms going forward is not a slap on the wrist, and certainly

9   if the Court were to double or treble the reasonable royalty

10  award or the lost profits, that wouldn't be deemed not -- I'm

11  not aware of any context where paying twice or treble damages

12  is deemed to be a slap on the wrist, particularly if it is

13  accompanied by something else going forward.

14         Now, ePlus points to a significant body of cases, and

15  we don't disagree that those cases are out there, that have

16  allowed disgorgement in civil contempt proceedings, and they

17  start with the *Leman* case, and then they cite to a big string

18  cite of cases that have allowed it, but what we pointed out in

19  our reply brief, and we've looked at these cases very

20  carefully, is that with very, very, very few exceptions, those

21  cases arise where disgorgement is allowed in the underlying

22  statute in which the case is pursued.

23         Now, why does that make sense?  So let's look at what

24  was before the *Leman* court.  The *Leman* court was looking at a

25  status of patent law where disgorgement was available.  So if a

1    patent is infringed and the patent owner brings a case for

2    infringement, they can get disgorgement.

3            Then there's an injunction, and there's a violation

4    of the injunction, and they bring a contempt proceeding, and

5    the infringer says, well, you're only allowed to get your

6    actual loss, so even though if you sued me for infringement in

7    the first instance you could get disgorgement, applying these

8    cases, the judge's hands are tied, you actually have to give

9    less than in the underlying case.

10           That reasoning holds the same in a copyright case or

11   a trademark case.  That saying that the remedy in civil

12   contempt has to be tied to actual loss would be to say that the

13   plaintiff gets less than the plaintiff would get in a brand new

14   case or in the underlying case.

15           It's quite clear why that doesn't make sense to the

16   courts and why the courts have said, no, in that sense, if a

17   remedy is available to you in the underlying case, then we're

18   not going to tie the hands of the court from giving that remedy

19   in the contempt proceeding.

20           But there's a reason that the vast majority of the

21   cases that they cite comes from that context, because the

22   reasoning is completely different with what ePlus is trying to

23   do here.  What ePlus hopes to do here, having been excluded

24   from presenting damages evidence at the underlying trial, ePlus

25   is now trying to jump to a much, much larger number in this

1    case and make up for those damages and get something that would

2    not be available to them in a case of infringement, and the

3    cases that they cite that allow disgorgement in different

4    statutory contexts just do not support that reason.

5            THE COURT:  What was Mangum's figure for damages

6    based on a reasonable royalty in the underlying case?  I've

7    forgotten.

8            MR. DUSSEAULT:  I have a slide on it.  Let's go to

9    1815, please.  Let me take a moment, if I could, Your Honor, to

10   walk through this, because we've done some math on these

11   numbers to make them helpful to the Court.

12           The underlying infringement case, Mangum's number

13   with a five percent royalty rate came to $20.1 million, and a

14   few things are important to reiterate about that.

15           That was for nearly seven years of infringement, six

16   years ten months, as I recall.  It involved three patents and

17   five challenged configurations, and when he came to the Court

18   and said, here's reasonable compensation for that infringement,

19   it comes to $20.1 million.

20           Now, what is Dr. Ugone asking for here?  There's some

21   confusion in ePlus's brief on this issue, and I want to

22   emphasize that they use some numbers from the report that are

23   on the lower end and say, that's what Dr. Ugone is asking for,

24   and then he's asking for a daily rate going forward after the

25   entry of an award as a coercive measure.

1              That isn't actually what Dr. Ugone says.  He had data

2       from May 23 through November 30th of 2011, and what he did was

3       he did a lump sum for that, and then he calculated a daily rate

4       based on that data going forward.

5              Now, because of the six-month sunset provision for

6       the health care hospitals, many of their revenues were not

7       included in the first six-month figure, so that figure looks a

8       little more reasonable when you look only at that number.  It

9       looks a little lower at least.  But when you apply the daily

10      rate, you get a very different result.

11             So what we've done here is, let's assume that Your

12      Honor enters a contempt award on the one-year anniversary of

13      the injunction, May 23rd, and you take the lump sum award that

14      Dr. Ugone arrives at and the daily rate that he calculates.

15             He says that Your Honor should disgorge all of our

16      revenues, okay.  That, in the range that he gives, and there's

17      a couple of different assumptions, would be either 33.9 or

18      $56.1 million for one year compared to 20.1 million for seven

19      years.

20             Now, in his deposition, even Dr. Ugone seemed to

21      acknowledge that revenue disgorgement probably doesn't make

22      sense, so we've included a second figure which is his gross

23      profits disgorgement figure, but even that, even a gross

24      profits figure is for one year greater than what Dr. Mangum

25      asked for --

1          THE COURT:  Is the gross profits figure correct?  Is
2    that the right profit off of that revenue?
3          MR. DUSSEAULT:  It is -- let me answer that in two
4    ways, make sure I understand the question.  We do not believe
5    that that's the right profit to use off that revenue at all.
6    We provided net profit information at their request that gives
7    a much, much lower number, and then, of course, Dr. Ugone says,
8    well, no, I think it should be gross profits.
9          THE COURT:  I meant to ask was the gross profit
10   figure right.
11         MR. DUSSEAULT:  There are a few disagreements, Your
12   Honor, so I don't want to say it's correct.  There's a little
13   bit of variance, but the numbers are relatively close.  There's
14   disagreements about certain types of revenues, did the
15   injunction intend to preclude, for example, a health care
16   customer from adding a user if they hire a new employee.  They
17   say, yes, you weren't allowed to add a user, so that's bad
18   revenue, something like that.
19         There are some disagreements, but the major
20   disagreement that we'll have if we get into disgorgement is
21   over what the right profit margin is.
22         THE COURT:  Whether it's net or gross, you mean?
23         MR. DUSSEAULT:  Net or gross, and then they've also
24   talked about incremental.  Dr. Ugone didn't offer an
25   incremental profit figure in his initial report, but when Dr.

1    Putnam talked about incremental profits, he came back with one,

2    so he's offered an incremental profit alternative as well.

3              But what's clear, Your Honor, is that for a

4    relatively short period of infringement, they are seeking

5    something that bears no relationship whatsoever to

6    compensation.

7              Now, if the Court decides that despite the case law

8    that we've cited compensation is not actually the purpose of

9    the retroactive award, then the Court might look to these

10   numbers, but we would submit that if the Court's goal, as the

11   case law seems to require when assessing a backward-looking

12   award is to compensate, then it has to have some relationship,

13   and let me make this clear.

14             It's not only that Dr. Ugone isn't using the figure

15   for actual loss, be it lost profits or what they would get in a

16   reasonable royalty.  It's that he doesn't even mention it or

17   calculate it.  He doesn't give Your Honor any kind of benchmark

18   against which to evaluate whether this award is compensatory or

19   punitive.  And if I could direct Your Honor, there's a case out

20   of the Third --

21             THE COURT:  What would it take for them to prove

22   actual loss as a consequence of the alleged violations of the

23   injunction in your view?

24             MR. DUSSEAULT:  Well --

25             THE COURT:  In other words, what would they be

1    required to show?

2        MR. DUSSEAULT:  Well, let me answer that in two ways,

3    because I asked Dr. Ugone that question, and Dr. Ugone has

4    repeatedly, in many, many, many patent infringement cases, been

5    more than able to calculate a lost profits number.  So since

6    he's the expert who they hired to do this analysis, I basically

7    asked him, you know, this is something that you've been able to

8    do over and over again, and he acknowledged yes.  There may be

9    some cases where he has taken the position that it's not the

10   appropriate measure, but it is something that he can do.

11       Now, how would they go about doing it?  I think they

12   need to come up with some evidence of efforts on their part to

13   make sales that they lost, and if I could, this might be a good

14   time to direct Your Honor to some testimony that we got on that

15   subject, and this is beginning at slide 1813.

16       Now, you may remember, Your Honor, from the

17   injunction proceeding that Mr. Farber of ePlus testified about

18   what having an injunction in place would enable ePlus to do,

19   and he gave the Court the impression, and I believe he

20   testified that if an injunction was in place, then ePlus could

21   go out and try to make sales to Lawson customers who have some

22   of the foundation products but may be looking for add-on

23   products.

24       So what we asked in his deposition was basically

25   whether you've done this, and here's the questions and answers.

1   The first one says, "Question:  Before the injunction entered,

2   was there any form of contingency planning by ePlus as to how

3   ePlus might be able to take advantage of an injunction from a

4   business perspective if an injunction were entered by Judge

5   Payne?

6          Answer:  I don't believe at that point, no.

7          Question:  At any time following the May 23rd, 2011,

8   entry of an injunction, did ePlus form a strategy to try to

9   take advantage of the injunction from a business perspective?

10         Answer:  No."

11         And then on the next slide, and this is referring to

12  the testimony that I mentioned a moment ago, "Question:   In

13  light of the fact that, as you testified, ePlus had the

14  capability of selling a requisition system to replace RSS with

15  a customer who was otherwise using the Lawson system

16  foundation, did you consider attempting to make direct appeals

17  to Lawson customers to accomplish that?

18         Answer:  Before litigation?

19         Question:  No, after the date of the injunction.

20         Answer:  No.  I had mentioned earlier in this

21  deposition that is was ill-advised by me to do so."  So --

22         THE COURT:  What does that mean?

23         MR. DUSSEAULT:  I think what he's -- it's an odd turn

24  of phrase, certainly, but I think what he is saying is that he

25  made the decision not to pursue sales to Lawson's customers.

