1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF VIRGINIA

3                      RICHMOND DIVISION

4

5

    ---------------------------------------
6                                         :
    ePLUS, INC.                           :    Civil Action No.
7                                         :    3:09CV620
    vs.                                   :
8                                         :
    LAWSON SOFTWARE, INC.                 :    October 24, 2012
9                                         :
    ---------------------------------------
10

11

              COMPLETE TRANSCRIPT OF THE MOTIONS HEARING
12
              BEFORE THE HONORABLE ROBERT E. PAYNE
13
                 UNITED STATES DISTRICT JUDGE
14

15  APPEARANCES:

16  Scott L. Robertson, Esquire
    Jennifer A. Albert, Esquire
17  Michael G. Strapp, Esquire
    Goodwin Procter, LLP
18  901 New York Avenue NW
    Suite 900
19  Washington, D.C.  20001

20  Paul W. Jacobs, II, Esquire
    Christian & Barton, LLP
21  909 East Main Street
    Suite 1200
22  Richmond, Virginia  23219-3095
    Counsel for the plaintiff
23

24                  Peppy Peterson, RPR
                   Official Court Reporter
25              United States District Court

```
1    APPEARANCES:  (cont'g)

2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219

5    Daniel J. Tomasch, Esquire
     Richard W. Mark, Esquire
6    Josh Krevitt, Esquire
     Gibson Dunn
7    200 Park Avenue
     New York, New York 10166
8    Counsel for the defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2

3         THE CLERK:  Civil action number 3:09CV00620, ePlus

4  Inc., versus Lawson Software, Incorporated.  Mr. Scott L.

5  Robertson, Ms. Jennifer A. Albert, Mr. Michael G. Strapp, and

6  Mr. Paul W. Jacobs, II, represent the plaintiff.

7         Mr. Josh Krevitt, Mr. Daniel Thomasch, Mr. Dabney J.

8  Carr, IV, Mr. Richard W. Mark represent the defendant.  Are

9  counsel ready to proceed?

10        MR. ROBERTSON:  Plaintiff is, Your Honor.

11        MR. THOMASCH:  Defendant is, Your Honor.

12        THE COURT:  All right.  It's your motion, I believe.

13        MR. THOMASCH:  Your Honor, if I might, I have one

14  preliminary matter before Mr. Robertson starts.

15        THE COURT:  Come up here so she can hear you.  Yes,

16  sir.

17        MR. THOMASCH:  The only preliminary matter, Your

18  Honor, is I don't know, obviously, the content of Mr.

19  Robertson's argument.  To the extent that he intends to

20  disclose the content of any of the documents on our privilege

21  log, then we do want to make sure that we don't find ourselves

22  in a situation where this proceeding constitutes a waiver.

23        We've filed the papers, as has the plaintiffs, under

24  seal, and would I ask that the proceedings be closed to the

25  public if the content of the documents is going to be

1    disclosed.  If not, then we can, obviously, talk about the

2    legal issues and the procedures without regard to -- I'm not

3    desirous of having anyone leave the courtroom, but I am,

4    obviously, sensitive, under the circumstances, to assertions of

5    waiver.

6            THE COURT:  All right.

7            MR. THOMASCH:  Thank you, Your Honor.

8            THE COURT:  What is your response on that, Mr.

9    Robertson?

10           MR. ROBERTSON:  I have no problem with that, Your

11   Honor.  I do just point out --

12           THE COURT:  What is the solution?

13           MR. ROBERTSON:  Well --

14           THE COURT:  Are you going to use the content of the

15   documents I think is the fundamental question Mr. Thomasch is

16   raising.

17           MR. ROBERTSON:  Yes, Your Honor, I think we are going

18   to be looking at some of the content of the documents, but I

19   think mostly we're going to be focusing on entries in the

20   privilege log.

21           In fact, there are one or two examples I might be

22   bringing to Your Honor's attention about issues that are the

23   withhold documents under the Court's February 21 order.  I

24   don't think there's anybody in the courtroom right now with the

25   exception of Mr. Farber who, you will recall, is my client

representative who can be here under the rules and has been

here throughout the trial when documents that were proprietary

were revealed.  So I don't see how this is open to the public.

THE COURT:  Because it's always open to the public

unless it's sealed, and then there's a transcript, and if you

order the transcript, which I think you all have frequently

done -- I guess that's sort of an understatement -- then it's

available to the public, too.  So I think that's what he's

concerned about.

MR. ROBERTSON:  Well, Your Honor, then I don't have a

problem --

THE COURT:  Why don't we take it this way:  Why don't

we seal the proceedings for now, and then you all are charged

with the responsibility of, within ten days after the

transcript is available to you, identifying in a paper that

part or those parts of the transcript which you believe needs

to be sealed, and if you all are in agreement, we'll enter an

order to that effect, and the rest of it will be open to the

public.

MR. THOMASCH:  Thank you, Your Honor.

THE COURT:  So I'll leave that -- I'm going to put

that particular matter, Mr. Thomasch, on your plate as the

party who has got the greatest interest in identifying the

parts.  So if you'll take care of that and be responsible for

doing that, I'd appreciate it.

```
1              MR. THOMASCH:  We will, Your Honor.

2              MR. ROBERTSON:  Thank you, Your Honor.  May I

3    proceed?

4              THE COURT:  Sure.

5              MR. ROBERTSON:  Good morning.  May it please the

6    Court --

7              THE COURT:  Good morning.

8              MR. ROBERTSON:  As you're well aware, we're here on

9    ePlus's motion to enforce the Court's February 21, 2012, order

10   requiring Lawson to produce documents that were otherwise

11   attorney/client privileged or subject to the work product

12   privilege which has been waived, or were improperly logged on a

13   fourth iteration of a privilege log that did not contain

14   authors or recipients or were distributed widely or documents

15   that were merely cc-ed to attorneys or documents even between

16   laypersons at Lawson that supposedly reflected attorney

17   privileged communications.

18             At this point, Your Honor, given that we are now

19   eight months from the Court's order and almost three months

20   from an extraordinary writ of mandamus that was denied by the

21   Federal Circuit, we believe that sanctions are now appropriate

22   for Lawson's failure to produce more than 4,000 documents that

23   were subject to the Court's order.

24             THE COURT:  Isn't the predicate whether they have, in

25   fact, not complied with the order?
```

1          MR. ROBERTSON:  There is, Your Honor, and I'm going

2    to get very specific about why they have not complied with that

3    order.  And let's not forget, Your Honor, first principles

4    about why we're all here.  We're here now some 16 months after

5    the Court entered an injunction and almost a year after the

6    Court found -- granted a show cause motion for why Lawson

7    should not be held in contempt of this Court's injunction.

8          Now, the defendant complains that we didn't properly

9    meet and confer with respect to the -- before we filed this

10   motion.  Not only did we meet and confer on at least two

11   occasions, we had extensive correspondence between the parties,

12   and, indeed, we held a meet-and-confer in which, I would

13   suggest, the Court participated on September 14 and gave Lawson

14   express instructions and guidance as to how to comply with this

15   Court's order.

16         And notwithstanding those express instructions and

17   guidance from the Court more than a month ago, they have still

18   failed to comply with this Court's order.  Now, not only did

19   the Court clarify how they should comply, the Court made clear

20   that this was a subject matter waiver.  And what they have done

21   is they have taken a look at what the subject matter is, which

22   involved the redesign, or alleged redesign, of the infringing

23   systems, and they have taken a cramped and hyper technical view

24   as to what that means.

25         It's as restrictive as they can notwithstanding that

1   the Court, on September 14, told them that they couldn't get

2   cute with the words.

3          But in their opposition, which was two weeks after

4   the Court's instructions, they are now trying to limit the

5   waiver to what they call RQC development and nothing more than

6   that notwithstanding that their privilege log reviews that

7   there are multiple documents that involve that development that

8   they failed to produce.  In fact --

9          THE COURT:  Let's see what -- what did the order say

10  was the subject of the subject matter waiver?

11          MR. ROBERTSON:  Certainly, Your Honor.  If I might --

12          THE COURT:  Isn't that the matter -- I don't need to

13  be redefining anything that's already been settled.  I want to

14  make sure we're all working from the same definition.

15          MR. ROBERTSON:  Understood, Your Honor.

16          MR. THOMASCH:  I can read it to Your Honor if Your

17  Honor wants.

18          MR. ROBERTSON:  I'd like to be able to present my own

19  argument if I could, Your Honor.  I have a PowerPoint, and I

20  have the order right here, the operative wording.  It's at page

21  two, Your Honor, and it's on your screen, but I know you prefer

22  to see it in a hard copy as well.

23          THE COURT:  Well, when you get to be 71, you might

24  prefer that, too.

25          MR. ROBERTSON:  But it's at page two, and it says,

1    "The attorney-client privilege has been waived as the subject

2    matter of Lawson's development of the RQC module."

3            Then number three goes on to identify why the

4    privilege log entries were defective, and I won't go through

5    those right now, but number four is also pertinent.  It says

6    Lawson has not shown work product protection attaches to the

7    lawyer work in developing RQC.

8            I also have another document I'd like to hand up to

9    Your Honor which we have indicated that there are more than

10   4,000 documents still at issue, and what I did is I asked one

11   of my colleagues to go through those documents and come up with

12   200 exemplary documents that we think are relevant and subject

13   to the Court's order.  And what I did in this document, Your

14   Honor, is I whittled that down to 30 documents that I would say

15   are exemplary and demonstrate Lawson's willful violation of

16   this Court's order and its subsequent guidance.

17           If I might just --

18           THE COURT:  We're here for two reasons, though.  One

19   is a motion to compel, and in order to do that, the appropriate

20   order that issues from a court if a motion of that sort is

21   granted is to identify what it is that is to be compelled.  Are

22   you now saying to me that the reach of your motion is confined

23   to these 30 documents that you are talking about?

24           MR. ROBERTSON:  No, sir.  I'm providing them as

25   exemplary, because I did not want the Court to have to go

1    through 4,000 documents.  I know the Court has looked at *in*
2    *camera* in the past, I know just this past summer 100 documents.
3    What I wanted to do is if the Court deems it necessary, produce
4    an exemplary 200 documents.  So you or your law clerk probably,
5    unfortunately, will have to go through these --
6              THE COURT:  Actually, when I have privilege issues, I
7    generally do that myself.
8              MR. ROBERTSON:  Understood.
9              THE COURT:  In addition to having the law clerk
10   double-check what I'm doing, but privilege waivers are, in the
11   Court's judgment, very serious matters, and they're not
12   lightly, ever found because they can have such serious
13   ramifications for the lawyers and for the clients, and so I
14   study that matter very carefully.  So these are just examples.
15             MR. ROBERTSON:  Yes, sir.  And I understand and
16   appreciate that, and I want to refresh the Court that we went
17   through this exercise before, and the Court did find a waiver
18   which was subject --
19             THE COURT:  On page 18 of the opinion it says,
20   "Lawson clearly waived the privilege with respect to the
21   subject matter of the development of the RQC module," which is
22   reflected in the concluding paragraphs of the opinion, on page
23   23 of the opinion and subparagraph two, and in subparagraph
24   four where the Court deals with the work product protection
25   which is dealt with on pages 21 and 22 holding that Lawson has

1    not established that the work of the lawyers was done in

2    anticipation of litigation and that they waived -- they haven't

3    shown work product protection for the documents dealing with

4    the development of RQC.  So those are findings there.  We don't

5    need to revisit those.

6          So the question is, are there documents that are

7    being withheld that fit description.  If they are, then you may

8    be entitled to relief.  If they're not, you're not.

9          MR. ROBERTSON:  Understood, Your Honor, and I

10   understand that's my burden, and now I'd like to address that.

11   The document that I handed you that's entitled 30 examples of

12   Lawson's willful violation of this Court's order at page two,

13   there's a heading that says, "Lawson continues to refuse to

14   produce documents related to development of requisition

15   center," RQC, and I'm not going to belabor the point, Your

16   Honor, because there's several examples, and as I say, they are

17   only examples.  We believe there are more than 800.

18         Let's just take a look at a few of the examples, and

19   I'm just going to recite the document number and the

20   description.  So the first example is document -- this is a

21   privilege number from Lawson's privilege log, 682.

22   Description:  Document disseminating legal advice from internal

23   counsel re: RQC replacement for customers prepared in

24   anticipation of litigation.  That, of course, is work product.

25   Your Honor actually found they didn't establish a work product

1    privilege clearly directed to the RQC development.

2              Document 804 --

3              THE COURT:  This is the listing that was on the

4    privilege list that I reviewed?

5              MR. ROBERTSON:  Yes, sir.  This is lifted right out

6    of the privilege log.  I didn't create this.  We inserted this

7    into the document.

8              Document 804, description:  Email reflecting legal

9    advice of Jordan Ekelin, who is an attorney, re: RQC/RSS,

10   software migration and customer service in anticipation of

11   litigation.

12             Document 1376, email requesting legal advice re: RQC

13   performance issue prepared in anticipation of litigation.

14             Document 2229, email conveying legal advice re:

15   launch of RQC prepared in anticipation of litigation.

16             Let me drop down to document 3853 discussing RQC

17   source code.  You'll recognize Mr. Schultz is one of the

18   copyees on that document.  Document 5279, questions and

19   responses from Bruce McPheeters -- that was Lawson's general

20   counsel at the time -- re: RQC upgrade plan.

21             Document 6437 -- I'm now on page four, Your Honor --

22   email conveying legal opinion re: RQC differences.

23             Document 6798, discussing RQC upgrade.

24             Document 8442, conveying question from in-house legal

25   counsel regarding changes and compliance with injunction.

1    There are more than 800 documents, Your Honor, of this nature

2    that Lawson continues to withhold notwithstanding the Court's

3    explicit order and guidance that you provided.  If you can go

4    to the transcript on September 14 with the Court's

5    instructions.

6           That would be -- this is in the PowerPoint, Your

7    Honor, that I've given you, slide eight.  This was Your Honor's

8    instructions.

9           THE COURT:  What page?

10          MR. ROBERTSON:  Page eight, Your Honor.  Apparently

11   there was some confusion with regard to the scope of Your

12   Honor's order that we had discussed in several

13   meet-and-confers, and Lawson had asked us to tell them what our

14   understanding of the order was, and our understanding of the

15   order was you need to comply with it.

16          And then they said -- I asked them what was their

17   understanding, and they said they hadn't developed one yet.

18   And we said, well, when do you think you'll develop it, and

19   they said, we couldn't give you any time certain, which

20   prompted us to file this motion.  This was the day after we

21   filed the motion.

22          The Court indicated, "If your document has a caption

23   on it that it is re: RSS or RQC or redesign or whatever it is,

24   you have to produce it."  And the Court went on to say after I

25   argued that -- these are their own self descriptions, Your

1    Honor.  These are what they're saying it involves.

2         They say, "but if your own client captioned it as one

3    way or another, and you captioned that particular description

4    and put it and used it on your log, you can't withhold the

5    document on the grounds that it didn't comply with what its

6    heading was.  That means -- that won't fly."  And here we are

7    now, more than a month after that, and we still have at least

8    800, and we think many more, that fall directly within the

9    Court's February 21 order.

10        Now, to be certain, there are a number, more than

11   2,000 or so, that have cryptic descriptions that we don't know,

12   because we don't know what we don't know, what the document

13   said.  But they are from the usual suspects that were involved

14   in the redesign, and they are within the parameters

15   post-injunction, pre -- post-injunction hearing, excuse me, pre

16   your injunction order which was May 24 of 2011, and they

17   clearly involve -- I mean, because during that period, that was

18   the period of activity in which they were attempting to

19   redesign around something which we believe they have not

20   redesigned around, but we don't know -- it doesn't expressly

21   say RQC, Your Honor.

22        So on the basis of that, they're withholding those

23   documents, and what they say is, well, we reviewed them, and

24   trust us, that, you know, they really don't apply.

25        THE COURT:  Why do I not take them -- they're

1    officers of the court.

2          MR. ROBERTSON:  Excuse me, sir?

3          THE COURT:  They're officers of the court that are

4    saying that.  What reason do I have to believe that they

5    have -- if, in the case of a document that doesn't have any

6    indication on its log that it's redesign or development of the

7    RQC/RSS, then -- and they say, well, we've reviewed the

8    underlying document and it doesn't pertain to that, why do I

9    have a ground upon which to say, you're not basically shooting

10   straight and you're not telling me the truth?  That's a pretty

11   serious thing.

12         MR. ROBERTSON:  I understand, Your Honor.  It's a

13   very serious thing, and here's why:  I just gave you a dozen

14   examples of things that expressly reference RQC development

15   that they're withholding, and I just represented to the Court

16   that there are more than 800 of those documents that they're

17   withholding.

18         THE COURT:  Right, in a different category and being

19   withheld, I believe, for a different reason, aren't they?

20         MR. ROBERTSON:  Well, Your Honor, quite frankly,

21   that's why *in camera* review is appropriate here, because while

22   we should trust, we should verify, and, you know, there's an

23   old expression, Scottish expression since I'm Scottish, fool me

24   once, shame on them, fool me twice, shame on me.  And I feel

25   we've been fooled here, both on the contempt that's underlying

1    this whole thing and on these privilege issues, because we are

2    seeing a number of documents, Your Honor, that are being

3    produced that demonstrate to us that there is a fraud on the

4    Court going on here, and if I might just go in your

5    PowerPoint --

6            THE COURT:  You mean that there was a fraud going on

7    in the redesign and the statements made with respect to it?

8            MR. ROBERTSON:  Yes, sir, both --

9            THE COURT:  Not that the current lawyers are

10   committing a fraud on the Court now.  You're not saying that,

11   are you?

12           MR. ROBERTSON:  I'm not saying that yet, Your Honor,

13   and, Your Honor, I raised that before, but I understand that's

14   a very serious charge, but, you know -- and you must consider

15   the perspective, but I think there's a serious conspiracy going

16   on here with respect to this, and documents that are being

17   produced --

18           THE COURT:  Conspiracy about what?

19           MR. ROBERTSON:  Concerning both withholding these

20   documents that are relevant and pertinent and subject to the

21   Court's order --

22           THE COURT:  A conspiracy between whom?

23           MR. ROBERTSON:  The lawyers and Lawson.  This

24   whole --

25           THE COURT:  Current counsel?

1          MR. ROBERTSON:  Well, the current counsel must have

2     been involved at some point with the fact of defending this

3     alleged redesign, and they must have been brought up to speed

4     on whether or not it was a fraud, a sham, or whether it was

5     fair and if it is a colorable difference, and I'm going to tell

6     Your Honor, and the documents will show when we get to the

7     substance of this, that this whole process was lawyer-driven,

8     that everything was lawyer-driven and, in fact, in some

9     instances, Lawson disregarded the lawyers' opinions and advice.

10          THE COURT:  That's not the current counsel.  That was

11     another law firm that was involved at that stage, as I

12     understand it.  Am I not right about that?

13          MR. ROBERTSON:  There were several law firms

14     involved, Your Honor.  In fact, there was another lawyer,

15     Robert Crawford, who is subject to Your Honor's order, and they

16     haven't produced documents from Mr. Crawford.

17          THE COURT:  Who is Mr. Crawford?

18          MR. ROBERTSON:  Mr. Crawford was outside counsel in

19     Minnesota who was actually advising Lawson on the alleged RQC

20     design-around.

21          THE COURT:  Is he in a law firm there?

22          MR. ROBERTSON:  He is in a law firm.  I think it's

23     called Crawford & Mauna.  I'm not sure I have the pronunciation

24     right, but he is in a law firm there, and he was commenting --

25          THE COURT:  Why haven't they produced those

1   documents?

2          MR. ROBERTSON:  I don't know, Your Honor.

3          THE COURT:  Have you asked them and talked to them?

4          MR. ROBERTSON:  There are documents that were

5   communications from Mr. Crawford to Lawson, so it's clear that

6   they searched Lawson's documents and produced some of them, but

7   there are other documents that are in Mr. Crawford's possession

8   clearly --

9          THE COURT:  Have you subpoenaed Crawford's --

10         MR. ROBERTSON:  I prepared a subpoena on Monday, Your

11  Honor, but I didn't want to serve it before we had this

12  hearing.  Quite frankly, I think that they should go to Mr.

13  Crawford and ask Mr. Crawford to voluntarily produce these

14  documents, because he's clearly an agent of the client and, as

15  defined in our document request, should have been produced.

16         THE COURT:  Are you saying that the documents that

17  Crawford has about the redesign and control -- the redesign are

18  within the custody, possession, or control of Lawson?

19         MR. ROBERTSON:  Absolutely.

20         THE COURT:  Which one?

21         MR. ROBERTSON:  I'm sorry?

22         THE COURT:  Custody, possession, or control?

23         MR. ROBERTSON:  I think all, particularly control

24  since he's an agent and since he communicated to them.

25         THE COURT:  They're in the possession of Crawford.

1          MR. ROBERTSON:  They are in the possession of Mr.
2   Crawford.
3          THE COURT:  Okay, so we rule that out.  Now we have
4   custody.  Are they in the custody of Crawford or the custody of
5   Lawson?
6          MR. ROBERTSON:  I think they're in the custody of
7   Lawson and Mr. Crawford, and I'll tell you why.
8          THE COURT:  So there's joint custody.
9          MR. ROBERTSON:  Yes, sir, because the documents that
10  the lawyer produces are the property of the client.  That's,
11  you know, black letter law.  So I think they are both in the
12  custody and control, and in some instances, since they, you
13  know, may have -- well, they have been -- a subset have been
14  given to Lawson, and a subset have been produced to us.  But
15  there are still documents we believe that they haven't produced
16  concerning RQC development, because in a way, he was sort of
17  the outside critiquer of Lawson's attempted design-around of
18  the RSS infringing system, and he weighed in on a number of
19  things that Merchant & Gould recommended, and, you know, in
20  many instances it's quite revealing when he indicates that he
21  doesn't believe that the design that Lawson has come up with,
22  as guided by Merchant & Gould, is sufficient to escape
23  infringement.
24          So I think his documents are highly pertinent.  I can
25  subpoena him, but I'd rather, given the fact he is an agent of

1    Lawson, have them go back and search for those documents and

2    produce them promptly.

3              More to Your Honor's point, there are documents also,

4    a handful, on the privilege log involving Gibson Dunn, and so

5    this is a year ago.  I want the Court to appreciate that it's

6    been more than a year -- actually, I'm sorry, slightly less

7    than a year since the last iteration of the privilege log was

8    produced back in November of 2011, and the Court indicated in a

9    September 14th conference that given this was a subject matter

10   waiver, it had no temporal limitations to it.

11             In fact, the argument was made that they didn't have

12   to produce any documents after the release of RQC, and the

13   Court made very clear it didn't matter if it was prerelease or

14   post-release.  In fact, there are many documents that are

15   post-release in which they're talking about whether RQC

16   actually avoids infringement, and there clearly could be

17   relevant documents hypothetically, because I haven't seen them

18   all, in which someone says, you know, that RQC really doesn't

19   avoid infringement, and we need to, you know, think about

20   something else.

21             Let me just give you one example if I can point to

22   it, and I don't want to belabor the process, but if you look at

23   page 13 of the PowerPoint, here's one that I find to be very

24   interesting.  It's the third bullet point, sir.  This was when

25   we filed the show cause for why they should not be in contempt,

1    and this is a point where Gibson Dunn had gotten involved, and

2    they were preparing -- and to be sure, I just want to make sure

3    -- this was Will Schultz was preparing a declaration.

4              THE COURT:  Who is Mr. Schultz?

5              MR. ROBERTSON:  Mr. Schultz was an attorney from

6    Merchant & Gould.

7              THE COURT:  That's what I thought.

8              MR. ROBERTSON:  Mr. Schultz was the one who wanted to

9    rewrite evidence law by saying he had hearsay on hearsay for a

10   document that didn't exist.  Mr. Schultz was preparing a

11   declaration that was to be used with the Court to try and

12   defeat our show cause motion for contempt, and Mr. Dooner was

13   giving a declaration.

14             Now, Mr. Dooner is a Lawson employee who was involved

15   in the redesign, the alleged redesign, and one of the things

16   they argued --

17             THE COURT:  Was Schultz preparing Dooner's affidavit,

18   or was Schultz preparing Schultz's affidavit?

19             MR. ROBERTSON:  Schultz was preparing Mr. Dooner's

20   affidavit.

21             THE COURT:  All right.

22             MR. ROBERTSON:  And I actually have one of the

23   drafts.  There are several drafts that were on the privilege

24   log that they haven't produced.

25             THE COURT:  How do you have one?

1      MR. ROBERTSON:  Because they produced one iteration

2  of apparently several.  And in that draft --

3      THE COURT:  Is this a document that was intended to

4  be filed publicly?

5      MR. ROBERTSON:  Is this a document that was intended

6  to be filed publicly?

7      THE COURT:  What is the Fourth Circuit law on that

8  kind of document?

9      MR. ROBERTSON:  I think this --

10      THE COURT:  What is the difference between that and a

11  10-Q?

12      MR. ROBERTSON:  You are testing my memory, Your

13  Honor.  I'm not sure whether the motion to show cause --

14      THE COURT:  A document that's prepared with the

15  intent to be filed in the public doesn't have privilege in the

16  Fourth Circuit, does it?

17      MR. ROBERTSON:  I think that's right, but this --

18  these were iterations that had attorney/client communications

19  back and forth as to what the substance of the declaration

20  would be.

21      THE COURT:  I see.

22      MR. ROBERTSON:  Okay.  I just wanted to point out --

23  Your Honor asked me whether, you know, we think --

24      THE COURT:  I got you off track.  What part of page

25  13 are you talking about now?

1          MR. ROBERTSON:  It's the last bullet point.  So this

2    draft -- in fact, I have the document, actually, Your Honor, if

3    you want me to hand it up, the draft of the declaration.  I

4    don't want to go through it at length, Your Honor, because I

5    know time is short.

6          Here's the important part.  So one of the things they

7    say is a design-around, Your Honor, and I'm going to be testing

8    your memory now, but you remember, when you go through the

9    Lawson system, you can prepare a shopping cart that has the

10   items you want to buy that you're going to put in a

11   requisition, and then you're going to generate a purchase order

12   to buy it.

13         This document is dated September of 2011.  Now,

14   that's five months, four months after Your Honor's injunction,

15   ███████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ██████████████████████████████████████████████████████████

19   ███████████████████████████

20          ████████████████████████████████████████████████████

21   █████████████████████████████████████████████████████████████

22   ██████████████████████████████████████████████████████████

23   ████████████████████████████████████

24          That's one of the three bases, they say, that they

25   ██████████████████████████████████████████████████

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ██████████████████████████████████████████████████

4        Now, you'll hear from our experts that that feature

5 has not been removed, that they still have what's called a

6 cache that holds the requisition items in order to put them on

7 the requisition and then issue the purchase order.

8        So that's why I think, Your Honor, when you hear the

9 substantive evidence, you will find that this is and has been a

10 fraud on the court.

11       Now, Your Honor, I'm not going through a lot of

12 Lawson's representations that they made to you about full

13 compliance with Your Honor's February 20 order, but Mr.

14 Thomasch did, in open court, say that if they lost at the

15 Federal Circuit, he assumed complete production.

16       He also said it wasn't going to be difficult to

17 figure out which documents Your Honor's order applied to.  He

18 also stated that as soon as their petition for mandamus was

19 denied, they would commence the proceedings without delay.

20       Now, Your Honor, let me just show you -- in fact,

21 while we're on page 13 -- a couple more examples.  Here was a

22 ████████████████████████████████████████████████

23 ██████████████████████████████████████

24 ████████████████████████████████████████████████

25 ██████████████████████████████████████████████████



