## Page 1

```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
                     RICHMOND DIVISION
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                 :
ePLUS, INC.,                     :
                                 :
         Plaintiff,              :
    v.                           :  Civil Action
                                 :  No. 3:09CV620
LAWSON SOFTWARE, INC.,           :
                                 :  March 25, 2011
         Defendant.              :
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

                DAILY COPY

   COMPLETE TRANSCRIPT OF EVIDENTIARY HEARING
     BEFORE THE HONORABLE ROBERT E. PAYNE
         UNITED STATES DISTRICT JUDGE

APPEARANCES:
Scott L. Robertson, Esq.
Jennifer A. Albert, Esq.
Michael T. Strapp, Esq.
GOODWIN PROCTOR
901 New York Avenue, NW
Washington, D.C.  20001

Craig T. Merritt, Esq.
CHRISTIAN & BARTON
909 E. Main Street, Suite 1200
Richmond, VA  23219-3095
     Counsel for the plaintiff ePlus

          DIANE J. DAFFRON, RPR
          OFFICIAL COURT REPORTER
        UNITED STATES DISTRICT COURT
```

## Page 2

```
APPEARANCES: (Continuing)
Daniel W. McDonald, Esq.
Kirstin L. Stoll-DeBell, Esq.
William D. Schultz, Esq.
MERCHANT & GOULD
3200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2215

Dabney J. Carr, IV, Esq.
TROUTMAN SANDERS
Troutman Sanders Building
1001 Haxall Point
P.O. Box 1122
Richmond, VA  23218-1122

     Counsel for the defendant Lawson.
```

## Page 3

(The proceedings in this matter commenced at 9:30 a.m.)

THE CLERK: Civil Action No. 3:09CV620, ePlus, Incorporated v. Lawson Software, Incorporated.

Mr. Scott L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr. Michael G. Strapp represent the plaintiff. Mr. Daniel W. McDonald, Mr. Dabney J. Carr IV, Ms. Kirstin L. Stoll-DeBell, Mr. William D. Schultz, and Ms. Rachel C. Huey represent the defendant.

Are counsel ready to proceed?

MR. ROBERTSON: The plaintiff is, Your Honor.

MR. McDONALD: Lawson is as well, Your Honor.

THE COURT: All right. This is the evidentiary hearing on the issue of an injunction.

Is there another firm coming into this case for you-all?

MR. McDONALD: The Finnegan firm is involved, Your Honor, but they are not going to be participating in this hearing. They are going to be involved with the appeal primarily, but they wanted to have access to the documents.

THE COURT: Oh, okay.

Mr. Robertson.

## Page 4

MR. ROBERTSON: Good morning, Your Honor.

If I might, I just have a few brief opening remarks to just sort of put some of the issues in context and then preview for the Court or highlight some of the topics that are going to be addressed today by Mr. Farber's testimony, if that's permissible.

THE COURT: All right.

MR. ROBERTSON: First, we are here to discuss the supplemental evidence, testimony and documentation that have been provided to the Court and exchanged by the parties since the trial ended that we believe will support the Court's discretion to grant an injunction in this case to prevent the ongoing infringement of ePlus' patents.

We certainly don't want to be here today, and I know the Court doesn't want to retry the case, or reargue a number of the issues involving hotly contested issues that are before the Court.

That said, there will be some additional details concerning evidence that did come out that we think would be important for the Court to consider.

I'd just like to highlight Section 154 of the Patent Act. Your Honor, the only right conferred upon a patent owner under the Patent Statute is the right

**5**

1  to exclude. And that is the right that we are here to
2  enforce today as the Court knows.
3      The Patent Act was what's called a carefully
4  crafted bargain by Congress which provided a limited
5  right to exclude for a period of years in exchange for
6  disclosure to the world of the invention.
7      As you know, the eBay case has indicated and
8  confirmed that the Court has substantial discretion in
9  granting an injunction. And if we could just put up
10 the factors for the eBay test.
11     This four-factor test, which has been called
12 the eBay factors, are, of course, as the Court
13 recognizes, the traditional factors for a court
14 entering injunctive relief.
15     Irreparable injury and adequate remedy at law
16 have often been called the two sides of the same coin.
17 Balancing of the harms, of course, needs to be
18 considered as well as the public interest. But even
19 in the eBay case, an issue that arose was whether or
20 not a case called Continental Paper Bag, a 100-year
21 old decision, which had held that a patent owner, even
22 a non-practicing patent owner, had the right to
23 exclude an infringer from the marketplace.
24     And the Court considered that case and
25 whether or not it actually had to reverse that

