1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF VIRGINIA
2                   RICHMOND DIVISION

3      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                        :
4    ePLUS, INC.,                       :
                                        :
5                   Plaintiff,          :
      v.                                : Civil Action
6                                       : No. 3:09CV620
    LAWSON SOFTWARE, INC.,              :
7                                       : March 7, 2012
                    Defendant.          :
8      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

9


10
        COMPLETE TRANSCRIPT OF CONFERENCE CALL
11       BEFORE THE HONORABLE ROBERT E. PAYNE
            UNITED STATES DISTRICT JUDGE
12


13


14


15


16   APPEARANCES:   (Via telephone)

17   Jennifer A. Albert, Esq.
     GOODWIN PROCTOR
18   901 New York Avenue, NW
     Washington, D.C.   20001
19
     Michael G. Strapp, Esq.
20   GOODWIN PROCTOR
     Exchange Place
21   53 State Street
     Boston, MA   02109
22


23


24           DIANE J. DAFFRON, RPR
            OFFICIAL COURT REPORTER
25         UNITED STATES DISTRICT COURT

2

```
1    APPEARANCES:   (Continuing)

2    Craig T. Merritt, Esq.
     CHRISTIAN & BARTON
3    909 E. Main Street, Suite 1200
     Richmond, VA   23219-3095
4
               Counsel for the plaintiff ePlus
5
     Daniel J. Thomasch, Esq.
6    Josh Krevitt, Esq.
     Richard Mark, Esq.
7    GIBSON DUNN & CRUTCHER
     200 Park Avenue
8    New York, NY   10166-0193

9    Christopher D. Dusseault, Esq.
     GIBSON DUNN & CRUTCHER
10   333 South Grand Avenue
     4th Floor
11   Los Angeles, CA   90071

12   Dabney J. Carr, IV, Esq.
     TROUTMAN SANDERS
13   Troutman Sanders Building
     1001 Haxall Point
14   P.O. Box 1122
     Richmond, VA   23218-1122
15
               Counsel for the defendant Lawson Software.
16

17

18

19

20

21

22

23

24

25
```

3

1      (The proceedings in this matter commenced at 3:30

2   PM.)

3           THE COURT:  Hello.  This is ePlus, Inc.

4   against Lawson Software, Inc., Civil No. 3:09CV620.

5           Starting with counsel for the plaintiff,

6   who's present?

7           MR. MERRITT:  Craig Merritt for ePlus, Your

8   Honor.

9           MR. STRAPP:  Michael Strapp for ePlus.

10          MS. ALBERT:  Jennifer Albert for ePlus.

11          MR. CARR:  Judge, this is Dabney Carr for

12   Lawson Software.  And I'll have my co-counsel

13   introduce themselves.

14          MR. THOMASCH:  Your Honor, in New York for

15   Lawson, this is Daniel Thomasch.  With me is Josh

16   Krevitt and Richard Mark.

17          MR. DUSSEAULT:  Good afternoon, Your Honor.

18   Chris Dusseault also on the line.

19          THE COURT:  Good afternoon, gentlemen and

20   ladies.

21          This is set to begin on April the 2nd.  Let's

22   deal with what you-all have in your letters here.  I

23   have several things, too.

24          First, I have the letter here from Mr. Strapp

25   dated the 7th of March.  He gave a copy of it that

1   says to "Counsel of Record."  And the first item is

2   Mr. Hager and what his situation is.

3            Mr. Strapp, since you raised the point, go

4   right ahead.  I've read the letter.

5            MR. STRAPP:  Yes, Your Honor.  I would like

6   Mr. Merritt to address the point with Mr. Hager.

7            THE COURT:  That's fine.  All right.

8            MR. MERRITT:  Your Honor, good afternoon.

9            THE COURT:  Good afternoon.

10           MR. MERRITT:  The Hager situation is fairly

11  straightforward.  You've read our letter.  I won't

12  embellish that.  He was Lawson's sole witness when you

13  took evidence in advance of issuing the injunction.

14  There are matters to which Mr. Hager could and we

15  believe should testify, not only on some timeline

16  issues and on the colorability issue, but certainly in

17  response to some fairly pointed instruction we

18  received from the Court along the way as to Your

19  Honor's interest in exactly how that record was laid

20  before the Court.

21           In January of 2012, Mr. Hager gave a

22  deposition when this hearing was previously scheduled

23  last year.  At that time he was represented by the

24  Gibson, Dunn firm.  It was stated that he would have

25  been present last year and he intended to be present

1   in person.

2        The parties, as you may recall, made some

3   prehearing exchanges and perhaps even submissions of

4   proposed deposition excerpts.  And at the time Lawson

5   objected to deposition excerpts from Mr. Hager on the

6   ground that they intended to make him available in

7   person at the hearing, and it was, therefore,

8   unnecessary.

9        We understand that there's been a passage of

10  time.  We started after the Federal Circuit rule

11  reaching out to Lawson's counsel to see if Mr. Hager

12  would still be available.  They did not have a clear

13  answer for several weeks.  We were recently advised

14  that Mr. Hager has now obtained separate counsel in

15  the person of Rick Witthoefft, who I know is

16  well-known to the Court.  The last I have heard on

17  this from Mr. Witthoefft was an email midday today

18  saying that he's not able to report Mr. Hager's final

19  position on whether he will appear but believes we

20  would be wise to prepare for the hearing as if he

21  would not be present in person.

22       We understand, Your Honor, that you have

23  previously indicated a very strong desire to have

24  witnesses available in person to give their testimony

25  to be cross-examined and to provide answers to any

1    questions that the Court might have.

2          We certainly share that strong bias.

3    However, we don't have control over making Mr. Hager

4    appear, and if we're not able to, we're going to need

5    the Court's guidance and its permission to submit what

6    testimony we do have by other means, and we didn't

7    want to wait until the last minute to raise the issue.

8          THE COURT:  Is Mr. Hager still an officer of

9    the company?

10         MR. MERRITT:  No, sir.  He's left Lawson's

11   employment.

12         THE COURT:  All right.

13         MR. MERRITT:  And I believe he had already

14   left Lawson's employment at the time he gave his

15   deposition in January of 2012, but I believe Mr.

