# Exhibit A

PAGES 1 - 230

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE PHYLLIS J. HAMILTON, JUDGE

FRESENIUS MEDICAL CARE      )
HOLDINGS, INC. AND          )
FRESENIUS USA, INC.,        )
                            )
        PLAINTIFFS/         )          NO. C-03-1431 PJH
    COUNTERDEFENDANTS,      )
                            )
  VS.                       )          FRIDAY, DECEMBER 2, 2011
                            )
BAXTER INTERNATIONAL,       )          OAKLAND, CALIFORNIA
INC., AND BAXTER HEALTHCARE )
CORPORATION,                )
                            )
        DEFENDANTS/         )
    COUNTERCLAIMANTS.       )
_____)

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

**FOR PLAINTIFFS:**           FISH & RICHARDSON
                             12390 EL CAMINO REAL
                             SAN DIEGO, CALIFORNIA 92130
                      BY:    JUANITA R. BROOKS, ESQUIRE

                             FISH & RICHARDSON
                             60 SOUTH SIXTH STREET, SUITE 3300
                             MINNEAPOLIS, MINNESOTA 55402
                      BY:    MICHAEL E. FLOREY, ESQUIRE

**FOR DEFENDANTS:**           K&L GATES
                             70 WEST MADISON STREET, SUITE 3300
                             CHICAGO, ILLINOIS 60602
                      BY:    MICHAEL J. ABERNATHY, ESQUIRE
                             SANJAY K. MURTHY, ESQUIRE
                             BRIAN J. ARNOLD, ESQUIRE

**ALSO PRESENT:**             JOSEPH P. REAGEN,
                             ASSISTANT GENERAL COUNSEL IP BAXTER

**REPORTED BY:**              DIANE E. SKILLMAN, CSR 4909, RPR, FCRR
                             OFFICIAL COURT REPORTER

I N D E X

PLAINTIFFS' WITNESSES:                                          PAGE

**CRNKOVICH, MARTIN**

DIRECT EXAMINATION BY MS. BROOKS                                129

CROSS-EXAMINATION BY MR. ABERNATHY                             154

REDIRECT EXAMINATION BY MS. BROOKS                             170

**LIPPS, BEN**

DIRECT EXAMINATION BY MS. BROOKS                                174

CROSS-EXAMINATION BY MR. ABERNATHY                             191

**RUBINFELD, DANIEL**

DIRECT EXAMINATION BY MR. FLOREY                                202

CROSS-EXAMINATION BY MR. ABERNATHY                             215


DEFENDANTS' WITNESSES:

**DEN UYL, R. BRUCE**

DIRECT EXAMINATION BY MR. MURTHY                                 50

CROSS-EXAMINATION BY MS. BROOKS                                 72

REDIRECT EXAMINATION BY MR. MURTHY                             106

RECROSS-EXAMINATION BY MS. BROOKS                              107

| | |
|---|---|
| 1 | <u>FRIDAY, DECEMBER 2, 2011</u>                    <u>9:00 A.M.</u> |
| 2 | P R O C E E D I N G S |
| 3 | **THE CLERK:**  CALLING CIVIL CASE NUMBER 03-1431 |
| 4 | FRESENIUS U.S.A. VERSUS BAXTER INTERNATIONAL. |
| 5 | COUNSEL, PLEASE STEP FORWARD AND STATE YOUR |
| 6 | APPEARANCES. |
| 7 | **MS. BROOKS:**  GOOD MORNING, YOUR HONOR.  JUANITA |
| 8 | BROOKS AND MICHAEL FLOREY ON BEHALF OF FRESENIUS.  AND ALSO AT |
| 9 | THE TABLE WITH US IS DR. BENJAMIN LIPPS. |
| 10 | **THE COURT:**  ALL RIGHT.  GOOD MORNING. |
| 11 | **MR. ABERNATHY:**  GOOD MORNING, YOUR HONOR.  MICHAEL |
| 12 | ABERNATHY ON BEHALF OF BAXTER.  WITH ME TODAY ARE MY |
| 13 | COLLEAGUES, SANJAY MURTHY, BRIAN ARNOLD AND JOSEPH REAGEN FROM |
| 14 | BAXTER.  MR. REAGEN IS THE ASSISTANT GENERAL COUNSEL FOR |
| 15 | BAXTER. |
| 16 | **THE COURT:**  ALL RIGHT.  GOOD MORNING. |
| 17 | NOW I WAS JUST ADVISED THAT YOU ALL HAVE BROUGHT |
| 18 | WITNESSES.  I DIDN'T KNOW EXACTLY HOW YOU WANTED TO PROCEED |
| 19 | TODAY.  I AM HOPEFUL THAT WE CAN CONCLUDE IN A HALF A DAY.  I |
| 20 | AM NOT SURE WHAT YOU HAVE IN MIND FOR ME.  OR WHAT THESE |
| 21 | WITNESSES ARE GOING TO TESTIFY ABOUT. |
| 22 | KEEP IN MIND THIS WAS NOT A CASE THAT I TRIED.  IT'S |
| 23 | VERY DIFFICULT FOR A JUDGE WHO HASN'T TRIED THE CASE TO WORK ON |
| 24 | THE KINDS OF ISSUES THAT YOU ALL HAVE PUT FORWARD SINCE I DON'T |
| 25 | KNOW WHAT THE TRIAL JUDGE WAS THINKING.  AND ONE OF THE |

1    QUESTIONS IS WHAT HER ANALYSIS WAS IN THE ROYALTY -- ON THE

2    ROYALTY ISSUE.

3            THE FEDERAL CIRCUIT'S OPINION IS NOT ENTIRELY CLEAR

4    ABOUT WHAT THEY INTENDED AS WELL, SO WHAT YOU ARE ASKING ME TO

5    DO IS SORT OF TAKE A NEW LOOK AT IT, I GUESS, TO TRY TO

6    UNDERSTAND WHAT THE TRIAL JUDGE AND THE APPELLATE COURT HAD IN

7    MIND, AND TO COME UP WITH A RESOLUTION.

8            I THINK IT'S REALLY A VERY DIFFICULT QUESTION.  SO,

9    KEEP IN MIND WHAT I NEED YOU TO DO IS TO TRY TO JUST POINT ME

10   IN THE RIGHT DIRECTION AND GIVE ME SOME BASIS FOR FINDING ON

11   ONE WAY OR THE OTHER.  CHANCES ARE, I AM NOT GOING TO INVENT

12   SOMETHING OUT OF WHOLE CLOTH.  CHANCES ARE I AM GOING TO BE

13   PERSUADED BY ONE POSITION OR ANOTHER.  I DOUBT I AM GOING TO BE

14   ABLE TO FIGURE OUT SOMETHING DOWN THE MIDDLE OR SOMETHING

15   ENTIRELY DIFFERENT TO DO.  SO IT'S ONE OR THE OTHER.

16           OKAY?

17           **MR. ABERNATHY:**  UNDERSTOOD, YOUR HONOR.

18           **THE COURT:**  ALL RIGHT.  SO LET'S START.  FIRST,

19   PLAINTIFF HAS THREE WITNESSES.  YOU WANT TO CALL THE WITNESSES

20   FIRST OR DO YOU WANT TO MAKE SOME KIND OF A STATEMENT FIRST?

21           **MS. BROOKS:**  WITH THE COURT'S PERMISSION, YOUR

22   HONOR, IF WE CAN MAKE A STATEMENT SO WE CAN PUT INTO

23   PERSPECTIVE WHAT THE WITNESSES WILL BE TALKING TO YOUR HONOR

24   ABOUT.

25           JUST TO GIVE A VERY, IF IT'S POSSIBLE, BRIEF

```
1   PROCEDURAL HISTORY OF THE CASE.

2               THIS CASE WAS ORIGINALLY BROUGHT BY FRESENIUS AS A

3   DECLARATORY JUDGMENT ACTION AGAINST BAXTER WHERE WE ASKED THAT

4   WE RECEIVE A DECLARATORY JUDGMENT THAT THE ASSERTED CLAIMS THAT

5   BAXTER WAS THREATENING TO ASSERT WERE INVALID AND/OR NOT

6   INFRINGED.

7               AFTER A LENGTHY PERIOD OF TIME, SEVERAL CLAIM

8   CONSTRUCTION HEARINGS, ESSENTIALLY AT THE END OF THE DAY BEFORE

9   THE FIRST TRIAL, WE WERE LEFT WITH ONLY TWO CLAIMS UPON WHICH

10  WE HAD A NONINFRINGEMENT DEFENSE.  THE REST OF THE CLAIMS,

11  WHICH WERE FOUR PATENTS, AND I BELIEVE 16, 17 ASSERTED CLAIMS,

12  WE EITHER HAD AN INVALIDITY DEFENSE BASED ON ANTICIPATION OR AN

13  INVALIDITY DEFENSE BASED ON OBVIOUSNESS.

14              WE THEN WENT THROUGH A LENGTHY TRIAL IN JUNE, I

15  BELIEVE IT WAS, OF 2006.  I THINK PERHAPS EVEN IN THIS

16  COURTROOM BEFORE JUDGE ARMSTRONG.  AT THE END OF THAT TRIAL,

17  THE JURY FOUND ALL OF THE ASSERTED CLAIMS INVALID, EITHER AS

18  ANTICIPATED OR AS OBVIOUS, AND THE TWO CLAIMS FOR WHICH WE HAD

19  A NONINFRINGEMENT DEFENSE, THE JURY FOUND THOSE CLAIMS NOT

20  INFRINGED.

21              WE THEN WENT THROUGH POST-TRIAL MOTIONS.  IN JANUARY

22  OF --

23              THE COURT:  SO, IN OTHER WORDS, FRESENIUS PREVAILED.

24              MS. BROOKS:  YES, YOUR HONOR.

25              THE COURT:  IN THE ENTIRETY.
```

1       **MS. BROOKS:** IN ITS ENTIRETY. HENCE, WHY THERE WAS

2  NO DAMAGES BECAUSE WE PREVAILED.

3       WHAT THEN HAPPENED IS WE WENT THROUGH POST-TRIAL

4  MOTIONS, AND IN JANUARY OF 2007, JUDGE ARMSTRONG GRANTED JMOL

5  FOR BAXTER AND FOUND THAT OUR EXPERTS' TESTIMONY HAD BEEN -- WE

6  HAD, I THINK, FOUR EXPERTS THAT WE CALLED, HAD BEEN TOO

7  GENERALIZED AND CONCLUSORY, THEREFORE, WE HADN'T MET OUR BURDEN

8  BY CLEAR AND CONVINCING EVIDENCE THAT THE PATENTS WERE, INDEED,

9  INVALID. AND SO ENTERED JUDGMENT ON BEHALF OF BAXTER AND ALSO

10  SET ASIDE THE JURY'S FINDING OF NONINFRINGEMENT, BUT DIDN'T

11  ENTER JUDGMENT FOR BAXTER ON THAT.

12       WE THEN PROCEEDED TO COME TO A DAMAGES TRIAL IN

13  OCTOBER OF 2007. SHORTLY BEFORE THAT TRIAL -- SO THE TRIAL WAS

14  ACTUALLY WAS GOING TO BE ON TWO THINGS. ONE, ON THE TWO CLAIMS

15  FOR WHICH WE HAD A NONINFRINGEMENT DEFENSE; THAT WAS GOING TO

16  GET RETRIED, AND THEN DAMAGES FOR THE OTHER CLAIMS WHERE WE DID

17  NOT HAVE A NONINFRINGEMENT DEFENSE, BUT WHICH HER HONOR HAD NOW

18  FOUND VALID AS A MATTER OF LAW.

19       SHORTLY BEFORE THAT TRIAL, BAXTER DROPPED THE ONE

20  REMAINING PATENT TO WHICH WE HAD A NONINFRINGEMENT DEFENSE, AND

21  SO WE WENT TO A DAMAGES TRIAL ON THREE PATENTS. THAT DAMAGES

22  TRIAL, I BELIEVE, TOOK PLACE OVER THE COURSE OF APPROXIMATELY A

23  WEEK.

24       AT THE TRIAL, BAXTER WAS ASKING FOR DAMAGES ON TWO

25  COMPONENTS. ONE WAS THE HEMODIALYSIS MACHINE ITSELF, AND OUR

1   WITNESSES WILL WALK YOU THROUGH, YOUR HONOR, THE DIFFERENCE

2   BETWEEN HEMODIALYSIS MACHINE AND A PERITONEAL DIALYSIS MACHINE

3   THAT I KNOW YOUR HONOR BECAME QUITE FAMILIAR WITH.

4           THE DIALYSIS MACHINE ITSELF, THE CORE OF THE

5   INFRINGEMENT ALLEGATION WAS THAT WE HAD PUT A TOUCHSCREEN ON

6   IT.  AND BAXTER HAD PREVIOUSLY PURCHASED A COMPANY CALLED

7   ALTHIN.  AND IN PURCHASING ALTHIN, BAXTER HAD PURCHASED ALTHIN

8   MACHINES, CALLED THE TINA, PLUS PATENTS THAT COVERED THE TINA,

9   AND SOME OTHER -- SOME OTHER TECHNOLOGY FROM ALTHIN.

10          AND SO BAXTER WAS ASSERTING THOSE PATENTS AGAINST

11  THE 2008K MACHINE BECAUSE EACH OF THE CLAIMS -- AND IF I COULD

12  ACTUALLY GO TO THE OPENING SLIDES --

13          **MR. ABERNATHY:**  EXCUSE ME, YOUR HONOR.

14          I THOUGHT WE WERE GOING TO HAVE A PROCEDURAL

15  HISTORY.  WE HAVE THE BURDEN OF PROOF ON THIS MOTION.  IF WE

16  ARE GOING TO GO INTO OPENINGS, I WOULD SUGGEST, SINCE WE HAVE

17  THE BURDEN, WE WOULD PROCEED FIRST.

18          I FIND IT HELPFUL TO HAVE THE PROCEDURAL HISTORY,

19  BUT IF WE ARE GOING TO GET INTO THE MERITS, I WOULD

20  RESPECTFULLY SUGGEST, WHICH WE HAD AGREED --

21          **THE COURT:**  I DON'T THINK THAT THE ORDER MATTERS.  I

22  AM GOING TO GIVE BOTH SIDES A FULL OPPORTUNITY TO SAY WHATEVER

23  IT IS YOU WANT TO SAY TODAY.

24          **MR. ABERNATHY:**  OKAY.

25          **MS. BROOKS:**  I WAS ACTUALLY STICKING WITH THE

1    PROCEDURAL HISTORY.  I JUST WANTED TO SHOW YOUR HONOR WHAT THE

2    ISSUE WAS NOW AT THE DAMAGES TRIAL.

3            SO THE DAMAGES TRIAL WAS, WHAT WAS THE VALUE OF THE

4    TOUCHSCREEN TO THE OVERALL HEMODIALYSIS MACHINE THE 2008K.

5            FOR THAT, I BELIEVE, BAXTER WAS ASKING FOR A

6    7 PERCENT ROYALTY, WHICH WOULD HAVE AMOUNTED TO APPROXIMATELY

7    $54 MILLION.  IT'S BEEN A WHILE, BUT I THINK ABOUT $54 MILLION

8    OF DAMAGES ON THE MACHINE.

9            SECONDLY, THOUGH, BAXTER WAS ALSO ASKING FOR A

10   ROYALTY ON DISPOSABLES.  AND WHAT DISPOSABLES ARE -- THEY DO

11   NOT COME WITH THE MACHINE.  THEY ARE, INDEED, DISPOSABLES.

12           WE HAVE GOT, FOR EXAMPLE, THE SALINE SOLUTION THAT

13   GETS BOUGHT SEPARATELY.  WE HAVE WHAT ARE CALLED BLOOD LINES

14   AND FISTULAS, WHICH ARE USED WHEN A PATIENT HAS THE TREATMENT

15   THAT THEN, OF COURSE, GETS DISCARDED.

16           AND PROBABLY THE HIGHEST SELLING ITEM IS THE

17   DIALYZER.  AND YOUR HONOR MAY RECALL IN THE PD CASE, DR. LIPPS

18   BRIEFLY TESTIFIED ABOUT THE CREATION -- HIS CREATION OF THE

19   ARTIFICIAL KIDNEY.  THAT'S WHAT THIS IS, IS THE DIALYZER.

20           BAXTER WAS ASKING FOR 91 MILLION IN DAMAGES FOR THE

21   DISPOSABLES UNDER THE THEORY THAT WHEN ONE BOUGHT A MACHINE,

22   THAT THERE WAS SOME PULL-THROUGH OF SALES OF DISPOSABLES AS A

23   RESULT OF THE PURCHASE OF THE MACHINE.

24           **THE COURT:**  ARE THE DISPOSABLES MANUFACTURED AS WELL

25   BY FRESENIUS?

```
 1              MS. BROOKS:  CORRECT, YOUR HONOR.

 2              THE COURT:  AND ARE THEY -- CAN A PATIENT OR A

 3    FACILITY THAT USES ONE OF THESE MACHINES -- WELL, I GUESS IT

 4    WOULDN'T BE A PATIENT, BUT WOULD THE FACILITY BE ABLE TO USE

 5    ANOTHER COMPANY'S DISPOSABLES IN OR IN CONJUNCTION WITH ONE OF

 6    FRESENIUS' MACHINES?

 7              MS. BROOKS:  ABSOLUTELY, YOUR HONOR.  AND THAT

 8    WAS -- IT'S DIFFERENT -- WE HAVE ACTUALLY A HOMECHOICE BACK

 9    THERE (INDICATING).

10              I DON'T KNOW IF YOUR HONOR REMEMBERED THE CASSETTE

11    IN THE HOMECHOICE IS DESIGNED JUST TO BE USED ON THE

12    HOMECHOICE.  AND WE HAD THE LIBERTY, WHERE THE CASSETTE IS JUST

13    FOR THE LIBERTY.

14              THESE ARE MIX AND MATCH.  SO YOU COULD HAVE A BAXTER

15    ALTHIN, FOR EXAMPLE, AND USE A FRESENIUS DIALYZER.  OR YOU

16    COULD HAVE A FRESENIUS 2008K AND USE A BAXTER DIALYZER.  SO

17    THEY ARE COMPLETELY INTERCHANGEABLE.  THERE IS NO NOTHING

18    UNIQUE ABOUT THE DISPOSABLES TO THE MACHINE.

19              BUT BAXTER HAD A THEORY THAT BECAUSE A CUSTOMER

20    MIGHT BUY A MACHINE, EVEN THOUGH THEY MIGHT HAVE THAT MACHINE

21    FOR SEVEN, EIGHT YEARS, THERE MIGHT BE SOME PULL-THROUGH OF

22    FRESENIUS' DISPOSABLES, THEREFORE, THEY HAD A RIGHT TO A

23    7 PERCENT ROYALTY ON ALL DISPOSABLES.

24              THAT CAME TO $91 MILLION, IS WHAT BAXTER WAS ASKING

25    FOR AT THAT TRIAL.  WE THEN WENT THROUGH THE FULL TRIAL.  AND
```

```
1    WHAT WE POINTED OUT TO THE JURY IS THAT THE PATENTS AT ISSUE

2    ARE WHAT ARE CALLED IMPROVEMENT PATENTS.  THEY AREN'T FOR THE

3    CREATION OF A HEMODIALYSIS MACHINE OR FOR THE DEVELOPMENT

4    REALLY OF ANY -- THE POINT OF NOVELTY BEING THAT BAXTER, FOR

5    ALTHIN, THEIR PREDECESSOR, ADMITTEDLY WAS THE FIRST COMPANY TO

6    PUT A TOUCH SCREEN AS THE USER INPUT MECHANISM ON THE -- ON A

7    HEMODIALYSIS MACHINE.

8                    (DOCUMENT DISPLAYED ON SCREEN.)

9             BUT IN THE PATENT ITSELF -- THIS IS FROM THE

10   ABSTRACT.  IT TALKS ABOUT THAT THE PATENTS COVER A NUMBER OF

11   IMPROVEMENTS, INCLUDING USING A TOUCH SCREEN USER INTERFACE.

12   THIS WAS ONE OF THE CLAIMS.

13            THE '027 PATENT, THIS DEPENDENT CLAIM SAYS:

14            "A KIDNEY DIALYSIS MACHINE OF CLAIM 10 WHEREIN

15            THE DATA INPUT DEVICE COMPRISES A TOUCH SCREEN."

16            SO AN EXCEEDINGLY BROAD CLAIM, MEANING IF YOU USED A

17   MOUSE AND A KEYBOARD INSTEAD OF A TOUCH SCREEN TO INPUT THE

18   DATA, THEN YOU WOULD NOT BE INFRINGING THIS CLAIM.

19            THIS WAS ONE OF THE CLAIMS THE JURY FOUND OBVIOUS.

20   AND -- BUT NOW JUDGE ARMSTRONG HAD SET THAT ASIDE.  SO NOW THE

21   JURY IS GOING TO BE ASKED TO MONETIZE, WHAT IS THE VALUE OF

22   THAT TO FRESENIUS.

23            AGAIN, BAXTER ADMITTED IN THE PATENTS KIDNEY

24   DIALYSIS MACHINES WERE WELL-KNOWN IN THE ART, AND THAT EVEN

25   TOUCH SCREENS WERE WELL-KNOWN AND THEY WERE AVAILABLE,
```

1    COMMERCIALLY AVAILABLE OFF-THE-SALE ITEMS FROM COMPANIES --

2    THEY EVEN LISTED A COMPANY CALLED ELOGRAPHICS.

3           WE ACTUALLY CALLED, AT THE FIRST TRIAL, A GENTLEMAN

4    FROM ELOGRAPHICS TO TALK ABOUT THE DEVELOPMENT OF THE TOUCH

5    SCREEN AND HOW EASY IT IS TO INTEGRATE INTO A MEDICAL DEVICE.

6           IN FACT, BAXTER ALSO ADMITTED IN THE PATENT THAT THE

7    USE OF TOUCH SCREENS AS USER INTERFACE DEVICES WERE WELL-KNOWN

8    EVEN ON MEDICAL EQUIPMENT, JUST NOT ON A HEMODIALYSIS MACHINE.

9           THIS WAS ANOTHER CLAIM FROM THE '434 PATENT, WHICH

10   IS THE ONLY EXISTING PATENT LEFT THAT IS BEFORE YOUR HONOR.

11   AND WHAT I SHOWED THE JURY AT THE DAMAGES TRIAL WAS THAT EVERY

12   ELEMENT OF THAT CLAIM HAD BEEN DONE PRIOR TO THIS PATENT BEING

13   APPLIED FOR.  AND THAT THE ONLY POINT OF NOVELTY WAS, ONCE

14   AGAIN, THAT THE USER INPUT DEVICE COMPRISED THE TOUCH SCREEN.

15          SO THERE WAS REALLY NO DISPUTE THAT THAT'S WHAT WE

16   WERE HERE ABOUT AND THAT'S WHAT THE JURY WAS BEING ASKED TO

17   MONETIZE.

18          SO THEN WE SHOWED THE JURY HOW IMPORTANT IS IT TO

19   HAVE A TOUCH SCREEN AS YOUR USER INTERFACE DEVICE VERSUS

20   SOMETHING ELSE.  AND THIS WAS A GRAPHIC THAT WE SHOWED WHERE

21   YOU GO FROM -- LET ME GO BACK.  I HIT THAT TOO QUICKLY.

22          YOU GO FROM USING THE TOUCH SCREEN -- IF WE CAN PLAY

23   IT INSTEAD OF --

24                  (PAUSE IN THE PROCEEDINGS.)

25                  (GRAPHIC DISPLAYED ON SCREEN.)

```
 1              WHAT YOU SEE IS HERE, THE TOUCH SCREEN, YOU SEE HOW

 2    IT'S AS IF YOU ARE PUNCHING IN NUMBERS THERE, BUT WE JUST

 3    REMOVED IT.  AND NOW WE TURN IT INTO A MOUSE AND SHOW THAT

 4    THAT'S ALL REALLY THE TOUCH SCREEN IS ALL ABOUT.

 5              THANK YOU.

 6              SO WHAT HAPPENED AT THE END OF THE DAY, THE JURY

 7    CAME BACK AND RETURNED A VERDICT OF LUMP SUM.  THEY DID NOT

 8    GIVE A ROYALTY RATE.  THEY DID NOT GIVE A ROYALTY BASE.  BUT

 9    BAXTER HAD BEEN ASKING FOR 91 MILLION ON DISPOSABLES, AND THE

10    JURY AWARDED 91,000.

11              AND AT FIRST EVERYBODY SAID, ARE YOU SURE YOU GOT

12    THE ZEROS RIGHT?  BUT THEY SAID, YES, WE MEAN TO AWARD 91,000.

13              AND ON THE MACHINE, BAXTER HAD BEEN ASKING FOR

14    APPROXIMATELY, LIKE I SAID, I THINK ABOUT 54 MILLION AND THE

15    JURY AWARDED APPROXIMATELY 14 MILLION.  THAT WAS FOR PAST

16    DAMAGES.  AND IT WAS ACTUALLY FOR SEVEN YEARS OF DAMAGES.

17              SO, THEN WE CAME THEN AFTER, AND ONLY AFTER THE

18    DAMAGES TRIAL, WHICH WAS IN OCTOBER OF 2007, DID BAXTER MOVE

19    FOR AN INJUNCTION.  AND THEY REQUESTED THAT THE 2008K BE

20    ENJOINED.

21              WE, NEEDLESS TO SAY, PUT UP A VERY, VERY STRONG

22    OBJECTION TO THAT AND SAID THIS IS THE LEADING HEMODIALYSIS

23    MACHINE RIGHT NOW ON THE MARKET.  PATIENTS RELY ON THIS FOR

24    LIFE-SAVING TREATMENTS, AND THE STAFF AND THE TECHNICIANS HAVE

25    ALL GOTTEN VERY USED TO USING THE TOUCH SCREEN AS THE USER
```

```
 1   INPUT DEVICE.

 2            JUDGE ARMSTRONG DISAGREED AND SHE DID, IN FACT,

 3   ISSUE AN INJUNCTION, BUT SHE GAVE US A NINE-MONTH PERIOD TO GET

 4   THE DESIGN AROUND IN PLACE AND, IF NECESSARY, GO THROUGH FDA

 5   APPROVAL IF THE CHANGES THAT WE MADE REQUIRED THAT.

 6            SO THEN THE QUESTION WAS, THEN WHAT SHOULD FRESENIUS

 7   HAVE TO PAY DURING THAT NINE-MONTH TIME PERIOD WHEN WE ARE

 8   WORKING ON THE DESIGN AROUND AND GETTING IT IMPLEMENTED.

 9            WHAT -- HER HONOR TOOK BRIEFING ON IT, BUT WE DID

10   NOT HAVE ORAL ARGUMENT.  AND BAXTER SUBMITTED AN ORDER ASKING

11   FOR A 7 PERCENT ROYALTY ON THE ENTIRE BASE, ALL OF THE

12   DISPOSABLES DURING THAT NINE-MONTH PERIOD AND A 10 PERCENT

13   ROYALTY ON THE MACHINES.  AND HER HONOR SIGNED OFF ON THAT

14   ORDER.

15            AS A RESULT OF THAT, DURING THAT NINE-MONTH PERIOD,

16   WE SET UP AN ESCROW ACCOUNT AND PUT THAT MONEY INTO THE ESCROW

17   ACCOUNT, TO THE TUNE OF APPROXIMATELY $70 MILLION FOR A

18   NINE-MONTH PERIOD.

19            NOW, LET'S FAST FORWARD.  WE GO TO THE FEDERAL

20   CIRCUIT.  WE ARE APPEALING JUDGE ARMSTRONG'S ORIGINAL ENTRY OF

21   THE JUDGMENT AS A MATTER OF LAW FOR BAXTER.

22            AT THE FEDERAL CIRCUIT, WE HAD A PRETTY GOOD IDEA

23   HOW IT WAS GOING WHEN JUDGE DYK ASKED -- BILL LEE REPRESENTED

24   BAXTER AT THE FEDERAL CIRCUIT ARGUMENT.  I REPRESENTED

25   FRESENIUS.
```

1        AND JUDGE DYK ASKED MR. LEE, WELL, IF WE GET RID OF

2   ALL THE TOUCH SCREEN CLAIMS AND FIND IT WAS OBVIOUS TO PUT A

3   TOUCH SCREEN ON A HEMODIALYSIS MACHINE, WHAT ARE YOU LEFT WITH?

4        AND HE SAID, WELL, WE DO HAVE SOME

5   MEANS-PLUS-FUNCTION CLAIMS IN ONE PATENT, THE '434 PATENT, AND,

6   THEREFORE, THEY WOULD BE OUTSIDE OF SIMPLY A TOUCH SCREEN ON A

7   HEMODIALYSIS MACHINE.

8        AND, IN FACT, I THINK THIS MIGHT BE A GOOD TIME TO

9   DO THE BOARD SO WE CAN SHOW THE TWO CLAIMS.

10            (BLOWUP DISPLAYED ON EASEL.)

11        SO THE DIFFERENCE WAS, THERE WERE -- MOST OF THE

12  CLAIMS LOOKED LIKE THE BOTTOM ONE, THE '027, WHICH WAS SIMPLY

13  BASICALLY A HEMODIALYSIS MACHINE WHERE THE USER INPUT MECHANISM

14  IS THE TOUCH SCREEN.

15        BUT THERE WERE, IN THE '434 PATENT, SOME

16  MEANS-PLUS-FUNCTION CLAIMS.  SO THIS ONE WAS, A MEANS FOR

17  CONTROLLING A DIALYSATE PARAMETER SELECTED FROM A GROUP, AND SO

18  ON, WITH A USER INTERFACE CONNECTED, THAT USER INTERFACE BEING

19  A TOUCH SCREEN.

20        THE FEDERAL CIRCUIT FOUND THAT OUR EXPERT HAD FAILED

21  TO IDENTIFY THE CORRESPONDING STRUCTURE IN THE

22  MEANS-PLUS-FUNCTION CLAIMS, HAD FAILED TO IDENTIFY IT IN THE

23  PRIOR ART.  AND, FRANKLY, THEY WERE CORRECT.

24        JUDGE DYK AND I HAD AN INTERESTING DISCUSSION WHERE

25  HE SAID, MS. BROOKS, SHOW ME WHERE YOUR EXPERT IDENTIFIED THE

1    CORRESPONDING STRUCTURE AS CONSTRUED BY THE COURT IN THE PRIOR

2    ART.  AND I SHOWED HIM WHERE IT WAS IN THE PRIOR ART.

3            AND HE SAID, NO, I WANT YOU TO SHOW ME WHERE IN THE

4    TESTIMONY YOUR EXPERT IDENTIFIED THE CORRESPONDING STRUCTURE.

5            TO WHICH I RESPONDED, WELL, IF YOU MEAN DID HE SAY

6    THE MAGIC WORDS "CORRESPONDING STRUCTURE", TO WHICH JUDGE DYK

7    SAID, MS. BROOKS, THOSE ARE NOT MAGIC WORDS, THOSE ARE THE LAW.

8            TO WHICH I SAID, OKAY, WELL, HE DIDN'T USE THOSE

9    WORDS.

10           SO THE FEDERAL CIRCUIT REINSTATED THE JURY'S VERDICT

11   ON ALL BUT THE '434 PATENT.  SO THEY FOUND THAT ALL OF THE

12   CLAIMS OF THE '027 PATENT WERE, IN FACT, INVALID AS BEING

13   OBVIOUS, ALL OF THE ASSERTED CLAIMS OF THE '131 PATENT WERE, IN

14   FACT, INVALID AS BEING OBVIOUS.  AND THEN, AS YOUR HONOR --

15   WHICH IS WHY YOUR HONOR IS NOW HERE, THE REMANDED -- THEY

16   VACATED JUDGE ARMSTRONG'S DAMAGES, VACATED THE INJUNCTION, AND

17   REMANDED TO THE DISTRICT COURT WITH INSTRUCTIONS TO ESSENTIALLY

18   REDO IT IN LIGHT OF THE FACT THAT NOW THERE'S ONLY ONE PATENT

19   REMAINING, INSTEAD OF THREE, AND IN LIGHT OF THE REST OF THE

20   TEACHINGS IN THEIR OPINION.

21           IN THE MEANTIME, JUDGE ARMSTRONG, I BELIEVE, RECUSED

22   HERSELF BECAUSE SHE HAD HIRED BACK AS HER PERMANENT LAW CLERK,

23   A GENTLEMAN WE HAD ACTUALLY USED AS LOCAL COUNSEL.  SO SHE HAD

24   TO RECUSE HERSELF.  AND, HENCE, WE ENDED UP WITH YOUR HONOR.

25           THAT'S SORT OF THE PROCEDURAL HISTORY ON THE

1    DISTRICT COURT LEVEL.

2              NOW, JUST TO GIVE YOUR HONOR THE FULL PICTURE, THE

3    '434 PATENT WAS PUT INTO RE-EXAM.  AND -- ACTUALLY ALL OF THE

4    PATENTS WERE IN RE-EXAM, BUT ONCE THE FED CIRCUIT FOUND THE

5    OTHER ONES WERE INVALID, THEN THE RE-EXAM WAS DEAD AS TO THOSE.

6              BUT THE '434 PATENT WORKED ITS WAY THROUGH RE-EXAM

7    AND, IN FACT, THE EXAMINER FOUND THAT THE ASSERTED CLAIMS WERE,

8    INDEED, INVALID AS BEING OBVIOUS.  THAT WENT UP TO THE BOARD OF

9    PATENT APPEALS.  THE BOARD OF PATENT APPEALS AFFIRMED THAT

10   FINDING, AND THAT CASE IS NOW AT THE FEDERAL CIRCUIT.

11             AND SO WE ARE WAITING -- IF THE FEDERAL CIRCUIT

12   AFFIRMS THE HOLDING OF THE BOARD OF PATENT APPEALS, THE '434

13   PATENT GOES AWAY, AND IT WILL HAVE BEEN DEEMED VOID AB INITIO.

14             **THE COURT:**  HOW DOES THAT AFFECT THE CASE BEFORE ME?

15   I MEAN, IT'S ONLY THE '434 PATENT THAT'S AT ISSUE ON THIS

16   MOTION.

17             **MS. BROOKS:**  THAT'S CORRECT, YOUR HONOR.  SO, WE HAD

18   FILED A MOTION WITH YOUR HONOR -- THE ANSWER IS, IF YOUR HONOR

19   STAYED THIS CASE AND WAITED TO SEE WHAT HAPPENED AT THE FEDERAL

20   CIRCUIT WITH THE '434 PATENT, AND, INDEED, IT WAS FOUND VOID AB

21   INITIO, THEN WE OWE BAXTER NO DAMAGES BECAUSE YOU DON'T HAVE TO

22   PAY DAMAGES FOR AN INVALID PATENT.

23             AND JUDGE DYK, IN HIS CONCURRENCE, ACTUALLY

24   SUGGESTED THAT THAT MIGHT BE EXACTLY WHAT THE DISTRICT COURT

25   MIGHT WANT TO DO.

| | |
|---|---|
| 1 | **THE COURT:** I THINK I ALREADY DENIED THAT MOTION. |
| 2 | **MS. BROOKS:** YOU DID. YOU DENIED THAT MOTION, YOUR |
| 3 | HONOR. HENCE, WHY WE ARE HERE. |
| 4 | **THE COURT:** BUT WHAT ULTIMATELY HAPPENS DEPENDING |
| 5 | UPON THEIR RULING? WHAT IF THERE'S A CONFLICT BETWEEN THE |
| 6 | RULING THAT I ENTER AND THE APPEAL? |
| 7 | **MS. BROOKS:** IF, IN FACT, THE '434 PATENT, THE |
| 8 | INVALIDITY ASPECT OF IT GOES TO FINAL JUDGMENT, THAT IS IF THE |
| 9 | FED CIRCUIT AFFIRMS THE DECISION OF THE BOARD OF PATENT APPEALS |
| 10 | BEFORE THIS CASE GOES TO FINAL JUDGMENT, THEN INDEED THE PATENT |
| 11 | IS VOID AB INITIO AND WE OWE BAXTER NO DAMAGES. |
| 12 | **THE COURT:** AND WHAT IF THE CONVERSE OCCURS? |
| 13 | **MS. BROOKS:** IF THE CONVERSE OCCURS, WE HAVE TO PAY |
| 14 | BAXTER. AND -- |
| 15 | **THE COURT:** WHAT WOULD BE DEEMED FINAL JUDGMENT |
| 16 | HERE; ANY ORDER I ISSUE ON THIS MOTION OR AN APPEAL FOLLOWING |
| 17 | AN APPEAL ON THE SUBSTANTIVE ISSUE? |
| 18 | **MS. BROOKS:** FOLLOWING THE APPEAL. THAT WOULD BE |
| 19 | DEEMED FINAL JUDGMENT. |
| 20 | SO WE HAVE -- WE HAVE THESE GOING IN PARALLEL NOW |
| 21 | WITH ONE SLIGHTLY AHEAD OF THE OTHER. BUT, ESSENTIALLY, THAT'S |
| 22 | EXACTLY RIGHT. OUR POSITION IS, YOUR HONOR, THAT WE -- WITH |
| 23 | ALL DUE RESPECT, INTEND TO APPEAL THE COURT'S DENIAL OF A NEW |
| 24 | TRIAL ON THE PAST DAMAGES, BECAUSE NOW WE ARE ONLY DOWN TO ONE |
| 25 | PATENT, AND WE OBVIOUSLY WILL APPEAL WHATEVER YOUR HONOR FINDS |

1    FOR THAT RUNNING ROYALTY PERIOD OF NINE MONTHS, WE WILL ALSO

2    APPEAL THAT TO THE FEDERAL CIRCUIT.  SO, WHICHEVER ONE THEY GET

3    TO FIRST WILL TRUMP THE OTHER.

4            SO NOW WE COME BEFORE YOUR HONOR TODAY WITH THE

5    ISSUE OF WHAT IS A REASONABLE ROYALTY FOR THAT NINE-MONTH

6    PERIOD BETWEEN WHEN THE PREVIOUS COURT ISSUED THE INJUNCTION

7    AND WHEN WE WERE ABLE TO GET THE K2 MACHINE, WHICH I BELIEVE IS

8    ALSO HERE IN COURT, ON THE MARKET.

9            WHAT HER HONOR FOUND -- I AM SORRY, YOUR HONOR.

10           **THE COURT:**  AND WITH REGARD TO THE DISPOSABLES FOR A

11   LONGER PERIOD.

12           **MS. BROOKS:**  YES.  BECAUSE THE DISPOSABLES

13   SUPPOSEDLY ARE STILL LINKED BACK TO THE MACHINES THAT ARE IN

14   THE FIELD.  BUT THEY END ALSO AT THE NINE MONTH -- I'M CHECKING

15   WITH MR. FLOREY.

16           **MR. FLOREY:**  NO.  NO.  SO BAXTER'S ROYALTY

17   REQUEST -- THE REASON THAT THE DISPOSABLE NUMBER IS SO BIG, IT

18   GETS UP TO AROUND $98 MILLION, IS THERE'S TWO THINGS.  THEY ARE

19   SEEKING A DISPOSABLE ROYALTY NOT ONLY ON THE NEW K'S THAT WERE

20   SOLD DURING THE NINE-MONTH PERIOD, BUT ALL THE ONES THAT WERE

21   PREVIOUSLY SOLD THAT THE JURY HAD ALREADY AWARDED DAMAGES ON.

22           SO THEY ARE SEEKING A ROYALTY ON THAT.  AND NOT ONLY

23   RUNNING FOR THE NINE-MONTH PERIOD, BUT OUT TO THE EXPIRATION OF

24   THE PATENT IN APRIL OF THIS YEAR, OF 2011.  THEY ARE GOING BOTH

25   BACKWARDS ON MACHINES AND FORWARDS PASSED THE INVOCATION OF THE

1    INJUNCTION TO GET TO THESE VERY, VERY LARGE NUMBERS.

2            **MR. ABERNATHY:**  YOUR HONOR, MAY I COMMENT ON THIS

3    POINT?  JUST TO THE PROCEDURAL POINT THAT MR. FLOREY RAISED ON

4    DISPOSABLES?

5            **THE COURT:**  OKAY.

6            **MR. ABERNATHY:**  THE QUESTION OF A ROYALTY ON

7    DISPOSABLES, THESE THINGS, (INDICATING), FOR MACHINES THAT WERE

8    ALREADY IN THE FIELD PRE-VERDICT AND FOR SALES THAT OCCURRED

9    POST-VERDICT, JUDGE HAMILTON (SIC) AWARDED A ROYALTY.

10           **THE COURT:**  JUDGE ARMSTRONG.

11           **MR. ABERNATHY:**  I AM SORRY, JUDGE ARMSTRONG.

12           FRESENIUS APPEALED THAT ISSUE TO THE FEDERAL

13   CIRCUIT, AND WE WILL SHOW THAT IN A BIT.  THE FEDERAL CIRCUIT,

14   IN ITS DECISION, CONSIDERED THAT ARGUMENT AND REJECTED THAT

15   ARGUMENT.

16           THE ISSUE OF A ROYALTY FOR DISPOSABLES SOLD TO

17   MACHINES SOLD PRE-VERDICT HAS BEEN RESOLVED BY THE FEDERAL

18   CIRCUIT IN THIS CASE IN THAT APPEAL.  AND WE WILL TALK ABOUT

19   THIS LATER, BUT UNDER THE MANDATE RULE, YOUR HONOR, THAT ISSUE,

20   WE THINK, HAS BEEN RESOLVED.  IT'S THE LAW OF THE CASE, AND

21   SHOULD NOT BE RECONSIDERED.  AS A MATTER OF FACT, AS WE

22   UNDERSTAND THE MANDATE RULE, YOUR HONOR LACKS JURISDICTION TO

23   RECONSIDER THAT ISSUE.

24           I JUST WANTED TO PUT THAT ON THE TABLE, AND I DIDN'T

25   MEAN TO INTERRUPT OTHERWISE.

 1          **MR. FLOREY:**  IF I MAY RESPOND VERY BRIEFLY, YOUR

 2     HONOR.

 3          WE DID -- WE RAISED AS A LEGAL ISSUE AT THE FEDERAL

 4     CIRCUIT, WE BELIEVE THAT THAT WAS A SEVENTH AMENDMENT ISSUE

 5     BECAUSE BAXTER DID NOT SEEK DAMAGES FOR FUTURE DISPOSABLE SALES

 6     IN FRONT OF THE JURY.  AND UNDER THE LAW, WHEN A JURY AWARDS

 7     DAMAGES, THOSE MACHINES ARE CONSIDERED LICENSE.  SO WE ARGUED

 8     AS A LEGAL MATTER THE JUDGE COULD NOT HAVE DONE THAT.

 9          NOW, IT IS TRUE THE FEDERAL CIRCUIT SAID LEGALLY THE

10     JUDGE HAS THE DISCRETION TO DO IT, AND I THINK WE CONCEDE IN

11     OUR BRIEFS THAT FOR PURPOSES OF THIS RECORD, YOU HAVE THE

12     DISCRETION TO DO IT.  THAT'S VERY DIFFERENT THAN SAYING YOU

13     SHOULD DO IT.

14          BUT BECAUSE JUDGE ARMSTRONG GAVE NO REASONS FOR HER

15     RULING, IT WAS VACATED, SO WE BELIEVE THAT WHILE UNDER --

16     MR. ABERNATHY'S RIGHT, UNDER THE RULING OF THE FEDERAL CIRCUIT,

17     YOU HAVE THE DISCRETION TO DO THAT, IT'S STILL THEIR BURDEN TO

18     SHOW THAT YOU SHOULD DO IT AND IT'S OUR POSITION THAT THAT'S

19     NOT A GOOD EXERCISE OF YOUR EQUITABLE DISCRETION.

20          **THE COURT:**  OKAY.

21          **MR. ABERNATHY:**  YOUR HONOR, JUST -- I DON'T THINK

22     YOU HAVE DISCRETION AT THIS POINT TO REVISIT THE ISSUE --

23          **THE COURT:**  LET'S LEAVE THE ARGUMENT AS TO WHAT I

24     SHOULD DO AFTER -- UNTIL AFTER I HAVE HEARD ALL OF THE FACTS

25     ABOUT WHAT HAPPENED IN THE PAST AND WHAT YOUR POSITIONS ARE

1   NOW, AND THEN YOU CAN TRY TO CONVINCE ME WHY I SHOULD ADOPT

2   EITHER OF YOUR POSITIONS.

3           **MR. ABERNATHY:**  OKAY.

4           **THE COURT:**  WHY DON'T YOU FINISH UP ON THE

5   PROCEDURE.

6           **MS. BROOKS:**  I THINK THAT BROUGHT US TO WHY WE ARE

7   HERE TODAY, YOUR HONOR.

8           SO THE FED CIRCUIT REMANDED WITH INSTRUCTIONS TO

9   TAKE INTO CONSIDERATION THAT THERE'S ONLY ONE PATENT NOW RATHER

10  THAN THREE.  AND BASED ON THAT, WHAT, IF ANY, IS THE

11  APPROPRIATE ROYALTY FOR THAT NINE-MONTH TRANSITION PERIOD.

12          WE DID ASK ALSO FOR A NEW TRIAL FOR THE PAST

13  DAMAGES.  THAT WAS DENIED.  WE WILL, OF COURSE, TAKE THAT UP ON

14  ANOTHER DAY.

15          WITH THE COURT'S PERMISSION WE WOULD CALL -- WE ARE

16  INTENDING TO CALL THREE WITNESSES.  THE FIRST WITNESS --

17          **THE COURT:**  FIRST OF ALL, I WANT TO HEAR --

18          **MS. BROOKS:**  I AM SORRY.

19          **THE COURT:**  -- IF OPPOSING COUNSEL WISHES TO MAKE

20  SOME OPENING STATEMENT.  IT SOUNDS LIKE SHE PRETTY MUCH COVERED

21  THE PROCEDURE.

22          **MR. ABERNATHY:**  YOUR HONOR, I DO HAVE AN OPENING

23  STATEMENT.  IT WILL GO BEYOND SOME OF THE PROCEDURAL ISSUES.

24  IF I MAY.

25          **THE COURT:**  OKAY.  YOU CAN.

1          **MR. ABERNATHY:**  THANK YOU.

2          YOUR HONOR, WE HAVE PUT TOGETHER A SHORT POWER

3     POINT, BELIEVE IT OR NOT.  AND I HAVE COPIES, YOUR HONOR, OF

4     THE SLIDES.

5          AND, YOUR HONOR, I ALSO HAVE A COPY FOR -- AN EXTRA

6     COPY FOR YOUR CLERK.  MAY I APPROACH?

7          (BINDERS HANDED TO COURT AND CLERK.)

8          **THE COURT:**  OKAY.

9          **MR. ABERNATHY:**  MAY IT PLEASE THE COURT, YOUR HONOR,

10    I WILL START WITH MS. BROOKS' SLIDE OF THE '434 PATENT.

11         AND MAYBE THIS GOES INTO THE PROCEDURAL ISSUES.  AS

12    WE STAND HERE TODAY, THIS CLAIM, CLAIM 26 OF THE '434 PATENT

13    HAS BEEN FOUND INFRINGED AND FOUND VALID BY THE FEDERAL

14    CIRCUIT.

15         IT'S THE '434 PATENT THAT BRINGS US HERE TODAY, BUT

16    THAT CLAIM IS VALID AND INFRINGED, AND THERE'S NO DISPUTE AS TO

17    THAT.

18         WE HAVE GONE THROUGH TWO JURY TRIALS, EIGHT YEARS OF

19    LITIGATION, MULTIPLE MOTIONS, AS YOU CAN PROBABLY TELL FROM THE

20    DOCKET, AND TODAY, AFTER EIGHT YEARS, I THINK THIS CASE COMES

21    DOWN TO ONE ISSUE.

22         YOUR HONOR, THIS IS A QUOTE FROM THE FEDERAL

23    CIRCUIT'S OF MANDATE.  YOU PROBABLY LOOKED AT IT.  WHERE THE

24    FEDERAL CIRCUIT SAID:

25         "IN PARTICULAR, WE NOTE THAT OUR REVERSAL OF

```
1              JMOL MAY AFFECT THE DISTRICT COURT'S

2              CONSIDERATION OF THE PUTATIVE ROYALTY RATE"....

3              THAT, YOUR HONOR, IS THE ONLY ISSUE I BELIEVE THAT

4    IS AT ISSUE TODAY.

5              IN DENYING FRESENIUS' MOTION FOR A NEW TRIAL, YOUR

6    HONOR ALSO IDENTIFIED THE REMAINING ISSUE AS THE FEDERAL

7    CIRCUIT, "REMANDED WITH INSTRUCTIONS TO CONSIDER WHETHER THE

8    PRIOR ROYALTY AWARD WAS PROPER IN LIGHT OF THE REVERSAL OF JMOL

9    AS TO TWO OF THE THREE PATENTS".

10             SO AS WE SIT HERE RIGHT NOW, YOUR HONOR, WE ARE NOT

11   HERE TO RE-ARGUE DAMAGES.  WE ARE NOT HERE TO RE-ARGUE

12   LIABILITY.  WE ARE HERE TO ANSWER THAT VERY SIMPLE QUESTION.

13             SO WHAT IS THE ANSWER?  YOUR HONOR, THE WAY THIS

14   PATENT IS FRAMED AND THE WAY THE EVIDENCE IS IN THE RECORD, THE

15   NUMBER OF PATENTS DOES NOT MATTER.  SO, AT THE DAMAGES TRIAL,

16   THERE WERE THREE PATENTS AT ISSUE.  TWO WERE FOUND INVALID; THE

17   '434 IS VALID.

18             THE COURT:  I FORGET.  WITH REGARD TO THE FEDERAL

19   CIRCUIT'S OPINION, DOES THE FEDERAL CIRCUIT ACKNOWLEDGE THAT

20   INDEED ONLY -- THE NUMBER OF PATENTS WASN'T AT ISSUE DURING THE

21   COURSE OF THE TRIAL?

22             MR. ABERNATHY:  IT ACKNOWLEDGED THAT THERE WERE

23   THREE PATENTS AT ISSUE AT THE TRIAL.  AND IT ACKNOWLEDGED THAT

24   ONE REMAINS VALID, TWO INVALID, AND THE REMAND ORDER ASKS YOUR

25   HONOR TO DETERMINE DOES THE FACT THAT TWO OF THE PATENTS HAD
```

1    BEEN, IN EFFECT, TAKEN OUT OF THE CASE, AFFECT JUDGE

2    ARMSTRONG'S ROYALTY AWARD.  THAT'S THE ISSUE ON THE TABLE

3    TODAY.

4            **THE COURT:**  BUT MY QUESTION IS I THINK A LITTLE

5    NARROWER THAN THAT.

6            YOU ARGUE THAT THE NUMBER OF PATENTS WAS NOT AN

7    ISSUE AT TRIAL.  SO NO ONE SAID TO THE JURY THAT OUR DAMAGES

8    ARE DEPENDENT UPON A FINDING OF INFRINGEMENT ON -- AS TO MORE

9    THAN ONE OF THE CLAIMS ON ONE OF THE PATENTS.  NO ONE EVER

10   RAISED THAT AT TRIAL.

11           DID THE FEDERAL CIRCUIT -- WAS THERE ANY DISCUSSION

12   ABOUT THAT BEFORE THE FEDERAL CIRCUIT, THE FACT THAT THE TRIAL

13   RECORD DOESN'T REFLECT ANY DISTINCTION MADE BY PLAINTIFFS OR

14   DEFENDANTS ABOUT THE NUMBER OF PATENTS?

15           **MR. ABERNATHY:**  THE FEDERAL CIRCUIT MADE NO COMMENT

16   ON THAT.  AND I THINK THE REASON THE FEDERAL CIRCUIT DID NOT IS

17   BOTH PARTIES AT THE DAMAGES TRIAL IN 2007 AND AT THE FIRST

18   TRIAL IN 2006 AGREED THAT IT WAS TOUCH SCREEN TECHNOLOGY THAT

19   DROVE THE HYPOTHETICAL NEGOTIATION.

20           ALL PARTIES AGREED, AS MS. BROOKS JUST SAID, THAT

21   ALL THE PATENTS AT ISSUE, FOUR, THREE, OR ONE, ALL DEALT WITH

22   TOUCH SCREEN TECHNOLOGY AS APPLIED TO A HEMODIALYSIS MACHINE.

23           SO WHAT I HAVE UP ON THE SLIDE, YOUR HONOR, IS AN

24   EXCERPT FROM FRESENIUS' EXPERT, DR. RUBINFELD, WHO I THINK MAY

25   TESTIFY HERE TODAY, HE SAID, IN ESSENCE, I NOTE THAT BAXTER'S

Case 3:09-cv-00680-RFP Document 1031-1 Filed 03/21/18 Page 26 of 232 PageID# 33871
Case4:09-cv-01431-PJH Document1156 Filed08/02/12 Page26 of 291

25

 1   EXPERT ASCRIBES NO INDEPENDENT VALUE TO THE PATENTS AND SIMPLY

 2   ASCRIBES INDEPENDENT VALUE TO THE TOUCH SCREEN FEATURES OF THE

 3   CLAIMS.

 4           AND WHAT HE SAID IN 2006 IS, "I WILL DO THE SAME IN

 5   MY REPORT." AND, INDEED, HE DID.

 6           AND, YOUR HONOR, IN DENYING FRESENIUS' MOTION FOR A

 7   NEW TRIAL IN MAY OF THIS YEAR, YOU NOTED THAT FRESENIUS DID NOT

 8   ARGUE AT TRIAL OR ON APPEAL THAT THE CALCULATION OF PAST

 9   DAMAGES DEPENDED ON THE NUMBER OF PATENTS INFRINGED.

10           AND LET ME JUST GO BACK AND EXPLAIN WHY.  THREE

11   PATENTS AT SUIT IN THE TRIAL, THE DAMAGES TRIAL.  EVERY PATENT

12   INVOLVED TOUCH SCREEN TECHNOLOGY, CERTAIN FEATURES OF TOUCH

13   SCREEN TECHNOLOGY.  ALL THREE OF THE PATENTS HAVE A COMMON

14   SPECIFICATION.  ALL THREE OF THE PATENTS ARE RELATED, BUT THE

15   '434 PATENT IS THE PARENT.  AND IN ORDER TO PRACTICE TOUCH

16   SCREEN TECHNOLOGY, FRESENIUS WOULD HAVE TO HAVE A LICENSE TO

17   THE '434 PATENT.  WHY?  BECAUSE IT COVERS A TOUCH SCREEN USER

18   INTERFACE.

19           AND, AGAIN, THERE'S REALLY NO DISPUTE.  I THINK

20   MS. BROOKS JUST SAID IT.  ALL THE PATENTS IN SUIT DEALT WITH

21   THIS FUNDAMENTAL TOUCH SCREEN TECHNOLOGY.  SO THE NUMBER OF

22   PATENTS DOES NOT MATTER.  THEIR EXPERTS SAID IT.  OUR EXPERTS

23   SAID IT.  AND, FRANKLY, YOUR HONOR, IN LOOKING AT THEIR MOTION,

24   YOU COMMENTED UPON IT AS WELL.  TO ME, IT REALLY -- THAT ISSUE

25   IS NOT AN ISSUE.

1        THE NEXT QUESTION IS, WELL, THE FEDERAL CIRCUIT

2   DIRECTED YOUR HONOR TO LOOK AT JUDGE ARMSTRONG'S ROYALTY RATE

3   IN LIGHT OF THE GEORGIA-PACIFIC FACTORS.  SO WE HAVE THE

4   GEORGIA-PACIFIC FACTORS UP THAT BOTH SIDES HAVE ARGUED ABOUT,

5   AT THE TRIAL AND HERE TODAY.

6        IN EACH OF THOSE FACTORS, YOUR HONOR, DEALS WITH

7   COMPETITIVE CONDITIONS, RELATIONSHIPS OF THE PARTIES, THINGS OF

8   THAT NATURE.  BUT NONE OF THEM, NONE OF THEM DEAL WITH THE

9   NUMBER OF PATENTS ASSERTED.

10        AND, AGAIN, FRESENIUS DOES NOT DISPUTE THAT FACT.

11        SO I WOULD SUBMIT, YOUR HONOR, THAT AS TO THE ISSUE

12   ON REMAND, DOES THE NUMBER OF PATENTS ASSERTED, THREE VERSUS

13   ONE, AFFECT JUDGE ARMSTRONG'S PUNITIVE ROYALTY RATE?  THE

14   ANSWER IS NO.  AND UNDER THE REMAND DIRECTIVE, IT ANSWERS THE

15   QUESTION.

16        I ALSO WANT TO TALK ABOUT THIS ISSUE OF THESE

17   DISPOSABLES WE JUST TALKED ABOUT.  I ARGUED IT, BUT I JUST

18   WANTED TO SHOW YOU EXACTLY WHAT I WAS REFERRING TO.

19        AGAIN, JUDGE ARMSTRONG SAID THAT AS TO DISPOSABLES

20   THAT ARE SOLD TO MACHINES PRE-VERDICT THAT WERE IN THE FIELD

21   PRE-VERDICT BUT WERE SOLD POST-VERDICT, BAXTER IS ENTITLED TO A

22   ROYALTY ON THOSE DISPOSABLES.

23        AS I MENTIONED, FRESENIUS ARGUED THIS VERY POINT IN

24   ITS FEDERAL CIRCUIT BRIEFING.  I HAVE ON THE SCREEN A COPY OF

25   THE PAGES FROM THEIR BRIEF, PAGES 57 THROUGH 58, WHERE

 1   FRESENIUS PUT THIS ISSUE TO THE FEDERAL CIRCUIT.  AND THE

 2   FEDERAL CIRCUIT REJECTED IT.

 3         THIS, AGAIN, IS FROM THE FEDERAL CIRCUIT'S OPINION.

 4   I HAVE HIGHLIGHTED THE FEDERAL CIRCUIT'S SUMMATION OF

 5   FRESENIUS' ARGUMENT.  AND THE FEDERAL CIRCUIT RULED THAT "THE

 6   DISTRICT COURT WAS WITHIN ITS DISCRETION TO IMPOSE A ROYALTY ON

 7   THOSE SALES OF DISPOSABLE PRODUCTS IN ORDER TO FULLY COMPENSATE

 8   BAXTER FOR ITS INFRINGEMENT".

 9         WE SUBMIT, YOUR HONOR, THAT IN LIGHT OF THAT

10   DECISION, UNDER THE MANDATE RULE, THIS COURT LACKS JURISDICTION

11   TO REVISIT THAT ISSUE.

12         I HAVE A CITE FROM THE AMADO VERSUS MICROSOFT CASE.

13   BOTH PARTIES BRIEFED IT.  IT SAYS THOUGH:

14              "THE MANDATE RULE PROVIDES THAT ISSUES ACTUALLY

15              DECIDED", AND THEY WERE HERE, "THOSE WITHIN THE

16              SCOPE OF THE JUDGMENT APPEALED FROM, MINUS THOSE

17              EXPLICITLY RESERVED OR REMANDED BY THE COURTS

18              ARE FORECLOSED FROM FURTHER CONSIDERATION."

19         THIS WAS SPECIFICALLY DECIDED BY THE FEDERAL

20   CIRCUIT, AND I WOULD SUBMIT, YOUR HONOR, IT IS NOW FORECLOSED

21   FROM FURTHER CONSIDERATION.

22         SO I THINK THEN THE QUESTION IS, WAS TO DISPOSABLES,

23   ARE YOU TELLING ME IT'S COMPLETELY OFF THE TABLE?  NO.

24         I THINK THE ISSUE IS, AS TO ENTITLEMENT FOR

25   DISPOSABLES THAT ISSUE HAS BEEN RESOLVED BY THE FEDERAL

1    CIRCUIT.  THE QUESTION OF WHAT THE --

2            **THE COURT:**  AS TO ENTITLEMENT TO DAMAGES.

3            **MR. ABERNATHY:**  TO A ROYALTY.

4            **THE COURT:**  TO A ROYALTY.

5            **MR. ABERNATHY:**  ENTITLEMENT TO A ROYALTY.  THAT HAS

6    BEEN RESOLVED BY THE FEDERAL CIRCUIT.

7            I BELIEVE THE ONLY QUESTION LEFT IS, WHAT SHOULD THE

8    ROYALTY RATE BE FOR THOSE SALES.  BAXTER'S ENTITLEMENT TO THAT

9    ROYALTY HAS BEEN DECIDED.  THE ISSUE UNDER THE REMAND TO YOU,

10   YOUR HONOR, IS WHAT IS THE RATE.

11           AND AGAIN, YOUR HONOR, IN TERMS OF THE MANDATE RULE,

12   IN YOUR ORDER DENYING FRESENIUS' MOTION FOR A NEW TRIAL, YOUR

13   HONOR RECOGNIZED THE MANDATE RULE AND SAID THAT IT REQUIRES THE

14   DISTRICT COURT TO FOLLOW AN APPELLATE DECREE AS LAW OF THE

15   CASE, AND WE AGREE WITH THAT.

16           SO, AGAIN, YOUR HONOR, I THINK IN TERMS OF THE ISSUE

17   THAT WAS PUT TO YOU, DOES THE NUMBER OF PATENTS MATTER?  WE

18   BELIEVE THE RECORD IS OVERWHELMING THAT THEY REALLY DON'T.  AND

19   THE RECORD IS LARGELY, IF NOT COMPLETELY, UNDISPUTED.

20           BUT I THINK IF -- YOU STILL MAY HAVE A QUESTION,

21   WELL, WHAT ABOUT THESE ROYALTY RATES?  WERE THEY REASONABLE AND

22   HOW DO I KNOW THEY ARE REASONABLE?

23           **THE COURT:**  IF THE NUMBER OF THE PATENTS DOESN'T

24   MATTER, WHY ISN'T THAT SOMETHING THAT THE FEDERAL CIRCUIT

25   DIDN'T ADDRESS?

```
1          I MEAN, AS I UNDERSTAND IT, THE ARGUMENTS WEREN'T

2    MADE BECAUSE THE ARGUMENTS WERE MADE AS TO THE ENTIRETY OF THE

3    PATENTS THAT WERE BEFORE IT, TO ALL OF THEM, BUT WHY ISN'T THAT

4    SOMETHING THAT'S--

5          MR. ABERNATHY:  THAT'S A FAIR QUESTION AND ONE THAT

6    I HAVE BEEN THINKING A LOT ABOUT.  I THINK THERE ARE A COUPLE

7    OF REASONS.

8          ONE, IN MOST PATENT CASES, PARTICULARLY WHEN YOU

9    HAVE LOTS OF PATENT CLAIMS ASSERTED, WHICH WE HAD HERE, AND

10   WHERE YOU HAVE TWO COMPETITORS WITH LOTS OF PRODUCTS IN THE

11   MARKET, TYPICALLY THE FEDERAL CIRCUIT, WHEN IT REVERSES ON A

12   DAMAGES ISSUE AND WHERE THERE ARE ISSUES OF LIABILITY THAT WERE

13   MIXED, INVALIDITY, VALIDITY, AS WE HAVE HERE, THE FEDERAL

14   CIRCUIT DOES NOT WANT TO SORT OF GET INTO THE RECORD AND PARSE

15   WHAT REMAINS, WHAT DOESN'T.  SO IT TYPICALLY WILL REMAND AND

16   ASK FOR THE DISTRICT COURT TO DETERMINE DOES IT REALLY MATTER.

17         HERE, I THINK THE DIFFERENCE IS WE HAVE THREE

18   PATENTS THAT HAVE COMMON SPECIFICATIONS, THAT CONCEDEDLY ALL

19   RELATE TO TOUCH SCREEN TECHNOLOGY, AND UNLIKE MOST FEDERAL

20   CIRCUIT CASES AND MOST PATENT CASES THAT I HAVE BEEN INVOLVED

21   WITH, WE HAVE A SINGLE INFRINGING PRODUCT, THE 2008K.  AND,

22   AGAIN, I BELIEVE BOTH SIDES AGREE THAT ABSENT A LICENSE TO THE

23   '434 PATENT, FRESENIUS COULD NOT SELL THAT MACHINE IN THE

24   MARKETPLACE.

25         SO UNLIKE THE TYPICAL CASE, PATENTS RELATE TO THE
```

1    SAME TECHNOLOGY, RELATE TO THE SAME INFRINGING FEATURE, AND

2    THERE IS ONLY ONE PRODUCT INVOLVED.  TYPICALLY WHEN THE FEDERAL

3    CIRCUIT -- I THINK THAT'S THE ANSWER.  I HAVE ASKED THAT

4    QUESTION, TOO, BUT I THINK THAT IS THE ANSWER.

5            SO, YOUR HONOR, I WANT TO TALK BRIEFLY ABOUT THE

6    ROYALTY RATES HERE.  WHAT IS IN THE RECORD TO SHOW THE

7    REASONABLENESS OF WHAT JUDGE ARMSTRONG DID.  SO IF YOU ARE

8    GOING TO TALK ABOUT ROYALTY RATES, YOU HAVE TO TALK ABOUT THE

9    HYPOTHETICAL NEGOTIATION.

10           HERE IT IS UNDISPUTED THAT THE HYPOTHETICAL

11   NEGOTIATION WOULD HAVE OCCURRED IN NOVEMBER 2007, ABOUT THE

12   TIME THAT BAXTER MOVED FOR A PERMANENT INJUNCTION.  SO, HERE

13   ARE THE FACTORS AGAIN I THINK UNDISPUTED IN THE RECORD THAT WE

14   BELIEVE WOULD INFLUENCE THE HYPOTHETICAL NEGOTIATION.

15           NUMBER ONE, AGAIN, THE '434 PATENT HAD BEEN FOUND

16   INFRINGED, INVALID, AND THE 2008K MACHINE INFRINGED IT AND USED

17   ITS FEATURES.  BAXTER HAD MOVED FOR A PERMANENT INJUNCTION, AND

18   AT THAT TIME, FRESENIUS HAD 96 PERCENT OF THE HEMODIALYSIS

19   MACHINE MARKET.  IT DOMINATED THE MARKET.

20           BUT ALSO AT THAT TIME, NO DISPUTE ABOUT THIS,

21   FRESENIUS DID NOT HAVE ANOTHER MACHINE TO PUT ON THE

22   MARKETPLACE.  IT TOLD JUDGE ARMSTRONG, IT TOLD THE FEDERAL

23   CIRCUIT THAT IT WOULD NEED AT LEAST A YEAR TO GET A DESIGN

24   AROUND INTO THE MARKET.  AND, BY ITS OWN ADMISSION, IN PAPERS

25   FILED WITH JUDGE ARMSTRONG, FRESENIUS TOLD JUDGE ARMSTRONG AND

1   I SAY, HENCE THE WORLD, THAT IT DESPERATELY NEEDED THAT LICENSE

2   IN ORDER TO CONTINUE TO COMPETE AND IN ORDER TO CONTINUE TO

3   MAINTAIN ITS MARKET SHARE.

4           SO I JUST WANTED TO GO THROUGH QUICKLY SOME OF THE

5   EVIDENCE THAT WE SHOWED JUDGE ARMSTRONG ON THESE ISSUES.

6           NUMBER ONE, THERE IS NO DOUBT THAT THE 2008K WAS

7   DESIGNED TO FEATURE A TOUCH SCREEN INTERFACE.  WE KNOW THAT

8   BECAUSE WE HAVE FRESENIUS' OWN LANGUAGE FROM THEIR PRODUCT

9   LAUNCH DOCUMENT THAT SAYS THAT FOLLOWING DEMAND IN THE

10  MARKETPLACE, FOR A MORE USER FRIENDLY OPERATING INTERFACE, WE

11  HAVE DESIGNED THE 2008K WITH A NEW LEVEL OF TOUCH SCREEN

12  CONVENIENCE.  THIS WAS WRITTEN AT THE TIME OF THE LAUNCH,

13  AROUND SEPTEMBER 2000, BY FRESENIUS' VICE PRESIDENT OF

14  MARKETING.

15          WE ALSO KNOW THAT IN ITS BROCHURES IN MARKETING

16  FRESENIUS TOUTED THE TOUCH SCREEN ASPECTS OF ITS NEW MACHINE.

17  IT SAID THAT THIS MACHINE IS IN TOUCH WITH THE NEW GENERATION

18  AND CONSTANTLY FEATURED PEOPLE TOUCHING THE TOUCH SCREEN.

19          BUT WE ALSO HAVE TESTIMONY FROM RICE POWELL AT THE

20  2007 TRIAL IN OCTOBER TALKING ABOUT THE MARKET DEMANDS FOR

21  TOUCH SCREEN TECHNOLOGY.  NOW, HE WAS REFERRING TO THE POINT OF

22  RELEASE, BUT I THOUGHT IT'S INTERESTING IN LIGHT OF SOME OF THE

23  BRIEFING HERE THAT TALKS ABOUT WHERE'S YOUR EVIDENCE OF MARKET

24  DEMAND, WELL, HERE'S OUR EVIDENCE OF MARKET DEMAND.

25          AT THE TRIAL IN THIS ROOM, I ASKED RICE POWELL THESE

1    QUESTIONS AND, IN ESSENCE, WHAT HE SAID IS CUSTOMERS DEMANDED

2    THE TOUCH SCREEN USER INTERFACE, NURSES, TECHNICIANS, DOCTORS.

3          THAT INTERFACE DROVE DEMAND IN OCTOBER 2000 AT THE

4    POINT OF RELEASE, AND HE SAID BECAUSE IT DROVE DEMAND,

5    FRESENIUS WAS HINGING EVERYTHING ON IT.  AND, INDEED, IT DID.

6          FROM -- IN 2000, FRESENIUS' MARKET SHARE WAS AROUND

7    64 PERCENT.  AT THE POINT OF THE HYPOTHETICAL NEGOTIATION IN

8    NOVEMBER 2007, FRESENIUS' MARKET SHARE HAD RISEN, AS I SAID, TO

9    96 PERCENT.  NO DISPUTE ABOUT THAT.

10          NOW LET'S LOOK AT FRESENIUS' MINDSET AT THE POINT OF

11    THE NEGOTIATION, NOVEMBER 2007.  IT IS UNDISPUTED, AS I

12    MENTIONED, THAT FRESENIUS HAD NO ALTERNATIVE NONINFRINGING

13    MACHINE.  AGAIN, WE HAVE THEIR OWN WORDS TO SAY IT.

14          THIS IS FROM FOOTNOTE FIVE IN FRESENIUS' OPPOSITION

15    BRIEF TO OUR MOTION FOR PERMANENT INJUNCTION.  THEY TOLD THE

16    COURT THEY WOULD NEED NINE MONTHS TO DESIGN AROUND AND THREE

17    MORE TO GET FDA APPROVAL.

18          IN SUPPORT OF THAT MOTION THEY ALSO SAID THAT FROM A

19    MANUFACTURING STANDPOINT, WE CANNOT SWITCH BACK TO OUR OLD

20    NONTOUCH SCREEN INTERFACE MACHINE.  IN ADDITION THEY SAID, WE,

21    FRESENIUS, WOULD FACE SIGNIFICANT HARDSHIP IF WE WERE ENJOINED

22    FROM MAKING THE 2008K.  THAT STATEMENT WAS NOT MADE BY SOME LOW

23    LEVEL PERSON, IT WAS BY THEIR SENIOR VICE PRESIDENT OF

24    MARKETING FOR NORTH AMERICA, GLENN SLATER.  SIGNIFICANT

25    HARDSHIP.  NOVEMBER 2007.

```
 1            THEY ALSO SAID THAT IF AN INJUNCTION ISSUED, THERE

 2    WOULD BE LAYOFFS AND THERE WOULD BE HARM DONE TO THEIR FACTORY

 3    IN WALNUT CREEK.  THEY SAID THERE WOULD BE UP TO POTENTIALLY

 4    247 EMPLOYEES WHO WOULD BE AFFECTED IF THERE WERE A -- IF THERE

 5    WERE LAYOFFS IN VIEW OF THE INJUNCTION.

 6            FRESENIUS ALSO PRESENTED DECLARATIONS FROM DOCTORS

 7    AND OTHER MEDICAL PROFESSIONALS WHO SAID THAT BECAUSE OF THE

 8    FEATURES OF THE 2008K AND THE AMOUNT OF SALES FRESENIUS HAD

 9    GAINED, THAT AN INJUNCTION WOULD BE DETRIMENTAL TO THE PATIENTS

10    USING THOSE DEVICES.  AND, AGAIN, THIS IS FROM DR. WARREN

11    SHAPIRO THAT I HAVE ON THE SCREEN WHO MADE THESE STATEMENTS TO

12    JUDGE ARMSTRONG.

13            AND AGAIN, DR. SHAPIRO SAID TO JUDGE ARMSTRONG, IT

14    WILL BE OF EXTREME IMPORTANCE TO PATIENTS IN CLINICS ALIKE THAT

15    WE KEEP THIS DEVICE IN THE FIELD.

16            SO WE KNOW FRESENIUS' MINDSET AT THE POINT OF THE

17    HYPOTHETICAL NEGOTIATION.  JUDGE ARMSTRONG SUMMARIZED IT NICELY

18    IN HER INJUNCTION OPINION.  SHE CALLED WHAT FRESENIUS HAD

19    PRESENTED TO HER A PARADE OF HORRIBLES.  AND SHE NOTED THAT

20    FRESENIUS TOLD HER THAT IF AN INJUNCTION WERE TO ISSUE, ITS

21    BUSINESS WOULD BE DESTROYED AND TENS OF THOUSANDS OF

22    HEMODIALYSIS PATIENTS WOULD SUFFER AS A RESULT.

23            THAT'S JUDGE ARMSTRONG'S FINDING AS TO THIS.  I

24    RAISE THIS, YOUR HONOR, BECAUSE, AGAIN, AT THE POINT OF THE

25    HYPOTHETICAL NEGOTIATION ASKED, IF I AM NEGOTIATING WITH YOU,
```

```
1    IN EFFECT, WHAT'S IN YOUR MIND, WHAT'S IN MY MIND, AND HOW

2    WOULD THAT NEGOTIATION BE CONDUCTED.

3            WELL, WE KNOW FRESENIUS' MINDSET.  FRESENIUS, AS

4    JUDGE ARMSTRONG SAID, WAS FACING THE DESTRUCTION OF ITS

5    BUSINESS, 96 PERCENT SHARE, AND THERE'S ALSO CONCERN THAT

6    THOUSANDS OF PATIENTS WOULD SUFFER AS A RESULT.

7            BUT THERE WAS MORE GOING ON.  THE PARADE OF

8    HORRIBLES ALSO INCLUDED THE NUMBER OF POTENTIAL SALES THAT

9    FRESENIUS WOULD LOSE IF AN INJUNCTION WERE TO ENTER.  AND WE

10   KNOW THIS RETROSPECTIVELY.

11           I HAVE A CHART ON THE SCREEN, YOUR HONOR, THAT SHOWS

12   THE NUMBER OF SALES THAT FRESENIUS MADE DURING THE TRANSITION

13   PERIOD.  AND I WANT TO CLARIFY TO MAKE SURE WE ARE CLEAR WHAT

14   THE TRANSITION PERIOD ENTAILS.

15           THE TRANSITION PERIOD INVOLVED 14 MONTHS.  NOT NINE

16   MONTHS, 14 MONTHS.  THAT IS UNDISPUTED.  DR. RUBINFELD SAID IT

17   IN HIS DECLARATION.  SO FOR TWO MONTHS IN 2007 THROUGH THE

18   REMAINDER OF 2008, FRESENIUS SOLD 19,369 MACHINES.

19           **THE COURT:**  WHAT ACCOUNTS FOR THE 14 MONTHS?  WE

20   HAVE THE INITIAL NINE-MONTH PERIOD.

21           **MR. ABERNATHY:**  YES, YOUR HONOR.

22           **THE COURT:**  AND THEN WHAT'S --

23           **MR. ABERNATHY:**  I CAN EXPLAIN THAT.

24           **THE COURT:**  WHAT ACCOUNTS FOR THE OTHER FOUR OR

25   FIVE?
```

1          **MR. ABERNATHY:**  SURE.  THE INJUNCTION KICKED IN --

2    OR THE AGREEMENT WAS THE INJUNCTION WOULD KICK IN NOVEMBER OF

3    '07.  AND FRESENIUS DID NOT HAVE AN ALTERNATIVE MACHINE UNTIL

4    JANUARY 1ST, 2009.

5          SO DURING THAT PERIOD, THAT TRANSITION PERIOD,

6    FRESENIUS WAS SELLING INFRINGING MACHINES, ADMITTEDLY

7    INFRINGING MACHINES BY SUFFERANCE THROUGH THE AGREEMENT OF THIS

8    TRANSITION PERIOD THAT WAS EMBEDDED IN JUDGE ARMSTRONG'S ORDER.

9          SO UNDER THE <u>AMADO</u> DECISION BY THE FEDERAL CIRCUIT,

10   IT IS IMPORTANT TO UNDERSTAND THAT EVERY ONE OF THOSE SALES,

11   19,369, EVERY ONE WAS AN INFRINGING SALE OF A VALID PATENT.

12         WHAT'S ALSO INTERESTING ABOUT THIS SLIDE, YOUR

13   HONOR, IS WE HEARD THROUGHOUT THE TRIAL -- I THINK YOU ARE

14   GOING TO HEAR IT TODAY -- THE TOUCH SCREEN WAS WORTHLESS.  IT

15   WAS A PIECE OF PLASTIC.

16         IF IT WAS SO WORTHLESS, WHY DID FRESENIUS KEEP USING

17   THE TOUCH SCREEN AND GROWING ITS TOUCH SCREEN BUSINESS

18   THROUGHOUT THE TRANSITION PERIOD?  IF IT WAS SO WORTHLESS, WHY

19   WAS FRESENIUS PAYING INTO ESCROW, I THINK MS. BROOKS SAID,

20   $70 MILLION.  AND IF IT IS JUST A TOUCH SCREEN THAT YOU CAN

21   TAKE OFF, ONE OR THE OTHER, WHERE WAS THE REDESIGN?  THEY HAD

22   NO REDESIGN.

23         AND, AGAIN, THE TOUCH SCREEN WAS EMBEDDED INTO THEIR

24   MARKETING, IT WAS EMBEDDED INTO THEIR TECHNOLOGY, AND THEY

25   SIMPLY DID NOT HAVE AN ALTERNATIVE MACHINE.

1          SO HOW MUCH DID FRESENIUS MAKE DURING THE TRANSITION

2    PERIOD INFRINGING THE '434 PATENT?  WE HAVE IT ON THE SCREEN.

3    $248,200,000 INFRINGING REVENUE.

4          ALSO DURING THAT TIME, IT SOLD A LOT OF LINKED

5    DISPOSABLES, 442 MILLION PLUS.

6          SO, AGAIN, MY QUESTION IS, GO BACK TO THE

7    HYPOTHETICAL NEGOTIATION; NOVEMBER 2007.  FRESENIUS TELLS JUDGE

8    ARMSTRONG AT THAT POINT AN INJUNCTION WILL DESTROY OUR BUSINESS

9    AND THERE WILL BE HEALTH CONCERNS TO OUR PATIENTS.

10         IT ALSO KNOWS THAT WITHOUT AN INJUNCTION, ITS

11   96 PERCENT SHARE IN THE MARKET WILL BE DEVASTATED, AND EACH AND

12   EVERY ONE OF THESE SALES WILL NOT OCCUR.

13         I WOULD SUBMIT, YOUR HONOR, THAT AT THAT

14   HYPOTHETICAL NEGOTIATION, BAXTER WOULD HAVE A LOT OF LEVERAGE

15   TO SAY HERE IS WHAT A ROYALTY RATE OUGHT TO BE.  AND I WOULD

16   ALSO SUBMIT, YOUR HONOR, THAT FRESENIUS WOULD BE MORE THAN

17   WILLING TO SAY, WE WILL TAKE 10 PERCENT.

18         BUT ACTIONS SPEAK LOUDER THAN WORDS.  THIS ISN'T

19   HYPOTHETICAL.  WE KNOW WHAT THEY DO.  THEY WERE PAYING

20   10 PERCENT FOR EVERY ONE OF THOSE SALES.  THEY CONTINUED TO PAY

21   IT.  THEY DIDN'T INTRODUCE A DESIGN AROUND.  THEY WERE WILLING

22   TO LIVE WITH THAT.  THEY STRUCK A BARGAIN, IN EFFECT, AND DID

23   WELL IN THE MARKETPLACE AS A RESULT.

24         SO HOW MUCH DID FRESENIUS MAKE DURING THE TRANSITION

25   PERIOD BY INFRINGING BAXTER'S PATENT?  $690,700,000.

```
 1          AGAIN, MAYBE AT THE POINT OF ACTIONS SPEAK LOUDER

 2   THAN WORDS, AS MS. BROOKS SAID, BAXTER HAD A JUDGMENT OF

 3   INFRINGEMENT ON THE '434 IN 2006.  WE HAD MOVED FOR SUMMARY

 4   JUDGMENT AND WON ON THE '434, I THINK, 2005, 2006.

 5          JUDGE ARMSTRONG GRANTED JMOL, AND STILL FRESENIUS

 6   CONTINUED TO USE THE INFRINGING TOUCH SCREEN, CONTINUED TO USE

 7   THE TECHNOLOGY.

 8          JUDGE ARMSTRONG SAID SHE WAS BEWILDERED BY THE FACT

 9   THAT THEY DIDN'T REDESIGN AND BY THE FACT THAT THEY BROUGHT

10   THEMSELVES TO THE PRECIPICE AND DIDN'T HAVE ANYTHING TO USE.

11          BUT, AGAIN, IN TERMS OF ACTIONS SPEAK LOUDER THAN

12   WORDS, THE FACT THAT FRESENIUS CONTINUED TO USE THIS TECHNOLOGY

13   TELLS ME THE MARKET DEMANDED IT, TELLS ME THERE'S LOTS OF VALUE

14   IN IT, TELLS ME THAT FRESENIUS WOULD BE A WILLING LICENSEE AT

15   THE RATES THAT BAXTER HAD PROPOSED.

16          YOUR HONOR, I NOW WANT TO TALK QUICKLY ABOUT THIS

17   ISSUE OF LINKED DISPOSABLES.  FIRST, AS I MENTIONED, I THINK IN

18   TERMS OF ENTITLEMENT, THIS ISSUE HAS BEEN DECIDED BY THE

19   FEDERAL CIRCUIT, AND UNDER THE MANDATE RULE, IT CANNOT BE

20   RECONSIDERED NOW.

21          BUT IN ANY EVENT, WHAT MS. BROOK DIDN'T TALK ABOUT

22   WHEN SHE TALKED ABOUT CLAIM 26 IS THAT THAT CLAIM SPECIFICALLY

23   REQUIRES THE DISPOSABLES, DIALYSATE CONCENTRATE, DIALYSATE AND

24   HEMODIALYZER.  THE DISPOSABLES ARE CLAIMED IN THE INFRINGING

25   CLAIM 26.
```

```
1          WE ALSO KNOW THAT FRESENIUS SOLD THE 2008K AND

2    BUNDLED IT WITH THESE DISPOSABLE ANCILLARY PRODUCTS.  AND,

3    AGAIN, WE CAN LOOK TO FRESENIUS' OWN DOCUMENTS FOR THAT POINT.

4          THIS IS A DOCUMENT THAT WAS PRODUCED IN DISCOVERY.

5    IT IS A STRATEGIC DOCUMENT THAT WAS WRITTEN AND REVIEWED AT THE

6    HIGHEST LEVELS OF THE COMPANY.  IT TALKS ABOUT FRESENIUS'

7    BUNDLING PROGRAM, MEANING SELLING MACHINES, DISPOSABLES

8    ALTOGETHER WITHIN THE COMPANY.  IT WAS STRATEGIC.

9          FRESENIUS WANTED TO ENSURE THAT ITS CUSTOMERS WERE

10   BUNDLING.  IT WANTED TO ENSURE THAT IT HAD REBATE CONTRACTS

11   THAT INDUCED BUNDLING.

12         AND THERE REALLY ISN'T A DISPUTE AS TO THIS.  SO,

13   FOR INSTANCE, WHEN I DEPOSED MR. POWELL -- THIS IS AT THE

14   TRIAL.  I ASKED HIM:  HEY, YOUR LARGEST CUSTOMER IS RCG, RIGHT,

15   IN EFFECT?  YEAH.

16         IT IS TRUE THAT FRESENIUS BUNDLED THE 2008K FOR

17   MACHINE WITH OTHER PRODUCTS?  YEAH.  HE WAS VERY FORTHRIGHT.

18         AND YOU BUNDLED DIALYZERS, BLOOD LINES, CONCENTRATE

19   AND NEEDLES WITH A 2008K?  YEAH.  WITH YOUR LARGEST CUSTOMER.

20         THE COURT:  WERE THE $442 MILLION WORTH OF

21   DISPOSABLES, THAT YOU JUST SHOWED IN ONE OF YOUR SLIDES,

22   BUNDLED WITH THE $248 MILLION WORTH OF 2008K'S?

23         MR. ABERNATHY:  THEY WEREN'T ALL BUNDLED IN THAT

24   SENSE, YOUR HONOR.  WE DID NOT HAVE THE EVIDENCE TO DETERMINE

25   WHAT WAS BUNDLED AND WHAT WAS NOT.  WHAT OUR EXPERT DID --
```

1      **THE COURT:**  SO YOU DON'T KNOW IF SOME OF THOSE THAT

2  ARE REPRESENTED BY THAT FIGURE WERE ACTUALLY SOLD FOR USE WITH

3  PRODUCTS OTHER THAN THE 2008K?

4      **MR. ABERNATHY:**  IN TERMS OF BUNDLING, WE DON'T --

5  WELL, I CAN'T --

6      **THE COURT:**  IF THERE WERE OTHER PRODUCTS.  I DON'T

7  KNOW.

8      **MR. ABERNATHY:**  YOUR HONOR, I CAN'T SAY THAT EVERY

9  DISPOSABLE WITHIN THE REALM OF JUDGE ARMSTRONG'S ROYALTY AWARD

10  WAS BUNDLED.  WE DON'T HAVE THAT EVIDENCE.

11      BUT WHAT WE DID DO IS CONDUCT AN EMPIRICAL STUDY

12  THAT SHOWED WHAT MACHINES WERE LINKED TO DISPOSABLES IN THE

13  FIELD.

14      SO IF YOU LOOK AT THE FEDERAL CIRCUIT'S DECISION,

15  THE FEDERAL CIRCUIT TALKS ABOUT LINKED DISPOSABLES WITH

16  MACHINES.  THAT EMPIRICAL STUDY WAS DONE BY OUR EXPERT, MR. DEN

17  UYL, WHO IS HERE TODAY.

18      ALSO -- IF WE CAN GO BACK TO THAT SLIDE.

19      (SLIDE DISPLAYED ON SCREEN.)

20      THIS SLIDE.  THE NUMBERS WE HAVE IN THE SLIDE FOR

21  DISPOSABLES, THESE ARE NUMBERS THAT FRESENIUS REPORTED TO US AS

22  PART OF THE ESCROW ARRANGEMENT THAT SHOWS LINKED DISPOSABLE

23  REVENUE.

24      **THE COURT:**  SO IRRESPECTIVE OF WHETHER THEY WERE

25  BUNDLED --

```
 1              MR. ABERNATHY:  THEY WERE LINKED.

 2              THE COURT:  THEY WERE LINKED, MEANING THERE WAS SOME

 3      CONNECTION.  THEY WERE SOLD TO CUSTOMERS WHO ALSO PURCHASED THE

 4      2008K.

 5              MR. ABERNATHY:  CORRECT, YOUR HONOR.

 6              AGAIN, THESE NUMBERS ON THE SCREEN, THE BOTTOM LINE

 7      NUMBER AND THE LINKED DISPOSABLE REVENUE NUMBER, THOSE NUMBERS

 8      ARE ALL FROM FRESENIUS.  I THINK WE DID THE MATH IN TERMS OF

 9      GETTING THE BOTTOM LINE.

10              SO BACK TO BUNDLING QUICKLY, YOUR HONOR.  WE ALSO

11      KNOW THAT FRESENIUS USED ITS BUNDLING STRATEGY TO ATTACK BAXTER

12      AND OTHER COMPETITORS IN THE MARKET.

13              BUT MAYBE WHAT WE OUGHT TO DO, I HAVE A TWO-MINUTE

14      CLIP FROM RICE POWELL WHO WAS FRESENIUS' NORTH AMERICA CEO.  I

15      DEPOSED HIM IN 2006 ON THIS DOCUMENT AND BUNDLING.  I HAVE

16      EDITED IT DOWN.  I THINK IT'S TWO MINUTES AND 47 SECONDS.

17              MAY I PLAY IT, YOUR HONOR?

18              (VIDEO PLAYED AS FOLLOWS:

19              "Q.  WILL YOU PLEASE STATE YOUR FULL NAME FOR

20          THE RECORD?

21              "A.  ROBERT MAURICE POWELL, JUNIOR.  I GO BY

22          RICE POWELL.  MY FRIENDS AND AT WORK, AND IN PRETTY

23          MUCH ALL WALKS OF LIFE.

24              "Q.  HAVE YOU HAD A CHANCE TO REVIEW DEFENDANT'S

25          EXHIBIT 86?
```

1          "A.  YES.

2          "Q.  CAN YOU IDENTIFY THIS AS A POWER POINT

3     PRESENTATION THAT MR. FARRELL MADE ON OR AROUND

4     JANUARY 30TH, 2001?

5          "A.  YES.

6          "Q.  NOW, IF YOU TURN TO THE SLIDE THAT IS

7     NUMBERED 8, IT'S GOT THE PRODUCTION NUMBER OF F194502.

8          "A.  OKAY.

9          "Q.  IT SAYS DPD, DISCOUNT PROGRAMS, BUNDLING.

10    DO YOU SEE THAT TITLE?

11         "A.  YES.

12         "Q.  AND DO YOU UNDERSTAND THE PHRASE "BUNDLING"

13    TO BE USED HERE IN THE SAME WAY THAT YOU DESCRIBED IT

14    EARLIER IN YOUR DEPOSITION?

15         "A.  MM-HMM.

16         "Q.  SO BUNDLING -- IS THAT A "YES"?

17         "A.  YES.  I AM SORRY.

18         "Q.  "BUNDLING" IS A TERM THAT IS USED WITHIN

19    FRESENIUS' UPPER MANAGEMENT?

20         "A.  YES.

21         "Q.  AND IT'S A TERM THAT HAS BEEN USED BY

22    FRESENIUS' UPPER MANAGEMENT IN TERMS OF FORMULATING

23    CONTRACT STRATEGIES TO LARGE NATIONAL ACCOUNTS?

24         "A.  YES.

25         "Q.  THAT PHRASE TO ENCOURAGE CUSTOMERS TO

Case 3:09-cv-00688-RFP  Document 1031-1  Filed 03/21/13  Page 43 of 232  PageID# 33888
Case4:09-cv-01491-PJH  Document1156  Filed03/01/12  Page42 of 231

42

1    PURCHASE A BROADER GROUP OF DIALYSIS PRODUCTS REFERS

2    TO THE BUNDLING STRATEGY.  IN OTHER WORDS, BUNDLING IS

3    DESIGNED TO ENCOURAGE CUSTOMERS TO PURCHASE A BROADER

4    GROUP OR ALL DIALYSIS PRODUCTS FROM FMC?

5         "A.  AS I SAID, ANOTHER TERM FOR "SINGLE SOURCE"

6    WOULD BE "ONE-STOP SHOP" --

7         "Q.  YES.

8         "A.  -- TO BE ABLE TO AFFORD PEOPLE THE

9    OPPORTUNITY TO BUY WHAT THEY NEED FROM US WITHOUT

10   HAVING TO SHOP IN MULTIPLE PLACES.

11        "Q.  RIGHT.  AND THE ONE-STOP SHOP, OR SOURCE,

12   IS ACCOMPLISHED THROUGH BUNDLING?

13        "A.  ALLOWING THEM TO BUY MULTIPLE PRODUCTS AT

14   DIFFERENT, YOU KNOW, DIFFERENT VOLUMES OR WHATEVER,

15   YES, AS WE DISCUSSED.

16        "Q.  ITS CORE DIALYSIS PRODUCTS WOULD INCLUDE

17   2008K HEMODIALYSIS MACHINES?

18        "A.  YES.  DIALYZERS, BLOOD LINES, CONCENTRATE.

19   THOSE ARE THINGS WE PRODUCE IN OUR OWN FACTORY.  YES.

20        "Q.  SO IS IT ACCURATE TO SAY THAT IN RESPONSE

21   TO THE ANTICIPATED GAMBRO OF A NEW MACHINE, A NEW

22   HEMODIALYSIS MACHINE, YOU WERE PROPOSING THE BUNDLING

23   OF THE 2008K WITH OTHER HEMODIALYSIS PRODUCTS?

24        "A.  CONSISTENT WITH WHAT I AM SAYING, YES,

25   WE'RE SELLING EVERYTHING IN THE BAG."

1          **MR. ABERNATHY:**  AND BY THE WAY, YOUR HONOR, THAT

2     CLIP WAS ALSO PLAYED FOR JUDGE ARMSTRONG AT THE DAMAGES TRIAL

3     FOR THE JURY AS WELL.

4          ANOTHER QUESTION THAT IS RAISED IN THE BRIEFING IS,

5     WELL, DO THESE -- DO THESE DISPOSABLES IN THE 2008K FUNCTION

6     TOGETHER.

7          AGAIN, ON THAT, THERE IS NO DOUBT.  THE MACHINE

8     WON'T DO IT ALONE.  IN OTHER WORDS, WITHOUT THE DISPOSABLES,

9     THE MACHINE WON'T WORK.  THERE CAN BE NO HEMODIALYSIS.  AGAIN,

10    MR. POWELL WAS VERY CLEAR ON THAT.

11         ANOTHER ISSUE THAT HAS COME UP IN THE BRIEFING, I

12    WILL DEAL WITH IT VERY QUICKLY IS FRESENIUS SAYS AT THE POINT

13    OF THE HYPOTHETICAL NEGOTIATION, BAXTER AND FRESENIUS DID NOT

14    COMPETE.  THIS ISSUE WAS PUT BEFORE JUDGE ARMSTRONG, IT WAS PUT

15    BEFORE THE JURY.  THERE WAS A TON OF TESTIMONY ON IT.  AND

16    JUDGE ARMSTRONG RULED THAT THOSE TWO COMPANIES ARE HEAD-TO-HEAD

17    COMPETITORS IN THE SAME MARKET WITH BAXTER SELLING HEMODIALYSIS

18    MACHINES.

19         FRESENIUS, AGAIN, APPEALED THAT ISSUE TO THE FEDERAL

20    CIRCUIT.  AND I HAVE A COPY OF THEIR BRIEF FROM PAGE 51 TO THE

21    FEDERAL CIRCUIT WHERE THEY SAID THAT, IN EFFECT, BAXTER AND

22    FRESENIUS WERE NOT COMPETITORS, AND JUDGE ARMSTRONG ERRED IN

23    FINDING THAT.

24         AND, AGAIN, THE FEDERAL CIRCUIT REJECTED THAT

25    NOTION.  IF YOU LOOK IN THE SLIDE THAT I HAVE FROM PAGE 1303 OF

1    THE FEDERAL CIRCUIT'S DECISION, THE FEDERAL CIRCUIT REFERS TO

2    PAGES 50 THROUGH 52 WHERE FRESENIUS HAD MADE THOSE ARGUMENTS.

3    AND THE COURT FOUND THAT THE RECORD CONTAINS SUPPORT FOR THE

4    DISTRICT COURT'S FACTUAL DETERMINATIONS.  THE DISTRICT COURT

5    CLEARLY DID NOT ERR.

6              YOUR HONOR, I WOULD SUBMIT AGAIN UNDER THE MANDATE

7    RULE THAT ISSUE HAS BEEN RESOLVED.

8              AND FINALLY IN TERMS OF WHAT DID THE JURORS HEAR,

9    WHAT DID JUDGE ARMSTRONG HEAR?  THE DATE OCTOBER 25TH, 2007,

10   THIS IS TESTIMONY FROM ROBERT KEELEY, VICE PRESIDENT OF BAXTER

11   AT THE TIME.  HE SAID THAT AT THAT TIME, BAXTER AND

12   FRESENIUS -- BAXTER WAS SELLING HEMODIALYSIS MACHINES.  THEY

13   WERE SELLING MACHINES FROM THE INVENTORY.  THEY WERE SERVING AS

14   A DISTRIBUTOR FOR A COMPANY CALLED GAMBRO, AND THAT BAXTER HAD

15   INVESTED OVER $400 MILLION INTO THE HEMODIALYSIS BUSINESS.

16             THERE'S OTHER EVIDENCE THAT I THINK CONFIRMS THIS

17   POINT.  WE WILL SEE SOME LATER TODAY, IF NECESSARY.  HERE IS A

18   STATEMENT FROM FRESENIUS' 2007 ANNUAL REPORT, AT THE TIME OF

19   THE HYPOTHETICAL NEGOTIATION, NOTING THAT BAXTER WAS ONE OF ITS

20   COMPETITORS IN THIS MARKET.

21             SO QUICKLY, YOUR HONOR, IN TERMS OF ROYALTY RATES.

22   WE PRESENTED TO JUDGE ARMSTRONG IN TERMS OF THE BRIEFING OF

23   WHAT AN APPROPRIATE ROYALTY RATE OUGHT TO BE, A VERY ELABORATE

24   DETAILED DECLARATION FROM OUR EXPERT, MR. DEN UYL.

25             MR. DEN UYL WENT THROUGH LICENSE BY LICENSE,

Case 3:09-cv-00680-RFP Document 1031-1 Filed 03/21/13 Page 46 of 232 PageID# 33891
Case4:09-CV-01424-PJH Document 156 Filed 08/03/12 Page 46 of 231

45

1    GEORGIA-PACIFIC FACTOR AFTER GEORGIA-PACIFIC FACTOR, WHAT

2    FACTORS WOULD INDICATE WHAT A REASONABLE ROYALTY OUGHT TO BE.

3           THAT DECLARATION SHOWS THAT THE RANGE OF LICENSE

4    RATES IN THIS INDUSTRY INVOLVING FRESENIUS, BAXTER OR RELATED

5    COMPANIES RANGE FROM 4 TO 25 PERCENT.

6           AND, AGAIN, FRESENIUS DID NOT PRESENT TO JUDGE

7    ARMSTRONG ANY EXPERT DECLARATION WITH THIS SORT OF DETAIL.  IT

8    SIMPLY ARGUED THAT THE JURY'S VERDICT AS TO DISPOSABLES OUGHT

9    TO BE USED AS THE BASIS.

10          AN AGREEMENT THAT MR. DEN UYL TALKS A LOT ABOUT IN

11   HIS DECLARATION, HE'S HERE TODAY TO TESTIFY AS WELL IF YOUR

12   HONOR NEEDS IT, IS PROBABLY AN AGREEMENT YOU MIGHT HAVE HEARD

13   SOMETHING ABOUT A COUPLE OF SUMMERS AGO, AN AGREEMENT BETWEEN

14   BAXTER AND DEKA IN TERMS OF A PERSONAL CYCLER.

15          THIS AGREEMENT PROVIDED A 7 PERCENT ROYALTY ON

16   MACHINES, A 7 PERCENT ROYALTY ON DISPOSABLES.  AND, AGAIN, THIS

17   AGREEMENT IS NOT IDENTICAL TO THE SITUATION WE HAVE BEFORE US

18   RIGHT NOW.  MR. DEN UYL TALKED ABOUT THE VARIOUS FACTORS,

19   WEIGHED AND ANALYZED THEM TO COME UP WITH HIS CONCLUSIONS IN

20   TERMS OF THE APPROPRIATE ROYALTY RATE.

21          ALSO, IN THE RECORD IS AN AGREEMENT BETWEEN

22   FRESENIUS U.S.A. AND FRESENIUS AG THAT WAS NEGOTIATED BY

23   DR. LIPPS.  THIS AGREEMENT PROVIDED THAT FRESENIUS WOULD PAY

24   ITSELF, IN EFFECT, 4.5 PERCENT FOR DIALYZERS.

25          AGAIN, IN TERMS OF THE REASONABLENESS OF THE ROYALTY

1   THAT JUDGE ARMSTRONG APPLIED, 10 PERCENT FOR MACHINES,

2   7 PERCENT FOR DISPOSABLES, IT FALLS WELL WITHIN THE RANGE, 4 TO

3   25 PERCENT, IT'S CONSERVATIVE, IT'S REASONABLE.  THERE WAS

4   AMPLE EVIDENTIARY SUPPORT FOR HER CONCLUSIONS.

5           SO WHAT WILL FRESENIUS SAY?  THEY WILL SAY A LOT,

6   BUT JUST A COUPLE OF THINGS.

7           NUMBER ONE, THEY ARE GOING TO SAY THE BASE FOR

8   DETERMINING THE ROYALTY HERE OUGHT TO BE WHAT -- THE PRO FORMA

9   OR THE IMPUTED ROYALTY RATE FROM THE JURY'S VERDICT.

10          I JUST WANTED TO POINT OUT, YOUR HONOR, WHAT THE

11  FEDERAL CIRCUIT HAS SAID ABOUT THAT APPROACH.  IN THE AMADO

12  CASE, WHICH BOTH PARTIES BRIEFED, THE COURT SAID THERE IS A

13  FUNDAMENTAL DIFFERENCE BETWEEN A PRE-VERDICT ROYALTY AND A

14  POST-VERDICT ROYALTY, BECAUSE ONCE A JUDGMENT OF VALIDITY AND

15  INFRINGEMENT HAVE BEEN ENTERED, THE FUNDAMENTAL ECONOMICS

16  CHANGE AND THE BARGAINING POSITION CHANGES AS WELL.

17          AND INTERESTINGLY IN AMADO, THE FEDERAL CIRCUIT

18  REVERSED A ROYALTY RATE THAT SIMPLY USED A MULTIPLIER ON THE

19  JURY'S IMPUTED ROYALTY RATE AND SAID THAT THAT APPROACH WAS

20  BASED ON A FAULTY PREMISE.

21          AND WE SUBMIT, YOUR HONOR, AND WE WILL SEE MAYBE A

22  LITTLE BIT TODAY, THAT DR. RUBINFELD IN HIS DECLARATION TO YOUR

23  HONOR BASES HIS CALCULATION ON THE SAME FAULTY APPROACH AS THE

24  FEDERAL CIRCUIT FOUND IN AMADO BECAUSE HE USES THE JURY'S

25  FINDINGS AS A STARTING POINT AND THEN HE APPLIES A MULTIPLE TO

1    THE JURY'S FINDING.  AGAIN, FAULTY PREMISE.  IT IS NOT

2    ACCEPTABLE.

3         THE OTHER THING I THINK WE WILL HEAR A LITTLE BIT

4    ABOUT TODAY IS, WELL, IN JANUARY 2009, 14 MONTHS AFTER THE

5    HYPOTHETICAL NEGOTIATION, WE, FRESENIUS, INTRODUCED A NEW

6    MACHINE, THE 2008K2, AND IT DIDN'T HAVE A TOUCH SCREEN.

7         I WOULD SUBMIT, YOUR HONOR, IT'S IRRELEVANT FOR A

8    NUMBER OF REASONS.  NUMBER ONE, IT DID NOT EXIST AT THE POINT

9    OF THE HYPOTHETICAL NEGOTIATION.  THAT IS UNDISPUTED.

10        NUMBER TWO, THE WHOLE PURPOSE FOR THIS TRANSITION

11   PERIOD, AS FOUND BY JUDGE ARMSTRONG AND AS ARGUED BY THE

12   PARTIES' BRIEFS, WAS THAT FRESENIUS DIDN'T HAVE A NONINFRINGING

13   SUBSTITUTE WHEN IT NEEDED IT IN NOVEMBER 2007.

14        AND, FINALLY, YOUR HONOR, I WOULD SUBMIT THAT UNDER

15   THE COURT'S -- UNDER THE FEDERAL CIRCUIT'S MANDATE RULE, IT'S

16   INAPPROPRIATE TO BE RELYING ON EVIDENCE THAT JUDGE ARMSTRONG

17   COULD NOT HAVE CONSIDERED, THAT WAS NOT IN THE RECORD, AND

18   SIMPLY DID NOT EXIST AT THE TIME WHEN SHE DETERMINED HER

19   REASONABLE ROYALTY RATE.

20        AND I WANT TO CONCLUDE, YOUR HONOR, WITH JUST A

21   COUPLE OF THOUGHTS.  YOU ASKED -- OR YOU SAID YOU WEREN'T

22   INVOLVED WITH THE TRIAL.  BOTH MS. BROOKS AND I WERE AND WE

23   HAVE OUR OWN VIEWS OF HOW THINGS WENT.  BUT JUDGE ARMSTRONG DID

24   SIT THROUGH A VERY LONG, TOUGH CASE BETWEEN TWO COMPETITORS.

25   LOTS OF BRIEFING BACK AND FORTH, BUT IT'S INTERESTING WHAT HER

1    COMMENTS WERE WHEN SHE ISSUED HER OPINION ON THE INJUNCTION AND

2    ON THE ROYALTY RATES.

3              SHE POINTED OUT THAT FRESENIUS WAS SINGING A FAR

4    DIFFERENT TUNE TO HER THAN IT HAD TO THE JURORS IN TERMS OF THE

5    IMPORTANCE OF THE TOUCH SCREEN.  SHE NOTED THAT IN OPENING AND

6    IN OTHER ARGUMENTS, FRESENIUS SIMPLY SAID THE TOUCH SCREEN IS

7    IRRELEVANT, YOU SIMPLY SLAP IT ON, IT'S, IN EFFECT, A NEAR

8    VALUELESS ITEM.  AND SHE SAID, BOY, I CAN'T SQUARE THAT WITH

9    WHAT YOU ARE TELLING ME IN THE BRIEFS.

10             SHE ALSO SAID THAT FRESENIUS HAD EMPLOYED AN

11   ARGUMENTATIVE STRATEGY AT TRIAL TO AVOID STRAIGHTFORWARDLY

12   CONTRADICTING THE REPRESENTATIONS IT MADE AT TRIAL.  THAT WAS

13   JUDGE ARMSTRONG'S VIEW AS SHE CONCLUDED HER TENURE ON THIS

14   CASE.

15             SO, YOUR HONOR, I WILL CONCLUDE.  PROBABLY BEEN

16   DOING THIS TOO LONG.  THE ABSENCE OF THE '131 AND '027 PATENTS

17   DOES NOT IMPACT THE ROYALTY RATES THAT JUDGE ARMSTRONG FOUND.

18   WHY?  BECAUSE IN ORDER TO COMPETE IN THE MARKETPLACE, IN ORDER

19   TO CONTINUE TO SELL THE TOUCH SCREEN MACHINES, FRESENIUS NEEDED

20   TO HAVE A LICENSE TO THE '434.

21             THE HYPOTHETICAL NEGOTIATION WOULD HAVE BEEN THE

22   SAME IF THERE WERE THREE PATENTS OR ONE PATENT; FRESENIUS

23   NEEDED A LICENSE TO TOUCH SCREEN TECHNOLOGY.

24             AND AS WE NOTED, YOUR HONOR, THERE IS A WEALTH OF

25   EVIDENCE SHOWING THE REASONABLENESS OF JUDGE ARMSTRONG'S AWARD,

1    EVIDENCE THAT SHE SAT THROUGH FOR A NUMBER OF YEARS -- THAT SHE

2    CONSIDERED FOR QUITE AWHILE, AND I WOULD SUBMIT, YOUR HONOR,

3    THAT THAT AWARD IS REASONABLE AND SHOULD BE APPLIED HERE.

4             THANK YOU.

5             **THE COURT:**  ALL RIGHT.  NOW, COUNSEL, YOU HAVE --

6    HAVE YOU CONCLUDED YOUR ARGUMENT WITH THE EXCEPTION OF YOUR

7    PRESENTATION OF TESTIMONY FROM BRUCE DEN UYL?

8             **MR. ABERNATHY:**  CORRECT, YOUR HONOR.

9             **THE COURT:**  I WOULD LIKE TO HEAR FROM YOUR WITNESS

10   THEN.  HE WILL BE CONCLUDED AND THEN I WILL HEAR FROM

11   FRESENIUS.

12            **MR. ABERNATHY:**  THANK YOU, YOUR HONOR.  SO WE WILL

13   CALL MR. DEN UYL.

14            **MS. BROOKS:**  YOUR HONOR, YOU WISH THEM TO CALL

15   MR. DEN UYL FIRST --

16            **THE COURT:**  I WOULD LIKE THEM TO FINISH UP THEIR

17   CASE NOW SINCE HE HAS PRETTY MUCH CONCLUDED BOTH HIS OPENING

18   AND SUBSTANTIVE ARGUMENTS TOGETHER.  IT'S JUST CLEANER.

19            **MS. BROOKS:**  THANK YOU.

20            **THE COURT:**  SO WOULD YOU CALL YOUR WITNESS?

21            **MR. MURTHY:**  MAY IT PLEASE THE COURT, YOUR HONOR, WE

22   WILL CALL BRUCE DEN UYL.

23                      **BRUCE DEN UYL,**

24   CALLED AS A WITNESS FOR THE DEFENDANTS, HAVING BEEN DULY SWORN,

25   TESTIFIED AS FOLLOWS:

1          **THE WITNESS:**  I DO.

2          **THE CLERK:**  PLEASE BE SEATED.  PLEASE STATE YOUR

3     FULL NAME AND SPELL YOUR LAST NAME FOR THE RECORD.

4          **THE WITNESS:**  YES.  IT IS BRUCE DEN UYL.  D-E-N,

5     CAPITAL U-Y-L.

6                    **DIRECT EXAMINATION**

7     BY MR. MURTHY:

8     **Q.**   GOOD MORNING, MR. DEN UYL.

9          WHY ARE YOU HERE TODAY?

10    **A.**   I AM HERE TO PROVIDE AN OPINION AS TO WHETHER THE ABSENCE

11    OF THE '131 AND '027 PATENTS WOULD EFFECT THE ROYALTY RATES

12    THAT JUDGE ARMSTRONG DECIDED FOR THE TRANSITION PERIOD.

13         I AM ALSO GOING TO PROVIDE AN OPINION ON WHETHER THE

14    ROYALTY RATES OF 10 PERCENT ON THE 2008K MACHINE AND 7 PERCENT

15    ON THE DISPOSABLES FOR THE TRANSITION PERIOD AND FOR THE

16    DISPOSABLES UNTIL THE END OF THE PATENT ARE APPROPRIATE AND

17    SUPPORTABLE.

18    **Q.**   AND FOR EASE OF REFERENCE, CAN WE JUST REFER TO THE PERIOD

19    FROM NOVEMBER OF 2007 UNTIL JANUARY 1 OF 2009 AS THE TRANSITION

20    PERIOD?

21    **A.**   YES.

22         **THE COURT:**  LET ME JUST GO BACK.

23         THE SECOND ISSUE, CLEARLY, HE CAN OFFER AN OPINION

24    ON.  I AM NOT ENTIRELY SURE THAT IT WOULD BE APPROPRIATE WITH

25    REGARD TO THE FIRST OPINION, THOUGH, AS TO WHETHER THE ABSENCE

1   OF THE OTHER TWO PATENTS WOULD AFFECT THE ROYALTY RATES THAT

2   JUDGE ARMSTRONG DECIDED.  ISN'T THAT A QUESTION FOR ME TO

3   DECIDE?

4           **MR. MURTHY:**  IT IS, YOUR HONOR, THE QUESTION FOR YOU

5   TO DECIDE HERE, AND MR. DEN UYL IS GOING TO GIVE INFORMATION

6   RELEVANT TO THAT DETERMINATION.

7           **THE COURT:**  OKAY.  WELL, I AM GOING TO LISTEN

8   CAREFULLY.  I DON'T WANT HIM TO INVADE THE PROVINCE OF THE

9   COURT'S DETERMINATION AS TO WHETHER OR NOT THOSE RATES SHOULD

10  HAVE BEEN IMPOSED.

11          **MR. MURTHY:**  NO, YOUR HONOR.

12          **THE COURT:**  CLEARLY ANY OPINION HE HAS AS TO THE

13  REASONABLENESS OF THOSE RATES IS PERTINENT.

14          **MR. MURTHY:**  THAT'S CORRECT, YOUR HONOR.  THAT'S

15  GOING TO BE THE TENURE OF HIS OPINION HERE.

16          **THE COURT:**  OKAY.

17  **BY MR. MURTHY:**

18  **Q.**   MR. DEN UYL, WHY ARE YOU FOCUSING ON THE NOVEMBER 7TH,

19  2007 THROUGH JANUARY 1, 2009 TIME PERIOD?

20  **A.**   WELL, THAT'S THE PERIOD IN WHICH JUDGE ARMSTRONG STAYED

21  THE INJUNCTION.

22  **Q.**   BEFORE WE GET INTO THE SPECIFICS OF YOUR OPINION, COULD

23  YOU JUST BRIEFLY DESCRIBE YOUR EDUCATIONAL BACKGROUND FOR US?

24  **A.**   SURE.  I HAVE A BACHELOR'S OF SCIENCE IN ECONOMICS GEOLOGY

25  WITH HONORS FROM LAWRENCE UNIVERSITY.  I HAVE A MASTER'S IN

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/13 Page 52 of 232 PageID# 33898
Case4:09-CF-01431-PJH Document1156 Filed08/02/12 Page52 of 231

52

DEN UYL – DIRECT / MR. MURTHY

1    NATURAL RESOURCES ECONOMICS FROM THE UNIVERSITY OF MICHIGAN,

2    AND COMPLETED ALL COURSE WORK FOR A PH.D. IN NATURAL RESOURCES

3    ECONOMICS ALSO FROM THE UNIVERSITY OF MICHIGAN.

4    **Q.**    CAN YOU BRIEFLY DESCRIBE FOR US YOUR OCCUPATION?

5    **A.**    YES.  I AM A MANAGING DIRECTOR AT ALIX PARTNERS WHERE I

6    HAVE BEEN FOR THE PAST 13 YEARS.  PRIOR TO THAT I WAS A PARTNER

7    AT PRICEWATERHOUSE IN CHICAGO, ILLINOIS.

8    **Q.**    AND HAVE YOU IN THE PAST ASSISTED COMPANIES WITH

9    REASONABLE ROYALTY ANALYSES?

10   **A.**    YES.  MUCH THAT I DO IS LOOKING AT ROYALTY RATES IN A

11   NUMBER OF CONTEXT.  TO LOOK AT FOR LICENSING PURPOSES WHAT

12   COMPANIES MIGHT LICENSE THEIR TECHNOLOGY FOR, TO LOOK AT THE

13   VALUE OF INTELLECTUAL PROPERTY IN CONNECTION WITH BOTH

14   LICENSING AND TRANSACTIONS, AS WELL AS TO PROVIDE EXPERT

15   OPINIONS IN PATENT AND TRADEMARK INFRINGEMENT MATTERS.

16   **Q.**    JUST GENERALLY, WHAT TYPE OF COMPANIES HAVE YOU WORKED FOR

17   IN THE PAST?

18   **A.**    WELL, IT'S A BROAD ARRAY OF COMPANIES.  FROM COMPANIES

19   LIKE THIS, IN MEDICAL TECHNOLOGY, TO COCA-COLA.  I WORKED ON

20   THE LICENSING OF THE HIGH DEFINITION PATENTS THAT WE SEE IN ALL

21   TELEVISIONS TODAY, AND I EVEN HELPED THE ACADEMY DETERMINE THE

22   APPROPRIATE ROYALTY RATE FOR THE OSCAR.

23   **Q.**    AND, MR. DEN UYL, HOW MANY YEARS OF EXPERIENCE DO YOU HAVE

24   WORKING ON THESE TYPES OF MATTERS?

25   **A.**    OVER 20 YEARS OF EXPERIENCE.

Case 3:09-cv-00680-REP  Document 1031-1  Filed 03/21/18  Page 54 of 232 PageID# 33899
Case4:03-cv-01431-PJH  Document1156  Filed09/02/12  Page53 of 291

DEN UYL - DIRECT / MR. MURTHY

1   **Q.**   WHAT I WOULD LIKE TO TURN TO NOW IS, HAVE YOU PREPARED AN

2   OPINION REGARDING THE APPROPRIATE ROYALTY RATES IN THIS CASE?

3   **A.**   YES, I HAVE.

4   **Q.**   AND WHAT IS YOUR OPINION, SIR?

5   **A.**   MY OPINION IS THAT THE ROYALTY RATES OF 10 PERCENT ON THE

6   2008K AND 7 PERCENT ON THE DISPOSABLES, AS DECIDED BY JUDGE

7   ARMSTRONG, ARE APPROPRIATE.

8   **Q.**   AND WHAT, GENERALLY, DID YOU DO TO DETERMINE THE

9   APPROPRIATENESS OF THE ROYALTY RATES?

10  **A.**   WELL, TWO THINGS.

11          ONE, I LOOKED AT THE BARGAINING POSITION OF THE

12  PARTIES AT THE TIME OF THE HYPOTHETICAL NEGOTIATION IN NOVEMBER

13  OF 2007.  SO LOOKING AT THE STRENGTHS AND WEAKNESSES OF THEIR

14  BARGAINING POSITION AND THEN I ALSO REVIEWED THE

15  GEORGIA-PACIFIC FACTORS WHICH LOOK AT A NUMBER OF ECONOMIC

16  INDICIA OF WHAT THE ROYALTY RATE SHOULD BE.

17  **Q.**   NOW WHY DID YOU LOOK AT THE PARTIES' BARGAINING POSITION

18  AT THE TIME OF THE POST-JUDGMENT HYPOTHETICAL NEGOTIATION?

19  **A.**   WELL, BECAUSE THE BARGAINING POSITION HAD CHANGED SINCE

20  THE TIME OF THE ORIGINAL NEGOTIATION IN THE YEAR 2000.  SO,

21  THE -- YOU HAVE TO LOOK AT THE POSITION AT THAT TIME AND THE

22  RELATIVE STRENGTH OF EACH PARTY IN THE BARGAIN IN 2007.

23  **Q.**   WHAT WOULD BAXTER AND FRESENIUS HAVE CONSIDERED AT THE

24  TIME OF THE POST-JUDGMENT NEGOTIATION?

25  **A.**   WELL, THEY WOULD HAVE CONSIDERED THAT THE PATENT WAS

DEN UYL − DIRECT / MR. MURTHY

1    INFRINGED AND VALID.  AND THEY WOULD HAVE CONSIDERED THAT THE

2    MARKET SHARE OF FRESENIUS HAD INCREASED DURING THAT TIME UP TO

3    96 PERCENT.  THEY WOULD HAVE ALSO CONSIDERED THAT THE -- THERE

4    WAS A PERMANENT INJUNCTION THAT WAS PENDING AT THAT TIME, AND

5    THAT THEY DIDN'T HAVE A NONINFRINGING ALTERNATIVE AT THAT TIME.

6    **Q.**   AND WERE THESE FACTORS THAT YOU'VE IDENTIFIED IMPORTANT IN

7    UNDERSTANDING THE PARTIES' RESPECTIVE BARGAINING POSITION?

8    **A.**   YES.  THEY SORT OF DEFINED THE BARGAINING POSITION OF EACH

9    OF THE PARTIES AT THAT TIME.

10   **Q.**   AND DID YOU ALSO ANALYZE SPECIFICALLY FRESENIUS'

11   BARGAINING POSITION?

12   **A.**   YES.

13         FRESENIUS WOULD HAVE HAD -- WOULD HAVE KNOWN THAT IF

14   IT DID NOT REACH A LICENSE WITH BAXTER, THAT IT WOULD NOT BE

15   ABLE TO SELL THE 2008K MACHINE, WHICH WAS EXTREMELY SUCCESSFUL

16   AND PROFITABLE, SO IT WOULD LOSE THOSE PROFITS.

17   **Q.**   NOW YOU'VE ALSO MENTIONED THAT YOU CONSIDERED THE PARTIES'

18   RESPECTIVE BARGAINING POSITION.

19         WHAT EXACTLY WOULD FRESENIUS HAVE STOOD TO LOSE?

20   **A.**   WELL, THEY WOULD STAND TO LOSE THE SALES OF THAT 2008K

21   MACHINE DURING THAT PERIOD OF TIME BECAUSE THEY HAD NO

22   ALTERNATIVE AT THAT TIME.  THAT WAS THE ONLY MACHINE THAT THEY

23   HAD ON THE MARKETPLACE.  SO THEY WOULD LOSE THE SALES OF

24   THOSE -- OF THE 2008K DURING THE TRANSITION PERIOD IF THEY DID

25   NOT TAKE A LICENSE.

1  Q.   WOULD FRESENIUS LOSE ANYTHING ELSE?

2  A.   YES.  WELL, THEY WOULD LOSE, YOU KNOW, THE BUSINESS.  THEY

3  MAY HAVE TO LAY OFF EMPLOYEES.  THEY WOULD LOSE PERHAPS AN

4  EFFECT ON THEIR REPUTATION, AS WELL AS, YOU KNOW, JEOPARDIZE

5  THE PUBLIC HEALTH.

6  Q.   HOW ABOUT SALES OF DISPOSABLES; WOULD FRESENIUS STAND TO

7  LOSE SALES OF DISPOSABLES?

8  A.   YES.

9       SO THE DISPOSABLES THAT ARE SOLD WITH THE 2008K

10 MACHINE, THEY WOULD ALSO LOSE SALES OF THAT BECAUSE THEY WOULD

11 NOT HAVE THE EFFECT OF THE PULL THROUGH THAT YOU GET FROM THE

12 SALES OF THE 2008K MACHINE.

13 Q.   NOW, THERE'S ALREADY BEEN SOME DISCUSSION HERE TODAY ABOUT

14 THIS TERM "LINKED DISPOSABLES".

15      CAN YOU PLEASE DESCRIBE FOR US WHAT ARE LINKED

16 DISPOSABLES?

17 A.   WELL, LINKED DISPOSABLES ARE DISPOSABLES THAT ARE SOLD

18 WITH THE 2008K MACHINE.

19      SO, WHAT I DID WAS I LOOKED AT A DATABASE OF THE

20 SALES OF THE 2008K TO THE CUSTOMERS THAT HAD BOUGHT THEM AND

21 THEN IDENTIFIED THOSE CUSTOMERS THAT ALSO BOUGHT THE

22 CORRESPONDING DISPOSABLE PRODUCTS, THE DIALYZERS, THE BLOOD

23 LINES, AND SO FORTH.

24 Q.   NOW WHAT WERE THE PROFITS EARNED BY FRESENIUS ON THE

25 INFRINGING 2008K MACHINE AND LINKED DISPOSABLES?

Case 3:09-cv-00680-REP Document 1031-1 Filed 03/21/18 Page 57 of 232 PageID# 33902
Case 3:09-cv-01431-JJH-DUP Document 1156 Filed 05/02/12 Page 56 of 291

DEN UYL — DIRECT / MR. MURTHY

1  **A.**    THE PROFIT MARGIN FOR FRESENIUS WAS ABOUT 30 TO

2  31 PERCENT.  SO ABOUT 30 CENTS OF EVERY DOLLAR OF SALES THEY

3  MADE WAS PROFIT TO FRESENIUS.

4  **Q.**    AND IN PART OF YOUR ANALYSIS ON THE BARGAINING POSITION OF

5  THE PARTIES, WHAT WOULD FRESENIUS' PROFIT MARGIN HAVE ON ITS

6  BARGAINING POSITION?

7  **A.**    WELL, THE -- TWO THINGS.

8         ONE, THE HIGHER THE PROFIT MARGIN, THE HIGHER THE

9  ROYALTY RATE WOULD BE.  BECAUSE EVEN THOUGH IT PAID BAXTER A

10  ROYALTY, IN THIS CASE, OF 10 PERCENT, IT WOULD STILL BE LEFT

11  WITH OVER 20 CENTS OF ITS PROFIT THAT IT WOULD KEEP.

12         AND SO IT WOULD AFFECT THE AMOUNT OF THE PROFIT AND

13  THE CORRESPONDING LOSS IF IT COULD NOT SELL ITS PRODUCT.

14  **Q.**    AND WHAT DOES THIS PROFIT INFORMATION TELL YOU ABOUT THE

15  BARGAINING POSITIONS OF THE PARTIES WITH RESPECT TO THE ROYALTY

16  RATES THAT JUDGE ARMSTRONG SET?

17  **A.**    WELL, IT'S THE AMOUNT THAT FRESENIUS WOULD POTENTIALLY PAY

18  IS UP TO THE PROFIT OF THE MACHINE, SO UP TO 30 PERCENT ON THE

19  MACHINE.  BUT JUDGE ARMSTRONG CAME UP WITH A ROYALTY RATE OF

20  10 PERCENT, WHICH IS ONLY A THIRD OF THAT PROFIT.

21  **Q.**    NOW, BEYOND THE PROFITS THAT FRESENIUS WOULD FOREGO IF IT

22  DID NOT OBTAIN A LICENSE FROM BAXTER, ARE YOU AWARE OF ANY

23  OTHER HARDSHIPS THAT FRESENIUS WOULD HAVE FACED IF IT HAD BEEN

24  PREVENTED FROM SELLING THE 2008K MACHINE AND RELATED

25  DISPOSABLES?

Case 3:09-cv-00680-RFP Document 1031-1 Filed 03/21/18 Page 58 of 232 PageID# 33903
Case4:09-cv-01491-PJH Document1156 Filed 08/07/12 Page58 of 291

57

DEN UYL - DIRECT / MR. MURTHY

1   **A.**   YES.  POTENTIALLY YOU WOULD HAVE LAYOFF OF EMPLOYEES,

2   BECAUSE THEY ARE NOT MAKING THE MACHINE, YOU WOULD HAVE LOSS TO

3   THE REPUTATION, AS WELL AS POTENTIAL PUBLIC HEALTH CONCERNS.

4   **Q.**   NOW, DID YOU ALSO ANALYZE THE GEORGIA-PACIFIC FACTORS IN

5   ASSESSING THE NEGOTIATING POSITIONS OF THE PARTIES?

6   **A.**   YES, I DID.

7                    (SLIDE PROJECTED ON SCREEN.)

8   **Q.**   WHICH GEORGIA-PACIFIC FACTORS WERE MOST RELEVANT TO YOUR

9   ANALYSIS?

10  **A.**   WELL, I LOOKED AT THE ONES ON THE LIST HERE.  FACTOR TWO,

11  THE RATES PAID BY THE LICENSES -- LICENSEES FOR COMPARABLE

12  LICENSE, THE ESTABLISHED LICENSING POLICY; FACTOR FIVE, THE

13  COMMERCIAL RELATIONSHIP BETWEEN THE PARTIES; FACTOR SIX,

14  ADDITIONAL SALES OF OTHER ITEMS; EIGHT SPEAKS TO THE

15  PROFITABILITY OF THE PRODUCT; NINE, THE ADVANTAGES OF THE

16  PATENTED TECHNOLOGY; 11, TO THE EXTENT THAT FRESENIUS USED THE

17  INVENTION; 12, THE RATES THAT ARE TYPICAL FOR SUCH TECHNOLOGY;

18  13, THE PROPORTION OF PROFIT THAT IS CREDITED TO THE

19  INNOVATION.

20  **Q.**   WHAT I WOULD LIKE TO DO IS START WITH GEORGIA-PACIFIC

21  FACTOR NUMBER FIVE.

22               WHAT DID YOUR ANALYSIS OF GEORGIA-PACIFIC FACTOR

23  NUMBER FIVE SHOW?

24                    (SLIDE PROJECTED ON SCREEN.)

25  **A.**   WELL, THAT LOOKED AT WHETHER THE PARTIES ARE COMPETITORS

DEN UYL - DIRECT / MR. MURTHY

1    IN THE INDUSTRY.

2    **Q.**   AND WHAT EVIDENCE DID YOU REVIEW IN RELATION TO THE

3    COMPETITIVE RELATIONSHIP BETWEEN BAXTER AND FRESENIUS?

4    **A.**   WELL, THERE ARE SEVERAL THINGS.

5            ONE, WE HAD THE TESTIMONY IN 2007 OF MR. KEELEY, WHO

6    WAS A BAXTER EXECUTIVE, THAT THE NUMBER ONE COMPETITOR TO

7    BAXTER IN THE RENAL MARKETPLACE IS FRESENIUS.

8    **Q.**   HOW ABOUT FRESENIUS' STANDPOINT; DID YOU SEE ANY EVIDENCE

9    THAT FRESENIUS BELIEVED IT WAS IN COMPETITION WITH BAXTER

10   RELATED TO DIALYSIS PRODUCTS?

11   **A.**   YES.  IF YOU LOOK AT THEIR ANNUAL REPORT OR SEC FILINGS,

12   THEY IDENTIFY BAXTER AS ONE OF THEIR PRINCIPAL COMPETITORS.

13   **Q.**   AND WHAT IS YOUR UNDERSTANDING WITH RESPECT TO WHETHER OR

14   NOT JUDGE ARMSTRONG DETERMINED WHETHER OR NOT THE PARTIES WERE

15   COMPETITORS?

16           (SLIDE PROJECTED ON SCREEN.)

17   **A.**   WELL, JUDGE ARMSTRONG SAID IN HER ORDER THAT BAXTER AND

18   FRESENIUS ARE HEAD-TO-HEAD COMPETITORS WITHIN THE SAME MARKET.

19   **Q.**   AND IS THERE ANY OTHER REASON WHY YOU BELIEVE THAT BAXTER

20   WAS IN THE HEMODIALYSIS MARKET IN 2007?

21   **A.**   YES.  AT THAT TIME THEY WERE MAKING SIGNIFICANT

22   INVESTMENTS IN A NEW HEMODIALYSIS MACHINE.  SO THAT OVER THE

23   NEXT, SINCE 2007, THEY HAVE INVESTED ALMOST $200 MILLION IN THE

24   DEVELOPMENT OF A NEW HEMODIALYSIS MACHINE.

25   **Q.**   AND AT THE END OF THE DAY, WHAT IS THE ECONOMIC IMPACT OF

1   BAXTER AND FRESENIUS BEING COMPETITORS WITH ONE ANOTHER?

2   **A.**   WELL, BECAUSE THEY ARE COMPETITORS, BAXTER DOESN'T REALLY

3   WANT TO LICENSE THEIR COMPETITOR BECAUSE THEY ARE IN THE SAME

4   MARKETPLACE.

5   **Q.**   THANK YOU, MR. DEN UYL.

6             NOW WHAT I WOULD LIKE TO DO IS TURN TO

7   GEORGIA−PACIFIC FACTOR NUMBER FOUR.  WHAT DID YOU FIND WITH

8   RESPECT TO GEORGIA−PACIFIC FACTOR NUMBER FOUR?

9                     (SLIDE PROJECTED ON SCREEN.)

10  **A.**   WELL, FOUR ASKED WHETHER THERE'S A HISTORY OF THE PATENTEE

11  FOR LICENSING ITS COMPETITORS OR MAINTAINING ITS PATENT

12  MONOPOLY.

13            IN THIS CASE, CLEARLY BAXTER HAS NOT LICENSED ITS

14  COMPETITOR.  IT HAS MADE SIGNIFICANT INVESTMENTS IN THE RENAL

15  MARKETPLACE AND IT HAS NEVER LICENSED ONE OF ITS COMPETITORS.

16  **Q.**   NOW, WHAT I WOULD LIKE TO DO IS TURN TO GEORGIA−PACIFIC

17  FACTOR NUMBER NINE, MR. DEN UYL.  WHAT DID YOU FIND WITH

18  RESPECT TO THAT FACTOR?

19                    (SLIDE PROJECTED ON SCREEN.)

20  **A.**   WELL, THIS IS LOOKING AT THE UTILITY OR ADVANTAGES OF THE

21  PATENTED PROPERTY.

22  **Q.**   WHAT DID YOU FIND WITH RESPECT TO GEORGIA−PACIFIC FACTOR

23  NUMBER NINE?

24  **A.**   WELL, THERE'S A NUMBER OF THINGS, DOCUMENTS THAT FRESENIUS

25  HAD THAT TALKED ABOUT THE IMPORTANCE OF THIS TECHNOLOGY.

Case 3:09-cv-00680-REP-4Document 1031-1 Filed 03/21/13 Page 61 of 232 PageID# 33906
Case4:09-cv-01431-PJH Document1136 Filed09/02/12 Page60 of 291     60
DEN UYL – DIRECT / MR. MURTHY

1          HERE WE HAVE THEIR DESIGN AND DEVELOPMENT PLAN FROM

2    THE YEAR 2000 TALKING ABOUT THAT TO MAINTAIN THE LEADERSHIP IN

3    THE HEMODIALYSIS MARKETPLACE, THEY NEEDED THIS TOUCH SCREEN

4    TECHNOLOGY.

5               (SLIDE PROJECTED ON SCREEN.)

6    Q.   NOW DO YOU KNOW WHETHER OR NOT THE 2008K MACHINE DID, IN

7    FACT, ALLOW FRESENIUS TO MAINTAIN LEADERSHIP IN THE

8    HEMODIALYSIS MARKET?

9    A.   YES.   IN THE YEAR 2000, FRESENIUS HAD A MARKET SHARE OF

10   ABOUT 64 PERCENT AND BY THE YEAR 2006, THAT MARKET SHARE HAD

11   INCREASED TO 96 PERCENT DURING THE TIME THEY WERE SELLING THE

12   2008K MACHINE.

13   Q.   AND WHAT FEATURES DID FRESENIUS' MARKETING BROCHURES FOR

14   THE 2008K EMPHASIZE DURING THIS TIME PERIOD?

15              (SLIDE PROJECTED ON SCREEN.)

16   A.   WELL, THE BROCHURES THAT WE SEE HERE POINT TO THE TOUCH

17   SCREEN FEATURE OF THE 2008K MACHINE.   IT SHOWS THE MACHINE AND

18   "IN TOUCH WITH A NEW GENERATION".   SO CLEARLY IT WAS

19   ADVERTISING THIS FEATURE.

20              (SLIDE PROJECTED ON SCREEN.)

21   Q.   AND HOW ABOUT THE TESTIMONY FROM FRESENIUS' WITNESSES;

22   WHAT DID FRESENIUS' WITNESSES HAVE TO SAY ABOUT THE ADVANTAGES

23   OF THE PATENTED TECHNOLOGY?

24   A.   WELL, THIS TESTIMONY IS FROM MR. POWELL.   AND HE WAS ASKED

25   WHETHER CUSTOMERS DEMANDED THE TOUCH SCREEN INTERFACE.

Case 3:09-cv-00680-REP Document 1031-1 Filed 03/21/18 Page 62 of 232 PageID# 33907
Case4:09-cv-01401-UFP Document1156 Filed08/07/12 Page61 of 291    61
DEN UYL – DIRECT / MR. MURTHY

1    AND HE TESTIFIED THAT, YES, NURSES DEMANDED IT,

2    TECHNICIANS DEMANDED IT, AS WELL AS DOCTORS.  AND THAT, IN

3    FACT, IT DROVE THE DEMAND FOR THE PRODUCT, AND THAT EVERYTHING

4    HINGED ON THAT TECHNOLOGY.

5    **Q.**  WHAT DOES THE FACT THAT THE 2008K MACHINE HAVE ADVANTAGES

6    OVER THE PRIOR ART DO TO THE NEGOTIATING POWER OF THE PARTIES

7    AT THE TIME OF THE NEGOTIATION?

8    **A.**  WELL, IF YOU KNOW THAT IT'S GOING TO BE IMPORTANT

9    TECHNOLOGY WHEN YOU SIT DOWN AT THE NEGOTIATING TABLE, THEN YOU

10   HAVE A STRONGER BARGAINING POSITION BECAUSE YOU ARE PROVIDING

11   SOMETHING OF VALUE TO THE OTHER SIDE.

12        (SLIDE PROJECTED ON SCREEN.)

13   **Q.**  NOW WHAT I WOULD LIKE TO DO IS TURN TO GEORGIA-PACIFIC

14   FACTOR NUMBER SIX.  WHAT DID YOU FIND WITH RESPECT TO THAT

15   GEORGIA-PACIFIC FACTOR?

16   **A.**  GEORGIA-PACIFIC FACTOR SIX IS LOOKING AT WHETHER BY

17   SELLING THAT PATENTED PRODUCT YOU ALSO GET THE BENEFIT OF

18   SELLING ADDITIONAL PRODUCTS.

19        AND SO WHAT I LOOKED AT WAS NOT ONLY THE SALES OF

20   THE 2008K MACHINE, BUT ALSO THE LINKED DISPOSABLES THAT WE HAVE

21   TALKED ABOUT HERE.

22   **Q.**  NOW, I THINK THIS IS QUITE IMPORTANT.

23        HOW DID FRESENIUS' DATA ALLOW YOU TO IDENTIFY

24   CUSTOMERS THAT PURCHASED BOTH 2008K MACHINES AND DISPOSABLES?

25   **A.**  WELL, THE DATA SHOWED WHO HAD BOUGHT THE 2008K MACHINE BY

1   CUSTOMER.  AND THEN I ALSO WAS ABLE TO SEE HOW MUCH OF THESE

2   DISPOSABLE PRODUCTS THAT SAME CUSTOMER HAD PURCHASED.

3            SO IT SHOWED THAT THE PEOPLE THAT HAD BOUGHT THE

4   2008K MACHINE HAD BOUGHT, IN THOSE CASES, A NUMBER OF THOSE

5   DISPOSABLE PRODUCTS.

6                    (SLIDE PROJECTED ON SCREEN.)

7   Q.   WHAT ARE SOME EXAMPLES OF THE DISPOSABLES AT ISSUE THAT

8   ARE RELATED OR LINKED TO THE 2008K MACHINE?

9   A.   WELL, YOU HAVE THE DIALYZER, THE BLOOD LINES, THE FISTULA,

10  AND THE CONCENTRATES.

11  Q.   AND HOW DOES GEORGIA-PACIFIC FACTOR NUMBER SIX TAKE INTO

12  ACCOUNT THE FACT THAT YOU ARE SELLING ADDITIONAL DISPOSABLES

13  WITH THE 2008K MACHINE?

14  A.   WELL, IT SHOWS THAT YOU WANT TO IDENTIFY IF YOU'VE

15  RECEIVED ADDITIONAL VALUE AS A RESULT OF SELLING THAT PATENTED

16  PRODUCT.

17           SO, IN OTHER WORDS, IT WANTS TO -- WHEN YOU ARE

18  SITTING AT THE TABLE AND YOU ARE NEGOTIATING THIS, YOU SAY,

19  WELL, I KNOW I'M NOT ONLY GOING TO BENEFIT FROM SELLING THE

20  MACHINE, BUT YOU ARE ALSO GOING TO BENEFIT FROM SELLING THE

21  RELATED DISPOSABLES.

22                    (SLIDE PROJECTED ON SCREEN.)

23  Q.   WHAT EVIDENCE HAVE YOU SEEN THAT DEMONSTRATES THAT THE

24  2008K MACHINE DROVE SALES OF DISPOSABLES?

25  A.   WELL, THERE'S A NUMBER OF THINGS.

Case 3:09-cv-00620-REP  Document 1031-1  Filed 03/21/13  Page 64 of 232 PageID# 33909
Case4:09-cv-01431-PJH  Document1156  Filed03/07/12  Page63 of 231        63
                    DEN UYL - DIRECT / MR. MURTHY

```
 1              ONE, LOOKING AT THE TESTIMONY OF MR. POWELL, THE CEO

 2    OF FRESENIUS NORTH AMERICA, HE TALKED ABOUT THE FACT THAT

 3    FRESENIUS BUNDLES THE PRODUCTS, THE DISPOSABLES WITH THE

 4    MACHINE.  SO, IN OTHER WORDS, THEY ARE SELLING BOTH THE MACHINE

 5    AND THE RELATED DISPOSABLES IN BUNDLES.  THEY WANT TO HAVE THEM

 6    BUY FROM ONE SOURCE.

 7    Q.   AND HAVE YOU SEEN ANY EVIDENCE THAT THE 2008K MACHINE AND

 8    THE DISPOSABLES WORK TOGETHER?

 9              (SLIDE PROJECTED ON SCREEN.)

10    A.   YES.

11              IN THIS EXAMPLE WE HAVE UP HERE, THIS IS FROM A

12    STRATEGY DOCUMENT THAT FRESENIUS PUT TOGETHER IN 2002.  THEY

13    SAID THAT THEY WANT TO ATTACK THEIR COMPETITORS, INCLUDING

14    BAXTER, WITH COMMITTED BUNDLE CONTRACTS.

15              SO -- AND THE BUNDLING IS A STRATEGY THAT FRESENIUS

16    HAD AT THAT TIME.

17    Q.   DID YOU SEE ANY OTHER DOCUMENTS RELATED TO THIS BUNDLING

18    STRATEGY THAT FRESENIUS WAS USING?

19              (SLIDE PROJECTED ON SCREEN.)

20    A.   YES.

21              THE NEXT DOCUMENT LOOKS AT THE STRATEGY TO ENCOURAGE

22    THE CUSTOMERS TO BUY THIS BROADER GROUP OF DIALYSIS PRODUCTS --

23    FMC IS FRESENIUS -- TO BE THE SINGLE SOURCE, AND THAT THEY

24    WOULD GIVE REBATES IF THEY BUY BUNDLES OF PRODUCTS.

25    Q.   AND DID YOU SEE ANY DOCUMENTS THAT SHOWED THAT FRESENIUS'
```

Case 3:09-cv-00680-REP Document 1031-1 Filed 03/21/18 Page 65 of 232 PageID# 33910
Case4:09-CV-01431-PJH Document1156 Filed03/05/12 Page64 of 231    64

DEN UYL − DIRECT / MR. MURTHY

```
1    STRATEGY FOR BUNDLING INCLUDED DIALYSIS MACHINES?

2                    (SLIDE PROJECTED ON SCREEN.)

3    A.   YES.  THIS DOCUMENT SHOWS THAT THEY ARE TALKING ABOUT

4    MACHINE STRATEGIES HERE.  AND THEY SAY THAT INCLUDING MACHINES

5    IN THE BUNDLE WOULD MEAN YOU WOULD HAVE -- THAT THAT CLIENT

6    WOULD BE A SINGLE USE BUYER OF THE MACHINE AND THE DISPOSABLES.

7    Q.   NOW, IN CONNECTION WITH YOUR ANALYSIS MR. DEN UYL, DID YOU

8    REVIEW ANY LICENSE AGREEMENTS WHERE ROYALTIES ARE PAID ON BOTH

9    DIALYSIS MACHINES AND DISPOSABLES?

10                   (SLIDE PROJECTED ON SCREEN.)

11   A.   YES.  THE DEKA AGREEMENT, WHICH IS AN AGREEMENT THAT

12   BAXTER HAD WITH A DEVELOPMENT COMPANY, WITH DEKA, HAD A ROYALTY

13   ON BOTH THE MACHINE, IN THIS CASE A PERITONEAL DIALYSIS

14   MACHINE, AND THE RELATED DISPOSABLES.

15   Q.   AND WHAT IMPACT -- AT THE END OF THE DAY, WHAT IMPACT DOES

16   FRESENIUS' BUNDLING STRATEGY HAVE ON THE HYPOTHETICAL

17   NEGOTIATION?

18   A.   WELL, YOU KNOW THAT YOU ARE GOING TO BE ABLE TO BENEFIT

19   FROM THE SALE NOT ONLY OF THE MACHINE, BUT THE SALE OF THE

20   BUNDLED DISPOSABLES.

21        SO YOU ARE GOING TO INCLUDE THAT IN THE NEGOTIATION

22   AND THE RATE THAT YOU CHARGE FOR THE LICENSE.

23   Q.   AND, FINALLY, WHAT DID JUDGE ARMSTRONG HAVE TO SAY ABOUT

24   WHETHER OR NOT FRESENIUS SHOULD PAY A ROYALTY ON DISPOSABLES?

25   A.   SHE SAID THAT THEY SHOULD PAY A 7 PERCENT ROYALTY ON THE
```

DEN UYL – DIRECT / MR. MURTHY

1    SALE OF THE DISPOSABLE PRODUCTS THAT ARE LINKED TO THE

2    INFRINGING PRODUCTS.

3    **Q.**   NOW, DID YOU ALSO CONSIDER GEORGIA-PACIFIC FACTORS TWO AND

4    12 IN ANALYZING THE APPROPRIATENESS OF THE POST-JUDGMENT

5    ROYALTY RATES?

6    **A.**   YES, I DID.

7    **Q.**   WHAT DID THAT ANALYSIS SHOW?

8    **A.**   THIS LOOKS AT RATES THAT ARE PAID IN THE INDUSTRY.  "THIS"

9    BEING THE DIALYSIS INDUSTRY, AS A -- ONE THING THAT IS

10   CONSIDERED WHEN YOU ARE LOOKING AT ROYALTY RATES.

11   **Q.**   AND IN CONNECTION WITH YOUR ANALYSIS, DID YOU REVIEW A

12   NUMBER OF LICENSE AGREEMENTS?

13   **A.**   YES, I DID.

14                    (SLIDE PROJECTED ON SCREEN.)

15   **Q.**   WHAT DID THOSE LICENSE AGREEMENTS SHOW?

16   **A.**   WELL, HERE WE SEE A NUMBER OF LICENSE AGREEMENTS BETWEEN

17   BAXTER, IN ONE CASE, AND OTHER PARTIES AND LICENSES THAT

18   FRESENIUS HAD WITH OTHER PARTIES, AND THE RATES THAT THEY PAID

19   FOR THOSE LICENSES OF DIALYSIS PRODUCTS.

20   **Q.**   AND HOW DID THE ROYALTY RATES THAT WERE PAID IN THESE

21   LICENSE AGREEMENTS COMPARE TO THE RATES THAT JUDGE ARMSTRONG

22   SET?

23   **A.**   WELL, THE RANGE WE HAVE HERE SHOWS A RANGE OF 4 PERCENT TO

24   25 PERCENT AND JUDGE ARMSTRONG'S RATE WAS 10 PERCENT ON THE

25   MACHINES AND 7 PERCENT ON THE DISPOSABLES, SO IT FALLS WITHIN

Case 3:09-cv-00688-RFP Document 1031-1 Filed 03/21/13 Page 67 of 232 PageID# 33912
Case4:09-cv-01431-PJH Document1156 Filed03/05/12 Page67 of 291
DEN UYL – DIRECT / MR. MURTHY

1   THAT RANGE.

2   **Q.**   AND DID YOU ANALYZE THE SIMILARITIES AND DIFFERENCES

3   BETWEEN THE DEKA AGREEMENT AND THE HYPOTHETICAL NEGOTIATION?

4   **A.**   YES.  AS I DID FOR ALL OF THE LICENSES.

5        THE DEKA AGREEMENT HAS SOME DIFFERENCES FROM THE

6   HYPOTHETICAL LICENSE BETWEEN FRESENIUS AND BAXTER.  ONE, IT WAS

7   A WORLDWIDE TERRITORY AND PROVIDED EXCLUSIVE RIGHTS AND HAD A

8   NONINFRINGING ALTERNATIVE PROVISION.

9        IN THOSE CASES, IT WOULD MEAN, YOU KNOW, WHEN YOU

10  COMPARE IT TO THE FRESENIUS SITUATION, IT WOULD SUGGEST A LOWER

11  ROYALTY.  ON THE OTHER HAND, BAXTER HAD PROVIDED SIGNIFICANT

12  DEVELOPMENT FUNDING, AND DEKA AND BAXTER WERE NOT HEAD-TO-HEAD

13  COMPETITORS; AS WELL BAXTER PROVIDED KNOW-HOW IN THE

14  DEVELOPMENT OF THIS NEW PRODUCT, AND SO THAT WOULD TEND TO

15  RAISE THE ROYALTY RELATIVE TO THE ROYALTY THAT FRESENIUS WOULD

16  TAKE.

17  **Q.**   NOW WHAT I WOULD LIKE TO DO IS TURN TO GEORGIA-PACIFIC

18  FACTORS EIGHT AND 13.

19        WHAT DO THOSE FACTORS RELATE TO?

20             (SLIDE PROJECTED ON SCREEN.)

21  **A.**   EIGHT AND 13 RELATE TO THE PROFITABILITY OF THE PRODUCT AS

22  WELL AS THE PORTION OF THE PROFIT THAT SHOULD BE PAID AS

23  OPPOSED TO OTHER ELEMENTS OF THE MACHINE.

24             (SLIDE PROJECTED ON SCREEN.)

25  **Q.**   WHAT DID FRESENIUS' CEO, MR. POWELL, HAVE TO SAY ABOUT THE

Case 3:09-cv-00680-REP Document 1031-1 Filed 03/21/13 Page 68 of 232 PageID# 33913
Case4:09-cv-01431-PJH Document1156 Filed09/02/12 Page67 of 231

67
DEN UYL – DIRECT / MR. MURTHY

1    PROFIT THAT FRESENIUS ACHIEVED SELLING THE 2008K MACHINE?

2    **A.**   WELL, HE SAID THAT FRESENIUS EARNED A PROFIT OF ABOUT 40

3    CENTS ON EVERY DOLLAR.

4              SO ABOUT $4,000 ON THE SALE OF A MACHINE THAT COST

5    ABOUT $14,000.

6                        (SLIDE PROJECTED ON SCREEN.)

7    **Q.**   NOW, USING MR. POWELL'S ESTIMATE OF FRESENIUS' PROFIT

8    MARGIN, WHAT WOULD THE END RESULT BE IF ONE APPLIED A

9    10 PERCENT ROYALTY ON THE MACHINE?

10   **A.**   WELL, IT WOULD RESULT IN A ROYALTY OF APPROXIMATELY $1,400

11   PER MACHINE.

12                       (SLIDE PROJECTED ON SCREEN.)

13   **Q.**   AND IN THAT CASE, HOW MUCH WOULD FRESENIUS KEEP IN PROFIT?

14   **A.**   SO IN THAT CASE, FRESENIUS' PROFIT WOULD BE ABOUT $4200.

15   IT WOULD PAY A ROYALTY TO BAXTER OF $1400, AND IT WOULD STILL

16   KEEP A PROFIT OF $2800, OR TWICE THE AMOUNT THAT IT'S PAYING TO

17   BAXTER.

18   **Q.**   AND WHAT DO PROFIT MARGINS OF THAT LEVEL SUGGEST TO YOU

19   REGARDING THE HYPOTHETICAL NEGOTIATION?

20   **A.**   WELL, IT SAYS THAT IT'S A FAIR ROYALTY BECAUSE IT ALLOWS

21   FRESENIUS TO KEEP THE SIGNIFICANT PORTION OF THE PROFIT WHILE

22   PAYING BAXTER A 10 PERCENT ROYALTY.

23   **Q.**   AND HOW WOULD THAT PROFIT EFFECT THE PARTIES' RESPECTIVE

24   BARGAINING POSITION?

25   **A.**   WELL, BOTH PARTIES WOULD KNOW OF THIS INFORMATION AT THE

Case 3:09-cv-00680-REP Document 1031-1 Filed 03/21/13 Page 69 of 232 PageID# 33914
Case4:09-cv-01431-PJH Document1156 Filed09/02/12 Page69 of 231    69
DEN UYL – DIRECT / MR. MURTHY

1    TIME.  SO BAXTER WOULD KNOW THAT FRESENIUS STOOD TO EARN A

2    PROFIT OF ABOUT $4,000.  AND IN ITS NEGOTIATION, IT WOULD KNOW

3    THAT IT IS TO LOSE THAT AMOUNT IF IT DID NOT REACH A LICENSE

4    DURING THIS PERIOD.

5              SO IT –– BAXTER WOULD HAVE STRONG BARGAINING

6    STRENGTH AT THAT TIME.

7                   (SLIDE PROJECTED ON SCREEN.)

8    Q.   NOW, CAN WE TURN TO GEORGIA–PACIFIC FACTOR 11.

9              WHAT DOES THAT RELATE TO?

10   A.   SO THAT'S THE AMOUNT THAT THE INFRINGER HAS USED THE

11   INVENTION AND THE AMOUNT THAT –– A VALUE THAT'S RECEIVED FROM

12   THE USE OF THAT INVENTION.

13                  (SLIDE PROJECTED ON SCREEN.)

14   Q.   HAVE YOU ANALYZED FRESENIUS' SALE OF 2008K MACHINES DURING

15   THE TRANSITION PERIOD?

16   A.   YES.  THIS IS THE DATA THAT FRESENIUS HAS PROVIDED IN THIS

17   CASE.

18              AND IT SHOWS THE AMOUNT OF SALES OF BOTH THE

19   INFRINGING MACHINE, THE 2008K, AND THE LINKED DISPOSABLE

20   REVENUE.

21                  (SLIDE PROJECTED ON SCREEN.)

22   Q.   WHAT OCCURRED WITH RESPECT TO FRESENIUS' SALES OF 2008K

23   MACHINES DURING THE TRANSITION PERIOD?

24   A.   DURING THAT PERIOD, AS YOU SEE ON THE GRAPH, THE SALES OF

25   THE 2008K INCREASED IN EVERY QUARTER UP TO TOTAL UNITS SOLD WAS

```
 1    JUST A LITTLE UNDER 20,000 UNITS.

 2                    (SLIDE PROJECTED ON SCREEN.)

 3    Q.   HOW ABOUT FOR SALES OF DISPOSABLES; HOW DID FRESENIUS'

 4    SALES OF DISPOSABLES GO DURING THE TRANSITION PERIOD?

 5    A.   WELL, THEY WENT, AS YOU WOULD EXPECT, IN A SIMILAR MANNER;

 6    SO THEY INCREASED DURING THE ENTIRE TRANSITION PERIOD.

 7            THESE ARE THE, BASICALLY, THE FOUR AND A HALF

 8    QUARTERS OF THE TRANSITION PERIOD.  SO THE TOTAL REVENUE FROM

 9    LINKED DISPOSABLES WAS ABOUT $443 MILLION.

10    Q.   WHAT DOES THAT SUGGEST TO YOU, THE SUCCESS OF FRESENIUS'

11    SALES OF MACHINES AND DISPOSABLES DURING THE TRANSITION PERIOD?

12    A.   WELL, IT SUGGESTS THAT THIS IS OBVIOUSLY A VERY VALUABLE

13    PRODUCT TO FRESENIUS.  AND WHEN YOU ARE LOOKING AT THE

14    BARGAINING POSITION OF THE PARTIES AT THAT TIME, BOTH FRESENIUS

15    AND BAXTER WOULD KNOW THAT IT'S VERY VALUABLE, AND FRESENIUS

16    WOULD NOT WANT TO LOSE THESE SALES AND PROFITS.

17                    (SLIDE PROJECTED ON SCREEN.)

18    Q.   NOW, AFTER PAYING BAXTER A 10 PERCENT ROYALTY ON SALES OF

19    INFRINGING 2008K MACHINES DURING THE TRANSITION PERIOD, HOW

20    MUCH WOULD FRESENIUS HAVE EARNED?

21    A.   FRESENIUS WOULD EARN ABOUT $223 MILLION AFTER PAYING

22    BAXTER A ROYALTY OF 10 PERCENT.

23                    (SLIDE PROJECTED ON SCREEN.)

24    Q.   AND AFTER PAYING BAXTER A ROYALTY OF 7 PERCENT ON SALES OF

25    LINKED DISPOSABLES, HOW MUCH WOULD FRESENIUS HAVE EARNED?
```

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/13 Page 71 of 232 PageID# 33916
Case4:09-cv-01491-PJH Document1156 Filed08/02/12 Page70 of 291
70
DEN UYL – DIRECT / MR. MURTHY

1   **A.**   IT WOULD STILL KEEP REVENUES OF ABOUT $411 MILLION EVEN

2   AFTER PAYING BAXTER ITS 7 PERCENT ROYALTY.

3                    (SLIDE PROJECTED ON SCREEN.)

4   **Q.**   AND AFTER PAYING BAXTER'S ROYALTY OR THE 10 PERCENT AND

5   7 PERCENT ORDERED BY JUDGE ARMSTRONG, WHAT WOULD BE THE TOTAL

6   AMOUNT THAT FRESENIUS WOULD HAVE RETAINED?

7   **A.**   WELL, THE TOTAL AMOUNT THAT THEY WOULD RETAIN IS ABOUT

8   $635 MILLION.

9                    (SLIDE PROJECTED ON SCREEN.)

10  **Q.**   AND HOW WOULD THAT $635 MILLION THAT YOU HAVE HERE, HOW

11  WOULD THAT RELATE TO THE AMOUNT OF PROFIT THAT FRESENIUS WOULD

12  KEEP?

13  **A.**   BASED ON THE PROFITABILITY OF THE PRODUCT AND THE

14  DISPOSABLES, FRESENIUS WOULD STILL KEEP APPROXIMATELY

15  $190 MILLION IN PROFIT.

16  **Q.**   SO IS IT FAIR THAT FRESENIUS WOULD KEEP MORE IN PROFITS

17  THAN IT WOULD PAY TO BAXTER IN ROYALTY?

18  **A.**   OH, YES, MUCH MORE.  IT -- BAXTER WOULD HAVE A MUCH

19  SMALLER AMOUNT THAN FRESENIUS WOULD KEEP.

20  **Q.**   AND WHAT DOES FRESENIUS' SUCCESS MEAN IN TERMS OF THE

21  NEGOTIATING POSITION OF THE PARTIES?

22  **A.**   WELL, FRESENIUS WOULD NOT WANT TO LOSE THIS PROFIT.  IT'S

23  OBVIOUSLY QUITE A BIT OF MONEY AND FRESENIUS WOULD WANT TO

24  RETAIN THIS PROFIT AS OPPOSED TO NOT TAKING A LICENSE AND NOT

25  BEING ABLE TO SELL THE MACHINE DURING THE TRANSITION PERIOD.

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/18 Page 72 of 232 PageID# 33917
Case4:09-cv-01491-PJH Document1156 Filed08/02/12 Page72 of 291
DEN UYL – DIRECT / MR. MURTHY

```
 1              (SLIDE PROJECTED ON SCREEN.)
 2    Q.    AND JUST TO WRAP UP, MR. DEN UYL, WHAT IS YOUR OVERALL
 3    CONCLUSION AND OPINION IN THIS MATTER REGARD WHAT THE ROYALTY
 4    RATE SHOULD BE FOR THE TRANSITION PERIOD?
 5    A.    THAT JUDGE ARMSTRONG'S POST-JUDGMENT ROYALTY RATES OF
 6    10 PERCENT ON THE MACHINE AND 7 PERCENT ON THE DISPOSABLES IS
 7    APPROPRIATE AND SUPPORTABLE.
 8              MR. MURTHY:  THANK YOU, MR. DEN UYL.  I HAVE NO
 9    FURTHER QUESTIONS.
10              THE COURT:  MS. BROOKS, WE ARE GOING TO TAKE A SHORT
11    BREAK BEFORE YOU CONDUCT YOUR CROSS-EXAMINATION OF THE WITNESS.
12              15 MINUTES EVERYONE.
13              MS. BROOKS:  THANK YOU, YOUR HONOR.
14                  (RECESS TAKEN AT 10:55 A.M.)
15              (PROCEEDINGS RESUMED AT 11:10 A.M.)
16              THE CLERK:  PLEASE REMAIN SEATED AND COME TO ORDER.
17              THE COURT:  ALL RIGHT.
18              COUNSEL, DO YOU HAVE A SET OF THE SLIDES FOR THE
19    LAST PRESENTATION WITH THE WITNESS?
20              MR. MURTHY:  YES, YOUR HONOR.
21              THE COURT:  IT'S EASIER FOR ME TO LOOK AT THE SLIDES
22    AS OPPOSED TO LOOKING AT THE SCREEN AND LOOKING AT THE WITNESS
23    AT THE SAME TIME.
24                  (BOOKLET HANDED TO COURT.)
25              THE COURT:  THANK YOU.
```

Case 3:09-cv-00688-RFP   Document 1031-1   Filed 03/21/08   Page 72 of 232   PageID# 33918
Case4:09-cv-01431-PJH   Document1156   Filed08/02/12   Page72 of 291                72
DEN UYL – CROSS / MS. BROOKS

```
1          MS. BROOKS:  MAY I PROCEED, YOUR HONOR?

2          THE COURT:  YES.

3                    CROSS-EXAMINATION

4   BY MS. BROOKS:

5   Q.   GOOD MORNING, MR. DEN UYL.

6   A.   GOOD MORNING.

7   Q.   MR. DEN UYL, WE HAD IN THIS CASE A DAMAGES TRIAL IN

8   OCTOBER OF 2007; IS THAT RIGHT?

9   A.   YES.

10  Q.   AND YOU, INDEED, TESTIFIED AT THAT DAMAGES TRIAL, DID YOU

11  NOT?

12  A.   YES, I DID.

13  Q.   AND DID YOU SIT, IN FACT, THROUGH THE ENTIRE TRIAL?

14  A.   NOT THE ENTIRE TRIAL.  MOST OF IT, THOUGH.

15  Q.   IT WENT ON FOR A PERIOD OF DAYS; IS THAT CORRECT?

16  A.   YES.

17                  (DOCUMENT DISPLAYED ON ELMO.)

18  Q.   I PUT ON THE ELMO A DEMONSTRATIVE THAT YOU USED AT THAT

19  TRIAL WHERE YOU TOLD THE JURY THAT YOU BELIEVED A REASONABLE

20  ROYALTY RATE IN THE CASE FOR FRESENIUS' INFRINGEMENT OF THREE

21  PATENTS WAS THE 7 PERCENT RATE; IS THAT CORRECT?

22  A.   YES.  AS OF THE NEGOTIATION IN 2000.

23  Q.   AS OF THE NEGOTIATION IN 2000.

24       AND THEN YOU APPLIED THAT 7 PERCENT RATE TO THE

25  ENTIRE -- OR THE ROYALTY BASE WAS THE ENTIRE MACHINE; IS THAT
```

Case 3:09-cv-00680-REP Document 1031-1 Filed 03/21/08 Page 74 of 232 PageID# 33919
Case4:09-cv-01431-PJH Document1156 Filed08/02/12 Page73 of 231 73

DEN UYL - CROSS / MS. BROOKS

1    CORRECT?

2    **A.**   YES.  THE MACHINE AND THEN DISPOSABLES AS WELL.

3    **Q.**   WE'RE GOING TO GET TO THAT.  LET'S KEEP THEM APART FOR A

4    SECOND AND JUST FOCUS RIGHT NOW ON THE MACHINE.

5            YOU TOLD THE JURY THAT IN YOUR EXPERT OPINION

6    7 PERCENT WAS A REASONABLE ROYALTY RATE FOR FRESENIUS'

7    INFRINGEMENT OF BAXTER'S THREE PATENTS THAT WERE AT ISSUE,

8    CORRECT?

9    **A.**   NO, NOT -- I GAVE AN OPINION THAT 7 PERCENT WAS A

10   REASONABLE RATE FOR THE USE OF THE TOUCH SCREEN TECHNOLOGY.

11   **Q.**   AT THAT TRIAL, HOWEVER, THERE WERE INDEED THREE PATENTS AT

12   ISSUE; IS THAT CORRECT?

13   **A.**   YES, BUT FOR WHAT I WAS LOOKING AT, IT WAS THE VALUE OF

14   THAT TOUCH SCREEN TECHNOLOGY.

15   **Q.**   ALL RIGHT.

16           AND NOW THE BASE THAT YOU USED WAS THE ENTIRE

17   MACHINE, CORRECT?

18   **A.**   YES.

19   **Q.**   YOU DID NOT TRY TO APPORTION IT IN ANY WAY; IS THAT

20   CORRECT?

21   **A.**   NO.  THAT'S RIGHT.  THE DEMAND FOR THE MACHINE WAS CREATED

22   BY THE TOUCH SCREEN TECHNOLOGY.

23   **Q.**   ALL RIGHT.

24           WE ARE GOING TO GET TO THAT IN JUST A MINUTE AND SEE

25   IF YOU'VE ACTUALLY PROVEN THAT.

Case 3:09-cv-00680-RFP-4 Document 1031-1 Filed 03/21/13 Page 75 of 232 PageID# 33920
Case4:09-cv-01491-PJH Document1156 Filed09/03/12 Page74 of 231          74
DEN UYL - CROSS / MS. BROOKS

1          NOW WHAT YOU ALSO SAID TO THE JURY WAS THAT YOU

2     BELIEVED IN YOUR EXPERT OPINION THAT 7 PERCENT WAS A REASONABLE

3     ROYALTY RATE FOR THE DISPOSABLES; IS THAT CORRECT?

4     **A.**   YES, THAT'S RIGHT.

5     **Q.**   NOW, THE DISPOSABLES WERE NOT ACCUSED OF INFRINGING ANY

6     BAXTER PATENTS, CORRECT?

7     **A.**   THAT'S CORRECT.

8     **Q.**   BAXTER WAS ASKING FOR A ROYALTY ON THE DISPOSABLES UNDER A

9     PULL THROUGH THEORY; IS THAT RIGHT?

10    **A.**   WELL, IT'S FACTOR SIX IN THE GEORGIA-PACIFIC FACTOR.

11    THESE WERE CONVOYED SALES, YES.

12    **Q.**   ALL RIGHT.

13          YOU TOLD THE JURY THIS -- THAT AT THE TRIAL,

14    CORRECT?

15    **A.**   YES.

16    **Q.**   AND THE BASE YOU USED FOR THE DISPOSABLES WAS, AGAIN, THE

17    SALE OF ALL DISPOSABLES, CORRECT?

18    **A.**   NO.  JUST THOSE LINKED TO THE SALE OF THE 2008K MACHINE.

19    **Q.**   ALL RIGHT.

20          WHEN YOU SAY "LINKED", YOU DON'T MEAN THEY WERE SOLD

21    AT THE SAME TIME AS THE MACHINE; IS THAT RIGHT?

22    **A.**   THEY WERE SOLD TO THE SAME CUSTOMERS THAT OWN THE 2008K.

23    IT COULD BE AT DIFFERENT TIMES.

24    **Q.**   RIGHT.

25          I MEAN, FOR EXAMPLE, A CUSTOMER COULD EASILY USE THE

```
1    2008K FOR SEVEN, EIGHT YEARS, CORRECT?

2    A.   WELL, IT ONLY HAD BEEN AROUND AT THAT TIME FOR A LITTLE

3    LESS THAN SEVEN YEARS, BUT IT COULD HAVE BEEN USING IT FOR A

4    WHILE.

5    Q.   BUT A CUSTOMER WOULD HAVE TO ORDER DISPOSABLES ON A WEEKLY

6    BASIS?

7    A.   YES.  THAT'S RIGHT.

8    Q.   SO IT WOULDN'T BE THAT EVERY TIME ONE ORDERED DISPOSABLES,

9    ONE WAS ALSO BUYING A MACHINE, CORRECT?

10   A.   THAT'S CORRECT.

11   Q.   YOU CAME ULTIMATELY TO THE OPINION THAT BASED ON YOUR

12   EXPERT OPINION, FRESENIUS SHOULD HAVE TO PAY 58.5 MILLION ON

13   THE MACHINES AND 91 MILLION ON THE DISPOSABLES; IS THAT

14   CORRECT?

15   A.   YES.

16   Q.   NOW, AT THAT TRIAL, DR. RUBINFELD ALSO TESTIFIED, DID HE

17   NOT?

18   A.   YES, HE DID.

19   Q.   AND MR. CRNKOVICH TESTIFIED?

20   A.   YES, HE DID.

21   Q.   DR. LIPPS TESTIFIED?

22   A.   RIGHT.

23   Q.   MR. POWELL TESTIFIED?

24   A.   YES, HE DID.

25   Q.   A NURSE BY THE NAME OF BRENDA TEEL LASH TESTIFIED?
```

Case 3:09-cv-00680-REP Document 1031-1 Filed 03/21/13 Page 77 of 232 PageID# 33922
Case4:09-cv-01434-PJH Document1156 Filed09/02/12 Page76 of 291
76
DEN UYL - CROSS / MS. BROOKS

1   A.   YES.

2   Q.   AND MR. KEELEY WAS THE ONLY OTHER WITNESS BESIDE YOU FOR

3   BAXTER; IS THAT RIGHT?

4   A.   YES.

5   Q.   AND AT THE CONCLUSION -- AND A LOT OF THE DOCUMENTS YOU

6   SHOWED HER HONOR THIS MORNING, YOU SHOWED THE JURY AT THAT LAST

7   TRIAL, CORRECT?

8   A.   SOME OF THE DOCUMENTS, YES.  CERTAINLY.

9   Q.   AND ULTIMATELY WHAT THE JURY DETERMINED WAS THAT INSTEAD

10  OF FRESENIUS OWING 91 MILLION FOR DISPOSABLES, THEY FOUND THAT

11  FRESENIUS OWED 91,000, CORRECT?

12  A.   YES.  THAT'S RIGHT.

13  Q.   AND THAT COMES TO A .007 PERCENT ROYALTY RATE, CORRECT?

14  A.   YES.

15  Q.   AND AT THAT TRIAL, AFTER THE JURY HEARD ALL OF THE

16  EVIDENCE, THE JURY ORDERED THAT FRESENIUS PAY A LITTLE OVER

17  14 MILLION AS A ROYALTY ON THE MACHINES, CORRECT?

18  A.   YES, THAT'S RIGHT.

19  Q.   AND THAT COMES TO APPROXIMATELY 1.7 PERCENT ROYALTY RATE;

20  IS THAT CORRECT?

21  A.   THAT IS CORRECT.

22  Q.   SO -- AND CERTAINLY THE JURY WAS FREE TO ACCEPT OR REJECT

23  YOUR TESTIMONY; IS THAT RIGHT, MR. DEN UYL?

24  A.   YES.

25  Q.   AND APPARENTLY THEY DIDN'T -- CERTAINLY DIDN'T ACCEPT IT

DEN UYL – CROSS / MS. BROOKS

1    IN ITS ENTIRETY, CORRECT?

2    **A.**    NO.  THEY HAD A LOWER RATE AT THAT TIME.

3    **Q.**    THEN AFTERWARD, IN POST-TRIAL PROCEEDINGS, THE PREVIOUS

4    COURT ORDERED THAT FRESENIUS BE ENJOINED, CORRECT?

5    **A.**    YES.

6    **Q.**    AND THEN ENTERED THIS ORDER.

7                     (DOCUMENT DISPLAYED ON ELMO.)

8              AND THE COURT ORDERED THAT DURING THE TRANSITION

9    PERIOD BETWEEN WHEN FRESENIUS WAS ENJOINED --

10             **THE COURT:**  THAT'S OUT OF FOCUS, I THINK.

11             **MS. BROOKS:**  OH, IT IS.  I'M SORRY YOUR HONOR.

12   MAYBE WE CAN GET IT TO AUTO FOCUS HERE.

13             THERE WE GO.  NO.

14             IS THAT CLEAR NOW, YOUR HONOR?

15             **THE COURT:**  YES.

16   **BY MS. BROOKS:**

17   **Q.**    AND WHAT THE COURT ORDERED WAS THAT DURING THE TRANSITION

18   PERIOD BETWEEN WHEN FRESENIUS HAD BEEN ENJOINED, OR THAT THE

19   MACHINE HAD BEEN ENJOINED, AND BEFORE FRESENIUS COULD GET A

20   DESIGN AROUND OUT ONTO THE MARKET, DURING THAT TRANSITION

21   PERIOD FRESENIUS WAS TO PAY A 10 PERCENT ROYALTY ON MACHINES

22   AND A 7 PERCENT ROYALTY ON DISPOSABLES.

23             CORRECT?

24   **A.**    YES.  THAT'S RIGHT.

25   **Q.**    AND THAT WOULD COME TO, IF WE GO BACK TO THE ONE I JUST

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/13 Page 79 of 232 PageID# 33924
Case4:09-cv-01491-PJH Document1156 Filed09/02/12 Page79 of 291
DEN UYL - CROSS / MS. BROOKS

```
1   HAD UP ON THE SCREEN, ESSENTIALLY IT CAME TO ONE, ONE HUNDREDTH

2   THOUSAND PERCENT HIGHER RATE FOR THE DISPOSABLES THAN WHAT THE

3   JURY HAD FOUND, CORRECT?

4   A.  I HAVEN'T DONE THE MATH.

5   Q.  WELL, 7 PERCENT VERSUS .007 PERCENT?

6   A.  IT IS ABOUT A THOUSANDTH PERCENT.

7   Q.  OKAY.  CERTAINLY SIGNIFICANTLY HIGHER, CORRECT?

8   A.  YES, IT IS.

9   Q.  AND THE 10 PERCENT ON MACHINES CAME OUT TO APPROXIMATELY

10  584 PERCENT HIGHER RATE THAN WHAT THE JURY HAD FOUND WAS

11  REASONABLE AFTER THE TRIAL, CORRECT?

12  A.  RIGHT.  BUT IT'S A DIFFERENT NEGOTIATION DATE.  THIS IS AT

13  2007 THAT THE JURY WAS FINDING WHAT WOULD HAVE BEEN THE RIGHT

14  RATE IN 2000.

15  Q.  UNDERSTOOD.

16      SO, OF COURSE, A RATE MAY HAVE BEEN, ACCORDING TO

17  THE PACE CASE, IT IS REASONABLE TO RAISE THE RATE FOR A POST --

18  ON A POST-VERDICT ROYALTY THAN WHAT PERHAPS THE JURY FOUND,

19  CORRECT?

20  A.  YES.  I THINK IT SAYS YOU HAVE TO LOOK AT THE SITUATION AT

21  THE -- AT THE NEW DATE AND LOOK AT THE FACTS AND CIRCUMSTANCES

22  AT THAT TIME, NOT JUST LOOK AT THE JURY AWARD.

23  Q.  WE ARE GOING TO GET TO THAT IN A SECOND.

24      BUT CERTAINLY WHATEVER THAT INCREASE IS, STILL HAS

25  TO BE WITHIN THE BOUNDS OF REASON, CORRECT?
```

DEN UYL – CROSS / MS. BROOKS

1    **A.**   YES.

2    **Q.**   AND STILL HAS TO BE BASED ON FACTS OF THE CASE, CORRECT?

3    **A.**   I BELIEVE SO, YES.

4    **Q.**   AND IN THIS PARTICULAR CASE, THE COURT'S ORDER DID NOT

5    GIVE ANY GUIDANCE AS TO WHY THE COURT BELIEVED THESE RATES WERE

6    REASONABLE, CORRECT?

7    **A.**   I DON'T KNOW WHAT THE RATIONALE WAS.  THEY WERE SIMILAR TO

8    THE RATES THAT I TALKED ABOUT.

9    **Q.**   BUT THERE WAS NOTHING IN THE COURT'S ORDER THAT EXPLAINED

10   WHY THE COURT WAS ORDERING THESE PARTICULAR RATES?

11   **A.**   THAT'S CORRECT.

12   **Q.**   AND THEN YOU KNOW THAT FRESENIUS APPEALED TO THE FEDERAL

13   CIRCUIT COURT OF APPEALS; YOU UNDERSTAND THAT?

14   **A.**   YES.

15                    (DOCUMENT PROJECTED ON ELMO.)

16   **Q.**   AND ONE OF THE THINGS THAT FRESENIUS APPEALED WAS THE

17   REASONABLENESS OR WHAT FRESENIUS CONTENDED WAS THE

18   UNREASONABLENESS OF THE COURT'S ROYALTY DURING THIS TRANSITION

19   PERIOD.

20            YOU ARE AWARE OF THAT?

21   **A.**   YES.

22   **Q.**   AND WHAT THE FEDERAL CIRCUIT HELD WAS, "WE DO NOT DECIDE

23   TODAY WHETHER THE DISTRICT COURT'S ROYALTY AWARD WAS PROPER."

24            SO THEY DIDN'T -- THEY DECIDED NOT TO REACH THAT

25   ISSUE, CORRECT?

Case 3:09-cv-00620-REP  Document 1031-1  Filed 03/21/13  Page 81 of 232 PageID# 33926
Case4:09-cv-01491-PJH Document1156  Filed03/07/12 Page80 of 291

80
DEN UYL – CROSS / MS. BROOKS

1  **A.**  YES, I THINK THAT'S RIGHT.

2  **Q.**  INSTEAD, WHAT THEY DID, WAS THEY VACATED THAT ROYALTY

3  AWARD AND REMANDED TO THE DISTRICT COURT TO CONSIDER WHETHER

4  THE PREVIOUS AWARD IS PROPER IN LIGHT OF THIS COURT'S

5  MODIFICATION OF THE DISTRICT COURT'S JUDGMENT.

6          CORRECT?

7  **A.**  YES.  I AM NOT A LAWYER, BUT I UNDERSTOOD THAT THE –– THEM

8  TO BE SAYING THAT WE NOW HAVE TWO LESS PATENTS, SO YOU NEED TO

9  RECONSIDER WHETHER THE ROYALTY RATE IS APPROPRIATE.

10  **Q.**  WELL, THEY DON'T ACTUALLY SAY THAT, DO THEY, MR. DEN UYL?

11          **THE COURT:**  YOU KNOW, I'LL INTERPRET THIS.

12          **MS. BROOKS:**  OKAY.

13          **THE COURT:**  THIS IS NOT SOMETHING YOU NEED TO ASK

14  HIM.

15          **MS. BROOKS:**  THANK YOU, YOUR HONOR.

16  **BY MS. BROOKS:**

17  **Q.**  SO –– BUT, MR. DEN UYL, YOU UNDERSTAND THAT WE'RE HERE

18  TODAY BECAUSE OF THE COURT'S VACATING OF THE PREVIOUS COURT'S

19  ROYALTY RATES, CORRECT?

20  **A.**  WELL, AGAIN, I AM NOT A LAWYER.  I UNDERSTAND THAT HER

21  HONOR IS GOING TO HAVE TO DECIDE WHETHER, YOU KNOW, WHETHER

22  THERE SHOULD BE A DIFFERENT ROYALTY RATE OR NOT.

23  **Q.**  YOU ARE HERE TO TRY TO ASSIST THE COURT IN MAKING THAT

24  DETERMINATION; IS THAT RIGHT?

25  **A.**  YES.

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/13 Page 82 of 232 PageID# 33927
Case4:09-cv-01531-PJH Document1156 Filed09/02/12 Page82 of 291    81
DEN UYL - CROSS / MS. BROOKS

1    **Q.**   NOW, YOU ARE STILL OF THE OPINION THEN, AS YOU WERE AT THE

2    ORIGINAL TRIAL, THAT 7 PERCENT IS AN APPROPRIATE ROYALTY FOR

3    THE DISPOSABLES, CORRECT?

4    **A.**   YES.  I THINK JUDGE ARMSTRONG'S OPINION WAS REASONABLE,

5    YES.

6    **Q.**   AND NOW THAT 10 PERCENT IS AN APPROPRIATE ROYALTY ON THE

7    MACHINES; IS THAT CORRECT?

8    **A.**   YES.  I THINK THAT'S AN APPROPRIATE ROYALTY RATE.

9    **Q.**   AND YOU BASE THAT ON SOME OF THE INFORMATION THAT YOU HAVE

10   GIVEN US TODAY, CORRECT?

11   **A.**   YES.  THE BARGAINING POSITION OF THE PARTIES HAS CHANGED

12   SINCE THE 2000 DATE.

13   **Q.**   NOW, ORIGINALLY, WHEN YOU FIRST OPINED ON YOUR 7 PERCENT

14   ROYALTY, EVEN AFTER THE COURT'S -- JUDGE ARMSTRONG'S PREVIOUS

15   ORDER, YOU GAVE A BASIS FOR YOUR 7 PERCENT ROYALTY.

16           PART OF THAT BASIS WAS, UNDER THE 25 PERCENT RULE OF

17   THUMB RULE.  DO YOU RECALL THAT?

18           **MR. MURTHY:**  YOUR HONOR, I APOLOGIZE.  I HAVE TO

19   OBJECT THIS IS BEYOND THE SCOPE OF HIS DIRECT EXAMINATION.  HE

20   DIDN'T TESTIFY ABOUT THE 25 PERCENT RULE.

21           **THE COURT:**  SUSTAINED.

22   **BY MS. BROOKS:**

23   **Q.**   NOW, LET'S TURN, IF WE COULD, FOR A MOMENT, FROM YOUR

24   ROYALTY -- THE BASIS -- WELL, ACTUALLY LET'S STICK WITH YOUR

25   ROYALTY RATE.

Case 3:09-cv-00680-RFP Document 1031-1 Filed 03/21/18 Page 82 of 232 PageID# 33928
Case4:09-cv-01431-PJH Document1186 Filed03/02/12 Page82 of 231          82
DEN UYL - CROSS / MS. BROOKS

1    YOU SHOWED US TODAY A SERIES OF LICENSES.  AND YOU

2    SHOWED US --

3              (SLIDE PROJECTED ON SCREEN.)

4              -- THESE LICENSES THAT YOU SAY JUSTIFY THE 7 AND

5    10 PERCENT RATE.

6              IS THAT CORRECT?

7    **A.**   NO.  I THINK I TESTIFIED THAT JUDGE ARMSTRONG'S RANGE OF 7

8    TO 10 PERCENT FALLS WITHIN THE RANGE OF THESE DIALYSIS ROYALTY

9    RATES.

10   **Q.**   NOW YOU ARE AWARE OF A CASE CALLED RESCUE NET?

11   **A.**   YES.

12   **Q.**   AND YOU'RE AWARE THAT IN ORDER TO RELY UPON CERTAIN

13   LICENSES IN ARRIVING AT AN APPROPRIATE ROYALTY RATE, IT IS

14   ON -- THE BURDEN IS ON THE PATENT HOLDER TO SHOW THAT THOSE

15   LICENSES ARE, IN FACT, COMPARABLE TO THE LICENSE AT ISSUE?

16   **A.**   YES, IF YOU'RE JUST GOING TO RELY ON THE LICENSES.  THAT'S

17   NOT WHAT I DID HERE.  THAT'S FACTOR -- GEORGIA-PACIFIC FACTOR

18   ONE.

19             I JUST USED THESE RATES TO SHOW WHAT RATES WERE THAT

20   WERE IN THE INDUSTRY, THE DIALYSIS INDUSTRY.

21   **Q.**   AND SO ARE YOU SAYING, MR. DEN UYL, THAT YOU AREN'T

22   TELLING THE COURT THAT ANY OF THESE LICENSES THAT YOU HAVE UP

23   HERE ON THIS POWER POINT ARE, IN FACT, COMPARABLE TO WHAT THE

24   LICENSE AT ISSUE WOULD BE?

25   **A.**   YES.  I MEAN THESE ARE INDUSTRY ROYALTY RATES.  THESE ARE

Case 3:09-cv-00620-RFP-4 Document 1031-1 Filed 03/21/18 Page 84 of 232 PageID# 33929
Case4:09-cv-01414-PJH Document1156 Filed09/07/12 Page84 of 291 85
DEN UYL - CROSS / MS. BROOKS

1    NOT RATES THAT WERE FOR THE EXACT TECHNOLOGY, BUT THEY PROVIDE

2    A RANGE THAT LICENSING, PEOPLE SITTING AT THE TABLE WOULD LOOK

3    AT IN DECIDING ONE OF THE FACTORS IN THE ROYALTY RATE.

4    Q.   YOU ARE AWARE THAT NOT ONLY RESCUE NET BUT LUCENT SAYS

5    SIMPLY SAYING A LICENSE IS WITHIN AN INDUSTRY, IS NOT

6    SUFFICIENT IN ORDER TO USE THAT LICENSE TO SUPPORT A ROYALTY

7    RATE.

8           CORRECT?

9    A.   YES.  I MEAN, THOSE CASES ARE WHERE THE EXPERT JUST USED

10   THOSE ROYALTY RATES, THOSE LICENSES.

11          IN THIS CASE, I AM USING THESE LICENSES, I AM USING

12   THE PROFITABILITY, I AM USING THE FACT THEY ARE COMPETITOR; ALL

13   OF THE GEORGIA-PACIFIC FACTORS.  SO I AM NOT JUST RELYING ON

14   THESE LICENSES.

15   Q.   I UNDERSTAND.  RIGHT NOW I AM TRYING TO FOCUS THOUGH ON

16   THESE LICENSES.  OKAY?

17   A.   YES.  I AM TELLING YOU HOW I USED THEM IN THIS CASE.

18   Q.   HAVE YOU SHOWN THE COURT HOW ANY OF THESE LICENSES ARE

19   COMPARABLE TO THE TECHNOLOGY AT ISSUE AND THE LICENSE AT ISSUE?

20   A.   NO.  I AM NOT HOLDING THEM OUT AS COMPARABLE TO THE

21   TECHNOLOGY.

22          I AM SAYING THESE ARE LICENSING RATES IN THE

23   INDUSTRY THAT WOULD BE A GUIDE TO, YOU KNOW, THE PARTIES AT THE

24   NEGOTIATING.

25   Q.   THANK YOU.

Case 3:09-cv-00688-RFP  Document 1031-1  Filed 03/21/13  Page 85 of 232  PageID# 33930
Case4:09-cv-01431-PJH  Document1156  Filed03/02/12  Page84 of 231   84
DEN UYL - CROSS / MS. BROOKS

1    **MS. BROOKS:**  IN THAT CASE, YOUR HONOR, UNDER BOTH

2    LUCENT, RESCUE NET, AND UNILOC I WOULD MOVE TO STRIKE ALL OF

3    THESE OF LICENSES AS NOT BEING RELEVANT TO THE LICENSE AT

4    ISSUE.

5         **THE COURT:**  I WILL DETERMINE HOW MUCH WEIGHT TO GIVE

6    TO THIS PARTICULAR PIECE OF EVIDENCE.

7         **MS. BROOKS:**  THANK YOU.

8    **BY MS. BROOKS:**

9    **Q.**  YOU CALLED OUT ONE SPECIFIC LICENSE, WHICH WAS THE LICENSE

10   BETWEEN BAXTER AND DEKA; IS THAT RIGHT?

11   **A.**  YES, THAT'S CORRECT.

12   **Q.**  AND ONE OF THE THINGS YOU FOUND OF NOTE IN THAT PARTICULAR

13   LICENSE IS IT ALSO DEALT WITH DISPOSABLES; IS THAT CORRECT?

14   **A.**  YES.  THEY PAY A ROYALTY ON THE DISPOSABLES AS WELL AS THE

15   MACHINE.

16   **Q.**  BUT YOU ARE AWARE, ARE YOU NOT, SIR, IN A CASE OF A

17   PERITONEAL DIALYSIS CYCLER, WHICH IS WHAT THE BAXTER AND DEKA

18   LICENSE IS ALL ABOUT, THE DISPOSABLES COME WITH THE MACHINE?

19   **A.**  WELL, IN PART.  YOU BUY ADDITIONAL DISPOSABLES JUST LIKE

20   YOU DO IN A HEMODIALYSIS MACHINE.

21   **Q.**  BUT YOU ARE AWARE THAT YOU CAN ONLY USE A HOMECHOICE

22   CASSETTE WITH A HOMECHOICE MACHINE?

23   **A.**  YES, THAT'S CORRECT.

24   **Q.**  AND YOU WOULD ONLY BE ABLE TO USE A FRESENIUS CASSETTE

25   WITH A FRESENIUS LIBERTY MACHINE; YOU UNDERSTAND THAT?

Case 3:09-cv-00688-REP Document 1031-1 Filed 03/21/13 Page 86 of 232 PageID# 33931
Case4:09-cv-01431-PJH Document1156 Filed09/07/12 Page85 of 291
85
DEN UYL - CROSS / MS. BROOKS

1    **A.**   YES.

2    **Q.**   THAT'S A VERY DIFFERENT CIRCUMSTANCE THAN WHAT WE ARE

3    TALKING ABOUT HERE, CORRECT?

4    **A.**   NO, I DON'T THINK IT IS FROM AN ECONOMICS STANDPOINT.  IN

5    BOTH CASES YOU GET THE SALE OF THE DISPOSABLE PRODUCTS IN

6    ADDITION TO THE SALE OF THE MACHINE.

7         ONCE YOU SELL THE MACHINE, IT CREATES THE DEMAND FOR

8    THE ADDITIONAL DISPOSABLE PRODUCTS.

9    **Q.**   AND ARE YOU AWARE, MR. DEN UYL, THAT NOT ONLY CAN YOU ONLY

10   USE A HOMECHOICE CASSETTE WITH A HOMECHOICE MACHINE, BUT THAT

11   MR. KAMEN, ONE OF THE PARTIES TO THIS LICENSING AGREEMENT, HAD

12   A SEPARATE PATENT ON THE CASSETTE?

13   **A.**   YES.  I AM AWARE OF THAT.

14   **Q.**   AND, AGAIN, THAT'S NOT THE SITUATION HERE, CORRECT?

15   BAXTER ISN'T SAYING WE'VE GOT A LICENSE, A PATENT THAT COVERS

16   FRESENIUS DIALYZERS?

17   **A.**   NO, I DON'T THINK BAXTER IS SAYING THAT.  NO.  IT IS

18   SAYING THAT THE 2000K (SIC) THE TECHNOLOGY CREATED THE DEMAND

19   FOR THAT DIALYZER.

20   **Q.**   ARE YOU, AGAIN, SAYING THEN THAT THE 2008K CREATES THE

21   DEMAND FOR A FRESENIUS DIALYZER; IS THAT RIGHT?

22   **A.**   YES.  THE DATA HAS SHOWN THAT PEOPLE THAT BUY THE 2008K

23   WILL ALSO BUY THAT DIALYZER.

24   **Q.**   ARE YOU AWARE, SIR, AND THIS CAME UP AT THE PREVIOUS

25   TRIAL, THAT ANOTHER REASON THAT PEOPLE WERE BUYING FRESENIUS

DEN UYL – CROSS / MS. BROOKS

1   DIALYZERS IS BECAUSE FRESENIUS DIALYZERS HAD NEVER RESULTED IN

2   THE DEATHS OF ANY PATIENTS?

3           **MR. MURTHY:**  YOUR HONOR, I AM GOING TO OBJECT AGAIN

4   AS BEING BEYOND THE SCOPE OF HIS DIRECT EXAMINATION.

5           **THE COURT:**  I AM GOING TO PERMIT THIS.

6   **BY MS. BROOKS:**

7   **Q.**   ARE YOU AWARE, SIR, AND IT CAME UP DURING THE LAST TRIAL,

8   THAT ANOTHER REASON, SEPARATE AND INDEPENDENT OF THE MACHINE,

9   ANOTHER REASON WHY PHYSICIANS WERE PRESCRIBING FRESENIUS

10  DIALYZERS IS THAT NO PATIENT HAD EVER DIED USING FRESENIUS

11  DIALYZERS, RIGHT?

12  **A.**   WELL, IT --

13          **THE COURT:**  YOU CAN ANSWER.

14          **THE WITNESS:**  OKAY.  IT CERTAINLY COULD BE ONE OF

15  THE REASONS.  AND THAT'S WHY WE ARE NOT TAKING ALL OF THE

16  PROFIT FROM THE DIALYZERS.

17          SO IT IS JUST THAT PORTION OF THE PROFIT WHICH WOULD

18  BE RELATED TO THIS PULL THROUGH OF THE K MACHINE.

19  **BY MS. BROOKS:**

20  **Q.**   WELL, YOU HAD NO IDEA WHETHER OR NOT CLINICS THAT HAVE

21  FRESENIUS MACHINES ARE BUYING FRESENIUS DIALYZERS BECAUSE THEY

22  ARE SAFE AND EFFECTIVE OR BECAUSE THEY HAVE A FRESENIUS

23  MACHINE?

24  **A.**   WELL, I THINK IT'S PROBABLY BOTH.  AND THE EMPIRICAL DATA

25  SHOWS THAT ONCE THEY BUY THE K, THEY WILL ALSO BUY THE

Case 3:09-cv-00680-REP Document 1031-1 Filed 03/21/13 Page 88 of 232 PageID# 33933
Case4:09-cv-01434-PJH Document1156 Filed03/05/12 Page87 of 291 87
DEN UYL – CROSS / MS. BROOKS

1    DIALYZER.

2    **Q.**    AT THE POINT OF THE TRIAL, BAXTER HAD DIALYZERS, CORRECT?

3    **A.**    YES.

4    **Q.**    THAT CONSUMERS CERTAINLY COULD HAVE BOUGHT OR DOCTORS

5    COULD HAVE PRESCRIBED, CORRECT?

6    **A.**    CORRECT.

7    **Q.**    THOSE DIALYZERS HAD BEEN ACQUIRED BY BAXTER WHEN THEY

8    ACQUIRED THE ALTHIN, CORRECT, THE ALTHIN COMPANY?

9    **A.**    YES.

10   **Q.**    THEY ACQUIRED THE TINA, WHICH WAS THE HEMODIALYSIS MACHINE

11   THAT HAD THE TOUCH SCREEN ON IT, CORRECT?

12   **A.**    YES, THAT'S RIGHT.

13   **Q.**    THEY HAD ACQUIRED THE PATENTS AT ISSUE, CORRECT?

14   **A.**    YES.

15   **Q.**    AND THEY HAD ACQUIRED A MANUFACTURING PLANT THAT

16   MANUFACTURED DIALYZERS, CORRECT?

17   **A.**    YES, THAT'S RIGHT.

18   **Q.**    ISN'T IT TRUE THAT THAT MANUFACTURING PLANT ENDED UP USING

19   THE WRONG CHEMICALS WHEN THEY MANUFACTURED THE DIALYZERS AND

20   PEOPLE DIED AS A RESULT?

21   **A.**    YES.  THAT UNFORTUNATELY DID OCCUR.

22   **Q.**    AND WOULD YOU THINK IT'S REASONABLE THEN THAT A PHYSICIAN

23   MIGHT WANT TO PRESCRIBE A FRESENIUS DIALYZER OVER A BAXTER

24   DIALYZER COMPLETELY INDEPENDENT OF WHETHER OR NOT THEY WERE

25   USING A 2008K?

Case 3:09-cv-00689-RFP 4Document1031-1 Filed 03/21/13 Page 89 of 232 PageID# 33934
Case4:09-cv-01431-PJH Document1156 Filed 09/02/12 Page 89 of 291
DEN UYL - CROSS / MS. BROOKS

1    **A.**   WELL, IT COULD BE, BUT CERTAINLY BAXTER FIXED THAT

2    PROBLEM.

3    **Q.**   BUT CERTAINLY THE WORLD WAS AWARE THAT IT HAD HAPPENED,

4    CORRECT?

5    **A.**   YES.

6    **Q.**   NOW, I WOULD LIKE TO GO TO THE BASE THAT YOU USED, MR. DEN

7    UYL.

8             YOU ARE TELLING THE COURT THAT IT WOULD BE

9    REASONABLE TO TAKE 7 PERCENT OF THE ENTIRE SALES OF THE 2008K,

10   CORRECT?

11   **A.**   NO.  I AM TELLING THE COURT 10 PERCENT DURING THE

12   TRANSITION PERIOD.

13   **Q.**   I'M SORRY, 10 PERCENT.  EVEN HIGHER, THAT'S RIGHT.  .

14             CORRECT?

15   **A.**   YES.

16   **Q.**   AND THAT'S BECAUSE THE 2008K HAS A TOUCH SCREEN ON IT; IS

17   THAT RIGHT?

18   **A.**   YES.  THAT TECHNOLOGY DRAWS THE DEMAND FOR THE K MACHINE.

19   **Q.**   NOW YOU KEEP SAYING THAT; THE TECHNOLOGY DROVE THE DEMAND

20   FOR THE K MACHINE.

21             DO YOU HAVE ANY EVIDENCE, BE IT A SURVEY, BE IT YOU

22   INTERVIEWING SOMEONE, ANY EVIDENCE WHATSOEVER THAT EVEN ONE

23   CLINIC BOUGHT THE 2008K BECAUSE IT HAD A TOUCH SCREEN ON IT?

24   **A.**   YES.  I HAVE THE TESTIMONY OF THE CEO OF FRESENIUS NORTH

25   AMERICA SAYING IT DROVE THE DEMAND.

Case 3:09-cv-00688-RFP Document 1031-1 Filed 03/21/13 Page 90 of 232 PageID# 33935
Case4:09-cv-01431-PJH Document1156 Filed03/08/12 Page89 of 231
89
DEN UYL - CROSS / MS. BROOKS

1  Q.   I AM SORRY, SIR, THAT WASN'T MY QUESTION.  WE ARE GOING TO

2  HAVE SOON THE TESTIMONY OF THE CEO WORLDWIDE OF FRESENIUS.

3       DO YOU HAVE EVIDENCE WHERE ONE PERSON SAID TO YOU OR

4  IN A SURVEY, OR TO ANYONE, I BOUGHT THE 2008K BECAUSE IT HAD A

5  TOUCH SCREEN ON IT?

6  A.   NO, BUT I HAVE FRESENIUS' OWN DOCUMENTS THAT SPEAK TO

7  THAT, OR TESTIMONY.

8  Q.   THOSE ARE MARKETING DOCUMENTS, CORRECT?

9  A.   YES.

10 Q.   WHERE THEY ARE SAYING WE HAVE THIS COOL NEW FEATURE, A

11 TOUCH SCREEN, CORRECT?

12 A.   YES.  THAT'S RIGHT.

13 Q.   AND THAT IT WAS AN IMPROVEMENT OVER THE 2008H, CORRECT?

14 A.   WELL, THEY WERE SAYING THE 2008H WAS BECOMING OBSOLETE,

15 THAT IT WAS MORE THAN JUST AN IMPROVEMENT, I THINK.

16 Q.   IN FACT, THERE WERE SEVERAL UPGRADES THAT TOOK PLACE ON

17 THE 2008K, CORRECT?

18 A.   YES.

19 Q.   BESIDES THE TOUCH SCREEN?

20 A.   YES.  THAT'S RIGHT.

21 Q.   FOR EXAMPLE, THERE WAS AN LCD COLOR DISPLAY THAT WAS ADDED

22 TO THE 2008K THAT WAS NOT ON THE 2008H, CORRECT?

23 A.   YES.  THAT'S RIGHT.  AND THAT'S WHY YOU DON'T TAKE ALL OF

24 THE PROFITS.  YOU ARE ONLY PAYING BAXTER A PART BECAUSE THERE

25 ARE OTHER FEATURES THAT ARE THE REASON PEOPLE BUY THE MACHINES.

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/13 Page 91 of 232 PageID# 33936
Case4:09-cv-01434-PJH Document156 Filed 09/07/12 Page302 of 291 90
DEN UYL - CROSS / MS. BROOKS

1  **Q.**   MR. DEN UYL, YOU ARE USING THE ENTIRE SALE OF THE K AS THE

2  BASE, CORRECT?

3  **A.**   YES.  THAT'S APPROPRIATE WHERE IT DRIVES THE DEMAND FOR

4  THE MACHINE.

5  **Q.**   AND YOU'RE AWARE OF THE <u>LUCENT</u> CASE, ARE YOU NOT?

6  **A.**   YES, I AM.

7  **Q.**   WHERE IN ORDER TO GET THE ENTIRE MACHINE, YOU MUST SHOW

8  THAT THE IMPROVEMENT IS THE BASIS FOR CUSTOMER DEMAND, CORRECT?

9  **A.**   YES.  AND WE HAVE THE EVIDENCE AND THE TESTIMONY TO THAT.

10 **Q.**   JUST ONE MORE TIME THEN FOR THE RECORD.

11          WHAT EVIDENCE OR TESTIMONY DO YOU HAVE WHERE ONE

12 PERSON SAID THEY BOUGHT THE K BECAUSE IT HAD A TOUCH SCREEN?

13 ONE PERSON.

14 **A.**   AGAIN, MR. POWELL TESTIFIED TO THAT AND THE DOCUMENTS TALK

15 ABOUT THAT.

16 **Q.**   MR. DEN UYL, LET ME ASK THE QUESTION AGAIN.

17          WHAT EVIDENCE DO YOU HAVE THAT EVEN ONE PERSON SAID

18 THEY BOUGHT THE K BECAUSE IT HAD A TOUCH SCREEN?

19 **A.**   AGAIN, I AM USING THE BEST EVIDENCE I CAN.  THAT'S THE

20 PEOPLE THAT ARE OUT MARKETING THAT PRODUCT.

21 **Q.**   NOW LET'S GO TO THE DISPOSABLES.

22          WELL, ACTUALLY BEFORE WE MOVE AWAY FROM THAT, CAN

23 YOU SEE THAT CHART UP THERE, SIR?

24 **A.**   NOT VERY WELL.

25 **Q.**   LET ME SEE IF I CAN BLOW IT UP ON THE ELMO SO WE CAN GET

Case 3:09-cv-00688-RFP-4  Document 1031-1  Filed 03/21/18  Page 92 of 232 PageID# 33937
Case4:09-cv-01431-JPH  Document 1156  Filed 03/02/12  Page 31 of 291   91
DEN UYL - CROSS / MS. BROOKS

1    IT CLEAR.

2                    (DOCUMENT DISPLAYED ON ELMO.)

3            NOW, SEE IF IT WILL AUTOFOCUS.

4            **MR. MURTHY:**  CAN YOU IDENTIFY THIS FOR ME PLEASE?

5            **MS. BROOKS:**  IT'S PTX216.  AND IT WAS TURNED OVER --

6    I CAN'T READ THE BATES NUMBER.  WE SENT IT OVER TO BAXTER A FEW

7    DAYS AGO.

8            **MR. ABERNATHY:**  THANKS.

9            **MS. BROOKS:**  YOU'RE WELCOME.

10   **BY MS. BROOKS:**

11   **Q.**  WHAT WE HAVE HERE, SIR, IS A SUMMARY OF SALES OF BOTH

12   DISPOSABLES AND MACHINES OVER A PERIOD OF TIME.

13           NOW, IF WE LOOK AT THE TOP COLUMN, I WILL REPRESENT

14   THAT THAT WAS IN 2000 AND -- I AM LOOKING AT MR. FLOREY, 7?

15           **MR. FLOREY:**  THE TOP IS 2008.

16   **BY MS. BROOKS:**

17   **Q.**  2008.  NOW THIS IS WHEN THE K'S ARE ON THE MARKET, THE

18   ONES WITH THE TOUCH SCREEN?

19   **A.**  YES.  THAT'S RIGHT.

20   **Q.**  IF WE LOOK, THESE ARE THE SALES VOLUMES FOR THE K'S, THE

21   MACHINES THEMSELVES IN 2008.

22           WE SEE THESE NUMBERS RIGHT HERE.  3900, 4,000 FOR

23   Q2, LITTLE OVER 4,000 FOR Q3, 4300 FOR Q4, FOR A GRAND TOTAL OF

24   A LITTLE OVER 16,000 K'S WERE SOLD IN 2008, CORRECT?

25   **A.**  YES.  THAT'S WHAT IT SHOWS.

DEN UYL - CROSS / MS. BROOKS

1    **Q.**   THEN THERE WAS AN INJUNCTION THAT WAS ISSUED BY THE COURT;

2    IS THAT RIGHT?

3    **A.**   YES.

4    **Q.**   AND IN THE BEGINNING, FIRST QUARTER OF 2009, FRESENIUS

5    INTRODUCED THE K2 WHICH DID NOT HAVE A TOUCH SCREEN ON IT; IS

6    THAT RIGHT?

7    **A.**   THAT'S MY UNDERSTANDING, YES.

8    **Q.**   AND SO NOW WE SHOULD LOOK AND SEE WHETHER OR NOT IF THE

9    TOUCH SCREEN WAS WHAT WAS DRIVING SALES, WHETHER WE HAD A DIP

10   IN SALES OF THE MACHINE NOW THAT THE TOUCH SCREEN IS NO LONGER

11   ON IT.

12           AND IS IT TRUE, MR. DEN UYL, THAT RATHER THAN HAVING

13   A DIP IN SALES, THERE WERE ACTUALLY MORE SALES OF THE K2

14   WITHOUT A TOUCH SCREEN THAN THERE HAD BEEN OF THE K THAT HAD

15   THE TOUCH SCREEN?

16   **A.**   IN 2009?

17   **Q.**   YES.

18   **A.**   NO, NOT ACTUALLY, BUT IT'S PRETTY CLOSE.

19   **Q.**   OKAY.  I AM SORRY.  I THOUGHT THAT 16,741 WAS HIGHER THAN

20   16,515.

21   **A.**   I WAS LOOKING AT THE REVENUE, ACTUALLY.

22   **Q.**   I AM JUST LOOKING OVER HERE AT THE NUMBER OF MACHINES

23   SOLD.

24           DO YOU SEE THAT, SIR?

25   **A.**   YES, I DO.

Case 3:09-cv-00680-RFP Document 1031-1 Filed 03/21/13 Page 94 of 232 PageID# 33939
Case4:09-cv-01491-PJH Document1156 Filed09/02/12 Page93 of 291 93
DEN UYL – CROSS / MS. BROOKS

1    **Q.**   WERE MORE K2'S THAT DID NOT HAVE THE TOUCH SCREEN SOLD IN

2    2009 THEN K'S WITH A TOUCH SCREEN WERE SOLD IN 2008?

3    **A.**   IT LOOKS THIS WAY.  YEAH.

4    **Q.**   IF WE GO DOWN TO THE FOLLOWING YEAR NOW, 2010, WE HAVE YET

5    EVEN MORE HEMODIALYSIS MACHINES K2'S AND SOMETHING CALLED A T

6    THAT DID NOT HAVE A TOUCH SCREEN AT THAT POINT, WE NOW HAVE

7    SALES OF 17,223 MACHINES IN 2010; IS THAT CORRECT?

8    **A.**   YES.  IT LOOKS THAT WAY.

9    **Q.**   I WANT TO HIT JUST A COUPLE OF OTHER POINTS THAT YOU MADE,

10   MR. DEN UYL.

11         YOU SAID THAT FRESENIUS AND BAXTER WERE VERY FIERCE

12   COMPETITORS AND THAT WOULD DRIVE THE ROYALTY RATE UP; IS THAT

13   RIGHT?

14   **A.**   YES.

15   **Q.**   ARE YOU AWARE THAT MS. JILL SCHAAF TESTIFIED AT HER

16   DEPOSITION IN NOVEMBER OF 2008 THAT BY THAT TIME, BAXTER --

17              **MR. ABERNATHY:**  OBJECTION, YOUR HONOR.

18              **THE COURT:**  YES.

19              **MR. ABERNATHY:**  I BELIEVE THIS DEPOSITION IS NOT

20   FROM THIS LITIGATION.  I BELIEVE THIS DEPOSITION WAS FROM THE

21   PD CASE.

22         I ALSO UNDERSTAND THAT DEPOSITION IS SUBJECT TO A

23   PROTECTIVE ORDER.  I HAVE BEEN LEAD COUNSEL SINCE 2003.  I

24   DON'T KNOW WHAT THIS IS ABOUT.

25         AND SO I WILL OBJECT, YOUR HONOR.  IT IS NOT IN THIS

DEN UYL - CROSS / MS. BROOKS

1    RECORD.  IT IS UNFAIR.  I DON'T KNOW WHAT'S GOING ON.

2            **THE COURT:**  OFFER OF PROOF.

3            **MR. FLOREY:**  YOUR HONOR, FIRST OF ALL, IT IS YOUR

4    PROTECTIVE ORDER FROM THE PD CASE.  WE, IN OUR BRIEFING, WE

5    ADVISED THE OTHER SIDE THAT WE INTENDED TO USE THIS VERY

6    TESTIMONY AT THIS --

7            **THE COURT:**  WHAT'S THE RELEVANCE OF ANY DEPOSITION

8    GIVEN IN THE PERITONEAL DIALYSIS CASE TO THIS CASE?

9            **MS. BROOKS:**  MY OFFER OF PROOF IS, YOUR HONOR, THAT

10   MS. SCHAAF TESTIFIED THAT AS OF NOVEMBER 2008, BAXTER DID NOT

11   SELL ANY HEMODIALYSIS MACHINES IN THE UNITED STATES; THAT THEY

12   HAD OPTED TO EXIT THE HEMODIALYSIS MARKET.

13           THIS GOES DIRECTLY TO BAXTER'S ASSERTION THAT

14   FRESENIUS AND BAXTER WERE HEAD-TO-HEAD COMPETITORS IN THE

15   HEMODIALYSIS SPACE WHEN, IN FACT, BAXTER HAD EXITED THAT SPACE.

16           **THE COURT:**  OKAY.

17           **MR. ABERNATHY:**  YOUR HONOR, AGAIN, I HAVEN'T SEEN

18   THIS.  I DON'T KNOW -- I UNDERSTOOD WHAT I JUST HEARD IN THE

19   PROFFER THAT IT WAS REFERRING TO SOME TIME IN 2008.  I BELIEVE

20   THAT WE HAVE BEEN FOCUSING ON THE POINT OF A HYPOTHETICAL

21   NEGOTIATION IN NOVEMBER 2007.

22           SO THIS IS OUTSIDE THE RECORD.  I CAN'T LOOK AT IT

23   UNDER THE PROTECTIVE ORDER.  I HAVEN'T SEEN IT.  THEY HAVEN'T

24   SHOWN IT TO ME.  IT'S NOT RELEVANT, IT'S OUTSIDE OF THIS

25   RECORD.  I DON'T THINK IT SHOULD BE USED.

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/18 Page 96 of 282 PageID# 33941
Case4:09-cv-01482-PJH Document156 Filed 08/02/12 Page93 of 231
DEN UYL – CROSS / MS. BROOKS
95

 1          **THE COURT:** I OVERRULE ALL OF THE OBJECTIONS EXCEPT

 2    WITH RESPECT TO THE FACT THAT IT IS SUBJECT TO A PROTECTIVE

 3    ORDER.

 4          HOW FAIR IS IT THAT YOU USE IT, SINCE YOU ARE

 5    SUBJECT TO THAT PROTECTIVE ORDER, YOU ARE A PARTY TO IT AND THE

 6    OPPOSING SIDE NOT BE ABLE -- PERMITTED TO USE IT OR IMPEACH IT

 7    IN ANY WAY; HOW ARE THEY SUPPOSED TO CHALLENGE IT IF THEY DON'T

 8    EVEN KNOW WHAT IT IS?

 9          **MS. BROOKS:** WITH THE COURT'S PERMISSION, THEN, YOUR

10    HONOR, SINCE IT WAS BAXTER WHO DESIGNATED MS. SCHAAF'S -- LET

11    ME BACK UP A LITTLE BIT.

12          MS. SCHAAF TESTIFIED IN COURT, IN OPEN COURT IN THE

13    PD CASE. SHE WAS THE REPRESENTATIVE FROM BAXTER THAT WE CALLED

14    ADVERSELY IN OUR CASE. THERE WAS THE WHOLE THING ABOUT THEY

15    HIRED A CIA AGENT --

16          **THE COURT:** I VAGUELY REMEMBER WHO SHE IS.

17          **MS. BROOKS:** SO THIS -- BAXTER DESIGNATED THIS

18    HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY AND IF THEY ARE WILLING

19    TO LIFT THIS, WE CAN HAND THE TRANSCRIPT TO THEM RIGHT NOW

20    BECAUSE IT'S THEIR DESIGNATION.

21          **THE COURT:** OKAY.

22          **MR. ABERNATHY:** AGAIN, YOUR HONOR, I HAVEN'T READ

23    THIS DEPOSITION. I DON'T KNOW WHAT'S THERE. I DON'T KNOW WHAT

24    ELSE SHE SAID.

25          **THE COURT:** DID YOU ALL OTHERWISE EXCHANGE EXHIBITS

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/13 Page 97 of 232 PageID# 33942
Case4:09-cv-01434-PJH Document 1156 Filed 05/02/12 Page 96 of 231

96
DEN UYL – CROSS / MS. BROOKS

1    IN ADVANCE OF THIS PROCEEDING?

2            **MS. BROOKS:** WE DID, YOUR HONOR. THEY WERE ALL

3    ATTACHED TO OUR MOTION. THE ONLY ONE WE DIDN'T WAS BECAUSE OF

4    THE PROTECTIVE ORDER, BUT WE SAID WE WERE GOING TO OFFER IT AT

5    THIS HEARING.

6            THEIR IN-HOUSE COUNSEL IS SITTING RIGHT HERE. IF

7    THEY HAVE NO OBJECTION, I WILL HAND IT TO THEM RIGHT NOW.

8            **THE COURT:** I'M GOING TO -- SINCE IT IS -- I MEAN,

9    YOU -- YOUR CLIENT WAS A PARTY TO THIS. I AM GOING TO OVERRULE

10   THE OBJECTION.

11           **MR. ABERNATHY:** I UNDERSTAND, YOUR HONOR. COULD

12   I --

13           **THE COURT:** IF YOU WOULD LIKE TO HAVE A LITTLE TIME

14   TO LOOK AT IT, AND IF ONE OF YOUR -- MAYBE ONE OF -- YOU HAVE

15   SOMEBODY ELSE HERE IN COURT WHO MIGHT BE ABLE TO REBUT IT IF

16   YOU THINK IT IS SUBJECT TO BEING REBUTTED? OTHERWISE JUST

17   ARGUE IT IS NOT RELEVANT BECAUSE IT IS A YEAR LATER.

18           **MR. ABERNATHY:** I UNDERSTAND. COULD THE WITNESS

19   ALSO LOOK AT, GET A COPY OF THIS? THIS WITNESS HAS NOT SEEN

20   IT.

21           **MS. BROOKS:** WITH BAXTER'S PERMISSION, OF COURSE,

22   YOUR HONOR.

23           **THE COURT:** WITH THAT PERMISSION.

24           **MR. ABERNATHY:** THANK YOU, YOUR HONOR.

25           **THE WITNESS:** THANK YOU.

1    **BY MS. BROOKS:**

2    **Q.**   MR. DEN UYL, MAYBE WE WILL COME BACK TO THAT WHEN YOU HAVE

3    HAD A CHANCE TO READ IT OVER BECAUSE I JUST HAVE A COUPLE MORE

4    AREAS THAT I WANTED TO COVER WITH YOU AND THEN I THINK I AM

5    DONE.

6    **A.**   OKAY.

7    **Q.**   YOU MENTIONED ALSO THAT -- AND I THINK IT WAS YOUR -- LET

8    ME FIND YOUR LAST POWER POINT.  HERE WE GO.

9                    (SLIDE DISPLAYED ON ELMO.)

10                   YOU MENTIONED THAT THE ABSENCE OF THE '131 AND '027

11   PATENTS DOES NOT IMPACT THE POST-JUDGMENT ROYALTY RATES

12   PREVIOUSLY IMPOSED BY JUDGE ARMSTRONG.

13                   IS THAT RIGHT?

14   **A.**   YES.

15   **Q.**   AND THAT'S BECAUSE IN YOUR OPINION ALL THOSE PATENTS WERE

16   THE SAME?

17   **A.**   NO, NOT THE SAME, BUT THE RELEVANT PATENT RIGHT NOW IS --

18   PREVENTS THEM FROM USING THE TOUCH SCREEN TECHNOLOGY WITHOUT

19   INFRINGING THE MACHINES.

20                   SO, NOTHING HAS REALLY CHANGED THERE.

21   **Q.**   SO YOU ALSO SHOWED US THIS.  AND ACTUALLY THAT WAS A

22   COUPLE OF SLIDES LATER WHERE ONE OF THE FACTORS -- YOU

23   MENTIONED IT SEVERAL TIMES.

24                   (SLIDE DISPLAYED ON ELMO.)

25                   **MR. MURTHY:**  ACTUALLY, YOUR HONOR, THIS WAS NOT

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/18 Page 99 of 232 PageID# 33944
Case4:09-cv-01434-PJH Document1156 Filed09/02/12 Page98 of 231   98
DEN UYL - CROSS / MS. BROOKS

1    COVERED IN HIS DIRECT EXAMINATION.

2              **MS. BROOKS:**  I AM SORRY.  WELL, MAY I USE IT?

3    SINCE --

4              **THE COURT:**  WAIT, WAIT.  WHAT ARE WE TALKING ABOUT?

5    WHAT SUBJECT WAS NOT COVERED?

6              **MR. MURTHY:**  THIS SUBJECT, YOUR HONOR.  THE SLIDE

7    WAS NOT USED IN HIS DIRECT EXAMINATION.

8              **THE COURT:**  THE SLIDE WASN'T USED.

9              **MR. MURTHY:**  THE SUBJECT WASN'T COVERED EITHER.

10             **MS. BROOKS:**  MAY I ASK A QUESTION TO ESTABLISH THAT?

11             **THE COURT:**  OKAY.

12   **BY MS. BROOKS:**

13   **Q.**   MR. DEN UYL, DIDN'T YOU TELL US REPEATEDLY THAT FRESENIUS

14   HAD NO ALTERNATIVE AVAILABLE IN 2007 AND THE 2008K2 WAS NOT

15   AVAILABLE UNTIL JANUARY OF 2009?

16   **A.**   NO.  I SAID THERE WAS NO NONINFRINGING ALTERNATIVE, BUT I

17   DIDN'T MENTION THE K2 MACHINE.

18   **Q.**   OKAY.

19             BUT YOUR HYPOTHETICAL NEGOTIATION TAKES PLACE AT THE

20   END OF 2007; IS THAT RIGHT?

21   **A.**   NOT JUST MINE, BUT THE ONE WE ARE CONSIDERING HERE.

22   **Q.**   THE ONE WE ARE CONSIDERING HERE, THE HYPOTHETICAL

23   NEGOTIATION TAKES PLACE AT THE END OF 2007; IS THAT RIGHT?

24   **A.**   YES.

25   **Q.**   AND ONE OF THE THINGS THAT YOU SAID DROVE UP THE ROYALTY

1    RATE WAS THE FACT THAT FRESENIUS HAD NO NONINFRINGING

2    ALTERNATIVE AT THAT POINT IN TIME?

3    **A.**   RIGHT.  IT DIDN'T HAVE ANYTHING ELSE TO SELL, SO WITHOUT

4    BEING ABLE TO SELL THE K MACHINE IT WOULD LOSE SALES.

5    **Q.**   ALL RIGHT.  LET'S SEE IF THAT'S ACCURATE.

6                     (BLOWUP DISPLAYED ON EASEL.)

7              NOW, WHEN THE PREVIOUS COURT REVERSED THE JURY'S

8    VERDICT AND ENTERED JUDGMENT FOR BAXTER, THAT WAS JUDGMENT FOR

9    BAXTER ON BOTH THE '027 PATENT, CORRECT?

10   **A.**   I AM SORRY, YOU ARE GOING -- I AM NOT FOLLOWING HERE.

11   **Q.**   THERE WERE THREE PATENTS AT ISSUE IN THE CASE,

12   ORIGINALLY -- IN THE DAMAGES CASE, CORRECT?

13   **A.**   AT THE DAMAGES TRIAL?  YES.

14   **Q.**   YES.

15             THAT WAS BECAUSE WHAT THE DISTRICT COURT HAD DONE,

16   IS THE DISTRICT COURT HAD SET ASIDE THE JURY'S VERDICT AND

17   ENTERED JUDGMENT FOR BAXTER ON ALL OF THE PATENTS THAT WERE AT

18   ISSUE AT THAT POINT, CORRECT?

19   **A.**   I BELIEVE SO, YES.

20   **Q.**   AND ONE OF THOSE WAS THE '027 PATENT; IS THAT RIGHT?

21   **A.**   YES.

22   **Q.**   AND ONE OF THEM WAS THE '131 PATENT; IS THAT RIGHT?

23   **A.**   CORRECT.

24   **Q.**   AND ONE OF THEM WAS THE '434 PATENT, CORRECT?

25   **A.**   YES.

Case 3:09-cv-00688-REP  Document 1031-1  Filed 03/21/13  Page 101 of 232 PageID# 33946
Case 3:09-cv-01431-PJH  Document 156  Filed 06/21/12  Page 100 of 291                100
DEN UYL - CROSS / MS. BROOKS

1   Q.   AND THEN YOU'RE AWARE THAT THE FEDERAL CIRCUIT

2   REINSTITUTED THE JURY'S FINDING OF INVALIDITY ON THE '027

3   PATENT AND '131 PATENT, CORRECT?

4   A.   THEY FOUND THAT THEY WERE NOT VALID.  THAT'S CORRECT.

5   Q.   BUT THAT, THE '434 PATENT BECAUSE IT WAS

6   MEANS-PLUS-FUNCTION CLAIMS, THEY DID NOT INVALIDATE; IS THAT

7   RIGHT?

8   A.   YES.  I DON'T KNOW THE REASON, BUT THEY DIDN'T INVALIDATE.

9   Q.   NOW, AT THE TIME, HOWEVER, OF THE HYPOTHETICAL

10  NEGOTIATION, FRESENIUS HAS THE BENEFIT OF WHAT IS CALLED THE

11  BOOK OF WISDOM; IS THAT RIGHT?

12  A.   WELL, I AM NOT SURE EXACTLY WHERE YOU ARE GOING.  I MEAN,

13  THEY HAD THE FACTS AS OF THAT DATE.

14  Q.   WELL, BUT THEY ALSO COULD LOOK INTO THE FUTURE AND KNOW

15  THAT AS OF THAT DATE, DOWN THE ROAD, THE ONLY PATENT THEY WERE

16  GOING TO BE FACING THAT WAS STILL GOING TO BE ALIVE WAS THE

17  '434 PATENT, CORRECT?

18  A.   I THINK THAT'S -- I CAN'T SAY LEGALLY WHETHER THAT'S TRUE,

19  BUT CERTAINLY THAT WAS TRUE WITH RESPECT TO THE ECONOMICS THAT

20  THE '434 WOULD CONTINUE TO MAKE THE K AN INFRINGING MACHINE.

21  Q.   OKAY.  SO I AM GOING TO ASK YOU -- SINCE YOU ARE AN

22  EXPERT, I GET TO ASK HYPOTHETICALS.  I AM GOING TO ASK YOU A

23  HYPOTHETICAL.

24       HYPOTHETICALLY, IF FRESENIUS HAD READY AT THE END OF

25  2007 A DESIGN AROUND WHERE THERE WAS A HEMODIALYSIS MACHINE AND

Case 3:09-cv-00610-RFB Document 1031-1 Filed 03/21/13 Page 102 of 232 PageID# 33947
Case 3:09-cv-01491-RFB Document 156 Filed 03/21/12 Page 102 of 291

161
DEN UYL - CROSS / MS. BROOKS

```
 1    IT HAD A TOUCH SCREEN -- BACK UP.

 2              YOU WOULD AGREE THAT AT THE END OF 2007, FRESENIUS

 3    DID NOT HAVE A DESIGN AROUND WHERE THEY HAD A HEMODIALYSIS

 4    MACHINE THAT DID NOT HAVE A TOUCH SCREEN.

 5              CORRECT?

 6    A.   THAT'S MY UNDERSTANDING.

 7    Q.   BECAUSE THE K HAD A TOUCH SCREEN, RIGHT?

 8    A.   YES.

 9    Q.   AND THE H WAS NO LONGER BEING MANUFACTURED, CORRECT?

10    A.   THAT'S MY UNDERSTANDING.  YES.

11    Q.   NOW, LET'S LOOK -- AND THAT IS THE '027 PATENT, CLAIM 11.

12              LET'S LOOK AT WHAT THE '434 PATENT CLAIM 26

13    REQUIRES.

14              THE '434 PATENT CLAIM 26 TALKS ABOUT A HEMODIALYSIS

15    MACHINE, CORRECT?

16    A.   YES.

17    Q.   AND A MEANS FOR CONTROLLING A DIALYSATE PARAMETER,

18    CORRECT?

19    A.   YES.

20    Q.   SELECTED FROM A GROUP CONSISTING OF DIALYSATE TEMPERATURE,

21    DIALYSATE CONCENTRATION AND A MEANS FOR DELIVERING THAT

22    DIALYSATE TO A COMPARTMENT OF THE HEMODIALYZER.

23              CORRECT?

24    A.   THAT'S WHAT IT READS.

25    Q.   THIS IS WHAT A HEMODIALYSIS MACHINE DOES, RIGHT?
```

DEN UYL - CROSS / MS. BROOKS

 1   **A.**   IT'S ONE OF THE THINGS IT DOES.

 2   **Q.**   OKAY.

 3         AND THE SECOND PART SAYS THAT:

 4         "THE USER MACHINE INTERFACE IS COUPLED TO THE

 5         DELIVERY, AND IT IS COMPRISED OF A TOUCH

 6         SCREEN."

 7         DO YOU SEE THAT?

 8   **A.**   YES, I DO.

 9   **Q.**   (READING)

10         "AND THAT THAT TOUCH SCREEN IS ADAPTED TO

11         DISPLAY AN INDICIUM CORRESPONDING TO A PARAMETER

12         PERTINENT TO OPERATION OF THE HEMODIALYSIS

13         MACHINE FOR PERFORMING HEMODIALYSIS AND TO

14         PERMIT THE USER BY TOUCHING THE INDICIUM TO

15         CAUSE A CHANGE IN THE PARAMETER."

16         DID I READ THAT CORRECTLY?

17   **A.**   YES, YOU DID.

18   **Q.**   LET ME ASK YOU HYPOTHETICALLY.

19         IF FRESENIUS HAD A DESIGN AROUND AVAILABLE AT THE

20   END OF 2007 WHEREIN THE CHANGING OF THE PARAMETER DIDN'T TAKE

21   PLACE USING THE TOUCH SCREEN, BUT TOOK PLACE USING BUTTONS OFF

22   THE TOUCH SCREEN, THEN FRESENIUS DID, IN FACT, HAVE A VIABLE

23   DESIGN AROUND AT THE END OF 2007, CORRECT?

24         **MR. MURTHY:**  I AM GOING TO OBJECT, YOUR HONOR.  THIS

25   IS FAR INTO TECHNICAL DETAILS.  MR. DEN UYL IS NOT A TECHNICAL

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/13 Page 104 of 232 PageID# 33949
Case 4:09-cv-01421-PJH Document 156 Filed 08/02/12 Page 103 of 231
103
DEN UYL - CROSS / MS. BROOKS

1    EXPERT.

2              **THE COURT:**  SUSTAINED.  I DON'T SEE HOW HE COULD BE

3    EXPECTED TO ANSWER THAT.

4    **BY MS. BROOKS:**

5    **Q.**   WELL, LET ME ASK YOU THIS, MR. DEN UYL.

6              DID YOU TAKE INTO CONSIDERATION THE DIFFERENCES

7    BETWEEN CLAIM 7 OF THE '027 PATENT AND CLAIM 26 OF THE '434

8    PATENT?

9    **A.**   YES.  I CONSIDERED THAT.  AND AS I SAID, WE'VE ALWAYS,

10   BOTH YOUR EXPERT AND MYSELF HAVE ALWAYS CONSIDERED THE ISSUE TO

11   BE THE TOUCH SCREEN ITSELF, NOT WHETHER A PARTICULAR PATENT WAS

12   AT ISSUE HERE.

13   **Q.**   WOULD YOU AGREE THAT THE '027 CLAIM 7 IS DIFFERENT THAN

14   CLAIM 26 OF THE '434 PATENT?

15             **MR. MURTHY:**  I OBJECT, YOUR HONOR.  IT CALLS FOR A

16   LEGAL CONCLUSION AND A TECHNICAL OPINION THAT THIS WITNESS IS

17   NOT CAPABLE OF PROVIDING.

18             **THE COURT:**  ARE YOU ASKING FOR A TECHNICAL OPINION?

19             **MS. BROOKS:**  I AM NOT, YOUR HONOR.  I AM ASKING IF

20   HE FACTORED THIS IN TO HIS OPINION AS A DAMAGES EXPERT.

21             **THE COURT:**  OVERRULED.  YOU MAY ANSWER IT.

22             **THE WITNESS:**  AGAIN, I DON'T KNOW.  I AM NOT A

23   TECHNICAL, I AM AN ECONOMIST.  SO THE KEY THING THAT WE HAVE

24   ALWAYS FOCUSED ON IS THIS TOUCH SCREEN TECHNOLOGY.

25             IT'S MY UNDERSTANDING THAT THE REMAINING PATENT, THE

DEN UYL - CROSS / MS. BROOKS

 1   '434, YOU KNOW, SAYS THE K STILL INFRINGES.  THAT'S THE ISSUE

 2   WE HAVE.

 3   **BY MS. BROOKS:**

 4   **Q.**   THAT THE K DOES?  I AM SORRY.  DID YOU SAY?

 5   **A.**   THE K INFRINGES THAT -- THE '434 PATENT, AND THEY CAN'T

 6   USE THE TOUCH SCREEN AS A RESULT OF THAT PATENT.

 7   **Q.**   AND SO MY QUESTION IS -- BY THE WAY, AT THAT OTHER TRIAL,

 8   I FORGOT THERE WAS ANOTHER WITNESS FOR BAXTER, THE DAMAGES

 9   TRIAL, A MR. FERRARO.

10        DO YOU REMEMBER THAT?

11   **A.**   YES, I DO.

12   **Q.**   HE WAS A TECHNICAL EXPERT FOR BAXTER, CORRECT?

13   **A.**   YES.

14   **Q.**   HE ACTUALLY DIFFERENTIATED BETWEEN THE VARIOUS CLAIMS AND

15   WHERE THEY COULD BE FOUND IN THE MACHINE, CORRECT?

16   **A.**   I DON'T REALLY RECALL.  HIS TESTIMONY WAS TECHNICAL ISSUES

17   THAT HE DEALT WITH.

18   **Q.**   AND DID YOU ASK BEFORE TESTIFYING TODAY TO BE ABLE TO

19   CONSULT WITH MR. FERRARO TO SEE WHETHER OR NOT THERE WAS A

20   TECHNICAL DIFFERENCE BETWEEN WHAT WAS REQUIRED IN THE '434

21   PATENT CLAIM -- '434 PATENT CLAIM 26 AND THE '027 PATENT

22   CLAIM 7?

23   **A.**   NO.  AGAIN, BECAUSE I AM JUST FOCUSED ON THE ISSUE OF THE

24   ECONOMIC EFFECT OF THAT 2000K MACHINE, THAT IT INFRINGES THE

25   TOUCH SCREEN PATENT.

DEN UYL - CROSS / MS. BROOKS

```
1    Q.   AND ONE OF THE ECONOMIC EFFECTS IS WHETHER OR NOT

2    FRESENIUS WOULD HAVE HAD A DESIGN AROUND AVAILABLE AT THE END

3    OF 2007 BEGINNING OF 2008, CORRECT?

4    A.   THAT WOULD BE -- THAT'S CERTAINLY ONE OF THE THINGS I

5    CONSIDERED.  YES.

6    Q.   THAT CAN CERTAINLY MAKE A SIGNIFICANT DIFFERENCE IF, IN

7    FACT, A DESIGN AROUND WAS AVAILABLE?

8    A.   NO, I DON'T KNOW THAT IT WOULD MAKE A SIGNIFICANT

9    DIFFERENCE BECAUSE, YOU KNOW, I DON'T KNOW WHAT THAT MACHINE

10   WOULD BE.  IT DIDN'T EXIST.

11        BUT IT WOULDN'T BE -- IT WOULD HAVE TO BE SOMETHING

12   THAT, YOU KNOW, THAT THEY FELT THAT THEY COULD SELL AS OPPOSED

13   TO THE K, WHICH WAS THE BEST SELLING MACHINE AND THE ONLY ONE

14   OUT THERE.

15        MS. BROOKS:  BY THE WAY, YOUR HONOR, MY COLLEAGUE

16   TELLS ME I MISSPOKE.  IT'S CLAIM 11 OF THE '027 PATENT, JUST

17   FOR THE RECORD.

18        I HAVE NO FURTHER QUESTIONS.  THANK YOU.

19        THE COURT:  ALL RIGHT.

20        MR. MURTHY:  JUST TWO VERY QUICK THINGS.

21        THE COURT:  ALL RIGHT.

22        MR. MURTHY:  IF I CAN HAVE THIS UP.

23             (SLIDE DISPLAYED ON SCREEN.)

24   ///

25   ///
```

Case 3:09-cv-00609-RFB Document 1021-1 Filed 03/21/18 Page 107 of 232 PageID# 33952
Case 3:09-cv-01491-PJH Document 156 Filed 03/02/12 Page 106 of 291          106
DEN UYL - REDIRECT / MR. MURTHY

<u>**REDIRECT EXAMINATION**</u>

**BY MR. MURTHY:**

**Q.**   MR. DEN UYL, MS. BROOKS ASKED YOU A SERIES OF QUESTIONS
REGARDING THE 2008K2, AND THE FACT THAT THE SALES DID NOT
DECLINE DURING THE TRANSITION PERIOD.

         DO YOU RECALL THOSE?

**A.**   YES, I DO.

**Q.**   ARE YOU SURPRISED THAT FRESENIUS WAS ABLE TO CONTINUE
SELLING THE 2008K2 MACHINE?

**A.**   NO, I AM NOT.  THE FRESENIUS HAD A 96 PERCENT SHARE OF THE
MARKET.  SO ESSENTIALLY THEY HAD THE WHOLE MARKET.  SO ANY NEW
MACHINE THAT THEY WOULD INTRODUCE WOULD HAVE THE WEIGHT OF
BEING BASICALLY THE ONLY SELLER IN THE MARKETPLACE.

**Q.**   THANK YOU.

         IF I CAN HAVE THIS ONE?

                (SLIDE DISPLAYED ON SCREEN.)

         NOW, MS. BROOKS ALSO SHOWED YOU THIS EXHIBIT.  AND
WHAT I WANT TO HIGHLIGHT HERE IS IF YOU LOOK AT THE MACHINE
REVENUE FOR THE 2008K FOR THE YEAR 2008.

         DO YOU SEE THAT, MR. DEN UYL?

**A.**   YES, I DO.

**Q.**   AND CAN YOU LOOK AT THE MACHINE REVENUE FOR THE 2008K2 FOR
THE YEAR 2009?

         DO YOU SEE THAT?

**A.**   YES.

Case 3:09-cv-00629-REP Document 1031-1 Filed 03/21/13 Page 108 of 232 PageID# 33953
Case 4:03-cv-01431-PJH Document 156 Filed 08/02/12 Page 107 of 291    107
DEN UYL – RECROSS / MS. BROOKS

1    **Q.**    COULD YOU TELL US, SIR, WHICH MACHINE, THE 2008K OR THE

2    2008K2, IS MORE PROFITABLE FOR FRESENIUS?

3    **A.**    WELL, YOU MEAN WHICH HAD MORE REVENUES?

4    **Q.**    CORRECT.

5    **A.**    THE 2008K IN 2008 HAD SLIGHTLY HIGHER REVENUES.

6              **MR. MURTHY:**  THANK YOU.

7              YOUR HONOR, I HAVE NO FURTHER QUESTIONS.

8              **THE COURT:**  ALL RIGHT.

9              **MS. BROOKS:**  YOUR HONOR, MY COLLEAGUE REMINDS ME I

10   FORGOT TO FINISH UP WITH THE JILL SCHAAF DEPO.

11             **THE COURT:**  YOU ALL HAVE HAD A CHANCE TO LOOK AT IT?

12             **MR. ABERNATHY:**  THAT'S FINE.

13             **THE COURT:**  ALL RIGHT.  THE WITNESS HAS A COPY OF

14   THE TRANSCRIPT.

15                        **RECROSS-EXAMINATION**

16   **BY MS. BROOKS:**

17   **Q.**    UNFORTUNATELY HE HAS MY ONLY COPY, BUT HIGHLIGHTED THERE,

18   MR. DEN UYL, AM I CORRECT THAT MS. SCHAAF SAID, THAT AT LEAST

19   AT THE TIME OF HER DEPOSITION, WHICH WAS NOVEMBER OF 2008, THAT

20   BAXTER HAD EXITED THE HEMODIALYSIS MARKET?

21   **A.**    WELL, AGAIN, I'M SORT OF TAKING YOUR WORD FOR IT HERE.

22             THIS IS AFTER THE DATE OF THE HYPOTHETICAL

23   NEGOTIATION IN 2007.  AND EVEN IF THEY WERE ABSENT, YOU KNOW,

24   NOT SELLING MACHINES AT THAT TIME, THEY WERE CERTAINLY INTENSE

25   COMPETITORS IN THE DIALYSIS MARKETPLACE.

Case 3:09-cv-00620-REP Document 1021-1 Filed 03/21/13 Page 109 of 232 PageID# 33954
Case 3:09-cv-01434-PJH Document 156 Filed 05/11/12 Page 108 of 231   108
DEN UYL - RECROSS / MS. BROOKS

1   **Q.**   I AM SORRY.  I THINK I EITHER NEED A "YES" OR "NO" SO WE

2   CAN HAVE OUR RECORD CLEAR.

3         DID MS. SCHAAF SAY THAT BY AT LEAST NOVEMBER OF

4   2008, BAXTER HAD EXITED THE HEMODIALYSIS MARKET?

5   **A.**   JUST ON WHAT'S HIGHLIGHTED.  I HAVEN'T LOOKED AT ALL

6   THAT'S IN THE DEPOSITION.  YES.

7   **Q.**   BUT BASED ON WHAT'S HIGHLIGHTED; IS THAT CORRECT?

8   **A.**   YES.

9   **Q.**   AND ACTUALLY MR. MURTHY SHOWED YOU THIS, AND IT REMINDED

10  ME THERE WAS ONE THING I FORGOT.

11  **A.**   LET ME JUST CLARIFY.  I AM SORRY TO INTERRUPT.

12         WHAT SHE SAYS IS WE DON'T CURRENTLY SELL A

13  HEMODIALYSIS MACHINE.

14         I THINK YOUR QUESTION TO ME WAS WHETHER THEY EXITED

15  THE HEMODIALYSIS MARKET.  THAT CERTAINLY IS NOT THE CASE.

16  **Q.**   IF YOU LOOK, I THINK, AT THE NEXT ONE HIGHLIGHTED SAYS

17  THEY CHOSE TO EXIT THE MARKET?

18  **A.**   EXIT THE INSTRUMENT MARKET.  YEAH.

19         THEY CERTAINLY WERE COMPETITORS IN THE HEMODIALYSIS

20  MARKET SELLING OTHER PRODUCTS.

21  **Q.**   BUT WE ARE TALKING ABOUT THE MACHINE?

22  **A.**   SHE'S TALKING ABOUT THE MACHINE, YES.

23  **Q.**   OKAY.

24         AND ONE MORE THING I FORGOT TO ASK YOU.  AS FAR AS

25  THE DISPOSABLES ARE CONCERNED NOW, YOU USED, AGAIN, THE ENTIRE

DEN UYL - RECROSS / MS. BROOKS

1    SALE OF WHAT YOU CALL LINKED DISPOSABLES AS YOUR ROYALTY BASE

2    FOR DISPOSABLES, CORRECT?

3    **A.**   I AM SORRY, WHAT ARE YOU REFERRING TO?  HERE ON THIS --

4    **Q.**   NO.  I AM GOING TO GET TO THAT.

5          GOING BACK TO YOUR OPINION, YOU USED AS YOUR ROYALTY

6    BASE ON DISPOSABLES THE SALE OF ALL DISPOSABLES THAT YOU SAY

7    WERE LINKED TO 2008K'S; IS THAT RIGHT?

8    **A.**   WELL, THIS INFORMATION IS PROVIDED BY FRESENIUS, NOT ME.

9    I MEAN, I THINK THEY'RE -- YOU KNOW, THEY ARE LINKED.  THAT'S

10   WHAT IT IS SUPPOSED TO BE.

11   **Q.**   I'M SORRY, YOU MISUNDERSTOOD MY QUESTION.

12          THE BASE, YOUR BASE, YOU SAY WHAT SHOULD THE

13   7 PERCENT BE APPLIED TO IN YOUR OPINION WHEN IT COMES TO

14   DISPOSABLES?

15   **A.**   THE LINKED DISPOSABLES ASSOCIATED WITH THE K MACHINE.

16   **Q.**   THANK YOU.  THAT'S WHAT I WAS TALKING ABOUT.

17          NOW, AGAIN, DID YOU TALK TO ONE PERSON WHO SAID WE

18   BOUGHT FRESENIUS DISPOSABLES BECAUSE THE FRESENIUS 2008K HAD A

19   TOUCH SCREEN ON IT?

20   **A.**   WELL, NO, BUT THE DATA I HAD SHOWED THOSE EXACT CUSTOMERS

21   THE K BUYING THESE DISPOSABLES PRODUCTS.

22   **Q.**   DID IT SHOW THAT THEY DID IT BECAUSE THE K HAD A TOUCH

23   SCREEN ON IT?

24   **A.**   WE DON'T KNOW FOR CERTAIN, BUT THEY CERTAINLY WAS THE

25   OVERWHELMING CHOICE OF THE PEOPLE THAT BOUGHT THE K.

Case 3:09-cv-00620-REP Document 1021-1 Filed 03/21/13 Page 111 of 232 PageID# 33956
Case 3:09-cv-01492-PMP Document 1156 Filed 06/02/12 Page 110 of 291    110
DEN UYL - RECROSS / MS. BROOKS

1    **Q.**    AS WE SEE HERE WHEN WE GO TO THE K2 STARTING IN '09, THE

2    SALE OF DISPOSABLES DOES NOT GO DOWN EITHER, DOES IT?

3    **A.**    NO.    THEY WOULD NEED TO USE THESE DISPOSABLES.

4                **MS. BROOKS:**    THANK YOU.    NO FURTHER QUESTIONS.

5                **MR. MURTHY:**    NOTHING FURTHER.

6                **THE COURT:**    ALL RIGHT.    YOU MAY STEP DOWN, MR. DEN

7    UYL.

8                I ASSUME THEN YOU ARE FINISHED WITH YOUR

9    PRESENTATION?

10                **MR. ABERNATHY:**    SUBJECT TO CROSS-EXAMINATION, WE

11    REST.

12                **THE COURT:**    ALL RIGHT.    AND HOW DID YOU WISH TO

13    PROCEED?

14                **MS. BROOKS:**    IF I MIGHT MAKE AN OFFER OF PROOF, YOUR

15    HONOR.

16                WE HAVE THREE WITNESSES.    THE FIRST WOULD BE MARTY

17    CRNKOVICH.    AND THE PURPOSE, ACTUALLY, OF ALL THREE OF OUR

18    WITNESSES IS TO, NUMBER ONE, ASSIST THE COURT IN DETERMINING

19    WHAT IS THE CONTRIBUTION OF THE TOUCH SCREEN TO THE OVERALL

20    MACHINE AND THE CONTRIBUTION OF THE TOUCH SCREEN TO THE SALE OF

21    DISPOSABLES.    AND WHAT WOULD BE NOT ONLY THE APPROPRIATE RATE,

22    BUT WHAT WOULD BE THE APPROPRIATE BASE.

23                AND SO MR. CRNKOVICH, WHO DESIGNED THE 2008K AND

24    ALSO DESIGNED THE 2008K2 WILL TESTIFY FIRST.    DR. LIPPS, WHO

25    WOULD BE THE GENTLEMAN AT THE HYPOTHETICAL NEGOTIATION TABLE

```
 1    WILL TESTIFY SECOND ABOUT BASED UPON THAT, WHERE HE PUTS THE

 2    TOUCH SCREEN AS FAR AS IN THE -- THE VALUE TO THE K MACHINE,

 3    AND THEN LASTLY WOULD BE DR. RUBINFELD TO TIE ALL THAT TOGETHER

 4    IN HIS EXPERT OPINION AS TO WHAT THE APPROPRIATE ROYALTY WOULD

 5    BE --

 6              THE COURT:  HE IS THE ECONOMIST?

 7              MS. BROOKS:  YES, YOUR HONOR.

 8              THE COURT:  ALL RIGHT.  AND I ASSUME THAT EACH OF

 9    THEIR TESTIMONY IS NOT GOING TO TAKE AN INORDINATE AMOUNT OF

10    TIME.

11              MS. BROOKS:  NO, YOUR HONOR.  WE WILL TRY TO MAKE IT

12    AS EXPEDITIOUS AS POSSIBLE.

13              THE COURT:  IT'S BEGINNING TO GET A LITTLE BIT

14    REPETITIVE.  I HAVE SOME QUESTIONS, AND I WILL SEE IF THEY GET

15    ANSWERED BY THESE WITNESSES PRIMARILY ABOUT THE LINKED

16    DISPOSABLES.  I STILL HAVEN'T GOTTEN A CLEAR EXPLANATION FOR

17    EXACTLY WHAT THAT MEANS, AND I AM ASSUMING SOMEONE IS GOING TO

18    TALK TO ME ABOUT --

19              MR. FLOREY:  YOUR HONOR --

20              THE COURT:  -- THESE LINKED DISPOSABLES.

21              MR. FLOREY:  I CAN CLEAR THAT UP BECAUSE THAT'S

22    ACTUALLY A LEGAL ISSUE THAT WAS DONE BY THE LAWYERS.

23              JUDGE ARMSTRONG, IN HER ORDER, SAID YOU HAVE TO PAY

24    MONIES INTO ESCROW FOR LINKED DISPOSABLES WITHOUT ANY

25    DEFINITION.
```

```
1        AND SO REALLY THAT IS NOTHING MORE THAN A RELATIVE

2   FORMULA.  FOR EXAMPLE, FRESENIUS OWNS CLINICS.  SO FRESENIUS,

3   IN ITS CLINICS, KNOWS WHAT MACHINES ARE IN ITS CLINICS.  SO FOR

4   A GIVEN CLINIC, IF 50 PERCENT OF THE MACHINES ARE H'S AND

5   50 PERCENT OF THE MACHINES ARE K'S, THE INFRINGING MACHINE,

6   THAT'S 50/50, WE SIMPLY LOOKED AT ALL OF THE DISPOSABLES THAT

7   CLINIC BOUGHT AND SPLIT IT IN HALF, ASSUMING THAT HALF WOULD BE

8   USED WITH THIS MACHINE AND HALF WOULD BE USED WITH THAT.

9        SO LINKED IS NOTHING MORE THAN A TERM --

10       THE COURT:  HOW WOULD YOU KNOW IF ONE OF THE

11  MACHINES WASN'T FUNCTIONING AT A GIVEN TIME OR PATIENTS OR

12  DOCTORS PREFERRED ONE OVER THE OTHER?  I DON'T QUITE UNDERSTAND

13  HOW THE LINKING OCCURRED -- LET'S BACK UP.

14       I HAVE A QUESTION PRELIMINARY TO THAT.

15       IN TERMS OF THE PULL THROUGH, YOU ALL REFER TO THIS

16  TERM PULL THROUGH TO DESCRIBE THE DAMAGES.  SOMETHING THAT YOU

17  ASKED ONE OF THE WITNESSES STRUCK ME, AND THAT WAS ON THE

18  PERITONEAL DIALYSIS CASE, YOU REMINDED THE WITNESS THAT THE

19  CASSETTE HAD BEEN PATENTED.

20       I AM NOT EXACTLY SURE HOW THERE ARE REASONABLE

21  ROYALTIES ATTACHED TO DISPOSABLES WHEN THE DISPOSABLES DON'T

22  INFRINGE THE PATENT.  I THOUGHT THE REASONABLE ROYALTY WAS

23  ATTACHED TO THE INFRINGING MACHINE.

24       I DON'T UNDERSTAND THAT CONCEPT AT ALL.  AND

25  OBVIOUSLY IF I SAT THROUGH THE TRIAL MAYBE I WOULD UNDERSTAND
```

```
1    IT SINCE, BUT SINCE I DIDN'T SIT THROUGH THE TRIAL AND I

2    HAVEN'T READ ALL THE TRANSCRIPTS, I DON'T UNDERSTAND HOW IF

3    THEY DON'T INFRINGE, YOU ARE ENTITLED TO A ROYALTY.

4                WHAT I WOULD ASSUME IS THAT YOU WOULD BE -- THAT

5    THAT WOULD BE FACTORED IN TO THE GEORGIA-PACIFIC FACTORS AS ONE

6    OF --

7                MR. FLOREY:  I APOLOGIZE, YOUR HONOR.  I WILL SIT

8    DOWN.

9                THE COURT:  -- ONE OF THE FACTORS THAT ONE WOULD

10   TAKE INTO ACCOUNT IN DECIDING WHAT THE ROYALTY WOULD BE.  THAT

11   COULD POSSIBLY BE FACTORED IN AND IT MIGHT ACCOUNT FOR SOME

12   INCREASE IN THE ROYALTY THAT GOES ALONG WITH THE INFRINGING

13   DEVICE.  SO I AM NOT --

14               MR. ABERNATHY:  MAY I RESPOND, YOUR HONOR?

15               THE COURT:  -- CLEAR AT ALL WHY THERE ARE TWO

16   DIFFERENT ROYALTIES AT ISSUE.

17               MR. ABERNATHY:  MAY I RESPOND?

18               SO, YOU'RE RIGHT.  THERE ARE TWO ISSUES ON THE

19   TABLE.

20               ONE IS WHAT SHOULD BE INCLUDED IN THE BASE.  IN

21   OTHER WORDS, SHOULD THE NONPATENTED DISPOSABLES BE INCLUDED IN

22   THE BASE OR NOT.

23               MR. DEN UYL CALLED IT A QUESTION OF CONVOYED SALES.

24   THE FEDERAL CIRCUIT, IN A DECISION CALLED RITE-HITE ADDRESSED

25   THIS ISSUE.  THE FEDERAL CIRCUIT SAID THAT IF YOU HAVE PATENTED
```

1    PRODUCTS THAT FUNCTION TOGETHER WITH NONPATENTED COMPONENTS, AS

2    A SINGLE UNIT OR IF THEY FUNCTION TOGETHER, IT IS APPROPRIATE

3    TO INCLUDE THOSE NONPATENTED, IN THIS CASE, DISPOSABLES IN THE

4    ROYALTY BASE.  RITE-HITE VERSUS KELLEY, I BELIEVE, YOUR HONOR.

5         SECOND QUESTION IS --

6         **THE COURT:**  OKAY.  BUT THAT STILL DOESN'T SUGGEST TO

7    ME THAT IT IS A SEPARATE ROYALTY.

8         I MEAN, FACTORING IT INTO THE ROYALTY BASE SEEMS TO

9    SUGGEST WHAT I JUST TOLD YOU WOULD BE MY NATURAL INCLINATION,

10   IS TO TAKE THAT INTO ACCOUNT IN DETERMINING WHAT THE OVERALL

11   ROYALTY WOULD BE FOR THE INFRINGING PRODUCT GIVEN THAT THERE

12   WERE SOME OTHER ITEMS THAT YOUR --

13        **MR. ABERNATHY:**  YES.

14        **THE COURT:**  -- YOUR CLIENT LOST REVENUE FOR BECAUSE

15   OF THE INFRINGEMENT.

16        **MR. ABERNATHY:**  SO, AGAIN, I THINK THERE ARE TWO

17   DISTINCT -- I HATE TO USE THE WORD "BUCKET", BUT BUCKETS OR

18   INQUIRIES.

19        NUMBER ONE, WHAT IS THE BASE?  SHOULD THE ROYALTIES

20   FOR -- EXCUSE ME, THE REVENUE FROM THE DISPOSABLES BE INCLUDED

21   IN THE BASE?  AGAIN, IS A LEGAL MATTER.  THE RITE-HITE CASE

22   ADDRESSES THAT AND SAYS, IF THEY FUNCTION TOGETHER, THEY MAY BE

23   INCLUDED IN THE BASE.

24        THE NEXT QUESTION IS, IF THEY ARE INCLUDED IN THE

25   BASE, WHAT SHOULD THE APPROPRIATE ROYALTY BE.  AND HERE THAT'S

1   WHAT WE ARE TRYING TO DETERMINE TODAY.

2           THIS WAS AN ISSUE THAT WAS ARGUED VERY AGGRESSIVELY

3   BEFORE JURY INSTRUCTIONS.  IT WAS SUBJECT TO THE PARTIES' JURY

4   INSTRUCTIONS.  IT WAS -- THERE WAS A SPECIAL INTERROGATORY

5   POSED TO THE JURY ON THIS ISSUE GOING TO THE BASE.

6           IN OTHER WORDS, LADIES AND GENTLEMEN OF THE JURY,

7   SHOULD THESE DISPOSABLES BE INCLUDED IN THE BASE OR NOT.  THE

8   JURORS FOUND THEY SHOULD BE INCLUDED IN THE BASE.

9           MORE IMPORTANT, THE LEGAL ISSUE, YOUR HONOR, IS IT

10  APPROPRIATE AS A MATTER OF LAW TO INSTRUCT THE JURORS THAT THEY

11  COULD INCLUDE THAT IN THE BASE?  AND DID THE JURY INSTRUCTIONS

12  APPROPRIATELY APPLY RITE-HITE VERSUS KELLEY AND ITS PROGENY WAS

13  AN ISSUE THAT, AGAIN, I WAS THERE, HOTLY DEBATED WITH JUDGE

14  ARMSTRONG AT THE JURY CONFERENCE -- JURY INSTRUCTION

15  CONFERENCE.

16          THAT WAS AN ISSUE THAT IF FRESENIUS HAD A PROBLEM

17  WITH IT, THEY SHOULD HAVE TAKEN IT UP.  I THINK IN PART THEY

18  DID, BUT THE FEDERAL CIRCUIT, I THINK AS WE DISCUSSED DURING MY

19  PRESENTATION, DID ADDRESS THIS ISSUE IN TERMS OF THE BASE.

20          NOW --

21          **THE COURT:**  SO IF IT'S INCLUDED IN THE BASE

22  ROYALTY --

23          **MR. ABERNATHY:**  YES.

24          **THE COURT:**  -- WHY ARE THE TWO ROYALTY PERCENTAGES

25  DIFFERENT?

```
 1              MR. ABERNATHY:  OKAY.

 2              THE COURT:  AND WHY ARE THE ROYALTY PERIODS

 3     DIFFERENT?

 4              MR. ABERNATHY:  OKAY.  SO AS TO WHY DIFFERENT

 5     ROYALTIES.

 6              IT IS, AND THIS GOES TO THE AMADO CASE, IT GOES TO

 7     THE PAICE CASE.  THE FEDERAL CIRCUIT SAID THAT ONCE SOMEONE IS

 8     ADJUDGED AN INFRINGER, THE ROYALTY RATE FOR PRODUCTS CAN BE

 9     HIGHER THAN THEY WOULD HAVE BEEN PRE-INFRINGEMENT.

10              AND SO WHAT WE ARGUED TO JUDGE ARMSTRONG WAS, EVEN

11     THOUGH WE SAID 7 PERCENT IN 2000 AT THE POINT OF THE

12     HYPOTHETICAL NEGOTIATION FOR MACHINES, BECAUSE FRESENIUS DIDN'T

13     HAVE A PRODUCT, BECAUSE THEY HAD THIS PARADE OF HORRIBLES, IT

14     WOULD BE APPROPRIATE TO HAVE A RATE HIGHER THAN YOU WOULD HAVE,

15     IN EFFECT, AT THE POINT OF THE ORIGINAL INFRINGEMENT HERE

16     AUGUST OF 2002.

17              BOTH THE AMADO CASE AND PAICE CASE FROM THE FEDERAL

18     CIRCUIT ADDRESSED THAT ISSUE.  THE FEDERAL CIRCUIT HAS SAID

19     POST-VERDICT THAT ROYALTY FOR THE MACHINES CAN BE HIGHER.

20              SO, THAT'S WHY WE ARGUED FOR MACHINES BECAUSE IT WAS

21     JUST GOING TO BE A SHORT PERIOD AND THEY NEEDED THAT TECHNOLOGY

22     IT SHOULD BE 10 PERCENT BASED ON FEDERAL CIRCUIT LAW AND THE

23     RECORD.

24              NEXT QUESTION YOU ASKED:  WHY A SEPARATE ROYALTY

25     RATE FOR DISPOSABLES?  WHY NOT THE 10 PERCENT?  AND WHY ARE THE
```

1    PERIODS DIFFERENT?

2              AGAIN, THERE IS A TRANSITION PERIOD THAT ALLOWED

3    FRESENIUS TO SELL MACHINES.  THAT WENT FROM NOVEMBER 2007 TO

4    THE END OF DECEMBER 2008, AND FRESENIUS WAS ALLOWED TO SELL

5    THOSE MACHINES.  JUDGE ARMSTRONG ALSO SAID, WHICH THE FEDERAL

6    CIRCUIT AFFIRMED, THAT IF YOU HAVE INFRINGING PRODUCTS IN THE

7    FIELD PRE-VERDICT, AND THOSE PRODUCTS CONTINUE TO DRIVE THE

8    DEMAND OR CONTINUE TO HAVE CONVOYED DISPOSABLE SALES ASSOCIATED

9    WITH THEM, IT IS APPROPRIATE TO HAVE AN ONGOING ROYALTY FOR

10   MACHINES SOLD PRE-VERDICT AS TO DISPOSABLES SOLD POST-VERDICT.

11            **THE COURT:**  WITHOUT ANY PROOF THAT THEY WERE USED ON

12   THE MACHINES THAT WERE PUT INTO THE STREAM OF COMMERCE DURING

13   THAT INTERIM PERIOD OF TIME?

14            **MR. ABERNATHY:**  THAT'S WHERE I WOULD -- I DON'T

15   AGREE WITH THAT PREMISE BECAUSE WE SHOWED AT THE TRIAL AND WE

16   SHOWED IN THE DEN UYL DECLARATION THAT WAS SUMMARIZED HERE IN

17   HIS TESTIMONY THAT THERE IS A LINKAGE BETWEEN SALES OF MACHINES

18   AND DISPOSABLES.

19            AND AGAIN, YOUR HONOR --

20            **THE COURT:**  EXPLAIN.  EXPLAIN THE LINKAGE TO ME.

21   YOU HAVE A FOUR-, FIVE-YEAR PERIOD OF TIME THAT THE ROYALTY

22   COVERS DISPOSABLES.  IT'S TO THE EXPIRATION --

23            **MR. ABERNATHY:**  IT'S TO --

24            **THE COURT:**  -- OF THE PATENT FOR THE K.

25            **MR. ABERNATHY:**  CORRECT, YOUR HONOR.

1          **THE COURT:** THAT'S IN APRIL OF THIS PAST YEAR? NEXT

2    YEAR?

3          **MS. BROOKS:** THIS YEAR.

4          **MR. ABERNATHY:** THE PATENT'S EXPIRED.

5          **THE COURT:** THE PATENT'S EXPIRED. OKAY. SO IT WAS

6    FROM NOVEMBER OF 2007 TO APRIL OF 2011.

7          **MR. ABERNATHY:** CORRECT, YOUR HONOR.

8          **THE COURT:** FOR THAT PERIOD OF TIME.

9          I MEAN, HOW IS IT THAT YOU ARE ABLE TO DETERMINE,

10   PARTICULARLY THAT GIVEN SOME OF THAT PERIOD -- DURING SOME OF

11   THAT PERIOD OF TIME THE K'S WERE NO LONGER BEING SOLD AFTER

12   JANUARY OF 2009?

13         **MR. ABERNATHY:** RIGHT.

14         **THE COURT:** HOW ARE YOU ABLE TO DETERMINE THAT THERE

15   IS SOME LINKAGE BETWEEN THE DISPOSABLES, WHICH I HAVE ALREADY

16   ASKED EARLY ON IF THEY CAN BE USED IN OTHER MACHINES.

17         **MR. ABERNATHY:** RIGHT.

18         **THE COURT:** HOW DO YOU KNOW THEY WEREN'T USED IN

19   MACHINES OTHER THAN THE K, THAT THEY WEREN'T USED IN MACHINES

20   OTHER THAN FRESENIUS'?

21         **MR. ABERNATHY:** BECAUSE OF THE ECONOMIC DATA, YOUR

22   HONOR, SHOWING THE LINKAGE BETWEEN A MACHINE SOLD PRE-VERDICT

23   AND THE DATA INDICATING THAT CUSTOMERS HAVE A PROPENSITY TO BUY

24   DISPOSABLES ONCE THEY BUY A 2008K MACHINE OR ANY MACHINE IN

25   THIS INDUSTRY.

```
 1            IT'S MUCH LIKE MANY INDUSTRIES WHERE THERE IS A

 2    RAZOR BLADE RAZOR EFFECT.  IN OTHER WORDS, IF YOU ARE ALLOWED

 3    TO PUT YOUR MACHINE INTO A CLINIC, IF YOU ARE ALLOWED TO PUT

 4    YOUR MACHINE INTO A HOSPITAL, YOU ESTABLISH THE RELATIONSHIP

 5    AND YOUR ALLOWED THEN TO HAVE A LEG UP IN TERMS OF SELLING THE

 6    DISPOSABLES.

 7            THE ECONOMICS IN THIS INDUSTRY, AGAIN, THIS IS IN

 8    THE DAMAGES RECORD, ARE SUCH THAT THE PROFIT IN THIS INDUSTRY

 9    IS WITH THE DISPOSABLES.  SO, YES, IN THIS INDUSTRY, FRESENIUS,

10    BAXTER, GAMBRO, BRAUN, EVERYONE WANTS TO SELL THE MACHINE AND

11    THEY WANT TO HAVE GOOD TECHNOLOGY TO DO SO, BUT THE REAL

12    PROFITABILITY IN THE INDUSTRY IS DRIVEN BY THE ASSOCIATED

13    DISPOSABLES.

14            SO WITH THE JURY'S VERDICT FINDING THAT LINKAGE

15    OCCURRED --

16        THE COURT:  BUT THE JURY OBVIOUSLY FOUND THAT THE

17    CLAIM FOR DISPOSABLES IN THE $91 MILLION RANGE WAS EXCESSIVE.

18            WHAT IS THAT BASED ON?  PROBABLY SOME OF THE SAME

19    QUESTIONS THAT I AM HAVING ABOUT HOW YOU -- I ASSUME YOU PUT ON

20    PROOF AT TRIAL --

21        MR. ABERNATHY:  SURE.

22        THE COURT:  -- THAT THE AMOUNT OF DISPOSABLES THAT

23    YOU WERE CLAIMING WERE LINKED TO THIS ONE PERIOD ABOUT A YEAR'S

24    WORTH OF K'S --

25        MR. ABERNATHY:  YES.  WELL, MORE THAN THAT.
```

1          **THE COURT:** DID YOU LINK THEM TO MORE THAN JUST THE

2    NOVEMBER 7TH TO DECEMBER 31ST --

3          **MR. ABERNATHY:** THE LINKAGE EVIDENCE OCCURRED

4    THROUGHOUT THE ENTIRE PERIOD OF INFRINGEMENT. FROM, I THINK IT

5    WAS, AUGUST, SEPTEMBER 2000 UNTIL -- I FORGET WHEN DISCOVERY

6    CLOSED. WE HAD ABOUT, AGAIN THIS -- I'M ABOUT, YOUR HONOR, I

7    STRESS "ABOUT" SIX YEARS OF DATA THAT WE ANALYZED IN ORDER TO

8    ESTABLISH THIS LINKING EVIDENCE.

9          SO, WHAT WE DID -- FRESENIUS PROVIDED US WITH

10   ELECTRONIC DATA, WENT THROUGH A TON OF DISCOVERY, WHERE WE WERE

11   ABLE TO EXAMINE THE EFFECT WHAT -- HOW DO CUSTOMERS BUY

12   DISPOSABLES IN THIS MARKETPLACE.

13         THE TERM "LINKAGE" COMES FROM THE FACT THAT WE

14   IDENTIFIED CUSTOMERS THAT IF THEY BOUGHT A MACHINE, IF THEY

15   BOUGHT A MACHINE THEY WERE BUYING DISPOSABLES WITH IT.

16         SO, MR. FLOREY SAID, THERE WERE TWO MACHINES IN THE

17   MARKET. I THINK THIS IS THE H, (INDICATING) NO TOUCH SCREEN,

18   NOT INFRINGING, AND THE 2008K.

19         IN THIS STUDY THAT MR. DEN UYL CONDUCTED, HE DID NOT

20   INCLUDE DISPOSABLES THAT WOULD HAVE BEEN SOLD TO THE H BECAUSE,

21   AGAIN, THERE WAS NO LINKAGE TO THE PATENTED TECHNOLOGY.

22         BUT IF HE FOUND A CUSTOMER THAT WAS -- THAT

23   PURCHASED THE MACHINE AND THEN THE DATA VERIFIED SHOWS THAT

24   CUSTOMER WAS PURCHASING DISPOSABLES, THERE WAS LINKAGE.

25         AGAIN, IT IS CONSISTENT, YOUR HONOR, WITH FEDERAL

1    CIRCUIT LAW THAT SAYS IT IS APPROPRIATE TO INCLUDE NONPATENTED

2    DISPOSABLES IF THE PATENTED PRODUCT AND THE NONPATENTED

3    DISPOSABLES FUNCTION TOGETHER.

4              **THE COURT:**  OKAY.  ALL RIGHT.  BUT THE JURY WAS

5    OBVIOUSLY HAD SOME DIFFICULTY.

6              **MR. ABERNATHY:**  THEY HAD DIFFICULTY, YOUR HONOR --

7              **THE COURT:**  THEY AWARDED 10 PERCENT IN TERMS OF THE

8    AMOUNT OF DAMAGES THAT WERE BEING SOUGHT FOR THE SALE OF THE

9    DISPOSABLES, CORRECT?

10             **MR. ABERNATHY:**  CORRECT.  BUT WHAT THE JURY FOUND --

11   AGAIN, TWO QUESTIONS.

12             SHOULD THE DISPOSABLES BE INCLUDED, IN EFFECT, IN

13   THE BASE?  THE JURY SAID YES.  THE JURY DISAGREED WITH OUR

14   CALCULATION AS TO THE RATE.

15             SO, AGAIN, I KEEP COMING BACK TO WHAT'S IN THE BASE.

16   AND THEN ONCE YOU DECIDE, OKAY, THAT'S IN THE BASE, THEN WHAT

17   WOULD SOMEONE COME UP WITH A HYPOTHETICAL RATE FOR THAT WHICH

18   IS IN THE BASE.

19             AND SO ON APPEAL, FRESENIUS SAID, JUDGE, TO THE

20   FEDERAL CIRCUIT, IN EFFECT, IT IS UNFAIR TO INCLUDE IN THE

21   AWARD NONPATENTED DISPOSABLES FOR MACHINES IN THE FIELD.  I

22   THINK THE ARGUMENT FRESENIUS MADE WAS, WITH A VERDICT, THOSE

23   MACHINES ARE LICENSED AND WE CAN SELL THOSE DISPOSABLES ANY WAY

24   WE WANT.

25             THE FEDERAL CIRCUIT CONSIDERED THAT ARGUMENT AND

1    REJECTED IT.  IT FOUND THAT FRESENIUS -- JUDGE ARMSTRONG WAS

2    WITHIN HER DISCRETION.  FRESENIUS, IN ITS APPEAL BRIEFING, ALSO

3    SAID, I HAVE GOT THE PAGES AND I CAN SHOW YOU, THAT AS TO

4    MACHINES SOLD POST-VERDICT, POST-VERDICT, AND DISPOSABLES

5    LINKED TO THEM, THAT THAT WOULD BE APPROPRIATE TO INCLUDE IN

6    THE BASE.

7              AND, AGAIN, I WOULD SUBMIT, YOUR HONOR, THAT AS TO

8    THIS QUESTION OF WHAT'S IN THE BASE, I BELIEVE THE FEDERAL

9    CIRCUIT HAS RESOLVED THAT.  FRESENIUS GAVE THEIR BEST SHOT.

10   THE BRIEFING WENT BACK AND FORTH.  THE LAW WAS ARGUED.  AND

11   FRESENIUS LOST THAT.

12             IT COMES DOWN, YOUR HONOR, TO A QUESTION, IT SEEMS

13   TO ME, OF RATE.  A QUESTION OF RATE.  AND SO IT'S NOT LIKE WE

14   HAD A SMALL DATABASE --

15             **THE COURT:**  AND THE RATES THAT HAVE BEEN PUT BEFORE

16   THE COURT ARE THE RATE FOUND BY THE JURY, THE RATE TESTIFIED TO

17   BY YOUR EXPERT AT TRIAL, AND THEN THE RATE THAT JUDGE ARMSTRONG

18   ADOPTED.  ALL THREE ARE DIFFERENT.

19             **MR. ABERNATHY:**  CORRECT.

20             **THE COURT:**  AND I AM SUPPOSED TO PICK ONE OF THOSE

21   OR DECIDE ON A RATE SOMEWHERE IN BETWEEN.

22             **MR. ABERNATHY:**  I THINK AT LEAST TWO OF THE RATES

23   ARE FISH AND FOUL FOR THIS REASON:  AT THE DAMAGE TRIAL, WE

24   WERE LOOKING AT WHAT WOULD THE PARTIES HAVE NEGOTIATED IN

25   AUGUST OF 2000.

1          **THE COURT:**  SURE.  SURE.  I UNDERSTAND -- I

2     UNDERSTAND THAT THERE IS A SEVEN-YEAR DIFFERENCE IN THE TIME

3     PERIOD.  WOULD THE SEVEN-YEAR DIFFERENCE ACCOUNT FOR THE 1,000

4     HIGHER RATE IN THE ROYALTY CHANGE?

5          I DIDN'T NOTICE THAT MUCH OF A SWING BETWEEN THE

6     FOUR YEARS OF THE VOLUME AND PROFITS OF FRESENIUS FOR THOSE

7     YEARS, WHY WOULD THE AMOUNT OF THE AWARD CHANGE SO DRAMATICALLY

8     IN SEVEN YEARS?  THAT'S ONE QUESTION THAT I HAVE.  AND PERHAPS

9     I WILL GET AN ANSWER FROM ONE OF THE OTHER WITNESSES THIS

10    AFTERNOON.

11         **MR. ABERNATHY:**  OKAY.

12         **THE COURT:**  OKAY.  ALL RIGHT.  DID YOU WANT TO

13    RESPOND TO ANY OF THIS?

14         **MS. BROOKS:**  IF I COULD.  I JUST HAVE THREE SHORT

15    POINTS, YOUR HONOR, THAT MIGHT HELP CLEAR THIS UP.

16         FIRST OF ALL, SOMETIMES IT'S BETTER TO SEE THINGS

17    VISUALLY.

18         IF I CAN HAVE THE ELMO, PLEASE.

19              (DOCUMENT DISPLAYED ON ELMO.)

20         SO THIS IS THE TIME LINE.  AND YOUR HONOR IS

21    ABSOLUTELY RIGHT AS FAR AS THE DIFFERENCE.

22         SO THE JURY'S AWARD FOR THIS SEVEN-YEAR PERIOD CAME

23    OUT TO 14 MILLION FOR MACHINES AND 91,000 FOR THE DISPOSABLES.

24         AND WHAT BAXTER'S ASKING FOR NOW WOULD COME OUT TO

25    24 MILLION FOR MACHINES DURING THIS NINE-MONTH PERIOD HERE AND

1    98 MILLION FOR DISPOSABLES.  SO OBVIOUSLY THAT'S WHY BAXTER IS

2    FIGHTING SO HARD ON THE DISPOSABLE ISSUE.

3              NOW, WHY DID THE JURY COME UP WITH 91,000?  BY THE

4    WAY, WE ARE IMPUTING WHAT THAT RATE WAS.  THE JURY SIMPLY DID

5    LUMP SUM.

6              SO IF WE TAKE THE AMOUNT OF DISPOSABLES AT ISSUE AND

7    WE USE THIS 91,000, THE RATE LOOKS LIKE IT WAS .007.  BUT, YOU

8    KNOW, WHAT DID THEY REALLY FIND HERE?

9              SO BAXTER MADE A MOTION FOR NEW TRIAL, OBVIOUSLY, ON

10   THIS AND SAID THAT CAN'T BE RIGHT, 91,000.  AND THIS IS WHAT

11   JUDGE ARMSTRONG HELD IN HER OPINION IN THAT CASE IN DENYING

12   THEIR MOTION FOR A NEW TRIAL.

13             AND THIS, I THINK, MAYBE WILL HELP YOUR HONOR ANSWER

14   SOME OF THESE QUESTIONS.

15        **THE COURT:**  THERE'S AN INCONSISTENCY, THOUGH, WITH

16   THIS FINDING AND THE JMOL FINDING, AND I AM HAVING A HARD TIME

17   RECONCILING IT.

18        **MS. BROOKS:**  I KNOW.  IT'S INTERESTING.  MAYBE, I

19   DON'T KNOW, DIFFERENT LAW CLERKS WROTE IT OR SOMETHING.

20             HERE IS WHAT HER OPINION SAYS ON THE DENIAL OF THE

21   NEW TRIAL.  SHE SAYS:

22             "INDEED, IN LIGHT OF THE JURY INSTRUCTIONS ON

23   DAMAGES GIVEN BY THE COURT, THE JURY COULD HAVE DETERMINED THAT

24   BAXTER SHOULD ONLY BE AWARDED A ROYALTY ON DISPOSABLES THAT

25   WERE SOLD WITH THE MACHINES AT THE POINT OF SALE."

```
 1            AND WHILE TECHNICALLY WHAT THE RECORD SHOWED IS THEY

 2   CAN'T REALLY BE CALLED DISPOSABLES, BUT WITH THE MACHINE COMES

 3   A BICARB JUG AND SOME -- THE DIALYSATE CUP HOLDER, SOME

 4   ACCESSORIES COME WITH IT AT THE POINT OF SALE.

 5            THE COURT:  WAS THERE EVIDENCE AT TRIAL AS TO WHAT

 6   THE DISPOSABLES SOLD AT THE POINT OF SALE WERE --

 7            MS. BROOKS:  YES.

 8            THE COURT:  -- AMOUNTED TO?

 9            MS. BROOKS:  YES.  THEY WEREN'T CALLED DISPOSABLES

10   THOSE WERE CALL ACCESSORIES BECAUSE YOU CAN ACTUALLY REUSE

11   THEM.  THERE WERE ACCESSORIES ABOVE AND BEYOND THE MACHINE.

12            NOW, WHAT'S INTERESTING IS, THIS IS BEFORE THE

13   CORNELL CASE.  JUDGE RADER, SITTING BY JUDGE DESIGNATION AS A

14   DISTRICT COURT JUDGE -- JUDGE RADER IS THE ONE THAT'S BEEN

15   LEADING THE CHARGE ON NEW DAMAGES LAW.  IN THE CORNELL CASE,

16   HERE'S WHAT HE SAID.

17            "THE ENTIRE MARKET VALUE RULE, IN THE CONTEXT OF

18             ROYALTIES, REQUIRES ADEQUATE PROOF OF THREE

19             CONDITIONS.  ONE, THE INFRINGING COMPONENTS MUST

20             BE THE BASIS FOR CUSTOMER DEMAND FOR THE ENTIRE

21             MACHINE, INCLUDING THE PARTS BEYOND THE CLAIMED

22             INVENTION", WHICH IS WHAT WE HAVE HERE.

23            "TWO, THE INDIVIDUAL INFRINGING AND

24             NONINFRINGING COMPONENTS MUST BE SOLD TOGETHER

25             SO THAT THEY CONSTITUTE A FUNCTIONAL UNIT OR ARE
```

```
 1                 PARTS OF THE COMPLETE MACHINE OR SINGLE ASSEMBLY

 2                 OF PARTS.

 3                 "AND THREE, THE INFRINGING AND NONINFRINGING

 4                 COMPONENTS MUST BE ANALOGOUS TO A SINGLE

 5                 FUNCTIONING UNIT."

 6                 SO -- AND THEN HE SAID -- YOUR HONOR HIT THE NAIL ON

 7     THE HEAD:

 8                 "NOTABLY THESE REQUIREMENTS ARE ADDITIVE, NOT

 9                 ALTERNATIVE WAYS TO DEMONSTRATE ELIGIBILITY FOR

10                 THE APPLICATION OF THE ENTIRE MARKET VALUE

11                 RULE."

12                 SO, YOUR HONOR IS RIGHT AND JUDGE RADER SAID THE

13     SAME THING, WHICH IS HOW CAN YOU BE GETTING THIS HUGE ROYALTY

14     ON THESE DISPOSABLES WHEN, YOU KNOW -- THEY USE THE TERM

15     "LINKED", BUT LET'S SAY THERE IS A CLINIC THAT HAS HALF H'S AND

16     HALF K'S.

17                 UNDER BAXTER'S THEORY, AND BECAUSE WE DIDN'T WANT TO

18     GET HELD IN CONTEMPT, WE PUT 50 PERCENT OF THE DISPOSABLE SALES

19     IN THAT CASE INTO AN ESCROW.  FOR ALL WE KNOW, THE H'S WERE

20     USED THREE TIMES MORE THAN THE K'S.  WE DON'T KNOW.  IT COULD

21     BE THE OTHER WAY AROUND.

22                 THE BOTTOM LINE IS, THERE IS NO WAY TO SHOW LINKAGE.

23     AND THERE IS NO WAY TO SHOW THAT THOSE DISPOSABLES WERE, IN

24     FACT, USED WITH THE K.

25                 AND THAT GETS US BACK ALSO TO THIS WHOLE ISSUE --
```

1    YOU KNOW, IT'S A SHAME THE JURY EVEN FOUND THE 91,000 BECAUSE

2    THEN DISPOSABLES WOULD HAVE BEEN OUT OF THE CASE ALTOGETHER.

3    WHY THEY DID, WE DON'T KNOW.  BAXTER WAS ASKING FOR 91 MILLION.

4    MAYBE THEY WANTED TO SEND THEM A MESSAGE WITH THE 91,000.

5         THE POINT IS THEY DID FIND SOME INFINITESIMAL AMOUNT

6    OF PULL THROUGH.  AS A RESULT OF THAT, BAXTER HAS A RIGHT TO

7    SOME INFINITESIMAL AMOUNT OF ROYALTY BASED ON THAT PULL

8    THROUGH.  BUT IT IS THEIR BURDEN TO SHOW HOW -- MUCH OF THAT

9    PULL THROUGH ACTUALLY OCCURS AND WHAT THAT ROYALTY SHOULD BE

10   WITHOUT VIOLATING THE ENTIRE MARKET VALUE.

11        **THE COURT:**  SURE, BUT THEY DO HAVE AN ORDER SIGNED

12   AWARDING 7 PERCENT ROYALTY ON THE PULL THROUGH.

13        **MS. BROOKS:**  THEY DID.  THE FEDERAL CIRCUIT VACATED

14   IT IN ITS ENTIRETY.  SO --

15        **THE COURT:**  THIS IS REALLY AN UNFORTUNATE SITUATION

16   WE HAVE HERE, WHERE YOU HAVE A JUDGE OTHER THAN THE TRIAL JUDGE

17   WHO, I DON'T BEGIN TO UNDERSTAND WHAT HAS OCCURRED IN THIS CASE

18   OVER THE SIX YEARS THAT IT HAS BEEN PENDING.  IT IS REALLY

19   UNFORTUNATE BECAUSE I DOUBT I WOULD HAVE TRIED IT IN THE SAME

20   WAY.  THAT'S WHAT GENERALLY HAPPENS.  THAT'S WHY WE HAVE

21   DIFFERENT APPROACHES.

22        I HAVE NO IDEA HOW I AM GOING TO FIGURE THIS OUT.

23   BUT I THINK WE SHOULD TAKE A LUNCH BREAK AND THEN WE'LL COME

24   BACK AND WE'LL FINISH UP.  I WOULD LIKE TO CONCLUDE TODAY NO

25   LATER THAN 3:00 O'CLOCK.

1              **MS. BROOKS:**  WE WILL DO THAT, YOUR HONOR.

2              **THE COURT:**  OKAY.  SO LET'S BREAK UNTIL 1:05.

3      FORTY-FIVE MINUTES SHOULD BE GOOD ENOUGH FOR EVERYONE.  BACK AT

4      1:05.

5              **MS. BROOKS:**  THANK YOU, YOUR HONOR.

6

7              (LUNCHEON RECESS WAS TAKEN AT 12:25 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:09-cv-00609-RFP Document 1031-1 Filed 03/21/13 Page 130 of 232 PageID# 33975
Case 3:09-cv-01431-WH Document 1156 Filed 03/21/12 Page 130 of 291    129
CRNKOVICH – DIRECT / MS. BROOKS

```
 1    AFTERNOON SESSION                                     1:05 P.M.

 2                     P R O C E E D I N G S

 3            THE CLERK:  PLEASE REMAIN SEATED AND COME TO ORDER.

 4            THE COURT:  ALL RIGHT.  HAVE A SEAT.  ALL RIGHT.

 5    NICHOLE?

 6            THE CLERK:  PLEASE RISE AND RAISE YOUR RIGHT HAND.

 7                     MARTIN CRNKOVICH,

 8    CALLED AS A WITNESS FOR THE PLAINTIFFS, HAVING BEEN DULY SWORN,

 9    TESTIFIED AS FOLLOWS:

10            THE WITNESS:  I DO.

11            THE CLERK:  PLEASE BE SEATED.

12            PLEASE STATE YOUR FULL NAME AND SPELL YOUR LAST NAME

13    FOR THE COURT.

14            THE WITNESS:  MY NAME IS MARTIN CRNKOVICH.  LAST

15    NAME IS SPELLED C-R-N-K-O-V-I-C-H.

16            MS. BROOKS:  YOUR HONOR, MAY I APPROACH WITH A COPY

17    OF POWER POINTS FOR THE COURT AND ONE FOR YOUR HONOR'S LAW

18    CLERK?

19            THE COURT:  YES, PLEASE.

20            (BINDERS HANDED TO COURT AND LAW CLERK.)

21                     DIRECT EXAMINATION

22    BY MS. BROOKS:

23    Q.  MR. CRNKOVICH, WE ARE GOING TO TRY TO MOVE THIS ALONG AS

24    QUICKLY AS WE CAN, ALTHOUGH THERE'S KIND OF SOME TECHNICAL

25    STUFF THAT WE NEED TO TAKE A LITTLE BIT OF TIME ON.
```

Case 3:09-cv-00609-RFB  Document 1021-1  Filed 03/21/13  Page 131 of 232  PageID# 33976
Case 3:09-cv-01431-PJH  Document 156  Filed 03/02/12  Page 130 of 291    130
CRNKOVICH – DIRECT / MS. BROOKS

1          FIRST OF ALL, CAN YOU TELL THE COURT WHO YOU ARE AND

2    WHAT YOU DO?

3    **A.**   MY NAME IS MARTIN CRNKOVICH, BUT I GO BY MARTY.  AND I AM

4    RESPONSIBLE FOR THE DEVELOPMENT OF THE HEMODIALYSIS MACHINES

5    FOR FRESENIUS.

6    **Q.**   DID YOU EVER SPEND ANY TIME -- HOW LONG HAVE YOU BEEN AT

7    FRESENIUS?

8    **A.**   22 YEARS.

9    **Q.**   DID YOU EVER SPEND ANY TIME AT FRESENIUS WORKING ON

10   PERITONEAL DIALYSIS MACHINES?

11   **A.**   ONLY ONE YEAR.  OTHERWISE, FOR THE OTHER 21 YEARS, I HAVE

12   BEEN WORKING ON HEMODIALYSIS MACHINES.

13   **Q.**   DO YOU HAVE ANY KIND OF A TECHNICAL BACKGROUND?

14   **A.**   YES.  MY TECHNICAL BACKGROUND, I HAVE A BS IN ELECTRICAL

15   ENGINEERING FROM MARQUETTE UNIVERSITY.

16   **Q.**   BEFORE COMING TO FRESENIUS, WHERE DID YOU WORK?

17   **A.**   I WORKED FOR THE NAVY.  I WORKED FOR THE -- DEVELOPING

18   LIFE SUPPORT SYSTEMS FOR SUBMARINES.

19   **Q.**   LET'S JUST CUT TO THE CHASE.

20          WERE YOU THE LEAD ENGINEER ON THE TEAM THAT

21   DEVELOPED WHAT HAS NOW BEEN REFERRED TO AS THE INFRINGING

22   2008K?

23   **A.**   YES, I WAS.

24   **Q.**   AND DID YOU ALSO ASSIST IN DEVELOPING THE 2008K2, WHICH

25   WAS THE NONINFRINGING ALTERNATIVE TO THE K?

CRNKOVICH – DIRECT / MS. BROOKS

1    **A.**    YES.

2    **Q.**    NOW, I WOULD LIKE TO GO THROUGH BRIEFLY AND TRY TO ASSIST

3    THE COURT IN DETERMINING THE VALUE OF THE TOUCH SCREEN ON THE K

4    TO THE REST OF THE FEATURES THAT ARE ON THE K.

5                 (SLIDE DISPLAYED ON SCREEN.)

6           SO LET'S START WITH THIS FIRST SLIDE.  RIGHT HERE,

7    THIS SAYS THE 2008H FEATURES.

8           NOW, IS THE 2008H SITTING BY THE K?

9    **A.**    YES, IT IS.  IT'S TO THE RIGHT OF THE K.

10   **Q.**    AND JUST VERY QUICKLY, COULD YOU EXPLAIN TO THE COURT WHAT

11   VARIOUS FEATURES THE 2008H HAD?

12   **A.**    THE 2008H HAD A LOT OF FEATURES AND IT HELPED US TO BE THE

13   LEADER.

14          IT HAD A PLASMA DISPLAY, WHICH OUTSIDE OF ONE LINE

15   DISPLAY, ADVANCE MICROPROCESSOR CONTROLLED.  WE WERE ABLE TO

16   CALIBRATE THE MACHINE FROM THE FRONT OF THE PANEL.

17   **Q.**    YOU'RE GOING TO HAVE TO SLOW DOWN JUST A LITTLE BIT.

18   **A.**    OKAY.

19          WHAT WE DID WITH OUR VENOUS LIMITS IS WE MADE IT

20   MORE SAFE.  WITH HEMODIALYSIS WE -- THERE'S TWO LINES THAT ARE

21   CONNECTED, TWO BLOOD LINES THAT ARE CONNECTED TO THE DIALYZER.

22   AND ONE WAY TO DETECT A VENOUS NEEDLE DISCONNECT IS TO TIGHTEN

23   THE VENOUS LIMITS.  SO THAT'S SOMETHING THAT WE DID WITH THIS

24   DEVICE.

25          THEN FLUID MANAGEMENT WITH ULTRAFILTRATION CONTROL,

CRNKOVICH – DIRECT / MS. BROOKS

1    SODIUM MANAGEMENT WITH THE SODIUM VARIATION SYSTEM, BLOOD

2    PRESSURE MANAGEMENT WITH BLOOD PRESSURE.  THESE ARE ALL

3    FEATURES THAT ARE ON OUR MACHINE THAT SET US APART FROM OTHER

4    MACHINES.

5             AND THEN THREE CONCENTRATE FAMILIES.  WHEN WE

6    DEVELOPED THE H MACHINE, WE WANTED IT TO BE EVERYTHING FOR

7    EVERYONE.  SO EVERYONE -- WE COULD USE ANYBODY'S CONCENTRATE ON

8    OUR MACHINES.  SO WE DEVELOPED OUR MACHINE TO BE USED WITH

9    ANYBODY'S CONCENTRATES.

10            AND THEN JUST GOING DOWN A LITTLE BIT FURTHER, THE

11   DIASAFE; WE ALLOW FOR BETTER WATER INTO THE MACHINE, WE ADD

12   ANOTHER FILTER, AND WE HAVE A TEST TO TEST FOR THAT BETTER

13   WATER.  ALSO WE HAVE TEMPERATURE MANAGEMENT OF THE PATIENT

14   USING THE BTM, WHICH ALSO CAN LOOK AT THE ACCESS AND DETERMINE

15   IF THERE'S RECIRCULATION.

16   **Q.**   OKAY.

17   **A.**   GO ON?

18   **Q.**   YOU CAN --

19   **A.**   I AM EXCITED ABOUT MY MACHINE.  I AM SORRY.

20   **Q.**   I KNOW YOU CAN GO ON FOR DAYS, MR. CRNKOVICH, BUT WE ARE

21   GOING TO MOVE AHEAD.

22            (SLIDE DISPLAYED ON SCREEN.)

23            RIGHT NOW WE ARE LOOKING AT WHAT WE CALL THE

24   EVOLUTION OF FRESENIUS HEMODIALYSIS MACHINES.  MAYBE I CAN HELP

25   SUMMARIZE.

CRNKOVICH – DIRECT / MS. BROOKS

1      WE SEE HERE A SERIES OF MACHINES ENDING WITH THE

2  2008K.  DID EACH OF THE FRESENIUS HEMODIALYSIS MACHINES BUILD

3  UPON THE PREVIOUS DIALYSIS MACHINE OF FRESENIUS?

4  **A.**    THEY DID.  THE HYDRAULICS ARE BASICALLY THE SAME.  FROM

5  YEAR TO YEAR, WE CONSTANTLY IMPROVED UPON THE HYDRAULICS, WHICH

6  IS AT THE BOTTOM OF THE MACHINE.

7      THE MIDDLE PART OF THE MACHINE IS YOUR BLOOD

8  HANDLING CIRCUIT, AND THE BLOOD PUMPS, HEPARIN PUMP, LEVEL

9  DETECTOR, THOSE WERE ALL DEVELOPED YEARS AGO BUT CONSTANTLY

10  THERE'S IMPROVEMENTS IN EACH OF THOSE MODULES.

11      AND THEN THE TOP PART IS, IS THE USER INTERFACE.

12  AND AS YOU CAN SEE THERE'S BEEN IMPROVEMENTS ON THAT OVER TIME.

13  **Q.**    NOW THERE'S A BIG GAP BETWEEN WHEN THE 2008H WAS

14  INTRODUCED, RIGHT HERE IN ABOUT 1993 (INDICATING) TO WHEN THE

15  2008K WAS INTRODUCED IN 2000 WITH NO OTHER MACHINES.

16      WHY SUCH A LONG GAP IN THERE?

17  **A.**    IT WAS AN EXTREMELY RELIABLE MACHINE.  IT WAS A WORKHORSE.

18  EVERYONE UNDERSTOOD IT TO BE A WORKHORSE.  AND PEOPLE LIKED IT.

19  IT WAS A GREAT MACHINE.

20  **Q.**    NOW, DURING THIS TIME PERIOD, BEFORE THE K WAS INTRODUCED,

21  WAS THERE A MACHINE ON THE MARKET CALLED THE ALTHIN TINA?

22  **A.**    YES, THERE WAS.

23  **Q.**    DID IT HAVE A TOUCH SCREEN?

24  **A.**    YES.

25  **Q.**    HOW DID THE 2008H, THAT DID NOT HAVE A TOUCH SCREEN, FAIR

Case 3:09-cv-00620-REP Document 1021-1 Filed 03/21/13 Page 135 of 232 PageID# 33980
Case 4:09-cv-01434-PJH Document 156 Filed 08/02/12 Page 134 of 231    134
CRNKOVICH – DIRECT / MS. BROOKS

1    AGAINST THE ALTHIN TINA IN COMPETING THAT DID HAVE A TOUCH

2    SCREEN?

3    **A.**    THE H DID MUCH BETTER.

4    **Q.**    WAS THAT -- BY THE WAY, ALTHIN WAS TAKEN OVER EVENTUALLY

5    BY BAXTER?

6    **A.**    THAT IS CORRECT.

7    **Q.**    DID B. BRAUN ALSO HAVE, DURING THIS TIME PERIOD, A

8    HEMODIALYSIS MACHINE ON THE MARKET THAT HAD A TOUCH SCREEN?

9    **A.**    YES, IT DID.

10   **Q.**    HOW DID THE H COMPARE IN COMPETITION THAT DIDN'T HAVE A

11   TOUCH SCREEN TO THE B. BRAUN MACHINE THAT DID?

12   **A.**    ALSO MUCH BETTER.

13   **Q.**    AND, LASTLY, DID GAMBRO HAVE A HEMODIALYSIS MACHINE CALLED

14   THE PHOENIX DURING THIS TIME PERIOD THAT ALSO HAD A TOUCH

15   SCREEN?

16   **A.**    YES.

17   **Q.**    AND HOW, AGAIN, DID THE H, WITHOUT THE TOUCH SCREEN,

18   COMPARE TO THE PHOENIX THAT DID HAVE A TOUCH SCREEN?

19   **A.**    ALSO MUCH BETTER.

20   **Q.**    SO IF THE H WAS SO SUCCESSFUL IN HERE, DURING THIS TIME

21   PERIOD, WHY INTRODUCE THE K AT ALL AND GET US INTO THIS

22   NEVER-ENDING LAWSUIT?

23   **A.**    THERE WAS A NEED TO MODERNIZE.  THE LIFE CYCLE FOR A

24   MACHINE IS USUALLY SEVEN YEARS.  AND THERE WAS A BIG PUSH TO

25   HAVE A BIGGER DISPLAY.

Case 3:09-cv-00609-RFB Document 1021-1 Filed 03/21/13 Page 136 of 282 Page ID# 33981
Case 4:09-cv-01401-PJH Document 156 Filed 08/02/12 Page 136 of 291 199
CRNKOVICH – DIRECT / MS. BROOKS

1          WE WANTED A NICE BIG COLOR LCD DISPLAY.  IT WAS

2    ASKED FOR WHEN WE CAME OUT WITH THE H MACHINE AND THE PLASMA

3    DOT, WE ALSO LOOKED AT THE K DISPLAY, BUT IT WAS TOO EXPENSIVE.

4    AND SO BY THE TIME WE -- WE WENT TO THE K MACHINE, WE WOULD GO

5    TO A HIGH -- BASICALLY A MUCH COLORFUL BIG DISPLAY.

6                    (SLIDE DISPLAYED ON SCREEN.)

7    Q.    AND SO WE HAVE HERE THE COMPARISONS.

8          THE 2008H HAD A DISPLAY THAT'S CALLED A MONOCHROME

9    PLASMA DOT; IS THAT RIGHT?

10   A.    THAT'S CORRECT.

11   Q.    AND IT WAS PRETTY SMALL AND ALSO MONOCHROME, OBVIOUSLY?

12   A.    YES.

13   Q.    AND THEN YOU UPGRADED ON THE K TO A COLOR LCD.  AND IT

14   COST $380 VERSUS THE HUNDRED DOLLARS ON THE DISPLAY FROM THE H?

15   A.    YES.

16   Q.    AND WE SAW SOME RECORDS EARLIER TALKING ABOUT -- INTERNAL

17   FRESENIUS RECORDS HOW IT WAS IMPORTANT THE H NEEDED A FACE-LIFT

18   IN ORDER TO COMPETE.

19         DID THE DISPLAY, WAS THAT PART OF THE FACE-LIFT?

20   A.    THAT WAS, I THOUGHT, THE MAIN PART OF THE FACE-LIFT.  IT

21   WAS -- IF YOU LOOK AT THE DISPLAY, ONE OF THE FEATURES WAS

22   EVERYTHING THAT WAS ON THE H IS NOW ON THE K.  AND IT'S MORE

23   COLORFUL.

24         ONE OF THE STORIES I LIKE TELLING IS EVEN THE FONT,

25   WE'S WERE ABLE TO GO TO A BETTER FONT ON THE K MACHINE.  WE

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/13 Page 137 of 232 PageID# 33982
Case 4:09-cv-01494-CW Document 156 Filed 08/02/12 Page 136 of 291    136
CRNKOVICH – DIRECT / MS. BROOKS

1    USED THE FRUTIGER FONT.  THE FRUTIGER --

2    **Q.**    YOU ARE GOING TOO FAST.

3    **A.**    AM I GOING TOO FAST?  I'LL SLOW DOWN.

4            THE FRUTIGER FONT IS USED --

5            **THE COURT:**  COULD YOU SPELL THAT?

6            **THE WITNESS:**  FRUTIGER IS F-R-U-T-I-G-E-R.

7            THE FRUTIGER FONT WAS A FONT USED AT THE CHARLES DE

8    GAULLE AIRPORT IN PARIS, FRANCE SO YOU COULD SEE THE WRITING OF

9    THE AIRPORT AT A DISTANCE.

10           WE CHOSE THAT SO YOU CAN SEE THE DISPLAY FROM A

11   DISTANCE.  AND THAT WAS WELL ACCEPTED WHEN WE WERE SHOWING OFF

12   THE K FOR THE FIRST TIME.

13   **BY MS. BROOKS:**

14   **Q.**    NOW, DOES THIS HAVE ANYTHING TO DO WITH THE TOUCH SCREEN,

15   THIS LCD DISPLAY?

16   **A.**    NO.

17   **Q.**    AND, IN FACT, IF YOU COULD, COULD YOU JUST STEP DOWN, WITH

18   THE COURT'S PERMISSION FOR A MOMENT, MR. CRNKOVICH, AND SHOW

19   THE COURT THE DIFFERENCE IN THE DISPLAY BETWEEN THE K AND THE

20   K2, THE K2 BEING THE DESIGN AROUND THAT DOESN'T HAVE THE TOUCH

21   SCREEN?

22   **A.**    (WITNESS STEPS DOWN TO MACHINES.)

23           HERE IS THE K2 AND HERE IS THE K.  AND THEY LOOK

24   ALMOST IDENTICAL.  THE DIFFERENCE IS, ON THE K MACHINE, YOU CAN

25   CHANGE THE SCREENS BY PRESSING ON THE BUTTONS BELOW.  AND ON

CRNKOVICH – DIRECT / MS. BROOKS

1    THE K2, WE ADDED BUTTONS BELOW THE TOUCH SCREEN SO THAT YOU

2    COULD CHANGE BETWEEN THE DIFFERENT SCREENS ON THE K2.

3             SO -- BUT FROM A USER STANDPOINT, THE SCREENS LOOK

4    IDENTICAL.

5    **Q.**   AND, IN FACT, I THINK MR. ABERNATHY EARLIER TODAY WAS

6    HOLDING THE K2 AND IDENTIFYING IT AS BEING THE K?

7    **A.**   HE DID, AND HE WAS -- HE SAID THAT HE THOUGHT THERE WAS A

8    TOUCH SCREEN ON HERE.

9    **Q.**   BUT THERE'S NOT?

10   **A.**   THERE'S NOT.  NO.

11   **Q.**   THANK YOU, MR. CRNKOVICH.  YOU CAN RETAKE THE STAND.

12   **A.**   (WITNESS RESUMES WITNESS STAND.)

13   **Q.**   IN FACT, I AM HOLDING UP HERE A PIECE OF PLASTIC.  IS THIS

14   A TOUCH SCREEN?

15   **A.**   YES, IT IS.

16   **Q.**   AND HOW WOULD YOU THEN INTEGRATE THE TOUCH SCREEN ONTO,

17   FOR EXAMPLE, THE K2 THAT DOESN'T HAVE A TOUCH SCREEN?

18   **A.**   IT WOULD JUST BE PART OF THE PANEL.  WE WOULD INTEGRATE IT

19   INTO THE PANEL IF WE HAD TO PUT A TOUCH SCREEN ONTO THE K2.

20   **Q.**   LET'S MOVE ON TO THIS LIST RIGHT HERE.

21             (SLIDE DISPLAYED ON SCREEN.)

22             WE HAVE LISTED -- NOW WE ARE GOING BACK TO THE K

23   THAT DID HAVE THE TOUCH SCREEN.

24             IN ADDITION TO HAVING THE LARGER COLOR DISPLAY THAN

25   THE H, AND HAVING A TOUCH SCREEN THAT THE H DIDN'T HAVE, DID

Case 3:09-cv-00609-RFP Document 1021-1 Filed 03/21/13 Page 139 of 232 Page ID# 33984
Case 4:09-cv-01624-PJH Document 156 Filed 08/02/12 Page 138 of 291   138
CRNKOVICH – DIRECT / MS. BROOKS

1    THE K ALSO HAVE OTHER FEATURES UNRELATED TO THE TOUCH SCREEN

2    THAT WERE IMPROVEMENTS OVER THE H?

3    **A.**   IT DID.

4             ON THE H WE RAN OUT OF COMPUTING POWER, SO WE WENT

5    TO A MORE POWERFUL PROCESSOR.

6             WE ALSO ADDED ACCESS FLOW.  ACCESS FLOW IS A WAY OF

7    LOOKING AT THE QUALITY OF A DIALYSIS -- A PERSON'S ACCESS.  AND

8    IT WENT ALONG PRETTY -- VERY WELL WITH ON-LINE CLEARANCE WHICH

9    LOOKED AT THE ACCESS -- LOOKED AT THE QUALITY OF DIALYSIS.

10            AND WITH BLOOD VOLUME MONITOR, WE HAD BIOFEEDBACK

11   CONTROL.

12            I CAN GO ON AND ON, BUT THERE WERE JUST A LOT OF

13   FEATURES THAT WE PUT IN THE K THAT PEOPLE EXPECTED IN THE H,

14   BUT IT MADE THE MACHINE SO MUCH BETTER THAN THE H BECAUSE OF

15   THESE ADDITIONAL FEATURES.

16   **Q.**   INDEPENDENT FROM THE TOUCH SCREEN?

17   **A.**   INDEPENDENT FROM THE TOUCH SCREEN.

18            NONE OF THESE HAVE ANYTHING TO DO WITH THE TOUCH

19   SCREEN.

20            (SLIDE DISPLAYED ON SCREEN.)

21   **Q.**   NOW LET'S GO, IF WE COULD, AND COMPARE, ONCE AGAIN, THE

22   FRONT PANEL OF THE 2008H TO THE 2008K AS FAR AS WHAT A USER

23   WOULD DO OFF OF THE TOUCH SCREEN.

24            CAN YOU SHOW THE COURT WHAT WE ARE LOOKING AT HERE?

25   EXPLAIN TO THE COURT WHAT WE ARE LOOKING AT HERE IN THIS SLIDE?

CRNKOVICH – DIRECT / MS. BROOKS

1    **A.**   THE KEYS ARE -- IF YOU LOOK AT THE H, FIRST OF ALL, THE

2    KEYS ARE BROKEN UP INTO THREE AREAS.  WAY ON THE LEFT SIDE ARE

3    THE KEYS FOR CONTROLLING, RESETTING, AND MUTING ALARMS.

4              IN THE -- ACTUALLY, IN THE RED BLOCK AND ON THE

5    RIGHT SIDE ARE CONTROL FUNCTION KEYS.  AND THEN IN THE MIDDLE,

6    BENEATH THE DISPLAY, ARE THOSE KEYS THAT ARE USED TO CONTROL

7    THE DISPLAY.

8              AND ON THE K MACHINE, WE USED AN IDENTICAL USE OF

9    KEYS.  WE USED THE LEFT KEYS, AGAIN, FOR BASIC OPERATION.  WE

10   ADDED A NEW TX KEY, A NEW TREATMENT KEY TO LET THE USER TO KNOW

11   WHEN TO START THE TREATMENT AND WHEN TO RESET PARAMETERS.

12             AND ON THE RIGHT SIDE, WE LEFT ALL OF THE BUTTONS

13   FOR THE SPECIAL FUNCTIONS OR FEATURES THAT WE HAVE WITH OUR

14   MACHINE.

15             THEN UNDERNEATH THE DISPLAY, WE HAVE ADDED A

16   NUMERICAL KEY PAD SO THAT PEOPLE OR THE CUSTOMER, THE USER,

17   COULD ENTER PARAMETERS -- ENTER THE VALUE FOR THE PARAMETERS SO

18   MUCH QUICKER.

19   **Q.**   SO WHY NOT, SINCE YOU HAVE A TOUCH SCREEN ON THE K, WHY

20   NOT HAVE ALL THIS FUNCTIONALITY THAT THESE BUTTONS DO, WHY NOT

21   HAVE IT ON THE TOUCH SCREEN?

22   **A.**   FOR SPEED, QUICKNESS, EASE OF USE.  THESE WERE ALL

23   ADVANTAGES THAT WE SAW BY PUTTING THESE INDIVIDUAL BUTTONS OFF

24   THE SCREEN.

25   **Q.**   AND SPECIFICALLY HERE, WE ARE POINTING OUT THE DATA ENTRY

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/13 Page 141 of 232 PageID# 33986
Case 4:09-cv-01434-PJH Document 156 Filed 05/21/12 Page 140 of 291   140
CRNKOVICH – DIRECT / MS. BROOKS

1    KEYS, THE NEW PATIENT KEY, AND THE CONFIRM KEY.

2              WHY ISN'T THE CONFIRM KEY ON THE TOUCH SCREEN?

3    **A.**   THE CONFIRM KEY WAS SPECIAL BECAUSE WE DIDN'T WANT ANYONE

4    TO MISADJUST ANY OF THE PARAMETERS ON THE MACHINE AND THEN --

5    AND THEN THE MACHINE STARTS RUNNING.  WE WANTED IT TO BE OFF

6    SCREEN THAT YOU WOULD CONFIRM A PARTICULAR PARAMETER.

7    **Q.**   AND WHAT WAS THE TOUCH SCREEN ON THE K THEN USED FOR?

8    **A.**   THE TOUCH SCREEN WAS USED FOR SELECTION.  IT WAS USED TO

9    SELECT THE DIFFERENT SCREENS.  AND IT WAS ALSO USED TO SELECT

10   THE PARAMETER THAT YOU WANTED TO CHANGE.

11   **Q.**   SO, SELECTING -- COULD YOU STEP DOWN, WITH THE COURT'S

12   PERMISSION, YOUR HONOR, AND SHOW HER HONOR HOW ONE WOULD

13   SELECT -- I MADE THE SAME MISTAKE AND POINTED TO THE K2, IF YOU

14   COULD SHOW HER HONOR AND HER HONOR'S CLERK HOW ONE WOULD GO

15   ABOUT EITHER NAVIGATING OR GOING THROUGH THE VARIOUS SCREENS

16   AND THEN HOW ONE WOULD GO ABOUT SETTING A PARAMETER?

17   **A.**   (WITNESS STEPS DOWN TO MACHINES.)

18             TO SELECT A SCREEN, I ALREADY SHOWED YOU, IT WAS BY

19   USING THE TOUCH SCREEN ON THE BOTTOM TO SELECT THE DIFFERENT

20   SCREENS.

21             THEN TO SELECT THE PARAMETER, YOU WOULD PRESS THAT

22   PARAMETER, IT WOULD HIGHLIGHT, AND THEN YOU COULD KEY IT IN AND

23   PRESS "CONFIRM" TO CHANGE THE VALUE.

24   **Q.**   NOW HOW WOULD ONE DO ON THE K2 THAT NO LONGER HAS A TOUCH

25   SCREEN?

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/24/13 Page 142 of 232 PageID# 33987
Case 4:09-cv-01434-PJH Document 156 Filed 08/02/12 Page 142 of 291    141
CRNKOVICH – DIRECT / MS. BROOKS

1    **A.**    FOR THE K2, WE HAVE A ROW OF BUTTONS UNDERNEATH.  AND,

2    AGAIN, THAT'S HOW YOU SELECT THE DIFFERENT SCREENS.

3           THEN TO SELECT A PARAMETER, YOU WOULD HIGHLIGHT IT

4    USING THESE NAVIGATIONAL KEYS HERE, (INDICATING), MAKE YOUR

5    CHANGE, AND THEN PRESS "CONFIRM".

6    **Q.**    THANK YOU, MR. CRNKOVICH.  YOU CAN RETAKE THE STAND.

7    **A.**    (WITNESS RESUMES WITNESS STAND.)

8    **Q.**    NOW, THE TOUCH SCREEN THAT WAS USED ON THE K, WAS THAT AN

9    OFF-THE-SHELF ITEM?

10   **A.**    YES, IT WAS.

11   **Q.**    WHERE DID YOU GET IT FROM?

12   **A.**    FROM ELOGRAPHICS.

13   **Q.**    I AM SORRY?

14   **A.**    IT'S FROM ELO, YES.

15   **Q.**    HOW MUCH DID IT COST?

16   **A.**    IT COST $60.

17   **Q.**    AND THE ABILITY TO INTEGRATE OR INTERFACE THE TOUCH SCREEN

18   WITH THE K MACHINE, WHO PROVIDED THAT?

19   **A.**    THAT ALSO CAME FROM ELO.  ELO PROVIDED US THE ELECTRONIC

20   DRAWINGS, THEY PROVIDED US THE SOFTWARE, SOME CODE SO WE COULD

21   PUT IT INTO OUR MACHINE.  ALL OF THAT WAS PROVIDED.  AND THEN

22   WORKBOOKS AND DATA SHEETS ON HOW TO IMPLEMENT IT.

23   **Q.**    NOW, IN BAXTER'S BRIEFING -- THEY DIDN'T SAY ANYTHING

24   ABOUT IT TODAY, MR. CRNKOVICH, BUT IT IS IN THEIR BRIEF, AND SO

25   WHILE YOU'VE GOT THE OPPORTUNITY, THEY SAID THAT YOU ADMITTED

1   THAT YOU COPIED THEIR ALTHIN MACHINE.

2           IS THAT TRUE?

3   **A.**   ABSOLUTELY INCORRECT.  NO.  WE DIDN'T COPY THEIR ALTHIN

4   MACHINE.

5   **Q.**   IN FACT, DID YOU TESTIFY AT THE FIRST TRIAL IN THIS CASE?

6   **A.**   YES.

7   **Q.**   WHERE THE JURY FOUND ALL OF THE CLAIMS EITHER INVALID

8   AND/OR NOT INFRINGED?

9   **A.**   YES.

10  **Q.**   DID YOU TESTIFY AT THE SECOND TRIAL, THE DAMAGES TRIAL?

11  **A.**   YES.

12  **Q.**   AND IN EACH INSTANCE, DID YOU DENY THAT YOU COPIED

13  ANYTHING FROM THE ALTHIN?

14  **A.**   THAT'S CORRECT.  YES.

15  **Q.**   NOW LET'S MOVE FROM THE MACHINES TO DISPOSABLES.

16          WHEN I SAY "DISPOSABLES", WHAT DOES THAT MEAN TO

17  YOU?

18  **A.**   DISPOSABLES ARE THE DIALYZER, BLOOD LINES OR CONCENTRATES

19  THAT ARE USED WITH THE MACHINE.

20  **Q.**   DID YOU HAVE ANYTHING TO DO WITH THE DESIGN OF ANY OF THE

21  DISPOSABLES?

22  **A.**   NO.

23  **Q.**   DOES ONE HAVE TO USE FRESENIUS, FOR EXAMPLE, DIALYZER IF

24  USING A FRESENIUS MACHINE?

25  **A.**   NO.

CRNKOVICH – DIRECT / MS. BROOKS

1    **Q.**   CAN THE DIALYZERS BE USED ON ANYBODY'S MACHINE?

2    **A.**   YES.

3    **Q.**   WERE THERE SOME, I DON'T KNOW IF THEY WOULD BE CALLED

4    DISPOSABLES, ACCESSORIES THAT DID COME WITH THE MACHINE,

5    HOWEVER?

6    **A.**   THERE ARE ACCESSORIES.  WE HAVE THE CONCENTRATE JUGS, ACID

7    AND BICARBONATE CONCENTRATE JUGS, WE HAVE IV POLE HOLDER, WE

8    HAVE THE DIALYZER HOLDER, AND WE HAVE BLOOD PRESSURE CUFF

9    HOLDER THAT ALL COME WITH THE MACHINES.

10   **Q.**   BUT AS FAR AS THE DIALYZER ITSELF, THAT DOES NOT COME WITH

11   THE MACHINE?

12   **A.**   THAT'S CORRECT, NO.

13   **Q.**   AS FAR AS THE BLOODLINES, THEY DO NOT COME WITH THE

14   MACHINE?

15   **A.**   THAT'S CORRECT, YES.

16   **Q.**   THE FISTULAS, THEY DO NOT COME WITH THE MACHINE?

17   **A.**   THAT IS CORRECT, YES.

18   **Q.**   AND THE CONCENTRATES, THEY DO NOT COME WITH THE MACHINE?

19   **A.**   THAT IS CORRECT.

20   **Q.**   LET'S SHIFT GEARS AGAIN.

21          BEFORE THE TIME OF THE FIRST TRIAL IN THIS CASE,

22   JUNE OF 2006, DID YOU AND YOUR ENGINEERS AT FRESENIUS BEGIN

23   WORKING ON A POSSIBLE DESIGN AROUND TO THE TOUCH SCREEN IN CASE

24   THE JURY DISAGREED WITH FRESENIUS' POSITION?

25   **A.**   YES, WE DID.

CRNKOVICH – DIRECT / MS. BROOKS

1    **Q.**    APPROXIMATELY WHEN DID YOU BEGIN WORKING ON THAT?

2    **A.**    IT WAS –– LET'S SEE.  JUNE OF 2006.

3    **Q.**    OKAY.

4              NOW, I AM GOING TO SHOW YOU THIS SLIDE.  AND IT SAYS

5    "USER INTERFACE ONE DIFFERENCE GUIDE".

6                    (SLIDE DISPLAYED ON SCREEN.)

7              WHAT IS THIS?

8    **A.**    THIS IS A GUIDE WE PREPARED TO SHOW WHAT WE COULD DO WITH

9    THE SOFTWARE.  AND IT WAS A GUIDE THAT WOULD ALLOW YOU TO USE

10   THE SOFTWARE THAT WE MADE FOR THE K MACHINE.  IT WAS A WORK

11   AROUND.

12             AND BASICALLY WHAT IT DID IS, INSTEAD OF BEING ABLE

13   TO SELECT THE PARAMETERS, YOU COULD ONLY SELECT THE BOTTOM ROW

14   OF BUTTONS OR THE –– BASICALLY THE DIFFERENT SCREENS USING THE

15   TOUCH SCREEN.

16             AND THEN TO SELECT THE PARAMETERS, IF YOU WANT TO GO

17   TO THE NEXT SLIDE, YOU CAN.

18                    (SLIDE DISPLAYED ON SCREEN.)

19   **Q.**    THERE WE GO.

20   **A.**    TO SELECT THE DIFFERENT PARAMETERS, YOU USE THE UP AND

21   DOWN KEYS ON THE K TO NAVIGATE BETWEEN THE DIFFERENT

22   PARAMETERS.

23   **Q.**    AND SO WHAT ARE WE LOOKING AT?  WE WILL GO THROUGH THESE

24   FAIRLY QUICKLY.

25             WHAT IS THIS DESCRIBING HERE NOW, MR. CRNKOVICH?

CRNKOVICH – DIRECT / MS. BROOKS

1    **A.**   ON THE K MACHINE, WE ADDED A NEW TREATMENT KEY.  AND WE

2    TOOK IT ONE STEP FURTHER JUST TO MAKE IT MORE EASY -- OR EASIER

3    FOR THE USER ON WHAT WE REFER TO AS THE K1 OR USER INTERFACE

4    ONE TO BE ABLE TO SET UP ALL THE PARAMETERS.

5            SO YOU'D HIT THE NEW TREATMENT KEY.  AND THEN GO TO

6    THE NEXT SLIDE.

7                    (SLIDE DISPLAYED ON SCREEN.)

8            AND YOU WILL SEE THAT IT'S A ONE SCREEN WHERE ALL OF

9    THE PARAMETERS FOR THE MACHINE CAN BE SET UP QUICKLY BY

10   PRESSING THE UP AND DOWN ARROWS AND USING THE NUMERICAL KEY PAD

11   TO SET IT.

12           THIS WAS JUST A CONVENIENCE WE WERE LOOKING AT K1 TO

13   MAKE IT EASIER FOR THE USER TO SET UP THE MACHINE.

14   **Q.**   NOW, THIS K1 THAT YOU ARE TALKING ABOUT, THAT'S NOT THE K2

15   THAT WE HAVE HERE IN THE COURTROOM, CORRECT?

16   **A.**   YES, THAT'S CORRECT.

17   **Q.**   THE K1 STILL HAD THE TOUCH SCREEN ON IT?

18   **A.**   YES.

19   **Q.**   BUT WHAT WOULD THE USER HAVE BEEN ABLE -- NOT BEEN ABLE TO

20   DO ANY MORE WITH THE TOUCH SCREEN?

21   **A.**   THE USER WOULD NOT BE ABLE TO SELECT A PARAMETER.

22   **Q.**   OKAY.

23           AND ABOUT WHAT TIME FRAME --

24           **THE COURT:**  EXCUSE ME.  ARE WE TALKING ABOUT THREE

25   MACHINES, A K, K1 AND K2?

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/13 Page 147 of 232 PageID# 33992
Case 3:09-cv-01431-PJH Document 156 Filed 08/02/12 Page 146 of 291          146

CRNKOVICH – DIRECT / MS. BROOKS

1     **MS. BROOKS:**  CORRECT, YOUR HONOR.  THE K1 WAS NEVER

2     INSTITUTED.  AND WE'LL, WITH THE COURT'S PERMISSION, I WILL

3     EXPLAIN WHY IN A MOMENT.

4             **THE COURT:**  ALL RIGHT.

5     BY MS. BROOKS:

6     Q.    MR. CRNKOVICH, IF WE LOOK AT CLAIM 26 OF THE '434 PATENT,

7     THIS TALKS ABOUT SELECTING A PARAMETER BY TOUCHING A BUTTON TO

8     CAUSE A CHANGE IN THAT PARAMETER ON THE TOUCH SCREEN.

9             WOULD THE K1, BASED ON YOUR DESIGN, BE A

10    NONINFRINGING ALTERNATIVE TO THIS CLAIM?

11    **A.**    YES.

12            **MR. ABERNATHY:**  OBJECTION, YOUR HONOR, CALLING FOR A

13    LEGAL CONCLUSION.  SHE'S ASKING THIS WITNESS TO RENDER AN

14    OPINION ON A PATENT, WHICH IS A MATTER OF LAW.

15            **THE COURT:**  TECHNICALLY, YES, BUT I WILL GIVE IT

16    WHATEVER WEIGHT.  I AM NOT EXACTLY SURE HOW -- WHAT I WOULD DO

17    WITH IT IN THE COURSE OF DECIDING THIS CASE, BUT I WILL LISTEN.

18            **MS. BROOKS:**  AND, YOUR HONOR, PERHAPS, WOULD IT HELP

19    IF I MADE AN OFFER OF PROOF, SINCE THERE'S NO JURY HERE, THAT I

20    CAN PUT IN CONTEXT?

21            **THE COURT:**  YES.

22            **MS. BROOKS:**  HERE'S WHAT WE ARE GETTING AT, YOUR

23    HONOR, IS THAT AS OF -- LET ME ASK YOU.

24    BY MS. BROOKS:

25    Q.    WHEN WAS THE K1 READY?

Case 3:09-cv-00629-REP Document 1031-1 Filed 03/21/13 Page 148 of 232 PageID# 33993
Case 3:09-cv-01431-PJH Document 156 Filed 08/02/12 Page 147 of 231          147
CRNKOVICH – DIRECT / MS. BROOKS

1    **A.**   THE K1 WAS READY AT THE END OF 2007.

2    **Q.**   OKAY.

3            **MS. BROOKS:**  SO, YOUR HONOR, THE K1, AS

4    MR. CRNKOVICH EXPLAINED, REMOVED THE ABILITY TO CHANGE A

5    PARAMETER ON THE TOUCH SCREEN.  THAT ABILITY WAS GONE.

6            AND SO IT'S OUR POSITION THAT, FROM A LEGAL

7    PERSPECTIVE, I WON'T ASK MR. CRNKOVICH THIS, THAT THE K1 WOULD

8    HAVE BEEN A DESIGN AROUND TO THIS CLAIM BECAUSE WE TOOK THE

9    ABILITY TO CHANGE A PARAMETER BY USING THE TOUCH SCREEN,

10   REMOVED IT.

11           HOWEVER, THE PROBLEM WAS THAT JUDGE ARMSTRONG'S

12   RULING HAD REINSTITUTED ALL OF THE PATENTS.  SO THE '027 PATENT

13   IS SIMPLY HAVING A TOUCH SCREEN ON A HEMODIALYSIS MACHINE.

14   **BY MS. BROOKS:**

15   **Q.**   SO WAS THERE STILL A TOUCH SCREEN ON THE K1?

16   **A.**   THERE WAS.  AND THIS WAS STRICTLY A SOFTWARE CHANGE TO THE

17   K MACHINE.

18   **Q.**   AND WOULD A USER HAVE BEEN ABLE TO USE THAT TOUCH SCREEN

19   ON THE K1 TO DO SOMETHING, NOT CHANGE A PARAMETER, BUT TO DO

20   SOMETHING ELSE?

21   **A.**   ON THE K MACHINE, WITH THE NEW SOFTWARE, YOU COULD

22   NAVIGATE TO THE DIFFERENT SCREENS USING THE TOUCH SCREEN.

23           **MS. BROOKS:**  AND THE SIGNIFICANCE OF THIS, YOUR

24   HONOR, IS THAT BAXTER IS ARGUING IT DIDN'T MATTER WHETHER THERE

25   WAS ONE PATENT OR THREE PATENTS; IT DID SIGNIFICANTLY BECAUSE

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/24/13 Page 149 of 232 PageID# 33994
Case 4:03-cv-01431-PJH Document 1156 Filed 08/02/12 Page 148 of 291     148
CRNKOVICH - DIRECT / MS. BROOKS

 1    THE PATENT -- THE ONLY PATENT THAT WAS LEFT, WE HAD A DESIGN

 2    AROUND FOR.

 3            THE PROBLEM WAS WE DIDN'T HAVE A DESIGN AROUND READY

 4    FOR THE '027 CLAIM BECAUSE THAT WAS SIMPLY -- WE HAD TO TAKE

 5    THE TOUCH SCREEN OFF IN ORDER TO DO THAT.  WHEREAS IN ORDER TO

 6    DESIGN AROUND THE '434 CLAIM 26, WHICH IS NOW THE ONLY

 7    REMAINING PATENT, THAT DESIGN AROUND, AS MR. CRNKOVICH JUST

 8    TESTIFIED, WAS INDEED READY TO GO BY CHANGING IT SO YOU

 9    COULDN'T CHANGE THE PARAMETERS ON THE MACHINE.  THAT WAS READY

10    TO GO BY THE END OF 2007.

11            **THE COURT:**  BUT YOU COULDN'T USE IT BECAUSE OF THE

12    REINSTATEMENT OF THE VALIDITY.

13            **MS. BROOKS:**  EXACTLY.  AND IT WASN'T UNTIL THE FED

14    CIRCUIT RE-INVALIDATED -- VALIDATED AGAIN THIS PATENT THAT THIS

15    DESIGN AROUND WOULD HAVE BEEN OKAY, BUT BY THEN WE HAD DONE THE

16    OTHER DESIGN AROUND.  WE PUT THE K2 IN THE FIELD.

17            SO THIS IS LAYING OUR RECORD, YOUR HONOR, TO SHOW

18    THAT, INDEED, THERE IS A SUBSTANTIAL CHANGE AS A RESULT OF THE

19    FED CIRCUIT INVALIDATING TWO OUT OF THOSE THREE PATENTS.

20    **BY MS. BROOKS:**

21    **Q.**   SO, THIS IS JUST, AGAIN, MR. CRNKOVICH, CLAIM 11 OF THE

22    '027 PATENT; DID THE K1 HAVE A TOUCH SCREEN ON IT?

23            YOU HAVE ALREADY ANSWERED THAT, BUT AGAIN?

24    **A.**   YES.

25                    (SLIDE DISPLAYED ON SCREEN.)

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/12 Page 150 of 232 PageID# 33995
Case 4:09-cv-01434-PJH Document 156 Filed 02/22 Page 149 of 291      149
CRNKOVICH – DIRECT / MS. BROOKS

1   **Q.**   LASTLY, AND YOU PROBABLY CAN'T EVEN SEE THESE NUMBERS OUT

2   THERE, BUT -- NOW WERE YOU INVOLVED IN THE DESIGN OF THE K2?

3   **A.**   YES.

4   **Q.**   AND THAT'S THE ONE WITHOUT THE TOUCH SCREEN?

5   **A.**   YES.

6   **Q.**   WHEN WAS THAT INTRODUCED, IF YOU CAN RECALL, INTO THE

7   FIELD?

8            ABOUT JANUARY --

9   **A.**   JANUARY 2009.

10  **Q.**   AND WHENEVER YOU INTRODUCE A NEW MACHINE INTO THE FIELD,

11  DO YOU DO ANY KIND OF USABILITY STUDIES TO SEE THE REACTION?

12  **A.**   WE DID.  THAT'S PART OF THE PROCESS.

13           AND DURING OUR USABILITY STUDY, WE LOOKED AT -- THE

14  FEEDBACK WE GOT FROM THE FIELD WAS THAT WHEN THEY LOOKED AT THE

15  K2 MACHINE, 50 PERCENT OF THE PEOPLE SAID THE TOUCH SCREEN

16  DOESN'T MATTER.  WHETHER IT'S THERE OR NOT, IT DOESN'T MATTER.

17           25 PERCENT OF THE PEOPLE SAID THAT THEY NEVER DID

18  LIKE THE TOUCH SCREEN.  THE OTHER 25 PERCENT OF THE PEOPLE SAID

19  THEY LIKED THE TOUCH SCREEN.

20           **MR. ABERNATHY:**  YOUR HONOR, I WILL OBJECT, HEARSAY,

21  MOVE TO STRIKE THE LAST ANSWER.

22           **THE COURT:**  IT IS HEARSAY.  IS THERE SOME EXCEPTION

23  THAT IT MIGHT COVER?

24           **MS. BROOKS:**  I BELIEVE THERE IS.  UNFORTUNATELY, I

25  DIDN'T BRING THE CASE WITH ME ABOUT CUSTOMER STATEMENTS ABOUT A

Case 3:09-cv-00628-REP Document 1021-1 Filed 03/21/13 Page 151 of 232 PageID# 33996
Case 3:09-cv-01431-PJH Document 156 Filed 03/02/12 Page 150 of 231    150
CRNKOVICH – DIRECT / MS. BROOKS

1   PARTICULAR PRODUCT.  WE WENT THROUGH THIS BEFORE AND I FORGOT

2   TO DO THE RESEARCH.

3          WITH THE COURT'S PERMISSION, PERHAPS WE CAN DO SOME

4   POCKET BRIEF AFTER.  IF WE DON'T SATISFY THE COURT, THAT

5   TESTIMONY CAN BE STRICKEN.

6          **MR. ABERNATHY:**  IT'S BEING OFFERED FOR THE TRUTH,

7   YOUR HONOR.  THERE IS NO EXCEPTION.

8          **MS. BROOKS:**  WE ARE DEFINITELY OFFERING IT FOR THE

9   TRUTH, BUT --

10         **THE COURT:**  IT IS.  IT'S HEARSAY.  IT IS OFFERED FOR

11  THE TRUTH.  THE ONLY QUESTION IS, IS THERE SOME EXCEPTION THAT

12  WOULD PERMIT ME TO CONSIDER WHAT DIFFERENT CUSTOMERS HAVE SAID.

13         **MS. BROOKS:**  AND THE ANSWER IS I BELIEVE THERE IS.

14  I BELIEVE THERE IS CASE LAW TO THAT EFFECT.  I APOLOGIZE THAT I

15  DIDN'T BRING IT WITH ME TODAY, YOUR HONOR, BUT I WOULD BE HAPPY

16  TO GO BACK AND FIND IT.

17         **THE COURT:**  I WILL SET THE PARAMETERS FOR ANY

18  FOLLOW-UP BRIEFING AT THE END OF THE PROCEEDING.

19         **MS. BROOKS:**  THANK YOU.

20  **BY MS. BROOKS:**

21  **Q.**   THE BOTTOM LINE, MR. CRNKOVICH, YOU PROBABLY CAN'T SEE

22  THAT ON THIS SCREEN, BUT DID WE GO OVER THESE NUMBERS TOGETHER,

23  IN FACT, EARLIER WITH MR. DEN UYL?

24  **A.**   YES.

25  **Q.**   DID FRESENIUS SEE A LOSS IN ANY WAY OF SALES ONCE THE K2,

CRNKOVICH - DIRECT / MS. BROOKS

1    WITHOUT THE TOUCH SCREEN, WAS INTRODUCED?

2    **A.**   NO.

3              BOTH THE SALES INCREASED AND MARKET SHARE INCREASED.

4              **THE COURT:**  BUT YOU ALWAYS HAD MOST OF THE MARKET

5    SHARE, CORRECT?

6              **THE WITNESS:**  WE'VE HAD A LARGE PART OF THE MARKET

7    SHARE YES.  AND -- BUT -- TAKING THE TOUCH SCREEN OFF, WE --

8    OUR MARKET SHARE AND SALES INCREASED.

9              **THE COURT:**  TAKING IT OFF --

10             **THE WITNESS:**  WHEN WE WENT TO THE K2, IT DIDN'T

11   AFFECT OUR MARKET SHARE -- IT INCREASED OUR MARKET SHARE AND

12   OUR SALES.

13             **THE COURT:**  OKAY.  BUT WE HAVE ALSO HEARD TESTIMONY

14   THAT BAXTER EXITED THE --

15             **MS. BROOKS:**  CORRECT.

16             **THE COURT:**  -- THE HEMODIALYSIS MARKET IN 2008.

17             **MS. BROOKS:**  AT LEAST BY 2008.

18             **THE COURT:**  WOULDN'T THAT ACCOUNT FOR, IN PART, AN

19   INCREASE IN THE MARKET SHARE?

20             **MS. BROOKS:**  CERTAINLY.  IN FACT, I WAS GOING TO ASK

21   MR. CRNKOVICH THAT.

22   **BY MS. BROOKS:**

23   **Q.**   IN ADDITION TO JUST THE FACT THAT YOU HAD THE K2 OUT

24   THERE, DID BAXTER EXIT THE MARKET DURING THAT TIME PERIOD ALSO?

25   **A.**   YES.

CRNKOVICH – DIRECT / MS. BROOKS

1  **Q.**   AND THEN DID GAMBRO RUN INTO SOME KIND OF QUALITY PROBLEMS

2  AND HAVE TO ALSO EXIT THE MARKET?

3  **A.**   YES.  THEY ALSO HAD PROBLEMS.

4          **THE COURT:**  WHAT I AM TRYING TO UNDERSTAND IS, WHAT

5  OTHER OPTIONS DO PEOPLE HAVE?

6          I MEAN, IF FRESENIUS HAS THE BULK OF THE MARKET

7  SHARE, I AM JUST TRYING TO DETERMINE HOW TO VALUE THIS

8  EVIDENCE.

9          WHAT OPTIONS DO PROSPECTIVE PURCHASERS HAVE IF MOST

10 OF THEM COME FROM FRESENIUS?

11         **MS. BROOKS:**  IT IS TRUE, YOUR HONOR, IT HAS BECOME

12 THAT.

13         **THE COURT:**  SO ASSUMING PEOPLE WANTED TOUCH SCREENS

14 AND IT WAS DRIVEN -- THE MARKET FOR THE TOUCH SCREENS WAS

15 DRIVEN BY THAT FEATURE, ONCE THAT FEATURE DISAPPEARS, IF THERE

16 ARE NO OTHER ALTERNATIVES WITH THAT FEATURE, WOULDN'T ONE

17 NORMALLY EXPECT TO SEE THE COMPANY WITH THE LARGEST MARKET

18 SHARE CONTINUING TO DO WELL?

19         **MS. BROOKS:**  CERTAINLY, YOUR HONOR.  WE DON'T

20 DISAGREE WITH THAT.

21         ALTHOUGH, WHEN THE 2008H WAS ON THE MARKET, AND THAT

22 WAS -- WE WILL GO BACK TO THE -- THAT VERY EARLY ON SLIDE, IF I

23 CAN, FOR ALMOST A DECADE -- BUT, OF COURSE, BE THE VERY FIRST

24 ONE.  WE ARE ALMOST THERE.  THERE WE GO.

25         (SLIDE DISPLAYED ON SCREEN.)

Case 3:09-cv-00680-REP Document 1031-1 Filed 03/21/18 Page 154 of 232 PageID# 33999
Case 4:09-cv-01491-PJH Document 156 Filed 08/02/12 Page 153 of 291   153
CRNKOVICH – DIRECT / MS. BROOKS

```
1              WHEN THE 2008H WAS ON THE MARKET WITHOUT A TOUCH

2    SCREEN FOR ALMOST A DECADE, THERE WAS THE GAMBRO THAT HAD A

3    TOUCH SCREEN, THE ALTHIN THAT HAD A TOUCH SCREEN, AND SO THOSE

4    WERE ALTERNATIVES TO CONSUMERS BACK THEN, AND THEY ALL CHOSE

5    THE H WITHOUT THE TOUCH SCREEN.

6              THE COURT:  SURE, BUT WHEN DID THE GAMBRO AND THE

7    BRAUN THAT HAD TOUCH SCREENS BECOME UNAVAILABLE?

8              MS. BROOKS:  I DON'T KNOW.  I WILL ASK MR. CRNKOVICH

9    IF YOU HAVE ANY RECOLLECTION.

10             THE WITNESS:  THE BRAUN IS STILL AVAILABLE.

11             MS. BROOKS:  OH.  WELL, THERE'S ONE ALTERNATIVE

12   THEN.

13             THE COURT:  SO DO WE HAVE ANY INFORMATION ABOUT HOW

14   WELL OR HOW POORLY THOSE OTHER TOUCH SCREEN PRODUCTS DID WHEN

15   YOUR TOUCH SCREEN WAS REMOVED?

16   BY MS. BROOKS:

17   Q.   HOW IS THE K2 COMPETING NOW, THE ONE WITHOUT THE TOUCH

18   SCREEN, AGAINST THE BRAUN THAT DOES HAVE A TOUCH SCREEN?

19   A.   THE MARKET SHARE FOR BRAUN IS ABOUT THE SAME AS IT WAS

20   BEFORE WE CAME OUT WITH THE K2.  SO THERE'S NO DIFFERENCE.

21   Q.   YOU HAVEN'T SEEN ANY MIGRATION FROM THE FRESENIUS MACHINE

22   WITHOUT THE TOUCH SCREEN TO, FOR EXAMPLE, THE BRAUN WITH THE

23   TOUCH SCREEN ONCE THE K2 WAS INTRODUCED?

24   A.   NO.

25             THE COURT:  OKAY.
```

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/13 Page 155 of 232 PageID# 34000
Case 3:09-cv-01494-UHP Document 156 Filed 08/02/12 Page 154 of 291          154
CRNKOVICH – CROSS / MR. ABERNATHY

```
 1            MS. BROOKS:  DID YOUR HONOR HAVE -- I THINK THAT'S

 2   ALL THE QUESTIONS I HAD.  DID YOUR HONOR HAVE ANY MORE

 3   QUESTIONS FOR MR. CRNKOVICH?

 4            THE COURT:  NO.

 5            MS. BROOKS:  THANK YOU, YOUR HONOR.

 6            THE COURT:  CROSS?

 7            MR. ABERNATHY:  THANK YOU, YOUR HONOR.

 8                      CROSS-EXAMINATION

 9   BY MR. ABERNATHY:

10   Q.  MR. CRNKOVICH, GOOD TO SEE YOU AGAIN.

11            IT'S CRNKOVICH, RIGHT?

12   A.  CRNKOVICH, YES.

13   Q.  I KEEP BOTCHING YOUR NAME.  HAVE I DONE THAT OVER THESE

14   YEARS?

15   A.  NO, I THINK YOU'VE ALWAYS GOTTEN IT RIGHT.

16   Q.  I APOLOGIZE.

17            YOU'RE AN ENGINEER, RIGHT?

18   A.  THAT IS CORRECT.  YES.

19   Q.  AND YOU ARE ON THE ENGINEERING SIDE OF FRESENIUS'

20   BUSINESS?

21   A.  YES.

22   Q.  YOU DON'T CONSIDER YOURSELF TO BE A MARKETER, RIGHT?

23   A.  I KNOW WHAT MARKETING IS DOING.  I AM VERY -- I WORK VERY

24   CLOSELY WITH MARKETING.

25   Q.  BUT WHEN YOU WERE DEVELOPING THE 2008K, YOU WERE ON THE
```

Case 3:09-cv-00629-REP Document 1021-1 Filed 03/21/13 Page 156 of 232 PageID# 34001
Case 3:09-cv-01434-WHA Document 156 Filed 08/02/12 Page 156 of 291    155
CRNKOVICH - CROSS / MR. ABERNATHY

1    R&D SIDE OF THE BUSINESS, RIGHT?

2    **A.**    THAT IS CORRECT, YES.

3    **Q.**    AND OTHERS WERE ON THE MARKETING SIDE OF THE BUSINESS?

4    **A.**    THAT'S CORRECT.

5    **Q.**    MR. SCHLAEPER?

6    **A.**    YES.

7    **Q.**    HE WAS VICE PRESIDENT OF MARKETING, WASN'T HE?

8    **A.**    YES.

9    **Q.**    WHEN YOU WERE DEVELOPING THE 2008 -- STRIKE THAT.

10            WHEN YOU WERE THINKING ABOUT THE NEXT GENERATION FOR

11   THE 2008H, YOU DID NOT WANT THAT NEW GENERATION MACHINE TO HAVE

12   A TOUCH SCREEN USER INTERFACE, RIGHT?

13   **A.**    THAT'S CORRECT.  I DO NOT -- I PREFER NO TOUCH SCREENS,

14   YES.

15   **Q.**    THE PEOPLE AT MARKETING -- IN MARKETING AT FRESENIUS,

16   HOWEVER, WANTED A TOUCH SCREEN USER INTERFACE, CORRECT?

17   **A.**    YES.

18   **Q.**    AND THAT WAS MR. SCHLAEPER LEADING THAT EFFORT, RIGHT?

19   **A.**    YES.

20   **Q.**    HE WAS VICE PRESIDENT OF MARKETING AROUND 2000 WHEN THIS

21   MACHINE WAS INTRODUCED, CORRECT?

22   **A.**    YES.

23   **Q.**    AND EVEN THOUGH YOU MAY NOT HAVE AGREED WITH IT, IT WAS

24   MR. SCHLAEPER'S POSITION AT FRESENIUS THAT NURSES, DOCTORS, AND

25   TECHNICIANS WANTED THE CONVENIENCE OF A TOUCH SCREEN, RIGHT?

Case 3:09-cv-00609-RFP Document 1021-1 Filed 03/21/12 Page 157 of 232 PageID# 34002
Case 3:09-cv-01434-WHA Document 156 Filed 08/02/12 Page 158 of 291   158

CRNKOVICH - CROSS / MR. ABERNATHY

1   **A.**   NO.  MY EXPERIENCE WITH CHRISTIAN IS, HE CAME FROM A

2   SCHOOL IN GERMANY WHERE ONE OF HIS CLASSES THAT HE TOOK WAS ON

3   TOUCH SCREENS.

4          AND SO WHEN HE CAME TO FRESENIUS, HE WAS VERY PRO

5   TOUCH SCREEN AND HE WANTED TO PUT THAT ON THE NEXT MACHINE.

6   **Q.**   BUT DIDN'T HE WRITE AT FRESENIUS THAT THE MARKET DEMANDED

7   THE CONVENIENCE OF A TOUCH SCREEN?

8   **A.**   I THINK HE SAW THE ADVANTAGES OF THE TOUCH SCREEN, YES.

9   **Q.**   DIDN'T HE WRITE THAT AT THE TIME OF THE INTRODUCTION OF

10  THE 2008K?

11  **A.**   YES.

12         **MR. ABERNATHY:**  SO, IF WE CAN HAVE SLIDE 16 FROM THE

13  OPENING.

14              (SLIDE DISPLAYED ON SCREEN.)

15  **BY MR. ABERNATHY:**

16  **Q.**   I HAVE ON THE SCREEN WHAT HAS BEEN MARKED AS MURTHY

17  EXHIBIT 11 IN THE BRIEFING.

18         YOU RECOGNIZE THIS, DON'T YOU, AS THE PRODUCT LAUNCH

19  FOR THE 2008K?

20         IT'S THE FIRST PAGE OF IT?

21  **A.**   YES.

22  **Q.**   AND THIS IS SOMETHING THAT YOU DIDN'T WRITE, MR. SCHLAEPER

23  WROTE; ISN'T THAT CORRECT?

24  **A.**   YES.

25  **Q.**   AND THIS CAME FROM THE MARKETING SIDE OF THE BUSINESS, NOT

Case 3:09-cv-00630-REB Document 1031-1 Filed 03/21/13 Page 158 of 232 PageID# 34003
Case 3:09-cv-01434-PJH Document 156 Filed 03/02/12 Page 137 of 291    137

CRNKOVICH - CROSS / MR. ABERNATHY

1    THE ENGINEERING SIDE OF THE BUSINESS; IS THAT RIGHT?

2    **A.**   YES.

3    **Q.**   AND IN THIS DOCUMENT, MR. SCHLAEPER AND THE MARKETING

4    PEOPLE WROTE THAT "TO MAINTAIN THE LEADERSHIP IN THE

5    HEMODIALYSIS MARKET AND TO FOLLOW THE DEMAND FOR A MORE USER

6    FRIENDLY OPERATOR INTERFACE", AND IT GOES ON, BUT, IN ESSENCE,

7    THE 2008K HAS BEEN REDESIGNED WITH A NEW LEVEL OF TOUCH SCREEN

8    CONVENIENCE.

9          RIGHT?

10   **A.**   YES.

11   **Q.**   AND THIS WAS IN THE DOCUMENT THAT ACCOMPANIED THE RELEASE

12   OF THE 2008K IN AROUND SEPTEMBER OF 2000, RIGHT?

13   **A.**   YES.

14   **Q.**   YOU WERE IN THE ROOM THIS MORNING DURING THE ARGUMENTS

15   INITIALLY.

16          DO YOU RECALL THAT I SHOWED SOME BROCHURES THAT

17   ACCOMPANIED THE RELEASE OF THE 2008K WITH TOUCH SCREENS ON THE

18   COVER?

19   **A.**   YES.

20   **Q.**   WE TALKED ABOUT THOSE BROCHURES DURING YOUR DEPOSITION,

21   CORRECT?

22   **A.**   YES.

23   **Q.**   THOSE CAME FROM THE MARKETING SIDE OF THE BUSINESS, RIGHT?

24   **A.**   YES.

25          **MR. ABERNATHY:**   COULD I HAVE SLIDE 17, PLEASE?

Case 3:09-cv-00629-REP Document 1031-1 Filed 03/21/13 Page 159 of 232 PageID# 34004
Case 4:09-cv-01434-PJH Document 156 Filed 08/02/12 Page 159 of 291    159
CRNKOVICH – CROSS / MR. ABERNATHY

 1                    (SLIDE DISPLAYED ON SCREEN.)

 2    **BY MR. ABERNATHY:**

 3    **Q.**    THESE WERE BROCHURES THAT FRESENIUS PUT OUT TO ACCOMPANY

 4    THE RELEASE OF THE 2008K, CORRECT?

 5    **A.**    YES.

 6    **Q.**    AND YOU AGREE WITH ME THAT THE COVERS FEATURE THE TOUCH

 7    SCREEN ASPECT OF THE 2008K, CORRECT?

 8    **A.**    YES.

 9    **Q.**    AND AT THE RELEASE POINT, ONE OF THE MARKETING SLOGANS FOR

10    THE 2008K WAS "IN TOUCH WITH THE NEW GENERATION".  RIGHT?

11    **A.**    YES.  IT WAS A NICE JINGLE.

12    **Q.**    IT WAS A NICE JINGLE THAT RESONATED IN THE MARKET, TOO,

13    DIDN'T IT?

14    **A.**    I CAN'T -- I DON'T KNOW.

15    **Q.**    IN 2000, RICE POWELL WAS THE -- WAS YOUR BOSS AT

16    FRESENIUS, ONE OF THEM?

17    **A.**    NOT DIRECTLY.

18    **Q.**    INDIRECTLY THOUGH?

19    **A.**    YES.

20    **Q.**    IN THE HIERARCHY OF THINGS, HE WAS WAY ABOVE YOU, WASN'T

21    HE?

22    **A.**    YES.

23    **Q.**    AND RICE POWELL HAD HIS FINGER ON THE PULSE OF FRESENIUS'

24    MARKETING AT THE TIME, DIDN'T HE?

25    **A.**    I DON'T KNOW.  I WOULD -- I WOULD SAY YES.

Case 3:09-cv-00629-REP Document 1031-1 Filed 03/21/13 Page 160 of 232 PageID# 34005
Case 4:03-cv-01431-PJH Document 156 Filed 08/02/12 Page 160 of 291          159
CRNKOVICH - CROSS / MR. ABERNATHY

1   Q.   THAT WAS YOUR EXPERIENCE, WASN'T IT?

2   A.   I DIDN'T REALLY WORK WITH RICE POWELL, SO I CAN'T SAY.

3   Q.   YOU WOULD AGREE WITH ME THAT RICE POWELL, THE CEO FOR

4   FRESENIUS' NORTH AMERICAN BUSINESS, UNDERSTOOD THE DEMAND

5   DRIVERS IN THE MARKET AT THE TIME THAT 2008K MACHINE WAS

6   RELEASED?

7   A.   I WORKED WITH MARKETING, I WORKED WITH CHRISTIAN

8   SCHLAEPER, I DIDN'T WORK DIRECTLY WITH RICE POWELL.  SO I

9   DON'T -- I CAN'T SPEAK FOR RICE POWELL.

10  Q.   OKAY.

11         YOU WOULDN'T DISAGREE WITH WHAT RICE POWELL SAID

12  ABOUT DEMAND DRIVERS, THOUGH, WOULD YOU IN THE MARKETPLACE?

13  A.   I WOULD NOT DISAGREE WITH ANYTHING RICE SAYS.

14  Q.   BECAUSE HE'S PRETTY HIGH UP IN THE COMPANY, RIGHT?

15  A.   UNLESS IT'S TECHNICAL.

16         **MR. ABERNATHY:**  LET'S TURN TO SLIDE 18.

17              (SLIDE DISPLAYED ON SCREEN.)

18  BY MR. ABERNATHY:

19  Q.   AND, AGAIN, I THINK YOU WERE AT THE TRIAL, FOR THE DAMAGES

20  TRIAL IN OCTOBER OR NOVEMBER OF 2007.

21         YOU REMEMBER WHEN RICE POWELL TESTIFIED?

22  A.   I DON'T THINK I WAS IN THE ROOM AT THE TIME, NO.

23  Q.   WELL, WHAT RICE POWELL SAID WAS FRESENIUS WAS HINGING

24  EVERYTHING ON THE TOUCH SCREEN USER INTERFACE AT THE POINT OF

25  RELEASE IN AUGUST OF 2000.

Case 3:09-cv-00610-REP Document 1021-1 Filed 03/21/13 Page 161 of 232 PageID# 34006
Case 4:09-cv-01494-PJH Document 156 Filed 08/02/12 Page 160 of 291          160
CRNKOVICH – CROSS / MR. ABERNATHY

1              DO YOU SEE THAT?

2   **A.**   I SEE THAT, YES.

3   **Q.**   YOU HAVE NO REASON TO DISAGREE WITH RICE POWELL, DO YOU?

4   **A.**   UMM -- I -- PERSONALLY I DISAGREE WITH HIM, YES.

5   **Q.**   HE WAS YOUR BOSS?

6   **A.**   HE WAS THE BOSS, YES.

7   **Q.**   HE CERTAINLY KNEW THE MARKETING SIDE OF THE BUSINESS,

8   RIGHT?

9   **A.**   AGAIN, I DIDN'T DEAL DIRECTLY WITH RICE.

10  **Q.**   LET'S TALK ABOUT REDESIGN EFFORTS.

11         **MR. ABERNATHY:**  CAN WE HAVE SLIDE 27?

12              (SLIDE DISPLAYED ON SCREEN.)

13  **BY MR. ABERNATHY:**

14  **Q.**   SO I PUT UP A TIME LINE HERE.

15         AND JUST -- I THINK I GOT IT FROM YOUR DIRECT

16  EXAMINATION, YOU HAVE BEEN INVOLVED WITH MACHINE DEVELOPMENT

17  THROUGH THE H UP UNTIL TODAY, RIGHT?

18  **A.**   YES.

19  **Q.**   YOU'VE SEEN A LOT?

20  **A.**   YES.

21  **Q.**   OKAY.

22         REMEMBER THAT, I THINK IT WAS AROUND THE TIME I TOOK

23  YOUR DEPOSITION IN 2005, THE COURT HAD GRANTED SUMMARY JUDGMENT

24  FOR BAXTER OF INFRINGEMENT OF THE '434 PATENT.

25         DOES THAT RING A BELL?

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/13 Page 162 of 232 PageID# 34007
Case 4:09-cv-01434-PJH Document 156 Filed 08/02/12 Page 163 of 291    161
CRNKOVICH – CROSS / MR. ABERNATHY

1    **A.**    YES.

2    **Q.**    YEAH.

3              AND THEN THERE'S A TRIAL IN JUNE OF 2006 THAT YOU

4    TESTIFIED AT, RIGHT?

5    **A.**    YES.

6    **Q.**    AND DO YOU RECALL RIGHT BEFORE THAT TRIAL STARTED,

7    FRESENIUS STIPULATED TO INFRINGEMENT OF THE '434 AND THE OTHER

8    PATENTS AT ISSUE, WITH THE EXCEPTION OF TWO CLAIMS OF THE '476,

9    RIGHT?

10   **A.**    YES.

11   **Q.**    AND IT WAS AROUND 2006 THAT YOU STARTED WORKING ON THE

12   DESIGN AROUND, YOU SAY?

13   **A.**    YES.

14   **Q.**    THAT WAS CALLED WHAT, THE K?

15   **A.**    AT THE TIME, IT WAS CALLED THE USER INTERFACE ONE.

16   **Q.**    ALL RIGHT.  2006, THAT INTERFACE, RIGHT?

17   **A.**    YES.

18   **Q.**    BUT YOU DIDN'T RELEASE THAT MACHINE TO THE MARKETPLACE,

19   RIGHT?

20   **A.**    YES.  THAT'S CORRECT.

21   **Q.**    SO, IN 2006, YOU ARE WORKING ON AN ALTERNATIVE DESIGN.

22   FRESENIUS HAD BEEN FOUND TO INFRINGE, BUT YOU CONTINUED TO USE

23   THE 2008K, RIGHT?

24   **A.**    YES.

25   **Q.**    CONTINUED TO SELL IT?

Case 3:09-cv-00629-REP Document 1031-1 Filed 03/21/13 Page 163 of 232 PageID# 34008
Case 4:03-cv-01431-PJH Document 156 Filed 08/02/12 Page 162 of 291      162
CRNKOVICH — CROSS / MR. ABERNATHY

1    **A.**   YES.

2    **Q.**   THERE IS A TRIAL THAT, AS YOU KNOW, THE COURT ENTERED

3    JUDGMENT IN FAVOR OF BAXTER, CALLED JMOL.  RECALL THAT?

4    **A.**   YES.

5    **Q.**   THAT OCCURRED IN 2007?

6    **A.**   YES.

7    **Q.**   DID YOU CONTINUE TO WORK ON YOUR REDESIGN DURING THAT

8    TIME?

9    **A.**   THE REDESIGN WAS -- WAS -- I WOULD SAY YES.  YES.

10   **Q.**   WELL, IN NOVEMBER OF 2007, OBVIOUSLY FRESENIUS CONTINUED

11   TO SELL THE 2008K, RIGHT?

12   **A.**   YES.

13   **Q.**   YOU HAD NOT SUBMITTED THIS ALTERNATIVE DESIGN TO ANY OF

14   THE REGULATORY AUTHORITIES, CORRECT?

15   **A.**   YES.

16   **Q.**   YOU DID NOT SUBMIT IT FOR SOMETHING CALLED 510K

17   CERTIFICATION?

18   **A.**   YES.

19   **Q.**   AND YOU KNOW IN ORDER TO SELL A MACHINE IN THIS

20   MARKETPLACE, A MEDICAL DEVICE, A HEMODIALYSIS MACHINE, YOU HAVE

21   TO GET WHAT'S CALLED 510K CERTIFICATION FROM THE FDA, CORRECT?

22          **MS. BROOKS:**  OBJECTION, CALLS FOR A LEGAL

23   CONCLUSION.

24          **MR. ABERNATHY:**  WE TALKED ABOUT THIS IN HIS

25   DEPOSITION, YOUR HONOR --

Case 3:09-cv-00629-REP Document 1021-1 Filed 03/21/13 Page 164 of 232 PageID# 34009
Case 3:09-cv-01484-PJH Document 156 Filed 08/02/12 Page 163 of 291    163
CRNKOVICH – CROSS / MR. ABERNATHY

1      **THE COURT:**  ACTUALLY, IF HE KNOWS, HE CAN ANSWER.

2   **BY MR. ABERNATHY:**

3   **Q.**   YOU MAY ANSWER.

4           DON'T YOU HAVE TO GET 510K CERTIFICATION BEFORE A

5   MACHINE CAN BE SOLD, A HEMODIALYSIS MACHINE CAN BE SOLD IN THE

6   MARKETPLACE?

7   **A.**   IT DEPENDS UPON THE CHANGE TO THE MACHINE.

8           IF IT'S NOT A SIGNIFICANT CHANGE, YOU DON'T NEED

9   510K APPROVAL.  IF THE CHANGE FROM -- THAT YOU ARE MAKING ON

10  THE MACHINE IS NOT A SIGNIFICANT CHANGE, THERE IS NO NEED TO

11  GET 510K APPROVAL.

12  **Q.**   IN 2007, AT THE POINT -- IN NOVEMBER OF 2007, FRESENIUS

13  HAD NOT INTRODUCED THIS ALTERNATIVE MACHINE THAT YOU TALKED

14  ABOUT CALLED THE K1, RIGHT?

15  **A.**   YES.

16  **Q.**   IT WASN'T AVAILABLE IN THE MARKET, CORRECT?

17  **A.**   YES.

18  **Q.**   NO ADVERTISING IN THE MARKET?

19  **A.**   YES.

20  **Q.**   AND AT THE TIME THAT WAS SECRET WITHIN FRESENIUS, RIGHT,

21  THAT DEVELOPMENT EFFORT?

22  **A.**   YES.

23  **Q.**   BAXTER DIDN'T KNOW ABOUT IT, RIGHT?

24  **A.**   NO.

25  **Q.**   NOW, IN APRIL OF 2008, THE COURT GRANTED A PERMANENT

Case 3:09-cv-00629-REP Document 1031-1 Filed 03/21/13 Page 165 of 232 PageID# 34010
Case 3:09-cv-01495-PJH Document 156 Filed 09/02/12 Page 164 of 291 164
CRNKOVICH - CROSS / MR. ABERNATHY

1    INJUNCTION THAT BRINGS US HERE TODAY, RIGHT?

2    **A.**    YES.

3    **Q.**    AND EVEN AFTER THAT INJUNCTION ISSUED, FRESENIUS DID NOT

4    RELEASE THE K1 INTO THE MARKETPLACE, RIGHT?

5    **A.**    YES.

6    **Q.**    IT CONTINUED TO SELL THE 2008K WITH THE TOUCH SCREEN USER

7    INTERFACE, RIGHT?

8    **A.**    YES.

9    **Q.**    AND IT DID SO UP UNTIL JANUARY 2009, CORRECT?

10   **A.**    YES.

11   **Q.**    FRESENIUS, FROM NOVEMBER 2007 UNTIL JANUARY OF 2009, HAD

12   THE OPTION NOT TO SELL A TOUCH SCREEN HEMODIALYSIS MACHINE,

13   CORRECT?

14   **A.**    I DON'T UNDERSTAND THE QUESTION.

15   **Q.**    AT THE POINT THE COURT ENTERED THE INJUNCTION, FRESENIUS

16   COULD HAVE STOPPED SELLING THE 2008K, CORRECT?

17   **A.**    I DON'T UNDERSTAND THE QUESTION.

18          YOU'RE SAYING CAN -- COULD FRESENIUS STOP SELLING

19   THE 2008K?  YES.  SURE.

20   **Q.**    THEY COULD HAVE BACK IN NOVEMBER 2007?

21   **A.**    I GUESS YOU CAN QUIT SELLING A MACHINE AT ANY POINT, YES.

22   **Q.**    CORRECT.

23          YOU AGREE WITH ME FROM NOVEMBER 2007 UNTIL JANUARY

24   OF 2009 FRESENIUS WAS SELLING THE 2008K THAT HAD A TOUCH SCREEN

25   AND DID SO FOR 14 MONTHS, CORRECT?

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/13 Page 166 of 232 PageID# 34011
Case 4:09-cv-01434-PJH Document 556 Filed 06/01/12 Page 169 of 291   169
CRNKOVICH - CROSS / MR. ABERNATHY

1    **A.**   YES.

2    **Q.**   AND YOU ALSO UNDERSTOOD AT THE TIME FROM 2007,

3    NOVEMBER 2007 UNTIL JANUARY 1ST, 2009, THAT THAT MACHINE, THE

4    2008K HAD BEEN ADJUDGED TO BE INFRINGING?

5    **A.**   YES.  THAT'S MY UNDERSTANDING.

6              **MR. ABERNATHY:**  COULD WE GO TO THE NEXT SLIDE,

7    PLEASE.

8              THAT'S THE SLIDE.  COULD YOU GO UP, PLEASE?  THE ONE

9    YOU HAD WITH THE TEXT.

10             (SLIDE DISPLAYED ON SCREEN.)

11   **BY MR. ABERNATHY:**

12   **Q.**   SO, MR. CRNKOVICH, I AM SHOWING YOU LANGUAGE FROM JUDGE

13   ARMSTRONG'S INJUNCTION ORDER IN THIS CASE WHERE SHE FOUND IT

14   BEWILDERING THAT, HAVING ADMITTED TO INFRINGING THE PATENTS FOR

15   NEARLY TWO YEARS, AND HAVING KNOWN FOR AT LEAST A YEAR THAT AN

16   INJUNCTION WAS ALL BUT INEVITABLE, FRESENIUS HAS APPARENTLY

17   DONE NOTHING TO IMPLEMENT ANY ALTERNATIVE TO THE 2008K.

18             AT THE TIME THIS INJUNCTION WAS ISSUED, FRESENIUS

19   HAD DONE NOTHING TO COMMERCIALIZE AN ALTERNATIVE TO THE 2008K,

20   CORRECT?

21   **A.**   I DISAGREE.  NO.  WE -- WE -- WE WERE WORKING ON K1.  WE

22   WERE WORKING ON -- WE ULTIMATELY WERE WORKING ON K2, BUT WE

23   WERE DOING SOMETHING.

24   **Q.**   OKAY.  BUT THERE'S NOTHING IN THE MARKETPLACE AT THAT

25   TIME, RIGHT?

Case 3:09-cv-00680-REF Document 1031-1 Filed 03/21/13 Page 167 of 232 PageID# 34012
Case 3:09-cv-01434-WHF Document 156 Filed 08/02/12 Page 100 of 291    100
CRNKOVICH – CROSS / MR. ABERNATHY

1          AN ALTERNATIVE TO THE 2008K IN THE MARKET THAT

2    FRESENIUS COULD HAVE TURNED TO; IS THAT RIGHT?

3    **A.**   YES.

4    **Q.**   NOW, WE HAVE TALKED ABOUT THIS COMPANY CALLED ALTHIN.  YOU

5    UNDERSTAND THAT ALTHIN WAS A HEMODIALYSIS MACHINE COMPANY IN

6    THE MARKETPLACE THAT BAXTER ACQUIRED, RIGHT?

7    **A.**   YES.

8    **Q.**   ALTHIN WAS THE FIRST COMPANY IN THE MARKET TO INTRODUCE A

9    TOUCH SCREEN USER INTERFACE ON A HEMODIALYSIS MACHINE, RIGHT?

10   **A.**   YES.

11   **Q.**   AND DURING THE DEVELOPMENT OF THE 2008K, PRIOR TO ITS

12   RELEASE IN AUGUST OF 2000, YOU HAD AN ALTHIN TOUCH SCREEN USER

13   INTERFACE MACHINE AT YOUR RESEARCH FACILITY, CORRECT?

14   **A.**   YES.  THAT'S CORRECT.

15   **Q.**   AND YOU TURNED THAT MACHINE ON, RIGHT?

16   **A.**   WE TURNED IT ON, YES, AND IT DIDN'T WORK.

17   **Q.**   YOU LOOKED AT THE SCREENS OF THE MACHINE, CORRECT?

18   **A.**   YES.

19   **Q.**   YOU ALSO HAD AN ALTHIN USER'S MANUAL, RIGHT?

20   **A.**   YES.

21   **Q.**   AT THE TIME YOU DEVELOPED THE 2008K, YOU HAD THE ALTHIN

22   TOUCH SCREEN USER INTERFACE PATENTS, TOO, CORRECT?

23   **A.**   YES.

24   **Q.**   AND YOU READ THOSE PATENTS, RIGHT?

25   **A.**   YES.

1          (PAUSE IN THE PROCEEDINGS.)

2  **Q.**   NOW, WE TALKED ABOUT REDESIGN MACHINES.  I WANT TO TALK

3  ABOUT ONE MORE HERE.

4          IN NOVEMBER OF 2001, DIDN'T FRESENIUS INTRODUCE A

5  MACHINE CALLED THE 2008, WAS IT T?

6  **A.**   YES.

7  **Q.**   AND THAT MACHINE IS A HEMODIALYSIS MACHINE?

8  **A.**   THAT'S CORRECT.  YES.

9  **Q.**   THAT MACHINE HAS A TOUCH SCREEN USER INTERFACE ON IT,

10  DOESN'T IT?

11  **A.**   IT HAS, YES.

12  **Q.**   AND IT RECEIVED 510K CLEARANCE, CORRECT?

13  **A.**   IT RECEIVED 510K CLEARANCE, YES.

14  **Q.**   HAVE YOU SEEN ANY ADVERTISING FOR THAT MACHINE WHERE

15  FRESENIUS HAS SAID IN 2011 THAT THIS NEW MACHINE NOW HAS TOUCH

16  SCREEN NAVIGATION?

17  **A.**   I DON'T RECALL.

18          **MR. ABERNATHY:**  CAN WE SEE SLIDE 62, PLEASE?

19              (SLIDE DISPLAYED ON SCREEN.)

20  **BY MR. ABERNATHY:**

21  **Q.**   I AM SHOWING YOU -- AND WE WILL MARK THIS FOR THE RECORD,

22  BUT IT'S -- WE WILL CALL IT HEARING EXHIBIT A1 TEMPORARILY.

23          NOW, YOU RECOGNIZE THIS AS A BROCHURE FOR THE 2008T,

24  CORRECT?

25  **A.**   THAT'S CORRECT.

Case 3:09-cv-00688-RFB Document 1021-1 Filed 03/21/13 Page 169 of 232 PageID# 34014
Case 3:09-cv-01434-PJH Document 156 Filed 08/02/12 Page 168 of 291      168
CRNKOVICH – CROSS / MR. ABERNATHY

1   Q.   AND THIS WAS INTRODUCED BY FRESENIUS IN NOVEMBER OF THIS

2   YEAR, RIGHT?

3   A.   YES.

4   Q.   AND IT WAS RELEASED IN PHILADELPHIA AT THE ASN CONVENTION,

5   RIGHT?

6   A.   IT WAS AT THE ASN CONVENTION, YES.

7   Q.   THE ASN CONVENTION IS THE LARGEST NEPHROLOGY SHOW IN THE

8   UNITED STATES, ISN'T IT?

9   A.   YES.

10  Q.   IN THE WORLD?

11  A.   YES.

12  Q.   AND AT THAT SHOW, DIDN'T FRESENIUS RELEASE BROCHURES THAT

13  SHOWED THIS NEW TOUCH SCREEN HEMODIALYSIS MACHINE FEATURING

14  TOUCH SCREEN NAVIGATION?

15  A.   YES.

16  Q.   AND YOU AGREE WITH ME -- DIFFERENT TOPIC -- THAT THE 2008K

17  WAS DESIGNED TO WORK TOGETHER WITH THE DISPOSABLE PRODUCTS THAT

18  WE HAVE TALKED ABOUT TODAY, DIALYZERS, FISTULA NEEDLES,

19  TUBINGS, ET CETERA, RIGHT?

20  A.   YES.

21  Q.   THEY WORK TOGETHER?

22  A.   YES.

23  Q.   AND THEY ARE DESIGNED TO WORK TOGETHER?

24  A.   YES.

25  Q.   THAT'S SOMETHING FRESENIUS TOUTS IN ITS ADVERTISING?

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/13 Page 170 of 232 PageID# 34015
Case 3:09-cv-01434-PJH Document 156 Filed 06/02/12 Page 169 of 291    169
CRNKOVICH - CROSS / MR. ABERNATHY

1    **A.**   WE TOUT THAT THE MACHINE WORKS WITH DIALYZERS, BLOODLINES,

2    CONCENTRATES.  YES.

3              **MR. ABERNATHY:**  CAN I SEE SLIDE 64, PLEASE?

4                   (SLIDE DISPLAYED ON SCREEN.)

5    **BY MR. ABERNATHY:**

6    **Q.**   I TOOK THIS OFF FRESENIUS' WEBSITE.

7              "TODAY FRESENIUS MEDICAL CARE IS THE LEADING

8              PROVIDER OF DIALYSIS MACHINES AND DISPOSABLES IN

9              THE UNITED STATES WITH A SYSTEM OF PRODUCTS

10             DESIGNED TO WORK TOGETHER."

11             DO YOU SEE THAT?

12   **A.**   YES.

13   **Q.**   THE SYSTEM OF PRODUCTS INCLUDE THE DISPOSABLES THAT WE

14   HAVE BEEN TALKING ABOUT TODAY, RIGHT?

15   **A.**   YES.

16   **Q.**   AND THEY FUNCTION TOGETHER AS WELL, DON'T THEY?

17   **A.**   YES.

18   **Q.**   THE DESIGN WORKS?

19   **A.**   THEY'RE SUPPOSED -- YES.  OF COURSE.

20             **MR. ABERNATHY:**  THAT'S ALL I HAVE, YOUR HONOR.

21             **THE COURT:**  ALL RIGHT.  ANYTHING ELSE?

22             **MS. BROOKS:**  JUST VERY BRIEFLY, YOUR HONOR.

23             MIGHT WE HAVE A COPY OF THE SLIDES THAT WERE

24   REFERRED TO WITH MR. CRNKOVICH?

25             **THE COURT:**  DO YOU HAVE -- I ASSUME ALL OF YOU HAVE

Case 3:09-cv-00689-RFB Document 1031-1 Filed 03/21/18 Page 171 of 232 PageID# 34016
Case4:03-cv-01431-PJH Document156 Filed08/02/12 Page170 of 291        170
CRNKOVICH – REDIRECT / MS. BROOKS

 1    SHARED ALL OF YOUR SLIDES WITH EACH OTHER.

 2                    (COUNSEL CONFER.)

 3            **MS. BROOKS:**  WE NOW HAVE THE SLIDES.  THANK YOU.

 4                    **REDIRECT EXAMINATION**

 5    **BY MS. BROOKS:**

 6    **Q.**   JUST A COUPLE OF THINGS I WANT TO GET CLEAR,

 7    MR. CRNKOVICH.

 8            WHEN THE COURT ORDERED THE INJUNCTION, FRESENIUS WAS

 9    ENJOINED BASED ON NOT JUST THE '434 PATENT, BUT THE '027 PATENT

10    AND THE '131 PATENT; IS THAT RIGHT?

11    **A.**   YES, THAT'S CORRECT.

12    **Q.**   NOW WHEN FRESENIUS WENT TO TRIAL IN 2006, WAS IT OUR

13    POSITION THAT THOSE PATENTS WERE INVALID?

14    **A.**   YES.

15    **Q.**   DID THE JURY AGREE WITH US?

16    **A.**   YES.

17    **Q.**   AND WHEN WE WENT UP TO THE FED CIRCUIT, DID THE FED

18    CIRCUIT AGREE ON TWO OUT OF THE THREE PATENTS?

19    **A.**   YES.

20    **Q.**   AND AS OF TODAY, HAS THE BOARD OF PATENT APPEALS AGREED ON

21    THE FINAL PATENT?

22    **A.**   YES.

23    **Q.**   AND WE'LL SEE WHAT THE FED CIRCUIT DOES WITH THAT ONE.

24            BUT DESPITE THAT, STARTING IN JUNE OF 2006, YOU AND

25    YOUR TEAM BEGAN EFFORTS TO DESIGN AROUND AT LEAST THE PART

Case 3:09-cv-00620-REP Document 1021-1 Filed 03/24/13 Page 172 of 232 PageID# 34017
Case 3:09-cv-01493-PJH Document 156 Filed 08/02/12 Page 173 of 291   171
CRNKOVICH – REDIRECT / MS. BROOKS

 1    ABOUT CHANGING PARAMETERS BY USING A TOUCH SCREEN; IS THAT

 2    RIGHT?

 3    **A.**    YES.  THAT'S CORRECT.

 4    **Q.**    AND WAS THAT A DIFFICULT DESIGN AROUND?

 5    **A.**    NO.  THAT WAS VERY EASY.

 6    **Q.**    WHEN WAS IT READY TO GO AS FAR AS IF WE HAD ONLY BEEN

 7    ENJOINED ON THE '434 PATENT, AND THE '027 WAS STILL DEEMED

 8    INVALID, WHEN WOULD THAT DESIGN AROUND HAVE BEEN READY TO GO?

 9    **A.**    JANUARY OF 2009.

10    **Q.**    2009 OR '8?

11    **A.**    2008.

12    **Q.**    WHY DID IT TAKE LONGER TO DO THE K2 DESIGN AROUND WHERE

13    THERE IS NO TOUCH SCREEN AT ALL?

14    **A.**    THE TOUCH -- THE K2 REQUIRED A HARDWARE CHANGE, FRONT

15    PANEL CHANGE, ELECTRONICS, AND IT WAS A PRETTY ELABORATE

16    CHANGE.

17    **Q.**    AND DO YOU RECALL HOW LONG THAT TOOK, THAT DESIGN AROUND

18    EFFORT?

19    **A.**    NINE MONTHS.

20    **Q.**    NOW, WE DON'T HAVE ALL OF THE BROCHURES, BUT WERE THESE

21    SAME BROCHURES THAT WERE SHOWN TO HER HONOR TODAY WITH THE

22    TOUCH AND SO ON, WERE THEY SHOWN TO THE JURY IN THE FIRST

23    TRIAL?

24    **A.**    YES.

25    **Q.**    WERE THEY SHOWN TO THE JURY THE DAMAGES TRIAL?

1   **A.**   YES.

2   **Q.**   AND MR. POWELL'S TESTIMONY THAT YOU WERE SHOWN WHERE HE

3   SAID THAT THE TOUCH SCREEN WAS, I THINK IT WAS DATED -- TRYING

4   TO FIND IT IN HERE.

5          HERE WE ARE -- I CAN'T FIND IT, BUT IT WAS

6   MR. POWELL'S TESTIMONY FROM THE OCTOBER 2007 TRIAL.  DO YOU

7   RECALL THAT?

8   **A.**   YES.

9   **Q.**   AND WAS THAT THE DAMAGES TRIAL?

10  **A.**   YES.

11  **Q.**   DID THE JURY FIND THE APPROPRIATE DAMAGES WAS 91,000 FOR

12  DISPOSABLES?

13  **A.**   YES.

14  **Q.**   AND 14 MILLION FOR MACHINES?

15  **A.**   YES.

16  **Q.**   AND LASTLY, AS FAR AS DISPOSABLES ARE CONCERNED, ARE

17  FRESENIUS MACHINES DESIGNED TO WORK TOGETHER WITH ANYONE'S

18  DISPOSABLES?

19  **A.**   CORRECT.  I THINK THAT WAS ONE OF OUR BIG FEATURES IS THAT

20  WE COULD WORK WITH ANYBODY'S DISPOSABLES.

21  **Q.**   AND COULD YOUR DISPOSABLES WORK WITH ANYONE ELSE'S

22  MACHINES?

23  **A.**   YES.

24  **Q.**   WAS THAT A PURPOSE -- WAS THAT ON PURPOSE?

25  **A.**   YES.

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/13 Page 174 of 232 PageID# 34019
Case 4:09-cv-01405-PJH Document 156 Filed 08/02/12 Page 173 of 291          173
CRNKOVICH - REDIRECT / MS. BROOKS

1        **MS. BROOKS:** THANK YOU. NO FURTHER QUESTIONS.

2        THANK YOU, YOUR HONOR.

3        **THE COURT:** ALL RIGHT.

4        ANYTHING ELSE, MR. ABERNATHY?

5        **MR. ABERNATHY:** NO, YOUR HONOR.

6        **THE COURT:** THANK YOU, MR. CRNKOVICH. YOU MAY STEP

7    DOWN.

8        ALL RIGHT. WE HAVE ANOTHER HOUR, SO HOW ARE WE

9    GOING TO USE THAT?

10       **MS. BROOKS:** YOUR HONOR, WE HAVE DR. LIPPS, WHICH

11   SHALL BE VERY BRIEF, AND THEN WE HAVE DR. RUBINFELD.

12       UNFORTUNATELY WE DON'T HAVE TOO MUCH CONTROL OVER

13   THE CROSS-EXAMINATION. I CAN JUST MAKE THE DIRECT AS BRIEF AS

14   POSSIBLE.

15       **THE COURT:** ALL RIGHT.

16       **MS. BROOKS:** WE CALL DR. LIPPS.

17       **THE CLERK:** PLEASE RAISE YOUR RIGHT HAND.

18                       **BEN J. LIPPS,**

19   CALLED AS A WITNESS FOR THE PLAINTIFFS, HAVING BEEN DULY SWORN,

20   TESTIFIED AS FOLLOWS:

21       **THE WITNESS:** I DO.

22       **THE CLERK:** PLEASE STATE YOUR FULL NAME AND SPELL

23   YOUR LAST NAME.

24       **THE WITNESS:** BEN J. LIPPS, L-I-P-P-S.

25       **MS. BROOKS:** YOUR HONOR, THE GOOD NEWS IS I HAVE

Case 3:09-cv-00600-REP Document 1031-1 Filed 03/21/18 Page 175 of 232 PageID# 34020
Case 3:09-cv-01431-PJH Document 136 Filed 09/02/12 Page 174 of 291    174
LIPPS – DIRECT / MS. BROOKS

1    ONLY ONE DEMONSTRATIVE WITH DR. LIPPS.  IF I MIGHT APPROACH?

2          (DEMONSTRATIVE HANDED TO COURT AND LAW CLERK.)

3                    **DIRECT EXAMINATION**

4    **BY MS. BROOKS:**

5    **Q.**   GOOD AFTERNOON, DR. LIPPS.

6          YOU'VE ALREADY MET HER HONOR BEFORE IN THE

7    PERITONEAL DIALYSIS CASE, BUT JUST TO REFRESH THE COURT'S

8    RECOLLECTION BECAUSE IT HAS BEEN SOME TIME, COULD YOU PLEASE

9    TELL THE COURT WHAT YOUR POSITION IS AT FRESENIUS?

10   **A.**   YES.  I AM CEO OF THE GLOBAL COMPANY AND CHAIRMAN OF THE

11   BOARD OF THE MANAGEMENT BOARD FOR THE GLOBAL COMPANY.

12   **Q.**   AND AT THE PREVIOUS TRIAL, WE WERE FOCUSED ON PERITONEAL

13   DIALYSIS MACHINES.  NOW WE ARE FOCUSED ON HEMODIALYSIS

14   MACHINES.

15         WHAT TYPE OF TECHNICAL BACKGROUND DO YOU HAVE THAT

16   WOULD ENABLE YOU TO EXPLAIN TO THE COURT THE DETAILS OF A

17   HEMODIALYSIS MACHINE?

18   **A.**   I HAVE A BS, MS AND PH.D. IN CHEMICAL ENGINEERING.  SO,

19   TECHNOLOGY HAS BEEN MY TRAINING.

20   **Q.**   AND, IN FACT, I THINK YOU MAY HAVE TESTIFIED IN THE

21   HEMODIALYSIS CASE THAT ESSENTIALLY A HEMODIALYSIS MACHINE IS

22   LIKE A SMALL CHEMICAL PLANT?

23   **A.**   THAT'S WHY WE CHEMICAL ENGINEERS GOT INVOLVED MANY YEARS

24   AGO.  YOU ARE BASICALLY PROCESSING BLOOD, BUT YOU HAVE TO DO IT

25   VERY SENSITIVE AND THERE'S A NUMBER OF THINGS THAT WE'VE

LIPPS - DIRECT / MS. BROOKS

1   DEVELOPED OVER THE YEARS SO THAT THE TREATMENT GOES WELL AND

2   PATIENTS DON'T HAVE PROBLEMS WHEN THEY ARE DIALYZED.

3   **Q.**   COULD YOU EXPLAIN BRIEFLY TO THE COURT HOW A DIALYSIS

4   TREATMENT, HOW THE MACHINE HELPS THE DIALYSIS TREATMENT?

5          WHAT HAPPENS?  THE PATIENT GETS HOOKED UP, AND THEN

6   WHAT HAPPENS?

7   **A.**   WELL, WE BASICALLY WILL REMOVE THEIR WASTE BY RUNNING THE

8   BLOOD THROUGH THE ARTIFICIAL KIDNEY, HAVING IT DEFUSED THROUGH

9   THE MEMBRANES, AND THEN CARRIED AWAY BY THE DIALYSATE, WHICH IS

10  A CONCENTRATE THAT WE TALKED ABOUT.

11         ONE OF THE REAL FEATURES OVER THE YEARS AND THAT'S

12  WHY THE H WAS --

13  **Q.**   YOU ARE GOING TO HAVE TO SLOW WAY DOWN.

14  **A.**   ONE OF THE ISSUES DURING DIALYSIS IS WHAT HAPPENS TO BLOOD

15  PRESSURE, A NUMBER OF THINGS, BECAUSE YOU DO HAVE A SIGNIFICANT

16  AMOUNT OF BLOOD OUTSIDE THE BODY, SO YOU HAVE TO MONITOR THE

17  PATIENT.  AND YOU HAVE TO BASICALLY CONTROL A NUMBER OF

18  FEATURES SO THAT YOU DON'T ESSENTIALLY PUT THEM INTO

19  HYPERTENSION OR CAUSE A NUMBER OF PROBLEMS.

20         SO SAFETY, RELIABILITY, AND ALSO WHAT THE SYSTEM

21  DOES IS VERY IMPORTANT OVER THE YEARS, AND THAT'S WHY WE HAVE

22  BEEN SUCCESSFUL.  WE HAVE EMPHASIZED THAT.

23  **Q.**   BEFORE COMING TO FRESENIUS, WERE YOU WITH A COMPANY CALLED

24  SERATRONICS?

25  **A.**   YES.

LIPPS – DIRECT / MS. BROOKS

1    **Q.**   DID YOU PARTICIPATE IN HELPING TO CREATE THE FIRST

2    COMPUTER-CONTROLLED HEMODIALYSIS MACHINE?

3    **A.**   YES.  THAT WAS THE SERATRON BACK IN THE EARLY '80S.

4    **Q.**   NOW, WE HAVE BEEN TALKING ABOUT DIALYZERS BEING A

5    DISPOSABLE.  DID YOU MAKE ANY CONTRIBUTION TO THE FIELD OF

6    DIALYZERS?

7    **A.**   A LITTLE BIT.

8    **Q.**   COULD YOU TELL THE COURT?

9    **A.**   I DEVELOPED THE HOLLOW FIBER DIALYZER BACK IN THE '60S.

10   AND WE BASICALLY COMMERCIALIZED IT THEN THROUGH THE '70S.

11          SO I THINK RIGHT NOW, WE, AS FRESENIUS MEDICAL CARE,

12   MAKE 100 MILLION DIALYZERS A YEAR AND WE ARE ABOUT HALF THE

13   BUSINESS AROUND THE WORLD.  THERE'S ABOUT 250 MILLION

14   ARTIFICIAL KIDNEYS PRODUCED EVERY YEAR.  THIS WAS ALL PART OF

15   OUR DEVELOPMENT OVER THE LAST 40 YEARS.  '66 TO 2000.

16          **THE COURT:**  THOSE CAN'T BE REUSED, CAN THEY?

17          **THE WITNESS:**  WELL, IN SOME COUNTRIES THEY DO FOR

18   ECONOMICS.  BUT WE, AS A COMPANY, DON'T ENCOURAGE IT.  WE HAVE

19   GOTTEN THE PRICE DOWN TO WHERE THEY CAN FORWARD TO DO IT.

20          SO RIGHT NOW IN THE U.S., IT IS PROBABLY 70 PERCENT

21   NONUSE -- WE CALL IT SINGLE USE.  IN EUROPE, IT'S CLOSER TO A

22   HUNDRED PERCENT.  IN LATIN AMERICA IT'S MORE LIKE 30 PERCENT

23   SINGLE USE.

24          **THE COURT:**  HOW MUCH DO THOSE COST?

25          **THE WITNESS:**  WE SELL THEM FOR ABOUT, SOMEWHERE

Case 3:09-cv-00688-REP Document 1031-1 Filed 03/21/18 Page 178 of 232 PageID# 34023
Case 4:09-cv-01434-PJH Document 156 Filed 08/02/12 Page 177 of 231   177
LIPPS - DIRECT / MS. BROOKS

1    BETWEEN TEN, $11.  AND THERE'S 10,000 HOLLOW FIBERS IN THERE

2    AND YOU HAVE TO MAKE SURE THAT THEY DON'T LEAK.  IT'S A LOT OF

3    TECHNOLOGY.

4              **THE COURT:**  10 OR $11?

5              **THE WITNESS:**  YES.  IT IS ALL AUTOMATED.  AND IT'S

6    BEEN -- BUT YOU HAVE TO DO THAT BECAUSE THERE HAVE BEEN NO

7    REIMBURSEMENT INCREASES FOR 20 YEARS.  SO YOU REALLY HAVE TO

8    KEEP DECREASING THE COST, BUT DON'T GIVE UP QUALITY.

9    **BY MS. BROOKS:**

10   **Q.**   NOW, WERE THESE DIALYZERS DESIGNED TO ONLY FUNCTION ON

11   FRESENIUS HEMODIALYSIS MACHINES?

12   **A.**   NO.  WE WERE THE ONLY COMPANY BACK IN THE '80S THAT TOOK

13   THE PATH THAT WE WANT OUR MACHINE TO WORK WITH EVERY DIALYZER,

14   EVERY MANUFACTURER OF BLOODLINE, EVERY CONCENTRATE, AND OUR

15   COMPETITION SORT OF WENT THE OTHER WAY TO SELL DISPOSABLES.

16              BUT THAT'S PAID OUT VERY WELL BECAUSE OVER TIME YOU

17   CAN USE OUR PRODUCTS ON ANY MACHINE AND YOU CAN USE ANYBODY'S

18   PRODUCTS ON OUR MACHINE.

19   **Q.**   WHY DID YOU GO THAT PATH RATHER THAN HAVE WHAT WOULD BE

20   CALLED DEDICATED DISPOSABLES?

21   **A.**   BECAUSE I FELT OVER TIME YOU COULD NEVER GUARANTEE THAT

22   YOU WOULDN'T HAVE A QUALITY PROBLEM.  AND IF THEY CAN'T USE

23   YOUR PRODUCT, YOUR MACHINE, WITHOUT USING SOMEONE ELSE'S

24   PRODUCT, YOU ARE GOING TO JEOPARDIZE THE LIFE OF THOSE

25   PATIENTS.

Case 3:09-cv-00629-REP Document 1031-1 Filed 03/21/13 Page 179 of 232 PageID# 34024
Case 3:09-cv-01431-PJH Document 156 Filed 03/02/12 Page 178 of 231    178
LIPPS — DIRECT / MS. BROOKS

1          GAMBRO, BAXTER, ALL OF THEM HAVE DONE THAT OVER THE

2    YEARS, AND BASICALLY THAT'S WHAT HAPPENED.  SO WE VERY MUCH

3    WANT TO MAKE SURE THE PATIENT IS PROTECTED.  IF WE HAVE A

4    PROBLEM THAT WE CAN'T PRODUCE DIALYZERS, SOMEONE ELSE SHOULD BE

5    ABLE TO STEP IN.

6    **Q.**   LET ME GET MY READING GLASSES, DR. LIPPS.

7          ARE DIALYZERS EVER SOLD AS PART OF THE MACHINE?  IN

8    OTHER WORDS, COME IN THE BOX WITH THE MACHINE?

9    **A.**   IT'S TOTALLY DIFFERENT LOGISTICS AND HOW THEY ARE

10   PURCHASED.  SO THEY ARE NOT RELATED TO THE MACHINE.

11   **Q.**   IN FACT, ARE THEY A PRESCRIPTION --

12   **A.**   YES, THEY ARE A PRESCRIPTION --

13   **Q.**   -- COMMODITY?

14   **A.**   -- ITEM, RIGHT.

15         YOU HAVE TO HAVE A PRESCRIPTION AND THEY ARE

16   ORDERED, BASICALLY, ALONG WITH THE OTHER DISPOSABLES THROUGH A

17   DIFFERENT SYSTEM.

18   **Q.**   WHO PRESCRIBES THEM?

19   **A.**   PHYSICIAN.  ALL OF THIS IS PRESCRIBED BY A PHYSICIAN.

20   **Q.**   DOES FRESENIUS EVER TELL THE PHYSICIANS WHAT DIALYZERS

21   THEY ARE TO PRESCRIBE?

22   **A.**   ABSOLUTELY NOT.  WE TREAT ALMOST 230,000 PATIENTS IN OUR

23   OWN CLINICS, AND ONE OF THE THINGS WE HAVE DONE AROUND THE

24   WORLD IS THAT THE PHYSICIAN GETS TO DECIDE THE DIALYZER.  AND

25   WE ABSOLUTELY MAKE SURE BECAUSE THEY ARE WRITING THE

LIPPS – DIRECT / MS. BROOKS

1  PRESCRIPTIONS.  THOSE PATIENTS ARE THEIR PATIENTS, NOT OURS.

2  SO THEY WRITE THE PRESCRIPTION.

3  **Q.**   NOW, DR. LIPPS, DID YOU TESTIFY AT THE FIRST TRIAL IN THIS

4  CASE IN JUNE OF 2006?

5  **A.**   YES, I DID.

6  **Q.**   AND WAS IT YOUR BELIEF AT THAT POINT IN TIME THAT BAXTER'S

7  CLAIMS THAT PUTTING A TOUCH SCREEN ON A HEMODIALYSIS MACHINE

8  WERE NEW AND NOVEL AND NONOBVIOUS, WAS IT YOUR BELIEF THAT THEY

9  WERE, IN FACT, VERY OBVIOUS AND --

10 **A.**   WELL, I MEAN, WE CERTAINLY PRESENTED OUR POSITION THAT

11 THOSE WERE INVALID PATENTS, AND THAT WAS CERTAINLY NOT

12 SOMETHING IN ITSELF THAT WAS NOVEL AND PATENTABLE.  WE MADE OUR

13 CASE, AND I THINK THAT WAS -- THEY UNDERSTOOD THAT.

14         AND THAT'S STILL MY BELIEF.  AND I THINK ALL THE

15 RECORD OVER THE LAST NUMBER OF YEARS -- THE -- IN THE U.S.

16 TODAY, WE STILL HAVE BRAUN THAT HAS A TOUCH SCREEN.  IT'S A

17 GERMAN MADE MACHINE, BUT IT'S RELIABLE.  AND SO THEY HAVE ABOUT

18 3 TO 4 PERCENT OF THE MARKET.

19         AND MARTY IS TALKING ABOUT MARKET SHARE, WE ARE

20 MEASURING IT IN FRACTIONS NOW.  THE QUESTION IS WE INTRODUCED

21 THE K, DID ALTHIN, WITH THEIR TOUCH SCREEN, GET ANY MORE

22 BUSINESS, AND THE ANSWER IS NO.

23         SO THAT'S WHY IT'S A CONVENIENCE, NOT A -- NOTHING

24 SIGNIFICANT.

25 **Q.**   HOW DID YOU FEEL ABOUT THE TOUCH SCREEN PERSONALLY?

LIPPS – DIRECT / MS. BROOKS

1    **A.**   I WOULDN'T LET -- CHRISTIAN AND THE GUYS THAT -- EVEN BACK

2    BEFORE THAT WANTED TO PUT IT ON THE MACHINE AND I WOULD NOT

3    ALLOW THAT BECAUSE IT WAS NOT RELIABLE.

4            I THINK TIME HAS PROBABLY SHOWN THAT THAT'S -- WAS

5    THE RIGHT DECISION.

6    **Q.**   IS THAT ONE OF THE REASONS WHY THE IMPORTANT KEYS, TO THIS

7    DAY, ARE NOT ON THE TOUCH SCREEN?

8    **A.**   WELL, I HAVE TO SAY, I HAVE LOST A LITTLE TOUCH WITH

9    EXACTLY WHAT THE GUYS HAVE DONE IN THE LAST THREE OR FOUR

10   YEARS, BUT TO ME IT'S ALL ABOUT RELIABILITY.

11           YES, IT'S A LITTLE MORE CONVENIENT, BUT I THINK

12   THAT -- THERE'S A LOT OF OTHER THINGS ABOUT THE MACHINE THAT

13   ARE -- THAT ARE MUCH MORE MEDICAL AND ACTUALLY THEY ARE

14   CONVENIENT, TOO.

15   **Q.**   SO LET'S CUT TO THAT THEN.

16           IN OCTOBER OF 2007, WE HAD ANOTHER TRIAL ON DAMAGES.

17   DID YOU TESTIFY AT THAT TRIAL?

18   **A.**   YES, I DID.

19   **Q.**   AND WE HAVE SEEN TESTIMONY FROM MR. POWELL WHO ALSO

20   TESTIFIED AT THAT TRIAL REGARDING BUNDLING.

21           DO YOU RECALL SEEING THAT?

22   **A.**   RIGHT.

23   **Q.**   CAN YOU EXPLAIN TO THE COURT WHAT IS MEANT BY BUNDLING

24   WHEN FRESENIUS USES THAT TERM?

25   **A.**   BUNDLING REFERS ONLY TO THE DISPOSABLES.

Case 3:09-cv-00609-RFB Document 1031-1 Filed 03/21/13 Page 182 of 232 PageID# 34027
Case 3:09-cv-01491-PJH Document 156 Filed 08/02/12 Page 181 of 291    181
LIPPS - DIRECT / MS. BROOKS

1          AND SO WHAT WE HAVE DONE OVER THE YEARS, AS OTHER

2     COMPANIES HAVE DONE, TOO, BECAUSE OF NO REIMBURSEMENT INCREASE,

3     WE HAVE FOUND -- WE'VE TRIED TO FIND WAYS IN WHICH WE CAN KEEP

4     THE PRICES FROM GOING UP FOR THE DISPOSABLES BY HAVING A

5     LOGISTIC SYSTEM WITH AN ORDER; THE MORE THEY ORDER FROM US, WE

6     DELIVER IT ON OUR TRUCKS, OBVIOUSLY IT'S MORE EFFICIENT.

7          BUNDLING REFERS ONLY TO THE DISPOSABLES AND DO YOU

8     WANT TO BUY THE CONCENTRATE, THE BLOODLINES AND THE DIALYZERS

9     FROM ONE SOURCE OR DO YOU WANT TO BUY THEM INDIVIDUALLY, WHICH

10    YOU CAN STILL DO.  MOST OF THE -- BECAUSE OF THE COST

11    STRUCTURE, MOST CLINICS WILL BUY SORT OF ONE GROUP OF

12    DISPOSABLES FROM SOMEBODY OR DIFFERENT GROUP OF DISPOSABLES,

13    BUT IT STRICTLY RELATES TO HOW YOU MARKET THE DISPOSABLES FOR

14    ECONOMIC REASONS.

15    Q.   YOU ARE NOT REFERRING TO BUNDLING AS IN BUNDLING THE SALE

16    OF THE MACHINES WITH THE DISPOSABLES?

17    A.   YOU CAN'T DO THAT.  YOU CAN'T OBLIGATE ANYBODY FOR SEVEN

18    YEARS TO USE YOUR DISPOSABLES WHEN YOU SELL THEM A DIALYSIS

19    MACHINE.  THAT'S JUST NOT RIGHT AND IT DOESN'T HAPPEN.

20         NOW, IF YOU GIVE THEM THE MACHINES, THEN THEY'VE GOT

21    TO BUY A CERTAIN AMOUNT OF DISPOSABLES TO PAY FOR THE MACHINE,

22    YOU'RE BASICALLY -- YOU'RE BASICALLY THEIR BANK.  BUT THEY CAN

23    GIVE YOU BACK THE MACHINE AFTER SO MANY TIMES.

24         SO THERE IS A -- THERE'S A CONCEPT THAT'S CALLED

25    BUNDLING WHERE THEY'LL ACTUALLY GIVE SOMEBODY THE MACHINES FOR

Case 3:09-cv-00609-RFP-1 Document 1021-1 Filed 03/21/13 Page 183 of 232 PageID# 34028
Case 4:09-cv-01431-PJH Document 156 Filed 09/02/11 Page 182 of 291

182
LIPPS – DIRECT / MS. BROOKS

1    THE FIVE YEARS IF THEY BUY THEIR DISPOSABLES, BUT THAT'S NOT

2    VERY POPULAR IN THE U.S. BECAUSE THERE'S ENOUGH ECONOMICS,

3    THERE'S ENOUGH -- YOU CAN LEASE THEM, YOU DON'T HAVE TO BUY

4    THEM.  BUT THAT'S --

5    **Q.**   DOES FRESENIUS FOLLOW THAT MODEL YOU JUST DESCRIBED?

6    **A.**   IN CERTAIN COUNTRIES WHERE THERE'S AN ECONOMIC SITUATION,

7    IT'S BETTER FOR US TO LET THEM USE THE MACHINES.  AND IT IS

8    THEIR CHOICE, BECAUSE IF THEY DON'T LIKE THE DISPOSABLES, THEY

9    WON'T -- THEY WON'T -- GAMBRO OFFERS FREE MACHINES, EVERYBODY

10   OFFERS FREE MACHINES IN EUROPE, BUT THEY HAVE TO BUY THE

11   DISPOSABLES BECAUSE THEY WANT THE DISPOSABLES NOT NECESSARILY

12   THE MACHINE.

13   **Q.**   AND HERE IN THE U.S., DO YOU HAVE THAT CONCEPT --

14   **A.**   THAT'S NOT POPULAR HERE BECAUSE MOST CLINICS CAN LEASE

15   MACHINES.  IT'S A CAPITAL EQUIPMENT THING.  THEY BUY THEM ONCE

16   EVERY SIX OR SEVEN YEARS, MAYBE A FEW EXTRA MACHINES AS THEY GO

17   ALONG IF THEY GROW, BUT THEY CAN GET LEASES, AND THOSE ARE

18   VERY --

19              **THE REPORTER:**  I'M SORRY --

20              **THE WITNESS:**  I'M SORRY, I'VE GOT TO SLOW DOWN.

21              IN THE U.S., THERE ARE LEASING COMPANIES THAT WILL

22   LEASE MACHINES TO YOU.  SO WE DON'T NEED TO BE THEIR BANK.

23   OKAY.  AND THEY GET A BETTER -- SO THAT'S WHAT HAPPENS IN THE

24   U.S., BUT THERE ARE CERTAIN COUNTRIES THERE ARE NO LEASING

25   OPPORTUNITIES, SO WE NEED TO PROVIDE THE MACHINES.  AFRICA, AND

LIPPS – DIRECT / MS. BROOKS

 1    VARIOUS PLACES.

 2    **Q.**   NOW, I QUESTIONED MR. DEN UYL -- LET'S GO BACK TO THE WHY

 3    SOMEONE WOULD BUY, FOR EXAMPLE, A FRESENIUS DIALYZER OVER LET'S

 4    SAY A BAXTER DIALYZER.

 5    **A.**   WELL, YOU KNOW, BAXTER GOT OUT OF THE DIALYZER BUSINESS

 6    WITH THE ALTHIN PROBLEM, BUT THEY ARE NOT OUT.  THEY SELL

 7    NIPROS FROM JAPAN.

 8         AND SO THERE ARE GAMBRO, BAXTER AND BRAUN, ALL OF

 9    THEM HAVE DIALYZERS, BUT THEY BASICALLY ARE LOOKING FOR THE

10    QUALITY OF THE DIALYZER, WHAT'S THE PERFORMANCE OF THE

11    DIALYZER.  AND AS WE OFFER NEW PRODUCTS, WE'VE OFFERED -- EVERY

12    COUPLE YEARS WE OFFER A NEW IMPROVED DIALYZER WITH DIFFERENT

13    FEATURES.

14         SO IT'S THE PHYSICIANS DECISION.  HE MAKES THAT

15    DECISION.  HE OR SHE MAKES THAT DECISION.

16    **Q.**   WAS THERE A POINT IN TIME WHEN THERE WAS A PROBLEM AT

17    BAXTER'S MANUFACTURING PLANT IN ITALY THAT CAUSED SOME OF THE

18    DIALYZERS TO ACTUALLY BECOME DEADLY DIALYZERS?

19    **A.**   WELL, I DON'T WANT TO EMPHASIZE ANYTHING ABOUT, BUT

20    MANUFACTURING DIALYZERS WITH 8,000 TO 10,000 LITTLE HAIR-LIKE

21    FIBERS, ALL OF THEM THAT DON'T LEAK AND HAVE HOLES THROUGH

22    THEM, IS NO EASY CONCEPT.

23         SO THAT WAS ALL TRANSFERRED TO ITALY, AND SOMETHING

24    GOT LOST IN THE TRANSLATION.  IT STARTED OUT IN THE U.S. IN

25    MIAMI AND GOT TRANSFERRED.

Case 3:09-cv-00629-REP Document 1031-1 Filed 03/21/13 Page 185 of 232 PageID# 34030
Case 4:09-cv-01491-PJH Document 156 Filed 08/02/12 Page 184 of 291  184
LIPPS — DIRECT / MS. BROOKS

1      AND WHEN THAT HAPPENS, IT'S PRETTY DEVASTATING TO

2   THE PATIENTS, IF SOMETHING CATASTROPHIC LIKE THAT HAPPENS.  I

3   THINK THAT BUSINESS WAS CLOSED DOWN SOMETIME IN THIS TIME

4   PERIOD.

5   **Q.**   LET'S MOVE NOW TO WHAT YOUR TESTIMONY WAS IN THE OCTOBER

6   TRIAL.

7      DID YOU ATTEMPT TO ASSIST THE JURY IN WHAT YOU

8   BELIEVED WAS A REASONABLE ROYALTY AT -- IF THE HYPOTHETICAL

9   NEGOTIATION HAD TAKEN PLACE IN 2000?

10  **A.**   YES, I DID.

11      (SLIDE DISPLAYED ON SCREEN.)

12  **Q.**   AND DID YOU SHOW WHAT WE HAVE UP HERE ON THE SCREEN, DID

13  YOU SHOW THIS DEMONSTRATIVE TO THE JURY?

14  **A.**   YES.  THIS WAS TRYING TO PUT THE TOUCH SCREEN INTO WHAT I

15  WOULD CONSIDER A CONVENIENT -- OR INTO A CONVENIENT SITUATION,

16  WHICH IS WHAT IT IS.

17      SO I PUT IT IN TERMS OF THE FEATURES THAT WE LOOK

18  FOR, CONVENIENCE, AND THAT'S WHERE I THINK IT FALLS, AND THAT'S

19  WHERE IT CONTINUES TO FALL OVER THE YEARS.

20  **Q.**   SO, DR. LIPPS, WHY -- THESE ARE ALL THE FEATURES THAT

21  MR. CRNKOVICH HAS ALREADY TALKED ABOUT, THE NEW FEATURES OF THE

22  2008K ABOVE AND BEYOND WHAT THE H HAD, AND YOU PUT THEM INTO

23  THREE DIFFERENT BUCKETS:  IMPROVED MEDICAL THERAPY FEATURES,

24  FEATURES FOR MORE VERSATILITY, AND CONVENIENCE FEATURES.

25      WHY DID YOU DO THESE THREE BUCKETS?

1  **A.**   WELL, I THINK, OVER MY YEARS, I LOOK AT THE MOST IMPORTANT

2  IS REALLY THE MEDICAL THERAPY.  AND THEN, OF COURSE, THE

3  VERSATILITY, OR THE RELIABILITY, WILL THE MACHINE, OVER SEVEN

4  YEARS, PROVIDE THE DOCTOR WITH THE THERAPY THEY WANT.  AND

5  THEN, FINALLY, YOU GET INTO CONVENIENCE.

6          AND, AGAIN, THE MARKETING GUYS ALWAYS LOOK AT

7  CONVENIENCE AND THINK IT'S KIND OF IMPORTANT, AND IT IS, BUT IT

8  IS ALWAYS NOT THE DRIVING FEATURE OF THE MACHINE.

9          AND I THINK WE HAVE SEEN THAT OVER THE YEARS AS WE

10 MOVE THROUGH THE H.  AND BEFORE THAT WE HAD LITTLE BUTTONS ON

11 THE MACHINE AND EVERYBODY HAD TOUCH SCREENS.  AND IT'S STILL --

12 WE SOLD OUR MACHINES BECAUSE THEY WORKED AND THEY HAD THE

13 FEATURES.

14 **Q.**   WHEN IT COMES TO HEMODIALYSIS MACHINES, FOR WHICH THEY ARE

15 USED FOR LIFE-SAVING HEMODIALYSIS TREATMENTS, IN YOUR

16 EXPERIENCE WOULD THE TOUCH SCREEN DRIVE THOSE SALES?

17 **A.**   IT ISN'T EVEN MY EXPERIENCE.  IT'S WHAT WE HAVE SEEN WITH

18 THE H VERSUS THE ALTHIN, VERSUS THE GAMBRO MACHINES.  THEY ALL

19 HAD TOUCH SCREENS.  AND THEY'RE BOTH NOT ON THE MARKET TODAY

20 FOR VARIOUS QUALITY REASONS.  SO THE ANSWER IS NO.

21          I'VE ALWAYS BELIEVED IT'S RELIABILITY AND QUALITY

22 AND TOUCH SCREEN IS CONVENIENCE, BUT THERE'S ALSO OTHER

23 CONVENIENCE FEATURES YOU CAN SEE THERE.

24 **Q.**   IN YOUR VAST EXPERIENCE, WHAT DRIVES THE SALES OF

25 HEMODIALYSIS MACHINES?  WHAT IS THE CONSUMER LOOKING FOR?

LIPPS — DIRECT / MS. BROOKS

1    **A.**    WELL, THE PHYSICIAN HAS TO BE ABLE TO OFFER THE THERAPY

2    THAT HE WANTS TO OFFER.

3            AND, SECONDLY, IT'S GOT TO BE RELIABLE.  WHEN THE

4    PATIENT COMES TO THE CHAIR AT 5:30 IN THE MORNING, THERE CAN'T

5    BE A BROKEN MACHINE AND TOLD THAT HE CAN'T BE DIALYZED OR HE

6    HAS TO WAIT THREE OR FOUR HOURS.  SO IT'S GOT TO BE -- THE

7    RELIABILITY HAS TO BE THERE.

8            THOSE ARE THE TWO THINGS, I THINK, OVER THE YEARS

9    HAVE BEEN VERY IMPORTANT IN THE DESIGN OF THE MACHINES.

10   **Q.**    NOW, DID YOU SHOW THIS DEMONSTRATIVE TO THE JURY DURING

11   THE DAMAGES TRIAL IN OCTOBER OF 2007?

12   **A.**    I THINK WE DID.

13   **Q.**    NOW, LET'S MOVE TO OUR LATEST CONSTRUCT, WHICH NOW IS THAT

14   YOU ARE SITTING AT THE HYPOTHETICAL NEGOTIATION TABLE, BAXTER

15   IS ON THE OTHER SIDE, AND IT IS NOW LATE 2007 AND YOU ARE

16   FACING, AS MR. DEN UYL SAID, AN INJUNCTION.

17           BASED ON WHAT YOU HEARD MR. CRNKOVICH TESTIFY, WHAT

18   WERE FRESENIUS' OPTIONS AT THAT POINT?

19   **A.**    OKAY.  IT'S 2007.

20           I THINK WE'VE GONE THROUGH -- WE HAD, IN MY MIND,

21   SAID -- HAD WON THE FIRST ROUND OF THE TRIAL, AND CLEARLY

22   THE -- IT REAFFIRMED TO ME THAT THE PATENTS WERE INVALID.

23           AND THEN I THINK IT WAS REVERSED WHERE BASICALLY WE

24   HAD TO FACE THEM ALL AGAIN.

25           SO, FINALLY, WHERE I WAS IN 2007, I CAN'T REMEMBER

Case 3:09-cv-00609-REP Document 1031-1 Filed 03/21/13 Page 188 of 232 PageID# 34033
Case 3:09-cv-01431-PJH Document 156 Filed 08/02/12 Page 187 of 291    187
LIPPS − DIRECT / MS. BROOKS

1   EXACTLY, IS THAT WE CLEARLY HAD A COUPLE OF THE PATENTS, THE

2   '07 THAT SORT OF SAID IF THERE'S ANY TOUCH SCREEN ON THE

3   MACHINE, IT'S GOING TO BASICALLY INFRINGE THAT PATENT.

4            AND SO I MADE THE DECISION, ALONG WITH THE GUYS,

5   LOOK, YOU'VE GOT A VERY INTERESTING ALTERNATIVE, NUMBER ONE,

6   BUT IT STILL HAS A TOUCH SCREEN.  IF WE ARE GOING TO HAVE TO

7   SPEND, BACK IN COURT, WHICH WE ARE, THEN I WANT YOU TO GO TO

8   SOMETHING THAT DOESN'T HAVE A TOUCH SCREEN ON IT.  I DON'T WANT

9   TO BE DISCUSSING THIS.  SO WE DID THAT.

10           AND, OF COURSE, 510K FILING, THE ANSWER TO THAT

11  QUESTION, THERE'S A WHOLE SERIES OF STEPS YOU GO THROUGH TO

12  DETERMINE WHETHER YOU HAVE TO FILE A 510K.  BUT FOR CONVENIENCE

13  YOU CLEARLY DON'T.  SO WE WENT THROUGH THAT STEP AND THAT'S WHY

14  THERE WAS NO FILING OF 510K AT THE TIME THAT WE TALKED ABOUT IT

15  HERE.

16           BUT AT THAT POINT, I WAS, OKAY, WE WILL GO BACK AND

17  TAKE THAT TOTALLY OFF THE K2, AND WE DID THAT WITHIN NINE

18  MONTHS, WHICH −− AND GOT IT ON THE MARKET.  IT'S NOT JUST

19  TAKING IT OFF, IT'S GETTING THE RELIABILITY PROVEN AND ON THE

20  MARKET.

21  **Q.**   DR. LIPPS, THIS IS GOING TO BE A HARD CONSTRUCT FOR YOU.

22  **A.**   OKAY.

23  **Q.**   WE HAVE SOMETHING CALLED THE BOOK OF WISDOM THAT YOU

24  GET −−

25  **A.**   OH, OKAY.

Case 3:09-cv-00629-RFB Document 1031-1 Filed 03/21/13 Page 189 of 232 PageID# 34034
Case 3:09-cv-01431-PJH Document 156 Filed 08/02/12 Page 189 of 291     189
LIPPS – DIRECT / MS. BROOKS

1    Q.    -- THAT YOU GET TO OPEN AT THE HYPOTHETICAL NEGOTIATION

2    TABLE.  AND SO NOT ONLY DO YOU GET TO LOOK BACKWARD, YOU GET TO

3    LOOK FORWARD.

4            ASSUME FOR ME, IF YOU WILL, THAT YOU DON'T HAVE TO

5    WORRY ABOUT THE '027 PATENT ANYMORE WHILE YOU ARE SITTING THERE

6    AT THE HYPOTHETICAL NEGOTIATION TABLE.

7            **MR. ABERNATHY:**  YOUR HONOR, I AM GOING TO OBJECT,

8    THIS IS SPECULATIVE.  PLAINTIFFS' NOVEMBER OF 2007 BOOK OF

9    WISDOM DOESN'T ALLOW YOU TO CHANGE REALITY.  SO I WILL OBJECT

10   ON RELEVANCY GROUNDS AND SPECULATION.

11           **THE COURT:**  WHAT TIME FRAME ARE WE TALKING ABOUT,

12   COUNSEL?

13           **MS. BROOKS:**  IT WOULD BE IN LATE 2007, YOUR HONOR.

14           MY POINT BEING, THE BOOK OF WISDOM ALLOWS YOU TO

15   LOOK INTO THE FUTURE.  AND INTO THE FUTURE, DR. LIPPS WOULD

16   KNOW THAT HE WON'T HAVE TO WORRY ABOUT THE '027 PATENT WHERE

17   YOU CAN'T HAVE A TOUCH SCREEN AT ALL; THAT ALL HE HAS TO WORRY

18   ABOUT IS THE '434 PATENT CLAIM, THAT'S THE ONLY ONE THAT'S

19   GOING TO BE LEFT STANDING AS HE LOOKS INTO THE FUTURE IN THE

20   BOOK OF WISDOM WHERE AS LONG AS YOU DON'T USE THE TOUCH SCREEN

21   TO CHANGE PARAMETERS, THEN HE'S GOT HIMSELF A DESIGN AROUND.

22           AND AS THE PERSON SITTING AT THE HYPOTHETICAL

23   NEGOTIATION TABLE, MY QUESTION TO HIM IS, WOULD HE HAVE THOUGHT

24   HE HAD A DESIGN AROUND ALREADY AT THAT POINT IN TIME LOOKING

25   FORWARD.

Case 3:09-cv-00629-REP Document 1031-1 Filed 03/21/13 Page 190 of 232 PageID# 34035
Case 3:09-cv-01431-PJH Document 156 Filed 08/02/12 Page 189 of 291    189
LIPPS – DIRECT / MS. BROOKS

1          **THE COURT:**  I AM GOING TO ALLOW IT.  OVERRULED.

2     **BY MS. BROOKS:**

3     **Q.**   DR. LIPPS, BASED ON WHAT MR. CRNKOVICH TOLD US ABOUT THE

4     K1 AND IT WAS READY TO GO BY THE END OF 2007, WHERE HE

5     DESCRIBED HOW YOU DID NOT USE THE TOUCH SCREEN TO CHANGE THE

6     PARAMETERS ANYMORE, IN YOUR MIND, WOULD YOU HAVE HAD A WORKING

7     DESIGN AROUND TO THE '434 CLAIM AT THE TIME OF THE HYPOTHETICAL

8     NEGOTIATION?

9     **A.**   '434 CLAIM, ABSOLUTELY.  NO QUESTION ABOUT THAT AT ALL.

10          THE QUESTION IS WHAT WAS GOING TO HAPPEN TO THE '027

11    AND I THINK BY THAT TIME WE HAD SEEN ENOUGH TO SAY THAT WASN'T

12    GOING TO CARRY.

13          SO THE ANSWER IS, YES, WE HAD A WORK AROUND AT THAT

14    POINT THAT WAS CLEARLY, IN MY MIND, WORKED AROUND THE '434

15    PATENT FOR WHATEVER LIFE IT'S GOING TO HAVE UNTIL IT FINALLY

16    WAS INVALIDATED.

17    **Q.**   AND WOULD YOU EVER HAVE TAKEN THE POSITION THAT IT WOULD

18    HAVE BEEN REASONABLE FOR FRESENIUS TO PAY 7 PERCENT OF ITS

19    DISPOSABLES, NONINFRINGING DISPOSABLES, PAY THAT TO BAXTER?

20    **A.**   ABSOLUTELY NOT.  I WOULD HAVE BEEN SUED FOREVER BECAUSE

21    OUR TOTAL PROFIT MARGIN, EVEN THOUGH THE GENTLEMAN LOOKED AT IT

22    IN TERMS OF MANUFACTURING MARGIN, WHICH IS NOT BEFORE SG&A, NOT

23    BEFORE INTEREST, AND NOT BEFORE DEPRECIATION.

24          THERE'S ONLY 7 TO 8 PERCENT, SO I WOULD BE PAYING

25    THEM ALL OF OUR PROFIT FOR THIS PARTICULAR ISSUE, AND I

LIPPS – DIRECT / MS. BROOKS

```
 1    WOULDN'T DO IT.

 2              I'LL TELL YOU WHAT I WOULD HAVE DONE, BUT I WOULDN'T

 3    HAVE DONE THAT.  SO FROM THAT STANDPOINT, THAT WAS NOT RATIONAL

 4    AT THIS POINT.

 5    Q.   AS FAR AS THE 10 PERCENT FOR THE MACHINE, HAVE YOU SEEN

 6    ANY LICENSE, BE IT FRESENIUS, OR BAXTER'S, OR ANYBODY ELSE'S IN

 7    THE INDUSTRY WHERE THEY PAY 10 PERCENT FOR THE RIGHT TO USE A

 8    TOUCH SCREEN ON A -- AS THE USER INPUT MECHANISM?

 9    A.   THAT WASN'T RATIONAL EITHER.  SO THE ANSWER IS NO.

10    Q.   IN FACT, AT THE PREVIOUS TRIAL, DID YOU COME ABOUT IT BY

11    LOOKING AT THE COST DIFFERENTIAL BETWEEN USING THE TOUCH SCREEN

12    VERSUS USING AN ALTERNATIVE INPUT LIKE A MOUSE AND A KEYBOARD?

13    A.   AND I RECOMMENDED IT AT THE TIME, IF THEY WERE SERIOUS

14    ABOUT PATIENT CARE, THEN I WOULD HAVE PAID THAT AMOUNT.  AND IN

15    THE MEANTIME, WE WOULD HAVE -- THERE'S A LOT OF ALTERNATIVES,

16    BUT CLEARLY THIS WAS WAY OFF SCALE IN TERMS OF THE VALUE OF

17    THAT, AND I COULDN'T BE BLACKMAILED INTO IT.

18              MS. BROOKS:  THANK YOU.

19              NO FURTHER QUESTIONS, YOUR HONOR.

20              THE COURT:  ALL RIGHT.  MR. ABERNATHY?

21              THE WITNESS:  GOOD TO SEE YOU AGAIN.

22              MR. ABERNATHY:  DR. LIPPS, GOOD TO SEE YOU AGAIN.

23              THE WITNESS:  THIS IS ROUND THREE, RIGHT?

24              MR. ABERNATHY:  ROUND THREE, BUT WE ARE STILL

25    FRIENDS, RIGHT?
```

LIPPS – CROSS / MR. ABERNATHY

1         **THE WITNESS:** COME ON.

2              **CROSS-EXAMINATION**

3   **BY MR. ABERNATHY:**

4   **Q.**   GO TO THE HYPOTHETICAL NEGOTIATION. MS. BROOKS TALKED TO

5   YOU ABOUT THAT.

6         COULD I HAVE -- JUST SO I UNDERSTAND, CLEAR THE AIR.

7         IN NOVEMBER 2007, FRESENIUS HAD NO 510K APPROVED

8   ALTERNATIVE MACHINE TO THE 2008K?

9   **A.**   NOW, THE ANSWER IS --

10   **Q.**   YES OR NO.

11   **A.**   FRESENIUS DID NOT NEED A 510K AND YOU KNOW THAT, TOO. SO

12   FROM THAT STANDPOINT, WE -- THAT WAS NOT A PATH THAT WE NEEDED

13   TO GO THROUGH FOR THAT CONVENIENCE CHANGE.

14   **Q.**   NOT AT ALL?

15   **A.**   NOT AT ALL. IN ALL THE YEARS, EVERYBODY LOOKED AT THAT.

16   AND THERE'S A WHOLE PATH THAT THE FDA GIVES YOU THAT YOU GO

17   THROUGH AND YOU ANSWER ALL THE QUESTIONS. AND WE CLEARLY ARE

18   RESPONSIBLE BECAUSE WE ARE STILL MAKING MACHINES IN THE U.S.

19   AND NO ONE ELSE IS.

20         SO, FROM THAT STANDPOINT, YES, WE COVERED THAT. WE

21   DID NOT NEED A 510K. AND WE HAD COVERED THAT QUITE CLEARLY.

22   SO IT'S IRRELEVANT.

23   **Q.**   IF SOMEONE ARGUED THAT AT THAT TIME YOU NEEDED A 510K FOR

24   AN ALTERNATIVE NONTOUCH SCREEN MACHINE, THAT PERSON WOULD BE

25   MISREPRESENTING THEMSELVES?

Case 3:09-cv-00620-REP Document 1021-1 Filed 03/21/13 Page 193 of 232 PageID# 34038
Case 4:09-cv-01434-PJH Document 156 Filed 09/02/12 Page 132 of 291        192
LIPPS - CROSS / MR. ABERNATHY

1    **A.**    THAT PERSON WOULD BE WRONG.  THAT'S ALL.

2    **Q.**    WRONG.

3    **A.**    YEAH.

4              **MR. ABERNATHY:**  COULD I HAVE SLIDE 11?

5                   (SLIDE DISPLAYED ON SCREEN.)

6    **BY MR. ABERNATHY:**

7    **Q.**    DR. LIPPS, I HAVE A SLIDE HERE THAT SHOWS A PAGE FROM

8    FRESENIUS' BRIEF TO THE FEDERAL CIRCUIT.

9    **A.**    OKAY.

10   **Q.**    NOW, AFTER THE INJUNCTION ISSUED, FRESENIUS AUTHORIZED

11   YOUR LAWYERS TO FILE AN EMERGENCY STAY WITH THE FEDERAL

12   CIRCUIT.

13             DO YOU RECALL THAT?

14   **A.**    UH-HUH.

15   **Q.**    YES?

16   **A.**    RIGHT.

17   **Q.**    AND YOU WANTED FRESENIUS TO GET THAT INJUNCTION OVERTURNED

18   IMMEDIATELY, RIGHT?

19   **A.**    THAT'S RIGHT.

20   **Q.**    AND YOU WANTED THEM TO MAKE THE BEST POSSIBLE ARGUMENTS TO

21   THE FEDERAL CIRCUIT, RIGHT?

22   **A.**    WELL, THAT'S THEIR JOB, YES.

23   **Q.**    SURE.

24             I HAVE ON THE SCREEN THE ARGUMENTS THAT FRESENIUS

25   MADE ON BEHALF OF YOUR COMPANY.  THIS IS WHAT FRESENIUS TOLD

Case 3:09-cv-00629-REP Document 1031-1 Filed 03/21/13 Page 194 of 232 PageID# 34039
Case 4:03-cv-01431-PJH Document 156 Filed 08/02/12 Page 133 of 291
LIPPS – CROSS / MR. ABERNATHY

199

1    THE FEDERAL CIRCUIT.

2              "FRESENIUS WILL BE FORCED TO IMMEDIATELY

3              UNDERTAKE A REDESIGN PROCESS TO HAVE ANY CHANCE

4              OF SETTLING ON A REDESIGNED MACHINE SUBMITTING

5              IT FOR FDA APPROVAL AND RECEIVING CLEARANCE TO

6              SELL IT IN TIME."

7              DO YOU SEE THAT?

8    **A.**   YES.

9    **Q.**   THE FDA APPROVAL REFERS TO THE FDA 510K PROCESS, DOESN'T

10   IT?

11   **A.**   THAT'S CORRECT.  I ASSUME IT DOES, YES.

12   **Q.**   THAT'S WHAT YOUR LAWYERS TOLD THE FEDERAL CIRCUIT IN EARLY

13   2008, CORRECT?

14   **A.**   WHAT'S THE DATE ON IT?  I AM NOT SURE OF THE DATE.

15   **Q.**   APRIL 28TH, 2008.

16   **A.**   OKAY.  THAT WOULD HAVE BEEN BASICALLY WHERE WE WERE AT

17   THAT POINT.

18   **Q.**   AT THE POINT OF THE HYPOTHETICAL NEGOTIATION, RIGHT?

19   **A.**   RIGHT.

20              **MR. ABERNATHY:**  NOW CAN WE HAVE SLIDE 20?

21              **THE WITNESS:**  OKAY.  GO AHEAD.

22              **MR. ABERNATHY:**  SLIDE 20, PLEASE FROM THE OPENING.

23                   (SLIDE DISPLAYED ON SCREEN.)

24   **BY MR. ABERNATHY:**

25   **Q.**   I ALSO HAVE A PORTION OF AN ARGUMENT THAT YOUR LAWYERS

Case 3:09-cv-00629-REP Document 1031-1 Filed 03/21/13 Page 195 of 232 PageID# 34040
Case 3:09-cv-01404-PJH Document 156 Filed 08/02/12 Page 194 of 231        194
LIPPS - CROSS / MR. ABERNATHY

1    MADE TO JUDGE ARMSTRONG IN OPPOSITION TO BAXTER'S MOTION FOR A

2    PERMANENT INJUNCTION.

3              AND, AGAIN, THEY SAID "TO GET A REDESIGN VALIDATED

4    AND, IF NECESSARY, SUBMITTED FOR FDA APPROVAL WITHIN NINE

5    MONTHS."

6              DO YOU SEE THAT?

7    **A.**   I SEE THAT.

8    **Q.**   (READING)

9              "AND IF FDA APPROVAL IS REQUIRED, IT WOULD TAKE

10             TYPICALLY THREE ADDITIONAL MONTHS"?

11   **A.**   THAT'S CORRECT.  THAT'S THE QUICK -- THAT'S THE POINT --

12   THE REASON THAT WAS THERE, IS I SAID IF IT IS REQUIRED, AND

13   THAT'S WHY WE WERE ABLE TO DO IT IN NINE MONTHS.

14   **Q.**   OKAY.  BUT MY POINT IS SIMPLY, AT THE POINT OF THE

15   HYPOTHETICAL NEGOTIATION --

16   **A.**   RIGHT.

17   **Q.**   -- NOVEMBER 2007, YOU WILL AGREE WITH ME THAT FRESENIUS

18   DID NOT HAVE A MACHINE THAT IT COULD INTRODUCE INTO THE

19   MARKETPLACE IN PLACE OF THE 2008K, RIGHT?

20   **A.**   WRONG.  WE COULD HAVE INTRODUCED THE K1 IMMEDIATELY.

21   OKAY, BECAUSE IT DID NOT -- DOES NOT NEED ANY APPROVAL.

22             SO THE ANSWER IS -- AND THAT WOULD NOT HAVE

23   INFRINGED '434.

24   **Q.**   FRESENIUS NEVER TOLD THE FEDERAL CIRCUIT THAT?

25   **A.**   I HAVE NO IDEA.

LIPPS - CROSS / MR. ABERNATHY

1    **Q.**    CERTAINLY NEVER TOLD JUDGE ARMSTRONG?

2    **A.**    THEY SAID NINE MONTH.  SO TO ELIMINATE THE ACTUAL TOUCH

3    SCREEN, WE SAID NINE MONTHS IS WHAT WE REQUIRED, YES.

4            BUT TO KEEP PATIENTS ALIVE AND BE ABLE TO CONTINUE,

5    THERE'S ABOUT 30 PERCENT OF THE SALES ARE NEW CLINICS.  THEY

6    HAVE TO HAVE MACHINES.  THE OTHERS THEY CAN RUN THEM FOR

7    ANOTHER SIX OR SEVEN YEARS.  THEY RUN THEM FOR SIX TO EIGHT

8    YEARS.

9            SO THE ANSWER IS, THERE WAS A BUNCH OF ALTERNATIVES

10   THAT WE COULD LOOK AT, AND AS FAR AS I AM CONCERNED, THE BEST

11   ONE WAS TO GO AHEAD AND TAKE THE NINE MONTHS, TAKE THE TOUCH

12   SCREEN OFF, LET THE PATENTS WORK THEIR WAY THROUGH, GET

13   INVALIDATED, AND GO FORWARD.  OKAY.

14   **Q.**    ON THE DATE JUDGE ARMSTRONG INTRODUCED HER INJUNCTION --

15   **A.**    I DON'T KNOW THE EXACT DATE.

16   **Q.**    -- ASSUME SHE HAD SAID FRESENIUS IS PERMANENTLY ENJOINED,

17   THE NEXT DAY FRESENIUS WOULD NOT HAVE HAD A MACHINE TO SELL,

18   CORRECT?

19   **A.**    THE NEXT DAY I WOULD HAVE BEEN IN WASHINGTON.  I WOULD

20   HAVE EXPLAINED IT TO CMS, AND WE WOULD HAVE BASICALLY TAKEN

21   CARE OF THAT BECAUSE IT HAPPENS AROUND THE WORLD.

22           AND SO FROM THAT STANDPOINT, WE COULD NOT CONTINUE

23   TO -- WE ARE THE ONLY ONES OTHER THAN BRAUN PROVIDING MACHINES.

24           BUT THE ANSWER IS, I WOULD HAVE FOUND A WAY TO KEEP

25   THE MACHINES TO THE PATIENTS THAT NEEDED THEM FOR THE NEW

Case 3:09-cv-00610-RFB Document 1031-1 Filed 03/21/18 Page 197 of 232 PageID# 34042
Case 3:09-cv-01414-PJH Document 196 Filed 08/02/12 Page 196 of 291        196
LIPPS – CROSS / MR. ABERNATHY

1    MACHINES, BUT WE WOULD HAVE HAD TO TREAT THOSE PATIENTS, AND I

2    WOULD HAVE FOUND A WAY TO DO THAT.  OKAY.

3    **Q.**   WELL, YOU FOUND A WAY --

4    **A.**   ONE, WE WOULD HAVE INTRODUCED THE K1 IMMEDIATELY TO SHOW

5    IN THE SPIRIT OF WHAT WE WERE DOING.

6              **THE COURT:**  WHAT'S CMS?

7              **THE WITNESS:**  CMS IS THE CENTER FOR

8    MEDICARE/MEDICAID, AND THEY PAY FOR ALL THE MEDICARE.  SO YOU

9    COULDN'T HAVE THESE PATIENTS NOT BE TREATED.  OKAY.

10             **THE COURT:**  OKAY.

11             **THE WITNESS:**  NOT FOR A SILLY --

12             **THE COURT:**  OKAY.

13             **THE WITNESS:**  NOT FOR A SILLY SUIT LIKE THIS.

14             **THE COURT:**  I JUST WANTED TO KNOW.

15             **MR. ABERNATHY:**  ONE MINUTE, YOUR HONOR.

16                  (PAUSE IN PROCEEDINGS.)

17   **BY MR. ABERNATHY:**

18   **Q.**   JUST A COUPLE OF MORE QUESTIONS, DR. LIPPS.

19   **A.**   SURE.

20   **Q.**   I THINK WE TALKED ABOUT THIS IN YOUR DEPOSITION.

21             YOU ARE FAMILIAR WITH A LICENSE AGREEMENT BETWEEN

22   FRESENIUS U.S.A. AND FRESENIUS AG, CORRECT?

23   **A.**   YES.  I NEGOTIATED THAT.

24   **Q.**   YES.  AND I SHOWED THAT EXHIBIT DURING THE OPENING

25   STATEMENT, RIGHT?

Case 3:09-cv-00689-RFB Document 1031-1 Filed 03/21/13 Page 198 of 232 PageID# 34043
Case 4:03-cv-01431-PJH Document 156 Filed 02/12 Page 197 of 291    197
LIPPS - CROSS / MR. ABERNATHY

1    **A.**   YES.  IT WAS ON YOUR LIST, FOUR AND A HALF PERCENT.

2    **Q.**   RIGHT.

3              **MR. ABERNATHY:**  CAN WE HAVE SLIDE 49 FROM THE

4    OPENING?

5              (SLIDE DISPLAYED ON SCREEN.)

6    **BY MR. ABERNATHY:**

7    **Q.**   I HAVE ON THE SCREEN, DR. LIPPS, THE FRONT PAGE OF AN

8    AGREEMENT THAT IS IN EVIDENCE THAT IS A LICENSE AGREEMENT

9    BETWEEN FRESENIUS U.S.A AND FRESENIUS AG, CORRECT?

10   **A.**   CORRECT.

11   **Q.**   PARDON ME?

12   **A.**   YES, CORRECT.

13   **Q.**   AND YOU SIGNED THIS AGREEMENT, RIGHT?

14   **A.**   YES, I BELIEVE I DID.

15   **Q.**   YOU NEGOTIATED IT, RIGHT?

16   **A.**   RIGHT.

17   **Q.**   AND THE AGREEMENT DEALS WITH TECHNOLOGY FOR RENAL DIALYSIS

18   PRODUCTS?

19   **A.**   WELL, THE AGREEMENT WAS THAT WE COULD BUILD A

20   MANUFACTURING PLANT AND TAKE ALL THE GERMAN TECHNOLOGY AND

21   BRING IT TO THE U.S. AND MAKE DIALYZERS IN THE U.S. AND NOT

22   HAVE TO IMPORT THEM OVER THE NEXT -- SINCE 1994.  AND I

23   INSISTED ON THAT BECAUSE I DO NOT WANT PRODUCTS BEING MADE

24   OUTSIDE OF THE REGION THEY ARE BEING USED.

25              SO THAT WAS A COMPLETE TECHNOLOGY PACKAGE THAT I GOT

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/24/13 Page 199 of 232 PageID# 34044
Case 4:09-CV-01434-PJH Document 156 Filed 08/02/12 Page 199 of 291      199

LIPPS - CROSS / MR. ABERNATHY

1    FOR FOUR AND A HALF PERCENT WHICH -- BUT IT'S NOT A LITTLE

2    TOUCH SCREEN.  OKAY.

3    **Q.**   ALL I AM ASKING, DR. LIPPS, IS IT INVOLVED A LICENSE,

4    RIGHT?

5    **A.**   PLUS TECHNOLOGY, PLUS THEY BUILD A PLANT FOR US.

6    **Q.**   FOR HOLLOW FIBER DIALYZERS --

7    **A.**   FOR THE DIALYZER YOU ARE LOOKING AT.

8    **Q.**   YOU'RE THE PRINCIPAL NEGOTIATOR FOR THAT TECHNOLOGY?

9    **A.**   THAT'S CORRECT.

10   **Q.**   AND THE ROYALTY RATE BETWEEN THE TWO COMPANIES WAS

11   NEGOTIATED AT 4.5 PERCENT, CORRECT?

12   **A.**   YES.  WE -- THEY OWNED 80 PERCENT OF THE U.S. COMPANY, BUT

13   THERE WERE 20 PERCENT THAT WERE SHAREHOLDERS.  SO IT WOULD HAVE

14   TO BE FAIR TO BOTH SIDES.

15          BUT THAT'S FOR A COMPLETE TECHNOLOGY PACKAGE,

16   INCLUDING ALL OF THE TECHNOLOGY FOR THE DIALYZER AND COMING

17   OVER AND BUILDING A PLANT.

18   **Q.**   MY QUESTION SIMPLY WAS IT WAS FOR 4.5 PERCENT, CORRECT?

19   **A.**   IT'S 4.5 PERCENT, YES.

20   **Q.**   YOU CONSIDERED THAT YOU HAD CUT A FAIR BARGAIN WITH

21   FRESENIUS AG, RIGHT?

22   **A.**   THAT'S CORRECT.

23   **Q.**   YOU CONSIDERED THIS TO BE AN ARM'S LENGTH TRANSACTION,

24   CORRECT?

25   **A.**   YES.

Case 3:09-cv-00629-REP Document 1031-1 Filed 03/21/13 Page 200 of 232 PageID# 34045
Case 3:09-cv-01431-PJH Document 156 Filed 08/02/12 Page 199 of 291     199
LIPPS – CROSS / MR. ABERNATHY

1    **Q.**    AND YOU KNOW A GENTLEMAN BY THE NAME OF MARK LIEBERMAN,

2    DON'T YOU?

3    **A.**    YES.

4    **Q.**    AT THE TIME OF THIS AGREEMENT HE WAS A FRESENIUS EMPLOYEE,

5    CORRECT?

6    **A.**    RIGHT.

7    **Q.**    AND AT THE TIME, DIDN'T HE WRITE YOU A MEMO IN DECEMBER OF

8    1998 CONCERNING THIS LICENSE AGREEMENT?

9    **A.**    GO AHEAD.  I DON'T REMEMBER.

10   **Q.**    IF WE COULD --

11   **A.**    I KNOW MARK, BUT I DON'T REMEMBER HIS MEMOS.  IF YOU HAVE

12   IT, THAT WOULD BE GREAT.

13   **Q.**    LET ME SHOW YOU WHAT WE USED IN YOUR DEPOSITION DR. LIPPS.

14            AND, YOUR HONOR, I WILL PUT AN EXHIBIT TAG ON THIS

15   WHEN WE ARE DONE.

16            **MS. BROOKS:**  MIGHT WE HAVE A COPY, YOUR HONOR?

17            **MR. ABERNATHY:**  SURE.  IT'S IN THE GIANT BINDER.

18            MAY I STAND BY THE WITNESS, PLEASE, FOR A MINUTE?

19   **BY MR. ABERNATHY:**

20   **Q.**    SO, DR. LIPPS, THIS WAS A DOCUMENT THAT YOU RECEIVED IN

21   CONNECTION WITH YOUR WORK ON THE DIALYZER AGREEMENT?

22   **A.**    YES, UH-HUH.

23   **Q.**    AND YOU RECALL RECEIVING IT?

24   **A.**    I DON'T RECALL THIS MEMO, BUT I RECALL THE TOPIC.  SO,

25   WHAT --

Case 3:09-cv-00688-RFB Document 1031-1 Filed 03/21/13 Page 201 of 232 PageID# 34046
Case 3:09-cv-01491-PJH Document 156 Filed 08/02/12 Page 200 of 231
200
LIPPS − CROSS / MR. ABERNATHY

1    **Q.**   IT'S TRUE, ISN'T IT, DIDN'T MR. LIEBERMAN SAY THAT THE

2    4.5 PERCENT IS WITHIN A REASONABLE RANGE FOR TECHNOLOGY OF THIS

3    KIND?

4    **A.**   YES.

5            BUT, AGAIN, I WANT TO EMPHASIZE THAT WAS A COMPLETE

6    PRODUCT PRODUCTION AND BRINGING IT TO THE U.S.  SO I THOUGHT

7    THAT WAS FAIR, AND IT IS AT FOUR AND A HALF PERCENT FOR THAT.

8    OKAY.

9    **Q.**   DID I HEAR YOU CORRECTLY THAT FRESENIUS DOES NOT BUNDLE

10   MACHINES WITH ITS DISPOSABLES?

11   **A.**   YES.

12   **Q.**   IT NEVER HAS?

13   **A.**   I CAN'T -- I TOLD YOU WHAT GOES ON OUTSIDE THE U.S.

14   **Q.**   WHAT ABOUT WHAT GOES ON IN THE UNITED STATES?

15   **A.**   NOT THAT I KNOW OF.

16          **MR. ABERNATHY:**  COULD I HAVE SLIDE 36 FROM THE

17   OPENING, PLEASE?

18                  (SLIDE DISPLAYED ON SCREEN.)

19   **BY MR. ABERNATHY:**

20   **Q.**   RICE POWELL TOLD US THAT FRESENIUS HAS BUNDLED 2008K

21   MACHINES WITH OTHER PRODUCTS.

22          HE ALSO SAID THAT RCG BUYS DIALYZERS, BLOODLINES,

23   CONCENTRATES, FISTULA NEEDLES FROM FRESENIUS BUNDLED WITH

24   2008K'S.

25          DO YOU SEE THAT?

Case 3:09-cv-00689-RFB Document 1031-1 Filed 03/21/13 Page 202 of 232 PageID# 34047
Case 3:09-cv-01414-PJH Document 156 Filed 08/02/12 Page 201 of 231    201
LIPPS − CROSS / MR. ABERNATHY

1    **A.**   I SEE THAT, YES.

2    **Q.**   AND BEFORE RCG WAS ACQUIRED BY FRESENIUS?

3    **A.**   THAT'S CORRECT.

4    **Q.**   RCG WAS FRESENIUS' LARGEST CUSTOMER, RIGHT?

5    **A.**   SECOND.  DAVITA WAS THE LARGEST.

6    **Q.**   SECOND LARGEST CUSTOMER?

7    **A.**   SECOND LARGEST, YEAH.

8    **Q.**   MR. POWELL, WHO WAS RUNNING THE NORTH AMERICA BUSINESS AT

9    THE TIME, SAID THAT FRESENIUS HAS BUNDLED THE 2008K MACHINE

10   WITH OTHER PRODUCTS, CORRECT?

11   **A.**   THAT'S WHAT I -- I AM SORRY, I WASN'T AT THE DEPOSITION,

12   BUT THAT'S WHAT IT SAYS, YES.

13            **MR. ABERNATHY:**  THANK YOU.  THAT'S ALL I HAVE, YOUR

14   HONOR.

15            **THE WITNESS:**  TO MY KNOWLEDGE THAT DIDN'T HAPPEN.

16            **THE COURT:**  HOLD ON.  HOLD ON.

17            IS THERE ANYTHING ELSE?

18            **THE WITNESS:**  I'VE GOT MORE.  I AM SORRY.

19            **THE COURT:**  IS THERE ANYTHING FURTHER?

20            **MS. BROOKS:**  NO, YOUR HONOR.  I WAS GOING TO INQUIRE

21   IF YOUR HONOR HAD ANY QUESTIONS OF DR. LIPPS.

22            **THE COURT:**  NO.

23            ALL RIGHT.  YOU ARE EXCUSED, DR. LIPPS.

24            **THE COURT:**  ALL RIGHT.  LAST WITNESS.  I AM GOING TO

25   DIVIDE THE TIME BETWEEN EACH OF YOU EQUALLY.  ALL RIGHT.  SO

Case 3:09-cv-00680-REF Document 1031-1 Filed 03/21/13 Page 203 of 232 PageID# 34048
Case 3:09-cv-01491-PHJ Document 156 Filed 08/02/12 Page 202 of 231    202
RUBINFELD – DIRECT / MR. FLOREY

1    EACH OF YOU HAVE 12 AND A HALF MINUTES.

2              **MR. ABERNATHY:**  THANK YOU, YOUR HONOR.

3                        **DANIEL RUBINFELD**,

4    CALLED AS A WITNESS FOR THE PLAINTIFFS, HAVING BEEN DULY SWORN,

5    TESTIFIED AS FOLLOWS:

6              **THE WITNESS:**  I DO.

7              **THE CLERK:**  PLEASE BE SEATED.  STATE YOUR FULL NAME

8    AND SPELL YOUR LAST NAME FOR THE RECORD.

9              **THE WITNESS:**  DANIEL RUBINFELD, R-U-B-I-N-F-E-L-D.

10             **MR. FLOREY:**  YOUR HONOR, MIGHT I HAND UP A COPY.

11   AND FOR THE RECORD, SO THERE'S NOT ANY CONFUSION, WE HAVE

12   MARKED THESE SLIDES AS RHX.  AND THAT IS FOR RUBINFELD HEARING

13   EXHIBIT.  NOT A SECRET CODE.

14                      **DIRECT EXAMINATION**

15   **BY MR. FLOREY:**

16   **Q.**   SO, PROFESSOR RUBINFELD, ONCE AGAIN WE ARE IN THE TIGHT

17   TIME SLOT, SO I AM GOING TO JUMP FORWARD INTO YOUR PRESENTATION

18   SO WE CAN GET SOME OF THESE NUMBERS INTO THE RECORD.

19             VERY QUICKLY, YOU TESTIFIED FOR FRESENIUS AT THE

20   INITIAL TRIAL IN 2006, CORRECT?

21   **A.**   YES, THAT'S RIGHT.

22   **Q.**   AND YOU TESTIFIED AGAIN FOR FRESENIUS AT THE DAMAGES TRIAL

23   IN 2007; IS THAT CORRECT?

24   **A.**   YES.

25   **Q.**   AND YOU ALSO WERE FRESENIUS' EXPERT IN THE PERITONEAL

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/22/13 Page 204 of 232 PageID# 34049
Case 4:09-cv-01434-PJH Document 156 Filed 03/12/12 Page 203 of 291    203
RUBINFELD - DIRECT / MR. FLOREY

 1    DIALYSIS CASE HERE IN OAKLAND, CORRECT?

 2    **A.**    YES.  I ATTENDED THAT TRIAL.

 3    **Q.**    YOU DIDN'T TESTIFY, BUT YOU ATTENDED THE TRIAL; IS THAT

 4    RIGHT?

 5    **A.**    YES.

 6    **Q.**    SO, WE WILL WRAP BACK TO THE SLIDES IF TIME PERMITS, BUT I

 7    WANT TO JUMP FORWARD AND GET SOME OF THESE -- I WANT TO START

 8    HERE.

 9                    (SLIDE DISPLAYED ON SCREEN.)

10              AND I WANT TO START WITH THIS SLIDE, TITLED

11    "APPORTIONED ROYALTY BASE AT 7 PERCENT".

12              YOU RECALL, PROFESSOR RUBINFELD, AT THE DAMAGES

13    TRIAL, MR. DEN UYL TESTIFIED THAT A REASONABLE ROYALTY RATE ON

14    THE MACHINES WOULD BE 7 PERCENT.

15              DO YOU RECALL THAT?

16    **A.**    YES, I DO.

17    **Q.**    AND YOU HAD TESTIFIED TO THE JURY THAT THEY SHOULD DO AN

18    APPORTIONMENT OF THE VALUE OF THE 2008K, CORRECT?

19    **A.**    YES.  I LOOKED AT THE INCREMENTAL VALUE CREATED COMPARING

20    THE SALES OF THE K TO THE H, AND I MADE DIFFERENT ASSUMPTIONS

21    ABOUT HOW MUCH OF THAT ADDITIONAL VALUE, ADDITIONAL

22    PROFITABILITY SHOULD BE APPORTIONED TOWARDS AND CREDITED

23    TOWARDS TOUCH SCREEN.

24    **Q.**    OKAY.

25              AND THE QUESTION I HAVE FOR YOU IS, LET'S ASSUME

Case 3:09-cv-00609-REP Document 1031-1 Filed 03/21/13 Page 205 of 232 PageID# 34050
Case 4:09-cv-01434-PJH Document 156 Filed 03/02/12 Page 204 of 231    204
RUBINFELD – DIRECT / MR. FLOREY

1    THAT THE JURY HAD USED MR. DEN UYL'S 7 PERCENT ROYALTY RATE.

2    IN TERMS OF ITS 14 MILLION-DOLLAR AWARD, WHAT AMOUNT, WHAT

3    APPORTIONED DOLLAR AMOUNT WOULD THAT CORRESPOND TO?

4    **A.**   SO, WHAT I DID WAS I TOOK THE AWARD OF 14 MILLION AND

5    DIVIDED IT BY THE NUMBER OF K'S WERE SOLD, 59,000, AND THAT

6    GENERATED $3,431.

7         SO THAT WOULD BE -- THAT WOULD HAVE BEEN THE

8    APPORTIONED AMOUNT OF THE -- OF APPROXIMATE VALUE OF THE ENTIRE

9    MACHINE, WHICH IS $14,200.

10   **Q.**   THANK YOU.

11        AND THEN CAN YOU EXPLAIN FOR -- AT A 7 PERCENT

12   ROYALTY RATE FOR DISPOSABLES, WHAT VALUE WOULD THE JURY HAVE

13   ATTRIBUTED TO PER MACHINE TO DISPOSABLES TO REACH ITS $91,000

14   AWARD?

15   **A.**   I DID THE SAME CALCULATION.  I TOOK THE $91,000, DIVIDED

16   IT BY THE 59,000 MACHINES, AND THAT TURNED OUT TO BE $22 A

17   MACHINE -- I AM SORRY, $20 BASED ON DISPOSABLE SALES.  AND

18   THAT'S ASSUMING THE 7 PERCENT RATE.

19   **Q.**   AND THEN DID YOU ALSO, AGAIN, USING THE JURY'S AWARD,

20   CALCULATE A PER MACHINE DOLLAR AMOUNT THAT THE JURY'S AWARD

21   CORRESPONDS TO?

22   **A.**   YES, I DID.

23   **Q.**   CAN YOU WALK US THROUGH THAT REALLY BRIEFLY?

24   **A.**   YES.

25        I ESSENTIALLY TOOK THE CALCULATIONS FROM THE

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/13 Page 206 of 232 PageID# 34051
Case4:09-cv-01434-PJH Document156 Filed 08/02/12 Page208 of 291 2091
RUBINFELD – DIRECT / MR. FLOREY

1    PREVIOUS SLIDE, WHICH CAME OUT TO THE 14 MILLION DIVIDED BY

2    59,000, THAT TURNED OUT TO BE $240 PER MACHINE.

3              AND THE DISPOSABLE CALCULATION TURNED OUT TO BE A

4    DOLLAR 54 PER MACHINE.  AND I SIMPLY ADDED THEM UP.

5              SO IF YOU ARE ACCEPTING THE FOUNDATION OF THE JURY

6    AWARD AND ACCEPTING THE 7 PERCENT ROYALTY RATE, YOU WOULD

7    GENERATE A ROYALTY AMOUNT OF $241.75 PER MACHINE.

8    **Q.**   AND THEN WE HAVE A TIME LINE HERE.

9                   (SLIDE DISPLAYED ON SCREEN.)

10             I KNOW THE -- THERE'S A LOT OF DIFFERENT TIME

11   PERIODS THAT HAVE BEEN DISCUSSED IN THIS CASE.  WHEN YOU

12   TESTIFIED AT THE DAMAGES TRIAL, WHAT TIME PERIOD WERE YOU

13   ASSESSING DAMAGES FOR?

14   **A.**   I WAS COVERING ESSENTIALLY THE SEVEN-YEAR PERIOD FROM 2000

15   THROUGH THE TRIAL IN OCTOBER 2007.

16   **Q.**   AND DURING THAT -- AT ISSUE IN FRONT OF THE JURY WERE

17   ABOUT 59,000 OF THE 2008K'S; IS THAT CORRECT?

18   **A.**   THAT'S CORRECT.

19   **Q.**   AND THEN HOW MANY K'S ARE AT ISSUE IN THIS PROCEEDING

20   DURING THE TRANSITION PERIOD; HOW MANY K'S DID FRESENIUS SELL?

21   **A.**   AS YOU CAN SEE, SOMETHING OVER 19,000 K'S AT ISSUE IN THE

22   TRANSITION PERIOD, THE 14-MONTH PERIOD WE ARE TALKING ABOUT.

23   **Q.**   SO I WANT TO ASK YOU NOW, LET'S ASSUME THAT WE HAVE TAKEN

24   THE JURY'S AWARD, THAT AMOUNT, AND APPLIED IT TO FRESENIUS'

25   SALES DURING THE TRANSITION PERIOD.

1         ARE YOU FOLLOWING ME?

2    **A.**   YES.

3    **Q.**   AND AS A STARTING POINT, CAN YOU EXPLAIN TO THE COURT

4    WHERE THAT WOULD LAND IN TERMS OF A PER MACHINE ROYALTY?

5    **A.**   SURE.

6         ON A PREVIOUS SLIDE, I EXPLAIN THAT FOR THE K, THE

7    JURY AWARD WAS CONSISTENT WITH AN AWARD OF $240 PER MACHINE AND

8    A DOLLAR 54 BASED ON DISPOSABLES.  AND SO I JUST MULTIPLIED

9    THAT BY THE 19,300 AND SOME MACHINES SOLD DURING THE TRANSITION

10   PERIOD.  AND THAT GENERATED AN AWARD FOR MACHINES FOR THE

11   TRANSITION PERIOD OF 4,600,000, AND FOR DISPOSABLES SOMETHING

12   OVER 29,000.  AND THE TOTAL AWARD ON THIS BASIS WOULD BE

13   4,600,000 PLUS.

14   **Q.**   NOW TURNING TO THE HYPOTHETICAL NEGOTIATION IN NOVEMBER OF

15   2007 FOR THE TRANSITION PERIOD, DO YOU BELIEVE THAT THE PARTIES

16   WOULD HAVE CONSIDERED THE JURY'S REASONABLE ROYALTY AWARD AS AN

17   IMPORTANT DATA POINT IN THEIR NEGOTIATION?

18   **A.**   YES, I ABSOLUTELY DO.

19   **Q.**   HOW SO?

20   **A.**   WELL, IT WOULD HAVE BEEN KNOWN THAT THE JURY HAD SAT

21   THROUGH, AS WE ALL DID, THROUGH THE DAMAGE TRIAL AND CONSIDERED

22   ALL OF THE EVIDENCE PRESENTED OVER, I THINK, A WEEK-LONG TRIAL,

23   AND CAME TO THEIR CONSIDERED OPINION, BOTH ABOUT THE MACHINE

24   ROYALTIES AND DISPOSABLE ROYALTIES.  SO, OF COURSE, IT WOULD BE

25   SOMETHING THAT WOULD BE A FACTOR TO TAKE INTO ACCOUNT IN THIS

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/13 Page 208 of 232 PageID# 34053
Case 4:09-cv-01434-PJH Document 156 Filed 02/12 Page 207 of 291                    207
RUBINFELD – DIRECT / MR. FLOREY

 1    NEGOTIATION.

 2    **Q.**   PROFESSOR RUBINFELD, DID EITHER SIDE APPEAL THAT

 3    REASONABLE ROYALTY AWARD FROM THE JURY?

 4    **A.**   YES.  THE AWARD ITSELF?

 5    **Q.**   LET ME ASK, DID BAXTER APPEAL THE AMOUNT AWARDED BY THE

 6    JURY FOR PAST DAMAGES?

 7    **A.**   NO.

 8    **Q.**   AND SO IN TERMS OF WHAT THE PARTIES WOULD AGREE TO AS A

 9    GOING FORWARD ROYALTY IN NOVEMBER OF 2007, DO YOU HAVE AN

10    OPINION AS TO WHAT THAT AMOUNT WOULD BE?

11                    (SLIDE DISPLAYED ON SCREEN.)

12    **A.**   WELL, AS WE DISCUSSED EARLIER, I THINK IT WOULD BE

13    APPROPRIATE, GIVEN THAT THERE HAD BEEN -- THE JUDGE HAD RULED

14    THAT THERE WAS INFRINGEMENT, I THINK IT WOULD BE APPROPRIATE TO

15    USE SOME MULTIPLE OF THE JURY AWARD.

16             AND SO IN THIS SLIDE THAT YOU PUT IN FRONT OF ME, I

17    HAVE CONSIDERED THE EXTENT TO WHICH ONE SHOULD INCREASE THAT

18    AWARD TO REFLECT THE FACT THAT THERE HAD BEEN A DECISION THAT

19    THERE HAD BEEN AN INFRINGEMENT OF THIS ONE PATENT.

20    **Q.**   AND WHAT'S YOUR OPINION AS TO THE AMOUNT THE PARTIES WOULD

21    AGREE ON TO INCREASE THAT REASONABLE ROYALTY FOUND BY THE JURY?

22    **A.**   AFTER THINKING ABOUT THIS FOR QUITE AWHILE, I CONCLUDED

23    THAT A MULTIPLE OF 1.5 TO 2 WOULD BE REASONABLE IN THIS CASE.

24    **Q.**   BASED ON A MULTIPLE OF 1.5 TO 2, IN WHAT RANGE DO YOU

25    BELIEVE THE PARTIES' LICENSE AWARD AGREEMENT WOULD HAVE LANDED?

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/21/13 Page 209 of 232 PageID# 34054
Case 4:09-cv-01434-PJH Document 156 Filed 02/12/12 Page 209 of 291     209
RUBINFELD - DIRECT / MR. FLOREY

1    **A.**   SO WHEN I JUST DO THE MULTIPLICATION AND ADD UP THE DAMAGE

2    AMOUNTS, I CONCLUDE THAT A REASONABLE RANGE FOR AN AWARD FOR

3    THIS TRANSITION PERIOD WOULD BE FROM 7 MILLION, SLIGHTLY OVER

4    7 MILLION TO $9,360,000.

5    **Q.**   I HAVE TO ASK YOU, PROFESSOR RUBINFELD, I SEE THAT YOU

6    HAVE AN AMOUNT FOR DISPOSABLES ON THAT SLIDE.

7         IN YOUR OPINION, SHOULD ANY DISPOSABLES BE INCLUDED

8    IN THE ROYALTY AWARD FROM THE HYPOTHETICAL NEGOTIATION?

9    **A.**   NO.  THERE SHOULD BE NO DISPOSABLES.  I TESTIFIED

10   EXTENSIVELY ABOUT THAT AT THE ORIGINAL TRIAL, AND MY OPINION

11   HAS NOT CHANGED.

12   **Q.**   WHY DID YOU INCLUDE THAT AMOUNT THEN ON YOUR SLIDE HERE?

13   **A.**   WELL, I GIVE GREAT WEIGHT TO THE JURY'S DELIBERATION, AND

14   THE JURY HAD DECIDED TO AWARD THE $91,000 WE HAVE HEARD ABOUT

15   EARLIER TODAY.  SO I -- AND I DO CONSIDER THAT AN IMPORTANT

16   POINT UPON WHICH TO BASE DAMAGES.

17        SO IF WE WERE FOLLOWING THE JURY'S WISDOM, THEN WE

18   WOULD AWARD SOME MODEST AMOUNT FOR DISPOSABLES.

19   **Q.**   YOU HEARD IN COURT ALL OF THE TESTIMONY THAT WE HAVE SEEN

20   HERE TODAY ABOUT BUNDLING, CORRECT?

21   **A.**   YES.

22   **Q.**   NOW, IN YOUR OPINION, DOES -- THIS DISCUSSION OF BUNDLING,

23   DOES THAT MEAN IT BECOMES APPROPRIATE TO AWARD A ROYALTY ON

24   THESE UNPATENTED GENERIC DISPOSABLES?

25   **A.**   NO.  THE IMPORTANT THING TO UNDERSTAND IS THAT BUNDLING IS

Case 3:09-cv-00620-REP Document 1021-1 Filed 03/21/13 Page 210 of 232 PageID# 34055
Case 4:09-cv-01434-PJH Document 156 Filed 08/02/12 Page 209 of 291    209
RUBINFELD - DIRECT / MR. FLOREY

1    A METHOD OF OFFERING A PRICE DISCOUNT TO CUSTOMERS.  AND IT IS

2    NOT A TIE.  THERE'S NO CONDITION THAT SAYS YOU HAVE TO BUY ONE

3    PRODUCT IN ORDER TO GET THE OTHER.  THERE'S NO SUCH TIE IN THIS

4    CASE.  THEY ARE REALLY QUITE SEPARATE.  AS WE'VE HEARD, YOU CAN

5    BUY ANYONE'S DISPOSABLES, SO THERE IS NO TIE.

6            AND AS LONG AS THERE'S NO TIE, AND FOR OTHER REASONS

7    WE HAVE HEARD IN THE CASE, THE CONCEPT OF CONVOYED SALES IN

8    THIS CASE DOESN'T MAKE SENSE.

9    **Q.**   IN FACT, ARE YOU AN EXPERT IN TYING AND ANTITRUST

10   ECONOMICS.

11   **A.**   ABSOLUTELY.  I WAS THE CHIEF ECONOMIST AT THE JUSTICE

12   DEPARTMENT FOR TWO YEARS AND I'VE BEEN TEACHING ANTITRUST FOR

13   20 YEARS.  AND TYING AND BUNDLING IS SOMETHING I TEACH ABOUT.

14   **Q.**   DID YOU BRING ALL THAT KNOWLEDGE TO BEAR IN YOUR TESTIMONY

15   IN FRONT OF THE JURY?

16   **A.**   YES.

17   **Q.**   NOW, I WANT TO, AGAIN, ASK SOMETHING I KNOW IS NOT YOUR

18   OPINION, BUT WILL MAYBE PROVIDE US SOME DATA POINTS.

19           EARLIER YOU WALKED US THROUGH GETTING AN APPORTIONED

20   DOLLAR AMOUNT FOR THE MACHINES AND DISPOSABLES BASED ON THE

21   JURY AWARD.

22           DO YOU RECALL THAT?

23   **A.**   YES.

24   **Q.**   AND YOU UNDERSTAND FOR THIS TRANSITION PERIOD, BAXTER'S

25   ASKING FOR AN INCREASED RATE OF 10 PERCENT ON MACHINES AND THE

Case 3:09-cv-00688-REP Document 1031-1 Filed 03/21/13 Page 211 of 232 PageID# 34056
Case 4:09-cv-01431-PJH Document 156 Filed 08/02/12 Page 210 of 231    210
RUBINFELD - DIRECT / MR. FLOREY

```
1   SAME RATE OF 7 PERCENT ON DISPOSABLES, CORRECT?

2   A.  I DO.

3   Q.  SO WHAT HAPPENS IF YOU WERE TO TAKE THE JURY'S APPORTIONED

4   DOLLAR AMOUNT AND APPLY THE RATES -- THE RATES THAT BAXTER IS

5   ASKING FOR IN THIS TRANSITION PROCEEDING, WHAT IS THE RESULT?

6   A.  WELL, THAT WOULD RAISE THE EARLIER ROYALTY PERMISSION AND

7   I TALKED ABOUT SOMEWHAT; IT WOULD GO UP TO $344.

8   Q.  AND WHAT ULTIMATE AWARD WOULD THAT RESULT IN IF YOU

9   FOLLOWED THAT ANALYSIS?

10  A.  IF I TOOK THE $344 PER MACHINE, MULTIPLIED IT BY THE

11  19,000 PLUS MACHINES SOLD DURING THE TRANSITION PERIOD, I WOULD

12  GET A ROYALTY AWARD OF $6,670,000.

13  Q.  AND HOW DOES THAT COMPARE TO THE -- YOUR OPINION OF THE

14  ROYALTY AWARD FOR THE TRANSITION PERIOD?

15  A.  WELL, IT'S CLOSE TO BEING IN THE RANGE I DESCRIBED

16  PREVIOUSLY AS BEING CONSISTENT WITH THE JURY AWARD.

17  Q.  IS THERE ANY SCENARIO UNDER WHICH YOU BELIEVE THAT IT'S

18  APPROPRIATE FOR THIS TOUCH SCREEN PATENT TO TAKE THE ENTIRE

19  VALUE OF THAT HEMODIALYSIS MACHINE AS THE ROYALTY BASE?

20  A.  NO.  IT'S SIMPLY A QUESTION OF HOW MUCH OF THE INCREMENTAL

21  VALUE CREATED BY ALL OF THE IMPROVEMENTS TO THE K SHOULD BE

22  ATTRIBUTED TO THE TOUCH SCREEN, BUT CERTAINLY NOT THE ENTIRE

23  VALUE OF THE MACHINE.

24  Q.  WE HAVE HEARD SOME ARGUMENT THAT MAYBE THERE IS SOME

25  DIFFERENT FACTORS AT THE '07 NEGOTIATION VERSUS THE 2000
```

Case 3:09-cv-00620-REP Document 1031-1 Filed 03/24/13 Page 212 of 232 PageID# 34057
Case 4:09-cv-01434-PJH Document 156 Filed 08/02/12 Page 213 of 291    211
RUBINFELD - DIRECT / MR. FLOREY

```
 1   NEGOTIATION.

 2              DO YOU GENERALLY AGREE WITH THAT?

 3   A.   I DO, YES.

 4   Q.   AND IN COMING UP WITH YOUR OPINION THAT THE JURY'S AWARD

 5   WOULD BE INCREASED BY 1.5 TO 2 TIMES, DID YOU CONSIDER THE

 6   CHANGED FACTORS IN 2007?

 7   A.   I DID.

 8   Q.   AND SO I WANT TO START, DID YOU IDENTIFY ANY POST-VERDICT

 9   FACTORS THAT YOU BELIEVE FAVORED --

10              THE COURT:   THIS IS GOING TO BE THE LAST AREA I AM

11   GOING TO ALLOW YOU TO GO IN.

12              MR. FLOREY:   FAIR ENOUGH, YOUR HONOR.   WE'LL WRAP IT

13   UP.

14   BY MR. FLOREY:

15   Q.   DID YOU CONSIDER ANY FACTORS YOU BELIEVED FAVORED BAXTER?

16   A.   YES.   I HAVE LISTED TWO HERE ON THE CHART, JUST TO MOVE IT

17   ALONG.

18              (SLIDE DISPLAYED ON SCREEN.)

19              FIRST, THERE HAD BEEN LIABILITY ESTABLISHED, AS I

20   SAID EARLIER.   AND, SECONDLY, FRESENIUS HAD INVESTED

21   SIGNIFICANTLY IN THESE 2000K MACHINES AND, THEREFORE, WHEN THEY

22   WERE BARGAINING, THEY WOULD HAVE TO TAKE ACCOUNT OF THE FACT

23   THAT THEY HAD SUNK THIS SUBSTANTIAL INVESTMENT.

24   Q.   YOU HEARD THE TESTIMONY THAT FRESENIUS HAD A DESIGN AROUND

25   READY TO GO; YOU JUST HEARD THAT, CORRECT?
```

Case 3:09-cv-00688-RFB Document 1031-1 Filed 03/21/03 Page 213 of 232 PageID# 34058
Case 4:03-cv-01431-PJH Document 196 Filed 08/02/12 Page 213 of 291    212
RUBINFELD − DIRECT / MR. FLOREY

1    **A.**   YES.

2    **Q.**   BUT ALL THINGS BEING EQUAL, THEY WOULD HAVE PREFERRED TO

3    PAY SOME ROYALTY TO KEEP THE SAME MACHINE ON THE MARKET; IS

4    THAT FAIR?

5    **A.**   THAT'S CORRECT.

6    **Q.**   OKAY.

7         SO THEN DID YOU IDENTIFY ANY CHANGED CIRCUMSTANCES

8    IN THE NEGOTIATION THAT YOU BELIEVED FAVORED FRESENIUS?

9    **A.**   YES, I DID.

10   **Q.**   COULD YOU EXPLAIN TO THE COURT WHAT FACTORS YOU

11   IDENTIFIED?

12   **A.**   WELL, THERE ARE QUITE A FEW.

13        FIRST, BAXTER BASICALLY WAS NOT A COMPETITOR FOR HD

14   SALES.  WE HAVE HEARD DISCUSSION ABOUT THE FACT THAT OVER THIS

15   PERIOD OF TIME, THE -- BAXTER WAS BASICALLY WITHDRAWING FROM

16   THE MARKET FOR HD MACHINES.  AND BASICALLY THE COMPETITION --

17   THERE WAS SOME RESIDUAL SALES FROM INVENTORY, BUT THE BASIC

18   COMPETITION FRESENIUS FACED WOULD HAVE BEEN FROM BRAUN AND

19   GAMBRO, NOT FROM BAXTER.

20   **Q.**   AND, PROFESSOR RUBINFELD, WHEN BAXTER FILED ITS MOTION IN

21   FRONT OF JUDGE ARMSTRONG INITIALLY, DID IT ADVISE JUDGE

22   ARMSTRONG THAT IT WAS IN THE PROCESS OF EXITING THE

23   HEMODIALYSIS MACHINE MARKET?

24   **A.**   NOT THAT I AM AWARE OF, NO.

25        I LISTED THE SECOND -- SECOND FACTOR WAS THAT AT THE

Case 3:09-cv-00629-RFB Document 1031-1 Filed 03/21/13 Page 214 of 232 PageID# 34059
Case 4:09-cv-01434-PJH Document 156 Filed 08/02/12 Page 233 of 291   213
RUBINFELD – DIRECT / MR. FLOREY

1    TIME OF THE ORIGINAL HEARING, I WAS ASSUMING THAT THE -- ALL

2    THREE TOUCH SCREEN PATENTS WERE VALID AND INFRINGED, WHEREAS WE

3    FOUND OUT -- FOUND OUT AROUND THE TIME PERIOD OF THE

4    HYPOTHETICAL NEGOTIATION THAT TWO OF THE THREE PATENTS WERE

5    INVALIDATED.

6              AND CERTAINLY THAT WOULD BE SOMETHING THAT WOULD

7    AFFECT THE NEGOTIATION BECAUSE AS WE HAVE HEARD A LITTLE TODAY,

8    IT WOULD CHANGE THE COST OF INVENTING AROUND THE PATENTS.

9    Q.   SO AT THIS HYPOTHETICAL NEGOTIATION, JUDGE ARMSTRONG'S

10   INJUNCTION AGAINST THE '027 AND THE '131 IS GONE, RIGHT?

11   A.   CORRECT.

12   Q.   THIS IS ALL ABOUT THE VALUE OF THE '434, CORRECT?

13   A.   YES.  IT'S A QUESTION OF WHETHER WE CAUSE SOME INVENT

14   AROUND THE '434, WHICH WOULD CREATE PART OF THE BARGAINING

15   POSITION THAT FRESENIUS WOULD TAKE IN THIS HYPOTHETICAL

16   NEGOTIATION.

17   Q.   LAST SLIDE.  I HAVE MORE, BUT I HEAR YOUR HONOR.  THIS

18   WILL BE THE LAST ONE, PROFESSOR RUBINFELD.

19                  (SLIDE DISPLAYED ON SCREEN.)

20              WHAT ARE THE OTHER TWO POST-VERDICT FACTORS THAT YOU

21   BELIEVE FAVORED FRESENIUS AT THE HYPOTHETICAL NEGOTIATION?

22   A.   WELL, THE FACT IS THAT THE -- THERE'S NO EVIDENCE OF ANY

23   EFFECT ON SALES FROM FRESENIUS' POINT OF VIEW AS TO WHETHER

24   THEY HAD A TOUCH SCREEN OR NOT.  THEY DID DOMINATE THE MARKET

25   FOR LOTS OF REASONS WE TALKED ABOUT.

Case 3:09-cv-00629-REP Document 1031-1 Filed 03/21/18 Page 215 of 222 PageID# 34060
Case 4:03-cv-01431-PJH Document 156 Filed 02/12/08 Page 214 of 291   214
RUBINFELD – DIRECT / MR. FLOREY

1           AND IT'S TRUE THAT THE TOUCH SCREEN WAS SOLD AS A

2   MARKETING DEVICE, BUT I DON'T BELIEVE IT AFFECTED THEIR SELLS.

3   THEY WERE GOING TO SELL A LOT OF MACHINES IRRESPECTIVE OF

4   WHETHER THEY HAD THE TOUCH SCREEN ON THE MACHINE OR NOT.

5   **Q.**   AND WHAT ABOUT THAT DATA?  WE HAVE HEARD ALLEGATIONS OF

6   LINKING WITH DISPOSABLES.  WHEN FRESENIUS TOOK THE TOUCH SCREEN

7   OFF ITS MACHINE, DID IT HAVE ANY EFFECT AT ALL ON SALES OF

8   DISPOSABLE PRODUCTS?

9   **A.**   NO, IT DIDN'T.  IN FACT, THERE'S NO EVIDENCE THERE AND

10  ALSO IN THE ORIGINAL TRIAL I TESTIFIED THAT THERE WAS ACTUALLY

11  NOT THAT HIGHER CORRELATION BETWEEN THE SALE OF DISPOSABLES AND

12  MACHINES.

13          WHEN I WENT BACK AND LOOKED AT BAXTER'S OWN

14  EXPERIENCE, I FOUND THAT DISPOSABLE SALES FLUCTUATED DEPENDING

15  ON OTHER FACTORS.  SO THE CORRELATION WASN'T ALL THAT HIGH.

16  **Q.**   AND THE FINAL FACTOR YOU HAVE LISTED UP THERE, CAN YOU

17  EXPLAIN HOW THAT PLAYS IN?

18  **A.**   LET'S SEE.  YES.

19          BAXTER HAD AGREED THAT THIS -- DURING THIS EARLY

20  PART OF THE TIME PERIOD WE ARE TALKING ABOUT TO THE NINE-MONTH

21  STAY OF THE INJUNCTION TO GIVE TIME FOR FRESENIUS TO INVENT

22  AROUND THE PATENT.

23  **Q.**   SO TO ACTUALLY GET THE INJUNCTION IN THE FIRST PLACE WITH

24  JUDGE ARMSTRONG, BAXTER SAID IT AGREED TO THE STAY; IS THAT

25  ACCURATE?

Case 3:09-cv-00629-REP Document 1031-1 Filed 03/21/13 Page 216 of 232 PageID# 34061
Case 4:03-cv-01431-PJH Document 1156 Filed 05/13/12 Page 216 of 291    215
RUBINFELD – CROSS / MR. ABERNATHY

1   **A.**   YES.  I THINK THEY UNDERSTOOD THAT THERE WAS A HEALTH

2   ISSUE HERE AND THEY WANTED TO GIVE FRESENIUS A CHANCE TO GET

3   THESE MACHINES TO THE PATIENTS.

4   **Q.**   SO DO YOU FIND CREDIBLE AN IDEA THAT AT THE HYPOTHETICAL

5   NEGOTIATION BAXTER WOULD SAY, WE HAVE A GUN TO YOUR HEAD AND WE

6   ARE GOING TO THROW YOUR MACHINE OFF THE MARKET TOMORROW?

7   **A.**   NO.

8           **MR. FLOREY:**  I HAVE NOTHING FURTHER.  THANK YOU,

9   YOUR HONOR.

10          **THE COURT:**  ALL RIGHT.  COUNSEL?

11          YOU CAN HAVE AN EQUIVALENT AMOUNT OF TIME.  HE TOOK

12  20 MINUTES.

13                      **CROSS-EXAMINATION**

14  **BY MR. ABERNATHY:**

15  **Q.**   PROFESSOR RUBINFELD, DO YOU BELIEVE THERE IS A FUNDAMENTAL

16  DIFFERENCE BETWEEN REASONABLE ROYALTY FOR PRE-VERDICT

17  INFRINGEMENT AND POST-VERDICT INFRINGEMENT?

18  **A.**   YES, I DO.

19  **Q.**   AND DO YOU AGREE THAT PRIOR TO JUDGMENT, LIABILITY FOR

20  INFRINGEMENT AS WELL AS PATENT INVALIDITY IS UNCERTAIN?

21  **A.**   CAN YOU JUST SAY THAT ONE MORE TIME, PLEASE?

22  **Q.**   PRIOR TO A VERDICT, IT IS UNCERTAIN WHETHER INFRINGEMENT

23  EXISTS OF A VALID PATENT, CORRECT?

24  **A.**   YES, THAT'S CORRECT.

25  **Q.**   YOU AGREE WITH THAT?

1    **A.**   YES.

2    **Q.**   AND YOU ALSO AGREE THAT ONCE A JUDGMENT OF VALIDITY AND

3    INFRINGEMENT HAS BEEN ENTERED, THE CALCULUS FOR DETERMINING A

4    REASONABLE ROYALTY BECOMES MARKEDLY DIFFERENT, CORRECT?

5    **A.**   IT BECOMES DIFFERENT, AND I HAVE DESCRIBED BRIEFLY,

6    BECAUSE OF TIME CONSIDERATIONS, HOW I THINK IT SHOULD ACCOUNT

7    FOR THESE FACTORS.  I WOULD SAY DIFFERENT.  WHETHER IT'S

8    MARKEDLY DIFFERENT DEPENDS ON THE CONTEXT OF THE CASE.

9    **Q.**   IF THE FEDERAL CIRCUIT SAID IT WAS MARKEDLY DIFFERENT,

10   WOULD YOU AGREE?

11   **A.**   IF THEY USE THAT LANGUAGE, I HAVE NO REASON TO DISAGREE

12   WITH THEIR LANGUAGE.

13   **Q.**   DO I HAVE IT RIGHT THAT IN YOUR DIRECT TESTIMONY, YOU DID

14   NOT MENTION THE TERM "GEORGIA-PACIFIC FACTORS"?

15   **A.**   WHEN YOU SAY IN THE ORIGINAL TRIAL?

16   **Q.**   NO, JUST NOW.

17   **A.**   YES.  WE HAD VERY LITTLE TIME, SO I DIDN'T HAVE TIME TO

18   TALK ABOUT IT.

19   **Q.**   YOU DIDN'T MENTION IT, RIGHT?

20   **A.**   NO, I DON'T THINK I DID.

21   **Q.**   YOU DID NOT SUBMIT A DECLARATION TO JUDGE ARMSTRONG IN

22   CONNECTION WITH HER CONSIDERATION OF WHAT THE REASONABLE

23   ROYALTY RATES OUGHT TO BE IN THIS CASE, CORRECT?

24   **A.**   IN THE ORIGINAL TRIAL --

25   **Q.**   NO, I AM NOT TALKING ABOUT THE ORIGINAL TRIAL.

Case 3:09-cv-00629-REP Document 1031-1 Filed 03/21/13 Page 218 of 232 PageID# 34063
Case 4:03-cv-01431-PJH Document 156 Filed 09/02/12 Page 217 of 291 217
RUBINFELD – CROSS / MR. ABERNATHY

1          I AM TALKING ABOUT IN BAXTER'S MOTION FOR A

2    PERMANENT INJUNCTION, YOU DID NOT SUBMIT A DECLARATION IN

3    OPPOSITION TO THAT MOTION, CORRECT?

4    **A.**   YES, I BELIEVE THAT'S CORRECT.  I DID SUBMIT EXTENSIVE

5    TESTIMONY USING THE GEORGIA-PACIFIC FACTORS IN THE ORIGINAL

6    TRIAL.

7    **Q.**   RIGHT.

8          IN THE ORIGINAL TRIAL THE HYPOTHETICAL NEGOTIATION

9    WAS AUGUST 2000?

10   **A.**   YES.

11   **Q.**   AND THIS IS NOVEMBER 2007, CORRECT?

12   **A.**   CORRECT.

13   **Q.**   AND IN YOUR DECLARATION TO THE COURT IN THIS ROUND OF

14   BRIEFING, I THINK YOU SAID THAT FRESENIUS, AT THE POINT OF THE

15   HYPOTHETICAL NEGOTIATION, HAD THE OPTION TO SIMPLY DISCONTINUE

16   SELLING THE 2008K, CORRECT?

17   **A.**   I ACTUALLY DON'T RECALL WHETHER I USED EXACTLY THAT

18   LANGUAGE OR NOT.

19   **Q.**   DID YOU SAY THAT IN EFFECT THAT FRESENIUS HAD THE CHOICE

20   TO STOP SELLING THE 2008K?

21   **A.**   I HONESTLY DON'T REMEMBER THAT.  YOU WILL HAVE TO SHOW IT

22   TO ME.  I AM SORRY.

23          **MR. ABERNATHY:**  YOUR HONOR -- SEE IF I CAN REFRESH

24   YOUR RECOLLECTION.

25          **THE WITNESS:**  I CAN IMAGINE WHAT I WAS THINKING, BUT

Case 3:09-cv-00689-RFB Document 1031-1 Filed 03/21/13 Page 219 of 232 PageID# 34064
Case 3:09-cv-01434-PJH Document 156 Filed 03/02/12 Page 218 of 231                                    218
RUBINFELD - CROSS / MR. ABERNATHY

1    I AM NOT SURE I ACTUALLY SAID THAT.

2            IF IT WILL SAVE TIME, I CAN PROBABLY TELL YOU WHY

3    THERE'S SOME CONFUSION IN MY MIND ABOUT THAT.  AND WHILE YOU

4    ARE LOOKING, I'LL TELL YOU --

5            **MR. ABERNATHY:**  NO.

6            **THE WITNESS:**  -- THE ISSUE HAS TO DO WITH THE

7    THINKING ABOUT INVENTING AROUND RATHER THAN -- THAN SELLING THE

8    K.

9            SO THE QUESTION WOULD BE, IN FRESENIUS' MIND, HOW

10   LONG WOULD IT TAKE TO INVENT AROUND SO THEY WOULDN'T HAVE TO

11   SELL -- SELL THE K.

12   **BY MR. ABERNATHY:**

13   **Q.**   SEE IF THIS REFRESHES YOUR RECOLLECTION.

14           PARAGRAPH 46 OF YOUR DECLARATION, DIDN'T YOU SAY:

15           "HERE I UNDERSTAND THAT FRESENIUS COULD HAVE

16           STOPPED SELLING 2008K HEMODIALYSIS MACHINES

17           IMMEDIATELY FOLLOWING THE COURT'S INJUNCTION

18           UNTIL THE 2K MACHINE WAS READY."

19   **A.**   YEAH.  I ALSO SAID THAT WAS NOT THEIR FIRST CHOICE BECAUSE

20   OF PUBLIC HEALTH CONCERNS.

21   **Q.**   RIGHT.  BUT THAT WAS A CHOICE FRESENIUS HAD, CORRECT?

22   **A.**   THEY COULD HAVE CONSIDERED -- THEY COULD HAVE

23   CONSIDERED -- THEY HAD H'S THAT WERE, AT THAT TIME WERE

24   AVAILABLE.  THEY COULD HAVE STILL HAD A HEMO FOR PEOPLE WHO

25   WERE RELYING ON THE H'S.

Case 3:09-cv-00609-RFB Document 1021-1 Filed 03/21/13 Page 220 of 232 PageID# 34065
Case 4:09-cv-01434-PJH Document 156 Filed 05/11/12 Page 230 of 291
219
RUBINFELD - CROSS / MR. ABERNATHY

1            THE H'S HAS A LIFE THAT'S SOMEWHAT FLEXIBLE, SO THAT

2    WOULD HAVE BEEN AN ALTERNATIVE.  BUT I MADE IT VERY CLEAR, THAT

3    WASN'T THEIR CHOICE.  THEY WANTED TO HAVE THE NEWER MACHINES.

4    **Q.**   RIGHT.

5            YOU SAY THE H WAS STILL AVAILABLE AT THE POINT OF

6    THE HYPOTHETICAL NEGOTIATION?

7    **A.**   YEAH.  THERE WERE H'S IN THE CLINICS.  PEOPLE WERE USING

8    THE H'S AS WELL AS THE K'S.

9    **Q.**   AND IF FRESENIUS HAD TOLD JUDGE ARMSTRONG THAT THE H WAS

10   NOT A SUBSTITUTE FOR THE 2008K IN NOVEMBER OF 2007, WOULD

11   FRESENIUS BE WRONG?

12   **A.**   WHEN SHE WAS SAYING IT WAS NOT A SUBSTITUTE, WE AGREE IT'S

13   NOT A PERFECT SUBSTITUTE.  THAT'S THE BASIS OF MY AWARD FOR --

14   MY DECISION ABOUT HOW TO AWARD REASONABLE ROYALTY DAMAGES.  OF

15   COURSE IT'S NOT A PERFECT SUBSTITUTE.

16   **Q.**   NO, NO, NO.

17           IN NOVEMBER OF 2007, IF FRESENIUS SAID THE 2008H WAS

18   NO LONGER COMMERCIALLY AVAILABLE, WOULD FRESENIUS BE CORRECT --

19       **MR. FLOREY:**  YOUR HONOR, I HAVE AN OBJECTION.  I

20   BELIEVE THEY ARE TALKING PASSED EACH OTHER.

21           WE ADMIT WE SAID THAT WE WERE NOT PRODUCING 2008H'S

22   SO THAT WE WOULD SELL THE NEW INTO THE MARKET.  I BELIEVE

23   PROFESSOR RUBINFELD JUST TESTIFIED ABOUT H'S THAT WERE ALREADY

24   PRIOR SOLD IN CLINICS LEAVING THEM THERE AS OPPOSED TO SWAPPING

25   THEM FOR K'S.

RUBINFELD – CROSS / MR. ABERNATHY

1      **THE COURT:**  YOUR OBJECTION IS WHAT?

2      **MR. FLOREY:**  THAT MR. ABERNATHY'S QUESTION ASSUMES

3  SOMETHING THAT PROFESSOR RUBINFELD DID NOT, IN FACT, SAY.

4      **THE COURT:**  OKAY.  ALL RIGHT.  I WILL ALLOW YOU TO

5  CLARIFY.

6      **THE WITNESS:**  I WILL JUST SAY --

7      **THE COURT:**  HOLD ON.  HOLD ON.  HE GETS TO ASK THE

8  QUESTIONS.  YOU ASK THE QUESTION YOU WANT AND LET'S SEE IF THE

9  WITNESS CAN NOW ANSWER IT GIVEN THAT CLARIFICATION OFFERED BY

10 MR. FLOREY.

11 **BY MR. ABERNATHY:**

12 **Q.**   IN NOVEMBER OF 2007, YOU AGREE THAT THE 2008H WAS NO

13 LONGER COMMERCIALLY AVAILABLE FROM FRESENIUS?

14 **A.**   I DO AGREE WITH THAT, YES.

15 **Q.**   THANK YOU.

16      YOU ALSO AGREE, DON'T YOU, THAT WHEN BAXTER MOVED

17 FOR A PERMANENT INJUNCTION AND AGREED TO A STAY, IT CONDITIONED

18 THAT STAY ON A 10 PERCENT ROYALTY RATE ONGOING FOR THE SALE OF

19 THE INFRINGING 2008K?

20 **A.**   I DO BELIEVE THAT WAS THE BASIS FOR THE MONEY THAT WAS PUT

21 INTO ESCROW UNTIL THIS CASE WAS RESOLVED, YES.

22 **Q.**   PLEASE ANSWER MY QUESTION.

23 **A.**   I THOUGHT I HAD.

24 **Q.**   LET'S JUST MAKE SURE.

25      YOU TESTIFIED THAT BAXTER WAS A WILLING LICENSOR,

Case 3:09-cv-00609-RFB Document 1021-1 Filed 07/21/13 Page 222 of 232 PageID# 34967
Case 3:09-cv-01434-PJH Document 156 Filed 08/02/12 Page 221 of 231   221
RUBINFELD – CROSS / MR. ABERNATHY

1    RIGHT?  IT'S THE LAST POINT OR SECOND TO THE LAST POINT IN THE

2    LAST BULLET POINT?

3    **A.**   YES.

4    **Q.**   BAXTER WAS A WILLING LICENSOR IN 2007, AT THE POINT OF THE

5    HYPOTHETICAL NEGOTIATION, AGREEING TO A STAY OF THE INJUNCTION

6    SUBJECT TO ITS REQUEST FOR A 10 PERCENT ROYALTY, RIGHT?

7    **A.**   I THINK THAT THAT IS A CORRECT STATEMENT OF WHAT HAPPENED

8    AT THAT POINT IN TIME.

9         OBVIOUSLY IT WASN'T A STATEMENT OF AN AGREEMENT BY

10   FRESENIUS THAT THAT WOULD BE THE APPROPRIATE ROYALTY.

11   **Q.**   BUT THAT WAS BAXTER'S WILLINGNESS AT THE TIME, CORRECT?

12   **A.**   THAT WAS BAXTER'S POINT OF VIEW, YES.

13        **MR. ABERNATHY:**  THANK YOU.  THAT'S ALL I HAVE, YOUR

14   HONOR.

15        **THE COURT:**  ALL RIGHT.  ALL RIGHT.

16        **MR. FLOREY:**  NOTHING FURTHER.

17        **THE COURT:**  THANK YOU.  YOU MAY STEP DOWN.

18        **THE WITNESS:**  THANK YOU.

19        **THE COURT:**  ALL RIGHT.  A FEW THINGS BEFORE WE

20   ADJOURN.

21        I WANT TO MAKE SURE THAT I UNDERSTAND WHERE YOU ALL

22   THINK WE ARE.  NOW, THIS WAS ACTUALLY MORE FACTUAL TESTIMONY

23   THAN I ANTICIPATED.  I ACTUALLY DIDN'T KNOW WHAT TO ANTICIPATE

24   AS TO WHETHER OR NOT THERE WOULD BE WITNESSES HERE AND WHAT

25   KIND OF TESTIMONY THAT WOULD BE OFFERED IF THERE WERE WITNESSES

1    HERE.

2              SO, IT'S AN EVIDENTIARY PROCEEDING.  I MEAN, I

3    TYPICALLY, FOLLOWING A BENCH TRIAL, MAKE FINDINGS AS REQUIRED

4    BY RULE 52.  THAT'S NOT NECESSARILY CONTROLLING HERE, BUT IT

5    CERTAINLY MIGHT BE HELPFUL GIVEN THE STATUS OF THE RECORD HERE.

6              I MEAN, I THINK THE ONE THING I DO WANT TO DO IS

7    MAKE IT CLEAR TO YOU ALL WHY I AM RULING IN THE WAY IN WHICH I

8    AM RULING.  SO I THOUGHT IT MIGHT BE HELPFUL IF YOU ALL

9    PREPARED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON

10   THIS EVIDENTIARY PROCEEDING.  THAT WAY YOU COULD AT LEAST POINT

11   ME TO THE PARTS OF THE RECORD, BECAUSE IT IS MASSIVE AND I

12   DON'T KNOW WHERE EVERYTHING IS AND I HAVEN'T TOUCHED EVERY

13   PIECE OF PAPER YOU ALL HAVE SUBMITTED.

14             SO IT WOULD BE HELPFUL FOR ME TO KNOW WHAT PARTS OF

15   THE RECORD YOU THINK ARE SUPPORTIVE OF YOUR POSITION.  YOUR

16   SLIDES ARE VERY HELPFUL, BUT A CITATION WOULD BE GREAT IF THERE

17   IS SOMETHING TO EITHER THE SLIDES THAT YOU HAVE USED AND MOST

18   OF THE SLIDES REPRESENT TRIAL EXHIBITS IN ANY EVENT, SO, I

19   THINK THAT MIGHT BE HELPFUL.

20             HOW DO YOU ALL FEEL ABOUT THAT?

21             **MS. BROOKS:**  WE WOULD AGREE, YOUR HONOR.  WE THINK

22   THAT'S A VERY GOOD IDEA ESPECIALLY IN LIGHT OF THE PAICE CASE

23   THAT SAYS THAT THE COURT DOES NEED TO MAKE VERY SPECIFIC

24   FINDINGS TO SUPPORT WHATEVER ROYALTY YOUR HONOR EVENTUALLY

25   COMES UP WITH.

1          **THE COURT:** RIGHT.  RIGHT.

2          **MR. ABERNATHY:**  YOUR HONOR, I AGREE AS WELL.

3          JUST ONE THOUGHT.  THERE IS AN INORDINATE AMOUNT OF

4   BRIEFING ALREADY ON THIS ISSUE.  I THINK WE ARE AT OUR THIRD

5   ROUND.

6          I THINK IT WOULD -- SO WE COULD INCORPORATE A LOT OF

7   STUFF THAT HAS ALREADY BEEN WRITTEN.  THERE ARE PILES OF BRIEFS

8   THAT I WENT THROUGH TO PREPARE FOR THIS.  I THINK IT WOULD BE

9   HELPFUL FOR ALL OF US IF WE HAD SOME SORT OF LIMITED PAGE TO

10  FORCE US TO GET TO THAT WHICH COUNTS.

11         **THE COURT:**  I AM GOING TO --

12         **MR. ABERNATHY:**  I WAS THINKING LIKE TEN PAGES OF

13  PROPOSED FINDINGS, OR SOMETHING LIKE THAT.

14         **THE COURT:**  WELL, I WAS GOING TO IMPOSE A LIMIT OF

15  25 PAGES ON THE ENTIRETY.  YOU CAN USE WHATEVER YOU WANT FOR

16  PROPOSED FINDINGS, AND THE CONCLUSIONS, THE PROPOSED

17  CONCLUSIONS OF LAW WOULD ESSENTIALLY ENCOMPASS THE ARGUMENTS

18  THAT YOU ALL HAVE MADE.  BUT YOU WILL HAVE THE CONTEXT OF THE

19  FACTUAL MATTERS THAT HAVE BEEN PRESENTED.

20         I UNDERSTAND THAT THE WITNESSES YOU'VE PRESENTED ARE

21  JUST AN EXCERPT OF THE FACTUAL MATTERS THAT ARE AVAILABLE FOR

22  THE COURT'S CONSIDERATION, SO I DON'T WANT TO LIMIT YOU TO JUST

23  THE TESTIMONY HERE.  BUT TO THE EXTENT THAT YOU FIND IT HELPFUL

24  AND SUPPORTIVE, I WOULD LIKE YOU TO CITE THE PARTS THAT YOU

25  THINK ARE HELPFUL AND SUPPORTIVE AS WELL AS THE OTHER FACTUAL

```
 1   MATTERS.  JUST SO I AM NOT MISSING ANYTHING.

 2            MR. ABERNATHY:  SURE.

 3            THE COURT:  I WOULD LIMIT YOU TO 25 PAGES.

 4            MR. ABERNATHY:  SURE.

 5            THE COURT:  OKAY?

 6            MR. ABERNATHY:  ANOTHER QUESTION, YOUR HONOR, JUST

 7   LOGISTICALLY.  IS THIS WHERE YOU WOULD WANT CONCURRENT

 8   SUBMISSIONS FROM BOTH SIDES AND THEN BOTH REPLY, OR JUST ONE

 9   SHOT?

10            THE COURT:  JUST ONE SHOT.

11            MR. ABERNATHY:  CONCURRENTLY?

12            THE COURT:  SAME TIME.

13            MR. ABERNATHY:  GREAT.

14            THE COURT:  ABSOLUTELY.  ONE -- GENERALLY BEFORE

15   TRIAL, BEFORE A BENCH TRIAL, I WOULD REQUEST THEM IN ADVANCE

16   AND THEN EACH SIDE WOULD KNOW WHAT THE OTHER SIDE WAS

17   ATTEMPTING TO PROVE.  BUT HERE NOW WE'VE GOT THE RECORD AND

18   BOTH OF YOU CAN MAKE OF IT WHAT YOU WILL.

19            THERE'S AN AWFUL LOT OF THINGS YOU DISAGREE ON AND I

20   ANTICIPATE THAT, BUT I WOULD JUST LIKE TO BE ABLE TO HAVE A

21   ROAD MAP, ESSENTIALLY, TO WHAT YOUR ARGUMENTS ARE AND WHAT

22   FACTS YOU THINK ARE SUPPORTED.

23            MR. ABERNATHY:  THANK YOU, YOUR HONOR.

24            THE COURT:  NOW -- SO WE WILL TALK ABOUT THAT AND

25   ABOUT THE TIMING, BUT I ALSO WANT TO JUST MAKE SURE I
```

1    UNDERSTAND WHERE -- WHAT YOU ALL THINK THE PURPOSE OF THIS

2    PROCEEDING WAS.

3              AS I READ THE FEDERAL CIRCUIT'S OPINION, THE REMAND

4    WAS SOLELY ON THE QUESTION OF THE INJUNCTION AND THE ROYALTIES.

5    SINCE THE PATENT EXPIRED, THERE ARE REALLY NO ISSUES WITH

6    RESPECT TO THE INJUNCTION THAT NEED TO BE ADDRESSED.

7              **MR. ABERNATHY:**  CORRECT, YOUR HONOR.

8              **THE COURT:**  IT'S REALLY ALL ABOUT THE ROYALTIES.

9    AND THERE ARE TWO ASPECTS OF THAT.  THE ROYALTIES FOR THE

10   MACHINES AND THE ROYALTIES FOR THE DISPOSABLES.  THAT'S

11   ESSENTIALLY IT.  CORRECT?

12             **MR. ABERNATHY:**  YES, YOUR HONOR.

13             **THE COURT:**  I UNDERSTAND FROM SOMETHING YOU SAID

14   EARLIER THAT YOU BELIEVE THAT THE -- YOUR CLIENT'S ENTITLEMENT

15   TO A ROYALTY FOR BOTH OF THOSE PARTS, MACHINES AND DISPOSABLES,

16   HAS BEEN ESTABLISHED AND IT IS JUST A MATTER OF THE RATE OF

17   ROYALTY.

18             **MR. ABERNATHY:**  YES, YOUR HONOR.

19             **THE COURT:**  I UNDERSTAND YOUR ARGUMENT TO BE THAT

20   THERE IS NO ENTITLEMENT, THAT THE COURT COULD LOOK AT THE

21   ENTIRETY TO DETERMINE WHETHER OR NOT IT'S EITHER OR BOTH ARE

22   WARRANTED.

23             IT IS NOT ENTIRELY CLEAR FROM THE FEDERAL CIRCUIT'S

24   OPINION.  THE FEDERAL CIRCUIT SAYS WE DON'T -- "WE DO NOT

25   DECIDE TODAY WHETHER THE DISTRICT COURT'S ROYALTY AWARD WAS

```
 1    PROPER."

 2                THAT SUGGESTS TO ME THAT MAYBE THEY THINK THAT MAYBE

 3    IT WASN'T PROPER AND MAYBE THAT DOESN'T SUGGEST AN ENTITLEMENT

 4    TO ANY KIND OF A ROYALTY.  MAYBE THAT'S SOMETHING I AM SUPPOSED

 5    TO VISIT DE NOVO.

 6                YOU ALL CAN ADDRESS THAT IN YOUR PAPERS.  I WILL

 7    SIMPLY TELL YOU THAT IT IS NOT ENTIRELY CLEAR TO ME THAT EITHER

 8    ONE OF YOU IS RIGHT ON THAT.  I DON'T KNOW HOW I WOULD

 9    INTERPRET THAT, BUT I WOULD LIKE TO SEE WHAT YOU ALL HAVE TO

10    SAY ABOUT THAT.

11                SO, WE ESSENTIALLY HAVE THE ARGUMENTS ON THE

12    DISPOSABLES AND ON THE REASONABLE ROYALTY.  AND I THINK THAT

13    YOU ALL HAVE PUT FORWARD, AT LEAST THE FACTUAL BASIS, AND I

14    THINK YOUR OPENING -- IN YOUR OPENING COMMENTS AND ARGUMENT,

15    YOU'VE ESSENTIALLY PUT FORWARD THE LEGAL BASES WHY YOU THINK

16    YOUR POSITION IS CORRECT.  SO I THINK I UNDERSTAND IT.  IT

17    WOULD JUST BE HELPFUL IF YOU PUT IT ALL IN WRITING AS I WORK MY

18    WAY THROUGH THIS.

19                ANOTHER THING THAT WOULD BE HELPFUL, BOTH SIDES USED

20    VARIOUS DIFFERENT CHRONOLOGICAL EXHIBITS SHOWING -- BUT YOU

21    ONLY SHOWED THE THINGS YOU WANTED TO SHOW TO MAKE WHATEVER

22    POINTS YOU WERE MAKING.  AND IT WOULD REALLY BE HELPFUL, AND I

23    DON'T KNOW IF YOU CAN PREPARE IT JOINTLY, TO GIVE ME KIND OF A

24    JOINT CHRONO SO I HAVE EVERYTHING IN CONTEXT.  YOU ALL HAVE

25    LIVED WITH THIS CASE FOR YEARS; I HAVEN'T.  IT WOULD BE
```

1    HELPFUL.  I THINK I HAVE A GENERAL SENSE, BUT I HAD TOTALLY

2    FORGOTTEN ABOUT THE STIPULATIONS AS TO INFRINGEMENT, AND THAT

3    OCCURRED -- THAT APPEARED ON ONE OF THE SLIDES, BUT I DIDN'T

4    SEE IT ON ANY OF THE OTHERS, AND THAT WAS IN 2006?

5         **MR. ABERNATHY:**  '6.

6         **MS. BROOKS:**  THERE WAS ONE SUMMARY JUDGMENT MOTION

7    GRANTED FINDING THAT WE INFRINGED.  AND THEN SHORTLY BEFORE

8    TRIAL, IN ORDER TO ESSENTIALLY TAILOR OR NARROW THE ISSUES, WE

9    STIPULATED THAT UNDER THE COURT'S CLAIM CONSTRUCTIONS, WHICH

10   WERE EXTREMELY BROAD, THEN WE INFRINGE CERTAIN CLAIMS.

11        **THE COURT:**  WERE ALL THREE PATENTS -- DID YOU

12   STIPULATE TO INFRINGEMENT AS TO ALL THREE?

13        **MS. BROOKS:**  WE DID, YOUR HONOR.  THERE WAS A FOURTH

14   PATENT THAT WE DID NOT, WHICH THE JURY FOUND WAS NOT INFRINGED.

15   THAT WAS SENT BACK, BUT BAXTER DROPPED THAT RIGHT BEFORE --

16        **THE COURT:**  THAT'S OUT OF THE CASE.

17        **MS. BROOKS:**  YES, YOUR HONOR.

18        **THE COURT:**  SO WITH REGARD TO THESE THREE.  ANYWAY,

19   IT WOULD BE HELPFUL.  IT WOULD BE HELPFUL.

20        **MR. ABERNATHY:**  I THINK WE CAN DO IT.

21   NOTWITHSTANDING THE BACK AND FORTH THROUGH ALL THE YEARS WORKED

22   A LOT AND STIPULATED TO A LOT, I THINK WE WILL CONTINUE IN THAT

23   SPIRIT OF WORK HARD, TRY TO AGREE HARD.

24        **THE COURT:**  IF YOU CAN PROVIDE ME WITH A, KIND OF A

25   CHRONOLOGICAL CHART OF SOME KIND SHOWING ALL OF THE RESPECTIVE

```
1    EVENTS, JUST SO THAT I DON'T GET CONFUSED ABOUT WHAT HAPPENED

2    HERE, ET CETERA.

3              MR. ABERNATHY:  SURE.

4              THE COURT:  ALL RIGHT.  SO, THE ONLY OTHER ISSUE WAS

5    THE WHOLE QUESTION -- I DON'T KNOW HOW IMPORTANT IT IS TO YOU,

6    BUT YOUR FIRST WITNESS TESTIFIED AS TO THE CUSTOMER COMMENTS

7    AND YOU WANTED TO PROVIDE SOME AUTHORITY FOR THAT.

8              MS. BROOKS:  WE WILL FIND THAT, YOUR HONOR.  WE CAN

9    EITHER DO IT SIMPLY AS A POCKET BRIEF OR INCLUDE IT AS PART OF

10   THE --

11             THE COURT:  IF YOU DO THAT, THEN THE OTHER SIDE

12   DOESN'T HAVE AN OPPORTUNITY TO RESPOND.  SO MAYBE YOU SHOULD DO

13   IT IN A POCKET BRIEF, AS YOU CALL IT.  TWO PAGES, TWO PAGE

14   RESPONSE.

15             MR. ABERNATHY:  SURE.  THANK YOU, YOUR HONOR.

16             THE COURT:  HOW MUCH TIME WOULD YOU ALL LIKE TO

17   PREPARE YOUR PROPOSED FINDINGS OF FACT AND PROPOSED CONCLUSIONS

18   OF LAW?

19             MS. BROOKS:  YOUR HONOR, IN LIGHT OF THE HOLIDAYS

20   AND SOME OF US HAVE BEEN WORKING KIND OF AROUND THE CLOCK, WE

21   WOULD ASK, BASICALLY, FOR AS MUCH TIME AS YOUR HONOR IS WILLING

22   TO GIVE US.  I DON'T KNOW IF THE NORMAL TIME WOULD HAVE BEEN 30

23   DAYS, AND IF SO, COULD WE HAVE 60 IN LIGHT OF THE HOLIDAYS?

24             THE COURT:  I DON'T REALLY CARE ONE WAY OR THE

25   OTHER.  I KIND OF WOULD LIKE TO DO IT SOONER RATHER THAN LATER,
```

1    BUT I AM SO BUSY NOW, I HAVE NO IDEA WHEN I AM GOING TO BE ABLE

2    TO COME BACK TO THIS IN ANY EVENT.

3              SO YOU TAKE WHAT TIME YOU WANT.  DO YOU WANT TO

4    AGREE TO SOMETHING AND THEN LET ME KNOW?  YOU WANT TO TALK

5    ABOUT IT?

6         **MR. ABERNATHY:**  MAYBE WE SHOULD.  I AM GOING TO BE

7    IN TRIAL FOR MUCH OF THE FIRST QUARTER OF NEXT YEAR.  I WOULD

8    LIKE TO GET THIS DONE BEFORE THE HOLIDAYS.  IT HAS BEEN

9    EXTREMELY EXTENSIVELY BRIEFED.  WE HAVE NEW INFORMATION TODAY,

10   BUT IT HAS ONLY BEEN A FEW HOURS.  THIS MATERIAL IS NOT NEW AS

11   YOU PROBABLY GATHERED TODAY.

12             I THINK WE CAN PACKAGE THIS WELL.  BOTH SIDES, I

13   THINK, GAVE A LOT OF THOUGHT TO THIS HEARING.  I WOULD PROPOSE,

14   YOUR HONOR, THAT I DON'T KNOW, THE 23RD OR THE 22ND WE SUBMIT

15   THESE.  THEN IT'S OUT OF OUR HAIR AND OUT -- WHENEVER YOU RULE

16   ON IT, YOU CAN RULE ON IT.  JUST PERSONALLY, I AM CONCERNED I

17   AM GOING TO BE GONE.

18        **THE COURT:**  THEN YOU CAN DO YOURS EARLY.  DO YOU

19   HAVE ANY PROBLEM DOING YOURS BEFORE?

20        **MR. ABERNATHY:**  THEN SHE GETS A REPLY, IN EFFECT.

21        **THE COURT:**  I WOULD BE HARD PRESSED TO REQUIRE

22   ANYBODY ON THIS CASE TO DO IT BEFORE CHRISTMAS.

23        **MR. ABERNATHY:**  I HEAR YOU.  WE WILL COME UP WITH AN

24   AGREEMENT.

25        **THE COURT:**  ALL RIGHT.  ALL RIGHT.  JUST SO THAT

```
 1    BOTH OF YOU AGREE TO SUBMIT AT THE SAME TIME.

 2            MR. ABERNATHY:  SURE.

 3            THE COURT:  OKAY?

 4            MS. BROOKS:  THANK YOU, YOUR HONOR.

 5            THE COURT:  SO WITH YOUR POCKET BRIEF THEN, SUBMIT

 6    EITHER WITH YOURS OR WITH YOUR RESPONSE, IT DOESN'T MATTER.

 7    E-FILE A STIPULATION WITH REGARD TO THE FILING OF THE FINDINGS.

 8            MR. ABERNATHY:  SURE.

 9            THE COURT:  AND THAT WILL CLOSE THE RECORD.

10            MR. ABERNATHY:  THANK YOU, YOUR HONOR.

11            THE COURT:  ANYTHING ELSE?

12            MS. BROOKS:  NOTHING ON OUR SIDE.

13            THE COURT:  AS USUAL, YOU ALL DID A VERY GOOD JOB.

14    THIS IS A TOUGH CASE.  NOT SO MUCH FOR WHAT YOU ALL HAVE DONE,

15    BUT JUST BECAUSE OF THE PROCEDURAL HISTORY, BECAUSE SO MANY

16    COURTS HAVE BEEN INVOLVED IN IT, AND IT'S VERY DIFFICULT.  BUT

17    I THINK YOU ALL DID A VERY GOOD JOB IN AT LEAST HELPING ME KIND

18    OF SEE THE WAY TODAY.

19            MR. ABERNATHY:  THANK YOU, YOUR HONOR.

20            MS. BROOKS:  THANK YOU, YOUR HONOR.

21            MR. ABERNATHY:  THANKS FOR YOUR TIME.

22

23            (PROCEEDINGS ADJOURNED AT 3:15.)

24

25
```

## CERTIFICATE OF REPORTER

I, DIANE E. SKILLMAN, OFFICIAL REPORTER FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C-03-1431 PJH, FRESENIUS USA, INC., ET AL. VERSUS BAXTER INTERNATIONAL, INC., ET AL., PAGES NUMBERED 1 THROUGH 230, WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF FILING.

THE INTEGRITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON REMOVAL FROM THE COURT FILE.


/S/ DIANE E. SKILLMAN

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR