**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**



ePLUS INC.,

        Plaintiff,

v.                              Civil Action No. 3:09cv620

LAWSON SOFTWARE, INC.,

        Defendant.

### MEMORANDUM OPINION

This matter is before the Court on Lawson Software, Inc.'s ("Lawson") MOTION TO STRIKE EXPERT OPINIONS OF DR. KEITH UGONE (Docket No. 892). For the reasons below, the motion will be denied as to testimony about disgorgement of profits and denied as moot as to testimony about cost savings.

### PROCEDURAL BACKGROUND

On January 27, 2011, following a two-week trial, a jury returned a verdict of infringement in favor of ePlus Inc. ("ePlus") and against Lawson finding that several claims of three of the patents-in-suit had been infringed. On May 23, 2011, the Court issued a permanent injunction as part of the remedy for the infringement, enjoining Lawson and "any person in active concert or participation with them . . . from directly or indirectly making, using, offering to sell, or selling within the United States or importing into the Unites States" certain

product configurations and services. Injunction Order (Docket
No. 729). On September 9, 2011, ePlus filed a Motion to Show
Cause, alleging that Lawson was in contempt of the Injunction
Order. (Docket No. 798). The focus of ePlus' contempt motion
concerned an application of one of the infringing system
configurations, Requisition Self-Service ("RSS"). Lawson
redesigned this application and created Requisition Center
("RQC"). ePlus alleges that the new RQC product is not colorably
different from RSS.[1]

On February 16, 2012, ePlus filed its MOTION TO STRIKE
TESTIMONY OF LAWSON ECONOMIC EXPERT JONATHAN D. PUTNAM
CONCERNING AWARD OF ROYALTY AND UNOPPOSED REQUEST FOR EXPEDITED
BRIEFING (Docket No. 902), contending that Dr. Putnam's
testimony concerning reasonable royalty rates should be stricken
because his calculations were based on Dr. Mangum's
calculations. Lawson filed an opposition, and ePlus filed a
reply.

---

[1] During discovery, both sides had experts prepare reports
concerning damages. Lawson's expert, Dr. Jonathan Putnam,
suggested that, if ePlus prevailed, the Court should use a
"reasonable royalty" damages figure. Putnam Rpt. (Docket No.
886). To support his analysis, Dr. Putnam adopted the reasonable
royalty rate of Dr. Russell Mangum, III, a damages expert whom
ePlus proffered at the initial patent-infringement proceeding.
The Court granted Lawson's motion *in limine* before the trial and
struck Dr. Mangum's testimony, finding that his reasonable
royalty calculation did not satisfy the requirements of Fed. R.
Evid. 702. (Docket No. 410); see also Memorandum Opinion (Docket
No. 596). That decision was affirmed on appeal. ePlus Inc. v.
Lawson Software, Inc., 700 F.3d 509, 522-23 (Fed. Cir. 2012).

2

In the meantime, ePlus's expert Dr. Keith Ugone filed a report suggesting that disgorgement would be the appropriate measure of damages should the Court find Lawson in contempt. Ugone Rpt. (Docket No. 869). Dr. Ugone argued that ePlus should either be awarded the profits that Lawson made because of its use of RQC or the costs that Lawson saved by not complying with the Court's Injunction Order. Id. On February 15, 2012, Lawson filed its MOTION TO STRIKE EXPERT OPINIONS OF DR. KEITH UGONE (Docket No. 892) and supporting memorandum, objecting to Dr. Ugone's testimony on the ground that disgorgement is a punitive remedy, and arguing that such remedies are inappropriate in civil contempt proceedings. The opposition and reply to Lawson's motion were filed shortly thereafter.

On February 29, 2012, the Court heard argument on both Lawson's and ePlus's motions. The Court granted ePlus's motion, striking Dr. Putnam's testimony on reasonable royalty rates, on March 3, 2012 (Docket No. 944).

The foregoing facts form the basic context for the assessment of Lawson's motion to strike. The parties' arguments will be addressed in turn. Other facts will be found in the discussion of the analytical component to which they relate.

