## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND, VIRGINIA

```
----------------------------:
                            :
ePLUS, INC.,                :
                            :
      Plaintiff,    : Civil Action
                    : No. 3:09CV620
      vs.           :
                    :
LAWSON SOFTWARE, INC.,      :
                            :
      Defendant.    :
                    :
----------------------------:
```

Minneapolis, Minnesota
March 22, 2013

Videotaped Deposition of:
DEAN HAGER
called for oral examination by counsel for Plaintiff,
pursuant to notice, at Bassford Remele, 33 South Sixth
Street, Minneapolis, Minnesota, Suite 3800, before Karen
J. Macaulay, a Notary Public in and for the state of
Minnesota, commencing at 8:02 a.m. on March 22, 2013.

## Page 2

```
 1              A P P E A R A N C E S
 2    Paul Jacobs, Esq.
 3    Christian & Barton, L.L.P.
 4    909 East Main Street
 5    Suite 1200
 6    Richmond, VA 23219-3095
 7    (804) 697-4110
 8        On behalf of the Plaintiff.
 9    Daniel J. Thomasch, Esq.
10    Gibson, Dunn & Crutcher, LLP
11    200 Park Avenue
12    New York, NY 10166-0193
13    (212) 351-3800
14        On behalf of the Defendant.
15    Charles F. "Rick" Witthoefft, Esq.
16    Hirschler Fleischer, PC
17    The Edgeworth Building
18    2100 East Cary Street
19    P.O. Box 500
20    Richmond, VA 23218-0500
21    (804) 771-9562
22        On behalf of the witness, Dean Hager.
23    Videographer:
24       Steven J. Knutson, CCVS
25
```

## Page 3

```
 1                  I N D E X
 2    DEPONENT:  DEAN HAGER
 3    EXAMINATION:              PAGE:
 4    Mr. Jacobs          7
 5    Mr. Thomasch           157
 6    Mr. Jacobs          192
 7    Mr. Thomasch           201
 8
 9    Objections:  9, 12, 13, 14, 15, 18, 23, 25, 28, 29,
      30, 33, 35, 40, 41, 42, 43, 44, 45, 46, 48, 50, 51,
10    52, 53, 54, 56, 57, 58, 59, 61, 62, 64, 65, 66, 67,
      69, 70, 72, 73, 74, 75, 77, 79, 80, 81, 83, 84, 85,
11    86, 89, 90, 91, 92, 95, 96, 99, 100, 102, 103, 104,
      105, 106, 108, 109, 110, 111, 112, 113, 117, 118,
12    120, 121, 123, 124, 130, 133, 135, 136, 137, 138,
      140, 141, 142, 143, 147, 148, 152, 153, 154, 155,
13    157, 159, 161, 164, 176, 181, 183, 188, 190, 194,
      195, 196, 198, 199
14
      Requests:  None
15    Instructions Not to Answer:  None
16                  E X H I B I T S
17    NUMBER      DESCRIPTION          PAGE
18    Ex. 1  E-mail string, March 30 and 31, 2011,    19
            between Jennifer Langer and Blake Terry
19          and others
            PX-1264, RQC2714421
20    Ex. 2  E-mail, April 12, 2011 from Matthew Braun  31
            with attached PowerPoint
            PX-1089, RQC2631716 through RQC2631750
21
22    Ex. 3  E-mail, March 9, 10, and 11,      36
23          between Harry Debes, Bruce McPheeters,
            and others, RE:  ePlus case update
24          PX-1258, RQC3003518 through RQC3003520
25
```

## Page 4

```
 1    Ex. 4  E-mail string, March 25, 2011, between   54
            Keith Lohkamp and Dean Hager, RE:
 2          Questions
            PX-1090, RQC0026599 through RQC0026602
 3
      Ex. 5  E-mail, March 25, 2011, from Dean Hager  58
 4          to Harry Debes and Bruce McPheeters,
            RE:  ePlus Notes with attachment, ePlus
 5          by the Numbers
            PX-1230, RQC0922460_00001, RQC0922457,
 6          and RQC0922458
 7    Ex. 6  E-mail string, May 26 and 27, 2011,    63
            between Christy Gustafson to Jennifer
 8          Langer and others RE:  Action:
            The 277 - next step
 9          PX-1229, RQC0922314 through RQC0922318
10    Ex. 7  E-mail string, March 29 and 30, 2011,    67
            between Dean Hager, Jim Catalino, and
11          others, RE:  EPlus Litigation - Urgent
            Action for you
12          PX-1091, RQC0328897 and RQC0328898
13    Ex. 8  E-mail string, March 30, 2011, between   76
            Jennifer Langer, Jordan Ekelin, Kathy
14          Madson, and others, RE:  Proposed language
            for sales on plus
15          PX-1092, RQC2300898 through RQC2300900
16    Ex. 9  E-mail string, April 1 and 3, 2011,    82
            between Jordan Ekelin, Bruce McPheeters,
17          and others, RE:  ePlus - CUE Messaging and
            Scenarios for Executive Management,
18          PX-1233, RQC1002444 through RQC1002450
19
      Ex. 10 E-mail, April 1, 2011, from          97
20          Communications Team, Employee, RE:
            Important:  CUE 2011 Say/Don't Say
21          Guidance Attached, with attachment
            RQC2125984 through RQC2125993
22
23    Ex. 11 E-mail string, April 6 and 11, 2011,   103
            between Dean Hager, Bruce McPheeters,
24          and others, RE:  Confidential discussion
            draft of press release re ePlus injunction
25          PX-1263, RQC3004438 and RQC3004439
```

Page 5

1    Ex. 12 E-mail string, April 8 and 13, 2011,    115
          between Keith Lohkamp, Jordan Ekelin,
2        and others, RE:  Lawson healthcare Weekly
          Pulse:  Week Ending April 8, 2011
3        PX-1261, RQC3005817 through RQC3005820
4    Ex. 13 E-mail string, April 13, 2011, between    121
          Mike Cohen, Jim Catalino, and Jennifer
5        Langer, RE:  ePlus
          PX-1252, RQC3000374
6
7    Ex. 14 E-mail, April 22, 2011, from Mike Cohen    124
          to Dean Hager and Bruce McPheeters, RE:
          Requisition Center
8        PX-1251, RQC3000370
9    Ex. 15 E-mail string, May 3 and 4, 2011,    127
          between Dean Hager, Jennifer Langer,
10       and others; RE:  Dean - can you review
          and approve for RSS next steps?
11       PX-1094, RQC2631677 through RQC2631679
12   Ex. 16 E-mail, May 24, 2011, from Terry Blake    134
          to Jennifer Langer RE:  E-plus litigation
13       PX-1099, RQC0764901 through RQC0764903
14   Ex. 17 E-mail, May 26, 2011, from Dean Hager    139
          to Harry Debes RE:  Another customer
15       Letter, with Summa Health System
          attachment
16       PX-1098, RQC0813754 and RQC0813755
17   Ex. 18 E-mail string, May 26 and 27, 2011,    144
          between Dean Hager, Brad Fridell, and
18       others, RE:  Lawson's response to
          Summa's concerns
19       PX-1266, RQC0893665_00001 and
          RQC0893665_00002
20
21   Ex. 19 May 26, 2011 letter to Summa Health    150
          System from Dean Hager
22       PX-1267, RQC0893666
23   Ex. 20 E-mail string, June 9 through 20, 2011,    151
          between Christy Gustafson, Bruce
24       McPheeters, Jennifer Langer, and others,
          RE:  EPlus - follow up re customer counts
25       and maintenance revenues at risk
          PX-1265, RQC1001739 through RQC1001745

Page 6

1              P R O C E E D I N G S
2              VIDEOGRAPHER:  This begins Volume II,
3    tape number one, of the videotaped deposition of
4    Dean Hager.  It's taken in the matter of ePlus,
5    Incorporated, versus Lawson Software, Incorporated.
6    It's filed in the U.S. District Court, Eastern
7    District of Virginia, Richmond Division.  The case
8    number is 3:09-CV-620 (JRS).  This deposition is
9    being held at Bassford Remele, located in
10   Minneapolis, Minnesota, on March 22nd, 2013, at
11   approximately 8:02 a.m.
12             My name is Steve Knutson with the firm of
13   Capital Reporting Company.  I am the legal video
14   specialist.  The court reporter is Karen Macaulay in
15   association with Capital Reporting Company, located
16   at 1821 Jefferson Place, Washington, DC 20036.
17             For the record, would counsel please
18   introduce themselves and who they represent?
19             MR. JACOBS:  I'm Paul Jacobs, and I'm
20   with the firm of Christian & Barton in Richmond,
21   Virginia, and I represent ePlus.
22             MR. WITTHOEFFT:  I'm Rick Witthoefft
23   with Hirschler Fleischer in Richmond, Virginia.  I
24   represent the -- specially Dean Hager in the case.
25             MR. THOMASCH:  And Daniel Thomasch,

Page 7

1    Gibson, Dunn & Crutcher.  I'm representing Lawson
2    Software, Inc.
3              VIDEOGRAPHER:  The court reporter will
4    now swear in the witness.
5              DEAN HAGER,
6    called as a witness, having been first duly
7    sworn, was examined and testified as follows:
8              CROSS EXAMINATION
9    BY MR. JACOBS:
10     Q.  Please state for the record your full name.
11     A.  Dean Joseph Hager.
12     Q.  And Mr. Hager, I'm Paul Jacobs.  I
13   represent ePlus in this matter.  I'll be asking you
14   a series of questions today in a deposition that may
15   be viewed by Judge Payne as part of a contempt
16   hearing scheduled for April 2, 3, and 4 in Richmond,
17   Virginia.  Do you understand that?
18     A.  Yes.
19     Q.  All right.  Do you understand you're under
20   oath to tell the truth as if you were sitting in
21   Judge Payne's courtroom giving testimony?
22     A.  I do.
23     Q.  Okay.  Are you taking any -- any
24   medications today that could affect your ability to
25   give full and accurate answers to the questions?

Page 8

1      A.  No.
2      Q.  Are you represented by counsel here today?
3      A.  I am.
4      Q.  And who is that?
5      A.  Mr. Witthoefft.
6      Q.  All right.  You're not represented by
7    Gibson Dunn law firm today?
8      A.  I am not.
9      Q.  Okay.  Now, are you the same Dean Hager
10   that was executive vice president of S3 industries
11   at Lawson Software?
12     A.  Yes.
13     Q.  All right.  And the same Dean Hager that
14   testified at the injunction proceedings in this case
15   on March 25, 2011?
16     A.  Yes.
17     Q.  And you also gave a prior deposition in
18   this case on January 6th, 2012, in this contempt
19   proceeding.  Is that correct?
20     A.  Yes.
21     Q.  Okay.  Now, do you recall stating at your
22   deposition on January 6th, 2012, that under your
23   exit agreement with Lawson, Lawson was covering your
24   legal expenses in this case?
25     A.  I do recall saying that.

Page 9

1    Q.  All right.  And does that still hold true?
2    A.  The only question that I have is I don't
3  know if Lawson exists anymore because of an
4  acquisition that occurred some time ago.
5    Q.  It was acquired by Infor?
6    A.  Correct.
7    Q.  All right.  Is Lawson or its parent, Infor,
8  covering your legal expenses in this case?
9    A.  Just to be exact, I actually would have to
10  ask Mr. Witthoefft, because I'm -- I'm not exactly
11  sure.
12    Q.  All right.  You don't -- you don't know if
13  anyone is covering your legal expenses.
14    A.  I know somebody is.  I don't know who.
15        MR. THOMASCH:  Objection to form.
16        THE WITNESS:  I'm sorry.
17  BY MR. JACOBS:
18    Q.  All right.  Where do you now reside?
19    A.  In Afton, Minnesota.
20    Q.  All right.  And you're employed, sir?
21    A.  I am.
22    Q.  Okay.  Who's your employer?
23    A.  Kroll Ontrack, which is a company of
24  Altegrity.
25    Q.  What is your position?

Page 10

1    A.  I am the president and CEO of Kroll
2  Ontrack.
3    Q.  And how many people report to you?
4    A.  Direct reports or the entire company?
5    Q.  Well, first let's take direct reports.
6    A.  Seven, I believe.
7    Q.  And overall, how many report to you in the
8  entire company?
9    A.  In the company, we have slightly over a
10  thousand people, but that is not an exact statement.
11  It's an es -- rough estimate.
12    Q.  Now, will you be attending the hearing
13  scheduled in this case in Richmond, Virginia, on
14  April 2, 3, and 4?
15    A.  No.
16    Q.  Will you be within a hundred miles of
17  Richmond between now and April 2, 3, and 4?
18    A.  I -- I don't recall.  I don't have access
19  to my calendar right now, but I don't believe so.
20    Q.  Okay.  Have you had any discussions within
21  the past 60 days with anyone at Lawson or Infor
22  concerning your attendance at the contempt hearing
23  in April?
24    A.  I'm -- I'm sorry?
25    Q.  Have you had any discussions within the

Page 11

1  past 60 days with anyone at Lawson or Infor about
2  your attendance at the contempt hearing this April?
3    A.  No.
4    Q.  Okay.  Have you had any discussions within
5  the past 60 days with anyone at Gibson Dunn
6  concerning your attendance at the hearing in April?
7    A.  Yes.
8    Q.  And who did you have those discussions
9  with?
10    A.  Mr. Thomasch.
11    Q.  All right.  And when were those
12  discussions?
13    A.  I don't know the exact date.  I don't know
14  the exact date, but within that range that you
15  discussed.
16    Q.  All right.  And were you asked to attend
17  the hearing in Richmond and be prepared to testify?
18    A.  I can't recall how the question was
19  phrased.  I think I was asked whether I would be
20  willing to go, and I ref -- after consulting with
21  Mr. Witthoefft, con -- decided no.
22    Q.  Okay.  What did you do to prepare for your
23  deposition today?
24    A.  I had a brief meeting with Mr. Thomasch and
25  Mr. Witthoefft yesterday where I was presented with

Page 12

1  a few documents to see whether I had seen them
2  before; and then last night for about an hour, I
3  tried to read through the last deposition to just
4  recall, since it's been a while.
5    Q.  And did reading through the deposition
6  refresh your memory with respect to the events as
7  described in the deposition?
8    A.  It helped.
9        MR. THOMASCH:  Objection to form.
10    Q.  Okay.
11        THE WITNESS:  I'm sorry.
12    A.  Yeah.
13    Q.  Did you also review the transcript of the
14  March 25, 2011 testimony in federal court?
15    A.  Very, very briefly.
16    Q.  Okay.  You left Lawson in December 2011.
17  Is that correct?
18    A.  Correct.
19    Q.  All right.  And at that time, you were
20  executive vice president of S3 industries.  Is that
21  right?
22    A.  Correct.
23    Q.  All right.  And your duties with respect to
24  S3 industries included the S3 procurement products.
25  Is that right?

Page 13

1    A.  Selling and servicing that product.
2    Q.  Right.
3    A.  Correct.
4    Q.  And in that capacity, you reported to Harry
5  Debes, the CEO?  Is that correct, sir?
6    A.  Correct.
7    Q.  All right.  How long had you been executive
8  vice president?
9    A.  I'm -- I'm sorry.  I -- can I clarify?
10    Q.  Sure.
11    A.  I don't believe on December 2nd when I -- I
12  believe it was December 2nd, 2011, when I left.  At
13  that time, I don't believe Harry Debes was still
14  with the company.  I think he had departed some
15  months earlier as part of the acquisition, but
16  during most of the period we're talking about, I
17  reported to Harry Debes.
18    Q.  During the spring of 2011 through -- let's
19  say June of 2011, you reported to Mr. Debes.
20    A.  Correct.
21    Q.  Is that correct?
22      MR. THOMASCH:  Objection to form.  You
23  may answer.
24    Q.  How long had you been executive vice
25  president of S3?

Page 14

1    A.  I can't recall the exact time frame now as
2  it's been a while.  A -- more than a year, but I
3  can't recall the exact amount of time any longer.
4    Q.  Would it have -- if you left in December of
5  2011, did you become executive vice president prior
6  to December 2010?
7    A.  I -- I believe so.  I believe so.
8    Q.  How long had you worked at Lawson?
9    A.  Since May of 1998.
10    Q.  Now, as part of your duties as executive
11  vice president of S3, did you track the financial
12  performance of the S3 group?
13    A.  Correct.  Yes.
14    Q.  And did you track revenue from the S3
15  procurement products?
16    A.  Yes.
17    Q.  Okay.  And would you periodically report to
18  Mr. Debes with respect to such revenue tracking?
19      MR. THOMASCH:  Objection to form.
20    A.  For clarity, the group that would actually
21  do the tracking was our finance accounting group.
22    Q.  Yes.
23    A.  So usually I was along with Harry,
24  Mr. Debes, as the finance accounting group would
25  present to us what the financial results would be.

Page 15

1    Q.  And you would occasionally have discussions
2  with Mr. Debes about those financial results.
3  Correct?
4    A.  Yes.
5    Q.  Okay.  Now, when you were at Lawson, it was
6  on a fiscal year that ended May 31.  Is that
7  correct, sir?
8    A.  Yes.
9    Q.  Okay.  So is it correct that revenue earned
10  by Lawson in its Q4, or fourth quarter of the fiscal
11  year, was for the months of March, April, and May of
12  the particular year?
13    A.  For fourth quarter, yes.
14    Q.  Yes, sir.  Okay.  Now, in the spring of
15  2011, you were involved in the process of the
16  transition from RSS to RQC.  Is that right, sir?
17    A.  Yes.
18    Q.  Okay.  And were you involved in the
19  messaging to customers concerning the ePlus lawsuit?
20      MR. THOMASCH:  Objection to form.  You
21  may answer.
22    A.  I was involved, yes.
23    Q.  Okay.  And in that role, did you consider
24  yourself what -- I would use the phrase "voice of
25  the customer"?

Page 16

1    A.  I considered myself the voice of the
2  customer, yes.
3    Q.  All right.  And you recall using that
4  phrase in your previous deposition?
5    A.  I -- I've used the phrase many times, yes.
6    Q.  Okay.  And -- and if you want -- I have a
7  copy of your -- your deposition, and you may want to
8  refer to it.
9    A.  Is that this top document?
10    Q.  I think it's the -- it's -- it's this one,
11  it -- that counsel is just looking at.
12    A.  Oh, yes.  Okay.  M-hm.
13    Q.  All right.  And if you turn to Pages 30 and
14  31, I want to make sure I get your phraseology
15  correct.
16    A.  Clarity.  By "pages," do you mean the
17  number that comes before pa -- or --
18      MR. WITTHOEFFT:  Here.  Let me show
19  you.  The --
20      THE WITNESS:  I'm sorry.  Go ahead.
21      MR. WITTHOEFFT:  It would be this --
22      THE WITNESS:  It would be that.  Okay.
23      MR. WITTHOEFFT:  Yeah.  This page
24  right here.
25      THE WITNESS:  Got it.  Thank you.

Page 17

1    MR. JACOBS:  Thank you,
2  Mr. Witthoefft.
3  BY MR. JACOBS:
4    Q.  And if you look at the top of -- top of 31,
5  you describe there what I believe you meant by
6  "voice of the customer."  I'll give you a second to
7  look at it.
8    A.  (Pause.)  I see it.
9    Q.  All right.  And that -- that involved, if I
10  understand, whether the customers understand your
11  messages and would they be able to make the
12  transition and would the expectations that Lawson
13  had for the customer be reasonable.  Is that
14  correct?
15    A.  Yes.  That -- that was what I represented.
16    Q.  All right.  And it wasn't -- did it also
17  include being truthful in your communications
18  with -- with the customers?
19    A.  Yes.
20    Q.  All right.  And did you always believe you
21  were so truthful with your customers concerning the
22  transition?
23    A.  I always believed I was, yes.
24    Q.  Okay.  Now, do you recall that Jennifer
25  Langer was with Lawson in the spring of 2011?

Page 18

1    A.  Yes.
2    Q.  Okay.  And during the spring of 2011, she
3  was vice president corporate portfolio management in
4  the S3 product management at Lawson.  Is that right?
5    A.  I don't recall her exact title, but I know
6  that she was in product management and her
7  responsibilities were along the S3 product line.
8    Q.  All right.  If -- if e-mails received from
9  her had that particular title under her name on
10  those e-mails, you wouldn't question that as being
11  her -- her title, would you, sir?
12    A.  No.
13    Q.  Okay.  She did not report to you, did she?
14    A.  Correct.  She did not.
15    Q.  All right.  Now, how did her duties with
16  respect to S3 products differ from yours?
17    MR. WITTHOEFFT:  Object to the form.
18    A.  My responsibility was to sell the products
19  to the customers and then to service those
20  customers.  Her responsibility would have been to
21  develop the strategy on the direction of the product
22  and to be involved in the creation of the product
23  roadmap in terms of what would be developed in the
24  future.
25    Q.  Okay.  Did you, in the spring of 2011, ask

Page 19

1  Ms. Langer to assist you with creating messaging
2  regarding the ePlus lawsuit?
3    A.  I don't recall -- I don't recall a
4  conversation where I asked her that specifically.
5  The messaging that was created was done by a team of
6  people, and I believe that Jennifer was involved in
7  it.  I can't recall a conversation like that,
8  though.
9    Q.  Is it possible it could have been in an
10  e-mail exchange?
11    A.  It's possible.
12    Q.  Okay.
13    MR. JACOBS:  I guess we'll make this
14  Number 1.
15    (Hager II Exhibit 1 was marked for
16  identification.)
17    MR. JACOBS:  (Handing.)
18    MR. WITTHOEFFT:  Thanks.
19    MR. JACOBS:  Sure.
20  BY MR. JACOBS:
21    Q.  Mr. Hager, let me hand you what the
22  reporter has marked for Hager II as Exhibit
23  Number 1, and if you take a moment, you'll see an
24  e-mail at the bottom dated March 30, 2011, from
25  Jennifer Langer in which you are a copyholder.  Do

Page 20

1  you see that, sir?
2    A.  I do.
3    Q.  And do you also see a sentence in there in
4  which Ms. Langer says, "Dean has asked me to be his
5  messenger and voice on creating the messaging.  He
6  also wants to be a key approver for all messaging on
7  this topic."  Do you see that, sir?
8    A.  I do.
9    Q.  Okay.  What was "this topic" that
10  Ms. Langer was to be your messenger on?
11    A.  I -- I don't recall the specific context of
12  the message.  I could only go off of the subject
13  line, as -- as would you.
14    Q.  All right.  And to the -- do you recall,
15  however, sir, that it -- it related to -- to
16  customer communications?
17    A.  I don't recall the -- the dialogue in
18  general.  I would just be reading it and drawing the
19  same conclusions you would.
20    Q.  Okay.  We'll -- we'll return to this one
21  and --
22    A.  Okay.
23    Q.  -- perhaps we'll be able to bear down on
24  that a little bit.
25    A.  Okay.

Page 21

1    Q.  Bruce McPheeters was the Lawson general
2    counsel in the spring of 2011.  Is that correct,
3    sir?
4    A.  Correct.
5    Q.  And do you recall, was Jordan Ekelin an
6    attorney at Lawson in spring 2011?
7    A.  I believe so.
8         (Reporter interruption.)
9         MR. JACOBS:  Ekelin.  I believe it's
10   E-k-e-l-i-n.
11        THE REPORTER:  And what was the rest
12   of your question?
13        MR. JACOBS:  That he was an attorney
14   at Lawson in the spring of 2011.
15        THE REPORTER:  Thank you.
16   BY MR. JACOBS:
17   Q.  And did he report to Mr. McPheeters?
18   A.  I didn't know Jordan well.  Honestly, I
19   don't even know that I would recognize him, but I --
20   I would just draw the conclusion since he was a
21   lawyer, he probably did, but I wouldn't know that
22   for a fact.
23   Q.  And you occasionally received e-mail
24   communications from Mr. Ekelin?
25   A.  I recall seeing his name on e-mails, yes.

Page 22

1    Q.  Okay.  Who were your direct reports in the
2    spring of 2011?
3    A.  I can't recall all of my direct reports,
4    but I had the gen -- I know that I had the general
5    managers for the healthcare business unit, the
6    public sector business unit, and what was known as
7    the services industries business unit reported
8    straight -- directly to me.
9    Q.  Approximately how many direct reports did
10   you have?
11   A.  I -- I can't recall.  I can't recall.
12   Q.  More than a dozen?
13   A.  Oh, no.  I would -- I would never have more
14   than a dozen direct reports, so it was something
15   less than that.  Even ten seems like a high number,
16   so it would be something less than that.  I just
17   don't recall exactly what my organization looked
18   like at that time.
19   Q.  Who were your gen -- if you recall the
20   names of any of your healthcare general managers,
21   who were those?
22   A.  The general manager, the one general
23   manager for healthcare's name was Jim Catalino.
24   Q.  Did Mr. Catalino have any responsibilities
25   with any healthcare internal periodicals that

Page 23

1    were -- that were put out by Lawson?
2         MR. THOMASCH:  Objection to form.
3         MR. WITTHOEFFT:  Your focus is still
4    on the spring of 2011?
5         MR. JACOBS:  Yes, it is.
6         MR. WITTHOEFFT:  Okay.
7    A.  And so can you repeat the question, please?
8    Q.  Sure.  Did Mr. Cata -- Catalino?
9    A.  Catalino.
10   Q.  -- Catalino have any responsibilities for
11   any internal healthcare periodicals that were put
12   out by Lawson?
13   A.  Internal?
14   Q.  Yes, sir.
15   A.  I know that he had internal communication
16   plans with his healthcare group, so that would have
17   been with -- within his responsibility.  I don't
18   know who exactly would have done it, but I know
19   somewhere within his group there was communication.
20   Q.  Do you recall something called Healthcare
21   Pulse, Weekly Pulse?
22   A.  It rings a bell, but the main reason it
23   rings a bell is because it was on a document that I
24   looked at last night.
25   Q.  Okay.

