IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| ePLUS INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:09CV620 (REP) |
| ) | |
| LAWSON SOFTWARE, INC., ) | |
| ) | |
| ) | |
| Defendant. ) | |

**LAWSON SOFTWARE, INC.'S OBJECTIONS TO PLAINTIFF'S
SUPPLEMENTAL SUMMARY OF THE DEPOSIITON OF DEAN J. HAGER**

Lawson Software, Inc. ("Lawson") hereby objects to Plaintiff ePlus, Inc's Supplemental Summary of The Deposition of Dean J. Hager on the following grounds. Lawson provides a counter-summary of Hager's testimony where ePlus's summary of the topic is misleading or incomplete. Hager was deposed under oath two times, first on January 26, 2012 ("H-I") and again on March 22, 2013 ("H-2")

**General Objections—Relevance**

Virtually all of the testimony of Hager that ePlus, Inc. ("ePlus") discusses in its summary is irrelevant to the issues the Court has defined for adjudication in this contempt hearing, namely: (1) whether the newly-accused products are more than colorably different from the previously adjudged-infringing products; (2) whether the newly-accused products infringe method claim 26 of the '683 patent (the only asserted patent claim remaining in this case); or (3) whether Lawson violated the terms of the Court's May 23, 2011 Injunction Order.[1]

As discussed more specifically below, much of ePlus's summary of testimony on changes made to the functionality of the accused products concerns changes not related to the changes at issue in this proceeding and is therefore irrelevant to the issues the Court defined for the contempt hearing in an order dated January 24, 2013.  D.I. 1002.

---

[1] The only part of the ePlus summary that relates to an issue in the scheduled hearing is the reference to Hager's testimony concerning a March 29, 2011 email stating that Punchout would have to be excluded from fourth quarter 2011 deals because there was no alternative at that time.

The Court's order scheduling the contempt hearing post-dated the Federal Circuit's decision invalidating system claim 1 of the '172 patent and system claim 3 of the '683 patent. The only design change(s) to Configuration Nos. 3 and 5 that could be at issue in the contempt hearing are:

>    (i) the changes in RQC that block a user from accessing and searching the Item Master after selecting an item from a Punchout vendor's website (and vice versa), and precluding the combination of items from Item Master and Punchout in a single requisition; and

>    (ii) the changes in RQC that block a user from accessing and searching a Punchout vendor's website if a requisition already contains items from a different Punchout vendor's website, and precluding the combination of items from different Punchout vendors on a single requisition.

Testimony and documents relating solely to non-Punchout related changes are not relevant.

The Court has divided the contempt hearing into two phases: the first phase to take evidence limited to whether the redesigned, newly-accused products are more than colorably different than the previously adjudged-infringing products; and the second phase to take evidence limited to whether the redesigned, newly-accused product continues to infringe. D.I. 1002. The Court has stated that evidence in the two phases will be taken separately. *See* 3/7/13 Tr. at 27-29. ePlus has not designated what portions of Hager's designated testimony, if any, will be offered in either the "colorability" or the "infringement" stages of the contempt hearing.

**Objections to Specific Hager Deposition Topics as Summarized by ePlus**

ePlus's summaries mischaracterize Dean Hager's testimony, or are incomplete, as follows:

**Status of the Redesign as of March 25, 2011**

ePlus selectively paraphrases Hager's testimony to imply that Hager was not forthcoming with the Court at the March 25, 2011 evidentiary hearing on the injunction because he did not volunteer that Lawson had a design around in place. The deposition testimony shows that summary is factually incorrect. Hager testified at deposition that Lawson did not have such a design around as of March 25, 2011. Hager was aware at the time of the March 25, 2011 hearing that any proposed design-around did not have legal approval, did not have committed delivery, did not have development commitment and that Lawson was unsure whether any proposed design around could be delivered. H-I 69:1-4; 71:16-17; 377:5-17; 356:6-357:1; H-I Ex. 5.

On March 29, 2011, Hager sent an email instructing Lawson employees to check to "see if pulling at a minimum, [P]unchout, and potentially even both [RSS and Punchout] harm the closing" of new software deals. H-II Ex. 7 (PX-1091). Hager did not testify that the ultimate design around relating to method claim 26 had even been raised or conceived as of that email's date. Rather, the documents reflect that as of March 29, 2011 Lawson expected to pull Punchout out of deals with customers because no acceptable design around had been achieved for method claim 26. H-II Ex. 7 (PX-1091); H-I Ex. 26 (PX-1109). Hager stated in a March 29, 2011 email that even where a customer required Punchout, Lawson would need to "pull Punchout out of the

2

deal" if Lawson were to be enjoined because, as of that date "We have no development alternative." H-I Ex. 26 (PX-1109). Hager was informed that Lawson was, with respect to Punchout, "still seeking Legal guidance on whether we can make our product non-infringing." H-I Ex. 26 (PX-1109).

