# APPENDIX A

**DEPOSITION SUMMARY**
**DEAN J. HAGER**
**H-I** (January 6, 2012)
**H-II** (March 25, 2013)

Mr. Hager served as the former Executive Vice-President of S3 Industries of Lawson Software. (**H-I** 9:11-22; 12:6-12;14:9-15; 20:5-11; 20:17-22; 21:3-7.) In this position, Mr. Hager previously ran the healthcare, public sector and services industries business units. (**H-I** 17:21-18:8; 22:14-20.) His duties included selling and servicing S3 procurement products and he reported directly to Harry Debes, the Lawson's CEO. (**H-II** 12:23-13:6.) He served in that capacity for at least a year prior to leaving Lawson in December 2011. (**H-II** 13:24-14:9.)

Mr. Hager testified at the March 25, 2011 injunction hearing that an injunction specific to servicing RSS and Punchout would be extraordinarily difficult to implement in reality (**H-I** Ex. 3 (3/25/11 Injunctive Relief Hearing Tr.); 50:22-51:1; 5-11; 52:15-16; 52:18-53:18; 54:19-55:15; 17; 55:22-56:8; 11-14; 60:2-22; 61:3), and that to move away from RSS would take around nine months at a cost of, in some cases, over a million dollars per client. (**H-I** 61:16-64:12; 91:3-12; 92:10-15; 92:18-93:1; 3-4; 6-9; 93:16-94:3; Ex. 6 (PX-1090); 110:22-111:1; 4-7; 11-18; 112:1-5; 12-14; 113:14-114:19; 115:4-9; 115:21-116:17; 116:21-117:5; 15-17; 117:19-118:22; 119:3-8; 119:12-120:5; 7-9; 11-14; 120:16-121:3; 5; Ex. 13 (PX-1097); 188:3-4; 7-9; 188:17-190:11; 14-15; 191:21-192:11; 193:7-20; 194:1-11; 14-18; 194:22-195:2.)

On the morning of March 25, 2011, Mr. Hager asked Keith Lohkamp by email, "How many healthcare customers run RSS and estimate how many hospitals that represents." Mr. Lohkamp responded, "Over 270 Healthcare customers. We've been estimating 9 hospitals per HC customer meaning around 2500 hospitals." (**H-II** Ex. 4 ((PX-1090).) When asked why he used precisely 277 healthcare customers and 2500 hospitals in his testimony at the hearing, Mr. Hager testified that he used Mr. Lohkamp's numbers to merely cross check other information that he had. He further denied telling Jennifer Langer that the Court created the 277 number out of some "fantasy," but he did have the feeling after his testimony as expressed in an email to Mr. Debes and Mr. McPheeters that "the judge doesn't understand half of what he hears." (**H-II** Ex. 6 (PX-1229); 58:24-59:15, 20-22; 61:19-21-61:24-62:3; 63:12-64:16, 20.) He further did not recall telling Ms. Langer other comments she attributed to him in an email including that the intent of the testimony was to protect organizations solely providing patient care and that "he used this 'life and death' urgency to show how we need more time to ensure disruptions didn't occur." (**H-II** 66:14-67:1, 3; Ex. 6 (PX-1229).) Mr. Hager was a recipient of the email string in which Ms. Langer's comments were made. (**H-II** Ex. 6 (PX-1229).) Mr. Hager acknowledged that according to a report of June 17, 2011, of the 277 healthcare customers given six months under the injunction order to convert from 214 had already converted to the replacement product and only 63 remained. (**H-II** Ex. 20 (PX-1265); 156:3-157:9, 11-16.)

Mr. Hager was aware as early as March 6, 2011 that Lawson was considering implementing its own design-around product, but did not inform the Court of this fact at the March 25, 2011 injunction hearing. (**H-I** 67:16-68:2; 68:6-69:7; 11; 71:5-7; 11-14; 16-17; 73:15-74:2; 4-15; Ex. 4 (PX-1088); 74:21-75:1; 4-12; 76:2-7; 77:13-78:5; 78:17-79:6; Ex. 5 (PX-1089); 79:20-21; 80:2-12; 80:16-81:1; 3-9; 16-22; 82:21-83:6; 84:20-85:3; 85:9-86:12; 15-20;

98:19-99:15; 18-21; 104:3-8; 12-19; 105:5-8; 105:11-18; 105:20-106:1; 106:6-19; Ex. 7 (PX-1091); 130:7-131:5; 9-19; 131:21-132:8; 13-17; 133:3-4; 133:6-134:4; 7-11; 325:22-326:5; 7-9; 374:8-13; 16-19; 375:17-376:4; 8-20; 377:5-17; 380:22-381:2; 4-5).

