1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF VIRGINIA
2                   RICHMOND DIVISION

3    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ :
4    ePLUS, INC.,                      :
                                       :
5                      Plaintiff,      :
      v.                               : Civil Action
6                                      : No. 3:09CV620
    LAWSON SOFTWARE, INC.,             :
7                                      : April 2 , 2013
                       Defendant.      :
8    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ :

9

10

        COMPLETE TRANSCRIPT OF MOTIONS HEARING
11       BEFORE THE HONORABLE ROBERT E. PAYNE
              UNITED STATES DISTRICT JUDGE
12

13

14

15   APPEARANCES:

16   Craig T. Merritt, Esquire
     Christian & Barton, LLP
17   909 East Main Street
     Suite 1200
18   Richmond, Virginia   23219-3095

19   Jennifer A. Albert, Esquire
     Goodwin Procter, LLC
20   901 New York Avenue, NW
     Washington, D.C.   20001

21

22            DIANE J. DAFFRON, RPR
              OFFICIAL COURT REPORTER
23          UNITED STATES DISTRICT COURT

24

25

1    APPEARANCES:    (Continuing)

2    Michael G. Strapp, Esquire
      Goodwin Procter, LLC
3    Exchange Place
      53 State Street
4    Boston, Massachusetts    02109

5    Paul W. Jacobs, II, Esquire
      Christian & Barton, LLP
6    909 E. Main Street, Suite 1200
      Richmond, Virginia    23219-3095

7

8            Counsel for the plaintiff, ePlus

9    Daniel J. Thomasch, Esquire
      Gibson Dunn & Crutcher
10   200 Park Avenue
      New York, New York    10166-0193

11

12   Christopher D. Dusseault, Esquire
      Gibson Dunn & Crutcher
      333 South Grand Avenue
13   4th Floor
      Los Angeles, California    90071

14

15   Dabney J. Carr, IV, Esquire
      Troutman Sanders
      Troutman Sanders Building
16   1001 Haxall Point
      P.O. Box 1122
17   Richmond, Virginia    23218-1122

18   Josh Krevitt, Esquire
      Gibson Dunn & Crutcher, LLP
19   200 Park Avenue
      New York, New York    10166-0193

20

21   Richard W. Mark, Esquire
      Gibson Dunn & Crutcher, LLP
      200 Park Avenue
22   New York, New York    10166-0193

23
              Counsel for the defendant, Lawson Software
24

25

3

1            (The proceedings in this matter commenced at
2      9:43 AM --0)
3            THE CLERK:  Case number 3:09CV620, ePlus,
4      Incorporated v. Lawson Software, Incorporated.
5            If counsel will please stand, state your name
6      for the record and identify the party they represent.
7            MR. STRAPP:  Michael Strapp representing the
8      plaintiff, ePlus.
9            MS. ALBERT:  Jennifer Albert representing the
10     plaintiff, ePlus.
11           MR. MERRITT:  Craig Merritt representing the
12     plaintiff, ePlus, along with my partner Paul Jacobs.
13           THE COURT:  All right.
14           MR. THOMASCH:  Your Honor, Daniel Thomasch
15     for defendant Lawson Software, Incorporated.  With me
16     at counsel table, the attorneys, Josh Krevitt, Richard
17     Mark, Dabney Carr, and Chris Dusseault.
18           THE COURT:  All right.  Glad to have you.
19           All right.  We're here on the issue of the
20     show cause for contempt and the issue of how to deal
21     with the Court of Appeals mandate on the question of
22     injunction.
23           The first thing we'll do is hear the evidence
24     on the contempt in your case.
25           MR. THOMASCH:  Your Honor, may I just note

1  for the record I feel compelled.  I know Your Honor is

2  familiar with our position, but I do feel we need to

3  put on the record, Your Honor, our objection to

4  proceeding with the contempt proceeding in this

5  sequence of events.  Because this is a civil contempt

6  case and not a criminal contempt case, Lawson cannot

7  be considered in contempt of anything other than an

8  injunction that's in force.

9        THE COURT:  The injunction is in force, Mr.

10 Thomasch, and the only issue is how does it get

11 modified.  The Federal Circuit did not change the

12 injunction.  It said you are to consider how to modify

13 it.  So right now it's in force.

14       MR. THOMASCH:  I understand that, Your Honor.

15 It does seem that both parties have agreed that the

16 injunction as issued in 2011 can no longer stand, and

17 we believe it is a threshold issue to determine what

18 the injunction is that we're alleged to be in

19 violation of.

20       THE COURT:  The injunction is already extant

21 that you're in violation of.  The only thing you can

22 be in violation of is that part of it that applies to

23 what is it?  Claim 26.

24       MR. STRAPP:  Yes.

25       THE COURT:  That's the only part you can be

1    in violation of.  I'm just now hearing the evidence.

2         MR. THOMASCH:  Thank you, Your Honor.

3         THE COURT:  You-all, I hope, will not be in

4    the sweat chamber much longer.

5         MR. STRAPP:  Your Honor, with your permission

6    we'd like to offer an opening statement.

7         THE COURT:  All right.  I've read all of what

8    you have had.  So you can make one, but you don't need

9    to go into great detail.  The only thing you're

10   putting on evidence about is whatever your contention

11   is with respect to contempt to the remaining claim.

12        MR. STRAPP:  That's correct.

13        THE COURT:  Is that right?

14        MR. STRAPP:  That's correct.

15        THE COURT:  All right.

16        MR. STRAPP:  We have some slides.  So we're

17   going to put them up on the screen, Your Honor.

18        THE COURT:  All right.

19        MR. STRAPP:  Good morning, Your Honor.

20        THE COURT:  Good morning.

21        MR. STRAPP:  At the outset of this contempt

22   hearing, I think it's important to just briefly

23   understand how we got here.  More than two years ago,

24   January 2011, there was a jury verdict that included a

25   finding that Lawson Configurations 3 and 5 infringe

1    Claim 26 of the '683 Patent.

2            THE COURT:  Before you lay too much emphasis

3    on how long it's been, remember one thing.  I gave you

4    the opportunity to litigate this while the matter of

5    the mandamus was on appeal, and you-all chose not to

6    do that.  I guess for economic reasons.  I don't know.

7    But I gave you the choice to do it.  And we would have

8    been finished with it long ago had you opted to do

9    what you were given the option to do.

10           So I can't place too much emphasis on the

11   duration, Mr. Strapp, after you were given that

12   option.  So whatever period of time is the duration,

13   some of that is on your shoulders.  I'm not quite sure

14   how we allocate all that later, but I just think you

15   need to keep that in mind.

16           MR. STRAPP:  Understood.

17           Almost immediately after the jury verdict,

18   within a matter of days, in fact, Lawson began the

19   process of developing a replacement for RSS.  Within a

20   month after that, an evidentiary hearing on ePlus's

21   motion for a permanent injunction was held.  And the

22   Court may recall that it was at that hearing on

23   March 25 that the executive vice president of Lawson

24   at the time, Dean Hager, talked about severe harm that

25   would befall Lawson's customers were the Court to

1    enter an injunction.

2          In May 2011, May 18 to be precise, Lawson

3    made available to its customers via a free 20-minute

4    download a software module that it calls RQC.  And

5    five days after that Your Honor entered the

6    injunction.

7          Now, during the four months between

8    January 2011 and May 2011, there were some important

9    decisions made by Lawson that have critical

10   consequences as the evidence will show over the next

11   few days.

12         First, Lawson decided, although it had began

13   developing RQC within a few days after the jury

14   verdict, to withhold from the Court during the

15   injunction proceedings any specific information about

16   that new module.  And contemporaneous Lawson emails

17   will show that this was a calculated and strategic

18   decision that was made by Lawson to maximize their

19   odds of defeating ePlus's injunction motion.

20         The second decision Lawson made during that

21   four-month window was whether to significantly change

22   the infringing Configurations 3 and 5 or instead to

23   make some minor modifications.

24         Now, Lawson, the evidence will show,

25   considered but rejected substantial changes because of

1      the expected negative response of its customers and

2      because it realized it would require actually a

3      significant investment of time and money to try to

4      design around ePlus's patents.

5             So instead, as Lawson told its customers, it

6      changed RQC so that RQC wasn't really a change at all,

7      but instead retained 100 percent of the functionality

8      of RSS.

9             And a third decision that Lawson made in that

10     four-month window between the verdict and the

11     injunction was also motivated by placating its

12     customers in the aftermath of the injunction.

13            The evidence will show that Lawson

14     specifically designed this new module RQC so that it

15     actually could be run in parallel with RSS.  In other

16     words, the infringing system with RSS and the

17     infringing system with RQC, it could be run

18     simultaneously by Lawson's customers.

19            Actually, Lawson went one step further and

20     instructed its customers on how to continue running

21     RSS even after the customers had downloaded RQC.

22            Now, the key question at this hearing, as

23     Your Honor has framed in a January 24 order, is

24     whether Lawson was at any time after May 23, 2011, in

25     violation of the injunction.  And ePlus will show that

1   Lawson violated the injunction in the followings ways:

2         First, evidence will be put on by ePlus to

3   show that RQC and the configurations with RQC are not

4   more than colorably different than the configurations

5   with RSS.

6         Second, ePlus will put on evidence to prove

7   that Lawson uses Configurations 3 and 5 with RQC to

8   infringe Claim 26, and that it induces its customers

9   to do the same.

10         And, third, ePlus will show that Lawson

11   violated the injunction by actually inducing its

12   customers to continue using the original infringing

13   configurations with RSS.

14         The first segment of the hearing will be

15   devoted to colorability.  And in TiVo, the Federal

16   Circuit gave a few guideposts as to how to deal with

17   this colorability issue.

18         First, the Federal Circuit said, "Ask whether

19   or not the modifications were made to what it called

20   randomly chosen features."

21         Now, what the Federal Circuit meant by the

22   term "randomly chosen features" is whether the

23   modification was made to a feature of the claim that

24   has nothing to do with the actual functionality or

25   structure recited in the claim element.

1        Now, this alone can be dispositive.  If the
2   Court were to find, for example, that the modification
3   Lawson made, and the parties agree on what that
4   modification is, it has nothing to do with the claim
5   element of Claim 26, it means the inquiry is over.
6   The accused products with RQC is not more than
7   colorably different from the product that was already
8   found to infringe.

9        But if the Court finds that the modification
10  wasn't directed to a randomly chosen feature, the next
11  step is to evaluate whether or not the modification is
12  significant.  And the Federal Circuit teaches that one
13  guidepost for determining significance of a
14  modification is whether the new design-around module
15  is innovative or if it's simply a degradation in
16  functionality.

17       A modification that just goes backwards in
18  functionality is more likely to be insignificant.
19  Conversely, a modification that's innovative will be
20  more likely to be found a significant and more than
21  colorable change.

22       But one thing that is not relevant to the
23  colorability analysis is the defendant's purported
24  diligence and good faith efforts.  The TiVo decision
25  makes clear any evidence that Lawson presents over the

1   next few days about the time and expense it incurred

2   to create RQC or, for example, opinions of counsel it

3   received that blessed its RQC design, are irrelevant.

4   Those are the same defenses that were raised by

5   EchoStar, the defendant in TiVo, and that were

6   rejected by the Federal Circuit as not bearing on the

7   colorability question.

8           So the colorability analysis will focus not

9   on Lawson's purported good faith efforts, but instead

10  on whether Configurations 3 and 5 with RQC are more

11  than colorably different that Configurations 3 and 5

12  with RSS.

13          Your Honor may recall these block diagrams

14  that were presented during the trial that show the

15  different software building blocks that make up these

16  various Lawson software configurations.

17          Now, when the Court addresses this

18  colorability question, I think it's important to keep

19  in mind that even though Configurations 3 and 5, which

20  you see side by side here on this slide, consist of

21  several different software modules.  It's undisputed

22  the parties agree that no relevant modifications were

23  made to any of these modules except to the RSS module.

24          So if you take a look at the slide, you'll

25  see at the bottom there's a yellow building block.

1   That's called the platform technology foundation.   And

2   it's made up of LSF and process flow.   Right above

3   that is a blue block called S3 procurement modules.

4   That consists of three separate modules; purchase

5   order, requisitions, inventory control.

6          And at the top you'll see there's an orange

7   box, which is Punchout.   And a purple box in

8   Configuration 5, which is electronic data interchange.

9          All of those modules remain exactly the same.

10   No source code changed.   No functionality changed.

11   And that's undisputed here.   The parties agree on

12   that.

13          The only module that was changed was RSS.

14   RSS became requisition center or RQC.

15          Now, the parties agree not only about the

16   lone module that was changed, but also about the

17   single modification that was made to that module

18   that's relevant to this hearing.

19          So what is that modification?   Well, as

20   Lawson put it in its pre-hearing brief, it was a

21   modification to remove from RQC a user's ability to

22   combine either items from item master in a Punchout

23   vendor or items from multiple Punchout vendors in a

24   single requisition.

25          Of course, the colorability question is

1   whether or not that modification is significant.
2   EPlus submits that --
3            THE COURT:  The modification that you're
4   talking about here is a functionality modification.
5            MR. STRAPP:  That's correct.
6            THE COURT:  All right.
7            MR. STRAPP:  EPlus submits that this
8   functionality modification that Lawson made to RQC is
9   insignificant.  In fact, it's one that Lawson
10  described internally and to its customers as no real
11  change at all.
12           You'll hear evidence regarding insignificance
13  of this modification from ePlus's technical expert,
14  Dr. Alf Weaver, who is a professor of computer science
15  at the University of Virginia, but much of the
16  evidence regarding insignificance of this modification
17  will come from the mouths of Lawson's own witnesses.
18  That's who we intend to call in our case-in-chief,
19  both current and former employees.
20           The current employees are Dale
21  Christopherson, who is the director of ERP
22  development, Keith Lohkamp, Lawson's product director
23  of supply chain management, and Scott Hanson, who is
24  the practice director of technology at Lawson.
25           Through deposition destination, ePlus will

1    call the former executive vice president and submit

2    his testimony to you, and that's Dean Hager's

3    testimony.

4          The documents produced by Lawson in this case

5    will also establish that the configurations containing

6    RQC are not more than colorably different.

7          Now, when ePlus submits evidence over the

8    next few days from Lawson's own documents, we would

9    ask you to focus on the following questions:

10         First of all, what did Lawson say internally?

11   What did Lawson employees say to each other about this

12   modification?

13         Second:  What did Lawson tell its customers

14   about this modification?

15         Third:  What did Lawson's customers think

16   about this modification?

17         Now, Lawson demonstrated this new product in

18   something called a webinar.  That's where 800 Lawson

19   customers and other folks log on.  Lawson gives a live

20   demonstration over the Internet and says, Here's new

21   product.  Here's how it works.

22         Well, during that webinar, questions and

23   answers were taken from customers in which customers

24   gave their impressions of what they thought of this

25   new product.  Some of this evidence, we think, is

1   revealing, as well.

2          And I think after you see all of that

3   evidence, it will be interesting to compare and

4   contrast what Lawson said and what Lawson's customers

5   said with what Lawson's lawyers will tell you over the

6   next few days.

7          Let's take a look first at what the evidence

8   will show about what Lawson's employees said to each

9   other regarding the modification made to RQC.  For

10  example, and you'll see several documents similar to

11  these, Scott Hanson, who'll testify here live,

12  informed his direct report that while this is a new

13  product, the new product is a change in the user

14  interface only.  The procurement business

15  functionality and data remains the same.

16         Another Lawson employee said, "I tell the

17  customer if they ask about the differences between RSS

18  and RQC, it's just a difference in a web front, and

19  really just looks and feel like RSS.

20         Now, that's very similar to what Lawson told

21  its customers.  For example, in responding to a

22  question regarding training issues that it received

23  from a customer called Western Municipal Water

24  District, Lawson said, Since RQC has 100 percent of

25  the existing functionality of RSS, no training issues

1   have been identified.

2         Likewise, in a response to an inquiry from a

3   customer called Cleveland Clinic regarding the

4   interplay of RQC with Punchout and how that was

5   affected by the modification, Lawson said, With regard

6   to Punchout, RQC will function as RSS did.

7         And last, Lawson told its customer Norton

8   Health Care, we've developed this replacement product

9   RQC.  It has all of the functionality RSS had and

10  more.

11        And those are the same impressions Lawson's

12  customers got when they had a chance to look at RQC.

13  For example, an outside contractor from Art Crandell

14  said RQC appears to look, function and operate the

15  same as RSS.

16        And the Children's Health of Atlanta customer

17  representative said, Hey, the view looks very similar

18  to current RSS.

19        Now, although Lawson said one thing

20  internally and to its customers, and its customers had

21  a very similar impression to the message Lawson gave,

22  you'll hear something different from Lawson's lawyers

23  over the next few days.  They are going to try to tell

24  you that there were significant functional limitations

25  through this modification or that this modification

1   made the product significantly more cumbersome, but

2   those arguments simply, we submit, cannot be squared

3   with what Lawson's own employees said about RQC.  And

4   Lawson has to live with the fact that it chose not to

5   make any significant modifications to its software.

6          After the colorability case is finished,

7   ePlus is going to turn to infringement.  Infringement

8   with respect to RQC.  And the question that TiVo tells

9   us to ask is whether the newly accused system, that

10  is, the configurations with RQC meet each element of

11  Claim 26.  I have the elements of Claim 26 up there on

12  a slide.  And ePlus will show that each of these

13  elements are met through testimony from Alf Weaver,

14  Dale Christopherson and Keith Lohkamp.

15         But I think it's important to note that the

16  infringement phase of this proceeding, it's not going

17  to be written on a blank slate.  The Federal Circuit

18  has already said with respect to Claim 26, which is

19  the claim at issue here, that there's no serious

20  dispute that Lawson's customers infringed Claim 26,

21  and the same types of facts that ePlus presented to

22  the jury regarding Claim 26 at trial will be presented

23  over the next few days.

24         For example, the evidence will show that more

25  than 350 Lawson customers have taken the RQC download

1    and are in various phases of migrating to the product.

2          The evidence will show that Lawson has

3    realized tens of millions of dollars in licensing and

4    maintenance revenue for the accused configurations.

5    It's always important to note the Federal Circuit said

6    it's not just Lawson's customers, but Lawson itself,

7    there's substantial evidence that Lawson itself

8    infringed this Claim 26.

9          The type of evidence cited by the appeals

10   court included installation, maintenance, webinars,

11   professional services.  And that very kind of evidence

12   that the Federal Circuit characterized as substantial

13   is the type of evidence the ePlus will show over the

14   next few day.

15         For example, ePlus will show that Lawson

16   itself went live with an infringing configuration with

17   RQC, that Lawson's so-called RQC SWAT team assisted

18   customers by actually performing hands on

19   installations of RQC, and that Lawson offered guides

20   and webinar presentations for infringing

21   configurations with RQC to its customers.

22         EPlus will show evidence that this one

23   modification the that the parties agree on that I

24   already mentioned, the RQC modification, that actually

25   has no bearing on any one of the elements of Claim 26.

1        So if we take a look at the first element of

2   Claim 26, it says, Maintaining at least two product

3   catalogs on a database containing data relating to

4   items associated with the respective sources."

5        EPlus will show that this element of Claim 26

6   is satisfied in any one of three ways.  Through a user

7   who has an item master that has two product catalogs.

8   Through a user of Configurations 3 and 5 who has

9   connection to two different Punchout sites, each with

10  a single vendor.  Or through a user who has a

11  connection to a multi vendor site.

12       And the modification to RQC, it just doesn't

13  prevent a user from maintaining the product catalogs

14  in any of these three ways.

15       Likewise, with respect to the selecting and

16  searching elements of Claim 26, ePlus will -- first of

17  all let me just point out.  The Court already issued a

18  claim construction on these terms that is binding for

19  these proceedings.  And it's also important, too.

20  That construction said that the selecting the product

21  catalogs limitation must allow for selecting only one

22  catalog.

23       And in so ruling, the Court rejected Lawson's

24  claim construction argument that a user must select

25  two or more catalogs.  Thus, ePlus will show the

1  selecting and searching elements are also met in any

2  one of three ways.

3          THE COURT:  Slow down.

4          MR. STRAPP:  If the user selects to search

5  one or more catalogs from an item master, if a user

6  selects to search a single vendor Punchout site, or if

7  a user selects to search one or more catalogs within a

8  single multi vendor Punchout site.

9          The next element of Claim 26 requires

10 building a requisition using data relating to selected

11 matching items and their associated sources.  And I

12 underlined here in this slide the word "sources."

13 You'll see there's an apostrophe around the last "s."

14 The reason there's an apostrophe there is that the

15 language in the claim clearly states the element is

16 satisfied by building a requisition using items that

17 are associated with one source or building a

18 requisition using data related to selecting matching

19 items from more than one source.

20         So ePlus will present evidence that

21 requisitions using configurations 3 and 5 with RQC can

22 be built through a single source or several sources in

23 one or more catalogs in item master, using data

24 relating to selected items associated with a single

25 source from a single vendor Punchout site, or using

1   data from a single source or several sources in one or

2   more catalogs within a multi vendor Punchout site.

3       The RQC modification that we'll discuss and

4   focus on the next few days also has no bearing on the

5   element of Claim 26 that requires processing the

6   requisition to generate one or more purchase orders.

7   This element by its plain terms is satisfied by

8   processing the requisition to generate one purchase

9   order or more than one purchase order.

10      So a requisition that's built using

11  Configurations 3 and 5 with RQC can be processed to

12  generate one purchase order for selecting matching

13  items with one selected matching item or more than one

14  purchase order for selected matching items associated

15  with several sources.

16      And, finally, here, the last element of the

17  claim talks about determining whether selected

18  matching item is available in inventory.  Lawson

19  doesn't even contend that the RQC modification has any

20  impact whatsoever on this particular claim element.

21  And you'll hear evidence that this element is

22  satisfied when a user of Configurations 3 or 5 checks

23  whether an item is available in inventory either

24  through Punchout vendor inventory or through an EDI

25  purchase report.

1          The evidence will show that Lawson is in

2   contempt not only because the configurations with RQC

3   infringe Claim 26 but also because Lawson has

4   encouraged and assisted its customers to continue

5   using the original infringing configurations with RSS.

6          Indeed, you'll hear evidence that Lawson

7   specifically designed RQC so it can be run in parallel

8   with RSS.

9          THE COURT:  Is there evidence why?

10         MR. STRAPP:  Is there evidence why?  Yes.

11         THE COURT:  Why it was designed that way?

12         MR. STRAPP:  The implication of the evidence

13  that I've seen is that they didn't want their

14  customers to be frustrated by requiring their

15  customers to take on a new product all of a sudden in

16  light of the injunction.  They wanted their customers

17  to continue using the old technology if they felt more

18  comfortable with RSS instead of requiring them to

19  immediately switch over to RQC.

20         THE COURT:  Somebody will address this?

21         MR. STRAPP:  Yes.  Evidence regarding this

22  will be presented both through Scott Hanson and to the

23  extent that Lawson calls Elizabeth Homewood, she will

24  also address this issue.

25         Now, what Lawson told its customers is,

1    Here's what we're going to do.  We're going to design

2    RQC and RSS so they can run in parallel.  Even with

3    Punchout installed as well.  They said, If there are

4    multiple users at your company who are using RSS and

5    RQC, don't worry.  We've designed it so they can both

6    run each module at the same time.

7              They told other customers, You've got lots of

8    different ways you can do requisitions now.  You can

9    do RSS.  You can do RQC.  Whatever you choose.

10             And Scott Hanson, who will be testifying,

11   said, When we install, we go out to our customer sites

12   and put in this new module, we don't touch RSS at all.

13   We don't uninstall it.  We don't remove it from our

14   customer's systems.  Therefore, both products are

15   available on the client's server.

16             So you may hear Lawson say that all this

17   hearing is about is the configurations with RQC.  But,

18   in fact, Lawson is also in violation of the injunction

19   because it specifically designed these configurations

20   you see on your screen, Configurations 3 and 5 with

21   RQC, to permit RQC and RSS to run in parallel.

22             THE COURT:  Are you telling me that there are

23   systems out there right now that are running RSS?

24             MR. STRAPP:  From the evidence --

25             THE COURT:  Even though they're running it in

1   parallel.

2          MR. STRAPP:  From the evidence that was

3   presented to us during discovery, that's what we saw.

4          Now, Lawson actually went one step further.

5   They actively instructed their customers on how to

6   continue using RSS even after they had downloaded RQC.

7   For example, Lawson provided some detailed technical

8   instructions on how to continue running RSS even after

9   downloading RQC to a non-healthcare customer within

10  weeks after the injunction had entered.

11         And they gave that customer, which was called

12  Western Lake Superior Sanitary, two different detailed

13  technical options on how they could continue running

14  RSS with RQC.

15         The first option was manually create RSS

16  bookmarks under something called a portal

17  administration in the bookmark manager file.

18         The second technical option was you could

19  also edit the Lawson LD dot shopping dot CSV file if

20  you want to keep on running these two modules together

21  at the same time.

22         After evidence is presented on colorability

23  and infringement, ePlus will present evidence

24  regarding the remedies it seeks.  EPlus will present

25  evidence related to its request for an award of

1  disgorgement.  It will ask for a multiplier for a

2  finding of wilful infringement.  It will ask for a

3  declaration of an exceptional case and award of

4  attorneys' fees.

5          To the extent Lawson doesn't come into

6  compliance with the injunction if a contempt is found,

7  ePlus will seek a course of remedy in the form of a

8  daily fine going forward to prevent ongoing contempt

9  until such time as Lawson can prove that it's in

10 compliance with the Court's order.

11         And to the extent Lawson comes back to you a

12 few months from now and says, Hey, we've got

13 design-around 3.0 in the works, we would ask that Your

14 Honor require Lawson come and seek pre-approval before

15 that new design around be issued to customers.

16         The Court has broad discretion to fashion a

17 remedy here for violation of its own orders.  And the

18 Court has recognized already that disgorgement is an

19 appropriate remedy.

20         The Court has also stated that if Lawson

21 wants to deduct costs from the revenues it realized

22 from licensing, servicing and maintaining infringing

23 Configurations 3 and 5, it, Lawson, bears the burden

24 of proving that those costs are related to and should

25 be deducted from the revenues it earned from

1   infringing activity.

2          EPlus will present expert testimony from

3   Dr. Keith Ugone who will show the Court that Lawson

4   has earned total revenue for the accused modified

5   Configurations 3 and 5 with RQC through November 30,

6   2012, which is the last date on which Lawson provided

7   financial information of 29.4 million.

8          And Dr. Ugone will also show that Lawson's

9   gross profits derived from that infringing activity

10  are 18.1 million.

11         But the fact that Lawson withheld information

12  from this Court two years ago at the injunction

13  proceedings is also relevant to the remedies phase.

14  Your Honor said in November 8, 2011, at a hearing,

15  that the remedy ePlus is entitled to and the interest

16  this Court has in enforcing its own injunction is

17  informed if, in fact, Lawson came in here and made

18  misrepresentations about the length of time it would

19  take to accomplish their design around and the expense

20  that it would require.

21         Lawson made no mention of its design-around

22  efforts at the March 25 evidentiary hearing on the

23  injunction or at the April 4 oral argument.  In fact,

24  the evidence will show Lawson made a concerted

25  decision to withhold information from the Court.

1        During the injunction proceeding, the Court

2   may recall that Lawson's lawyers and Mr. Dean Hager

3   actually argued that it would take tremendous amounts

4   of money and time to replace RSS with a non-infringing

5   substitute.

6        The Court may recall on April 1st, 2011, in a

7   signed pleading submitted to this Court by Lawson's

8   lawyers, Lawson contended, This is not software that

9   will be uploaded over the weekend.  That's April 1st,

10  2011.

11       May 27, 2011, less than two months later,

12  Lawson's CEO at the time, a man named Terry Devis,

13  sent a letter out to over 800 Lawson customers said.

14  The download should take 20 to 30 minutes.

15       THE COURT:  Is there a difference between

16  downloading and uploading?

17       MR. STRAPP:  Your Honor, the only witness who

18  I think can really explain that is Dean Hager.

19       THE COURT:  Did you ask him?

20       MR. STRAPP:  We asked him that at his

21  deposition.  We asked him several questions and we

22  will submit that testimony to Your Honor.

23       THE COURT:  All right.

24       MR. STRAPP:  Also on March 25, 2011, it was

25  Mr. Hager who said, From an implementation

1  perspective, knowing how long these things take, I

2  don't believe it's overstating to say it's going to

3  take nine months on average.

4       Well, two months later at this webinar that I

5  told you about where over 800 customers were watching

6  RQC being demonstrated live, Lawson said to set aside

7  any concerns from its customers that it was going to

8  be a large undertaking to get RQC running, they said,

9  Don't worry about it.  Lawson was the first

10 implementation.  We went live using our own internal

11 IT department with RQC in under one day of elapsed

12 time.

13      Now, this Court's recognized on several

14 occasions civil contempt is not unique to patent law.

15 18 U.S.C. Section 401, that's the section that vests

16 the Court with statutory authority to wield the power

17 of contempt if there's disobedience or resistance to a

18 lawful order.

19      Moreover, the Supreme Court more than a

20 century ago said, The power to punish for contempt is

21 inherent in all courts.  Its existence is essential to

22 the preservation of order in judicial proceedings, to

23 the enforcement of judgments and orders, and

24 consequently, to the due administration of justice.

25      At the conclusion of these proceedings, ePlus

1    will ask the Court to exercise its inherent authority

2    to enforce its own orders and to find Lawson in

3    contempt of the injunction.

4          Thank you, Your Honor.

5          MR. THOMASCH:  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MR. THOMASCH:  Your Honor, I intend in my

8    opening statement to focus on the phase 1 proceedings,

9    and I will make that clear as I discuss it.

10          Before I get there, I do want to address one

11    matter Your Honor raised.  You will not hear any

12    evidence that any of Lawson's customers are running

13    RSS.  There was a period of time, Your Honor will

14    recall, a six-month period of time when healthcare

15    systems, 277 identified hospitals and healthcare

16    providers, were permitted to be continuing to run RSS.

17          During that time period, and it was actually

18    front-loaded in that time period, but during that time

19    period those customers were transitioning over.

20    There's one reason you would operate the system in

21    parallel.  You operate the system in parallel so that

22    you can have a test environment and a production

23    environment.  And what you do is you're doing the same

24    searches on the new system that you haven't tested out

25    yet and the old system that you know works.  You know

1    how the requisitioning works.

2            THE COURT:  That time period was allowed, Mr.

3    Thomasch, because I was told that it would take a long

4    time to do this.

5            MR. THOMASCH:  Your Honor --

6            THE COURT:  And that's the only reason it was

7    allowed.  In fact, it was requested by Lawson I think

8    maybe a longer period, but I can't recall that.  And

9    so I'm not quite sure that I take a great deal of

10   comfort in hearing what you're saying if you're saying

11   that that process lasted more than the short period of

12   time it has now been shown to use the RQC --

13           MR. THOMASCH:  I'm not --

14           THE COURT:  -- assuming that the RQC is

15   different than the RSS.

