1              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
2                    RICHMOND DIVISION

3     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:
4     ePLUS, INC.,                      :
                                        :
5                        Plaintiff,     :
       v.                               : Civil Action
6                                       : No. 3:09CV620
      LAWSON SOFTWARE, INC.,            :
7                                       : April 3 , 2013
                         Defendant.     :
8     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

9

10

        COMPLETE TRANSCRIPT OF MOTIONS HEARING
11       BEFORE THE HONORABLE ROBERT E. PAYNE
            UNITED STATES DISTRICT JUDGE

12

13

14                       **DAILY**

15

16    APPEARANCES:

17    Craig T. Merritt, Esquire
      Christian & Barton, LLP
18    909 East Main Street
      Suite 1200
19    Richmond, Virginia   23219-3095

20    Jennifer A. Albert, Esquire
      Goodwin Procter, LLC
21    901 New York Avenue, NW
      Washington, D.C.   20001

22

23               DIANE J. DAFFRON, RPR
                OFFICIAL COURT REPORTER
24            UNITED STATES DISTRICT COURT

25

```
 1    APPEARANCES:   (Continuing)

 2    Michael G. Strapp, Esquire
      Goodwin Procter, LLC
 3    Exchange Place
      53 State Street
 4    Boston, Massachusetts    02109

 5    Paul W. Jacobs, II, Esquire
      Christian & Barton, LLP
 6    909 E. Main Street, Suite 1200
      Richmond, Virginia    23219-3095
 7
               Counsel for the plaintiff, ePlus
 8
      Daniel J. Thomasch, Esquire
 9    Gibson Dunn & Crutcher
      200 Park Avenue
10    New York, New York    10166-0193

11    Christopher D. Dusseault, Esquire
      Gibson Dunn & Crutcher
12    333 South Grand Avenue
      4th Floor
13    Los Angeles, California    90071

14    Dabney J. Carr, IV, Esquire
      Troutman Sanders
15    Troutman Sanders Building
      1001 Haxall Point
16    P.O. Box 1122
      Richmond, Virginia    23218-1122
17
      Josh Krevitt, Esquire
18    Gibson Dunn & Crutcher, LLP
      200 Park Avenue
19    New York, New York    10166-0193

20    Jason C. Lo, Esquire
      Gibson Dunn & Crutcher, LLP
21    333 South Grand Avenue
      46th Floor
22    Los Angeles, California    90071

23    Richard W. Mark, Esquire
      Gibson Dunn & Crutcher, LLP
24    200 Park Avenue
      New York, New York    10166-0193
25
               Counsel for the defendant, Lawson Software
```

1              (The proceedings in this matter commenced at

2        9:35 AM.)

3

4              THE CLERK:   Civil Action No. 3:09CV00620,

5        ePlus, Incorporated v. Lawson Software, Incorporated.

6              Ms. Jennifer A. Albert, Mr. Michael G.

7        Strapp, Mr. Craig T. Merritt and Mr. Paul W. Jacobs,

8        II represent the plaintiff.

9              Mr. Daniel Thomasch, Mr. Josh Krevitt,

10       Mr. Richard Mark, Mr. Dabney Carr, IV, and

11       Mr. Christopher Dusseault represent the defendant.

12             Are counsel ready to proceed?

13             MS. ALBERT:   Yes, Your Honor.

14             MR. THOMASCH:   Ready for the defendant, Your

15       Honor.

16             THE COURT:   Do you have a witness.

17             MS. ALBERT:   EPlus calls Dale Christopherson

18       to the stand.

19

20         DALE CHRISTOPHERSON, called by the Plaintiff,

21       first being duly sworn, testified as follows:

22

23         DIRECT EXAMINATION

24       BY MS. ALBERT:

25       Q   Good morning, Mr. Christopherson.

CHRISTOPHERSON - DIRECT                    244

1   A    Good morning, Ms. Albert.

2   Q    At the time you gave a deposition --

3            THE COURT:   Let's just go ahead and get him

4   to spell his name.   Spell your last name.

5            THE WITNESS:   Sure, Your Honor.

6   C-H-R-I-S-T-O-P-H-E-R-S-O-N.

7            THE COURT:   All right.   Go ahead.

8   Q    At the time your deposition was taken in this

9   contempt proceeding, your title at Lawson was director

10  of ERP, application development; is that correct?

11  A    That's correct.

12  Q    Is that still your current title?

13  A    It's changed slightly.   Still director of software

14  development for the improvement of Lawson products.

15  Q    And the products for which you have responsibility

16  are the procurement suite on the ERP side; is that

17  correct?

18  A    That is one of them, yes.

19  Q    And you also have responsibility for self-evident

20  applications, correct?

21  A    For those that are in the financial and for the

22  procurement side, not the HR side anymore.

23            THE COURT:   What is ERP?

24            THE WITNESS:   Enterprise resource planning.

25  Q    And you have responsibility for the electronic

CHRISTOPHERSON - DIRECT                    245

1    data interchange application; is that correct?

2    A    That's correct.

3    Q    You also have responsibility for procurement

4    Punchout; is that correct?

5    A    Yes.

6    Q    And you also have responsibility for Lawson's

7    requisition center application; is that correct?

8    A    Yes.

9    Q    You were in charge of the development team for

10   RQC, correct?

11   A    Yes.

12   Q    And the persons involved in the requisition center

13   development effort included you, Keith Knuth, Keith

14   Lohkamp, Todd Dooner, Stephanie Limb, Donna Hacarte

15   and several people from a different team, correct?

16   A    That is correct.

17   Q    Now, Lawson first began work on the requisition

18   center application as early as February 8, 2011,

19   correct?

20   A    That is correct.

21   Q    And Lawson began unit testing for requisition

22   center as early as March 1st, 2011, correct?

23   A    That's correct.

24   Q    Lawson held a launch start-up meeting for RQC on

25   March 30, 2011, correct?

1   A    I believe that's correct, yes.

2   Q    And the requisition center product was released to

3   customers on May 18, 2011, correct?

4   A    That's correct.

5   Q    Let me have you take a look at Plaintiff's Exhibit

6   1015 in your binder.  It's also on your screen, I

7   think.

8   A    Okay.

9   Q    Now, do you recognize this as an email message

10  between Keith Lohkamp, Dwight DeLancey and yourself?

11  A    That is correct.

12  Q    Take a look at the page marked RQC 364471.

13  A    Okay.

14  Q    Refer to the original email dated February 18,

15  2011, from you to Keith Lohkamp and Dwight DeLancey.

16  Do you see that email?

17  A    That is correct.  I do see it, yes.

18  Q    And you indicated that Lawson proposes that "We

19  would restrict Procurement Punchout (Punchout) to only

20  connect to catalog providers that have a license for

21  the '683 Patent from ePlus, Inc."  Do you see that

22  statement?

23  A    Yes, I do.

24  Q    This was the redesign proposal that you referred

25  to as crippled Punchout; is that correct.

1   A   Yes.   That's pretty close to describing what we

2   were thinking at that point.

3   Q   And refer to the page marked RQC 364469.

4   A   Okay.

5   Q   I refer to the top email on that page from you to

6   Mr. DeLancey and Mr. Lohkamp.  Do you see that email?

7   A   Yes, I do.

8   Q   And there you state in the first paragraph,

9   "You're not to do the work at all at this time.  We

10  would need to have it approved by the Judge and that

11  will not happen until early April at best.  All we

12  need to do is create a description of our proposal

13  that the legal team would then present to the Judge.

14  So details such as we have been discussing can occur

15  later as far as I know."  Do you see that statement?

16  A   Yes, I do.

17  Q   So as of mid-February Lawson intended to present

18  it's proposed redesign ideas to the Judge at the April

19  injunction hearing; is that correct?

20          MR. THOMASCH:  Objection to form.

21          THE COURT:  Overruled.

22          THE WITNESS:  As far as I know, that was

23  their intention to present that, yes.

24          MS. ALBERT:  Your Honor, I would offer

25  Plaintiff's Exhibit 1015 into evidence.

CHRISTOPHERSON - DIRECT                    248

1        THE COURT:  Any objection?

2        MR. THOMASCH:  No, Your Honor.

3        THE COURT:  It's admitted.

4        (Plaintiff's Exhibit 1015 is admitted.)

5   Q   Let me have you look at Plaintiff's Exhibit 1256.

6   A   Okay.

7   Q   I'm sorry.  Can you look at 1259?  Do you

8   recognize this as an email from yourself to Bruce

9   McPheeters with a carbon copy to John Mulchrone dated

10  March 7, 2011?

11  A   I do.

12  Q   Can you read your first paragraph of your email to

13  Mr. McPheeters into the record?

14  A   Sure.  We are continuing down the path of

15  exploring and designing the options with Punchout and

16  RSS.  What people may be reacting to is that Will call

17  me to ask that we continue right with the changes.  I

18  told them that we will work on the design but no

19  implement or make code changes until I know that the

20  Judge is okay with the proposed changes.

21  Q   So as of March 7, 2011, you still intended to

22  present the proposed changes to the Judge for approval

23  prior to implementation, correct?

24  A   That's my understanding.

25        MR. THOMASCH:  Objection to the form, Your

1    Honor.

2              THE COURT:   Overruled.

3    A    That's my understanding.

4    Q    Let's talk about the modification that prevents a

5    user of RQC from placing items from two or more

6    Punchout providers onto a single requisition.   Are you

7    familiar with that modification?

8    A    Yes.

9    Q    The coding effort for that modification only

10   required two days of work; isn't that right?

11   A    Two, two and a half, maybe three.

12   Q    And between the time that this particular

13   modification was proposed on June 3, for all of the

14   development, unit testing, QA testing, change of

15   documentation, the entire process took six days,

16   correct?

17   A    Correct.

18   Q    And the initial release of requisition center did

19   not include this particular modification, correct?

20   A    That's correct.

21             THE COURT:   What's the modification again?

22             MS. ALBERT:   It's the modification relating

23   to preventing a user from placing items from two

24   different Punchout vendors in a single requisition.

25             Just for housekeeping, I forgot to move

CHRISTOPHERSON - DIRECT          250

1   Plaintiff's Exhibit 1259 into evidence.  So I would

2   like to do so.

3          THE COURT:  Any objection?  1259.

4          MR. THOMASCH:  1259, Your Honor.  Only on

5   relevance grounds, Your Honor.  We do object on

6   relevance grounds.

7          THE COURT:  Overruled.

8          MS. ALBERT:  Thank you.

9          (Plaintiff's Exhibit No. 1259 is admitted.)

10  BY MS. ALBERT:

11  Q    This modification that we've been talking about

12  was included in what Lawson calls patch 1 to RQC; is

13  that correct?

14  A    That's correct.

15  Q    And patch 1 was made available to RQC users on

16  June 9, 2011, correct?

17  A    Yes.

18  Q    The requisition center application did not require

19  that Lawson make any modifications to the Punchout

20  servlet, did it?

21  A    That is correct.

22         THE COURT:  What date was patch 1 made

23  available?

24         THE WITNESS:  It was made available on

25  June 9, 2011.

CHRISTOPHERSON - DIRECT              251

1        THE COURT:  June 9?

2        THE WITNESS:  Yes.

3   Q    For a single Punchout session in a system that has

4   requisition center and Punchout, the process for

5   Punchout setup requests and Punchout setup response is

6   the same as it was for the system having requisition

7   self-service and Punchout applications, correct?

8   A    That is correct.

9   Q    Lawson did not make any changes to the process

10  used by a Lawson system user to search for items at a

11  Punchout a catalog site, correct?

12  A    That is correct.

13  Q    After a user of a system having requisition center

14  and Punchout selects items at a Punchout catalog,

15  those selected items are still contained in a Punchout

16  order request document that is sent to the Punchout

17  servlet, correct?

18  A    That is correct.

19  Q    And that was the same process that was used in

20  connection with a system having the requisition

21  self-service and Punchout applications, correct?

22  A    That is correct.

23  Q    The contents of the Punchout servlet with respect

24  to a system having requisition center and Punchout are

25  retrieved and placed in the items list in the

1  right-hand side of the user interface of the

2  requisition center application, correct?

3  A   Correct.

4          THE COURT:  Are you talking about in RQC?

5          MS. ALBERT:  That was with RQC.  That was my

6  question.

7          THE COURT:  That's what I'm asking.

8  BY MS. ALBERT:

9  Q   So in a system having RQC and Punchout, the

10  contents of the Punchout servlet are retrieved and

11  placed in the items list in the right-hand side of the

12  user interface, correct?

13  A   Correct.

14  Q   And with respect to a system having requisition

15  self-service and Punchout, the contents of the

16  Punchout servlet are retrieved and placed in the items

17  listing in the right-hand side of the user interface,

18  correct?

19  A   Correct.

20  Q   Let me ask you to take a look at Plaintiff's

21  Exhibit 1022.  You were copied on this email string

22  and responded to it, correct?

23  A   Yes, I did.

24  Q   And Mr. Lohkamp was forwarding to you some

25  questions the Cleveland Clinic had including questions

1   about Punchout functionality, correct?

2   A    That is correct, yes.

3   Q    Refer if you would to page RQC 7678.

4   A    Uh-huh.

5   Q    On the email on the bottom of that page Kristin

6   Stolte of Lawson provided an email response to a set

7   of questions.  Do you see that?

8   A    Yes, I do.

9   Q    She stated in that email, "With regard to Punchout

10  and SciQuest, RQC will function as RSS did.  We

11  support one Punchout vendor website per connection.

12  SciQuest will come back with multiple vendors on the

13  same requisition with one Punchout."  Do you see that

14  statement?

15  A    I do.

16  Q    It's accurate that with respect to a system having

17  requisition center and Punchout, if a user punches out

18  to a multiple vendor site, such as SciQuest, the user

19  can shop at that site and select items from multiple

20  different vendors, return those items back to the

21  Lawson user interface, and have multiple items

22  associated with multiple vendors on the same

23  requisition with a single Punchout session, correct?

24          MR. THOMASCH:  Objection to relevance, Your

25  Honor.  This goes to the issue of what was contended

CHRISTOPHERSON - DIRECT          254

1   and proved at the first trial where there was no

2   evidence about multi-vendor sites.

3             THE COURT:   Overruled.

4   Q   Do you have my question in mind?

5   A   I do have your question in mind and I was going to

6   ask for really a clarification of vendors because

7   sometimes vendors and manufacturers or providers of

8   goods are confused with people who are responding to

9   them.   An example of that would be when you go to

10  Dell.   Dell is a Punchout provider.   They are a

11  website.   And in that particular case when you're

12  getting on his back, it may be for multiple vendors or

13  manufacturers.

14       So in this case, the way I've always viewed

15  SciQuest is I'm punching out to them just like I do

16  with Dell establishing one connection.   I myself have

17  never done an actual connection with SciQuest to know

18  what you're asking.

19  Q   Mr. Christopherson, do you recall giving a

20  deposition in this contempt proceeding on December 20,

21  2011?

22  A   I certainly do, yes.

23  Q   Before you answered questions in the deposition,

24  you were sworn by the court reporter to tell the truth

25  weren't you?

CHRISTOPHERSON - DIRECT                    255

1   A    Yes, I was.

2   Q    And you did tell the truth during that deposition,

3   didn't you?

4   A    Yes.

5   Q    After you finished testifying, you had a chance to

6   review your deposition testimony and make sure it was

7   accurate, correct?

8   A    That is correct.

9   Q    Why don't you turn in your binder to your

10  deposition transcript?

11  A    Sure.

12  Q    Turn to page 404, please.

13  A    404.

14  Q    And refer to line 10.

15          THE COURT:  Which deposition transcript?

16          THE WITNESS:  Okay.

17          THE COURT:  Which transcript?

18          MS. ALBERT:  The transcript dated

19  December 20, 2011, page 404.

20          THE COURT:  All right.

21  BY MS. ALBERT:

22  Q    During that deposition, you were asked the

23  following question:

24      "But is it accurate that with respect to RQC if a

25  user punches out to a multi vendor site such as

CHRISTOPHERSON - DIRECT                256

1   SciQuest, the user can shop at that site and select

2   items from multiple different vendors, return those

3   items back to the Lawson user interface, and have

4   multiple items associated with multiple vendors on the

5   same requisition with a single Punchout session,

6   correct?"

7        And you gave the following answer:

8        "Same question you basically asked a couple of

9   minutes ago.  And the answer was yes."

10       That was your answer to that question on that day,

11  correct?

12  A    That is correct, yes.

13  Q    Thank you.  Why don't you turn to Plaintiff's

14  Exhibit 1013.

15  A    1013?  Okay.

16            MS. ALBERT:  I'd like to move into evidence

17  Plaintiff's Exhibit 1022.

18            THE COURT:  Any objection?

19            MS. ALBERT:  I believe there are no

20  objections to that exhibit.

21            THE COURT:  Is it on Docket 1030 as agreed?

22            MS. ALBERT:  Yes.

23            MR. THOMASCH:  Yes, Your Honor.  No

24  objection.

25            THE COURT:  All right.

1          (Plaintiff's Exhibit No. 1022 is admitted.)

2     Q    Are you at Plaintiff's Exhibit 1013?

3     A    Yes, I am.

4     Q    You were either the author or the recipient of the

5     emails in that email string; is that correct?

6     A    That is correct, yes.

7     Q    And this was an email string between different

8     members of your team participating in the design

9     work-around; is that correct?

10    A    That is correct.

11    Q    Refer to your email dated February 12, 2011, at

12    3:22 AM at the bottom of the first page.  In the

13    second paragraph of your email, you indicate, "Claim

14    26 is right on the mark.  Inventory is the key.  There

15    are two other items that get pulled into this based

16    upon the systems that infringe and ePlus arguments.

17    ASN from EDI is said to provide the ability to know if

18    something is in inventory.  Then some Punchout sites

19    also provide this.  So this claim is going to be a

20    tough one to navigate."  Do you see that statement?

21    A    Yes, I do.

22    Q    There were no changes made to the inventory

23    capabilities of the configurations that were found to

24    infringe Claim 26, were there?

25    A    That's correct.

CHRISTOPHERSON - DIRECT          258

1    Q    And Lawson did not make any changes to the EDI

2    functionality, did it?

3    A    That is correct.

4    Q    Well, Lawson did not make any changes to any

5    Punchout sites that provide inventory functionality,

6    correct?

7    A    That is correct.

8             MS. ALBERT:  Your Honor, I would move into

9    evidence Plaintiff's Exhibit 1013.

10            THE COURT:  Any objection?

11            MR. THOMASCH:  No objection, Your Honor.

12            THE COURT:  It's admitted.

13            (Plaintiff's Exhibit No. 1013 is admitted.)

14   BY MS. ALBERT:

15   Q    Turn to Plaintiff's Exhibit 1256.

16   A    Okay.

17   Q    You received a copy of the email from William

18   Schultz dated May 26, 2011; is that correct?

19   A    Yes, I did through Mike Cohen.

20   Q    May 26, 2011, is after the Court issued the

21   injunction in this matter; is that correct?

22   A    Yes.

23   Q    May 26, 2011, is after the date that Lawson

24   released RQC, correct?

25   A    That is correct.

1  Q    Mr. Schultz was one of Lawson's trial attorneys,

2  correct?

3  A    That is correct.

4  Q    Refer to Mr. Schultz's email beginning at the

5  bottom of the page RQC 3002882.   And that email

6  continues over to the next page.   And he states,

7  "Bruce, we have been looking at options related to the

8  Punchout program in order to design around the alleged

9  infringement even though Lawson does not control the

10  content on the vendor end.   Below is a potential idea

11  where the vendor content would be placed in

12  conformance with a redesign."   Do you see that

13  statement?

14  A    Yes, I do.

15  Q    Then Mr. Schultz continues in the next paragraph,

16  "The testimony at trial showed that Punchout sites are

17  not public sites but are customized sites for a

18  particular customer.   For example, Cleveland Clinic

19  would have a customized Dell website.   This redesign

20  would require the vendor, i.e., Dell, to modify its

21  customized website to be compliant or the Punchout

22  program would not work with that site.   Here is the

23  process.   Lawson would assemble a list of all prior

24  Punchout vendors and vendors whether part of the

25  Punchout program or not.   We understand the number of

1   vendors is around 30 to 35 at this point.   Lawson

2   would contact the Punchout vendors and instruct them

3   that the site must remove inventory and UNSPSC scripts

4   that show to the end user."  Do you see that

5   statement?

6   A    Yes, I do.

7   Q    Now, following paragraphs A and B in Mr. Schultz's

8   email, he continues as follows:   "Lawson would prepare

9   a script for its Punchout system that would allow the

10  communication to work with a vendor website who is in

11  compliance with the removal of inventory and UNSPSC

12  codes.   Lawson's system would not allow the Punchout

13  communication to occur with websites that did not have

14  the UNSPSC and inventory checking functionality

15  disabled.   A pop-up would occur showing that that site

16  needed to be approved."  Do you see that statement?

17  A    Yes, I do.

18  Q    In the last paragraph of Mr. Schultz's email, he

19  indicates, "This idea is still in its early stages,

20  however, with the urgency on this issue, I am getting

21  this out for your thoughts."  Do you see that?

22  A    Yes, I do.

23  Q    So notwithstanding that Lawson had already

24  released RQC, your lawyers were advising you that

25  additional changes to Punchout were needed, correct?

CHRISTOPHERSON - DIRECT                261

1    A    That is correct.

2    Q    Refer to the first page of the document.

3    A    Okay.

4    Q    And the top email on that page is your response to

5    Mr. Schultz's suggested design-around, correct?

6    A    Yes.  Not directly to Mr. Schultz, but to

7    Mr. Cohen and Mr. Crawford, yes.

8    Q    You said, "So here is my list of issues.

9    Customized sites are customized for content, meaning

10   items, not the shopping experience.  Why would vendors

11   want to do more customization just for Lawson

12   customers?"  Was that your statement?

13   A    That is my statement.

14   Q    And also stated in the next paragraph, "The

15   Punchout program is cXML compliant, a standard.  There

16   is no way to prevent the connection.  We would not

17   even know.  Say, Dell's we do not do that, but then

18   does, or worse, there are many sites beyond the 30

19   plus, and a customer could connect to them.  So the

20   capable item is not something we can design around."

21   Was that your statement?

22   A    Yes.

23   Q    So Lawson rejected your attorneys' proposed

24   design-around related to the Punchout program,

25   correct?

1  A   What I raised in this process is from an

2  engineering standpoint why I felt that it was not

3  something that would be viable.

4  Q   And no changes were made to the Lawson systems to

5  disable them from connecting to Punchout sites that

6  have inventory checking functionality, correct?

7  A   That is correct.

8  Q   A Lawson system that has requisition center and

9  Punchout can communicate with a Punchout website that

10  has inventory checking functionality, correct?

11  A   Correct.

12  Q   Now, you said earlier that persons involved in the

13  requisition center development effort included

14  yourself, Keith Knuth, Todd Dooner and some others?

15  A   Yes, I did.

16  Q   Let me show you Plaintiff's Exhibit --

17        MS. ALBERT:  Can I move into evidence

18  Plaintiff's Exhibit 1256?

19        THE COURT:  Any objection?

20        MR. THOMASCH:  Yes, Your Honor.  We object on

21  relevance for a variety of reasons including the fact

22  that this document pertains to a number of changes

23  that are not at issue that were at issue at the time

24  of this document, but aren't the ones that we're

25  litigating today.

1        MS. ALBERT:  This is relevant to show

2   Lawson's motivation for not making a more significant

3   change to requisition center that would actually be a

4   design-around, and the fact that they didn't believe

5   that they could do this more significant change.  So

6   it's relevant to show their motivation and why they

7   didn't make a more significant change.

8        MR. THOMASCH:  Your Honor, certainly

9   motivation, I do not believe, goes to the question of

10  whether something is more than colorable, but the

11  issue that's more than colorable relates to the third

12  changes that relate to Punchout and the ability of

13  Punchout to interact with item master and other

14  Punchout sites not with respect to UNSPSC codes, which

15  relate to converting inventory items.

16       THE COURT:  Overruled.  It's relevant to set

17  the context and to understand the circumstances of how

18  the modification that is at issue came to be.  It will

19  be considered for that purpose.

20  BY MS. ALBERT:

21  Q   Let's look at Plaintiff's Exhibit 1006.  You

22  received a copy of this email and the attachment

23  authored by Mr. Knuth; is that correct?

24  A   Yes, I did.

25  Q   And Mr. Knuth drafted this document in connection

1    with his responsibilities on your development team for

2    RQC; is that correct?

3    A    That is correct.

4    Q    Refer to page RQC 364607.  Do you see there

5    there's a heading "Claim 26"?

6    A    Yes, I do.

7    Q    With respect to the first element of Claim 26 of

8    the '683 Patent reciting, "Maintaining at least two

9    product catalogs on a database containing data

10   relating to items associated with the respective

11   sources," Mr. Knuth indicates, "RSS does not include a

12   database; however, the IC and PO systems do contain a

13   database.  The database does contain data relating to

14   items associated with vendors."

15        Do you see that statement?

16            THE COURT:  Associated vendors.

17            MS. ALBERT:  Associated vendors.  Excuse me.

18            THE COURT:  Is that the right place?

19            MS. ALBERT:  Yes.

20   Q    Do you see that statement?

21            MR. THOMASCH:  Objection, Your Honor.  I

22   object to the question.  I object to the reading of

23   the document where we do have an objection to this

24   document, reading of the document into the evidence

25   before it's been ruled into evidence or accepted.  We

1  have an objection to the document based on hearsay and

2  also on relevance. This is a purported legal analysis

3  not done by this witness. It goes entirely -- the

4  document by its heading says "Analysis of

5  Infringement." It is not a document that under any

6  circumstances, I believe, is appropriate for the

7  colorability phase. But it's not this witness's

8  document. And the individual who wrote it is a

9  non-lawyer. So we would object to any statement

10  that's within the scope of his responsibility or

11  without a showing that it's within the scope of his

12  responsibilities to give legal advice.

13      MS. ALBERT: Well, first of all, as to

14  whether it was within the scope of his

15  responsibilities, Mr. Christopherson has testified

16  that Mr. Knuth was on his development team responsible

17  for development of RQC and he drafted this document in

18  connection with his roles and responsibilities on the

19  development team for RQC. So I believe that it would

20  be nonhearsay under Rule 801(d)(2)(D) nonhearsay

21  admission of a party opponent.

22      Then this is not being offered for

23  infringement purposes. I'm offering it as to its

24  relevance to show the motivation for why Lawson did

25  not make more significant changes to the infringing

1    configurations.

2         Mr. Christopherson testified about this

3    document at length during his deposition.  He answered

4    numerous questions about this document.  He is very

5    familiar with this document.

6         THE COURT:  Does that make a document

7    admissible that you testified to it?

8         MS. ALBERT:  Well, Mr. Knuth is not rendering

9    legal opinions.  He's actually reviewing the product

10   in connection with his, you know, his opinions are

11   based on his own impressions of having knowledge of

12   Lawson's product and its functionality.  So it's not

13   being offered as a legal opinion.  It's a lay opinion

14   of a witness in connection with his personal knowledge

15   of the functionality of the product.

16        THE COURT:  All right.

17        MR. THOMASCH:  It's a lay opinion that goes

18   through means for element 1, means for element 2.  It

19   recites the patent.  It says it's a patent

20   infringement analysis.

21        Mr. Knuth was on the design development team.

22   There's been no testimony elicited from this witness,

23   Mr. Knuth, who headed this team that he was directed

24   to do a legal analysis or that one should be done.

25   That change that has been the subject of Dr. Weaver's

1  testimony and is the only issue that is raised as the

2  basis for the defense in this case, that change had

3  not -- was no part of this document.  Hadn't been

4  developed as of this date.  This has nothing to do

5  with the issue of whether the change that was made is

6  more than colorable.

7          THE COURT:  So the objection is relevance?

8          MR. THOMASCH:  Relevance and hearsay, Your

9  Honor.  We do not believe this is a document that

10  comes in under 801 without any showing that a

11  non-lawyer was directed or asked or within the scope

12  of his job to render legal advice.

13          THE COURT:  All right.

14          MS. ALBERT:  EPlus is offering it not to

15  show --

16          THE COURT:  Are you going to say anything

17  different than you said before?

18          MS. ALBERT:  No.

19          THE COURT:  Objection overruled as to

20  hearsay.  It's a document prepared by one of the

21  development team within the scope of his authority and

22  he is discussing the product and the changes.  And the

23  fact that it comes in or that he discusses it in part

24  after he recites an aspect of Claim 26 doesn't change

25  the fact that he makes several factual assertions

CHRISTOPHERSON - DIRECT                    268

1   therein that do not constitute a legal opinion.  He's

2   not offering a legal opinion.  He's offering a factual

3   description.  And the factual description is relevant

4   to understanding the nature of the changes that were

5   made and why and the significance thereof.

6           Overruled.  It's admitted.  The testimony is

7   admitted.  But it is better if you're offering a

8   document and you know there's an objection to it, to

9   get the objection sorted out before you start reading

10  from it.  You can ask him questions about the topic

11  that's in there without reading from it.  But if there

12  is an objection, it is a preferable course to get the

13  objection sorted out first.  All right?

14          MS. ALBERT:  Understood, Your Honor.

15          THE COURT:  Objections are overruled.

16  BY MS. ALBERT:

17  Q   I don't know if you still have my question in

18  mind.

19          THE WITNESS:  No, I don't.

20          THE COURT:  We don't have a question because

21  the objection was made in the middle of it.

22          MS. ALBERT:  Thank you, Your Honor.

23          THE COURT:  If he can answer what you were

24  going to ask, I want him to come to work with me.

25  Q   Referring back to page RQC 364607, do you see the

1    statement that Mr. Knuth made, "RSS does not include a

2    database; however, the IC and PO systems do contain a

3    database.  The database does contain data relating to

4    items associated vendors."  Do you see that statement?

5    A    Yes, I do.

6    Q    And then in the next paragraph Mr. Knuth concludes

7    with respect to that first element of Claim 26, "RSS

8    alone does not infringe in this area.  This function

9    cannot be removed from IC and PO without crippling the

10   product."  Do you see that statement?

11   A    Yes, I do.

12   Q    So Lawson concluded that this function could not

13   be removed from the inventory control and purchase

14   order modules without crippling the procurement

15   product suite; is that correct?

16          MR. THOMASCH:  Objection to form, Your Honor.

17   Contributing the remarks of Mr. Knuth to Lawson as a

18   whole with no showing that Lawson adopted that

19   position.

20          MS. ALBERT:  That's what I'm asking him.

21          THE COURT:  Overruled.  She's asking the

22   question.

23   A    It was Mr. Knuth's opinion at that time, yes.

24   Q    And Lawson agreed with that opinion, right?

25   A    I don't think that we ever really looked from

1    Lawson as a whole from a legal and a business aspect

2    looking at this in detail.

3              THE COURT:  I don't think that's really what

4    she's asking.  She wants to know whether you agreed

5    with it and whether you-all acted in accordance with

6    it.  She's not asking whether it went up through some

7    formal change of command and structure and got a board

8    approval.  That's not what she's asking.  She's asking

9    whether the corporation acted in accord with this

10   thing.

11             Now, ask the question again and with the

12   understanding that you're not answering corporate

13   policy approved by a board, but the facts of life.

14             Go ahead and answer the question according to

15   the way it's asked.

16             Start all over again, please.

17   Q   So Lawson concluded that this function could not

18   be removed from the inventory control and purchase

19   order modules without crippling the procurement

20   product suite; is that correct?

21   A   That's correct.

22   Q   Refer to page RQC 634608.

23             THE COURT:  Excuse me.  I thought you were

24   going to ask a question so I can understand his

25   answer.

CHRISTOPHERSON - DIRECT          271

1      THE WITNESS:  Yes, Your Honor.

2      THE COURT:  It says "this function" in that

3  question you just answered down on the bottom of page

4  4607 of PX 1006.  Do you see that?

5      THE WITNESS:  Yes, I do.

6      THE COURT:  What function is that referring

7  to insofar as you understand it?  Describe the

8  function that is being addressed there.

9      THE WITNESS:  In looking at it, he's really

10 referring back to that last sentence of the previous

11 paragraph which is RSS does not maintain information

12 in the database about relations from items to sources.

13 So he's saying that function, that exists with inside

14 of IC and PO.  Not in RSS by itself.

15 Q   Are we saying that that function cannot be removed

16 from IC and PO, correct?

17 A   Correct.

18 Q   Now, refer to page RQC 364608.  Do you see the

19 heading, "Means for No. 3"?

20 A   Yes, I do.

21 Q   Do you see that Mr. Knuth refers us back to Claim

22 3 means for No. 3?

23 A   Yes, I do.

24 Q   So refer back to the bottom of page RQC 364606.

25 A   Okay.

1   Q    Do you see the heading "Means for No. 3"?

2   A    Yes, I do.

3   Q    And underneath that there's a quote, "Means for

4   searching for matching items among the selected

5   product catalogs."  Do you see that?

6   A    Yes, I do.

7   Q    Mr. Knuth states there, "RSS does allow for search

8   for items but not in selected product catalogs."  Do

9   you see that statement?

10  A    That is correct.

11  Q    Then on the next page, he continues, "Removing the

12  ability to search for items would severely limit the

13  usefulness of the product.  While the selection could

14  be limited to just items on templates (shopping lists)

15  this would be unacceptable for many customers."  Do

16  you see that statement?

