500

```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
                     RICHMOND DIVISION


   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                      :
   ePLUS, INC.,                       :
                                      :
                     Plaintiff,       :
    v.                                : Civil Action
                                      : No. 3:09CV620
   LAWSON SOFTWARE, INC.,             :
                                      : April 4 , 2013
                     Defendant.       :
   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ :
```

           COMPLETE TRANSCRIPT OF MOTIONS HEARING
          BEFORE THE HONORABLE ROBERT E. PAYNE
                UNITED STATES DISTRICT JUDGE


                         **DAILY**


APPEARANCES:

Craig T. Merritt, Esquire
Christian & Barton, LLP
909 East Main Street
Suite 1200
Richmond, Virginia   23219-3095

Jennifer A. Albert, Esquire
Goodwin Procter, LLC
901 New York Avenue, NW
Washington, D.C.   20001


                 DIANE J. DAFFRON, RPR
                 OFFICIAL COURT REPORTER
              UNITED STATES DISTRICT COURT

```
 1    APPEARANCES:   (Continuing)

 2    Michael G. Strapp, Esquire
      Goodwin Procter, LLC
 3    Exchange Place
      53 State Street
 4    Boston, Massachusetts    02109

 5    Paul W. Jacobs, II, Esquire
      Christian & Barton, LLP
 6    909 E. Main Street, Suite 1200
      Richmond, Virginia    23219-3095
 7
              Counsel for the plaintiff, ePlus
 8
      Daniel J. Thomasch, Esquire
 9    Gibson Dunn & Crutcher
      200 Park Avenue
10    New York, New York    10166-0193

11    Christopher D. Dusseault, Esquire
      Gibson Dunn & Crutcher
12    333 South Grand Avenue
      4th Floor
13    Los Angeles, California    90071

14    Dabney J. Carr, IV, Esquire
      Troutman Sanders
15    Troutman Sanders Building
      1001 Haxall Point
16    P.O. Box 1122
      Richmond, Virginia    23218-1122
17
      Josh Krevitt, Esquire
18    Gibson Dunn & Crutcher, LLP
      200 Park Avenue
19    New York, New York    10166-0193

20    Jason C. Lo, Esquire
      Gibson Dunn & Crutcher, LLP
21    333 South Grand Avenue
      46th Floor
22    Los Angeles, California    90071

23    Richard W. Mark, Esquire
      Gibson Dunn & Crutcher, LLP
24    200 Park Avenue
      New York, New York    10166-0193
25
              Counsel for the defendant, Lawson Software
```

502

```
 1            (The proceedings in this matter commenced
 2     at 9:30 a.m.)
 3            THE CLERK:  Civil Action No. 3:09CV00620,
 4     ePlus, Incorporated v. Lawson Software, Incorporated.
 5            MS. Jennifer A. Albert, Mr. Michael G.
 6     Strapp, Mr. Craig T. Merritt and Mr. Paul W. Jacobs,
 7     II, represent the plaintiff.
 8            Mr. Daniel Thomasch, Mr. Josh Krevitt, Mr.
 9     Dabney J. Carr, IV, Mr. Richard W. Mark and
10     Mr. Christopher D. Dusseault represent the defendant.
11            Are counsel ready to proceed?
12            MS. ALBERT:  Yes, Your Honor.
13            MR. THOMASCH:  Ready for the defense, Your
14     Honor.
15            THE COURT:  All right.  Yesterday evening
16     you-all were going to give me a list of the documents
17     that you wanted to put in.  Have you got that list?
18            MR. THOMASCH:  I do, Your Honor.
19            THE COURT:  May I have it?  I think what I'm
20     going to do is reflect upon this.  They filed a brief
21     last night.  I just need to look at it.  So we'll keep
22     at the record open for you for that.
23            MR. THOMASCH:  We have a mini motion and
24     memorandum to admit right on the front of the list.
25            THE COURT:  A mini motion?
```

1      MR. THOMASCH:  It's very short, Your Honor.

2      THE COURT:  Well, look, I might like to get

3  those appropriated in the new rules of procedure.

4      MR. THOMASCH:  Your Honor, you did ask us to

5  for consult.  We consulted ever so briefly, but --

6      THE COURT:  And it didn't work?

7      MR. THOMASCH:  Well, I'm not so sure it

8  didn't work.  It may have reduced it in part.  Many of

9  those exhibits, as you'll see from the list in front

10  of Your Honor, are excerpts of the trial transcript as

11  a whole.  It's the witnesses that we feel had

12  testimony that bear on the issues in this proceeding.

13  There has been a concern raised about cherrypicking or

14  excerpts.  That's why we put in the whole transcript

15  of the witness and not just the pages that we liked.

16  We put in the whole thing.

17      But we have no objection whatsoever to ePlus

18  putting in any other part of the trial transcript they

19  deem relevant.  I believe they would like to say the

20  whole transcript is just in.  Other than that, it does

21  put in material from the underlying case that has no

22  possible bearing on this.  I don't object.  It's just

23  seems like it might be overdoing it.  But our issue is

24  not to try to keep anything out.  It's just to try to

25  make unambiguously clear what went on at the first

1    trial, so that that's in the record.  The parties can

2    cite to it and a reviewing court can look to it if

3    need be.  That's all we're trying to accomplish.

4         THE COURT:  I'll look at it, but it

5    implicates something much broader than that.  It has

6    to do with what that case means.  If that case means

7    that we retry the whole case, then the Federal Circuit

8    has done something unprecedented, and I would have

9    thought that they would have said so.  But we're not

10   going to retry -- we're going to draw the line here

11   and let the Federal Circuit decide how it wants to go

12   because it's going to go on your case, I guess, from

13   what you-all say.  You're going to take it up.  That's

14   fine.  But I'm not going to be the one that opens the

15   floodgates and says we're retrying the whole case

16   every time we have a contempt issue.

17        I've been through a number of contempt cases

18   and part of it involved what happened at the trial,

19   and I've never seen a process like suggest.  And in

20   addition to that, I have read all of the cases that

21   you all have cited to me since TiVo, and I find

22   nothing in any of the authority of the other district

23   courts that have taken this approach.

24        So I need to think through all that when I'm

25   dealing with it.  And we'll deal with admission of

1   this later.  I have a couple of other questions.

2          I was examining TiVo last night again for

3   another purpose.  And it occurred to me that something

4   I did last week may have not been what I intended to

5   do.  I don't want to make a shaggy dog story out of

6   it, but I cut out -- I can't remember the docket

7   number of the opinion, but I said you can't retry the

8   validity issues.

9          In doing that, I did not mean -- in doing

10  that, I went back and thought through was there

11  anything in the Goldberg testimony that fell into the

12  catagory of evidence that is permitted by TiVo in

13  showing innovation.  The colorability analysis.  It's

14  at page 88283 of TiVo.  It says, A Court must also

15  look to the relevant prior art if any is available to

16  determine if the modification merely employs or

17  combines elements already known in the prior art in a

18  manner that would have been obvious to a person of

19  ordinary skill in the art at the time the modification

20  was made.  A non-obvious modification may well result

21  in a finding of more than colorable difference.

22          I made a note to myself to go back to look at

23  Goldberg's report to see if there was any such

24  testimony of that as opposed to validity *vel non*.  I

25  didn't see any, but I don't remember going back to

1   double check my opinion to make sure I didn't

2   inadvertently knock out something that pertained to

3   that area.  I don't think I did.  I've gone back

4   quickly to scan it as quick as I can given the time.

5          But, Mr. Lo or Mr. Thomasch, I don't care,

6   Mr. Lo handled the examination, was their evidence

7   that fit that component of TiVo that you all intended

8   to put in because I didn't see it in the Goldberg

9   report.

10          MR. THOMASCH:  I think the answer to your

11   question, Your Honor, is no, but it's really a mirror

12   image of that.  We did not say that the change that

13   was made was innovative.  The change that was made

14   was a decade back.

15          THE COURT:  Right.

16          MR. THOMASCH:  But the flip side of that,

17   Your Honor, that we do feel very strongly is relevant

18   is that it was the functionality that was removed that

19   was the advancement over the prior art that ePlus said

20   was the innovation and was the essence of their patent

21   in the first instance.

22          THE COURT:  Where is that in Goldberg's

23   opinion?

24          MR. THOMASCH:  It's not in Goldberg's

25   opinion.  That has been our view as to the problem of

1    the changing theory of infringement that we feel that

2    they have made.

3            THE COURT:  Well, I don't even understand --

4    I don't think I really understand what you said.

5            MR. THOMASCH:  That aspect Mr. Lo could

6    address.

7            THE COURT:  As long as I didn't cut out

8    evidence inadvertently of the sort and as long as I

9    correctly read Goldberg's report, then I'm okay.  But

10   I went back to he check it and I didn't see anything.

11   However, I remember making a note to myself to go

12   check the opinion to see if in fact I had

13   inadvertently done something I didn't intend to do,

14   and I don't remember editing the opinion with that in

15   mind.  And I wasn't looking for a major edit.  It was

16   just one of the paragraphs or something that was

17   excised out, I believe.  I was trying to check.  But

18   it's been awhile and I decided as I was reading TiVo I

19   ought to double check it to let you-all put that

20   evidence in if you have any.

21           All right.  Mr. Thomasch says there isn't any

22   such evidence.  So I don't need to worry about it.

23           MR. LO:  Your Honor, Dr. Goldberg in his

24   report cites to testimony from the underlying trial

25   with respect to validity in the colorability section,

1   and he does so for two reasons.  One of which I know
2   Your Honor has addressed and probably does not want to
3   rehear.  And the first one, just briefly, is that
4   because TiVo requires you to look at what was
5   contended or proven, he looked at that to see what the
6   contentions were.

7          I understand Your Honor is moving pass that.
8   But the other reason he looks at what, for example,
9   Dr. Hilliard said in the underlying trial with respect
10  to validity, is that Dr. Hilliard would make
11  statements in terms of, Here was the prior art.  Here
12  is the --

13         THE COURT:  You need to get this into a
14  sentence that I understand the framework of first.
15  I'm trying to move the case along and get us going.  I
16  don't want to in asking you what time it is to hear
17  the history of Switzerland.

18         So help me.  What's your point just so I can
19  get that in mind?

20         MR. LO:  Dr. Goldberg looks to Mr. Hilliard's
21  analysis in the underlying trial because the
22  statements about how --

23         THE COURT:  That's not what I'm asking you.
24  I'm not asking you about whether he looked to the
25  statement in the underlying trial.  I'm asking you --

1    you know TiVo, right?

2              MR. LO:  Yes.

3              THE COURT:  Let's just -- the court also

4    looked at relevant prior art if any is available to

5    determine if the modification, the modification,

6    merely employs or combines elements already known in

7    the prior art in a manner that would have been obvious

8    to a person of ordinary skill in the art at the time

9    the modification was made.

10             All I want to know is did you have any

11   testimony from Dr. Hilliard that fit that description,

12   and did I by accident strike it out?  And I think the

13   answer is no.  That's all I'm trying to figure out.

14             MR. LO:  That is correct, Your Honor.

15             THE COURT:  Okay.  That's fine.  Thank you.

16             You-all have your objection on the other part

17   of it and I don't want to the hear any argument on

18   that.  All right.  Thank you.

19             You-all want to know something about

20   scheduling.  In part, that has to do with how much

21   time you-all have left to go.  How much time do you

22   have left for your -- you've got infringement left.

23             MR. STRAPP:  We have three witnesses on

24   infringement.  It should not take more than today

25   definitely, but we probably will be done by early

1   afternoon.

2          THE COURT:  How much time is your time?

3          MR. THOMASCH:  We have at most one witness on

4   infringement.  We believe we will 1certainly finish

5   the infringement case today and may finish most of the

6   damages case today, but not the entire damages case.

7          THE COURT:  All right.  You think we'll be

8   finished Friday?

9          MR. THOMASCH:  I'm confident --

10          THE COURT:  I want to know whether to tell

11   the court staff we're going to be here on Saturday.

12   And my dog asked me if we're going to get to go to the

13   dog park on sat morning.

14          MR. THOMASCH:  We can't assume we're going to

15   be done today.  I don't see any reason we wouldn't be

16   done tomorrow.

17          If we can bring one matter to the Court's

18   attention.  Because we won't necessarily finish today,

19   we have one witness who is no longer an employee of

20   Lawson who came who is in the damages phase, and we

21   just want to --

22          THE COURT:  You want to take that witness out

23   of order?

24          MR. THOMASCH:  We want to assure he gets on

25   and off.  If he could go on maybe right after lunch,

1   and by that time we may be in the damages case.  We'll

2   see.

3           THE COURT:  All right.

4           MR. THOMASCH:  And Mr. Strapp has been

5   accommodating.

6           THE COURT:  That's fine.  I don't mind taking

7   it out of order if you-all agree with that.  That's

8   fine.

9           Did you-all just want to leave the injunction

10  issue, argument on that, to -- nobody wanted to put on

11  evidence.  Did you want to just let me handle that on

12  the papers?  It's already briefed.

13          MR. THOMASCH:  We would prefer to have oral

14  argument.

15          THE COURT:  I'll hear you tomorrow on that,

16  too.

17          MR. THOMASCH:  We thought possibly, and I

18  haven't had a chance to speak with opposing counsel on

19  this, but instead of holding up witnesses in the

20  court, to get all the evidence in, as Your Honor has

21  repeatedly expressed is your preference, and then both

22  sides having preserved their 52(c) motions, to deal

23  with that issue, and possibly that and the injunction

24  together tomorrow will be wonderful from our

25  perspective.

512

1          THE COURT:  I'd like to get it on the record
2     and see.
3          MR. STRAPP:  Your Honor, in the January
4     order, you suggested you may want to have post-hearing
5     briefing, and you may want to have oral argument at
6     the end of April.  I was wondering if you have any
7     preference now as to whether or not you want
8     post-hearing briefing and an oral argument the end of
9     April or whether --
10         THE COURT:  I don't know, but I'd rather get
11    the witnesses under control before we deal with that,
12    if you don't mind.  I haven't finished hearing
13    everything yet.
14         MR. STRAPP:  All right.
15         THE COURT:  Anything else?
16         MR. THOMASCH:  There is only one open issue,
17    Your Honor, and that is --
18         THE COURT:  No, there isn't.  There's another
19    open issue that you need to remember, and that is you
20    have a motion you want to make under 52(c).  I'll
21    consider that you have -- we'll hear it later.
22         MR. THOMASCH:  Thank you, Your Honor.
23         THE COURT:  So you don't waive anything by
24    going forward.
25         MR. THOMASCH:  I very much appreciate that.

513

1        And there is one additional matter if I may

2   raise it with the Court.

3        THE COURT:  Yes.

4        MR. THOMASCH:  And this one may fall into

5   catagory of housekeeping, Your Honor.  I don't know

6   yet.  But last night when we were otherwise occupied,

7   we received notice from ePlus that they wished to

8   delete certain of their designations of the Hager

9   transcript.  And they gave us yesterday evening a line

10  listing of those portions of their prior designations

11  that we wish to delete.

12       It is untimely, but we don't object to them

13  deleting if they wish other than we would like to make

14  sure that we can not only keep our fairness

15  designations, but cross designate because we want the

16  Court to have Mr. Hager's testimony and to see

17  Mr. Hager testify.  And I don't want the video reduced

18  down and submitted to the Court until we've had a

19  chance to review what they have taken out.

20       THE COURT:  You can't review the video anyway

21  until I rule on the objections.

22       MR. THOMASCH:  I understand.  I mean review

23  the transcript of the designations.  In other words,

24  what they designated originally we didn't cross

25  designate.  They had already designated it.

1          THE COURT:  I understand.

2          MR. THOMASCH:  So we just want --

3          THE COURT:  When do you want to do that?

4          MR. THOMASCH:  Frankly --

5          THE COURT:  Why didn't you do it last night?

6          MR. THOMASCH:  I was the weak link in that

7    chain, Your Honor.

8          THE COURT:  Trying to get some sleep, huh?

9          MR. THOMASCH:  That actually didn't happen.

10         THE COURT:  Okay.  All right.  You can work

11   something out how to handle that.  You-all talk about

12   it and get it done and get it done right.  They

13   changed the game on you.  You're entitled to have the

14   time to sort it out.

15         All right.  Your witness.

16         MS. ALBERT:  EPlus calls Dr. Alfred Weaver.

17         MR. THOMASCH:  Just for the record, Your

18   Honor, it will probably be appropriate for Lawson

19   Software, Inc., to rest on the issue of colorability.

20         THE COURT:  All right.  Reserving your

21   rights.

22         MR. THOMASCH:  Yes, Your Honor.

23         THE COURT:  And, of course, the record is

24   open respecting these 500 series exhibits.

25         THE CLERK:  Do you want him resworn?

WEAVER - DIRECT                    515

1          THE COURT:  No.  Dr. Weaver, I remind you,

2    you're under the same oath which you took earlier in

3    these proceedings.

4          Thank you, Mr. Neal.

5          THE WITNESS:  Yes, Your Honor.

6

7    ALBERT WEAVER, called by the Plaintiff, having

8    been duly sworn, testified as follows:

9

10   DIRECT EXAMINATION

11   BY MS. ALBERT:

12   Q    Good morning, Dr. Weaver.

13   A    Good morning, Ms. Albert.

14   Q    We're now turning to the issue of infringement.

15   Do you have an opinion as to whether or not the

16   configurations having RQC can be used to infringe

17   Claim 26?

18   A    Yes, I do.

19   Q    What is your opinion?

20   A    I believe that a user of a system containing RQC

21   would be able to perform all the steps of Claim 26.

22   Q    Do you have any system demonstrations that

23   illustrate the use of the software configurations with

24   RQC to perform the steps of Claim 26?

25   A    Yes, I have two.

1   Q    What was the system that you used for your

2   demonstrations?

3   A    This was a demonstration system that was provided

4   by Lawson on a laptop.  It included the infringing

5   systems and all of the modules therein except for EDI.

6   Then it also included a system using RQC.  It also

7   contained the ability to record the user's

8   interactions with either of those systems.

9           THE COURT:  Was this something Lawson

10  provided in discovery or something they provided to

11  customers or they did it for their own reason or

12  demonstrative or what is this?  Do you have mind

13  filling that out a little more completely for me?

14          MS. ALBERT:  Yes.

15  BY MS. ALBERT:

16  Q    Dr. Weaver, are you familiar with whether or not

17  Lawson provided this demonstration system in discovery

18  to ePlus?

19  A    Yes, they did.

20  Q    Does Lawson utilize a similar demonstration system

21  for its business purposes?

22  A    Yes, in their sales and marketing and training.

23          THE COURT:  And what's the exhibit number on

24  that?

25          MS. ALBERT:  Well, the we have exhibits for

1   the videos.  One is PX-1135 and the other is PX-1134.

2           THE COURT:  Well, if there's a demonstration,

3   it ought to go in as a whole, I would think.

4           MS. ALBERT:  We put in the demonstrations the

5   same way we did at trial with the screen capture of

6   the video.  Not the laptop itself.

7           THE COURT:  Well, I wasn't looking for a

8   laptop.

9           MS. ALBERT:  Okay.  We do have DVDs to

10  provide the Court.

11          THE COURT:  That's what I was trying to say.

12          MS. ALBERT:  Right.

13          THE COURT:  DVD.

14          MS. ALBERT:  Right.

15  BY MS. ALBERT:

16  Q   Did you direct the preparation of the system

17  demonstrations?

18  A   Yes, I did.

19          THE COURT:  Wait a minute.  I thought that

20  Lawson did the system demonstration.  I thought this

21  is what came from Lawson.

22  Q   Did Lawson provide to ePlus a laptop computer in

23  discovery that had the demonstration systems loaded on

24  it?

25  A   Yes, the demonstration systems being the system

WEAVER - DIRECT                    518

1    using RSS and the system using RQC, but I was the one

2    who directed how it would be used to create the

3    demonstration I would like to show Your Honor today.

4              THE COURT:  Thank you for that clarification.

5    Q   Can you provide a high level summary of what we're

6    going to see in the first demonstration?

7    A   In the first demonstration, we will see that a

8    user can use RQC in order to perform the first five

9    steps of Claim 26.

10             MS. ALBERT:  And can we have Plaintiff's

11   Exhibit 1135, please.

12   Q   Can you explain what you're doing, how you're

13   interacting with the computer as the video provides?

14   A   Sure.  We'll begin by play.  We'll begin by

15   logging in to the Lawson system.  Stop.  This takes us

16   to the Lawson home.  And in that left-hand navigation

17   bar under the white block, the first blue box or bar

18   underneath that is requisition self service.  And the

19   one under that is requisition center.  So I'm going to

20   click on requisition center to open that as a window

21   within the browser window that we have here.

22             THE COURT:  Can you stop that a minute?

23             Is the print over on the left side in Lawson,

24   is that fuzzy to you all?

25             THE WITNESS:  Yes, Your Honor.

1              THE COURT:  It is?  I was concerned.  I've

2    had some eye surgery and I was checking to make sure

3    whether it worked or not.

4              THE CLERK:  Our IT department was aware of

5    this problem.  They discussed it.  It's a problem with

6    what they're sending to us.  It's not showing the

7    whole document.  Isn't that correct?

8              THE COURT:  It's more than that.  I can't

9    read it.  I'm asking if it's fuzzy.  I can't read the

10   words.

11             The word "Lawson" is overlapped, that is

12   there's some gray tinge on each side of the letters,

13   and then there's the word -- I guess that's "home" up

14   there, isn't it?

15             THE WITNESS:  Yes, Your Honor, it is.

16             THE COURT:  I can barely make that out.

17             Is that the same -- is that extant on your

18   screens as well or is it just mine?

19             MS. ALBERT:  It's a little bit fuzzy on this

20   screen as well.

21             THE COURT:  It's more than a little bit fuzzy

22   no matter what I do with it.

23             All right.  Go ahead.

24   A    Your Honor, let me reorient us.  On this left-hand

25   navigation bar, this link says "requisition self

WEAVER - DIRECT                    520

1  service."  That's the older infringing system that we

2  discussed at trial.

3          Underneath that is a link to "requisition

4  center."  And that's the one that I'm going to click

5  in order to launch that demonstration of RQC.

6          THE COURT:  You're clicking "requisition

7  center"?

8          THE WITNESS:  That's right, Your Honor.

9  A    Play.  It takes a minute to load.  Stop.

10         MR. THOMASCH:  Your Honor, may I note for the

11  record I was trying to confirm, this demonstration is

12  disclosed in the expert report as a demonstration for

13  Claim 28, not Claim 26.  Claim 28 is no longer at

14  issue by order of the Court and we would object on

15  those grounds.

16         MS. ALBERT:  That's correct, Your Honor, but

17  the first five elements of Claim 26 are the same as

18  the first five elements of Claim 28.  So this video is

19  equally relevant to show how the system can perform

20  those steps of Claim 26.

21         And one of the reasons that we would like to

22  show this is because the demonstration system produced

23  by Lawson did not include the EDI module.  We wanted

24  to be able to demonstrate the infringement of Claim 26

25  with components of the system other than showing the

WEAVER - DIRECT                    521

1    Punchout capabilities, and this does that.  So it is

2    relevant to the issues in this proceeding.  And we had

3    asked Lawson to produce the demonstration system with

4    the EDI module.

5              They had represented that they would do so,

6    but then when it was produced, it did not include the

7    EDI module.  So we would have been able to show you

8    all six elements of Claim 26 with the components that

9    we're demonstrating currently plus EDI.

10             Then we have a second demonstration that

11   shows Punchout.  So I think it is relevant to the

12   issues in this proceeding.

13             THE COURT:  And they agreed to provide one

14   with EDI and then didn't?

15             MS. ALBERT:  That's correct, Your Honor.  I

16   mean, I have the correspondence if you wanted to see

17   it.

18             THE COURT:  No.  I don't think I need it.

19             MR. THOMASCH:  May I see it?

20             THE COURT:  Mr. Thomasch may want to see it.

21             MS. ALBERT:  Yes.

22             THE COURT:  I don't need it up here.

23             MS. ALBERT:  Here I could show you Claim 26

24   and 28 side by side.

25             THE COURT:  The first five elements of 28 are

1   the same as the first five in 26.

2             MS. ALBERT:  That's what this demonstration

3   is showing.

4             THE COURT:  I see.

5             MS. ALBERT:  The first five elements of Claim

6   26.

7             MR. THOMASCH:  May I see the correspondence?

8             MS. ALBERT:  Yes, you may.

9             If you would note, in our July 1 letter, at

10  page 4.

11            MR. THOMASCH:  Your Honor --

12            THE COURT:  You're talking to Mr. Thomasch?

13            MS. ALBERT:  Yes.

14            THE COURT:  She was talking to you, I think.

15            MR. KREVITT:  Okay.

16            THE COURT:  Do you object to her talking to

17  you?

18            MR. THOMASCH:  It's unusual, but I do not

19  object.

20            MS. ALBERT:  I was just going to note that we

21  had asked for a full demonstration system with all of

22  the components of the infringing configurations plus

23  requisition center.

24            MR. THOMASCH:  And, Your Honor, I frankly

25  can't speak to that.  These letters are dated -- the

WEAVER - DIRECT                    523

1    letter that was just made reference to is dated July 1

2    of 2011, more than three months before the motion for

3    an order to show cause took place.  It almost sounded

4    like we've had a Rule 26 discovery dispute ruling

5    here, which would be an unusual thing to come up

6    during the cross-examination of a witness.

7          This is three months before there was even an

8    allegation of contempt made.

9          THE COURT:  Oh, I don't think so.  I think

10   those letters, it was the run-up to all this.  I was

11   inundated and treated to all this.

12         MR. THOMASCH:  You are correct, Your Honor.

13   It was a run-up where we were trying to show them why

14   we thought it was not infringing.  They wanted some

15   information about it.  But if there was a need for an

16   additional video, when the case was brought we

17   produced 2 million pages of documents by my

18   recollection.  We had 20-some odd 30(b)(6) notices.

19         THE COURT:  Excuse me.  I guess the basic

20   point is that this wasn't asked for in discovery and

21   it wasn't that they --

22         MR. THOMASCH:  I don't think this is an

23   appropriate point to do a discovery dispute.

24         THE COURT:  Oh, it comes up all the time in

25   witness's testimony.

1      MR. THOMASCH:  I will say I was not on notice

2   of that, Your Honor.  What I am on notice of is the

3   expert witness report which identifies this as

4   evidence in support of Claim 28, not Claim 26.  And at

5   some point it does seem to me the Court has been

6   fastidious about making certain that the expert

7   discloses in the right section of their report, puts

8   opposing counsel on notice as to what the evidence is

9   they're citing and what they're citing it for.

10      We're not calling our expert in this phase of

11   the case based on rulings made by the Court.  I don't

12   think that it's appropriate to just say, Well, this

13   evidence which is in for Claim 28 is also relevant to

14   another claim.  We just didn't mention that in our

15   report.

16      MS. ALBERT:  Well, Dr. Weaver has articulated

17   opinions going to the item master component, the PO

18   component, the RQ component, and the EDI module as

19   being the basis for his opinions on infringement.

20      THE COURT:  When you disclosed your evidence

21   you were going to use in this case in this part of the

22   case, did you disclose this to the other side?

23      MS. ALBERT:  Yes.  We produced this video

24   with Dr. Weaver's report.  We put this video on the

25   exhibit list.

1          THE COURT:  Was there any objection to it?

2          MS. ALBERT:  There was an objection, yes.

3          THE COURT:  What was the objection?

4          MS. ALBERT:  Relevance.

5          MR. THOMASCH:  There was an objection to

6   relevance because in the report it is cited to as a

7   video of the demonstration of Claim 28, which is no

8   longer in the case.

9          THE COURT:  Anything else?

10          MS. ALBERT:  I have nothing else.

11          THE COURT:  How are you prejudiced if this

12   comes in given that it's not talking about Claim 28,

13   it's talking about Claim 26 and the same five elements

14   of each?  How are you prejudiced by that?  It looks to

15   me like it's the same thing.  It may be elevating form

16   over substance to sustain your objection, which I

17   don't like to do.

18          MR. THOMASCH:  I respect that, Your Honor.

19   They are the same five elements.  I don't think that

20   the video was properly disclosed.

21          I do think that the rules here have been

22   strict.  This is a suggestion that having lost our

23   expert, we should not face -- it is on their own

24   exhibit list as identified as being relevant to Claim

25   28 of the patent.  That's what their list that they

1   filed with the Court says.

2          Your Honor is correct.  The first --

3          THE COURT:  Claim 28?  Why would they do

4   that?  That wasn't in the case when the exhibit list

5   was filed.  Somebody got the wrong list, I think.  I

6   mean, according to what she said.

7          MR. THOMASCH:  This was filed on March 12,

8   2013.  I believe what happened was after March 12,

9   2013, an amended list was filed.  And then they

10  switched it to say relevant to something else, but the

11  expert reports, of course, had been locked down, and

12  those had it down as a Claim 28 evidence.

13         MS. ALBERT:  Yeah, we amended the exhibit

14  list and we said it was RQC demonstration regarding

15  item master requisitioning.

16         MR. THOMASCH:  Your Honor, the bigger issue

17  here, obviously, is we believe this video and this

18  testimony captures a different theory of the

19  infringement that was used against RSS.  And so by

20  definition we will object to all demonstrations.  This

21  one there's an additional ground that the report

22  doesn't disclose it.  But it is the change in the

23  theory of infringement that does most prejudice us and

24  is the reason I stand and object.  Because if it was

25  the same theory, I wouldn't care.

1        THE COURT:  Thank you.  I don't think there's

2   a change in the theory of infringement.  They're

3   arguing that there's an infringement by a different

4   product.  But in any event, you haven't been

5   prejudiced insofar as the first five elements of Claim

6   26 are concerned, and there was an amended witness

7   list that had that on there.

8        The objection is overruled provided that the

9   testimony must be confined and the demonstration must

10  be confined to the first five elements of Claim 26,

11  which are listed in this demonstrative as the first

12  five elements of Claim 28 and correctly so.  So I

13  don't see there's been any prejudice.

14       I don't think there's been an offense of the

15  rules on expert disclosures.  It's a consequence of

16  the changing groundwork of the case as to which

17  reasonable notice was given.  The changing groundwork

18  is that during the course of discovery in this case,

19  the Federal Circuit changed made some decisions that

20  changed what we're litigating.

21       All right.  And you have your objections

22  overruled.  You may go ahead.

23  BY MS. ALBERT:

24  Q    Can you continue, Dr. Weaver?

25  A    Sure.  So, Your Honor, what we have here is the

WEAVER - DIRECT                528

1    pop-up, the browser window within a browser that

2    represents the requisition center interface.

