```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                     RICHMOND DIVISION

 4

 5

 6    ------------------------------------
                                        :
 7    ePLUS, INC.                       :   Civil Action No.
                                        :   3:09CV620
 8    vs.                               :
                                        :
 9    LAWSON SOFTWARE, INC.             :   April 5, 2013
                                        :
10    ------------------------------------

11

12        COMPLETE TRANSCRIPT OF THE MOTIONS HEARING

13          BEFORE THE HONORABLE ROBERT E. PAYNE

14              UNITED STATES DISTRICT JUDGE

15

16    APPEARANCES:

17    Craig T. Merritt, Esquire
      Christian & Barton, LLP
18    909 East Main Street
      Suite 1200
19    Richmond, Virginia  23219-3095

20    Jennifer A. Albert, Esquire
      Goodwin Procter, LLP
21    901 New York Avenue, NW
      Washington, D.C.  20001
22

23

24              Peppy Peterson, RPR
              Official Court Reporter
25          United States District Court
```

```
 1    APPEARANCES:  (cont'g)

 2    Michael G. Strapp, Esquire
      Goodwin Procter, LLC
 3    Exchange Place
      53 State Street
 4    Boston, Massachusetts  02109

 5    Paul W. Jacobs, II, Esquire
      Christian & Barton, LLP
 6    909 East Main Street
      Suite 1200
 7    Richmond, Virginia  23219-3095

 8    David M. Young, Esquire
      Goodwin Procter, LLP
 9    901 New York Avenue, NW
      9th Floor East
10    Washington, D.C.  20001

11        Counsel for the plaintiff;

12
      Daniel J. Thomasch, Esquire
13    Gibson Dunn & Crutcher, LLP
      200 Park Avenue
14    New York, New York  10166-0193

15    Josh Krevitt, Esquire
      Gibson Dunn & Crutcher, LLP
16    200 Park Avenue
      New York, New York  10166-0193
17
      Jason C. Lo, Esquire
18    Gibson Dunn & Crutcher, LLP
      333 South Grand Avenue
19    46th Floor
      Los Angeles, California  90071
20
      Dabney J. Carr, IV, Esquire
21    Troutman Sanders, LLP
      1001 Haxall Point
22    Richmond, Virginia  23219

23    Richard W. Mark, Esquire
      Gibson Dunn & Crutcher, LLP
24    200 Park Avenue
      New York, New York  10166-0193
25
```

```
 1   APPEARANCES:  (cont'g)

 2   Christopher D. Dusseault, Esquire
     Gibson Dunn & Crutcher, LLP
 3   333 South Grand Avenue
     46th Floor
 4   Los Angeles, California  90071

 5             Counsel for the defendant

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                    P R O C E E D I N G S

        THE CLERK:  Civil action number 3:09CV620, ePlus,
Incorporated versus Lawson Software, Incorporated.  Ms.
Jennifer A. Albert, Mr. Michael G. Strapp, Mr. Craig
Merritt, and Mr. Paul W. Jacobs, II, represent the
plaintiff.

        Mr. Daniel Thomasch, Mr. Josh Krevitt, Mr.
Richard W. Mark, Mr. Dabney J. Carr, and Mr. Christopher
D. Dusseault represent the defendant.  Are counsel ready
to proceed?

        MS. ALBERT:  ePlus is ready.

        MR. THOMASCH:  Ready for the defendant.

        THE COURT:  Dr. Weaver, I remind you you are
under the same oath which you took yesterday or several
days ago.

        MS. ALBERT:  Your Honor, for housekeeping, I have
a copy of the notes from Dr. Weaver's notebooks to hand up
to Your Honor, and sorry for the disruption yesterday.  If
I had known that the witness was --

        THE COURT:  That kind of thing happens in trials
all the time.  It's one of the things that happens.

        MS. ALBERT:  Thank you, Your Honor.

        THE COURT:  There's nothing wrong with it.
People make notes to testify from.  The rules provide a

1    mechanism to deal with it, and that's one of those things

2    that happens.

3          THE COURT:  Even the labels of notebooks are

4    argumentive these days.  One side characterizes the label

5    as Dr. Weaver's testimony on infringement, the other is

6    non-infringement.  The subtlety of it all.  Please.

7

8                          **ALFRED WEAVER,**

9    a witness, called at the instance of the plaintiff,

10   having been first duly sworn, testified as follows:

11                      CROSS-EXAMINATION

12   BY MR. THOMASCH:

13   Q    Good morning, Dr. Weaver.

14   A    Good morning, Mr. Thomasch.

15   Q    Just by way of very quick initial housekeeping, if you

16   would turn in the notebook, I want to ask you about the

17   notes and annotations that you made that were copied

18   yesterday evening.  And just, if you would, turn to tab

19   one in the cross-examination booklet.

20   A    Yes.

21   Q    That's two pages.  The first one starts with your

22   notes on indirect infringement; is that correct?

23   A    That's correct.

24   Q    And the second relates to your annotations of the

25   claim chart; is that correct?

1    A    That's correct.

2    Q    And can you just tell me, when did you prepare these

3    notes?

4    A    These were -- I started on these last Friday.

5    Q    And you used these throughout the course of your

6    testimony?

7    A    I used them yesterday.

8    Q    If we turn to tab two, you'll see that -- let me skip

9    tab two for the moment, because that's sort of what is

10   left.  So tab three are the notes that relate to the first

11   demonstration; is that correct?

12   A    Yes, it is.

13   Q    And on the left-hand side, it says 51 slides.  I'll

14   refer to them as slide one, slide two, et cetera?

15   A    That's correct.

16   Q    And when did you prepare the notes on demo one?

17   A    Yesterday afternoon.

18   Q    If we turn to tab four, am I correct, sir, that tab

19   four, if you can tell, are the annotations that you made

20   on -- it's the pages that had writing on them of the slide

21   deck on demonstration two?

22   A    That's correct.

23   Q    And when did you make those notes?

24   A    Yesterday afternoon.

25   Q    Now we'll turn back, if you would please, to all of

1   the other pages, and if you can just flip through those --

2            THE COURT:  What does that mean, all the other

3   pages?

4            MR. THOMASCH:  I'm sorry, Your Honor.  That was a

5   terrible question.

6   Q    If you would flip back to tab two which contains

7   annotations on numerous exhibits and documents that were

8   used in your colorability testimony, do you see those?

9   A    I do.

10  Q    And when did you make those notes?

11  A    Those started in February.

12  Q    Okay.  And you had those documents with you and made

13  reference to them during your testimony earlier in the

14  trial; correct?

15  A    Correct.

16  Q    I'd like to talk to you initially about the second

17  demonstration, and the slide deck there, I believe, is

18  PX-1135-A, and there's a separate notebook with the

19  slides.  I think it is the second tab, if you can follow

20  along with me there.

21  A    PX-35-A --

22            THE COURT:  Wait a minute.  I'm not quite sure

23  I'm following.  It's tab what?

24            MR. THOMASCH:  It is not in my notebook, Your

25  Honor.  This is the contempt proceeding screen shots that

Weaver - Cross

1    were handed out in yesterday's note --

2            THE COURT:  Yesterday's.

3            MR. THOMASCH:  Yes.  I'm sorry, Your Honor.  The

4    notebook on its front should say, Screen Shots from

5    PX-1134 and PX-1135.

6    Q    Dr. Weaver, is that in front of you possibly on the

7    front edge?

8            THE COURT:  Do you have it, sir?

9            THE WITNESS:  I do now.

10           THE COURT:  Take your time.

11   Q    If you could open up that notebook and turn to the

12   tab, the second tab which is screen captures, PX-1135?

13   A    Okay.

14   Q    I may toggle back and forth or ask for assistance in

15   doing that, but while you are looking at the book, I will

16   have some questions with you about how this relates to the

17   claim elements, and I'll ask to put up the claim elements

18   on the screen.  I'll just give you a moment to take a look

19   at those.  Do you recognize those as the elements of

20   method claim 26?

21   A    I do, uh-huh.

22   Q    So the demonstration that's marked PX-1135-A was a

23   single shopping session in item master; correct?

24   A    Correct.

25   Q    And when you began your presentation, you indicated

1    that what you were going to show is that the first five

2    elements of the six-element claim can be practiced in RQC

3    with item master alone; is that correct?

4    A    That's correct.

5    Q    Just doing those five elements was not an

6    infringement.  If someone did just those five elements,

7    that would not be an infringement of method claim 26;

8    correct?

9    A    Correct.

10   Q    What configuration among the accused systems was this

11   meant to represent?

12            THE COURT:  "This" meaning what?

13            MR. THOMASCH:  "This" meaning the system that you

14   were using for the test.

15            THE COURT:  You mean 1135-A?

16            MR. THOMASCH:  Yes, 1135-A, thank you.

17   A    That's configurations three and five.

18   Q    And configurations three and five both contain

19   Punchout; correct?

20   A    They do.

21   Q    Did Punchout have any involvement in your example?

22   A    No, not this example.

23   Q    Okay.  Did you mention Punchout in regard to your

24   testimony, as you recall it, in regard to this

25   demonstration?

1    A    No.

2    Q    Did Punchout provide any of the features or the

3    capacity that you relied on to say that in doing your

4    demonstration, you were performing the first five elements

5    or steps of claim 26?

6    A    Not for this demonstration.

7            THE COURT:  You mean in 1135-A.

8            THE WITNESS:  Yes, 1135-A.

9    Q    Am I correct that the first step in 1135-A is

10   maintaining at least two product catalogs on a database

11   containing data relating to items associated with the

12   respective sources?  Is that the first element as you

13   understand it?

14   A    Yes, it is.

15   Q    And we can refer to that as the maintaining at least

16   two product catalogs step?

17   A    Yes.

18   Q    You'd recognize that?

19   A    Sure.

20   Q    Now, if you would turn in your cross-examination

21   binder to the Weaver initial contempt report, I want to

22   draw your attention to page 65, and actually, why don't

23   we, for context, start at page 64.  Are you there, Dr.

24   Weaver?

25   A    I am.

1   Q    And do you see in the middle of the page heading two,

2   demonstrative -- I'm sorry, demonstration establishing

3   that the RQC configurations continue to satisfy the

4   elements of claim 28 of the '683 patent; do you see that?

5   A    I do.

6   Q    And the section of your report that relates to Exhibit

7   1135-A and the video that accompanied it begins at

8   paragraph 135 and continues through to page 68, paragraph

9   155; is that correct?

10  A    That's correct.

11  Q    Now, it ends with paragraph 155; thus, this

12  demonstration confirms that the RQC configurations

13  continue to literally satisfy each and every element of

14  claim 28; do you see that?

15  A    I do.

16  Q    Okay.  This demonstration wasn't intended for claim

17  26, was it?

18  A    It was not possible to make a demonstration for every

19  claim under every configuration, so this demonstration is

20  applicable -- is perfectly applicable to claim 28, and

21  it's applicable to the first five elements of claim 26

22  because they are identical.

23  Q    Does your expert report disclose any opinion that

24  suggests this demonstration intended, in any way, to

25  support an opinion on claim 26?

1    A    I don't think it says that in words, but that's a

2    logical inference.

3    Q    So the reader of your report, you think, would

4    understand that this was intended to be a demonstration

5    about part of claim 26 and all of claim 28; is that what

6    you thought?

7    A    Yes.

8    Q    Now, the last paragraph that I read to you that said,

9    this demonstration confirms that the RQC configurations

10   continue to literally satisfy each and every element of

11   claim 28, why didn't you note that it also satisfies

12   certain limitations of claim 26?

13   A    I can't write down everything, so I just didn't write

14   that down.  It seemed obvious that since the first five

15   elements were identical, that the reader would intuitively

16   understand that.

17   Q    If we substituted the number 26 for 28 in paragraph

18   155, the sentence would be inaccurate; correct?

19   A    It would.

20   Q    Now, turning within that section of your report back

21   to page 65, paragraph 141, do you see references to the

22   Office Max and Diablo catalogs?

23   A    Yes, I do.

24   Q    Those are each -- Office Max and Diablo both have

25   catalogs that contain all catalog items sold by that

1   vendor; correct?

2   A    I don't know if the Office Max trading partner

3   contains everything sold by Office Max, but it contains

4   whatever it contains.

5   Q    Office Max has a catalog that contains Office Max

6   items only, correct, items sold by Office Max?

7   A    Correct.

8   Q    And Diablo has a catalog that contains only items sold

9   by Diablo; correct?

10  A    Correct.

11  Q    And item master is a database that includes items from

12  product catalogs; correct?

13  A    Yes.

14  Q    Item master doesn't capture the whole catalog.  It

15  takes items from catalogs and puts them in a database;

16  right?

17  A    It takes substantial information from the catalogs of

18  Office Max or Diablo or whoever and puts that into a

19  database including the vendor, the item description,

20  picture, price, unit of measure, all of the things that

21  define an item in a catalog per the Court's Markman

22  hearing.

23  Q    Understood.  It takes detailed information, but it

24  takes them on an item-by-item basis, not on a

25  catalog-by-catalog basis; correct?

1   A   You load catalogs into the item master.

2   Q   Is that correct?

3   A   Yes.

4   Q   And do you know that that's how Lawson customers use

5  item master?

6   A   Lawson provides the software to do that.

7   Q   Okay.  Now let's go to the second step in claim 26,

8  selecting the product catalogs to search; correct?

9   A   Correct.

10   Q   Now, there's no part of your demonstration that

11  depicts the catalogs in item master; correct?

12   A   I used that category search tree.

13   Q   I'm just asking you, sir, the first step is

14  maintaining catalogs.  You can't take a snapshot that

15  shows the various catalogs; correct?

16   A   No.

17   Q   Okay.  So if you will turn to page two of your

18  demonstration.  This is the first -- this is what you'd

19  see when you go into the demonstration laptop or setup

20  that you used; correct?

21   A   Correct.

22   Q   This isn't a production system; right?

23   A   No.  It's a demonstration system.

24   Q   Have you ever seen a production system?

25   A   No.

1   Q    So if you looked down under Lawson home, you see

2   items, sort of an index, in white and in blue on the

3   left-hand side of the page; do you see that?

4   A    Yes.

5   Q    Do you see where it says after the first white block,

6   under that requisition self-service and then Requisition

7   Center?

8   A    Yes.

9   Q    That was on a demonstration setup; correct?

10  A    Correct.

11  Q    You understand that's not the way that the system ever

12  looks in a customer's production environment; is that

13  right?

14          MS. ALBERT:  Objection; lacks foundation.

15          MR. THOMASCH:  Certainly.  Let me just establish.

16  Q    Do you know how the system looks when it's used by a

17  customer not in a demonstration?

18  A    I know from the documents that RSS and RQC can run on

19  the same machine.

20  Q    Right.  I'm asking you how it looks and whether it is

21  simply a matter of point the mouse and click on what you

22  want.  Is that the way you understand it looks on a

23  customer's system?

24  A    I don't know about the customer's system.

25  Q    If we turn to page two, is page two the beginning of

1    the search process that you engaged in?

2    A    No.

3    Q    What is depicted on page two?

4    A    The same things we just looked at.

5    Q    Do you see that the categories bar has been

6    highlighted?

7    A    You must be on slide three.

8    Q    I'm sorry.  You are correct, sir.  What does page

9    three depict?

10   A    It's the beginning of the category search.

11   Q    So what page -- withdrawn.  Do you understand -- claim

12   elements, please.

13        Do you understand that the searching for matching

14   items is a separate method step that occurs after the

15   selection of the product catalogs to search?

16   A    Say that again, please.

17   Q    Do you understand in your consideration of

18   infringement opinions on claim 26 that searching for

19   matching items among the selected product catalogs comes

20   after selecting the product catalogs to search?

21   A    These steps don't have to be performed in order.

22   Q    Do they both have to be performed?

23   A    Yes.

24   Q    Were they performed in order here?

25             THE COURT:  Which order?  They were performed in

1    some order.

2              MR. THOMASCH:  Thank you, Your Honor.

3    Q    In this instance, and by this instance I mean your

4    demonstration that you used as a basis for your

5    infringement opinion, 1135-A, was the step of selecting

6    the product catalogs to search performed?

7    A    Yes.

8    Q    Was the step of searching for matching items among the

9    selected product catalogs performed?

10   A    Yes.

11   Q    Which step was performed first?

12   A    The selecting the product catalogs.

13   Q    Can you show me where you selected the product

14   catalogs?

15   A    Certainly.

16   Q    And specifically, I'd like to see where you selected

17   either or both of the Office Max and Diablo product

18   catalogs to search.

19   A    Slide eight.

20             THE COURT:  Is that represented by the -- what is

21   it -- five catalogs listed beginning with IBM?

22             THE WITNESS:  There are five items in the vendor

23   master from different vendors.

24             THE COURT:  Oh, okay.

25   Q    Does that represent the selection of the Office Max

1   catalog, sir?

2   A    This selects the catalogs.

3   Q    Do you mean the items or the catalogs?

4   A    The catalogs.

5   Q    Which catalogs are selected?

6   A    It's Office Max and Diablo which we find out, not on

7   this page --

8   Q    How many different IBM catalogs did you select, or did

9   you not select IBM catalogs?

10   A    I did not select an IBM catalog.

11   Q    On page 1135-A-008, I see reference to IBM ThinkPad

12   T20 as well as an IBM enterprise server.  Are those

13   separate IBM catalogs?

14   A    Those are items.

15   Q    Those are items from an IBM catalog.

16   A    It doesn't say from -- who is selling it for that

17   particular one.

18   Q    Does that tell you that it's an Office Max catalog?

19   A    You would have to click on the item number to

20   determine that.

21   Q    Okay.  I want to know -- before you click on the item

22   number and search, I want to know, can you select the

23   Office Max catalog and say, I just want to look, I like

24   Office Max products, I like those, so I want to look for a

25   desk, but I don't want to look at all the desks in the

1   world, I want to look at Office Max desks, can you -- did

2   you, in your demonstration, show how to do a -- how to

3   select an Office Max catalog?

4   A    I could have done that with a keyword search, but

5   that's not what this demonstration was about.

6   Q    This demonstration did not show the selection of any

7   particular vendor's catalog or any assortment of specific

8   catalogs; is that correct?

9   A    No.

10  Q    No, it's not correct?

11  A    It is not correct.

12  Q    Tell me which catalogs you selected before you engaged

13  in the search.

14  A    In this case, the selection and the search are

15  combined by clicking on the third-level UNSPSC code,

16  computers, I find those items from the catalogs that match

17  the query term.

18  Q    Can you click using UNSPSC and find only items from a

19  specific vendor?

20  A    No.

21  Q    Can you use UNSPSC to find only items from multiple

22  vendors like Diablo and Office Max?

23  A    Yes.

24  Q    And not items from others through --

25          THE COURT:  What do you mean, not items from

1   others?

2          MR. THOMASCH:  Withdrawn.

3   Q    Can you use UNSPSC to search and bring up only, for

4   instance, laptops sold by Office Max and Diablo and not

5   also bring up laptops sold by other vendors that are in

6   item master?

7   A    If they are coded to the same code, then it will bring

8   up all of them.

9   Q    Because item master searches for items, not for

10  catalogs; correct?

11  A    In this case, we searched for items and catalogs

12  simultaneously.

13  Q    There are two separate steps; correct?

14  A    Well, there are two elements, but since they don't

15  have to be performed in order, they can be performed

16  together.  That's what my demonstration is.

17  Q    So your testimony is you did not perform the second

18  step of selecting the catalogs to search before you

19  performed the third step of searching the catalogs;

20  correct?

21  A    I performed elements two and three -- I practiced

22  elements two and three simultaneously.

23  Q    Using UNSPSC, can you pull up all Office Max items

24  that are sold through catalog and only the items sold by

25  Office Max?

1          MS. ALBERT:  Asked and answered.

2          THE COURT:  Sustained.

3  Q    You mentioned keyword coding.  You did not show in

4  your demonstration or discuss in your testimony yesterday

5  keyword coding, did you?

6  A    Yes.

7          THE COURT:  I thought he mentioned keyword

8  search.  Is that what you are referring to?  He said he

9  could do a keyword search.  That's different than doing

10 the coding.

11 Q    In your expert report in regard to this demonstration,

12 is there reference to keyword searching?

13 A    It's in the other demonstration.

14 Q    Okay.  And keyword --

15         THE COURT:  Excuse me.  It's in 1134-A?

16         THE WITNESS:  Yes, Your Honor.

17 Q    It's in the Punchout demonstration, not in the item

18 master demonstration; correct?

19 A    Correct.

20 Q    And when you do keyword coding, you don't get only --

21 if I did a keyword code because I want to buy an Apple

22 iPhone, and I put in Apple, I wouldn't only get products

23 out of the Apple catalog, would I, sir?

24         THE COURT:  Excuse me.  Your question changed

25 from searching to coding, and I don't know if there's a

 1  difference or you intend a difference.

 2              MR. THOMASCH:  There isn't, Your Honor.  I --

 3              THE COURT:  To me there is a difference, but

 4  that's just because I'm a layperson.

 5              MR. THOMASCH:  It's actually because my question

 6  is not as specific as it should be.  It's my fault in the

 7  question.  It's not --

 8              THE COURT:  Good; I'm glad somebody else takes

 9  the blame.  I've gotten more than my share already today.

10              MR. THOMASCH:  That one I'm happy --

11              THE COURT:  Not from you all but other sources.

12  Q    All right.  In this instance in item master, you did

13  not use a keyword search; correct?

14  A    Correct.

15  Q    And if you use a keyword search in item master, what

16  will come back are all items in the item master that

17  have -- that are associated with that word such as every

18  product from that company no matter who sells it and in

19  whose catalog it was originally; correct?

20              MS. ALBERT:  Objection; relevance.  Lawson, to my

21  knowledge, doesn't have any allegation that they've

22  modified any feature of item master, so I don't really

23  understand what the relevance of all this line of

24  questioning is.

25              MR. THOMASCH:  We had direct examination

1   yesterday, and a witness said this --

2             THE COURT:  Overruled.

3             MR. THOMASCH:  Thank you.

4   Q    In the demonstration that you relied on, was there any

5   selection of a catalog as opposed to a selection of items

6   that came from catalogs?

7   A    As I explained, elements two and three were performed

8   simultaneously.

9             MR. THOMASCH:  Move to strike as nonresponsive,

10  Your Honor.

11            THE COURT:  I think it's very responsive.  He

12  said it, I think, three times that he did it together, he

13  did it simultaneously, and you don't have to do it in any

14  order, but the way he did it for purposes of this

15  demonstration was to do the two steps together.  That may

16  be right or wrong, but that's what he said three times

17  now.

18  Q    On what basis did you make the determination that the

19  selection of items using UNSPSC codes fulfilled the claim

20  element of selecting the catalogs to search?

21            MS. ALBERT:  Asked and answered.

22            THE COURT:  I'm not sure I agree with that.  Go

23  ahead.  If you understand the question, answer it.

24            THE WITNESS:  I do.

25  A    On slide eight, if I click on the item number for the

1    ThinkPad, that brings up the item detail page, and that

2    gives me the catalog information.  So that's when I

3    selected the catalog, when I clicked on item number.

4    Q    And what catalog came up?

5    A    For the IBM ThinkPad, it was Office Max.

6    Q    And is everything in the Office Max catalog then

7    available to you on this page?

8    A    No, just that one item.

9    Q    Just one item from the catalog?

10   A    Just the one item I selected.

11   Q    And did items come up from other catalogs?

12   A    On the item detail page.

13   Q    On this page, page eight.

14   A    Well, we do have items from other catalogs on this

15   slide eight.

16   Q    Did you select those catalogs intentionally?

17   A    Yes.

18   Q    Which catalogs did you select?

19   A    Well, when I clicked on the item number for a

20   ThinkPad, I got -- it showed that that was from the Office

21   Max catalog.  When I clicked on the item number for the

22   Dell computer, it showed me that that was from the Diablo

23   catalog.

24   Q    So you figured out what catalog you had after the

25   search result was made apparent to you; is that right?

1    A    Yes.

2    Q    And I just want to go back to the claim elements,

3    please.  With reference to the relationship between the

4    second and third terms where it says, selecting the

5    product catalogs to search, the following term is

6    searching for matching items among the selected product

7    catalogs.

8         Are you under the impression that the Court has

9    specifically addressed whether those two steps need to be

10   done in sequence or may be done simultaneously?

11   A    I think they can be done simultaneously.

12   Q    And was that --

13            THE COURT:  I don't think that's the question,

14   though.  I think what his question was, are you aware of

15   whether in some opinion that I've issued I have said they

16   could be done simultaneously or otherwise.  Are you aware

17   of anything I've said on the topic, I think, is his

18   question.

19            MR. THOMASCH:  It is.

20   Q    Were you relying on an order of the Court that I'd

21   like to find out about that would specifically address

22   this issue, or did you have a different reason for

23   believing that you could do them together, not

24   sequentially?

25            THE COURT:  You mean different than an order of

1    the Court.

2              MR. THOMASCH:  Different from an order of the

3    Court.

4    A    I believe you could practice these simultaneously

5    because they don't have to be done in order.

6    Q    Right, and what I want to know is whether your belief

7    that they don't need to be done in order is because of

8    your expertise in patent law, your plain reading of the

9    claim, or an order of the court.

10   A    Plain reading of the claim.

11   Q    So your plain reading of searching among the selected

12   product catalogs doesn't require you to have first

13   selected the product catalogs to search; right?

14   A    I did them simultaneously.

15   Q    When you interpreted the claim, did you first form a

16   belief -- before you actually did the demonstration, did

17   you first form a belief as to whether or not selecting

18   catalogs to search needed to come before searching among

19   the catalogs?

20   A    I believe they could be done simultaneously.

21   Q    And you did that based on your plain -- your reading

22   of the plain meaning of the terms.

23   A    Yes.

24   Q    I believe you mentioned early on your direct testimony

25   that claims 28 and 26 have the first five elements in

1    common; is that correct?

2    A    Correct.

3    Q    Claim 28 then adds a converting step; right?

4    A    Correct.

5    Q    That is that's not present in claim 26?

6    A    Correct.

7    Q    Claim 26 has a sixth step that adds an inventory

8    checking step; correct?

9    A    Correct.

10   Q    That's not present in 28?

11   A    Correct.

12   Q    The inventory step is necessary in order to have

13   infringement of claim 26; correct?

14   A    Correct.

15   Q    The inventory step cannot be performed without the use

16   of either Punchout or EDI among the configurations that

17   were at issue in this case; correct?

18   A    Correct.

19   Q    I'm sorry?

20   A    Correct.

21   Q    Now, your demonstration doesn't implicate Punchout at

22   all; correct?

23           MS. ALBERT:  Asked and answered.

24           THE COURT:  You are talking about 1135-A?

25           MR. THOMASCH:  Yes, I am.

1   Q    Correct?

2           MS. ALBERT:  Objection; asked and answered.

3           THE COURT:  Does it use Punchout?

4           MR. THOMASCH:  Punchout is not part of his

5   demonstration at all.

6           THE COURT:  I think he's already said that.

7           MR. THOMASCH:  I think he did.  I just wanted to

8   --

9           THE COURT:  Listen, I was paying attention.  I'm

10  pretty sure he said it maybe more than once.  Let's go.

11  Q    So in this case, your -- what you are doing here is

12  looking at the relationship between item master and EDI;

13  correct?

14  A    I don't understand your question.

15  Q    All right.  In the demonstration, were you purporting

16  to show that the first five elements could be fulfilled by

17  item master in RQC and then you would need to have either

18  EDI or Punchout in order to do the next step; correct?

19  A    Correct.

20  Q    And because you didn't use Punchout, you were relying

21  on EDI to do that next step; right?

22  A    I know from the documentation that if the

23  demonstration system had contained EDI, we would have been

24  able to show the sixth inventory determination step, but

25  because we didn't get EDI, I could not put it in the

1    demonstration.

2    Q    I understand, but what you were attempting to show was

3    RQC with item master and EDI can perform the six elements

4    together; correct?

5    A    Or Punchout.  Punchout or EDI.

6    Q    Was Punchout what you were demonstrating?

7    A    No.

8    Q    Was your testimony yesterday intended to suggest that

9    Punchout had a role in the performance of the first five

10   steps?

11   A    Not in this demonstration.

12   Q    Are you suggesting that you cannot use Punchout in the

13   first five steps but Punchout can then be in the sixth

14   step?

15   A    No.

16   Q    With RQC?

17   A    No.

18   Q    Okay.  In this demonstration, were you attempting to

19   show that item master and EDI together can do the six

20   elements?

21   A    That was the conclusion, yes.

22   Q    May I have just a demonstrative showing configurations

23   three and five.

24        You mentioned your demonstration was in relationship

25   to configuration three and five.  Configuration five

1    contains electronic data interface or EDI; correct?

2    A    Correct.

3    Q    Configuration three does not; correct?

4    A    Correct.

5    Q    So the demonstration you did was, in fact, related to

6    configuration five alone, not configuration three, and you

7    demonstrated the first five elements and then said, with

8    EDI, we could have all six; right?

9    A    Right.

10   Q    Configuration three, without the use of Punchout,

11   could never infringe claim 26; correct?

12   A    Correct.

13   Q    You are in configuration three.  Even under your view

14   of infringement and your view of the claims, you need to

15   use Punchout in order to infringe claim 26 because there's

16   no other way to check inventory?

17   A    Correct.

18   Q    Now, neither claim 26 nor claim 28 was found to be

19   infringed at trial in regard to any configuration that did

20   not contain Punchout; correct?

21          MS. ALBERT:  I object that we're retreading the

22   jury verdict and the trial.  I think that was the subject

23   of the Court's order.

24          THE COURT:  I think we're going too far over the

25   line now, Mr. Thomasch.  I've given you considerable

1     leeway because you're on cross-examination to test the

2     validity, but he actually gave a demonstration.  You all

3     provided him with the material from which he was able to

4     use the demonstration.  You didn't provide all of it.  He

5     did what he said.  He explained it.

6              If that's sufficient, it's not.  If it is, it

7     isn't, but we don't need to now go back and re-plow what

8     happened at the trial.  Whether or not -- the question is

9     beyond where we need to go.

10             MR. THOMASCH:  Your Honor, I only have two

11    questions for him that relate to the impact on his

12    opinion.  I'm not trying to prove any objective fact, just

13    whether or not he considered something.  I would ask that

14    I be able to put that on the record as an offer of proof.

15             MS. ALBERT:  Objection; same objection that it's

16    the subject of your order, and you prohibited us from

17    re-treading the trial and, you know, looking into the

18    minds of the jury.  And he's already made a motion for an

19    offer of proof.  I think that's already been made.

20             THE COURT:  All right.  What do you want?

21             MR. THOMASCH:  I would like to find out whether

22    he considered that fact --

23             THE COURT:  Do you want to ask the question and

24    have me sustain an objection to it so that it's in the

25    record?  Is that what you are asking me to do?

1          MR. THOMASCH:  Yes, Your Honor.

2          THE COURT:  Ask the question, and then if she

3    objects, places her objection, I'll rule on it if it's the

4    same question and same objection.

5          MR. THOMASCH:  I'll only have two questions that

6    are intended to draw the objection, Your Honor.  I don't

7    mean to belabor this in any way.

8          THE COURT:  Try it out and see.  Let's go.

9    Q    Did you consider, in forming your opinions in this

10   case, your infringement opinions in this case, Dr. Weaver,

11   that neither claim 26 nor claim 28 was found to be

12   infringed at trial in regard to any configuration that did

13   not contain Punchout?

14         MS. ALBERT:  Objection; relevance.

15         THE COURT:  Sustained.

16   Q    Did you consider that ePlus alleged that item master

17   and EDI, in the context of configuration four, infringed

18   claim 26 and the jury rejected that allegation?

19         MS. ALBERT:  Objection; relevance.

20         THE COURT:  Sustained.

21   Q    Dr. Weaver, if you had had EDI when you did the

22   demonstration three months before -- withdrawn.

23         If you had EDI at the time you did the demonstration,

24   you would have then included screen shots from that;

25   correct?

1    A    Correct.

2    Q    And you testified on direct to what that process would

3    have been and how that would have handled the sixth

4    element; correct?

5    A    Correct.

6    Q    Are you in any way -- is there anything you need in

7    order to convey to the Court and to counsel your opinion

8    that EDI would satisfy this sixth element?

9    A    True.

10   Q    That's clear; correct?

11   A    Yes.

12   Q    That's your opinion.  Does EDI have a role in the

13   first five elements?

14   A    No.

15   Q    When does the inventory checking occur --

16        THE COURT:  You mean does EDI have a role in

17   performing the first five elements?

18        MR. THOMASCH:  I'll withdraw the question and

19   rephrase it.

20        THE COURT:  It clearly has a role in the

21   effectuation of it according to everybody's evidence.

22   Q    In performing the first five elements of claim 26, do

23   you need to use EDI at all?

24   A    No.

25   Q    If you had had EDI available to you, it would have

1    changed the screen shots in your book.  Would it have

2    changed your opinion in any way?

3    A    No.  I would simply be able to demonstrate that EDI

4    can tell you what's available in inventory.

5    Q    May I go over now to the Punchout demonstration.  That

6    was, I believe, shown on screen shots at PX-1134-A.  Do

7    you see that?

8    A    Yes, it's up now.

9    Q    Okay.  And if you recall, in that demonstration that

10   you testified about yesterday, it ultimately concluded

11   with your demonstrating how to purchase one Global desk

12   from Staples; correct?

13   A    Correct.

14   Q    Now, in that demonstration, did item master come into

15   play at all?

16   A    No.  This was about Punchout.

17   Q    So this was about going to Punchout, making a

18   selection, building a requisition, checking out, and

19   having Punchout perform that checking inventory step; is

20   that right?

21   A    That's correct.

22   Q    So I believe page two shows that you are going to

23   Punchout; is that right?

24   A    That's right.

25   Q    Then on page three, did you have a choice at that

1    point to punch out to the Staples site or punch out to the

2    Dell website?

3    A    Yes, I did.

4    Q    And which choice did you elect?

5    A    Staples.

6    Q    Now, if a Lawson client with configuration three or

7    five -- withdrawn.  Both configurations three and five

8    have Punchout in them; correct?

9    A    They do.

10   Q    If a Lawson client with configuration three or five

11   had Punchout relationships with Dell and Staples only, as

12   shown in this limited demonstration, would the

13   configuration satisfy element one of claim 26 which

14   requires, quote, maintaining at least two product catalogs

15   on a database containing data related to items associated

16   with the respective sources?

17   A    Yes.

18   Q    Where is the database for the Punchout catalogs?

19   A    One of those is at Staples, and one is at Dell.

20   Q    And who maintains those databases?

21   A    Staples and Dell in partnership with Lawson.

22   Q    Does the customer maintain -- may I have claim one,

23   please.

24        Does the customer maintain a database containing data

25   related to items associated with the respective sources?

1   A    There would be the seller, Staples or Dell.

2   Q    And does Staples maintain the Dell catalog on its

3   database?

4   A    No.

5   Q    Does Dell maintain the Staples catalog?

6   A    No.

7   Q    Are there one database or two databases?

8   A    Those are two separate databases.

9   Q    They are two separate databases, each containing one

10  vendor's catalog; correct?

11  A    Correct.  Don't forget about item master.  Although it

12  wasn't used in the demonstration, it's still present, and

13  it still contains multiple catalogs in a single database.

14  Q    Did item master have anything to do with the

15  demonstration by which you said you were showing

16  infringement?

17  A    I was just showing Punchout.

18           THE COURT:  Wait a minute.  The answer to the

19  question is, yes, it did, on 1135.  It did not on 1134;

20  right?  So let's get straight what we're talking about.

21  Q    Right.  The demonstration I'm now talking about is

22  exclusively 1134, and is it fair to refer to it as a

23  Punchout only demonstration?

24  A    Yes.

25  Q    In testifying about how to use Punchout to fulfill the

1    items of claim 26, did you indicate that you needed to use

2    item master to show infringement of claim 26 in the

3    Punchout demonstration, 1134?

4    A    No.  I merely pointed out that it was present.

5    Q    I need to be able to ask you questions about the

6    demonstration you gave when you said, I'm showing how

7    infringement can occur.

8    A    Sure.

9    Q    You didn't suggest in your testimony that what you

10   were showing was the only possible way that you could

11   infringe; correct?

12   A    You are correct.

13   Q    But what you showed, what you have in the snapshots

14   and what you testified to before the Court is a basis for

15   your opinion that this system can be used to infringe

16   claim 26.

17   A    Correct.

18   Q    You do understand by your reading of the plain

19   language of the claim that the step of maintaining at

20   least two product catalogs on a database containing data

21   related items associated with the respective sources must

22   be performed in order for there to be direct infringement?

23   A    Sure.

24   Q    Did you have an opinion when you did the demonstration

25   that is reflected in Exhibit 1134 as to what the database

1    was that fulfilled element one of claim 26?

2    A    Yes.

3    Q    And what was the database?

4    A    That would be the database in a multi-vendor Punchout

5    catalog.

6    Q    Was there a multi-vendor Punchout catalog anywhere

7    referenced in this demonstration?

8    A    Not in this demonstration.

9    Q    Okay.  I am asking you about the demonstration that

10   you gave the Court --

11             THE COURT:  No.  What you asked him was about

12   what his opinion was.  It wasn't confined to the

13   demonstration.  He answered the question you asked.  If

14   you want to ask a different one, you can ask it.

15   Q    Let me ask you about the demonstration, the Punchout

16   only demonstration reflected in Exhibit 1134.  That

17   demonstration did not show punching out to a multi-catalog

18   vendor or a multi-vendor catalog; correct?

19   A    Correct.

20   Q    So in the demonstration that you showed, where was the

21   database containing data related to items associated with

22   the respective sources?

23   A    There were -- there's a database at Staples, there's a

24   database at Dell, and there's a database in the item

25   master.

1   Q    And who maintained the databases?  Separate

2   individuals?

3   A    Separate companies.

4            THE COURT:  Separate companies being --

5            THE WITNESS:  Staples and Dell and Lawson

6   maintaining the item master.  Or a customer.

7            THE COURT:  Earlier you said something about

8   Lawson in partnership with Staples and Dell.  Are you

9   talking about the same thing or different?

10           THE WITNESS:  The partnership is the ability of

11  the Lawson software to remain connected when you punch out

12  to Dell or Staples, but Staples maintains their database.

13  Q    Punchout gives a Lawson customer access to the Staples

14  website that has been sort of specially configured for

15  that customer; correct?

16  A    Correct.

17  Q    And gives them access to potentially a modified

18  Staples catalog but some Staples catalog; correct?

19  A    Correct.

20  Q    That catalog is actually maintained by Staples, but

21  the access is through the Lawson system; correct?

22  A    Correct.

23  Q    Now, in the answer before His Honor had a follow-up

24  question, you mentioned at the end that the catalogs may

25  have been maintained by Lawson in item master; do you

1    recall just saying that?

2    A    Yes.

3    Q    That wasn't part of your demonstration; correct?

4    A    Correct.

5         THE COURT:  In 1134.

6         MR. THOMASCH:  In 1134.

7    Q    Correct?

8    A    Yes, that's correct.

9    Q    So you had a demonstration that we talked about

10   earlier that only involved item master and EDI, and in the

11   second demonstration that we're now talking about, 1134,

12   you used Punchout and not EDI and not item master;

13   correct?

14        MS. ALBERT:  Objection; asked and answered.

15        MR. THOMASCH:  Just for clarification, Your

16   Honor.

17        THE COURT:  Mr. Thomasch, I think it's clear here

18   that there were two different demonstrations, that they

19   each had different purposes, and they are not

20   all-encompassing, and they were exactly what they were

21   purported to be which was a demonstration and not the

22   entire proof of the entire case about everything.  And I

23   think you've established that fairly well, and you can go

24   on to something else if you'd like to.

25   Q    If you would turn to page 16 of 1134, please.  Am I

1   correct that this shows adding a desk to the cart at

2   Staples?

3   A    That's correct.

4   Q    And then feel free if there's something important in

5   between, but I'd like to next walk you through to page 20.

6   Do you see where the submit button is highlighted?

7   A    Yes.

8   Q    And so that would be, in effect, checking out of

9   Staples so that you would then return to the Lawson RQC?

10  A    Correct.

11  Q    And that's shown in slide 21?

12  A    Yes.  This is returning the items from the Staples

13  shopping cart to the Lawson requisition lines.

14  Q    Okay.  And you are back with both Staples and Dell

15  being shown as the Punchout vendors that are available

16  through this -- on this demo machine; correct?

17  A    That's correct.

18  Q    Page 22, if you flip ahead, this shows now that that

19  desk from Staples has been placed into the requisition

20  lines; correct?

21  A    Correct.

22  Q    May I go to the claim terms, please.  Is that entry of

23  the Staples desk, the desk from Staples, into requisition

24  lines, is that relevant to the performance of any of the

25  six steps of claim 26 that are on the screen?

1    A    It's requisite for building the requisition.

2    Q    So the fourth element of claim 26 is building a

3    requisition using data related to selected matching items

4    and their associated sources; correct?

5    A    Correct.

6    Q    And so in this instance --

7         MS. ALBERT:  Objection; I think you misread the

8    claim elements.

9    Q    Let me reread it to be better -- to appear more

10   accurately in the transcript.

11        It's building a requisition using data relating to

12   selected matching items and their associated source(s),

13   period; correct?

14   A    Correct.

15   Q    Is it your testimony that this single item that

16   appears in the requisition lines satisfies the fourth

17   element of claim 26?

18   A    Yes.

19   Q    Now, at this point in the demonstration --

20        THE COURT:  That's on slide 22, Dr. Weaver.

21        THE WITNESS:  Yes, Your Honor, slide 22.

22   Q    At this point in the demonstration, you proceeded

23   ahead to go through the checkout process that would

24   involve generating a purchase order; correct?

25   A    Lawson now calls it the release process.

Weaver - Cross

1    Q    You went through the release process; correct?

2    A    I did.

3    Q    But for purposes of building the requisition, that

4    single item from the Staples Punchout site, that was

5    sufficient to satisfy the fourth element in your opinion;

6    correct?

7    A    Correct.

8    Q    At that point in the process, could you have gone back

9    to Dell, purchased an item from Dell and brought it

10   forward and put it on the same requisition?

11   A    No.

12   Q    Could you have at that point, if you had wanted to,

13   kept the requisition open, gone to item master, brought

14   back an item master item from some source other than

15   Staples, and added it to the requisition?

16   A    No.

17   Q    Indeed, you couldn't even go to item master to get a

18   Staples item to put on the requisition, could you?

19   A    Correct.

20   Q    Because you can't get into item master when you have

21   an item in requisition lines through a Punchout search;

22   right?

23   A    Right.

24   Q    Now, you have previously had familiarity with how RSS

25   worked; correct?

1    A    Correct.

2    Q    In RSS, with RSS, you could have done a very similar

3    search to what you just did; correct?

4    A    Yes.

5    Q    And by what you just did, I mean what you are

6    testifying about now which is the demonstration that's

7    reflected in the screen shots at 1134-A.

8    A    Yes.

9    Q    But with RSS, you could have gone -- after buying the

10   item or putting the item into requisition lines, you could

11   have then sought to add into the requisitioning process an

12   item from a different source, specifically Dell; right?

13   A    You could.

14   Q    In that instance, the fourth item would have been

15   satisfied by building a requisition that had multiple

16   sources; correct?

17   A    The fourth element?

18   Q    Yes.

19   A    Yes.

20   Q    Are you aware that neither party in the underlying

21   litigation asked the Court to construe the fourth element

22   of claim 26?

23   A    Yes.

24   Q    So were you relying, when you formed your opinions on

25   infringement of claim 26 through the activities that you

1    demonstrated in 1134, were you relying on your

2    understanding of the plain language of that claim?

3    A    Yes.

4    Q    You testified on direct right at the very beginning, I

5    believe it was actually in the morning session in one of

6    the first or second questions, that RQC can be used to

7    perform all steps of claim 26; do you recall that?

8    A    Yes.

9    Q    It's not your opinion, is it, that all uses of

10   configurations three and five infringe claim 26; correct?

11   A    Let me go back to that last question, because I don't

12   think that was accurate.  Maybe we should go look up my

13   testimony to see what I said.

14   Q    How about if I modify it, because I think I know where

15   you are, and if you are, I think it deserves

16   clarification.

17        Would it be right to say that you indicated that RQC

18   can be used to perform the first five elements of claim

19   26?

20   A    I said RQC and the surrounding procurement system

21   could be used to show the first five elements of claim 26.

22   Q    So put more broadly, configuration three and

23   configuration five, in your opinion, can be used to

24   infringe claim 26?

25   A    Correct.

1    Q    But all uses of configuration three and configuration

2    five are not infringing; correct?

3    A    All uses?

4    Q    Are there ways that a user can productively use

5    configuration three or configuration five to perform

6    intended purposes of the software and not infringe claim

7    26?

8            MS. ALBERT:  Objection; beyond the scope of my

9    direct.

10           THE COURT:  What difference does it make if

11   there's some -- let's assume there's one use that doesn't

12   infringe.

13           MR. THOMASCH:  Your Honor --

14           THE COURT:  That still infringes if there are

15   other uses that do.

16           MR. THOMASCH:  There are many uses that don't,

17   Your Honor, and in trying to understand what is infringing

18   and what is not in his opinion, I would like to know where

19   the line is that he's drawn and what he has on each side.

20           THE COURT:  What difference does it make is her

21   point, I think.

22           MR. THOMASCH:  Well --

23           THE COURT:  She didn't cover that in her

24   examination.

25           MR. THOMASCH:  This is an infringement case --

1          THE COURT:  I understand that, but you don't try

2    what's not infringing in an infringement case.

3          MR. THOMASCH:  Well, they have brought a claim of

4    indirect infringement.  They have brought a claim of

5    contributory infringement, and the issues, the issues of

6    substantial non-infringing uses, Your Honor, are central

7    and will be up before the Court when the damages witnesses

8    testify.

9          THE COURT:  I haven't seen that in anybody's

10   evidence so far.

11         MR. THOMASCH:  I believe Dr. Weaver's

12   expert report -- may I ask?

13         THE COURT:  Go ahead, but you are confusing the

14   issues that have to be decided here, I think.  She didn't

15   cover it.  I'm sustaining her objection.  It's beyond the

16   scope of her direct examination, and if you want to cover

17   another -- cover it another way, perhaps you can, but not

18   with that question.  In addition to that, it's so broad I

19   don't know that anybody could ever answer it.  You'd have

20   to know what all other people do.

21   Q    Dr. Weaver, in your expert report, did you offer an

22   opinion that RQC and configurations three and five have no

23   substantial non-infringing use?

24   A    Yes.

25   Q    Is that your opinion?

1   A    Yes.

2              MR. THOMASCH:  Your Honor, may I continue?

3              THE COURT:  With a question that is permissible,

4   sure.

5   Q    When you did the demonstration in 1135-A, were you

6   requisitioning a stock item from item master?

7   A    Yes.

8   Q    What stock item were you requisitioning in 1135?

9   Withdrawn.  Maybe as a predicate, what is a stock item if

10  you understand that term?

11  A    I think I misspoke.  Stock item is something that's

12  already present in the company.  The items that I was

13  looking at required ordering, so they were not stock

14  items.

15  Q    So a stock item might be like yellow pads at a law

16  firm, and I want to have 100 available, they are in stock,

17  and if someone needs some and you have actually 300 in

18  stock, you say, I want five yellow pads, they come to you,

19  there's no purchase order; correct?

20  A    That's right.

21  Q    In that situation, you are using item master, but even

22  under your definitions and read of the claims, that's not

23  an infringement, is it?

24  A    It's not, because there's no requisition and purchase

25  order.

1  Q    And so that's why you didn't use a stock item in your

2  demonstration?

3  A    Yes.

4  Q    When you were -- when you requisition special items by

5  manually filling out requisition forms without searching

6  for a matching item, that wouldn't infringe claim 26,

7  would it?

8  A    You have to do a search.

9  Q    And that sort of thing, doing a specific requisition

10 where you know just what you want, you can go into item

11 master, write that in without ever searching, and you can

12 use item master to purchase that item; correct?

13 A    Yes.

14 Q    And that's within the capacity of configurations three

15 and five?

16 A    Yes.

17 Q    And also, you can purchase items through pre-completed

18 templates, like every month we'll order 100 yellow pads

19 automatically, you can do that through item master;

20 correct?

21 A    Yes.

22 Q    And that's not an infringement of claim 26.

23 A    If there's no search.

24       THE COURT:  You had to get a search to get there,

25 don't you?

1          THE WITNESS:  You would have had to do a search

2     initially.

3     Q    Do you have to do a search -- let's clarify.  If you

4     are a law firm and you decide that every month you want to

5     order 100 yellow legal pads from Office Max, and you have

6     a standing template that you then, in January, in

7     February, and the first of March, you order 100 pads, is

8     that considered by you, the use of a template to fill out

9     recurring orders, is that a search within the meaning of

10    the claim language as you understand it in claim 26?

11    A    No.

12    Q    So if it's not, then doing so would not be infringing

13    claim 26; correct?

14    A    Correct.

15         THE COURT:  While he's asking that, do you have

16    to get a search to establish the template?

17         THE WITNESS:  Yes, sir, you do.

18    Q    Have you ever entered items in an item master?

19    A    Not me personally.

20    Q    Have you ever performed a template order using item

21    master?

22    A    Not me personally.

23    Q    Do you know how that process works and whether a

24    search is actually required?

25    A    From the documents, it appears to me that the template

 1    is filled as a result of doing searches, and then the

 2    template gets saved and then can be reused.

 3    Q    And that -- your basis for that is what you've seen in

 4    specific documents?

 5    A    Yes, that's right.

 6    Q    Can you identify any of those -- withdrawn.  Does your

 7    expert report identify any of those?

 8              MS. ALBERT:  Objection; I think this is beyond

 9    the scope --

10              MR. THOMASCH:  I'll withdraw the question.

11              MS. ALBERT:  I'll stipulate --

12              THE COURT:  He fished for it, the fact it's not

13    in his report.  He fished for it, and you let it be

14    answered.  You could have objected, but you didn't, and

15    now he's got to deal with the answer one way or the

16    another.

17              MS. ALBERT:  Understood.

18              THE COURT:  There's no reason to object, but

19    there's no reason to go any further.  It's been

20    established.

21    Q    Even in configurations three and five with users who

22    have Punchout or EDI, under your reading of the claims,

23    there is no infringement unless the Punchout or item

24    master vendors have the capability to check inventory;

25    correct?

Weaver - Cross

1    A    Say that again, please.

2    Q    Under your reading of the claims with respect to

3    configurations three and five, Lawson users who have

4    Punchout and/or EDI capacity still cannot infringe claim

5    26 if they engage in a transition with a vendor who does

6    not have the capability to check inventory; is that

7    correct?

8    A    I think that's correct.

9    Q    Punchout vendors must support the capacity of

10   reporting whether the item you want is in inventory in

11   order for you -- that vendor to be part of an infringement

12   of claim 26; correct?

13   A    Correct.

14   Q    And the same holds true for transactions with EDI.

15   Even if the Lawson customer has EDI, unless the vendor

16   also has the capacity to do the electronic checking of

17   inventory, there will be no infringement of claim 26 under

18   your view; correct?

19            MS. ALBERT:  Objection; relevance.  Lawson has no

20   contention in this proceeding that it's made any

21   modifications to any inventory determining capabilities

22   that were found to infringe.

23            THE COURT:  Beyond that, have you put in any

24   evidence of non-infringing uses that anybody is using?  Is

25   there anything in the record about this?  You are asking

1    him opinions in the air, and opinions in the air don't

2    mean anything unless they are tied to a non-infringing use

3    made by you or somebody else, and I haven't seen anything

4    in the record that shows that.

5         MR. THOMASCH:  I believe, Your Honor, there has

6    been enormous discussion about the capacity --

7         THE COURT:  I'm not talking about discussion.

8    I'm talking about a substantial non-infringing use, and

9    what you are doing is you are going into a bunch of

10   questions about something that, so far as I'm aware,

11   nobody put anything in the record about, but if I'm wrong

12   about that I want to know so I can refresh memory.

13        MR. THOMASCH:  Dr. Weaver is providing testimony

14   about the capacity of the machines to perform substantial

15   non-infringing uses, and there is no good-faith dispute

16   about whether those uses take place.  The burden of proof

17   is on --

18        THE COURT:  No, the burden of raising a

19   substantial non-infringing use is on you, I think.  You

20   have to put it up -- put it forward.  Sustained on the

21   objection.

22        MS. ALBERT:  Thank you.

23        THE COURT:  Enough is enough.

24   Q    Do the documents that you reviewed reflect that Lawson

25   customers use item master to purchase stock items?

1    A    Can be used to purchase stock items, yes.

2    Q    You've seen reference that they do, don't you?

3    A    Yes.

4    Q    You made reference to SciQuest on your direct

5    examination; correct?

6    A    I did.

7    Q    Am I correct that your opinion about SciQuest is the

8    Lawson customer who has a relationship with SciQuest has

9    the capacity to infringe claim 26 by going to SciQuest,

10   but you don't actually know of any customer who has done

11   so; is that right?

12   A    No.

13   Q    How many customers do you know of who have gone to

14   SciQuest?

15   A    Cleveland Clinic.

16   Q    Do you know of any others?

17   A    That's the one I read about.

18   Q    When Cleveland Clinic went to SciQuest, what did they

19   do?  What did they purchase?

20   A    I don't know.

21   Q    Did the purchase, in your mind, infringe claim 26?

22   A    It has the capacity to infringe claim 26.

23   Q    We are talking about infringement.  I want to know if

24   you are aware of any evidence that Cleveland Clinic used a

25   Lawson system to infringe claim 26.

Weaver - Cross

1    A    I know that Cleveland Clinic asked about using

2    SciQuest and got reassures that using SciQuest would work

3    just fine and would bring back multiple items from

4    multiple vendors, put on one requisition, and generate

5    multiple purchase orders.  I think it's a reasonable

6    assumption that if they ask that question, they are using

7    that functionality.

8    Q    And in your answer just then about what was reasonable

9    to assume, you ticked right through five of the six

10   elements but did not mention determining whether a

11   selected matching item is available in inventory; correct?

12   Is that true that you did not mention that?

13   A    I did not mention it.

14   Q    Even if you went to SciQuest, unless there is a

15   determination of whether a selected matching item is

16   available in inventory, there's no infringement of claim

17   26; correct?

18           MS. ALBERT:  Asked and answered, Your Honor.

19           THE COURT:  Overruled.

20   A    There would not be.

21   Q    What is your understanding about the capacity of

22   SciQuest or partners of SciQuest to do -- to determine

23   whether selected matching items are available in

24   inventory?

25   A    We know that the SciQuest system has hundreds or

1    thousands of catalogs, and so I believe it's possible to

2    check inventory there.

3    Q    Through which catalogs?

4    A    I don't know their names.

5    Q    You are just making an assumption based on numbers; is

6    that correct?

7    A    Yes.

8    Q    Do you have any information about a single --

9    withdrawn.  You have previously done demonstrations

10   similar to the two that you spoke about in court in order

11   to provide bases for infringement opinions; correct?

12          MS. ALBERT:  Objection.  I think now we're

13   retreading the trial record, and that's not relevant.

14          MR. THOMASCH:  I'm not retreading the trial

15   record.  I am --

16          THE COURT:  What are you asking?  I don't even

17   understand the question, to tell you the truth.

18          MR. THOMASCH:  I'm asking him whether he has

19   previously, and he has at trial, I understand that, but

20   has he previously done demonstrations --

21          THE COURT:  In his other work as an expert, has

22   he done demonstrations?

23          MR. THOMASCH:  In the course of this case, Your

24   Honor, I'll limit it to.

25          THE COURT:  What does that have to do with

