```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                     RICHMOND DIVISION

 4

 5

 6    ------------------------------------
                                         :
 7    ePLUS, INC.                        :    Civil Action No.
                                         :    3:09CV620
 8    vs.                                :
                                         :
 9    LAWSON SOFTWARE, INC.              :    April 9, 2013
                                         :
10    ------------------------------------

11

12        COMPLETE TRANSCRIPT OF THE MOTIONS HEARING

13          BEFORE THE HONORABLE ROBERT E. PAYNE

14             UNITED STATES DISTRICT JUDGE

15

16    APPEARANCES:

17    Craig T. Merritt, Esquire
      Christian & Barton, LLP
18    909 East Main Street
      Suite 1200
19    Richmond, Virginia  23219-3095

20    Jennifer A. Albert, Esquire
      Goodwin Procter, LLP
21    901 New York Avenue, NW
      Washington, D.C.  20001
22

23

24              Peppy Peterson, RPR
              Official Court Reporter
25           United States District Court
```

```
 1   APPEARANCES:   (cont'g)

 2   Michael G. Strapp, Esquire
     Goodwin Procter, LLC
 3   Exchange Place
     53 State Street
 4   Boston, Massachusetts   02109

 5   Paul W. Jacobs, II, Esquire
     Christian & Barton, LLP
 6   909 East Main Street
     Suite 1200
 7   Richmond, Virginia   23219-3095

 8   David M. Young, Esquire
     Goodwin Procter, LLP
 9   901 New York Avenue, NW
     9th Floor East
10   Washington, D.C.   20001

11        Counsel for the plaintiff;

12
     Daniel J. Thomasch, Esquire
13   Gibson Dunn & Crutcher, LLP
     200 Park Avenue
14   New York, New York   10166-0193

15   Josh Krevitt, Esquire
     Gibson Dunn & Crutcher, LLP
16   200 Park Avenue
     New York, New York   10166-0193
17
     Jason C. Lo, Esquire
18   Gibson Dunn & Crutcher, LLP
     333 South Grand Avenue
19   46th Floor
     Los Angeles, California   90071
20
     Dabney J. Carr, IV, Esquire
21   Troutman Sanders, LLP
     1001 Haxall Point
22   Richmond, Virginia   23219

23   Richard W. Mark, Esquire
     Gibson Dunn & Crutcher, LLP
24   200 Park Avenue
     New York, New York   10166-0193
25
```

```
 1   APPEARANCES:  (cont'g)

 2   Christopher D. Dusseault, Esquire
     Gibson Dunn & Crutcher, LLP
 3   333 South Grand Avenue
     46th Floor
 4   Los Angeles, California  90071

 5        Counsel for the defendant

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           P R O C E E D I N G S

2

3           THE CLERK:  Civil action number 3:09CV00620,

4  ePlus, Incorporated versus Lawson software, Incorporated.

5  Mr. Michael G. Strapp, Ms. Jennifer A. Albert, Mr. Craig

6  T. Merritt represent the plaintiff.  Mr. Christopher D.

7  Dusseault and Mr. Dabney J. Carr, IV represent the

8  defendant.  Are counsel ready to proceed?

9           MR. DUSSEAULT:  Defense is ready, Your Honor.

10           MR. STRAPP:  ePlus is ready, Your Honor.

11           THE COURT:  All right.  Good morning.

12           MR. DUSSEAULT:  Good morning, Your Honor.

13           THE COURT:  Are we ready to proceed with your

14  witness, Mr. Dusseault?

15           MR. DUSSEAULT:  Yes, we are, Your Honor.  Lawson

16  would call Jonathan Putnam.

17           Your Honor, we have binders to pass out.

18           THE COURT:  All right.

19           MR. STRAPP:  Your Honor, we would like to pass up

20  copies of redline reports that strike out the sections

21  pursuant to order that Dr. Putnam is no longer allowed to

22  testify about.

23           THE COURT:  All right.

24           MR. DUSSEAULT:  Your Honor, I would note for the

25  record, I haven't had a chance to review the redline

1   prepared by ePlus, but I'm assuming they've done it

2   accurately, and if any inaccuracies come to my attention,

3   I'll let you know.  I haven't had a chance to see these.

4            THE COURT:  As Judge Williams was fond of saying,

5   we'll abide the event.

6            MR. DUSSEAULT:  May I proceed, Your Honor?

7            THE COURT:  Please.

8

9                      **JONATHAN D. PUTNAM,**

10  a witness, called at the instance of the defendant,

11  having been first duly affirmed, testified as follows:

12                      DIRECT EXAMINATION

13  BY MR. DUSSEAULT:

14  Q    Good morning, Dr. Putnam.

15  A    Good morning, Mr. Dusseault.

16  Q    Would you please state your full name for the record,

17  sir.

18  A    Yes.  Jonathan, middle initial D, Putnam.

19  Q    Dr. Putnam, would you please briefly describe for the

20  Court your educational background.

21  A    Yes.  I received a bachelor's degree, master's degree,

22  and a Ph.D. degree, all in economics, and all from Yale

23  University.

24  Q    Dr. Putnam, where are you currently employed?

25  A    I'm the founder and a principle at a firm called

 1    Competition Dynamics which is located in the Boston area,

 2    and before that when this case started, I was a vice

 3    president at Charles River Associates which is another

 4    litigation firm also located in Boston.

 5    Q    Dr. Putnam, have you taught in the field of economics?

 6    A    Yes.

 7    Q    Where?

 8    A    Most recently, I taught at the University of Toronto,

 9    faculty of law.  I held the -- a professorship in the law

10    and economics of intellectual property at the faculty of

11    law there.

12         I've also taught at Boston University, Vassar College,

13    Columbia University, and Yale College in the fields of

14    intellectual property, industrial organization, and the

15    economics of technology.

16    Q    Dr. Putnam, have you received any professional grants,

17    fellowships, honors, or awards for your work in economics?

18    A    Yes.  I was a Mellon Foundation fellow at Yale Law

19    School where I studied intellectual property law and

20    antitrust.  I was a Julia Silver Foundation fellow at

21    Columbia Law School where I studied the economics of

22    technology, and I received a National Science Foundation

23    fellowship based on my dissertation on the value of

24    international patent rights to measure the value of

25    international patent portfolios held by firms.

1    Q    Has your professional work in economics focused on any

2    particular topics?

3    A    Yes.  I worked exclusively on the economics of

4    intellectual property rights and antitrust since I

5    graduated from college more than 30 years ago.

6    Q    Have you authored any books or articles in the field

7    of economics?

8    A    Yes.  I edited -- most recently edited a volume called

9    Intellectual Property Rights and Innovation in the

10   Knowledge-Based Economy.  If you look at the leading

11   encyclopedia of economics under the entry for patent

12   valuation, I authored that entry, and most recently I

13   published a paper on international intellectual property

14   rights.

15   Q    Have you authored peer reviews of other scholarly

16   work?

17   A    Yes.  I've been a reviewer for the *American Economic*

18   *Review*, the *Journal of International Economics*, the

19   *Journal of Industrial Economics*, and maybe a dozen other

20   referee journals.

21   Q    Have you testified in court before as an expert

22   witness?

23   A    Yes.

24   Q    Approximately how many times?

25   A    About 20.

1  Q    Dr. Putnam, do you work with both plaintiffs and

2  defendants?

3  A    Yes.  I would say it's probably tilted a bit more

4  towards defendants, maybe 60/40, but certainly with both

5  of them.

6          MR. DUSSEAULT:  Your Honor, I would offer Dr.

7  Jonathan Putnam as an expert in economic and financial

8  analysis in damages pertaining to intellectual property.

9          THE COURT:  Any objection?

10         MR. STRAPP:  No objection.

11         THE COURT:  So accepted.

12  Q    Dr. Putnam, on Friday afternoon, the Court heard

13  testimony from ePlus's damages expert, Dr. Ugone, and I

14  understand you were not in the courtroom for that

15  testimony, but I'd like to begin by having you directly

16  address and respond to Dr. Ugone's approach to damages as

17  you understand it from his reports.  Is that acceptable?

18  A    Sure.

19  Q    Now, based on Dr. Ugone's reports, do you have a

20  general understanding of the types of remedies that he

21  offers in this matter?

22  A    Yes.

23  Q    And what are they?

24  A    Well, there's basically three.  Dr. Ugone says that

25  the proper remedy is to disgorge what he views as being

1    Lawson's profits, and he offers three measures of that;

2    Lawson's entire revenues from the sales of the accused

3    configurations, three and five --

4          MR. STRAPP:  Your Honor, I'm going to object to

5    this line of testimony.  Dr. Putnam was not present in the

6    courtroom when Dr. Ugone testified, and, in fact, there is

7    a sequestration order.  So I don't see how Dr. Putnam can

8    fairly comment on what Dr. Ugone said in court on Friday.

9          MR. DUSSEAULT:  Your Honor, Dr. Putnam --

10         THE COURT:  Excuse me one minute.  I don't

11   remember issuing a sequestration order for these

12   proceedings.  Did I?

13         MR. STRAPP:  It was issued prior to the

14   proceedings that were about to begin a year ago in

15   February of 2012.

16         MR. DUSSEAULT:  Your Honor, I need to correct

17   something.

18         THE COURT:  Say again, Mr. Strapp.

19         MR. STRAPP:  A sequestration order was issued a

20   year ago, before we were about to begin --

21         THE COURT:  When the hiatus occurred because of

22   the petition for mandamus; is that what you are saying?

23         MR. STRAPP:  That's correct.

24         MR. DUSSEAULT:  Your Honor, and to clarify,

25   Lawson specifically moved to be able to have experts in

1  the courtroom to hear and respond to the testimony of the

2  other experts.  That was opposed by ePlus.  So what I'm

3  having Dr. Putnam do is explain the opinions as they were

4  articulated in the reports that it's part of his

5  assignment to respond to.

6      MR. STRAPP:  To the extent it's just fairly

7  confined to the reports and not to comment on testimony in

8  live court for which Dr. Putnam was not present, I will

9  not object.  I'll withdraw.

10     THE COURT:  Well, I think the purpose of the

11 sequestration order was -- is generally to have the

12 witness's testimony uninfluenced by -- in substance by the

13 testimony of other people and to be able to address their

14 own views or their facts depending on whether they are

15 fact or expert witnesses.

16     I don't think it's improper to remind the

17 defendant, frankly, what the basic premise was of Dr.

18 Ugone's testimony and then let him comment on that

19 premise, and I don't think that violates sequestration.

20     However, I must say that Dr. Ugone did not offer

21 disgorgement of profits.  What he offered was disgorgement

22 of gain and tendered three modes of measuring gain, as I

23 understand it; revenues, gross profits, and incremental

24 profits.  Isn't that correct?

25     MR. STRAPP:  That's correct, Your Honor.

Putnam - Direct                                    1013

1          THE COURT:  All right.  I think that's what he

2    testified to.  He wasn't confining it to profits or he was

3    talking about gain and offered three ways to measure the

4    gain which -- or the quantum of the gain that ought to be

5    disgorged, I guess, is the best way to put it.  Did I miss

6    his testimony in that regard?

7          MR. STRAPP:  No, I agree completely with the

8    characterization.

9          MR. DUSSEAULT:  Your Honor, if I could clarify

10   one point --

11         THE COURT:  You can lead him.

12         MR. DUSSEAULT:  Yeah, and to be clear, because of

13   the sequestration order and the fact that we were not

14   allowed to talk to Dr. Putnam about what was actually

15   said, he doesn't have any knowledge of what was said.

16   What he's addressing, part of his assignment was to

17   respond to the opinions as articulated by Dr. Ugone, and

18   that's what he's doing.

19         THE COURT:  So I guess that's overruled.

20   Q    Sorry, Dr. Putnam.  Had you finished your --

21         THE COURT:  With modifications.

22   Q    I'm not -- why don't I ask the question again just so

23   we have it in one piece in the record.  What is your

24   understanding, based on Dr. Ugone's reports, of the three

25   measures that he offered?

1    A    Well, certainly keeping in mind the Court's

2    characterization which, I think, is completely right,

3    there were three measures of gain that Dr. Ugone offered,

4    one being Lawson's revenues from the accused

5    configurations; secondly, it's gross profits; and thirdly,

6    what he characterizes as Lawson's incremental profits.

7    Q    Dr. Putnam, do you intend to offer any additional

8    measures here today within the confines of Dr. Ugone's

9    disgorgement approach?

10   A    Yes.

11   Q    And what would those be, just briefly?

12   A    Two further ones, one being a correct characterization

13   of Lawson's incremental profits, and then secondly,

14   Lawson's net profits.

15   Q    Now, by addressing and responding to Dr. Ugone's

16   disgorgement approach as you understand it from his

17   reports, do you intend to offer the opinion that that

18   approach is an appropriate remedy in this case?

19   A    No.  The methods -- the whole disgorgement subject

20   turns out to be an inaccurate proxy for ePlus's --

21              THE COURT:  Excuse me, Doctor.

22              THE WITNESS:  I'm sorry, sure.

23              MR. STRAPP:  Your Honor, I'm sorry to interrupt,

24   but I just object to this question and this answer because

25   Your Honor has already determined the disgorgement is an

1    available remedy in patent-related civil contempt cases

2    and explained why in a memorandum opinion, docket 1032.

3    So I don't think it's appropriate to elicit testimony from

4    the witness that contradicts the settled matter that's the

5    law of the case here.

6              MR. DUSSEAULT:  Your Honor, the motion that Mr.

7    Strapp is referring to was the motion to exclude Dr. Ugone

8    from even touching on the subject, and Your Honor ruled

9    that it was an available remedy.  Whether within --

10             THE COURT:  Whether it's an appropriate remedy is

11   different than whether it's available.

12             MR. DUSSEAULT:  Absolutely, Your Honor.

13             THE COURT:  Overruled.  But to get down to the

14   bottom line fairly quickly, it's my recollection that Dr.

15   Ugone testified that in his opinion, the most accurate way

16   to measure Lawson's gain was the incremental profit mode

17   if I remember correctly.  Didn't he end up saying that in

18   response to a question that I asked him?

19             MR. STRAPP:  I have a different recollection,

20   Your Honor.  I think that his opinion was that you have

21   broad discretion, and he didn't favor or say that you

22   should choose one of the three options.

23             THE COURT:  I know he said that at one point in

24   time, but I asked him didn't he think that the right

25   measure of the gain was the incremental profit measure,

1    and I think he said, yes.

2              The record will speak for itself, but if I'm

3    wrong -- apparently he's thinks I'm wrong, so you can go

4    ahead and develop whatever you want to develop, and we'll

5    have a complete record on it.

6    Q    Dr. Putnam, at the time of the objection, you were

7    explaining why you don't believe that Dr. Ugone's

8    disgorgement approach is the appropriate remedy on the

9    facts and circumstances of this case.

10   A    Sure.  So there's two categories of testimony that I

11   want to discuss, one of them being what's the appropriate

12   measure of profits, and then the second one being -- or

13   gain, and the second one being is disgorgement itself an

14   accurate proxy for the harm to ePlus.  And I don't believe

15   that disgorgement itself, by any measure, is an accurate

16   proxy of the harm to ePlus, and we'll talk about that

17   later.

18   Q    Thank you.  Let's stay for now within a response to

19   Dr. Ugone's disgorgement approach.  What steps, if any,

20   are necessary to calculate a disgorgement measure under

21   that approach?

22   A    Basically there's two.  You've got to identify the

23   revenues in question and measure those accurately, and

24   then you need to deduct the appropriate costs from those

25   revenues to determine what Lawson's gain is.

1   Q    So let's talk first about determining the revenues.

2   Have you prepared a demonstrative to assist you in

3   explaining this step to the Court?

4   A    Yes.

5   Q    Now, could we please put up demonstrative 702, please.

6   Dr. Putnam, could you please walk the Court through what

7   this demonstrative shows.

8   A    Sure.  And I think it will be mostly review given what

9   I understand Dr. Ugone's testimony to be, but it's

10  important to be on the same baseline.  First step is to

11  identify those customers that have the accused

12  configurations which are numbers three or five.  Dr. Ugone

13  and I agree that there are 146 such customers during the

14  contempt period.  Having identified --

15  Q    Could I stop you there just on that step and ask you a

16  question.  When you began your analysis, was the number

17  146 customers?

18  A    No.  That was -- you mean a year ago?

19  Q    Yes, sir.

20  A    No, the number was not 146 customers.  A year ago,

21  prior to the Federal Circuit's ruling, configuration two

22  was also in the case, and with configuration two

23  customers, the total was approximately 610 total

24  customers.  After the Federal Circuit ruling that narrowed

25  the infringed claims, that number dropped to 146.

1  Q     Thank you.  Please proceed.

2  A     Sure.  So we have 146 customers that Dr. Ugone and I

3  agree are the target customers who paid revenues for the

4  infringing or accused configurations.  Having identified

5  those customers, then you can go through Lawson's

6  financial records to see exactly how much they paid for

7  the various SKUs or stock-keeping units that make up

8  configurations three and five.

9       So we add together the licensing and maintenance

10  revenues that they paid to Lawson during the contempt

11  period.  There are two adjustments to that, both of which

12  are proposed by Dr. Ugone and which I accept.  One of them

13  is called the large suite SKU apportionment which deducts

14  from those revenues modules that are not part of the

15  Court's contempt order or injunction order, and secondly,

16  an apportionment to reflect the portion of the foundation

17  software which is called LSF and process flow, the portion

18  of that software that is used for non-infringing modules

19  or product lines.

20  Q     And Dr. Ugone did address these subject, so we don't

21  need to belabor them, but roughly what percentage of the

22  large suite SKU revenues is apportioned to configurations

23  three and five?

24  A     For large suite SKUs, it's approximately 35 percent.

25  That's the figure that Dr. Ugone used and I accept.

1   Q    And roughly what percent of the LSF process flows

2   revenues are apportioned to configurations three and five?

3   A    And it's about 15 percent, and, again, I reach a

4   slightly different number, but it's basically the same.

5   Q    And then the third piece of your slide here refers to

6   service revenues?

7   A    Yes.  So having added up the licensing and maintenance

8   revenue, then one needs to allocate a portion of the

9   service revenue that Lawson also received, which is not

10  tracked on a per-product basis, and so you apportion the

11  service revenues in proportion to the license and

12  maintenance revenues and add that to the total, so at the

13  end of the day, your total is the sum of the relevant

14  licensing, maintenance, and service revenues.

15          THE COURT:  In other words, you are using the

16  same 35 percent and 15 percent to apportion the service

17  revenues as you did to the licensing?

18          THE WITNESS:  That's correct, Your Honor.

19          THE COURT:  And maintenance revenues.

20          THE WITNESS:  Yes, Your Honor.

21          THE COURT:  Or licensing revenues.

22          THE WITNESS:  That's right.

23  Q    Dr. Putnam, do you and Dr. Ugone differ in your

24  treatment of licensing revenues received from designated

25  health care customers during the sunset period?

1    A    Yes, there is one difference there, that's right.

2    Q    And what is that difference, sir?

3    A    The parties have taken different positions on the

4    scope of the injunction and what it means.  Dr. Ugone

5    includes revenues that were paid by the health care

6    customers during the sunset period for licensing, and I

7    exclude those revenues based on the respective positions

8    taken by the parties.

9    Q    And what is the monetary impact, if any, of that

10   disagreement between you and Dr. Ugone?

11   A    The amount of health care revenues that Lawson

12   received during the contempt period from health care

13   customers was about $900,000, and so that's the magnitude

14   of the difference.  However, it's resolved by the Court.

15   Q    So, Dr. Putnam, taking this slide as a whole, if you

16   take the two apportionments that you deem to be

17   appropriate and that Dr. Ugone proposed, and you

18   incorporate into the revenue base Lawson's position

19   regarding health care customers, what's the relevant

20   figure of total revenue attributable to configurations

21   three and five that you come to?

22           MR. STRAPP:  Objection.  Just vague as to time

23   period here.

24           MR. DUSSEAULT:  Fair enough.

25   Q    For the purposes of this question, I mean through

1    November 30th, 2012.

2    A    Yes, and I'm sure Dr. Ugone made this point, but the

3    data that we have is through November 30th of 2012, so

4    through that date, beginning with the Court's order on

5    May 23rd, 2011, the total revenues are $21.7 million.

6    Q    Dr. Putnam, let's turn to what you describe as the

7    second step of analyzing disgorgement under Dr. Ugone's

8    approach which is to look at the profit margin.  Is it

9    correct that to look at a profit margin, what you are

10   looking is whether to deduct particular costs from the

11   revenue base?

12   A    Yes.  The various definitions of profit differ only in

13   the costs that are deducted.

14   Q    And why is it necessary to take this step of deducting

15   certain costs from the revenue base to come up with gain

16   or profit?

17   A    Well, as the Court pointed out, we're all trying to

18   get at Lawson's gain, and the gain is the difference

19   between what Lawson took in in revenues and what it had to

20   pay out to make those revenues.  So the short version is,

21   you've got to spend money to make money, and if you take

22   in more than you spend, then that's profit.  And it would

23   be -- it's only correct to deduct the expenses that Lawson

24   incurred in defining its gain.

25   Q    What is the source of information that you and, to

1   your knowledge, Dr. Ugone use for revenues and costs?

2   A    We both relied on profit-and-loss statements produced

3   by Lawson in the course of these proceedings.

4   Q    Could we briefly put up demonstrative 703, and

5   understanding all of us have had some difficulty reading

6   the detail of this, I'm not going to ask you to do that,

7   sir.

8        Can you tell me if the two exhibits on this slide

9   represent the profit-and-loss statements that you are

10  referring to?

11  A    Well, I can't say I recognize the numbers, but I do

12  recognize the colors, and they do look like the documents

13  that we both were working from, that's right.

14  Q    Now, you mentioned earlier that Dr. Ugone proposed

15  measures of revenues and gross profits to measure Lawson's

16  gain; is that correct?

17  A    Yes.

18  Q    Do you have an opinion, sir, as to whether either of

19  those measures accurately states Lawson's gain?

20  A    Yes, I do.

21  Q    What is that opinion?

22  A    Both of those measures overstate Lawson's gain,

23  because by definition they fail to deduct all of the costs

24  that Lawson incurred in order to make the sales that it

25  made.

Putnam - Direct

1  Q    So with that in mind, have you prepared a

2  demonstrative that identifies the other measures that Dr.

3  Ugone and you have proposed within the disgorgement

4  approach?

5  A    Yes.

6  Q    Let's take a look at demonstrative 704.  Now, within

7  the context of Dr. Ugone's proposed disgorgement approach,

8  both you and Dr. Ugone attempt to calculate what you each

9  describe as incremental profits; correct?

10 A    Yes.

11 Q    Please describe very briefly for the Court, because

12 the Court heard testimony on this from Dr. Ugone, your

13 view of what the concept of incremental profits means?

14 A    So an incremental profit means the profit that one --

15 a firm earns from making an additional sale in the short

16 run, given the understanding that in the short run,

17 certain costs cannot be varied.  So it's the increment to

18 profit that occurs from an increment to sales given that

19 certain costs are fixed in the short run.

20         THE COURT:  You and Dr. Ugone don't differ in the

21 conceptual articulation of that concept, do you?

22         THE WITNESS:  No, we don't, Your Honor, that's

23 correct.  It's a very common economic concept, and we

24 would use the word the same way.

25         MR. DUSSEAULT:  I would say again, though, Your

1    Honor, just noting that Dr. Putnam is not aware of what

2    Dr. Ugone may have said in the courtroom.

3              THE COURT:  But you just told him.

4              MR. DUSSEAULT:  I guess I did, Your Honor.

5              THE COURT:  Which is all right.  That's how you

6    ask the question.  It's okay.

7    Q    Now, Dr. Putnam, can incremental profits be analyzed

8    or measured over a longer period of time than, let's say,

9    the short term?

10   A    Sure, but the longer the period of time over which you

11   measure incremental profit, the more incremental profit

12   becomes net profit, and the reason why is because costs

13   that are fixed in the short run become variable in the

14   long run.

15             So in the long run, all costs can be changed, all

16   costs are variable, and so there is no such thing as

17   incremental profit, or one would say differently,

18   incremental profit and net profit are the same thing

19   because they deduct the same costs.

20             THE COURT:  You mean if I look at the period of

21   time of a couple, three days, incremental profit might be

22   an appropriate measure, but if I look at the same basic

23   figures or parameters but for a period of time of a year,

24   then you don't use incremental profit, you use net profit.

25             THE WITNESS:  That's right, Your Honor.

Putnam - Direct

1    THE COURT:  Because the cost structure shifts

2  from fixed to variable.

3    THE WITNESS:  That's right, exactly.  Almost all

4  costs are governed by a contract, and so the contract that

5  governs those costs may be one that can't be varied over a

6  period of days or weeks but can be varied -- like a lease,

7  for example.  You would not renew a lease at the end if

8  you were trying to reduce costs, and so whatever the term

9  of the lease is, that becomes variable at the end of that

10  lease.

11    THE COURT:  But if you own the building, it

12  doesn't become variable at all except by virtue of what?

13    THE WITNESS:  Well, if you own the building, Your

14  Honor, you actually have greater flexibility, because you

15  can sell the building.

16    THE COURT:  I know, but you don't.  If you don't

17  sell the building, it's a fixed cost, isn't it?  You don't

18  determine the value, the categorization of an asset based

19  on whether or not it is alienable in concept, do you?

20    THE WITNESS:  No, that's correct, Your Honor.

21  It's purely an economic determination, and so, for

22  example, I own my house, and if I was willing to reduce

23  the price enough, I could sell it almost immediately.

24  It's just a question of what's the economic thing to do.

25    THE COURT:  That doesn't change the fact that

1    it's a fixed asset until -- fixed cost until you, in fact,

2    do the change itself; right?  Except for the possibility

3    of depreciation; right?

4           THE WITNESS:  Well, the way an economist would

5    say it, I think, Your Honor, is that all costs are

6    variable eventually, and so whether, in fact, it is varied

7    or not is a different question from whether one can vary

8    it or not, and so as long as you hold on to it, is it a

9    fixed cost.  That certainly is true.

10          If it's available to be changed, then you may

11   choose to hold on to it, but you've treated it as a, for

12   example, a renewable asset that I keep maintaining rather

13   than disposing of.

14          THE COURT:  But in accounting and economics, you

15   don't change the definition of a fixed cost merely because

16   it is susceptible of being changed in its character down

17   the road somewhere varying upon various contingencies, do

18   you?  You wait until the contingency occurs, and then you

19   decide it.

20          THE WITNESS:  Well, I guess I would say, Your

21   Honor, that it depends on the -- the way an economist

22   thinks about it, and this might different for accounting

23   purposes, but the way an economist would think about it

24   is, do I have the flexibility to alter my expenditures

25   over a certain time period, and so if I have the

1  flexibility to do that, but I choose not to do that, then

2  I have treated that asset as variable even though --

3           THE COURT:  An accountant doesn't treat it that

4  way.  You look at the period for which the accountancy

5  occurs, don't you?

6           THE WITNESS:  Well, that's true.  An accountant

7  -- that's actually a really good point, Your Honor.  An

8  accountant would classify the asset based on whether it is

9  possessed and maintained or not.  This is, I think, the

10  whole point of why economists provide some value added.

11          An accountant doesn't use the concept of an

12  incremental cost at all.  That would never appear on a

13  profit-and-loss statements statement.  It's purely an

14  economic construction, and the reason why is because an

15  economist says, let's look at the flexibility that a firm

16  has over a particular time period, recognizing that over a

17  very, very long time period, all costs can be varied

18  regardless of how they're classified for accounting

19  purposes.  They can be disposed of, and that's the

20  critical point in --

21          THE COURT:  How do you determine -- in a

22  situation, in a world where you consider all costs as

23  potentially variable, what is it that you use to determine

24  when a fixed cost becomes a variable cost?

25          THE WITNESS:  The point in time at which you are

1   able to vary your expenditures on that.

2         THE COURT:  And how do you judge that?

3         THE WITNESS:  Well, with respect to any

4   particular asset -- that's actually an excellent question.

5   With respect to any particular asset, it could actually be

6   quite a complicated inquiry.

7         THE COURT:  Yes, it can.  That's exactly my

8   point.  In fact, if you're going to use a piece of

9   property as an example, if you own the piece of property,

10  you can't -- you're never going to sell that property if

11  you're in the middle of a down market and don't absolutely

12  have to.

13        So you look at what's the market, what's

14  available, and whether you have to, and then in order to

15  get into that, you have to look at all these other

16  factors, too, don't you?

17        THE WITNESS:  You are exactly right, Your Honor.

18        THE COURT:  So then isn't the best thing to do is

19  to treat the building as a fixed cost so you don't have to

20  get into the speculative nature of treating it as a

21  variable cost; isn't that, for purposes of the law, an

22  accurate measure?

23        THE WITNESS:  I understand the Court's point, and

24  certainly with respect to Lawson, for example, there are

25  going to be literally thousands of assets where one could

1   go through line by line and say, for what purposes would

2   we consider this asset to be variable or fixed and over

3   what time period and what the contingencies and that sort

4   of thing.

5          Obviously, we don't have anything like that level

6   of detail about any particular asset, and we have to look

7   at how the company, as a whole, manages the whole

8   selection of assets.

9          THE COURT:  Okay.

10  Q   Dr. Putnam, let me ask just two quick follow-up

11  questions to that.  You discussed in response to the

12  Judge's question the distinction between incremental

13  profits and net profits.  Is it possible, as an economist,

14  to address the concept of incremental profits over a

15  longer period than the instant, let's say something like a

16  quarter?

17  A    Sure.

18  Q    And is it possible to address the concept of

19  incremental profits over a defined period of time, not a

20  quarter, but a period of time that may become relevant in

21  the context of a dispute?

22  A    Of course.  Again, it depends on the time period over

23  which one can actually vary the expenditures.

24  Q    Now, the Court asked you a couple of questions about

25  types of costs that might be fixed or variable.  In terms

1    of salaries of employees, as an economist, do you have a

2    general view as to whether those are variable or fixed?

3    A    In general, I would say, particularly for a firm

4    like -- software firm like Lawson, they would be treated

5    as variable in the short to immediate run, because one can

6    always terminate or hire employees.  There are some

7    transitional costs like severance pay and things like

8    that, but if a firm wants to downsize, for example, it can

9    lay people off, and it can typically do that relatively

10   quickly, usually within a quarter.

11           THE COURT:  Well, it can if you're an at-will

12   employee.  Can't if you're a contract employee without

13   sustaining costs which you can determine.

14           THE WITNESS:  Certainly, Your Honor, and so --

15   if, for example, you had a unionized workforce, your labor

16   costs would be less variable than they would be, say, in a

17   software company where one of the advantages of a software

18   company is the flexibility you have with respect to labor.

19           So I wouldn't want to say all firms are one way

20   or the other.  Obviously we're concerned about Lawson, and

21   typically in a software company, most employees are

22   employees at will.

23   Q    Does incremental profit properly measured deduct from

24   revenues all variable costs?

25   A    Yes.

1    Q     Now --

2          MR. STRAPP:  Your Honor, could I just ask for a

3    clarification?  That question didn't apply to any

4    particular incremental profits or any company, or was that

5    theoretically incremental profits?

6          MR. DUSSEAULT:  Your Honor, I think Mr. Strapp

7    can follow up --

8          THE COURT:  You can do that on cross-examination

9    if you want to.

10   Q     Now, within the context of Dr. Ugone's proposed

11   disgorgement approach, which I know you've said you don't

12   endorse, both you and Dr. Ugone attempt to calculate the

13   incremental profit; correct?

14   A     Yes.

15   Q     Now, what's the fundamental difference between your

16   measure of incremental profits and what Dr. Ugone

17   described in his report as an incremental profit?

18   A     Well, I think if you -- if we turn back to the

19   demonstrative that's on the screen, this illustrates the

20   contrast, and the effects are different approaches.

21         We both begin with a total accused revenue,

22   recognizing that there are some minor differences in that

23   figure.  We both subtract the cost of goods sold which is

24   the cost of actually producing the accused modules.  Dr.

25   Ugone then subtracts all of Lawson's sales and marketing

1    expenses, in other words, treating them all as variable.

2    I, on the other hand, estimate the share of sales and

3    marketing expenses that are variable on a

4    quarter-to-quarter basis.  Then I also do the same thing

5    for Lawson's R&D and general and administrative expenses

6    and subtract those.

7        The difference between us is that by subtracting out

8    the additional costs, I arrive at an incremental profit

9    margin of about 26 percent.  Dr. Ugone's profit margin is

10   50.9 percent.

11   Q    Dr. Putnam, would you please describe to the Court, at

12   a high level, how you went about, as an economist,

13   determining whether Lawson's operating costs are variable?

14   A    Sure.  So I'm sure the Court's aware, Lawson was a

15   public company, and so we looked at the financials that

16   Lawson submitted to the Securities and Exchange Commission

17   since the year 2000.  They've got to file quarterly

18   reports that, among other things, name their revenues and

19   also various categories of their operating costs, in

20   particular the three categories that we discussed here.

21       That gives us a data set that allows us to ask the

22   following question:  When Lawson's revenues varied in the

23   past, how did Lawson vary its expenditures in these three

24   cost categories accordingly.  And by summarizing the

25   relationship between revenues and the various categories

1    of operating costs, we can then ask the question, which is

2    relevant to these proceedings, had Lawson's revenues

3    varied by $21.7 million over the injunction period, how

4    would we expect Lawson to have responded by adjusting its

5    costs if it were to have responded as it has in the past.

6    Q    Dr. Putnam, what economic tool, if any, did you use to

7    conduct that analysis?

8    A    So any time that you've got a data set like this, and

9    you've got variables that are moving together, economists

10   naturally think to use something called regression

11   analysis which is a statistical tool that describes the

12   relationship between a variable that you want to explain,

13   which, in this case, is the level of costs, and a variable

14   that is doing the explaining, which, in this case, is

15   revenues.  So put differently, how much do costs vary when

16   revenues vary.

17   Q    Is regression analysis a commonly used tool in the

18   field of economics?

19   A    Yes, it's absolutely standard.  You are taught this.

20   Now it's taught to undergraduates.  When I was in graduate

21   school, it was part of the first year curriculum, and it's

22   used routinely to summarize data and describe

23   relationships between economic variables.

24   Q    Now, have you prepared demonstratives to illustrate

25   for the Court the results of your regression analysis

1   studying the relationship between Lawson's revenues and

2   its operating costs?

3   A    Yes.

4   Q    Let's turn, if we could, to demonstrative 705.  Dr.

5   Putnam, please explain to the Court what demonstrative 705

6   shows, because to me it looks like a lot dots of lines.

7   A    Yes.  Well, that's, as a matter of fact --

8            THE COURT:  Because it is.

9   A    Yes.  So just to break this down into steps, the first

10  thing I would do is direct the Court's attention to the

11  blue dots which are the -- that's the real world, okay?

12  So what I've plotted in the blue dots on the horizontal

13  axis is Lawson's revenue, and on the vertical axis is --

14  I've taken one category of cost to illustrate this.  It's

15  the same for the other two, but to illustrate this, I've

16  used sales and marketing costs.

17       Each blue dot represents the combination of revenues

18  and sales and marketing costs that we observe in one of

19  Lawson's quarterly statements filed with the SEC.  So

20  that's real data.  That's what actually happened.

21       And then what an economist would like to do given that

22  date is to say, is there a way of summarizing this

23  relationship so that we can say with some degree of

24  confidence or on average, when revenue increases or

25  decreases, how do costs respond to that on average.  And

1  so the fact that the line is upward-sloping tells you that

2  when revenue increases, that sales and marketing costs

3  increase as well.  That's what the title of the slide

4  says.

5      Obviously the reverse of that is also true.  When

6  revenues decrease, costs also decrease, and then the slope

7  of that line tells you exactly how much costs increase or

8  decrease when revenue increases or decreases.  So in other

9  words, it gives you the mathematical relationship between

10  revenue and costs?

11  Q    And just in summary, Dr. Putnam, what does this

12  demonstrative show you in terms of the relationship

13  between Lawson's revenues and its sales and marketing

14  costs?

15  A    Well, what it shows you is that the dots are clustered

16  very close to the line which means that there is a clear

17  and relatively precisely estimated relationship between an

18  increase in revenues and increase in costs based on

19  Lawson's historical experience.

20  Q    Did you perform this analysis for the other categories

21  of operating costs, specifically research and development

22  and general and administrative expenses?

23  A    Yes.  I did exactly the same thing.  I only provided

24  the scatter plot for sales and marketing costs, but the

25  data would look very similar if you did the same thing for

Putnam - Direct                                    1036

1    -- if you plotted it for R&D and for G&A also.

2    Q    Now, as I look at this scatter plot, I think as you

3    described it, I notice that some of the plot points are

4    higher than the line, and some are lower than the line; is

5    that true?

6    A    That's right.

7    Q    Does that raise any concerns to you regarding the

8    accuracy of your analysis?

9    A    No, not at all.

10   Q    Now, explain that.  Why not?

11   A    So the world, the real world, as the Court has pointed

12   out, is a complicated place, and costs vary for -- in a

13   given period, costs vary for many hundreds of reasons,

14   because individual people are adjusting each quarter their

15   expenditures to the revenues that change as well as to

16   other things that may not necessarily concern revenues.

17        So the way an economist approaches this is to say,

18   we're trying to summarize these complex relationships

19   using a single -- a single coefficient or a single number

20   that says on average, how much do revenues and sales and

21   marketing costs vary together.  In any particular period,

22   a firm might undertake an initiative to invest in training

23   its sales personnel, and so expenditures go up, or there's

24   a cost-cutting initiative and expenditures go down.

25        There's lots of reasons why the dots are going to

1   fluctuate around this line, but the line is a good summary

2   of the average relationship expressed by the dots.

3   Q    Now, in his reports, did Dr. Ugone comment on any

4   instances where the point is on or above the line?

5   A    Yes.  Dr. Ugone made a point in his report -- I don't

6   know what he said in court, but he made the point that --

7            MR. STRAPP:  Can I object, Your Honor?  This is

8   calling for testimony about Dr. Ugone's report in which he

9   responded to testimony or to the report of Dr. Putnam.  So

10  now we're far afield from what Dr. Ugone actually offered

11  as evidence in this court.

12           It's not Dr. Ugone's affirmative opinions.  It's

13  Dr. Putnam's response to Dr. Ugone's criticisms of Dr.

14  Putnam's report.  So I don't think that's appropriate to

15  draw, especially where there's a sequester order in place.

16           MR. DUSSEAULT:  Your Honor, if I may, I think

17  it's appropriate for Dr. Putnam who is offering this

18  analysis to defended it and explain why a concern that the

19  other side raised in its reports, which is what he has to

20  go on, in his view whether it's meritorious or not.

21           THE COURT:  Sustained.  If they raise it in

22  cross-examination, we can deal with it.  If they don't

23  raise it in cross-examination, we don't need to deal with

24  it.

25           MR. DUSSEAULT:  Fair enough.  Thank you, Your

1   Honor.

2   Q    Dr. Putnam, let's turn to demonstrative 706, please.

3   A    Sure.

4   Q    And the last one may have been a bunch of dots.  This

5   one is to be a bunch of numbers.  Can you explain what

6   demonstrative 706 is showing?

7   A    Yes.  This is not a user-friendly version, but this is

8   actually how an economist summarizes a regression in a way

9   that reports the relevant facts about it and allows other

10  people who know how to interpret regressions to assess

11  whether it was done accurately and whether it's reliable.

12       So just to summarize in words the relevant points

13  briefly, it's probably easiest to start on the bottom of

14  the screen with a line that's marked N.  N is the number

15  of observations.  And so we ask the question, is there

16  enough data to tell us reliably whether there's a

17  relationship between costs and revenues.

