**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| *e*PLUS INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:09-CV-620 (REP) |
| | ) | |
| v. | ) | |
| | ) | |
| LAWSON SOFTWARE, INC., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF *e*PLUS INC.'S POST-HEARING**
**BRIEF ON THE 'NOT MORE THAN COLORABLY DIFFERENT' ISSUE**

Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB#35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone: (202) 346-4000


Michael G. Strapp (admitted *pro hac vice*)     Craig T. Merritt (VSB #20281)
**GOODWIN PROCTER LLP**                          Paul W. Jacobs, II (VSB #16815)
Exchange Place                                   **CHRISTIAN & BARTON, LLP**
53 State Street                                  909 East Main Street, Suite 1200
Boston, MA 02109-2881                            Richmond, Virginia 23219-3095
Telephone: (617) 570-1000                        Telephone: (804) 697-4100

*Attorneys for Plaintiff ePlus Inc.*

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

I.      LEGAL STANDARD.................................................................................2

II.     THE MODIFICATION ...............................................................................3

        A.      Timeline For Development Of RQC........................................................3

        B.      Lawson's Modification ...........................................................................5

III.    LAWSON'S PURPORTED MODIFICATION DOES NOT RENDER THE RQC
        CONFIGURATIONS MORE THAN COLORABLY DIFFERENT FROM THE
        INFRINGING CONFIGURATIONS ...........................................................6

        A.      Modification Is Not Related To Any Requirement Of Claim 26............................6

        B.      Lawson Made No Changes To The Core Procurement Functionality Of
                The Infringing Configurations ...................................................................8

        C.      Modification Was Not Innovative — At Best It Slightly Degraded
                Functionality ...........................................................................................9

        D.      Lawson Described The Modification Internally And To Its Customers As
                Either No Change At All Or Just A Slight Change ................................................10

        E.      Lawson Presented No Evidence Of Any Of The Alleged Detriments Of
                The Modification ......................................................................................12

                1.      RQC Still Permits Comparison Shopping ................................. 12

                2.      Lawson Presented No Evidence To Show Customers Complained
                        that Preparing Requisitions Using RQC Configurations Took
                        Longer Than Infringing Configurations.....................................................14

        F.      Lawson's Customers Thought Configurations With RQC Were Essentially
                The Same As The Infringing Configurations.........................................................15

        G.      No New Training Or Testing Was Required For Customers Using RQC
                Configurations..........................................................................................16

        H.      The Download, Installation And Implementation Process Was Simple And
                Straightforward ........................................................................................17

        I.      Time To Develop Modifications Was Very Short...............................................18

IV.     CONCLUSION...........................................................................................18

## **<u>TABLE OF AUTHORITIES</u>**

Page(s)

**Cases**

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
    2012 WL 3579607 (M.D. Pa. Aug. 17, 2012) ........................................................ 1, 6

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.,*
    2013 WL 1149230  (M.D. Pa. Mar. 19, 2013) ........................................................ 3

*Merial Ltd. v. Cipla Ltd.,*
    681 F.3d 1283 (Fed. Cir. 2012) ........................................................................ 2

*Suntiger, Inc. v. Telebrands Adver. Corp.,*
    2003 U.S. Dist. LEXIS 265564 (E.D. Va. 2003)...................................................... 6

*TiVo Inc. v. Echostar Corp.,*
    646 F.3d 869 (Fed. Cir. 2011) ................................................................... 2, 6, 7, 9

# INTRODUCTION

In accordance with Paragraph F of this Court's January 24, 2013 Order (Dkt. No. 1002), Plaintiff *e*Plus Inc. ("*e*Plus") respectfully submits this Post-Hearing brief on the 'Not More Than Colorably Different' issue.

During the contempt hearing, *e*Plus adduced clear and convincing evidence that Defendant Lawson Software Inc.'s ("Lawson's") one and only alleged design change that it has asserted with respect to claim 26 of U.S. Patent No. 6,023,683 (the "'683 Patent") does not render the Lawson system Configurations 3 and 5 with Requisition Center ("RQC") ("the RQC Configurations") more than colorably different from the adjudicated infringing Configuration Nos. 3 and 5 with RSS ("the Infringing Configurations"). The single change Lawson made to the Infringing Configurations is not relevant to any element of claim 26 as construed by this Court. Therefore, as a matter of law, the change cannot present a more than colorable difference from the Infringing Configurations. *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 2012 WL 3579607, *5-7 (M.D. Pa. Aug. 17, 2012) (holding that alleged design changes not relevant to any claim element were "randomly chosen features" that could not present a more than colorable difference). Additionally, the lone modification Lawson made to the Infringing Configurations is insignificant and did not affect any core procurement functionality of the Infringing Configurations. Indeed, the evidence shows that Lawson represented — both internally and externally — that the change was at best "slight," "insubstantial," and "trivial," and had no impact on Lawson's customers. Accordingly, *e*Plus respectfully requests that the Court find the RQC Configurations not more than colorably different from the Infringing Configurations and hold Lawson in contempt for its long-standing violation of this Court's injunction.

