IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| *e*PLUS INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 3:09-CV-620** |
| | ) | **(REP)** |
| **v.** | ) | |
| | ) | |
| **LAWSON SOFTWARE, INC.,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

PLAINTIFF *e*PLUS INC.'S POST-HEARING
BRIEF ON REMEDIES

Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB#35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000


Michael G. Strapp (admitted *pro hac vice*)          Craig T. Merritt (VSB #20281)
**GOODWIN PROCTER LLP**                              Paul W. Jacobs, II (VSB #16815)
Exchange Place                                       **CHRISTIAN & BARTON, LLP**
53 State Street                                      909 East Main Street, Suite 1200
Boston, MA 02109-2881                                Richmond, Virginia 23219-3095
Telephone:  (617) 570-1000                           Telephone: (804) 697-4100

*Attorneys for Plaintiff ePlus Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

I.      LEGAL STANDARD...................................................................................1

II.     LAWSON'S GAINS SHOULD BE DISGORGED ........................................1

    A.      Calculation Of Revenue ...................................................................3

    B.      Calculation Of Gross Profit .............................................................6

    C.      Calculation of Incremental Profits ...................................................8

    D.      Damages After Injunction and Until Court Finds Contempt ...................................9

III.    LAWSON'S ATTEMPTS TO QUANTIFY DISGORGEMENT ARE FLAWED ..........10

    A.      Dr. Putnam's Net Profits Opinion ..................................................10

    B.      Lawson's Approach To Compute Incremental Profits Is Erroneous .....................11

IV.     *e*PLUS IS ENTITLED TO ENHANCED DAMAGES FOR LAWSON'S WILLFUL INFRINGEMENT .......................................................................12

    A.      Lawson Knowingly Failed To Redesign Its Products To Avoid Infringement.......................................................................................13

    B.      Lawson Ignored Counsel's Advice That The Modification It Did Make Was Insufficient .........................................................................14

    C.      Lawson Took No Steps to Require Its Customers To Uninstall RSS ....................15

    D.      Lawson Encouraged and Instructed Its Customers to Continue Using RSS .........16

    E.      Lawson Intentionally Misled The Court During The Injunction Proceedings .........................................................................................16

    F.      Lawson's Actions Warrant A Finding Of Willfulness And An Award Of Enhanced Damages .........................................................................21

V.      THE COURT SHOULD FIND THIS CASE EXCEPTIONAL AND AWARD ePLUS ATTORNEYS' FEES AND COSTS ....................................................23

VI.     COERCIVE REMEDY TO PREVENT ONGOING CONTEMPT ................24

    A.      Shutdown of Relevant Part of Business.........................................24

    B.      Daily Fine.......................................................................................24

    C.      Requirement that any Future Design-Around be Pre-Approved ..........................25

VII.    CONCLUSION.........................................................................................25

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Aevoe Corp. v. AE Tech.*,
    2012 WL 4960357 (D. Nev. Oct. 15, 2012) ........................................................... 23

*Alopex Indus., Inc. v. Seibel,*
    61 F.3d 919, 1995 WL 424845 (Fed. Cir. July 18, 1995) ........................................ 12

*August Tech. Corp. v. Camtek Ltd.*,
    2011 WL 7615088 (D. Minn. Aug. 11, 2011) ......................................................... 12

*Brine, Inc. v. STX, L.L.C.*,
    367 F. Supp.2d 61 (D. Mass 2005) (*aff'd,* 139 Fed. Appx. 281 (Fed. Cir. 2005) ...................... 6

*Buffalo Wings Factory, Inc. v. Mohd,*
    574 F. Supp.2d 574 (E.D. Va. 2008) ................................................ 2, 23, 24, 25

*Celanese Corp. v. BP Chemicals, Ltd.*,
    78 F.3d 1575 (Fed. Cir.1996) ................................................................. 13

*Diamond Heads, LLC v. Everingham*,
    2011 WL 833986 (M.D. Fla. Jan. 28, 2011) ........................................................... 25

*Harris Research, Inc. v. Perrine*,
    2009 WL 1457674 (D. Utah May 22, 2009) ......................................................... 12

*In re Seagate Tech., LLC,*
    497 F.3d 1360 (Fed. Cir. 2007) ............................................................... 13

*Leman v. Krentler-Arnold Hinge Last Co.*,
    284 U.S. 448 (1932) ....................................................................... 1, 2

*LMK Enter., Inc. v. Perma-Liner Ind., Inc.*,
    2012 U.S. Dist. LEXIS 31542 (M.D. Fla. Mar. 9, 2012) ...................................... 13, 23

*Omega World Travel, Inc. v. Omega Travel and Shipping Agencies*, Inc.,
    1990 WL 74305 (4th Cir. May 10, 1990) ...................................................... 1, 2

*Read Corp. v. Portec*,
    970 F.2d 816 (Fed. Cir. 1992) ............................................................... 13, 22

*The Colonial Williamsburg Found. v. The Kittinger Co.*,
    792 F. Supp. 1397 (E.D. Va. 1992), *aff'd* 38 F.3d 133 (4th Cir. 1994) ........................ 1, 2

*United States v. Darwin Construction Co., Inc.*,
    873 F.2d 750 (4th Cir. 1988) ................................................................. 24

**Statutes**

35 U.S.C. § 285 ................................................................................. 23

## INTRODUCTION

In accordance with Paragraph F of this Court's January 24, 2013 Order (Dkt. No. 1002) and pursuant to the Court's instructions on April 9, 2013, Plaintiff *e*Plus Inc. ("*e*Plus") respectfully submits this Post-Hearing brief regarding remedies that the Court should impose after finding Defendant Lawson Software, Inc. ("Lawson") in contempt.

## I.    LEGAL STANDARD

In a civil contempt proceeding, a "district court has broad discretion to frame remedies to fit violations of its orders," in consideration of "the nature of the harm and the probable effect of alternative sanctions." *See Omega World Travel, Inc. v. Omega Travel and Shipping Agencies*, *Inc.*, 1990 WL 74305, *3 (4th Cir. May 10, 1990). The sanction for contempt "generally may serve either or both of two purposes: to coerce the contemnor into complying in the future with the court's order, or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *The Colonial Williamsburg Found. v. The Kittinger Co.*, 792 F. Supp. 1397, 1407 (E.D. Va. 1992), *aff'd* 38 F.3d 133 (4th Cir. 1994). As set forth herein, the available remedies include compensatory damages, enhanced damages for willfulness, an award of attorney's fees and costs, and other measures to ensure compliance with the Court's orders.

