# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

*e*PLUS INC.,                )

                          )

         **Plaintiff,**       )     **Civil Action No. 3:09-CV-620 (REP)**

                          )

        **v.**                  )

                          )

**LAWSON SOFTWARE, INC.,**   )

                          )

                          )

        **Defendant.**     )

## PLAINTIFF *e*PLUS INC.'S POST-HEARING
## BRIEF WITH RESPECT TO INFRINGEMENT

Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB#35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000


Michael G. Strapp (admitted *pro hac vice*)     Craig T. Merritt (VSB #20281)
**GOODWIN PROCTER LLP**              Paul W. Jacobs, II (VSB #16815)
Exchange Place                     **CHRISTIAN & BARTON, LLP**
53 State Street                    909 East Main Street, Suite 1200
Boston, MA 02109-2881          Richmond, Virginia 23219-3095
Telephone:  (617) 570-1000       Telephone: (804) 697-4100

*Attorneys for Plaintiff ePlus Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

I.   LAWSON'S ALLEGED MODIFICATION TO THE PREVIOUSLY
     ADJUDGED INFRINGING CONFIGURATIONS DOES NOT RENDER THEM
     NON-INFRINGING .....................................................................................................5

     A.   The Infringing Systems..........................................................................................5

     B.   Element-By-Element Analysis................................................................................5

     C.   Lawson's Configurations 3 and 5  With RQC Are Used to Infringe Claim
          26..........................................................................................................................6

          1.   Configuration 5 with Item Master, RQC and EDI Is Used to
               Infringe Claim 26 ..................................................................................... 11

          2.   Configurations 3 and 5 with RQC and Punchout Are Used to
               Infringe Claim 26 ..................................................................................... 12

          3.   Configurations 3 and 5 With RQC Connect to Multi-Vendor
               Punchout Sites And Are Used to Infringe Claim 26................................. 13

     D.   Lawson's Modification Is Irrelevant To Claim 26 .................................................15

     E.   Lawson Directly Infringes Claim 26 By Using Configurations 3 And 5
          With RQC ............................................................................................................15

     F.   Lawson Customers Directly Infringe Claim 26 By Using Configurations 3
          And 5 With RQC ..................................................................................................16

     G.   Lawson Indirectly Infringes Claim 26 By Aiding And Abetting Its
          Customers' Infringement Using The RQC Configurations ....................................18

II.  LAWSON HAS INDUCED ITS CUSTOMERS TO CONTINUE USING
     ENJOINED CONFIGURATIONS WITH RSS TO INFRINGE CLAIM 26...................20

     A.   RQC Is Designed To Run In Parallel With RSS....................................................20

     B.   Lawson Did Not Uninstall RSS Nor Did It Require Its Customers To
          Uninstall RSS ......................................................................................................23

     C.   Mere Download of RQC Means Nothing — Installation And
          Implementation Is Required..................................................................................24

III. CONCLUSION.............................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.,*
  154 F.3d 1345 (Fed. Cir. 1998) .................................................................. 1

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.,*
  2012 WL 3579607 (M.D. Pa. Aug. 17, 2012) ............................................ 2

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.,*
  2013 WL 1149230 (M.D. Pa. Mar. 19, 2013) .......................................... 19

*Brine, Inc. v. STX, L.L.C.,*
  367 F. Supp.2d 61 (D. Mass. 2005) ............................................................ 1

*Broadcom Corp. v. Qualcomm Inc.,*
  543 F.3d 683 (Fed. Cir. 2009) .................................................................. 18

*ePlus Inc. v. Lawson Software, Inc.,*
  700 F.3d 509 ................................................................................ 7, 8, 10, 11

*Lucent Techs., Inc. v. Gateway, Inc.,*
  580 F.3d 1301 (Fed. Cir. 2009) ................................................................ 18

*Merial Ltd. v. Cipla Ltd.,*
  681 F.3d 1283 (Fed. Cir. 2012) .................................................................. 1

*Mondis Tech., Ltd. v. LG Elecs., Inc.,*
  2011 WL 3847603 (E.D. Tex. Aug. 29, 2011) ......................................... 18

*TiVo Inc. v. EchoStar Corp.,*
  646 F.3d 869 (Fed. Cir. 2011) .................................................................... 2

*Toshiba Corp. v. Imation Corp.,*
  681 F.3d 1358 (Fed. Cir. 2012) ................................................................ 18

*Water Techs. Corp. v. Calco, Ltd.,*
  850 F.2d 660 (Fed. Cir. 1988) .................................................................. 18

## INTRODUCTION

In accordance with Paragraph F of this Court's January 24, 2013 Order (Dkt. No. 1002), Plaintiff *e*Plus Inc. ("*e*Plus") respectfully submits this Post-Hearing brief on infringement.  It is plain that Defendant Lawson Software, Inc. ("Lawson") continues to infringe claim 26, both directly and indirectly.

*First,* the use of Lawson's modified Configuration Nos. 3 and 5, using the RQC "redesign," infringes claim 26.  The prior trial and appeal conclusively established that the use of those configurations, with RSS, infringed claim 26.  The ***sole modification*** Lawson made to the infringing configurations was one that did not address any element of claim 26 as construed by the Court.  The expert testimony of Dr. Weaver confirmed this, and was not contradicted by any expert testimony from Lawson.

Accordingly, as night follows day, it follows that the use of Configuration Nos. 3 and 5 with RQC likewise infringes.  Those configurations have not been modified in any manner that affects the infringement analysis from what was conclusively proven at trial.  Infringement by the original product or process, or the features or method steps thereof, may not be challenged by the accused contemnor.  *Merial Ltd. v. Cipla Ltd.,* 681 F.3d 1283, 1299 (Fed. Cir. 2012 ("infringement by an originally accused product [is] generally not open to challenge in contempt proceedings"); *see also Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.,* 154 F.3d 1345, 1350 (Fed. Cir. 1998) (cited with approval in *TiVo v. EchoStar Corp.,* 646 F.3d 869, 880-82 (Fed. Cir. 2011) (*en banc*) ("infringement by the original device [is] not open to challenge"); *Brine, Inc. v. STX, L.L.C.,* 367 F. Supp.2d 61, 68 (D. Mass. 2005) (("[A] finding of infringement may be predicated upon a conclusion that the modified device has not been changed from the adjudged device in a way which affects an element of a claim." (internal quotation marks omitted)).

