**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| *e*PLUS INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 3:09-CV-620 (REP)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LAWSON SOFTWARE, INC.,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |


**PLAINTIFF *e*PLUS INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF
LAW IN SUPPORT OF MOTION FOR CONTEMPT FOR VIOLATION OF
PERMANENT INJUNCTION**

Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB#35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000


Michael G. Strapp (admitted *pro hac vice*)     Craig T. Merritt (VSB #20281)
**GOODWIN PROCTER LLP**                          Paul W. Jacobs, II (VSB #16815)
Exchange Place                                   **CHRISTIAN & BARTON, LLP**
53 State Street                                  909 East Main Street, Suite 1200
Boston, MA 02109-2881                            Richmond, Virginia 23219-3095
Telephone:  (617) 570-1000                       Telephone: (804) 697-4100

*Attorneys for Plaintiff ePlus Inc.*

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ........................................................................................... 1

II. PROPOSED FINDINGS OF FACT ............................................................... 1

   A.  ePlus's Patent ........................................................................................ 1

   B.  The Jury's Verdict ................................................................................ 2

   C.  The Permanent Injunction .................................................................... 3

   D.  The Federal Circuit Decision ............................................................... 4

   E.  Person Of Ordinary Skill In The Art .................................................... 4

   F.  Lawson's Purported Modification ........................................................ 4

        i.    Timeline For Development Of RQC ........................................... 4

        ii.   Various Contingency Plans Lawson Considered And Rejected ... 7

   G.  No Colorable Difference Between Infringing Configurations And RQC
        Configurations ..................................................................................... 12

        i.    Lawson's Modification Has No Relevance To Any Element Of
              Claim 26 ................................................................................... 12

        ii.   Lawson Made No Changes To The Core Procurement Functionality
              Of The Infringing Configurations ............................................ 17

        iii.  RQC Has 100% Of The Functionality Of RSS ........................... 19

        iv.   Lawson's Representations That RQC Is Substantially The Same As
              RSS ........................................................................................... 23

   H.  Lawson's Contentions As To Why The Modification Is Allegedly
        Significant Are Irrelevant And Not Supported By The Evidence ......... 25

        i.    Users Can Still Comparison Shop Using RQC ............................ 25

        ii.   Lawson Represented To Its Customers that Requisitioning With
              RQC Was Easy .......................................................................... 26

        iii.  Lawson's Modifications Had No Negative Impact On Customers ... 27

   I.   Lawson's Configurations Including RQC Are Used To Infringe Claim 26 ... 28

        i.    RQC Configurations With Item Master And EDI Are Used To
              Infringe Claim 26 ..................................................................... 30

        ii.   RQC Configurations With Punchout Can Be Used To Infringe
              Claim 26 ................................................................................... 33

        iii.  RQC Configurations Connected to Multi-Vendor Punchout Sites
              Are Used to Infringe Claim 26 .................................................. 36

i

iv.   Lawson Directly Infringes Claim 26 By Using Configurations 3 And 5 With RQC ...................................................................39

v.   Lawson Customers Directly Infringe Claim 26 by Using Configurations 3 And 5 With RQC ..........................................42

vi.   Lawson Indirectly Infringes Claim 26 By Aiding, Abetting And Contributing To Its Customers' Infringement Using The RQC Configurations ..............................................................44

J.   Lawson Still Aids And Abets Its Customers' Infringement Of Claim 26 Through The Use Of The Original Adjudicated Infringing Configurations With RSS ..........................................................................47

i.   RQC Is Designed To Run In Parallel With RSS ...................................47

ii.   Lawson Did Not Uninstall RSS Nor Did It Require Its Customers To Uninstall RSS ..........................................................53

iii.   Download Of RQC Means Nothing – Installation And Implementation Is Required ..........................................................55

iv.   Merely Downloading RQC By Customers Was Sufficient Basis For Lawson To Provide Support; Installation And Implementation Were Not Required ..........................................................58

K.   Lawson's Gains Should Be Disgorged ...................................62

i.   Revenue ...................................................................62

ii.   Gross Profit ..............................................................69

iii.   Incremental Profit ........................................................73

iv.   Damages After Injunction And Until Court Finds Contempt ...................77

L.   Lawson's Attempts to Quantify Disgorgement Are Flawed...........................78

i.   Net Profits Is An Inaccurate Measure..........................................78

ii.   Lawson's Approach To Compute Incremental Profits Is Erroneous..........82

M.   Treble Damages Is Appropriate For Lawson's Willful Infringement Of Claim 26..........................................................................87

i.   Lawson Knowingly Failed To Redesign To Avoid Infringement ..............87

ii.   Lawson Ignored Counsel's Advice That The Modification Was Not Enough ..................................................................89

iii.   Lawson Took No Steps To Ensure Customers Uninstalled RSS................89

iv.   Lawson Encouraged And Instructed Customers To Continue Using RSS ..................................................................91

v.   Lawson Intentionally Misled The Court During The Injunction Proceedings ..................................................................93

N.   Coercive Remedy To Prevent Ongoing Contempt ...............................98

III.     PROPOSED CONCLUSIONS OF LAW ...................................................................... 100

IV.     CONCLUSION ........................................................................................................... 103

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ePlus, Inc. v. Lawson Software, Inc.,*
  700 F.3d 509 (Fed. Cir. 2012) ................................................................................................. 4

**Statutes**

35 U.S.C. § 283 .......................................................................................................................... 1

35 U.S.C. § 285 ...................................................................................................................... 102

## I.      INTRODUCTION

Pursuant to Fed. R. of Civ. P. 65 and 35 U.S.C. § 283, and this Court's Order of March

11, 2011, *e*Plus, Inc. ("*e*Plus") respectfully submits the following proposed findings of fact and

conclusions of law in support of its motion for contempt against Defendant Lawson Software,

Inc.'s ("Defendant's") continuing direct and indirect infringement of claim 26 of U.S. Patent No.

6,023,683 (or, "the '683 Patent").

## II.     PROPOSED FINDINGS OF FACT

### A.      *e*Plus's Patent

1.      The '683 Patent entitled "Electronic Sourcing System and Method" was issued

on February 8, 2000 from patent application serial number 08/288,577, filed on August 10, 1994.

PX-1 at *e*Plus 703517.

2.      Claim 26 of the '683 Patent recites the following:

> 26.  A method comprising the steps of:
>
> maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources;
>
> selecting the product catalogs to search;
>
> searching for matching items among the selected product catalogs;
>
> building a requisition using data relating to selected matching items and their associated sources(s);
>
> processing the requisition to generate one or more purchase orders for the selected matching items; and
>
> determining whether a selected matching item is available in inventory.

PX-1 at Col. 26, l. 61-Col. 27, l. 6.

### B.    The Jury's Verdict

3.    On January 27, 2011, the jury in this matter returned a unanimous verdict that the

'683 Patent was infringed, and that all of the asserted claims of the *e*Plus patents-in-suit were not

invalid.  *See* Dkt. No. 600 at 2-7.  In particular, the jury determined that *e*Plus proved that the

following configurations of Defendant's S3 Procurement System infringe claim 26 of the '683

Patent, both directly and indirectly:

a)    Defendant's Core S3 Procurement System (including Lawson System Foundation

(LSF) and Process Flow in combination with Inventory Control, Requisition, and Purchase Order

modules), Requisition Self-Service (RSS), and Punchout, infringes claim 26 of the '683 Patent,

both directly and indirectly ("Configuration No. 3").  *Id.* at 2.  *See also* Tr. at 67:24-68:6

(Weaver Direct) ("Q: Let's look at configuration number three.  What are the components of

configuration number three?  A: At the bottom are the platform technology foundation including

Lawson System Foundation and process flow.  Above that, the S3 procurement modules which

include purchase order, requisitions and inventory control.  Above that, requisition self-service,

and above that, Procurement Punchout.");

b)    Defendant's Core S3 Procurement System, RSS, Punchout, and Electronic Data

Interchange or "EDI," infringes claim 26 of the '683 Patent, both directly and indirectly

("Configuration No. 5").  *Id.* at 3.  *See also* Tr. at 68:7-68:9 (Weaver Direct) ("Q: How does

configuration five differ from configuration number three?  A: It adds the electronic data

interchange module.");  and

c)    Pursuant to the Parties' Stipulation With Respect To M3 Infringement, as set forth

in the Revised Amended Final Pretrial Order (Dkt. No. 481 at 4-5), because *e*Plus proved that the

aforementioned configurations of Defendant's S3 Procurement System infringe claim 26 of the

'683 Patent, both directly and indirectly, *e*Plus also proved that Defendant's M3 e-Procurement Software infringes claim 26 of the '683 Patent, both directly and indirectly.

### C. The Permanent Injunction

4. On May 23, 2011 the Court permanently enjoined Lawson from directly or indirectly making, using, offering to sell or selling within the United States, or importing into the United States, Configuration Nos. 3 and 5 and ***any colorable variations thereof*** (the "Infringing Configurations"). Order (Dkt. No. 729) at 2-3.

5. The injunction also precludes Lawson from providing "installation, implementation, design, configuration, consulting, upgrade, maintenance and support and training" and other related and associated services with respect to the Infringing Configurations. *Id.*

6. In addition, Lawson was enjoined from "[c]irculating, publishing, or disseminating within the United States any literature or information that encourages the use, sale, or importation of any of the Infringing Products and Services." *Id.* at 3.

7. Further, Lawson was enjoined from "[a]iding and abetting, actively inducing, or in any way contributing to the making, use, sale, or importation of any of the Infringing Products and Services within the United States." *Id.* at 3.

8. With respect to the 277 customers who provide only healthcare services, and who had previously purchased the Infringing Configurations before the verdict, the prohibition on Lawson's installation, implementation, design, configuration, consulting, upgrade, maintenance, support, training, and associated services for such customers did not take effect until November 23, 2011. *Id.* at 4.

### D. The Federal Circuit Decision

9. On November 21, 2012, the Federal Circuit affirmed the validity of claim 26 of the '683 Patent and this Court's finding that Configuration Nos. 3 and 5 infringe, both directly and indirectly. *See ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509 (Fed. Cir. 2012).

### E. Person Of Ordinary Skill In The Art

10. The '683 Patent involves technical concepts related to computer science and computer architecture. Dr. Weaver opined that a person of ordinary skill in the art to whom the patents were directed is a person having a bachelor's degree in computer science or a similar technical discipline and one or two years of practical experience writing code and working with supply chain management. Tr. at 67:8-67:15 (Weaver Direct). Lawson did not rebut Dr. Weaver's opinion as to the level of ordinary skill in the art.

### F. Lawson's Purported Modification

#### i. Timeline For Development Of RQC

11. Following the jury's verdict, Lawson modified the RSS application, and renamed it Requisition Center ("RQC"). RSS was the only component of the Infringing Configurations that was modified. Tr. at 69:12-69:16 (Weaver Direct) ("Q: Out of the all of the modules and applications included in the infringing configurations, which modules and applications have been modified? A: Only one, and that was requisition self service, RSS, was modified to produce Requisition Center, RQC."); Tr. 335:6-11 (Christopherson Direct) (changes were made to RSS component).

12. Lawson first began work on the Requisition Center application as early as February 8, 2011, six weeks prior to the Court's March 25, 2011 injunction evidentiary hearing. Tr. at 245:17-245:20 (Christopherson Direct); PX-1269 at Resp. to Interrogatory No. 4

("Lawson states it began the process to develop a replacement to the Requisitions Self Service product on February 8, 2011").

13.     The Lawson development team included Messrs. Christopherson, Knuth, Lohkamp, and Dooner, and Msses. Lim and Hicarte.  Tr. at 245:12-245:16 (Christopherson Direct).

14.     As of mid-February, Lawson intended to present its proposed re-design ideas to the Court at the injunction evidentiary hearing.  PX-1015 at RQC 364469; Tr. at 247:3-247:23 (Christopherson Direct) ("Q: And there you state in the first paragraph, "You're not to do the work at all at this time.  We would need to have it approved by the Judge and that will not happen until early April at best.  All we need to do is create a description of our proposal that the legal team would then present to the Judge. So details such as we have been discussing can occur later as far as I know."…So as of mid-February Lawson intended to present its proposed redesign ideas to the Judge at the April injunction hearing; is that correct? A:  As far as I know, that was their intention to present that, yes.").

15.     Lawson began unit testing for RQC as early as March 1, 2011.  Tr. at 245:21-245:23 (Christopherson Direct) ("Q: And Lawson began unit testing for requisition center as early as March 1st, 2011, correct? A: That's correct.").  PX-1088; Hager I at 78:21 –79:6; 67:16-68:2; 68:6-69:7; 11; 71:5-7; 11-14; 16-17; 73:15-74:2; 4-15; PX-1088; Hager I at 74:21-75:1; 4-12; 76:2-7; 77:13-78:5; 78:17-79:6; PX-1089; 79:20-21; 80:2-12; 80:16-81:1; 3-9; 16-22; 82:21-83:6; 84:20-85:3; 85:9-86:12; 15-20; 98:19-99:15; 18:21; 104:3-8; 12-19; 105:5-8; 105:11-18; 105:20-106:1; 106:6-19; PX-1091; Hager I at 130:7-131:5; 9-19; 131:21-132:8; 13-17; 133:3-4; 133:6-134:4; 7-11; 325:22-326:5; 7-9; 374:8-13; 16-19; 375:17-376:4; 8-20; 377:5-17; 380:22-381:2; 4-5.

16.     As of March 7, 2011, Lawson still intended to present the proposed changes to the Court for approval prior to implementation.  PX-1259 ("We are continuing down the path of exploring and designing the options with Punchout and RSS.  What people may be reacting to is that Will call[ed] me to ask that we continue right with the changes.  I told them that we will work on the design but [not to] implement or make code changes until I know that the Judge is okay with the proposed changes."); Tr. at 248:7-248:24 (Christopherson Direct) ("Q: So as of March 7, 2011, you still intended to present the proposed changes to the Judge for approval prior to implementation, correct? A: That's my understanding.").

17.     From February 8 to March 30, Lawson developers met on nearly a daily basis to configure and design the new system.  PX-1269 at Resp. to Interrogatory No. 4.  Unit testing from a development perspective was done on a module-by-module basis starting in March of 2011.  Todd Dooner was Lawson's main contact related to development testing.  *Id.*

18.     Lawson held a launch startup meeting for RQC on March 30, 2011 .  Tr. at 245:24-246:1 (Christopherson Direct); PX-1269 at Resp. to Interrogatory No. 4.

19.     The work on the modification that prevents a user of RQC from placing items from Item Master and a Punchout shopping session onto a single requisition occurred over a 5 day period.  Tr. at 364:3-365:2 (Christopherson Direct) (work on modification began on April 25, 2011); Tr. at 359:12-14 (coding work was complete by the end of April).  *See also* PX-1178 at RQC357.

20.     RQC was released to customers on May 18, 2011.  Tr. at 246:2-246:4 (Christopherson Direct) ("Q: And the requisition center product was released to customers on May 18, 2011, correct? A: That's correct."); PX-1269 at Resp. to Interrogatory No. 4.

21.     Lawson required only days of work to code RQC for the aspect of the modification at issue that prevents a user of RQC from placing items from two or more Punchout sites on a single requisition (*i.e.,* one component of the software update termed "Patch 1").  Tr. at 249:4-249:11 (Christopherson Direct) ("Q: Let's talk about the modification that prevents a user of RQC from placing items from two or more Punchout [sites] onto a single requisition.  ["Patch 1"].  Are you familiar with that modification? A: Yes. Q: The coding effort for that modification only required two days of work; isn't that right? A: Two, two and a half, maybe three.").

22.     The entire process for Patch 1 to RQC -- from proposal, development, unit testing, quality assurance testing, and change of documentation -- took Lawson a total of six days.  This work began on June 3, 2011, more than two weeks after RQC was released to customers.  Tr. at 249:12-249:20 (Christopherson Direct) ("Q: And between the time that this particular modification was proposed on June 3, for all of the development, unit testing, QA testing, change of documentation, the entire process took six days, correct? A: Correct. Q: And the initial release of requisition center did not include this particular modification, correct? A: That's correct.").

23.     Patch 1 to RQC was made available to customers on June 9, 2011. Tr. at 250:11-250:21 (Christopherson Direct) ("Q: This modification that we've been talking about was included in what Lawson calls patch 1 to RQC; is that correct? A: That's correct. Q: And patch 1 was made available to RQC users on June 9, 2011, correct? A: Yes.).

**ii.     Various Contingency Plans Lawson Considered And Rejected**

24.     After the jury's verdict, Lawson's product development team began meeting to consider different alternative redesign ideas in February 2011.  Tr. 323:6-326:12 (Christopherson Direct).

25.     Lawson realized early on that claim 26 was going to be a difficult claim to design around.  PX-1013; Tr. at 257:11-258:7 (Christopherson Direct) ("Q: Refer to your email dated

February 12, 2011, at 3:22 AM at the bottom of the first page.  In the second paragraph of your email, you indicate, "***Claim 26 is right on the mark***.  Inventory is the key.  There are two other items that get pulled into this based upon the systems that infringe and ePlus arguments. ASN from EDI is said to provide the ability to know if something is in inventory.  Then some Punchout sites also provide this*.  **So this claim is going to be a tough one to navigate***." …There were no changes made to the inventory capabilities of the configurations that were found to infringe Claim 26, were there? A: That's correct. Q: And Lawson did not make any changes to the EDI functionality, did it? A: That is correct. Q: Well, Lawson did not make any changes to any Punchout sites that provide inventory functionality, correct? A: That is correct." (emphasis added)).

26.     The product development team analyzed the infringing systems and determined that many of the modules and infringing functionalities could not be modified without crippling the systems.  *See, e.g.*, PX-1006 at RQC 364607-08.  Further, Lawson's customers would find such proposed modifications unacceptable.  *Id.*  For example, Lawson concluded that the Item Master catalog database in Configuration Nos. 3 and 5 of Lawson's system containing items associated with vendors could not be removed from the Inventory Control and Purchase Order modules without crippling the procurement product suite.  PX-1006 at RQC 364607; Tr. at 263:21-264:6, 268:25-269:11 (Christopherson Direct) ("Q:… Mr. Knuth concludes with respect to that first element of Claim 26, "RSS alone does not infringe in this area.  This function cannot be removed from IC and PO without crippling the product."  Do you see that statement? A: Yes, I do."); 270:17-270:21 ("Q: So Lawson concluded that this function could not be removed from the inventory control and purchase order modules without crippling the procurement product suite; is that correct? A: That's correct.").

27.     Lawson also concluded it would be unacceptable to remove the search capabilities from the infringing systems.  PX-1006 at RQC 364606-8; Tr. at 271:18-273:4 (Christopherson Direct) ("Q:  Mr. Knuth states there, "RSS does allow for search for items but not in selected product catalogs," … Then on the next page, he continues, "Removing the ability to search for items would severely limit the usefulness of the product.  While the selection could be limited to just items on templates shopping lists this would be unacceptable for many customers."… Lawson ultimately agreed with Mr. Knuth's analysis with respect to this functionality of searching for items, correct? A: Yes. Q: And Lawson concluded that it would be unacceptable to remove the search capabilities from the infringing configurations, correct?…A: Yes.").

28.     Lawson further determined that it would be unacceptable to remove requisition building functionality from Configuration Nos. 3 and 5.  PX-1006 at RQC 364607; Tr. at 273:5-274:3 (Christopherson Direct) ("Q: And Mr. Knuth's analysis with respect to that claim element was, "RSS does allow for building requisitions from selected matching items.  RSS must be allowed to build requisitions; however, if the search function was removed see means for No. 3, then it would not build requisitions from selected matching items."…Lawson ultimately agreed with Mr. Knuth's analysis that RSS must be allowed to build requisitions, correct? A: Correct.").

29.     Lawson additionally determined then that it would be unacceptable to remove the purchase order generation functionality from the infringing systems.  PX-1006 at RQC 364608; Tr. at 274:15-275:12 (Christopherson Direct) ("Q: As to that claim element, Mr. Knuth stated, "RSS does not generate purchase orders, however, the PO system does.  The PO system must be allowed to generate purchase orders for requisitions originating from RSS.  RSS would be crippled without this feature."…Lawson ultimately agreed with Mr. Knuth's analysis that the systems would be crippled if PO was not allowed to create purchase orders from the requisitions

generated, correct? A: Correct. Q: So Lawson determined then that it would be unacceptable to remove the purchase orders' functionality from the infringing configurations, correct? A: Correct.").

30.     Lawson determined that it would be unacceptable to remove inventory checking capabilities from the Punchout sites even after Lawson's lawyers explained that it was necessary to make this change to Punchout in order to design around *e*Plus's patent.  Tr. at 373:12-373:17 (Christopherson Cross) ("Q: When your lawyers told you you had to make another change to Punchout to remove the inventory capabilities from the Punchout sites, you didn't accept their advice, did you? A: We had a discussion on that, and I did not accept it, correct."); PX-1256 ("Bruce, we have been looking at options related to the Punchout program in order to design around the alleged infringement even though Lawson does not control the content on the vendor end.  Below is a potential idea where the vendor content would be placed in conformance with a redesign… This redesign would require the vendor, *i.e*., Dell, to modify its customized website to be compliant or the Punchout program would not work with that site.  Here is the process. Lawson would assemble a list of all prior Punchout vendors and vendors whether part of the Punchout program or not.  We understand the number of vendors is around 30 to 35 at this point. Lawson would contact the Punchout vendors and instruct them that the site must remove inventory and UNSPSC scripts that show to the end user…" ).  The decision Lawson made not to modify the Punchout inventory functionality notwithstanding advice of counsel, was made in June 2011, after Lawson had already released RQC.  Tr. at 258:15-261:1 (Christopherson Direct) ("Q: So notwithstanding that Lawson had already released RQC, your lawyers were advising you that additional changes to Punchout were needed, correct? A: That is correct.");

31.     Another alternative proposal Lawson considered, but rejected, was referred to as "crippled Punchout."  PX-1015 at RQC 364471; Tr. at 246:5-247:2 (Christopherson Direct) ("Q: And you indicated that Lawson proposes that "We would restrict Procurement Punchout to only connect to catalog providers that have a license for the '683 Patent from ePlus, Inc." …This was the redesign proposal that you referred to as crippled Punchout; is that correct? A: Yes.  That's pretty close to describing what we were thinking at that point.").  This proposal was ultimately rejected by Lawson's attorneys.  Tr. 350:2-354:17 (Christopherson Direct).