1    So whether hypothetically, Your Honor, in some cases

2  it could be tough to wrestle with or approve the issue of

3  actual loss where the head of a company says under oath, and by

4  the way, not just individually but as the Rule 30(b)(6)

5  designee whose answers are binding on the company says, we

6  didn't even try, we didn't even try.

7    Now, oddly, Dr. Ugone lists the Farber testimony as

8  one of the documents that he considers in coming to his

9  opinions, but he doesn't talk about this.  He doesn't mention

10  it.

11    Now, even if in a hypothetical case it could be tough

12  to wrestle with actual loss, it's not that tough here.  Not

13  that tough when the head of the company says that he's made no

14  effort.

15    So the point is that Dr. Ugone has made a strategic

16  decision here, I'm sure in consultation with counsel, not to

17  get into the issue of actual loss.  They're not going to try

18  and prove lost profits, they're not going to talk about the

19  reasonable royalty.  They're just going to offer these

20  disgorgement figures that we've seen are totally

21  disproportionate to Lawson harm and apparently take the gamble,

22  Your Honor, that if that's the only option on your plate, that

23  it's what they'll get, because Your Honor will feel obliged to

24  give them some kind of compensation, and that's a very risky

25  gamble.

1          Dr. Ugone says, I'm trying to provide assistance to

2     the Court, I'm trying to help the Court.  I'm giving the Court

3     a menu of options, but the menu he's giving you, Your Honor, is

4     disgorgement, disgorgement, or disgorgement, disgorgement of --

5          THE COURT:  Only steak, no fish.

6          MR. DUSSEAULT:  Only steak, no fish.

7          THE COURT:  What was the commercial; only fish no --

8          MR. DUSSEAULT:  It reminded me of the scene from

9     *Forest Gump*; you've got the grilled shrimp and the barbecued

10    shrimp and the Cajun shrimp.  That's, I think, his idea of what

11    the menu would look like.

12         The point is, Your Honor, is that reliable where the

13    case law directs us that it has to be compensatory, to do that

14    in a way that's divorced from any measure of harm.

15         Now, again, we know that there are cases out there

16    that have allowed disgorgement, but there is that clear

17    distinction in the vast majority of them that that is in cases

18    where disgorgement is otherwise available.

19         So I think that's enough on that point, Your Honor.

20    I'm going to leave that general challenge to Dr. Ugone, and I

21    do want to touch just briefly on a more specific challenge that

22    we have raised to Dr. Ugone which is one of his disgorgement

23    options which is cost savings.

24         Let me try and explain the cost savings theory to

25    Your Honor and explain why we believe it's unreliable and

1    inadmissible.  The basic point of this argument is that

2    according to Dr. Ugone, he reviewed more than 300 contracts.

3    He says he reviewed them and that those contacts contain

4    indemnification provisions that, according Dr. Ugone, would

5    make Lawson responsible for the cost of customers to make

6    switches to other products, and what he says is, well, based on

7    testimony at trial that's cited in the Court's opinion, ePlus

8    could switch somebody for about $150,000, and I see, you know,

9    600-plus, 800-plus customers on a list here who have RSS.  So

10   if you take that and you multiple it by 150,000, you get

11   $129 million, and then I'm going to apportion that down and I

12   land at a number in the 20 millions --

13             THE COURT:  Is the cost savings option based on the

14   indemnification provisions of the contract?

15             MR. DUSSEAULT:  Entirely.

16             THE COURT:  Don't the indemnification provisions --

17   aren't they indemnity based on -- indemnity that would occur

18   only in the event of a suit or a claim?

19             MR. DUSSEAULT:  Absolutely correct.

20             THE COURT:  So has anybody shown the predicate of

21   that, that is that there's been a suit or a claim against them?

22             MR. DUSSEAULT:  No, they've not shown that at all.

23   Dr. Ugone, in his report, and this is one of the things that

24   makes it's so unreliable, just skips that part of the language.

25             THE COURT:  I don't think -- I'm going to let them

1    explain why cost savings is appropriate under -- if it's all

2    based on the indemnity provision, and as I read it, the

3    indemnity applies to -- where claims are made against the

4    customer, I don't understand why cost savings have been

5    achieved at all, so I'll let them handle that, and you can have

6    the right of rebuttal.

7             MR. DUSSEAULT:  Let me just point out, if we can go

8    to slide 1817, just to the extent this will aid the discussion

9    with counsel for ePlus, this is sample language from one of the

10   contracts.  It is the Detroit Medical Center contract.  It's

11   section 11.  My understanding is that this -- virtually this

12   exact language exists in about 40 percent of the contracts.

13   Language to this effect is in about 60 percent of the

14   contracts.  The language does vary a bit, as you would expect,

15   in some of the contracts.

16             The very beginning of section 11 says the following:

17   "Lawson will, at its expense, retain counsel and defend any

18   suit or claim brought against client group and will indemnify

19   client group against any third-party damage claims."

20             So right up front, this provision that Dr. Ugone has

21   relied on as creating an obligation where there's no lawsuit

22   against the customer talks about the lawsuit.  He also assumes

23   that it's basically self-executing, that every single customer

24   will get indemnification, you don't have to demand it, but

25   let's look at the next callout from this agreement.  It comes

1    into effect if client, quote, promptly notifies Lawson after

2    client learns of the suit or claim.

3         So there is, in fact, an obligation on the client to

4    assert it, but the most important provision is the third

5    callout here which is the one that Dr. Ugone is referring to,

6    at least in part.  He says, "If the products are held or are

7    reasonably believed by Lawson to infringe under this section

8    11, Lawson will, at its expense, do these things.

9         Well, what's under this section 11?  It's lawsuits

10   against customers.  And even in the other contracts that we've

11   looked at, Your Honor, usually there's a single paragraph that

12   begins by talking about lawsuits against customers, and the

13   indemnification language arises only in that context.

14        The only other point, Your Honor -- there's various

15   other challenges that we have to the cost approach that I'm not

16   going to get into in their specifics, but there's one general

17   one, Your Honor, that I do think is important to emphasize, and

18   it's simply this:  If Dr. Ugone is right, let's assume his

19   reading of the contract is right, the costs aren't saved at

20   all, because his view is that he assumes that you, Your Honor,

21   find RQC to be infringing, and you find us to be in contempt.

22        So to the extent Lawson has any contractual

23   obligation to the customer before it rolls out RQC, it has that

24   same obligation, whatever it may be, at the end.  So it's not a

25   cost savings in the sense that cases usually talk about that,

1    where alleged -- defendant has saved some costs that it gets to

2    keep and it gets to benefit from --

3              THE COURT:  Isn't his theory that they've avoided --

4    up to date they've avoided lawsuits and the costs that would be

5    required here?

6              MR. DUSSEAULT:  No, Your Honor.  He makes no mention

7    of lawsuits, because he hasn't talked about that at all.

8    That's not what he's talking about.

9              What he's talking about is that under his theory, if

10   we hadn't rolled out RQC, we would have started getting phone

11   calls from customers the day after the injunction, hey, I'm

12   switching over here, you owe me 150,000, oh, hey, I'm switching

13   to here, you owe me 150,000, or maybe it's 300,000, and that

14   checks would just start flying around.

15             That's not at all the way this would work, but that's

16   his view.  The point is, though, Your Honor, any obligation

17   that we actually had at the beginning is, in fact, an

18   obligation that we have once Your Honor rules, so it's not

19   saved.

20             Now, when we brought this to his attention in his

21   deposition, he was basically forced to concede that, okay, it's

22   not really saved, maybe it's just delayed, but, of course, that

23   isn't a point that he had made in his initial report where he

24   characterized them as costs savings.  So for that reason and

25   because of the customer lawsuits, it's unreliable.  So at that

1   point, Your Honor, I'll close.  Thank you.

2           THE COURT:  Did you decide those cost savings

3   probably are not very useful to you and you're not going to

4   talk about that or give up on it?

5           MR. STRAPP:  Well, I definitely won't talk about it

6   at first, but I will give it a mention at the end.  I just want

7   to hand out some slides here.

8           THE COURT:  Do you know what happens if the dog

9   doesn't hunt, what you do with it, don't you?

10          MR. STRAPP:  You got to put it back in the kennel.

11          THE COURT:  That's right.

12          MR. STRAPP:  If there's one thing I've learned, it's

13  that.

14          Your Honor, Lawson seeks by this motion to strike Dr.

15  Ugone to limit the remedies that an Article III court can

16  impose for violation of its orders, but --

17          THE COURT:  What is the source of the remedy here?

18          MR. STRAPP:  The source of the remedy and the

19  specific source of this remedy, disgorgement of patent

20  infringers' profits in a contempt proceeding is an issue that

21  was raised 80 years ago in a Supreme Court holding that's

22  directly on point, but, interestingly, it doesn't warrant a

23  mention in the 25-page opening brief --

24          THE COURT:  But, more basic than that, are you saying

25  that this is just one of the plenary powers that a court has to

1    enforce contempt, or is it statutorily origin -- statutory in

2    origin?