```
1
2
3
4
5
6
7
8
9
```

10          In fact, you'll find out, Your Honor, from the

11   documents that have already been produced when we commenced the

12   contempt proceedings that Lawson rejected counsel's advice at

13   the time and did not remove the shopping cart cache.

14          So I'd like to move on to a couple of other

15   categories, if I could, Your Honor, that concern documents that

16   we believe were subject to the Court's order beyond the RQC

17   development.

18          THE COURT:  Mr. Robertson, I'm going to tell you now

19   that I'm not putting any time limits on this proceeding today

20   because I want to get it right, and I don't want to spend a lot

21   of time doing it, so I want you to go through it in an orderly

22   way, topic by topic, so I can make a decision on this matter,

23   and I'm going to ask you to focus on one topic at a time, and

24   then we're going to Mr. Thomasch and let Mr. Thomasch address

25   that topic.  That way I'll have a handle on exactly what needs

1    to be done and -- or if anything needs to be done.

2            So the thing I think we were talking about to begin

3    with was documents that are picked up in that part of the

4    February 21 order and opinion that hold that there has been a

5    subject matter waiver about the design and development of

6    RQC/RSS, and you finish -- get your presentation on that one,

7    and then I'm going to give Mr. Thomasch, or whoever is going to

8    deal with it, time to deal with that, and then I'll take the

9    next topic.  That way we'll have an orderly procedure and an

10   orderly record.

11           You all are a lot more familiar with this than I am,

12   and it will help me if I have it compartmentalized a little

13   bit.

14           MR. ROBERTSON:  What I've done then is given you, I

15   think, in that PowerPoint and those exemplary documents at

16   least 12 examples that specifically reference RQC.  What I

17   represented to the Court --

18           THE COURT:  Of 800, or are there -- there are

19   800-some that have these references or that do not have -- some

20   of which have references and some of which you think I should

21   infer they, in fact, pertain to the development because of the

22   nature of the entry and the time frame and the persons

23   involved?

24           MR. ROBERTSON:  Yes, that's exactly right, Your

25   Honor.  So what we've done is we've provided you with -- taking

1   their privilege log, and after they've completed their

2   production, we've given you a color-coded example.  I believe

3   it's Exhibit A to the reply brief, and --

4            THE COURT:  That's that disk.

5            MR. ROBERTSON:  Yes, sir, and we're going to get that

6   printed -- we're going to attempt to get that printed out in

7   hard copy for you, but, yes, that's that disk.

8            THE COURT:  How big is that going to be once it's

9   printed out?

10           MR. ROBERTSON:  I believe their privilege log had

11  some 10,000 documents and was about 1,500 pages long?  Maybe

12  more than 1,500 pages, but that's that disk.

13           What I've then done, to try and simplify the matter,

14  and I have a printout and I apologize, I only have one copy, so

15  I'm reluctant to hand it up to the Court today because I don't

16  have one for counsel, but I can get it to the Court tomorrow,

17  but I have a printout of 200 examples that is color-coded with

18  what we believe are clean examples of RQC documents that fall

19  within the Court's order.

20           THE COURT:  And that's the one you want me to review,

21  your 200-sample documents.

22           MR. ROBERTSON:  Yes, sir.

23           THE COURT:  What would you have me do with the 200

24  samples?  Find that because all of the 200 or any of the 200

25  meet your description, that they just have to produce

1    everything and let it rip?

2          MR. ROBERTSON:  I think that would be -- yes, I think

3    that would be the just result, that if we give you examples of

4    200 and you find that there is a significant number of them, a

5    majority, whatever the Court deems in its discretion should

6    have fallen within the Court's order, at this point it should

7    be game over, and they should produce the entire privilege log

8    in its entirety.

9          THE COURT:  Is there any authority that you have for

10   using the procedure of that sort to make this kind of decision?

11         MR. ROBERTSON:  Um, there is, I believe -- I might

12   have the case wrong, but it's the -- the Court, this summer,

13   looked at 100 documents and found that they weren't privileged

14   and, I think, required an entire production, but I think the

15   authority is well within the Court's discretion given the

16   procedural status of where we are now.

17         I would not want to have to put the Court through the

18   burden of having to go through some 4,000-plus documents on a

19   one-by-one basis to make that determination, but if you find

20   based on --

21         THE COURT:  I thought you said 800.

22         MR. ROBERTSON:  Well, sir, there are 800 that we

23   believe -- 800-plus -- explicitly reference RQC within their

24   description, and there's that other --

25         THE COURT:  There's another 3,200 or so that you say

1  are impliedly related or encompassed within the subject matter

2  waiver; is that right?

3          MR. ROBERTSON:  Yes, sir.  That's based on, you

4  know -- let me be clear.  It's based on our informed surmise

5  and supposition given the cryptic descriptions, and, you know,

6  they write the descriptions, and the participants and the time

7  frame.  That's our best estimate.

8          Now, there are a number of other documents, and I

9  understand the Court wants to do this in a structured fashion,

10  that we think there are bright line rules that we will address

11  later, like that are merely cc-ed to an attorney.

12          THE COURT:  We'll deal with that category after we

13  finish with the subject matter waiver.

14          MR. ROBERTSON:  Well, Your Honor, then I'm done with

15  my RQC argument.  I've given you, I think, 12 examples in that

16  set of 30.  I have other examples for other categories that

17  fall within the Court's order.

18          THE COURT:  We'll get back to that.

19          MR. ROBERTSON:  I have the list of 200 that I'll get

20  to Your Honor, but -- that I think demonstrate many additional

21  RQC documents that should have been produced and haven't been

22  produced and, therefore, at this stage of the proceedings

23  warrant sanctions, but I'll address those other categories as

24  the Court wishes as we proceed.  Thank you.

25          MR. THOMASCH:  Your Honor, Daniel Thomasch for

1    Lawson.  It's frankly difficult to know where to begin other

2    than to note, and I'll note it first because in 31 years of

3    practice, this is the first time that this has happened, that

4    I've been accused of being part of a conspiracy and having been

5    engaged in some form of crime fraud.

6            Your Honor said --

7            THE COURT:  We haven't got any papers on that, and I

8    don't have that -- that's not going to be considered right now.

9            MR. THOMASCH:  That's what I wanted --

10           THE COURT:  If we want to have to deal with that

11   issue, that issue has to be teed up directly.  It has to be

12   specifically presented so that the lawyer and the client both

13   have an opportunity to understand and address what's going on,

14   and so does the Court.  So let's go to the documents that are

15   being withheld that are claimed to be within the RQC waiver.

16           MR. THOMASCH:  And I don't -- my argument is on the

17   facts here, and I want to deal with that, but Your Honor asked

18   a question about law of Mr. Robertson, and so just because

19   you've asked the question, I'll note for the Court that in the

20   case of *American National Bank and Trust Company of Chicago v.*

21   *Equitable Life Assurance Society of the United States*, 406 F.3d

22   867, Seventh Circuit Court of Appeals decided May 4th, 2005, in

23   that case, there was a process in which the plaintiff attempted

24   to do a little of what I understand Mr. Robertson now wants to

25   do.

1          The relief he just asked for, production of the

2     entire privilege log, actually goes beyond the relief he asked

3     for in his papers which is the production of some 4,500

4     documents, although I must say there's not that much difference

5     between the two because he has put virtually every document in

6     the log into what he calls RQC development.

7          But in that case from the Seventh Circuit, the

8     magistrate didn't want to go through the whole process of

9     looking at all of the documents, and so the magistrate judge

10    said to the plaintiff's counsel, you pick 20, and I'll review

11    those 20, and if I find five or more of them are not properly

12    privileged, then the whole log gets produced.  And he found

13    five had not been properly logged, and he ordered the

14    production of all of it, and it went up, and unusual for a

15    discovery matter, it made into the Federal Court of Appeals.

16         And the Seventh Circuit reversed, said it was abuse

17    of discretion, said it was inherently arbitrary to let the

18    plaintiff's counsel select out the most favorable small

19    selection, and there was no reason to believe that those small

20    selection was representative of the larger sum of documents at

21    issue, and here, particularly where there's so many documents

22    at issue, I think that's particularly appropriate.

23         THE COURT:  Did the Court comment on the procedure of

24    allowing both sides to submit an appropriate sample and then to

25    judge on the basis of a submission made by both sides?

1            MR. THOMASCH:  That was not discussed in the case

2    because that was not the facts in that case.

3            THE COURT:  Let me tell you my problem.

4            MR. THOMASCH:  Yes, Your Honor.

5            THE COURT:  This needs to be resolved.  Has the

6    Federal Circuit set a date for the hearing on the merits of the

7    appeal yet?

8            MR. THOMASCH:  Yes, Your Honor, on June 6th of this

9    year --

10           MR. ROBERTSON:  June 8th.  I argued it, Your Honor.

11           MR. THOMASCH:  The record will reflect it.  In early

12   June, Your Honor, the case was argued in the United States

13   Court of Appeals for the Federal Circuit.

14           THE COURT:  It's already been argued.

15           MR. THOMASCH:  It's been argued.  It was argued

16   almost five months ago.  So that case is proceeding on its own.

17   There is a related case in the Federal Circuit, because certain

18   of these claims were held ultimately in the PTO, after all

19   appeals were over, to be invalid, and ePlus has taken an appeal

20   of the invalidity over, so those are also pending.  That has

21   not yet been argued.

22           MR. ROBERTSON:  I'm sorry, Your Honor --

23           THE COURT:  Mr. Robertson, let him finish, and you

24   can make notes and then I'll hear you.  It just is helpful to

25   hear one person at a time.  Then we get everything straight.

1    So the decision on the merits of the case is pending.

2              MR. THOMASCH:  That one has been argued --

3              THE COURT:  Then there is another case that is

4    related to it.  It's the re-examination case, and it hasn't

5    been argued yet, or it has?

6              MR. THOMASCH:  It has not been argued, and we do

7    not know whether --

8              THE COURT:  Is one being held for the other; do you

9    know?

10             MR. THOMASCH:  We don't know.  There have been

11   letters to the Court about the relationship between the two,

12   but we do not know -- the Court doesn't tell us -- how it's --

13   whether it's going to be the same panel or not and whether they

14   will be -- whether the first will be held for the second.  We

15   have no insight into that to offer.

16             THE COURT:  All right.  I want to get this finished,

17   and, I mean, it's a fairly simple matter to determine, it seems

18   to me, whether the privilege log, on its face, claims matters

19   that are related to or describes matters that are related to

20   the design of the RQC and produce those documents, and there's

21   no reason not to have produced every one of them by now.

22             MR. THOMASCH:  I agree, Your Honor, and I think it is

23   fairly simple, and I'd just like to address it briefly, because

24   I think there's a point of difference between us.

25             THE COURT:  What is the difference?

1          MR. THOMASCH:  The difference is the word development

2    or redesign or design or any word that approximates that, and

3    so when he started his argument, Mr. Robertson said that Lawson

4    had taken a cramped and hyper technical response to the order

5    because we had limited things, our production, to the RQC

6    development, but, Your Honor, that is precisely what the waiver

7    is.

8          The waiver is the subject matter of Lawson's

9    development of the RQC module.  So what we have here, every

10   document that deals with RQC does not deal with the development

11   of RQC, and I would say there's two enormous buckets that

12   encompass thousands of documents that are at issue here.

13         One is the rollout of RQC.  RQC was designed, but

14   then it had to be rolled out.  It had to be sent to the

15   customers who were -- had RSS and who were paying maintenance

16   on RSS.  And so those customers had to be informed what was

17   going to happen.

18         RSS was decommissioned.  When RSS was decommissioned,

19   that affected their ability to get service on it.  They had to

20   be communicated with.  There were enormous numbers of documents

21   that were generated about how to explain this to the

22   marketplace, what their rights are going to be, things of that

23   nature.

24         They don't deal with the development.  Those aren't

25   developers.  That's the communications, the marketing group and

1   the customer service group.  They have to figure out how to

2   answer the phones.  If someone says, I have a problem, what do

3   they say.  That's not the development of RQC.

4           So there is the rollout of RQC to the public.  There

5   is the sale of RQC to non-customers, how much are we going to

6   charge for it, how are we going to advertise --

7           THE COURT:  Is that part of the rollout?

8           MR. THOMASCH:  That would be part of -- that would be

9   generally part of the rollout.  What I would think of as the

10  rollout is how do we commercialize and sell and deal with our

11  customer base about this new product in our product line.

12  That's number one.

13          Number two, another big bucket that encompasses large

14  quantities of documents here are litigation about RSS and RQC;

15  in other words, this case.

16          Now, I understood Your Honor's order, and, you know,

17  I don't want to say we're not involved to suggest that that

18  means that someone who was previously involved did something

19  wrong, because I don't imply that at all, but we weren't in

20  this case at the September 15th date.  I'd never heard of

21  Lawson or been involved in this lawsuit as of that time.  We

22  were retained after that fact.  We weren't involved in the

23  creation of those documents.  But there were documents that

24  were created --

25          THE COURT:  Which documents?

1          MR. THOMASCH:  Documents such as the draft Dooner

2    declaration and the comments from Mr. Schultz about what would

3    be in it or not in it.

4          There has been litigation that has been ongoing since

5    early September in front of Your Honor, September 2011, over

6    whether or not there should be contempt.

7          THE COURT:  When did you get in the case?  It's in

8    the record, but I don't have it.

9          MR. THOMASCH:  In very early October.  There were

10   hearings with Magistrate Judge Dohnal on somewhere in the

11   neighborhood of 8th, 9th, 10th of October.  My personal

12   involvement began --

13          THE COURT:  I'm talking --

14          MR. THOMASCH:  The firm, I didn't initially take it

15   on, but I believe it was very early October.  It could have

16   been the last day of September, but I believe it was the first

17   week of October.

18          At any rate, there has been litigation ongoing since

19   then about generally our contention that RQC is a separate

20   product from RSS and is different from RSS and is more than

21   colorably different from RSS, far more.

22          That litigation has been ongoing, and there have been

23   enormous numbers of communications about how to defend that

24   litigation.  We do not look at that -- I have never interpreted

25   that, and I don't as I stand here, as being in the subject

1    matter of RQC development.

2            So that is a place where we differ dramatically as

3    between the plaintiff and the defendant over what is covered by

4    Your Honor's order.

5            As I understood Your Honor's order, you said that --

6    Mr. Robertson made a comment about the redesign was

7    lawyer-driven.  Yes, the redesign was heavily influenced by the

8    lawyers, because the lawyers were involved in providing IP

9    advice.

10           THE COURT:  Is it simply your contention that the

11   waiver that is mentioned, that is the subject of the order,

12   does not involve waiver about -- of the subject of RQC design

13   that is any discussion of that topic about how it was designed,

14   about how it was developed in the past, which discussion was

15   had with Gibson Dunn in defending the charge of contempt?  Is

16   that your point?

17           MR. THOMASCH:  Well, certainly I would take the

18   position that anything that Gibson Dunn has done to defend this

19   litigation that allowed us to investigate past facts and to do

20   that, that --

21           THE COURT:  Who was defending the cases when these

22   depositions were taken?

23           MR. THOMASCH:  When the depositions were taken, we

24   were, Your Honor.  They were in January of this year.  We began

25   in October of last year, and so when we prepared the

1  witnesses -- I think that's a good example.  We prepared Mr.

2  Christopherson for a deposition.  I would not have felt that if

3  Mr. Robertson wanted to be invited and attend that deposition

4  preparation session that he would be entitled to.

5       I would have thought I had a work product privilege

6  to meet with my client to discuss the defense of the

7  litigation, and if Mr. Christopherson testifies before trial in

8  this Court or a hearing in this Court on the contempt, I would

9  expect to prepare him beforehand, and I would not expect Mr.

10  Robertson to have a right to come or to ask his first question,

11  what did you do in preparation in talking with Mr. Thomasch.

12       THE COURT:  Well, now, the opinion said Lawson waived

13  its privilege during the depositions of Mr. Christopherson, Mr.

14  Hagar, and Mr. Lohkamp.

15       MR. THOMASCH:  Yes.

16       THE COURT:  The development of the module was

17  carefully outlined in a document about which Mr. Christopherson

18  was questioned in his deposition.

19       MR. THOMASCH:  Yes.

20       THE COURT:  That is a document that was prepared

21  before that deposition.

22       MR. THOMASCH:  And the documents that were prepared

23  were produced.  They were treated as documents that were about

24  subject matter -- the development of the product.  They may

25  have been work product.  The issue becomes whether or not the

1    subject of the document was preparation for testimony or the

2    subject was the development, and I did view and I do view that

3    the subject matter waiver which, in the Fourth Circuit, is

4    supposed to be tightly constrained to the subject matter, the

5    subject of the development, I did not think would extend, for

6    instance, to preparing for testimony in this court in the

7    future.

8           When Mr. Christopherson or Mr. Dooner comes to trial,

9    they will be prepared, and I wouldn't think if I prepared a

10   witness outline to prepare my witness to testify about the

11   historical events, I would not think that that witness outline

12   had to be turned over.

13          If it does, it does, and it's an issue that we'll

14   have to preserve our rights and deal with later, but I will

15   say, Your Honor, in 31 years of litigation, I have never heard

16   of an order that went so far as to say that the preparation of

17   a witness for trial other than in a crime-fraud exception

18   situation.  That would be different.  If the attorneys are part

19   of a crime, that's a different story, but I haven't lost my

20   ability to prepare witnesses for trial simply because Mr.

21   Robertson alleges --

22          THE COURT:  You are focusing on preparing people for

23   trial, and we haven't gotten to that point yet.  Where is it

24   that you are drawing the distinction in these documents, Mr.

25   Thomasch, because most of these documents are Lawson documents.

1   They're not your documents.

2          MR. THOMASCH:  Correct.  That's absolutely correct.

3   Here's how we did it.

4          THE COURT:  And it's Lawson that waived the privilege

5   here, and it may or may not have been done with consent, but it

6   was Lawson that waived the privilege.

7          MR. THOMASCH:  Right.  We have viewed the issue as

8   not being technical in any way.  We have not done this.  We ran

9   a search term, a phraseology that was a string of search terms

10  that were like, you know, a dozen terms long, this or that or

11  the other, because we wanted to make sure that we captured all

12  the right terms.

13         In addition, we read every document ourselves.  We

14  read them, and we did a computer search to check our reading,

15  but we looked for redesign, development, redevelopment.

16         THE COURT:  If the word doesn't appear --

17         MR. THOMASCH:  No.  That was just a flag --

18         THE COURT:  -- that's the test?

19         MR. THOMASCH:  No, that is not the test.  If the word

20  did appear, if the word appeared in the log, we produced.  We

21  did not produce, he says, 800 entries that say RQC.  We did not

22  produce every document that says RQC.

23         We produced documents that said RQC development, RQC

24  design, RQC redesign, RSS redesign, RSS to RQC, anything like

25  that.  If the words were on the log and Your Honor told me to

1  do this on September 14th, if the words were on the log, we

2  produced it.

3          THE COURT:  Who is Jordan Ekelin?  Let's look at --

4  you have his handout there?

5          MR. THOMASCH:  I do, Your Honor.  In-house counsel

6  for --

7          THE COURT:  Paragraph two -- page two, excuse me.

8          MR. THOMASCH:  In-house counsel at the time, no

9  longer with the company, I believe the general counsel of

10  Lawson.  Not the general, I'm sorry, Mr. McPheeters was.  Mr.

11  Ekelin was in-house counsel.

12          THE COURT:  All right.  Nancy Anderson is who?

13          MR. THOMASCH:  I'm sorry, Your Honor, if I could ask

14  you where you are.

15          THE COURT:  I'm sorry, document 804 on page two of

16  his slide.  Sorry.

17          MR. THOMASCH:  I have this --

18          THE COURT:  I gave you the wrong document.  Sorry.

19  That's my fault.  30 examples of Lawson's willful violation of

20  this Court's order, do you have that?  Did you give him one

21  there, Mr. Robertson?

22          MR. ROBERTSON:  Yes, sir.  I'll see if I have another

23  copy.

24          MR. THOMASCH:  I was using the PowerPoint, Your

25  Honor.  That's my fault.  I have 30 examples.