**6**

1  decision. And it found that it did not. And I think
2  there's some interesting wording in that case that I'd
3  like to bring to the Court's attention.
4      It said from that right to exclude, the only
5  right granted to the patent owner, we may judge the
6  patent owner's remedies. Nothing less than an
7  injunction can retain that right of exclusivity
8  granted by the patent.
9      As Justice Roberts noted in his concurrence
10 in the eBay case, citing Justice Holmes, a page of
11 history is worth a volume of logic. Infringement
12 having been found, the traditional remedy is to enter
13 the injunction.
14     Those are my opening arguments.
15     THE COURT: It's been interpreted to mean
16 there's a presumption of entitlement to injunctive
17 relief as opposed to an absolute entitlement to
18 injunctive relief; is that your point?
19     MR. ROBERTSON: I think the issue is still
20 open as to whether or not the presumption still
21 applies. I think certainly in instances where there
22 has been established proven competition,
23 overwhelmingly courts have entered the injunctions in
24 favor of the patent owner, infringement having been
25 found.

**7**

1      But even competition itself, Your Honor, is
2  not critical to the injunctive relief we're seeking
3  here. We think the parties have focused significantly
4  in their posttrial submissions on this issue of
5  competition, and there will be a lot of discussion
6  about that today.
7      But even the Federal Circuit post eBay has
8  said, for example, you're not required to prove actual
9  lost sales in order to obtain an injunction. You're
10 not even required to show that you have a commercial
11 product that's marketed in direct competition.
12     Those cases I can cite to the Court are Eye
13 For Eye, Limited. The citation is 598 F.3d 831. It's
14 a 2010 case. And Broadcom v. Qualcomm, which is 543
15 F.3d 683. Obviously, we'll be citing those in our
16 posttrial brief, Your Honor. But, nevertheless, we
17 believe at the end of this hearing the evidence will
18 be overwhelming that there's direct competition in the
19 same marketplace, in the same market sectors,
20 involving Lawson and ePlus for these procurement
21 software solutions.
22     So, first, I think it is important to
23 emphasis to the Court that ePlus does practice its own
24 patents. It's not what is known has an NPE, as it's
25 come up, or a non-practicing entity, or the more

**8**

1  disparaging term, a patent troll.
2      Mr. Farber is going to address the importance
3  of the products that ePlus sells in this marketplace.
4  The Court may recall they are called Procure+ and
5  Content+, and how they embody the patents-in-suit.
6      He's going to describe the ongoing role of
7  those software solutions for the company, how ePlus
8  has generated tens of millions of dollars in revenues
9  from licensing not only those products, but by
10 leveraging the sale of other related products for
11 those Content+ and ePlus.
12     He's going to explain how those products help
13 support and retain customers for its other business
14 and distinguish itself from its competitors in the
15 marketplace.
16     We are also going to have Mr. Farber address
17 issues about how ePlus markets those products and
18 solicits its customers, about the process and the
19 context and the significant overlap that it has with
20 the same way that Lawson solicits and targets its new
21 potential customers using a variety of means to obtain
22 leads and contact potential customers. He's going to
23 describe ePlus' sales and marketing efforts in that
24 manner.
25     And Your Honor may also recall that in this

**17**

1  So when you drill down and really look at the
2  competition here, what's going to become clear is that
3  ePlus has not lost a single sale due to Lawson's RSS
4  or Punchout products.  And that's a very, very
5  important issue on whether or not they would be
6  irreparably harmed in a way that cannot be compensated
7  by money.
8       Is there a little bit of competition?  There
9  might be literally one or two customers.  I don't even
10 know if those are really competition.  When you really
11 get down to it, it's a small number because it's the
12 people that are within that 2 percent that have the
13 Lawson ERP suite and now they're looking to add this
14 type of procurement functionality.  So you're in a
15 subset of that 2 percent that even would be in that
16 ballpark.  So it's very, very rare.
17      The other key things here, that 2 percent
18 number is also significant in another way.  Less than
19 2 percent of ePlus' business is this procurement
20 business, this Procure+ and Content+.  They call them
21 their flagship products within this niche, but it's an
22 awfully small armada within that company.  It's only
23 about $6 million out of over $800 million in sales.
24 Lately, it's been less than 1 percent of their sales.
25 So it's very small.