16   Thomasch defended that deposition, and he can correct

17   me if that's wrong.

18         MR. STRAPP:  Where is Mr. Hager now?

19         MR. THOMASCH:  Your Honor, this is Mr.

20   Thomasch.

21         THE COURT:  Excuse me a minute, Mr. Thomasch.

22         Where is Mr. Hager now?

23         MR. MERRITT:  Your Honor, he is the CEO of

24   another company, we believe.  We have seen its

25   website.  We believe it's in the Minneapolis area, but

1  again, that's from memory, and I don't have that in

2  front of me.

3          THE COURT:  All right.

4          All right.  Mr. Thomasch.  Excuse me.

5          MR. THOMASCH:  Yes, sir, Your Honor.  To

6  answer your last question, my understanding is that

7  Mr. Hager is at a company called Kroll Ontrack in

8  Minneapolis, Minnesota.  His employment with Lawson

9  ended in December of 2011.

10         He was deposed in January of 2012.  At the

11 time of that deposition he was not employed.  He was

12 between jobs.  At that time the contempt proceeding

13 was scheduled to go to trial in February of 2012, and

14 when asked whether he intended to attend trial at his

15 deposition in January of 2012, he said that that was

16 his current intention.

17         It's been more than a year since then.  We

18 did always have a preference to have testimony live

19 and to bring our witnesses, and it is our intention to

20 bring those Lawson witnesses who we control whose

21 testimony will be relevant to the proceeding to court.

22 Whether they are to be called by us or whether they

23 are to be called by the plaintiff, we will bring them.

24         We don't have that luxury with Mr. Hager.

25 That is ultimately his determination.  And as Mr.

1   Merritt informed you, he has separate counsel.  And we

2   have the same information that Mr. Merritt has in

3   regard to whether that's going to occur.

4          Earlier we did object to using deposition

5   testimony of witnesses who were going to be present in

6   person.  Obviously, if Mr. Hager, who is unavailable

7   to both parties, is not going to testify at trial, we

8   would withdraw objections that were made on the basis

9   of his availability.  Obviously, there might be

10  objections to individual questions, but not to the use

11  of a deposition as a whole.  We would not have a

12  problem.  He was deposed for seven hours.  He appeared

13  voluntarily after his employment had ended, and he was

14  questioned at great length on all issues relevant to

15  the contempt proceeding, and it may well be that the

16  parties, both of us, wind up using that testimony.

17         There is certainly testimony from Mr. Hager

18  that we affirmatively want to bring to the Court's

19  attention and we would want to use his deposition as

20  well if he doesn't appear live.

21         THE COURT:  The letter here from Mr. Strapp

22  says, "Thus, we wish to confirm whether there is any

23  acceptable alternative for presenting evidence if Mr.

24  Hager refuses to appear."

25         Is that a way of asking whether he can be

1    deposed for purposes of having his testimony available

2    at trial what in the state court proceedings would be

3    called a de bene esse deposition?  But, of course,

4    that procedure doesn't exist in the federal system by

5    that name or by any other name.  Depositions are

6    depositions.  But were you asking for another

7    deposition I guess is what I'm asking?

8         MR. MERRITT:  Your Honor, we did consider

9    that as an option.  We don't have, as Your Honor

10   knows, a true de bene esse procedure in federal

11   practice.  There are some things that sort of approach

12   it obliquely.  We assumed it would be within the

13   Court's discretion and oversight of these proceedings

14   to authorize it if we wanted to do it.  It is fairly

15   time consuming and fairly late in the game, and much

16   of this has been covered.

17        One of the difficulties -- the two

18   difficulties we have are, one, there are questions of

19   demeanor that can never be captured in a deposition no

20   matter how artfully it's taken.

21        And, second, there are some materials that

22   were produced by Lawson as a result of the Court's

23   rulings on the waiver of the attorney-client privilege

24   that were not available when his deposition was taken

25   and he has not been confronted with them.

1       THE COURT:  All right.  So what do you want?

2   Another deposition or what?  I just need to know what

3   to do and hear what their position is.

4       MR. MERRITT:  Judge, would you give us until

5   tomorrow morning to determine whether we think that is

6   worth the candle and let you know if we are seeking

7   leave for that?  Or in the alternative, if we can just

8   be allowed to rely on the record that's already been

9   developed?

10      THE COURT:  I guess I'll hear from you at

11  some point in the morning on it.

12      What's your position on it, Mr. Thomasch?

13  Let's assume for the moment they want another

14  deposition.  What is your position?  Do you know?

15      MR. THOMASCH:  Our position, Your Honor, is

16  it is unnecessary on the demeanor point.  The

17  deposition was filmed, and so there is a video of the

18  deposition and not just a transcript, and I believe

19  that does a good job of capturing exactly what

20  Mr. Hager's demeanor was when he was answering

21  questions.

22      With regard to the privilege documents, I

23  know that in fact it was my apparently erroneous

24  allowance of Mr. Hager to be questioned on privilege

25  documents that served in part for Your Honor's ruling

1   that we waived the privilege because there are some

2   documents that had been produced before the deposition

3   that were used at the deposition in which Mr. Hager

4   says that we have to do this because the attorneys

5   tell us we have to do it, and we allowed that

6   questioning to explain what his state of mind was when

7   the changes were made.  So those documents have been

8   the subject of questioning.

9        I don't know if there are any other specific

10  Hager documents.  I'm not aware of any that are going

11  to be used as exhibits that were subsequently produced

12  that he hasn't been questioned on, but I think he has

13  been thoroughly questioned on the issues in the case,

14  and we would think at the moment there is no need

15  subject to any showing that may be made by plaintiff's

16  counsel.

17       THE COURT:  You don't need him, in other

18  words?

19       MR. THOMASCH:  We feel that we have testimony

20  on the matters that are at issue and we would want to

21  present that testimony through his existing

22  deposition, which was taken after he left the company

23  but in anticipation of the contempt proceeding.

24       THE COURT:  All right.

25       MR. MERRITT:  Your Honor, one possibility of

1    resolving this short of taking another deposition, I

2    do believe there is a small number of documents that

3    were produced after the Hager deposition that were in

4    the privilege category and were subject to the Court's

5    ruling.