## LEGAL STANDARD

Under Federal Rule of Evidence 702, an expert may testify if: "(1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case." The expert must file a report in which he provides a "complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). These conditions represent the codification of the concepts announced in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). Daubert established that the trial judge must ensure that expert evidence is reliable and relevant. Relevant expert testimony is testimony that will "assist the trier of fact to understand the evidence or to determine a fact in issue."

The Court has "wide discretion" in determining whether expert testimony would "assist the trier of fact." Sun Yung v. Zom Clarendon, L.P., No. 10-1344, 2011 U.S. App. LEXIS 9381, at *21-22 (4th Cir. May 6, 2011) (quoting Mercado v. Austin Police Dep't, 754 F.3d 1266, 1269 (5th Cir. 1985)); see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1992) (noting that courts of appeals apply an "abuse-of-discretion standard" when

4

reviewing a district court judge's decision to admit or exclude expert testimony). This is particularly true when "the court sits as the trier of fact, for [it] is then in the best position to know whether expert testimony would help [it]." Id. (quoting Mercado, 754 F.3d at 1269).

## DISCUSSION

### A.   Disgorgement Remedy

#### 1. The Parties' Contentions

Lawson contends that Dr. Ugone's report should be stricken in its entirety because Dr. Ugone relies on the mistaken premise that disgorgement is an available compensatory remedy in a civil contempt proceeding when that contempt proceeding is being held due to the violation of an injunction prohibiting continued infringement of a patent. According to Lawson, the 1946 amendments to the Patent Act eliminating disgorgement as a remedy for infringement also eliminated the remedy of disgorgement in related civil contempt proceedings. And, regardless of whether the 1946 amendments eliminated the disgorgement remedy, Lawson contends that the Supreme Court's decision in United States v. United Mine Workers of Am., 330 U.S. 258, 303-04 (1947) eliminated disgorgement remedies in civil contempt cases in which the plaintiff fails to show "actual loss." Lawson argues that the Fourth Circuit interpreted United Mine Workers as eliminating the remedy in its decisions

5

in <u>Carbon Fuel Co. v. United Mine Worker</u>, 517 F.2d 1348 (4th
Cir. 1975) and <u>Windsor Power House Coal Co. v. District 6,
United Mine Workers of Am.</u>, 530 F.2d 312 (4th Cir. 1976).

ePlus contends that disgorgement of profits is an available
remedy in civil contempt proceedings; that the 1946 amendments
to the Patent Act did not eliminate this remedy; and that it
need not show its actual amount of loss or damages in order to
recover a disgorgement remedy. ePlus points to language in <u>Leman
v. Krentler-Arnold Hinge Last Co.</u>, 284 U.S. 448 (1932), arguing
that neither <u>United Mine Workers</u> nor the 1946 amendments to the
Patent Act disturbed the holding in that case. ePlus points out
that only one decision after the 1946 amendments has held that
the amendments eliminated disgorgement of profits as a remedy in
civil contempt proceedings.

## 2. Civil Contempt Remedies

In civil contempt proceedings, the chosen remedy must serve
either or both of two purposes: "to coerce the contemnor into
complying in the future with the court's order, or to compensate
the complainant for losses resulting from the contemnor's past
noncompliance." See <u>The Colonial Williamsburg Found. v. The
Kittinger Co.</u>, 792 F. Supp. 1397, 1407 (E.D. Va. 1992), aff'd 38
F.3d 133 (4th Cir. 1994) (citations omitted). Courts have broad
discretion in choosing a remedy "based on the nature of the harm
and the probable effect of alternative sanctions." <u>Id.</u> (quoting

6

Connolly v. J.T. Ventures, 851 F.2d 930 (7th Cir. 1988) (citing United Mine Workers, 330 U.S. 258, 303-04 (1947))). Here, the dispute between the parties is centered on whether the disgorgement remedy can be considered "compensatory." Neither party argues that it is intended to be coercive.[2]