Page 24

1    A.  But it wasn't something that I really have
2    great recollection over.
3    Q.  Okay.  Do you recall the name John
4    Mulchrone?
5    A.  I do.
6    Q.  And what were -- what were his duties at
7    Lawson?
8    A.  At that time, I believe he was the research
9    and development leader of the S3 product line.
10   Q.  When you say "development," do you mean
11   software development?
12   A.  Correct.
13   Q.  Okay.  And Mr. Hager, if -- unless I say
14   otherwise, I'm trying to restrict our -- the time
15   frame to, say, January to June of 2011 in -- in my
16   questions to you, so --
17   A.  Okay.
18   Q.  But if you are not clear on that, please
19   let me know, but that's -- that's the time frame I'm
20   focusing on.
21        MR. THOMASCH:  And -- for going
22   forward, but your questions previously have been
23   about the spring, which I trust weren't intended to
24   go back to January, were they?
25        MR. JACOBS:  No, but I wanted the --

Page 25

1   the -- the broad period, and I didn't define what
2   "spring" meant, so -- so -- and if we want to take,
3   say, February through June when I'm talking various
4   people, that's the -- the time frame I'm -- I'm --
5   I'm looking for.
6           MR. THOMASCH:  Okay.  I'll have a sort
7   of a general objection on Lawson's behalf to -- to a
8   time period where I think that, because of the
9   subject matter, the specific time may be of
10  consequence and -- and vagueness or breadth on
11  those -- on those questions I would -- I would
12  object to the form of.
13          MR. JACOBS:  That's fine, and I'll try
14  to be more precise on the dates as we go along in
15  the -- in the -- looking at the documents.
16          MR. THOMASCH:  Thank you, Paul.
17  BY MR. JACOBS:
18      Q.  Let me ask you about Jim Millard.  What
19  role at Lawson, if any, did he have in the spring of
20  2011?
21      A.  Jim Millard?
22      Q.  Jim Millard.  Thank you.
23      A.  Yeah.  He was -- Jim was with the company a
24  long time and he switched roles a lot.  I know what
25  business unit he was in.  He was in the services

Page 26

1   industries business unit, and I know he had
2   responsibility for sales within that business unit
3   at the time, but I can't recall what his exact
4   position was at the time or I can't recall if at
5   that time he reported straight to me or reported to
6   somebody who reported to me, because it changed
7   quite a bit.
8       Q.  And you anticipated my next question.  He
9   was someone who was -- was in your chain beneath you
10  in reporting?
11      A.  Yes, but I can't recall if it was direct
12  or -- or through a reporting chain.
13      Q.  And I'm -- I'm sure I'm going to fracture a
14  lot of these names, so you'll have to help me.  Dick
15  "Seickert" or "Sickert"?  Is that --
16      A.  Sickert?
17      Q.  Yes.
18          MR. THOMASCH:  Spell it.
19      A.  Dick Sickert.
20      Q.  And maybe I misspelled it.  S-i-c-k-e-r-t?
21      A.  S-i-c-k-e-r-t.  I don't recall that name.
22      Q.  Okay.  Mike Cohen.  Was he an in-house
23  attorney in the spring of 2011?
24      A.  I don't know if -- I -- I didn't know Mike,
25  so I'm not exactly sure.

Page 27

1       Q.  Okay.  Ingrid Svennson?
2       A.  Hon -- if -- if I hadn't looked at
3   documents last night, I would say I've never heard
4   of the person, but I did remember Ingrid after I --
5   I looked at a little bit, because she hadn't been
6   with Lawson all that long, so she was within the
7   healthcare -- she worked with the healthcare
8   business unit.  I can't remember what her reporting
9   chain was.
10      Q.  All right.  Not certain if it was a report
11  up in your chain or not?
12      A.  I can't recall if it was a report up into
13  my chain or a report up into the marketing chain.
14      Q.  How about Mindy "Kleb" or "Klebe"?
15      A.  I didn't know her.
16      Q.  All right.  Dan Davidson?
17      A.  I didn't know him.
18      Q.  All right.  Matthew Bragstad?
19      A.  I -- I didn't know him.
20      Q.  Someone who I believe is in healthcare but
21  you can correct me:  Robert Ainsbury?
22      A.  Similar to Ingrid, I think.  It would be
23  the same answer:  I know he worked with healthcare;
24  I can't remember his exact reporting chain.
25      Q.  All right.  Diana Orndorff?

Page 28

1       A.  I recall that name.  I can't remember what
2   her position was at the time.
3       Q.  Okay.  Henrik Billgren?
4       A.  I knew Henrik.
5       Q.  All right.  And what was his role in the
6   company in the -- the spring of 2011?
7       A.  At the time, I believe that he was the
8   product management leader for the M3 products.  I
9   recall him having a similar position as what
10  Jennifer Langer had for S3 for the M3 product line.
11      Q.  Okay.  And there were M3 sales in the
12  United States as well as in Europe.  Is that right?
13          MR. THOMASCH:  Objection to form.
14      A.  Correct.
15      Q.  Okay.  Jeff Goldman?  Do you recall his
16  role in the company?
17      A.  No.
18      Q.  All right.  Mary Finck -- Finckler?
19      A.  That name rings a bell.  I can't think of
20  what her role was.
21      Q.  Could she have been an account manager?
22      A.  I don't know.
23      Q.  Okay.  Aaron Price?
24      A.  I don't recall.
25      Q.  Steve Fanning?

Page 29

1    A.  That name also rings a bell.  I'd be
2  speculating on the role.  I have a suspicion of what
3  the role would be, but I don't know for certain.
4    Q.  And -- and what is your suspicion grounded
5  in?
6    A.  I -- only just trying to remember back.  I
7  re -- I remember his name.  At -- at one point in
8  time with Lawson, I thought he was in sales, but I
9  don't know what his role was at -- at that time.
10    Q.  Okay.
11    A.  I didn't work directly with him.
12    Q.  Megan Anderson?  Do you recall her role in
13  the company?
14    A.  I don't remember the name.
15    Q.  If I suggested she was in supply chain
16  management, would that help?
17    A.  No.  I don't remember her name.
18    Q.  Okay.  Mr. Hager, do you recall at your
19  previous deposition you were asked some questions
20  about your awareness of two questions that had been
21  posed by Mr. Debes concerning the injunction?
22        MR. THOMASCH:  Objection to form.
23    Q.  Do you recall that?
24    A.  You're asking --
25    Q.  If you recall that from your earlier

Page 30

1  deposition.
2    A.  From the deposition?
3    Q.  Yes, sir.
4    A.  I don't actually recall it.  I saw it in
5  the deposition last night.
6    Q.  All right.
7    A.  Yeah.
8    Q.  And I'll ask you in a minute you -- if you
9  want to refresh your -- your memory on that.  Do you
10  recall that in looking at your deposition and
11  perhaps refreshing, you were shown an exhibit,
12  rather thick one, that was dated March 14, 2011,
13  with some PowerPoints in it?
14        MR. THOMASCH:  Objection to form.
15    A.  I don't recall that specifically.
16    Q.  Okay.  Let me help you out there then.
17        MR. JACOBS:  (Handing.)  This will be
18  Number 2.
19        MR. WITTHOEFFT:  Just keep this up
20  here.
21        THE WITNESS:  Thank you.
22        MR. WITTHOEFFT:  Keep them straight.
23  Yeah.  They'll go back to them.
24    A.  Oh.  Do I -- do I take this, or --
25    Q.  Well, she's going to --

Page 31

1    A.  Oh.  Okay.  Gotcha.
2    Q.  -- mark it first for you.
3        (Hager II Exhibit 2 was marked for
4  identification.)
5    A.  Now do I take it?
6    Q.  Now you can take it.
7    A.  Okay.
8    Q.  All right.  And I'll represent to you that
9  this was used at your last deposition, and you may
10  in fact want to look at Pages 79 through 86, sir, in
11  this transcript that's open first, and you'll see
12  where you talked about it.
13    A.  Oh.  Okay.
14        MR. THOMASCH:  Paul, can we i --
15  identify the document, because it --
16        MR. JACOBS:  Yes.
17        MR. THOMASCH:  -- there has been prior
18  testimony, and obviously, there's a cover e-mail
19  that the witness is not -- not mentioned on as an
20  author or simply under CC.
21        MR. JACOBS:  Right.
22        MR. THOMASCH:  And the record ought to
23  be at least clear what the document is.
24        MR. JACOBS:  Absolutely, Dan.  Thank
25  you.

Page 32

1  BY MR. JACOBS:
2    Q.  This was -- at the previous deposition,
3  this was Hager 5, RQC2631716 through RQC2631750, and
4  it's been premarked for the hearing as PX-1089.
5    A.  I'm sorry.  What page did you say the --
6    Q.  Yes, sir.
7    A.  -- the question was asked?
8    Q.  Page -- starting on Line 20, Page 79 and
9  going through Line 20, Page 86 is where you
10  discussed this.
11    A.  Okay.
12        MR. THOMASCH:  Through what page?
13        MR. JACOBS:  86, Dan.
14        MR. THOMASCH:  Okay.  Can I have a
15  moment?
16        MR. JACOBS:  Sure.  Please.
17        MR. WITTHOEFFT:  Is there a pending
18  question, Paul, or are you just asking him to
19  refresh himself?
20        MR. JACOBS:  Well, I thought it's --
21  it's -- just would be useful if he refreshes --
22        MR. WITTHOEFFT:  Okay.
23        MR. JACOBS:  -- himself first.
24        THE WITNESS:  Okay.  Appreciate that.
25        (Reporter interruption.)

Page 33

```
 1              THE WITNESS:  Oh.  Sorry.
 2         MR. WITTHOEFFT:  Take a moment and
 3    read through it, both your testimony and the
 4    document, Dean.
 5              THE WITNESS:  Okay.
 6         MR. THOMASCH:  Yeah.  I -- I do want
 7    to make clear on the record that refreshed
 8    recollection is to remember -- and I'm not sure if
 9    you're asking him whether he remembers giving the
10    testimony or he remembers the underlying documents
11    as a result of this.  This is sort of an odd use of
12    refreshed recollection, and I'm not really sure
13    what's being asked.
14         MR. JACOBS:  Well, and I want to -- I
15    want to move on to, then, another document on this,
16    and I thought it would be useful if -- if he at
17    least could bring him back to what he said a -- a
18    year ago, so --
19         MR. THOMASCH:  Okay.  I --
20         MR. JACOBS:  I can take -- I can take
21    him a different -- different way.
22         MR. THOMASCH:  No, I -- I think it's
23    a -- I think it's an improper use of prior
24    testimony, but it --
25              THE WITNESS:  Okay.
```

Page 34

```
 1         MR. THOMASCH:  I'll note my objection
 2    and you can proceed as you think --
 3         MR. JACOBS:  Sure.
 4         MR. THOMASCH:  -- appropriate.
 5         MR. JACOBS:  All right.
 6    BY MR. JACOBS:
 7         Q.  And if you look at page -- on the Exhibit 2
 8    that's just been marked, Mr. Hager, and if you turn
 9    to the third page in, which is the second page in
10    the PowerPoint, you'll see "Harry's Questions."
11         A.  Yes.  I see.
12         Q.  All right.  And I see that Mr. -- Harry's
13    Questions are what are the implications to us if we
14    temporarily prevent -- are temporarily prevented
15    from selling RSS and Punchout and, two, what effort
16    is required to create a workaround on these two
17    products so they don't infringe on these patents.
18    Did I read that correctly, sir?
19         A.  It appears so.
20         Q.  All right.  And then if you turn to Page 86
21    of the transcript, and that's --
22         A.  Oh.
23         Q.  -- that document.  And you were asked at
24    Line 17, "And, sir, you were aware of that question
25    11 days prior to your testimony at the injunction
```

Page 35

```
 1    hearing."  Your answer, "Yes."  Did I read that
 2    correctly?
 3         A.  Yes.
 4         Q.  All right.  And you weren't --
 5         MR. THOMASCH:  Note my -- note my
 6    objection to the use of the prior transcript and --
 7    and I would in -- incorporate the objection made at
 8    the prior deposition to the predicate for that
 9    question.
10         MR. JACOBS:  That is -- objection is
11    noted.
12    BY MR. JACOBS:
13         Q.  You were, in fact, aware of these two
14    questions on or about March 14, 2011, that Mr. Debes
15    had posed.  Is that correct, sir?
16         A.  Ye --
17         MR. THOMASCH:  Objection to form,
18    misstates the record.  You may answer.
19         A.  I was aware that Harry had asked these two
20    questions.
21         Q.  All right.  And in fact, Mr. Hager, didn't
22    Mr. Debes pose those two questions to you even prior
23    to March 14, 2011?
24         A.  I don't recall the exact date the questions
25    were posed or who -- who they were posed to.
```

Page 36

```
 1         Q.  All right.
 2         MR. JACOBS:  (Handing.)  This will be
 3    Number 3.
 4         (Hager II Exhibit 3 was marked for
 5    identification.)
 6    BY MR. JACOBS:
 7         Q.  All right.  Mr. Hager, let me hand you what
 8    the reporter has marked as Exhibit 3.  It's been
 9    premarked as PX-1258 and appears to be an e-mail
10    string.  Do you see that, sir?
11         A.  I do.
12         Q.  And if you turn to the last page,
13    RQC3003520, you see that it is a -- a -- an e-mail
14    from Mr. Harry Debes of March 9, 2011?
15         A.  I do.
16         Q.  And you were a recipient of that e-mail,
17    sir?
18         A.  Yes.
19         Q.  All right.  And do you see in that e-mail
20    the same two questions as contained in Exhibit 2 we
21    just looked at?
22         A.  Yes.
23         Q.  All right.  Do you have any reason to
24    believe that you did not receive and review this
25    e-mail from Mr. Debes on or about March 9, 2011?
```

Page 37

1    A.  I have no reason to believe that I didn't
2  receive it.
3    Q.  Okay.  All right.  If you would look --
4  take the last paragraph of that e-mail from
5  Mr. Debes on the page that you're focused on at the
6  moment and just read that out loud for a minute?
7    A.  The last paragraph --
8    Q.  Yes, sir.
9    A.  -- of the final --
10   Q.  Don't -- don't misunderstand my question --
11  my questions.
12   A.  "Don't misunderstand my questions:  I
13  believe that ultimately we will prevail in this
14  case.  Until then we are not going to settle this
15  case for the blackmail the other side is asking
16  for--but I think it makes sense for us to be
17  prepared as it's possible that the decision by the
18  judge could be handed down during CUE.  We don't
19  want to be unprepared in case it temporarily goes
20  against us."
21   Q.  You read the --
22    MR. THOMASCH:  I'll note for the
23  record under Rule 611, the document continues,
24  "Regards, Harry."
25    MR. JACOBS:  Thank you, Mr. Thomasch.

Page 38

1  BY MR. JACOBS:
2    Q.  When you used the word "CUE," are those
3  initials C-U-E?
4    A.  Yes.
5    Q.  All right.  And what did C-U-E stand for?
6    A.  I believe it stood for client user
7  exchange, but --
8    Q.  Is --
9    A.  -- it was -- it was our big client show
10  each year.
11   Q.  I'm sorry.  I didn't hear.  What -- ever --
12  each year?
13   A.  Every year, we did it.
14   Q.  Okay.  And the 2011 CUE was scheduled for
15  around April 4, 2011.  Is that correct, sir?
16   A.  I don't remember the exact dates, but we
17  always did it in the spring.
18   Q.  All right.  Just to refresh your memory on
19  the precise dates, let me just show you a document
20  that I pulled off the -- the web and ask you if that
21  helps refresh your memory as to the date.
22    MR. THOMASCH:  May I see the -- the
23  document --
24    MR. JACOBS:  Yes.  I'm sorry.
25    MR. THOMASCH:  -- that's being used

Page 39

1  to -- and I do apologize.  Obviously, the rule of
2  completeness is Rule 106.  I just misspoke the other
3  one.  (Pause.)  Okay.  Thank you for showing me the
4  document.  Is there a question pending?
5    MR. JACOBS:  Yes.  I want to know if
6  this re -- helps refresh his memory that the CUE was
7  on or about April 4, 2011.
8    MR. THOMASCH:  As to whether he has an
9  independent recollection of it as opposed to whether
10  it's what the document says?
11    MR. JACOBS:  Yes, if this helps
12  refresh his memory as to the date.
13   A.  It doesn't help refresh my memory, but I
14  would draw the same conclusions you would in looking
15  at it and it would -- I would not be surprised if
16  those were the dates because, as I mentioned, we
17  always did it in the spring.
18   Q.  Okay.  Now, were you planning to
19  participate in CUE in 2011?
20   A.  Yes.
21   Q.  Okay.  Did you attend?
22   A.  Yes.
23   Q.  All right.  And was it your understanding
24  in March 2011 that the CEO, Mr. Debes, was looking
25  for a software workaround solution to a possible

Page 40

1  injunction by the time of CUE?
2    A.  Could you restate the question?
3    Q.  Was Mr. Debes seeking a software solution
4  around a possible injunction to be occurring by the
5  time of CUE?
6    MR. THOMASCH:  Objection to form.
7    A.  I don't know what the word "occurring"
8  means.  Do you mean a software to be delivered or a
9  plan to be in place?  I'm -- I need clarity on that
10  question.
11   Q.  Was he looking for development internally
12  of a solution to a possible injunction occurring by
13  the time of CUE?
14    MR. THOMASCH:  Objection to form.
15    A.  The only thing I would know about what
16  Harry was working on were the questions that -- that
17  he posed here.
18   Q.  Okay.  All right.  If you turn back to
19  Exhibit 3 and go one previous page --
20   A.  Exhibit 3?
21   Q.  Yes.  Exhibit 3.  Thank you.
22   A.  The --
23   Q.  Page RQC --
24    MR. WITTHOEFFT:  The one you're
25  holding.  Yeah.

Page 41

```
 1        Q. -- 3003519.
 2            THE WITNESS:  Thank you.
 3        Q. And you'll see an e-mail from John
 4    Mulchrone.  Do you see that, sir?
 5        A. Yes.
 6        Q. Dated March 9, 2011?
 7        A. Yes.
 8        Q. And you received that.  Is that correct,
 9    sir?
10        A. I'm on the "to" line.
11        Q. Yes.  At the -- at 1:38 p.m., it's at the
12    bottom of the page.  Do you see that?
13        A. I see it.
14        Q. All right.  And you see where he says,
15    "Punch-out should be easy to resolved (see more
16    detail explanation below)".  Do you see that, sir?
17        A. I do.
18        Q. All right.  Now turn back to the following
19    page, to the e-mail from Mr. Debes, and do you see
20    some bold type under the two questions from
21    Mr. Debes?
22        A. Yes.
23        Q. All right.  And reading this, is it your
24    understanding that that was an insertion that wasn't
25    originally Mr. Debes's e-mail?
```

Page 42

```
 1            MR. WITTHOEFFT:  Object to the form.
 2            MR. THOMASCH:  Objection to form.
 3        A. I -- I'm sorry.  I wouldn't know.  I can't
 4    recall.
 5        Q. When you see in Mr. Mulchrone's e-mail on
 6    3519, that second page at the bottom, where he says,
 7    "and we (LPD) have proposed product changes to
 8    Requisition Self Service which may help, though
 9    awaiting feedback from Legal (outside and
10    internal)--enclosed are a few slides on the
11    changes."  Do you see that, sir?
12        A. Correct.
13        Q. All right.  When he says "we (LPD),"
14    what -- what did LPD mean?
15        A. Lawson Product Development.
16        Q. And that's the group that Mr. Mulchrone was
17    involved with?
18        A. Correct.
19        Q. All right.  Was LPD a group within Lawson
20    that would propose product changes to Requisition
21    Self Service?
22            MR. WITTHOEFFT:  Object to the form.
23            MR. THOMASCH:  Objection to form.
24        A. LPD was the group that would code any new
25    functionality.  Whether they would propose the
```

Page 43

```
 1    solutions or whether that proposal would come from
 2    product management -- proposals could come from
 3    anywhere, but LPD executed them.
 4        Q. Okay.  They had the technical expertise --
 5    expertise to make changes --
 6        A. Correct.
 7        Q. -- in coding?  On the next page, on 3520,
 8    the last page, where it says "(RSS) Requisition Self
 9    Service--working with Legal on potential product
10    changes--see enclosed powerpoint," do you recall if
11    in fact there was a PowerPoint that was enclosed,
12    sir?
13            MR. THOMASCH:  Objection to form.
14        A. I don't recall.
15        Q. Okay.  Do you know if the PowerPoint that
16    we looked at which was Hager Exhibit 2, Hager II
17    Exhibit 2, was -- there was a slightly earlier
18    iteration of that?
19        A. I'm sorry?
20        Q. Was there a slightly earlier iteration of
21    Hager Exhibit 2, sir?
22            MR. WITTHOEFFT:  Object to the form.
23        A. Other than depositions, I don't recall this
24    PowerPoint, so I'm not sure when it was attached,
25    and if you'll notice the latter e-mails here, I'm
```

Page 44

```
 1    not on the "to" of any of them, so the PowerPoint
 2    could have been attached at any time.
 3        Q. Okay.
 4        A. And that text could have been inserted on
 5    any of the forwards, so I'm not saying I didn't
 6    receive it; I'm just saying I have no recollection
 7    of it.
 8        Q. All right.  Apart from Mr. Mulchrone's
 9    reference where he says "see more detail explanation
10    below" and "enclosed are a few slides on the
11    changes," is there anything else you see in this
12    e-mail that suggests there's an attachment?
13            MR. THOMASCH:  Objection to form.
14        A. In the entire string, you're saying?
15        Q. Yes, sir.
16        A. I'm not sure that I completely understand
17    the question, but I -- I don't see anything else
18    about an attachment --
19        Q. Okay.
20        A. -- no.
21        Q. If you look again at page -- above
22    Mr. Mulchrone's e-mail and your -- I do note your
23    comment that you weren't copied above that line,
24    you'll notice, however, Mr. McPheeters mentions a
25    meeting call for Wednesday, March 16, at 8:00 a.m.
```

Page 45

```
 1   Do you see that, sir, to dis -- to discuss ePlus
 2   planning?
 3       A. Yes.
 4       Q. Do you recall attending or participating in
 5   a meeting call on or about March 16 to discuss ePlus
 6   planning and how to respond if we get an adverse
 7   ruling on April 4?
 8           MR. THOMASCH: Objection to form.
 9   Lack of foundation. You may answer.
10       A. I don't recall.
11       Q. Do you recall any discussions in this time
12   frame about changes to RSS?
13           MR. THOMASCH: Objection to form.
14       A. I don't recall any discussions from -- from
15   March of 2011. The only recollection I would have
16   would be from the e-mail documents that have been
17   presented to me in depositions, so....
18       Q. On the first page of that Exhibit 3, you'll
19   see an e-mail from Daniel McDonald, and, again,
20   you're not copied on this, but you'll see in the
21   middle where he says, "Bottom line is that I think
22   the changes to RSS look very good." Do you see
23   that, sir?
24           MR. THOMASCH: Hold on a second.
25       A. No, actually, I don't.
```

Page 46

```
 1           MR. THOMASCH: May I ask where you
 2   are? I -- I don't see where the --
 3           MR. JACOBS: The first page.
 4           MR. THOMASCH: Are you in the middle
 5   e-mail from Bruce --
 6           MR. JACOBS: No, the -- from -- at the
 7   bottom. Daniel Mc --
 8           MR. THOMASCH: Oh. From Daniel
 9   McDonald.
10           MR. JACOBS: Yes, to Bruce McPheeters.
11       A. Oh. Okay. I see that sentence.
12       Q. Okay. And it's the middle paragraph of the
13   e-mail of March 10, 2011, 8:32 a.m., Dan McDonald to
14   Bruce McPheeters. Were you aware in the mid-March
15   2011 timeframe that Lawson's outside counsel had
16   expressed the view that the changes to RSS looked
17   good?
18           MR. THOMASCH: Objection to form.
19   Lack of foundation. You may answer.
20       A. No. I -- I didn't know that outside
21   counsel had said that.
22       Q. Did you have any conversations in the
23   mid-March 2011 timeframe with Merchant & Gould about
24   the status of the design-around?
25       A. I don't recall any of those conversations.
```

Page 47

```
 1       Q. Did you have any conversations at the time
 2   of CUE with Merchant & Gould about the status of the
 3   design-around?
 4       A. I don't recall any conversa -- in general,
 5   I didn't talk to Merchant & Gould very often.
 6           MR. THOMASCH: Paul, if you're done
 7   with that document, just for the record, I'd like
 8   to, under Rule 106, read in the balance of the
 9   paragraph that you quoted in part from.
10           MR. JACOBS: Please.
11           MR. THOMASCH: The quote you had was
12   "Bottom line is that I think the changes to RSS look
13   very good," period. The rest of the paragraph
14   reads, "Punchout just to e+ licensees also looks
15   very good," period. But I think it is time to get
16   your independent IP counsel in the loop to review
17   those changes and give you an opinion on them, if we
18   are going to be ready as we want to be on April 4,
19   period. Thank you.
20           MR. JACOBS: Thank you, sir.
21       A. Is there a point of clarity I could make
22   about this stuff -- about Harry's questions?
23       Q. Certainly.
24       A. Yeah. On the final note where you have
25   many members on the "to" field and then two
```

Page 48

```
 1   questions that he posed, just for point of clarity,
 2   the second question was -- even though I'm on the
 3   "to" line, wasn't posed to me because I didn't have
 4   any product responsibilities. So Harry would have
 5   had a tendency to send two questions to all of the
 6   people that could potentially answer them, so the
 7   first question would have been my question. The
 8   second question would have been Guenther Tolkmit's
 9   question.
10       Q. Thank you for that clarification. Now,
11   with respect to that first question, if, as I
12   understand it, it was directed to you or your group,
13   did you have any conversations with Mr. Debes about
14   the implications to us if we're temporarily
15   prevented from selling RSS and Punchout in the
16   March 9, 2011 time frame?
17           MR. WITTHOEFFT: Object to the form.
18       A. I can't recall a specific question or
19   specific conversation with him only because it was a
20   long time ago, but it wouldn't surprise me if I had
21   conversations with him about it.
22       Q. All right. The second question that you
23   said would not have been directed to you, to whom
24   would it have been directed?
25       A. And I'm simply going off of logical
```

Page 49

1  conclusion, but since the head of research and
2  development, Guenther Tolkmit, and since the head of
3  S3 development, John Mulchrone, is on the "to" line,
4  the implication would be that that question would be
5  directed to them.
6      Q.  And did you have any conversation with
7  Mr. Tolkmit or Mr. Mulchrone about responses to
8  question two?
9      A.  I can't recall those conversations, no.
10     Q.  Turn back, if you would for a minute, to
11  Exhibit 2, which was the PowerPoint, the thick
12  document.
13     A.  Okay.
14     Q.  And turn if you would to RQC2631722.  Looks
15  like -- looks like that.
16     A.  Yes.
17     Q.  Okay.  And you see at the top, it says
18  "Updated 3/30"?
19     A.  I see.
20     Q.  Okay.  And you'll see in somewhat lighter
21  type underneath the number 1 that says "Rework the
22  Application so it's not infringing:  Goal GA or
23  limited availability by 5/31/2011."  Do you see
24  that, sir?
25     A.  Yes.