### Hager's March 25, 2011 Testimony

There is no basis for ePlus's suggestion that Hager, a witness, was responsible to decide what information about a development project was relevant to, or should be presented at the March 25, 2011 injunction hearing. Neither Lawson's counsel, nor plaintiff's counsel, nor the Court, asked Hager about potential redesigns at the March 25, 2011 injunction hearing. H-I 71:18-6; 68:2-6; H-I Ex. 3 (3/25/13 Tr.). Nor was Hager asked about the cost or time it would take a customer to change from RSS to a redesigned Lawson product. H-I 366:4-367:19. Rather, he was asked about the time and effort required to completely remove RSS and replace it with a third-party's different product. H-I Ex. 3 at 219:1-16, 261:25-263:20; H-I 67:12-15, 88:17; 89:5-7; 357:11-365:15 (designated portions). ePlus gives an incomplete summary of this testimony when it says that Hager testified that "to move away from RSS would take around nine months at a cost of, in some cases, over a million dollars per client." ePlus omits that this testimony concerned switching from a Lawson product to a non-Lawson product, H-I 67:12-15, 88:17; 89:5-7; 357:11-365:15 (designated portions); H-I Ex. 6, in the context of very large hospital customers. H-I 61:16-63:5, H-I Exhibit 3 (3/25/11 Injunctive Relief Hearing Tr.) 262:3-263:20. Hager was specifically asked regarding the time it would take to "actually select and implement and verify" a replacement system for the accused infringing product. H-I Ex. 3 (3/25/13 Hearing Tr.) 219:1-12; H-I 360:12-362:21. His answer at the injunction hearing encompassed Configuration No. 2. That system, which represents more than 80% of the Lawson customers that had been covered by the May 23 Injunction Order, is not at issue in the contempt hearing. D.I. 1002.

Lawson asserts a relevance objection to the testimony regarding Hager's previous testimony at the injunction hearing. First, it is undisputed that Lawson disclosed to the Court, before the May 23, 2011 injunction, that it was planning to design around the patents. The Court discussed the potential design around in its Memorandum Opinion concerning the injunction. D.I. 728 at 42; H-I at 369:6- 370:12 (designated portions). Second, the cost of ripping out RSS and replacing the system with a third-party system was only relevant to damages under a disgorgement of saved costs theory, but ePlus abandoned that theory after the Federal Circuit invalidated the system claims in this case. Third, the testimony does not relate to whether the changes at issue are more than colorably different or whether RQC infringes method claim 26.

### The 277 Healthcare Customers

Lawson asserts a relevance objection to testimony regarding the number of healthcare customers Lawson had in May 2011. ePlus does not contend, and does not cite any Hager testimony suggesting that Hager overstated the number of healthcare customers. Hager's testimony that Lawson had 277 healthcare customers was his best understanding at the time he gave it, and if anything, understated the correct figure as shown by sales personnel later asking whether it was possible to "get an additional 38 customers to cover until November" because "the number 277 is not enough." H-II 170:10-16; H-II Ex. 6 (PX-1229). This subject does not relate to any issues in the contempt proceeding.

ePlus's summary regarding Hager's testimony on this subject is incomplete because it omits Hager's explanation that he testified regarding the 277 healthcare companies providing patient care because he was worried about forcing those customers off their systems too quickly. H-II 7:16.  Although, Lawson has healthcare customers who are not healthcare providers but are instead insurance companies, Hager attempted to identify only the healthcare providers because "that's where [he] thought the greatest usage of the product was and the most potential harm that could be done to [Lawson's] clients." H-II 171:2-25.

Lawson objects to Hager II Exhibit 6 in which Jennifer Langer states that Hager told her that the Court created the 277 number from some "fantasy." The exhibit and its subject matter are irrelevant to the issues in this case, and the document contains hearsay within hearsay. ePlus further mischaracterizes the document and the testimony by failing to point out that Hager does not recall having any conversation with Langer that would have been the basis for the statements she attributes to him. H-II 169:2-6. ePlus also misleadingly states that "Mr. Hager was a recipient of the email string in which Ms. Langer's comments were made," without stating that Hager was not a recipient of the email from Ms. Langer, but was the recipient of an email seven emails later in the email chain from a person who was also not copied on the original email. H-II Ex. 6.