As early as March 9, 2011, Lawson's CEO Mr. Debes raised the following two questions with his subordinates: (1)"What are the implications to us if we are temporarily prevented from selling RSS and punchout?" and (2) "What effort is required to create a work-around on these 2 products – so they don't infringe on these patents?" He further advised his subordinates that "Don't misunderstand my questions: I believe that ultimately we will prevail in this case. Until then we are not going to settle this case for the blackmail the other side is asking for – but I think it makes sense for us to be prepared as it's possible that the decision by the judge could be handed down during CUE." (**H-II** Ex. 3 (PX-1258); 36:7-37:24.) The first question was within Mr. Hager's area of responsibility (**H-II** 47:21-48:16, 18-21.) CUE was the annual client user exchange that was scheduled for April 4, 2011. (**H-II** 38:5-21; 39:13-17.) Draft scenarios were prepared for messaging to customers during CUE in the event an injunction ruling came down from the Court. In the event that that the Court ruled that Lawson was enjoined from selling and supporting RSS or RSS and Punchout, the message proposed by Jennifer Langer (the Vice President Corporate Portfolio Management and S3 Product Management) for customers with RSS was that "Lawson's new version for self-service requisitions will be available in May and is not impacted by the ruling." (**H-II** Ex. 8 (PX-1092).)

Mr. Hager derived his understanding of the Court's injunction, and its application to Lawson's products, solely from Lawson's legal team. (**H-I** 25:20-26:4; 6-10; 26:22-27:3; 6-16; 27:19-28:1; 28:14-16; Ex. 14 (PX-1098); 199:18-20; 200:1-4; 200:8-201:14; 201:19-203:1; 5-17; 203:22-206:3; 206:12-16; 18-21; 207:3-11; 207:22-208:1; 4-9; 13-14; 208:20-209:1; Ex. 18 (PX-1102); 229: 8- 230:1; 231:12- 232:9; 233:10-14; Ex. 21 (PX-1104); 271:13-272:10; 14-22; 273:13-16; 275:9-276:6; 373:7-21). Mr. Hager was involved in the messaging to customers concerning the *e*Plus lawsuit and considered himself the "voice of the customer." In that role, he was concerned with whether the customer understood Lawson's messages; whether they would be able to make the transition to a replacement product; and whether the expectations that Lawson had for the customer were reasonable. (**H-II** 15:18; 15:22-16:3; 17:4-25.)

After the injunction hearing in March 2011, Lawson released its software solution, Requisition Center ("RQC") as a replacement for Requisition Self Service ("RSS"). (**H-I** 29:19-22; 30:3-17; 31:1-9; 31:15-32:1; 33:12-18; 34:4-6; 8-12). Mr. Hager was not involved in determining what modifications should be made to RSS and/or Punchout in light of the jury verdict (**H-I** 43:2-5; 8-11; 13-15; 44:4-11; 13; 149:7-11; Ex. 26 (PX-1109); 317:13-15; 318:2-319:8; 319:7-320:9; 321:14-21; 322:8-14; 322:16-323:5; Ex. 28 (PX-1111); 333:2-4; 14-16; 20; 333:22-334:3; 335:19-336:10; 336:21-337:6) but claimed to have a high level understanding of the differences between RSS and RQC. (**H-I** 45:17-19; 46:1; 46:20-47:1; 47:11-19.) The process of modifying RSS was driven by Lawson counsel. (**H-I** Ex. 12 (PX-1096); 178:22-180:5; 182:9-15; 183:4-184:9; 184:13-185:7; 10-21; 186:1.) The product development team was primarily in charge of executing this task. (**H-I** 47:20-48:1; 5-12; Ex. 16 (PX-1100); 216:7-8; 11-15; 217:4-10; 217:20-218:9; 218:14-219:5; 8-9; 14-19; 219:21-220:3; 5-8; 220:21-221:6.) Mr. Hager's understanding was that when a customer used RQC, a requisition would be created directly, as opposed to it being a separate tool, but he did not understand other alleged changes

made to RSS.  (**H-I** 46:2-7; 13-19; Ex. 24 (PX-1107); 300:5-21; 303:20-304:1; Ex. 27 (PX-1110); 332:8-20.)