16           MR. THOMASCH:  Yes.  The RQC -- I want to

17   focus on that because that's the key issue for phase

18   1, but RQC is different.  It was used for the

19   period -- and not for the full six months.  You'll see

20   most occurred at the front end.  The idea was to

21   transition the customers from RSS to RQC.  They ran it

22   in a test environment and a production environment

23   side by side to confirm that it worked.  Then they

24   used the RQC in the production environment and the RSS

25   is gone.

Case 3:09-cv-00620-REP   Document 1052   Filed 04/10/13   Page 31 of 240 PageID# 34276

31

1      There will be no testimony, no testimony,

2 that any RSS -- that there are any RSS customers of

3 Lawson, that any Lawson customer who was in any way

4 involved in this case is running RSS.  That's not

5 going to be presented to Your Honor.

6      Any implication to the contrary is simply

7 inaccurate.  And there are a host of inaccuracies and

8 out of context statements that relate to our factual

9 conduct, Lawson's factual conduct.  We will present

10 evidence.  We will meet that.  I'm not saying don't

11 pay attention to that.  I'm saying listen to the

12 evidence on that.

13      I want to focus today in the time allotted

14 for opening statement on what we consider to be the

15 critical, single issue for phase 1 of this proceeding

16 recognizing that there are more than one phase that

17 can occur in such proceedings.

18      Phase 1 is about whether the two-part change

19 made to the functionality of Punchout renders the

20 modified Configurations 3 and 5 more than colorably

21 different from the infringing configurations.

22      THE COURT:  Do you have books with your

23 opening statements?

24      MR. THOMASCH:  Yes, Your Honor.  We handed

25 one to plaintiff's counsel.  Would Your Honor like

1      There will be no testimony, no testimony,

2 that any RSS -- that there are any RSS customers of

3 Lawson, that any Lawson customer who was in any way

4 involved in this case is running RSS.  That's not

5 going to be presented to Your Honor.

6      Any implication to the contrary is simply

7 inaccurate.  And there are a host of inaccuracies and

8 out of context statements that relate to our factual

9 conduct, Lawson's factual conduct.  We will present

10 evidence.  We will meet that.  I'm not saying don't

11 pay attention to that.  I'm saying listen to the

12 evidence on that.

13      I want to focus today in the time allotted

14 for opening statement on what we consider to be the

15 critical, single issue for phase 1 of this proceeding

16 recognizing that there are more than one phase that

17 can occur in such proceedings.

18      Phase 1 is about whether the two-part change

19 made to the functionality of Punchout renders the

20 modified Configurations 3 and 5 more than colorably

21 different from the infringing configurations.

22      THE COURT:  Do you have books with your

23 opening statements?

24      MR. THOMASCH:  Yes, Your Honor.  We handed

25 one to plaintiff's counsel.  Would Your Honor like

1   one?

2           THE COURT:   Yes.

3           MR. THOMASCH:   I have very few slides, I'm

4   pleased to say.

5           So the phrase "more than colorably different"

6   is one that you've heard about throughout this case

7   and we've discussed and you're very familiar with.

8   The TiVo case, which is the guiding light from the

9   Federal Circuit on how to deal with civil contempt in

10  a patent law context with a redesigned product, TiVo

11  expressly equates more than colorable with

12  significant.   That's the word that's used throughout

13  the TiVo case.   Both sides have used that word.   I

14  don't think there's any fair dispute there.

15          The question is how does one -- what does it

16  mean?   How does one conduct an analysis about the

17  significance?

18          TiVo makes clear the significance analysis

19  requires an evaluation of the specific differences

20  between the original and the modified products.   That

21  is critical language.   I have it up on the monitor.

22  This is out of TiVo at page 884 of the decision.

23          For the record, it says, "The colorable

24  differences analysis should be based on the Court's

25  independent evaluation of specific differences between

1    the original and the modified products."

2         The Court went on to deal with how that would

3    play out in the TiVo case itself and said, "Here the

4    Court must compare the newly developed statistical

5    estimation feature with the original start code

6    detection feature to determine if the difference

7    between the two is significant.  Not the difference

8    between the entire products.  The difference between

9    the original and the modified features that are at

10   issue in the hearing.

11        So that takes me to what exactly is the

12   modification in this case?  Let's at least understand

13   what changed between the infringing configurations and

14   the configurations that are now the subject of this

15   contempt proceeding.

16        And Mr. Strapp mentioned very briefly that it

17   related to how things are organized on a requisition.

18   I'd like to be a little more specific because this is

19   important.  These are changes to source code of

20   computer software.  The source code is contained in

21   the RSS module, which is sort of the nerve center and

22   commands, directs the functionality of other aspects

23   of the overall configuration.

24        THE COURT:  Does it make any difference what

25   the change to the source code is as much as -- what

1    really makes a difference is what's the functionality.

2         MR. THOMASCH:  I would agree 100 percent,

3    Your Honor.  What I was just simply saying is it

4    doesn't matter that it's a change to the source code

5    or in what module the source code is, the

6    functionality, and it's a big issue here, and you're

7    going to see, and I'll talk about it a littler later,

8    but the change is in the functionality of the Punchout

9    and how it relates to item master.  It's not a change

10   in other aspects of RSS that were at issue previously

11   in this case.

12        So there's a two-part change here, Your

13   Honor.  The first part, and I want to go through it

14   slowly so that we understand what is actually at

15   issue.  What was the specific change in the words of

16   TiVo.

17        So part 1, when using the modified products,

18   a Lawson customer who has searched for and selected a

19   matching item or items from item master cannot access

20   a Punchout vendor's website during that shopping

21   session.

22        So if you've started with item master and you

23   have selected an item, you bring it back and it gets

24   put directly onto a requisition in the RQC module.

25   Once you do that, you can't get access to a Punchout

1    vendor's website.  You can't look and see is there a

2    comparison product that I would like to buy.  Can I

3    find this at a better price?  You're unable to even

4    get to the website after you have put an item master

5    item on the requisition.

6         Now, similarly, if a shopping session starts

7    with a search and selection of one or more items from

8    Punchout, if you have an item from a Punchout vendor's

9    website, the customer cannot then access the item

10   master.  So it works in both ways.

11        Once you have made a selection from one, you

12   can't even get into the other to look and see if

13   there's a better selection, much less can you see is

14   there an additional selection.

15        Thus, the redesigned product prevents a user

16   from searching and combining items from both item

17   master and a Punchout vendor's website on a single

18   requisition.

19        Now, it is not disputed that functionality

20   was a feature in the infringing configurations.  You

21   had that functionality.  Now you don't.

22        The second part of the change is a variation

23   on that theme, but it sort of completes the loop

24   between the interaction of Punchout and item master.

25   Your Honor will recall from the trial, item master, a

1    big database with potentially thousands of items in

2    it.  Punchout, separate websites for different

3    Punchout vendors.  So you can go to this specially

4    designed Dell website or specially designed Staples

5    website.  Or there could be 100 different Punchout

6    vendors that a Lawson customer has.

7         Well, when using the modified products, a

8    Lawson customer who has searched and selected an item

9    from one Punchout vendor's website cannot access a

10   second Punchout vendor's website.  And, thus, you

11   can't go -- you can't look at something from Company

12   A, bring it back to your requisition, and then say,

13   Maybe I can get a better buy at Company B.  Let me go

14   see what they have in this good.  Well, that's not

15   available.  You can't get to Company B's Punchout

16   site.

17        So the redesigned product prevents the user

18   from selecting and combining items from different

19   Punchout vendors' websites on a single requisition.

20   And, again, Your Honor, that is functionality that

21   concededly was present in the infringing products.

22   These changes in functionality are facts.  They are

23   not in dispute.  And it's also clear that the

24   functionality change is entirely to the detriment of

25   the product.

1           This product has been impaired.  It is not as
2   good as it used to be.  There is no corresponding
3   benefit.  And Your Honor remembers there were other
4   aspects of this case in regard to the question about
5   whether there's a shopping cart and an order list or
6   whether you could go directly to a requisition.  Much
7   time and discovery and argument was had about that
8   change.  No longer at issue.

9           But there in that context, Lawson came up
10  with what I would call an elegant design around where
11  they accomplished what they wanted to do on a
12  design-around basis and they didn't impair
13  functionality.  They did it a different way, but they
14  didn't impair functionality.  And that was sort of
15  used against us.

16          This is different.  We impaired it.  We
17  couldn't do with Punchout what we had done with the
18  shopping cart.  The only way to address the injunction
19  was to put a clever to the product and make it
20  different than it was.  So the Punchout works
21  differently.  These changes are significant.  They are
22  more than colorable.  They are absolutely significant.
23  And there's three ways I want to stress right at the
24  start as to why they are significant.

25          One, by restricting access after an item is

1    selected from either item master or a Punchout

2    vendor's website, RQC diminishes the ability that RSS

3    Punchout users had had to conveniently engage in

4    comparison shopping.

5         This product is not used by Your Honor or

6    your law clerk or me or Mr. Strapp.  That is not the

7    customer.  This is not for someone that occasionally

8    goes to Amazon and orders a book and then might want

9    to see, oh, can I go to Barnes & Noble and get a

10   better book?

11        This is used by requisition professionals

12   whose job it is to go to work and buy product for big

13   organizations and who are consistently buying lots of

14   things.  And comparison shopping is a big part of

15   their job.  And the old product allowed it,

16   facilitated it, made it convenient.  The new product

17   prevents it.

18        Secondly, by preventing you from being able

19   to group things on a single requisition and do

20   multiple shopping excursions in one shopping session,

21   it now takes more time for the user to procure goods

22   from multiple sources.  Time is money.

23        Third, you prolong and complicate the

24   requisition approval process.  So Your Honor will

25   recall from the trial, the front line user of this

1     product in the first instance who actually does the

2     searches, finds the matching items, builds the

3     requisition, that's someone who is a requisitioner

4     purchasing professional. That person, however,

5     typically wants to generate a purchase order to go out

6     and, of course, commit his or her organization to pay

7     money. There's usually an approval process between

8     creating the requisition and actually sending out the

9     purchase order.

10         So someone has to approve the requisitions.

11     Under the old system, if an individual requisitioner

12     was buying items from 15 places and 150 items total,

13     they all were back on one requisition and the party

14     that was doing the approval could look at the whole

15     thing, the array of goods being purchased and say,

16     okay, I approve or I disapprove. Now that party has

17     10 different requisitions to approve and the time

18     involved and, of course, when they are approving the

19     first, they don't even know what the tenth one says.

20     So it's a different world altogether and more

21     complicated both at the front end and at the back end

22     of the process by which these machines are used in the

23     real world.

24         Lawson did not want to make these

25     modifications. I want to be clear about that.

1    There's no advantage to Lawson.   There was one reason

2    and one reason only that these were made.   Because of

3    the injunction and Lawson's respect for this Court and

4    for the injunction, it made the changes.   And you will

5    see evidence that, for instance, as of the time of the

6    March 25th hearing in this court, there was not even a

7    clue as to how Lawson would deal with Punchout.   They

8    didn't know what to do because they were still trying

9    to figure out is there a way in which we can do this

10   without impairing our customers' ability to use it.

11   Can we do it without a loss of functionality?   And

12   they came up with a couple of ideas and it didn't

13   work.   The lawyers said, That's not good enough.

14           So they had nothing at that point.   And the

15   documents say, Well, what are we going to do about

16   that because we have deals that are closing?   And they

17   said, Well, if we have a redesigned RSS, and what that

18   really means is this order list of direct requisition,

19   that whole user interface other aspect of the case

20   that you heard about where the shopping cart existed,

21   and then it was replaced, it was eliminated and it was

22   replaced by direct requisition technique, they said,

23   If that redesign is going to work, if we can get

24   something there, this was done in mid April, if we can

25   get something there we'll sell that to the customer

1    instead of RSS and we will put Punchout out of the

2    deal.   In other words, we can't sell them Punchout

3    because Punchout is still not changed.   It hasn't --

4    we haven't got a design around.   So we'll pull it out

5    of the deal.   That would have had an adverse

6    consequence on Lawson.

7           As it turned out, Lawson came up with an idea

8    that was better than pulling it out.   It was cutting

9    off much of the functionality so that functionality

10   that was necessary wasn't there.

11          What we will talk about during this trial is

12   what we like to call the delta between the

13   functionality of the infringing configuration, which

14   is the greater functionality, and the lesser

15   functionality of the modified configurations, and we

16   will try to isolate and focus on that delta with each

17   witness because that's what TiVo said.

18          Look at the significance of the specific

19   differences.   And that's what we intend to do.   TiVo

20   directs us to do that.   EPlus isn't going about this

21   case that way.   They are not talking about

22   colorability in that light.   They offer little or no

23   evidence or argument that directly addresses the

24   comparison of the feature that existed and the feature

25   as it is changed.   And that's the TiVo analysis.

1          Now, I know it seems preposterous to say

2     after all that we've been through in this case that

3     they have no evidence on the central point for the

4     phase 1 proceeding, but that is the case.  They have

5     talked about these as cosmetic and aesthetic changes.

6     They are not.  They are real world changes that impair

7     the functionality.

8          They use those terms a lot with other aspects

9     of the redesign.  We had whole different arguments

10    that are never going to be brought before the Court.

11    But we had good arguments.

12         But in this situation there's nothing

13    aesthetic or cosmetic about what's at issue.  There

14    are changes.  They are real.  They are undisputed.

15    And it's up to the Court to evaluate the significance

16    of them.

17         Let's go to slide 5, please.  Consistent with

18    what ePlus put in it pretrial statements, Mr. Strapp's

19    opening statement didn't make reference to the kind of

20    evidence that you would expect to see from a party

21    that bears the burden of proof if they were going to

22    be able to show that the differences were not

23    significant.

24         First, in this case, there will be nothing to

25    dispute the fact that the modifications were made to

1    the infringing components and that the loss of

2    functionality is real.

3            Second, there is not going to be any

4    testimony by a Lawson witness that the modifications

5    that are now at issue are insignificant.  That just --

6    there isn't such testimony.

7            THE COURT:  Is there a difference between

8    insignificant in the generic sense of the word and

9    insignificant in the assessment and application of the

10   test under TiVo?

11           MR. THOMASCH:  I think that word actually

12   is -- I could see that one could bandy about

13   significance or insignificance in a way that wasn't

14   directly related to TiVo, but I think TiVo said the

15   test is whether something is more than colorably

16   different.  And then you had to look at whether it was

17   significant.  And I think significance relates to in

18   this instance the functionality that the product was

19   designed to have.

20           THE COURT:  But they say that their argument

21   is that if you do a degradation of the product, which

22   you said you've done, then that's an indication that

23   it is not significant because it is not an innovation

24   or under the TiVo meaning of significance, you don't

25   pass muster.

1        MR. THOMASCH:  Right.  And that's simply

2   wrong.  And that's a legal issue for Your Honor.

3        THE COURT:  You're saying that's a legal

4   question.

5        MR. THOMASCH:  It's a legal question.  It's a

6   legal question.  There's no doubt.  We're not trying

7   to claim that this was innovative.  It wouldn't have

8   been innovative if we had simply said, Don't sell

9   Punchout.  But if we didn't sell Punchout, we wouldn't

10  be alleged to be infringing Claim 26.

11        So the notion here that somehow if it's not

12  innovative -- the Court in TiVo said if it is

13  innovative, there could be some relevance to that.  It

14  didn't say what would happen if it's not innovative.

15  TiVo itself involved a step backwards.

16        There is no doubt that TiVo was a loss of

17  functionality case, and the Court didn't say, Oh, you

18  have a loss of functionality.  Then you are not more

19  than colorably different.

20        The Court sent it back to say we have to

21  compare the difference between the old and the new

22  feature.

23        THE COURT:  What happened on the send back?

24        MR. THOMASCH:  I don't believe it ultimately

25  was resolved, Your Honor.  To my knowledge that

1   case -- I believe that case settled.  And I could be

2   mistaken.  I certainly am confident that there aren't

3   published opinions after that.  I think I have drawn

4   that conclusion that it settled.  But I don't have

5   firsthand knowledge of that and wasn't involved in the

6   case.

7           So ePlus doesn't have testimony by Lawson

8   witnesses about this difference, okay.  What they aim

9   at -- there were lost of depositions of Lawson

10  customers.  And what they're asked about are all the

11  things that didn't change and whether you can still do

12  things with the product that you could have done

13  before.  They never focus on the actual difference and

14  on this things that you can't do.  And that's where

15  TiVo takes the testimony.  It takes the analysis.

16          They are not going to call any Lawson

17  witness.  We will both come forward with some evidence

18  about what Lawson witnesses -- Lawson customers -- I'm

19  sorry.  They are not --

20          THE COURT:  They are not going to call any

21  Lawson witnesses?

22          MR. THOMASCH:  I misspoke, Your Honor.  I

23  misspoke and I apologize.

24          They are not going to call any Lawson

25  customers.  And there are customers within the

1    subpoena power of the Court that they could have

2    called.  They have a list of our customers.  This case

3    started at one time with approximately 2000 customers

4    who had systems accused of being infringing.

5          As of the time that there was an injunction,

6    there were 864 of them.  And I believe 137, and I

7    could be off by one or two, but I think 137 of those

8    864 had Configurations 3 and 5.  This deals with, this

9    Configuration 3 and 5 is identical -- well,

10   Configuration 3 is identical to Configuration 2, which

11   is not in the case but for the addition of Punchout.

12         Punchout is about 10 percent of our customer

13   base.  It doesn't drive the sales.  It isn't the big

14   product.  The big product, Configuration 1, which

15   gives you the real sophisticated, all the underlying

16   guts.  Configuration 2, which gives you that and RSS,

17   which is that sort of user-friendly interface that

18   allows you to with minimal training be able to do what

19   Configuration 1 can do.

20         They have the same ability to do things, but

21   it's easier to do them on Configuration 2.  It's not

22   relevant for patent purposes, but in the real world

23   marketplace, it's relevant to have RSS or RQC because

24   it helps someone who is used to operating on a

25   computer terminal do sort of point and click.

1          So those two accounted for 17 or 1800 of the

2    customers.  And there was a Configuration 4 that had

3    some customers and it's not in this case.  We're left

4    with a very small group of customers who the reason

5    they have 3 -- the difference between having 3 and

6    having 2, I can still do everything that I could do

7    with 2.  In addition I have an added benefit.  I can

8    do a search with Punchout and item master or Punchout

9    alone.  And that's what we've changed.

10          Finally, there isn't going to be -- you heard

11   about Dr. Weaver.  There is not going to be an expert

12   opinion in this case from the plaintiffs that the

13   modifications are insignificant.  He is not going to

14   testify that they are insignificant independent of the

15   alleged infringement.  And that's a big issue.  And

16   I'll talk about that in a little bit.

17          If we could go to the next slide, I want to

18   talk about the arguments they are making and not the

19   evidence that they didn't make.  I want to go through

20   quickly, but to argue that the modifications concern

21   random features not relied on.  Well, there is nothing

22   random about what we changed.  What we changed was the

23   functionality that was at the epicenter of the first

24   trial.

25          THE COURT:  Leave random out of it.  Leave

1  the modifier "random" out of it.

2        MR. THOMASCH:  Understood.

3        Your Honor, there is -- we would agree on a

4  point that there's a threshold question whether you

5  could make a change to -- the TiVo case says a random

6  feature.  You could make a change that is unrelated to

7  the evidence that came in at trial.  And that got us

8  into the whole contended and proved issue.  And if you

9  made a change to that, it wouldn't matter.  It has to

10 be to something that was contended and proved to be

11 part of the case.  Now, here --

12       THE COURT:  It has to be something that is an

13 element of the claim.

14       MR. THOMASCH:  That relates to an element of

15 the claim.  It identifies what differences you take

16 evidence about.  We are sort of past that point and we

17 went through lots of letters, and we didn't have sort

18 of identification, but we did say, Here are the three

19 changes.  And we've identified the changes.  And now

20 we're down to the changes that relate to Punchout for

21 Configurations 3 and 5.  So that argument, in effect,

22 is a legal argument for the Court to decide what is

23 relevant or not, and it's something that normally you

24 would deal before you got here.  We're here and we

25 know what we're talking about.

1        Number 2 is they spent a lot of time talking
2   about the significance of unchanged features of the
3   infringing configurations.  And you heard Punchout
4   didn't change.  Well, the functionality of Punchout
5   changed.  The system flow didn't change.  The base
6   didn't change.  It's absolutely right.  There are lots
7   of parts of it that didn't change.
8        TiVo says, Look at what did change.  See if
9   what did change is significant.  I talked about the
10  question whether the changes are in the Punchout
11  module or in RSS.  What's important about that is that
12  the witness -- you'll see RSS is the user interface
13  that's on every configuration that was found
14  infringing.  All 864.  That was -- there were separate
15  issues there on the way in which the RSS operated
16  behind the screen.  The way in which it processed your
17  order.
18       Did it go into a temporary shopping cart and
19  then from there to a requisition?  And we made a
20  change to go directly to a requisition.  And there's
21  been a lot of briefing on that.
22       But it was a point of pride to Lawson that we
23  did that.  And we eliminated something that was
24  critical to the patent, but we did it in a way that
25  was of no loss of functionality to our customers

1   whatsoever.   And on that issue, which is not the part

2   of this trial, but is the part of our document base,

3   it is the part of our development story, it is a real

4   thing.

5           In that situation, we were proud of the fact

6   that we didn't impair functionality at all.  We did it

7   in an elegant way that eliminated the shopping cart

8   but allowed the user who used to be able to know how

9   to use RSS to be able to use RQC easily.

10          That's not what this is about.  And when they

11  point to documents that talk about RSS and RQC are

12  similar, the same, no big change, if you know how to

13  do one, you can do the other, that's talking about the

14  user interface and the direct to requisition.

15          There's no testimony, they didn't take those

16  documents, show it to the witness and say, Were you

17  talking about Punchout and get an affirmative

18  response.   Those are not Punchout-related documents.

19  They don't relate to Configurations 3 and 5.   They

20  largely relate to the common aspect of 2, 3 and 5,

21  every one of the 864 customers who had the shopping

22  cart.

23          They will -- finally, they will argue that

24  the modified product still infringes the claims at

25  issue.   And I think this is the conflation point

1    that's so central, and I want to show you exactly how

2    it comes up because they are going to argue

3    colorability and the lack of significance here, and we

4    had expert reports, and there's been, again, much

5    motion practice and decision on expert reports.  But

6    if there's one thing that's been clear it's that if

7    you want to say something in court, it has to be in

8    your expert report.

9           And we then took depositions based on the

10   expert reports.  And I deposed Dr. Weaver.  And the

11   deposition testimony I want to refer to is the

12   specific section that was addressed to what the basis

13   was for his claim that the changes were not more than

14   colorable because that's the opinion he expressed.

15          And for the record, I asked him question:

16   Did you also form an opinion as to whether the changes

17   that were made were more than merely colorable?  And I

18   will note away from the quote, that this was

19   specifically in regard to the two Punchout-related

20   changes that I mentioned to the Court.  That's the

21   section of this deposition that I'm now excerpting

22   from.

23          The answer:  Yes, I am of the opinion that

24   they are not more than colorably different.

25          Question:  Okay.  Then what is the basis for

1    that opinion?

2          Answer:  Because the functionality of RQC

3    even with the reconfigured Punchout still has the

4    functionality of the '683 claims.

5          And then I followed up, question:  So by

6    saying you have the functionality of the '683 claims,

7    you're saying that you infringe the '683 claims?

8          Answer:  Yes.

9          Question:  And on that basis, you have the

10   personal opinion that changes made to Punchout are not

11   more than colorably different?

12         Answer:  That's correct.

13         Dr. Weaver's testimony was unambiguous and

14   his two expert reports totaling 135 plus pages are

15   absolutely consistent with this.  He does not say, I

16   am comparing the features, the functionality of the

17   infringing Punchout in the overall system with the

18   same aspects as modified and looking to see whether

19   the difference between the original and the modified

20   is significant.  He doesn't do that.

21         The comparison for Dr. Weaver is not the TiVo

22   comparison between infringing and modified.  It's

23   between modified and patent claims.  And he says, If

24   the modified still infringes, it's not more than

25   colorable.  That puts stage 2 in front of stage 1.

1   And the Federal Circuit has made it clear that is

2   incorrect.

3            Indeed, the Federal Circuit in TiVo made new

4   law.  It rejected and overruled the KSR case.  It said

5   what it called the infringement based understanding of

6   the colorable differences test was being overruled.

7   That's at TiVo at 646 F.3d 869 page 882.  They

8   overruled the infringement based understanding of the

9   colorability difference test.  That's what Dr. Weaver

10  did.  Dr. Weaver gave an opinion that's consistent

11  with KSR --

12           THE COURT:  Are you saying in all of his

13  report, Dr. Weaver didn't take a look at the modified

14  product with the elements and match them to the

15  elements of Claim 26?

16           MR. THOMASCH:  No, I am not saying that.

17           THE COURT:  Because that's what he's supposed

18  to do.  And if he did that, that's fine.

19           MR. THOMASCH:  Your Honor, what he did --

20           THE COURT:  I think -- I have to tell you --

21  okay.  I just want to make sure I understand.  You're

22  saying he didn't do that.

23           MR. THOMASCH:  I want to be clear what he

24  didn't do.  What he didn't do was compare the

25  functionality of the infringing configuration and the

1   functionality of the modified configuration.  He did

2   not look at those two and say, "Is this significant?"

3          TiVo says that if that difference is

4   significant, you never reach the question of

5   infringement.  What he did was he looked at the -- he

6   compared the modified product and the patent claims

7   and said it still infringes.  And because it still

8   infringes, I believe it's not more than colorable.

9          He has two reports.  He does not offer any

10   opinion or any basis that a comparison of the feature

11   of the infringing product and the feature of the

12   modified product are not significantly different.  He

13   doesn't say so.  He will not say so in this court

14   unless he offers testimony beyond the scope of his

15   report, which I don't believe will be allowed.

16          The quoted testimony was not an accident or a

17   slip of tongue or something taken out of context.

18   This is consistent with his report.  And the reason,

19   Your Honor, the reason we submit that in 130 plus

20   pages of expert reports Dr. Weaver never says that the

21   change in functionality between what was on trial

22   before and what is now at issue, the reason he doesn't

23   say that that's not significant is because he has

24   previously said it is significant.

25          He previously identified that capacity as, "A

1    big deal."  This was something -- this was a feature

2    of centrality and importance to Dr. Weaver.  If it is

3    a big deal to have it, it's a big deal to lose it.

4    That's our position, Your Honor.

5            Now, ePlus has a very heavy burden of proof

6    in this contempt proceeding as Your Honor is aware,

7    and we could simply rest on their failure to address

8    the TiVo issue that I had forth on the first slide.

9    That is our position.  We are going to isolate that

10   difference between the products and talk about whether

11   they are different product to you product, feature to

12   feature.  Original infringing and modified and

13   accused.  Whether that difference is significant.

14           And they don't do that.  And we could just

15   say fine.  We're ships passing in the night.  Put your

16   evidence in.  We'll make our legal argument.

17           We don't have a reason or a need or a burden

18   to affirmatively come forward with evidence.  They

19   have a clear and convincing burden.  And if they don't

20   address the central question that TiVo dictates, then

21   they cannot carry that burden, at least in our

22   position, and we're not going to change that position.

23           THE COURT:  So you're not putting on any

24   evidence?

25           MR. THOMASCH:  But we will put on evidence.

1    We don't have to, but we will.  We will put on

2    evidence and we will show because we want to answer

3    the Court's questions, we want to deal with this.  And

4    so, yes, we are going to put on that.  But we are

5    going to try in the course of that presentation to

6    keep coming back to the test that TiVo says and not

7    the distractions that have been used time and again.

8         You will see in that evidence that Lawson's

9    business managers did not want to make either part of

10   the two-part change that ultimately was made, but the

11   lawyers who had the final say said it had to be done

12   in order to conform with the injunction.

13        That evidence is going to come in through the

14   testimony of Mr. Christopherson and Mr. Lohkamp, who

15   will be in court.  It has already come in through the

16   testimony of Mr. Hager and his deposition has been

17   submitted and is available for the Court, and it will

18   be reflected in documents that Dr. Weaver reviewed but

19   did not comment on in his expert report.

20        Unless ePlus can show that the differences

21   are not substantial, they should not be permitted to

22   continue this case.  They have a right to say that the

23   analysis they want to engage in is the modified

24   product still within the claims of the patent.  They

25   want to the argue that.  They want to say we're in

1  patent infringement.

2       I want to be clear.  If we win this case, if

3  we win on colorability, that doesn't end our potential

4  liability in any way, shape or form.  They can sue us

5  for patent infringement for prior conduct for the cost

6  of a civil action number.  That is their entitlement.

7       What they are not free to do is to try to

8  prove infringement in a new case with no new claim

9  construction, with no jury, with new theories, with a

10  new way of saying that we infringe.  They are not free

11  to do that when the product they're talking about is

12  significantly different than the product that already

13  has been found to be infringing.  That's the issue in

14  this case.

15       It's isn't fair or proper to have that form

16  of infringement analysis when the underlying product

17  has been significantly changed.  TiVo says so.  TiVo

18  says that issue is not relevant at that point.

19       Configurations 3 and 5 containing the new RQC

20  and the limitations on how RQC interacts with Punchout

21  are more than colorable different from Configurations

22  3 and 5 containing RSS.  The evidence will show that.

23  We will ask the Court to constantly focus on whether

24  what is being discussed is in fact a comparison of the

25  differences.

1          That is what TiVo says the case should be.
2     That is the case we will try to victory or to defeat.
3     That is our case.  And we think that the evidence only
4     permits one conclusion.  There isn't another
5     reasonable side.  This is functionality.  This is not
6     lipstick on a pig.  This is not cosmetic.  It's not
7     nomenclature.  It's not labeling.  It's real life
8     functionality that diminishes the ability of the user
9     of the product to do what Configuration 3 and
10    Configuration 5 are intended to do to the extent that
11    the customer wants to use that separate functionality,
12    which is necessary for Claim 26.
13          Remember, Configuration 2, which is just like
14    3 but doesn't have Punchout, Configuration 2 wasn't
15    even accused of infringing Claim 26.  And
16    Configuration 4, which had EDI in it, was accused of
17    infringing Claim 26, but the jury rejected that.
18          So the only -- where you have this cased all
19    shaping up is they know that you need Punchout in
20    order to be relevant to Claim 26.  We're in agreement
21    on that.  It's Punchout as it's used in the system.
22    It's not just about Punchout.  But it's the Punchout
23    functionality that's necessary because if you don't
24    have Punchout functionality, they don't even accuse us
25    of infringing Claim 26.

1          The Punchout functionality is what we are
2     going to be talking about.  We changed the product.
3     We changed it any a big way.  It is a big deal in the
4     words of Dr. Weaver.  And at the end of this phase of
5     the case, we will ask Your Honor for judgment as a
6     matter of law and a termination of the proceeding at
7     least with respect to the questions that concern RQC.
8          Thank you, Your Honor.
9          THE COURT:  We are going to take a recess and
10    change court reporters in just one second, but we
11    started roughly an hour and a half ago, and the reason
12    we're doing the order of proceedings and order of
13    March as we are, which is to take up the proofs
14    respecting the contempt, is that we don't have any
15    proofs being offered on the issue of the injunction.
16    That's only going to be legal argument.  And you-all
17    set your witnesses and the availability of your
18    experts and the availability of the lawyers around a
19    date that was picked sometime ago.  And I'm going on
20    and take that testimony.  But I would like to make
21    sure we get the witnesses' testimony in given that we
22    have structured the whole order of proceedings in
23    order that we make sure we do get the testimony in.
24    We'll take a 20-minutes recess.
25          (Recess taken at 10:55 AM.)