17  A    Yes, I do.

18  Q    Lawson ultimately agreed with Mr. Knuth's analysis

19  with respect to this functionality of searching for

20  items, correct?

21  A    Yes.

22  Q    And Lawson concluded that it would be unacceptable

23  to remove the search capabilities from the infringing

24  configurations, correct?

25  A    Can you say that again?

CHRISTOPHERSON - DIRECT          273

1   Q    Lawson concluded it would be unacceptable to

2   remove the search capabilities from the infringing

3   configurations, correct?

4   A    Yes.

5   Q    Refer back to page RQC 364608.

6   A    Okay.

7   Q    Under the heading, "Means for No. 4," do you see

8   that Mr. Knuth refers us back to Claim 3 means for

9   No. 4?

10  A    Yes.

11  Q    So let's look back at page RQC 364607 under the

12  heading, "Means for No. 4."  That claim element

13  recites "Means for building the requisition using data

14  related to selected matching items and their

15  associated sources."  Do you see that?

16  A    Yes.

17  Q    And Mr. Knuth's analysis with respect to that

18  claim element was, "RSS does allow for building

19  requisitions from selected matching items.  RSS must

20  be allowed to build requisitions; however, if the

21  search function was removed (see means for No. 3),

22  then it would not build requisitions from selected

23  matching items."  Do you see that statement?

24  A    Yes.

25  Q    Lawson ultimately agreed with Mr. Knuth's analysis

CHRISTOPHERSON - DIRECT                274

1  that RSS must be allowed to build requisitions,

2  correct?

3  A    Correct.

4  Q    So Lawson determined that it would be unacceptable

5  to remove requisition building functionality from the

6  Lawson configurations, correct?

7           MR. THOMASCH:  Objection, Your Honor.  I

8  believe counsel is trying to sum up the last statement

9  and misstates what the witness just said.

10          THE COURT:  Overruled.  Ask it again.

11  Q    So Lawson determined that it would be unacceptable

12  to remove requisition building functionality from the

13  Lawson configurations, correct?

14  A    Correct.

15  Q    Refer now to means for No. 5 on page RQC 364608.

16  And that claim element recites processing the

17  requisition to generate one or more purchase orders

18  for the selected matching items.  Do you see that

19  claim element?

20  A    Yes.

21  Q    As to that claim element, Mr. Knuth stated, "RSS

22  does not generate purchase orders, however, the PO

23  system does.  The PO system must be allowed to

24  generate purchase orders for requisitions originating

25  from RSS.  RSS would be crippled without this

CHRISTOPHERSON - DIRECT                    275

1    feature."  Do you see that statement?

2    A    I do.

3    Q    Lawson ultimately agreed with Mr. Knuth's analysis

4    that the systems would be crippled if PO was not

5    allowed to create purchase orders from the

6    requisitions generated, correct?

7    A    Correct.

8    Q    So Lawson determined then that it would be

9    unacceptable to remove the purchase orders'

10   functionality from the infringing configurations,

11   correct?

12   A    Correct.

13   Q    Now, Mr. Christopherson, you've referred to some

14   of the changes that were made to RQC as "lipstick on a

15   pig," correct?

16   A    Some of the changes, yes.

17   Q    And lipstick is a reference to a cosmetic item,

18   correct?

19   A    That is correct.

20   Q    Let me have you take a look at Plaintiff's Exhibit

21   1030.

22             MS. ALBERT:  I guess PX-1006 is already in?

23             THE CLERK:  Yes.

24             THE COURT:  What?

25             MS. ALBERT:  Is Plaintiff's Exhibit 1006

1   already?

2           THE COURT:  Is it?

3           THE CLERK:  Yes, sir.

4           Which one are we calling up now?

5           MS. ALBERT:  Plaintiff's Exhibit 1030.

6   Q    Are you there, Mr. Christopherson?

7   A    Yes, I am.

8   Q    You were copied on this email chain, correct?

9   A    Yes.

10  Q    Matthew Bragstad was one of Lawson's support

11  managers, correct?

12  A    That is correct.

13  Q    And his title was director, Lawson global support,

14  S3 applications, correct?

15  A    Don't recall his title.  I'm pretty sure he wasn't

16  a director, but he was in change of supply chain

17  management within the support team.

18  Q    Do you see in the original email that begins on

19  the bottom of the first page and carries over to the

20  second page, Mr. Bragstad says in his email, "Besides

21  some label/visual (or lipstick on a pig as Dale so

22  eloquently puts it) changes, there were three

23  functional adjustments."  Do you see that statement?

24  A    Yes, I do.

25  Q    Then if you would turn over to the second page,

CHRISTOPHERSON - DIRECT          277

1    the third item, Mr. Bragstad describes that change as

2    "The process in which Punchout is being performed has

3    changed slightly.  You know get a warning pop-up that

4    you are about to leave the Lawson site when you punch

5    out.  The process remains completely the same except

6    if you try to punch out on a req. that is already in

7    use with non-Punchout items, it will tell you that you

8    need to open a separate req., and it will perform that

9    action for you."  Do you see that will statement?

10   A    Yes, I do.

11   Q    Mr. Bragstad concluded in the next paragraph by

12   stating, "All other back office and RSS functionality

13   remains the same in RQC including consolidation of

14   requisitions and purchase orders."  Do you see that

15   statement?

16   A    Yes, I do.

17   Q    Then in the last paragraph in the email

18   Mr. Bragstad asks you, "Dale, please correct any

19   misstatements above."  Do you see that?

20   A    Yes, I do.

21   Q    How did you respond to Mr. Bragstad in the email

22   on page RQC 8088?

23   A    In the next email I say, "Matt, you summed it up

24   very well.  We also have slides that point out the

25   differences if it helps.  Additionally, during the

1   launch process, there were WebEx's that were recorded

2   that show these differences.  Further, there's one

3   addition that is covered in the statement of

4   direction.  There's a plan to add Mobile Requisition

5   as a capability to RQC."

6   Q   So you told Mr. Bragstad that he summed up the

7   changes that were brought with RQC very well, correct?

8   A   Yes, I did.

9               MS. ALBERT:  Thank you, Mr. Christopherson.

10              No further questions.

11              THE COURT:  Is 1030 in?

12              MS. ALBERT:  Sorry.  I move the admission of

13  Plaintiff's Exhibit 1030.

14              THE COURT:  Any objection?

15              MS. ALBERT:  There were no objections.

16              MR. THOMASCH:  No, Your Honor.

17              THE COURT:  All right.

18              (Plaintiff's Exhibit No. 1030 is admitted.)

19

20      CROSS-EXAMINATION

21  BY MR. THOMASCH:

22  Q   Mr. Christopherson, if you would just go back to

23  1030 where the questioning just finished up.  Why

24  don't we take a look at that document?

25  A   Okay.

1   Q    Specifically, down to the last memo, May 25, 2011,

2   on the bottom of the front page ending 8088.  Do you

3   see that?

4   A    Yes, I do.

5   Q    So the last email there, which is from

6   Mr. Bragstad; is that right?

7   A    That's correct.

8   Q    All right.  There's reference made to a comment

9   attributed to you of lipstick on a pig.  Would you

10  identify for the Court what changes -- withdrawn.  Do

11  you recall ever using that term?

12  A    Sure, I do.

13  Q    What changes were you referring to as lipstick on

14  a pig?

15  A    They were elements of the user interface, what we

16  call a UI.  We were simply making some label changes

17  to make sure that the text to the label would mean the

18  same or have the same labels as what it had in RQ 10

19  as what it had in RQC.  An example of that would be in

20  what was on the right-hand side of RSS, it was called

21  checkout.  And we changed that button to say

22  "released" instead.

23  Q    Did it have effectively the same functionality?

24  A    Effectively, yes.

25  Q    Would you consider that a cosmetic change?

1    A    Yes.

2    Q    Would you consider that a significant change to

3    the functionality of the manner in which Punchout

4    operates?

5    A    No.

6    Q    Are you aware of Lawson ever taking the position

7    in this case that that sort of cosmetic change

8    constitutes a significant change to the functionality

9    of Punchout?

10    A    I'm not aware of any.

11    Q    Can you look at the three changes that are

12    identified in the next paragraph?  Do you see Mr.

13    Bragstad's reference to those in addition to the

14    cosmetic changes as being "three functional

15    adjustments"?  Do you see that?

16    A    Yes, I do.

17    Q    Are those indeed functional changes?

18    A    I'll just review them real quick here.  Yes, they

19    are.

20    Q    Now, looking at the first change, does that relate

21    to RSS?

22            MS. ALBERT:  Beyond the scope.  I didn't ask

23    about the first change, and it's not relevant as it's

24    not one of the changes at issue here.

25            MR. THOMASCH:  Absolutely not one of the

1  changes at issue.  It relates to RSS.  Much of what we

2  have seen over the last day and a half relates to RSS

3  and has nothing to do with the change at issue.  I

4  think I have to have an ability to draw out that

5  distinction.

6              THE COURT:  That doesn't address why it's

7  relevant.

8              MR. THOMASCH:  It's relevant --

9              THE COURT:  Stuff she's been addressing is

10  offered for a different purpose than what you seem to

11  be doing.  I just don't understand why you're getting

12  into it.

13              MR. THOMASCH:  May I ask, Your Honor, this

14  is, of course, a Lawson employee who we've designated

15  on our witness list.  Are we allowed to be asking

16  questions of this witness on direct?

17              THE COURT:  Do you object to him taking the

18  questions out of order?  The way I usually do it is if

19  there's no objection, then you put him on now, but you

20  finish all your cross-examine, and then go into your

21  direct.  So that we have in the record what it is.  Or

22  he has to come back.  One way or the other.  Depends

23  on if you object to him asking those questions, doing

24  direct now.

25              MS. ALBERT:  I prefer the procedure that you

CHRISTOPHERSON - CROSS                282

1    described.

2             THE COURT:  Do you want him back or do you

3    want to allow him to ask the questions while he's here

4    now?

5             MS. ALBERT:  He can ask the questions.

6             THE COURT:  As long as he does it later?

7             MS. ALBERT:  Correct.

8             THE COURT:  Hold all of your direct until you

9    say "I'm finished with cross," and then we'll go from

10   there.  Because then she has other questions that she

11   needs ask, too.

12   BY MR. THOMASCH:

13   Q   Let me take you to the third point about which you

14   were asked on direct.  We're back on page ending 8089.

15   Do you see that?

16   A   Yes, I do.

17   Q   Is the statement that if you try to punch out on a

18   req. that's already in use would non-Punchout items,

19   it will tell you that you need to open a separate

20   req., and it will perform that action for you," is

21   that an accurate statement?

22   A   Yes.

23   Q   So if you have gone to one Punchout vendor and

24   selected items to put on a requisition, and then you

25   want to go to a second Punchout vendor, can you do so?

1    A    Let me check something here.  At that particular

2    time patch 1 didn't exist.

3             THE COURT:  I think the problem is it's not

4    clear what you're asking about.  I was about ready to

5    do a follow-up myself because I wasn't sure what

6    iteration of the product was being referred to.  So

7    maybe you start again.

8             MR. THOMASCH:  I will, Your Honor.

9             THE COURT:  Particularly in view of his

10   answer.

11   Q    As of the date of this memo, if you were shopping

12   in item master and you selected an item back from item

13   master and then you wished to after it was on the

14   requisition go to a Punchout site, search there for an

15   alternative or an additional item and bring it back on

16   to the same requisition, could you do so?

17   A    No, you could not.

18   Q    Is that what is being referred to as you

19   understood it in paragraph 3?

20   A    Yes, it is.

21   Q    Is that a cosmetic change?

22   A    No, it's not.

23             THE COURT:  Excuse me a minute.  Are you

24   talking about now in your answer and in this third

25   paragraph if you were using RQC?  Is that what you

1  mean?

2       THE WITNESS:  Correct, sir.

3       THE COURT:  I think you-all are so familiar

4  with this, it kind of gets second nature to you, but

5  to me and to the record it would be helpful if you

6  talk about RSS or RQC and just include which product

7  you're talking about in the question, I think.

8       MR. THOMASCH:  We'll try to do that.

9       THE COURT:  Both of you.  I didn't mean to

10  confine it just to you.

11  Q   Mr. Christopherson, the date of this email is

12  May 25, 2011.  Is that approximately one week after

13  RQC was made generally available?

14  A   Yes.

15  Q   So is this, as you understand the email as it was

16  directed to you, did it relate to RQC or RSS?

17  A   It related to RQC.

18  Q   Okay.  And a part from the date, does the

19  description of the functionality as not being able to

20  do certain things, does that tell you whether it

21  relates to RSS or RQC?

22  A   It does and it's RQC.

23  Q   Why can you determine that it's RQC from the

24  description in paragraph 3?

25  A   In paragraph 3, RQC did not have this ability.

1  RSS did have this ability.

2  Q   Would you please go to Exhibit 1006, Plaintiff's

3  Exhibit 1006?

4           THE COURT:  Before we go there, you said that

5  the change referred to in paragraph 3 was significant.

6           THE WITNESS:  Let me go back through again,

7  Your Honor.  Which one?

8           THE COURT:  That same exhibit, 10,000 -- what

9  is it?

10          MR. THOMASCH:  That was 1030, paragraph 3.

11          THE COURT:  Last page.  You said that change

12  was significant.

13          THE WITNESS:  Correct, yes, I did.

14          THE COURT:  Why was it significant?

15          THE WITNESS:  Okay.

16          THE COURT:  In your view.

17          THE WITNESS:  In my view, when people are

18  ordering things -- keep in mind, this is not your

19  typical end user who might be at home in the evening

20  ordering things.

21          THE COURT:  I'm not ordering a book from

22  Amazon.

23          THE WITNESS:  Right.  You're ordering things

24  usually for some sort of project or mission or

25  something.  You want to order them as a whole for that

1    mission.  So you may have a project that you need to

2    go and order things that you have in inventory that

3    are in item master, but you may have some things that

4    are not, and then you would normally have to go punch

5    out to those.

6            Well, now you have got to split those apart

7    into two separate requisitions.  So your shopping

8    experience for the end user has changed.  So they now

9    have two or more requisitions, depending on how many

10   places to have to go to.

11           THE COURT:  It's harder for them to do.

12           THE WITNESS:  It's harder for them to do, but

13   also it continues on further.  Let's assume that those

14   items need to be approved by a manager.  There's a

15   manager getting those, and I being a manager having to

16   have gotten those before, I am now not getting a view

17   of the project cost of what's being requested from one

18   approval.  I'm getting approval from requisition 1 and

19   approval for requisition 2.  And I'm having to take

20   those and, in my day, I'm getting, you know, well over

21   1,000, not 1,000, but 100 emails a day, trying to

22   combine those together in my head to come together.

23   Okay.  I can do that.  That's simple math.  But if

24   it's separated by a period of time, I'm now having to

25   remember to put those altogether.

CHRISTOPHERSON - CROSS                287

1          THE COURT:  It's harder to use, I guess, is

2    one reason, and the other reason is the approval

3    process is more difficult for the person doing the

4    approval.

5          THE WITNESS:  Yes.  The management of that,

6    yes.

7          THE COURT:  Okay.  Thank you.

8          Sorry to interrupt you.

9          THE WITNESS:  That sums it really well.

10   Q   Does the difficulty to use the system as modified

11   in RQC change the time it takes to engage in

12   requisitioning activities if the requisitioning

13   activities that you wish to do involve both item

14   master and Punchout items?

15         MS. ALBERT:  Outside the scope of my

16   examination.

17         MR. THOMASCH:  If it is, Your Honor, then I

18   believe your questions were outside the scope.

19         THE COURT:  I think basically I've caused the

20   problem.  And it's perfectly all right to object to

21   the judge's question, Ms. Albert, if you want to.  In

22   fact, in the very first bench trial that I ever had, I

23   asked a question, and then immediately sustained an

24   objection to it.  So it's perfectly all right.  But

25   you can go ahead and ask, but don't be getting into

1    things that you're going to.  I think you can ask it

2    because of my question, but that doesn't open the door

3    all the way.

4    Q   Is there a difference in the time it takes for

5    users under RSS and RQC to complete requisitioning

6    activities that involve purchasing items from item

7    master and Punchout vendors?

8    A   Yes.

9    Q   What is the difference?  Which takes more time and

10   which takes less time?

11   A   RQC, if you're having to do item master, and in

12   this particular case at this time, punching out, it

13   takes more time as compared to RSS.

14   Q   May I ask you to look at Plaintiff's Exhibit 1006

15   that you were asked about on direct examination?

16   A   Okay.

17   Q   I want you to go to the first -- once again, who

18   is Mr. Knuth?

19   A   Mr. Knuth is an architect in the product

20   development team.

21             THE COURT:  In the what?

22             THE WITNESS:  A software architect on the

23   software development team.

24   Q   Is he a lawyer as well as a software architect?

25   A   No, he's not.

CHRISTOPHERSON - CROSS                289

1  Q    Did you ask him to perform the analysis that's set

2  forth in Exhibit 1006?

3  A    I did not.

4  Q    If you would look at the page ending with the

5  numbers 4607, and do you see where there's reference

6  to means for No. 4 about which you were asked on

7  direct?

8  A    Yes.  For Claim Three?

9  Q    Yes.

10  A    Okay.

11  Q    And it indicates after the quoted means in the

12  second paragraph, RSS must be allowed to build

13  requisitions, period.  Do you see that?

14  A    Yes, I do.

15  Q    So a requisitioning management tool requires

16  requisitions; is that right?

17  A    That's implied, but yes.

18  Q    And you can prepare or generate or build a

19  requisition under RQC even after the modification,

20  correct?

21  A    Correct.

22  Q    Is the building of a requisition for Punchout

23  items in RQC the same or different, is it done in the

24  same or different way as building a requisition in RSS

25  when a shopper is trying to combine item master items

CHRISTOPHERSON - CROSS                    290

1  and Punchout items?

2  A   You're trying to combine.  It is different in that

3  it is two separate requisitions, otherwise the

4  requisition itself for each is the same.

5          THE COURT:  The process of building the

6  requisition is the same in RSS and RQC.  The

7  difference being that in RQC, you have to build more

8  than one requisition depending on what you're buying?

9          THE WITNESS:  Correct.

10          THE COURT:  And in RSS you have to build only

11  one?

12          THE WITNESS:  You just build one.

13          THE COURT:  Is that right?

14          THE WITNESS:  That is correct, Your Honor.

15  Q   And in that situation where the user has shopped

16  in item master and checked out and created a

17  requisition, and the shopper goes to Punchout, you

18  would create a second requisition; is that correct?

19  A   That is correct.

20  Q   Then how many purchase orders would come out of

21  that for approval or how many requisitions?  There

22  would be two requisitions, correct?

23  A   Two requisitions.

24  Q   How many purchase orders would that generate?

25  A   Well, I'm not really sure.  It's going to be at

1  least one because you're going to have a purchase

2  order for what we call the special item out of

3  Punchout.  So for all of those there's going to be a

4  purchase order.  For the ones from item master,

5  depends whether or not they are in inventory, or

6  non-stock, stock items, specials.

7  Q   In other words, not all items from item master

8  require the creation of a purchase order?

9  A   Correct.

10 Q   Do some?

11 A   Yes.

12 Q   In a situation where you're selecting an item that

13 isn't already in inventory and you have to buy it from

14 someone but it's in the item master, and then you are

15 also purchasing from a Punchout vendor with RQC, in

16 that situation there would be two requisitions, you

17 said.  How many purchase orders would there then be?

18       MR. STRAPP:  This is outside the scope of my

19 examination.

20       THE COURT:  Why is it?

21       MS. ALBERT:  I didn't ask about the item

22 master and Punchout.

23       MR. THOMASCH:  There was specific questioning

24 on the purchase order with respect to means No. 5.

25 The area was directly questioned about.

1        THE COURT:  Overruled.

2   Q   Do you have the question in mind?

3   A   No, I don't.

4        MR. THOMASCH:  May I have it read back?

5        THE COURT:  We don't do that.  You have to do

6   it.

7   Q   With RQC where you are shopping from item master

8   for an item that's not in stock in inventory but

9   requires purchase from a third party vendor and when

10  you are also buying an item from a Punchout vendor,

11  when you're doing both of those things, how many

12  purchase orders will be created?

13  A   Two.

14  Q   Now, does the purchase order module have the

15  capacity to recognize that there would be a need for

16  more -- there would be a need for more than one

17  purchase order if there were different sources on the

18  requisition?

19  A   Yes.

20  Q   So the capacity exists in the purchase order

21  module the same as it existed in RSS; is that correct?

22  A   That's correct.

23  Q   But is the capacity with RQC used or is that

24  capacity unused in situations where someone is

25  shopping from both item master and Punchout?

1  A    I' m not sure of the question.  I didn't quite

2  understand it.

3  Q    With RSS, if you had an item master item and a

4  Punchout item, they could go on the same requisition,

5  correct?

6  A    Correct.

7  Q    And the purchase order module would actually be

8  able to recognize that these are from two separate

9  sources and so it would have to generate two purchase

10  orders from that one requisition, correct?

11  A    Correct.

12  Q    With RQC, the purchase order module has the same

13  capacity, correct?

14  A    Correct.

15  Q    But if there's only an item from one source on the

16  requisition at a time, then it has to do a separate

17  purchase order for each source; is that correct?

18  A    Uh-huh.

19  Q    Is that a difference in the way in which purchase

20  orders are generated even though there's no difference

21  to the purchase order module?

22  A    No.

23  Q    Is it a difference in the number of purchase

24  orders that will be generated in situations where

25  someone is shopping from websites or Punchout vendors

1   and item master vendors?

2   A    No.

3   Q    With RQC, if you're shopping from an item master

4   and a Punchout, and you want to buy one item from

5   each, with RQC how many purchase orders will you have?

6   A    Two.

7   Q    With RSS, if you wanted to shop from another

8   vendor through item master and through Punchout, how

9   many would you have?

10  A    Two.

11  Q    Would you have those --

12          THE COURT:   It's the same.  He said that once

13  before.

14  Q    So the difference is in the requisitioning stage;

15  is that correct?

16  A    Correct.

17  Q    If would you look at Exhibit 1015.

18  A    Okay.

19  Q    When you get there, if would you go to the

20  document from ending with the Bates No. 4469?

21  A    Okay.

22  Q    Were you involved in the decision as to whether or

23  not an application would be made to the Court for a

24  pre-approval of any specific item of any redesign that

25  might be developed at Lawson?

CHRISTOPHERSON - CROSS                    295

1    A    I was under the impression the whole time that the

2    legal team was going to do that.  That was the extent

3    of my involvement.

4    Q    Whose decision was it as to whether design issues

5    should be pre-approved by the Court or not?

6    A    As far as I knew, that was our trial legal team.

7            THE COURT:  Was there a business person on

8    the trial team?

9            THE WITNESS:  A business person?

10           THE COURT:  Yeah.  A lot of times when people

11   have -- when corporations are having cases tried, they

12   have lawyers, but they have a business person so that

13   the business person can vet, so to speak, the legal

14   decisions from a business standpoint.  I don't know

15   that you all did that.  I just was asking.

16           THE WITNESS:  I was the representative at

17   that point.

18           THE COURT:  But it didn't go through you.

19           THE WITNESS:  Right.  We had -- our business

20   person was Mr. Lohkamp also.  So there was a

21   development side, which was myself, and then there's

22   legal, and there's the business side, which is

23   Mr. Lohkamp.

24           THE COURT:  All right.

25   Q    Did either you or to your knowledge Mr. Lohkamp

1    have responsibility for making decisions or vetoing

2    them or approving them as to what information would be

3    transmitted to the Court?

4    A    We did not, no.

5    Q    Now, as of February 18, 2011, what was the status

6    of the design around solution that was ultimately

7    implemented on May 18, 2011 and June 9, 2011?

8    A    It wasn't even up for discussion because it hadn't

9    even made it into a brainstorming session yet.

10          THE COURT:  Will someone refresh my

11   recollection and tell me what was the date of the

12   injunction hearing in this case.

13          MR. THOMASCH:  The injunction hearing was on

14   March 25.

15          THE COURT:  Thank you.

16   Q    Would you look at Exhibit 1022, please.

17   A    Okay.

18   Q    With regard to the email that you were asked about

19   at page ending at 678.

20   A    Okay.

21   Q    As a preliminary matter, a Punchout site to

22   something like Dell that a given Lawson customer would

23   have, is that the same as Dell.com or is that a

24   customized site for that customer?

25   A    It's typically a customized site.  It's not the

1   same URL.

2   Q   Is the discussion about SciQuest, the ability to

3   go to SciQuest, and Sciquest would have a capacity to

4   link users to certain other sites; is that correct?

5            THE COURT:  Wait a minute.  Go over that

6   again.  I didn't understand it.  He might, but I sure

7   didn't.

8            MR. THOMASCH:  Okay.

9   Q   Is shopping --

10            THE COURT:  You're talking about the question

11   about SciQuest on the document?

12   Q   You were asked about Sciquest on the document.

13   There's a reference to Dell.

14            THE COURT:  Do you see that at the bottom of

15   678?

16            THE WITNESS:  Yes, I do.

17            THE COURT:  With respect to --

18   BY MR. THOMASCH:

19   Q   If a Lawson customer wanted to do a Punchout

20   session with Dell and had that capacity with RSS, if

21   in RQC they went to SciQuest instead, and if SciQuest

22   had access to a Dell catalog, would it be the same

23   shopping experience as it had been when there was a

24   direct link in RSS?

25   A   I wouldn't know.

1   Q    The experience would be different in that

2   situation?

3            THE COURT:  He said "I wouldn't know."

4            MS. ALBERT:  Lacks foundation.

5            THE COURT:  I think he said, "I wouldn't

6   know."  Isn't that what you said.

7            MR. THOMASCH:  I'm sorry, Your Honor.

8   Q    I ask you look to look at Exhibit 1013.

9   A    Okay.

10  Q    There's a memo dated February 12, 2011, on which

11  you were questioned.  If you'll just look through the

12  email that you wrote on that date that starts at the

13  bottom.

14  A    Uh-huh, correct.

15  Q    Does it relate exclusively to Punchout or to more

16  than Punchout as far as the changes that were working

17  on at that time?

18  A    It relates to more than just Punchout.

19  Q    Okay.  What was the status of the Punchout changes

20  that were ultimately implemented in this case as of

21  the date of this document?

22  A    None of them were up for discussion.

23  Q    Had they been developed yet?

24  A    No, since they hadn't been up for discussion.

25  Q    Moving to PX-1259.

1   A    1259?

2   Q    Yes, 1259.

3   A    Okay.

4   Q    This is a later document dated March 7, 2011.  Do

5   you see that?

6   A    Yes, I do.

7   Q    Do you have an understanding when you wrote this,

8   you wrote, So here's what we're doing.  And you have

9   two paragraphs.  One paragraph begins, "Punchout" and

10  the next paragraph begins "RSS."  Do you see that?

11  A    Yes, I do.

12  Q    Are the changes to the Punchout functionality

13  contained in the replacement for RSS?

14  A    Yes.

15  Q    So why is it that you wrote two separate

16  paragraphs, one Punchout and one RSS?

17  A    At that particular time we were looking for a

18  change within Punchout.  We determined over the course

19  of the next month, a little more than that, that we

20  couldn't find a change within Punchout, but we could

21  find a change in how Punchout was used.  And that

22  would mean a change to what became RQC.

23  Q    So RQC -- when you say "RQC," there's a change to

24  the way it's used, how does that relate to the

25  ultimate functionality of a shopper who is using

1   Punchout?

2   A    Within RQC that's where for the first release we'd

3   put in a barrier such that you could no longer put on

4   a single requisition items from item master and items

5   from a Punchout provider and that was controlled from

6   within RQC.

7   Q    So the blockage occurs at RQC's level?

8   A    Yes.

9   Q    What about the second change that was made.  Would

10  you briefly describe that change?

11  A    Yes.  That's what we referred to earlier in court

12  today as patch 1.  And that particular item or that

13  change, you can no longer go from one Punchout

14  provider to another Punchout website.  You have to go

15  to one, and if you're going to go to a second one,

16  you'll have to have another requisition.  So it was

17  the same wall or same barrier in design that we had

18  placed earlier in the product.

19  Q    Was that wall or barrier placed in RQC or in the

20  Punchout module?

21  A    It was done in RQC.

22  Q    The status of those changes, if we move forward to

23  March 7, 2011, what was the status of those two

24  changes as of March 7, 2011?

25  A    We still hadn't come up with them yet.

1    Q    Had you come up with them by March 25, 2011?

2    A    No.

3    Q    When did you first even discuss the idea that

4    became the ultimate changes that we're talking about

5    in this proceeding?

6    A    For the first change, that was in the month of

7    April, and the second change was approximately June 1.

8    Q    We'll get there on direct examination, but just

9    because it relates to this, can you approximate about

10   when in April that first change was first conceived

11   of?

12   A    Approximately in the middle of the month there

13   were discussions between myself and Bob Crawford.

14   Q    Who is Bob Crawford?

15   A    He was yet another independent lawyer that we

16   brought in to help advise us on these proceedings.

17   Q    Just lastly on the follow-up from documents used

18   on direct examination, can I take you to Exhibit 1256?

19   A    Okay.

20   Q    On page 2883 that you were questioned about, do

21   you see the reference to UNSPSC scripts?

22   A    Scripts.  I see UNSPSC several times on the page.

23   Q    On the first, second or third paragraph that

24   begins "Lawson would contact."

25   A    Okay.

CHRISTOPHERSON - CROSS                    302

1    Q    Do you see that?

2    A    Yes, I do.

3    Q    And the removal of UNSPSC scripts, was that

4    related to one of the three changes that were the

5    subject of your design team's work?

6    A    Yes.

7    Q    Which of those three changes did it relate to?

8            MS. ALBERT:  Your Honor, relevance.  This

9    particular --

10           THE COURT:  Well, I think he's just

11   excluding -- it wasn't related to Punchout; is that

12   what you're saying?

13           MR. THOMASCH:  That is.

14           THE COURT:  Why don't you just ask it that

15   way.

16   Q    Was the discussion here related to Punchout and

17   specifically the capacity of Punchout not to be used

18   with UNSPSC --

19           MR. THOMASCH:  Withdrawn.  I'm sorry, Your

20   Honor.  It's hard to say what it's not.

21   Q    Does this reference to UNSPSC relate to the

22   Punchout changes that you first conceived of around

23   April 18 and were later implemented on May 23 and

24   June 9?

25   A    No.

1        MR. THOMASCH:  Nothing further on that

2   document, Your Honor.  I would switch over at this

3   point.

4        THE COURT:  I think, given that I actually

5   set an order in the trial proceeding order telling

6   you-all which way to do things, I don't want to take

7   things out of order in this case at this time.  I

8   think it's going to be easier for me to understand and

9   keep track of if we do it the way I set up in the

10  order.  So I'm going to change that.  Even though they

11  agreed, I'm going to change it.  You can call him back

12  when your time comes.

13       MR. THOMASCH:  Thank you, Your Honor.

14       THE COURT:  Any redirect?

15       MS. ALBERT:  Some briefly.

16

17   REDIRECT EXAMINATION

18  BY MS. ALBERT:

19  Q    Now, you said it was the lawyers' decision whether

20  to seek the Court's pre-approval of the proposed

21  redesign 'is that correct?

22  A    That's my understanding, yes.

23  Q    Are you saying that the lawyers were on their own

24  without client approval?

25       MR. THOMASCH:  Objection to form.  There are

1    lawyers at the clients.

2            THE COURT:  What?

3            MR. THOMASCH:  There are lawyers at the

4    client.  He's talking without the trial team, which

5    are outside lawyers.  And the suggestion is now being

6    made that just misstates the testimony.

7            THE COURT:  Well, I think she was asking --

8            MS. ALBERT:  I was asking --

9            THE COURT:  Why don't you just sort of

10   acknowledge -- I mean, maybe he's drawing a difference

11   between in-house lawyers and the lawyers outside of

12   Merchant & Gould.

13           THE WITNESS:  Can you ask the question again?

14   Q   Are you saying that the lawyers were on their own

15   without client approval?

16   A   I would not know.

17   Q   Now, you said that the changes related to

18   requisitioning with Punchout weren't brainstormed

19   until April.  Did you talk to the lawyers about

20   bringing to the Court's attention these changes after

21   they were developed in April?

22           MR. THOMASCH:  Objection, Your Honor.  I will

23   object to questioning from counsel.  It tends to

24   elicit privileged communications.  We do have

25   privilege documents in the case over our objection,

1   and we haven't been separately objecting because you

2   have already ordered that they can be used, but I

3   don't believe there can be separate inquiry about

4   privileged communications.  At least I'd like to note

5   our objection.

6          THE COURT:  Is there a document?  To what

7   extent is the privilege opened up in your view?

8          MS. ALBERT:  I'll withdraw the question.

9          THE COURT:  He's got a legitimate point that

10  we need to sort out.  There was an opening of the

11  privilege.  It opens it very extensively under the

12  Fourth Circuit, but it doesn't open it all the way.

13          MS. ALBERT:  I'll withdraw the question.

14          THE COURT:  All right.

15  BY MS. ALBERT:

16  Q   Now, you talked about the longer time the

17  requisitioning process will take for end users.  Was

18  that your testimony?

19  A   I did say it would take longer, yes.

20  Q   So users have informed you that the requisitioning

21  process with RQC and Punchout takes longer?

22  A   Users have not informed me of that except through

23  my direct testing of the application.