3        So, Your, Honor I know it's fuzzy, but up here at

4    the top in this navigation bar there are some choices.

5    And this one that is admittedly very hard to say see

6    says, "Find/shop."

7        So I'm going to click on that and that will open a

8    drop-down menu.  And at the bottom of that menu will

9    be a choice of searching by categories.  And that's

10   what I'm going to click on.

11       Play.  Stop.  So what I've done now is I've begun

12   to select the product catalogs to search.  This is

13   done using the catagory hierarchy tree.  And, Your

14   Honor, you'll remember from the trial lots of

15   discussions about the --

16           THE COURT:  Let's don't talk about the trial.

17   Just tell me what you're doing.

18           THE WITNESS:  Yes, sir.

19   A   What we're seeing here are some top level

20   elements, listings that come from the UNSPSC codes.

21   This first one is about live plants.  That's not what

22   I'm going to choose.  What I'm going to do is scroll

23   down until we get to a catagory that's related to

24   computers.

25       Play Stop.  Well, I clicked on "communications and

WEAVER - DIRECT                    529

1    computing equipment."  It's not worth going back to

2    see that.  That takes me to the second level of the

3    hierarchy tree.  And this one says, "Hardware and

4    accessories."  So I'm going to click on that and go to

5    a third level.

6        Play.  Stop.  So now there are two choices at the

7    third level.  The top one is computers.  That's the

8    one I'm going to choose.  So I'll click on that.

9            MR. THOMASCH:  Your Honor, I'm sorry to

10   interrupt.  We're actually having some difficulty

11   following the demonstrative.

12           THE COURT:  Because it's fuzzy?  Is that what

13   you're talking about or something else?

14           MR. THOMASCH:  No, simply -- I'm having

15   trouble reading it, and I'm not certain, and I may

16   have missed it.  I'm not certain whether he says he's

17   in Punchout or item master.  And I can't read what's

18   happening here.

19           MS. ALBERT:  He said he selected the

20   selection for categories.

21           MR. THOMASCH:  He's in RQC for categories.

22   Okay.

23           THE COURT:  Let me ask you something.  Who

24   talked to the IT people?  Let's go off the record.

25               (Discussion off the record.)

WEAVER - DIRECT                    530

1         THE COURT:  We're on the record now.  Lawson

2   object ed because they can't see the demonstration

3   because it is fuzzy and it is fuzzy.  It's hard to

4   follow.  And that's difficult for Mr. Thomasch to

5   prepare or to deal with his cross-examination, even

6   though I'm sure he's prepared some.  Nonetheless, he's

7   got to be able to deal with what happens in the

8   courtroom.

9         So off the record you agreed, ePlus, to

10  provide screen shots and to use this testimony with

11  screen shots.

12        Is that what we're going to do?

13        MR. STRAPP:  Your Honor, could we --

14        THE COURT:  How long does it take to get

15  screen shots?

16        MR. STRAPP:  We're trying to figure that out

17  right now.  We're going to do it as fast as we

18  possibly can, and we'll bring them to the court as

19  soon as they are printed.

20        Would it be possible to proceed with the

21  video and provide the screen shots afterwards?

22        THE COURT:  Well, I think that impairs his

23  ability to cross-examine.

24        MR. THOMASCH:  I think the problem is, in

25  effect, counsel and the witness know where this is

WEAVER - DIRECT                    531

1    going to go and I don't.

2              THE COURT:  I understand.

3              MR. THOMASCH:  I'm okay to do it without the

4    demonstration and then have these come in after the

5    fact.  You've admitted it in evidence.  I'm not trying

6    to keep it out, but I would like to be able to read

7    it.

8              THE COURT:  I understand.

9              MR. STRAPP:  So can we proceed without the

10   video then?

11             THE COURT:  Upon his agreement we can.

12             MR. THOMASCH:  I agree.

13             THE COURT:  He's agreed to it.  And I'll try

14   to follow it as best I can.  So will he.

15             I want you to rush that screen production, if

16   you will.

17             MR. STRAPP:  Absolutely.

18             MS. ALBERT:  Is there any reason to try the

19   second video to see if that's any clearer?

20             THE COURT:  Can you understand the second

21   video better than the first one?

22             MS. ALBERT:  I haven't seen it on the

23   courtroom system.  So I'm not sure.

24             Would it be possible perhaps to recess Dr.

25   Weaver and call a different witness?

1      THE COURT:  Yeah, we can do that.  It will

2  make it easier for Mr. Thomasch.  I want him to be

3  able to cross-examine, and I want to be able to follow

4  it.  It's a legitimate position created by some

5  technological problems.  We'll solve it that way.

6      Dr. Weaver, you can kind of just leave that

7  stuff up there.  You don't have to be hauling it

8  around.

9      THE WITNESS:  Thank you, Your Honor.

10      (The witness was excused from the witness

11  stand.)

12      MS. ALBERT:  EPlus calls Keith Lohkamp.

13      THE COURT:  Mr. Lohkamp, I remind you, you're

14  under the same oath which you took earlier in these

15  proceedings.

16      THE WITNESS:  Yes, Your Honor.

17

18   KEITH LOHKAMP, called by the Plaintiff, having

19  been duly sworn, testified as follows:

20

21   DIRECT EXAMINATION

22  BY MS. ALBERT:

23  Q   Good morning, Mr. Lohkamp.

24  A   Good morning, Ms. Albert.

25  Q   The item master of systems having requisition

LOHKAMP - DIRECT                    533

1  center continues to be able to maintain data

2  associated with items of multiple different vendors,

3  correct?

4  A    Correct.

5  Q    If a user using Lawson S3 procurement system

6  including RQC searches the item master, that user can

7  select multiple items for inclusion in the requisition

8  that could be purchased from multiple different

9  vendors, correct?

10 A    Yes.

11        MR. LO:  Your Honor, we object to the form of

12 the question insofar as Ms. Albert is reading lay

13 terms from the patent, insofar as there's no

14 foundation that Mr. Lohkamp has read Your Honor's

15 claim constructions and understands it and is giving

16 testimony in compliance with the Court's claim

17 construction.

18        MS. ALBERT:  I'm not reading claim terms from

19 the patent.  I'm using terms that are used in

20 connection with the operation of the Lawson

21 procurement systems.

22        THE COURT:  Overruled.

23        MS. ALBERT:  Did I have a question pending?

24 Did he answer?  I'll ask it again.

25        THE COURT:  Ask it again.

1  Q    If a user using Lawson S3 procurement system

2  including RQC searches the item master, that user can

3  select multiple items for inclusion in a requisition

4  that can be purchased from multiple different vendors,

5  correct?

6  A    Yes.

7  Q    Assuming you conduct a search of the item master

8  using requisition center and select an item master

9  item associated with vendor A and an item master item

10 associated with vendor B and place both of those items

11 in a single requisition, when you click "release," the

12 purchase order module will generate two purchase

13 orders, one to vendor A and one to vender B, correct?

14 A    Yes.

15 Q    With respect to Lawson procurement systems that

16 include the requisition center application and the

17 Procurement Punchout application, a user of such a

18 system can have business relationships with multiple

19 Punchout vendors, correct?

20 A    Could you repeat the question?

21 Q    With respect to a Lawson procurement system that

22 includes RQC and Procurement Punchout, a user of such

23 a system can have business relationships with multiple

24 Punchout vendors, correct?

25 A    Yes.

1  Q    And Lawson made no changes to a system that would

2  have the core procurement suite, requisition center

3  and Punchout with respect to disallowing such a system

4  from connecting to multiple different Punchout sites,

5  correct?

6  A    Correct.

7  Q    When a user of a system having the core

8  procurement suite, requisition center and Procurement

9  Punchout clicks on the find/shop drop down menu, there

10 would be a Punchout option available on that menu,

11 correct?

12 A    If the user has access to Punchout.

13 Q    Assuming the system user has business

14 relationships with Dell and Staples, for example, when

15 the system user clicks that find/shop drop down menu

16 and clicks "Punchout" as the option, the system will

17 then display an icon for the Dell Punchout site as

18 well as an icon for the Staples Punchout site,

19 correct?

20 A    Yes, if the user has access to those sites.

21 Q    The system can be connected to both of those

22 different catalogs, correct?

23 A    Yes, to both those websites.

24 Q    In fact, there are some Punchout websites that are

25 multi vendor Punchout sites, correct?

1    A    Yes.

2    Q    One example would be SciQuest, correct?

3    A    Yes.

4    Q    Another example would be GHX, Global Healthcare

5    Exchange; is that correct?

6    A    Yes.

7    Q    Another example of a multiple vendor Punchout site

8    is Perfect Commerce, correct?

9    A    Yes.

10   Q    You're aware that there are customers of Lawson

11   that maintain connections to the SciQuest Punchout

12   site, correct.

13   A    Yes.

14   Q    Now, with respect to a Punchout shopping session

15   at the SciQuest site, if a user selects from multiple

16   different vendors during that Punchout shopping

17   session at the SciQuest site, those items are returned

18   back to the Lawson system to the right-hand side of

19   the user interface of requisition center, correct?

20   A    That is my understanding of the SciQuest

21   functionality.

22   Q    Once the user clicks "release," that requisition

23   will be released, correct?

24   A    Yes.

25   Q    Assuming my requisition with the line item from

1  vendor A and a line item from vend B was approved and

2  my system has a purchase order module, the purchase

3  order module will generate a purchase order from my

4  line item that I want to purchase from vendor A and

5  that a second purchase order from the line item from

6  vendor B, correct?

7  A    Correct.

8  Q    Now, Lawson performs demonstrations of its

9  requisition center systems for its customers, correct?

10  A    Yes.

11  Q    And you've participated in meetings with customers

12  where Lawson has demonstrated the features and

13  functionality of a system with requisition center,

14  correct?

15  A    Yes.

16  Q    For example, Lawson demonstrated its requisition

17  center systems at the west coast healthcare summit

18  meeting that you attended, correct?

19  A    I believe we showed a PowerPoint of it.

20        THE COURT:  So the answer is yes?

21        THE WITNESS:  Yes.

22  Q    Now, a download of a product does not render that

23  product operational, does it?

24  A    No, it does not.

25  Q    A product needs to be installed in order to

1    execute; isn't that correct?

2    A    Yes, it does.

3    Q    A download of requisition center isn't the same as

4    an installation of requisition center, correct?

5    A    Correct.

6    Q    So a simple download of requisition center without

7    any further actions would not change a customer's

8    system configuration, correct?

9    A    They would need to install that to use it.

10   Q    Thank you.

11        Let me have you look at Plaintiff's Exhibit 1113

12   in your book.  As indicated on the first page on the

13   email chain on June 3, 2011, you forwarded the slides

14   attached to this email to Dale Christopherson; is that

15   correct?

16   A    Correct.

17   Q    Let's turn to --

18        MS. ALBERT:  I would move the admission of

19   Plaintiff's Exhibit 1113 into evidence.

20        THE COURT:  Any objection?

21        MR. LO:  No objection, Your Honor.

22        THE COURT:  It's admitted.

23        (Plaintiff's Exhibit 1113 is admitted.)

24   Q    Turn to page RQC 883192.  The attachment to the

25   email is a slide presentation entitled, Introducing

1    Lawson requisition center from a webinar that Lawson

2    presented on June 3, 2011; is that correct?

3    A    That's correct.

4    Q    This webinar was presented to Lawson's customers;

5    is that correct?

6    A    Yes.

7    Q    You were the primary compiler of the slides in

8    this presentation; is that correct?

9    A    Yes, and in conjunction with Jennifer Langer.

10   Q    And you authored some of the slides in this

11   presentation and got input from others, correct?

12   A    Yes.

13   Q    Why don't you turn to page RQC 883193.  I'm sorry.

14   196.  Do you see under the heading "The Court Order,"

15   the second bullet states, "Lawson is ordered to no

16   longer provide support to RSS; however, customers are

17   not ordered to stop running RSS."  Do you see that?

18   A    Yes.

19   Q    Now, systems that included RSS were the subject of

20   the Court's injunction order, correct?

21   A    To my understanding, yes.

22   Q    You're aware, aren't you, that the Court's

23   injunction order prohibited Lawson from circulating,

24   publishing or disseminating within the United States

25   any literature or information that encourages the use

1  of the infringing systems, correct?

2  A   I'm not sure if that's the exact word or not.

3  Q   But do you have that understanding that Lawson was

4  prohibited from circulating literature that encourages

5  use of RSS?

6  A   That was my understanding.

7  Q   Thank you.

8      Can you turn to Plaintiff's Exhibit 1105?  Do you

9  see on this page a June 3 email from Kim Ross to you?

10 A   Yes.

11 Q   In that email, she states, "Hi.  The transcript of

12 questions from the webinar is attached."  Do you see

13 that?

14 A   Yes, I do.

15         THE COURT:  I'm sorry.  What page is that?

16         MS. ALBERT:  The first page of 1105, PX-1105.

17         THE COURT:  Yes.  Okay.

18 Q   The attachment to this email is the transcript of

19 questions from the June 3 Lawson customer webinar on

20 requisition center; is that correct?

21 A   It appears to be so.

22 Q   And you received a copy of the attached

23 transcript: is that correct?

24 A   That is correct.

25 Q   The questions and answers that are included in the

1    attachment are the questions and answers that were

2    taken during the course of Lawson's June 3, 2012

3    webinar presented to its customers concerning

4    requisition center; is that correct?

5    A    Yes.

6    Q    These questions and answers were made available to

7    the public subsequent to the webinar on the

8    MyLawson.com website; is that correct?

9    A    Well, the final copy after we reviewed the

10   questions and put together answers had all that

11   reviewed by legal with input from different teams.  We

12   published then a final version of Q and A to the

13   customers.

14           THE COURT:  Is that this?

15           THE WITNESS:  That's not this.

16           THE COURT:  What?

17           THE WITNESS:  That's not this.  This is the

18   raw Q and A question and answer coming from the WebEx.

19   Then we took this and created a final document that we

20   shared back.

21   Q    And the final document was posted on the

22   MyLawson.com website; is that correct?

23   A    That's correct.

24   Q    And Lawson's customers, partners and employees

25   have access to MyLawson.com; is that correct?

LOHKAMP - DIRECT                          542

1    A    That is correct.

2    Q    Were live answers to the customers' questions

3    given during the course of the webinar?

4    A    Yes, there were.

5    Q    Were you one of the persons answering the

6    questions during the course of the webinar?

7    A    Yes, I was.

8    Q    Why don't you look at page RQC 869067.  Do you see

9    on that page the third question from the bottom from

10   Sharon Ewing?  Do you see that question?

11   A    Yes.

12   Q    Sharon Ewing asks, "Other than changing the RSS

13   bookmarks, nothing else will be required for the

14   existing RSS to continue to run; is that correct?"  Do

15   you see that?

16   A    Yes, I see that.

17   Q    And the answer to the question provided by

18   Jennifer Langer of Lawson is, "Correct."  Is that

19   accurate?

20   A    That's what -- that's accurate, yes.

21   Q    The customer is asking about things that need to

22   be changed in order for the existing requisition self

23   service to continue to run, correct?

24   A    Correct.

25   Q    Why don't you turn to page RQC 869072.  In the

LOHKAMP - DIRECT                    543

1   middle of the page there's a question from a

2   Mr. Wacarkhan (phonetic).  Do you see that?

3   A    Yes.

4   Q    And he asks, "What about if we want to run RSS and

5   RQC side by side?"  Do you see that question?

6   A    Yes.

7   Q    And how did Jennifer Langer of Lawson answer that

8   question?

9   A    She answered, "Designed to run in parallel with

10  only changes to the RSS bookmarks.

11  Q    Turn to page --

12           THE COURT:  What does "run in parallel" mean?

13           THE WITNESS:  It means that for some of our

14  customers who may want to be testing both RQC and RSS,

15  they basically can be running RSS and install RQC and

16  be able to test that before they go live.  In this

17  case this was --

18           THE COURT:  I think you're going beyond what

19  I asked.  I mean what does it mean to run it parallel.

20  Not why you run in parallel.  I want to know what it

21  means to run it parallel.

22           THE WITNESS:  It means that a user could

23  access requisition center so someone could access

24  requisition center and run that and then also have

25  requisition self service and be able to access that

1    and access the functions in requisition self service.

2              THE COURT:  So if you have RSS and you get

3    RQC, you can continue to run RSS and also run RQC?

4              THE WITNESS:  It is technically possible,

5    yes.

6              THE COURT:  Well, is there anything that

7    Lawson has done to keep that from happening

8    technologically?

9              THE WITNESS:  Technologically, when you

10   install requisition center, it basically changes the

11   bookmarks to the end users so the end users are now

12   pointed to requisition center.  A customer would have

13   to go and modify that to undo that change.

14             THE COURT:  By changing the bookmarks in RSS?

15             THE WITNESS:  Correct.

16             THE COURT:  And then could you continue to

17   run both systems in parallel?

18             THE WITNESS:  If you had not uninstalled RSS,

19   yes.

20             THE COURT:  What?

21             THE WITNESS:  If you had not uninstalled RSS.

22             THE COURT:  If you had not uninstalled RQC?

23             THE WITNESS:  Uninstalled RSS.

24   Q    And Lawson in the course of this customer webinar

25   was providing instructions to its customers for how to

1    change the bookmarks so they would be able to access

2    RSS to continue to run, correct?

3    A    We'd provide some guidance on it.

4    Q    Turn to page RQC 869068.  Refer to the second

5    question from the top on that page from Grant Brown at

6    WLSSD.com.  Do you see that?

7    A    Yes.

8    Q    And WLSSD is a reference to Western Lake Superior

9    Sanitary District; is that correct?

10   A    I'm not sure.

11           THE COURT:  Excuse me.  What page are you on?

12           MS. ALBERT:  RQC 869068.  The question from

13   Grant Brown.

14           THE COURT:  All right.

15           Go ahead.

16   Q    Western Lake Superior Sanitary District was not

17   one of the 277 healthcare customers who had the sunset

18   provision under the injunction, was it?

19   A    Not to my knowledge.

20   Q    Mr. Brown asked, "Are there any known/or possible

21   issues when multiple users are using RSS and others

22   are using RQC at the same time?  Are they all balanced

23   on the same databases?"  Do you see that question?

24   A    Yes, I do.

25   Q    How did Jennifer Langer of Lawson respond?

LOHKAMP - DIRECT                    546

1   A    "Designed to work this way."

2   Q    So Lawson told its customers that requisition self

3   service and requisition center were designed to allow

4   multiple users to use the two applications

5   simultaneously; is that correct?

6   A    Jennifer said, "It was designed to work this way."

7           MS. ALBERT:  Thank you.  Nothing further.

8

9        CROSS-EXAMINATION

10  BY MR. LO:

11  Q    Good morning, Mr. Lohkamp.

12  A    Good morning.  Mr. Lo.

13  Q    What you were just shown -- let's go to the last

14  exhibit.  Were the answers provided in that document

15  the final answers provided to Lawson customers?

16  A    No, they weren't.

17  Q    Let me ask you to take a look at what's been

18  marked as Plaintiff's 1002.

19           MR. LO:  Your Honor, while we a grab that

20  exhibit, perhaps I should go to the next question so

21  we save the Court some time.

22           THE COURT:  All right.

23  Q    Mr. Lohkamp, you were asked by counsel for ePlus

24  about issues regarding running RSS and RQC in

25  parallel.  When RQC is installed, what happens to the

LOHKAMP - CROSS                    547

1  user's ability to access RSS?

2  A   When RQC is installed, the bookmarks change and

3  the users who previously had access to RSS are

4  directed via the bookmarks to RQC.

5  Q   Does the installation program for RQC give users

6  the option of keeping the RSS bookmarks?

7  A   No.

8            THE COURT:  I thought you just told me they

9  could change the bookmarks on RSS and run them both in

10 parallel.

11           THE WITNESS:  The installation program does

12 not allow it afterwards.

13           THE COURT:  You mean, the installation

14 program does not teach it?  It doesn't do it, but you

15 can do it if you know to do it; is that right or

16 wrong?

17           THE WITNESS:  No.  The installation program

18 that we provide does that.  That basically changes the

19 bookmarks after the fact.  The customer could go in

20 and rename some things, bookmarks.

21           THE COURT:  I guess I need to get straight

22 once and for all, if you had RSS, then you get RQC,

23 you get it installed, do you have the capability, if

24 I'm the customer, to change the bookmarks on RSS and

25 then run them both at the same time?

LOHKAMP - CROSS                    548

1        THE WITNESS:  Yes.

2        THE COURT:  And can if I were a customer of

3   Lawson running RSS in June of 2011, do I still have

4   that capacity if I have RSS and RQC today?

5        THE WITNESS:  Yes, you have that capability

6   to change the bookmarks.

7        THE COURT:  All right.  And I can run them

8   both in parallel?

9        THE WITNESS:  Yes.

10  Q    Mr. Lohkamp, the change that the Judge asked you

11  about, who would have to make that change?

12  A    The customer.

13  Q    Does Lawson provide any software in the

14  installation program that otherwise does that change

15  for the customer to your knowledge?

16  A    Not to my knowledge.

17  Q    Does the typical end user of Lawson software can

18  that end user easily change the bookmarks as you've

19  just described to Judge Payne?

20       MS. ALBERT:  Lack of foundation.

21  Q    Mr. Lohkamp, do you know whether a typical user of

22  Lawson software would have the capability, the right

23  to change the bookmark as Judge Payne has just asked

24  you about?

25       THE COURT:  The right?

1        MR. LO:  Yes.

2        THE COURT:  The legal right?  Is that what

3   you're talking about?

4        MR. LO:  No, Your Honor.  Let me rephrase my

5   question.

6        THE COURT:  All right.

7   Q   Mr. Lohkamp, are you aware of whether different

8   users of Lawson software might have different

9   administrative rights within the software?

10  A   Yes.

11       THE COURT:  I don't know what administrative

12  rights means, Mr. Lo.  Can you help me?

13       MR. LO:  Yes.

14  Q   Would you please explain what it means to have

15  administrative rights within the software?

16  A   Different users who have access to the Lawson

17  system have access to different functions.  And a user

18  that has administrative rights has a greater ability

19  to make changes to the system including configuration.

20       THE COURT:  Like the fellow here at the

21  courthouse who goes into my computer and logs in as

22  administrator, he can do a lot of things that I can't

23  do.  Is that the same thing?

24       THE WITNESS:  Yes.  Exactly.

25       THE COURT:  Okay, I understand.

1    Q    Why is it that different levels of administration

2    are given with these types of procurement software?

3    A    Really to control who has access to do what.  So

4    requesters are usually just limited to being able to

5    order and use requisition.  The administrator has the

6    ability to make changes into the configuration of the

7    software typically.

8    Q    And when we're talking about using the Lawson

9    procurement software to make purchases, is it to your

10   knowledge either usually the requester or the

11   administrator that conduct those tasks?

12   A    It's typically the requester that performs the

13   task of ordering items.

14   Q    Do the requesters using Lawson software typically

15   have the administrative right to change the bookmarks

16   as Judge Payne was asking you about?

17   A    Typically, no.

18   Q    You were asked a series of questions by ePlus's

19   counsel regarding the vendor SciQuest.  Do you recall

20   that?

21   A    Yes.

22   Q    Is SciQuest a specific site that all SciQuest --

23   all customers who access SciQuest see the same thing

24   or is it customized for each particular customer that

25   might access SciQuest?

LOHKAMP - CROSS                    551

1        MS. ALBERT:  Lack of foundation.

2        THE COURT:  What do you say about her

3   objection?

4        MR. LO:  Your Honor, my question actually

5   asked him whether he knew the answer to that question.

6        THE COURT:  So the answer is yes or no.  Do

7   you know?  Do you want it again?

8        THE WITNESS:  Yes.

9        THE COURT:  Give him the question again.

10  Q    Sure.  Mr. Lohkamp, are you aware of whether all

11  users who access SciQuest are looking at the same site

12  with the same items and the same pricing or are there

13  variations depending on which customer is accessing

14  SciQuest at a particular moment?

15       MS. ALBERT:  Lack of you foundation.  I don't

16  know how he can possibly know about all users.

17       THE COURT:  I don't either, but I think

18  that's the question.  I don't know if there are two

19  users or one or 5,550.

20       Do you know what all of them do?

21       THE WITNESS:  I don't know what all of them.

22

23       THE COURT:  All right.  Thank you.

24  Q    Do you whether there is variation among what users

25  see when they access SciQuest?

1  A    Yes.

2  Q    Is there?

3  A    To my understanding, yes.

4  Q    Yes, meaning there --

5  A    There are variations.

6  Q    What types of variations are there?

7  A    My understanding is that SciQuest can put

8  different products, make those available for a

9  particular customer, as well as different prices.

10 Q    Do you have personal knowledge of whether Lawson

11 customers actually use SciQuest to order items from

12 multiple vendors on the same requisition?  Do you have

13 personal knowledge of that fact one way or the other?

14       THE COURT:  You can walk up there.  You don't

15 have to creep up.

16       MS. ALBERT:  Objection.  I believe I asked

17 him the same question on my examination and he's

18 already answered it.

19       MR. LO:  No, Your Honor.  I think the

20 question on direct examination was whether it's

21 capable, and now I'm asking Mr. Lohkamp whether he has

22 actual knowledge of that happening.

23       THE COURT:  All right.  Overruled.

24 A    I don't know specifically how the customers have

25 used that.

1  Q   So you have no personal knowledge of that

2  happening; is that correct?

3  A   That's correct.

4          THE COURT:  He doesn't know one way or the

5  other.  He doesn't know either way.  Is that what

6  you're saying?  You don't know?

7          THE WITNESS:  I don't know, yes.

8  Q   How many customers to your knowledge, how many

9  Lawson customers to your knowledge use SciQuest as a

10  Punchout vendor?

11          THE COURT:  Use SciQuest what?

12          MR. LO:  SciQuest as a Punchout vendor.

13  A   Approximately five or so.

14  Q   For any of those five, do you have personal

15  knowledge as to what that set-up looks like for that

16  individual customer?

17  A   No.

18  Q   Now, earlier on -- would you turn to Plaintiff's

19  1105.  And that was a document that plaintiff's

20  counsel placed in front of you earlier.  And I'll ask

21  you to turn to the page that ends in RQC 068.  And you

22  recall a series of questions regarding the question

23  asked by Mr. Grant Brown?

24  A   Yes.

25  Q   And are the answers provided in these documents,

1    are they drafts or are they what was actually provided

2    in terms of final answers to the customers?

3    A    These were answers that were provided in the Q and

4    A live but not in the final document.

5    Q    To your knowledge did any Lawson customers obtain

6    a copy of what we're looking at in Plaintiff's 1105?

7    A    Not to my knowledge.

8    Q    Let me hand up to you what's been marked as

9    Plaintiff's 1002.  What is Plaintiff's 1002?

10   A    It appears to be the final copy of the requisition

11   center webinar Q and A answers.

12          THE COURT:  It's the edited version, final

13   version, of 1105; is that what you're saying?

14          THE WITNESS:  That's correct.

15          THE COURT:  All right.  Pardon.  Go ahead.

16          MR. LO:  Thank you, Your Honor.

17   Q    Was Plaintiff's 1002 to your knowledge provided to

18   Lawson customers?

19   A    Yes, to my knowledge.

20   Q    And you recall earlier there were some questions

21   about multiple users using RSS and RQC, correct?

22   A    Correct.

23   Q    Let me direct your attention to the page that ends

24   in RQC 646.  Do you see a section of that page that is

25   labeled as "Running Requisition Center in Parallel

1  with Requisition Self Service"?

2  A    Yes.

3  Q    Now, let me direct your attention to the third row

4  down from there.  And I'll read you -- and ask you to

5  read the left-hand column.  It starts with "are there

6  any."

7  A    Okay.  "Are there any known or possible issues

8  when multiple users are using RSS and others are using

9  RQC at the same time?  Are they all balanced on the

10 same data tables?"

11 Q    What does that represent?  What is that left-hand

12 column there that you just read?

13 A    The left-hand column is the question that was

14 entered during the webinar.

15 Q    Where is the answer to that question that was

16 provided to Lawson customers?

17 A    The answer is in the next column over.

18 Q    Would you read that, please?

19 A    "There should not be any issues.  The system

20 should behave similar to having multiple RSS users

21 using the system at the same time.  Lawson will only

22 support RQC and customer will mitigate risks by moving

23 to RQC."

24 Q    Was that to your knowledge the final answer that

25 was provided to Lawson customers as to that question?

1    A    Yes.

2    Q    Let me direct your attention to the last row in

3    that particular section and ask you to read the

4    question that starts with "if a client."

5    A    "If a client is running Punchout and wants to test

6    RQC while still using RSS, how will that work?"

7    Q    And, again that's the question that was asked by

8    the customer, correct?

9    A    Correct.

10   Q    What was Lawson's final response to customers as

11   to that question?

12   A    "Running RQC and RSS in parallel with Punchout

13   installed will work.  However, both RSS and RQC will

14   need to be configured to interface with Punchout.

15   Customers are encouraged, however, to stop using RSS.

16   Lawson will only support RQC and customer will

17   mitigate risks by moving to RQC."

18            MR. LO:  Thank you, Mr. Lohkamp.

19            THE WITNESS:  You're welcome.

20   Q    Well, Mr. Lohkamp, earlier on you were asked a

21   series of questions regarding the capability of RQC.

22   Do you recall that?

23   A    Yes.

24   Q    And you were posed a hypothetical example of a

25   user punching out to SciQuest and adding to the

1   requisition items from SciQuest.  Do you recall that

2   line of questioning?

3   A   Yes, I do.

4   Q   Using RQC, once a user has added an item to the

5   requisition from SciQuest, is it possible for the user

6   then to punch out to another site?

7   A   No, it is not.

8   Q   Once a user has added, again following ePlus's

9   counsel's hypothetical, in a situation where the user

10  has already added into the requisition something from

11  SciQuest, would it be possible for the user to access

12  item master?

13  A   No, it would not.

14  Q   And in that situation, would a user then be able

15  to search or add items from item master?

16  A   No, they would not.

17  Q   Mr. Lohkamp, have you read the '683 Patent?

18  A   I've briefly read it.

19  Q   Are you aware of what a Markman order is?

20  A   No, I'm not.

21  Q   Then I take it you haven't -- you're not aware of

22  whether Judge Payne has issued a Markman order in this

23  case, correct?

24  A   That's correct.

25  Q   And you would not have read any such order; is

LOHKAMP - CROSS                    558

1   that correct?

2   A   I would not have read it.

3   Q   Let me ask you to turn to Plaintiff's 1113.

4   That's a document that was placed in front of you

5   earlier.  Do you recall being asked questions with

6   respect to the page that ends in RQC 196?

7   A   Yes.

8   Q   You were asked a series of questions regarding the

9   provision of customer support by Lawson.  Do you

10  recall that?