```
 1   anything if they're not in evidence here?
 2          MR. THOMASCH:  I would like to contrast the
 3   demonstrations he did before with the demonstrations that
 4   he --
 5          THE COURT:  Demonstrations he did at trial?
 6          MR. THOMASCH:  Yes.
 7          THE COURT:  With demonstrations he did here.
 8          MR. THOMASCH:  Yes.
 9          THE COURT:  Objection sustained.
10   Q    One last -- withdrawn.
11          MR. THOMASCH:  Nothing further, Your Honor.
12          THE WITNESS:  Thank you.
13
14                  REDIRECT EXAMINATION
15   BY MS. ALBERT:
16   Q    Good morning, Dr. Weaver.
17   A    Good morning, Mrs. Albert.
18   Q    Do you know whether or not the inventory control
19   modules sold by Lawson has a program enabling loading of
20   catalogs into the item master?
21   A    I know it does.
22   Q    Can you tell me whether or not the user of the
23   demonstration system that's reflected in the screen shots
24   of PX-1134-A maintains multiple catalogs in the item
25   master and connections to multiple Punchout catalogs?
```

1    A    Yes, it does.

2    Q    Now, with respect to the demonstration illustrated in

3    the slides of PX-1134-A, can you tell me whether or not

4    the requisition is built when an item is placed in the

5    requisition lines, or is it built at the time that the

6    release button is clicked?

7              MR. THOMASCH:  Objection; very close to leading,

8    Your Honor.  I think the proper question for her own

9    witness is how is it built or when is it built.

10             THE COURT:  Overruled.

11             MR. THOMASCH:  The question is suggesting the

12   answer.

13             THE COURT:  Overruled.  I don't think it does.

14   Q    Can you tell me whether or not the requisition is

15   built by the Lawson system when the item is placed in the

16   requisition lines, or is it built at the time when the

17   release button is clicked?

18   A    It is built after you click on the release button and

19   you get the popup window telling you that the requisition

20   has been created.

21   Q    Is it the user of the system that queries the

22   inventory database of the Punchout vendor?

23   A    Yes.

24   Q    Is it the user of the system that receives the

25   purchase order acknowledgment report and can then

1    determine whether or not an item ordered is available in

2    the vendor's inventory?

3    A    Correct.

4    Q    Can we look at claim 26?  Now, with respect to the

5    plain language of the fourth element of claim 26, does

6    that element require that a requisition built by the

7    system user include items associated with multiple

8    vendors?

9    A    No.

10         MR. THOMASCH:  Objection, Your Honor.  Calls for

11   the witness to give a claim construction on what does the

12   claim require, and the Court has not done a claim

13   construction on this, and our witness was precluded from

14   offering his opinion about what was required by this step,

15   and I think it's a matter for the Court and not for Dr.

16   Weaver.

17         THE COURT:  I would agree with that except that

18   you asked him about it and you asked him what his opinion

19   was and opened the door to it.  And she didn't object to

20   it.  I would have sustained the objection.

21         MR. THOMASCH:  I asked if that's his opinion.

22   Ms. Albert asked what is required as if it were a ruling

23   from the Court.  If she wants to rephrase as to his

24   opinion, I will withdraw.

25         THE COURT:  I think that's a legitimate request

1   for revision.

2   Q    In your opinion, does the plain language of claim 26

3   require that a requisition built by the system user

4   include items associated with multiple vendors?

5            THE COURT:  Wait a minute.  What you are asking

6   him -- in his opinion in forming the infringement analysis

7   did he hold that opinion; is that right?

8            MS. ALBERT:  Yes, correct.

9            THE COURT:  All right.

10  A    It does not require multiple items from multiple

11  vendors in a single requisition.

12           MS. ALBERT:  Thank you.  Nothing further.

13           THE COURT:  All right, can he be excused?

14           MS. ALBERT:  Yes.

15           THE WITNESS:  Thank you, Your Honor.

16           THE COURT:  Can he be excused permanently?  How

17  about you all?

18           MR. THOMASCH:  No, Your Honor.

19           THE COURT:  All right, you can be excused

20  permanently, Dr. Weaver.  We'll take a 20-minute recess

21  and change court reporters.

22

23           (Brief recess.)

24

25

HOMEWOOD - DIRECT                797

1           MS. ALBERT:  Your Honor, for the record,

2    ePlus rests its infringement case.

3           THE COURT:  All right.

4           All right, sir.

5           MR. MARK:  Elizabeth Homewood, please.

6

7       ELIZABETH HOMEWOOD, called by the Defendant, first

8    being duly sworn, testified as follows:

9

10      DIRECT EXAMINATION

11   BY MR. MARK:

12   Q    Good morning, Ms. Homewood.

13   A    Good morning.

14   Q    Would you lean into the microphone a little bit or

15   move it closer to you and then give your name to the

16   court reporter and spell your last name, please?

17   A    Elizabeth Homewood, H-O-M-E-W-O-O-D.

18   Q    Ms. Homewood, where do you work?

19   A    I work for Infor.

20   Q    What do you do there?

21   A    I'm the senior director for support operations.

22           THE COURT:  You're what?

23           THE WITNESS:  Senior director for support

24   operations.

25   Q    What is the support option?

HOMEWOOD - DIRECT                      798

1   A    Support operations is the department that's

2   responsible for providing support to our customers if

3   they have questions on the software or if they're

4   experiencing a problem running the software, or

5   anything like that, they reach out to us to answer

6   those questions.

7   Q    How long have you worked for Infor?

8   A    Just over three years.

9   Q    By Infor with the three years, are you including

10  within that working for Lawson?

11  A    I'm sorry, yes.

12         THE COURT:  Is Lawson still an extant company

13  or has it been merged into Infor?

14         THE WITNESS:  It was merged into Infor just

15  over a year ago, I believe.  It's no longer an

16  affiliate.  It's part of Infor now.

17         THE COURT:  And it didn't exist anymore?

18         THE WITNESS:  Correct.

19         THE COURT:  So if I wanted to Google Lawson,

20  I'd come up with its past, but not its presents?

21         THE WITNESS:  Correct.

22         THE COURT:  Not that I am.

23  BY MR. MARK:

24  Q    Can you just give a brief overview of your career

25  background and the work you've done before you came to

1    Lawson?

2    A    Prior to Lawson I worked for a company called Soft

3    Brands, Incorporated.  And I worked in -- I started in

4    their technical consulting team for a few years.  Then

5    I spent about 15 years in their support operations

6    department at Soft Brands.  And then in 2009, I left

7    Soft Brands and went to Lawson in their support

8    operations team.

9    Q    So, adding up, you've had about 18 years of

10   experience in software and support operations?

11   A    Yes.

12   Q    Let me direct your attention to May 2011.  Were

13   you aware towards the end of that month that this

14   court issued an injunction involving certain Lawson

15   software products?

16   A    Yes, I was.

17   Q    How did you become aware of it?

18   A    I was notified of the initial notification of the

19   injunction by my boss at the time, Nancy Anderson.

20   Q    Were you given responsibilities at Lawson for

21   carrying out actions by the company to comply with the

22   Court's injunction?

23   A    Yes, I was.

24   Q    What responsibilities were you given?

25   A    I was given responsibilities to help with the

1   ceasing of the support aspect of that.  So do you want

2   me to go into a specific --

3   Q   Ceasing?  Just for the court reporter, was that

4   c-e-a-s-i-n-g?

5   A   Correct.

6   Q   It sounded like CC at first.

7   A   Sorry.

8   Q   And about when did you become involved?  About

9   when specifically, do you remember, did you get

10  involved with that?

11  A   I believe it was on the morning of the 25th of

12  May.

13  Q   Let me ask you to turn to the binder that's in

14  front of you to the tab with Exhibit 563, Defendant's

15  Exhibit 563.  Do you see that?

16  A   Yes.

17  Q   Do you recognize this document?

18  A   Yes, I do.

19  Q   Did you prepare it?

20  A   Yes.

21         MR. MARK:  Your Honor, this document is on

22  the agreed upon list and I move it into evidence.

23         THE COURT:  It's admitted.

24         MR. STRAPP:  No objections.

25         (Defendant's Exhibit 563 is admitted.)

1    Q    Now, does this document set forth a timeline of

2    activities that you were involved in in connection

3    with implementing Lawson's response to the Court's

4    injunction?

5    A    Yes.  It would be their activities that I was

6    involved in in some way, yes.

7    Q    The timeline begins on May 25.  Could you read

8    that entry into the record, please?

9    A    Received initial notice to discontinue service,

10   support and distribution of collateral of RSS

11   Procurement Punchout not part of RQC and M3 e

12   procurement in the U.S. for all non-healthcare

13   customers while emergency stay is being reviewed.

14   Q    When you first became involved with this

15   implementation activity, had Lawson stopped selling

16   the software defined in the injunction?

17   A    Yes.

18   Q    Let me ask you to turn -- strike that.  In terms

19   of the support operation, how does the support

20   function actually work in terms of customers

21   requesting and receiving support?

22   A    There's a couple ways.  Generally, customers will

23   log onto our customer portal and into what we call the

24   ticket incident management system.  They will enter

25   their information, the question, that gets assigned to

1   a support engineering.  And the support engineer would

2   then follow-up with the customer either via like an

3   email type, typing it into the system, or a phone

4   call.

5   Q   When a customer logs into the system is an

6   electronic record created of the customer putting in

7   its query?

8   A   Yes.  If a customer logs in and enters a support

9   ticket, there is a record of that support ticket in

10  our system.

11  Q   When the customer initiates a request, does the

12  customer have to identify in some way the nature of

13  the problem for which they're seeking support?

14  A   Yes.  Generally, they're required to enter the

15  module and the screen if it's applicable, and then a

16  summary description of what their issue is.

17          THE COURT:  What are we doing here?  I'm not

18  sure where we're heading.

19          MR. MARK:  Your Honor, where we're headed

20  into is describing how the company implemented actions

21  in response some Your Honor's injunction.

22          THE COURT:  Ask her the bottom line question.

23  Did they stop?  She said they stopped selling the

24  software.  Now ask her if they stopped servicing the

25  software.

HOMEWOOD - DIRECT                803

1        MR. MARK:  We actually had testimony from

2   Mr. Hanson on that.

3        THE COURT:  Maybe that's through.  So why are

4   we doing what's she's doing?

5   Q   What's the difference between service and support

6   at Lawson?

7   A   The difference is the services team is responsible

8   for installing, implementing and consulting on the

9   software.  The support team is responsible for

10  answering questions or addressing problems with the

11  software.

12  Q   Let me ask about a third catagory of items.  Are

13  you familiar with the term "maintenance"?

14  A   Yes.

15  Q   What's maintenance?

16  A   Maintenance is the actual code fix or delivery of

17  fixing problems within the code.

18  Q   How is maintenance provided to Lawson customers?

19  A   The development team is responsible for doing the

20  maintenance.  It's provided to the customers through

21  the support team.

22  Q   Maintenance consists, for example, when you have a

23  particular software product and there's an update and

24  there's a patch, a customer maintains their software

25  by going to the website and downloading and installing

1   the patch, right?

2   A    Yes, that would be correct.

3   Q    So that's maintenance as distinguished from

4   support and service?

5   A    Correct.

6   Q    Okay.  Did Lawson stop all three, maintenance,

7   support and service in response to the Court's

8   injunction?

9   A    Yes, we did.

10  Q    Relating to the enjoined products, correct?

11  A    Correct.

12  Q    Okay.  Let's talk about how Lawson stopped the

13  support function because that's your area, right?

14  A    Yes.

15  Q    How many support -- how many people work in the

16  support area for Lawson?

17  A    Currently or --

18  Q    At the time of the injunction, May 2011.

19  A    At that time the Lawson support team was just over

20  320 people or so.

21  Q    Did you disseminate to the support team policy

22  regarding the provision of support after the

23  injunction?

24  A    Yes.

25  Q    How did you do that?

1    A    It was done through a combination of verbal

2    meetings and emails.

3              THE COURT:  Excuse me.  I'm confused now.

4    Did you stop providing support or did you provide

5    support after the injunction?

6              THE WITNESS:  We stopped providing support.

7    Q    Did you communicate the direction to stop

8    providing support to the support technicians?

9    A    Yes, I did.

10   Q    Are you familiar with a Lawson feature called

11   knowledge base?

12   A    Yes, I am.

13   Q    What is knowledge base?

14   A    Knowledge base is an online database or repository

15   of information regarding all of the products where

16   customers can through self service, they log onto the

17   website in the knowledge base, and they can search for

18   information and solutions themselves without ever

19   contacting the support team.

20   Q    Did Lawson change the knowledge base for the

21   products covered by the injunction after the

22   injunction issued?

23   A    Yes, we did.

24   Q    What did Lawson do to the knowledge base for the

25   products covered by the injunction?

HOMEWOOD - DIRECT                    806

1   A   We did a comprehensive search on the terms related

2   to the products and we removed all of the articles,

3   the documentation.  Any patches or information related

4   to the products was taken out of the knowledge base

5   for customer view.

6   Q   So customers could not get after the injunction

7   material from Lawson advising them on how to fix or

8   adjust certain things in the software covered by the

9   injunction, correct?

10  A   That would be correct, yes.

11  Q   Are you familiar with a service --

12          THE COURT:  Excuse me a minute.  Do you

13  dispute that they stopped providing maintenance,

14  support and service for the infringing products,

15  Mr. Strapp?

16          MR. STRAPP:  Yes, we do, Your Honor.

17          THE COURT:  Obviously, they didn't for the

18  people who were covered by the sunset provision.

19  That's, obvious, I would assume, that they continued

20  to do that.

21          MR. STRAPP:  We do --

22          THE COURT:  Do you agree that you continued

23  to do it for the people covered by the sunset

24  provision.

25          MR. MARK:  There were the 277 that were

1    identified for the sunset provision, that's correct,

2    but otherwise we understand that they have contested

3    this and we want to illustrate --

4             THE COURT:  That's what I'm trying to get at.

5             MR. STRAPP:  We do contest the issue.  In

6    fact, we presented evidence they were instructing

7    customers on how to run RSS and RQC in parallel.  That

8    came in yesterday.

9             THE COURT:  That's what you're talking about,

10   that kind of evidence?

11            MR. STRAPP:  In addition to other evidence.

12            THE COURT:  All right.

13        Your questions then about stopping the

14   maintenance, support and service do not pertain to the

15   maintenance, support and service of the adjudged

16   infringing products as to the 277 customers covered

17   under the sunset provision; is that correct?

18            MR. MARK:  That is correct, Your Honor.

19            THE COURT:  Do you understand that to be the

20   case, ma'am?

21            THE WITNESS:  Yes, I do.

22            THE COURT:  All right.

23   BY MR. MARK:

24   Q   Are you familiar, Ms. Homewood, with a service

25   provided by Lawson where it hosts software for its

HOMEWOOD - DIRECT                808

1   customers and actually runs the software for its

2   customers?

3   A    Yes, I am familiar with that.

4   Q    Did Lawson provide hosting services to customers

5   who used the software configurations covered by the

6   injunction?

7   A    Yes, they did.

8   Q    After the injunction issued, what did Lawson do

9   regarding changing the software that had RSS and

10  changing it to RQC for these hosted customers?

11  A    They contacted the customers and collaborated with

12  them to immediately migrate them or change them over

13  to RQC.

14  Q    Are you aware that Lawson also provides system

15  administration services for customers who host Lawson

16  software in their own computer systems, but then use

17  Lawson to administer the software?

18  A    Yes, I am.

19  Q    Did Lawson for those customers who use Lawson

20  system administration for products covered by the

21  injunction, did Lawson change that software from using

22  RSS to installing and implementing RQC?

23  A    Yes, they did.

24  Q    After the injunction was issued, was a team formed

25  at Lawson with various responsibility to carry out

HOMEWOOD - DIRECT                    809

1   steps for complying with the Court's order?

2   A    Yes, there was a functional team put together.

3   Q    You were part of that team?

4   A    Yes, I was.

5   Q    Did it meet regularly?

6   A    Yes, we met at least daily initially.

7   Q    Let me direct you to Plaintiff's Exhibit 1101 in

8   the binder in front of you.

9          THE COURT:  Back at the back there.  All the

10  way at the back.  The last one.

11  Q    The last 1.

12  A    Okay.

13  Q    Do you see the first page is a cover email from

14  Mary Jo Tinture to a long list of people?

15  A    Yes, I do see that.

16  Q    And were you part of the project team?

17  A    Yes, I was.

18         MR. MARK:  Now, Your Honor, I believe this

19  document is on the agreed upon list and I move it into

20  evidence.

21         THE COURT:  All right.  It's admitted.

22         (Plaintiff's Exhibit No. 1101 is admitted.)

23  Q    If you turn to the fourth page of the exhibit

24  you'll see a large spreadsheet.

25  A    Yes, I see that.

1    Q    The spreadsheet is divided with white boxes and

2    occasion light blue rows dividing the white space,

3    correct?

4    A    Yes, it is.

5    Q    Do the blue lines on Exhibit 1101 reflect the

6    different areas of tasks or areas that were being

7    addressed by this team in implementing the response to

8    the Court's injunction?

9    A    Yes, they do.

10   Q    The group met.  Did it meet in person, by phone or

11   by webinar?

12   A    It was generally by phone and WebEx.

13   Q    Now, let's turn to -- strike that.

14        In connection with the support operation which you

15   supervise, could you tell the Court in an average

16   month about how many support queries come into Lawson?

17   A    On an average month for the team that I supervise,

18   about 7- to 8,000.

19   Q    And turn in the binder to Exhibit 1058, which is

20   in evidence.  Are these printouts of the type of

21   support communications you described earlier where a

22   customer will send in a query to Lawson and Lawson

23   will respond?

24   A    Yes, that does look like what these are.

25             THE COURT:  What?  I'm sorry.

1        THE WITNESS:  Yes.

2        THE COURT:  I have a seasonal adjustment.

3        MR. MARK:  I'm enjoying the pollen myself,

4   Your Honor.

5   Q   Are you able to, from your experience, are you

6   able when you look at various of these queries, are

7   you able to gather from the nature of the query what

8   the issue the customer is seeking to have Lawson

9   resolve?

10  A   Generally, I can, yeah.  Not always.

11  Q   Are you able to tell, for example, are there some

12  queries where information is provided that allows

13  someone to interpret whether the customer is actually

14  running RQC?

15  A   I'm sorry.  Could you repeat that?

16  Q   Is there information in some of these queries that

17  allows you to understand whether from the query you

18  can tell that the customer is running RQC?

19  A   Yes.  You often can tell that.

20  Q   Turn if you would to page with the Bates No.

21  ending 415.  I think it's the fourth page of the

22  document.

23        THE COURT:  Ending what?

24        MR. MARK:  415.  I'm sorry.  114815.

25  Q   Do you see at the bottom of that page case 126805?

HOMEWOOD - DIRECT                    812

1    A    Yes, I see that.

2    Q    And you see a dialogue that is initiated, I guess,

3    by involving a particular customer there between Linda

4    Ueland and Debbie Gunn?

5    A    Yes, I see that first entry.

6    Q    Do you see in the entry 6/7/2011 at 3:00:44 from

7    Debbie Gunn to Scott Hanson where it says, "Hi, Scott,

8    I received this error after installing RQC." Do you

9    see that?

10   A    Yes.

11   Q    Is that an indication that the customer has

12   installed RQC?

13   A    Yes, absolutely.

14   Q    Do you see in the response below that in reference

15   to a computer file RQC_config.XML?

16   A    Yes, I see that.

17   Q    Is that a file that is associated with implemented

18   RQC on a customer's system?

19   A    Yes, it is.

20   Q    Turn if you would to the page with the Bates

21   numbers ending 115251.

22   A    Okay.

23   Q    Do you have that?

24   A    Yes, I do.

25   Q    Do you see there a case -- I'm sorry.  I gave you

HOMEWOOD - DIRECT                813

1  the wrong page.  The next page ending in 252.  The

2  case No. 132006.

3  A    Yes, I see that.

4  Q    Do you see the entry for June 21, 2011, at

5  9:29:55 p.m?

6  A    Yes, I do.

7  Q    Do you see the reference there where Anna Perez is

8  asking Mike Meyer, "Hi, Mike.  Please send your

9  RQC_config.XML file for my review."  Do you see that

10 entry?

11 A    Yes.

12 Q    Does that indicate that the customer is running

13 RQC on its system?

14 A    Yes, it does.

15 Q    Turn if you would to the page ending --

16           THE COURT:  Is the bottom line here that

17 she's reviewed the records and sees evidence that some

18 of the customers are running RQC?

19           MR. MARK:  The contention has been made --

20           THE COURT:  Is that what you're asking?

21           MR. MARK:  That's the bottom line.

22           THE COURT:  Ask her that question.  That will

23 kind of get us where we're going.  And then maybe the

24 next question is:  Were there some that didn't quite

25 make it?  Were there some -- you know, we can get to

1   the bottom line without going through every entry in

2   the document.

3   BY MR. MARK:

4   Q    Taking the judge's question, you're aware from

5   reviewing these records that there are customers who

6   after the RQC upgrade to that new redesigned product

7   was made available they implemented RQC, correct?

8   A    Correct.

9   Q    And that activity started right from when the

10  injunction was entered and carried through, correct?

11  A    That's correct.

12  Q    Now, after the injunction was issued, are you

13  familiar with the term decommission notice?

14  A    Yes, I am.

15  Q    What is a decommission notice?

16  A    A decommission notice is the notice to our

17  customers that we're ceasing or stopping development

18  and further sales or any related activities to a

19  particular product.

20  Q    Did Lawson issue a decommission notice for RSS?

21  A    Yes, we did.

22  Q    Turn if you would to Defendant's Exhibit 557 in

23  front of the book.  Is that the -- do you recognize

24  that as the decommission notice for RSS?

25  A    Yes, I do.

HOMEWOOD - DIRECT                    815

1          THE COURT:  What exhibit is it?  I'm sorry.

2          MR. MARK:  Defendant's Exhibit 557.

3          THE COURT:  All right.

4          MR. MARK:  Your Honor, this is on the agreed

5     upon list and I would move it into evidence.

6          THE COURT:  It's admitted.

7          (Defendant's Exhibit No. 557 is admitted.)

8     Q    After a product is decommissioned, can anyone with

9     the product -- is maintenance available on that

10    product anymore?

11    A    No, not once it's been decommissioned.

12    Q    If someone buys or licenses Lawson software and

13    then after a time decides not to continue in a support

14    or maintenance relationship with the company, are

15    those people normally able to receive updates or

16    maintenance, whatever, on the product that they might

17    still be running on their computers?

18    A    No.  If a customer is not maintaining activity

19    maintenance on a product, then they are not entitled

20    to receive maintenance updates, patches, or any type

21    of support on that.

22          THE COURT:  Does active maintenance mean

23    there's some kind of contractual arrangement and they

24    pay you for it or what do you mean by active

25    maintenance?

HOMEWOOD - DIRECT                    816

1          THE WITNESS:  Yes.  What I mean is they have

2    paid for maintenance on that product and it's part of

3    their contract.

4          THE COURT:  From time to time you get a

5    notice -- well, you can review your maintenance

6    program on this even though --

7          THE WITNESS:  Right.  So there's a regular

8    renewal period on the products and the customers

9    always have the option of whether or not to

10   maintaining that relationship and to pay for that

11   maintenance.

12         THE COURT:  They don't, they don't get the

13   maintenance you're sending out.  If they do, they do.

14         THE WITNESS:  Correct.

15   Q   Now, in connection with notification to customers,

16   you're aware that Lawson sent copies of the injunction

17   to every customer that had at some point licensed the

18   any one of the infringing configurations?

19   A   Yes, I'm aware of that.

20   Q   When I say "any customer," did that notice go to

21   customers who were not on any kind of activity

22   maintenance with the company?

23   A   Yes, it did.  It went to all customers.

24         THE COURT:  All customers --

25         THE WITNESS:  That had licensed the product

HOMEWOOD - DIRECT                817

1  at any point in time whether they were active or

2  inactive.

3  Q    Was RQC made available for free to anyone who had

4  at any time licensed one of the infringing

5  configurations?

6  A    Yes, it was.

7  Q    So even for a customer who was no longer in an

8  active relationship with Lawson, the new product was

9  made available to them, correct?

10 A    Yes, it was.

11 Q    About how many customers make up that universe

12 that the notice went to between those on maintenance

13 and those who were no longer on maintenance when the

14 injunction issued?

15 A    I believe that number was around 864.

16 Q    How many in that 860 or so were no longer on

17 active maintenance in May of 2011?

18 A    No longer on active maintenance for the product

19 was around 370, 380.  Something like that.

20 Q    Now, in terms of stopping support for Lawson

21 customers, did Lawson have a policy -- what was

22 Lawson's policy after the injunction issued regarding

23 the support it would provide?

24           MR. STRAPP:  Objection; asked and answered.

25           THE COURT:  I think you have.

HOMEWOOD - DIRECT                    818

1   Q   Let's then cut to the end.  Are you aware now

2   about how many customers of Lawson as of May 2011 had

3   Configurations 3 or 5 at any point?

4   A   Yes.

5           THE COURT:  Configuration 3 or 5 what?  I

6   lost the last word.

7   Q   How many had Configurations 3 or 5 as of May 2011.

8           MR. STRAPP:  Objection.  Can we establish the

9   foundation that the witness understands what

10  Configurations 3 and 5 are?

11          THE COURT:  Do you know?

12          THE WITNESS:  Yes.

13          THE COURT:  Do you know what those are and

14  what's been introduced here?

15          THE WITNESS:  Yes, I'm aware.

16  Q   You have seen the description of the components of

17  the Lawson products may make up Configuration 3 and 5,

18  correct?

19  A   Yes.

20  Q   How many customers are in that as of May 2011 who

21  had Configuration 3 or 5?

22  A   About 135.

23  Q   Is Lawson providing any type of maintenance or

24  support to any customer who's running its procurement

25  software Configuration 3 or 5 where that person is

HOMEWOOD - DIRECT                    819

1    either not running RQC or not running anything?

2            MR. STRAPP:  Objection.  Vague as to time,

3    Your Honor.

4    Q    Today.

5            THE COURT:  Today?

6    Q    Today.

7    A    I'm sorry.  Could you repeat the question?

8    Q    I'll try it again.  Is Lawson providing

9    maintenance or support to any customer who had license

10   Configuration 3 or 5 as of May 2011 where that

11   customer is not today either running RQC or is not

12   running either RQC or RSS?

13           MR. STRAPP:  Objection, Your Honor.  I'm

14   not --

15           THE COURT:  I understand the part about RQC.

16   I don't understand the last part.  So let's have

17   her --

18           MR. STRAPP:  Your Honor, I have a different

19   objection as well.  We asked an interrogatory during

20   discovery regarding which customers had actually --

21   were running RQC.  We asked that very question.  And

22   we received an answer that Lawson doesn't know who's

23   running RQC.  They don't know a single customer.  They

24   couldn't identify any for us.  They know who had

25   downloaded RQC, but they didn't know who had

1  implemented and installed RQC.  And we waited.

2          THE COURT:  That's the extant answer of the

3  company?

4          MR. STRAPP:  Correct.  Never supplemented

5  during the course of the discovery.  I have a copy of

6  the interrogatory to hand up to Your Honor.

7          THE COURT:  Hand it to him.  He's going to

8  have to deal with it.  You can show it to me after he

9  looks at it.

10          MR. STRAPP:  Here's a copy for, Your Honor.

11          MR. MARK:  Here is part of Plaintiff's

12  Exhibit 20, 1269, which I believe is in evidence.

13          THE COURT:  I have 1269 up here already.  I

14  have a copy of it already.

15          What interrogatory is it, Mr. Strapp?

16          MR. STRAPP:  Response to interrogatory No. 3.

17          THE COURT:  Three?

18          MR. STRAPP:  Yes.  I'm referring in

19  particular to the part of the answer at the top of

20  the --

21          THE COURT:  Wait just a minute.  I need to

22  get it.  Okay.  The question is, "Identify all

23  customers of any infringing system who have, (A)

24  uninstalled and/or removed RSS; (B) not uninstalled or

25  removed RSS; (C) installed and implemented RQC and not

HOMEWOOD - DIRECT                    821

1   installed or implemented RQC.  And then what's the

2   answer?

3           MR. STRAPP:  Your Honor, if you carry over to

4   the next page at the top, the first sentence at the

5   top of that page that begins "Lawson is therefore not

6   in possession."

7           MR. MARK:  Let me ask Your Honor to start

8   reading --

9           THE COURT:  Just a minute.  Let me read it.

10  Okay.  Go ahead.

11          MR. MARK:  Look at the preceding page.

12          THE COURT:  All right.

13          MR. MARK:  Start reading at the --

14          THE COURT:  Where do you want me to read?

15          MR. MARK:  Start at the last two lines of

16  that page.

17          THE COURT:  For privacy purposes?

18          MR. MARK:  Yes.

19          THE COURT:  All right.  So they have said,

20  though, in the next sentence that they are not in

21  possession of the information as to any of those

22  categories.

23          MR. MARK:  As of -- may I lay a foundation

24  for why this witness should be allowed to go further

25  into this matter?

HOMEWOOD - DIRECT                822

1          THE COURT:  You should -- if you want to go

2     into this, you should have updated the answer to that

3     interrogatory.

4          MR. MARK:  Your Honor, the answer to the

5     interrogatory was, in fact, as Your Honor has heard in

6     earlier testimony, this answer is correct as of that

7     date.  At Ms. Homewood's deposition --

8          THE COURT:  I don't care about that.  You

9     have to update the answer to the interrogatory if you

10    have a different answer.

11         MR. MARK:  And further, the answer and the

12    information, as counsel knows, has been supplied to

13    counsel regarding Configurations 3 and 5, plus

14    Ms. Homewood received an accusation --

15         THE COURT:  You're saying you did update?

16    When did you update the answer to the interrogatory?

17         MR. MARK:  In connection with --

18         THE COURT:  When connotes a date.  And then

19    he can find it in his files.

20         MR. MARK:  I will agree that the

21    interrogatory was not updated but information was

22    otherwise made available through the discovery and

23    deposition process.

24         MR. STRAPP:  Your Honor, if he could

25    specifically tell me exactly when that information was

1    supplemented that's responsive to this interrogatory,

2    by whom in discovery, whether it was in a specific

3    document or discovery response, I'll take a look, but

4    I don't believe that that's the case.

5         THE COURT:  Go back there and talk to him and

6    tell him.  Go back there and tell him so he can find

7    it, if you would.

8         MR. STRAPP:  Your Honor, I think this is

9    going to come up in cross-examination as well because

10   Ms. Homewood testified at her deposition she was not

11   in possession of this information, and they never

12   supplemented her testimony either.

13        THE COURT:  You are in disagreement over what

14   she said at her deposition.  Go back to the table and

15   point him to where he should look and then maybe we

16   can resolve it.

17             (Counsel are conferring.)

18        THE COURT:  You-all can't solve it?

19        MR. MARK:  We can't solve it.

20        THE COURT:  The rule says under Rule 26(e)

21   that you have to timely supplement or correct a

22   disclosure response if you learn that the response is

23   incomplete or incorrect and if the additional

24   corrective information has not otherwise been made

25   known to the other party during the discovery process

1   or in writing.

2          So you must point specifically to someplace

3   in the discovery process or a writing that corrects

4   this information or you cannot get it in.  So that's

5   all I'm asking you to do.  To identify precisely

6   where.  Obviously, it doesn't have to be a

7   supplemental answer, although that's the preferable

8   course to do, but you have to identify where.  If you

9   say there is no updated interrogatory, you have to

10  then point to someplace otherwise in the discovery

11  where this information was provided.  So point.

12         MR. MARK:  Your Honor, I'll make it short.  I

13  cannot point to that, but may I make a brief legal

14  argument on the issue?

15         THE COURT:  I'll hear it.

16         MR. MARK:  Two sentences.

17         THE COURT:  Let's hope it's a good one.

18         MR. MARK:  I don't know if it will be good

19  enough, but I'll make the point.  The provision that

20  Your Honor cited in 26(e), we are well familiar with

21  it.  What it goes to is whether the information

22  provided, whether information comes to an attorney

23  afterwards showing that the information provided at

24  the time was correct or not.  There is nothing

25  incorrect about the interrogatory answer that Mr.

HOMEWOOD - DIRECT                    825

1    Strapp brought to your attention.

2           At Ms. Homewood's deposition, the allegation

3    was made that Lawson buried its head in the sand

4    regarding customer information.

5           THE COURT:  This is not helpful.  You've got

6    to point to somewhere I can deal with it.  You said

7    you can't, but there's some legal argument.  So far

8    I've heard you say that the rule doesn't mean what it

9    says.  I conclude to the contrary it does.

10          MR. MARK:  I understand Your Honor's ruling.

11   The position that I would advocate is that with

12   respect to that reading of the Rule 26(e) under

13   "precedents" does not govern this situation because

14   the information that Ms. Homewood is prepared to

15   provide regarding the current status does not come

16   under the supplementation rule.

17          THE COURT:  Because you have to correct this

18   information?

19          MR. MARK:  Correct.

20          THE COURT:  I understand what you said.

21          MR. STRAPP:  Your Honor, my response is this

22   is exactly what Rule 26 and Rule 37 is designed to

23   preclude.  A surprise at hearing with information that

24   wasn't provided during discovery.

25          THE COURT:  Thank you.  The objection is

 1  sustained.

 2          MR. MARK:  May I ask the Court to accept as

 3  an offer of proof just marked for identification as

 4  the offer Defendant's Exhibit 562A reflecting the

 5  information --

 6          THE COURT:  You can put in an offer of proof

 7  until the cows come home, but if you think the Federal

 8  Circuit is going to pay a lot of attention to that, I

 9  don't think it's going to, but you can put it in.

10  What is it?

11          There comes a time when you simply have to

12  acknowledge that you haven't obeyed the rule and

13  you've got to quit.  And you-all need to learn that.

14  And offers of proof are appropriate if, in fact,

15  they -- and they are called for, and they are

16  recognized, and I appreciate it and encourage lawyers

17  to do it.  But it's getting a little out of hand now.

18  So it's Exhibit 562A.  It's in the record, but it's

19  not admitted.

20          MR. MARK:  Thank you, Your Honor.  No further

21  questions.

22          THE COURT:  Thank you.

23          MR. STRAPP:  Your Honor, I would just note

24  562A, I'm seeing it for the very first time.  I guess

25  this just proves the point.  This is something I've

HOMEWOOD - DIRECT                827

1    never seen before.

2             THE COURT:  You have noted that, too.  You

3    can deal with it.

4             Do you have a notebook for her?

5             MR. STRAPP:  Yes, we do.

6             THE COURT:  Let's get them up so we can get

7    going.

8             MR. STRAPP:  Can we put up on the screen

9    Exhibit 583.  I'm sorry.  Plaintiff's Exhibit 1058.

10            THE COURT:  1058?

11            MR. STRAPP:  Yes.

12            THE COURT:  I think that's in that other

13   notebook, isn't it?

14            MR. STRAPP:  That's correct.

15

16      CROSS-EXAMINATION

17   BY MR. STRAPP:

18   Q   In your white notebook, can you turn to

19   Plaintiff's Exhibit 1058, please?

20            THE COURT:  Do you see that, Ms. Homewood?

21            THE WITNESS:  Yes, I see that.

22   Q   Okay.  Now, these pages aren't numbered in

23   sequential order, but if you could turn to the ninth

24   page, which has a Bates No. RQC 115250.  Tell me when

25   you're there.

1   A    Yes, I see that.

2   Q    Do you see in the middle of the page there there's

3   a customer 6178 Wi. Schools Consortium?

4   A    Yes.

5   Q    Is that Wisconsin Schools Consortium?

6   A    Yes, I believe it is.

7   Q    Is that a non-healthcare customer?

8   A    Yes.

9   Q    Can you look, please, at the second entry under

10  case 124617.  Do you see that there is a date, May 27,

11  2011?

12  A    Yes.

13  Q    Do you understand that's after the Court's

14  injunction order, correct?

15  A    Yes.

16  Q    Do you see that there's references in this

17  question that says "Were they using RSS XML and

18  Procurement Punchout just fine and now they're getting

19  this error?  If so, what installs or what changed on

20  their system?"

21  A    Yes, I do see that.

22  Q    Okay.  Do you see down at the next time entry

23  there, May 27, 2011, 3:52:45 p.m.  There's a dialogue

24  and it states, "Hi, Mindy - this is an RSS upgrade.

25  And the error occurs afterward."  Do you see that?

HOMEWOOD - CROSS                           829

1   A    Yes.

2   Q    And then if you go down a few lines later to the

3   4:36:51 p.m. entry, am I reading this correctly:  "So

4   this error is only happening to some users when using

5   RSS and Punchout?"  Do you see that?

6   A    Yes.

7   Q    Can you tell me in your role as the global support

8   director for Lawson what your interpretation of this

9   discussion is here regarding the Wisconsin Schools

10  Consortium on May 27, 2011?

11  A    Yes.  It appears to be support engineer and

12  customer working on an issue, a product issue, with

13  the RSS.

14          THE COURT:  A what?

15          THE WITNESS:  A product issue for RSS.

16  Q    And Punchout?

17  A    Punchout is referenced here, yes.

18          THE COURT:  Is that your way of saying that

19  there's support going on for RSS and Punchout as of

20  that date?

21          THE WITNESS:  Yes, that's what's shown here.

22          THE COURT:  All right.

23  Q    Just to be clear, that would be after the

24  injunction for a non-healthcare customer, correct?

25  A    That would be correct.

1   Q    And your understanding of Configuration 3 is it

2   includes RSS and Punchout, correct?

3   A    That's correct.

4   Q    Configuration 5 also includes RSS and Punchout,

5   correct?

6   A    That's correct.

7   Q    Could you on that same very page, can you go up

8   and you'll see towards the top there's a case 160235?

9   Do you see there's a date there, September 27, 2011?

10  A    Yes, I see that.

11  Q    September 27, 2011 was after the date of the

12  injunction, correct?

13  A    Yes, that's correct.

14  Q    Now, do you see in the dialogue here on the right,

15  it says, "Hi, Matt.  Yes, both RSS and RQC can run at

16  the same time.  It really just means that you would

17  now have three ways to enter in a requisition; RQ10,

18  RSS and RQC."  Did I read that correctly?

19  A    Yes, you did.

20  Q    And as the global support director for Lawson at

21  the time, what's your interpretation of this dialogue

22  that's going on September 27, 2011?

23  A    It appears support is responding to a question or

24  an inquiry regarding RSS and RQC.

25  Q    What's the nature of the inquiry?  What's your

HOMEWOOD - CROSS                    831

1   interpretation of the nature of the inquiry in your

2   role as global support director?

3   A    It's hard to interpret everything, but looks like

4   a response to a question as to whether RSS and RQC can

5   run at the same time.

6   Q    Do you believe that the answer that was given by

7   the support personnel is an accurate and consistent

8   answer regarding the capability of RSS and RQC to run

9   at the same time?

10            MR. MARK:  Objection to foundation.

11            THE COURT:  Overruled.

12            THE WITNESS:  I'm sorry?

13   Q    I'll ask that question again.  In your role as

14   global support director, you do you believe that the

15   information that was provided to this customer from

16   support personnel regarding RSS and RQC being able to

17   run at the same time is accurate and correct

18   information?

19   A    I believe it's a limited answer in the sense that

20   she's not going into the detail as to what would be

21   required, but it's accurate that it could be done.

22   Q    Do you have any reason to believe that it was not

23   done by customers?

24   A    No.

25   Q    And a customer would ask a question about running