18       The answer is yes.  For two variables like this, we

19  have 47 observations, 47 quarters, so that's almost

20  12 years of data, and that's more than enough to give a

21  reliable answer in principle.

22       Moving up, the next line is something called adjusted

23  R squared which tells you the answer to the following

24  question:  How much of the variation in the various cost

25  categories can we explain using revenues to explain them,

 1    and the answer is somewhere between 85 and 89 percent of

 2    the total variation in these categories of expenditures is

 3    explained just knowing the revenues.  So in other words,

 4    if you know how much Lawson sold, you have a very good

 5    idea of how much they spent.

 6         Moving up one further line, those numbers in

 7    parentheses tell you the degree of precision with which we

 8    have our estimates, and so they answer the following

 9    question:  Are the results statistically significant,

10    meaning if someone said, how do you know that the true

11    relationship is not zero, how do you know that you haven't

12    been fooled into believing that there's a relationship

13    when there isn't one, these numbers tell you that you

14    haven't been fooled and that your estimates are

15    statistically significant which means you can reject the

16    claim that the true relationship is zero.

17         This is important because Dr. Ugone, in fact, makes

18    exactly this claim for R&D and G&A and says the true

19    relationship between sales and these cost categories is

20    zero.  We can say that it is statistically certain that

21    that relationship is not zero.

22         MR. STRAPP:  Your Honor, I object, and I move to

23    strike.  He's commenting on Dr. Ugone's testimony.  It's a

24    mischaracterization of what was said in court.  Dr. Putnam

25    wasn't present, didn't hear what Dr. Ugone's said, and

1    it's also not present in his expert report either.  So I

2    would move to strike that testimony as an inaccurate

3    characterization of what was said by another expert,

4    either in the report or in the live testimony in court.

5              THE COURT:  Where does it appear in his report?

6              MR. DUSSEAULT:  I'm sorry, Your Honor.

7              THE COURT:  He said it didn't appear in his

8    report.  Where does --

9              MR. STRAPP:  I'm specifically referring to the

10   last statement that Dr. Putnam said about the fact that

11   zero dollars of product and development is varying with

12   respect to -- revenues with product and development can't

13   be explained by cost with respect to product and

14   development.  I don't think that appears --

15             THE COURT:  Why don't you slow down a little bit.

16   I'm having trouble following, and I know the court

17   reporter must be.

18             MR. STRAPP:  Your Honor, maybe I could start

19   again.  I think what I'm -- the point of my objection is

20   that Dr. Putnam is commenting on testimony that Dr. Ugone

21   gave, which Dr. Ugone actually didn't give, and he's also

22   trying to characterize it as being present in Dr. Ugone's

23   report, and I feel like the characterization wasn't a fair

24   characterization of what's actually in Dr. Ugone's report.

25             THE COURT:  I understand, okay.

1    MR. DUSSEAULT:  On this issue, Your Honor, ePlus

2    moved to keep Dr. Putnam from hearing what was said in the

3    courtroom.  Part of Dr. Putnam's assignment is to respond

4    to the opinions to be offered by Dr. Ugone which he does

5    based on the reports.

6        So what he is talking about is the reports.  In

7    his report, he talks about the different ways in which

8    they measure incremental profits and notes, as Dr. Ugone

9    did say, that he treats R&D and G&A as fixed.  And he

10   doesn't -- he treats 100 percent of the sales and

11   marketing as variable.

12       He addresses that, and he explains why the better

13   approach is to look at the variable portion of each.  It

14   was at ePlus's own insistence that his opinion is based on

15   the reports and not based on testimony that ePlus said

16   they didn't want him to hear.

17   MR. STRAPP:  Your Honor, I feel like this is an

18   inappropriate characterization of Dr. Ugone's testimony.

19   THE COURT:  I think the way to solve this is not

20   to ask the question with respect to the report.  Just ask

21   him what his opinion is on a topic, and then you can

22   compare it when you do your papers to whatever he said,

23   Dr. Ugone said.

24   MR. DUSSEAULT:  So, Your Honor, I can ask Dr.

25   Putnam what Dr. Ugone's opinion was?

1    THE COURT:  No.  You ask him his opinion on a

2  topic; in other words, do you think the car was going

3  35 miles an hour.  Let's suppose that Dr. Ugone has said,

4  I think the car is going 82 miles an hour, and you ask him

5  not do you think Dr. Ugone is right, you just ask him the

6  question what is your opinion as to whether the car was

7  going 35 miles an hour, and then I can decide which one of

8  the experts I want to believe when you compare them in

9  your papers.

10    MR. DUSSEAULT:  Your Honor, the only issue I'd

11  raise is Dr. Ugone is a defense expert.  Part of his

12  assignment --

13    THE COURT:  He's a what?

14    MR. DUSSEAULT:  He's a defense expert in this

15  case.  He's the defendant's expert.  He did his report

16  after Dr. Ugone.

17    THE COURT:  You mean Dr. Putnam is.

18    MR. DUSSEAULT:  I'm sorry, Dr. Putnam is a

19  defense expert.  He was retained, in part, to address the

20  opinions expressed by Dr. Ugone and respond to them.  And

21  so part of his affirmative opinions is, in fact, to

22  comment on what Dr. Ugone has said.

23    We moved the Court to allow him to hear what was

24  actually said in court so that he could speak to that, but

25  to a certain point, Your Honor, I think we need to have

1    latitude for him to be able to respond to the only

2    opinions that he was allowed to hear which are those -- to

3    which he should have been confined in court anyway.

4              MR. STRAPP:  And, Your Honor, if I could make one

5    point on that.  It's actually interesting.  Even though

6    Dr. Ugone submitted the first report, it was Dr. Putnam

7    who was the first one to issue an affirmative opinion

8    regarding incremental profits.

9              So in this instance, it's not that Dr. Putnam's

10   responding to Dr. Ugone's opinion on incremental profits,

11   it's the opposite.  So I feel like that's an inaccurate

12   characterization of this portion of Dr. Putnam's

13   testimony.

14             MR. DUSSEAULT:  I hear Mr. Strapp's point.  It's

15   an inaccurate one for this reason as Mr. Strapp knows.

16   The parties did supplemental reports.  In the first

17   supplemental report, Dr. Ugone used this approach where he

18   treated G&A and R&D as fixed.

19             Dr. Putnam then responded.  He said, my

20   assignment is to respond, and he responded.  So because

21   the parties supplemented reports, it's absolutely part of

22   his response.

23             MR. STRAPP:  And, Your Honor, I would just say --

24             THE COURT:  I think the first solution I set upon

25   is the right one, and you all just proved it to me.

1    MR. DUSSEAULT:  I'll try and follow that lead,

2  Your Honor.

3  Q    Dr. Putnam, were you done discussing your own analysis

4  of the regression and what demonstrative 706 shows?

5  A    Not quite yet, so just to finish up the previous

6  point, the numbers in parentheses test the claim --

7    THE COURT:  Excuse me.  I, therefore, strike Dr.

8  Putnam's answer with respect to what Dr. Ugone said.  All

9  right.

10    THE WITNESS:  So that's fine.  That's fine.  The

11  hypothesis to be tested when one says something is

12  statistically significant is, is the true relationship

13  zero, and to say that something is statistically

14  significant is to say, in this case, that the true

15  relationship is not zero, it's something else.  And that

16  is what's demonstrated by the numbers in parentheses.

17    So the something else that it is, which is the

18  only thing we really care about for these proceedings, is

19  the numbers shown in yellow under the line revenues.

20  That's the portion of -- or the share of revenues that

21  vary for each of these cost categories, and it's those

22  numbers we're going to carry forward into the rest of the

23  analysis.

24    So just to be concrete, in the sales and

25  marketing column, we see the number 0.177.  What that

1    means is that for every increase of $1 in revenues, there

2    is a 17.7 cent increase on average in sales and marketing

3    costs, or more generally, if revenues go up by a certain

4    percentage, costs go up in the sales and marketing column

5    by about 17.7 percent of that percentage.

6            These the numbers that we're going to carry over,

7    because these are the ones that show us the portion of

8    these cost categories that are variable.

9            MR. DUSSEAULT:  Thank you, Dr. Putnam.

10           THE COURT:  This just shows companywide; right?

11   It doesn't show product by product.

12           THE WITNESS:  That's right, Your Honor.

13           THE COURT:  In other words, you don't know

14   whether, and we can't tell from anything we've got,

15   whether the costs -- whether from the revenue of selling

16   the configurations three and five the costs went up or

17   incurred per dollar was point 17 cents; right?

18           THE WITNESS:  That's certainly correct.

19           THE COURT:  You can't tell that.  This is just a

20   companywide figure to which we would conceptually -- which

21   we would conceptually use as a proxy for a particular

22   situation, in this situation whatever the gain was on

23   configuration three.

24           THE WITNESS:  That's exactly right, Your Honor.

25   We only have companywide data for costs of any kind.

1    Q    Dr. Putnam, in coming to your opinions, did you

2    consider any testimony from Lawson about the

3    reasonableness of using companywide data as a proxy for

4    the cost data pertaining to configurations three and five?

5    A    Yes.

6    Q    What information did you consider?

7    A    In particular, I spoke with Mr. Samuelson, who is the

8    CFO, and asked him this question:  Is it fair to treat

9    companywide data as a proxy for the sales of the accused

10   configurations and the accused modules, and he said that

11   there was no reason not to treat these modules as being

12   typical of the broader set of products sold by the

13   company.

14          THE COURT:  And you relied on that in forming

15   your opinion as to the incremental profit figure that you

16   offered.

17          THE WITNESS:  Yes, Your Honor.

18   Q    Did you also rely on deposition testimony in forming

19   your opinion as to incremental profit and what costs of

20   Lawson were variable?

21   A    Yes.  I spoke with both Mr. Samuelson, and I also read

22   his deposition.  I forget in which source he said that --

23          MR. STRAPP:  Your Honor, I would object to -- let

24   me let him finish the question, because I don't think this

25   is in the report, but I'll let him finish.  Go ahead.

1    THE COURT:  I think maybe go ahead.  You

2    considered the deposition?

3              THE WITNESS:  Yes, I did, Your Honor.

4              THE COURT:  His deposition as well.

5              THE WITNESS:  Mr. Samuelson's, yes, that's right.

6              THE COURT:  At least on what he said there, you

7    thought it was reasonable to use this as a -- the overall

8    damage figures as a proxy for the -- the overall cost

9    figures as a proxy for the costs of the configurations

10   three and five, the modules at issue.

11             THE WITNESS:  That's right.  There was nothing

12   idiosyncratic about these particular modules that I could

13   see from the testimony.

14   Q    Now, what impact, if any, Dr. Putnam, did your review

15   of deposition testimony and your discussion with Mr.

16   Samuelson have on your view of the results generated by

17   your regression analysis?

18             MR. STRAPP:  Your Honor, I'm going to object.

19             THE COURT:  What are you going object to?

20             MR. STRAPP:  This is not in the report.  The

21   discussion about Dr. Samuelson's deposition testimony --

22   Mr. Samuelson's deposition testimony and how that supports

23   Dr. Putnam's opinion is relegated to the net profit

24   section of his report.  It doesn't have anything do with

25   the incremental profit section of his report.

1        MR. DUSSEAULT:  Your Honor --

2        THE COURT:  In other words, he didn't give an

3   opinion on the costs?

4        MR. STRAPP:  He gave an opinion on the costs, but

5   in his report he said, Mr. Samuelson provides support for

6   what my opinion is, but he said that with respect to net

7   profit, not with respect to incremental profit.

8        THE COURT:  I see.

9        MR. DUSSEAULT:  Your Honor, Dr. Putnam identifies

10  as one of the materials he relied upon Samuelson

11  deposition testimony.  At page 47 of his first report, he

12  specifically talks about Mr. Samuelson's testimony as it

13  pertains to costs.  It's clearly been disclosed.

14        Then in the deposition, Mr. Strapp asked Dr.

15  Putnam more than a year ago to explain in detail all

16  conversations he had with Mr. Samuelson, which he did.  So

17  I think it's fair game.  It's covered by the report, and I

18  seem to recall this issue also came up with, I think it

19  was Dr. Weaver.  There's certainly no prejudice, Your

20  Honor, given that the reliance on this information has

21  been disclosed more than a year ago.  There's no

22  prejudice --

23        THE COURT:  Well, the analogy to the -- the

24  analogy is the same, I guess, as the validity to which one

25  could ascribe testimony about configuration 28 and -- I

1    mean claim 28 and claim 26.  They're sufficiently

2    analogous points that the data on which he's relying is

3    transferable, notwithstanding that one was offered for

4    claim 28 as opposed to claim 26, and the same analogy

5    would apply here.

6              It's sufficiently connected that he has relied

7    upon it, and it's maybe parsing the rule too tightly to

8    strike the testimony on that basis.

9              MR. STRAPP:  Could I make one point, Your Honor?

10             THE COURT:  You know the rule of

11   outcome determinative?

12             MR. STRAPP:  I do.  I just want to --

13             THE COURT:  If it's not outcome determinative,

14   most of the time it's better not to deal with it.

15             MR. STRAPP:  All right, Your Honor, just one

16   point of clarification.  In Dr. Putnam's report, he has a

17   two-page section at the end of a 79-page report -- or

18   three-page section on incremental profits, and that

19   incremental profits section, that three pages of his

20   report, is strictly limited to this regression model.

21   That's the basis for his incremental profits.

22             THE COURT:  You can handle that in

23   cross-examination.

24   Q    So, Dr. Putnam, let me ask the question again just so

25   the record is clear.  What impact, if any, did your review

1   of the deposition testimony and your discussions with Mr.

2   Samuelson have on how you viewed the results of your

3   economic regression analysis as to the variability of

4   Lawson's costs?

5   A    Well, they seem completely consistent.  When I spoke

6   with Mr. Samuelson, he said that the way he summarized his

7   view of the variability of costs was that between 80 to

8   90 percent of costs could be varied within two to six

9   weeks of a decision being made of the need to vary those

10  costs.

11       So when I did the regression results, I computed the

12  share of costs that were variable and found that overall

13  about 89 percent is variable which is right within the

14  window he described.

15  Q    Dr. Putnam, how did you use the results of your

16  regression analysis to calculate a measure of Lawson's

17  incremental profits here?

18  A    Well, so what you want to do is take the numbers that

19  are found in the yellow band on demonstrative 706 and say,

20  this is the portion of revenues or the percentage of

21  revenues that should be treated as variable in the short

22  run, which I take to mean on a quarter-to-quarter basis.

23       So if you add up those three numbers in yellow, 0.177,

24  0.083, and 0.135, you get 39.5 percent.  So in other

25  words, 39.5 percent of Lawson's revenues should be treated

1   as variable costs, variable operating costs on a

2   quarter-to-quarter basis.

3   Q    And, Dr. Putnam, what do you calculate Lawson's

4   incremental profit margin to be, if we can go back to

5   slide 704 which we saw earlier?

6   A    So if you start with -- just to do the math, you start

7   with Lawson's accused revenue, subtract the costs of goods

8   sold.  That gives you the gross margin of about

9   65.5 percent.  Then if you subtract the variable sales and

10  marketing, the variable R&D, and variable G&A, which I've

11  together said make 39.5 percent, 65.5 minus 39.5 gives you

12  an incremental profit margin of 26 percent.

13  Q    Now, Dr. Putnam, I'm going to shift from incremental

14  profits to the measure of net profit which you've already

15  discussed a bit with the Court.  If we could look at

16  demonstrative 707, is this a demonstrative that you

17  prepared to help explain the concept of net profits to the

18  Court?

19  A    That's right.

20  Q    And you offer a measure of net profits in this case?

21  A    Yes, that's right.

22  Q    What are net profits?

23  A    Net profits are sort of what you would think of

24  naively if you just said, how much money did a firm make

25  from a particular sales activity, because it takes into

1    account all the costs that the firm incurred in order to

2    make those sales.  So in addition to all the cost you've

3    identified previously, the costs of goods sold and the

4    variable sales and marketing and R&D and G&A expenditures,

5    it also subtracts those costs that were treated as fixed

6    in the short run but that could have been varied over a

7    longer decision horizon.

8         So by after subtracting out the fixed costs portion,

9    then -- which amounts to nine percent of revenues, then

10   you reach -- you go from 26 percent profit margin to the

11   net profit which is 17 percent, and that accounts for all

12   of Lawson's costs.

13   Q    Do you offer an opinion, sir, as to whether this

14   measure of net profits is an accurate measure of Lawson's

15   gain in the context of this proceeding?

16   A    Yes.

17   Q    What is that opinion?

18   A    Well, actually, I think it's the best measure.  It's

19   the simplest and -- conceptually simplest and also the

20   best measure, and the reason why is because the exercise,

21   as I understand it, is that we're contemplating the

22   position Lawson would have been in had it complied with

23   the Court's order on May 23rd, 2011.

24        If it was faced with a permanent loss of revenue as of

25   that date, then it would be making permanent decisions

1    with respect to the costs that correspond to those

2    revenues.  In other words, it would be making a long-run

3    decision rather than a series of short-run decisions.

4        Faced with a long-run decision and the loss of

5    $21.7 million in revenue, the best way to think about this

6    is that Lawson would have moved to preserve its long-run

7    profit margin of 17 percent and reduced its costs

8    accordingly as it could over time.  It couldn't have done

9    that immediately on May 23rd, but it would have done that

10   as expeditiously as made sense.

11              THE COURT:  Which is how long?

12              THE WITNESS:  I'm sorry, Your Honor?

13              THE COURT:  Which is how long?

14              THE WITNESS:  Well, it's going -- for the reasons

15   you've articulated, it depends on the particular assets in

16   question.  Some of them -- Mr. Samuelson said that between

17   80 to 90 percent of his costs could be varied within a

18   quarter which means -- or two to six weeks.

19              I calculated that about 89 percent could be

20   varied between quarters, and so the remaining 11 percent

21   would take longer than a quarter, and, truthfully, Your

22   Honor, the data don't allow us to say exactly what point

23   in time that remaining 11 percent would have varied.

24              THE COURT:  Did you do any looking at whether

25   there have been similar economic consequences to the loss

1   of $21.7 million in revenue at any time over the 12-year

2   period you looked at and determine how long it did take

3   them, in fact, to reduce their costs?  Did you ever look

4   at that?

5          THE WITNESS:  It's a good question, Your Honor,

6   and I did look at -- obviously revenues are fluctuating

7   from quarter to quarter, and so I asked the following

8   question:  So $21.7 million over the injunction period is

9   a reduction of about $15 million per year, because it's a

10  one-and-a-half-year period.

11         That reduction is about $4 million per quarter,

12  and Lawson is selling about $125 million per quarter.  So

13  it's a reduction of about three percent in Lawson's

14  revenues or roughly one-sixth of Lawson's profit during

15  that time period.

16         On average --

17         THE COURT:  Net profit?

18         THE WITNESS:  I'm sorry?

19         THE COURT:  Net profit?

20         THE WITNESS:  Yes, three percent of Lawson's

21  revenues corresponds to one-sixth of its 17 percent profit

22  margin.  So I looked at the fluctuation in revenues, and

23  it turns out that revenues fluctuated, on average, by more

24  than three percent, and I looked to see the speed at which

25  it was able to make these adjustments and determined that

1    about 89 percent of the adjustment could be made within --

2    from one quarter to the next.

3              I wasn't able to determine how rapidly it was

4    able to make the remainder of that adjustment, and I've

5    had to rely on qualitative testimony by Mr. Samuelson as

6    to how rapidly it could cut its costs --

7              THE COURT:  For example, did you look at how much

8    in any one quarter they had actually cut the cost of

9    employees and reduced the employees?

10             THE WITNESS:  Well, Your Honor --

11             THE COURT:  Their biggest cost is employees.

12             THE WITNESS:  Yes.

13             THE COURT:  So perhaps a reasonable way to look

14   at it is to say, how long did it take them to cut

15   employees when they were faced with this kind of loss, and

16   I haven't heard -- Mr. Samuelson never did testify to

17   that.  He was testifying theoretically and generally, not

18   specifically, and I guess my question is, did you see

19   anything that gave you specific information about how

20   much, for example, they cut their costs, cut their

21   employee costs in any quarter in which they had a

22   comparable loss?

23             THE WITNESS:  Yes, Your Honor, and, in fact, it

24   was --

25             THE COURT:  Where is that figure?

1    THE WITNESS:  I'm sorry?

2    THE COURT:  And where is that actual figure?

3    THE WITNESS:  Well, the -- I didn't ask for a

4    number.  I asked for the degree of flexibility, and so the

5    specific question --

6    THE COURT:  Degree of what?

7    THE WITNESS:  The degree of flexibility that

8    Lawson had.  In other words, how long did it take to cut

9    employees substantially.

10    THE COURT:  You asked Mr. Samuelson this?

11    THE WITNESS:  I did ask this question, Your

12    Honor.

13    THE COURT:  That's not what I'm asking.  I'm

14    asking if you ever tested what Mr. Samuelson told you by

15    looking at any hard data.

16    THE WITNESS:  Well --

17    THE COURT:  If the answer is no, then say no.

18    THE WITNESS:  I didn't do any case studies of

19    individual instances where Lawson had to cut employee

20    costs.

21    THE COURT:  I'll tell you the same thing I told

22    Dr. Ugone.  A good answer to that question then is no.

23    Thank you.

24  Q    Let me ask you one more question on that subject.

25  What is the relationship, if anything, Dr. Putnam, between

1  the regression analysis that you did and the concept of

2  looking at hard data to see whether costs such as salaries

3  vary over a period of like a quarter?

4  A    Well, the -- the hard data tells you at the highest

5  level -- as opposed to doing a case study, the hard data

6  tells you at a high level how did Lawson cut its various

7  categories of expenditures in response to a change in

8  revenues.

9      So some of those employees were lost by the sales and

10  marketing department, some were lost by the R&D

11  department, and some were lost by the administrative

12  section of the company.

13      I asked Mr. Samuelson during the recession how rapidly

14  he was able to cut those costs, and he said, during the

15  recession, we laid off people quickly, within a quarter.

16  So the hard data revealed that in 2007, Lawson dropped its

17  costs significantly in response to a corresponding

18  reduction in revenues.

19  Q    Thank you.  Now, on --

20          THE COURT:  The hard data you are talking about,

21  though, is what Mr. Samuelson told you.

22          THE WITNESS:  And the data confirm --

23          THE COURT:  No.  I just said you relied on what

24  Mr. Samuelson told you.

25          THE WITNESS:  Yes, Your Honor.

1    THE COURT:  To reach that conclusion.  That's all
2    I'm trying -- that's not hard data to me.  That's just
3    testimony.  That's his view of things based on how you
4    looked at things, and what I was asking is, did you ever
5    go into the records of the company and see, all right,
6    they had X employees at this time, they had Y employees at
7    this time, and, in fact, they did cut these people for a
8    quarter, not extrapolating from graphs and regression
9    analyses, but checking the hard data.  Did you ever do
10   that?
11   THE WITNESS:  I did not check employee head
12   counts, Your Honor.
13   THE COURT:  All right.  That's all I was asking.
14   Q    Is your regression analysis based on hard data?
15   MR. STRAPP:  Objection; asked and answered.  He
16   already testified it was based on SEC data.
17   MR. DUSSEAULT:  Your Honor, Your Honor just asked
18   a question about whether his opinions are based on
19   testimony and conversations or data, and my question is,
20   was your regression analysis based on data.
21   MR. STRAPP:  Same objection.  Asked and answered.
22   That's what we started off with.
23   THE COURT:  I think he said it was based on SEC
24   data and what Mr. Samuelson told him.
25   THE WITNESS:  Yes.  All of those things are true.

1    Q    We'll move on from that.  Back on the subject of net

2    profits, sir, do you have a view as to whether it's

3    possible for a cost to be at the same time fixed and also

4    still beneficial to a particular product?

5    A    Sure.

6    Q    And could you describe that, please.

7         MR. STRAPP:  Objection; foundation, Your Honor.

8    There's no testimony or support in the expert reports

9    regarding any opinion about which costs are beneficial if

10   they're fixed or not beneficial if they're fixed.  I think

11   it's far afield from this particular economics expert's

12   role and assignment on this case to analyze particular

13   profits, and I don't think it's disclosed in the reports.

14   So I think it's unfair surprise.

15        THE COURT:  Where is it closed in the report?

16        MR. DUSSEAULT:  Your Honor, when Dr. Putnam talks

17   about why net profit is an appropriate measure, he talks

18   about the fact that --

19        THE COURT:  Give me a report and page.  That's

20   the simplest way to rule on that objection.

21        MR. DUSSEAULT:  Sorry, Your Honor.  He has two

22   reports.

23        THE COURT:  Sure.  Do you know where it is?  He

24   might be able to help.  Since you wrote it, maybe you can

25   help us out.

1    MR. DUSSEAULT:  That would help me much, thank
2    you.

3    THE WITNESS:  I think I'd probably refer the
4    Court to paragraph 82 and footnote 77 of my initial
5    report, Your Honor.

6    THE COURT:  Page what?

7    THE WITNESS:  Page 44.

8    THE COURT:  Footnote 77?

9    THE WITNESS:  Yes.

10    THE COURT:  He just talks about whether they are
11    costs of doing business and uses that as an example of
12    cost of doing business.  That's not an opinion on whether
13    it's beneficial as -- although the cost of doing business
14    conceptually is beneficial if you sell something.

15    I think maybe we don't need to get into this
16    anyway.  I don't think it helps his analysis to get into
17    that.  Let's go ahead to something else.

18    MR. DUSSEAULT:  Your Honor, if I could, I think I
19    found on page 25 of the supplemental report --

20    THE COURT:  I don't have that.

21    MR. DUSSEAULT:  The supplemental record is in
22    your binder.

23    THE COURT:  Which date?

24    MR. DUSSEAULT:  March 8th of 2013, sir.

25    THE COURT:  I'm sorry.  It was hidden back here.

1   All right, what page?

2            MR. DUSSEAULT:  Page 25, Your Honor.

3            THE COURT:  What paragraph?

4            MR. DUSSEAULT:  It's the paragraph right after

5   the three romanettes, Your Honor.  It says for all these

6   reasons --

7            THE COURT:  Okay, let me read it.  What do you

8   say, Mr. Strapp?

9            MR. STRAPP:  I don't see any mention of the word

10  fixed in this entire paragraph, nor do I see any mention

11  of the word beneficial, fixed costs.  I don't see any

12  expression of any opinion whatsoever on this page that

13  even bears a relationship to the testimony that was trying

14  to be elicited from the witness, so I think it's really

15  far afield, and if this is the best support that Mr.

16  Dusseault can muster, I would urge Your Honor to strike

17  this testimony.

18           MR. DUSSEAULT:  May I be heard, Your Honor?

19           THE COURT:  I don't think he's given any

20  testimony yet, has he?

21           MR. DUSSEAULT:  May I be heard on the subject?

22  Dr. Putnam is specifically talking about net profit, which

23  is what he's talking about here, and he says that he

24  believes it's the measure that most comprehensively

25  captures the firm's gain because it accounts for the costs

1  that Lawson actually incurred to earn the revenues at

2  issue in this proceeding.  And so what I asked him about

3  was whether costs could be both fixed and beneficial to

4  the product.  That's directly related to the concept of

5  whether a measure accounts for the costs that Lawson

6  actually incurred to earn the revenues at issue.

7          THE COURT:  I think maybe it conceptually has

8  that relationship, but he didn't say that there, so I'm

9  going to sustain the objection.

10 Q    Now, Dr. Putnam, let's go to the next slide.  Have you

11 prepared a slide that summarizes the various profit

12 margins and the measure of damages that they result in,

13 sir?

14 A    Yes.

15 Q    And if you would --

16          THE COURT:  Which is that, 14.

17          MR. DUSSEAULT:  It's 708, Your Honor.

18 Q    Dr. Putnam, if you could, please walk the Court

19 through what Exhibit 708 shows as to the measure of

20 damages, noting that it appears to be for the relevant

21 time period, through November 30, 2012?

22 A    Sure.  So in red, we have Dr. Ugone's calculations, or

23 my understanding of them I should say, which is that given

24 that we make the same apportionments of revenues, which

25 are called the large suite SKU and LSF apportionments, Dr.

1  Ugone offers the opinion that the incremental profits are

2  11.7 million during the period indicated.

3      In contrast to that, I make the same apportionments,

4  and having computed the correct incremental profit and the

5  net profit, at margins of 26 percent and 17 percent

6  respectively, the profits on the $21.7 million in revenue

7  would be 5.6 million and 3.7 million for the two measures

8  of profit that I've calculated.

9  Q    Dr. Putnam, you use a daily rate to calculate these

10 measures for the dates beyond which we have the actual

11 data which is November 30, 2012; correct?

12 A    Yes.

13 Q    Have you prepared a demonstrative for the Court's

14 benefit that shows what the measure would be if one

15 combines the figure through November 30, 2012, with the

16 calculated daily rate up to today?

17 A    Yes.

18         MR. DUSSEAULT:  And If we could take a look at

19 demonstrative 709.

20         MR. STRAPP:  Objection, Your Honor.  We haven't

21 had any testimony yet regarding daily rates or what Dr.

22 Putnam's daily rate is, so I don't think it's appropriate

23 to introduce testimony regarding a daily rate without any

24 clarification or basis for how Dr. Putnam calculated a

25 daily rate.

1     THE COURT:  What is the daily rate, I think, is

2   the first question.  I see what your objection is.

3   Without knowing that -- I mean, I guess you could go back

4   and do the math, but it would be helpful to have the

5   foundational question asked.

6                MR. DUSSEAULT:  Sure, Your Honor.

7   Q    Have you prepared, Dr. Putnam, a demonstrative that

8   shows the different daily rate measures?

9   A    Yes.

10               MR. DUSSEAULT:  If we could turn to demonstrative

11   717, and if you could direct the Court -- Your Honor, some

12   --

13   Q    If you could direct the Court, please, Dr. Putnam,

14   some of these pertain to other measures that you haven't

15   yet addressed, but where on this demonstrative do you set

16   forth the daily rate for Dr. Ugone's disgorgement

17   approach?

18   A    Yes.  So most of this is a summary slide, so most of

19   this is not relevant at this point, but would I direct the

20   Court's attention to the first column which is listed as

21   large suite and LSF apportionment which means that

22   accepting Dr. Ugone's method of disgorgement, the daily

23   rate using the incremental profit measure is $12,761.

24               THE COURT:  Using the incremental measure that

25   you are arrived at.

1    THE WITNESS:  That's right, Your Honor, and you

2    can see that because I've used the 26 percent profit

3    margin which is in the far right column.  So incremental

4    means as I've used that term.

5    MR. STRAPP:  Your Honor, could I just ask for a

6    clarification, because I believe that the incremental

7    profit, the daily rate with the apportionments that Dr.

8    Ugone testified to was approximately double the daily rate

9    that's set forth here on this demonstrative, and if I

10   could refer Your Honor to -- I don't know if you have the

11   binder in front of you, but during the Dr. Ugone direct --

12   actually it was during the redirect, Dr. Ugone testified

13   about table two in his supplemental reply expert report at

14   page 15, and in there, he had a figure for incremental

15   profit daily rates of 24,850, and it appears that this is

16   about 50 percent of that.

17   So I don't understand necessarily where Dr.

18   Putnam derived this, if he's trying to calculate a daily

19   rate that would then be used to figure out --

20   THE COURT:  As I understand it, Ugone did a daily

21   rate for all of the configurations, and this breaks them

22   out only, I guess.  What is the significance of breaking

23   it out, and what's -- what does the 12,761 compare to is,

24   I guess is what he's asking, and I have the same question.

25   MR. DUSSEAULT:  Your Honor, I would suggest if

1   Mr. Strapp wants to ask Dr. Putnam about his figures, he

2   can certainly do that.

3           THE COURT:  No, no, no.  I'm talking about how he

4   got here, what his predicate is.  It doesn't make any

5   sense without understanding what his predicate is.

6   Q    Can you describe the --

7           THE COURT:  Take him where he has three different

8   figures on the same page.

9   Q    Could you please describe for the Court, Dr. Putnam,

10  how you arrive at your daily rate.

11          MR. STRAPP:  Your Honor, can I just lodge one

12  additional objection, and that is that I don't believe

13  that this daily rate figure or any of these daily rate

14  figures appears anywhere in Dr. Putnam's report, and

15  that's part of my confusion.

16          I can't reference it and use as a bench something

17  that was in a report, so I have nothing to compare this

18  against.  This is coming in for the first time I've seen

19  it.  So that's why I'm a little confused as well.

20          THE COURT:  Was Dr. Ugone's in his report?

21          MR. STRAPP:  Dr. Ugone's was in his report, but

22  Dr. Putnam's, I don't think, is, and that's part --

23          THE COURT:  Just a minute.  Is the daily rate

24  figure in Dr. Putnam's report?

25          MR. DUSSEAULT:  It is, Your Honor.

1      THE COURT:  Could you just tell me where it is so

2  we can --

3  Q    Dr. Putnam, if you can help me with it, I'd appreciate

4  it.

5  A    In what's called Revised Exhibit 3 --

6      THE COURT:  Which report are you in?

7      THE WITNESS:  In my supplemental report.

8      THE COURT:  That's March of 2013?

9      THE WITNESS:  That's right, Your Honor.

10      THE COURT:  Let me get there.  March 2013, and

11  what page?

12      THE WITNESS:  There's Exhibit 3, but it's revised

13  Exhibit 3, so please don't be confused by the original

14  Exhibit 3.  The title should say Revised Exhibit 3 at the

15  top.  It contained an error.

16      THE COURT:  It's one of the last two things in

17  the back of the notebook here.  I see.

18      THE WITNESS:  That's right, Your Honor.

19      THE COURT:  All right.  And the daily rate is?

20      THE WITNESS:  Line F of the exhibit, and you'll

21  see it's an expression in thousands of dollars, and you'll

22  see the first number is 12.76 which is $12,760.

23      MR. STRAPP:  Your Honor, I think I understand now

24  looking at this the confusion here, and I didn't want to

25  get into in yet because it's going to come up later, but I

1   think I need to lodge an objection now, because this

2   figure is based on an opinion regarding substantial

3   non-infringing uses, and what I think Dr. Putnam is doing

4   is taking out several of the modules of the configuration

5   and looking just at Punchout and EDI and then calculating

6   a daily rate based on revenues from Punchout and EDI.

7           I think that is based on a substantial

8   non-infringing use opinion.  That is improper for Dr.

9   Putnam to advocate, and I think we'll get into this in

10  some more detail, because I see this on additional slides,

11  but I need to bring it up now, because I believe that this

12  daily rate figure is apportioned using a substantial

13  non-infringing use opinion that I think is improper for

14  Dr. Putnam to testify to.

15          THE COURT:  He is not an infringing use person

16  qualified to testify to that; is that what you are saying?

17          MR. STRAPP:  That's one objection.  The other

18  objection is there's no foundation in the record --

19          THE COURT:  No, let's take that one first.  Now,

20  but we know that he could assume X and talk about assume

21  that what X said was correct about non-infringing uses and

22  then give an opinion based on that.  Did he do that?

23          MR. STRAPP:  He could have -- --

24          THE COURT:  Did he do that?

25          MR. STRAPP:  He did not do that, and there was X

1  who said it, so there was nothing for him to assume.

2          THE COURT:  Well, I thought X who said it may

3  have been Dr. Ugone.

4          MR. STRAPP:  Your Honor, Dr. Ugone did not --

5          THE COURT:  In the alternative method that he

6  didn't testify to that came out during his

7  cross-examination.

8          MR. STRAPP:  That alternative method was

9  regarding apportionment for LSF and process flow.

10          THE COURT:  It had nothing to do with products.

11          MR. STRAPP:  Exactly.  Had nothing to do with

12  non-infringing uses.

13          MR. DUSSEAULT:  Your Honor, I think to say that

14  Mr. Strapp is getting ahead of himself and ahead of us is

15  putting it mildly.  There will be testimony about the

16  measure of non-infringing use that's going to be offered.

17  That's not what he's offering here.

18          If Mr. Strapp is trying to say, before Dr.

19  Putnam's had a chance to testify, that this measure is not

20  the daily rate for what he's talking about, that's

21  incorrect.  The daily rate that Dr. Putnam has pointed to

22  is the daily rate that he calculates for the measure that

23  he's talking about here, disgorgement of revenues.

24          MR. STRAPP:  And, Your Honor --

25          THE COURT:  Wait a minute, Mr. Strapp, he's still

1    talking.

2           MR. DUSSEAULT:  These objections, Your Honor, are

3    really Mr. Strapp making points about what he thinks the

4    facts are that are much, much more efficiently handled in

5    cross-examination if he wants to do it that way.

6           MR. STRAPP:  Your Honor, I think that this will

7    clarify the issue.  If you look at this Revised Exhibit 3

8    that Dr. Putnam is pointing us to, line F is the daily

9    rate incremental, and that's what he -- and that number

10   matches up with a number on the demonstrative.

11          Now, if you move down to the notes and sources,

12   for line F, it says F, here I compute the daily rate by

13   adding to E for each scenario one, two, PNO and PNO plus

14   EDI.  And if you refer up to line A, you'll see that PNO

15   is Punchout as fair market value, and PNO plus EDI is

16   Punchout and EDI is the fair market value.

17          So the assumptions for this daily rate

18   calculation are that the only revenue that's relevant are

19   for the modules Punchout and Punchout and EDI as opposed

20   to the configuration as a whole, and what that is is

21   essentially a substantial non-infringing use opinion that

22   the rest of the modules don't matter and that all we need

23   to look at is Punchout and EDI.  And I believe that that's

24   an improper opinion both under Federal Rule of

25   Evidence 702 as well as under Federal Rule Civil Procedure

1   26 and 37.

2           MR. DUSSEAULT:  Your Honor, could I just suggest

3   that it might be most efficient to let Dr. Putnam explain

4   his daily rate?

5           THE COURT:  Well, his footnote talks about his

6   revenue for health care customers during the delay period,

7   and that's not what we're talking about, is it?  I mean,

8   this is revenue for configuration three and five not

9   confined to health care customers, is it?

10          MR. STRAPP:  Your Honor, I don't think it's

11  configurations three and five.  I think it's some

12  subset --

13          THE COURT:  That's what we are talking about

14  here, is configuration three and five not just for health

15  care customers.

16          MR. STRAPP:  And not just for the Punchout and

17  EDI modules.

18          THE COURT:  Just take one thing at a time, Mr.

19  Strapp.  I understand your point about that.

20          MR. STRAPP:  Okay.

21          THE COURT:  So I guess the question is, there's a

22  lack of foundation about how he got to this daily rate, so

23  we need to ask about that.  Sustained.

24  Q   Now, Dr. Putnam, you were talking about Revised

25  Exhibit 3.  Could you just explain to the Court how you

1    went about calculating the daily rate that you applied to

2    the measure of remedy or damages for Dr. Ugone's

3    disgorgement approach?

4    A    Sure.  Maybe I can clear this up.  Mr. Strapp

5    expressed the concern that the 12,700 --

6              THE COURT:  Wait a minute.  Don't be addressing

7    his objection.  You go ahead and answer the question, if

8    you would.  How did you calculate the daily rate, I think,

9    is what we're getting at.

10             THE WITNESS:  Thank you, Your Honor.  The daily

11   rate is calculated by computing the profits, either

12   incremental or net, that were earned per day during the

13   injunction period.  That's all it is.  It's the average

14   rate of profit per day during the injunction period with

15   the two apportionments we've discussed, large suite SKUs

16   and LSF and process flow but no further apportionments.

17   Q    Does your calculation of daily rate, Dr. Putnam,

18   exclude any modules?

19   A    No, it doesn't.

20   Q    Are these figures that you are pointing the Court to

21   here, the 12.76 and 8.33, are those the daily rates that

22   are basis for your calculation of a daily rate to apply to

23   your damages through November 30 for Dr. Ugone's

24   disgorgement approach?