## I.    LEGAL STANDARD

The Federal Circuit's *en banc* decision in *TiVo* provides the standard for this Court's evaluation of contempt as related to modifications of infringing products.[1]  *TiVo* and subsequent cases make clear that Lawson may not expand this proceeding into a new trial of infringement issues, or any other issues for that matter.  *TiVo*, 646 F.3d at 889; *Merial Ltd. v. Cipla Ltd.,* 681 F.3d 1283, 1299 (Fed. Cir. 2012) ("infringement by an originally accused product [is] generally not open to challenge in contempt proceedings").  The Federal Circuit explained that, as a threshold matter, district courts have "broad discretion" to hold contempt proceedings, and may do so simply upon receipt of "a detailed accusation from the injured party setting forth the alleged facts constituting the contempt."  *Id.* at 881.  *TiVo* requires that *e*Plus prove "that the newly accused product is not more than colorably different from the product found to infringe and that the newly accused product actually infringes."  *Id.* at 882.  A defendant's alleged "good faith" or lack of intent is not a defense to either of these inquiries.  *Id.* at 880.

The "colorable differences" analysis focuses on those elements of the accused product that the defendant has allegedly modified or removed, and requires "an inquiry into whether that modification is significant."  *Id.* at 882.  The significance of the modification is a question of fact and is dependent on the nature of the products at issue.  *Id*. at 882-83.  "[T]he innovative significance of the modification is best viewed in light of the existing art and ***from the perspective of one of ordinary skill in the art***."  *Id.* at 883, n.1 (emphasis added).  Thus, this Court must "directly compare the elements of an accused product that previously were specifically identified or

---

[1] *TiVo Inc. v. Echostar Corp.*, 646 F.3d 869 (Fed. Cir. 2011) pertains to the assessment of alleged modifications to infringing products, *i.e.,* product "redesigns."  The additional issue of Lawson's continued inducement of its customers to use the enjoined and ***unmodified*** Infringing Configurations with RSS does not present any issue of modification or redesign.  *e*Plus therefore addresses this issue in its infringement brief, filed this same day, because no issue of colorable differences is presented with respect to an unmodified product.

accused by the patentee *as meeting a disputed claim limitation*, and any subsequent modifications made by the accused infringer to those specifically accused elements." *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.,* 2013 WL 1149230, at *8-9 (M.D. Pa. Mar. 19, 2013) (emphasis added).

## II.    THE MODIFICATION

### A.    Timeline For Development Of RQC

On January 27, 2011, the jury returned a unanimous verdict that claim 26 of the '683 Patent was infringed, and that it was not invalid.  Dkt. No. 600 at 2-3.  In particular, the jury determined that *e*Plus proved that the following configurations of Defendant's S3 Procurement System infringe claim 26 of the '683 Patent, both directly and indirectly: (i) "**Configuration 3**," comprising Lawson's Core S3 Procurement System (including Lawson System Foundation (LSF) and Process Flow in combination with Inventory Control, Requisition, and Purchase Order modules), Requisition Self-Service (RSS), and Punchout; (ii) "**Configuration 5**," comprising Lawson's Core S3 Procurement System, RSS, Punchout, and EDI; and (iii) Lawson's M3 e-Procurement Software (collectively, the "Infringing Configurations").  *Id.*

Following the jury's verdict, Lawson claimed that it had modified RSS and renamed it Requisition Center ("RQC").  *See e*Plus's Proposed Findings of Fact and Conclusions of Law ("PFF"), ¶ 11.  It is undisputed that RSS was the only component of the Infringing Configurations that was modified.  *Id.*

Lawson first began work on RQC as early as February 8, 2011, prior to the Court's March 25, 2011 injunction evidentiary hearing.  PFF ¶ 12.  As of mid-February 2011, Lawson intended to present its proposed redesign ideas to the Court.  PFF ¶ 14.  Lawson began unit testing for RQC as early as March 1, 2011 (PFF ¶ 15), and as of March 7, 2011, Lawson still intended to present the changes it intended to make to the Infringing Configurations to the Court for approval prior to implementation (PFF ¶ 16).

However, at the injunction evidentiary hearing, Lawson presented no testimony concerning the existence of any redesign of the Infringing Configurations.  D.I. 637.  Rather, Lawson Executive Vice President Dean Hager represented to the Court that to move away from RSS would take around nine months at a cost of, in some cases, over a million dollars per customer.  *Id.*; PFF ¶ 212. But according to Lawson's own documents, Mr. Hager's representations to the Court were not based on the costs associated with the modifications being made to RSS, but rather, predicated on the cost to "[Lawson's] most complex RSS user to rip out RSS and replace with ePlus."  PFF ¶ 221. Mr. Hager failed to inform the Court that Lawson intended to implement its own design-around product instead of requiring its customers to "rip out RSS" and replace RSS with ePlus's software products.  PFF ¶¶ 221-223.