## II.   LAWSON'S GAINS SHOULD BE DISGORGED

As this Court noted when denying Lawson's motion to exclude the testimony of *e*Plus's remedies expert Dr. Ugone, Dkt. No. 1032 at 6-15, the Supreme Court has unequivocally held that (1) disgorgement of gains is available as a remedy in civil contempt proceedings in patent cases and (2) a compensatory remedy is not limited to the loss suffered by the patentee. *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 455-57 (1932) (ordering disgorgement of the contemnor's ***gross profits*** as a compensatory remedy for civil contempt of an injunction order; "***in a proceeding for civil contempt for disobedience to an injunction granted in an***

*infringement suit, the profits derived from the violation of the injunction are recoverable*.") (emphasis added).

Since *Leman,* courts in this Circuit and in this district have often held that disgorgement of a contemnor's gains is an appropriate compensatory remedy for civil contempt, without regard to the amount of loss suffered by the patentee.  *See, e.g., Omega World Travel, Inc.,* 1990 WL 74305, at *4 ("World asserts that a monetary fine, if intended to compensate Travel, may be imposed only if Travel can show actual loss …. We do not believe that a district court's hands should be tied in unusual cases such as the one *sub judice*."); *The Colonial Williamsburg  Found.,* 792 F. Supp. at 1407 ("A civil contempt fine, even when compensatory in nature, need 'not always [be] dependent on a demonstration of 'actual pecuniary loss.'" (citing *Leman*))*; Buffalo Wings Factory, Inc. v. Mohd,* 574 F. Supp.2d 574, 582 n. 3 (E.D. Va. 2008) ("disgorging profits even when compensatory in nature, need not always [be] dependent on a demonstration of actual pecuniary loss") (internal citations omitted).

Disgorgement of gains therefore remains an appropriate compensatory remedy in cases where a defendant is held in civil contempt for violating an injunction related to patent infringement.  Dkt. No. 1032 (holding that "if the Court were to endorse Lawson's interpretation of both *Leman* and the import of the 1946 amendments, the Court would, in effect, be granting Lawson a compulsory license for the period of the alleged contempt," resulting in an economic incentive for Lawson to not comply with the Court's order.).[1]  The Court can use any of the following measures to determine the gains associated with the infringing configurations: (1) Lawson's revenues, (2) Lawson's gross profits, or (3) Lawson's incremental profits.  *e*Plus

---

[1] This Court further held that "penalizing ePlus for failure to show actual loss in a case such as this, where the amount of loss is so difficult to quantify, would be manifestly unjust."  Dkt. No. 1032 at 16, n.6.

submits, however, that in this case disgorgement of Lawson's gross profits is the most appropriate remedy.

### A.      Calculation Of Revenue

The relevant Lawson revenue streams can be divided into three categories: license revenue, maintenance revenue and service revenue.  License revenue and maintenance revenue can be measured directly using data associated with Stock-Keeping Units (SKUs) maintained by Lawson.  PFF ¶ 155.  However, Lawson tracks service revenue on a customer basis rather than a SKU basis.  PFF ¶ 156.

The first step in calculating the appropriate revenue is to determine the time period for which the calculations will be performed.  Since the injunction order specified a special sunset period for designated healthcare customers, the relevant time period for the two categories of customers (healthcare and non-healthcare) is different.  The appropriate time period for calculating the revenues for non-healthcare customers is from the date of the injunction, May 23, 2011, through the last date on which Lawson provided financial data, November 30, 2012.  The appropriate time period for calculating maintenance and service revenues for designated health care customers is from the conclusion of the sunset period, November 23, 2011, to November 30, 2012.  PFF ¶ 159.[2]  As discussed *infra,* the Court should calculate an additional amount based on a daily rate thereafter or based on updated financial information that Lawson may be ordered to provide.

The sunset provision in the injunction specifically stated that the injunction order would not take effect for healthcare customers until November 23, 2011 "with respect to Lawson's installation, implementation, design, configuration, consulting, upgrade, maintenance, support,

---

[2] This relevant time period is referred to herein as the "Injunction Period."

training, and other related and associated services." Dkt. 729 at 4.  Because Lawson was not permitted to license the Infringing Configurations to healthcare customers during the sunset period, Dr. Ugone included license revenues for healthcare customers from the date of the injunction, May 23, 2011, through the last date on which Lawson provided financial data, November 30, 2012.[3]  Except for the fact that Dr. Putnam excluded license revenue from Lawson's healthcare customers that Lawson earned in the six months following the injunction order, Lawson's expert Dr. Putnam, and Dr. Ugone, are in agreement regarding the calculation of revenues that Lawson earned from licensing, maintaining and servicing the Infringing Configurations during the Injunction Period.  PFF ¶ 157.

### License and Maintenance Revenue

A list of SKUs provided by Lawson, in which each module of the Infringing Configurations is mapped to a list of SKUs that correspond to that module, can be used to determine which SKUs were associated with the various software modules included in the Infringing Configurations.  PFF ¶ 160.  The S3 Procurement Modules (Purchase Order, Requisitions and Inventory Control) can show up in the license and maintenance revenues in three ways: (1) individually, so the data would show revenue separately for Purchase Order, Requisitions and Inventory Control as individual SKUs; (2) under a SKU called PROC that includes all three S3 Procurement Modules together; and (3) as part of a "Large Suite SKU, " a single SKU that includes a large bundle of products – not only the S3 Procurement Modules but also additional modules that are not part of Configurations  3 and 5.  PFF ¶ 161.

_____

[3] For purposes of this brief only, "Infringing Configurations" is defined as Configurations 3 and 5 with RSS and/or RQC since revenues associated with the original adjudicated infringing configurations as well as revenues associated with configurations including RQC are both relevant to calculating a disgorgement award.  Lawson's M3 Procurement products are also specifically included within the definition of "Infringing Configurations."

Since the Large Suite SKUs include SKUs that are not part of the Infringing Configurations, only a portion of the license and maintenance revenue associated with the Large Suite SKUs are included in calculating the revenue Lawson received as a result of continuing to license and maintain the Infringing Configurations during the Injunction Period.  PFF ¶ 162.  Dr. Putnam, Lawson's expert, agrees with the way in which Dr. Ugone apportioned licensing and maintenance revenue.[4]  PFF ¶ 164.