*Unmodified* features are therefore irrelevant to the infringement analysis and cannot form the basis for a defense against contempt. *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 2012 WL 3579607, *3 (M.D. Pa. Aug. 17, 2012) The *Arlington Industries* court held, "**[the accused contemnor] is not entitled to raise arguments pertaining to unmodified features of the [accused products]**. A contempt hearing must be limited to only the alterations between the infringing and modified products because a finding of infringement 'necessarily and conclusively establishe[s] that [Plaintiff] met each limitation recited in the asserted claims of the patent.'" *Id.* (emphasis added) (citing *Merial,* 681 F.3d at 1300). Both *TiVo* and *Arlington Industries* included infringement of method claims, and therefore this principle applies regardless whether an apparatus or method claim is implicated. *TiVo*, 646 F.3d at 876-77; *Arlington Industries,* 2012 WL 3579607 at *4.

The *Arlington Industries* court explained, "[o]pening the analysis to such unchanged features would amount to a collateral attack on the underlying matter, which is impermissible as 'a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy.'" *Id.* (citing *TiVo,* 646 F.3d at 889 (quoting *Maggio v. Zeitz,* 333 U.S. 56, 69 (1948)). For this reason, the *Arlington Industries* court granted the patentee's motion *in limine* and stated, "[the accused contemnor] will be **precluded from presenting arguments of non-infringement pertaining to any limitation unaffected by the redesign of its [accused product]."** *Arlington Industries,* 2012 WL 3579607, at *3 (emphasis added). This Court has likewise already ruled that infringement and validity issues resolved at trial are not subject to dispute in this proceeding. *See* Dkt. No. 1034 at 3 (ruling that Lawson's expert "may not testify about infringement and invalidity issues that were resolved [by] the jury verdict at the trial on the merits and may not testify about what

the jury's verdict means."). As set forth herein, the infringement analysis that was confirmed by the Federal Circuit is entirely unchanged by Lawson's "redesign."

Moreover, any suggestion from Lawson that there is insufficient proof of actual use of Configurations 3 and 5 with RQC is not a contention that can be made in good faith. Lawson witnesses conceded at the hearing that over 100 of its customers are using Configurations 3 and 5 with RQC and perform the steps of claim 26. Further, Lawson's witnesses conceded that Lawson itself uses the RQC Configurations to conduct procurement and to demonstrate and train its customers on how to use the systems. Lawson itself uses the RQC configurations to perform each step of claim 26. The entire premise of Lawson's defense in this proceeding has been that it had ceased selling and supporting — and that its customers had stopped using — the infringing configurations with RSS, but that instead Lawson is selling, supporting, and using the infringing configurations with RQC. There is no third option. Under these facts, it would be sophistry for Lawson to contend that it is not actually using, selling, and otherwise inducing its customers to use the very RQC configurations that formed the sole basis for Lawson's defense.

An additional related reason exists why any such argument from Lawson should be rejected. The Federal Circuit found that there was no serious dispute that Lawson's customers use Configurations 3 and 5 to perform the steps of claim 26. Moreover, the Federal Circuit found that the record contained substantial evidence that Lawson itself infringed claim 26 by installing, demonstrating, performing live testing, maintaining and managing the infringing systems for its customers. ***In the course of this proceeding, Lawson has never claimed that any of those actions ceased.***

Instead, Lawson relied solely on the argument that it had made three design changes (only one allegedly pertinent to claim 26) to the functions of the infringing configurations. Prior

to the hearing, the Court confirmed this limited scope of the proceeding with Lawson on several occasions.  Thus, when the Court sought to confirm the scope of the proceedings during a Nov. 8, 2011 hearing, the following colloquy took place:

> LAWSON COUNSEL: But at any rate, ***the three changes are not in dispute***.  ***The significance of them and whether or not they take the product out of being infringing, that is in dispute, but we know what they are***.
>
> THE COURT:  ***You understand, Mr. Thomasch, that you can't step beyond that.  Not one step beyond it.***
>
> LAWSON COUNSEL:  ***I understand, Your Honor.***
>
> THE COURT:  If you do, that will be the end of it.
>
> LAWSON COUNSEL:  I understand that.

Dkt. No. 845 (Tr. of Nov. 8, 2011) at 75:13-16, 76:11-17 (emphasis added).

The Court should therefore reject any argument by Lawson that there is insufficient proof that the configurations with RQC are, in fact, being used.  Lawson chose to defend this proceeding solely on the basis of three alleged design changes, and for the reasons discussed in this brief and *e*Plus's brief with respect to "no colorable differences," those changes are immaterial to the infringement of claim 26.

*Second*, this Court heard clear and convincing evidence that Lawson continued to induce its customers to use the enjoined configurations ***with RSS***, that is, the very ***unmodified*** products used to perform the method of claim 26.  Lawson chose to provide its RQC "redesign" in such a manner that the customers could continue to use the enjoined RSS version "in parallel," and specifically instructed customers how they could do so.  Such acts of inducement are clearly prohibited by the Injunction Order, and no issue of "colorable differences" are presented by the continued inducement to use the unmodified configurations.

**I.      LAWSON'S ALLEGED MODIFICATION TO THE PREVIOUSLY ADJUDGED INFRINGING CONFIGURATIONS DOES NOT RENDER THEM NON-INFRINGING**

**A.      The Infringing Systems**

On January 27, 2011, the jury in this matter returned a unanimous verdict that claim 26 of the '683 Patent was infringed, and that it was not invalid.  Dkt. No. 600 at 2-3.  In particular, the jury determined that *e*Plus proved that the following configurations of Defendant's S3 and M3 Procurement Systems are used to infringe claim 26 of the '683 Patent, both directly and indirectly:

(i)      "Configuration No. 3," comprising Lawson's Core S3 Procurement System (including Lawson System Foundation (LSF) and Process Flow in combination with Inventory Control, Requisition, and Purchase Order modules), Requisition Self-Service (RSS), and Punchout;

(ii)     "Configuration No. 5," comprising Lawson's Core S3 Procurement System, RSS, Punchout, and EDI; and

(iii)    Lawson's M3 e-Procurement Software (collectively, the "Infringing Configurations").

*See* Jury Verdict at 2-3 (Dkt. No. 600); Judgment at 2 (Dkt. No. 736); Injunction Order at 2-3 (Dkt. No. 729).  Following the jury's verdict, Lawson claimed that it had modified RSS and renamed it Requisition Center ("RQC").  *See e*Plus's Proposed Findings of Fact and Conclusions of Law ("PFF"), ¶ 11.