32.     Ultimately, Lawson decided to make a modification to RSS that requires that an item ordered through Punchout must be on a separate requisition from items selected from the Item Master or another Punchout site.  PX-1155 at RQC 711 ("Requisition Center requires that an items ordered through punchout must be on a separate requisition from items from the item master or specials/service. In addition, Requisition Center will create separate requisitions for each punchout vendor for items requisitioned using punchout."); Tr. at 92:1-92:6 (Weaver Direct) ("It's the fifth one down.  It says, Requisition Center requires that items ordered through Punchout must be on a separate requisition from items from the item master or special/service. In addition, Requisition Center will create separate requisitions for each Punchout vendor for items requisitioned using Punchout."); 93:5-93:11 (Weaver Direct) ("Q: Can you describe how the system with RQC now works with respect to Punchout items?  A: Sure.  So if a user has selected a catalog in the item master and has picked an item to add to the order list and then at that point attempts to do a punchout, then that will not succeed.  There will be a popup window that tells you you can't do that.").

### G. No Colorable Difference Between Infringing Configurations And RQC Configurations

#### i. Lawson's Modification Has No Relevance To Any Element Of Claim 26

33.　Lawson's modification to RSS that requires that an item ordered through Punchout in configurations with RQC must be on a separate requisition from items selected from the Item Master or another Punchout site is not significant in the context of any feature that *e*Plus relied upon at trial to prove infringement of claim 26.  Tr. at 92:25-93:4 (Weaver Direct) ("Q: Is the modification that prevents items from shopping sessions conducted at multiple Punchout sites from being included in a single requisition relevant to any feature recited in claim 26?  A: No, it is not."); Tr. at 92:19-92:24 (Weaver Direct) ("With respect to the modification that Lawson has made to the systems such that Punchout items must be on a separate requisition from items selected by searching the catalogs stored in the item master, is that modification relevant to any of the functionality of claim 26?  A: No, it is not.").

34.　Lawson Configurations 3 and 5 with RQC and Punchout can still be used to: (i) select and search one or more vendor catalogs maintained in the Item Master; (ii) connect to external Punchout sites of Lawson's trading partners, search those catalogs, and select items to add to a requisition; (iii) combine multiple types of products and services from multiple different vendors onto a single requisition; (iv) generate one or more purchase orders from a single requisition; and (v) check the availability of selected matching items in inventory.  Tr. at 77:18-78:17 (Weaver Direct); PX-1000 at RQC005 ("Lawson Procurement Punchout works with Lawson Requisition Center to allow end-users to seamlessly browse PunchOut-enabled vendor web-sites, select from approved products and prenegotiated prices create requisitions route for approval and then generate purchase orders. Lawson Procurement Punchout eliminates the need

12

to load and maintain item master data for noninventoried or highly configured products"). *See also* PX-1003.

35.     In particular, the modification made to RSS had no impact on the capabilities of the configurations with RQC to maintain at least two product catalogs on a database containing data relating to items associated with the respective sources in accordance with the first element of claim 26.  The modification did not impact the system's capability to maintain multiple vendor catalogs in Item Master; to maintain connections to multiple single vendor Punchout sites; or to maintain connections to multi-vendor Punchout sites that host multiple vendor catalogs at a single Punchout site.  Tr. at 99:5-100:5 (Weaver Direct); PX-1072 at RQC 014103 ("While this is a new product, the new product is a change to the user interface only. The procurement business functionality (and data) remains the same.").

36.     The modification also did not eliminate the capability of the RQC Configurations to select and then search a product catalog from among two or more product catalogs.  Tr. at 104:1-24 (Weaver Direct) ("Q: ...Did the modifications relating to requisitions with Punchout items eliminate the capability from the configurations with RQC to select and then search a product catalog from among the at least two product catalogs?  A: They did not.").  Further, the modification did not eliminate the capability of the RQC Configurations to select and search one or more product catalogs from among the catalogs included in the Item Master.  Tr. 104:25-105:3 (Weaver Direct).

37.     For example, the modification did not eliminate the capability of the RQC configurations to select a Punchout catalog site to search from among multiple Punchout sites configured in the system.  Tr. at 85:6--85:13 (Weaver Direct);  104:1-24 (Weaver Direct) (user can select to search a single- or multi-vendor Punchout catalog); 251:9-251:12 (Christopherson

13

Direct) ("Q: Lawson did not make any changes to the process used by a Lawson system user to search for items at a Punchout a catalog site, correct? A: That is correct."). *See also* PX-1000; PX-1003.

38.     The modification also did not eliminate the capability of the RQC Configurations to select items, *e.g.*, at a Punchout trading partner catalog site.  Selected items are then retrieved and placed in the items listing in the right-hand side of the RQC user interface.  Tr. at 85:14-85:18 (Weaver Direct) ("Q: Can a user of the system having the Requisition Center and Punchout applications select items out of a Punchout catalog site to retrieve and place in the Requisition Center user interface requisition lines section?  A: Yes, they can."); Tr. at 251:13-251:22; 252:9-252:19 (Christopherson Direct); PX-1000; PX-1072.

39.     The modification did not eliminate the capability of the RQC Configurations to build a requisition using selected matching items and their associated source or sources.  Tr. at 107:11-107:24 (Weaver Direct) ("Q: Did the modifications with respect to requisitions with Punchout items remove the capability from the RQC configurations to be able to build a requisition using data related to selected matching items and their associated source or sources? A: No, it didn't.  One can continue to search a single catalog and select one or more items from that single catalog, so that single source, and then generate a single requisition that reflects that single source, or one could select multiple product catalogs either from the item master or from a multi-vendor Punchout site and then bring back multiple items -- one could select multiple items from multiple vendors and then bring that back into the requisition lines to form a single requisition."); Tr. 307:21-308:3 (Christopherson Cross) (users of systems with RQC and Punchout still have capability to build requisitions from Punchout shopping sessions); PX-1000 at RQC005 ("Lawson Procurement Punchout works with Lawson Requisition Center to allow

14

end-users to seamlessly browse PunchOut-enabled vendor web-sites, select from approved products and prenegotiated prices create requisitions route for approval and then generate purchase orders."); PX-1003 at RQC 691 ("With Lawson Requisition Center and Procurement Punchout, you can: ... Consolidate multiple types of products and services into a single requisition") and at RQC 692 ("With Lawson Requisition Center, users can:  create a single requisition for stock, nonstock and special order items, as well as services, ...").

40.     The modification did not eliminate the capability of the RQC configurations to process a requisition to generate one or more purchase orders for the selected matching items. Tr. at 108:3-108:8 (Weaver Direct) ("Q: Did the modifications with respect to requisitions with Punchout items remove the capability of processing the requisition to generate one or more purchase orders for the selected matching items from the RQC configurations?  A: It did not."); Tr. 308:19-24 (Christopherson Cross) (users of systems with RQC and Punchout are using those systems to build requisitions from Punchout shopping sessions and generate purchase orders); PX-1000 at RQC005 ("Lawson Procurement Punchout works with Lawson Requisition Center to allow end-users to seamlessly browse PunchOut-enabled vendor web-sites, select from approved products and prenegotiated prices create requisitions route for approval and then generate purchase orders.").

41.     For example, Lawson's Configurations 3 and 5 with RQC can be used to create a single requisition for nonstock items (*i.e.*, those items to be ordered from vendors).  The systems can then automatically generate one or more purchase orders from that requisition.  PX-1003 at RQC 692; Tr. at 78:18-78:25 (Weaver Direct) ("Q: Let's turn to page RQC 692 of the exhibit. Under the heading key features and benefits, what does Lawson indicate that users can do with Lawson Requisition Center and Procurement Punchout under that first bullet?  A: The first bullet

15

says, create a single requisition for stock, nonstock, and special order items as well as services. Lawson procurement can then automatically generate multiple purchase orders from that requisition.").

42.    Configurations 3 and 5 with RQC and Punchout generate one or more purchase orders from a requisition in the same way as the Infringing Configurations did.  Tr. at 293:3-294:10 (Christopherson Cross) ("Q: With RSS, if you had an item master item and a Punchout item, they could go on the same requisition, correct? A: Correct. Q: And the purchase order module would actually be able to recognize that these are from two separate sources and so it would have to generate two purchase orders from that one requisition, correct? A: Correct. Q: With RQC, the purchase order module has the same capacity, correct? A: Correct. Q: But if there's only an item from one source on the requisition at a time, then it has to do a separate purchase order for each source; is that correct? A: Uh-huh. Q: Is that a difference in the way in which purchase orders are generated even though there's no difference to the purchase order module? A: No. Q: Is it a difference in the number of purchase orders that will be generated in situations where someone is shopping from websites or Punchout vendors and item master vendors? A: No. Q: With RQC, if you're shopping from an item master and a Punchout, and you want to buy one item from each, with RQC how many purchase orders will you have? A: Two. Q: With RSS, if you wanted to shop from another vendor through item master and through Punchout, how many would you have? A: Two."); PX-1022 at RQC007678 ("With regard to punchout (and SciQuest) RQC will function as RSS did. We support one punchout vendor website/connection. SciQuest will come back with multiple vendors on the same requisition with one punchout").

43.     The modification also did not eliminate the capability of the RQC configurations to determine whether a selected matching item is available in inventory.  Tr. at 108:9-108:13 (Weaver Direct) ("Q: Does the modification relating to requisitions with Punchout items have any relevance to the capability of determining whether a selected matching item is available in inventory?  A: It does not.").

44.     For example, Configuration 5 with RQC and EDI can be used to send purchase orders to a vendor, and receive purchase order acknowledgements.  The purchase order acknowledgment report shows users whether or not a specific item that was ordered is available in a vendor's inventory.  Tr. at 84:14-84:20 (Weaver Direct) ("As we discussed at trial, the electronic data interchange module allows the Lawson system to send purchase orders to a vendor, and then EDI is able to receive purchase order acknowledgements and from that produce a purchase order acknowledgment report in which we can see whether or not a specific item that was ordered is available in the vendor's inventory."); Tr. 80:14-83:21 (Weaver Direct); PX-1002 at RQC650.

45.     Additionally, Lawson Configurations 3 and 5 with RQC and Punchout can be used to determine whether a selected matching item is available in inventory by querying the Punchout vendor's inventory database.  Tr. 108:9-19 (Weaver Direct); Tr. 84:21-85:5 (Weaver Direct) (Punchout allows the user to connect to a Lawson trading partner and to search that trading partner's inventory).

### ii.     Lawson Made No Changes To The Core Procurement Functionality Of The Infringing Configurations

46.     Since the injunction, Lawson has made no changes to the Inventory Control Module in its procurement systems.  Tr. at 72:21-24 (Weaver Direct) ("Q: Now, Dr. Weaver, did Lawson make any changes to the inventory control module…? A:  They did not."); Tr. at 73:21-

17

73:24 (Weaver Direct) ("Q: Do the functions of the inventory control module in the current systems that have Requisition Center remain the same as they were in the infringing configurations?  A: They remain the same.").

47.    Since the injunction, Lawson has made no changes to the Item Master of the Inventory Control module in its procurement systems.  The Item Master continues to maintain multiple product catalogs that can be selected and searched, and items from search results can be chosen for inclusion in a requisition.  Tr. at 73:25-75:13 (Weaver Direct) ("Q: Was the item master of the inventory control module modified for purposes of Lawson's release of Requisition Center?  A: It was not."); Tr. at 532:25-533:4 (Lohkamp Direct).

48.    Since the injunction, Lawson has made no changes to any keyword search capability and the programs associated with keyword search in its procurement systems.  Tr. at 75:10-75:13 (Weaver Direct) ("Q: Did Lawson make any changes to the process used to search for items by keywords in the catalogs stored in the item master?  A: They did not, so there's no changes to keyword search.").

49.    Since the injunction, Lawson has made no changes to the EDI application in its procurement systems.  PX-1002 ( Q: "what about EDI? How is it going to change?" A: "there are no product changes to EDI, and your current setup will not be impacted.");  Tr. at 80:14-80:17 (Weaver Direct) ("Q: Was the electronic data interchange application modified for purposes of Lawson's release of the Requisition Center application?  A: No, it was not."); PX-1013; Tr. at 257:2-258:7 (Christopherson Direct) ("Q: And Lawson did not make any changes to the EDI functionality, did it? A: That is correct.).

50.    Since the injunction, Lawson has made no changes to the Punchout application in its procurement systems, or the steps of the Punchout process.  PX-1000; Tr. at 87:4-87:8

(Weaver Direct) ("Q: Can you tell me whether or not the steps of the current Punchout process when initiating a new Punchout session differ from those in the Punchout process used in the infringing configurations?  A: They do not."); Tr. at 251:3-252:19; 262:4-262:7 (Christopherson Direct) (for a single Punchout session, the Punchout process remains the same as was used in the Infringing Configurations); PX-1022 at RQC007678 ("With regard to punchout (and SciQuest) RQC will function as RSS did. We support one punchout vendor website/connection. SciQuest will come back with multiple vendors on the same requisition with one punchout").

51.      Since the injunction, Lawson has made no changes to the RQ10 program in the Requisitions module in its procurement systems that allows a user to build and manage requisitions.  Tr. at 75:14-75:20 (Weaver Direct) ("Q: Can you tell me whether or not the current version of the requisition's module still allows the user to build and manage requisitions?  A: Yes, it does."); PX-1006; Tr. 274:15-275:12 (Christopherson Direct) ("Q: So Lawson determined then that it would be unacceptable to remove the purchase orders functionality from the infringing configurations, correct?  A:  Correct.")

52.      Since the injunction, Lawson has made no changes to the Purchase Order module in its procurement systems that allow a user to generate one or more purchase orders necessary to fulfill requisitions.  Tr. at 75:21-76:1 (Weaver Direct) ("Q: Can you tell me whether or not the purchase order module of the systems having Requisition Center is still used to generate purchase orders necessary to fulfill requisitions for items not found in stock?  A: Yes, it works that way…").

### iii.      RQC Has 100% Of The Functionality Of RSS

53.      RQC serves the very same purpose as RSS in the Infringing Configurations, namely, it provides a user-friendly overlay to the underlying Inventory Control, Requisitions and Purchase Order modules of the Core Procurement system.  Tr. at 69:17-69:20; 73:21-73:24

(Weaver Direct) ("Q: What functions are performed by the Requisition Center application in the configurations having RQC?  A: It provides a user interface and a view to the data and functions in the S3 procurement modules."); PX-1072 at RQC0014103 ("While this is a new product, the new product is a change to the user interface only. The procurement business functionality (and data) remains the same.").

54.     Lawson marketed its RQC product to customers as having "100% of the functionality you require." Tr. at 376:21-376:24 (Christopherson Cross) ("Q: Hasn't Lawson said that RQC contains 100 percent of the functionality that customers require? A: I believe that's in one of the marketing documents I have seen before, yes."); PX-1030 ("Besides some label/visual or lipstick on a pig as Dale so eloquently puts it changes, there were three functional adjustments…The process in which Punchout is being performed has changed slightly.  You know get a warning pop-up that you are about to leave the Lawson site when you punch out. The process remains completely the same except if you try to punch out on a req. that is already in use with non-Punchout items, it will tell you that you need to open a separate req., and it will perform that action for you…All other back office and RSS functionality remains the same in RQC including consolidation of requisitions and purchase orders…Dale, please correct any misstatements above."); Tr. at 276:5-278:8 (Christopherson Direct) ("Q: So you told Mr. Bragstad that he summed up the changes that were brought with RQC very well, correct? A: Yes, I did."); Tr. at 290:5-290:14 (Christopherson Cross); PX-1056 at RQC0905561 (Change to RQC was "designed to minimize impact on our customers."); *id*. at RQC0905565 (Lawson designed RQC "with 3 principles in mind," and the first of these was "100% functionality you require must be included."); *see also* PX-1010 at RQC000685.

55.    Mr. Christopherson testified that "with respect to RQC, there was not one moving part in RSS that changed for RQC."  Tr. at 377:12-377:15 (Christopherson Cross).

56.    According to Lawson's own expert, Dr. Goldberg, RQC provides "the same end result functions as RSS."  Tr. at 477:25-478:13 ("Q:  Do you agree that, "stated simply, RQC provides the same end result functions as RSS, just not necessarily done in the same way?"... A: I would guess I would agree with it. THE COURT: Would or wouldn't?  A: Would."); 478:14-478:17 (Goldberg Cross) ("Q:…And you would agree, wouldn't you, that a large portion of the RSS functionality remains in the RQC product; correct? A: Yes.").

57.    Lawson designed RQC with the intention of providing its customers a software module with the same functionality as RSS.  PX-1010 ("100 percent functionality you require must be included"); PX-1026 ("Mr. Christopherson: "key is that RQC is built on RSS.  So it is not a 100% new product.");  PX-1123 (Mr. Lohkamp: "since RQC is based on RSS code, it is not a 100% new product and thus most of the code has been tested/used many times.  And, when you look at the differences, most changes would have very minimal code impact and thus a limited risk."); PX-1124 (Mr. Lohkamp indicated in response to a customer's inquiry that no customers are yet live with RQC, but the implementation of RQC "should be similar to installing a new version of RSS.");  PX-1065 (Scott Hanson: "We do the install for no charge – that's what the whole RQC SOF is about.  There is no conversion necessary.  RQC is just a new user interface to access their requisition functionality. Think of it as they used to access the Internet [read: requisitions] via Internet Explorer on their PC [read:  RSS].  What we are now saying is that you cannot use IE any longer, and instead have to use Firefox.  So, Lawson is offering to install Firefox [read: RQC] on their PC's, to use instead of IE [read:  old RSS] to access the Internet read:  their existing and new requisitions]. There is no requirement to 'convert' a

requisition.  A requisition is a requisition.  We are just providing a new utility to view that requisition.").

58.     Lawson designed RQC with the intent to cause minimal impact upon customers. Tr. at 109:15-110:4; 118:23-119:11; 122:10-122:23 (Weaver Direct) ("Q:…How does Lawson describe the Requisition Center application to its customers here?  A: In the third bullet, it says, its designed to minimize impact on our customers.").

59.     Lawson told customers they would not notice any differences between RSS and RQC.  PX-1124 (Mindy Klebe: "I've tested it.  *It works the same as RSS XML*.  There are some 'cosmetic' changes such as changing 'Checkout' to 'Release' and 'Shopping Cart' says 'Requisition Lines'…*It looks/appears exactly like RSS XML did.  It uses the exact same files and programs as RSS & installs the same as RSS did.*  The only change that is 'major' (if you want to call it that) is that when you add an item to the Shopping Cart now, it adds the Requisition Line (there's no 'save' needed anymore) — so — it's basically acting a lot more like RQ10.  Otherwise, *users will probably not even notice the difference, really.*"); PX-1100.

60.     The download, installation and implementation process for RQC is simple and straightforward.  PX1056 at RQC0905561 ("Simple 20 minute process by which you can download RQC");  PX1056 at RQC0905563 ("Lawson moved to Requisition Center with 1 day's work spread over a two-day period.");  PX1056 at RQC0905565 ("Implementation [of RQC is] straightforward.");  PX1056 at RQC0905586 ("Most of you will find the download and installation relatively simple. AND many of you will be able to complete this migration on your own with little disruption."); PX-1067 (Scott Hanson: "[RQC installation] [s]houldn't take more than 1 hr to do."); PX-1002 at RQC000640 ("""Lawson was the first implementation and we went live using our internal IT department in under 1 day of elapsed time").

22

### iv.     Lawson's Representations That RQC Is Substantially The Same As RSS

61.     Lawson's Practice Director of Technology in its Consulting Services organization and head of Lawson's RQC SWAT team, Scott Hanson, characterized the changes made to RSS as minimal and "really nothing" -- amounting to a change to the user interface only.  He acknowledged that there were no changes made to the procurement business functionality or data and concluded that no re-testing would be needed.  PX-1072 (In an email string relating to customers' concerns about re-testing needed for RQC, Mr. Walters indicated, "some customers are concerned about the retesting investment they need to make with the change to RQC.  I know you stated it is minimal – is there talking points or recommendations on how to diffuse this concern with customers you can send me?"  Mr. Hanson responded by stating "while this is a new product, the new product is a change to the user interface only.  The procurement business functionality (and data) remains the same.  If the user uses RSS already, they will intuitively be able to use the RQC product.  There is very little change in the functionality." Mr. Walters then asked a further question regarding "what is our guidance on testing understanding it is just a change to user interface." Mr. Hanson then indicated "for the risk adverse — perform any tests that would have normally been performed with deploying RSS or patching RSS.  For the non-risk takers — ***test what has changed…which is really nothing.***"); Tr. at 164:14-164:25 (Weaver Direct) ("Q: What if any impact does this communication have upon your analysis of whether or not the differences between the systems having RQC and the infringing configurations with RSS are more than colorably different?  A: So this email exchange represents RQC as being a maintenance patch.  It clearly says that nothing in core Lawson has changed.  So the only changes are to the user interface, not to the core functionality.  So this suggests minimal cosmetic changes to the user interface.").

62.     Lawson Vice President, Corporate Portfolio Management and S3 Product Management, Jennifer Langer, also characterized RQC as a change to the user interface only. PX-1110 (Jennifer Langer: "There is a change to the UI but the menu structure is essentially the same.  We do have a PowerPoint showing the UI changes and it will be available in the Launch Toolkit.  This can be used with prospects to show the changes.").

63.     Lawson described the modification internally and to its customers as either no change at all or just a slight change.  PX1056 at RQC0905561 (The change to RQC was "Designed to minimize impact on our customers."); PX1056 at RQC0905565 (Lawson designed RQC "with 3 principles in mind," and the first of these was "100% functionality you require must be included.").

64.     Since Lawson employees acknowledged that the changes to RSS were minimal and RQC was substantially the same as RSS, and the minimal changes were to the user interface only, they concluded that no new training was required to demonstrate the differences between RSS and RQC.  PX-1110 (Dean Hager responded to Michael Polling's concern about training by stating "No new training should be needed.  And re-demoing shouldn't be needed.");  Tr. at 165:23-166:16 (Weaver Direct); PX-1070 (Scott Hanson: "As for training…it varies, but generally minimal (if any) re-training is necessary."); Tr. at 165:1-165:4 (Weaver Direct) ("Q: What's important about that statement to your opinion about lack of colorable difference?  A: If RQC requires minimal or no retraining, then RQC must be very similar to RSS."); 166:17-166:23 ("Q:  So what is important about these statements that were made in this exhibit to your opinions about lack of colorable difference?  A: In my opinion, if no retraining is going to be required, if no training is going to be required, then the functionality of RQC has to be very

similar to that of RSS."); PX-1057 at attachment at 20 ("Since RQC has 100% of the existing functionality of RSS, no training issues have been identified to date.").