3          MR. STRAPP:  Your Honor, there was some confusion in

4    the case law prior to 1930 about whether or not disgorgement

5    was an appropriate remedy in contempt, whether that fell within

6    a court's inherent discretion to enforce its own orders.  So

7    the Supreme Court took it up, and if you could turn to the next

8    slide, please, in 1932 the Supreme Court was presented with a

9    question of whether a party who had infringed a patent and then

10   violated an injunction needed to disgorge its profits as a

11   remedy for the contempt and violation of the injunction.

12         And the First Circuit Court of Appeals in that case

13   essentially took the same position which Lawson takes now.  The

14   position that the First Circuit Court of Appeals said was,

15   disgorgement can't be equated with compensatory remedy, and

16   since the purpose of this remedy, the purpose of the sanction

17   in contempt is to compensate the party who owns the patent,

18   therefore, disgorgement is unavailable as a matter of law as a

19   remedy that can be imposed to a patent infringer who has

20   violated an injunction.

21         The Supreme Court said, First Circuit Court of

22   Appeals, you're taking way too narrow a view of what's an

23   appropriate remedy in a sanction context where a court has

24   broad discretion to enforce its own orders, and I thought that

25   since this is really the seminal controlling case on point but

1      it's not really mentioned at all by Lawson --

2               THE COURT:  You're big on that point.

3               MR. STRAPP:  Yeah.  Let me just --

4               THE COURT:  I understand it.  I got it.

5               MR. STRAPP:  Let me hand up a copy of it.  So this is

6      really --

7               THE COURT:  Is this an appropriately highlighted

8      copy?

9               MR. STRAPP:  It is.

10              THE COURT:  I don't even have to get my marker out.

11              MR. STRAPP:  Right.  I want to direct Your Honor's

12     attention to a few statements that the Court addressed.  The

13     first question that the Court really had to grapple with is how

14     can a disgorgement remedy be considered a compensatory remedy.

15     Now, that's the argument that Lawson advances here, and it's a

16     good question, and the Supreme Court said, well, there's

17     clearly a distinction between damages on the one hand, the

18     actual losses that the patent owner has suffered and the

19     profits that the infringer has made, and granted, you are

20     right, those are two different concepts, but nonetheless, the

21     profits of the infringer may be included in the concept of

22     compensatory relief, and it's not by way of punishing the

23     infringer, but rather it's by way of compensating the patent

24     owner.

25              So the Supreme Court addressed the very issue that

1    we're here to talk about today, the very issue presented by Dr.

2    -- the motion to strike Dr. Ugone and decided that disgorgement

3    of profits is an appropriate remedy.  It's squarely on point,

4    it's controlling authority.  The last quote really says it all.

5    It says, "In a proceeding for civil contempt for disobedience

6    to an injunction granted in an infringement suit, the profits

7    derived from the violation of the injunction are recoverable."

8            So Lawson has a few responses to this argument, some

9    of which we heard today.  I'd say that the principle argument

10   they make is that *Leman* is not really any longer good law in

11   the patent context, because in 1946 the patent laws were

12   amended.  Disgorgement of profits no longer became an available

13   remedy for a prevailing patent plaintiff in the underlying

14   patent action.

15           So the question is, does that mean that disgorgement

16   of profits is no longer available in a contempt proceeding.  We

17   concede the point it's not available in the underlying patent

18   case.  What about in a contempt proceeding?  Well, the Fifth

19   Circuit addressed this question back in 1970, and subsequent

20   courts have also addressed the same question including in

21   several cases cited by Lawson in its briefs.

22           What the Fifth Circuit said was, in dealing with the

23   civil contempt proceeding, the district Court is not bound by

24   the 1946 patent law remedies which is in section 284 of those

25   laws.  Rather, it's free to exercise the inherent discretion

1       possessed by a court to correct willful violation of its

2       solemnly passed orders.

3               Now, what does that mean?  That means that

4       notwithstanding the changes to the patent laws in 1946 that

5       limit the remedies available to a prevailing patent plaintiff

6       in the underlying case, the Court still has this broad

7       discretion which includes disgorgement of profits gained by the

8       infringer in the contempt proceeding, because the contempt

9       proceeding isn't limited and circumscribed by 35 U.S.C. 284,

10      and there's really no dispute about that point.

11              Another challenge that Lawson raises to the *Leman*

12      case and whether or not it's really good law in the patent

13      context is it says, well, let's just look at case law after

14      *Leman*.  Let's see what the other courts have done subsequent to

15      *Leman*.  Do they really still award disgorgement of profits, or

16      is that not really any longer a remedy that seems to be

17      prevailing in cases today?

18              And so what Lawson says is, let's just look at the

19      kinds of cases that ePlus is citing post-1946, for example.

20      Really they're trademark cases or they're copyright cases, and

21      those are distinguishable, because in the underlying statute in

22      trademark and copyright, disgorgement of profits is available

23      as a remedy.

24              Well, in fact, post-1946, Your Honor, there have been

25      at least eight cases that we have found in the patent context

1   where disgorgement of profits was awarded as a contempt remedy,

2   and I just want to hand up those cases, Your Honor, as well.

3   These are highlighted as well.  I actually have two sets.

4          Now, these cases range from cases decided as recently

5   as 2008 all the way back to 1950, and they were decided both by

6   district courts as well as you'll see there's a couple of

7   Federal Circuit opinions in here, a Seventh Circuit opinion,

8   Sixth Circuit opinion.  No court addressing the question of

9   whether disgorgement of profits is available in a patent

10  contempt proceeding before or after 1946 has held that *Leman* is

11  no longer good law and that disgorgement is not available.

12         So if the 1946 patent statute didn't change the

13  remedies that a court can impose, and cases after 1946 in the

14  patent context have imposed disgorgement of profits as a remedy

15  in contempt basis, really there's no basis -- there's no legal

16  basis left for Lawson's motion to strike, because really, at

17  heart, this isn't a battle about Dr. Ugone's qualifications.

18         It's not a battle about how he calculated profits or

19  revenues.  It's a question of whether disgorgement, as a matter

20  of law, is available as a remedy in a contempt proceeding, and

21  we know that under *Leman*, controlling Supreme Court authority,

22  and all its subsequent post-1946 patent cases, it is available

23  as a remedy.

24         Now, certainly the Court has discretion to choose

25  other remedies, and counsel for Lawson referenced the fact that

1    those other options weren't presented by Dr. Ugone.  For

2    example, a lost profits option wasn't presented, a reasonable

3    royalty option wasn't presented.

4         Given the facts and circumstances of this case and

5    the prior rulings of the court, disgorgement of profits is the

6    most appropriate remedy for these contempt proceedings and has

7    the best fit for the following reasons:  First of all, with

8    respect to a royalty, you've already heard Mr. Merritt address

9    the Court's prior rulings on the royalty that was proffered by

10   Dr. Mangum and a royalty that was proffered by Mr. Green and

11   the compulsory license that was advocated for by Lawson at the

12   injunction stage, and in each instance Your Honor struck the

13   experts or said that the compulsory license wasn't appropriate,

14   and said on the evidence -- on the record evidence as of the

15   date of the injunction, there wasn't adequate basis to

16   calculate what post-verdict royalty should be.

17        Well, Dr. Ugone, ePlus counsel, we respect those

18   rulings, we understand them to be the law of the case, and for

19   that reason, Dr. Ugone didn't offer a reasonable royalty

20   opinion.  But what about lost profits?  There's a lot of

21   discussion in the motion papers about how Dr. Ugone hasn't

22   attempted to quantify what the losses are to ePlus.

23        Well, Your Honor, we'll concede that ePlus is not

24   seeking lost profits.  It didn't seek lost profits in the

25   underlying case, it's not seeking lost profits here, and here's

1    the reason why:  In a two-supplier marketplace, it's fairly

2    easy to calculate what the lost profits are.  If your

3    competitor makes the sale, you can say, that's a sale I would

4    have made but for the fact my competitor made it.

5          In the context in which we find ourselves, which is

6    an ERP software procurement market, it's a very crowded

7    marketplace with several competitors.  It becomes exceedingly

8    difficult to determine whether a lost sale from one competitor

9    would have been made by another competitor, whether if Lawson

10   had not made a sale, ePlus would have made that sale, and

11   that's a fact we readily concede.

12         That's a point that was made in Dr. Putnam's brief

13   when he was addressing the lost profit factors, and for that

14   reason, ePlus did not ask Dr. Ugone to try to calculate lost

15   profits.  We believed it would be too speculative of a venture

16   for him.

17         What is clear here are the profits that Lawson has

18   made from its infringing activity and, should the Court find it

19   in contempt, from its ongoing sales of this design-around RQC

20   product, and we know that it's been quite a profitable product.

21   We had numbers put up on a slide by Mr. Dusseault that showed

22   that the gross profits, if you take a year-long snapshot from

23   the date of the injunction to May 2012, are in the range of 20

24   to 30 million.  The net and the incremental profits are

25   probably somewhere lower than that, but any way you calculate

1  it, Lawson has been quite profitable in selling this

2  design-around product.

3         Now, notwithstanding the fact that Lawson has made

4  quite a bit of money and stands to make quite a bit of money

5  more selling this design-around product, it's Lawson's opinion

6  that the appropriate remedy in this case should be a royalty

7  that's constricted to a very narrow sales base with a rate that

8  is not to exceed five percent.