```
 1              THE COURT:  Page two of that, second document.
 2              MR. THOMASCH:  Yes, Your Honor.
 3              THE COURT:  It says, "RQC/RSS software migration."
 4   What does that mean?  To me, that's a term that was used in the
 5   testimony here that had to do with the way that it functioned.
 6   What does that mean and why is that being withheld?  It sounds
 7   like a document, even though it doesn't say development, that
 8   relates to development.
 9              MR. THOMASCH:  Well, it says, "Re: RQC/RSS software
10   migration and customer service in anticipation of litigation."
11              THE COURT:  Customer service in anticipation of
12   litigation is not the development of the RQC by its terms.
13              MR. THOMASCH:  Correct.
14              THE COURT:  Software migration is a term that was
15   used here, I think, that had something to do with the way the
16   product functioned.  I may be wrong about that, but at least
17   there's some indication that maybe that's a document that ought
18   to be produced.
19              MR. THOMASCH:  Let me tell you how we would have
20   dealt with this document.
21              THE COURT:  All right.
22              MR. THOMASCH:  The words -- there is nothing on that
23   that talks about development, redesign, or design, so we would
24   not have automatically produced it, but I can tell Your Honor
25   that we would have read it, we would have looked at it, and if
```

1   we believed that it related to the development of RQC, we would

2   have produced it.  I don't have that document in front of me,

3   and I can't speak to precisely what that document says.

4          THE COURT:  Why not?  How come you can't remember

5   everything that's in every one of these documents?

6          MR. THOMASCH:  I do -- I will note for Your Honor

7   that during the course of the day, we'll discuss three

8   different buckets of documents.  This is the first, which is

9   the large one, of 4,500.  In each instance, Your Honor, to

10  facilitate things, if you wish, we have brought down disks

11  appropriately marked that separate them by bucket as to the

12  documents that are in dispute so that to the extent Your Honor

13  wants a disk with the documents, we have brought them with us.

14         THE COURT:  Next one down, 1376, "RQC performance."

15  Now, that doesn't say design and development, but given the

16  context of the issues here, RQC performance could mean how does

17  it work.

18         MR. THOMASCH:  It could.

19         THE COURT:  That certainly, in this time frame,

20  pertains to its development and design, more to its design than

21  its development.  So I would say that one would be a jump-out

22  to me that would say produce the thing.

23         MR. THOMASCH:  That would be a jump-out to me to say

24  read the thing, Your Honor, with all due respect.

25         THE COURT:  Who read it?  Who is reading these

1    things?

2          MR. THOMASCH:  Well, we had them read by our team,

3    Gibson Dunn.  It was a team of associates working on the case

4    working with myself, Mr. Mark, and Mr. Krevitt, and Mr. Lo as

5    well.

6          We had situations set up so that every document they

7    had a question on, they could email to us.  We would then --

8    all the partners on it would look at it.  I don't recall seeing

9    this particular document, but the work of going through --

10          THE COURT:  You had a two-level review, a substantive

11    review.  I understand you to say and be telling me that in the

12    case where there was a question created by the text of the log,

13    the privilege log that might implicate design or development of

14    RQC, that it was then substantively reviewed, that if it had

15    design or development in its text, you produced the document.

16    If it didn't have design or development in its text but had a

17    word in it such as performance which could legitimately be

18    construed to include design, you then had the document reviewed

19    by your team.

20          It first went to a team of associates, and once that

21    was done, a team of partners, a partner or some partners looked

22    at it; is that what you are telling me happened?

23          MR. THOMASCH:  No, Your Honor.

24          THE COURT:  Then I misunderstood, so tell me what did

25    happen.

```
1            MR. THOMASCH:  I'll try to be very specific.

2            THE COURT:  Because that's important.  You are

3    putting your firm behind this.

4            MR. THOMASCH:  I understand.  I want to be very

5    specific about how this was done.  First, we dealt with the log

6    itself.  This was done -- when I say first, it's the first way

7    I'll deal with it, but because of your comments on

8    September 14th, we went back and did this.  We had already been

9    working, but we looked at the log itself.

10           If the log entry said things such as RSS to RQC, RQC

11   development, RSS development, then we produced it

12   automatically, and we did that -- without regard to what the

13   document said at all.  Forgetting about the document, just

14   because of the log entry.

15           Your Honor told me, you are stuck with it, and I

16   accepted that.  And so we did it two different ways.  We had

17   someone read through the log entries, and we also did a search

18   term through the computer on the log itself to see if those

19   words came up.  If they came up, we produced the document

20   without reading it.