**18**

1  So when you're looking at harm and the
2  injunction, there's really no harm to ePlus.  With all
3  the other competitors out there, the different
4  products, whether or not Lawson is enjoined isn't
5  going to alleviate any harm to ePlus.
6       THE COURT:  Is it your view that I can impose
7  royalties going forward?
8       MR. McDONALD:  Yes.
9       THE COURT:  And I can hear evidence on that
10 now?
11      MR. McDONALD:  Yes.
12      THE COURT:  I don't need a jury?
13      MR. McDONALD:  That's correct.
14      THE COURT:  That's the Toyota case?
15      MR. McDONALD:  Right.
16      THE COURT:  Is that case on appeal?
17      MR. McDONALD:  That was the Federal Circuit.
18      THE COURT:  I know, but did it go up?
19      MR. McDONALD:  I believe it did.
20      THE COURT:  Has it been denied writ?
21      MR. McDONALD:  Did it go to the Supreme
22 Court, you mean?
23      THE COURT:  Yes.
24      MR. McDONALD:  I'm pretty confidant the
25 Supreme Court hasn't accepted anything.  I don't know

**19**

1  whether it was petitioned for cert or not.
2       THE COURT:  The issue is whether it's
3  pending.  I don't know of anything being granted.
4       MR. McDONALD:  I think the time has passed
5  for that, Your Honor, just looking at the district
6  court decision back in 2006, but I'm not sure.
7       THE COURT:  Oh, yeah.
8       MR. McDONALD:  So on the harm issue, I'm not
9  clear what exactly ePlus is asking for in terms of a
10 scope of injunction.  I didn't hear Mr. Robertson talk
11 about that in his opening remarks, but we have seen
12 some indication in their papers they're seeking an
13 injunction not just in going forward RSS and Punchout
14 sales by Lawson, which is one thing for customers that
15 aren't in the pipeline, etc., but they actually have
16 indicated that while they want to let our existing
17 customers continue to use RSS and Punchout -- Your
18 Honor asked that question to Mr. Robertson at one of
19 our hearings, I think, between trial and now, and he
20 said, oh, no, we're not seeking to stop the customers
21 from using it, but they are seeking to have Lawson
22 stop servicing those customers.  And that would be
23 very harmful.
24      Lawson's life would go on at some level for
25 Lawson, but we're really talking about there is a harm

**20**

1  for the customers because they cannot use unsupported
2  software, especially industries like health care and
3  the public sector.  We're talking about buying the
4  supplies for people's operations.  And if they have an
5  unsupported system, they have a problem with it, it is
6  actually -- for example, Google makes a change to
7  their system.  Well, if the product interfaces with
8  Google, there might be a little glitch or something.
9  The customer needs to pick up the phone and call
10 Lawson and fix that.
11      It's like saying you can keep driving the
12 car, but you just can't put anymore gas in it because
13 the support is so critical to using these things.
14 We're talking about people having operations.  We're
15 talking about Virginia Commonwealth university, which
16 is a Lawson customer of RSS.
17      If you enjoin Lawson from supporting them,
18 they don't have any other options.  No other company
19 out there supports Lawson's systems.  You have to have
20 a knowledge and understanding and access to the code
21 of the Lawson systems to be able to fix those types of
22 glitches and figure out how it interacts with the
23 other Lawson systems in that suite of products to
24 solve those problems.
25      So you're talking about a very significant