6           If we could show those to Lawson, get a

7    stipulation that they are in fact Lawson business

8    records that were received, sent or seen by Mr. Hager,

9    and be permitted to place them in the record without

10   objection, then that might be sufficient to lay the

11   record we need to make in your court without going

12   through the deposition exercise again.

13          THE COURT:  Well, that's something that

14   sounds to me like you-all need to talk about and see.

15   Let Mr. Thomasch make a decision based on the

16   documents that he has in front of him at the time

17   you're talking about it instead of trying to do it

18   over the phone.

19          MR. MERRITT:  We will do that.

20          THE COURT:  So I think that's the best way to

21   do it.

22          But why then don't I hear from you with a

23   final decision on all this on Monday morning at 11:30.

24   Can we do that?

25          MR. MERRITT:  Yes, sir.

1           THE COURT:  Is that satisfactory, Mr.

2    Thomasch, for you?

3           MR. THOMASCH:  Yes, it is, Your Honor.

4           THE COURT:  All right.  That way it will give

5    you-all time to sort out where you stand on this

6    issue.

7           Borrowing a new deposition, I would think

8    that under the circumstances it would be appropriate

9    to allow the use of his testimony to the extent he's

10   been deposed about it, to the extent that the Federal

11   Rules of Civil Procedure allow it to be used in accord

12   with the proper law on that subject.

13          And I assume that's what you-all would prefer

14   to do.  Is that correct from your standpoint?  I mean,

15   you would prefer to do it if you can't get him here in

16   person.

17          MR. MERRITT:  Yes, sir, that's correct.

18          THE COURT:  And if you don't need another

19   deposition.

20          Mr. Thomasch, I assume that's what you would

21   propose to do if you decide you don't need another

22   deposition or if he can't be here in person; is that

23   right?

24          MR. THOMASCH:  That is correct, Your Honor.

25   There may be some objections we maintain, but, as you

1    said, per the federal rules.

2              THE COURT:  Yeah.  That's what the rules are

3    for.  We will deal with that when the time comes.

4              MR. THOMASCH:  Yes.

5              THE COURT:  All right.  That takes care of

6    that situation.  The second item in Mr. Strapp's

7    letter is the scope of the contempt proceeding.

8              Mr. Strapp, are you addressing that?

9              MR. STRAPP:  Yes, Your Honor.

10             During a telephone conference between the

11   parties in the past few weeks, we learned that there

12   is a disagreement regarding potential witnesses that

13   we intend to call at the hearing and evidence that we

14   intend to present regarding Lawson's ongoing

15   infringement and ongoing violation of the injunction

16   by using the actual infringing systems.  Not the

17   systems as modified with RQC, but the systems that

18   were found to infringe with RSS.

19             When we raised this issue on a call, Mr.

20   Thomasch indicated that Lawson's understanding was

21   that that evidence would be outside the scope of the

22   order that Your Honor entered on January 24 regarding

23   the order of proof for the contempt hearing.  And we

24   took a look back at that order.

25             Our understanding of that order is that it

1    would definitely include evidence within the scope.

2    It would include evidence that goes to the issue of

3    whether or not Lawson is in violation of the order of

4    injunction.   That comes from paragraph B on the first

5    page of the order.   And that's docket 1002.

6              THE COURT:   What's the case number?   Give me

7    the case number.   I want to look it up here.

8              MR. STRAPP:   The case number is 3:09CV620.

9              THE COURT:   You would think that would be

10   emblazoned upon my memory, but it isn't.

11             What's the docket number?

12             MR. STRAPP:   1002.

13             THE COURT:   All right.   And you were

14   referring to what paragraph?

15             MR. STRAPP:   Page 1, paragraph B.

16             THE COURT:   All right.   I've read that.

17   Okay.   Go ahead.

18             MR. STRAPP:   Our understanding is that

19   Lawson's view of this order and the scope that Lawson

20   intends to place on the order comes from page 2 of the

21   order, paragraph E.   And on page 2 of the order,

22   paragraph E, Your Honor set forth a structure for

23   proof on the point with respect to the two-part test

24   that is set out in the Federal Circuit's TiVo opinion

25   with the first part of the proof offerings being

1   directed to the issue of whether or not the modified

2   products are more than colorably different, and the

3   second part of the TiVo test and the proof offerings

4   being directed to the infringement issue.

5          While we agree and understand and intend to

6   present proof offerings on those two issues in the

7   order that Your Honor has set forth, we don't believe

8   that that in and of itself is a limitation on what

9   comes in at the actual contempt hearing.  For

10  example --

11         THE COURT:  All right.  Well, let me hear

12  from Mr. Thomasch on this.

13         MR. THOMASCH:  Your Honor, we are prepared to

14  try any case that you want tried.  We have requested

15  that the Court bifurcate the TiVo portion of the

16  proceeding so that the first phase would be limited to

17  colorability.  And it has been our concern that the

18  plaintiffs have attempted to blur the line between

19  infringement and colorability throughout this

20  proceeding.  And in the conversation that Mr. Strapp

21  indicates that he had with me, I did not indicate that

22  we felt that this was entirely beyond the bounds of

23  the hearing as much as we didn't understand how it fit

24  into the order, and that we might need to jointly seek

25  guidance from the Court.

1            We do not believe, however, that the issue of

2     whether or not this issue that he's talking about

3     comes into colorability.  I just want to stress what

4     Mr. Strapp is saying and the underlying evidence we

5     could not disagree with him more about, but what he is

6     arguing is that we are in contempt even if the RQC

7     redevelopment, the redesigned product, is more than

8     colorably different and is non-infringing, either or

9     both of those.  He's saying, Nevertheless, you're

10    still in contempt because you did something with a

11    customer who downloaded RQC but may not have run RQC,

12    and that's the issue he now wants to say can be tried.

13            If Your Honor wants to hear evidence on that

14    case, we are more than happy to present it in the

15    multiple discussions that the parties have had about

16    what would proceed at the hearing.  That has not been

17    the subject of discussion at all.  And it caught me by

18    somewhat surprise that they were still pursuing those

19    allegations, but we have an answer to them.  It's

20    compelling and we're prepared to present it, but we do

21    not want it to infiltrate the separate analysis of the

22    two-part TiVo case, the colorability and the

23    infringement analysis.