The Supreme Court addressed the issue of whether disgorgement of profits could be considered "compensatory" for the purposes of a civil contempt proceeding in Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448 (1932). In that case, as in this one, the respondent was accused of violating a permanent injunction that had been granted after a finding of patent infringement. The Court of Appeals rejected a disgorgement of profits remedy, holding that compensatory civil contempt remedies had to be based on "pecuniary injury or damage." Id. at 455. The Supreme Court reversed:

> While the distinction is clear between damages, in the sense of actual pecuniary loss, and profits, the latter may none the less be included in the concept of compensatory relief. In a suit in equity against an infringer, profits are recoverable not by way of punishment but to insure full compensation to the party injured . . . Profits are [] allowed 'as an equitable measure of compensation' . . . it is apparent that there is no necessary

---

[2] Dr. Ugone also provided some testimony about a fine that would be imposed post-contempt proceeding until Lawson complied with the injunction. The only dispute as to that testimony appears to be the amount of the fine.

> exclusion of profits from the idea of
> compensation in a remedial proceeding.

Id. at 456.

Fifteen years after Leman was decided, the Supreme Court decided United States v. United Mine Workers of Am., 330 U.S. 258 (1947). At issue in that case was the issuance of several injunctions and a finding of both civil and criminal contempt. The defendants' principal contention was that several laws prohibited the injunctions issued against them. Id. at 268-69. They also argued that the lower court improperly had held them in both criminal and civil contempt, an argument that the Supreme Court found unpersuasive. Id. at 299-302.

And, they argued that the fines assessed against them for criminal and civil contempt were excessive. Id. at 302-03. The Supreme Court noted that the civil contempt fine was coercive and was not intended to be compensatory. Id. at 304-05. Because the fine was coercive and the lower court had not given the defendants an option to purge themselves of the fine by complying with the injunctions, it was held to be excessive. Id. In its discussion of civil contempt, the Court noted in passing, "[w]here compensation is intended, a fine is imposed . . . [i]t must of course be based on evidence of complainant's actual loss . . ." Id. at 304 (citing Leman v. Krentler-Arnold Co., 284 U.S. 448, 455, 456 (1932); Gompers v. Buck's Stove & Range Co.,

8

221 U.S. 418, 443, 444 (1911); Parker v. United States, 126 F.2d 370, 380 (1st Cir. 1982); Judelshon v. Black, 64 F.2d 116 (2d Cir. 1933); Norstrom v. Wahl, 41 F. 2d 910, 914 (7th Cir. 1930)).

United Mine Workers did not overrule Leman. The focus of the decision in United Mine Workers was primarily the validity of injunction orders, not civil contempt remedies. And, to the extent that, in United Mine Workers, the Supreme Court analyzed civil contempt remedies, it did so only in the context of the proper scope and wording of coercive civil contempt remedies. No compensatory remedy was at issue in United Mine Workers. Nor was disgorgement of profits at issue. Finally, the Court explicitly cited Leman to support the one proposition in the decision that could be read to conflict with Leman, the proposition that a compensatory fine be based on the complainant's "actual loss." See also Connolly v. J.T. Ventures, 851 F.2d 930, 934 (7th Cir. 1988) (holding that Leman remained good law and that United Mine Workers did not overrule it) (citing National Drying Machinery Co. v. Ackoff, 245 F.2d 192, 194, 195-96 (3d Cir. 1957)(en banc) (Biggs, C.J., dissenting from denial of petition for rehearing en banc), cert denied 355 U.S. 832 (1957)). Disgorgement of profits remains a viable remedy in civil contempt proceedings, even when a plaintiff cannot demonstrate "actual pecuniary" loss. See, e.g, Buffalo Wings Factory, Inc. v. Mohd, 574 F.