Page 50

1      Q.  All right.  In the context of your work at
2  Lawson, would you understand "GA" to be general
3  availability?
4      A.  That would be my understanding.
5      Q.  Okay.  And did you have an understanding
6  that there was a goal to try to have general
7  availability of a rework of the RSS application
8  available by 5/31/2011?
9          MR. THOMASCH:  Objection the form.
10         MR. WITTHOEFFT:  Object to the form.
11     A.  Is there a time frame there you're asking
12  if I had that understanding?
13     Q.  Did you have it as of March 30, 2011?
14     A.  I can't recall the exact date I would have
15  had that understanding, but I recall sometime during
16  the spring having that understanding.
17     Q.  All right.  You see at the bottom of that
18  page there are a number of strike-throughs on the --
19     A.  Yes.
20     Q.  Okay.  And do you see one of the words
21  stricken, or two words, is "Perfect Commerce"?
22     A.  I see that.
23     Q.  All right.  Is that a company?
24     A.  I don't know.
25     Q.  Do you -- do you know what -- do you know

Page 51

1  what Perfect Commerce is?
2      A.  No.
3      Q.  Okay.  You said you had an understanding
4  sometime in the spring of 2011 that the goal was to
5  have an application of general availability by
6  May 31, 2011.  What was the significance of having
7  that availability by that date?
8          MR. WITTHOEFFT:  Object to the form.
9      A.  I don't -- I would simply infer that it
10  was -- if that's the right word to use, that it was
11  by the end of our fiscal year.
12     Q.  All right.  Were S3 software sales booked
13  for revenue recognition when license agreements were
14  entered?
15     A.  Repeat, please.
16         MR. THOMASCH:  Objection to form, lack
17  of foundation, and note that Lawson has provided a
18  Rule 30(b)(6) witness on this topic, so the
19  testimony I want to make clear is not binding on
20  Lawson.  The witness may answer to the best of his
21  knowledge.
22     A.  If you could just repeat.
23     Q.  Sure.  Were S3 software sales booked for
24  revenue recognition when license agreements were
25  entered?

Page 52

1      A.  Depending on the way the contract was
2  written.  Sometimes it was; sometimes it wasn't.
3      Q.  How about for procurement products?
4      A.  Again, it would depend on how the contract
5  was written.
6      Q.  Was there concern that if an injunction was
7  entered during the fourth quarter prohibiting sales
8  of RSS, Lawson would be unable to book revenue for
9  that quarter unless it had a replacement software
10  available?
11         MR. WITTHOEFFT:  Object to the form.
12         MR. THOMASCH:  Objection to form.
13     A.  My recollection is we were concerned about
14  software sales that quarter.
15         (Reporter interruption.)
16     Q.  Mr. Hager, do you recall that at the
17  injunction hearing on March 25, 2011, you testified
18  about the number of RSS healthcare-only clients that
19  could be impacted by an injunction and how long it
20  would take them to implement the changes?
21         MR. WITTHOEFFT:  Object to the form.
22     A.  Yes.
23     Q.  And do you recall providing the court with
24  a very precise number of healthcare customers and a
25  very precise number of hospitals impacted?

Page 53

1      MR. THOMASCH:  Objection to form.
2      A.  I can't recall my exact testimony and I
3  didn't get to that part of the review.  I -- I don't
4  recall.
5      Q.  All right.  Sitting right in front of you
6  is your testimony from that hearing, and I would ask
7  if you would turn to Page 219.
8      A.  I'm there.
9      Q.  All right, sir.  And if you'd look to the
10  paragraph that begins at Line 17 and through
11  Line 21, would you read that, sir?
12      A.  "I" --
13      MR. THOMASCH:  Objection to having the
14  witness read out loud.  You may answer.
15      A.  "I do say that with some level of ex" -- "I
16  do say that with some level of expertise.  We have
17  277 requisition self service health care only
18  customers that represent 2500 different hospitals,
19  which is about a third of the hospitals in the
20  United States.  We do have a lot of experience."
21      Q.  All right.  Thank you, sir.  Now, where did
22  you get that very precise number of 277 healthcare
23  customers?
24      A.  I can't recall.  It would have been out of
25  a report or perhaps asking somebody, but it would

Page 54

1  have been something that would have been reported to
2  me in some way.
3      Q.  All right.  And do you recall where you got
4  that precise number of 2500 hospitals?
5      A.  Likely the --
6      MR. THOMASCH:  Objection to form.
7      THE WITNESS:  I'm sorry.
8      A.  Likely the same source, which, because it's
9  an exact 2500 number, my conclusion would be that
10  that was an estimate.
11      Q.  Well, you did not use the word "estimate"
12  in your answer there, did you, sir?
13      MR. WITTHOEFFT:  Objection to form.
14      (Reporter interruption.)
15      MR. THOMASCH:  Objection,
16  argumentative.
17      A.  I don't see the word "estimate" in there.
18      Q.  You had an e-mail exchange that morning of
19  your testimony with Mr. Lohkamp on the subject of
20  the number of healthcare customers and hospitals.
21  Do you recall that, sir?
22      A.  I recall having an e-mail conversation with
23  Mr. Lohkamp.
24      Q.  All right.
25      MR. JACOBS:  (Handing.)

Page 55

1      (Hager II Exhibit 4 was marked for
2  identification.)
3      MR. JACOBS:  Is this 4?
4      THE REPORTER:  Yes.
5      MR. JACOBS:  This will be 4.
6      MR. THOMASCH:  Thank you.
7  BY MR. JACOBS:
8      Q.  All right.  Mr. Hager, if you take a look
9  at Exhibit 4, which was previously Hager 6 to your
10  first deposition and premarked as PX-1090, and if
11  you would, sir, look at the bottom of the first page
12  and you'll see the beginning of an e-mail from Dean
13  Hager to Keith Lohkamp.  Do you see that, sir?
14      A.  Yes.
15      Q.  March 25, 2011, 8:12 a.m.?
16      A.  Yes.
17      Q.  All right.  And then if you follow to the
18  second page, you'll see that Mr. Lohkamp wrote to
19  you at 11:07 a.m.  Do you see that, sir?
20      A.  I see it.
21      Q.  All right.  And -- and he uses the phrase
22  in his e-mail to you, "Over 270 Healthcare
23  customers."  Do you see that, sir?
24      A.  Yes.
25      Q.  And "We've been estimating 9 hospitals per

Page 56

1  HC customer meaning around 2500 hospitals"?
2      A.  Yes.
3      Q.  All right.  And did you understand from
4  Mr. Lohkamp's e-mail -- well, first, let me ask you,
5  do you have any reason to believe that you did not
6  receive and review this e-mail on the morning of
7  March 25, 2011?
8      A.  No.
9      Q.  Okay.  Mr. Lohkamp says "Over 270
10  Healthcare customers," but your testimony was
11  precisely 277 healthcare customers.  What happened
12  between 11:07 a.m. and your testimony to come up
13  with the precise number of 277?
14      MR. WITTHOEFFT:  Object to the form.
15      MR. THOMASCH:  Objection to form.
16      A.  The conversation with Mr. Lohkamp that
17  morning was not the only conversation on this topic.
18  I had prior -- at prior times reviewed reports and
19  had information prior to this testimony.  The
20  conversation I was having with Mr. Lohkamp this
21  morning was essentially to double check what had
22  been previously told me so that my testimony could
23  be as accurate as possible, so his answer here would
24  have been consistent with what I had heard
25  previously.

Page 57

```
 1          Q.  And at 8:05 a.m., you asked him the -- the
 2   question.  Is that correct, sir?
 3              MR. THOMASCH:  Objection to form.
 4          Q.  From the previous e-mail beneath that?  How
 5   many healthcare customers run SSS [sic] and estimate
 6   how many hospitals it rep -- that represents.  Do
 7   you see that, sir?
 8          A.  I do see that.
 9          Q.  All right.  And your testimony, then, is
10   that you were merely comparing Mr. Lohkamp's numbers
11   to other information you had?
12              MR. WITTHOEFFT:  Object to the form.
13              MR. THOMASCH:  Objection to form.
14          A.  I'd refer to it as cross checking, yes.
15          Q.  Okay.  And tell me again what document it
16   was that you used that told you exactly 277?
17              MR. WITTHOEFFT:  Object to the form.
18          A.  I can't -- I can't recall.
19          Q.  Were you concerned at all in your
20   testimony, Mr. Hager, that if you used a more
21   precise number than an estimate, it would give more
22   weight to what you were trying to convey to the
23   court?
24              MR. WITTHOEFFT:  Object to the form.
25              MR. THOMASCH:  Objection to form.
```

Page 58

```
 1          A.  This was the very first day of my life that
 2   I had ever been in court, and at that time, I
 3   hadn't -- I wasn't schooled in the difference
 4   between a typical conversation and the need to
 5   preface every sentence with "to the best of my
 6   recollection" or "to the best of my knowledge," so I
 7   was simply trying to be helpful and as accurate as I
 8   could possibly be.
 9          Q.  Were you concerned that the -- the judge
10   didn't understand what you were telling him?
11              MR. WITTHOEFFT:  Object to the form.
12              MR. THOMASCH:  Objection to form.
13          A.  Yes, I do recall having that feeling.
14          Q.  In fact, you told that to Mr. Debes and
15   Mr. McPheeters, didn't you, sir?
16          A.  Yes, only because I recall seeing it on a
17   document last night that was presented to me.
18              MR. JACOBS:  (Handing.)  This is the
19   next exhibit.
20              (Hager II Exhibit 5 was marked for
21   identification.)
22              MR. JACOBS:  Is this 5?
23   BY MR. JACOBS:
24          Q.  Let me show you what's now been marked as
25   Exhibit 5 -- it's premarked PX-1230 -- and ask you,
```

Page 59

```
 1   you sent the -- did you send this e-mail, sir, on
 2   about March 25, 2011, 10:00 at night, or 10:09 at
 3   night, to Mr. Debes and Mr. McPheeters?
 4          A.  I don't recall the act of sending it, but I
 5   would conclude the same thing as you would in -- in
 6   looking at the e-mail.
 7          Q.  All right.  And in the second line,
 8   second -- second paragraph, you say, "I actually
 9   enjoyed testifying.  Cross examination was not tough
10   at all.  They just don't have a good case.
11   Unfortunately, I don't think the judge understands
12   half of what he hears."  Do you see that, sir?
13          A.  I do.
14          Q.  All right.  And did that express what you
15   felt at the time when you wrote this e-mail to --
16              MR. WITTHOEFFT:  Ob --
17          Q.  -- Mr. -- Mr. Debes and Mr. McPheeters?
18              MR. WITTHOEFFT:  Object to the form.
19              MR. THOMASCH:  Objection to form.
20          A.  Again, I don't recall writing the e-mail,
21   but in full disclosure, I do recall having the
22   feeling.
23          Q.  Okay.  At the top of the e-mail, it has --
24   it notes an attachment, ePlus by the Numbers.pdf.
25   Do you see that, sir?
```

Page 60

```
 1          A.  I do.
 2          Q.  All right.  And attached to this e-mail are
 3   two pages, and the first page headed "ePlus by the
 4   Numbers."  Do you see that, sir?
 5          A.  I see it.
 6          Q.  All right.  And was this a document that
 7   you composed on the airplane home after the -- after
 8   the hearing?
 9          A.  I do recall writing it, but I haven't seen
10   it since I wrote it and so I don't recall the
11   contents of it.
12          Q.  All right.
13          A.  I'll read it, here.
14          Q.  And if you look on the second page of the
15   attachment --
16              MR. WITTHOEFFT:  Let him -- if you
17   don't mind, Paul, let him take a moment to review
18   the whole thing.
19              MR. JACOBS:  Absolutely, Rick.
20              (Pause.)
21          A.  Okay.
22          Q.  All right.  On the second page, you see the
23   number "277"?
24          A.  Yes.
25          Q.  And "number of Lawson Healthcare customers
```

Page 61

1  running RSS."  That's the same 277 about which you
2  testified previously that day in court.  Is that
3  right?
4      A.  Correct.
5      Q.  And the "2,500--number of U.S. Hospitals
6  represented by Lawson's 277 RSS customers" is the
7  2500 hospitals that you had testified previously
8  that day in court.  Is that right, sir?
9          MR. THOMASCH:  Objection to form.
10     A.  Yes, and given that this was an internal
11  note, it's clear from this that that's what I
12  actually believed at the time --
13     Q.  Okay.
14     A.  -- of the case.
15     Q.  Did you subsequently have a conversation
16  with Jennifer Langer about your testimony of
17  March 25, 2011?
18     A.  I don't recall.
19     Q.  All right.  Did you ever tell her that the,
20  quote, knucklehead, closed quote, judge created the
21  277 number from some fantasy?
22          MR. WITTHOEFFT:  Object to the form.
23          MR. THOMASCH:  Objection to form.
24     A.  I don't recall that exact quote, but in
25  full disclosure, I recall a document being presented

Page 62

1  to me at the last deposition that Jennifer wrote and
2  those were Jennifer's words.  I don't recall saying
3  those words to Jennifer.
4      Q.  Did you tell her that the intent of using
5  the 277 number was to protect the organizations
6  solely providing patient care?
7          MR. THOMASCH:  Objection to form.
8      A.  I don't -- I don't recall the conversation.
9      Q.  All right.  If Ms. Langer had, as you said,
10  later quoted you --
11     A.  I didn't say that.
12     Q.  Ah.  Okay.
13     A.  I said Ms. Langer wrote the e-mail.  I
14  didn't say she quoted me.
15     Q.  Okay.  If Ms. Langer later wrote an e-mail
16  that attributed to you the statement that you did
17  not use a precise number on the stand, would she
18  have been inaccurate?
19          MR. THOMASCH:  Objection to form.
20     A.  I'm not sure I follow the question.
21     Q.  If she later attributed to you a statement
22  that you did not use a precise number on the stand,
23  would she have been inaccurate?
24     A.  If she attributed to me a statement that I
25  did not use -- I'm -- I'm slow.  I'm not -- I'm

Page 63

1  not -- I don't know how to answer that question.
2      Q.  Let's just cut to -- cut to the chase.
3      A.  Yeah.  I don't know how to answer that
4  question.
5      Q.  Sure.
6          MR. JACOBS:  (Handing.)
7          (Hager II Exhibit 6 was marked for
8  identification.)
9          MR. JACOBS:  Is this 6?
10         THE REPORTER:  Yes.
11  BY MR. JACOBS:
12     Q.  Mr. Hager, let's take a look at Exhibit 6,
13  please, and if you would turn to the second page,
14  RQC0922315, this is -- this document has been
15  premarked as PX-1229, and look at the e-mail at the
16  bottom of that page from Jennifer Langer to a number
17  of people that does not include you.  All right?
18     A.  (Nodding head.)
19     Q.  And you see in the middle of the e-mail a
20  paragraph:  "To quote Dean...the 'knuckle-head,'
21  judge created this 277 number from some fantasy,"
22  period.  "Dean's testimony was based on a guess that
23  Keith Lohkamp did with about 45 seconds to reply,"
24  period.  "Keith used a 'white space' report that we
25  have that shows customers by BU for key SKU's.  The

Page 64

1  number of around 250-300 went to Dean," period.
2  "Dean says he didn't use a precise number on the
3  stand.  So we have no idea where the 277 came from.
4  In speaking with Dean earlier, he indicated that the
5  intent was to protect organizations solely providing
6  patient care," period.  "He used this 'life and
7  death' -- quotes around "life and death" -- "urgency
8  to show how we needed more time to ensure
9  disruptions didn't occur," period.  Did I read that
10  correctly from this e-mail, sir?
11     A.  You read it correctly.
12     Q.  All right.  Now, let's parse this
13  paragraph.
14     A.  M-hm.
15     Q.  Did you call the judge, to Ms. Langer, a
16  knucklehead?
17          MR. THOMASCH:  Objection, asked and
18  answered.
19          MR. WITTHOEFFT:  Same objection.
20     A.  I don't recall.
21     Q.  Okay.  Did you tell Ms. Langer that you
22  created -- that the judge created this 277 number
23  from some fantasy?
24          MR. WITTHOEFFT:  Object to the form.
25          MR. THOMASCH:  Objection to form.

1    A.  I don't -- I don't recall ever making that
2  statement, and given that it's in the record, I
3  can't imagine that I would have, but I don't recall
4  ever making that statement.
5       Q.  Okay.  When she says, "Dean's testimony was
6  based on a guess that Keith Lohkamp did with about
7  45 seconds to reply," did that information come from
8  you?
9            MR. WITTHOEFFT:  Object to the form.
10           MR. THOMASCH:  Objection to form.
11      A.  The correct answer is I don't recall.  The
12  speculative answer would be I doubt it.
13      Q.  Okay.  "Keith used a 'white space' report
14  that we have that shows customers by BU for key
15  SKU's."  Did that information come from you?
16           MR. WITTHOEFFT:  Object to the form.
17           MR. THOMASCH:  Objection to form.
18      A.  The answer -- again, the factual answer is
19  no.  My speculation is that since Keith worked for
20  Jennifer, she more than likely got this information
21  from Keith.  From Keith's perspective, I was asking
22  him this moments before going on the stand.  From my
23  perspective, as I mentioned earlier, I was cross
24  checking with Keith.
25      Q.  "The number of around 250-300 went to

1  Dean."  Did that information come from you?
2            MR. THOMASCH:  Objection to form.
3            MR. WITTHOEFFT:  Object to the form.
4       A.  I -- I -- same answer as before:  I don't
5  recall anything about that number.
6       Q.  Okay.  "Dean says he didn't use a precise
7  number on the stand."  Did you tell Ms. Langer you
8  did not use a precise number on the stand?
9            MR. WITTHOEFFT:  Object to the form.
10           MR. THOMASCH:  Objection to form.
11      A.  I don't recall saying that.  And frankly, I
12  can't imagine saying it since it's very, very clear
13  in the record that I did.
14      Q.  "In speaking with Dean earlier," as it says
15  in this e-mail, "he indicated that the intent was to
16  protect organizations solely providing patient
17  care."  Now, did you speak with Ms. Langer in which
18  that statement or words to that effect were stated?
19           MR. WITTHOEFFT:  Object to the form.
20           MR. THOMASCH:  Objection to form.
21      A.  Once again, same -- I don't recall any of
22  this conversation with Jennifer Langer.
23      Q.  "He used this 'life and death' urgency to
24  show how we needed more time to ensure disruptions
25  didn't occur."  Did you impart that information to

1  Ms. Langer?
2            MR. WITTHOEFFT:  Same objection.
3       A.  And same answer.
4       Q.  As we sit here today, Mr. Hager, do you
5  believe that the comments attributed to you by
6  Ms. Langer were simply fabrications?
7            MR. WITTHOEFFT:  Object to the form.
8            MR. THOMASCH:  Objection to form.
9       A.  I -- I couldn't speculate on -- I'm not
10  even copied on the note.  I -- I have no idea.
11           MR. JACOBS:  (Handing.)
12           (Hager II Exhibit 7 was marked for
13  identification.)
14           MR. JACOBS:  Is this Number 7?
15           THE REPORTER:  Yeah.
16           MR. WITTHOEFFT:  Are you doing okay?
17           THE WITNESS:  Actually, I could use a
18  little more water.  Is that possible?
19           MR. THOMASCH:  When it's convenient, I
20  could use a break.
21           MR. JACOBS:  Why don't we take it now.
22           (Discussion off the record.)
23           VIDEOGRAPHER:  We're going off the
24  record at about 9:15 a.m.
25           (Recess, 9:15-9:24 a.m.)

1            VIDEOGRAPHER:  Okay.  Just one moment,
2  please.  This begins tape number two in the
3  deposition of Dean Hager, Volume II, taken on
4  March 22nd, 2013.  Time is about 9:25 a.m.  We're
5  back on the record.
6  BY MR. JACOBS:
7       Q.  Mr. Hager, let me hand you what's been
8  marked as Hager II Exhibit 7, and it was used at
9  your last deposition by coincidence as Hager 7,
10  premarked as PX-1091.  You'll note, sir, in the
11  middle of this e-mail there's a e-mail from Jim --
12  did you tell me it's Millard?
13      A.  Millard.
14      Q.  Millard.  Thank you.  And it was to Dave
15  Siebert and to you.  If I didn't ask this question
16  before, what was the position of Dave Siebert?
17      A.  And now that I see this, I recall what Jim
18  Millard's position was as well.  Jim Millard was the
19  head of sales for the services industries unit.  He
20  reported to Dave Siebert, who was the general
21  manager for the services industries business unit;
22  and Dave Siebert reported to me.
23      Q.  All right.  His -- Mr. Millard's e-mail of
24  Wednesday, March 30, 2011, 7:56 a.m., says, "Gents,
25  this deal at Jackson is now questionable for Q4

Page 69

1  based on our demo several days ago which exposed
2  several gaps in our solution.  That said, we can
3  hold Punchout out of the deal but we do need a
4  solution for RSS.  Let me know if you need a greater
5  level of detail.  Jim."  By "Q4," did you understand
6  that to mean fourth quarter?
7      A.  That's my understanding.
8      Q.  By "demo," did you understand that to be a
9  demonstration?
10     A.  That's my understanding.
11     Q.  All right.  And what was it a demonstration
12  of?
13         MR. WITTHOEFFT:  Object to the form.
14     A.  From this, I would say of our software.
15     Q.  All right.  As a demonstration of some
16  attempted change to RSS?
17         MR. THOMASCH:  Same objection to form.
18     A.  I -- I don't know whether he's talking
19  about specifically the demo of RSS or the more
20  exhaustive software demo.  Since RSS was one
21  component of our overall solution, usually all of
22  that was demoed in one big long day for the client,
23  so I'm not exactly sure what he's referring to here.
24     Q.  Do you know whether a demonstration of a
25  proposed non-infringing product was done several

Page 70

1  days prior to this e-mail?
2         MR. WITTHOEFFT:  Object to the form.
3      A.  Can you repeat the question, please?
4      Q.  Sure.  Do you know whether a demonstration
5  of a proposed solution for a non-infringing product
6  was done several days prior to this e-mail?
7         MR. WITTHOEFFT:  Same objection.
8      A.  I --
9         MR. THOMASCH:  Objection to form.
10     A.  I don't.
11     Q.  All right.  Do you recall whether there was
12  a staffing -- staffing.  A lengthy staff meeting
13  that morning of March 30 to discuss the status of a
14  design-around?
15     A.  I -- I don't recall.
16     Q.  Okay.  Turn back, if you would, then, sir,
17  to the first exhibit we looked at.  You can find
18  that in the stack.
19         MR. WITTHOEFFT:  I think it's -- it's
20  this one.
21     A.  This one?
22     Q.  It's -- at the top says, PX-1264.
23     A.  Yes.
24     Q.  All right.  And if you look at the bottom,
25  it's from Jennifer Langer to various people, and

Page 71

1  you're copied on this.  And she says in the
2  e-mail -- well, let's read it.  "I know that you are
3  collaborating on the messaging around ePlus"
4  addressed to Terry and Jordan.  "The S3 General
5  Managers and Dean are deeply concerned over the
6  impact of a future ruling on Q4 revenues.  This was
7  a conversation that went long and deep this morning
8  on Dean's staff meeting.  Dean also discussed it
9  today with Bruce.  Dean has asked me to be his
10 messenger and voice on creating the messaging.  He
11 also wants to be a key approver for all messaging on
12 this topic.  In addition, he wants the draft key
13 messages approved by end of day Thursday.  Can you
14 help me deliver on his requests," question mark.
15         MR. THOMASCH:  Would --
16     Q.  Did -- did I read that --
17         MR. THOMASCH:  Paul, could you just
18 complete under the rule of completeness and --
19 and --
20         MR. JACOBS:  Yeah.  I was going to get
21 to the PS afterwards, but we'll do it right now.
22         MR. THOMASCH:  Thank you.
23     Q.  "PS:  Today I compiled the GM/Dean
24 recommended messages and Jordan has a copy.  He is
25 running it through a legal review.  Dean and I are

Page 72

1  awaiting those results," signed "Jennifer Langer."
2         MR. THOMASCH:  Thank you.
3      Q.  Let's go back to the -- to the first
4  lengthier paragraph in that e-mail, Mr. Hager, and
5  do you recall having a -- a lengthy staff meeting
6  that day?
7      A.  No.
8      Q.  All right.  Do you recall having a staff
9  meeting -- did you have staff meetings weekly?
10     A.  We had staff meetings scheduled weekly.
11 Because of my travel schedule, many would be
12 cancelled; many would occur without me being there,
13 because it was still valuable for my staff to get
14 together even if I wasn't there.  They were all
15 called "Dean's staff meetings" whether I attended or
16 not.
17     Q.  Do you recall in this time period having a
18 lengthy staff meeting in which concern was expressed
19 over the impact of a future ruling on Q4 revenues?
20         MR. WITTHOEFFT:  Object to the form.
21     A.  I don't -- given it was two years ago, I
22 don't recall any given staff meeting, but I do
23 recall having staff meetings and I do recall having
24 that concern, so --
25     Q.  Do you recall discussing those concerns

Page 73

1  with Mr. McPheeters?
2     A.  I couldn't recite a specific conversation,
3  but I know that Mr. McPheeters and I had
4  conversations.
5     Q.  When Ms. Langer, who's copied you on this,
6  says "Dean also discussed it today with Bruce,"
7  would it be your understanding that she -- the
8  reference is to Bruce McPheeters?
9           MR. WITTHOEFFT:  Objection to form.
10    A.  That -- that would be my understanding.
11    Q.  Okay.  And he's copied on this e-mail as
12 well.  Do you see that, sir?
13    A.  Correct.
14    Q.  Okay.  Generally, how many people attended
15 your staff meetings?
16    A.  Earlier, how large did I say my staff was?
17 I -- I -- I don't recall citing a specific number
18 because I can't recall, but it would have been
19 however large my staff was at the time.
20    Q.  All right.  At the top of the page, you'll
21 see an e-mail from Ms. Langer to Terry Blake?
22    A.  Yes.
23    Q.  Do you see that?  And who was Terry Blake?
24    A.  Terry Blake was in our marketing
25 organization and was responsible for communications.

Page 74

1     Q.  Okay.  She says to Terry -- Terry Blake,
2  "What Dean and the GMs are concerned about is the
3  impact on more than $5 million in recognized revenue
4  this quarter.  Glad to hear a stay may help there."
5  This is an e-mail of March 31, 2011, 6:30-something
6  in the morning.  And then she says, "Can we give him
7  msg" -- I assume that means "message" -- "to approve
8  before CUE so that he can sleep at night," question
9  mark.  Did I read that -- that accurately, sir?
10    A.  It appears so.
11    Q.  All right.  Now, you're not copied on that
12 e-mail, but when she says, "Dean and the GMs are
13 concerned about the impact on more than $5 million
14 in recognized revenue this quarter," was she
15 accurately stating your concern?
16    A.  Regarding the exact dollar amount, I don't
17 recall any more than what I see in these e-mails as
18 well, but certainly I had a concern about the impact
19 that a ruling could have on sales that quarter.
20    Q.  Okay.  Prior to the jury verdict in the
21 ePlus case, had there been estimates made at Lawson
22 about fourth quarter 2011-2012 revenues for S3?
23         MR. WITTHOEFFT:  Object to the form.
24         MR. THOMASCH:  Objection to form.
25    A.  I don't recall.