Finally, ePlus's summary statement that "Mr. Hager acknowledged that according to a report of June 17, 2011, of the 277 healthcare customers given six months under the injunction order to convert from 214 had already converted to the replacement product and only 63 remained" is incorrect. Hager testified that he had never seen this report before, and that "I would be interpreting [the report] the same way that anybody – I would have no extra expertise on it." H-II 157:4-14.

### Hager's Role In The Redesign

ePlus maintains that "Mr. Hager . . . claimed to have a high level understanding of the differences between RSS and RQC." This is not a fair or accurate summary. Hager stated that he had understanding—at only a "high level"—of only one difference between RSS and RQC, and that difference is not at issue in this proceeding. H-I 46:4-7. Hager could not speak to any changes to Punchout functionality—the relevant differences at issue—beyond knowing that changes were made. H-I 47:15-19; 149:7-11. Hager had no responsibility for analyzing the product changes in light of the infringement findings, and did not participate in any way in infringement analyses on potential redesigned products. H-II 190:6-15, 17-22. He did, however, testify that he initially was concerned about making the change to Punchout to remove the ability to access and search a Punchout vendor's website after previously selecting an item from a different Punchout vendor's website, thus combining items from the different Punchout vendors on a single requisition because doing so "would have a negative impact on our customers and be a step backwards." H-I 347:1-349:18; H-I Ex. 12. He stated that "ultimately this is a legal decision. Throughout this process, we have been depending on legal opinion to formulate our plans. We need to do what we need to do... and if we feel there is substantial risk to the current path, then we must make the change." H-I Ex. 12. Ultimately the change was made notwithstanding the negative impact on customers. H-I 351:3-10.

4

### Punchout Held Out Of Deals

ePlus's summary of Hager II Exhibit 7 (PX-1091) is incomplete because it omits that on March 29, 2011, Hager sent an email to select members of sales personnel asking whether it was possible to pull RSS and Punchout out of potential deals. He stated that a design around was being developed for RSS but "[w]e have no known way around Procurement Punchout at this time. Please check with your RSM's / AE's on these deals and see if pulling at [a] minimum, punchout, and potentially even both harm the closing of the deal in Q4." H-II Ex. 7. ePlus also selectively quotes a later email from Hager in the same document as stating "[w]e have a solution for RSS now . . . so proceed and try to win the deal.'" The entire statement by Hager in the email is "'[w]e have a solution for RSS now . . . so proceed and try to win the deal …. ***But hold Punchout out of it***." H-II Ex. 7 (emphasis added; ellipses in original). Considering the full quote, Hager's statement that "we have a solution for RSS now" refers to the changes to RSS not at issue in this proceeding; a solution for Punchout had not been achieved at this time, and it was accordingly being held out of this deal. H-II Ex. 7 (PX-1091); H-II 174:24-175:3. Punchout was not a critical component the removal of which would kill a deal. H-II 175:19-20.

### Communications with Summa Healthcare

Hager II Exhibit 18 (PX-1266), an email from Hager to a potential customer, Summa Healthcare, is irrelevant. Summa Healthcare was not an existing customer of Lawson, and there is no testimony in the Hager transcripts indicating that it was seeking to license either Configuration No. 3 or No. 5. While not in the Hager testimony, both parties' experts agree that Summa Healthcare does not have Configuration No. 3 or No. 5. There is thus no basis to find that the statements in this email relate to any issue in the contempt hearing.

ePlus's summary of Hager II Exhibit 18 (PX-1266) is misleading because it omits that Hager never had a conversation with anyone at Summa about the nature of the changes made to the functionality of Punchout. H-II 161:2-6, 8. Hager never described the changes to Punchout functionality as "slight." H-II 163:19-5.

### Communications Regarding A Stay of The Injunction

In discussing Hager II Exhibit 13, which is an April 13, 2011 email from Mike Cohen to Catalino, ePlus mischaracterizes Hager's testimony in order to imply that Lawson did not announce a design-around in April 2011 in order to not "negate any efforts to obtain a stay." Hager testified that there was no final redesign as of April 13, 2011. H-II 181:10-13, 15-19. Hager also testified that he did not know if the "policy" referred to in Hager II Exhibit 13 had been implemented. H-II 124:17-21. Hager stated that not announcing a release date for a design around was consistent with Lawson's general policy, applied to all products, not to identify to the public projected release dates for new software because such projects are unpredictable. H-II 189:519; 95:4-15; 96:4-9; 102:13-17. At the time Lawson applied for a stay of the injunction, RQC was generally available to the public. H-II 189:5-9.