It was Lawson's goal as early as March 29, 2011 to release RQC in May.  (**H-I** Ex. 9 (PX-1093); 149:18-19; 149:22-150:3; 5-6; 8-9; 14-18; 150:21-151:6; 155:10-14; 155:17-156:15; Ex. 26 (PX-1109); 323:12-324:11; 15-16; **H-II** 50:5-8, 11-16.)  Lawson was concerned that if an injunction was entered during its fourth quarter (March-May 2011) prohibiting sales, Lawson would be unable to book revenue for that quarter unless it had replacement software available.  (**H-II** 15:1-12; 52-6, 13-14.)  On March 30, 2011, Mr. Hager received an email from Jim Millard, who was one of Mr. Hager's indirect reports, that a deal seemed questionable for the fourth quarter because we "can hold [P]unchout out of the deal but we do need a solution for RSS."  Mr. Hager advised Mr. Millard that day that "[w]e have a solution for RSS now … so proceed and try to win the deal."  (**H-II** Ex. 7 (PX-1091); 68:7-69-6.)

On April 6, 2011, Lawson's General Counsel Mr. McPheeters circulated a discussion draft of a possible press release "if an injunction were to be issued."  The draft contained a blank to be filled in as to the date in 2011 when "a redesign of the RSS and Punchout products" that did not infringe would be made available.  Mr. Hager advised that he liked the draft, noting "[i]f they don't infringe support, then we won't need to go this far. But if they do, this message is exactly what we will need."  (**H-II** Ex. 8 (PX-1092); 104:1-24;105:1-19; 105:21-108:1.)  Mr. Hager was advised by Mr. McPheeters that a press release of a design around would be withheld until after Lawson was successful in getting a stay of the case. (**H-II** Ex. 11 (PX-1263).)

On April 13, 2011, Mr. Catalino was asked by Lawson legal counsel to retract a statement in an internal healthcare newsletter that stated "I would like to make everyone aware of the e-Plus lawsuit related to our Punchout and Requisition Self Service is still active. The good news, regardless of outcome, Lawson is now prepared with substitute solutions/products should something occur."  The reason given by counsel was that "[t]hese statements may be used by ePlus or the Judge to negate any efforts to obtain a stay from either the district court or court of appeals."  Mr. Hager, was copied on the advice concerning the retraction by Ms. Langer who further advised that Mr. Hager adhere to the policy that "it is premature to suggest that an alternative to RSS or Punchout is available at this time. A judgment or injunction has not yet been issued." (**H-II** Ex. 13 (PX-1252); 121:9-13; 121:19-122:11; 123:1-11, 13-18; 124:5-9, 12-21.)

On May 4, 2011, Mr. Hager drafted a "Basic Message for Customers" with four bullet points that included the following: "Lawson Requisition Center has been designed specifically to NOT infringe on the ePlus patent, while preserving the key functionality customers need in their requisition process."  (**H-II** Ex. 15 (PX-1094); 132:12-20.)

On May 26, 2011, Mr. Hager wrote to a potential $1 million healthcare customer Summa Health, "regarding our legal issues with ePlus."  He noted that "[w]e are very confident that Summa will see negative impact from the slight product configuration change we have made in regards to the patent claim.  In fact, we believe you will end up with a solution that is actually better."  Mr. Hager would not have said any statements to a customer he did not believe to be true.  (**H-II** Ex. 18 (PX-1266); 145:4-146:1; 146:4-148:9, 11-22.)

The loss of RSS would have hurt Lawson's ability to compete in the marketplace (**H-I** 97:17-21), and Lawson considered pulling Punchout out of pending deals rather than RSS. (**H-I** Ex. 7 (PX-1091); 125:-126:2; 8-13; 127:9-11; 128:3-10; 128:21-129:1; 5; 8-20.) A replacement product that did not infringe on ePlus's patents could not be promised to all customers. (**H-I** Ex. 15 (PX-1099); 211:3-6; 10-12; 212:9-13; 213:19-214:6; 18-22; 215:2; 216:5-6; 371:22-372:6.) Lawson's standard license agreement provides for customer indemnifications from intellectual property infringement. (**H-I** Ex. 14 (PX-1098); 209:20-210:6; 12-20.)