1          THE COURT:  Call your first witness, please.

2          MS. ALBERT:  Yes, Your Honor.  ePlus calls Dr.

3    Alfred Weaver.

4

5                    **ALFRED C. WEAVER,**

6    a witness, called at the instance of the plaintiff,

7    having been first duly sworn, testified as follows:

8                    DIRECT EXAMINATION

9    BY MS. ALBERT:

10   Q    Good morning, Dr. Weaver.

11   A    Good morning.

12   Q    Would you state your full name for the record.

13   A    Alfred C. Weaver.

14   Q    Would you tell us your current occupation.

15   A    I'm a professor of computer science at the University

16   of Virginia, and I'm director of the university's Applied

17   Research Institute.

18   Q    What are your fields of expertise?

19   A    Computer science, computer systems, computer network

20   architecture, databases, internet, and electronic

21   commerce.

22   Q    Were you previously qualified as an expert in this

23   case by the Court during trial?

24   A    Yes, I was.

25          MS. ALBERT:  Your Honor, I would proffer Dr.

1    Weaver as an expert in the field of computer science,

2    computer systems, networks, databases, and internet and

3    electronic commerce.

4              THE COURT:  Any objection?

5              MR. THOMASCH:  No objection, Your Honor.

6              THE COURT:  He is so qualified.

7    Q    Dr. Weaver, what issues were you asked to analyze for

8    purposes of this proceeding?

9    A    I was asked to analyze two issues:  One, whether or

10   not the changes that have been made in the -- to RSS to

11   produce RQC are more than colorably different -- let me

12   say that again.  Whether the systems now, the procurement

13   system using RQC is more than colorably different from the

14   systems that were adjudged to infringe in the previous

15   trial, and then secondly, whether or not the RQC system

16   coupled with the S3 procurement system continues to

17   infringe claim 26.

18   Q    What is the Requisition Center or RQC application?

19   A    This is a software module that overlays the

20   procurement system, and it provides friendly user

21   interface to the procurement system.

22   Q    What materials did you review and rely upon in order

23   to render your opinions in this proceeding?

24   A    There were lots of documents produced by Lawson during

25   the --

1          THE COURT:  Excuse me a minute.  I thought you

2   took the view that claim 26 was a method claim.

3          MS. ALBERT:  Claim 26 is a method claim.

4          THE COURT:  Why is he talking about a system

5   then?

6          MS. ALBERT:  The system is used to perform the

7   method.

8          THE COURT:  I assume you'll cover that with him.

9          MS. ALBERT:  Yes, Your Honor.

10          THE COURT:  All right.

11   A    Okay, so I reviewed documents that Lawson produced

12   during discovery.  I read the testimony of their experts.

13   I reviewed some of the webinars about training for RQC.

14   Lawson provided a demonstration system that ran RQC and

15   RSS on the same computer.  I made experiments with that

16   and developed some demonstrations that we might see later.

17   I spoke with ePlus's other expert, Patrick Niemeyer, about

18   the source code.

19   Q    Did you review the deposition of Lawson's technical

20   witness, Mr. Christopherson?

21   A    Yes, I did.

22   Q    Did you review the depositions of Lawson's other

23   corporate representatives, Ms. Homewood and Mr. Hansen?

24   A    Yes, I did.

25   Q    Did you review the depositions of Lawson's other

Weaver - Direct

1    witnesses, Mr. Lohkamp and Mr. Hager?

2    A    Yes, I did.

3    Q    Did you review any technical manuals that Lawson

4    produced relating to the systems having Requisition

5    Center?

6    A    Yes, I did.

7    Q    Did you review, for example, the Lawson Requisition

8    Center user guide?

9    A    Yes, I did.

10   Q    Did you review Lawson's inventory control user guide?

11   A    Yes, I did.

12   Q    Did you review Lawson's Procurement Punchout

13   installation and administration guide?

14   A    Yes, I did.

15   Q    Are these technical guides the types of documents that

16   experts in your field would find relevant to understanding

17   the operation of the Lawson systems?

18   A    Yes, they are.

19   Q    Did you review declarations, written testimony that

20   was submitted by Lawson's witnesses, Mr. Christopherson,

21   Mr. Dooner, and Dr. Shamos in opposition to ePlus's motion

22   to show cause why Lawson should not be held in contempt of

23   the Court's injunction?

24   A    Yes, I've read all three.

25   Q    Did you have the opportunity to review the report of

1   Lawson's technical expert, Dr. Goldberg?

2   A    Yes, I did.

3   Q    Did you have the opportunity to review communications

4   that Lawson issued to its customers concerning the

5   functionality of the Requisition Center application?

6   A    Yes, I did.

7   Q    Did you review any internal communications within

8   Lawson with respect to the functionality of the

9   Requisition Center application?

10  A    Yes, I did.

11  Q    Now, these types of documents that we've been talking

12  about, the technical manuals, the user guides, the

13  customer communications, internal communications, training

14  courses, demonstration systems, webinars, are these the

15  types of documents that an expert in your field who is

16  going to be offering opinions on the functionality of a

17  computer software implemented process would reasonably

18  rely upon in forming opinions about the issues involved in

19  this contempt proceeding?

20  A    Yes, they are.

21  Q    And did all of these materials assist you in

22  formulating the opinions that you've rendered for purposes

23  of this contempt proceeding?

24  A    Yes, they did.

25  Q    For purposes of your analysis of the RQC systems and

1    the opinions that you are rendering here today, what do

2    you consider to be the appropriate level of ordinary skill

3    in the art?

4    A    I think that would be a person who --

5              MR. THOMASCH:  Objection, Your Honor.  The issue

6    of ordinary skill in the art is relevant to infringement.

7    I do not believe that there's been any finding on the

8    issue of ordinary skill in the art is relevant to the

9    colorable differences test.

10             MS. ALBERT:  I believe that the *TiVo* case does

11   indicate that when viewing the significance of a change to

12   the accused system, that you are to view that modification

13   in terms of the perspective of a person of ordinary skill

14   in the art.  *TiVo* says at --

15             THE COURT:  What page is it on?

16             MS. ALBERT:  646 F.3d, page 882, that the Court

17   must also look to the relevant prior art, if any is

18   available, to determine if the modification merely employs

19   or combines elements already known in the prior art in a

20   manner that would have been obvious to a person of

21   ordinary skill in the art at the time the modification was

22   made.  A nonobvious modification may well result in a

23   finding of a more than colorable difference.

24             So here you see clearly that the context of the

25   colorable difference is to be viewed in the prism of the

1    person of ordinary skill in the art.

2            MR. THOMASCH:  Your Honor, I think to the extent

3    that that is the issue that's being framed, a person of

4    ordinary skill in the art can comment.  If there was a

5    question about whether, for instance, this was practicing

6    a prior art, I think that a person of ordinary skill in

7    the art standard would be appropriate, but if it's a

8    question of whether there's a significant difference in

9    the functionality, I don't think that that's necessarily

10   drawn, and I don't think *TiVo* indicates that that's

11   necessarily drawn from one of ordinary skill in the art or

12   which art would be relevant for the colorable differences

13   test in that regard.

14           THE COURT:  Anything else?

15           MS. ALBERT:  Pardon me?

16           THE COURT:  Is there anything else?

17           MS. ALBERT:  I mean my position is that we

18   believe that it is relevant --

19           THE COURT:  I mean other than to repeat what

20   you've already said.

21           MS. ALBERT:  No.  I mean, I'm not going to repeat

22   what I already said.

23           THE COURT:  That's what "anything else" means.

24   Overruled.

25   Q    Do you consider yourself to be at least a person of

Weaver - Direct

1   ordinary skill in the art?

2   A    Yes.

3          THE COURT:  He didn't answer the question.

4          MS. ALBERT:  Pardon me?

5          THE COURT:  He didn't answer the question because

6   there was an objection.

7          MS. ALBERT:  I'm sorry.  Let me go back.

8   Q    For purposes of your analysis of the RQC systems and

9   the opinions that you are rendering here today, what do

10  you consider to be the appropriate level of a person of

11  ordinary skill in the art?

12  A    I believe that person would have a Bachelor of Science

13  degree in computer science or a similar technical

14  discipline and one or two years of practical experience

15  writing code and working with supply chain management.

16  Q    And are you a person of ordinary skill in the art?

17  A    No.  I'm an expert.

18  Q    Thank you.  Let's review, if we could, the Lawson

19  configurations that were found to be used to infringe the

20  method of claim 26 of the '683 patent.  How many

21  configurations did the jury find were used to infringe

22  claim 26?

23  A    Two; configurations three and five.

24  Q    Let's look at configuration number three.  What are

25  the components of configuration number three?

1  A    At the bottom are the platform technology foundation

2  including Lawson System Foundation and process flow.

3  Above that, the S3 procurement modules which include

4  purchase order requisitions and inventory control.  Above

5  that, requisition self service, and above that,

6  Procurement Punchout.

7  Q    Now can we see configuration five, please.  How does

8  configuration five differ from configuration number three?

9  A    It adds the electronic data interchange module.

10 Q    Let's briefly review claim 26 of the '683 patent at

11 issue in this proceeding.  Could you briefly walk us

12 through the elements in that claim.

13 A    This is a method claim that has six elements:  First,

14 maintaining at least two product catalogs on a database

15 containing data relating to items associated with the

16 respective sources.

17      Second, selecting the product catalogs to search;

18 third, searching for matching items among the selected

19 product catalogs; fourth, building a requisition using

20 data relating to selected matching items and their

21 associated source or sources.

22      Fifth, processing the requisition to generate one or

23 more purchase orders for the selected matching items; and

24 sixth, determining whether a selected matching item is

25 available in inventory.

Weaver - Direct

1  Q    Now, in conducting your assessment of whether the

2  Lawson systems, which include the Requisition Center

3  application are more than colorably different from the

4  infringing configurations, did you review any evidence

5  concerning whether or not certain components and

6  functionality of the infringing configurations were

7  changed for purposes of the release of the Requisition

8  Center application?

9  A    Yes, I did.

10       MS. ALBERT:  Can we look at configurations three

11  and five.

12  Q    Out of the all of the modules and applications

13  included in the infringing configurations, which modules

14  and applications have been modified?

15  A    Only one, and that was requisition self service, RSS,

16  was modified to produce Requisition Center, RQC.

17  Q    What functions are performed by the Requisition Center

18  application in the configurations having RQC?

19  A    It provides a user interface and a view to the data

20  and functions in the S3 procurement modules.

21  Q    After the jury's verdict, did Lawson make any

22  modifications to the underlying Lawson System Foundation

23  for purposes of the release of RQC?

24       MR. THOMASCH:  Objection, Your Honor.  There is

25  no dispute about that.  We've been through that in

1    multiple court proceedings, and *TiVo* says that you do not

2    look to those aspects of the system that are unchanged but

3    focus only on those that are changed, and there is no

4    dispute between the parties as to what was not changed.

5    It's not relevant to this proceedings, we would suggest.

6         MS. ALBERT:  Your Honor, Dr. Weaver's opinion as

7    to whether the change that's been brought by RQC renders

8    the configurations more than colorably different from the

9    infringing configurations takes into account the entire

10   functionality of the configuration that was found to

11   infringe, and I think you'll find from his testimony that

12   he does consider it to be significant that only a single

13   module was changed and that the change within that module

14   was also insignificant.

15        So this is part of his colorability analysis.  He

16   considers the entire infringing configuration as a whole

17   versus the accused configuration as Mr. Thomasch said was

18   the test in his opening statement.

19        MR. THOMASCH:  And that does join the legal

20   issue, Your Honor.  *TiVo* specifically talked about how it

21   would play out in *TiVo*, and they would look at not the

22   entire systems, not the DV recorders but rather the

23   feature of the statistical estimation feature and the

24   original stark code detection feature.  That was the

25   comparison.  *TiVo* could not be plainer on the fact that

1    unchanged elements do not enter into the analysis.  The

2    analysis must focus on only that which is different.

3              MS. ALBERT:  Part of Dr. Weaver's --

4              THE COURT:  Wouldn't you agree that the

5    analysis -- that the ultimate decision focuses on what Mr.

6    Thomasch said, I take it, but your point is that in order

7    to get there and understand Dr. Weaver's testimony about

8    that aspect of the colorability analysis, it is helpful to

9    the trier of the fact to understand the extent to which,

10   vel non, there were changes otherwise in the infringing

11   system?

12             MS. ALBERT:  That's correct, Your Honor.

13             THE COURT:  Is that your point?

14             MS. ALBERT:  That is correct.

15             THE COURT:  With that limitation, the objection

16   is overruled.

17             MS. ALBERT:  Thank you, Your Honor.

18             THE COURT:  Now that they've agreed that there

19   isn't any difference, I think he doesn't need to go

20   through and prove there isn't any difference because

21   they've agreed there isn't any changes to that.  He can

22   testify -- I mean there aren't any changes.

23             He can testify what is the significance in his

24   view of the failure to make the changes, to pursue the

25   theory you are pursuing.  Do you agree?

1          MS. ALBERT:  That's fine, Your Honor.

2          THE COURT:  All right.  You do stipulate there

3   are no changes to the other parts of it.

4          MR. THOMASCH:  Correct, Your Honor.  The code

5   changes were in RSS, and the code changes impact the way

6   RSS directs Punchout to operate, but the other modules

7   were not changed.  It's not in dispute, and we believe

8   that all such testimony is actually irrelevant and takes

9   us away from the point that *TiVo* says.

10          MS. ALBERT:  We believe that the testimony is

11   relevant because *TiVo* says you should not focus on

12   randomly chosen features that aren't relevant to the

13   features that were relied upon to prove infringement at

14   trial, and Dr. Weaver will briefly overview what aspects

15   of the modules perform specific functions that are

16   relevant to the claims and compare and contrast that with

17   the change that was made that he has opined is a randomly

18   chosen feature that's not significant for purposes of the

19   claim.

20          THE COURT:  Overruled.

21   Q    Now, Dr. Weaver, did Lawson make any changes to the

22   inventory control module that's in the blue block of the

23   diagram?

24   A    They did not.

25   Q    Do functions of the inventory control module in the

1    current systems with RQC remain the same as they were in

2    the infringing configurations?

3             MR. THOMASCH:  Your Honor, I object.  If I could

4    have a running objection to all matters that relate to

5    what didn't change and not interrupt counsel, I would be

6    happy to do that, or I'm happy to interject --

7             THE COURT:  You can have that objection, but once

8    she gets off of that, you have -- if she ever comes back

9    to it, you have to renew it.

10            MR. THOMASCH:  Fair enough.

11            THE COURT:  For this series.

12            MR. THOMASCH:  This series on this exhibit, we

13   object to those that relate to that part which we've

14   agreed is not changed.

15            THE COURT:  Go ahead.

16            MS. ALBERT:  Do I have a question pending?

17            THE COURT:  The objection is overruled.  What?

18            MS. ALBERT:  I think there's a question pending

19   that Dr. Weaver has yet to answer.

20            THE COURT:  Well, ask it again.

21   Q    Do the functions of the inventory control module in

22   the current systems that have Requisition Center remain

23   the same as they were in the infringing configurations?

24   A    They remain the same.

25   Q    Was the item master of the inventory control module

1  modified for purposes of Lawson's release of Requisition

2  Center?

3  A    It was not.

4  Q    What functions relevant to claim 26 are performed

5  using the item master?

6           MR. THOMASCH:  Objection, Your Honor.  That, I do

7  very, is a very different question, and I do not believe

8  that this witness is an expert in a way that allows him to

9  say what is relevant to a claim.

10          This really is at this point a legal analysis of

11 relevance, and if, for instance, counsel is correct that

12 this is a randomly chosen feature, then we don't have a

13 defense.

14          If it's a randomly chosen feature, it isn't

15 eligible for consideration of insignificance.  If it is,

16 and, of course, it's eligible to be considered as

17 significant, then at that point the witness is not in a

18 position to determine what is relevant and what is not

19 relevant.

20          That is entirely a threshold issue for the Court.

21 It was not brought to the Court's attention.  There was no

22 motion made to exclude all evidence that relates to this

23 feature which is what they're trying to do.  If it's

24 randomly chosen, then we don't get to talk about RSS and

25 Punchout.  It's not randomly chosen, and then they can't

1    talk about the other things.  Your Honor, that's what *TiVo*

2    says.

3              THE COURT:  Ask the question again.  Overruled.

4    Q    What functions relevant to claim 26 are performed

5    using the item master?

6    A    Item master is capable of maintaining multiple product

7    catalogs that then can be searched and can then be

8    selected, and from that items can be chosen for inclusion

9    in a requisition.

10   Q    Did Lawson make any changes to the process used to

11   search for items by keywords in the catalogs stored in the

12   item master?

13   A    They did not, so there's no changes to keyword search.

14   Q    Did Lawson make any changes to the requisitions

15   program, RQ 10, that's used for building a requisition?

16   A    They did not.

17   Q    Can you tell me whether or not the current version of

18   the requisition's module still allows the user to build

19   and manage requisitions?

20   A    Yes, it does.

21   Q    Can you tell me whether or not the purchase order

22   module of the systems having Requisition Center is still

23   used to generate purchase orders necessary to fulfill

24   requisitions for items not found in stock?

25   A    Yes, it works that way, and if we get to it, I'll show

1     a demonstration of that.

2     Q     Have you reviewed any Lawson documents indicating

3     whether or not this capability to generate purchase orders

4     from a requisition still exists in the current Lawson

5     systems having Requisition Center?

6     A     Yes, I have.

7             MS. ALBERT:  Can we look at Plaintiff's

8     Exhibit 1003.  Just as a point of order, Your Honor, do

9     you want me to separately move each exhibit as I proceed,

10    or should I move --

11            THE COURT:  Have you all sorted out the

12    objections to the exhibits?  Have you agreed that these

13    exhibits can come in?

14            MS. ALBERT:  I believe for this particular one,

15    there are no objections to this exhibit.

16            THE COURT:  Well, move the admissions of them,

17    and if there's an objection, they'll make it.  If not --

18    we haven't had a pretrial conference, so.

19            MS. ALBERT:  Thank you, Your Honor.

20            THE COURT:  I didn't know whether you all had

21    just agreed to it or not.

22    Q     Now, referring to Plaintiff's Exhibit 1003, did you

23    review this exhibit in connection with your analysis?

24    A     Yes, I did.

25    Q     What is the exhibit?

1   A    This is a brochure that Lawson produced to explain the

2   features and capabilities of the Lawson Requisition Center

3   and Punchout.

4            MS. ALBERT:  Your Honor, I would move the

5   admission of Plaintiff's Exhibit 1003.

6            THE COURT:  Any objection?

7            MR. THOMASCH:  No objection, Your Honor, to 1003.

8            THE COURT:  It's admitted.

9

10           (ePlus Exhibit 1003 admitted.)

11

12  Q    Referring to the bottom of the first page of the

13  exhibit, do you see a series of bullet points on that page

14  indicating that, quote, with Lawson Requisition Center and

15  Procurement Punchout, you can, and then there's a series

16  of bullet points?

17  A    Right, five bullet points.

18  Q    What are some of the functions that can be conducted

19  by Lawson procurement systems which include the

20  Requisition Center and Punchout applications that are

21  relevant to the Court's analysis here?

22  A    Let's start with the second bullet.  Allow end users

23  such as internal requesters to search the item master and

24  choose from an approved selection of items at negotiated

25  prices.

1       Also the third bullet point, connect to an external

2    vendor-maintained website to browse and select items to

3    add to a requisition.  And also the fifth bullet,

4    consolidate multiple types of products and services into a

5    single requisition.

6    Q    How, if at all, is this discussion of the capabilities

7    of configurations having Requisition Center and

8    Procurement Punchout relevant to your analysis of whether

9    or not such configurations are more than colorably

10   different from the infringing configurations?

11   A    This tells me that the Lawson procurement system, with

12   RQC, continues to have the functionalities that we

13   discussed at trial.  The ability to search vendor catalogs

14   in the item master, the ability to punch out and select

15   items that the user can add to a requisition and the

16   ability to include multiple items from multiple vendors on

17   a single requisition.

18   Q    Let's turn to page RQC 692 of the exhibit.  Under the

19   heading key features and benefits, what does Lawson

20   indicate that users can do with Lawson Requisition Center

21   and Procurement Punchout under that first bullet?

22   A    The first bullet says, create a single requisition for

23   stock, nonstock, and special order items as well as

24   services.  Lawson procurement can then automatically

25   generate multiple purchase orders from that requisition.

Weaver - Direct

1   Q    How, if at all, is this description of the

2   capabilities of Lawson procurement systems having

3   Requisition Center and Procurement Punchout relevant to

4   your analysis today?

5            MR. THOMASCH:  Objection, Your Honor, to

6   relevance.  Again, this doesn't relate to Punchout, it

7   does not relate to the change.

8            THE COURT:  Overruled.

9   Q    The procurement systems using RQC can create a single

10   requisition with multiple items from multiple vendors, and

11   then the purchase order module can generate multiple

12   purchase orders for items in a single requisition, and

13   this is the same functionality that the jury found to

14   infringe at trial.

15            MR. THOMASCH:  Objection, Your Honor, to

16   testimony about what the jury found to infringe at trial,

17   and we've obviously had lots of discussions on that.

18            THE COURT:  I don't think he can testify what the

19   jury found.  I didn't let their expert, Dr.

20   What's-his-name, Goldberg, testify to that, and he can't

21   either, so would you like to reframe your question?

22   Objection sustained.

23   Q    How, if at all, is this description of the

24   capabilities of the Lawson procurement systems having RQC

25   relevant to your analysis of whether those systems are

1    more than colorably different from the infringing

2    configurations?

3    A    Well, it tells me that the functionalities that were

4    adjudged to be infringed at trial with the procurement

5    system and RSS, those -- of those capabilities, this one

6    is talking about generating multiple purchase orders.

7    That element continues -- that functionality continues to

8    be present in the new Lawson procurement system using RQC.

9    Q    Thank you.  Let's have the system configurations

10   again.

11            THE COURT:  I'm sorry, I just -- it's that time

12   of the year in Virginia, and those of you who aren't from

13   Virginia will soon find that out if you're here very long.

14   Q    Was the electronic data interchange application

15   modified for purposes of Lawson's release of the

16   Requisition Center application?

17   A    No, it was not.

18   Q    Did you review any documents that confirmed whether or

19   not there were any changes made to the EDI application?

20   A    Yes, I did.

21   Q    Let's see, if we could, Plaintiff's Exhibit 1002.

22   What is this exhibit, Dr. Weaver?

23   A    PX-1002 results from Lawson having conducted a webinar

24   about RQC, and in that webinar, the customers are allowed

25   to ask questions and Lawson responds with answers.  And

1   this is a printed list of the questions and answers that

2   resulted from that webinar about RQC.

3   Q    And did you review and rely upon this exhibit for

4   purposes of your analysis?

5   A    Yes, I did.

6           MS. ALBERT:  Your Honor, I would move the

7   admission of Plaintiff's Exhibit 1002 into evidence.

8           THE COURT:  Any objection?

9           MR. THOMASCH:  Yes, Your Honor.  No threshold

10  showing of relevance.  I don't believe just because he's

11  reviewed it for purposes of his consideration it makes the

12  exhibit admissible.  The counsel has not said what it's to

13  be used for.

14          MS. ALBERT:  You did not proffer any objections

15  to this exhibit in the pretrial submission.

16          THE COURT:  They didn't offer any objections to

17  it?

18          MS. ALBERT:  No.  There were no objections to

19  this exhibit.

20          MR. THOMASCH:  Your Honor, we did actually object

21  to all exhibits that did not come in through a witness who

22  had knowledge of the exhibit.  We don't believe it is a

23  proper way to put the exhibits in to simply show it to the

24  expert and say, did you review and did you rely on it.

25          If counsel wants to establish what in the exhibit

Weaver - Direct

1   is relevant to this proceeding, that might change our

2   position, but it is not an appropriate way --

3           THE COURT:  So he did preserve his objection if

4   it was not put in through a witness with knowledge.

5           MR. THOMASCH:  That is exactly what we said, Your

6   Honor, as to all exhibit that didn't have a sponsor with

7   knowledge.

8           THE COURT:  Is that an authentication objection

9   or a relevance objection?

10          MR. THOMASCH:  Your Honor, I think it's a more

11  general foundation.  We do not --

12          THE COURT:  It's a foundational question.

13          MR. THOMASCH:  It is.  We don't challenge the

14  authenticity of the document, but the use of the document

15  we do.

16          THE COURT:  All right, foundation.

17  Q    Did you review any depositions where Lawson witnesses

18  discussed this exhibit?

19  A    Yes, I did.

20  Q    And did those Lawson witnesses indicate what the

21  nature of the document was?

22  A    Yes, that it was question and answers from a webinar.

23  Q    And what was the webinar concerning?

24  A    RQC.

25          THE COURT:  Do you want to point him to some part

1    of the exhibit that he reviewed that has pertinence to his

2    opinion so that he can know whether he wants to object to

3    it further or not.

4          MR. THOMASCH:  That is entirely correct.  It's

5    not the document we're objecting to.

6          THE COURT:  I understand.  So she's going to do

7    that.

8    Q    Let me go ahead and refer you to the page marked RQC

9    650, and do you see the third question from the top

10   asking, quote, what about EDI, how is it going to change?

11   A    Yes, I do.

12   Q    How did Lawson respond to that question?

13         MR. THOMASCH:  Objection, Your Honor, again,

14   relevance.  EDI did not change.  It's not disputed.

15         THE COURT:  I thought you had a running objection

16   to that.

17         MR. THOMASCH:  I wasn't sure if she had -- she

18   did move off of it.

19         THE COURT:  Well, she did.  Overruled.  Go ahead.

20   A    The answer was, there are no product changes to EDI,

21   and your current setup will not be impacted.

22         MS. ALBERT:  So, Your Honor, I would submit that

23   this exhibit is relevant to show that Lawson was

24   communicating to its customers that certain functionality

25   in the systems was not going to change or be impacted, so

1    it's relevant to the significance of the change.

2              THE COURT:  And you have the same objection to

3    that?

4              MR. THOMASCH:  I do, Your Honor.

5              THE COURT:  Overruled.  It's admitted for that

6    purpose.

7    Q    What capabilities of the EDI application are relevant

8    to claim 26?

9              MR. THOMASCH:  Same objection on relevance, Your

10   Honor, of his comparing an unchanged feature to the

11   relevance of a patent claim.

12             THE COURT:  Sustained.  I mean overruled, excuse

13   me.

14   A    As we discussed at trial, the electronic data

15   interchange module allows the Lawson system to send

16   purchase orders to a vendor, and then EDI is able to

17   receive purchase order acknowledgements and from that

18   produce a purchase order acknowledgment report in which we

19   can see whether or not a specific item that was ordered is

20   available in the vendor's inventory.

21   Q    Was the Punchout application modified for purposes of

22   the release of Requisition Center?

23   A    It was not.

24   Q    And what are the functionalities of the Punchout

25   application?

1    A    Punchout is a -- Punchout allows the user to connect

2    to a Lawson trading partner and to search that trading

3    partner's inventory and possibly select items to be

4    ordered and to bring them back into the Lawson requisition

5    and purchase order system.

6    Q    Can users of the Lawson systems that have Requisition

7    Center continue to utilize the Punchout functionality to

8    connect to a Lawson Punchout trading partner catalog?

9    A    Yes, they can.

10   Q    Can a user of the system having the Requisition Center

11   and Punchout applications continue to search for items on

12   the Punchout trading partner catalog website?

13   A    Yes, they can.

14   Q    Can a user of the system having the Requisition Center

15   and Punchout applications select items out of a Punchout

16   catalog site to retrieve and place in the Requisition

17   Center user interface requisition lines section?

18   A    Yes, they can.

19   Q    Have you reviewed documents confirming whether or not

20   the Punchout functionality has been changed in the Lawson

21   procurement systems having Requisition Center?

22   A    Yes, I have.

23   Q    Let's look for, if we could, at Plaintiff's

24   Exhibit 1000.  What is Plaintiff's Exhibit 1000?

25   A    This is a manual that Lawson distributed following the

1    release of RQC with instructions on how to install and use

2    Punchout.

3    Q    Did you review and rely upon this document for

4    purposes of your opinion?

5    A    Yes, I did.

6    Q    Can we see the page marked RQC 12.  What is

7    illustrated on this page of the Punchout guide?

8    A    As we saw previously at trial, this is the eight steps

9    that are required for Punchout to work, and the steps

10   cover getting connected to the Punchout partner and

11   retrieving items that are in the Punchout partner's

12   shopping cart and moving those to the Lawson requisition

13   line.

14   Q    Can you tell me whether or not the steps of the

15   current Punchout process differ from those in the Punchout

16   process used in the infringing configurations.

17   A    They do not differ.

18           MR. THOMASCH:  Objection.  Lack of foundation as

19   to the question.  I believe that there needs to be a

20   predicate in the question as to whether this is an initial

21   search by a Punchout user or whether it's a search after

22   the Punchout user has already brought an item back from a

23   different Punchout.  It depends -- the question presumes a

24   fact that's not stated in the question, and if it's a

25   question for a new search, I would withdraw my objection.

1              THE COURT:  What do you say to his objection?

2              MS. ALBERT:  I can rephrase my question so it's

3    clearer.

4    Q    Can you tell me whether or not the steps of the

5    current Punchout process when initiating a new Punchout

6    session differ from those in the Punchout process used in

7    the infringing configurations?

8    A    They do not.

9    Q    How does the fact that no changes were made to these

10   various modules, applications, and programs in the

11   infringing configurations relate to your analysis of

12   whether the current systems with RQC are more than

13   colorably different from those that were found to be

14   infringing?

15   A    This tells me that because there were no changes to

16   anything by RSS, the same capabilities that were present

17   in the infringing system are still present in the new

18   procurement system using RQC.  The only thing that's been

19   modified is the user interface.  None of the core

20   functionality that enables procurement has been changed.

21             MS. ALBERT:  Your Honor, just for point of order,

22   I don't believe I moved the admission of Plaintiff's

23   Exhibit 1000.

24             THE COURT:  Any objection?

25             MR. THOMASCH:  I'm sorry, Your Honor, which

Weaver - Direct

1    exhibit?

2            MS. ALBERT:  Plaintiff's Exhibit 1000.

3            MR. THOMASCH:  No objection.

4            THE COURT:  It's admitted.

5

6            (ePlus Exhibit 1000 admitted.)

7

8    Q    Now, let's discuss the change that Lawson contends

9    it's made to the requisition self service --

10           THE COURT:  So I understand, we went through all

11   that basically to show what they stipulated, that there

12   had been a change?  I didn't understand -- he said that

13   the meaning of the absence-of-changes testimony respecting

14   his colorability analysis, to him, and the import of it to

15   his opinion was that it identifies there had been only one

16   change made.  I thought that's what they stipulated to.

17           MS. ALBERT:  I think he's said there's no change

18   in the underlying procurement functionality.