24  Q   So are you aware of any customers that use RQC and

25  Punchout?

1   A    Am I aware of any customers that do use it, yes, I

2   am aware.

3   Q    What customers are those?

4   A    Cleveland Clinic uses that, Indiana University

5   Healthcare uses it.  I'm not sure if all of them.

6   There's over 100 customers that use it.

7   Q    That use RQC and Punchout?

8   A    Correct.

9   Q    And those customers have the capability then with

10  those systems with RQC and Punchout to select a

11  Punchout catalog search, right?

12  A    Correct.

13  Q    And those customers have the capability to use the

14  systems with RQC and Punchout to search for items at

15  those Punchout sites, correct?

16          MR. THOMASCH:  Objection, Your Honor.  Beyond

17  the scope of cross and simply repeating the element by

18  element infringement analysis that we objected to

19  earlier on direct.

20          THE COURT:  I didn't perceive that's where

21  she was heading.  I thought she was following up your

22  questions about the time it took and the difficulty

23  that it took.

24          Am I wrong about the purpose of your

25  questions?

1     MS. ALBERT:  I am following up on those

2  questions and following up as far as what he was

3  saying about the customers, the end-user experience.

4  So I was trying to elicit some testimony about the

5  end-users experience.

6     THE COURT:  I think that's where she's

7  helping, not the way you were.

8     MR. THOMASCH:  Well, the question as phrased,

9  Your Honor, was about the capability of the system,

10  and I do object to that as being beyond the scope.

11     THE COURT:  Well, I think she's just asking

12  if they have RQC and Punchout.  Right?

13     MS. ALBERT:  Right.

14     THE COURT:  And then go ahead from with there

15  to develop the line.

16  Q   Those customers such as Cleveland Clinic, they

17  have the ability using that system with RQC and

18  Punchout to search for items at a Punchout site,

19  right?

20  A   Correct.

21  Q   And they have the ability to bring selected items

22  back from a Punchout site into the requisition line

23  user interface of the Lawson system, right?

24  A   Correct.

25  Q   And they have the capability to process those

1    requisition lines and generate a requisition from

2    that, right?

3    A    Correct.

4    Q    And they have the capability to generate --

5              THE COURT:  I think you're doing what he

6    objected to now.

7    Q    So those customers are using the systems with

8    requisition center and Punchout to perform the

9    capabilities of building a requisition and generating

10   purchase order from that requisition, correct?

11             MR. THOMASCH:  Objection to the form of the

12   question and "those customers" without specificity.

13   Objection to failure to establish personal knowledge.

14             MS. ALBERT:  He said he was aware of

15   Cleveland Clinic and the other customers who have

16   systems with RQC and Punchout.

17             THE COURT:  Objection overruled.

18             THE WITNESS:  Can you say the question again?

19   Q    The customers of which you're aware that have

20   systems with RQC and Punchout are using those systems

21   to build requisitions from Punchout shopping sessions

22   and generate purchase orders from those requisitions,

23   right?

24   A    Yes.

25             MS. ALBERT:  Thank you.  No further

1   questions.

2          MR. THOMASCH:  Very briefly, Your Honor.

3          THE COURT:  Now, you understood, I thought,

4   we weren't going to do -- we only do direct, cross and

5   redirect.

6          MR. THOMASCH:  May I ask one question?

7          THE COURT:  Yeah.  And this is the last time

8   unless something comes up.

9

10     RECROSS-EXAMINATION

11  BY MR. THOMASCH:

12  Q    Would you just explain, Mr. Christopherson, the

13  extent to which your job duties have you interrelating

14  with customers about their experiences with the

15  products that you are involved with on the design

16  side?

17  A    Very little on a day to day basis.

18         MR. THOMASCH:  Nothing further.

19         THE COURT:  All right.

20         You always get the last question.

21         MS. ALBERT:  I move to strike all of Mr.

22  Christopherson's testimony relating to end-user

23  experience based on lack of foundation.

24         THE COURT:  All of it including what you

25  asked about?  Is that what you want?

310

1          MS. ALBERT:  I'll leave it in the record.

2          THE COURT:  Okay.  Well, I've done that

3   before when the development calls for it.

4          All right.  You're temporarily excused.

5   We'll take a 20-minute recess.

6              (Recess taken at 11:06 AM.)

```
 1              THE COURT:  All right.
 2              MS. ALBERT:  Your Honor, at this time, we'd like
 3     to move into evidence some deposition designations from
 4     Mr. Hager's deposition, and would I ask my colleague Mr.
 5     Jacobs to handle this matter.
 6              THE COURT:  Are we doing Hager's deposition by
 7     videotape?
 8              MR. JACOBS:  Your Honor, we have video clips that
 9     we're not going to show.  Mr. Thomasch has asked that we
10     submit those along with the written transcripts, and we
11     will do that, to the Court.
12              We have prepared a notebook which we'll hand up
13     to the Court that has two tabs, color-coded tab for his
14     first deposition on January 6th, 2012, and one from
15     March 22, 2013.  They contain the color-coding of the
16     designated portions as well as objections.
17              The objection -- the exhibits are also contained
18     in the notebook, some of which are objected to, and they
19     are noted which ones.
20              Your Honor, we also have several exhibits that
21     were used to which no objections were made, and if I could
22     just read that list in the record, we would ask that those
23     be accepted into evidence.
24              THE COURT:  Gentlemen, Mr. Hager's testimony
25     is -- his credibility is fairly important, and I want to
```

1    see him.  I know he's not here, but I thought I mentioned
2    on the telephone that he was to be presented by videotape.
3    Did I not do that?  If I didn't, I didn't.  I mean, I must
4    not have, or you all would have done it.
5        MR. THOMASCH:  It was our understanding -- I
6    didn't read it as a Court directive.  It was our
7    understanding that was what was happening, and that's what
8    Mr. Jacobs accurately said.
9        I ask that if the deposition is going in the
10   video go in, because the demeanor was raised as an issue,
11   and I would like the Court to see the testimony if the
12   Court is considering it.
13       MR. JACOBS:  Your Honor, we do have video clips
14   that we will submit for Your Honor's viewing.  We thought
15   that given the length of time and --
16       THE COURT:  How long is it, Mr. Jacobs?
17       MR. JACOBS:  Your Honor, there were several hours
18   of testimony in two depositions.  A lot of the deposition
19   was designated, some of which was objected to, some of
20   which was not, and we thought that it would be most
21   convenient to the Court to have it in a format that off
22   the bench Your Honor could see the designated portions
23   and/or watch the video clips, and we could have them done
24   in a way to make it convenient to the Court.
25       THE COURT:  How many objections to the questions

1    are there?

2         MR. JACOBS:  Your Honor, questions as to form,

3    there were objections throughout, and there were

4    objections that we have provided in the notebook we're

5    handing up to the Court that were running into dozens, if

6    not more, along the way as to relevance, hearsay, and

7    several other objections.

8         So that's why we thought in order to save time,

9    we could provide you with the color-coded version with the

10   objections marked in the margins, Your Honor can read it

11   in context and decide then if the objections are

12   well-taken.

13        THE COURT:  All right.

14        MR. JACOBS:  Your Honor, if I --

15        MR. THOMASCH:  Your Honor, I would note that the

16   parties exchanged actual objections after the fact so that

17   not all objections made by either party at the deposition

18   are objections on which we're asking for Your Honor's

19   ruling.  We did go back through the depositions.

20        THE COURT:  Have the ones to which you don't

21   object been excised from what I've got so I know what to

22   rule on or not?

23        MR. JACOBS:  Your Honor, you will find in the

24   notebook, where the objection is made, in the margin you

25   will see exactly the question, the answer to which there

1    is an objection.  Otherwise, there is no objection as

2    you'll read through it.

3         THE COURT:  In other words, you have excised

4    those objections which you all have resolved?

5         MR. JACOBS:  Yes, Your Honor.  Anything that has

6    been resolved I believe --

7         MR. THOMASCH:  It is the case that the transcript

8    will say objection, but there will be no Rule 403 next to

9    it or no 802 next to it, and that means it's been

10   withdrawn?

11        MR. JACOBS:  If there is a standing objection

12   such as hearsay or relevance, the rule of evidence number

13   is noted in the margin precisely where --

14        THE COURT:  So if I see an objection and there's

15   nothing in the margin, the objection has been resolved.

16        MR. JACOBS:  That is correct, Your Honor.  And if

17   I read the exhibits numbers to those exhibits to which

18   there is no objection, those would be PX-1088, 1090, 1091,

19   1096, 1098, 1100, 1102, 1010, 1104, 1105, 1112 -- excuse

20   me, 1111 and 1112, and that, I believe, is it.

21        The rest are noted in the margins, Your Honor.

22   And Mr. Thomasch has also asked me during the break if

23   they would have the opportunity, of course, to go through

24   and make sure that our people marked it correctly, and if

25   we find any mistakes, we will, of course, substitute

1   pages.

2           THE COURT:  Sure.

3           MR. THOMASCH:  We have no objection.  We assume

4   that they're very careful, and we don't have any problem

5   subject to our final check.

6           THE CLERK:  Are you admitting this notebook now

7   or later?

8           THE COURT:  The exhibits that he just read off

9   are all admitted without objection.

10          MR. THOMASCH:  Yes, Your Honor.

11          THE COURT:  And I'm going -- what I'm going to

12  do -- what I'm going to do is read the deposition and mark

13  in the margins my ruling, and then the whole thing will go

14  in.  Therefore, the rulings will be in, the documents will

15  be in, and that will be how that will happen.

16          MR. JACOBS:  We will submit the video for your

17  viewing, Your Honor.

18          MR. THOMASCH:  Your Honor, the final matter that

19  was discussed, because we only found out this morning

20  about this procedure, is the question of what is the

21  testimony being offered for, and I understand from Mr.

22  Jacobs that they are designating all the testimony for

23  colorability, and they are designating -- and they believe

24  that some testimony comes in for what he's referred to in

25  our discussions as remedies, but not -- nothing is being

 1   offered for purposes of infringement.

 2           THE COURT:  Is that right?

 3           MR. JACOBS:  That is correct, Your Honor.  It

 4   comes in at this phase of the hearing.

 5           THE COURT:  All right.

 6           MR. THOMASCH:  Thank you.

 7           THE COURT:  Thank you.  Next witness.

 8           MS. ALBERT:  ePlus rests its case on lack of

 9   colorable difference.

10           THE COURT:  All right.

11           MR. THOMASCH:  Your Honor, two matters, and the

12   first may be a housekeeping matter, but Mr. Scott Hanson,

13   who was the subject of some testimony and who was on

14   plaintiff's witness list, is here in the courthouse.  He

15   came from Minnesota because he was identified on

16   plaintiff's list.  He is not a witness that we ever

17   identified, and I would ask that he now be released.

18           MS. ALBERT:  We're intending to call Mr. Hanson

19   in our infringement case.

20           THE COURT:  All right.

21           MR. THOMASCH:  Secondly, Your Honor, under

22   Federal Rules of Civil Procedure 52(c), we will have a

23   motion for judgment on partial findings as will be

24   applicable in a bench trial after a party has been fully

25   heard on a necessary issue.

1           Of course, as to those aspects of this proceeding

2    that relate to the claim that configurations three and

3    five with the modified RSS components are not more than

4    colorably different from those -- from the component, RSS

5    component.  We would say that they have failed by any

6    reasonable measure to carry burden of clear and convincing

7    proof on that issue.

8           We would ask Your Honor, because the rule allows

9    flexibility, to allow us to articulate in more detail the

10   basis for our objections after all evidence on the issue

11   of colorability is in given that it's a bench trial and

12   there's not a waiver situation, but I wanted to alert Your

13   Honor to the upcoming motion.

14          MR. STRAPP:  Your Honor, we oppose the motion.

15   We can articulate the basis for our opposition now, or we

16   can do that in papers following the case in chief, when

17   Lawson rests its case.

18          MR. THOMASCH:  We would ask to set forth our

19   position and hopefully be able at least to orally argue it

20   at the close.  *TiVo* is very specific about what should be

21   done between phase one and phase two, and Federal Rule of

22   Civil Procedure 52(c) allows us that opportunity at any

23   time after the plaintiff has been fully heard.

24          I would just prefer instead of doing that fully

25   this morning, that we finish up with the witnesses, some

1    of whom are from out of town, and then when all evidence

2    on colorability is in, at that time to make our motion in

3    more detail.

4            MR. STRAPP:  Your Honor, it's your preference.

5    If you would like us to argue the motion now in our

6    opposition, we're happy to do that.  We can also do it at

7    the close of their case on colorability.

8            THE COURT:  Well, I have got a deposition that's

9    been offered that I haven't read.  There's no way I can

10   make a ruling on this until I read that, and I'm not going

11   to read it before I hear the infringement.  I'm going to

12   tell you that right now.

13           I'm going to hear all the evidence and then

14   decide.  I can't do that.  I've got -- so I think -- I

15   don't know how useful this motion is as opposed to the

16   ultimate decision, but we'll see.

17           MR. THOMASCH:  Your Honor --

18           THE COURT:  *TiVo* does not require me to stop the

19   trial and make a finding and then let you go on.  It

20   doesn't require it.  I never has, it never will.  I've

21   told you all that before, that I'm going to hear the

22   evidence, and if you all feel like it's important to file

23   the motion, you can file the motion, but I'm going to hear

24   the evidence and go on.

25           I've got to get this done, and I've got the

1    witnesses here, and then the decision can be made as to

2    whether or not there's a problem with it.  So far as I

3    know, nobody has ever showed me anything that says you

4    have to stop the trial and then go on.

5           MR. THOMASCH:  Well, Your Honor, it is our

6    position that there does need to be a ruling, because *TiVo*

7    doesn't give any direction --

8           THE COURT:  The Federal Circuit has never held

9    that, though, have they?

10          MR. THOMASCH:  The Federal Circuit has held that

11   if the product is more than colorably different, then the

12   issue, the entire issue of infringement is irrelevant, and

13   the problem, Your Honor, in stark simplicity, is if our

14   product is as we say it is, more than colorably different

15   from the product that was found infringing, there's no way

16   for us to fashion fairly the infringement trial.  We're

17   stuck.

18          We have a different product than was alleged to

19   be infringing, and the issue, the issues of claim

20   construction become real and necessary.  There may be

21   claim constructions that neither party needed with the old

22   product, neither party asked for because they were

23   irrelevant.  They related to undisputed features of the

24   old product.  The feature has been changed.

25          THE COURT:  You are talking about infringement

1    trial.  I don't read that's how *TiVo* deals with this.

2    Anyway, you can -- I can't entertain such a motion now

3    because you all have tendered a deposition that I haven't

4    even had a chance to read as part of the evidence.  I

5    can't do it.  We didn't build this in, and I can't do it,

6    and we're not going to do it, so let's go ahead with your

7    evidence.

8         MR. THOMASCH:  Your Honor, may I please, for the

9    record then, note our objection to proceeding with Mr.

10   Hager's deposition in that way, because if that --

11        THE COURT:  I thought you all -- you could have

12   sorted this out before the trial, Mr. Thomasch.

13        MR. THOMASCH:  Your Honor, we found out about

14   this process this morning.

15        THE COURT:  Oh, I didn't understand.

16        MR. THOMASCH:  I did not know until I came to

17   court this morning that this was the procedure, and --

18        THE COURT:  Then it's a little hard for --

19        MR. THOMASCH:  In the context of a bench trial, I

20   am trying to work with opposing counsel and not cause

21   problems, but I don't think that there was an intention

22   that it prejudiced us, and I don't think it should

23   prejudice us.

24        Our position is that the evidence should go in,

25   and we should have the right to make a motion under

1    Rule 52(c) before we then proceed to the next stage of the

2    case, and the relationship between that --

3          THE COURT:  You can make the motion, but I'll

4    deal with it when it comes up.  All right.  I'm going to

5    hear the evidence.  We're not going -- this thing has drug

6    out and drug out and drug out, and to my knowledge, the

7    Federal Circuit has never said that you have to have a

8    split procedure.

9          It just hasn't said that, and I haven't seen any

10   cases where that was done that I can recall, but maybe

11   there have been.  Are you an aware of cases where it was

12   done that way?

13         MR. THOMASCH:  No, Your Honor, there aren't cases

14   in a post-*TiVo* context that bear any factual relationship

15   to this case at all.  We are in an area where *TiVo* is our

16   closest model, and *TiVo* doesn't give any guidance to the

17   Court about how would you try infringement with a

18   respectable product that, in fact, is more than colorably

19   different, because there are issues of prior art and

20   issues of claim construction that are not implicated in a

21   *TiVo* situation where it's the same product.

22         If it's the same product, then the same ground

23   rules should apply, the same prior art, the same claim

24   construction.  That's fair if it's the same product.  If

25   it's a different product --

```
 1              THE COURT:  You try the issue assuming that it is

 2    not more than colorably different.  That's how you try the

 3    issue.  That's how you try it, because otherwise there's

 4    nothing to be tried.  If it's more than colorably

 5    different, there isn't anything to try.

 6              MR. THOMASCH:  That may leave us with nothing to

 7    try.  Our position is they are now coming up and

 8    articulating a new theory of infringement that wasn't used

 9    at the first trial, and we're, in effect, barred from

10    being able to meet that.

11              THE COURT:  Well, I think that isn't what's

12    happening, I don't believe, but anyway, we'll deal with

13    that down the road.  Now, it's your time to put on

14    evidence on colorability.

15              MR. THOMASCH:  Thank you, Your Honor.  Your

16    Honor, Lawson would recall Dale Christopherson to the

17    stand.

18              THE COURT:  Mr. Christopherson, I remind you that

19    you are under the same oath you took earlier today.

20              THE WITNESS:  Okay, thank you, Your Honor.

21

22

23

24

25
```

1          **DALE CHRISTOPHERSON,**

2     a witness, called at the instance of the defendant,

3     having been first duly sworn, testified as follows:

4                      DIRECT EXAMINATION

5     BY MR. THOMASCH:

6     Q    Mr. Christopherson, you may have mentioned it at the

7     start, but could you repeat for the Court what your job is

8     and the basic nature of your responsibilities in general?

9     A    For this particular effort, I was director of product

10    development, and I took it UPON myself to really be the

11    lead designer of RQC as far as the workarounds we were

12    looking at.

13    Q    Okay.  And as lead designer, what was your role in

14    developing what became ultimately to be sold as RQC?

15    A    My job was to work with the engineering team which was

16    primarily Mr. Dooner as far as making sure that his -- he

17    was able to understand the requirements and the design

18    that I was articulating to him, and then I would take that

19    design -- it would be -- we'd go through a process with

20    both the business side, which was Mr. Lohkamp, and then

21    legal and then myself, and we would -- we were

22    brainstorming on, you know, what could we and what

23    couldn't we do with the constraints of the products and

24    what they were supposed to in respect to the patents that

25    we were found guilty of.

1    Q     And you mentioned Mr. Dooner.  What is Mr. Dooner's

2    first name?

3    A     What is that?

4    Q     What is Mr. Dooner's first name?

5    A     Todd.

6    Q     And what specifically was his role as far as -- if

7    any, as far as developing the ideas that led to the

8    redesign?

9    A     Very, very little.  He was involved in some of the

10   meetings where we'd meet with legal during some of the

11   brainstorming sessions, particularly some of the ones

12   early on in February where we would -- what we would do is

13   we would listen to an idea, he would go and code a

14   prospective idea, or we might put it on paper what he was

15   going to do, and then we'd present it back to the legal

16   team and to the business side, Mr. Lohkamp, and say, this

17   is what we think we're saying we would go do, do we all

18   agree with that, and there was times where he'd be in that

19   room and we'd find that maybe we need to make a few more

20   tweaks to that.

21   Q     Who was most directly responsible for doing the

22   changes to the computer software code that would

23   effectuate whatever redesign was being determined?

24   A     Mr. Dooner was.

25   Q     This project that you've described with respect to the

Christopherson - Direct

1  redesign, what percentage of your job did it take during

2  the time you were working on that, if you can estimate?

3  A    I couldn't give you a solid estimate.

4  Q    About how busy were you on this task?

5  A    Very busy.  Much more than most normal projects.

6  Q    Where did it fit into the priority of your job during

7  the time you were engaged in this process?

8  A    It was my number one priority.

9  Q    Were you given any fixed date by which it was

10  essential that a redesign be developed?

11  A    No.

12  Q    Was there any fixed budget that limited your work on

13  trying to develop a redesign?

14  A    No, there was not.

15  Q    How did you start the process of trying to come up

16  with a redesign?

17  A    It started first by me having sat through the trial.

18  I knew things that were presented in trial that discussed.

19  That would give me some ideas.

20  Q    Let me interrupt you there, if I might.  You say you

21  sat through the trial.  Were you the designated corporate

22  representative for Lawson at that trial?

23  A    Yes, I was.

24  Q    Okay.  And if you could, continue describing how you

25  set about the process of beginning the design-around

1    project?

2    A    That gave me some ideas, and then we began -- really

3    what we needed to know is what were we found guilty of, as

4    much information to find out what do we really need to

5    work on, and that was -- in late January, early February

6    there was meetings that occurred.  Some of those I could

7    not attend because they were -- I was in Manila, so I was

8    13 hours difference from everyone else, so they were doing

9    them in the middle of my night, but I was kept abreast of

10   those later, and we came up with some ideas -- starting

11   right around the 8th, we started coming up with some ideas

12   to start working on.

13   Q    Were the outside lawyers that represented Lawson at

14   the first trial, the trial in 2011, were they involved in

15   the early stage redesign process in any way?

16        MS. ALBERT:  Objection; relevance.  Good faith is

17   not relevant to issues under *TiVo*.

18        THE COURT:  I'm not sure what -- he hasn't gone

19   anywhere just other than asking were they.  So I don't

20   think that objection is mature at this time, so go ahead.

21   Overruled.

22   A    Say the question again.

23   Q    Sure.  The outside counsel who represented Lawson at

24   the infringement trial, were they part of the team that

25   was working on the early stage redesign efforts?

 1    A    Absolutely.

 2    Q    And can you describe what role they played and what

 3    role you played?

 4             MS. ALBERT:  Objection; I mean now we're opening

 5    the door to privilege, so is it going to be opened --

 6             THE COURT:  If he opens the door to privilege,

 7    it's open, and you get it.

 8             MS. ALBERT:  And Lawson is not --

 9             THE COURT:  But all he asked at this juncture is

10    what role, not what advice was given or anything else.  If

11    he opens it, he opens it.  That's his decision to make.

12             MS. ALBERT:  And I maintain my relevancy

13    objection because good faith is not an issue under *TiVo*.

14             THE COURT:  Well, it isn't.  There's no question

15    it is or it isn't.  I think he's just trying to lay the

16    foundation for how it happened, and if he starts making a

17    big deal out of their good faith and all that, then we'll

18    deal with that.  He hasn't gotten there yet.  I think he

19    knows good faith is not a defense.

20             MR. THOMASCH:  It is not, Your Honor.  I do

21    believe that counsel for the plaintiffs have argued that

22    there has been bad faith and that bad faith, as I heard in

23    opening statement, can be used in the calculation of any

24    remedy in the event that plaintiffs were to prevail in the

25    action.

1          We may negate bad faith accusations that were

2   made by the plaintiff, but I am not asserting good faith.

3   We don't need to, and we're not.

4          THE COURT:  Well, they made the allegations.  I

5   don't know that they put on any proof about it.

6          MR. THOMASCH:  Understood, Your Honor.

7   Q   As a factual matter, in the team that was involved in

8   coming up with the ideas, could you just generally

9   describe, without getting into communications, just roles,

10  what roles did you have and what roles did the trial

11  counsel have in that process?

12  A   Sure.  My role was to look at it and determine is it

13  something that we could do with the software, with the

14  system.

15  Q   When you say could do, do you mean from a legal

16  perspective or from a software engineering perspective?

17  A   Software engineering perspective.

18  Q   Who was involved in the decision-making as to what you

19  were permitted to do?

20  A   As far as the permitted, that was coming from legal.

21  Q   Did you make suggestions along the way based on your

22  understanding of the evidence from the first trial?

23          MS. ALBERT:  Objection.  Your Honor has excluded

24  evidence related to rehashing the trial.  It's not

25  relevant.

1            MR. THOMASCH:  I'm not rehashing --

2            THE COURT:  He hasn't gotten there yet, Ms.

3   Albert.  Wait until he gets there.  He's just asking some

4   preliminary questions about what happened and how the

5   process went.  If he starts asking those questions, you

6   may have a legitimate objection, but he hasn't gotten

7   there yet.

8   Q    Mr. Christopherson, when you were looking at -- when

9   you were collaborating with the outside counsel in trying

10  to brainstorm about design ideas, were your views

11  influenced by the testimony that you had heard at the

12  trial that you attended?

13  A    Yes.

14  Q    Did the team that initially started on the

15  brainstorming expand over time?

16  A    Yes.

17  Q    Who was added to the team?

18  A    Bob Crawford was added.

19  Q    Is Mr. Crawford a patent attorney?

20  A    That's my understanding, yes.

21  Q    Was he, to your understanding, part of the trial team

22  that defended Lawson in the case in which you were a

23  corporate rep?

24            MS. ALBERT:  Relevance.

25            THE COURT:  I don't know what difference -- was

1    he in-house or outside?

2              THE WITNESS:  He was outside, Your Honor.

3              THE COURT:  What firm?

4              THE WITNESS:  I don't know the firm offhand.

5              THE COURT:  It wasn't Merchant & Gould?

6              THE WITNESS:  No, it was not.

7    Q    Did he have an important role, from your perspective,

8    in the group effort that led to the redesign changes?

9    A    Which redesign changes?

10   Q    The ones that were ultimately implemented with respect

11   to the functionality of Punchout.

12   A    Yes.

13   Q    Did you have final say within Lawson as to whether or

14   not a particular design idea would be implemented?

15   A    No.

16   Q    Who did?

17   A    Final say would have really -- it would have had to

18   have been something we could do, so engineering was part

19   of that decision, and it had to make sense for the

20   business, so that was Mr. Lohkamp, but regardless, there

21   was veto power, if you would, at the legal level.  So if

22   Keith and I liked something, legal still had to agree to

23   it.

24             THE COURT:  When you say legal, do you mean your

25   general counsel, or do you mean the outside law firm?

1            THE WITNESS:  It started off, Your Honor, with

2    the outside law firm, but what we would find at times was

3    it was difference of opinions with different attorneys on

4    some of that items that we were looking at, how far we

5    should go, shouldn't go.  So we ended up eventually

6    working on it with Mr. McPheeters which is inside counsel.

7    He would listen to the advice of all the different ones,

8    and then he'd come back and say, this is the direction we

9    want from legal.

10           THE COURT:  All right.

11   Q   And what is Mr. McPheeters' position within the legal

12   department?  What was it at that time?

13   A   He was the vice president, senior vice president of

14   counsel.

15   Q   And was he the highest-ranking lawyer in the company?

16   A   Yes, he was.

17   Q   What analysis was done, to the best of your knowledge,

18   to determine what design changes would be necessary to

19   make the redesign effective and avoiding infringement?

20   A   What I know is --

21           MS. ALBERT:  Objection; relevance.  I think this

22   goes to infringement rather than colorability.

23           MR. THOMASCH:  It goes to the redesign.  The

24   redesign was intended to render the product

25   non-infringing.

Christopherson - Direct

1              THE COURT:  Overruled.

2    A    Can you say the question again.

3    Q    Actually lost my train of thought.  In the

4    brainstorming sessions, what was the -- how did the group

5    go about trying to determine what sorts of changes needed

6    to be made to address the infringement findings that had

7    been made?

8    A    Counsel would usually provide some recommendations of

9    ideas that they had, and then we would look at that from a

10   business and also an engineering standpoint and determine

11   is it something that we could do.

12   Q    What was your goal when you began the redesign

13   process?

14   A    My goal was, first and foremost, was to find

15   design-arounds for each of the claims that we were found

16   guilty of, and second, to have as little impact as

17   possible upon the customers.

18   Q    Were there more than one areas of product

19   functionality that needed to be redesigned, in your

20   opinion, in order to address the various findings of

21   infringement made at the first trial?

22   A    Yes.

23   Q    Generally, how many overall areas needed to be

24   addressed?

25   A    Three respective areas.

Christopherson - Direct

1   Q    Was one of those three the functionality of Punchout?

2   A    And how eventually -- we thought initially it was a

3   functionality of Punchout, but that turned into how we

4   would call the functionality of Punchout.  So it

5   transformed itself.

6   Q    Understood.  So that's the RQC Punchout relationship?

7   A    Correct.

8   Q    And what were -- just at a very high level, what were

9   the other two areas of -- that were under discussion by

10  the group that needed to be addressed at that time?

11           MS. ALBERT:  Relevance.

12           THE COURT:  Overruled.

13  A    UNSPSC, and also the shopping cart which was related

14  to -- if I recall, it was the order list in the patents.

15  Q    And first with respect to the shopping cart and the

16  order list -- I want to just get those out of the way --

17  were you able to, in your mind, achieve the two goals that

18  you had set out on to both design around the patent and

19  not impact the customer experience?

20  A    Yes.

21  Q    Did you have the same success with Punchout --

22  A    No.

23  Q    -- and the interaction of RSS and Punchout?

24  A    No, we did not.

25  Q    And to what extent were you able -- to what extent did

1    you fail to succeed your initial goal at the beginning of

2    the design-around process as respects the ability of a

3    user to shop with Punchout?

4              MS. ALBERT:  Objection.  The witness testified

5    earlier that he hadn't talked to any customers about their

6    end-user experience.

7              MR. THOMASCH:  I'm talking about the --

8              THE COURT:  I don't think he asked about that.

9              MR. THOMASCH:  I'm asking about the witness's own

10   objectives and whether he succeeded or failed.

11             THE COURT:  Overruled.

12   Q    To the extent you had those twin goals with respect to

13   how Punchout is used and how shopping can be done with

14   Punchout, were you able to succeed on both fronts?

15   A    No.

16   Q    And in which front did you fail, in your view, at the

17   time?

18   A    Limiting or keeping to a minimum the extent to which

19   we were impacting the customer.

20   Q    And was the impact on the customer greater or less

21   than you were hoping for?

22   A    I guess it depends on how you define impact.  It was

23   certainly more impact on the customer than we hoped when

24   we originally started the project, yes.

25   Q    Now, the testimony has been that the change in the

1    manner in which Punchout operates for customers who desire

2    to use either item master and Punchout or Punchout and

3    Punchout, that the current product differs from the prior

4    product, and that's correct generally; right?

5    A    Correct.

6    Q    And there's been testimony that that was -- that those

7    changes were made to the RSS component and not the

8    Punchout component; is that correct?

9    A    To the RQC component.

10   Q    RQC is the successor to RSS?

11   A    Correct.

12   Q    Why were the changes made in RSS as opposed to being

13   made directly in the Punchout module?

14   A    Punchout module itself simply establishes

15   communication from the customer's website running RSS or

16   RQC to that vendor's website, establishes a communication

17   and allows for messages to be sent back and forth.  It

18   doesn't really have any business logic in it.

19   Q    So does -- would a change made to the Punchout module

20   affect the preexisting ability to have a single

21   requisition with items from both item master and Punchout

22   on it?

23   A    No, because it doesn't handle requisitions.  It's not

24   doing the requisition, and it has no knowledge of item

25   master.

 1              THE COURT:  Are you saying you had to change?

 2     You came to the conclusion that you had to change RSS in

 3     order to effectuate changes in the Punchout functionality?

 4              THE WITNESS:  Correct, Your Honor.

 5     Q    How does the change that was made to RSS in the

 6     development of RQC affect Punchout functionality?

 7     A    The first change, what it does is it limits such that

 8     if you have gone to -- two different ways.  If you start a

 9     requisition, a shopping experience, and you are looking at

10     things in item master, and you put that into your

11     requisition, one or more items, you are then prohibited

12     from adding to that requisition items from a -- into your

13     shopping cart or into your requisition from a Punchout

14     vendor or Punchout website.  We don't even allow you to

15     even go there.  You can select --

16     Q    When you say you can't go there, if you have -- with

17     RQC, if you have selected an item master item for your

18     requisition, and you only want one item but you are not

19     sure whether you want that one and you want to compare it

20     to a Punchout vendor's alternative, can you go the

21     Punchout vendor's alternative and see it and then make the

22     choice as to which to do?

23     A    No.

24     Q    Why not?

25     A    Because we don't allow you to go to Punchout as long

Christopherson - Direct

```
1    as you've selected that one item in item master and you

2    put it into that requisition.

3              THE COURT:  Refresh my recollection, if you

4    would, Mr. Christopherson.

5              THE WITNESS:  Sure, Your Honor.

6              THE COURT:  Item master is what you have in store

7    or in your inventory at Lawson; right?

8              THE WITNESS:  At the customer site.  It can be

9    items that are -- I'll expand a little bit.  There's a

10   couple categories.  There's items that you keep that are

11   what we call stock items which is what you are referring

12   to.  You may have other items that you have that are

13   nonstock items.  You frequently buy them, but you don't

14   want to keep them in stock, maybe the expense of them or

15   they have some sort of age on them.

16             Then there's another category -- actually those

17   are the two items that are primarily in item master.  You

18   can order special items, but that's not in item master.

19             THE COURT:  Item master shows the customer what

20   the customer has in store, or does it also show what you

21   can get directly from Lawson?

22             THE WITNESS:  Yeah, what else -- and it's not

23   from Lawson, but, again, it's from the customer and their

24   vendor.

25             THE COURT:  I'm sorry, from people who are
```

1   already listed in item master.  You are drawing a

2   distinction between item master and vendor selection, and

3   I'm trying to make sure I understand.  It's been awhile

4   since we went over it.  I want to make sure, if you don't

5   mind.  I'll just let you describe it.