11  A   Yes.

12  Q   In your role at Lawson, what if anything do you

13  have to do with providing customer support?

14  A   I do not provide commercial support.

15  Q   Are you aware of the circumstances under which

16  Lawson did or did not provide customer support for

17  users of RQC or RSS?

18  A   No, I'm not.

19          MR. LO:  Thank you, Mr. Lohkamp.  No further

20  questions.

21          MS. ALBERT:  One housekeeping matter.  I

22  wanted to move the admission of Plaintiff's Exhibit

23  1105 into evidence.

24          THE COURT:  Any objection?

25          MR. LO:  No objection, Your Honor.

1           THE COURT:  It's admitted.

2           (Plaintiff's Exhibit 1105 is admitted.)

3

4    REDIRECT EXAMINATION

5    BY MS. ALBERT:

6    Q   Now, Mr. Lohkamp, referring back to Plaintiff's

7    Exhibit 1105, let's look at the first page.  Referring

8    to the bottom line on that page, beginning

9    "registration report," do you see that?

10   A   Yes.

11   Q   It says, "Wow, a 1049 people registered.  I

12   believe we topped out at 870 online at one time."  Do

13   you see that?

14   A   Yes.

15   Q   So during the course of the webinar, customers

16   were asking these questions live, correct?

17   A   Live via the Q and A feature, yes.

18           THE COURT:  There's something called a chat

19   box, you can type your question in and then the answer

20   come back on the chat box?

21           THE WITNESS:  Correct.  They would type in

22   the questions and then they could be answered through

23   typing back.

24   Q   And Lawson was providing the answers live to the

25   customers, correct?

 1  A    Yes.

 2           THE COURT:  So that means in the vernacular

 3  that if you ask a question and they respond to it, and

 4  I'm on the webinar, I can also see the question and

 5  the answer; is that right?

 6           THE WITNESS:  So it depends upon how the

 7  question is answered.  The question can be answered

 8  privately just to that individual or it can be

 9  answered publicly.  And so the feature doesn't show

10  all the questions to everyone, but when we answer

11  them, we could either answer them publicly or

12  privately.  And I don't know how these answers were

13  done whether they were just to that questioner or

14  publicly.

15           THE COURT:  Thank you.

16  BY MS. ALBERT:

17  Q    In the course of the webinar, Lawson provided

18  instruction to its customers for how to change the

19  bookmarks so the customers could run RSS in parallel

20  with RQC, correct?

21  A    Through the questions or in the presentation?

22  Q    Through the questions and answers.

23  A    Yes.  From the questions it gave some guidance on

24  how the bookmarks would need to change.

25  Q    If a system administrator sets up a system to run

1    RQC and RSS in parallel, all users of the system can

2    run both applications, correct?

3    A    It would depend upon if the users were provided

4    access to the system.

5    Q    Assuming that the users had access rights to the

6    system and the system administrator set up the system

7    to run RQC and RSS in parallel, then the users of the

8    system would be able to run both applications,

9    correct?

10   A    Assuming that the users were provided access to

11   both RQC and RSS.

12   Q    Thank you.  Turn to Plaintiff's Exhibit 1002 that

13   Mr. Lo referred you to.

14          THE COURT:  Is 1002 in?

15          MS. ALBERT:  I believe it's already admitted.

16          THE CLERK:  Yes, sir.

17          MR. LO:  That's my understanding as well.

18          THE COURT:  All right.  Thank you.

19   BY MS. ALBERT:

20   Q    With reference to page RQC 646, Mr. Lo referred

21   you to a section of that page.  Can you read what the

22   title of that entire section of questions and answers

23   is?

24   A    Yes.  It's running requisition center in parallel

25   with requisition self service.

LOHKAMP - REDIRECT                    562

1              MS. ALBERT:  Thank you.  Nothing further.

2              THE COURT:  All right.  I have one question

3       for you, Mr. Lohkamp.

4              THE WITNESS:  Yes.

5              THE COURT:  I wrote down to ask yesterday and

6       didn't while you're here.  To your knowledge, has

7       Lawson lost any customers who had RSS and who told you

8       that they were quiting Lawson because of the shift to

9       RQC?

10             THE WITNESS:  I personally am not aware of

11      any.

12             THE COURT:  All right.  Thank you.  Anybody

13      have any questions based on what I asked?

14             MS. ALBERT:  No, Your Honor.

15             MR. LO:  No, Your Honor.

16             THE COURT:  Can he be permanently excused or

17      do you need him around?

18             MR. LO:  We may recall him.

19             THE COURT:  All right.  Mr. Lohkamp, you're

20      temporarily excused.  You may be recalled.

21             THE WITNESS:  Thank you.

22             (The witness was excused from the witness

23       stand.)

24             MS. ALBERT:  EPlus calls Scott Hanson.

25             THE COURT:  Wait just a minute.  I think we

LOHKAMP - REDIRECT                563

1    need to change court reporters.