1  RQC and RSS in parallel to Lawson's support only if

2  they wanted to run RQC and RSS in parallel?

3              MR. MARK:  Objection, speculative.

4              THE COURT:  Sustained.

5  Q   Could you turn to the exhibit that's in this white

6  notebook that you described as a decommission notice.

7  I believe it's DX-557.  And if we could put that up on

8  the screen, please.

9      I want to direct your attention to the middle of

10 the document.  There's a question in bold that says

11 when is RSS being decommissioned.  Do you see that?

12 A   Yes, I do.

13 Q   Do you see that for a customer type, non-U.S.

14 customers outside the United States, the effective

15 date is November 23, 2011?

16             MR. MARK:  Beyond the scope, Your Honor.

17 Objection.

18             THE COURT:  I thought you asked her about the

19 decommission notice.  Did you not?

20             MR. MARK:  I didn't go into outside the

21 United States and outside the United States is beyond

22 the scope of the United States.

23             THE COURT:  You really don't want to make

24 that objection, do you?  Come on.  Let's go.

25 Overruled.

HOMEWOOD - CROSS                    833

1   Q    Do you see where I was reading from about non-U.S.

2   customers outside the United States effective date

3   November 23, 2011?

4   A    Yes, I see that.

5   Q    Is this decommission notice, am I interpreting it

6   correctly to read that Lawson's support personnel were

7   authorized to provide maintenance and support for

8   customers of the infringing configurations so long as

9   they were outside the United States from the

10  injunction up until November 23, 2011; is that

11  correct?

12  A    At that point in time, yes.

13  Q    Okay.  And is it also correct that Lawson

14  personnel providing support to the non-U.S. customers

15  were based in the United States?

16  A    Potentially, yes.

17           THE COURT:  What did you say?  Officially?

18           THE WITNESS:  Potentially.  We have support

19  personnel in multiple locations.

20           THE COURT:  So they may have been inside the

21  United States, but they may have been elsewhere

22  outside the United States; is that what you're saying?

23           THE WITNESS:  Correct.

24  Q    Where were you working at this time on June 3,

25  2011?  Where were you based?

HOMEWOOD - CROSS                834

1   A   I was based in St. Paul, Minnesota.

2   Q   Were other personnel in the support organization

3   that were also based in St. Paul, Minnesota at that

4   time?

5   A   As I mentioned, we have personnel in several

6   locations.

7   Q   About how many employees in the support personnel

8   team were based in St. Paul, Minnesota, for Lawson as

9   of June 3, 2011?

10  A   Approximately, maybe 100 to 125.

11  Q   How many were there total at that time in the

12  support personnel team or organization for Lawson?

13  A   About 325.

14  Q   How many out of those 325 were based outside the

15  United States?

16          THE COURT:   325 minus 100 is 225.

17  Q   I think there's some in St. Paul.  Are there

18  others in other locations in the United States?

19  A   Exactly.  So outside the United States were

20  probably roughly around 200, just under 200.

21  Q   Could you turn to Defendant's Exhibit 563 in the

22  same notebook, please.  This is the document entitled,

23  Timeline for ePlus Patent Litigation."

24  A   Okay.

25  Q   Who asked you to put together this document?

HOMEWOOD - CROSS                    835

1   A    I believe it was my boss at the time, Nancy

2   Anderson.

3   Q    Nancy Anderson?

4   A    Yes.

5   Q    Is she still employed with Lawson?

6   A    No, she's not.

7   Q    Can you look at the entry under May 26 and

8   specifically the last paragraph under that last

9   sentence under that entry?  Do you see it says,

10  "Communicated with is SCM team to reassign existing

11  cases to Mindy, Anna, and reinforced that we are no

12  longer to work cases related to RSS.  They should be

13  stalled with we are researching your issue."  Do you

14  see that?

15  A    Yes, I see that.

16  Q    Were you aware of any reason why customers were

17  not told why they weren't provided with support or

18  maintenance for RSS at that time and were instead

19  provided a message of we are researching your issue?

20  A    At that point we were -- it was my understanding

21  we still had an emergency stay in place that we were

22  waiting on a ruling, and we didn't want to just turn

23  off the customer.  So we ceased working on them, but

24  we didn't do anything more beyond that.

25  Q    So your understanding as the global support

HOMEWOOD - CROSS                    836

1    director at the time was there was an emergency stay

2    that had been in place for the injunction entered by

3    the Court?

4    A    There was an emergency stay that was being

5    requested.

6         THE COURT:  You're saying when you use the

7    term "emergency stay," you mean you were asking for an

8    emergency stay, not that there had been one issued; is

9    that right?

10        THE WITNESS:  Cross.

11        THE COURT:  I think she just was using the

12   shorthand term.

13   Q    Okay.  If you could move down to the next day, May

14   27.  And the second sentence there.  Do you see that

15   it says, "Case admin skills updated to remove all

16   engineers from RSS product areas with the exception of

17   Mindy, Andrea and Anna"?  Can you explain to me what

18   that sentence means?

19   A    Case admin skills are -- the case was the support

20   ticket system at the time, and the admin skills were

21   the way the case would route or the system would route

22   incoming ticket incidents.  So by updating the skills

23   to remove all engineers if a case were to come in, it

24   would go to Mindy, Andrea or Anna.

25        THE COURT:  Does that mean that Mindy, Andrea

HOMEWOOD - CROSS                    837

1    and Anna were the people assigned to deal with

2    inquiries about the RSS product?  Is that what that

3    means?

4              THE WITNESS:  Exactly.

5              THE COURT:  While he's looking, do you know

6    why the date in that November 23, 2011, is used in the

7    decommissioning notice for the healthcare customers

8    and non-U.S. customers?

9              THE WITNESS:  The date for the healthcare

10   customers, it's my understanding that was the

11   exception where those 277 were allowed support and

12   maintenance through until that date.

13             THE COURT:  So you stopped it for the

14   non-U.S. customers at the same time you stopped it for

15   the healthcare customers?

16             THE WITNESS:  That was the intent at that

17   time, yes.

18             THE COURT:  Is that what was going on there?

19             THE WITNESS:  Yes.  At that time that's what

20   we did, yes.

21             THE COURT:  All right.

22   Q    Lawson did not attempt to determine whether

23   customers that had a license to RSS actually

24   uninstalled or removed RSS from their systems, did it?

25   A    I'm sorry.  Could you say that again?

HOMEWOOD - CROSS                    838

1  Q    Lawson did not attempt to determine whether
2  customers that had a license to RSS uninstalled or
3  removed RSS from their systems, did it?
4  A    We did eventually, yes.
5  Q    Ms. Homewood, do you recall being deposed in this
6  case on December 21, 2011?
7  A    Yes, I do.
8  Q    And you recall meeting with me for that deposition
9  in a conference room at Goodwin Procter's offices?
10 A    Yes.
11 Q    Do you recall that Lawson's attorney Mr. Thomasch
12 was there as well?
13 A    Yes.
14 Q    Do you recall you swore an oath to tell the truth
15 in that deposition?
16 A    Yes.
17 Q    And you understood at the time you gave that oath
18 that you were under the same obligation as you would
19 be in court to answer truthfully, right?
20 A    Yes.
21 Q    Could you please turn to the tab in the black
22 binder that says, "Deposition Transcript of Elizabeth
23 Homewood"?  And I would direct your attention to page
24 19 of the document.  And, specifically, line 16.  This
25 is a transcript of your deposition, right?

1        MR. MARK:  What page?

2        MR. STRAPP:  19.

3        MR. MARK:  Of the transcript.

4        MR. STRAPP:  Correct.

5   Q    Is this the transcript of your deposition,

6   Ms. Homewood?

7   A    Yes, it appears to be.

8   Q    All right.  Can you please follow along silently

9   as I read aloud from line 16 on page 19.

10       "And did you attempt to determine whether

11  customers that had a license to RSS have uninstalled

12  or removed RSS from their systems?"

13       Answer:  "Lawson doesn't have that information."

14  Did I read that correctly?

15  A    Yes, you did.

16  Q    And at the time of your deposition on December 21,

17  2011, you were not aware of any specific customer that

18  had previously licensed RSS before the injunction who

19  had uninstalled and removed RSS, right?

20  A    At that time, yes.

21  Q    And December 21, 2011, was about seven months

22  after the Court's injunction, right?

23  A    Yes.

24  Q    You weren't aware of a single customer that had

25  uninstalled RSS?

1   A    Not specifically.  I mean, I'm sure there were

2   some.  If I were to research all the ticket

3   information, I might be able to see that or talk to

4   the SWAT team.

5           THE COURT:  That's kind of guessing, though.

6   That's something you could do.  As of that time you

7   didn't know?

8           THE WITNESS:  Right.

9           THE COURT:  You said earlier today at some

10  point in time you had tried to find out who had

11  uninstalled it.

12          THE WITNESS:  Correct.

13          THE COURT:  When did that happen?

14          THE WITNESS:  That happened early February of

15  2012.

16          THE COURT:  After your deposition?

17          THE WITNESS:  Yes.

18          THE COURT:  All right.

19  Q    Lawson did not attempt to determine whether

20  customers who have downloaded RQC have actually

21  installed and implemented RQC, did it?

22  A    Can you say it again?  I'm sorry.

23  Q    Lawson did not attempt to determine whether

24  customers who had downloaded RQC have actually gone

25  ahead and installed and implemented RQC, did it?

1   A   We wouldn't have any way to determine that, so no.

2   Q   As of your deposition December 21, 2011, you

3   didn't have any idea or even an estimate of how many

4   Lawson customers that had downloaded RQC had actually

5   installed and implemented RQC, correct?

6   A   Correct.

7   Q   Likewise, at the time of your deposition, you

8   didn't even have an idea or an estimate of the

9   customers who had uninstalled and removed RSS, right?

10  A   Correct.

11  Q   Now, customers who have downloaded RQC I think you

12  said can still run RSS; is that correct?

13  A   With certain configurations.

14          MR. MARK:  Objection.  Beyond the scope of

15  direct actually.  Although he did ask a question about

16  it earlier in his own cross.

17          THE COURT:  Actually, I think that there was

18  some of the information you inquired about that had

19  them running it parallel as part of the inquiry.  But

20  in any event, hasn't she already answered the

21  question?

22  Q   Let me move along.

23      You're not familiar with whether anyone at Lawson

24  took any efforts whatsoever to get customers to

25  actually install and implement RQC rather than just

1  installing RQC, are you?

2  A    Not specifically.  I mean, we had the SWAT team,

3  but that was their intent, but --

4  Q    So your answer is you're not aware of any efforts

5  whatsoever that Lawson took to actually get customers

6  to install and implement RQC; is that correct?

7  A    Not beyond testimony SWAT team, no.

8  Q    Let me ask you to turn back to your deposition.

9  This is the tab of your deposition transcript.  This

10  is the deposition at which you swore to tell the

11  truth --

12            THE COURT:  She already acknowledged that and

13  I think we all understand what you do at the

14  commission of a deposition.

15  Q    All right.  Let me direct to you page 113 of your

16  deposition, please.  And can you follow along with me,

17  please, as I read from the transcript starting at line

18  1 of page 113.

19       Now, Mr. Ansberry writes in his email in the

20  middle of the document after he's provided with

21  information from Ms. Orndorf regarding the master list

22  of customers, he writes, "Thanks.  Between us, what is

23  troubling to me is that no one is doing the important

24  part, getting people to switch.  It's no use that they

25  put the vitamins in their are basket.  They were free

1   after all.  They have to be digested.  Heads up.  I'm

2   going to stir things up around getting deployment

3   moving.  Are you familiar with whether anyone at

4   Lawson took any efforts whatsoever to get customers to

5   actually install and implement RQC rather than just

6   downloading RQC?"

7        Answer:  "Not specifically, no."

8            MR. MARK:  Objection.  I don't think -- I

9   don't think that's impeachment of the previous

10  statement if that was the point of reading that.

11           THE COURT:  I think that there is a

12  distinction between the answer given here and the

13  answer given there.

14           Who is Mr. Ansberry?  Do you know?  Is he

15  somebody in Lawson?

16           THE WITNESS:  He was somebody in Lawson.  I

17  don't know specifically what role he had.

18           THE COURT:  All right.

19  Q   Lawson keeps track of what products a customer has

20  using a record called the product configuration,

21  right?

22  A   Correct.

23  Q   Now, if a customer of Lawson downloaded RQC but

24  didn't actually install or implement RQC, am I correct

25  that the product configuration for that customer would

1    nevertheless be updated to show that they had RQC

2    instead of RSS?

3    A    Correct.

4    Q    So a customer of Lawson could have a product

5    configuration that shows that that customer has RQC

6    yet Lawson would have no idea whether the customer was

7    still using RSS, correct?

8    A    Correct.

9    Q    I want to ask you about a few of your co-workers

10   at the time in 2011 that we're discussing, around the

11   time of the injunction.  Do you now an individual

12   named Dan Davidson?

13   A    Yes.

14   Q    And at the time of the injunction, May 2011, Dan

15   Davidson was in charge of Lawson's partner and

16   alliance relationships, right?

17   A    I don't know specifically.  I know he worked in

18   the partner area.  I don't know what title he had or

19   responsibilities.

20   Q    Let me direct your attention to see if I can

21   refresh your recollection.  If I could direct you,

22   please, to page 65, line 2.  And if you could just

23   read to yourself from lines 2 to 5, and let me know

24   whether that refreshes your recollection regarding who

25   Dan Davidson is?

1    THE COURT:  I think that's the same thing she

2  just said, that she wasn't sure of his exact title,

3  but he was in charge of the partner and alliance

4  relationships.

5    Is that what you said earlier or did I

6  misunderstand your answer?

7    THE WITNESS:  No, that is what I said.  I

8  don't know his exact title.  I know he works in the

9  partner alliances area.

10    THE COURT:  Worked in and in charge of are

11  two different things.  I understood you to have said

12  in charge of.  Did you intend to say "worked in" when

13  you first answered the question or now?  You're

14  drawing a distinction between worked in and in charge

15  of.

16    THE WITNESS:  Two years later I know Dan

17  Davidson no longer works at Lawson.

18    THE COURT:  So you don't recall?

19    THE WITNESS:  Yeah.

20  Q   At the time if he was in charge of Lawson's

21  partner and alliance relationships, would that mean he

22  was the primary contact for Lawson's third party

23  service support partners?

24    MR. MARK:  Objection, foundation.

25    THE COURT:  If you know.

HOMEWOOD - CROSS                    846

1  Q    If you know?

2  A    I would have to make an assumption there, yes.

3          THE COURT:  No.  But do you know?

4          THE WITNESS:  No.

5          THE COURT:  All right.  She doesn't know.

6  Q    Let me just direct you back to the very same page

7  of the deposition, and let me ask you to follow along

8  as I read aloud from page 65 line 6.  And this follows

9  the answer you just previously gave regarding Dan

10 Davidson.  And I asked you, Question:  "What does that

11 mean?"

12     And you said, Answer:  "He's the person -- he's

13 the primary contact for our partners or alliances that

14 we have with non-Lawson companies."

15     Does that refresh your recollection regarding the

16 specific responsibility that Dan Davidson had at that

17 time?

18 A    It doesn't necessarily refresh my recollection.

19 Again, I know he worked in the partner area.  I

20 haven't worked with him for a while.  We're two years

21 later here so.

22 Q    Okay.

23          THE COURT:  To the best of your knowledge,

24 you gave an accurate answer when you gave it back at

25 the time of your deposition; is that right?

1          THE WITNESS:  Correct, yes.

2          THE COURT:  Okay.

3    Q    One more individual.  Matthew Bragstad.  Was he

4    the director of application support for the Americas

5    for Lawson at the time of the injunction?

6    A    Yes, he was.

7    Q    Okay.  Could you please display on the screen --

8    let me ask you to turn in your binder first to

9    PX-1034.  This is in the black binder.  And if you

10   could display that on the screen, please.

11       If you look at the bottom of the email exchange

12   here, and that's on the second page of the document,

13   do you see that there's an email from Dan Davidson to

14   Matthew Bragstad and with a copy to you.  The date is

15   June 8, 2011?

16   A    Yes, I see that.

17   Q    Now, Mr. Davidson wrote Mr. Bragstad, "Thanks,

18   Matthew.  As a point of clarification, simply

19   downloading RQC will allow our affected RSS customers

20   to again receive support from Lawson, correct?"  Do

21   you see that question?

22   A    Yes, I do see that.

23   Q    Then if you turn to the next email in the chain at

24   the bottom of page RQC 369859, do you see that Mr.

25   Bragstad replied to Mr. Davidson on June 8, 2011?

1  A    Yes, I see that.

2  Q    And there's a copy of that email to you.  Do you

3  see that?

4  A    Yes.

5  Q    Do you see that Mr. Bragstad replies, "Downloading

6  it changes their configuration.  We have no knowledge

7  if they are running it or not.  So we will support

8  them again."  Did I read that correctly?

9  A    Yes, you did.

10         MR. STRAPP:  Now, Your Honor, I would like to

11  move for the admission over PX-1034 into evidence.

12         THE COURT:  Any objection?

13         MR. MARK:  No objection, Your Honor.

14         THE COURT:  It's admitted.

15         (Plaintiff's Exhibit No. 1034 is admitted.)

16         THE COURT:  Ms. Homewood, is that what was

17  going on, that customers who had RSS, once they

18  downloaded the RQC, they could get support, and there

19  were no questions asked about what was going on?  Is

20  that right?

21         THE WITNESS:  No.  The downloading it would

22  change their product configuration.  They could get

23  support on other products, not RSS, but they could get

24  support on HR, and payroll, and all the products that

25  they own.

1    THE COURT:  How did they get support on RSS

2  for the people who were getting support on RSS that he

3  asked you about at the beginning back in, say, like in

4  September?  How did that happen?  Was it just a

5  mistake?

6    THE WITNESS:  The only RSS, there was a

7  handful of incidents out of the several thousand we

8  get every month that there were a few incidents,

9  isolated incidents where we had an issue.  It was a

10  mistake on the part of the support engineer, and when

11  we discovered it, we put in measures to make sure we

12  stopped the support and that it didn't happen again.

13    THE COURT:  All right.

14  Q   Can you look on your screen, I have a slide up

15  there that's a building block demonstrative exhibit of

16  Configurations 3 and 5.  Do you see that?

17  A   Yes, I do.

18  Q   Is that consistent with your understanding of what

19  software modules make up Configurations 3 and 5?

20  A   Yes.

21  Q   Let me ask you some specific questions.  If you

22  could turn in your notebook just for reference back to

23  PX-1034.  We'll leave this on the screen here.  Now,

24  let's say a customer of Lawson downloaded RQC and that

25  customer had Configuration 5 on their system.  Okay?

1    A    Okay.

2    Q    And the customer didn't actually install and

3    implement RQC but just continued running RSS.  Do you

4    understand my question?

5    A    I believe so, yes.

6    Q    Now, if that customer contacted Lawson after the

7    injunction and asked for support on procurement

8    Punchout, Lawson would provide support for Procurement

9    Punchout, correct?

10   A    Correct.  If they downloaded RQC and the product

11   configuration records showed RQC.

12   Q    That's even if the customer hadn't actually

13   installed and implemented RQC, correct?

14   A    Potentially, yes.

15   Q    And that's even if the customer was still running

16   RSS, correct?

17   A    It could be as we wouldn't know that at that point

18   in time, no.

19   Q    Let's say that same customer said, I've electronic

20   data interchange, and I've a problem.  I need a fix or

21   patch.  I need maintenance or support.  The Lawson

22   support personnel would provide to that customer

23   support and maintenance for electronic data

24   interchange; is that correct?

25             MR. MARK:  Can we ask for clarification of

1    time period.

2    Q    After the injunction.  And let's just say more

3    than six months after the injunction so we're not

4    within the sunset period for anyone.

5    A    Okay.

6    Q    Do you want me to ask the question again?

7    A    If you could, please.

8    Q    All right.  We have a Lawson customer who has

9    Configuration 5.  They download RQC.  They don't

10   install or implement RQC, and they are continuing to

11   run RSS.  Do you understand?

12   A    Yes.

13   Q    And the time period is seven months out from the

14   injunction.  Okay?

15   A    Okay.

16   Q    That customer calls up Lawson support and says, I

17   need maintenance and support for electronic data

18   interchange.  And my question is:  Lawson would

19   provide support for that customer's electronic data

20   interchange module; isn't that correct?

21   A    That is correct.

22   Q    Now, you have that same customer, has RSS running,

23   had downloaded RQC but hadn't done anything.  It's

24   just sitting there on their system, not installed and

25   not implemented, and the customer says to Lawson seven

1    months after the injunction, I need support on all my

2    S3 procurement modules, purchase order, requisitions,

3    inventory control.   I'm having problems with

4    generating purchase orders and I'm having problems

5    creating requisitions.

6         Lawson's support personnel will provide

7    maintenance and support to customer seven months after

8    the injunction; isn't that correct?

9    A    They would provide support initially.   If at any

10   point during that interaction it became apparent they

11   were running RSS, we would stop support at that point.

12   Q    But if the Lawson support personnel were unaware

13   that the customer had actually not uninstalled RSS,

14   they would provide the support we just discussed,

15   correct?

16   A    Correct.

17   Q    And the same question with respect to

18   Configuration 3.   The customer has Configuration 3,

19   downloads RQC, never teaches RQC.   It's just sitting

20   there as a file on their system.   They continue

21   running Configuration 3 with RSS.   They call up Lawson

22   seven months after the injunction and say, Mr. Support

23   Manager at Lawson, I need some help.   My Punchout's

24   not working.   Lawson support will help support and

25   maintain the Punchout module for that customer of

1   Configuration 3 seven months after the injunction

2   who's running RSS, correct?

3   A    Until we discovered if they were running RSS, yes.

4   Q    And Lawson -- excuse me.  Can you please turn to

5   PX-1041 in your binder?

6            THE CLERK:  I'm sorry.  PX what?

7            MR. STRAPP:  1041.

8            Your Honor, I believe this is not objected

9   to.  We would move for its admission into evidence.

10           MR. MARK:  No objection.

11           THE COURT:  It's admitted.

12           (Plaintiff's Exhibit No. 1041 is admitted.)

13  Q    This is a meeting invitation that Jennifer Langer

14  sent to you on June 7, 2011, correct?  You and others?

15  A    Correct.

16  Q    Do you see that there's a section of this meeting

17  invitation, it's the first section that's bold and

18  underlined and it says "situation"?

19  A    Yes, I see that.

20  Q    Do you see it says, "Upon further review, legal

21  has requested code changes to Procurement Punchout.

22  Product management concurs.  This will require a patch

23  to RQC and to the 4 GL system."  Do you see that?

24  A    Yes.

25  Q    Do you see the next section that's entitled,

1   Impact on products and status, describes the patch

2   that was going to be made available to Lawson's

3   customers?

4   A    Yes, I see that.

5   Q    Do you see that that's called Patch 1?

6   A    Yes.

7   Q    Now, Lawson does not track information about

8   whether a specific customer has downloaded a specific

9   patch for RQC; isn't that correct?

10  A    That is correct.

11  Q    So Lawson has no way of knowing whether or not the

12  customers who downloaded RQC ever took a download of

13  Patch 1, correct?

14  A    Not through any download records, no.

15  Q    I think you testified earlier that Matthew

16  Bragstad was Lawson's director of applications support

17  for the Americas, correct?

18  A    At that point in time, yes.

19  Q    Now, as the support director for Lawson at the

20  time of the injunction, did you have any concerns that

21  no one had said to you outside of the Lawson

22  organization that the solution that Lawson had come up

23  with with RQC avoided infringement or was not in

24  violation of the injunction?

25  A    I'm sorry.  Could you say that again?

HOMEWOOD - CROSS                    855

1   Q    Let me ask it a different way.  From the period

2   after the injunction when you found out about the

3   injunction about what products it affected and you

4   learned that there was going to be this RQC module

5   made available.  Did you have any concerns that no one

6   outside the Lawson organization had said, We agree

7   that this RQC solution solves the legal problems that

8   we're having?

9   A    No, not to my recollection.

10            THE COURT:  I'm having trouble understanding

11   how someone outside the Lawson organization would be

12   commenting about solving Lawson's legal problems.

13            MR. STRAPP:  I'm sorry.  I think it's my

14   confusion.

15            THE COURT:  I don't understand that.

16            MR. STRAPP:  That's my problem with the

17   question.  Let me see if I can try to rephrase it.

18   Q    Perhaps if I direct to you PX-1044, maybe this

19   will assist.  Could you bring that up on the screen,

20   please.

21        Now, as of a month after the injunction -- let me

22   focus, sorry, on this document here.  Do you see

23   there's a date June 23, 2011?

24   A    Yes, I see that.

25   Q    And do you see that this appears to be an instant

1   message discussion between you and Matthew Bragstad

2   that's dated June 23?

3   A    Yes, that's what it appears to be.

4   Q    Do you see at the top of the document that Mr.

5   Bragstad asked you, "Does it scare you as much as me

6   that at this point nobody at the courts or ePlus has

7   said that RQC complies?"  Do you see that?

8   A    Yes, I see that.

9   Q    Could you please read your response to his

10  question there at 2:02 p.m.?  And this is June -- this

11  is June 23.  So it's a month after the injunction.  So

12  what's your response to Mr. Bragstad's question?

13  A    Absolutely.

14  Q    There's an exclamation point there, right?

15  A    Yes.

16  Q    What did you mean when you told Mr. Bragstad you

17  were absolutely scared as much as him that nobody in

18  the courts or ePlus had said that RQC complied?

19  A    I wasn't scared so much whether the product

20  complied as much as what the impact that would have on

21  our customers and our operations if that were to be

22  the case.

23  Q    Now, you see Mr. Bragstad responds to you at

24  2:03 p.m."  He says -- before I ask you that, was it

25  your understanding at the time that neither the Court

1   nor ePlus had said that RQC was in compliance with the

2   Court's injunction?

3   A    If I recall correctly, it was just a comment that

4   there was a question as to there was something in

5   question as to whether or not RQC would be in

6   compliance.

7   Q    And that scared you?

8             MR. MARK:  Objection.  It mischaracterizes

9   her testimony.

10             THE COURT:  Overruled.

11  A    It didn't.  Again, I just said it didn't scare me

12  whether that would be found in compliance as much as

13  what scared me was we had just spent a month working

14  with our customers to migrate them and encourage them

15  to use RQC, and then to hear that potentially we'd

16  have to go through all that pain and impacted on our

17  customers again is what scared me, not the actual

18  product.

19  Q    When Matthew Bragstad responded to you one minute

20  later at 2:03 p.m., he writes, "It also said that

21  Nancy and support in general are taking this a lot

22  more serious than the rest of the company right now.

23  This group almost seems like, This is so last year, or

24  maybe everyone has just checked out."  Did I read that

25  correctly?

1    A    Yes, you did.

2    Q    And you replied, "A little of both, I think."  And

3    then I think you have a little smiley face there,

4    correct?

5    A    Right.

6    Q    What did you mean when you said that the rest of

7    the company besides support was not taking this

8    seriously and seemed like everyone had just checked

9    out?

10   A    I don't think he said they weren't taking it

11   seriously.  I think what he said is support was taking

12   it more seriously, and at this point in time we're a

13   month after the injunction, a lot of the tasks to

14   comply with the injunction for the other departments

15   were complete.  Support was still dealing with this on

16   a day in and day out basis.  So I think he was saying

17   it seems as if support is still dealing with this and

18   is more fully engaged, whereas, you know, the

19   marketing team that had already removed all of their

20   documentation, their role was done."

21   Q    And support's role was done.  Do you have any

22   understanding of why Matthew Bragstad was scared at

23   that point?

24            MR. MARK:  Objection.  That is a

25   mischaracterization of the testimony.  She said

1   support was continuing.  Others were done.

2          THE COURT:  He's right on that, isn't he?

3          MR. STRAPP:  Your right.  I'll withdraw the

4   question.

5          Your Honor, let me move into evidence this

6   exhibit.  It's PX1044.

7          THE COURT:  Any objection?

8          MR. MARK:  No objection.

9          THE COURT:  It's admitted.

10         THE CLERK:  1044 or 1041?

11         MR. STRAPP:  PX-1044.

12         THE COURT:  1041 he just admitted.  This is

13  1044.

14         THE CLERK:  Thanks.

15         (Plaintiff's Exhibit No. 1044 is admitted.)

16         MR. STRAPP:  Could I hand up something, Your

17  Honor.  PX-1269, which is --

18         THE COURT:  PX-1269 is the interrogatory

19  answers. right?

20         MR. STRAPP:  Correct.

21         THE COURT:  I've got them.

22         You know, there's a rule, don't you?  That

23  you have to go through eternity strapped to your back

24  with all the papers that you present that are

25  unnecessary.

1      MR. STRAPP:  It would be heavy lifting.

2  Q    Could I direct your attention, please, to

3  interrogatory No. 3.

4      And you'll see on the second page of that answer

5  there's a sentence at the very end that says, When RQC

6  is installed, customers automatically lose access to

7  RSS.  Isn't it true that RQC and RSS can actually be

8  run in parallel?

9      MR. MARK:  Objection, foundation.

10     THE COURT:  Overruled.

11 A    So you pointed me to a point here.  What was the

12 question again?  I'm sorry.

13 Q    I want to just clarify that it's true, isn't it,

14 that RQC and RSS can actually be run in parallel?

15 Isn't that correct?

16 A    Not without additional configuration.

17 Q    And is it your understanding that Lawson provided

18 support and instruction to its customers on how to do

19 that additional configuration, to design RQC and RSS

20 to run in parallel?

21 A    I've seen a couple isolated incidents on that,

22 yes.

23     MR. STRAPP:  Thank you, Your Honor.  I have

24 no further questions.

25     THE COURT:  Redirect.

1

2        REDIRECT EXAMINATION

3    BY MR. MARK:

4    Q   Ms. Homewood, could I ask you to turn back to

5    Exhibit in 1038 in the white binder.

6    A   1038?

7    Q   1050.  I'm sorry.

8             THE COURT:  1058 or 1050?

9             MR. MARK:  1058.

10            THE COURT:  Okay.  She's got it.

11   Q   And you were asked questions about a support

12   interaction that appears on the pages starting 115250

13   to 115251 involving Wisconsin Schools.  Do you recall

14   that?

15   A   Yes.

16   Q   You were also asked about whether support would

17   stop being provided if in the course of a support

18   interaction the technician learned that the customer

19   was running RSS.  Do you recall those questions?

20   A   Yes.

21   Q   Turn if you would to 115251, and do you see the

22   entries on June 1, 2011, between Megan Anderson and

23   Mike Meyer?  Do you see the entry there?

24   A   Yes, I do.

25   Q   Does that reflect a denial of support?

HOMEWOOD - REDIRECT                    862

1   A    Yes, that is.

2   Q    Does that reflect a denial of support after the

3   support entity learned that the customer was running

4   RSS?

5   A    Yes.

6           THE COURT:  Is that person named Mindy the

7   same person who was asked to be one of the three

8   people when the administrative skills --

9           THE WITNESS:  Yes.

10          THE COURT:  Same Mindy?

11          THE WITNESS:  Yes.

12  Q    Are you familiar with the term "canned message"?

13  A    Yes, I am.

14  Q    The paragraph June 1, 2011, 3:34:51 p.m., could

15  you read that into the record?

16  A    "Thank you for contacting Lawson Global Support

17  with your question regarding requisition self-service,

18  RSS.  Due to the recent court ruling regarding the

19  ePlus patent litigation, Lawson is no longer

20  supporting the requisition self-service, RSS, product.

21  For additional information regarding this court

22  ruling, please visit MyLawson.com.  Requisition

23  center, RQC, the replacement product for RSS, is

24  available to you at this time free of charge from

25  Lawson.  For more information, please visit

1  MyLawson.com or contact your account executive.  At

2  this point I will be closing your RSS case.  I look

3  forward to supporting you on requisition center.

4  Thank you.  Megan Anderson, supervisor, supply chain

5  management."

6  Q    And in the support interactions, canned messages

7  were used to deliver a consistent message to customers

8  when support was stopped, correct?

9  A    Correct.

10  Q    Turn if you would to Exhibit 563 in your binder.

11  On the second page of the exhibit, can I direct your

12  attention to the entry for June 6?  Do you see that?

13  A    Yes, I do.

14  Q    Now, you're asked questions on cross-examination

15  about the policy and the nature of the products where

16  support was being provided to customers.  Did that

17  policy change over time?

18  A    Yes, it did.

19  Q    Does the entry on June 6 reflect a change to that

20  policy?

21  A    Yes, it does.

22  Q    What's the nature of the change from what was the

23  policy to what became the policy on June 6?

24  A    On June 6 we expanded the stop support to all

25  product lines that run on the LSF platform until such

1   time that the product configuration containing RSS had

2   changed."  So that would include all product lines

3   such as HR, payroll, financials, anything that ran on

4   the LSF platform.

5   Q   That policy continued in force?

6   A   Yes, it did.

7   Q   You were asked questions about providing support

8   to international customers and the time frame for

9   that.  Do you recall how many customers Lawson had on

10  maintenance who were outside the United States?

11          MR. STRAPP:  Objection.  Vague as to which

12  customers.  You mean all customers?

13          MR. MARK:  Customers who had products covered

14  by the injunction.

15  A   I'm sorry.  Could you repeat the question?

16  Q   Do you know how many customers outside the United

17  States had products covered by the injunction and were

18  on maintenance at or about the time the injunction was

19  entered?

20  A   I don't recall the specific number.  It was, you

21  know, a small amount.  I think I remember around 20 or

22  something like that.  Less than 20.

23  Q   I'll provide with you a copy of what's been marked

24  as Plaintiff's Exhibit 1038.  And I want to direct you

25  to the line --

1    MR. STRAPP:  Your Honor, if I may interpose

2  an objection.  I think this is beyond the scope of my

3  cross, and he's introducing new material on redirect

4  that was not directing brought up on my cross.

5    MR. MARK:  Mr. Strapp asked about the nature

6  of support being provided to international customers.

7  This goes directly to that issue.  It's a document

8  that's not only marked, but that agreed upon.

9    THE COURT:  Do you know it's a good idea to

10  ask some questions without documents?  This document

11  is something she doesn't have any -- it doesn't even

12  mention her.  And if it's in, it's in for whatever use

13  it's in for.  So why do you need to ask her about

14  something she doesn't know anything about?

15    Let me hear your question, but apart from the

16  document.

17    MR. MARK:  But I will move Plaintiff's

18  Exhibit 1038 into evidence.

19    MR. STRAPP:  I don't object to the extent

20  it's on the agreed upon list, but I don't believe it

21  should be introduced with this witness because she's

22  not on the document.  She has no firsthand knowledge

23  of it.

24    THE COURT:  It's in.

25    (Plaintiff's Exhibit No. 1038 is admitted.)

1   Q    Was the mandate from --

2            THE COURT:  So don't answer.  You don't need

3   the document.  You're not being asked about it

4   anymore, I think.

5   Q    Was the mandate from Lawson to the support

6   organization to direct the international customers to

7   download and install RQC?

8   A    Yes, it was.

9   Q    Indeed, that was the mandate from the policy

10  mandate of Lawson for all of its customers who had

11  been running RSS, to download and to install RQC,

12  correct?

13  A    Yes.

14           MR. MARK:  Thanks.  No further questions.

15           THE COURT:  Can she be excused permanently?

16           MR. STRAPP:  Yes, Your Honor.

17           THE COURT:  Thank you for being with us,

18  Ms. Homewood.  You may be excused.

19            (The witness was excused from the witness

20   stand.)

21           THE COURT:  Do you have any other witnesses

22  on your infringement case?

23           MR. THOMASCH:  Your Honor, we did have one

24  more witness on our list, Dr. Benjamin Goldberg.  I

25  believe that in light of Your Honor's ruling striking

1    his opinion, and while there were certain issues that

2    were --

3            THE COURT:  I didn't strike all of his

4    opinion.

5            MR. THOMASCH:  I understand, Your Honor, but

6    you did strike the bases for his opinion, and you've

7    also -- he was going to come here to talk about issues

8    that directly related to that which you struck.  And

9    we have decided to proceed forward without him.  Your

10   general rule that prevents us from talking about what

11   happened at the first trial, that informs most every

12   aspect of his opinion.  And because of that we're

13   respecting Your Honor's ruling that we're not to get

14   into the issue of what was contended and proved at the

15   first trial.  With that limitation --

16           THE COURT:  That isn't exactly what the

17   ruling was, but the ruling speaks for itself.

18           MR. THOMASCH:  I understand, Your Honor, and

19   I meant in the course of our attempt to question, for

20   instance, Dr. Weaver, the way this has undergone, we

21   are not going to call Dr. Goldberg.

22           THE COURT:  That's a decision that you can

23   make if you want to.  All right.  So you rest?

24           MR. THOMASCH:  We rest, Your Honor.

25           THE COURT:  Any rebuttal?

1          MR. STRAPP:  Your Honor, our next witness is

2    here.  We can call him or we can take a lunch break.

3    It's Dr. Ugone.  It's your preference.

4          MR. STRAPP:  He is not on infringement, is

5    he?  We're on damages.

6          MR. STRAPP:  Damages, that's correct.

7          THE COURT:  How many witnesses are you going

8    to put on?

9          MR. STRAPP:  Just one.

10          THE COURT:  Did you succeed in honing.

11          MR. STRAPP:  I did.  I honed my best last

12    night.

13          THE COURT:  Good.  How long do you think his

14    testimony will be?

15          MR. STRAPP:  I think definitely under an hour

16    and a half.

17          THE COURT:  I'm not sure that's a big hone.

18    All right.

19          You have how many witnesses?  Mr. Dusseault,

20    are you handing the damages part of it?

21          MR. DUSSEAULT:  Yes, sir.

22          THE COURT:  How many witnesses do you have?

23          MR. DUSSEAULT:  I believe we only have one.

24          THE COURT:  All right.

25          Now, somebody yesterday raised the question

1    about modifying the designations for Mr. Hager.  Has

2    that been accomplished and is everybody in agreement?

3    And if you do, you need to give me a new set of

4    documents, so I read only what I'm supposed to read.

5           MR. STRAPP:  We'll attempt to work it out

6    with counsel.  We'd like to submit a slimmed down

7    version to make things more efficient.

8           THE COURT:  You gave it to them, didn't you?

9           MR. STRAPP:  We provided that to them not

10   last night, but the night before, but we haven't heard

11   a response he yet.

12          MR. THOMASCH:  It was, Your Honor.  Mr. Hager

13   was my witness.  I defended both his depositions.  I

14   need to be involved in that.  And until I finish with

15   the witnesses this morning, I have not reviewed those

16   changes that were made after they were submitted after

17   we agreed.

18          THE COURT:  I understand.  I'm just trying to

19   figure out where we are.  So it still has to done?

20          MR. THOMASCH:  Yes, Your Honor.

21          THE COURT:  All right.  Have you all sorted

22   out, is there any significance to the fact Lawson

23   doesn't exist anymore?

24          MR. THOMASCH:  No, Your Honor.

25          MR. STRAPP:  I don't believe so, Your Honor.

1       THE COURT:   In terms of this case.

2       MR. STRAPP:   I don't believe so.

3       THE COURT:   Well, for example, if an

4   injunction is issued, I think maybe it might make a

5   difference.

6       MS. ALBERT:   I believe the injunction covers

7   successors.

8       THE COURT:   Yeah, I know it does.   So we

9   don't need to change the style of the case or

10  anything?

11      MR. MARK:   No.

12      THE COURT:   All right.   Well, we'll take an

13  hour for lunch and we will come back and resume the

14  evidence.

15          (Luncheon recess taken at 1:00 p.m.)

16

17

18

19

20

21

22

23

24

25