25   A    Yes, that's right.  Those are found written out in

1   full on demonstrative 717, and the numbers are $12,761 per

2   day for the incremental profit rate and $8,329 per day at

3   the net profit rate.  If one were to add these --

4            THE COURT:  Wait a minute.  Let me get back

5   there, if you will.

6            THE WITNESS:  I'm sorry, Your Honor.

7            THE COURT:  Seven --

8            THE WITNESS:  717.

9            THE COURT:  12,761 for the incremental?

10           THE WITNESS:  That's correct, Your Honor.

11           THE COURT:  And net is 8,329.

12           THE WITNESS:  That's right, Your Honor.

13           THE COURT:  And that's the first column under the

14   heading large suite and LSF apportionment on 717.

15           THE WITNESS:  That's right, Your Honor.

16           THE COURT:  So that's the daily rate you are

17   talking about that is equivalent to the daily rate that

18   Dr. Ugone testified to.

19           THE WITNESS:  Conceptually the same, exactly.

20           THE COURT:  The difference being that you are

21   using a different figure for the incremental profit that

22   you -- and the net -- and then there's a figure for the

23   net profit.

24           THE WITNESS:  That's right.

25           THE COURT:  That's the difference in that column

Putnam - Direct                                         1074

1   of this demonstrative.

2              THE WITNESS:  That's exactly right.

3              THE COURT:  Is that the part you are offering

4   now?

5              MR. DUSSEAULT:  Yes, it is, Your Honor.

6              THE COURT:  You just turned there saying -- you

7   turned when you began this questioning to this exhibit

8   saying where is it so he could explain the rate but said

9   also there are other things on there we're not going to

10  get into yet.

11             MR. DUSSEAULT:  Yes.

12             THE COURT:  And we're not into it yet.

13             MR. DUSSEAULT:  That is absolutely correct, Your

14  Honor.

15             THE COURT:  Thank you.  Now, do you have any

16  objection to that testimony?

17             MR. STRAPP:  I understand it now.

18             THE COURT:  Okay, thank you.

19  Q   And just one last question on this.  To the extent the

20  dollar figure of the daily rate is lower if we're looking

21  to Exhibit 717, to the extent the dollar figure of the

22  daily rate, daily rate number one incremental, is lower

23  than something that Dr. Ugone may have testified to about

24  incremental, is that accounted for by the fact that your

25  incremental figure and Dr. Ugone's are different?

Putnam - Direct                                                    1075

1   A    Yes.  Mr. Strapp pointed out that Dr. Ugone's figure

2   is approximately twice as high, but that's because Dr.

3   Ugone's profit margin is approximately twice as high.  And

4   so if you have the profit margin, you're going to have the

5   daily rate.

6   Q    Thank you.

7             THE COURT:  Are you through with that part of

8   your testimony right now?

9             MR. DUSSEAULT:  I was going to bring him back

10  just quickly to the slide that started all of this, Your

11  Honor, 709.

12            THE COURT:  As long as we can do that and then

13  change court reporters.

14            MR. DUSSEAULT:  Yes, we can change quickly.

15            THE COURT:  Seven what?

16            MR. DUSSEAULT:  709.

17            THE COURT:  All right.

18  Q    Now, is slide 709 the demonstrative, Dr. Putnam, that

19  reflects the measures of damages if carried out to today's

20  date?

21  A    Yes.  709 and 708 are identical except for the fact we

22  added the daily rate since November 30th, 2012, and so we

23  get the numbers that we see on 709.  So just to be clear,

24  through today, if one accepts the -- calculates Lawson's

25  revenues through today, the incremental profit on those

1  revenues would be 7.3 million, and the net profit would be

2  4.8 million.

3          THE COURT:  And if you use Dr. Ugone's figures,

4  it's 15.

5          THE WITNESS:  That's correct.

6          THE COURT:  Is that a good place?

7          MR. DUSSEAULT:  It certainly is, Your Honor.

8  Thank you.

9          THE COURT:  We'll take a 20-minute recess.  How

10  much longer do you have, Mr. Dusseault?

11          MR. DUSSEAULT:  It's already taken longer than I

12  thought it was going to be, Your Honor.  I would guess 20

13  to 25 minutes.

14          THE COURT:  We will be in recess.

15

16          (Brief recess.)

17

18

19

20

21

22

23

24

25

PUTNAM - DIRECT                    1077

1        THE COURT:  All right.

2        MR. DUSSEAULT:  May I proceed?

3        THE COURT:  Please.

4   BY MR. DUSSEAULT:  (Continuing

5   Q    Dr. Putnam, I'd like to move at this point from

6   your discussion of the correct measures under Dr.

7   Ugone's disgorgement approach to any other opinions

8   that you have offered in this case.

9        Are you aware that Lawson has taken the position

10  in this case that configuration numbers 3 and 5 have

11  both infringing and non-infringing uses?

12       MR. STRAPP:  Your Honor, I object.  Lawson --

13  I think that's unfair characterization because I don't

14  believe Lawson has any evidence in the record that

15  there are substantial non-infringing uses.  So whether

16  or not their attorney takes that issue I think is

17  irrelevant here.  So I object on relevance grounds.

18       MR. DUSSEAULT:  Your Honor, on ePlus's

19  motion, Dr. Putnam has been excluded from hearing

20  what's actually in the record.  He's offered opinions

21  based on what he was told about the positions of the

22  parties, and he's offering measures that the Court can

23  use based upon those.

24       THE COURT:  I agree with that, but I guess

25  the basic question at this juncture is:  Has anybody

PUTNAM - DIRECT                    1078

1    ever testified to a non-infringing use?  And I

2    believe, if I remember correctly, Mr. Thomasch took

3    the position that it was undisputed that there were

4    non-infringing uses.  So if there isn't any testimony

5    about it, then if it's not disputed, then it can still

6    come in.

7            So (A) is it disputed take there are

8    non-infringing uses?

9            MR. STRAPP:  It's disputed, Your Honor.

10           THE COURT:  Okay.  (B) who testified that

11   there were non-infringing uses, Mr. Dusseault?

12           MR. DUSSEAULT:  Your Honor, I believe there

13   was testimony in Dr. Weaver's testimony, both on

14   direct and cross, that we believe establishes that

15   there are non-infringing uses.

16           THE COURT:  So you're saying that you think

17   Weaver is the predicate for it?

18           MR. DUSSEAULT:  I don't want to say, Your

19   Honor, that it's exclusively so, but I believe that I

20   heard testimony from Dr. Weaver suggesting that there

21   are ways in which configurations No. 3 and 5 can be

22   used without practicing the method.

23           THE COURT:  Didn't he testify to that?  I

24   think I recall that he did testify to that.

25           MR. STRAPP:  On cross examination, Mr.

PUTNAM - DIRECT                    1079

1    Thomasch questioned Dr. Weaver about whether they

2    could be used in certain non-infringing ways.  I think

3    that's the extent and universe of the testimony that's

4    come in.

5         THE COURT:  Okay.  But that's the predicate

6    at least.  At least that is a predicate.  So the issue

7    then will be:  Is it sufficient?  But that doesn't

8    preclude this witness from expressing economic

9    opinions on the basis of assumptions predicated on the

10   testimony that there are non-infringing uses assuming

11   that appropriate foundation is laid as to what he was

12   told and what he's assuming.

13        MR. STRAPP:  Your Honor, I don't think that

14   Dr. Putnam in his report referenced anything from Dr.

15   Weaver as a predicate.  So I would say to the extent

16   he's going to be testifying about substantial

17   non-infringing uses --

18        THE COURT:  Are you closer on this one than

19   you were on the last one because you missed the boat

20   on the daily rate.

21        MR. STRAPP:  Dr. Putnam certainly has

22   opinions on non-infringing uses.  I'm not disputing

23   that.  That's all over his report.  That's a

24   substantial basis of his report.  All I'm saying is he

25   doesn't explain that that testimony that he wants to

1  offer today is linked to what Dr. Weaver said on cross

2  examination.

3          THE COURT:  Well, I don't know that he can do

4  that.  He can make assumptions, and if it's there,

5  it's there.  If it's not there, it's not there.

6          Objection overruled.  Go ahead, Mr.

7  Dusseault.  You have to lay the predicate for it,

8  though.

9  BY MR. DUSSEAULT:

10 Q   Are you aware that Lawson has taken the position

11 in this case that configuration numbers 3 and 5 have

12 both infringing and non-infringing uses?

13 A   Yes.

14 Q   What is the basis for your awareness of that

15 point?

16 A   My understanding is that based on the Federal

17 Circuit's narrowing of the claims that the remaining

18 claim in the case is a method patent and that as a

19 matter of liability the apparatus in question can be

20 used both in infringing and non-infringing was, I

21 don't express any opinion about that at all.

22         THE COURT:  Do you understand that's Lawson's

23 opinion or position?  Is that what you're saying?

24         THE WITNESS:  That's correct, Your Honor.

25         THE COURT:  Mr. Strapp, what is it?

PUTNAM - DIRECT                1081

1        MR. STRAPP:  I was just going to say, Your

2   Honor, to the extent his opinion is based on counsels

3   reading of the Federal Circuit's decision regarding

4   whether there are or not substantial non-infringing

5   uses, I don't think that's a sufficient basis under

6   Rule 702 for him to form an expert opinion.

7        THE COURT:  He's assuming that.

8        MR. STRAPP:  I understand that, but under

9   702, he has to have a basis for his expert opinion

10  that's reliable, and I don't believe counsel's

11  interpretation of the Federal Circuit's opinion

12  satisfies Rule 702.

13       MR. DUSSEAULT:  Your Honor, it's entirely

14  appropriate, I think Dr. Ugone did it as well, for an

15  expert to take an assumption, this is a contention of

16  the parties --

17       THE COURT:  We'll deal with the assumption

18  whether it's appropriate or not at a later time.

19       MR. DUSSEAULT:  Shall I move on, Your Honor?

20       THE COURT:  So you can ask the question.

21  BY MR. DUSSEAULT:

22  Q   Let me ask this, Dr.Putnam.  Are you offering any

23  measures today that the Court could use if the Court

24  were to find that configuration numbers 3 and 5 have

25  both infringing and non-infringing uses and that

PUTNAM - DIRECT                    1082

1  disgorgement of profits should be limited to the

2  profits related to the infringing uses?

3  A    Yes, I am.

4  Q    How many such measures are you offering?

5  A    Two general measures each with two variations.

6  Q    Let's take each of your two proposed measures in

7  turn.

8            THE COURT:  Do you have any view, Doctor,

9  about which is the right one or the best one?  Justice

10 Frankfurter said, "If you have several opinions, if

11 you can't win on your best one, you can't win on any

12 of them."  Give me your best one.  That's a lot of

13 variations.  All right.  Go ahead.

14           MR. STRAPP:  I just want to put on a standing

15 objection to the line of questioning regarding

16 substantial non-infringing uses so I don't have to

17 keep on jumping up and down.

18           THE COURT:  All right.

19 BY MR. DUSSEAULT:

20 Q    Let's put up demonstrative No. 710, if we could.

21 Now, what is the first measure -- how would you

22 describe for the Court the first measure that you have

23 offered in the event that the Court finds that

24 configurations 3 and 5 have infringing and

25 non-infringing uses and that it wishes to disgorge

1    only the profits limited to the infringing use?

2    A    Sure.  With respect to the Court's concern about

3    multiple opinions, this is the horse that I'm backing.

4    We'll pull it that way.  Generically, if you were to

5    ask the question, What is the value contributed by a

6    particular feature to a system?  Then you would look

7    at the price of a system or the market value of a

8    system having that feature, compare that to the market

9    value of a system that was otherwise identical that

10   didn't have that feature, take the difference of those

11   two, and that would be the additional or incremental

12   value provided by the accused feature.

13       So in slide 710, we've just illustrated that.  And

14   we have on the left an illustration, in this case of

15   configuration 5, which comprises LSF, process flow,

16   the S3 procurement modules, and then the three

17   requisition modules including the two that define

18   infringing configuration Punchout and EDI.

19       So we look at the market price of an accused

20   configuration, which can be 3 or 5 depending on

21   whether EDI is included or not, we subtract from that

22   the price of a non-accused configuration, which is an

23   otherwise identical system lacking the accused

24   functionality, and then the difference is the benefit,

25   as determined in the marketplace, of the accused

PUTNAM - DIRECT                    1084

1   functionality based on the price that sellers, in this

2   case Lawson, are asking, and buyers, in this case

3   Lawson's customers, are willing to pay.

4   Q   Are you able to see from the data, Dr. Putnam,

5   both the total price that a customer paid and the

6   price for those particular modules, let's say, that

7   would make up non-infringing configuration 2, as

8   opposed to configurations 3 or 5?

9   A   Yes.  In this case, it's somewhat unusual.  We

10  actually have the price of the underlying components

11  expressed individually.

12  Q   What does this analysis lead you to?

13  A   So if you actually performed this analysis, the

14  price of an accused configuration minus the price of a

15  non-accused configuration leads you as a residual or

16  incremental value to the price of Punchout or Punchout

17  plus EDI as being the difference in the value of the

18  two systems.

19  Q   Now, Dr. Putnam, by doing this calculation, are

20  you taking the position that the infringement, if any,

21  within the system resides only in Procurement Punchout

22  or EDI?

23        MR. STRAPP:  Objection, foundation.  This

24  witness has not been proffered as an expert on

25  infringement or any technical issues.

PUTNAM - DIRECT                    1085

1     THE COURT:  I think he's saying he's not

2  doing that.  He's establishing the predicate that

3  would be the basis for an objection.  He's saying it

4  doesn't exist; isn't that right?

5     MR. DUSSEAULT:  And I would have asked it in

6  a leading manner, if I could, Your Honor.

7     THE COURT:  I wish you had.

8  Q   With that permission, if I could, you're not

9  taking the position, Dr. Putnam, that the

10  infringement, if any, in the configuration depicted on

11  this demonstrative resides only in Procurement

12  Punchout or Punchout and EDI, are you?

13  A   No, I'm making an economic statement about the

14  difference in system values, not a technical statement

15  about the location of infringement.

16     THE COURT:  Just so I understand it, you're

17  basing your opinion here on the pricing that was set

18  by Lawson for the modules with and without the alleged

19  infringing components; is that right?

20     THE WITNESS:  That's right, Your Honor.

21     THE COURT:  You're not basing it on sales

22  data as to which customers actually bought or did not

23  buy any such modules as I understand it.

24     THE WITNESS:  Well, in the event, Your Honor,

25  with the way you capture that is to look at the price

PUTNAM - DIRECT                    1086

1    of the individual modules in question, and then add

2    that up over all customers who had those modules.  So

3    the answer is yes, we do.  We actually compute the

4    incremental value.

5              THE COURT:  No, that's not what I'm asking.

6    I'm asking whether or not you actually looked at

7    figures of people who bought these things.  Did you

8    look at the sales figures or are you just saying this

9    is what the modules sell for, and if somebody bought

10   them, this would be the incremental value of the

11   accused functionality in what they really bought?

12             THE WITNESS:  I looked at the actual sales

13   figures, Your Honor.

14             MR. DUSSEAULT:  I can clarify, Your Honor.

15   Q   When you say you look at the actual sales figures,

16   are you looking at the price information for the, I

17   believe it was, 147 customers that are identified as

18   having configurations 3 or 5?

19   A   146 customers.  And yes, I looked at exactly what

20   they paid for these modules in question.

21   Q   To make sure that it's clear, you're looking at

22   what they paid for the total configuration as they

23   purchased it, let's say, it's a configuration 3,

24   correct?

25   A   Yes.

1  Q    Then you're looking at the broken out pricing for

2  the pieces that would make up configuration 2 for that

3  customer, correct?

4  A    Yes.

5              THE COURT:  But you don't know which way they

6  used it and you're not talking about that.

7              THE WITNESS:  No, that's right, Your Honor.

8  That's right.

9  Q    To be clear, you're attempting to put an economic

10 measure on the value that they're paying to be able to

11 practice the claim that one can practical by becoming

12 a configuration 3 or -- practice the method, excuse

13 me, that one could theoretically practice by becoming

14 a 3 or a 5, correct?

15 A    Yes, and assigning the entire value of the modules

16 in question to Claim 26.

17 Q    Now, Dr. Putnam, do you have an opinion on whether

18 this measure of the value that a customer is putting

19 on the additional functionality of being able to

20 practice this method is a conservative one?

21 A    I think it is conservative, yes.

22 Q    Why is that?

23 A    Well, as I just said, by computing the value in

24 this case, one is in effect saying that the entire

25 value of Punchout or Punchout plus EDI is based on the

PUTNAM - DIRECT                1088

1   ability to practice Claim 26.  If there were other

2   uses of Punchout or Punchout and EDI that did not

3   practice Claim 26, then they should not be included in

4   this calculation, but conservatively I have included

5   them.

6            THE COURT:  Let me ask you so I understand

7   it.  Would it make any difference to your opinion if

8   you knew that the customers who bought configurations

9   3 and 5 actually had the method, had the ability to

10  practice the infringing as well as the non-infringing

11  modes that you base your calculation on?

12           THE WITNESS:  No.  For these purposes, I have

13  assumed that every time they used these modules, they

14  practiced the method.  I don't actually have

15  information on whether they practiced the infringing

16  method or not when they used these modules.  So I have

17  assumed that all the uses are infringing.  And then

18  the value of the modules captures the value of that

19  use.

20           THE COURT:  So it doesn't make any difference

21  to you in your analysis whether a customer is actually

22  using it in the infringing mode so long as there is a

23  non-infringing mode?

24           THE WITNESS:  For purposes of this

25  calculation, that's correct, Your Honor.  That's

1    right.

2    Q    But if I could clarify, overall for purposes of

3    arriving at these measures, have you assumed that

4    there are both infringing and non-infringing uses that

5    the customer could put the configuration to?

6    A    Yes, so that the active infringement is not the

7    possession of the system or the sale of the system but

8    the use of the system and, conversely, the nonuse of

9    the system.

10             THE COURT:  You're assuming that a sale is

11   not an infringement; is that what you're saying?

12             THE WITNESS:  For the method claim in

13   question, yes, Your Honor.

14   Q    Now, you, in this approach, this incremental value

15   of accused functionality approach, you're ascribing

16   the entire value of the difference that a customer

17   pays to have configuration 3, which can practice the

18   method, versus configuration 2 which cannot, you're

19   ascribing the entire value of that difference to

20   practicing that method?

21   A    That's right.

22             THE COURT:  Excuse me.  When you say you're

23   assuming that a sale doesn't infringe, are you

24   including the securing of a license in the word

25   "sale"?

1     THE WITNESS:  Your Honor can appreciate this.

2  Not being a lawyer, this is getting into areas that

3  I'm not comfortable with.

4     THE COURT:  Well, I'm asking you about what

5  you are comfortable with.  In other words, are you

6  distinguishing between licensing and sales?

7     THE WITNESS:  No, Your Honor, I'm not.

8     THE COURT:  So to you a license is the same

9  as a sale?

10    THE WITNESS:  For the purposes of these

11 calculations.

12    THE COURT:  For your calculations.

13    THE WITNESS:  Exactly, yes, Your Honor.

14 Q   Have you prepared a demonstrative for the Court

15 that shows the -- actually, strike that.

16    You mentioned to the Court that you offered two

17 measures under each approach.  Can you just explain

18 very briefly the difference in the measures?

19 A   Sure.  The reason for the variation is that -- the

20 question is, with respect to EDI, and how one treats

21 EDI as being a module that is necessary to the

22 infringement, one could argue that because

23 configuration 5 incorporates both Punchout and EDI,

24 that EDI should be treated as a module that is,

25 obviously, part of the infringing configuration.

PUTNAM - DIRECT                1091

1    On the other hand, EDI, by itself, apparently, is

2    not considered infringing because it was part of

3    configuration 4, which the jury originally found not

4    to be infringing.

5        MR. STRAPP:  Objection, Your Honor.  I'm

6    going to move to strike that testimony.  This is under

7    a different basis.  This is under the basis that in

8    the motions concerning the testimony that Dr. Weaver

9    and Dr. Goldberg would be allowed to talk about, Your

10   Honor explicitly made clear that we were not going to

11   retread the trial testimony and the jury verdict and

12   try to parse why and why not the jury decided that

13   certain configurations did or did not infringe.

14        (The court reporter had a brief technical

15   problem.)

16        THE COURT:  Do you need to go back to his

17   objection since you got interrupted in the middle?

18        THE COURT REPORTER:  Yes, please.

19        THE COURT:  Okay.  Your objection is?

20        MR. STRAPP:  My objection is based on the

21   grounds that Your Honor had already stricken and

22   precluded Dr. Weaver and Dr. Goldberg from testifying

23   about the import and impact of the jury verdict and

24   from testifying about --

25        THE COURT:  My ruling stands for itself.  The

PUTNAM - DIRECT                1092

1    objection is sustained.  We don't need him to testify

2    about what any of that means.  He can make

3    assumptions, and then if the assumptions are there by

4    the record, we can deal with that.  He can't testify

5    about that.  He's not qualified.

6           MR. DUSSEAULT:  Thank you, Your Honor.

7    BY MR. DUSSEAULT:

8    Q   Have you prepared a demonstrative that shows the

9    measures of damages that you arrive at through this

10   incremental value approach?

11   A   Yes.

12   Q   Let's turn to demonstrative 711, please.  Does

13   Exhibit 711 show the measures that you get when you

14   apply the approach with Punchout and EDI or with just

15   Punchout and then apply an incremental profit measure,

16   your incremental profit measure, or your net profit

17   measure?

18   A   That's right.

19   Q   Now, because the Judge said -- the Court had asked

20   you what your favorite approach was.  Is there a

21   particular figure here that you believe is the most

22   accurate measure?

23   A   Yes.

24   Q   What would that be?

25   A   So I, overall, think that the net profit margin is

1    the right way to think about the gains to Lawson.  The

2    only ambiguity that I was trying to take into account

3    was how to treat EDI.  So with the assumes that EDI

4    should be included as part of the difference between

5    an infringing and non-infringing system, then I would

6    take the first column and the bottom number, which

7    would be 1.2 million.  That's the net profit or

8    Lawson's gain from selling Punchout plus EDI, which is

9    the difference between an infringing system and an

10   otherwise identical non-infringing system.

11   Q    I want to talk very briefly about the second

12   approach, but I believe you said that the incremental

13   value approach is the horse you're riding or the horse

14   you're betting on?

15   A    That's the one I'm backing.

16   Q    The one you're backing.  Thank you.  So I want to

17   be very brief then on this alternative approach.  Have

18   you prepared a demonstrative that summaries the

19   alternative approach?

20   A    Yes.

21   Q    Could we put demonstrative 712 up, please.

22        Could you explain to the Court -- this has the

23   heading, "Apportionment for Non-infringing Uses."  Can

24   you explain to the Court what you've done here?

25   A    Sure.  Just so the basis of my opinion is clear,

1  configuration 2 consists of the three boxes, the

2  yellow, the blue, and the green box.  In other words,

3  it incorporates RQC, but not Procurement Punchout or

4  EDI.

5      Configuration 3 adds Procurement Punchout, the

6  gold box.  And configuration 5 adds the purple box,

7  which is EDI.

8      What I want to do is get some measure of how a

9  system that incorporates the two additional modules,

10 that convert a configuration into an infringing

11 configuration, the rate at which they're used.  So I

12 followed Dr. Ugone's suggestion, which as to apportion

13 the value based on the maintenance payments that are

14 paid for the three modules, two of which can be used

15 in an infringing manner, and one of which when used on

16 its own is not used in an infringing manner.

17     So I took the ratio of expenditures on Procurement

18 Punchout and EDI to expenditures on Procurement

19 Punchout, EDI and Requisition Center or RQC and

20 discovered that that's just under half.

21     Knowing that the value of the two infringing

22 modules or the two modules that convert a

23 non-infringing configuration to an infringing

24 configuration is approximately half, I then

25 apportioned all of the expenditures by that fraction.

1    It's actually 46.4 percent for the record.  And said

2    that half of the system should be apportioned to the

3    infringing uses and the remainder to non-infringing

4    uses as reflected in the ratio of Procurement Punchout

5    and EDI to the three requisition modules.

6    Q    Dr. Putnam, as with your incremental value

7    measure, did you run numbers for this assuming --

8    looking both only at Punchout and then also at

9    Punchout and EDI?

10   A    Yes.  One can do it either way and I did it both

11   ways.

12   Q    Have you prepared a demonstrative that reflects

13   the numbers that are generated when you apply this

14   system apportionment approach?

15   A    Yes.

16   Q    If we could put up demonstrative 713, please.

17        If you look, the two left-hand columns refer to

18   the incremental value approach, which you already

19   discussed with the Court.  Is the system apportionment

20   approach results the third and fourth column, sir?

21   A    That's right.

22   Q    So that sets forth the measures of damages that

23   you get when you attempt to apportion the value in the

24   manner you just described?

25   A    That's exactly right.

1   Q    Do you have an opinion as between the four

2   measures under system apportionment approach as to

3   which is the most accurate?

4   A    Well, again, I would say that the one on the lower

5   left, which is 2.4 million, reflects the net profit

6   margin, just a long run decision horizon.  And it

7   includes both Punchout and EDI.  And so,

8   conservatively, it addresses any ambiguity as to

9   whether EDI itself should be included as an infringing

10  module.

11  Q    Now, these figures that are on demonstrative 713

12  are through November 30, 2012, correct?

13  A    That's correct.

14  Q    One would apply a daily rate thereafter?

15  A    That's also correct.

16  Q    Could we take a look at a demonstrative we've

17  already seen, demonstrative 717, please.

18       Dr. Putnam, does demonstrative 717 show the daily

19  rates for each of the eight measures that you have

20  offered under the approaches that you have just

21  explained to the Court?

22  A    Yes.  For all my multiple opinions, the daily rate

23  here is calculated for each one.

24  Q    Just so that the record is clear, sir, could you

25  just read into the record what each of those daily

1  rates is?

2  A    Sure.   I'll start with the two that I focused on.

3  Under the incremental value approach --

4          THE COURT:  Isn't it easier just to put this

5  in the record by having this marked as an exhibit?

6          MR. DUSSEAULT:  I'd be happy to do that?

7          THE COURT:  Any objection?

8          MR. STRAPP:  No objection, Your Honor.

9          THE COURT:  DEM 717 has all the daily rates

10  in it.  It will be defense exhibit whatever is the

11  next one in order.  Anybody know?  How about the legal

12  assistants?

13          MR. DUSSEAULT:  It would be 759, Your Honor.

14          THE COURT:  All right.  DEM 717 is admitted

15  as Defense Exhibit 759.  It's the daily rate measure

16  for the alternatives.  All three of them.

17          (Defendant's Exhibit No. 759 is admitted.)

18  BY MR. DUSSEAULT:

19  Q   Dr. Putnam, have you prepared a demonstrative that

20  shows the measures of profits under these two

21  approaches up to today's date applying those daily

22  rates?

23  A    Yes.

24  Q   If we could look at demonstrative 714, please.

25  Could you just identify for the Court the measures

1    through today's date for each of the approaches?  I

2    think you can focus on the measures that you have

3    identified as the ones you consider most reliable.

4    A    Again, under the incremental value approach, which

5    is the approach I think is simplest and makes the most

6    sense, through today's date, the figure would be 1.6

7    million, which is the net profit on the sales of

8    Punchout and EDI.

9        Under the system apportionment approach, which

10   adds to that a portion of the S3 procurement modules

11   and LSF, the number is 3.1 million through today's

12   date.

13   Q    Now, I'd like to move onto a final area of your

14   examination, Dr. Putnam.  Do you have any opinions as

15   to whether the disgorgement approach proposed by Dr.

16   Ugone provides an accurate proxy or measure for the

17   actual harm suffered by ePlus?

18   A    Yes.

19   Q    What is that opinion?

20   A    All of these measures are poor proxies for ePlus's

21   actual harm.

22   Q    Now, can you just very, very briefly describe for

23   the Court what it means as a matter of economic

24   principle to compensate a party for actual harm?

25   A    Sure.  Compensation simply means restoring them to

1  the position that they would have occupied absent some

2  change in their state, either positive or negative.

3  Q    From an economic perspective, and as a conceptual

4  manner, does looking at and calculating Lawson's

5  profits create or give rise to a proxy of ePlus's

6  actual loss, an accurate proxy of ePlus's actual loss?

7  A    No.

8  Q    Why not?

9  A    You're looking at the wrong party.  If you're

10 trying to compensate somebody, you need to look at the

11 state they occupy initially, the state that they have

12 been changed to, and the difference between those two

13 states.  We should be looking at ePlus for those

14 purposes.  And Lawson's profits bear no relationship

15 to either of ePlus's states.

16 Q    If you assume, hypothetically, Dr. Putnam, that

17 ePlus were to lose $2 million of sale, and as an

18 economic matter you were trying to compensate them for

19 that loss, are you with me so far?

20 A    Yes.

21 Q    Would it matter to that analysis if you learn that

22 Lawson in engaging in the conduct that's challenged

23 had only earned $1 million?

24 A    No.

25 Q    Would there be -- strike that.  Let me ask a

1   corollary.

2       If one were to find that Lawson somehow was able

3   to make $3 million from the challenged conduct, would

4   that shed any light to you as to the measure necessary

5   to compensate ePlus for its harm?

6   A    No, compensation is defined with respect to ePlus

7   and the outcome for Lawson is irrelevant to that

8   calculation.  I should say in general.  There may be

9   circumstances where it's an accurate proxy, but in

10  general the two have nothing to do with each other.

11  Q    Dr. Putnam, have you prepared a demonstrative

12  showing the more specific reasons that you believe

13  that on the facts and circumstances of this case in

14  particular, Lawson's profits do not represent an

15  accurate proxy for ePlus's harm?

16  A    Yes.

17  Q    Could we take a look at demonstrative 715, please?

18  Now, let's take these in orders, if you would.  What's

19  the first reason that you have identified, Dr. Putnam?

20  A    Well, the first one is that Lawson could have

21  retained the sales of all modules other than Punchout.

22  So this is really a restatement of the discussion

23  we've had previously, which is that Lawson could have

24  sold a non-infringing module or configuration, in

25  particular, configuration 2.

1    So the baseline that we should be assuming for

2  Lawson is not zero sales had it complied with the

3  injunction, but the sales that it would have tried to

4  make as a profit maximizing firm in compliance with

5  the injunction.  And the baseline, therefore, is a

6  system that is otherwise identical to an infringing

7  system but lacking Punchout or Punchout plus EDI.

8      Given that baseline, Lawson's additional sales

9  would be Punchout plus Punchout and EDI.  That bears

10  no relationship to any loss that ePlus has suffered.

11  Q   So let me walk through maybe an example or two

12  just to be sure I understand this point.  Suppose that

13  a customer has configuration 2 at the beginning of the

14  injunction period.  You with me on that?

15  A   Yes.

16  Q   During the injunction period, that customer in the

17  data it reflects has added Punchout so they now have

18  configuration 3, correct?

19  A   Yes.

20  Q   What does Dr. Ugone's disgorgement approach assume

21  about what happened to those revenues from the day

22  that that customer adds Punchout going forward?

23  A   Dr. Ugone's approach treats all of the revenues

24  from that accused configuration 3 as being a gain to

25  Lawson, even though Lawson was previously earning the

1    revenues because it had sold configuration 2.

2         So by treating all those revenues as a gain --

3              THE COURT:  Excuse me.

4              MR. STRAPP:  I believe, Your Honor, that the

5    witness is mischaracterizing Dr. Ugone's opinions.

6    I'm not sure what the basis is for this particular

7    question and answer, especially since Dr. Putnam

8    wasn't here.

9              MR. DUSSEAULT:  Your Honor, Mr. Strapp can

10   cross-examine him.

11             THE COURT:  I know, but I will say this.  The

12   disgorgement remedy is not confined to merely gain

13   deprivation.  It is also intended to coerce compliance

14   and to make sure that there isn't any benefit from

15   violating court orders, not that it's punitive, but

16   that its deterrent effect has got to be taken into

17   account.  And neither expert can address that question

18   at all.

19             So I don't know that I need to get into this.

20   It's an awful lot -- in addition to that, I've read

21   this 715, and it's sort of repetitive of most of what

22   he said.  So I'd like to wrap him up.

23             MR. DUSSEAULT:  And I will, Your Honor.

24   Understanding your point, I want to make something

25   clear.  What we're intending to do is offer an opinion

1    in the event that the Court decides after considering

2    all the evidence and in your broad discretion that you

3    want a measure that is a reasonable proxy of ePlus's

4    harm.

5              We're not arguing at this point that that's

6    the only option you have.  But we want to see whether

7    this disgorgement is that.

8              If we all agree that disgorgement is not a

9    measure of their actual harm, then I don't think we

10   need to --

11             THE COURT:  No, I don't think there's any

12   agreement on that by the other side.

13             MR. DUSSEAULT:  I agree.  That's why I wanted

14   to have our expert walk through why he believes --

15             THE COURT:  I know, but it's repetitive of

16   what he said before.  That's one of my points.

17             They have to have a chance to cross-examine

18   him, and I think we need to wrap him up if you don't

19   mind.

20             MR. DUSSEAULT:  Very well.  Let me just take

21   a quick look, Your Honor.

22             I'll just stop, Your Honor.  Thank you very

23   much.

24             THE COURT:  All right.  Thank you.

25             I have a question before he starts.  You

PUTNAM - DIRECT                    1104

1   looked at the SCC filings for 12 years, I think.  And

2   that's a number of quarters.  Or 12 quarters, I guess

3   it was.

4             THE WITNESS:  Twelve years or 47 quarters,

5   Your Honor.

6             THE COURT:  Twelve years.  And the most

7   recent ones, for example, in the last couple of years,

8   did Lawson tell its shareholders or the SCC what its

9   profit was?

10            THE WITNESS:  Your Honor, Lawson was taken

11  private in 2011.  So it no longer files financial

12  statements with the SCC.

13            THE COURT:  Did it say in 2011, the last

14  filing of the SCC, what its profit was, tell its

15  shareholders that or the SCC?

16            THE WITNESS:  Yes, it did, Your Honor.

17            THE COURT:  What was the percentage?  What

18  was the amount?

19            THE WITNESS:  I don't know the number off the

20  top of my head, Your Honor.

21            THE COURT:  Isn't that the most accurate

22  picture of their profits what they're telling the

23  public and their shareholders?

24            THE WITNESS:  The best information I can give

25  you, Your Honor, is what they told themselves in 2012

PUTNAM - DIRECT          1105

1   privately, and the profit margin there was 17 percent.

2   I'm sorry, was 15.8 percent in 2012.

3           THE COURT:  But what was it in 2011 when they

4   filed with the SCC?

5           THE WITNESS:  I can tell you --

6           THE COURT:  That seems -- what they're

7   telling the public seems to me to be the most

8   important component and I haven't heard it.  And since

9   you examined the SCC, I thought maybe you could tell

10  me.

11          THE WITNESS:  Your Honor, if I could direct

12  your attention, this is the best I can do sitting

13  here, to Exhibit 9 of my supplemental report, the one

14  filed in March.

15          THE COURT:  Exhibit 9?

16          MR. DUSSEAULT:  Which exhibit?

17          THE WITNESS:  Exhibit 9.

18          THE COURT:  What did they tell -- is that

19  what they told the SCC?

20          THE WITNESS:  Your Honor, just to be clear,

21  it was in the middle of 2011 that Lawson went private

22  and so some of these filings will reflect the fact

23  that they filed with the SCC and some do not.

24          THE COURT:  What did they say the profit was.

25  It's line what?

1    THE WITNESS:  It's going to be the last fine,

2  line X, Your Honor.  And that's going to give you the

3  quarterly profit margin.

4    THE COURT:  15.8, 20.4, 19.1, 14.8, annual

5  18.2.

6    THE WITNESS:  That's right, Your Honor.

7    THE COURT:  Then they told the shareholders

8  -- they told their -- no, they made statements and

9  said it was what?  17 percent in 2012?

10    THE WITNESS:  That's over the entire period,

11  Your Honor.  It was 15.8 in 2012 and an average over

12  the two years of 17 percent, which is the number that

13  I used for the net profit margin.

14    THE COURT:  17 percent?

15    THE WITNESS:  That's right, Your Honor.

16    THE COURT:  And their gross profit is in line

17  L?

18    THE WITNESS:  That's correct, Your Honor.

19    THE COURT:  All right.  Thank you.

20    Do you know what profit figure they used in

21  paying bonuses to executives?

22    THE WITNESS:  I'm not familiar with the

23  financial compensation of the executives, Your Honor.

24    THE COURT:  Most executive bonuses are tied

25  to a percent of profit, isn't it?  Or a lot of it,

1   isn't it?  So you don't know what they did in this

2   case?

3            THE WITNESS:  For public companies, it's

4   usually shares of stock that are directly paid because

5   that's in effect a claim on the profits.

6            THE COURT:  Right, but you can value that.

7            THE WITNESS:  You certainly can, and I don't

8   know what their practices were.  It varies actually

9   widely.

10            THE COURT:  All right.  Go an ahead, Mr.

11   Strapp.

12

13     CROSS-EXAMINATION

14   BY MR. STRAPP:

15   Q   Dr. Putnam, you offered some opinions regarding

16   what you call non-infringing uses of configurations 3

17   and 5; is that correct?

18   A   Yes.

19   Q   You arrived at those opinions by mapping the

20   Federal Circuit's determinations and characterizing

21   those determinations, and then figuring out what your

22   mapping and characterization implied; isn't that

23   correct?

24   A   Well, no, I would say that my understanding of

25   non-infringing uses is formed by conversations with

1   counsel.  I obviously read the Federal Circuit's

2   opinion so that I could understand at a lay level what

3   the infringing and non-infringing configurations were.

4   Q    Could I ask you, sir, to turn to your supplemental

5   report and --

6          THE COURT:  It's right before the numbered

7   exhibit ins that notebook, Dr. Putnam.

8          THE WITNESS:  Thank you.

9          THE COURT:  What page?

10          MR. STRAPP:  Page 6, paragraph 12.

11          THE WITNESS:  Yes.

12   Q    Do you see that you write at paragraph 12, "Mapped

13   onto the Federal Circuit's infringement and validity

14   determinations, this characterization implies the

15   following distinctions between infringing and

16   non-infringing uses of the two configurations at

17   issue."  Now, sir, did I read that correctly?

18          THE COURT:  The question is:  Did he read it

19   correctly?  And you object to that?

20          THE WITNESS:  You did.

21          THE COURT:  Do you object to that?

22          MR. DUSSEAULT:  I object, Your Honor, to the

23   extent he's trying to impeach the witness.  It's

24   non-impeaching.  The question was based on a different

25   predicate.  It was based on a predicate of his

1  assessment of non-infringing uses.  This is a sentence

2  from the background section of his report about the

3  revised scope of Lawson's liability.

4          THE COURT:  He's on cross-examination.  He

5  can probe it given the nexus between the question and

6  the answer that he's trying to impeach on.

7  BY MR. STRAPP:

8  Q    Isn't it correct, sir, that you mapped the Federal

9  Circuit's infringement and validity determinations?

10  Isn't that correct?

11  A    As a lay person would, sure.

12  Q    And isn't it correct that you characterized the

13  Federal Circuit's infringement and validity

14  determinations?

15          THE COURT:  It doesn't say anything about

16  validity here.

17          MR. STRAPP:  It does, Your Honor.  Paragraph

18  12, the first clause of the first sentence.

19  Infringement and validity determinations.

20          MR. DUSSEAULT:  Your Honor, it's beyond the

21  scope.