Mr. Hager's decision to withhold information from the Court was consistent with Lawson's company-wide policy to not disclose the existence of work on its purported design-around product. Thus, for example, on April 13, 2011, Lawson legal counsel advised a Lawson employee to retract a statement in an internal healthcare newsletter that stated "I would like to make everyone aware of the e-Plus lawsuit related to our Punchout and Requisition Self Service is still active. The good news, regardless of outcome, Lawson is now prepared with substitute solutions/products should something occur."  The reason given by counsel was that "[t]hese statements may be used by ePlus or the Judge to negate any efforts to obtain a stay from either the district court or court of appeals." PFF ¶ 220.

A mere five days after the injunction evidentiary hearing, Lawson held a launch startup meeting for RQC on March 30, 2011.  PFF ¶ 18.  Lawson ultimately required only a few days of work to develop and implement the modification to RSS at issue in these proceedings.  PFF ¶¶ 19,

21.  Indeed, the entire process for Patch 1 to RQC — including proposal, development, unit testing, QA testing, and change of documentation — took Lawson a total of six days.  PFF ¶ 22.

RQC was released to customers on May 18, 2011.  PFF ¶ 20.  Patch 1 to RQC was made available to customers on June 9, 2011.  PFF ¶ 23.

### B.       Lawson's Modification

Lawson realized early on that claim 26 was going to be a difficult claim to design around. PX-1013 ("***Claim 26 is right on the mark…So this claim is going to be a tough one to navigate***."); PFF ¶ 202; Tr. at 257:2-258:7 (Christopherson Direct).  Accordingly, Lawson considered, but ultimately rejected, several different possible modifications.

Soon after the verdict, Lawson's product development team analyzed the Infringing Configurations and determined that many of the modules and infringing functionalities could not be modified without crippling the systems.  Lawson also decided that its customers would find such modifications unacceptable.  Lawson concluded, for example, that the Item Master catalog database in the Infringing Configurations that contained items associated with vendors could not be removed from the Inventory Control and Purchase Order modules without crippling the procurement product suite.  PFF ¶ 26.  Lawson also concluded it would be unacceptable to remove the search capabilities from the Infringing Configurations.  PFF ¶ 27.  Lawson further determined that it would be unacceptable to remove requisition building functionality from Configurations Nos. 3 and 5.  PFF ¶ 28.  Lawson additionally determined then that it would be unacceptable to remove the purchase orders functionality from the infringing systems.  PFF ¶ 29.  Lawson concluded as well that it would be unacceptable to remove inventory checking capabilities from the Punchout sites.  PFF ¶ 30.

Another alternative proposal Lawson considered, but rejected, was referred to as "crippled Punchout."  PX-1015 at RQC 364471; Tr. at 246:5-247:2 (Christopherson Direct) ("Q: And you indicated that Lawson proposes that "We would restrict Procurement Punchout to only connect to

catalog providers that have a license for the '683 Patent from ePlus, Inc." …This was the redesign proposal that you referred to as crippled Punchout; is that correct? A: Yes.  That's pretty close to describing what we were thinking at that point.").  This proposal was ultimately rejected by Lawson's attorneys.  PFF ¶ 31.

Ultimately, Lawson decided to make a ***single*** modification to RSS that requires that an item ordered through Punchout must be on a separate requisition from items selected from the Item Master or another Punchout vendor site.  PFF ¶ 32.  But Lawson's lawyers advised Lawson, even after it had made RQC generally available, that additional changes to Punchout were necessary to avoid infringement.  PX-1015 at RQC 364471; Tr. at 246:5-247:2 (Christopherson Direct); PX-1256; Tr. at 258:15-261:1 (Christopherson Direct) ("Q: So notwithstanding that Lawson had already released RQC, your lawyers were advising you that additional changes to Punchout were needed, correct? A: That is correct."); PFF ¶¶ 204-205.  Lawson did not heed the warnings and advice of its counsel, and instead rejected the design-around related to Punchout proposed by its attorneys in June 2011.  *Id.*

### III.   LAWSON'S PURPORTED MODIFICATION DOES NOT RENDER THE RQC CONFIGURATIONS MORE THAN COLORABLY DIFFERENT FROM THE INFRINGING CONFIGURATIONS

#### A.   Modification Is Not Related To Any Requirement Of Claim 26

The sole modification made by Lawson has no relevance to any requirement of Claim 26. As stated *supra*, the modification therefore cannot render the RQC Configurations more than colorably different from the Infringing Configurations.  *Arlington Indus,* 2012 WL 3579607, at *5-7 (alleged design changes not relevant to any claim element were "randomly chosen features" that could not present a more than colorable difference) (citing *TiVo,* 646 F.3d at 882); *see also Suntiger, Inc. v. Telebrands Adver. Corp.,* 2003 U.S. Dist. LEXIS 265564, at *15-16 (E.D. Va. 2003) (the "comparison of the respective technical characteristics of the infringing [] product and

the accused [] product focuses solely on product features which are potentially read upon by the asserted claims of the [patent-in-suit]"  All of the numerous other 'similarities' identified in plaintiff's motion are irrelevant ….").