### Service Revenue

Service revenue cannot be determined using the SKU-based method that both ePlus and Lawson used to calculate license and maintenance revenue.  PFF ¶ 165.  Further, the appropriate service revenue cannot be calculated by just counting all the service revenue from any customer who had the Infringing Configurations.  PFF ¶ 166.  The correct way to determine service revenue is by calculating a ratio of Infringing Configuration maintenance fees to total maintenance fees for the identified 146 customers with Infringing Configurations and then applying that ratio to service revenues from the 146 customers to apportion service revenues to the Infringing Configurations.  PFF ¶ 167.  Lawson's revenue from the different revenue streams during the Injunction Period after the application of the Large Suite SKU and service revenue apportionment is summarized below.  These revenues do not include any revenues Lawson

---

[4] Dr. Ugone also calculated an alternative revenue apportionment that would deduct 85% of revenues associated with the Lawson System Foundation (LSF) and Process Flow (PF) for customers of the Infringing Configurations since additional Lawson software modules may sometimes utilize the functionality of LSF and PF.  The Court in its discretion may apply the additional LSF and PF apportionment in arriving at a disgorgement award, but ePlus would urge the Court not to do so.  Unlike the Large Suite SKUs which are apportioned because they include modules that are not part of the Infringing Configurations, LSF and PF are part and parcel of the Infringing Configurations.  Dkt. 729 at 2-3. Because revenue associated with LSF and PF is revenue that Lawson earned from licensing, maintaining and servicing the Infringing Configurations, this revenue, or alternatively the gross or incremental profits associated with this revenue, should be disgorged in its entirety from Lawson.  PFF ¶ 170.

earned from licensing, servicing and maintaining the Infringing Configurations after November 30, 2012.  PFF ¶ 169.

| License Revenue | $7,120,110 |
| Maintenance Revenue | $12,693,419 |
| Service Revenue | $9,589,546 |
| **Total Revenues** | **$29,403,076** |

PFF ¶ 168.  The corresponding estimated daily revenue earned by Lawson during the Injunction Period is $62,362.[5]  PFF ¶ 230.

### B.      Calculation Of Gross Profit

Another measure of Lawson's gains is the gross profits it derived from the Infringing Configurations.  *See e.g.*, *Brine, Inc. v. STX, L.L.C.*, 367 F. Supp.2d 61, 71 (D. Mass 2005) (*aff'd*, 139 Fed. Appx. 281 (Fed. Cir. 2005) (sanction approximating the defendant's gross profit from sale of the infringing product is appropriate for two reasons:  (i) due to "evidentiary difficulties in calculating net profit … there is increased risk that the plaintiff will not be made whole;" and (ii) award of gross profit is "an amount which bears a direct relationship to the degree of infringement.").  Gross profit is the difference between revenue and the direct costs of providing a good or service.  PFF ¶ 172.

As discussed above, Lawson's revenue derived from the infringing configurations during the infringement period was $29.4 million.  To determine Lawson's gross profits, one must first determine the appropriate costs to deduct from that revenue.  This Court has ruled that "the burden of proof rests on the defendants 'to prove any deductions for its costs from the gross revenues attributable to contempt.'"  Dkt. No. 1032 at 18 (citing *The Colonial Williamsburg*

*Found.*, 792 F. Supp. at 1407).

In light of the deposition testimony of Mr. Samuelson, Lawson's former CFO, and the Profit & Loss statements produced by Lawson for its fiscal years 2011 and 2012, both Dr. Putnam and Dr. Ugone agreed that the following three categories of costs are properly deducted from revenue to calculate Lawson's gross profits associated with the Infringing Configurations: (1) the direct costs of  licensing, (2) the direct costs of maintenance, and (3) the direct costs of service.  PFF ¶ 174.  Both Dr. Ugone and Dr. Putnam agree that the gross profit margin for Lawson should be approximately 66%.  PFF ¶ 175.

The direct cost of licensing includes costs associated with the licensing revenues that Lawson has received, such as royalties paid to third-party technology partners or commissions paid to resellers, and the cost of hardware infrastructure use for hosting the software.  PFF ¶ 176. The direct cost of maintenance includes costs associated with internal support group, royalties paid to third-party technology partners, commissions paid to third parties and commissions paid to Lawson's sales people.  PFF ¶ 177.  The direct cost of service includes costs incurred for providing a service, such as costs associated with internal consulting personnel, third party consulting expenses and commissions, bonuses and travel-related costs.  PFF ¶ 178.

Lawson's direct costs of licensing, maintenance and service during the Injunction Period for the Infringing Configurations were approximately $11.3 million.  PFF ¶ 179.  The gross profits Lawson earned from the Infringing Configurations during the Injunction Period through November 30, 2012 are $18,091,683.  PFF ¶ 179.

---

[5] If the Court decided to also apply the alternative apportionment of LSF and PF revenues, Lawson's revenues during the Injunction Period would total $23,045,333 and the corresponding daily rate for Lawson's revenues would be $48,821.  Tr. at 997:24-998:23 (Ugone Redirect).

| Infringing Revenues | $29,403,076 |
|---|---|
| Less: Direct Costs of Licensing, Maintenance, and Service | $11,311,393 |
| **Gross Profits** | **$18,091,683** |

The corresponding estimated daily gross profits earned by Lawson during the injunction period is $38,928.[6]  PFF ¶ 231.

### C.    Calculation of Incremental Profits

Another measure of Lawson's gains is incremental profits.  Lawson does not track incremental profits.  PFF ¶ 181.  Both Dr. Ugone and Dr. Putnam nevertheless attempted to estimate Lawson's incremental profits for the Infringing Configurations.  In theory, incremental profits can be calculated by subtracting certain operating expenses from the gross profits.  Lawson tracks three different categories of operating expenses: (1) general and administrative, (2) product development (research and development), and (3) sales and marketing.  PFF ¶ 182.

Although there is no actual evidence that any of Lawson's operating expenses varied based on revenues derived from the Infringing Configurations, Dr. Ugone nevertheless conservatively deducted ***all*** of Lawson's sales and marketing operating expenses in an attempt to estimate Lawson's incremental profit from licensing, maintaining and servicing the Infringing Configurations.  Dr. Ugone took this conservative approach because some costs tracked under sales and marketing operating expenses could have conceivably varied with respect to revenue, although Lawson provided no evidence of any actual operating expenses that did in fact vary with revenue that it earned from the Infringing Configurations.  PFF ¶ 183.

Dr. Ugone did not deduct general and administrative costs in calculating an incremental

---

[6] If the Court decided to also apply the alternative apportionment of LSF and PF revenues, Lawson's gross profits during the injunction period would total $14,159,905 and the corresponding daily rate for Lawson's gross profits would be $30,497.  PFF ¶ 171.

profit margin because those costs are mostly fixed and would not vary with revenue associated with the Infringing Configurations during the Injunction Period.  PFF ¶ 184.  Dr. Ugone also did not deduct product development costs to calculate an incremental profit margin because there was no evidence that any such costs were associated with the Infringing Configurations during the Injunction Period.  PFF ¶ 184.