**B.      Element-By-Element Analysis**

The components of Infringing Configurations 3 and 5 are used to perform the steps of claim 26, which recites a method comprising the steps of:

maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources;

selecting the product catalogs to search;

searching for matching items among the selected product catalogs;

building a requisition using data relating to selected matching items and their associated source(s);

processing the requisition to generate one or more purchase orders for the selected matching items; and

determining whether a selected matching item is available in inventory.

PX-1 at Col. 26, l. 61-Col. 27, l. 6; PFF ¶ 2.

It is undisputed that RSS was the only component of the Infringing Configurations that was modified in order to remove a user's "abilities to combine either (i) items from Item Master and a Punchout vendor or (ii) items from multiple Punchout vendors, in a single requisition." Lawson Pre-Hr'ng Br. at 8; *see* PX-1155; Tr. at 92:1-92:6 (Weaver Direct); 93:5-93:11 (Weaver Direct);  PFF ¶ 32.

Otherwise, Configurations 3 and 5 "***remain[] completely the same***."  PX-1030 (emphasis added);  Tr. at 276:5-278:8; 290:5-290:14 (Christopherson Cross); PFF ¶¶ 33-45.  Nothing about Lawson's modification, however, avoids the elements of claim 26.  Tr. at 721:14-9.  *e*Plus's expert Dr. Weaver demonstrated at the hearing how a user of Lawson's configurations including RQC can perform all of the steps of claim 26 using the RQC configurations.  Tr. at 686:16-717:24 (Weaver Direct) (testifying to system demonstrations that illustrate the use of the software configurations with RQC to perform the steps of Claim 26 with demonstration system provided by Lawson on a laptop.); PX-1134; PX-1134A; PX-1135; PX-1135A; PFF ¶¶ 74-98.

**C.     Lawson's Configurations 3 and 5  With RQC Are Used to Infringe Claim 26**

The first step of the method of Claim 26 requires that the electronic sourcing system "***maintain[] at least two product catalogs associated with the respective sources***."  With respect to Infringing Configuration Nos. 3 and 5 with RSS, the substantial evidence at trial, as affirmed by the Federal Circuit, established that this element was satisfied by the inclusion of multiple vendor catalogs in the Item Master of the IC module and/or by connection to one or more

6

catalogs of Punchout vendors and/or by some combination thereof.  The claim simply requires that the system user maintain at least two product catalogs.  *See ePlus Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 514 (Fed. Cir. 2012).

A user of Configurations 3 and 5 with RQC maintains at least two product catalogs.  Dr. Weaver testified that this claim element is satisfied in multiple ways.  Tr. at 721:25-722:10 (Weaver Direct) ("[T]hey can maintain multiple vendor product catalogs in the item master…You could [also] connect to multiple Punchout sites and search their catalogs…In addition, I could have connected to a multi-vendor Punchout site…); *see also* PFF ¶¶ 76, 82, 87-88, 94.

The second step of the method of claim 26 is "***selecting the product catalogs to search***." The Court in its *Markman* Order held that this claim element can be satisfied where a user selects to search only one catalog from among the at least two product catalogs maintained by the system.  *See Markman* Order (Dkt. No. 204) at 40-41.  Alternatively, the Court held that the claim element is also satisfied where a user selects multiple catalogs to search.  *Id.*

Configurations 3 and 5 with RSS are used to perform the second step of claim 26 by selecting one catalog to search (either a catalog in the Item Master or a Punchout catalog). Further, this claim element is also satisfied when a user selects more than one catalog to be searched (either selecting to search multiple Item Master catalogs, an Item Master catalog and a Punchout catalog, multiple Punchout catalogs or multiple catalogs maintained at a multi-vendor Punchout site).  *ePlus*, 700 F.3d at 514.  In Infringing Configuration Nos. 3 and 5, the user interface included in the RSS component enabled a user (either Lawson when it demonstrates its systems, or a Lawson customer) to "select[ ] the product catalogs  to search" thereby satisfying the second element of claim 26.  *See ePlus*, 700 F.3d at 513.

Dr. Weaver testified that a user of Configurations 3 and 5 with RQC likewise performs this step in a number of ways:

> ePLUS COUNSEL: How were the RQC configurations used to perform the [second step] of selecting the product catalogs to search and then [the third step] searching for matching items among the selected product catalogs?

> DR. WEAVER: The system with RQC can still be used to select the product catalogs to search from among the two or more product catalogs in the item master, or I could have selected one of multiple Punchout catalogs to search, or I could select one or more vendor catalogs to search at a multi-vendor Punchout site.

Tr. at 722:11-722:20 (Weaver Direct); *see also* PFF ¶¶ 83, 89, 95.

The third step of the method of claim 26 is "***searching for matching items among the selected product catalogs***."  In other words, the user searches for items in the one or more catalogs that the user selected to be searched.  The evidence at trial established that a user of the Infringing Configurations with RSS can "search[ ] for matching items among the selected [Item Master] product catalogs" by a number of criteria, including vendor, manufacturer, catalog number, and partial item description, thereby satisfying the third element of claim 26.  This search capability is provided through the Requisitions module of the Core Procurement System.  *See ePlus*, 700 F.3d at 513-14.  In addition, the evidence at trial established that a user performs this claim step by searching a selected Punchout catalog.  *Id.* at 514.

It is undisputed that this search functionality is still provided in Configurations 3 and 5 with RQC.  Dr. Weaver further demonstrated that Configurations 3 and 5 with RQC can be used to perform this step.  Tr. at 722:11-722:20 (Weaver Direct) (the user of the RQC system can select and then search one or more of the catalogs in the Item Master, a single-vendor Punchout catalog or one or more catalogs at a multi-vendor Punchout site); *see also* PFF ¶¶ 83, 89, 95.

The fourth step of the method of claim 26 is "**building a requisition using data relating to selected matching items and their associated source(s)**."  As the claim language makes clear by using the word "source(s)," if the system user selects to search only one catalog from the at least two product catalogs maintained in the system (*e.g.*, in the Item Master, a single-vendor Punchout catalog or a catalog at a multi-vendor Punchout site), then the items selected for inclusion in the requisition will all be associated with a single source.  Alternatively, if a user selects to search more than one catalog from among the at least two product catalogs maintained in the system (*e.g.*, in the Item Master or at a multi-vendor Punchout site), and selects items to requisition that are associated with multiple vendors, then the requisition built by the system will include items associated with multiple sources.  Alternatively, a user could select more than one catalog to search, but only select items from one of the multiple catalogs searched.  In such case, the requisition built by the system will include items associated with only a single source.