65. Lawson employee Mindy Klebe, who was responsible for customer support for RQC, described RQC as "really the same thing" as RSS. PX-1027 (Mindy Klebe described RQC to Mr. Drury of Providence Health by stating "Hey, didn't mean to imply that it's RQC... it's not – it's really the same thing as RSS XML was except for a few adjustments. (however, I'm not allowed to say that)."); Tr. at 143:13-144:1 (Weaver Direct).

**H. Lawson's Contentions As To Why The Modification Is Allegedly Significant Are Irrelevant And Not Supported By The Evidence**

    **i. Users Can Still Comparison Shop Using RQC**

66. Contrary to representations made by Lawson counsel, Lawson's software configurations with RQC can be used to comparison shop. Tr. at 374:6-374:24 (Christopherson Cross) ("Q: In a system having requisition center and procurement Punchout, you can compare items available from different vendors by performing searches for items in the item master, right? A: Yes. Q: And in a system with requisition self-service and Procurement Punchout, you can compare items available from different vendors by searching the items in the item master, right? A: Correct. Q: So you might be able to perform a search for a computer by searching the items in the item master in a system with requisition center and Procurement Punchout, right? …A: Correct."); 374:6-376:13 (Christopherson Cross); 480:24-481:18 (Goldberg Cross) (RQC system users can comparison shop by searching catalogs in Item Master and comparing the items in search results or by searching a Punchout catalog and comparing items in search results).

67. For example, users can compare the different items found in searching the catalogs in the Item Master. Tr. at 480:24-481:18 (Goldberg Cross). Users can also compare items found searching a Punchout site. Tr. at 481:5-482:17 (Goldberg Cross) ("Q: And you

could do comparison shopping.  If I wanted to compare different pens available at Staples, I could compare a box of Bic brand blue ink ballpoint pens available at Staples to a box of Pilot brand blue ink pens available at Staples in my hit list of matching search results; correct?  A: Yes.  Q: And this same functionality existed in the system with RSS and Punchout; correct?  A: That did, yes.").

### ii.   Lawson Represented To Its Customers that Requisitioning With RQC Was Easy

68.     Contrary to representations made by Lawson counsel regarding the difficulty in requisitioning items in light of the modification Lawson made in RQC, Lawson told its customers that RQC was a "superior product" to RSS, was "easy to use," and "provide[d] a streamlined way to automate, expedite, track, and simplify the requisitions process."  Tr. at 438:24-439:25 (Lohkamp Cross) ("Q: But didn't you tell your customers that Lawson had developed superior replacement product, Lawson Requisition Center?  A: Yes, we did.  Q: And you didn't mean to mislead your customers, did  you?  A: No, we did not.").

69.     Lawson described RQC to its customers as nothing more than a "maintenance patch" for RSS.  PX-1100 at RQC 848776 (Dean Hager:  "straightforward installation that most companies typically do themselves but we are happy to do it for no fee... effort level can be thought of as a maintenance release effort.").

70.     There were no database changes and no upgrades required in software or environment to implement RQC.  PX-1010 at RQC 0000665 ("No required upgrades in software or environment"); PX-1066 (Scott Hanson: "There is no data migration.  RSS and RQC are just 2 UI's that point to the same requisition data.  Think of it like using IE [Internet Explorer] versus Firefox to hit (access) a website."); Tr. at 110:5-110:9 (Weaver Direct) ("Q: Under the heading Implementation straightforward, what does Lawson indicate concerning implementation of

Requisition Center?  A: It says, no database changes, no required upgrades in software or environment.").

71.     The only alleged customer feedback Lawson received concerning the purported diminished capabilities of RQC did not come from Lawson customers who had actually used Lawson's RQC system.  Tr. at  437:24-438:23 (Lohkamp Cross) ("Q:  You mentioned that you had received some feedback from customers regarding change number one that was made to the Punchout requisitioning process, and you mentioned Central DuPage Trinity Health and Cleveland Clinic; do you recall that?  A: Yes.  Q: So these customers had already implemented Requisition Center and Punchout in their production systems; is that correct?  A: No.  Q: Well, how were they providing you feedback on change number one if they hadn't implemented it?  A: They provided feedback via the questions and the Q&A based on the change we presented.  Q: So their feedback had no relationship to whether they had used the system or not; correct?  A: Correct.").

### iii.     Lawson's Modifications Had No Negative Impact On Customers

72.     Lawson has not lost any customers because of the change from RSS to RQC.  Tr. at 562:5-562:11 (Lohkamp Redirect) ("THE COURT:  I wrote down to ask yesterday and didn't while you're here.  To your knowledge, has Lawson lost any customers who had RSS and who told you that they were quitting Lawson because of the shift to RQC?  A: I personally am not aware of any.").

73.     Most Lawson customers actually praised RQC and thought it was the same.  PX-1105 at RQC0869077 ("RQC appears to look, function and operate the 'same' as RSS."); PX-1105 at RQC0869081 ("[T]he view looks very similar to current RSS.").

## I.   Lawson's Configurations Including RQC Are Used To Infringe Claim 26

74.     Configuration Nos. 3 and 5 with RQC continue to be used to infringe claim 26 of the '683 patent.  Tr. at 721:14-721:19 (Weaver Direct) ("Q:…  Do you have an opinion as to whether or not the systems configurations three and five having RQC continue to infringe claim 26 of the '683 patent?  A: Yes, I do believe that configurations three and five with RQC continue to infringe claim 26."); 515:22-516:8 (Weaver Direct).

75.     Lawson's software Configurations with RQC and Punchout can be used to: (i) maintain at least two product catalogs;  (ii) select one or more vendor catalogs maintained in the Item Master and then search those selected catalogs; (iii) connect to external Punchout sites of Lawson's trading partners to search those catalogs; (iv) combine one or more selected items from one or more vendors into a single requisition; (v) generate one or more purchase orders from a single requisition; and (vi) determine the availability of a selected item in the vendor's inventory. PX-1003; Tr. at 77:18-78:17 (Weaver Direct).

76.     In particular, the Configurations with RQC maintain at least two product catalogs on a database containing data relating to items associated with the respective sources in accordance with the first element of claim 26.  The system maintains multiple vendor catalogs in Item Master, and connections to one or more single vendor Punchout sites, connections to one or more multi-vendor Punchout sites that host multiple vendor catalogs at a single Punchout site, or some combination thereof.  Tr. at 99:5-100:5 (Weaver Direct).

77.     The RQC Configurations are used to select and then search a product catalog from among the at least two product catalogs.  Tr. at 102:13-102:19 (Weaver Direct) ("Q: Did the modifications relating to requisitions with Punchout items eliminate the capability from the configurations with RQC to select and then search a product catalog from among the at least two product catalogs?  A: No, it did not….").

28

78.     The RQC Configurations are used to select items, e.g., from the Item Master or at a Punchout trading partner catalog site, and place them in the items listing in the right-hand side of the RQC user interface.  Tr. at 85:14-85:18 (Weaver Direct) ("Q: Can a user of the system having the Requisition Center and Punchout applications select items out of a Punchout catalog site to retrieve and place in the Requisition Center user interface requisition lines section?  A: Yes, they can."); Tr. at 251:13-251:22; 252:9-252:19 (Christopherson Direct).

79.     The RQC Configurations build a requisition using selected matching items and their associated source or sources.  Tr. at 107:11-107:24 (Weaver Direct) ("Q: Did the modifications with respect to requisitions with Punchout items remove the capability from the RQC configurations to be able to build a requisition using data related to selected matching items and their associated source or sources?  A: No, it didn't.  One can continue to search a single catalog and select one or more items from that single catalog, so that single source, and then generate a single requisition that reflects that single source, or one could select multiple product catalogs either from the item master or from a multi-vendor Punchout site and then bring back multiple items -- one could select multiple items from multiple vendors and then bring that back into the requisition lines to form a single requisition.").

80.     The RQC Configurations process a requisition to generate one or more purchase orders for the selected matching items.  Tr. at 108:3-108:8 (Weaver Direct) ("Q: Did the modifications with respect to requisitions with Punchout items remove the capability of processing the requisition to generate one or more purchase orders for the selected matching items from the RQC configurations?  A: It did not."); 293:3-294:10 (Christopherson Cross) ("Q: With RQC, if you're shopping from an item master and a Punchout, and you want to buy one item from each, with RQC how many purchase orders will you have? A: Two. Q: With RSS, if

you wanted to shop from another vendor through item master and through Punchout, how many would you have? A: Two."); PX-1003 at RQC 692.

81.     The RQC Configurations are also used to determine whether a selected matching item is available in inventory. Tr. at 108:9-108:13 (Weaver Direct) ("Q: Does the modification relating to requisitions with Punchout items have any relevance to the capability of determining whether a selected matching item is available in inventory?  A: It does not.").

### i.     RQC Configurations With Item Master And EDI Are Used To Infringe Claim 26

82.     A user of a Lawson system with RQC can maintain at least two product catalogs on a database containing data relating to items associated with the respective sources in accordance with the first element of claim 26.  RQC Configurations with Item Master maintain data associated with items of multiple different vendors.  PX-1135, PX-1135A; Tr. at 690:10-690:14 (Weaver Direct) ("Q: Dr. Weaver, do you understand whether or not multiple product catalogs are maintained in the item master?  A: Absolutely, they are."); 721:25-722:10 (Weaver Direct); 532:25-533:4 (Lohkamp Direct) ("Q: The item master of systems having requisition center continues to be able to maintain data associated with items of multiple different vendors, correct? A: Correct."); 708:13-708:20 (Weaver Direct) ("So looking at the text of claim 26, the system using RQC was able to use a method comprising the steps of maintaining at least two product catalogs on a database containing data relating to items associated with respective sources.  So we saw in my demonstration that there were at least two product catalogs.  In fact, we saw three, Office Max, Diablo, and Baxter Health Care.").

83.     A user of the Lawson systems with RQC can select one or more catalogs to search in the Item Mater and then search among the selected Item Master catalogs in accordance with the second and third steps of claim 26.  PX-1135, PX-1135A; Tr. at 688:6-688:8 (Weaver

Direct); ("Q: Which catalogs does the categories search feature search? A: That searches all the catalogs in the item master."); 689:19-689:23 (Weaver Direct); 692:5-692:20 (Weaver Direct); 699:13-699:15 (Weaver Direct) ("Q: What catalogs can be selected to be searched using the catalogs hierarchy tree? A: It's the catalogs in the item master."); 722:11-722:17  (Weaver Direct) ("Q: How were the RQC configurations used to perform the steps of selecting the product catalogs to search and then searching for matching items among the selected product catalogs?  A: The system with RQC can still be used to select the product catalogs to search from among the two or more product catalogs in the item master."); 708:20-709:3 (Weaver Direct) ("And then for elements two and three, we saw selecting the product catalogs to search and searching for matching items among the selected product catalogs.  When we were using the category search, we found the ThinkPad from Office Max that I put on the requisition lines and then later deleted, and then we saw the Dell computer from Diablo and the surgical gloves from Baxter Health Care.")

84.     A user of a Lawson system having RQC with Item Master can build a requisition using data related to selected matching items and their associated source or sources, in accordance with the fourth step of claim 26.  PX-1135, PX-1135A; Tr. at 534:1-534:6 (Lohkamp Direct) ("Q: If a user using Lawson S3 procurement system including RQC searches the item master, that user can select multiple items for inclusion in a requisition that can be purchased from multiple different vendors, correct? A:  Yes."); 694:19-694:24 (Weaver Direct); 696:18-698:12 (Weaver Direct); 702:25-703:15 ("[W]e're now on slide 32 where we have successfully added the case of surgical gloves to the requisition lines. So now what I'm going to do is go down here and click on the release button.  And this is going to set in motion the steps necessary to build a single requisition containing two items from two different catalogs.…Now I'm on

slide 33 where I am releasing.  Releasing here means that we're putting the information from the requisition lines, which is the description of the items together with the vendor information in order to build a requisition with two items from two different vendors."); 704:6-704:8 (Weaver Direct) ("So now we're on slide 34, which tells us that the requisition has been successfully submitted, and its number is 1045."); 709:4-709:10 (Weaver Direct).

85.     A user of a Lawson system having RQC with Item Master can then process the requisition to generate one or more purchase orders for the selected matching items, in accordance with the fifth step of claim 26.  PX-1135, PX-1135A; Tr. 704:22-706:15 (Weaver Direct) ("So up here in the corner I can run programs in the Lawson procurement system.  So I've typed in PO 100, which is the purchase order generation program….So I'm just about to run the program.  So when we go forward, we'll run PO 100 and we'll see what its user interface looks like…So now you see we're on the purchase order interface for Lawson applications, PO 100.  So in order to go from a requisition to a purchase order, I've got to add some more information like who is doing the buying.  So there are required fields that I've got to complete…So we'll start with identifying the company that's doing the buying.  And then next after that identify the person who is doing the buying."); Tr. at 707:3-708:9 (Weaver Direct) ("So we're ready to click on the submission button, and we're on slide 45.  And by submit, we're submitting the requisition to the purchase order processing module, and it's going to produce purchase orders for us…So we have a first purchase order, and we have a second purchase order."); Tr. at  534:7-534:14 (Lohkamp Direct) ("Q: Assuming you conduct a search of the item master using requisition center and select an item master item associated with vendor A and an item master item associated with vendor B and place both of those items in a single requisition,

32

when you click "release," the purchase order module will generate two purchase orders, one to vendor A and one to vender B, correct? A: Yes."); 709:8-709:14 (Weaver Direct).

86.     A user of a Lawson system having RQC with EDI can perform the last step of determining whether a selected matching item is available in inventory via the Purchase Order acknowledgement report generated by the EDI module.  This report indicates if the vendor has an ordered item in stock.  Tr. at 709:22-710:4 (Weaver Direct) ("Q: What additional capabilities could you have demonstrated with the EDI module? A: The EDI module could have sent these purchase orders to the vendors, the vendors would have responded with a purchase order acknowledgment, and the EDI module would have compiled a purchase order acknowledgment report that would have told us whether these items were available in the inventory and vendor."); Tr. at 723:13-723:22 (Weaver Direct) ("Q: Now, with respect to the last element of claim 26, how are the RQC configurations used to perform that step?  A: …[I]f we had had the EDI module, we would have been able to show that we could receive purchase order acknowledgements from the vendor, and EDI would have built a purchase order acknowledgment report that would have told us whether or not the items were available in the vendor's inventory.").

### ii.     RQC Configurations With Punchout Can Be Used To Infringe Claim 26

87.     A user of a Lawson system having RQC with Punchout can maintain at least two product catalogs on a database containing data relating to items associated with the respective sources as required by the first element of claim 26.  PX-1134; PX-1134A; Tr. at 710:19-711:10 (Weaver Direct) ("Q: Which catalogs are you going to select to search? A:…So now instead of using categories to search the item master, I'm going to choose Punchout and look at what catalogs are available from the Punchout trading partners."); 716:23-717:2 (Weaver Direct) ("Q:

33

Can you tell me whether you saw that the user maintained at least two product catalogs on a database containing data relating to items associated with the respective resources?  A: We did, and that was the Staples and Dell catalogs."); Tr. 481:10-13 (Goldbert Cross) (Q: ... your system was configured so that you could connect to either the Staples catalog or the Dell catalog, correct?  A:  That's right.").

88.     Lawson made no changes to Punchout with respect to disallowing such RQC configurations from connecting to multiple different Punchout sites.  Tr. at  535:1-535:6 (Lohkamp Direct) ("Q: And Lawson made no changes to a system that would have the core procurement suite, requisition center and Punchout with respect to disallowing such a system from connecting to multiple different Punchout sites, correct? A: Correct."); PX-1134; PX-1134A; PX-1096 at RQC914944 ("We have around 110 Procurement Punchout customers.  A large majority of them would have more than one punchout vendor setup…"); Tr. 415:8-415:24 (Lohkamp Direct) ("I responded with the number of Procurement Punchout customers and mentioned that a large majority of them would have more than one Punchout vendor set-up.")

89.     In RQC configurations with Punchout, a user can select and search a  single-vendor Punchout catalog, in accordance with the second and third steps of claim 26.  PX-1134; PX-1134A; Tr. at 712:4-715:5 (Weaver Direct) ("This is Staples, the Lawson trading partner, and what I want to do is search for a desk.  …Okay, so in the text box where the cursor is sitting at the middle top of the screen, I'm going to use the keyword search capability, and I'm going to type in desk, and I'm going to click on that blue button that says search to the right of that text box."); 717:3-717:8 (Weaver Direct) ("Q: And were you able to select product catalogs to search? A: Yes.  I selected Staples.  Q: And were you able to search for matching items among that selected product catalog? A: I was.  I searched for desk."); 251:9-251:12 (Christopherson

34

Direct) ("Q: Lawson did not make any changes to the process used by a Lawson system user to search for items at a Punchout a catalog site, correct? A: That is correct.").

90.     This Court has construed the "selecting" and "searching" elements such that they are satisfied by selecting one product catalog to search from among the at least two product catalogs. *See Markman* Order, Dkt. No. 204 at 41.

91.     A user of a Lawson system having RQC with Punchout can then build a requisition using data related to selected matching items and their associated source or sources, in accordance with the fourth step of claim 26.  PX-1134; PX-1134A; Tr. at 714:22-715:5 (Weaver Direct) ("This is why Lawson and the Punchout partner have to stay connected.  When I've checked out from Staples, there has to be a transfer of information back into requisition lines.  That's what's going on here with slide 21.  So when we get to slide 22, that information will be in requisition lines."); Tr. at 717:9-717:12 (Weaver Direct) ("Q: Did we see the step of building a requisition using data relating to the selected matching items and their associated source? A: Yes, we built a requisition for the Global brand desk."); Tr. at 307:21-308:3 (Christopherson Cross) (users of systems with RQC and Punchout still have capability to build requisitions from Punchout shopping sessions); Tr. at 536:14-536:24 (Lohkamp Direct) (Items selected from Punchout shopping sessions are brought back to Requisition Line user interface of Lawson to build requisition).

92.     A user of a Lawson system having RQC with Punchout can generate one or more purchase orders for the selected matching items, in accordance with the fifth step of claim 26. PX-1134; PX-1134A; Tr. at 715:16-715:18 (Weaver Direct) ("We're going to run the PO 100 program.  We're going to build a purchase order from this one item in this one requisition.  So I'll let this play until we get to the purchase order part, the part that we want to see... At the very

bottom it says report completed, one purchase order created."); Tr. at 717:13-17 (Weaver Direct) ("Q: Were you able to process the requisition to generate one or more purchase orders for the selected matching items? A: Yes, we did. We generated a purchase order for the Global desk."); Tr. at 308:19-308:24 (Christopherson Cross) (users of systems with RQC and Punchout are using those systems to build requisitions from Punchout shopping sessions and generate purchase orders.).

93.     A user of a Lawson system having RQC with Punchout can determine whether a selected matching item is available in inventory, in accordance with the last step of claim 26. PX-1134; PX-1134A; Tr. at 717:18-717:24 (Weaver Direct) ("Q: And in your demonstration, were you able to determine whether a selected matching item was available in inventory? A: Yes. When we looked for that Ameriwood desk, we found that it was backordered, so we didn't pursue that and instead picked the Global desk, and it was available in inventory."). Additionally, a user of a Lawson system with RQC, Punchout and EDI can use the EDI module to issue a purchase order to a Punchout vendor and receive a purchase order acknowledgement from such vendor from which the user can determine whether the item ordered is available in the vendor's inventory. Tr. 84:7-20 (Weaver Direct).

> **iii.    RQC Configurations Connected to Multi-Vendor Punchout Sites Are Used to Infringe Claim 26**

94.     A user of a Lawson system with RQC and Punchout can connect to multi-vendor Punchout sites that are configured to maintain at least two product catalogs on a database containing data relating to items associated with respective sources in accordance with the first step of claim 26. RQC systems with Punchout can be configured to connect to multiple different single-vendor Punchout catalogs or to one or more multi-vendor Punchout catalogs. Or, the systems can have some combination of these catalogs. PX-1022 at RQC007678 ("With regard to

punchout (and SciQuest) RQC will function as RSS did. We support one punchout vendor website/connection. SciQuest will come back with multiple vendors on the same requisition with one punchout"); Tr. at 721:25-722:10 (Weaver Direct) ("Q: What are the ways that they can maintain product  catalogs associated with multiple sources?  A: …I could have connected to a multi-vendor Punchout site like SciQuest and searched multiple catalogs there."); Tr. at 535:21-536:13 (Lohkamp Direct) ("Q: The system can be connected to both of those different catalogs, correct? A: Yes, to both those websites. Q: In fact, there are some Punchout websites that are multi vendor Punchout sites, correct? A: Yes. Q: One example would be SciQuest, correct? A: Yes. Q: Another example would be GHX, Global Healthcare Exchange; is that correct? A: Yes. Q: Another example of a multiple vendor Punchout site is Perfect Commerce, correct? A: Yes. Q: You're aware that there are customers of Lawson that maintain connections to the SciQuest Punchout site, correct. A: Yes.").

95.     In RQC configurations connected to one or more multi-vendor Punchout sites, a user can select and search one or more catalogs at such site, in accordance with the second and third steps of claim 26.  PX-1022.  The system then builds a requisition using data related to selected matching items and their associated source or sources, in accordance with the fourth step of claim 26.  *Id.*; Tr. at 535:21-536:24 (Lohkamp Direct) ("Q: Now with respect to a Punchout shopping session at the SciQuest site, if a user selects from multiple different vendors during that Punchout shopping session at the SciQuest site, those items are returned back to the Lawson system to the right-hand side of the user interface of requisition center, correct? A: That is my understanding of the SciQuest functionality. Q: Once the user clicks "release," that requisition will be released, correct?  A: Yes.").  The requisition is then processed to generate

one or more purchase orders for the selected matching items, in accordance with the fifth step of claim 26.

96.     If a user of a Lawson system with RQC has business relationships with multiple Punchout vendors, the system can be configured to connect to each such vendor's Punchout catalog site.  Tr. at  535:7-536:13 (Lohkamp Direct) ("Q: The system can be connected to both of those different catalogs, correct? A: Yes, to both those websites. Q: In fact, there are some Punchout websites that are multi vendor Punchout sites, correct? A: Yes. Q: One example would be SciQuest, correct? A: Yes. Q: Another example would be GHX, Global Healthcare Exchange; is that correct? A: Yes. Q: Another example of a multiple vendor Punchout site is Perfect Commerce, correct? A: Yes. Q: You're aware that there are customers of Lawson that maintain connections to the SciQuest Punchout site, correct. A: Yes.").