9         When I tried to put some dollars and cents on that in

10  the deposition I took of Dr. Putnam, I asked him, based on the

11  calculations that he had done in the report he had given me,

12  what he thought an appropriate dollar figure was for a royalty

13  calculated through the date where we had financial data

14  available which was through the end of November, and I said to

15  him at his deposition -- this is at page 246 of his deposition.

16  I said, "Your opinion about compensatory remedy to ePlus, if

17  contempt is found, is such that if that remedy were $262,803,

18  the appropriate compensatory remedy of 262,803, that would

19  almost certainly be too high."

20         So Dr. Putnam, when posed with that question, putting

21  in dollars said, "Yes, under the assumptions that I have made,

22  yes, $226,000 is too high of a compensatory remedy."

23         So on the one hand, you hear Lawson saying in their

24  motion papers, Dr. Ugone is asking for the world, it's going to

25  be inappropriate to put in a remedy that's been endorsed by the

1    Supreme Court, a disgorgement of profits remedy, because it's

2    more than ePlus really was seeking at trial.

3            THE COURT:  In deciding whether to impose

4    disgorgement as a remedy or how much disgorgement, is it proper

5    for the Court to take into account the deterrent effect of that

6    sum on future potential violations by Lawson?

7            MR. STRAPP:  Well, Your Honor, I would submit that --

8            THE COURT:  Or is that punitive?

9            MR. STRAPP:  I would submit that in a civil contempt

10   proceeding, the sanction award that's to deter Lawson from

11   ongoing infringement is the coercive sanction which is the

12   prospective sanction, not the retrospective sanction.  The

13   retrospective sanction is intended to be compensatory, and on

14   this point, Lawson and ePlus counsel agree.

15           The question is, what is compensatory, and the

16   Supreme Court said, should we take such a narrow view of

17   compensatory sanctions that it doesn't include disgorgement, or

18   should we expand the concept of disgorgement -- of compensatory

19   sanctions to include disgorgement, and the analogy that the

20   Supreme Court offered back in 1932 to help understand why

21   disgorgement really is compensatory, I think, is quite useful.

22           What the Supreme Court said in 1932 was that, in

23   effect, when a patent infringer who is faced with an injunction

24   decides to continue infringing, whether it's by using the

25   original infringing product or a design-around that's not more

1    than substantially different, effectively what has happened is

2    that infringer has become a constructive trustee of the

3    intellectual property of the patent owner, and the ill-gotten

4    gains of that trustee here, the patent infringer, should be

5    returned as a matter of compensation, not as a matter of

6    punishment to the patent owner.

7          So the disgorgement remedy that could be awarded by

8    Your Honor under the discretion that the Court has to enforce

9    its own orders would be a remedy that's compensatory would be

10   returning to ePlus the ill-gotten gains that Lawson has made by

11   becoming, in effect, a constructive trustee of ePlus's

12   intellectual property during the contempt hearing.

13         THE COURT:  Why is gross profit as opposed to net

14   profit the appropriate measure of disgorgement if disgorgement

15   is a proper remedy?

16         MR. STRAPP:  Well, Your Honor, once we get into the

17   question of exactly what profit margin is appropriate, that's

18   where I believe that the expert testimony that both Dr. Ugone

19   and Dr. Putnam have offered is quite helpful in the sense that

20   they've looked at company-wide costs, both operating expenses,

21   and tried to determine whether or not those costs vary with the

22   revenues that are specific to these infringing products and to

23   determine in the sense if a cost is varying with a revenue

24   that's directly related to the infringing products, perhaps

25   that's a cost that should be deducted and that the profits

1    should be the revenues subtracted by those operating expenses

2    that directly vary with the revenues for the product.

3          But to the extent that Lawson has fixed costs, for

4    example, in a sense of its general and administrative expenses,

5    its real estate expenses, its human resources department that

6    do not vary and are fixed and do not vary with the revenues

7    that are attributable to the infringing products, our expert

8    has offered an opinion that those costs aren't properly

9    deducted from the revenues that Lawson has earned from the

10   infringing products, and, therefore, either a gross profits

11   number or perhaps more appropriately an incremental profits

12   number where additional costs are deducted, beside those direct

13   costs additional costs that also vary with the revenue

14   attributable to the infringing products are directed so that

15   you end up with an incremental profits that would be disgorged

16   as a compensatory remedy.

17         But on that spectrum between gross profits and net

18   profits, Your Honor, there's four different opinions proffered

19   by the experts.  Dr. Ugone offers a gross profits number and an

20   incremental profits number which is lower --

21         THE COURT:  What did *Leman* do?

22         MR. STRAPP:  *Leman* awarded gross profits, and, in

23   fact, Your Honor, the two most recent patent cases that have

24   faced this question of what measure of profits should be

25   awarded as disgorgement have both awarded gross profits, and I

1    have given those cases up to you, but just to reference them --

2    if you can put slide four back up -- the *Broadcom* case which

3    is -- *Broadcom* case, which is the third case on this list,

4    Northern District of California, it's a district court opinion

5    from 2008.

6          That was an award of gross profits by the district

7    court for violation of an injunction in a patent case, and if

8    you could -- and the *Brine* case, which is a case decided by the

9    District of Massachusetts in 2005 and affirmed by the Federal

10   Circuit that same year, is also a case where gross profits were

11   awarded as a disgorgement remedy.

12         THE COURT:  Was *Qualcomm* appealed?

13         MR. STRAPP:  *Qualcomm* was appealed, and I've actually

14   read the appellate briefs in that case, but I don't think that

15   there is a decision by the Federal Circuit that goes to the

16   sanction issue.  So the Federal Circuit didn't address that or

17   reach that issue in that case.

18         THE COURT:  What happened in *TiVo*?

19         MR. STRAPP:  In *TiVo*, it's quite interesting, Your

20   Honor.  The same expert that we have retained here, Dr. Ugone,

21   was the expert for *TiVo* in the *TiVo v. Echostar* case, and he

22   offered the Court two different options.  One was a purely

23   disgorgement remedy, and it was a remedy that the Court

24   rejected and did not accept.

25         THE COURT:  Which court?

1          MR. STRAPP:  The district court.  And he also offered

2    another option.  He said, in the underlying case, there was

3    1.25 royalty that was -- that was -- the royalty that was found

4    by the jury.  What I'm going to do is take that 1.25 royalty,

5    and I'm going to add on to it a dollar so it becomes a $2.25

6    royalty.

7          Now, the rationale he had for adding that dollar was

8    that there had been a fee increase in the product that was at

9    issue in the *TiVo* case, it was called the DVR product, and he

10   said, as a remedy, we should add on to that 1.25 the full

11   disgorgement of that additional revenue for the fee, so it

12   becomes, in a sense, a hybrid disgorgement royalty sanction,

13   the 1.25 royalty plus the dollar disgorgement which adds up to

14   a $2.25 royalty/disgorgement award.

15         That was the sanction that was imposed, and that

16   sanction was affirmed by the Federal Circuit in the *TiVo*

17   decision.

18         I think that Your Honor asked at the outset of this

19   for some comments on the cost savings, and I'd like to just

20   present a few comments on that issue.  Let me just start -- if

21   you can turn to slide 15 -- with some language from the

22   injunction opinion that Your Honor authored on May 23rd.

23         In the injunction opinion, Your Honor wrote, "Lawson

24   is obligated contractually to indemnify these customers for the

25   loss of use of the infringing systems by obtaining the right

1    for the customers to use the infringing product, replacing or

2    modifying the products so they become non-infringing, or

3    terminating the licenses and reimbursing the customers in an

4    amount equal to the license fees paid."

5            Now, Your Honor, in Lawson's presentation, two

6    points, two critiques were made of the cost savings approach

7    which is just another form of disgorgement that have been

8    offered by Dr. Ugone.  The first critique was that the

9    contractual language doesn't really support this

10   indemnification idea.

11           In other words, Lawson has no obligation to indemnify

12   its customers unless they are sued.  Well, first of all, I

13   would submit that the contracts that we have looked at indicate

14   that at least in certain circumstances, Lawson does have an

15   obligation to indemnify its customers if the product that it

16   has sold to those customers or licensed to those customers is

17   found to be an infringing product.

18           THE COURT:  Where does that appear?

19           MR. STRAPP:  Could you pull up that agreement?  Go to

20   section 9.2.

21           MR. DUSSEAULT:  Do you have a copy?

22           MR. STRAPP:  Let me see.

23           THE COURT:  I can't read it on the screen.  Can you

24   read it on screen?

25           MR. DUSSEAULT:  I'd like an opportunity, Your Honor,

1   to see the whole paragraph, not just the middle of it.

2          THE COURT:  Do you have a hard copy of it over there

3   somewhere?

4          MR. STRAPP:  Yeah, I do.

5          THE COURT:  Why don't you give it to Mr. Dusseault

6   since he needs to meet it.

7          MR. STRAPP:  Here is a copy.  So in this

8   indemnification agreement, which is just a typical

9   indemnification agreement and one of the contracts that Lawson

10  has with its customers, it says that if any product becomes or,

11  in Lawson's opinion, is likely to become the subject of a claim

12  for infringement of a copyright or a patent, Lawson will, at

13  its option and expense, procure for client the right to

14  continue using the product, replace or modify the product to

15  make it non-infringing, or refund the initial license fee for

16  that product upon return of the product by client.