21           THE COURT:  Okay.

22           MR. THOMASCH:  Then, step two in sort of the logical

23   sequence of events, we read every document that plaintiffs put

24   on their list of disputed documents.  We read 100 percent of

25   them.
```

1          That first reading was done in the first instance by

2    associates at the law firm of Gibson, Dunn & Crutcher.  We

3    didn't outsource it, we didn't hire contract attorneys, we

4    didn't give it to paralegals --

5          THE COURT:  It was done by associates, and you gave

6    them instructions how to do it.

7          MR. THOMASCH:  We gave them instructions.  I was

8    involved in giving the instructions, but we gave them

9    instructions.  We instructed them that where there were close

10   judgment calls, to err on the side of production, but we did

11   leave those judgment calls to them.

12         We also then had a procedure where every night they

13   would call in, and they would raise questions.  They would not

14   flag every document that had words in it.  They were making

15   decisions produce or not produce, but where they had questions

16   about how to do it and often questions that might impact many

17   documents, what do we do in this sort of situation, we had a

18   conference call, and I would be part of that conference call.

19         Mr. Mark was an integral part of that process, Mr. Lo

20   was a part of that process, and we spoke about the documents

21   and what decisions would be made, and then we would make, in

22   effect, a ruling.  We talked about the commissioner's office.

23   We'd make a ruling, and that would apply to all the documents

24   that they were reviewing.

25         We -- could mistakes be made in the course of

1    reviewing 4,500 documents?  Yes, they could.  Did I try to set

2    up a system so that we would capture those mistakes?  Yes.

3            If there are documents not produced, I would say that

4    a small number of them -- and I don't believe that there are.

5    I believe we produced properly, but if there are documents, I

6    would say the small percentage of them would be someone made an

7    error in executing on the directions, and I would say in large

8    part it would be we did not understand the order to go so far.

9            When we saw the word subject matter of RQC

10   development, we understood that.  The context of this, Your

11   Honor, was an alleged fraud.  Not fraud on the court by the

12   lawyers but an alleged fraud in making and passing off a

13   product that only had cosmetic differences.  That was their

14   claim.

15           Their claim was that you just put lipstick on a pig,

16   they like to say, that you just had -- you just made minor

17   cosmetic, and then you put it out, and you knew it was the same

18   product.  So that led to this question about the developmental

19   timeline, and the key timeline was between February of 2011

20   when, after the jury verdict, the project to redevelop RSS or

21   to develop RQC came online, and June 9th of 2011 when the

22   product was fully commercialized and out to the public, and

23   that was, I will say, Your Honor, that was entirely our focus

24   back in February.

25           THE COURT:  But you've gone beyond that.

1    MR. THOMASCH:  But we've now gone beyond that.  We

2    had to go back and redo it because of Your Honor's

3    instructions, and, indeed, I'm sorry -- we had started to redo

4    that ahead of time, because in the meet-and-confer process, I

5    told Mr. Strapp at the time and Mr. Jacobs -- Mr. Robertson was

6    not part of those discussions, but I was, and I spoke with Mr.

7    Strapp and I spoke with Mr. Jacobs, and I said, if you give us

8    a list, we will review every document you put on the list.

9    And they gave us, interestingly, lists in two ways.

10    They started out with initial lists, and I think in this

11    category there were like 200 documents.  And then I told them

12    we would review every one, and we got a list of 4,500.

13    I must say, for 24 hours, I didn't know whether I was

14    going to maintain the position that we would review them all.

15    I told Mr. Strapp, I said, I haven't gotten my hands around how

16    I even approach what you've now dumped on me, because I'm

17    stumped, and then we went back and we said, we will review

18    every one, and we did review every one, and we had done that,

19    and we were doing that by the time that we had the phone call

20    with Your Honor.  But their motion intervened in that process.

21    This is a process that lawyers could have worked out

22    down to maybe a small nub, and then we could have come to Your

23    Honor for guidance, but the goal here wasn't to work it out and

24    get down to a nub.  The goal was to run to court and scream

25    about Lawson.

1          THE COURT:  All right, well -- I'm trying to stay out

2   of these kinds of attributive motivational remarks and resolve

3   the question on the basis of its merits.

4          Let's look at the third page of his exemplary group,

5   3853.  It's a document discussing source code.

6          Now, perforce, it doesn't have, or by definition it

7   doesn't have design or development in it, but the source code

8   is really the guts of how all this stuff works according to the

9   testimony at trial.  That may be -- that's a nontechnical

10  description.

11         MR. THOMASCH:  Right, I understand.

12         THE COURT:  How can you have the design of this RQC

13  not include a discussion of the source code?  And so that

14  certainly has -- looks like on its face it is something that

15  ought to be produced in terms of the way the case was

16  litigated.

17         MR. THOMASCH:  The only thing I say to Your Honor is

18  I don't have that document here, and I would say on its face it

19  looks like it needs to be read.  The document needs to be read,

20  but to say discussing source code, I have no living clue what

21  that discussion was about, and I do not know that in any way,

22  shape, or form that discussion -- I mean, I note that the date

23  on it is September 23rd, 2011, and I think that -- we went back

24  and we looked at documents later, and documents that would have

25  dealt with sort of historically how we got here or what the

1    development was, how we developed it, any of that came into

2    place and was produced and --

3              THE COURT:  How about the next one, 5279, RQC upgrade

4    plan, May 27, 2011.  That's what was going on here allegedly.

5    You all were upgrading --

6              MR. THOMASCH:  We were.  I don't know that document,

7    but based on that time frame, I would very much think that that

8    was leading up to the webcast to the customers.

9              We had a webcast for the customers to tell them about

10   the rollout of the new product.  I would very much think this

11   was related to that.

12             THE COURT:  And if the rollout, of course, mentions

13   in any way the difference between the two, then you're talking

14   about the development of documents dealing with the development

15   of RQC.

16             Let's suppose that your rollout document says to

17   Payne who is buying this stuff, this is what was sued upon,

18   this is what you are getting, this is the difference.  You have

19   then discussed the development and design of exactly what it is

20   that's at issue in the case, and you've waived the subject

21   matter of it, it seems to me.  Did you all look at it that way?

22             MR. THOMASCH:  I don't think we looked at it --

23             THE COURT:  Don't you see that?  You don't agree with

24   that?

25             MR. THOMASCH:  No, I don't, with all due respect.

1            THE COURT:  It's all right.

2            MR. THOMASCH:  I do not agree with that.  I think

3    that is actually very much wrong.  If, for instance, we sent

4    out a document to our customers that said, we're going to make

5    RQC available to you at no charge on this date, you will note,

6    for instance, that in RQC you can only search to the class

7    level, not the commodity level of the -- using UNSPSC codes.

8    If we said that, that would comment on an objective difference.

9    It wouldn't say anything whatsoever about how we got --

10            THE COURT:  That would comment on the design of RQC.

11            MR. THOMASCH:  Excuse me?

12            THE COURT:  That would comment about the design of

13   RQC.

14            MR. THOMASCH:  It would comment on the design, in a

15   sense the finished product, and everything we send out by way

16   of marketing literature will, at some point, discuss the

17   qualities of the final product.

18            THE COURT:  Don't you --

19            MR. THOMASCH:  I view that as very different than the

20   development of the product which is -- which, in my mind, was

21   aimed at why were we making these changes, were they fraud or

22   were they a good-faith attempt to try to remedy the problems of

23   the infringement.

24            THE COURT:  I understand that, but what you said

25   about it certainly is pertinent information to them in testing

1    the validity vel non of what it is you say in court.

2          MR. THOMASCH:  But there is absolutely no -- the

3    problem here -- I shouldn't say it's the problem, Your Honor.

4    What frustrates me, I will say, is that this ties back, in

5    effect, to *TiVo*.

6          The differences, the three differences between the

7    products are not in dispute.  They're real, they exist.  We say

8    they make them more than colorably different and

9    non-infringing.  And they say they're not more than colorably

10   different and they are infringing.

11         THE COURT:  Mr. Thomasch, please understand that

12   somebody who has -- with respect to somebody who has to decide

13   this issue about whether they do or not, whether there's a

14   colorable difference, one of the things that's important is

15   whether the people who designed it thought there was a

16   colorable difference.

17         MR. THOMASCH:  Correct.

18         THE COURT:  And in deciding what those people say,

19   what they said earlier -- what they say in court, in deciding

20   what they say in court and whether it's true or not, what they

21   said in the past is pertinent, too, not just in deciding

22   whether to believe them but in deciding whether there is a

23   colorable difference, and I think maybe you are taking a fairly

24   restrictive view of the way that *TiVo* has to work and the way

25   it works in the mind of a decider of these issues.

1              It isn't only confined to -- it's certainly important

2     to know what happens with the experts and what the objective

3     differences are, and maybe that's the ultimate resolution, but

4     important to it is what was going on at the time.

5              MR. THOMASCH:  Obviously Your Honor is the decider,

6     and you will decide what is important to you.  I don't see

7     anything in *TiVo* that supports the notion that -- these are

8     different people.  The people involved in the rollout are

9     different people from the people who are product designers.

10    Those two Venn diagrams don't overlap in any substantial way.

11             THE COURT:  But the common denominator is the lawyers

12    who were involved in both.  That's what you are dealing with.

13             MR. THOMASCH:  Well, there were in-house counsel that

14    were involved in both.

15             THE COURT:  Right.  That's waived -- if it relates to

16    the subject matter of the waiver, it's waived.  Let's look at

17    document 6437.  RQC differences.  Next one, 8442, changes in

18    compliance with injunction.  Changes in what?  The RQC is what

19    it seems given that that's what the issue is.

20             MR. THOMASCH:  Individuals could have a question.  If

21    someone put a question in, and we had lots of these questions

22    about who will pay for training, questions about how much --

23    how are you handling service, questions about that --

24             THE COURT:  Doesn't have anything to do with the

25    case.

1          MR. THOMASCH:  And we don't think it has anything to

2     do with RQC development.

3          THE COURT:  But that doesn't mean that something else

4     in the document doesn't have something to do with it.

5          MR. THOMASCH:  You are correct.  All I can say with

6     these entries is that these entries do require -- they are not

7     something where I could stand here and say, on its face, it's

8     not waived, I don't have to read the document.  I agree I have

9     to read the document.

10         THE COURT:  How about these drafts of the affidavit,

11    Dooner affidavit, number 1438 and 5585?

12         MR. THOMASCH:  I think -- I don't know precisely

13    without looking at the whole list of documents, but I believe

14    that most of the outside counsel's discussions with the clients

15    about testimony in the case or submissions of court documents

16    in the fall and later, of 2011, I think they would have been

17    viewed as the subject matter, I think would have been viewed as

18    the litigation and not the development of anything.

19              At that time, at the time that was done --

20         THE COURT:  But you produced this --

21         MR. THOMASCH:  That's why I say it may be -- I don't

22    know -- I have to go back and go through the whole process to

23    determine how an individual document got produced.  There are

24    20 copies of many, many documents.  In a world in which

25    everything is electronically stored and emailed around between

1    people, the number of duplicates is stunning, and they aren't

2    eliminated in the system.  Different people have them on their

3    hard drives.

4              THE COURT:  Then produce them.  There's not one

5    difference between that and the old days before we ever had

6    electronics.  We had more different copies of documents running

7    around once the Xerox got going, and that was more -- there was

8    more when the old carbon copy got going and the Ditto machine,

9    mimeograph machine.

10             MR. THOMASCH:  Multigraphs, yeah.

11             THE COURT:  That's just a function of the development

12   of technology, and the law has been since there were copies,

13   produce them all.

14             MR. THOMASCH:  And we did.

15             THE COURT:  You didn't do this one.

16             MR. THOMASCH:  Well, we produced that one.  We may

17   not have produced -- but I don't know whether we produced that

18   one in error or not.

19             THE COURT:  You didn't produce 5585, and you didn't

20   produce 1438, but you did produce one iteration of that

21   document -- of both those documents.

22             MR. THOMASCH:  As I said, Your Honor, the two big

23   areas in which I think account for the lion's share of the

24   documents are documents that relate to the rollout or the

25   commercial -- the sale of the product as opposed to the

1  development, how do we support it, how do we sell it, and

2  documents that relate to the litigation itself, and it may be

3  that Your Honor is -- I did not, and as I stand here today, I

4  do not read the subject matter of RQC development as

5  encompassing the way you defend the litigation.

6          I may be wrong, but I would have thought that was a

7  crime-fraud exception and only a crime-fraud exception.  This

8  is a scope of waiver that I don't think is narrowly constrained

9  as the Fourth Circuit mandates, but we will -- we will honor

10  whatever ruling Your Honor makes.

11          We are not -- I have spent since I got into this case

12  with a number one goal of getting past the problems that I

13  viewed prior Lawson counsel had with trying to worry about what

14  got disclosed and what didn't.  I wanted to produce them,

15  produce them as fast as I could and get by all that, and when

16  this issue arose, I could not have done anything more to tell

17  the plaintiff's counsel that I will work with you, and I will

18  go through it, and I'll review them all.

19          Now, there may be places where they say, no, Judge

20  Payne's order requires this, and I think it doesn't.  Then we

21  could come to the Court and ask for a ruling.  I don't know why

22  it all has to be sanctions.  I don't know why it all has to be

23  with this tone.

24          These are tough issues, and waiver, I just can't

25  assume everything is waived or I get hit with an argument that,

1   well, you overproduced and you waived again.  The waiver issue

2   is still very real, and I'm trying to do our best to figure out

3   how to handle that.  And if we've made mistakes, we will go

4   back and deal with them, but it is not because we are trying to

5   selectively produce a document, hide a document, or anything

6   else.

7          We've produced 4,000 privileged documents.  I don't

8   think the other 4,000 matter a wit in the overall scheme of

9   things, but if I produce them, it will be a waiver.  So I'm

10  stuck.  I need -- we'll have this issue with the next two

11  categories.  I have very discrete rulings.

12         I just want to make sure that Your Honor's ruling

13  understands the issue and orders me to produce it so that no

14  one later says, you didn't need to produce that.

15         THE COURT:  Mr. Thomasch, I understand that, but let

16  me tell you something.  I haven't, in 40-something years of

17  practicing law, come across a situation in which lawyers can't

18  construct different meanings out of different words in judges'

19  orders, and we're beyond that in this case.  It can't be done

20  that way.

21         I may have to have a special master appointed to look

22  at these waiver documents, and I think I'm going to have to do

23  it, but it's going to slow the case down.  I want to get to the

24  question about whether your company did what it allegedly did,

25  and I would assume your client wants to get to there, although

1   Mr. Robertson says your client is out there selling this stuff

2   and profiting by it, and, therefore, it's not to your advantage

3   to move this thing along.

4           MR. THOMASCH:  Your Honor, we were all within a week

5   --

6           THE COURT:  I'm assuming you have segregated your

7   sales records so that all of your profits can be taken away

8   from you if that's the necessary result in such a way that that

9   can be done.  So I guess that's the -- but somewhere along the

10  line, you all have to decide, each of you, do you want to get

11  to the playing field or not, or do you want to have these

12  skirmishes and -- we need to sort this out, and I don't know

13  how -- what do you think about the process --

14          MR. THOMASCH:  We have taken virtually no discovery.

15  The plaintiffs wanted massive discovery.  The request for

16  privileged documents has delayed us.  We are not the cause of

17  the delay.  Mr. Robertson wants these materials.  It takes --

18  then that adds time into the process.

19          THE COURT:  They're not the one who makes --

20          MR. THOMASCH:  We have -- delay does not benefit us,

21  Your Honor, but a process by which we understand what the

22  issues are in the case -- I mean, that's the part that we're

23  most interested in, is the six letters that we wrote from

24  February 29th -- when we were here in front of you, you

25  directed the parties to do something, and for a month, nothing

1    happened from the plaintiffs about what was the post-*TiVo*

2    procedure.  You asked us, how do you define the animal --

3              THE COURT:  That's a different issue.

4              MR. THOMASCH:  It is, but that is what we want to get

5    to, Your Honor, and I think a special magistrate is a good

6    idea.  I must say that when we had the conversation on

7    September 14th, things you said caused me to go back and

8    re-instruct our group, and we produced hundreds of additional

9    documents as a result, and then we produced attachments that

10   related to them and the like.

11             Your Honor has made comments today that, again, I

12   feel as though there are places where you are reading this

13   order in a way that, in my mind, if you had said the subject

14   matter of the waiver concerns RQC, I would understand, but I

15   don't understand where the line is drawn between a document

16   that relates --

17             THE COURT:  Rollout of RQC, you're not waiving the

18   privilege about that, because that's not part of the

19   development of RQC, but if in the process of talking about the

20   rollout of RQC you discuss the design and the development, then

21   that part of what you've done is waived.

22             MR. THOMASCH:  And --

23             THE COURT:  Do you understand?

24             MR. THOMASCH:  I do, Your Honor.  I hope you can

25   appreciate that in good faith I see a big difference, not a

1    lawyer's difference, a real difference between --

2           THE COURT:  I hope it's a lawyer's difference.  It's

3    what you get paid to do.

4           MR. THOMASCH:  You just said the development and

5    design of the product, and I will tell you that in final

6    marketing literature, every one of those documents will relate

7    to the design.  It will tell you what features the final

8    product has.

9           I don't view every document that says what the

10   product is to be a document that says what the development of

11   the product was, because necessarily you had to develop it

12   before you could sell it, but you just used development and

13   design in the same sentence three words apart.

14          The order said the development, and I do read

15   development to mean the process by which you do something and

16   retrospectively what it was that you were doing.

17          THE COURT:  What do you do in the process of

18   developing?

19          MR. THOMASCH:  You analyze --

20          THE COURT:  You design.  The design is the central,

21   one of the central components of development.  Development is a

22   broader term that includes design.

23          MR. THOMASCH:  And to be clear, if we were talking

24   about RSS design or RQC design while we were doing the product,

25   we absolutely produced that.  I view that as in development.

1    The act of designing the product is totally development, but

2    when the product is sold in the marketplace, you can't sell a

3    product without saying what its features are, and every one of

4    our products, every single piece of commercial literature we

5    have about our product --

6                THE COURT REPORTER:  Mr. Thomasch.

7                MR. THOMASCH:  I'm sorry.  Every piece of commercial

8    literature we have and every discussion we have about the

9    finished product will discuss the design features, but they

10   won't say how we got there or why we got there.  They'll just

11   say what they are, and it's not even in dispute what they are.

12               THE COURT:  I understand that.  That's different.

13               MR. THOMASCH:  I still don't understand if Your Honor

14   is saying if we identify what the feature is, and it's a

15   feature that --

16               THE COURT:  I didn't say if you identified the

17   feature.  I didn't say that at all.

18               All right, let me ask you this:  What if I took 200

19   documents from you and 200 documents from him, each of you

20   select your best shot that you think is illustrative, would

21   that be an acceptable, appropriate way to try to resolve the

22   dispute short of having some special master appointed that

23   would review every single document, or I review every single

24   document?

25               MR. THOMASCH:  Your Honor, I do not believe that a

1  sample can be used to then make rulings on documents that no

2  one ever looked at.  I do think, Your Honor, that as a

3  practical way out of this --

4        THE COURT:  We select presidents on the basis of

5  samples.

6        MR. THOMASCH:  I still believe everyone's vote

7  counts.

8        THE COURT:  Well said.

9        MR. THOMASCH:  And in this state more than most.

10        THE COURT:  Unfortunately.

11        MR. THOMASCH:  Your Honor, I would say as a workable

12  way to go through.  You have, again, enlightened me with your

13  views on this subject.  I cannot tell you that I believed that

14  the judgment calls we made were made in conformity, precisely

15  with the way that you have just articulated it.

16        That is a more expansive view than I understood even

17  after September 14th, and if I'm dense, I'm dense, but I honest

18  to God did not understand that you would go that far, but I

19  think I understand where you are --

20        THE COURT:  That I would go that far?

21        MR. THOMASCH:  You wrote the order very carefully,

22  and I thought I understood the reasons for it.  So I would say

23  that the thing we should do is we should look at these and see

24  whether or not one more time, see whether we should purge and

25  voluntarily produce certain documents.

1              I don't know whether there are any.  We've gone

2    through this a lot carefully, and I don't know there are any

3    that we're going to give up on, but I think we should do it one

4    more time to look at it.

5              Then I think it would be useful for you to get the

6    samples of 200 each because it's a starting place.  I do not

7    agree that your findings there should allow you to extrapolate

8    to the whole thing.  On the other hand, if you looked at those,

9    and you came to the conclusion, as I think you will, that we

10   don't -- we're not holding back documents that relate to it,

11   well, then I think plaintiffs will have failed to make their

12   showings, and I think at that point you can deny the motion.

13             So I do favor the 200/200 approach, but I think that

14   we have to be careful --

15             THE COURT:  So you want it structured in a way within

16   which you prevail if it comes out one way but they don't

17   prevail if it comes out the other.

18             MR. THOMASCH:  Your Honor, I do think as a litigant

19   that's a good way to look at the situation.

20             THE COURT:  Yes, it always was.  We're going to take

21   a recess, because the court reporter is going to fire me and

22   you if we don't stop.  We'll take 20 minutes.

23

24             (Recess taken.)

25

```
 1            THE COURT:  All right, anything else, Mr. Thomasch,
 2    about the RQC?
 3            MR. THOMASCH:  Yes, Your Honor.  I did want to
 4    mention one thing on RQC and particularly in regard to the
 5    trying to get understanding and guidance at this point really.
 6            I talked about the two buckets that I was
 7    particularly interested in.  There are, obviously, other
 8    documents, but the rollout documents and the litigation
 9    documents.
10            On the litigation documents, I just want to go back
11    to that momentarily, Your Honor, because at pages eight to nine
12    of your February 21st order, you found that we had, indeed,
13    claimed certain documents were prepared by specific attorneys
14    in anticipation of litigation, and with respect those entries
15    the privilege is not waived, and then you discussed the issue
16    in regard to the development of RQC at page 22 of the
17    February 21st order.  And there you say in dealing --
18            THE COURT:  Where are you referring me, page 22?
19            MR. THOMASCH:  Your February 21 order, page 22.  Page
20    22, you discuss whether or not documents relating to the
21    development of RQC were done in anticipation of litigation, and
22    in the middle of the page, there's a sentence that reads, "The
23    record shows that the documents at issue here were not
24    'prepared in anticipation of litigation.'  Rather, they were
25    drafted to help Lawson create a new product that it could
```

1    market to consumers.  Here, the documents at issue reveal the

2    fact that lawyers were involved in RQC's development and the

3    fact that those lawyers recommended that specific changes be

4    made to RSS.  On this record, Lawson has not established that

5    the work of the lawyers was in anticipation of litigation even

6    though it was done during litigation.  Hence, Lawson has not

7    shown work product protection of the documents dealing with the

8    development of RQC."

9             So I will say to the Court that is where I was taking

10   the notion that the development of RQC was, in this time

11   period, where recommendations were being made and the product

12   was, in effect, being developed, and I understand, and I'm not

13   trying to talk about subject matter waiver, but when we get

14   into September of 2011 and forward, there was actual litigation

15   on this issue.

16            And so even if the subject matter waiver continues

17   unabated, the attorney opinion work product doctrine protects

18   documents where there was opinion work product in anticipation

19   of litigation or during litigation, and once --

20            THE COURT:  Not or, and.

21            MR. THOMASCH:  Yes.  Once we were in September and

22   the plaintiffs have brought on their, I think, ill -named

23   motion for order to show cause --

24            THE COURT:  When was the motion for show cause filed?

25            MR. THOMASCH:  That was filed in September, I

1    believe.  I would defer to plaintiff's counsel.  It was filed

2    before I was involved --

3              THE COURT:  There's a docket in front of me.

4              MR. THOMASCH:  The other thing is, of course, as Your

5    Honor certainly is familiar, your own decision in the *DuPont*

6    case makes clear, opinion work product is only waived to the

7    extent of a document-by-document basis where it is waived, and,

8    again, that's why we do not agree and can't agree to a process

9    by which some hand-picked number of selected documents would

10   lead to an order that would apply to documents that hadn't been

11   reviewed, because -- particularly when so many of the documents

12   involved claims of opinion work product, we do believe they

13   need to be reviewed.

14             We don't object to any process by which, if Your

15   Honor wants to see documents, they are provided.  There are

16   smaller sets that would be easy and we can get Your Honor

17   today.  The plaintiffs have put in -- you know, have in their

18   reply memo 16 or so documents.  We have a dozen or so documents

19   in ours.  We have those we could put on disk and send over to

20   the Court this afternoon for *in camera* review.

21             They're the ones they selected and we selected for

22   the purpose of briefing to give you an idea of what they look

23   like.  That might inform Your Honor if Your Honor was making

24   any order.

25             I think the long-term resolution of this, which,

 1   hopefully, is not actually in the long term, but the complete

 2   resolution of this should be a two-step process by which we

 3   review the documents again.  I actually think if you look at a

 4   small section, gave us more instruction --

 5        THE COURT:  28 documents, is that what you want me to

 6   look at?

 7        MR. THOMASCH:  I believe it's 12 and 16.  I think

 8   it's 28, within a document or two either way.

 9        THE COURT:  I would prefer to see hard copies of

10   things.  I don't like to read --

11        MR. THOMASCH:  We can easily do hard copy.  That's a

12   very manageable number.  These are mostly emails, short

13   documents.  It's the ones that are in their reply brief.  It's

14   the documents that were identified in their brief that we have

15   not produced and the documents that we identified that were on

16   their log that we say have anything to do with development.  It

17   would be that sampling.

18        We could get you that.  I think eventually, though,

19   if the plaintiffs want to pursue this 4,000 document grab, I

20   think it has to go to a special master and have the documents

21   looked at.

22        THE COURT:  All right.

23        MR. THOMASCH:  Thank you.  And I don't know if it is

24   all 4,000.  Mr. Robertson himself broke this into two

25   categories.  He said 800 of them mention RQC, and, of course,

1    we did not produce everything that mentions RQC.  It was RQC

2    development, design, redesign, but I don't know whether we're

3    down to that 800 or whether he's still saying there's some

4    implied reference in regard to a broader total.  800 is a much

5    more workable number, but I'm not sure where the parameters of

6    his motion are at the moment.

7            THE COURT:  All right.

8            MR. ROBERTSON:  Thank you, Your Honor.  Just briefly,

9    I want to start with a fundamental premise, and that was, after

10   Your Honor granted the show cause motion, you permitted us to

11   pursue discovery with respect to design, development, and

12   launch of RQC, and we were very focused on that.  We just had

13   20 or so document requests.

14           We limited it in time from after the jury trial until

15   going forward as of -- I believe the document requests were

16   September 18, 2011.  And so by definition, the documents that

17   are on the privilege log were responsive and relevant to our

18   document request concerning RQC.

19           So I think we start with that fundamental premise

20   that basically says that they reviewed those documents,

21   determined that they were relevant and responsive, but also

22   determined that they were privileged, and now the privilege has

23   been waived with respect to that.

24           And it was Gibson Dunn that prepared the privilege

25   log, four iterations of it, you will recall, and it was Gibson

1   Dunn that created the descriptions for those documents when

2   they did it after four -- presumably after reviewing them four

3   times in order to provide them to Your Honor.

4          So we think by definition they are responsive to our

5   requests, and they would fall within the Court's order.  Now, I

6   thought Your Honor actually hit on the fundamental point here

7   and that we are in a court of justice, and this is a search for

8   the truth.  So the question is whether or not they are saying

9   one thing to the Court and perhaps even one thing to their

10  customers and then saying something completely else internally

11  or to their lawyers as about what the differences are between

12  RSS and RQC if there are any.

13         They keep bringing up this lipstick-on-a-pig issue as

14  if I made that phrase up.  That was in their documents.  I

15  didn't create that phrase.  Let me tell you another document

16  that they produced which I thought was interesting, and it's

17  going to come up in the next bucket of documents we're talking

18  about.

19         It was a document that was authored on June 9, 2011.

20  ████████████████████████████████████████████

21  ██████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  ██████████████████

1 ████████████████████████████████████████

2 ████████████████████████████████████████

3 relevant, Your Honor, because apparently there was a series of

4 questions that were issued as to what they tell the public when

5 they launched RQC, because they wanted to minimize fears among

6 their customers that there were going to be significant

7 changes.  We've seen other documents that we gave to Your Honor

8 in our motion that said, for example, one sales rep to a

9 customer.  There's not anything that's really changed in RSS,

10 but we're not allowed to tell people that.

11        So the documents are going to show, Your Honor, that

12 there is not one thing they changed.  I'd like to come back to

13 this point, though, about the descriptions that are in the log

14 that Gibson Dunn authored, and I just had a couple others, and

15 just, you know, to show you how relevant these are, this is at

16 page seven through nine of our reply brief, and a few of them I

17 have included in the 30 exemplary documents I provided you.

18        But here's document number 6798 at page seven of our

19 brief, description, "discussing RQC upgrade."  Now, how they

20 can claim that doesn't have to do with the development, design,

21 and launch of RQC, I don't understand.

22        Also -- this is at page eight, document 7609,

23 "conveying legal advice regarding RQC code"; page nine,

24 document 2424, "email chain with attorney William Schultz

25 discussing legal advice concerning RQC source code."

1            Now, one of the documents I cited to you before that

2    actually you raised, Your Honor, was document 3853.  You raised

3    that with Mr. Thomasch.  And you'll see it says, "discussing

4    RQC source code."  Mr. Dooner is listed as one of the

5    recipients.  Mr. Dooner is the Lawson employee who wrote the

6    source code, and you will hear, when you hear the evidence,

7    that less than one percent of the source code from -- in RQC

8    was changed from RSS.  That's after we confirmed what the

9    source code was.

10           So if you start with the premise that our document

11   requests were all aimed at RQC, then all of the documents in

12   there are responsive.

13           So, Your Honor, I don't think I'll belabor that point

14   anymore.  I would just ask, Your Honor, given that there have

15   been significant delays in here, appointing a special master

16   would just delay these proceedings further.

17           THE COURT:  What do you say that I should do to solve

18   the problem, Mr. Robertson?

19           MR. ROBERTSON:  I would suggest --

20           THE COURT:  The Fourth Circuit counsels us that we're

21   to be careful because of the purposes served by the

22   attorney-client privilege and the work product doctrine and how

23   we deal with that and how we make the decisions, and I don't

24   know of any authority that says you can take a sampling and

25   decide -- and then infer everything fits the bill of the sample

1   and make a decision on that basis.

2          If I could, I think I'd be inclined to do it because

3   it's a simple way to resolve the problem, and I think that the

4   decision that Mr. Thomasch mentioned, I think I actually

5   remember reading a decision when it came out and was struck by

6   some of the language about how, if it's the case I'm thinking

7   of -- I haven't looked at it since he cited it -- how arbitrary

8   it was to take five, a sample of five and only from one side

9   and how unfair all of that was.

10          And I think I would agree with the premise of that

11   decision anyway if it's the one of which I think I recall.  But

12   what authority do I have to do anything other than send --

13   either I do it or I send it to a special master.

14          MR. ROBERTSON:  Well, Your Honor, I do think if we

15   provided 200 documents as a statistical sampling, and Your

16   Honor started to look at those documents and started to find

17   that the overwhelming majority of them were subject to the

18   waiver given what the document requests were directed to, and,

19   you know, it would be fine if Lawson's counsel provided Your

20   Honor with 200 documents.  I suspect they'll go through the log

21   and pick whatever relevant documents they can find, because I

22   will tell you, and we said it in the papers, some of the

23   documents that we're turning up as privileged included, for

24   example, a memorandum on their social networking policy for

25   employees.  They turned up a bill from Skadden Arps on --