2011.03.25 Hearing - Injunctive Relief  3/25/2011  8:54:00 AM

**21**

1  harm. They can't simply just stop using our product
2  and switch to another one tomorrow. That takes
3  months, even years, to qualify the products to make
4  sure they work so they don't cause products with
5  supplying operations and things like that. It
6  literally takes years for a customer to switch to a
7  different product. So that would be a devastating
8  thing.
9      And ePlus has nothing to gain from that.
10 They don't provide service to the Lawson customers.
11 We're talking about an injunction here that would
12 really just hurt customers without helping ePlus. The
13 right thing to do would be to just -- we would keep
14 track of our sales. Everybody can take their appeals.
15     The only way to make sure that nobody is
16 irreparably harms here is to deny an injunction,
17 because those customers, there's no way to compensate
18 them if they are lost from support and ePlus loses on
19 appeal. What recourse do they have at that point? So
20 that's the right thing to do here when you look at the
21 balance of the harms.
22     So that in a nutshell -- Mr. Hager is our
23 person. He's the VP from the S3 part of Lawson, which
24 has these RSS and Punchout products, very
25 knowledgeable about many aspects of the company

**23**

1      THE COURT: I didn't ask you that.
2      MR. ROBERTSON: I'm not going to ask for that
3  relief, Your Honor. We want --
4      THE COURT: Ever?
5      MR. ROBERTSON: Excuse me?
6      THE COURT: Are you ever going to come to me
7  and ask for that relief?
8      MR. ROBERTSON: This is what we want.
9      THE COURT: E-v-e-r, Mr. Robertson?
10     MR. ROBERTSON: I am not going to ask you for
11 that relief, Your Honor, because I want an injunction,
12 and once the injunction enters, if my client so
13 decides that it wants to determine to license Lawson,
14 that's when the playing field has been leveled.
15     In fact, Judge Ellis wrote a very thoughtful
16 decision on this very point saying that it is
17 difficult for courts who are ill-equipped to determine
18 what the appropriate licensing terms should be between
19 these two parties. The Court is not an expert in the
20 software industry, with all due respect. And as Judge
21 Ellis pointed out, once the injunction enters, it is
22 indeed the marketplace that sets the terms for the
23 license that could issue going forward.
24     In other words, Lawson would have to sit down
25 with ePlus and determine, based on marketplace

**22**

1  because he's held different jobs within S3. And he'll
2  help you understand the competitive landscape out
3  there, what we really sell, how it's sold, and also
4  this impact on customers if an injunction is entered.
5      Thank you.
6      Oh, we have a cite for the Federal Circuit
7  decision in Pace v. Toyota. It's 504 F.3d 1293.
8  That's from 2007. And somebody just checked that cert
9  was denied.
10     Thank you.
11     MR. ROBERTSON: If I might briefly respond.
12     THE COURT: I don't want you to do anything
13 except tell me one thing.
14     MR. ROBERTSON: Yes, sir.
15     THE COURT: If you are denied an injunction,
16 am I going to be facing a request for going forward
17 royalty?
18     MR. ROBERTSON: Sir --
19     THE COURT: Assume you're going to be denied
20 an injunction today after I hear the evidence and tell
21 you I don't think there's any reason for an
22 injunction, are you going to be asking for going
23 forward royalty?
24     MR. ROBERTSON: I think the Court has the
25 authority to do it.

**24**

1  factors, how valuable the technology is that is
2  infringing.
3      THE COURT: The answer is no, you're not
4  going to come to me for royalty going forward if the
5  injunction is denied?
6      MR. ROBERTSON: I suppose if the injunction
7  is denied and the Federal Circuit then upholds the
8  denial of the injunction, it would probably be
9  remanded for some relief because, as the Court knows,
10 the statute says a licensee, excuse me, I mean a
11 patent owner shall receive no less than a reasonable
12 royalty.
13     So I think they would remand indicating that
14 since there was no injunction granted, that there had
15 to be some relief afforded by the district court.
16     I wanted to point out something about the
17 Toyota v. Pace case if I could. It's a very unique
18 case. In fact, that's a case where the Court did
19 impose a compulsory license, but it turned on the fact
20 that the patent owner was an NPE, didn't have its own
21 product, wasn't out there competing in the
22 marketplace, didn't have a product covered by the
23 patents. And that is why and that was the only reason
24 why.
25     THE COURT: Tell the record what an NPE is.