24            TiVo tells us how that's to be done.  And the

25    issue of whether we're in contempt because the

redesign was a fraud, as they have alleged, is very,
very different from this new issue, which is whether
we're in contempt because we somehow continue to deal
with a customer who had downloaded the redesign but
they say didn't install it, and we say they're wrong.

MR. STRAPP:  Your Honor, this is Mr. Strapp.
If the concern of Lawson is that these issues must be
segregated, in other words, the issue of whether
Lawson has continued to support its customer's use of
the original infringing systems, must be segregated
from the issue of whether or not RQC is a more than
colorable difference from RSS.  We're entirely in
agreement that those two issues can and should be
segregated at the contempt hearing.

But one issue that I do want to correct I
think there might be a misperception about is that
this is a newly raised issue.  This was a subject of
discovery at length preceding the contempt hearing
that was scheduled in February of 2012.  There were
multiple depositions taken on this issue.  There were
interrogatories exchanged and documents exchanged.

So this isn't a new issue that ePlus is
raising at the last minute but rather it's an issue
that's been at the forefront of both parties'
discovery efforts for several months.

1          THE COURT:  Apart from your discovery

2     efforts, is it alleged in the petition seeking a

3     contempt?

4          MR. STRAPP:  Well, Your Honor, at the time

5     that we submitted -- I don't have that petition in

6     front of me.

7          THE COURT:  You've got a computer in front of

8     you, don't you?

9          MR. STRAPP:  Right.  At the time we submitted

10    that petition that was back in September of 2011, I

11    believe.  And September 2011, our understanding based

12    on the representations that Lawson had publicly made

13    because we didn't yet have discovery regarding

14    contempt was that Lawson had made available to its

15    customers and its customers were actually downloading,

16    installing and implementing this new RQC module and

17    that the customers were no longer using the

18    adjudicated infringing systems.

19          When we asked in an interrogatory about which

20    customers had actually installed and implemented the

21    design-around RQC module, we were shocked and

22    surprised to learn that actually Lawson couldn't tell

23    us of a single customer who had installed and

24    implemented RQC because Lawson said it simply didn't

25    know.  It just knew customers had downloaded RQC, but

1   that downloading RQC doesn't mean that a customer was

2   actually using RQC.

3          So we learned about that in discovery.  And

4   we took quite a bit of discovery because, as you can

5   imagine, we were surprised and we thought, Well, if

6   Lawson is actually still supporting the use of the

7   original infringing systems, that couldn't be more

8   relevant to the issue of whether or not Lawson has

9   violated the actual terms of the injunction.

10         So that's been the subject of discovery.  And

11  to the extent that we did allege that Lawson was in

12  violation of the injunction, obviously a violation of

13  the injunction would include the continuing and

14  ongoing maintenance and support and encouragement of

15  its customers' use of the original infringing systems.

16         MR. THOMASCH:  Your Honor, if I might briefly

17  respond.

18         THE COURT:  Yes, go ahead.

19         MR. THOMASCH:  I just would like to clarify

20  that, one, as far as whether the issue is new or not,

21  there was discovery about it.  That's not disputed.

22  What I meant to say is it has not been part of the

23  discussion as to what this hearing would be about at

24  all in my memory at any time.  And we have repeatedly

25  requested that there actually be a petition that

1   alleged what it is that we're said to have done and

2   the basis for it for contempt.  And we have not

3   received one with regard to this issue.

4          The only thing that there was was a motion

5   seeking permission, an order to show -- I'm sorry.

6   Seeking an order to show cause as to why we shouldn't

7   be held in contempt.  But that related to the alleged

8   lack of a colorable difference between the old systems

9   and the redesign systems.  And that's the case that we

10  expected to go to a hearing on on April 2 and which

11  we're ready.  If Your Honor wants broader issues, we

12  will handle them.

13         The questions that came up at the deposition

14  were with regard to, in the abstract, the status of

15  customers who downloaded RQC.  This is computer

16  software.  So they downloaded it.  But had they gone

17  the next step and installed it and were they running

18  it in production?  And witnesses said, Well, we didn't

19  know about that.

20         What we also put out in interrogatories that

21  clarified that before any support was given to those

22  customers, their status was checked, and only

23  customers who were confirmed to have installed and

24  implemented RQC were eligible to get service during

25  the period in which the injunction was in effect

1  against them.

2       There could have been service of RSS

3  customers who were health care customers in the

4  six-month period where the injunction was not

5  implemented against them, but we've been very strict

6  in not providing service to anyone without having

7  confirmed that they had implemented RQC.

8       Indeed, after the depositions, we went back

9  and we rechecked with every customer and confirmed

10  that every customer is using RQC in its production

11  mode.  And if that issue is to be tried, we will

12  supplement our discovery responses and we will bring

13  that evidence to court because it's simply a question

14  of what were we prohibited from doing.  We were

15  prohibited from providing support to people who were

16  still using the old system, and we have not done that.

17  We have not violated the order at all.  But that isn't

18  the issue that we thought the Court teed up in its

19  order of January 24.

20       MR. MERRITT:  Judge Payne, this is Craig

21  Merritt.  You had asked a question a moment ago about

22  ePlus's early papers on the contempt proceeding and

23  what was addressed in those.  I've taken a quick look,

24  and if you're able to pull up docket No. 808, it's an

25  ePlus reply brief filed on September 23, 2011.

```
 1              THE COURT:  Just a minute.  What is it?
 2              MR. MERRITT:  It's document 808.
 3              THE COURT:  There isn't any 808.
 4              MR. MERRITT:  It was filed September 23,
 5    2011.  Docket No. 808.
 6              THE COURT:  These docket numbers are out of
 7    order.  Okay.  Okay.  Where is it?
 8              MR. MERRITT:  In any event --
 9              THE COURT:  Where is it?  What page?
10              MR. MERRITT:  It's page 15.
11              THE COURT:  Okay.  Let me get there.
12              MR. MERRITT:  Yes, sir.
13              THE COURT:  All right.
14              MR. MERRITT:  You'll see the heading "D," and
15    as early as September 23, 2011, ePlus had put in
16    contention its view that Lawson was continuing to
17    encourage its customers to keep using the infringing
18    systems that included RSS.
19              Now, I don't know --
20              THE COURT:  Wait just a minute.  I don't see
21    that entry on page 15.
22              MR. STRAPP:  Your Honor, the page number at
23    the bottom of the page is 13.
24              MR. MERRITT:  It's page 13.  I'm sorry.  I
25    was looking at the top at the Court's numbering.  My
```

1    apologies.