Supp. 2d 574, 582 n.3 (E.D. Va. 2008); Manhattan Indus., Inc. v.
Sweater Bee by Banff, Ltd. 885 F.2d 1, 5 (2d Cir. 1989); Marshak
v. Treadwell, 595 F.3d 478, 495 (3d Cir. 2009); Connolly v. J.T.
Ventures, 851 F.3d at 932; Jerry's Famous Deli, Inc. v.
Papanicolaou, 383 F.3d 998, 1004 (9th Cir. 2004); Howard Johnson
Co., Inc. v. Khimani, 892 F.2d 1512, 1521 (11th Cir. 1990); see
also Abbott Labs. v. Unlimited Beverages, Inc., 218 F.3d 1238,
1242 (11th Cir. 2000) (noting that, where a plaintiff's harm "is
difficult to calculate," disgorgement of profits is an available
civil contempt remedy).[3]

---

[3] Carbon Fuel Co. v. United Mine Worker and Windsor Power House
Coal Co. v. District 6, United Mine Workers of Am. do not hold
otherwise. In Carbon Fuel, the Fourth Circuit held that the
lower court's fine was not a proper civil contempt remedy,
focusing on the fact that it was made payable "to the clerk of
the court and not to the appellee." 517 F.2d 1348, 1350 (4th
Cir. 1975). The Fourth Circuit explained that the fine was not
"intended to be 'compensatory' of any losses sustained by the
appellee." Id. Similarly, in Windsor, the Fourth Circuit noted
disapprovingly the fact that a civil contempt fine had been made
payable to the clerk of the court rather than the appellee and
that it did not "match the contemnor's conduct." 530 F.2d 312,
317 (4th Cir. 1976). The Fourth Circuit remanded the case to the
district court, asking it to more carefully consider the
calculation of the fine and the wording of its contempt order.
Id.

    Unlike this case, both Carbon Fuel and Windsor involved
fines. The amount of the fines appeared unconnected to any
damage done to the plaintiff or to any wrongdoing done by the
defendant. And, the fines were made payable to the clerk of the
court rather than the plaintiff, indicating that they were not
intended to compensate the plaintiff in any way. Here, the
amount of disgorgement is based entirely on the defendant's
wrongdoing and the fact that the defendant harmed the
plaintiff's business. There is no question that the award will
go directly to the plaintiff.

Having resolved that disgorgement of profits remains an
available compensatory remedy in civil contempt cases, it is
next necessary to address whether the amendments to the Patent
Act in 1946 eliminated the availability of the disgorgement
remedy in cases where a defendant is held in civil contempt for
violating an injunction related to patent infringement. The 1946
amendments to the Patent Act eliminated disgorgement of an
infringer's profits as "an independent measure of the patentee's
recovery." See Georgia-Pacific Corp. v. United States Plywood
Corp., 243 F. Supp. 500, 520-21 (S.D.N.Y. 1965).[4] According to

___

Cases since Carbon Fuel and Windsor, like The Colonial
Williamsburg Found. v. The Kittinger Co., 792 F. Supp. 1397
(E.D. Va. 1992), aff'd 38 F.3d 133 (4th Cir. 1994), Buffalo
Wings Factory, Inc. v. Mohd, 574 F. Supp. 2d 574, 582 n.3 (E.D.
Va. 2008), and Omega World Travel, Inc. v. Omega Travel and
Shipping Agencies, Inc., 1990 WL 74305 (4th Cir. May 10,
1990)(unpublished opinion) have awarded disgorgement of profits
in civil contempt cases even where the plaintiff did not
quantify the harm.

[4] Those amendments are codified in 35 U.S.C. § 284. Section 284
provides that, "upon finding for the claimant the court shall
award the claimant damages adequate to compensate for the
infringement, but in no event less than a reasonable royalty for
the use made of the invention by the infringer, together with
interest and costs as fixed by the court." The precursor to §
284 provided: "Upon a decree being rendered in any such case for
an infringement the complainant shall be entitled to recover, in
addition to the profits to be accounted for by the defendant,
the damages the complainant has sustained thereby . . . ." R. S.
§ 4921, as amended, 42 Stat. 392.

In Aro Mfg. Co. v. Convertible Top Replacement Co., 377
U.S. 476, 505 (1964), the Supreme Court noted that "the purpose
of the change was precisely to eliminate the recovery of profits
as such and allow recovery of damages only," emphasizing that
the earlier version of the statute allowed "profits" and

Lawson, these amendments also eliminated disgorgement as a remedy in related civil contempt proceedings.