Page 75

1     Q.  Okay.  You don't have any memory of any
2  particular estimates for fourth quarter revenues for
3  2011?
4          MR. THOMASCH:  Objection to form.
5  Paul, your prior question said before the jury
6  verdict and you haven't identified --
7          MR. JACOBS:  Yes, and I'm trying to
8  expand that to find out --
9          (Reporter interruption.)
10         MR. JACOBS:  And he didn't recall --
11 he didn't recall that and I want to find out if he
12 new -- recalls any fourth quarter estimates.
13         MR. THOMASCH:  Objection to form.  You
14 may answer.
15    A.  I remember the process that we used to
16 estimate revenue, and my responsibility in the job I
17 had was to estimate revenues within the quarter that
18 we were in.  Fourth quarter, as I recall, was a few
19 months after when the jury verdict came in, so at
20 that time, I likely would not have had good
21 visibility into fourth quarter.
22    Q.  All right.  In the PS that I read earlier
23 at the bottom of the -- of the page, the e-mail from
24 Ms. Langer in which you are a copyholder, where she
25 says, "I compiled the GM/Dean recommended messages

Page 76

1  and Jordan has a copy," "He's running it through a
2  legal review," "Dean and I are awaiting" these re --
3  "those results," do you recall a -- some form of
4  compilation of messages to be used?
5     A.  I don't recall this specific case, but our
6  business process at the time was to leverage the
7  people who were the voice of the customer -- myself
8  and our GMs -- to get input from us of what we would
9  want the customer messaging to be, but then it
10 always flowed to legal and communications and
11 product management to essentially finalize the
12 messages for us and then turn them around for us to
13 deliver.
14    Q.  And you did actually anticipate my next
15 question, which was this was messaging for the
16 customer?
17    A.  Correct.
18    Q.  Okay.
19    A.  To my understanding, I should say.
20    Q.  Sure.
21         MR. JACOBS:  (Handing.)
22         (Hager II Exhibit 8 was marked for
23 identification.)
24         MR. THOMASCH:  Thank you.
25         MR. JACOBS:  M-hm.

Page 77

1    BY MR. JACOBS:
2        Q.  All right.  Mr. Hager, let me show you for
3    Hager II Exhibit 8 that was used at your prior
4    deposition, and, again, by quirk of fate, it was
5    also Hager 8 then.  It bears the exhibit number
6    PX-1092 at the top.  And you'll note, sir, that
7    there is an e-mail at the bottom, part of which has
8    been marked out for privilege, but which is from
9    Jennifer Langer with a -- and you're shown as a
10   copyholder.  Do you see that, sir?
11       A.  I do.
12       Q.  Okay.  And this is dated March 30, 2011,
13   12:49 p.m.  Do you see that, sir?
14       A.  March 30th, 2011, 12:49, yes.
15       Q.  All right.  And this is just a few days
16   before CUE.  Is that correct, sir?
17       A.  Correct.
18       Q.  Okay.  Would the information that is shown
19   in Ms. Langer's e-mail as these -- what appear to be
20   scenario number one and scenario number two, were
21   these proposed scenarios to be used in customer
22   communications depending on what happened with
23   respect to the injunction?
24            MR. WITTHOEFFT:  Object to the form.
25            MR. THOMASCH:  Objection to form.

Page 78

1        A.  That's what the e-mail would indicate.
2        Q.  Did you discuss these scenarios with
3    Ms. Langer before she sent out this communication?
4        A.  I don't recall any specific discussion.  I
5    mean, there were a lot of conversations going on at
6    the time, so I can't tell you that I remember this
7    specific discussion with Jennifer.
8        Q.  Okay.  And my specific question was with --
9    before she sent this out, would that also -- the
10   same answer be as to communications after this was
11   sent out?
12       A.  One -- one is I don't have -- I have no
13   recollection that I spoke with her prior to this
14   note being sent out.  I recall having conversations
15   about scenarios going into CUE.  Frankly, I don't
16   ever remember talking to Jennifer about it.  I can
17   remember vague conversations, but I don't recall any
18   conversations with Jennifer specifically.
19       Q.  If you look at scenario two, which is on
20   the second page and runs into the third page,
21   RQC20 -- 2300900, do you see, sir, that this was a
22   scenario that, if the court rules during CUE that we
23   are injuncted from selling and supporting the
24   following combination of products, RSS and RSS plus
25   Punchout, do you see that?

Page 79

1        A.  I do.
2        Q.  All right.  And then there were some
3    recommended -- what's called "Recommended simple
4    message for prospective customers in these
5    situations."  Do you see that?
6        A.  Yes.
7        Q.  All right.  And then under that -- neath
8    that was "Recommended simple message for current
9    customers in this situation."  Do you see that, sir?
10       A.  I do.
11       Q.  All right.  And then if you turn on the
12   last page, it has two numbered points with respect
13   to those current customers, if the court enjoins
14   sales and support of RSS and RSS plus Punchout, and
15   I wanted to focus your attention on number one.
16       A.  I see it.
17       Q.  Okay.  And you'll see in the middle of that
18   paragraph, "Lawson's new version for self-service
19   requisitions will be available in May and is not
20   impacted by the ruling."  Do you see that, sir?
21       A.  I do.
22       Q.  And was it your understanding that this
23   message was intended to be used by CUE if, in fact,
24   an injunction had come out under these circumstances
25   on April 4th?

Page 80

1            MR. THOMASCH:  Objection to form and
2    relevance.
3            MR. WITTHOEFFT:  Object to the form.
4        A.  It should be noted that the note itself is
5    sent a week prior to CUE and it's an e-mail and the
6    words "recommended" are all over the message.
7    There's nothing indicating that any of these
8    messages were the final messages that would go out.
9    It was quite customary that proposals would be
10   written and then they would be discussed and
11   finalized.  I have no indication from this note that
12   any of these messages are the final messages.
13       Q.  All right.  And when the wording is said
14   that "Lawson's new version for self-service
15   requisitions will be available in May," do you know
16   whether that fact was -- was true?
17            MR. WITTHOEFFT:  Object to the form.
18            MR. THOMASCH:  Objection to form.
19       Q.  As of this date?
20       A.  Are you -- are you asking whether or not I
21   knew that the product would be ready by May or
22   whether the product actually came out on May?
23       Q.  No.  Whether you knew it would be ready by
24   May.
25       A.  I did not know it would be ready by May

Page 81

1  which, for what it's worth, is the reason why that
2  message at CUE was not delivered to customers.  That
3  I do recall.
4      Q.  That's the reason it was not delivered to
5  customers?
6      A.  I said we never delivered a message to
7  customers in -- at CUE that a product would be ready
8  by May.
9      Q.  And the reason it was not delivered was
10 because it was not known it would be delivered --
11 deliverable by May?  Is that your answer?
12         MR. THOMASCH:  Objection to form.
13     A.  That --
14         THE WITNESS:  Thank you.
15     A.  At that time, we did not have certainty
16 that it would deliver in May.
17         MR. THOMASCH:  Paul, if you're done
18 with that document, I would ask to read into the
19 record under Rule 106 the next paragraph, which
20 begins, "Customers with Punchout."  States, quote,
21 "We know that you rely on Requisition Self-Service
22 and Punchout daily to ensure that the right products
23 and services are available at the" -- "at the right
24 time for your business.  Lawson will work to ensure
25 that your operations are not disrupted.  The ePlus

Page 82

1  case may impact our Punch-out product.  We are
2  currently researching alternatives and are going to
3  legally fight this decision.  We believe that we
4  have a strong case.  Watch MyLawson.com for a
5  Statement of Direction and updates," signed
6  "Jennifer Langer."
7         MR. JACOBS:  Okay.  Thank you,
8  Mr. Thomasch.  All right.  (Handing.)
9         (Hager II Exhibit 9 was marked for
10 identification.)
11 BY MR. JACOBS:
12     Q.  Mr. Hager, let me show you a document which
13 has been marked Hager II Exhibit 9, premarked as
14 PX-1233.  It's an e-mail string bearing dates from
15 April 1 through 3, 2011, and an attachment.  Do you
16 see that you are a copyholder on this e-mail string,
17 sir?
18     A.  I do.
19     Q.  All right.  And if you turn to page -- the
20 second page, RQC1002445, where I believe the string
21 starts chronologically, take a second to read that,
22 sir, if you would.
23     A.  I see it.
24     Q.  All right.  And you see a reference in that
25 e-mail to a hearing on April 4th?

Page 83

1      A.  I do.
2      Q.  All right.  And did you have an
3  understanding that there was a follow-up hearing to
4  your in -- the injunction to your -- to the hearing
5  at which you testified on March 25?
6      A.  I mean, I know there were follow-ups.  I --
7  I didn't know what any of them were.
8      Q.  All right.  Was there a concern at Lawson
9  that the court could enter an injunction as early as
10 Monday, April 4th?
11         MR. WITTHOEFFT:  Object to the form.
12         MR. THOMASCH:  Objection to form.
13     A.  I recall being concerned of not knowing
14 when a ruling would be entered.
15     Q.  And if an injunction were entered as early
16 as April 4th, that would be during the CUE
17 conference.  Right?
18     A.  I already can't recall what you showed me
19 earlier what the dates were, so --
20     Q.  The record will speak for itself with
21 respect to --
22     A.  I'm willing to give the -- I'm willing to
23 give it the benefit of the doubt, yeah.
24     Q.  All right.  The first e-mail by Mr. Ekelin
25 of 12:53 on April 1 makes reference to an attached

Page 84

1  draft copy of C -- of CUE messaging.  Do you see
2  that?
3      A.  I do.
4      Q.  All right.  And then attached to it is a
5  document of that date from Lawson Legal on CUE
6  messaging for ePlus patent infringement case.  Do
7  you see that?
8      A.  I do.
9      Q.  Do you recall seeing this document on or
10 about April 1, 2011?
11     A.  I don't.
12     Q.  Okay.  As you sit here today, can you think
13 of any reason you would not have received the
14 document attached to this e-mail?
15         MR. THOMASCH:  Objection to form.
16 Which e-mail now?  Because the e-mail you've been
17 talking about he is not a CC on, but he is a CC on
18 later ones.  The one that says "attachment" is one
19 that he is not an E -- a CC on.
20         MR. JACOBS:  Let me just look at that.
21 BY MR. JACOBS:
22     Q.  You were a recipient of an e-mail from
23 Jennifer Langer of April 1, 2011, at 1:06 p.m.?
24     A.  I see that.
25     Q.  Do you see that, sir?  And it is connected

Page 85

1  through an e-mail string to the previous one from
2  Mr. Jordan.  Do you -- Jordan Ekelin.  Do you see
3  that, sir?
4       A.  I do.
5       Q.  All right.  And that first e-mail, which is
6  attached to the one you did receive, has a draft
7  copy of CUE messaging.  Do you see that, sir?
8            MR. THOMASCH:  Objection to form.
9       A.  I'm sorry.  Can you repeat that?
10      Q.  Yes.  The e-mail to which you were a
11 recipient is attached to Mr. Ekelin's e-mail that
12 did have the attachment called CUE messaging for
13 ePlus patent infringement case.  Do you see that,
14 sir?
15           MR. THOMASCH:  Objection to form.  You
16 may answer.
17      A.  I see that the document is here.  Just for
18 point of clarity, not knowing how the collection was
19 done or how this was created, in looking at this,
20 I'm assuming it means that that attachment was in
21 all of these e-mails, but I don't know anything in
22 looking at the e-mail for certain whether that
23 attachment was in the one that I was copied on.
24      Q.  Do you recall, sir, in this time frame
25 whether or not that, in some cases, the proposed

Page 86

1  messaging was to tell customers about the possible
2  workaround; in other cases, not to tell them about a
3  possible workaround?
4            MR. WITTHOEFFT:  Object to the form.
5            MR. THOMASCH:  Object to form.
6       A.  I don't recall having a conversation about
7  which cases we would tell or not tell.  No.  I don't
8  recall having those conversations.
9       Q.  Okay.  If you look at Page RQC1002447,
10 which is messaging prior to injunction ruling by
11 district court --
12      A.  M-hm.
13      Q.  -- take a minute to look at it and confirm
14 to me whether or not you see any mention of any
15 design-around in that scenario.
16           MR. THOMASCH:  Objection to form.
17      A.  On the top paragraph, it says we are
18 considering all available options, including
19 potential design workarounds.
20      Q.  Okay.  And then if you turn to page
21 RQC1002449, and -- which I believe is tied to the
22 previous page under the heading messaging post
23 injunction, let me focus your attention on 2 a. 1
24 [sic].  Do you see a reference to design-around
25 there, sir, in the -- I'll focus your attention on

Page 87

1  2 a. little i.
2       A.  2 a. 1 or little i?
3       Q.  2 a. -- yes, sir.
4       A.  Okay.  Again, I see a reference to say we
5  are pursuing a design workaround but do not have a
6  finalized version at this time.  And, again, for
7  point of clarity, this is an internal document and I
8  have no idea whether any of these messages were
9  actually finalized or -- or delivered to anybody.
10      Q.  It says we are diligently pursuing a design
11 around.  Do you see that, sir?
12      A.  I do see that.
13      Q.  Okay.  Turn back, if you would --
14           MR. THOMASCH:  Are you done with this
15 document?
16           MR. JACOBS:  Yes.  I'm done with this
17 document for the moment, yes.
18           MR. THOMASCH:  Okay.  Then I'll
19 just -- I want to read in the balance of the same
20 paragraph that you were reading.
21           MR. JACOBS:  And this -- this is on
22 Page RQC1002449, 2 a. little i?
23           MR. THOMASCH:  Yes, correct.
24           MR. JACOBS:  Sure.
25           MR. THOMASCH:  And I believe the

Page 88

1  sentence that was read between you and the witness
2  are, "We are diligently pursuing a design workaround
3  but do not have a finalized version at this time."
4  The balance of that paragraph says, "Because you are
5  ready to move forward with the Lawson ERP contract,
6  we will be unable to license [RSS/Punchout/e-
7  Procurement]" period.  "However, this may be subject
8  to change in the future depending on legal
9  proceedings.  Lawson will continue to vigorously
10 defend itself in this case."
11           MR. JACOBS:  Thank you, sir.
12           MR. THOMASCH:  Thank you.
13 BY MR. JACOBS:
14      Q.  All right.  And if you would turn back to
15 the first page of the e-mail, which is Exhibit
16      A.  Oh.
17      Q.  -- 9 --
18      A.  Okay.
19      Q.  -- from Ms. Langer copying you of April 1,
20 2011, 1:06 p.m., she says, in the second paragraph,
21 "I believe we now face a strategic business decision
22 that must be elevated to our Senior Leaders.  I
23 believe we sit between two conflicting
24 recommendations in the case that we are injuncted
25 and do not receive a stay.  I cannot see a path to

Page 89

1    achieve both goals."  Did I read that correctly,
2    sir?
3           A.  It appears so.
4           Q.  All right.  She used a capital S for
5    "senior" and capital L for "leaders."  Who would
6    they be?
7           A.  There was --
8                MR. THOMASCH:  Objection to form.  You
9    may answer.
10          A.  There was no specific group called "the
11   senior leaders," so it -- I'm assuming she meant who
12   we would informally refer to as senior leaders,
13   which there was no defined group, but for the sake
14   of the discussion, you know, I'm willing to say that
15   I was more than likely a part of the larger group
16   that she would be referring to.
17          Q.  As -- as executive vice president for S3,
18   that -- that would include --
19          A.  It's a fair -- it's a fair assumption.
20          Q.  Right.  All right.  And then she goes on
21   to -- to list two numbered paragraphs that are
22   indicated to be conflicting recommendations.  The
23   first is number one, quote, "The Legal
24   recommendation is to withhold from any conversations
25   or statements of direction about any possible

Page 90

1    re-engineering efforts, replacement products, or
2    other alternatives that might be made available to
3    customers.  The impact of these 'work-arounds' would
4    be negative on our Legal case."  Do you see that,
5    sir?
6           A.  I do.
7           Q.  All right.  And did I -- did I read that
8    correctly?
9           A.  It appears so.
10          Q.  All right.  And did you have any
11   discussions with Ms. Langer about the legal position
12   stated in her paragraph number one?
13               MR. WITTHOEFFT:  Object to the form.
14          A.  I don't recall, and I would be very
15   surprised whether I would have had any conversation
16   like that as I was not part of the legal side of the
17   discussion.
18          Q.  All right.  Let's move to number two, which
19   is at the top of Page RQC1002445, in which -- this
20   is the other side of the -- the conflict.  She says,
21   number two, "The S3 Group recommendation is to
22   ensure that we can meet our Q4 Revenue Targets by
23   reassuring prospects and customers that we will
24   swiftly have at least a partial solution with a
25   re-engineered RSS replacement product delivered in

Page 91

1    Q4," period.  "Without this reassurance and
2    execution, the business will potentially be damaged
3    as in excess of $5 million of Q4 opportunities
4    contain RSS.  RSS would be considered a critical
5    component to these competitive situations.  In
6    addition, we need to swiftly inform AE's and Sales
7    Leaders to remove Punch-out from their Q4 contracts.
8    At this time I do not know the potential revenue
9    impacts on the M3 business."  Signed, "Jennifer
10   Langer."  Did I read that correctly, sir?
11          A.  It appears so.
12          Q.  All right.  And, again, by "Q4 Revenue
13   Targets," is the reference to fourth quarter revenue
14   targets?
15          A.  Yes.
16          Q.  All right.  And by "AE's," is that
17   reference to account executives?
18          A.  Correct.
19          Q.  All right.  When she says, "The S3 Group
20   recommendation," was -- is she summarizing the
21   recommendation of your group, sir?
22               MR. WITTHOEFFT:  Objection to form.
23          A.  According to her wording, that would appear
24   so.
25          Q.  All right.  Did you have a recommendation

Page 92

1    different than as stated by Ms. Langer in this
2    Paragraph 2?
3                MR. THOMASCH:  Objection to form.
4           A.  The po -- I do recall the position that we
5    had in around the CUE time, and by "position," I
6    mean the opinion that the S3 sales leaders held, and
7    our position or our opinion was that regardless of
8    ruling, we needed to tell our customers that we
9    would solve the problem for them, that the onus was
10   on us, it was our responsibility, and so this is
11   Jennifer paraphrasing that position that we had.
12          Q.  Thank you.  When she uses the phrase
13   "without this reassurance and execution," do you
14   understand "reassurance" to be reassurance to the
15   customer?
16          A.  My understanding of that sentence would be
17   without providing the client reassurance that we own
18   solving the problem is how I would interpret that.
19          Q.  And "execution."  Does that mean producing
20   a solution?
21          A.  That's how I would read that, yeah.
22          Q.  If you move up the page on the first page,
23   which is RQC1002444 in the e-mail string, there is a
24   response.
25          A.  I'm sorry.  Which --

Page 93

1    Q.  On the first page of Exhibit 9, right above
2  Ms. Langer's e-mail, you see in the string an e-mail
3  from Jordan Ekelin, the in-house attorney at Lawson.
4    A.  M-hm.
5    Q.  Is that correct?  To Ms. Langer and copies
6  to Bruce McPheeters and others and -- and copies you
7  as well.  Do you see that, sir?
8    A.  I do.
9    Q.  All right.  And he says, for clarification,
10  we can state that we're in the process of developing
11  non-infringing alternatives but do not have
12  finalized versions yet.  We can not, with an
13  emphasis on the word "not," say what functional
14  changes or differences may be made to the products
15  or when non-infringing alternatives may be
16  available.  It would be premature to discuss new
17  functionality or timeliness for delivery without
18  knowing the scope of the injunction, let alone
19  whether there will even be one.  We can reassure
20  customers that we are working to create a solution
21  as soon as possible, but like with any development
22  effort we can't guarantee a delivery date.  Once we
23  know the court's decision, which could be as early
24  as Monday, we should be able to provide more
25  specific direction to customers, period.  Did I read

Page 94

1  that correctly, sir?
2    A.  It appears so.
3        MR. THOMASCH:  I -- I believe you --
4  you may have misread the word "timelines" as
5  "timeliness," but I may have misheard you.
6        MR. JACOBS:  I did.
7        MR. THOMASCH:  At any rate --
8        MR. JACOBS:  I think you're right.  I
9  think I did say "timeliness."
10        MR. THOMASCH:  That's what I heard.
11        MR. JACOBS:  Or timelines for
12  delivery.  Thank you, Mr. Thomasch, for correcting
13  that.
14  BY MR. JACOBS:
15    Q.  Now, Mr. Ekelin says, "Once we know the
16  court's decision, which could be as early as
17  Monday," you see that this e-mail went out on
18  Friday, April 1?
19    A.  Yes.
20    Q.  All right.  And would you agree with me
21  that April 4 would be the following Monday?
22    A.  Yes.
23    Q.  Okay.  What was it about knowing the
24  court's decision that would allow information with
25  respect to the functionality and timeline for

Page 95

1  delivery to be imparted?
2        MR. WITTHOEFFT:  Object to the form.
3        MR. THOMASCH:  Objection to form.
4    A.  One, I -- I couldn't speculate on what
5  Jordan was thinking.  The only thing I would observe
6  is that the operative sentence there is, "but like
7  with any development effort."  It was our policy at
8  the time that prior to any code shipping, we were
9  not supposed to talk about that code with customers,
10  so this, you know, guideline would have been
11  consistent with what our company policy was.
12  Because IT projects so often slip or don't deliver,
13  we just had a policy, as most software companies do,
14  not to refer to any future product until it was
15  ready.
16    Q.  All right.  But your answer is you don't
17  know what the reference is to "once we know the
18  court's decision," as to why that would impact
19  functionality or timeliness?
20        MR. WITTHOEFFT:  Object to the form.
21        MR. THOMASCH:  Same objection.
22    A.  No, I don't know what he was thinking.
23    Q.  Did you have any discussion with Ms. Langer
24  or any of the other recipients of this e-mail
25  concerning the functionality or timeliness for

Page 96

1  delivery on or about April 1, 2011?
2        MR. WITTHOEFFT:  Object to the form.
3        MR. THOMASCH:  Same objection.
4    A.  I don't recall, but again, because I was on
5  the -- sort of the client side of the company, our
6  policy was always very clear, and that is, until a
7  product is ready, we don't go out and talk to
8  clients about it.  So I would have glanced at this,
9  saw it consistent with our policy, and moved on.
10    Q.  Okay.  Mr. -- let me see.  Let me see what
11  this is.  Hm.  Turn if you would to the next page.
12  It's back to Mr. Ekelin's e-mail of April 1, 2011,
13  at 12:53, and at the end of that communication,
14  after he's talked about the attached copy of CUE
15  messaging, he says, "Other employees should continue
16  to follow the guidance in the Say/Don't Say document
17  provided by Corporate Communications.  Additional
18  guidance will be provided following a definitive
19  ruling by the court."  Were you aware of a separate
20  Say/Don't Say document that had been prepared by
21  corporate communications for use at CUE?
22        MR. THOMASCH:  Objection to form.
23    A.  One is -- just for point of clarity, I'm
24  not on this e-mail.  And two is the Say/Don't Say
25  document, there's no indication in here that that

Page 97

1  has anything specifically to do with ePlus.  In
2  general, when we went to client shows every year, we
3  would produce a key messaging for all employees to
4  use with clients and remind employees things that
5  they shouldn't say in front of customers, and
6  usually that had to do with future product and those
7  types of things.  So from recollection, I believe
8  that that was a more generic document that was
9  regularly produced prior to the CUE show.
10     Q.  Okay.
11         MR. JACOBS:  (Handing.)
12         (Hager II Exhibit 10 was marked for
13  identification.)
14         MR. THOMASCH:  Thank you.
15  BY MR. JACOBS:
16     Q.  Let me show you what the reporter has
17  marked as Hager II's Exhibit 10 and ask you to take
18  a minute to look at that, sir.
19     A.  Is there a "to" line on here?
20     Q.  I'm going to ask you about that.
21     A.  Pardon me?
22     Q.  I'm going to ask you about that.
23     A.  Oh.  Okay.  (Pause.)  Okay.
24     Q.  All right.  This is a document from
25  Communications Team, comma, Employee, sent April 1,

Page 98

1  2011, in -- at night, subject, Important, C-U-E, CUE
2  2011 Say/Don't Say Guidance attached, and it says
3  "This message is sent to Lawson employees attending
4  CUE 2011."  Do you see that, sir?
5     A.  I do.
6     Q.  All right.  And then attached to it is a
7  document that says CUE 2011 Say/Don't Say Guidance.
8     A.  Excuse me.
9     Q.  If you turn the page, you'll see that at
10  the top.
11     A.  I see it.
12     Q.  All right.  Now, do you recall that there
13  was a Say/Don't Say guidance for the CUE 2011
14  conference?
15     A.  As I previously stated, it was normal
16  business process prior to the show to create a
17  Say/Don't Say document.
18     Q.  All right.  And if you turn to the second
19  page into the guidance, which is RQC2125986, do you
20  see a blocked heading at the bottom saying "Pending
21  Decision on ePlus and Lawson Litigation"?
22     A.  I do.
23     Q.  And then underneath that, it says, quote,
24  the decision on the ePlus and Lawson litigation
25  could occur during CUE.  Lawson legal and corporate

Page 99

1  communications are monitoring the situation and are
2  prepared to react quickly to whatever decision is
3  handed down.  As needed, you will receive the
4  appropriate updated messages via e-mail so be alert
5  while at CUE, closed quote.  Did I read that
6  correctly?
7     A.  It appears so.
8     Q.  All right.  Do you have any reason to
9  believe that this document was not the Say/Don't Say
10  guidance that was used at the CUE conference you
11  attended?
12         MR. THOMASCH:  Objection to form.
13     A.  I have no reason not to believe it, but I
14  also don't know for certain that this is the final
15  version of it.
16     Q.  Do you recall at the CUE meeting that
17  Lawson employees were on notice to be prepared for
18  anything that might come down in the ePlus lawsuit
19  corporate communications?
20         MR. WITTHOEFFT:  Object to the form.
21     A.  I recall that employees were communicated
22  that the potential of a ruling would come out
23  sometime in the near future, which included
24  potentially during CUE.
25     Q.  Do you recall whether Lawson was prepared

Page 100

1  to give its employees talking points about the
2  status of a design-around if an injunction had come
3  out during CUE?
4         MR. WITTHOEFFT:  Object to the form.
5         MR. THOMASCH:  Objection to form.
6     A.  I don't recall that specifically.
7     Q.  Do you recall if an injunction had come out
8  during CUE that enjoined the sale of RSS and
9  Punchout, that Lawson was prepared to tell customers
10  it was working on a solution?
11         MR. WITTHOEFFT:  Object to the form.
12         MR. THOMASCH:  Objection to form.
13     A.  I -- I don't have recollection of what that
14  messaging would be, other than the documents you've
15  been putting in front of me.
16     Q.  Okay.
17         MR. THOMASCH:  Before you move on, may
18  I just hear the last question back, please?
19         (Record read.)
20         MR. THOMASCH:  Thank you.  I misheard.
21         MR. JACOBS:  Okay.
22  BY MR. JACOBS:
23     Q.  You may have answered this previously, and
24  I apologize for asking it again if you had.
25  Approximately how many Lawson employees attended CUE