### Other Mischaracterizations

ePlus mischaracterizes the testimony with respect to a number of other exhibits. First, ePlus incompletely summarizes Hager II Exhibit 15 (PX-1094) in which Hager wrote, "Lawson Requisition Center has been designed specifically to NOT infringe on the ePlus patent, while

5

preserving the key functionality customers need in their requisition process." Specifically, ePlus omits that Hager testified that this message did not relate to Punchout. H-II 186:8-187:10. This exhibit relates to the two changes made to RSS that are relevant to system claims that the Federal Circuit held invalid as a matter of law. Additionally, Hager testified that the exhibit reflects his role as the "voice of the customer" regarding what he believed a customer would want assurance of. He wrote to the recipients to "push back if this is inappropriate." H-I Ex. 10/H-II Ex. 15; H-I 351:15-352:19.

ePlus's summary that "A replacement product that did not infringe on ePlus's patents could not be promised to all customers" mischaracterizes Hager's testimony. The emails referenced in Hager I Exhibit 15 spoke only to M3 products. H-I 216:5-6; 344:21-345:345:15, 346:1-16. Lawson has not designed-around the M3 product, which it has not sold in the United States since the injunction.

ePlus claims that "Lawson's standard license agreement provides for customer indemnifications from intellectual property infringement." The summary is irrelevant because these customer agreements were only relevant to ePlus's damages theory regarding disgorgement of costs savings, which ePlus has since abandoned. 3/14/13 Tr. at 22-23. Moreover, the summary is incomplete.

ePlus claims that "Lawson also had no knowledge as to whether its customers had downloaded, installed or implemented RQC." This mischaracterizes Hager's testimony, in which he stated that he personally did not know how many customers actually downloaded RQC. H-I 197:4-7. Hager's testimony does not support, much less establish, this point as Hager was not a Rule 30(b)(6) witness and did not speak for Lawson on this topic.

ePlus claims that "Although there were concerns that customers would see RQC as a degradation from RSS, customers were informed that the RQC 'replacement' product was actually an improvement over RSS and preserved key functionality without infringing ePlus's patents." This is an incomplete and unfair summary because Hager stated that his only basis for believing RQC to be an improvement was because of the addition of mobile solutions. H-I 165:7-15; 238:18-21. Hager's understanding was that functionality "would be available but done in different ways." H-I 341:14-15. As to the changes specific to Punchout—the only design changes at issue in this proceeding—Hager testified that the changes "would have a negative impact on our customers and be a step backwards." H-I 347:1-349:18; H-I Ex. 12.

ePlus claims that Hager testified that "RSS and RQC can be run in parallel." This is a mischaracterization of testimony. Hager actually stated that he had "no idea" whether RSS and RQC could be run in parallel. H-I 292:9-17.

6

Dated: April 1, 2013

                            LAWSON SOFTWARE, INC.

                       By: \_\_\_\_/s/_____
                           Of Counsel

Dabney J. Carr, IV, VSB #28679
Robert A. Angle, VSB #37691
**TROUTMAN SANDERS LLP**
P. O. Box 1122
Richmond, Virginia 23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com

Josh A. Krevitt (admitted *pro hac vice*)
Daniel J. Thomasch (admitted *pro hac vice*)
Christopher D. Dusseault (admitted *pro hac vice*)
Jason C. Lo (admitted *pro hac vice*)
Richard W. Mark (admitted *pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

*Attorneys for Defendant Lawson Software, Inc.*

## CERTIFICATE OF SERVICE

I certify that on this 1st day of April, 2013, a true copy of the foregoing will be filed electronically with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Craig T. Merritt
Paul W. Jacobs, II
Henry I. Willett, III
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
cmerritt@cblaw.com
pjacobs@cblaw.com
hwillett@cblaw.com

Jennifer A. Albert
David M. Young (VSB No. 35997)
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001
jalbert@goodwinprocter.com
dyoung@goodwinprocter.com

*Attorneys for Plaintiff*

Michael G. Strapp
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, MA 02109-2881
mstrapp@goodwinprocter.com

 

/s/
Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
Megan C. Rahman (VSB No. 42678)
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
megan.rahman@troutmansanders.com
**TROUTMAN SANDERS LLP**
1001 Haxall Point
Richmond, VA 23219
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
*Counsel for Defendant Lawson Software, Inc.*

8