It was Mr. Hager's understanding that the Court's injunction enjoined Lawson, but not the ability of Lawson customers to use RSS. (**H-I** Ex. 8 (PX-1092); 138:21-139:1; 4-6; 8-17; 143:10-13; 143:15-144:2; 5; 10-20; 145:21-146:5; 11-13; 17; 146:20-147:5; 12-13; 147:18-148:2; 4-5; 8-17; Ex. 19 (PX-1103); 260:21-261:9; 261:13-262:9; Ex. 20 (PX-1010); 262:10-13; 263:9-12; 265:9-15; 267:7-9; 17-22; 268:12-269:4; 14-16; 269:22-270:1; Ex. 21 (PX-1104); 278:17-279:9; 282:11-17; 285:22-286:7; 9-10; 12-14.) Lawson also had no knowledge as to whether its customers had downloaded, installed or implemented RQC. (**H-I** 196:8-22; 197:4-10; 313:1-3; 5-6; 317:2-5; 7-8.) Implementation and deployment to a production system includes downloading, installing, configuring, testing, training, QA testing and changing modifications. (**H-I** 316:1-17.)

Although there were concerns that customers would see RQC as a degradation from RSS, customers were informed that the RQC "replacement" product was actually an improvement over RSS and preserved key functionality without infringing ePlus's patents. (**H-I** Ex. 10 (PX-1094); 158:11-22; 159:7-13; 159:16-160:11; 160:22-161:4; 12-21; 162:2-14; 19-21; 163:10-164:1; 164:8-20; 165:7-15; 169:19-170:5; 8-10; 170:19-171:1; 171:10-172:4; Ex. 11 (PX-1095); 172:6-7; 10-12; 172:20-173:7; 173:22-175:3; 11-17; 176:5-22; 177:10-11; 238:18-21; Ex. 18 (PX-1102); 244:22-245:8; 12-18; 246:11-13; 246:15-247:7; 250:16-251:8; 251:10-252:2; 252:4-9; 11-14; 253:5-12; 253:21-254:4; 6-7; Ex. 19 (PX-1103); 254:14-16; 254:22-255:1; 255:6-22; 256:11-17; 257:1-10; 13-18; 259:2-8; 259:21-260:15.) RSS and RQC can be run in parallel. (**H-I** Ex. 22 (PX-1105); 287:2-14; 288:6-14; 288: 22-289:14; 17-18; 290:1-4; 6-15; 291:8-292:2; 9-15; 293:1-294:5; Ex. 27 (PX-1110); 327:19-20; 328:3-6; 328:10-329:13; 329:15-330:1; 330:8-10; 12; 331:14-16; 18-20; Ex. 29 (PX-1112); 338:12-339:7; 339:21-340:11; 340:21-341:1; 3-21; 342:5-10.)

The designated exhibits from these depositions are Hager I Ex. 4 (PX-1088), Hager I Ex. 5 (PX-1089), Hager I Ex. 6 (PX-1090), Hager I Ex. 7 (PX-1091), Hager I Ex. 8 (PX-1092), Hager I Ex. 9 (PX-1093), Hager I Ex. 10 (PX-1094), Hager I Ex. 11 (PX-1095), Hager I Ex. 12 (PX-1096), Hager I Ex. 13 (PX-1097), Hager I Ex. 14 (PX-1098), Hager I Ex. 15 (PX-1099), Hager I Ex. 16 (PX-1100), Hager I Ex. 18 (PX-1102), Hager I Ex. 19 (PX-1103), Hager I Ex. 20 (PX-1010), Hager I Ex. 21 (PX-1104), Hager I Ex. 22 (PX-1105), Hager I Ex. 24 (PX-1107), Hager I Ex. 26 (PX-1109), Hager I Ex. 27 (PX-1110), Hager I Ex. 28 (PX-1111), Hager Ex. 29 (PX-1112), Hager II  Ex. 3 (PX-1258); Hager II Ex. 4 ((PX-1090); Hager II Ex. 6 (PX-1229); Hager II Ex. 7 (PX-1091); Hager II Ex. 8 (PX-1092); Hager II Ex. 11 (PX-1263); Hager II Ex. 13 (PX-1252); Hager II  Ex. 15 (PX-1094); Hager II Ex. 18 (PX-1266); and Hager II Ex. 20 (PX-1265).