19           THE COURT:  Well, he said that, but he said that

20   all the way up, but he didn't explain why that had

21   anything do with the colorability analysis.

22   Q    Can you explain why the fact that there have been no

23   changes made to the various modules, applications, and

24   programs in the infringing configurations but for the

25   change made to requisition self service has any bearing on

1   your analysis of whether the accused systems with RQC are

2   more than colorably different from those that were found

3   to be infringing?

4   A    The capability of RQC in the procurement system is the

5   same with regard to claim 26.  All elements of claim 26

6   can still be practiced.  So there is -- there is no

7   significant difference in the operation of RQC as viewed

8   in light of claim 26.

9            MR. THOMASCH:  Objection; motion to strike.  I

10  believe that is precisely the infringement based

11  colorability analysis that *TiVo* says is no longer

12  permitted.

13           MS. ALBERT:  That's the threshold inquiry that

14  *TiVo* requires you to make, and that is whether or not the

15  modification that was made is one to a random feature or

16  whether it has bearing on features that were used in the

17  infringing product to perform the claim, and so what Dr.

18  Weaver is saying is that the change has no bearing on any

19  feature that was used to perform the elements of the

20  claim, and that's the threshold --

21           THE COURT:  Is that what you just said?

22           THE WITNESS:  Yes, sir.

23           MS. ALBERT:  And if that is true, then you don't

24  even get to any further part in the *TiVo* test.  As a

25  matter of law, there is no colorable difference because

1   the change relates to a feature that's not relevant to the

2   claim.

3           MR. THOMASCH:  Counsel's last comment, that last

4   segment of it, is correct.  If there is a random feature,

5   then the significance of a random feature doesn't matter.

6   Our defense, I have made clear, relates to a particular

7   feature.

8           If it's random, we don't need to proceed further.

9   It is not random, and *TiVo* says that the determination of

10  randomness, what is a random feature and what is not,

11  depends, Your Honor, on what was contended and proved at

12  trial.  We went over and over again and attempted to get

13  the plaintiffs to identify what was contended and proved

14  at trial that would be the predicate for identifying what

15  this hearing would be, what, in Your Honor's words, was

16  the animal against which we would measure the

17  modification.

18          We were not given anything other than the

19  position of ePlus was, we've already identified the three

20  changes that were at issue, and there were three before

21  the Federal Circuit decision came down, and now it's just

22  the one two-part change.

23          But their position was that's a threshold issue

24  to identify what the hearing is about.  We already know

25  what the hearing is about.  Once we are here, the issue of

1    relevance between the change and the claim, *TiVo* says, is

2    not the issue.  The issue is between the modified feature

3    and the original feature.

4                THE COURT:  I think that morphed into about three

5    different points not really responsive to her point as to

6    why this particular testimony was relevant.  The objection

7    is overruled.

8    Q    Dr. Weaver, let's turn now to discuss the change that

9    Lawson contends it's made to the requisition self service

10   application in connection its release of RQC.  Can we see

11   Plaintiff's Exhibit 1155, please.  What is this exhibit,

12   Dr. Weaver?

13               THE COURT:  What exhibit is it?

14               THE CLERK:  1155, Your Honor.

15               THE COURT:  All right.

16   A    This is a set of PowerPoint slides that Lawson posted

17   on its website to explain the differences between RSS and

18   RQC to its customers and to the public.

19   Q    And did you review and rely upon this document for

20   purposes of your analysis?

21   A    I did.

22   Q    Let's look at page RQC 711.  Under the heading What's

23   New and Different in Requisition Center, what bullet is

24   relevant to our analysis today with respect to claim 26 of

25   the '683 patent?

1   A    It's the fifth one down.  It says, Requisition Center

2   requires that items ordered through Punchout must be on a

3   separate requisition from items from the item master or

4   special/service.  In addition, Requisition Center will

5   create separate requisitions for each Punchout vendor for

6   items requisitioned using Punchout.

7   Q    Now, with respect to the modification that Lawson has

8   made to the system such that Punchout items are placed on

9   a separate requisition from items selected by searching

10  the catalogs in the item master, is that modification

11  relevant to any functionality of claim 26?

12          MR. THOMASCH:  Objection, Your Honor.  Same

13  grounds as previously stated.

14          THE COURT:  Overruled.

15  A    Would you repeat the question.

16  Q    With respect to the modification that's directed to

17  preventing a system, the system -- let me start over

18  again.

19       With respect to the modification that Lawson has made

20  to the systems such that Punchout items must be on a

21  separate requisition from items selected by searching the

22  catalog stored in the item master, is that modification

23  relevant to any of the functionality of claim 26?

24  A    No, it is not.

25  Q    Is the modification that prevents items from shopping

1  sessions conducted at multiple Punchout sites from being

2  included in a single requisition relevant to any feature

3  recited in claim 26?

4  A    No, it is not.

5  Q    Can you describe how the system with RQC now works

6  with respect to Punchout items?

7  A    Sure.  So if a user has selected a catalog in the item

8  master and has picked an item to add to the order list and

9  then at that point attempts to do a punchout, then that

10  will not succeed.  There will be a popup window that tells

11  you you can't do that.

12  Q    What happens if you try to add a Punchout item to --

13  I'm sorry, strike that.

14       Let's look at page RQC 718, please.

15            THE COURT:  On 1155?

16            MS. ALBERT:  Yes.

17  Q    What is illustrated on this page?

18  A    This is the order list or requisition lines in which

19  an item has already been added from the item master, and

20  at that point, the user has selected the Punchout choice

21  from the drop-down menu of find and shop.  And the

22  result -- let me get rid of those -- is this popup window

23  that says Punchout items must be on a separate

24  requisition.

25            MS. ALBERT:  I move the admission of Plaintiff's

1    Exhibit 1155.

2              THE COURT:  Any objection?

3              MR. THOMASCH:  No objection.

4              THE COURT:  It's admitted.

5

6              (ePlus Exhibit 1155 admitted.)

7

8    Q    Let's look at Plaintiff's Exhibit 1032.  What is

9    Plaintiff's Exhibit 1032?

10   A    This is an internal Lawson email that is trying to

11   communicate some concerns, and as you can see from the

12   subject line up here, it's about changes being brought

13   with Requisition Center.

14   Q    And referring to the bottom email from Matthew

15   Bragstad, he says, quote, I wanted to make sure that the

16   support leadership team was aware of the changes that RQC

17   has brought.  Do you see that statement?

18   A    I do.

19   Q    And how did he describe the changes that RQC has

20   brought?

21   A    So beginning just under that line, he says, besides

22   some label/visual, (or lipstick on a big as Dale so

23   eloquently puts it), changes -- there were three

24   functional adjustments, and the one that's relevant to us

25   is number three.

1    The process in which Punchout is being performed has

2  changed slightly.  You now get a warning popup that you

3  are about to leave the Lawson site when you punch out.

4  The process remains completely the same except if you try

5  to punch out on a req that is already in use with

6  non-Punchout items, it will tell you that you need to open

7  a separate req, and it will perform that action for you.

8  Q    What does this communication tell you about how Lawson

9  has internally characterized the change brought by RQC

10  with respect to Punchout?

11  A    So here we see Lawson employees that are telling each

12  other that the Punchout process remains, quote, exactly

13  the same, unquote, except for a popup message.  So Lawson

14  is characterizing this change as insignificant.

15        MR. THOMASCH:  Objection, Your Honor, motion to

16  strike.  I don't believe the witness has expertise in

17  interpreting emails, and to characterize the -- the

18  document says what the document says.  It has not yet been

19  offered into evidence.  We will have an objection when it

20  does, but in the meantime, we certainly object to the

21  witness both reading from a document not in evidence and

22  then characterizing what is meant by two individuals

23  without any showing of firsthand knowledge and on a

24  subject matter which the expertise of the witness is not

25  brought to bear.

1          THE COURT:  Why is he an expert in explaining

2   what documents mean?

3          MS. ALBERT:  Well, let me rephrase my question.

4          THE COURT:  Sustained.

5   Q    What does this communication indicate to you about

6   whether the difference that's brought with RQC and

7   Punchout item is -- whether or not that's more than

8   colorable difference from the infringing configurations?

9          MR. THOMASCH:  Your Honor, note my objection

10  again on grounds that it's not a proper basis.  There's no

11  foundation that this interpretation of emails of witnesses

12  who have not testified in the case is a proper basis for

13  an expert opinion or regularly relied upon by experts in

14  the field of computer science.

15  Q    Would experts in the field of computer science

16  regularly rely upon internal communications among

17  technical personnel discussing changes in a particular

18  system?

19  A    Yes, they would.

20         THE COURT:  Objection overruled.  So the question

21  is now what does it mean to you.  That's the question;

22  right?

23  Q    The question is, what does this communication tell

24  you, for purposes of your analysis, as to whether the

25  systems with RQC and Punchout are more than colorably

1  different from the infringing configurations?

2  A    It tells me that they are not more than colorably

3  different because the change is so insignificant.

4         MS. ALBERT:  Your Honor, I would move the

5  admission of Plaintiff's Exhibit 1032 into evidence.

6         THE COURT:  Any objection?

7         MR. THOMASCH:  Yes, Your Honor.  Lack of

8  foundation.  I do note the witness that wrote the email

9  will not testify and has not been deposed.  There will be

10  testimony from a witness who saw the email.  I don't

11  believe that the foundation is proper coming into evidence

12  through Dr. Weaver.

13         THE COURT:  There's no foundation.  Is there

14  objection to the authenticity?

15         MR. THOMASCH:  There's no objection to

16  authenticity but lack of foundation, Your Honor.

17         THE COURT:  What is your response to his

18  objection?

19         MS. ALBERT:  It's the type of evidence that an

20  expert can rely upon in forming his opinions, and he has

21  relied upon this and has discussed it in his report, and

22  it does bear on his opinion as to whether or not it's more

23  than colorably different.

24         Under Rule 703, an expert may base an opinion on

25  facts or data in the case that the expert has been made

1    aware of or personally observed.  If experts in the

2    particular field would reasonably have relied upon those

3    kinds of facts or data in forming an opinion on the

4    subject, they need not be admissible for the opinion to be

5    admitted.

6              MR. THOMASCH:  Your Honor, that's --

7              THE COURT:  I think that's the point he's making,

8    is that he didn't object to the opinion.  He objected to

9    the introduction of the document because the document

10   doesn't come into evidence under 703.

11             703 doesn't get it into evidence just because

12   it's the kind of document that an expert relies upon.  It

13   is up to you to get it into evidence by using some aspect

14   of the Rules of Evidence other than the fact that the

15   expert relied upon it, as I understand the objection, and

16   I think that objection is well-taken.

17             MS. ALBERT:  Yes, Your Honor.  We'll lay the

18   foundation with a different witness.

19             THE COURT:  All right.

20   Q   Let's turn back to claim 26 if we could.  Dr. Weaver,

21   do you have an understanding as to which claim elements

22   Lawson contends that the modifications relate to?

23   A   Yes.

24             MR. THOMASCH:  Objection, Your Honor, both to the

25   subject matter generally and to his understanding of our

1    allegations, allegations that we are -- have not made in

2    this portion of the case.

3              MS. ALBERT:  I'll withdraw my question.

4              THE COURT:  All right.

5    Q    Do the modifications relating to requisitions with

6    Punchout items have any impact on the capability of the

7    configurations having RQC to maintain at least two product

8    catalogs on a database continuing data relating to items

9    associated with the respective sources?

10   A    It did not.  A procurement system using RQC continues

11   to have the capability of holding items from multiple

12   vendors and multiple catalogs as was true with the

13   infringing systems, and I saw confirmation of that in

14   deposition testimony.

15   Q    Can you tell us whether or not the modifications have

16   any impact on the capability of the systems having RQC to

17   maintain connections to the catalogs of multiple Punchout

18   vendors?

19   A    No, that capability still exists.  There are no

20   changes made there.

21   Q    Can you tell us whether or not the modifications have

22   any impact on the capability of the configurations having

23   RQC to maintain connections to multi-vendor Punchout sites

24   that host multiple vendor catalogs at a single site?

25   A    That capability still exists and was confirmed in

1    depositions and documents.

2    Q    What are some examples of these multi-vendor Punchout

3    sites that host multiple vendor product catalogs?

4    A    The two we discussed a trial were SciQuest and Global

5    Health Exchange, DHX.

6              MR. THOMASCH:  Objection, Your Honor.  Move to

7    strike the testimony, and I actually believe that does

8    mistake the trial testimony, and our basis is that Your

9    Honor has seemingly prevented us from going into what was

10   said at trial as the basis to show what was contended and

11   proved.

12             THE COURT:  What was contended and proved.  I

13   think that we need to stay away from that kind of

14   testimony.  You all objected to it, and I sustained your

15   objection, and I think it was right, but you can't then

16   get in through the back door that which you've shut out

17   the front door.

18   Q    Are you aware of evidence --

19             THE COURT:  I sustain the objection and strike

20   the testimony, and you may ask another question designed

21   to get something other than that which was stricken.

22   Q    Are you aware of evidence in the discovery in this

23   contempt proceeding as to examples of multi-vendor

24   Punchout sites that host multiple vendor product catalogs?

25   A    Yes, I am.

1   Q    What are some examples that have been provided during

2   discovery in the contempt proceeding of multi-vendor

3   Punchout catalogs?

4   A    Well, the example I'm thinking of is the list of

5   Punchout trading partners associated with Lawson, and

6   SciQuest and Global Health Exchange appear on that list as

7   pre-approved trading partners.

8   Q    Now, referring to the second and third elements of

9   claim 26 reciting selecting the product catalogs to search

10  and searching for matching items among the selected

11  product catalogs, did the Court have a claim construction

12  relevant to those claim terms?

13            MR. THOMASCH:  Objection, Your Honor.  I do

14  believe the claims construction is not relevant to the

15  colorability phase.  There are issues about claims

16  construction that relate to the infringement phase.

17            THE COURT:  It might be -- certainly it's

18  relevant in that phase, but she hasn't asked a question

19  that implicates your objection at this stage.  She simply

20  asked if there was one and he was aware of it.

21            MR. THOMASCH:  Thank you.

22  A    Yes, there is.  The Court's Markman ruling, the ruling

23  said that --

24            MR. THOMASCH:  Objection, Your Honor.  The

25  question was whether there was a ruling.  The answer is

1   yes.  Now the question is --

2            THE COURT:  No, there isn't any question.

3   There's no question yet.

4   Q   What is your understanding of what the Court defined

5   those claim elements to require?

6            THE COURT:  Aren't they already defined?  Why do

7   we need to get into that?  You didn't want their expert to

8   be able to explain what I said, and it's there for better

9   or worse, and the Federal Circuit -- I don't know if it

10  was even brought to the Federal Circuit.

11           MS. ALBERT:  Thank you, Your Honor.  I'll move

12  on.

13  Q   Did the modifications relating to requisitions with

14  Punchout items eliminate the capability from the

15  configurations with RQC to select and then search a

16  product catalog from among the at least two product

17  catalogs?

18  A   No, it did not, and if we get to it, I'll show that in

19  my demonstration.

20  Q   What are some examples of ways the configurations with

21  Requisition Center and Punchout have the capability to

22  select and then search a property catalog from among the

23  at least two product catalogs?

24  A   In my demonstration, I'll show that there are catalogs

25  from Staples and from Dell, and one can do a Punchout

1    where you can select one catalog or the other, and in the

2    selected catalog you can search for items, put them in a

3    shopping cart, bring those back to the Lawson Requisition

4    Center.

5              MR. THOMASCH:  Objection, Your Honor, and move to

6    strike on the basis that we're getting a description of a

7    demonstration.  The demonstration was not disclosed in the

8    expert witness report as relating to any colorability

9    analysis as to claim 26.  There is a demonstration with

10   respect to infringement.  There was once a demonstration

11   with respect to the converting element of claim 28, but

12   the expert witness report does not talk on this subject

13   matter, and so this testimony is beyond the scope of the

14   expert report, and I would move to exclude it.

15   Q    Without reference to your demonstrations, did the

16   modifications relating to requisitions with Punchout items

17   eliminate from the configuration --

18             THE COURT:  Excuse me.  I believe I need to rule.

19             MR. THOMASCH:  Correct, I have a motion to

20   strike.

21             THE COURT:  Yes.  You've responded to that by

22   rephrasing the question, I think, so I sustain the

23   objection in view of your approach to rephrasing the

24   question and strike the answer, and now you may ask your

25   question.

1   Q    Without reference to any demonstrations that we

2   haven't seen yet, did the modifications relating to

3   requisitions with Punchout items eliminate from the

4   configurations having Requisition Center the capability to

5   select and then search a product catalog from among the at

6   least two product catalogs included in the configuration?

7   A    They did not.

8   Q    And what are some of the ways that the configurations

9   having Requisition Center have the capability to select

10  and then search a product catalog from among at least two

11  product catalogs?

12          MR. THOMASCH:  Objection, Your Honor, to the form

13  of the question which makes no reference to whether this

14  is a derivative of the change that was made to the

15  product.  It's a similar objection to what we made before,

16  but I feel compelled to make it again, Your Honor.

17          THE COURT:  Overruled.

18  A    One can punch out to one of Lawson's trading partners

19  and then bring back items to put in requisitions, and then

20  one can select a different -- well, and then turn that

21  requisition into a purchase order, and then one could

22  select a different Punchout site and do the same thing, or

23  one could select a multi-vendor Punchout site and search

24  that and find multiple items from multiple vendors.

25  Q    Does the system with Requisition Center include the

1    capability to select and search a product catalog from

2    among the catalogs included in the item master?

3    A    Yes, it does.

4              THE COURT:  You are talking about the system as

5    modified.

6              MS. ALBERT:  The system having Requisition

7    Center, does that --

8              THE COURT:  I know, but I think that's what you

9    mean, but I didn't know that.  The record needs to be

10   clear about which system you are talking about, because

11   you've talked about a pre-change system and a post-change

12   system.

13   Q    Do you have an understanding --

14             THE COURT:  Wait a minute.  Excuse me.

15             MR. THOMASCH:  We object on the form of the

16   question with respect to the aspects of the item master

17   which were not changed and to the use of the phrase

18   catalogs in item master.  That raises a whole different

19   issue again as to what was -- what was found by the jury

20   in the first trial given the very split verdict.

21             We don't object to phraseology which talks about

22   items from item master as a more neutral way of dealing

23   with it, but we do object to any testimony about the

24   unchanged feature.

25             THE COURT:  I think neither the witness nor I

1  could understand anything that was said hereafter given

2  what I said, what you said, and what you said.  So why

3  don't you start again and without me having to rule on

4  anything.

5  Q    Did the modifications relating to requisitions with

6  Punchout items eliminate from the Requisition Center

7  configurations the capability to select and search a

8  product catalog from among the product catalogs included

9  in the item master?

10  A    It did not.

11         MR. THOMASCH:  Same objection, Your Honor.

12         THE COURT:  Overruled.

13  Q    Now, referring to the fourth element of claim 26

14  reciting building a requisition using data related to

15  selecting matching items and their associated source or

16  sources, did the modifications with respect to

17  requisitions with Punchout items remove the capability

18  from the configurations having RQC to build a requisition

19  using selected matching items and their associated source

20  or sources?

21         MR. THOMASCH:  Objection, Your Honor, again.  I

22  believe there's a proper infringement question if we've

23  reached infringement as to whether the RQC system

24  infringes.  That is a different question entirely from

25  whether it removes some capacity from infringement when

107

1    there is a dispute about what infringement was found at

2    the first trial.

3              This is not the right way, in our opinion, to

4    follow *TiVo* with respect to colorability.  This goes to

5    infringement.

6              THE COURT:  Overruled.

7              MS. ALBERT:  Thank you, Your Honor.  I think the

8    question is still pending.

9              THE COURT:  Ask it so he can understand it and

10   answer it.  His objection is preserved.

11   Q    Did the modifications with respect to requisitions

12   with Punchout items remove the capability from the RQC

13   configurations to be able to build a requisition using

14   data related to selected matching items and their

15   associated source or sources?

16   A    No, it didn't.  One can continue to search a single

17   catalog and select one or more items from that single

18   catalog, so that single source, and then generate a single

19   requisition that reflects that single source, or one could

20   select multiple product catalogs either from the item

21   master or from a multi-vendor Punchout site and then bring

22   back multiple items -- one could select multiple items

23   from multiple vendors and then bring that back into the

24   requisition lines to form a single requisition.

25   Q    Did the --

108

1           THE COURT:  You're talking about using RQC?

2           THE WITNESS:  Yes, sir, using RQC.

3    Q     Did the modifications with respect to requisitions

4    with Punchout items remove the capability of processing

5    the requisition to generate one or more purchase orders

6    for the selected matching items from the RQC

7    configurations?

8    A     It did not.

9    Q     Does the modification relating to requisitions with

10   Punchout items have any relevance to the capability of

11   determining whether a selected matching item is available

12   in inventory?

13   A     It does not.

14   Q     And do the systems configurations having Requisition

15   Center and Punchout have the capability to determine

16   whether a selected matching item is available in

17   inventory?

18   A     Yes.  They continue to have that ability using

19   Punchout or EDI.

20           MR. THOMASCH:  Note my objection, Your Honor, to

21   the witness's testimony, and this is a continued activity

22   from an unchanged feature.

23           THE COURT:  Overruled.

24   Q     Have you reviewed documentation relating to how Lawson

25   has described the changes that were made to RSS, both

1   internally and to its customers?

2   A     Yes, I have.

3   Q     Let's look at some of those.  Let's look at

4   Plaintiff's Exhibit 1010.  What is this exhibit?

5   A     This is an email that is providing a preview of

6   announcement --

7               THE COURT:  Wait a minute.  1010 is --

8               THE WITNESS:  Oh, I'm sorry.

9               THE COURT:  -- something, not an email.  It may

10  have been sent by email, but it's not what I refer to --

11              THE WITNESS:  My mistake.  I opened 1110 by

12  accident.

13              THE COURT:  All right, that's fine.  That way

14  we'll be ahead of the game.

15  A     Now using the correct exhibit, 1010, this is a set of

16  PowerPoint slides from a webinar where, as the title

17  shows, Lawson is introducing the Lawson Requisition

18  Center.

19  Q     And let's turn to page RQC 661.  How does Lawson

20  describe the Requisition Center application to its

21  customers here?

22  A     In the third bullet, it says, its designed to minimize

23  impact on our customers.

24  Q     Let's refer to page RQC 665.  Under the heading

25  Designed with Three Principles in Mind, what does Lawson

1    say about the functionality of the Requisition Center

2    application?

3    A    It says that RQC has 100 percent functionality you

4    require must be included.

5    Q    Under the heading Implementation straightforward, what

6    does Lawson indicate concerning implementation of

7    Requisition Center?

8    A    It says, no database changes, no required upgrades in

9    software or environment.

10   Q    So what is your takeaway from this exhibit with

11   respect to whether or not the systems having Requisition

12   Center are more than colorably different from those that

13   were found to be infringing?

14        MR. THOMASCH:  Objection to the form of the

15   question and lack of specificity of these changes to the

16   issue that relates to the changed features in Punchout.

17   We do know, Your Honor, that there were multiple changes

18   to RQC that are not at issue in this case.

19        MS. ALBERT:  I think that the document speaks in

20   general to Requisition Center and the changes including

21   the change to requisitioning with Punchout, and,

22   therefore, it is relevant to --

23        THE COURT:  It may be, but given there are

24   changes that are not at issue, maybe the best thing to do

25   is to phrase the question to deal with the changes that

1   are at issue, and that makes it more helpful to the finder

2   of the fact in understanding the evidence.

3   Q    How does this exhibit bear or impact upon your

4   analysis of whether the systems with Requisition Center

5   and Punchout are more than colorably different from those

6   that were found to infringe?

7   A    Because we see here that a design principle is

8   100 percent functionality that you require must be

9   included, that says that RQC is going to include Punchout

10  as a requirement -- well, RQC and Punchout will both be

11  required.

12       It tells me that RQC is going to have the same

13  functionality as RSS because it says 100 percent

14  functionality require must be included.  And so in my

15  opinion, RQC has only minor changes from RSS.

16            MR. THOMASCH:  Objection, Your Honor, move to

17  strike the last portion of that answer which interpreted

18  and assumed what the document meant beyond the words that

19  were stated and changed specifically the words "you

20  require" to what "you previously had."

21            And there's testimony on this, Your Honor.

22  Witnesses with knowledge were asked about this and

23  distinguished it, and now a witness without knowledge

24  comes in and interprets the language of a document, and

25  that's what we find to be improper.

1       MS. ALBERT:  This testimony was how it bears upon

2  his analysis of the colorability issue.  I think he's

3  permitted to say how it -- what his takeaway is from

4  reading the document and how it bears upon his analysis.

5       MR. THOMASCH:  Again, Your Honor, I don't think

6  this witness has any special knowledge in interpreting

7  internal documents to say things that they don't say.

8       THE COURT:  Objection overruled.

9       MS. ALBERT:  I would move the admission of

10  Plaintiff's Exhibit 1010.

11       THE COURT:  Any objection?

12       MR. THOMASCH:  Objection to it coming in through

13  this witness, Your Honor.

14       MS. ALBERT:  You had no objections that you

15  interposed.

16       MR. THOMASCH:  Again, Your Honor, we do not

17  object to this document -- if this document is shown to a

18  witness that was actually on the scene and knows what was

19  said in the document, we will not object to the document

20  coming in.

21       We object to it coming in through an expert who

22  is allowed to testify regardless of its admissibility.

23  703 is not an independent basis for admissibility.  No

24  other foundation has been laid.

25       THE COURT:  And your answer is?  You have to lay

1   a foundation.  You have to get a document in by something

2   other than 703, because 703 actually says that the expert

3   can testify even if it's not admissible, a document is not

4   admissible, and he's been allowed to so testify, but that

5   doesn't get the document in.  So there needs to be some

6   basis for getting the document in.

7          Now, I guess I'm a little -- I don't quite

8   understand what you mean, Ms. Albert, by saying you didn't

9   object to this earlier.  Was it our protocol here that

10  there were objections -- exhibits filed, objections

11  lodged, and the absence of an objection had the effect, as

12  it does in the pretrial order, of meaning there's no

13  objection to it and the document can be used?

14         MS. ALBERT:  That was our understanding of Your

15  Honor's pretrial order.

16         THE COURT:  Do you have the order, because I

17  don't happen to have it right here.

18         MS. ALBERT:  Yes, I do.

19         THE COURT:  It's the second time you've raised

20  it.  The last time he dealt with it by saying there was

21  another objection that covered it, and you rephrased it.

22  All exhibits to which no objection is made shall be

23  admitted without further order according to docket number

24  115.

25         MR. THOMASCH:  Your Honor, may I address that?

1          THE COURT:  I will have to say that I believe

2     that the document you are talking about was entered at the

3     commencement of the case in 2009, and I guess what I

4     was -- this is the rule for trial, and I guess what I was

5     trying to say is, is there some other order or

6     understanding between the two sides that if you listed

7     documents as exhibits and the other side didn't object to

8     them, that they were admitted?

9          There has to be something to animate that

10    concept, and the animation of that concept at the trial

11    was docket number 115 which you just handed me.  That's

12    the rule, and it's been the rule here for years.  However,

13    we didn't have a final pretrial conference, and I'm not

14    sure that order actually -- I don't think that that order

15    that you pointed to, docket number 115, actually governs

16    the process -- the procedure here unless somehow you all

17    have taken that concept and made it applicable here.

18         MS. ALBERT:  Your Honor required us to submit in

19    a filing last week the list of exhibits to which no

20    objections were raised, and this was included on that

21    list.

22         THE COURT:  Now, give me that document so I can

23    follow what you are saying.  I have ePlus exhibit list,

24    and --

25         MS. ALBERT:  We had a joint submission of the

1   parties.

2          THE COURT:  Yes.  I just don't happen to have it

3   up here.

4          MR. THOMASCH:  Your Honor, might I make reference

5   to our objection as stated and filed and as given to the

6   plaintiff's counsel.

7          THE COURT:  Can you let me get all this stuff in

8   front of me first?

9          MR. THOMASCH:  Absolutely, Your Honor.

10         THE COURT:  You say there is an objection you did

11  lodge?

12         MR. THOMASCH:  We had two objections, Your Honor.

13         THE COURT:  I mean did you lodge it in a paper.

14         MR. THOMASCH:  Yes, we did.

15         THE COURT:  What is the docket number of that

16  paper so I can get it in front of me?

17         MR. THOMASCH:  They were exchanged between the

18  parties, Your Honor, but to my knowledge, they were not

19  filed.

20         THE COURT:  Not, filed okay.

21         MR. THOMASCH:  I have it in front me

22  electronically, and I do know what our objections were.

23         THE COURT:  I understand, but your electrons

24  don't get to my electrons.

25         MR. THOMASCH:  I know Your Honor.

1      THE COURT:  Does somebody have the documents, I

2  guess, they're talking about so I can look at it?  Do you

3  have more than one copy?

4      MS. ALBERT:  I don't know if we have more than

5  one copy.

6      THE COURT:  All right.  Why don't we do this:

7  Why don't you -- do you want to hand it to me?  This is a

8  list of documents that are agreed upon, and it's docket

9  number -- what is it now, Ms. Albert?  110?  1010.

10      MS. ALBERT:  I think it's on the first page.

11      THE COURT:  It says, it's here as a joint list of

12  exhibits that are agreed upon, Mr. Thomasch, so it looks

13  to me like that unless there's something that I don't

14  understand, it's in.

15      MR. THOMASCH:  Yes, Your Honor.  If I might

16  address it briefly.

17      THE COURT:  Yes.

18      MR. THOMASCH:  To the extent that it was

19  identified on plaintiff's exhibit list, we objected

20  specifically under Rule 403.  We also objected as our

21  first general objection, Your Honor, to -- general

22  objection number one, Lawson objects to the inclusion in

23  the record of any designated exhibit that is offered by

24  ePlus but is not the subject of a testimony at the

25  contempt proceeding by a witness having personal knowledge

1   of the document.  That is the basis.  We do believe that

2   to set a foundation --

3            THE COURT:  Wait just a minute.  Wait just a

4   minute.  What date was that, all that filed?

5            MR. THOMASCH:  That was March 18th.

6            THE COURT:  On March 20th, though, you all filed

7   in a document that superseded that.  It says here the

8   documents that are agreed upon presumably notwithstanding

9   your previously lodged objections, because one's agreement

10  supersedes one's prior objections, I think.

11           MR. THOMASCH:  I understand, Your Honor.  It is

12  actually a very practical objection that we have.  I don't

13  dispute that this document can come into evidence and can

14  come into evidence through a witness with personal

15  knowledge.  This is not such a witness.

16           I will tell Your Honor, I labored over how are we

17  to interpret the rule in good faith, and we made it clear

18  that it isn't the document.  It isn't that we say that

19  this is inadmissible through anyone, but we do say in

20  order to admit the document, you have to have personal

21  knowledge.

22           If we had a witness with personal knowledge,

23  cross-examination or examination about the document would

24  be fruitful.  We object on the admission of the document

25  through a witness through whom no foundation has been

1    made.

2               THE COURT:  All right.  Now, what do you have to

3    say?