6           THE WITNESS:  Let me try again.  So a customer --

7   you're going to have in item master essentially two types

8   of items.  Ones that they're using pretty frequently, they

9   want to keep those in stock.  An example, ballpoint pens,

10  legal pads, things like that.

11          The other items, nonstock items, those are items

12  that, again, you've got them in your item master, you

13  don't keep them in your store, your warehouse, your file

14  cabinet.  You don't keep them in stock, you have no

15  inventory of those.  You probably have special preferred

16  pricing with that vendor.  Does that help, Your Honor?

17          THE COURT:  Right.

18  Q   Just to take out, just as a background matter of how

19  item master operates, when you are checking for a stock

20  item and you look and it's in stock, can you requisition

21  that item?

22  A   Sure.

23  Q   And does that then lead to a purchase order?

24  A   It may or may not.

25  Q   If it's a stock item?

1   A    Correct.

2   Q    Under what circumstances would it or would it not?

3   A    Usually with stock items, and we'll take the ballpoint

4   pen example, maybe you've established a minimum stock

5   level of 50, and you've got 70 in stock and you simply are

6   requesting five.  There's no need to request a purchase

7   order because we're still above minimum stock.  So the

8   five would be delivered to you since that's what you

9   requested and assuming that gets approved.

10  Q    Now, a Lawson customer who has RQC and wants to -- in

11  their item master, may they have items from third-party

12  vendors?  Not Lawson and not their own stock but items in

13  the item master by way of listing, catalog type items

14  where there's information about individual desks, pens,

15  staplers, are those identified in the item master?

16  A    There are items in the item master that someone has

17  loaded in that are going to be coming from other vendors.

18  Q    And why would anyone have those items in an item

19  master?  What would be the purpose for that as you

20  understand the system?

21  A    Those are items that you need for your business and

22  that you are going to have preferred or negotiated

23  contracted pricing established.

24  Q    So you described one of the two changes in RQC that

25  exists now compared to RSS with respect to the ability to

1    put on a single requisition items from third-party vendors

2    that were in item master and items from Punchout vendors;

3    is that correct?

4    A    Correct.

5    Q    Was there another change?

6    A    There was another change -- first of all, the reverse

7    is also true on the one we just were talking about.

8    Q    So if you start your shopping with a desk from

9    Staples, and then you want to see whether or not you have

10   a preferred price on a desk somewhere else in item master,

11   are you able to go from the requisition with the Punchout

12   item on it back into item master to see if you have a

13   better deal in-house?

14   A    No.

15   Q    And why is that?

16   A    It's the same basic logic.  We put a prevention in

17   there where it will tell you that you're going to have to

18   open up a new requisition.

19   Q    Did you have that capacity with RSS?

20   A    No.

21   Q    With RSS, were you able to both start a shopping

22   session with Punchout, and then while you had a Punchout

23   item on your requisition, check against it in item master?

24   Could you do that with RSS?

25   A    Absolutely we could, yes.

1    Q    Is that one of the aspects of the blockage that

2    occurred, is that you no longer can do that with RQC?

3    A    Correct.

4         THE COURT:  The mechanism of the change that kept

5    that from happening is the blocking by way of the pop-up;

6    is that right?

7         THE WITNESS:  Yes.

8    Q    And so --

9         MR. THOMASCH:  I'm sorry to interrupt.

10        THE COURT:  Go ahead.

11   Q    The pop-up gives notice of the block, or does the

12   pop-up, in effect, is that the block?

13   A    That could get into maybe legal words, and I don't

14   want to go there, but it is notifying, in my mind, that

15   I'm simply notifying you can't go there, but we've already

16   prevented you.

17        THE COURT:  Something in the software keeps you

18   from going there, and the pop-up says hey, this computer

19   that you want to use to do what you want to do is telling

20   you to stifle, you can't do it.

21        THE WITNESS:  Right, and simply just closing it

22   or ignoring it doesn't make it go away.  The block is

23   still there.

24        THE COURT:  It's still there.

25        THE WITNESS:  Yes.

1    Q    Just before we go back through the chronology, what is

2    the second change that was referred to as the June 9

3    patch?  Could you explain that?

4    A    There we put in a further block, and that was if you

5    had started a shopping experience with a Punchout website,

6    and you brought back an item into your requisition, you

7    could then not go and select another website and go and

8    punch out to that, and you get a similar pop-up message,

9    and it was blocked.

10              THE COURT:  Again, the change that was made was

11   the block or the pop-up?

12              THE WITNESS:  Correct.

13              THE COURT:  The block was built in.  The pop-up

14   told you it's blocking you.

15              THE WITNESS:  Yes.

16   Q    The design-around chronology, for want of a better

17   term, you mentioned a brainstorming project starting.

18   About when did that start?

19   A    For the first change, that was somewhere right in the

20   middle of April.

21   Q    I want to go back now to the more broad -- after the

22   jury verdict in the case, you talked about a project being

23   initiated.  When did that project get initiated?

24   A    We had that going on February 8th, 2011.

25   Q    May I ask you to turn in your book to Defendant's

1    Exhibit 698.

2    A    Sure.

3         MR. THOMASCH:  Your Honor, I would offer

4    Defendant's Exhibit 698 into evidence --

5         THE COURT:  Are these in the agreed?

6         MS. ALBERT:  No objection, Your Honor.

7         THE COURT:  All right.  Are you going to use all

8    these ones, these that are in the notebook?

9         MR. THOMASCH:  Yes, Your Honor.

10        THE COURT:  Is 1018, 1178, 1002, are they all

11   agreed to, Ms. Albert, so we don't have to worry about it?

12        MS. ALBERT:  We have no objections to those

13   exhibits.

14        THE COURT:  All right.  They're all in, 619 --

15   excuse me, 698, 1018, 1178, 1002, and that's it, is it --

16        MR. THOMASCH:  That is, Your Honor, and I'd note

17   for the record that the first one, 698, is a defense

18   exhibit, and then it's Plaintiff's Exhibits 1018, 1178,

19   and 1002.

20        THE COURT:  All right, thank you.  I see that.

21   I'm waiting for new glasses, so I didn't focus quickly on

22   the D and the P.

23        MR. THOMASCH:  I understand.

24

25        (ePlus Exhibits 1002, 1018, and 1178 admitted.)

1              (Lawson Exhibit 698 admitted.)

2

3    Q    Turning to Defendant's 698, at the top is an email.

4    What is the date for the record on that email?

5    A    January 28th, 2011.

6    Q    And who is it from?

7    A    From Bruce McPheeters.

8    Q    And, again, Mr. McPheeters' position?

9    A    He was in charge of -- our internal counsel.

10   Q    Your head lawyer?

11   A    Yes.

12              THE DEFENDANT:  Did you think I had already lost

13   that fact?

14              MR. THOMASCH:  I did not, Your Honor.  I was

15   bringing it together on the record.

16   Q    Am I correct that this sets a meeting for

17   February 1st, 2011, to begin at 1:00 p.m.?

18   A    Yes, it does.

19   Q    Were you in attendance at that meeting?

20   A    No, I was not.

21   Q    Why did you not attend that meeting?

22   A    Because I was in Manila at that point, and it would

23   have been 2:00 a.m. in the morning for me.

24   Q    Were you vacationing in Manila?

25   A    I was not.

1   Q    Why would you be in Manila?

2   A    Because I also have -- not only are some of my team

3   located in St. Paul, but also a majority of my team is

4   really located in Manila, so I do go there several times a

5   year usually to check up to see how their particular

6   projects are going and lay direction, and usually the

7   beginning of the year, that's where I'm laying the

8   direction for how we're going to be working this

9   particular calendar year.

10  Q    What is the bottom half of the first page of the

11  exhibit to the extent you recognize it?

12          MS. ALBERT:  Objection; lacks foundation.  He

13  said he wasn't in attendance at the meeting.

14          THE COURT:  He got a copy of it, didn't he?

15          MR. THOMASCH:  I'm just asking about the document

16  itself.

17  Q    Are you familiar with this document?

18  A    I've seen it, yes.

19  Q    Do you understand that there was an agenda for the

20  meeting that you were not personally at?

21  A    Correct.

22  Q    The first item on the agenda is understanding the

23  Court's verdict, and next to it says, Dan.  Who is being

24  referred to, to the best of your knowledge, there?

25  A    It would have been Dan Macmillan.  Not Dan Macmillan.

1    My mistake.  A different Dan.  Dan McDonald.

2    Q    And Mr. McDonald is?

3    A    He was the lead trial counsel that we had.

4    Q    And the next step says, discuss schedule and the next

5    steps in the ePlus case (evidentiary hearing, briefing,

6    argument, etc.)  Again Dan.  That would be the same Dan?

7    A    Yes, it was.

8    Q    The names next to the third column, which are update

9    on re-examinations/impact based on verdict, are Dan and

10   Will.  Who is Will?

11   A    Will Schultz.

12   Q    And was -- who is he?

13   A    He was also on the attorneys that we had from Merchant

14   & Gould for the trial.

15   Q    The fourth one says, demo of RQ, RSS, and Punchout in

16   Lawson's current GA products, (show

17   similarities/differences of RQ and RSS product) Jeff.  So

18   I want to go through and decipher what that is.  First,

19   who is Jeff, to work backwards?

20   A    Jeff, and I'm going to spell it for the report.

21   H-v-a-s-s, Hvass.

22   Q    How did you pronounce it?

23   A    Hvass.  I could be wrong with that, too, myself.

24   Q    It speaks of in Lawson's current GA properties.  What

25   are current GA properties?

Christopherson - Direct

1   A    That would be the current releases that were available

2   to our customers for the products that were mentioned.

3   Q    What does GA actually stand for?

4   A    General availability.

5   Q    So those products are on the market?

6   A    Correct.

7   Q    There's a reference to RQ before RSS and Punchout.

8   What is RQ?

9   A    That is the requisition module.

10  Q    And what is the relationship between RQ and RSS?

11  A    RQ was the older particular module that we had.   In

12  trial it was referred to as, I believe, the core system,

13  or part of the core system.   RSS sits on top of the core

14  system, so it basically has a lot of the functionality

15  that RQ has.

16  Q    To the best of your understanding, was RQ one of the

17  components that were in the configurations found

18  infringing?

19  A    Yes.

20  Q    Now, the next topic is facts needed to address the

21  following four-part test for permanent injunction, and the

22  reference is to Dan McDonald, and you indicated who that

23  is; correct?

24  A    Correct.

25  Q    And then, understanding the connectivity between

1    RQ/IC/PO and RSS (what does RSS add from a source code

2    perspective) - Todd.  Who is Todd?

3    A    That's Todd Dooner.

4    Q    And he's sort of the source code engineer?

5    A    Yes, he is.

6    Q    And RQ/IC/PO, what are IC and PO?

7    A    IC is inventory control.  PO is purchase order.  There

8    are two additional modules just like RQ in the core

9    system.

10   Q    That underlie RSS?

11   A    Yes.

12   Q    Then if you move to the page that begins RQ -- that is

13   numbered RQC-1000848, do see item seven?

14   A    Yes, I do.

15   Q    Would you read that into the record?

16   A    Discuss possible product modifications for RSS and

17   Punchout.  Keith, Darci, Todd, and Dwight.

18   Q    Working right to left, who is Dwight?

19   A    Dwight is Dwight deLancey.

20   Q    And what is his role?

21   A    His role is, he is the software engineer for the

22   developer just like Todd is, except he specializes in

23   Punchout of the Punchout module.

24   Q    And Todd?

25   A    Todd is Todd Dooner.  Darci -- go ahead.

1    Q    Yes, Darci?

2    A    Darci Snyder, and she's in charge of product

3    management, and then Keith, I'm not sure which Keith that

4    is, if that's Keith Knuth or if that is Keith Lohkamp,

5    because there's two Keiths, and it could have been either.

6    Q    Running down eight through 12, you are not identified

7    by name on any of these; do you see that?

8    A    That's correct, yes, I do.

9    Q    And on 12, it says, confirm next steps, owners and

10   timetable, Dan and Bruce.  First, what did you

11   understand -- what do you understand owners to mean?

12   A    Someone who is going to be in charge of certain action

13   items.

14   Q    And Dan and Bruce who are in charge of that, who are

15   they?

16   A    Dan is Dan McDonald, and Bruce is Bruce McPheeters.

17   Q    Did either Dan McDonald or Bruce McPheeters ever put

18   you in a position where you had responsibility on this

19   redesign project?

20   A    Either of them directly coming to me, I don't believe

21   they did.

22   Q    How did you get into the process and when?

23   A    I think I was always just assumed to be in that

24   process.  I don't think anyone ever came and waved a magic

25   wand and said I was part of the project team.  It made

1    sense, because this is in my product area.

2    Q    Were there other potential design-arounds that would

3    have impacted on Punchout that were considered by the

4    redesign group in advance of the consideration of the --

5    of what became the actual implemented changes?

6    A    Yes.

7    Q    And could you just briefly describe whether there was

8    one idea or more than one idea in that regard?

9    A    There were two ideas that were somewhat related, and

10   that was leveraging both Perfect Commerce and SciQuest.

11           THE COURT:  Say that again.  I lost it.

12           THE WITNESS:  There were two basic ideas.  They

13   both related in that we were going to leverage the

14   relationship that we had with Perfect Commerce and

15   SciQuest.

16   Q    And by that -- withdrawn.  Did you understand that

17   Perfect Commerce and SciQuest had licenses from ePlus?

18   A    Yes.

19   Q    Would you look at what's been admitted into evidence

20   as Plaintiff's Exhibit 1018.

21   A    Okay.

22   Q    And this is a document from you to Mr. Lohkamp; is

23   that correct?

24   A    At the top, yes, and actually it looks like we're

25   going back and forth, so, yes.

1   Q    It's an email chain?

2   A    Yes, uh-huh.

3   Q    What is the range of dates on the emails for the

4   record, please?

5   A    They all are -- well, first one is on March 11th,

6   March 11th, and then March 18th.

7   Q    Directing your attention to the top email from you to

8   Mr. Lohkamp, March 18, 2011 --

9   A    Uh-huh.

10  Q    -- it says, thanks for the reminder, it's been a busy

11  week with legal, to catch you up on how the options are

12  stacking up.  What is meant by "to catch you up on how the

13  options are stacking up"?

14  A    Basically I'm going to give him a rundown as far as

15  where we stood with the different options we're looking at

16  with legal, and also any update -- basically update as far

17  as if there was any development.  It's just getting him up

18  to date.  It was not uncommon.  Usually we would do a lot

19  of phone calls between each other.

20  Q    The first one says, changes to RSS are being viewed

21  very well.  That will remove the '172 patent; do you see

22  that?

23  A    Yes, I do.

24  Q    When did you mean when you wrote that?

25  A    What I meant by that is, you know, particularly the

1    very first sentence, obviously I'm having lots of meetings

2    with legal, and the changes there that we were making for

3    the '172 patent, we were getting a very good positive view

4    that those were something that we should pursue from

5    legal.

6    Q    And at a very high level abstraction, as general as

7    you can be, what was the nature of those changes that are

8    being referred to in the first line of Exhibit 1018?

9    A    Sure.  We ended up calling it direct to req or direct

10   to requisition.  What that did is when an item was put

11   into the right-hand side of the screen in RSS or RQC, it

12   was immediately placed into the requisition such that one

13   could actually go see it in RQ-10.  That was not the case

14   the way RSS had worked.  It was always in an intermediate

15   state.

16   Q    Now, it says that those were --

17            MS. ALBERT:  Move to strike as not relevant.

18            THE COURT:  Overruled.

19   Q    It indicates that changes to RSS are being viewed very

20   well, and you just described at a high level what those

21   changes were.  The change that ultimately was made, or

22   changes to the Punchout functionality, were also made to

23   RSS; correct?

24   A    Correct.  They made themselves into RQC, but, yes.

25   Yep.

Christopherson - Direct

1   Q    And by saying changes to RSS, did you in any way --

2   were you incorporating any thought process in that

3   sentence with respect to work on the Punchout-related

4   issues?

5   A    No.

6   Q    The next one indicates, changes to UNSPSC will remove

7   claim three from the '683 patent.  Just again very

8   generally, what is that relating to?

9            MS. ALBERT:  Objection; relevance.

10           THE COURT:  We haven't gotten where we need to

11   get, Mr. Thomasch.  Are you going to get there quickly?

12           MR. THOMASCH:  The next sentence.

13           THE COURT:  Okay, let's go.

14   A    So in this case, we were removing the ability to go

15   down to the fourth level of searching with UNSPSC.

16   Q    Did you do that by making changes in RSS as it became

17   RQC?

18   A    Yes.

19   Q    And is that -- are those changes in RQC the changes

20   that we've been talking about with respect to the

21   limitations on requisitioning, item master, and Punchout

22   items or Punchout and Punchout items?

23   A    No, they are not.

24   Q    The next sentence says, that just leaves Punchout the

25   need to cripple it for ePlus licensed parties only, lots

Christopherson - Direct

1    of discussion there.  Legal does not think this will work

2    since they are pretty sure that the licenses do not cover

3    this scenario.  Do you see that?

4    A    Yes.

5    Q    Can you explain to me what was the option on the table

6    that you were writing to Mr. Lohkamp that legal doesn't

7    think will work?

8    A    Sure.  We had a project that we were looking at or a

9    thought of what we called crippling Punchout.  Instead of

10   going to all of the different vendors that we were working

11   with with Punchout, we would limit it such that it would

12   only be permitted to go to SciQuest and/or Perfect

13   Commerce since they were licensees from ePlus.

14   Q    Was that idea ultimately implemented?

15   A    No, it was not.

16   Q    Who made the decision to not implement it?

17   A    Legal.

18   Q    Did you understand as of March 18 that another

19   analysis was being made of how to handle the jury verdict

20   on Punchout?

21   A    Yes.

22   Q    And does the document reflect that in the sentence

23   that begins, but legal is also going to present new

24   decisions that came down from the circuit during our court

25   case that the remaining claims, since they are method

1   claims, need to be done by one party, not multiple.  If

2   successful, then Punchout is no longer an issue in the

3   remaining claims.  Was that your understanding at the

4   time?

5   A    Yes, it is.

6   Q    And by saying if successful, then Punchout is no

7   longer an issue in the remaining claims, if Punchout had

8   not been an issue anymore, would you have gone forward

9   with what eventually became the redesign of RQC as it

10   pertains to limitations on Punchout functionality?

11   A    To the best of my understanding at that time, yes.

12   Q    You would have gone forward and tried to limit

13   Punchout no matter what?

14   A    No, we would not have gone and limited Punchout.  If

15   it did not matter, then going back to the goals of my

16   project, why would I go and remove functionality from

17   customers if I didn't need to remove it?

18   Q    Was there any business benefit or interest that you

19   understood in making what ultimately became the changes to

20   Punchout functionality other than the need to comply with

21   legal issues?

22   A    It was only done for legal issues.

23   Q    Did you find that the changes as made, apart from

24   legal issues, provided any benefit to Lawson or Lawson's

25   customers?

Christopherson - Direct

1  A   I'm not aware of any.

2  Q   Do you remember when you -- when this group first came

3  up with the idea for the first Punchout change that

4  eventually was implemented?

5  A   Yes.

6  Q   When was that?

7  A   It was Bob Crawford and I.  We were meeting in, like I

8  said, about the middle of April, and then we began to

9  communicate -- as he and I bantered around for several

10  days to make sure we had a solid solution, what we thought

11  would be a solid solution, and him from a legal aspect,

12  then we took it out to the rest of the team right around

13  the 20th, 21st of April.

14  Q   Had anyone even discussed that solution -- withdrawn.

15  Had you considered that solution as a viable option

16  earlier than April?

17  A   No.

18  Q   After you came up with that first idea with Bob

19  Crawford to implement the first of the changes that were

20  actually made to the functionality of Punchout, what

21  general steps did the development team take to explore

22  that possibility?

23  A   Once -- in my mind, as soon as we got to a point where

24  we still didn't have Bob saying yes, but it was starting

25  to go get pretty solid, I began to talk to Todd to get his

1   buy-in on the project and told him that he could start

2   developing that at that point but in his own separate what

3   we call sandboxes, his own separate place and code so that

4   that code doesn't escape anywhere else until we get a

5   green light.  It's not in the production code or what

6   would be the production code.  We'd merge that in later

7   once we got that green light.

8        Then once we got the green light after meeting with

9   Mr. Lohkamp, some discussions with him on the business

10  aspect, confirming that back with legal, then instructed

11  Mr. Dooner to go ahead and make those changes and merge

12  back into the main line of the code.

13  Q    And can you just one more time explain, since I'm not

14  sure I directly followed it, sort of what Mr. Dooner was

15  doing sometime after April 18 with respect to the

16  attempting to effectuate that idea.

17  A    He was beginning the software changes.  It wouldn't

18  have been on the 18th but would have been a few days later

19  probably.  It could have been the 19th, 20th, somewhere in

20  there.

21  Q    Are there testing steps necessary to move from a

22  conceptual idea to an implemented generally available

23  product?

24  A    Yes, several.

25  Q    Can you describe generally what those are?

1   A    With RQC and the changes we were doing for Punchout, I

2   personally took a very active role in testing prior to our

3   normal quality assurance team.  I wanted to make sure

4   that, you know, when there was a block, there was a block,

5   I couldn't work my way around that.

6        So I would be testing.  As Mr. Dooner would be

7   finishing some things up and saying, go ahead and look at

8   this, go ahead and try to break it, I would come over to

9   his system, and I would try that.  Once he and I were

10  comfortable with that, then we turned it over to our

11  quality assurance individual, Stephanie Lim.

12       And we had briefed her on what the requirements were.

13  She independently went in and verified it, and then Todd

14  would have gone through and fixed any issues that she

15  would have found, and then she would have gotten to the

16  point where she viewed she had no issues.

17       Then we package it, and then going to an installation

18  test, and then after the installation test reaffirmed it

19  functionally is working the way it's supposed to just in

20  case something wasn't really there in the package that was

21  supposed to be there.

22  Q    And you mentioned her last name.  Would you spell it

23  for the record.

24  A    Lim, L-i-m.

25  Q    And her position generally?

1    A    Quality analyst.

2    Q    Did she come up with any way that someone with RQC

3    could circumvent the pop-up message and, nevertheless,

4    gain access to a Punchout vendor site after putting an

5    item master item on their requisition, or vice versa, put

6    an item master item on their requisition after having put

7    one on from a Punchout vendor's website?

8    A    She certainly tried, but she did not get past that.

9    Q    So you indicated that the coding work began sometime

10   after April 18 on this change; is that correct?

11   A    Yes.

12   Q    And about when was the software coding done?

13   A    Software coding itself would have been done, oh,

14   memory serves me correctly, right about the end of April.

15   Q    And at that point, is it clear that you've

16   accomplished a mission, or are there further steps that

17   are necessary before you have a generally available

18   product?

19   A    It still needed to go through the packaging and

20   installation testing and then functional testing of that

21   and finish up documentation.

22   Q    What is installation testing?

23   A    Make sure that the customers are able to take the

24   product as we package it up and follow the installation

25   directions and actually install the product, making sure

1    that it then works.

2    Q    Who at Lawson was involved in making sure that

3    customers who wanted to install the product would know how

4    to install the product?

5    A    It was a separate team that they specialize in all

6    installation testing.

7    Q    Who headed the installation team?

8    A    Elaine Maaco.

9    Q    What involvement, if any, did Mr. Hanson have?

10   A    Mr. Hanson, at that particular point, he had none in

11   early May.

12   Q    No involvement whatsoever in the Punchout project?

13   A    Not at that particular time, no.

14   Q    After this idea was the subject of brainstorming

15   between you and Mr. Crawford, and through that period

16   where Mr. Dooner was working on the coding and then

17   testing was going on, did you form an opinion as to

18   whether this change, if made, would be a significant

19   change, in your view?

20           MS. ALBERT:  Objection; improper lay opinion.  He

21   hasn't offered any kind of expert report or expert

22   disclosure.  He's not entitled to offer an opinion.

23           THE COURT:  There's a difference between expert

24   and lay opinion.  Which one are you --

25           MR. THOMASCH:  A lay opinion based --

1          THE COURT:  Lay opinions don't have to -- you

2    don't have to offer expert reports on.

3          MS. ALBERT:  He's not entitled to offer an expert

4    opinion that's being elicited by this question on the

5    issue of colorability.

6          MR. THOMASCH:  Your Honor, under certain

7    circumstances, I would, of course, have the right to

8    elicit a lay opinion formed on the stand at the time, but

9    that's not what this is.  This is simply historically in

10   context, as a matter of fact, did he have a view on the

11   subject matter at that time.

12         THE COURT:  Overruled.

13   A    Yes, I did.

14   Q    And what was your opinion at the time about the

15   significance of this change?

16   A    My view at that time is it was a significant change.

17   Q    And why so?

18   A    Because we were removing functionality that had been

19   in RSS that customers may be using, and they weren't going

20   to have that ability anymore.

21   Q    Let me --

22         THE COURT:  Significant for the reasons you told

23   me earlier today.

24         THE WITNESS:  Correct, yes.

25   Q    And let me ask you to turn to Plaintiff's

1    Exhibit 1178.

2    A    Okay.

3    Q    And do you see at it's an email chain again, and with

4    respect to the top, it's Dale Christopherson to Patti

5    Langer, dated 4/26/2011, April 26th, 2011; correct?

6    A    That's correct.

7    Q    And what was going on around this time?

8    A    What we were going through at this particular time is

9    Mr. Dooner has finished, he believes, his unit testing,

10   and he's beginning to have functional testing with Ms.

11   Lim.

12       So what happens when we move to the functional testing

13   is that we remove it, take the code off of Mr. Dooner's

14   system, we put it on Ms. Lim's system, because her system

15   is supposed to be clean, so to speak.

16   Q    Okay.  Now, what of the three changes does this

17   document concern, and by three changes I meant at that

18   high-level abstraction, direct to requisition, the UNSPSC

19   codes, and the Punchout functionality, which one of those

20   three is this directed to?

21   A    Punchout.

22   Q    All right.  And what are the pages ending in 355 and

23   356, what do they just show?

24   A    355, 356, it's some discussion going back and forth

25   between Mr. Dooner and myself and Ms. Lim about things

1    she's seeing.  She is probably getting clear in her mind,

2    this is what I'm seeing, is this what I'm supposed to be

3    seeing.

4    Q    Okay.  And what is the pop-up on 355?

5    A    355, this is essentially the pop-up that we've talked

6    about where it's saying, now you've got an item in your

7    requisition, and you can see that on the right-hand side

8    of that screen, that there is an item there under

9    requisition lines, and she has then elected to try to then

10   punch out somewhere, and she's gotten the pop-up she can't

11   get there.

12   Q    So in 355, the special item identified in the

13   right-hand side above the pop-up window, that's reflecting

14   an item from item master or elsewhere?

15   A    Item master.

16   Q    And so is this an indication of what you would see if

17   you went first to item master and then tried to go to

18   Punchout?

19   A    Correct.

20   Q    And then what's the relationship of the pop-up on 356

21   to 355?

22   A    In this particular case, she's gone the reverse

23   direction.  So the item, she has gone to -- it appears as

24   though she's gone to Dell.  She's retrieved an item from

25   there, it's come back into the requisition as shown on the

1    right-hand side, and then she's elected to try to go into

2    item master, and she was prevented from doing that.

3    Q    Okay.  Now, if you'd flip to the last page of the

4    document, Bates number 357, is this an email that you

5    wrote on Monday, April 25, 2011?

6    A    Yes.

7    Q    And the first line says, decision was made at noon

8    locally to add this feature; do you see that?

9    A    Yes.

10   Q    What feature was the decision made at noon Monday,

11   April 25, to add?

12   A    The first change for Punchout.

13   Q    The one we've just discussed?

14   A    Absolutely.

15   Q    And it says below, skipping down it says, the change

16   is business rule, and then paragraph four, items from

17   Punchout will be on a separate requisition from items

18   added through find/shop, express, categories, or special

19   -- or service/special; do you see that?

20   A    Yes, I do.

21   Q    Is that relating to -- those last categories relating

22   to items that may have been acquired through searches on

23   item master?

24   A    Yes.

25   Q    So that is the change we've been discussing; correct?

1    A    Absolutely.

2              THE COURT:  Change one.

3              THE WITNESS:  Yes.  First change of Punchout.

4    Q    Now, the email you sent went to Stephanie Lim, Todd

5    Dooner, and Matthew Braun.  I believe you've identified

6    Stephanie Lim and Todd Dooner.  Who is Matthew Braun?

7    A    Matthew Braun worked at this time -- actually still

8    works in product management, and his role with this

9    particular project was he was the launch manager.

10   Q    Okay.  And would you read into the record the second

11   line of your memo of April 25, 2011?

12   A    Matt, this is a significant change if you want to add

13   this to the launch info for this week.

14   Q    What did you mean by it's a significant change?

15   A    Significant change in that we're removing

16   functionality, and the launch team -- I don't know -- we

17   haven't talked about it today while I've been in court.

18   That team involves sales, services, support, and obviously

19   teams are already involved, product management and product

20   development.

21              We need to let those other teams know that, one, don't

22   go out and try to sell functionality that isn't going to

23   be there anymore; two, don't try to support functionality

24   that isn't going to be there anymore, and services, don't

25   try to implement functionality that isn't going to be

1   there anymore.

2   Q    Would you have written -- would you have simply

3   described as a significant change something along the

4   lines of the cosmetic changes to the user interface that

5   you previously referenced in your testimony?

6              MS. ALBERT:  Leading.

7              THE COURT:  Sustained.

8   Q    What types of changes would not qualify as a

9   significant change in your mind?

10  A    Simple UI changes where we've changed a label, for

11  instance, is one that we wouldn't, but generally, if we're

12  changing functionality, that's something that we need to

13  let everyone know in the organization.

14  Q    And is there any question in your mind as to whether

15  functionality was changed in this instance?

16  A    There is no question in my mind.

17  Q    Was this change ultimately approved?

18  A    Yes.

19  Q    Who had the final approval on this change?

20  A    That would have come from legal.

21             THE COURT:  Wait just a minute.  Go ahead; excuse

22  me.

23  Q    Mr. Christopherson, who had the final approval on this

24  change?

25  A    Legal.

1    Q    Did you agree with it?

2    A    I did agree with it.  I wasn't happy with it, but I

3    agreed with it.

4    Q    Why were you not happy with it?

5    A    I wasn't happy with it because I like to have good

6    product, and I feel that, okay, in my words, I'm

7    deprecating or removing functionality product.  I don't

8    like that, but I understand and I could live with the

9    legal decision, and we did so.

10   Q    Turning to what's been described as the second

11   Punchout change that was made generally available on

12   June 9, 2011, were you involved in that change as well?

13   A    Yes, I was.

14   Q    And when do you, to the best of your recollection,

15   recall first being involved in a discussion about the

16   development of that additional change?

17   A    Approximately the 1st of June.

18   Q    Was it your recommendation that that change be made?

19   A    It was not.

20   Q    Did you ultimately agree to that change?

21   A    Yes, I did.

22   Q    Who had the final say on that change?

23   A    Legal.

24   Q    Would you explain briefly just the narrative by which

25   you recall that second change being adopted, approved, and

 1  implemented?

 2            THE COURT:  I think that's --

 3            MR. THOMASCH:  Too compound, Your Honor?

 4            THE COURT:  It is not necessarily compound, but

 5  it's so open-ended -- what do you mean by the narrative by

 6  which -- what did everybody say?  What was the schedule or

 7  what?  I think maybe take it in bites.

 8            MR. THOMASCH:  Thank you, Your Honor.  I'll

 9  rephrase.

10  Q    Who did you first discuss this change with?

11  A    It was discussed first definitely with legal, with

12  Mr. Dooner shortly -- there might have been at the same

13  time or shortly thereafter.  Had a separate discussion

14  with Mr. Lohkamp about the change and expressed to him how

15  I really didn't like to do it, and we proceeded to have

16  further discussions within our leadership team and then

17  eventually back with counsel and determined that we needed

18  to make this change.

19  Q    Did you have any concerns that either of these changes

20  were going to cause your customers to be unable to

21  understand how to use RSS?

22  A    Understand how to use it, I think we did a pretty good

23  job documenting that within inside of the WebEx we had on,

24  I believe it was the 3rd of June.

25  Q    Did you expect any extensive training would be

1    necessary to teach people how to use Punchout in light of

2    the new limitations?

3    A    No.  That's what the WebEx was handled for.  That's

4    why we recorded it.  We felt if someone used that, it was

5    pretty self-explanatory.  In fact, the applications are

6    self-evident applications.  They're designed by their very

7    nature not to have much training.

8    Q    Do you know who the first customer to go live on RQC

9    is?

10   A    It was Lawson.

11   Q    And I use the word "live on RQC" in my question.  I

12   should have asked, what does that mean?

13   A    Live on Lawson?

14   Q    No, live on RQC.  What does it mean to be live?

15   A    That meant that Lawson had taken RQC itself internally

16   and was using it in a production mode, not in development,

17   not in tests, but it's own separate procurement office was

18   using RQC.