2              We'll take a 20-minute recess at this time.

3              (Recess taken at 11:05 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              MS. ALBERT:  ePlus calls Scott Hanson to the
 2    stand.
 3              THE COURT:  All right.
 4
 5                        SCOTT HANSON,
 6    a witness, called at the instance of the plaintiff,
 7    having been first duly sworn, testified as follows:
 8                     DIRECT EXAMINATION
 9    BY MS. ALBERT:
10    Q    Good morning, Mr. Hanson.
11    A    Good morning.
12    Q    In December of 2011 when you were deposed, you were
13    the practice director of technology --
14              THE COURT:  Let's just get his name.
15              MS. ALBERT:  Pardon me?
16              THE COURT:  Your name.
17    Q    Can you state your name for the record, please.
18    A    Scott Hanson.
19              THE COURT:  And will you spell the last name.
20              THE WITNESS:  H-a-n-s-o-n.
21              THE COURT:  All right.  And you work with?
22              THE WITNESS:  Infor, currently Infor.
23              THE COURT:  And Infor was formerly?
24              THE WITNESS:  Lawson.
25    Q    In December 2011 when you were deposed in this matter,
```

1    you were the practice director of technology in the Lawson

2    consulting services organization; is that correct?

3    A    That's correct.

4    Q    What is your current position?

5    A    Same position.

6    Q    In that position, your responsibilities include

7    managing the set of technical and systems consultants that

8    perform installation and administrative activities for

9    Lawson clients; is that correct?

10   A    That's correct.

11   Q    Your responsibilities previously included oversight

12   responsibility for the requisition self-service

13   application; is that correct?

14   A    Could you say your question again.

15   Q    Your responsibilities previously included oversight

16   responsibility for the requisition self-service

17   application; is that correct?

18   A    Installation activities of RSS or RQC, yes.

19   Q    Thank you.  And your responsibilities also included

20   oversight into the installation and implementation of the

21   procurement Punchout application; is that correct?

22   A    Correct.

23   Q    Your responsibilities also include oversight with

24   respect to the installation of the Requisition Center or

25   RQC application; is that correct?

1  A    That's correct.

2  Q    You were the head of Lawson's RQC SWAT team; correct?

3  A    That's correct.

4  Q    The RQC SWAT team was created at the end of May 2011

5  to assist Lawson customers in transitioning from RSS to

6  RQC; is that correct?

7  A    That is correct.

8  Q    The SWAT team's responsibilities involved answering

9  any questions that the customers may have had as well as

10 providing actual installation of the RQC product on their

11 system; is that correct?

12 A    That's correct.

13 Q    Now, I would like to discuss the process that's used

14 to install and integrate RQC into the core S3 procurement

15 system.  The first step would be a customer would have to

16 download RQC; is that correct?

17 A    That's correct.

18 Q    The customer must then use the RQC install guide and

19 follow the steps in that guide to install the product; is

20 that correct?

21 A    That is correct.

22 Q    And Lawson provides the RQC install guides to its

23 customers for this instruction; is that correct?

24 A    That is correct.

25 Q    If a customer has both a test system and a production

1   system, there would be two different RQC installations

2   required, one to the test environment and one to the

3   production environment; is that right?

4   A     That is correct.

5   Q     And can you explain what a production system or

6   production environment is?

7   A     The production system is the real or live systems

8   where actual requisitions are actually occurring.

9   Q     After downloading, an installation system

10  configuration is also required; is that correct?

11  A     Correct.

12  Q     And the nature of tasks associated with configuration

13  includes determining and setting up PO companies, item

14  masters, item locations, and setting up the procurement

15  system; is that correct?

16  A     In an implementation, yes, that's correct.

17  Q     Configuration is required in order to render RQC fully

18  implemented following installation; is that correct?

19  A     That's correct.

20  Q     Other steps that are required for implementation

21  include doing end user training, applying security, and

22  setting up users as requisitioners; correct?

23  A     Correct.

24  Q     Now, prior to the injunction, Lawson had roughly 860

25  customers who had licensed RSS application; is that

1   correct?

2   A    To my knowledge, yes.

3   Q    As of December 2011, more than seven months after the

4   Court's injunction was entered, the RQC SWAT team had

5   communicated with about 240 customers about RQC issues; is

6   that correct?

7   A    That is correct.

8   Q    However, Lawson did not actually install RQC for those

9   240 clients; right?

10  A    We would have installed RQC for a subset of those

11  clients.

12  Q    So not the full 240; correct?

13  A    That is correct.

14  Q    As of the date of your deposition, December 29th,

15  2011, you did not know how many of these 240 clients

16  actually performed the installation of RQC for themselves,

17  did you?

18  A    That is correct.

19  Q    And with respect to the other 620 RSS customers that

20  the SWAT team did not communicate with, as of December of

21  2011, Lawson had no information as to the status of either

22  the RSS application or the RQC application; correct?

23  A    I do not have that knowledge.

24  Q    Well, is your understanding that Lawson had any

25  information as to the status of either the RSS application

1    or the RQC application with respect to the 620 RSS

2    customers that the SWAT team did not communicate with?

3              MR. MARK:  Objection; foundation.

4              THE COURT:  Overruled.

5    A    Can you repeat the question?

6    Q    With respect to the other 620 RSS customers that the

7    SWAT team had not communicated with as of December 2011,

8    Lawson had no information as to the status of either the

9    RSS application or the RQC application; correct?

10   A    I do not have that knowledge.

11   Q    Do you recall being deposed on December 29th, 2011?

12   A    Yes, I do.

13   Q    And before you answered questions in the deposition,

14   you were sworn by the court reporter to tell the truth,

15   weren't you?

16   A    Yes.

17   Q    And you did tell the truth during that deposition,

18   didn't you?

19   A    Yes.

20   Q    After you finished testifying, you had a chance to

21   review your deposition testimony to make sure it was

22   accurate, didn't you?

23   A    Yes.

24   Q    Why don't you turn to page 66 of your deposition

25   transcript in your binder.  And during your deposition,

1    you were asked the following question:  I'm referring to

2    line two on page 66.

3         So with respect to the -- okay.  So between 860 RSS

4    licensees and the 240 for which Lawson has provided

5    assistance with the installation of RQC, does Lawson have

6    any information as to the status of either the RSS

7    application or the RQC application for the remaining 620

8    customers?

9         Then there was an objection, and you gave the

10   following answer:  My understanding is no.

11        Was that your answer on that day to that question?

12   A    Yes, it was.

13             MR. MARK:  Your Honor, I object to this as a form

14   of impeachment.  As noted in the transcript, Mr. Hanson

15   was not designated on that topic.  It was beyond the scope

16   of the examination, and the questions and answers that

17   follow that, starting at line 14 on page 66 and continuing

18   to page 67, make clear that his answer is consistent with

19   what he testified here to today, that is he actually had

20   no knowledge one way or the other.

21             MS. ALBERT:  Well, I think his answer today

22   varies from the answer he gave at his deposition.  He

23   said, my understanding is no.  Today he said, I don't

24   know.

25             THE COURT:  Objection overruled.

1    Q    Why don't you turn to Plaintiff's Exhibit 1056 in your

2    binder.  Are you there, Mr. Hanson?

3    A    Yes, I am.

4    Q    Attached to the covering email there's a PowerPoint

5    presentation entitled Introducing Lawson Requisition

6    Center dated June 3rd, 2011; is that correct?

7    A    That is correct.

8    Q    These slides were presented to Lawson customers during

9    the RQC webinar given on June 3rd, 2011; is that correct?

10   A    That is correct.

11           MS. ALBERT:  I would like to move the admission

12   of Plaintiff's Exhibit 1056.

13           MR. MARK:  No objection, Your Honor.

14           THE COURT:  How many times does this exhibit

15   get --

16           MS. ALBERT:  This is a different exhibit.

17           THE COURT:  It's a different one?

18           MS. ALBERT:  Yes.  It hasn't been admitted yet.

19           THE COURT:  It sure looks like a number of its

20   cousins bearing the same date.  All right.

21

22           (ePlus Exhibit 1056 admitted.)

23

24   Q    Turn to page RQC 905561.

25   A    Okay.

1    Q    Do you see on that page the third bullet from the

2    bottom reads, quote, RQC available to all impacted

3    customers at no charge; do you see that statement?

4    A    Yes, I do.

5    Q    On that same page, the next bullet reads, quote,

6    simple 20-minute process by which you download RQC; do you

7    see that?

8    A    Yes, I do.

9    Q    Now, downloading RQC refers only to a customer's act

10   of downloading the software from Lawson's support site,

11   MyLawson.com; correct?

12   A    Correct.

13   Q    The act of downloading RQC does not actually render

14   RQC operational; correct?

15   A    Correct.  You still need to install it.

16   Q    Thank you.  Turn to page 905565.  Do you see the last

17   bullet on that page reading, quote, to avoid possible

18   support delays, download RQC immediately?  Do you see

19   that?

20   A    Yes, I do.

21   Q    You have no knowledge why merely downloading RQC would

22   enable customers to avoid possible support delays, do you?

23   A    I do not.

24            THE COURT:  What page are you on?

25            MS. ALBERT:  RQC 905565, the last bullet on the

1    page.

2            THE COURT:  I see.

3    Q    The act of installing RQC does not render RQC running

4    and fully implemented; correct?

5    A    Correct.

6    Q    As of December 29th, 2011, in your deposition, you did

7    not know how many requisition self-service licensees had

8    installed RQC; correct?

9    A    That's correct.

10   Q    Lawson does not maintain any records that would

11   document the number of RSS licensees that have actually

12   installed RQC; correct?

13   A    I don't have any knowledge of that.

14   Q    Do you recall being deposed on December 2011 --

15   December 29th, 2011?

16   A    Yes, I do.

17   Q    And you've already verified you were under oath that

18   day?

19   A    Yes.

20   Q    And you told the truth that day?

21   A    Yes.

22   Q    Why don't you turn to page 128 of your deposition.

23   Starting at line ten, you were asked the following

24   question:  Does Lawson -- do you personally know how many

25   requisition self-service licensees have installed RQC, and

1   the answer you gave was, no, I do not?

2        THE COURT:  Sounds like what he just said.

3   That's not impeaching, I don't think.  I think he said the

4   same thing.  If he didn't, the import of it was the same.

5        MS. ALBERT:  Okay, I'll move on.  Thank you, Your

6   Honor.

7        THE COURT:  You know the rule about touching the

8   king, don't you?

9        MS. ALBERT:  Yes.

10  Q    Lawson relies on the download record, not the

11  installation record, to determine whether it can continue

12  to provide support services to a customer; correct?

13       MR. MARK:  Objection; foundation.

14  A    I do not know that answer.

15       THE COURT:  He just said he doesn't know, so I

16  guess he established there isn't a foundation.

17  Q    You are aware, sir, that Lawson relies on the download

18  record as far as the flag for SWAT services or whether

19  they can continue to provide services to a customer?

20       MR. MARK:  Can we get clarification, Your Honor?

21  I have an objection on just the time frame, whether the

22  question relates to today, past, or what's being referred

23  to at the time of the deposition.

24  Q    Well, as of the time of your deposition, sir, you were

25  aware that Lawson relied on the download record as far as

1   the flag for SWAT services or whether Lawson could provide

2   services to a customer, weren't you?

3   A    That is incorrect.

4   Q    Why don't you turn to page 147 of your deposition.

5   Starting at line 12, you were asked the following

6   question:  Quote, how does Lawson know whether it can

7   continue to provide services for those customers' systems

8   if it doesn't know whether the customer has installed RQC

9   or not?

10       Answer:  We rely on the download record as far as the

11   flag for the SWAT services or any of the others as to

12   whether we can provide services or not.

13       You gave that answer to that question on that day, did

14   you not, sir?

15   A    Yes, I did.

16   Q    Thank you.  Merely downloading RQC is not the same as

17   installing and implementing RQC into the client's

18   procurement system; correct?

19           THE COURT:  He already answered that.  You start

20   off asking if it took 20 minutes to download it, that

21   didn't render it operational, you needed to install it,

22   and even after you installed it, you needed to do other

23   things to have it operational.  We've already been there,

24   I think.

25   Q    If a client has not installed and implemented RQC,

1  doesn't the client still have a system with RSS on it?

2  A    I would need clarification.

3  Q    If the client previously had RSS on its Lawson

4  procurement system and the client had not installed and

5  implemented RQC, wouldn't the client still have a system

6  with RSS on it?

7  A    If they had not installed RQC, yes, they'd still have

8  RSS on it.

9  Q    Thank you.  As of December 2011 when you were deposed,

10  Lawson had no idea how many of its customers that had

11  downloaded RQC had actually implemented RQC; correct?

12  A    Can you repeat the question?

13  Q    As of December 2011 when you were deposed, Lawson had

14  no idea how many of its customers that had downloaded RQC

15  had actually implemented RQC; correct?

16  A    That's correct.

17  Q    As of December 29th, 2011, when you were deposed, you

18  did not know of any Lawson customer that had gone live on

19  RQC; correct?

20  A    That is correct.

21  Q    As of December 2011, you were not aware of any Lawson

22  customer that had implemented RQC in a production

23  environment; is that right?

24  A    That is correct.

25  Q    In your deposition, you couldn't tell me a single

1    individual within Lawson who had responsibility for

2    tracking whether or not a customer had replaced RSS with

3    RQC in their production system; correct?

4    A    That is correct as of that date.

5    Q    If clients had systems that included RSS in their

6    production environment and they have not implemented RQC

7    in the production environment, they could still be using

8    RSS for procurement activities, couldn't they?

9    A    Repeat the question.

10   Q    If clients had systems that included RSS in their

11   production environment and they have not implemented RQC

12   in the production environment, they could still be using

13   RSS for procurement activities; correct?

14   A    That's correct.

15   Q    Thank you.  Can you turn to Plaintiff's Exhibit 1057.

16   The covering email on the exhibit forwards an attachment

17   with questions and answer from a customer webinar that

18   Lawson conducted relating to RQC; correct?

19   A    That is correct.

20   Q    And do you see in the middle of the first page there's

21   an email from Steve, Steven Merten, to a number of

22   persons?

23   A    Yes, I do.

24   Q    And you are one of the persons who received this email

25   and attachment; correct?

1   A    Yes, I did.

2   Q    Do you see that Mr. Merten indicates that updates have

3   been made by the SWAT team in blue font with initials and

4   date; do you see that statement?

5   A    Yes, I do.

6   Q    You were one of the persons who made updates to the

7   questions and answers attachment on behalf of the SWAT

8   team; correct?

9   A    That is correct.

10  Q    Turn, if you would, to the first page of the

11  attachment to Plaintiff's Exhibit 1057, and I refer to

12  question number three on that first page from Sharon

13  Ewing; do you see that question?

14  A    Yes, I do.

15  Q    She asks, quote, one, can Req Center run while RSS is

16  still running, and, two, can we switch users over in

17  phases, or do we have to do an all-or-nothing switch.  Do

18  you see that question?

19  A    Yes, I do.

20  Q    And the answer posted, do you see the heading of the

21  column next to the question, the heading is Answer to be

22  Posted in FAQ; do you see that?

23  A    Yes, I do.

24  Q    Does that indicate that this particular answer was

25  going to be posted in a final frequently asked questions

Hanson - Direct

1   document available on MyLawson.com?

2   A    Yes.

3   Q    The answer that's listed to be posted in FAQ is,

4   quote, yes, because RQC is a new application, it can be

5   run in parallel.  The RSS bookmarks need to be renamed

6   since the RQC bookmark file is the same as RSS.  Customers

7   are encouraged, however, to stop using RSS; do you see

8   that?

9   A    Yes, I do.

10  Q    Turn, if you would, to Plaintiff's Exhibit 1067.  I

11  think 1057 is already in evidence.  If not --

12            THE COURT:  57 or 67?

13            MS. ALBERT:  Plaintiff's Exhibit 1057.

14            THE CLERK:  It is in, Your Honor.

15            MS. ALBERT:  Thank you.

16  Q    I'm turning now to Plaintiff's Exhibit 1067, and this

17  is an email chain between you and a David Utteridge; is

18  that correct?

19  A    That is correct.

20  Q    Who is Mr. Utteridge?

21  A    He is a system consultant in the U.K. office.

22  Q    In the U.K. office for Lawson?

23  A    That is correct.

24  Q    And the subject of the email is RQC at Nuffield; do

25  you see that?

1    A    Yes, I do.

2    Q    Who is Nuffield?

3    A    Their customer over in the U.K.

4    Q    Go to the earliest email on the chain on page RQC

5    19876, and that email bridges over to the following page.

6    Mr. Utteridge asks you a question.  Nuffield Hospitals

7    have asked if I'm available to install RQC for them.  Is

8    that okay for me to do this, or do you want me to arrange

9    it through RQC.SWAT@lawson.com; do you see that question?

10   A    Yes, I do.

11   Q    Then in the next email from Mr. Utteridge to yourself

12   on page RQC 19876, he asks you, quote, should I uninstall

13   RSS first; do you see that?

14   A    Yes, I do.

15   Q    How did you respond to Mr. Utteridge's question?

16   A    The next email is, no, do not uninstall RSS first.

17   RQC can be installed in addition to RSS when installing

18   RQC running LO920 will update the existing RSS bookmarks

19   to point to RQC.  However, they still could access RSS

20   (for testing purposes) by manually typing the RSS URLs in

21   the browser.  I will set up with a SA task for this.

22   Q    So Lawson is aware that customers could still access

23   RSS even if they've installed RQC; correct?

24   A    Yes, if you do additional setups, yeah.

25   Q    Thank you.  Turn to Plaintiff's Exhibit 1269.

1           MS. ALBERT:  I would like to move the admission

2    of Plaintiff's Exhibit 1067.

3           THE COURT:  Any objection?

4           MR. MARK:  No objection.

5           THE COURT:  It's admitted.

6

7           (ePlus Exhibit 1067 admitted.)

8

9    Q    Are you at 1269, sir?

10   A    Yes, I am.

11   Q    Do you see on the first page that these are Lawson's

12   responses to ePlus's interrogatories for contempt

13   proceeding?

14   A    Yes.

15   Q    Why don't you turn, if you would, to interrogatory

16   number three in Lawson's answer.  It's on the sixth page

17   of the document.  I'd like to direct you to the last

18   sentence of Lawson's response to interrogatory number

19   three.  What does that sentence say?

20   A    When RQC is installed, customers automatically lose

21   access to RSS.

22   Q    That statement is false, isn't it?

23   A    No, it is not.

24   Q    We just saw in the prior exhibit that customers did

25   not lose access to RSS; correct?

1    A    With additional setup, you could enable access.

2    Q    Thank you.

3    A    Or re-enable access.

4    Q    Thank you.  Turn, if you would, to Plaintiff's

5    Exhibit 1058.  These are excerpts from Lawson's customer

6    support records; is that correct?

7    A    That is correct.

8    Q    Turn, if you would, to the page marked -- the first

9    page, RQC 114812.  Do you see at the bottom of the page

10   there's a customer number, 5605, Columbia Association; do

11   you see that?

12   A    Yes, I do.

13   Q    Columbia Association is not one of the 277 health care

14   customers that were subject to the sunset provision in the

15   injunction, is it?

16   A    I do not believe so.

17   Q    Thank you.  Do you see following that reference,

18   there's a case number, 120652?  Do you see that?

19   A    Yes, I do.

20   Q    That indicates a customer support case opened by

21   Columbia Association; correct?

22   A    Yes, I do.

23   Q    Do you see the entry dated May 23rd, 2011, at

24   7:57:14 p.m. from Mindy Klebe to Gladys Taylor-Brown?

25   A    Yes.

1    Q    Mindy Klebe is employed by Lawson; correct?

2    A    Correct.

3    Q    Mindy Klebe was asking Gladys Taylor-Brown, quote,

4    could you please send back a copy of your rss_config.xml

5    file from LAWDIR/system for review; do you see that?

6    A    Yes, I do.

7    Q    Turn to the next page.  Do you see the second entry on

8    that page dated May 24th, 2011, at 3:01:50 p.m. from Mindy

9    Klebe to Imane -- I don't know how to pronounce the last

10   name.

11   A    Yes, I see.

12   Q    Do you see that entry?

13   A    Yes, I do.

14   Q    And, again, Mindy Klebe of Lawson was asking the

15   client, quote, could you please send back a copy of your

16   rss_config.xml file from LAWDIR/system for review; do you

17   see that?

18   A    Yes, I do.

19   Q    You don't know of any reason for Lawson to review a

20   customer's rss_config.xml file in order to provide support

21   services for Requisition Center, do you?

22   A    I am not in the support organization, so I do not know

23   what she was doing or what she was referring to.

24   Q    The rss.config.xml file has no relevance to

25   Requisition Center, does it?

1    A    No, it does not.

2    Q    Thank you.  Look down on that same page to the entry

3    dated May 25th, 2011, at 8:05:15 p.m. from Mindy Klebe to

4    that same client.  Do you see that entry?

5    A    Yes, I do.

6    Q    And in this entry, Mindy Klebe of Lawson states,

7    quote, Imane and Gladys, I am testing this issue in 901+

8    apps and 901+ environment with RSS XML release 9.0.1.4.01

9    installed, and I'm not able to duplicate the issue; do you

10   see that entry?

11   A    Yes, I do.

12   Q    So this entry indicates that on May 25th, 2011, Mindy

13   Klebe was testing the issue with RSS XML installed; is

14   that correct?

15   A    I'm not in the support organization, but, yeah,

16   according to that sentence, I would agree with that, yes.

17   Q    Thank you.  Turn to the page marked RQC 114819.

18        THE COURT:  Just so I understand it, you are

19   saying that RQC was installed on May 25th, 2011, and that

20   there was a test run on it in connection with running it

21   with RSS.  Is that what you are telling me?

22        THE WITNESS:  I do not know if they had RQC on

23   the system or not.  I don't see any reference to RQC.  All

24   I see is she was testing -- all I can do is respond to

25   this sentence, because I don't know what she was doing.

1           THE COURT:  I understand that, but you know what

2      was going on as head of the SWAT team, so I guess what I'm

3      asking you is, was RQC available to be run in parallel

4      with RSS as of May 25th, 2011?

5           THE WITNESS:  So as of that date, yeah, you could

6      run it in parallel, yes.  I don't know if this client was

7      trying to do that or not.

8           THE COURT:  Okay.

9      Q    Turn to page RQC 114819.  In the middle of the page,

10     do you see the entry dated June 30th, 2011, at

11     10:24:35 p.m. from Deb Stark to Debbie Gunn?

12     A    Yes, I see that.

13     Q    And there Deb Stark asks Debbie Gunn the following

14     question:  Quote, I am asking this as you had indicated

15     that these were being created in RSS.  For one of the

16     requisitions having this issue, can you dump in csv format

17     with headers, (or excel spreadsheet) the REQLINE file, end

18     quote.  Do you see that statement?

19     A    Yes, I do.

20     Q    So Lawson had knowledge that this client was asking a

21     question with respect to requisitions being created in

22     requisition self-service on June 30th, 2011; correct?

23     A    Again, I'm not in the support organization, but if I

24     were to interpret this case, it was -- they are actually

25     working on RQ 10 it looks like, since that's what all of

1    the entries are about, and then the support representative

2    was trying to figure out if you were trying to do this via

3    web side or directly with the back office applications,

4    and they use the term RSS in this case to ask about the

5    web.

6    Q    So they were providing support with respect to

7    requisition self-service; correct?

8                MR. MARK:  Objection; misstates the witness's

9    testimony.

10                THE WITNESS:  She was providing support on RQ 10.

11    Sorry.

12                THE COURT:  I stepped on your line.  Say it

13    again.  Overrule the objection.  Ask again.  I don't think

14    any of it is clear.

15    Q    So Lawson, as of June 30th, 2011, was providing

16    support to this customer with respect to issues in

17    requisition self-service; correct?

18    A    My understanding is they're providing support to RQ

19    10, and they used the term RSS to determine if they were

20    entering the requisition via the web-based product or the

21    back office product which they were actually providing

22    support for.

23    Q    And the web-based product was requisition

24    self-service; correct?

25    A    In this case, it looks like the client stated, yeah,

1    requisitions were created in RSS.

2            THE COURT:  I lost your answer.  The answer is,

3    yes, it was requisition self-service, that was the

4    web-based service?

5            THE WITNESS:  Correct, in the web base.

6    Q    Thank you.  Turn further back in the same exhibit to

7    page RQC 113787.  They're not in order.  This was the way

8    the exhibit was during your deposition.

9    A    I only go up to 114.

10   Q    113787?

11           THE COURT:  Look at the last four digits.

12   A    113?

13   Q    787.

14   A    787, okay.

15   Q    Or if you want to, you can look at it on the screen.

16           THE COURT:  It's hard to see on the screen.

17           THE WITNESS:  It's hard to see, yeah.  I do have

18   it now.

19   Q    Thank you.  At the -- towards the bottom of that page,

20   there's a customer ID, 2059, for Western Lake Superior

21   Sanitary; do you see that?

22   A    Yes, I do.

23   Q    Then, so, do you understand that this case number,

24   116839, was a case opened by Western Lake Superior

25   Sanitary?

1    A    Yes.

2    Q    Turn to the page RQC 113793.  And the second entry,

3    referring to the second entry from Jennifer Nordby dated

4    June 9th, 2011, at -- I'm sorry.  I guess it's the fourth

5    entry from Jennifer Nordby dated June 9th, 2011 at 8:38:17

6    p.m. in communication with Grant Brown; do you see that

7    entry?

8    A    Yes, I do.

9    Q    And in this entry, Ms. Nordby states to Grant Brown of

10   Western Lake, quote, okay, let me explain this better.

11   After you load RQC, you have two options if you want to

12   run RSS and RQC in parallel.

13        And then she provides an option one, you can manually

14   create the RSS bookmarks under Portal Administration under

15   Bookmark Manager, and she provides some instructions, and

16   then further down she provides an option two, you could

17   also edit the LAWSONLD.shopping.csv file; do you see that?

18   A    Yes, I do.

19   Q    So Ms. Nordby of Lawson is describing a way that this

20   client could reinstate the RSS product after installing

21   RQC; correct?

22   A    Yes.

23   Q    And Western Lake Superior Sanitary is not one of

24   Lawson's health care clients, is it?

25   A    No.

1   Q    So in this instance, Lawson was providing instruction

2   to a non-health care entity for how to reinstate

3   requisition self-service into their system; correct?

4   A    Again, I'm not in the support organization, but I see

5   the steps listed here.

6   Q    So would the answer to the question be, yes, that's

7   correct?

8   A    I'm sorry.  You have to repeat the question.

9   Q    So in this instance, Lawson was providing instruction

10  to a non-health care entity for how to reinstate RSS into

11  their system; correct?

12  A    So, yes.

13          MS. ALBERT:  Thank you.  Nothing further.  I'd

14  like to move Plaintiff's Exhibit 1058 into evidence.

15          THE COURT:  Any objection?

16          MR. MARK:  No objection.

17          THE COURT:  How about 1269?  Is it in?

18          MS. ALBERT:  I believe 1269 is already in

19  evidence.

20          THE CLERK:  1269 is in.

21          THE COURT:  All right.

22

23          (ePlus Exhibit 1058 admitted.)

24

25

1                    CROSS-EXAMINATION

2    BY MR. MARK:

3    Q    Mr. Hanson, let's talk about what you do as practice

4    director of technology.  What is the scope of your

5    responsibilities?

6    A    Manage a set of system consultants and technical

7    consultants that do product installations, system admin

8    activities, and customizations to the S3 products.

9    Q    The installation of the S3 products, that involves

10   taking software and putting it on computers of customers;

11   correct?

12   A    That's correct.

13   Q    Do you have any responsibility for developing

14   applications?

15   A    No, I do not.

16   Q    Do you have any responsibility to write code?

17   A    No, I do not.

18   Q    Do you have any responsibility for testing code to see

19   if it works?

20   A    No, I do not.

21   Q    When an application is installed by a consultant under

22   your supervision, does the installer need to know the

23   business functionality of that software to install it?

24   A    No, they do not.

25   Q    Do you have any knowledge of the business

Hanson - Cross

1    functionality of Punchout?

2    A    At the very highest level.

3    Q    At the time that the injunction issued in this matter

4    in May of 2011 and in June when we've just been talking

5    about, do you have any knowledge of the business function

6    -- of how the Punchout functionality worked in RQC?

7    A    No, I did not.

8              MS. ALBERT:  Objection; beyond the scope.

9              THE COURT:  Overruled.

10   Q    SWAT team was mentioned.  You were head of the SWAT

11   team, and when did you get that responsibility?

12   A    The last week of May.

13   Q    Were there -- there were other members of the SWAT

14   team?

15   A    Yes, there was.

16   Q    And were these members drawn from parts of Lawson with

17   different expertise?

18   A    Yes, they were.

19   Q    Who were the other members and what expertise was

20   brought together in the SWAT team?

21   A    So there were technical folks like myself, Steven

22   Merten and Mark Deutsch, as originally identified to the

23   fight SWAT team.  There were folks from the application

24   side, Cristi Bennett, Kathryn Molarian, and Kitty

25   Brozinski, and then also from the learning area, Pamela

1    Schultz.

2    Q    And what was your -- what expertise did you bring to

3    the SWAT team?

4    A    Technical.

5    Q    Involving the same installation processes you

6    supervised in your regular job?

7              MS. ALBERT:  Objection; leading.

8              THE COURT:  Overruled.

9    A    Exactly.

10   Q    Now, does Lawson -- when software in the S3 suite is

11   sold to a Lawson customer, does Lawson -- under what

12   circumstances does Lawson perform the installation of the

13   software?

14   A    Can you repeat the question?

15   Q    Sure.  When Lawson sells software to a customer -- by

16   the way, is the sale of the software, the licensing of it,

17   is that part of your responsibility?

18   A    No, it is not.

19   Q    How does the install group get involved?

20             THE COURT:  How does what group?

21             MR. MARK:  The installation group --

22             THE COURT:  Group, okay.

23   A    So once a client purchases our software, we'll get our

24   consulting services engaged, a project manager is

25   assigned.  That project manager dictates when to install

1    those products and what products to install, and they

2    would contact our resource planner, and we would do the

3    installation of whatever product they asked for.

4    Q    Is it necessary to have Lawson installers install the

5    software?

6    A    No, not necessarily.  Partners can do it, the client

7    could try to do it, but most likely they're going to need

8    our assistance installing it.

9            THE COURT:  Excuse me.  Can you buy Lawson

10   software from anybody other than Lawson?

11           THE WITNESS:  No, you have to buy it from Lawson,

12   but the services provided could be provided by Lawson or a

13   certified partner, right.

14           THE COURT:  All right.

15   Q    And let's talk about installing the redesigned RQC to

16   someone who is already a Lawson customer.  Must that

17   installation be performed by a Lawson installer?

18   A    No.

19   Q    So if a customer has a sophisticated IT department,

20   could that IT department perform the install?

21   A    Yes, they could.

22   Q    Are you aware of such customers?

23   A    I am not aware of any particular customer names.

24   Q    Are you aware that there are customers that perform

25   installs on their own?

1        MS. ALBERT:  Objection; lacks foundation.

2        THE COURT:  It would be hard for him to answer

3   that question yes if he doesn't know anybody's names.

4        MR. MARK:  He said he did not know any particular

5   customers.  I asked if he was aware generally if there

6   were customers who have such -- follow such practices.

7        THE COURT:  How could he know that?

8   Q    For example, in the service organization, do you

9   sometimes receive queries from customers who are

10  performing installs?

11  A    Yes.

12  Q    So these are customers who have attempted to do an

13  installation on their own; correct?

14  A    Correct.

15       MS. ALBERT:  Objection; leading.

16       THE COURT:  Listen, on the leading, Judge Merhige

17  had a rule that said something like this:  That it went

18  out with the Coolidge administration in bench trials

19  except as to really significant matters.  If it's really a

20  preliminary matter, we don't worry about it, but if the

21  lawyer is testifying about something important, then the

22  Coolidge administration rule fails.

23       MR. MARK:  Thank you, Your Honor.

24       MS. ALBERT:  Understood, Your Honor.

25       MR. MARK:  I'm trying to keep things moving a

1    little bit, Your Honor, but I'll try to stay within

2    bounds.

3    Q    So, customers are capable of installing and receiving

4    instruction on how to install the RQC redesign, and they

5    can do it by themselves; correct?

6    A    That is correct.

7              THE COURT:  Judge Merhige had another rule, and

8    that is, don't presume that the judge is not listening to

9    what's been said.  That's already been dealt with two or

10   three times.  I think I got it.

11   Q    From your perspective as an installer, could you

12   compare the amount of work required to install RQC and the

13   procurement suite at a new Lawson customer to that

14   required to install RQC at an existing Lawson customer?

15   A    So if a client is installing it from scratch, they

16   would have a lot more activities that they would need to

17   do as far as setting up procurement, setting up item

18   masters, doing the configuration, testing, and then doing

19   the end user training because they'd be seeing it for the

20   first time.

21        From a client transitioning, a lot of that has been

22   set up, so a transition client would only need to get the

23   new product and then do product testing and, again, end

24   user training, but now differences, not trying to explain

25   everything.  So it will vary greatly.

Hanson - Cross

1    Q    In terms of the user, end user training, who performs

2    that work?

3    A    The client does.

4    Q    And by end user, can you describe the category of

5    person that is?

6    A    The end user is going to be an end user of that

7    organization, so health care, it would be a nurse or maybe

8    a doctor.  If it's in the public sector, it could be an

9    administrator person.

10   Q    So people who would use it to requisition items, for

11   example?

12   A    That's correct.

13            MR. MARK:  Could we have Plaintiff's

14   Exhibit 1057, please.

15   Q    You were shown this exhibit during your direct

16   examination?

17   A    Yes, I was.

18   Q    And looking at the first page, the email forwarding

19   the attachment, it says -- the re line is, Q&A from Friday

20   webinar - current version.  Are you aware of what the

21   attachment is?

22   A    It is one of the drafts that was floating around to

23   answer these questions.

24   Q    And this is not the final version, as you understand

25   it, that was posted?

1   A    That is correct.  This is just a draft that was being

2   circulated.

3   Q    If you could turn to the page with number one in the

4   lower left-hand corner, and question three, Sharon Ewing,

5   you were shown that question on direct examination;

6   correct?

7   A    Yes, I was.

8   Q    And the question reads, one, can Req Center run while

9   RSS is still running, and two parens, can we switch users

10  over in phases, or do we have to do an all-or-nothing

11  switch; correct?

12  A    Correct.

13  Q    Now, could we have, please, Plaintiff's Exhibit 1002.

14  And go to the page with 64 --

15          THE COURT:  1002 was used by Mr. Lo in some

16  examination, Mr. Lohkamp was it?

17          MR. LO:  Yes, Your Honor.  It should have been

18  passed up.

19          THE COURT:  Everybody got a copy of it then.  I

20  was just trying to tell them where they had gotten hold of

21  it.

22          MR. MARK:  You are keeping better track than me,

23  Your Honor.

24  Q    The page with 646 on the lower right, do you see that?

25  A    Yes, I do.

1    Q    And do you see the heading, Running Requisition Center

2    in Parallel With Requisition Self-Service?

3    A    Yes, I do.

4    Q    And do you see the first question underneath that

5    heading?

6    A    Yes, I do.

7    Q    Could you compare -- if you are able to have the two

8    documents next to each other, can you compare the question

9    on Plaintiff's Exhibit 1002 on page 646 under the heading

10   Running Requisition Center in Parallel with the Sharon

11   Ewing question on Plaintiff's Exhibit 1057?

12   A    So the final draft has an additional -- or the final,

13   whatever this is, 1002, has an additional sentence that's

14   not in the draft.

15   Q    The questions are the same; correct?

16   A    The questions are the same, yes.

17   Q    Looking at the answer provided to the questions, are

18   the answers different between the draft and the final?

19   A    So the answer is different.

20   Q    What is different about the answer in the final

21   version of the response?

22   A    The final version has an additional sentence, Lawson

23   will only support RQC and customers will mitigate risk by

24   moving to RQC.

25   Q    And is it correct -- and is it correct, looking at the

1   answers provided to various questions under this running

2   Requisition Center and parallel with requisition

3   self-service as appears on Plaintiff's Exhibit 1002, that

4   the sentence you just read stating that Lawson will only

5   support RQC appears in the answers to the first, second,

6   third, fourth, seventh, eighth, ninth, 10th?  I may have

7   missed a couple.

8              THE COURT:  I've read it.  It's there a lot.

9   Somebody has already testified that it's after the lawyers

10  got hold of it.  There's three iterations of it.  One is

11  what happened in the webinar and the spontaneous answers.

12  Then there's the technical people and business people's

13  edits, and then there's the lawyers were added on to it.

14  That's the final version that was published.  I think I

15  got the drift on all this, on that part of it at least.

16  Q   If you could turn in the notebook that was provided to

17  Plaintiff's Exhibit 1269.  I'm sorry, not 1269.  1067.

18             THE COURT:  1067?

19             MR. MARK:  Yes.

20  Q   Do you have that?

21  A   Yes, I do.

22  Q   And do you know, where is the business site where this

23  installation exists?

24  A   In the --

25             MS. ALBERT:  Asked and answered.

1          THE COURT:  Well, I don't know that I remember.

2    What is it?  Go ahead.

3    A    In the United Kingdom.

4          THE COURT:  Is this the Nuffield one?  Yes.

5    Q    And if you could, turn to the page ending in 19876.

6    The email of September 7th, 2011, from Mr. Utteridge to

7    you asking, should I uninstall RSS first, and you answered

8    that email at the top.  It appears on the top of the page

9    where you say, no, do not uninstall first; correct?

10   A    Correct.

11   Q    From an installation perspective, why do you advise

12   not to uninstall RSS before installing RQC?

13   A    If you uninstall RSS, again, you are getting back to

14   having to re-implement it to get all the configurations

15   back.  You could lose some of those configurations in

16   trying to get it back, so to save time in doing the

17   transition, we installed RQC on top of RSS so we could

18   retain those configurations and thereby making RSS

19   inaccessible as well.

20   Q    So that once the installation of RQC is completed in a

21   production environment, RSS is inaccessible?

22   A    That's correct.

23   Q    Now, an end user such as you described previously

24   access the guts of the software where the bookmarks are

25   set?

1   A    No, they cannot.

2   Q    Who has access to that aspect of the software at a

3   customer?

4   A    System administrator.

5   Q    In setting up a software system and installing RQC,

6   does part of the procedure involve protecting access to

7   that part of the software where the bookmarks are kept?

8   A    Yes.

9   Q    What kind of protection is provided?

10  A    There's additional configuration for specifying who is

11  a portal administrator, who has access to those

12  configurations.

13  Q    Turn, if you would, to Plaintiff's Exhibit 1058.  The

14  first example from this that you were shown by plaintiff's

15  counsel involve a dialogue for a customer identified as

16  Columbia Association; correct?

17  A    Correct.

18  Q    Again, this is from the support organization?

19  A    Correct.

20  Q    If you'd turn to the second page of the document

21  ending in 813 -- I'm sorry, the third page of the document

22  ending 814, do you see that a case number 121274 appears

23  in the top third of the page?

24  A    Yes, I see that.

25  Q    Does that appear to mark the start of a new case and

1    the end of the previous case involving the Columbia

2    Association?

3    A    Yes, they do.

4    Q    The last entry in the Columbia Association case,

5    612011 at 3:16 p.m., can you read what appears there?

6    A    Thank you for contacting Lawson Global Support with

7    your questions regarding requisition self-service, RSS.

8    Due to the recent court ruling regarding the ePlus patent

9    litigation, Lawson is no longer supporting the requisition

10   self-service, RSS product.  For additional information

11   regarding the Court ruling, please visit MyLawson.com.

12   Requisition Center, RQC, the replacement product for RSS,

13   is available to you at this time free of charge from

14   Lawson.  For more information, please visit MyLawson.com

15   or contact your account executive.  At this point, I will

16   be closing your RSS case.  I look forward to supporting

17   you on Requisition Center.  Thank you.  Megan Anderson,

18   supply chain management supervisor.

19   Q    That reflects an end of support to that customer;

20   correct?

21   A    That is correct.

22   Q    Turn, if you would, to the page ending 819.  This

23   reflects a dialogue between someone named Deb Gunn and