```
1                    THE COURT:  All right.

2                    MR. STRAPP:  Your Honor, ePlus calls its next

3    witness, Dr. Keith Ugone.

4                    Your Honor, before we begin, ePlus would like to

5    offer into evidence several documents that Dr. Ugone

6    relied upon and that Lawson has agreed may come into

7    evidence.  These are all exhibits that are on the

8    agreed-to list.

9                    THE COURT:  All right.

10                   MR. STRAPP:  They are PX-1080, 1081, 1082, 1241,

11   1242, 1243, 1246, 1247, and 1248.

12                   THE COURT:  They are admitted.

13

14                   (ePlus Exhibits 1080, 1081, 1082, 1241, 1242,

15            1243, 1246, 1247, and 1248 admitted.)

16

17                          KEITH R. UGONE,

18   a witness, called at the instance of the plaintiff,

19   having been first duly sworn, testified as follows:

20                        DIRECT EXAMINATION

21   BY MR. STRAPP:

22   Q    Good afternoon, Dr. Ugone.

23   A    Good afternoon.

24   Q    Would you please introduce yourself to the Court and

25   spell your name.
```

1   A    Sure.  My name is Keith Raymond Ugone.  Last name is

2   spelled U-g-o-n-e.

3   Q    And where do you live, sir?

4   A    I actually live in a little town called Grand Saline,

5   Texas, so about 75 miles east of Dallas or so.

6   Q    What do you do for a living?

7   A    I usually describe myself as wearing two hats.  I call

8   myself a forensic economist and a damage quantifier.

9            THE COURT:  And a what?

10           THE WITNESS:  Damage quantifier.

11  Q    What does that mean, sir?

12  A    Well, the way I think about it is, is that it's not

13  uncommon for companies, much like ePlus and Lawson here,

14  to get in commercial disputes, and usually one of the

15  companies is alleging economic harm.

16       And so the forensic economics part of it is just

17  figuring out what happened and what would have happened in

18  the absence of the alleged wrongful conduct, and the

19  damage quantification part of it is quantifying the

20  damages or the amount of that harm or a measure of that

21  harm.

22  Q    Have you prepared a demonstrative to help you

23  summarize your educational background and your

24  qualifications?

25  A    I have.

1    Q    Is this the demonstrative that you prepared?

2    A    Yes.

3    Q    Would you please briefly describe your educational

4    background since high school?

5    A    So my educational background is on the left-hand side

6    of this chart.  I have a bachelor's degree in economics

7    from the University of Notre Dame which I received in

8    1977, and then I have a master's degree in economics which

9    I received from the University of Southern California in

10   1979, and then I received my Ph.D. in economics, again,

11   from Arizona State University in 1983.

12   Q    What position do you currently hold?

13   A    I am a managing principle at a company called Analysis

14   Group, Incorporated.

15   Q    And what type of work is Analysis Group known for?

16   A    Analysis Group does economic, financial, strategy

17   consulting type work for corporations, government

18   agencies, and law firms.

19   Q    What do you do as a managing principle at Analysis

20   Group?

21   A    Well, I do two things.  One, I run the Dallas office

22   of Analysis Group, but in terms of the client service

23   work, I usually perform economic-related work or

24   damages-related work in a dispute type environment.

25   Q    How long have you been a managing principle at

1   Analysis Group?

2   A    Since 2004, so a little over nine years.

3   Q    What did you do before that?

4   A    Prior to that, immediately prior to that, I was with

5   PricewaterhouseCoopers or its legacy firms, because there

6   was a merger between Pricewaterhouse and Coopers &

7   Lybrand, for about 18 years.  I was a partner principle

8   there as well, but for a large portion of my career, the

9   early part of my career, for 18 years I was with

10  PricewaterhouseCoopers or its legacy firms.

11  Q    What type of work did you do at

12  PricewaterhouseCoopers?

13  A    Well, that's actually, in 1985, where I started doing

14  the work that I do today.  So that's where I started

15  initially doing economics and damages work in what I call

16  a dispute environment.

17  Q    Have you held any other economics-related positions?

18  A    Early in my career after I got my Ph.D., I taught full

19  time at one of the California state university systems

20  schools, Cal State Northridge.  I was there full time for

21  two years, '83 to 1985, but even after I joined

22  Pricewaterhouse in 1985, I continued to teach one class a

23  semester at Cal State Northridge for about another seven

24  years.  And it's not on here, but I've taught summer

25  classes, about five years worth of summer classes in the

1   MBA program at SMU as well, Southern Methodist University.

2   Q    Are you a member of any professional associations?

3   A    Yeah.  So there's the American Economic Association,

4   the America Statistical Association, those types of

5   associations, yes.

6   Q    Have you published any papers?

7   A    Yes, I have a few papers that I've published dealing

8   with sort of economics in a litigation environment.

9   Q    Outside of this case, have you ever testified at trial

10  or in a deposition before?

11  A    Yes.  So, actually, the first time I testified was in

12  1990, and I've testified quite a few times since that over

13  the course of my career.

14  Q    What types of cases have you testified in?

15  A    I've testified in patent infringement cases, so either

16  in deposition or trial, and that includes -- you know,

17  there's intellectual property, patent infringement,

18  trademark, trade secret type cases, but I've also

19  testified on other causes of action such as security

20  cases, antitrust cases, breach of contract case,

21  professional negligence cases.

22       So really all the different causes of action, anything

23  that requires economic analysis or damages type analysis,

24  I've generally probably testified in those types of cases

25  over the course of my career.

Ugone - Direct

1   Q    How many times have you testified at trial --

2            THE COURT:  Do you accept him as an expert?

3            MR. DUSSEAULT:  Yes, Your Honor.

4            THE COURT:  What area are you qualifying or

5   tendering him in --

6            MR. STRAPP:  I would proffer the witness, Your

7   Honor, as an expert in the field of economics and damages

8   quantification.

9            THE COURT:  You accept him as such?

10           MR. DUSSEAULT:  I do, Your Honor.

11           THE COURT:  All right.  He's so accepted.

12  Q    Have you been retained by the patent owner, ePlus?

13  A    Yes.

14  Q    And what did ePlus ask you to do?

15  A    Well, I was asked to provide guidance to the Court

16  should Lawson be found in contempt of the injunction order

17  as to certain remedies that -- and numbers that the

18  Court -- providing a menu of options to the Court that the

19  Court may choose from as a remedy for that finding if

20  Lawson is found to have violated the injunction order.

21  Q    Have you prepared a demonstrative to help you

22  summarize the evidence you reviewed?

23  A    Yes.

24  Q    And is this the demonstrative you prepared?

25  A    It is, yes.

Ugone - Direct

1   Q    What materials did you rely on in forming your

2   opinions in this case?

3   A    This is a very high-level listing.  As you can see in

4   the footnote there, in my reports I have an Exhibit 3 that

5   lists all the documents that were considered, but there

6   were legal documents, the injunction opinion, the

7   injunction order.  There's what I'll call financial and

8   profit and loss and licensing, maintenance, and service

9   revenue related spreadsheets and documents produced by

10  Lawson.  There were hearing transcripts, depositions I

11  reviewed.  And the opposing expert in this case is named

12  Dr. Putnam, and I reviewed his reports, obviously, as

13  well.

14  Q    You mentioned that you reviewed depositions.  Did you

15  review the deposition of Kevin Samuelson, the witness

16  Lawson designated as its corporate representative to

17  testify about several financial topics?

18  A    Yes.

19  Q    Did you review financial spreadsheets that were

20  produced by Lawson?

21  A    Yes.  So those included like the licensing,

22  maintenance, and service revenue spreadsheets that Lawson

23  produced and also certain profit-and-loss statements that

24  Lawson produced.

25  Q    And are the deposition transcripts and the

1    spreadsheets that you reviewed the type of documentation

2    that experts in your field would find relevant to

3    calculating damages?

4    A    Yes.  I've been doing this for 27 or 28 years, and

5    those are the types of documents that a financial and

6    economic expert such as myself typically rely upon.

7    Q    Did all these materials assist you in formulating the

8    opinions you've rendered in this matter?

9    A    Yes.

10   Q    Were you asked to make any assumptions?

11   A    I was asked to make an assumption, yes.

12   Q    And what was that?

13   A    The assumption that I was asked to make was that

14   Lawson would be found in contempt of the injunction order.

15   Q    Did you come to a conclusion about a specific amount

16   of damages that the Court should award ePlus in the event

17   that Lawson is found in contempt?

18   A    I don't know if I would quite phrase it that way.  I'd

19   phrase it a little differently in terms of the conclusions

20   that I reached.

21   Q    Why wouldn't you phrase it the way I did?

22          THE COURT:  Why don't you phrase it the way he

23   would?

24   A    The way I would phase it is, my understanding is that

25   the Court has discretion in terms of the options that may

1    be chosen in terms of a remedy if contempt is found.  And

2    so I kind of view it as an if/then statement.  If the

3    Court determines that one remedy is a disgorgement of

4    revenues, I've quantified what those revenues are.

5        If the Court determines that one remedy is a

6    disgorgement of gross profits of Lawson during the

7    injunction period, I've quantified what that is.  If the

8    Court decides that the appropriate remedy is incremental

9    profits that Lawson earned during the injunction period,

10   then I've quantified that.

11       So I've quantified numbers for the Court to choose

12   from depending on the remedy that the Court chooses.

13   Q    Have you prepared a demonstrative to summarize those

14   options?

15   A    Yes.

16   Q    Is this the demonstrative you prepared?

17   A    Yes, it is.

18   Q    And I think you just discussed these are the three

19   operations; is that correct?

20   A    Yes.  So if we look at the title, Measure of Lawson's

21   Gains From Failing to Comply with the Injunction, then on

22   the left-hand side we see measure one, measure two,

23   measure three, and then in the blue, under the heading

24   Gains Associated with Infringing configurations, I've done

25   work to identify Lawson's revenues, Lawson's gross

1    profits, and Lawson's incremental profits.  So that's what

2    I was trying to describe in my prior answer to you.

3    Q    I want to turn your attention first to the first

4    measure, Lawson's revenues.  Can you describe for me how

5    you identified Lawson's revenues?  What was the first step

6    you took?

7    A    Well, the first step was to identify the customers

8    that had the infringing configurations.

9    Q    And have you prepared a demonstrative to help you

10   explain what you understand to be the infringing

11   configurations?

12   A    Yes.

13   Q    Is this the demonstrative you prepared?

14   A    Yes, it is.

15   Q    And can you describe for me what we see on this

16   demonstrative here, please.

17   A    Well, on the left-hand side, we have my understanding

18   of what I believe is called configuration number three.

19   On the right-hand side, we have is what is my

20   understanding of configuration number five, that those are

21   the configurations in dispute in this matter for this

22   hearing here, and what I did was was able to identify the

23   number of customers that had configuration number three,

24   which was 72, and the number of customers that had

25   configuration number five, which was 74, for a total of

1   146 customers.

2   Q    How did you identify those customers that you describe

3   as having configurations three and five?

4   A    Well, we knew the -- there was some information that

5   we had received where we could match up revenues that were

6   received with various modules, and so that's how we were

7   ultimately able to identify the customers that had each of

8   those configurations.

9   Q    Okay.  Have you prepared a demonstrative to help you

10  explain how you determined those revenue amounts?

11  A    Yes.

12  Q    Is this the demonstrative you prepared?

13  A    Right.  So, again, the title says How Revenue Amounts

14  were Determined, and on the left-hand side, I list three

15  different revenue categories which may have been discussed

16  in court here, but there's something called licensing

17  revenue or license revenue.  There's maintenance revenue,

18  and there's service revenue, and through the documents

19  that were produced in this case, I was able to identify

20  those revenues for each of the customers that I talked

21  about previously, the 146.

22       Now, there were a couple of different ways that I did

23  that which we'll get into, but those were the revenue

24  categories that I compiled.

25  Q    What is license revenue?

1   A    Just think about that, that's the fee you pay to use

2   the software.  That's the easiest way to think about that.

3   Q    What is maintenance revenue?

4   A    Maintenance revenue, I almost view it like when you

5   get a warranty on your car or you might get a warranty on

6   your appliances, your refrigerator.  That's kind of what

7   maintenance revenue is with respect to software.  If any

8   bugs come up, that if you paid the maintenance revenue,

9   then that will be taken care of by Lawson.

10  Q    What is service revenue?

11  A    Service revenue is a little bit different.  That's

12  almost like consulting revenue, but it's the installation,

13  it might be implementation, it might be training, it might

14  be consulting.  All of that would go into the service

15  revenue bucket, as I call it.

16  Q    Did you use the same method to determine all three

17  types of revenue?

18  A    Actually, I was able to use the same method for the

19  first two categories, license revenue and maintenance

20  revenue, and I had to use a different methodology for the

21  service revenue.

22  Q    Can you describe generally how you measured license

23  revenue and maintenance revenue first?

24  A    With respect to license revenue and maintenance

25  revenue, it's almost like a Rosetta Stone aspect where