22          THE COURT:  It does say that, but read what

23  you're asking.

24          MR. STRAPP:  I'm asking --

25          THE COURT:  You then went to the next clause

1   which doesn't deal with validity.  It deals with

2   infringement and non-infringement.  That's what

3   happened to your question.  So ask him gain.

4           MR. DUSSEAULT:  I would add objection, Your

5   Honor, to the extent it's dealing with invalidity, its

6   entirely beyond the scope.

7           THE COURT:  No, I know that.

8   Q   Dr. Putnam, did you attempt to characterize the

9   Federal Circuit's infringement determinations?

10  A   For the purposes of separating infringing from

11  non-infringing configurations and uses, yes.

12  Q   Did you attempt to figure out what your

13  characterization of the Federal Circuit's infringement

14  determinations implies?

15  A   I don't understand the question.

16          THE COURT:  Did you do what you said in the

17  second clause of paragraph 12, is what he's asking.

18  A   Yes.  All right.  In that, of course, I did, yes.

19  If you're quoting my report, I derived the following

20  implications from reading the opinion, yes, that's

21  right.

22  Q   Now, you're not an expert in intellectual property

23  law, are you?

24  A   No.

25  Q   And you also don't have any degrees in computer

1    science, do you?

2    A    That's true.

3    Q    You're not an expert in software or source code;

4    is that correct?

5    A    Also true.

6              THE COURT:  I don't think they're relying on

7    him as the predicate to establish what is and what is

8    not a non-infringing use.  And if he is offering that

9    opinion, he's not been qualified in that area, and,

10   therefore, I would not consider it.  But since they

11   haven't offered it, I don't think I need to get there.

12   And to the extent he says anything in his report to

13   the contrary that actually suggests that that's what

14   he's done in arriving at some opinion, perhaps that's

15   appropriate ground for examination.  This looks like

16   to me it's a lot of background material in the

17   opinion.  At least that's what it looks like on a

18   quick look.  I haven't study it carefully.

19   Q    Let me follow-up with a few clarifying question.

20        You don't presume to name a specific feature or

21   benefit of RSS or RQC that's unrelated to the patented

22   technology, do you?

23   A    I don't presume anything about the technical

24   features.  I don't actually understand that question,

25   Mr. Strapp.

PUTNAM - CROSS                    1112

1    THE COURT:  Do you know what RSS and RQC is?

2    THE WITNESS:  I certainly do, Your Honor.  I

3  just wouldn't want to say that I know what it means to

4  be related to the patented technology.

5  Q    So, in other words, you don't have an opinion

6  about any specific feature or benefit of RSS that's

7  unrelated to the patented technology?

8  A    The only thing I know as an economist is that one

9  can use the system with RSS and not infringe because

10  that's configuration 2.  That's all I know.

11  Q    Let me ask you to turn to the tab of your binder

12  in front of you that's the deposition transcript and

13  direct you to page 274.

14    And, Dr. Putnam, do you recall giving the

15  deposition in this matter?

16  A    Yes.

17  Q    Do you recall that I was there and Mr. Dusseault

18  was present as well?

19  A    Yes.

20  Q    You swore an oath to tell the truth at that

21  deposition?

22  A    That's right.

23  Q    And you understood you were under an obligation

24  just as you would be in this courtroom to answer

25  truthfully; is that right?

1   A    Yes, I did.

2   Q    Does this appear to be a transcript of that

3   deposition?

4   A    Yes.

5   Q    Now, if I could direct your attention specifically

6   to page 274, line 14, and ask that you follow along as

7   I read out loud.

8        As you sit her today, can you provide me one

9   specific feature or benefit of RSS that's unrelated to

10  the patented technology?

11       Answer:  No, I think that's a statement about both

12  the scope of the patent and also the technical

13  features of and how that scope interacts with RSS.

14  And I wouldn't presume to do that.

15       Did I read that correctly?

16            MR. DUSSEAULT:  Your Honor, I object.  It's

17  improper impeachment.  It's not directly inconsistent

18  with the testimony that was given.

19            THE COURT:  Overruled.  But, Mr. Strapp, you

20  said it's page 274?

21            MR. STRAPP:  Your Honor, there's a tab.

22            THE COURT:  How many depositions are there?

23            MR. STRAPP:  There are a few.  So in the

24  black binder that I handed up, I believe there are two

25  deposition transcripts, and I was referring to the

1    first one that has a tab, deposition transcript of

2    Jonathan Putnam.

3              THE COURT:  I was on the wrong one because it

4    sure didn't say what you said, but he was on the right

5    one.

6              MR. STRAPP:  It was specifically page 274,

7    lines 14 through 20.

8              THE COURT:  All right.  And did you have a

9    question?  He raised an objection and I overruled it.

10             MR. STRAPP:  No.  I'm moving on to my next

11   question.

12   Q    You would agree, Dr. Putnam, that it would be

13   irresponsible for you to try to say what things are

14   combined in the patent that make it advantageous over

15   old ways of doing things?  Let me withdraw that

16   question and move on.

17        I want to talk, Dr. Putnam, a little bit about

18   where you and Dr. Ugone agree.  Now, you agree,

19   essentially, completely with Dr. Ugone's calculations

20   of Lawson's license and maintenance revenues; isn't

21   that correct?

22             MR. DUSSEAULT:  Objection, Your Honor.

23   Vague.  We have established Dr. Putnam wasn't here

24   when Dr. Ugone testified.  That was at their request.

25   And they objected repeatedly to any questions this

1    morning about what Dr. Ugone said.

2              MR. STRAPP:  Maybe, Your Honor, to short

3    circuit this, I could direct Dr. Putnam to the

4    demonstrative that was shown on his direct by which he

5    testified.

6              THE COURT:  You're going to rephrase the

7    question?  All right.

8    BY MR. STRAPP:

9    Q    Could you, please, for the purpose of expediting

10   these questions, can you please put up defendant's

11   slide 702 on the screen?  And the slide is entitled,

12   Calculation of revenue base.  Do you see that?

13   A    Yes.

14   Q    And you have three different columns on the slide;

15   is that correct?

16   A    That's right.

17   Q    I just want to ask you with respect to each column

18   on the slide whether Dr. Ugone and you are in

19   agreement.  Okay.  Do you understand the question?

20   A    I do.

21   Q    Now, are you and Dr. Ugone in agreement regarding

22   the customers that you identified to calculate the

23   revenue base?

24   A    Yes.

25   Q    Are you and Dr. Ugone in agreement regarding the

1    apportionment of licensing and maintenance revenue

2    that you calculated?

3    A    There were two apportionments.  I agree with Dr.

4    Ugone on both of them.  I think both are mandatory.

5    He thinks one is optional, but other than that we

6    agree.

7    Q    Do you agree with the way in which Dr. Ugone

8    calculated service revenues?

9    A    Yes.

10   Q    Now, if someone were to tell you to compute

11   Lawson's gross margins, you would end up with a very

12   similar number to what Dr. Ugone presents; isn't that

13   correct?

14   A    Yes.

15   Q    When you were calculating incremental profits, the

16   way you did that is you started with total revenue and

17   you subtracted the cost of goods, correct?

18   A    To obtain gross profits?

19   Q    That's correct.

20   A    Yes.

21   Q    That gave you a gross margin of somewhere around

22   65 percent; is that correct?

23   A    That's right.

24   Q    So you agree with Dr. Ugone in his original report

25   that the gross margin for the infringing

1   configurations was approximately 65 percent, correct?

2   A    In his original report?

3   Q    Yes.

4   A    I don't recall.  The infringing configurations

5   were different then, but it wouldn't surprise me if

6   that were still the case.

7   Q    You say that one reason a gross margin is

8   generally an incorrect measure of damages is because

9   it doesn't take into account non-manufacturing costs

10  that are associated with each sale; isn't that

11  correct?

12          MR. DUSSEAULT:  Your Honor, vague and beyond

13  the scope as to you say that.  I'm not sure whether

14  he's talking about testimony because I don't recall

15  that being said here.  I guess I don't really

16  understand what he's referring to.

17          THE COURT:  He objects to the form of the

18  question.

19          MR. STRAPP:  I can rephrase.

20          THE COURT:  Do it.

21  Q    You assume sir, don't you, that one reason gross

22  margin is generally an incorrect measure of damages in

23  compensation is because it doesn't take into account

24  additional non-manufacturing costs that a firm incurs

25  to make the sale; isn't that correct?

1   A    Yes.   We call them operating costs, that's right.

2   Q    But, in fact, direct costs that are subtracted to

3   calculate gross profits are not limited to

4   manufacturing costs, are they?

5   A    There are costs that are also subtracted directly

6   that are not considered part of the cost of goods

7   sold, that's true.

8   Q    Those costs are subtracted to get to a gross

9   margin, correct?

10  A    Not necessarily.

11  Q    Well, are there direct costs that are subtracted

12  from revenue to arrive at a gross margin that do not

13  include manufacturing costs?

14  A    For example, sales commissions.   So yes.

15  Q    You and Dr. Ugone, I think you testified,

16  estimated different incremental profit margins; is

17  that correct?

18  A    I estimated it.   He assumed it.   That's right.

19  Q    Now, leaving that characterization aside, you both

20  agree that incremental profit margins reflect the

21  additional costs that a firm must incur when making an

22  additional sale; is that right?

23  A    Yes, in the short run.

24  Q    Lawson does not compute an incremental profit

25  margin, does it?

PUTNAM - CROSS                    1119

1   A    No, it's an economic concept.

2   Q    Indeed, that's not how Lawson thinks about its

3   business, right?

4   A    In general, accountants don't compute incremental

5   margins at all, that's right.

6   Q    So the incremental profit margin that you say is

7   the one we should use for determining incremental

8   profits associated with configurations 3 and 5 is one

9   that's your own construct, your own calculation; isn't

10  that correct?

11  A    It's what economists do typically and I did the

12  typical thing, that's right.

13  Q    Specifically, the way you did it was by computing

14  incremental profits using regression analysis, right?

15  A    That's correct.

16  Q    I think you testified that the data you used to

17  perform this regression was company-wide data; is that

18  correct?

19  A    That's right.

20  Q    And just to clarify, that underlying data, that's

21  not specific to configurations 3 and 5, correct?

22  A    That's true.

23  Q    Would you agree that insofar as you're trying to

24  accurately characterize what Lawson would have done

25  during the injunction period, you would probably be

1    more interested in data that's closer in time to that

2    injunction period as opposed to data that's father

3    back in time?

4    A    Only if one had reason to believe that the

5    behavior was different further back in time, which I

6    don't.

7            THE COURT:  If you're talking about profits,

8    isn't it more important in measuring profits to

9    measure it closer in time to the point at which a

10   court has to actually assess what was the profit?

11           THE WITNESS:  That's a really good point,

12   Your Honor.  And the answer is yes.  And I did use,

13   for the purpose of the margin, the margins in 2012.  I

14   did do that.

15           The regression analysis is asking a

16   behavioral question, which is:  How does the firm

17   respond to a change in its revenues by varying its

18   costs?  So that's not asking the total margin.  It's

19   asking the change in the margin in response to a

20   change in revenue.

21           THE COURT:  I think the question he's asking,

22   and I perhaps am interested in, is to what extent is a

23   regression analysis affected by changes in management

24   in the company, changes in economic conditions in a

25   year in which a data point is compiled, and at what

1    point can you actually be comfortable that the

2    conditions over a 12-year period are replicated at

3    about the time the measurement needs to be made as

4    opposed to the beginning of the period where the data

5    set is accumulated?

6                THE WITNESS:  It's an excellent question,

7    Your Honor, and we could do a whole master class on

8    the diagnostics of a regression, which I wouldn't want

9    to bore the Court with, but from an economic

10   perspective, the question is, is there any evidence

11   that the behavior of the firm changed at any point

12   during this period.  One would look for evidence of

13   that change by saying that those -- instead of those

14   dots clustering along that line, that there were some

15   dots that appeared far off the line and seemed to be

16   different.  They are called outliers.  I didn't find

17   any outliers.  So I had no reason to believe that the

18   behavior of the firm changed over time, particularly

19   with respect to a relatively small change in revenue

20   of about 3 percent.

21   Q    Your regression analysis was based on SCC filings

22   and specifically 10-Q filings that Lawson made between

23   2000 through the third quarter of its fiscal year in

24   2011; is that correct?

25   A    That's correct.

1   Q    Lawson's 10-Q for the third quarter of fiscal year

2   2011 went through the end of February 2011; is that

3   right?

4   A    I think that's right.

5   Q    The Court order that is alleged to be infringed,

6   the injunction order, that's dated May 23, 2011,

7   right?

8   A    That's right.

9   Q    Could we put up slide 703, defendant's slide 703,

10  please.

11       Mr. Dusseault asked you about this slide earlier

12  today.  This has fiscal year 2011 and fiscal year 2012

13  profit and loss spreadsheets.  Do you see that?

14  A    Yes.

15  Q    And you understand that those were provided and

16  produced by Lawson in these proceedings?

17  A    Yes.

18  Q    Now, you issued a supplemental report in this

19  matter on March 8, 2013; isn't that correct?

20  A    Yes.

21  Q    Now, in that supplemental report, you didn't

22  update or calculate a new regression to take into

23  account this 2012 data, did you?

24  A    Yes.  They were reported differently.  They

25  weren't reported in a comparable format.  So I could

1   not simply add them to the prior data.

2            THE COURT:  The answer is no, you didn't.

3            THE WITNESS:  You're right, Your Honor.  I

4   didn't do it because one could not do it.  That's

5   right.

6   Q   You say you could not update your old regression

7   because the old regression was worldwide data that was

8   publicly reported and this data is limited to the U.S,

9   correct?

10  A   That's right.

11  Q   But you also didn't create a new regression based

12  on this 2012 and 2011 profit and loss data for the

13  Americas, did you?

14  A   There are only eight observations that would be

15  less reliable.

16           THE COURT:  The answer, though, is that you

17  didn't.

18           THE WITNESS:  I did not do that, that's true.

19  You're right.

20  Q   You could have done that and then compared that

21  new regression with new data against the old data that

22  you used in your first regression and you didn't do

23  that either, right?

24  A   I could have done that.  I didn't think it would

25  be reliable given the few observations, but in any

1    event, I did not could it, that's right.

2    Q   You didn't think it would be reliable to look at

3    the most recent data and calculate a new regression;

4    that's your testimony?

5    A   Regressions depend on having a certain amount

6    of data.

7          THE COURT:  He asked you -- that's answerable

8    yes or no, Dr. Putnam.

9          THE WITNESS:  I'm sorry, Your Honor.  I did

10   not compute a regression for those two years, that's

11   right.

12   Q   You said that this data you did use to --

13         THE COURT:  I don't think that was the

14   question.  I think his question was about the

15   reliability of doing that.

16         Ask your question again.

17   Q   My question is:  You didn't consider it reliable

18   to rely on new data from 2011 and 2012 and create a

19   regression and test that data versus your old

20   regression model?

21         THE COURT:  Yes or no?

22   A   I did not consider that procedure reliable, you're

23   right.

24   Q   Now, the data you used for your old regression

25   model -- let me just rephrase that.  The data you used

PUTNAM - CROSS                    1125

1    for your only regression model, the 2000 to 2011 data,

2    that was data was worldwide Lawson revenue and cost

3    data; isn't that correct?

4    A    Yes.

5    Q    And that data was all from the time that Lawson

6    was a public company, correct?

7    A    Yes.

8    Q    Now, you understand that Lawson was taken private

9    in a transaction involving Infor in approximately the

10   second quarter of 2011, around April of 2011; do you

11   understand that?

12   A    Yes.

13   Q    You don't know how the company has been run since

14   it was taken private in that time period, do you?

15   A    Well, I spoke with Mr. Samuelson, who is the CFO,

16   during that period.  So to that extent, yes, I do.

17   Q    Let me direct you back to your deposition, please,

18   sir, and ask you to turn to page 207.

19            THE COURT:  Is that the first tab?

20            MR. STRAPP:  That's the first tab.

21   Q    Once you're there, I'll ask you to turn on 207 to

22   line 9, please.

23   A    Okay.

24   Q    Actually, let me start with line 3.  Line 2, I'm

25   sorry.  207, line 2, and please follow along as I read

1   aloud.

2       Question:  When did that occur?

3       Answer:  Well, Lawson was taken private in 2010, I

4   think, or, I mean, I should have --

5       Question:  I think it was 2011.

6       Answer:  I'm sorry, yes, it was, what, the second

7   quarter of 2011 or something.  I forget the exact

8   date.

9       Question:  So that effect wouldn't have shown up

10  in your data, would it have?

11      Answer:  The effect of -- well, in other words,

12  let's assume that -- in other words, the only data I

13  have is for when Lawson was a public company.  So I

14  don't know how the company has been run since it was

15  taken private because I don't observe that.

16      Do you see that?

17  A   Yes.

18  Q   Now, isn't it in fact true that you did have data

19  regarding how Lawson has been run since it was taken

20  private from the 2011 and 2012 profit and loss

21  statements that we just showed on the screen?

22  A   That is certainly true.  You have that financial

23  data.  The question is how to marry it to the earlier

24  data to see if there's been a change.

25  Q   You didn't attempt to marry that data by creating

1   a new regression analysis, did you?

2   A    Because the data themselves also are not

3   comparable, that's right.

4   Q    Now, changing control or management of a business

5   can lead to differences in the willingness of

6   management to address and regulate expenses and costs;

7   isn't that correct?

8   A    As a matter of principle, sure.

9   Q    You mentioned that the 10-Q forms you looked at

10  contain Lawson's worldwide financial data; isn't that

11  correct?

12  A    Yes.

13  Q    You didn't include any information from those 10-Q

14  forms in your regression analysis that would be

15  limited to Lawson's U.S. revenues and cost data, did

16  you?

17  A    I did not.  I'm not sure that one could.

18  Q    You don't cite any evidence or analysis in either

19  of your reports to suggest that Lawson worldwide data

20  is representative of Lawson U.S. data, do you?

21  A    My understanding was it was representative, but I

22  didn't cite specific evidence to that to make that

23  point, that's true.

24  Q    You didn't cite any basis for your opinion that

25  worldwide data is representative of the U.S. data, did

1    you?  Yes or no?

2    A    I did not cite any such evidence.

3    Q    Okay.  Now, the regression analysis that you

4    calculated applied results of worldwide data to a cost

5    and revenue analysis for just the U.S. data; isn't

6    that correct?

7    A    If you mean that the patent affected revenues in

8    the U.S. and therefore the loss would have been to the

9    U.S. unit of Lawson, then that's true.  It would have

10   been dealt with on a global basis, but sure.

11   Q    You said that you used the word "regression

12   analysis" --

13        THE COURT:  I guess part of what I'm

14   interested in is wouldn't the validity of the

15   underlying figure, such as labor costs, for example,

16   be significantly affected and wouldn't the average be

17   dropped down if they are paying Philippine labor

18   charges versus Minnesota labor charges?

19        THE WITNESS:  That's a very good question,

20   Your Honor, but the ultimate question we're interested

21   in is not trying to explain all the reasons why Lawson

22   spent the money that it spent.  The question is:  How

23   did Lawson respond to a change in its revenues as

24   reflected in the change in its costs?

25        THE COURT:  I understand that, but my

1    question was different than that.  And that is:

2    Doesn't it make a different where the costs are

3    incurred in determining what is the quantum and

4    whether or not they'd be willing to take action in

5    respect of those costs?

6            THE WITNESS:  Well --

7            THE COURT:  And the answer has got to be yes

8    or no on that one.

9            THE WITNESS:  It's a compound question, Your

10   Honor, with all respect.

11           THE COURT:  It is.

12           THE WITNESS:  So the answer is the

13   location -- the location certainly does make a

14   difference as to the total level of costs, but as to

15   the second part, whether it makes a difference in

16   their willingness to take action, I'm not aware of any

17   differential in their willingness to take action in

18   response to a change in revenue occurring in the U.S.

19   versus some other place.  They're still trying to

20   maximum profits regardless of where those profits are

21   being earned.

22           THE COURT:  Well, then why do they outsource

23   that?  Why do they get places -- it looks to me like,

24   from what Mr. Samuelson said, the first place that

25   they would cut is Minnesota, not the Philippines.

 1  That would increase your margin, wouldn't it, if

 2  you're cutting costs?

 3          THE WITNESS:  In Minnesota?

 4          THE COURT:  Yes.  If you cut the higher paid

 5  employees and keep the lower paid, your margin is

 6  going to be increase, isn't it?

 7          THE WITNESS:  That certainly is true.

 8          THE COURT:  This just goes to the reliability

 9  of the use of that data, I think, is his question.

10          Is that right?

11          MR. STRAPP:  That's right, Your Honor.

12          THE COURT:  I see.

13          MR. STRAPP:  Since Your Honor asked about the

14  Philippines, I want to hand up Lawson's 10-K.

15          THE COURT:  That'll teach me.

16  BY MR. STRAPP:

17  Q   Now, you reviewed Lawson's 10-K from fiscal year

18  2010, didn't you?

19  A   I believe so, yes.

20          MR. STRAPP:  Can we put up the 10-K on the

21  screen, please?  If I could direct Your Honor's

22  attention specifically to page 46 of the 10-K.

23  Q   Once we're all there, I would ask you to turn, Dr.

24  Putnam, to the section on research and development.

25  Do you see that?

1    A    Yes.

2    Q    And, specifically, to the second paragraph in that

3    section.  Are you with me?

4    A    Yes.

5    Q    Do you see that it states "Research and

6    development expenses for fiscal 2010 increased 7.9

7    million or 9.6 percent compared to fiscal 2009.  This

8    increase was primarily due to a net increase in

9    employee related costs of 5.5 million related to an

10   increase in incentive compensation as well as an

11   increase in our offshore capacity in Manila, you see

12   that?

13   A    Yes.

14   Q    You did not mention this explanation that Lawson

15   gave in its public 10-K as the primary reason for

16   increase in its R&D expenses in either of your

17   reports, did you?

18   A    No, but it's not a general explanation.  It's

19   something that happened in a particular quarter in

20   response to particular events in a particular place.

21   So one would not mention this in a regression

22   analysis.  This is typical of the kinds of things that

23   vary from quarter to quarter and place to place that

24   the regression doesn't capture and isn't intended to

25   capture.

PUTNAM - CROSS                    1132

1   Q    If I could direct your attention also to the sales

2   and marketing section here on the same page, the

3   second paragraph.  Do you see that it states, "For the

4   fiscal 2010 sales and marketing expenses decreased

5   0.7 million or 0.4 percent compared to the similar

6   period in fiscal 2009.  The decrease was primarily the

7   result of a $1.8 million decrease in marketing

8   programs costs, a $1 million decrease in professional

9   fees, a .6 million dollar decrease in third party

10  costs, and a .5 million dollar decrease in employee

11  related costs due to lower head count and lower travel

12  expenses.

13       Did I read that correctly?

14  A    Yes.

15  Q    Now, you did not mention this explanation that

16  Lawson gave as its primary reason for decreases in

17  sales and marketing expenses in either of your

18  reports, did you?

19  A    Because these aren't economic variables.  These

20  are particular effects that happened --

21  Q    I asked you whether or not you included it in your

22  reports; just yes or no?

23  A    I did not include the fiscal's 2010 explanation of

24  changes in sales and marketing expenses in my report,

25  that's true.

1    Q    Isn't it correct, sir, that when Lawson is

2    describing the primary reasons for changes in costs

3    for research and development and sales and marketing

4    in its 10-K, it mentions nowhere that there was an

5    increase or decrease in revenues that drove

6    corresponding costs for research and development and

7    sales and marketing; isn't that correct?

8    A    Well, but that's because -- the answer is they

9    don't relate it to revenues, at least in these

10   paragraphs.

11   Q    Maybe turn to the next page, page 47, please.

12   The second paragraph here under the general and

13   administrative section.  Are you there?

14   A    Yes.

15   Q    Do you see it states, General administrative

16   expenses increased $4.5 million or 5.7 percent in

17   fiscal 2010 compared to fiscal 2009?  The increase was

18   primarily the result of $4.4 million related to

19   adjustments recorded to our pre-merger litigation

20   reserve recorded in fiscal 2009 without comparable

21   adjustments in fiscal in 2010.

22        Did I read that correctly?

23   A    Yes.

24   Q    There's no mention that the general and

25   administrative expenses increased because of some

1    increase in revenue, is there?

2    A    Of course not, no.

3    Q    Put that aside.  In general, you would agree with

4    me that a regression analysis is a technique for

5    determining the relationship between a dependent

6    variable that you want to explain and one or more

7    independent explanatory variables, correct?

8    A    Yes.

9    Q    In performing your regression, the only

10   explanatory variables you used to explain Lawson's

11   expenses were a constant term and Lawson's revenues,

12   correct?

13   A    That's right.

14   Q    Let's turn to figure 5 from your report.  It's

15   also DX 673.

16           MR. STRAPP:  And if I could ask Your Honor to

17   turn -- it's in the binder towards the back.  There's

18   a tab DX 673.  I'll also put it up on the screen.

19           MR. DUSSEAULT:  Your Honor, if it would help,

20   we have no objection to moving this into evidence.

21           MR. STRAPP:  I'm not going to move it into

22   evidence.

23           THE COURT:  All right.

24   Q    Figure 5 of your report here, which is -- it's

25   been marked as DX 673.  This shows data points in a

1  regression line for sales and marketing costs,

2  correct?

3  A   Yes, this is identical to the graph that we saw

4  earlier, that's right.

5  Q   That was one of the slides that was put up during

6  your direct examination?

7  A   That's right.

8  Q   That was the slide that had all those dots on it

9  and a line?

10 A   Yes, that's right.

11         THE COURT:  The one that was put up that

12 calculated the -- it had the slope calculation in it,

13 I believe.

14         THE WITNESS:  That's right, Your Honor.

15 Q   Now, you also gathered data points and calculated

16 regressions for general and administrative costs and

17 for research and development costs, correct?

18 A   Yes.

19 Q   But you didn't actually include the graphs that

20 showed the data points and regression line for your

21 general and administrative regression or your research

22 and development regression in either of your reports,

23 did you?

24 A   That's right.  They are very similar.

25 Q   You testified that the reason you didn't is

1    because, as you just said, they are very similar,

2    correct?

3    A    Yes.

4    Q    Actually, isn't it true that the graphs, the

5    regression graves for research and development, and

6    the regression graph for general and administrative

7    expenses would have different slopes from the graph

8    shown here at DX 673?

9    A    Of course.  Because as revenues rise, the

10   expenditures on those cost categories rise at

11   different rates.

12   Q    You just said they very similar.  Are they very

13   similar or are they not very similar?

14   A    They're very similar.  They have lines that have

15   different slopes by definition, but, in other words,

16   to the Court or to an untrained observer, they would

17   look like a line through a bunch of dots.  That's the

18   only point that I was trying to make, not that the

19   slopes were identical.

20   Q    But you said they are very similar, correct?

21   A    And they are very similar, that's right.

22   Q    I'd like for you to turn in your deposition,

23   please, sir, to page 181.  That is the first

24   deposition tab.  In particular, once you get to 181,

25   focus on line 22.  I'm going to read from 181, line

1   22.   Please follow along, sir as I read aloud.

2        Question:  Is the slope of the line that you would

3   draw if you were graphing the R&D regression results,

4   would it be the same slope as the sales and marketing

5   line?

6        Answer:  No, it would be about half the slope.

7        Question:  So it wouldn't be the same?

8        Answer:  Well, that is certainly true.  And I

9   don't mean to suggest that the coefficient is the

10  same.  What I mean to suggest is that, well, in other

11  words, it is what it is.  They would have different

12  slopes.

13       Did I read that correctly?

14  A    Yes.

15            MR. DUSSEAULT:  Your Honor, I would object

16  because that's obviously not properly impeachment.

17  That's pretty much what Dr. Putnam said today.

18            MR. STRAPP:  Your Honor, I think that there's

19  a large difference between very similar slopes and

20  slopes that are halfway different from each other.

21            MR. DUSSEAULT:  Your Honor, Mr. Strapp is

22  mischaracterizing what he said.  He's taking the very

23  similar from one statement and Dr. Putnam's testimony

24  that the slopes would be different, and he's combining

25  them together.

PUTNAM - CROSS                    1138

1       THE COURT:  Overruled.

2    Q    Let's look at the one graph you actually did

3    include in your reports, the sales and marketing data

4    graph.  And that, I think, is -- we had it up on the

5    screen.  It's DX 673.  So I want to turn back to that.

6    Are you there, sir?

7    A    Yes.

8    Q    Now, in the data that you looked at and for this

9    regression analysis, sometimes the revenue that Lawson

10   received in one quarter was approximately the same as

11   the amount it received in another quarter, correct?

12   A    Yes.

13   Q    For example, if you look closely on the screen

14   here, do you see just on the X axis that it's plotted

15   quarterly revenues.  Do you see where I am?

16   A    Yes.

17   Q    And you added 000, right, to figure out what those

18   revenues are in actual dollar figures?

19   A    Yes, that's right.

20   Q    So if we looked right next to the $100 million on

21   a quarter revenue X axis line, do you see that?

22   A    The $100 million figure, yes.

23   Q    Yes.  Just before you get to the $100 million

24   figure, if you go upwards and look up on this graph,

25   you'll see there's a cluster of data points that is

1  right around the $100 million or maybe the $90 million

2  figure.  Do you see that?

3  A    Yes.

4  Q    Now, if we look at the Y axis of this graph,

5  that's plotting sales and marketing expenses, correct?

6  A    Yes.

7  Q    That's also you add a 000 there to figure out what

8  the actual sales and marketing expenses are in dollar

9  figures, correct?

10 A    Yes.

11 Q    Now, if we just focus on this cluster of data

12 points I'm referring you to right around the $90

13 million revenue figure, just focus on that for a

14 minute.  Do you see that the sales and marketing

15 expenses in that cluster of data points, it ranges

16 from about 15 or $16 million in sales and marketing

17 expenses all the way up to about $32 million in sales

18 and marketing expenses; is that correct?

19 A    Yes.

20 Q    Now, isn't it true there can be several different

21 factors and several different reasons why sales and

22 marketing expenses could widely vary in a particular

23 quarter even if the revenues are roughly the same?  Is

24 that true?

25 A    True.

1  Q   In fact, there are probably a thousand reasons,

2  right?

3  A   It's a large company with people making thousands

4  of decisions in every quarter, that's true.   Of

5  course.

6  Q   You didn't actually investigate any of those

7  reason when you calculated Lawson's incremental profit

8  margin, did you?

9  A   Well, I don't think that's exactly true.   I

10  certainly spoke with Mr. Samuelson about

11  representative reasons, but it's a complicated company

12  making complicated decisions.   Many complicated

13  decisions.

14  Q   So the answer is you didn't investigate the

15  reasons why sales and marketing, R&D, and G&A expenses

16  can widely vary in a particular quarter even if

17  revenues are roughly the same, did you?

18  A   The answer is no, that's not true.   I spoke with

19  Mr. Samuelson about it.

20          THE COURT:   Or the answer is yes, it is true

21  except as I said, I spoke with Mr. Samuelson about it.

22  One way or the other.   But in either way, he spoke to

23  Mr. Samuelson about it.

24  Q   Did you speak to Mr. Samuelson about specifically

25  why quarterly sales and marketing expenses can vary

1    from 16 million to 32 million in a quarter when

2    revenues are roughly the same?  Did you ask him that

3    question?

4    A    Not knowing that you would ask me today, no, I

5    didn't.

6    Q    Now, let's turn to DX 659.  Let's put that up on

7    the screen.  Sir, these are some of your regression

8    results, right?

9    A    Yes.

10   Q    So once you did the regression, you applied the

11   coefficients you have generated to Lawson's total

12   revenues, and you used your regression results to

13   classify some portion of Lawson's sales and marketing,

14   general and administrative and research and

15   development costs as variable costs, correct?

16   A    That's right.

17   Q    What we're looking at here, if you go to line E,

18   do you see there's a line variable general and

19   administrative costs?

20   A    Yes.

21   Q    And you see there's a column heading "fiscal year

22   2011"?

23   A    Yes.

24   Q    So it's your calculation then using your

25   regression model that the variable general and

1    administrative costs incurred by Lawson in 2011 were

2    $64,380,034; is that correct?

3    A    That's the implication of the regression, yes.

4         MR. STRAPP:  Can we put up DX 656, please.

5    Could I ask everyone to turn in their binders, please,

6    to DX 656.

7    Q    Dr. Putnam, let me know when you're there.

8    A    I have it on the screen.

9    Q    Do you see that this is an income statement from

10   Lawson for fiscal year 2011?

11   A    Yes.

12   Q    I want to direct your attention to the column on

13   the right, which is total, and the line T, which is

14   general and administrative, and tell me when you're

15   there.

16   A    I see it.

17   Q    If you look at the total G&A expenses for fiscal

18   year 2011, do you see that they're reported by Lawson

19   at 68,113,139?

20   A    Yes.

21   Q    So in fiscal year 2011, you classified about 64

22   million of Lawson's total 68 million general and

23   administrative costs as variable; is that roughly

24   accurate?

25   A    That's what the regression would predict for that

1  particular data point, that's right.

2  Q   That's over 90 percent of Lawson's general and

3  administrative costs you're classifying as variable

4  based on your regression results, correct?

5  A   That's right.

6  Q   You reviewed and actually you said you relied on

7  the deposition testimony of Kevin Samuelson in forming

8  your opinion, correct?

9  A   Yes, I did.

10  Q   So you must be aware, sir, that Mr. Samuelson

11  testified that most general and administrative costs

12  are probably fixed costs, aren't you?

13  A   When he used the word "fixed," he had a particular

14  meaning, but he did say that, that's right.

15  Q   If you're classifying G&A as over 90 percent

16  variable, that's inconsistent with Mr. Samuelson's

17  testimony, isn't it?

18  A   Actually, taking his testimony as a whole, it's

19  quite consistent.  In the long run, all of these costs

20  are variable.  So one would expect them all to be

21  variable finding that over 90 percent over a year is

22  variable is completely consistent.

23  Q   You understand that Mr. Samuelson's testimony, he

24  didn't characterize "fixed cost" the way that you do

25  with long run or short run.  He just said that most

PUTNAM - CROSS                    1144

1    G&A costs for Lawson are probably fixed.  Isn't that

2    correct?

3    A    I think you're actually mischaracterizing his

4    testimony.  And he did explicitly say that what

5    mattered was the horizon over which one made the

6    decision.

7    Q    I'll ask you to turn to a second deposition tab in

8    your binder.  You'll see that there's deposition

9    transcript of Kevin Samuelson.  And I want to direct

10   your attention, once you're there, to page 319 of that

11   transcript of Kevin Samuelson, the CFO at the time of

12   Infor.

13              THE COURT:  What page?

14              MR. STRAPP:  Page 319 of Kevin Samuelson's

15   deposition.  That's the second deposition tab.

16   A    Yes, I see it.

17   Q    Once you're at page 319, please turn to line 12

18   and follow along, sir, as I read aloud.

19        Actually, let's play the video here.  I want to

20   play the video of this portion of his transcript.

21        Go ahead.

22        (A video clip is played.)

23   Q    When you were doing your regression analysis, sir,

24   you didn't ever ask Lawson to provide you with any of

25   the line items that roll up under the cost categories

1   set forth on the P&L statement DX 656, did you?

2   A    I didn't think it was necessary and I didn't,

3   that's right.

4   Q    In fact, you didn't think that information

5   regarding the line items and the components of the

6   cost categories set forth in the P&L statement were

7   relevant in any way to the analysis that you did to

8   calculate Lawson's profit margin, did you?

9   A    That's right.  They're not relate.  One can't do

10  regression by line items.

11  Q    Well, as a factual matter, sir, isn't it correct

12  that you're not even sure exactly how Lawson allocates

13  and tracks its costs?

14  A    I don't understand that question.

15  Q    As a factual matter, you are not sure exactly how

16  Lawson allocates and tracks its costs; isn't that

17  correct?

18  A    Well, I understand it generally from speaking with

19  Mr. Samuelson and understanding how firms track costs.

20  I'm sure they have internal procedures that are

21  specific to the company that I don't know about.

22  Q    I'm not sure I understood your answer.  Let me

23  just ask it again.

24       As a factual matter, you're not sure exactly how

25  Lawson allocates and tracks its costs, are you?

1   A    Okay.   I'm not trying to be hard to live with,

2   Mr. Strapp, but I'm sure they do things that I don't

3   fully know for their own reasons.   In general, I

4   understand their cost procedures and how they allocate

5   costs from speaking with Mr. Samuelson and from my

6   general knowledge of how firms track costs,

7   particularly software firms.   So I know generally, but

8   there are things that I don't know.   I would certainly

9   concede that.

10  Q    Isn't it true that you didn't even pose the

11  question to Mr. Samuelson of how Lawson allocates and

12  tracks its costs?

13  A    Because Mr. Samuelson's answer to that question

14  couldn't help me, so yes, that's right.

15  Q    I want to turn to DX 725.   You'll see that in your

16  binder.   This also was an exhibit to your expert

17  report.

18          MR. STRAPP:   But if everyone looks at the

19  back of the binder, almost at the very end, DX 725.

20  A    Okay.

21  Q    Now, this appears to be based on the fiscal year

22  2011 and 2012 profit and loss statements produced by

23  Lawson; isn't that correct?

24  A    Yes.

25  Q    I want to ask you about some of the figures here.

1   This is fine print.  So let's try to focus here on --

2            THE COURT:  We're going to have to do it

3   without regard to the monitor.  Can you read that?

4            MR. STRAPP:  I think that we'll be able to

5   blow it up once I direct us where to go.

6            THE COURT:  But can you read it the way it is

7   now?

8            THE WITNESS:  I'm fine, Your Honor.  I have

9   it in my binder.  I'm good.

10           THE COURT:  But I'm asking you a different

11  question.  I'm testing my own vision.

12           THE WITNESS:  Your Honor, actually, I can

13  read those numbers, yes.

14           THE COURT:  You can?  Okay.

15  Q   Let's focus on the line R in the first instance.

16  Tell me when you're there.

17           THE COURT:  Is that sales?

18           MR. STRAPP:  Yes.

19  Q   Do you see that that says "sales"?

20  A   Yes.

21  Q   And this is under a subheading -- if you see in

22  between L & M, there's a subheading operating

23  expenses.  Do you see that?

24  A   Yes.

25  Q   So these are the sales operating expenses.  Is

1   that consistent with your understanding?

2   A    Yes.

3   Q    Now, if you look over to the 2012 column, it's the

4   second from the right, the total 2012 column.  Do you

5   see that?

6   A    Yes.

7   Q    So total sales operating expenses for 2012 are

8   reported at $60,786,448.  Do you see that?

9   A    Yes.

10  Q    Just for the sake of making this a little bit

11  easier, I'm going to call that --

12            THE COURT:  Wait a minute.  Where?

13            MR. STRAPP:  Sales operating expenses.

14            THE COURT:  You're talking about R?  Line R?

15            MR. STRAPP:  Line R. and column total 2012.

16            THE COURT:  60 million.

17            MR. STRAPP:  60.8 million.

18            THE COURT:  Yeah.

19  Q    All right.  On the line right below that, which is

20  line S, those are marketing and product management

21  operating expenses.  Do you see that?

22  A    Yes.

23  Q    For 2012, those are reported at 16.8 million, do

24  you see that?

25  A    Yes.

1   Q    So is it fair to say that the total sales and

2   marketing operating expenses for 2012 were about

3   77.6 million?