The evidence shows that the Lawson systems having RQC continue to have the capability to maintain at least two product catalogs on a database containing data relating to items associated with the respective sources as was true with the Infringing Configurations.  PFF ¶ 35.  The modification also did not eliminate the capability of a system user to select and search one or more product catalogs from among the at least two product catalogs, including those in the Item Master, or those on single- and multi-vendor Punchout sites.  PFF ¶¶ 36-38.  A user of the RQC Configurations continues to have the capability to: (i) build a requisition using data related to selected matching items and their associated source or sources (PFF ¶ 39); (ii) process the requisition to generate one or more purchase orders for the selected matching items (PFF ¶¶ 40-42); and (iii) determine whether a selected matching item is available in inventory (PFF ¶¶ 43-44).  For example, Configuration 5 with RQC and EDI can be used to send purchase orders to a vendor, and receive purchase order acknowledgements.  The purchase order acknowledgment report shows users whether or not a specific item that was ordered is available in a vendor's inventory.  PFF ¶ 44.  Additionally, Configurations 3 and 5 with RQC and Punchout can be used to determine whether a selected matching item is available in inventory by querying the Punchout vendor's inventory database.  PFF ¶ 45.

The Federal Circuit in *TiVo* made clear that a modification that does not relate to a feature relied upon to prove infringement is not relevant.  646 F.3d at 882.  *e*Plus did not rely upon the capability of including items from a Punchout catalog on the same requisition as items found in searching the catalogs in the Item Master to prove infringement of claim 26 because there is no such

requirement in any element of claim 26.  Nor did *e*Plus rely upon the capability of including items from multiple Punchout sites on the same requisition to prove infringement of claim 26.  Again, such capability is not necessary to establish infringement of claim 26.  Thus, the lone modification made by Lawson to the Infringing Configurations cannot, as a matter of law, render the RQC Configurations more than colorably different from the Infringing Configurations.

**B.     Lawson Made No Changes To The Core Procurement Functionality Of The Infringing Configurations**

Lawson has made no changes to the core procurement functionality of the Infringing Configurations.  In particular, the evidence shows that Lawson made no changes whatsoever to the following components of the Infringing Configurations relevant to claim 26:

- Inventory Control Module, which still stores catalog data associated with multiple vendors in the Item Master (PFF ¶¶ 46-47);

- Item Master, which continues to maintain multiple vendor product catalogs that can be selected and searched and includes items from search results that can be chosen for inclusion in a requisition (PFF ¶ 47);

- Search capability, and the programs associated therewith (PFF ¶ 48);

- EDI application, which allows a user to determine the availability of a selected matching item in the vendor's inventory (PFF ¶ 49);

- Punchout application and the steps of the Punchout process, which allow a user to connect to a selected Punchout catalog to search, search that selected Punchout catalog, select items found in searching that Punchout catalog, and create a Punchout order request document that contains those selected items for return to the Lawson user interface (PFF ¶ 50);

- Requisitions program RQ10, which allows a user to build a requisition including the selected items (PFF ¶ 51);

- Purchase Order module, which allows a user to generate one or more purchase orders necessary to fulfill requisitions (PFF ¶ 52); and

- Inventory determination capability available at Punchout sites (PFF ¶ 50).

RQC also serves the very same purpose as RSS did in the Infringing Configurations, namely it provides a user-friendly overlay to the underlying Inventory Control, Requisitions and Purchase Order modules of the Core Procurement system.  PFF ¶ 53.  According to Lawson's own expert, Dr. Goldberg, RQC provides "the same end result functions as RSS."  Tr. at 477:25-478:13 (Goldberg Cross) ("Q: Do you agree that, 'stated simply, RQC provides the same end result functions as RSS, just not necessarily done in the same way?'... A: I would guess I would agree with it. THE COURT: Would or wouldn't?  A: Would."); *see also* Tr. at 478:14-478:17; PFF ¶ 56.

Thus, because it is undisputed that six out of seven components in Configuration 3, and seven out of eight components in Configuration 5 are wholly unchanged, and the underlying procurement functionality remains unchanged, the RQC Configurations are certainly not more than colorably different from the adjudicated Infringing Configurations.

**C.     Modification Was Not Innovative — At Best It Slightly Degraded Functionality**

*TiVo* instructs that a "nonobvious modification may well result in a finding of more than a colorable difference" as opposed to a "modification [that] merely employs or combines elements already known in the prior art in a manner that would have been obvious to a person of ordinary skill in the art."  *TiVo*, 646 F.3d at 882.  In this case, this consideration weighs ***against*** an argument that Lawson's modification was significant, because Lawson repeatedly conceded at the hearing that its modification actually ***degraded*** the product and was not innovative, notwithstanding what it told its customers.  Tr. at 461:15-20 (Goldberg Direct); Tr. at 398:5-399:9 (Lohkamp Direct) (change relating to Punchout took away functionality); Tr. at 408:2-19 (Lohkamp Direct) (change in Patch 1 took away functionality).