Dr. Ugone calculated that if one were to deduct all of Lawson's sales and marketing operating expenses in addition to the direct costs deducted to arrive at a gross margin,  Lawson's incremental profits during the Injunction Period through November 30, 2012 would total approximately $15 million.  PFF ¶ 185.  The corresponding estimated daily incremental profits earned by Lawson during the Injunction Period is $31,742. [7]  PFF ¶ 232.

To summarize, Lawson's gains under each of the measures discussed above during the Injunction Period through November 30, 2012 are:

| | |
|---|---|
| **Lawson's Revenue** | **$29,403,076** |
| **Lawson's Gross Profits** | **$18,091,683** |
| **Lawson's Incremental Profits** | **$14,966,166** |

**D.     Damages After Injunction and Until Court Finds Contempt**

Damages from November 30, 2012, the date on which Lawson's financial information ends, through the date when the court finds contempt, can be quantified either by analyzing updated financial information that Lawson may be required to provide, or by multiplying the average daily revenue or profits Lawson has already made during the injunction period by the number of days between November 30, 2012 and the date on which the Court finds Lawson in

---

[7] If the Court decided to also apply the alternative apportionment of LSF and PF revenues, Lawson's incremental profits during the Injunction Period would total $11,730,074 and the corresponding daily rate for Lawson's incremental profits would be $24,850.  PFF ¶ 171.

contempt.  PFF ¶ 186.[8]

## III.   LAWSON'S ATTEMPTS TO QUANTIFY DISGORGEMENT ARE FLAWED

Lawson's expert, Dr. Putnam, offers a disgorgement opinion based on his calculation of Lawson's net profits.  PFF ¶¶ 187-192.  Dr. Putnam also attempts to estimate Lawson's incremental profits during the Injunction Period using irrelevant worldwide data that pre-dates both the acquisition of Lawson by Infor and the Injunction Period.  PFF ¶¶ 193-197.  Lawson's approach to calculating disgorgement damages is fatally flawed.

### A.   Dr. Putnam's Net Profits Opinion

Net profit is derived by deducting from revenues all costs of doing business, including costs that are fixed and do not vary with revenue.  PFF ¶ 187.  Disgorgement of Lawson's net profit is not appropriate because the costs Lawson uses to calculate its net profit margins are not associated with the Infringing Configurations.  PFF ¶ 188.  Indeed, none of Lawson's operating costs can be specifically allocated to the Infringing Configurations.

> Q: Do you have any other reasons for your opinion that in this case it was inappropriate to calculate net profits?
>
> A: Well, also there's been testimony by Mr. Samuelson that these costs are not directly related to the infringing configurations, and if they're not directly related, they shouldn't be subtracted out.  If you ended up subtracting them out, you'd result in a windfall gain to Lawson.

PFF ¶ 189 (Ugone Direct).

Moreover, it is inappropriate to deduct fixed costs when calculating a profitability figure in this instance because Lawson would have incurred many of these fixed costs regardless of whether Lawson did or did not comply with the Injunction Order.  PFF ¶ 190.  In fact, even Dr.

---

[8] If the Court were to order disgorgement of Lawson's gross profits, for example, the Court could use the daily gross profits rate and multiply that daily figure by the number of days between November 30, 2012 and the date on which the Court finds Lawson in contempt.

Putnam assumed that Lawson's general and administrative costs continued unchanged subsequent to the injunction. PFF ¶ 191. Dr. Putnam also agreed that there was no evidence that Lawson had to incur any additional product development costs after the date of the injunction as a direct result of continuing to license, maintain or service the Infringing Configurations. PFF ¶ 191.

Dr. Putnam's net profit opinion is also unreliable and should be given no weight because it rests on a demonstrably false foundation. Dr. Putnam opined that the Court should disgorge Lawson's net profits because he assumed that the Injunction Period should be viewed as an infinite time horizon, even though in reality, as he eventually conceded, the Injunction Period is not an infinite time period. Indeed, the '683 Patent expires on February 8, 2017. PFF ¶ 192.

### B.    Lawson's Approach To Compute Incremental Profits Is Erroneous

Since Lawson itself does not compute incremental profits, Lawson's expert, Dr. Putnam, relied on a regression model that he constructed to attempt to estimate the incremental profits associated with the Infringing Configurations. PFF ¶ 193. However, Dr. Putnam's regression was erroneous and unreliable for multiple reasons.

First, the regression model relied upon worldwide data even though the correct universe of data is that associated with Lawson's activities in the United States. PFF ¶ 194. Relatedly, even though data for Lawson's revenues and costs in the U.S. was available to Dr. Putnam, he chose not to rely on this data and to instead exclusively use Lawson's worldwide data. PFF ¶ 195.

Second, even though profit and loss data was available during the injunction period, Dr. Putnam chose to rely only on old data from 2000 through Q1 (the "first quarter") of Lawson's 2011 fiscal year ("FY"). Dr. Putnam chose not to update his regression model or create a new regression model to take into account data from the injunction period. PFF ¶ 196. Instead, Dr.

Putnam made the deliberate decision to rely exclusively on old worldwide financial data to build his regression model. PFF ¶ 197.

Third, because Dr. Putnam relied on outdated and irrelevant data his regression model yielded unreliable predictions about Lawson's costs and revenues during the injunction period. For example, Dr. Putnam's regression model incorrectly predicted that when Lawson's revenue decreased, general and administrative (G&A) costs would also decrease. In fact, between Q4 2011 and Q1 2012, when Lawson's revenues decreased by over $4 million, G&A costs more than doubled. PFF ¶ 198.

Also, Dr. Putnam's regression model predicted that Lawson's variable sales and marketing costs would exceed Lawson's actual total sales and marketing costs in FY 2012 even though such a result is impossible. Indeed, the sales and marketing expenses that Dr. Putnam's regression model predicted in FY 2012 were almost $13 million higher than Lawson's actual total sales and marketing expenses during that time period. PFF ¶ 199.

Another glaring example of the unreliability of Dr. Putnam's model is that his regression model predicted that over 90% of Lawson's G&A costs are variable costs. This prediction is clearly contradicted by the testimony of Lawson's former CFO, Mr. Samuelson, who testified that most of Lawson's G&A costs are fixed, not variable. PFF ¶ 200.