All of these scenarios are available to a user of Configurations 3 and 5 with RQC, and each scenario satisfies the express language of the fourth element of claim 26.  Dr. Weaver demonstrated that Configurations 3 and 5 with RQC perform this step.  Tr. at 722:21-723:5 (Weaver Direct); *see also* PFF ¶¶ 84, 91, 95; PX-1003 at RQC 691-2; PX-1022 at RQC 7678; Tr. at 252:20-256:12 (Christopherson Direct) (a user of Configurations 3 and 5 with RQC can shop at SciQuest multi-vendor Punchout site and select items from multiple different vendors and have multiple items associated with multiple vendors on the same requisition with a single Punchout session).

The fifth step of the method of claim 26 requires "**processing the requisition to generate one or more purchase orders for the selected matching items.**"  The claim language is satisfied when a system user generates a single purchase order from a requisition and, in addition, when a

9

system user generates multiple purchase orders from the single requisition.  If, for example, the requisition that was built in the fourth step only included selected matching items associated with a single source, then only one purchase order is generated from that requisition.  If, on the other hand, the requisition included selected matching items associated with multiple sources, then the system will generate multiple purchase orders from that requisition.  As was established at trial, both scenarios satisfy the fifth step of claim 26.

There is no dispute that a user of Configurations 3 and 5 with RQC can perform the fifth step of claim 26 using the Purchase Order module of the Core System, which has not been modified.  *ePlus*, 700 F.3d at 513.  Dr. Weaver demonstrated this step.  Tr. at 723:6-723:12 (Weaver Direct) ("If the requisition has items associated with a single source, then the system will generate one purchase order.  If the requisition contains items from multiple vendors, then…the system will generate multiple purchase orders."); *see also* 707:22-708:9 (Weaver Direct); 721:3-721:13 (Weaver Direct); PFF ¶¶ 85, 92, 97; PX-1003 at RQC 692.

Finally, the sixth step of method claim 26 requires that a system  user "***determin[e] whether a selected matching item is available in inventory***."  It was established at trial that the Infringing Configurations perform this step in multiple ways.  In Configuration 5 with RSS and EDI for example, EDI is used to electronically transmit purchase orders to vendors and receive purchase order responses from vendors.  The EDI purchase order acknowledgement enables the user to determine whether the vendor to whom the purchase order was transmitted has the ordered item in stock and can fulfill the order.  *ePlus*, 700 F.3d at 520.  The EDI purchase order transaction is used to transmit purchase orders to vendors associated with items ordered from Item Master catalogs as well as items ordered from Punchout catalogs.  Likewise, as the Federal Circuit found, in a configuration with RSS and Punchout, such as Configuration 3, the Punchout

site may include functionality to enable the user to look up a selected item in the Punchout vendor's inventory database and determine whether a selected item is available in the vendor's inventory.  *See ePlus,* 700 F.3d at 514.

These capabilities remain unchanged in Configurations 3 and 5 with RQC.  Tr. at 717:18-717:24 (Weaver Direct); 723:13-723:22 (Weaver Direct) ("That could be done either by -- at a Punchout site, querying the vendor's inventory as I showed in my demonstration, or if we had had the EDI module, we would have been able to show that we could receive purchase order acknowledgements from the vendor, and EDI would have built a purchase order acknowledgment report that would have told us whether or not the items were available in the vendor's inventory"); Tr. at 257:2-258:7 (Christopherson Direct) (Lawson made no changes to the inventory capabilities of infringing configurations; Lawson made no changes to EDI functionality nor did it make changes to inventory functionality at Punchout sites).  *See also* PFF ¶¶ 86, 93, 98.

> **1.      Configuration 5 with Item Master, RQC and EDI Is Used to Infringe Claim 26**

The evidence shows that Configuration 5 with RQC, Item Master and EDI, among other modules, is used to infringe claim 26.  Dr. Weaver demonstrated that a user of a Lawson system with RQC can maintain at least two product catalogs on a database containing data relating to items associated with the respective sources in accordance with the first element of claim 26. Configuration 5 with RQC and EDI and Item Master maintains multiple product catalogs containing data associated with items of multiple different vendors in the Item Master, thereby satisfying the first step of claim 26.  PX-1135, PX-1135A; PFF ¶ 82.  A user of Configuration 5 can select one or more catalogs in the Item Master to search and then search among those selected Item Master catalogs in accordance with the second and third elements of claim 26.

PFF ¶ 83. A user of Configuration 5 can build a requisition using data related to selected matching items and their associated source or sources, in accordance with the fourth step of claim 26. PFF ¶ 84. A user can then process the requisition to generate one or more purchase orders for the selected matching items, in accordance with the fifth step of claim 26. PFF ¶ 85.

Configuration 5 with RQC and EDI is then used to perform the last step of determining whether a selected matching item is available in inventory via the Purchase Order acknowledgement report generated by the EDI module. This report indicates if the vendor has an ordered item in stock. Tr. at 709:22-710:4 (Weaver Direct); Tr. at 723:13-723:22 (Weaver Direct); PFF ¶ 86.

> ### 2. Configurations 3 and 5 with RQC and Punchout Are Used to Infringe Claim 26

The evidence shows that Configurations 3 and 5 with RQC and Punchout also infringe claim 26. Dr. Weaver demonstrated that a user of Configurations 3 and 5 with RQC and Punchout can maintain at least two product catalogs on a database containing data relating to items associated with the respective sources as required by the first element of claim 26. PX-1134; PX-1134A; PFF ¶ 87. It is undisputed that Lawson made no changes to Punchout with respect to disallowing such RQC configurations from connecting to multiple different Punchout sites. Tr. at 535:1-535:6 (Lohkamp Direct) ("Q: And Lawson made no changes to a system that would have the core procurement suite, requisition center and Punchout with respect to disallowing such a system from connecting to multiple different Punchout sites, correct? A: Correct."); PX-1134; PX-1134A; PX-1096 at RQC914944; Tr. at 415:8-24 (Lohkamp Direct) ("I responded with the number of Procurement Punchout customers and mentioned that a large majority of them would have more than one Punchout vendor set-up."); PFF ¶ 88.

In Configurations 3 and 5 with RQC and Punchout, a user can also select and then search a single-vendor Punchout catalog, in accordance with the second and third steps of claim 26. PFF ¶ 89.  A user of Configurations 3 and 5 with RQC and Punchout then builds a requisition using data related to selected matching items and their associated source, in accordance with the fourth step of claim 26 (PFF ¶ 91), and generates a purchase order for the selected matching items, in accordance with the fifth step of claim 26.  PFF ¶ 92.  Finally, a user determines whether a selected matching item is available in the Punchout vendor's inventory by querying the vendor's inventory database, in accordance with the last step of claim 26.  Tr. at 717:18-24 (Weaver Direct) ("When we looked for that Ameriwood desk, we found that it was backordered, so we didn't pursue that and instead picked the Global desk, and it was available in inventory."). Additionally, a user of Configuration 5 with RQC, Punchout and EDI can use the EDI module to issue a purchase order to a Punchout vendor and receive a purchase order acknowledgement from such vendor from which the user can determine whether the item ordered is available in the vendor's inventory.  Tr. at 84:7-20 (Weaver Direct).  PFF ¶ 93.