97.     If a requisition has items associated with a single source, the user will use the system to generate one purchase order.  If a requisition includes items associated with multiple sources, a user can then use the system to generate multiple purchase orders.  Tr. at 723:6-723:12 (Weaver Direct) ("Q: How are the RQC configurations used to perform the fifth step of claim 26?  A: If the requisition has items associated with a single source, then the system will generate one purchase order.  If the requisition contains items from multiple vendors, then it will -- the system will generate multiple purchase orders."); Tr. at 536:25-537:7 (Lohkamp Direct) ("Q: Assuming my requisition [from SciQuest Punchout shopping session] with the line item from vendor A and the line item from vendor B was approved and my system has a purchase order module, the purchase order module will generate a purchase order from my line item that I want to purchase from vendor A and that a second purchase order from the line item from vendor B, correct? A: Correct."); Tr. at  308:19-308:24 (Christopherson Redirect) ("Q: The customers of

38

which you're aware that have systems with RQC and Punchout are using those systems to build requisitions from Punchout shopping sessions and generate purchase orders from those requisitions, right? A: Yes. ").

98.     A user of a Lawson system having RQC that is connected to one or more multi-vendor Punchout sites can determine the availability of a selected matching item in inventory in accordance with the sixth element of claim 26 by querying the vendor's inventory database at the Punchout site.  Tr. at 723:13-723:22 (Weaver Direct) ("Q: Now, with respect to the last element of claim 26, how are the RQC configurations used to perform that step?  A: That could be done either by -- at a Punchout site, querying the vendor's inventory as I showed in my demonstration…");  PX-1134;  PX-1134A.

>    **iv.    Lawson Directly Infringes Claim 26 By Using Configurations 3 And 5 With RQC**

99.     Lawson itself has installed and implemented Configurations 3 and 5 with RQC and Punchout.  Tr. at 723:23-724:8 (Weaver Direct) ("Q: Have you reviewed any evidence indicating whether or not Lawson has installed and implemented systems with RQC and Punchout?  A: Yes. Q: What have you reviewed?  A: Well, I've seen documents indicating that Lawson is using systems with RQC and Punchout, and I know that Lawson is using the system that I showed you in its sales and marketing and training efforts, and Lawson has produced and disseminated training videos and webinars that show customers how to use RQC and Punchout.");  PX-1056 at RQC0905563 ("Lawson moved to Requisition Center with 1 day's work spread over a two-day period.");  PX-1057 at attachment at 9 ("Lawson has extensively tested Requisition center. In addition, Lawson has already moved our own internal systems to Requisition Center without issues.").

100.     Lawson uses, in its sales and marketing efforts, as well as customer training, a system having all modules of the S3 Procurement system, RQC and Punchout.  Tr. at 515:22-516:8 (Weaver Direct) ("Q: Do you have any system demonstrations that illustrate the use of the software configurations with RQC to perform the steps of Claim 26? A: Yes, I have two. Q: What was the system that you used for your demonstrations? A: This was a demonstration system that was provided by Lawson on a laptop.  It included the infringing systems and all of the modules therein except for EDI. Then it also included a system using RQC.  It also contained the ability to record the user's interactions with either of those systems."); Tr. at 516:20-516:22 ("Q: Does Lawson utilize a similar demonstration system for its business purposes? A: Yes, in their sales and marketing and training."); Tr. at 377:16-378:1 (Christopherson Cross) ("Lawson uses the RQC systems in production mode to procure products from suppliers);  PX-1002 at RQC640 ("Lawson was the first implementation and we went live using our internal IT department in under 1 day elapsed time.");  PX-1124 (Mindy Klebe of Lawson indicates: "Requisition Center is installed here [at Lawson]. I've tested it. It works the same as RSS XML.").

101.     Lawson also performs demonstrations of its RQC systems for its customers.  Tr. at  537:8-537:21 (Lohkamp Direct) ("Q: Now, Lawson performs demonstrations of its requisition center systems for its customers, correct? A: Yes. Q: And you've participated in meetings with customers where Lawson has demonstrated the features and functionality of a system with requisition center, correct? A: Yes. Q: For example, Lawson demonstrated its requisition center systems at the west coast healthcare summit meeting that you attended, correct? A: I believe we showed a PowerPoint of it."); Tr. at 378:9-378:16 (Christopherson

Cross) (Lawson uses systems with RQC and Punchout to perform customer demonstrations and for training.).

102.    Lawson's systems with RQC and Punchout are connected to multiple product catalogs, thus satisfying the first element of claim 26.  PX-1022; Tr. at 721:25-722:10 (Weaver Direct) ("Q: What are the ways that they can maintain product  catalogs associated with multiple sources?  A: …I could have connected to a multi-vendor Punchout site like SciQuest and searched multiple catalogs there."); PX-1134; PX-1134A (Lawson system connected to two Punchout catalogs, a Staples Punchout catalog and a Dell Punchout catalog).

103.    When Lawson uses systems with RQC and Punchout to perform customer demonstrations, Lawson demonstrates selecting a Punchout catalog from among multiple connected Punchout catalogs, in accordance with the second element of claim 26.  Tr. at 378:17-378:21 (Christopherson Cross) ("Q: Now, when Lawson uses systems having requisition center and procurement Punchout to perform customer demonstrations, Lawson demonstrates the capability of selecting a Punchout catalog, correct? A: Correct.").

104.    When Lawson uses systems with RQC and Punchout to perform customer demonstrations, it demonstrates searching the selected Punchout catalog as required by the third element of claim 26.  Tr. at 378:22-378:24 (Christopherson Cross) ("Q: And Lawson also demonstrates the capability to search that Punchout catalog, correct? A: Correct.").

105.    When Lawson uses systems with RQC and Punchout to perform customer demonstrations, it demonstrates the capability to check the availability of items found in a search of the selected Punchout catalog, as recited in the sixth element of claim 26.  Tr. at 378:25-379:3 (Christopherson Cross) ("Q: Lawson also demonstrates the capability to check the pricing and availability of items that are found in a search, correct? A: Correct").

41

106.    Lawson also demonstrates the capability to bring a Punchout item back into the requisition lines user interface of the Lawson system and generate a requisition for that item, as required by the fourth element of claim 26.  Tr. at 379:4-379:8 (Christopherson Cross) ("Q: Lawson also demonstrates the capability to bring a Punchout item back into the requisition lines user interface of the Lawson system and generate a requisition for that item, correct? A: Correct.").

107.    Additionally, Lawson demonstrates to its customers the capability of the system with RQC and Punchout to generate a purchase order for the items in the requisition in accordance with the fifth element of claim 26.  Tr. at 379:9-379:12 (Christopherson Cross) (Q: Lawson also demonstrates the capability to its customers to generate a purchase order for the items in the requisition, correct? A: Correct.").

### v.    Lawson Customers Directly Infringe Claim 26 by Using Configurations 3 And 5 With RQC

108.    Over 100 Lawson customers are using Configurations 3 and 5 with RQC and Punchout.  Tr. at 305:24-306:8 (Christopherson Redirect) ("Q: So are you aware of any customers that use RQC and Punchout?  A: Am I aware of any customers that do use it, yes, I am aware.  Q: What customers are those? A: Cleveland Clinic uses that, Indiana University Healthcare uses it…There's over 100 customers that use it.  A: That use RQC and Punchout? A: Correct.").

109.    Lawson has earned over $20 million in revenue from its customers who have licensed Configurations 3 and 5 with RQC.  PX-1080; PX-1081; PX-1082; PX-1241; PX-1242; PX-1243; PX-1246; PX-1247; PX-1248; Tr. at  894:13-895:20 (Ugone Direct).

110.    The majority of Lawson's customers with Configurations including RQC and Punchout have systems configured to connect to multiple Punchout catalogs and thus perform

step 1 of claim 26. PX-1096 at RQC 914945; Tr. at 415:15-415:24 (Lohkamp Direct) ("Q: In that first response to you, Mr. Hager asks you any estimate of how many of our customers use this functionality. Do you see that? A: Yes. Q: What was your response to Mr. Hager? A: I responded with the number of Procurement Punchout customers and mentioned that a large majority of them would have more than one Punchout vendor set-up.")

111. The Lawson customers using systems with RQC and Punchout can select a Punchout catalog to search in accordance with the second step of claim 26. Tr. at 306:9-306:12 (Christopherson Redirect) ("Q: And those customers have the capability then with those systems with RQC and Punchout to select a Punchout catalog search, right? A: Correct.").

112. The Lawson customers using systems with RQC and Punchout have the ability using such system to search for items at a selected Punchout catalog, as required by the third step of claim 26. Tr. at 307:16-307:20 (Christopherson Redirect) ("Q: Those customers such as Cleveland Clinic, they have the ability using that system with RQC and Punchout to search for items at a Punchout site, right? A: Correct.").

113. The Lawson customers using systems with RQC and Punchout can bring selected items back from a Punchout site, into the requisition lines user interface of the Lawson system and generate a requisition from those line items as required by the fourth step of claim 26. Tr. at 307:21-308:3 (Christopherson Redirect) ("Q: And they have the ability to bring selected items back from a Punchout site into the requisition line user interface of the Lawson system, right? A: Correct. Q: And they have the capability to process those requisition lines and generate a requisition from that, right? A: Correct.").

114. The Lawson customers using systems with RQC and Punchout are using those systems to build requisitions from Punchout shopping sessions and generate purchase orders

from those requisitions, as recited in the fourth and fifth steps of claim 26.  Tr. 308:19-308:24.

(Christopherson Redirect) ("Q: The customers of which you're aware that have systems with

RQC and Punchout are using those systems to build requisitions from Punchout shopping

sessions and generate purchase orders from those requisitions, right? A: Yes.").

115.    Finally, since Lawson made no modifications to the ability of the systems to

determine the availability of a selected matching item in the Punchout vendor's inventory, such

capability remains in the customers' systems having RQC and Punchout.  Tr. at 108:9-108:13

(Weaver Direct) ("Q: Does the modification relating to requisitions with Punchout items have

any relevance to the capability of determining whether a selected matching item is available in

inventory?  A: It does not.").

> **vi.    Lawson Indirectly Infringes Claim 26 By Aiding, Abetting And Contributing To Its Customers' Infringement Using The RQC Configurations**

116.    Lawson indirectly infringes claim 26 of the '683 Patent by aiding, abetting and

contributing to its customers' use of the systems having RQC.

117.    First, Lawson provides the RQC software to its customers free of charge.  It

makes the software available to its customers for download from its website.  PX-1010 at RQC

661 ("RQC available to all impacted customers at no charge; simple 20-minute process by which

you can download RQC; download and learn more at MyLawson.com."); Tr. at 727:24-728:4

(Weaver Direct) ("Q: What evidence have you reviewed and relied upon that relate to your

opinions that Lawson indirectly infringes claim 26 by aiding and abetting and contributing to its

customers' use of the systems having RQC?  A: Lawson provides RQC on its website with the

intent  that it will be downloaded by customers.").

118.    Second, Lawson established an RQC SWAT team to assist its customers with the

installation, configuration, testing and implementation of RQC.  PX-1010 at RQC 660 ("Created

SWAT team ready to help install, configure, test and implement."); Tr. at 566:4-566:12 (Hanson Direct) ("Q: The RQC SWAT team was created at the end of May 2011 to assist Lawson customers in transitioning from RSS to RQC; is that correct? A: That is correct. Q: The SWAT team's responsibilities involved answering any questions that the customers may have had as well as providing actual installation of the RQC product on their system; is that correct? A: That's correct."); Tr. at 727:24-728:6 (Weaver Direct) ("Q: What evidence have you reviewed and relied upon that relate to your opinions that Lawson indirectly infringes claim 26 by aiding and abetting and contributing to its customers' use of the systems having RQC? A: Lawson provides RQC on its website with the intent that it will be downloaded by customers. Lawson has fielded an RQC SWAT team to assist customers with RQC installation").

119.    Lawson has actually installed and implemented Configurations 3 and 5 with RQC and Punchout for its customers. PX-1269 at Response to Interrog. No. 8 ("The SWAT team also assists customers by actually performing hands-on assistance by installing RQC, thereby removing RSS, or troubleshooting an issue of a customer attempting to perform the install itself."); PX-1057 at attachment at 16 ("Lawson provides step by step instructions on how to install RQC. The installation of RQC takes between one and two hours and would be part of a standard implementation.").

120.    Third, Lawson provides its customers with technical and instructional manuals and guides to instruct and assist them in using the systems having RQC. See, e.g., PX-1000 (Lawson disseminated a Lawson Procurement Punchout and PO Dispatcher Installation and Administration Guide to aid a certified installer to install Procurement Punchout and the PO Dispatcher program to send POs to vendors. The Lawson Procurement Punchout and PO Dispatcher Installation and Administration Guide provides instructions on how to perform

administrative functions required for those processes.); Tr. at 723:23-724:8 (Weaver Direct) ("Q: Have you reviewed any evidence indicating whether or not Lawson has installed and implemented systems with RQC and Punchout?  A: Yes. Q: What have you reviewed?  A: Well, I've seen documents indicating that Lawson is using systems with RQC and Punchout, and I know that Lawson is using the system that I showed you in its sales and marketing and training efforts, and Lawson has produced and disseminated training videos and webinars that show customers how to use RQC and Punchout.").  Lawson also provides training courses and webinars to instruct its customers on how to use the RQC systems.  *See, e.g.*, PX-1010; PX-1070; PX-1155.

121.    Fourth, Lawson offers ongoing consulting and maintenance and support services to customers having RQC.  All of the activities aid and abet and contribute to Lawson's customers' use of the systems having RQC.  Tr. at 727:24-728:20 (Weaver Direct) ("Q: What evidence have you reviewed and relied upon that relate to your opinions that Lawson indirectly infringes claim 26 by aiding and abetting and contributing to its customers' use of the systems having RQC?  A: Lawson provides RQC on its website with the intent that it will be downloaded by customers.  Lawson has fielded an RQC SWAT team to assist customers with RQC installation.  Lawson has published and distributed manuals explaining how to configure and use systems having RQC.  Lawson has disseminated training programs showing how to use systems having RQC.  Lawson produced webinars and video training systems that show how to use RQC, and Lawson provides ongoing consulting and maintenance and support services.  Q: What is the basis for your opinion that Lawson continues to induce and contribute to the direct infringement of claim 26 by aiding and abetting its customers' ongoing use of the infringing configurations

46

having RSS?  A: I have seen documents in which Lawson is telling its customers that they continue to use RSS and explaining how to do so.");

122.    Lawson continues to induce or contribute to its customers' direct infringement by the customers' use of systems having RQC and Punchout.  Tr. at 727:9-727:23 (Weaver Direct) ("Q: Dr. Weaver, have you rendered any opinions as to whether or not Lawson continues to induce or contribute to its customers' direct infringement of claim 26?  A: Yes, I have.  Q: What are the bases for your opinion?  A: RQC continues to infringe, and Lawson continues to induce or contribute to its customers' direct infringement by the customers' use of systems having RQC. And Lawson has told the customers that RQC has 100 percent of the functionality of RSS in order to induce them to download RQC.")

**J.    Lawson Still Aids And Abets Its Customers' Infringement Of Claim 26 Through The Use Of The Original Adjudicated Infringing Configurations With RSS**

**i.    RQC Is Designed To Run In Parallel With RSS**

123.    Lawson did not instruct its customers to cease using RSS.  Rather, Lawson told its customers they could continue to use RSS.  PX-1010 at RQC 660 ("Customers are not ordered to stop running RSS.");  Tr. at 728:21-729:7 (Weaver Direct) ("Q: Do you know whether or not Lawson made any efforts to determine whether its customers had actually installed and implemented RQC into their production procurement systems? A: From the deposition testimony that I read, I think that Lawson has not put any effort into determining whether customers are actually installing and using RQC.  As late as January 2012, Lawson witnesses testified that they only knew one or two customers that had installed and implemented RQC. The witnesses also testified that Lawson doesn't maintain records identifying which of those customers installed and implemented RQC.");  Tr. at 840:23-841:10 (Homewood Cross) ("Q: Lawson did not attempt to determine whether customers who had downloaded RQC have actually gone ahead and installed

and implemented RQC, did it? A: We wouldn't have any way to determine that, so no. Q: As of your deposition December 21, 2011, you didn't have any idea or even an estimate of how many Lawson customers that had downloaded RQC had actually installed and implemented RQC, correct? A: Correct.").

124.    Lawson designed RQC to run in parallel with RSS.  Tr. at  542:12-542:24 (Lohkamp Direct) ("Q: "Other than changing the RSS bookmarks, nothing else will be required for the existing RSS to continue to run; is that correct?"…And the answer to the question provided by Jennifer Langer of Lawson is, "Correct."  Is that accurate? A: That's what – that's accurate, yes. Q: The customer is asking about things that need to be changed in order for the existing requisition self service to continue to run, correct? A: Correct."); Tr. at 547:21-548:9 (Lohkamp. Cross) ("THE COURT:  I guess I need to get straight once and for all, if you had RSS, then you get RQC, you get it installed, do you have the capability, if I'm the customer, to change the bookmarks on RSS and then run them both at the same time? THE WITNESS:  Yes. THE COURT:  And can if I were a customer of Lawson running RSS in June of 2011, do I still have that capacity if I have RSS and RQC today? THE WITNESS:  Yes, you have that capability to change the bookmarks. THE COURT:  All right. And I can run them both in parallel? THE WITNESS:  Yes."); PX-1002 at RQC 643-646 (RQC runs in parallel with RSS so "there should not be any issues … with running RSS and RQC at the same time"); PX-1057 at attachment at 3 ("Because RQC is a new application, it can be run in parallel. The RSS bookmarks need to be renamed since the RQC bookmark file is the same as RSS."); *id.* at attachment at 4 ("there should not be any issues … when multiple users are using RSS and others are using RQC at the same time" since RQC is "designed to work this way").

125.     Lawson admits that other than changing the RSS bookmarks nothing else was required for the existing RSS to continue to run in parallel with RQC.  Tr. at  542:12-542:24 (Lohkamp Direct); Tr. at 612:15-613:2 (Hanson Redirect) ("Q: Turn back to Defendant's Exhibit 587.  Counsel for Lawson directed you to this exhibit and to the sentence reading, do not install, uninstall, or patch RSS for any client.  Do you see that statement?  A: Yes, I do.  Q: So you left requisition self-service on the customers' systems; correct?  A: Correct.  Q: Isn't it correct that a customer system today can run both requisition self-service and Requisition Center in parallel?  A: If you perform the additional actions to make it available, yes.").

126.     Lawson provided support and specifically instructed its customers on how to run RSS and RQC in parallel.  Tr. at 860:13-860:22 (Homewood Cross) ("Q: I want to just clarify that it's true, isn't it, that RQC and RSS can actually be run in parallel?  Isn't that correct? A: Not without additional configuration. Q: And is it your understanding that Lawson provided support and instruction to its customers on how to do that additional configuration, to design RQC and RSS to run in parallel?  A: I've seen a couple isolated incidents on that, yes."); PX-1105 (Q: "What about if we want to run RSS and RQC side by side?"  A: "Designed to run in parallel with only changes to the RSS bookmarks.");  PX-1067 ("No, do not uninstall RSS first. RQC can be installed in addition to RSS.");  PX-1058 at RQC0113793 (After the date of the Court's injunction, Lawson's employee Ms. Nordby provided the following instruction to Lawson's non-healthcare customer Western Lake Superior Sanitary:

> "Okay, let me explain this better.  After you load RQC, you have two
> options if you want to run RSS and RQC parallel:
>
> Option 1:
>
> You can manually create the RSS bookmarks under Portal Administration
> under Bookmark Manager.  You will need to create the Parent RSS
> bookmark and the children under it.  You can copy the URL paths from
> the RQC bookmarks, just use /RQC instead of /RSS and you'll have your

bookmarks.  Example: Utilities, the path is /RQC/html/utility.htm for RQC and you can change this to /RSS/html/utility.htm for RSS.

Option 2:

You could also edit the LAWSONLD.shopping.csv file in LAWDIR/logon/work/LAWSONLD prior to running L0920 to reload the RSS bookmarks.  I would recommend you modify the PREREQUISITION line and add an "A" or a "2" after this and make this entire file different and then reload this by running L0920.

Does this help?").

Tr. at 580:11-580:24 (Hanson Direct) ("Q: Then in the next email from Mr. Utteridge to yourself on page RQC 19876, he asks you, quote, should I uninstall RSS first…How did you respond to Mr. Utteridge's question?  A: The next email is, no, do not uninstall RSS first.  RQC can be installed in addition to RSS when installing RQC running LO920 will update the existing RSS bookmarks to point to RQC.  However, they still could access RSS (for testing purposes) by manually typing the RSS URLs in the browser.  I will set up with a SA task for this.  Q: So Lawson is aware that customers could still access RSS even if they've installed RQC; correct?  A: Yes, if you do additional setups, yeah.");  Tr. at 588:2-589:12 ("Q: And then she provides an option one, you can manually create the RSS bookmarks under Portal Administration under Bookmark Manager, and she provides some instructions, and then further down she provides an option two, you could also edit the LAWSONLD.shopping.csv file; do you see that?  A: Yes, I do.  Q: So Ms. Nordby of Lawson is describing a way that this client could reinstate the RSS product after installing RQC; correct?  A: Yes.  Q: And Western Lake Superior Sanitary is not one of Lawson's health care clients, is it?  A: No…Q: So in this instance, Lawson was providing instruction to a non-health care entity for how to reinstate RSS into their system; correct?  A: So, yeah.");  Tr. at 544:2-545:3 (Lohkamp Direct) ("THE COURT:  So if you have RSS and you get RQC, you can continue to run RSS and also run RQC?  THE WITNESS:  It is technically

50

possible, yes. THE COURT:  Well, is there anything that Lawson has done to keep that from happening technologically?  THE WITNESS:  Technologically, when you install requisition center, it basically changes the bookmarks to the end users so the end users are now pointed to requisition center.  A customer would have to go and modify that to undo that change. THE COURT:  By changing the bookmarks in RSS?  THE WITNESS:  Correct. THE COURT:  And then could you continue to run both systems in parallel?  THE WITNESS:  If you had not uninstalled RSS, yes....Q: And Lawson in the course of this customer webinar was providing instructions to its customers for how to change the bookmarks so they would be able to access RSS to continue to run, correct?  A: We'd provide some guidance on it."); PX-1102 at RQC 907460 ("RSS and RQC can run together. What you need to do: 1. Rename the bookmark file for RQSS before you install RQC. Have certain users pointing to RQSS, and take new bookmarks and give to other users who you want to have access to RQC.").