17         Now, that language doesn't contemplate that a lawsuit

18  is necessary or is a predicate to the indemnification

19  obligation being invoked --

20         THE COURT:  Is that in all the contracts?

21         MR. STRAPP:  Well, Your Honor, there's over 863

22  customers.  There's 863 customers that Lawson has for these

23  infringing systems, and there's a variety of different

24  indemnification obligations.  They come in a few flavors, but

25  they don't have the exact same language.

1           THE COURT:  Have you looked at them?

2           MR. STRAPP:  We analyzed the ones we have.  We don't

3    have all 863.  We have 365 of them.

4           THE COURT:  And in those 365, do they have the same

5    language in them?

6           MR. STRAPP:  No, they don't have the identical

7    language.

8           THE COURT:  Isn't it important to know what the

9    language is?

10          MR. STRAPP:  There are about 60 percent of the

11   indemnification contracts that have this language that don't

12   reference a lawsuit against the customer, and there are

13   40 percent that have the language that you saw that was

14   presented by Mr. Dusseault.

15          Now, here's the point I want to --

16          THE COURT:  This is a different kind of indemnity.

17   Does this contract also have a liability, a traditional

18   indemnification against suits and claims?

19          MR. DUSSEAULT:  Your Honor, just in fairness, you're

20   only being shown section 9.2 of the larger paragraph 9.0.  9.1

21   specifically refers to -- Mr. Strapp is showing you only

22   section 9.2 out of a paragraph 9.0 called non-infringement

23   warranty, but 9.1, which comes right before it, refers

24   specially --

25          MR. STRAPP:  Well, 9.1 --

1          THE COURT:  Wait a minute.  You were talking.  Refers

2     specifically to what?

3          MR. DUSSEAULT:  Customer lawsuits.  The language in

4     9.1, which isn't on the screen, says, "Lawson will, at its

5     expense, defend any suit against client and will indemnify

6     client against an award of damages and costs made against

7     client."

8          MR. STRAPP:  Right, and, Your Honor, Mr. Dusseault is

9     answering your question correctly which is that these

10    provisions include both, both the indemnification section for

11    lawsuit against a client and an indemnification provision that

12    is triggered notwithstanding a lawsuit against the customer.

13         THE COURT:  Yes, I think that's the way it's read,

14    but has your man figured out what 60 percent of all this would

15    be?  Where did he come up with this cost savings based on 9.2?

16    Where did he come up with that, or did he?

17         MR. STRAPP:  Your Honor, you know, the genesis of

18    this idea really, to be frank and candid, is from the

19    injunction proceedings.  You may recall that at the injunction

20    proceedings, Lawson stated to Your Honor that should an

21    injunction enter, that Lawson's customers, and in particular

22    its public health customers and its governments customers,

23    would be severely harmed and that the public interest factor of

24    the four-factor test suggested that an injunction should not be

25    imposed, and you may recall there was testimony offered by Mr.

1    Hager, who was an executive at the time at Lawson, who said

2    that should this injunction enter, it's going to take our

3    customers somewhere on the order of six to nine months and

4    somewhere between 300,000 to a million dollars to replace the

5    systems that are found to be infringing.

6          And so with that testimony on the record, Lawson

7    supplemented it with a declaration from one of its customers.

8    This was a customer called Providence Health Care.  Now,

9    Providence Health Care submitted a sworn declaration in which

10   they said, the cost to us, to Providence Health Care, would be

11   about 850,000 if we were forced to replace the infringing

12   system, and we went out and took a deposition of Providence

13   Health Care.

14         They are located out near Seattle, and at the

15   deposition, what Providence Health Care said was that 850,000,

16   that really is sort of an underestimate, because in addition,

17   we have all sorts of other attendant costs that would drive

18   that cost up.  It would be probably more than a million dollars

19   is what was said at the deposition.

20         So we thought to ourselves, if this is the sworn

21   testimony from Lawson, this is the sworn testimony from

22   Lawson's customer about the harm that would befall it if an

23   injunction entered, well, let's try to put some numbers on that

24   and calculate it in an economically viable way to determine

25   really what costs they've avoided, what harm they discussed but

1    now hasn't befallen them because they've rolled out this

2    design-around.

3              Now, Your Honor, Dr. Putnam suggests that the --

4              THE COURT:  Wait a minute.  Tell me what your man

5    did.

6              MR. STRAPP:  Okay.  So what Dr. Ugone did was he

7    actually analyzed these agreements, and he said, very likely,

8    as an economic matter, Lawson is going to take whatever the

9    least costly option it has to comply with the obligations it

10   would have to its customers, and in many instances, the least

11   costly option would be just to refund the license fee, not to

12   replace and put in an $850,000 new system, just pay them back

13   the license fee as you're allowed to do under these license

14   obligations.

15             So one way he calculated the costs --

16             THE COURT:  Where did he get the cost of the license

17   fee?

18             MR. STRAPP:  We have historical data from the

19   underlying case about license revenues that Lawson has

20   generated for each of these customers.  So he went back and

21   looked at that license revenue, and he added that up.

22             And what he did, to make sure he was doing this

23   conservatively, is he actually amortized that license revenue

24   over a six-year period, because some of these contracts say

25   that if you paid the license fee more than six years ago, we

1   have no obligation to do a refund.  So he took that into

2   account, and he figured out what would be the total cost to

3   Lawson if it took the least costly options to indemnify these

4   customers.

5           He also went through and calculated these numbers

6   based on some of the testimony from Mr. Farber who, you may

7   remember, said it would cost $150,000 for ePlus to come in

8   there and replace the systems or based on the low end of the

9   testimony offered by Mr. Hager which was $300,000 per system.

10          Just one point I want to make on this testimony, and

11  sort of the genesis for it was, obviously, the sworn testimony

12  from Lawson and its customer, we now hear as one of the primary

13  critiques from Dr. Putnam and from Lawson that these costs are

14  really uncertain, they're not fixed, they're ambiguous.  In

15  fact, Dr. Putnam, in his expert report, refers to the sworn

16  testimony of Mr. Hager as, quote, anecdotal testimony, and he

17  says it was improper for Dr. Ugone to rely on this anecdotal

18  testimony.

19          Well, Your Honor, these were their sworn statements.

20  This was the genesis for this idea.  It stems from the same

21  principle of disgorgement of ill-gotten gains.  It can be

22  profits, it can be cost savings.  Either way, it's disgorgement

23  of gains that Lawson has made, so Your Honor obviously --

24          THE COURT:  Did your fellow look at the contracts and

25  determine that 60 percent of them had 9.2, had section 9.2 in

1    it?

2           MR. STRAPP:  What he did was he analyzed -- we

3    analyzed every single of the 365 contracts to see what options

4    were available to Lawson to execute its indemnification

5    obligations, whether they included, for example, a license

6    refund, whether they included amortization of that license

7    refund, whether they didn't include a license refund option,

8    and based on the proportions for the 365 we did, he expanded

9    that out to the 863 as a base, and that's testimony that he

10   would offer should he be permitted to offer it --

11          THE COURT:  He extrapolated it.

12          MR. STRAPP:  Correct, because we didn't have the 863

13   contracts, although we asked for them.  Lawson did not produce

14   all 836 contracts.

15          THE COURT:  When did you ask for them?

16          MR. STRAPP:  During the contempt proceedings.

17          THE COURT:  Why didn't they give them to you?

18          MR. STRAPP:  They said that it was not sufficiently

19   specified in our discovery request that we wanted that

20   information and that the only discovery requests that really

21   called for that information had been served in the underlying

22   case, so, therefore, because it's the contempt proceedings now,

23   they no longer had an obligation to complete a production which

24   was partially complete in the underlying case but had never

25   been completed in its entirety.

1        THE COURT:  Do they attack Mr. Ugone's testimony on

2    the basis that it's incomplete for failure to -- for being

3    based on 300-something contracts instead of 800?

4            MR. STRAPP:  No, that's not the principle basis --

5            THE COURT:  Did they attack it on that basis at all?

6            MR. STRAPP:  I don't believe so.

7            THE COURT:  All right.  Excuse me, go ahead.

8            MR. STRAPP:  If Your Honor has nothing further,

9    that's all I have.

10           THE COURT:  All right.  Mr. Dusseault, do you have

11   anything else?

12           MR. DUSSEAULT:  I do, Your Honor.  Just a few points

13   of rebuttal, Your Honor, and I think a good place to start

14   might be the *TiVo* case, so if we could turn --

15           THE COURT:  Which one, the appeal --

16           MR. DUSSEAULT:  No, Your Honor, the district court

17   where the issue of the contempt sanction was decided by the

18   court.

19           THE COURT:  655 F.Supp.2d.

20           MR. DUSSEAULT:  Yes, Your Honor, and it's slide 1811.

21   Because I believe -- and they did this in their reply brief,

22   too.  Do you need a moment?

23           THE COURT:  No, I've got it.

24           MR. DUSSEAULT:  They did this in their reply brief as

25   well.  It seems as if ePlus is trying to re-characterize the

1    *TiVo* case, to try and cast the decision of the district court

2    as -- I think it was described as a disgorgement hybrid or

3    something.  It was a phrase that you certainly won't find in

4    the decision.