```
 1              THE COURT:  That kind of thing happens in large

 2    litigation.  I took a deposition of a guy one time and had a

 3    great deal of fun with him by taking out a picture from Playboy

 4    that he had in his files, and they produced that as privileged

 5    and confidential, extra confidential, but, you know, that

 6    happens, and so it makes for good cocktail conversation, but

 7    beyond that, we shouldn't really be making decisions on it.

 8              MR. ROBERTSON:  But it was represented to you, Your

 9    Honor --

10              THE COURT:  Unless that's typical of the production.

11              MR. ROBERTSON:  If they have any of those, Your

12    Honor, I'd ask they be produced forthwith.

13              Your Honor, what I'm hearing from Mr. Thomasch is not

14    only did they review this four times before Your Honor even

15    ruled on this for the four privilege logs, they went back and

16    reviewed it again thoroughly, and here we are still missing

17    documents that clearly fall within the scope of Your Honor's

18    ruling.

19              THE COURT:  His view is that the ones that you say

20    clearly fall within the scope are such that the description of

21    those documents is such that it prompted them to go back and

22    review the text, and they reviewed the text and concluded that

23    notwithstanding the somewhat amorphous description, it

24    substantively didn't fit the scope of the waiver.  The only way

25    I know to resolve that is to look at the documents.
```

1          MR. ROBERTSON:  There's nothing amorphous about

2     discussing RQC source code and things like that.

3          THE COURT:  I understand.

4          MR. ROBERTSON:  And, Your Honor, there's no reason to

5     have some arbitrary cutoff as of the time, you know, that

6     Gibson Dunn came on board.  It's a subject matter waiver, Your

7     Honor.

8          THE COURT:  It is a subject matter waiver, but what's

9     the scope of the waiver is the issue, and here they are

10    defending the case now.  They're not involved in the

11    development of it, and development includes its design, of

12    course, but they -- for the RQC issue, but they pick up the

13    defense of the case, and so now they're defending the case.

14         Let's suppose that Mr. Thomasch is getting ready for

15    trial and talking to Mr. -- what is it? -- Dooner.

16         MR. ROBERTSON:  Yes, sir.

17         THE COURT:  Mr. Dooner, let's take him.  Is it your

18    view that because they discuss the topic of the design and

19    development of RQC, that whatever Mr. Dooner says to Mr.

20    Thomasch is the subject of the waiver?

21         MR. ROBERTSON:  Well --

22         THE COURT:  You can't take that view, can you?  I

23    didn't intend that.

24         MR. ROBERTSON:  Let me ask a hypothetical in response

25    to your hypothetical, and that is --

1          THE COURT:  I get to ask them.  As long as I don't

2   have to answer it.

3          MR. ROBERTSON:  I want to answer your question by

4   posing, what if, for example, Mr. Christopherson or Mr. Dooner

5   or Mr. Hagar, who testified for purposes of the injunction and

6   told you a horror story about how people would be dying on

7   operating room tables because there were 277 health care

8   facilities that had 2,000 hospitals that depended on them, and

9   if he made that up from whole cloth, and Mr. Hagar comes back

10  here and they have to represent him and they have to ask

11  questions to Mr. Dooner, to Christopherson, to Mr. Hagar about,

12  you know, we're preparing you and they know that there are

13  going to be false statements made or they know --

14         THE COURT:  They know what to do in that case.  They

15  know that they have to resign or something else.  There's a

16  different rule that applies there.  The question is does the

17  subject matter -- that's different.

18         You're talking about a lawyer knowingly putting on

19  perjured testimony, and I don't have any reason to believe that

20  Mr. Thomasch is going to be engaged in that kind of activity

21  any more than I do that you are.

22         MR. ROBERTSON:  My point is, sir, that there have

23  been communications that we've actually received after

24  September, whatever cutoff date they want, in which there are

25  lawyers advising Lawson with respect to these issues, and I

1  believe those will be relevant to showing that RQC is a sham.

2  Communications back and forth.  Now, I don't know if it

3  continues --

4          THE COURT:  Let's say Mr. Thomasch in the court says,

5  look, I'm going to tell you this is a sham, in my opinion it's

6  a sham, and he tells that to somebody in the course of

7  preparing them in a deposition.  Are you saying that's covered

8  within the waiver?

9          MR. ROBERTSON:  I think again then Mr. Thomasch --

10          THE COURT:  It's a different issue.

11          MR. ROBERTSON:  Gibson Dunn would have to resign,

12  because I don't know how they can defend a product before this

13  Court that they know has no colorable difference.

14          THE COURT:  They can't.  Rule 11 forecloses them from

15  doing that, and so do other things, but those rules have

16  meaning, and they apply at different times.  We're talking

17  about a rule now of waiver of the privilege and when does that

18  apply.

19          MR. ROBERTSON:  I would -- I understand Your

20  Honor's --

21          THE COURT:  How far do you want to go, in other

22  words, I guess --

23          MR. ROBERTSON:  I would suggest that it would go up

24  until Your Honor's February 21, 2011, order, and here's why:

25  The waiver occurred on Gibson Dunn's watch, and they were the

1    ones who put the witnesses -- or defended the witnesses, and

2    there were statements made with respect -- and were revealed

3    and came out when Your Honor determined a waiver had occurred.

4         And so with respect to those communications up to

5    that date, I think they're fair game, because that -- even if

6    they were done in the course of the depositions or in

7    preparation for deposition, because that applied, and that was

8    the subject matter waiver that Your Honor made based on the

9    evidence presented and documents produced during that period of

10   time.

11        So that would be my suggestion, Your Honor.  I would

12   prefer, although I know it would be an enormous burden, that if

13   Your Honor feels the need to review the documents or have

14   someone review the documents, that it be Your Honor and not a

15   special master who will need to get up to speed on this, and so

16   I regret that that would impose a burden on the Court.

17        I am aware, although I have not read it recently, of

18   your decision in the *Brainware* case this past summer, and I

19   thought you had a process for reviewing a sampling of

20   documents.  I think it was a hundred documents in the case.

21        THE COURT:  That's because it shows what to do.

22        MR. ROBERTSON:  And the outcome was that you

23   determined that there was a waiver.

24        THE COURT:  They ended up narrowing it down to

25   determine that it was a hundred documents that were at issue by

1   virtue of negotiation.  So they tendered the 100 documents that

2   both of them agreed on.

3          MR. ROBERTSON:  Well, Your Honor, I'd be happy to

4   review the remaining 4,280 documents myself and tell you which

5   ones I think constitute relevant waiver.

6          THE COURT:  That's not what actually happened.

7          MR. ROBERTSON:  I don't know how they agreed, Your

8   Honor, because --

9          THE COURT:  They agreed to withdraw the request --

10  the plaintiffs agreed to withdraw the request as to a hundred,

11  and the defendant said, these hundred are the ones that we are

12  continuing to believe represent the claim of privilege, and

13  thereupon I had a predicate to make a decision about how to

14  proceed.  That was done essentially by agreement.  The opinion

15  may not reflect that.  I don't know.  I don't remember.

16         MR. ROBERTSON:  I'll go back and look at it, Your

17  Honor, but I guess my point is, you know, I don't have the

18  documents in my possession, so I can't make that determination.

19         THE COURT:  Do you want me to -- do you know how much

20  time it's going to take to review 4,000 documents?  Do you want

21  me -- or have somebody undertake it and do that, and then we'll

22  get the decision on the contempt about a year after the Federal

23  Circuit's decided whether the verdict stands or not.  Maybe

24  that will move the whole thing.

25         MR. ROBERTSON:  Your Honor, can I reflect on that and

1    discuss it with my client, because I obviously want to move

2    this forward, and I don't want to put that burden on the Court.

3              THE COURT:  I get paid so well to do that, so don't

4    worry about it.

5              MR. ROBERTSON:  Your Honor, I was going to move on to

6    the text grouping.

7              MR. THOMASCH:  Your Honor, may I address one factual

8    point to correct a factual misstatement before we leave this

9    topic?

10             THE COURT:  Sure.

11             MR. THOMASCH:  Mr. Robertson said that by definition,

12   the documents on our log are responsive and relevant, they were

13   reviewed and then produced, and he knows, if he thinks -- maybe

14   he's just forgotten, but he knows that's wrong.

15             The fact of the matter was, we weren't involved in

16   the document production.  We came in as that was all going on.

17   Your Honor had ruled on September 15th, before we were in the

18   case, that they were to get whatever discovery they wanted and

19   we were not to object, and then --

20             THE COURT:  I don't think it was quite that precise.

21             MR. THOMASCH:  That is the way we understood the

22   transcript after reading the transcript.  And it reminded me of

23   the George Allen line, because I grew up in Washington, when

24   they said, I gave them an unlimited budget and he exceeded it.

25   But when given carte blanche, they went to the cleaners and put

1    in broad-ranging document requests, but the key was that there

2    was an agreement reached, and I assume it was mutual, but it

3    was somehow between Merchant & Gould and Goodwin Procter that

4    this would be done by having every document optically imaged so

5    it could be computer read and then using search terms, so that

6    if a document's term, the word injunction or any variant on

7    injunction or design or any of these words showed up in the

8    document, then it was automatically produced.

9           No lawyer read the documents before they were

10   produced.  No one made a decision that they were responsive to

11   a document request.  They were a match to a word on a computer

12   search.  That was the only way that that -- I'm sorry, two

13   million pages of documents were produced, frankly, as fast as

14   computers could print them.

15          Attorneys weren't involved in that process at all

16   unlike anything I've been involved in.  They weren't being

17   produced in response to request number three or four.  They

18   were being produced because the word was in the document that

19   was on the agreed term of -- group of search terms that was

20   devised by Goodwin Procter.

21          So there was no decision about responsiveness or

22   relevance whatsoever, and the documents were put on the

23   privileged log not because anyone made a decision about

24   anything.  They were what he calls the first log which was not

25   a privilege log.  It was a list -- Magistrate Dohnal had this,

1    a list of potentially privileged documents based on an attorney

2    being involved in the document's creation or recipient of the

3    document or the attorney's name being in the document, and that

4    led to a list that was then reviewed and ultimately brought

5    down.

6           We're creating history to try to make somebody look

7    bad that just isn't the issue here.  There are a large number

8    of documents.  There's a privilege log, and we will try to

9    follow the rules.  I do think that the attorney work product

10   privilege for documents that have -- that don't relate to the

11   time frame during which Your Honor's opinion addressed the

12   waiver and said that during the development stage, and it's

13   very clear, page 22, that you're now talking about that time

14   period before it came to market, that during that time frame

15   you said, the attorneys have not shown that they were working

16   as attorneys, they were working involving in the design of the

17   product, and we respected that waiver of the attorney work

18   product, but subsequent to that time, the work product doctrine

19   applies on a document-by-document basis, Your Honor.  Thank

20   you.

21          MR. ROBERTSON:  Just briefly in response to that,

22   Your Honor, I don't want to get a he-said-she-said, but Lawson

23   granted itself four extensions on the document production, and

24   we finally had to go to Judge Dohnal after a month and a half,

25   and he entered an order giving them an additional extension to

1    provide documents.

2              Now, they chose to do word searches.  Lawson

3    contacted us and said, tell us the keywords you want to search

4    for, and we gave them some.  They gave us back another list.

5    We said, these are over inclusive.  You're going to be

6    producing way too many documents, and you haven't limited it to

7    the time frame we suggested which is starting the date after

8    the trial, because that's when it's going to be relevant to

9    whether there was a design-around or not, and that's where the

10   document requests were focused on.

11             As to this issue about when the cutoff should be,

12   I've suggested to Your Honor that it should be at least as of

13   the date of your order, but the fact is, it is a subject matter

14   waiver, and if there was involvement with attorneys after the

15   fact that reveal that this, indeed, was a fraud or sham, that

16   should be open to the subject matter waiver because we are on a

17   search for truth, and we need to know, and Your Honor was

18   exactly right when it said, if you're saying that this is

19   design, either the public or the Court -- and it's new, and

20   you're going to see when you look at that Christopherson

21   document, they're saying, we have to say it's new even if it's

22   not new.

23             If you're saying that to the public or the Court,

24   that will inform the Court was to whether or not there were

25   colorable differences involved in here or not, and if the

1   lawyers involved, whether in-house or outside counsel, that

2   should be subject to Your Honor's order.

3           With that, if I could move on, I think these next two

4   issues are going to be fairly black and white, and, you know,

5   it's rare a lawyer ever says that, but there are issues here

6   with respect to Your Honor's ruling on whether or not a

7   document that is merely cc-ed to an attorney is covered by a

8   privilege, and I was surprised, because I thought Your Honor

9   made that crystal clear both in the order and as well in a

10  September 14th conference.

11          THE COURT:  How many documents are in this category?

12          MR. ROBERTSON:  23, Your Honor.  Your Honor, it's --

13  I'm sorry, sir.  It's slide 14 in our PowerPoint.

14          THE COURT:  30 examples or the PowerPoint that has

15  Goodwin Procter at the top?  Which page?

16          MR. ROBERTSON:  14.  There's two categories here,

17  Your Honor.  Maybe I should group them together.  There are

18  documents that are missing an author or recipient which Your

19  Honor's order made clear needed to be produced.  So there are

20  226 of those documents, and then there are documents between

21  non-attorneys reflecting legal advice.

22          I'm sorry, Your Honor.  So the ones that just are

23  between non-attorneys reflecting legal advice is what I'm

24  talking about where a lawyer was merely cc-ed, and Your Honor

25  made clear that could not be protected by the attorney-client

1    privilege.

2         Now, and the other ones are where Your Honor made

3    clear the privilege log was defective because it was missing

4    either an author or recipient.  The argument is made that,

5    well, some of these documents don't have authors or recipients,

6    but they certainly have what's called metadata, Your Honor,

7    that reveals, for example, who the author would be, that sort

8    of data that backs up the document, that shows who created the

9    document, how many versions there are, who might have modified

10   the document.

11        That could have been entered, but Your Honor's order

12   was clear.  If the log didn't have an author or recipient, or

13   if it just merely had a cc of an attorney, that wouldn't be

14   covered, and they had to produce them.

15        Now, at the September 14th conference, you raised

16   that point, and Mr. Thomasch responded by saying, "I did not

17   understand the ruling that way, but we will adopt, obviously,

18   your position."  Well, they haven't adopted your position, and,

19   in fact, they continue in their opposition to this motion to

20   argue that the Court was wrong when it indicated that documents

21   merely cc-ed to lawyers are not covered by the attorney-client

22   privilege.

23        Now, that's just merely a motion for reconsideration

24   that Your Honor has affirmed twice, and we think that's not

25   appropriate.  So that's -- you know, we think this is

1    clear-cut, it's black and white, and those documents can be

2    produced forthwith and should be.

3        I have one last argument with respect to attachments

4    that have not been produced or even married up to cover emails.

5    For example, there are emails that will indicate that there's

6    an attachment, and we will receive the email but not the

7    attachment, and I have a few poster children, if you will, Your

8    Honor, for that I can address after Mr. Thomasch addresses, or

9    whoever it's going to be, addresses this issue about cc-ed

10   documents and documents containing no author or recipient.

11   Thank you.

12        MR. THOMASCH:  I actually agree with Mr. Robertson on

13   one point.  These issues are actually fairly straightforward.

14   There are two categories we're discussing at the moment, and

15   I'll break then down separately.  One is what Mr. Robertson is

16   calling the attorney cc documents.  The other is the no author

17   or recipient documents meaning that in the to and from fields,

18   and limiting the recipient to from and not cc, in the to and

19   from fields there are not attorneys.  So in those two things.

20        Let's look at what he's calling the attorney cc-ed

21   documents.  I did hear Your Honor's ruling on September 14, and

22   we went back through all of them, and we produced multiple

23   documents.  We are left with 24 documents.  We are not asking

24   for a motion for reconsideration.

25        I may be asking for a motion for guidance or a

1    specific order to produce them.  I have them on a CD.  I can

2    give Your Honor the documents in hard copy or on CD, if you

3    wish them, to review *in camera*, but when Your Honor made the

4    ruling about attorney cc's, there was -- this issue, I don't

5    think, came up about these are documents where it's -- the log

6    entry and the document clearly reflect that the cc-ed

7    attorney's legal advice is in the document.

8         And so if an attorney were to give advice to the head

9    of the department, and the head of the department then gives an

10   instruction to one of the people that work for her and say that

11   the attorney has advised me of X, our legal department says Y,

12   and passes that on so the person can do her work in conformity

13   with the legal instruction that a company should be providing

14   to their employees, we believe that that is fairly privileged,

15   and we think that that's -- that that is covered by the

16   privilege and hasn't been, in any sense, waived.

17        But the document does not actually -- it wasn't

18   authored by an attorney, and it wasn't received by an attorney.

19   The attorney is a recipient of the document.  Instead of it

20   being to them, they are cc-ed, but I've never taken the

21   position in my career you can take an unprivileged document and

22   somehow make it privileged by attaching it to some cover email

23   and sending it off.

24        That's not what this is about.  This isn't about just

25   two people talking to each other.  This is where two employees

1    of the company are communicating, the substance of the legal

2    advice appears in their communication, and the person who gave

3    the advice is a cc to the document.

4           Now, if that's unprivileged, we can produce these

5    documents as soon as they're processed, but they've been

6    segregated, they're there.  I can produce hard copies of the

7    documents today and give them to Your Honor for review.  I

8    don't want to reargue and move for reconsideration, but I do

9    want to make sure we understand the rules and we don't over

10   produce, and that's what -- it's two dozen documents out of

11   that 9,700, and they're not important because of their

12   substance.

13          It's the principle at point that we don't think that

14   the question of privilege depends solely on whether the

15   recipient is a cc versus a person in the to column, but that's

16   all there is to say on that point.

17          On the other point, where it's no author or recipient

18   on the log, Your Honor identified logging deficiencies, and so

19   logging deficiencies included where there was no author or

20   recipient on the log.  You know, I note that, again, because

21   this is not outrageous conduct, this is not intentionally,

22   flagrantly violating court orders or anything else, the log

23   that was produced to us in response -- in connection with about

24   a 500-page document production by ePlus has many, many entries

25   that have no author or recipient identified.  That's in the

1    nature of the business when you separately log cover memos and

2    attachments, and the attachment often is a document that

3    doesn't have an author or recipient.

4         If it's -- an easy example would be supplemental

5    interrogatory number five.  You'll recall when we first started

6    out in the case, we were doing two things.  We were trying to

7    produce documents, and we were trying to identify in an

8    interrogatory a narrative of what changes were made, just what

9    are the changes that are at issue, that's it, and we had

10   thought originally that that was okay.  We gave them source

11   code and a file that showed them every change of the source

12   code, and then they wanted a narrative, so we did that.

13        If I were to send draft interrogatories back and

14   forth with a client, say, here's a draft of supplemental

15   interrogatory number five, would you review it and provide me

16   with any additional comments that you might have, please

17   confirm that these are the three changes that we want to

18   discuss -- that's a hypothetical, but let's just say that went

19   on.  I would consider that to be privileged, and my draft