### 25

1  MR. ROBERTSON: That's the non-practicing
2  entity, sometimes referred to, as mentioned before,
3  the patent troll.
4  THE COURT: What if I decided that the public
5  interest here requires a compulsory license because
6  when one of my colleagues goes to the Medical College
7  of Virginia for open heart surgery, I can't be putting
8  him or any other member of the public, colleague or
9  not, Mr. Merritt, Mr. Carr, or anybody in his firm,
10 anybody in the Richmond area, at risk of losing a
11 stitch or two, or not having the right syringe, or not
12 having the right product. So instead of an
13 injunction, I say you're entitled to a remedy, and
14 under the circumstances an injunction is not the right
15 one, but a compulsory license is.
16 At that juncture I'd have to find out what
17 the license is or rate is, wouldn't I?
18 MR. ROBERTSON: You would probably need to
19 make findings of fact with respect to what a
20 reasonable royalty would be.
21 THE COURT: How would I do that on the record
22 that would be before me at the conclusion of these
23 proceedings?
24 MR. ROBERTSON: I think it would be very
25 difficult, Your Honor.

### 26

1  THE COURT: It would be somewhat difficult
2  unless one accepts Ouija work, dart boards, and those
3  kinds of things as the bases for deciding evidence.
4  MR. ROBERTSON: One of the things that the
5  Court suggested earlier was that we should be looking
6  at comparable licenses. Of course, we did that when
7  we went out in preparing our damages model for the
8  Court, and we didn't find comparable licenses.
9  The Federal Circuit has been very particular
10 in what it has determined to be comparable licenses in
11 the same technology. I don't want to relive that, the
12 argument with respect to ResQNet, but one of the
13 reasons they say to look to the settlement agreements
14 was they were the most pertinent because they
15 addressed the very patents that were at issue in the
16 case.
17 I looked at some of the other comparable
18 licensing. In fact, it involved some of my clients,
19 licenses I knew that the clients had never received a
20 penny in royalties under, notwithstanding what the
21 terms were. I looked at the technology that was
22 identified.
23 So we had a handful, maybe five, that we
24 thought were comparable or could be considered
25 comparable and determined that they all were not

### 27

1  because they did not involve the same technology or
2  they were not really arms' length negotiated
3  comparable licenses.
4  So I think it's going to be very difficult
5  for the Court to try and come up with a royalty rate
6  given the sort of absence of examples out there for
7  the Court to draw upon.
8  Lawson has offered in its own self-serving
9  way. It wants to dictate what the terms of the
10 licensing are.
11 THE COURT: They said what?
12 MR. ROBERTSON: They said first it should
13 only be on the revenues they generate from licensing
14 fees. Why is that? Because it's a very small portion
15 of revenues they generate from --
16 THE COURT: Mr. McDonald can't argue that
17 anymore after what he just argued about the critical
18 nature of the service aspect of their business. He
19 just said that's the integral link, the thing that
20 keeps things going, the thing that creates such a
21 significant interest in the public that an injunction
22 couldn't possibly lie.
23 And if that's the effect of it there,
24 certainly it has another effect in the dollar arena,
25 doesn't it?

### 28

1  MR. ROBERTSON: Certainly, Your Honor, I
2  think Mr. McDonald has overstated the harm.
3  THE COURT: He's bound by it now having
4  stated it.
5  MR. ROBERTSON: First let me say, as a matter
6  of law, Your Honor, let me cite this case to you.
7  It's Acumed v. Stryker Corporation. It's 551 F.3d
8  1323. It's a 2008 case. It says, in considering the
9  balance of the hardships in an injunction
10 determination, you only consider the hardships between
11 the patent owner and the infringer. The effect on a
12 customer's -- and in this case, it was a medical case
13 -- patients is irrelevant under this prong.
14 There have been a number of cases actually
15 involving medical devices where injunctions have
16 entered.
17 THE COURT: Is that before or after eBay?
18 MR. ROBERTSON: It's a 2008 case.
19 THE COURT: I have to read that case because
20 it sounds to me like -- I think I've looked at it, but
21 I think it's rather remarkable to say that you don't
22 pay any attention to the public interest. Here you're
23 not talking about the customers, you're talking about
24 the patients in the hospital who aren't the customers
25 at all.