2              THE COURT:  Page 13.  Okay.

3              MR. MERRITT:  And you'll see the subtopic

4    heading "D."

5              THE COURT:  "Defendant has violated the

6    injunction order by encouraging its customers to

7    continue using the infringing systems."

8              MR. MERRITT:  And you had asked the question

9    if that issue had been put in play by ePlus's initial

10   papers.  I did find it in the reply.  I haven't had a

11   chance to look at the initial filing, but it's

12   certainly been in play in the case since September 23,

13   2011.

14             I can't speak to Mr. Thomasch's comment about

15   when that may have ceased because we haven't received

16   any updated discovery from Lawson on that, but at that

17   point it was certainly placed in issue by ePlus.

18             MR. THOMASCH:  Craig, may I ask you because I

19   don't have that brief in front of me, does that

20   section that you're referring to have anything to do

21   with the download status versus the installation

22   status or is that predicated on the webinar from June

23   of 2011?

24             MR. MERRITT:  At that point it was predicated

25   on the communications from Lawson to its customers

1   that they were not prohibited from continuing to use

2   the infringing software.

3            MR. THOMASCH:  Okay.  With all due respect,

4   that I would say, I would suggest, is not the issue

5   that was raised in connection with the allegations

6   made in the letter of today by Mr. Strapp, which

7   relate to whether when customers were encouraged to

8   transfer over to RQC, the first step in that process

9   is to download RQC, and it is only after that that you

10  install it and uninstall RSS.  It related to that.

11           I think that you are inadvertently moving to

12  something that sounds like but is actually

13  fundamentally different from what we're talking about.

14           THE COURT:  All right, gentlemen and ladies,

15  this:  I did not intend in any way to limit paragraph

16  B of the order of January the 24th by the terms of

17  paragraph E setting forth the order of proofs on the

18  TiVo issue.  E was designed to deal with the

19  colorability and infringing allocation and to the

20  parts of your letters which had extensively addressed

21  how that ought to be done.  E doesn't limit that which

22  is permitted by B.

23           B permits a hearing on whether Lawson at any

24  time after May 23, 2011, was in violation of the order

25  entered into on that date, except you don't have the

1  prohibitions that are precluded or excluded from that

2  reach of that provision.

3       Now, in my judgment, you have to go look at

4  the petition for an order to show cause and the

5  materials submitted in connection therewith in order

6  to identify the issues on which the contempt hearing

7  is going to be had as to whether or not conduct

8  constitutes contempt or not because that's what's

9  framed the question.

10       I have no idea whether there have been

11  pleadings that have amended the original petition.

12  And I can't look at it now and don't know.  But one

13  way or the other, you-all can sort all that out.

14       However, I do believe that evidence

15  respecting the state of mind of Lawson is something

16  that can be considered, and evidence of the type

17  you're talking about may be probative on that topic

18  even if it's not the predicate for a finding of

19  contempt, if you understand the distinction I'm

20  drawing.  Do you?

21       MR. MERRITT:  Yes, sir.

22       THE COURT:  All right.  So I think you-all

23  have some homework to do, both of you, to sort that

24  out.

25       And I agree with Mr. Thomasch that I want to

1    hear the things dealt with in E1 and E2 in that order

2    and discretely because then I've got a record

3    altogether at one place in which to make findings.

4    And I don't know that this kind of information is

5    helpful even if it's a predicate for contempt as

6    opposed to an evidence of state of mind or evidence of

7    contemptuous conduct of some kind.

8            I hope it can be presented.  I'd like to have

9    it presented separately.  And I hear Mr. Strapp and

10   Mr. Thomasch basically saying that that's a good idea,

11   and I do, too.

12           MR. MERRITT:  Judge Payne, may I ask a

13   question by way of clarification?

14           THE COURT:  I always get in trouble when you

15   do that.

16           MR. MERRITT:  To use the simplest example I

17   can think of, let's take someone like Dr. Weaver, who

18   is an expert who will, I believe, be addressing both

19   colorability and infringement.

20           Does the Court anticipate that we would call

21   him once to deal with colorability, and then there

22   will be some sort of a gatekeeping process by the

23   Court, and then we'll be asked to call him a second

24   time?

25           THE COURT:  There won't be any gatekeeping in

1  the sense of dealing with any issue.  It's just I want

2  it all to be in one place at one time so that I

3  understand what you-all, each of you, think is the

4  evidence on the colorability question and the evidence

5  of the infringement question.  I think it may be you

6  have to call them back in order to do that, but I

7  don't envision any decisional process between the two.

8          MR. MERRITT:  That's what we were trying to

9  figure out because, as a practical matter, just

10 putting a witness on, there are a couple ways to do

11 it.  We can call the witness twice or, since this is a

12 bench proceeding, we can say, Your Honor, we're going

13 to ask Dr. Weaver about the colorability issue.  And

14 then when that's concluded, simply highlight that

15 we're moving on to another issue.  We just want to be

16 sure that we present the proof in the way you would

17 like to see us do it.

18         THE COURT:  I do understand that mode of

19 proof, but I think in this in instance, it's going to

20 be easier to call them back.  And the same thing for

21 you.  And in fact, gentlemen, just a minute, and

22 ladies, excuse me.  I need to get my copy of my order.

23         Yes.  The order provides, this is what I

24 thought, that all of the evidence on colorability from

25 both sides, opening, response and reply, will come in

1  as what's called the first offering, and then the

2  second offering, all of the evidence from each side

3  will come in on that issue.  That's what the meaning

4  of E3 is.

5          MR. THOMASCH:  Understood, Your Honor.

6          THE COURT:  And we can put in the evidence of

7  the other -- if other infringing conduct has been

8  charged and discovered, then it can be considered as

9  other infringing conduct.