Lawson, however, has cited no authority supporting that proposition. The best that can be said is that one commentator explained that disgorgement of profits in a civil contempt proceeding "would seem appropriate whenever the same general sort of act would permit an unjust enrichment claim in law or equity." See Dan B. Dobbs, Handbook on the Law of Remedies § 2.9 at 100 n. 31 (1973). Note that the commentator did not argue that disgorgement is only available in situations where the underlying act permits a disgorgement remedy. And, the same commentator noted more recently:

> Quite apart from contempt sanctions, a defendant who gains benefits as a result of wrong done to the plaintiff may be made to disgorge those benefits under the law of restitution and on the ground that such disgorgement is required to prevent the defendant's unjust enrichment. Could a court award restitution of the defendant's unjust gains as a remedial sanction for contempt? Although a few courts have been negative, a number have permitted a civil contempt sanction in this form.

1 Dan B. Dobbs, Law of Remedies § 2.8(2), at 195 (2d ed. 1993).

Lawson seeks to draw comfort from Georgia-Pacific Corp. v. United States Plywood Corp., 243 F. Supp. 500 (S.D.N.Y. 1965), but that case does not lend support for its contentions. In

---

"damages" whereas the later version allowed only "damages."

fact, the Georgia-Pacific court distinguished civil contempt
proceedings for violations of injunctions relating to patent
infringement from patent infringement proceedings themselves:

> While Leman may continue to control cases
> involving the violation of an injunction
> against patent infringement . . . the court
> believes that Congress intended to proscribe
> its 'mode of approach,' at least in patent
> infringement proceedings, such as these,
> which do not involve a civil contempt . . .
> A number of sharply differentiating factors
> distinguish Leman from the present case. As
> a civil contempt proceeding Leman was not
> governed by the statutory provisions of the
> patent laws. Secondly, the primary interest
> to be vindicated in Leman was the public
> policy of effectuating compliance with the
> court's injunction and not simply
> compensation for a private wrong. Thirdly,
> an auxiliary sanction for the enforcement of
> the injunction was to deprive the wrongdoer
> of the profits he made as the direct result
> of his defiance of the court's order. Since
> remedial damages are an adjunct of civil
> contempt proceedings, the court quite
> understandably ordered the contemnor's
> profits to be turned over to the aggrieved
> party by treating such profits 'as if' they
> were the latter's damages.

243 F. Supp. at 540-41 (emphasis added).

The one case distinguishing the Leman holding, National
Drying Machinery Co. v. Ackoff, did so in a trademark
infringement action, not a patent infringement action. 245 F.2d
192, 194 (3d Cir. 1957)(en banc), cert denied 355 U.S. 832
(1957). The basis for the Third Circuit's finding that "the
Leman case does not relieve the complainant of showing that the

contemptuous conduct did, in fact, have substantial injurious effect upon his economic interest" had nothing to do with the underlying trademark statute or any other statute. Id. at 194-95. Instead, the decision was based on the fact that there was absolutely no evidence of harm or damage. The case came "down to the question whether the trademark owner will be protected in a field he has not actually entered." Id. at 195.

And, just a year after National Drying was decided, Judge Learned Hand of the Second Circuit reiterated the Leman holding, that disgorgement of profits could be awarded in a civil contempt proceeding even when the plaintiff had not proven damages, explaining that he "f[ound] it impossible to reconcile [the National Drying holding] with the language used in Leman." Sunbeam Corp. v. Golden Rule Appliance Co., 252 F.2d 467 (2d Cir. 1958) (Hand, C.J., concurring). The 1946 amendments to the Patent Act did not supersede the decision in Leman.[5]