Page 101

```
 1   in 2011?
 2        A.  I don't know the exact number.  But I -- I
 3   know that it was always measured in the hundreds, so
 4   I don't know if that's 100 or 200 or 300, but it was
 5   more than ten or 20.
 6        Q.  Was this an invitation-only event with
 7   respect to customers and prospective customers?
 8        A.  No.  Any client could sign up for it.
 9        Q.  How would you reach out to potential
10   clients to attend CUE?
11        A.  If they were potential clients, they would
12   be invited specifically by any member of our sales
13   team.
14        Q.  Do you recall approximately how many
15   customers and potential customers were represented
16   at CUE in 2011?
17        A.  Not precisely, no.
18        Q.  Were those in the -- the dozens or the
19   hundreds?
20        A.  It would be measured in the thousands.  I
21   couldn't get more accurate than that.
22        Q.  Okay.  Did you have conversations with
23   customers and potential customers during CUE?
24        A.  Yeah.
25        Q.  Did the subject of an injunction or the
```

Page 102

```
 1   potential for an injunction come up during those
 2   conversations?
 3        A.  I don't recall, but I do recall that --
 4   because I recall that an injunction did not come out
 5   during CUE, the topic -- I don't -- I remember
 6   thinking afterwards the topic really didn't come up
 7   all that much if at all.
 8        Q.  Did the subject of a potential
 9   design-around come up in conversations with
10   customers and potential customers?  And by
11   "design-around," I mean for the products that had
12   been previously determined to be infringing.
13        A.  I don't recall, but as I mentioned, our
14   policy was until a product was ready, it isn't
15   something you talk about with customers, so we would
16   have attempted to follow that policy to the best of
17   our ability.
18        Q.  Do you recall whether there was any
19   discussion with customers and potential customers
20   about any revised product to RSS coming out in -- by
21   the end of May?
22            MR. WITTHOEFFT:  Object to the form.
23        A.  I don't recall that.
24        Q.  Do you recall internal discussions in early
25   April 2011 time frame of a Lawson press release that
```

Page 103

```
 1   would be used in the event an injunction came out
 2   then?
 3            MR. THOMASCH:  Objection to form.
 4        A.  I -- by "then," do you mean during CUE?
 5        Q.  Well, during CUE or in the same time frame.
 6   Let's say the first week of April.
 7        A.  I remember conversations that if an
 8   injunction came out, we were going to need to issue
 9   a press release.
10            MR. JACOBS:  (Handing.)
11            (Hager II Exhibit 11 was marked for
12   identification.)
13            MR. JACOBS:  What's this?  11?
14            THE REPORTER:  Yes.
15   BY MR. JACOBS:
16        Q.  Let me show you what's been marked Hager II
17   Exhibit 11, previously marked PX-1263.  Purports to
18   be an e-mail string of April 6 through 11, 2011, and
19   I'd ask that -- and I see your name -- well, is your
20   name at the top of the page, sir, as a recipient?
21        A.  Yes.
22        Q.  All right.  And the e-mail beneath that,
23   you sent an e-mail to Mr. McPheeters.  Is that
24   right, sir?
25        A.  I see it.
```

Page 104

```
 1        Q.  All right.  Do you recall receiving an
 2   e-mail from Mr. McPheeters on or about April 6th,
 3   2011, to which you then had an e-mail correspondence
 4   with him?
 5        A.  Again, I don't --
 6        Q.  And the subject --
 7        A.  I don't recall it.  I just --
 8        Q.  Do you recall this e-mail?
 9        A.  Again, I can't recall the exact e-mail.  I
10   remember talking about the potential of a press
11   release at this time and I remember talking with
12   Bruce about it.  I -- but it's a vague -- vague
13   memory.
14        Q.  Okay.  And in the middle of this first
15   page, RQC3004438, you commented upon a draft press
16   release Mr. McPheeters sent to you.  Correct?
17        A.  I see that, yes.
18        Q.  Okay.  And that draft bears a date of
19   April 6, 2011.  Do you see that, sir?
20        A.  Yes.
21        Q.  And the -- and as this was a draft, it had
22   an assumption in it, and the assumption is that
23   Lawson was enjoined from sale and support of RSS and
24   Punchout.  Is that correct, sir?
25            MR. WITTHOEFFT:  Object to the form.
```

Page 105

1          MR. THOMASCH:  Objection to form.
2      A.  I'm sorry.  Repeat the question.
3      Q.  Well, read through the draft and tell me if
4  it is not assumed that RSS and Punchout have been
5  enjoined from sales and support.
6      A.  I'm sorry.  I still don't understand the
7  question.  You said --
8      Q.  This is not --
9      A.  -- it is not --
10      Q.  This is not a press release that in fact
11  had been issued.  Is that correct?
12      A.  Yeah.  Correct.  This was not issued.
13      Q.  It was merely a draft.  Is that right?
14      A.  It was merely a draft.
15      Q.  Right.
16      A.  I'm sorry.  Yes.
17      Q.  And the draft was indicating that RSS and
18  Punchout were enjoined and this would be the
19  response to that.  Is that correct, sir?
20          MR. WITTHOEFFT:  Object to the form.
21      A.  I believe it was written in -- with the
22  potential that the enjoinment would happen, yes.
23      Q.  All right.  And in the first sentence in
24  bold of that draft is "Lawson Seeks a Stay and
25  Appeals ePlus' Patent Injunction, and Announces a

Page 106

1  Planned Redesign of the Impacted Products."  Did I
2  read that correctly, sir?
3      A.  You did read that correctly.
4      Q.  All right.  And was it your understanding
5  that the press release was designed to be issued as
6  soon as an injunction was issued by the court?
7          MR. WITTHOEFFT:  Object to the form.
8      A.  I -- I can't specifically state that.  What
9  I can say is the context or the scope of the
10  discussion, if you'll notice on the final page,
11  there's one paragraph that's in a different font
12  than the rest.  The conversation between Bruce and
13  myself was not so much on the entire press release,
14  but rather just that paragraph, which is why it's a
15  different format.  I -- I can say that because that
16  would have been my area of responsibility.
17      Q.  And -- and -- and could you read, please,
18  sir, the -- into the record the paragraph that
19  you're talking about that has a different font?
20      A.  "Lawson plans to make available by," blank,
21  "2011" -- as we didn't know when it would be -- a
22  re -- "redesign of the RSS and Punchout products so
23  that neither of those redesigned products will
24  infringe the ePlus patents."  And then this chime --
25  this is where I chimed in:  "Any Lawson customer who

Page 107

1  has previous licensed RSS or Punchout will receive
2  those new products from Lawson free of charge.  For
3  those customers who are currently purchasing
4  maintenance from Lawson for RSS or Punchout, Lawson
5  will migrate those customers to the new products
6  free of charge."  And that was the position that I
7  had been taking with the company, that we shouldn't
8  cause our clients any undue expense, that I felt
9  that we needed to take that upon us, so I do recall
10  asking Bruce to draft language that would show that
11  it was our responsibility and not their
12  responsibility, so that specifically is the
13  paragraph I was commenting on when I said, "I quite
14  like this, Bruce."
15      Q.  All right.  So that I understand the -- the
16  context and -- and timing, the -- the words that you
17  just read in the different font, was that -- were
18  those words that were added by Mr. McPheeters to
19  this -- to the draft?
20      A.  Either -- either Bruce or -- I don't know
21  who had written -- I don't know who wrote it --
22      Q.  All right.
23      A.  -- is the answer.
24      Q.  The -- the concept, though, was a concept
25  that you asked him to add, beginning with "Any

Page 108

1  Lawson customers previously licensed" and so forth?
2          MR. WITTHOEFFT:  Object to the form.
3      A.  Not the specific language:  The concept
4  that we owned the problem and the customers don't
5  own the problem and that we should bear the expense
6  and our customers shouldn't was the position that I
7  was taking at this point in time.
8      Q.  All right.  And the par -- the beginning of
9  that language in that changed font that begins
10  "Lawson plans to make available by" blank "2011 a
11  redesign of the RSS and Punchout products so that
12  neither of those redesigned products will infringe
13  the ePlus patents," how would that blank be filled
14  in --
15          MR. THOMASCH:  Objection to form.
16      Q.  -- at this time frame?
17          MR. THOMASCH:  Sorry.  Objection to
18  form.
19      A.  Well, at this time frame, the blank wasn't
20  filled in.
21      Q.  Right.  I understand that, sir.
22      A.  So -- so that's a non-answerable question,
23  because at this time frame, it wasn't filled in.
24      Q.  All right.
25      A.  And that would have been because we didn't

Page 109

1 know.
2    Q.  If you go back up to the beginning of
3 Mr. McPheeters' e-mail of April 6, 5:07 p.m., under
4 "Privileged and Confidential," he writes -- and this
5 is right above the draft.  Okay? -- "There is no
6 decision yet from the District Court about ePlus'
7 motion for a permanent injunction.  I have pasted
8 below a discussion draft of a possible press
9 release, if an injunction were to be issued.  We
10 need to confirm alignment and timing about the
11 redesigns, launch, rev rec etc.  Please provide your
12 comments to Terry Blake and me.  Thanks, Bruce."  Do
13 you see that, sir?
14    A.  I do.
15    Q.  Did I read that accurately?
16    A.  It appears so.
17    Q.  First, what -- what did you understand "rev
18 rec" meant?
19    A.  Rev rec is short for revenue recognition.
20    Q.  Okay.
21    A.  It's an accounting term.
22    Q.  Okay.  Did you understand this e-mail to be
23 a discussion of a draft press release to be issued
24 once an injunction came down?
25          MR. WITTHOEFFT:  Object to the form.

Page 110

1     A.  I understood this to be a draft proposal of
2 a press release if an injunction were to come down
3 at this period of time that it was written.
4    Q.  Right.
5     A.  I don't know -- at least I don't think that
6 this press release ever went out because no -- no
7 decision was actually issued and -- and I don't know
8 where this e-mail went to after this, but -- but I
9 don't think it ever actually -- anything happened
10 with them.
11    Q.  And there -- there was the possibility that
12 an injunction could come down as early as April 4th.
13 That was -- that was Lawson's understanding.  Is
14 that right, sir?
15    A.  It was our understanding that it could come
16 out -- down in April.  That -- I shouldn't say that
17 was Lawson's under -- it was my understanding --
18    Q.  Right.
19    A.  -- that it could come out in April, yeah.
20    Q.  If an injunction had come down as of
21 April 6, 2011 when this draft was prepared, how
22 could the blank have been filled in at that time?
23          MR. THOMASCH:  Objection to form.
24 Lack of foundation.
25          MR. WITTHOEFFT:  Object to the form.

Page 111

1     A.  I -- I don't know that we could have filled
2 in the blank.  I mean, it was blank for a reason.
3    Q.  Who -- who would have had the information
4 on filling in the blank?
5     A.  Ultimately, our research and --
6          MR. THOMASCH:  Objection to form.
7          THE WITNESS:  I'm sorry.
8          MR. THOMASCH:  Objection to form.
9     A.  Ultimately, our research and development
10 organization is the one who is able to commit to the
11 delivery time frame of a -- of a product.
12    Q.  Is that the LPD we talked about earlier?
13    A.  Yes.  Lawson Product Development I should
14 have said, yes.
15    Q.  Okay.  Now, at the top of this e-mail
16 string, Mr. Hager, is an e-mail from Mr. McPheeters
17 to you of April 11, 2011.  Do you see that, sir?
18    A.  I do.
19    Q.  All right.  And there's a number of other
20 people copied on it, and Mr. McPheeters says, No
21 word from the judge yet about the injunction.  We
22 had a working group call on Friday and decided we
23 need to split the press release in two, and hold
24 back about announcing the design around until after
25 we have succeeded in getting the injunction stayed

Page 112

1 by emergency appeal.  Will be ready to address any
2 noise raised by ePlus after the judge renders his
3 injunction decision.  Bruce.
4          Did I read that accurately, sir?
5     A.  It appears so.
6    Q.  All right.  So your understanding, that by
7 splitting it in two, then the first press release is
8 a press release about the injunction and the second
9 press release would be about the design-around?
10          MR. WITTHOEFFT:  Object.
11    Q.  Is that your understanding, sir?
12          MR. WITTHOEFFT:  Object to the form.
13    A.  I -- I don't know.  I would conclude the
14 same things you would conclude from reading the
15 paragraph.  I don't -- as I recall, it really didn't
16 go anywhere from here, so I don't really have re --
17 good recollection of it.
18    Q.  Okay.  And the timing, as you understood
19 it, of the design-around was the timing of a stay by
20 appeal?  Is -- that was your understanding from
21 this?
22          MR. THOMASCH:  Objection to form.
23    A.  Can you repeat that?
24    Q.  You understood that Lawson was planning to
25 seek help from the appellate court to stop the

Page 113

```
1   enforcement of the injunction.  Is that right, sir?
2        MR. THOMASCH:  Objection to form.
3        A.  I recall our legal team doing something to
4   the effect that I didn't quite understand, but it
5   was something to that effect, yeah.
6        Q.  Right.  And the announcement of the
7   design-around would not occur until -- under this
8   proposal, until after a federal appeals court had
9   stopped the effect of the injunction.  Was that the
10  proposal as you understood it?
11       MR. WITTHOEFFT:  Object to the form.
12       MR. THOMASCH:  Objection to form.
13       A.  I don't recall the proposal.
14       Q.  Okay.  We talked earlier about Lawson's
15  newsletter, and I referred it to as the Weekly
16  Pulse.  Do you recall that?
17       A.  I recall the conversation, but it was not
18  considered Lawson's newsletter, I don't believe.  I
19  think we were talking about healthcare specifically
20  and also specifically an internal message, not
21  external.
22       Q.  Right.  It was called Lawson Healthcare,
23  Our Weekly Pulse.  Do you recall that?
24       A.  I recall the conversation.
25       Q.  Right.  Was that sent out to -- to the
```

Page 114

```
1   people in the healthcare division by -- by e-mail?
2        A.  I don't recall the delivery of it or who
3   the recipients were.  I would only go by the title
4   of it.
5        Q.  And did Mr. Catalino have responsibility
6   for that?
7        A.  He had responsibility for healthcare, but I
8   don't know who his author was or what his
9   distribution engine would have been.
10       Q.  Okay.  And in your position of executive
11  vice president of S3, did you occasionally read the
12  Weekly Pulse?
13       A.  Occasionally, but honestly, I can't even
14  remember if I was on the "to" list, whether I read
15  them by somebody forwarding it to me or whether I
16  was on each distribution, and I can't remember.  I
17  really don't remember a whole lot about the Weekly
18  Pulse.  Did I say that right?  Weekly Pulse?
19  That would imply weekly, I think, so yeah.  I wasn't
20  even exactly sure how often it went out, so --
21       Q.  I will show you one in a minute.  Have
22  you -- have you -- recall that there was an e-mail
23  group called Team-FY11?
24       A.  "An e-mail group called Team-FY11"?
25       Q.  You know, occasionally that groups are
```

Page 115

```
1   given names --
2        A.  Distribution list?
3        Q.  -- distribution lists and stuff?
4        A.  Yeah.  I don't recall that distribution
5   list.
6        Q.  Okay.  Let me show you, sir --
7        MR. JACOBS:  Mark this first.
8        MR. THOMASCH:  Thank you.
9        (Hager II Exhibit 12 was marked for
10  identification.)
11  BY MR. JACOBS:
12       Q.  Let me show you what the reporter has
13  marked as Hager II Exhibit 12.  And if you turn,
14  sir, to the second page, beginning RQC3005818
15  through 20, you'll see something with bold brackets
16  with a Lawson insignia, says "Lawson Healthcare, Our
17  Weekly Pulse, Simplifying Healthcare."  Do you see
18  that?
19       A.  I do.
20       Q.  All right.  And do you see it's over the
21  computer signature of Jim Catalino on that first
22  page, 5818?
23       A.  I see that it was sent by Wes Tufte on
24  behalf of Jim Catalino.
25       Q.  Right.  And he's -- it's kind of signed in
```

Page 116

```
1   cursive at the bottom of the page?
2        A.  Not actually signed.
3        Q.  No.  That's what I meant.
4        A.  Just with a font.
5        Q.  With a computer font?
6        A.  With a -- a font.
7        (Reporter interruption.)
8        Q.  Yes.
9        A.  Yes.
10       THE WITNESS:  Sorry.
11       Q.  All right.  Take a moment to --
12       A.  Do you want me to read the whole --
13       Q.  Well, just read the -- I'm going to focus
14  on the -- the first page, actually.
15       A.  (Pause.)  Okay.
16       Q.  All right.  And I'd like to call your
17  attention to the last paragraph on that page.
18       A.  Of what page?
19       Q.  On Page 5818, which is on the --
20       A.  Okay.
21       Q.  -- under Lawson Healthcare Weekly Pulse,
22  and it reads, "Finally there are no updates on the
23  Infor situation at this time.  I would like to make
24  everyone aware of the e-Plus lawsuit related to our
25  Punchout and Requisition Self Service is still
```

Page 117

1   active.  The good news, regardless of outcome,
2   Lawson is now prepared with substitute
3   solutions/products should something occur," period.
4   "Based on this, no one should slow down sales
5   processes around these solutions.  I do ask everyone
6   to pay attention if something changes in this area,"
7   period.  "Have a great week.  Jim."  Did I read that
8   accurately?
9        A.  It appears so.
10       Q.  Okay.  Would Mr. Catalino be someone in a
11  position to know whether at this time Lawson is
12  prepared with substitute solutions/products should
13  something occur as stated in that paragraph?
14           MR. WITTHOEFFT:  Object to the form.
15           MR. THOMASCH:  Objection to form.
16       A.  Just for purposes of -- Jim Catalino.
17       Q.  Thank you.  I keep making that mistake.
18       A.  And -- that's okay.  And he was the general
19  manager of healthcare but did not have any product,
20  product management, marketing, or legal
21  responsibilities, so -- and -- and in addition, he
22  was -- since he was an executive, it's entirely
23  possible that somebody created this letter on his
24  behalf.  That team would not have been the team that
25  anybody was turning to for the latest news on -- on

Page 118

1   what was happening with RSS or -- or Punchout or
2   legal proceedings.
3        Q.  At this point in time -- April 8th, 2011 --
4   did you have any information different than as
5   stated by Mr. Catalino that I just read?
6            MR. WITTHOEFFT:  Object to the form.
7            MR. THOMASCH:  Objection to form.
8        A.  I don't recall what information I had or
9   didn't have, but as I mentioned earlier in my
10  testimony, the statement that is written in that
11  last paragraph would have been contrary to what
12  Lawson's policy was of referring to product prior to
13  it shipping, and it was an internal-only message and
14  you can see on Page 1 that essentially, he was
15  called out on that and said that's premature to be
16  sending messages like that to the sales team.
17       Q.  Okay.  And thank you for bringing that to
18  my attention on -- that was your reading from the
19  e-mail of attorney Jordan Ekelin of Friday,
20  April 8th, so on the first page, RQC3005817.  Is
21  that right?  Is that what -- is that what -- to
22  which you were referring when you say he was called
23  out on that?
24       A.  Yeah.  And that actually is a misstatement,
25  since I don't see Jim anywhere on the front note, so

Page 119

1   he indeed wasn't.  These conversations are -- are
2   all between Keith Lohkamp and a few of our lawyers
3   on the front page, so I have no indication of
4   whether or not Jim was communicated.  It's also
5   worth noting that I'm not on any of these documents.
6        Q.  I understand.  Do you recall that
7   Mr. Catalino was called out on that statement in the
8   Weekly Pulse?
9        A.  No.  I don't recall this entire scenario at
10  all.
11       Q.  And do you see above that the e-mail from
12  Mr. Cohen to Mr. Ekelin in which he says, quote,
13  Based on our discussion with Finnegan yesterday we
14  may want to have Jim Catalino issue a retraction or
15  clarification of his statement to make it clear
16  Lawson is actively developing a potential work
17  around but that's premature to suggest that an
18  alternative to RSS and Punchout is available.  We
19  have not received a court ruling of any injunction
20  so it is premature for us to state we have a
21  substitute product or solution.  These statements
22  could impair our ability to obtain a stay.  We
23  should also make sure the same type of
24  communications is not sent out by others.  Let me
25  know what you think and if you want me to do

Page 120

1   anything further on this.  Mike.
2            Did I read that correctly?
3        A.  It appears so.
4        Q.  All right.  Did you have any information
5   around this April 13, 2011 time frame that the
6   reason for changing the messaging was because there
7   was simply not a court ruling about the injunction?
8            MR. THOMASCH:  Objection to form.
9            MR. WITTHOEFFT:  Object to the form.
10           MR. THOMASCH:  Misstates the record.
11       A.  I have no information like that, and the
12  conversation you're referring to is entirely between
13  our legal team and nobody else is copied on it.
14       Q.  And so your -- your testimony is that you
15  were unaware that Mr. Catalino had been called out
16  and was asked to retract that statement because it
17  sent the wrong message at the time of the
18  injunction?
19           MR. THOMASCH:  Objection to form.
20       A.  Again, as I stated, I already misstated by
21  saying "called out," because I don't see any
22  evidence that this went back to Jim Catalino on this
23  e-mail stream.  All I see is a forwarding of the
24  message with no commentary from Keith Lohkamp to our
25  legal team, and then I see simply a conversation

Page 121

1   between our legal team and nobody else.
2         MR. JACOBS:  (Handing.)
3         (Hager II Exhibit 13 was marked for
4   identification.)
5         MR. JACOBS:  Is this 12?
6         THE REPORTER:  13.
7         MR. JACOBS:  13.  Time flies.
8   BY MR. JACOBS:
9         Q.  Mr. Hager, let me show you Hager II
10  Exhibit 13 and ask you, sir, if you have seen this
11  e-mail string before.
12        A.  I don't recall it, but I see that I'm on
13  the "to" list.
14        Q.  All right.  And at the top is an e-mail
15  from Jennifer Langer to you of April 13, 2011, at
16  12:03 p.m.  Do you see that, sir?
17        MR. THOMASCH:  Objection to form.  I
18  do think that misstates the document inadvertently.
19        Q.  Ms. Langer sent you an e-mail dated
20  April 13, 2011, 12:03 p.m. to you and to Team-Dean
21  Hager.  Do you see that, sir?
22        A.  I do.
23        Q.  All right.  What was Team-Dean Hager?
24        A.  I can't recall the distribution list.  I'm
25  going to do what I shouldn't do.  My assumption is

Page 122

1   that it was my staff.
2         Q.  Okay.  And it's attaching an e-mail from
3   Mike Cohen of April 13, 2011, 12:52.  Do you see
4   that, sir?
5         A.  I see that.
6         Q.  Okay.  And in the e-mail from Mr. Cohen,
7   it's addressed to Mr. Catalino.  Do you see that,
8   sir?
9         A.  I do.
10        Q.  And to Ms. Langer?
11        A.  I do.
12        Q.  All right.  And the first paragraph says,
13  of that, Jim and Jennifer, we had a discussion
14  yesterday afternoon with our outside counsel who are
15  preparing to obtain a stay of any injunction should
16  one issue in this case.  This could happen any day.
17  The one thing they warned us against was Lawson
18  making any statements that suggest we already have a
19  workaround or substitute product ready to go.  These
20  state -- statements may be used by ePlus or the
21  Judge to negate any efforts to obtain a stay from
22  either the district court or court of appeals.
23  Jim-Could you issue a retraction or clarification to
24  the following statement made on the Healthcare
25  Weekly Pulse, question mark.

Page 123

1         Did I read that accurately?
2         A.  It appears so.
3         Q.  All right.  And the -- the following
4   retraction and clarification is the same statement
5   we saw before in that weekly healthcare pulse.  Is
6   that right, sir?
7         A.  It appears so.
8         Q.  All right.  And your understanding from
9   this e-mail is it's addressed to Mr. Catalino asking
10  him to make a retraction.  Is that what you see
11  there, sir?
12        MR. WITTHOEFFT:  Object to the form.
13        A.  Yes, I -- I see that here.
14        Q.  All right.  And that e-mail was attached to
15  the e-mail from Ms. Langer to you and Dean -- and
16  Team-Dean Hager of that same date.  Do you see that,
17  sir?
18        A.  I do see that.
19        Q.  Okay.  And as I mentioned in Staff today,
20  please adhere to the following policy, Ms. Langer
21  says.  We are actively exploring potential
22  workarounds but it's premature to suggest that an
23  alternative to RSS or Punchout is available at this
24  time.  A judgment or injunction has not yet been
25  issued.  We will continue to monitor the situation

Page 124

1   very closely and let you know if anything has
2   changed.
3         Did I read that accurately, sir?
4         A.  Appears so.
5         Q.  All right.  And when she says, "please
6   adher [sic] to the policy below," is it your
7   understanding that the "policy below" is the
8   language I just read, that we're actively exploring
9   potential workarounds, etc.?
10        MR. WITTHOEFFT:  Object to the form.
11        MR. THOMASCH:  Objection to form.
12        A.  That would be my understanding from the
13  note.
14        Q.  All right.  And was that a policy that you
15  then implemented as of -- of this date or adhered to
16  as of this date?
17        A.  I can't say for certain.  I will say that
18  that statement that Jennifer wrote would be
19  consistent with what our product development policy
20  was, which was not to commit to the future delivery
21  of a product.
22        Q.  All right.
23        MR. JACOBS:  (Handing.)
24        (Hager II Exhibit 14 was marked for
25  identification.)