4               MS. ALBERT:  I think we're entitled to have

5    notice if there are going to be objections to particular

6    exhibits, particularly after we had a meet-and-confer and

7    we exchanged the list of agreed-upon exhibits with counsel

8    for Lawson prior to submitting this to the Court.

9               THE COURT:  All right.  Thank you.  Once there's

10   an objection filed, the objection stands unless it's

11   resolved.  The objection is resolved by an agreement to

12   allow the document to come into evidence.  If there is no

13   such agreement, the party tendering the exhibit knows to

14   bring someone or to deal with it in some way other than

15   which results from an agreed-upon exhibit, so the document

16   is in by virtue of the list of exhibits that are agreed

17   upon, and if you believe that that's an erroneous ruling,

18   Mr. Thomasch, just say "yes," and I will say "over

19   objection" on my notation.

20              MR. THOMASCH:  Yes, Your Honor.

21              THE COURT:  Over objection then.  It's in.  All

22   right, Ms. Albert.

23   Q    Let's turn, if we could, to Plaintiff's Exhibit 1026.

24   What is this exhibit, Dr. Weaver?

25   A    This is a set of emails among Lawson employees that

1   are considering how to respond to client concerns about

2   RQC.

3   Q    What were the client concerns about RQC as related by

4   Mr. Ciarochi in the bottom email?

5   A    He says, We have heard clients concerned that Req

6   Center is going to be buggy since it is new.  Do you have

7   any information that we can send to clients to debunk

8   these concerns?

9   Q    And how did Mr. Christopherson respond?

10  A    He said, Key is that RQC is built on RSS, so it is not

11  a 100 percent new product.

12  Q    And how is this communication relevant to your

13  analysis of whether or not this configuration having RQC

14  are more than colorably different from the infringing

15  configurations?

16  A    This tells me that Lawson --

17           MR. THOMASCH:  Objection, Your Honor.  Beyond the

18  scope of the witness's expert report specifically

19  identified by Bates number, documents the witness used,

20  and unless I have missed it, which could happen in the

21  column of numbers, I don't see it there, Your Honor.

22           MS. ALBERT:  It's in his initial report at page

23  22.

24           MR. THOMASCH:  Your Honor, it's apparently

25  identified in the body of the report elsewhere other than

1    colorability where my focus was.  So it's a document that,

2    again, goes to a different analysis we would argue.

3              MS. ALBERT:  It's in the section of his report --

4              THE COURT:  Do I have that report up here?  I

5    mean I'm not going -- initial expert report, what page?  I

6    have it.

7              MS. ALBERT:  It's at page 22.

8              THE COURT:  Page what?

9              MS. ALBERT:  22.  Do you see on Plaintiff's

10   Exhibit 1026 there's a reference to Christopherson 36?

11   That was the deposition exhibit number.  And if you refer

12   to the bullets on that page on page 22, he has a

13   discussion of Christopherson Deposition Exhibit 36.

14             THE COURT:  But it is under the section

15   entitled -- no, it's modifications to the infringing

16   configurations are minimal and cosmetic.  To me, that

17   doesn't confine it to an infringement analysis, Mr.

18   Thomasch.

19             It means that it's pertinent to the colorability

20   analysis.  Objection overruled.  And I think that's clear

21   from the rest of the report as well.  You haven't answered

22   the question, though, Doctor, I don't believe.

23   Q    I think the question was, how does this communication

24   impact your analysis of whether or not the systems having

25   RQC are more than colorably -- whether or not they are

1    more than colorably different from the infringing

2    configurations?

3    A    This document confirms that Lawson used the code from

4    RSS in order to create RQC.

5            THE COURT:  You mean confirms your opinion on

6    that; is that what you are saying?

7            THE WITNESS:  Yes, sir.

8    Q    And does that, the fact that they used the code from

9    RSS to form RQC have any bearing on whether or not the

10   changes are more than colorable between the RQC

11   configurations and the infringing configurations?

12   A    They are not more than colorably different.

13           MS. ALBERT:  I would move the admission of

14   Plaintiff's Exhibit 1026 into evidence.

15           THE COURT:  Any objection?

16           MR. THOMASCH:  Yes, Your Honor, on previously

17   stated grounds.

18           THE COURT:  Is this in the agreed-upon --

19           MS. ALBERT:  Yes.

20           THE COURT:  -- exhibits?  Is it covered by that

21   agreed-upon list?

22           MS. ALBERT:  Yes, it is, Your Honor.

23           THE COURT:  It's admitted over your objection on

24   the basis of the agreement reflected in docket number --

25   what is it?  What is that docket number?

1         MS. ALBERT:  It's docket number 1030.

2         THE COURT:  1030, okay.  Thank you.

3   Q    Now let's look at Plaintiff's Exhibit 1123, if we

4   could.  Is this document one that you reviewed in

5   connection with your analyses?

6   A    Yes, it is.

7   Q    Does this exhibit relate to the prior exhibit?

8   A    Yes.  This is Mr. Lohkamp's response to the same

9   question.

10  Q    What was Mr. Lohkamp's response to Mr. Ciarochi's

11  question?

12  A    In the second bullet --

13        THE COURT:  Excuse me.  What exhibit number is

14  it?

15        MS. ALBERT:  Plaintiff's Exhibit 1123.

16        THE COURT:  I'm sorry.  I was looking in the

17  wrong section.  All right, go ahead.

18  A    In the second bullet, Mr. Lohkamp says, since RQC is

19  based on RSS code, it is not a 100 percent new product,

20  and, thus, most of the code has been tested/used many

21  times.  And when you look at the differences, most changes

22  would have very minimal code impact and, thus, a limited

23  risk.

24  Q    So how does this exhibit bear on your analysis of

25  whether the configurations having RQC are more than

Weaver - Direct

1    colorably different from the infringing configurations?

2          MR. THOMASCH:  Objection, Your Honor, relevance,

3    given that the testimony just read was about most changes

4    having minimal.  I believe that the document does not

5    address the changes that were made and, again, take us

6    outside of the *TiVo* analysis.

7          THE COURT:  Overruled.  It goes to the weight,

8    not admissibility.  Now you need to get the question and

9    the answer, and he's got his objection.

10   Q    How does this communication impact your analysis of

11   whether or not the systems having RQC are more than

12   colorably different from the infringing configurations?

13   A    Mr. Lohkamp's response is telling them that there

14   shouldn't be any bugs because this is not a new product.

15   The fact that he says there are very minimal code impact

16   suggests that there are only minimal changes, and the fact

17   that he says that there is limited risk of using this

18   suggests to me that there's been a large reuse of RSS code

19   in building RQC.

20         MS. ALBERT:  I would move the admission of

21   Plaintiff's Exhibit 1123.

22         MR. THOMASCH:  Same objection, Your Honor, about

23   the witness not having established a foundation.

24         THE COURT:  Is this covered by 1031 as well?

25         MS. ALBERT:  Well, the objection that was raised

1    was one to relevance, and I think we've established that

2    it has relevance to the issue of whether or not the

3    differences are more than colorable.

4              THE COURT:  So the answer is, it's not covered by

5    the agreed upon --

6              MS. ALBERT:  No, it's not covered --

7              THE COURT:  And the objection raised was

8    relevance?

9              MR. THOMASCH:  There is a relevance objection,

10   Your Honor.

11             THE COURT:  All right.  Overruled.

12   Q    Let's look at Plaintiff's Exhibit 1124, please.  Did

13   you review this exhibit for purposes of your analysis?

14   A    Yes, I did.

15   Q    What is it?

16   A    This is an email where they are discussing customer

17   concerns about RQC, and the customer wanted to talk to

18   some other customer who had already implemented RQC.

19   Q    And what was Mr. Lohkamp's response to the inquiry?

20   A    He said, we have a couple customers thinking of moving

21   quickly, but none are live yet to my knowledge, and below

22   that, implementation should be similar to installing a new

23   version of RSS.

24   Q    How did Mindy Klebe respond to the inquiry?

25   A    She said, I agree with Keith.  Requisition Center is

125

1    installed here, and "here" means at Lawson.  I've tested

2    it.  It works the same as RSS XML.  There is some cosmetic

3    changes such as changing checkout to release and shopping

4    carts and requisition lines.  It looks/appears exactly

5    like RSS XML did.  It uses the exact same files and

6    programs as RSS and installs the same as RSS did.  The

7    only change that is, quote, major, quote, if you want to

8    call it that, is that when you add an item to the shopping

9    cart now, it adds the requisition line.  There is no save

10   needed anymore.  So, it's basically acting a lot more like

11   RQ10.  Otherwise, users will probably not even notice the

12   difference really.

13   Q    What does this internal Lawson communication indicate

14   to you as far as any differences between the

15   configurations having RQC and the infringing

16   configurations with RSS?

17   A    This says that RQC works the same as RSS except for

18   the cosmetic changes, and importantly to my analysis,

19   Mindy Klebe says, customers will not notice the

20   difference.

21          MS. ALBERT:  I would move the admission of

22   Plaintiff's Exhibit 1124.

23          MR. THOMASCH:  Your Honor --

24          THE COURT:  Is it on the agreed list?

25          MS. ALBERT:  No, it is not.

1          THE COURT:  And the objection is?

2          MR. THOMASCH:  The objection, Your Honor, was

3    both hearsay and objection on relevance grounds.

4          MS. ALBERT:  I would say it's relevant to show

5    how Lawson characterized the differences between RQC and

6    RSS, and I would also say it's not hearsay because under

7    801, it's the admission of a party opponent.

8          MR. THOMASCH:  Your Honor, I would indicate in

9    response to that that the document, by its terms, is

10   dealing with things such as checkout to release and

11   shopping cart which are RSS features that were prominently

12   at issue with regard to all of the other customers and are

13   no longer at issue in this case.  This is a document that

14   relates to other issues on its face.

15          As to the hearsay objection, Your Honor, this is

16   unambiguously hearsay.  It is being offered for the truth

17   of the purposes asserted in it.  There is no admission.

18   There is no indication that every email between two

19   employees is something that the company has manifested an

20   adoption or agreement of, and I don't know how that

21   analysis could be performed.  The admission section of the

22   rules has additional requirements --

23          THE COURT:  Give me the rule.  My copy of it is

24   blocked by all these nice documents that you all delivered

25   to me, and I can't be a weightlifter and get it up here.

1          Okay, you are saying it comes in under 801 what?

2          MS. ALBERT:  801(d)(2).

3          THE COURT:  801 what?

4          MS. ALBERT:  (d)(2).

5          THE COURT:  Now, which part of it, because it

6   says it has to be made by a party.  The party here is

7   Lawson.

8          MS. ALBERT:  Right.

9          THE COURT:  That's one.  I mean that's (2)(A).

10  (2)(B) is -- first it's offered against an opposing party,

11  so it's qualified under there.

12          Is one the party manifested that it adopted or

13  believed to be true?  Are you saying it comes in under

14  (2)(B) or (2)(C), was made by a person whom the party

15  authorized to make a statement on the subject, or (D), was

16  made by the party's agent or employee on a matter within

17  the scope of that relationship and while it existed, or

18  was made by -- coconspirator doesn't --

19          MS. ALBERT:  It's made --

20          THE COURT:  What does it come in under?  There's

21  a lot of stuff under (2)(D).

22          MS. ALBERT:  (d)(2)(C), made by a person whom the

23  party authorized to make a statement on the subject.

24          THE COURT:  How do we know that?  I need to know

25  that.

1    MS. ALBERT:  I'm sorry, (d)(2)(D), was made by

2 the party's agent or employee on a matter within the scope

3 of their -- that relationship.  Mindy Klebe was one of the

4 people involved with RQC --

5    MR. THOMASCH:  Your Honor, I actually would

6 object to counsel trying to provide foundation for a

7 document when not even a foundational question was asked

8 of the witness about 801(d)(2)(D).

9    THE COURT:  She's not confined to the witnesses

10 in providing an answer to the foundation if she can find

11 it elsewhere, as, for example, in the document.  For

12 example, if the document said, I'm authorized to make this

13 statement or whatever, you know, the document itself can

14 provide the foundation, or if it says, Mindy Klebe,

15 employee on a matter within the scope of that

16 relationship.  So -- and there are other places such as

17 other places in the record which they can vouch and say it

18 exists, and I'll connect it up and strike it up if it

19 doesn't get connected up.  It doesn't have to be with this

20 witness.  I can't imagine this witness would know what

21 Mindy Klebe does --

22    MS. ALBERT:  We will connect it up that Mindy

23 Klebe --

24    THE COURT:  How are you going to connect it,

25 though, is his question.  That is the essence of your

1    objection.

2              MR. THOMASCH:  It is, and that Mindy Klebe is not

3    authorized by Lawson in any function that would relate to

4    the issue of evaluating or considering the significance --

5              THE COURT:  They are not offering it under

6    authorized.  They are offering it now under (D) which is

7    she's an employee acting within the scope of her

8    employment and making a statement, and it sort of looks

9    like she is, but I don't know that.  Just from the text.

10   How are you going to connect it?

11             MS. ALBERT:  We'll connect it up through a

12   different witness.

13             THE COURT:  All right.  Then do you want to hold

14   the objection -- I mean the admission until then, or do

15   you want to admit it subject to connecting it up and

16   having it stricken?

17             MS. ALBERT:  Admit subject to connecting it up, I

18   guess.

19             THE COURT:  You guess?

20             MS. ALBERT:  Yes.  I would prefer to admit

21   subject to connecting it up.

22             THE COURT:  I'm going to admit it provisionally

23   under 801(d)(2)(D) subject to a foundation in other

24   testimony.  All right?  You all have to keep up with all

25   this.  I'm not going to keep up with who struck John here.

1   It looks to me like it's probably a good place to take

2   lunch.  How much more do you think you have, Ms. Albert?

3   I'm not rushing you.  I'm trying to make plans.

4           MR. THOMASCH:  Probably about 20 more minutes

5   with this witness.

6           THE COURT:  Mr. Thomasch, you have a few

7   questions?

8           MR. THOMASCH:  I do have a few questions, Your

9   Honor.

10          THE COURT:  All right.  Thank you.  We'll come

11  back in an hour.

12

13          (Luncheon recess.)

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:   I have been informed that somehow

2   there's Internet access in the courtroom and there's

3   not supposed to be access to any Internet.   So anybody

4   who has access to the Internet has to take the device

5   and rid themselves of it.   Is there anybody?   I know

6   there are wi-fis.   So who has it?   We can't

7   communicate from the courtroom with Internet.   And the

8   rule is we can't have access to it in the courtroom.

9   So who's got it?   Anybody?   Raise your hand.

10          UNIDENTIFIED MAN:   Your Honor, my cellphone

11   is capable, but I turned it off and disabled it.

12          ANOTHER UNIDENTIFIED MAN:   I have a cellphone

13   also.

14          THE COURT:   Off.

15          ANOTHER UNIDENTIFIED MAN:   We have a wireless

16   access device.

17          THE COURT:   Off.   Okay.

18          MS. ALBERT:   Your Honor, can I --

19          THE COURT:   It's particularly important in

20   cases where there's sensitive material and protected

21   material being discussed because if it happens by

22   chance to be disseminated, then it's out, and that's

23   why the rule exists.

24          All right.   Excuse me, Ms. Albert.   Resume

25   your examination.

1          MS. ALBERT:  I wanted to see if I could take

2     up the housekeeping issue that we had with reference

3     to Plaintiff's Exhibit 1124, and I have, Your Honor, a

4     sworn answer to interrogatory that has been submitted

5     by Lawson in these proceedings marked Plaintiff's

6     Exhibit 1269.  It's a not objected to exhibit.  And I

7     wanted to refer you to the answer to interrogatory

8     No. 10.

9          THE COURT:  All right.

10          MS. ALBERT:  Which is on -- there are no page

11     numbers.

12          THE COURT:  I've got it.

13          MS. ALBERT:  So in the answer to

14     interrogatory 10 where Lawson was asked to identify

15     certain costs relating to development, implementation

16     and maintenance of RQC, they identified personnel on

17     the teams that were required to inspect and test the

18     RQC product during development and launch and listed

19     personnel that had those responsibilities for

20     inspection and testing of RQC.

21          And on the second page of the answer towards

22     the bottom, Mindy Klebe is identified in that capacity

23     as being a support -- Lawson's support personnel with

24     responsibilities in her employment to inspect and test

25     the RQC product during development and launch.

1    So I would submit that the statement made by

2    Mindy Klebe in Plaintiff's Exhibit 1124 was indeed

3    within the scope of her employment and therefore

4    qualifies as a nonhearsay admission of a party

5    opponent under Rule 801(d)(2)(D).

6        THE COURT:  Mr. Thomasch, I've read it.

7        MR. THOMASCH:  Your Honor, Ms. Klebe is

8    identified with two words.  One word.  Support.  And

9    she's down with a group of other individuals in

10   support, approximately a dozen, 10 to 12, who in total

11   billed 57 hours in the aggregate to in some way be

12   involved in development, installing, implementing and

13   maintaining RQC.  Support doesn't do the design.

14       The questions we're going to the

15   functionality of the product and the like.  The fact

16   that she is one of a dozen people that collectively

17   spent 57 hours in providing some unidentified support

18   service I would suggest, Your Honor, is not a

19   foundation.

20       If there was a desire to set a foundation,

21   plaintiffs could have done so.  They could have

22   deposed her or asked her an interrogatory about her or

23   done something, but this document with the word

24   "support" does not do it in my mind, Your Honor.

25       MS. ALBERT:  The interrogatory identifies her

1    as among the team members that were required to

2    inspect and test the RQC product.

3              THE COURT:  Where does it say that?

4              MS. ALBERT:  In the email --

5              THE COURT:  Ms. Albert, where does it say

6    that?

7              MS. ALBERT:  It says it on the first page of

8    the answer in the middle of that textural paragraph,

9    Beyond the developer time associated with writing the

10   code for RQC, Lawson also incurred additional costs

11   associated with other teams that were required to

12   inspect and test the RQC product during the

13   development and launch process.  The costs are

14   estimated to be $75,000.  Hours associated with those

15   costs are set forth in the following chart.

16            The support costs are identified without

17   hours.  And then she's listed as among the support

18   personnel.

19            In the exhibit in question, Plaintiff's

20   Exhibit 1124, she is specifically commenting on things

21   that are within the responsibility identified in the

22   interrogatory.  She says, I've tested RQC.  It works

23   the same as RSS, XML.  Users will not notice a

24   difference.  That's clearly within the scope of her

25   responsibilities that are set forth in the

1    interrogatory relating to testing RQC with the

2    development and launch process.

3              MR. THOMASCH:  Your Honor, may I ask the

4    witness one question on voir dire?

5              THE COURT:  What's that?

6              MR. THOMASCH:  May I ask the witness one

7    question on voir dire?

8              THE COURT:  What's that got to do with the

9    admission of the document under 801(d)(2)(D)?  He

10   doesn't know anything about the admissibility.

11             MR. THOMASCH:  That's fine, Your Honor.

12             THE COURT:  I don't understand how he

13   could --

14             MR. THOMASCH:  You're correct.  They

15   originally tried to bring it in through him and now

16   it's a separate issue.  I'll respond to that issue

17   when you like, but I withdraw the request.

18             THE COURT:  All right.  Well, you're offering

19   this answer to interrogatory, to which no objection is

20   made --

21             MS. ALBERT:  Correct.

22             THE COURT:  -- as proof that Mindy Klebe in

23   this document was an employee who made a statement on

24   a matter within the scope of her relationship as

25   employee and while it existed.  Is that right?

1           MS. ALBERT:  That's correct.

2           THE COURT:  That's what she's offering this

3    to show.  What's your position?

4           MR. THOMASCH:  Our position is that the

5    document is hearsay.  The exception to the hearsay

6    rule has not been met.  We certainly have not shown in

7    any way, shape or form that this witness is in a

8    position of employment in which he has either

9    knowledge of or authorization to speak about matters

10   that are relevant to this lawsuit.

11          She may have some knowledge about testing

12   that she may have worked approximately five hours on,

13   but it is an enormous reach to go from a document

14   which identifies things such as checking checkout to

15   release and shopping cart, which are the very changes

16   that are no longer in the case, the document does not

17   say a word about Punchout.  There is no knowledge, and

18   I jumped ahead, Your Honor, but there's no indication

19   that she tested a system that had Punchout in it as a

20   separate module.

21          Nothing in here suggested that she even

22   touched or saw or dealt with Punchout.  And to that as

23   the foundation for admission of a document I think is

24   woefully insufficient.

25          THE COURT:  All right.  Anything else?

WEAVER - DIRECT                    137

1        MS. ALBERT:  Nothing else, Your Honor.

2        THE COURT:  Objection overruled.  It's

3   admitted.  There's sufficient evidence to show the

4   statement made by Ms. Klebe was made by her during her

5   employment and in the scope of it based on the answer

6   to the interrogatory.  All right.

7        (Plaintiff's Exhibit is admitted.)

8   BY MS. ALBERT:

9   Q   Back to you, Dr. Weaver.  We were reviewing some

10  exhibits that you had relied upon in your colorability

11  analysis.  Let's turn if we could to Plaintiff's

12  Exhibit 1100.  What is this exhibit?

13  A   This is some email listing from Mr. Hager, some

14  sales messaging points about RQC.

15  Q   What does Mr. Hager say here about communications

16  that Lawson should provide to its customers concerning

17  RQC?

18        THE COURT:  What exhibit are you on?

19        MS. ALBERT:  Plaintiff's Exhibit 1100.

20        THE COURT:  Thank you.

21  A   Mr. Hager says, Does not require upgrade to any

22  other technology, applications or any other Lawson

23  components.  Delivered via download, which takes about

24  20 minutes.  Straightforward installation that most

25  companies typically do themselves, but we are happy to

WEAVER - DIRECT                    138

1   do it for no fee.  Installation takes a couple of

2   hours.  Configuration varies a bit but typically will

3   be completed in a day or two.  Again, done by us at no

4   fee.

5       User training can be done electronically and would

6   be estimated as an hour or two of information for

7   users.  And skipping to the last bullet point.

8       Effort level can be thought of as a maintenance

9   release effort, but only changes to the requisition

10  center.  Nothing is -- nothing in core Lawson.

11          MR. THOMASCH:  Your Honor, might I just

12  object and ask that the one paragraph, one line that

13  was skipped over, be read under the rule of

14  completeness, Rule 106?

15          MS. ALBERT:  I have no objection to that.

16          THE COURT:  All right.

17          THE WITNESS:  So the bullet point next to the

18  last, "The wild card is in modifications and what

19  level of testing the customer requires, which is very

20  customer specific."

21  Q   So what does this communication indicate to you

22  concerning any differences between the infringing

23  configurations with RSS and the configurations having

24  RQC?

25          THE COURT:  It's not what it indicates to

1  him.  It's what if anything did it do in respect of

2  the shaping of his opinions.  I think that's what the

3  pertinent question is.  They are two different

4  questions entirely.

5          Is that why you rise, Mr. Thomasch?

6          MR. THOMASCH:  That's part of why I rise.

7          THE COURT:  I didn't mean to cut you off.

8          MR. THOMASCH:  No, no, Your Honor.  The other

9  part of why I rise is, for the record, there is no

10 foundation laid that this document relates in any way

11 to the change in functionality that is the subject of

12 this hearing.  And, thus, to deal only with the

13 generality of RSS or RQC in light of the prior

14 proceedings that we've had here where we know that

15 there were changes made that were not proper for this

16 proceeding.

17         THE COURT:  Is this a relevance objection?

18         MR. THOMASCH:  It is, Your Honor.

19         THE COURT:  All right.  Is this document 1030

20 or Docket No. 1030 an agreed exhibit or not?

21         MS. ALBERT:  Yes, it is, Your Honor.

22         THE COURT:  Then objection overruled.

23         MS. ALBERT:  Just for the record --

24         THE COURT:  As to the admission of the

25 document, but not as to the question.  The question

1   still is defective.

2   BY MS. ALBERT:

3   Q    What if anything impact does this communication

4   have upon your analysis of whether or not the

5   differences between the systems having RQC and the

6   infringing configurations with RSS are more than

7   colorably different?

8   A    So this email exchange represents RQC as being a

9   maintenance patch.  It clearly says that nothing in

10  core Lawson has changed.  So the only changes are to

11  the user interface, not to the core functionality.  So

12  this suggests minimal cosmetic changes to the user

13  interface.

14          THE COURT:  What is a maintenance patch?

15          THE WITNESS:  Typically, it's a code change

16  that gets downloaded and installed.

17  BY MS. ALBERT:

18  Q    What's the difference between a maintenance patch

19  and a new release?

20  A    A maintenance patch is simple.  A new release is

21  complex.

22  Q    What's the date of Mr. Hager's email?

23  A    May 26, 2011.

24  Q    What's the subject line in Mr. Hager's email?

25  A    "Update on requisition center and Punchout -

1  Sutter."

2  Q    Do you know whether or not any of the changes

3  relevant to this proceeding were implemented in

4  requisition center as of the date May 26, 2011?

5  A    Yes.

6  Q    Which change?

7  A    The -- I've drawn a blank.

8  Q    Was the change relating to requisitioning with

9  item master items and Punchout items implemented as of

10 May 26, 2011?

11 A    In the RQC release, yes.

12 Q    Thank you.  Let's turn, if we could, to

13 Plaintiff's Exhibit 1072.  Did you review this exhibit

14 in connection with your colorability analysis?

15 A    Yes, I did.

16 Q    What is it?

17 A    So this is yet another email string, this time

18 concerning customers who have questions about testing.

19 Q    Let's look at the earliest email in time on RQC

20 14104 from Mr. Walter's of Lawson where he indicates,

21 "Scott, some customers are concerned about the

22 retesting investment they need to make with the change

23 to RQC.  I know you stated it is minimal.  Is there

24 talking points or recommendations on how to diffuse

25 this concern with customers you can send me?"

1      Do you see that question?

2  A    Yes, I do.

3  Q    How did Mr. Hanson respond to those concerns?

4  A    He said, While this is a new product, the new

5  product is a change to the user interface only.  The

6  procurement business functionality and data remains

7  the same.  If a user uses RSS already, they'll

8  intuitively be able to use the RQC product.  There is

9  very little change in the functionality.

10 Q    How did Mr. Walter's respond then to Mr. Hanson?

11 A    He then asks another question.  "What is our

12 guidance on testing understanding it is just a change

13 to the user interface?"

14 Q    What further guidance did Mr. Hanson provide to

15 Mr. Walters on testing understanding that RQC was just

16 a change to the user interface?

17 A    He replied, "For the risk averse, perform any

18 tests that would have normally been performed with

19 deploying RSS or patching RSS.  For the non-risk

20 takers, test what is changed, which is really

21 nothing."

22 Q    How does this communication impact upon your

23 analysis of whether the configurations having RQC,

24 whether or not those are more than colorably different

25 from the infringing configurations?

WEAVER - DIRECT                    143

1    A    In my opinion, it's a very powerful statement to

2    say that you don't need testing of what is purportedly

3    a new product.  So that indicates to me that RQC is

4    very similar to RSS.  So it's very similar to the

5    systems that have already been installed.

6              MS. ALBERT:  Your Honor, I would move the

7    admission of Plaintiff's Exhibit 1072.

8              THE COURT:  Any objection?

9              MR. THOMASCH:  No, Your Honor.

10             THE COURT:  Admitted.

11             (Plaintiff's Exhibit 1072 is admitted.)

12   BY MS. ALBERT:

13   Q    Let's turn to Plaintiff's Exhibit 1027.  Did you

14   review this exhibit in connection with your

15   colorability analysis?

16   A    Yes, I did.

17   Q    What is it?

18   A    It's a communication between Mindy Klebe of Lawson

19   and Aaron Drury of Providence Health where they're

20   discussing RQC.

21   Q    How does Mindy Klebe describe RQC to Mr. Drury of

22   Providence Health?

23   A    She says in the first two lines, Hey, didn't mean

24   to imply that it's RQC.  It's not.  It's really the

25   same thing as RSS XML was except for a few

1    adjustments; however, I'm not allowed to say that.

2    Q    So what if any impact does this communication have

3    upon your analysis of whether or not the

4    configurations having RQC are more than colorably

5    different from the infringing configurations?

6    A    So this clearly indicates that Mindy Klebe told

7    this Lawson client, Aaron Drury of Providence Health,

8    that RQC was really the same thing as RSS.

9              MS. ALBERT:  Your Honor I would move the

10   admission of Plaintiff's Exhibit 1027.

11             MR. THOMASCH:  Objection, Your Honor.  Lack

12   of foundation, hearsay.  It is on our objection list.

13   It is not --

14             THE COURT:  The objection is what?  Hearsay?

15             MR. THOMASCH:  Hearsay and relevance, Your

16   Honor.

17             THE COURT:  All right.

18             MS. ALBERT:  It's relate to show how Lawson

19   itself characterizes the difference between RQC and

20   RSS.  And, again, I would submit that it's a

21   nonhearsay admission of a party under Rule

22   801(d)(2)(D).  Mindy Klebe has responsibility for

23   customer support and this is in the scope of her

24   employment to communicate to a customer concerning

25   concerns they had about RQC.

WEAVER - DIRECT                     145

1      THE COURT:  Overruled.

2   BY MS. ALBERT:

3   Q    Let's turn to Plaintiff's Exhibit 1066.  Did you

4   review this exhibit in connection with your

5   colorability analysis?

6   A    Yes, I did.

7   Q    What is it?

8   A    This is internal communications between Lawson

9   employees concerning a question that they had received

10  from one of their customers named Heartland.

11  Q    In the earliest email in time on the bottom of the

12  page from James Healey to Scott Hanson, Mr. Healey

13  indicates, "I need to install RQC on their new box.

14  Can we upgrade data from RSS to RQC?"  Do you see that

15  question?

16  A    Yes, I do.

17  Q    How did Scott Hanson respond to Mr. Healey's

18  question?

19  A    Mr. Hanson answered, "There is no data migration.

20  RSS and RQC are just two UIs," user interfaces, "that

21  point to the same requisition data.  Think of it like

22  using, IE, Internet Explorer versus Firefox to hit

23  access a website."

24  Q    How does this communication impact upon your

25  opinion as to whether or not the systems having RQC

1   are more than colorably different from those found to

2   be infringing?

3          MR. THOMASCH:  Objection.  Relevance, Your

4   Honor.

5          THE COURT:  Overruled.

6   A   So this confirms my opinion that if there is going

7   to be no data migration, then RQC and RSS are using

8   exactly the same databases.  So, again, the change

9   from RSS to RQC is just confined to the user

10  interface, not to any core functionality of the

11  procurement system.

12  Q   Let's look at Plaintiff's Exhibit 1065.

13         MS. ALBERT:  Oh, I guess I would move the

14  admission of Plaintiff's Exhibit 1066.

15         THE COURT:  Any objection?

16         MR. THOMASCH:  No objection.

17         THE COURT:  It's admitted.

18         (Plaintiff's Exhibit 1066 is admitted.)

19  Q   Now, referring to Exhibit 1065, did you also

20  consider this exhibit in connection with your

21  colorability analysis?

22  A   Yes, I did.

23  Q   What is it?

24  A   This is more email this time concerning questions

25  that Lawson's customer Kennedy Health had concerning

1  Lawson's RQC SWAT team.

2  Q    How did Scott Hanson respond to Wendy Schulte's

3  question, "So when you say we will be happy to work

4  with Kennedy Health to do their production RQC

5  install, if necessary, billable or the non-bill for

6  conversion?"