19   Q    Meaning procuring items that Lawson, as a business,

20   requires to run its own business?

21   A    Correct.  Myself, I would have been and was at that

22   time an RQC user.

23   Q    Did you require -- well, withdrawn.  To your

24   knowledge, did Lawson employees require extensive

25   retraining to understand how to use the system in light of

1    the limitations on its functionality?

2    A    I'm not aware of any.

3    Q    Am I correct that the RQC product is not 100 percent

4    different than the RSS product?

5    A    Can you say that again?

6    Q    Yes.  Is the RQC product 100 percent different from

7    the RSS product?

8    A    100 percent, no.

9    Q    Why -- withdrawn.  And what does it mean to be less

10   than 100 percent different from prior software?

11   A    It means that I'm reusing some of the components or

12   modules inside of the other product.

13   Q    And why did you choose to do that?

14   A    It's good engineering practice to reuse code that

15   already works and that you could use.  An example of that

16   would be a date conversion routine of converting a date

17   from U.S. standard where generally we go month first, then

18   date, then year, and then European the reverse where it's

19   date, month, year.  I've got to handle both of that within

20   the product.  I didn't view I needed to change that

21   routine for this.  I would have reused it.

22   Q    Did the fact that you built RQC on RSS and didn't

23   entirely change all preexisting code, does that influence

24   your opinion at all as to whether the functionality

25   differences in the use of Punchout were significant?

1    A    Does not.

2    Q    If I could ask you to look at Exhibit 1002.

3              THE COURT:  Plaintiff's exhibit?

4              MR. THOMASCH:  Plaintiff's exhibit.  Might I have

5    a second, Your Honor?

6              THE COURT:  Sure.

7    Q    Mr. Christopherson, I have no question on 1002.

8    Sorry.

9         In connection with the second change, the one that

10   went generally available on June 9...

11   A    Okay.

12   Q    Do you know who came up with that idea?

13   A    I don't know specifically who came up with it.  It was

14   kind of a -- we were meeting with legal to review again,

15   as we were for several days, the injunction, and it was

16   kind of an a-ha moment when someone says, oops, can we do

17   this, can we do Punchout to two places within the same

18   requisition, and we all kind of said, oops, we have to

19   make this change and we need to do it now.

20   Q    Was the basis for your concern about whether we could

21   do it specific language in the injunction or the evidence

22   at the trial that you had attended?  What caused the

23   concern about can we do this and have multiple items on

24   the same requisition?

25   A    It really goes back to the first change where we were

1   trying to put barriers between catalogs and whether or not

2   item master was a catalog.  We didn't take an opinion one

3   way or the other.  We wanted to have those barriers

4   between there, so it goes back to the first.

5        As far as an opinion, I would have relied on legal for

6   that.

7             MR. THOMASCH:  Nothing further, Your Honor.

8             THE COURT:  Isn't this a good time to take the

9   luncheon recess?

10            MR. THOMASCH:  Yes, Your Honor.

11            THE COURT:  For planning purposes, I've forgotten

12  what you told me yesterday, how many witnesses you plan to

13  call on this question.

14            MR. THOMASCH:  We have Mr. Lohkamp.

15            THE COURT:  And Dr. --

16            MR. THOMASCH:  Yes, and we have Dr. Goldberg.

17            THE COURT:  All right, thank you.  We'll take an

18  hour's recess.

19

20            (Luncheon recess.)

21

22

23

24

25

CHRISTOPHERSON - CROSS                    373

1        THE COURT:  All right.

2

3        CROSS-EXAMINATION

4    BY MS. ALBERT:

5    Q    Mr. Christopherson, you said that legal had the

6    final say on design changes, right?

7    A    That's correct.

8    Q    And you didn't want to make the Punchout

9    requisitioning changes, but legal told you that you

10   had to, right?

11   A    Correct.

12   Q    When your lawyers told you you had to make another

13   change to Punchout to remove the inventory

14   capabilities from the Punchout sites, you didn't

15   accept their advise, did you?

16   A    We had a discussion on that, and I did not accept

17   it, correct.

18   Q    Now, you talked about comparison shopping.  Do you

19   recall that in your direct testimony?

20   A    I don't think the word "comparison shopping" ever

21   came up, but I understand what comparison shopping is.

22   Q    In a system having requisition center and

23   procurement Punchout, you can comparison shop among

24   products offered by different vendors by performing

25   searches of different catalogs, right?

1   A    Not within the same requisition, no.

2   Q    But you can, for example, you could compare items

3   available from different vendors by searching the

4   items in item master, right?

5   A    Can you say the question again?

6   Q    In a system having requisition center and

7   procurement Punchout, you can compare items available

8   from different vendors by performing searches for

9   items in the item master, right?

10  A    Yes.

11  Q    And in a system with requisition self-service and

12  Procurement Punchout, you can compare items available

13  from different vendors by searching the items in the

14  item master, right?

15  A    Correct.

16  Q    So you might be able to perform a search for a

17  computer by searching the items in the item master in

18  a system with requisition center and Procurement

19  Punchout, right?

20  A    Say that again.

21  Q    You might be able to perform a search for a

22  computer by searching the items in the item master

23  catalog, correct?

24  A    Correct.

25  Q    And then you could punch out to Dell and search

1  the Dell catalog for a computer, right?

2  A    Not on that same requisition.

3  Q    That wasn't in my question, though, sir.  I didn't

4  ask about requisitions.  Listen to my question.

5       You can perform a search using a system having

6  requisition center and Procurement Punchout by

7  punching out to Dell to search for a computer, right?

8  A    Yes, you can.

9  Q    So you can search the catalogs in the item master

10  for a computer and then you could punch out to Dell

11  and search the Dell catalog for a computer, correct?

12           MR. THOMASCH:  Objection to the form of

13  question as to whether this is in the same search or

14  not.  Whether one search has to terminate before the

15  next begins.  It's not stated either way in the

16  question.  He can answer it either way, but it should

17  be clear what he's being asked.

18  Q    In a system having requisition center and

19  Procurement Punchout, you can perform one search for a

20  computer by searching the catalogs in the item master,

21  right?

22  A    Correct.

23  Q    And then you could start a new search and perform

24  a search by punching out to Dell and searching the

25  Dell catalog for a computer, correct?

CHRISTOPHERSON - CROSS                    376

1          MR. THOMASCH:  Same objection, Your Honor.

2          THE COURT:  Overruled.

3          THE WITNESS:  Yes.

4    Q    And in a system having requisition self-service

5    and Procurement Punchout, you could also perform a

6    search of the catalogs in the item master and look

7    among those catalogs for a computer, correct?

8    A    Correct.

9    Q    And in a system having requisition self-service

10   and Procurement Punchout, you could also perform a

11   second search and punch out to the Dell catalog and

12   search that catalog for a computer, correct?

13   A    Correct.

14   Q    Now, your view is that the change that's been made

15   to the requisition process with Punchout items is a

16   significant change, correct?

17   A    Correct.

18   Q    But haven't you said that RQC contains 100 percent

19   of the functionality that customers require?

20   A    I did not say that.

21   Q    Hasn't Lawson said that RQC contains 100 percent

22   of the functionality that customers require?

23   A    I believe that's in one of the marketing documents

24   I have seen before, yes.

25   Q    And you --

CHRISTOPHERSON - CROSS                377

1        THE COURT:  Marketing document distributed by

2    Lawson?

3        THE WITNESS:  Yes, correct.

4    Q    You, Mr. Christopherson, have also said that there

5    was not one moving part in RSS that changed for RQC,

6    correct?

7    A    Can you say that again?

8    Q    You, personally, have also said that there was not

9    one moving part in RSS that changed for RQC, correct?

10   A    If it's not in RSS, it's not in RQC, correct.  If

11   I understood your question correctly, yes.

12   Q    So you said that with respect to RQC, there was

13   not one moving part in RSS that changed for RQC,

14   correct?

15   A    Correct, yes.

16   Q    Now, you indicated that Lawson is using RQC in the

17   production mode.  Do you recall that?

18   A    Yes, I do.

19   Q    What do you mean by production mode?

20   A    What I mean by that is it is actually used by our

21   own company to order supplies internally off of item

22   master.

23   Q    So you would use Lawson procurement system having

24   requisition center to purchase desired items from

25   vendors, correct?

1   A    Off of item master, yes.

2   Q    Did you also use systems within Lawson that have

3   requisition center and procurement Punchout?

4   A    No.

5   Q    Well, haven't you, in fact, personally

6   demonstrated such a system?

7   A    Not in production, correct.  If you're talking

8   about a demo system, then yes.

9   Q    Lawson uses systems with requisition center and

10  Procurement Punchout to perform customer

11  demonstrations, correct?

12  A    That is correct.

13  Q    And Lawson uses systems with requisition center

14  and Procurement Punchout to perform customer training,

15  correct?

16  A    Correct.

17  Q    Now, when Lawson uses systems having requisition

18  center and procurement Punchout to perform customer

19  demonstrations, Lawson demonstrates the capability of

20  selecting a Punchout catalog, correct?

21  A    Correct.

22  Q    And Lawson also demonstrates the capability to

23  search that Punchout catalog, correct?

24  A    Correct.

25  Q    Lawson also demonstrates the capability to check

1    the pricing and availability of items that are found

2    in a search, correct?

3    A    Correct.

4    Q    Lawson also demonstrates the capability to bring a

5    Punchout item back into the requisition lines user

6    interface of the Lawson system and generate a

7    requisition for that item, correct?

8    A    Correct.

9    Q    Lawson also demonstrates the capability to its

10   customers to generate a purchase order for the items

11   in the requisition, correct?

12   A    Correct.

13           MS. ALBERT:  Thank you.  No further

14   questions.

15

16        REDIRECT EXAMINATION

17   BY MR. THOMASCH:

18   Q    Mr. Christopherson, did you have the authority to

19   override legal and to move forward with a change that

20   legal said was insufficient for legal purposes?

21   A    No I did not.

22   Q    The functionality of Procurement Punchout between

23   RSS and RQC, is it 100 percent the same?

24   A    Procurement Punchout --

25   Q    The way in which Procurement Punchout interacts

1   with RSS and RQC --

2              MS. ALBERT:  Asked and answered.

3              THE COURT:  Overruled.

4   Q   Are those 100 percent the same?

5   A   Yes.  The functionality between those systems,

6   yes.

7   Q   Can you do the same functions by way of ordering

8   from item master and requisition, from item master and

9   Punchout vendors with RQC, can you do that all in the

10  same way that you used to do it with RSS?

11  A   No.

12  Q   Ultimately, to the extent that a customer wants to

13  purchase something from item master that could have

14  been done with RSS, that can still be done with RQC,

15  correct?

16             MS. ALBERT:  Leading.

17             THE COURT:  Overruled.

18  A   Yes, it can.

19  Q   Similarly, to the extent that a customer in a

20  separate shopping experience wants to buy a Punchout

21  vendor item, do they have the same ability to buy a

22  Punchout vendor item with RQC as they used to with

23  RSS?

24  A   Yes.

25  Q   Do they have the same ability to enter into

1   shopping sessions that combine those two with RSS and

2   RQC?

3   A    No.

4   Q    You were asked about the notion that there is not

5   one moving part in RQC that wasn't in RSS.  Can you

6   explain what you mean by that, what you mean by moving

7   parts in the context of software and what that phrase

8   means to you?

9   A    The modules are going to be -- because we start at

10  the same spot the basic modules are going to be the

11  same for what was in RSS.  If you would, RQC inherits

12  everything that was in RSS.  Then we begin to change

13  or modify the inheritance of what is actually coming

14  into the system.  So that's where we begin to make the

15  changes.

16  Q    By making those changes, that was adding the code

17  that causes the blockage; is that correct?

18              MS. ALBERT:  Leading.

19              THE COURT:  Overruled.

20  A    Correct.

21              THE COURT:  That's the change?

22              THE WITNESS:  For Punchout, yes.

23              THE COURT:  Yes.  That's it?

24              THE WITNESS:  Yes.  Two changes, but yes.

25              THE COURT:  Both of them are blocks and pop

1   outs?

2          THE WITNESS:  Absolutely.

3          THE COURT:  It was just done a different way?

4          THE WITNESS:  Yes.

5   BY MR. THOMASCH:

6   Q   So you added code to cause the blockage.  It

7   wasn't taking away something that was previously there

8   as far as computer code goes, correct?

9          MS. ALBERT:  Objection; leading.

10          THE COURT:  Overruled.

11   A   Correct.

12   Q   And as to functionality, did you then reduce the

13   functionality available to someone trying to use the

14   RQC system by virtue of the blockage?

15   A   Yes.

16          MR. THOMASCH:  Nothing further.

17          THE COURT:  All right.  Are you going to need

18   Mr. Christopherson in your other case?  I guess you'll

19   have him here voluntarily anyway, but are you going to

20   need him is the real question?

21          MS. ALBERT:  EPlus intends to call Mr.

22   Christopherson in the infringement phase.

23          THE COURT:  All right.  You're not free to go

24   permanently, but you're free to go back and do

25   something for a while with your day other than be a

1    witness.   They'll let you know when they need you.

2              THE WITNESS:   Okay.

3              (The witness was excused from the witness

4      stand.)

5              THE COURT:   Next witness.

6              MR. LO:   Your Honor, Jason Lo on behalf of

7    Lawson.

8              Lawson calls as its next witness Keith

9    Lohkamp.

10

11      KEITH LOHKAMP, called by the Defendant, first

12   being duly sworn, testified as follows:

13

14      DIRECT EXAMINATION

15   BY MR. LO:

16   Q    Good afternoon, Mr. Lohkamp.

17   A    Good afternoon.

18   Q    Would you please state and spell your name for the

19   record, please.

20   A    Keith David Lohkamp.   It's L-O-H-K-A-M-P.

21   Q    Where are you currently employed, Mr. Lohkamp?

22   A    I'm employed by Infor which purchased Lawson.

23   Q    Have you been sitting in the courtroom as the

24   corporate representative for Lawson Software?

25   A    Yes, I have.

1          THE COURT:  Excuse me just a minute.

2          You need to turn that system on over there.

3    Is that what it is?

4          MR. LANGFORD:  Yes.

5          THE COURT:  You need to activate the system

6    for the defendants.

7          Excuse me, Mr. Lo.  I interrupted what you

8    were saying.

9          MR. LO:  It's not a problem, Your Honor.

10          THE COURT:  Just do it again.

11   BY MR. LO:

12   Q   Mr. Lohkamp, have you been sitting in the

13   courtroom as the corporate representative for Lawson

14   Software during these proceedings?

15   A   Yes, I have.

16   Q   Were you present during the opening statements?

17   A   Yes, I was.

18   Q   Were you present during the testimony in the last

19   two days?

20   A   Yes.

21   Q   What is your current job at Infor?

22   A   I'm product director for the Lawson supply chain

23   management suite.

24   Q   What does it mean to be a product director?

25   A   I'm part of the product management team.  And in

1    my role, I work with customers, prospective customers,

2    sales team.  I also work with analysts and attend

3    conferences, really just trying to understand where do

4    we need to invest in either enhancements to current

5    products or invest in new products.

6    Q    What was your position during the spring of 2011

7    time frame?

8    A    I was a product strategist for Lawson.

9    Q    So that was just pre-acquisition by Infor; is that

10   correct?

11   A    Correct.

12   Q    As product strategist at Lawson, did your job also

13   relate to the supply chain management suite?

14   A    Yes, it did.

15   Q    Did your general job responsibilities, were they

16   the same in the spring 2011 time frame as they are

17   today with Infor?

18   A    Yes.

19   Q    You have been in the courtroom while there's been

20   a lot of testimony about the changes to Punchout

21   functionality, correct?

22   A    Correct.

23   Q    So I won't go through the whole thing with you,

24   but can we just agree on terminology, that there's two

25   parts of the change, and when I refer to the first

1  part, I'll be referring to the change that prohibits

2  putting items from item master and Punchout on a

3  single requisition.  Can we agree to that just as a

4  matter of terminology?

5  A    Yes.

6  Q    When we're talking about the second change, can we

7  agree that we're talking about the change in

8  functionality that prevents an RQC user from placing

9  on a single requisition items from two or more

10  Punchout vendors?

11  A    Yes.

12  Q    When did you start working for Lawson?

13  A    In May of 2005.

14  Q    To your knowledge how long has RSS been in

15  existence?

16  A    It was in existence when I started.

17  Q    So at least since 2005?

18  A    At least since 2005.

19  Q    Do you know when RSS first provided users with the

20  ability to combine items from item master and Punchout

21  on a single requisition?

22  A    I don't know when it was first added, but it was

23  there when I started in May of 2005.

24  Q    Do you know when RSS first provided users with the

25  ability to combine in a single requisition items from

1  two or more Punchout vendors?

2  A   I'm not sure when it was first added, but it was

3  there in May of 2005 when I started.

4  Q   Did you have any involvement in making the

5  alterations to RSS that resulted in the creation of

6  RQC?

7  A   Yes.  I had a role in terms of providing input in

8  terms of the design and approach.

9  Q   When did that role begin?

10  A   It began in beginning of February when we first

11  started as far as putting together a plan.

12  Q   Would that be February 2011?

13  A   Yes, sorry.

14  Q   It's okay.  Did you work with anybody in this

15  role?

16  A   Yes, I did.  I worked with Mr. Christopherson.  I

17  also worked without legal team, both outside counsel

18  and corporate counsel.  And then involved as needed

19  with other development representatives.

20  Q   Prior to making the changes to the Punchout

21  functionality that we just talked about, the change 1

22  and the change 2, during this redesign process, did

23  Lawson implement any other changes relating to

24  Punchout functionality?

25  A   Yes.

1   Q    What were those changes?

2   A    One change was basically to pop up the message

3   when a user tries to access a Punchout site.

4   Basically just a disclaimer saying that Lawson didn't

5   control what happened at that site.

6        We also removed the Lawson logo that was framing

7   the vendor website and we also eliminated the Punchout

8   partner program.

9   Q    Let's start with the last one.  What is the

10  Punchout partner program?

11            MS. ALBERT:  Objection, relevance.

12            MR. LO:  Your Honor, ePlus has solicited a

13  lot of testimony in terms of the design process to put

14  the context in terms of what was done here, and

15  there's been a suggestion in the testimony that the

16  company chose essentially the easiest possible option.

17  And I'm establishing with this witness that not that's

18  the case.  And so it's in direct response to ePlus's

19  case-in-chief in which they're that the context of

20  other changes made or rejected are relevant to these

21  proceedings.

22            THE COURT:  Anything in response?

23            MS. ALBERT:  These changes weren't

24  implemented and they're not being contested here.  So

25  they are not relevant.

1          MR. LO:  Just as a factual matter, the

2    witness is testifying to changes that were

3    implemented.

4          THE COURT:  All right.  A question or two,

5    but I don't want to spend much time on it, please.

6          MR. LO:  Yes.

7    Q    What was the Punchout partner program?

8    A    The Punchout partner program was a program where

9    we would sign up vendors that can provide Punchout and

10   agreed to do some testing with them.  And then we

11   would add them to our Punchout trading partner list.

12   Q    Do you have an understanding as to why that

13   elimination occurred?

14   A    Yes.  The reason we eliminated it is because

15   during the trial it had come up that it seemed to be

16   an issue in terms of perception that we were

17   controlling what was going on at the vendor websites.

18         MS. ALBERT:  Your Honor, this has never been

19   disclosed to us in discovery the fact that Lawson

20   discontinued this Punchout partner program.  So it's a

21   Rule 26, Rule 37 issue.

22         MR. LO:  Your Honor, I'm not sure how to

23   respond because I haven't heard --

24         THE COURT:  Do you mind showing me where it

25   was disclosed?

1      MR. LO:  What I was about to say, Your Honor,

2   is I'm not sure if Ms. Albert is claiming there's a

3   document request or an interrogatory that called for

4   it and we didn't disclose it.  I can certainly

5   represent to the Court that it's in the documents that

6   we produced.  So I don't know if she's saying that

7   there's an interrogatory response or something else to

8   which this would have been responsive.

9      MS. ALBERT:  We had an interrogatory asking

10  for all differences between the current system and the

11  infringing configurations.

12     MR. LO:  Right.

13     THE COURT:  Did you answer that interrogatory

14  to say Punchout partner had been eliminated?

15     MR. LO:  The partner program, and then I can

16  elicit it from the witness.

17     THE COURT:  Did you answer the interrogatory

18  to say the Punchout program had been eliminated is the

19  question?

20     MR. LO:  We did not because the interrogatory

21  calls for software changes, and I can elicit the

22  testimony from the witness.  What he's talking about

23  was a cancellation of a program.  It was not a

24  software change that was made.  It was a business

25  change that was made and that' not what --

LOHKAMP - DIRECT                391

1    THE COURT:  Let me hear the interrogatory

2  again.

3    MS. ALBERT:  "Identify with specificity any

4  portions of the core S3 procurement system source code

5  that were modified during the development and creation

6  of RQC.

7    MR. LO:  Your Honor, we'll stipulate that

8  what he's talking about is not a source code change,

9  but it's a change to the Punchout program that was

10  made available to Lawson customers.

11    THE COURT:  Anything else, Ms. Albert?

12    MS. ALBERT:  No, sir.

13    THE COURT:  Overruled.

14  BY MR. LO:

15  Q   Let me just reask the question, Mr. Lohkamp.  Do

16  you have an understanding as to why the Punchout

17  partner program was eliminated?

18  A   Yes.

19    THE COURT:  Because of something he heard at

20  trial.  Because of something he heard at trial.  They

21  decided they were going to eliminate it.  Now, let's

22  go on.

23    It's not at issue here.  So we're not going

24  to need to get into that, but he's already answered

25  the question.

1       MR. LO:  That's fine, Your Honor.

2    Q   The other change you had talked about was a pop-up

3    and you had described in your previous answer.  Mr.

4    Lohkamp, the Court has heard some testimony about the

5    pop-ups that occurred with the Punchout changes that

6    we're talking about in this case.  Can you explain

7    whether that's the same or different as what you have

8    testified to earlier?

9        THE COURT:  He testified it was different.

10   He said it was a pop-up that was at the site and there

11   was a concern over controlling the vendor site.  So

12   they dropped the pop-up to show that.  I think he said

13   that.

14       MR. LO:  If I could elicit just one more

15   answer, Your Honor.

16   Q   Mr. Lohkamp, did those pop-ups actually prevent

17   the user from accessing the Punchout sites after the

18   user saw the pop-ups?

19   A   No, it did not.

20   Q   To your knowledge, when was the first time the

21   Punchout changes, the changes to Punchout

22   functionality that are at issue here were first

23   discussed within the company?

24   A   To my knowledge around April 20, 21.

25   Q   And prior to that point, did Lawson have any

1   contingency plans in terms of how to deal with the

2   Punchout functionality were there to be an injunction

3   issued?

4   A   We had some ideas and some possibilities, and

5   those included things like limiting Punchout to ePlus

6   licensees or to even stop selling Punchout, but none

7   of them had been decided upon.

8           THE COURT:  So you're saying both change 1

9   and change 2 began to be discussed in April 20, 21?

10          THE WITNESS:  I'm saying that change 1 was

11  discussed April 20, 21.  The change 2 was discussed

12  later, around June 1.

13          THE COURT:  Listen to the question because

14  the question he asked you was when were the changes

15  first discussed.  And you answered April 20, April 21.

16  So now you're saying something different.  You're

17  saying that it wasn't both changes.  It was just one

18  change, right?

19          THE WITNESS:  Correct, just the first change.

20  Sorry.

21  Q   And my question was probably a little bit unfair,

22  Mr. Lohkamp.  When was the first time you were aware

23  that there was a discussion about the second change to

24  Punchout functionality?

25  A   About June 1st.

1  Q    Prior to April 21 when you first heard about the

2  first change to Punchout functionality, what was the

3  contingency plan for Lawson to comply with any

4  potential injunction?

5  A    We still really didn't have a complete plan and

6  one of the options was to pull Punchout from sales,

7  particularly in Q4.

8          THE COURT:  As to what?

9          THE WITNESS:  To pull Punchout from any sales

10  in that quarter.

11         THE COURT:  Not sell --

12         THE WITNESS:  Not sell Punchout, yes.

13         THE COURT:  If an injunction was issued?

14         THE WITNESS:  Yes.

15  Q    Mr. Lohkamp, if I could just direct your attention

16  to the exhibit that's been marked as PX-1109.

17         THE COURT:  11 or 10?

18         MR. LO:  1109, Your Honor.

19         THE COURT:  You have in your book 1019.  You

20  don't have 11 -- I don't think you have 1109 or at

21  least I don't find it.  Do you need it?  Is that what

22  you want to use?

23         MR. LO:  Yes, Your Honor.

24         THE COURT:  Let somebody get it and hand it

25  to you and give one to the other side.

1          MR. LO:  1109.

2          THE COURT:  Is it in your books?

3          MS. ALBERT:  No.

4          MR. STRAPP:  PX-1109.

5          THE COURT:  Is it DX or PX?

6          MR. LO:  Plaintiff's Exhibit, Your Honor.

7          THE COURT:  If you have copies, give them to

8    us and to the witness as well.

9          Where did she go?  Oh, there.  Have you got

10   another copy?

11         UNIDENTIFIED PARALEGAL:  Yes.

12         THE COURT:  The legal assistants have done a

13   good job having everything ready to go.  Every once in

14   awhile you don't do everything perfectly or maybe he

15   didn't.  But I certainly would never expect him to

16   blame you.

17         MR. LO:  The bucks only stops with me, Your

18   Honor.

19         THE COURT:  It does.  All right.  1109,

20   right?

21         MR. LO:  Yes, Your Honor.  Thank you.

22         THE COURT:  All right.  Let's go.

23   BY MR. LO:

24   Q   Mr. Lohkamp, do you recognize what's been marked

25   as Plaintiff's 1109?

1   A    Yes, I do.

2   Q    What is it?

3   A    It is an email chain that started from Dean Hager

4   initially going to sales leadership Jim Catalino, Dave

5   Seibert and Brian Murphy regarding the ePlus

6   litigation.

7   Q    What is the date on Mr. Hager's email?

8   A    It's March 29, 2011.

9   Q    Did you eventually receive a copy of this email?

10  A    Yes, I did.

11  Q    When is that?

12  A    I received a copy on March 29.

13  Q    Okay.  Did you read this email around that time

14  frame, March 29?

15  A    Yes, I did.

16  Q    Let me direct your attention to the second to the

17  last paragraph of plaintiff's 1109.

18       "However, we have no known way around Procurement

19  Punchout at this time.  Please check with your

20  RSM's/AE's on these deals and see if pulling at

21  minimum Punchout, and potentially even both, harm the

22  closing of the detail in Q4."  Do you see that. sir?

23  A    Yes, I do.

24  Q    Do you have an understanding of what was being

25  conveyed here?

1   A   Yes, I do.

2   Q   What is that?

3   A   It was that we didn't have a work around yet

4   figured out for Procurement Punchouts, and basically

5   Dean was suggesting that the Procurement Punchout be

6   pulled and basically not sold as part of the deals in

7   Q4.

8   Q   Is that consistent with your understanding of the

9   status of the Punchout design-around process in the

10  March 29, 2011 time frame?

11  A   Yes.

12  Q   Let me draw your attention to the email from

13  Ms. Langer dated March 29, 2011, and sent at 6:09 p.m.

14  Do you see that?

15  A   Yes, I do.

16  Q   And I want to focus on your attention to the first

17  bullet point, second sentence.  "We are still awaiting

18  legal guidance on whether we can make our product

19  non-infringing."  Do you see that?

20  A   Yes, I do.

21  Q   What was your understanding of what was being

22  stated there?

23  A   My understanding was that we still didn't have a

24  work-around, a design-around that we had gotten the

25  okay on from legal.

1   Q    Was that consistent with your understanding of the

2   design-around process with respect to the Punchout

3   functionality as of March 29, 2011?

4   A    Yes, it was.

5   Q    Now, you testified earlier that you first found

6   out about change 1 to the Punchout functionality on

7   April 21, right?  On or around April 21?

8   A    Yes.

9   Q    From whom did you learn that?

10  A    I learned that from Dale Christopherson.

11  Q    Did you have a conversation with Mr.

12  Christopherson upon learning about that potential

13  change?

14  A    Yes, I did.

15  Q    What if anything did you tell Mr. Christopherson

16  about that potential change?

17  A    Well, I told Mr. Christopherson that I was

18  concerned about the impact on our customers and it

19  wasn't going to be a good experience for them because

20  it was basically taking away functionality.  So I

21  expressed my concern about it.

22  Q    How is it that you would have any idea about the

23  concerns of Lawson customers?

24  A    Well, in my role I regularly work with customers

25  who use our products.  In fact, in some cases I've

1    co-presented webinars with customers on Procurement

2    Punchout as well as I've asked customers to present at

3    our user conferences on the topic.

4    Q    As of April 21, what did you ultimately convey to

5    Mr. Christopherson as to whether this change would

6    have a positive or a negative impact on Lawson

7    customers?

8    A    Well, I conveyed that it would have a negative

9    impact on Lawson customers.

10            MR. LO:  Your Honor, we would move into

11   evidence Exhibit PX-1109.

12            THE COURT:  Any objection?

13            MS. ALBERT:  Pardon me?

14            THE COURT:  Any objection?

15            MS. ALBERT:  No objection.

16            THE COURT:  It's admitted.

17            (Plaintiff's Exhibit 1109 is admitted.)

18   Q    Let me direct your attention to what's been marked

19   as Plaintiff's 1049.  Do you recognize this document?

20            THE COURT:  What is it?

21            MR. LO:  1049, plaintiffs, Your Honor.

22   A    Yes, I do.

23   Q    What is this document?

24   A    It's an email chain initiating first with Dale

25   Christopherson to myself, Todd Dooner and Bob

1  Crawford, and it's basically summarizing the proposal

2  for change 1 to Punchout.

3  Q    And you answered this a little bit.  Does the

4  proposal here relate to either of the changes that

5  we're talking about in these proceedings?

6  A    It relates to change 1.

7  Q    Which portion of this document, Plaintiff's 1049,

8  relates to that?  Would you mind reading that, sir?

9  A    It is bullet point 1.  It says, "Go out with

10  release 1 end of May.  Add an item from item master

11  and then we lock out the ability to add Punchout items

12  to the req.  User want to punchout, then we prompt the

13  user to release req and create a new one, or keep req

14  as unreleased and create a new one, or cancel going to

15  punchout."

16       And B is, "Add an item from Punchout, then we lock

17  out the ability to search item master to" that looks

18  like "reg" but they mean req.  "User wants to use item

19  master items, then we prompt the user to release req

20  and create a new one, or keep req as unreleased and

21  create a new one, or cancel going to punchout.  If the

22  user selects an item master item, then the item is

23  added to the new req."

24            THE COURT:  So as of April 21, your company's

25  plan was to go with change No. 1 at the end of May; is

1    that what you just said?

2         THE WITNESS:  My recollection of this email

3    is that --

4         THE COURT:  I'm asking you the question, not

5    the email.  Was it your company's plan to go with

6    change No. 1 at the end of May as of April 21?

7         THE WITNESS:  As of April 21, it was a

8    proposal that we were reviewing.

9         THE COURT:  All right.  How long did you

10   think it was going to take for a user to make the

11   change if you went out with it at the end of May as of

12   April 21?

13        THE WITNESS:  How long would it take?

14        THE COURT:  How long was it going to take the

15   user to put the change into effect?  In other words,

16   what did you think on April 21 as to how long it was

17   going to take the user to put change 1 into effect if

18   you released it at the end of May?

19        THE WITNESS:  In terms of -- I just want to

20   make sure I understand your question.  Our customers

21   in terms of putting the change into effect?

22        THE COURT:  Yes.

23        THE WITNESS:  So at the end of May, excuse

24   me.  If we released at the end of May, it would take

25   them the time it takes to go ahead and install the

1   new --

2           THE COURT:  How long is what I'm asking?

3           THE WITNESS:  I don't know how long it takes

4   to install.  Usually, my understanding is it takes --

5   it could take a few hours to install.

6           THE COURT:  Okay.  So as of April the 1st,

7   you thought that change 1, if you released it in May,

8   the end of May, would take the customers a few hours

9   to install?

10          THE WITNESS:  To install, yes.

11          THE COURT:  All right.  Thank you.

12  BY MR. LO:

13  Q   Mr. Lohkamp, as of April 21, did you have an

14  understanding as to when change 1 might be implemented

15  or might be a made available to customers?

16  A   Yes.  The target was going to be the end of May.

17  Q   Now, you testified earlier that you were against

18  change 1.  Did the company move forward with making

19  change 1?

20  A   Yes.

21  Q   Let me show you what's been marked as Plaintiff's

22  1019.

23  A   Okay.

24  Q   1019.  Do you recognize this document, Mr.

25  Lohkamp?

1    A    Yes, I do.

2    Q    What is it?

3    A    It is an email chain starting from Dale

4    Christopherson describing some initial proposed design

5    for the change 1, and then me providing some feedback

6    and suggestions to try to simplify it, and then

7    ultimately me forwarding on and sharing it with other

8    members of the product management team to give them a

9    heads-up of what was being proposed.