24   Imane Adouani; correct?  Deb Stark and Debbie Gunn, I'm

25   sorry.

1   A    Yes, between Deb Stark and Debbie Gunn.

2   Q    Now, the portion that you were shown, does that appear

3   to begin on the previous page, that dialogue?

4   A    That dialogue spans multiple pages.

5   Q    The entry on page -- the page ending 819, do you see

6   an entry for 6/30/2011, 10:08:22 p.m. from Debbie Gunn --

7   it appears to be from Debbie Gunn to Deb Stark; do you see

8   that?

9   A    Yes, I do.

10  Q    What does that entry say?

11  A    Deb, the example Imane sent earlier in the case was

12  done in RQ 10.  I don't requisitions.

13  Q    Are you able to determine from this entry whether the

14  product the customer was asking about was RQ 10 or RSS?

15  A    This, to me, looks like it was done in RQ 10.

16  Q    That would not be providing support to RSS then;

17  correct?

18  A    That is correct.

19  Q    Turn, if you would, to the page ending 113787

20  involving Western Sanitary.  Finding that is always a

21  little difficult.

22  A    I still have not found it.  Okay, I found it.

23  Q    Now, does this appear to be a dialogue relating to

24  running a system in test?

25           MS. ALBERT:  Objection; leading.

1          THE COURT:  That's one of the ones where the

2    Coolidge administration rule doesn't apply.  Let him

3    testify to what he understands about it himself.

4    A    My understanding, based upon right at the very

5    beginning, Jacobson is saying, I am running in this test.

6    I am attaching the ic234 from test.  So my assumption is

7    this is on a test system.

8    Q    Turn, if you would, to the page ending RQC 113793.

9    You were asked questions about this dialogue as well?

10   A    Yes, I was.

11   Q    Let's turn to the previous page ending in 792; do you

12   see the entry at June 9th, 2011, at 2:25?

13   A    Yes, I do.

14   Q    And from Jennifer Nordby to Grant Brown.  What does

15   that entry state?

16   A    You can go into Portal Administration under Bookmark

17   Manager and rename these bookmarks for now if you want.

18   Q    If you would turn to page ending 793, the first entry

19   on the page, June 9th at 7:58:31 p.m., Grant Brown to

20   Jennifer Nordby.  Would you read that entry, please?

21   A    This appears to have changed the names.  So when I

22   install RQC (since it used the same names as the old

23   bookmarks) they will not get overridden.  I changed all

24   the RSS bookmarks with a preface of RSS (ex. RSS

25   Utilities).  I just need to make sure our users can

1    continue unsupported with RSS until we have tested RQC and

2    trained them.

3    Q     That responsive testing and training something,

4    response from a customer that typical something you have

5    experienced in doing installs?

6    A     Yes.

7    Q     Customers would want to test their system before

8    completing a production install?

9    A     Correct.

10   Q     The entry -- let's go back to the SWAT team briefly.

11   When were you designated to lead the SWAT team?

12   A     Last week of May.

13   Q     And were there -- were you given a policy to follow as

14   far as the mission of the SWAT team relating to RQC?

15   A     Yes.

16   Q     What was that?

17   A     It was to transition all of our existing RSS customers

18   to RQC, answering any questions or doing installs as part

19   of the SWAT team.  Additionally was to stop doing any work

20   on RSS.

21   Q     Now, after you became head of the SWAT team, did you

22   convey the policy on the installation of RQC and the

23   denial of service on RSS to people under your supervision?

24   A     Yes, I did.

25   Q     How did you do that?

1    A     On May 27th, I sent an email to all of the S3

2    installers which included my team but a coworkers's team

3    as well to stop any of the, any work on RSS and contact

4    myself and their project managers if they do encounter RSS

5    to understand what actions that they can continue to do.

6    Q     Let me show you what's been marked at Defendant's 587.

7    Do you have that in front of you?

8    A     Yes, I do.

9    Q     Is that the email you just described?

10   A     Yes, it is.

11   Q     You wrote that email?

12   A     Yes, I did.

13   Q     And in terms of a customer who had an engagement that

14   had been arranged before the issuance of this Court's

15   injunction, did you provide instruction in this email for

16   what your installers were supposed to do regarding RQC?

17   A     Yes, I did.

18   Q     What did you tell your installers?

19   A     So the second and third points in the email, so it was

20   basically to, instead of installing -- instead of

21   installing RSS at that point, they should instead install

22   RQC.

23   Q     And the first piece of advice or policy guidance you

24   gave to your installers in the email, what was that that

25   you gave?

1   A    The first was cease all work that might have been

2   asked to do regarding RSS.  Don't install, uninstall, or

3   patch RSS for any client.  If you are requested to do any

4   of those actions, please inform your PO, which is project

5   manager, and myself, Mark and/or Steven.

6   Q    So after the Court issued the injunction, you told

7   your installers to install RQC and not even to touch RSS;

8   correct?

9   A    That's correct.

10  Q    RSS was radioactive.

11  A    That is correct.

12        MR. MARK:  I'd offer Defendant's 587 in evidence.

13        THE COURT:  Any objection?

14        MS. ALBERT:  No objection.

15        THE COURT:  It's admitted.

16

17        (Defendant's Exhibit 587 admitted.)

18

19  Q    Did you have -- are you aware of instances where

20  particular installers had appointments, as we just saw in

21  Defendant's Exhibit 587 and did not install RSS?

22  A    Yes.

23  Q    Do you know who Felix Epia is?

24  A    Yes.

25  Q    Did I say his name correctly?

Hanson - Cross

1   A    Yes, you did.

2   Q    Who is he?

3   A    He's a system consultant in the Philippines.

4   Q    And do you recall receiving a request for guidance

5   from Mr. Epia regarding a scheduled install of RSS?

6              MS. ALBERT:  Objection; lacks foundation.

7              MR. MARK:  I asked him if he recalled receiving

8   such a request.

9              THE COURT:  Overruled.

10  A    Yes, I did.

11  Q    What was the nature of the request?

12  A    The nature --

13             MS. ALBERT:  Objection; hearsay.

14             THE COURT:  If you are asking what he asked,

15  that's hearsay.

16             MR. MARK:  Mr. Hanson, as the supervisor of his

17  install crew, has responsibilities for directing their

18  actions and so forth.  He receives requests and responds

19  to them, providing them guidance and directing their

20  actions.  This is notice to him of what his folks in the

21  ground are doing so he can direct their actions.

22             MS. ALBERT:  He's still asking for an

23  out-of-court statement for the truth --

24             THE COURT:  He's offering it for a non-hearsay

25  purpose, I guess is his point, but the question is, is

1   that relevant.  What does notice to him have anything to

2   do with the case?

3   Q    Let me ask it way:  Without telling me what he asked

4   you about, did you have a communication from Mr. Epia; yes

5   or no?

6   A    I don't recall.

7   Q    Do you recall whether a request from Mr. Epia was

8   transmitted to you?

9   A    I don't recall if it was from Mr. Epia himself.

10  Q    Did you direct Mr. Epia, in response to the question

11  you received, not to install RSS at a customer?

12           MS. ALBERT:  Objection; lacks foundation.  He

13  said he did not recall a request from Mr. Epia.

14           THE COURT:  I think you've gone about as far as

15  you can without him -- if he doesn't know anything.

16  Q    Let me ask you to take look at Defendant's

17  Exhibit 588.  Do you have that in front of you?

18           MS. ALBERT:  Objection; hearsay.

19           THE COURT:  He hasn't asked a question yet.

20  Q    Now, you see the second --

21           THE COURT:  What are you doing, asking him if

22  that refreshes his recollection?

23           MR. MARK:  I'll start with that.

24           THE COURT:  That's a good place to start.  Then

25  you don't get into trouble.

1          MR. MARK:  Okay.

2     Q    Do you see -- read to yourself --

3          THE COURT:  Look at that document and tell us if

4     it refreshes your recollection about whether you received

5     any communication from Mr. Epia about installing RSS.  The

6     answer is yes or no.  It does or doesn't refresh your

7     recollection.  Do you understand what I'm saying when I

8     say refresh your recollection?

9          THE WITNESS:  I do.

10         THE COURT:  Does reading that prompt your memory

11    in respect -- without reading the document to give the

12    answer, does it prompt your own independent memory with

13    respect to whether or not you had such a communication;

14    yes or no?

15         THE WITNESS:  Yeah, this recollects --

16         THE COURT:  Now, what do you recall -- without

17    reading the document, what do you recall, if anything?

18         THE WITNESS:  So I was responding to the PM,

19    actually his question, but I was -- so I was responding to

20    him, but I was also cc-ing Felix.  So I was providing

21    information to Felix, but Felix was not, in this instance,

22    did not come and talk to me.  It was actually through the

23    project manager and the resource planners how the question

24    got provided.

25         MS. ALBERT:  We're dealing with hearsay within

1    hearsay.

2    Q    What did you direct -- what action did you direct

3    after receiving the inquiry?

4    A    After receiving the inquiry, I responded back to both

5    Michelle Roisum, who is the resource planner, Brian as

6    well as Felix and said, yes, we will install RQC instead

7    of RSS.  I will work with Felix to ensure this happens.

8            MR. MARK:  Thank you.  I offer Defendant's

9    Exhibit 588 in evidence.

10           MS. ALBERT:  Objection; hearsay, hearsay within

11   hearsay as well.

12           MR. MARK:  It's a statement from Mr. Hanson made

13   at the time and memorializes --

14           THE COURT:  What does that mean?  Does that make

15   it any less hearsay?  It's hearsay.  You used it for its

16   purpose which was to refresh his recollection.  Now you

17   have the testimony.  Turn mother's picture to the wall,

18   and move on.  Enlist in the service of the country and go

19   to war.  Let's go.

20   Q    In terms of the work that the SWAT team did, did

21   you -- were RQC -- was RQC installed at customers in a

22   production environment under your supervision?

23   A    Yes.

24   Q    During -- so during the summer of 2011, were such

25   installs completed by you?

Hanson - Cross

1    A    Yes.

2    Q    And were any installations -- was the objective of

3    such installs and the work of the SWAT team to get

4    installs done in a production environment?

5    A    Yes.

6    Q    Do you have any recollection of approximately how many

7    installs were completed as of, let's say, December 2011?

8    A    We did roughly 60 installs or assistance of installs.

9             MR. MARK:  No further questions.

10            THE COURT:  Any redirect?

11            MS. ALBERT:  I just have a couple.

12

13                    REDIRECT EXAMINATION

14   BY MS. ALBERT:

15   Q    Turn back to Defendant's Exhibit 587.  Counsel for

16   Lawson directed you to this exhibit and to the sentence

17   reading, do not install, uninstall, or patch RSS for any

18   client.  Do you see that statement?

19   A    Yes, I do.

20   Q    So you left requisition self-service on the customers'

21   systems; correct?

22   A    Correct.

23   Q    Isn't it correct that a customer system today can run

24   both requisition self-service and Requisition Center in

25   parallel?

1    A    If you perform the additional actions to make it

2    available, yes.

3              MS. ALBERT:  Nothing further.

4              THE COURT:  Can he be excused?  Does anybody need

5    him further?

6              MS. ALBERT:  We have nothing further.

7              THE COURT:  All right, Mr. Hanson, you are

8    excused.  Thank you for being with us and giving us your

9    testimony.

10             THE WITNESS:  Thank you.

11             THE COURT:  Do you have Dr. Weaver, or is that

12   the end of your case except for Dr. Weaver?

13             MS. ALBERT:  I think we're ready with the slides

14   from the videos.

15             THE COURT:  I'm going to ruin Mr. Thomasch's

16   lunch.  Why don't you give them to him so he can take a

17   look at them, familiarize himself with them while he's

18   eating his sandwich.  Then we will resume at ten minutes

19   to 2:00 after I -- you if you feel like that's

20   insufficient time, you'll please let us know and we'll get

21   you some extra time.

22             MR. THOMASCH:  Thank you, Your Honor.

23             THE COURT:  I don't know if you're trying to run

24   it in parallel with the machine or not.

25             MS. ALBERT:  I believe Dr. Weaver -- I mean, I

1   believe it would be easier to run the video at the same

2   time as he's explaining with the slides.  It might be

3   easier that way.

4           THE COURT:  All right.  You can do that.  Do you

5   know, whoever it was that talked with IT people -- excuse

6   me.  I wasn't sure who it was.  Do you know if there's

7   anything they can do --

8           THE CLERK:  They said there was not.

9           THE COURT:  They said there's nothing?  Huh.

10          THE CLERK:  They told me our system -- that --

11  the problem stems from their resolution.  Do you want me

12  to have Scott come up?

13          THE COURT:  No.  I just wondered if it was worth

14  the effort, but if they've already been through it,

15  there's no sense in going through it again.

16          MR. THOMASCH:  Your Honor, may I inquire on one

17  matter?  I believe that we will probably have enough time

18  to deal with the slides.  That's not my concern.  I am

19  thinking that we're behind the schedule that I expected.

20  I thought today would move a little quicker than it has.

21          THE COURT:  So, too, did I.

22          MR. THOMASCH:  And so now I'm not sure how long

23  the plaintiffs intend with Dr. Weaver, and I'm starting to

24  get concerned about Mr. Samuelson who, as I mentioned, is

25  a former employee who took time off and came here --

1          THE COURT:  Do you want to take him right after
2    lunch?
3          MR. THOMASCH:  I'd prefer to take him right after
4    lunch.
5          THE COURT:  Any objection?
6          MS. ALBERT:  No objection.
7          THE COURT:  We'll take Mr. Samuelson right after
8    lunch.
9          MR. THOMASCH:  Thank you, Your Honor.
10
11          (Luncheon recess.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

 1        THE COURT:  All right.  Is this

 2  Mr. Dusseault.

 3            MR. DUSSEAULT:  Yes, Your Honor, thank you.

 4  And thank you to the Court and to ePlus for indulging

 5  us to take this witness out of order.

 6            Lawson calls Kevin Samuelson in as part of

 7  its remedies case.

 8            THE COURT:  Samuelson.  Okay.  Thank you.

 9

10       KEVIN SAMUELSON, called by the Defendant, first

11  being duly sworn, testified as follows:

12

13       DIRECT EXAMINATION

14  BY MR. DUSSEAULT:

15  Q    Good afternoon, Mr. Samuelson.

16  A    Hi.

17  Q    Will you please state your full name for the

18  record?

19  A    Kevin Samuelson.

20  Q    Where do you currently work, sir?

21  A    I work at Backcountry.com.

22  Q    What is Backcountry.com?

23  A    A $400 million e commerce company.

24  Q    What does it sell?

25  A    We sell -- it's a technology company that also

1    sells equipment for outdoor sports, biking, cycling,

2    etc.

3    Q    Where did you work before joining backcountry.com?

4    A    Infor.

5    Q    What was your position at Infor when you left that

6    company?

7    A    Chief financial officer.

8    Q    How long did you work at Infor?

9    A    Approximately 10 years.

10   Q    When did you start at Infor if you recall?

11   A    In full-time basis, 2002.

12   Q    Could you describe briefly the positions you held

13   while at Infor?

14   A    Sure.  When I started at Infor I was the vice

15   president of acquisitions and integrations.  Later the

16   senior vice president of acquisitions and

17   integrations, and then later chief financial officer.

18   Q    Have you ever held a position at Lawson?

19   A    Yes.  I served at chief financial officer at

20   Lawson as well.

21   Q    When was that, sir?

22   A    From the close of the acquisition by Golden Gate

23   Capital in July until approximately September.  So

24   July 2011 through September 2011.

25   Q    What is the relationship between Infor and Lawson?

1    A    Sure.

2              THE COURT:    Excuse me a minute.    Take that

3    microphone, pull it towards you just a touch.    You

4    don't need to lean up and speak into it.    It will pick

5    you up.    But I think it will be easier for everybody

6    to hear.

7              THE WITNESS:    Is that better?

8              THE COURT:    Yes, it is.

9    A    So Golden Gate Capital is the primary owner of

10   Infor and Golden Gate Capital first acquired Lawson on

11   a stand alone basis, and then subsequently Infor

12   acquired Lawson and the two companies were put

13   together and merged.

14   Q    What were your job responsibilities as vice

15   president of mergers and acquisitions at Infor?

16   A    Sure.    So in that role, I looked for companies to

17   possibly buy.    Did due diligence on those companies to

18   make sure that there was a strategic fit and there

19   weren't any issues.

20        Then following the purchase of companies,

21   integrated them with Infor.

22   Q    What were your responsibilities, just very

23   briefly, when you were the CFO of Lawson?

24   A    Oversaw all of the preparation and execution of

25   everything related to financials as well as IT.

SAMUELSON - DIRECT                    619

1   Q    When you transitioned from your role as CFO of

2   Lawson to CFO of Infor, did you have any

3   responsibility for Lawson's finances?

4   A    Yes, I did.   Lawson actually did what's called a

5   shared services agreement, so effectively outsourced

6   all of their financial and IT operations to Infor.

7   Then as CFO of Infor, I oversaw those operations.

8   Q    Are you personally familiar with Lawson's

9   finances, including generally its revenues, cost and

10  profitability for the time period between May 2011 and

11  when you left the company?

12  A    Yes, I am.

13  Q    How did you become familiar with this company?

14  A    So, initially, again, I was part of the due

15  diligence team when we looked to the Golden Gate

16  Capital to acquire Lawson, which began in early 2011.

17  Did significant due diligence on the financial

18  statements to and including hiring

19  PricewaterHousecoopers to go and analyze all the

20  financial statements and then obviously as CFO of

21  Lawson and then CFO of Infor overseeing those

22  financials, I was also involved in the numbers.

23          THE COURT:   You ceased being CFO of Infor

24  when did you say?

25          THE WITNESS:   In February 15, 2014.

SAMUELSON - DIRECT                    620

1        THE COURT:  Thank you.

2   Q    Now, I'd like you to just very briefly describe to

3   the Court your background before you joined Infor.

4   Where did you attend college?

5   A    University of California at Berkeley.

6   Q    Where did your work after college?

7   A    The American College of Sophia, an American school

8   in Sophia, Bulgaria.

9   Q    What is did you do there?

10  A    Taught English.

11  Q    That's a bit different from your other jobs.  What

12  was your next job?

13  A    It gets better.  I worked at Bank of America

14  Securities, which is the investment banking arm of

15  Bank of America.

16  Q    What did you do at Bank of America?

17  A    Sure.  I was on what's called the retail team.  So

18  we looked at retail companies, helped with equity

19  research, initial public offerings, acquisitions, and

20  following offerings.

21  Q    Where did you work after that?

22  A    Then I went to Robertson Stephens where I was on

23  the Internet and technology team and then ultimately

24  the media team.  So same of work, but all around

25  technology companies.

1   Q    What is Robertson Stephens?

2   A    An investment bank.

3   Q    Where did you work after Robertson Stephens?

4   A    Parallax Capital, which is a private equity fund

5   which focuses on acquiring software companies.

6   Q    How long were you at Parallax Capital?

7   A    Roughly, two years.

8   Q    What did you do while you were at Parallax

9   Capital?

10  A    Parallax is a fund, and what the Parallax does is

11  goes and buys primarily software companies, operates

12  them, and then either takes them public or sells them.

13  So I sourced transactions.  So looked for company to

14  potentially buy.  Did due diligence on those

15  companies.  Then when there are integrations with

16  other portfolio companies, worked on those

17  integrations.

18  Q    What was your next position after Parallax

19  Capital?

20  A    So Infor -- Parallax is a small owner at Infor.

21  So I went directly from working on transactions

22  related to Infor to being a full-time employment at

23  Infor.  That's when I became advice president of

24  mergers and acquisitions.

25  Q    In summary, sir, how many years have you been

1    working in the field of finance?

2    A    Fifteen.

3    Q    Over that 15-year period, have you had the

4    opportunity to look at and work with and company

5    costs, P&Ls and profits?

6    A    All 15 years.

7    Q    Now, I'd like to ask you a few questions more

8    specifically about Lawson.  And the Court obviously

9    has some background in this.  So I don't want to go

10   too deep in the detail, but just very generally what

11   kind of products does Lawson sell?

12   A    Sure.  So at the highest and broadest level,

13   Lawson sells what are called enterprise software

14   products.  So products that companies use to run their

15   operations.  Lawson is particularly strong in products

16   that run manufacturing companies, financial-based

17   products and human capital management products.

18   Q    What are Lawson's primary revenue streams, again

19   just briefly?

20   A    Sure.  Lawson's primary revenue streams are the

21   same as most enterprise software companies.  There are

22   three revenue streams.  The first is called license

23   revenue.  That's when you sell a customer a license.

24   90 percent of the time that's what's called a

25   perpetual license, so it's good forever.  So that

SAMUELSON - DIRECT                    623

1  gives a customer the right to use the software.

2  That's normally a one-time cost and that customer then

3  owns it indefinitely.

4      The second revenue stream is what's called

5  maintenance or support.  And those terms are used

6  interchangeably.  And that's usually approximately 20

7  percent of the license cost.  So if a customer pays

8  $100 one time for a license, they'll pay $20 every

9  year for maintenance and support.  And that entitles

10 that customer to any help they might need.  So there

11 are call centers with people who provide support to

12 help them use the product, updates to the products,

13 bug fixes, any kind of advancements we work on in our

14 research and development group all go to customers who

15 annually pay maintenance.

16     The third revenue stream is called services or

17 consulting.  And that's where our people go on site

18 with customers and do what we call implement our

19 software.  Put it into the business.  Also do custom

20 work to change how the software works on site for a

21 customer.

22 Q   At a very high level, we'll talk about this in

23 more detail, what kind of cost does Lawson have to

24 incur and may in order to earn these revenue streams?

25 A   Sure.  So Lawson, like many companies, has cost of

1    goods.   So costs that are directly attributable to

2    very specific revenue lines.   But also like other any

3    other company, Lawson has what are called operating

4    costs, thinks like a sales force, a finance group, and

5    HR group, all things that are required to operate a

6    business and sell product.

7    Q    Does the amount of money that Lawson has to spend

8    vary based on the amount of revenue coming into the

9    company?

10   A    Yes, absolutely.

11   Q    Explain again just generally how that works.

12   A    Sure.   So like any company, we have a cost base.

13   Some of those costs will automatically adjust

14   depending on what our revenue is.

15        So think of third party costs that are only paid

16   when something is sold.   But also, for example, we

17   have a sales force, and the size of our sales force is

18   dictated by the amount of our sales.   And we can

19   adjust it when sales are up or when sales are down.

20   Q    Now, if Lawson were to learn that it were to

21   permanently lose a particular stream of revenues from

22   a particular product, would that affect the company

23   spending on cost?

24   A    Yes.

25   Q    How?

SAMUELSON - DIRECT                625

1   A    So as a management team, everybody within the

2   company down to the lowest level of managers, are

3   generally paid on revenue, on how much revenue they

4   generate, but also how much margin they general.

5        So specific groups are always looking at what does

6   the demand look like, are we properly staffed, are we

7   properly spending relative to demand.  And when demand

8   is strong, we're hiring and we're spending more to

9   meet that demand, but when demand slackens off, for

10  example, when the economy goes bad, our teams take

11  actions to make sure that costs are cut.

12  Q    Again, at a very high level, I want to talk about

13  some of the products that the company sells to the

14  extent they may come up later in your testimony.

15       Not particularly by name, but just terms we might

16  use.  Does the term "stock keeping unit or SKU" mean

17  anything to you?

18  A    Yes.

19  Q    What does it mean?

20  A    So that's kind of the most granular level to think

21  about a product.  So, for example, Lawson has 4,000

22  SKUs.  You look at Infor, it's multiples of that.  So

23  those are the most kind of granular level of product.

24  That's not necessarily how a customer thinks about our

25  product or frankly even a salesperson thinks about our

1  product.  It's at a very granular level.

2  Q   Are you familiar with the term "module" used in

3  the context of Lawson products?

4  A   Yes, I am.

5  Q   What does that mean?

6  A   So that's -- effectively think of that as a

7  combination of SKUs that will be used to solve a

8  specific business problem.

9  Q   Are you familiar with the term "configuration"

10 used within Lawson's products?

11 A   Yes.

12 Q   What does that mean?

13 A   Think of that as how a module is actually deployed

14 and used and configured to solve that specific

15 problem.

16 Q   Are you familiar with a term "suite" as used in

17 connection with the products?

18 A   Yes.  So a suite would be a combination of

19 modules.

20 Q   Are you familiar with use of the word "product" in

21 the context of the business and, if so, how would you

22 use it?

23 A   Yes.  So product, frankly, means different things

24 to different people in a software company.  If you ask

25 me what a product is, I would say something like ERP

1   is a product.  But if you ask someone in development,

2   they would be much more granular and specific and say,

3   you know, inventory management is a product.  So

4   that's a little bit more loosing used term in our

5   industry.

6   Q    Does Lawson specifically track its costs on a SKU

7   by SKU or configuration by configuration basis?

8   A    No.

9   Q    Does Lawson specifically track its profitability

10  on a SKU by SKU or configuration by configuration

11  basis?

12  A    No.

13  Q    Based on your 15 years of experience in finance,

14  do you have an understanding of whether software

15  companies more generally track cost and profitability

16  on a SKU or configuration basis?

17  A    I've probably have done diligence on 100 software

18  companies, and at Infor we acquired 50, and I've never

19  seen anyone do that.

20  Q    Does Lawson track its overall company-wide cost

21  and profitability?

22  A    Yes.

23  Q    Do you consider the information that Lawson keeps

24  with respect to its company-wide profits and costs to

25  be reliable?

SAMUELSON - DIRECT                     628

1  A    Yes, absolutely.  We're audited by

2  PricewaterHousecoopers, which is a well-known

3  accounting firm.  Lawson prior to acquisition would

4  have publicly traded equities.  So it was scrutinized

5  by the SCC.  And then following the acquisition had

6  publicly traded bonds, which were also under SCC.  So

7  they are heavily scrutinized financial statements.

8  Q    Based on your experience at Infor and Lawson, do

9  you believe that Lawson's company-wide cost and profit

10 margins shed any light on the cost and profit margins

11 of specific products, such as the products that make

12 up the configurations at issue here?

13 A    Sure.  I so think that's probably the best proxy

14 for the products in question here.  The way I sort of

15 think about it is fairly simple.  We have sort of

16 three tranches of products, if you will.

17      There are products that are brand new where we're

18 investing very heavily in R&D without much in the way

19 of sales.  Those are far less profitable than most

20 other products, and certainly the products in question

21 here today.

22      On the other end of the spectrum, there are

23 products that are very old where we're no longer

24 selling licenses associated with those products.

25 We're merely running them for support.  Those have

SAMUELSON - DIRECT                   629

1    incredibly high margins.

2        The products that we're talking about here today

3    are more middle of the road or common or average

4    relative to our products.  Where we are selling them,

5    we are investing in them.  So I think our overall

6    profits are a pretty good proxy for the specific

7    profits of those products.

8    Q   I'd like to put up a slide, Mr. Samuelson.  Slide

9    802.

10           THE COURT:  You said your overall profits

11   were a proxy for the kind of products that we're

12   talking about here.  You mean the percentage, the

13   gross, the net?  What are you talking about when you

14   say that?

15           THE WITNESS:  I would say operating profits

16   are pretty similar.  So the amount of not just cost of

17   goods, but sales cost that goes into them, the R&D

18   cost that goes into them.  G&A costs, all of those

19   costs are probably about the same for these products

20   as they are for the average of the company.

21           THE COURT:  So when you use the term

22   "profits," you're talking about operating profits?

23           THE WITNESS:  Correct.

24   Q   Let me ask one following up on that, if I could.

25   Do you have a view as to whether the ratio of

1    percentage of Lawson's overall costs to its revenues

2    is comparable company-wide to what you would expect it

3    to be with the products at issue?

4    A    I'm not quite sure I follow your question.  Could

5    you repeat it?

6    Q    Sure.  I'm trying to clarify it.  I may not be

7    doing that.  Do you have a view on whether the

8    percentage of the company's overall revenues that are

9    made up of a particular group of costs on a

10   company-wide basis is comparable to what you would

11   expect to see if you were looking at these particular

12   products?

13   A    I believe it's roughly comparable.  I believe the

14   company's profit margins are roughly comparable to the

15   products in question, if that's what you ask.

16   Q    Thank you.

17   A    Yes.

18   Q    Now, I did --

19        THE COURT:  The overall profit margin is

20   roughly comparable to the products at issue?

21        THE WITNESS:  That's correct.

22   Q    If I could, I'd like to show slide 802.  And slide

23   802 --

24        THE COURT:  Excuse me just a minute.  Does

25   anybody have a streaming slide?  Mine is on the move.

SAMUELSON - DIRECT                    631

1    Call IT and ask them if they can come up.

2            THE CLERK:  All right.

3            THE COURT:  Do you have a book that has a

4    slide in it?

5            MR. DUSSEAULT:  We do, Your Honor.

6            THE COURT:  Thank you.

7            MR. DUSSEAULT:  Sorry.  I thought that was up

8    there.

9            THE COURT:  Nobody else has this?

10           MR. DUSSEAULT:  No.

11           THE COURT:  You're okay?

12           MR. DUSSEAULT:  We're fine.

13           THE COURT:  Thank you.

14           MR. DUSSEAULT:  And, Your Honor, I'd clarify,

15   this slide contains on it two exhibits, defense

16   exhibit -- excuse me.  Plaintiff's Exhibit 1074 and

17   Defense Exhibit 711, both of which are on the list of

18   exhibits to which there's no objections.  So I would

19   move Plaintiff's 1074 and Defendant's 711 into

20   evidence.

21           MR. STRAPP:  No objection.

22           THE CLERK:  1074 plaintiff and 711 defendant?

23           THE COURT:  Yes.  And they are in without

24   objection.

25           THE CLERK:  Thank you.

SAMUELSON - DIRECT                    632

1              (Plaintiff's Exhibit No. 1074 and Defendant's

2    711 are admitted.)

3    Q   Mr. Samuelson, are you able to see slide 802 okay?

4    A   Yes.

5    Q   Do you recognize the documents that are on slide

6    802?

7    A   Yes.

8    Q   What are they?

9    A   The document on the left is the 2011 profit and

10   loss statement for Lawson, U.S. only.  And the

11   statement on the right is the 2012 profit and loss

12   statement for Lawson only, U.S. only.

13   Q   Did you supervise the creation of these documents?

14   A   Yes.

15   Q   Explain for the Court just very briefly?

16            THE COURT:  Excuse me.  I don't have the

17   slide.  Is 1074 the 2011 P&L?

18            THE WITNESS:  Yes.

19            THE COURT:  And the 711 is the what?

20            THE WITNESS:  2012 profit and loss statement.

21            THE COURT:  All right.  Sorry.

22            THE WITNESS:  No problem.

23   Q   Mr. Samuelson, did you supervise the creation of

24   these two P&Ls?

25   A   Yes.

1    Q    If you could, just explain to the Court again very

2    generally what a P&L statements is.

3    A    Sure.  Just like the name indicates, this shows

4    our profits and our losses.  So it starts with our

5    revenue.  Backs out costs that are specific to cost of

6    goods, then operating costs, then other costs, working

7    our way down to net income.

8    Q    What is the source of the financial information

9    that's contained on the P&L?

10   A    This is comprised by using our general ledger,

11   which is literally thousands and thousands of lines at

12   a very, very granular level that our accountants used

13   and closed the books on every month and quarter.  On

14   the left-hand side is Lawson's original system that

15   they used when we acquired them which is why it looks

16   a little different than the right-hand side.  And the

17   P&L on the right-hand side comes from Infor system,

18   which is used for that same type of work.

19   Q    Was there a transition between the Lawson system

20   and the Infor system between the time that these two

21   profit and loss sheets were generated?

22   A    That's correct.  So following the acquisition by

23   Infor, we ultimately put all of Lawson on Infor set of

24   systems.

25              MR. DUSSEAULT:  Your Honor, are you okay for

1  us to proceed?

2          THE COURT:  Excuse me just a minute.  Based

3  on what you've seen, is it best just to shut it off

4  and wait for a while?

5          (Discussion off-the-record with the court IT

6  staff.)

7          THE COURT:  All right.  Let me ask you

8  something.  Can you read what's on your screen?

9          THE WITNESS:  No, but I am very familiar with

10 this.

11         THE COURT:  It's all fuzzy?

12         THE WITNESS:  Correct.

13         THE COURT:  Thank you.  We're going to

14 adjourn and I'm going back to Dr. Baker.

15         Okay.  Is this another one of these problems

16 with the system?

17         MR. DUSSEAULT:  Your Honor --

18         THE COURT:  Have you talked with them about

19 whether your system is equally as fuzzy as their

20 system is?

21         (Discussion with IT staff off-the-record.)

22         THE COURT:  Thank you for your help.

23         Now you know that neither the witness nor I

24 can read what is here.

25         MR. DUSSEAULT:  Your Honor, just for this

1    afternoon's purposes, when I question Mr. Samuelson

2    about specific line items, we're going to put up a

3    different version with larger print.

4              THE COURT:  Okay.

5              MR. DUSSEAULT:  I'm not going to test

6    everybody's eyesight.

7    BY MR. DUSSEAULT:

8    Q   Mr. Samuelson, before we broke, briefly, you were

9    talking about the source of the P&L information coming

10   from the general ledger?

11   A   Correct.

12   Q   You had spoken earlier in your testimony about the

13   reliability of Lawson's financial information.  Do you

14   recall that?

15   A   Yes.

16   Q   Do you consider the information to be maintained

17   in Lawson's general ledger to be reliable?

18   A   Yes, it's the same system by which those audits by

19   PricewaterHousecoopers were done.  To the extent we

20   are audited by tax authorities, it's the same

21   information that's used for that.  It's the same

22   information we supply financials to the SCC.  So it's

23   the same source of record.

24   Q   What geographic regions do these two P&L records

25   cover?

1   A    The United States.

2   Q    The Judge already asked you a question along this

3   line, but could you just very briefly describe to the

4   Court how you would go about using company-wide

5   information on this P&L to calculate a profit margin?

6   A    So at a company level?  A profit margin at a

7   company level?

8   Q    Yes.

9   A    Again, we take the revenues, subtract the cost of

10  goods, subtract the operating costs to get to an

11  operating margin.  Then if we wanted to go to a net

12  margin, we'd subtract other costs like interest,

13  depreciation, amortization, etc.

14  Q    Now, Mr. Samuelson, is the type of information

15  covered in these two P&L statements generally the

16  same?

17  A    Yes, again, it's the same exact information, just

18  that after Infor acquired Lawson, we moved to a

19  different system, so the depiction is different, but

20  the information is the same.

21  Q    Just to be clear, the actual numbers are different

22  because it's different years, but the categories are

23  the same?

24  A    That's correct.

25  Q    Now, I'd like to direct you to Exhibit DX 711,

1  which has been moved into evidence, which is a 2012

2  statement.  And if I ask you questions about the

3  categories of spending on the 2012 statement, would

4  those also be generally applicable to 2011 as well?

5  A   Yes.

6  Q   To assist everybody in seeing what's on the

7  screen, we're going to pull up a screen shot of

8  Defense Exhibit 711, the 2012 P&L, which zooms in on

9  the relevant portion.  All right?

10          THE COURT:  I can tell you that's tremendous

11  improvement in the size of the fuzziness.

12          MR. DUSSEAULT:  We may all be following along

13  in the paper version.

14          THE COURT:  We'll do it the old-fashioned

15  way.

16          MR. DUSSEAULT:  That's probably right.  Okay.

17  BY MR. DUSSEAULT:

18  Q   All right.  Well, Mr. Samuelson, do you see a line

19  on the 2012 financial that refers to cost of sales?

20  A   Yes, I do.

21  Q   What are costs of sales?

22  A   So, again, this is -- generally-accepted

23  accounting principles or GAP is the governing body

24  that determines how exactly or where exactly we record

25  our costs.

1     So cost of sales are those costs that are very

2   specifically allocatable to one specific line, a

3   revenue line, effectively.

4   Q   What are the general categories that make up the

5   cost of sales?  And if you can identify them from the

6   spreadsheet, that would be great.

7   A   Sure.  So they actually align perfectly with the

8   revenue.  So I talked earlier about license revenue,

9   maintenance or support revenue, and services revenue.

10  So you can see our cost of goods are summed up in

11  exactly the same fashion.  There's a cost of license,

12  a cost of support, and a cost of services.

13  Q   I'd like you to talk very briefly about each one

14  of those separately, sir.  What are examples of costs

15  of licenses?

16  A   Sure.  I'll go through the top two.  They are very

17  good examples.  So the top cost there, total channel

18  partner commission, so we have 500 smaller companies

19  who resell our software.  When they resell our

20  software, we recognize the revenue and then we pay

21  them a commission.  That commission is in the cost of

22  goods.

23     The second one is what's called a third party

24  royalty.  So that's where we sell a product.  There's

25  a third party product involved, something from a

1   company like IBM, Oracle.  I know in the products in

2   question here there's a royalty to IBM, for example.

3   That's where we, again, recognize all that revenue,

4   then we remit a payment to that third party.  That's a

5   specific cost of goods.  So those are two examples.

6   Q    I know you're not on the product or sales side of

7   the company, but do you have a general understanding,

8   sir, of the two product configurations that are at

9   issue in this particular proceeding?

10  A    Yes.

11  Q    Now, do these costs, these cost of licenses,

12  benefit or pertain to the two procurement

13  configurations that we're talking about in this

14  proceeding?

15  A    Yes.  Again, if any one of our partners, those

16  smaller companies, resells these products, they're

17  then due a commission based on those sales.  Equally,

18  I think their products like IBM products embedded in

19  the products and the combinations of products we're

20  talking about here.  So if someone like IBM would be

21  due a payment as well.

22  Q    Are you familiar, sir, with the concept of

23  variable costs?

24  A    Yes.

25  Q    What does that concept mean to you?

1  A    The sort of what I'll call academic definition

2  would be a cost that varies with revenue.

3  Q    What could a fixed cost be?

4  A    A cost that doesn't vary with revenue.  And I

5  think there's gray area around real application of

6  that, but that's the kind of what I would call true

7  definition, at least in my mind.

8  Q    Does a variable cost necessarily vary

9  automatically meaning the moment a sale isn't made,

10 the revenue isn't there?

11 A    Some costs vary automatically.  Those examples I

12 just gave, if a channel partner sells a product, we

13 may them a commission.  If they don't seel it, we

14 don't pay a commission.  So that commission would vary

15 automatically.

16     But other costs in our business, and our business

17 is 70 to 80 people, you make cost decisions very

18 quickly.  And they are based on revenue or demand.

19 And they vary, but it doesn't happen automatically.

20 We need to make decisions about where and how to cut

21 costs.

22 Q    Can whether a given cost is fixed or variable

23 differ based on the time window that you're

24 addressing?

25 A    Well, certainly.  I guess over an unlimited amount

1    of time everything is variable.  But the way we think

2    about it is can the cost come out of the business

3    quickly after we determine there's going to be a

4    change in revenue.  And by quickly, I would say within

5    weeks or months.

6    Q    Now, with that understanding of variable costs,

7    sir, are the costs of licenses that the company incurs

8    that you have been talking about costs that you would

9    consider to be variable?

10   A    Yes, those are variable costs.

11   Q    Why is that?

12   A    Because those vary directly with revenue.  If a

13   partner doesn't sell a product, we don't have a cost.

14   So it's directly and automatically variable, for

15   example.

16   Q    So if Lawson were to refrain from selling

17   procurement configurations No. 3 and 5, those costs

18   would not be incurred?

19   A    That's correct.  If a channel partner wasn't able

20   to sell the product, we wouldn't have to pay a

21   commission.

22   Q    You also referred to another catagory called cost

23   of maintenance or cost of support.

24   A    Yes.

25   Q    Describe for the Court what that is.

1  A    Sure.  I mentioned earlier that maintenance or

2  support revenue our revenue customers pay us, and they

3  expect for that to be able to receive support for

4  their products.  They have questions about how to use

5  it or if they need fixes, they expect to get that.

6  And, equally, if our research and development groups

7  improve the product, they have access to those

8  improvements.

9  Q    What's sorts of costs does Lawson have to pay to

10 provide that?

11 A    Sure.  The primary costs are headcount costs

12 related to the people who individual that support.  So