```
 1   there's something called stock-keeping units, and so
 2   revenue was catalogued according to these abbreviations,
 3   in a sense, but we knew the -- and we were able to uncover
 4   the stock-keeping units that were associated with
 5   different types of revenues for different types of
 6   customers.
 7        So via these stock-keeping units, we were able to do
 8   that matching exercise for the licensing receive and for
 9   the maintenance revenue.
10   Q    How does Lawson track service revenue?
11   A    Service revenue is a little bit different.  So with
12   the SKUs for the license revenue and maintenance revenue,
13   there were SKUs that matched up to the modules that are in
14   the infringing configurations.  So we were able to
15   directly match those in a sense.
16        However, service revenue at Lawson was compiled on a
17   customer basis rather than a, let's just say a module
18   basis or a configuration basis.  So how the data was
19   catalogued was a little different by customer rather than
20   by SKU and module.
21   Q    We'll turn in a few minutes to how you specifically
22   calculated revenue, but first, could you please explain
23   for the Court why you've provided revenues as one option
24   for the Court to consider?
25   A    It was a couple of different reasons why I provided
```

1    revenue.  It's almost a choice and a reference point.  So

2    my understanding that one remedy could be a discussion --

3    a disgorgement of the revenues earned during the

4    injunction period if contempt is found, so I've provided

5    that number for the Court's consideration.

6          But also, it just helps, from a reference point of

7    view, to know the magnitude of the revenues that we're

8    talking about, and ultimately, when you get down to

9    looking at different profitability measures such as gross

10   profits or incremental profits, you have to start out with

11   a revenue.

12         You take revenues, subtract certain costs, and you get

13   certain profitability measures.  So it's both a choice but

14   also a reference point here.  So I think it's useful

15   information to present to the Court.

16   Q    What was the time period for which you calculated

17   revenues?

18   A    So that would be -- obviously, it's a little

19   complicated, but it's over what I'll call the injunction

20   period.  Now, there's different dates, but it's over the

21   injunction period.

22   Q    Have you prepared a demonstrative to help you explain

23   how you define the injunction period?

24   A    Yes.

25   Q    Is this the demonstrative you prepared?

1  A    Yes.

2  Q    Can you explain what the relevant time period is that

3  you looked at?

4  A    So we have a timeline here, and I'm just going to

5  point out three dates.  There's the May 23rd, 2011, date,

6  the November 23rd, 2011, date, and November 30th, 2012,

7  date.  So the easiest way to think about this is, the

8  entire injunction period for which we have data is

9  May 23rd, 2011, through November 30th, 2012, and for

10  non-designated health care customers, in other words,

11  other customers, we compiled the license, maintenance, and

12  service revenues over that entire time period.

13       With respect to the designated health care customers,

14  we compiled the maintenance and service revenues after the

15  sunset period from November 23rd, 2011, to November 30th,

16  2012, and then finally, for the designated health care

17  customers, we compiled the licensing revenue over the

18  entire time period.

19  Q    And can you explain the significance of November 30th,

20  2012, which appears as the last date on your timeline?

21  A    That would be the last point in time, the last date

22  for which Lawson provided data.  So that's not sort of the

23  end of the injunction period.  It's dictated by the end of

24  the data that was provided by Lawson.

25  Q    All right.  Let's turn to license and maintenance

1    revenues.

2            THE COURT:  I don't understand why the revenues

3    for designated health care customers under the maintenance

4    and service is one period and the designated health care

5    customers revenue for licenses is another period.  Why is

6    that so?

7            MR. STRAPP:  Your Honor, if you --

8            THE COURT:  I was asking the witness.

9            MR. STRAPP:  I'm sorry.

10           THE COURT:  Why did you choose that?

11           MR. DUSSEAULT:  I was just going to say, I'd

12   certainly prefer to have the witness testify to that than

13   counsel.

14           THE COURT:  You don't want to cross-examine him?

15           MR. DUSSEAULT:  Withdrawn.

16           THE WITNESS:  My understanding of the Court's

17   order was that there was a sunset period, and during that

18   sunset period, the software that the designated health

19   care customers had could be maintained and allowed for a

20   transition period.  And so that sunset period was six

21   months, and when that sunset period ended, so that's when

22   we start picking up the maintenance and service.  So that

23   explains the top part of the chart.

24           And I think what you are really asking me is the

25   bottom part of the chart is why are we picking up license

1    revenue over the entire time period, and my understanding

2    for the injunction order is that there, in a sense, could

3    be no new licensing by these customers.  It would just be

4    sort of a maintenance mode during the sunset period.

5              So that's why there's license revenue over the

6    entire time period, and the maintenance and service is

7    after the sunset period.

8              THE COURT:  All right.

9    Q    Now, Dr. Ugone, you testified that license and

10   maintenance revenues are associated with SKU data that's

11   provided by Lawson; is that correct?

12   A    Yes.

13   Q    How did you determine which SKUs or stock-keeping

14   units were associated with the various software modules

15   included in configurations three and five?

16   A    That's -- I've been referring to it as a Rosetta

17   Stone, but we had a document that was able to match up

18   SKUs with the modules in the infringing configurations.

19   Q    Could you please turn in your binder to PX-1078.

20   A    (Witness complied.)

21   Q    Dr. Ugone, are you familiar with this exhibit?

22   A    Yes, I am.

23   Q    And what is this document?

24   A    This was an exhibit to Mr. Samuelson's deposition, and

25   this is what I was talking about in a sense of, as I use

1    that term Rosetta Stone, but on the left-hand side, you

2    can see in this exhibit --

3            THE COURT:  Excuse me.  Which one are we doing?

4            THE CLERK:  1078, Your Honor.  1078.

5            THE COURT:  I'm sorry.  Go ahead.

6    A    So in Plaintiff Exhibit 1078, we have a one-page

7    document which is from Mr. Samuelson's deposition.  On the

8    left-hand side, the left-hand column, we basically have

9    the modules that are in the infringing configurations.

10          In the next two columns, and primarily the right-hand

11   column, we have what are called SKUs or stock-keeping

12   units.  So to the extent that revenue was compiled in the

13   Lawson revenue spreadsheets by SKU, we were able to use

14   this mapping to tell us, okay, if we saw certain letters,

15   what modules did those letters go along with, and so

16   that's what this document helps us do.

17   Q    Was this document created by you?

18   A    No.  This was a Lawson document.

19          MR. STRAPP:  Your Honor, I would proffer PX-1078

20   into evidence.

21          THE COURT:  Any objection?

22          MR. DUSSEAULT:  No, Your Honor.

23          THE COURT:  It's admitted.

24

25          (ePlus Exhibit 1078 admitted.)

1    Q    Have you prepared a demonstrative to help you explain

2    the significance of the SKUs?

3    A    Yes.

4    Q    And let's turn to this demonstrative you prepared.

5    Can you explain to me what it is?

6    A    Yes.  So remember what I said very early on, we use

7    the SKUs to help us identify licensing and maintenance

8    revenues.  We had to use a different technique for the

9    service revenues.

10        So the title of this chart is called Identification of

11   Licensing and Maintenance Revenues.  We happen to be

12   showing configuration number five here on the left-hand

13   side, and if we temporarily just ignore the blue box, S3

14   procurement modules, if we just take that out of the

15   picture for a second, you can see for each box or each

16   module, in a sense, the corresponding SKUs.  That's what

17   we're trying to communicate.

18        So if I wanted to add together all of the, say,

19   licensing revenues, or separately all of the maintenance

20   revenues associated with configuration five, and I'm going

21   to come back to the blue box in a second, we would add

22   together -- based on Plaintiff's Exhibit 1078, we'd add

23   together the revenues that are in the SKUs that we have on

24   the right-hand side of the chart that's in front of us.

25   Q    You said that the S3 procurement modules you treated

1    differently.  Why was that?

2    A    Well, because there was some different categories of

3    how the data was compiled.  It still used SKUs, but it was

4    a little bit different compilation of the SKUs and what

5    was combined in each of the SKUs.

6    Q    Have you prepared a demonstrative to help you explain

7    how you calculated license and maintenance revenues for

8    the S3 procurement modules?

9    A    Yes.

10   Q    And is this the demonstrative you prepared?

11   A    Yes, it is.

12   Q    What are the three ways the S3 procurement modules

13   show up in license and maintenance revenues?

14   A    Well, as you see in the blue box there, S3 procurement

15   modules, there's purchase order, requisitions, and

16   inventory control.  So when you look at how Lawson

17   compiled the revenue data, sometimes they would put that

18   revenue into an IC bucket, a PO bucket, or an RQ bucket.

19        Those are SKUs, so those are pretty straightforward.

20   That's just inventory control, purchase order, and

21   requisitions.  So that was just a straightforward way of

22   figuring out what those revenues were.  But there's other

23   times, depending on how the customer would pay, they would

24   compile the information differently.  So there was another

25   SKU called proc, p-r-o-c, which was a combination of IC

1    plus PO plus RQ.  So it wasn't shown individually.  It was

2    shown compiled into one number.  But, again, that was

3    relatively straightforward, so we took 100 percent of that

4    number.

5         Now, where required, some data compilation and

6    manipulation on our part was that sometimes there would be

7    a suite of modules where the customer would buy the suite

8    of modules that would include purchase order,

9    requisitions, and inventory control, but it might include

10   other modules as well.

11        So that's called the large suite SKUs, and that would

12   include, like I said, those three modules, but it might

13   include others.  So we had to do an apportionment

14   approach, and at the end of the day, we would take

15   35 percent of the large suite revenues for the blue box,

16   as I describe it.

17   Q    How was the 35 percent apportionment for the large

18   suite SKUs determined?

19   A    Ultimately, it ended up being pretty straightforward,

20   that when you looked at the pricing associated with

21   ThinPro, for example, and you compared that to the pricing

22   of the three modules that we're interested in for the

23   infringing configuration here, the purchase order,

24   requisitions, and inventory control, the price of the

25   three sort of S3 procurement modules relative to the price

Ugone - Direct                                                    892

1   of the large suite ultimately, after some calculations, we

2   determined was about 35 percent.  So we took 35 percent of

3   those revenues.

4   Q    Did you also apportion the revenue recorded under the

5   SKUs besides the large suite SKUs?

6   A    No, because those were all just entirely part of the

7   infringing configurations.

8   Q    Were you able to determine Lawson's service revenue

9   for the infringing configurations three and five using the

10  same method that you used for license and maintenance?

11  A    No, we were not able to do it the same way, because

12  Lawson did not service by SKUs.  So we didn't have the

13  same mapping that we've been talking about for the last

14  couple of minutes.  We would have service revenue by

15  customer, not service revenue by SKU.

16  Q    Well, could you just include all the service revenue

17  associated with the 146 customers that had configurations

18  three and five?

19  A    Well, I wouldn't want to do that, because if they had

20  more software modules from Lawson than just the infringing

21  configurations, then you'd be overstating the service

22  revenue, so we did not take that approach.

23  Q    Have you prepared a demonstrative to help explain how

24  you apportion service revenues?

25  A    Yes.

1    Q    Is this the demonstrative you've prepared?

2    A    Right.  So at the top it's called Apportionment of

3    Service Revenues, correct.

4    Q    How did you determine to apportion service revenues?

5    A    Again, this ended up being a relatively

6    straightforward calculation.  We used maintenance revenues

7    as a proxy.  So what we said was, once we know our 146

8    customers, let's see the total that they pay in

9    maintenance revenues.  And we also happen to know the SKUs

10   associated with the infringing configurations, so let's

11   figure out the maintenance revenues that are paid related

12   to the infringing configurations.

13        Once we have the maintenance revenue associated with

14   the infringing configurations, and once we have the total

15   maintenance revenue, we can just take the ratio of the two

16   and apply that to service revenues.  So roughly speaking,

17   As the chart shows here, when you look at all the

18   customers, Lawson customers with the infringing

19   configurations, about 20 percent of their maintenance

20   revenues in total that were paid were associated with the

21   infringing configurations.

22        We used that 20 percent and applied it to the service

23   revenues.  So that dictated how much of the service

24   revenues we used in my calculations.

25   Q    Did you apply that 20 percent apportionment to Lawson

1   service revenues?

2   A     Yes.  So that's what this is trying to show here.  We

3   did the calculation for maintenance revenues, we used that

4   as a proxy for service revenues, and we applied it to

5   service revenues.

6   Q     Were you able to calculate the revenues that Lawson

7   earned from configurations three and five after the

8   effective dates of the injunction order?

9   A     Yes.  I'm sorry.  After the effective dates, no.  We

10  did the calculation during the injunction period, but as I

11  mentioned previously, the data ended as of November 30th,

12  2012, so we don't have the data past that.

13  Q     Between the period of the injunction, effective date

14  of the injunction and November 30th, 2012, were you able

15  to calculation the revenues associated with configurations

16  three and five?

17  A     Yes.

18  Q     And have you prepared a demonstrative to show the

19  results of those calculations?

20  A     Yes.

21  Q     Is this the demonstrative you prepared?

22  A     Yes, it is.

23  Q     And what does this show?

24  A     So, again, it's entitled Lawson's Infringing Revenues,

25  so these are the revenues associated with the infringing

1   configurations during the injunction period up until

2   November 30th, 2012, and we've broken it out by license

3   revenues, maintenance revenues, and service revenues.

4        So on the right-hand side, we see that license

5   revenues over the injunction period, as I've defined it

6   according to the Court's order, was $7.1 million,

7   maintenance revenues were $12.7 million during that time

8   period, and service revenues as I have described are

9   $9.6 million over that injunction period for a total of

10  $29.4 million.

11  Q    Do the revenue calculations that are shown on this

12  demonstrative account for the 35 percent apportionment

13  that you discussed for large suite SKUs?

14  A    Yes.

15  Q    And do the revenue calculations shown on this

16  demonstrative also account for the 20 percent

17  apportionment for service revenues that you discussed?

18  A    That's correct, yes.  So all of that is embedded in

19  these numbers.  So we've done the appropriate calculations

20  and subtracted out the appropriate amounts.

21  Q    Let's turn now to profits.  Did you review information

22  from Lawson specifically about the profitability of the

23  infringing configurations?

24  A    Not with respect to the infringing configurations

25  specifically.  That data was not available.

1   Q    Why not?

2   A    Lawson does not track profitability by product or by

3   module or by those infringing configurations.

4   Q    So what profitability data were you able to review

5   that Lawson provided?

6   A    Lawson did provide, for example, their profit-and-loss

7   statements.  So I've seen those for a number of different

8   years.

9   Q    Is there, in your opinion, any way to estimate the

10  profitability associated with configurations three and

11  five?

12  A    Well, if you are very careful in terms of making sure

13  you are capturing the right costs and understand the right

14  relationships, and if you use a series of assumptions, and

15  as long as they are appropriate assumptions, you can make

16  some estimates of the profitabilities associated with the

17  infringing configurations at those revenues that we've

18  identified, the $29.4 million.

19  Q    Are there different types of profits that can be

20  calculated for Lawson?

21  A    Yes.

22  Q    Could you give me a few examples?

23  A    This is -- especially to an economist, you always have

24  to be careful when you say the term profits, because an

25  economist is always going to look for an adjective in

1   front of profits, a descriptor, because there's many

2   different types of profits.  So one could talk about gross

3   profits, one could talk about incremental profits, one

4   could talk about net profits, and those are all very

5   different types of profits.  So it's always important to

6   have the word in front of profits, but those are examples

7   of profits.

8   Q    And what are gross profits?

9   A    The easiest way to describe gross profits, I always

10  think about -- you know, if you think about a

11  manufacturing facility, and if they're making widgets or

12  maybe they're making ballpoint pens.  So you might take

13  the revenues, minus the material cost and the labor cost

14  to make either the widgets or the pens.

15       When you do that subtraction of what I'll call direct

16  costs, that gives you what's called gross profits.  That's

17  the easiest way to think about that, just some -- in a

18  factory, that would be the material and the labor.

19       Now, when you get to things like software, it's a

20  little bit different, but the concept is the same, those

21  direct costs associated with those revenues.

22  Q    What are incremental profits?

23  A    Incremental profits, you're not going find these on

24  the financial statements.  They're more difficult to

25  calculate, but the easiest way to think about incremental

1   profit is, if I sell one more unit, or maybe if I get one

2   more dollar of revenue, what's the profitability

3   associated with that incremental unit I've sold or that

4   incremental dollar of revenue that I've taken in.

5       And that would go beyond just those direct costs that

6   I talked about, because there might be other costs within

7   a company that may vary as sales vary.  So that's what

8   you're trying to capture.  Any other incremental or

9   variable costs, you take those away from the gross

10  profits, and you'll get what's called incremental profits.

11  Q   And I think the last example you mentioned are net

12  profits.  Can you explain what net profits are?

13  A   Without getting too technical about it, the way I

14  think about net profits, the easiest way to describe it is

15  basically subtracting out all the costs.  So there might

16  be the direct costs, there could be these variable costs,

17  but there could be a whole series of what's called fixed

18  costs, costs -- you know, the accounting department, or it

19  could be the information technology group, or it to be

20  Human Resources.

21      Those are all examples of costs that may not vary as

22  you sell more units, but when you are looking at net

23  profits, you are subtracting out all of those what are

24  called fixed costs as well, and, remember -- I'm throwing

25  out a whole bunch of terms here, but there's variable

1    costs, costs that vary as you produce more.  There's fixed

2    costs that are relatively constant as you produce more.

3    But all of those are subtracted out to get to net profits.

4    Q    Have you attempted to calculate profits that Lawson

5    made from licensing, maintaining, and servicing

6    configurations three and five during the injunction

7    period?

8    A    Yes.

9    Q    Have you calculated gross profits?

10   A    Yes, I have.

11   Q    And have you calculated incremental profits?

12   A    Yes.

13   Q    And have you also offered a calculation for net

14   profits?

15   A    No.

16   Q    Have you prepared a demonstrative to help you explain

17   why you didn't calculate net profits?

18   A    I do have a demonstrative on that, yes.

19   Q    Is this the demonstrative you prepared?

20   A    Yes.

21   Q    And do you have an opinion about whether or not the

22   calculation of net profits is appropriate in this case?

23   A    I do, and you can look at the top of the chart.  It

24   says, net profit margin is inappropriate for measuring

25   Lawson's gains, and I give just some examples of why I

1    hold that opinion.

2    Q    Can you provide us with your understanding of why you

3    believe that net profits are inappropriate in this case.

4    A    Remember what I said when we were talking about net

5    profits, we're subtracting out all the costs in a sense.

6    So we're subtracting out the direct costs and what are

7    even called operating expenses.

8         So those operating expenses might include general and

9    administrative costs, and we'll give some examples of that

10   in a second.  Some product development or research and

11   development costs, it would include sales and marketing

12   costs.  So when you're talking about net profits, you are

13   subtracting all of those out.

14        Now, when we're talking about the injunction period,

15   what we're saying is, what costs would have varied in that

16   injunction period; in other words, if I want to understand

17   the gains to Lawson during the injunction period, I'd be

18   subtracting out the costs from revenues but those costs

19   that would vary with revenues.  I wouldn't subtract out

20   the fixed costs, because when I'm subtracting out the

21   fixed costs, then you're subtracting out too many costs.

22             THE COURT:  Subtracting out what?

23             THE WITNESS:  Too many costs.  You're subtracting

24   out costs that would not vary with a change in the

25   revenues associated with the infringing configurations.

1    This is all exciting stuff to an economist.  I apologize.

2    Q    Do you have any other reasons for your opinion that in

3    this case it was inappropriate to calculate net profits?

4    A    Well, also there's been testimony by Mr. Samuelson

5    that these costs are not directly related to the

6    infringing configurations, and if they're not directly

7    related, they shouldn't be subtracted out.  If you ended

8    up subtracting them out, you'd result in a windfall gain

9    to Lawson.

10   Q    And can you explain why, in your opinion, it's wrong

11   to deduct fixed costs when attempting to calculate the

12   profits that Lawson gained from the infringing

13   configurations?

14   A    Well, that's where you'd end up with a windfall gain

15   to Lawson, because you'd be subtracting out too many

16   costs, leaving too little profit associated with the

17   provision of those infringing configurations.  So that's

18   why you would not subtract out those fixed costs.

19            THE COURT:  That presupposes that you know why

20   it's too many costs.

21            THE WITNESS:  Yes, and we'll get into some detail

22   on that, so, yes.

23   Q    Could you turn to PX-1244 in your binder, please.

24   A    I'm there.

25   Q    Are you familiar with this exhibit?

1    A    Yes.

2    Q    What does it show?

3    A    This is -- if you look up in the upper left-hand

4    corner, you'll see some information.  So this is a

5    profit-and-loss statement for Lawson for fiscal year 2012,

6    and it's for the United States, and then you'll see what I

7    call left labels on the left-hand side that give different

8    line items, and then sort of in the middle of the chart

9    you'll also see some numbers.  So basically a profit and

10   loss statement.

11   Q    Is this information specific to configurations three

12   and five?

13   A     No.  This is for all of Lawson, the entire company,

14   the U.S.

15   Q    If you look at the right side of the first page of the

16   spreadsheet, do you see that there are some columns with

17   Xs underneath them?

18   A    Yes.

19   Q    What do those mean?

20   A    Well, the easiest to do that is, is the Xs tell you

21   where to place the line items if you wanted to divide up

22   these revenues into different buckets like licensing,

23   maintenance, or service revenues.

24        So, for example, we could -- if you look at -- and

25   hopefully everybody has a color copy of this, but if you

1    look at the left labels on the left-hand side in the blue

2    section, it says, new software license.  If you go all the

3    way over to the right where it says allocation method,

4    you'll see that there's an X under license.

5         So what Lawson is telling us is, is that new software

6    license goes into the license bucket in terms of what they

7    would catalog as licensing revenue.

8    Q    And how do you know that your interpretation of this

9    Lawson spreadsheet is correct?

10   A    This was described in Mr. Samuelson's deposition.

11             MR. STRAPP:  Your Honor, I would offer PX-1244

12   into evidence.

13             THE COURT:  Any objection?

14             MR. DUSSEAULT:  No, Your Honor.

15             THE COURT:  It's admitted.

16

17             (ePlus Exhibit 1244 admitted.)

18

19   Q    I'd like to turn to your gross profits calculation.

20   You mentioned that gross profits are calculated by

21   subtracting direct costs from revenue.

22   A    Yes.

23   Q    How do you know, in this case, which costs to

24   subtract?

25   A    If I understand your question, that would be from this

1    exhibit we just looked at.  So, for example, I gave you an

2    example of how one would know the licensing revenue using

3    the left labels and the Xs -- left labels on the left and

4    the Xs on the right, but, for example, if we take another

5    example where it says midway down, cost of licenses, if

6    you just follow that line item all the way across, you'll

7    see an X under license.  So now I know the associated

8    direct costs that go along with the license revenue.

9        So from this spreadsheet, we will -- we were able to,

10   in a sense, reorganize it based on the Xs to come up with

11   gross profit margins.

12   Q    Have you prepared a demonstrative to help explain in

13   this case what direct cost you subtracted from revenues to

14   calculate gross profits?

15   A    Yes.

16   Q    And is this the demonstrative you prepared?

17   A    Yes.  So we can see the title again, Expenses Deducted

18   to Derive Gross Profits, and there's the direct cost of

19   licensing, the direct costs of maintenance, and the direct

20   costs of service, and this is based on deposition

21   testimony again of Mr. Samuelson.

22       What are the different conceptual cost categories that

23   are part of the direct costs of licensing, direct costs of

24   maintenance, and direct costs of service.  So we've listed

25   out examples of those direct costs.

Ugone - Direct

1    Q    And could you give me some examples that you deducted

2    from revenues to calculate gross profits?

3    A    So, for example, under direct costs of licensing,

4    there might be royalties paid to third-party technology

5    partners or commissions paid to resellers, cost of

6    hardware infrastructure use for hosting the software.

7    That would all be costs associated with the licensing

8    revenues that Lawson has received.

9         Similarly, if we go to the direct costs of

10   maintenance, there's the internal support group costs.

11   That's the first line item there.  All the way down to the

12   last one in that column, commissions paid to Lawson

13   salespeople, those are all the things that were testified

14   to by Mr. Samuelson.

15        The direct costs of service, there's internal

16   consulting personnel, there might be third-party

17   consulting expenses, commissions, bonus, travel expenses

18   because you are doing consulting and going on site to the

19   -- potentially to the customer site.  So those are the

20   types of things you would subtract out of the service

21   revenue as direct costs of providing that service.

22        So this conceptually tells us what are the costs, the

23   different buckets or categories of costs associated with

24   each of the revenues.

25   Q    And, again, this was from the spreadsheet that we just

1   looked at?

2   A    These are from the spreadsheet but also in combination

3   with Mr. Samuelson's deposition testimony.

4   Q    Has Lawson provided ePlus with data regarding gross

5   margins for licensing, maintenance, and service?

6   A    On a companywide basis, yes.  So that was from a

7   document that we've seen.

8   Q    Okay.  And have you prepared a demonstrative to show

9   the gross profits that Lawson received in your calculation

10  from licensing, maintaining, and servicing configurations

11  three and five?

12  A    Yes.  I've prepared a chart, yes.

13  Q    Is this the demonstrative you prepared?

14  A    Yes.

15  Q    Can you explain what this shows, please?

16  A    So, again, I try to entitle my charts such that

17  they're descriptive, but it says Lawson's Infringing Gross

18  Profits.  We talked at first how I compiled the infringing

19  revenues which was $29.4 million.  We've just talked about

20  the direct costs of licensing, maintenance, and service,

21  and those direct costs are approximately 11.3 million.

22       We subtract the direct costs from the revenues in

23  dispute, the infringing revenues, and you get what's

24  called gross profits which is $18.1 million.

25  Q    Let's turn to incremental profits.  Does Lawson track

1   incremental profits?

2   A    No.

3   Q    Did you attempt to estimate Lawson's incremental

4   profits for configurations three and five?

5   A    I did, yes.

6   Q    Have you prepared a demonstrative to help you explain

7   how you calculated Lawson's incremental profit?

8   A    I did prepare some additional charts, yes.

9   Q    Let's take a look at your demonstrative.  Is this the

10  demonstrative you prepared?

11  A    I did prepare this demonstrative, yes.  This one is

12  going to the bottom line in terms of the results of my

13  work.

14  Q    What costs did you consider deducting to calculate an

15  incremental profit margin?

16  A    The way to think about it is, again, we have revenues

17  less direct costs give gross profits.  The question is,

18  are there any other costs to deduct, and those costs that

19  you can consider would be operating expenses.  And we've

20  provided three different categories of operating expenses

21  here which are general and administrative, product

22  development, which is the same as R and D, research and

23  development, and also sales and marketing.  Below each of

24  those, based on the deposition testimony of Mr. Samuelson,

25  we've tried to conceptually say, what are in each of those

Ugone - Direct                                                      908

1   operating expenses buckets.

2   Q    How does Lawson track these types of operating

3   expenses?

4   A    Well, they did not track them on a product-by-product

5   basis if that's what you're asking, so they all went into

6   one compilation.

7   Q    Have you prepared a demonstrative to help you explain

8   which of these costs could and which could not be used to

9   estimate incremental profits?

10  A    Yes.

11  Q    Is this the demonstrative you prepared?

12  A    Yes.  So this -- in a sense, if you keep in mind the

13  prior chart that lists out the three different types of

14  operating expenses and also keep in mind the buckets of

15  costs that are within each of those categories of general

16  and administrative, product development, and sales and

17  marketing, this chart shows my ultimate conclusions of the

18  which ones I would deduct to come up with incremental

19  profits and which ones I would not deduct because they are

20  fixed costs.  That's what this chart is telling us.

21  Q    Can you explain which costs -- well, let's start with

22  the G&A cost on this demonstrative.  Can you explain why

23  it's your opinion that you would not deduct G&A costs to

24  calculate incremental profits?

25  A    Well, when we're talking about general and

1    administrative costs, we're talking about the finance

2    department, we're talking about the information

3    technology, IT group, we're talking about HR.  Those are

4    all the things that were on the prior chart, and if you

5    think about it, those are not the types of costs that

6    would vary with revenue associated with the infringing

7    configurations during the injunction period.

8              THE COURT:  They're going to be there anyway.

9              THE WITNESS:  They're going to be there anyway,

10   yes.

11   Q    Was there any documentation you relied on to come to

12   that conclusion?

13   A    Actually, there was deposition testimony that I relied

14   upon.

15   Q    What about financial information produced by Lawson?

16   A    I also looked at their 10Ks, and in their 10Ks they

17   would often describe movements in general and

18   administrative costs or other costs, and they would give

19   other reasons other than revenue.  In other words, these

20   were varying for -- there was a merger or there was a

21   change in compensation, or they've done something else,

22   but it wasn't because of sales increasing, and, clearly,

23   these were stay fixed.  They wouldn't change with the

24   infringing configuration revenues.

25   Q    What about product development costs; can you explain

1   why you didn't deduct product development costs to

2   calculate incremental profits?

3   A    Same concept there.  They wouldn't change whether you

4   are providing the infringing configurations or not, and,

5   in fact, there was deposition testimony that there was

6   no -- in other words, I've seen no evidence of any product

7   development expenses associated with the infringing

8   configurations.

9        So I think it's important to remember here, we're not

10  just even talking about changes in Lawson's revenue

11  generally.  We're talking about the infringing

12  configurations, was there any product development expenses

13  incurred associated with the infringing configurations

14  during the injunction period, and I've seen no evidence of

15  that, and, hence, that's why there's a no in this bucket

16  here of product development, why it is not subtracted out

17  as a cost.

18  Q    So is it your opinion that when you calculate an

19  incremental profit margin, you can never deduct product

20  development costs?

21  A    So with G&A, for example, and with product

22  development, I'm not saying that it's never appropriate to

23  deduct that.  I'm saying given the facts and circumstances

24  of what's going on in this dispute, looking at the

25  infringing configurations and those revenues during the

1    injunction period, if those revenues were taken away,