4   A    Yes.

5   Q    Could we turn to DX 728?  Now, DX 728 is also an

6   exhibit to your report, and this is your calculation

7   of Lawson's incremental profit based on your

8   regression results, correct?

9   A    Yes.

10  Q    And you have here your predictions for what your

11  regression results would predict for various

12  categories of costs for fiscal year 2012, correct?

13  A    Yes.

14  Q    I want to just test your prediction with respect

15  to sales and marketing against the actual data, which

16  we have.  Okay?  So let's look at your prediction on

17  row D for variable sales and marketing expenses.  Do

18  you see where I am?

19  A    Yes.

20  Q    Do you see that your regression result predicts

21  that in fiscal year 2012 there will be $90.4 million

22  of variable sales and marketing expenses?

23  A    Yes.

24  Q    So what you're saying here -- what your regression

25  model predicts is that there are higher variable sales

1   and marketing costs in 2012 than there were actual

2   total sales and marketing expenses that year; isn't

3   that correct?

4   A   That's what it says, that's right.   For a

5   particular year, that's true.

6   Q   In fact, they were almost -- your prediction with

7   respect to variable sales and marketing expenses was

8   almost $13 million higher than the total sales and

9   marketing expenses in 2012; isn't that correct?

10  A   Sure.

11  Q   Now, I think that if we could just turn to

12  Defendant's Slide 705.   Okay.

13      This is a slide that Mr. Dusseault asked you about

14  on your direct.   And if you look at the title of the

15  slide, what you say under your regression model is

16  when revenues increase, costs increase, correct?

17  A   Yes.

18  Q   You also say that under your regression model,

19  when revenues decrease, costs decrease; isn't that

20  correct?

21  A   That has to be true, yes, that's right.

22  Q   So your regression model would predict that when

23  revenues go up, general and administrative costs

24  should go up also, right?

25  A   That's right.

1    Q    And your regression model would predict that when

2    revenues go down, general and administrative costs

3    should go down, correct?

4    A    That's right.

5    Q    Okay.  All right.  Let's take a look and see what

6    actually happened during the injunction period.  And I

7    want to direct your attention back to DX 725, please.

8         DX 725, I think you testified, sir, is based on

9    Lawson's profit and loss statements for 2011 and 2012,

10   correct?

11   A    That's right.

12   Q    All right.  So let's start by looking at revenue.

13   Can we look at quarter 4, 2011, total revenue.  So

14   that's line E.  Line E is total revenue.  And then go

15   over to the fourth column, quarter 4, 2011.  Do you

16   see the total revenue reported there is 126.3 million?

17   A    Yes.

18   Q    Now, move over one quarter to quarter 1, 2012.

19   The total revenue that Lawson reports here, and the

20   profit and loss statement for quarter 1, 2012 is

21   121.5 million.  Do you see that?

22   A    Yes.

23   Q    So it's fair to say then from the fourth quarter

24   of 2011 to the first quarter of 2012 revenues

25   decreased by over $4 million, right?

1    A    Yes.

2    Q    That means that your regression results would

3    predict a corresponding decrease in general and

4    administrative costs, correct?

5    A    Yes.

6    Q    Let's look and see what actually happened.  Can

7    you look at the fourth quarter of 2011 again?  This

8    time I want you to move down to line T, general and

9    administrative.  Tell me when you're there.

10    A    I have it.

11    Q    Quarter 4, 2011, general and administrative costs

12    are 20.3 million.  Do you see that?

13    A    Yes.

14    Q    If we go over one quarter, first quarter of 2012

15    and look at general and administrative costs, do you

16    see that it says about 48.6 million, right?

17    A    Yes.

18    Q    So isn't it true that in this time frame in which

19    your model would predict G&A and costs decreasing, the

20    G&A costs actually more than doubled; isn't that

21    correct?

22    A    If you're going to pick a quarter in isolation,

23    that's certainly is true, and it's certainly possible.

24    Q    It's not just possible, it's true, right?

25    A    That's what actually happened, yes.

1    MR. STRAPP:  Can we put slide 707 up on the

2  screen.

3  Q   This is a slide, Dr. Putnam, you'll see on the

4  screen that you prepared regarding net profit, right?

5  A   Yes.

6  Q   You say on this slide that net profit subtracts

7  cost of goods sold, variable sales and marketing,

8  variable R&D/G&A and short run fixed costs, right?

9  A   Yes.

10 Q   Isn't it true, sir, that net profits are what's

11 left when you subtract all costs of doing business

12 from revenue, not just short run fixed costs and these

13 other costs you have listed here?

14 A   Well, it depends on the precision of the

15 accounting definition.  I've used a measure called

16 earnings before interest, taxes, depreciation and

17 amortization.  So there are various other costs that

18 are actually not taken into account that are not

19 operating costs.  And if you want to call those costs,

20 it should be accounted for in the net profit.  Then

21 you could.  Had you done that, Lawson's margin would

22 be lower and ePlus's damages would be less.

23 Q   Isn't it your opinion, sir, that net profit

24 margins take account of all costs that firms incur to

25 make sales?

1    A    All operating costs.  So in other words, if you

2    want the net operating margin, you need to look at the

3    operating costs.  This doesn't take into account

4    operating costs.

5    Q    I want to direct you to your report, sir.  It's

6    expert report of Jonathan D. Putnam.  Your first

7    report.  It's a tab in your binder.  And I want to

8    specially ask you to turn to page 44 in your report,

9    sir.  Let me know when you're there.

10   A    Okay.

11   Q    Once you're at page 44 of your expert report, I

12   want to ask you to turn to paragraph 82.

13   A    I have it.

14   Q    Now, do you see in paragraph 82, you say, I

15   understand that the law supports the use of net profit

16   margins when evaluating an infringer's profits in the

17   context of a contempt award.  In general, this is

18   appropriate because net profit margins take account of

19   all costs that firms incur to make sales.  Do you see

20   that statement?

21   A    Yes, that's right.

22   Q    Now, you used Lawson's company-wide net profit

23   margin, not a net profit margin specific to

24   configurations 3 and 5, when you calculated net

25   profits for these proceedings, correct?

1  A    Those don't exist, but yes, that's right.

2  Q    So yes, it's right that you used company-wide net

3  profit margin?

4  A    Yes.

5  Q    And the company-wide net profit margin is

6  calculated by deducting 100 percent of Lawson's

7  operating expenses from its revenue, right?

8  A    Yes.

9  Q    And net profits also take into account fixed

10  costs, correct?

11  A    That's true.

12  Q    It's your opinion, sir, that costs are fixed if

13  they do not vary directly with the number of sales

14  that a company makes, right?

15  A    Depending on the meaning of "directly," yes.

16         THE COURT:  That sort of sounds like what's

17  the meaning of "is."

18         THE WITNESS:  I appreciate that, Your Honor.

19  Do you want me to clarify or not?

20         THE COURT:  Yes.  I want to understand what

21  you're talking about.

22         THE WITNESS:  Okay.  There are costs that

23  vary directly in the sense that they are

24  self-executing.  So if a salesperson has a contract

25  with the company that says "if you make an additional

1    sale, you will be paid 5 percent of that sale as a

2    commission," then that is varying directly and at the

3    moment that the sale is made.

4         There are other types of costs that don't

5    vary directly in the same sense that are still being

6    managed.  And so, for example, if you discover that

7    you're going to make more sales than you otherwise

8    thought you would, you say to the HR department, We're

9    going to have to hire more people in order to support

10   these sales in the service department.  Those sales

11   vary directly, but not in a self-executing way with

12   the level of revenues.

13        THE COURT:  Do you define "directly" to mean

14   those that vary with self-execution or not or both?

15        THE WITNESS:  I would say that "directly"

16   means something more than self-executing.  It means

17   something that is managed with one eye on revenues and

18   is correlated with revenues so that when revenues

19   increase, they tend to increase.

20        THE COURT:  All right.

21   BY MR. STRAPP:

22   Q    Sir, you have not seen evidence that Lawson had to

23   incur additional general and administrative costs

24   after the date of the injunction as a direct result of

25   continuing to license, maintain or service the

1    infringing configurations, have you?

2    A    They didn't add to their costs.  They went on as

3    they were before as I understand it.  So that's right.

4    Q    So from a business perspective, it was business as

5    usual, right?

6    A    I think that's a cavalier way of putting it, but

7    in other words, I'm not aware of any changes in their

8    cost structure related to the introduction of RQC.

9    Q    So from a G&A or general and administrative

10   perspective, you would expect that Lawson's expenses

11   continued as they did prior to the injunction, right?

12   A    Right, but that's not the question that we're

13   asking, right?

14   Q    I'm asking you a new question.  The new question

15   is:  From a general and administrative perspective,

16   you would expect that Lawson's expenses continued

17   after the injunction as were prior to the injunction,

18   correct?

19   A    That's my understanding, yes.

20   Q    Now, you also haven't seen any evidence that

21   Lawson had to incur additional product development

22   costs after the date of the injunction as a direct

23   result of continuing to license, maintain or service

24   the infringing configurations, have you?

25   A    Maybe I don't understand the premise of the

PUTNAM - CROSS                    1158

1  question, Mr. Strapp.  Isn't what we're asking is what

2  Lawson would have done if its revenues had gone down?

3          THE COURT:  Wait a minute.  Do you understand

4  the question, not the premise, but the question?

5          MR. STRAPP:  Do you want me to ask the

6  question again?

7          THE COURT:  Yes, ask the question.  See if

8  you understand it.  If you understanded it, please

9  answer it.

10 Q    You have not seen evidence, Dr. Putnam, that

11 Lawson had to incur additional product development

12 costs after the date of the injunction as a direct

13 result of continuing to license, maintain or service

14 the infringing configurations, have you?

15 A    You mean in addition to the costs that they were

16 incurring before the injunction?

17 Q    Correct.

18 A    No, I'm not aware of any evidence like that.

19 Q    And you have not seen any evidence that Lawson had

20 to incur additional sales and marketing costs after

21 the date of the injunction as a direct result of

22 continuing to license, maintain or service the

23 infringing configurations, have you?

24 A    No.  I'm struggling with what your question

25 actually means.

1    THE COURT:  It doesn't make any difference

2  what it means.  If you understand it, answer it yes or

3  no.  We'll wrestle with what it means legally later.

4    All right.  Go ahead.

5  Q   You testified that if this Court wants to disgorge

6  Lawson's profits, it should disgorge net profits,

7  right?

8  A   Yes.

9  Q   In your opinion about the reason net profits

10  should be disgorged instead of incremental profits is

11  that the decision horizon over which a firm is

12  responding to a permanent injunction is in effect

13  infinity, correct?

14  A   Yes.

15  Q   You know that, in fact, there is actually a date

16  certain on which the Court issued an injunction and

17  that that date is May 23, 2011, correct?

18  A   Yes.

19  Q   And you also assume that contempt will be found on

20  some fixed date in the future, correct?

21  A   Yes.

22  Q   And you also understand, don't you, sir, that the

23  patent at issue in this case will expire in 2017,

24  correct?

25  A   Yes.

1   Q    So the injunction period is not infinite, is it?

2   A    Not literally infinite, no.  For economic

3   purposes, it's as close to infinity as one cares to

4   get.

5             MR. STRAPP:  No further questions.

6             THE COURT:  How much do you have?

7             MR. DUSSEAULT:  I will anticipate about 20

8   minutes, Your Honor.

9             THE COURT:  Why don't we take an hour for

10  lunch.

11            (Luncheon recess taken at 1:05 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE CLERK:  All right, Mr. Dusseault.

2        MR. DUSSEAULT:  Thank you, Your Honor.

3

4               REDIRECT EXAMINATION

5    BY MR. DUSSEAULT:

6    Q    Good afternoon, Dr. Putnam.

7    A    Good afternoon.

8    Q    Dr. Putnam, during Mr. Strapp's examination, Judge

9    Payne asked you a question about to what extent a

10   regression analysis is impacted by changes in the time

11   period, changes in management, factors like that; do you

12   recall that?

13   A    Yes.

14   Q    Have you considered, in coming to your opinions, the

15   impact of the change in time period, and particularly the

16   change in management to Infor on the accuracy of your

17   regression?

18   A    Yes.

19   Q    What have you determined the impact is, if any?

20   A    I've a two-part answer I guess I would say.  First of

21   all, a regression analysis is designed to --

22        MR. STRAPP:  Your Honor, I'm going to object to

23   this question as calling for testimony that's not set

24   forth in Dr. Putnam's expert report.

25        MR. DUSSEAULT:  Your Honor --

1       THE COURT:  It was set forth in response to a

2   question that I asked, I think.  Now, that doesn't make it

3   admissible.  If you had objected to it, I told you, I'd

4   sustain objections to my own questions.  It's all right to

5   do that, but if -- now he's objecting to it, Mr.

6   Dusseault.

7       MR. DUSSEAULT:  Well, Your Honor --

8       THE COURT:  So how do we deal with it?  He's

9   saying that it was an improper question, area of inquiry.

10      MR. DUSSEAULT:  I hate to say Your Honor has

11  opened the door, but I think it's open here, Your Honor,

12  and I want to just -- just a couple follow-ups.

13      THE COURT:  Overruled.

14  Q    Go ahead.

15  A    So I think the question is, did I consider the effect

16  of changes in time period and changes in control in my

17  regression analysis, and the answer is, in general, yes.

18  The regression analysis takes into account things that

19  vary over time provided that they are not systematic.

20      So we saw some examples from Lawson's 2010 10K that

21  were individual examples of changes in expenditures that

22  did not recur and that were not systematic.

23      As to the specific question of how Lawson's

24  expenditures changed after the acquisition and it went

25  private, the real question is, was Lawson more likely to

1   be sensitive to costs or less likely, or, in other words,

2   is the estimate that I made of the share of sales and how

3   they adjusted -- or the -- the costs and how they adjusted

4   to changes in sales, is that likely to be understated or

5   overstated.

6        My understanding from speaking with Mr. Samuelson is

7   that, if anything, Lawson became more sensitive to costs

8   after the acquisition which means that -- in fact, that

9   might have even motivated the acquisition --

10           THE COURT:  I wasn't asking about that.  My

11  question went to the extent to which changes over time

12  backwards, from the beginning, not changes after the time

13  but changes from the beginning of the analytical period

14  had an impact, if any, on the reliability of the

15  regression analysis, and you answered that.

16           THE WITNESS:  Yes.

17           THE COURT:  I've already got an answer for that.

18  Q    Is Infor a private equity firm, if you know?

19  A    Yes.

20  Q    And do you have a view as to whether a private equity

21  firm is more or less likely than Lawson pre-acquisition to

22  reduce costs in order to maintain profit margins?

23           THE COURT:  I think that's beyond, and sustained.

24  Q    One point I wanted to clarify, Dr. Putnam, you were

25  talking about gross profits, and Mr. Strapp asked you a

1  question about sales commissions.  Are sales commissions

2  part of the sales and marketing operating expense or part

3  of the gross profit?

4  A    Typically they are classified as part of sales and

5  marketing expenses.

6  Q    Now, Mr. Strapp asked you some questions about your

7  regression and particularly why you didn't create a new

8  regression with your second report to reflect data after

9  the acquisition and after Lawson went private; do you

10 recall that?

11 A    Yes.

12 Q    Why did you -- I want to take these in parts.  Why did

13 you not create a separate regression analysis that

14 analyzed just that time period?

15 A    Well, for that time period, we only have eight

16 observations.  So you will recall when I put up the

17 regression result initially, I pointed to the fact that

18 there were 47 observations.  When you have eight

19 observations, you've got a necessarily less reliable

20 regression.

21      I didn't think that it was -- would be reliable to try

22 to use so few observations for the 2011/2012 time period.

23 Also, I didn't marry the earlier data to the later data

24 because the earlier data were reported on a worldwide

25 basis, and the later data were reported on a U.S. basis.

1    So one can't simply append them to each other and increase

2    the sample size that way.

3    Q    Now, when you -- you've issued two reports in this

4    case; correct?

5    A    Yes.

6    Q    When did you first run a regression analysis?

7    A    In the context of preparing my first report.

8    Q    Did Dr. Ugone have a reply to that?

9    A    Yes.

10   Q    Did he run a regression analysis to correct any

11   supposed errors in the way you've done it?

12           MR. STRAPP:  Objection; beyond the scope, and I

13   don't think there's any relevance here.

14           MR. DUSSEAULT:  Your Honor, there's been

15   questions, a litany of questions about the reliability of

16   the regression analysis.  I'm allowed to explore whether

17   he was -- whether their own expert ran a regression to try

18   to correct for these errors.

19           THE COURT:  I think not.  Objection sustained.

20   It's not relevant.

21   Q    Mr. Strapp asked you some questions about Lawson's 10K

22   statements and particularly some particular descriptions

23   of factors that impact costs for a particular year; do you

24   recall that?

25   A    Yes.

1    Q    And Mr. Strapp asked you whether these particular

2    factors were something that you had incorporated into your

3    discussion; do you recall that?

4    A    Yes.

5    Q    Let me ask a threshold question.  To the extent

6    there's a cost described in 2010 in the 10K or a 10Q, is

7    that cost part of what you looked in doing your regression

8    analysis?

9    A    Of course.

10   Q    So let me ask the second question which is, to the

11   extent you didn't incorporate the specific descriptions of

12   a factor that may have impacted a cost, why is it that you

13   didn't do that?

14   A    In general, economists divide explanations into two

15   types.  There are variables which affect the outcome or

16   the dependant variable in every period, and then there are

17   random or unexplained deviations that affect the outcome

18   in any particular period.

19        None of the categories of expenses that Mr. Strapp

20   identified constitutes an economic variable.  They're all

21   properly classified as idiosyncratic effects that

22   affect -- that Lawson certainly spent the money, but it

23   was idiosyncratic particular to that particular period,

24   and there were expenses like that for every period.

25        What you are trying to do is to isolate the systematic

1   part of the expenses, which is the relationship to

2   revenues, from the idiosyncratic part which is expenses

3   that Lawson incurred for its own best reasons but may not

4   be related to revenues at all.

5        And it turns out that there's well-known diagnostic

6   tests for how to determine the relative importance of

7   those two things, and the systematic part, which is the

8   part that revenues explain is by far the most important

9   explanation for how Lawson costs changed.

10       As I explained, it accounts for between 85 and

11  89 percent of the total variation in costs.  So Mr.

12  Strapp's idiosyncratic factors, while certainly present,

13  are idiosyncratic and de minimus.

14  Q    Thank you for that, Dr. Putnam.  There was another

15  point in the cross-examination where Mr. Strapp showed you

16  two exhibits, Defendant's Exhibit 725 and Defendant's

17  Exhibit 659, and he had you compare -- in one instance, he

18  said that the actual costs were lower than what the model

19  predicted for variable costs, and in another instance, he

20  said that the variable costs were very close to what the

21  model predicted?

22  A    Yes.

23  Q    One was involving sales and marketing, and the other

24  was involving G&A; do you recall that?

25  A    Yes.

1          MR. STRAPP:  Your Honor, I think that

2     mischaracterizes the testimony, because I only asked about

3     general and administrative, not sales and marketing on my

4     cross.

5          MR. DUSSEAULT:  Let's look at 725.

6          THE COURT:  Let's just ask the question and not

7     ask him what he remembers.  Just ask him the questions you

8     want to ask him.

9          MR. DUSSEAULT:  Let me get the exhibit, if I

10    could.  I stand corrected.  It is general and

11    administrative.  Let me ask a different question then.

12    Q    Does it concern you, in terms of the reliability of

13    your regression, that one can point to a particular

14    category of operating costs in a particular quarter and

15    find that the actual costs are either close to or even

16    higher than the predicted variable?

17    A    Not at all.

18    Q    Why not?

19    A    Well, if you go back to the scatter plot, which is

20    Defendant's Exhibit 673 that we talked about, you'll see

21    that in every one of those data points, if you were to

22    look at it with a large enough magnifying glass, every one

23    of those data points differs from the regression line

24    itself which means that the regression line is incorrect

25    in the sense it doesn't get the actual data exactly for

1    any of the quarters in question.

2        About half the time, the situation is as Mr. Strapp

3    describes which is that the regression predicts more

4    expenditures than actually occurred.  About half the time

5    the regression predicts lower expenditures than actually

6    occurred which is what you would expect of any average.

7    Half the time the actual data is below the average and

8    half the time it's above the average.

9        So it doesn't concern me at all that in the example

10   that Mr. Strapp pointed to, that prediction is not equal

11   to the outcome.  If that were truly a critique, one

12   couldn't do data analysis at all, because one would be

13   held to a standard of invariably having to predict the

14   data exactly which can't be right.  We're only trying to

15   predict the average relationship here, and we've done that

16   precisely.

17   Q    Now, Dr. Putnam, do you recall when Mr. Strapp asked

18   you some questions about deposition testimony from Kevin

19   Samuelson?

20   A    Yes.

21   Q    Can we go to page 319, line 12 through line 19, of the

22   Samuelson deposition.

23   A    I have it.

24   Q    You have it, and you see this is the part that Mr.

25   Strapp went over with you where Mr. Samuelson makes a

1    statement that most of the G&A would probably be fixed; do

2    you see that?

3    A    Yes.

4    Q    Now, I think you said when Mr. Strapp was asking you

5    about the Samuelson testimony, that you thought that the

6    testimony as a whole was consistent with your position.

7    What did you mean by that?

8    A    Well, what I meant is that Mr. Strapp has simply taken

9    certain quotes without actually providing the context or

10   the follow-up questions, and if you were to continue to

11   read Mr. Samuelson's testimony, he goes on to talk about

12   how costs vary with revenues.

13   Q    So let me post another question to you, if I could.  I

14   want to read to you, starting at the line where Mr. Strapp

15   stopped, down to line 19 on page 320.  So it says,

16   Question:  And can you give me an example of a variable

17   cost, let's say, for example, under the sales line items.

18       Answer:  Commission would be an example.

19       Question:  Okay, a product development cost, let me

20   ask you whether the costs that are rolled up into the

21   product development line, the desegregated line items

22   under the general ledger for product development, are

23   those primarily fixed or variable costs?

24       Answer:  Both.

25       Question:  Both?  And give me --

1      Answer:  And there's some -- by the way, there's some

2   gray area on where do people fit.

3      Question:  Right.

4      Answer:  Is that fixed or variable?  And there are

5   very different opinions in software about where that

6   falls, and that's, obviously, the largest portion of our

7   cost structure, our people.

8      Question:  Right.

9      Answer:  So depending on how you perceive that,

10  obviously, to the extent we sold less product, we would

11  need less people.  So at some level, it is variable.

12      Is that part of the testimony as a whole that you

13  considered in reaching your opinion, sir?

14  A   Yes.

15  Q   Now, Mr. Strapp asked you another question towards the

16  end of his cross, and he asked you whether you've seen any

17  evidence that Lawson had to incur additional expenses by

18  continuing to sell configurations three and five after the

19  injunction; do you recall that question?

20  A    Yes.

21  Q   Now, for purposes of calculating damages and applying

22  profit margins to a damage calculation, is that the right

23  question to be asking, whether Lawson incurred additional

24  expenses after the injunction as compared to before the

25  injunction?

1    A    No.

2    Q    What is the right question to be asking, sir?

3              THE COURT:  You mean from an economist's

4    standpoint.

5              MR. DUSSEAULT:  Yes, sir.

6              THE COURT:  May very well be the right question

7    from a legal standpoint.

8    Q    Let me ask this:  In terms of evaluating what costs

9    should be deducted, in your view as an economist, is that

10   the right question?

11   A    No.

12   Q    What would be the right question, sir?

13   A    As I understand it, and in trying to carry out the

14   legal task, to compute damages, the question is a

15   counterfactual one, not an actual one.

16        In other words, what are the -- what would Lawson have

17   done had it complied with the injunction and not earned

18   the revenues that it, in fact, did.  As part of asking

19   that question, one has to also ask, what costs would

20   Lawson have avoided or not incurred had it complied with

21   the injunction.

22        So rather than looking at the costs that it did incur

23   and whether they varied, which one would not expect, one

24   should ask the question, what costs would Lawson have

25   avoided, or, in other words, how much lower would its

1    costs have been it had not taken in those revenues that

2    it, in fact, took in.

3         And that's what I've actually tried to measure with

4    the regression analysis.  I've tried to answer that

5    hypothetical question, because what actually happened is

6    not -- we're measuring the difference between what

7    happened and what ought to have happened.

8              MR. DUSSEAULT:  Thank you very much.  I have

9    nothing further.

10             THE COURT:  Can he be excused?

11             MR. STRAPP:  Yes, Your Honor.

12             THE COURT:  Thank you very much for being with

13   us, Dr. Putnam.

14             MR. DUSSEAULT:  Your Honor, before Lawson rests

15   on remedies, the only housekeeping stuff we have is we

16   want to submit to Your Honor 30(b)(6) testimony from ePlus

17   relevant to remedies.  It's the deposition testimony of

18   Mr. Farber, but it's a 30(b)(6) deposition testimony.

19             MR. STRAPP:  Your Honor, I would just request

20   that the fairness designations and the objections that we

21   submitted be included as part of that package.

22             MR. DUSSEAULT:  They are.

23             THE COURT:  Are they included?

24             MR. DUSSEAULT:  Yes, they are, Your Honor.

25             THE COURT:  All right.  Is that an exhibit?  Is

1   that marked as an exhibit?

2           MR. DUSSEAULT:  Your Honor, it's not marked as an

3   exhibit.  This is deposition designations that were part

4   of the joint statement filed with the Court that we're now

5   submitting for the Court's consideration.

6           THE CLERK:  I think the clerk's office will need

7   a copy to keep in the file.  Okay, thank you.

8           THE COURT:  Will you give these back to Mr.

9   Strapp.

10          MR. DUSSEAULT:  Your Honor, the only other

11  housekeeping issue, there was one demonstrative that Your

12  Honor proposed that we mark as an exhibit and be deemed

13  admitted.  Do you need the parties to do anything to

14  present that to you for the record?

15          THE COURT:  I've got a copy of it.  We'll need to

16  put it in the record, because it's not in your exhibits.

17          MR. DUSSEAULT:  Do you want us to put that in the

18  record here?

19          THE COURT:  Yes.  Physically you have to put it

20  in the book.  You've all got a bunch of these exhibits

21  that you've got up here -- I mean that I have up here, and

22  the clerk has a copy of them.  You can just put it in

23  there and mark it as tab 578 or whatever it was.

24          MR. DUSSEAULT:  Can we take care of that this

25  afternoon or tomorrow morning?

1           THE COURT:  Any time.  Any rebuttal?

2           MR. STRAPP:  No, Your Honor.

3           THE COURT:  All right.

4           MR. STRAPP:  Your Honor, just one point before we

5      close the evidentiary record here.  With respect to the

6      Hager deposition designations --

7           THE COURT:  I have that question, too.  Where do

8      we stand on Hager?

9           MR. STRAPP:  I think as of today, we've resolved

10     the issues with counsel for Lawson, and we have an

11     agreed-upon list of designations that is slimmed down from

12     what we previously provided to you.

13          We don't yet have it ready physically to hand up

14     because the agreement was reached this morning, but we

15     think it should be prepared in short order.

16          THE COURT:  Take this Hager binder and get -- and

17     then give me a new one.

18          MR. STRAPP:  That's what we'll do, Your Honor.

19          MR. DUSSEAULT:  Your Honor, one other

20     housekeeping matter.  Your Honor's previous orders

21     specified post-trial briefing on colorability and

22     infringement and particular dates for each.  It didn't say

23     anything specifically about briefing remedies, but I

24     personally --

25          THE COURT:  It would be on the same schedule.

1    MR. STRAPP:  Should we do that in a separate

2    brief, Your Honor?

3         THE COURT:  I think what I want you to do is to

4    do it in a separate brief, because I believe that's what's

5    required for the colorability and infringement.  Yes, it

6    is.  And the remedies would be in a separate brief.

7         MR. STRAPP:  We'll do that, Your Honor.

8         THE COURT:  In the same order.

9         MR. DUSSEAULT:  Yes, sir.

10        THE COURT:  Now, I was to have the hearing on

11   April 30th, but I apparently have a criminal trial that is

12   not going to resolve itself on that date, and so rather

13   than do anything else about it, when is -- I'll hear the

14   argument on Friday, April 26, at 10:00 a.m.  Anybody can't

15   do that?  All right.

16        Your brief on the 23rd, briefs on the 23rd are

17   due by five o'clock.  I'll deal with admission of the

18   exhibits in the 500 series after I finish doing some

19   further reading.

20        At one point in time, all of you sent me cases

21   that had been decided after *TiVo*.  To your knowledge, have

22   I got all the cases decided after *TiVo* on contempt

23   hearings?

24        MR. STRAPP:  I think, Your Honor, there have been

25   cases decided subsequent to the last submission, so we

1    could update that submission and include some additional

2    cases.

3            THE COURT:  How about -- are there a lot of

4    people violating injunctions?  Is that what's going on?

5            MR. STRAPP:  It doesn't happen often, but it does

6    happen.  So I think that there are at least -- at least I

7    know of one other published decision that we haven't yet

8    provided you.

9            THE COURT:  What I want you to do is to sit down

10   and agree on the list of cases in which, after *TiVo*, a

11   court has considered the question of contempt, and I want

12   you to just give me the citations of those in a letter,

13   and I don't need any copies or argument or anything.  I

14   just need the citations.

15           I want to make sure -- I think I've read

16   everything of which I am aware, but we haven't done any

17   updated research to find out if there's anything else at

18   this particular point.

19           We're now ready to hear the issue on the

20   injunction, Mr. Thomasch, having looked like he did not

21   take a red eye.

22           There are two things here.  One is the Court of

23   Appeals gave a mandate to consider whatever it actually

24   said verbatim will be in the mandate, or any opinion, but

25   issued an opinion and instructed to consider what to do --

1    how to modify the injunction in light of the opinion.

2              Then Lawson filed a motion to dissolve the

3    injunction.  Is that basically -- as I construe it, it was

4    your way of getting that issue on the table; is that

5    correct?

6              MR. THOMASCH:  I think that is correct, Your

7    Honor.

8              THE COURT:  All right.  I just wanted to make

9    sure of that.

10             MR. THOMASCH:  And, Your Honor, I do want to

11   start by thanking you.  I was in court in California

12   yesterday and did arrive back at Dulles at 5:55 this

13   morning.

14             THE COURT:  You did take a red eye.

15             MR. THOMASCH:  I most certainly took the red eye

16   from Sacrament to Long Beach to Dulles and came from

17   Dulles to here but obviously could not have done the

18   argument sooner, and I appreciate the opportunity to be

19   able to make the argument to Your Honor.

20             It is a very important and fundamental argument,

21   and the jumping-off point, from our view here, is Your

22   Honor's order of March 12, 2013, docket number 1019.

23             One, Your Honor indicated in an order to the

24   parties that the Court, quote, remains of the view that it

25   is appropriate to reassess the propriety and scope of an

1  injunction as directed by the United States Court of

2  Appeals for the Federal Circuit in perspective of

3  additional briefing on the topic of the four factors that

4  must be considered in assessing the issuance of an

5  injunction as prescribed in *eBay® v. MercExchange, LLC*,

6  547 U.S. 388, 2006.

7        THE COURT:  Mr. Thomasch, I will tell you that

8  after having done that, I have done considerable

9  additional reading, and I'm not sure that that's correct.

10 I may have erred in doing that, so I do want to a hear the

11 arguments on the effect, vel non, of the mandate and the

12 decision as well as the four -- I'm still studying the

13 extent to which the four-factor test comes into play and

14 the propriety of considering it either separately or in

15 conjunction with a modification that would be -- whether

16 or not a modification could be consistently implemented as

17 required by the Federal Circuit while still considering

18 those factors.  So I may have erred in that, but I don't

19 know.

20       MR. THOMASCH:  Okay.

21       THE COURT:  I just kept reading trying to do some

22 assessing, but all I say that for is so that all of you

23 will address both of the issues, and then I will have your

24 positions in mind when I am finishing the decisional

25 process.

1    MR. THOMASCH:  I want to distinguish early out,

2    because I do think that whether we go out this from the

3    point of view of the mandate or the point of view of

4    Rule 60(b)(5), we effectively get to the same place, and

5    that is that our fundamental attack, first and foremost,

6    although there is an alternative argument, but our

7    fundamental attack is that this injunction needs to be

8    dissolved *ab initio*.

9    It is Rule 60(b)(5), of course, Your Honor, would

10   allow us to argue that certain facts -- let me withdraw

11   that.  Let me see if I can rephrase that.  It would allow

12   us to argue that even though the injunction on May 23rd,

13   2011, was properly granted, something has happened since

14   then by way of new facts that we could bring to the

15   Court's attention, and we would have a burden to show to

16   the Court that those new facts justify the Court in

17   amending or modifying or even dissolving the injunction on

18   a prospective basis, because while it was appropriate when

19   rendered, it became inappropriate in light of things.

20   And most likely that would occur in the context

21   of a change in the competitive environment where either

22   the patentholder ceased being a competitor or moved into a

23   widespread licensing, or even any licensing activities,

24   that indicated that there was no longer irreparable harm

25   from competition, money damages were now adequate, et

1    cetera.

2           If changed circumstances that were not present in

3    2011 came upon us, that would be one aspect of

4    Rule 60(b)(5) that we could have brought to Your Honor's

5    attention, and we would have the burden of proof to

6    establish that in light of those new facts -- first, that

7    the facts existed, and second, in light of them it was

8    inappropriate or unfair to continue the injunction, no

9    longer equitable in the rules of the rule.

10          We are in a different situation here.  Our

11   situation as we have it is that the injunction was

12   predicated on a judgment.  The judgment was the judgment

13   of infringement that was entered nunc pro tunc to

14   January 28, 2011.

15          THE COURT:  You are going under Rule 60(b)(5),

16   the component that says, it has been based on an earlier

17   judgment that has been reversed or vacated.

18          MR. THOMASCH:  That is correct.  And I believe

19   that we would get to the same place, and I'll address that

20   differently from the perspective of the mandate, that this

21   is an appropriate exercise for the Court to determine on

22   remand from the Federal Circuit, but I just want to make

23   clear where it is that we're -- where we're going.

24          So we would argue and have argued in our papers,

25   Your Honor, that the order of injunction was itself

1    predicated on a different order, that being the judgment

2    of infringement.  Had there been no judgment of

3    infringement, there would be no junction.

4            The judgment of infringement has been in part,

5    and in substantial part, reversed and vacated by the

6    Federal Circuit in its decision of November 21st, 2012.

7    We suggest, Your Honor, that if the proper facts had been

8    before the Court in 2011, the injunction would not and,

9    indeed, could not have issued.  That's the basic

10   underpinning of this motion, is that the Court was

11   influenced in entering an injunction by evidence that

12   related to five patent claims in total, not one.

13           Two of those patent claims were systems claims

14   which are very important because, as Your Honor is aware,

15   a system claims come under 271-A which makes it an act of

16   infringement to make, use, or sell, whereas 271-B and C

17   that relate potentially to method claims do not make it an

18   act of infringement to sell something.

19           So there's -- the system claims are very

20   important here.  Every aspect of the system was deemed by

21   the jury to be infringing when it was used in a

22   configuration, configuration two, three, or five.

23   Configurations two, three, and five the jury found in toto

24   amounted to infringing goods, and their use was also

25   infringing.

1        Now the issue of whether configuration two is

2  infringing, for instance, is off the table.  There is no

3  doubt that -- I mean, the plaintiff has not challenged the

4  notion that the injunction must be modified and that the

5  injunction, as it pertained to configuration two, must be

6  dissolved *ab initio*.

7        They are not suggesting that somehow that had

8  continuing force up until November 21st.  The Federal

9  Circuit found that the error that caused the reversal is

10  an error made at the summary judgment stage of the trial

11  court proceedings on the merits.

12        Had that error not been made, the jury would

13  never even have been presented with the issue of whether

14  the configuration two infringed the '172 patent.  That

15  '172 patent wouldn't have been in the case at all.  The

16  '683 patent would not have had in the case the fundamental

17  underlying system claim.  There would have been a wholly

18  different analysis of the componentry and the parts,

19  because, as Your Honor is aware, configuration three is

20  the exact same configuration as configuration two except

21  that it includes Punchout.

22        Now, there was argument at the merits trial about

23  how somehow the injunction should be limited to RSS or

24  limited to Punchout or limited to RSS and Punchout, but at

25  the end of the day, Your Honor found, because of the

1    system claims, there's a basis to find the entire system

2    was infringing.

3          Well, now, everything that's in configuration

4    three except Punchout can be sold, can be used, and can be

5    sold and used without any question or complaint from

6    ePlus.  The competition in the system that include RSS is

7    fair.  It is not an infringement on their right.  They

8    have no right to exclude competition for the sale of the

9    entire underlying core S3 componentry and the RSS or RQC

10   system.  That configuration, which makes up --

11         THE COURT:  Talking about configuration two?

12         MR. THOMASCH:  Configuration two, which makes up

13   the vast majority of the configurations that were at issue

14   at the stage of the injunction.  Your Honor may recall

15   that originally there was a configuration one that was in

16   the case, and the plaintiffs lost on that.  That

17   configuration was the most popular configuration, and then

18   the second most popular was configuration two.

19         We're down to where there's only 137 or so

20   customers who, at the time of the injunction, possessed

21   either configuration three or five.  Everybody wanted the

22   underlying modules, because they can be used full service.

23   They can be used for item master, for instance, and to do

24   all the things that you can do in item master, you don't

25   need configuration three or five for that.  You only add

1    three and five if you want either Punchout or Punchout and

2    EDI.

3           But the configuration two module exists, there is

4    no dispute about the fact that competition over customers

5    for that module, for the guts of the system without the

6    add-on, is fair, and if there's any harm that's caused to

7    ePlus as a result of that, it's not harmed in any way that

8    relates to patent infringement.

9           It's just the harm that someone might have a

10   better product than they do and win sales in the

11   marketplace.  That's not something this Court needs to

12   worry itself with.

13          Now, we think that this is a very, very

14   straightforward case about if the Court goes back and

15   looks at the injunction and says, can the injunction

16   stand, taking for the moment that Your Honor was correct

17   when you wrote Document 1019 and said, we're going to look

18   back at that test, if the Court goes in that direction as

19   we believe is appropriate --

20          THE COURT:  Excuse me.

21          MR. DUSSEAULT:  If the Court goes to the

22   four-factor test, as we believe is appropriate and would

23   certainly -- it cannot be disputed that the Court has the

24   right to do, it is within the discretion of the Court to

25   do, but if the Court goes there, we think it's a very

 1    short trip from going there to dissolving the injunction,

 2    and we rest primarily -- I mean, there's a lot of case law

 3    cited in our briefs, but the case that stands apart is

 4    *Apple v. Samsung*, 695 F.3d 1370.  Federal Circuit decided

 5    that case on October 11th of 2012, and rehearing en banc

 6    was denied on January 31, 2013, so only a few months ago.

 7          To my knowledge, it is the Federal Circuit's most

 8    recent pronouncement, and it's a huge pronouncement that's

 9    garnered enormous attention, The most recent pronouncement

10    on what is required for an injunction under the *eBay*®

11    four-factor test.

12          And the interesting thing there, Your Honor, is

13    we argued that at page 13 of our opening brief, we argued

14    it again in our reply brief.  In between, that case is not

15    even cited in ePlus's brief.  There is no attempt

16    whatsoever to say that they could meet the findings, no

17    attempt whatsoever for ePlus to say that they could meet

18    the findings that *Apple v. Samsung* puts in place.