D.     **Lawson Described The Modification Internally And To Its Customers As Either No Change At All Or Just A Slight Change**

Lawson's witnesses readily acknowledged, and its documents confirm, that Lawson's own technical personnel view the modification as insignificant and insubstantial.  PFF ¶¶ 53-56.  Indeed, Lawson described the modification as merely a "slight change."  PX-1030 ("Besides some label/visual or lipstick on a pig as Dale so eloquently puts it changes, there were three functional adjustments.… The process in which Punchout is being performed has ***changed slightly***.  You know get a warning pop-up that you are about to leave the Lawson site when you punch out.  ***The process remains completely the same*** except if you try to punch out on a req. that is already in use with non-Punchout items, it will tell you that you need to open a separate req., and it will perform that action for you…***All other back office and RSS functionality remains the same in RQC*** including consolidation of requisitions and purchase orders….").  PFF ¶ 63.

Lawson's director of RQC development Dale Christopherson testified that "with respect to RQC, there ***was not one moving part in RSS that changed for RQC***."  Tr. at 377:12-377:15 (Christopherson Cross); PFF ¶ 55.  Likewise, Lawson employee Mindy Klebe, responsible for RQC customer support, described RQC as "really the same thing" as RSS.  PX-1027 (Mindy Klebe described RQC to Mr. Drury of Providence Health by stating "Hey, didn't mean to imply that it's RQC... it's not – it's really the same thing as RSS XML was except for a few adjustments. (however, I'm not allowed to say that).");  PFF ¶ 65.

Indeed, Lawson's own support personnel were "scared" that RQC did not comply with this Court's injunction order and that Lawson continued to sell, maintain and support an infringing product.  There were also misgivings at Lawson that the support staff in charge of the migration to RQC were not taking the court's injunction order "seriously."  For example, on June 23, 2011, one

month after the injunction, Lawson personnel involved in supporting Lawson's customers of the

Infringing Configurations exchanged the following email:

| Mr. Bragstad: | "Does it scare you as much as me that at this point nobody at the courts or ePlus has said that RQC complies?" |
|---|---|
| Ms. Homewood: | "absolutely!" |
| Mr. Bragstad: | "It also seems that Nancy and Support in general are taking this a lot more serious that the rest of the company right now. This group almost seems like, this is so last year. Or maybe everyone has just checked out" |
| Ms. Homewood: | "A little of both I think  :)" |

PX-1044; Tr. at 855:18-585:20 (Homewood Cross); PFF ¶ 203.

Externally, Lawson marketed RQC to customers as having "100% of the functionality you

require," Tr. at 376:21-376:24 (Christopherson Cross).  Lawson even told customers they would not

notice any differences between RSS and RQC:

> I've tested it.  ***It works the same as RSS XML***.  There are some 'cosmetic' changes such as changing 'Checkout' to 'Release' and 'Shopping Cart' says 'Requisition Lines'…It looks/appears exactly like RSS XML did.  It uses the exact same files and programs as RSS & installs the same as RSS did.  The only change that is 'major' (if you want to call it that) is that when you add an item to the Shopping Cart now, it adds the Requisition Line (there's no 'save' needed anymore) — so — it's basically acting a lot more like RQ10.  ***Otherwise, users will probably not even notice the difference, really.***

PX-1124; *see also* PX-1056 at RQC0905561 (the change to RQC was "Designed to minimize

impact on our customers."); RQC0905565 (Lawson designed RQC "with 3 principles in mind," and

the first of these was "100% functionality you require must be included."); PFF ¶¶ 54-59.

Lawson also repeatedly represented to customers that RQC works the same as RSS.  For

example, Lawson represented to its customers that:

- "***Requisition Center ... works the same as RSS*** XML.  There are some 'cosmetic' changes ... ***it looks/appears exactly like RSS XML did***.  It uses the exact same

files and programs as RSS & installs the same as RSS did." (PX-1124 at RQC 2214590; PFF ¶ 59);

- "The new product is a change to the user interface only. ***The procurement business functionality (and data) remains the same.*** If the user uses RSS already, they will intuitively be able to use the RQC product. ***There is very little change in the functionality***." Therefore, customers can "perform any tests that would normally have been performed with deploying RSS or patching RSS" or "***test what has changed ... which is really nothing***." (PX-1072 at RQC 14103; PFF ¶ 61);

- "Since ***RQC has 100% of the existing functionality of RSS***, no training issues have been identified to date." (PX-1057 at RQC 2609831.20; PFF ¶ 64); and

- "***With regard to punchout (and SciQuest) RQC will function as RSS did***. . . . SciQuest will come back with multiple vendors on the same requisition with one punchout." (PX-1022 at RQC 7678; PFF ¶50).