## IV.  *e*PLUS IS ENTITLED TO ENHANCED DAMAGES FOR LAWSON'S WILLFUL INFRINGEMENT

A district court has the power to order enhanced damages if the court concludes that the defendant's conduct was willful. *See, e.g., Alopex Indus., Inc. v. Seibel,* 61 F.3d 919, 1995 WL 424845, at *3 (Fed. Cir. July 18, 1995) (affirming award of treble damages for contempt); *August Tech. Corp. v. Camtek Ltd*., 2011 WL 7615088, at *5 (D. Minn. Aug. 11, 2011) (finding enhanced damages and award of attorney fees appropriate for contempt); *Harris Research, Inc. v.*

*Perrine*, 2009 WL 1457674, *4 (D. Utah May 22, 2009)  (holding that the defendants "should be subject to enhanced penalties for willful infringement of Harris Research's '577 and '892 Patents since entry of the Permanent Injunction.").  Willfulness exists when an infringer acted "despite an objectively high likelihood that its actions constituted infringement of a valid patent" and "that this objectively-defined risk was either known or so obvious that it should have been known to the accused infringer."  *In re Seagate Tech., LLC,* 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc).

Where willfulness is found, courts typically decide whether to enhance damages based on the totality of the circumstances, which may include (1) whether the infringer deliberately copied the ideas or design of another, (2) whether the infringer knew of the patent, investigated the patent's scope and formed a good-faith belief of its invalidity or non-infringement, (3) the infringer's behavior as a party to the litigation, (4) the infringer's size and financial condition, (5) the closeness of the case, (6) the duration of Defendant's misconduct, (7) remedial action by the infringer, (8) the infringer's motivation for harm and (9) whether the infringer attempted to conceal its misconduct.  *Read Corp. v. Portec*, 970 F.2d 816, 826 (Fed. Cir. 1992), *superseded on other grounds* as recognized by *Celanese Corp. v. BP Chemicals, Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir.1996; s*ee also LMK Enter., Inc. v. Perma-Liner Ind., Inc.*, 2012 U.S. Dist. LEXIS 31542 (M.D. Fl. Mar. 9, 2012) ("the Court finds that there is an element of willful infringement as to Defendant's continued sales of the unmodified … system, coupled with Defendant's recognition of the validity and enforceability of the … Patent … and Defendant's knowledge of the Consent Judgment to which Defendant agreed.").

### A.    Lawson Knowingly Failed To Redesign Its Products To Avoid Infringement

Although Lawson contends that it attempted in good faith to design around claim 26, the evidence tells a different story.  Lawson repeatedly told its customers that RQC did not represent

a change to the functionality of the Infringing Configurations.  Indeed, contrary to Lawson's current arguments, Lawson marketed its "modified" RQC product to customers as having "100% of the functionality you require."

> Q: Hasn't Lawson said that RQC contains 100 percent of the functionality that customers require?
>
> A: I believe that's in one of the marketing documents I have seen before, yes.

PFF ¶ 202 (Christopherson Cross).  *See also* PFF ¶ 54-65.

Lawson rejected other design alternatives and instead made a modification to the Infringing Configurations that had absolutely no impact on any of the functionality relevant to claim 26.  PFF ¶¶ 33-45.  Lawson acknowledged that claim 26 of the '683 patent was "right on the mark," and that claim 26 "is going to be a tough one to navigate," yet it made no serious effort to implement a design-around that would actually avoid infringement.  PFF ¶ 202; PX-1013.  To the contrary, during its "redesign efforts" following the injunction, Lawson concluded that for business reasons it would be unacceptable to remove the catalogs from the Item Master, search capabilities, requisition building or purchase order functionality from the Infringing Configurations.  PFF ¶¶ 27-29.

**B.     Lawson Ignored Counsel's Advice That The Modification It Did Make Was Insufficient**

Lawson rejected its counsel's advice to make further design changes to avoid infringing *e*Plus's patent.  Thus, even after Lawson released RQC, Lawson's lawyers advised that additional changes to the Infringing Configurations were still necessary:

> Q:     So notwithstanding that Lawson had already released RQC, your lawyers were advising you that additional changes to Punchout were needed, correct?
>
> A:     That is correct.

PFF ¶ 30 (Christopherson Direct).

14

However, Lawson ignored the advice of its counsel by refusing to remove the inventory determination capabilities from the Punchout sites.

> Q:  When your lawyers told you you had to make another change to Punchout to remove the inventory capabilities from the Punchout sites, you didn't accept their advice, did you?
>
> A:  We had a discussion on that, and I did not accept it, correct.

PFF ¶ 30  (Christopherson Cross).

Lawson personnel stated that they were "scared" that RQC did not comply with the injunction order, yet Lawson nonetheless continued to sell, maintain and support configurations with RQC.  PFF ¶ 203.  There were also misgivings at Lawson that the support staff in charge of the migration to RQC were not taking the court's injunction order "seriously."  For example, on June 23, 2011, one month after the injunction, Lawson personnel who were involved in the "redesign" efforts exchanged the following email:

> Mr. Bragstad:  "Does it scare you as much as me that at this point nobody at the courts or ePlus has said that RQC complies?"
>
> Ms. Homewood:  "absolutely!"
>
> Mr. Bragstad:  "It also seems that Nancy and Support in general are taking this a lot more serious that the rest of the company right now. This group almost seems like, this is so last year. Or maybe everyone has just checked out"
>
> Ms. Homewood:  "A little of both I think  :)"

PFF ¶ 203.

### C.    Lawson Took No Steps to Require Its Customers To Uninstall RSS

Lawson took no steps whatsoever to ensure that its customers uninstalled RSS and, in fact, went so far as to encourage and instruct its customers to continue using the Infringing Configurations with RSS.  PFF ¶¶ 124, 126, 127.  No individual within Lawson had responsibility for tracking whether or not a customer had replaced RSS with RQC in their

15

production procurement system.  PFF ¶ 206.  Since a mere download of RQC does not render it

operable, additional steps of actually installing and implementing RQC are required.  PFF ¶¶

139-143.  Unless all the three steps are performed, a customer with the Infringing Configurations

would still be running RSS and thus continuing to utilize the original adjudicated infringing

software configurations.  PFF ¶¶ 144-148.  Even though Lawson knew that its customers would

be using the Infringing Configurations with RSS unless those customers installed and

implemented RQC, Lawson only required its customers to download, but not install or

implement, RQC.  PFF ¶¶ 149, 207.

### D.    Lawson Encouraged and Instructed Its Customers to Continue Using RSS

RQC was specifically designed by Lawson so that Lawson's customers could run RQC in

parallel with RSS.  PFF ¶ 124.  Furthermore, Lawson was aware that its customers could still

access RSS even if they had installed and implemented RQC.