### 3. Configurations 3 and 5 With RQC Connect to Multi-Vendor Punchout Sites And Are Used to Infringe Claim 26

The evidence shows that Configurations 3 and 5 with RQC are connected to multi-vendor Punchout sites and are used to infringe claim 26.  Configurations 3 and 5 with RQC and Punchout can be configured to connect to multiple different single-vendor Punchout catalogs or to one or more multi-vendor Punchout catalogs or some combination of these catalogs.  PX-1022; Tr. at 721:25-722:10 (Weaver Direct) ("Q: What are the ways that they can maintain product catalogs associated with multiple sources?  A: …I could have connected to a multi-vendor Punchout site like SciQuest and searched multiple catalogs there."); Tr. at 535:21-536:24 (Lohkamp Direct) ("Q: The system can be connected to both of those different catalogs, correct?

A: Yes, to both those websites. Q: In fact, there are some Punchout websites that are multi vendor Punchout sites, correct? A: Yes.  Q: One example would be SciQuest, correct?  A:  Yes. Q: Another example would be GHX, Global Healthcare Exchange; is that correct?  A:  Yes.  Q: Another example of a multiple vendor Punchout site is Perfect Commerce, correct?  A: Yes.  Q: You're aware that there are customers of Lawson that maintain connections to the SciQuest Punchout site, correct. A: Yes.").  Thus, a user of Configurations 3 and 5 with RQC and Punchout "maintain[s] at least two product catalogs on a database containing data relating to items associated with the respective sources," in accordance with the first element of claim 26. *See* PFF ¶¶ 94-96.

In Configurations 3 and 5 with RQC that are connected to one or more multi-vendor Punchout sites, the evidence shows that a user selects and searches one or more catalogs at such sites, in accordance with the second and third steps of claim 26.  PX-1022; PFF ¶ 95.  The system then builds a requisition using data related to selected matching items and their associated source or sources, in accordance with the fourth step of claim 26.  *Id.*; Tr. at 535:21-536:24 (Lohkamp Direct) ("Q: Now with respect to a Punchout shopping session at the SciQuest site, if a user selects from multiple different vendors during that Punchout shopping session at the SciQuest site, those items are returned back to the Lawson system to the right-hand side of the user interface of requisition center, correct? A: That is my understanding of the SciQuest functionality. Q: Once the user clicks "release," that requisition will be released, correct?  A: Yes."); PFF ¶ 95.

The requisition is then processed to generate one or more purchase orders for the selected matching items, in accordance with the fifth step of claim 26.  Tr. at 723:6-723:12 (Weaver Direct); Tr. at 536:25-537:7 (Lohkamp Direct) ("Q: Assuming my requisition [from SciQuest

Punchout shopping session] with the line item from vendor A and the line item from vendor B was approved and my system has a purchase order module, the purchase order module will generate a purchase order from my line item that I want to purchase from vendor A and that a second purchase order from the line item from vendor B, correct? A: Correct."); Tr. at 308:19-308:24 (Christopherson Redirect) ("Q: The customers of which you're aware that have systems with RQC and Punchout are using those systems to build requisitions from Punchout shopping sessions and generate purchase orders from those requisitions, right? A: Yes."); PFF ¶ 97.

A user can determine the availability of a selected matching item in inventory in accordance with the sixth element of claim 26 by querying the vendor's inventory database at the multi-vendor Punchout site.  Tr. at 723:13-723:22 (Weaver Direct); PFF ¶ 98.

### D.      Lawson's Modification Is Irrelevant To Claim 26

As also set forth in *e*Plus's "colorable difference" brief, the modification did not eliminate any infringing functionality from Configurations 3 and 5.  *See* PFF ¶¶ 33-45.  The testimony of Lawson's witnesses and Lawson's documents demonstrate that Configurations 3 and 5 with RQC continue to be used to perform all the elements of claim 26.  Tr. at 721:14-721:19 (Weaver Direct); PFF ¶ 74.

### E.      Lawson Directly Infringes Claim 26 By Using Configurations 3 And 5 With RQC

The Federal Circuit found that Lawson itself directly infringed claim 26.  That continues to be the case.  There is no dispute that Lawson itself has installed and implemented Configurations 3 and 5 with RQC and Punchout.  Tr. at 723:23-724:8 (Weaver Direct); PFF ¶¶ 99-101.

Lawson uses, in its sales and marketing efforts, as well as customer training, systems with all modules of the S3 Procurement System, RQC and Punchout (Configuration 3).  PFF ¶ 100.  Lawson also performs demonstrations using these systems for its customers.  PFF ¶ 101.

Lawson uses Configuration 3 with RQC and Punchout to practice each step of claim 26. Lawson connects Configuration 3 with RQC and Punchout to multiple product catalogs, thus satisfying the first element of claim 26. PFF ¶ 102. When Lawson uses Configuration 3 with RQC and Punchout to perform customer demonstrations, it demonstrates selecting and then searching a selected Punchout catalog as required by the second and third elements of claim 26. PFF ¶¶ 103-104. Lawson further demonstrates checking the availability of items found in a search of the selected Punchout catalog, as recited in the sixth element of claim 26. PFF ¶ 105. Lawson also demonstrates bringing a Punchout item back into the requisition lines user interface of the Lawson system and generating a requisition for that item, as required by the fourth element of claim 26. PFF ¶ 106. Additionally, Lawson demonstrates to its customers how Configuration 3 with RQC and Punchout is used to generate a purchase order for the items in the requisition in accordance with the fifth element of claim 26. PFF ¶ 107. Lawson also uses Configuration 5 with RQC and Punchout and EDI for its own procurement activities. PFF ¶ 100.

### F.   Lawson Customers Directly Infringe Claim 26 By Using Configurations 3 And 5 With RQC

It is undisputed that over 100 Lawson customers are using Configurations 3 and 5 with RQC and Punchout. Tr. at 305:24-306:8 (Christopherson Redirect) ("Q: So are you aware of any customers that use RQC and Punchout?  A: Am I aware of any customers that do use it, yes, I am aware.  Q: What customers are those?  A: Cleveland Clinic uses that, Indiana University Healthcare uses it…There's over 100 customers that use it.  A: That use RQC and Punchout?  A: Correct.").  Lawson has earned over $20 million in revenue from its customers who have licensed Configurations 3 and 5 with RQC. *See* PFF ¶¶ 108-109.