127.    Lawson told its customers that RSS and RQC were designed to allow multiple users to use the RSS and RQC applications simultaneously.  Tr. at  545:20-546:6 (Lohkamp Direct) ("Q: Mr. Brown asked, "Are there any known/or possible issues when multiple users are using RSS and others are using RQC at the same time?  Are they all balanced on the same databases?"  Do you see that question?  A: Yes, I do.  Q: How did Jennifer Langer of Lawson respond?  A: "Designed to work this way."  Q: So Lawson told its customers that requisition self service and requisition center were designed to allow multiple users to use the two applications simultaneously; is that correct?  A: Jennifer said, "It was designed to work this way."").

128.    As of June 9, 2011, a month after the injunction, Lawson was providing instruction to a non-healthcare entity for how to reinstate RSS into their system.  PX-1058 at RQC0113793;  Tr. at 582:13-584:16 (Hanson Direct) ("Q: Columbia Association is not one of

the 277 health care customers that were subject to the sunset provision in the injunction, is it?  A: I do not believe so. …Q: You don't know of any reason for Lawson to review a customer's rss_config.xml file in order to provide support services for Requisition Center, do you?  A: I am not in the support organization, so I do not know what she was doing or what she was referring to.  Q: The rss.config.xml file has no relevance to Requisition Center, does it?  A: No, it does not.  Q: Thank you.  Look down on that same page to the entry dated May 25th, 2011, at 8:05:15 p.m. from Mindy Klebe to that same client.  Do you see that entry?  A: Yes, I do.  Q: And in this entry, Mindy Klebe of Lawson states, quote, Imane and Gladys, I am testing this issue in 901+ apps and 901+ environment with RSS XML release 9.0.1.4.01 installed, and I'm not able to duplicate the issue; do you see that entry?  A: Yes, I do.  Q: So this entry indicates that on May 25th, 2011, Mindy Klebe was testing the issue with RSS XML installed; is that correct?  A: I'm not in the support organization, but, yeah, according to that sentence, I would agree with that, yes.").

129.     As of June 30, 2011, Lawson was providing support to customers who had issues with RSS.  Tr. at 586:15-587:5 (Hanson Direct) ("Q: So Lawson, as of June 30th, 2011, was providing support to this customer with respect to issues in requisition self-service; correct?  A: My understanding is they're providing support to RQ10, and they used the term RSS to determine if they were entering the requisition via the web-based product or the back office product which they were actually providing support for.  Q: And the web-based product was requisition self-service; correct?  A: In this case, it looks like the client stated, yeah, requisitions were created in RSS. THE COURT:  I lost your answer.  The answer is, yes, it was requisition self-service, that was the web-based service?  THE WITNESS:  Correct, in the web base.").

52

### ii. Lawson Did Not Uninstall RSS Nor Did It Require Its Customers To Uninstall RSS

130. The installation of the RQC application does not automatically uninstall the infringing RSS application. Tr. at 729:11-729:13 (Weaver Direct) ("Q: Does the installation of RQC automatically uninstall the RSS application? A: It does not."); Tr. at 576:3-576:8 (Hanson Direct) ("Q: If the client previously had RSS on its Lawson procurement system and the client had not installed and implemented RQC, wouldn't the client still have a system with RSS on it? A: If they had not installed RQC, yes, they'd still have RSS on it.").

131. Lawson itself did not uninstall RSS for its customers. PX-1269 at Interrogatory 8 ("With the exception of the 277 healthcare customers, Lawson does not interact with the customers' RSS system in any way, including manually uninstalling the RSS product.").

132. Furthermore, Lawson explicitly instructed its personnel to not install, uninstall or patch RSS for any customer. DX-587 ("Do not install, uninstall, or patch RSS for any client.") (emphasis added).

133. Lawson took no steps whatsoever to ensure that its customers uninstalled RSS and, in fact, went so far as to encourage and instruct its customers to continue using RSS. PX1044 at RQC 0538393(Matthew Bragstad: "It also seems that Nancy and Support in general are taking this a lot more serious that the rest of the company right now[.] This group almost seems like, this is so last year[.] Or maybe everyone has just checked out[.]" Elizabeth Homewood replied: "A little of both I think :)"); PX1056 at RQC0905560 (In a webinar presented to its customers, Lawson specifically announced, "Lawson is ordered to no longer provide support to RSS. However, Customers are not ordered to stop running RSS."); PX-1067 at RQC 0019876 (When a consultant asked if he should uninstall RSS before installing RQC, Scott Hanson replied, "No, do not un-install RSS first. RQC can be installed in addition to RSS.

When installing RQC, running LO920 will update the existing RSS bookmarks to point to RQC. However, they still could access RSS (for testing purposes) by manually typing the RSS URLs in the browser.").

134.   No individual within Lawson had responsibility for tracking whether or not a customer had replaced RSS with RQC in their production system.  Tr. at 576:25-577:4 (Hanson Direct) ("Q: In your deposition, you couldn't tell me a single individual within Lawson who had responsibility for tracking whether or not a customer had replaced RSS with RQC in their production system; correct?  A: That is correct as of that date.").

135.   Even seven months after the injunction. there was no evidence of any customer who uninstalled and removed the RSS application.  Tr. at 839:16-840:18 (Homewood Cross) ("Q: And at the time of your deposition on December 21, 2011, you were not aware of any specific customer that had previously licensed RSS before the injunction who had uninstalled and removed RSS, right? A: At that time, yes. Q: And December 21, 2011, was about seven months after the Court's injunction, right? A: Yes."); Tr. at 840:23-841:10 ("Q: [A]t the time of your deposition, you didn't even have an idea or an estimate of the customers who had uninstalled and removed RSS, right? A: Correct.  Q: Likewise, at the time of your deposition, you didn't even have an idea or an estimate of the customers who had uninstalled and removed RSS, right? A: Correct.");  PX-1269 at Response to Interrogatory 3 (Lawson "cannot determine the status of the software on a customer's system without direct interaction with a customer. Lawson is therefore not in possession of the information as to whether its customers (a) uninstalled and/or removed RSS, (b) did not uninstall or remove RSS, (c) installed and implemented RQC, or (d) did not install or implement RQC unless a particular customer contacted Lawson regarding its system.").

### iii.   Download Of RQC Means Nothing – Installation And Implementation Is Required

136.   Lawson's customers obtained RQC by downloading Lawson's RQC patch.  Tr. at 566:13-566:17 (Hanson Direct) ("Q: Now, I would like to discuss the process that's used to install and integrate RQC into the core S3 procurement system.  The first step would be a customer would have to download RQC; is that correct?  A: That's correct.").

137.   Downloading RQC refers only to a customer's act of downloading the software from Lawson's support site, MyLawson.com.  Tr. at 572:9-572:12 (Hanson Direct) ("Q: Now, downloading RQC refers only to a customer's act of downloading the software from Lawson's support site, MyLawson.com; correct?  A: Correct.").

138.   Downloading RQC is a simple 20-minute process.  PX-1056 at RQC 0905561 ("simple 20 minute process by which you download RQC"); Tr. at 571:24-572:8 (Hanson Direct) ("Q: Turn to page RQC 905561.  A: Okay.  Q: Do you see on that page the third bullet from the bottom reads, quote, RQC available to all impacted customers at no charge; do you see that statement?  A: Yes, I do. Q: On that same page, the next bullet reads "simple 20-minute process by which you download RQC." Do you see that?  A: Yes, I do.").

139.   Merely downloading the RQC application does not render it operational.  Tr. at 537:22-537:24 (Lohkamp Direct) ("Q: Now, a download of a product does not render that product operational, does it? A: No, it does not."); Tr. at 572:13-572:15 (Hanson Direct) ("Q: The act of downloading RQC does not actually render RQC operational; correct?  A: Correct. You still need to install it.").

140.   After the RQC application is downloaded, a system install is required.  Tr. at 537:25-538:9 (Lohkamp Direct) ("Q: A product needs to be installed in order to execute; isn't that correct? A: Yes, it does. Q: A download of requisition center isn't the same as an installation

of requisition center, correct? A: Correct. Q: So a simple download of requisition center without any further actions would not change a customer's system configuration, correct?  A: They would need to install that to use it."); Tr. at 567:9-567:11(Hanson Direct) ("Q: After downloading, an installation system configuration is also required; is that correct?  A: Correct."); Tr. at 729:8-729:10 (Weaver Direct) ("Q: In your opinion, does a download of the RQC application change a customer's configuration?  A: No.").

141.    The act of installing RQC does not render RQC running and fully implemented. Additional system configuration is required to render RQC running and fully implemented.  Tr. at 573:3-573:5 (Hanson Direct) ("Q: The act of installing RQC does not render RQC running and fully implemented; correct?  A: Correct.").  Tr. at 567:17-567:19 (Hanson Direct) ("Q: Configuration is required in order to render RQC fully implemented following installation; is that correct?  A: That's correct.");

142.    The nature of the tasks associated with configuration includes determining and setting up PO companies, Item Masters, item locations, and setting up the procurement system. Tr. at 567:12-567:16 (Hanson Direct) ("Q: And the nature of tasks associated with configuration includes determining and setting up PO companies, item masters, item locations, and setting up the procurement system; is that correct?  A: In an implementation, yes, that's correct.").

143.    Other steps that are required for implementation include doing end user training, applying security as needed and setting up users as requisitioners.  Tr. at 567:20-567:23 (Hanson Direct) ("Q: Other steps that are required for implementation include doing end user training, applying security, and setting up users as requisitioners; correct?  A: Correct.").

144.    As of December 2011, Lawson had no idea how many of its customers that had downloaded RQC had actually implemented RQC.  Tr. at 576:13-576:16 (Hanson Direct) ("Q:

As of December 2011 when you were deposed, Lawson had no idea how many of its customers that had downloaded RQC had actually implemented RQC; correct?  A: That's correct.").

145.    As of Dec. 2011, Lawson had no idea how many of its customers had gone live on RQC.  Tr. at 576:17-576:24 (Hanson Direct) ("Q: As of December 29th, 2011, when you were deposed, you did not know of any Lawson customer that had gone live on RQC; correct?  A: That is correct.  Q: As of December 2011, you were not aware of any Lawson customer that had implemented RQC in a production environment; is that right?  A: That is correct.").

146.    As of January 2012, Lawson was only aware of one or two customers who had actually installed and implemented the RQC application into their production procurement systems.  Tr. at 728:21-729:7 (Weaver Direct) ("Q: Do you know whether or not Lawson made any efforts to determine whether its customers had actually installed and implemented RQC into their production procurement systems?  A: From the deposition testimony that I read, I think that Lawson has not put any effort into determining whether customers are actually installing and using RQC.  As late as January 2012, Lawson witnesses testified that they only knew one or two customers that had installed and implemented RQC.  The witnesses also testified that Lawson doesn't maintain records identifying which of those customers installed and implemented RQC.").

147.    Lawson is aware that customers can still access RSS even if they have installed RQC.  Tr. at 577:10-577:14 (Hanson Direct) ("Q: If clients had systems that included RSS in their production environment and they have not implemented RQC in the production environment, they could still be using RSS for procurement activities; correct?  A: That's correct.").

57

148.     Substantial evidence indicates that Lawson's response to Interrogatory No. 3 was

misleading when it stated "When RQC is installed, customers automatically lose access to RSS."

Tr. at 581:15-582:3 (Hanson Direct) ("Q: Why don't you turn, if you would, to interrogatory

number three in Lawson's answer.  It's on the sixth page of the document.  I'd like to direct you

to the last  sentence of Lawson's response to interrogatory number three.  What does that

sentence say?  A: When RQC is installed, customers automatically lose access to RSS.  Q: That

statement is false, isn't it?  A: No, it is not.  Q: We just saw in the prior exhibit that customers

did not lose access to RSS; correct?  A: With additional setup, you could enable access.  Q:

Thank you.  A: Or re-enable access.").

> ### iv.     Merely Downloading RQC By Customers Was Sufficient Basis For Lawson To Provide Support; Installation And Implementation Were Not Required

149.     Lawson continued to provide support to customers running RSS, so long as they

merely downloaded RQC.  PX-1034 at RQC 0369860 (Dan Davidson wrote to Matthew

Bragstad and Elizabeth Homewood, "As a point of clarification, simply downloading RQC will

allow our affected RSS customers to again receive support from Lawson, correct?"  Bragstad

confirmed, "Downloading it changes their configuration. We have no knowledge of if they are

running it or not so we will support them again." Dan Davidson then forwarded this with a note

to a recipient at Velocity Technology Solutions, saying, "Here is confirmation from Lawson

Global Support (LGS) regarding affected RSS customers downloading RQC as the basis for

again receiving support from Lawson.");  PX-1058 at RQC0114257 (Customer Jackson

Laboratory asked, "I need [to] clarify. Is support discontinued until the product is downloaded or

installed?" Angie Larson of Lawson replied, "At this time, I only need to confirm that it's been

downloaded.");  Tr. at 729:14-729:19 (Weaver Direct) ("Q: Will Lawson continue to provide

assistance to a customer with RSS as long as the customer had downloaded RQC?  A: Yes.  The

deposition testimony that I saw said that the only thing Lawson considered was whether or not a download had been done."); Tr. at 851:8-853:3 (Homewood Cross) ("Q: All right.  We have a Lawson customer who has Configuration 5.  They download RQC.  They don't install or implement RQC, and they are continuing to run RSS.  Do you understand?  A: Yes.  Q: And the time period is seven months out from the injunction.  Okay?  A: Okay.  Q: That customer calls up Lawson support and says, I need maintenance and support for electronic data interchange.  And my question is:  Lawson would provide support for that customer's electronic data interchange module; isn't that correct? A: That is correct. Q: Now, you have that same customer, has RSS running, had downloaded RQC but hadn't done anything.  It's just sitting there on their system, not installed and not implemented, and the customer says to Lawson seven months after the injunction, I need support on all my S3 procurement modules, purchase order, requisitions, inventory control.  I'm having problems with generating purchase orders and I'm having problems creating requisitions.  Lawson's support personnel will provide maintenance and support to customer seven months after the injunction; isn't that correct?  A: They would provide support initially.  If at any point during that interaction it became apparent they were running RSS, we would stop support at that point.  Q: But if the Lawson support personnel were unaware that the customer had actually not uninstalled RSS, they would provide the support we just discussed, correct?  A: Correct.  Q: And the same question with respect to Configuration 3.  The customer has Configuration 3, downloads RQC, never teaches RQC.  It's just sitting there as a file on their system.  They continue running Configuration 3 with RSS.  They call up Lawson seven months after the injunction and say, Mr. Support Manager at Lawson, I need some help.  My Punchout's not working.  Lawson support will help support and maintain the Punchout

module for that customer of Configuration 3 seven months after the injunction who's running RSS, correct?  A: Until we discovered if they were running RSS, yes.").

150.    As of December 2011, more than seven months after the court's injunction was entered, the RQC SWAT team had communicated with about 240 customers about RQC issues. Tr. at 568:3-568:7 (Hanson Direct) ("Q: As of December 2011, more than seven months after the Court's injunction was entered, the RQC SWAT team had communicated with about 240 customers about RQC issues; is that correct?  A: That is correct.").  However, Lawson did not actually install RQC for those 240 clients.  Tr. at 568:8-568:13 (Hanson Direct) ("Q: However, Lawson did not actually install RQC for those 240 clients; right?  A: We would have installed RQC for a subset of those clients.  Q: So not the full 240; correct?  A: That is correct.").

151.    And with respect to the other 620 RSS customers that the SWAT team did not communicate with, as of Dec. 2011, Lawson had no information as to the status of either the RSS application or the RQC application.  Tr. at 569:6-570:12 (Hanson Direct) ("So between 860 RSS licensees and the 240 for which Lawson has provided assistance with the installation of RQC, does Lawson have any information as to the status of either the RSS application or the RQC application for the remaining 620 customers?  Then there was an objection, and you gave the following answer:  My understanding is no.  Was that your answer on that day to that question?  A: Yes, it was.").

152.    Lawson's support personnel initially took the position that they were authorized to provide maintenance and support for customers of the Infringing Configurations so long as they were outside the United States from the injunction up until November 23, 2011.  However, Lawson's Legal Department later determined that international customers could not be supported because such support was provided by Lawson personnel from within the United States.  DX-

557 at RQC 0000636 (The decommission date for "Non-US customers" was "November 23, 2011."); DX-563 at RQC 0561909 (It was not until 7/18 that the Support group "Received verbal confirmation from Legal that we cannot support non-US RSS customers through November 21, 2011 (decomm date) as the support tools reside on US servers."); PX-1038 at RQC 2657685 (as of 9/6/2011, Lawson had not yet mailed an official letter to international customers informing them "that we can't support international customers because our support comes from the US."); Tr. at 833:5-833:25 (Homewood Cross) ("Q: Is this decommission notice, am I interpreting it correctly to read that Lawson's support personnel were authorized to provide maintenance and support for customers of the infringing configurations so long as they were outside the United States from the injunction up until November 23, 2011; is that correct? A: At that point in time, yes. Q: Okay. And is it also correct that Lawson personnel providing support to the non-U.S. customers were based in the United States? A: Potentially, yes.").

153. Lawson had no knowledge of whether its customers had even downloaded Patch 1, which contained one aspect of the modification to RSS at issue in these contempt proceedings. Patch 1 was not part of the original release of RQC, but was instead made available on June 9, 2011. PX-1041; Tr. at 853:20-854:14 (Homewood Cross) ("Q: Do you see it says, "Upon further review, legal has requested code changes to Procurement Punchout. Product management concurs. This will require a patch to RQC and to the 4 GL system." Do you see that? A: Yes. Q: Do you see the next section that's entitled, Impact on products and status, describes the patch that was going to be made available to Lawson's customers? A: Yes, I see that. Q: Do you see that that's called Patch 1? A: Yes. Q: Now, Lawson does not track information about whether a specific customer has downloaded a specific patch for RQC; isn't that correct? A: That is correct.

Q: So Lawson has no way of knowing whether or not the customers who downloaded RQC ever took a download of Patch 1, correct? A: Not through any download records, no.").

### K.   Lawson's Gains Should Be Disgorged

#### i.   Revenue

154.   The relevant Lawson revenue streams can be divided into three categories: license revenue, maintenance revenue and service revenue.

155.   License revenue and maintenance revenue can be measured directly using the data associated with Stock-Keeping Units (SKUs) maintained by Lawson.  Tr. at 882:22-883:9 (Ugone Direct) ("Q: Can you describe generally how you measured license revenue and maintenance revenue first?  A: With respect to license revenue and maintenance revenue, it's almost like a Rosetta Stone aspect where there's something called stock-keeping units, and so revenue was catalogued according to these abbreviations, in a sense, but we knew the -- and we were able to uncover the stock-keeping units that were associated with different types of revenues for different types of customers. So via these stock-keeping units, we were able to do that matching exercise for the licensing receive and for the maintenance revenue."); Tr. at 887:9-887:12 ("Q: Now, Dr. Ugone, you testified that license and maintenance revenues are associated with SKU data that's provided by Lawson; is that correct?  A: Yes.").

156.   Lawson tracks service revenue on a customer basis rather than a SKU basis.  Tr. at  883:10-883:20 (Ugone Direct) ("Q: How does Lawson track service revenue?  A: Service revenue is a little bit different.  So with the SKUs for the license revenue and maintenance revenue, there were SKUs that matched up to the modules that are in the infringing configurations.  So we were able to directly match those in a sense.  However, service revenue at Lawson was compiled on a customer basis rather than a, let's just say a module basis or a

configuration basis.  So how the data was catalogued was a little different by customer rather than by SKU and module.").

157.     Lawson's expert Dr. Putnam is in agreement with Dr. Ugone's calculations of earned profits and revenues.  Tr. at 1115:21-1116:9 (Putnam Cross) ("Q: Now, are you and Dr. Ugone in agreement regarding the customers that you identified to calculate the revenue base? A: Yes. Q: Are you and Dr. Ugone in agreement regarding the apportionment of licensing and maintenance revenue that you calculated?  A: There were two apportionments.  I agree with Dr. Ugone on both of them.  I think both are mandatory. He thinks one is optional, but other than that we agree. Q: Do you agree with the way in which Dr. Ugone calculated service revenues?  A: Yes.").

158.     The first step in calculating the appropriate revenue is to determine the time period for which the calculations will be performed.  Since the injunction order specified a special sunset period for designated health care customers, the relevant time period for the two categories of customers (health care and non-health care) is different.  Order (Dkt. No. 729) at 4.

159.     The appropriate time period for calculating the revenues for non-designated health care customers is from the date of the injunction, May 23, 2011, through November 30, 2012, and that for designated health care customers is from after the sunset period, November 23rd, 2011 to November 30th, 2012.  Tr. at  885:2-885:18 (Ugone Direct) ("Q: Can you explain what the relevant time period is that you looked at?  A: So we have a timeline here, and I'm just going to point out three dates.  There's the May 23rd, 2011, date, the November 23rd, 2011, date, and November 30th, 2012, date.  So the easiest way to think about this is, the entire injunction period for which we have data is May 23rd, 2011, through November 30th, 2012, and for non-designated health care customers, in other words, other customers, we compiled the license,

maintenance, and service revenues over that entire time period. With respect to the designated health care customers, we compiled the maintenance and service revenues after the sunset period from November 23rd, 2011, to November 30th, 2012, and then finally, for the designated health care customers, we compiled the licensing revenue over the entire time period.").

**License And Maintenance Revenue**

160.    A list of SKUs provided by Lawson, in which each module of the infringing configuration is mapped to a list of SKUs that correspond to that module, can be used to determine which SKUs were associated with the various software modules included in Configuration Nos. 3 and 5.  PX-1078;  Tr. at  887:13-888:18 (Ugone Direct).

161.    The S3 Procurement Modules (Purchase Order, Requisitions and Inventory Control) can show up in the license and maintenance revenues in three ways: (1) Individually, so the data would show revenue separately for Purchase Order, Requisitions and Inventory Control as individual SKUs, (2) Using a SKU called PROC that according to Lawson includes all three of these modules together, and (3) Through what is known as a "Large Suite SKU, " a single SKU that includes a large bundle of products – not only the S3 Procurement Modules but also additional modules that are not part of Infringing Configuration Nos. 3 and 5.  Tr. at  890:12-891:16 (Ugone Direct) ("Q: What are the three ways the S3 procurement modules show up in license and maintenance revenues?  A: Well, as you see in the blue box there, S3 procurement modules, there's purchase order, requisitions, and inventory control.  So when you look at how Lawson compiled the revenue data, sometimes they would put that revenue into an IC bucket, a PO bucket, or an RQ bucket. Those are SKUs, so those are pretty straightforward. That's just inventory control, purchase order, and requisitions.  So that was just a straightforward way of figuring out what those revenues were.  But there's other times, depending on how the customer

would pay, they would compile the information differently.  So there was another SKU called proc, p-r-o-c, which was a combination of IC plus PO plus RQ.  So it wasn't shown individually. It was shown compiled into one number.  But, again, that was relatively straightforward, so we took 100 percent of that number. Now, where required, some data compilation and manipulation on our part was that sometimes there would be a suite of modules where the customer would buy the suite of modules that would include purchase order, requisitions, and inventory control, but it might include other modules as well. So that's called the large suite SKUs, and that would include, like I said, those three modules, but it might include others.  So we had to do an apportionment approach, and at the end of the day, we would take 35 percent of the large suite revenues for the blue box, as I describe it."); PX1080;  PX1081;  PX1241; PX1242;  PX1246; PX1247.