5         Let's look at what *TiVo* did, because *TiVo* is

6    obviously one of the critical cases in the contempt field, and

7    it involved the same expert.  So this is straight out of the

8    district court's opinion, and what the district court ruled is,

9    "TiVo requests that monetary sanctions be issued that will

10   disgorge Echostar of DVR profits made during the period that

11   Echostar was in contempt of this Court's injunction.  Based on

12   TiVo's calculation, Echostar made at least 974.5 million in DVR

13   profit between April 18, 2008, and July 28, 2009," and they

14   cite to the Ugone declaration.

15        So although they try and draw some distinguishment

16   [sic] in their brief and say, well, he was talking about all

17   the products, the Court clearly says that he was seeking

18   disgorgement of profits for the DVR product.

19        Let's look at what the court says about it in *TiVo*.

20   "TiVo suggested disgorgement of nearly one $1 billion is

21   unreasonable under the circumstances of this case.  TiVo's

22   suggested sanction seeks to punish Echostar for its actions.

23   While the Court can appreciate the impetus behind the desire to

24   see Echostar punished, the Court cannot approve such an award."

25        THE COURT:  What were the circumstances of this case

1   that made it unreasonable?

2          MR. DUSSEAULT:  It's interesting, Your Honor, because

3   the Court actually goes through and it awards -- it chooses to

4   base its award on a royalty, and I want to directly answer your

5   question, because the Court actually says that it finds that

6   Echostar actually believed, or there's evidence that they

7   actually believed that they had a valid workaround which the

8   Court said obviously wouldn't impact the finding of contempt

9   itself but does impact the appropriate award, so the Court

10  doesn't do --

11         THE COURT:  That's the difference, isn't it?  He said

12  that they had a good-faith belief that they didn't offend and

13  that that was something you took into account in arriving at

14  the quantum of the compensatory --

15         MR. DUSSEAULT:  No, Your Honor, and I apologize if I

16  misspoke.  That's something the court took into account when

17  rejecting TiVo's request that it be doubled or tripled.  The

18  court doesn't connect its finding that disgorgement of all

19  profits is punitive rather than compensatory.  It doesn't tie

20  that to that particular circumstance.

21         Indeed, it references the circumstances.  It says it

22  can understand why *TiVo* might have a desire to punish, but it's

23  saying what the cases that we've cited to in our briefs have

24  said, which is, for the backward-looking, retrospective portion

25  of the award, punishment isn't the function.  It's

1    compensation.

2           THE COURT:  But I didn't find in reading the *TiVo*

3    district court's opinion any explanation for what the

4    circumstances of this case were that made it inappropriate to

5    give a billion dollars of profits except as I read the part of

6    it that said that TiVo -- he essentially held they had a

7    good-faith belief they weren't infringing which doesn't stop a

8    contempt judgment but is a factor in arriving at a punishment,

9    although the decision doesn't link those two thoughts

10   specifically.

11          MR. DUSSEAULT:  Let's be clear about something, Your

12   Honor.  If ePlus's reading of the law is correct, then *TiVo* is

13   wrong, because what they're telling you is that disgorgement

14   isn't punishment.  They're telling you *Leman* is controlling,

15   it's right on point, and it holds that disgorgement isn't

16   punishment, but the Court held that disgorgement was

17   punishment, and the Court instead based its ruling on a

18   reasonable royalty that it then enhanced.

19          THE COURT:  The way I look at it, it didn't hold that

20   disgorgement was punishment.  It held that a billion dollars of

21   disgorgement was punishment, and to me -- I can't find any

22   reasoning in here that supports the decision to go the way the

23   Court went when rejecting the disgorgement other than to --

24   and, again, I say, I don't see a direct quote from the court

25   that says this, but the only rationale that appears in the

1    opinion that seems, to me, that it would be linked to that

2    judgment, i.e., the circumstances of this case would be that it

3    was -- they had a good-faith belief that they weren't violating

4    it, the injunction, but I don't know that that's right.  I'm

5    just trying to see what you think is the -- under the

6    circumstances of this case, what does that really mean.

7            MR. DUSSEAULT:  It's difficult to tell, Your Honor,

8    and I, frankly, read it more to be saying that disgorgement of

9    the profits of the product at issue is punitive.  Again, if

10   their reading of the law is correct, then disgorgement of DVR

11   profits would not be punitive, but the Court is saying that it

12   is.

13           Remember, it's the same exact expert.  He did offer

14   more options in the other case, true.  He chose not to offer

15   the reasonable royalty option here, but he took the -- this is

16   the way that the Court describes it on the previous slide that

17   I showed, 1811, that he was seeking to disgorge Echostar of DVR

18   profits and that he had calculated that the DVR profits came to

19   $974.5 million, and the Court said that disgorgement would be

20   unreasonable and punitive.

21           It does say under the circumstances of this case,

22   Your Honor, but, again, ePlus seems to be saying that one ought

23   to read *Leman* as saying that can't be punitive because it's a

24   compensatory award.

25           THE COURT:  He does link it to what they call the

1   Lamar Financial factors out of the Fifth Circuit, and there are

2   five or four of those, and one of those is willfulness of the

3   contemnor in disregarding the court's order, and another is the

4   resources of the contemnor, and it looks to me like if you read

5   this opinion, you have to somehow figure, discern what were the

6   circumstances of the case, and the only real circumstances of

7   the case that he discusses leading up to the conclusion is

8   the -- that I can find is the willfulness-of-the-contemnor

9   language that appears, and it's disconnected.  I agree.  I'm

10  not saying your analysis is wrong.  I just can't find much in

11  the way of support for the decision anyway on that particular

12  score.

13          MR. DUSSEAULT:  But, Your Honor, I think the

14  disconnect, as you refer to it, is actually an important point,

15  because what we're arguing is the standard is that under

16  controlling law, the award has to be based on and somehow

17  tethered to actual loss and harm.

18          So what the court in *TiVo* did was it didn't take

19  disgorgement, it took a royalty number, and then it applied

20  those factors and looked at how to increase it and how not to

21  increase it.  So it increased it by 80 percent, but it didn't

22  then give a doubling or a tripling as was requested.

23          THE COURT:  But if that's the case, you could never

24  -- the *Leman* disgorgement doesn't fly, because there's no

25  linkage in the *Leman* case to what their actual damage was.  I

1    haven't read all these other cases that were handed up.  I

2    think they were cited, but I don't remember that distinction

3    being made in *Broadcom*, but there have been so many cases that

4    we've looked at that I, honestly, can't recall all of them

5    right now.

6         MR. DUSSEAULT:  So, Your Honor, let's talk about

7    *Leman* for a moment because one thing ePlus didn't do in its

8    argument today and didn't do in its brief is really wrestle

9    with this concept of the different justification for deeming

10   disgorgement to be somehow appropriate or compensatory where

11   the statute actually allows that remedy.

12        ePlus basically wants to say, no, *Leman* is just

13   absolute, it means you can get it, it doesn't really matter

14   that the statute was fundamentally changed to take away

15   disgorgement of the remedy.  That's irrelevant.

16        Now, first of all, from a common sense perspective,

17   that doesn't make any sense.  It makes perfect sense that you

18   would not tie the hands of a district court to a contempt

19   remedy that is less than is available in the first instance.

20   That makes perfect sense.

21        It makes much less sense if you are truly trying to

22   give a compensatory remedy, and Mr. Strapp answered you very

23   directly that we both agree that this has to be a compensatory

24   remedy.  You're not trying to teach a lesson, you're not trying

25   to deter with a past award, you are compensating.

1            In *Leman*, the court says that the award is

2    compensatory because that award is actually giving the

3    plaintiff what it would get in an infringement case.  It would

4    make no sense to give it less.

5            That is very different here, and ePlus basically

6    says, well, because you're not strictly limited to statutory

7    remedies and contempt, that basically means that there's no

8    connection between what award is available in a contempt

9    proceeding and the underlying statute.

10           But if you read the *Leman* case itself, Your Honor, it

11   says something to the contrary, and I'm just looking at the

12   copy that Mr. Strapp passed up, and you have to read a bit

13   beyond his highlighting to get here, but on page 456, there's a

14   paragraph that begins "While the distinction is clear."  This

15   is the sentence that they make much of.

16           So the sentence that they quote a lot is, "While the

17   distinction is clear between damages in the sense of actual

18   pecuniary loss and profits, the latter may, nonetheless, be

19   included in the concept of compensatory relief."  But the very

20   next sentence, Your Honor, says, "In a suit in equity against

21   an infringer, profits are recoverable not by way of punishment

22   but to ensure full compensation to the party insured."

23           And then the next paragraph -- the header is nine and

24   ten.  This is highlighted in the version that was passed up to

25   you -- says, "The respondent insists that this contempt

1    proceeding is not a suit in equity, but, as we have seen, the

2    proceeding is part of the main cause in equity and is for the

3    enforcement of the decree, and there is no reason why, in such

4    a proceeding, equitable principles should not control the

5    measure of relief to be accorded to the injured party."

6              The *Leman* decision is specifically referring to

7    what's available in an underlying infringement case, and I

8    would note, Your Honor, that while ePlus takes this absolute

9    position that there's no connection between the underlying

10   statute and a contempt remedy, the very cases that they have

11   relied on find that connection.

12             The *Abbott Labs* case, which is out of the Eleventh

13   Circuit which was a trade dress case allowing disgorgement,

14   specifically pointed to the fact that disgorgement was

15   available under the Lanham Act when justifying what it did.