20   interrogatory response that showed where my thinking was at

21   that time as I worked back and forth with my client to develop

22   the document to serve, I would say that draft is a privileged

23   document, it's attorney work product, and it's an

24   attorney/client communication, but the draft interrogatory

25   doesn't have an author or recipient.

1          THE COURT:  Of course, it does.  Whoever wrote it.

2    Every document has an author or recipient.  It doesn't have an

3    author or recipient stated on it, but every document has an

4    author of some kind if it's a prepared document, doesn't it?

5          MR. THOMASCH:  I guess you --

6          THE COURT:  I have a lot of documents in my file that

7    reflect letters -- they're not in my file, they're in my

8    drawer -- that I've written, and I have putative recipients,

9    but I never sent them.

10          MR. THOMASCH:  But a document like an interrogatory

11    response --

12          THE COURT:  I thought better of it.

13          MR. THOMASCH:  It may be a collection of comments

14    from lots of people.

15          THE COURT:  The point is, there is an author to every

16    one of your documents, isn't there?

17          MR. THOMASCH:  In that sense, yes, there is, but as a

18    logging deficiency matter, in the realities of modern

19    electronic discovery, the way that logs get created in the

20    first instance is generated by a computer, and there is no

21    author or recipient that is recognized on the document.  The

22    document doesn't reflect such.  There's no way.

23          It doesn't reflect it in any data, so in that

24    situation where these are attachments and drafts and things of

25    that nature where we believe that the document is independently

1    privileged --

2            THE COURT:  Okay, let's take this:  I write a memo.

3    I'm a lawyer.

4            MR. THOMASCH:  Yes.

5            THE COURT:  I send it to you.  It's to Mr. Thomasch

6    from Mr. Payne.

7            MR. THOMASCH:  Right.

8            THE COURT:  Are you taking the view that the document

9    that I write that doesn't have my name on it anywhere is not

10   authored by me and that you don't have to --

11           MR. THOMASCH:  That would be authored by you.  That

12   would be authored by you.

13           THE COURT:  If you have a logging deficiency that

14   relates to the integrated document, then the integrated

15   document is one.  Just because your computer has separated it

16   artificially doesn't change it in any way, the fact that

17   there's a logging deficiency as to it, does it?

18           MR. THOMASCH:  I don't think it's a logging

19   deficiency -- if you send me a letter, then you are the author,

20   and we will have the author on the log.

21           THE COURT:  That's not what I'm talking about.

22   There's a memo, cover memo, Mr. Thomasch, here's my draft,

23   period.  That's all it says.  And attached to it -- in the old

24   days, it would be stapled or paper-clipped.

25           MR. THOMASCH:  Yes.

1          THE COURT:  And, in fact, I think some of the

2    computer features actually refer to it as an attachment, don't

3    they?

4          MR. THOMASCH:  Right.

5          THE COURT:  Most of them do.  So that's today's

6    equivalent of paper.  If that document authored by me -- and it

7    doesn't have my author on it -- my name on it, that's a logging

8    deficiency as to the whole entity that is the document, isn't

9    it?

10          MR. THOMASCH:  I honestly don't think so.

11          THE COURT:  Why?

12          MR. THOMASCH:  Because I've never heard that in the

13    midst of producing millions of documents we have to go out and

14    do investigations.  There's no requirement that people --

15    usually when someone sends you a document, your name is on the

16    document.  But if someone has a document in their file and it's

17    a draft plan of X, they have a draft plan about the rollout, it

18    may have been collectively authored by 30 people, but the

19    document itself doesn't reflect an author.

20          Now, if I say -- if I'm a lawyer and I say I have

21    marked this up because I think there's things here that we have

22    to change, and we have to do X, Y, and Z, and I provide legal

23    advice on that draft brochure, I would say that -- if the

24    comments are on the brochure on a separate piece of paper, and

25    I author that, I'm the author, and whoever I send it to is the

1    recipient, but the brochure that I'm attaching -- yes, someone

2    created it, but it's not a logging deficiency --

3              THE COURT:  It isn't a matter of someone creating it.

4    I created it.

5              MR. THOMASCH:  I didn't create that document.

6    Someone sends me a draft --

7              THE COURT:  You must be talking about something

8    different --

9              MR. THOMASCH:  Let me try it --

10             THE COURT REPORTER:  Mr. Thomasch, one at a time,

11   please.

12             THE COURT:  She's kind enough not to remind me.  I'll

13   get mine later.

14             MR. THOMASCH:  It was I that spoke over you.  If

15   someone -- and I'm a lawyer and my client sends me a draft

16   brochure and says, this is the brochure that we've been

17   developing and we'd like to send this out to people to explain

18   this subject, but would you give us your legal input, and I

19   review it and then I write back and say, I think you need to

20   make changes at pages five, seven, and nine, okay, and I send

21   it back to them, and now in their files is the original

22   brochure and my letter back to them about making changes to

23   pages five, seven, and nine.  It seems to me that the document

24   is not going to have an author, the underlying document.  As

25   the lawyer, I didn't create the brochure.  I commented on the

1   draft brochure.

2           THE COURT:  The document has an author.  The document

3   has an author that came originally with it.  The problem is --

4   remember what we're dealing with.  There's a rule that says

5   what you are supposed to do in creating a privilege log.  There

6   was an order in this case about what you were supposed to do,

7   and it was clear as a bell what you were supposed to do about

8   author and recipients, and there's a reason for both the rule

9   and the order, and that is so that the other entity that's

10  going to get this log can make a challenge to it, and it's

11  supposed to have enough information on it that's sufficient to

12  allow them to do it.

13          A deficiency in the log is what happened here.  That

14  may seem technical, but it's not technical in this case because

15  it was an effort -- the order and application of the rule were

16  an effort to get this done quickly and to get this thing

17  straightened out, this mess straightened out that was this

18  document production, and it was a simple matter, and the fact

19  is that somehow somebody didn't do the log right, and that was

20  held to be a waiver of the privilege because the log, after

21  specific instruction, wasn't done right.

22          If your contention is there's this cover memo that

23  says from Payne to Thomasch, and Payne sends the documents,

24  says, here's the draft, and, in fact, there's no Payne listed

25  on the attachment, but you link those documents together,

1    they're one document, and the waiver applies to those, to both

2    of them, because they are one document.

3              MR. THOMASCH:  I do understand.  I do understand your

4    example now, and I understand that.  When the document came to

5    me from you -- the document I received, you're the recipient of

6    both.  You were the author of both.  If you send me the cover

7    memo and send me the brochure, when I receive it, I say, both

8    of them came from you.

9              THE COURT:  Here's the memo.

10             MR. THOMASCH:  I got it, but what I'm saying is, now

11   that document goes in files, and it may be that I only have in

12   the file the attachment.  I don't know what the facts are, but

13   years later or months later we have a document production, and

14   when the document gets swept up in the production, the

15   underlying document doesn't show any author or recipient

16   because no one signed or entered that information at the time

17   of its creation which was pre-litigation, pre-document request,

18   everything else.

19             Now, when it comes time to make the log, the only way

20   I could do that is if I went out and did a factual

21   investigation --

22             THE COURT:  That is precisely what you do.  There's

23   no difference between the way documents are to be reviewed

24   today and the way they were reviewed 20 years ago.  You have a

25   computer that allows you to do it more expeditiously, but

1    that's not the answer, to rely just on the computer.  The

2    answer is to use the computer as a tool to set it up, but once

3    you get the situation that you have -- if I were back in the

4    old days looking at the piece of paper, I would look at Joe

5    Smith's file, and would I say, there's the memo, there's the

6    attachment, and they belong together because I can read the

7    attachment, the attachment that says here's the attachment, it

8    is X for example, and it's there, and I have to produce it, and

9    then you have a way of ascertaining -- everything else that

10   matches that particular document that was lost from the

11   original cover memo, and every copy of it has to be produced,

12   and that hasn't changed just because the computer does things a

13   somewhat different way I don't think.

14           The answer to the question is, yes, there's more to

15   do than to rely on the computer.

16           MR. THOMASCH:  I understand, and I don't believe that

17   in this case there would have been time to do that which is now

18   apparently required.  The fact of the matter is the --

19           THE COURT:  It's not that which is now

20   apparently required.  It is that which has always been

21   required.

22           MR. THOMASCH:  I understood.  I do think Rule 502 of

23   the Rules of Civil Procedure, the new Rule 502, I think,

24   recognizes that the drafters of the Federal Rules of Civil

25   Procedure see a marked difference in the manner in which

1    documents are produced and the extent to which privilege can be
2    waived and should not be deemed to be waived --
3              THE COURT:  You are talking about the pending draft.
4    You're talking about the old rule, the extant rule.  There are
5    pending drafts of these rules.
6              MR. THOMASCH:  Yes.
7              THE COURT:  When you say the draft of 502, are you
8    talking about that one?
9              MR. THOMASCH:  Yes.
10             THE COURT:  It doesn't apply.
11             MR. THOMASCH:  The existing Rule 502.
12             THE COURT:  Are you talking about the commentary to
13   the existing rule or what?  I want to know what you're talking
14   about so I can find it.
15             MR. THOMASCH:  I can hand up Rule 502.  May I
16   approach the clerk?
17             THE COURT:  I have 502.  I just want to know what
18   you're talking about.  I wasn't sure what you were talking
19   about.
20             MR. THOMASCH:  I'm talking about --
21             THE COURT:  What part of it are you talking about?
22             MR. THOMASCH:  Specifically in the rule, I think the
23   rule has been changed quite substantially from its predecessor
24   to allow for party agreements on the effective disclosure in a
25   federal procedure, in a federal --

1           THE COURT:  Yes, it has.  Is there such an agreement?

2    If there's an agreement, I apply the agreement, but there isn't

3    an agreement -- nobody has brought to my attention the

4    existence of an agreement on this topic.

5           MR. THOMASCH:  We have a discovery order that was the

6    subject of discussion among the --

7           THE COURT:  It may have been, but did anybody put

8    this in any of your briefs?

9           MR. ROBERTSON:  No, Your Honor, it wasn't briefed

10   because there is no agreement.  There was an agreement that

11   inadvertent disclosure -- in fact, Your Honor did address that

12   in your memorandum opinion.  Inadvertent disclosure, if it

13   occurred, is not clawed back after ten days.  Your Honor made a

14   ruling with respect to --

15          THE COURT:  I understand that, but that's not what

16   I'm talking about.  He's apparently talking about something

17   other than inadvertent disclosure.  You are talking about an

18   agreement respecting the way documents are produced, and I

19   don't see that.

20          MR. THOMASCH:  No, I'm sorry.  I was talking about

21   the fact that inadvertent disclosures of electronic documents,

22   the rule was changed, in my mind, to be far more forgiving than

23   the prior rule with respect to hard copy documents on how one

24   deals with inadvertent disclosure of documents --

25          THE COURT:  I agree with that in part, but we don't

1    have inadvertent disclosure here.  That's not what we're

2    dealing with here.  You're using that as an analogy to say

3    times have changed, and you better recognize it, old boy.

4            MR. THOMASCH:  Not the last sentence, but I was using

5    it as an analogy to suggest that the world of electronic

6    discovery is different and that if a document, on its face,

7    doesn't show an author or recipient, I think that there is a

8    good-faith reason to believe that it is not a deficiency in the

9    log, and I note, as I say, the other log that we received has

10   exactly that same problem, and those documents haven't been

11   produced.

12           THE COURT:  But we haven't -- that's not before me.

13           MR. THOMASCH:  You are correct, Your Honor.  You are

14   100 percent correct.  At any rate, those two issues are quite

15   discrete.  That's all there is to it, and we have in both

16   instances -- and it may not matter to Your Honor.  In both

17   instances, we have the documents segregated and available for

18   Your Honor's review, and in either instance, frankly, I just

19   would like to make sure that there's no question later when the

20   issue is dealt with about whether the district court intended

21   the order to go this far.

22           If Your Honor intends it to go this far, then we have

23   the documents, we can produce them in native form, you know,

24   this afternoon or tomorrow morning.  We can produce them in

25   three days in processed form.  It's not a dispute.  It's really

1    an asking for guidance.

2            THE COURT:  Processed form means hard copies?

3            MR. THOMASCH:  It's more than that.  It means

4    electronic copy with Bates number and OCR, optical character

5    recognition.  This came up at the November 8th conference, and

6    Mr. Robertson asked for all the documents to be produced in OCR

7    form, and we said, that will take time, but we will agree.

8            He did not want them in native form which is just a

9    copy of the document, and we've agreed, and we pay an expense,

10   and we have the staff to do it, but we image all the documents

11   and we give them with Bates number and optical character

12   recognition so that they can be searched.  That's the

13   processing steps which takes about two to three days, and we

14   can have hard copies which are in native form.

15           THE COURT:  How do I identify what I'm reading in an

16   order if I don't have it in processed form?

17           MR. THOMASCH:  Either way, either native form or

18   processed form, you have the document.  The only question is,

19   one of them is just a collection of pages, and you can't search

20   for them.  You can't ask the computer to give me all documents

21   that have the word Dooner in them.

22           THE COURT:  I'm not going to do that.

23           MR. THOMASCH:  He would like to.

24           THE COURT:  That's fine.

25           MR. THOMASCH:  He could do it himself, but Your Honor

1    asked me --

2           THE COURT:  Excuse me.  When you say produced, you

3    were talking about produced to him if you are told to do it.

4           MR. THOMASCH:  Right.

5           THE COURT:  I see.

6           MR. THOMASCH:  In other words, I have a keen sense

7    that I'm losing this argument.

8           THE COURT:  I don't know that you are.  I'm trying to

9    sort out the issues.  I ask a lot of questions to find out

10   answers because I know that I don't have all the answers, and

11   as much as I try to keep up with what happens in the world of

12   electronic discovery, I find every day there are things going

13   on that I don't know about.

14          I think it's important for judges to know about that,

15   because that's what's happening in the world over which I'm

16   presiding.  So I ask a lot of questions that probably may seem

17   wrongheaded to you.

18          MR. THOMASCH:  Not in the least, Your Honor.  There's

19   been the discussion -- the use of the word forthwith or

20   immediately has come up on multiple occasions, and we have

21   received scathing attacks because we didn't do something on the

22   day it was ordered to be done.

23          THE COURT:  Do you know how often I read all those

24   love notes that you all send to each other?  I have so many

25   more things to do than to read this kind of stuff.  I don't

1    like it to begin with.  I don't read it unless I actually have

2    to, and once I read it, I try to get it out of my mind because

3    I really try to decide the issues on the issues, not on

4    pejorative or ad hominem statements.  I don't think that helps

5    advance the ball for either one of you.

6             MR. THOMASCH:  I agree, and as the recipient of them,

7    I was trying to prevent it from happening by making clear if we

8    have to produce them and we need to process them, it takes 48

9    to 72 hours do so.  We can produce hard copy within 24 hours

10   without problems.  We have them set aside, they're ready, and

11   Your Honor could review them if he wished.

12            THE COURT:  What would I be reviewing is how --

13            MR. THOMASCH:  You would review one of two things.

14   You could review either on your computer screen -- you would

15   just pull it up, and it would show you the log entry of the

16   document and the documents, or I can copy them, and you can

17   review old-fashioned documents.

18            In either case, one is, I think, 24 documents in the

19   attorney category, and I believe there are roughly 250

20   documents in the no-author or recipient category.

21            THE COURT:  They say 226.

22            MR. THOMASCH:  We say 224, they say 226.

23            THE COURT:  You all are in the ball bark.

24            MR. THOMASCH:  We're in the ball park.  We do have

25   them, they're ready.

1          THE COURT:  Thank you.

2          MR. ROBERTSON:  Just briefly on that, Your Honor,

3    one, I would respectfully suggest that no review is necessary

4    here.  This whole issue is fully briefed.  Your Honor had all

5    the arguments in front of him.  Your Honor is exactly right

6    what the Federal Rules of Civil Procedure require.

7          They didn't comply, and so why review something?  You

8    ruled on this on February 21, and you said, "The following

9    privilege log entries are inadequate:  Entries that do not

10   contain an author or recipient."  So that was just a motion for

11   reconsideration, respectfully, Your Honor, and all Your

12   Honor needs to do --

13         THE COURT:  Made a motion for clarification, what

14   does it mean in the case of a document where there's a cover

15   memo and the document to which it's attached doesn't reflect an

16   author or a recipient, and those kind of things happen.

17         MR. ROBERTSON:  Let me just address that, then.  Mr.

18   Thomasch represented to you the production they made was an

19   entire electronic production; in other words, all these

20   documents were on computers.  On every computer, even Your

21   Honor's computer, your law clerk's computer --

22         THE COURT:  Even as old-fashioned as our computers

23   are?

24         MR. ROBERTSON:  Even that old-fashioned computer you

25   have, Your Honor.

1          THE COURT:  You don't know how old-fashioned.  I

2   don't know if I can even read your disks.

3          MR. ROBERTSON:  I guarantee, Your Honor, whatever age

4   that computer is, it has that metadata that shows who the

5   author is, the date it was created, the time it was created.

6          THE COURT:  I know, and you know what -- Mr. Thomasch

7   says in his papers that they were trying to do that until you

8   all fired off your motion here, and you made them mad.

9          MR. ROBERTSON:  That's not accurate, Your Honor,

10  because --

11         THE COURT:  What; didn't make him mad?

12         MR. ROBERTSON:  Well, I try not to make Mr. Thomasch

13  mad.

14         THE COURT:  I don't think you try real hard.

15         MR. ROBERTSON:  My point is, Your Honor, that it

16  easily could have been done.  It could have been after your

17  February 21 order, but they never changed it, because at the

18  time of your order, that information wasn't there, and that's

19  not what Mr. Thomasch has been complaining about.

20         THE COURT:  What information wasn't there?

21         MR. ROBERTSON:  The information --

22         THE COURT:  That information --

23         MR. ROBERTSON:  The author and recipient on the

24  privilege log was not there.  So that's never been changed,

25  never been modified, and there's never been representation that

1   they were going to fix that after the fact.  We came in to
2   simply enforce the Court's order that they were in violation of
3   for not producing documents that did not have an author or
4   recipient.  That's the posture of the case now, not go back and
5   fix it.
6           Let me make another point about that, Your Honor.
7   The reason they should have made that inquiry, as Your Honor
8   has suggested, is because to put it on a privilege log, they
9   would have had to determine that it was privileged, and that
10  would require knowing was it authored by an attorney and was it
11  received by a client.
12          THE COURT:  That's why the author and recipient are
13  important.  It's not just the prurient interest of finding out
14  who the author or recipient is.  It is that somebody --
15  privilege exists.  It has a definition.  It says, it is
16  communication to a lawyer for the purpose of seeking legal
17  advice or from a lawyer communicating legal advice, and the
18  purpose of the rules and the purpose of the order that was
19  issued here is to structure a log that is sufficient to allow
20  those judgments to be made so that we don't have to do what
21  we're doing here.
22          Now, what's happened here is, look, they were moving
23  fast, they made some mistakes, they did something maybe wrong,
24  and in addition to that, there was an interpretive difference,
25  and you all have got to find some way to sort these things out

1   without fighting over all of them.

2         I'm going to have to resolve them, but there's

3   something much more important here to both of your clients, and

4   that's what happened in this process, and I want to get to that