10         If it comes in as evidence of a state of mind

11 or for some other purpose, it can be presented apart

12 from these two locations, but it will be considered,

13 assuming that it's pertinent.

14         All right.  Are those the two things that

15 were in your letter, I believe?

16         MR. STRAPP:  Yes, Your Honor.

17         THE COURT:  All right.  Now, is there

18 anything else that you folks want to take up?

19         MR. MERRITT:  Not from the ePlus side.

20         MR. THOMASCH:  There is one item from

21 Lawson's side.

22         THE COURT:  What's that, sir?

23         MR. THOMASCH:  And that is, Your Honor,

24 briefly, we're in an unusual situation now as the case

25 has been brought down to the changes relevant with

1   respect to Claim 26 where we have identified two

2   changes.  What the changes are are not in dispute at

3   all.  The functional effect of the changes is not in

4   dispute.

5        What's in dispute is the significance of

6   those changes from not significant at all to case

7   dispositive, prove our point.  And that issue,

8   frankly, depends largely on what was the basis for

9   claiming that Claim 26 was infringed at the first

10  trial.

11       The only place where the real colorability

12  evidence is addressed, and our arguments are addressed

13  in ePlus's submission on contempt, is at page 16 of

14  their submission.  In the last paragraph, they allege

15  what they did not rely on.  They say twice, We did not

16  rely on certain evidence to prove infringement of

17  Claim 26.

18       They do not say what they did rely on to

19  prove infringement of Claim 26.  And we would contend

20  that we have shown what they relied on and that's why

21  our changes are very significant.

22       THE COURT:  What submissions are you speaking

23  of?

24       MR. THOMASCH:  Your Honor, in the order that

25  we've been discussing of January 24, 2013, docket

1    1002, you called for submissions on page 2, paragraph

2    F.  You asked for a submission from ePlus that was

3    made on February 11.  And it is that submission on

4    page 16 --

5            THE COURT:  What's the docket number of that?

6            MR. THOMASCH:  I do not have, I'm sorry, Your

7    Honor, the docket number of ePlus's submission of that

8    date.

9            THE COURT:  What date was it submitted?

10           MR. THOMASCH:  It was submitted on

11   February 11 of 2013.  It's called, "Plaintiff ePlus,

12   Inc.'s Prehearing Statement Of Position On Contempt."

13           THE COURT:  That would be 1008?

14           MR. THOMASCH:  That sounds approximately

15   right.

16           THE COURT:  Well, it's sealed so I can't see

17   it.  You-all have put it in secret, so I can't see it.

18           MR. THOMASCH:  Your Honor, I just would read

19   one of the two sentences to Your Honor that says,

20   "ePlus did not rely upon the capability of including

21   items from a punchout catalog on the same requisition

22   as items found in searching the catalogs in the item

23   master to prove infringement of Claim 26 because there

24   is no such requirement in any element of Claim 26.

25   And we would disagree with that statement.

1          I think both parties know that that change

2   has been made so it no longer can punch out, put on

3   the same requisition a punchout search and an item

4   master search.   Everybody agrees that can no longer be

5   done and it used to be something that could be done.

6   And they're saying that that's, in a sense,

7   irrelevant, and we're saying it's essential.   And the

8   relevance or lack thereof of that change depends

9   primarily on what was contended and proved at the

10  merits trial when Dr. Weaver, in particular, testified

11  and did his demonstrations, we would allege.

12          And TiVo tells us that in defending this

13  case, I believe that Lawson is entitled as a matter of

14  due process to understand what ePlus says that it

15  contended and proved at the first trial and to

16  understand that so we can rebut it.

17          They are now saying they didn't rely on that

18  evidence at trial.   We think they did.   And we feel

19  like that really crystallizes this case for Your

20  Honor.   We don't actually have a dispute about what

21  the change is.   We have a dispute about the

22  significance of it, and that dispute ultimately lies

23  in the record from the first trial.   And I don't know

24  how we are to bring that to Your Honor's attention

25  because the hearing on April 2, 3 and 4 seems like a

1  very bad place us to be telling Your Honor what was

2  said at the last trial.

3          TiVo would have suggested to us that that be

4  done pretrial.  We have had seven letters between us

5  to the Court on this subject.  We have consistently

6  requested in those letters that plaintiff be required

7  to tell us what they believe was contended and proved,

8  and we be required to respond to that.  And we would

9  once again ask the Court to enact that sort of

10  requirement before we go to trial because we think

11  that crystallizes the dispute about the significance

12  of the undisputed changes that were indeed made to

13  punchout and to Configurations 3 and 5.

14          MR. STRAPP:  Your Honor, this is Michael

15  Strapp.  Can I respond to that, please?

16          THE COURT:  Sure.

17          MR. STRAPP:  Our understanding of TiVo and

18  all of the cases that have applied TiVo, the district

19  courts that have had contempt hearings post-TiVo, is

20  that TiVo does not require on a contempt hearing to

21  reopen the trial record, pore through the transcript,

22  try to decipher the black box that was the jury room

23  and make out what the verdict was.

24          In fact, no case post-TiVo has so held as

25  Lawson has suggested TiVo should be interpreted.  And

1   we set this all out in extensive letter briefing

2   several months ago to Your Honor.

3        In fact, there is one case that we cited in

4   our opening brief, and that will also be featured in

5   the reply brief that we will be filing tomorrow, on

6   the 8th, called "Arlington Industries," in which this

7   issue was squarely presented to a District Court.

8        The question was whether or not a party who

9   was contending that it had made certain modifications

10  to an infringing product should be permitted to even

11  present evidence regarding those changes if the claim

12  that was at issue in that case didn't require the

13  feature that had been changed.

14       And what the District Court said in this case

15  in Arlington Industries was, it granted a motion in

16  limine to exclude that evidence because it said,

17  quoting from TiVo, that if a modification was made to

18  a "randomly chosen feature," that can't be the basis

19  for a finding of more than colorable differences here.

20       And what that means -- and here is probably

21  the crux of the disagreement, is that you don't

22  measure whether or not a change is relevant to a prior

23  finding of infringement based on poring through a

24  thousand-page trial record, but rather you look to the

25  element of the claim that was found to infringe to

1    make that benchmark determination.