---

[5] See Schlegel Mfg., Co. v. USM Corp., 525 F.2d 775 (6th Cir. 1975); Kiwi Coders Corp. v. Arco Tool & Die Works, 250 F.2d 562 (7th Cir. 1957); Brine, Inc. v. STX, L.L.C., 367 F. Supp. 2d 61 (D. Mass. 2005), aff'd 139 Fed. Appx. 281 (Fed. Cir. 2005); Town v. Willis, 89 F. Supp. 437 (W.D. Mo. 1950); Broadview Chemical Corp. v. Loctite Corp., 311 F. Supp. 447, 449 (D. Conn. 1970) ("Since this is a civil contempt proceeding, the court is not bound by the statutory provision, 35 U.S.C. § 284, relating to damages for patent infringement.") (citations omitted); Shell Oil Co. v. Barco Corp., No. 65-C-508-EC, 1971 U.S. Dist. LEXIS 13395, at *3-4, (N.D. Iowa May 7, 1971) (unpublished opinion); Peterson Filter & Engineering Co. v. Envirotech Corp., No. C-30-66, 1973 U.S. Dist. LEXIS 15599 (D. Utah Apr. 30, 1973) (unpublished opinion).

14

Any other interpretation would contravene logic and common sense. The civil contempt cases awarding disgorgement of profits as a remedy do not do so because of the remedies in any underlying statutory act, though some of the cases do use the underlying act as further support for their holdings. The Leman holding was not based on the fact that the defendant previously had been found guilty of patent infringement. And, courts did not so interpret it. Courts cite Leman to support disgorgement remedies in civil contempt proceedings involving issues of trademark, copyright, patent, and other law. The nature of the underlying action does not dictate the remedy for violation of court orders.

In this case, if the Court were to endorse Lawson's interpretation of both Leman and the import of the 1946 amendments, the Court would, in effect, be granting Lawson a compulsory license for the period of the alleged contempt. The cost of the license or Lawson's estimated reasonable royalty is so minimal in comparison to the profits gained by violating the Court's Injunction Order (the profits are approximately 80 times as much as the proposed reasonable royalty figure) that Lawson would have an economic incentive not to comply with the Court's order. Even doubling or tripling the reasonable royalty rate, as Lawson argues the Court would have discretion to do, Lawson's profits would still be 26 times as much as the remedy to be

15

paid. Such a methodology would encourage continued wrongdoing and would undermine the integrity of the judicial process by equating court orders to little more than flies buzzing in the contemnor's ear, annoying but easily swatted away. The Court declines to take this course.[6]

## B.    Dr. Ugone's Estimates

In his report, Dr. Ugone posited two different measures of Lawson's profits during the alleged period of contempt. First, he calculated the revenues and profits that Lawson earned on the accused products. Second, he calculated the costs that he believed Lawson had saved as the result of introducing RQC. The parties have agreed that Dr. Ugone will not testify regarding "cost saving" and, therefore, as to that aspect of Dr. Ugone's testimony, the motion is denied as moot. His calculations regarding the revenues and profits, however, remain contested.

### Revenues/gross profits

Lawson is, for the most part, in agreement with Dr. Ugone's calculations of earned profits and revenues. However, Lawson contends that they amount to so high an award that it would be punitive to require Lawson to pay them. According to Lawson, Dr.

---

[6] Penalizing ePlus for failure to show actual loss in a case such as this, where the amount of loss is so difficult to quantify, would be manifestly unjust. The Court has noted that the nature of the e-procurement industry makes it particularly difficult to determine all lost sales. Id. at 26. Dr. Ugone noted these findings in his testimony. See Ugone Rpt. ¶¶ 17, 39-47 (Docket No. 867); Ugone Reply Rpt. ¶ 6 (Docket No. 889).

16

Ugone's figures amount to a 65-100 percent royalty, which is far greater than the royalty ePlus sought in the underlying infringement proceeding. Lawson points out that the infringement period was five times longer and sales were 20 times as much in the earlier proceeding. And, Lawson argues that ePlus should have presented some alternative remedy to disgorgement.

ePlus contends that the fact that disgorgement of profits may result in an award that is greater than the plaintiff's actual loss is not a reason to reject a disgorgement remedy. According to ePlus, disgorgement can be wholly compensatory even when it results in a windfall to the plaintiff. And, ePlus points out that the Court previously noted the difficulty of calculating a reasonable royalty in the infringement proceeding, and that the Court rejected ePlus's expert's reasonable royalty calculation in that earlier proceeding.