Page 125

1    BY MR. JACOBS:
2        Q. I'm going to show you what's been marked as
3    Hager II Exhibit 14, which has been previously
4    marked as PX-1251, and do you see, sir, this is a
5    e-mail to you and Bruce McPheeters of -- from Mike
6    Cohen of April 22, 2011?
7        A. I do.
8        Q. All right. And Mr. Cohen says, I was not
9    on the first part of the phone call yesterday but
10   understand that there was some discussion about a
11   field flash or other communication stating that RC
12   is ready or will be ready to release to customers.
13   My understanding from our outside legal counsel who
14   are poised and ready to seek an immediate stay of an
15   injunction that might issue is that we not make any
16   internal or public statements regarding the
17   availability of replacement or new products prior to
18   the court ruling. There's no problem with stating
19   we're working on such products and plans to
20   implement them but to announce we are ready --
21   already have a product and plans to implement may
22   jeopardize efforts to obtain a stay. Has something
23   changed to suggest we can do otherwise, question
24   mark. Can legal be involved in reviewing any field
25   flashes or other communications related to RC and

Page 126

1    Punchout, question mark. Mike Cohen.
2        Did I read that correctly, sir?
3        A. It appears so.
4        Q. All right. What did you understand R --
5    the initials -- excuse me -- "RC" to mean?
6        A. It's actually new to me. I don't think it
7    stands for anything. If -- if I were to -- I
8    probably shouldn't -- I mean, we didn't have a
9    product called RC, so I'm not sure what that --
10       Q. Well, at the top of the line, it says -- on
11   the subject line, it says "Requisition Center"?
12       A. Well, that's probably what's being referred
13   to then.
14       Q. All right. And was there a name being used
15   at this time of something called Requisition Center?
16       A. I don't think that was the full name of the
17   product. Wasn't it -- and again, I'm trying to go
18   off of memory. It's in some of these other
19   documents. But there was a -- a product that
20   Requisition Center was to -- I think -- I thought
21   there was a third word to it. Maybe not.
22       Q. Was there an initial? Was it RQC?
23       A. That was it. I'm sorry. I'm sorry. That
24   was it. So that was the -- became the official name
25   of the product. When it became the official name of

Page 127

1    the product, I don't know.
2        Q. Did you have any conversation with
3    Mr. Cohen or Mr. McPheeters or Jordan Ekelin, who's
4    also copied on this, about the availability of RC or
5    Requisition Center around April 22?
6        A. I don't re -- I don't recall any
7    conversation like that.
8        Q. All right. What -- at your time at Lawson,
9    what was a -- a field flash?
10       A. An internal e-mail that would go to our
11   sales team.
12       MR. JACOBS: (Handing.)
13       MR. THOMASCH: Thanks, Paul.
14       (Hager II Exhibit 15 was marked for
15   identification.)
16   BY MR. JACOBS:
17       Q. Mr. Hager --
18       MR. THOMASCH: I'll -- I'm sorry. No.
19   Go ahead. I was just going to make an
20   off-the-record comment.
21       MR. JACOBS: That's okay. Let's go
22   off the record.
23       MR. THOMASCH: I'm sorry. I didn't
24   mean --
25       VIDEOGRAPHER: We're going off the

Page 128

1    record about 10:47 a.m.
2        (Recess, 10:47-11:01 a.m.)
3        VIDEOGRAPHER: This begins tape number
4    three in the deposition of Dean Hager on March 22nd,
5    2013. We're back on the record at about 11:01 a.m.
6    BY MR. JACOBS:
7        Q. All right. Mr. Hager, let me show you
8    what's been marked as Hager II Exhibit 15, and it's
9    been premarked as PX-1094. Purports to be an -- an
10   e-mail string, and do you see your name at the
11   e-mail at the top, sir?
12       A. I do.
13       Q. All right. And you'll see at the bottom of
14   that string or on that first page of 2631677, the
15   first page, an e-mail from you to Ms. Jennifer
16   Langer of May 4, 2011, at six in the morning. Do
17   you see that, sir?
18       A. Yes.
19       Q. All right. And you say to Ms. Langer,
20   "This is good work." Do you see that?
21       A. I see that.
22       Q. All right. And was that a comment in
23   reference to her e-mail to you on the next page,
24   2631678, of May 3, 2011, at nine in the morning?
25       A. Do you mind if I take a moment to read it?

Page 129

1    Q. Please take a moment.
2    A. This doesn't look familiar to me and I
3  don't recall it in the depo, so --
4    Q. Yeah. Take your time. While you're doing
5  that, I don't recall if I noted, this was Hager 10
6  at the last deposition.
7    A. (Pause.) Okay. I'm familiar enough with
8  it. Okay.
9    Q. All right. And my previous question was
10  when you made the reference "This is good work," was
11  that in reference to her e-mail to you of May 3,
12  2011, at nine in the morning?
13    A. I'm not exactly certain, only because that
14  e-mail references an attachment as well that isn't
15  here, so I don't know if I'm referring to the
16  attachment or whether I'm referring to her e-mail
17  or -- or what have you.
18    Q. Okay. In her e-mail to -- to you of May 3
19  at 9 a.m., she says, "We have plans in place to
20  execute on the replacement of RSS in Q4 deals as
21  early as next Monday. We need your input and
22  direction to move forward." And, again, did you
23  understand that "Q4" meant deals by May 31 of 2011?
24    A. Correct.
25    Q. All right. And this was written on a

Page 130

1  Thursday, April 28, so the reference would be --
2  would your understanding be to the -- the following
3  -- the following Monday?
4    A. M-hm. That would be my understanding.
5    Q. All right. By "deals" in her reference,
6  would you understand that to be to the cu --
7  customer contracts?
8    A. Deals should be a contract, correct.
9    Q. Okay. In your e-mail response to her of
10  May 4, you state as a question, Does Requisition
11  Center do the same thing and work similar to the RSS
12  demo that I saw, question mark.
13    Did I read that accurately?
14    A. It appears so, yes.
15    Q. Okay. Did you see an RSS demo?
16    MR. THOMASCH: Objection, relevance.
17  You may answer.
18    A. From a clarity perspective, now that I see
19  this, when I say "This is good work. First off, on
20  the letter to AE's," I'm referring to the attachment
21  that isn't here.
22    Q. Okay.
23    A. Okay? Secondly, as I've mentioned before,
24  my role was to be the voice of the customer. When I
25  write there's one big question that isn't answered

Page 131

1  however, the reason that's bullet-pointed and
2  phrased the way it is is I'm there being the voice
3  of the customer, so that question is to be as if the
4  customer is asking it. So -- so the "I" would not
5  be me personally in that case, "in the demo that I
6  saw"; I'm actually being the voice of the customer.
7  I'm referring to the -- what the customer would say.
8  Do you understand what I mean by that?
9    Q. I -- I -- well, let me ask this: Did you
10  see an RSS demo?
11    A. Prior to this date, I don't believe so.
12    Q. Okay. Did you get an answer to your
13  question: Does Requisition Center do the same thing
14  and work similar to the RSS demo that I saw?
15    A. I don't recall what the -- I don't recall
16  what the final letter to AE was, so this entire
17  dialogue is about a letter to AE's that I reviewed.
18  I put in a voice-of-the-customer response, and then
19  I -- my final words are word-smith as you like and
20  push back of -- if my suggestions are the wrong
21  wording, essentially. I used the word
22  "inappropriate." And then I don't know where this
23  e-mail went to, so I don't know whether that letter
24  to AE was changed. I don't have the initial draft
25  or the final draft here.

Page 132

1    Q. All right. And you made reference to
2  these -- these points. There are four numbered
3  points underneath a paragraph that reads,
4  "Essentially, we want to get around needing to demo
5  Requisition Center in order to get the deal done. I
6  know we are walking a fine line in how we respond to
7  that. I would like to see your bold text 'Basic
8  Message to Customers' to have four bullet points
9  under it," and then you have four -- four numbered
10  points. Do you see that, sir?
11    A. I do.
12    Q. All right. And the four numbered points,
13  are these the points that you wanted to have in --
14  in customer -- in communications to customers about
15  the new product?
16    A. These were my suggested points back to
17  Jennifer, but I didn't own the authoring of the
18  final letter that would have gone out to clients.
19    Q. All right. And did you have --
20    A. Or to AE's in this case.
21    Q. Okay. All right. Did you have in -- any
22  discussion with Ms. Langer subsequent to this e-mail
23  in which you discussed your four points?
24    A. I don't recall any conversation like that.
25    Q. All right. When you say in your fourth

Page 133

1   point, "Lawson Requisition Center has been designed
2   specifically to NOT infringe on the ePlus patent,
3   while preserving the key functionality customers
4   need in their requisition process.  If needed, we
5   can share a screen-shot comparison between the two
6   products to demonstrate that Lawson Requisition
7   Center still satisfied our customers requirements."
8   Did I read that correctly?
9        A.  It appears so.
10       Q.  All right.  Had you, in fact, seen screen
11  shots to -- of the -- to show that there was a
12  comparison and how they compared?
13       A.  I don't recall, and again, the -- this
14  wording was from a customer's perspective, what I
15  would like to say to customers.  It doesn't imply
16  that that was actually something we were able to do
17  or not, which is why I was sending it to Jennifer
18  for her review and legal review as opposed to simply
19  sending it out to anybody else.
20       Q.  Did anyone tell you at Lawson that you
21  re -- that you recall that you could not say to
22  customers that RQC would preserve the key
23  functionality customers need in their requisition
24  process?
25       A.  I --

Page 134

1        MR. THOMASCH:  Objection to form,
2   relevance.
3        A.  I don't recall that conversation.
4        MR. JACOBS:  (Handing.)
5        MR. WITTHOEFFT:  Thank you.
6        (Hager II Exhibit 16 was marked for
7   identification.)
8   BY MR. JACOBS:
9        Q.  I'm going to show you, Mr. Hager, what the
10  reporter has marked as Hager II Exhibit 16.  It
11  was -- been premarked PX-1099, and it was Hager 15
12  at your -- your last deposition.  You'll notice at
13  the bottom an e-mail from Ms. Langer of May 24,
14  2011.  Do you see that, sir?
15       A.  On -- on page one?
16       Q.  Yes, sir.
17       A.  April 24, 2011, from -- yes, I see that.
18       MR. THOMASCH:  Did -- did you say
19  "April"?
20       THE WITNESS:  Did I say April?  I
21  don't know.  Did I say --
22       MR. THOMASCH:  It's May 24.  Right?
23       A.  May 24.
24       Q.  May 24.
25       A.  Thank you for -- so about midway down the

Page 135

1   first page, from Jennifer Langer, May 24, 2011,
2   5:16.
3        Q.  And do you recall this was just after the
4   injunction had been entered by Judge Payne in the
5   case?
6        A.  I don't recall the date of the injunction,
7   but I see it's May.  I know the injunction was in
8   May, so --
9        Q.  When Ms. Langer says at the bottom in her
10  e-mail of May 24 to you and to Terry Blake, quote,
11  "There are also M3 customers involved.  We have no
12  replacement product for them."  And she lists them,
13  "Finning, dWheeler, Butler, etc."  "How do we cover
14  them in a Press Release?  Or do we reach out to them
15  individually?"  Now, what did you understand her to
16  mean?
17       MR. THOMASCH:  Objection to form,
18  relevance.
19       A.  I would have probably deleted this e-mail
20  message as I would have read this as being really a
21  message to Terry Blake, who was the person who was
22  responsible for writing press releases, and I had no
23  M3 responsibility whatsoever, so you'll notice that
24  Terry simply did a "reply all" that -- which is why
25  I got copied again, and then somebody realized that

Page 136

1   I didn't need to be on it, which is why it just
2   became a conversation between Terry and Henrik.
3        Q.  Did you have any understanding whether M3
4   products sold in the United States were enjoined as
5   well as S3 products?
6        MR. THOMASCH:  Objection to form.
7        A.  I -- I -- I wasn't -- I had no knowledge
8   or -- no knowledge of that.
9        Q.  I believe you told me before Mr. Henrik,
10  Mr. -- excuse me -- Henrik Billgren, he was in
11  charge of -- of M3 products?
12       A.  Yeah.  He was Jennifer's counterpart --
13       Q.  At --
14       A.  -- on the M3 side.
15       Q.  The M3 side?
16       A.  Yeah.
17       Q.  Okay.  You do recall, sir, that the court
18  in late May did issue an injunction with respect to
19  Lawson Software?
20       A.  Late May of 2011 --
21       Q.  Right.
22       A.  -- I recall.
23       Q.  And do you recall that an effort was made
24  with the federal appeals court to have the impact of
25  that injunction stopped or delayed?

Page 137

1    MR. THOMASCH:  Objection to form.  You
2  may answer.
3       A.  I don't -- is this referring to the
4  conversation we had earlier --
5       Q.  Yes.
6       A.  -- on the -- what's called the stay?
7       Q.  Exactly.
8       A.  Okay.  I remember that there was work going
9  on there, but I had no real detailed knowledge of
10  any of it.
11       Q.  All right.  Was it your understanding that
12  after the stay was denied, you were free to
13  communicate with customers about the availability of
14  a workaround to the infringing products?
15            MR. WITTHOEFFT:  Object to the form.
16            MR. THOMASCH:  Objection to form.
17       A.  I don't recall that conversation in any
18  relation to the stay.  I only recall it in relation
19  to when the products were actually ready.
20       Q.  What day were the products ready, sir?
21       A.  I'm going off of a -- the documents, not my
22  recollection.  I thought I saw a date of -- of
23  May 18th in something I looked at last night, but
24  again, I'm just going off the documents.
25       Q.  And were the products launched to the

Page 138

1  public on May 18?
2       A.  I -- I -- what exact day it was, I can't
3  recall exactly.  I'm just -- I assume so, given the
4  documents that I saw.
5       Q.  Did you have any communications with
6  customers prior to the injunction being entered that
7  RQC was -- was ready for download?
8       A.  I -- I'm sorry.
9            MR. THOMASCH:  Objection to form.
10       A.  Repeat that again.
11       Q.  Did you have any communications with
12  customers prior to the injunction being entered
13  telling them that RQC was ready for download?
14            MR. THOMASCH:  Objection to form.
15       A.  Again, I don't remember when the injunction
16  happened versus when the product was ready, you
17  know, so --
18       Q.  Well --
19       A.  -- I just remember that I had conversations
20  after the product was ready for download that it was
21  ready for download.
22       Q.  If I represent to you that the date of the
23  injunction was May 23 --
24       A.  Okay.
25       Q.  -- 2011, did you have any communications

Page 139

1  with customers prior to that date advising them that
2  RQC was ready for download?
3       A.  Again, I'm -- keeping in mind this is all
4  two years ago, I know I had communication with
5  clients in late May that RQC was ready for download.
6  I don't remember the exact dates of anything.  I --
7  I'm more than likely going to agree with you if you
8  lay out the dates for me, so I'm not trying to be
9  argumentative; I just -- I just can't recall what
10  they are.
11       Q.  I see.
12            MR. JACOBS:  (Handing.)
13            (Hager II Exhibit 17 was marked for
14  identification.)
15  BY MR. JACOBS:
16       Q.  Let me show you what the reporter has
17  marked as Hager II Exhibit 17, which was previously
18  Hager 14 and has been premarked as PX-1098, and
19  you'll see this, sir, is an e-mail from you to Harry
20  Debes of May 26th, 2011, 5:46 p.m.  Do you see that,
21  sir?
22       A.  I do.
23       Q.  And attached -- and it notes an attachment
24  Summa Health System PDF, and attached to it you'll
25  see a letter of May 26th, 2011.

Page 140

1       A.  I see it.
2       Q.  All right.  And is that your signature at
3  the bottom of the letter?
4       A.  It is, yes.
5       Q.  All right.  And did you draft this letter?
6       A.  I would have drafted portions of it, but
7  not the entire letter, no.
8       Q.  What portions would you have drafted?
9            MR. THOMASCH:  Objection, asked and
10  answered based on the first deposition at length,
11  but you may answer.
12       A.  All -- all of the middle section about the
13  specifics of the infringing and all of those points,
14  that was drafted for me by our legal team.
15       Q.  All right.  And the parts above the five
16  numbered paragraphs and below the five numbered
17  paragraphs, was that your drafting?
18       A.  Even that, not the original, as I look at
19  it.  Many of the words that are used actually came
20  out of a corporate communications message that had
21  been done at some point in time, so even that was
22  not original.  That was borrowed from our corporate
23  communication messaging.
24       Q.  Did you put this letter together?
25       A.  It was sent from my ID, but typically,

Page 141

1   letters like this, I had people who were more
2   knowledgeable than me make sure that the facts were
3   right so that I could issue the letter.
4        Q.  And in the cover e-mail to Mr. Debes, you
5   say, I'm now personally addressed -- "I've now
6   personally addressed several of these letters.  I
7   wanted to send this one to you again because Summa
8   (a forecasted $1 million deal) wanted more technical
9   detail regarding RSS & RQC.  I've told the sales
10  team they should not get into this with new
11  prospects.  They should simply tell them we don't
12  sell the infringing products anymore.
13  Unfortunately, this rep mentioned the RSS/RQC swap.
14  So I had to address in the letter why RSS infringed
15  and RQC didn't.  I did it in the most simple way I
16  could.  Bruce reviewed.  Because of this technical
17  explanation, I'm sending to you in case you get
18  questions like this."  So when you say that "I had
19  to address in the letter why RSS infringed and RQC
20  didn't," "I did it in the most simple way I could,"
21  to what are you referring to in this letter, sir?
22       A.  One is --
23            MR. WITTHOEFFT:  Object -- object to
24  the form.
25       A.  As a point, I personally addressed several

Page 142

1   of these letters, the word "addressed" is
2   specifically used because I didn't say I personally
3   wrote these letters.  It was something that I sent
4   to try and compile as simply as I possibly could the
5   facts that question -- that clients were asking.  So
6   not being the one that was knowledgeable on why one
7   product infringed and another product didn't, I
8   would rely on the legal team to explain that and
9   then try and package it down into one page as simply
10  as I could to send out.  But as you can see from
11  this, the final versions were always completely
12  reviewed by Bruce.
13       Q.  And -- and that was -- you anticipated my
14  next question.
15       A.  M-hm.
16       Q.  Was Bruce McPheeters the legal team that
17  put this together, or was -- did this come from some
18  other lawyer?
19       A.  Well, I mean, Bruce ran Lawson's legal team
20  so he was responsible for the Lawson legal team.
21       Q.  When you say in here that "Bruce reviewed,"
22  did he draft it or simply review what you had
23  drafted?
24            MR. WITTHOEFFT:  Object to the form.
25            MR. THOMASCH:  Objection to form.

Page 143

1        A.  The -- the drafts from -- the way that a
2   letter like this is typically constructed is, as I
3   mentioned, the top half of the letter appears, in
4   looking at it, that it came out of some of our
5   corporate communications, so that is typically going
6   to be drafted by a Terry Blake.  Then that middle
7   section where it gets into the real nitty-gritty
8   details is going to be drafted by our legal team.
9   And then somebody on my staff would put this
10  together into a single document, and then we'd have
11  Bruce review the final version of it.  So at the end
12  of the day, there are several contributors to this,
13  which is why we always have legal review the final
14  versions of it.
15       Q.  Now, did you send out this letter to Summa,
16  or was it sent out in your name?
17       A.  I mean, my name is on it.  I don't know how
18  it got sent to Summa, whether it was sent via an
19  e-mail or whether it was a paper letter.  I -- I'm
20  not sure.
21       Q.  You previously testified it was sent in
22  your name.  Do you recall that?
23       A.  I don't.
24            MR. WITTHOEFFT:  Object -- object to
25  the form.

Page 144

1        Q.  All right.
2        A.  I don't.
3        Q.  Take a look, if you would, at your previous
4   deposition, Page 207.
5        A.  Okay.
6        Q.  And you were asked a series of questions
7   about what was Hager 14, and you'll see in bold your
8   response on Page 207.
9        A.  Yep.
10       Q.  Okay.
11            MR. THOMASCH:  I'm sorry.  What lines
12  on 207 are you referring to?
13            MR. JACOBS:  Specifically his answer
14  on Line 10, and -- 9 and 10.  "This was actually
15  written by our legal team and sent out in my name."
16            MR. THOMASCH:  Okay.
17       A.  Yeah.  I don't think that anything that
18  I've said today is inconsistent with this.  It was a
19  letter that was compiled for me, and a year ago I
20  would have remembered how it got sent out better
21  than I do today, so I have no reason to disagree
22  with that.
23       Q.  All right.  Well, let me help you with
24  that, Mr. Hager.
25            MR. JACOBS:  (Handing.)

Page 145

1          (Hager II Exhibit 18 was marked for
2    identification.)
3    BY MR. JACOBS:
4          Q.  Let me show you what the reporter has
5    marked as Hager II Exhibit 18, which has been
6    premarked PX-1266, and if you look at the bottom,
7    sir, you'll see an e-mail from you of May 26th,
8    2011, 6:08 p.m.
9          A.  M-hm.
10         Q.  And it's to what appear to be three
11   individuals, two of whom have a e-mail address that
12   says summahealth.org.  Do you see that, sir?
13         A.  I do.
14         Q.  All right.  And do you see, sir, that it --
15   it references on this date "a letter signed by me
16   that addresses all of the core concerns outlined on
17   my call today with Jay"?  Do you see that?
18         A.  Yes.
19         Q.  Did you know the people at Summa by their
20   first names?
21         A.  I don't know any of those people.  Given
22   that the letter says that I recently had a call with
23   them, I'm assuming I'm referring to somebody with
24   the customer that I had a call with, but I -- I
25   mean, I don't know them well.  Or I don't know them

Page 146

1    at all now.
2          Q.  All right.  And you see, sir, that it
3    references an attached letter, and this e-mail is of
4    May 26th, the same date as the letter that we saw in
5    Exhibit 17?
6          A.  I do.
7          Q.  All right.  Do you have any reason to think
8    that the letter you sent as an attachment to Summa
9    on May 26th is any different than we saw as the
10   attachment to Exhibit 17?
11         A.  I have no reason to believe that it's not
12   that.
13         Q.  Okay.  And you go on to say in your e-mail,
14   We are very confident that Summa will see
15   negative -- zero negative impact from the slight
16   product configuration change we've made in regard to
17   the patent claims.  In fact, we believe you will end
18   up with a solution that is actually better.  Our
19   service estimate for existing customers to take them
20   through this change is only eight hours, which we do
21   at our expense.  Your new implementation project
22   will not change at all.  That should give you an
23   indication for how minor a change this is in context
24   to the larger project.
25              Do you see that, sir?

Page 147

1          A.  I see it.
2              MR. THOMASCH:  Objection to form,
3    relevance.
4          Q.  All right.  And did I read that correctly?
5          A.  It appears so.
6          Q.  All right.  The -- the wording that you
7    used in that paragraph, was -- were those Dean
8    Hager's words or did you get those from someone
9    else?
10         A.  I don't recall.
11         Q.  If you had written these -- as you did,
12   wrote these words to a customer, Summa Health, at
13   the time on May 26th, 2011 --
14         A.  Just a point for clarity --
15         Q.  Yes, sir.
16         A.  -- they actually weren't a customer.  They
17   were a prospect, so they did not have RSS and so
18   therefore the change from RSS to RQC was really
19   nothing to them because they didn't have RSS in the
20   first place.
21         Q.  Right.  Thank you for that.  And they were
22   forecast to be a $1 million deal if -- if you made a
23   deal with them.  Is that right?  From -- we saw in
24   Exhibit 17?
25         A.  I would have no reason to dispute that, but

Page 148

1    I don't recall it.
2          Q.  Well -- all right.  You said at the first
3    line of Exhibit 17, "I wanted to send this one to
4    you again because Summa (a forecasted $1 million
5    deal) wanted more technical detail."
6          A.  And I have no reason to dispute that, yeah.
7          Q.  Okay.  Would you have said these words to
8    Summa on May 26th, 2011, if you did not believe them
9    to be true?
10             MR. THOMASCH:  Objection to form.
11         A.  No, I would have never said anything to a
12   client that I wouldn't have -- or a prospect that I
13   wouldn't have believed to be true, and -- and for
14   what it's worth, just for point of clarity, both
15   myself and my administrator had access to send
16   e-mails from my account, so there would be times
17   where I would be on the road or out that she would
18   send out things in my name; with my approval, of
19   course, but that's where that language might have
20   come from, too.
21         Q.  So you're saying that your assistant would
22   have written the words in this e-mail and not you?
23             MR. THOMASCH:  Objection to form.
24   Misstates the record.
25         A.  No.  I didn't say that.

Page 149

1    Q. Okay.
2    A. I didn't say that.
3    Q. I just -- I just wanted clarification.
4  Thank you.  One e-mail up from that is 11:43 p.m.
5  the same date, May 26th, from Brad Fridell.  Do you
6  see that?
7    A. I do.
8    Q. Who is Brad Fridell?
9    A. As I recall, he was a salesperson.
10   Q. All right.  Was he under your chain of
11 command?
12   A. Yes.  He was in the healthcare
13 organization.
14   Q. All right.  Had you sent this -- a letter
15 attachment and e-mail out at his request?  Do you
16 recall?
17   A. I'm -- I don't recall the origins of the
18 prospect engagement.
19   Q. Okay.  Do you recall if you were able to
20 obtain a contract with Summa before -- and book it
21 for the fourth quarter?
22   A. I don't recall.
23   Q. Okay.
24   A. Do you know?
25      MR. WITTHOEFFT:  (Indicating.)