7  A    So Mr. Hanson's answer was:  "We do the install

8  for no charge.  That's what the whole RQC SOF is

9  about.  There is no conversion necessary.  RQC is just

10 a new user interface to access their requisition

11 functionality.  Think of it as they used to access the

12 Internet, [read: Requisitions] via Internet Explorer

13 on their PC [read: RSS].  What we are now saying is

14 you cannot use IE any longer, and instead have to use

15 Firefox.  So, Lawson is offering to install Firefox

16 [RQC] on their PC's, to use instead of IE [read: old

17 RSS] to access the Internet [read: their existing and

18 new requisitions].  There is no requirement to

19 "convert" a requisition.  A requisition is a

20 requisition.  We are just providing a new utility to

21 view that requisition."

22 Q    How does this communication between the Lawson

23 employees impact upon your analysis as to whether or

24 not the configurations having RQC are or are not more

25 than colorably different from the infringing

1   configurations?

2           MR. THOMASCH:  Objection.  Relevance.

3           THE COURT:  What's that?

4           MR. THOMASCH:  Objection.  Relevance, Your

5   Honor.

6           THE COURT:  Overruled.

7   A   So here we see that Lawson personnel are once

8   again showing in their communications that they view

9   the differences between RQC and RSS to be minimal with

10  no real functional differences.  The changes are to

11  the user interface only and not to the core

12  functionality.  So the changes made to the infringing

13  systems with the release of the new RQC, in my

14  opinion, were not more than colorable differences.

15          THE COURT:  I guess I have a question I'm

16  trying to sort out here.  What is the significance in

17  your opinion of the distinction you're drawing between

18  a change in functionality and change in user

19  interface?  That obviously means something to you, but

20  what does it mean?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  It's technical jargon that I need

23  to understand better, if you'll help me.

24          THE WITNESS:  Yes, Your Honor.  When I'm

25  talking about the functionality, I'm talking about the

1    core functionality of the Lawson system that enables

2    procurement.  With regard to Claim 26 it's what are

3    the functionalities that map from the Lawson system to

4    maintaining a database of at least two product

5    catalogs, being able to search the catalogs, being

6    able to select items from the catalogs, being able to

7    build a requisition from the selected items, and being

8    able to generate one or more purchase orders for those

9    items.  That's the functionality.

10          What has come out during my entire testimony

11   is perhaps confusion that ePlus had never accused RSS

12   of infringement.  It was the infringing systems,

13   Configurations 3 and 5, were RSS and all of those

14   other modules that I had on my demonstrative.

15          So in my opinion when Lawson replaced RSS

16   with RQC, they changed the one program that changed

17   the view of the data.

18          THE COURT:  That's the user interface?

19          THE WITNESS:  Yes, sir.  So they changed the

20   user interface, but they didn't change any of the core

21   functionality.  And so for my colorability analysis,

22   I'm going back to the fact that random changes don't

23   apply to my colorability analysis.  Only those that

24   are relevant to the elements of the claim.

25          THE COURT:  All right.

1    MR. THOMASCH:  Your Honor, just for the

2  record, in light of that explanation, we would move to

3  strike all of the testimony that Mr. Weaver has given

4  with respect to the way he is defining core

5  functionality versus user interface as irrelevant and

6  patently outside the TiVo analysis by his own

7  statement.

8    MS. ALBERT:  I don't believe that it's

9  outside of the TiVo analysis.  The TiVo analysis says

10  as an initial hurdle, you have to consider whether the

11  modification that was made to the infringing systems

12  has any relevance to the features that were relied

13  upon to prove infringement.  A random change that

14  isn't related to any claim element as a matter of law

15  cannot be more than a colorable difference.  So Dr.

16  Weaver is pointing out that the features that related

17  to the procurement functionality that are relevant to

18  the claim are based on the underlying modules of the

19  system and not based on the user interface.

20    THE COURT:  Overruled.  Tell me something,

21  both of you, please.  Is there something that I've

22  missed about the meaning of the word "random" that

23  gives it some special meaning in the patent law?

24    MR. THOMASCH:  No, absolutely not.

25    THE COURT:  It's just an ill-chosen word that

1    doesn't really mean anything.  What it refers to is

2    changes that aren't pertinent to what is in the patent

3    or what is accused as being modified or what is

4    accused as infringing an element.  It doesn't have any

5    independent meaning, does it?  Everybody is adopting

6    "random" as if it means something.

7                MS. ALBERT:  No.

8                THE COURT:  I feel like that we'd be just as

9    well off if that word were out of the quotation.

10               MR. THOMASCH:  Your Honor, the word is in the

11   quotation.

12               THE COURT:  It is.

13               MR. THOMASCH:  We think it is important.

14               THE COURT:  Why is it important then?  Help

15   me with it.

16               MR. THOMASCH:  Yes, Your Honor.  Because I

17   believe that the articulation that Your Honor gave is

18   not faithful to TiVo.  It is not a question of what is

19   relevant to the modified product's infringement.  What

20   the issue is is whether or not the subject, the

21   modification, relates to what was contended and proved

22   at the first trial.

23               THE COURT:  Let me see the quote that has the

24   "random" in it.  I may have opened Pandora's box.  I

25   don't know what I've done with my thumb-worn copy of

1   TiVo.

2           MR. THOMASCH:  Your Honor, I can read it to

3   you or hand it up.

4           THE COURT:  Hand it to me.  Let me see it.

5           MR. THOMASCH:  It begins on the lower

6   left-hand part of page 882, which is page 14 of the

7   Westlaw for counsel's sake.

8           THE COURT:  All right.  Well, you-all are

9   also taking "random" out of context from the way the

10  Federal Circuit used it.  It says, "The analysis must

11  focus not on the differences between the randomly

12  chosen features of the product found to infringe in

13  the earlier infringement trial and the newly accused

14  product, but on those aspects of the accused product

15  that were previously alleged to be and were a basis

16  for the prior finding of infringement and the modified

17  features of the newly accused products.  Specifically,

18  one should focus on those elements of the adjudged

19  infringing products that the patentee previously

20  contended and proved but satisfied specific

21  limitations of the asserted claims."

22          That's what I was trying to say in short form

23  and I butchered it when saying it.  But the randomly

24  chosen, the word "randomly" just basically means you

25  can't go out and choose some feature and say, It's

1    different.  The issue is whether it was a feature that

2    was involved in the infringement, I think.  So

3    anyway --

4          MR. THOMASCH:  Your Honor, can I just make

5    clear on the record --

6          THE COURT:  No.  You've already made clear on

7    the record so many times.  Make it quickly, if you

8    will, Mr. Thomasch.  I understand, I think.  So you'll

9    have it in the record right here.

10         MR. THOMASCH:  Yes, Your Honor.  We may not

11   pick a randomly chosen feature and say we changed it.

12   It is our obligation as we set forth what changes

13   matter, and there were many changes, but when we

14   identify what changes matter, the question is:  What

15   does that have to link up to?  And I think there are

16   two very different schools of thought.

17         The plaintiffs say the question is whether

18   what you changed takes you out of infringement.  Does

19   your modified product still practice the claims --

20         THE COURT:  No, they don't.  They say, Does

21   it colorably change what was proved to be infringed?

22         MR. THOMASCH:  This analysis takes us back

23   twice.  This analysis takes us back to what was

24   contended and proved at the first trial.  And what was

25   contended and proved at the first trial about the

1    features that we changed are what we think --

2          THE COURT:  I understand, Mr. Thomasch.

3    You're going to have a chance to take up with the

4    Federal Circuit exactly whether your interpretation is

5    right or not.  And you've preserved it seven ways from

6    Sunday, I think.  And it isn't as if I don't

7    understand it.  I just don't think it's correct.  I

8    understand what you're saying.

9          MR. THOMASCH:  All right.  And I would just

10   note that that, of course, is directly related to the

11   part of TiVo that I showed during opening statement

12   that relates to the manner in which the very TiVo

13   analysis was done looking only at the changed

14   features, not at the entire product that was at issue.

15         THE COURT:  That doesn't mean that that's all

16   you can consider.  What you're doing is saying that

17   the only thing you can consider in coming to judgment

18   is that evidence even if there's plenty of other

19   evidence that relates to it that helps inform what

20   that evidence means.  And that's what they're doing is

21   putting in the evidence that puts the context to

22   what's going on.  And that's what's happening.

23         At least that's what I see as happening.

24   That's what their papers say.  And you-all are at odds

25   over it.  And I think their approach is correct and

1    yours is not.  But you've made it clear that that's

2    what you think is right.  And I'm sure the Federal

3    Circuit will have the opportunity to decide which is

4    the correct view.

5              MR. THOMASCH:  Thank you, Your Honor.

6              MS. ALBERT:  I think I have the question

7    pending.

8              THE COURT:  If you do, you have to ask it

9    again.

10   BY MS. ALBERT:   (Continuing)

11   Q    How does the communications in Plaintiff's Exhibit

12   1065, how do those impact upon your analysis of

13   whether or not the changes that were brought by the

14   configurations having requisition center render those

15   configurations more than colorably different from the

16   infringing configurations?

17   A    The documentation that we have here I think shows

18   conclusively that Lawson personnel see or view the

19   differences between RQC and RSS to be very minimal, to

20   be changes to the user interface only with no change

21   to the core functionality of the procurement system.

22   So the changes made to the infringing systems by the

23   release of RQC, in my opinion, are not more than

24   colorably different.

25   Q    Just point out for the record, what are the dates

1   on the emails in Plaintiff's Exhibit 1065?

2   A    September 1, 2011.

3   Q    Do you know whether or not the changes that are at

4   issue here relating to requisitions with Punchout

5   items were implemented prior to September 1, 2011?

6   A    Yes, they were.

7           THE COURT:  Let me make clear here, we don't

8   have a jury, and there wasn't any real objection to

9   that answer, but it isn't how he interprets what the

10  Lawson people think that really informs his opinion

11  that that is -- he can testify that it informs his

12  opinion if their text explains a technical term that I

13  need to understand.  I can understand what they mean

14  when they say "There's no lipstick on a pig" or

15  whatever it is.  I just use that as an example.  In

16  fact, they point out that that didn't even relate to

17  the change at issue.  It related to something else

18  anyway.  I use that only as an example.

19          But if he says, "Mary said there's no

20  lipstick on a pig, and therefore you don't have to do

21  this," then the important part of what his

22  interpretation has to be is what is the meaning of

23  "you don't have to do this"?  Do you understand what I

24  am saying?

25          MS. ALBERT:  Yes, Your Honor.

1        THE COURT:  That's where he is helpful to the

2   trier of fact, not in interpreting the plain language

3   and everyday vernacular of the Lawson people in making

4   the statements of which you-all are so fond.  I can

5   deal with those on my own and draw inferences in that

6   way, but it helps me if I understand what it is that

7   the witness thinks is important about the statement,

8   for example, what we're now saying is that you can't

9   use IE any longer and instead have to use Firefox.  So

10  Lawson is offering to install Firefox [read: RQC] on

11  their PCs to use instead of IE [read: old RSS] to

12  access the Internet [read: their existing and new

13  requisitions].

14        That has a lot of technical terms in there

15  that would be helpful to have him interpret.  And

16  that's what his office is.  Not to take the plain

17  language and give me an interpretation of that.

18        If you want to ask him that, you can ask him

19  that.  I'm not going to pay any real attention, I

20  don't think, to his interpretation of the nontechnical

21  terms used in the communications that we're dealing

22  with because I don't think that's really what his

23  opinion is based on.  His opinion's got to be based on

24  what the technical aspects of the communications are.

25        MR. THOMASCH:  Objection.  I would just note,

1   Your Honor, that he has actually repeatedly said that

2   his opinion is based on the nontechnical, and we

3   believe that is a reason why it needs to be struck as

4   not proper expert testimony.  It is his testimony that

5   that is the basis.

6            THE COURT:  Well, actually, I've been

7   listening quite carefully, Mr. Thomasch, to what he

8   has been saying, and every time she's called upon him

9   to deal with the opinion, she has, in fact, linked it

10  to some component that I need help on, and he has

11  answered in that way, but in this instance he did not

12  do that, which is why I raised it.

13           So your objection is overruled to the extent

14  it reaches backwards and I've already dealt with it.

15  We'll strike the answer and let you start again on

16  this document, if you'd like to.

17  BY MS. ALBERT:

18  Q   What is important about the statements that

19  Mr. Hanson made about the differences between RQC and

20  RSS that are relevant to the analysis the Court has to

21  make about the colorability issue?

22           THE COURT:  That are relevant to your opinion

23  about why the change is not more than colorably

24  different.

25           MS. ALBERT:  Thank you, Your Honor.

1          THE COURT:  That is, I think, what you

2    intended to say.

3    BY MS. ALBERT:

4    Q   What is important about the statements that

5    Mr. Hanson made here about the differences between RQC

6    and RSS that is important to your opinion that the

7    changes that were made via RQC rendered the systems no

8    more than colorably different from the infringing

9    configurations?

10   A   Okay.  Let's remove all the highlighting.  So this

11   statement, "There is no conversion necessary," that

12   says that RQC is using the same data as RSS.

13          THE COURT:  Using the same data --

14          THE WITNESS:  Data in the procurement system.

15          THE COURT:  Using the same data.

16          THE WITNESS:  Right.

17          THE COURT:  All right.

18   A   So given that that is true, the next statement,

19   "RQC is just a new user interface to access the

20   requisition functionality."  So this is saying that

21   the user interface, which is the view of the data,

22   that's what's new.  Just the user interface.  Nothing

23   is said here about core functionality changes.

24   There's no requirement to convert a requisition.  So

25   requisitions are not different in RSS and RQC.

1        So, in my opinion, the changes from RSS to RQC are

2    minimal and cosmetic, not related to the core

3    functionality.

4            THE COURT:  That kind of testimony is helpful

5    to my understanding of your view.

6    BY MS. ALBERT:

7    Q   What about the statement that he makes about what

8    we are now saying is that you cannot use IE any longer

9    and instead have to use Firefox?  How is that relevant

10   to your opinions about lack of colorable difference

11   between the configurations having RQC and the

12   infringing configuration?

13   A   That you could have used -- you could have and did

14   use Internet Explorer.  That was RSS.  But now you

15   have to use Firefox, that's RQC.  But they are

16   interchangeable.

17   Q   Are Internet Explorer and Firefox user interfaces?

18   A   No, they are complete browser systems.

19           MS. ALBERT:  I don't think I've moved the

20   admission of Plaintiff's Exhibit 1065 into evidence.

21   I'd like to do so.

22           THE COURT:  Any objection?

23           MR. THOMASCH:  No objection, Your Honor.

24           THE COURT:  It's admitted.

25           (Plaintiff's Exhibit No. 1065 is admitted.)

1    MS. ALBERT:  Just for housekeeping, I am not

2    sure if I moved the admission of Plaintiff's Exhibit

3    1269 into evidence.  That was the interrogatory

4    answers.  And I would like to do that.

5    THE COURT:  You did not.

6    MS. ALBERT:  I would like to do that.

7    THE COURT:  Any objection?

8    MR. THOMASCH:  No objection, Your Honor.

9    THE COURT:  It is admitted.

10   (Plaintiff's Exhibit 1269 is admitted.)

11   THE CLERK:  What about 1032?

12   THE COURT:  1032?

13   THE CLERK:  1032, Your Honor.  Is that

14   admitted?

15   THE COURT:  I don't know where it was even

16   asked about.  I write them down.  No, it's not

17   admitted.  Changes brought -- no.  1032 is not

18   admitted yet.

19   THE CLERK:  That's what I have.  Thank you.

20   BY MS. ALBERT:

21   Q   Dr. Weaver, did you review any documents relating

22   to whether or not new training was required for RQC?

23   A   Yes, I did.

24   Q   Let's look at Plaintiff's Exhibit 1057.  What is

25   this exhibit?

WEAVER - DIRECT                  162

1          THE COURT:  What number, Ms. Albert?

2          MS. ALBERT:  1057.

3          THE COURT:  All right.  Excuse me.

4  A    So this is an email that contains an attachment

5  and in the attachment are the questions and answers

6  from an RQC webinar where once the questions and

7  answers have been printed, they have then been updated

8  by the RQC SWAT team, and this email is distributing

9  that updated question and answer list.

10 Q    What was the RQC SWAT team?

11 A    These are Lawson personnel whose job was to assist

12 customers with the installation of RQC.

13 Q    Let's look at page 20 of the attachment with the

14 questions and answers.  How did Lawson respond to the

15 customer's question at line 204, "What are some of the

16 end user training issues that we should be aware of?"

17         THE COURT:  Line what?

18         MS. ALBERT:  Line 204.

19 Q    How did Lawson respond to that question?

20 A    Their answer was, "Since RQC has 100 percent of

21 the existing functionality of RSS, no training issues

22 have been identified to date."

23 Q    So what is important about that statement to your

24 opinions about lack of colorable difference?

25 A    Lawson is telling its customers that RQC has

1  100 percent of the functionality of RSS.  So there's

2  nothing new, so there's no new training required.

3             MR. THOMASCH:  Objection to form, Your Honor,

4  to the addition of the words "there's nothing new."

5  He read the document.  He inserted an editorial.

6             THE COURT:  Objection to the response to the

7  question, is that what you're saying?

8             MR. THOMASCH:  Yes.

9             THE COURT:  Is your objection to the

10 response?

11            MR. THOMASCH:  It is actually, Your Honor.

12 The objection --

13            THE COURT:  Sustained.  He misread the

14 response.  So do you want to read it again, Doctor?

15            THE WITNESS:  Lawson is telling its customers

16 that RQC has 100 percent of the functionality of RSS

17 and so no new training is needed.

18 Q   So what's the significance to the statement that

19 no new training is needed from a computer science

20 point of view with respect to whether or not the

21 systems having RQC are or are not more than colorably

22 different from the infringing configurations?

23 A   If no new training is needed, then there must not

24 be much difference between the systems.  In this case,

25 RSS and RQC.

1      MS. ALBERT:  Your Honor, I would move the

2  admission of Plaintiff's Exhibit 1057.

3      THE COURT:  Any objection?

4      MR. THOMASCH:  No objection, Your Honor.

5      THE COURT:  It's admitted.

6      (Plaintiff's Exhibit 1057 is admitted.)

7  Q   Let's look at Plaintiff's Exhibit 1070.  Did you

8  consider this exhibit in connection with your

9  colorability opinions?

10  A   Yes, I did.

11  Q   What is it?

12  A   This is an email from Scott Hanson relating to the

13  question of RQC training.

14  Q   Let's look at the earliest email in time on page

15  RQC 19870.  Do you see the question there from

16  Christopher Milliner of Lawson, "What can we expect

17  from our requisition center (RQC install)?  What have

18  other customers done around differences training for

19  their requesters?"  Do you see that?

20  A   Yes, I do.

21  Q   How did Mr. Hanson respond to that question?

22  A   Just above is Mr. Hanson's response.  "We will

23  assist them in installing RQC.  As for training, it

24  varies, but generally minimal, if any, retraining is

25  necessary."

1   Q    What's important about that statement to your

2   opinion about lack of colorable difference?

3   A    If RQC requires minimal or no retraining, then RQC

4   must be very similar to RSS.

5   Q    Let's look at Plaintiff's Exhibit 1110.

6           MS. ALBERT:  Oh, also I forgot to move the

7   admission of Plaintiff's Exhibit 1070.

8           THE COURT:  Any objection?

9           MR. THOMASCH:  No objection, Your Honor.

10          THE COURT:  It's admitted.

11          (Plaintiff's Exhibit No. 1070 is admitted.)

12  Q    Can you note the date of Plaintiff's Exhibit 1070?

13  A    That date was September 21, 2011.

14  Q    Was that date before or after the changes that are

15  at issue here with respect to requisitioning with

16  Punchout items?

17  A    That was after.

18  Q    Let's look at Plaintiff's Exhibit 1110.  What is

19  this exhibit?

20  A    This is more email.  This time it includes a

21  preview of an announcement to account executives that

22  provided some questions about RQC training issues.

23  Q    In the middle email from Michael Poling, what was

24  his question that he expressed there?

25  A    He says, "All:  I'm concerned that introducing

1    requisition center as 'new product' will put us in a

2    position that we have to demonstrate the new

3    capabilities or differences.  Does it have to be a new

4    product or can it be a replacement?"

5    Q    How did Jennifer Langer respond to that?

6    A    In the email just above, "There is a change to the

7    UI, but the menu structure is essentially the same.

8    We do have a PowerPoint showing the UI changes and it

9    will be available in the launch toolkit.  This can be

10   used with prospects to show the changes."

11   Q    UI, what's that mean?

12   A    That's user interface.

13   Q    How did Dean Hager respond to Michael Poling's

14   concern?

15   A    He said, "No new training should be needed.  And

16   re-demoing shouldn't be needed."

17   Q    So what is important about these statements that

18   were made in this exhibit to your opinions about lack

19   of colorable difference?

20   A    In my opinion, if no retraining is going to be

21   required, if no training is going to be required, then

22   the functionality of RQC has to be very similar to

23   that of RSS.

24           THE COURT:  Did you think maybe I wasn't

25   paying attention the first two or three times you-all

1    made that point?

2    BY MS. ALBERT:

3    Q    Based on your review of Lawson's technical

4    documentation, its internal and external

5    communications, the testimony of Lawson's witnesses,

6    and your review of the systems, do you have an opinion

7    as to whether or not the change Lawson made to prevent

8    items selected from a Punchout site from appearing on

9    the same requisition as item master items or items

10   from a different Punchout site renders the

11   configurations with RQC more than colorably different

12   from the infringing Configurations 3 and 5?

13   A    I believe that they are not more than colorably

14   different.

15   Q    What are the bases for your opinion?

16   A    First, the changes that have been made are not

17   related to any claim element in Claim 26.

18        Second, there are no changes to any other module

19   other than RSS.  No changes to inventory control or

20   requisition or purchase order or Punchout or EDI.

21        So there have been no changes to the capabilities

22   regarding the use of catalogs, of selecting a catalog

23   to search, of selecting items in the catalog to put in

24   a requisition, of building a requisition, of

25   generating a purchase order from the requisition, no

1   changes to inventory determination and Punchout or

2   EDI.

3       And lastly, as we've seen, Lawson's internal

4   communications continually characterize the changes as

5   minimal with no retraining needed.

6           MS. ALBERT:  Thank you, Dr. Weaver.  I have

7   no further questions.  Please answer any questions

8   that Mr. Thomasch may have.

9           THE WITNESS:  Certainly.

10

11      RECROSS-EXAMINATION

12  BY MR. THOMASCH:

13  Q   Good afternoon, Dr. Weaver.

14  A   Good afternoon, Mr. Thomasch.

15  Q   Right at the outset of your examination you were

16  asked by counsel about what you were asked to analyze

17  in this case.  Do you recall that?

18  A   I do.

19  Q   If I heard you correctly you said whether the

20  changes made, and then you corrected yourself and said

21  whether the systems made are more than colorably

22  different.  Do you recall that?

23  A   Well, I don't recall every word.

24  Q   But you recall that you actually changed from "the

25  changes made" to "the system made," don't you?

1   A    No.

2   Q    You don't?

3   A    No.

4   Q    Which is it that is the basis for your opinion,

5   that the changes made or that the systems are not more

6   than colorably different?

7   A    It's the changes.  Are the changes more than

8   colorably different.

9   Q    Did you compare just the changes in isolation, the

10  infringing part of the system, to that which had been

11  changed?

12  A    I was comparing the operation of the system with

13  RQC versus the system with RSS.

14  Q    And there are many parts of the overall

15  Configuration 3 and 5 that can be used and not

16  infringe Claim 26, correct?

17  A    Well, I suppose parts could be used in isolation

18  and not infringe, that's right.

19  Q    You understand, don't you, that Configuration 3 is

20  the same as Configuration 2 but includes the Punchout

21  module?

22  A    Yes, that's correct.

23  Q    And you have shown that in your drawings, correct?

24          MS. ALBERT:  Beyond the scope.  I didn't go

25  into Configuration No. 2.

WEAVER - CROSS                    170

1          MR. THOMASCH:  I'm just trying to identify

2    what the subject matter of the witness --

3          THE COURT:  Overruled.

4          THE WITNESS:  Please repeat the question.

5    Q   Configuration 3 is identical to Configuration 2

6    except the Configuration 3 includes Punchout, correct?

7    A   That's correct.

8    Q   In the trial of this action, it was not even

9    alleged that Configuration 2 infringed Claim 26, was

10   it, sir?

11   A   That's correct.

12         MS. ALBERT:  Beyond the scope, Your Honor,

13   and also we're delving into the trial.

14         THE COURT:  Now you are.  Objection

15   sustained.

16         MR. THOMASCH:  May I have Slide 1, please?

17         THE COURT:  What are we doing here?

18         MR. THOMASCH:  I'm sorry, Your Honor.  I'm

19   trying to pull up a slide to ask a question.

20         THE COURT:  Whose slides?

21         MR. THOMASCH:  It was our --

22         THE COURT:  On your side or their side?

23         MR. THOMASCH:  Our slide from --

24         THE COURT:  Okay.

25   BY MR. THOMASCH:

1  Q    Dr. Weaver, you were not here for opening, were

2  you?

3  A    No, sir, I was not.

4  Q    Okay.   I want to show you something that I showed

5  to the Court just to identify what it is that is the

6  change and see if we're in agreement about the nature

7  of the change as opposed to the significance of the

8  change.   All right?

9  A    Okay.

10 Q    So do you understand that the change in the

11 functionality of Punchout was indeed a two-part

12 change?

13 A    Please explain that.

14 Q    Let me ask you to read with me and see if you

15 understand whether this is part of the overall change

16 in functionality to Punchout.   Is it, in fact, your

17 understanding, Dr. Weaver, that when using the

18 modified products, a Lawson customer who has searched

19 for and selected a matching item or items from item

20 master cannot access a Punchout vendor's website

21 during that shopping session; is that correct?

22 A    That's correct.

23 Q    Is it also correct, sir, that if a shopping

24 session starts with a search and selection of one or

25 more items from a Punchout vendor's website, the

1   customer cannot then access item master; is that a

2   factually correct statement?

3   A    It is.

4   Q    Is it true, sir, that the redesigned product

5   prevents a user from selecting and combining items

6   from both item master and a Punchout vendor's website

7   on a single requisition?  Is that true?

8   A    Yes, that's true.

9   Q    Was that functionality available?  Was it a

10  feature of the infringing configurations?

11  A    It was a feature, but, of course, it was not the

12  only feature.

13  Q    I asked you:  Was it a feature of the infringing

14  configurations?

15  A    It was.

16  Q    The next slide, please.

17       Is it true, Dr. Weaver, that when using the

18  modified products, a Lawson customer who has searched

19  and selected an item from one Punchout vendor's

20  website cannot access a second Punchout vendor's

21  website and, thus, cannot search and select items from

22  more than one Punchout vendor's website in a shopping

23  session?  Is that an accurate statement?

24  A    It is.

25  Q    Is it further true, Dr. Weaver, that the

1    redesigned product prevents a user from selecting and

2    combining items from different Punchout vendors'

3    websites on a single requisition?  Is that true?

4    A    That is.

5    Q    Was that functionality present in the infringing

6    configurations?

7    A    It was.  So were other functionalities.

8    Q    So when counsel talked about changes we contend or

9    Lawson contends to be made, the changes that I would

10   like to discuss with you are these that we have just

11   identified.  Is that clear?

12   A    Yes, sir.

13   Q    And am I correct that you do not dispute that

14   those changes were made?

15   A    Those changes were made.

16   Q    In RSS, a user could add all items from one

17   requisition, could add all items onto one requisition

18   regardless of the source; is that correct?

19   A    Yes.

20   Q    For example, if you started by punching out to a

21   Staple's Punchout site, you could search for a desk,

22   select a desk, and add a desk to the requisition,

23   correct?

24   A    Correct.

25   Q    You could then punch out to a Dell Punchout site,

1    correct?

2    A    Correct.

3    Q    You could then search for and might ultimately

4    come upon a printer, you could select that printer and

5    add it to the requisition, correct?

6    A    Correct.

7    Q    Then you could go to checkout if you wished,

8    correct?

9    A    Correct.

10   Q    In RQC, that specific process cannot be performed;

11   is that correct?

12   A    Correct.

13   Q    In RQC under the modified product, you can start

14   by punching out to a Staple's Punchout site if, as a

15   customer, you have a Punchout link to Staples,

16   correct?

17   A    Correct.

18   Q    You can select a desk and add that to a

19   requisition in RQC, correct?

20   A    Correct.

21   Q    Then you could try to punch out to Dell.  If you

22   tried to do so, will you be able to do so?

23   A    No.

24           MR. THOMASCH:  May I have Exhibit 1155,

25   please, called up.

WEAVER - CROSS                          175

1        THE COURT:  Plaintiff's Exhibit 1155?

2        MR. THOMASCH:  Yes, Your Honor.  I'm sorry

3   for not specifying.

4   Q    Go to page 10 of the document Bates No. ending

5   with 718.  Tell me when you have that in front of you.

6   A    Yes, sir, I do.

7   Q    This is something that you looked at during direct

8   examination, correct?

9   A    Yes, it is.

10  Q    It captions "Punchout items will be on separate

11  requisitions," and it shows a pop-up screen; is that

12  correct?

13  A    Correct.

14  Q    That's down in the lower right-hand corner where

15  there is some sort of triangular warning, and it says,

16  "Punchout items must be on a separate requisition," is

17  that right?

18  A    That's correct.

19  Q    Now, is that -- that's on the screen of the

20  computer of the user when the user tries to punch out

21  and go to Dell and buy something, correct?

22  A    Well, not the screen as you've shown here.  The

23  pop-up.

24  Q    The pop-up would be?

25  A    The pop-up would be.

1    THE COURT:  Excuse me.  You're now continuing

2    with the situation in which you've gone to Staples,

3    punched out, ordered a desk, and now you want to go to

4    Dell and order a computer?

5    MR. THOMASCH:  That is correct, Your Honor.

6    THE COURT:  What happens is this pop-up comes

7    up.  Is that what you're saying, Dr. Weaver?

8    THE WITNESS:  I don't think that description

9    is correct, Your Honor.  I think you've gone to item

10   master.

11   THE COURT:  What?

12   Q    In my example, you punch out to Staples Punchout

13   and you select a desk, and then you attempt to punch

14   out to Dell.

15   A    I'm sorry, sir.  That's not your example.

16   Q    It's not the pop-up here?

17   A    It's not the requisition line.

18   Q    Okay.  What will happen -- put aside the document

19   for the moment.  What will happen if you punch out to

20   Staples, you select a desk, you add it to the

21   requisition, and you attempt to punch out to Dell?

22   What happens then?

23   A    You'll get a pop-up like this one.

24   Q    A pop-up like this one, correct?

25   A    Correct.

1            THE COURT:  But the screen doesn't look like

2     what's at page 718; is that your point?

3            THE WITNESS:  That's my point, Your Honor.

4            THE COURT:  So the screen comes up with this,

5     "Punchout items must be on a separate requisition.

6     Click stop to return to your current position?

7            THE WITNESS:  Yes, Your Honor.

8            THE COURT:  Then there's another one.  Click

9     continue to create the new requisition.