10   Q    Let's start at the earliest email in this chain.

11   The one from Mr. Christopherson that starts at the

12   Bates No. ending 409.  Do you see that, sir?

13   A    Yes.

14   Q    What is the date and time on that email, Mr.

15   Lohkamp?

16   A    April 22, 2011, at 7:30 a.m.

17   Q    So this would be early morning the day after you

18   first discussed change No. 1; is that correct?

19   A    That's correct.

20   Q    What was Mr. Christopherson sending you at 7:30

21   a.m. on April 22?

22   A    He was sending me a proposed design of what the

23   pop-up message would look like.

24   Q    And this is the pop-up message.  What would be the

25   purpose of this pop-up message to your understanding?

1   A    The pop-up message would be to explain to the user

2   what was happening and their options.

3   Q    Did you review Mr. Christopherson's proposal?

4   A    Yes, I did.

5   Q    Why did you do that?

6   A    As my role as product management, I'd have input

7   on what customers might experience to try to simplify

8   the process.

9   Q    So what did you respond to Mr. Christopherson

10  then?

11  A    I responded with an email that was I trying to

12  suggest a different message that I thought would make

13  it simpler on the customers and more clear when the

14  message came up.

15  Q    Why was it important for you that the message

16  about this change was simple and clear to the

17  customer?

18  A    Because we wanted to make sure that it was very

19  clear, clear to the customer so that they wouldn't

20  need a lot of training and that they'd know what's

21  happening and wouldn't really get stuck.

22  Q    Would you just note the time and date of your

23  email response to Mr. Christopherson?

24  A    It was Friday, April 22, 2011, at 9:45 a.m.

25  Q    Then let me go to the portion of the email that's

1  dated April 25, 2011, 11:47:05 a.m.  Do you see that?

2  A    Yes.  Let me just direct your attention to the

3  section that says "possible change behavior."  And

4  there are two bullet points under that.  Do you see

5  that?

6  A    Yes.

7  Q    Does that change behavior relate to any of the

8  changes we're talking about to Punchout functionality

9  in these proceedings?

10  A    Yes, it does.  It relates to what we've been

11  talking about as change 1.

12  Q    Let me direct your attention to the first two

13  sentences.  Last week Dale and I were asked to make

14  additional changes related to functionality in

15  requisition center.  I would prefer not do this, but

16  our advice is that we need to do something like this.

17  Do you see that, sir?

18  A    Yes, I do.

19  Q    Is that something you wrote on April 25?

20  A    Yes.

21  Q    Why did you write that?

22  A    I wrote that really just to convey that we had

23  received this request and summarizing it to my product

24  management colleagues that this request had come from

25  legal and they are asking us to make this change.  And

1  that I had raised my concerns about how it impacts the

2  customers, but we're making this proposal based on

3  strong advice from our legal team.

4  Q    And in that same email from you dated April 25,

5  the last portion says "alternative approach."  Do you

6  see that?

7  A    Yes.

8  Q    And it reads, "If a user already has added an item

9  from Punchout to requisition, only present a message

10  about creating a new requisition when a user tries to

11  add a new item to a requisition from fine/shop express

12  categories or service/special, but not before."  Do

13  you see that?

14  A    Yes.

15  Q    Was this an alternative approach that you provided

16  on or around April 235?

17  A    Yes.

18  Q    Why were you proposing this alternative approach

19  to the change that we know as change 1 to Punchout

20  functionality?

21  A    I was basically proposing that as a different

22  alternative in terms of how we might have the user

23  behavior function and how the functionality works.  So

24  it was another idea that we wanted to -- that I put

25  out there that would have allowed a user to go ahead

1   and go ahead and go to -- if they had already started

2   adding an item from Punchout, that they could go ahead

3   to the fine shop and access searching the item master.

4   So it was going to let them do that while still

5   preventing them from mixing the items on the item

6   master.

7   Q   Which one, the alternative approach or the

8   approach that we now know as change No. 1, in your

9   view was more detrimental to Lawson customers?

10  A    In my view, the change that was ultimately made

11  was more detrimental.

12          MR. LO:  Your Honor, we move into evidence

13  Plaintiff's Exhibits 1049 and 1019.

14          THE COURT:  Any objection?

15          MS. ALBERT:  No objection.

16          THE COURT:  They are admitted.

17          (Plaintiff's Exhibits 1049 and 1019 are

18  admitted.)

19  BY MR. LO:

20  Q   Let's turn to the change in Punchout functionality

21  that we know as change number 2.  What was your

22  involvement with that change, sir?

23  A    My involvement in that change was again to provide

24  input from a product management perspective on that

25  change.  So either provide it for the customer or

1    provide additional ideas.

2    Q    Approximately, when did you first find out about

3    this change again?

4    A    June 1.

5    Q    Who did you find out this change from?

6    A    From Dale Christopherson.

7    Q    As with change No. 1, did you have a conversation

8    with Mr. Christopherson about this change?

9    A    Yes, I did.

10   Q    What did you express to Mr. Christopherson about

11   this proposed change that became change number 2?

12   A    I expressed that I was also concerned about us

13   taking away those capabilities from our customers.

14   Q    Why is that?

15   A    Because previously customers were able to in a

16   single requisition go to one Punchout site, select an

17   item, and then punch out to a second site, select an

18   item, and then go ahead an process that single

19   requisition.

20   Q    Let me direct your attention what's been marked as

21   Defendant's 691, Mr. Lohkamp.

22   A    Okay.

23   Q    What is Defendant's 691, sir?

24   A    Defendant's 691 is an email that was first sent by

25   me to Jennifer Langer, copying Dale Christopherson,

1    Dave Kempker, Darci Snyder and Bruce McPheeters.  And
2    then there was a follow on email where Dale had
3    forwarded it to John Mulchrone.
4    Q   And the original email you wrote, Mr. Lohkamp,
5    that's dated June 1, 2011, 2:14 p.m.; is that correct?
6    A   Yes.
7    Q   And what were you expressing in this email to
8    Ms. Langer in the carbon copies of the email?
9    A   So what I was communicating is that the legal team
10   requested that we make another change related to how
11   Procurement Punchout worked.  And then I described the
12   change that required one requisition per Punchout
13   vendor.  And I communicated that thought that I
14   thought it would have a negative impact on our
15   customers, but said that they had already been
16   impacted by the first change as well.  So it was
17   adding onto it.
18   Q   So let's take those one at a time.  The first
19   sentence is, "The legal team has requested that we
20   consider another change related to Procurement
21   Punchout."  Do you have an understanding as to whether
22   that sentence relates to either of the changes we're
23   talking about in these proceedings?
24   A   Yes.  It relates to change No. 2.
25   Q   Now, let's go to the third paragraph.  This will

1  have a negative impact on our customers, but they are

2  already impacted by our requirement to different

3  requisitions for Punchout versus non-Punchout items.

4  Do you see that, sir?

5  A    Yes.

6  Q    Let's break that sentence apart.   Why did you

7  write that "This will have a negative impact on our

8  customers"?

9  A    Because in my experience and my belief, customers

10 who are using our Punchout had that ability to be able

11 to take Punchout items from different Punchout sites,

12 combine on a single requisition, submit a single

13 requisition, and then go through a single approval

14 process.   And so that if we took that away, it would

15 add extra work on the requesters who would have to

16 create more than one requisition and potentially have

17 more than one approval process.

18 Q    And the second part of that sentence, "They are

19 already impacted by our requirement to different

20 requisitions for Punchout versus non-Punchout items."

21 Does that relate, does that half of the sentence

22 relate to either of the changes we're talking about in

23 these proceedings?

24 A    That second half relates to the first change we

25 made.

1   Q    Let me direct your attention to the fifth

2   paragraph.  "If we need this, I think customers could

3   live with this but will be unhappy."  Do you see that,

4   sir?

5   A    Yes.

6   Q    Did you feel that way about the second change on

7   or around June 1, 2011?

8   A    Yes, I did.

9          MR. LO:  Your Honor, we move Defendant's

10  Exhibit 691 into evidence.

11         MS. ALBERT:  No objection.

12         THE COURT:  It's admitted.

13         (Defendant's Exhibit 691 is admitted.)

14  BY MR. LO:

15  Q    After you sent that June 1, 2011 email to

16  Ms. Langer, what happened in terms -- what happened

17  next in terms of change number 2 to the Punchout

18  functionality?

19  A    Well, after -- what happened after this was we

20  basically shared -- requested a change also with Dean

21  Hager because he wanted to know about any additional

22  communications or changes that we might have been

23  making.  So we wanted to share with him so that he

24  could have his input on that.  Because we were asking

25  for -- to start getting final approval to go ahead and

LOHKAMP - DIRECT                    412

1   move ahead with the change.

2            THE COURT:  What was Mr. Hager's job?

3            THE WITNESS:  He was in charge of product

4   management.

5   Q   Let me direct your attention to what's been marked

6   as Plaintiff's 1096.

7            THE COURT:  We don't have that in the book.

8            MS. ALBERT:  I don't have it.

9            MR. LO:  I'm happy to proceed first, Your

10  Honor, while we find that.

11           THE COURT:  A lot of these questions you can

12  ask, but you don't have to ask every question with

13  reference to a document.  She hasn't objected to any

14  of them, but you're asking about your own documents,

15  so they fall under different rules, you know.

16           MR. LO:  Yes, Your Honor, I understand.

17           THE COURT:  I guess you-all have an

18  understanding.  So it's okay.  But let's go ahead and

19  get where we're going.

20           MR. LO:  Yes.

21  BY MR. LO:

22  Q   Mr. Lohkamp, when you communicated the possibility

23  of change number 2 to Mr. Hager, did you express your

24  views as to whether you thought that was a good change

25  or a bad change from a customer prospective?

1   A    I expressed that it was a bad change from the

2   customer perspective, that it would have a negative

3   impact on them.

4   Q    Did you express whether this would be a step

5   backwards for Lawson customers?

6   A    Yes, I did.

7   Q    At the time that you communicated change number 2

8   to Mr. Hagger, had you already heard -- at the time

9   you communicated the possibility of change number 2 to

10  Mr. Hager, had you already heard feedback from

11  customers regarding change No. 1?

12  A    Yes, I had.

13  Q    Which customer?

14  A    I had heard feedback from Central Dupaige and

15  Trinity Health.

16  Q    Did you also hear feedback from Cleveland Clinic?

17  A    Yes, I did.

18  Q    Let me now direct your attention to what's been

19  marked as Plaintiff's 1096, Mr. Lohkamp.  Do you

20  recognize this document, sir?

21  A    Yes, I do.

22  Q    Let's start from the email chain at the very

23  bottom, and you'll see that there's an email from

24  yourself to Ms. Langer and Mr. Hager dated June 3,

25  2011, 12:47 p.m.  Do you see that, sir?

1    A    Yes.

2    Q    The first sentence say, "Our legal counsel

3    recommended that we make one additional change to

4    requisition center that impacts Procurement Punchout

5    to help address concerns about being able to add items

6    from two vendor catalogs."  Do you see that?

7    A    Yes.

8    Q    Does that statement relate to either of the

9    changes that we're talking about in these proceedings?

10   A    Yes, it does.  It relates to change number 2.

11   Q    On this email, did you provide your analysis of

12   the impact or the potential impact of this change?

13   A    Yes, I did.

14   Q    Can you read the part of your analysis of the

15   impact that you provided to Mr. Hager?

16   A    Impact.  This will have a negative impact on our

17   customers who use Punchout.  And this is on top of the

18   change we made to require different requisitions for

19   Punchout vs. non-Punchout items.

20   Q    Would you also read the next paragraph starting

21   with "this will be a step"?

22   A    "This will be a step backwards for customers, and

23   we've been talking about RQC as a superior product.

24   Cleveland Clinic, for example, specifically asked

25   during the webinar Q and A about whether they could

1   put two Punchout vendors on a single requisition.

2   Q    Is Cleveland Clinic -- do you know whether

3   Cleveland Clinic is a large customer of Lawson's?

4   A    Yes, it is.

5   Q    How do you know that, sir?

6   A    From my experience working directly with Cleveland

7   Clinic.

8   Q    And did Mr. Hager respond to your information

9   about the second proposed change?

10  A    Yes, he did.

11  Q    Where is that response on this document, sir?

12  A    It's the next email.

13  Q    So is that the one on the page that ends with RQC

14  944?

15  A    His first response is on 1945.

16  Q    In that first response to you, Mr. Hager asks you

17  any estimate of how many of our customers use this

18  functionality.  Do you see that?

19  A    Yes.

20  Q    What was your response to Mr. Hager?

21  A    I responded with the number of Procurement

22  Punchout customers and mentioned that a large majority

23  of them would have more than one Punchout vendor

24  set-up.

25  Q    Let me direct your attention to your email to Mr.

1    Hager dated June 3, 2011, 1:18 p.m., and that's on the

2    page that ends with 944 as the Bates number.  Do you

3    see that, sir?

4    A    Yes.

5    Q    And the last sentence of that email is, "The

6    bigger impact on Punchout processes was the change we

7    already made and discussed today."  Do you see that,

8    sir?

9    A    Yes.

10   Q    What was the impact on Punchout processes in

11   reference to?

12   A    It was in reference to the changes we made with

13   change 1 which prevented the users from putting an

14   item master item and a Punchout item on a single

15   requisition.

16   Q    Why did you think that the customers were more

17   impacted by change No. 1 than at this point potential

18   change number 2, but what became change number 2?

19   A    From my experience working with customers like

20   Central Dupaige, for example, I knew that they allowed

21   their users to put items from the item master and from

22   Punchout on a single requisition.  So I knew that that

23   would be an impact.

24   Q    So is it fair to say that you thought both change

25   1 and change 2 had detrimental effects, but as between

1   those two customers would care more about change

2   No. 1?

3              MS. ALBERT:  Leading.

4              THE COURT:  Sustained.

5              MR. LO:  I'll withdraw that question.  Thank

6   you, Your Honor.

7   Q   Let me ask you what Mr. Hager's response to you

8   was on June 3, 2011, 1:47 p.m.?

9   A   His response was that at the time he would have to

10  say no.

11  Q   So is it correct that as of June 3, 2011, both you

12  and Mr. Hager were not happy about the proposed change

13  that became change number 2?

14             MS. ALBERT:  Objection, leading.  Also calls

15  for speculation.

16             THE COURT:  You got a double one on that one.

17             MR. LO:  Yes, Your Honor.

18             THE COURT:  And both of them are right.

19  BY MR. LO:

20  Q   As of June 30, 2011, what was your feeling towards

21  the proposed change that ultimately became change

22  number 2?

23  A   My feeling was that in an ideal world I'd prefer

24  not to do it because it was a step back for customers,

25  but if, based on legal advise, they felt we needed to

1   do it, I would support doing that.

2   Q   As of that same date, had Mr. Hager expressed to

3   you his views as to the proposed change that became

4   change No. 2?

5            MS. ALBERT:  Hearsay.

6            THE COURT:  Not yet.  The question is had he

7   expressed.  The answer is yes or no.  Yes or no?

8            THE WITNESS:  Yes.

9            THE COURT:  And then the next question is?

10  Q   What was your understanding of Mr. Hager's views

11  as to the proposed change that became change number 2

12  as of June 3?

13           MS. ALBERT:  Objection, hearsay.

14           THE COURT:  Sustained.  You can't get around

15  that one.

16           MR. LO:  That's fine, Your Honor.

17           THE COURT:  Unless you're offering it for a

18  nonhearsay purpose, and then the nonhearsay purpose

19  has to have relevance, and I don't see any.

20           MR. LO:  Your Honor, we are actually offering

21  it for that purpose and the purpose is --

22           THE COURT:  Make it a good one.

23           MR. LO:  All right.  The purpose is there's

24  an allegation that the business folks' interests

25  overrode the legal requirements, and the expressed

1  views of Mr. Lohkamp and Mr. Hager to the rest of the

2  group that was in the redesign process --

3          THE COURT:  Show that that's not true.

4          MR. LO:  Correct.

5          THE COURT:  So you're offering it for the

6  truth.

7          MR. LO:  No, I'm offering it in terms of

8  whether they expressed that view to the legal

9  department, Your Honor, not whether --

10          THE COURT:  Whether they expressed that view

11  as what relevance?

12          MR. LO:  Because it goes to show what -- it

13  goes to show legal's knowledge as to whether the

14  business folks cared about it or not and it just goes

15  to their notice as to do the business people care

16  about it.  And it's outside of the fact of whether Mr.

17  Lohkamp or Mr. Hager --

18          THE COURT:  In Hanover County they say, "That

19  dog won't hunt."  Sustained.

20          MR. LO:  Yes, Your Honor.

21  Q   Mr. Lohkamp, ultimately, to your knowledge who

22  made the decision to implement change number 2?

23  A   To my knowledge it was our legal counsel.

24          MR. LO:  Your Honor, we would move into

25  evidence what's been marked as Plaintiff's 1096.

1          MS. ALBERT:  No objection.

2          THE COURT:  It's admitted.

3          (Plaintiff's Exhibit 1096 is admitted.

4    BY MR. LO:

5    Q   Mr. Lohkamp, let me direct your attention to

6    what's been marked as Plaintiff's 1010.  And you'll

7    probably recognize this is a document that's been

8    discussed before, Mr. Lohkamp.  What is it, generally?

9    What is 1010?

10   A   1010 is a copy of the slides that we presented at

11   the Introducing Lawson Requisition Center Webinar on

12   June 3.

13   Q   Just for those of us who aren't familiar with it,

14   what is a webinar?

15   A   A webinar is a presentation that we do over the

16   Internet in this case using software called WebEx

17   where we're basically able to display our slides to

18   attendees.  So they register beforehand.  They sign in

19   and then view and listen to the presentation.

20   Q   So was there an audio portion to the presentation

21   as well as a video one?

22   A   Yes, there was.

23   Q   Is Exhibit 1010 part of the visual presentation

24   provided at the webinar?

25   A   Yes.

1    Q    Let me direct your attention to page 10 of this

2    document, and it's the page that ends with RQC and the

3    Bates number ends in 665.  Do you see that, sir?

4    A    Yes.

5    Q    Let me direct your attention to the second large

6    bullet point "designed with three principles in mind."

7    Do you see that, sir?

8    A    Yes.

9    Q    And the first sub bullet point under that is

10   "100 percent of the functionality you require must be

11   included."  Do you see that, sir?

12   A    Yes.

13   Q    Did you have any role in drafting this particular

14   statement, "100 percent of functionality you require

15   must be included"?

16   A    Yes, I did.

17   Q    What was that involvement?

18   A    I helped put together this presentation, and one

19   of the requests we got from Dean Hager was to be able

20   to position that we were providing to our customers at

21   least the key features they needed to still conduct

22   their business.  So that they were still able to do

23   things like requisition items from the item master or

24   requisition items from Punchout.

25   Q    And was there a careful selection of words in how

LOHKAMP - DIRECT                  422

1   you framed the sentence?

2   A   Yes.

3   Q   How is that?

4   A   So we --

5            THE COURT:  Come on, now.  Come on.

6            MS. ALBERT:  Objection, leading.

7            THE COURT:  That wasn't leading, but we need

8   to get there.  We don't need to -- hit a home run.

9   See if you can avoid singles.

10            MR. LO:  I understand, Your Honor.

11            THE COURT:  Where are you going with it, in

12   other words?

13            MR. LO:  Yes, Your Honor.

14   Q   In preparing this presentation and putting in the

15   statement "100 percent functionality you require must

16   be included," was it your belief --

17            THE COURT:  What was your belief?

18   Q   What was your belief --

19            THE COURT:  Why did you say this?  Why did

20   you say it the way you said it?  That's what you want

21   to ask him.  He's your witness, so you can't lead him.

22   Go ahead and ask him.  That's what you want to know,

23   right?

24            MR. LO:  Yes.

25            THE COURT:  Why did say this the way you said

1   it?

2   A   We said it this way so that we were reassuring our

3   customers that they would be able to do their key

4   business functionalities, but we weren't trying to

5   suggest that they would have 100 percent of the

6   functionality that they had had before.

7   Q   At the time you crafted this statement, did you

8   think that the customers would not -- did you have an

9   understanding -- did you have an understanding as to

10  whether customers might or might not notice this

11  change?

12  A   Which change?

13  Q   I'm sorry.  The change to Punchout functionality

14  that we've been talking about.

15  A   No.  I knew that customers would notice the

16  change.

17  Q   Now, the webinar, were there any other features to

18  it other than the visual and the audio portions that

19  you described earlier?

20  A   Yes.  There was a Q and A portion as well.

21  Q   Can you describe what you mean by a Q and A

22  portion of the webinar?

23  A   The WebEx allows us to allow our attendees to ask

24  questions through a Q and A panel through the WebEx

25  software.  And those questions are being asked

1    realtime as we're doing our presentation.

2    Q   Were you monitoring these questions during the

3    presentation?

4    A   Yes.

5    Q   Let me direct your attention to Plaintiff's 1057.

6    Do you recognize Plaintiff's 1057, sir?

7    A   Yes, I do.

8    Q   What is it?

9    A   It's an email chain starting from Elizabeth

10   Homewood related to compiling the answers from the

11   questions that came from the webinar and then there's

12   a draft version of the Q and A.

13   Q   Let's go to the third page of this document that

14   looks like a table.  Can you describe what we're

15   looking at starting from the third page?  The table.

16   A   Sir, which --

17            MS. ALBERT:  For point of clarification, does

18   it have page 1 at the bottom of the page?

19            MR. LO:  Yes, page 1.  It's marked --

20   the table has --

21            THE COURT:  It's the questions and the

22   answers that came from the chat session of the

23   webinar; is that what that is?

24            THE WITNESS:  Yes, it is.

25   Q   Let me direct your attention to a -- the questions

1   are numbered, Mr. Lohkamp, and so for reference let me

2   direct your attention to what was labeled as question

3   64.

4   A    Okay.

5   Q    And the second column has a name, Don

6   Grochocinski.  Do you see that, sir?

7   A    Yes, I do.

8   Q    Can you explain what information is provided in

9   that particular box?

10  A    It provides Don Grochocinski's name, his email

11  address, and the time the question was submitted.

12  Q    When did the webinar begin?

13  A    At around 10 a.m.

14  Q    So Mr. Grochocinski's question was submitted at

15  10:20 a.m., 20 minutes into the webinar?

16  A    Yes.

17  Q    What was Mr. Grochocinski's question?

18  A    "With RSS we were able to mix Punchout items with

19  stock items on a requisition.  I've seen info that

20  suggests that is not possible with RQC.  Is this

21  previous functionality of RSS likely to be restored to

22  RQC?"

23  Q    And did you ultimately -- did Lawson ultimately

24  formulate a response to Mr. Grochocinski as to this

25  question?

1    A    Yes.

2    Q    What was that's response?

3    A    If circumstances change, we will revisit this

4    functionality.

5    Q    Let me direct your attention to the question 117.

6    Actually, before I move on, Mr. Lohkamp, who is

7    Mr. Grochocinski?  Do you know?

8    A    I know Mr. Grochocinski worked in IT at Central

9    Dupaige Hospital.

10   Q    What is Central Dupaige Hospital?

11   A    It's a healthcare provider that uses our software.

12   Q    Let's go to 117.  What information is provided in

13   that first box on 117, question 117, on page 12 of

14   this document?

15   A    The name of the person asking the question, Sam

16   Swanson, her email address and the time.

17   Q    Do you know who Sam Swanson is?

18   A    Yes, I do.

19   Q    Who is that?

20   A    She works at Central Dupaige Hospital as well and

21   she supports the users of the supply chain apps.

22   Q    What was her question submitted in the Q and A?

23   A    "Will the functionality be changed in the future

24   so a requisition can contain both Punchout and item

25   master items?"

1    Q    Did you respond to that inquiry or did Lawson

2    respond to that inquiry?

3    A    Yes.

4    Q    What was that response?

5    A    If circumstances change, we will revisit this

6    functionality.

7    Q    All right.  What about -- let's turn to 178.  And

8    it's on page 17.  Can you identify what information is

9    provided in that second column in that box?

10   A    Yes.  It's the name of the person who asked the

11   question, Barb Klag, her email address, and the time

12   she asked the question, 10:36 a.m.

13   Q    Do you know if 10:36 a.m., was this webinar still

14   ongoing or had it concluded by that point?

15   A    It was still ongoing.

16   Q    The email is -- the email domain is CCF.org.  Do

17   you have an understanding of what organization that

18   is?

19   A    Yes.  That's Cleveland Clinic Foundation.

20   Q    What is the question that was submitted at 10:36

21   a.m. by Ms. Klag?

22   A    Can you mix Punchout vendor items, example,

23   Granger and Staples?

24   Q    What was Lawson's response on that particular Q

25   and A?

LOHKAMP - DIRECT                    428

1   A    No.   Items from each Punchout vendor will be

2   placed on a separate requisition.

3   Q    Thank you.

4        Is Central Dupaige a large customer of Lawson's?

5   A    No, it's not a large customer.

6   Q    Since the implementation of the changes to

7   Punchout functionality, have you heard any other

8   feedback from Lawson customers regarding the changes

9   to Punchout functionality?

10            MS. ALBERT:   Objection, hearsay.

11            MR. LO:   It's not going to the truth of the

12   matter asserted, Your Honor.   Again, it's just to show

13   that the company was on notice that customers knew

14   about this change, cared about the feature, and

15   ultimately did nothing about it, and it rebuts the

16   claim by ePlus that all of this was done in bad faith

17   and without regard to the Court's order and placing

18   customer concerns over the Court's order.

19            THE COURT:   Sustained.

20            Anything else, Mr. Lo?

21            MR. LO:   I am crossing out some things, Your

22   Honor.

23   Q    Let me direct your attention to what's been marked

24   as Plaintiff's 1124, sir.   This is a document that was

25   the subject of some testimony yesterday.   Do you

1   recognize Plaintiff's 1124, Mr. Lohkamp?

2   A    Yes, I do.

3   Q    What is it?

4   A    It's an email chain initiating from Mary Finkler

5   first to Mindy Klebe with a copy to myself asking --

6   basically asking if -- asking for one of our customers

7   to be able to speak with a beta or customer who's live

8   on RQC.

9   Q    Let me direct your attention to your response on

10  May 21, 2011 at 3:57 p.m.  It reads, "Hi, Mary.

11  Lawson is live on RQC if you want to have your

12  customers speak to our ITS team."  Do you see that,

13  sir?

14  A    Yes.

15  Q    What did you mean when you said Lawson is live on

16  RQC?

17  A    What I meant was that Lawson internally for its

18  internal procurement requisitioning process, it had

19  already converted over to requisition center and was

20  live in production.

21  Q    Let me just read to you Ms. Klebe's response.

22  "Mary, I agree with Keith.  Requisition center is

23  installed here.  I've tested it.  It works the same

24  always RSS XML."  Do you see that, sir?

25  A    Yes.

1   Q    The requisition center that Lawson was running as

2   of May 31, 2011, did that include Punchout

3   functionality?

4   A    No, it did not.

5             THE COURT:  Mr. Lo, I'm not sure we're

6   getting anywhere here.

7             MR. LO:  Your Honor, may I have one second?

8   I'm just crossing off.

9             THE COURT:  Sure.

10  Q    Mr. Lohkamp, if you were given the option of

11  reversing the changes to Punchout functionality, would

12  you recommend that that option be taken?

13  A    Yes.

14  Q    Can you think of any customer related reason why

15  the changes to Punchout functionality made the Lawson

16  product better than RSS, the adjudged infringing

17  product?

18  A    No, I can't think of any.

19            MR. LO:  Thank you.  Your Honor, I have no

20  further questions.  Just one housekeeping item.  I

21  don't believe I've moved Plaintiff's 1057 into

22  evidence.

23            THE COURT:  Any objection?

24            MS. ALBERT:  No objection.

25            THE COURT:  It's admitted.

431

1          (Plaintiff's Exhibit No. 1057 is admitted.)

2          THE COURT:  We're going to take a 20-minute

3    recess and swtich court reporters while we do it.

4          MR. LO:  Thank you, Your Honor.

5          (Recess taken at 3:20 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  All right.

2

3                      CROSS-EXAMINATION

4  BY MS. ALBERT:

5  Q     Good afternoon, Mr. Lohkamp.

6  A     Good afternoon.

7  Q     Now, you mentioned during your direct examination that

8  you spoke with Mr. Hager from time to time during the

9  spring of 2011 about the development of Requisition

10 Center; correct?

11 A     Correct.

12 Q     And did you discuss the RQC development with Mr. Hager

13 as early as February 2011?

14 A     I don't recall discussing that with him.

15 Q     Well, certainly you were discussing RQC development

16 with Mr. Hager by March of 2011; correct?

17 A     I believe so.

18 Q     You never discussed with Mr. Hager a plan by Lawson to

19 have its customers rip out RSS and replace it with ePlus,

20 did you?

21           MR. LO:  Your Honor, we object.  It's beyond the

22 scope.

23           MS. ALBERT:  He opened the door on the

24 development timeline and the various contingency plans

25 that Lawson discussed with respect to designing around

Lohkamp - Cross

1    Punchout, and I just wanted to delve into that area.

2         THE COURT:  Overruled.

3    A   Yes, I did.

4    Q   Lawson never had a contingency plan, though, to have

5    its customers rip out RSS and replace with ePlus; correct?

6    A   Correct.

7    Q   Were you surprised, sir, when Mr. Hager asked you on

8    March 25th, 2011, what it would cost your most complex RSS

9    user to rip out RSS and replace with ePlus?

10        MR. LO:  Your Honor, same objection.  Outside the

11   scope of direct.

12        THE COURT:  Why is it within the scope of direct?

13        MS. ALBERT:  This relates to --

14        THE COURT:  Part of the option, part of the

15   contingency plan?

16        MS. ALBERT:  Right.

17        THE COURT:  Overruled.  I mean part of the

18   contingency plan examination, all right.

19   Q   Were you surprised, sir, when Mr. Hager asked you on

20   March 25th, 2011, what it would cost your most complex RSS

21   user to rip out RSS and replace with ePlus?

22   A   Yes, I was surprised.

23   Q   Let me show you a document that's been marked as

24   PX-1090.

25        THE COURT:  Do you have another one?  All right.

1    Q    The document that's been marked as Plaintiff's

2    Exhibit 1090 is an email chain, and you received a copy of

3    this email chain; is that correct?

4    A    Yes.

5    Q    And you also were the author of some of the emails on

6    this email chain; correct?

7    A    Correct.

8    Q    And let me refer you to the page marked RQC 26601, and

9    do you see the email at the top of that page?  It actually

10   begins at the bottom of the prior page, 26600 and

11   continues over to the top of 26601; do you see that email?

12           THE COURT:  From Mr. Hager?

13   Q    From Mr. Hager to yourself?

14   A    This one that starts at the top of 26601?

15   Q    Yes, correct, do you see that?

16   A    Yes.

17           THE COURT:  Actually starts at the bottom of the

18   next page showing the address line as Mr. Hager.  You are

19   the addressee.  You have the right one now?

20           THE WITNESS:  Yes, I do.  Thank you.

21   Q    Do you see that Mr. Hager asked you on March 25th,

22   2011, quote, pick your most complex RSS user, if they were

23   told to rip out RSS and replace with ePlus, how long and

24   how much.  I know it's a guess.

25           Do you see that question that Mr. Hager asked you?

Lohkamp - Cross

1    A    Yes.

2    Q    And what was your response that you provided to Mr.

3    Hager?

4            MR. LO:  Your Honor, the questions as to whether

5    something is or is not part of the contingency planning I

6    thought Your Honor has ruled is fair game.  At this point,

7    she's getting into the substance of a communication, and

8    there's been no foundation laid that it now relates to any

9    kind of contingency planning with --

10            THE COURT:  I think that's where she's going.

11   All right, overruled.

12   Q    What was the answer that you provided to Mr. Hager on

13   March 25th at 11:03 a.m. that's shown on page RQC 26600?

14   A    Would you like me --

15   Q    Yes.

16   A    -- to read it?

17   Q    Could you provide us with what you answered Mr. Hager?

18   A    Yes.  I said, here are my thoughts:  Our most complex

19   users have 5- to 8,000 users spread across the country and

20   regularly use the system.  Planning for transition would

21   evaluating all the processes for creating requisitions

22   including approvals.  Interfaces would need to be created

23   between ePlus and Lawson procurement assuming Lawson still

24   creates the PO.  Retraining would be required, strategies

25   for addressing commitments, budget checking would need to

Lohkamp - Cross

1    be in place if even possible, templates would need to be

2    reimplemented, and user setup and security.  So I would

3    guess at least nine months given all the planning, process

4    reengineering, testing, training rollout, interface

5    development, et cetera.  This could run into the hundreds

6    of thousands of dollars given all the time and work

7    required.

8    Q    Did you have any understanding at the time as to the

9    reason for Mr. Hager's question to you?

10   A    No, I did not.

11   Q    You were aware, though, that he was testifying in

12   Virginia on that day, weren't you?

13   A    I was aware he was in Virginia for the trial.  I

14   didn't know if he was testifying that day or not.

15   Q    Thank you.  Now, on direct, you were referred to

16   Defendant's Exhibit 691.  Could you take a look at that,

17   please.  And Lawson counsel referred you to the statement

18   in the fifth paragraph, Lawson counsel referred you to,

19   quote, if we need this, I think customers could live with

20   this but will be unhappy.  Do you recall that?

21   A    Yes.

22   Q    Lawson counsel did not refer to the next sentence.

23   Could you please read that into the record.

24   A    But they will still be able to complete the basic

25   requisitioning process.