13 if a customer has a question about how to use a

14 product, they call into our support line, and a person

15 helps them and answers their question.

16 Q    Does money that Lawson spends on support benefit

17 the procurement configurations 3 and 5 at issue in

18 this cost?

19 A    Yes.

20 Q    How so?

21 A    Well, looking at the two primary lines, you can

22 see they are in cost to support.  Obviously, the third

23 party royalties, that benefits -- if we're paying --

24 if a customer is paying support or maintenance and we

25 need to remit to a third party as a result of this,

SAMUELSON - DIRECT                    643

1  that cost would be there.  But then, obviously, if

2  customers with these combinations have questions about

3  how the product works, they call in, and our folks

4  help them.  So they are employed to help on these

5  configurations, if you will.

6  Q   If Lawson were to lose revenues for a significant

7  body of products, say for configurations 3 and 5, what

8  would happen to those costs?

9  A   So the royalties would go away automatically.

10 There would be no revenue, ergo, there would be no

11 royalty to be paid.

12     With respect to support, that's an example of a

13 cost where we would take action to cut costs, but it

14 wouldn't happen automatically.  So in our support

15 center, we look at call volume, the number of calls

16 that our support folks analyze.

17     If revenues go away, our products go away, call

18 volume goes down, and therefore we would cut costs as

19 a result of fewer calls and less activity.

20 Q   Do you consider these costs to be variable as you

21 used that term earlier?

22 A   Yes.  Again, in our view, because we would be able

23 to and would take action quickly, like in days, weeks

24 or months, then I would call that variable.

25 Q   The third catagory of the cost of sales you

SAMUELSON - DIRECT                644

1  described is cost of services.  You've already

2  described generally what that services piece is.  What

3  kind of cost does Lawson have to incur to provide

4  services?

5  A   So the primary cost of goods there are our actual

6  consultants.  So those people who that out to

7  customers site, work with the customers to implement

8  their product, configure their product, make it work,

9  that's the primary cost in that cost of good.

10 Q   And do costs of services that Lawson expends to

11 provide these consulting services benefit the products

12 at issue, Configuration 3 and 5 here?

13 A   Yes.

14 Q   How so?

15 A   So again if a customer buys one of these products,

16 they need to have it implemented.  They oftentimes

17 want to make specific changes to it.  Therefore, they

18 hire our consulting group or third parties that run

19 through our consulting revenue line to go ahead and do

20 that work.

21 Q   What would happen with respect to these costs if

22 Lawson were to refrain from seeking or accepting

23 service business as to Configurations 3 and 5?

24 A   Sure.  So similar some support, all of our

25 services or consulting people are focused on achieving

SAMUELSON - DIRECT                645

1    revenue and margin targets.   And if the demand didn't

2    exist because sales weren't occurring in a specific

3    area, we would cut back on cost, which could either

4    mean using fewer third parties or having fewer direct

5    employees focused on those areas.

6    Q    Now, Mr. Samuelson, if you look under cost of

7    sales on Defense Exhibit 711, there's a reference to

8    gross margin.  Do you see that?

9    A    Yes.

10   Q    What does gross margin refer to?

11   A    Very simply, it's our revenues minus again those

12   cost of goods that are specifically allocable to

13   specific revenues lines.

14   Q    Does the gross profit or gross margin of a company

15   account for all the money that the company has had to

16   spend in order to earn particular revenues?

17            MR. STRAPP:  Objection, leading.

18            MR. DUSSEAULT:  I can ask it in a different

19   way if you'd like.

20            THE COURT:  Overruled.

21   A    No.  So our sales force, for example, those are

22   the people that are out actually selling the products.

23   It's an operating cost.  The R&D, the people who

24   create the product, sits below gross margin.  And then

25   the G&A are the finance people who spend the bills and

1   collect the cash.  All those are required to operate

2   the business and ultimately sell and deploy the

3   product.

4   Q   If you're looking on the paper exhibit towards the

5   bottom of the page there's a reference to operating

6   expenses.  Do you see that?

7   A   Yes.

8   Q   I believe you referred to that earlier, but if you

9   could just describe for the Judge generally what

10  operating expenses are as compared to cost of sales?

11  A   Sure.

12          MR. STRAPP:  Objection.  Could I just ask for

13  a clarification?  Are we talking in the abstract about

14  operating expenses or specific to Lawson or specific

15  to these products?  It just seems to me to be unclear.

16          MR. DUSSEAULT:  I'll ask a different

17  question.

18          THE COURT:  All right.

19  Q   What does the line operating expenses on Defense

20  Exhibit 711 refer to?

21  A   It's a summation of our sales costs, marketing

22  costs, R&D costs, and our G&A costs, effectively.  So

23  those things that sit below cost of goods but that are

24  still costs.

25  Q   Are these kept according to the GAP principles you

1   referred to earlier?

2   A    Yes.   There, again, we don't decide where costs

3   are put on our profit and loss statement.   GAP or

4   generally-accepted accounting principles dictates

5   that.   So we record these where we're effectively told

6   to.   And that's how the P&L takes this form.

7   Q    Without explaining in detail what the categories

8   are, what are the general categories that make up

9   Lawson's operating expenses?

10  A    Without explaing what they are?

11  Q    Without explaining in detail at the moment.

12  A    Okay.   So sales, obviously those are all the costs

13  associated with selling our products.   Marketing, the

14  costs associated with making our company name and

15  products known.   Research and development are the

16  people actually writing the code that turns into our

17  products.   And general administrative are finance, IT,

18  HR, and legal employees and costs.

19  Q    Do you consider Lawson's operating expenses to be

20  variable?

21  A    Yes.

22  Q    Now, do you have an estimate based on your

23  experience of just roughly what percentage of Lawson's

24  operating expenses are variable?

25  A    Sure.   Again, for better or worse, a software

1    company, and Lawson in particular, 70 to 80 percent of

2    our cost headcount.  So in our view that's variable

3    because we can and oftentimes do take quick action

4    both to let people go if there's not demand or to hire

5    quickly in order to meet demand.

6        We don't have much of what I would call fixed

7    costs, like factories or we don't own buildings or

8    anything like that.  So that's 70, 80 percent employee

9    base I would view as variable.

10       Then there's also things like commissions we pay

11   to our sales force that are completely variable.  So I

12   would say 85 to 90 percent of our costs are truly

13   variable.

14   Q    Does that 85 to 90 percent cost apply to each of

15   the categories of operating expenses that you

16   described?

17   A    Roughly, yes.

18   Q    Now, you talked about costs that vary

19   automatically versus those that require some action.

20   When you say 85 to 90 percent are variable, do you

21   mean automatically variable with some action or both?

22   A    Both.  Much of the cost would require some action.

23   It wouldn't happen automatically.

24   Q    Now, for those costs that do not -- strike that.

25       Explain with respect to a cost that requires some

1    action how Lawson would take that action and what

2    might prompt Lawson to take that action.

3    A    Sure.  So a good example would be sales.  We have

4    a sales force.  So sales reps whose job it is to go

5    out and sell our products.  They are measured on

6    license revenue.  And our managers are then measured

7    on the license revenue and the seven or eight sales

8    reps that they manage.

9         If there isn't demand, if a sales manager see that

10   sales reps are not selling as much as they should,

11   they would then cut the number of sales reps in order

12   to achieve the right ratio of sales to sales reps.

13   That would be an example of where management would

14   take action.

15   Q    Did you have any actual experiences while you were

16   at Infor or Lawson where you had an opportunity to

17   observe the impact of a loss of sales on the amount

18   that the money spends on operating expenses?

19   A    Yes.  So we have many, many examples.  Probably

20   the most obvious one is the recent economic downturn

21   where Infor and Lawson, like every other software

22   company, saw significant decline in revenues because

23   demand went away, but what you'll notice if you look

24   at our financials is our margins stayed intact.  So we

25   continued to generate margins in the high 20, low

1   30 percent range even though revenues were very

2   swiftly put into decline.

3   Q   I take it that you might see a loss in the course

4   of Lawson's business that you viewed to be temporary?

5   A   Sure.  We would never take a cost cutting action,

6   particularly around headcount, if we believed that

7   demand would come back.

8   Q   What would you do if you saw a loss of revenue

9   that you understood for some reason was to be a

10  permanent loss of revenue?

11  A   We would clearly take cost action.  Again, looking

12  at the economic example, that wasn't even permanent,

13  but we felt it would be protracted, so we took fairly

14  aggressive action.

15  Q   Do you understand that in this case the Court

16  entered a permanent injunction as to Configurations 3

17  and 5 with respect to RSS?

18  A   Yes.

19  Q   Is that the sort of permanent loss that you're

20  referring to?

21  A   Yes.  If it was determined that we couldn't sell

22  specific products, and I guess I'm a little bit

23  confused because we did sell RQC.

24          MR. STRAPP:  Object to foundation here about

25  the question.  I don't think the witness has --

1    there's been no establishment of foundation, the

2    witness has any personal knowledge about the impact or

3    non-impact of an injunction.

4         MR. DUSSEAULT:  Let me ask a different

5    question.

6    Q    You talked about permanent loss versus a temporary

7    loss.  If you were to see a permanent injunction from

8    a court that says you cannot going forward sell

9    particular products, is that the sort of permanent

10   loss that you're talking about?

11        MR. STRAPP:  I'm going to object again

12   because it depends on whether or not the party

13   complies with the injunction or continues selling some

14   replacements products.  It seems like an incomplete

15   hypothetical.

16        THE COURT:  I think he's assuming compliance

17   with -- the question assumes compliance with the

18   injunction, I believe, in the way it was worded.

19   A    If for any reason we were to get no more revenue

20   on a specific product, we would take cost action to

21   make sure our margin stayed intact just like we did in

22   economic downturn example.

23   Q    When you say "take action to make sure your

24   margins stay intact," what does that mean?

25   A    That our margin levels stay approximately where

1  they are.

2  Q   Now, what I'd like to do is walk through the

3  categories of operating expenses in a bit more detail,

4  starting with sales.  We've prepared a few graphics.

5  Can you just describe for us the basic types of

6  expenses that are involved in sales?

7  A   Yes.  So sales is primarily our sales force.  So

8  those are the individual people who go to customers,

9  who go to prospects, talk about our products.  We have

10 what's called presale, so those are the technical

11 consultants then give demonstrations of the products.

12 That's the support staff that sits around that sales

13 force.

14      And then our sales force is paid, and most sales

15 forces, are paid commissions.  And so in the case of

16 our team, for approximately every dollar of license

17 sales they generate, they get about 15 cents

18 personally in commissions.

19      Obviously, there are their benefits like

20 healthcare are in that line.  The cost to go and do

21 those sales like travel costs, all of things comprise

22 sales cost.

23 Q   Are Lawson's sales cost variable in the sense that

24 you described when talking about these costs

25 generally?

1  A    Yes.   Lawson is -- we are constantly looking at

2  demand and making adjustments to our sales force based

3  on where we see demand or lack thereof.

4  Q    Are some of these costs within sales the type

5  where there would be an automatic variance?

6  A    Commissions would certainly be automatic.   So if

7  something isn't sold, no one is paid commissions.   So

8  that element would be truly automatic.

9       But, again, the headcount, we would take actions,

10 which we do on a regular basis.

11 Q    Do the sales costs that Lawson incurs in its

12 business generally benefit the products at issue in

13 this case, Configurations 3 and 5 of the procurement

14 software?

15 A    Yes.   In those cases, a sales force is required.

16 They are complex products.   It's required to have a

17 salesperson.   It's required to give demonstrations

18 with our pre-sales group, etc.

19 Q    Does the sales force sell the SKUs or modules that

20 make up Configuration No. 3 and 5 at the same time

21 that it's selling other products?

22 A    Yes.

23 Q    Let's turn to marketing as a category of costs.

24 Again, we have a slide here.   If you could just walk

25 the Court generally through the types of more specific

SAMUELSON - DIRECT                 654

1  expenses included in marketing?

2  A    Sure.  So there's a marketing staff.  So we have a

3  group of people that are focused on marketing and

4  their salaries and benefits and the like are included

5  in that cost.

6       To the extent we do advertising, we do, for

7  example, online advertising where people search for

8  specific software types we pay Google to make sure

9  that our name comes up.  There's advertising we do in

10 magazines, billboards, etc.

11 Q    You described earlier, Mr. Samuelson, different

12 sort of levels of specificity, SKUs, configurations

13 and suites.  At what level of specificity does Lawson

14 advertise products?

15 A    It's what I would call a catagory level.  So we

16 would advertise financials or human capital management

17 or HR software or manufacturing software.  It would be

18 a little bit more unusual for us to -- we would never

19 advertise at a SKU level.  It would be fairly rare to

20 advertise meaningfully at a module level.

21 Q    Are marketing costs variable?

22 A    Yes.  Because -- yes.

23 Q    How do they vary?

24 A    Our marketing teams decide where to spend costs.

25 As a budgeting matter, we generally look at marketing

1    cost as a percent of revenue.  Again, if demand isn't

2    there, we have a tendency to cut back, again, in order

3    to keep our margins intact.  If we see demand is

4    strong, sometimes we will spend more to continue to

5    generate demand.

6    Q    How do Lawson's marketing costs benefit the

7    products at issue in this proceeding, Configurations 3

8    and 5?

9    A    Sure.  So, again, all of our advertising campaigns

10   that are around our financial products, if a customer

11   through those advertising campaigns becomes interested

12   and ultimately buys our products, those configurations

13   in question could be part of that sale.

14   Q    The next category of expenses on the sheet is R&D

15   costs?

16   A    Yes.

17   Q    Again, we have a graphic.  I notice we have a

18   hammer in this one, too.

19   A    I was wondering.

20   Q    Could you walk the Court very briefly through the

21   types of costs that Lawson incurs on research and

22   development?

23   A    Sure.  So the primary costs are our development

24   teams.  So those developers that are writing in code

25   the products that we ultimately sell.  Again, the

1    benefits and the associated costs with those

2    engineers.  But we also sometimes use third parties to

3    help us develop or get products to market more

4    quickly.

5        So that's also in that cost line.  But it's

6    primary people costs.

7    Q   Earlier in your testimony you referred to the

8    maintenance revenue stream.  Do you recall that?

9    A   Yes.

10   Q   What if anything is the relationship between

11   earning money from maintenance on the one hand and

12   incurring research and development costs on the other?

13   A   Sure.  So when a customer pays maintenance, one

14   big reason that they pay is it entitles them to

15   updates and upgrades of the products that they have

16   purchased.

17       So let's say they buy financial software and tax

18   laws change.  They want to make sure that that

19   software is able to capture those tax changes, for

20   example.  Our R&D group would write those changes.

21   Then it would be released to that customer assuming

22   they were paying maintenance.

23   Q   If Lawson were to discontinue offering a

24   particular product, say, a Punchout, would it continue

25   to incur any R&D type expenses for maintenance of that

1  product?

2  A    If we were no longer allowed to sell and no longer

3  allowed to support customers on a product, we would

4  not spend R&D dollars on it, no.

5  Q    Do the developers at Lawson track specifically

6  what SKU or configuration they are working on when

7  they do their R&D?

8  A    They do not.

9  Q    Are R&D costs -- strike that.

10       In your experience generally in the company, in

11  the industry, as you mentioned, looking at software

12  companies, would it be common for researchers and

13  developers to track the specific module or SKU they're

14  working on?

15  A    I've never seen that done before, no.

16  Q    In your view, are Lawson's research and

17  development cost variable?

18  A    Yes.  Again, like the other costs that we've

19  talked about, when we see demand change for a specific

20  product, we adjust our R&D spending.

21  Q    How does Lawson's R&D spending generally benefit

22  the specific products we're talking about here, the

23  Configurations 3 and 5?

24  A    There's development time.  And, again, there's a

25  little bit of a point of confusion.  So the infringing

1    product, RSS, related products, there's no development

2    going on there.  Obviously, there's significant

3    development, much more so, frankly, than normal going

4    on around RQC.

5    Q    Are you aware of any R&D costs that were incurred

6    specifically and uniquely in connection with

7    Configurations 3 and 5 after the Court's injunction

8    was entered?

9    A    To clarify, to my knowledge there was no

10   development done on RSS related products, but there

11   was significant development done on RQC products.  Is

12   that your question?

13   Q    Yes, it is.

14   A    Okay.

15   Q    Let me ask a follow-up.  What information do you

16   have or what are you aware of as to R&D spending on,

17   let's say, RQC?

18   A    Earlier in the discussion, I talked about sort of

19   putting products in three tranches.  Those that are

20   receiving an enormous amount of development expense

21   with minimal sales.  So a disproportionate amount of

22   R&D spending.  Those that I'll call middle of the road

23   products where R&D spending is kind of average and

24   consistent and we're still selling the product.  And

25   those that are in what I'll call support mode where we

1   don't necessarily sell new licenses.  So there's

2   minimal development going on with very, very high

3   profits.

4        So in a normal course, the products in question

5   would fit into that middle category, but obviously we

6   spent disproportionately given all this activity.

7   Q    Now, the final category of costs I want to cover

8   with you is G&A.  So we'll put up another slide for

9   that.

10       If you could describe, Mr. Samuelson, what the

11  categories of general and administrative costs are

12  that the company incurs.

13  A    Yes.  So G&A costs are our whole finance

14  department, our legal department, our HR department

15  and our IT department.

16  Q    Let's take legal first.  Just very generally, what

17  does a legal department do?

18  A    By and large, our customers when they buy one of

19  our products they negotiate a contract with us.  They

20  are large purposes generally and complicated

21  purchases.  So our legal team spends a lot of time

22  writing and negotiating those contracts.  They also

23  assist with mergers and acquisitions.  They are

24  involved in litigation.  So all the things that a

25  department would do.

1    But because of the complexity of our products and

2  business, there's a lot of time spent on contracts.

3  Q    What does the IT department do?  What function --

4  actually, let me ask a better question.  What sorts of

5  things would the company spend on in the area of IT?

6  A    So servers, laptops, IT infrastructure, basically.

7  Q    What sorts of things would the company spend on in

8  HR?

9  A    People costs.  So our HR department is the largest

10  cost category.  We sometimes use third parties like we

11  have advisers to help us pick the best benefits plan,

12  for example, but they are costs that are specific to

13  managing our human capital.

14  Q    On the slide, I see to the right of finance,

15  there's a list of other categories.  Are they sub

16  categories of finance?

17  A    Right.  Those are departments within our finance

18  department.

19  Q    Are those areas in which the company would spend

20  money that you would categorize as finance?

21  A    Correct.  So we have to send bills.  We collect

22  cash.  We pay our taxes.  We have people that manage

23  all of our bank accounts, and we obviously do a budget

24  and do annual planning.

25  Q    Based on your experience at Infor and Lawson, do

1   you consider Lawson's G&A costs to be variable in the

2   sense of including both automatically variable and

3   variable requiring some action?

4   A    Sure.  There aren't many automatically variable

5   costs in G&A, but, clearly, if we're doing less

6   business, that means we need to do fewer contracts in

7   our legal departments, send fewer bills, unfortunately

8   collect less cash.  So, therefore, again, we look at

9   G&A as a percent of revenue and are constantly

10  adjusting our cost structure based on demand.

11  Q    How do the costs that Lawson incurs for general

12  administrative expenses benefit a more specific

13  product like Configurations 3 and 5 here?

14  A    There, again, if a customer were to purchase those

15  products, we'd need to write a contract with them.

16  We'd need to send them an invoice.  We'd need to

17  collect the cash.  So the G&A department has a role in

18  making sure that those products -- the business goes

19  on as long as those products exist, effectively.

20  Q    Could Lawson earn revenues with respect to

21  Configurations 3 and 5 if it weren't spending money on

22  G&A?

23  A    No, I don't think we could make money on any

24  products without a finance department, a legal

25  department, an IT department or HR department.

662

1          MR. DUSSEAULT:  Thank you, Mr. Samuelson.   No

2    further questions.

3          THE COURT:  Any questions?

4          MR. STRAPP:  Yes.

5          Could you put those slides back up on the

6    screen.

7

8    CROSS-EXAMINATION

9    BY MR. STRAPP:

10   Q   Good afternoon, Mr. Samuelson.

11   A   Hello.

12   Q   You were talking about various categories of

13   operating expenses.  And I'd like to discuss that with

14   you as well.  And I think you had some demonstrative

15   slides.  So perhaps we could just use those

16   demonstrative slides.  And I'll ask you about the

17   various costs referenced on each slide.

18       Could you please put up slide 810, please.

19       Now, slide 810 refers to research and development

20   costs.  Do you see that?

21   A   Yes.

22   Q   And are those also sometimes called in Lawson,

23   within Lawson, product development costs?

24   A   Correct.

25   Q   And the product development costs include, I think

1   you mentioned, salaries, benefits and bonuses for

2   software developers employed by Lawson; is that right?

3   A    That's correct.

4   Q    And these developers usually work on more than one

5   product at a time, right?

6   A    That's correct.

7   Q    So these developers, for example, wouldn't be

8   specifically focused on, in this case, Configurations

9   3 and 5.  They'd be working on other products as well,

10  correct?

11  A    That's correct, although they would spend time on

12  Configurations 3 and 5.

13  Q    Could you go to slide 808, please.

14       These are the operating sales costs I think you

15  referred to.  These sales costs would include salaries

16  and commissions for all Lawson sales employees, right?

17  A    That's correct.

18  Q    The sales costs referenced here would include

19  sales events, and travel costs, and anything that's

20  related to actually going out and selling Lawson's

21  products, correct?

22  A    That's correct.

23  Q    Could you turn to slide 809, please.  These are

24  the marketing costs, right?

25  A    Yes.

1    Q    These include advertisement, B generation, and

2    product management employees as well, right?

3    A    R&D employees would be in the R&D cost or product

4    management costs.

5    Q    Could you turn to slide 811, please.

6         I think you mentioned that these general and

7    administrative costs, would they include, as well,

8    audit costs and costs associated with closing books

9    and financial offerings?

10   A    Yes.  Those costs that you just articulated are

11   also based on revenue.  So our audit cost goes up as

12   we become bigger, unfortunately, and goes down when we

13   become smaller.

14   Q    The G&A cost, I think you mentioned, include IT

15   infrastructure, as well, correct?

16   A    As I mentioned, for example, laptops for

17   employees.  That's our No. 1 IT cost line, which is

18   based on our employee size.

19   Q    If Lawson paid for Microsoft Windows for its

20   employees, that would be included in G&A, right?

21   A    That's correct.

22   Q    Can you give me an example of a fixed cost that

23   would be a component of the general and administrative

24   costs of Lawson?

25   A    Sure.  A fixed cost would be -- let's say we owned

1   a server.  We would buy that server.  It would have a

2   longer life.  If our sales went way up or our sales

3   went way down, we would still own that server and its

4   value wouldn't change.  That's not something we could

5   change quickly.

6   Q   Most of Lawson's general and administrative costs

7   would probably be fixed, correct?

8   A   Again, we're back to this definition of fixed

9   versus variable.  Most of Lawson's G&A costs, if you

10  look at will they automatically vary?  No.  But would

11  we take actions in the event of a change in revenue?

12  Yes, we would.

13  Q   Mr. Samuelson, do you recall being deposed in this

14  case on January 5, 2012?

15  A   Yes.

16  Q   Do you recall meeting with me for that deposition

17  in a conference room at Goodwin Procter's offices?

18  A   Yes.

19  Q   Do you recall Lawson's attorney, Mr. Dusseault,

20  was there as well, right?

21  A   Yes, he was.

22  Q   Do you recall that you swore an oath to tell the

23  truth at that deposition?

24  A   I do.

25  Q   And you understood at the time you gave the oath

1  you were under the same obligation that you would have

2  if you were testifying in court here today, correct?

3  A   Yes.

4  Q   Can you please turn to the portion of the binder

5  in front of you that has your deposition transcript?

6  A   Yes.

7  Q   I want to direct you to page 319 of your

8  deposition.  And if you could you turn to line 12.

9  Follow along silently as I read aloud from your

10 deposition.

11    "Okay.  Can you give me an example of a fixed cost

12 that would, let's say, be rolled up under the general

13 administrative line here?"

14    Answer:  "Fixed cost could be the people in the

15 department, could be the equipment that we use.  It

16 could be our maintenance on our software that we use.

17 I would think most of, most of G&A would probably be

18 fixed."

19    Did I read that question and did I read your

20 answer correctly?

21 A   It's read correctly, but a little bit out of

22 context, but yes.

23         MR. DUSSEAULT:  Your Honor, I would object.

24 That's not proper impeachment.  In the interest of

25 completion, I'd ask that page 319, lines 3 through 11,

1   be read where the questions were specifically limited

2   to costs that varied directly with revenue.

3             MR. STRAPP:  I don't think that's correct,

4   Your Honor.  I think that 393 through 3911 is just a

5   basic definition of what fixed costs and variable

6   costs are.

7             MR. DUSSEAULT:  But, Your Honor, in the

8   testimony immediately preceding the question, he

9   offers a definition where he's talking about those

10   costs that vary directly or automatically, not those

11   that can be varied with action.  It's not impeachment.

12             THE COURT:  Overruled.  You can deal with it

13   on cross-examination.

14             MR. STRAPP:  Your Honor, I think that there's

15   actually the incorrect deposition transcript that was

16   pulled up on the screen.  Do we have control of the

17   transcript here?  I think that there's actually a

18   typographical error because the corrected transcript

19   that I have in front of me says that -- the last line

20   says, Most of G&A would probably be mixed, on the

21   screen.

22             We actually have the video of this deposition

23   transcript, and I would ask with your indulgence to

24   play this video portion.

25             THE COURT:  My transcript says "fixed."

1          MR. STRAPP:  My transcript says "fixed" as

2     well.  I would just say on the demonstrative that came

3     up on the screen, it says "mixed," M-I-X-E-D.  In the

4     interest of avoiding any confusion here, I would just

5     play that 15-second video clip.

6          MR. DUSSEAULT:  Your Honor, before it's

7     played, I can explain the situation.  When the

8     transcript came out, it says "mixed."  When we did a

9     cross-examination of their expert, we asked him about

10    the "mixed" because he had referred to it as "fixed."

11    There are questions about this.

12         The next day we got a call from the court

13    reporter service that they were changing it from

14    "mixed" to "fixed," at the request of ePlus's counsel.

15    The videotape says "fixed."  But that's the background

16    of the change.

17         MR. STRAPP:  Your Honor, I think just in the

18    sake of clarity, it's going to take less than 15

19    seconds.  I would ask to be permitted to play it or if

20    you think that there's no need since the transcript

21    says "fixed," we can just proceed.

22         THE COURT:  If you want to play it, play it.

23         MR. STRAPP:  All right.  Let's play it.

24         (The videotape is played.)

25         MR. DUSSEAULT:  Your Honor, the same

1  objection as to completeness as the preceding answer

2  referred to directly.

3  BY MR. STRAPP:

4  Q   Could you pull up -- could we switch back to your

5  slides, please.  Could you pull up slide 810.  Could

6  you pull up 810.

7      These are the research and development costs we

8  referred to.  These catagory of operating costs, they

9  include fixed costs, correct?

10  A   There's fewer fixed costs in research and

11  development than G&A, for example, because it is

12  mostly people, but there would be some.

13  Q   Is the answer to my question that product

14  development costs or research and development costs

15  include fixed costs, is the answer to that question

16  yes, sir?

17  A   A very, very small amount of fixed cost would

18  exist in R&D, yes.

19  Q   For example, a royalty paid by Lawson to use Java

20  internally is a research and development or product

21  development cost that would be a fixed cost, right?

22  A   That's correct.

23  Q   Could you turn to PX-1074 in your binder?

24          MR. DUSSEAULT:  Is this the binder you have?

25          MR. STRAPP:  It's your binder.

1    THE COURT:  Do you have that there, Mr.

2  Samuelson?

3    THE WITNESS:  Yes.

4    THE COURT:  All right.

5  Q   I think you mentioned earlier, Mr. Samuelson, that

6  this is a fiscal year 2011 profit and loss statement;

7  is that correct?

8  A   That's correct.

9  Q   And you are involved in the creation of this

10  profit and loss statement; is that correct?

11  A   Again, I supervised the creation.

12  Q   You have personal knowledge about the contents of

13  this document?

14  A   Yes.

15  Q   Now, in the creation of this document, Lawson did

16  not distinguish at all between fixed and variable

17  costs associated with licensing, maintenance and

18  consulting revenue, did it?

19  A   We followed generally-accepted accounting

20  principles which don't break costs out in that manner.

21  Q   Let me ask the question again and ask you if you

22  can fairly answer it yes or no.  In calculating the

23  company-wide profit margins in PX-1074, Lawson did not

24  distinguish at all between fixed and variable costs

25  associated with licensing, maintenance and consulting

SAMUELSON - CROSS                     671

1    revenue, did it?

2    A    We followed generally-accepted accounting

3    principles.   From a management perspective, we think

4    about the business by way of fixed and variable costs,

5    but that's not how GAP has us report numbers.

6              THE COURT:  I think the answer is no.

7              THE WITNESS:  No, right.

8    Q    The answer to the question is no?

9              THE COURT:  Yes, the answer is no.

10   Q    Okay.  Now, none of the costs associated with

11   product development can be specifically allocated to

12   revenues for infringing products and services, can it?

13   A    So, again, we would look at the time spent on

14   developing those products and think about what the

15   costs would be associated with that.  And there would

16   be costs there, yes.

17   Q    So I'm not sure I understood your answer.  None of

18   the costs associated with product development can be

19   specifically allocated to revenues for infringing

20   products and services; is that correct?

21   A    Not in this P&L.  This R&D line can't be allocated

22   to those costs, no.  I don't quite understand your

23   question, to be honest.

24   Q    Let's see if I can ask it a different way.  Let me

25   just ask you a general question.  Is it fair to say

1    that none of the costs associated with product

2    development, sales and marketing, or general and

3    administrative costs can be specifically allocated to

4    revenues for infringing products and servicer; is that

5    a fair and correct statement?

6    A    It's possible.   That's not how we run our

7    business, though.

8    Q    Let me ask you to turn back to your deposition

9    transcript.   This is the deposition that you offered

10   on January 5, 2012.   Do you recall that?

11   A    Yes.

12   Q    Do you recall you were under oath?

13   A    Yes.

14   Q    Could you turn, please, to page 100, line 4.   This

15   is the transcript of your deposition, right?

16   A    Uh-huh.

17   Q    You had an opportunity to review this deposition

18   after it was taken and ensure that it was accurate,

19   correct?

20   A    Yes.

21   Q    Please follow along silently as I read aloud from

22   page 100, line 4.

23        Question: "Okay.   Let me just ask you a general

24   question and let me, you know, you can tell me whether

25   or not I'm characterizing what you say correctly.   Is

SAMUELSON - CROSS                    673

1   it your testimony that none of the costs associated

2   with product development, sales and marketing or

3   general and administrative costs can be specifically

4   allocated to revenues for infringing products and

5   services?"

6       Answer:  "Yes, that's correct."

7       Did I read that correctly?

8   A   Yes.

9   Q   Now, sir, you said on your direct testimony that

10  there were significant development costs regarding RQC

11  products.  Was that -- is that a correct summary of

12  your testimony?

13  A   Yes.

14  Q   I think you characterized it as disproportionate

15  costs; was that correct?

16  A   Correct.

17  Q   When you said "disproportionate," what did you

18  mean by disproportionate?

19  A   I mean relative to the revenue from those

20  products, we invested a lot in R&D relative to what we

21  would invest on average for a product that's producing

22  that level of revenue.

23  Q   Let me hand up to you here --

24          THE COURT:  Are you saying that the R&D costs

25  were significant measured against the revenue received

SAMUELSON - CROSS                    674

1   for RQC or that they were absolutely significant?

2          THE WITNESS:  Relative to the revenue.

3   Q    Were the costs to develop, install, implement and

4   maintain RQC significant?

5   A    Relative to the revenue, yes.

6   Q    What, approximately -- do you have an approximate

7   idea of what the revenue was earned from this product

8   over the last -- since it was introduced, let's say,

9   in May 18, 2011?

10  A    That's not something I know off the top of my

11  head, no.

12  Q    How do you know it was a significant cost relative

13  to the revenue if you don't know what the revenue was?

14  A    I know it was less than a couple of hundred

15  million dollars during the years in question, and I

16  know we spent a lot of time as a team talking about it

17  and working on it, and I know a lot of development

18  work was put into it.  So relative to other products

19  that are that size or smaller, I know it received a

20  lot of attention.

21  Q    Would it be fair to say that the revenue was more

22  than a million dollars?

23  A    Yes.  Again, I don't know the revenue from

24  inception, which was your question.  The time in which

25  I was involved in it, it was more than a million

1    dollars.

2    Q    And the cost to develop, install, implement and

3    maintain as compared to that revenue was

4    disproportionate; that's your testimony?

5    A    The amount of -- yes, I believe that there was

6    more work put into those products as a result of all

7    this activity than would normally be put into them.

8              MR. STRAPP:  Can I hand up to the witness

9    what's been previously marked and admitted as PX-1259.

10   Q    Now, the document you have in front of you is

11   Defendant Lawson Software's answers to plaintiff's,

12   ePlus, first set of interrogatories for contempt

13   proceeding.  Do you see that?

14   A    Yes.

15   Q    The title page?

16   A    This is from 12-29-11?

17   Q    Yes.  Maybe I could ask you to just turn to the

18   second to last page here of the document.  There's a

19   subtitle verification.  Do you see that?

20   A    Yes.

21   Q    Do you see that that says the undersigned has read

22   the contents of defendant Lawson Software's objection

23   and answers to plaintiff ePlus's first set of

24   interrogatories for contempt proceedings dated October

25   7, 2011, and knows the contents thereof and that the

1    contents and facts therein contained are true and

2    correct to the best of hers/her information, knowledge

3    and belief, and that his/her information, knowledge

4    and belief is based on facts obtained by others from

5    corporate records, employees agents.   Do you see that?

6    A    Yes.

7    Q    Did I read that correctly?

8    A    Yes.

9    Q    Do you see that's signed by someone named Dale

10   Christopherson?

11   A    Yes.

12   Q    I ask you to turn to interrogatory No. 10.   It's

13   about midway through the document.   There's no page

14   numbers, but you'll find it because they are in

15   sequential order.

16   A    Okay.

17   Q    I ask you to turn first to the interrogatory and

18   the question, if you could read it into record,

19   please?

20   A    Uh-huh.

21   Q    I'll read it into the record.   It says, "Identify

22   the cost to develop, install, implement and maintain

23   RQC measured both on an overall basis and on a

24   customer by customer basis."   Do you see that

25   question?

SAMUELSON - CROSS                677

1   A   Yes.

2   Q   Do you see that there is an answer below that was

3   provided by Lawson and verified as true by the

4   company?

5   A   Uh-huh.

6   Q   I'd ask you to turn to the second sentence of the

7   answer as I read it aloud.  It says, "Without waiving

8   the forgoing objection, Lawson states, Lawson devoted

9   at least 735 development hours to the development of

10  the RQC product.  Those hours equate to an estimated

11  cost of $35,000."  Did I read that correctly?

12  A   Yes.

13  Q   Would you consider $38,000 of development costs to

14  be disproportionately significant for a product that

15  in your estimation has earned at least a million

16  dollars?

17  A   If those were the only costs that ever went into

18  the product, I wouldn't say that.

19  Q   Let's talk about some additional costs that are

20  mentioned here.  Do you see it says, "Additionally,

21  Lawson incurred opportunity costs by devoting

22  developers to the RQC project"?

23  A   Yes.

24  Q   And that beyond the developer time associated with

25  writing the code for RQC, Lawson also incurred

1    additional costs associated with other teams that were

2    required to inspect and test the RQC product during

3    the development and launch process.  Did I read that

4    correctly?

5    A    Yes.

6    Q    Do you see that the next sentence that all of

7    those additional costs are estimated to be $75,000?

8    A    Yes.

9    Q    Would you consider if I added those two numbers

10   together, 75,000 plus 38,000, that those two numbers

11   in the aggregate are disproportionate costs as

12   compared to revenues for a product that earned at

13   least a million dollars?

14   A    Again, if those were the only costs ever incurred,

15   then that would not be disproportionate.

16   Q    Let me just point you -- I think there is an

17   additional category of costs referenced here.  So in

18   the interest of completeness, if you could turn to the

19   third page of this interrogatory answer, at the top,

20   do you see that it says, Additionally, Lawson's

21   development team has incurred approximately $10,000

22   per month on maintenance cost associated with the RQC

23   product?  Did I read that correctly?

24   A    Yes.

25   Q    All right.  Now, with these three categories of

1   costs that Lawson identified in the aggregate as being

2   relevant or associated in any way with RQC, is it

3   still your opinion that those costs are

4   disproportionately large as compared to revenues for

5   the product?

6   A   Again, no, if that was the only spending that

7   occurred.

8   Q   What additional spending and costs are you aware

9   of that Lawson did not provide ePlus in its

10  interrogatory responses?

11  A   I assumed that there have been costs subsequent to

12  these interrogatories to continue to build and advance

13  the product.

14  Q   That's an assumption.  You don't have any personal

15  knowledge about that; is that correct?

16  A   I certainly know I've been on calls with people

17  and discussed this and know that work had gone on.  I

18  don't know the specifics of the work.

19  Q   Can you identify for us here in court any specific

20  additional costs that Lawson failed to include in its

21  interrogatory responses, yes or no?

22  A   I know work has gone on subsequent to this

23  interrogatory, but it's not something I have

24  memorized.

25          MR. STRAPP:  I move to strike that answer as

1    nonresponsive.

2    Q    Can you answer the following question?

3              THE COURT:   Do you want me to rule on the

4    motion?

5              MR. STRAPP:   I'm sorry, Your Honor.

6              THE COURT:   Or did you rule already?

7              MR. STRAPP:   I should await your ruling.

8              THE COURT:   Any comment?

9              MR. DUSSEAULT:   Your Honor, I think Mr.

10   Samuelson is just trying to explain that when there

11   are certain costs that are identified here, those

12   aren't necessarily all the costs that relate to the

13   product itself.   There may be costs that go into the

14   development of RQC because of the injunction, but

15   there could be other R&D or other related costs and

16   costs incurred after the injunction.   He's explained

17   his answer.

18             THE COURT:   I think you may be right, but I

19   also think it's nonresponsive.   Objection sustained.

20   The answer is stricken.

21             Ask it again.   Please listen to the question

22   and answer, if you can.

23   BY MR. STRAPP:

24   Q    Can you identify any additional specific costs

25   that Lawson failed to provide in its interrogatory

1   response that are directly associated with RQC as you

2   sit here today?