2    would these costs have declined and/or changed, and

3    there's been no evidence of that.

4    Q    What about sales and marketing expenses?  Can you

5    explain why you deducted sales and marketing expenses in

6    calculating incremental profits here?

7    A    So I have a yes here, so I ended up some doing some

8    deductions which we'll explain in a second, but there were

9    categories here that one would think would vary with

10   revenue, for example, commissions.  And because of that, I

11   made the determination that I would do some deductions for

12   those costs.

13   Q    Well, under this reasoning, is it appropriate to

14   deduct all sales and marketing expenses?  Was that your

15   ultimate opinion?

16   A    Well, what I ended doing for conservatism, I did

17   subtract all sales and marketing expenses.  It's highly

18   unlikely that all of them would be variable related to the

19   infringing configurations during the injunction period,

20   but for conservatism, on a percentage basis I subtracted

21   out all of the sales and marketing expenses.

22   Q    Have you prepared a demonstrative to help you explain

23   what Lawson's incremental profit margin on figure

24   configurations three and five was if you adopt this

25   approach?

1   A    Yes.

2   Q    And is this the demonstrative you prepared?

3   A    Yes, it is.

4   Q    Can you explain what it shows?

5   A    This really is pulling everything together that we've

6   talked about.  If you look at revenue, and let's just call

7   that 100 percent, that's the -- for example, the

8   $29.4 million, subtract out the direct costs, which are

9   about 33.9 percent, yields a gross profit margin of about

10  66.1 percent.

11      We then subtract out on a percentage basis all of the

12  sales and marketing expenses for conservatism.  That's

13  another 15.2 percent, and you end up with an incremental

14  profit margin of 50.9 percent.

15      So the thing I'll point out here is, we talked about

16  the revenues first, the 29.4 million, and we'll see this

17  in a summary chart.  Then we talked about gross profits,

18  and now we're taking it down to incremental profits.

19  Q    And have you also prepared a demonstrative to help you

20  explain in dollar figures what you calculated Lawson's

21  incremental profits to be?

22  A    Yes.

23  Q    Is this the demonstrative you prepared?

24  A    Yes, it is.

25  Q    What does this show?

1    A    So there were infringing revenues of 29.4 million

2    compiled according to that methodology I talked about

3    earlier.  I've talked about how I have derived an

4    incremental profit margin of 50.9 percent.  You multiple

5    that incremental profit margin of 50.9 percent times the

6    $29.4 million of infringing revenues associated with the

7    infringing configurations during the injunction period,

8    and you get incremental profits to Lawson of $15 million.

9    Q    You have reviewed a few different measures of damages

10   during the injunction period through the end of

11   November 2012.  Have you prepared a demonstrative to

12   summarize the different opinions you've provided?

13   A    Yes.

14   Q    Is this the demonstrative you've prepared?

15   A    Yes.  So this is actually taking us full circle to the

16   very beginning where I talked about the different measures

17   that I was providing for the Court's consideration,

18   measure one, measure two, and measure three, and so we see

19   here, as its entitled, Summary Disgorgement Damages, and

20   that would be basically from the injunction through

21   November 30th, 2012.  That's important.  And then I give

22   the quantification of each of those concepts.

23        So Lawson's revenues were $29.4 million; Lawson's

24   gross profits during this period of time, $18.1 million;

25   and Lawson's incremental profits were $15 million, and,

1   again, this is all associated with the infringing

2   configurations during the injunction period up through

3   November 30th, 2012.

4   Q    Do you have an opinion about how to quantify damages

5   after November 30th, 2012, should the Court find Lawson in

6   contempt?

7   A    There's really two different ways that that could be

8   done.  It could be that after the Court's finding, that

9   Lawson provides updated data in which case I would just

10   follow this same methodology for the data that goes from

11   December 1st, 2012, through, let's say, today, or what

12   I've also done and provided here is what I'll call a daily

13   rate.

14        So for each of these disgorgement measures, I've

15   calculated what it is on a daily basis, and so the Court

16   could take that daily rate and then multiple by the number

17   of days.

18   Q    Have you provided any damages options for the Court to

19   consider if Lawson does not comply with the Court's order

20   should the Court find Lawson in contempt?

21   A    Right.  So like I said, there's a daily rate.  Now,

22   what the daily rate can do is from the history, the number

23   of days from November 30th, 2012, through today, you can

24   use that daily rate, but on a going-forward basis, in a

25   sense that could be a rate that the Court could apply, in

1    a sense, as a penalty for each day that Lawson does not

2    comply with the injunction order.  So you could use the

3    same numbers but for different purposes.

4    Q    Have you prepared a demonstrative to summarize these

5    daily measures?

6    A    Yes.

7    Q    Is this the demonstrative you've prepared?

8    A    Yes, it is.

9    Q    And what does it show?

10   A    So daily rates, and I've got my three measures again,

11   daily revenues, daily gross profits, daily incremental

12   profits.  That's what's shown on the right, so each day in

13   the past up through today, or you could use that as a

14   course of payment in the future if Lawson does not comply,

15   the daily revenues associated with the infringing

16   configurations, on average, are $62,362; daily gross

17   profits, $38,928; and the daily incremental profits,

18   $31,742.

19            MR. STRAPP:  No further questions.

20            THE COURT:  Are these disks and all these

21   documents in here, are they all agreed?

22            MR. STRAPP:  Your Honor --

23            THE COURT:  Are they part of what you gave me as

24   agreed exhibits early on?

25            MR. STRAPP:  Exactly.  These are actually DVDs of

1    large financial spreadsheets.  If you get bored this

2    weekend, they're there for you.

3            THE COURT:  I'm a Louisville supporter.  I don't

4    think I'm going to get bored this weekend.

5            MR. DUSSEAULT:  That hurt, Your Honor.

6            THE COURT:  Only when Kentucky is not in the

7    tournament.

8            MR. DUSSEAULT:  May I proceed?

9            THE COURT:  Please.

10

11                    CROSS-EXAMINATION

12   BY MR. DUSSEAULT:

13   Q    Good afternoon, Dr. Ugone.

14   A    Good afternoon.

15   Q    You mentioned early in your testimony that your

16   assignment or role here was to provide guidance to the

17   Court; correct?

18   A    Yes.

19   Q    And you recognize that the Court has broad discretion

20   in awarding a remedy in a contempt proceeding; correct?

21   A    That's my understanding, yes.

22   Q    And you also recognize that the Court exercises that

23   discretion only after considering the relevant facts and

24   circumstances; correct?

25   A    I would agree with that, yes.

1    Q    You also described to the Judge that the way you

2    evaluate this is sort of an if/then statement; correct?

3    A    Yes.

4    Q    Meaning if the Court finds a particular remedy to be

5    appropriate, then you play your role of calculator and you

6    calculate that; right?

7    A    It's a little bit more than that, but I'll accept the

8    -- in the spirit of your question, I will accept that,

9    yes.

10   Q    I appreciate that, thanks.  The only measure of

11   damages you've offered today with Mr. Strapp are

12   disgorgement of profits and revenues; correct?

13   A    I have just provided disgorgement of revenues,

14   disgorgement of gross profits, and disgorgement of

15   incremental profits.

16   Q    Take your if/then construct with me, if you would,

17   sir.  If the Court decides in his broad discretion after

18   hearing all the evidence that it wants to award a remedy

19   other than disgorgement, then you've given the Court

20   nothing it can use; true?

21             THE COURT:  Then what?

22   Q    Then you've given the Court nothing at all it can use;

23   correct?

24   A    I would be a little careful with that.  At the bottom

25   line, yes, I've provided three measures to the Court, but

1  there's valuable information in the data that I've

2  provided to the Court, and the Court can take that

3  information and use it how they want.  But in terms of

4  bottom lines measures, I'm not going to disagree.  I've

5  provided three measures for the Court.

6  Q    Okay, and just to be sure I didn't overstate, let's

7  clarify that.  You've offered three measures, but every

8  one of the measures is a disgorgement of either revenues

9  or profits; true?

10  A    I believe I would agree with that, yes.

11  Q    Let's look at your calculator role.  If the judge

12  decides it wants -- that he would like to award a remedy

13  anywhere out in the universe other than disgorgement,

14  taking your calculator role, you have not calculated an

15  award that he can give here; correct?  That's true, isn't

16  it, sir?

17  A    What I was trying to say is I would agree with the

18  spirit of your question, but there's a lot of numbers I

19  presented to the Court.  The Court can choose to use those

20  numbers as they wish, because it's various categories, but

21  in terms of the bottom line numbers I've provided, yes,

22  there's three disgorgement measures.

23  Q    Okay.  And you were asked by Mr. Strapp about any

24  assumptions you've made.  Do you recall that?

25  A    Yes.

1    Q    And you only identified one assumption which was that

2    the Court finds Lawson to be in contempt; correct?

3    A    Yes, and -- the answer is yes, and the reason why I

4    did that is that's usually the primary assumption that a

5    damage quantifier makes.  Otherwise, the numbers aren't

6    relevant.

7    Q    But that isn't really the only assumption you made, is

8    it?

9    A    Well, I tried to have empirical anchors and inputs for

10   other -- the bases for the calculations.  Now, whether we

11   call them inputs or assumptions, but there was data I was

12   using.  There was deposition testimony.

13   Q    But, in fact, sir, you relied on a representation from

14   ePlus's lawyers that disgorgement is an appropriate remedy

15   in this proceeding; you relied on that, correct?

16   A    I would agree with that, yes.

17   Q    And you can't --

18   A    I'm sorry.  If I could add a little bit.  And also,

19   I've seen that before in some of the other work that I've

20   done.  So it was not like that assumption seemed out of

21   the ordinary.  It seemed to make sense, but you are right,

22   I'm not a lawyer, so I can't make that determination

23   myself.

24   Q    Right, and we'll talk a little bit about some of the

25   other work you've done.  You say you -- strike that.

1        It's true that you can't speak to whether disgorgement
2    is always an appropriate remedy, can you?
3    A    I put that into more of what I'll call the legal
4    bucket rather than the economic bucket, so I can't -- nor
5    would I attempt to speak to that.
6    Q    So is the answer yes?
7             THE COURT:  I think a good answer to that is, no,
8    I can't speak to that.
9    A    I cannot speak to that, correct.
10   Q    You also can't speak to whether the willfulness of any
11   infringement that's found has any impact on whether
12   disgorgement is an appropriate remedy, can you?
13   A    I would agree with that statement.
14   Q    And you've testified in trial and deposition more than
15   200 times since 1990; true?
16   A    That's correct.
17   Q    And you've testified in trial alone between 75 and 80
18   times just since 1990; correct?
19   A    It's closer to 90, but I would agree with that.
20   Q    Now, you understand, sir, that courts can take a
21   calculation of a plaintiff's lost profits into account
22   when awarding a remedy in a contempt proceeding; correct?
23   A    I'm sorry.  If I could just have the question again.
24   Q    You understand that courts can take a calculation of a
25   plaintiff's lost profits into account when exercising its

1    broad discretion to award a contempt remedy; correct?

2    A    Yep.  I understand the Court can exercise broad

3    discretion and take that in consideration, sure.

4    Q    But here, you have made no attempt to calculate the

5    profits that Lawson -- excuse me, that ePlus lost as a

6    result of any alleged contempt; correct?

7    A    I haven't done that calculation.  We might have talked

8    about that during my deposition.  There's a reason why,

9    but I haven't done that.

10   Q    So the answer is you haven't done it?

11   A    I have not done it, that's correct.

12   Q    Now, in fact, you haven't made any attempt to

13   determine whether ePlus has lost any profits at all as a

14   result of conduct during the contempt period; true?

15   A    In terms of -- if you are asking the calculations that

16   I did, you are absolutely right.  I did disgorgement

17   measures, the three that I talked about.  I did not do a

18   lost profits calculation.

19   Q    Sir, that wasn't my question.  My question is this:

20   It's true that you made no attempt to determine whether

21   ePlus lost any profits at all as a result of Lawson's

22   alleged contempt; correct?

23   A    You are asking did I make that attempt.  I want to

24   make sure I have your question.  I did not do that

25   calculation.

1    Q    Let me ask it one more time and see if you can answer

2    yes or no --

3              THE COURT:  He's trying to find out the answer

4    whether you made a calculation or not.

5              THE WITNESS:  I did not make that calculation.

6    If that's what he's asking, I did not --

7              THE COURT:  The question is, did you attempt to

8    find out the information, i.e., by asking somebody.  Did

9    you ask Mr. Farber how much profits did you lose, for

10   example?  That's part of what he wants to know.

11   Q    Right.  And you did actually talk to Mr. Farber;

12   right?

13   A    Yes.

14   Q    But you didn't ask him that, did you?

15   A    That's correct.

16   Q    Now, in coming to your opinions in this case, you

17   didn't see any market share data specifically pertaining

18   to the period from the injunction forward; correct?

19   A    That's correct.

20   Q    You didn't see any data about ePlus's post-injunction

21   revenues; correct?

22   A    I believe that to be correct, yes.

23   Q    You didn't consider any information about ePlus's

24   profits post-injunction; correct?

25   A    That would be correct.

1   Q    You didn't have any data concerning the number of

2   post-injunction sales made by ePlus; correct?

3   A    Correct.

4   Q    You can't speak to whether, in fact, after the

5   injunction was entered, ePlus went out and tried to win

6   any business from Lawson customers; correct?

7   A    I can't speak to those activities post -- are you

8   asking post --

9   Q    Let me ask it again and see if you can answer yes or

10  no for me.  You can't speak to whether, in fact, after the

11  injunction was entered, ePlus went out and tried to win

12  business from Lawson's customers; correct?

13  A    That's correct.

14  Q    Now, you are not offering an independent opinion in

15  this case that lost profits are incapable of calculation,

16  are you?

17  A    I've read some of the court papers, but I'm not giving

18  an independent assessment of that.

19  Q    So is that a -- you are not offering that opinion?

20  A    I believe you asked me if I'm giving an independent

21  opinion as to whether lost profits can be calculated.  Is

22  that what you are asking me?

23  Q    Let me ask it again, see if you can answer yes or no

24  for me.  You are not offering an independent opinion that

25  lost profits are incapable of calculation, are you?

1    A    I'm not giving an independent opinion of that.  I've

2    read some of the Court's orders and opinions, but I'm not

3    giving an independent opinion on that.

4    Q    But since my question went to an independent opinion,

5    your answer is you are not?

6    A    I'm not, that's correct.

7    Q    Now, you've calculated lost profits in patent cases

8    somewhere between 20 and 50 times; correct?

9    A    I'm not sure if I remember the number, but I've done

10   it many times, yes.

11   Q    Do you have any reason to disagree with that?

12   A    No, no.

13   Q    You are aware that another measure the courts use for

14   contempt awards in some cases is a reasonable royalty or

15   the equivalent thereof; correct?

16             MR. STRAPP:  Objection, Your Honor.  Your Honor

17   has already ruled on the reasonable royalty and has struck

18   Dr. Putnam or any expert from talking about that in the

19   contempt hearing.  I think this question is improper.

20             MR. DUSSEAULT:  Your Honor, there was no motion

21   or ruling whatsoever about asking this expert about his

22   decision not to try and measure reasonable royalty.

23             THE COURT:  Overruled.

24   Q    Let me ask the question again.  You are also aware

25   that another measure courts use for a contempt award is

Ugone - Cross

1   reasonable royalty or the equivalent thereof; correct?

2   A    Or they can consider it, sure.

3   Q    You are not offering a reasonable royalty opinion in

4   this case; correct?

5   A    That's correct.

6   Q    You've calculated reasonable royalties in patent cases

7   at least 50 times, sir; correct?

8   A    I would probably agree with that.

9   Q    In fact, at the time of your deposition -- we met

10  before, right, when I took your deposition?

11  A    In the deposition, yes.  I alluded to that a little

12  bit ago, but, yes.

13  Q    At the time of your deposition in this case, you could

14  only think of one time other than this case that you were

15  retained as a testifying expert in a patent-related case

16  in which you didn't offer an opinion as to either lost

17  profits or reasonable royalty; isn't that true?

18  A    I'm not sure if I remember that, that answer, that I

19  only could think of one time, there was -- I'm struggling

20  a little bit with the question.  Are you saying there's

21  only one time when I could not give either of those, or I

22  didn't give either of those?

23  Q    Let me ask the more direct question.  As you sit here

24  today, can you think of any other case in your career,

25  patent-related case, where you have offered neither a

1    reasonable royalty or lost profits opinion?

2    A    Generally, to the best of my recollection, I usually

3    offer a lost profits or a reasonable royalty opinion.

4    There's been other times where I've done disgorgement-

5    related opinions relating to intellectual property, but

6    generally, in a patent infringement context, I will give a

7    lost profits or a reasonable royalty.

8    Q    You are not offering any opinion that you are

9    incapable of doing a reasonable royalty calculation in

10   this case; correct?

11   A    I'm not giving that opinion, no.

12   Q    Counsel for ePlus didn't ask you to do a reasonable

13   royalty in this case; right?

14   A    I would agree with that.

15   Q    So you didn't do it; right?

16   A    That's correct.  There was discussion -- you've seen

17   what I presented, the disgorgement approach.

18   Q    Now, you referred earlier in this cross-examination to

19   some of the others cases in which you've testified, some

20   of the other work that you've done about disgorgement; do

21   you recall saying that?

22   A    I believe I had a question as to the different types

23   of cases that I've testified on.

24   Q    And you responded to one of my questions by referring

25   to other work that you've done that involved disgorgement;

1  do you recall that?

2  A    I remember talking about different causes of action.

3  Q    Let me just get to it.  You were an expert witness in

4  the trial in the *TiVo* case, weren't you?

5  A    Yes, I was.

6  Q    And in that case, you offered the Court a

7  $974.5 million disgorgement revenue of DVR profits;

8  correct?

9  A    That was one of the menu of options I gave to the

10  Court, yes.

11  Q    And there were two items on that menu; right?

12  A    Yes.

13  Q    The other menu item that you gave that Court was one

14  based on a reasonable royalty; correct?

15  A    Yes.  The jury had come back with a reasonable royalty

16  answer -- I had testified at trial as to a reasonable

17  royalty.  The jury found that appropriate.  They came back

18  with a number that I said, so when it got to the contempt

19  phase, it was also natural to have a reasonable royalty on

20  the menu.  So, yes, I did do that.

21  Q    So the answer to the question I asked is yes.

22  A    Yeah, sure, yes.

23  Q    Now, in *TiVo*, the district court rejected your

24  disgorgement remedy as unreasonable under the

25  circumstances of that case; correct?

1          MR. STRAPP:  Your Honor, I believe this beyond

2     the scope of my direct.

3          MR. DUSSEAULT:  He testified on direct about his

4     effort to provide assistance to the Court by offering a

5     menu to address your if/then situations.  I think I'm

6     allowed to explore that in other cases he's chosen to

7     offer some menu items he didn't choose to offer today.

8          THE COURT:  Overruled.

9     Q    Let me ask you the question again.

10    A    Sure.

11    Q    In *TiVo*, the Court rejected your disgorgement remedy

12    as unreasonable under the circumstances of the case;

13    correct?

14    A    I don't remember the phraseology, but it is true that

15    when you give a menu and only one is chosen, the other

16    ones are not chosen, so I don't disagree the Court didn't

17    take all options.

18    Q    Are you taking issue with the fact that the Court

19    actually deemed your disgorgement remedy to be

20    unreasonable?

21    A    No, I'm not taking issue with that.  I'm just saying

22    that when you give you a menu -- when you give a menu of

23    options, there's going to be options that aren't taken.

24    The Court, in that case, as you know, did take exactly one

25    of my options.

1    Q    Sure, but I want to be very careful that we're

2    focusing on my questions here, sir.  I'm not asking

3    whether he picked one of two reasonable choices.  I'm

4    asking whether it's accurate to say that the Court in *TiVo*

5    found your disgorgement remedy to be unreasonable; yes or

6    no?

7              THE COURT:  Under the circumstances.

8              MR. DUSSEAULT:  Under the circumstances, yes,

9    sir.

10   Q    It did, didn't it?

11   A    If you will just bear with me --

12             THE COURT:  Do you remember what the Court held

13   on that point?

14             THE WITNESS:  That's what I was trying to do.  I

15   as trying to --

16             THE COURT:  Just say, no, I don't remember, if

17   you don't remember.

18             THE WITNESS:  I'm willing to accept the spirit of

19   what you said.  I don't remember the exact words.

20             THE COURT:  I can read what they say.

21   Q    Would it help you if I pulled out the opinion --

22             THE COURT:  I can read it.  Either they did or

23   they didn't.

24   Q    The Court also described your disgorgement remedy as

25   seeking to punish EchoStar for its actions; correct?

1    A    I'll accept your representation.  I don't remember the

2    exact phraseology.

3    Q    And instead, the Court adopted your measure that was

4    based on a reasonable royalty; correct?

5    A    What I call a reasonable royalty plus, yes.

6    Q    When you say plus, you are talking about a $1

7    adjustment that was made to the royalty based on increase

8    in what EchoStar was charging; correct?

9    A    It was the royalty the jury awarded, and I gave the

10   menu to the Court of that royalty plus a $1 addition to

11   that based on a number of factors.

12   Q    Dr. Ugone, do you understand that ePlus is taking the

13   position in this case, in this proceeding, that Lawson is

14   in contempt not only with respect to RQC but also with

15   respect to continuing use of RSS by customers after the

16   date of the injunction?

17   A    The way I understand it is, is that there's an

18   infringing configuration three and infringing

19   configuration five.  I think of it as the totality of my

20   understanding of what's been defined as infringing

21   configurations, but those have been ongoing and provided

22   to the marketplace.  That's how I think about it.

23   Q    Just to clarify, nobody has found a configuration with

24   RQC to be infringing yet; right?  Isn't that true?

25   A    Well, I just know three and five is what I'm --

1   Q    RQC -- let me ask a couple foundation questions.  RQC

2   is the workaround change to what was RSS; correct?

3            MR. STRAPP:  Objection, Your Honor.  This is also

4   beyond the scope.  We're going into technical areas which

5   I never asked the witness about.

6            THE COURT:  You are getting a little far afield,

7   I think.

8            MR. DUSSEAULT:  Well, maybe I'll bring it back,

9   Your Honor.  This issue is actually totally within the

10  scope.  I was just trying to lay a foundation.

11  Q    Do you understand, sir, just on a very basic level,

12  that there was the RSS product that was at issue in the

13  case, and there's an RQC workaround that's at issue now?

14  A    Yeah.  Sometimes I use different words, so there's the

15  requisition self-service, there was Requisition Center.

16  Those are the initials that you are using.  I do

17  understand that the attempted workaround was what I call

18  the Requisition Center.  If that's what you're asking, I

19  do understand that.

20  Q    Now, you assume for purposes of your opinion that the

21  Court finds RQC to be infringing; right?

22            MR. STRAPP:  Your Honor, I just object for

23  clarity sake.  It's not RQC that is infringing.  It's the

24  configuration that's made up of several modules.  RQC is

25  only one of those modules.

1        MR. DUSSEAULT:  I'll ask a better question.

2   Q    You assume for purposes of your opinion that the Court

3   finds configurations three and five using RQC rather than

4   RSS to be infringing; correct?

5        THE COURT:  You're assuming that there's a

6   finding of infringement that authorizes damages of some

7   kind.

8        THE WITNESS:  That's correct, or that there's a

9   violation of the injunction order.  That's what I said

10  very, very early on, that that's an assumption.

11  Q    Assume hypothetically that the Court finds that

12  configurations with RQC, the new workaround product, don't

13  infringe.  Are you with me so far?

14  A    Yes.

15  Q    So the only issue left for the Judge to decide is

16  whether the customers who used RSS after the injunction

17  date, whether customers used RSS after the injunction

18  date, and, therefore, Lawson is in contempt on that basis;

19  can you assume that?

20  A    Yes.

21  Q    Now, you offer no opinions to the Court in this case

22  as to the identity or numbers of customers who allegedly

23  used RSS after the injunction -- excuse me.  Let me ask

24  again, because I'm tripping over my words.  I want to be

25  sure it's right.

1      You've offered no opinion in this case as to the

2 identity or number of customers that allegedly used RSS

3 after the effective date of the injunction; true?

4 A    If you are saying to me have I taken my numbers and

5 split out those customers that are still using the RSS

6 versus the Requisition Center as part of the infringing

7 configuration, I haven't separated those numbers if that's

8 what your question is.

9 Q    Thank you.  I appreciate that, but I'll take it a step

10 further.  You haven't even analyzed what customers are or

11 aren't using RSS; right?

12 A    I would have to go back and look and see if that's

13 actually in our work papers, if one could tell that or

14 not, but that's not a calculation that I have separately

15 done.

16 Q    And you haven't offered this Court a measure of

17 damages in the event the Court finds configurations with

18 RQC are non-infringing, but folks who continue to use RSS,

19 they are infringing; correct?

20 A    I have not provided that number today.  The only

21 caution I would give is, there's some profitability

22 numbers that one might be -- the Court might be able to

23 apply to some revenue numbers if they have the revenue

24 numbers.  So I think some of the cost considerations would

25 go over, but I have not provided a separate number.

1    Q    So in the if/then construct of your opinions, if the

2    Court finds I will award contempt only as to people using

3    RSS, then you have not given the Court a measure; right?

4    A    Not a bottom line measure, that's correct.

5    Q    Have you given a top line measure?

6    A    What I'm trying to say is there's the costs side of

7    it.  If the Court had --

8              THE COURT:  You're saying there's information in

9    there that somebody could use to come to that conclusion

10   if they were inclined to do that, but you haven't done it.

11             THE WITNESS:  That's correct.

12             MR. DUSSEAULT:  Thank you.

13   Q    Now, you've offered three different disgorgement menu

14   items to the Court; revenues, gross profits, and

15   incremental profits; correct?

16   A    Yes.

17   Q    And your position is that those measures provide

18   assessments of the gain to Lawson by not complying with

19   the injunction order; correct?

20   A    That's correct.

21   Q    And the gain to Lawson by not complying with the

22   injunction order, assuming that's what the Court finds, is

23   the difference between the profits that Lawson earned by

24   engaging in enjoined conduct versus what it would have or

25   could have earned if it hadn't engaged in enjoined

1   conduct; right?

2   A    I believe that could be a way of phrasing it, sure.

3   Q    Now, you've reviewed the Federal Circuit ruling;

4   right?  That was one of the ones on the slides you looked

5   at?

6   A    Yes.

7   Q    And you would agree that under the Federal Circuit

8   ruling, Lawson is free to do business with customers as to

9   several of the modules of configuration three and five as

10  long as those customers don't have Punchout; correct?

11  A    I think I'll go along with the spirit.  My

12  understanding is, is that there's -- my understanding is,

13  as a nontechnical person, there's two infringing

14  configurations we're talking about, and if there's

15  something else that's going on that doesn't match up with

16  those infringing configurations, then that's okay.

17  Q    In arriving at your disgorgement measures, your three

18  measures, you treated Lawson's gain 100 percent of the

19  revenues that Lawson earned from customers with

20  configurations three and five; correct?

21  A    You are going to have to ask that question again,

22  because I don't think it's quite right.

23         THE COURT:  I think the answer to that one is no

24  if you don't think the answer is right.

25         THE WITNESS:  No.

1  Q    Let me try and clarify.  You have identified -- what

2  you've tried to do in the process that Mr. Strapp took you

3  through is identify the revenues that are attributable to

4  the customers with configurations three and five for those

5  configurations; right?

6  A    Yes.  Well, attributable -- the revenues attributable

7  to those configurations and customers.

8  Q    And once you identify that revenue -- let's say you

9  were to disgorge all of that revenue.  It would be

10  100 percent of that revenue.

11  A    Of the revenue associated with the infringing

12  configurations.

13  Q    So you don't calculate what portion of that revenue,

14  if any, Lawson might still be able to have gotten by

15  selling a different configuration, let's say configuration

16  two?

17  A    I have not calculated revenues associated with

18  non-infringing configurations, so what I --

19            THE COURT:  That's enough.

20  Q    Let's go ahead and put up -- we have a couple slides

21  about this, slide 1102.  I think you'll be seeing it on

22  your screen.

23            MR. STRAPP:  Your Honor, before we get into these

24  questions, I think this is beyond the scope.  I didn't ask

25  about configuration two, and, in fact, configuration two

1    isn't even part of this proceeding, so I'm not sure where

2    Mr. Dusseault is going, but objection, beyond the scope.

3            THE COURT:  I lost the last part of what you

4    said.

5            MR. STRAPP:  Objection, beyond the scope, is a

6    short way of saying it, because I think this is not only

7    beyond my direct, but I think it's also beyond the scope

8    of this proceeding.

9            MR. DUSSEAULT:  My position on that, Your Honor,

10   would be the witness expressly testified that what he's

11   trying to do is measure the gain to Lawson, and he's

12   assuming that the gain is 100 percent of the revenues from

13   configurations three and five.

14           If Lawson can comply by selling the customer

15   configuration two, then that's a faulty assumption as to

16   the gain.  So I'd like to ask him a few questions about

17   that subject.

18           MR. STRAPP:  Your Honor, his opinion is about the

19   revenues and profits that Lawson earned from

20   configurations three and five.  He has offered no opinion

21   about what Lawson might do in the future with respect to

22   selling those customers configuration two.

23           That's not at issue in this proceeding.  He has

24   no opinion about it.  It's not in his report.  It wasn't

25   in the scope of my direct, and this proceeding is confined

1    to the modifications that were made relevant to

2    configurations three and five.  I don't think see the

3    relevance whatsoever.

4              MR. DUSSEAULT:  I think I can clarify, because I

5    think Mr. Strapp may be misunderstanding what I said.  I'm

6    not talking about what Lawson would do going forward.

7    There's a gain premise that he's talked about which is

8    comparing compliance with noncompliance.

9              The witness seems to be assuming that

10   noncompliance means foregoing all the revenue.  If

11   lawfully Lawson could have complied with the injunction by

12   selling a different product, that's something I'd like to

13   explore, at least to know whether he's thought about that.

14             MR. STRAPP:  Your Honor, he's offered no opinions

15   about what Lawson could have done by selling some other

16   product.  It's beyond the scope of his opinion, beyond the

17   scope of my direct.

18             THE COURT:  Sustained.

19   Q    Now, Dr. Ugone, do you understand that in this

20   proceeding, Lawson contends that configurations three and

21   five have substantial non-infringing uses?

22             MR. STRAPP:  Your Honor, I'm going to object

23   again.  It's beyond the scope of the direct, it's beyond

24   the scope of the opinions, and it's beyond the scope of

25   the contentions that Lawson made.  I think this came up

1    earlier today when substantial non-infringing use was

2    raised on cross-examination of another witness, and the

3    question was made, well, has that been part of these

4    proceedings, has an allegation been made by Lawson and is

5    there evidence in the record.

6              There isn't.  The witness hasn't examined any.

7    He certainly hasn't relied on any in forming his opinions,

8    so I would ask Your Honor to sustain the objection because

9    it's not relevant and it's beyond the scope of my direct.

10             MR. DUSSEAULT:  Your Honor, if I may, it's

11   absolutely untrue to say that it hasn't been addressed in

12   reports.  Dr. Putnam specifically addresses appropriate

13   measures for a remedy in the event that the Court might

14   find that there are non-infringing uses.  He did that in

15   his supplemental report, and Dr. Ugone addressed and

16   responded to that position in his last of four reports,

17   and it's a relevant issue, Your Honor, to probe --