19          *Apple v. Samsung* is a case in which there was

20    patent infringement about a very interesting and important

21    feature of cell phones that were on the Samsung cell

22    phone.  It was the searching technology that allowed a

23    user to search in, for instance, a name and come up with

24    that name from the phone's contact list and from where

25    that names appears in the internet, where that name

1    appears in email on the phone.  It was an important

2    feature of the Samsung phone.

3            It also was a feature that had been previously

4    patented by Apple.  So Apple sued for petition

5    infringement, and Apple won, and there was a finding that

6    there was infringement.

7            There was a hearing with regard to an injunction,

8    and the issue of irreparable harm was briefed at great

9    length, orally argued at great length, and, in the concept

10   of great length, I believe that the District Court's

11   decision in the Northern District of California was just

12   over 100 pages long, very, very detailed decision

13   analyzing the competition between Apple and Samsung in the

14   cell phone market and finding irreparable injury.  That

15   finding ultimately was not disturbed.

16           There was irreparable injury because this was

17   effectively a two-player market where there wasn't

18   licensing and where these phones competed and these

19   features were important to the competition.  Apple took

20   the position that case law that the Federal Circuit had

21   set up for some period of time permitted an injunction

22   under those circumstances.

23           It went up to the Federal Circuit, and Samsung

24   won, and Samsung won on the issue of the injunction, not

25   on the issue of whether they infringed.  They lost.  They

1    didn't win on the issue of whether or not there was

2    irreparable harm.  They won on the issue of whether the

3    injunction was proper, and the Court put forward -- I'm

4    sorry.  Mr. Krevitt, who was actually counsel of record in

5    the case and, thus, should be trusted more on details,

6    indicated to me it was a preliminary injunction, went up.

7    The test is the same on the four factors, but there needed

8    to be a likelihood of success, and that was shown.

9            That was not the reason when the Court upset the

10   preliminary injunction and vacated it.  The reason appears

11   at page 1374 of the decision where the Court stated, to

12   satisfy the irreparable harm factor in a patent

13   infringement suit, a patentee must establish both of the

14   following requirements:  One, that absent an injunction,

15   it will suffer irreparable harm; and two, that a

16   sufficiently strong causal nexus relates the alleged harm

17   to the alleged infringement.  Both showings need to be

18   made.

19           Here, neither showing can be made on this record,

20   and Your Honor gave ePlus the chance to supplement the

21   record.  I was surprised when they chose not to take that

22   opportunity, but I think --

23           THE COURT:  Suspicion causal nexus exists what?

24           MR. THOMASCH:  That a sufficiently strong causal

25   nexus relates the alleged harm to the alleged

1    infringement.

2         THE COURT:  But that's different, isn't it, when

3    you have a preliminary injunction than in a final

4    injunction?  The Fourth Circuit law sure is.  They don't

5    have any patent cases on that topic, but they have a lot

6    of other cases that actually discuss what the difference

7    is in the preliminary stage and the permanent stage of the

8    injunction.

9         MR. THOMASCH:  There isn't a difference in

10   irreparable harm.  This is looked at as a function of

11   irreparable harm.  The Court said, while we consider these

12   two factors --

13        THE COURT:  Well, irreparable harm is different

14   in a final injunction than a preliminary injunction, isn't

15   it, according to the Federal Circuit?

16        MR. THOMASCH:  The need to show irreparable harm

17   exists in both, and the need to show irreparable harm --

18   in a final context, I believe that the Federal Circuit

19   would have no difficulty finding that what is necessary is

20   that the strong causal nexus relates the proven harm to

21   the proven infringement as opposed to the alleged harm to

22   the alleged infringement, but it is the same causal nexus

23   that must exit.

24        There's nothing in this opinion that suggests in

25   any way, shape, or form this sort of limited reading, and

1  there's nothing that I'm aware of in any commentary since

2  that --

3          THE COURT:  I don't know that it's a limited

4  reading.  It's a different analytical approach to the

5  impact, I think.

6          MR. THOMASCH:  I understand.  Our position on

7  this, Your Honor --

8          THE COURT:  I mean according to your --

9          MR. THOMASCH:  In this context, there's nothing

10  in the opinion that suggested, and the Federal Circuit has

11  said that in both the situation involving preliminary

12  injunctions and permanent injunctions in a patent case,

13  the *eBay®* factors are -- must be applied, and the *eBay®*

14  factors are what this was about.

15          THE COURT:  I don't think there's any question

16  that the factors have to be applied.  In fact, that's the

17  fundamental meaning of the Supreme Court's decision in

18  *EBay®*, I understand.  That's not what I'm asking.

19          I'm asking you whether the analytical calculus is

20  not different between how -- you can measure the harm and

21  the causal connection at the preliminary stage versus the

22  final stage.  That is how you measure it, not whether you

23  measure it.

24          MR. THOMASCH:  Well, here, the question really

25  becomes whether or not there needs to be a measurement,

1    because if there needs to be a causal nexus, it doesn't

2    exist in this record, and so the only --

3           THE COURT:  That's your point, is that isn't a

4    causal nexus shown in the record.

5           MR. THOMASCH:  There is nothing shown in the

6    record, and, indeed, Your Honor, I believe that the way in

7    which you would look at it, there is a concession that is

8    dispositive in this case.  In the Apple case, the Federal

9    Circuit said, Apple has presented no evidence that

10   directly ties consumer demand for the, what is the Samsung

11   Galaxy nexus to its alleged infringing feature.

12          Now, our situation here, it's different because

13   we have concessions made in the record that the demand for

14   the product, the demand for the module that is necessary

15   in order for there to be an infringement, which is

16   Punchout -- if you don't have Punchout, you don't have

17   either configuration three or configuration five, but

18   Punchout does not drive demand for the product, and this

19   goes to irreparable harm, and I base that first on an

20   absence of any proof in the record that there is such a

21   demand, and secondly, on statements made, particularly at

22   paragraph 51 of ePlus's proposed findings of fact at the

23   injunction stage, which is docket 641, I believe.

24          EPlus argued for an injunction that not all of

25   Lawson's customers have procurement Punchout.  Procurement

1   Punchout does not drive S3 sales, and Lawson has never won

2   a sale merely because of its Punchout product.

3           It went on in the same document to say that there

4   was no evidence that, quote, any customer would not have

5   purchased an S3 system if Lawson did not offer procurement

6   Punchout and that that not all customers that have

7   Punchout make use of it.

8           At that time, at that time, ePlus was attempting

9   to argue the balancing-of-equities factor and to say,

10  look, there isn't even going to be much harm to Lawson

11  from an injunction that captures within Punchout, because

12  Punchout doesn't drive anything.  People don't buy this

13  because of Punchout, there's no showing that there's any

14  sales that are Punchout-dependent, and people who have

15  Punchout don't necessarily use it.

16          Those facts were marshalled by ePlus for a

17  different purpose.  They were marshalled by ePlus to say,

18  so it's no big deal to Lawson if you enter an injunction,

19  but the facts are the facts.  It doesn't matter why they

20  said those facts exist.  Their factual statements,

21  proposed findings of fact based on the trial record was

22  that Punchout was not driving sales.

23          THE COURT:  What pages in docket 461 are you

24  talking about?

25          MR. THOMASCH:  I believe it's at page 25, Your

1    Honor.

2              THE COURT:  You said it was at several pages.

3              MR. THOMASCH:  I indicated that there were

4    paragraphs 51 through 53, and I think in the corrected

5    findings of -- proposed findings, that appears in the

6    record at DI-707-1.  Those are the corrected findings.

7    It's paragraphs 51 to 53.  Indeed, one of the

8    affirmative --

9              THE COURT:  Docket number what was the second

10   one?

11             MR. THOMASCH:  Second one, the corrected one, was

12   707-1.

13             THE COURT:  All right.

14             MR. THOMASCH:  Another point made in paragraph 53

15   was only ten or 11 percent of Lawson's customers even have

16   this, and so, again, the flip side of that coin is

17   relevant here where if you look at configuration three,

18   it's configuration two plus Punchout, and it's conceded

19   that we can compete on configuration two.  All that

20   competition is in the marketplace.

21             There's no evidence in this record that I'm aware

22   of, and no evidence that ePlus has cited, that ePlus has a

23   Punchout-only module that it sells in competition with

24   Punchout.  What it has is Content+ and Procure+ which it

25   described as being in competition for people who wanted to

 1   add on to the underlying core to add RSS and Punchout.

 2          They said, well, if you wanted to add RSS and

 3   Punchout, we would have a product to sell.  But, of

 4   course, if you have configuration two, and, indeed, there

 5   are individuals in this case there was testimony about who

 6   do have configuration two and then later add on Punchout,

 7   and then they become a configuration three customer.

 8          But if they have configuration two, they wouldn't

 9   go to Content+ or Procure+, because those are much bigger

10   products than the Punchout module only.  So there isn't

11   even a substitute product that has been alleged, but they

12   have made the point that those, that product, those

13   modules that are necessary for infringement in this case

14   do not drive the sales, and so the infringement analysis

15   on claim 26 -- claim 26 requires that use of those

16   modules.

17          The same analysis would apply with regard to the

18   add-on module of EDI which is, frankly, almost never

19   mentioned.  If you go through the submissions that ePlus

20   made, it's very, very rare that there's any reference to

21   Punchout or EDI except in the paragraph 51 to 53 and in

22   the very beginning where they have an introduction in a

23   couple of paragraphs that say, all of these configurations

24   infringe all of these claims.  That's our point, Your

25   Honor.

1        Now, assuming we are correct that the record
2   doesn't contain evidence that would justify a finding of
3   an injunction under the four-factors test, then we don't
4   get to the alternative argument that the injunction would
5   be dissolved *ab initio*.  And we do think that is
6   appropriate, and it's more than just because of the Apple
7   test.  It really is that fundamentally they don't meet any
8   of the findings.  The briefing sets that forth as to why
9   the record --
10        THE COURT:  Before you get, move to another
11   point, I seem to recall that there was a petition filed in
12   Apple.  Is it pending or not?  It may have been that what
13   I've read is there was no petition filed.  I can't recall.
14   Do you know, Mr. Krevitt?
15        MR. KREVITT:  Your Honor, if I may, there was a
16   petition filed by Apple.
17        THE COURT:  There was.
18        MR. KREVITT:  There was, Your Honor.
19        THE COURT:  Has it been dealt with?
20        MR. KREVITT:  It has, Your Honor.  In January of
21   this year, that petition was denied.
22        THE COURT:  Okay.
23        MR. KREVITT:  If you mean a petition to the
24   Supreme Court --
25        THE COURT:  A petition for a writ.

1    MR. KREVITT:  I'm sorry.  There has not been.

2    THE COURT:  Has the time run?

3    MR. KREVITT:  There will not be.  There's no

4    intention to file a writ to the Supreme Court.

5    MR. THOMASCH:  Two small points before we move to

6    the alternative argument.  One, what is replete through

7    ePlus's brief is that there is evidence in the injunction

8    record that relates in some way to claim 26 and that we

9    haven't shown, Lawson hasn't shown that that evidence

10   doesn't relate to claim 26.

11   We don't deny that there was evidence put in

12   generally as to all five, that was as to all the

13   configurations and all the claims, and essentially what it

14   was was competition for eProcurement systems.  That's what

15   was being dealt with, Content+ and Procure+ versus

16   configurations two, three, and five.  And that's what the

17   record shows, and there is nothing that you could go into

18   that record and segregate out and say, okay, I see, this

19   particular product, for instance, was only deemed to

20   infringe one patent, and because that claim has been

21   invalidated, we can take that out.

22   That's fine if it's nice and clean and severable,

23   but there's nothing severable about what's in there on the

24   '683 patent.  The '683 patent was in there with respect to

25   the underlying system claim and the competition for the

1    eProcurement systems, and ePlus did not attempt to make

2    any record that there was specific competition that

3    related to the method of using the system that is patented

4    in claim 26.

5            And that's what they needed to do then, or Your

6    Honor gave them an opportunity now to come back and point

7    you to that specific evidence, and I believe you even

8    invited them to try to come forward with evidence that

9    could have been put in the record in 2011 had everyone

10   understood the real set of facts which is that, indeed,

11   the system claims don't matter because those patent claims

12   are invalid, and claims 28 and 29 don't matter because

13   those claims weren't actually proven to infringe, and this

14   all comes down to putting everything on the back of claim

15   26 alone.

16           They suggest that somehow they don't have to make

17   any such showing.  I suggest to Your Honor that that

18   absolutely is what they must do, and the fact that all the

19   claims supported the injunction, that is not at issue

20   anymore.  We don't have to deal with whether all the

21   evidence under all the claims supported everything you

22   enjoined, because everyone knows that the injunction has

23   to be modified in part because of the decision from the

24   Federal Circuit.

25           I would like to go back to the mandate issue,

1  Your Honor, and deal with that for a moment, and there's

2  only one case I want to raise in that regard because I

3  think it's so thoroughly on point, and that is *Amado v.*

4  *Microsoft* which Your Honor would find at 513 F.3d 1353.

5  That is a 2008 case from the Federal Circuit.  Amado sued

6  Microsoft and won.  They received an award of past damages

7  in the form of a royalty of four percent per unit that had

8  been sold up to the date, and going forward they received

9  a permanent injunction.

10        The District Court, however, stayed the

11  injunction and said that it would go into effect seven

12  days after the appeal was resolved or abandoned.  The

13  District Court also required that Microsoft put into

14  escrow a significant sum of money, more than the $0.04 per

15  unit, but actually I believe $2 per unit to put into

16  escrow so that if it turned out that Amado won the appeal,

17  there would be no doubt but that the money that would

18  relate to infringement during the time of the stay would

19  be available for Amado.

20        So Microsoft was continuing to sell goods that

21  had been found to be infringing.  The injunction against

22  doing that had been entered but stayed.  In effect,

23  damages were accruing in the event that the stay was of an

24  injunction that was proper.  So that's the procedural

25  situation as it goes up to the Federal Circuit.

1    When it went up to the Federal Circuit, Microsoft

2    said, we should have won on the merits, we shouldn't have

3    been enjoined, and Microsoft lost across the board, and

4    the mandate issued.  The only thing that the mandate

5    remanded the case to the District Court for was

6    disposition of funds held in escrow during the stay.

7    That's what the Court remanded it back for, disposition of

8    the funds.

9    Now, while the case was in the Federal Circuit,

10   *eBay®* came down from the Supreme Court, and when it got --

11   when the the case got back after the mandate from the

12   Federal Circuit, which was after *eBay®* was decided, it

13   goes back to the District Court, and Amado says, it's been

14   seven days, the injunction should go into place, and I

15   should receive the money held in escrow.

16   The District Court, however, extended the stay of

17   the injunction and said, I want to know whether or not the

18   injunction I previously issued was proper under the *eBay®*

19   factors, and there was a hearing.  After the end of that

20   hearing, the district judge said, no, without the

21   presumption that existed prior to *eBay®,* there shouldn't

22   have been an injunction.

23   So the judge indicated in that situation that he

24   was going to award damages for the time period under the

25   stay but dissolve the injunction thereafter.

1           It went back up to the Federal Circuit, and Amado
2   said, you can't do this -- the District Court couldn't do
3   this.  The injunction and the underlying merits were all
4   decided in our favor, and the mandate said nothing more
5   than dispense the funds held in escrow.  And the Federal
6   Circuit in the Amado case specifically stated, an
7   appellate mandate does not turn a district judge into a
8   robot.
9           They went on to talk about how the judge had
10  every right, broad discretion to at any time revisit
11  whether an injunction is proper under the law and that the
12  judge did the right thing, it was not an abuse of
13  discretion, and Microsoft prevailed on that appeal, the
14  injunction was dissolved, notwithstanding that nothing
15  about the injunction at all was in the mandate, and,
16  indeed, in the Federal Circuit decision, Amado won every
17  issue.
18          They were totally unlike this case where most of
19  the case was reversed or vacated and one claim against two
20  configurations was upheld.
21          I think what *Amado* ultimately says is that an
22  injunction is the application of facts to a legal
23  framework.  In *Amado*, the District Court looked and said,
24  you know, when I entered that injunction, I was working
25  with one legal framework, and that proved not to be

1    correct.  I need to look at whether the facts match up

2    with the right legal framework.

3              We are the flip side of that coin, Your Honor.

4    Your Honor applied a set of facts that existed after the

5    merits trial and the judgment in favor of ePlus which was

6    very broad.  You took those facts, and you applied it to a

7    legal standard.

8              Now, wholly apart from whether *Apple* has changed

9    the legal standard to make it even tougher, which I would

10   suggest it has, the facts have undeniably changed.  The

11   facts that you based it on, finding two system claims to

12   be infringed, finding configuration two to be infringing,

13   those facts available to Your Honor have been proved

14   inaccurate over time.

15             Now the question is, Your Honor has every right,

16   and whether or not it's mandated or not I don't think is

17   the question, because *Amado* says you are not a robot, you

18   have the right to do this, and I believe Your Honor will

19   do that which is right.

20             What is right is to look back and say, if the

21   right set of facts exist, why should Lawson be prejudiced

22   because an error in good faith was made about the validity

23   of two patent claims?  There's no reason that Lawson

24   should be prejudiced by that.  We should go back and look

25   at it without the erroneous information.  We should look

1    back and strip the record of everything that relates to

2    four of the five claims and one of the key configurations,

3    the configuration that is everything but the add-on

4    modules, and when you look at that, the issue is, is what

5    is left enough, and the answer is, it's not even close.

6    It's not even close.

7         If it wasn't for the contempt proceeding and

8    everything that's been built up about this, we wouldn't

9    have this issue.  It would be so readily apparent and so

10   obvious.

11             THE COURT:  How's that?  I'm not following.

12             MR. THOMASCH:  Because there's nothing there.

13   There is no showing that in any way, shape, or form there

14   was irreparable harm because Punchout and the ability to

15   use Punchout or use Punchout and EDI in a specific way

16   that allowed for the checking of inventory, which is, of

17   course, necessary for claim 26, that that step to check

18   inventory somehow affected the competitive relationship

19   between ePlus and Lawson.

20             Remember, the testimony is clear.  You can use

21   Punchout and use EDI and never infringe claim 26 because

22   either -- because the vendor that you are communicating

23   with may not have the capacity so send back something.

24             THE COURT:  I understand that, but that's not

25   what I was asking.  You say we wouldn't be here if it

1   weren't for the contempt proceedings.

2           MR. THOMASCH:  Because honestly, Your Honor --

3           THE COURT:  You mean they would have dropped the

4   contempt issue?

5           MR. THOMASCH:  What I was suggesting is I think

6   that the injunction here, any attempt to keep an

7   injunction after what the Federal Circuit did in light of

8   the law under the *eBay®* case and under the *Apple* case --

9           THE COURT:  It's just an effort to bootstrap the

10  reason to give a contempt citation.

11          MR. THOMASCH:  It is.  It's a hail Mary, Your

12  Honor.

13          THE COURT:  Is that what you are saying?

14          MR. THOMASCH:  Yes.  I believe that's all that

15  this comes down to, and if Your Honor, without regard to

16  whether you have to or not, if you simply say it is fair

17  to try to re-evaluate whether Lawson should have been

18  enjoined under the real facts where it's only claim 26

19  that is not invalid and infringed, I think then the answer

20  will resolve itself pretty quickly.

21          I think at the end of the day, they're hoping

22  that you continue to give them the credit for spillover

23  evidence that doesn't relate to claim 26 alone, doesn't

24  relate to Punchout or EDI alone, but relates to the 2011

25  framework in which total competition in eProcurement

1    systems was what was at issue.  That's no longer at issue,

2    Your Honor.

3              THE COURT:  All right.

4              MR. THOMASCH:  The alternative argument that I

5    don't believe the Court needs to or should reach in

6    today's -- in the context of this proceeding is if somehow

7    the record contains sufficient evidence to allow for an

8    injunction, or if Your Honor feels that you are not

9    mandated to do so and you choose not to do so even though

10   you absolutely have the right to, and you don't go back

11   and look at that and you say, there's going to be a

12   continuing injunction, then the question becomes, what is

13   the scope of that injunction, and I think that the obvious

14   things are that configuration two cannot be part of the

15   injunction.

16             It was supported only by an invalid claim of the

17   '172 patent.  I think that claims 28 and 29 cannot be part

18   of an injunction when they were not proven at trial, and I

19   think that it is equally self-evident that the sale of any

20   configuration, particularly remembering that the accused

21   infringing products that we have been talking about are

22   configuration three and configuration five, that's what

23   the injunction is, the whole configuration, that you

24   couldn't reasonably enjoin the sale of the full

25   configuration when there are absolutely substantial

1    non-infringing uses, and in that regard, Your Honor --

2              THE COURT:  Is that what you mean?

3              MR. THOMASCH:  Yes.

4              THE COURT:  Because you argue broader than that.

5    You argue you can't enjoin the sale at all, and that is

6    not what the -- I don't understand how the Federal Circuit

7    could have issued a decision that it issued if it didn't

8    understand that the injunction applies to the sale of what

9    was defined in the injunction, because the undisputed

10   evidence is the only way this product ever gets out to the

11   market is if you sell it.

12             MR. THOMASCH:  I understand.  I understand.

13             THE COURT:  And that argument that you make in

14   your brief is way too broad.  You are now narrowing it to

15   say that you can't enjoin the sale of configuration two

16   even if you find it's sufficient to enjoin the sale of

17   configuration three and five.

18             MR. THOMASCH:  That is not actually my argument,

19   Your Honor.  Configuration two I take off the chart

20   without regard to contributory infringement on the

21   grounds --

22             THE COURT:  You mean of the elements that add on

23   to two to form three and five.

24             MR. THOMASCH:  Right.  What I would argue, Your

25   Honor, is that the injunction goes to configurations three

1   and five, and those configurations undeniably have

2   substantial non-infringing uses including everything that

3   can be done with configuration two can be done with three

4   and can be done with five.

5          Because there are undeniably substantial

6   non-infringing uses, then in that situation, a method

7   claim will not allow for an injunction against the sale of

8   a product, and it is important to me, Your Honor, that

9   when the Federal Circuit looked at the liability under

10  claims 26 and it said Lawson was liable, the Federal

11  Circuit full well knew that we sold the product.

12         The Federal Circuit said that there was evidence

13  to show that Lawson itself infringes claim 26.  This is at

14  page 520 to -21 of the been, 700 F.3d 509, 520 to 212.

15  The Court continued, in particular, there is evidence that

16  Lawson installed, maintained, demonstrated, and managed

17  the infringing systems for its customers.  That's what the

18  court said.

19         The Court didn't say that the sale was an

20  infringement of claim 26, and the sale is not an

21  infringement of claim 26 if there is a substantial

22  non-infringing use which there are.

23         Your Honor has previously said --

24         THE COURT:  Who is it that testified that there's

25  a non-infringing use, and what is the non-infringing use

1   that you are referring to?

2          MR. THOMASCH:  The non-infringing use that I'm

3   referring to includes but is not limited to every use --

4          THE COURT:  You have to give me everything.

5          MR. THOMASCH:  It is every use of configuration

6   two.  Anything that you can do with configuration two you

7   can do with configuration three and configuration five,

8   and when you do that, when you do that, you are not

9   infringing a valid patent claim, and on that there can be

10  no dispute.

11         The fact there were substantial uses to

12  configuration two is not in reasonable dispute.  There was

13  an entire trial over the infringement of configuration

14  two.  The jury found -- heard about the uses of

15  configuration two.

16         THE COURT:  I understand.  I just was asking.

17  Who testified to all that?

18         MR. THOMASCH:  I believe --

19         THE COURT:  What evidence am I going to use to

20  find that there's a non-infringing use?

21         MR. THOMASCH:  I believe it is self-evident from

22  the fact that configuration two was previously accused and

23  found to be infringing and was enjoined by Your Honor.

24  You would not have enjoined it unless there was a use to

25  the product, and now competition in configuration two is

1   permissible.

2           The test for substantial non-infringing use is

3   exceedingly low, and what needs to be shown is just that

4   there's some basis in reality for a belief that someone

5   could use the product for that purpose.

6           This is in addition to configuration two, when

7   just using three and five, you can certainly check stock

8   items or check specials, or you can use it with a vendor

9   that does not have the capacity to send back and does not

10  send back a confirming message on inventory.  And in all

11  of those situations, there is no infringement, because you

12  haven't practiced all of the steps of claim 26.

13          That was admitted by Dr. Weaver, and it was the

14  subject of -- it is the subject of testimony, and on the

15  issue of burden, Your Honor, it is very important here.

16  Your Honor made a comment during Dr. Weaver's testimony

17  that it was somehow Lawson's burden to establish

18  non-infringing uses.  The law is to the contrary, Your

19  Honor.  It is directly --

20          THE COURT:  It is your burden to bring up the

21  non-infringing use.  There isn't any question about it.

22  You have to identify it as an issue, and then what happens

23  with respect to the burden of proof is different, but the

24  burden of bringing it forward is yours.  They do not have

25  to come in and prove every non-infringing --

1  non-infringing uses in order to prevail.

2          MR. THOMASCH:  It is our position -- I understand

3  Your Honor disagrees with it.  It is position that the

4  language of 271(c) is quite specific --

5          THE COURT:  Is that the authority on which you

6  are basing the argument?

7          MR. THOMASCH:  Our authority in addition to

8  271(c), plain language, is *Toshiba v. Imation Corp.,* 681

9  F.3d 1358, Federal Circuit 2012 at pages 1362 to 1363.

10          THE COURT:  Is that in the briefs?

11          MR. THOMASCH:  I do not --

12          THE COURT:  I don't see it cited.

13          MR. THOMASCH:  I do not believe Toshiba is,

14  because this question of burden --

15          THE COURT:  What's the citation again?

16          MR. THOMASCH:  The citation is 681 F.3d 1358 at

17  1363, Federal Circuit 2012, and I would read one brief

18  point and that is, the Court stated, the Federal Circuit

19  stated, we agree with appellees, the alleged infringers,

20  the infringers.  We agree with appellees that Toshiba --

21  I'm sorry.  I'm sorry, Your Honor.  Let me change that.

22          The statement is, we agree with appellees that

23  Toshiba failed to proper evidence that creates a genuine

24  issue of material fact.  Because Toshiba had the burden to

25  prove the lack of substantial non-infringing uses, Toshiba

1   was required to put forth evidence showing that the use of

2   unfinalized DVDs was not substantial.

3   Toshiba is the patent holder and the plaintiff in

4   the case, and the Federal Circuit said Toshiba had the

5   burden to prove the lack of substantial non-infringing

6   uses, and the Federal Circuit was not creating new law.

7   It cited Golden Blount, Inc., v. Robert H.

8   Peterson Co., at 438 F.3d 1354, 1363, Federal Circuit

9   2006.

10   So we did bring the matter to the Court's

11   attention on this motion.  This issue about sale, if there

12   is going to be an injunction, can it cover the sale of

13   configurations where the configurations as a whole have

14   substantial non-infringing uses.  We briefed that in both

15   of our briefs.  That has never been, in any way, shape, or

16   form, a matter of surprise whatsoever.

17   The response has been largely that the systems

18   don't have substantial non-infringing uses because the

19   Federal Circuit didn't go to that argument in its opinion.

20   With regard to all of the uses that derive from

21   configuration two, that you can use configuration two, the

22   substantial non-infringing use didn't exist until the

23   Federal Circuit decided the case on November 21st.  At

24   that point, it said, in effect, competition in regard to

25   configuration two is permissible, and we know that

1    configuration three and five do everything that two does.

2    Those are uses of the enjoined configurations that are not

3    infringing, and so it's absolutely clear in that regard.

4         There isn't a dispute, but the burden is to show

5    we've raised the issue, and the evidentiary burden would

6    be on the plaintiff to show that there is no substantial

7    non-infringing use, and they can't do that.  The testimony

8    of their own witness indicated that on specials, on stock

9    items, and with vendors that do not have the requisite

10   electronic technology, you can't infringe claim 26 even if

11   you are using configuration three and configuration five.

12        So this part of the motion comes up under the

13   Rule 60(b)(5) element applying it prospectively is no

14   longer equitable.  It is longer equitable to ignore the

15   uses of configuration two in light of the Federal

16   Circuit's decision of November 21st of last year.

17        Finally, Your Honor, I just want to note one last

18   argument that I think need not take long to address, but

19   at page 21 of the opposition brief, ePlus argues in the

20   middle of page 21, quote, indeed, under Lawson's argument,

21   ePlus would have no remedy at all for Lawson's affirmed

22   infringement of claim 26.

23            THE COURT:  That's right, isn't it?

24            MR. THOMASCH:  That's not right.

25            THE COURT:  The only thing they can do is sue you

1    down the road.

2            MR. THOMASCH:  They absolutely can sue us down

3    the road.

4            THE COURT:  That's their point, I think.

5            MR. THOMASCH:  They can sue us for willful

6    infringement.  They can sue us for treble damages.  They

7    could have chosen, but didn't -- I mean, you gave them an

8    option, and I would suggest there were two options

9    available to them after the Federal Circuit decision.

10           One option was to try to put evidence in the

11   record that would justify an injunction.  It's not good

12   enough, Your Honor, to say, I had the opportunity to do so

13   but I declined, because why do I need to put anything in

14   the record?  You can't leave me remedy-less.

15           I mean, that's not an effective argument.  If

16   they are not entitled to a particular remedy, in this case

17   injunction, then they don't get it.  Whether that leaves

18   remedy-less or not doesn't matter.  The question is, are

19   they are entitled to an injunction, and under the facts

20   that are accurate and the law that is current, they are

21   not.

22           THE COURT:  I know, but the point is, it does

23   leave them without a remedy.

24           MR. THOMASCH:  They could have -- they could have

25   chosen -- I don't think --

1          THE COURT:  Isn't that right?

2          MR. THOMASCH:  I don't think it is without a

3     remedy, because they have a patent claim that has been

4     adjudicated, so we wouldn't, for instance --

5          THE COURT:  It leaves them without a remedy in

6     this case.  You have to acknowledge that.  Can they do

7     something else?  Can they bring another suit?  Of course

8     they can bring another suit.

9          MR. THOMASCH:  Yes.

10          THE COURT:  That's not the point that they are

11     making.  Whether or not that is relevant is a different

12     issue.

13          MR. THOMASCH:  But this question about the

14     injunction, this is a question about the injunction that

15     was written against RSS in May of 2011.  This is not a

16     question that's linked into the contempt case necessarily.

17     This is really about the original injunction was based on

18     a finding of infringement.  The finding of infringement

19     was substantially reversed or vacated, and we brought --

20     before there was a contempt proceeding, we brought a

21     motion asking for dissolution or modification.

22          THE COURT:  What?  Before there was a contempt

23     proceeding?

24          MR. THOMASCH:  Before there was a hearing on the

25     contempt proceeding.

1        THE COURT:  Okay.

2        MR. THOMASCH:  That existed independently.  We,

3   for instance, are in a situation where because claim 26

4   has been valid and infringed, and because of what the

5   Federal Circuit said on it, if an injunction doesn't issue

6   right now, if there's no injunction, we're not somehow

7   free to go back to RSS and use it.

8        We would love to go back to RSS, at least the

9   functionality of Punchout.  The functionality of Punchout

10  we would love to restore, but we're not going to restore

11  that, because the Federal Circuit has said doing so and

12  then maintaining that and servicing that, that would be an

13  infringement, and we don't want to be sued for treble

14  damages.

15       THE COURT:  The point, I suppose, that bears some

16  consideration in this is that there's evidence in the

17  contempt proceeding that you are using and were using RSS,

18  and what you did, in essence, is set up a mechanism, your

19  design-around, set up a mechanism in which you knew well

20  that simply by changing some tabs, all you had to do, if

21  you were a customer, to use RSS was to do that and you

22  could use it, and you all put something in front of it to

23  insulate it.

24       That's one inference that could be drawn, and

25  you, therefore, are continuing to allow by what you have

1    done and by not saying, you can't do this this way

2    notwithstanding that conceptually it can be done by

3    running in parallel, that you are in continued violation

4    of infringement right now, and that, therefore, an

5    injunction is appropriate.

6         MR. THOMASCH:  I think that inference is entirely

7    unwarranted and contrary to the evidence --

8         THE COURT:  I understand there's another side to

9    it.

10        MR. THOMASCH:  Thank you.  There is another side,

11   and we'll present it --

12        THE COURT:  I didn't make any finding.  You can't

13   have sat through the testimony I sat through and not

14   understood that that argument is there.

15        MR. THOMASCH:  I understand that argument is

16   there, and I understand full well the facts about it.

17        THE COURT:  I understand the other side of it,

18   too.

19        MR. THOMASCH:  If you presuppose for the purposes

20   of argument that that constituted infringement, that that

21   was the use of RSS in an infringing way, then they would

22   have a lawsuit against us, and they'd have a lawsuit for

23   treble damages against us.  We don't get a free ride out

24   of this.

25        THE COURT:  And they could reach back for how

1   long?

2          MR. THOMASCH:  Six years.  They could reach back

3   for six years.  They could capture every action that's at

4   issue.  They could have discovery about it, they could sue

5   us for treble damages.  They could say it's an exceptional

6   case because we did so after all of this evidence, and

7   they could seek their fees.  There is a whole raft of

8   things they could do, and I will tell you --

9          THE COURT:  That wraps up your argument, does it?

10          MR. THOMASCH:  Yes, it does, Your Honor.

11          THE COURT:  And it could be assigned to another

12   judge is the end of the argument.  Did you have anything?

13   I think you made your point.

14          MR. THOMASCH:  I do want to note, Your Honor,

15   that at the time of the injunction, they had a right to

16   ask Your Honor, and Your Honor had every authority under

17   Federal Circuit law, *Paice v. Toyota* being a leading case

18   in this regard, Your Honor could have imposed an ongoing

19   royalty in this case had you sought -- had you wanted to

20   do so.

21          You had the power to do that.  That existed.

22   They intentionally declined that.  What they've done is

23   take all the traditional remedies that would be available

24   in their situation, and they've either disqualified

25   themselves from it by their own discovery misconduct, or

1    by election they have said, don't give me lesser remedies

2    so that they can say, I want a huge remedy, and I want

3    injunctions, and I was disgorgement for violations of

4    injunction, I want all of this, and if you don't give me

5    that, Your Honor, I'm some pathetic orphan --

6              THE COURT:  They are making the orphan argument.

7              MR. THOMASCH:  Yeah, they're making the orphan

8    argument, and the orphan argument is an unattractive

9    argument, and it does a disservice to orphans everywhere,

10   Your Honor.

11             THE COURT:  We are going to take a recess because

12   I have to go now judge whether we're going to have a

13   suitable flooring in our elevator, so we'll be 25 minutes.

14

15             (Brief recess.)

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  All right.

2    MR. STRAPP:  Your Honor, we have some slides

3    to hand up.

4    THE COURT:  Thank you.

5    MR. STRAPP:  And I want to start with slide

6    2.

7    Your Honor, I think that the one thing that

8    we don't dispute because there's a lot that is in

9    dispute is that this is Lawson's motion.  They are the

10   ones who filed this Rule 60(b) motion.  And, of

11   course, since they filed the motion, they are the ones

12   who bear the burden here.  It's their burden to show

13   that Rule 60(b) should be invoked by Your Honor to

14   either, as they request, dissolve the injunction *ab*

15   *initio* or to modify the injunction.

16   THE COURT:  There are two questions.  One is

17   the Federal Circuit has said I have to consider how to

18   modify the injunction.  It didn't say whether to

19   modify it.  It said how, right?

20   MR. STRAPP:  Right.

21   THE COURT:  And then in addition to that,

22   they filed a motion to dissolve the injunction, and

23   they say that's the way of getting it on the table.

24   So I'm not quite sure exactly what burden lies at

25   juncture.

1    MR. STRAPP:  Well, I think, Your Honor, if

2 you look at the mandate from the Federal Circuit, what

3 it directed Your Honor to do, it set out the last

4 sentence, it says, We remand for the District Court to

5 consider what changes are required to determine the

6 injunction consistent with this opinion.  In all other

7 respects, we affirm.

8    I think certainly if the Federal Circuit had

9 in mind dissolution of the injunction in its entirety

10 or *ab initio*, as Lawson's urges Your Honor to do, it

11 would have said so.  That's nowhere, I don't think,

12 found anywhere in the Federal Circuit's opinion in the

13 *eBay* case, and I think that to the extent that

14 Lawson's wants to prevail on that request to dissolve

15 the injunction *ab initio*, it's their burden to do so.

16    In light of that burden, what I found

17 surprising personally was that when we were on a call

18 with Your Honor regarding this motion and whose burden

19 it was, Your Honor asked Mr. Thomasch on behalf of

20 Lawson whether they requested an evidentiary hearing

21 or whether they requested to put in some evidence to

22 meet the burden that they have under this Rule 60(b)

23 motion.  And Lawson suggested that they needed no new

24 evidence and they required no evidentiary hearing to

25 meet the burden to show that they are entitled to the

1   relief of dissolving this injunction, even though

2   there is no hint in the ePlus Federal Circuit opinion

3   that dissolution of the injunction is the appropriate

4   course for Your Honor to take.  I just want to start

5   with that.

6           Now, Your Honor, I think given the nature of

7   Lawson's request here, which is let's start over from

8   scratch, get rid of the injunction, and then, ePlus,

9   go file a new patent lawsuit and we'll start over.  We

10  understand you have no relief here, but let's just

11  start the whole thing over from scratch and forget

12  about what happened.  I think what's interesting is

13  that in light of that premise, which seems a little

14  bit extreme and radical, you would think that there

15  would be some support in the case law for following

16  this course of action.

17          But, Your Honor, the cases that were

18  mentioned during the oral argument and the cases that

19  are mentioned in Lawson's brief are scant of any

20  support for the notion that in a situation like this

21  that you, first of all, you need to reevaluate the

22  four factors at all.

23          In fact, Lawson hasn't cited a single case in

24  which a court faced with this situation, a district

25  court who had a mixed appeal decision where it was

1221

1    reversed in part, affirmed in part, and remanded for

2    further consideration, in that kind of situation there

3    is no case post *eBay* where a district court has said

4    "I need to rehear and understand and reevaluate all

5    the evidence that came in that was in support of my

6    *eBay* injunction decision and determine whether that

7    injunction is still appropriate in light of that

8    evidence."

9           That's simply a course of action being urged

10   by Lawson without precedent or without support in the

11   case law.  I think, in contrast, what's interesting is

12   there's cases in which courts have taken the opposite

13   approach.  And if I could just direct your attention

14   to slide 15.  There are several instances we found in

15   cases similar to this where the Federal Circuit

16   affirmed in part and reversed in part and vacated to

17   the district court to consider what further changes

18   were necessary to an injunction that had already been

19   issued.  And in each of those cases, the ones we cite

20   here are *Pfizer*, *MPT*, and *Broadcom*.  In each of those

21   cases, the district court didn't conduct a new

22   evidentiary hearing on the propriety of an injunction

23   in light of the evidence that had formerly been

24   adduced, but instead went ahead and blue penciled the

25   injunction order that was already in place and took

1222

1   out, for example, a claim that had been found invalid

2   or took out, for example, a claim that was determined

3   not to be infringed by the Federal Circuit.

4           That's the course of action that seems most

5   straightforward and that's been endorsed by all the

6   cases that we've seen in the post *eBay* decision-making

7   universe.

8           Lawson has certainly cited nothing to the

9   contrary in support of the radical proposition that we

10  need to reevaluate in its entirety the whole body of

11  evidence that came in before Your Honor during the

12  proceeding two years ago.

13          Lawson also hasn't cited any case that would

14  suggest that in a circumstance like this the

15  appropriate coursed of action is to just dissolve *ab*

16  *initio*, as Mr. Thomasch put it, the injunction.