On May 26, 2011, Mr. Hager wrote to a potential $1 million healthcare customer Summa Health, "regarding our legal issues with ePlus." *See* PX-1266. He noted that "[w]e are ***very confident that Summa will see [no] negative impact from the slight product configuration change*** we have made in regards to the patent claim. In fact, we believe you will end up with ***a solution that is actually better***." *Id.*

### E. Lawson Presented No Evidence Of Any Of The Alleged Detriments Of The Modification

Despite Lawson's modification, the RQC Configurations function identically to the Infringing Configurations in the context of the functionality of claim 26. Lawson nevertheless asserts that its modification is "significant" because, it alleges, requisitions will take longer and users can no longer "comparison shop." These contentions are both inaccurate and irrelevant.

### 1. RQC Still Permits Comparison Shopping

Lawson's own witnesses testified during the contempt hearing that Configurations 3 and 5 with RQC can be used to "comparison shop." Tr. at 374:6-374:24 (Christopherson Cross); PFF ¶ 66. In Configuration 3 or 5 with RQC and Punchout, for example, one can compare items available

from different vendors by performing searches for items in the Item Master catalogs.  Tr. at 480:24-481:18 (Goldberg Cross) (RQC system users can comparison shop by searching catalogs in Item Master and comparing the items in search results or by searching a Punchout catalog and comparing items in the search results); Tr. 374:6-376:13 (Christopherson Cross) (RQC system users can compare items available from different vendors by searching the catalogs in Item Master and/or then punching out to a Punchout catalog to compare items available from the Punchout vendor to those available from the vendors associated with the Item Master items); PFF ¶¶ 66-67.

Even Lawson's expert, Dr. Goldberg, testified that users can comparison shop on a Punchout site:

> Q: And users of a system with RQC and Punchout can still connect to Punchout catalogs; correct?
>
> A:Yes.  As we saw, as long as you don't have something in your requisition already, you can go ahead and go to a Punchout vendor.
>
> Q: Then your demonstration that you showed, your system was configured so that you could connect to either the Staples catalog or the Dell catalog; correct?
>
> A: That's right.
>
> Q: Users of a system with RQC and Punchout can still comparison shop by searching items out at a Punchout site and comparing the items found in the hit list of search results; correct?
>
> A: Yes, for that -- only for that Punchout vendor.

Tr. at 482:8-482:17 (Goldberg Cross); *see also* PFF ¶ 67.  Thus, contrary to Lawson's allegations, the evidence shows that users of RQC could indeed comparison shop, and accordingly, installing RQC was not detrimental to Lawson's customers.

2. **Lawson Presented No Evidence To Show Customers Complained that Preparing Requisitions Using RQC Configurations Took Longer Than Infringing Configurations**

Nor did Lawson present any testimony proving that Lawson customers complained that the requisitioning process using the RQC Configurations took "longer" than that performed using the Infringing Configurations or had any other drawbacks.  In fact, Lawson told its customers that RQC was a "superior product" to RSS, was "easy to use," and "provide[d] a streamlined way to automate, expedite, track, and simplify the requisitions process."  PFF ¶ 68.  Indeed, Mr. Lohkamp's testimony directly contradicts Lawson's allegation that RQC is a severely compromised product:

*e*PLUS COUNSEL: Now, you said that the modifications that were made to the requisitioning process for Punchout items degraded functionality; is that your position?

MR. LOHKAMP: Yes.

*e*PLUS COUNSEL: But didn't you tell your customers that Lawson had developed superior replacement product, Lawson Requisition Center?

MR. LOHKAMP: Yes, we did.

*e*PLUS COUNSEL: And you didn't mean to mislead your customers, did  you?

MR. LOHKAMP: No, we did not.

*e*PLUS COUNSEL: Lawson intends to be truthful and accurate in its customer presentations; correct?

MR. LOHKAMP: Yes, we do.

*e*PLUS COUNSEL: Lawson also told its customers that Requisition Center delivers all necessary functionality required by customers; correct?

MR. LOHKAMP: We said 100 percent of needed functionality, functionality you need.

*e*PLUS COUNSEL: That was an accurate statement; right?

MR. LOHKAMP: Yes.

>*e*PLUS COUNSEL: And Lawson also told its customers that Lawson Requisition Center is a new, easy to use, web-based requisitioning solution that can be set up by customers to provide a streamlined way to automate, expedite, track, and simplify the requisitions process; correct?
>
>MR. LOHKAMP: Correct.

Tr. at  438:24-439:25 (Lohkamp Cross); PFF ¶ 68.

Customers were thus informed that Configurations 3 and 5 with RQC were actually improvements over the Infringing Configurations and preserved key functionality.  These statements by Lawson plainly contradict its recent allegation that Configurations 3 and 5 with RQC are severely compromised products.

Indeed, Configurations 3 and 5 with RQC can still be used to create a single requisition for stock, nonstock and special-order items available from multiple vendors.  The systems can then automatically generate multiple purchase orders from that requisition.  PX-1003; Tr. at 78:18-78:25 (Weaver Direct) ("Q: Let's turn to page RQC 692 of the exhibit.  Under the heading key features and benefits, what does Lawson indicate that users can do with Lawson Requisition Center and Procurement Punchout under that first bullet?  A: The first bullet says, create a single requisition for stock, nonstock, and special order items as well as services.  Lawson procurement can then automatically generate multiple purchase orders from that requisition."); *see also* PFF ¶ 75.  There is no evidence in the record that creating such a requisition takes any different amount of time as compared to systems having RSS; instead the record evidence proves that "***RQC behaves identically to RSS*** (minor cosmetic changes only)." PX-1124 at RQC 2115686; *see also* PFF ¶ 59.