> Q: If clients had systems that included RSS in their production environment and
> they have not implemented RQC in the production environment, they could still
> be using RSS for procurement activities; correct?
>
> A: That's correct.

PFF ¶ 147 (Hanson Direct).  *See also* PFF ¶¶  124-129, 208.

Lawson instructed its customers about how to run RSS in parallel with RQC even if those

customers were not covered by the sunset provision of the Court's injunction order.  For

example, on June 9, 2011 Lawson instructed a non-healthcare customer on how it could reinstate

RSS.  PFF ¶ 210.  *See also* PFF ¶¶  124-154.

### E.    Lawson Intentionally Misled The Court During The Injunction Proceedings

Mr. Hager, Lawson's former Executive Vice-President of S3 Industries, testified at the

March 25, 2011 injunction evidentiary hearing that an injunction that would prohibit Lawson

from servicing and maintaining RSS and Punchout would be extraordinarily difficult to

implement, particularly for 277 healthcare customers of software configurations with those modules.  PFF ¶ 211.  He also testified that to move Lawson's customers away from RSS would take around nine months at a cost of, in some cases, over a million dollars per client.  PFF ¶ 212; *see also* D.I. at 637.  The evidence shows that these sworn statements to the Court were untrue and intentionally calculated to mislead the Court about the impact that an injunction would have on Lawson in an attempt to maximize Lawson's chances of defeating ePlus's motion for a permanent injunction.  PFF ¶¶ 211-228.

Lawson first began work on RQC on February 8, 2011, six weeks prior to the Court's March 25, 2011 injunction evidentiary hearing.  PFF ¶ 12.  As of mid-February 2011, Lawson intended to present its proposed re-design ideas to the Court.  PFF ¶ 14.  Lawson began unit testing for RQC as early as March 1, 2011, and Mr. Hager himself was aware as early March 6, 2011 that Lawson was planning to make available to its customers a "design-around" software module.  PFF ¶ 15.  As of March 7, 2011, Lawson still intended to present this "design-around" to the Court for approval prior to making the product available to its customers.  PFF ¶ 16.

But at the injunction evidentiary hearing, Lawson presented *no testimony concerning its ongoing effort to develop and make available a re-design of the Infringing Configurations*. D.I. at 637.  Indeed, even as Mr. Hager testified about the severe harm that would befall Lawson and its customers (including, in particular, its hospital and healthcare organization customers) if an injunction entered, he knew full well that Lawson was working on a design-around for the RSS product that it intended to release within a couple of months.  PFF ¶ 214.

Four days after the injunction evidentiary hearing, on March 29, 2011, Mr. Hager confirmed in an internal communication that he was fully aware that Lawson was attempting to write software code to re-design RSS and create a new product that would offer fundamentally

the same functionality as RSS.  PFF ¶ 215.  Also on March 29, 2011, Mr. Hager was informed

by Ms. Langer that RQC could be product-ready by May.  PFF ¶ 216.

The evidence shows that Lawson was concerned that if an injunction was entered during

the fourth quarter of its fiscal year (March-May 2011) to prohibit Lawson from selling the

Infringing Configurations with RSS, Lawson would be unable to book revenue for that quarter

unless it had replacement software available and ready to be deployed to its customers.  PFF ¶

217.  On March 30, 2011, five days after the hearing, Mr. Hager received an email from Jim

Millard, who was concerned that a deal with a customer who was seeking RSS seemed

questionable for the fourth quarter of Lawson's fiscal year because, he thought, Lawson still

would "need a solution for RSS."  Mr. Hager advised Mr. Millard that same day – March 30,

2011 – that "[*w*]*e have a solution for RSS now* … so proceed and try to win the deal."  PFF ¶

218 (emphasis added).  Thus, only five days after Mr. Hager had testified to the Court about the

severe harm that would befall Lawson and its customers if the Court were to enter an injunction,

he informed others at Lawson that Lawson had "a solution for RSS now."  PFF ¶ 218.

The evidence shows that Lawson made a concerted decision to conceal evidence about its

purported design-around from the Court.  Little more than a week after the injunction evidentiary

hearing, on April 6, 2011, Mr. Hager was advised by Mr. McPheeters, Lawson's General

Counsel, that a press release regarding RQC should be withheld until after Lawson was

successful in getting a stay (if the Court were to enter an injunction order).  PFF ¶ 219.  This

strategy of "withholding information" to improve Lawson's chances for a stay of any injunction

was communicated to other employees as well.  PFF ¶ 220.  On April 13, 2011, Mr. Catalino,

Senior Vice President, Lawson Global Operations, was asked by Lawson legal counsel to retract

a statement in an internal healthcare newsletter that stated "I would like to make everyone aware

18

of the e-Plus lawsuit related to our Punchout and Requisition Self Service is still active.  The good news, regardless of outcome, Lawson is now prepared with substitute solutions/products should something occur."  The reason given by counsel for its retraction request was that "[t]hese statements may be used by ePlus or the Judge to negate any efforts to obtain a stay from either the district court or court of appeals."  PFF ¶ 220.

Mr. Hager's testimony to the Court concerning the scope and impact of the injunction was not only calculated to hide from the Court the work Lawson was undertaking regarding RQC, it was also untethered to the facts regarding the impact of an injunction on Lawson or its customers.  For example, according to Lawson's own documents, Mr. Hager's representations to the Court concerning the impact of an injunction were neither based on the costs associated with the modifications being made to RSS, nor on information from Lawson's customers.  Instead, the very specific claims Mr. Hager made at the injunction hearing regarding the projected impact of the injunction were based entirely on speculative estimates provided to Mr. Hager from Mr. Lohkamp *the same morning of the hearing* regarding the cost to "[Lawson's] most complex RSS user to rip out RSS and replace with ePlus,"  PFF ¶ 221.  Mr. Hager later testified during his deposition that the *only* document he is aware of that supports his testimony about the time and cost to change away from RSS is the single email exchange that he had with Mr. Lohkamp on the morning of the injunction hearing.  PFF ¶ 222.