16

The majority of customers that have Configurations 3 and 5 with RQC and Punchout have systems configured to connect to multiple Punchout catalogs and thus perform step 1 of claim 26. PX-1096 at RQC 914945; Tr. at 415:15-24 (Lohkamp Direct) ("Q: In that first response to you, Mr. Hager asks you 'any estimate of how many of our customers use this functionality.' Do you see that? A: Yes. Q: What was your response to Mr. Hager? A: I responded with the number of Procurement Punchout customers and mentioned that a large majority of them would have more than one Punchout vendor set-up."); PFF ¶ 110. The evidence also shows that Lawson customers using Configurations 3 and 5 with RQC and Punchout:

(i) select a Punchout catalog to search in accordance with the second step of claim 26. Tr. at 306:9-12 (Christopherson Redirect) ("Q: And those customers have the capability then with those systems with RQC and Punchout to select a Punchout catalog search, right? A: Correct."); PFF ¶111;

(ii) search for items at a selected Punchout catalog, as required by the third step of claim 26. Tr. at 307:16-20 (Christopherson Redirect) ("Q: Those customers such as Cleveland Clinic, they have the ability using that system with RQC and Punchout to search for items at a Punchout site, right? A: Correct."); PFF ¶ 112;

(iii) bring selected items back from a Punchout site, into the requisition lines user interface of the Lawson system and generate a requisition from these line items as required by the fourth step of claim 26. Tr. at 307:21-308:3 (Christopherson Redirect) ("Q: And they have the ability to bring selected items back from a Punchout site into the requisition line user interface of the Lawson system, right? A: Correct. Q: And they have the capability to process those requisition lines and generate a requisition from that, right? A: Correct."); PFF ¶ 113;

(iv) generate one or more purchase orders from those requisitions, as recited in the fifth step of claim 26. Tr. 308:19-24. (Christopherson Redirect) ("Q: The customers of which you're aware that have systems with RQC and Punchout are using those systems to build requisitions from Punchout shopping sessions and generate purchase orders from those requisitions, right? A: Yes."); PFF ¶ 114; and

(v) finally, since Lawson made no modifications to the ability of the systems to determine the availability of a selected matching item in the Punchout vendor's inventory, such functionality remains in Configurations 3 and 5 with RQC and Punchout. Tr. at 108:9-108:13 (Weaver Direct) ("Q: Does the modification relating to requisitions

17

with Punchout items have any relevance to the capability of determining whether a selected matching item is available in inventory?  A: It does not."); PFF ¶ 115.[1]

### G.     Lawson Indirectly Infringes Claim 26 By Aiding And Abetting Its Customers' Infringement Using The RQC Configurations

The evidence showed that Lawson actively induces infringement by selling and offering to sell the RQC configurations with the intent that its customers use those systems in an infringing manner, and with knowledge of claim 26 of the '683 Patent.  Intent to induce infringement may be established through circumstantial evidence.  *Broadcom Corp. v. Qualcomm Inc.,* 543 F.3d 683, 700 (Fed. Cir. 2009) ("There is no requirement that direct evidence be introduced, nor is a jury's preference for circumstantial evidence over direct evidence unreasonable *per se*."); *see also Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 669 (Fed. Cir. 1988)  (intent to induce "may be inferred from all of the circumstances.").

Thus, to prevail on a claim of induced infringement, "[c]ircumstantial evidence must show that at least one person directly infringed an asserted claim during the relevant time period." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1364-65 (Fed. Cir. 2012) ("[W]here an alleged infringer designs a product for use in an infringing way and instructs users to use the product in an infringing way, there is sufficient evidence for a jury to find direct infringement.") *Id.; see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317-19 (Fed. Cir. 2009) (substantial evidence supported verdict of indirect infringement where the evidence consisted of the defendant's sales of the accused product and dissemination of instruction manuals); *Mondis Tech., Ltd. v. LG Elecs., Inc.*, 2011 WL 3847603, at *5 (E.D. Tex. Aug. 29, 2011) (evidence of extensive sales of the accused products and infringer's provision of instruction manuals was

---

[1] In addition, in Configuration 5 with RQC, Punchout and EDI, the EDI module can be used to transmit a purchase order to a Punchout vendor and receive a purchase order acknowledgement from which the system user can determine the availability of the ordered item(s) in the Punchout vendor's inventory.  PFF ¶ 93.

sufficient to find liability).  Most recently in *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,

2013 WL 1149230, at *8-9 (M.D. Pa. Mar. 19, 2013, the district court found that by presenting

evidence of sales of the accused products and the defendant's instructions that teach the

infringing use of the products, the patentee had demonstrated direct infringement by customers.

Lawson continues to design, install, implement, test, service, and maintain

Configurations 3 and 5 with RQC and Punchout, and instructs its customers in how to use them,

as the evidence showed at the hearing.  Tr. at 727:9-727:23 (Weaver Direct) ("Q: Dr. Weaver,

have you rendered any opinions as to whether or not Lawson continues to induce or contribute to

its customers' direct infringement of claim 26?  A: Yes, I have.  Q: What are the bases for your

opinion?  A: RQC continues to infringe, and Lawson continues to induce or contribute to its

customers' direct infringement by the customers' use of systems having RQC.  And Lawson has

told the customers that RQC has 100 percent of the functionality of RSS in order to induce them

to download RQC.").  Such conduct also constitutes a violation of this Court's Injunction Order.

Dkt No. 729 at 2-3; PFF ¶¶ 5-7.

Lawson further aids and abets its customers' use of Configurations 3 and 5 with RQC

and Punchout in that:

- Lawson provides the RQC software to its customers free of charge.  It makes the software available to its customers for download from its website.  PFF ¶ 117;

- Lawson established an RQC SWAT team to assist its customers with installation, configuration, testing and implementation of RQC.  PFF ¶¶ 118-119;

- Lawson provides its customers with technical and instructional manuals and guides to instruct and assist them in using the systems having RQC.  *See, e.g.*, PX-1000 (Lawson disseminated a Lawson Procurement Punchout and PO Dispatcher Installation and Administration Guide to aid a certified installer to install Procurement Punchout and the PO Dispatcher program to send POs to vendors. The Lawson Procurement Punchout and PO Dispatcher Installation and Administration Guide provides instructions on how to perform administrative functions required for those processes.); *see also* PFF ¶ 120; and

19

- Lawson offers ongoing consulting and maintenance and support services to customers having RQC.  PFF ¶ 121.