162.    Since the Large Suite SKU may include non-infringing configurations, only a portion of the license and maintenance revenue associated with the Large Suite SKUs are included in the calculation of how much revenue Lawson received as a result of continuing to license and maintain the still-infringing configurations.  Tr. at  891:17-892:3 (Ugone Direct) ("Q: How was the 35 percent apportionment for the large suite SKUs determined?  A: Ultimately, it ended up being pretty straightforward, that when you looked at the pricing associated with ThinPro, for example, and you compared that to the pricing of the three modules that we're interested in for the infringing configuration here, the purchase order, requisitions, and inventory control, the price of the three sort of S3 procurement modules relative to the price of the large suite ultimately, after some calculations, we determined was about 35 percent.  So we took 35 percent of those revenues.").

65

163.    Data for the revenue recorded under the SKUs besides the Large Suite SKUs does not require apportionment because they were entirely part of the infringing configurations.  Tr. at 892:4-892:7 (Ugone Direct) ("Q: Did you also apportion the revenue recorded under the SKUs besides the large suite SKUs?  A: No, because those were all just entirely part of the infringing configurations.").

164.    Both ePlus and Lawson experts are in agreement with Dr. Ugone's apportionment of licensing and maintenance revenue.  Tr. at 1115:25-1116:9 (Putnam Cross) ("Q: Are you and Dr. Ugone in agreement regarding the apportionment of licensing and maintenance revenue that you calculated?  A: There were two apportionments.  I agree with Dr. Ugone on both of them.  I think both are mandatory. He thinks one is optional, but other than that we agree. Q: Do you agree with the way in which Dr. Ugone calculated service revenues?  A: Yes.").

**Service Revenue**

165.    Service revenue cannot be determined based on the same method used to calculate license and maintenance revenue.  Tr. at  892:8-892:15 (Ugone Direct) ("Q:  Were you able to determine Lawson's service revenue for the infringing configurations three and five using the same method that you used for license and maintenance?  A: No, we were not able to do it the same way, because Lawson did not service by SKUs.  So we didn't have the same mapping that we've been talking about for the last couple of minutes. We would have service revenue by customer, not service revenue by SKU.").

166.    Further, the appropriate service revenue cannot be calculated by just counting all the service revenue from any customer who had the Infringing Configurations.  Tr. at  892:16-892:22 (Ugone Direct) ("Q: Well, could you just include all the service revenue associated with the 146 customers that had configurations three and five?  A: Well, I wouldn't want to do that,

because if they had more software modules from Lawson than just the infringing configurations, then you'd be overstating the service revenue, so we did not take that approach.").

167.    The correct way to determine service revenue is by calculating a ratio of Infringing Configuration maintenance fees to total maintenance fees for the identified 146 customers with infringing configurations and then applying that ratio to service revenues from the 146 customers to apportion service revenues to the infringing configurations.  Tr. at  893:4-894:5  (Ugone Direct) ("Q: How did you determine to apportion service revenues?  A: Again, this ended up being a relatively straightforward calculation.  We used maintenance revenues as a proxy.  So what we said was, once we know our 146 customers, let's see the total that they pay in maintenance revenues.  And we also happen to know the SKUs associated with the infringing configurations, so let's figure out the maintenance revenues that are paid related to the infringing configurations. Once we have the maintenance revenue associated with the infringing configurations, and once we have the total maintenance revenue, we can just take the ratio of the two and apply that to service revenues.  So roughly speaking, As the chart shows here, when you look at all the customers, Lawson customers with the infringing configurations, about 20 percent of their maintenance revenues in total that were paid were associated with the infringing configurations. We used that 20 percent and applied it to the service revenues.  So that dictated how much of the service revenues we used in my calculations. Q: Did you apply that 20 percent apportionment to Lawson service revenues?  A: Yes.  So that's what this is trying to show here. We did the calculation for maintenance revenues, we used that as a proxy for service revenues, and we applied it to service revenues.");  PX1082;  PX1243; PX1248.

67

168.    Based on the methodology described above, the license, maintenance and service revenues for Configuration Nos. 3 and 5 earned during the injunction period up until November 30th, 2012 were:

| | |
|---|---|
| License Revenue | $7.1 million |
| Maintenance Revenue | $12.7 million |
| Service Revenue | $9.6 million |
| **Total Amount of Revenues** | **$ 29.4 million** |

PX1074;  PX1244; PX-1080, PX-1081, PX-1082, PX-1241, PX.1242, PX-1243, PX-1246, PX-1247, and PX-1248; Tr. at  894:13-895:20 (Ugone Direct).

169.    Unfortunately, the revenues that Lawson earned from configurations three and five after November 30, 2012 could not be calculated because the data provided by Lawson ended on November 30, 2012.  Tr. at  894:6-894:12 (Ugone Direct) ("Q: Were you able to calculate the revenues that Lawson earned from configurations three and five after the effective dates of the injunction order?  A: Yes.  I'm sorry.  After the effective dates, no.  We did the calculation during the injunction period, but as I mentioned previously, the data ended as of November 30th, 2012, so we don't have the data past that.").

170.    Dr. Ugone calculated an alternative apportionment of the Lawson System Foundation(LSF) and Process Flow (PF) revenues with an apportionment figure of 85%.  If apportionment is performed for LSF/PF, the resulting Lawson gain numbers for revenue, gross profits and incremental profit would be as follows:

| | |
|---|---|
| **Lawson's Revenue** | $ 23.0 million |
| **Lawson's Gross Profits** | $ 14.2 million |
| **Lawson's Incremental Profits** | $ 11.7 million |

Ugone Suppl. Expert Report at p. 14.

171.    The corresponding daily rate figures based on the alternative apportionment of the

Lawson System Foundation(LSF) and Process Flow (PF) revenues with an apportionment figure

of 85% would be as follows:

| | |
|---|---|
| **Daily Revenues** | $48,821 |
| **Daily Gross Profits** | $30,497 |
| **Daily Incremental Profits** | $24,850 |

Ugone Suppl. Expert Report at p. 15;  Tr. at 997:24-998:23 (Ugone Redirect) ("Q: Dr. Ugone, can you

explain to the Court what table 2 is, please? A: Yes.  The Court -- well, let me take a step back. In my

direct testimony I gave certain daily rates.  If you look at table 2 the middle column, it says, With

apportionment of large suite revenues, those are the daily rates I presented to the Court during my

testimony. On cross-examination, I was asked about daily rates with apportionment of large suite LSF

and process flow revenues. And so what this table does is it gives the daily rates for that alternative

scenario. THE COURT:  With the 85 percent figure as the apportionment? THE WITNESS:

Correct.…MR. DUSSEAULT:  Could I just ask that the numbers be read into the record so they are part

of the record?  THE COURT:  The revenues is 48,821.  The gross profits, 30,497.  Incremental profits,

24,850.").

### ii.    Gross Profit

172.    Gross profit is the difference between revenue and the direct costs of providing a

good or service.  Tr. at  897:8-897:21 (Ugone Direct) ("Q: And what are gross profits?  A: The

easiest way to describe gross profits, I always think about -- you know, if you think about a

manufacturing facility, and if they're making widgets or maybe they're making ballpoint pens. So you might take the revenues, minus the material cost and the labor cost to make either the widgets or the pens. When you do that subtraction of what I'll call direct costs, that gives you what's called gross profits. That's the easiest way to think about that, just some -- in a factory, that would be the material and the labor. Now, when you get to things like software, it's a little bit different, but the concept is the same, those direct costs associated with those revenues.").

173.    As discussed above, Lawson's gross revenue during the infringement period was $29.4 million.

174.    The next step to determine gross profits is to determine the costs that must be deducted from revenue. The following three categories of costs are deducted from revenue when calculating gross profits: (1) the direct cost of licensing, (2) the direct costs of maintenance, and (3) the direct costs of service. Tr. at 904:12-904:21 (Ugone Direct) ("Q: Have you prepared a demonstrative to help explain in this case what direct cost you subtracted from revenues to calculate gross profits? A: Yes. Q: And is this the demonstrative you prepared? A: Yes. So we can see the title again, Expenses Deducted to Derive Gross Profits, and there's the direct cost of licensing, the direct costs of maintenance, and the direct costs of service, and this is based on deposition testimony again of Mr. Samuelson."); PX1074; PX1244.

175.    Both Lawson and ePlus experts agree that the gross profit margin for Lawson should be around 66.1 percent. Tr. at 911:22-912:18 (Ugone Direct) ("Q: Have you prepared a demonstrative to help you explain what Lawson's incremental profit margin on figure configurations three and five was if you adopt this approach? A: Yes. Q: And is this the demonstrative you prepared? A: Yes, it is. Q: Can you explain what it shows? A: This really is pulling everything together that we've talked about. If you look at revenue, and let's just call that

70

100 percent, that's the -- for example, the $29.4 million, subtract out the direct costs, which are about 33.9 percent, yields a gross profit margin of about 66.1 percent.  We then subtract out on a percentage basis all of the sales and marketing expenses for conservatism.  That's another 15.2 percent, and you end up with an incremental profit margin of 50.9 percent.  So the thing I'll point out here is, we talked about the revenues first, the 29.4 million, and we'll see this in a summary chart.  Then we talked about gross profits, and now we're taking it down to incremental profits."); Tr. at 1116:10-23 (Putnam Cross) ("Q: Now, if someone were to tell you to compute Lawson's gross margins, you would end up with a very similar number to what Dr. Ugone presents; isn't that correct?  A: Yes.  Q: When you were calculating incremental profits, the way you did that is you started with total revenue and you subtracted the cost of goods, correct?  A: To obtain gross profits? Q: That's correct.  A: Yes. Q: That gave you a gross margin of somewhere around 65 percent; is that correct?  A: That's right.").

**Direct Cost Of Licensing**

176.    Direct costs of licensing includes costs associated with the licensing revenues that Lawson has received, such as royalties paid to third-party technology partners or commissions paid to resellers, cost of hardware infrastructure use for hosting the software.  Tr. at  905:1-905:8 (Ugone Direct) ("Q: And could you give me some examples that you deducted from revenues to calculate gross profits?  A: So, for example, under direct costs of licensing, there might be royalties paid to third-party technology partners or commissions paid to resellers, cost of hardware infrastructure use for hosting the software. That would all be costs associated with the licensing revenues that Lawson has received.").

**Direct Cost Of Maintenance**

177.    Direct costs of maintenance includes costs associated with internal support group, royalties paid to third-party technology partners, commissions paid to third parties and commissions paid to Lawson's sales people.  Tr. at  905:9-905:14 (Ugone Direct) ("Similarly, if we go to the direct costs of maintenance, there's the internal support group costs. That's the first line item there.  All the way down to the last one in that column, commissions paid to Lawson salespeople, those are all the things that were testified to by Mr. Samuelson.").

**Direct Cost of Service**

178.    Direct costs of service includes costs incurred for providing a service, such as, costs associated with internal consulting personnel, third party consulting expenses and commissions, bonuses and travel-related costs.  Tr. at  905:15-906:3 (Ugone Direct) ("The direct costs of service, there's internal consulting personnel, there might be third-party consulting expenses, commissions, bonus, travel expenses because you are doing consulting and going on site to the -- potentially to the customer site.  So those are the types of things you would subtract out of the service revenue as direct costs of providing that service. So this conceptually tells us what are the costs, the different buckets or categories of costs associated with each of the revenues.  Q: And, again, this was from the spreadsheet that we just looked at?  A: These are from the spreadsheet but also in combination with Mr. Samuelson's deposition testimony.").

**Gross Profit Calculation**

179.    Lawson's direct costs of licensing, maintenance and service during the appropriate time period were $11.3 million.  Tr. at  906:8-906:24 (Ugone Direct) ("Q: Okay. And have you prepared a demonstrative to show the gross profits that Lawson received in your calculation from licensing, maintaining, and servicing configurations three and five?  A: Yes.

I've prepared a chart, yes.  Q: Is this the demonstrative you prepared?  A: Yes.  Q: Can you explain what this shows, please?  A: So, again, I try to entitle my charts such that they're descriptive, but it says Lawson's Infringing Gross Profits.  We talked at first how I compiled the infringing revenues which was $29.4 million.  We've just talked about the direct costs of licensing, maintenance, and service, and those direct costs are approximately 11.3 million. We subtract the direct costs from the revenues in dispute, the infringing revenues, and you get what's called gross profits which is $18.1 million.").

180.    Lawson's revenues for Configuration Nos. 3 and 5 earned during the injunction period up until November 30th, 2012 are $29.4 million.  *Id.*  Thus, the gross profits on the Infringing Configurations during the injunction period up through November 30th, 2012 are $18.1 million.

| Infringing Revenues | $29.4 million |
|---|---|
| Less: Direct Costs of Licensing, Maintenance, and Service | ($11.3 million) |
| **Gross Profits** | **$18.1 million** |

### iii.    Incremental Profit

181.    Lawson does not track incremental profits.  Tr. at  906:25-907:2 (Ugone Direct) ("Q: Let's turn to incremental profits. Does Lawson track incremental profits?  A: No."); Tr. at 1118:24-1119:5 (Putnam Cross) ("Q: Lawson does not compute an incremental profit margin, does it?  A: No, it's an economic concept. Q: Indeed, that's not how Lawson thinks about its business, right?  A: In general, accountants don't compute incremental margins at all, that's right.").

182.    Lawson tracks three difference categories of operating expenses: (1) general and administrative, (2) product development (research and development), and (3) sales and

marketing. Tr. at  907:14-908:1 (Ugone Direct) ("Q: What costs did you consider deducting to calculate an incremental profit margin?  A: The way to think about it is, again, we have revenues less direct costs give gross profits.  The question is, are there any other costs to deduct, and those costs that you can consider would be operating expenses.  And we've provided three different categories of operating expenses here which are general and administrative, product development, which is the same as R and D, research and development, and also sales and marketing.  Below each of those, based on the deposition testimony of Mr. Samuelson, we've tried to conceptually say, what are in each of those operating expenses buckets.").

183.    Of the three categories of operating expenses, Dr. Ugone opined that only sales and marketing expenses should be factored into an estimate of incremental profit from revenue. Tr. at  911:4-912:18 (Ugone Direct) ("Q: What about sales and marketing expenses?  Can you explain why you deducted sales and marketing expenses in calculating incremental profits here? A: So I have a yes here, so I ended up some doing some deductions which we'll explain in a second, but there were categories here that one would think would vary with revenue, for example, commissions.  And because of that, I made the determination that I would do some deductions for those costs.  Q: Well, under this reasoning, is it appropriate to deduct all sales and marketing expenses?  Was that your ultimate opinion?  A: Well, what I ended doing for conservatism, I did subtract all sales and marketing expenses.  It's highly unlikely that all of them would be variable related to the infringing configurations during the injunction period, but for conservatism, on a percentage basis I subtracted out all of the sales and marketing expenses. Q: Have you prepared a demonstrative to help you explain what Lawson's incremental profit margin on figure configurations three and five was if you adopt this approach?  A: Yes.  Q: And is this the demonstrative you prepared?  A: Yes, it is.  Q: Can you explain what it shows?  A:

This really is pulling everything together that we've talked about.  If you look at revenue, and let's just call that 100 percent, that's the -- for example, the $29.4 million, subtract out the direct costs, which are about 33.9 percent, yields a gross profit margin of about 66.1 percent.  We then subtract out on a percentage basis all of the sales and marketing expenses for conservatism.  That's another 15.2 percent, and you end up with an incremental profit margin of 50.9 percent.  So the thing I'll point out here is, we talked about the revenues first, the 29.4 million, and we'll see this in a summary chart.  Then we talked about gross profits, and now we're taking it down to incremental profits.").

184.    Neither general and administrative costs, nor product development costs should be deducted from revenue to calculate an incremental profit margin.  Tr. at  908:21-909:14 (Ugone Direct) ("Q: Can you explain which costs -- well, let's start with the G&A cost on this demonstrative.  Can you explain why it's your opinion that you would not deduct G&A costs to calculate incremental profits?  A: Well, when we're talking about general and administrative costs, we're talking about the finance department, we're talking about the information technology, IT group, we're talking about HR.  Those are all the things that were on the prior chart, and if you think about it, those are not the types of costs that would vary with revenue associated with the infringing configurations during the injunction period. THE COURT: They're going to be there anyway.  THE WITNESS:  They're going to be there anyway, yes.  Q: Was there any documentation you relied on to come to that conclusion? A: Actually, there was deposition testimony that I relied upon."); Tr. at  909:25-911:3 (Ugone Direct) ("Q: What about product development costs; can you explain why you didn't deduct product development costs to calculate incremental profits?  A: Same concept there.  They wouldn't change whether you are providing the infringing configurations or not, and, in fact, there was deposition testimony that

there was no -- in other words, I've seen no evidence of any product development expenses associated with the infringing configurations. So I think it's important to remember here, we're not just even talking about changes in Lawson's revenue generally.  We're talking about the infringing configurations, was there any product development expenses incurred associated with the infringing configurations during the injunction period, and I've seen no evidence of that, and, hence, that's why there's a no in this bucket here of product development, why it is not subtracted out as a cost. Q: So is it your opinion that when you calculate an incremental profit margin, you can never deduct product development costs?  A: So with G&A, for example, and with product development, I'm not saying that it's never appropriate to deduct that.  I'm saying given the facts and circumstances of what's going on in this dispute, looking at the infringing configurations and those revenues during the injunction period, if those revenues were taken away, would these costs have declined and/or changed, and there's been no evidence of that."); Tr. at 992:6-993:1 (Ugone Redirect) ("Q: Question.  Let's start on line 8.  "Is it your testimony that none of the costs associated with product development, sales and marking, or general and administrative costs can be specifically allocated to revenues for infringing products and services?" Answer from Mr. Samuelson, "That is -- yes, that's correct." And my question to you is whether or not that was a statement from Mr. Samuelson that was part or one of the bases for your opinions? A: Yes, it was. Q: And in way was that a basis for your opinion? A: Well, he was the 30(b)(6) corporate representative on these subject matters. Q: How did that affect your opinion regarding product development costs? A: Well, it told me that none of the product development costs could be specifically allocated to the infringing configurations, which was also supported by other testimony throughout his deposition.").

185.     Of the $29.4 million in Lawson revenue associated with the Infringing Configurations during the injunction period, $15.0 million is an estimate of Lawson's incremental profit if all sales and marketing operating expenses, in addition to all of Lawson'd direct costs, are subtracted from Lawson's revenues.  Tr. at  912:19-913:8 (Ugone Direct) ("Q: And have you also prepared a demonstrative to help you explain in dollar figures what you calculated Lawson's incremental profits to be?  A: Yes.  Q: Is this the demonstrative you prepared?  A: Yes, it is.  Q: What does this show?  A: So there were infringing revenues of 29.4 million compiled according to that methodology I talked about earlier.  I've talked about how I have derived an incremental profit margin of 50.9 percent.  You multiply that incremental profit margin of 50.9 percent times the $29.4 million of infringing revenues associated with the infringing configurations during the injunction period, and you get incremental profits to Lawson of $15 million."); PX-1244; PX-1074.

### iv.     Damages After Injunction And Until Court Finds Contempt

186.     Damages from November 30, 2012 through the date when the court finds contempt can be quantified either by analyzing updated financial information that Lawson may be required to provide, or by determining Lawson's average daily revenue and profits, and then using these figures as a daily rate for each day after November 2012 and going forward until suc time as Lawson is found to be in contempt. Tr. at  914:4-914:17 (Ugone Direct) ("Q: Do you have an opinion about how to quantify damages after November 30th, 2012, should the Court find Lawson in contempt?  A: There's really two different ways that that could be done.  It could be that after the Court's finding, that Lawson provides updated data in which case I would just follow this same methodology for the data that goes from December 1st, 2012, through, let's say, today, or what I've also done and provided here is what I'll call a daily rate.  So for each of these disgorgement measures, I've calculated what it is on a daily basis, and so the Court could take

that daily rate and then multiple by the number of days.").

### L.     Lawson's Attempts to Quantify Disgorgement Are Flawed

#### i.     Net Profits Is An Inaccurate Measure

187.    Net profit is what you get when you deduct from the gross profits all costs of doing business including costs such as product development, sales and marketing, and general and administrative costs – even if such costs are fixed and do not vary with revenue earned from a particular product. Tr. at  898:11-899:3 (Ugone Direct) ("Q: And I think the last example you mentioned are net profits.  Can you explain what net profits are?  A: Without getting too technical about it, the way I think about net profits, the easiest way to describe it is basically subtracting out all the costs.  So there might be the direct costs, there could be these variable costs, but there could be a whole series of what's called fixed costs, costs -- you know, the accounting department, or it could be the information technology group, or it to be Human Resources. Those are all examples of costs that may not vary as you sell more units, but when you are looking at net profits, you are subtracting out all of those what are called fixed costs as well, and, remember – I'm throwing out a whole bunch of terms here, but there's variable costs, costs that vary as you produce more. There's fixed costs that are relatively constant as you produce more. But all of those are subtracted out to get to net profits.").