16             I found the *Colonial Williamsburg* case in the

17   district court before Judge Williams here in the Eastern

18   District to be very informative in this respect, too, Your

19   Honor.  That was a trademark case, and in trademark,

20   disgorgement is allowed.  Now, Judge Williams looked at that

21   and said, in this context, this remedy is allowed, and he

22   described the comparison between the case before him and what

23   the Lanham Act allows as, quote, a useful analogy.

24             So ePlus is telling you that you don't have to think

25   about the fact that the Patent Act is quite different today

1   than it was under *Leman*, but even the cases that they point to

2   make this reference.

3         The *Jerry's Famous Deli* case from the Ninth Circuit,

4   2004, allows disgorgement in a trademark case and specifically

5   refers to disgorgement as the traditional remedy in trademark

6   cases.  So the very cases on which they rely see a connection

7   that they're now essentially trying to disavow.

8         THE COURT:  Isn't disgorgement of profits of a

9   trustee a quintessential remedy for the malfeasance of a

10  trustee?  I mean, at least it was when I was in law school.

11        MR. DUSSEAULT:  The trustee reference is very

12  interesting, Your Honor, because my understanding -- I don't

13  know and it wasn't clear to me from the *Leman* case whether that

14  was drawing specifically from patent cases.

15        It seemed to be drawing from patent cases that used

16  that trustee analogy to justify disgorgement, but in the modern

17  Patent Act, there is no such theory.  The argument could

18  certainly be made, Your Honor, that in the first instance of a

19  patent lawsuit, disgorgement ought to be allowed, because that

20  would somehow discourage people from infringing patents.

21        THE COURT:  Has any case actually held that the

22  change in the 1946 act has import on this issue as opposed to

23  those cases that are drawing a distinction between *Gibbs* and

24  *Leman*?

25        MR. DUSSEAULT:  Well, the case, I think -- there's

1    certainly law review scholarship on this issue.  The case that

2    I think comes closest, and it doesn't say because of the change

3    in the act it doesn't apply, but the case that comes closest is

4    *National Drying Machines* -- it's slide 1808 -- and this is a

5    post-*Leman* decision.

6              THE COURT:  18-what?

7              MR. DUSSEAULT:  1809, excuse me.

8              THE COURT:  Wait a minute.  I don't have that.  Which

9    number on your page is it?

10             MR. DUSSEAULT:  1809.

11             THE COURT:  I'm sorry.  I was looking at the wrong

12   one.

13             MR. DUSSEAULT:  Let's go to 1810.

14             THE COURT:  Okay.  I see.

15             MR. DUSSEAULT:  1810 is the *National Drying Machine*

16   case out of the Third Circuit, and here's what it said:  "The

17   *Leman* case does not relieve the complainant of showing that the

18   contemptuous conduct did, in fact, have substantial injurious

19   effect upon his economic interest."

20             THE COURT:  What proof of that is there in this case,

21   that it had an injurious effect, as opposed to proving what the

22   quantum of that effect is?  Anybody testify to that?

23             MR. DUSSEAULT:  The testimony is what I showed you

24   before from Mr. Farber, that they made no efforts whatsoever to

25   make the sales, Your Honor.  So I believe the evidence, the

1    only evidence in the case is that they've suffered no harm.

2          Now let me explain how Dr. Ugone tries to get around

3    that.  Dr. Ugone says, well, Judge Payne ruled that you would

4    suffer irreparable harm as ePlus.  So I'm not ignoring harm.

5    Judge Payne said that there would be irreparable harm, but,

6    obviously, you were taking testimony from Mr. Farber about what

7    he would do in the future and making essentially a prediction,

8    if you will, that sales would be lost in the absence of an

9    injunction.

10         We now have testimony from Mr. Farber that they had

11   no plans in place to make these sales, and they didn't try.  So

12   there's absolutely no evidence in the record that would

13   establish this nexus which is probably why they're fighting so

14   hard to argue that they don't have to establish the nexus at

15   all.

16         THE COURT:  Okay.  I didn't ask him about that, and I

17   want to hear from him about it.

18         MR. DUSSEAULT:  Do you want me to conclude with other

19   points?

20         THE COURT:  Yes.

21         MR. DUSSEAULT:  Just a couple of other points.  One

22   point I wanted to make, Your Honor had asked me earlier, and I

23   don't think I emphasized this issue enough.  You asked me what

24   the difference was between Dr. Mangum's analysis and Dr.

25   Ugone's, and I showed you how different the numbers were.

1          One of the things that I think makes that difference

2    really even understated, I mean underplays it is that you have

3    to understand that the $20 million that ePlus said before would

4    compensate it for seven years was on five configurations, and

5    remember, that includes the configuration, configuration number

6    one, which involves a lot of customers, a lot of businesses.

7          So even looking at the years or the difference in

8    dollars understates the issue.  The point is that they were

9    saying $20.1 million would be compensatory to them even if they

10   had proven all the configurations which they didn't ultimately

11   prove.

12         This is just to correct a point, Your Honor, but Mr.

13   Strapp pointed to an answer to a question in Dr. Putnam's

14   deposition about what the reasonable royalty would come to in

15   dollar figures in this case.

16         THE COURT:  $262,000 --

17         MR. DUSSEAULT:  And to clarify, that's only through

18   November 30, and that's on a view that Dr. Putnam espoused that

19   given the Court's rulings about where these parties compete, it

20   might make sense to have the royalty only run on the add-on

21   products, because ePlus isn't trying to compete for the

22   foundation products.

23         If you take the reasonable royalty, and you apply it

24   to the entire infringing configuration, for the year, to put it

25   in context, it's $1.6 million.  That's what it would come to.

1          THE COURT:  All right, thank you.

2          MR. DUSSEAULT:  Let me see if I have anything else.

3     Two last points.  There was some discussion of net versus gross

4     products, and since the Court is getting into this again, I

5     think, I do want to clarify the reasons that net profit is

6     appropriate and net profit is used in some disgorgement --

7          THE COURT:  I don't think you need to worry about

8     that.  If we get to that, I'm going to have to have somebody

9     actually sit down and testify about that.  That's a

10    fairly sophisticated analysis that I don't want to deal with on

11    a motion.

12         MR. DUSSEAULT:  Fair enough.  The last point I would

13    make on this issue of the costs savings and the contracts, a

14    couple of points.  I find it kind of puzzling that ePlus is now

15    taking the position, they show you this agreement that has this

16    section nine instead of section 11.

17         Remember, Dr. Ugone doesn't acknowledge that any

18    customer contracts require a customer lawsuit.  He asks for an

19    award of every customer, even inactive customers.  So when you

20    look about reliability and methodology of an expert, he just

21    glosses over that language, and as I said, our position, and I

22    know Dr. Putnam says this in his report, is that 60 percent of

23    the contracts have language similar to section 11, not section

24    nine.  I don't believe that Dr. Ugone said it was 60 percent

25    section nine.

1        Section nine, though, again --

2        THE COURT:  He's right, though, that at the

3   injunction hearing there was a big point made out of all this,

4   and I was led to believe from the testimony -- I'm not saying

5   anybody tried to mislead me.  I'm saying it's the inference

6   that I drew from the testimony, was that that was one of the

7   consequences that ePlus was arguing would happen to it as

8   respects every one of its customers, and that is that it was

9   either going to have to refund the license fee or fix the

10  costs -- or pay for the cost of a do-around, or what was the

11  other, the first clause in there?

12        There were three of them, and they're reflected in

13  paragraph 9.2, and I believed, I thought at the time that ePlus

14  was taking that position that that requirement obtained to

15  every one of its customers.

16        MR. DUSSEAULT:  Your Honor, I've poured over the

17  record.  Let me try and clarify what I understand the record to

18  be.  There was testimony about what it would cost customers to

19  switch to a completely different system, and that point was

20  made, I believe, in connection with establishing harm to

21  customers.

22        THE COURT:  Right.  That was.

23        MR. DUSSEAULT:  ePlus then weighed in and said, well,

24  that shouldn't deter the Court because there's these

25  indemnification provisions, and Lawson is going to have to pay

1   all the costs.  I don't know whether they, when making that
2   argument, pointed you to the language that I pointed you to
3   today.
4           THE COURT:  I thought somebody from Lawson said they
5   were going to have to do that.  I may be wrong about that
6   testimony, but I recall that being the case.
7           MR. DUSSEAULT:  I've scoured the record, Your Honor,
8   and what I have found is there were arguments made by Lawson
9   that if we were enjoined from providing service and
10  maintenance, we would be in breach of contracts and could be
11  sued.  That is a different point than the point that ePlus made
12  about indemnification.
13          THE COURT:  Oh, yeah, that's a different issue.  In
14  fact, that plays into the argument about paragraph 11 being the
15  operative provision for using in assessing --
16          MR. DUSSEAULT:  So I guess all I would say is that
17  when the issue is whether to allow expert testimony and whether
18  it's reliable, the issue that you consider ought to be what the
19  contracts actually say, and it's a bit puzzling that their
20  expert would ignore language that specifically refers to
21  customers.
22          THE COURT:  Do you want to address that point that I
23  said I wanted to hear from you?
24          MR. STRAPP:  Yes.  I think that was about the
25  testimony of Mr. Farber at his deposition that was taken in the

1    last couple of months.