5   just as soon as I can.  So I think I understand what the deal

6   is.

7         MR. ROBERTSON:  To be fair, Your Honor --

8         THE COURT:  You all probably didn't do everything

9   perfect, either.

10         MR. ROBERTSON:  That's probably absolutely true, but

11   to be fair, there were four iterations of this, and then we had

12   to go to the magistrate judge and then we had to come to you,

13   and so they had four opportunities to fix that problem.  They

14   didn't do it.  That's what Your Honor cited in your memorandum

15   opinion.  So this isn't a situation where now they should get a

16   fifth bite at the apple, Your Honor, based on the ruling before

17   you, and, respectfully, I think that was a motion for

18   reconsideration or clarification, but I think your order --

19         THE COURT:  Why don't you go a little faster and see

20   if you can really get Ms. Peterson to get down on me.

21         MR. ROBERTSON:  I'm slowing down, Your Honor.  So I

22   come to the last category.

23         THE COURT:  How long is the last category going to

24   take?

25         MR. ROBERTSON:  If Your Honor is suggesting a lunch

1  break, I think Ms. Peterson would probably appreciate that as

2  well.

3         THE COURT:  I think everybody would probably benefit

4  from a little bit of time away.  We'll come back in an hour.

5

6         (Luncheon recess.)

7

8         THE COURT:  All right, attachments is the next issue;

9  is that right?

10         MR. ROBERTSON:  Yes, sir.

11         THE COURT:  Okay.

12         MR. ROBERTSON:  And it concerns an issue we're having

13  with regard to the failure to provide us with attachments to

14  documents that either have been provided or indicate that there

15  would be attachments, and before I do that, the attachment

16  issue is also relevant to this issue we were talking about

17  where there were documents on the privilege log that contained

18  no author or recipient, because when we had that during our

19  meet-and-confer, we provided Lawson's counsel with a list of a

20  number of those documents and said, you know, we need to know

21  what these are because we can't determine what they are.

22         The response we got back on many of them were, we're

23  not producing them because they're attachments.  I don't know

24  of any reason why the mere fact that it's an attachment to some

25  other document they wouldn't need to produce it, but it begs

1  the question, Your Honor, of course, which is the whole reason

2  that the author and recipient information is critical is

3  because we would need to determine why an attachment that they

4  must have ascertained was privileged based on the fact that it

5  was attached to something, and that's why it made its way onto

6  the privilege log.

7        So it's those kind of things that I think are

8  exacerbated by the fact they failed to include the author and

9  recipients with a number of attachments.  With respect to some

10 of the other documents, and I have examples for you, they have

11 included a cover email to a document that says right on its

12 face, there is an attachment.

13       Now, the cover email really communicates nothing

14 sometimes other than from client to attorney or attorney to

15 client, here is an attachment for you to consider in our

16 analysis of RQC, for example.

17       Let me give you some of the names of attachments,

18 because I find them to be quite interesting.  In many

19 instances, we do have the cover email, and I have some examples

20 for you if you want to see them, Your Honor, but some of the

21 ██████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████

23 ██████████████████████████████████████████

24       This is all at page 13, Your Honor, of our reply

25 brief, and there is a tab two that has a table that contain all

1   of these examples.

2   ██████████████████████████████████████████████████

3   ██████████████████████████████████████████████████

4   ██████████████████████████████████████████████████

5   ████████████████████████████████████████████

6   ███████████████

7       On other occasions, the contents of the communication

8   ██████████████████████████████████████████████

9   ███████████████████████████████████████████████

10  ████████████████████████████████████████████

11  ███████████████████████████████████████

12  ████████████████████████████████████████

13  ██████████████████████████████████

14  ███████████████████████████████████████████████

15        ██████████████████████████████████████

16  ███████████████████████████████████████

17  █████████████████████████████████

18  ██████████

19        I could go on and on and on, Your Honor.  There's a

20  number of these, but the point is, as the Federal Rules of

21  Civil Procedure make clear, they need to produce the documents

22  as they're maintained in their ordinary course.  I think Your

23  Honor made the point a little earlier talking about another

24  category of documents when you said, when you open up the

25  document and it's the cover memo, and it says attachment, all

1    you need to do is click on it and it should be produced in the
2    ordinary course of business, and it should be produced
3    together.
4           The other problem we're having, Your Honor, is we may
5    have some attachments, although some of the ones I mentioned
6    were clearly -- we do not have them, but they haven't married
7    them up with the document, the cover memo that says, please see
8    the enclosed attachment, and they're refusing to do that for us
9    now.  They're saying they can't do it.
10          Now, that's just not right, Your Honor, under the
11   rules.  In fact, we cited some case law to Your Honor, several
12   cases in which the courts have ruled that one would expect, and
13   I'm quoting now, that an email and its attachment would have
14   been kept together in the regular course of business.  And
15   there's cases cited at page 12 of our brief.
16          And so, Your Honor, there's no reason not to produce
17   attachments so we can find out who received the attachment,
18   what was the purpose, what was said in it, and the content of
19   that.
20          I think it's clear, I think the federal rules compel
21   it, I think there's no reason for them to be playing
22   gamesmanship like this, and if they have them, they don't tell
23   us what they're married to.  It's as if they shuffled the deck
24   on us, and we can't figure what's matched up to what, but we do
25   know, Your Honor, on several critical ones, based on the

1    description I just gave you, we don't have that in the

2    production.  Thank you.

3              MR. THOMASCH:  Your Honor, Mr. Mark is going to speak

4    to this issue if he may.

5              THE COURT:  All right.

6              MR. MARK:  Afternoon, Your Honor.  Richard Mark for

7    Lawson Software.

8              THE COURT:  Good afternoon.

9              MR. MARK:  The issue of attachments as raised here

10   can be resolved fairly easily.  It's between counsel, and let

11   me start with this factual statement:  The issue is raised in

12   Exhibit 2 to the ePlus reply brief, and there are 15 documents

13   listed in there.  The proposition is that there are related

14   attachments to those documents that are not married up and that

15   they don't have them.

16             Those two statements are not correct.  They have

17   every one of the attachments listed in there, and they have

18   been produced in a way that allows the attachments and the

19   documents to be married up using ordinary, as I expect counsel

20   has, e-discovery software that digests that.

21             So I don't think I should spend a lot of time on the

22   issue other than just to outline what has been done so Your

23   Honor understands how the production has occurred that allows

24   this to happen and that we have, in fact, complied with the

25   discovery order, and when documents, you know, principle emails

1    or root documents and their attachments are produced, they can,

2    in fact, be married up.

3              THE COURT:  But in the ordinary course of business,

4    they are married up, so that's how they ought to be produced.

5    The fact that you have to use some software to do it is neither

6    here nor there.

7              In other words, what you just told me is the same

8    thing as saying, as I understand it, if I give you documents in

9    a box, you could -- if I give you the index -- figure out what

10   sub files they go in, if I tell you what sub files they would

11   be placed in, and that's not producing them in the ordinary

12   course of business.  That's what people did in the old days.

13             In fact, that's why the rule requiring production in

14   the ordinary course of business was done, was precisely to stop

15   this shuffling which people were doing.

16             It sounds to me like what you are saying is it's

17   sufficient that you can produce them in a shuffled form, but

18   because there exists a software that can be applied to them and

19   marry them up, you don't have the obligation to produce them in

20   their -- in the form that they're kept.  Am I misunderstanding

21   the argument?

22             MR. MARK:  That's not what I intended to say.

23             THE COURT:  Okay.

24             MR. MARK:  Indeed, to use the card deck analogy is --

25   perhaps I should go back.  The way this comes up is, it did, in

1    fact -- it is, in fact, the case that as documents were

2    produced, there were judgments made, and on occasion a judgment

3    would be made that either a -- let's call the principle email a

4    root, r-o-o-t, document.  That's the root, and then there's an

5    attachment to it, okay?  I'll just use that vocabulary.  That

6    one or the other might have been viewed as privileged and the

7    other would be produceable.  So there have been instances when

8    one or the other was produced separately.

9            The 15 examples they give you, if that's what that

10   offer was intended to be, what has happened or the case with

11   each of those documents is one of two things:  Either there is

12   no attachment to the document at all.  That happens in the

13   case, for example, as I'm sure Your Honor is familiar, you'll

14   sometimes receive an email with an attachment, and then there's

15   a reply to that.  You might see an attachment was referenced,

16   but that reply email will not send the attachment back.

17           The attachment may, in fact, and in this case, we

18   have identified, was produced as an attachment to the original

19   root email so they could find it that way.  That was produced

20   in the ordinary course.

21           Let's go to the second example which would be of

22   concern, and that is where in the initial production you had

23   one produced and the other not.  How would you know, how would

24   you figure out that these two are related to each other?

25   Rather than -- what happened, what the software does is better

1   in some ways, we think, than what used to happen with

2   old-fashioned hard copy, because what happens is, numbers are

3   assigned to the documents that allow them actually to be

4   inserted and associated as a family in a relationship with the

5   document they should be attached to.  So, in fact, they are put

6   into the exact order in which that ordinary course production

7   would require.

8          THE COURT:  Do they have the software?  Does your

9   opponent have the software?

10          MR. MARK:  We have -- I actually don't know the

11   answer to that question.

12          THE COURT:  Wouldn't that solve a lot?

13          MR. MARK:  I would be surprised if they do not,

14   because it is fairly standard among law firms, and we have not

15   had this type of complaint earlier than this stage.  That's why

16   I say --

17          THE COURT:  Earlier than what?

18          MR. MARK:  It has come up in the context of this

19   motion.

20          THE COURT:  But after the motion was filed, did you

21   call them and say, hey, do you have software X, and if you do,

22   all you have to do is run it and you can solve all these

23   attachment problems and narrow it down, or if you don't, here's

24   where you buy it, or if it's proprietary to you, you could say,

25   we'll let you have it.

1           MR. MARK:  It's not proprietary to us.  It's off the

2     shelf.  As I say, this came up in the reply brief after sort of

3     the meet-and-conference process had been truncated.

4           I do also want to go back, though, and note that in

5     the discovery order in terms of what is required of the parties

6     for production, paragraph --

7           THE COURT:  Which order are you talking about?

8           MR. MARK:  This is the November 3rd, 2009, joint

9     discovery plan, and it has protocols that are followed for

10    various parts of the case, and one paragraph dealing with the

11    production of documents says, "The OCR," optical character

12    recognition, "of each document and/or extracted text with

13    metadata shall also be exchanged."

14          Mr. Thomasch referred earlier to a November 8th

15    conference last year at which the issue of the format of

16    document production came up, and at page 78, there is reference

17    made by counsel for ePlus to this stipulation and the entry of

18    a court order saying that documents should be produced OCR

19    readable format.  That is further discussed by the parties.  It

20    is -- Mr. Thomasch explained on the transcript what that

21    processing entails to make it OCR readable, and the expense and

22    the work which he averted to earlier, and then on page 81 and

23    82, as the issue is resolved in terms of who is going to do

24    what, Your Honor says -- makes reference to this again and at

25    the top of page 82 says, "By the 18th," referring to

1    November 18th, "in OCR format will be what you'll do."

2           That is, as I understand it, the way documents had

3    been produced earlier in the case.  It is the way we processed

4    and produced them pursuant to the discovery order and was

5    highlighted on November 8th, and it provides the information

6    that, in fact, makes this linkage that is the subject of the

7    complaint.

8           So I understand Your Honor's statement that perhaps

9    this should have provoked discussion among counsel earlier, but

10   I do think that if that is a problem that they are having, the

11   data has been supplied to them that allows this identification

12   of attachments to take place, and if there's an issue, we will

13   resolve it with them.

14          THE COURT:  What is the software called?

15          MR. THOMASCH:  Concordance® does it, Relativity® does

16   it, but whatever database that they have, I'm -- the reason

17   they want it OCR readable is they are putting it in some sort

18   of computer database that allows them to search through the

19   documents using word searches and whatnot.  So they have some

20   kind of software, and these are standard products that law

21   firms have.

22          THE COURT:  You all haven't talked about this?

23          MR. MARK:  Thank you, Your Honor.

24          MR. ROBERTSON:  Your Honor, I'm surprised at that

25   representation because we did raise this with them.  We told

1   them we couldn't match up the documents.  We told them they

2   needed to either marry them for us by letting us know what they

3   were and produce it.

4           The only way you can use this software that Mr. Mark

5   is talking about is if you have the metadata.  We asked them

6   for the metadata.  They said, no, you can't have it.  So they

7   refused --

8           THE COURT:  Say again now.  You can't -- you do have

9   the software that he's talking about.  You know what he's

10  talking about.

11          MR. ROBERTSON:  I know what he's talking about.

12          THE COURT:  You do have the software; is that right?

13          MR. ROBERTSON:  I'm not a hundred percent positive.

14  I think we have Concordance®.

15          THE COURT:  So you do have it?

16          MR. ROBERTSON:  Yes, sir.

17          THE COURT:  But as I understand what you are saying,

18  you can't use it because you don't have the metadata; is that

19  right or not?

20          MR. ROBERTSON:  That's correct.  That's absolutely

21  correct.  And you can't use it to marry documents simply by

22  having OCR, because that just means you can scan it and then

23  search on the document.  It doesn't tell you that another

24  document that may or may not have been produced is associated

25  with that cover email.

1          THE COURT:  Would it solve the problem if they gave

2    you the metadata?

3          MR. ROBERTSON:  Not completely, Your Honor, because

4    the representation was made that we have all the documents that

5    are associated with the emails.  We'd ask them, if that's the

6    case, to please tell us what emails they were associated.

7          If I might just hand up to Your Honor, this is an

8    email chain that's dated April 29, you'll see, from Mike Cohen,

9    who is an in-house -- excuse me, who is a Lawson employee, or

10   was a Lawson employee, and a Mr. Bruce McPheeters who was their

11   general counsel.

12         Now, you'll see that one of the documents they

13   mentioned, redesign notes doc.  We are missing that attachment.

14   It's not in the production.  Now, this email, cover email was

15   produced to us as part of -- subsequent to Your Honor's ruling

16   and subsequent to our pressing them to produce documents that

17   concerned RQC.

18   ████████████████████████████████████████

19   ██████████████████████████████████████████████

20   ██████████████████████████████████████

21   ████████████████████

22         Now, you'll note, Your Honor, this is a little bit

23   ████████████████████████████████████████████

24   ██████████████████████████████████████████████

25   ████████████████████████████████████████

1 ███████████████████████████████████

2          Now, I could search for months with this software

3 looking for metadata, but I'm not if I don't have the document

4 that was attached to the email in order to try to marry them

5 up.

6          Quite frankly, Your Honor, since the rule requires

7 that they be produced in the ordinary course of the business,

8 why should it be our burden to have to go through and go

9 through that exercise to match it up?  They should know

10 readily, because they have the documents with the metadata,

11 and, apparently, they know quite well how to use this software

12 to do it.

13          It was their burden to do it, it's required under the

14 federal rules, it's required under case law, and I can't search

15 for documents I don't have.

16          If they now -- for the first time I'm hearing,

17 they're saying that we have all the documents with respect to

18 Exhibit 2.  I don't know why they just didn't tell us that and

19 say, here's the emails they go with, because we had to go

20 through the exercise for that.  It's just not right, Your

21 Honor.

22          MR. MARK:  One technical clarification, Your Honor.

23 With each document production, what is provided are the

24 documents in an electronic format in OCR, and each one is also

25 accompanied by something called a load file.  This file has in

1    it data that these computer programs read associated with Bates

2    numbers or other sequential numbers on the documents and

3    indicating familial relationships among the documents.

4              THE COURT:  So it wouldn't take you any time to run

5    your program and get that together; right?

6              MR. MARK:  Correct, and that is what we give them.

7              THE COURT:  Why don't you do it?

8              MR. MARK:  We have done that.

9              THE COURT:  Why don't you do it and just run it and

10   give them the documents.  What are you talking about in the way

11   of money?

12             MR. MARK:  We've already done that.  That is, in

13   fact, what we provide them.

14             THE COURT:  You've given them the document and that

15   which is attached to it in the right order; is that what you

16   are saying?

17             MR. MARK:  That's what I'm saying.

18             THE COURT:  One of you has to be wrong here at

19   least -- you may be talking language that I don't understand,

20   but somebody is wrong.

21             MR. MARK:  That's why, Your Honor, I guess we will

22   have the conversation and see what the issue is because --

23             THE COURT:  Why don't you give it to them?  Give them

24   to them in the order that they are kept in the regular course

25   of business, and you just give it to them that way.

1       If that means that you have to run another set of

2   them and hand them physically to them, do it.  I don't know

3   what's the best way to do it, but I don't want to spend any

4   time on things like this, and I don't think you all ought to be

5   spending time on it, and if it's a question that you feel like

6   the expense is something you are twice incurring, keep a record

7   of it and then make a claim for the expense later.

8       I don't know how to resolve it when one of you says

9   it's so and another one says it ain't, as the old boy said,

10  without getting into it myself.  And it seems to me like you're

11  willing to do it, and you're prepared to do it.  You think

12  you've done it, but maybe you haven't done it the way that they

13  need it, and I think the way to do it is just go do it again.

14      MR. MARK:  I think we will have the conversation with

15  them to see if it really is a problem that's identified, and we

16  will resolve it.

17      THE COURT:  I don't want you to spend any more than

18  about 15 minutes solving the problem, and if they can't -- if

19  they don't feel like they've got it, you give it to them.  If

20  it's a matter of expense, log the expense you incur and make a

21  claim for it later depending on who is right and who is wrong.

22      MR. MARK:  Understood, Your Honor.

23      THE COURT:  That ought to solve the problem.

24      MR. ROBERTSON:  I just want to address one issue with

25  respect to that, Your Honor, and that is, there are some

1    underlying documents that we don't have the attachments for.

2    So they're going to have to go and figure out if we have all

3    the attachments, because they can't just provide an email and

4    have an underlying document that clearly was subject to Your

5    Honor's order on the subject matter waiver of RQC development

6    three weeks before Your Honor issues the injunction and just

7    say, we're not going to produce it, and there are several

8    instances of that.

9              THE COURT:  Is that the one that's talked about in

10   this example you gave me called redesign notes?

11             MR. ROBERTSON:  Yes, sir.

12             THE COURT:  Did you give them that?

13             MR. MARK:  This document --

14             THE COURT:  Did you give them the redesign notes

15   which is an attachment to this document?

16             MR. MARK:  Standing here right now, I cannot answer

17   that.

18             THE COURT:  But you have to give it to them.

19             MR. MARK:  Correct.  I understand that.  All I'm

20   saying is this was not on the list of the 15 documents attached

21   to Exhibit 2 of the reply brief, so I haven't -- I haven't

22   looked this up, so I can't answer that question.