2          And if you find that the element of the claim

3    doesn't require the feature or the functionality that

4    was modified or removed, then as a matter of law there

5    cannot be a finding of more than colorable

6    differences.

7          That's the inquiry that TiVo directs courts

8    to undertake, and that's how TiVo has been interpreted

9    by every court that has looked at TiVo after that

10   decision was handed down by the Federal Circuit in

11   2011.  Not a single court has interpreted it the way

12   Lawson urges Your Honor to interpret it.

13         So we think that the contempt proceeding

14   should go forward as planned.  There doesn't need to

15   be some sort of prehearing issue on this front.  It

16   will be teed up in the briefs that have already been

17   filed and in the reply briefs that will be filed, but

18   we think it's simply a matter of comparing the

19   elements of Claim 26, the modification that has been

20   made by Lawson, and determining whether or not that

21   modification is relevant to any of the claim elements

22   in Claim 26.

23         MR. THOMASCH:  Your Honor, that does

24   crystallize the fact that we are seeing this

25   completely differently, we are reading the law

1   differently, and we're going into trial with a
2   fundamental misunderstanding of what the trial is.
3          TiVo talks about "contended" and "proved at
4   trial."  The Arlington case cited by Mr. Strapp did
5   not involve a trial.  There was never a trial in
6   Arlington.  There was a confession of judgment.  It
7   was a totally different situation.  Here there was a
8   trial.  The trial left an extensive verdict.  The
9   verdict does delineate between different
10  configurations and different product claims.
11         TiVo tells you, you must sort through that
12  and you don't look at the claims.  TiVo rejected the
13  analysis of colorability that is derived from the
14  infringement analysis of the claims.  The first stage
15  is a product-to-product comparison, and here is where
16  our product changed fundamentally, and everyone knows
17  it.  There's no dispute about it.  And what changed
18  was the functionality that was demonstrated to the
19  jury as the proof of infringement.  And we believe
20  that if we could get past this legal issue of what
21  TiVo says, we could have judgment as a matter of law.
22         THE COURT:  Mr. Thomasch, what you really
23  want to do is go into the mind of the jury and see
24  what the jury decided and that isn't what TiVo
25  requires.  And Mr. Strapp's got it, I think in my

1   judgment, about right.  This is rehashing a whole

2   bunch of communication that went on with eight or nine

3   letters that I read through before I issued the order

4   of January 24.

5           So I think we'll proceed as indicated and

6   without having a dive into the mind of the jury in the

7   other trial.  So I think that will take care of that.

8   I hope it does.

9           In any event, how many witnesses do you

10  expect to call, Mr. Strapp?

11          MR. STRAPP:  Your Honor, we anticipate

12  calling -- Dr. Weaver will be our one technical

13  expert.  And we also have a remedies damages expert.

14  That's Dr. Ugone.  Those are our two experts.

15          In terms of fact witnesses, we don't have any

16  ePlus witnesses we intend to call, but we do intend to

17  call adversely in our case Mr. Christopherson,

18  Mr. Lohkamp and Mr. Hanson.

19          THE COURT:  Are you playing part of

20  Mr. Hager's deposition if he doesn't come or call him

21  in?

22          MR. MERRITT:  We would like to call him and

23  have him there in person.  If not, we will go to plans

24  B or C, as previously discussed.

25          THE COURT:  Well, I hope we can be here in

1   person.

2         MR. MERRITT:  Well, we would certainly prefer

3   that and we understand that Mr. Thomasch would as

4   well.

5         THE COURT:  Yes.  How many witnesses are you

6   going to put on, Mr. Thomasch?

7         MR. THOMASCH:  Your Honor, actually, I do not

8   have that at the moment.  We certainly have a

9   technical expert and we have a damages expert.  We

10  will be questioning the witnesses that are in our

11  employ that are called during the plaintiff's case.

12  We may have some additional witnesses that will be on

13  our witness list at that time.  We have not yet made a

14  final decision.

15        THE COURT:  But how many in order of

16  magnitude are you thinking you're going to draft from?

17        MR. THOMASCH:  I would expect that with

18  the -- counting the three that are our employees that

19  are going to be called by the plaintiff, plus our two,

20  that's five witnesses, and then I would expect that

21  order of magnitude is zero to four more.

22        THE COURT:  Excuse me a minute.  Are you all

23  hearing any clicking on your line?

24        MR. THOMASCH:  Yes, Your Honor, but it has

25  not prevented us from being able to hear what's being

1   said.

2           THE COURT:  Do you know what it is?

3           MR. THOMASCH:  No, Your Honor.

4           THE COURT:  Has it been on your line before

5   or do you think it's our on our line?  We've had some

6   problems with our phone.

7           MR. THOMASCH:  We have not had problems, but

8   I'm in a conference room, and I can't say that I've

9   used this phone enough to be certain, Your Honor.

10          THE COURT:  Well, it may be.  I don't know.

11  I can hear it.

12          MR. THOMASCH:  Sounds like a creaky rocking

13  chair, Your Honor, but no one here is in a rocking

14  chair.

15          THE COURT:  Yeah.  It's a little early for

16  that for you all.

17          The schedule here, how many -- let me go at

18  it this way:  How many exhibits do you all anticipate

19  filing for ePlus and for Lawson, respectively?

20  Mr. Strapp?

21          MR. STRAPP:  Your Honor, we haven't finalized

22  our list of exhibits.  We do intend to provide a list

23  of exhibits to Lawson next week.  We're in the process

24  of trying to narrow that list down to a manageable

25  size, but we don't anticipate it's going to be a large

1    volume.

2             THE COURT:  This is the 7th of March and

3    you're proposing to do that on the 12th.

4             MR. STRAPP:  Right.

5             THE COURT:  How about you, Mr. Thomasch?

6             MR. THOMASCH:  Your Honor, I'm sorry.  We

7    will do it after Mr. Strapp, and I also don't have

8    that number, but I am hoping it will be considerably

9    fewer than what was originally in the case and trying

10   to make a list of ones that will actually come into

11   evidence.

12            THE COURT:  The 11th is Monday.  I'm trying

13   to see whether you-all don't need to advance this

14   schedule a little bit because I don't get until the

15   28th of March a resolution of what it is that has been

16   agreed to and then we start the hearing on the 2nd of

17   April.  That's pretty --

18            MR. THOMASCH:  Your Honor, what day would you

19   like them?