The reasonable royalty rate calculated by Lawson's expert, a rate that the expert testified was "almost certainly too high" Putnam Rpt. ¶ 154 (Docket No. 886), was "less than $265,000." Id. ¶ 160. The highest royalty estimate the expert gave was "$543,000," but that rate included Core S3 Procurement modules for customers. Id. Dr. Ugone testified that the disgorgement amount, if revenues were used, would be $13.1-17.8 million dollars and the amount, if gross profits were used, would be $8.4-11.4 million dollars. Ugone Reply Rpt., Exhibit 7 (Docket

17

No. 889). Dr. Ugone premised his calculations on an approximate six-month period of continued infringement. Id. (using the May 23, 2011 – November 1, 2011 time period to calculate profits and revenues). At the February 29, 2012 hearing, Lawson explained that it had re-calculated the disgorgement amount using a one-year period. (Feb. 29, 2012 Tr. 140). Lawson's calculations were based on the assumption that an award in the contempt proceeding will not be entered until May 23, 2012. (Id.) Lawson's figure for revenue disgorgement was $33.9-46.1 million, and its figure for gross profits disgorgement was $21.9-29.7 million.[7]

As an initial matter, it should be noted that "the burden of proof rests on the defendants 'to prove any deductions for its costs from the gross revenues attributable to contempt.'" The Colonial Williamsburg Found. v. The Kittinger Co., 792 F. Supp. 1397, 1407 (E.D. Va. 1992), aff'd 38 F.3d 133 (4th Cir. 1994). The Court's inquiry then does not start and stop with Dr. Ugone's calculations.

In any event, as Lawson did in its arguments concerning the post-1946 amendments to the Patent Act, Lawson here again

---

[7] At the February 29, 2012 hearing, Lawson explained that it was substantially in agreement with the calculations of Dr. Ugone. See (Feb. 29, 2012 Tr. 141). Lawson's counsel noted that its estimates for profits and revenues were "relatively close" to Dr. Ugone's. Counsel explained, "there are some disagreements [about the estimates] but the major disagreement that we'll have if we get into disgorgement is over what the right profit margin is [net, gross, or incremental]." Id.

conflates remedies for the initial infringement with remedies for contempt of a court order. The two are distinct. In the first instance, the harm done is to the patent holder. In the second, the harm done is to the court and the beneficiaries of the court's order. Where awarding a reasonable royalty would simply encourage continued defiance of court orders and promote disrespect for the law, where a defendant's profits from wrongdoing are so much greater than any estimated royalty amount, and where it is difficult if not impossible to calculate the actual loss of the plaintiff attributable to the contempt, limiting the courts to such a remedy would thwart rather than aid the hand of justice.

That is why courts continue to award disgorgement of profits as a remedy for civil contempt, even where such profit amounts to far greater a remedy than a reasonable royalty. Such awards are not meant to punish the contemnor. Instead, they are meant to ensure that the injured party is fully compensated for the harm done. The contemnor is treated as a trustee, holding the profits of the beneficiary plaintiff until the finding of contempt. The plaintiff simply is returned the profits to which he or she was entitled all along.[8]

---

[8] Indeed, Lawson itself admits that tripling or doubling the amount of the reasonable royalty, which would result in a windfall to the plaintiff under its theory, would be acceptable in this case. (Feb. 29, 2012 Tr. 135-137).

19

## CONCLUSION

For the reasons stated herein, Lawson's MOTION TO STRIKE EXPERT OPINIONS OF DR. KEITH UGONE (Docket No. 892) will be denied.

It is so ORDERED.

/s/   $REP$

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: March **26**, 2013

---

It is difficult to understand why tripling or doubling the reasonable royalty rate would be considered more "compensatory" than awarding a plaintiff the profits that the defendant earned because of a defendant's wrongdoing.

20