Page 150

1    A. I'm sorry.
2       MR. WITTHOEFFT:  Let's move ahead.
3       MR. THOMASCH:  Yes.
4       THE WITNESS:  Okay.  I'm sorry.
5       MR. JACOBS:  And this is just for
6  clarification.  (Handing.)
7          (Hager II Exhibit 19 was marked for
8  identification.)
9  BY MR. JACOBS:
10   Q. Let me show you Hager II Exhibit 19, and
11 let me just ask you, has it been marked as a
12 separate PX-1267, that you recognize this as the
13 same letter that was attached to Exhibit 17?  And if
14 you want to compare the two, please do.
15   A. I haven't read every word of it.  I would
16 need to read every word of both documents to say for
17 certain, but it appears to be the same letter.
18   Q. If you are more comfortable to read so, you
19 may do it.  I will represent the words are the same.
20   A. Okay.
21   Q. But....
22      MR. THOMASCH:  If you'll represent it,
23 Lawson will accept it and I don't think we need to
24 bother the witness on it.
25      MR. JACOBS:  I just -- save time

Page 151

1  later.  (Handing.)
2          (Hager II Exhibit 20 was marked for
3  identification.)
4  BY MR. JACOBS:
5    Q. Mr. Hager, let me show you what the
6  reporter has marked as Hager II Exhibit 20, which
7  appears to be an e-mail string that starts back on
8  June 9 and goes forward to June 20, 2011.  Do you
9  see that?
10   A. I do.
11   Q. And you'll see your name as recipient on
12 the next-to-last one in the chronology on the first
13 page, RQC1001739 on the very first page on June 17,
14 2011, 5:56 p.m.  Do you see that, sir?
15   A. Where I'm copied on it?
16   Q. Yes, sir.
17   A. Yes.
18   Q. All right.  Any reason to believe you would
19 not have received this on -- on or about June 17,
20 2011?
21   A. I have no reason to not believe it.
22   Q. Okay.  If you turn through the e-mail to
23 RQC1001744 --
24   A. Yes.
25   Q. -- and I believe that's the -- the first

Page 152

1  e-mail in the string, and if you turn your
2  attention -- it's from Christy Gustafson --
3  Gustafson, June 9th, 2011, to Mr. McPheeters, and
4  you'll see "Bruce," and then she goes through some
5  numbers, and she says -- it's underlined -- As a
6  subset of the numbers above:  The annual maintenance
7  fee for 277 HC customers extended into November
8  equals $103,267,029.23.  Did I read that accurately?
9    A. It appears so.
10   Q. Okay.  Do you understand the reference to
11 277 HC customers to be the same 277 healthcare
12 customers which you testified at the hearing and
13 about which we've talked about earlier in this
14 deposition?
15      MR. WITTHOEFFT:  Object to the form.
16   A. I -- yeah.  I wouldn't know for certain,
17 but I actually look at that and say obviously 277
18 was on a report somewhere, because this came from
19 Christy three months later, so it appears to be the
20 same 277.
21   Q. As someone -- as executive vice president
22 of S3 at Lawson --
23   A. M-hm.
24   Q. -- that periodically looked at revenue
25 information --

Page 153

1    A.  M-hm.
2        Q.  -- when you see this description, the
3    annual maintenance fees for these customers is a
4    hundred-plus million dollars, what does the
5    reference to "annual maintenance fees" mean?
6        A.  There is predominantly three sources of
7    revenue for a software -- typical software company:
8    License fees, which are software sales; services
9    fees, which are services rendered; and then
10   maintenance fees, which is a client's payment for
11   ongoing support and access to future releases of the
12   product.
13       Q.  Do you understand if the -- do you have an
14   understanding that the reference to the 103
15   million-plus dollars for the 277 healthcare
16   customers was for the extension of time on RSS by
17   reason of not having it apply at the time of the
18   injunction for another six months?
19            MR. THOMASCH:  Objection to form,
20   misstates the record.
21            MR. WITTHOEFFT:  Object to the form.
22       A.  I'm not sure I understood the question
23   anyway.
24       Q.  Let me try it better.  You understand that
25   the -- the healthcare customers did not have the

Page 154

1    injunction applied to them immediately, the 277?
2        A.  I do recall a ruling that, yeah, the 277
3    did not have the injunction applied immediately.
4        Q.  And do you recall that it -- it was
5    extended for a six-month period?
6        A.  You're actually triggering a memory.  Now I
7    do as you say that, yes.
8        Q.  Okay.  Do you know if the amount of
9    maintenance fees for these 277 healthcare customers
10   applied to the period of time where they could
11   remain on RSS instead of having to migrate to RQC?
12            MR. THOMASCH:  Objection to form.
13            MR. WITTHOEFFT:  Object to the form.
14       A.  Yeah.  I've got to read this a little
15   careful.  I mean, I don't have that understanding
16   off the top of my head.  I'd have to read this a
17   little bit more to see whether I would read the same
18   thing that you do, but I don't know that to be
19   certain.
20       Q.  Well, take your time and -- and see how you
21   do read that, sir.
22            MR. THOMASCH:  I object to this
23   witness interpreting a document that he doesn't
24   recall and is not on.
25       A.  And -- and -- and that is true.  I mean,

Page 155

1    this is a -- I've never looked at this before.  I
2    would just be interpreting it, and it's not a
3    report, it's just a unstructured e-mail text.  I
4    don't know that it would be fair for me to
5    try and -- and she could have had typos in there as
6    far as I know.
7            (Pause.)
8        A.  I'm sorry.  I didn't realize I was waiting
9    on a question.
10       Q.  No, and you were going -- the question --
11   you -- the question is still pending as to --
12       A.  Oh.  My -- my response is that it's -- it's
13   unfair for me to attempt to interpret this because
14   I'm interpreting data that I don't have any
15   knowledge of and it's somebody's e-mail that was
16   sent two years ago that I wasn't copied on and I'm
17   certain I've never read this before, so I don't know
18   that it would be fair for me to even attempt to
19   interpret it.
20       Q.  There's nothing you saw in there that
21   informed your based -- as a executive vice president
22   of S3 at the time how that $103 million was applied?
23            MR. THOMASCH:  Objection to form.
24       A.  No.
25       Q.  Okay.

Page 156

1        A.  I mean, I -- I really don't know how they
2    calculated it.
3        Q.  All right.  Turn if you would to the second
4    page of that e-mail string, sir, RQC1001740.
5        A.  Okay.
6        Q.  And turn your attention to Category 4.
7        A.  Yes.
8        Q.  "63 healthcare providers have not
9    downloaded but have a 6 month extension."  Do you
10   see that?
11       A.  I do.
12       Q.  All right.  And beneath as part of that, it
13   says, The court granted a six month extension for up
14   to 277 healthcare providers.  Many of these
15   customers have moved forward with the replacement
16   product.  There are 63 remaining healthcare
17   customers that are taking advantage of the extra
18   time to schedule the replacement product to be
19   accepted sometime before the November deadline.  We
20   are assuming that this revenue is not at risk as
21   these customers have time to plan.
22            Do you see that, sir?
23       A.  I do.
24       Q.  All right.  And from this, do you
25   understand that reference to 277 healthcare

Page 157

1  providers to be the -- the 277 that you testified at
2  the hearing on March 25?
3      A.  That's my assumption.
4      Q.  All right.  And would you read this to be
5  that if there's 63 remaining healthcare customers
6  that have not taken advantage of the time to
7  schedule the replacement, that by the simple math,
8  there were 214 that had?  Is that how you would read
9  that, sir?
10          MR. WITTHOEFFT:  Objection.
11      A.  And I would be interpreting it the same way
12  that you -- I've never read this document, so I
13  would be interpreting it the same way that
14  anybody -- I would have no extra expertise on it.
15      Q.  Those are all the questions I have for the
16  moment.
17          DIRECT EXAMINATION
18  BY MR. THOMASCH:
19      Q.  Mr. Hager, I have some questions on behalf
20  of Lawson, and I'm going to go through the
21  documents, but before we do that, maybe we'll just
22  stick with the most recent ones.
23      A.  Okay.
24      Q.  Let's start on the document that is in
25  front of you now, which I believe has been marked as

Page 158

1  Exhibit 19 of this deposition.  Is that correct?
2          MR. WITTHOEFFT:  20.
3          MR. JACOBS:  That's 20.
4      Q.  That's 20?  I'm already wrong.  On the
5  second page, there's reference to the 63 remaining
6  healthcare customers.  Do you see that?
7      A.  I see that.
8      Q.  And if that correctly assumes that 214 had
9  already taken advantage of the replacement product,
10  that was, as of June 17, 2011, less than 30 days
11  after the injunction.  Is that correct?  If I
12  represent to you the injunction was May 23, 2011?
13      A.  That would be my interpretation of it.
14      Q.  Okay.  And was it -- do you have anything
15  to do with the determination of the extent to which
16  any affected customer was required to continue
17  paying maintenance or would be relieved of a
18  requirement in whole or in part to pay maintenance?
19      A.  No.  That wasn't within my --
20      Q.  Did you have anything --
21      A.  -- area.
22      Q.  -- to do with that issue?
23      A.  Could you repeat it again?
24      Q.  Yes.  The question of whether or not if a
25  customer's -- an existing customer who had a product

Page 159

1  that had been found to be infringing and where
2  you -- there was an injunction, were you -- do you
3  have any responsibility for determining whether that
4  customer had a continuing obligation to pay
5  maintenance or not?
6          MR. JACOBS:  Objection as to form.
7      A.  On a customer-by-customer basis, that was
8  not my responsibility, no.
9      Q.  Did you have any responsibility for the
10  matters set forth in -- in this e-mail?
11          MR. JACOBS:  Objection as to form.
12      A.  I don't believe so, no.
13      Q.  Is it your understanding that some
14  customers who possessed infringing configurations as
15  the court defined them also had other modules that
16  they tied into their Lawson system?
17      A.  Yes, that was my understanding.
18      Q.  And do they pay different amounts of
19  maintenance depending on how many different Lawson
20  products they have?
21      A.  Yes.
22      Q.  Do you know how many, if any, of the 277
23  healthcare customers had either Punchout or EDI
24  modules?
25      A.  I don't know off the top of my head, no.

Page 160

1      Q.  I'd like to look at Exhibit 17 and 18,
2  which were two of the three exhibits Mr. Jacobs
3  marked that relate to Summa healthcare.
4      A.  Yes.
5      Q.  Let me ask you first, Mr. Hager, do you
6  know whether Summa healthcare was interested in
7  licensing from Lawson a system that included either
8  Punchout or EDI?
9      A.  I don't, no.
10      Q.  Let's look at Exhibit 17, if we might.
11      A.  Okay.
12      Q.  Would you just look through the cover memo
13  that you wrote that's a paragraph long, which I
14  believe you have already read once, but take a look
15  at that again and tell me whether there is any
16  intended reference to Punchout or EDI.  No.  In the
17  cover memo on the -- on the --
18      A.  Oh.
19      Q.  -- first page of Deposition Exhibit 17 --
20      A.  Oh.
21      Q.  -- which is your e-mail to Harry Debes,
22  May 26 -- it actually says 5/26/20 -- 2011, I'm
23  sorry, at 5:46 p.m.
24      A.  Okay.  I --
25      Q.  Do you see it?

Page 161

1    A.  I see no mention of Punchout or DEI.
2    Q.  Okay.  Did you -- to the best of your
3  recollection, did you ever have any conversation
4  with anyone from Summa about the nature of the
5  changes made by Lawson to the functionality of
6  Punchout?
7        MR. JACOBS:  Objection as to form.
8    A.  I don't recall any such conversation.
9    Q.  If you take a look at the letter that's
10  attached that went out over your name attached to
11  your e-mail on Hager Deposition Exhibit 17, is there
12  any intended reference here to any change between
13  the functionality of Punchout as sold prior to
14  May 23rd -- or prior to May 18, 2011, and the
15  functionality of Punchout after May 18th, 2011?
16    A.  No.  I don't see any reference of Punchout
17  anywhere in the letter.
18    Q.  I want to look at Exhibit 18 also in
19  reference to the Summa Health Systems potential
20  client and direct your attention down to the bottom
21  e-mail that you were asked about.  Do you see that?
22  May 26th, 2011, 6:08 p.m., from you to three
23  individuals, two of whom were at Summa Health?
24    A.  I see that.
25    Q.  The second sentence begins -- well, I'll

Page 162

1  read the whole sentence for the record.  "Attached
2  you will find a letter signed by me that addresses
3  all of the core concerns outlined on my call today
4  with Jay."  Why did you use the phrase "signed by
5  me" as opposed to simply saying enclo -- attached
6  you will find my letter of this date?
7    A.  For the same reason of why I used the
8  wording I did with Harry:  That it was authored by
9  others at Lawson, signed by me, so therefore coming
10  from Lawson.
11    Q.  It says it addresses all of the core
12  concerns outlined in my call today.  Do you recall
13  whether anyone raised any concern whatsoever that
14  related to Punchout or EDI?
15    A.  I don't recall the conversation, but since
16  it says "all concerns" and it's not referenced in
17  the letter, my conclusion would be that Punchout
18  wasn't discussed.
19    Q.  The next paragraph begins with the
20  following sentence:  "We are very confident that
21  Summa will see zero negative impact from the slight
22  product configuration change we have made in regards
23  to the patent claims."  It continues, "In fact, we
24  believe you will end up with a solution that is
25  actually better."  Do you see that?

Page 163

1    A.  I do.
2    Q.  Did you ever describe to a customer the
3  changes made to the functionality of Punchout as
4  being "slight"?
5    A.  I don't recall that, no.  I don't have any
6  recollection of ever saying something like that.
7    Q.  Just going back for one moment to the issue
8  about maintenance revenues for healthcare
9  customers --
10    A.  Okay.
11    Q.  -- do you recall that discussion?
12    A.  I do.
13    Q.  Did you talk with anyone about revenues --
14  maintenance revenues from healthcare customers
15  before you testified at the injunction hearing on
16  March 25th, 2011?
17    A.  In relation to this case, or --
18    Q.  In --
19    A.  -- in general?
20    Q.  In relation to the healthcare customers and
21  whether they should or could be enjoined.
22    A.  I had -- prior to March, I don't recall any
23  specific financial analysis of maintenance-paying
24  customers that were not for healthcare specifically.
25    Q.  All right.  Was any part of your testimony

Page 164

1  on March 18th directed to trying to somehow ensure a
2  continuation of healthcare client maintenance
3  payments?
4    A.  Oh.  It was March 25th.
5    Q.  I'm sorry.
6    A.  You mentioned March 18th.
7    Q.  March 25th.  You're correct.
8    A.  My concern was not around maintenance
9  payments for healthcare.  My only testimony was what
10  impact an injunction could have on the healthcare
11  client themselves.  That was what my focus of the
12  discussion was.
13        MR. JACOBS:  Objection as to form.
14  The testimony will speak for itself.  Go ahead.
15    Q.  If you'd look down at the bottom of your
16  stack to Exhibit 3.
17    A.  I should have kept this neater.
18        MR. WITTHOEFFT:  PX-1 --
19        THE WITNESS:  Which one is it?
20        MR. WITTHOEFFT:  PX-1258.
21        THE WITNESS:  Okay.
22        MR. WITTHOEFFT:  I'll try and get
23  those straight for you.
24        MR. JACOBS:  (Handing.)
25        MR. WITTHOEFFT:  There you go.

Page 165

1      THE WITNESS:  Oh.  There it is.  Thank
2  you.
3      A.  Okay.  Yes.
4      Q.  Just taking you back to this document
5  that -- you were questioned initially or at some
6  point about the last page, which is a e-mail from
7  Harry Debes to a number of people, including
8  yourself.  Do you see that?
9      A.  I do.
10      Q.  And there is -- there are two points in
11  a -- in a bolder type under the second question that
12  you were asked about on cross-examination.  Do you
13  see that?
14      A.  I do.
15      Q.  Do you know whether those two points were
16  in the memo that was sent out on Wednesday, March 9,
17  at 12:49 p.m. or whether those two points were
18  inserted later in connection with one of the
19  subsequent memos that did not go to you?
20      A.  I can't state for fact, but my strong
21  assumption would be that they were inserted later,
22  based on the words in it, that it's bold, that it's
23  different formatted, and the fact that it's been
24  forwarded several times and that Harry wouldn't have
25  been able to write those words.

Page 166

1      MR. JACOBS:  Mr. Thomasch, I'll
2  stipulate they were -- they were added later.
3      MR. THOMASCH:  Okay.  I'll accept that
4  stipulation.
5  BY MR. THOMASCH:
6      Q.  The Punchout proposal, if you would just
7  look at that, read it to yourself?
8      A.  Okay.  (Pause.)  Okay.
9      Q.  Are you aware of whether that proposal that
10  appeared in these e-mails in -- between March 9 and
11  11, 2011, was actually the Punchout redesign that
12  was implemented?
13      A.  I can't say for certain, no.
14      Q.  On the first page in the second e-mail, the
15  third sentence reads --
16      A.  I'm sorry.  The first page.
17      Q.  First page.
18      A.  Second e-mail.  Got it.
19      Q.  Right.  That's sort of in the middle of the
20  page.
21      A.  Yep.
22      Q.  And then in the middle of that, there's a
23  sentence, it's I think the fourth sentence.  "Right
24  now I think Bob Crawford will be doing the
25  noninfringement assessment on the design around."

Page 167

1      Do you see that sentence?
2      A.  I do.
3      Q.  Do you know who Bob Crawford is?
4      A.  I didn't know Bob Crawford.  The name rings
5  a bell.  I believe he was the person who is
6  essentially doing the -- an independent assessment
7  of -- of whether or not things infringed or not.
8      Q.  Did he ever communicate directly with you
9  to -- to get your views on -- on -- on
10  design-arounds or non-infringement assessments?
11      A.  Not that I recall, no.
12      Q.  Did you have any responsibility for either
13  of those subjects?
14      A.  No, nor knowledge on them.
15      Q.  I'd like to look at -- if you could fish
16  out both Exhibit 4 and Exhibit 6?
17      A.  In this pile.  I'm -- there we go.
18  There's 6.  And here's 4.  Okay.
19      Q.  Okay.  Let's start with 6.  I want to go to
20  the second page, and specifically, I want to follow
21  up questions that you were asked earlier today with
22  regard to the May 26th, 2011 9:00 p.m. e-mail sent
23  out from Jennifer Langer to a number of people with
24  a number of CCs.  Am I correct you are not a -- a
25  recipient in any way, shape, or form of this e-mail?

Page 168

1  Is that correct?
2      A.  Correct.
3      Q.  And this e-mail is attached to a chain of
4  e-mails that goes up, by my count -- one, two,
5  three, four, five, six -- seven additional e-mails,
6  and would you just look at those and see whether you
7  received any of those later e-mails that would have
8  had this included.
9      A.  No, I did not.  Oop.  The -- at the very
10  top, there is a note from Jim to me that says -- Jim
11  Catalino to me that says can we go back to court and
12  get additional 38 customers cover until November.
13      Q.  And then it contains "the number 277 is not
14  enough"?
15      A.  Yes.
16      Q.  Do you know whether you ever responded to
17  that inquiry?
18      A.  No.
19      Q.  Okay.  Let's go down to the -- the Jennifer
20  Langer e-mail of May --
21      A.  M-hm.
22      Q.  -- 26.  Am I right that you were asked at
23  length about the third paragraph in which Jennifer
24  Langer says, "To quote Dean" and it continues on?
25      A.  I do see that, and yes I remember being

Page 169

1    questioned about it.
2        Q.  And am I right, you do not have a
3    recollection of -- of any conversation with Jennifer
4    Langer that may have been the basis for this
5    information?  Is that correct?
6        A.  That's correct.
7        Q.  I want to draw your attention to in the
8    middle of Ms. Langer's paragraph, where she says,
9    and I quote, "The number of around 250-300 went to
10   Dean."  And that would be in regard to the
11   healthcare customers?  Is that what you understand
12   from reading this?
13       A.  From reading this, that appears to be what
14   they're writing about.
15       Q.  Did any --
16       A.  She's writing about.
17       Q.  Did anyone ever provide you with a
18   statement that around 250 to 300 healthcare
19   customers were at issue?
20       A.  I don't recall it, nor have I been able to
21   find it in any of the other e-mails or documents
22   that have been going around.
23       Q.  If you look at e-mail 4 -- I'm sorry --
24   Exhibit 4 --
25       A.  M-hm.

Page 170

1        Q.  -- on the second page, there is an e-mail
2    to you from Mr. Lohkamp.  Correct?
3        A.  Yes.
4        Q.  11:07 a.m. on March 25, and Mr. Lohkamp
5    says, "Over 270 Healthcare customers"?
6        A.  Correct.
7        Q.  Was that consistent with the testimony you
8    gave in court?
9        A.  It is consistent, yes.
10       Q.  Is the testimony you gave in court, was
11   that your best understanding and -- at the time you
12   gave it?
13       A.  That was my best understanding.
14       Q.  Was there any attempt to for any reason
15   deceive the court in regard to that number?
16       A.  No.
17       Q.  Is Ms. Ha -- is -- as far as you know, is
18   there any basis whatsoever for Ms. Langer's
19   statement that the number of around 250 to 300 went
20   to Dean?
21       A.  I see no basis that that's even a true
22   statement, no.
23       Q.  And do you have any knowledge of ever
24   having received such a number?
25       A.  I have no knowledge of receiving such a

Page 171

1    number.
2        Q.  Were there some healthcare -- withdrawn.
3            Were there some customers of Lawson who
4    were classified by Lawson as healthcare customers
5    who did not actually provide medical services to
6    patients?
7        A.  Yes is the answer.  They're -- within the
8    healthcare industry, there are different types of
9    healthcare companies.  Some might be healthcare
10   payers, some might be healthcare providers, so yes,
11   we had members of our customer base that were not
12   purely a healthcare provider.
13       Q.  What do you mean by a "healthcare payer"?
14       A.  Insurance company.  Like that -- that type
15   of a -- an insurance company that just provides
16   coverage for healthcare benefits would be considered
17   in the healthcare vertical, but they would not be
18   considered a healthcare provider or a hospital.
19       Q.  Were you ever attempting to identify those
20   to somehow seek an extension of the implementation
21   time for the healthcare payer customers?
22       A.  My intent was always to watch out for the
23   providers, because that's where I thought the
24   greatest usage of the product was and the most
25   potential harm that could be done to our clients.

Page 172

1        Q.  If you could turn to Exhibit 9, please.
2            MR. THOMASCH:  Do you have it, Paul?
3            MR. JACOBS:  I have it now.
4            MR. THOMASCH:  Okay.
5    BY MR. THOMASCH:
6        Q.  And Dean, do you have it?
7        A.  Not quite yet, but I am now ordering them
8    so I can get the right --
9            (Laughter.)
10       A.  -- on this.  There's 8.  The last one I
11   look at.  Okay.  Yes, I have it.
12       Q.  So I have a number of questions on -- on
13   this.  If you'd look through it, I first want to
14   direct your attention to the third page, which
15   appears to be an attachment to the first two pages
16   dated April 1, 2011, from the Lawson Legal
17   Department to Executive Management, Re line:  CUE
18   Messaging for ePlus Patent Infringement Case.  Do
19   you see that?
20       A.  I do.
21       Q.  And that document is five pages long.  Is
22   that correct?
23       A.  Correct.
24       Q.  Did you have any role in preparing this
25   document whatsoever?

Page 173

1    A.  No.
2    Q.  Do you know who prepared the document?
3    A.  Not for fact, no, but communications was a
4  collaborative effort between our legal team and our
5  corporate communications team.
6    Q.  And are you on either of those teams?
7    A.  No.  Or I wasn't when I was employed there.
8    Q.  Better answer.  More accurate.  To your
9  knowledge, was anything said by Lawson speakers at
10  the CUE conference regarding the design-around of
11  the products that had been at issue in the ePlus
12  trial?
13    A.  To my recollection, nothing was said about
14  that at CUE.
15    Q.  And would you look at the second page now
16  of the exhibit itself, which is the e-mail -- part
17  of the e-mail trail.
18    A.  Okay.
19    Q.  And just to refresh your recollection, the
20  bottom of the first page bridges over to the second
21  page with two conflicting recommendations as
22  described by Jennifer Langer in an e-mail in which
23  you're copied.  Do you see that?
24    A.  I do.
25    Q.  And I want to just go over to the second

Page 174

1  recommendation, which relates to the S3 group
2  recommendation.  Do you see that?
3    A.  I do.
4    Q.  It talks about -- in the second sentence,
5  it says, without this reassurance and execution, the
6  business will potentially be damaged as in excess of
7  $5 million of fourth quarter opportunities --
8  withdrawn.  Let me read that one more time.
9    "Without this reassurance and execution,
10  the business will potentially be damaged as in
11  excess of $5 million of Q4 opportunities contain
12  RSS," period.  RSS would be considered a critical
13  component of these competitive situations, period.
14  Do you see that?
15    A.  I do.
16    Q.  And it follows up immediately, "In
17  addition, we need to swiftly inform AE's and Sales
18  Leaders to remove Punch-out from their Q4
19  contracts," period.  Do you see that?
20    A.  I do.
21    Q.  Do you understand the discussion of RSS and
22  Punchout as being different situations there?
23    A.  Correct.
24    Q.  And was there a plan in place if at some
25  point there was a solution to RSS but no solution to

Page 175

1  Punchout, to simply go through with deals but pull
2  the Punchout product out of the deal?
3    A.  That's correct.
4    Q.  Had that needed to be done, would that --
5  pulling Punchout out of the deal have in any way
6  amounted to a $5 million effect on fourth quarter
7  revenues?
8    A.  I couldn't state for exact dollar amount
9  any impact that there would have been, but the
10  $5 million is not referring to the Punchout pullout,
11  it's referring to the RSS pullout, so certainly, no,
12  $5 million would not be exposed if Punchout had been
13  pulled out of those deals.
14    Q.  Where it says "RSS would be considered a
15  critical component to these competitive situations,"
16  did you understand that to mean that without RSS,
17  there would be no deal?
18    A.  In all likelihood, yes.
19    Q.  Did that same analysis apply to Punchout?
20    A.  No.
21    Q.  Did you have an understanding of what
22  percentage of Lawson's RSS customers had Punchout at
23  or about the time of these memos in -- in spring of
24  2011?
25    A.  I can't recall.

Page 176

1    Q.  If I suggested to you that it was about
2  10 percent, would that seem a reasonable estimate or
3  considerably too high or considerably too low?
4    MR. JACOBS:  Ob -- objection as to
5  form.
6    A.  I would have no reason to challenge that
7  estimate.
8    Q.  But --
9    A.  It was a minority.  It was not a majority.
10    Q.  All right.  But you don't have further
11  specific information?
12    A.  Correct.
13    Q.  If you would look at Exhibit 10, please.
14  Do you recall being asked questions about this
15  document in connection with messages being sent at
16  the 2011 CUE conference?
17    A.  I do.
18    Q.  And I'd ask you to turn your attention to
19  Pages 5 through 9.  Is that the part of the document
20  that is the Say/Don't Say Guidance?
21    A.  Yes, because what was customary is we would
22  put out a series of press releases specifically
23  around products, and this was our education to our
24  employee base of what is the proper messaging around
25  that announcement.