10           THE WITNESS:  That's correct.

11           THE COURT:  If you click continue to create a

12    new requisition, what happens?

13           THE WITNESS:  Then the requisition that you

14    currently are working on is abandoned.

15           THE COURT:  Abandoned completely?

16           THE WITNESS:  Yes, sir.

17           THE COURT:  Not saved?

18           THE WITNESS:  Not at all.

19           THE COURT:  All right.

20    BY MR. THOMASCH:

21    Q   Where is it -- how would you describe where it is

22    that you see at the pop-out?  Is that on the user

23    interface?

24    A   It's -- it is on the user's screen and it's

25    derived from the user interface code.

1   Q    When images are changed on the screen, do you call

2   that a change to the user interface?

3   A    No.

4   Q    Describe for me how you're using the term "user

5   interface".

6   A    The user interface code and then what it can do

7   and can't do.

8           THE COURT:  He is making a distinction

9   between user interface and user interface code, I

10  think.

11          MR. THOMASCH:  I now hear that.

12          THE WITNESS:  Correct, Your Honor.

13  Q    What I want to find out is can you just disregard

14  this message and say, oh, I know I'm not supposed to

15  do that, but I would rather punch out to Dell and keep

16  what I've done from Staples?

17  A    No.

18  Q    So there's a physical blocking of what you've

19  done, correct?  What you're trying to do?  You're

20  blocked, you're thwarted from what you're trying to

21  do; is that right?

22  A    If I understand your question, you have postulated

23  going to Staples, which is not what's shown on the

24  screen, but I accept --

25          THE COURT:  Let's take that down from the

1  screen because we're not talking about that anymore.

2  It's just confusing things.  He's asking you a

3  question without reference to the exhibit.

4            MR. THOMASCH:  Right.

5            THE COURT:  So user goes on, goes to Staples,

6  selects a desk.

7  Q    Puts it back onto the requisition and seeks to

8  punch out to Dell.  Am I correct they will be blocked

9  from doing so?

10 A    Yes.

11 Q    It's not just that they get a message that this

12 isn't a good idea.  They simply are incapable of now

13 carrying out that desired procurement; is that right?

14 A    Well, there are two choices.  You either abandon

15 the attempt to punch out to Dell and go back to the

16 requisition that you've got and release it, or if

17 you're going to keep your Staples requisition, then

18 you cannot punch out to Dell.

19 Q    Okay.  Hypothetically, let's just assume that

20 everyone agreed that you needed to have to be able, it

21 was critical that you be able to punch out to two

22 separate vendors, two separate vendors' websites, in

23 order to infringe the claim.  If that were the

24 assumption, then would this be something that went to

25 core functionality in your view?

1          MS. ALBERT:  Objection, relevance.

2          MR. THOMASCH:  Your Honor, I'm simply trying

3    to test the limits of the witness's opinion and

4    understand how he's using defined terms.

5          MS. ALBERT:  That's not relevant to the

6    claim.

7          THE COURT:  Was that in the claim

8    construction?

9          MR. THOMASCH:  No.  I am not suggesting that

10   that is required.  I'm asking hypothetically so I can

11   understand -- I'm framing an example so I can

12   understand how he's using the term "core

13   functionality."

14         THE COURT:  Well, if it doesn't relate to the

15   claim and the construction of the claim, I don't see

16   how it's relevant.

17         MR. THOMASCH:  Because it is a hypothetical,

18   I'm not suggesting it is the actual fact.  I'm asking

19   in a hypothetical.

20         THE COURT:  I understand, but hypotheticals

21   have to be relevant or they are stricken by virtue of

22   403 and I'm afraid that's where we are.

23         So objection sustained.

24   BY MR. THOMASCH:

25   Q   Let me ask you, Dr. Weaver, if a user of RQC and

1    Punchout came upon a screen that gave them the choice

2    to stop and return to your current requisition or to

3    continue to a new requisition, in which case the other

4    was abandoned, do you think that message is clear to

5    the person who receives it?

6    A    Yes.

7    Q    Do you think that if that -- and that is a change

8    from what RSS was, correct?

9    A    It is a change, but, as you know from my

10   testimony, I don't think it's related at all to Claim

11   26.

12   Q    Could I ask you, if you can, if you understand my

13   question, to answer my question and not put an

14   argumentative statement at the end of it.  Would that

15   be acceptable to you, sir?

16   A    Yes, sir.

17   Q    Recognizing that counsel for ePlus will have a

18   chance to follow-up and make sure there is nothing

19   unstated.  Okay?

20   A    Sure.

21   Q    All right.  So it is a change to have this

22   blockage in your ability to carry out the desired two

23   Punchout vendor websites requisition.  That's a

24   change, correct?

25   A    That's a change.

1   Q    Do you think any retraining of anyone would be

2   necessary if they knew how to use RSS, would any

3   training be necessary in order to be able to

4   understand and interpret this message?

5   A    Probably not for that message.

6   Q    Do you think that training would be necessary to

7   tell someone in light of that message that if they

8   want to go to Staples and then punch out to Dell, they

9   would have to do so in two separate shopping sessions,

10  not in one session?  Do you think someone would need

11  to be retrained to understand that?

12  A    It's probably understandable.

13  Q    So whether or not the training is necessary does

14  not necessarily show you the significance of the

15  activity that is being thwarted; is that correct?

16  A    Only true for your example.

17  Q    But for my example, it is true?

18  A    It is true for your example.

19  Q    Now, in RSS, after going to Staples and to Dell,

20  if the Lawson customer had relationships with 98 other

21  Punchout vendors, they could go to 98 other Punchout

22  vendor websites and they could shop, choose whether or

23  not to select an item, and bring back as many of those

24  items from as many of those websites as they wanted,

25  and bring them back to the same requisition during the

1   same shopping session; is that correct?

2   A    During the same Lawson shopping session with

3   multiple Punchouts, multiple serial Punchouts.

4   Q    Multiple serial Punchouts where the selected

5   matching items are brought back onto one requisition;

6   is that right?

7   A    That's correct.

8   Q    And then in those situations those different

9   sourced items would be on the same requisition, but

10  they would ultimately lead to different purchase

11  orders, correct?

12  A    Correct.

13  Q    As modified, RQC does not work the same way; is

14  that correct?

15  A    Correct.

16  Q    Now, that is a change in functionality; is it not?

17  A    It's a change between RSS and RQC.  It's not a

18  change to a core functionality.

19  Q    I am not adopting the term "core functionality" as

20  it relates to patent claims.  I am asking you, do you

21  understand my question when I am saying is it a change

22  in the functionality of the product as it concerns the

23  ability of a product user to use the product?

24  A    It's a change in the way it works.

25  Q    A change in the way it works?

1    A    (Nodded head.)

2    Q    And that's not a cosmetic change, is it, sir?

3    A    Yes.

4    Q    Yes, it's not, or yes, it is?

5    A    I think it's a cosmetic change.

6    Q    It's a cosmetic change to go from being able to

7    shop at 100 different Punchout websites and bring it

8    back to one requisition or to have to do one, and if

9    you want to go to the next one, you need to either

10   finish or abandon the first?  That's in your words

11   that's cosmetic?

12   A    That's cosmetic because it's not related to the

13   claim.

14   Q    It's cosmetic because no matter how severe the

15   difference is, it still infringes the claim in your

16   view; is that right?

17   A    I was talking about colorable difference, not

18   infringement.

19   Q    What I want to know is how is it that the ability

20   to go to 100 different sites for a purchasing

21   professional whose purchasing large volumes of

22   materials, how is it cosmetic for them to no longer be

23   able to go to 100 different places and bring that back

24   onto one requisition but need to do 100 separate

25   Punchout requisitions?  Why is that cosmetic?

1   A    Because the end result of being able to purchase

2   those hundred things from a hundred sites, that

3   functionality is still present.

4   Q    Is it more burdensome to have to do it with 100

5   separate requisitions?

6   A    Yes, but that's not part of the claim.

7   Q    Is it harder under the new Punchout with its

8   blockage limitations, is it harder to do comparison

9   shopping than it used to be?

10              MR. STRAPP:  Object to the characterization

11  of new Punchout particularly where counsel stipulated

12  that Punchout hasn't been changed.

13              THE COURT:  That's a fair point, isn't it?

14              MR. THOMASCH:  When I refer to Punchout, I'm

15  referring to Punchout functionality.

16  Q    Do you understand that?

17  A    Okay.

18  Q    And the Punchout functionality was due to coding

19  changes made in the process of moving from RSS to RQC

20  so that RQC relates to Punchout in a different way

21  than RSS did.  Is that your understanding?

22  A    No.  The interface between RQC and Punchout is

23  identical to the interface, I'm talking about the code

24  as you are, from RSS to Punchout.

25  Q    And the functionality of what can be accomplished

1    during a single shopping session has changed between

2    the way that Punchout operated with RSS and the way

3    Punchout operated with RQC; is that correct?

4    A    Yes.

5    Q    Are you familiar with the use of electronic

6    requisition software to allow users to do comparison

7    shopping?

8    A    Yes.

9    Q    Is comparison shopping rendered more easy when you

10   have a system such as RSS that allowed multiple

11   different Punchout vendor website items to be brought

12   together on a single requisition than if you have to

13   go to one site and either have to abandon it or

14   complete it before going to the next?

15             MS. ALBERT:  Relevance.

16             THE COURT:  Overruled.

17   A    I've forgotten which way you stated the question.

18   Q    I want to know whether the shopping is easier when

19   you can use the single requisition and harder when you

20   have the hundred requisitions?

21   A    That's correct, but not related to the claim.

22   Q    The approval process you're familiar with, are you

23   not?

24   A    Yes, sir.

25   Q    And the approval process is the approval of a

WEAVER - CROSS                    187

1   requisition which is a request to purchase from a

2   purchase order which is, in effect, a contract to

3   purchase; is that right?

4   A    Correct.

5   Q    So a different person in the requisition team for

6   a user company would be involved in approving the

7   requisitions; is that right?

8            MS. ALBERT:  Relevance, Your Honor.  There is

9   no claim element that relates to approval of a

10  requisition in Claim 26.

11           THE COURT:  Is it?  Did I misread it?

12           MR. THOMASCH:  There is not an approval step

13  in the claim.  There was specific discussion about the

14  approval process at the first trial in exactly this

15  situation.

16           MS. ALBERT:  But it has no relevance to any

17  claim.

18           MR. THOMASCH:  No, it doesn't have relevance

19  to the claim.  It has relevance to the colorability of

20  the change that was described to the jury.

21           THE COURT:  Excuse me.  She's looking at

22  something.

23           MS. ALBERT:  Your Honor said in your ruling

24  last week that we're not going to rehash the trial

25  testimony or explain what was shown at trial or

1    summarize the arguments of counsel at trial in this

2    proceeding.

3             THE COURT:   I don't think that's what he's

4    doing, but I also think the objection is well taken.

5    Sustained on relevance grounds.

6    BY MR. THOMASCH:

7    Q   I'd like to ask you a few follow-up questions on

8    certain of the documents that you looked at on direct

9    examination, Dr. Weaver.

10   A   Certainly.

11   Q   Might I ask you to pull up PX-1002.  Do you have

12   that?

13   A   Yes, I do.

14   Q   And you recognize that as questions and answers

15   that were taken down from a webinar on June 3, 2011?

16   A   That's correct.

17   Q   If you flip to page 650, I believe the third

18   question asks about, What about EDI?  Do you recall

19   being questioned about that?

20             THE COURT:   What page?

21             MR. THOMASCH:   That is at page 13 of 18

22   ending in 650 on the Bate's number on the lower right.

23             THE COURT:   Got you.

24   BY MR. THOMASCH:

25   Q   Specifically, Dr. Weaver, I'm directing your

WEAVER - CROSS                        189

1    attention to the third question on page 650 with

2    regard to EDI.

3    A    Okay.  I'm there.

4    Q    Do you recall being asked about that question?

5    A    I do.

6    Q    When you went through this document, is that the

7    question that seemed most pertinent to you about

8    today's proceeding?

9    A    It simply addressed the Configuration No. 5 that

10   had the EDI module and I wanted to show that it had no

11   changes.

12   Q    And you understand that no changes to EDI are

13   alleged, correct?

14   A    Yes.

15   Q    You do understand that changes to the

16   functionality of Punchout are alleged, do you not?

17   A    Yes.

18          MS. ALBERT:  Objection.

19   Q    If you would object your attention to page 651 --

20          MS. ALBERT:  I just object to characterizing

21   that the changes were made to Punchout again.

22          THE COURT:  He didn't say Punchout.  He said

23   functionality of Punchout, I think.

24          MR. THOMASCH:  I did, Your Honor, very

25   specifically.

1    THE COURT:  That changes your objection,

2    doesn't it, Ms. Albert?

3                MS. ALBERT:  Yes.

4                THE COURT:  All right.

5    BY MR. THOMASCH:

6    Q    Do you see at the bottom of page ending in Bates

7    No. 651 and carrying over to the middle of page 652,

8    do you see a section called "procurement Punchout"?

9    A    Yes.

10   Q    Did you review those questions and answers?

11   A    Yes.

12   Q    Did you see the question at the top of page 652

13   with RSS, we were able to mix Punchout items with

14   stock items on a requisition.  I've seen info that

15   suggests that is not possible with RQC.  Is this

16   previous functionality of RSS likely to be restored to

17   RQC?  Did you see that question?

18   A    Yes.

19   Q    Did you take from that, in the words of

20   plaintiff's counsel, the notion that at least this

21   customer felt that this was a loss of functionality

22   under RQC?

23   A    From the point of view of that customer, yes.

24   Q    So when the customer was talking about is it

25   likely to be restored, that's a suggestion that they

1  wanted to know whether they are going to get

2  functionality that's been removed back in the future,

3  correct?

4  A    Probably.

5  Q    And going down to the fourth question, to you see

6  where it asks --

7           MR. THOMASCH:   Page ending, counsel, 652,

8  top, fourth question.   Are you okay?

9           MS. ALBERT:   Uh-huh.

10 Q    Dr. Weaver, fourth question on 652, read with me,

11 "Will the functionality be changed in the future so a

12 requisition can contain both Punchout and item master

13 items?"  Do you see that?

14 A    I do.

15 Q    Does that suggest to you, again, that the

16 limitation on Punchout functionality was viewed as a

17 limitation by this customer?

18          MS. ALBERT:   Calls for speculation.

19          THE COURT:   Sustained.

20 BY MR. THOMASCH:

21 Q    Did you consider these questions in any way in

22 reaching your expert opinion?

23 A    Not the two that you pointed to.

24 Q    Could I show you -- if you could pull up

25 Plaintiff's Exhibit 1010.   Do you recognize that

1    document from direct examination captioned,

2    "Introducing Lawson Requisition Center" dated June 3,

3    2011?

4    A    Yes, I do.

5    Q    I believe if you turn to page or the Bates No.

6    661, you'll see a page that you commented on during

7    your direct examination.  Do you see that?

8    A    Yes.

9    Q    And it says that in the second bullet point

10   requisition center RQC is now generally available for

11   S3, correct?

12   A    Correct.

13   Q    And the next line which you focused on in your

14   direct examination and your answers to questions

15   during direct was designed to minimize impact on our

16   customers.  Do you see that?

17   A    I do.

18   Q    Now, the changes to RSS to develop RQC that are

19   being discussed in this document go beyond the change

20   that relates to the functionality of Punchout, don't

21   they?

22   A    Yes.

23   Q    And there was a change that related to the manner

24   in which items that were initially selected would go

25   into the shopping cart on RSS, correct?

1        MS. ALBERT:  Beyond the scope of my

2  examination.

3        THE COURT:  Well, I'm not sure.  We'll wait

4  and see where he's going with this.  He's on

5  cross-examination.  It may be but maybe not.

6        THE WITNESS:  Could you ask again?

7        THE COURT:  Start again, please.

8  Q    Yes.  Some of the changes in RSS to develop RQC,

9  some of the differences, were related to features that

10  have been identified as the shopping cart and the

11  manner in which a requisition on any requisition was

12  created; is that right?

13        MS. ALBERT:  Renew my earlier objection and

14  also object based on lack of relevance.

15        THE COURT:  I thought you made a point in

16  your opening statement that none of these were at

17  issue.

18        MR. THOMASCH:  They are not, Your Honor.

19        THE COURT:  Why are we asking about it then,

20  I guess?

21        MR. THOMASCH:  Because we have document after

22  document that talk about RSS or RQC without any

23  relationship or identification of Punchout

24  functionality.

25        If the only change in RSS to RQC related to

WEAVER - CROSS                    194

1   the Punchout functionality, it would be a fair

2   inference that such documents were pertinent to this

3   examination.

4          If that is a small change in the overall

5   context of other changes and there is no specification

6   of which change is at issue, I would like this

7   witness --

8              THE COURT:  Hand him the documents.

9              MR. THOMASCH:  If the documents doesn't --

10             THE COURT:  The purpose of asking it is to

11  help interpret the real meaning of a document.

12             MR. THOMASCH:  Yes.

13             THE COURT:  Because it could refer to more

14  than one thing?

15             MR. THOMASCH:  It could refer to something

16  entirely different.

17             THE COURT:  I see.  Objection overruled.

18  BY MR. THOMASCH:

19  Q   Your expert report contains both of them, multiple

20  sections, including a section that relates to changes

21  apart from Punchout functionality, correct?

22  A   Yes.

23  Q   And those other changes were in the RSS to RQC

24  module, correct?

25  A   You're talking about the three major changes?

1  Q    Yes.   That were the subject matter of both of your

2  reports, 130-some odd pages total?

3  A    Yes.

4  Q    And one of those three changes that you wrote

5  about relates to the functionality of Punchout about

6  which you've been testifying, correct?

7  A    Correct.

8  Q    Two were different, correct?

9  A    Yes, they were.

10  Q    But all three relate to RQC, correct?

11  A    Yes.

12  Q    In your analysis of the colorability of the other

13  changes you looked at whether or not they were

14  designed to minimize any impact on customers, didn't

15  you?

16  A    No.

17  Q    You didn't consider that?

18  A    I don't think so.

19  Q    You did consider other changes to RQC and you

20  cited to documents that just referenced RQC, correct?

21  A    Yes.

22  Q    So when a document indicates RQC, do you

23  automatically assume by definition that it also was

24  intended by the author of that document to encompass

25  Punchout, Punchout functionality?

1   A    No.

2   Q    Is it your statement that what has been done to

3   mitigate this issue, and I'm taking you now back to

4   page 661, asking about what have we done to mitigate

5   this issue.  Is there anything on page 661 that you

6   believe, you interpret, as being directly related to

7   Punchout functionality?

8   A    In the third bullet that you're discussing

9   designed to minimize impact on our customers, that's

10  talking about RQC.

11  Q    All talking about RQC, isn't it?

12  A    Yes, it is.

13  Q    Is it all talking about Punchout functionality as

14  directed by RQC?

15  A    Probably not.  Limited to Punchout.

16  Q    Is there anything in here that you find is

17  specific to Punchout?

18  A    Not labeled as --

19           THE COURT:  You mean on page 661?

20           MR. THOMASCH:  On 661.

21  A    No, not on page 661, that's right.

22  Q    Can we look at page 665, please?  And I want to

23  take your attention to the second bullet point.  You

24  were asked about this under the heading "Designed with

25  three principles in mind."  You'll see, "100 percent

1   functionality you require must be included."  That was

2   the first one, right?

3   A    That's right.

4   Q    The second one was add additional new functions;

5   is that correct?

6   A    Correct.

7   Q    The third one was opened up for future mobile

8   requisitioning capabilities; do you see that?

9   A    Yes.

10  Q    Opened up for future mobile requisitioning

11  capabilities was not in any way specific to Punchout,

12  was it, sir?

13  A    It is not.

14  Q    Additional new functions, were there any

15  additional new functions to Punchout functionality

16  that were added at the time that the limitations were

17  put in place?

18  A    No.

19  Q    No corresponding trade off.  We stopped you from

20  doing this, but we gave you something new and

21  different that you can do?

22  A    I don't understand your question, sir.

23  Q    Well, there were limitations on things you used to

24  be able to do that you now can't.  At the time those

25  changes were made, was Lawson able to figure out some

1   new benefit that you can get a better Punchout

2   experience with RQC?

3   A   I don't know.

4   Q   You're not aware of anything, are you?

5   A   No.

6   Q   The changes that you're aware of only go in one

7   direction, they only diminish functionality that was

8   previously available but is no longer available,

9   correct?

10  A   Correct.

11  Q   Now, the 100 percent functionality you require, do

12  you read that to mean 100 percent of the functionality

13  that you previously had?

14  A   Yes.

15  Q   You don't recognize a difference between those two

16  terms?

17  A   Which two terms?

18  Q   That you require and that you previously had.

19  A   You asked me how I interpreted this statement.

20  Yes, those are two different statements.

21  Q   Do you interpret those as the same?

22  A   I interpret 100 percent functionality you require

23  to reference the functionality that had previously

24  been provided in RSS, and that is the basis of the

25  requirement.  It's required in RQC because you had it

1    in RSS.

2    Q    Did you see any deposition testimony from Lawson

3    employees about what that phraseology meant?

4    A    No.

5    Q    I would ask you, sir, to look at Exhibit No. 1026.

6    Do you have that document in front of you?

7    A    I do, sir.

8    Q    It's a one-page email with three separate email

9    messages.  Do you see that?

10   A    I do.

11   Q    Is any part of this in your opinion specific to

12   Punchout functionality?

13   A    Punchout is not specifically named.

14   Q    Now, you made reference to the first message which

15   I believe is from Mr. Christopherson to Mr. Lohkamp,

16   and it says, "Key is that RQC is built on RSS.  So

17   it's not a 100 percent new product."  Do you see that?

18   A    I do.

19   Q    You're not aware of any allegation in this case

20   that RQC was a 100 percent new product, are you?

21   A    No.

22   Q    You, however, testified that that influenced your

23   opinion that it was not more than colorably different,

24   correct?

25   A    Correct.

1   Q    Does it have to be 100 percent new in order to be

2   more than colorably different in your opinion?

3   A    No.

4   Q    Does it have to be 90 percent new in your opinion?

5   A    That's a value judgment.

6   Q    Well, I know.  I'm looking for your values here.

7   I'm trying to figure out when you made a decision,

8   you've said it doesn't have to be 100.  Is there some

9   baseline minimum, it needs to be above that or it

10  can't be more than colorably different?

11  A    I think it would have to be 50 percent new.

12  Q    So more than 50 percent new to be more than

13  colorably different; is that your --

14  A    Yes.

15  Q    When you're deciding which percentage of a product

16  that is not 100 percent new is new, how do you

17  actually do that?

18  A    I would look at the way it operates.

19  Q    Would you look at the lines of code or would you

20  look at the -- would you look qualitatively at what it

21  does?

22  A    Certainly that would be one way, looking at the

23  code, but I looked at the way it operates.

24  Q    And it needs to be more than 50 percent new in its

25  operation?

1   A    That's my opinion.

2   Q    Okay.  And just to clarify terminology, if there's

3   a loss of functionality, is that a new -- is that new

4   for your purposes because it's different?

5   A    No.

6   Q    So is there any amount of lost functionality that

7   would be sufficient to make something more than

8   colorably different?

9   A    No.

10  Q    No matter how much functionality it lost, if it's

11  still there it's not more than colorably different?

12  A    Correct.

13  Q    If you could look at Exhibit 1124.  I want to ask

14  you about the Mindy Klebe to Mary Finkler document

15  that you incorporated into your analysis of your

16  expert opinion.  Okay?

17  A    Okay.

18  Q    Before you were questioned here today, did you

19  know who Mary Finkler is?

20  A    I was not asked that question.

21  Q    I know.

22  A    No, I don't.

23  Q    Did you know who Mindy Klebe was?

24  A    Yes.

25  Q    What did you understand about Mindy Klebe?

1   A    She was an employee of Lawson.

2   Q    And you saw that she indicates that she tested

3   requisition center, correct?

4   A    Yes.

5   Q    Are you aware that you can test -- withdrawn.

6   There's requisition center in Configuration 2,

7   correct?

8   A    Yes.

9   Q    And there's requisition center in Configuration 3,

10  correct?

11  A    Yes.

12  Q    Can you test requisition center without testing

13  the functionality of Punchout?

14  A    Yes.

15  Q    Do you have any idea whether what Mindy Klebe

16  tested included Punchout?

17  A    This does not say.

18  Q    So you do not know; is that right?

19  A    I do not know.

20  Q    So it's possible that this entire document relates

21  to testing of a configuration that didn't include

22  Punchout?

23  A    I don't know.

24  Q    If I could ask you to look at Exhibit 1100.  Do

25  you see it, sir?

1    A    Yes, I do.

2    Q    And your attention was drawn to, among other

3    things, the top two emails on the first page of

4    Exhibit 1100 including the statement from Dean Hager.

5    Do you see that?

6    A    Yes, I do.

7    Q    Is there anything in Mr. Hager's statement, the

8    body of the statement as opposed to the subject line,

9    is there anything in Mr. Hager's statement that

10   relates specifically to Punchout?

11   A    Punchout is not specifically named.

12   Q    It is noted, however, as counsel directed your

13   attention to, in the subject, is that right?

14   A    Yes, it is.

15   Q    Now, am I correct that update on requisition

16   center and Punchout is the original subject matter of

17   the first email that appears on page ending Bates

18   No. 778?  Do you see the 4:01 PM email from Michael

19   Poling?

20   A    Yes, I do.

21   Q    And that relates to requisition center and

22   Punchout, correct?

23   A    Yes, it does.

24   Q    It deals specifically with customers who have RSS

25   and Punchout deals, correct?

1    A    Correct.

2    Q    And further down there's a section called

3    "Services, customers who already own RSS buying

4    Punchout."  Do you see that?

5    A    Yes.

6    Q    Underneath it it says, "You're selling Punchout

7    for use with RQC.  We will not implement it with RSS."

8    Do you see that?

9    A    I do.

10   Q    Do you know whether anything in this document

11   relates to a description of the functionality of

12   Punchout in RQC or how that functionality compares to

13   the functionality of Punchout with RSS?

14   A    In this document?

15   Q    In this document.

16            THE COURT:  The whole document?

17            MR. THOMASCH:  Yes.

18            THE COURT:  I don't know if he's read that.

19            MR. THOMASCH:  I will withdraw that.

20            THE COURT:  If you're asking him to do that,

21   we're going to take a recess.

22            MR. THOMASCH:  I will withdraw it and just go

23   to the two emails that he read on direct examination.

24   Q    So if we look at the Dean Hager May 26, 8:02 AM

25   email, is there anything in there that you interpret

1    that relates to a comment on the functionality of

2    Punchout in the modified product or a comparison of

3    that functionality to the functionality that existed

4    with RSS?

5    A    Punchout is not specifically named in these

6    points.

7    Q    If we go up to the top email, again, is Punchout

8    functionality drawn out by the author of the top

9    email?

10   A    Not by name.

11   Q    Do you have Plaintiff's Exhibit 1072, sir?

12   A    Yes.

13   Q    Do you know who Mr. Charlie Walters is?

14   A    He's an employee of Lawson.

15   Q    Do you know who Mr. Scott Hanson is?

16   A    An employee of Lawson.

17   Q    What are Mr. Hanson's duties?

18   A    Well, I don't know specifically.  I don't know

19   specifically.

20   Q    Do his duties matter to you at all in trying to

21   interpret as an expert witness the significance of his

22   statements regarding RQC or RSS?  Does it matter what

23   his job is to you?

24   A    Yes.

25   Q    But you don't know his job?

1   A   Well, I did, but I've forgotten.

2   Q   Do you know whether Mr. Hanson, who will be a

3   witness at this case, or at least is on plaintiff's

4   witness list and is here to testify here in Richmond,

5   do you know if he knows anything about the differences

6   between the functionality of Punchout with RSS and

7   with RQC?

8   A   I believe he does.

9   Q   On the basis of that belief that he's

10  knowledgeable on that subject matter, you gave weight

11  to Exhibit 1072; is that correct?

12  A   Correct.

13  Q   If we look at 1027 quickly.  Have you read this

14  document?

15  A   Yes.

16  Q   You might recall that it covers a host of topics

17  including empty nest syndrome, puppies, Facebook

18  friending and the like, correct?

19  A   Correct.

20  Q   And at the very top there's a statement about RQC

21  and did you understand that Aaron Drury was a

22  customer?

23  A   Yes.

24  Q   Who is he a customer -- what customer is it?

25  A   Providence Health.

1   Q    Does Providence Health have Punchout?

2   A    I don't know.

3   Q    Is this document -- did you interpret this

4   document to be an analysis or communication by Mindy

5   Klebe about the functionality of Punchout in RQC?

6   A    It clearly says it's about RQC.

7   Q    Right.  And what I want to know is we've agreed,

8   have we not, that there are other aspects of RQC that

9   exist utterly independent of Punchout, right?

10  A    Correct.

11  Q    Can you tell when you read this document whether

12  what she's talking about relates to the other aspects

13  or relates to the Punchout aspects?  Can you divine

14  that?

15  A    No.

16  Q    I'd ask you to look at Exhibit 1066, please.

17  Specifically, your attention on direct examination was

18  to the email from Scott Hanson to James Healey, the

19  second email, June 30, 2011, 10:48 AM.  Do you see

20  that?

21  A    Yes, I do.

22  Q    Do you recall testifying about that?

23  A    I do.

24  Q    Am I right that, again, your belief that the

25  documents with Scott Hanson's name on it are relevant

1  to this proceeding is in part based on your belief

2  that Scott Hanson is knowledgeable about the

3  differences between the functionality of Punchout with

4  RSS and with RQC, correct?

5  A   Yes.

6  Q   When he said RSS and RQC are just two user

7  interfaces, did you interpret that to relate to the

8  functionality of trying to go from a search in one

9  Punchout vendor's website to a search in another

10 Punchout vendor's website?  Is that what that was

11 about?

12 A   It doesn't say that.

13 Q   Do you think it was about the functionality of

14 going from a search in item master and a selection of

15 a good in item master and then an attempt to try to go

16 to Punchout?  Do you think it had anything to do with

17 that?

18 A   No, it's about data migration.

19 Q   Lastly, if you would look at one more Scott Hanson

20 document, which is Plaintiff's Exhibit 1065.  This is

21 about installations for no charge in the email from on

22 Thursday, September 1, at 11:30, 6 AM in the middle of

23 the page .do you see that?

24 A   I do.  By the way, to answer a previous question

25 you asked of who is Scott Hanson, so now that I've

WEAVER - CROSS                    209

1    seen the email, I remember.  RQC's SWAT team manager.

2    Q    That was a special position he was put in after

3    the conversion from RSS to RQC, correct?

4    A    I guess.

5    Q    What was his job at that time?  His real job?

6            THE COURT:  At the time he was a SWAT team

7    manager?

8            MR. THOMASCH:  The SWAT team manager was a

9    function that he assumed.  He had a position.

10           THE COURT:  What was his other job?

11   BY MR. THOMASCH:

12   Q    What was his job at Lawson when they asked him to

13   serve in the role as SWAT team manager.

14   A    I've forgotten.

15           THE COURT:  Well, there are all kinds of

16   documents in here that say he's a technical manager.