1   Q    Thank you.  Now, you mentioned the approval process

2   for requisitions during your direct examination.  Do you

3   recall that?

4   A    Yes.

5   Q    The ePlus patent claim at issue here has nothing to do

6   with the requisition approval process, does it?

7          MR. LO:  Objection, Your Honor.  Outside the

8   scope.  I didn't ask Mr. Lohkamp anything about the

9   patents.

10         MS. ALBERT:  He asked about the approval process

11  for requisitions, so I want to show it has no relevance to

12  the issues involved in the contempt proceeding.

13         THE COURT:  Can't we tell that by reading the

14  patent?

15         MS. ALBERT:  Yes, Your Honor.  I'll move on.

16         THE COURT:  You don't contend that it does, do

17  you, Mr. Lohkamp?

18         MR. LO:  The patent has purchase orders which

19  implicate it, but the words approval process are not in

20  the claims, Your Honor.

21         THE COURT:  That isn't what I asked you.  Get

22  your tongue around yes or no.  Which is it?

23         MR. LO:  We do not contend that, Your Honor.

24  Q    Now, you are aware of customers that have implemented

25  Requisition Center in production; correct?

1    A    Correct.

2    Q    One would be Tucson school district; correct?

3    A    Yes.

4    Q    And Tucson school district's Lawson system with

5    Requisition Center also includes Punchout; correct?

6    A    I'm not certain right now.

7    Q    You mentioned that you had received some feedback from

8    customers regarding change number one that was made to the

9    Punchout requisitioning process, and you mentioned Central

10   Dupaige Trinity Health and Cleveland Clinic; do you recall

11   that?

12   A    Yes.

13   Q    So these customers had already implemented Requisition

14   Center and Punchout in their production systems; is that

15   correct?

16   A    No.

17   Q    Well, how were they providing you feedback on change

18   number one if they hadn't implemented it?

19   A    They provided feedback via the questions and the Q&A

20   based on the change we presented.

21   Q    So their feedback had no relationship to whether they

22   had used the system or not; correct?

23   A    Correct.

24   Q    Now, you said that the modifications that were made to

25   the requisitioning process for Punchout items degraded

1  functionality; is that your position?

2  A    Yes.

3  Q    But didn't you tell your customers that Lawson had

4  developed superior replacement product, Lawson Requisition

5  Center?

6  A    Yes, we did.

7  Q    And you didn't mean to mislead your customers, did

8  you?

9  A    No, we did not.

10  Q    Lawson intends to be truthful and accurate in its

11  customer presentations; correct?

12  A    Yes, we do.

13  Q    Lawson also told its customers that Requisition Center

14  delivers all necessary functionality required by

15  customers; correct?

16  A    We said 100 percent of needed functionality,

17  functionality you need.

18  Q    That was an accurate statement; right?

19  A    Yes.

20  Q    And Lawson also told its customers that Lawson

21  Requisition Center is a new, easy to use, web-based

22  requisitioning solution that can be set up by customers to

23  provide a streamlined way to automate, expedite, track,

24  and simplify the requisitions process; correct?

25  A    Correct.

1          MS. ALBERT:  Nothing further.

2

3                    REDIRECT EXAMINATION

4    BY MR. LO:

5    Q    Mr. Lohkamp, you were asked questions about statements

6    regarding the superiority of RQC to RSS; do you recall

7    that?

8    A    Yes.

9    Q    To your knowledge, what functionalities did those --

10   did that statement refer to?

11   A    It referred to being able to add mobile requisitions

12   and also the design that we had made, the direct to

13   requisition, so the initial feedback we had gotten from

14   customers that we described it to, they felt that that was

15   going to be a benefit to them by helping to validate the

16   requisition line immediately rather than having the items

17   held in a temporary state and validating at the end.

18   Q    Did you ever tell a client that the -- a customer that

19   the change in Punchout functionality that is at issue in

20   this case made RQC a product that is superior to RSS?

21   A    No, I did not.

22          MR. LO:  Nothing further, Your Honor.

23          THE COURT:  Do either one of you need Mr. Lohkamp

24   for any other parts of the case?

25          MS. ALBERT:  ePlus intends to call Mr. Lohkamp

1   during the infringement phase.

2           THE COURT:  All right, you are temporarily

3   excused, Mr. Lohkamp.

4           THE WITNESS:  Thank you, Your Honor.

5           THE COURT:  All right, next witness.

6           MR. LO:  Your Honor, Lawson calls for its next

7   witness Dr. Benjamin Goldberg.

8           THE COURT:  They need the defense system up.

9           MR. STRAPP:  Sorry to interrupt the proceedings.

10  We thought for your convenience it may be useful to

11  provide you with a redline version of Dr. Goldberg's

12  report that strikes out the paragraphs that were

13  referenced in your order of last week.

14          THE COURT:  All right.  Thank you.  I'll only use

15  that --

16          MR. STRAPP:  Only if necessary.

17          THE COURT:  Yes.

18

19              **BENJAMIN F. GOLDBERG,**

20  a witness, called at the instance of the defendant,

21  having been first duly sworn, testified as follows:

22                  DIRECT EXAMINATION

23  BY MR. LO:

24  Q   Good afternoon, Dr. Goldberg.

25  A   Good afternoon, Mr. Lo.

1    Q    Would you please state and spell your name for the

2    record, please.

3    A    Sure.  Benjamin Frederick Goldberg, B-e-n-j-a-m-i-n,

4    F-r-e-d-e-r-i-c-k, G-o-l-d-b-e-r-g.

5    Q    Dr. Goldberg, what is your current occupation?

6    A    I'm associate professor of computer science at NYU.

7    Q    And are you a tenured professor?

8    A    Yes.

9    Q    How long have you been teaching at NYU?

10   A    26 years.

11   Q    And what types of courses do you teach at NYU?

12   A    I tend to teach the more practical courses,

13   programming languages, operating systems, computer

14   hardware design, software development.

15   Q    And do you have any particular areas of expertise

16   within computer science?

17   A    Well, my research interests include programming

18   languages, compilers, software development, and program

19   verification which is proving that programs operate as

20   they are supposed to.

21   Q    And does your research involve database systems at

22   all?

23   A    I certainly teach database systems, and database

24   systems comprise much of the core of software development

25   these days.

1          MR. LO:  Your Honor, we proffer Dr. Goldberg as

2    an expert in the fields of programming languages,

3    compilers, databases, and software development.

4          THE COURT:  Any objection?

5          MS. ALBERT:  No objection.

6          THE COURT:  He is so accepted.

7    Q    Dr. Goldberg, would you please describe the work you

8    did for this case?

9    A    Yes.  I was asked to analyze the source code for the

10   current Lawson system, as well as the Lawson system that

11   was at issue previously at trial, to determine what the

12   changes were and the effect of those changes.

13   Q    Did you know why you were asked to make this analysis?

14   A    My understanding is to assist the Court in determining

15   whether those changes were significant and ultimately,

16   perhaps, whether the changed system infringes the '683

17   patent, claim 26.

18   Q    And you understand that for the purposes of today's

19   examination, all of my questions will be directed only to

20   those things related to colorability; do you understand

21   that?

22   A    I do.

23   Q    Just really quickly because the Court is aware of it,

24   would you just describe what were the infringing products,

25   and what you deem to be the new products just for

1    terminology sake?

2    A    Yes.   The infringing products was a Lawson procurement

3    system which included, among other things, the RSS, the

4    requisition self-service module, along with the Punchout

5    module or procurement Punchout module, and also in one

6    configuration, the electronic data interchange or EDI

7    module.

8    Q    And what about the new products?

9    A    The new product has many of the same modules as the

10   previous product, but instead of the RSS, it now has a

11   module called Requisition Center, RQC.

12   Q    And do you have an understanding of what these

13   software are used for?

14   A    Yes, I do.

15   Q    And what is it?

16   A    That is shopping for items from multiple places,

17   Punchout vendors, so-called item master, putting them on a

18   requisition, and generating purchase orders from that

19   requisition.

20   Q    And how did you conduct your analysis just comparing

21   RSS to RQC?

22   A    Well, the focus was really the source code, and that

23   is the way the humans write the source code which

24   ultimately gets compiled and run on computer systems.   So

25   I analyzed the previous version of the Lawson system

1   focusing on RSS and the parts of -- other parts of the

2   Lawson system that were affected by the use of RSS, and I

3   focused on RQC in the new system particularly paying

4   attention to the changes and what the impact of those

5   changes in the source code was.  I also used both systems,

6   the RSS and RQC, on the demonstration laptop.

7   Q     In performing your analysis, did you look at what are

8   called diff files, d-i-f-f?

9   A     Yes, I did.

10          MR. LO:  Mr. Simmons, would you put up 204,

11  please.

12          THE CLERK:  Pardon me?  What was the number?

13          MR. LO:  204.  It's a slide.

14          THE CLERK:  Defendant's?

15          MR. LO:  No, it's juts a graphics demonstrative.

16  A     Yes.  So this is a -- a diff file is simply a

17  computer-generated result which comes from comparing two

18  different versions of a file.  What you are seeing here is

19  a file on the left side and the right side.

20      This is computer code.  The left side is RSS, on the

21  right side is RQC, and what the tool does, this diff tool,

22  is highlight, particularly in gray and yellow shading,

23  differences between the left-hand side and the right-hand

24  side essentially a redline version of source code.

25      So this is a way of honing in very quickly on those

Goldberg - Direct

1    lines in the new system that are different from the old

2    one, and this is just an example of one screen of many

3    that I looked at.

4    Q    Besides using the software and looking at the source

5    code, did you do anything else as it relates to your

6    colorability analysis?

7    A    Yes.  I examined the deposition testimony regarding

8    the use of the product, I spoke to Lawson employees, I

9    looked at documents talking about the changes.

10   Q    And are all of those materials the type normally

11   reviewed by experts in your field for this type of

12   analysis?

13   A    Yes, certainly.

14   Q    Did you find any relevant changes between RSS and RQC?

15   A    Yes.  The fundamental change as it relates to claim 26

16   is the inability to have a session where one uses a single

17   requisition and is able to visit the item master and

18   Punchout vendors and put all the items that you want onto

19   a single requisition.

20   Q    And did you try this functionality in both RSS and

21   RQC?

22   A    Yes.  So I certainly, in the demonstration laptop, did

23   so on RSS.  One is easily able to do that, but in RQC it's

24   impossible to do that.

25   Q    Have you prepared a demonstration of RQC as relates to

Goldberg - Direct

1   this functionality?

2   A    Yes, so that the Court could see the actual software

3   in operation.  This is a video of the actual use of the

4   RQC product, the new interface, and as we'll see, it's

5   going to prevent the user from going to multiple places

6   and putting all the items onto a single requisition.

7   Q    Okay.  Can you describe what we're looking at?

8   A    Sure.  So this will be in segments.  What we're seeing

9   here is the RQC screen, and initially what we will see is

10  the user shopping from the item master and putting an item

11  from the item master into the requisition.

12       The requisition is on the right-hand side.  So I'll go

13  ahead and start it running, and here you see the user

14  clicking search catalogs, searching the item master, and

15  the user is looking for a goat here, and there are some

16  goats available for purpose.  He's going to select the

17  dairy Nubian goat which you see once he's added it is now

18  on the requisition on the right-hand side.  You'll see the

19  Nubian goat.

20       Now what the user is going to do is try to go to a

21  Punchout, a different vendor, while keeping this same

22  requisition, and so he's going to select Punchout, but

23  what's going to happen is he's going to be stopped by this

24  message that says, you can't use the same requisition if

25  you're going to a different Punchout vendor.

1        And so the user has a choice of either hitting cancel,

2   in which case he goes back to the item master and keeps

3   the requisition he's using, or he clicks continue which

4   will bring him to a Punchout vendor but will clear this

5   requisition from the screen and create a new one.  That's

6   what we're about to see.

7        He's going to click continue, and now you'll see

8   there's a new blank requisition on the right-hand side.

9   The item, the goat, was gone, and he cannot go any further

10  with that previous requisition if he's going to proceed to

11  the Punchout vendor.

12       So now he has a brand new requisition, and he can go

13  ahead and proceed to a Punchout vendor, so he clicks

14  Punchout.  He chooses Staples.  Now he gets a message

15  saying, well, you are leaving the Lawson website.

16       This is not the change that I found significant.  This

17  is just a notice to the user.  It was the previous screen

18  that he saw that would not let him proceed while using

19  that same requisition.

20       So the user here would click okay, and what you'll see

21  is that he's going to proceed to the Staples Punchout

22  site, and he's going to shop at Staples and adding items

23  to the Staples cart and then ultimately bringing those

24  items over to the new requisition which is associated with

25  Staples and cannot be used for any other vendor but

1   Staples.

2       So he's added an item to the list, he's clicking check

3   out from Staples, and now he's going to click submit which

4   will bring the item from Staples into his requisition in

5   the RQC system.

6       Now we see that he chose a Swingline stapler.  It's in

7   his requisition, but, of course, that's a different

8   requisition than the goat was on, and so that requisition

9   is not accessible at this point.

10      So the -- now in the demonstration, suppose he wants

11  to go to Dell.  When he clicks on Dell, he's going to get

12  a similar message he saw before saying he can't go any

13  further with the current requisition without closing out

14  that requisition and starting a brand new one.  Again, he

15  can click cancel to bring him back to Staples, but if he

16  wants to proceed with Dell, it has to be with a whole new

17  requisition.

18      So if he clicks continue in order to go on to Dell, we

19  see that the requisition screen is cleared, it's a brand

20  new requisition, and he's now ready to shop at Dell, but

21  it's on a new requisition.

22  Q   From a source code perspective, how are these changes

23  implemented?

24  A   So what the Lawson engineers had to do was they had to

25  go back, and they had to associate code that performed a

1    check for every button that the user could click that

2    could take the user from a Punchout vendor to another

3    Punchout vendor, or from item master to a Punchout vendor,

4    or vice versa.  Any possible way, they inserted a check to

5    make sure that the current requisition did not have any

6    items on it that weren't from the place that the user was

7    going to.

8         In fact, what I showed you in that diff file was an

9    example of that code that made the check would not allow

10   the user to proceed to another site if there's items on

11   the current requisition.

12             THE COURT:  Excuse me, Dr. Goldberg.  That which

13   is up on the screen now, it's hard for me to read, but is

14   it Dell?

15             THE WITNESS:  This is -- we're still in RQC but

16   --

17             THE COURT:  Is that Dell?  Is that the Dell

18   product up there or the Staples product?

19             THE WITNESS:  There's no product on here.

20             THE COURT:  Go back to where it had a stapler on

21   there, would you, please.

22             THE WITNESS:  Sure.

23             THE COURT:  Do you know how to do that?  I mean

24   can that be done?  Those are different questions.

25             THE WITNESS:  Is there any way to speed through

1   it?  Unfortunately, the way that PowerPoint works, it's

2   not so easy to go back to the middle of the video.  So

3   here's the goat from the item master.

4           THE COURT:  Okay, just take the goat.  The goat

5   is there.  I want to buy the goat.

6           THE WITNESS:  Right.

7           THE COURT:  I want to buy the goat.  I also need

8   a stapler, all right?  I can't get it on the same

9   requisition.

10          THE WITNESS:  Right.

11          THE COURT:  Can I save that requisition somewhere

12  and then go to the stapler?

13          THE WITNESS:  That's correct.  I can save the

14  requisition -- well, the requisition is in the database.

15  So when I go to get my stapler, that requisition is in the

16  database.  It's not accessible at the moment on the

17  screen.

18          THE COURT:  No, but I can save my goat.  Can I

19  save the goat requisition?

20          THE WITNESS:  Yeah, you haven't lost it.

21          THE COURT:  Then I go to the stapler requisition,

22  and I get a call and say, that's the end of what I want to

23  buy now today.  So can I go somewhere and call them up one

24  at a time and say, I want the goat, I want the stapler,

25  and say, submit, place the order and let's go?

1          THE WITNESS:  Yes.  You'd go back to the goat

2     requisition, submit that, then go back to the stapler

3     requisition and submit that.  They are two separate

4     requisitions.

5          THE COURT:  Is there a way, if I have the two

6     staplers, the stapler and a Dell stapler, for example,

7     there were two of them, is there a way I can look at the

8     requisitions side by side just to see the different

9     prices, or do I have to write the prices down on a piece

10    of paper to remember them?

11         THE WITNESS:  Within RQC, there's no way to see

12    them side by side.  You can only deal -- RQC can only

13    handle one requisition on the screen.

14         THE COURT:  All right, thank you.  Excuse me, Mr.

15    Lo.

16         MR. LO:  Not a problem, Your Honor.

17    Q    Dr. Goldberg, you were testifying about the database

18    changes.  Have you prepared a demonstrative to talk about

19    how those were implemented?

20    A    Yes.

21    Q    207.  It's a graphic.

22    A    What Lawson engineers had to do was actually related

23    to what the Judge was asking about, is suppose I went back

24    and brought up my Staples requisition.  What is to stop me

25    from later on adding Dell items to it?  Well, the answer,

1    what they did is they had to store information in the

2    database about each requisition and identified where the

3    items from that requisition came from.  So they used a new

4    field in the database -- I should say a previously unused

5    field, that labeled each requisition with the source of

6    its items.

7            THE COURT:  Excuse me, Dr. Goldberg.  I wasn't

8    talking about whether you could add the requisition one to

9    the other.  I was asking about whether you could see the

10   two so I could make the comparison.

11           In other words, if I'm buying staplers and I want

12   to buy -- I want to remember what the prices are, can I

13   look at the two requisitions or something on this system

14   and say, all right, this stapler is $50, this stapler is

15   $40, I decide I want the $40 one, good-bye $50 one, can I

16   do that?

17           THE WITNESS:  In RQC, you can't compare them side

18   by side.  I knew that was your question.

19           THE COURT:  Something you said led me to believe

20   that maybe I had not asked it correctly.

21           THE WITNESS:  No, no, no.  I was just referring

22   to the fact that you can go back tomorrow and pull out a

23   requisition that you were working on, and --

24           THE COURT:  Pardon me for interrupting.

25           THE WITNESS:  No, no.  Not at all.  What they had

1    to do is, what's to stop me tomorrow going out and pulling

2    out a requisition and adding items from a second vendor to

3    it?

4            Well, the answer is they had to use a field in

5    the database that RSS hadn't used previously in order to

6    associate with each requisition exactly where those items

7    came from.

8            THE COURT:  They do that by changing the source

9    code?

10           THE WITNESS:  The change in the source code was

11   in RQC.  The database is the data that changed.  So as you

12   can see --

13           MS. ALBERT:  Your Honor, I'm objecting to this

14   testimony, this description about the database changes.

15   It's not in Dr. Goldberg's report.

16           MR. LO:  Your Honor, this would be at --

17           THE COURT:  Show me where it is, Mr. Lo.  What

18   slide are we on here so I can find it?

19           THE WITNESS:  204.

20           THE COURT:  No, 204 is the diff file.

21           THE CLERK:  207, he said, Your Honor.

22           THE COURT:  207 is a computer store, this with

23   all these things on it.  You've got something that's a --

24   it's part of it, I guess.

25           THE WITNESS:  It's the animated version of that.

 1              THE COURT:  In other words, what he has got on

 2   the tape is the animated version of the hard copy.

 3              THE WITNESS:  Correct.

 4              THE COURT:  Computer, excuse me.

 5              MR. LO:  The database changes themselves are

 6   described in paragraph 37, Your Honor.

 7              THE COURT:  What page is it?

 8              MR. LO:  Page nine of Dr. Goldberg's report.

 9              THE COURT:  Where on page nine?  There's a lot of

10   words.

11              MR. LO:  Sure.  It's paragraph 37.

12              THE COURT:  The whole paragraph?

13              MR. LO:  Yes, Your Honor.

14              THE COURT:  Let me read it.

15              MS. ALBERT:  This says the database has not

16   changed.

17              THE COURT:  Now he's saying the database did

18   change.  That's a fairly significant difference.

19              MR. LO:  Your Honor, may I clarify with the

20   witness?

21              THE COURT:  We're going to strike all the

22   testimony that says the database changed unless you can

23   show me something in here that says it does change,

24   because he's got a report that says it doesn't.

25              MR. LO:  Yes.

1          THE COURT:  All that testimony is stricken.  You

2    need to ask your questions again.

3          MR. LO:  Sure.

4    Q    Dr. Goldberg, in implementing the changes from RSS to

5    RQC as relates to Punchout, what was done, if anything,

6    with the database?

7    A    The database code didn't change.  As I stated in my

8    report, at least one field in the database is now utilized

9    differently by RQC in order to facilitate the changes to

10   the Punchout limitations.

11       So as I was testifying before, there's a field that

12   wasn't used before that is now used.  That field simply

13   associates the requisition with where the items in that

14   requisition came from.

15         THE COURT:  But the database itself has not

16   changed?

17         THE WITNESS:  The code of the database did not

18   change.

19         THE COURT:  That's not what the sentence says.

20   The sentence says, while the database itself indeed has

21   not changed.  We're not talking about the code of the

22   database.  We're talking about the database.  Which is it?

23   Either the database changed or it didn't.

24         THE WITNESS:  Well, this report is talking about

25   the code, so the code did not change.  There's no question

1    that the field in the database is now utilized

2    differently.  The numbers stored there will be different.

3    The not changing is the fact that there's no code that

4    changed on that site.

5          THE COURT:  Well, is that all right with you, Ms.

6    Albert?

7          MS. ALBERT:  That's fine, but I think his

8    demonstrative may be misleading.

9          MR. LO:  We can restart the demonstrative and use

10   different terminology if it will satisfy Ms. Albert's

11   concerns, but I think the testimony is what it is.

12         THE COURT:  From my purposes, I'm taking as a

13   given that the database itself did not change, and there

14   will be no testimony to the contrary by this witness,

15   because that's what this witness said in this report.

16   Whatever else he's got to say about the code he can point

17   to, and if she objects to that, then she can -- if she

18   doesn't object to it, fine.  If she does object to it,

19   then you'll be able to point to somewhere in the report

20   where it says that; okay?

21         MR. LO:  Yes, Your Honor.

22         THE COURT:  At this juncture, I'm going to strike

23   everything that's been said about paragraph 37 and allow

24   you to start over again.

25         Ms. Albert, would you please listen so that in

1    the event you have any objections, you can articulate

2    them, or if you don't, you don't have any objections, and

3    I won't run into them down the road after several

4    different sentences have been spoken.  All right, go

5    ahead, Mr. Lo.  Pardon me.

6              MR. LO:  Thank you, Your Honor.

7    Q    Dr. Goldberg, in RQC, is there anything in the

8    software that controls whether a user may place onto a

9    single requisition items from two different Punchout

10   vendors?

11   A    Yes.  There's software in RQC that certainly does

12   prevent the user from accessing a requisition that -- and

13   putting items on to it from a source that is different

14   from the items that are already on the requisition.

15   Q    And to take on Judge Payne's question earlier, if a

16   user were to place something from Dell today into a

17   requisition and then come back to that requisition

18   tomorrow, is there anything in the source code in RQC that

19   prevents, at that point, a user from putting in something

20   from Staples, for example?

21   A    Yes.  When RQC extracts the requisition from the

22   database, it examines the field that indicates where the

23   current items came from, and if that's not the same place

24   that the user is going to to shop, it will prevent the

25   user from shopping.

1    Q    And so in your analysis of the source code, is that

2    something that a user can thwart by turning off the

3    computer, by waiting it out, by clicking on a button or

4    anything like that?

5    A    No.  That information is stored, and it's also

6    associated with the requisition.

7            THE COURT:  Because there's -- because of the

8    source code.

9            THE WITNESS:  Yes.

10   Q    The changes, and let's just get our terminology

11   correct, Dr. Goldberg.  You understand that there are two

12   basic changes that we've been discussing in these

13   proceedings?

14   A    Yes.

15   Q    And just for shorthand, can we say change number one

16   is the one that prevents a user from storing on a single

17   requisition items from item master and Punchout?

18   A    Okay.

19   Q    And change number two is the change that prevents

20   users from putting on a single requisition items from two

21   or more Punchout vendors?

22   A    Yes.  I'd also like to emphasize it doesn't get to the

23   point of being able to store.  You can't even go to a

24   Punchout vendor if you have items from somewhere else on

25   the requisition.  So it's even more restrictive than what

1   you just said.

2   Q    Yes.  Thank you for that correction.  I was using

3   shorthand, but thank you.  These changes to Punchout

4   functionality, did you believe they had an impact on

5   usability?

6   A    Yes.

7   Q    And how so?

8   A    Well, in RSS, you are free to go from one Punchout

9   vendor to the next to item master in one session, that is

10  one use of a single requisition, putting everything you

11  want on the requisition, and then when you are ready,

12  checking it out and only a single requisition will be

13  issued to be approved subsequently downstream.

14       In RQC, you can't do that.  If you are shopping from

15  multiple places, you need that many requisitions.  They

16  all have to be released and subsequently reviewed.

17  Q    Any other implications?

18       THE COURT:  Of what?

19  Q    Of the changes from RSS to RQC as it relates to the

20  Punchout functionality.  Any other implications for the

21  user of the software?

22  A    Yes.  Again, you are not able -- because you are not

23  able to see all the items that you've shopped for on the

24  screen at once, if you've shopped from multiple places, it

25  becomes more difficult to compare them.  You are at the

1   point of having to write down what you see or type it in

2   somewhere else.

3   Q    And did you evaluate whether these changes were

4   significant?

5   A    Yes.

6   Q    How did you evaluate whether they were significant or

7   not?

8   A    I thought about whether these changes removed

9   functionality that were significant to the user who is

10  performing the shopping, and, in fact, as we just

11  discussed, it's a significant change, being able in the

12  old system to shop -- one-stop shopping, so to speak, put

13  everything you want in a single requisition, and now you

14  are no longer able to do that.

15  Q    From a technological perspective, did you view the

16  changes to the Punchout functionality as a step backward,

17  a step forward, indifferent?  How did you view it?

18  A    It's clearly a step backward in the sense that

19  something that was provided, supported for the user is no

20  longer.

21  Q    In your evaluation of the software, RSS and RQC, did

22  you find anything about the Punchout changes, Punchout

23  functionality changes that rendered the new functionality

24  superior to the existing one?

25  A    No.  It's strictly a reduction in functionality.

1    There's no additional -- there's no benefit.

2    Q    We've been using a little bit of shorthand in terms of

3    the Punchout functionality changes, and there are two of

4    them, change number one and change number two.  Do you

5    have an opinion as to whether each individual change is

6    specific, both of them are specific, or only one them --

7    strike that question, Your Honor.

8         We've been talking about two different changes to

9    Punchout functionality, change number one and change

10   number two.  Did you deem change number one alone to be a

11   significant change or not?

12   A    It certainly was significant in the sense that the

13   functionality was reduced.  Change number one prevents you

14   from going between item master and Punchout on the same

15   requisition.

16        RSS allows you to do that.  RQC does not.  So in that

17   sense, it was significant.  It certainly wasn't

18   significant as those two restrictions together which

19   really prevent any way of shopping from multiple places

20   and putting them all in the same requisition.

21   Q    And a similar question, taking just change number two

22   in isolation, did you view that change as being a

23   significant one to the functionality at issue?

24   A    Yes.  Again, it removes a feature, and if I'm a

25   customer paying for Punchout, then I'm certainly getting

1   less functionality there.  Again, you know, considered

2   together, it's far more significant.

3   Q    You mentioned earlier that in reaching your

4   colorability analysis, you spoke to some Lawson employees;

5   is that correct?

6   A    Yes.

7   Q    Why did you do that?

8   A    I was interested, first, in the process for which

9   changes were made but also the effect on customers.

10  Q    And what did you learn?

11           MS. ALBERT:  Objection.  Hearsay, first of all.

12           MR. LO:  Your Honor --

13           THE COURT:  What's hearsay; the discussion with

14  the customers?

15           MS. ALBERT:  Yes.

16           THE COURT:  That's not hearsay.  That's double

17  hearsay.  Is that your objection?

18           MS. ALBERT:  Right.

19           THE COURT:  Or are you objecting to whatever --

20  now we're talking about he's now reciting the

21  customers' -- whatever the customers said to Lawson.

22           MS. ALBERT:  Right.

23           THE COURT:  And what Lawson said the customer

24  said, so we've got two degrees of hearsay.  How do you get

25  by that one?

1          MR. LO:  It's under 703, Your Honor.  We're not

2     seeking to admit those statements.  I'm simply getting his

3     basis, Dr. Goldberg's basis for reaching his opinions, and

4     they can question him as to whether that's an appropriate

5     basis or not, but Dr. Weaver, for example, also looked at

6     communications within Lawson and outside of Lawson, and

7     it's the type of evidence that experts in the field look

8     at to reach their conclusions.

9          MS. ALBERT:  I have an additional objection that

10    no discussions relating to any customer discussions are

11    set forth in Dr. Goldberg's report.

12         THE COURT:  Where are they in the report, Mr. Lo?

13         MR. LO:  So there are discussions, Your Honor,

14    about the --

15         THE COURT:  Give me page and a line or a page and

16    a paragraph, excuse me.

17         MR. LO:  Yes.  Page 62.

18         THE COURT:  62, all right.

19         MR. LO:  I'm sorry, Your Honor.  I gave you the

20    wrong paragraph.  Your Honor, I'll withdraw for now the

21    question about customers.

22         THE COURT:  All right.

23    Q   Dr. Goldberg, why did you have discussions with folks

24    at the company about the software, and without reference

25    to customers, obviously.

1    A    Certainly.  To confirm my understanding of the nature

2    of the changes, particularly the source code changes.  My

3    analysis is primarily based on the source code, but I find

4    it important also to talk to the engineers to confirm my

5    analysis.

6    Q    Dr. Goldberg, did you also look at the prosecution

7    history of the '683 patent in connection with your

8    analysis?

9            MS. ALBERT:  Objection, Your Honor.  This falls

10   within the scope of the subject matter that you excluded

11   on your order.

12           THE COURT:  It may when he asks the questions,

13   but right now he asked if he looked at something, and you

14   are apprehending what he's going to say.  I find that

15   ruling in apprehendo is not necessarily the best way to

16   go.  All right, so did you look at the file wrapper; is

17   that what you asked?

18           MR. LO:  Yes, Your Honor.

19           THE COURT:  Yes or no?

20           THE WITNESS:  Yes.

21           THE COURT:  Mr. Lo, knowing there's going to be a

22   question, an objection maybe, let's see what happens.  All

23   right, Mr. Lohkamp.

24   Q    Was there anything in the file wrapper discussing

25   whether the functionality at issue of being able to put,

1   on a single requisition, items from multiple stores as

2   being whether it was a benefit or a disadvantage?  Was

3   there anything in the file wrapper that illuminated that

4   issue?

5           MS. ALBERT:  Objection, Your Honor.  The

6   discussion of prosecution history that is in Dr.

7   Goldberg's report is in the infringement section, and it's

8   not relevant to colorability, and also it's premised on

9   the argument of claim construction which is the subject of

10  your order excluding certain of his paragraphs.

11          THE COURT:  Where in the report does he mention

12  what you are asking about in respect of colorability, Mr.

13  Lo?

14          MR. LO:  Yes, Your Honor, it is paragraph -- let

15  me give you the page number first, Your Honor.  It's on

16  page 128 and flows into 129.

17          THE COURT:  Give me a minute.

18          MR. LO:  Sure.

19          THE COURT:  Part of 128 has been stricken.  360

20  says the prosecution history further supports the fact.

21  Is that what you are talking about?  I just want to make

22  sure I'm at the right place.

23          MR. LO:  Yes, and I'm taking a look at the

24  version.  Your Honor, at least on the version that Mr.

25  Strapp handed up, 360 is not stricken.

 1             THE COURT:  No, it's not.

 2             MS. ALBERT:  This goes to the issue that you

 3     raised in your orders last week about preclusion of

 4     reargument of infringement and invalidity and claim

 5     construction, and that's what this paragraph of the report

 6     is directed to, and, in addition, this is in the

 7     infringement section of Dr. Goldberg's report rather than

 8     the colorability section.

 9             I believe the section begins on page 109.  It's

10     titled The New Limitations on Use of Punchout Avoid

11     Infringement.

12             THE COURT:  I don't see anything in here that

13     even remotely relates to colorability in paragraphs 360,

14     -61, and -62, which I have now read, Mr. Lo, with the sole

15     exception of something I'm not sure you even asked about,

16     so ask your question again.  Don't answer it, please, sir,

17     so I can hear your question again.

18             MR. LO:  Yes.

19             THE COURT:  I've gotten off the track, and I may

20     just be wrong about it.

21     Q    Did you see anything in the prosecution history that

22     talked about whether it was an advantage to be able to put

23     shopping items from multiple stores into a single

24     requisition?

25             THE COURT:  All right, you can answer -- do you

1    object to that?

2              MS. ALBERT:  I don't see how the prosecution

3    history bears on the issue of colorability.

4              THE COURT:  That's an interesting observation,

5    but do you object?  I rule on objections.

6              MS. ALBERT:  Objection based on relevance.

7              THE COURT:  It doesn't have anything to do with

8    colorability.  Is that why you are saying it's not

9    relevant?

10             MS. ALBERT:  That's one issue.  Also, it's going

11   to issues of validity which your order said we're not

12   going to rehash.

13             MR. LO:  Your Honor, my question is not

14   attempting to solicit anything on validity.  It's not

15   going to go anywhere near claim construction.  I'm not

16   going to be asking about the claim.