3   A    No.

4            MR. STRAPP:   Thank you.   No further

5   questions.

6

7            REDIRECT EXAMINATION

8   BY MR. DUSSEAULT:

9   Q    Just very briefly.   Mr. Samuelson, Mr. Strapp

10  asked you about your testimony concerning fixed and

11  mixed costs.   Do you recall that?

12  A    Yes.

13  Q    You read your deposition testimony where you were

14  talking about G&A costs and talking about fixed vs.

15  mixed; do you recall that?

16  A    Yes.

17  Q    Do you believe that the deposition testimony that

18  was read to you is inconsistent with the position

19  you've taken today?

20  A    No.

21  Q    Would you like to explain, because Mr. Strapp

22  didn't want to give you that opportunity, would you

23  like to explain why you believe that they are

24  consistent?

25            MR. STRAPP:   Objection, Your Honor.   He's

1   asking for the witness to comment on his own

2   testimony.  It's asked and answered.  I've already

3   gone over this testimony.

4           THE COURT:  I think he has a right to explain

5   his answer.  Overruled.

6   A   Yes.  Multiple times during the deposition this

7   subject came up and I think I was clear on multiple

8   occasions.  There is the what I'll call the

9   theoretical deposition of a cost automatically

10  changing with revenue, but also the practical

11  definition that we work with where we do adjust our

12  costs manually when revenue changes.

13      I think I gave multiple examples in the deposition

14  in areas such as G&A and others where we do that on a

15  regular basis.

16  Q   Mr. Samuelson, Mr. Strapp also pointed you to

17  Exhibit 1074.  And he asked you whether Lawson

18  distinguished between fixed costs and variable costs

19  on that document.  Do you recall that?

20  A   Yes.

21  Q   I believe you tried a few times to explain why,

22  some reference to GAP.  What explanation do you want

23  to provide, sir?

24  A   So, again, GAP dictates how we record our

25  financial statements.  That's not necessarily how we

1    operate our business.  And we certainly operate our

2    business through the lens of fixed versus variable

3    costs and commonly take actions and reduce costs when

4    revenues fall away.  And I gave examples of the

5    economy.  I can give lots of other examples.

6         So I don't think opining on how GAP asks us to put

7    our financial statements together is any indication of

8    how we actually operate our business.

9    Q   Mr. Samuelson, Mr. Strapp also asked you some

10   questions about whether costs could be specifically

11   allocated to specific products.  Do you recall that?

12   A   Yes.

13   Q   Could you explain in a little more detail, sir,

14   what you mean when you say costs can't be specifically

15   allocated to specific products?

16   A   Yes.  So, again, I think the difference between

17   the deposition and today, is today, in theory, you

18   could probably go off and venture some project, at a

19   SKU level assign costs.  Again, that's not how we

20   operate our business, but when we do see revenue fall

21   away or if we were not allowed to sell a product, we

22   would absolutely take cost action.

23        And specific to his example around R&D, developers

24   spend time on these products.  That time then would

25   open up, and we would either costs or if there was

SAMUELSON - REDIRECT                684

1    growth somewhere else that could take that revenue

2    away, we could put them to work on those types of

3    products.

4    Q   To the extent that you've stated in the past that

5    cost can't be specifically allocated to a particular

6    product, do you mean to communicate one way or the

7    other with that that the costs aren't necessary to

8    support that product?

9           MR. STRAPP:  Objection, leading.

10          THE COURT:  Overruled.

11   A   If your question is are these costs required --

12   are all these costs that we discussed required to sell

13   these products, the answer is yes.

14   Q   To the extent you said in the past that the cost

15   can't be specifically allocated to the product, did

16   you mean to communicate that you don't know whether

17   the costs play some role in earning revenue for the

18   product?

19   A   These costs clearly play a role in generating

20   revenue.  I'm not sure I understood your question, but

21   --

22          MR. DUSSEAULT:  I think you did.  Thank you.

23   That's all I have.

24          THE COURT:  Can he be excused permanently?

25          MR. DUSSEAULT:  He may.

 1          MR. ROBERTSON:  Yes, Your Honor.

 2          THE COURT:  Mr. Samuelson, thank you for

 3     being with us and giving us your testimony.  You're

 4     permanently excused.

 5              (The witness was excused from the witness

 6      stand.)

 7          MS. ALBERT:  EPlus is going to recall Dr.

 8     Weaver to the stand.

 9          THE COURT:  I remind you, Dr. Weaver, you are

10     under the same oath that you took earlier, sir.

11          THE WITNESS:  Yes, Your Honor.

12

13      ALFRED WEAVER, recalled by the Plaintiff, having

14     been duly sworn, testified as follows:

15      DIRECTION EXAMINATION

16          MS. ALBERT:  I think we were on Plaintiff's

17     Exhibit 1135.  And if I didn't already do it, I'd like

18     to move that into evidence.

19          THE COURT:  Any objection?

20          MR. THOMASCH:  No objection, Your Honor.

21          THE COURT:  It's admitted.

22              (Plaintiff's Exhibit No. 1135 is admitted.)

23          MS. ALBERT:  Then along with that we have

24     Plaintiff's Exhibit 1135A, which are the screen shots

25      for the video.  I'd like to move the admission of

1   those as well.

2            MR. THOMASCH:  No objection.

3            THE COURT:  Well, in my book here they are

4   labeled 35 and 34.  I don't have any 35A.

5            MR. STRAPP:  Your Honor, maybe I can just

6   point out, if you look at the bottom right on each

7   individual page, you'll see the 35 or 35A on the

8   actual screen shots themselves.

9            MS. ALBERT:  We could put an exhibit sticker

10  on the actual copy.

11           MR. STRAPP:  Yes.

12           MS. ALBERT:  For the Court.

13           THE COURT:  Yes, I see.  I see what you're

14  saying.  All right.

15  BY MS. ALBERT:

16  Q   Now, Dr. Weaver, we're going to play the video for

17  Plaintiff's Exhibit 1135.  And then can you tell us

18  what we're seeing as it proceeds, and then also refer

19  us, if you could, to the paper screen shot associated

20  with the video?

21  A   I'll try to do that.  It will be a little bit

22  awkward, of course, to start and stop and get the

23  screen to register exactly with the page, but Armando

24  and I will do our best here.

25           So we're at the login screen.  So play.  Stop.  So

1   this corresponds to your screen shot labeled

2   PX-1135A001.  So since there are, let's see how many,

3   51 slides in this deck, I'll just refer to them as

4   slide 1, slide 2, etc.

5        So this is slide 1.  So what I'm trying to

6   demonstrate is that a system with RQC can practice the

7   first five elements of Claim 26.

8        Play.  Stop.  Okay.  Play.  Stop.  Play.  Stop.

9   All right.  Now I'm going to see if I could draw with

10  a pen that would be less weighty than my finger.  And

11  the answer is no.

12  Q    You were drawing an arrow to indicate a tab on the

13  screen?

14  A    I was, but let me just start at the beginning.

15  Let me note up here that in the navigation bar on the

16  left, there would be the opportunity to use

17  requisition self service, the old RSS, which was

18  operational on the demonstration system along with the

19  new RQC.  So I have now chosen the RQC navigation.

20  It's opened the drop down menu.  And I'm about to

21  click on the shopping tab.

22  Q    And the video corresponds to which slide?

23  A    This would be slide 2.

24       Play.  This is the one that takes a moment to

25  load.  Stop.  So now we have entered the Lawson

1   requisition center.  Again, it's hard to see, but

2   there it is.  And we're going to go up to the

3   find/shop tab and click on that.  That will open a

4   drop down menu.  And the bottom choice there will be

5   "categories," and that will be slide 3.

6   Q   Which catalogs does the categories search feature

7   search?

8   A   That searches all the catalogs in the item master.

9       Play.  Stop.  Well, we just passed slide 3, but

10  you saw that.  So let's continue.  It's going to load

11  now the catagory hierarchy tree.

12      So we're moving towards slide 4.  Play.  Stop.  So

13  here at the top where the arrow is, this is the

14  beginnings of the list of the catagory hierarchy tree.

15  And in this example this corresponds to the top level

16  of the UNSPSC codes.

17      So what we're going to do is scroll down until we

18  find a top level category that's related to computers.

19  So this is slide 4.  And we're moving towards slide 5.

20      Play.  Stop.  So we're still at the top level of

21  the UNSPSC codes.  And we have found a catagory that

22  says "communications and computer equipment and

23  peripherals, and components, and supplies."

24      Here in slide 5, I've just clicked on that, and

25  that's starting to load.  And that's going to take us

SAMUELSON - REDIRECT                    689

1   to a drill down to the second level of the UNSPSC

2   code, and we're going to slide 6.

3        Play.  Okay.  So we just blew through slide 6.

4   And now we have arrived at hardware and accessories.

5   This is the second level of the UNSPSC codes.

6             THE COURT:  So far we're on the first step of

7   Claim 26?

8             THE WITNESS:  Correct, Your Honor.

9             THE COURT:  You're going to tell us when we

10   leave step 1 and go to step 2 or element 1 and element

11   2?

12             THE WITNESS:  I can do that.  And I was

13   certainly going to summarize that at the end.

14             THE COURT:  It would help me if I know when

15   you're moving.

16             THE WITNESS:  Okay.

17             THE COURT:  So if you get a chance, when you

18   go from one step to the other.

19   A   So what we're seeing here is both, the maintenance

20   of -- we're going to see the multiple product catalogs

21   in the item master.  So we're beginning the step of

22   searching to find -- rather to select product

23   catalogs, and we're just about there.

24             MR. THOMASCH:  Objection, Your Honor.  The

25   witness just skipped past the first claim element and

SAMUELSON - REDIRECT                690

1    did not identify as the Court asked where that

2    occurred.  And I believe in so doing the witness made

3    a statement of fact that's inconsistent with the prior

4    jury verdict.

5            THE COURT:  I don't understand.

6            MR. THOMASCH:  In other words, the witness --

7    you asked about the first element.  The first element

8    is maintaining at least two product catalogs.

9    BY MS. ALBERT:

10   Q   Dr. Weaver, do you understand whether or not

11   multiple product catalogs are maintained in the item

12   master?

13   A   Absolutely, they are.

14   Q   Will we see that as we proceed in the

15   demonstration?

16   A   Yes, we will.

17           MR. THOMASCH:  Your Honor, I'll just note my

18   objection.  This is one of the instances -- this is a

19   video that relates to Claim 28 where when only used

20   with item master the jury rejected the claim, and

21   there is no -- I do not believe that this is a fact

22   that has been established in litigation.  The witness

23   just treated it as an established fact.

24           THE COURT:  He's talking about Claim 26, not

25   Claim 28.

1        MR. THOMASCH:  It's the exact same claim

2   element.

3        THE COURT:  So what difference does it make?

4   If you're talking about one in one place and one in

5   the other, it's the same thing.  You're talking about

6   the same thing.  Your objection is noted.

7        I guess all I'm saying is that I'd like to

8   know as we go through at some point which slides I can

9   go to to find the first element, and then the second,

10  and the third, and the fourth, and the fifth.  So that

11  later when I'm looking at it I can understand which

12  slides correlate to which ones to the extent that that

13  can be done.  You can do that at the end of your

14  testimony if you want to .

15       THE WITNESS:  I think, Your Honor, since

16  these activities are somewhat distributed, it might be

17  cleaner at the end as I go through each one and

18  explain what I did.

19       THE COURT:  All right.

20       THE WITNESS:  And how it maps to elements 1,

21  2, 3, 4 and 5.

22       THE COURT:  All right.  That's fine.

23       THE WITNESS:  Okay.

24  A   Okay.  So we're pretty much on slide 6.  We're

25  ready to click this second level link and drill down a

1  bit more.  So play.  Stop.

2          THE COURT:  I don't have any picture, but

3  just go on, and I'll follow along with the slides.  Go

4  ahead.

5  A    All right.  So we need to move just a little more

6  to get the same image that is on slide 7.

7          So let's go forward but we'll stop real fast.

8          Play.  Stop.  Okay.  So now I've clicked on that

9  computer's link, and we're at the third level of the

10  UNSPSC codes.  And now we are searching for all items

11  from all vendors in the item master that are coded to

12  the UNSPSC code for computers.  So that's displayed on

13  this slide as 43-17-8.

14          So now we're ready to move to slide 8.  Play.

15  Stop.  So we've now searched for all the items from

16  all the vendors in the item master that are coded to

17  the UNSPSC class for computers, and we see because

18  this is a demonstration system, there are only five

19  products in the item master, but that's enough for the

20  demo.

21          THE COURT:  In other words, the real item

22  master would come up with more products than the five

23  listed here?

24          THE WITNESS:  Yes, sir.

25          THE COURT:  This item master, for purposes of

SAMUELSON - REDIRECT                    693

1    the demonstration, has been confined to have five of

2    these items; is that right?

3                THE WITNESS:  Yes, Your Honor, you're

4    correct.

5                THE COURT:  All right.  Thank you.

6    A    And so as we look at the items, the five items in

7    the item master that are coded to computers, we'll see

8    this first one is an IBM ThinkPad.  The second one is

9    a Dell Inspiron computer.  There are three more, but

10   I'm just going to use the first two.

11       All right.  Now we're ready to move on.  So play.

12   Stop.  So now I'm ready to inquire more deeply about

13   the description of the IBM ThinkPad.

14   Q    Which slide are you on now?

15   A    I'm on slide 9.  Thank you.

16       So I'm about to click on the item number for the

17   IBM ThinkPad to learn more about it.

18       So we're moving towards slide 10.  Play.  Stop.

19   So this is the item detail page that results from

20   looking at the ThinkPad.  So here on slide 10, here's

21   the item description.  Here's the IBM ThinkPad.

22   Here's the cost, $2,500.  And here is the vendor,

23   Office Max.  And as we --

24                THE COURT:  In other words, you've gone from

25   8 to 9 you have identified five.  Gone from five to

SAMUELSON - REDIRECT                694

1   pick the one that you want on 9.  Do you think the

2   ThinkPad is the best one.  And then you go -- now

3   you're on 10 and you have got the ThinkPad listed and

4   keyed to a vendor.

5           THE WITNESS:  Exactly right, Your Honor.

6           THE COURT:  All right.

7   A   What I'm going to do next, and this is just the

8   way the screen shots came out, I'm going to scroll

9   down, and that's going to be slide 11, but it doesn't

10  add any information.  So we'll scroll back up and

11  we'll be on slide 12.  But I'll tell you where we are.

12  We're on slide 10.  And play.  Scroll down.

13      That's slide 11.  Scroll back up.  Stop.  And

14  that's slide 12, plus just a little bit.  So what has

15  happened is that I've decided that I want to select

16  this IBM ThinkPad.  So I have clicked on the add

17  button.  And what this is going to do is to move the

18  ThinkPad into the requisition lines up here.

19      So, really, now we're on slide 13 where I'm about

20  to add the IBM ThinkPad to the requisition lines.

21      So moving towards slide 14.  Play.  Stop.  So now

22  the ThinkPad is up in requisition lines.

23  Q   That's slide 14?

24  A   And that's slide 14.  Thank you for reminding me

25  to identify the slide.

SAMUELSON - REDIRECT                695

1       Okay.  So now I've put the ThinkPad up in

2   requisition lines.  Now I'm having second thoughts

3   about the price of that item.  So I want to go back

4   and look at the items in the item master and see if I

5   can find a better deal on a computer.

6       So I'm going to go over here and click the back

7   button, and that will move us towards slide 15.  So

8   play.  Stop.  So now we're back to the screen that we

9   saw earlier where it's listing the five items that

10  were coded to computers.

11      So now as I look at this, I'm thinking, well, here

12  is the Dell Inspiron for $2,000.  And if that will do

13  the job, it will save me 500 bucks.  So I'm going to

14  look at the item description by clicking on the item

15  number, 6020.

16      So this is slide 15.  And we're headed to 16.

17  Play.  Stop.  So here I've highlighted the second

18  item.  The Dell computer.  And I'm about to select

19  that by clicking on the item number.  Play.  Stop.

20      So now I'm on slide 17.  And this is the item

21  description page.  So here is the item description.

22  Dell Inspiron 8,000.  Here's the price.  $2,000.

23  And --

24          THE COURT:  Ever since you put first the

25  ThinkPad in the requisition, it stayed up there?

SAMUELSON - REDIRECT                    696

1          THE WITNESS:  Yes.

2          THE COURT:  It's still up there for you to

3    look at and compare your price to on the Dell?

4          THE WITNESS:  That's right.

5          THE COURT:  And you went back?

6          THE WITNESS:  I'm comparison shopping.

7          THE COURT:  You're comparison shopping.  You

8    went back and you found on slide 15, you kept the IBM

9    on the requisition, and on slide 15 you went back and

10   took a good close look there at the Dell.  Looked at

11   the price.  It's 2000 instead of 2500.  Said I'm going

12   to go look for the Dell.  And now you're looking for

13   the Dell.

14         THE WITNESS:  That's right.  I've the item

15   description of the Dell here on slide 17.

16         THE COURT:  And you have gone to the Dell on

17   16 and 17.  All right.

18   A    And I see in the item description that the vendor

19   is Diablo.  So that's different from the ThinkPad,

20   which was Office Max.

21         THE COURT:  Where is the vendor?

22         THE WITNESS:  Well, it was in the item

23   description back on slide 10.

24         THE COURT:  Diablo.

25         THE WITNESS:  Slide 10 was showing that the

1   vendor for the ThinkPad was Office Max.

2        THE COURT:  Right.

3   Q   Who is the vendor for the Dell Inspiron?

4   A   That's Diablo on slide 17 where we are now.

5        THE COURT:  Where on 17 is the vendor named?

6        THE WITNESS:  Right here.

7   Q   What's the label above?

8        THE COURT:  I see.

9        THE WITNESS:  Source vendor.

10       THE COURT:  Source vendor name.

11       THE WITNESS:  Right.

12       THE COURT:  All right.  Go ahead.

13  A   So now what I'm going to do is, moving towards

14  slide 18, I'll be adding this Dell computer to the

15  requisition lines.  And then ultimately I'm going to

16  delete the IBM.  So we'll play to see me click the add

17  button here.

18      Play.  Stop.  We just went a little too far.

19  That's my fault.  We went past slide 19 where we saw

20  the pop-up that said adding the Dell Inspiron to the

21  requisition lines.  And now we are at slide 20.

22       THE COURT:  And you have got both of them on

23  there?

24       THE WITNESS:  Exactly.  We've both of them

25  here on requisition lines.  We've got both the IBM and

1    the Dell.

2         THE COURT:  If you wanted to buy both of

3    them, could you buy both of them by asking for a

4    requisition for each one of them?

5         THE WITNESS:  You certainly could.  It would

6    be one requisition with both on it and you would

7    generate two purchase orders because they are two

8    different vendors.

9         THE COURT:  Right.  Okay.  But the

10   requisition would be one and it would have both of

11   them on there?

12        THE WITNESS:  Exactly right.

13        THE COURT:  Okay.

14   A   So we're on slide 20.  I'm now ready to delete the

15   ThinkPad.  So moving towards slide 21.  Play.  Stop.

16   So I've highlighted the ThinkPad.  I've put my pointer

17   here on the delete button.  The X in a circle.  And

18   I'm going to click on delete and remove the ThinkPad

19   from requisition lines.  And that will give us a

20   pop-up that we see on slide 22 that gives me a second

21   chance.  When I'm doing a delete, you want to be

22   careful.  It will give me a second chance to think

23   about that command to delete.

24        So play.  Stop.  Play.  Stop.  So here is that

25   second chance.  Do you really want to remove this

1    line?  Well, I really do.  So I'm going to click on

2    yes, and that's going to take us here from slide 22 to

3    slide 23.

4        Play.  Stop.  So now if you look at requisition

5    lines, the ThinkPad is gone and the Dell computer

6    remains.  So I'm happy with that.

7        Now I'm going to shop for something entirely

8    different.  So what I'll do is go up here to find and

9    shop.  That will open the same drop down menu that we

10   saw before.  I'll click on the same bottommost choice

11   of categories.  And that will take us back to the

12   catagory hierarchy tree.

13   Q   What catalogs can be selected to be searched using

14   the catalogs hierarchy tree?

15   A   It's the catalogs in the item master.  All right.

16   So we're on slide 22 moving toward 23.  Play.  Stop.

17       So here's slide 23 where I've clicked on

18   categories.  So I'm going to go back and go through

19   the catagory hierarchy tree again.  Play.

20           THE COURT:  Because you want to look for

21   another kind of product.

22           THE WITNESS:  Right.  Something completely

23   different.  Not a computer at all.

24           THE COURT:  A Nubian goat.

25           THE WITNESS:  It could have been.

1   A   All right.  Where are we?  Slide 24.  So we have

2   gone back to the categories hierarchy tree.  And we're

3   back at the top level of the UNSPSC codes.  And we're

4   going to scroll down until we get to the catagory

5   about laboratory equipment.  So let's see that to make

6   this into the screen shot of slide 24.

7        So we'll play.  Stop.  Well done.  Okay.  So we

8   landed right where we're supposed to be.  This is

9   slide 24.  So this top level of the UNSPSC code is for

10  laboratory and measuring and observing and testing

11  equipment.  So that's how I'm going to get to my next

12  product.

13       So we're headed to side 25.  Play.  Stop.  Okay.

14  To make this slide 25, I'm going to click on the top

15  of the second level choices.  Laboratories and

16  scientific equipment.

17       And thank you, Armando.  That puts us exactly on

18  slide 25.

19       So I've just done the click.  Now I'm doing the

20  load.  And that's going to take me to the third level

21  choice on slide 26.

22       Play.  Stop.  So, again, because this is a

23  demonstration system and the database is small, and

24  the catagory hierarchy tree is sparse, as I get down

25  to the third level, now there's only one choice, and

1   that's this laboratory environmental conditioning

2   equipment.

3       So I'm going to take that third level choice, and

4   that's going to, again, bring up all the items from

5   all the vendors that are in the item master.

6              THE COURT:  Vendors of products of that kind?

7              THE WITNESS:  Exactly right.  Coded to this

8   third level catagory of laboratory environmental

9   conditioning equipment.

10             THE COURT:  And you come up with two?

11             THE WITNESS:  And I'm about to come up with

12  two.  That's right.

13  A   So let's play.  Stop.  So now we're on slide 27.

14  So we're at our third level of the categories.  And I

15  have exactly two choices.  I can get a case of sterile

16  surgical gloves, size 7, or I can get a case of

17  surgical gloves, size 8.

18      So why don't we make a choice of the size 7 gloves

19  and get us to slide 28.  So play.  There we are.

20  Stop.

21      So here I've selected the sterile gloves, size 7.

22  I'm clicking on the item number, and as we saw before,

23  that brings up a description.  So we'll move ahead to

24  get the item detail page.

25             Play.  Stop.  So here is the item detail page.

SAMUELSON - REDIRECT                    702

1    There's the glove.

2            THE COURT:   Slide 29?

3            THE WITNESS:   Thank you.   I am on slide 29.

4    A   There's the description.   Gloves, sterile,

5    surgical, size 7.   There's cost, $400.   And here under

6    source vendor is the name of the vendor, which is

7    Baxter Healthcare.

8        So what I'm moving toward now is adding that to

9    the requisition lines so that I can build a

10   requisition with two items from two separate vendors,

11   two different vendors.

12       All right.   So we're moving toward slide 30 by my

13   clicking on the add button here in slide 29.

14       All right.   So stop.   Let's see.   What did I do?

15   This was just scrolling down the page and back.   So we

16   can continue.   Play.   There's the add.

17           THE COURT:   Slide 31 is adding it?

18           THE WITNESS:   Right.

19           THE COURT:   And you haven't added it item

20   description yet?

21           THE WITNESS:   I just did.

22           THE COURT:   When you get to slide 32, it's on

23   the requisition?

24           THE WITNESS:   Right.

25   A   Due to the difficulty of controlling the timing of

1   this, we're now on slide 32 where we have successfully

2   added the case of surgical gloves to the requisition

3   lines.

4       So now what I'm going to do is go down here and

5   click on the release button.  And this is going to set

6   in motion the steps necessary to build a single

7   requisition containing two items from two different

8   catalogs.

9       So moving toward slide 33.  Play.  Here comes my

10  click on release.  Stop.  Now I'm on slide 33 where I

11  am releasing.  Releasing here means that we're putting

12  the information from the requisition lines, which is

13  the description of the items together with the vendor

14  information in order to build a requisition with two

15  items from two different vendors.

16          THE COURT:  You said you were building a

17  single requisition from two different catalogs.  Those

18  two catalogs being Office Max --

19          THE WITNESS:  Office Max and Diablo.

20          THE COURT:  No.  Excuse me.  Diablo and

21  Baxter.

22          THE WITNESS:  That's right, yes.  I deleted

23  Office Max when I deleted the ThinkPad.

24          THE COURT:  Officer Max had the ThinkPad.

25          THE WITNESS:  So that left me with the Dell

SAMUELSON - REDIRECT                    704

1  from Diablo and these gloves from Baxter.

2          THE COURT:  Right.

3          THE WITNESS:  Thanks for helping me out.

4  A   Okay.  So we're releasing and we're moving towards

5  slide 34.

6      Continue.  Stop.  So now we're on slide 34, which

7  tells us that the requisition has been successfully

8  submitted, and its number is 1045.

9      So I'm going to click on the okay button to

10 dismiss this pop-up window.  And that take us back to

11 Lawson home on slide 35.

12     So play.  Stop.  Okay.  So we're back to Lawson

13 home.  And what is a little bit subtle on this slide

14 is that now what I'm going to do is run the purchase

15 order creation module, which is the PO 100 program.

16 So up here in incredibly dim --

17 Q   I'm not sure that --

18 A   It hasn't come up yet.

19 Q   No.

20 A   So, Armando, we have to go forward just a little

21 bit.  Play.  Stop.  Thank you.

22     So up here in the corner I can run programs in the

23 Lawson procurement system.  So I've typed in PO 100,

24 which is the purchase order generation program.

25          THE COURT:  Are you on slide 36?

SAMUELSON - REDIRECT                    705

1          THE WITNESS:  35.

2          THE COURT:  I see.

3    A    So I'm just about to run the program.  So when we

4    go forward, we'll run PO 100 and we'll see what its

5    user interface looks like.

6          Play.  Stop.  So now you see we're on the purchase

7    order interface for Lawson applications, PO 100.

8          So in order to go from a requisition to a purchase

9    order, I've got to add some more information like who

10   is doing the buying.  So there are required fields

11   that I've got to complete.  And that will take us a

12   few slides to get that done.

13        So we'll start with identifying the company that's

14   doing the buying.  And then next after that identify

15   the person who is doing the buying.  So we're ready

16   now to move off of slide 36.

17         THE COURT:  Hold on.  We're going to need to

18   switch court reporters at this point.  So we'll take a

19   20-minute recess at this point.

20         (Recess taken at 3:50 p.m.)

21

22

23

24

25

1          THE COURT:  All right.  We had talked about slide

2    36 and the need to fill in the fields that are reflected

3    in the blue area there.

4          THE WITNESS:  That's right, Your Honor, and

5    although those actions are necessary to make the system

6    work, they're not important for what we're discussing

7    today.  So with your permission, I'd like to just let the

8    video play and blow through some of the slides that are

9    unimportant.

10          THE COURT:  Sure.

11          THE WITNESS:  When we get to slide 45, we'll stop

12    and go through them individually once more.

13          THE COURT:  All right.

14          THE WITNESS:  So the screen is now showing slide

15    37 where up here we filled in the job name and the job

16    description, and we'll see that coming back later.  So now

17    we'll just let the video role, and I'll narrate quickly.

18    Q    Did you accord this job description a name to identify

19    it with the requisition that you had previously?

20    A    Yes, I did.  This is job name RQC 1045, and job

21    description, requisition number 1045, and 1045 is what we

22    got in the popup window as we ran the creation of the

23    requisition.

24          Okay.  So, play.  And we're picking the company and

25    the person who is doing the buying.  We're selecting

1   fields that have to be selected.  Stop.  Let me see how

2   far we got.

3   Q    You are on slide 43 now?

4   A    Right, slide 43.  So a bit more.  Run.  Stop.  Okay,

5   so now we're on slide 45.  So we're ready to click on the

6   submission button, and we're on slide 45.  And by submit,

7   we're submitting the requisition to the purchase order

8   processing module, and it's going to produce purchase

9   orders for us.

10       So from slide 45, we're going to move on when we click

11  submit.  So, play.  Stop.  All right, in that instant, the

12  purchase orders have been created, and we're going to see

13  them by using this utility called the print manager.  So

14  we are now on slide 46, and we'll move toward slide 47.

15  Run.  Click on print manager, stop.

16       So here's a whole list of purchase orders that have

17  been produced.  They are sorted by date over here.  Since

18  ours was the last one to run, it's the top row on this

19  list.  So in order to view the purchase order, all I have

20  to do is click on that top row.

21       So I'm going from slide 47 toward slide 48.  Run.

22  Stop.  So now we're on slide 49 where we're seeing the

23  header of the purchase order that tells us who the buyer

24  was, and we're going to scroll down to see the purchase

25  order details themselves.  So, run.  Stop.

1          So here we are on slide 50.  So we have a first

2    purchase order, and we have a second purchase order.  The

3    first purchase order is for those sterile surgical gloves,

4    and that purchase order is headed to Baxter Health Care,

5    and the second purchase order is that Dell computer, and

6    that's going to go to Diablo.  Then we have confirmation

7    down at the bottom, report completed, and two purchase

8    orders are created.  And that is the content here of slide

9    51.

10         So my demonstration confirms that a system with RQC

11   can practice the first five elements of claim 26, and Your

12   Honor wanted to know on an element-by-element basis how

13   that was done.  So looking at the text of claim 26, the

14   system using RQC was able to use a method comprising the

15   steps of maintaining at least two product catalogs on a

16   database containing data relating to items associated with

17   respective sources.

18         So we saw in my demonstration that there were at least

19   two product catalogs.  In fact, we saw three, Office Max,

20   Diablo, and Baxter Health Care.  And then for elements two

21   and three, we saw selecting the product catalogs to search

22   and searching for matching items among the selected

23   product catalogs.

24         When we were using the category search, we found the

25   ThinkPad from Office Max that I put on the requisition

1    lines and then later deleted, and then we saw the Dell

2    computer from Diablo and the surgical gloves from Baxter

3    Health Care.

4         Then for the fourth element, building a requisition

5    using data related to selected matching items and their

6    associated source or sources, again we saw the Dell

7    computer from Diablo and the surgical gloves from Baxter

8    Health Care, and for the fifth element, processing the

9    requisition to generate one or more purchase orders for

10   the selected matching items.  That's where we are, back on

11   slide 51, the end of the slide deck.

12        Slide 51 showed that we did generate two purchase

13   orders, one to Diablo for the Dell computer and one to

14   Baxter Health Care for the surgical gloves.

15   Q    Did the demonstration system produced by Lawson in

16   discovery include the EDI module?

17   A    It did not.

18   Q    If it had included the EDI module, could you have

19   demonstrated any additional capabilities that would be

20   pertinent to the elements of claim 26?

21   A    Yes.

22   Q    What additional capabilities could you have

23   demonstrated with the EDI module?

24   A    The EDI module could have sent these purchase orders

25   to the vendors, the vendors would have responded with a

1    purchase order acknowledgment, and the EDI module would

2    have compiled a purchase order acknowledgment report that

3    would have told us whether these items were available in

4    the inventory and vendor.

5    Q    Do you have a second demonstration showing the use of

6    the systems having Requisition Center when searching a

7    Punchout catalog?

8    A    Yes, I do.

9         MS. ALBERT:  And, Your Honor, that would be

10   Plaintiff's Exhibit 1134 is the video, and the slide deck

11   corresponding to the video is Plaintiff's Exhibit 1134-A.

12   Q    And since we've seen some of the capabilities, perhaps

13   we can speed through the slides a little bit quicker, but

14   please explain what you are doing as the video progresses.

15   A    Okay.  All right.  So let's play.  Here is the log-in.

16   Here is choosing Requisition Center, slide two, the

17   shopping.  Then I'll go to that find/shop tab in just a

18   second.

19   Q    Which catalogs are you going to select to search?

20   A    Stop.  So now instead of using categories to search

21   the item master, I'm going to choose Punchout and look at

22   what catalogs are available from the Punchout trading

23   partners.  So we're almost up to slide three.  Play.  And

24   stop.

25   Q    How many catalogs are configured and connected to this

1    demonstration system?

2    A    For this system, there are two.  As you can see, there

3    are icons for Staples and for Dell.

4             THE COURT:  Again, there could be more vendors

5    than just two, but for purposes of this demonstration, you

6    have put two on here.

7             THE WITNESS:  That's right.  There could have

8    been many.

9    Q    And does system also have catalogs in the item master?

10   A    Yes, at the same time, right.  Okay, so I'm going to

11   choose the Staples catalog and move us along from slide

12   three, so play.  So that click put us in full screen mode.

13   Stop.

14        Now, Your Honor, I know that you can't see this, but

15   let me just note that -- now I can't draw.  I don't want

16   to do that.  Okay, Armando, can you do that again, please?

17   What I wanted to show you was that even though we have,

18   indeed, punched out to Staples, this is not the public

19   Staples that you or I would access from home.

20        This URL that you see up at the top of the enlarged

21   window here -- there we go, right.  You'll note that we

22   are connected to Lawson.com during the whole time that

23   we've punched out, and that's necessary so that when we're

24   done shopping, we can successfully take the shopping cart

25   at Staples and take that back into the requisition lines

of Lawson.

Okay, so let's go back to the video.

Q Which slide are you on now?

A We're now on slide five. This is Staples, the Lawson trading partner, and what I want to do is search for a desk. So up here in the -- I don't know why I can't draw anymore, but I can't. Okay, so in the text box where the cursor is sitting at the middle top of the screen, I'm going to use the keyword search capability, and I'm going to type in desk, and I'm going to click on that blue button that says search to the right of that text box. Play.

So I type in desk. That's slide six. Click search, stop. Now I'm on slide seven, and I really wish I could draw on this, but what it says is that your search for desk returned 1,415 matches. Well, I don't think we want to look at all of those, so I'm going to narrow the search by brand.

So over in the left-hand navigation, when I scroll down to the very bottom, there will be the opportunity to select brands. So I'm going to do that. I'm going to select the brands Ameriwood and Global, and that's going to drastically reduce the items that match desk, because they also have to match Ameriwood or Global.

So play. There I'm scrolling down to brand, I do the

1    check box for Ameriwood, I scroll down, I do the check box

2    for Global, I click on update.  It's updating.  Stop.

3        And so now I have a whole new set of desks to look at,

4    and I've moved us up to slide ten.  So the first desk in

5    the list of 72 matches is an Ameriwood desk.  So I'm going

6    to click on that link that you see outlined there, and

7    that's going to give me a description of this Ameriwood

8    desk.  Play.

9        Stop.  Here's the item detail page.  It has, as you

10   can see, a picture of the desk, a description of the

11   Staples item number and the manufacturer item number, and

12   at the bottom, you have a description of the desk, and

13   then underneath the button that says add to cart, there is

14   a link that says, check delivery date.  So I'm going to

15   click on that.  So that's going to take us from slide 11

16   forward.  Play.

17       Stop.  Now we're on slide 12, and so as a result of

18   clicking on that link, I have the response that this item

19   is backordered.  So I know now that this desk is not

20   available in the vendor's inventory, and so I want to get

21   something else.  So I'm going to go back and look at the

22   list of desks and pick another one.  So now moving forward

23   from slide 12, play.

24       So here's my list the of 72 desks.  So stop.  So I'm

25   going to select this Global Laurent double pedestal

1  executive desk, and that will bring up the item detail

2  page for that.  So now I'm moving off of slide 13.  Play.

3        Stop.  So here is the item detail that gives me the

4  picture, the numbers, the price, et cetera, the

5  description.  Under, again, that add to cart button is

6  check delivery date.  I'm going to click that link, so I'm

7  on slide 14.  Play.

8        So this gives -- stop.  This gives me the delivery

9  date.  I know it's not backordered, so I know that this

10 desk is available in Staples' inventory.  So now I'm going

11 to add it to the cart, so I'm moving towards slide 16.

12 Play.  Add to cart, and stop.

13       So now this desk has been added to the shopping cart.

14 I still see its description up in the top right-hand

15 corner where it has the icon of the -- the icon of the

16 shopping cart.  It says to the right of that, one item, it

17 gives the price, and now I can choose to check out from

18 Staples, so I'm going to click that.  Play.

19       Stop.  So now we're on slide 19.  So this is my chance

20 to review the item information and see if it's correct and

21 decide if I really want to return this item to the Lawson

22 system.  So I do.  So I'm going to scroll down here and

23 click on submit.  Play.  Clicking on submit, that's slide

24 20.  Poof.  Stop.

25       Slide 21.  This is why Lawson and the Punchout partner

1    have to stay connected.  When I've checked out from

2    Staples, there has to be a transfer of information back

3    into requisition lines.  That's what's going on here with

4    slide 21.  So when we get to slide 22, that information

5    will be in requisition lines.  Play.

6        Stop.  So there's the desk up in requisition lines.

7    So I'm ready to release this to build the purchase order,

8    so I'll go down to the bottom right button and click on

9    release.  So, play.  This is me clicking release, it's

10   releasing, slide 23.  24, stop.

11       So now I have the popup requisition has been

12   successfully submitted, and my requisition number is 1053.

13   So I'll need that information in a minute.  So now what

14   we're going to do is what we saw before.  We're going to

15   go back to Lawson home.  We're going to run the PO 100

16   program.  We're going to build a purchase order from this

17   one item in this one requisition.  So I'll let this play

18   until we get to the purchase order part, the part that we

19   want to see.

20   Q    And your requisition number is what number?

21   A    1053.  Okay, so now we're going to speed through this

22   to get to slide 42.  Play.  I say okay to clear the popup,

23   go back to Lawson home, run PO 100 that I've just typed

24   in.  Here is this information that's required, put in the

25   job name, the job description which is requisition number

1    1053, define the buyer company, the buyer person, the

2    other required information.

3            THE COURT:  What you are doing now, what you are

4    talking about now you're doing on slides 25 through 41.

5            THE WITNESS:  Right, correct.  Play.  Put in the

6    requisition number 1053, add that, and then submit to the

7    processing system.  Here's the submit.  And stop.

8            So we are now about to use the print manager that

9    we saw before.  It's going to take us to the list of

10   purchase orders.  Ours will be on top, and we'll click

11   that to view it.  Play.

12           So here's ours.  Click on it.  Here's the header,

13   and we're going to scroll down.  Stop.  And now if the

14   drawing worked, I could draw your attention to it, but

15   two-thirds of the way down, there's the Global Laurent

16   double pedestal desk, and to the left of that it says that

17   the vendor is Staples.  At the very bottom it says report

18   completed, one purchase order created.

19   Q    So with this demonstration, were we able to see that

20   the user had --

21           MS. ALBERT:  Can you bring up claim 26, please?

22   Sorry.

23   Q    Can you tell me whether you saw that the user

24   maintained at least two product catalogs on a database

25   containing data relating to items associated with the

1    respective resources?

2    A    We did, and that was the Staples and Dell catalogs.

3    Q    And were you able to select product catalogs to

4    search?

5    A    Yes.  I selected Staples.

6    Q    And were you able to search for matching items among

7    that selected product catalog?

8    A    I was.  I searched for desk.

9    Q    Did we see the step of building a requisition using

10   data relating to the selected matching items and their

11   associated source?

12   A    Yes, we built a requisition for the Global brand desk.

13   Q    Were you able to process the requisition to generate

14   one or more purchase orders for the selected matching

15   items?

16   A    Yes, we did.  We generated a purchase order for the

17   Global desk.

18   Q    And in your demonstration, were you able to determine

19   whether a selected matching item was available in

20   inventory?

21   A    Yes.  When we looked for that Ameriwood desk, we found

22   that it was backordered, so we didn't pursue that and

23   instead picked the Global desk, and it was available in

24   inventory.

25   Q    Thank you.  Dr. Weaver, I'd now like to direct your