18             THE COURT:  It was in his report; is that what

19   you are saying?

20             MR. DUSSEAULT:  It was absolutely in Dr. Putnam's

21   report, and a response was in Dr. Ugone's.

22             MR. STRAPP:  Your Honor, a couple things.  First

23   of all --

24             THE COURT:  Your answer to that is?

25             MR. STRAPP:  In the reply report, he responded to

1    Dr. Putnam's opinions.  He doesn't have any affirmative

2    opinions about non-infringing uses.  It was just simply a

3    rebuttal to Dr. Putnam, and the second thing I might

4    mention is that Dr. Putnam isn't qualified.  He's a

5    damages expert, not a technical expert, who could offer

6    opinions on substantial non-infringing uses in any event.

7             THE COURT:  I think that the bottom line is it's

8    beyond the scope of the opinions expressed here today.

9    Whether he said something about it in his report doesn't

10   open the door to letting it in today.

11            MR. DUSSEAULT:  Your Honor, if I could respond to

12   that, because I disagree with that for just this reason:

13   He has offered opinions that when you identify the revenue

14   for configurations three and five, what you do is you, as

15   the Judge, would disgorge either all of those revenues or

16   the profits.

17            I'm allowed to probe the reliability of that by

18   looking into the fact that he's ignored the potential that

19   what he's grabbing there is both revenue from infringing

20   activity and --

21            THE COURT:  You can ask that question, but that's

22   the only question, I think, you can get him to, and the

23   answer is he didn't consider it, and there isn't -- to my

24   knowledge, there is not one bit of substantive evidence

25   about non-infringing uses that have been tendered in the

1    case.  There have been -- there was questions asked of an

2    expert witness, but that's not substantive proof that

3    there's a non-infringing use that I know of.  You all can

4    tell me if there's substantive proof of something other

5    than what Dr. Weaver was asked about.

6              MR. DUSSEAULT:  Your Honor --

7              THE COURT:  Is there?  Have I missed that part of

8    the testimony?

9              MR. THOMASCH:  Your Honor --

10             THE COURT:  Who testified to it other than what

11   you asked Dr. Weaver, I guess is my question.

12             MR. THOMASCH:  We think that Dr. Weaver made

13   clear, and there is no dispute that everything that can be

14   done with configuration two can be done with configuration

15   three or five.

16             THE COURT:  I'm going to ask -- I'm going to use

17   Mr. Dusseault's technique.  How about answering my

18   questions?  Where did anybody testify to it other than

19   what Dr. Weaver said?  That's the first question.

20             MR. THOMASCH:  I hadn't thought that through.  I

21   think its through the record as a whole, and it wasn't

22   identified as such, but the facts that would allow you to

23   find it are there.

24             THE COURT:  No.  I want to know who testified to

25   it.  Then I can find it and recall it, but I don't

Ugone - Cross

1   remember any testimony of it, and the record as a whole

2   doesn't help me a whole lot, because I have to confess, I

3   don't have it all memorized.

4            MR. THOMASCH:  I think it's best we submit that

5   in writing then.

6            THE COURT:  I think so, too, if there's any proof

7   on it.  You can ask the one question I think you're

8   asking, is, did you, in your calculation, take into

9   account whether there might be non-infringing uses for

10  configurations three and five.

11  Q    Do you need me to repeat the Judge's question, or

12  would you like to answer that?

13  A    I think I understand the question.

14           THE COURT:  What is your answer?

15           THE WITNESS:  I need to say I'm not the technical

16  person.  Obviously, there's a lot going on in that

17  concept.  What I calculated was the revenues associated

18  with the two infringing configurations.  I didn't

19  calculate anything else.

20           THE COURT:  Okay.  We know that.  All right,

21  let's go on to what we are dealing with.

22  Q    So let's talk a bit --

23           THE COURT:  I have this big fat notebook, and you

24  haven't asked any -- oh, I see.  It's not all exhibits.

25           MR. DUSSEAULT:  Most of the fatness is the four

1    reports.

2            THE COURT:  I see now.

3    Q    Dr. Ugone, Mr. Strapp walked you through this, but is

4    it fair to say that the first step of using your

5    disgorgement method was to identify the revenues that are

6    attributable to the customers who have configurations

7    three and five for those configurations?

8    A    I would agree with that, sure.

9    Q    And could that be referred to as the revenue base?

10   Would it be fair to refer to that as the revenue base for

11   purpose of what you are doing?

12   A    For the purpose -- I've never called it the revenue

13   base.  It's the revenues associated with the infringing

14   configurations during the injunction period.

15           THE COURT:  Excuse me a minute, Mr. Dusseault.

16   How much more do you have of this witness?  I'm not trying

17   to rush you.  I'm trying figure out when the best time to

18   change court reporters is.

19           MR. DUSSEAULT:  My best estimate, Your Honor, is

20   45 minutes, but I would try to keep it to 30.

21           THE COURT:  I understand.  We'll take a 20-minute

22   recess and change now.

23

24           (Brief recess.)

25

 1          THE COURT:  I have been asked by the GSA how

 2    much longer you-all have got.  You say you've got 45

 3    minutes or so.  You've got your own witness, don't

 4    you?

 5          MR. DUSSEAULT:  I do, Your Honor.

 6          THE COURT:  That's how long?  A couple hours.

 7          MR. DUSSEAULT:  Your Honor, accepting that

 8    everything has taken a bit longer than we thought, I'd

 9    say between two and three hours probably, including

10    cross.

11          MR. STRAPP:  The one thing that's taken less

12    time, I thought mine would take an hour and a half,

13    and my direct took an hour.

14          THE COURT:  We're not levying fault here.

15          You're in trouble, Mr. Dusseault.  You're

16    about to get smacked.  He's already been punished.

17    He's a Duke fan.  Leave him alone.

18          MR. DUSSEAULT:  When I said two to three

19    hours, I was incorporating the cross.

20          THE COURT:  Okay.  I think I'd rather do it

21    Monday, than to stay Saturday, to tell you the truth,

22    because we've got the injunction argument to do, too,

23    don't we?

24          MR. STRAPP:  We do, Your Honor.

25          MR. DUSSEAULT:  Your Honor, I believe our

1  side has an issue as to the injunction argument for

2  Monday.

3          MR. THOMASCH:  Your Honor, we'll do whatever

4  schedule works for Your Honor.  I did want to ask the

5  Court for permission to be not present on Monday.  I

6  have a prior court engagement that has already been

7  put off by that court once.

8          THE COURT:  I'm not going to intrude on

9  another court's docket.  I don't think that's right.

10 Is somebody else going to argue the injunction?

11         MR. THOMASCH:  If it goes forward on Monday,

12 someone else will argue it.

13         THE COURT:  I mean, there are other days.

14         MR. THOMASCH:  If it could be done a

15 different day, I would argue.

16         THE COURT:  I gather nobody wants to do it

17 tomorrow.

18         MR. STRAPP:  We'd prefer --

19         THE COURT:  Did you have weddings or

20 something tomorrow you have to go to?

21         MR. THOMASCH:  We would be happy to confer

22 with counsel.

23         THE COURT:  All right.  You-all talk about

24 it.

25         MR. DUSSEAULT:  Your Honor, could I ask one

1    thing?  How late could we go tonight?  Is there a time

2    that we'd have to be done by?

3              THE COURT:  Tell them we need air and to keep

4    it on until 7 o'clock.

5              MR. STRAPP:  We'd prefer to wrap this up as

6    soon as possible.  So today, tomorrow, Monday.

7              THE COURT:  So do I, but I have a stress

8    test, besides this one to go to on Monday morning.  So

9    I couldn't do it until Monday afternoon anyway.

10             MR. DUSSEAULT:  On Monday afternoon?

11             THE COURT:  Anyway, just tell them to keep

12   the air on.  Get it until 9 just in case we change our

13   minds.

14             THE CLERK:  I can't be here until nine.

15             THE COURT:  You can't?  All right.  Let's go.

16             MR. DUSSEAULT:  Thank you, Your Honor.

17   BY MR. DUSSEAULT:

18   Q   Dr. Ugone, before the break, we were talking about

19   your calculation of the revenues connected with

20   Configurations 3 and 5.  Do you recall that?

21   A   Yes.

22   Q   And you testified on direct that you used Lawson's

23   data to identify customers who had the combination of

24   stock-keeping units that make up Configuration 3 or 5?

25   A   Yes.

1    Q    How many customers did you identify who had that?

2    A    I believe it was 72 were Configuration 3, 74 were

3    configuration 5 for a total of 146, if that's what you

4    asked.

5    Q    Yes.   Thank you.

6         Now, just to be clear, in some of your earlier

7    reports, you dealt with a much higher number of

8    customers, correct?

9    A    In another context, I think.

10   Q    Right.   But when you prepared your first two

11   reports in this case, I believe you were looking at a

12   customer group of as large as 800; is that correct?

13   A    I think that was data provided by Lawson, but I do

14   remember numbers of that size, yes.

15   Q    Did you in your reviews of the data, sir, see any

16   customers who did not have Punchout at the beginning

17   of the injunction period but acquired it during the

18   injunction period?

19   A    If I understand your question, I believe we saw

20   some customers, and I'm doing this from memory, where

21   the Punchout revenues started during the injunction

22   period, yes, to the best of our knowledge from looking

23   at the data.

24   Q    How did you handle that kind of a customer for

25   purposes of calculating the revenue if they were a

1    customer who did not have Punchout when the injunction

2    was entered but obtained it later?

3    A    So the date at which we saw the Punchout was when

4    we'd start picking up the revenues.

5    Q    For purposes of your three measures, you count all

6    of the revenues that that customer had as of the date

7    that they picked up Punchout?

8    A    From that point forward, if that's what you're

9    saying.

10   Q    For purposes of measuring that customer's gain,

11   you assume that as of the moment they picked up

12   Punchout, had Lawson complied, it would have lost not

13   just the Punchout revenue but all the revenue it had

14   before?

15   A    Actually, let's make sure we're speaking the same

16   conceptually here.  What I measured was the revenues,

17   gross profits and incremental profits associated with

18   a provision of an infringing configuration, either 3

19   or 5.

20        So I'm trying to directly answer your question.

21   So once you have an infringing configuration, my

22   understanding is that it's that entire configuration

23   that I've shown in the diagrams.  And so we picked up

24   all the revenue from that point forward.

25   Q    Yes.  I just want to be sure I understand, sir.

1    You picked up all the revenue from that point forward

2    and you include in your disgorgement remedy all of the

3    revenue from that customer from the moment that that

4    customer picked up Punchout?

5         MR. STRAPP:  Objection, asked and answered.

6         THE COURT:  Well, I think he's trying to

7    clarify it.  And I'd like to clear the answer.  So go

8    ahead.

9    A    I can't agree with the way you phrased it.

10         THE COURT:  Go ahead and answer it the way --

11   give him the answer to the question.  How did you

12   treat that revenue?

13         THE WITNESS:  Okay.

14   A    To your question, the answer is no.  How I did

15   treat it was I picked up for the infringing

16   configurations all the revenues.  You said all the

17   revenue of the customer.  All the revenue for the

18   infringing configurations of the customers.

19   Q    That you for the clarification.

20        So if a customer had all the pieces of

21   Configuration 3, let's say, before a certain date

22   except Punchout, are you with me so far?

23   A    I believe so.

24   Q    And then on a date within the injunction period

25   that customer picked up Punchout, with me on that?

1  A    Yes.

2  Q    You include in your disgorgement measure

3  100 percent or all of the revenues for that customer

4  as to Configuration 3 from the day they picked up

5  Punchout forward, correct?

6  A    That's correct.  My understanding of the

7  infringing configuration is the modules I showed, and

8  so I picked up all of those revenues.

9  Q    So you treat as Lawson's gain all of those

10 revenues even though Lawson was lawfully selling them

11 and maintaining and servicing all the other modules up

12 to the moment that they got Punchout, right?

13 A    I might use different words, but what I said was I

14 was picking up all of those revenues associated with

15 an infringing configuration.  Going forward I did make

16 a comparison.  I think this directly answers your

17 question.  I did make the comparison as to what was

18 being sold previously.

19 Q    But you essentially assume from the day they got

20 Punchout forward had Lawson complied, it would have

21 gotten none of the revenue from that configuration,

22 right?

23 A    No, I would say the assumption is a different one.

24 The question I was answering is what is the revenues

25 that Lawson got associated with the infringing

1   configurations, which would be all the modules that I

2   showed.  That's how I would describe the calculations.

3   Q   All right.  Okay.  Now, when talking about

4   revenue, Mr. Strapp asked you about an apportionment

5   that you made for large suite SKUs, do you recall

6   that?

7   A   For large suite SKUs, yes.

8   Q   I don't want to revisit that at all, but basically

9   you found that there were certain SKUs that included

10  both products that are part of the enjoined

11  configuration and also products that aren't mentioned,

12  and so you apportioned to reflect that fact; is that

13  fair?

14  A   What we did was we were just trying to capture the

15  infringing configuration revenues.  So I excluded

16  things that were not part of the infringing

17  configuration.  So that involved an apportionment, but

18  really, the point was excluding that which is not part

19  of the modules that make up the infringing

20  configuration.

21  Q   Okay.  And you would agree with me that it would

22  be erroneous to include in a disgorgement award

23  revenues as to SKUs that aren't mentioned in the

24  injunction as part of the configuration, correct?

25  A   I would -- well, what I attempted to do in my

1   calculation was pick up Configuration 3 or 5.  So I'm

2   not picking up other modules.

3   Q    Right.   Other modules that may be part of the

4   large suite SKU?

5   A    That's correct.  If I understand your question,

6   that is correct, yes.

7   Q    Would you agree with me that it would be erroneous

8   to include revenues from another module that's

9   included in the large suite SKU but is not part of

10  what's identified as Configuration 3 or 5?

11  A    I would want to pick up only those modules that

12  are part of the infringing configurations.  So I

13  believe that's a yes.  It depends on maybe what other

14  question you ask me, but I think I agree with you.

15  Q    And all three of the measures that is you offer

16  the Court include this apportionment for large suite

17  SKUs, right?

18  A    Yes.

19  Q    The revenues that you come to after making that

20  apportionment is roughly $29.4 million through

21  November 30, 2012?

22  A    During the injunction period, sure.

23  Q    You talked about a daily rate later, but you

24  didn't calculate your numbers to include the daily

25  rate.  Is there any particular reason you chose not to

1   do that?

2   A    I don't understand your question.

3   Q    When you gave numbers, and there were some numbers

4   up on the slides that Mr. Strapp did with, you recall

5   that?

6   A    Yes.

7   Q    Those were numbers just through November 30 of

8   2012, right?

9   A    Are you talking about the daily rate or are you

10  talking about the aggregate numbers?

11  Q    Yes.  You provided an aggregated number and you

12  provided a daily rate, right?

13  A    Yes.

14  Q    But you haven't calculated for the Court if the

15  Court were to issue an award today how much money that

16  would be, correct?

17  A    If you're asking if I took that daily rate times

18  the number of days between November 30, 2012 and

19  today, I haven't done that multiplication if that's

20  what you're asking.

21  Q    Does it sound about right that if you take your

22  daily rate and you add it to the period that ended on

23  November 30 at your daily rate, if you calculated it

24  today, it would be roughly $37 million of revenue?

25  A    I would have to do the calculation.

1    Q    You haven't done that?

2    A    I haven't done that calculation.

3    Q    Now, when you offered your reports and your

4    opinions in your reports -- strike that.

5         When you offered your opinions in your reports in

6    this case, you actually made a second apportionment to

7    revenue that you didn't talk about here today, right,

8    sir?

9    A    There was an alternative calculation I provided,

10   yes.

11   Q    It's also an apportionment, right, sir?

12   A    It does involve an apportionment, yes.

13   Q    You actually described it in your report multiple

14   times as an apportionment, right, sir?

15   A    Yes.

16   Q    There's actually a slide in the binder that I have

17   that wasn't shown to you that talks about this.  Can

18   we put number 12 up, please?

19            THE COURT:  What number?

20            MR. DUSSEAULT:  Slide 12 in ePlus's binder.

21            THE COURT:  Do you have it?

22            MR. DUSSEAULT:  It's not on my screen.

23            THE CLERK:  I don't think they have it.

24            MR. DUSSEAULT:  You don't have it

25   electronically, but I have it in my binder?

UGONE - CROSS                955

1      THE COURT:  It's your slide.  Do you have it

2  up?

3      MR. STRAPP:  We don't have the slide

4  electronically.

5      MR. DUSSEAULT:  It's in my binder.

6      THE COURT:  You don't have it electronically,

7  is that what you're saying?  I can't hear you.

8      MR. STRAPP:  We took it off of our electronic

9  system because it wasn't used as part of my direct.  I

10  think it was left in the physical binders because no

11  one took it out.

12      THE COURT:  Well, everybody has it.  Do you

13  have it in a binder there in front of you, Dr. Ugone?

14      THE WITNESS:  Yes.

15  Q   Isn't it true, sir, that this reason you made two

16  apportionments when doing your calculations was in an

17  effort to make sure we are using the right revenue

18  base?

19  A   I want to make sure when you said two

20  apportionments, what I did was I provided the

21  calculations that I presented to the Court, and in my

22  report, because I think I understood that Lawson was

23  making certain contentions, I provided an alternative

24  calculation.  Page 12 here, like at the top, it says,

25  "Alternative LSF process flow apportionment."  And

1   that's the calculation that we did.

2   Q    You keep using the word "alternative calculation"

3   instead of two apportionments.  Are you suggesting --

4   A    I'm sorry.  I didn't hear the beginning of what

5   you were saying.

6   Q    You keep correcting me when I talk about two

7   apportionments and saying "alternative calculation."

8   A    I didn't know what you meant by two calculations.

9   Q    Two apportionments.

10  A    I didn't know what you meant by that.  But you're

11  saying the first calculation I did and then this one

12  is the two you're counting?

13  Q    Right.  Do you think -- is it in any way

14  inaccurate to say that in your reports, sir, you made

15  two apportionments to revenue, the one you described

16  to the Court today for large suite SKUs, and a second

17  one for LSF and process flow?  You did that, didn't

18  you?

19  A    I did those calculations, but I don't think of

20  them as apportionments in the same way that you're

21  using the term.

22  Q    Forget about how I'm using the term.  Are you

23  saying you don't think of the LSF process flow

24  apportionment as an apportionment?

25  A    I'm saying not in the same sense that it was in

1  the platform technology, the gold box here.  So I'm

2  not denying I did two calculations.  I did two

3  calculations.

4  Q    Are you denying that you referred to it repeatedly

5  in your reports as an apportionment?

6  A    As an apportionment for the large suite SKUs, but

7  that was to remove out the modules that are not

8  related to the configurations in dispute.

9  Q    All right.  Now, I'd like to use the word

10 "apportionment" for purposes of my question and see if

11 you can answer this yes or no.  In an effort to make

12 sure that you are using the right revenue base, you

13 proposed two apportionments, correct?

14 A    I would not describe it that way.

15 Q    All right, sir.  Do you remember when I took your

16 deposition?

17 A    Yes.

18 Q    And it was in Washington, D.C., I believe, in

19 about February of 2012?

20 A    I think it was about a year ago.

21 Q    Do you recall you were under oath?

22 A    I do, sir.

23 Q    You testified truthfully, sir?

24 A    I'm sorry?

25 Q    You testified truthfully on that day when I took

1  your deposition?

2  A    Yes.  Yes.

3  Q    I'd like you to turn, if you would, to page 305 of

4  your deposition, line 6 through 9.

5  A    Let me catch up with you.  It's in the binder here

6  somewhere.

7  Q    Yes.

8  A    Okay.

9         THE COURT:  What page?

10        MR. DUSSEAULT:  It's page 305, Your Honor,

11 line 6.

12        THE WITNESS:  I'm sorry?

13        THE COURT:  Line 6, 7, 8 and 9.

14        MR. DUSSEAULT:  Yes.

15 BY MR. DUSSEAULT:

16 Q    Let me read this testimony to you, sir.

17     Question:  Now, in an effort to make sure we're

18 using the right revenue base, you proposed two

19 apportionments in your analysis, correct?  Answer:

20 Yes.

21     Did I ask you that question and you gave me that

22 answer?

23 A    Yes.  And I still stand by that answer.  I agree.

24 Q    There's no question that the two apportionments we

25 were talking about on that day was one for large suite

1    SKUs and one for LSF process flow, is there?

2    A    Yes.   In fact, I used that terminology, but the

3    apportionments are different.   There's a different

4    reason for them, but I don't disagree that you used

5    those words and I answered the question.

6    Q    I don't think I asked you any questions about the

7    reason for it yet.   I'm just trying to say you offered

8    an apportionment when you were talking about measuring

9    revenue that you didn't choose to offer to the Court

10   today, true?

11   A    I will agree with you.   Only one of the two did I

12   present to the Court.

13   Q    Now, LSF and process flow serve as the foundation

14   for Lawson's S3 software program, correct?

15   A    Yes.

16   Q    But they also support additional sweats of

17   software beyond procurement, correct?

18   A    Correct.

19   Q    For example, they support Lawson's financial

20   software, correct?

21   A    Yes.

22   Q    And its human resource software, correct?

23   A    I will agree.

24   Q    Can we show slide 1111, please?   Strike that.

25   Let's go to the slide that everyone has in their books

1   but is not available electronically.

2          THE COURT:  Is that 12?

3          MR. DUSSEAULT:  Slide 12, yes.

4   Q   Now, slide 12 is, I assume, a slide that you

5   prepared, sir?

6   A   Yes.

7   Q   This was your effort to explain the LSF process

8   flow, and you describe it here at the top with the

9   word "apportionment"?

10  A   Yes.

11  Q   And you proposed the apportionment of LSF process

12  flow in this case on your own initiative, not in

13  response to anything that Dr. Putnam argued, correct?

14         THE COURT:  Are you talking about the

15  apportionment shown in this slide?

16         MR. DUSSEAULT:  Yes, sir.  Oh, I'm sorry.

17  That is what I'm talking about.

18         THE COURT:  You proposed this apportionment

19  on slide 12 yourself on your own and not in response

20  to anything that Dr. Putnam said in his report is the

21  question.  Is that right or wrong?

22         THE WITNESS:  That's correct.

23  Q   In fact, you did so in your very first report,

24  right?

25  A   Yes.

1  Q    You addressed it in every report, all four, that

2  you issued in the case, right?

3  A    Yes.

4  Q    Obviously, at some point you were intending to

5  discuss it with the Court because it's in our binders,

6  right?

7  A    It was part of an initial slide deck as we were

8  putting the slide decks together, yes.

9  Q    Now, the apportionment that you do for LSF process

10 flow that you didn't describe today attributes

11 15 percent of revenues from LSF process flow to the

12 infringing configurations and 85 percent of it to

13 other configurations, correct?

14 A    That's correct based on a methodology, yes.

15 Q    And your methodology was intended to measure the

16 fact that while LSF process flow is used in some

17 context with the infringing configurations, it's used

18 actually in greater proportion, according to your

19 methodology, with other configurations, true?

20 A    If I understand your question, I was given the

21 option to the courts when I was writing my report of

22 using all of that yellow box, platform, technology

23 foundation, since that was my understanding of what's

24 part of the infringing configuration.  But if the

25 Court deemed that they wanted that bottom box

1  separated out, that's what this calculation does.

2          THE COURT:  What's a bottom box?

3          THE WITNESS:  The platform technology

4  foundation, Lawson system foundation and process flow.

5  The yellow box.

6          MR. DUSSEAULT:  It may help, Your Honor,

7  because I notice this picture is just of Configuration

8  5.

9          THE COURT:  Excuse me, but this does talk

10  about non-infringing modules supporting.  You're

11  asking about -- he wasn't asked about it on direct

12  examination, but I guess the real question is where

13  did you get that information, "non-infringing module

14  supported"?  What does that mean?

15          THE WITNESS:  So if you look at the bottom of

16  12, there's a footnote.  So in addition to like

17  Configuration 5 or Configuration 3, there's the human

18  resource management, financial management, and so

19  forth.  Just other software products, in a sense,

20  provided by Lawson that are not part of the infringing

21  configurations.

22  Q   I think it might help, Your Honor, it's not in the

23  picture that was prepared by ePlus used today, but if

24  we could show our slide 1111.

25          THE COURT:  Is that in your book here, slides

1  binder?

2        MR. DUSSEAULT:  It is, but can we put it on

3  the screen as well?

4        THE COURT:  Sure.  I just want to -- it's

5  1111.

6        MR. DUSSEAULT:  I believe it's 1111, yes.

7        THE COURT:  All right.

8        THE CLERK:  Defense what?

9        THE COURT:  It's up.

10       MR. DUSSEAULT:  It's slide 1111.

11       THE COURT:  That isn't slide 1111 in my book.

12       MR. DUSSEAULT:  Your Honor, I see at the

13  bottom here it says DDEM --

14       THE COURT:  See this.  This is what's 1111 in

15  my book.  Is it in your book?

16       THE WITNESS:  Yes.

17       MR. DUSSEAULT:  Is it the same?  Oh, because

18  it's going to build?

19       MR. STRAPP:  We haven't built it yet, Your

20  Honor.

21       THE COURT:  Okay.  I see.

22       THE WITNESS:  The boxes just aren't showing

23  up.

24  Q   As fun as building is, why don't we just build it

25  so we can look at the whole picture.

UGONE - CROSS                                   964

1          THE COURT:  All right.  We have an occupancy

2   permit, so go forward.

3   BY MR. DUSSEAULT:

4   Q    Now, Dr. Ugone, does this demonstrative show what

5   you're looking at with the LSF process flow

6   apportionment in that you attribute 15 percent of LSF

7   and process flow to the infringing configuration, but

8   you recognize and you attribute 85 percent of the

9   revenues from LSF and process flow to other modules

10  like HR and financial?

11  A    I think I agree with the spirit of what you're

12  trying to say.  I don't think you fully described what

13  I did.

14  Q    I'll take the agreement with the spirit.

15         THE COURT:  Spirit is getting me.

16         MR. DUSSEAULT:  Spirit is important on a

17  Friday afternoon, I think.

18         I'll try and cut a couple things here.

19  Q    Sir, if this court were to determine that it

20  should apportion revenues, not just for large suite

21  SKUs -- strike that.

22      If this court were to determine that it should

23  apportion revenues for both large suite SKUs and LSF

24  process flow, from your view as a forensic economist,

25  you don't have any issue with that, correct?

1   A    Can you just ask the question again?

2   Q    Yes.   If this court were to determine it should

3   apportion revenues for both large suite SKUs and LSF

4   process flow, from your view as a forensic economist,

5   you don't have any issue with that, correct?

6   A    If the Court made that determination, then that's

7   within the purview of the Court.

8   Q    Now, using the LSF process flow apportionment that

9   you discussed in all four of your reports but not

10  today, that reduces the revenue base as of

11  September 30, 2012, from $29.1 million to 23 million,

12  correct?

13  A    That's correct.

14  Q    Now, I'd like to turn to another slide that was

15  used.   This one was shown on the screen.   Slide 6.

16  EPlus's slide 6.   Can you put that up?

17           THE COURT:   Is it 23 million even?

18           THE WITNESS:   Yes.   That's rounded to the

19  nearest million.   To the nearest 10.   So it's 23.0

20  when you round.

21           MR. DUSSEAULT:   So can we put -- Skip, could

22  we switch back?

23           THE COURT:   Back to the plaintiff's.

24  Q    Now, do you recall when Mr. Strapp showed you this

25  slide, sir?

1   A    Yes.

2   Q    Do you recall that the Court asked you why you

3   were treating license and maintenance and service

4   differently for the healthcare customers.  Do you

5   recall that?

6   A    Why I was compiling over certain time periods,

7   yes.

8   Q    Is it fair to say that you were told by ePlus's

9   counsel that you should assume that Lawson was not

10  allowed to get any license revenue from a healthcare

11  customer during the sunset period?

12  A    From the designated healthcare customers, yes.

13  Q    Now, one way that Lawson could get revenue from a

14  designate healthcare customer during the sunset period

15  would be, say, they called up and said, Hey, I have to

16  add five users because we're expanding our group a

17  bit, you were told by ePlus that Lawson should have

18  answered that question no to the healthcare folks?

19  A    The assumption is that that would be in violation

20  of the injunction order.

21  Q    Did that make sense to you?

22  A    Frankly, it does.  My understanding is that the

23  Court in the injunction order was saying that you can

24  maintain the designated healthcare customers.  That's

25  my understanding.

1  Q    Your understanding of the order, and I don't want

2  you to get too far into interpreting the order, but

3  your understanding was that Lawson was allowed to

4  maintain the healthcare customers?

5  A    I believe so, yes.

6  Q    What it wasn't allowed to do was help the

7  healthcare customers if they called up and said, Hey,

8  I need to add 20 users?

9  A    And I agree with you.  The order is what it is and

10 it speaks for itself.  But that was how we implemented

11 our understanding of the order.

12 Q    That leads to about a 900,000-dollar difference in

13 defining the revenue base between you and Dr. Putnam,

14 true?

15 A    I believe there is about a 900,000-dollar

16 difference, yes.

17 Q    Now, I want to shift from talking about defining

18 the revenue base to talking about these profit margins

19 that you discussed.  Once you've determined what the

20 revenues are that derive from the customers with

21 Configurations 3 and 5 as to those configurations, are

22 you with me that far?

23 A    Yes.

24 Q    You then attempt to measure accurately Lawson's

25 gain as to those customers, correct?

1  A    Measure if you take those two configurations,

2  Configurations 3 and 5, and you have the revenues,

3  what's the profits associated with those revenues.

4  That's the question we're answering.  And that's the

5  measure of the gain that we're using.

6  Q    And the premise of disgorgement is that you're

7  allegedly taking away the gain from the wrongdoer,

8  correct?

9  A    The profits associated with provision of those two

10 configurations if they are deemed to be in contempt of

11 the injunction order.

12 Q    Okay.  But that's different from what I asked you.

13 So let me ask my question again.  The premise of

14 disgorgement is that you're allegedly taking away the

15 gain of the wrongdoer, right?

16         MR. STRAPP:  Objection, asked and answered.

17 I think we're just belaboring the process.  He got an

18 answer he didn't like and he asked the question.

19         MR. DUSSEAULT:  Your let me impeach then.  I

20 can skip right to impeachment if you want.

21         THE COURT:  All right.

22 Q    Do you recall your deposition?

23 A    Yes.

24 Q    I won't walk through all the things about the

25 oath.

1    If you could turn to page 299, line 22, sir.

2  A    I'm on page 299, line --

3  Q    Line 22.

4  A    That's where the question starts.

5  Q    Right.  Through page 300, line 5.  Do you see

6  where I am, sir?

7  A    Yes.

8  Q    The question I asked you was, "And I'm not going

9  to go over what you said about it earlier.  We've

10 covered that.  I just want to clarify.  Revenues --

11 strike that.  The premise of disgorgement is that

12 you're allegedly taking away the gain of the

13 wrongdoer, right?"  Answer:  "Yes".  Do you see that?

14      MR. STRAPP:  Your Honor, I believe this is

15 not proper impeachment.  I think it's consistent with

16 what the witness just testified to.

17      THE COURT:  Well, I'm not quite sure it is.

18 Go ahead.

19 Q    Did I ask you that question and you gave me that

20 answer, sir?

21 A    You asked that question.  I gave the answer.  What

22 I tried to explain is how I was measuring the gain,

23 which is --

24 Q    Thank you, sir.  For purposes here I just want to

25 be sure that I asked it and you answered it.  That's

1    true?

2    A    Sure.

3    Q    That's all I need.

4         MR. STRAPP:  Your Honor, can I just under the

5    rule of completeness just ask Mr. Dusseault to read

6    into the record the next few questions and answers?

7         THE COURT:  I think you can do that on

8    redirect.

9         MR. STRAPP:  All right.

10   BY MR. DUSSEAULT:

11   Q    All right.  So you have calculated three measures

12   of disgorgement; revenues, gross profits and

13   incremental profits, right?

14   A    Yes.

15   Q    And you gave the Court the numbers for those with

16   only the large suite SKU apportionment, but not with

17   the LSF process flow apportionment that you referenced

18   four times in four reports?

19   A    In my direct, we have now given the Court the 23

20   million on the revenue.

21   Q    The gross profit number when you make two

22   apportionments is roughly 14.1 million, correct?

23   A    To the best of my recollection I think that's

24   correct, yes.

25   Q    The incremental number when you make both

1  apportionments you had in your report is roughly

2  11.73 million, correct?

3  A    That's correct.

4  Q    And that's only through November 30, correct?

5  A    Through November 30, 2012.

6  Q    And I would ask you, because I've tried to

7  calculate what it actually is as of today, but you