17          In fact, the only case that Mr. Thomasch

18  mentioned on this point in his argument was this *Amado*

19  case.  Now, the *Amado* case, it's an interesting case

20  because, as Mr. Thomasch points out, it was decided

21  right around the time of *eBay*.  So when the district

22  court proceedings were ongoing and evidence was coming

23  in regarding whether or not an injunction was

24  appropriate, that district court didn't have the guide

25  of the Supreme Court's *eBay* decision.

1223

 1     I don't think it's a surprise that when the
 2  case was remanded to the district court, the district
 3  court said, Well, I have new directive and
 4  instructions from the Supreme Court about how I must
 5  go about interpreting and evaluating evidence
 6  regarding an injunction.
 7          And that in instance, the district court
 8  decided it was appropriate to conduct an evidentiary
 9  hearing.
10          THE COURT:  *EBay* come down after the mandate
11  of the Federal Circuit?
12          MR. STRAPP:  Yes, *eBay* came down in the
13  intervening period between the injunction being
14  initially entered by the district court and the
15  Federal Circuit's decision.
16          THE COURT:  The Federal Circuit's mandate
17  said, Go collect the money that's in escrow.
18          MR. STRAPP:  Right.
19          THE COURT:  In the meantime, then out came
20  the Supreme Court's decision in *eBay* that changed the
21  legal landscape by which the injunction was to be even
22  considered.
23          MR. STRAPP:  That's correct.  And because the
24  district court reconsidered the injunction evidence in
25  light of *eBay*, I think it makes -- it's entirely

1224

1  understandable why the district court did that.  There

2  was this intervening decision.  But what's interesting

3  is if you look at the seven years post-*eBay* because

4  *eBay* was decided by the Supreme Court in 2006, there

5  hasn't been any other case that we've seen that we are

6  aware of where there's this kind of decision from the

7  Federal Circuit, and then the district court gets the

8  case back and starts going through all the injunction

9  evidence again.  There's not one case that we're aware

10  of.  And we've cited cases where that hasn't happened.

11        Now, I think, you know, what's also

12  interesting, and I guess it's sort of the flip side of

13  the same coin is that Lawson hasn't cited any decision

14  that would suggest that when a case comes back down

15  from the Federal Circuit in these circumstances, that

16  you have to sort of scrub over and take a look at what

17  evidence had come in and decide and parse whether that

18  evidence supported the part of the verdict that still

19  stands after the Federal Circuit decision.  That makes

20  sense here especially.

21        When the injunction proceedings took place

22  back in March 2011 and April 2011 and there was

23  extensive evidentiary hearing, briefing, findings of

24  fact, and eventually led to a 63-memorandum opinion

25  from Your Honor on May 23, 2011, that evidence,

1 contrary to the suggestion in Lawson's brief, wasn't

2 focused on the system claims, wasn't focused on Claim

3 One of the '172 Patent.

4       The evidence came in in its entirely and

5 considered all of the patent claims that were then

6 found to be infringed, all five of them, as well as

7 the three system configurations that were at issue.

8 Configurations 2, 3 and 5.

9       Now, had it been the case back in March 2011

10 that Lawson decided, ePlus, you met your burden on

11 configurations 2 in the system claims, but you didn't

12 bring out any evidence with respect to configurations

13 3 and 5 or Method Claim 26.  So to the extent an

14 injunction is to be entered, it should be limited just

15 to the system claims in configuration 2.  That's an

16 argument they could have made and apparently that's an

17 argument they should have made by their own admission

18 because, according to Lawson, there wasn't sufficient

19 evidence in the record to support even at that time an

20 injunction that would have applied to Claim 26 and to

21 configurations 3 and 5.

22       But no such argument was made either before

23 the injunction issued or after in a motion that Lawson

24 filed to modify and to clarify the injunction.  That

25 was an argument that was never raised.  That's a new

1   argument that's newly minted after the Federal

2   Circuit's decision in which Lawson attempts to take a

3   large record body of evidence and say it only applies

4   to system claim or it applies primarily to system

5   claims and could not support an injunction that would

6   apply to Method Claim 26 and configurations 3 and 5.

7          I'll discuss in a little bit why we believe

8   that's not the case and why the evidence that was

9   adduced back two years ago supports an injunction that

10  would apply to configurations 3 and 5 in Claim 26.

11         Now, Your Honor, an argument that was made in

12  the alternative by Lawson and by Mr. Thomasch today is

13  that if the Court does not dissolve the injunction *ab*

14  *initio*, that the injunction should be modification.

15         The primary justification for Lawson's

16  request to modify the injunction is that it should be

17  permitted to sell configurations 3 and 5 to its

18  customers.

19         Now, it makes this argument notwithstanding

20  the Federal Circuit's finding that there's

21  infringement of Claim 26 both by Lawson and by its

22  customers.  But Lawson says, notwithstanding that

23  finding of the Federal Circuit, we should be permitted

24  to go ahead and continue selling configurations 3 and

25  5 to our customers.

1227

1    First of all, it just sort of defies logic

2  that they should be permitted to go sell

3  configurations that will be used by their customers to

4  infringe Claim 26 when we know that infringement is

5  ongoing, both by Lawson and its customers, but it also

6  doesn't make sense as a matter of law.

7    If I could direct Your Honor's attention,

8  please, to slide 13.  On slide 13, what we've done is

9  collected some of the cases that appear post *eBay* in

10 which district courts have entered injunctions that

11 prohibit the sale of products that are used to

12 infringe method claims.  This is slide 13.

13   And what's interesting here is that the

14 premise of Lawson's legal argument for their

15 alternative argument is that if all that's at issue

16 here is a method claim, which concededly that's all

17 that is at issue, it's Claim 26, that an injunction

18 can't reach so far as to prohibit sales of a product

19 that's used to practice that method claim.

20   Well, that's wrong for a few reasons, but we

21 know it's wrong, too, when we see that there's

22 district courts affirmed by the Federal Circuit in

23 several instances in the post *eBay* world that have

24 done exactly what Lawson is saying Your Honor cannot

25 do as a matter of law.

1   Eye for Eye is one example.  *Tristata*, the

2   argument was specifically raised and rejected.   So

3   this is another instance, I think, where Lawson is

4   urging Your Honor to take --

5   THE COURT:  What case?

6   MR. STRAPP:  Well, on slide 13, the first

7   case that's on slide 13 is a case called *Tristata*,

8   T-r-i-s-t-a-t-a.

9   THE COURT:  I just didn't hear what you were

10  saying.

11  MR. STRAPP:  Right.  In that case, the same

12  argument was made there as is being made by Lawson,

13  which is an injunction can't reach so far as to

14  prohibit sales.  That argument was raised and was

15  rejected.  The Federal Circuit has affirmed --

16  THE COURT:  How does any of the configuration

17  3 or 5 ever get maintained, installed, serviced, etc.,

18  if it's not sold?  How does that ever happen?

19  MR. STRAPP:  That's another reason --

20  THE COURT:  What's the record on that?

21  MR. STRAPP:  There is no record evidence

22  whatsoever that there's ever been a configuration of

23  any of the software sold that wasn't also maintained

24  and serviced.  That's part of the contract.  If --

25  THE COURT:  Beyond what's not there, the

 1    evidence is that Lawson sells these configurations,

 2    and that it does so by way of a license agreement, and

 3    that attached to the license agreements often are

 4    maintenance agreements, correct?

 5              MR. STRAPP:  That's correct, Your Honor.

 6    And, in fact, that's what the Federal Circuit found at

 7    pages 520 and 521 of its opinion.  It said there that

 8    the record contains substantial evidence to show that

 9    Lawson itself infringes Claim 26.  In particular,

10    there is evidence that Lawson installed, maintained,

11    demonstrated, and managed the infringing systems.

12              THE COURT:  But they draw comfort from the

13    language that you just quoted by virtue of the fact

14    that it does not mention sales.

15              MR. STRAPP:  And I think it's interesting

16    that they do draw comfort from that because the only

17    portion of the opinion, the Federal Circuit opinion,

18    that actually addresses the arguments that were made

19    with respect to the injunction, because you'll recall,

20    Your Honor, that Lawson appealed several issues to the

21    Federal Circuit.  Some had to do with infringement of

22    the method claims.  Some of the arguments were related

23    to the invalidity of certain claims.

24              Now, other arguments were directed to Your

25    Honor's injunction.  And there's a section of the

1230

1    Federal Circuit opinion that addresses those

2    arguments.  That's at pages -- that's at page 522 of

3    the Federal Circuit's opinion.

4         After discussing at length why it's going to

5    reject Lawson's arguments with respect to the scope of

6    Your Honor's injunction, there's a sentence at the end

7    that I think is very interesting that Lawson hasn't

8    mentioned in any of its briefs.  And what it says

9    there is it says, rejecting Lawson's arguments that

10   somehow Lawson was authorized to actually sell the

11   products, it says, It just so happens that because of

12   the district court's enforcement of the discovery

13   rules, ePlus was not permitted to present any evidence

14   of damages.

15        That does not mean that Lawson was authorized

16   to sell products that infringe ePlus's patents.  So I

17   think it's interesting.  I don't think that the

18   Federal Circuit could have been any clearer in a

19   section where they are discussing the injunction, they

20   say specifically, the panel says, There is no

21   authorization for Lawson to sell the products.  It's

22   not in the section that concerns Claim 26.  It's in

23   the section of the opinion that concerns the

24   injunction.

25        I would urge Your Honor to focus on that

 1   particular section when you consider whether or not

 2   Lawson's request to modify the injunction and permit

 3   them to sell the product is appropriate.

 4          Now, on the issue of contributory

 5   infringement, I'd like to turn to slide 3, please.

 6   What Lawson is essentially asking for --

 7          THE COURT:  Slide what?

 8          MR. STRAPP:  Slide 3.  The legal basis, I

 9   think, of Lawson's alternative argument regarding its

10   request for permission to sell configurations 3 and 5

11   even though its customers will then use those

12   configurations to infringe Claim 26, is the notion

13   that it should be permitted to do so because that sale

14   wouldn't somehow infringe Claim 26.  That sale alone

15   because Claim 26 is a method claim.  That's their

16   legal argument.

17          Now, that legal argument, I think it's wrong

18   for a few reasons, but let me just first suggest that

19   it's wrong because if Lawson is selling configurations

20   3 and 5 to its customers, and its customers are using

21   configurations 3 and 5 to practice Claim 26, Lawson is

22   liable as a contributory infringer under Section

23   271(c).

24          At slide 6, we have reproduced the language

25   of Section 271(c) in its entirety.  271(c) says, in

1  part, "Whoever offers to sell or sells within the

2  United States a component of a patented machine,

3  manufacturer, combination or composition or a material

4  or apparatus for use in practicing a patented process,

5  and the word "process" there is directed -- and this

6  is at slide 6.  The word "process" is directed to a

7  method claim here.  Constituting a material part of

8  the invention knowing the same to be especially made

9  or especially adapted for use and not a stable article

10  suitable for substantial non-infringing uses shall be

11  liable as a contributory infringer.

12        Now, Lawson argues that this section is

13  irrelevant because there are substantial

14  non-infringing uses.  I think you posed the question

15  to Mr. Thomasch, Well, where is that in the record?

16  And Mr. Thomasch said, Well, it's self-evident.

17        Now, I understand Mr. Thomasch thinks it's

18  self-evident that there are substantial non-infringing

19  uses, and that's his read of the Federal Circuit

20  opinion, but I would submit that that isn't sufficient

21  to prove that there are substantial non-infringing

22  uses.

23        In fact, I would suggest that if we turn to

24  slide 8, you may recall that this issue actually came

25  up in the post trial proceedings.  Now, at the time of

1  the verdict, the jury had a verdict form that said, Do

2  you find direct infringement?  And do you find

3  indirect infringement either by contributory

4  infringement and/or inducement of infringement of

5  Claim 26?  And the jury checked yes.

6          So a JMOL was filed by Lawson that said that

7  is an inappropriate finding because there was no basis

8  on which the jury could or should have found that

9  Lawson is a contributory infringer with respect to

10  Claim 26.  Your Honor heard that motion and docket 787

11  rejected the argument.  You said, The jury heard and

12  received substantial evidence to support a finding of

13  indirect infringement on either an inducement or

14  contributory infringement basis.

15          At slide 10, what we've done is we've

16  produced some -- and I'm sorry I'm jumping around

17  here, but this is a little out of order.

18          On slide 10, what we have reproduced here on

19  the left side are quotes from Lawson's appeal brief to

20  the Federal Circuit.  The top is a brief they filed in

21  August 2011.  And the bottom quote is from a brief

22  they filed in February 2012.  And what's interesting

23  was that Lawson chose to appeal this issue.  After the

24  JMOL that was decided by Your Honor, Lawson said to

25  the Federal Circuit, ePlus did not prove that Lawson

1234

 1   is a contributory infringer and substantial evidence

 2   does not establish contributory infringement.

 3           Now, the Federal Circuit didn't expressly

 4   take this head-on one way or the other in its opinion.

 5   In fact, there's no mention of contributory

 6   infringement one way or the other, but if you turn to

 7   the end of the Federal Circuit's opinion, the very end

 8   of the opinion, after the conclusion, there's a

 9   footnote 2, and it says in the footnote 2, and I

10   quote, "To the extent that we have not addressed any

11   of the parties' arguments on appeal or cross appeal,

12   we have determined them to be unpersuasive."

13           And I think that the simple and natural

14   reading of that footnote in the Federal Circuit's

15   opinion is that because Lawson's argument regarding

16   contributory infringement was not addressed, that the

17   Federal Circuit determined it to be unpersuasive.

18           So I would submit, Your Honor, that Lawson --

19   the finding that Lawson is a contributory infringer

20   with respect to Claim 26 is the law of the case.  That

21   cannot be varied coming back here on reconsideration

22   of the injunction.  And to the extent that Lawson is

23   asking Your Honor to modify the injunction and to

24   permit sales, essentially what that is is a request

25   for Your Honor to retry liability issues that have

1235

1    been finally decided and affirmed by the Federal

2    Circuit.

3              And we would submit that that would exceed

4    the power of a district court on remand.

5              THE COURT:  How do you deal with the cases of

6    *Ricoh v. Quanta*, *Ormco v. Align Tech*, *Joy Techs*,

7    *Standard Havens Products*, all of which -- let's see.

8    *Muniauction, Inc*. and *BMC v. Paymentech*, all of which

9    stand, says Lawson, for the proposition that mere sale

10   of a product by the manufacturer cannot constitute

11   direct infringement of a method claim.

12             MR. STRAPP:  We agree wholeheartedly with

13   that position.  And I'll tell you why.  Your Honor,

14   direct infringement is found under Section 271(a) of

15   the patent statute.  What I'm talking about is

16   contributory infringement, which is indirect

17   infringement under 271(c).

18             THE COURT:  The fact that there's indirect

19   infringement warrants the injunction against the sale.

20             MR. STRAPP:  That's correct.

21             THE COURT:  And indirect infringement has

22   been adjudicated by the Federal Circuit and resolved,

23   is now the law of the case, and that's the end of it

24   all.

25             MR. STRAPP:  That's correct.

1    THE COURT:  Okay.

2    MR. STRAPP:  Just one more point on this

3 contributory infringement before I move on.

4    You heard Mr. Thomasch talk about substantial

5 non-infringing uses, and if I could direct Your Honor

6 to slide 9 because I think it's interesting.  It's not

7 the first time in this case that we've heard about

8 substantial non-infringing uses.  In fact --

9    THE COURT:  Is it your burden to show there

10 are substantial non-infringing uses?

11    MR. STRAPP:  Your Honor, it's our burden to

12 prove contributory infringement, and yes, that's part

13 of the proof.

14    THE COURT:  Your point on that is that you've

15 proved it?

16    MR. STRAPP:  That's correct.  In fact, Your

17 Honor, at the trial the only evidence that came in, it

18 came in unrebutted, was from Dr. Weaver.  This was

19 back in January of 2011.  That each element of

20 contributory infringement including the no substantial

21 non-infringing uses element was adduced as evidence,

22 elicited from the testimony of Dr. Weaver and went

23 unrebutted from Dr. Shamos at trial.  And that was

24 part of the reason that Your Honor upheld the finding

25 of contributory infringement in the JMOL decision in

1   August of --

2          THE COURT:   That's already been decided.

3   It's gone up on appeal and I can't change it now.

4          MR. STRAPP:   That's correct, Your Honor.

5          THE COURT:   Is that your point?

6          MR. STRAPP:   That's my point.

7          THE COURT:   All right.

8          MR. STRAPP:   Now, just with respect to the

9   substantial non-infringing use point, at slide 9 when

10  Your Honor was considering whether to enter an

11  injunction and what the scope of any injunction that

12  should be entered would be, Lawson made an argument to

13  Your Honor, and this was on March 30, 2011, in a brief

14  entitled, Opposition to motion for permanent

15  injunction.   It's docket 705.   What they said to Your

16  Honor is, We don't believe an injunction should be

17  entered, but if one were to be entered, it should be

18  focused on the extra functionality that goes beyond

19  what's just at the core S3 level.

20          Now, Your Honor may recall at the time

21  configurations 2, 3 and 5 were found to be infringed.

22  Configuration 1 was not infringing.   Configuration 1

23  is just core S3.   That's inventory control, purchase

24  order and requisition on top of LSF and process flow,

25  the foundation that's in yellow, you might recall.

1   And Lawson's argument then was, Well, what's

2   built on top of that in configurations 2, 3 and 5 are

3   this RSS, Punchout and EDI box.  So if Your Honor is

4   inclined to enter an injunction, limit it to RSS,

5   Punchout and EDI.  And Your Honor rejected that

6   argument.  You said in your May 23 opinion that --

7   THE COURT:  You're saying, your argument was

8   if you're inclined to enter an injunction, then limit

9   it to those?

10  MR. STRAPP:  Right.  That was the argument

11  that Lawson made.  And that was an argument that Your

12  Honor rejected.  Your Honor said, According to Lawson,

13  only RSS and Punchout should be enjoined.  Lawson's

14  premise is simply wrong.

15  Now, the reason why Your Honor found that

16  premise simply wrong is that the evidence that came in

17  at trial was that configurations 2, 3 and 5 are

18  modular.  They are made up of several different

19  modules.  They're not just limited to

20  configurations -- sorry.  It's not just limited to RSS

21  and Punchout.  It's made up of several different

22  modules.

23  In fact, just going back for a moment to the

24  Federal Circuit's opinion in this case because the

25  Federal Circuit affirmed the finding that Your Honor

1   made in that regard.  At page 514 of the Federal

2   Circuit's opinion, the Federal Circuit specifically in

3   its discussion of what the accused product was talked

4   about the different functionality of each of these

5   modular building blocks that make up the

6   configurations and explicitly found that the different

7   modular building blocks have important and integrated

8   functionality that forms the whole.

9           In other words, the whole isn't just one

10  module or just two or three modules as Lawson seems to

11  urge Your Honor to understand and believe, but rather

12  it was the configuration in its entirety.

13          THE COURT:  Excuse me just a minute.

14          MR. STRAPP:  It was a configuration in its

15  entirety.  And for that reason Lawson's argument that

16  the injunction that was about to be entered should be

17  just limited to RSS and Punchout was rejected.

18          Now, here --

19          THE COURT:  In following the sentence that

20  says Lawson is simply wrong, the following appears:

21  The only acts the injunction may prohibit are

22  infringement of the patent by the adjudicated devices

23  and infringement by devices not more than colorably

24  different than the adjudicated devices.  As reflected

25  in the jury verdict form, the jury found that:

1    (1) Lawson's Core S3 Procurement System and

2    RSS infringes Claim One of the '172 Patent directly

3    and indirectly.  That no longer flies.

4    (2) Lawson's Core S3 procurement system RSS

5    and Punchout infringes claims 3, 26, 28 and 29 of the

6    '683 Patent, and Claim One of the '172 patent.  None

7    of that flies except the Claim 26 of the '683, and

8    (3) Lawson's Core S3 Procurement System, RSS,

9    Punchout and EDI infringes Claims 3, 26, 28 and 29 of

10   the '683 Patent.  And Claim One of the '172 patent.

11   None of that flies except for Claim 26 of the '683

12   patent, directly and indirectly.

13   MR. STRAPP:  That's correct, Your Honor.

14   THE COURT:  All right.  Then there's a

15   stipulation that Lawson's M3 e procurement software

16   infringes Claim One of the '172 Patent and Claims 3,

17   26, 28 and 29 of the '683 Patent, directly and

18   indirectly.

19   How much of that remains now of that

20   stipulation?  They have stipulated to infringement of

21   that part of it.

22   MR. STRAPP:  That stipulation remains in full

23   force and effect.

24   THE COURT:  All right.  So now once you do

25   that, what happens to the argument that the injunction

1   can remain just as to Claim 26?

2          MR. STRAPP:  Well, Your Honor, just as to

3   Claim 26 --

4          THE COURT:  As to configurations 3 and 5.

5          MR. STRAPP:  Right.  So maybe I could turn,

6   Your Honor -- direct Your Honor's attention, if Your

7   Honor is inclined to reconsider and address and is

8   interested in the evidence that was presented two

9   years ago --

10          THE COURT:  No, I'm interested in asking you

11   how I can do that?

12          MR. STRAPP:  Well, I have two answers.

13          THE COURT:  Okay.

14          MR. STRAPP:  The first answer is we would

15   submit that Your Honor should not go back and

16   reexamine the evidence.  We don't believe that's

17   necessary in this instance.  But let me --

18          THE COURT:  Reexamine the evidence?  I don't

19   think I do that anyway at this injunction in respect

20   of my question.

21          My question is, how can you reach -- let's

22   assume that I do what you want me to do.  How can the

23   injunction in that context with those findings and the

24   results of the Federal Circuit reach what you want me

25   to reach?

1   MR. STRAPP:  Well, Your Honor, the evidence

2   that was presented at the injunction hearing and the

3   decision Your Honor made at that time included and

4   encompassed Claim 26 and configurations 3 and 5.  That

5   was part of the finding.

6        The evidence at that time Your Honor found

7   supported an injunction that was directed to

8   configurations 3 and 5 and supported that injunction

9   specifically because Claim 26 was found infringed.

10       Now, that's now the law of the case.  That's

11  been taken up to appeal.  The Federal Circuit has

12  said, We have substantial evidence.  We find there's

13  substantial evidence that Lawson itself infringes

14  Claim 26, and that Lawson's customers infringe Claim

15  26, and that Lawson is indirectly infringing Claim 26

16  that's all explicit in the Federal Circuit's opinion.

17       Now, the question is:  What do you do with

18  that?

19       What we would suggest, Your Honor, is that

20  since you've already made findings sufficient to

21  justify and enter an injunction that would cover Claim

22  26, that would cover configurations 3 and 5, because

23  of the evidence adduced two years ago, nothing that's

24  happened subsequent to that disturbs that finding from

25  two years ago.

1          THE COURT:  I see.

2          MR. STRAPP:  That's our position.  Now, if we

3    look back at what that evidence was that supported the

4    finding that you made, which was that an injunction

5    was appropriate as to Claim 26 and configurations 3

6    and 5, a finding you made two years ago, I think what

7    we'll find is that evidence is still true today with

8    respect to the universe we're living in where

9    only Claim 26 is --

10          THE COURT:  All right.  Are you through with

11    the part of your argument where you don't address the

12    four factors or do you have other parts of it?

13          If you do, go ahead and make it.  I want to

14    talk about the other, but I'm willing to have you -- I

15    interrupted you with a question that sort of

16    overlapped both questions.  I don't mean to cut you

17    off.

18          MR. STRAPP:  I just want to make one more

19    point on this part of the argument and that is the

20    inducement point.  Could we turn to slide 5, please?

21          THE COURT:  What point?

22          MR. STRAPP:  Inducement.

23          So we discussed direct infringement, which is

24    271(a) and contributory infringement, which is 271(c).

25    I want to just briefly discuss inducement of

1244

1     infringement.  This is slide 5, which is 271(b).

2          The statute reads that whoever actively

3     induces infringement of a patent shall be liable as an

4     infringer.

5          Now, when the Federal Circuit considered

6     whether there was evidence to support a finding that

7     Lawson induced infringement of Claim 26, it answered

8     in the affirmative.  It said there was substantial

9     evidence to support a finding of inducement.

10          Now, the question then becomes whether or not

11     a finding of inducement can support an injunction that

12     would prohibit sales of an infringing configuration.

13          I've already displayed some cases in which

14     the Federal Circuit has found such an injunction, and

15     what we would submit, Your Honor, is that by

16     installing and maintaining and instructing and

17     training its customers on how to use configuration 3

18     and 5, in conjunction with selling those customers

19     configuration 3 and 5, Lawson is inducing infringement

20     and it would be ongoing infringement for them to

21     continue selling it.  Therefore, for that reason, in

22     addition to the reasons I've already mentioned, an

23     injunction that remains in full force including with

24     respect to sales is appropriate.

25          Let me turn now, Your Honor, to the four

1   factors and --

2           THE COURT:  Let's take irreparable injury.

3           MR. STRAPP:  All right.  Let's start off with

4   irreparable injury.

5           THE COURT:  Are ePlus and Lawson head to head

6   competitors in the eProcurement software marketplace?

7           MR. STRAPP:  They were in March 2011.  They

8   are today, in April 2013.

9           THE COURT:  There's no evidence that that's

10  changed?

11          MR. STRAPP:  That's correct, Your Honor.  If

12  I could direct your attention to slide 17, please.

13  This was evidence -- this is just a small sampling of

14  evidence that Your Honor found two years ago at the

15  injunction hearing.  And this evidence, it's both

16  relevant to configurations 3 and 5 in Claim 26, and

17  it's still true today just as it was back then.

18  There's no evidence otherwise.

19          First of all, ePlus practices its patents.

20  It's got Product, Content+ and Procure+ as Your Honor

21  found, that practices all of the elements of each of

22  the claims that were at issue then including Claim 26,

23  which is at issue now.

24          THE COURT:  By that what do you sell that

25  competes head to head with configuration 3 and 5?

1    MR. STRAPP:  Content+ and Procure+.

2    THE COURT:  Nothing has changed there?

3    MR. STRAPP:  That's right, Your Honor.  In

4    fact, Your Honor, I think you may have in front of you

5    your opinion from May 23, 2011.

6    THE COURT:  I live with it under my pillow.

7    MR. STRAPP:  Well, if I could direct Your

8    Honor's attention to page 17 of that opinion.  If you

9    could go toward the bottom of the page, there's a

10   sentence that starts, "According to Lawson."  So this

11   is evidence that Your Honor found that Lawson had

12   presented.  And what you say here is according to

13   Lawson, when customers buy its Core S3 Procurement

14   System, and that's just configuration 1, they

15   generally do so with the intent to purchase more

16   Lawson offerings.  So additional modules like RSS and

17   Punchout.

18         Now, a customer of Lawson who has Core S3 and

19   adds on RSS and Punchout has configuration 3.  Now,

20   Your Honor said that at the bottom of this page 17

21   there's no dispute that ePlus does not compete in the

22   ERP market, and Lawson does not compete in the best of

23   breed market.  But if we flip over to page 18, what

24   Your Honor found is while RSS and Punchout only work

25   with Lawson's Core S3 Procurement System, the S3

1247

1  system, that's just the core alone, so configuration 1

2  is configured to allow for integration with a stand

3  alone eProcurement product such as Procure+ and

4  Content+.

5           THE COURT:   Is that changed by anything on

6  appeal?

7           MR. STRAPP:   That has not changed on appeal.

8  That record still holds true today.   And Your Honor

9  found that, thus, when an existing Lawson Core S3

10  Procurement customer who does not own RSS or Punchout

11  is seeking further functionality with respect to

12  eProcurement software, the two companies' products

13  compete against each for that business.

14           THE COURT:   How does that apply to

15  configuration 3 and 5 alone?

16           MR. STRAPP:   Well, because, Your Honor,

17  configuration -- a customer of Lawson -- let's say we

18  have a customer of Lawson who has configuration 1.

19  They decide they want to add on RSS and Punchout

20  functionality.   They want to become a customer of

21  Lawson who owns configuration 3.   They've got two

22  options, as Your Honor found.   I mean, among other

23  options in the marketplace, but two of the options

24  they have are to either go back to Lawson and say,

25  Hey, we want to license RSS and Punchout from you and

1   get maintenance and service from you.  Or they can

2   call ePlus and say, you know, We're a little bit tired

3   of dealing with Lawson.  We want a new guy.  And we

4   want you to show us what your Content+ and Procure+

5   can do if you integrate those modules with our Core

6   S3.  So that's an instance of competition.

7            Now, if Lawson were enjoined from selling,

8   maintaining and servicing configurations 3 and 5, that

9   would give ePlus a chance to go to customers of Lawson

10  who have got Core S3 procurement and say, We know you

11  can't sell or license or maintain Punchout or EDI.  We

12  think we've got a good solution if you're interested

13  in that functionality.  That solution would be

14  Content+ and Procure+.

15           THE COURT:  Is there anything on appeal that

16  upsets the finding that evidence of direct competition

17  is found and the fact that both companies are

18  similar-sized companies, and the same customers are in

19  specific industries including healthcare, retail and

20  education to name a few?

21           MR. STRAPP:  No, there's been nothing that --

22           THE COURT:  In other words, does the

23  invalidation in configuration 2 affect that finding?

24           MR. STRAPP:  No, Your Honor.

25           THE COURT:  Was it contended to that end on

1  appeal?

2       MR. STRAPP:  No, Your Honor.  In fact, one

3  interesting thing to note, I did read earlier from the

4  Federal Circuit's appeal decision on ePlus, and

5  there's a section of that appealed decision that

6  concerns the injunction arguments that were made by

7  Lawson.  Now, Lawson had different arguments it could

8  choose to make regarding the injunction.  One argument

9  that was not make by Lawson --

10      THE COURT:  You mean on appeal?

11      MR. STRAPP:  On appeal.

12      One argument that was not made by Lawson on

13  Appeal was that Your Honor's interpretation of the

14  four-factor test, an application of that test to the

15  facts that were on record was somehow erroneous or an

16  abuse of discretion.  That argument was never made by

17  Lawson.

18      I think, in a sense, because Lawson chose not

19  to make that argument then, there's a waiver, and they

20  shouldn't be permitted to make it now because the

21  state of the injunction that existed then was such

22  that they were prohibited from using, selling,

23  offering to sell, maintaining, etc., with respect to

24  configurations 3 and 5 and Claim 26.

25      Lawson could have said, That finding isn't

1250

1  supported by the evidence that was put forward in

2  front of the District Court in March and April of

3  2011.  They chose not to make that argument.  To make

4  that argument for the first time on remand, I would

5  argue they should be barred from doing so under *res*

6  *judicata*, principles of collateral estoppel and under

7  the theory waiver.

8          Other findings that Your Honor made that we

9  believe support irreparable harm here include the fact

10 that ePlus has had to divert substantial resources

11 from its business in order to enforce its patent

12 against Lawson, that ePlus has lost sales and market

13 share resulting in lost revenue and lost opportunities

14 to cross sell and up sell other ePlus products.  And,

15 as Your Honor said, Lawson and ePlus market and sell

16 to companies in the same industries.  Companies with

17 market caps in the 50 million to $2.5 billion range.

18 The exact same companies in certain instances.

19         And, Your Honor, for example, even found that

20 there was one instance of a lost sale that ePlus knew

21 about where ePlus had lost a customer to Lawson who

22 had chosen to buy configuration 3, that is with RSS

23 and Punchout.  That was Deaconess Hospital.

24 Obviously, that finding is relevant, as relevant today

25 as it was then.

1    And Your Honor also found that in several
2    instances ePlus and Lawson do not even know when
3    they're competing against each other because of the
4    secretive nature of the way that companies go out and
5    bid in this marketplace.
6        Your Honor also found with respect to
7    irreparable harm that third party analyst reports
8    group the two companies as competitors in the software
9    market.  So it wasn't just ePlus saying that they were
10   competitors, but that they were third parties saying
11   that as well.
12       THE COURT:  Did you put into the record the
13   briefs on appeal?
14       MR. STRAPP:  The injunction briefs?
15       THE COURT:  The what?
16       MR. STRAPP:  Which briefs are you referring
17   to?
18       THE COURT:  Briefs on a appeal that led to
19   the Federal Circuit's decision.
20       MR. STRAPP:  I don't believe that that is --
21       THE COURT:  They filed separate briefs on
22   injunction alone or did they deal with it all?
23       MR. STRAPP:  I misunderstood Your Honor.  I
24   don't think we put into the record in this proceeding
25   the appeal briefs that were filed by the parties.  If

1  Your Honor would request that, we are happy to do so,

2  obviously, if you think that that's advisable.

3         THE COURT:  Excuse me.  Go ahead.

4         MR. STRAPP:  So those are some of the

5  findings that relate to irreparable harm which still

6  hold true today, and I don't think that Lawson has

7  made a contention in its papers, and certainly hasn't

8  made one today in the oral argument, that those

9  findings somehow are not relevant or should be

10  discarded in light of the Federal Circuit's decision.

11         THE COURT:  What they are saying, Yes, they

12  are arguing that.  They're saying that because of

13  configuration 2, and because of the drop out of the

14  case, and all the patents, and the only thing being

15  left is Claim 26 of the '683 Patent, it's just

16  inequitable to have an injunction here.  That's one

17  aspect of it relating to the third clause of 60(b)(5).

18         Then they say given that the appellate court

19  has vacated the findings respecting all of those other

20  claims and patents, you should never have issued the

21  injunction in the first place, and you need to relieve

22  us of that situation, or, alternatively -- that's the

23  *ab initio* argument.  And I think that's pretty hard to

24  make, *ab initio*.  But, alternatively, that under those

25  circumstances there isn't any irreparable injury here.

1  There's an adequate remedy at law.  Your adequate

2  remedy at law is to go sue them if you believe that

3  there's infringement now that you've gotten

4  adjudication.  And that failing those two things, I

5  ought to just acknowledge it and relieve them of the

6  burden of trying to comply with an injunction.

7          MR. STRAPP:  Let me address both of those

8  points in turn.  First of all, can we turn to slide

9  16, please.  I want to turn -- I know we're talking

10 about irreparable harm, but I think Your Honor's

11 comment also relates to balance of the hardships.

12         THE COURT:  Well, yes, they are actually

13 quite related concepts.  You can't have the one

14 without the other.

15         MR. STRAPP:  Right.  What's very interesting,

16 and you can see here on the slide --

17         THE COURT:  If you don't get irreparable

18 injury, you never get to the balance of the harms.

19         MR. STRAPP:  That's correct, Your Honor.

20         Now, on the balance of the harm factor,

21 what's very interesting is that Lawson argued in their

22 brief during the injunction proceedings, this is

23 docket 705 at page 20, that Lawson had "hundreds of

24 existing clients which require Lawson to provide

25 maintenance and support services."  And then they said

1   that those customers had no "viable alternative

2   sources for support other than Lawson."

3          So the argument that was made by Lawson at

4   the time was, We have 860 customers if you include

5   configuration 2.  It's a large number of customers.

6   If we're not allowed to go out and maintain and

7   support our products, these customers are going to be

8   harmed.  And a lot of them are hospitals.  A lot of

9   them are public sector type companies.  There's going

10  to be severe harm in the marketplace.

11         Now what they're trying to is sort of have

12  the other side of that argument, which is since

13  configuration 2 is no longer at issue and there's only

14  150 customers, therefore, ePlus shouldn't complain

15  about the harm because there's only a few customers.

16         Now, to me, it sounds like they're trying to

17  have their cake and eat it, too.  They wouldn't

18  prevail the their argument then.  I don't think they

19  should prevail on their argument now.

20         THE COURT:  Other than that well-settled

21  legal principle that you can't have your cake and eat

22  it too, what authority do you have for that?

23         MR. STRAPP:  Well, I would suggest, Your

24  Honor, that --

25         THE COURT:  What legal underpinning is it?

1    MR. STRAPP:  I would suggest, Your Honor,

2  that the fact that Lawson is continuing to sell and

3  maintain and service configurations 3 and 5 for 150

4  customers, and as the evidence showed, has made 20 to

5  $30 million in revenue from doing so since the date

6  the injunction was entered is evidence that Your Honor

7  can take note of that there is ongoing harm to ePlus.

8  EPlus's patented property is being used by Lawson to

9  continue generating revenues.

10    THE COURT:  What proof is there of that?

11    MR. STRAPP:  Well, Your Honor, I'm assuming

12  that contempt is found.  If contempt is not found, I

13  agree that that $30 million was lawfully made by

14  Lawson or we would have the responsibility to file a

15  new infringement lawsuit if contempt is not found to

16  then seek the damages.  But Lawson has been continuing

17  to use configurations 3 and 5.  We know that --

18    THE COURT:  Are you suggesting that I can use

19  the evidence from the contempt hearing as part of the

20  process of deciding the injunctive motion here?

21    MR. STRAPP:  I'm not suggesting that Your

22  Honor needs to even reach that question because --

23    THE COURT:  Well, suppose I were to just tell

24  that you I'd like to decide the injunction question

25  right away before you-all ever brief the contempt

1    question.  What evidence is there that warrants this

2    issue to be decided in the way you argue without

3    anything --

4              MR. STRAPP:  Well, your Honor --

5              THE COURT:  -- from the injunction hearing --

6              MR. STRAPP:  I --

7              THE COURT:  -- on the contempt hearing?

8              MR. STRAPP:  As of the date of the injunction

9    proceeding, we know that there were over 100 customers

10   that Lawson had.  It's not in dispute that Lawson had

11   over 100 of those customers that we mention for

12   configurations 3 and 5.  They also had an additional

13   few hundred that were just configuration 2.

14             Now, the evidence that was put forward

15   respecting both configurations 3 and 5 and

16   configuration 2 at the time of the injunction hearing

17   was decided by Your Honor to be sufficient evidence to

18   support a finding that an injunction was appropriate

19   as to configurations 2, 3 and 5.

20             What I've shown you today, I hope, is that

21   that evidence still holds true.  In other words --

22             THE COURT:  How does that evidence hold true?

23   How do I know that?

24             MR. STRAPP:  Because the fact of competition,

25   Lawson doesn't suggest there's no competition, that

1  finding is still applicable today.  The fact that --

2          THE COURT:  Well, I would think that

3  unless -- I would think your better argument is that

4  there's nothing in the record for me to make a finding

5  to change that holding unless I consider that which is

6  in the contempt record and reach the conclusion that's

7  opposite the one you want me to reach about whether or

8  not their conduct is infringing by allowing RSS to run

9  in parallel and by the way they use RQC.

10          So I guess my real question here is:  Do you

11  or do you not take the view that I need to consider

12  any aspect of the evidence in the contempt hearing in

13  order to decide the injunction question?  They want me

14  to decide the injunction question first.  And they say

15  I should have decided it, and, frankly, I would have

16  probably decided it long ago had it not been for the

17  fact that you all had this mandamus petition, and then

18  we had the unfortunate loss of Mr. Robertson, and it

19  all -- everything kind of got slowed down.  And then

20  when we picked things back up, we had already

21  scheduled this.  And as I said before, I wanted to

22  get -- I was on your dance card and you were on mine,

23  and I wanted to get that wrapped up.  But I until have

24  to decide the case.

25          Now, if I were you, I would articulate an

1258

1    objection to that rambling statement and say "I don't

2    have to answer it because I don't know what you're

3    asking," and that would be a well-taken objection.

4         Now the question you do have to answer is in

5    perspective of where we stand now.  Is it your

6    position that I can or cannot take into account any

7    evidence produced at the contempt hearing in deciding

8    the injunction case?

9         MR. STRAPP:  I'm going to try to give you my

10   shortest and best answer, which is that it's not

11   necessary to take into account any of that evidence.

12        THE COURT:  All right.  Thank you.

13        MR. STRAPP:  And the reason why is we believe

14   the record evidence as it stands supports an

15   injunction as we've suggested except with respect to

16   configuration 2 and claims 28 and 29.