### F.     Lawson's Customers Thought Configurations With RQC Were Essentially The Same As The Infringing Configurations

The response of Lawson's customers is telling in terms of how they perceived the modification.  For instance, an outside Lawson contractor from Art Crandall & Associates stated that "***RQC appears to look, function and operate the 'same' as RSS***".  PX-1105 at RQC 869077;

*see also* PFF ¶ 73.  Similarly, a webinar attendee from Children's Health of Atlanta asserted that "[T]he view looks very similar to current RSS."  PX-1105 at RQC 869081; PFF ¶ 73.

Lawson adduced no evidence during the hearing concerning customer feedback regarding any allegedly "diminished" capabilities of RQC.  In fact, there is no evidence that even a single customer complained about the modification, nor is there any evidence that Lawson lost even a single customer because of the modification.  Tr. 562:5-11 (Lohkamp Cross) (The Court:  I wrote down to ask yesterday and didn't while you're here.  To your knowledge, has Lawson lost any customers who had RSS and who told you that they were quitting Lawson because of the shift to RQC?  Mr. Lohkamp:  I personally am not aware of any.); PFF ¶ 72.

> **G.     No New Training Or Testing Was Required For Customers Using RQC Configurations**

Lawson designed RQC with the intention of providing its customers with the same functionality as RSS.  Configurations 3 and 5 with RQC were so similar to the Infringing Configurations, in fact, that Lawson did not require any of its customers to undergo re-training or testing of the new product.  PX-1110 (Dean Hager: "No new training should be needed.  And re-demoing shouldn't be needed."); PX-1070 (Scott Hanson: "As for training…it varies, but generally minimal (if any) re-training is necessary."); PFF ¶ 64.  Nor were there were database changes or upgrades required in software or environment to implement RQC.  PX-1010 ("No required upgrades in software or environment"); PX-1066 (Scott Hanson: "There is no data migration."); Tr. at 110:5-110:9 (Weaver Direct) ("Q: Under the heading Implementation straightforward, what does Lawson indicate concerning implementation of Requisition Center?  A: It says, no database changes, no required upgrades in software or environment."); PX-1072 ("For the risk adverse – perform any tests that would have normally been performed with deploying RSS or patching RSS. For the non-risk takers – test what has changed… which is really nothing."); PFF ¶ 70.

**H.     The Download, Installation And Implementation Process Was Simple And Straightforward**

Numerous Lawson employees described the RQC download and installation process as quick and easy.  Mr. Hager said:

> [D]oes not require upgrade to any other technology, applications or any other Lawson components.  ***[D]elivered via download, which takes about 20 minutes. [S]traightforward installation that most companies typically do themselves, but we are happy to do it for no fee.    Installation takes a couple of hours.*** [C]onfiguration varies a bit but typically will be completed in a day or two. Again, done by us at no fee.  [U]ser training can be done electronically and would be estimated as an hour or two of information for users... ***[E]ffort level can be thought of as a maintenance release effort, but only changes to the requisition center…Nothing in core Lawson.***

PX-1100; *see also* Tr. at 143:13-144:1; PFF ¶ 69.

> Likewise, Mr. Hanson described the ease of conversion:

> We do the install for no charge – that's what the whole RQC SOF is about.  There is no conversion necessary.   RQC is just a new user interface to access their requisition functionality. Think of it as they used to access the Internet [read: requisitions] via Internet Explorer on their PC [read:  RSS].   What we are now saying is that you cannot use IE any longer, and instead have to use Firefox.  So, Lawson is offering to install Firefox [read:  RQC] on their PC's, to use instead of IE [read:   old RSS] to access the Internet read:   their existing and new requisitions]. There is no requirement to 'convert' a requisition.  A requisition is a requisition.  We are just providing a new utility to view that requisition.

PX-1065; PFF ¶ 57.

Lawson described downloading RQC as a "[s]imple 20 minute process."  PX-1056 at RQC0905561; PFF ¶ 60.  Lawson itself installed RQC on its own systems with merely "1 day's work spread over a two-day period," and informed its customers that [i]mplementation [of RQC is] straightforward."  *Id.* at RQC0905563-65; PFF ¶ 60.  Mr. Hanson, the head of Lawson's RQC SWAT team, described the installation process as something that "[s]houldn't take more than 1 hr to do."  PX-1067; PFF ¶ 60.

**I.      Time To Develop Modifications Was Very Short**

During the March 25, 2011 injunction evidentiary hearing, Lawson Executive Vice

President Dean Hager represented to the Court that it would take 9 months, thousands of hours, and

hundreds of thousands of dollars to implement a product to replace Lawson's infringing products.