Mr. Hager did not ask Mr. Lohkamp about the costs associated with the actual modifications being made to RSS, nor did he provide the Court with information about any such costs.  D.I. at 637.  Instead, Mr. Hager asked Mr. Lohkamp only about the costs and time if a user was told "to rip out RSS and replace with ePlus," even though Lawson had never considered a contingency plan that would have required its customers to "rip out RSS" and replace it with

19

*e*Plus's software.  PFF ¶ 223.  Indeed, because no such plan was ever under consideration at Lawson, Mr. Lohkamp testified that he was surprised by Mr. Hager's questions and could not surmise why Mr. Hager was interested in the cost to "rip out RSS" and replace RSS with a third-party software solution.  PFF ¶ 224.  Mr. Lohkamp's testimony establishes that Mr. Hager blatantly misled the Court at the injunction hearing, because at no point did Lawson even consider "ripping out RSS" and requiring its customers to replace RSS with a solution from *e*Plus or any other third party.  Tr. 433:4-6 (Lohkamp Cross) ("Q:  Lawson never had a contingency plan, though, to have its customers rip out RSS and replace with ePlus; correct?  A:  Correct.").  PFF ¶ 223.

In stark contrast to the parade of horribles that Mr. Hager testified to at the injunction hearing, Lawson required less than two weeks ***in total*** to develop, test and implement the modification to RQC at issue in this contempt proceeding.  PFF ¶¶ 19, 21.  Indeed, the entire process for Patch 1 to RQC — including proposal, development, unit testing, QA testing, and change of documentation — took Lawson a total of ***six days***.  PFF ¶ 22.  On May 18, 2011, Lawson made RQC available to its customers via a free 20-minute download.  PFF ¶ 20.  The impact on Lawson's customers was negligible.  Moreover, Lawson made sure that its customers would not be affected at all by the RQC module by intentionally designing RQC and RSS to run in parallel.  PFF ¶ 124.  Thus, Lawson never lost a single customer because of the modification it made to RSS.

> THE COURT:  I wrote down to ask yesterday and didn't while you're here.  To your knowledge, has Lawson lost any customers who had RSS and who told you that they were quiting Lawson because of the shift to RQC?
>
> A: I personally am not aware of any.

PFF ¶ 72 (Lohkamp Redirect).

Mr. Hager's testimony during the injunction evidentiary hearing that "[Lawson has] 277 requisition self service health care only customers that represent 2500 different hospitals, which is about a third of the hospitals in the United States" was likewise a misrepresentation.  D.I. at 219; PFF ¶ 211.  For example, Jennifer Langer wrote in an email that:

> [T]o quote Dean [Hager]...the 'knuckle-head,' judge created this 277 number from some fantasy...Dean's testimony was *based on a guess* that Keith Lohkamp did with about 45 seconds to reply…Keith used a 'white space' report that we have that shows customers by BU for key SKU's.  The number of around 250-300 went to Dean…Dean says he didn't use a precise number on the stand.  So *we have no idea where the 277 came from*…In speaking with Dean earlier, he indicated that the intent was to protect organizations solely providing patient care…*He used this "life and death" urgency to show how we needed more time to ensure disruptions didn't occur*.

PFF ¶ 226 (emphasis added).  Lawson had no list of 277 healthcare customers when Mr. Hager testified to that number.  PFF ¶ 227.

Lawson intentionally misrepresented the purported harms that would befall its customers if an injunction were entered in an effort to limit the scope of any injunction as much as possible, and later, to support Lawson's application for a stay of the injunction.  The Court should consider these facts in determining whether to enhance any damage award.

### F.  Lawson's Actions Warrant A Finding Of Willfulness And An Award Of Enhanced Damages

For all the above reasons, the facts of this case warrant a finding of willfulness and an enhancement of damages.  Lawson was aware that its "redesigned" Configurations with RQC had all the same core procurement functionality as the adjudicated Infringing Configurations and could therefore be used by its customers to continue infringing claim 26.  *See e.g.*, PFF ¶¶ 201-202.  *See also* PFF ¶¶ 33-65.  Lawson discussed this fact both internally and with its customers.  *See e.g.*, PFF ¶ 203.  *See also* PFF ¶¶ 53-65.  Additionally, Lawson chose to deliberately ignore the advice of its counsel and instead chose to design a product that could be used to continue infringing *e*Plus's patent.  *See e.g.*, PFF ¶¶ 204-205.

At the same time, Lawson did not take any steps to ensure that its customers stopped using the Infringing Configurations with RSS, notwithstanding the explicit terms of the Injunction Order.  In fact, Lawson encouraged its customers to use RSS and even provided support and instruction to its customers on how to use RSS and RQC in parallel.  *See* PFF ¶¶ 124-154.

Based on the testimony of Lawson employees, emails sent by Lawson internally and to its clients, and the evidence of infringement presented during the contempt hearing, it is evident that Lawson knew that its Infringing Configurations after the permanent injunction continued to be used to infringe claim 26.  Indeed, Lawson's conduct during the injunction and contempt proceedings is evidence of a blatant disregard for the authority and integrity of the Court.  This conduct implicates several of the *Read* factors that this Court may look to determine whether to enhance damages.  At a minimum, the evidentiary record unmistakably establishes that Lawson: (1) knew of the patent and this Court's injunction, (2) investigated the patent's scope but rejected the advice of its counsel regarding additional modifications necessary to avoid infringement, (3) deliberately misled the Court during the injunction proceedings by misrepresenting the harm that would befall its customers if the Court were to enter an injunction, (4) had no good faith belief of non-infringement, (5) assisted its customers in continuing to infringe *e*Plus's patent using the Infringing Configurations with RSS notwithstanding the explicit terms of the Injunction Order, and (6) took no remedial action to prevent its customers from using the original adjudicated Infringing Configurations.  *See Read Corp.* 970 F.2d at 826.

Lawson willfully infringed claim 26 of the '683 patent.  In light of Lawson's willful conduct and for all the reasons set forth herein, this court should order enhanced damages for *e*Plus and award treble damages.

## V.   THE COURT SHOULD FIND THIS CASE EXCEPTIONAL AND AWARD ePLUS ATTORNEYS' FEES AND COSTS

In addition to damages, the Court has the power to grant attorney fees and costs incurred by the injured party in bringing the contempt action.  The patent statute specifically provides that the Court, "in exceptional cases may award reasonable attorney fees to the prevailing party."  35 U.S.C. § 285.  Numerous courts have found awards of attorney fees appropriate following a finding of contempt.  *See, e.g., Aevoe Corp. v. AE Tech.*, 2012 WL 4960357, at *2 (D. Nev. Oct. 15, 2012) ("Once a Court determines that a party has willfully violated a court order, an award of attorney fees to the opposing party is appropriate."); *LMK Enter.*, 2012 U.S. Dist. LEXIS 31542, at *16 ("The Court has made a determination of willful infringement. Even without the determination of willful infringement, it is within the Court's discretion to award attorney's fees and costs reasonably incurred to the injured party in a contempt proceeding."); *Buffalo Wings Factory,* 2008 WL 4642163, at *10 (holding the defendants liable "for any reasonable attorneys' fees Plaintiff has incurred in bringing this motion.").