Lawson also markets its RQC product as having "100 percent of the functionality of RSS" as an inducement to get customers to use the RQC Configurations.  *Id.*; *see also* Tr. at 729:20-729:25 (Weaver Direct); PFF ¶ 57.  The evidence further showed that Lawson continued to work closely with its customers in designing, configuring, installing, implementing, servicing, and maintaining Configurations 3 and 5 with RQC and Punchout, and therefore it could not plausibly claim to be unaware of its customers' infringing uses of those systems.  Indeed, Lawson's witnesses testified to Lawson's customers' infringing uses of Configurations 3 and 5 with RQC and Punchout.  PFF ¶¶ 118-122.  All of these activities aid and abet Lawson's customers' in their use of Configurations 3 and 5 with RQC and Punchout.  Tr. at 727:24-728:20, 727:9-727:23 (Weaver Direct); PFF ¶¶ 118-122.

## II.    LAWSON HAS INDUCED ITS CUSTOMERS TO CONTINUE USING ENJOINED CONFIGURATIONS WITH RSS TO INFRINGE CLAIM 26

### A.    RQC Is Designed To Run In Parallel With RSS

Following this Court's injunction, Lawson **enabled RSS to run in parallel with RQC,** and even instructed its customers how they could use the enjoined systems with RSS**.**  Multiple witnesses at the hearing testified that Lawson intentionally aided and abetted customers to continue using the infringing RSS systems.  Lawson did not instruct its customers to cease using RSS, nor did it verify that its customers had done so.  Tr. at 840:23-841:10 (Homewood Cross).  Rather, Lawson made RQC available for download, but ensured that its customers could continue using the Infringing Configurations with RSS even after downloading RQC.  PFF ¶¶ 123-129.

Lawson designed RQC to run in parallel with RSS.  Tr. at  541:21-542:24 (Lohkamp Direct) ("Q: "Other than changing the RSS bookmarks, nothing else will be required for the

existing RSS to continue to run; is that correct?"…And the answer to the question provided by Jennifer Langer of Lawson is, "Correct." Is that accurate? A: That's what – that's accurate, yes. Q: The customer is asking about things that need to be changed in order for the existing requisition self service to continue to run, correct? A: Correct."); PFF ¶ 124. During the hearing, Mr. Lohkamp confirmed that Lawson's customers can run both RSS and RQC at the same time:

> THE COURT:  I guess I need to get straight once and for all, if you had RSS, then you get RQC, you get it installed, do you have the capability, if I'm the customer, to change the bookmarks on RSS and then run them both at the same time?

> MR. LOHKAMP:  Yes.

> THE COURT:  And can if I were a customer of Lawson running RSS in June of 2011, do I still have that capacity if I have RSS and RQC today?

> MR. LOHKAMP:  Yes, you have that capability to change the bookmarks.

> THE COURT:  All right. And I can run them both in parallel?

> THE WITNESS:  Yes.

Tr. at 547:21-548:9 (Lohkamp Cross); PFF ¶ 124. Thus, other than changing the RSS bookmarks, nothing else was required for an existing customer of the Infringing Configurations with RSS to continue to use those Infringing Configurations even after downloading RQC. *Id.*; *see also* Tr. at 612:15-613:2 (Hanson Redirect) ("Q: Turn back to Defendant's Exhibit 587. Counsel for Lawson directed you to this exhibit and to the sentence reading, do not install, uninstall, or patch RSS for any client. Do you see that statement? A: Yes, I do. Q: So you left requisition self-service on the customers' systems; correct? A: Correct."); PFF ¶¶ 125-126.

Lawson also provided support and instruction to customers on how to run RSS and RQC in parallel, in violation of this Court's injunction. Tr. at 860:13-860:22 (Homewood Cross) ("Q: Q: And is it your understanding that Lawson provided support and instruction to its customers on how to do that additional configuration, to design RQC and RSS to run in parallel? A: I've

seen a couple isolated incidents on that, yes."); PX-1105 ("Q: What about if we want to run RSS

and RQC side by side?"  A: "Designed to run in parallel with only changes to the RSS

bookmarks."); PX-1067 ("No, *do not uninstall RSS first*.  RQC can be installed in addition to

RSS."); PFF ¶ 126.

After the date of the Court's injunction, Lawson's employee Ms. Nordby provided the

following instruction to an employee of Lawson's non-healthcare customer Western Lake

Superior Sanitary:

> "Okay, let me explain this better.  After you load RQC, you have two options if
> you want to run RSS and RQC parallel:
>
> Option 1:
>
> You can manually create the RSS bookmarks under Portal Administration under
> Bookmark Manager.  You will need to create the Parent RSS bookmark and the
> children under it.  You can copy the URL paths from the RQC bookmarks, just
> use /RQC instead of /RSS and you'll have your bookmarks.  Example: Utilities,
> the path is /RQC/html/utility.htm for RQC and you can change this to
> /RSS/html/utility.htm for RSS.
>
> Option 2:
>
> You could also edit the LAWSONLD.shopping.csv file in
> LAWDIR/logon/work/LAWSONLD prior to running L0920 to reload the RSS
> bookmarks.  I would recommend you modify the PREREQUISITION line and
> add an "A" or a "2" after this and make this entire file different and then reload
> this by running L0920.
>
> Does this help?

PX-1058 at RQC0113793; Tr. at 542:25-545:3 (Lohkamp Direct) ("THE COURT: And Lawson

in the course of this customer webinar was providing instructions to its customers for how to

change the bookmarks so they would be able to access RSS to continue to run, correct?  MR.

LOHKAMP: We'd provide some guidance on it.").[2]   Lawson also told its customers that RSS

---

[2] *See also* Tr. at 579:20-580:24 (Hanson Direct) ("Q: So Lawson is aware that customers could
still access RSS even if they've installed RQC; correct?  A: Yes, if you do additional setups,

and RQC were designed to allow multiple users to use the RSS and RQC applications simultaneously.  Tr. at 545:20-546:6 (Lohkamp Direct) ("Q: Mr. Brown asked, 'Are there any known/or possible issues when multiple users are using RSS and others are using RQC at the same time?  Are they all balanced on the same databases?'  Do you see that question?  A: Yes, I do.  Q: How did Jennifer Langer of Lawson respond?  A: 'Designed to work this way.'"); PFF ¶¶ 126-127.