188.    The calculation of net profit is not appropriate in this case because the operating expenses Lawson used to calculate its net profit margins includes both variable and fixed costs and most of the general and administrative costs included in Lawson's net profit calculations were fixed costs.  Tr. at  899:21-901:1 (Ugone Direct) ("Q: And do you have an opinion about whether or not the calculation of net profits is appropriate in this case?  A: I do, and you can look at the top of the chart.  It says, net profit margin is inappropriate for measuring Lawson's gains, and I give just some examples of why I hold that opinion.  Q: Can you provide us with your

understanding of why you believe that net profits are inappropriate in this case.  A: Remember what I said when we were talking about net profits, we're subtracting out all the costs in a sense. So we're subtracting out the direct costs and what are even called operating expenses. So those operating expenses might include general and administrative costs, and we'll give some examples of that in a second.  Some product development or research and development costs, it would include sales and marketing costs.  So when you're talking about net profits, you are subtracting all of those out. Now, when we're talking about the injunction period, what we're saying is, what costs would have varied in that injunction period; in other words, if I want to understand the gains to Lawson during the injunction period, I'd be subtracting out the costs from revenues but those costs that would vary with revenues.  I wouldn't subtract out the fixed costs, because when I'm subtracting out the fixed costs, then you're subtracting out too many costs. THE COURT: Subtracting out what?  THE WITNESS:  Too many costs.  You're subtracting out costs that would not vary with a change in the revenues associated with the infringing configurations. This is all exciting stuff to an economist. I apologize."); Tr. at 999:15-999:24 (Ugone Redirect) ("Q: Dr. Ugone, is it your understanding that in light of the injunction, the only module of the infringing configurations that was modification by Lawson was the green module here on your screen, the requisition self-service? Is that your understanding?  A: Yes.  Q: So there wouldn't have been any new development or research associated with the other modules; is that your understanding? A: That's my understanding.");  Tr. at 1153:6-1154:4 (Putnam Cross) ("Q: You say on this slide that net profit subtracts cost of goods sold, variable sales and marketing, variable R&D/G&A and short run fixed costs, right?  A: Yes. Q: Isn't it true, sir, that net profits are what's left when you subtract all costs of doing business from revenue, not just short run fixed costs and these other costs you have listed here?  A: Well, it depends on the precision of

the accounting definition.  I've used a measure called earnings before interest, taxes, depreciation and amortization.  So there are various other costs that are actually not taken into account that are not operating costs.  And if you want to call those costs, it should be accounted for in the net profit.  Then you could.  Had you done that, Lawson's margin would be lower and ePlus's damages would be less.  Q: Isn't it your opinion, sir, that net profit margins take account of all costs that firms incur to make sales?  A: All operating costs.  So in other words, if you want the net operating margin, you need to look at the operating costs.  This doesn't take into account operating costs.").

189.    None of these costs can be specifically allocated to the Infringing Configurations. Tr. at  901:2-901:9 (Ugone Direct) ("Q: Do you have any other reasons for your opinion that in this case it was inappropriate to calculate net profits?  A: Well, also there's been testimony by Mr. Samuelson that these costs are not directly related to the infringing configurations, and if they're not directly related, they shouldn't be subtracted out.  If you ended up subtracting them out, you'd result in a windfall gain to Lawson.").

190.    It is wrong to deduct fixed costs when calculating a profitability figure in these proceedings because Lawson would have such costs regardless of whether Lawson did or did not comply with the Injunction Order.  Tr. at  901:10-901:18 (Ugone Direct) ("Q: And can you explain why, in your opinion, it's wrong to deduct fixed costs when attempting to calculate the profits that Lawson gained from the infringing configurations?  A: Well, that's where you'd end up with a windfall gain to Lawson, because you'd be subtracting out too many costs, leaving too little profit associated with the provision of those infringing configurations.  So that's why you would not subtract out those fixed costs.");  Tr. at 1154:14-1155:11 (Putnam Cross) ("Q: Now, do you see in paragraph 82, you say, I understand that the law supports the use of net profit

margins when evaluating an infringer's profits in the context of a contempt award.  In general, this is appropriate because net profit margins take account of all costs that firms incur to make sales.  Do you see that statement?  A: Yes, that's right.  Q: Now, you used Lawson's company-wide net profit margin, not a net profit margin specific to Configurations 3 and 5, when you calculated net profits for these proceedings, correct?  A: Those don't exist, but yes, that's right.  Q: So yes, it's right that you used company-wide net profit margin?  A: Yes.  Q: And the company-wide net profit margin is calculated by deducting 100 percent of Lawson's operating expenses from its revenue, right?  A: Yes.  Q: And net profits also take into account fixed costs, correct?  A: That's true.").

191.    Even though Lawson's G&A continued unchanged subsequent to the injunction and there was no evidence that Lawson had to incur additional product development costs after the date of the injunction as a direct result of continuing to license, maintain or service the infringing configuration, these costs were incorrectly deducted by Dr. Putnam when computing Lawson's net profits.  Tr. at 1157:14-1157:19 (Putnam Cross) ("Q: I'm asking you a new question.  The new question is:  From a general and administrative perspective, you would expect that Lawson's expenses continued after the injunction as were prior to the injunction, correct?  A: That's my understanding, yes."); Tr. at 1158:10-1158:18 (Putnam Cross) ("Q: You have not seen evidence, Dr. Putnam, that Lawson had to incur additional product development costs after the date of the injunction as a direct result of continuing to license, maintain or service the infringing configurations, have you?  A: You mean in addition to the costs that they were incurring before the injunction?  Q: Correct.  A: No, I'm not aware of any evidence like that.").

192.    Dr. Putnam errs in assuming that the injunction period is viewed over an infinite time horizon, even though in reality, it is not infinite.  Tr. at 1159:9-1160:4 (Putnam Cross) ("Q:

In your opinion about the reason net profits should be disgorged instead of incremental profits is that the decision horizon over which a firm is responding to a permanent injunction is in effect infinity, correct?  A: Yes.  Q: You know that, in fact, there is actually a date certain on which the Court issued an injunction and that that date is May 23, 2011, correct?  A: Yes. Q: And you also assume that contempt will be found on some fixed date in the future, correct?  A: Yes. Q: And you also understand, don't you, sir, that the patent at issue in this case will expire in 2017, correct?  A: Yes. Q: So the injunction period is not infinite, is it?  A: Not literally infinite, no. For economic purposes, it's as close to infinity as one cares to get.").

### ii.     Lawson's Approach To Compute Incremental Profits Is Erroneous

193.     Lawson's expert, Dr. Putnam, relied on a regression model constructed by him to determine incremental profits associated with Configurations 3 and 5.  Tr. at 1118:24-1119:15 (Putnam Cross) ("Q: Lawson does not compute an incremental profit margin, does it?  A: No, it's an economic concept. Q: Indeed, that's not how Lawson thinks about its business, right?  A: In general, accountants don't compute incremental margins at all, that's right.  Q: So the incremental profit margin that you say is the one we should use for determining incremental profits associated with Configurations 3 and 5 is one that's your own construct, your own calculation; isn't that correct?  A: It's what economists do typically and I did the typical thing, that's right. Q: Specifically, the way you did it was by computing incremental profits using regression analysis, right?  A: That's correct.").

194.     The regression model relied upon worldwide data even though the correct universe of data is that associated with Lawson's activities in the United States.  Tr. at 1119:16-1119:22 (Putnam Cross) ("Q: I think you testified that the data you used to perform this regression was company-wide data; is that correct?  A: That's right. Q: And just to clarify, that underlying data, that's not specific to Configurations 3 and 5, correct?  A: That's true."); 1123:6-

1123:10 (Putnam Cross) ("Q: You say you could not update your old regression because the old regression was worldwide data that was publicly reported and this data is limited to the U.S, correct?  A: That's right.").

195.    Even though financial data for Lawson's operations in the U.S. was available to Dr. Putnam, he chose to rely only on Lawson's world-wide data.  Tr. at 1124:24-1125:12 (Putnam Cross) ("Q:… The data you used for your only regression model, the 2000 to 2011 data, that was data was worldwide Lawson revenue and cost data; isn't that correct?  A: Yes.  Q: And that data was all from the time that Lawson was a public company, correct?  A: Yes. Q: Now, you understand that Lawson was taken private in a transaction involving Infor in approximately the second quarter of 2011, around April of 2011; do you understand that?  A: Yes.").

196.    Even though profit and loss data was available for the Americas for 2011 and 2012, Dr. Putnam chose to rely on old data from 2000 to Q1 2011.  Lawson chose not to update or calculate a new regression to take into account this 2012 data.   Tr. at 1121:21-1123:5 (Putnam Cross) ("Q: Your regression analysis was based on SCC filings and specifically 10-Q filings that Lawson made between 2000 through the third quarter of its fiscal year in 2011; is that correct?  A: That's correct. Q: Lawson's 10-Q for the third quarter of fiscal year 2011 went through the end of February 2011; is that right?  A: I think that's right. Q: The Court order that is alleged to be infringed, the injunction order, that's dated May 23, 2011, right?  A: That's right. Q: Could we put up slide 703, defendant's slide 703, please.  Mr. Dusseault asked you about this slide earlier today.  This has fiscal year 2011 and fiscal year 2012 profit and loss spreadsheets. Do you see that?  A: Yes. Q: And you understand that those were provided and produced by Lawson in these proceedings?  A: Yes. Q: Now, you issued a supplemental report in this matter on March 8, 2013; isn't that correct?  A: Yes. Q: Now, in that supplemental report, you didn't

update or calculate a new regression to take into account this 2012 data, did you?  A: Yes.  They were reported differently.  They weren't reported in a comparable format.  So I could not simply add them to the prior data.  THE COURT:  The answer is no, you didn't. THE WITNESS:  You're right, Your Honor.  I didn't do it because one could not do it.  That's right.");  Tr. at 1123:11-1124:1 (Putnam Cross) ("Q: But you also didn't create a new regression based on this 2012 and 2011 profit and loss data for the Americas, did you?  A: There are only eight observations that would be less reliable.  THE COURT:  The answer, though, is that you didn't. THE WITNESS:  I did not do that, that's true.  You're right. Q: You could have done that and then compared that new regression with new data against the old data that you used in your first regression and you didn't do that either, right?  A: I could have done that.  I didn't think it would be reliable given the few observations, but in any event, I did not could it, that's right.").

197.    Additionally, Dr. Putnam relied on old data from 2000 to the first quarter of 2011 (data available before the injunction period).  Tr. at 1124:17-1124:23 (Putnam Cross) ("Q: My question is:  You didn't consider it reliable to rely on new data from 2011 and 2012 and create a regression and test that data versus your old regression model?  THE COURT:  Yes or no?  A: I did not consider that procedure reliable, you're right.");  Tr. at 1126:18-1127:8 (Putnam Cross) ("Q: Now, isn't it in fact true that you did have data regarding how Lawson has been run since it was taken private from the 2011 and 2012 profit and loss statements that we just showed on the screen?  A: That is certainly true.  You have that financial data.  The question is how to marry it to the earlier data to see if there's been a change. Q: You didn't attempt to marry that data by creating a new regression analysis, did you?  A: Because the data themselves also are not comparable, that's right. Q: Now, changing control or management of a business can lead to

differences in the willingness of management to address and regulate expenses and costs; isn't that correct?  A: As a matter of principle, sure.").

198.    The errors in Dr. Putnam's regression model are further proved by the inaccurate predictions that his model yields.   For example, Dr. Putnam's regression model incorrectly predicted that when revenue decreased, general and administrative (G&A) costs would also decrease.  In fact, between Q4 2011 and Q1 2012, when revenue decreased by over $4 million, G&A costs more than doubled during that time period. Tr. at 1150:18-1152:25 (Putnam Cross) ("Q: You also say that under your regression model, when revenues decrease, costs decrease; isn't that correct?  A: That has to be true, yes, that's right.  Q: So your regression model would predict that when revenues go up, general and administrative costs should go up also, right?  A: That's right.  Q: And your regression model would predict that when revenues go down, general and administrative costs should go down, correct?  A: That's right.  Q: Okay.  All right.  Let's take a look and see what actually happened during the injunction period.  And I want to direct your attention back to DX 725, please.  DX 725, I think you testified, sir, is based on Lawson's profit and loss statements for 2011 and 2012, correct?  A: That's right.  Q: All right.  So let's start by looking at revenue. Can we look at quarter 4, 2011, total revenue.  So that's line E.  Line E is total revenue.  And then go over to the fourth column, quarter 4, 2011.  Do you see the total revenue reported there is 126.3 million?  A: Yes.  Q: Now, move over one quarter to quarter 1, 2012. The total revenue that Lawson reports here, and the profit and loss statement for quarter 1, 2012 is 121.5 million.  Do you see that?  A: Yes.  Q: So it's fair to say then from the fourth quarter of 2011 to the first quarter of 2012 revenues decreased by over $4 million, right?  A: Yes. Q: That means that your regression results would predict a corresponding decrease in general and administrative costs, correct?  A: Yes.  Q: Let's look and see what actually happened.  Can you

look at the fourth quarter of 2011 again?  This time I want you to move down to line T, general and administrative.  Tell me when you're there.  A: I have it.  Q: Quarter 4, 2011, general and administrative costs are 20.3 million.  Do you see that?  A: Yes.  Q: If we go over one quarter, first quarter of 2012 and look at general and administrative costs, do you see that it says about 48.6 million, right?  A: Yes.  Q: So isn't it true that in this time frame in which your model would predict G&A and costs decreasing, the G&A costs actually more than doubled; isn't that correct?  A: If you're going to pick a quarter in isolation, that's certainly is true, and it's certainly possible. Q: It's not just possible, it's true, right?  A: That's what actually happened, yes.");  see also PX-1244, PX1074.

199.    Dr. Putnam's model also incorrectly predicted that Lawson's variable sales and marketing expenses in FY 2012 would be $13 million higher than Lawson's total actual sales and marketing expenses in FY 2012.  Tr. at 1149:20-1150:10 (Putnam Cross) ("Q: Do you see that your regression result predicts that in fiscal year 2012 there will be $90.4 million of variable sales and marketing expenses?  A: Yes.  Q: So what you're saying here -- what your regression model predicts is that there are higher variable sales and marketing costs in 2012 than there were actual total sales and marketing expenses that year; isn't that correct?  A: That's what it says, that's right.  For a particular year, that's true.  Q: In fact, they were almost -- your prediction with respect to variable sales and marketing expenses was almost $13 million higher than the total sales and marketing expenses in 2012; isn't that correct?  A: Sure.");  see also PX-1244.

200.    Additionally, Dr. Putnam's regression model predicted that over 90% of Lawson's G&A costs are variable even though Mr. Samuelson, Lawson's former CFO, testified that most of Lawson's G&A costs are fixed.  Tr. at 1142:17-1143:14 (Putnam Cross) ("Q: If you look at the total G&A expenses for fiscal year 2011, do you see that they're reported by Lawson

at 68,113,139?  A: Yes. Q: So in fiscal year 2011, you classified about 64 million of Lawson's

total 68 million general and administrative costs as variable; is that roughly accurate?  A: That's

what the regression would predict for that particular data point, that's right.  Q: That's over 90

percent of Lawson's general and administrative costs you're classifying as variable based on

your regression results, correct?  A: That's right.  Q: You reviewed and actually you said you

relied on the deposition testimony of Kevin Samuelson in forming your opinion, correct?  A:

Yes, I did. Q: So you must be aware, sir, that Mr. Samuelson testified that most general and

administrative costs are probably fixed costs, aren't you?  A: When he used the word "fixed," he

had a particular meaning, but he did say that, that's right.").

### M. Treble Damages Is Appropriate For Lawson's Willful Infringement Of Claim 26

#### i. Lawson Knowingly Failed To Redesign To Avoid Infringement

201.   Lawson marketed its "modified" RQC product to customers as having "100% of

the functionality you require." Tr. at 376:21-376:24 (Christopherson Cross) ("Q: Hasn't Lawson

said that RQC contains 100 percent of the functionality that customers require? A: I believe

that's in one of the marketing documents I have seen before, yes."); PX1056 at RQC0905561;

RQC0905565 ("The change to RQC was "Designed to minimize impact on our customers"...

Lawson designed RQC "with 3 principles in mind," and the first of these was "100%

functionality you require must be included.").

202.   Lawson acknowledged that claim 26 of the '683 patent was "right on the mark,"

and that claim 26 was "going to be a tough one to navigate," yet it made no effort to implement a

design-around that would avoid infringement.  PX-1013 at RQC 0377104; Tr. at 257:2-258:7

(Christopherson Direct) ("Q: Q: Refer to your email dated February 12, 2011, at 3:22 AM at the

bottom of the first page.  In the second paragraph of your email, you indicate, "***Claim 26 is right***

87

***on the mark***. Inventory is the key. There are two other items that get pulled into this based upon the systems that infringe and ePlus arguments. ASN from EDI is said to provide the ability to know if something is in inventory. Then some Punchout sites also provide this. ***So this claim is going to be a tough one to navigate.***" …There were no changes made to the inventory capabilities of the configurations that were found to infringe Claim 26, were there? A: That's correct. Q: And Lawson did not make any changes to the EDI functionality, did it? A: That is correct. Q: Well, Lawson did not make any changes to any Punchout sites that provide inventory functionality, correct? A: That is correct.") (emphasis added).

203.    Lawson personnel were "scared" that RQC did not comply with this Court's injunction order and that Lawson continued to sell, maintain and support an infringing product. There were also misgivings at Lawson that the support staff in charge of the migration to RQC were not taking the court's injunction order "seriously." For example, in June 2011, a month after the injunction, two Lawson personnel who were involved in the "redesign" efforts exchanged the following email:

| | |
|---|---|
| Mr. Bragstad: | Does it scare you as much as me that at this point nobody at the courts or ePlus has said that RQC complies? |
| Ms. Homewood: | absolutely! |
| Mr. Bragstad: | It also seems that Nancy and Support in general are taking this a lot more serious that the rest of the company right now. This group almost seems like, this is so last year. Or maybe everyone has just checked out |
| Ms. Homewood: | A little of both I think  :) |

PX-1044 at RQC 0538393;  Tr. at 855:18-859:15 (Homewood Cross).

ii.     **Lawson Ignored Counsel's Advice That The Modification Was Not Enough**

204.    Notwithstanding that Lawson had already released RQC, Lawson lawyers were advising Lawson that changes to Punchout were still needed to avoid infringement.  PX-1015 at RQC 364471; Tr. at 246:5-247:2 (Christopherson Direct); PX-1256; Tr. at 258:15-261:1 (Christopherson Direct) ("Q: So notwithstanding that Lawson had already released RQC, your lawyers were advising you that additional changes to Punchout were needed, correct? A: That is correct.").

205.    Lawson rejected their attorney's proposed design-around to avoid infringement of claim 26.  Tr. at 261:23-262:3 (Christopherson Direct) ("Q: So Lawson rejected your attorneys' proposed design-around related to the Punchout program, correct? A: What I raised in this process is from an engineering standpoint why I felt that it was not something that would be viable.").

iii.    **Lawson Took No Steps To Ensure Customers Uninstalled RSS**

206.    No individual within Lawson had responsibility for tracking whether or not a customer had replaced RSS with RQC in the customer's production system.  Tr. at 576:25-577:4 (Hanson Direct) ("Q: In your deposition, you couldn't tell me a single individual within Lawson who had responsibility for tracking whether or not a customer had replaced RSS with RQC in their production system; correct? A: That is correct as of that date.").

207.    Lawson's decision to treat the download of RQC on its own as inoculation for those customers to receive support and maintenance even when it knew that a download alone did not render RQC operational is a calculated violation of the unambiguous terms of the injunction.  PX-1034 at RQC 0369859-60 (Dan Davidson wrote to Matthew Bragstad and Elizabeth Homewood, "As a point of clarification, simply downloading RQC will allow our

affected RSS customers to again receive support from Lawson, correct?"  Bragstad confirmed,

"Downloading it changes their configuration. We have no knowledge of if they are running it or

not so we will support them again." Dan Davidson then forwarded this with a note to a recipient

at Velocity Technology Solutions, saying, "Here is confirmation from Lawson Global Support

(LGS) regarding affected RSS customers downloading RQC as the basis for again receiving

support from Lawson.");  PX-1058 at RQC0114257 (Customer Jackson Laboratory asked, "I

need [to] clarify. Is support discontinued until the product is downloaded or installed?" Angie

Larson of Lawson replied, "At this time, I only need to confirm that it's been downloaded.");  Tr.

at 729:14-729:19 (Weaver Direct) ("Q: Will Lawson continue to provide assistance to a

customer with RSS as long as the customer had downloaded RQC?  A: Yes.  The deposition

testimony that I saw said that the only thing Lawson considered was whether or not a download

had been done."); Tr. at 851:8-853:3 (Homewood Cross) ("Q: All right.  We have a Lawson

customer who has Configuration 5.  They download RQC.  They don't install or implement

RQC, and they are continuing to run RSS.  Do you understand?  A: Yes.  Q: And the time period

is seven months out from the injunction.  Okay?  A: Okay.  Q: That customer calls up Lawson

support and says, I need maintenance and support for electronic data interchange.  And my

question is:  Lawson would provide support for that customer's electronic data interchange

module; isn't that correct? A: That is correct. Q: Now, you have that same customer, has RSS

running, had downloaded RQC but hadn't done anything.  It's just sitting there on their system,

not installed and not implemented, and the customer says to Lawson seven months after the

injunction, I need support on all my S3 procurement modules, purchase order, requisitions,

inventory control.  I'm having problems with generating purchase orders and I'm having

problems creating requisitions.  Lawson's support personnel will provide maintenance and

support to customer seven months after the injunction; isn't that correct?  A: They would provide support initially.  If at any point during that interaction it became apparent they were running RSS, we would stop support at that point.   Q: But if the Lawson support personnel were unaware that the customer had actually not uninstalled RSS, they would provide the support we just discussed, correct?  A: Correct.  Q: And the same question with respect to Configuration 3.  The customer has Configuration 3, downloads RQC, never teaches RQC.  It's just sitting there as a file on their system.  They continue running Configuration 3 with RSS.  They call up Lawson seven months after the injunction and say, Mr. Support Manager at Lawson, I need some help.  My Punchout's not working.  Lawson support will help support and maintain the Punchout module for that customer of Configuration 3 seven months after the injunction who's running RSS, correct?  A: Until we discovered if they were running RSS, yes.").

### iv. Lawson Encouraged And Instructed Customers To Continue Using RSS

208.   Lawson is aware that customers can still access RSS even if they have installed RQC.  Tr. at 577:10-577:14 (Hanson Direct) ("Q: If clients had systems that included RSS in their production environment and they have not implemented RQC in the production environment, they could still be using RSS for procurement activities; correct? A: That's correct.").

209.   Substantial evidence indicates that Lawson's response to Interrogatory No. 3 was misleading when it stated "When RQC is installed, customers automatically lose access to RSS." Tr. at 581:15-582:3 (Hanson Direct) ("Q: Why don't you turn, if you would, to interrogatory number three in Lawson's answer.  It's on the sixth page of the document.  I'd like to direct you to the last  sentence of Lawson's response to interrogatory number three.  What does that sentence say? A: When RQC is installed, customers automatically lose access to RSS.  Q: That

statement is false, isn't it?  A: No, it is not.  Q: We just saw in the prior exhibit that customers did not lose access to RSS; correct?  A: With additional setup, you could enable access.  Q: Thank you.  A: Or re-enable access."); PX-1269 at Interrogatory 3 (Lawson falsely claimed in its interrogatory responses that "When RQC is installed, customers automatically lose access to RSS.").