2              THE COURT:  Yes.

3              MR. STRAPP:  So, the testimony that --

4              THE COURT:  Well, it's not about that.  It's about --

5    what's the name of that case, National Dryer?

6              MR. STRAPP:  *National Drying* --

7              THE COURT:  The Third Circuit, 1975 case?

8              MR. STRAPP:  1957.  Actually that case --

9              THE COURT:  But don't you have to prove that you've

10   had some damage even though you may not have to quantify it,

11   and what have you done to do that?

12             MR. STRAPP:  The *National Drying* case is the only

13   case of its kind since *Leman* that so held, and there is a

14   Second Circuit case that was decided the following year, 1958,

15   where Judge Learned Hand said the following:  He said --

16             THE COURT:  That's sort of like reading the

17   Scripture.

18             MR. STRAPP:  That's right.  That's why I bring the

19   Bible up to the lectern here.  He says, "It is true that the

20   Third Circuit en banc decided by a vote of five to two that

21   this was not what the Supreme Court meant and that the

22   plaintiff must show that the contemptuous conduct did, in fact,

23   have substantial injurious effect upon its economic interest,"

24   and that's the quote you saw on the slide.

25             So Judge Learned Hand goes on to say, "However, I

1   find it impossible to reconcile this holding with the language

2   used in *Leman,*" and then he quotes from *Leman*.  "While the

3   distinction is clear between damages in the sense of actual

4   pecuniary loss and profits, the latter may, nonetheless, be

5   included in the concept of compensation to the party injured."

6          And the Second Circuit, following Judge Learned

7   Hand's guidance, rejected the interpretation of the Third

8   Circuit.

9          THE COURT:  What case is that?

10         MR. STRAPP:  That case is called *Sunbeam Corporation*

11   *v. Golden Rule Appliance*, and the cite is 252 F.2d 467.

12         THE COURT:  So you just think I ought to follow the

13   Scripture?

14         MR. STRAPP:  No.  What I think is relevant here is

15   whether or not cases interpreting *Leman*, especially in the

16   patent context, because the point was made, well, look at

17   trademark cases, look at copyright cases, they are different.

18   So let's leave those aside for a minute.

19         Cases in the patent context that have addressed *Leman*

20   after the statute was changed in 1946 have interpreted *Leman* as

21   controlling authority and good law and have looked at

22   disgorgement as one of the options that a court may impose.

23   Not the only option, and that's why *TiVo* was decided the way it

24   was.

25         The district court said, the only option I have is

1    not disgorgement, and if I choose the disgorgement as not the

2    right fit for this case under these circumstances, I may go in

3    a different direction, and that's true for any district court

4    sitting in contempt who is enforcing its own orders.

5         The court has broad discretion to decide what's the

6    appropriate remedy, but, on the other hand, the court doesn't

7    have to say disgorgement is off the table and especially in a

8    patent context where the Supreme Court has so held.

9         Now, with respect to the issue of Mr. Farber and his

10   testimony, both at the injunction hearing and at his

11   deposition, about whether or not ePlus would go out and try to

12   get sales from Lawson customers should an injunction enter,

13   well, the testimony that Mr. Farber offered at the injunction

14   hearing presupposed that Your Honor's injunction order would be

15   followed and that the letter of the law would be complied with

16   and that the infringing products would be shut down by Lawson

17   opening up a marketplace of 863 customers that ePlus could come

18   in and compete for.

19        That's not what happened.  In fact, five days before

20   your order entered, Lawson made generally available a 20-minute

21   download on its website for free of a product called RQC.  Now,

22   its customers took that product, it was free, they got eight

23   hours of free support, they got the 20-minute free download,

24   and ePlus didn't have this marketplace opportunity that it

25   thought it would have when Mr. Farber had testified a month or

1    two earlier and didn't understand and didn't know, and I think

2    the Court didn't know at that point either that a 20-minute

3    free download would be rolled out.

4           So that's the reason that the testimony is different

5    between the injunction hearing and the deposition.  At the

6    deposition, Mr. Farber doesn't have that marketplace to go

7    after.  At the injunction hearing, he thought he would had an

8    injunction been entered.

9           THE COURT:  All right.

10          MR. DUSSEAULT:  Your Honor, one point on Mr. Farber,

11   if I could.  First, I would note that Mr. Strapp's explanation

12   of Mr. Farber and why he did or didn't do certain things

13   doesn't come from Mr. Farber's deposition.  It sounds like a

14   legal argument.

15          It's not something that Mr. Farber said, but if you

16   could show slide 1813 which I showed earlier, it seems to

17   contradict this justification of their lack of competition.

18          The first question, "Before the injunction entered,

19   was there any form of contingency planning by ePlus as to how

20   ePlus might be able to take advantage of an injunction from a

21   business perspective if an injunction were entered by Judge

22   Payne?

23          Answer:  I don't believe so at that point."

24          If this theory that, oh, we sure would have done it

25   except for RQC were true, wouldn't you expect business plans,

1    wouldn't you expect sales strategy?  You would.  The other

2    point is that Mr. Farber, and I didn't put this on the slide,

3    but Mr. Farber also referred to one instance where a customer

4    actually reached out to ePlus and said, do you want -- you

5    know, do you want to discuss the business, and Mr. Farber made

6    the decision not to return the call.  So that's what the

7    evidence from the Farber deposition actually shows.

8            THE COURT:  All right.  I'll take these into account

9    and give decisions on them.  We need to hear -- I need to hear

10   from you about how you propose going about dealing with *TiVo*.

11           In the *Petter Investments* case in 2011, it looks to

12   me like what the court did, and it looks like a much more

13   simple case than this, was look at what the claims were that

14   were asserted to be infringed, just looking at the allegations,

15   not looking at the testimony, what were the rulings -- that is,

16   what was held to be infringed; in other words, look at the

17   verdict and then assess whether the differences between the

18   products were significant or not, were they more than

19   colorable.

20           That isn't exactly what the court says it did, but it

21   looks to me like to be one of the most recent decisions on the

22   point, and that's what it looks to us like, that that's what it

23   did, the approach it actually took.

24           So I need to hear from you about how we're going to

25   handle this, and I've asked each of you, and you all have both

1  given some suggestions or some comments, but it's been pretty

2  well larded up with advocacy that was on the spot because you

3  didn't know exactly what I was going to do in asking for this

4  anyway, so when can I hear from you on what approach to take in

5  this case given the somewhat complicated nature of this case

6  about how we comply with the Federal Circuit's rule,

7  instructions in *TiVo*?

8          MR. THOMASCH:  We'd be happy, Your Honor, to submit a

9  written proposal next week.  Mid to late next week would be

10  best for us but at any time Your Honor directs us.

11          THE COURT:  Well, I want you to have time to think it

12  out and sort it out and talk to each other about it maybe.  I

13  don't want something done for the heck of getting it done.

14          MR. THOMASCH:  No, we do want whatever we do to take

15  account of the unique situation here where we had alternative

16  theories and multiple verdicts that are not in conflict with

17  each other but which differ, where the evidence, as you will

18  recall, was often given as to all five configurations, and

19  that's legion through the testimony of the experts and in the

20  discussions to the jury.

21          Things were said applicable to all five, but the jury

22  said, no, not applicable to all five, applicable to some and

23  not others, and we have to work through that.  We will propose

24  something in writing, Your Honor.

25          THE COURT:  Mr. Robertson.

1          MR. ROBERTSON:  Just very briefly, Your Honor.  I

2    know it's been a long day.  I think our view would be something

3    more consistent with the case Your Honor just outlined and that

4    approach.  I think we are going to be at fundamental

5    differences on how to approach this, and we certainly want to

6    take the more streamlined position and not be retrying the case

7    or trying to marshal all the evidence from a three-week trial

8    and establish what I think is almost impossible to establish as

9    to what evidence was accepted or what evidence was directed --

10         THE COURT:  That's a statement that you sort of made

11   once before that wasn't lost on me.  I was really asking you

12   about when you wanted to do it.

13         MR. ROBERTSON:  I think we should confer, and I would

14   suggest something a little bit further out than that was

15   suggested --

16         THE COURT:  You all talk and get on the phone and

17   call back tomorrow.

18         MR. ROBERTSON:  Judge, I just had two other post-*TiVo*

19   cases.  I'd direct you to the cites, but I can just tell you

20   that they were cited at pages seven and eight and ten of a

21   brief that we filed on *TiVo* on November 2nd, and they also

22   dealt with these kind of contempt proceedings in a much more

23   summary fashion.  One was one day, and one was a two-day

24   proceeding.  So you can find those cites there.  They were the

25   nCube --

1            THE COURT:  Were they the ones here -- okay.

2            MR. ROBERTSON:  They were the nCube Corp case --

3            THE COURT:  nCube?

4            MR. ROBERTSON:  nCube, small n, capital C-u-b-e, and

5    the Merial Limited Case, M-e-r-i-a-l.

6            nCube, the quote was that contempt proceedings are

7    generally summary in nature and may be decided by the court on

8    affidavits and exhibits without the formalities of a full

9    trial.

10           And, similarly, Merial Limited was a finding of

11   contempt following a two-day evidentiary hearing.

12           THE COURT:  All right.  Thank you all very much.

13   We'll be in adjournment.

14

15                    (End of proceedings.)

16

17

18           I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20

21

22   _____          _____

     /s/
23   P. E. Peterson, RPR                    Date

24

25