23             THE COURT:  What you have to do is you have to go

24   back through, and every document that has an attachment to

25   another document, you have to give them the cover -- what you

1    call the root document and the attachment together so that they

2    can see what it is, and if you say you've already done that and

3    you've done it once and they can't figure it out, if a simple

4    conversation won't show that, then do it again, give it to

5    them, and don't withhold anything that is clearly covered by

6    the order such as redesign notes that are attachments.  Put

7    them together.  Then give them -- then solve the software

8    problem, the matching-up problem the way I have indicated.  It

9    seems to me like that ought to solve your problem.

10             MR. MARK:  It should.

11             THE COURT:  Okay, thank you.  That ought to solve the

12   problem, Mr. Robertson.  Makes it easier for me to deal with

13   the rest of them.

14             MR. ROBERTSON:  Sure, assuming good faith --

15             THE COURT:  They're going to do it right.  Look,

16   let's assume -- let's do this.  Let's accept that lawyers in

17   good faith can differ over things and that you have

18   responsible, good lawyers on both sides of this case, and

19   conversation between the two of you, apart from anything,

20   blames the other one for doing something tricky or wrong will

21   get things solved, just like this conversation did right here,

22   and you all didn't even need to deal with that.

23             You could have been back home last night if you all

24   had talked, both of you.  And I'm not saying it's your fault

25   that you didn't talk, but I'm saying the failure to talk right

1    there is an example of how you had to incur some charges that

2    you didn't need to incur.

3              MR. THOMASCH:  I wonder if in that 15-minute

4    conversation we can have -- if our IT person can talk to their

5    IT person.  We might be able to just clear this up in a

6    heartbeat, because we do believe they have the capacity and

7    Concordance® to do this and match it up --

8              THE COURT:  Beyond capacity, though, this is going

9    back and producing things you haven't produced.

10             MR. THOMASCH:  We will check --

11             THE COURT:  The lawyers and the IT people can talk.

12   You need to solve the problem and get this stuff delivered.

13             MR. THOMASCH:  Absolutely.

14             THE COURT:  That way we can get on with the case.

15   Speaking of which, when can we get on with the case?  I want

16   you to give me the 23 documents in a separate package from the

17   226 documents, and I'm going to take a look at those.

18             MR. ROBERTSON:  So we're clear, there is 226 under

19   one category and 23 under another.

20             THE COURT:  Right.  That's what I mean.  I want

21   separate packages so I know that I'm dealing with a separate

22   package, and I want to see them, and I'm going to look at them.

23             MR. THOMASCH:  Both packages.  You want both packages

24   separated?

25             THE COURT:  Yes, so I can know what I'm dealing with.

1    I don't want to have to go through and un-shuffle.

2            MR. THOMASCH:  It should be very clear.

3            THE COURT:  I'll look at those.  I think I know how

4    to solve the problem with the rollout information and the

5    litigation matter which you are concerned about, defense of the

6    case issue that you raised.  I think I can solve that.  And I

7    think now we've solved the attachment problem by virtue of what

8    we've just been through, so that leaves me to solve the

9    earlier, the first thing you had -- first issue you had

10   argument about which is generally how to deal with the larger

11   problem of the RQC waiver, and I'm going to look at that in

12   view of what you've said.

13           You need to be aware that in *In Re: Grand Jury*

14   *Proceedings,* 748 F.2d 871 at 875, our Court of Appeals has held

15   that if a client communicates information to his attorney with

16   an understanding that the information will be revealed to

17   others, that information, as well as the details underlying the

18   data which was to be published, will not enjoy the privilege.

19   Footnote seven is the indicator there, and footnote seven

20   explains what the details are.  So it's not privileged in the

21   first place.

22           Now, the privilege of which the Court writes there is

23   the attorney-client privilege.  I do not know whether this has

24   been applied to the work product privilege by our Court of

25   Appeals, and I haven't had time to look at that.  But -- and if

1    you'll look at note seven in the case, it says it recognizes

2    that there may be some privileged document components of an

3    otherwise non-privileged document such as this affidavit of

4    Mr. Dooner that's in draft form.

5         It may be that that document is not privileged from

6    the attorney-client privilege, but it may have a work product

7    privilege associated with it that is -- that's over to the side

8    in this notation here.  Then you have the added problem that

9    once you've produced this document, you have to produce -- the

10   one that you did produce, you have to produce all of it, all of

11   them, every copy of it.  And then you have to decide whether or

12   not the principle in 748 F.2d 871, footnote seven, and the text

13   adjoining and the whole opinion doesn't require you to produce

14   the whole thing if it's intended for public consumption when it

15   is prepared.

16        MR. ROBERTSON:  Your Honor, could I address that

17   point for one issue, because you raised Mr. Dooner's

18   declaration.  Of course, that declaration was submitted to this

19   Court in final form for purposes of trying to convince the

20   Court that RQC was different from RSS.

21        So it falls directly under your fourth holding in

22   your ruling that Lawson has not shown work product protection

23   attaches to lawyer work in developing RQC.  So there are

24   several other declarations that they have not produced

25   throughout declarations that are part of the privilege log, and

1   we would think under the case that you just cited and your

2   ruling, that work product with regard to the RQC is not

3   protected, that they would have to produce all draft

4   declarations and any documents that fall within the scope of

5   that waiver.

6           MR. THOMASCH:  Your Honor, I will, of course, read

7   that case and the footnote and the text very closely.  I'm not

8   familiar with it.  I do not believe that the Dooner draft

9   declaration was part of the motion that was briefed and on

10  which Your Honor made findings of waiver.

11          THE COURT:  That's what I need to know, is what does

12  the Dooner affidavit relate to, this draft?  When was it

13  prepared, the draft here?  I don't see a date on it.  It's on

14  one of the privilege logs.  When was the date of this thing?

15          MR. THOMASCH:  I believe it is September, but I'm

16  operating from memory, Your Honor.

17          THE COURT:  Why was the final form of it submitted?

18  You said it was submitted for a purpose, and I didn't quite get

19  --

20          MR. ROBERTSON:  It was submitted in opposition, Your

21  Honor, by Merchant & Gould --

22          THE COURT:  Opposition to what?

23          MR. ROBERTSON:  The show cause motion for why Lawson

24  should not be found in contempt.  It was submitted because --

25

1   ████████████████████████████████

2              So there were several declarations submitted in

3   opposition to that show cause motion which we feel reveal that

4   there were no colorable differences between RQC and RSS when

5   you look at the communications associated between the lawyer

6   and the affiant in the documents.

7              THE COURT:  How can you say that if you don't have

8   them already?  If you already have them, why am I dealing with

9   them?

10             MR. ROBERTSON:  I only have one, and there were

11  several other Dooner declarations on the list that they haven't

12  given us, and there's a Christopherson --

13             THE COURT:  Seven other drafts of the Dooner --

14             MR. ROBERTSON:  Yes, I believe they are drafts.  And

15  there's a Christopherson one.  I will just note that here they

16  are representing that the shopping cart had been removed as one

17  of the changes, and they still maintain the shopping cart is

18  ████████████████████████████████████

19  ████████████████████████████████████████

20  ███████████████████

21             I'm sorry, Your Honor, that's paragraph 11 in the

22  ████████████████████████████████████████████

23  ████████████

24             THE COURT:  If I had my magnifying glass, I might be

25  able to read those, but I can't read them.

1          MR. ROBERTSON:  Well, Your Honor, I'm just saying

2    that's why it's relevant.

3          MR. THOMASCH:  Your Honor, I'm not addressing

4    relevance, simply the question -- it was sort of an attempt to

5    slide this in and say you've already decided on this and other

6    similar affidavits in litigation, and Your Honor's work product

7    ruling concerned documents that were during the pre-release

8    period, and you found that during that period where the people

9    were engaged in making recommendations about what should be

10   done to bring the product through the design process, you found

11   that we had not made a showing.

12         You made it clear at page 22 and 23 that that was --

13   that's a document-specific showing, and it hasn't been

14   litigated with regard to documents that weren't part of that

15   prior motion.  I'm not trying to argue the merits of that other

16   than to say you haven't decided this issue already on this and

17   other declarations, and other declarations could well be

18   privileged under the attorney work product privilege and not --

19   and it doesn't matter about the scope of the subject matter

20   waiver for that purpose.

21         THE COURT:  No, I see what you are saying.  All

22   right, thank you.

23         MR. THOMASCH:  Thank you.

24         THE COURT:  Your argument, Mr. Robertson, smacks more

25   of fraud-crime exception argument respecting the Merchant Gould

1   work in filing these affidavits and the client than it does of

2   waiving the privilege in the development process.  The mere

3   fact that this guy's job was to develop things, that statement

4   alone doesn't flip it into the process of that which has been

5   waived earlier in the development, because it was -- of the way

6   things were used in the development process, I don't think.

7           It may be -- the way you are making the argument, you

8   are really making a crime-fraud exception argument, not an

9   argument on the scope of the ruling as I hear you.  And I don't

10  have that motion, and so I'm not going to decide that issue.

11          MR. ROBERTSON:  Well, Your Honor --

12          THE COURT:  I'm not inviting one, either.

13          MR. ROBERTSON:  I understand.

14          THE COURT:  I'm just saying that that seems to me

15  where you are pitching your argument, and it's not in the

16  briefs, it's not something they've even had an opportunity to

17  respond to, and so I'm not going to decide it on that

18  framework.

19          MR. ROBERTSON:  I'm not asking to you decide it on

20  that grounds, Your Honor.  I think, you know, once we have

21  production of many of these privileged documents we're looking

22  at and documents we've already seen which suggest that this RQC

23  was a fraud and was a fraud on the court because it was

24  proffered to the Court as if it were a significant change in

25  RSS, but a document like that can go to relevancy of whether

1    RQC and RSS are the same.

2             THE COURT:  It can go to the relevance, but that

3    doesn't solve the problem whether the privilege has been

4    waived.  They are two different questions.  There's a lot of

5    stuff that's relevant as to -- if there were no privilege

6    that's related to it or protects it that would come in over a

7    relevance objection, but that's not what we have here.

8             MR. ROBERTSON:  I'm just -- I'm saying it's relevant

9    to both issues, crime fraud and to whether there are colorable

10   differences between RQC and RSS.

11            THE COURT:  It may be relevant to a colorable

12   difference argument, but before you ever get to that issue, the

13   point is, is it protected by the privilege or not and the scope

14   of the ruling that was made, and Mr. Thomasch is saying that by

15   virtue of the timing of it, it is beyond the period when the

16   ruling applies.  Isn't that what your argument is?

17            MR. THOMASCH:  Correct, Your Honor.

18            MR. ROBERTSON:  I'll have to go back and look at the

19   precise language, Your Honor.  I do have it here, but I don't

20   have it right in front of me.  I understood the work product

21   protection attaches to lawyer work in developing RQC, and I

22   understood that to be a subject matter waiver as well because

23   you were saying Lawson has not shown work product protection

24   with respect to developing RQC.

25            THE COURT:  I know, and he's saying this isn't

1    development.  This is defending your motion.

2           MR. ROBERTSON:  Well, substantively, what

3    Mr. Dooner --

4           THE COURT:  And that may be -- and it may be that

5    what's being said here is wrong and shouldn't be provided,

6    but -- I mean and shouldn't be allowed over -- to be protected

7    by the attorney-client privilege because it's subject to the

8    crime-fraud exception, but I don't have that in front of me

9    yet, and I'm not ruling on that.

10          MR. ROBERTSON:  I understand, sir, but according to

11   the case that you just gave us, if that was intended and was

12   made public, then, as you indicated, that and all subsequent or

13   all previous drafts should be produced.

14          THE COURT:  I agree.  That's what it says.  Over a

15   claim of attorney-client privilege.  That's what that case

16   held.  I thought I made that clear that that's what the case

17   was and that I personally hadn't had the time to go back and do

18   the checking to ascertain -- I have a recollection that this

19   principle applies with equal force in the work product area,

20   but there is also a nagging feeling that maybe that

21   recollection isn't right, and I haven't had time to look at it.

22          MR. ROBERTSON:  I'm sure we'll both go back and look

23   at that.  Thank you.

24          THE COURT:  I'm sure you will.  Anything else?

25          MR. THOMASCH:  No, Your Honor, except to point out

1    that on the 14th of September, you specifically cautioned

2    against embedded arguments about crime fraud that weren't the

3    subject of a motion that put us fairly on notice and allowed us

4    --

5              THE COURT:  I thought I just repeated that.

6              MR. THOMASCH:  Yes, sir.

7              THE COURT:  I'm not deciding it on the basis of the

8    crime fraud issue.  That is an entirely different question with

9    a lot of different tests, and it may require different proofs.

10   I don't know, and if he thinks, Mr. Robertson thinks that there

11   is a basis for bringing such a motion, he can bring that

12   motion, and I'll have to deal with it.  Until then, I'm going

13   to say grace over what I've got, because that's enough for now.

14             MR. THOMASCH:  I understand, and I think we're

15   actually done discussing the documents noting that we do have

16   someone who is coming to the court.  If the contents of the

17   documents is going to be discussed, I'd want to raise that

18   issue again, but I don't think it's necessary now, because I

19   think we're probably done that discussion.

20             THE COURT:  Okay, anything else that needs to be done

21   on this matter?  I need to set a date for a hearing here and

22   get moving.

23             MR. ROBERTSON:  Yes, Your Honor.

24             THE COURT:  Excuse me just a minute.  Ma'am, are you

25   with one of the parties here?

1          UNIDENTIFIED SPEAKER:  No, sir.

2          THE COURT:  Who are you with?

3          UNIDENTIFIED SPEAKER:  I'm with a class.

4          THE COURT:  Oh, you're a student?

5          UNIDENTIFIED SPEAKER:  Yes.

6          MR. ROBERTSON:  I'm not going to discuss substance --

7          THE COURT:  We're through with the sealed part of the

8    transcript, and the young lady may remain.  Sorry, we had

9    closed the proceedings, and we needed to ascertain that.  All

10   right.

11         MR. ROBERTSON:  Yes, Your Honor, we would like to set

12   a date.  Obviously we're anticipating production of some of the

13   documents subject to Your Honor's order.  We'd like to review

14   them.  It may require supplementing expert reports, but we

15   think since the documents have been in their possession for the

16   entire time and knew what they are, we should be permitted to

17   supplement our expert reports expeditiously --

18         THE COURT:  Slow down.

19         MR. ROBERTSON:  -- and get on with the hearing.

20         THE COURT:  I assume you haven't been somnolent

21   during the period of time that you've been litigating this

22   issue, that you all have been evaluating what you have been

23   provided, haven't you, or have you just been putting it off on

24   the side waiting for it to become more useful?

25         MR. ROBERTSON:  We have reviewed them and separated

1    them into what we call a hot documents folder, sir.

2            THE COURT:  Are you ready to use them?

3            MR. ROBERTSON:  We would like this additional

4    production.

5            THE COURT:  Do you need any more discovery?

6            MR. ROBERTSON:  No, Your Honor.  I'm sorry, yes.  I'm

7    reminded, since it's been sometime, we need additional

8    financial information from Lawson with respect to the sale of

9    RQC during this period since last year, Your Honor.

10           THE COURT:  Okay.  Is there an outstanding document

11   request that asks that, and if so, then they have an obligation

12   to update their response.

13           MR. ROBERTSON:  There was an original document

14   request, and they produced some documents, but they haven't

15   produced anything since last year.

16           THE COURT:  I'm sure you can talk to Mr. Thomasch.

17           MR. THOMASCH:  Yes, we're actively working on a

18   production, an update through the last fiscal quarter which is

19   August 31, and we're working on that right now.  We should have

20   that, and we'll produce it as soon as we have it, but we're

21   going forward already on that.

22           THE COURT:  All right.  I'm not -- excuse me.

23           MR. THOMASCH:  There was just a sort of a suggestion

24   by Mr. Robertson that the plaintiffs would update their expert

25   reports.  Obviously, if export reports --

1          THE COURT:  And you can't was the implied suggestion.

2          MR. THOMASCH:  It was, and I was just sort of --

3          THE COURT:  You rose to take issue.

4          MR. THOMASCH:  I was going to put our bid in for

5   possible mutuality of disclosure and opportunity to defend the

6   case.  Thank you, Your Honor.

7          THE COURT:  I can't imagine you'd want to do

8   something like that.  All right.  Well, I can't set the interim

9   schedule, but I'm going to decide this document issue as soon

10  as I can, and I'd like to go on and get on your dance card now

11  for the future.

12         Since they don't anticipate any discovery, you do

13  have probably -- I mean depositions, they are going to want to

14  do an updated expert report, I can sense, and so are you, and I

15  suppose you'll both -- do you want to depose each other's

16  experts?

17         MR. ROBERTSON:  We've already deposed them, Your

18  Honor.

19         THE COURT:  In view of the updated reports, I guess

20  is the question.

21         MR. ROBERTSON:  I suppose if they want to depose our

22  expert, we expect mutuality as well, Your Honor, but right now

23  I don't see the need to redepose the expert.  I'll put him on

24  the witness stand and go from there.

25         THE COURT:  He may have another report after your

1    report.

2              MR. THOMASCH:  Your Honor, I would not like to commit

3    as to whether or not a deposition of their expert is

4    appropriate until we see the revised expert report.  It might

5    be that he adds in two documents.  It might be he changes his

6    whole approach, and I think that would affect our thinking.

7              I would respectfully suggest to the Court that, in

8    Lawson's view, when we left on the 29th of February, you

9    specifically directed us to brief the process by which we would

10   have a hearing, how do we define the animal against which the

11   more than colorable changes are measured, in Your Honor's

12   words, and there has been a significant exchange of letters

13   with the Court on that subject.

14             THE COURT:  I need to pull those back out and look at

15   them.

16             MR. THOMASCH:  We would very much request an

17   opportunity for a hearing on that, because I think that coming

18   out of that it will be very clear as to how long the proceeding

19   will take which, I think, is going to be shorter than it would

20   otherwise be, when it should take place, and what the experts

21   will say which, I think, is going to be much less than the

22   experts have said so far.

23             I think if we just know what Your Honor views,

24   because this is Your Honor's decision as to what you find was

25   asserted and proved at the first case, and if you tell us that,

1    I think we'll have a roadmap to a hearing that can happen

2    quickly and easily.

3              THE COURT:  And they say I don't have to do that.

4              MR. THOMASCH:  They say you don't have to, and we

5    would like a hearing on that issue.

6              THE COURT:  I have to read all those.  Does somebody

7    have -- you all did this in letters, did you not?

8              MR. THOMASCH:  Yes, Your Honor, there are letters.

9    You asked us to confer.

10             THE COURT:  Are they only in letters?

11             MR. THOMASCH:  Yes.  There are no briefs on this.

12   There are six letters, three from each side.  We can give you

13   those in bound form today.

14             THE COURT:  I would like to have them that way.  That

15   would be great.  I think I've got everything assembled

16   properly, but if you have them --

17             MR. THOMASCH:  I want to make a copy that isn't

18   highlighted so there's no questions.

19             THE COURT:  Let me read those, and I'll be back in

20   touch with you.  Anything else that needs to be done today?

21   All right.

22             MR. ROBERTSON:  No, Your Honor.

23             MR. THOMASCH:  No, Your Honor.

24             THE COURT:  We'll be in adjournment.

25

1

2                        (End of proceedings.)

3

4

5          I certify that the foregoing is a correct transcript

6     from the record of proceedings in the above-entitled matter.

7

8

9     _____/s/_____              _____
      P. E. Peterson, RPR                Date
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25