20            THE COURT:  I'd like to have all of this

21   concluded by the 20th of March.  I'd like to have all

22   of those exchanges finished by the 20th of March.

23   Could you all tender another order that has that in

24   there or call in here and just tell Mr. Beerbower what

25   dates you want to put in for March 12, 15, 21, 25 and

1  28, and he can pencil them in, and I'll initial them

2  and just sign this order?

3          MR. THOMASCH:  Yes, Your Honor.

4          THE COURT:  All right.  You-all call

5  Mr. Beerbower and tell him that.  You-all can talk

6  about it after this call.

7          Now, is that everything for you-all?

8          MR. MERRITT:  Judge, with regard to the

9  Monday 11:30 deadline on Mr. Hager, was the Court

10 contemplating a conference call or just giving you

11 notice by then of what the resolution is?

12         THE COURT:  I'd like to have a call so we can

13 resolve everything if there is anything to resolve.

14         MR. MERRITT:  Judge, let me ask you, since

15 Mr. Hager is separately represented, would you like us

16 to give Mr. Witthoefft notice of that so that we can

17 get Mr. Hager's definitive position at that time?

18         THE COURT:  Absolutely.

19         MR. MERRITT:  I will do that.

20         THE COURT:  And he can sit in on the call if

21 he wants to.  He's invited, but I can't order him to

22 be here.

23         All right.  Is that it for you-all?

24         MR. THOMASCH:  Your Honor, it's Mr. Thomasch

25 for Lawson.  Only to note, Your Honor, that yesterday

1  we made a motion pursuant to Rule 60(b)(5).  That

2  motion by the normal briefing schedule will be fully

3  briefed before the time for the hearing, and we would

4  request oral argument on the motion at the Court's

5  earliest convenience.

6       THE COURT:  Well, I have to tell you that

7  back in early February, I was preparing to convene a

8  conference call with you-all to ask you about the

9  proceedings that the Federal Circuit required which

10  said to consider how to modify the injunction or

11  whatever the order of the Court said.

12       Then I learned of Mr. Robertson's untimely

13  and sad passing.  And the other thing was I didn't

14  think I had any authority to do any of that until the

15  mandate of the Federal Circuit was issued.  And then

16  on the 11th, three days later, the mandate was issued,

17  but you-all all had said put everything on hold until

18  you get things sorted out and can talk about where you

19  want to go and go where you want to go.

20       So I regard that I need to deal with the

21  question of the injunction and the modification of it

22  and would like to set a schedule for that.  But, now,

23  do you view that this is a substitute for that, Mr.

24  Thomasch?  I haven't read your motion.  I know you

25  have filed one, but I haven't read it.

1        MR. THOMASCH:  Well, it does make a formal

2   motion to request that the Court address the Federal

3   Circuit mandate and presents our position as to what

4   the proper resolution of addressing it would be.  Your

5   Honor did require, you'll recall, earlier this year

6   for the parties to submit position statements with

7   respect to the effect of the Federal Circuit decision

8   on the injunction as well as on the contempt

9   proceeding as separate issues.

10        At that time, however, the mandate had not

11   issued.  We put our position in to Your Honor.  Then

12   later the mandate issued, and we wanted to make sure

13   that we had made a formal motion and not simply relied

14   on having briefed our preferences, but actually --

15        THE COURT:  Well, it all got held up because

16   of the untimely death of Mr. Robertson.  You took the

17   position in your letter or position statement that the

18   Court didn't have jurisdiction to deal with the

19   injunction until the mandate issued.  And I think

20   that's right.  All of it was up before the Federal

21   Circuit.

22        So you say you filed this under Rule 60?

23        MR. THOMASCH:  Yes.  In other words, we have

24   made a motion, a formal motion, to dissolve or modify

25   the injunction, and Rule 60(b)(5), of course, allows

1      that when the underpinning of an order has been

2      reversed or vacated or where changed circumstances

3      would make the prospective continuation of an order

4      unfair.  And we believe that both of those grounds

5      apply here.

6              So now that the mandate was issued 3 1/2

7      weeks ago, we wanted to simply formally request that

8      the Court address that.  We believe that two things

9      are central.  One is that in order to determine

10     whether there should be an injunction going forward,

11     it is incumbent on the Court to reevaluate the

12     four-factor test under eBay.  And we believe that the

13     existing record would not support the continuation of

14     an injunction.  If the Court were to have a new --

15             THE COURT:  I mean, do you demonstrate why

16     you think that in this paper that you filed?

17             MR. THOMASCH:  Yes, we do, Your Honor.

18             THE COURT:  Okay.  All right.

19             MR. THOMASCH:  We incorporated by reference

20     our prior briefing because we didn't want to bog the

21     Court down, but it is essentially a self-contained

22     document, Your Honor, that says why we believe we're

23     entitled to the relief.

24             THE COURT:  Then you have to file a reply

25     here for ePlus.  So you-all need to -- when are you

1   going to do that?

2        MR. STRAPP:  Your Honor, I believe that our

3   opposition is due on March 18.  That's when we

4   intended to file.

5        THE COURT:  All right.  So you're filing it

6   in accord with the rules.

7        MR. MERRITT:  Yes, sir.

8        THE COURT:  All right.  That's fine.  I'll

9   hear the rely then and we'll go from there.

10       All right.  That helps me.  One of the

11  reasons I wanted to talk to you-all today was how do

12  we proceed from here as respects satisfying the order

13  of the Circuit now that the mandate has been issued.

14       All right.  I'll await being informed on that

15  and that takes care of everything, I think.  So thank

16  you all for being available and I'll talk to you on

17  Monday.

18       MR. MERRITT:  Thank you, Your Honor.

19       MR. THOMASCH:  Thank you, Your Honor.

20       THE COURT:  Bye-bye.

21       (The proceedings were adjourned at 4:35 PM.)

22       I, Diane J. Daffron, certify that the

23  foregoing is a correct transcript of the record of

24  proceedings in the above-entitled matter.

25
        _____        _____
        DIANE J. DAFFRON, RPR, CCR        DATE.