Page 177

1    Q.  Okay.  And was this giving direction to
2  Lawson spokespersons about what they should say and
3  what they should not say at the CUE conference in
4  2011?
5    A.  By "Lawson spokespersons," if you mean all
6  Lawson employees and present -- present at the show,
7  the answer is correct, yes.
8    Q.  Okay.  And were you the primary
9  spokesperson in any of the listed respects?
10    A.  No.
11    Q.  If you would go to the first -- I'm
12  sorry -- the -- first page of the attachment,
13  the CUE 2011 Say/Don't Say Guidance, Page 1, do you
14  see that?
15    A.  Yes.
16    Q.  There is reference at the top under
17  "General guidelines for," and there are four bullet
18  points.  Do you see that?
19    A.  Yes.
20    Q.  And the first bullet point is talking about
21  Infor/Golden Gate Capital's unsolicited proposal.
22  Do you see that?
23    A.  I do.
24    Q.  What is that generally referring to?
25    A.  At the time, Infor's ownership, the private

Page 178

1  equity fund Golden Gate Capital was pursuing an
2  acquisition of Lawson Software and had put forward
3  an unsolicited offer and a press release had gone
4  out to indicate that, so this was informing our
5  employees how they should respond to the fact that
6  this press release was out there.
7    Q.  Was Lawson a publicly held company at that
8  time?
9    A.  At that time, yes.
10    Q.  And was there concern about po --
11  compliance with federal securities laws if mention
12  was made to some individuals at the conference of
13  information about that deal and not made to the
14  general public?
15    A.  Exactly.  That's exactly what the concern
16  was.
17    Q.  And -- and what -- what did you understand
18  that concern to be generally?
19    A.  As a publicly traded company, if you
20  disclose any confidential information to one person,
21  you have to disclose it to the entire population, or
22  the -- via press release to all potential investors,
23  so therefore, since nothing was official from the
24  per -- from an acquisition perspective, we couldn't
25  have our employees at CUE speculating on what might

Page 179

1  happen, and so this type of document is to remind
2  them not to try to speculate on what happened and
3  just refer them to the proper people within the
4  company for proper messaging.
5    Q.  If you'd go to Page 3 of this Exhibit 10 of
6  this deposition --
7    A.  Yes.
8    Q.  -- in the top paragraph, do you see that
9  there was a quote that, if you go back to the prior
10  page, is described as a message you can share with
11  customers at the event until a court decision is
12  reached?
13    A.  Yes, I see it.
14    Q.  Okay.  And you were questioned about that,
15  and I believe the phrase that was used to describe
16  this was that Lawson was working on a solution.  Is
17  there any reference to a solution having been
18  achieved in this paragraph as you read it?
19    A.  Not to one having been achieved, no.
20    Q.  Is there any reference to the existence of
21  a design-around in place at that time?
22    A.  No.
23    Q.  Was that intentional?
24    A.  That was intentional.
25    Q.  Looking down at the five bullet points

Page 180

1  which are additional message -- messaging, do any of
2  them, to your eye, relate in any way to the
3  design-around issue?
4    A.  None of them relate to the design-around
5  issue.
6    Q.  Do any of them relate to Punchout?
7    A.  None of them relate to Punchout.
8    Q.  Looking at the next exhibit, Exhibit 11, I
9  want to take you down to what was described in your
10  questioning -- in the questions presented to you as
11  a -- as a draft press release, which bridges the
12  bottom of the first page of Exhibit 11 and carries
13  over onto the second page.  Do you see that?
14    A.  I do.
15    Q.  And do you see the words "discussion draft"
16  and then "4/6/2011"?
17    A.  Yes.
18    Q.  Is it your understanding that this was a --
19  a document that was ready to be released as of
20  April 6th, 2011?
21    A.  No.
22    Q.  Do you know whether, if the -- do you have
23  any knowledge as to whether, if the injunction had
24  come down on April 6th, 2011, a press release
25  similar to this would have been issued?

Page 181

1    A.  We discussed the probability that we would
2  need to issue some kind of a release if the
3  injunction came out, but I can't say for certain
4  that we would have since it didn't happen at that
5  time, but that was the discussion at the time.
6    Q.  If you'd go to Exhibit 13, please.  Do you
7  recall being questioned about these -- the series of
8  e-mails all dated Wednesday, April 13?
9    A.  I do.
10   Q.  Do you know as you sit here today whether
11  or not anyone at Lawson had determined that they had
12  a final redesign of the products found to be
13  infringing at the ePlus trial?
14   MR. JACOBS:  Objection as to form.
15   A.  I know at this time there was not -- what
16  was the wording that you used for it?
17   Q.  A final redesign, I believe is what I said.
18   A.  Yeah.  I know at this time there was not a
19  final redesign on the product.
20   Q.  Was the status of the redesign effort, to
21  the best of your knowledge, more advanced on
22  April 13th than it had been on March 25th when you
23  testified?
24   A.  Certainly, yes.
25   Q.  If indeed anyone at Lawson was of the view

Page 182

1  that by April 13th, they were confident that a
2  future redesign was achievable, if you accept
3  that -- that hypothesis, would that in any way cause
4  you to question the accuracy of what you testified
5  to in court on March 25th?
6    A.  No, not at all.
7    Q.  You were not asked about redesigns on
8  March 25th, were you, sir?
9    A.  Correct.  I was not.
10   Q.  Had you been asked about a redesign on
11  March 25th, 2011, would you have felt that there was
12  a redesign at that date that was sufficiently
13  advanced that you would be confident that it would
14  ultimately be released?
15   A.  No.  I had no confidence at that time.
16   Q.  Would you look at Exhibit 14, please?
17   A.  Yes.
18   Q.  There is a reference in -- this is the
19  e-mail from Mike Cohen to Dean Hager and Bruce
20  McPheeters sent April 22, 2011, at 11:59 a.m.
21  Correct?
22   A.  Correct.
23   Q.  There's a reference in the second line and
24  the last line of the e-mail to the acronym "RC."  Do
25  you see that?

Page 183

1    A.  I do.
2    Q.  And your assumption as you sit here today
3  is that is a predecessor to the RQC acronym that is
4  used to describe Requisition Center.  Is that right?
5    A.  That would be my assumption.
6    Q.  And do you see the last sentence of the
7  e-mail says, "Can legal be involved in reviewing any
8  field flashes or other communications related to RC
9  and Punchout?"  Do you see that?
10   A.  I do.
11   Q.  Did you distinguish between RC and Punchout
12  or Requisition Center and Punchout?
13   A.  Yeah.  They were two separate products.
14   Q.  And were there -- RQC was a replacement for
15  RSS.  Is that correct?
16   A.  Correct.
17   Q.  And Punchout was redesigned as Punchout.
18  Is that right?
19      MR. JACOBS:  Objection as to form.
20   A.  That's my understanding.
21   Q.  Okay.  And the changes that were -- let me
22  withdraw that.
23      Were there changes made after the jury
24  verdict -- at any time after the jury verdict, were
25  there changes made to the functionality of Punchout?

Page 184

1    A.  Yes, that's my understanding.
2    Q.  And that would -- became the redesigned
3  Punchout.  Is that right?
4    A.  That became the redesigned Punchout, yes.
5    Q.  To the extent of your knowledge, are the
6  code changes that affect the functionality of
7  Punchout, were they made to the Punchout module or
8  to the RQC module?
9    A.  I can't speak with great expertise on it,
10  but I believe that there were changes made in both
11  locations in regard to that.  I -- I know that
12  Punchout had redesign and RQC did, and since you
13  launched Punchout from RQC, that there had to be a
14  certain level of changes in RQC as well.  Yeah.
15   Q.  And when you read Lawson e-mails that
16  relate to changes to RQC, are you -- do you
17  understand those to relate to the
18  direct-to-requisition and order-list issue or the
19  Punchout issue?
20   A.  Gosh, I don't --
21   Q.  If you have -- if you have any
22  understanding at all.
23   A.  It's -- it's probably -- I don't know that
24  I would even draw a conclusion from that.  Yeah.
25   Q.  Then I won't ask any further questions on

Page 185

1    it.
2        A.  Okay.
3        Q.  Looking at Exhibit 15.
4        A.  I'm jumbled again.
5        Q.  There's a -- I'm sorry?
6        A.  I'm still having a little bit of an issue
7    here.
8        Q.  Tell me when you have it.
9            MR. JACOBS:  This one, PX-1094 at the
10   top.
11       A.  1094.
12       Q.  That's the one.
13       A.  There we go.  Okay.
14       Q.  The field of candidates was narrowing.  So
15   I want to take you down to that part of the e-mail
16   that you were particularly questioned about earlier
17   today from you to Jennifer Langer with a number of
18   CCs Wednesday, May 4, 6:00 a.m.  Do you see that?
19       A.  Yes.
20       Q.  So this is in part a comment on the letter
21   to AE's.  Is that account executives?
22       A.  Yes.
23       Q.  And -- and is that correct, this is your
24   e-mail comments on that letter?
25       A.  Correct.

Page 186

1        Q.  And when you say "There is one big question
2    that isn't answered," did I understand you to say
3    that if you were the recipient, as a customer of
4    this inquiry, the inquiry doesn't address one
5    question?
6        A.  Yes.  I was -- I was writing that question
7    as if I were the customer.
8        Q.  And that question is, "Does Requisition
9    Center do the same things and work similar to the
10   RSS demo that I saw?"  Do you see that?
11       A.  I see that.
12       Q.  Did you intend that question to address
13   Punchout?
14       A.  Not the way that I wrote it, and I don't
15   recall having written that in a way to address
16   Punchout.
17       Q.  Do you know whether this letter to AE's was
18   ultimately used?
19       A.  I don't know for certain.
20       Q.  In the basic messaging that appears in
21   points one through four in that same portion of the
22   e-mail?
23       A.  Yes.
24       Q.  Does any of that -- was any of that
25   intended by you to specifically relate to Punchout?

Page 187

1        A.  The way that I have it written here, I'm
2    only addressing the RSS to RQC, as that was far and
3    away my greater concern at the time.
4        Q.  Do you know whether any of the deals
5    referenced in this e-mail even related to customers
6    who had licensed either Punchout or EDI?
7        A.  I mean, from -- it -- it looks like we're
8    simply -- we're addressing the RSS-to-RQC customers.
9    I don't see anything in here specifically that's
10   relating to Punchout.
11       Q.  If you'd look at Exhibit 16.
12       A.  Here we go.  Okay.
13       Q.  Do you recall being questioned by
14   Mr. Jacobs on this with respect to whether you had
15   had any communications with customers about the
16   availability of a replacement product before the
17   injunction?  Do you recall being asked that?
18       A.  Am I on the right exhibit?  I -- I don't
19   know that that question maps to any relevance of the
20   exhibit that I'm on.  I'm -- it's 16?
21           MR. WITTHOEFFT:  16.
22       Q.  It is 16, and you --
23       A.  This is regarding the M3 dialogue.
24       Q.  You're right.  The -- the -- the --
25   questioning occurred after Exhibit 16 and it doesn't

Page 188

1    actually --
2        A.  Oh.  Okay.
3        Q.  -- refer to Exhibit 16.
4        A.  Okay.
5        Q.  But do you recall earlier in the deposition
6    being questioned by counsel for ePlus as to whether
7    or not you had made any disclosures to any customers
8    about the availability of a replacement product
9    before the injunction issued?
10       A.  I do recall that questioning.
11       Q.  All right.  And if I represent to you that
12   there was a generally available date on the RQC
13   product as of May 18 and the injunction issued on
14   May 23rd --
15       A.  Yes.
16       Q.  -- would that influence your thinking as to
17   whether you were likely to have spoken to any
18   customer about the availability of the product
19   before May 23rd?
20           MR. JACOBS:  Objection as to form.
21       A.  Yes.
22       Q.  In what way?
23       A.  In that when a product became generally
24   available, I typically began speaking with clients
25   right away on that topic.  And since the product

Page 189

1  became generally available prior to the injunction
2  coming out, in all likelihood, I had several
3  conversations with clients after May 18th but before
4  the 23rd.
5      Q.  And by the time anyone made an application
6  for a post-injunction stay, the product was not only
7  a possible redesign, it was generally available to
8  the public and known as such.  Correct?
9      A.  That's my understanding.
10     Q.  Was it your understanding as the general
11 policy at Lawson to not identify to the public
12 projected release dates for new software?
13     A.  That was our policy.
14     Q.  And why is that?
15     A.  Because IT projects are so unpredictable,
16 it's very hard to predict with accuracy into the
17 future of when they will deliver.  Many of them push
18 or get cancelled, so it was our policy not to
19 communicate to clients future delivery of product.
20     Q.  And to the best of your knowledge, did you
21 ever disclose to any Lawson client the availability
22 or future availability of the RQC product before its
23 May 18, 2011 release date?
24     A.  I have no recollection that I did that and
25 I would be very -- my assumption would be that I

Page 190

1  wouldn't, because I was pretty -- fairly disciplined
2  about that.
3      Q.  About providing specific target dates?
4      A.  About not providing significant -- or
5  future target dates for products, yes.
6      Q.  To what extent in -- if any, were you a
7  contributor to the ideas that led to the product
8  redesign that limited the prior functionality of
9  Punchout?
10     A.  Almost none.
11     Q.  To what extent, if any, during your tenure
12 at Lawson did you have responsibility for
13 determining what affect any product changes would
14 have on the infringement allegations that had been
15 made against the prior product?
16         MR. JACOBS:  Objection as to form.
17     A.  I had no responsibility and in -- in making
18 that determination.
19     Q.  Did you participate in any way in
20 infringement analyses on potential redesigned
21 products?
22     A.  No, not at all.
23     Q.  Were you responsible when at Lawson for
24 making determinations as to which customers would
25 receive maintenance and support following the

Page 191

1  injunction?
2      A.  I -- I did have some dialogue on that
3  topic, yes.  I recall having a dialogue on that
4  topic.
5      Q.  And -- and what do you recall in that
6  regard?
7      A.  My position at that time was to take the --
8  that Lawson should take the most conservative
9  approach so that we make sure not to make any
10 further mistakes in the eyes of the court.
11     Q.  And -- and did that go so far a --
12 withdrawn.
13         Did Lawson have customers who, in addition
14 to having the infringing configurations, also had
15 unrelated systems such as human resources or
16 accounting packages?
17     A.  Yes, that is the case.
18     Q.  And -- and were you involved in some
19 discussions about whether there may be a need to
20 preclude service on those unrelated components?
21     A.  Yeah.  I did not own the support
22 organization, but as the person representing the S3
23 customers, it was my position that we should deny
24 support for any customer that has the -- what's the
25 right -- the products that had been enjoined no

Page 192

1  matter what products that they had, so that we
2  couldn't even provide them service -- or support, I
3  should say, on their HR products, even though that
4  was outside the scope, because I wanted to be extra
5  conservative of providing them any support at all.
6         That was a little bit poorly stated, but
7  did you follow me?
8      Q.  Yes.  To your knowledge, did the ultimate
9  decision in how to deal with those unrelated
10 components and service, was that ultimate decision
11 in the hands of the lawyers and the legal
12 department?
13     A.  Yeah.  Ultimately, it was in the hands of
14 the lawyers and the legal department.
15     Q.  At any part in this process, have you
16 attempted to overrule or effect the decision that
17 came out of the lawyers involved in the redesign?
18     A.  No.
19     Q.  Thank you very much.  Nothing further.
20     A.  Thank you.
21         MR. WITTHOEFFT:  I have no questions.
22         RECROSS-EXAMINATION
23 BY MR. JACOBS:
24     Q.  I have a few follow-up questions to that.
25     A.  Okay.

Page 193

1   Q. Mr. Hager, before the court issued its
2 injunction on May 23, 2011, did you know exactly
3 what modules would be enjoined?
4   A. No.
5   Q. Did you know whether RSS would be enjoined?
6   A. I didn't -- I didn't know what would be
7 enjoined prior to the injunction.
8   Q. All right. So the concern was with all of
9 the related functions that had been -- as part of
10 the jury verdict in that case. Is that right, sir?
11   A. I'm not sure I understand the question.
12   Q. Well, was -- was Punchout a concern as to
13 whether that would be enjoined?
14   A. That was part of the concern, yeah.
15   Q. And EDI?
16   A. I don't recall any conversations on EDI.
17   Q. RSS?
18   A. I just -- in general, we talked about RSS
19 and Punchout.
20   Q. Okay. The 277 healthcare customers that
21 you testified to and we've had through these
22 depositions --
23   A. M-hm.
24   Q. -- do you know whether or not any
25 healthcare customers had Punchout and EDI?

Page 194

1   A. Whether "any"?
2   Q. Yes.
3   A. I couldn't quote an exact number, but I
4 think I was asked earlier and I said that some of
5 our healthcare customers did have Punchout. I
6 didn't say anything about EDI as I don't have
7 expertise there.
8   Q. Okay. Do you know as a fact that Summa
9 healthcare does not have Punchout or did not buy
10 Punchout?
11   A. I -- I don't know if they bought anything.
12 I -- I don't recall that. As -- as I recall,
13 they -- they weren't a customer, which is what I had
14 said in the letter that went to them.
15   Q. Do you know whether they were presented
16 with Punchout as a -- as an option for their
17 procurement system?
18   A. I -- I don't know. I just know that I
19 didn't refer to it in the letter.
20   Q. Sir, how do you know that the design-around
21 was more advanced on April 13 than on March 25?
22   MR. WITTHOEFFT: Object to the form.
23   A. Only in that the work was continuing from
24 March -- March 25th to April 13th, and in a series
25 of e-mails that was put out after March 25th, there

Page 195

1 seemed to be progress in doing the work, so if you
2 compile all of that activity, it sure appeared that
3 there was progress.
4   Q. Do you know one way or the other whether
5 there had been one change in terms of the coding
6 between March 25 and April 13?
7   MR. THOMASCH: Objection to form.
8   A. Do I know whether there had been coding
9 between March 25 and April 13th?
10   Q. Yes, sir.
11   MR. THOMASCH: Objection to form.
12   A. I didn't actually watch the coders, but I
13 was told that there was much coding that was going
14 on, yes.
15   Q. Do you know whether -- what the changes
16 were between March 25 and April 13?
17   A. No. I mean, that wouldn't be my area of
18 responsibility or knowledge.
19   Q. So you can't say whether it was advanced,
20 more advanced, or less advanced, can you, sir?
21   MR. THOMASCH: Objection to form,
22 misstates the record.
23   A. Based on what was reported to me, I would
24 say yes, it was more advanced on April 13.
25   Q. And who reported that to you, sir?

Page 196

1   A. The R&D team, the product management team,
2 the legal team.
3   Q. And what did the legal team tell you?
4   A. I don't recall the exact wording, but, I
5 mean, it's all over the e-mails that you're showing
6 me, that things had progressed.
7   Q. All right. And based on the e-mails
8 that -- that I showed you today, that's the basis
9 for your understanding that there had been progress
10 between March 25 and April 13?
11   A. Not just these --
12   MR. THOMASCH: Objection to form.
13   THE WITNESS: I'm sorry.
14   MR. THOMASCH: Objection to form.
15   A. Not just these e-mails, but I also remember
16 even the time through CUE and -- and shortly after
17 CUE that there was a lot of activity and progress
18 during those days, yes.
19   Q. But you can't tell me as we sit here today
20 what the activity was and what the progress was. Is
21 that right?
22   A. Only -- yeah. I mean, I don't -- like I
23 said, I don't look over the shoulders of the coders,
24 I couldn't tell you exactly what work was done, but
25 I can tell you that the teams that reported to me

Page 197

1    continued to report progress, yeah.
2        Q.  Turn if you would, sir, to Exhibit 6.
3        A.  Got it.
4        Q.  Okay.  And you see that -- I believe you
5    testified you were, in fact -- received the e-mail,
6    it was written to you, from Jim Catalino on May 27,
7    2011, in that e-mail string.  Do you see that, sir?
8        A.  I do see that.
9        Q.  All right.  And in that e-mail string,
10   Mr. Catalino says, "Can we go back to court to get
11   additional 38 customers cover until November."  Do
12   you see that?
13       A.  I do.
14       Q.  All right.  And were you part of the
15   discussion as to adding customers to that 277
16   number?
17       A.  Not that I recall, and I'm not sure who
18   sent this top e-mail here, but I don't -- I didn't
19   respond to it or I'm -- I'm not sure what that top
20   e-mail is.
21       Q.  Do you know why they wanted to add --
22   Mr. Cata -- Mr. Catalino wanted to add 38 customers
23   to the number of 277?
24       A.  Well, he owned the healthcare customers, so
25   as much relief as he could get for those customers

Page 198

1    as possible I imagine he wanted.
2        Q.  Do you recall there was a question as to
3    how to get as many as 277 customers to match your
4    list?
5            MR. THOMASCH:  Objection to form.
6        A.  I'm sorry?
7        Q.  Do you recall that there was, in fact,
8    discussion as to how to get up to 277 customers?
9        A.  "Up to"?
10           MR. THOMASCH:  Objection --
11       Q.  Yes, sir.
12           MR. THOMASCH:  Objection to form.
13       A.  Actually, that isn't how I recall the
14   conversation.
15       Q.  Tell me how you recall the conversation.
16       A.  I mean, obviously, in these e-mails, there
17   was a -- as this would indicate, there was a
18   discrepancy between the 277 and the final count that
19   somebody did, and my understanding was that the
20   final count was actually higher than the 277, and
21   thus I was, if anything, too conservative in court.
22       Q.  And did you have any discussion with anyone
23   about the fact that -- that there were -- that you
24   might have been too conservative in court and the
25   number could -- could have been higher?

Page 199

1            MR. WITTHOEFFT:  Object to the form.
2            MR. THOMASCH:  Objection to form.
3        A.  I recall being informed after that reports
4    that were being generated came in higher than 277,
5    as this e-mail would indicate.
6        Q.  Well, as someone who deals with these
7    customers, did you look at the reports to see if
8    those -- those numbers added up?
9        A.  That would have been the responsibility of
10   the team and nor would I have been able to bring any
11   extra expertise to that.  I would have trusted the
12   team to -- to come up with the proper count.
13       Q.  Okay.  Turn if you would to Exhibit 10.
14   That's the -- CUE Say/Don't Say e-mail with the
15   attached --
16       A.  Okay.
17       Q.  Got it, sir?
18       A.  Got it.
19       Q.  Okay.  Mr. Thomasch asked you about the
20   first page of the Say/Don't Say Guidance.
21       A.  M-hm.  Yes.
22       Q.  All right.  He asked you about talking
23   about the Infor/Golden Gate Capital's unsolicited
24   proposal?
25       A.  I see it.

Page 200

1        Q.  And you recall you told him that there were
2    various federal rules about disclosure and so forth?
3        A.  Yes.
4        Q.  The second bullet point, though, was
5    talking about the pending ePlus litigation.  Do you
6    see that?
7        A.  Yes.
8        Q.  You didn't mean your answer about federal
9    rules dealing with mergers to apply to that bullet
10   point, did you, sir?
11       A.  I wasn't referring to that bullet point at
12   all in my dialogue.
13       Q.  Okay.  How many customers did you talk to
14   between May 18 and May 23 about the new RQC product?
15       A.  I don't know.  I -- I don't recall.
16       Q.  Are you certain that you talked to any
17   customers between May 18 and May 23 about the new
18   RQC product?
19       A.  With absolute certainty, since I can't name
20   the customer, in fact I couldn't state by fact.
21       Q.  Okay.
22       A.  But I can, with a reasonable level of
23   certainty, say that I probably did, given that that
24   was my role when we came out with new general
25   availability products.  Not just this one, but

Page 201

1  whenever they came out, I typically talked with
2  customers shortly after.
3      Q.  And you're satisfied that you talked to
4  customers prior to the federal circuit denying your
5  stay?
6      A.  I don't remember when that was.
7      Q.  Well, if I told you it was May 25, 2011 --
8      MR. THOMASCH:  Close enough.  It's
9  certainly after May 23rd.
10     A.  Yeah.
11     Q.  Do you know to a certainty that you did
12 talk to customers about RQC prior to the issuance of
13 the --
14     A.  Again --
15     Q.  -- opinion on the stay?
16     A.  -- I can't remember exact days that I did,
17 but I know that it started after we GA'd the
18 product, so it wouldn't surprise me if I spoke with
19 customers about the GA'd product between those
20 dates.
21     Q.  No further questions.
22          REDIRECT EXAMINATION
23 BY MR. THOMASCH:
24     Q.  And just on that point, from your
25 perspective, was there any reason --

Page 202

1      A.  M-hm.
2      Q.  -- not to talk to customers about the new
3  product after it became generally available for
4  licensure?
5      A.  No.  There was no reason not to talk to
6  clients.  As a matter of fact, since it was a new
7  product we were proud of, we were enthusiastic about
8  talking to customers about it.
9      Q.  Was there any reason from your perspective
10 to not talk about when the product would become
11 generally available before it became available on
12 May 20 -- on May 18?
13     A.  Yeah.  Per policy, we did not talk about
14 the general availability dates of products prior to
15 them becoming generally available.
16     Q.  Nothing further.
17     MR. WITTHOEFFT:  I have no questions
18 of Mr. Hager.  He will waive the -- or not waive his
19 signature but reserve the right to review.  I know
20 there's a -- short fuse on -- on this transcript
21 and the hearing.
22     MR. JACOBS:  About as short as it
23 gets.
24     MR. WITTHOEFFT:  We will -- we will
25 certainly work with you to -- to make that -- make

Page 203

1  that work, but for the present purposes, he will not
2  waive.
3      MR. THOMASCH:  And I assume we can
4  stipulate he can sign before any notary and not
5  before this one?
6      MR. WITTHOEFFT:  Sure.
7      MR. THOMASCH:  That's okay?
8      MR. JACOBS:  (Nodding head.)
9      VIDEOGRAPHER:  We're going off the
10 record at about 12:47 p.m.
11     (The deposition concluded at 12:47 p.m.)

Page 204

C E R T I F I C A T E

I, Karen J. Macaulay, hereby certify that I am
qualified as a verbatim shorthand reporter;
    That I took in stenographic shorthand the
videotaped deposition under oath of DEAN HAGER at the
time and place aforesaid;
    That the foregoing transcript is a true and
correct, full and complete transcription of the
testimony of this witness, to the best of my ability;
    That the review of the transcript was reserved;
    That the cost of the original transcript has been
charged to the party who noticed the deposition and
that all parties who ordered copies have been charged
at the same rate for such copies;

    That I am not a relative or employee of any of the
parties or a relative or employee of any of the
attorneys;

    That I have no interest, financial or otherwise,
in this action and have no contract with the parties
or attorneys or persons with an interest in this
action;

    Witness my hand and seal this 23rd day of
March, 2013.

_____
KAREN J. MACAULAY
Registered Diplomate Reporter
Notary Public
Carlton County, Minnesota

Page 205

```
 1    A C K N O W L E D G E M E N T   O F   D E P O N E N T
 2
 3        I, DEAN HAGER, do hereby acknowledge I
 4    have read and examined the foregoing pages of
 5    testimony, and the same is a true, correct and complete
 6    transcription of the testimony given by me, and any
 7    changes or corrections, if any, appear in the attached
 8    errata sheet signed by me.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25   _____        _____
     DATE              DEAN HAGER
```

Page 207

```
 1    Capital Reporting Company
      1821 Jefferson Place NW
 2    Third Floor
      Washginton, D.C. 20036
 3    (202) 857-3376
 4        E R R A T A   S H E E T
 5    Case Name:  ePlus, Inc. vs. Lawson Software, Inc.
 6    Witness Name:  DEAN HAGER
 7    Deposition Date:  March 22, 2013
 8    PAGE NO.   LINE NO.        CHANGE/REASON FOR CHANGE
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25   _____        _____
     SIGNATURE              DATE
```

Page 206

```
 1    Charles F. Witthoefft
      Hirschler Fleischer
 2    2100 East Cary Street
      Richmond, VA 23223
 3
 4    In Re:  ePlus, Inc. vs. Lawson Software, Inc.
 5    Dear Mr. Witthoefft:
 6        Enclosed please find your copy of the deposition
 7    of DEAN HAGER, along with the original signature
 8    page.  As agreed, you will be responsible for
 9    contacting the witness regarding signature.
10        Within 21 days of March 25, 2013, please
11    forward errata sheet and original signed signature
12    page to counsel for the Plaintiff, Paul Jacobs, Esq.
13        If you have any questions, please do not hesitate
14    to call.  Thank you.
15    Yours,
16    Karen J. Macaulay, RDR
17
18    cc:  Paul Jacobs, Esq.
19        Daniel Thomasch, Esq.
20
21
22
23
24
25
```