17   Does that help me out at all?

18           MR. THOMASCH:  I think you'll hear testimony

19   that he oversees the individuals who do the

20   installations.

21           THE COURT:  So that's what a technical

22   manager is?

23           MR. THOMASCH:  Yes.

24           THE COURT:  Okay.

25           MR. THOMASCH:  He'll be here and can testify.

1    THE COURT:  Okay.  That's fine.  We spent a

2  lot of time on his job.  If he's going to be here, we

3  can ask him.

4  Q    But you in forming your opinions that are now on

5  the record considered his knowledge to be a basis for

6  crediting statements and interpreting statements, none

7  of which related to or specifically identified

8  Punchout; is that right?

9  A    Only in the -- in the emails that we looked at

10  today, that's true.

11    MR. THOMASCH:  Your Honor, I'm going to move

12  to a new area having finished the documents that I was

13  going to talk about.

14    THE COURT:  I was so hopeful that you were

15  through.  How much longer do you have?

16    MR. THOMASCH:  I have a ways to go, Your

17  Honor.

18    THE COURT:  Well, you have now marked

19  yourself as some kind of Southerner because you can't

20  talk in terms of time and terms of specified numbers

21  of units that are recognizable.  That comes from my

22  wife.  I've got some time.  Do you have any idea how

23  much time?

24    MR. THOMASCH:  I would probably estimate that

25  it would be between 30 and 60 minutes.

WEAVER - CROSS                              211

1            THE COURT:  All right.  We'll take a

2   20-minute recess to change reporters.

3            (Recess at 3:55 PM.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  All right, Mr. Thomasch.  Continue.

2          MR. THOMASCH:  Thank you, Your Honor.

3    Q    Dr. Weaver, I want to ask you some questions about

4    your views or opinions as to how the functionality of the

5    product would be perceived by users of the product; all

6    right?

7    A    Okay.

8    Q    You've used --

9          THE COURT:  Excuse me just a minute, Mr.

10   Thomasch.

11         MS. ALBERT:  Object; beyond the scope and beyond

12   the scope of the opinions rendered in his report.

13         THE COURT:  You say he didn't issue any opinions

14   on that?  Is that what you said?

15         MS. ALBERT:  Correct.

16         THE COURT:  Why are you getting into that?  She

17   didn't ask about it, did she?

18         MR. THOMASCH:  She showed customer inquiries in

19   the course of her examination.  She clearly has gone into

20   the perceptions of customers and what was being told to

21   customers and what customers were saying to Lawson.

22         MS. ALBERT:  He didn't rendered any opinions

23   about customer perceptions about the product.

24         MR. THOMASCH:  Let me rephrase the question.

25         THE COURT:  I understand what she did, but I

1   don't think she did what you -- what I understand you were

2   talking about doing, but maybe you can straighten it out.

3            MR. THOMASCH:  Sure.

4   Q   Dr. Weaver, you, yourself, have used electronic

5   purchasing requisition software; correct?

6   A   Yes.

7   Q   And you would agree with me, would you not, that you

8   consider it to be beneficial to be able to combine on a

9   single requisition search items from multiple Punchout

10   vendor sites?

11   A   Yes.

12   Q   You would agree with me that being able to do so is a

13   convenience compared to having to do multiple requisitions

14   on -- multiple purchases on multiple requisitions; is that

15   correct?

16            MS. ALBERT:  Objection; relevance.

17            THE COURT:  Overruled.

18   A   Yes.

19   Q   You would agree with me that the process of being able

20   to combine items from different Punchout vendor websites

21   onto a single requisition is, indeed, a cost-saver?

22            MS. ALBERT:  Objection; relevance.

23            THE COURT:  Where are you going with this?

24            MR. THOMASCH:  Your Honor, we're talking about

25   the functionality that has been changed in the product,

1   and I'm trying to say that the functionality is not a

2   matter of no consequence.

3           MS. ALBERT:  There's no contention that Lawson's

4   made here that there is any cost differentiation between

5   the systems.  That's never been contended to be one of the

6   differences between the RQC configurations and the RSS

7   configurations.

8           MR. THOMASCH:  I'm simply asking him whether or

9   not it is a cost savings to be able do that, and I base

10  that, Your Honor -- I have a good-faith basis for asking

11  the question.  I base it on prior statements made by the

12  witness himself, and I believe we're entitled to bring out

13  attributes of the product qualitatively, attributes of the

14  product that have been changed.

15          MS. ALBERT:  We're not -- now we are getting into

16  his prior trial testimony, and I thought that wasn't a

17  ground we were supposed to retread.

18          MR. THOMASCH:  I did not ask about his prior

19  testimony.  I asked as he sits here today.  If it turns

20  out that he was to deny something that he swore to before

21  Your Honor before, I might impeach him, but I'm not asking

22  about his prior testimony.  I'm asking about his opinions.

23          THE COURT:  I understand that.  I guess my

24  question is, what's the opinion got to do with anything we

25  have to decide here?

1          MS. ALBERT:  He hasn't rendered any opinions

2     about cost savings.

3          MR. THOMASCH:  Your Honor, he has a view as to

4     the benefits that existed in the system that was the

5     infringing system.  He has stated clearly and repeatedly

6     certain benefits that go with that.

7          THE COURT:  He didn't state it here.

8          MR. THOMASCH:  Well, he just said it was

9     beneficial --

10         THE COURT:  He didn't state it on direct

11    examination.

12         MR. THOMASCH:  And he has more that I believe he

13    agrees with based on his prior testimony, and I just want

14    to draw out, Your Honor, that which he says -- he has said

15    the prior system provided certain benefits.  It is those

16    benefits that have been sacrificed in the functionality

17    loss.

18         MS. ALBERT:  It's beyond the scope of my direct.

19    I didn't ask him about his prior trial testimony.

20         THE COURT:  I don't think he's really saying

21    that, but, one, he didn't testify on that topic in direct

22    examination.  Two, it sounds like you want to use him as

23    your witness to prove one of your points.  It's also

24    appropriate to ask him questions of this sort if it

25    impeaches him.  I don't think it does that.  It's also --

1    at least you haven't said that's what the purpose of it

2    is, and it's also permissible to ask him questions like

3    that to set some kind of context for something he did say,

4    but I haven't heard that either.

5              It sounds to me like what you are doing is you

6    want him to testify to things that basically are helpful

7    to -- as a part of your case in other words, and if you

8    want to do that, you have to call him back in your case

9    and -- and you have to pay him because he is an expert.

10   He has to have issued an opinion on the topic, and she

11   said he didn't issue an opinion on the topic as part of

12   his report, so I don't see how he can testify with

13   specific to any of it.  So help me out here.

14             MR. THOMASCH:  Sure.  It's cross-examination.

15             THE COURT:  I know, but that doesn't open up --

16             MR. THOMASCH:  I have half a dozen questions

17   about the qualitative benefit to the prior system that has

18   been lost as a result of the change, and the Federal

19   Circuit has told us to compare the old and the new, and

20   that comparison -- there's a specific delta.  There's

21   something that existed and has been lost.

22             If the what was changed was of no consequence to

23   anyone, I guarantee you they would have brought it out on

24   direct.  What they brought out on direct was that he

25   doesn't think it's any big deal, but he doesn't

1   acknowledge, he has not yet acknowledged that what was

2   lost is a matter of significance, and I do have a right to

3   establish that or I'm not able to put in context his

4   opinion that it's not more than colorably different.

5          THE COURT:  Ms. --

6          MR. THOMASCH:  Your Honor, he specifically said

7   it was cosmetic, and if it's cosmetic, it suggests to me,

8   as I hear that word and as I think Your Honor might hear

9   that word, that a cosmetic change, the loss of a cosmetic

10  change would not matter.

11         THE COURT:  You are getting a lot of coaching

12  here, aren't you?

13         MR. THOMASCH:  I am, and there is because I

14  should have but didn't memorize the report.  In paragraph

15  47 of his report on page 21, he does say that the changes

16  made to RSS were minimal and would not degrade system

17  functionality.

18         That's his point, is you are not losing something

19  that's important.  I can certainly establish that what's

20  being lost here is beneficial.

21         THE COURT:  All right.  Anything else, Ms.

22  Albert?

23         MS. ALBERT:  No, nothing else.

24         THE COURT:  I believe you can if you confine it.

25  Let me say that I'm aware that there are places in the

1    world where cross-examination is viewed as the right to be

2    here for weeks.  There's a case going on now where

3    cross-examination has lasted 15 days or something like

4    that.  This isn't one of those places, so I'm going to

5    expect you to tailor your questions, get in and get out

6    with the important points.

7              MR. THOMASCH:  I will do so, Your Honor.

8              THE COURT:  All right, objection overruled.

9    Q    Dr. Weaver, this quality of being able to bring

10   together items from multiple Punchout vendors' websites

11   that was present with RSS and is not present with RQC,

12   would you agree with me that that is a cost-saver in the

13   requisitioning process for the user?

14   A    Probably so, but it's not part of the claim.

15   Q    And I'll stipulate if it will help that I'm not asking

16   you about whether it's part of the claim in any of the

17   next series of questions.  I'm simply asking about the

18   experience in using it.

19   A    Understood.

20   Q    And having the ability to combine items from multiple

21   Punchout vendor websites on a single requisition is a

22   time-saver; is it not?

23   A    Yes.

24   Q    It is a cost-saver?

25   A    Probably.

1    Q    It is one of the novelties of the patent?

2              MS. ALBERT:  Object.  The novelties of the patent

3    are stated in the claims, and that is not a claim element.

4              THE COURT:  Sustained.

5    Q    You would agree with me, would you not, that being

6    able to pull those multiple sources from multiple Punchout

7    vendor websites down into one requisition is a, quote,

8    real benefit, end quote, would you not?

9    A    Yes.

10   Q    Indeed, it is a big deal.

11   A    It was a big deal in the context of the patent.

12   Q    Now, despite the fact that you would acknowledge that

13   that attribute which has been lost was beneficial, a

14   convenience, a time-saver, a benefit, and a big deal, I'm

15   right that you still don't think that it's more than

16   colorably different to have lost that attribute; is that

17   correct?

18   A    That's correct.

19   Q    Am I right that's because at the end of the day, what

20   was lost doesn't stop the product from infringing, in your

21   opinion?

22   A    No, that's not correct.  It's because those elements

23   that you discussed -- they are not elements.  Those

24   attributes that you discussed are not related to claim 26.

25   That's why they are not colorably different.

1   Q    Not related to claim 26.  To be related to claim 26,

2   it would relate to the functionality of the claims;

3   correct?

4   A    Absolutely.

5   Q    All right.  And saying that you have -- you have the

6   functionality of the '683 claims in the new product;

7   correct?

8   A    Yes.

9   Q    In your opinion?

10  A    In my opinion.

11  Q    And in saying that you have the functionality of the

12  '683 claims in the new product, you are saying that you

13  infringe the '683 claims, aren't you?

14  A    I'm not saying that today.  We're talking about

15  colorability.

16  Q    I'm asking you whether or not the capacity to

17  infringe -- withdrawn.  Let me ask you if you recall being

18  asked that question at your deposition.  If I can show you

19  your transcript.

20          MS. ALBERT:  This is improper to show him his

21  transcript without setting it up.

22          MR. THOMASCH:  Happy to not show him his

23  transcript.  I thought it was...

24          THE COURT:  Well, the proper procedure is to ask

25  the question without reference to the transcript, and if

1    he gives a different answer, then you give him an

2    opportunity to look at his testimony and find out, and

3    then -- and the testimony that was there given at the

4    deposition has to match exactly what it was that he's

5    asked here or it's not impeaching.  All right, so -- and

6    it also, of course, has to be relevant.  I don't want to

7    get into -- we're not into testimony about impeachment

8    yet -- I mean infringement yet.

9             MR. THOMASCH:  No, Your Honor, we're in testimony

10   about functionality, and I just want to understand his

11   understanding and his -- the way he is evaluating

12   functionality.

13            THE COURT:  I'll just take a question at a time.

14   I'm not going to rule on them in advance.  She can object

15   if she wants to object.  If she doesn't, I don't have to

16   rule.

17   Q    In the way you are using functionality, Dr. Weaver, as

18   you sit here and as you've given your testimony, I want to

19   understand that term.  Can you have the functionality of

20   the '683 claims without infringing the '683 claims?

21   A    No.

22   Q    So by saying you have the functionality of the '683

23   claims, you are saying that you do infringe the '683

24   claims, or Lawson does; correct?

25   A    Yes.

1          THE COURT:  I just told you I thought we weren't

2     going to get into the question of infringement, and you

3     just asked about it.

4          MR. THOMASCH:  Your Honor, I asked him to

5     understand that that is how he defines functionality in

6     this case.

7          THE COURT:  That isn't exactly what he said,

8     either.

9          MR. THOMASCH:  Your Honor, I'll live with the

10    record as it is.

11    Q    I have a binder for you.  Dr. Weaver, could I ask you

12    to turn to a document premarked as Plaintiff's

13    Exhibit 1019.  Do you recognize this document?

14    A    No.

15    Q    Do you have your expert witness report there, sir?

16    A    I do.

17    Q    Could you turn to your expert witness report, the

18    initial one, and turn to paragraph seven where you set

19    forth the documents that you reviewed in connection with

20    this case.

21    A    Yes.

22    Q    Do you see a list of documents on paragraph -- I'm

23    sorry, on page four?

24    A    I do.

25    Q    And looking for RQC 2291408.  Sorry, Your Honor.

1    A    No, I don't see that.

2              THE COURT:  I don't see it on this list.  Help us

3    with where it is.

4              MR. THOMASCH:  Your Honor, I'm sorry.  It was a

5    deposition exhibit, Christopherson 27.

6              THE COURT:  Excuse me.  It's not in his -- on

7    that list; is that what you are saying?

8              MR. THOMASCH:  What it is, Your Honor -- I'm

9    sorry, this is my fault.

10   Q    Dr. Weaver, page two says, materials reviewed and

11   relied on; do you see that?

12   A    Yes.

13   Q    And then if you turn over to page three, you see

14   subsection S?

15   A    Yes.

16   Q    Transcript of deposition of defendant's 30(b)(6)

17   witness, Dale Christopherson taken on December 19 to 20,

18   2011, and all exhibits thereto?

19   A    Yes.

20   Q    And do you see on this document, I'll represent to you

21   that exhibit sticker on the bottom indicates that this

22   document was from the second day of the Christopherson

23   deposition on 12/20/2011, was marked as Exhibit 27, and

24   this was one of the items subsumed within paragraph S on

25   page three of your report; is that correct?

1    A    That's apparently correct.

2    Q    So what I want to do is ask you to look through the

3    top of the document that indicates that it's from Keith

4    Lohkamp to three individuals including Jennifer Langer,

5    Darci Snyder, Dave Kempker; do you see that?

6    A    Yes.

7    Q    And in the first paragraph, Mr. Lohkamp -- withdrawn.

8    Do you know who Mr. Lohkamp is?

9    A    Yeah, Lawson employee.

10   Q    And you relied on certain documents that he was an

11   author or recipient of in forming your opinion?

12   A    I did.

13   Q    And in the beginning of this document, he says, late

14   last week, Dale and I were asked; do you see that?

15   A    Yes.

16   Q    The reference to Dale, would you --

17   A    Mr. Christopherson.

18   Q    -- expect that to be Mr. Christopherson?  Back to

19   quoting the document again, late last week, Dale and I

20   were asked to make additional changes related to

21   functionality in Requisition Center.  I would prefer not

22   to do this, but our advice is that we need to do something

23   like this.  Do you see that?

24   A    I do.

25   Q    All right.  And do you see that the summary of that

1    additional change related to functionality and Requisition

2    Center as set forth below?

3    A    Yes.

4    Q    That includes the business rule under -- where it

5    says, thanks, Keith.  Do you see where it says business

6    rule?

7    A    Yes.

8    Q    Items from Punchout will be on a separate requisition

9    from items added through find/shop, express categories, or

10   service/special?

11   A    Yes.

12   Q    Those functional changes were made and do exist in RQC

13   now; correct?

14   A    They were.

15   Q    And did you give any significance to Mr. Lohkamp's

16   statement that I would prefer not to do this as far as

17   whether the action being taken was a diminishing of the

18   functionality of the product?

19   A    I don't know what he was thinking.

20   Q    But you didn't make any -- you didn't read anything in

21   or have any takeaway message from this one?

22   A    No.

23   Q    If you would look at Plaintiff's Exhibit 1096, please.

24   This is a long series of emails that begins with an email

25   from Keith Lohkamp on Friday June 3rd, 2011, at 12:47 p.m.

1    which appears on the last page of the document; do you see

2    that?

3    A    I do.

4    Q    And this was part of the exhibits to the deposition of

5    Dean Hager which you also reviewed; correct?

6    A    That's right.

7    Q    Now, in that initial email, Keith Lohkamp to Dean

8    Hager and Jennifer Langer, and it begins with, Hi Dean,

9    our legal counsel recommended that we make one additional

10   change to Requisition Center that impacts Procurement

11   Punchout to help address concerns about being able to add

12   items from two vendor catalogs.  We wanted to escalate to

13   you, provide input and help the decision to make this

14   change.  Legal is requesting this decision today if

15   possible so development can begin.  Do you see that?

16   A    I do.

17   Q    And then the next paragraph has a requested change, a

18   development impact, and an impact; do you see that?

19   A    Yes.

20   Q    So the requested change itself is requiring one

21   requisition per Punchout vendor; in other words, you could

22   not put items from two Punchout vendor sites on a single

23   requisition; do you see that?

24   A    I do.

25   Q    And do you understand that to be the second of the

1    two-part change that we talked about at the very beginning

2    of your deposition when I had the description of the

3    changes on the board, on the TV monitor?

4    A    It wasn't my deposition.

5    Q    I'm sorry, in our questioning here today on

6    cross-examination at the beginning to clarify what changes

7    we were talking about, there were two slides shown to you

8    that you agreed were factually accurate.  The second one,

9    this change -- is describing this change; is that right?

10   A    That's right.

11   Q    The development impact says, Dale estimates two to

12   three days of development, and his team is ready to go

13   immediately if we give the go-ahead; do you see that?

14   A    I do.

15   Q    The next one says, impact, this will have a negative

16   impact on our customers who use Punchout, and this is on

17   top of the change we made to require different

18   requisitions for Punchout versus non-Punchout items; do

19   you see that?

20   A    I do.

21   Q    Did you consider and give any weight to that view

22   expressed in a Lawson internal document when you formed

23   your opinion?

24   A    No.  It's not relevant.

25   Q    The next word is concerns, and after concerns the

1    first concern is, this will be a step backwards for

2    customers, and we've been talking about RQC as a superior

3    product.  Cleveland Clinic, for example, specifically

4    asked during the webinar Q&A about whether they could put

5    two Punchout vendors on a single requisition; do you see

6    that?

7    A    I do.

8    Q    Do you agree with the statement that this will be a

9    step backwards for customers?

10   A    It's a difference.  It's not relevant.

11   Q    It's not relevant because in your mind it doesn't

12   relate to the patent claims in a way that you think it

13   needs to in order to be relevant?

14   A    That's right.

15   Q    But for the person who doesn't know about the patent

16   and is simply using the product, for that person, the

17   functionality change was a decrease in functionality;

18   correct?

19   A    Correct.

20   Q    And that's a step backwards; right?

21   A    Probably.

22   Q    The ability to combine items from multiple Punchout

23   vendor websites is one that's been around for at least a

24   decade; correct?

25   A    Correct.

1          MS. ALBERT:  Objection; lacks foundation.

2          MR. THOMASCH:  I have an expert on the stand,

3  Your Honor.  He knew the answer.

4          THE COURT:  He gave it.  Overruled.

5  Q    And, in effect, from a technology vantage point, this

6  is a step back by more than a decade; correct?

7  A    I guess you could consider it that way.

8  Q    May I ask you to look at Exhibit 1057.  Do you see

9  that this is a deposition exhibit of Scott Hanson?  Do you

10  recognize this as one of the Q&A documents you reviewed?

11  A    I do, yes.

12  Q    From the webinar?

13  A    Yes.

14  Q    So I would ask you, do you see in the left-hand column

15  there are numbered questions.

16  A    I do.

17  Q    If you would go to question 64, from Don Grochocinski.

18  I'll spell that for the reporter.  It's

19  G-r-o-c-h-o-c-i-n-s-k-i.  Do you see that gentleman's

20  question?

21  A    Yes, I do.

22  Q    And it says, with RSS, we were able to mix Punchout

23  items with stock items on a requisition; do you see that?

24  A    I do.

25  Q    Are stock items -- does that -- do you understand that

Weaver - Cross

1    to mean an item that you would get from item master?

2    A    Yes.

3    Q    So the gentleman says, with RSS, we were able to mix

4    Punchout items with stock items on a requisition.  I've

5    seen info that suggests that is not possible with RQC.  Is

6    this previous functionality of RSS likely to be restored

7    to RQC; did you see that?

8    A    I do.

9    Q    Did you give that comment any consideration in the

10   formulation of your opinion?

11   A    No.

12          MR. THOMASCH:  Your Honor, if I might have just a

13   moment.

14   Q    Did you review any documents from any health-care

15   provider indicating that by losing the functionality that

16   was lost in the move from RSS to RQC there would be

17   inefficiency from the need to create multiple

18   requisitions, multiple purchase orders, and multiple

19   invoices?

20   A    I don't remember.

21   Q    If you had seen evidence that indicated a health care

22   customer's concerns that the change in functionality would

23   create multiple requisitions, multiple purchase orders,

24   multiple invoices, and would be very inefficient, is that

25   something that would influence your opinion on

1    colorability, sir?

2           MS. ALBERT:  Objection; relevance and compound.

3    First of all, invoices have no relevance to this

4    proceeding.  Secondly, multiple requisitions aren't

5    relevant to the claim.

6           MR. THOMASCH:  This is exactly within the

7    epicenter of the lost functionality.  The witness has

8    testified all sorts of things that influence his

9    testimony.  I'd like to find out whether that set of facts

10   would matter to him.

11          MS. ALBERT:  Invoices have no relevance.

12          THE COURT:  I think you've gotten tied up in how

13   you presented it.  I assume you're going to offer proof

14   that somebody said that.

15          MR. THOMASCH:  Before the case is over, yes.

16          THE COURT:  All you need to ask him, would it

17   make a difference to your opinion if someone had expressed

18   that view and leave the invoice and all the other

19   information out of it, if a customer had expressed that

20   view, which is fairly close to what you did, but the way

21   you asked it elicited an objection.

22   Q    If a customer voiced those words and those thoughts,

23   would that matter to you in the formulation of your

24   opinion?

25   A    No.

1   Q    And is that because such complaints, such concerns

2   about inefficiency are not an element of claim 26?

3   A    They're not related to claim 26.

4   Q    But they relate to a difference in the real world as

5   to how the old system and the modified system actually

6   operate; correct?

7   A    They are different, a little bit different.

8   Q    If there was no prohibition, no injunction in place,

9   can you think of any business or technological reason why

10  Lawson would not restore that functionality to the

11  product?

12           MS. ALBERT:  Objection; vague.  What

13  functionality?  And relevance.

14  Q    Dr. Weaver, the functionality that I'm talking

15  about --

16           THE COURT:  What about the relevance?  I don't

17  understand.  There's a real reason to also.  You know what

18  the real reason is?

19           MR. THOMASCH:  I understand the legal

20  constraints.  I asked him --

21           THE COURT:  I know, but there's more than an

22  injunction.  There's the law of patent and there's the

23  extant patent.

24           MR. THOMASCH:  I understand that completely.

25           THE COURT:  You didn't put that in your question.

1          MR. THOMASCH:  Then I will ask Your Honor if I

2     can rephrase my question.

3          THE COURT:  Try that.

4     Q    If Lawson had a license from ePlus to practice under

5     any and all of its patents, would there be any reason,

6     from a technological standpoint or a business standpoint,

7     why it would not want to reinstate that lost

8     functionality?

9     A    Probably not.

10         MR. THOMASCH:  Nothing further, Your Honor.

11         THE COURT:  Redirect?

12         MS. ALBERT:  I have just a few.

13

14                    REDIRECT EXAMINATION

15    BY MS. ALBERT:

16    Q    Do we have the configuration demonstrative again with

17    three and five side by side?

18         Dr. Weaver, were any changes made to the Punchout

19    application?

20    A    Nothing.  Absolutely nothing.

21    Q    Now, were you aware of the relevant changes with

22    respect to requisitioning Punchout items and when they

23    were made at the time you rendered your opinions?

24    A    Absolutely.

25    Q    When you saw documents describing the system as a

1   whole during the relevant time frames, did you have any

2   reason to believe that this Punchout requisitioning

3   functionality was specifically excluded from the

4   descriptions of RQC and those documents?

5   A    No.

6   Q    Did it seem probable to assume a reference to the

7   entire configuration included reference to all of the

8   changes that were brought with RQC?

9   A    Yes, indeed.

10  Q    Now, did you render any opinions relating to lack of

11  colorable difference based on a percentage of code change?

12  A    No.

13  Q    Now, Mr. Thomasch asked you about a hypothetical

14  example of going to 100 Punchout sites and shopping on

15  those sites and bringing items back to requisition and

16  generating purchase orders.

17        How would you go -- how would you shop at 100 Punchout

18  sites and select items and requisition and order items

19  using the infringing configurations?  Can you describe

20  that process?

21  A    Using RSS you are asking?

22            THE COURT:  Wait a minute.  You are talking about

23  using RSS or RQC?

24            MS. ALBERT:  I want to compare and contrast the

25  process.

Weaver - Redirect

1          THE COURT:  I understand, but your first question

2   is RSS.

3          MS. ALBERT:  Using the infringing configurations

4   having requisition self service.

5   A    You could go to any number of -- this is with RSS.

6   You could go to any number of Punchout sites, choose

7   items, bring them back into the -- into a single

8   requisition, and then run the PO 100 purchase order

9   program and generate as many purchase orders as there were

10  distinct vendors.

11  Q    So when you went to the 100 Punchout sites, how many

12  punchouts do you have do in connection with that process?

13  A    100.

14  Q    And then were there any -- strike that.  How many

15  purchase orders would be generated from a requisition

16  having items from 100 Punchout sites included on that

17  requisition?

18  A    100.

19  Q    Now, would you be able to punch out to Punchout sites

20  simultaneously, or would you do that one at a time?

21  A    You would do it serially.

22  Q    Now, how would you punch out to 100 Punchout sites

23  using the RQC configurations?

24  A    You'd punch out one at a time, so serially.

25  Q    So the same way that you did it with RSS?

```
 1              MR. THOMASCH:  Objection; mischaracterizes the

 2   testimony and the facts.  It's a leading question of her

 3   own witness.

 4              MS. ALBERT:  I'll withdraw the objections.

 5              THE COURT:  That's a lot of objections.

 6              MR. THOMASCH:  It was a very objectionable

 7   question, Your Honor.

 8              THE COURT:  He's saying it's leading.  Let's

 9   start with that.  Do you want to --

10              MS. ALBERT:  I'll rephrase.

11   Q    So can you tell us whether or not you would have to

12   punch out one at a time with respect to RQC configurations

13   in order to go to 100 Punchout sites?

14   A    Yes, you would.

15   Q    And how many requisitions would you have to build from

16   punching out to 100 Punchout sites using the RQC

17   configurations?

18   A    100.

19   Q    How many purchase orders would be generated by the

20   systems having RQC?

21   A    100.

22   Q    And does claim 26 indicate that you have to have all

23   items selected from multiple vendors in a single

24   requisition?

25              MR. THOMASCH:  Objection to form and asking the
```

 1   witness for claim construction.

 2   Q    Is there any requirement in claim 26 --

 3            THE COURT:  Do you want to open that door?  I'm

 4   talking to her.

 5            MS. ALBERT:  I'm trying to compare the

 6   functionality of the two systems.

 7            THE COURT:  Maybe you can figure out a different

 8   way to do it than asking for a claim construction.  It's

 9   the same with their expert giving claim construction.  I

10   think that's not where we are.

11   Q    Is it relevant to claim 26 the number of requisitions

12   that have to be generated?

13            MR. THOMASCH:  Objection.  I believe Your Honor

14   is the only one that can make a relevance ruling, and the

15   witness can't give a factual question on relevance, and

16   doing so embeds a claim construction in his answer.

17            THE COURT:  I think that it's probably my

18   responsibility to rule on relevance, but if you want to

19   ask him something else.

20            MS. ALBERT:  I have no further questions.

21            THE COURT:  Okay.

22            THE WITNESS:  Thank you.

23            MR. THOMASCH:  Very briefly, Your Honor?

24            THE COURT:  What are we; California rules?  You

25   brought Mr. Dusseault, so you can have those.  All right,

1    but no more.

2

3                    RECROSS-EXAMINATION

4    BY MR. THOMASCH:

5    Q    Just for clarity, in the examples that you were just

6    given, under RQC, you need to do 100 separate

7    requisitions, and all of that could have been on one

8    requisition with RSS; correct?

9    A    Correct.

10             MR. THOMASCH:  Nothing further.

11             MS. ALBERT:  Just a point of housekeeping, I'm

12   reminded that in Dr. Weaver's direct examination, we had

13   discussed Plaintiff's Exhibit 1110, and I failed to move

14   that into evidence.

15             THE COURT:  You did not.

16             MS. ALBERT:  I'd like to move that into evidence.

17             THE COURT:  Any objection to 1110?

18             MR. THOMASCH:  Your Honor, might I have a moment

19   to find it?

20             THE COURT:  Oh, why?  Why do you need to know?

21   What's your answer?  Sure.

22             MR. THOMASCH:  We did object in the past, Your

23   Honor, so I'll make the objection.

24             THE COURT:  Is it on the agreed list or not?

25             MS. ALBERT:  It's not, but the only objection was

1    relevance, and I would say it was relevant to show how

2    Lawson characterized the differences between RSS and RQC.

3            THE COURT:  I remember the exhibit.  The

4    objection is overruled.  It's admitted.

5

6            (ePlus Exhibit 1110 admitted.)

7

8            THE COURT:  Is that it?

9            MR. THOMASCH:  Yes, sir.

10           THE COURT:  Well, in the old days we would take

11   an hour and a half for dinner and be back, and we would

12   sit until 11:00, but that was the old days.  How many more

13   witnesses are you calling?  We'll start in the morning at

14   9:30.

15           MS. ALBERT:  We have three more witnesses on

16   colorability.

17           THE COURT:  So you expect that they'll all be on

18   tap in the morning.

19           MS. ALBERT:  Correct.

20           THE COURT:  And then how many witnesses do you

21   have on infringement?  I'm just trying to make some plans.

22   I'm not asking you to make your final cut.  Your best

23   judgment is all I can ask for.

24           MS. ALBERT:  Four witnesses total, I believe, on

25   infringement.

1                THE COURT:  We'll start at 9:30 in the morning

2      with your witnesses continuing the hearing on

3      colorability.

4

5                     (End of proceedings.)

6

7

8                We certify that the foregoing is a correct

9      transcript from the record of proceedings in the

10     above-entitled matter.

11

12

13     _____                    _____
       P. E. Peterson, RPR                 Date

14

15

16     _____                    _____
       Diane J. Daffron, RPR               Date

17

18

19

20

21

22

23

24

25