17             I'm simply asking the witness whether he's seen

18   any statements about whether the functionality at issue is

19   advantage or not, and that statement would be relevant to

20   an analysis here whether it appeared in an ePlus marketing

21   brochure, anywhere else.  The fact it happens to be the

22   prosecution history, I think, probably gives it more

23   credence, but I'm not attempting to argue validity or

24   claim construction.  Neither of those objections will come

25   up in my questioning.

1              THE COURT:  Objection overruled.

2              MR. LO:  Thank you, Your Honor.

3    Q    Dr. Goldberg, did you see anything in the prosecution

4    history of the '683 patent that talks about whether the

5    functionality at issue was an advantage or disadvantage

6    for users of software?

7    A    Yes.  There is a passage where the patentee talks

8    about the advantages of his invention.

9    Q    Let me put up a copy of it for you.  It's in 211.

10             THE COURT:  What are you talking about, Mr. Lo?

11             MR. LO:  It's 208 on the slide deck in front of

12   Your Honor.  I'm just showing him the passage.

13             THE COURT:  It's not 208 on mine.

14             MR. LO:  Is it 212, Your Honor?

15             THE COURT:  Yes.

16             MR. LO:  Thank you, Your Honor.  Sorry about

17   that.

18   A    So related --

19             THE COURT:  Except that's not the one that's in

20   the report.

21             MR. LO:  Your Honor, it's the one on page 129,

22   and it is --

23             THE COURT:  Where?

24             MR. LO:  The second citation on paragraph 360,

25   response to first office action dated December 8, 1997,

1    page 15.  It's in the middle or second half of that

2    paragraph.  There's a citation to that.

3              THE COURT:  Can't use the slide.  It doesn't say

4    that in the report.  You can use what's in the report, and

5    that's all.

6              MR. LO:  Yes, Your Honor.

7    Q    Dr. Goldberg, what did you find in the prosecution

8    history -- what did you find in the prosecution history

9    that related to the functionality you analyzed for this

10   proceeding?

11   A    I found passages in the response to an office action

12   during the patent prosecution that touted the benefits of

13   essentially all-in-one shopping where the patentee talked

14   about the capability of shopping many stores at once and

15   being able to purchase all of the selected items from

16   desired sources without having to wait in the checkout

17   line in each store.

18   Q    And do you know which office action that happens to

19   be?

20   A    It's the response to the first office action dated

21   December 8th, 1997, that's found on page 15 of that

22   response.

23   Q    Did that response have any impact on your conclusions

24   here?

25             THE COURT:  You mean that text that he just read?

 1          MR. LO:  Yes, Your Honor.

 2          THE COURT:  The response is a whole lot more than

 3   just that text, I assume.

 4          MR. LO:  Fair enough, Your Honor.

 5   Q    Did the portion which you just testified to affect

 6   your analysis in this case?

 7   A    Yes, to the extent that the patentee claimed that

 8   being able to perform these kinds of actions was a

 9   benefit, that benefit has been removed from the Lawson

10   system, and I found that significant.

11   Q    Dr. Goldberg, just to wrap up a little here, from the

12   perspective of a user, did you see any possible benefits

13   that arise out of the changes to Punchout functionality?

14          THE COURT:  I think he's answered that.

15          MR. LO:  Your Honor, that's fine.  I will move

16   on.

17   Q    In your opinion, if Lawson were permitted legally to

18   revert back to RSS Punchout functionality, do you see any

19   technological or software reasons why you would not

20   recommend doing so?

21          MS. ALBERT:  Relevance.  Objection; relevance.

22          MR. LO:  Your Honor, it's a question that goes to

23   which version, the old or new, Dr. Goldberg thinks is

24   better.

25          MS. ALBERT:  It's also not in his report.

1           THE COURT:  Is it in his report?

2           MR. LO:  Your Honor, the entire report --

3           THE COURT:  Is it in his report?

4           MR. LO:  Yes, it is, Your Honor.

5           THE COURT:  Where is it?  He is an expert in

6    various areas of computers.  I'm not sure he's been

7    qualified as an expert in selling products or in

8    advertising products or making decisions which to buy,

9    which to make.  He may be, but he wasn't qualified in that

10   area.  What page?

11          MR. LO:  Page 57, paragraph 158.

12          MS. ALBERT:  Objection, Your Honor.  This

13   paragraph has nothing to do with if the injunction was

14   somehow vacated.

15          THE COURT:  I don't think that 158 supports that

16   question.

17          MR. LO:  Your Honor, I can rephrase the question.

18   Actually, Your Honor, I'll withdraw the question.

19          I'm done with my questions for Dr. Goldberg, Your

20   Honor, but just as a matter of preserving our objections,

21   the Court issued an order last week directing Dr. Goldberg

22   not to testify as to the underlying trial and anything

23   that happened there, and the Court is aware, Dr. Goldberg

24   did offer opinions relating to colorability that was based

25   on what he perceived to have been contended at the

1    underlying trial.  So I want to respect the Court's order,

2    and I just ask the Court, would the Court accept Dr.

3    Goldberg's report as effectively our offer of proof on

4    that issue?  That way I can preserve my objections and, of

5    course, respect the Court's order.

6            MS. ALBERT:  We'd object to that.  I mean that --

7            THE COURT:  Let me short-circuit this.  You can't

8    put in his whole report as your offer of proof.  You can

9    take out the parts you want to, show it to them and see if

10   they object to it.

11           You have to do it in some kind of way that links

12   it to -- I think, frankly, it was linked in your papers to

13   the extent I ruled on it.  I think it was linked there,

14   and wasn't the report an exhibit to the papers?

15           MR. LO:  They probably were, Your Honor.

16           THE COURT:  Somewhere I read it.  I don't know

17   how it got to me if it wasn't in some of your papers, but

18   if you want to make a separate offer of proof, you're

19   going to have to give it to them.  If that's how you want

20   to do it, then they can object to it or not, and then

21   we'll go from there.

22           MR. LO:  Yes, Your Honor.  I just wanted to make

23   sure you weren't requiring me to ask the questions and

24   have them object to them every time --

25           THE COURT:  They've objected to them, I've ruled,

1    and you're just going to show what you would have asked

2    and what his answers would have been.  You are relying on

3    the report.  Find the sections of the report and put it in

4    there.  That's what I ruled on.  Anything else?

5              MR. LO:  No, Your Honor.

6              THE COURT:  Cross-examination.

7

8                     CROSS-EXAMINATION

9    BY MS. ALBERT:

10   Q    Good afternoon, Dr. Goldberg.

11   A    Good afternoon, Ms. Albert.

12   Q    Now, you were retained as a consultant on behalf of

13   Lawson for this matter; correct?

14   A    Yes.

15   Q    And in preparation for rendering your opinions, you

16   had discussions with only two Lawson employees; Todd

17   Dooner and Dale Christopherson, correct?

18   A    That's correct.

19   Q    You had access to any Lawson employees that you wanted

20   to talk to, but the only two to whom you spoke were Mr.

21   Christopherson and Mr. Dooner; correct?

22   A    In the preparation of my report, that's correct.

23   Q    And notwithstanding that you had several telephone

24   conversations with Mr. Dooner, you never talked to him

25   about the amount of time that he spent performing the

1    coding work that was involved with the modifications to

2    Punchout; correct?

3    A    To the best of my recollection, that's correct.  I had

4    seen -- there's a spreadsheet showing cumulative time.

5    It's been awhile, but I remember seeing something to that

6    effect.

7    Q    You didn't have any discussions with any Lawson

8    marketing personnel; correct?

9    A    Marketing, that's correct.

10   Q    And in preparation for rendering your opinions in this

11   matter, you did not have any meetings or conversations

12   with any customers who had licensed any of the Lawson

13   accused products, did you?

14   A    That's correct.

15   Q    In preparation for rendering your opinions in this

16   matter, you did not have any meetings or conversations

17   with any Punchout site vendor; correct?

18   A    That's correct.

19   Q    You've never designed procurement software, have you?

20   A    I have not.

21   Q    And you've never implemented a computer software-based

22   procurement system either?

23   A    That's correct.

24   Q    Now, isn't it true that Requisition Center, like RSS

25   before it, provides to its customers the ultimate function

1    of an uncomplicated and user-friendly method of creating

2    requisitions?

3    A    Well, I would say with the exception of this feature

4    that's been removed, the functionality is otherwise the

5    same.  The fact that you can no longer shop and put items

6    from multiple places on the same requisition certainly

7    complicates the process.

8             THE COURT:  Dr. Goldberg, listen to the question,

9    and just answer the question.

10            MS. ALBERT:  Move to strike as unresponsive.

11            THE COURT:  It is.  Just listen to what she's

12   asking and answer the question she's asking you.  Go

13   ahead.

14   Q    Isn't it true that Requisition Center, like

15   requisition self-service before it, provides to its

16   customers the ultimate function of an uncomplicated and

17   user-friendly method of creating requisitions?

18   A    Based on my analysis, I would say no.

19   Q    Isn't that what you wrote in your report, sir?

20   A    I'm happy -- do you want to rephrase.

21            THE COURT:  Do you have your report, Dr.

22   Goldberg?

23            THE WITNESS:  I do.

24   Q    Why don't you take a look at paragraph 176.

25            THE COURT:  What page is that on?

1          MS. ALBERT:  It's on page 62.

2     Q    Didn't you say, sir, that, quote, in addition, when

3     discussing functionality, it is my understanding that

4     Lawson was speaking to the end objectives of its customers

5     an uncomplicated and user-friendly method of creating

6     requisitions.  RQC, like RSS before it, provides this

7     ultimate function.  Didn't you say that in your report?

8     A    This is paragraph -- what paragraph did you say, 176?

9     Q    Correct.

10         THE COURT:  You left out the last clause.  It

11    says, without incorporating the adjudged infringing

12    methods.  Do you see that, Doctor?

13         THE WITNESS:  Yes, I do.

14    Q    That's what you said in your report; correct?

15    A    Well, the --

16         THE COURT:  I can read the report.

17         THE WITNESS:  It says that what Lawson was

18    speaking to.  This has to do with what Lawson was saying,

19    and, certainly, you know, this is Mr. Hager, I believe.

20    This wasn't a technical -- from a technical point of view

21    it requires, as we saw, more complicated manipulation in

22    order to perform the same task.

23         MS. ALBERT:  Move to strike as nonresponsive.

24         THE COURT:  Overruled.

25    Q    Do you agree that, quote, stated simply, RQC provides

1    the same end result functions as RSS, just not necessarily

2    done in the same way?

3    A    If the functions that Mr. Hager -- you are asking me

4    about --

5             THE COURT:  Excuse me, Dr. Goldberg.  The

6    question is the statement that's in your report that

7    begins with the sentence, stated simply, and ends with the

8    word way, do you agree with that statement?  That's the

9    question.  Yes or no, I think, is the answer.

10            THE WITNESS:  I would guess I would agree with

11   it.

12            THE COURT:  Would or wouldn't?

13            THE WITNESS:  Would.

14   Q    Thank you.  And you would agree, wouldn't you, that a

15   large portion of the RSS functionality remains in the RQC

16   product; correct?

17   A    Yes.

18   Q    Your opinion is that the modified configurations

19   remove the ability of an end user to easily comparison

20   shop across item master and Punchout vendors; is that

21   correct?

22   A    Yes.

23   Q    And you stated in your report that in RSS, a user

24   could add similar items from both item master and Punchout

25   vendors onto a single instance of my cart to compare

1   prices and specifications; correct?

2   A   Yes, RSS.

3   Q   And, ultimately, it's your opinion that RQC users can

4   no longer do this; is that correct?

5   A   RQC cannot add items from item master and Punchout

6   onto the same requisition, that's correct.

7           THE COURT:  I'm not sure she was asking about the

8   requisition.  I thought that the question was, can you add

9   it to someplace so you can compare it.  Isn't that what

10  the question was?

11          MS. ALBERT:  Well, the question was, in RSS --

12          THE COURT:  Ask it again.

13  Q   In RSS, a user could add similar items from both item

14  master and Punchout vendors onto a single instance of my

15  cart to compare prices and specifications; correct?

16  A   Yes, in RSS.

17  Q   And, ultimately, your opinion is that RQC users can no

18  longer do this; is that correct?

19  A   Yes.  There is no my cart anymore.  It's just the

20  requisition.

21  Q   RQC users can still comparison shop between items

22  available from different vendors within the Lawson item

23  master; correct?

24  A   You can put items from the item master onto a single

25  requisition.  If they're ultimately from different

1    sources, you'll be able to see them in the same

2    requisition.

3    Q    And you can search the item master and compare items

4    that are found in your search results; correct?

5    A    Yes.

6    Q    And RQC users can still compare terms found in

7    searching the catalogs within the item master by comparing

8    the different items found in their display -- in their hit

9    list display of search results; correct?

10   A    As I stated, they can search items in the item master,

11   put them on their requisition, and see them there.

12   Q    That wasn't my question.  I said, RQC users can search

13   the catalogs in the item master and compare the items

14   found in the hit list of search results; correct?

15   A    I don't know what you mean by catalogs in the item

16   master.  There are items in the item master.

17            THE COURT:  Wait a minute.  You don't know what

18   she means by what?

19            THE WITNESS:  Catalogs in the item master.  You

20   can search for items in the item master.  The thing the

21   software does, there are items in the item master.  You

22   can search them, you can put the ones that you want onto

23   the requisition.

24   Q    And you can compare items found in searching the items

25   in the item master by comparing the results in your hit

1    list; correct?

2    A    Yes.  For the item master, you can see the items that

3    you've searched for, and you can see them in the

4    requisition.

5    Q    And users of a system with RQC and Punchout can still

6    connect to Punchout catalogs; correct?

7    A    Yes.  As we saw, as long as you don't have something

8    in your requisition already, you can go ahead and go to a

9    Punchout vendor.

10   Q    Then your demonstration that you showed, your system

11   was configured so that you could connect to either the

12   Staples catalog or the Dell catalog; correct?

13   A    That's right.

14   Q    Users of a system with RQC and Punchout can still

15   comparison shop by searching items out at a Punchout site

16   and comparing the items found in the hit list of search

17   results; correct?

18   A    Yes, for that -- only for that Punchout vendor.

19   Q    That's what I asked, sir.

20   A    Okay.

21   Q    And --

22            THE COURT:  That's if you go to Staple also as a

23   Punchout vendor and you are looking for staplers, you can

24   put in five staplers from Staples and compare what those

25   five are.  Is that what you were just talking about doing?

1            THE WITNESS:  Yes, you can certainly do that.

2   Q    When you have your hit list of search results when you

3   search a Punchout catalog, you can see those various items

4   and compare their pricing and availability by pulling up

5   the item information in the hit list; correct?

6   A    Yes.  Again, what you are talking about is just for

7   that vendor, that Punchout vendor.

8   Q    And you could do comparison shopping.  If I wanted to

9   compare different pens available at Staples, I could

10  compare a box of Bic brand blue ink ballpoint pens

11  available at Staples to a box of Pilot brand blue ink pens

12  available at Staples in my hit list of matching search

13  results; correct?

14  A    Yes.

15  Q    And this same functionality existed in the system with

16  RSS and Punchout; correct?

17  A    That did, yes.

18  Q    Now, you haven't cited any correspondence that Lawson

19  received from any customers concerning any purported end

20  user burden in your report, did you?

21  A    I don't recall.  I cited deposition testimony from Mr.

22  Lohkamp.  I don't know, recall -- it's been awhile now --

23  what documents I cited.

24  Q    You would agree, wouldn't you, that in designing RQC,

25  Lawson's motivation was to minimize the impact on its

1    customers?

2    A    I think that -- that's my understanding.

3    Q    And Lawson touted to its customers the fact that they

4    would not notice any functional difference between RQC and

5    RSS; correct?

6    A    Do you have a particular document that you are citing?

7    Q    Well, do you agree or disagree with the following

8    statement:  RQC was designed so that Lawson's customers

9    would have a hundred percent functionality that they

10   required?

11   A    I certainly disagree with that statement.

12   Q    Let me show you a document that's been marked as

13   Plaintiff's Exhibit 1010.

14            THE COURT:  Do we have a copy of that for him?

15   What page is that on, Ms. Albert?

16   Q    Do you see the exhibit, Plaintiff's Exhibit 1010?

17   A    Yes.

18   Q    Did you take that exhibit into account in rendering

19   your opinions?

20   A    I recall seeing --

21            THE COURT:  Is that the June 3rd document?

22            MS. ALBERT:  Yes.

23            THE COURT:  Look at the front of it.  At the

24   bottom, it's June 3, 2011, or something like that, and I

25   think it's -- other evidence has showed that it was part

1   of a presentation on a web, webinar.  Does that refresh

2   your recollection as to whether you took it into account

3   in deciding -- making your opinion, Dr. Goldberg?

4              THE WITNESS:  I remember seeing something like

5   this.  I don't recall if I actually saw this document.

6              THE COURT:  Okay.  He doesn't recall.

7              THE WITNESS:  I just don't recall.

8   Q    Can you turn to page RQC 665.  Do you see there that

9   Lawson represented to its customers that RQC was designed

10  with the principle that 100 percent functionality require

11  must be included?

12  A    I see that.

13             MR. LO:  Objection, Your Honor.  We're now

14  getting to she's asking about a document he's never seen,

15  and this is now exceeding the scope of my direct.  If she

16  wants to ask what he looked at or didn't look at, I think

17  is a fair question.

18             THE COURT:  I don't think it exceeds the scope of

19  your direct, but she can ask him the question.  He says

20  he's seen something like this.  He's not sure.  Look at it

21  and see if you've seen that statement before, Dr.

22  Goldberg, if you would, please.  Have you seen that

23  statement or something like it before?

24             THE WITNESS:  I think I have seen this.

25             THE COURT:  Now ask the question.

Goldberg - Cross

1    Q    Did you take that statement into account that Lawson

2    made to its customers in rendering your opinions related

3    to whether or not the RQC systems are more than colorably

4    different from the adjudicated infringing systems?

5    A    Yeah, I have seen statements like this.  I certainly

6    did take it into account.  Technical people often read

7    marketing documents with a grain of salt.

8    Q    You are a computer scientist, though; right?

9    A    Yes.

10   Q    You are not an expert in the marketing field, are you?

11   A    No.  I don't proffer to be.

12   Q    And you didn't have any discussions with Lawson

13   marketing personnel, did you?

14          THE COURT:  He's already said he didn't back a

15   long time ago.

16          MS. ALBERT:  No further questions.

17          THE COURT:  Any redirect, Mr. Lo?

18          MR. LO:  Thank you, Your Honor.

19

20                 REDIRECT EXAMINATION

21   BY MR. LO:

22   Q    Dr. Goldberg, why do technical folks take marketing

23   documents with a grain of salt?

24   A    Because --

25          THE COURT:  You mean why does he take it with a

1   grain of salt?

2   Q    Why did you take it with a grain of salt?

3   A    In my experience, both as part of litigation analysis

4   but also as a programmer, I've seen many marketing

5   documents that put a certain spin for the customers that

6   aren't necessarily grounded in fact, and I learned this

7   early on when I was a summer programmer working at Digital

8   Equipment Corporation.

9        My boss told me, when the marketing guys come around

10  to not talk to them, because if you say you're thinking

11  about something, they'll promise it to your customers.

12            MS. ALBERT:  I move to strike this because it's

13  not in his report.

14            THE COURT:  I will bet you it's not.  I'll

15  consider it for what it's worth.

16            THE WITNESS:  Anecdotal.

17            THE COURT:  You didn't ask him why it wasn't in

18  there.  All right, go ahead.

19  Q    Last question Dr. Goldberg.  In your view, does RQC

20  have 100 percent of the functionality of RSS?

21  A    No.  We've discussed --

22            THE COURT:  He's been there and done that today

23  at least once.

24            MR. LO:  That is it, Your Honor.

25            THE COURT:  Dr. Goldberg, do you happen to know

1    how one can put something into item master?  I want to put

2    a catalog into item master or something.  Do you know how

3    you do that?

4               THE WITNESS:  I don't.

5               THE COURT:  Thank you.  All right.  Dr. Goldberg

6    is temporarily excused; is that right?

7               MR. LO:  Yes, Your Honor.

8               THE COURT:  Thank you, Dr. Goldberg.  Do you

9    have -- is that the end of your witnesses on colorability?

10              MR. THOMASCH:  On colorability.  We will ask,

11   either tonight or tomorrow, depending how the Court will

12   proceed, to introduce certain exhibits into the record in

13   colorability, in this section that we believe can come in

14   by judicial notice and don't need a sponsoring witness.

15              THE COURT:  Have you talked to them about it?

16   Are they on the agreed exhibits?

17              MR. THOMASCH:  There are two that are agreed

18   exhibits.  There are another dozen that not only are not

19   on the agreed, I don't need to confer before I know that

20   they disagree.  These are, Your Honor, to be truthful, we

21   have two that are agreed upon, and those are Plaintiff's

22   Exhibit 0367 and 0379.

23              THE COURT:  0367.

24              MR. THOMASCH:  And 0379.

25              THE COURT:  And they are agreed.

 1              MR. THOMASCH:  Yes, they're on the agreed list.

 2              THE COURT:  They are admitted without objection.

 3              MS. ALBERT:  Where are they?

 4              THE COURT:  Wait a minute.  Uh-oh.  Excuse me.  I

 5    misspoke, Mr. Neal.

 6              MR. THOMASCH:  My understanding is that

 7    Plaintiffs 0367 is also Defense Exhibit 734.  If you wish

 8    us to confer --

 9              THE COURT:  Why don't you all talk about this --

10              MR. THOMASCH:  There are two that we understood

11    to be on the agreed list.  The others I know are

12    disagreed.

13              MS. ALBERT:  Well, these two defense exhibits

14    that he just referred to are exhibits from the prior

15    trial, and I thought that with your orders of last week,

16    that we were not to rehash the prior trial testimony and

17    evidence in this proceeding.

18              THE COURT:  We're not, but that doesn't

19    necessarily mean that exhibits aren't admissible.

20              MR. THOMASCH:  I have the list of agreed-upon

21    exhibits, and they're on there, and they have both a

22    plaintiff's number and a defendant's --

23              THE COURT:  If they are agreed upon, they come

24    in.  The same rule applies for you as applies to them.

25              MS. ALBERT:  I think they were exhibits from the

1    underlying trial.

2          THE COURT:  I understand, but if you agreed to

3    them, Ms. Albert, you agree to them.  That was what Mr.

4    Thomasch was held to, and that's what everybody is held

5    to.

6          MS. ALBERT:  Understood.

7          THE COURT:  They can come in, and that's

8    Plaintiff's Exhibit 0367 and 0379; is that right, Mr.

9    Thomasch?

10         MR. THOMASCH:  Yes, Your Honor.

11         THE COURT:  All right.  And then --

12         MR. THOMASCH:  367 and 379.

13

14         (Plaintiff's Exhibits 367 and 379 admitted.)

15

16         THE COURT:  Right, okay.  Now, what's the

17   judicial notice?  Of what?

18         MR. THOMASCH:  Those are documents that are

19   already in the court record, and we're trying, Your Honor,

20   just to make sure that there has been only a dispute about

21   what was contended and proved.  So, for instance, DX-500

22   is the signed jury verdict form.  It's in the court record

23   of this case under this civil number, but for purposes of

24   attempting to benchmark what was contended and what was

25   proved at the first trial, we obviously feel that the jury

1   verdict form tells us things about what was proved and

2   what was not proved, what systems were held infringing and

3   not infringing, and we have then a series of -- the

4   opening statement, some specific testimony that goes --

5           THE COURT:  Opening statement?

6           MR. THOMASCH:  Because, Your Honor, it says, the

7   contended and proved.  We believe the opening says what

8   the party contends they will prove.  We believe the

9   closing argument indicates not only what we believe we

10  have contended but what we believe we have, in fact,

11  proved.

12          It is a statement by ePlus as to what they say

13  they proved at the first trial, and it's very, very

14  telling.  And it goes right to the theory of our case, and

15  there's not -- it's not difficult to excerpt it.  It's a

16  question of what they relied on and what they told the

17  jury was the basis for their allegation of infringement.

18          We think under *TiVo*, the opening and the closing

19  are very important.  We believe the testimony of certain

20  individuals, particularly Dr. Weaver and Dr. Weaver's

21  demonstrations, which were relied upon by ePlus in closing

22  where they said, we've proven infringement, and they did

23  it by reference to the demonstrations.  The demonstrations

24  that they did demonstrate functionality that no longer

25  exists or it could be done again.

1          That is epicenter of our case.  We need to make
2     sure that if we're not allowed to discuss it, we at least
3     have laid the predicate for we want to have that in the
4     record, we want to be able to draw the Court's
5     attention --
6          THE COURT:  What is this; an offer of proof?  Is
7     that what you are saying?
8          MR. THOMASCH:  It's not an offer of proof.  It is
9     an offer to make certain that there is record evidence
10    that we can cite to Your Honor to say that -- our belief
11    as to what was contended and proved and to excerpt for you
12    out of these exhibits the most relevant sections just as
13    every other document someone pulls the paragraph out and
14    says, this is part I think you should focus on.  We would
15    like to do that.
16         The exhibits at issue that are in dispute are
17    Defendant's Exhibit 500, 501, 502, 503, 504, 505, 510,
18    512, 513, 514, 521, and 522.  500 is the verdict form.
19    The opening is 501.  502 through 513 is specific testimony
20    that, we believe, relates to the issues that we have here
21    today.  It is not the entire transcript.  It is the
22    transcript of witnesses whose testimony, we believe, bears
23    on the *TiVo* question.
24         514 is the closing arguments of counsel that say
25    what they believe they contended and proved.  521 is a

1    video that Dr. Weaver did that shows how to combine two

2    Punchout sites, how to take goods from two Punchout sites

3    and bring them together and put them on one requisition.

4         That's what's shown in that video, and he

5    demonstrates it for the jury and says that this is how

6    he's demonstrating infringement of claim 26 of the '683

7    patent, and Defendant's Exhibit 522 is another video

8    prepared by Dr. Weaver to show how he would tell the jury

9    you could infringe claim 26 bringing an item from item

10   master and an item from Punchout together on one

11   requisition and then generating two separate purchase

12   orders.

13        Those are critical to our presentation of the

14   case as far as why is it that the functionality that we

15   removed is not a random feature of the product and not a

16   feature that's unrelated to what the Court should be

17   considering now, but is, indeed, the very feature the

18   Court should look at in comparing the functionality of the

19   infringing product with the functionality of the modified

20   product.

21        MR. STRAPP:  Your Honor, we object to the

22   admission of any of this evidence.  First of all, it's

23   select excerpts that are cherry-picked from three weeks

24   worth of trial testimony that Lawson seeks to enter

25   through the back door even though Your Honor has already

1  excluded Lawson from entering it through the front door

2  through testimony, cross-examination of Dr. Weaver --

3      THE COURT:  Well, I said that he could -- the

4  expert couldn't testify about it.  I didn't rule on

5  whether it was otherwise admissible.  This was talking

6  about the expert in that order from last week.  Is that

7  what you are talking about?

8      MR. STRAPP:  Right.  Your Honor, so far we've

9  been proceeding that evidence the parties seek to submit

10 should be submitted through a witness.  They don't offer

11 any witness through which they're going to put in Mr.

12 Robertson's opening or closing statements, nor do they

13 offer a witness through which they intend --

14     THE COURT:  He's saying I can take judicial

15 notice of what's in the court record.

16     MR. STRAPP:  Of course the trial and injunction

17 trial transcripts are a matter of record in this Court,

18 and because trial evidence is of record, the Court can

19 take judicial notice of it for whatever relevance it may

20 or may not have.  We don't dispute that.

21     In fact, we prepared a bench brief we can submit

22 on these exhibits, and I can hand that up.  We don't think

23 there's any reason why Your Honor should take into

24 evidence relatively few select excerpts and sound bites

25 which Mr. Thomasch has chosen from a trial record, all of

1  which was duly considered by the jury and by the Court,

2  and the Federal Circuit affirmed the infringement claim,

3  and we don't see how they're going to present this through

4  any live witness at trial here.

5          We think both the trial excerpts and the attorney

6  argument, which is not even evidence, shouldn't come into

7  record here.

8          THE COURT:  Are these all trial exhibits?

9          MR. STRAPP:  These are defendant's exhibits on

10  their exhibit list which consists of select excerpts from

11  the trial and injunction hearing transcripts as well as --

12          THE COURT:  Do you have a list of which is which?

13  He read them off --

14          MR. STRAPP:  Yeah.  Let me hand this up to Your

15  Honor, if I may.

16          If Your Honor could turn to the bottom of page

17  two, you'll see we have a sub heading there, select

18  excerpts of trial transcript, and as we note in this brief

19  here, Lawson has included several exhibits which were just

20  read by Mr. Thomasch which are select excerpts from the

21  trial transcript and injunction proceeding including the

22  signed verdict form.

23          They include, for example, video excerpts, other

24  trial testimony that are culled from the several weeks of

25  testimony that was presented before Your Honor, and if you

1    turn to the bottom of page three, you'll see a sub

2    heading, attorney argument to the Court.  That refers to

3    DX-501 and DX-513.  That's the opening argument and

4    closing argument that were presented at the trial.

5              It's well-settled that that argument is not

6    evidence.  You can see, for example, the Court's jury

7    instruction number eight which was entered at the end of

8    the trial instructing the jury, among other things, that

9    statements and arguments made by counsel are not evidence.

10             And so as with other exhibits that are on

11   defendant's list which Mr. Thomasch has not proffered such

12   as, for example, correspondence --

13             THE COURT:  Don't deal with the ones that he's

14   not proffered.  I have to deal with the ones that have

15   been.

16             MR. STRAPP:  We don't believe these should be

17   admitted in this proceeding.  We don't think this is

18   evidence.  We don't think it's come in properly, and we

19   don't think that it's relevant to these proceedings.  And

20   if it is relevant, Your Honor can certainly take judicial

21   notice of the trial record that already exists in the

22   record.

23             MR. THOMASCH:  That actually would largely solve

24   the problem here, because we've asked you to take judicial

25   notice.  We have not picked excerpts.  We have picked

1    pulled testimony from witnesses whose testimony bears on

2    this issue.  There were many witnesses whose testimony had

3    nothing to do with these issues, and we tried not to

4    overburden the record with more.

5            Of course we went through a procedure for a long

6    time in which we requested that plaintiff, who actually

7    bears the burden to identify what was contended and

8    proved, would identify what they said, and then we would

9    join issue and try to resolve that.

10           THE COURT:  They did.

11           MR. THOMASCH:  We disagree as to the specificity

12   with how they --

13           THE COURT:  They did, and I've ruled on that,

14   but, look, why don't you all talk -- you may have some

15   kind of agreement, I don't know.  Whether one can take

16   judicial notice of something is not necessarily the same

17   thing as whether it's admissible into evidence.

18           MR. STRAPP:  That's exactly our point.

19           THE COURT:  So I'll let you all talk about it.

20   I'd like a list of what these things are, though.

21           MR. THOMASCH:  We'll provide that in the morning.

22           MR. STRAPP:  We will provide that, Your Honor.

23           THE COURT:  Each one of them, and if it's part of

24   a transcript, then I need to know that as well.  Then

25   we'll deal with it.  Here is this back.

```
 1              MR. STRAPP:  Your Honor, may I just raise one
 2   additional issue?  Now that defendant Lawson's case has
 3   been heard on their defense to colorability, we would just
 4   request a judgment under 52(c), Rule 52(c) on the
 5   following grounds:  That to the extent that the change
 6   that was made to the product was a change that's unrelated
 7   to any of the functionality set forth in the claim 26 of
 8   the '683 patent, it's our position that as a matter of law
 9   that cannot be a more than colorable difference, and
10   Lawson should be held in contempt.  We are making that
11   oral motion now under Rule 52(c).
12              MR. THOMASCH:  Your Honor, we have not yet rested
13   because we do have --
14              THE COURT:  I didn't think there was any resting
15   yet.
16              MR. THOMASCH:  I had indicated we didn't have
17   further witnesses.  We do have some issue on those, and
18   then at that time we will have a 52(c), and,
19   interestingly, we will be on a reciprocal side of
20   potentially being able to resolve this, because their
21   theory is, if accepted --
22              THE COURT:  Can you get yours in as quickly as he
23   just did?
24              MR. THOMASCH:  No.
25              THE COURT:  See if you can hone it.
```

1          MR. THOMASCH:  I can hone it.  I can't do it
2    quite that simply, but I can hone it.
3          THE COURT:  Good.  Is there some federal rule
4    that says I have to decide this now?
5          MR. THOMASCH:  Indeed, Your Honor, to my dismay,
6    the federal rule said you don't.
7          THE COURT:  That's what I thought it said, but
8    they always change these rules without telling the judges.
9    All right, at 9:30 in the morning.
10          MR. THOMASCH:  Your Honor, one scheduling issue
11    for tomorrow -- we'll take it up with plaintiff's counsel.
12    We'll be fine.  We'll work it out.
13          THE COURT:  Okay.
14          MR. STRAPP:  Thank you, Your Honor.
15          THE COURT:  All right, thank you.
16
17                    (End of proceedings.)
18
19
20
21
22
23
24
25

1

2         We certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6

7    _____/s/_____            _____
     P. E. Peterson, RPR                         Date
8

9

10   _____/s/_____            _____
     Diane J. Daffron, RPR                       Date
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25