```
 1   attention to Plaintiff's Exhibit 1022 in your exhibit

 2   binder.  Was this an example that you considered in

 3   connection with your analysis of the RQC configurations

 4   capabilities?

 5   A    Yes, it was.

 6   Q    What is this exhibit?

 7   A    It's an email relating to the Cleveland Clinic's

 8   questions about RQC.

 9   Q    Will you turn to page RQC 7678.

10   A    Yes.

11             THE COURT:  What exhibit are you on?

12             THE CLERK:  1022, Your Honor.

13             MS. ALBERT:  Just for recordkeeping, I'd like to

14   offer into evidence Plaintiff's Exhibit 1134 and 1134-A

15   which were the Punchout video and the slides.

16             THE COURT:  You have already objected to them.

17             MR. THOMASCH:  I have, and I would object in

18   particular to the video which I think is just --

19             THE COURT:  What is that?

20             MR. THOMASCH:  I would object in particular to

21   the videos which I think are just a demonstrative to help

22   explain testimony which is in the record.  I don't mind

23   the slides because they at least are identified in the

24   record by slide number, and I do think it would help, you

25   know, people to be able to associate what was being looked
```

1    at with what was being testified to, but the video, I

2    think, is best viewed as a demonstrative only and not as

3    admitted into evidence.

4              MS. ALBERT:  We already admitted the other video

5    into evidence, so I don't understand what the difference

6    is between --

7              THE COURT:  Which other video?

8              MS. ALBERT:  Plaintiff's Exhibit 1135 was already

9    admitted into evidence, so I don't really understand the

10   distinction between the two.  I think it's a video that

11   was captured using --

12             THE COURT:  Does it have the slide numbers on it

13   in the bottom right-hand corner?

14             MS. ALBERT:  The video?

15             THE COURT:  When you look at the same -- when you

16   look at the screen shot, it's got the slide numbers on it.

17   Does it have numbers on the corresponding location in the

18   video?

19             MS. ALBERT:  I don't believe so.  I think it just

20   has a time counter.  And the video is actually created

21   using the actual Lawson system that was produced in

22   discovery using the software on that system.

23             THE COURT:  All right, anything else?

24             MR. THOMASCH:  Nothing more.

25             THE COURT:  The videos are admitted as exhibits,

1    Plaintiff's Exhibits 1134 and -35 and the screen shots are

2    admitted as Plaintiff's Exhibits 1134-A and 1135-A.

3              MS. ALBERT:  Thank you, Your Honor.

4

5              (ePlus Exhibits 1134-A and 1135-A admitted.)

6

7    Q    Turning back --

8              THE COURT:  And you need to make sure that --

9    I've written on my copies of 1134 and -35 screen shots, A

10   and B.  You need to make sure the Court's copy has got

11   that so that in the record -- just take something and

12   write it on there with a Sharpie or something that won't

13   come off.

14   Q    Referring back to Plaintiff's Exhibit 1022 at RQC

15   7678?

16   A    Yes.

17   Q    Are you there?

18   A    I am.

19   Q    In the email from Kristin Stolte at Lawson.com to

20   Linda Koltas of Cleveland Clinic on June 20th, 2011, how

21   did Lawson, the representative of Lawson respond to

22   Cleveland Clinic's questions?

23   A    The answer was, with regard to Punchout and SciQuest,

24   RQC will function as RSS did.  We support one Punchout

25   vendor website/connection.  SciQuest will come back with

1    multiple vendors on the same requisition with one

2    punch-out.

3    Q    What do you consider important in connection with this

4    exhibit with respect to your infringement analysis?

5    A    This tells me that systems having RQC continue to have

6    the ability to connect to multi-vendor websites such as

7    SciQuest and that items associated with multiple vendors

8    can continue to be placed on a requisition when shopping

9    at a multi-vendor Punchout site.

10        So as we saw in my demonstration, if a requisition

11   includes items associated with multiple vendors, then the

12   purchase order module will generate multiple purchase

13   orders from that requisition.

14   Q    Thank you.  Let's turn back to claim 26.  Do you have

15   an opinion as to whether or not the systems configurations

16   three and five having RQC continue to infringe claim 26 of

17   the '683 patent?

18   A    Yes, I do believe that configurations three and five

19   with RQC continue to infringe claim 26.

20   Q    How are the RQC configurations used to perform the

21   first step of claim 26?

22   A    The systems with RQC continue to have the ability to

23   maintain at least two product catalogs associated with

24   their respective sources.

25   Q    What are the ways that they can maintain product

1  catalogs associated with multiple sources?

2  A    Well, they can maintain multiple vendor product

3  catalogs in the item master as I've shown in my

4  demonstration.  You could connect to multiple Punchout

5  sites and search their catalogs.  In my demonstration, I

6  did that with Staples, and I could have done that with

7  Dell.

8       In addition, I could have connected to a multi-vendor

9  Punchout site like SciQuest and searched multiple catalogs

10  there.

11  Q    How were the RQC configurations used to perform the

12  steps of selecting the product catalogs to search and then

13  searching for matching items among the selected product

14  catalogs?

15  A    The system with RQC can still be used to select the

16  product catalogs to search from among the two or more

17  product catalogs in the item master, or I could have

18  selected one of multiple Punchout catalogs to search, or I

19  could select one or more vendor catalogs to search at a

20  multi-vendor Punchout site.

21  Q    Do the RQC configurations build a requisition using

22  data related to selected matching items and their

23  associated source or sources in accordance with the fourth

24  element of claim 26?

25  A    Yes, they do.

1    Q    And how is that done?

2    A    So as we saw, as we searched for selected matching

3    items and brought them back into requisition lines, when

4    we release that, we built a requisition using the data

5    associated with the selected matching items.

6    Q    How are the RQC configurations used to perform the

7    fifth step of claim 26?

8    A    If the requisition has items associated with a single

9    source, then the system will generate one purchase order.

10   If the requisition contains items from multiple vendors,

11   then it will -- the system will generate multiple purchase

12   orders.

13   Q    Now, with respect to the last element of claim 26, how

14   are the RQC configurations used to perform that step?

15   A    That could be done either by -- at a Punchout site,

16   querying the vendor's inventory as I showed in my

17   demonstration, or if we had had the EDI module, we would

18   have been able to show that we could receive purchase

19   order acknowledgements from the vendor, and EDI would have

20   built a purchase order acknowledgment report that would

21   have told us whether or not the items were available in

22   the vendor's inventory.

23   Q    Have you reviewed any evidence indicating whether or

24   not Lawson has installed and implemented systems with RQC

25   and Punchout?

1    A    Yes.

2    Q    What have you reviewed?

3    A    Well, I've seen documents indicating that Lawson is

4    using systems with RQC and Punchout, and I know that

5    Lawson is using the system that I showed you in its sales

6    and marketing and training efforts, and Lawson has

7    produced and disseminated training videos and webinars

8    that show customers how to use RQC and Punchout.

9    Q    Now, turning to the issue of indirect infringement,

10   have you rendered any opinions as to whether or not Lawson

11   continues to induce and contribute to its customers'

12   direct infringement of claim 26 of the '683 patent?

13   A    Yes.  I have two bases for my opinion.  First, systems

14   having RQC continue to infringe, and Lawson continues to

15   induce --

16            THE COURT:  Excuse me just a minute.

17            MR. THOMASCH:  May I interrupt for a moment?  I'm

18   at a little bit of a disadvantage here, but I'm not -- the

19   witness appears to be a reading a document.  If he is, I

20   would ask for its production under Rule 612.  I don't know

21   if that's actually occurring or not, but it seems to be

22   because he is looking down and reading and turning pages.

23            THE COURT:  I can't see, so -- are you reading

24   from something?

25            THE WITNESS:  I have notes, Your Honor, yes.

 1              THE COURT:  You have notes.

 2              THE WITNESS:  Notes.

 3              MR. THOMASCH:  May I ask for their production

 4    under Rule 612, Your Honor?

 5              MS. ALBERT:  I have no objection.

 6              THE COURT:  But do you have copies of it?

 7              MS. ALBERT:  No.

 8              THE WITNESS:  Your Honor --

 9              MS. ALBERT:  I don't have --

10              THE WITNESS:  They are my notes.

11              THE COURT:  I know, but if you are using them to

12    testify, under the rules he is entitled to look at it, and

13    she doesn't have any objection, but he can't testify from

14    them and show them to Mr. Thomasch at the same time.  So I

15    need a copy of them is my point.  That's all I was trying

16    to say.  How many pages are there, because we can do it

17    back in my office.

18              THE WITNESS:  It's one page.

19              THE CLERK:  I'll do it, Your Honor.

20              MR. THOMASCH:  Your Honor, is that the totality

21    of the notes that Dr. Weaver has with him or just what he

22    was reading at the moment?

23              THE COURT:  What's that?

24              MR. THOMASCH:  May I ask if that was the totality

25    of notes that Dr. Weaver brought with him to the stand, or

1   whether that was simply the page he was referring to at

2   the moment.

3            THE COURT:  I understood him to say it was what

4   he had and what he was referring to.

5            THE WITNESS:  Those were my notes for those

6   questions.  I have a second page of notes.

7            MR. THOMASCH:  May I have --

8            THE COURT:  For subsequent questions, or for your

9   own use?

10           THE WITNESS:  It was for my own use in answering

11  the questions I was asked.

12           MR. THOMASCH:  It appeared a page has been turned

13  and that he had previously been reading.

14           THE COURT:  Is that other page that you have

15  another page, something you've looked at earlier?

16           THE WITNESS:  Yes, it is, Your Honor.

17           THE COURT:  Can we have that and give that to Mr.

18  Neal.  Sorry.  I didn't understand.

19           MR. THOMASCH:  Thank you, Your Honor.

20           MS. ALBERT:  Can we continue?

21           THE COURT:  Well, I'm going to get Mr.

22  Thomasch -- if the witness is using the note to help

23  himself, and it's a complicated area, I understand that,

24  Mr. Thomasch is entitled to have it, and so is the

25  witness.  That's all right.  It won't be but a minute.  I

1    hope they don't have to wait for the machine to warm up.

2             Do you need a copy?  I didn't ask you.

3             MS. ALBERT:  Pardon me?

4             THE COURT:  Do you need a copy?

5             MS. ALBERT:  I don't guess so.

6             THE COURT:  All right, do you know where you were

7    in your question?

8             MS. ALBERT:  I think so.

9    Q    Dr. Weaver, have you rendered any opinions as to

10   whether or not Lawson continues to induce or contribute to

11   its customers' direct infringement of claim 26?

12   A    Yes, I have.

13   Q    What are the bases for your opinion?

14   A    RQC continues to infringe, and Lawson continues to

15   induce or contribute to its customers' direct infringement

16   by the customers' use of systems having RQC.  And Lawson

17   has told the customers that RQC has 100 percent of the

18   functionality of RSS in order to induce them to download

19   RQC.

20        And I also think that Lawson continues to induce or

21   contribute to the infringement by asking its -- by aiding

22   and abetting its customers' use of the infringing systems

23   using RSS.

24   Q    What evidence have you reviewed and relied upon that

25   relate to your opinions that Lawson indirectly infringes

1   claim 26 by aiding and abetting and contributing to its

2   customers' use of the systems having RQC?

3   A    Lawson provides RQC on its website with the intent

4   that it will be downloaded by customers.  Lawson has

5   fielded an RQC SWAT team to assist customers with RQC

6   installation.  Lawson has published and distributed

7   manuals explaining how to configure and use systems having

8   RQC.  Lawson has disseminated training programs showing

9   how to use systems having RQC.  Lawson produced webinars

10  and video training systems that show how to use RQC, and

11  Lawson provides ongoing consulting and maintenance and

12  support services.

13  Q    What is the basis for your opinion that Lawson

14  continues to induce and contribute to the direct

15  infringement of claim 26 by aiding and abetting its

16  customers' ongoing use of the infringing configurations

17  having RSS?

18  A    I have seen documents in which Lawson is telling its

19  customers that they continue to use RSS and explaining how

20  to do so.

21  Q    Do you know whether or not Lawson made any efforts to

22  determine whether its customers had actually installed and

23  implemented RQC into their production procurement systems?

24  A    From the deposition testimony that I read, I think

25  that Lawson has not put any effort into determining

1    whether customers are actually installing and using RQC.

2    As late as January 2012, Lawson witnesses testified that

3    they only knew one or two customers that had installed and

4    implemented RQC.

5        The witnesses also testified that Lawson doesn't

6    maintain records identifying which of those customers

7    installed and implemented RQC.

8    Q    In your opinion, does a download of the RQC

9    application change a customer's configuration?

10   A    No.

11   Q    Does the installation of RQC automatically uninstall

12   the RSS application?

13   A    It does not.

14   Q    Will Lawson continue to provide assistance to a

15   customer with RSS as long as the customer had downloaded

16   RQC?

17   A    Yes.  The deposition testimony that I saw said that

18   the only thing Lawson considered was whether or not a

19   download had been done.

20   Q    So based on the documents you reviewed and the

21   deposition testimony of Lawson's witnesses, do you have an

22   opinion as to whether or not Lawson continues to induce

23   and contribute to its customers' use of the systems that

24   the jury found to be infringing with RSS?

25   A    My opinion is yes.

1        MS. ALBERT:  Thank you.  No further questions.

2

3                  CROSS-EXAMINATION

4   BY MR. THOMASCH:

5   Q    Good afternoon, Dr. Weaver.

6   A    Good afternoon, Mr. Thomasch.

7   Q    Can I ask you, the notebook in front of you, is that

8   your witness notebook?

9   A    Yes, it is.

10  Q    And do you have that annotated?

11  A    Yes, I do.

12  Q    And that's your handwriting?

13  A    Yes, it is.

14  Q    And as you were being questioned today, you were

15  making reference to is that; is that correct?

16  A    Of course.

17       MR. THOMASCH:  Your Honor, those are additional

18  writings, and I believe Rule 612 is very broad.  It

19  doesn't need to be a separate sheet of paper.  Any writing

20  that used by a witness while testifying needs to be

21  produced, and in light of what has been produced, I'm very

22  interested in having the balance produced, and I would

23  request them under Rule 612.

24       MS. ALBERT:  No objection.

25       THE COURT:  All right.  They'll be produced.

1          MR. THOMASCH:  Your Honor, I wonder if we might

2     be able to receive production tonight and start with cross

3     in the morning.  I do feel this is an important issue as

4     the extent of the writings involved are unusual.

5          THE COURT:  I sort of lost the last part.

6          MR. THOMASCH:  Your Honor, I said I believe the

7     extent of the writings are unusual, and before -- I'm

8     going to start with the demonstrations themselves, and if

9     there are notes on the tabs on the demonstration or the

10    like --

11         THE COURT:  There are notes on the demonstrations

12    or the witness notebook, the one that has 11 -- you are

13    talking about the 1134 and -35; is that what you are

14    talking about?

15         MR. THOMASCH:  That, if there was writing on

16    them --

17         THE COURT:  Are there notes on --

18         MR. THOMASCH:  And the witness's --

19         THE COURT:  Just a minute.  Are there copies of

20    your -- do you have notes on 1134 and 1135 as well?

21         THE WITNESS:  Yes, I do.

22         THE COURT:  Okay.  Now, so you want to do what?

23         MR. THOMASCH:  I would like to recess, Your

24    Honor.  I would like to receive copies of all writings

25    that the witness has made in aid of his testimony.  I

1    would like to receive copies of those, and after I've had

2    a chance to review them, I would like to cross-examine

3    this witness.

4              THE COURT:  You said you had no objection to the

5    production thereof?

6              MS. ALBERT:  No objection.

7              THE COURT:  All right.  You're going to work out

8    a way to copy them, because we're not going to work on

9    that copying.

10             MR. THOMASCH:  We can take care of that, Your

11   Honor.

12             THE COURT:  I assume they'll copy it.  Do you

13   have a copier here in the building?  Some of the lawyers

14   have imported copiers.

15             THE CLERK:  I'll provide the copy services in the

16   clerk's office.  If it won't take that long, I'll stay

17   with them tonight.

18             THE COURT:  You're about ready to get furloughed

19   if you are not careful.  That's a long time.  I see a

20   lot -- that witness notebook.  Well, I think it's all

21   right to -- just a minute.  They're talking.  What, Mr.

22   Strapp?

23             MR. STRAPP:  Just checking out logistics.

24             THE COURT:  How much longer do we have tomorrow?

25   We've got one witness that we've used on damages who has

1    testified only.  That's the only damage witness we've had.

2    How much longer?

3            MR. STRAPP:  We have one expert witness on

4    damages, and that's the only remaining witness for ePlus.

5            MR. DUSSEAULT:  We have a damage witness as well,

6    Your Honor.

7            THE COURT:  Do you have any idea how long that

8    will take, Mr. Strapp?

9            MR. STRAPP:  I think our expert, including direct

10   and cross, should probably be under two hours, maybe hour

11   and a half.

12           THE COURT:  And yours, Mr. Dusseault?

13           MR. DUSSEAULT:  I'm sorry.  I missed what Mr.

14   Strapp said.

15           THE COURT:  Under two hours.

16           MR. DUSSEAULT:  Including the cross.

17           MR. STRAPP:  I can't vouch for your cross.

18           MR. DUSSEAULT:  My estimate would be 60 to

19   90 minutes on our expert and 60 minutes in cross of theirs

20   if I actually received yes-and-no answers to the

21   questions.

22           THE COURT:  You talk about a caveat.

23           MR. DUSSEAULT:  I know that caveat has to be

24   given, Your Honor.

25           MR. THOMASCH:  Your Honor, we may have -- we may

1    have one short infringement fact witness.

2            THE COURT:  Are we going to do the rest of it on

3    Saturday or Monday?

4            MR. THOMASCH:  We will absolutely finish

5    tomorrow.

6            THE COURT:  Including all arguments.

7            MR. STRAPP:  Your Honor, could you just clarify,

8    please, if you could help us, what arguments do you want

9    to hear tomorrow?

10           THE COURT:  I thought you were going to provide

11   arguments on the injunction.

12           MR. STRAPP:  We can do that.

13           THE COURT:  That was my understanding.  What do

14   you propose to do about the rest of this?

15           MR. STRAPP:  We can offer either closing

16   arguments and that would be it, or we can do the

17   post-hearing briefing that you suggested you may be

18   inclined --

19           THE COURT:  Which do you want to do, I said.  I

20   tried to say.  I don't know what I said.  Sorry, it's

21   late.

22           MR. STRAPP:  I think, Your Honor, we prefer to

23   put in briefs with findings of facts and conclusions of

24   law.

25           MR. THOMASCH:  We would be happy to do that way.

1    As long as we have a change to orally argue before Your

2    Honor, that would save us the task of having to write

3    opinions.  We would do it at the Court's convenience.  I'm

4    perfectly happy to do what Mr. Strapp suggested.

5            THE COURT:  We'll hear the injunction argument

6    tomorrow, or we'll hear it Saturday or Monday.  I'm not

7    sure which.  I think there's some work going on in the

8    courthouse that may make Saturday impossible.  I didn't

9    think about that.  All right.  So 9:30 tomorrow morning.

10            MR. THOMASCH:  Thank you, Your Honor.

11            THE COURT:  You'll get the copies to him right

12    away.

13            MR. STRAPP:  Yes.

14            MR. DUSSEAULT:  If I may, I want to be clear.  On

15    our damages case, it is possible that we may have one very

16    short witness on a limited issue related to remedies, but

17    I didn't want to mislead --

18            THE COURT:  Another witness you mean other than

19    the expert?

20            MR. DUSSEAULT:  Yes, sir.

21            THE COURT:  Okay.  Maybe you all can spend the

22    evening honing.  All right.  We'll be in adjournment.

23

24                    (End of proceedings.)

25

1

2

3            We certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8    _____/s/_____                    _____
     P. E. Peterson, RPR                   Date
9

10

11   _____/s/_____                    _____
     Diane J. Daffron, RPR                 Date
12

13

14

15

16

17

18

19

20

21

22

23

24

25