8  haven't calculated that?

9  A    No, you would -- you could do a daily rate.

10  Q    Let's talk about your first measure, which is

11  disgorgement.

12        THE COURT:  What would you do?  Take the 14

13  million, divide it by the number of days, and that

14  would be the daily rate?

15        THE WITNESS:  That would get you close, yes.

16  There's some reasons why it's not exact, but that

17  would get you close.

18        THE COURT:  Well, usually when you're doing a

19  judgment, you don't do it close enough for government

20  work.  So I guess you can provide us a mechanism to do

21  that?

22        THE WITNESS:  Sure, I can do that.

23        MR. DUSSEAULT:  To clarify, the witness has

24  testified about what the daily rate is by his

25  calculation.  He just hasn't multiplied it out so that

1   you can see what the number that we're talking about

2   today really is.

3            THE COURT:  What is the daily rate by your

4   calculation with both assumptions?  It changes.  Do

5   you now it, Dr. Ugone?

6            THE WITNESS:  I would have to find the

7   exhibit in my report.

8            THE COURT:  What?

9            THE WITNESS:  I would have to find the

10  exhibit in my report in order to give you those exact

11  numbers.

12           THE COURT:  Well, Mr. Strapp can look that

13  up.  I don't want to interrupt Mr. Dusseault's

14  examination here.  You ask him about it, Mr. Strapp,

15  okay?

16           MR. STRAPP:  Yes.

17  BY MR. DUSSEAULT:

18  Q   Let's talk about your first measure, sir.  The

19  first measure you offer is all of the revenues, and

20  that measure deducts no costs whatever from Lawson's

21  revenues, correct?

22  A   That's correct.

23  Q   Total revenue isn't a true measure of Lawson's

24  gain, right?

25  A   It doesn't deduct out the cost, but it is a

1   consideration for the Court under certain

2   circumstances.  So it's part of the menu of options.

3   Q    Total revenue is not a measure of Lawson's gain,

4   correct?

5   A    Not from an economic perspective because there's

6   costs that could be deducted.

7   Q    What Lawson gains is the difference between the

8   revenue and what it costs to get the revenue, correct?

9   A    I would agree with -- I would agree with that.  As

10  you know, I think, too, though, but there's times that

11  the Court may consider the revenue, but I'm not

12  disagreeing with you that in order to get to a

13  profitability gain, you would need to subtract out the

14  costs.  So I would agree with that.

15  Q    Absent a determination by the Court that there's

16  issues with doing deductions of cost, you would not

17  default to a revenue award, true?  Let me ask the

18  question again so it comes in cleanly.

19       Absent a determination by the Court that there are

20  issues with doing some deductions of cost, you would

21  not default a revenue award, correct?

22  A    I think I would agree with that or absent other

23  considerations by the Court.  There may be other

24  considerations the Court may want to take into

25  account.

UGONE - CROSS                              974

1   Q    The second measure you offer is gross profits,

2   true?

3   A    Yes.

4   Q    With two apportionments, that's roughly

5   14.1 million, you said?

6   A    Yes.

7   Q    Through November 30?

8   A    Correct, 2012.

9   Q    Now, you used Lawson's company-wide financial

10  information?

11  A    Yes.

12  Q    To calculate this, right?

13  A    Based on those profit and loss statements that we

14  looked at that had the X's.

15  Q    Gross profits is revenues minus what economists

16  call the cost of goods sold, right?

17  A    Cost of goods sold.  I think Lawson sometimes

18  refers to them as direct costs, but yes.

19  Q    You would agree with me, wouldn't you, sir, that

20  your gross profit figure fails to deduct all variable

21  costs from Lawson's revenues, correct?

22  A    I would agree with that.

23  Q    Let me take just one example.  You're aware that

24  Lawson has sales costs, right?

25  A    Yes.

1    Q    Within those sales costs are commissions, right?

2    A    Correct.

3    Q    If a sale gets made, the commission gets paid,

4    correct?

5    A    Right.

6    Q    If a sale doesn't get made, commission doesn't get

7    paid, right?

8    A    Right.

9    Q    Your gross profit number fails to deduct even

10   those directly variable sales commission, right, sir?

11   A    Let's be careful.  When you say it fails to

12   deduct, it does not deduct because it's a different

13   measure of profitability.  So without putting a

14   connotation on it, there's revenues, gross profits,

15   and then incremental profit.  The incremental profit

16   has those extra costs deducted out.

17   Q    So you don't want to go so far as saying it fails

18   to deduct it, but you will agree with me it doesn't

19   deduct it?

20            MR. STRAPP:  Objection; asked and answered.

21            THE COURT:  Sustained.

22            MR. DUSSEAULT:  I'll move on.

23   Q    You don't take the position that gross profit is

24   the correct measure of Lawson's gain, do you, sir?

25   A    I say that that's an option for the Court to

1    consider.  But if you're looking at the incremental

2    profitability, obviously, additional costs have to be

3    subtracted from the gross profits.

4        But my understanding is there's times that a Court

5    may consider the gross profits.  So I've provided

6    that -- as I said from the very beginning, I've

7    provided that number.

8    Q    Let me try to be very direct in terms of what I'm

9    asking.  Direct testimony referred to trying to

10   measure Lawson's gain, that's a word you used, right?

11   A    As I've defined it, yes.

12   Q    And gross profit is not the correct measure of

13   Lawson's gain as you have defined it, correct?

14             MR. STRAPP:  Objection, asked and answered.

15   This is the third time.

16             THE COURT:  Overruled.

17   A    There are some incremental costs that can be

18   deducted.

19             MR. DUSSEAULT:  Your Honor, could you just

20   instruct the witness I'm asking yes or no questions

21   and I'm getting a speech.

22             THE COURT:  I agree.  Just answer the

23   question yes or no.  I think the bottom line, though,

24   is in your judgment, is the correct way to equate your

25   figures with the gain the incremental profit?

1              THE WITNESS:  Yes.

2              THE COURT:  That's what you're trying to get

3    at?

4              THE WITNESS:  Yes, Your Honor.  And I want

5    to -- yes, Your Honor.  I'll stop there.

6    Q    Now, the third measure that you testified about

7    today is incremental profits, correct?

8    A    Yes.

9    Q    When you issued your first report in this case,

10   you didn't even give a measure for incremental

11   profits, did you?

12   A    If I remember correctly, I believe we had the

13   revenues and the gross profits, if I remember

14   correctly.

15   Q    So is it correct that when you gave your first

16   report in this case, you didn't calculate incremental

17   profits?

18   A    To the best of my recollection I'm trying to say

19   yes, to the best of my recollection.

20   Q    If you have some question about it, shall we look?

21   A    No, I'm just saying to the best of my

22   recollection.

23              THE COURT:  There are two good words that are

24   helpful in answering questions; one is yes, and one is

25   no.  Let's try to use those.  If you need to explain,

UGONE - CROSS                    978

1   you can explain, but let's at least get yes and no at

2   the front end.

3           Also Mr. Strapp has an opportunity to come

4   back and cross-examine.  And it delays things to have

5   extraneous speeches.  All right.

6   Q   In your original report, there was no calculation

7   of incremental profits.  Dr. Putnam responded and

8   attempted to give an economic measure of incremental

9   profit as a menu item, correct?

10  A   Yes.

11  Q   It was only after he did that that you tried to

12  calculate another incremental profit figure, correct?

13  A   Yes.

14  Q   And is it fair to say that Dr. Putnam recognized

15  at least some degree of variability in all three areas

16  of operating costs; R&D, G&A, and sales and marketing?

17  A   His calculations --

18          MR. STRAPP:  Objection, Your Honor.  I think

19  he's asking now the witness to comment on Dr. Putnam's

20  report that's not in evidence, and he has not

21  testified here.  In fact, there is a sequestration

22  order that Your Honor has entered.  So I believe this

23  is an improper question for those reason.

24          MR. DUSSEAULT:  Your Honor, let me clarify.

25  The witness has already testified that he didn't give

1  an incremental profit number until Dr. Putnam gave

2  one.  And then he came in and gave a different one.  I

3  should be allowed to ask him what his understanding of

4  what Dr. Putnam's was and why he came up with a

5  different one.

6          THE COURT:  I don't think so.  Sustained.

7  BY MR. DUSSEAULT:

8  Q   You recognize that some portion of Lawson sales

9  and marketing expenses may have been avoided had

10  Lawson ceased to license, maintain, and service the

11  infringing system configurations, correct?

12  A   Yes.

13  Q   Again, those are costs that your gross profits

14  calculation doesn't deduct, right?

15  A   That's correct.

16  Q   Now, let me look at another one of the slides Mr.

17  Strapp showed you.  Let's look at plaintiff's slide 19

18  if we could.

19          So, Dr. Ugone, just to take these separately, and

20  I'll start with sales and marketing on the right.  In

21  your second report, you offered a measure of

22  incremental profits that you hadn't offered originally

23  that treats sales and marketing costs as variable,

24  correct?

25  A   Yes.

1   Q   And in the second report, you didn't treat it as

2   100 percent variable.  You actually used a calculation

3   of variability that Dr. Putnam had done for sales and

4   marketing, correct?

5   A   That's correct.

6   Q   But in your fourth report, you changed it and

7   decided to treat 100 percent of sales and marketing

8   expenses as variable, correct?

9   A   Yes.

10  Q   All right.  Now, so when you do your incremental

11  profit figure, you treat sales and marketing as

12  100 percent variable, but you treat product

13  development and general administrative as 100 percent

14  fixed, right, sir?

15  A   Yes.

16  Q   Now, let's look at the middle entry here, product

17  development.  You say that, the slide says here, no

18  evidence of product development expenses relating to

19  Configuration Nos. 3 and 5.  Do you see that?

20  A   Yes.

21  Q   Now, when you say Configuration Nos. 3 and 5, I

22  assume you mean with RQC in the post injunction

23  period.  Configuration 3 and 5 that have RQC as a

24  workaround of RSS?

25  A   Yes.  I'm assuming that the -- I think an

1  underlying assumption is the workaround would also be

2  found to violate the Court's order.

3  Q    Now, you say there's no evidence of product

4  development expenses relating to Configuration 3 and

5  5.  Didn't you describe the maintenance fees that

6  Lawson receives for Configuration 3 and 5 as including

7  some R&D, like workarounds, and things like that?  Did

8  you say that?

9  A    We talked about maintenance.  I used the term like

10 if there were bugs or fixes that were required.

11 Q    So how does one discover or correct a bug, sir, in

12 a technology?  Do you know?

13 A    They would work with a customer and research what

14 the problem is.

15 Q    So they would do research.  They may try and

16 develop a product to fix the bug, right?

17 A    No.  Or they might just go out to the site of the

18 customer and find out why the software is not working

19 properly.  I would not put it into the same research

20 and development catagory at all.

21 Q    Isn't it you're understanding that part of what

22 customers pay for when they pay maintenance to Lawson

23 is research and development to fixe and improve the

24 products over time?

25 A    What I would say is that they pay to make sure the

1    product is functioning properly.

2    Q    Are you disputing somehow that part of that is R&D

3    to improve it or fix things that are wrong with it,

4    sir?

5    A    If you want to call that -- it would go into a

6    different bucket of costs.  If you want to say that

7    that's R&D, then it's already in the maintenance.  So

8    I'm having problems with the nomenclature that you're

9    using.

10        If you want to call that R&D, it's already

11   accounted for in the maintenance costs.

12   Q    Are you saying that there's no R&D costs that are

13   part of what people are purchasing when they pay a

14   maintenance fee?

15   A    No.  I'm saying something different.

16   Q    Okay.

17   A    What I'm saying is with the infringing

18   configurations, and there's been testimony to this,

19   that there's been no R&D specific to the infringing

20   configurations that have been identified by Lawson.

21   Q    What's the basis for that statement, sir?

22   A    Mr. Samuelson's testimony.

23   Q    That there has been no research as to the

24   infringing configurations?

25   A    That he could not tie any R&D or product

1  development expenditures to the infringing

2  configurations.

3  Q   Do you know when he was asked that question

4  whether he was talking about the infringing

5  configurations, meaning those specified in the

6  injunction order with RSS or similar configurations

7  with the new product RQC?

8  A   I can't speak to what was in his mind when he was

9  answering that.

10  Q   You reviewed Mr. Samuelson's deposition testimony,

11  sir, as part of coming to your opinions, correct?

12  A   Yes.

13  Q   And that's what you're basing this on, you said,

14  that your view that somehow there's no R&D as to the

15  infringing products and services, correct?

16  A   During the injunction period, correct.

17  Q   Can we put up on the screen, and we have Mr.

18  Samuelson's deposition testimony in the binders, but

19  could we put up page 24, lines 14?

20  A   Do I also have it in my book?

21  Q   Yes.  You do have Mr. Samuelson's whole deposition

22  in your book, sir.  Page 24, line 14, through page 25,

23  line 3.

24      Now, what you were saying is you base your view

25  that there's no product development as to the

1   configurations at issue in this case on Mr.

2   Samuelson's statement that he wasn't aware of R&D as

3   to the infringing products and services, correct?

4   A    You're going to have to ask that question again.

5   Q    You testified, I believe when we were talking

6   about product development, that the reason you

7   concluded there's no evidence of product

8   development -- strike that.  Actually, let me try and

9   do this.  I may need help with a citation.

10       Turn to page 98, line 19, if you will.  Now, I'd

11  like to read to you Mr. Samuelson's testimony, page

12  98, line 19.  And this is Mr. Strapp examining Mr.

13  Samuelson.

14       "Okay.  And, again, there isn't any specific

15  employee costs associated with employees in product

16  development that you could say should be properly

17  allocated just to infringing products and services in

18  the sense that those product development costs are for

19  an employee who is specifically focused on developing

20  infringing products and services?"

21       Answer:  "I don't understand your question, but

22  there are no -- there are no developers, to my

23  knowledge, specifically focused on developing

24  infringing products."

25       Do you see that?

1    A    Yes, I do.

2    Q    That's the statement that you use as a foundation

3    for saying that R&D expenses are fixed, correct, sir?

4    A    One of them.  Not the only one.

5    Q    But when you talked about Mr. Samuelson's

6    testimony, that's what you're talking about, right,

7    sir?

8    A    One of them.

9    Q    Are there other -- can you point me to other

10   statements by Mr. Samuelson?

11   A    I think if you get my - is it my second report -

12   where I'm talking about in detail all the costs, and I

13   break out a lot of the rationales for what I'm doing

14   with these operating costs, I give quite a few

15   references to Mr. Samuelson.  So if you want to pull

16   out pages 2 through 11 of my second report, I think

17   you'll find all of those.

18   Q    But this is one that you specifically cited

19   several times in your report?

20   A    Among others, sure.

21            THE COURT:  Let me ask you something here.  I

22   cannot understand why it would make a great detail of

23   difference what the R&D costs are here because the

24   evidence is all of this happened in about two days.

25   So the R&D costs, whatever they would be, would be

1    negligible, and I'm not sure why we're spending a lot

2    of time on it.

3            MR. DUSSEAULT:  I believe Dr. Putnam will

4    speak to that, Your Honor, but I think that's actually

5    not correct.  I can explain, but I think there are

6    costs that Lawson incurs over a two-year period of

7    offering these configurations with RQC that our

8    position is you would not incur those R&D costs or you

9    might reduce your R&D costs if you were just

10   forfeiting, say, $30 million of revenue.

11           THE COURT:  I see.

12   Q   Now, just on this point of Mr. Samuelson's

13   statement about infringing products and services, I do

14   want to go back to page 24, line 14, through page 25,

15   line 3.  Are you there?

16   A   I believe I'm there, yes.

17   Q   This is again Mr. Strapp asking questions of Mr.

18   Samuelson.  "Okay.  Now, what's your understanding

19   regarding how that term is defined, 'infringing

20   products and services'?"

21       Answer:  "We referenced the primarily the jury

22   verdict and the specific mention in the actual

23   injunction itself."  Do you see that?

24   A   Yes.

25   Q   So when Mr. Samuelson was talking about R&D on

1    infringing products and services, he's talking about

2    R&D on the configurations that have RSS, correct?

3    A    He's referencing his understanding of what the

4    jury verdict was.  I would agree with that.

5    Q    Would it surprise you to learn that after the

6    injunction as to RSS, Lawson was not devoting research

7    and development specifically to configurations with

8    RSS?  That makes sense economically, right?

9              THE COURT:  Say that again.

10             MR. DUSSEAULT:  Let me try again.

11   Q    Expenses to creating a new product to workaround.

12   But my question -- let me ask a different question.

13   During the year and a half, close to two years that

14   the injunction has been in place, is it your position

15   that Lawson has spent no money on research and

16   development on Configurations 3 and 5 that have RQC?

17   A    I believe my understanding is that there was an

18   interrogatory answer that talked about 38,000 to

19   $75,000 that was used for the development of

20   requisition center.

21   Q    So that referred only to RQC, not to all the

22   modules that are in Configurations 3 and 5, correct?

23   A    That referred to requisition center, yes.

24   Q    Now, you also -- let me ask one more question.

25   Does it make economic sense to you as an economist

1    that Lawson's R&D costs as to these products would be

2    completely fixed over a two-year period?

3    A    Given the nature of how -- my understanding is how

4    the product development department is set up, and

5    given the answers of Mr. Samuelson as the corporation

6    representative, that's how we drew those conclusions.

7    He was saying there were no R&D individuals

8    specifically assigned to these infringing

9    configurations.   Those people would have been there

10   regardless.

11   Q    What he said was there were none assigned to the

12   infringing products and services as that's defined in

13   the Court's injunction, right?

14   A    Or that were focused on those.   So there's no

15   incremental costs associated with them.

16   Q    You also treat general and administrative costs as

17   100 percent fixed for purposes of your incremental

18   profit calculation, right?

19   A    Yes.

20   Q    Does that make economic sense to you, sir?

21   A    Yes.

22   Q    That G&A costs are 100 percent fixed over a

23   two-year period?

24   A    Given the answers of Mr. Samuelson in his

25   deposition, and given the smallness of the infringing

1  configurations relative to the overall size of Lawson,

2  yes, it made sense.

3  Q    I want to follow-up on a question that I asked.

4  You say given the testimony of Mr. Samuelson.   What

5  I'm looking at is something different.   You're an

6  economist, right?

7  A    Yes.

8  Q    You've been an economist for 30 plus years?

9  A    Yes.

10 Q    You've testified over 200 times?

11 A    Yes.

12 Q    You've seen a lot of businesses, right?

13 A    Yes.

14 Q    Are you saying it makes economic sense to you that

15 general and administrative costs would be 100 percent

16 locked in and fixed over a two-year period?

17 A    Okay.   I directly said this in my direct

18 examination.   I'm not saying in every situation that

19 G&A is fixed or that all of these are fixed.   I said

20 in the facts and circumstances of this case when we

21 look at the infringing situations over the injunction

22 period, and you look at the nature of what comprises

23 each of these costs, and you look at the smallness of

24 the revenues as a percentage of overall Lawson

25 revenues, then yes, it makes sense.   I'm not saying in

1    every situation.

2    Q   Sir, the revenue calculation that you offered when

3    Mr. Strapp was doing your direct examination was

4    $29.4 million through September 30.  So about

5    $30 million of revenue lost over a year and a half.

6    It makes economic sense to you that a company faced

7    with a loss of $30 million of revenue over a year and

8    a half and knowing that that's based on a permanent

9    injunction, wouldn't it make some adjustments to

10   maintain their profit margins?

11           MR. STRAPP:  Your Honor, I tried to sit down

12   as much as I can, but I feel like we're retreading the

13   same ground, and it's really belaboring the point.

14   Especially at five p.m.

15           THE COURT:  I think his position is clear.

16   Sustained.

17           MR. DUSSEAULT:  Okay.  Just one minute.

18           Nothing further, Your Honor.  Thank you.

19           THE COURT:  Any redirect?

20           MR. STRAPP:  Just a few.

21           THE COURT:  Do you know what in 2011 and 2012

22   Lawson's gross revenues were?

23           THE WITNESS:  Yes, I do.

24           THE COURT:  What were they?

25           THE WITNESS:  So in 2012, it was about

1   511 million .it was roughly that in 2011.  So we're

2   talking $30 million in relation of year and a half up

3   to about $750 million.

4            THE COURT:  I understand.  I can do the

5   relationship.  All I asked is what it was.  All right.

6

7       REDIRECT EXAMINATION

8   BY MR. STRAPP:

9   Q   Can you turn back to Mr. Samuelson's deposition

10  that Mr. Dusseault just reviewed with you, and

11  particularly -- he was talking about page 99 of that

12  deposition.  I'd like you to just turn there, and then

13  just move down one page, and I want to ask you about

14  that portion of the deposition transcript that he

15  didn't direct you to.

16  A   I apologize.  I lost the page number you wanted me

17  to go to.

18  Q   Page 100, starting at line 4.  Before I get to the

19  transcript, I just want to set the context here.  Do

20  you recall Mr. Dusseault was asking you about product

21  development costs?

22  A   Yes.

23  Q   Now, I want to read the following question and

24  answer from Mr. Samuelson's deposition and ask you

25  whether this was also a basis for your opinion since

1   Mr. Dusseault focused on one other question here.   And

2   here's the question.   Line 4.

3        Question:   "Okay."

4             THE COURT:   Go down to the question.   That's

5   a lot of preface there.

6   Q   Question.   Let's start on line 8.   "Is it your

7   testimony that none of the costs associated with

8   product development, sales and marking, or general and

9   administrative costs can be specifically allocated to

10  revenues for infringing products and services?"

11  Answer from Mr. Samuelson, "That is -- yes, that's

12  correct."

13       And my question to you is whether or not that was

14  a statement from Mr. Samuelson that was part or one of

15  the bases for your opinions?

16  A   Yes, it was.

17  Q   And in way was that a basis for your opinion?

18  A   Well, he was the 30(b)(6) corporate representative

19  on these subject matters.

20  Q   How did that affect your opinion regarding product

21  development costs?

22  A   Well, it told me that none of the product

23  development costs could be specifically allocated to

24  the infringing configurations, which was also

25  supported by other testimony throughout his

1  deposition.

2  Q   Now, Mr. Dusseault also asked you about TiVo.

3  That's a case we've heard a lot about.  You, I think,

4  testified on cross-examination that you provided the

5  TiVo court, as you're doing here, a menu of options;

6  is that correct?

7  A   Yes.

8  Q   And Dr. Dusseault talked about one option that the

9  Court did not accept; is that correct?

10 A   Yes.

11 Q   Can you describe for the Court the option on

12 damages and disgorgement in that case that was

13 accepted by the TiVo court?

14 A   Yes.  So I testified at trial as to a reasonable

15 royalty.  One of the options that I gave for the

16 contempt hearing in addition to the disgorgement of

17 profits was a reasonable royalty again, but there was

18 an addition onto it for a variety of reasons.  One

19 reason why I presented that was because in that case

20 the jury had determined that the appropriate measure

21 of damages was a reasonable royalty.

22      So in that case I took a reasonable royalty as a

23 contempt remedy approach, but there was a reason why I

24 added a dollar onto it.

25 Q   What was the reason for the dollar addition on top

1  per unit?

2  A    Because there was another price increase that Dish

3  Network or EchoStar had put through.  So I took that

4  entire dollar and added that onto the royalty.

5  Q    So is it fair to characterize that as a reasonable

6  royalty hybrid disgorgement?

7  A    Those are the words that I've used, yes.

8  Q    Mr. Dusseault asked you a little bit about the

9  sunset provision and the fact that you included

10 license revenue from the 277 healthcare customers as

11 part of your revenue calculations even if it was

12 during that sunset provision.  Do you recall that?

13 A    Yes, it was a smaller number of designated health

14 care customers, but yes.

15                MR. STRAPP:  I want to hand up to the

16 witness, if I may.

17 Q    I just handed up to you, Dr. Ugone, a copy of the

18 Court's injunction order from May 23, 2011.  And I

19 would ask you to turn to page 4.  That's the last

20 pager of the order?

21 A    Yes.

22 Q    And that last paragraph there is the sunset

23 provision that we were discussing.

24      Now, if you take a moment to read this sunset

25 provision, I want to ask you whether or not you see

1   any information in there that permitted Lawson during

2   that sunset provision to license new healthcare

3   customers or add additional users for pre-existing

4   licenses that healthcare customers already had?

5          MR. DUSSEAULT:  I object, Your Honor, as to

6   the relevance or usefulness of having an economist

7   interpret your order.

8          MR. STRAPP:  Your Honor, I'm only asking

9   about this because Mr. Dusseault went into it on

10   cross.

11          THE COURT:  Overruled.

12          MR. DUSSEAULT:  I didn't ask him to interpret

13   what it meant and what's what Mr. Strapp is asking.

14          THE COURT:  No, I think you asked him what

15   Mr. Strapp told him it meant.  Overruled.

16          THE WITNESS:  I'm sorry.  Are we looking at

17   this last part?

18          THE COURT:  What's your question?

19   BY MR. STRAPP:

20   Q   My question is whether or not your understanding

21   of the sunset provision was that Lawson was permitted

22   during the sunset provision to continue licensing

23   healthcare customers or whether that license -- excuse

24   me -- whether that sunset provision was just to allow

25   maintenance and service for the healthcare customers?

1       THE COURT:  I thought he said he got his

2   interpretation from you, not from reading the order,

3   or from somebody in your firm.

4       MR. STRAPP:  I think the injunction order was

5   listed as one of the materials considered in your

6   reports.

7       THE COURT:  I know.  That's true.  And if he

8   thought about it, but what he said is "I got that

9   information from the lawyers," I believe.

10      MR. STRAPP:  Okay.

11  Q    Let me just ask you this:  Have you reviewed the

12  injunction order before?

13  A    Yes.

14  Q    Have you reviewed the sunset provision of the

15  injunction order?

16  A    Yes.

17  Q    Was that one of the materials you considered in

18  forming your opinions?

19  A    Yes.

20  Q    Could we turn to your supplemental reply expert

21  report, which is in -- I think it's in both binders

22  you have.  So you can choose which one.  Just turn to

23  the supplemental reply report tab.  And I want to

24  direct you specifically to page 15 of that report in

25  the supplemental reply.

UGONE - REDIRECT                997

1    A    I'm there.

2    Q    Do you see that there's a table there, it's called

3    table 2?

4    A    Yes.

5    Q    Can you explain for the Court, please, what that

6    table 2 is?

7              THE COURT:  Wait a minute.  I must have the

8    wrong report.  What's the date of it?  March 20, 2013?

9              MR. STRAPP:  That is correct.

10             THE COURT:  Page 15?

11             MR. STRAPP:  Page 15.

12             THE COURT:  All it has is text.  Evaluated

13   plaintiff's damages claim.  It doesn't have a chart on

14   it at all.

15             MR. STRAPP:  You know what, Your Honor?  If

16   you turn to the very front of it, you may be in the

17   back in the exhibit section.  Perhaps if you look in

18   -- okay.  I think --

19   Q    Why don't you go to the white binder.

20             THE COURT:  I see.  There are two page 15s.

21   All right.  You have table 2.

22             MR. STRAPP:  Yes.

23             THE COURT:  All right.  I'm with you now.

24   Q    Dr. Ugone, can you explain to the Court what table

25   2 is, please?

1   A    Yes.   The Court -- well, let me take a step back.

2   In my direct testimony I gave certain daily rates.   If

3   you look at table 2 the middle column, it says, With

4   apportionment of large suite revenues, those are the

5   daily rates I presented to the Court during my

6   testimony.

7        On cross-examination, I was asked about daily

8   rates with apportionment of large suite LSF and

9   process flow revenues.   And so what this table does is

10  it gives the daily rates for that alternative

11  scenario.

12            THE COURT:   With the 85 percent figure as the

13  apportionment?

14            THE WITNESS:   Correct.

15            MR. DUSSEAULT:   Your Honor, could I just ask

16  that the numbers be read into the record so they are

17  part of our record?

18            THE COURT:   What's that?

19            MR. DUSSEAULT:   Could I just ask that the

20  numbers be read into the record so they are part of

21  the record?

22            THE COURT:   The revenues is 48,821.   The

23  gross profits, 30,497.   Incremental profits, 24,850.

24  Q    If you turn to the page before, page 14,

25  Dr. Ugone, do you see there's a table 1?

1   A    Yes.

2   Q    Can you explain to the Court what table 1 depicts?

3   A    So in table 1, the middle column, when I gave the

4   revenues, gross profits, and incremental profits as

5   the menu of options for a disgorgement remedy, the

6   middle column are the numbers that we presented to the

7   Court in my direct examination.

8         And cross-examination, I was asked what those

9   numbers would be with apportionment of large suite,

10  LSF, and process flow revenues.  So this is what we've

11  been shorthand saying the 85 percent scenario.  And

12  that's what those figures represent.

13            MR. STRAPP:  Can you put up Configurations 3

14  and 5, please.

15  Q    Dr. Ugone, is it your understanding that in light

16  of the injunction, the only module of the infringing

17  configurations that was modification by Lawson was the

18  green module here on your screen, the requisition

19  self-service?  Is that your understanding?

20  A    Yes.

21  Q    So there wouldn't have been any new development or

22  research associated with the other modules; is that

23  your understanding?

24  A    That's my understanding.

25            MR. STRAPP:  Okay.  I have no further

1    questions.

2            THE COURT:  Can he be excused or does he have

3    to come back?

4            MR. STRAPP:  He may be excused.

5            MR. DUSSEAULT:  He may be excused.

6            THE COURT:  You're not going to call him in

7    rebuttal to Dr. --

8            MR. STRAPP:  We're not going to hold him here

9    for rebuttal.

10           THE COURT:  All right.  You're excused,

11   Dr. Ugone.

12           THE WITNESS:  Thank you.

13           (The witness was excused from the witness

14    stand.)

15           MR. DUSSEAULT:  Your Honor, I'm sorry.  I may

16   have missed.  Are you guys resting your damages case?

17           MR. STRAPP:  Yes.  And we are resting our

18   damages case.

19           MR. DUSSEAULT:  I was going to make a

20   suggestion for consideration, which is Dr. Putnam, I

21   think, if we do it today, is probably, as I said, in

22   the two to three-hour range.  It's 5:00 o'clock.

23           I think if I go back and look at what we got

24   today, I could cut it substantially.  I believe that I

25   could.  I'd be willing to come and do that on Monday

1  afternoon.  And I don't know when you'd want to do the

2  argument, but I think that might make more sense.

3          THE COURT:  Well the argument on the

4  injunction, I think, is what we're talking about.

5          MR. DUSSEAULT:  Yes, sir.

6          THE COURT:  Did you want to be here to handle

7  the injunction argument, Mr. Thomasch?

8          MR. THOMASCH:  Obviously, it would be my

9  preference, but even with a redeye back, it would take

10 me until probably midday Tuesday to return.  My court

11 is on Monday in Sacramento, California, the Eastern

12 Division of California, before Judge Lawrence Carlton.

13          I'll come back right away, but my preference

14 would be Tuesday afternoon or any time thereafter at

15 the Court's convenience.

16          THE COURT:  I can do Tuesday afternoon.

17          MR. THOMASCH:  That would be wonderful, Your

18 Honor.

19          THE COURT:  You don't have to be here for

20 Dr. Ugone's testimony.

21          MR. THOMASCH:  Dr. Putnam.  I do not.

22          THE COURT:  I mean, Dr. Putnam.

23          MR. THOMASCH:  No.

24          THE COURT:  We'll do Dr. Putnam in the

25 morning and the injunction argument in the afternoon.

1    MR. THOMASCH:  Thank you, Your Honor.

2    THE CLERK:  What time are we starting, Your

3 Honor?

4    THE COURT:  We'll start at 9:30 on Tuesday

5 the 9th.  And then that will be finished by the lunch

6 hour, I'm sure, then we'll pick up at 1:30 or

7 2 o'clock, depending on what the situation is, and

8 then you can be here for the injunction argument.

9    MR. THOMASCH:  Thank you, Your Honor.

10    THE COURT:  All right.  And I'm sure that the

11 United States Government appreciate you not requiring

12 them to incur the added expenses of running things on

13 the weekend.  Or you can turn around and blame

14 everything on the U.S. Government.  Those who voted

15 Democratic and those who voted Republican all get a

16 share.

17    All right.  We'll be in adjournment.

18    (The proceedings were adjourned at 5:02 p.m.)

19    We, Diane J. Daffron and P. E. Peterson,

20 certify that the foregoing is a correct transcript

21 from the record of proceedings in the above-entitled

22 matter.

23             /s/
      _____   _____
24    DIANE J. DAFFRON, RPR, CCR       DATE
                   /s/
      _____   _____
25    P.E. PETERSON, RPR, CCR          DATE