17        THE COURT:  Uh-huh.

18        MR. STRAPP:  Now --

19        THE COURT:  I thought I heard you say earlier

20   that you thought that it was -- they hadn't put on any

21   evidence that would dispel the findings that were made

22   at the injunction hearing insofar as the dissolution

23   of the injunction is concerned pursuant to their

24   motion.  That was their burden.

25        MR. STRAPP:  That's correct, Your Honor.

1259

1    THE COURT:  They didn't put on any evidence

2  and therefore that's the end of the matter.

3    MR. STRAPP:  That's correct, Your Honor.

4  That's our position.

5    THE COURT:  Is that part of your position or

6  not?

7    MR. STRAPP:  That is part of our position.

8  Our position is -- let me see if I can clarify it and

9  clarify the confusion.

10    THE COURT:  I'm not confused now.  I just

11  wanted to make sure where we stood.

12    MR. STRAPP:  Okay.  Just to make sure that

13  it's clear on the record here that Lawson filed a

14  motion seeking modification or dissolution of an

15  injunction.  It's our position that it's their burden

16  to carry that motion forward.  And if they want to do

17  so with evidence, they can come forward with evidence.

18  They have chosen and waived the right to come forward

19  with evidence.  They said they don't need any

20  evidence.

21    Our position is they can't meet their burden,

22  especially without any new evidence because the

23  evidence that existed as of the date the injunction

24  was entered is sufficient to support a continuing

25  injunction with respect to configurations 3 and 5.

1   THE COURT:  All right.  I understand.

2   MR. STRAPP:  Now, Your Honor had also asked

3   about remedy at law, and Your Honor's question was,

4   Well, why not just let Lawson off scot-free and then

5   ePlus would have the opportunity to go ahead and sue

6   them again, and that could be their remedy at law and

7   that should be adequate?

8   I know that was a suggestion made by Lawson's

9   counsel.  I'm not sure if it was made in all

10  seriousness or not, but I frankly --

11  THE COURT:  I think what he was saying was in

12  response to one of the arguments you made was that you

13  would be without remedy, and he was saying that it

14  isn't all that unusual in the law that circumstances

15  occur where a party prevails but doesn't get a remedy.

16  And in this situation you are where you are because of

17  the ruling that was made with respect to the damages

18  expert and the fact that you eschewed your option

19  under *Pace* to seek an ongoing royalty, and that now

20  you can't satisfy the need for an injunction, and it

21  doesn't aid your cause in pursuit of an injunction to

22  say if you don't give us an injunction, we're without

23  a remedy.

24  I don't think I put it as eloquently as Mr.

25  Thomasch did, but isn't that, in essence, what you

1  were saying on that topic, Mr. Thomasch?

2          MR. THOMASCH:  It is, Your Honor.  And I

3  thought it was quite eloquent.

4          THE COURT:  Oh, flattery, thy tongue.

5          MR. STRAPP:  Your Honor, I think in your

6  opinion on the injunction from May 2011, what you said

7  was the question about an adequate remedy at law

8  inevitably overlaps what the question of whether a

9  patentee has suffered irrelevant harm.

10          And what you found in that injunction opinion

11  was that ePlus had demonstrated irreparable harm, and

12  that Lawson's argument that the injury inflicted on

13  ePlus could be satisfactorily addressed by some sort

14  of ongoing or running royalty was inappropriate.

15          One reason that Your Honor gave for that is

16  Your Honor decided that it would be too difficult to

17  parse out what the appropriate terms of a license

18  would be for an ongoing royalty in light of the record

19  evidence at that point.

20          Your Honor may recall that the five licenses

21  ePlus entered into, they are not part of this contempt

22  proceeding, but they are part of the trial record, and

23  those licenses had various components.  They weren't

24  as simple as an ongoing royalty term and a license to

25  a patent.  There were are all sorts of cross licenses

1    and --

2         THE COURT:   I thought it was addressed in the

3    the injunction opinion.

4         MR. STRAPP:   Right.   And that's all set forth

5    in the injunction opinion.

6         In light of the complexity of those license

7    agreements that ePlus had negotiated when it had a

8    chance to do so with other companies, and in light of

9    the fact that there wasn't evidence about how a

10   royalty would be calculated at that point in the

11   record, Your Honor found that Lawson's request to

12   enter into an ongoing, compulsory license with ePlus

13   was inappropriate as opposed to the injunctive relief

14   that ePlus was instead seeking.

15        I think that Your Honor also found that in

16   light of the harm to ePlus that was difficult to

17   quantify, especially with respect to its inability to

18   cross sell and up sell its VAR, value added retail

19   products, in conjunction with Content+ and Procure+ as

20   well as additional harm to ePlus, that there was no

21   adequate remedy at law.

22        THE COURT:   Was it briefed on appeal or upset

23   on appeal?

24        MR. STRAPP:   No.   That's the record as it

25   stands today.

1    Maybe I could turn to the public interest
2    factor because I think we've already talked about
3    balance of harms.
4        What's interesting about public interest is
5    that the arguments that -- a lot of the arguments that
6    Lawson made at the time about public interest appear
7    nowhere in their briefs, and I think it's for a good
8    reason.
9        The public interest arguments that were made
10   two years ago by Lawson, which were rejected by Your
11   Honor, were that there would be morale problems,
12   patient-care issues, loss of jobs at hospitals, that
13   Lawson's customers would have to pay 900,000 or a
14   million dollars and spend nine months implementing new
15   systems.  And that testimony was based -- that
16   evidence was based on testimony from Mr. Hager.
17       Now, Your Honor took it into account in part
18   by including a sunset provision in the injunction.
19           THE COURT:  That's why the sunset provision
20   was in.
21           MR. STRAPP:  Correct.
22           THE COURT:  It wouldn't have been put in if
23   it hadn't been for that testimony.
24           MR. STRAPP:  Exactly, Your Honor.  So the
25   sunset provision is part of the injunction because of

1264

1   the testimony from Mr. Hager.  That's the reason why

2   it was in the injunction.  But Your Honor said, I'm

3   going to address the public interest argument that's

4   being paid by Mr. Hager through a sunset provision,

5   but I still believe that the public interest factor

6   still weighs in ePlus's favor, and I'll do a sunset

7   provision, and I'll put it in the injunction.  As the

8   Court sitting in equity, that's what you decided to

9   do.  That's what remedy you decided was appropriate.

10          Now, the only thing I would submit that's

11  changed since then is that, frankly, we believe that

12  the evidence that Mr. Hager put on at trial wasn't

13  true.  That may be the reason why this argument

14  doesn't reappear in Lawson's briefs now as to why the

15  public interest factor isn't satisfied.  But certainly

16  if anything has changed with respect to public

17  interest, it's just that the arguments that Lawson had

18  made before, they have decided they are not going to

19  advance again with respect to Mr. Hager.

20          So if it weighted in our favor then, it's

21  certainly weighs in our favor now.

22          Those are the arguments I would make with

23  respect to each of the four factors.  And I think that

24  I just want to address one more point that Mr.

25  Thomasch brought up in his argument.

1      Mr. Thomasch directed Your Honor to a portion

2  of ePlus's findings of fact and conclusions of law

3  that it submitted -- that it submitted as part of the

4  injunction proceedings in which ePlus said that -- it

5  submitted testimony from Lawson's witnesses that it

6  obtained at depositions in 2009, at the outset of this

7  case, when all the configurations were at issue,

8  including configuration 1.  And that testimony that

9  ePlus put into the record at the time, it was

10  testimony from Mr. Hager and Mr. Lohkamp.

11      The testimony was, from Mr. Hager, that

12  Punchout does not drive S3 sales.  And defendant has

13  never won a sale merely because of its Punchout

14  products.  And that Mr. Lohkamp testified he wasn't

15  aware of a specific customer that would not have

16  purchased S3 if defendant didn't also offer

17  Procurement Punchout.

18      Now, I think it's important to understand two

19  things about that.

20      THE COURT:  You just read from Hager's

21  testimony; is that what you're saying?

22      MR. STRAPP:  I'm reading from our brief.  Let

23  me just put into the record.  So this is ePlus's

24  brief -- I'm sorry.  This is Lawson's memorandum in

25  support of its motion, its Rule 60(b) motion.  So this

1   is the brief that was just filed by Lawson.  Docket

2   1012 at page 19 and 20.  This is where Lawson is

3   quoting from the testimony that Mr. Hager and Mr.

4   Lohkamp offered that was part of the injunction

5   proceedings.

6           So if you turn to page 19 of Lawson's

7   brief --

8           THE COURT:  Which brief?

9           MR. STRAPP:  This is Lawson's memorandum in

10  support of Rule 60 motion to dissolve or modify the

11  injunction.  And it's docket 1012, page 19.

12          THE COURT:  Page 19 is a certificate of

13  service.

14          MR. STRAPP:  I'm sorry, Your Honor.  This is

15  actually Exhibit A to the brief.  That's why I was

16  confused.  Exhibit A to Lawson's memorandum in

17  support --

18          THE COURT:  It was ePlus's Rule 26 rebuttal

19  disclosure concern injunctive --

20          MR. STRAPP:  Correct.  Correct.  I'm sorry.

21  It's my confusion here.

22          In Exhibit A to Lawson's brief, which is

23  ePlus's rebuttal disclosure at page 19 and page 20,

24  this is what Mr. Thomasch was directing your attention

25  to earlier today.  If you turn to page 19 and then

1267

1    carrying over to page 20, you'll see that there's

2    quotes from a Hager deposition transcript, a

3    deposition transcript of Mr. Lohkamp.  These are from

4    October 2009.

5          Now, in October 2009, as Your Honor may be

6    aware, ePlus was pressing forward with its case that

7    configurations of 1, 2, 3, 4 and 5 were infringed.

8    So, in other words, at that point in the pretrial

9    proceedings, all the configurations were at issue.

10   Not just configuration 2, not just configuration 3 and

11   5.

12         Configuration 1 of Lawson, the record showed

13   at the time had -- Lawson had almost 2000 customers

14   for configuration 1.  So if we understand that at the

15   time that Mr. Lohkamp and Mr. Hager offered this

16   testimony with respect to whether Punchout was driving

17   sales of S3, and S3 is just the core procurement,

18   that's configuration 1, their testimony was, No.  And

19   that's easily understandable.  If there's only 150

20   customers that have Punchout, right, and 1800 do not,

21   then those 1800 who have chosen not to license

22   Punchout don't want Punchout, don't need Punchout, and

23   Punchout isn't driving the sales for configuration 1.

24         But let's focus on what's at issue here in

25   this proceeding.  What we're dealing with is a

1  universe of 150 customers, each one of which has

2  decided to license Punchout.  A customer wouldn't pay

3  Lawson just as a matter of logic extra money for

4  license, maintenance and service for Punchout unless

5  they wanted license, maintenance and service for

6  Punchout.

7        In other words, a customer of configuration 1

8  who doesn't have Punchout might not care about

9  Punchout, but a customer who has made the decision to

10  pay extra money to Lawson to get the Punchout module,

11  obviously wants and needs and desires Punchout so that

12  they can use Punchout as part of a system that they

13  have licensed from Lawson.

14        I guess -- let me just also address here

15  before I close the Apple Samsung case that Mr.

16  Thomasch focused on as well.  The Apple Samsung case,

17  that's a Federal Circuit decision from 2012, and

18  that's a preliminary injunction case in which the

19  Federal Circuit is applying the standard for

20  preliminary injunctions set forth in the *Winter v.*

21  *NRDC* case.  That's a 2008 Supreme Court decision, 555

22  U.S. 7.  That's the standard for preliminary

23  injunctions.

24        As Your Honor knows, what we're dealing with

25  here is a permanent injunction.  Your Honor applied

1   and took into great consideration the four factors set

2   forth in the *eBay* case.  That's a Supreme Court

3   decision from 2006 that set out the test for the

4   four-factor permanent injunction relief and issued a

5   63-page opinion finding that those factors were met.

6           So we would submit that this Apple decision

7   really has no relevance to these proceedings.

8           THE COURT:  You're saying that you have to

9   establish a causal nexus that relates the harm to the

10  alleged infringement and you haven't done that.

11          MR. STRAPP:  Your Honor, that's what Mr.

12  Thomasch is saying, but we would submit that we

13  have -- first of all --

14          THE COURT:  Why do you say you have done it?

15          MR. STRAPP:  Well, first of all, let me just

16  point out that in the *eBay* case, the words "causal

17  nexus" don't appear in the four-factor test.  And the

18  four factors in *eBay* are different than the four

19  factors in the *Winter* test, the preliminary injunction

20  test.

21          The factors in the *eBay* test for permanent

22  injunctions are (1) whether the plaintiff has suffered

23  any irreparable jury, (2) that remedies available at

24  law such as monetary damages are inadequate to

25  compensate for that injury, (3) considering the

1    balance of hardships, a remedy in equity is warranted,

2    and (4) that the public interest would not be

3    disserved.

4           Now, the *Winter* factors for preliminary

5    injunction are (1) that the plaintiff is likely to

6    succeed on the merits.  That doesn't appear in *eBay*.

7    (2) that the plaintiff is likely to suffer irreparable

8    harm in the absence of preliminary relief.  That's

9    different from the irreparable harm test that's stated

10   in *eBay*.  They may be similar, but it's different.

11   (3) that the balance of equities tips in its favor.

12   That's similar to the balance of hardships test, and

13   (4) that an injunction is in the public interest.

14   And, again, that's similar to the *eBay* test.

15          But, again, these two tests are different

16   tests.  They are similar, but they're not the same.

17          THE COURT:  But he's saying the irreparable

18   injury component of the *Winter* test as applied in

19   *Apple* and interpreted by the Federal Circuit shows

20   that you can't have irreparable injury unless you

21   establish a causal nexus.  You have to show

22   irreparable injury, and then you also have to show

23   that the irreparable harm that you claim or have shown

24   is causally connected to the alleged infringing

25   conduct, I believe is what he was saying.

1    MR. STRAPP:  Let me just make two points on

2    that issue on causal nexus.  First of all, it's our

3    position that we substantiated and proved a causal

4    nexus between their infringement -- Lawson's

5    infringement of Claim 26 and the irreparable harm

6    suffered by ePlus.  So we believe that that's in the

7    record.  It's part of the record that was made during

8    the injunction proceedings.  It's part of the reason

9    Your Honor entered a decision on the injunction in

10   ePlus's favor.

11   THE COURT:  It's reflected in the irreparable

12   injury component of the opinion; is that what you're

13   saying?

14   MR. STRAPP:  Yes, Your Honor, because Your

15   Honor specifically found in the irreparable injury

16   section of your opinion, which is the large bulk of

17   the opinion, that the injury to ePlus is causally

18   linked to the infringement by Lawson.

19   Now, at the time, as Lawson's has pointed

20   out, there were more than just one claim at issue.

21   There were several claims at issue.  But never in your

22   findings did you suggest or did Lawson argue, either

23   then or afterwards, that somehow the evidence in the

24   findings were limited to the system claims or were

25   limited to Claim One of the '172 Patent.

1    Those findings included and encompassed a

2    finding of irreparable harm that was caused by

3    Lawson's infringement of Claim 26.

4         THE COURT:  All right, Mr. Thomasch.

5         MR. THOMASCH:  Yes, Your Honor.  Thank you

6    for indulging both counsel.  I'll try to get right to

7    specific points and move through this quicker than

8    initially.

9         I want to start near the end because Mr.

10   Strapp just told you that by his deductive reasoning

11   Punchout was important to customers with

12   configurations 3 and 5, and he suggested that Punchout

13   was driving sales of certain configurations.

14        There is absolutely nothing in the record

15   that supports that statement.

16        He then talked a lot about how we were

17   quoting from Mr. Hager and Mr. Lohkamp.  Just to be

18   clear, Your Honor, we were quoting from plaintiffs.

19   The exhibit that we attached to our brief is a

20   document filed on March 31, 2011, by ePlus's counsel.

21   It is their statement of what facts they thought were

22   important.  And those facts state on their face that

23   Punchout, the module that is in configuration 3 and 5

24   but not in configuration 2, they cite those facts to

25   show that Punchout is not a driver of sales.

1    Now, Mr. Strapp says for the first time,

2  Well, that's because we were talking about

3  distinguishing away from configuration 1.  That's what

4  that was about.

5    He may be right.  And in being right, he

6  proves my point.  What went on below in the hearing in

7  2001 was in no way limited or segregated or isolated

8  to the one claim that is at issue and the two

9  remaining configurations.

10    If they put in evidence about configuration 1

11  and how people who had configuration 1 wanted to come

12  up to configuration 2, and they say that, they

13  specifically talk about if you don't have either RSS

14  or Punchout, well, the people who don't have either

15  RSS or Punchout are configuration 1 customers, and

16  they said, and they argued to you, there's competition

17  to sell that package of RSS and Punchout, and that

18  competition is between configuration 2 from Lawson or

19  Procure+ or Content+ from ePlus.

20    Well, that's fine, but that's not this

21  situation because configuration 2 contains RSS or RQC.

22  That's in configuration 2.  Now the only issue is --

23  and we're entitled to compete with them on

24  configuration 2.

25    Now, the only issue is:  Are we somehow

1   irreparably harming them because we also sell a

2   product that has Punchout in it?  Maybe we can say,

3   Okay, Lawson has a configuration 2 customer, and

4   Lawson may want to sell that customer Punchout, which

5   would make it a configuration 3 customer, but they

6   have it already.  And now they want to sell Punchout.

7   Well, do we compete with ePlus?  EPlus hasn't put in a

8   word of evidence.  They haven't cited you to anything

9   that suggests that they have a Punchout-only product.

10  Nobody would buy RSS and Punchout when you already

11  have RSS.

12          They haven't done anything that specifies

13  what part of the massive record that was in front of

14  Your Honor in 2011 remains applicable and they haven't

15  articulated why it's enough.

16          All they've said is there are things in there

17  that relate to Claim 28 and there are things in there

18  that relate to configurations 3 and 5.  And I agree.

19  Yes, there are.  It was all done in one collective

20  dump that all of these claims and all of these

21  configurations relate to competition between ePlus and

22  Lawson.  And it did at the time.

23          But now the situation has changed.  And Your

24  Honor asked question after question to Mr. Strapp.  I

25  would sale them softball questions the way they were

1    phrased.  But they were questions about whether or not

2    there was evidence to dispel aspects of what went --

3    where is the evidence?  Does anything in this that

4    we're talking about affect the findings that were

5    previously made?  And, specifically, in regard to

6    findings made in the memorandum opinion of Your Honor

7    dated May 23, 2011, docket 728, at pages 17 to 18.

8    You talk specifically about what's happened that

9    affects those findings.

10           And what has happened, Your Honor, is that

11   configuration 2, which we did not have the right to

12   compete with in 2011, we now have the right to compete

13   with.  That changes everything.

14           THE COURT:  All right.

15           MR. THOMASCH:  And they don't address that

16   point.

17           So, Your Honor, the first point that he

18   started with was we hadn't put in evidence, that is

19   correct, and they hadn't put in evidence.  And if the

20   evidence is in the record, if there's evidence in the

21   record that can be isolated and support the findings,

22   then they are entitled to an injunction.  And if there

23   is not, then they failed your request and offer to

24   give them a chance to make up for that.  Because it

25   would be a legitimate position for them to say, Well,

1276

1    we were assuming that all these claims were infringed,

2    and we were assuming that configuration 2 was an

3    infringing configuration.   How were we to know to

4    isolate and segregate our evidence?

5            Well, you gave them an opportunity.   They did

6    not avail themselves of it.

7            You asked Mr. Strapp about the cases that

8    Lawson relies on.   And then Mr. Strapp put up slide 13

9    and he said, Well, here are our cases.   We've

10   addressed the cases at slide 13, in footnote 6 of our

11   reply brief at page 11, and at footnote 3 on page 9.

12   And the fact of the matter is that in each of those

13   situations, for instance, in the *Tristata Tech* case,

14   423 F.Supp 2d at 466 to 67, the Court specifically

15   said that the accused products "were not suitable for

16   substantial non-infringing uses."

17           In our brief, we deal with each of these

18   cases.   In each case, there is not a substantial

19   non-infringing use.   And the law is clear.   The sale

20   of a product is never the direct infringement of a

21   method claim.   Counsel acknowledged that.   It might

22   seem counterintuitive.   It's the law.

23           The law also does allow for the sale of a

24   product to indirectly infringe a method claim if the

25   patentee proves that the product being sold has no

1  substantial non-infringing uses.  The patentee has not

2  and cannot prove that in this action.

3        The *Amado* case was mentioned only very

4  briefly and in part what was stated was incorrect.  To

5  be clear, and it's a very clear decision, and well

6  worth Your Honor's time, the Supreme Court decision in

7  *eBay* was deemed not an intervening decision in that

8  case.  The reason for that is an intervening decision

9  comes between the time of -- an intervening decision

10 if it's a Supreme Court decision would come after the

11 appeals court renders its decision, but before the

12 remand.  That space there, that's the time for an

13 intervening decision.

14       What happened in *Amado*, clear from the

15 procedural history in the case is that when the

16 district court judge rendered his injunction, *eBay* had

17 not been decided by the Supreme Court.  It went up on

18 appeal.  The appeals were briefed.  *EBay* had not been

19 decided.

20       Then *eBay* was decided.  After briefing,

21 before oral argument.  The Federal Circuit thought it

22 quite important that notwithstanding the importance of

23 *eBay*, Microsoft never brought *eBay* to the attention of

24 the court.  Did not suggest that that influenced in

25 any way what was to happen or how the Federal Circuit

 1   should address the injunction issues, which it was

 2   attacking.

 3           Microsoft ignored *the eBay* case.  When it

 4   went back down after the *eBay* case had issued, it went

 5   down.  The Federal Circuit decision postdates *eBay*.

 6   So *eBay* comes out.  The Federal Circuit comes down and

 7   it doesn't say, By the way, consider this *eBay* case.

 8   The Federal Circuit says, Remand to dispense the

 9   funds.

10           And the district court judge said, But wait a

11   minute.  It's not a question of what the mandate makes

12   me do.  The question is what's fair to do.  I issued

13   an injunction under a mistaken view of the law.

14           THE COURT:  I asked if it was appropriate to

15   issue an injunction, not on anything else.  There's a

16   big difference between what that rule is or what that

17   situation is and what we have here, it seems to me.

18           We have here the very clear understanding of

19   what the rules of law are respecting the issuance of

20   an injunction.  And that doesn't necessarily -- I mean

21   there's no reason to -- and we also have a case where

22   the Federal Circuit -- you-all have argued your case

23   to the Federal Circuit.  You had your right to take a

24   shot at the injunction.  You took such shots as you

25   could take, as you felt like you were advised to take,

1   and the only thing the Federal Circuit did was say,

2   There's nothing wrong with the scope of the

3   injunction, but you have to go back and revise it now

4   and modify it in view of what we've done.

5            MR. THOMASCH:  We took our shot at the

6   injunction, Your Honor.

7            THE COURT:  Isn't that different than the

8   case you're talking about?

9            MR. THOMASCH:  No.  Actually, to flip back to

10  *Amado* for a minute, no, I think it is absolutely two

11  sides of the same coin.  I think the injunction

12  analysis is taking a set of facts that have been

13  proven to the Court and then applying them to the law

14  of injunctions and seeing whether or not the facts are

15  sufficient.

16            And in *Amado*, they looked at the law, the

17  legal framework, and they said, Well, I had a

18  misapprehension of that legal framework at the time.

19  So, in fairness, I'll redo it.

20            Here, Your Honor, I submit you had a

21  misapprehension about the factual underpinning that

22  went into your decision.  You believed the system

23  claims were valid and infringed.  They are not.  That

24  is a factual mistake that was made.  It was made in

25  good faith, but it's real, and it has consequences.

 1    And I don't see why in the world we would be in a
 2    situation where that simply gets ignored.   The
 3    question is:   If you go back and if you knew the facts
 4    as they really exist, if you accepted the fact that
 5    those method claims were invalid and should have never
 6    come to trial.   We were deserving of summary judgment
 7    and didn't get it.   If you accept the fact that the
 8    jury did not prove Claims 28 and 29 were infringed.
 9    On the evidence that was given to you, would you have
10    come out the same way?   That's the analysis we asked
11    Your Honor to conduct.   We think it's totally
12    appropriate to do so.   *Amado* allows you to do so even
13    if it does not compel you to do so.
14            THE COURT:   All right.
15            MR. THOMASCH:   Your Honor, on the issue of
16    contributory infringement, the suggestion was somehow
17    made that the Federal Circuit decided that issue
18    against us.   One, I don't believe the Federal
19    Circuit's decision speaks to contributory infringement
20    at all.
21            THE COURT:   Did you raise the issue on
22    appeal?
23            MR. THOMASCH:   I wasn't the appellate
24    counsel, put appellate brief for Lawson has in it a
25    paragraph on contributory infringement.

1    THE COURT:  Then the Federal Circuit said

2  there's no merit to it.  We haven't dealt with it

3  here.

4    MR. THOMASCH:  It did not address it,

5  specifically.  What I'm suggesting, Your Honor, is the

6  non-infringing use wasn't before the Federal Circuit.

7  The non-infringing use, which is the use of

8  configuration 2.

9    THE COURT:  The non-infringing use was right

10  in front of the Federal Circuit by virtue of its own

11  decision.  How can you say that?  They made a

12  decision.  And if they had felt like there was a big

13  problem with respect to contributory infringement,

14  they could have said, Hey, look, in view of our

15  finding on No. 2, you need to redo this question on

16  contributory infringement.  Or they could have said,

17  The trial court must reconsider this question about

18  contributory infringement in view of our position on

19  configuration 2.  And if they didn't do that, I don't

20  know how I have a license to do what you want me to

21  do.

22    MR. THOMASCH:  One, because you're an Article

23  III judge.  You have a license.  You have a license to

24  do that.

25    THE COURT:  A lot of people a say that

1    Article III judges have a lot of power, but I'll tell

2    you something.  I adhere to mandates.  I've seen what

3    happens to district judges who do not do what they are

4    told.

5            MR. THOMASCH:  The decision of the Federal

6    Circuit in *Amado* is a decision about the mandate rule.

7    It is the Federal Circuit's decision on the scope of

8    the mandate rule.  And in the statement that on

9    remand, a judge is not a robot, applies in this case.

10   I don't think that would ever fairly apply to Your

11   Honor, but it says you're not limited to what they

12   said.

13           THE COURT:  Justice O'Connor expressed the

14   view about potted plants, if I remember correctly, and

15   district judges, and suggested that in certain

16   circumstances they are potted plants when it comes to

17   changing the law.

18           MR. THOMASCH:  We are not asking for the

19   district court in this instance to change the law in

20   the slightest.

21           THE COURT:  That's the point.  They say you

22   are.  You're asking me to change the law of the case

23   is what they're saying, as I understand their

24   argument.

25           MR. THOMASCH:  And I would submit that the

1  law of the case does not touch on the issue of whether

2  or not configuration No. 2, now that the patent has

3  been deemed -- the patent claim at issue has been

4  deemed invalid, then we are free to compete in that

5  regard.  It is a non-infringing use to use

6  configuration No. 2, and there's no possible way to

7  read the decision to the contrary.

8         It is impossible to suggest that somehow the

9  use of configuration 2 is infringing.  They never say

10  that.  Why not?  Why don't they just say, The use of

11  configuration 2 is infringing?

12         THE COURT:  Because the Federal Circuit said

13  no.

14         MR. THOMASCH:  Exactly.

15         THE COURT:  I assume that's why they said it.

16         MR. THOMASCH:  Exactly.  It was infringing in

17  2011.  It's not infringing now.  That's the new fact.

18         THE COURT:  All right.

19         MR. THOMASCH:  Very quickly on the adequacy

20  of money damages, whether or not anything would be.

21  Again, there is no showing that money damages would be

22  inadequate.  There's never been a claim that money

23  damages would be inadequate.  There's simply been a

24  desire not to have money damages because there is an

25  alternative remedy that they would prefer.

1    That isn't what inadequacy of money damages
2  means.  They are not wrapped within the case law on
3  that issue at all.  And on the question of public
4  interest, I don't really understand the argument made
5  other than maybe a chance to try to slam Mr. Hager,
6  but there's no possibility that we would be raising in
7  2013 the sunset provision as relating to whether or
8  not there should be an injunction today.
9    That's past.  You entered a sunset provision.
10  That period has past.  That public factor issue isn't
11  there.
12    We previously said, another issue, it was
13  right on the slide, was the reexamination proceedings.
14  Your Honor said those were too distant and uncertain
15  and that was the ruling.  They are right there.  They
16  are on the horizon right now.  They are in the Federal
17  Circuit where the United States Government has taken
18  the position that the last claim in this case is
19  invalid, along with the other method claims of the
20  '683 Patent.
21    THE COURT:  Am I to take comfort from the
22  fact that the United States Government takes a
23  position?
24    MR. THOMASCH:  I think it's an important
25  consideration to think that the PTO has finished all

1  appeals.   Every possible request for reconsideration

2  was made.   Every one of them was denied.   The issue is

3  now in the Federal Circuit.   It's teed up.   It's

4  briefed.   And we have to await oral argument and a

5  decision.   But in that decision comes down as an

6  affirmance, if the Court agrees with the position of

7  the government in that case, then all of this will

8  have been for naught because we would be in the same

9  position then as we are with the '172 Patent at the

10  moment.

11         If a patent is invalid, you can't predicate

12  infringement on it or anything else.   And so it is a

13  factor, we say, to suggest that we did, you know, we

14  took into account -- I know that there's been loose

15  argument all the time about how we just ignored what

16  Your Honor said, and we trampled it.   We did not.

17         And we were enjoined.   We were enjoined on

18  the '172 Patent.   And we changed the entire operating

19  system of RSS, not at issue in the contempt

20  proceeding, but a fact nonetheless.   We did that

21  because we were enjoined under the '172 Patent.

22         As it turns out, we should have never had to

23  do that.   We're not going to get a letter of apology

24  from ePlus, sorry about asserting that invalid patent

25  against you.   But the prejudice to us was real.

1    And at this point when the system claims have

2    been invalidated and the federal government says the

3    method claims are invalid, we do think public interest

4    would be served by allowing that proceeding to play

5    out before we rush into another injunction, Your

6    Honor.

7    So those are all the points I have.  I

8    believe that Mr. Krevitt wanted to correct one

9    statement that he made with respect to the Samsung

10   case, which is why I haven't mentioned that case

11   because I didn't want us double teaming on that.

12   MR. KREVITT:  Your Honor, if I may very

13   briefly.  As Mr. Thomasch noted, I was counsel for

14   Apple in that case and I am counsel for Apple in that

15   case, and argued the preliminary injunction motion.

16   Two quick things.  First, I believe I

17   misspoke earlier.  The time to file a petition to the

18   Supreme Court has not yet run.

19   THE COURT:  I think you said that.  You said

20   you weren't going to, though.

21   MR. KREVITT:  And the second part is I

22   actually am not aware of intentions one way or another

23   as to what Apple intends to do regarding a possible

24   petition to the Supreme Court.

25   THE COURT:  They may still file it.

1    MR. KREVITT:  They very well may.  The time

2  doesn't run until the end of this month.  I believe

3  early next month.

4    The other point I would mention, having been

5  involved and remain involved in that case, is the

6  standard for a preliminary injunction and a permanent

7  injunction, an issue that Your Honor raised and Mr.

8  Strapp addressed, is the same.  The Supreme Court held

9  that, Your Honor, in 1987 in the *Amoco Petroleum v.*

10  *Gamble* case, 480 U.S. 531.

11    The Supreme Court said the standard for a

12  preliminary injunction is essentially the same as for

13  a permanent injunction with the exception that the

14  plaintiff must show a likelihood of success on the

15  merits rather than actual success.

16    That case was cited by both *Winter*, which Mr.

17  Strapp mentioned, and *eBay*, approvingly.  That's at

18  footnote 12 in the *Amoco* case on page 546.

19    The standards are the same.  And it's an

20  important point, Your Honor, briefly because in the

21  *Apple* case, the Federal Circuit put in place this

22  causal nexus requirement.  Actually, Your Honor, there

23  were two Apple Federal Circuit decisions.

24    There's an Apple 1, as we say, and then an

25  Apple 2.  The Apple 1 decision came out in December of

2011.   The Apple 2 decision is the one Mr. Thomasch
was addressing, which came out in October of 2012.
Both cases addressed the causal nexus requirement.
And the significant point, Your Honor, is in both
cases, the Federal Circuit found that Apple and
Samsung, not surprisingly, are competitors.   They are
head-to-head competitors.

In fact, the district court found that it is
essentially a two-player market and found that there
is irreparable harm with the sale of the infringing
devices.   But nonetheless found, and notwithstanding
the irreparable harm that Apple will suffer because
the harm is not directly caused by -- the patented
feature is not directly caused by the functionality
that was at issue in that case, there can be no
injunction.   Preliminary or permanent.

In fact, Your Honor, following the Apple 2
decision about which Mr. Thomasch spoke, in October of
2011, the District Court, Judge Koh, in the Northern
District of California, had an opportunity to address
a permanent injunction in the first Apple case.

In the first Apple case, Apple 1 at trial
proved infringement.   And Judge Koh, relying on the
Federal Circuit decision nonetheless, notwithstanding
the competition, nonetheless denied the permanent

1   injunction on the basis that a causal nexus had not

2   been established.

3          That's why Mr. Thomasch addresses it here.

4   It's critical to the extent that ePlus has already

5   conceded that Punchout is not driving the sales, the

6   causal nexus precludes an injunction, permanent or

7   preliminary, on the sales of configurations that have

8   Punchout.

9          THE COURT:  If I find they actually did

10  concede that.

11         MR. KREVITT:  That's correct, Your Honor.

12  Thank you.

13         THE COURT:  All right.

14         MR. STRAPP:  Your Honor, could I just make

15  one point before we close today?  This is a short

16  point.

17         I just want to go back to where Mr. Thomasch

18  started a few hours ago.  He said that Lawson's

19  principal argument is that the District Court, this

20  Court, should dissolve the injunction *ab initio*.

21  Those were his words.

22         Now, I just want to end with this.  I think

23  there are two reasons why Your Honor shouldn't do

24  that.  First of all, at the conclusion of the Federal

25  Circuit opinion when it directs the district court

1   about what to do, it says, Consider what changes are

2   required to the terms of the injunction consistent

3   with its opinion.  Obviously, if there are going to be

4   changes to the terms of an injunction, that implies

5   that the injunction is not to be dissolved *ab initio*.

6         And then second, Mr. Thomasch pointed you to

7   the *Amado* case.  Now, interestingly, the *Amado* case

8   says at 517 F.3d 1360 that in an instance like this

9   one where you have a mandate that doesn't suggest that

10  there can be dissolution, it says, in that case, the

11  mandate rule would prevent the district court from

12  dissolving the injunction *ab initio*.  That's a quote

13  from that case.

14         THE COURT:  Say that again.

15         MR. STRAPP:  It says -- well, let me just

16  read the whole quote in context.  It says,

17  Accordingly, the mandate rule operates as a bar to the

18  district court's reconsideration of the initial

19  issuance of the injunction.  There is a fundamental

20  difference, however, between the granting of

21  retrospective relief and the granting of prospective

22  relief.  While the mandate rule would prevent the

23  district court from dissolving the injunction *ab*

24  *initio*, it does not preclude the district court from

25  modifying or dissolving the injunction if it

1  determines that it is no longer equitable.

2       THE COURT:  I, frankly, have always thought

3  that was the ruling.

4       MR. STRAPP:  Right.  Thank you, Your Honor.

5       THE COURT:  I don't think that's a surprise

6  that you have that power, period.  You've got it by

7  the mandate.

8       MR. STRAPP:  I'm just suggesting, Your Honor,

9  that the notion that this could be dissolved *ab initio*

10  finds no support in the law and is contrary to the

11  federal rules.

12       THE COURT:  It may or may not depending upon

13  the way I resolve the case, but the basic principle is

14  correct.

15       MR. STRAPP:  Thank you.

16       THE COURT:  If the mandate stops it, the

17  mandate stops it.  If it doesn't, it doesn't.

18       MR. STRAPP:  Thank you.

19       MR. THOMASCH:  Your Honor, and the part that

20  was left out, that entire discussion was specifically

21  identified by the Court because it was not an

22  intervening decision.  When it was not an intervening

23  decision, there was a different aspect of how you

24  handle retrospective relief.

25       THE COURT:  Basically, you mean it was dicta

1    on the point?

2            MR. THOMASCH:  No, it wasn't dicta in that

3    case.  In that case, the timing of the decision was

4    such that Microsoft was aware of the Supreme Court's

5    decision and chose not to raise it with the Federal

6    Circuit.  And then the Federal Circuit affirmed the

7    injunction.  It was because of that.

8            THE COURT:  Why didn't the Federal Circuit

9    address *eBay*?

10           MR. THOMASCH:  I think they actually gave

11   Microsoft -- I believe it says they gave Microsoft the

12   opportunity and Microsoft didn't take the opportunity.

13           THE COURT:  Strange workings.

14           All right.  Thank you.  It's submitted.

15           Now, there are a bunch of notebooks.  I think

16   I may have created a problem.  There are a bunch of

17   notebooks up here that you all have prepared for trial

18   and made part of the record, but you haven't used all

19   those things.  What you have used are what's in the

20   witness binders.  And I want you just to take all

21   of -- there's one set for ePlus and one set for

22   Lawson.  Come get them.  And take them.  Don't take

23   anything in this first thing.

24           Mr. Neal?

25           THE CLERK:  The top shelf?

1293

1      THE COURT:  No, this whole shelf leave.

2  Everything on the floor and on this shelf, the back

3  shelf, they take.  I think ePlus's is on the floor.

4  And Lawson's is --

5      THE CLERK:  As long as you leave these,

6  that's all we need to do?

7      THE COURT:  I need everything on the first

8  shelf and my bench.

9      THE CLERK:  And the second shelf is the only

10 shelf that goes then.

11     THE COURT:  And the floor.

12     THE CLERK:  And the floor.  Okay.

13     THE COURT:  Yes.

14     THE CLERK:  I'll be glad to meet with the

15 paralegals tomorrow or tonight.  It doesn't make any

16 difference to me.  Whatever they want to do.

17     THE COURT:  Okay.  Is there anything else we

18 need to deal with?  We set the date for the hearing on

19 the contempt; is that right?

20     MS. ALBERT:  Yes, sir.

21     THE COURT:  What have you done about Hager?

22     MR. STRAPP:  This is it.  Apparently, it's

23 been made while we were arguing this.  Our argument

24 went on sufficiently so we had time to get this binder

25 ready.  So I can hand this up to Your Honor.

1294

1    THE COURT:  All right.  That will stay up
2   here on the desk and we'll clean all this up later.

3        All right.  Thank you all.  I'd like to say
4   something.  There's been a lot of paperwork in this
5   case, and I think it's been very efficiently handled
6   by the legal assistants and the younger lawyers who
7   have worked on the case.

8        And notwithstanding the incompatibility of
9   our system and your system, the computer support has
10  been helpful where they could get it up, and we could
11  see it, and it was well organized.  Nothing happened
12  in any way to slow down these proceedings.

13       So I appreciate it.  And I appreciate having
14  the opportunity to work with lawyers who are prepared,
15  and know what they are doing, and give me all kinds of
16  problems in the decisional process.

17       Thank you.  We are in adjournment.

18       (The proceedings were adjourned at 5:30 p.m.)

19       We, Diane J. Daffron and P.E. Peterson,
20  certify that the foregoing is a correct transcript
21  from the record of proceedings in the above-entitled
22  matter.

23            /s/
            _____        _____
24          DIANE J. DAFFRON, RPR, CCR        DATE
                 /s/
            _____        _____
25          P. E. PETERSON, RPR, CCR          DATE