*See* PFF ¶ 212.  But a mere 5 days after the injunction evidentiary hearing, Lawson held a launch

startup meeting for RQC on March 30, 2011.  PFF ¶ 18.  Lawson ultimately required only days of

work to code RQC.  For example, the work on the modification that prevents a user of RQC from

placing items from Item Master and a Punchout shopping session onto a single requisition occurred

over a 5 day period.  PFF ¶ 19; PX-1178 at RQC357; Tr. at 364:3-365:2 (Christopherson Direct)

(work on modification began on April 25, 2011); Tr. at 359:12-14 (coding work was complete by

the end of April).  Lawson required only days of work to code RQC for the aspect of the

modification at issue that prevents a user of RQC from placing items from two or more Punchout

sites on a single requisition (*i.e.*, "Patch 1");  PFF ¶ 21; Tr. at 249:4-249:11 (Christopherson Direct)

("Q: Let's talk about the modification that prevents a user of RQC from placing items from two or

more Punchout [sites] onto a single requisition.  ["Patch 1"].  Are you familiar with that

modification?  A: Yes.  Q: The coding effort for that modification only required two days of work;

isn't that right?  A: Two, two and a half, maybe three.").  Indeed, the entire process for Patch 1 to

RQC — including proposal, development, unit testing, QA testing, and change of documentation —

took Lawson a total of six days.  PFF ¶ 22.  The time Lawson needed to develop, test and deploy the

modification at issue in these proceedings was incredibly short.  Such evidence supports the

conclusion that RQC was built from RSS code (PFF ¶ 57) and that the RQC Configurations are not

more than colorably different than the Infringing Configurations.

**IV.   CONCLUSION**

Lawson has left untouched the infringing features and functionality of Configurations 3 and

5.  The solitary, minimal, insubstantial, trivial change that Lawson contends to be pertinent to claim 26 is, in fact, not relevant to any claim element as construed by the Court, and it does not render the RQC Configurations more than colorably different from the Infringing Configurations.  *e*Plus respectfully requests that this Court find that Configurations 3 and 5 with RQC are not more than colorably different from the Infringing Configurations and hold Lawson in contempt of the Court's injunction.

Respectfully Submitted,

April 12, 2013

                                      _____/s/_____
                                      David M. Young (VSB #35997)
                                      Jennifer A. Albert (admitted *pro hac vice*)
                                      **GOODWIN PROCTER LLP**
                                      901 New York Avenue, N.W.
                                      Washington, DC 20001
                                      Telephone:  (202) 346-4000
                                      Facsimile: (202) 346-4444
                                      dyoung@goodwinprocter.com
                                      jalbert@goodwinprocter.com

                                      Michael G. Strapp (admitted *pro hac vice*)
                                      **GOODWIN PROCTER LLP**
                                      Exchange Place
                                      53 State Street
                                      Boston, MA 02109-2881
                                      Telephone:  (617) 570-1000
                                      Facsimile: (617) 523-1231
                                      mstrapp@goodwinprocter.com

                                      Craig T. Merritt (VSB #20281)
                                      Paul W. Jacobs, II (VSB #16815)
                                      **CHRISTIAN & BARTON, LLP**
                                      909 East Main Street, Suite 1200
                                      Richmond, Virginia 23219-3095
                                      Telephone: (804) 697-4100
                                      Facsimile: (804) 697-4112
                                      cmerritt@cblaw.com

                                      *Attorneys for Plaintiff ePlus Inc.*

19

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of April, 2013, I will serve

## PLAINTIFF *e*PLUS INC.'S POST-HEARING
## BRIEF ON THE 'NOT MORE THAN COLORABLY DIFFERENT' ISSUE

with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) via email to the following:

| | |
|---|---|
| Daniel J. Thomasch, *pro hac vice*<br>Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, NY 10166-0193<br>(212) 351-3800<br><br>Jason C. Lo, *pro hac vice*<br>Gibson, Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071-3197<br>(213) 229-7153<br>VAED-620ExternalServiceList@gibsondunn.com | Robert A. Angle, VSB#37691<br>Dabney J. Carr, IV, VSB #28679<br>Troutman Sanders LLP<br>P.O. Box 1122<br>Richmond, Virginia 23218-1122<br>(804) 697-1238<br>(804) 698-5119 (Fax)<br>robert.angle@troutmansanders.com<br>dabney.carr@troutmansanders.com<br><br>***Counsel for Defendant Lawson Software, Inc.*** |
| Donald R. Dunner, *pro hac vice*<br>Erika H. Arner, *pro hac vice*<br>Finnegan, Henderson, Farabow, Garrett & Dunner, LLP<br>901 New York Avenue, NW<br>Washington, DC 20001<br>(202) 408-4000<br>(202) 408-4400<br>EXT-Lawson-FinneganCorrespondence@finnegan.com | |

_____/s/_____
David M. Young (VSB #35997)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444
dyoung@goodwinprocter.com