As discussed *supra* in section IV, Lawson has continued to disregard the Court's Injunction Order and still infringes claim 26 of the '683 patent through its use of Configurations 3 and 5 with RQC, as well as its sale, installation, implementation, configuration, testing, demonstration, support and maintenance of Configurations 3 and 5 with both RSS and RQC. Lawson also proffered misleading testimony and argument at the injunction hearing and subsequent injunction proceedings.  PFF ¶¶ 211-228.  Indeed, the testimony of Mr. Hager was the only reason that the injunction order included a sunset provision.  PFF ¶ 211.  As a result of Lawson's misconduct, *e*Plus was forced to bring this contempt proceeding and incurred substantial attorney fees and costs.  *e*Plus should be permitted to recover the attorneys' fees and costs that it incurred in forcing an adjudicated infringer to comply with this Court's injunction

order.  Such costs should include, but are not limited to, the fees of the expert witnesses that

*e*Plus retained in connection with the contempt proceeding.

## VI.   COERCIVE REMEDY TO PREVENT ONGOING CONTEMPT

The remedies available to *e*Plus arising from Lawson's contempt may also include

coercive remedies.  Coercive remedies may include, but are not limited to, fines, imprisonment,

seizure of products incorporating or comprising the infringing configurations, and/or the closure

of Lawson's operations until it complies with the Court's injunction order.

### A.   Shutdown of Relevant Part of Business

The Court may order that the relevant part of Lawson's business be shut down until

Lawson can prove that it has complied with the Court's injunction order.  *Buffalo Wings Factory*,

2008 WL 4642163 at *13 ("Absent contrary authority, it appears this Court has the ability to

order Defendants and Respondents to shut down the restaurant until they comply with the CO

and the Contempt Order.").  For example, the Court could require a certification from Lawson's

CEO that Lawson has shut down, in its entirety, all business activities associated with the

Infringing Configurations.  The Court could also provide *e*Plus with the right to engage a third-

party to audit Lawson's business and determine that Lawson has, in fact, shut down its infringing

and contemptuous business.  The Court should also expand the existing permanent injunction in

this case to make clear that the injunction applies to Configurations 3 and 5 with RQC.

### B.   Daily Fine

In addition, the Court also has the power to order daily or weekly fines until Lawson

complies with the Injunction Order.  *See United States v. Darwin Construction Co., Inc.*, 873

F.2d 750, 756 (4th Cir. 1988) (affirming district court's imposition of daily fine for failure to

abide by court order); *Diamond Heads, LLC v. Everingham*, 2011 WL 833986, at *6 (M.D. Fla.

Jan. 28, 2011) (district court's authority includes numerous options to include a coercive daily

fine, a compensatory fine, attorney's fees and expenses, and even coercive incarceration); *Buffalo Wings Factory*, 2008 WL 4642163 at *4 (ordering defendant to pay weekly fine as civil contempt sanction for violation of consent decree in trademark case).

For example, the Court could consider imposing a daily fine, benchmarked to the daily revenues that Lawson has earned from its contemptuous activities, as a coercive remedy on a going forward basis, until such time as the Court deems Lawson is in compliance with the injunction. PFF ¶ 229. Dr. Ugone testified that the revenue Lawson realizes from the Infringing Configurations is $62,362 per day. PFF ¶ 230.

### C.     Requirement that any Future Design-Around be Pre-Approved

As a condition to lifting any coercive remedy imposed by the Court, the Court should require that Lawson submit for the Court's preapproval any proposed "second design-around" that it contends avoids the Court's Injunction Order and infringement of claim 26. Otherwise, if Lawson's past conduct is any guide, Lawson will simply introduce "RQC 2.0," with no real changes, and force *e*Plus to incur the heavy burden of prosecuting yet another contempt proceeding.

## VII.   CONCLUSION

*e*Plus respectfully requests that the Court find Lawson in contempt of the Court's injunction and enter an award imposing both compensatory remedies as well as coercive measures to ensure that Lawson complies with the permanent injunction. Additionally, *e*Plus respectfully requests that the Court award *e*Plus its attorney fees and costs incurred in the prosecution of this contempt proceeding. Furthermore, the Court is authorized, under the patent statute, to enhance up to three times the amount of any compensatory award, as a result of Lawson's willful infringement. Lawson's continued infringement since the time of the jury verdict has been willful, and the Court should enhance the damages it awards accordingly.

Respectfully Submitted,

April 12, 2013              _____/s/_____

David M. Young (VSB #35997)
Jennifer A. Albert (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile: (202) 346-4444
dyoung@goodwinprocter.com
jalbert@goodwinprocter.com

Michael G. Strapp (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
Facsimile: (617) 523-1231
mstrapp@goodwinprocter.com

Craig T. Merritt (VSB #20281)
Paul W. Jacobs, II (VSB #16815)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
Facsimile: (804) 697-4112
cmerritt@cblaw.com

*Attorneys for Plaintiff ePlus Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 12th day of April, 2013, I will serve

### <u>PLAINTIFF *e*PLUS INC.'S POST-HEARING<br>BRIEF ON REMEDIES</u>

with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) via email to the following:

| | |
|---|---|
| Daniel J. Thomasch, *pro hac vice*<br>Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, NY 10166-0193<br>(212) 351-3800<br><br>Jason C. Lo, *pro hac vice*<br>Gibson, Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071-3197<br>(213) 229-7153<br>VAED-620ExternalServiceList@gibsondunn.com | Robert A. Angle, VSB#37691<br>Dabney J. Carr, IV, VSB #28679<br>TROUTMAN SANDERS LLP<br>P.O. Box 1122<br>Richmond, Virginia 23218-1122<br>(804) 697-1238<br>(804) 698-5119 (Fax)<br>robert.angle@troutmansanders.com<br>dabney.carr@troutmansanders.com<br><br>***Counsel for Defendant Lawson Software, Inc.*** |
| Donald R. Dunner, *pro hac vice*<br>Erika H. Arner, *pro hac vice*<br>Finnegan, Henderson, Farabow, Garrett &<br>Dunner, LLP<br>901 New York Avenue, NW<br>Washington, DC 20001<br>(202) 408-4000<br>(202) 408-4400<br>EXT-Lawson-FinneganCorrespondence@finnegan.com | |

_____/s/_____
David M. Young (VSB #35997)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:   (202) 346-4444
dyoung@goodwinprocter.com