Lawson's counsel argued to the Court that Lawson designed RQC and RSS to run in parallel for the benefit of healthcare customers who were subject to the sunset period of the Injunction Order.  However, ***Lawson specifically instructed its non-healthcare customers on how to reinstate RSS on their systems even after downloading RQC***.  PX-1058 at RQC0113793; PFF ¶ 126.  As of June 30, 2011, Mr. Hanson testified that Lawson was continuing to provide customer support with respect to requisitions being created in RSS:

> ePLUS COUNSEL: So Lawson, as of June 30th, 2011, was providing support to this customer with respect to issues in requisition self-service; correct?
>
> MR. HANSON: My understanding is they're providing support to RQ10, and they used the term RSS to determine if they were entering the requisition via the web-based product or the back office product which they were actually providing support for.
>
> ePLUS COUNSEL: And the web-based product was requisition self-service; correct?
>
> MR. HANSON: In this case, it looks like the client stated, yeah, requisitions were created in RSS.

Tr. at 586:15-587:5 (Hanson Direct);  PFF ¶ 129.

### B.  Lawson Did Not Uninstall RSS Nor Did It Require Its Customers To Uninstall RSS

---

yeah."); Tr. at 588:2-589:12 (Q: So in this instance, Lawson was providing instruction to a non-health care entity for how to reinstate RSS into their system; correct?  A: So, yes."); PFF ¶126.

The evidence shows that the installation of the RQC application does not automatically uninstall the infringing RSS application (PFF ¶ 130), and Lawson admits that it did not uninstall RSS for its customers.  PX-1269 at Interrogatory 8 ("With the exception of the 277 healthcare customers, Lawson does not interact with the customers' RSS system in any way, including manually uninstalling the RSS product."); PFF ¶ 131.

Lawson also took no steps whatsoever to ensure that its customers uninstalled RSS and, in fact, went so far as to assure its customers they could continue using RSS.  PFF ¶¶ 132-133. In a webinar presented to its customers, Lawson specifically announced, "Lawson is ordered to no longer provide support to RSS.  However, ***Customers are not ordered to stop running RSS***." PX1056 at RQC0905560 (emphasis added); *see also* PX-1067 (when consultant asked if he should uninstall RSS before installing RQC, Scott Hanson replied, "No, ***do not un-install RSS first.  RQC can be installed in addition to RSS.***"); PFF ¶ 133.

No individual within Lawson had responsibility for tracking whether or not a customer had replaced RSS with RQC in their production system.  PFF ¶ 134.  Even seven months after the injunction, there was no evidence of any customer who uninstalled and removed the RSS application from their infringing configuration. PFF ¶ 135.

### C.    Mere Download of RQC Means Nothing — Installation And Implementation Is Required

Lawson's customers obtained RQC by downloading Lawson's RQC patch from Lawson's website.  PFF ¶ 136.  But downloading RQC refers only to a customer's act of downloading the software from Lawson's support site, MyLawson.com.  PFF ¶ 137.  The evidence shows that merely downloading the RQC application does not render it operational. *See, e.g.,* PFF ¶¶ 140-143.  For example, after the RQC application is downloaded, a system install is required, and then the patch needs to be configured to be implemented.  *Id.*

24

As of December 2011, Lawson claimed to have no idea how many of its customers that had downloaded RQC had actually implemented RQC.  Tr. at 576:13-576:16 (Hanson Direct).  PFF ¶¶ 144-145.  But regardless of whether a customer downloaded and implemented RQC, Lawson is aware that customers can still access RSS even if they have installed RQC.  Tr. at 577:10-577:14 (Hanson Direct) ("Q: If clients had systems that included RSS in their production environment and they have not implemented RQC in the production environment, they could still be using RSS for procurement activities; correct?  A: That's correct."); PFF ¶ 147.  Nonetheless, Lawson continued to provide support to customers running RSS, so long as they merely downloaded RQC.  PFF ¶ 149.  Thus, the evidence established that Lawson designed RQC such that when it was downloaded, the customers did not automatically lose access to RSS.  Tr. at 581:15-582:3 (Hanson Direct); PFF ¶ 148.

## III.   CONCLUSION

Lawson made no modification to enjoined Infringing Configurations 3 and 5 that render them non-infringing.  Users of Configurations 3 and 5 with RQC therefore continue to infringe claim 26 of the '683 patent.  Lawson also encourages and instructs its customers to continue using the Infringing Configurations with RSS.  *e*Plus accordingly respectfully requests that this Court hold Lawson in contempt of the Court's Injunction Order.

Respectfully Submitted,

April 12, 2013                  _____/s/_____

David M. Young (VSB #35997)
Jennifer A. Albert (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile: (202) 346-4444
dyoung@goodwinprocter.com
jalbert@goodwinprocter.com

Michael G. Strapp (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
Facsimile: (617) 523-1231
mstrapp@goodwinprocter.com

Craig T. Merritt (VSB #20281)
Paul W. Jacobs, II (VSB #16815)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
Facsimile: (804) 697-4112
cmerritt@cblaw.com

*Attorneys for Plaintiff ePlus Inc.*

26

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of April, 2013, I will serve

**PLAINTIFF *e*PLUS INC.'S POST-HEARING
BRIEF WITH RESPECT TO INRINGEMENT**

with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) via email to the following*:*

| | |
|---|---|
| Daniel J. Thomasch, *pro hac vice*<br>Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, NY 10166-0193<br>(212) 351-3800<br><br>Jason C. Lo, *pro hac vice*<br>Gibson, Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071-3197<br>(213) 229-7153<br>VAED-620ExternalServiceList@gibsondunn.com | Robert A. Angle, VSB#37691<br>Dabney J. Carr, IV, VSB #28679<br>TROUTMAN SANDERS LLP<br>P.O. Box 1122<br>Richmond, Virginia 23218-1122<br>(804) 697-1238<br>(804) 698-5119 (Fax)<br>robert.angle@troutmansanders.com<br>dabney.carr@troutmansanders.com<br><br>***Counsel for Defendant Lawson Software, Inc.*** |
| Donald R. Dunner, *pro hac vice*<br>Erika H. Arner, *pro hac vice*<br>Finnegan, Henderson, Farabow, Garrett &<br>Dunner, LLP<br>901 New York Avenue, NW<br>Washington, DC 20001<br>(202) 408-4000<br>(202) 408-4400<br>EXT-Lawson-FinneganCorrespondence@finnegan.com | |

_____
/s/
David M. Young (VSB #35997)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444
dyoung@goodwinprocter.com