210.    As of June 9, 2011, a few weeks after the injunction, Lawson was still providing instruction to a non-healthcare entity on how to reinstate RSS.  PX-1058 at RQC0113793; Tr. at 582:13-584:16 (Hanson Direct) ("Q: Columbia Association is not one of the 277 health care customers that were subject to the sunset provision in the injunction, is it? A: I do not believe so. Q: Thank you.  Do you see following that reference, there's a case number, 120652?  Do you see that? A: Yes, I do. Q: That indicates a customer support case opened by Columbia Association; correct? A: Yes, I do. Q: Do you see the entry dated May 23rd, 2011, at 7:57:14 p.m. from Mindy Klebe to Gladys Taylor-Brown? A: Yes. Q: Mindy Klebe is employed by Lawson; correct? A: Correct. Q: Mindy Klebe was asking Gladys Taylor-Brown, quote, could you please send back a copy of your rss_config.xml file from LAWDIR/system for review; do you see that? A: Yes, I do. Q: Turn to the next page.  Do you see the second entry on that page dated May 24th, 2011, at 3:01:50 p.m. from Mindy Klebe to Imane -- I don't know how to pronounce the last name. A: Yes, I see. Q: Do you see that entry? A: Yes, I do. Q: And, again, Mindy Klebe of Lawson was asking the client, quote, could you please send back a copy of your rss_config.xml file from LAWDIR/system for review; do you see that? A: Yes, I do. Q: You don't know of any reason for Lawson to review a customer's rss_config.xml file in order to provide support services for Requisition Center, do you? A: I am not in the support organization, so I do not know what she was doing or what she was referring to. Q: The rss.config.xml file has no relevance to

Requisition Center, does it? A: No, it does not. Q: Thank you.  Look down on that same page to the entry dated May 25th, 2011, at 8:05:15 p.m. from Mindy Klebe to that same client.  Do you see that entry? A: Yes, I do. Q: And in this entry, Mindy Klebe of Lawson states, quote, Imane and Gladys, I am testing this issue in 901+ apps and 901+ environment with RSS XML release 9.0.1.4.01 installed, and I'm not able to duplicate the issue; do you see that entry? A: Yes, I do. Q: So this entry indicates that on May 25th, 2011, Mindy Klebe was testing the issue with RSS XML installed; is that correct? A: I'm not in the support organization, but, yeah, according to that sentence, I would agree with that, yes.").

### v. Lawson Intentionally Misled The Court During The Injunction Proceedings

211.    At the March 25, 2011 injunction evidentiary hearing, Lawson Executive Vice President Dean Hager testified that an injunction that prohibited Lawson from servicing and maintaining RSS and Punchout would be extraordinarily difficult to implement, particularly for 277 healthcare customers of software configurations with those modules.  Hager I Ex. 3 (3/25/11 Injunctive Relief Hearing Tr.); 50:22-51:1; 5-11; 52:15-16; 52:18-53:18; 54:19-55:15; 17; 55:22-56:8; 11-14; 60:2-22; 61:3.

212.    Mr. Hager also represented to the Court that it would take 9 months, thousands of hours, and hundreds of thousands of dollars to re-design the infringing products.  Hager I Dep. at 61:16-64:12; 91:3-12; 92:10-15; 92:18-93:1; 3-4; 6-9; 93:16-94:3; PX-1090; Dep. at 110:22-111:1; 4-7; 11-18; 112:1-5; 12-14; 113:14-114:19; 115:4-9; 115:21-116:17; 116:21-117:5; 15-17; 117:19-118:22; 119:3-8; 119:12-120:5; 7-9; 11-14; 120:16-121:3; 5; PX-1097; Dep. at 188:3-4; 7-9; 188:17-190:11; 14-15; 191:21-192:11; 193:7-20; 194:1-11; 14-18; 194:22-195:2; D.I. 637.

213.     At the time of the injunction hearing, planning for RQC was well underway. Thus, even though the specific modification at issue in the injunction proceeding had not yet been developed, Lawson had decided that it would create a design-around instead of ripping out RSS in its entirety from its customers' systems.  PX-1269 at Response to Interrogatory No. 4 ("From February 8 to March 30 [2011], Lawson developers met on nearly a daily basis to configure and design the new system. Lawson held a Launch startup on March 30, 2011"); Tr. at 245:17-245:20 (Christopherson Direct).

214.     Even as Mr. Hager testified about the severe harm that would befall Lawson and its customers (including, in particular, its hospital and healthcare organization customers) if an injunction entered, he knew full well that Lawson was working on a design-around for the RSS product that it intended to release within a couple of months.  Hager I 69:6-7; 11.

215.     Four days after the injunction evidentiary hearing, on March 29, 2011, Mr. Hager confirmed in an internal communication with others at Lawson that he was fully aware that Lawson was attempting to write software code to re-design RSS and create a new product that would offer fundamentally the same functionality as RSS.  Hager I  Dep. at 130:20-131:5, 9-11; *see also* Dep. at 132:3-8, 13-17; PX-1091.

216.     Also on March 29, 2011, Mr. Hager was informed by Ms. Langer that RQC could be product-ready by May.  PX-1109.

217.     Lawson was concerned that if an injunction was entered during the fourth quarter of its fiscal year (March-May 2011) that prohibited Lawson from selling configurations of software with RSS, Lawson would be unable to book revenue for that quarter unless it had replacement software available and ready to be deployed to its customers.  Hager II Dep. at 15:1-14; 52-6.

218.    On March 30, 2011, five days after the hearing, Mr. Hager received an email from Jim Millard, who was concerned that a deal with a customer who was seeking RSS seemed questionable for the fourth quarter of Lawson's fiscal year because, he thought, Lawson still would "need a solution for RSS."  Mr. Hager advised Mr. Millard that same day – March 30, 2011 – that "[w]e have a solution for RSS now … so proceed and try to win the deal."  PX-1091; Hager II Dep. at 68:7-69-6.

219.    Little more than a week after the injunction evidentiary hearing, on April 6, 2011, Mr. Hager was advised by Mr. McPheeters (Lawson's General Counsel) that a press release regarding the RQC design around should be withheld until after Lawson was successful in getting a stay if the Court were to enter an injunction.  PX-1263.

220.    This strategy of "withholding information" to improve Lawson's chances for a stay of any injunction was communicated to other employees as well.  On April 13, 2011, Mr. Catalino, Senior Vice President, Lawson Global Operations, was asked by Lawson legal counsel to retract a statement in an internal healthcare newsletter that stated "I would like to make everyone aware of the e-Plus lawsuit related to our Punchout and Requisition Self Service is still active.  The good news, regardless of outcome, Lawson is now prepared with substitute solutions/products should something occur."  The reason given by counsel was that "[t]hese statements may be used by ePlus or the Judge to negate any efforts to obtain a stay from either the district court or court of appeals."  PX-1252;  Hager II Dep. at 121:9-13; 121:19-122:11; 123:1-11, 13-18; 124:5-9, 12-21.

221.    Mr. Hager's representations to the Court were based upon information provided to Mr. Hager in an email from Mr. Lohkamp, the S3 Supply Chain Management Suite Product Director at Lawson.  Mr. Lohkamp's email was sent in response to a request from Mr. Hager in

which Mr. Hager asked Mr. Lohkamp to determine the cost to "[Lawson's] most complex RSS

user to rip out RSS and replace with ePlus."  Notably, Mr. Hager did not ask Mr. Lohkamp about

the costs associated with the modifications being made to RSS, nor did he provide the Court with

information about any such costs.  PX-1090; Tr. at 433:23-436:7 (Lohkamp Cross) ("Q: Do you

see that [on page 26601] Mr. Hager asked you on March 25th, 2011 [to "]pick your most

complex RSS user, if they were told to rip out RSS and replace with ePlus, how long and how

much.  I know it's a guess.["]  Do you see that question that Mr. Hager asked you?  A:  Yes.  Q:

What was the answer that you provided to Mr. Hager on March 25th at 11:03 a.m. that's shown

on page RQC 26600? … A:  …  I said, here are my thoughts:  Our most complex users have 5-

to 8,000 users spread across the country and regularly use the system.  Planning for transition

would evaluating all the processes for creating requisitions including approvals.  Interfaces

would need to be created between ePlus and Lawson procurement assuming Lawson still creates

the PO.  Retraining would be required, strategies for addressing commitments, budget checking

would need to be in place if even possible, templates would need to be reimplemented, and user

setup and security.  So I would guess at least nine months given all the planning, process

reengineering, testing, training rollout, interface development, et cetera.  This could run into the

hundreds of thousands of dollars given all the time and work required.").

    222.    Mr. Hager later testified during his deposition that the only document he is aware

of that supports his testimony about the time and cost to change away from RSS is the single

email exchange that he had with Mr. Lohkamp on the morning of the injunction hearing.  Hager I

Dep. at 117:2-5; 118: 3-11.

    223.    Mr. Hager asked Mr. Lohkamp only about the costs and time if a user was told "to

rip out RSS and replace with ePlus," even though Lawson never even considered a contingency

plan that would have required its customers to "rip out RSS" and replace it with ePlus's software.  Tr. 433:4-6 (Lohkamp Cross).

224.    Mr. Lohkamp testified that he was not aware of the reasons behind Mr. Hager's questions.  Tr. at 435:12-436:14 (Lohkamp Cross) (Q: Did you have any understanding at the time as to the reason for Mr. Hager's question to you?   A: No, I did not.  Q: You were aware, though, that he was testifying in Virginia on that day, weren't you?  A: I was aware he was in Virginia for the trial. I didn't know if he was testifying that day or not.").

225.    Internal Lawson emails show that on the morning of the hearing, Mr. Hager asked Keith Lohkamp, "How many healthcare customers run RSS and estimate how many hospitals that represents."  Mr. Lohkamp responded, "Over 270 Healthcare customers.  We've been estimating 9 hospitals per HC customer meaning around 2500 hospitals."  PX-1090.

226.    In an email soon after the injunction hearing, Jennifer Langer writes:

> [T]o quote Dean [Hager]...the 'knuckle-head,' judge created this 277 number from some fantasy...Dean's testimony was **based on a guess** that Keith Lohkamp did with about 45 seconds to reply...Keith used a 'white space' report that we have that shows customers by BU for key SKU's. The number of around 250-300 went to Dean...Dean says he didn't use a precise number on the stand.  So we have no idea where the 277 came from...In speaking with Dean earlier, he indicated that the intent was to protect organizations solely providing patient care...He used this "life and death" urgency to show how we needed more time to ensure disruptions didn't occur.

*Id.*; *see also* Hager II Dep. at 66:14-67:1, 3.

227.    When asked why he used precisely 277 healthcare customers and 2500 hospitals in his testimony at the hearing, Mr. Hager testified that he used Mr. Lohkamp's numbers to merely cross check other information that he had.  But Mr. Hager's explanation is contradicted by internal Lawson emails.  *See* PX-1229.  Lawson did not have a list of 277 healthcare customers when Hager testified to that number.  DX-563 (shows that there was not an existing

list of 277 healthcare customers. "[May 27, 2011]: "BEFORE 277 list was identified."  [May 31,

2011]: "Initial list of 277 HC customers received."  [June 3, 2011]: "Received "final, final" list

of approved 277 HC customers who will receive support through November 21, 2011"");  PX-

1101 (Page 3 of 10 of attachment) (As of June 1, 2011, Lawson planned to "Re-instate RSS

patches and release for 277 healthcare clients . . . ASAP," but noted that they still "Need

definition of patient providers." "Identification of Healthcare 277 customers" was still on the to-

do list without an estimate to complete or a "most current status.").

228.    Mr. Hager expressed in an email to Mr. Debes, Lawson's CEO, and Mr.

McPheeters, Lawson's General Counsel, shortly after concluding his testimony at the injunction

hearing that "the judge doesn't understand half of what he hears."  Hager II Dep. at 58:24-59:15,

20-22; 61:19-21-61:24-62:3; 63:12-64:16, 20.

### N.    Coercive Remedy To Prevent Ongoing Contempt

229.    A daily fine may be used as a coercive remedy on a going forward basis, until

such time as the Court deems Lawson is in compliance with the injunction.  Tr. at  914:18-915:3

(Ugone Direct) ("Q: Have you provided any damages options for the Court to consider if

Lawson does not comply with the Court's order should the Court find Lawson in contempt? A:

Right.  So like I said, there's a daily rate.  Now, what the daily rate can do is from the history, the

number of days from November 30th, 2012, through today, you can use that daily rate, but on a

going-forward basis, in a sense that could be a rate that the Court could apply, in a sense, as a

penalty for each day that Lawson does not comply with the injunction order.  So you could use

the same numbers but for different purposes.").

230.    The daily revenue Lawson has earned from the infringing configurations is

approximately $62,000 per day.  Tr. at  915:4-915:18 (Ugone Direct) ("Q: Have you prepared a

demonstrative to summarize these daily measures? A: Yes. Q: Is this the demonstrative you've

prepared? A: Yes, it is. Q: And what does it show? A: So daily rates, and I've got my three measures again, daily revenues, daily gross profits, daily incremental profits.  That's what's shown on the right, so each day in the past up through today, or you could use that as a course of payment in the future if Lawson does not comply, the daily revenues associated with the infringing configurations, on average, are $62,362; daily gross profits, $38,928; and the daily incremental profits, $31,742.").

231.    The daily gross profit Lawson has earned from the infringing configurations is approximately $39,000 per day.  Tr. at  915:4-915:18 (Ugone Direct) ("Q: Have you prepared a demonstrative to summarize these daily measures? A: Yes. Q: Is this the demonstrative you've prepared? A: Yes, it is. Q: And what does it show? A: So daily rates, and I've got my three measures again, daily revenues, daily gross profits, daily incremental profits.  That's what's shown on the right, so each day in the past up through today, or you could use that as a course of payment in the future if Lawson does not comply, the daily revenues associated with the infringing configurations, on average, are $62,362; daily gross profits, $38,928; and the daily incremental profits, $31,742.").

232.    The daily incremental profit Lawson has earned from the infringing configurations is approximately $32,000 per day.  Tr. at  915:4-915:18 (Ugone Direct) ("Q: Have you prepared a demonstrative to summarize these daily measures? A: Yes. Q: Is this the demonstrative you've prepared? A: Yes, it is. Q: And what does it show? A: So daily rates, and I've got my three measures again, daily revenues, daily gross profits, daily incremental profits.  That's what's shown on the right, so each day in the past up through today, or you could use that as a course of payment in the future if Lawson does not comply, the daily revenues associated

with the infringing configurations, on average, are $62,362; daily gross profits, $38,928; and the daily incremental profits, $31,742."). A summary of the daily rates is shown below:

| Daily Revenues | $62,362 |
|---|---|
| Daily Gross Profits | $38,928 |
| Daily Incremental Profits | $31, 742 |

## III.    PROPOSED CONCLUSIONS OF LAW

233.    Configuration Nos. 3 and 5 with RQC is not more than colorably different than Configuration Nos. 3 and 5 with RSS, which both Lawson and its customers used to perform the method steps of claim 26 as found at trial and affirmed on appeal.

234.    Configuration Nos. 3 and 5 with RQC does not present a significant difference from Configuration Nos. 3 and 5 with RSS, which both Lawson and its customers used to perform the method steps of claim 26 as found at trial and affirmed on appeal.

235.    Lawson's RQC redesign does not alter the functionality of Configuration Nos. 3 or 5, or the manner in which those configurations are used to perform the method steps of claim 26, in any manner that avoids the recited elements of Claim 26.

236.    Accordingly, the Court concludes that it is appropriate to resolve this action through a contempt proceeding.

237.    This Court has already found that there was sufficient evidence to support the jury verdict that both Lawson and its customers directly infringe claim 26 by performing the recited steps through the use of Configurations 3 and 5, with RSS, as was shown at trial. This Court also found that there was sufficient evidence for the jury to find that Lawson induced and contributed to the customers' direct infringement. Those findings were affirmed on appeal to the Federal Circuit.

238.    Lawson's customers have continued to directly infringe claim 26 through the continued use of Configurations 3 and 5 with both RQC and RSS.

239.    Lawson has continued to induce and/or contribute to the customers' direct infringement of claim 26 through their continued use of Configurations 3 and 5 with both RQC and RSS, in violation of this Court's Injunction Order.  Accordingly, the Court finds that Lawson is in contempt of the Injunction Order.

240.    Lawson has violated this Court's Injunction Order, and continued to directly infringe claim 26, by performing the recited steps through the use of Configurations 3 and 5 with RQC.

241.    Lawson's customers directly infringe claim 26 by performing the recited steps through the use of Configurations 3 and 5 with RQC.

242.    Lawson has violated this Court's Injunction Order, and continued to indirectly infringe claim 26, by inducing its customers to directly infringe through the use of Configurations 3 and 5 with RQC.

243.    Accordingly, because the process by which Lawson and its customers use Configuration Nos. 3 and 5 with RQC is not more than colorably different from the manner in which they have used (and continue to use) Configuration Nos. 3 and 5 with RSS, and also because Configuration Nos. 3 and 5 with RQC are not more than colorably different from Configuration Nos. 3 and 5 with RSS, and further because Lawson continues to directly and indirectly infringe claim 26 through Configuration Nos. 3 and 5 with RQC, the Court finds that Lawson is in contempt of this Court's Injunction Order.

244.    The Court finds that Lawson's violation of the Injunction Order and its continued infringement through the inducement of customers to continue to use Configuration Nos. 3 and 5 with RSS is willful.

245.    The Court finds that Lawson's violation of the Injunction Order and its continued direct and indirect infringement through its various acts including the use, sale, advertisement, instruction, training, installation, implementation, maintenance, and servicing of Configuration Nos. 3 and 5 with RQC is willful.

246.    The Court finds that an enhancement in the form of treble damages is appropriate pursuant to 35 U.S.C. § 284.

247.    The Court further finds that ePlus is the prevailing party and that this case is exceptional, warranting an award to ePlus of its attorney fees and costs incurred in connection with this contempt proceeding, pursuant to 35 U.S.C. § 285.

248.    The Court finds that the appropriate measure of compensatory damages to ePlus is the disgorgement of Lawson's gross profits which Lawson enjoyed through its contempt of the Injunction Order and continued infringement.  The Court determines that the amount to be disgorged is $18,091,683 through November 30, 2012 plus $38,928 for each day from December 1, 2012 up to and including through the date on which the Court finds Lawson in contempt.

249.    The Court further finds that it will order that Lawson must immediately cease any and all uses of Configuration Nos. 3 and 5, until such time as the Court permits, as well as any further advertising, sales, installation, implementation, training, maintenance, and servicing of those configurations.

250.    The Court finds that Lawson should be ordered to pay a daily fine in the amount of $62,362 until such time as it provides sworn verification to the Court that it has fully complied with the Court's injunction order.  Such fine shall be payable to the Court.

251.    Lawson may not resume the activities listed in the Court's injunction order or the activities set forth in the Injunction Order with respect to Configuration Nos. 3 or 5 unless Lawson first provides the Court and ePlus with evidence and testimony, under oath, demonstrating that any new design of any software does not infringe and does not violate the Injunction Order or any further Order entered in this contempt proceeding, and the Court thereafter approves the resumption of such activities.  ePlus will first be given the opportunity to inspect any alleged redesign, and to present argument to the Court, if appropriate, with respect to whether such redesign violates this Court's Orders and is not more than colorably different from the use of Configurations 3 and 5 with RSS or RQC.

## IV.    CONCLUSION

Accordingly, based on the full evidentiary record at the hearing, *e*Plus respectfully moves that the Court adopt these proposed findings of fact and conclusions of law.

Respectfully submitted,

April 12, 2013                                          _____/s/_____
                                                       David M. Young (VSB #35997)
                                                       Jennifer A. Albert *(admitted pro hac vice)*
                                                       **GOODWIN PROCTER LLP**
                                                       901 New York Avenue, N.W.
                                                       Washington, DC 20001
                                                       Telephone:  (202) 346-4000
                                                       Facsimile: (202) 346-4444
                                                       dyoung@goodwinprocter.com
                                                       srobertson@goodwinprocter.com
                                                       jalbert@goodwinprocter.com

                                                       Craig T. Merritt (VSB #20281)
                                                       Henry I. Willett, III (VSB #44655)
                                                       **CHRISTIAN & BARTON, LLP**
                                                       909 East Main Street, Suite 1200
                                                       Richmond, Virginia 23219-3095
                                                       Telephone: (804) 697-4100
                                                       Facsimile: (804) 697-4112
                                                       cmerritt@cblaw.com
                                                       hwillett@cblaw.com

                                                       Michael G. Strapp (admitted *pro hac vice*)
                                                       **GOODWIN PROCTER LLP**
                                                       Exchange Place
                                                       53 State Street
                                                       Boston, MA 02109-2881
                                                       Telephone:  (617) 570-1000
                                                       Facsimile: (617) 523-1231
                                                       mstrapp@goodwinprocter.com

                                                       *Attorneys for Plaintiff ePlus Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of April, 2013, I will electronically file the foregoing

**PLAINTIFF *e*PLUS INC.'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) via email to the following:

| | |
|---|---|
| Daniel J. Thomasch, *pro hac vice*<br>Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, NY 10166-0193<br>(212) 351-3800<br><br>Jason C. Lo, *pro hac vice*<br>Gibson, Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071-3197<br>(213) 229-7153<br>VAED-620ExternalServiceList@gibsondunn.com | Robert A. Angle, VSB#37691<br>Dabney J. Carr, IV, VSB #28679<br>TROUTMAN SANDERS LLP<br>P.O. Box 1122<br>Richmond, Virginia 23218-1122<br>(804) 697-1238<br>(804) 698-5119 (Fax)<br>robert.angle@troutmansanders.com<br>dabney.carr@troutmansanders.com<br><br>***Counsel for Defendant Lawson Software, Inc.*** |
| Donald R. Dunner, *pro hac vice*<br>Erika H. Arner, *pro hac vice*<br>Finnegan, Henderson, Farabow, Garrett &<br>Dunner, LLP<br>901 New York Avenue, NW<br>Washington, DC 20001<br>(202) 408-4000<br>(202) 408-4400<br>EXT-Lawson-FinneganCorrespondence@finnegan.com | |

_____
/s/
_____
David M. Young (VSB #35997)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444
dyoung@goodwinprocter.com