# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| ePLUS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:09CV620 (REP) |
| | ) | |
| LAWSON SOFTWARE, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT LAWSON SOFTWARE, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR CONTEMPT

Josh A. Krevitt (admitted *pro hac vice*)
Daniel J. Thomasch (admitted *pro hac vice*)
Richard W. Mark (admitted *pro hac vice*)
Christopher D. Dusseault (admitted *pro hac vice*)
Jason C. Lo (admitted *pro hac vice*)
jkrevitt@gibsondunn.com
dthomasch@gibsondunn.com
rmark@gibsondunn.com
cdusseault@gibsondunn.com
jlo@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

*Attorneys for Defendant Lawson Software, Inc.*

# TABLE OF CONTENTS

<u>Page</u>

INTRODUCTION ................................................................................................ 1

PROPOSED FINDINGS OF FACT ................................................................... 1

I.     PROCEDURAL HISTORY ......................................................................... 1

     A.    Jury Findings ..................................................................................... 1

     B.    The May 23, 2011 Injunction ........................................................... 2

     C.    ePlus's Motion To Hold Lawson In Contempt Of Court ................... 3

     D.    The Federal Circuit Opinion ............................................................. 4

     E.    Lawson's Motion to Dissolve or Modify the Injunction .................. 5

     F.    April 2013 Contempt Hearing .......................................................... 7

II.    THE MODIFICATIONS MADE TO THE ADJUDGED INFRINGING PRODUCTS
RENDER THE MODIFIED FEATURES MORE THAN COLORABLY DIFERENT
FROM THE FEATURES THAT ePLUS CONTENDED AND PROVED TO BE
INFRINGING AT TRIAL ........................................................................... 8

     A.    Features Contended and Proved To Be Infringed ............................ 8

     B.    Lawson's Post-Verdict Design-Around Efforts ............................... 9

          1.    January 28, 2011 to March 25, 2011 ..................................... 9

          2.    March 25, 2011 to June 9, 2011 ......................................... 19

               a.    Change 1: the Item Master / Punchout Limitation ....... 19

               b.    Change 2: the Multiple Punchout Sites Limitation ...... 21

     C.    The Changes Made to Punchout Functionality ............................... 22

     D.    Evidence of the Significance of the Changes .................................. 24

     E.    Lawson's Post-RQC Release Internal Documents Do Not Establish That The
Changes Were Not More Than Colorable, As ePlus Alleges .............. 33

     F.    Lawson's Post-RQC Release Statements To Customers Do Not Establish That
The Changes Were Not More Than Colorable, As ePlus Alleges ........ 34

i

III.    ePLUS HAS FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT LAWSON VIOLATED THE TERMS OF THE INJUNCTION IN REGARD TO ITS DEALINGS WITH CONFIGURATION NO. 3 AND 5 CUSTOMERS .................. 36

        A.    General Matters ....................................................................................... 36

        B.    Maintenance, Service, Support ............................................................... 40

              1.    Maintenance ................................................................................. 40

              2.    Service .......................................................................................... 42

              3.    Support ......................................................................................... 48

        C.    ePlus's Customer-Specific Evidence Does Not Show Contempt By Lawson Or Inducement Of Customer's To Continue Using Configuration Nos. 3 And 5 With RSS ......................................................................................................... 55

        D.    Designing RQC To Run In Parallel With RSS Is Not Evidence of Contempt Or Bad Faith ................................................................................................. 55

        E.    Lawson's Customers Did Not Continue To Use RSS, But Rather Installed And Implemented RQC ................................................................................... 59

IV.     EVIDENCE RELATING TO NONINFRINGEMENT ..................................... 62

        A.    RQC Configuration Nos. 3 and 5 Were Not Proven To Be Capable of Infringing Claim 26 of the '683 Patent ................................................................... 62

              1.    ePlus Advanced Two Infringement Theories At The Contempt Hearing. 62

              2.    The Item Master-EDI Path Of Infringement Was Not Proved At The Infringement Trial .................................................................... 65

              3.    Dr. Weaver's Item Master-EDI Path Demonstration Failed To Show That Users Can Select A Product Catalog To Search In Item Master ............. 65

              4.    ePlus Never Alleged That The Single Punchout Path Could Infringe Claim 26 During The Infringement Trial ............................................ 69

              5.    Punchout Catalogs Are Maintained By The Punchout Vendor, Not Lawson or Lawson Customers ............................................................... 70

              6.    The Punchout Partner Program Was Eliminated ....................................... 71

              7.    ePlus Did Not Prove That Claim 26 Could Be Infringed By Procuring Items From Multi-Vendor Punchout Sites ................................................ 72

B.     ePlus Failed To Prove That Lawson Has Directly Or Indirectly Infringed Claim 26............................................................................................................... 73

     1.     ePlus Failed To Prove That Lawson Has Directly Infringed Claim 26 .... 75

     2.     ePlus Failed To Prove That Any of Lawson's Customers Have Directly Infringed Claim 26 ................................................................................ 76

     3.     ePlus Failed To Prove That Lawson Induced Its Customers To Infringe Claim 26 Through It's Support And Marketing Materials ...................... 77

     4.     ePlus Failed To Prove That Lawson Had The Intent Necessary For Induced Or Contributory Infringement ...................................................... 77

C.     The Accused RQC Configurations Are Capable Of Many Substantial Noninfringing Uses ................................................................................................. 78

V.     DAMAGES ........................................................................................................................... 79

A.     DISGORGEMENT IS NOT AN APPROPRIATE REMEDY HERE ................ 79

     1.     Disgorgement Without Proof of Actual Loss Is Not a Compensatory Remedy .................................................................................................... 79

     2.     ePlus Gambled by Limiting The Remedial Options Before the Court ..... 80

B.     EPLUS'S DISGORGEMENT MEASURE IS INFLATED AND INACCURATE ...................................................................................................................... 83

     1.     ePlus Overstates Lawson's Revenue from Configuration Nos. 3 and 5 ... 83

     2.     ePlus Advocates a Gross Profit Measure That Its Own Damages Expert Admitted Is Not The "Correct" Measure of Lawson's Gain ................... 87

     3.     ePlus's Incremental Profits Measure Is Inflated Because It Fails To Deduct Lawson's Variable Operating Costs ........................................................ 90

     4.     The Best Measure of Lawson's Gain Is Its Net Profit ........................... 103

     5.     Disgorgement of All Profits Related to Configuration Nos. 3 and 5 Overstates Lawson's True Gain ............................................................ 108

         a.     ePlus Improperly Seeks to Disgorge Profits Related to Lawful, Non-Infringing Uses of Configuration Nos. 3 and 5 .................. 108

         b.     ePlus Improperly Seeks to Disgorge Profits that Lawson Could Have Earned in Compliance with the Injunction ........................ 114

C.     A MULTIPLIER IS WHOLLY UNWARRANTED HERE .............................. 116

1.     Lawson Attempted in Good Faith to Redesign Its Products .................. 116

2.     Lawson Did Not Mislead The Court During Injunction Proceedings .... 119

D.    ePLUS IS NOT ENTITLED TO RECOVER ITS ATTORNEYS' FEES ......... 125

E.    ePLUS'S SUGGESTED PROSPECTIVE REMEDIES ARE UNPRECEDENTED, UNWARRANTED AND PREMATURELY SOUGHT 126

F.    ePLUS HAS NOT OFFERED ANY EVIDENCE OF INJURY OR DAMAGE FOR ALLEGED USE OF RSS AFTER THE MAY 23, 2011 INJUNCTION .. 127

VI.   CONCLUSIONS OF LAW ........................................................................ 128

A.    Civil Contempt .................................................................................... 128

B.    *TiVo* Step 1: More Than Colorable Differences ................................. 135

1.     First Prong Of *TiVo* Inquiry: Colorability .............................. 136

2.     The Second Prong Of *TiVo* Inquiry: Infringement Analysis [Contingent Findings] ............................................................ 140

3.     Use Of Expert Testimony .................................................... 141

4.     Infringement Of Method Claims Generally .......................... 142

5.     Direct Infringement of Method Claims ................................ 143

6.     Induced Infringement of Method Claims ............................. 144

7.     Contributory Infringement of Method Claims ...................... 149

C.    Remedies [Contingent Findings] ........................................................ 150

1.     DISGORGEMENT IS NOT AN APPROPRIATE REMEDY HERE ... 150

a.     Disgorgement Without Proof of Actual Loss Is Not a Compensatory Remedy ............................................ 150

b.     Disgorgement Is Not an Appropriate Remedy in this Case ........ 155

c.     ePlus Gambled by Limiting The Remedial Options Before the Court ...................................................... 160

2.     ePLUS'S DISGORGEMENT MEASURE IS INFLATED AND INACCURATE ......................................................................... 160

          a.      ePlus Advocates a Gross Profit Measure That Its Own Damages Expert Admitted Is Not The "Correct" Measure of Lawson's Gain .................................................................................. 160

          b.      ePlus's Incremental Profits Measure Is Inflated Because It Fails To Deduct Lawson's Variable Operating Costs.............................. 161

          c.      The Best Measure of Lawson's Gain Is Its Net Profits ............. 162

          d.      Any Disgorgement Measure Must Apportion For Lawful, Non-Infringing Uses the Challenged Configurations ........................ 165

      3.     A MULTIPLIER IS WHOLLY UNWARRANTED HERE ................. 167

      4.     ePLUS IS NOT ENTITLED TO RECOVER ITS ATTORNEYS' FEES ............................................................................................ 169

      5.     ePLUS'S SUGGESTED PROSPECTIVE REMEDIES ARE UNPRECEDENTED AND PREMATURELY SOUGHT.................... 170

VII.    CONCLUSION........................................................................................... 172

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Abbott Labs. v. TorPharm, Inc.*,
  503 F.3d 1372 (Fed. Cir. 2007) ........................................................... 138

*Accent Packaging, Inc. v. Leggett & Platt, Inc.*,
  707 F.3d 1318 (Fed. Cir. 2013) ........................................................... 144

*ACCO Brands, Inc. v. ABA Locks Mfr. Co.*,
  501 F.3d 1307 (2007)................................................... 145, 146, 149

*Aevoe Corp. v. AE Tech Co., Ltd.*,
  2012 WL 4960357 (D. Nev. Oct. 16, 2012) ............................... 154, 157

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
  692 F.3d 1301 (Fed. Cir. 2012) ................................ 142, 143, 144, 145

*Alopex Indus., Inc. v. Seibel*,
  61 F.3d 919, 1995 WL 424845 (Fed. Cir. July 18, 1995)..................... 157

*Altiris, Inc. v. Symantec Corp.*,
  318 F.3d 1363 (Fed. Cir. 2003) ........................................................... 143

*American St. Gobain Corp. v. Armstrong Glass Co.*,
  434 F.2d 1216 (6th Cir. 1970) ............................................................. 157

*Andrew Corp. v. Gabrial Electronics, Inc.*,
  785 F. Supp. 1041 (D. Me. 1992) ........................................................ 161

*Andrews v. Metro N. Commuter R.R. Co.*,
  882 F.2d 705 (2d Cir. 1989) ................................................................ 141

*Arbek Mfg. v. Moazzam*,
  55 F.3d 1567 (Fed. Cir. 1995) ............................................................. 135

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
  2012 WL 5296165 (M.D. Pa. Oct. 25, 2012) .............................. 154, 157

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
  No. 3:02-CV-0134, 2013 US Dist. LEXIS 37503 (M.D. Pa. Mar. 19, 2013) ...................... 146

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
  377 U.S. 476 (1964)................................................................... 153, 156

*Ashcraft v. Conoco, Inc.*,
  218 F.3d 288 (4th Cir. 2000) ....................................................... 131, 132

*August Tech. Corp. v. Camtek Ltd.*,
  2011 WL 7615088 (D. Minn. Aug. 11, 2011) ............................. 154, 157

*Blaylock v. Cheker Oil Co.*,
  547 F.2d 962 (6th Cir. 1976) ............................................................... 131

*Bradley v. Am. Household Inc.*,
   378 F.3d 373 (4th Cir. 2004) ........................................................................ 151

*Brine, Inc. v. STX, L.L.C.*,
   367 F. Supp. 2d 61 (D. Mass. 2005) ............................................ 156, 159, 161

*Broadcom Corp. v. Qualcomm Inc.*,
   543 F.3d 683 (Fed. Cir. 2008) .................................................................... 148

*Broadcom Corp. v. Qualcomm Inc.*,
   585 F.Supp.2d 1187 (C.D. Cal. 2008) ......................................................... 131

*Broadview Chem. Corp. v. Loctite Corp.*,
   311 F. Supp. 447 (D. Conn. 1970) .............................................................. 157

*C.B. Marchant Co. v. Eastern Foods, Inc.*,
   756 F.2d 317 (4th Cir. 1985) ....................................................................... 138

*Cal. Artificial Stone Paving Co. v. Molitor*,
   113 U.S. 609 (1885) ..................................................................................... 132

*Carbon Fuel Co. v. United Mine Workers of Am.*,
   517 F.2d 1348 (4th Cir. 1975) ..................................................... 130, 151, 158

*Clark v. United States*,
   61 F.2d 695 (8th Cir. 1932) ......................................................................... 134

*Cohesive Techs., Inc. v. Waters Corp.*,
   526 F. Supp. 2d 84 (D. Mass. 2007),
   *aff'd in part, vacated in part, rev'd in part* on other grounds,
   543 F.3d 1351 (Fed. Cir. 2008) ................................................................... 149

*Connolly v. J.T. Ventures*,
   851 F.2d 930 (7th Cir. 1988) ....................................................................... 152

*Dow Chem. Co. v. Chem. Cleaning, Inc.*,
   434 F.2d 1212 (5th Cir. 1970) ..................................................................... 157

*DSU Med. Corp. v. JMS Co., Ltd.*,
   471 F.3d 1293 (Fed. Cir. 2006) ........................................................... 147, 148

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
   363 F.3d 1263 (Fed. Cir. 2004) .................................................. 144, 145, 146, 149

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ................................................................................. 6, 133

*Elcock v. Kmart Corp.*,
   233 F.3d 734 (3d Cir. 2000) ........................................................................ 141

*E-Pass Techs., Inc. v. 3Com Corp.*,
   473 F.3d 1213 (Fed. Cir. 2007) .................................................. 143, 144, 147

*ePlus, Inc. v. Lawson Software, Inc.*,
   700 F.3d 509 (Fed. Cir. 2012) ............................ 4, 5, 7, 8, 109, 160, 167, 170

*Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*,
  350 F.3d 1327 (Fed. Cir. 2003) ........................................................................ 148

*Filebark v. U.S. Dept. of Transp.*,
  555 F.3d 1009 (D.C. Cir. 2009) ......................................................................... 150

*Fisher-Price, Inc. v. Safety 1st, Inc.*,
  2008 WL 1976624 (D. Del. May 5, 2008) ......................................................... 154

*Flat Slab Patents Co. v. Turner*,
  285 F. 257 (8th Cir. 1922) ................................................................................. 131

*Fred L. Pirkle, Therm-Omega-Tech, Inc. v. Ogontz Controls Co., Thomas M. Kenny*,
  1996 WL 146306 (E.D. Pa. Mar. 29, 1996) ...................................................... 158

*Fujitsu Ltd. v. Netgear Inc.*,
  620 F.3d 1321 (Fed. Cir. 2010) ......................................................................... 147

*GE Harris Ry. Electronics, L.L.C. v. Westinghouse Air Brake Co.*,
  2004 WL 1854198 (D. Del. Aug. 18, 2004) ............................................... 154, 157

*General Signal Corp. v. Donallco, Inc.*,
  787 F.2d 1376 (9th Cir. 1986) ........................................................................... 135

*Glasstech, Inc. v. AB Kyro OY*,
  1989 WL 151672(N.D. Ohio May 13, 1989) ...................................................... 157

*Global-Tech Appliances, Inc. v. SEB S.A*,
  131 S. Ct. 2060 (2011) ....................................................................................... 147

*Gompers v. Buck's Stove & Range Co.*,
  221 U.S. 418 (1911) ........................................................................................... 151

*Grdinich v. Bradlees*,
  187 F.R.D. 77 (S.D.N.Y. 1999) ......................................................................... 141

*Hamil America, Inc. v. GFI*,
  193 F.3d 92 (2d Cir. 1999) ................................................................................ 163

*Hampton Tree Farms, Inc. v. Yeutter*,
  956 F.2d 869 (9th Cir. 1992) ............................................................................. 132

*Henry v. A.B. Dick Co.*,
  224 U.S. 1 (1912) ............................................................................................... 149

*Hicks v. Feiock*,
  485 U.S. 624 (1988) ........................................................................................... 129

*Hi-Lo TV Antenna Corp. v. Rogers*,
  275 F.2d 452 (7th Cir. 1960) ............................................................................. 131

*Hoskins Lumber Co., Inc. v. United States*,
  20 F.3d 1144 (Fed. Cir. 1994) ........................................................................... 132

*In re Rezulin Prods. Liab. Litig.*,
  309 F.Supp.2d 531 (S.D.N.Y. 2004). ................................................................ 142

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
   512 U.S. 821 (1994)............................................................................ 134, 158, 170, 171

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
   512 U.S. 821 (1994).......................................................................................................... 151

*Jansen v. Rexall Sundown Inc.*,
   342 F.3d 1329 (Fed. Cir. 2003) ...................................................................................... 145

*Joy Techs. Inc. v. Flakt, Inc.*,
   6 F.3d 770 (1993)............................................................................................. 143, 145, 149

*Kamar Int'l Inc. v. Russ Berrie & Co.*,
   752 F.2d 1326 (9th Cir. 1984) ........................................................................................ 163

*Karaha Bodas Co., L.L.C. v. Negara*,
   335 F.3d 357 (5th Cir. 2003) .......................................................................................... 131

*Kerwit Medical Products, Inc. v. N & H Instruments, Inc.*,
   224 U.S.P.Q. 679 (N.D. Tex. July 12, 1984) ................................................................ 157

*Kiwi Coders Corp. v. Acro Tool & Die Works*,
   250 F.2d 562 (7th Cir. 1957) ..........................................................................  156, 158, 159

*Klett v. Pim*,
   965 F.2d 587 (8th Cir. 1992) .......................................................................................... 131

*KSM Fastening Sys., Inc. v. H.A. Jones Co., Inc.*,
   776 F.2d 1522 (Fed. Cir. 1985) .....................................................................  132, 135, 136

*Lane v. Prima Marketing LLC*,
   2008 WL 793642 (S.D. W.Va. Mar. 20, 2008) ............................................................ 169

*Latrobe Steel Co. v. United Steelworkers of Am., AFL–CIO*,
   545 F.2d 1336 (3d Cir. 1976) ................................................................................. 130, 131

*Leman v. Krentler-Arnold Hinge Last Co.*,
   284 U.S. 448 (1932)........................................................................................................ 156

*LinkCo, Inc. v. Fujitsu Ltd.*,
   No. 00 Civ. 7242 (SAS), 2002 U.S. Dist. LEXIS 12975 (S.D.N.Y. July 15, 2002) ............. 142

*Liquid Glass Enterprises, Inc. v. Liquid Glass Products Intern., Inc.*,
   1993 WL 315644 (E.D. Pa. Aug. 17, 1993) ................................................................. 161

*LMK Enter., Inc. v. Perma-Liner Ind., Inc.*,
   2012 U.S. Dist. LEXIS 31542 (M.D. Fla. Mar. 9, 2012) ............................................. 157

*LMK Enters. v. Perma-Liner Indus.*,
   2012 U.S. Dist. LEXIS 31542 (M.D. Fla. Mar. 9, 2012) ............................................. 129

*London v. Carson Pirie Scott & Co.*,
   946 F.2d 1534 (Fed. Cir. 1991) ..................................................................................... 134

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ..................................................................................... 146

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) ................................................................ 142

*Manhattan Indus., Inc. v. Sweater Bee By Banf, Ltd.*,
  885 F.2d 1 (2d Cir. 1989) ................................................................................. 164

*Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*,
  152 F.3d 1368 (Fed. Cir. 1998) ......................................................................... 143

*Manville Sales Corp. v. Paramount Sys.*,
  917 F.2d 544 (Fed. Cir. 1990) .................................................................... 148, 149

*McComb v. Jacksonville Paper Co.*,
  336 U.S. 187 (1949) ........................................................................................... 129

*McGowan v. Cooper Indus., Inc.*,
  863 F.2d 1266 (6th Cir. 1988) ........................................................................... 141

*McLean v. Central States, Se. & Sw. Areas Pension Fund*,
  762 F.2d 1204 (4th Cir. 1985) .................................................................... 130, 131

*Merial Ltd. v. Cipla Ltd.*,
  2011 WL 2489753 (M.D. Ga. Jun. 21, 2011) ................................................... 154

*MGM Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) ........................................................................................... 145

*Mirror Worlds, LLC v. Apple, Inc.*,
  784 F. Supp. 2d 703 (E.D. Tex. 2011) .............................................................. 144

*Muniauction, Inc. v. Thomson Corp.*,
  532 F.3d 1318 (Fed. Cir. 2008) ......................................................................... 143

*National Drying Mach. Co. v. Ackoff*,
  245 F.2d 192 (3rd Cir. 1957) ............................................................................. 152

*nCUBE Corp. v. SeaChange Int'l, Inc.*,
  C.A. No. 01–011–LPS., 2012 WL 4863049 (D. Del. Oct. 9, 2012) ................... 139

*NTP, Inc. v. Research In Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005) ......................................................................... 143

*Omega World Travel, Inc. v. Omega Travel, Inc.*,
  710 F. Supp. 169 (E.D. Va. 1989) ..................................................................... 169

*Ormco Corp. v. Align Tech., Inc.*,
  463 F.3d 1299 (Fed. Cir. 2006) ......................................................................... 142

*Peterson Filter & Engineering Co. v. Envirotech Corp.*,
  1973 U.S. Dist. LEXIS 15599 (D. Utah Apr. 30, 1973) .............................. 156, 157

*Polaroid Corp. v. Eastman Kodak Corp.*,
  1990 U.S. Dist. LEXIS 17968 (D. Mass. Oct. 12, 1990) .................................... 162

*Read Corp. v. Portec, Inc.*,
  970 F.2d 816 (Fed. Cir. 1992) .................................................................... 132, 133

*Ricoh Co., Ltd. v. Quanta Computer Inc.*,
  550 F.3d 1325 (Fed. Cir. 2008) ................................................................. 142

*Salvage Process Corp. v. Acme Tank Cleaning Process Corp.*,
  86 F.2d 727 (2d Cir. 1936) ....................................................................... 131

*Sandler v. Tarr*,
  345 F. Supp. 612 (D. Md. 1971), *aff'd*, 463 F.2d 1096 (4th Cir. 1972) ................ 131

*Schlegel Mfg. Co. v. U.S.M. Corp.*,
  525 F.2d 775 (6th Cir. 1975) ............................................................... 156, 159

*Schnadig Corp. v. Gaines Mfg. Co.*,
  620 F.2d 1166 (6th Cir. 1980) ................................................................... 162

*Schneider (Europe) AG v. Scimed Life Systems*,
  852 F. Supp. 813 (D. Minn. 1994) ............................................................... 162

*Scott & Fetzer Co. v. Dile*,
  643 F.2d 670 (9th Cir. 1981) .................................................................... 132

*Scott v. Sears, Roebuck & Co.*,
  789 F.2d 1052 (4th Cir. 1986) ................................................................... 141

*Seiko Epson Corp. v. Nu-Kote Int'l, Inc.*,
  190 F.3d 1360 (Fed. Cir. 1999) .................................................................. 157

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
  106 F.2d 45 (2d Cir. 1939) ................................................................ 162, 163

*Shell Oil Co. v. Barco Corp.*,
  1971 U.S. Dist. LEXIS 13395 (N.D. Iowa May 7, 1971) ................................. 156, 159

*Spindelfabrik Suessen-Schurr v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*,
  903 F.2d 1568 (Fed. Cir. 1990) .................................................................. 151

*State Indus. Inc. v. A.O. Smith Corp.*,
  751 F.2d 1226 (Fed. Cir. 1985) ................................................. 133, 134, 138, 158

*Stryker Corp. v. Davol, Inc.*,
  75 F. Supp. 2d 741 (W.D. Mich. 1999), *aff'd* 234 F.3d 1252, 1260 (Fed. Cir. 2000)........... 157

*Taser Int'l, Inc. v. Stinger Sys., Inc.*,
  No. CV07-42-PHX-JAT (D. Ariz. Jan. 18, 2012) ................................................ 139

*TiVo Inc. v. EchoStar Corp.*,
  646 F.3d 869 (Fed. Cir. 2011) ...................... 136, 137, 138, 139, 140, 141, 155, 157, 158, 160

*TiVo, Inc. v. Dish Network Corp.*,
  655 F. Supp. 2d 661 (E.D. Tex. 2009),
  *aff'd in relevant part, TiVo, Inc. v. EchoStar Corp.*,
  646 F.3d 869, 890 (Fed. Cir. 2011) ........................................... 155, 157, 160, 168

*Toshiba Corp. v. Imation Corp.*,
  681 F.3d 1358 (Fed. Cir. 2012) ............................................................ 145, 146

*Town v. Willis*,
   89 F. Supp. 437 (W.D. Mo. 1950) ........................................................... 156

*United Carbon Co. v. Binney & Smith Co.*,
   317 U.S. 228 (1942) .............................................................. 132, 133

*United States Catholic Conf. v. Abortion Rights Mobilization*,
   487 U.S. 72 (1988) ..................................................................... 129

*United States v. Darwin Constr. Co.*,
   679 F. Supp. 531 (D. Md. 1988) ............................................................ 135

*United States v. United Mine Workers of Am.*,
   330 U.S. 258 (1947) ......................................... 129, 130, 132, 151, 154

*United States v. Wilson*,
   421 U.S. 309 (1975) .................................................................... 135

*Universal Athletic Sales Co. v. Salkeld*,
   511 F.2d 904 (3d Cir. 1975) ............................................................ 132

*Upjohn Co. v. Medtron Laboratories, Inc.*,
   894 F. Supp. 126 (S.D.N.Y. 1995) ..................................................... 157

*Veritas Operating Corp. v. Microsoft Corp.*,
   562 F. Supp. 2d 1141 (W.D. Wash. 2008) ................................................ 147

*Vita-Mix Corp. v. Basic Holding, Inc.*,
   581 F.3d 1317 (Fed. Cir. 2009) .................................................... 146, 147

*Wagner v. Board of Educ. of Montgomery County, Maryland*,
   340 F. Supp. 2d 603 (D. Md. 2004) .................................................... 169

*Walman Optical v. Quest Optical Inc.*,
   2012 WL 3248150 (D. Minn. Aug. 9, 2012) .......................... 151, 152, 154, 155, 160

*Warner-Lambert Co. v. Apotex Corp.*,
   316 F.3d 1348 (Fed. Cir. 2003) .................................................... 145, 148

*Westvaco Corp. v. Int'l Paper Co.*,
   991 F.2d 735 (Fed. Cir. 1993) .................................................... 133, 134

*WMS Gaming Inc. v. Int'l Game Tech.*,
   184 F.3d 1339 (Fed. Cir. 1999) ......................................................... 133

*Worden v. Searls*,
   121 U.S. 14 (1887) .................................................................... 130

*Young v. U.S. ex rel. Vuitton Et Fils S.A.*,
   481 U.S. 787 (1987) .................................................................. 129

## Statutes

15 U.S.C. § 1117 ................................................................. 149, 150

17 U.S.C. § 504 ...................................................................... 149

35 U.S.C. § 271 ............................................................ 141, 143, 144, 145

35 U.S.C. § 284 ........................................................................................................... 150

**Other Authorities**

Caprice L. Roberts, The Case for Restitution and Unjust Enrichment Remedies in Patent Law, 14
    Lewis & Clark L. Rev. 653, 683-84 (2010) ........................................................... 149

Dan B. Dobbs, Dobbs Law of Remedies, Volume 2 § 6.2(4) at 41 (2nd ed. 1993) .................. 148

Dobbs, Handbook on the Law of Remedies § 2.9 at 100, n.31 (West 1973) ............................. 149

John M. Golden, Injunctions As More (or Less) Than "Off Switches": Patent-Infringement
    Injunctions' Scope, 90 Tex. L. Rev. 1399, 1412 n.54 (2012) ................................. 152

**Rules**

Fed. R. Civ. P. 54 ......................................................................................................... 147

Fed. R. Civ. P. 60 ......................................................................................................... 124

**INTRODUCTION**

Pursuant to the Court's April 16, 2013 Order and Federal Rule of Civil Procedure 52(a), Defendant Lawson Software, Inc. ("Lawson") hereby submits Defendant's Proposed Findings of Fact and Conclusions of Law ("DPFF").

**PROPOSED FINDINGS OF FACT**

I. **PROCEDURAL HISTORY**

    A. **Jury Findings**

    1.    At the infringement trial, the jury was asked to render a verdict on 38 separate allegations of infringement based on 12 claims in three patents asserted by ePlus Inc. ("ePlus") against the following five Lawson product configurations:

- *Configuration No.1* covers the Core S3 Procurement System ("core system"), in combination with Inventory Control, Requisitions, and Purchase Order Modules, Lawson's foundation software used by companies to purchase items.

- *Configuration No. 2* covers Lawson's core system (Configuration No. 1) and the Requisition Self-Service ("RSS") add-on module, which provides a user-friendly way to make requisitions.

- *Configuration No. 3* covers Lawson's core system and RSS (Configuration No. 2) and the Punchout add-on module.

- *Configuration No. 4* covers Lawson's core system (Configuration No. 1) and the EDI add-on module.

- *Configuration No. 5* covers Lawson's core system and RSS (Configuration No. 2) and adds both the Punchout and EDI software modules.

    2.    On January 27, 2011, the jury returned 11 findings of infringement and 27 findings of non-infringement with respect to the five accused configurations.  *See* Jury Verdict (D.I. 600).

- Configuration No. 1 was not found to infringe any of the asserted patent claims.

- Configuration No. 2 was found, *inter alia*, to infringe claim 1 of US Patent No. 6,505,172 ("'172 Patent) and was found not to infringe claims 3 and 28 of US Patent No. 6,023,683 ("'683 Patent"). ePlus did not allege that Configuration No. 2, which has RSS but neither Punchout nor EDI, infringed claim 26 of the '683 Patent.

- Configuration No. 3 was found, *inter alia*, to infringe claim 1 of the '172 Patent and claims 3, 26, 28, and 29 of the '683 Patent.

- Configuration No. 4 (which includes Item Master and EDI) was not found to infringe any of the asserted patent claims, including claim 26 of the '683 Patent.

- Configuration No. 5 was found, *inter alia*, to infringe claim 1 of the '172 Patent and claims 3, 26, 28, and 29 of the '683 Patent.

3.      The jury did not make a finding on damages.  The Court had precluded ePlus from presenting any evidence of damages at trial.  *See* D.I. 728 at 8-9.

**B.      The May 23, 2011 Injunction**

4.      On March 25, 2011, this Court held an evidentiary hearing on the issue of a permanent injunction.

5.      The parties then briefed the issue, and the Court heard oral argument on April 4, 2011.

6.      On May 23, 2011, the Court granted ePlus's motion for a permanent injunction.  *See* Permanent Injunction (D.I. 729).

7.      For 277 healthcare customers, the Injunction did not take effect until November 23, 2011.  *See* Permanent Injunction (D.I. 729); Tr. 807:13-21 (Homewood).

8.      Beginning before the entry of the Injunction, Lawson disclosed to ePlus and the Court information about its modifications to the accused configurations.

- Before the Court entered its Injunction, Lawson notified ePlus and the Court that it was working on a redesign.  *See* D.I. 705 at 19 (3/30/2011 Lawson's Injunction Opposition) ("This harm is particularly problematic because although Lawson is working on redesigning RSS and Punchout to

2

avoid the infringed claims, the design around is not done and Lawson has not determined when it will be done.").

- Lawson provided additional information about its efforts to develop a replacement of the RSS product and the basis for the redesign in letters to ePlus and the Court that pre-date the Injunction. *See* PX-1269 at Interrogatory No. 1 (discussing Lawson's May 6, 2011 (D.I. 727) and May 18, 2011 letters (D.I. 733) (informing Court and ePlus of general availability of RQC)).

- Lawson provided detailed information to ePlus about the nature of the significant modifications it made to RSS, producing documents that show the differences in the source code between RSS and RQC. D.I. 885 at Ex. 20 (Lawson Supplemental Response to interrogatory No. 5).

- Lawson continued to inform ePlus and the Court about its ongoing effort to comply with the Injunction after the Injunction issued. *See* PX-1269 at Response to Interrogatory No. 1 (discussing Lawson's letter to ePlus and the Court dated June 10, 2011).

- Lawson also provided extensive documentation regarding the redesign, offered a demonstration of the RQC product, and followed up to the demonstration with an offer to further discuss the changes in a letter dated August 24, 2011. *Id.*

**C.   ePlus's Motion To Hold Lawson In Contempt Of Court**

9.      On September 9, 2011, ePlus filed a motion to show cause for contempt. *See* D.I. 799. Lawson opposed ePlus's motion. *See* D.I. 804.

10.     At ePlus's request, the Court granted ePlus the opportunity to take broad discovery from Lawson about its redesign efforts and products. 09/15/2011 Tr. Court Conference at 22:4-24 (Court: "*I don't want a bunch of objections to discovery*…I do not expect to have any recurrence of some of the objections, the kinds of objections I had to deal with last time. I don't want that.) (emphasis added).

11.     Lawson identified with specificity all portions of the Core S3 Procurement System source code that were modified during the development and creation of RQC. *See* D.I. 885 at Ex. 20 (Lawson Supplemental Response to Interrogatory No. 5).

### D.     The Federal Circuit Opinion

12.     The Federal Circuit's November 21, 2012 opinion set aside four of the five

infringement findings that undergirded the judgment and injunction: systems claims 1 of the '172

patent and 3 of the '683 patent, and method claims 28 and 29 of the '683 patent.  *ePlus, Inc. v.*

*Lawson Software, Inc.*, 700 F.3d 509 (Fed. Cir. 2012).

13.     First, the Federal Circuit agreed with Lawson that claim 1 of the '172 patent and

claim 3 of the '683 patent were invalid for indefiniteness.  In particular, the Court found that "the

specification does not disclose sufficient structure for the 'means for processing' limitation" that

these two claims have in common.  *Id.* at 518.

14.     Second, the Federal Circuit reversed in part this Court's denial of Lawson's

JMOL, vacating the judgment of infringement as to claims 28 and 29 of the '683 patent.  *Id.* at

521.  Specifically, the Court "agree[d] with Lawson that the verdict of infringement is not

supported by substantial evidence."  *Id.*  The Federal Circuit explained that "ePlus did not

present any evidence to the jury to make th[e] showing, either directly or circumstantially" that

every step of the method of claims 28 and 29 was performed, choosing instead to improperly rely

on evidence about "the capability of the accused system, not an actual act of infringement."  *Id.*

15.     Third, the Federal Circuit affirmed "the district court's denial of JMOL of non-

infringement with respect to the jury's verdict of direct and induced infringement of Claim 26,"

finding that "there is evidence that Lawson installed, maintained, demonstrated, and managed the

infringing systems for its customers."  *Id.* at 520-21.  Specifically, the Federal Circuit's

infringement analysis as to claim 26 focused on the "determining whether a selected matching

item is available in inventory" step.  *Id.* at 513.  The Punchout module allows customers to

connect to a third-party vendor's website, which (the Federal Circuit stated) allows users to

determine whether the selected items are available in its inventory.  *Id.*

16.     Finally, after "revers[ing] the district court's determination that the system claims are not indefinite" and "vacat[ing] the judgment of infringement entered based on claims 28 and 29 of the '683 patent," the Federal Circuit, without addressing the merits of whether an injunction remains warranted, remanded for this Court to determine what changes to the injunction would be required by its decision.  *Id.* at 523.

17.     As a result of the Federal Circuit judgment, the only asserted claim held to be valid and infringed is method claim 26 of the '683 patent, and only when the method is practiced using either Configuration No. 3 or 5.  *Id.* at 520-21.  Configuration Nos. 3 and 5 include the add-on Punchout module.  No configuration without Punchout was found to infringe claim 26 of the '683 Patent.  *See* Jury Verdict Form at 2-3 (D.I. 600).

18.     ePlus's petition for rehearing was denied on January 29, 2013.

- *ePlus Inc. v. Lawson Software Inc.*, No. 2011-1396, D.I. 104 (Fed. Cir. Jan. 29, 2013).

19.     The mandate issued from the Federal Circuit on February 5, 2013.

- D.I. 1006

**E.     Lawson's Motion to Dissolve or Modify the Injunction**

20.     On March 6, 2013, Lawson moved to dissolve or modify the Injunction in light of the Federal Circuit's mandate to "to consider what changes are required to the terms of the injunction," *ePlus,* 700 F.3d at 523, and pursuant to  Rule 60(b)(5) of the Federal Rules of Civil Procedure.  *See* D.I. 1012.

21.     Lawson's argument was (and continues to be) two-fold: (i) the sole remaining patent claim at issue, method claim 26 of the '683 patent, is not infringed through the offer for sale, or sale, of any of the three system configurations identified in the May 23, 2011 Injunction, much less the modified products that are now at issue; and (ii) that the factual record advanced to

support the May 23, 2011 injunction under the four-factor test of *eBay Inc. v. MercExchange,*
*L.L.C.*, 547 U.S. 388, 391 (2006), does not contain discreet facts or segregated findings that
would have supported the issuance of any injunction had the District Court recognized the
invalidity of the system claims and the non-infringement of method claims 28 and 29 at the time
the Injunction issued.  *See* D.I. 1012 at 1.

22.     Lawson also argued that the existing record also does not support the continuation
of the Injunction, explaining that (1) there is no basis to find that any alleged resulting harm to
ePlus is due specifically to competition for systems that include Punchout and EDI, (2) the
Court's prior analysis as to the inadequacy of remedies at law no longer applies, (3) the balance
of hardships now tips in Lawson's favor, and (4) the public interest does not favor an injunction,
particularly given that the Board of Patent Appeals and Interferences ("BPAI")  affirmed the
United States Patent and Trademark Office's finding that claim 26 (as well as the other
previously asserted method claims of the '683 patent) are invalid over multiple prior art
references, a ruling now on appeal in the Federal Circuit.

23.     On March 14, 2013, the Court asked whether either party wanted an evidentiary
hearing regarding the propriety of an ongoing injunction against Lawson in light of the Federal
Circuit's mandate.  Neither party sought an evidentiary hearing.

• D.I. 1025 at 6-11

24.     At this time, the situation remains unchanged: the United States government is
still litigating against ePlus in the Federal Circuit, arguing for an affirmance of the PTO's
invalidity finding as to claim 26 (and the other method claims) of the '683 patent.  *See* D.I. 1012,
Ex. A.  In the event that the Federal Circuit affirms the BPAI decision invalidating claim 26, any
extant injunction in this case will necessarily be vacated.  *See* DPFF 502, *infra*.

25.     As of the date and time of the filing of Defendant's Proposed Findings of Fact and Conclusions of Law, no order has been entered addressing either Lawson's March 6, 2013 motion or the Federal Court's mandate.

**F.     April 2013 Contempt Hearing**

26.     Following the Federal Circuit Opinion, at the Court's request, the parties both filed a statement of position regarding the impact of the Federal Circuit's decision on contempt proceedings.  *See* D.I. 986, 991 and 992.

27.     Lawson's position was (and continues to be) that the Federal Circuit's ruling rendered the Injunction inoperative, eliminating any right on the part of ePlus to move for civil contempt as to the May 23, 2011 Injunction.  *See* D.I. 991.  In its Statement, Lawson argued that because a modified injunction cannot give rise to a remedial order based on conduct that pre-dates the injunction, this Court should reject ePlus's view that contempt proceedings can be initiated based on markedly different premises.  *Id.* at 3.  As Lawson explained, even if this Court choses to treat this case as if an alleged historical violation of some unmodified portion of the May 23, 2011 Injunction could be the subject of a civil contempt proceeding, it would still be incumbent on ePlus to first state what conduct by Lawson purports to violate what remains of the Injunction.  *Id.* at 3-4.

28.     The Court did not adopt Lawson's proposed approach, initiating instead a contempt hearing on April 2, 2013, before any decision on the issue of the required modification to the Injunction was ever rendered.  *See* D.I. 1020.

29.     Just before the contempt hearing, on March 27, 2013, the Court granted ePlus's Motion To Strike Portions of the Report of Lawson's Expert, Dr. Goldberg, And Exclude Portions of His Opinion From the Contempt Proceeding.  *See* D.I. 1034.  The Court struck (in part or in whole) a total of 55 paragraphs from Dr. Goldberg Expert Report On Colorability And

Non-Infringement for a number of reasons, one of which was that, according to the Court, Dr. Goldberg "improperly re-argues the Court's claim construction in [some] of his testimony." *Id.* at 1-3. The Court also ruled that "Dr. Goldberg may not testify about infringement and invalidity issues that were resolved when the jury rendered its verdict at the trial on the merits and may not testify about what the jury's verdict means." *See Id.* at 3. In a separate Order regarding Dr. Weaver, the Court stated that experts may not "rehash the trial testimony or [] explain what the documents in the trial showed, or [] summarize the arguments of counsel to aid the Court in the 'colorable difference' inquiry." *See* D.I. 1035 at 6

30.     The contempt hearing began on April 2, 2013 and concluded on April 9, 2013. *See* D.I. 1043, 1047-50. Both parties tendered evidence on the colorability and infringement prongs of the *TiVo* test as well as on damages. *Id.*

31.     After the conclusion of the contempt hearing on April 9, 2013, the Court held an oral hearing on the issue of the modification to the Injunction as mandated by the Federal Circuit opinion. *See* D.I. 1050.

## II. THE MODIFICATIONS MADE TO THE ADJUDGED INFRINGING PRODUCTS RENDER THE MODIFIED FEATURES MORE THAN COLORABLY DIFFERENT FROM THE FEATURES THAT ePLUS CONTENDED AND PROVED TO BE INFRINGING AT TRIAL

### A. Features Contended and Proved To Be Infringed

32.     Multiple jury findings of infringement, including as to claim 1 of the '172 Patent, were based on evidence regarding the functionality of RSS in Configuration Nos. 2, 3, and 5.

33.     Findings of infringement as to claims 28 and 29 of the '683 Patent were based on evidence regarding the functionality of UNSPSC Category Searching.

34.     Findings of infringement as to claim 26 of the '683 Patent were based on evidence regarding the functionality of Punchout generally, and the capacity of Configuration Nos. 3 and 5

(as demonstrated to the jury) to be used to perform all steps of claim 26 through shopping sessions that included: a) combining items selected from Item Master and items selected from a Punchout vendor's website on a single requisition and/or b) combining items selected from searches of multiple Punchout vendors' websites on a single requisition.  *See* DPFF 1-2; 48-50.

      **B.**      **Lawson's Post-Verdict Design-Around Efforts**

            **1.**      **January 28, 2011 to March 25, 2011**

35.      On January 28, 2011, the day after the jury's verdict, Lawson planned its first meeting to begin the process of designing around the patent claims that the jury had found Lawson infringed.

- DX-698 (January 28, 2011 agenda for first meeting to discuss next steps after jury verdict)

- Tr. 344:3-349:16 (Christopherson:  Discussion of DX-698)

- Tr. 325:24-326:12 (Christopherson: Lawson held meetings in late January and early February to begin the redesign process)

36.      Dale Christopherson was the director of product development at Lawson and the lead designer of RQC.  RQC was Mr. Christopherson's top job priority at Lawson at the time of the redesign, and was a project for which Dale was not given a fixed budget or a fixed time frame.

- Tr. 323:6-25 (Christopherson:  Dale Christopherson was the director of product development and the lead designer of RQC)

- Tr. 325:4-8 (Christopherson:  RQC was Dale Christopherson's number one priority, and kept him much busier than most normal projects)

- Tr. 325:9-11 (Christopherson:  Lawson did not give him a fixed date by which the redesign must be completed)

- Tr. 325:12-14 (Christopherson:  Lawson did not limit the budget that he could spend on the redesign efforts)

37.     Keith Lohkamp provided input on the redesign from the perspective of Lawson's

business department.

- Tr. 387:4-8 (Lohkamp:  Keith Lohkamp provided input into the design and approach for the redesign effort)

- Tr. 323:13-25 (Christopherson:  Keith Lohkamp represented the business side of Lawson in the redesign process)

38.     Lawson's General Counsel, Bruce McPheeters, Lawson's trial counsel from

Merchant & Gould (Daniel McDonald and William Schultz), and Bob Crawford, an independent

attorney hired by Lawson, assisted with the design-around process.

- Tr. 301:14-16 (Christopherson:  Bob Crawford "was yet another independent lawyer that we brought in to help advise us on these proceedings.")

- Tr. 326:23-327:1 (Christopherson:  The outside counsel who represented Lawson in the underlying infringement trial, including Dan McDonald and Will Schultz, worked on the redesign efforts)

39.     Lawson assigned Todd Dooner to write the code to implement the Punchout

changes.

- Tr. 324:21-24, 347:25-348:5 (Christopherson:  Todd Dooner was responsible for writing the changes to the software code to effectuate the proposed redesign ideas)

40.     Stephanie Lim conducted quality assurance testing for the coded redesign

changes.

- Tr. 357:21-358:16 (Chrisopherson:  Stephanie Lim was the quality assurance individual who verified that the software code met its requirements and fixed problems found in this verification)

41.     Dwight DeLancy, a software engineer specializing in Punchout, and Darci

Snyder, a business person in charge of product management, were assigned to assist with ideas

for possible product modifications for RSS and Punchout.

- Tr. 348:16-349:5 (Christopherson:  Dwight Delancy is the software engineer specialized in Punchout and Darci Snyder, is in charge of product management.  Both were among the individuals assigned to assist with ideas for possible product modifications to RSS and Punchout)

42.   Keith Knuth is a software architect in the development team who worked on the RQC redesign.

- Tr. 288:17-20 (Christopherson:  Keith Knuth is an architect in the product development team)

- Tr. 245:12-16 (Christopherson:  Keith Knuth was on the RQC development team)

43.   Donna Hicarte assisted in the redesign effort.

- Tr. 245:12-16 (Christopherson:  Donna Hicarte was on the RQC development team)

44.   Matthew Bragstad is a member of the Lawson support team, not a member of the redesign team.

- Tr. 276:10-17 (Christopherson:  "Q:  Matthew Bragstad was one of Lawson's support managers, correct?  A:  That is correct.  Q:  And his title was director, Lawson global support, S3 applications, correct?  A:  Don't recall his title.  I'm pretty sure he wasn't a director, but he was in charge of supply chain management within the support team.")

45.   Before the Injunction issued in May and in June 2011, Scott Hanson had no involvement with the redesign effort, nor knowledge of how the Punchout functionality worked in RQC.

- Tr. 591:3-7 (Hanson:  "Q:  At the time that the injunction issued in this matter in May of 2011 and in June when we've just been talking about, do you have any knowledge of the business function -- of how the Punchout functionality worked in RQC?  A:  No, I did not.")

- Tr. 590:13-20 (Hanson:  "Q:  Do you have any responsibility for developing applications?  A:  No, I do not.  Q:  Do you have any responsibility to write code?  A:  No, I do not.  Q:  Do you have any responsibility for testing code to see if it works?  A:  No, I do not.")

- Tr. 592:15-18 (Hanson:  "Q:  Sure. When Lawson sells software to a customer – by the way, is the sale of the software, the licensing of it, is that part of your responsibility?  A:  No, it is not.")

- Tr. 590:25-591:2 (Hanson:  "Q:  Do you have any knowledge of the business functionality of Punchout?  A:  At the very highest level.")

46.    Individuals who are not members of the RQC redesign team, such as consultant installers, do not need to know the business functionality of the RQC software.

- Tr. 590:21-24 (Hanson:  "Q:  When an application is installed by a consultant under your supervision, does the installer need to know the business functionality of that software to install it?  A:  No, they do not.")

- Tr. 590:25-591:2 (Hanson:  "Q:  Do you have any knowledge of the business functionality of Punchout?  A:  At the very highest level.")

47.    The starting point for Lawson's design-around changes was what ePlus contended and proved at trial.

- Tr. 325:8-9, 329:8-13 (Christopherson:  The redesign ideas initially came from what ePlus presented at trial)

48.    At the merits trial, ePlus demonstrated the ability of the Lawson configurations to combine items from Item Master and Punchout on a single requisition as a basis for infringement.

- Trial Tr. 760:11-766:12

- PX-379

- PX-380

- DX-735

49.    At the merits trial, ePlus demonstrated the ability of the Lawson configurations to combine items from from two different Punchout websites on a single requisition as a basis for infringement.

- Trial Tr. 683:6-698:2

- PX-367

- PX-368

- DX-734

50.     In its Brief in Support of Motion for Judgment as a Matter of Law of Direct and

Indirect Infringement, ePlus pointed to its demonstration of the ability of the Lawson

configurations to combine items from two different Punchout websites on a single requisition as

its proof for infringement of claim 26.

- D.I. 582 at 11 (ePlus Brief in Support of Motion for Judgment as a Matter of Law of Direct and Indirect Infringement)

- PX-367 (Trial exhibit video screenshots showing combining items from two different Punchout websites on a single requisition)

- PX-368 (Trial exhibit video showing combining items from two different Punchout websites on a single requisition)

51.     At the merits trial, Dr. Weaver called the ability to combine on a single requisition

(a) items from Punchout and Item Master, and (b) items from two different Punchout sites, "a big

deal," "a real benefit," a "cost saver," a "time saver," and a "convenience."

- Trial Tr. 505:9-17 (Weaver:  "If you go back to the example that I had where I had to get requisitions issued to each vendor and then a purchase order had to go individually to each vendor, that's a lot of time and effort. So the ability to put everything you want on one purchase requisition electronically and then have the computer system break that requisition up into however many purchase orders are appropriate, typically one purchase order per vendor with however many orders from the requisition, that's a real benefit.")

- Trial Tr. 550:22-551:9 (Weaver:  "So it's a convenience and a time saver and a cost saver if I can put all of the items that I want to order on a single requisition.  And then in this case because it's computerized, the purchase order module can look at the requisition and look at that single requisition and divide it into purchase orders automatically.  So the single requisition is a big deal.")

52.     At the merits trial, Dr. Weaver cited the ability to comparison shop as one of the benefits of being able to combine items from multiple sources on a single requisition.

- Trial Tr. 504:16-505:4 (Weaver:  "Q:  So just back to the basic subject matter, at a high level of these patents that were issued, what do you consider the benefits to be realized by the inventions over this procurement process that you have described? . . . A:  You make it more efficient, you make it more time-conserving,   and you save money.  Q:  How about the ability to search multiple vendors at the same time?  A:  Oh, of course.  Searching multiple catalogs gives you the ability to cross compare, to comparison shop.")

53.     At the merits trial, ePlus did not rely on the ability to purchase a single item from Item Master as a basis for infringement.

54.     At the merits trial, ePlus did not rely on the ability to purchase a single item from Punchout as a basis for infringement.

55.     The only configurations that the jury found to infringe claim 26 are those that include Punchout.

- D.I. 600 (Jury verdict)

56.     Lawson's redesign process began with recommendations from Lawson's legal counsel.

- Tr. 332:3-11 (Christopherson:  Redesign brainstorming began with suggestions from Lawson's legal counsel)

57.     Lawson's legal counsel, and specifically Bruce McPheeters, the highest-ranking lawyer at Lawson, had the final say and veto power over what product Lawson was allowed to release as a design-around.

- Tr. 328:18-20 (Christopherson:  Legal made decisions regarding design-around permissions)

- Tr. 330:13-331:16 (Bruce McPheeters, the highest ranking attorney at Lawson, had the final say and veto power over the final redesigned product)

14

58.    The initial design around changes focused on the entirety of the jury verdict, resulting in three primary changes to the RSS functionality: direct to requisition changes targeted at avoiding infringement of claim 1 of the '172 patent, UNSPSC changes targeted at avoiding infringement of claims 28 and 29 of the '683 patent, and changes to the functionality of Punchout targeted at avoiding infringement of claim 26 of the '683 Patent, the only remaining claim at issue.

- Tr. 332:18-333:14 (Christopherson:  Redesign focused on three areas of functionality: shopping cart/order list, UNSPSC, and Punchout)

59.    Of the three primary changes to RSS functionality, only the changes to Punchout functionality relate to claim 26 of the '683 patent.

- PX-1018 (March 18, 2011 email discussing changes unrelated to the implemented Punchout functionality changes)

- Tr. 353:6-23 (Christopherson:  UNSPSC changes referred to in PX-1018 relate to claim 3 of the '683 patent and are not related to the Punchout functionality changes at issue)

- Tr. 351:20-353:5 (Christopherson:  Direct to requisition changes referred to in PX-1018 relate to claim 1 of the '172 patent and are not related to the Punchout functionality changes at issue)

- Tr. 194:19-195:11 (Weaver:  Dr. Weaver's expert report discusses three major changes from RSS to RQC, only one of which relates to the relevant functionality of Punchout)

60.    Lawson had two goals for its redesign process:  its primary goal was to design around the adjudged-infringing claims, and its secondary goal was to minimize the impact of this redesign on its customers.

- Tr. 332:12-17.  (Christopherson:  Discussing twin goals for redesign)

61.    For the changes other than the Punchout changes that Lawson implemented, Lawson was able to achieve its goal of preventing the redesign from impacting its customers.

- Tr. 333:15-20 (Christopherson: "Q: And first with respect to the shopping cart and the order list – I want to just get those out of the way – were you able to, in your mind, achieve the two goals that you had set out on to both design around the patent and not impact the customer experience? A: Yes.")

62. Lawson designed RQC to be a self-evident application that should not require

much training beyond the training materials Lawson provided on the internet.

- Tr. 180:25-182:18 (Weaver: No new training is needed in light of the pop-up message shown to users that makes the changes easily understandable)

- Tr. 368:19-369:7 (Christopherson: "Q: Did you expect any extensive training would be necessary to teach people how to use Punchout in light of the new limitations? A: No. That's what the WebEx was handled for. That's why we recorded it. We felt if someone used that, it was pretty self-explanatory. In fact, the applications are self-evident applications. They're designed by their very nature not to have much training.")

- Tr. 404:15-21 (Lohkamp: Explaining that the pop-up message informing the user that Item Master and Punchout items must be on separate requisitions in RQC was written to be clear so that the user would not need additional training to use the software)

63. Whether or not training is necessary for RQC is not indicative of whether the

change is significant.

- Tr. 180:25-182:18 (Weaver: Training not necessary for RQC's self-evident application. Lack of necessity for training not indicative of lack of significance)

64. Lawson's statements regarding RQC's superiority to RSS relate to mobile

requisitions and the direct to requisition change, but not to the Punchout functionality changes.

- Tr. 440:5-21 (Lohkamp: "Q: Mr. Lohkamp, you were asked questions about statements regarding the superiority of RQC to RSS; do you recall that? A: Yes. Q: To your knowledge, what functionalities did those – did that statement refer to? A: It referred to being able to add mobile requisitions and also the design that we had made, the direct to requisition, so the initial feedback we had gotten from customers that we described it to, they felt that that was going to be a benefit to them by helping to validate the requisition line immediately rather than having the items held in a temporary state and validating at the end. Q: Did you ever tell a

16

client that the – a customer that the change in Punchout functionality that is at issue in this case made RQC a product that is superior to RSS?  A:  No, I did not.")

65.      By March 25, 2011, Lawson had not yet conceived of either of the ultimately implemented changes to Punchout functionality.

- Tr. 394:1-14 (Lohkamp:  Prior to April 21, 2011, Lawson did not have a complete plan regarding what to do to avoid infringement by the Punchout functionality, so was considering pulling Punchout from deals for RQC)

- Tr. 301:1-2 (Christopherson:  "Q:  Had you come up with them by March 25, 2011?  A:  No.")

66.      The vast majority of customers with RQC do not have Punchout.

- Tr. 1017:15-25 (Putnam:  When this case involved configurations two, three and five, there were 610 customers with adjudged-infringing systems, but after the Federal Circuit narrowed the infringing systems to only configurations three and five, there were only 146 customers with adjudged-infringing systems)

67.      PX-1013 relates to changes other than the Punchout changes that Lawson implemented.

- PX-1013 (Email mischaracterized at ePlus PFF 202 as relating to the Punchout functionality changes at issue.  Email is dated February 14, 2011, so predates the conception of the relevant implemented changes to Punchout functionality)

68.      PX-1013 is a legal analysis written by Keith Knuth, a non-lawyer software architect, who was not asked to perform such an analysis.

- Tr. 288:17-289:3 (Christopherson:  "Q:  I want you to go to the first – once again, who is Mr. Knuth?  A:  Mr. Knuth is an architect in the product development team.  The Court:  In the what?  A:  A software architect on the software development team.  Q:  Is he a lawyer as well as a software architect?  A:  No, he's not.  Q:  Did you ask him to perform the analysis that's set forth in Exhibit 1006?  A:  I did not.")

69.      PX-1015 relates to changes other than the Punchout changes that Lawson implemented.

- PX-1015 (Email mischaracterized at ePlus PFF 204 as relating to the Punchout functionality changes at issue. Email is dated February 24, 2011, so predates the conception of the relevant implemented changes to Punchout functionality)

70. As of March 30, 2011, Lawson had conceived of solutions for the non-Punchout-related changes, but did not have a solution for Punchout, resulting in contingency planning to pull Punchout out of all pending deals that were to close during the fourth quarter, ending May 31, 2011.

- PX-1091 (March 30, 2011 email chain mischaracterized at ePlus PFFs 15, 215 and 218 as relating to the Punchout functionality changes at issue. "We are currently coding around our infringement with RSS . . . . However, we have no known way around Procurement Punchout at this time. . . . We have a solution for RSS now.., so proceed and try to win the deal .... But hold punchout out of it.")

- PX-1109 (March 29, 2011 email chain mischaracterized at ePlus PFF 216 as relating to the Punchout functionality changes at issue. "However, we have no known way around Procurement Punchout at this time. Please check with your RSM's/AE's on these deals and see if pulling at minimum Punchout, and potentially even both, harm the closing of the deal in Q4" and "We are still awaiting legal guidance on whether we can make our product non-infringing.")

- Hager Dep., Mar. 22, 2013 at 174:24-175:3 (Hager: Plan in place to pull Punchout out of deals if solution for RSS, but not Punchout, is found)

- Tr. 396:7-397:25 (Lohkamp: Discussing PX-1109's correct representation that Lawson did not have a way to make the Punchout functionality non-infringing on March 29, 2011)

71. Internal Lawson documents dated prior to Lawson's conception of the implemented Punchout functionality changes are entirely unrelated to the changes at issue in this case and do not bear on the subject of whether the ultimate changes are more than colorably different from the features contended and proved to infringe.

## 2.   March 25, 2011 to June 9, 2011

72.   Prior to making the implemented Punchout changes, Lawson's employees came up with alternate redesign ideas that it did not implement because its legal counsel rejected them as sufficient design-around options.

- Tr. 353:24-354:17 (Lohkamp:  Discussing PX-1018)

- PX-1018 at RQC822226 (March 18, 2011 email "Q:  The next sentence says, that just leaves Punchout the need to cripple it for ePlus licensed parties only, lots of discussion there.  Legal does not think this will work since they are pretty sure that the licenses do not cover this scenario.  Do you see that?")

73.   Lawson did not implement an alternative redesign that would have been less detrimental to Lawson's customers than the implemented Punchout functionality changes, because Lawson's legal counsel determined that the alternative was insufficient.

- Tr. 406:4-407:11 (Lohkamp:  Mr. Lohkamp presented an alternative suggestion less detrimental to customers than initial Item Master/Punchout limitation but it was rejected for not going far enough)

74.   Lawson was prepared to stop selling Punchout if a design-around could not be achieved.

- Tr. 394:1-14 (Lohkamp: Indicating that one of Lawson's contingency plans was to stop selling Punchout)

### a.   Change 1: the Item Master / Punchout Limitation

75.   Bob Crawford and Dale Christopherson conceived of the initial Item Master/Punchout limitation, described in detail in section II.2.B, *infra*, in mid-April of 2011.

- Tr. 301:3-13, 356:2-17 (Christopherson:  Mr. Crawford and Mr. Christopherson conceived of the initial Item Master/Punchout limitation in mid-April of  2011)

76.     Around April 19th or 20th, Mr. Christopherson instructed Mr. Dooner to begin coding the initial Item Master/Punchout limitation so that the coding was partially complete by the time that Lawson approved the change.

- Tr. 356:18-357:20 (Christopherson:  Around April 19th or 20th, Mr. Christopherson instructed Mr. Dooner to start coding the initial Item Master/Punchout limitation outside of the production code)

77.     The initial Item Master/Punchout limitation was first discussed within Lawson around April 20 or 21, 2011.

- Tr. 392:20-393:7 (Lohkamp:  The initial Item Master/Punchout limitation was first discussed within the Lawson redesign team around April 20 or 21, 2011.  Prior to that time, Lawson did not have a plan for a Punchout redesign)

- PX-1094 (April 21, 2011 email chain discussing the initial Item Master/Punchout limitation)

- PX-1019 (April 22-April 25, 2011 email chain discussing the initial Item Master/Punchout limitation)

- PX-1178 (April 26, 2011 email chain mischaracterizing at ePlus PFF 19 the length of time spent coding a change as indicative of the significance of that change.  States that the initial Item Master/Punchout limitation had been approved)

78.     The software coding for the initial Item Master/Punchout limitation was done by the end of April, whereupon the change went through packaging, installation and functional testing, and the product documentation was updated to reflect the change.

- Tr. 359:9-21 (Christopherson:  Explaining the process for the initial Item Master/Punchout limitation, from coding through documentation)

79.     The modifications to Punchout functionality were implemented by changing the source code in RQC.

- Tr. 449:22-450:11 (Goldberg:  Describing source code changes in RQC that affect Punchout functionality.)

80.     Lawson's legal counsel gave the final approval for the initial Item

Master/Punchout limitation.

- Tr. 366:23-25 (Christopherson:  Discussing legal's approval of the initial Item Master/Punchout limitation)

81.     Lawson released RQC on May 18, 2011, which contained the first modification to

Punchout functionality.  *See* Part II.C, *infra.*

- Tr. 246:2-3 (Christopherson:  RQC released to customers on May 18, 2011)

**b.      Change 2: the Multiple Punchout Sites Limitation**

82.     Lawson's legal counsel recommended the Multiple Punchout Sites limitation,

described in detail in Part II.C, *infra.*

- PX-1096 (June 9 email chain mischaracterized at ePlus PFF 88 as evidence that Lawson does not block customers from accessing multiple Punchout vendor sites on a single requisition.  "Our legal counsel recommended that we make one additional change to requisition center that impacts Procurement Punchout to help address concerns about being able to add items from two vendor catalogs.")

- Tr. 414:2-10 (Lohkamp:  PX-1096 relates to the Multiple Punchout Sites limitation)

- Tr. 367:22-23 (Christopherson:  Legal had the final say relating to the Multiple Punchout Sites limitation)

83.     Lawson began discussing the Multiple Punchout Sites limitation on June 1, 2011.

- DX-691 (June 1, 2011 email discussing the Multiple Punchout Sites limitation)

84.     Lawson approved the Multiple Punchout Sites limitation on June 3, 2011.

- Tr. 409:4-17 (Lohkamp:  Discussing DX-691)

- Tr. 408:2-4; 393:11-12 (Lohkamp:  Found out about the Multiple Punchout Sites limitation on June 1, 2011)

- PX-1096 (June 9, 2011 email chain discussing the Multiple Punchout Sites limitation before and after approval)

- Tr. 301:6-7 (Christopherson:  Began discussing the Multiple Punchout Sites limitation on June 1, 2011)

85.     Lawson released Patch 1 on June 9, 2011, which implemented the second modification to Punchout functionality.  *See* Part II.C, *infra*.

- PX-1096 at RQC914942 (June 9, 2011 email that patch 1 is live for customers)

**C.      The Changes Made to Punchout Functionality**

86.     Change 1, the Item Master/Punchout limitation creates a limitation such that: when using the modified products, a Lawson customer who has searched for and selected a matching item or items from Item Master, cannot access a Punchout vendor's website during that shopping session.  Similarly, if a shopping session starts with the search and selection of one or more items from a Punchout vendor's website, the customer cannot then access Item Master. The redesigned product thus prevents a user from selecting and combining items from both Item Master and a Punchout vendor's website on a single requisition – functionality that was a feature of the infringing configurations.

- Tr. 779:8-23 (Weaver:  Dr. Weaver agrees with Lawson's characterization of the initial Item Master/Punchout limitation)

- Tr. 173:13-15 (Weaver:  "Q. And am I correct that you do not dispute that those changes were made?  A. Those changes were made.")

- Tr. 386:19-387:3 (Lawson's changes removed functionality that had been available in RSS since at least 2005)

- Tr. 283:11-22 (Christopherson:  Discusses the initial Item Master/Punchout limitation)

- Tr. 336:5-337:2 (Christopherson: Discusses both Punchout limitations)

- Tr. 290:5-23 (Christopherson:  The requisition process in RSS and RQC is the same, except that all purchasing in RSS can be accomplished on a single requisition, whereas RQC will require multiple requisitions if item master and a Punchout vendor, or multiple Punchout vendors, are involved)

87.     Change 2, the Multiple Punchout Sites limitation creates a limitation such that: when using the modified products, a Lawson customer who has searched and selected an item from one Punchout vendor's website cannot access a second Punchout vendor's website, and thus cannot search and select items from more than one Punchout vendor's website in a shopping session.  The redesigned product prevents a user from selecting and combining items from different Punchout vendors' websites on a single requisition – functionality that was a feature of the infringing configurations.

- Tr. 779:8-23 (Weaver:  Dr. Weaver agrees with Lawson's characterization of Multiple Punchout Sites limitation)

- Tr. 173:13-15 (Weaver:  "Q. And am I correct that you do not dispute that those changes were made?  A. Those changes were made.")

- Tr. 446:14-19, 449:10-21, 459:10-460:1 (Goldberg:  In RQC, Lawson removed the ability to combine items from two different Punchout sites on a single requisition)

- Tr. 386:19-387:3 (Lawson's changes removed functionality that had been available in RSS since at least 2005)

- Tr. 336:5-337:2 (Christopherson: Discusses both Punchout limitations)

- Tr. 290:5-23 (Christopherson:  The requisition process in RSS and RQC is the same, except that all purchasing in RSS can be accomplished on a single requisition, whereas RQC will require multiple requisitions if item master and a Punchout vendor, or multiple Punchout vendors, are involved)

88.     Users cannot thwart Lawson's modifications to the Punchout functionality.

- Tr. 357:21-358:21 (Christopherson:  Users could not get around the blocks inserted into RQC in order to utilize the blocked Punchout functionality that was available in RSS)

- Tr. 178:13-17 (Weaver:  Users cannot thwart Punchout functionality modifications)

- Tr. 459:1-6 (Goldberg: Users cannot thwart Punchout functionality modifications)

**D.      Evidence of the Significance of the Changes**

89.      The RSS Punchout functionality that Lawson now blocks in RQC is significant in

the context of the patent.

- Tr. 219:10-18 (Weaver:  "Q: Indeed, it is a big deal. A: It was a big deal in the context of the patent. Q: Now, despite the fact that you would acknowledge that that attribute which has been lost was beneficial, a convenience, a time-saver, a benefit, and a big deal, I'm right that you still don't think that it's more than colorably different to have lost that attribute; is that correct? A: That's correct.")

90.      The RSS Punchout functionality that Lawson now blocks in RQC is beneficial to

product users.

- Tr. 213:7-11 (Weaver:  "Q: And you would agree with me, would you not, that you consider it to be beneficial to be able to combine on a single requisition search items from multiple Punchout vendor sites? A: Yes.")

91.      The RSS Punchout functionality that Lawson now blocks in RQC is a

convenience to product users.

- Tr. 213:12-18 (Weaver:  "Q: You would agree with me that being able to do so is a convenience compared to having to do multiple requisitions on - - multiple purchases on multiple requisitions; is that correct? . . . A: Yes.")

92.      The RSS Punchout functionality that Lawson now blocks in RQC is a time-saver

for product users.

- Tr. 218:20-23 (Weaver:  "Q: And having the ability to combine items from multiple Punchout vendor websites on a single requisition is a time-saver; is it not? A: Yes.")

93.      The RSS Punchout functionality that Lawson now blocks in RQC is a real benefit

to product users.

- Tr. 219:5-9 (Weaver:  "Q: You would agree with me, would you not, that being able to pull those multiple sources from multiple Punchout vendor websites down into one requisition is a, quote, real benefit, end quote, would you not? A: Yes.")

94.     The RSS Punchout functionality that Lawson now blocks in RQC is a potential

cost-saver for product users.

- Tr. 218:24-25 (Weaver:  "Q: It is a cost-saver? A: Probably.")

- Tr. 218:9-14 (Weaver:  "Q: Dr. Weaver, this quality of being able to bring
  together items from multiple Punchout vendors' websites that was present
  with RSS and is not present with RQC, would you agree with me that that
  is a cost-saver in the requisitioning process for the user? A: Probably so,
  but it's not part of the claim.")

95.     The inventors of the '683 patent represented to the patent examiner that one of the

"distinct advantages of applicant's invention" is "being able to purchase all of the selected items

from all of the desired sources without having to wait in the check-out line at each of the stores."

- Applicant's April 6, 1998 Response to Office Action dated December 8,
  1997, at 15 (touting advantages of now-removed functionality)[1]

- Tr. 470:7-471:10 (Goldberg)

96.     With respect to the Punchout functionality changes, Lawson failed in its goal of

minimizing the redesign's impact on its customers.

- Tr. 334:12-19 (Christopherson:  "Q:  To the extent you had those twin
  goals with respect to how Punchout is used and how shopping can be done
  with Punchout, were you  able to succeed on both fronts?  A:  No.  Q:
  And in which front did you fail, in your view, at the time?  A:  Limiting or
  keeping to a minimum the extent to which we were impacting the
  customer.")

97.     Requisitioning via Punchout functionality takes more time for a requester to

complete in RQC than in RSS, since RQC with Punchout is no longer a one-stop shop for

whatever a customer may want to puchase.

- Tr. 288:4-13 (Christopherson:  Discussing why requisitioning via
  Punchout takes additional time in RQC as compared with RSS)

- Tr. 461:3-13 (Goldberg:  Lawson's changes are significant because they
  take away the functionality of one-stop shopping)

---

[1] Lawson requests the Court take judicial notice of the '683 file history pursuant to Fed. R. Evid. 201.

- Tr. 460:2-16 (Goldberg:  Discussing the negative effect of the Punchout functionality changes on the product's usability for Lawson's customers)

98.     The changes to Punchout functionality limit a user's ability to comparison shop.

- Tr. 460:22-461:2 (Goldberg:  "Again, you are not able -- because you are not able to see all the items that you've shopped for on the screen at once, if you've shopped from multiple places, it becomes more difficult to compare them.  You are at the point of having to write down what you see or type it in somewhere else.")

- Tr. 452:5-13 (Goldberg:  A user can no longer view items from multiple sources side-by-side)

- Tr. 186:9-21 (Weaver:  Comparison shopping is more difficult when multiple requisitions are required, as opposed to a single requisition)

99.     Lawson's development department viewed the initial Item Master/Punchout limitation as significant because it required splitting ordering for a project into multiple requisitions, making the ordering and approval process harder to accomplish and degrading the product's functionality.

- Tr. 285:14-286:11 (Christopherson:  Changes to Punchout functionality are significant because splitting of orders for a project into multiple requisitions makes requisition harder to do")

- PX-1178 at RQC10357 (Christopherson:  Changes to Punchout functionality are significant because they removed previously-available functionality from customers)

- Tr. 361:16-20 (Christopherson:  Discussing PX-1178)

- Tr. 367:1-9 (Christopherson:  Mr. Christopherson was unhappy with the initial Item Master/Punchout limitation because, from a development perspective, he liked to put out a good product, and viewed this change as a deprecation of the product)

- Tr. 416:9-23 (Lohkamp)

- Tr. 410:6-17 (Lohkamp)

100.    The changes to Punchout functionality make the requisition approval process more difficult by forcing an approver to approve separate requisitions, rather than a single requisition, for a project.

- Tr. 286:12-287:6 (Christopherson:  Punchout functionality changes make the requisition approval process more difficult by requiring multiple requisition approvals for a single project)

101.    Code reuse, which causes products to be less than 100 percent different from each other, is a good engineering practice.

- Tr. 370:9-21 (Christopherson:  "Q:  Why – withdrawn.  And what does it mean to be less than 100 percent different from prior software?  A:  It means that I'm reusing some of the components or modules inside of the other product.  Q:  And why did you choose to do that?  A:  It's good engineering practice to reuse code that already works and that you could use.")

102.    Mr. Christopherson stated that all moving parts in RSS are in RQC because RQC was built by adding code to RSS that created the blocks to certain Punchout functionality, rather than by deleting code or modules.

- Tr. 381:4-17, 381:20-382:8, 382:11 (Christopherson:  "The modules are going to be – because we start at the same spot the basic modules are going to be the same for what was in RSS.  If you would, RQC inherits everything that was in RSS.  Then we begin to change or modify the inheritance of what is actually coming into the system.  So that's where we begin to make the changes. . . . Q:  So you added code to cause the blockage.  It wasn't taking away something that was previously there as far as computer code goes, correct? . . . A:  Correct.")

103.    Lawson's business department did not want to implement the initial Item Master/Punchout limitation because the change would negatively impact Lawson's customers by removing functionality.

- Tr. 398:5-21 (Lohkamp:  Mr. Lohkamp, when first learning about the initial Item Master/Punchout limitation, expressed his concern that the change, by removing functionality, would negatively impact Lawson's customers because it was removing functionality)

- PX-1019 at RQC2291408 ("Last week Dale and I were asked to make additional changes related to functionality in requisition center.  I would prefer not to do this, but our advice is that we need to do something like this")

- Tr. 405:12-406:3 (Lohkamp:  Discussing PX-1019)

104.   Lawson's development department did not want to implement the Multiple Punchout Sites limitation.

- Tr. 367:18-19 (Christopherson:  Mr. Christopherson did not recommend that Lawson implement the Multiple Punchout Sites limitation)

- Tr. 368:10-18 (Christopherson:  When considering the Multiple Punchout Sites limitation, Dale Christopherson expressed to Keith Lohkamp that he did not want to make the change, but legal determined that Lawson did, indeed, need to make the change.)

- Tr. 409:7-17; 411:6-8; 414:2-19 (Lohkamp)

105.   Lawson's business department viewed the changes to Punchout functionality as having a significant negative impact on and being a step backwards for Lawson's customers.

- DX-691 at RQC1000157 (June 1, 2011 email:  "If we need this, I think customers could live with this but will be unhappy.")

- Tr. 411:1-8 (Lohkamp:  Discussing DX-691)

- PX-1096 at RQC914945 ("This will have a negative impact on our customers, but they are already impacted by our requirement to different requisitions for Punchout versus non-Punchout items.")

- PX-1096 at RQC914945 ("This will be a step backwards for customers, and we've been talking about RQC as a superior product.  Cleveland Clinic, for example, specifically asked during the webinar Q and A about whether they could put two Punchout vendors on a single requisition.")

- Tr. 414:20-415:7, 409:4-17, 409:25-410:25, 416:5-23 (Lohkamp: Discussing PX-1096)

- Tr. 417:20-418:1 (Lohkamp:  Mr. Lohkamp did not want to implement the Multiple Punchout Sites limitation because it was a step back for customers, but supported doing so if legal recommended it, regardless of the customer impact.)

- Tr. 408:10-19 (Lohkamp: Mr. Lohkamp expressed his concerns to Dale Christopherson that Multiple Punchout Sites limitation took away functionality from customers that previously existed.)

106.   ePlus has not disputed or rebutted the testimony of Lawson's witnesses regarding the significance of Lawson's changes to Punchout functionality.

107.   Lawson would reverse the changes to Punchout functionality, if given the option to do so.

- Tr. 430:10-18 (Lohkamp: Lawson would reverse the Punchout functionality changes, if possible)

108.   Lawson's customers evidenced concern and/or requested that Lawson restore the functionality removed by the initial Item Master/Punchout limitation and the Multiple Punchout Sites limitation.

- Tr. 413:7-17 (Lohkamp: By the time Lawson was considering the second Punchout change, Keith Lohkamp had already heard feedback from customers such as Central DuPage, Trinity Health and Cleveland Clinic regarding the first Punchout change)

- PX-1057 at attachment page 7; PX-1002 at RQC 652 (June 3, 2011 webinar question: "With RSS we were able to mix Punchout items with stock items on a requisition. I've seen info that suggests that is not possible with RQC. Is this previous functionality of RSS likely to be restored to RQC?"

- Tr. 424:21-425:7, 425:17-426:9 (Lohkamp: In PX-1057 at attachment page 7, Mr. Grochocinski, who works in IT at Central DuPage Hospital, asked during Lawson's webinar whether Lawson would restore the ability that customers had with RSS to mix Punchout items with stock items on a single requisition)

- PX-1057 at attachment page 12; PX-1002 at RQC 652 (June 3, 2011 webinar question: "Will the functionality be changed in the future so a requisition can contain both Punchout and item master items?")

- Tr. 426:12-25 (Lohkamp: In PX-1057 at attachment page 12, Ms. Swanson, who supports users of supply chain apps at Central DuPage Hospital, asked during Lawson's webinar whether Lawson would change RQC to allow both Punchout and item master items on a single requisition.)

- PX-1057 at attachment page 17; PX-1002 at RQC 652 (June 3, 2011 webinar question: "Can you mix Punchout vendor items, example, Granger and Staples?")

- Tr. 427:16-23 (Lohkamp: Ms. Klag of Cleveland Clinic Foundation asked during Lawson's webinar whether RQC allowed users to put items from multiple Punchout vendors on a single requisition.)

- PX-1057 at attachment page 27; PX-1002 at RQC 652 (June 3, 2011 webinar question: Trinity Health asked "Can you mix punchout vendors on the same Req?")

- PX-1269 at Interrogatory 18 (On October 7, 2011, Lawson identified customers Baylor Health, Central Dupage Health, and St. Jude as having expressed concerns over the changes to Punchout functionality)

109.    Dr. Weaver testified to his opinion that no amount of lost functionality would be

sufficient to make something more than colorably different.

- Tr. 201:6-9 (Weaver: "Q. So is there any amount of lost functionality that would be sufficient to make something more than colorably different?  A. No.").

110.    Dr. Weaver testified to his opinion that a modified product must contain 50% new

functionality in order to be more than colorably different.

- Tr. 200:6-11 (Weaver: "Well, I know.  I'm looking for your values here. I'm trying to figure out when you made a decision, you've said it doesn't have to be 100.  Is there some baseline minimum, it needs to be above that or it can't be more than colorably different?  A. I think it would have to be 50 percent new.")

111.    ePlus and Dr. Weaver base their positions on the more than colorable differences

issue on their contention that RQC infringes claim 26.

- Tr. 167:16-17 (Weaver: Dr. Weaver opining that RQC configurations are not more than colorably different than RSS configurations because the changes "are not related to any claim element in Claim 26.")

- Feb. 29, 2012 Hearing Tr. 55:2-4 (ePlus Counsel: "The colorable difference is inextricably intertwined with whether or not it satisfies the element and, therefore, infringes.")

30

- Tr. 89:4-8 (Weaver: "The capability of RQC in the procurement system is the same with regard to claim 26. All elements of claim 26 can still be practiced. So there is -- there is no significant difference in the operation of RQC as viewed in light of claim 26.")

- ePlus Colorably Different Post-Hearing Brief, p. 7 (ePlus asserting, on a limitation-by-limitation basis that claim 26 can be practiced by RQC)

- Tr. 99:5-14, 102:13-19, 104:1-7, 107:11-24, 108:3-19 (Weaver: Dr. Weaver, in the colorable differences phase of the contempt hearing, walking through each step of claim 26 and asserting that each limitation is still met)

112.    Dr. Weaver testified that because all elements of claim 26 can still be practiced, there is no significant difference between RQC and RSS.

- Tr. 89:4-8 (Weaver: If all elements of a claim are performed by RQC, then there is no significant difference between RSS and RQC.)

- Tr. 219:19-220:4, 221:22-25 (Weaver: "Q: Am I right that's because at the end of the day, what was lost doesn't stop the product from infringing, in your opinion? A: No, that's not correct. It's because those elements that you discussed -- they are not elements. Those attributes that you discussed are not related to claim 26. That's why they are not colorably different. Q: Not related to claim 26. To be related to claim 26, it would relate to the functionality of the claims; correct? A: Absolutely. . . . Q: So by saying you have the functionality of the '683 claims, you are saying that you do infringe the '683 claims, or Lawson does; correct? A: Yes.")

113.    During the colorable differences phase of the contempt hearing, Dr. Weaver walked through each element of claim 26 and asserted RQC continued to satisfy every element.

- Tr. 99:5-14; 102:13-19; 104:1-7; 107:11-24; 108:3-19 (Weaver element-by-element infringement analysis during colorability phase of hearing)

114.    Dr. Weaver asserts that the changes are not more than colorable because the "core functionality" was not changed.

- Tr. 87:19-20 (Weaver: "None of the core functionality that enables procurement has been changed.")

- Tr. 140:3-13, 146:6-11, 148:7-14, 149:19-24, 155:17-24, 159:18-160:3, 183:16-18 (Weaver: Core functionality has not been changed)

31

115.    Core procurement functionality existed prior to the patent-in-suit.

- '683 Patent at col. 1:10-17 ("There are a number of known
  requisition/purchasing systems that manage and process requisitions and
  purchase orders.")

116.    The '683 patent claims an improvement on core procurement functionality.

- '683 Patent at col. 1:1-3:25 (claiming improvements to core procurement
  functionality)

117.    Dr. Weaver ignored evidence of decreased convenience, increased cost and

impaired comparison shopping as "not part of the claim."

- Tr. 219:12-221:25 (Weaver:  Stating that indicators of lost functionality
  are irrelevant as the indicators of lost functionality are not claimed in the
  patent)

118.    Dr. Weaver ignored evidence showing resistance from Lawson and from

customers to the modifications to Punchout functionality.

- Tr. 191:21-23 (Weaver:  "Q: Did you consider these questions in any way
  in reaching your expert opinion? A: Not the two that you pointed to.")

- Tr. 230:3-11 (Weaver:  "Q: So the gentleman says, with RSS, we were
  able to mix Punchout items with stock items on a requisition. I've seen
  info that suggests that is not possible with RQC. Is this previous
  functionality of RSS likely to be restored to RQC; did you see that? A: I
  do. Q: Did you give that comment any consideration in the formulation of
  your opinion? A: No.")

- Tr. 227:15-24 (Weaver:  "Q: The next one says, impact, this will have a
  negative impact on our customers who use Punchout, and this is on top of
  the change we made to require different requisitions for Punchout versus
  non-Punchout items; do you see that? A: I do. Q: Did you consider and
  give any weight to that view expressed in a Lawson internal document
  when you formed your opinion? A: No. It's not relevant.")

- Tr. 225:15-22 (Weaver:  "Q: And did you give any significance to Mr.
  Lohkamp's statement that I would prefer not to do this as far as whether
  the action being taken was a diminishing of the functionality of the
  product? A: I don't know what he was thinking. Q: But you didn't make
  any -- you didn't read anything in or have any takeaway message from this
  one? A: No.")

**E.     Lawson's Post-RQC Release Internal Documents Do Not Establish That The Changes Were Not More Than Colorable, As ePlus Alleges**

119.     When Dale Christopherson referred to some RQC changes as "lipstick on a pig",

(*see* PX-1030), he was referring to user interface changes only, and specified Lawson's

functional changes, such as those to Punchout, as functional changes separate from the user

interface changes.

- PX-1030 (June 2, 2011 email mischaracterized at ePlus PFF 54 as characterizing the Punchout functionality changes at issue as "lipstick on a pig". Email discusses UI "lipstick on a pig" changes as distinct from functional changes)

- Tr. 279:8-280:10 ("Q: All right. There's reference made to a comment attributed to you of lipstick on a pig. Would you identify for the Court what changes -- withdrawn. Do you recall ever using that term? A: Sure, I do. Q: What changes were you referring to as lipstick on a pig? A: They were elements of the user interface, what we call a UI. We were simply making some label changes to make sure that the text to the label would mean the same or have the same labels as what it had in RQ 10 as what it had in RQC. An example of that would be in what was on the right-hand side of RSS, it was called checkout. And we changed that button to say "released" instead. Q: Did it have effectively the same functionality? A: Effectively, yes. Q: Would you consider that a cosmetic change? A: Yes. Q: Would you consider that a significant change to the functionality of the manner in which Punchout operates? A: No. Q: Are you aware of Lawson ever taking the position in this case that that sort of cosmetic change constitutes a significant change to the functionality of Punchout? A: I'm not aware of any.")

120.     PX-1066 relates to changes other than Punchout changes that Lawson

implemented.

- PX-1066 (June 30, 2011 email mischaracterized at ePlus PFF 70 as relating to the Punchout functionality changes at issue. Email discusses data migration, not changes to Punchout functionality)

- Tr. 208:13-18 (Weaver: "Q: Do you think it was about the functionality of going from a search in item master and a selection of a good in item master and then an attempt to try to go to Punchout? Do you think it had anything to do with that? A: No, it's about data migration.)

121.     PX-1072 discusses changes in user interface, not Punchout functionality.

- PX-1072 (June 8, 2011 email mischaracterized at ePlus PFF 61 as relating to the Punchout functionality changes at issue.)  PX-1072 discusses user interface changes, and not changes to Punchout functionality.

**F.    Lawson's Post-RQC Release Statements To Customers Do Not Establish That The Changes Were Not More Than Colorable, As ePlus Alleges**

122.    Marketing documents often contain a positive spin for customers.

- Tr. 486:3-8 (Goldberg:  "In my experience, both as part of litigation analysis but also as a programmer, I've seen many marketing documents that put a certain spin for the customers that aren't necessarily grounded in fact ")

123.    Lawson did not tell its customers that RQC has "100% of the existing functionality of RSS."

- PX-1002 at RQC00000653 (Final version of June 3, 2011 webinar does not include this language; ePlus relies on a draft version of the document (PX-1057 at attachment at 20).  ePlus mischaracterizes the language in PX-1057 as having been sent to customers.  *See* ePlus PFF 64.)

124.    Mr. Lohkamp testified that a marketing statement that "RQC contains 100 percent of the functionality that customers require" was meant to reassure customers that they would be able to perform their key business functionalities such as requisition items from item master or Punchout, but not to indicate that they would have 100 percent of the functionality that they had had before.

- Tr. 421:13-24 (Lohkamp: Mr. Lohkamp drafted a statement that "100 percent of the functionality you require" would be included).

- 422:25-423:16 (Lohkamp: Lawson phrased their statement this way to reassure customers that they could do their key business functionalities, "but we weren't trying to suggest that they would have 100 percent of the functionality that they had had before.").

125.    There is no evidence that PX-1027 relates to Punchout changes as opposed to the non-Punchout changes that Lawson implemented.

- PX-1027 (August 2, 2011 email mischaracterized at ePlus PFF 65 as relating to the Punchout functionality changes at issue)

- Tr. 207:1-15 (Weaver: Q: Does Providence Health have Punchout? A: I don't know. Q: Is this document -- did you interpret this document to be an analysis or communication by Mindy Klebe about the functionality of Punchout in RQC? A: It clearly says it's about RQC. Q: Right. And what I want to know is we've agreed, have we not, that there are other aspects of RQC that exist utterly independent of Punchout, right? A: Correct. Q: Can you tell when you read this document whether what she's talking about relates to the other aspects or relates to the Punchout aspects? Can you divine that? A: No.")

126.   PX-1124 relates to changes other than the Punchout functionality changes that Lawson implemented.

- PX-1124 (May 31, 2011 email mischaracterized at ePlus PFF 100 as evidence of Lawson's use of Punchout).  Email does not mention Punchout when discussing changes in RQC.

- Tr. 428:23-430:4 (Lohkamp:  In PX-1124, Ms. Klebe responds to a customer's question by explaining the basis of her knowledge is Lawson's going live on RQC.  Mr. Lohkamp explains that Lawson does not use Punchout in its own system)

- Tr. 202:5-23 (Weaver:  Dr. Weaver does not know whether PX-1124 relates to a configuration having Punchout)

127.   PX-1266 relates to changes other than the Punchout functionality changes that Lawson implemented.

- PX-1266 (May 27, 2011 email not mentioning Punchout when discussing changes in RQC)

- Deposition of Dean Hager, March 22, 2013, 162:11-162:18 ("Q. It says it addresses all of the core concerns outlined in my call today.  Do you recall whether anyone raised any concern whatsoever that related to Punchout or EDI?  A. I don't recall the conversation, but since it says "all concerns" and it's not referenced in the letter, my conclusion would be that Punchout wasn't discussed.")

128.   There is no evidence that the question asked by Art Crandall & Associates in PX-1105 relates to modifications to Punchout functionality.

- PX-1105 (June 3, 2011 email mischaracterized at ePlus PFF 73 as relating to the Punchout functionality changes at issue.  Email does not mention Punchout when discussing changes in RQC)

129.     Children's Health of Atlanta, to which ePlus referred in its opening statement, does not have Punchout.

- PX-1242 at M4166 (spreadsheet showing that Children's Health of Atlanta does not have Punchout)

- PX-1245 at M68106 (spreadsheet showing that Children's Health of Atlanta does not have Punchout)

- PX-1078 (chart showing SKUs that include Punchout)

130.     ePlus has not met its burden to show by clear and convincing evidence that the changes at issue are not more than colorable, and in fact, the modifications made to Punchout functionality are more than colorable.

## III.    ePLUS HAS FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT LAWSON VIOLATED THE TERMS OF THE INJUNCTION IN REGARD TO ITS DEALINGS WITH CONFIGURATION NO. 3 AND 5 CUSTOMERS

### A.    General Matters

131.     The May 23, 2011 Injunction enjoined Lawson from making, using, selling, installing, implementing, designing, configuring, consulting, upgrading, maintaining, supporting, training (or other related services) identified software configurations, all containing RSS.  For 277 healthcare customers, that Injunction did not take effect until November 23, 2011.

- D.I. 729.

- Tr. 807:13-21 (Homewood)

132.     As a direct consequence of the Injunction, Lawson took significant and immediate steps to ensure compliance with the terms of the Injunction.

133.     Lawson promptly notified all of its employees and affected groups about the Injunction.  Specifically, Mary Jo Tincher, Lawson's Director of Portfolio Management, Marketing and Strategy, orchestrated and communicated with group leaders and Lawson

employees to insure compliance with the order.  Ms. Tincher set up a communications plan to update all functional groups.  *Id.*; PX-1101 at RQC2076740 ("RSS Injunction Plan").

134.     Lawson revised its manuals and user guides when it transitioned from RSS to RQC.  *Id.*

135.     Lawson published documentation of the RQC product to replace documentation of the RSS product.  *Id.*

136.     Lawson did not sell any enjoined configuration starting at least at the date of the May 23, 2011 Injunction.

- Tr. 801:14-17 (Homewood).

- PX-1269 at Interrogatory No. 1.

137.     Lawson identified 864 customers that had licensed enjoined configurations containing RSS.  That figure included approximately 380 customers that had licensed the configurations at one time but that were not active Lawson customers at the time of the Injunction.

- Tr. 567:24-568:2 (Hanson).

- Tr. 817:11-19 (Homewood).

138.     Lawson sent a copy of the Court's Injunction to every one of its 864 customers that had, at some point, licensed a configuration that had been found to infringe.

- Tr. 816:15-817:2 (Homewood).

- PX-1269 at Interrogatory No. 1.

139.     Lawson posted notification of the Injunction Order on the MyLawson.com website .

- PX-1269 at Interrogatory No. 1.

140.   Lawson communicated with its vendors regarding the Injunction and informed the vendors to cease selling RSS.  *Id.*

- PX-1269 at Interrogatory No. 1.

141.   If a customer is not on "active maintenance" on a product, that customer is not entitled to receive maintenance updates, patches, or any type of support on the product.

- Tr. 815:12-816:14 (Homewood).

142.   The new RQC product was made available free of charge to all 864 customers identified as having licensed (at any time) an enjoined configuration containing RSS, including those that were no longer on active maintenance.

- Tr. 817:3-10 (Homewood).

143.   By June 3, 2011, more than 350 customers had downloaded RQC.

- PX-1002.

144.   Of the 864 customers, about 135 were on active maintenance for configurations 3 or 5 as of May 2011.

- Tr. 818:16-22 (Homewood).

145.   After the Injunction issued, Lawson created a task force of 31 individuals from functional groups affected by the Injunction.  The task force met daily to formulate and implement compliance actions.  An "RSS Injunction Plan" was created, outlining the tasks and due date for compliance for different groups.

- Tr. 808:24-809:6; 810:5-9 (Homewood).
- PX-1269 at Interrogatory No. 1.
- PX-1101 at RQC2076740 ("RSS Injunction Plan).

146.   As of June 1, 2011, "[a]ctivities by many groups [in the task force were] progressing extremely fast."

- PX-1101 at RQC2076740 ("RSS Injunction Plan).

147.    ePlus presented no evidence that Lawson adopted or followed any policy of engaging in any prohibited activity for an enjoined software configuration for any customer with Configuration No. 3 or Configuration No. 5.

148.    Lawson stopped maintenance, service, and support of RSS for all customers (except for the 277 healthcare customers) in response to the Injunction.

- Tr. 804:6-11 (Homewood) ("Q:  Okay. Did Lawson stop all three, maintenance, support and service in response to the Court's injunction? A: Yes, we did.  Q: Relating to the enjoined products, correct?  A: Correct.").

- Tr. 805:3-6 (Homewood) ("THE COURT: Excuse me. I'm confused now. Did you stop providing support or did you provide support after the injunction?  THE WITNESS: We stopped providing support.").

- Tr. 807:12-21 (Homewood: References to stopping support do not refer to the 277 healthcare customers during the sunset period).

149.    Lawson decommissioned RSS on June 3, 2011, after the Injunction was entered.

- DX-557.

- Tr. 814:20-25 (Homewood).

- PX-1269 at Interrogatory No. 1.

150.    Decommissioning a product ends development, sales, and related activity for the product.

- Tr. 814:15-19 (Homewood).

151.    Lawson's decommission notice states:  "In order to migrate from RSS to RQC, organizations will need to uninstall RSS and install RQC.  RSS customers are responsible for the download and implementation of RQC and must take delivery of RQC as soon as possible. . . Continued use of RSS is at the customer's own risk and will void a customer's right of indemnification by Lawson."

- DX-557.

**B.      Maintenance, Service, Support**

152.    "Maintenance" relates to fixing problems with software code, or improvements

subsequent to an original release, and providing the code to licensees for installation.

- Tr. 803:15-804:2 (Homewood) ("Q: What's maintenance?  A: Maintenance is the actual code fix or delivery of fixing problems within the code . . . .  Q: Maintenance consists, for example, when you have a particular software product and there's an update and there's a patch, a customer maintains their software by going to the website and downloading and installing the patch, right?  A: Yes, that would be correct.").

153.    "Service" relates to the installation of the licensed software for customers.

- Tr. 803:5-11 (Homewood) ("Q: What's the difference between service and support at Lawson?  A: The difference is the services team is responsible for installing, implementing and consulting on the software. The support team is responsible for answering questions or addressing problems with the software.").

154.    "Support" relates to answering questions or addressing problems with the

software.

- Tr. 798:1-6 (Homewood) ("A: Support operations is the department that's responsible for providing support to our customers if they have questions on the software or if they're experiencing a problem running the software, or anything like that, they reach out to us to answer those questions.").

**1.      Maintenance**

155.    Lawson removed all marketing materials that related to RSS.

- PX-1269 at Interrogatory No. 1.

156.    Lawson stopped development on RSS and removed RSS from future roadmap and

project plans.

- PX-1269 at Interrogatory No. 1.

- PX-1101 at RQC2076743 ("RSS Injunction Plan").

157.   Lawson removed RSS from its maintenance release framework.

- PX-1269 at Interrogatory No. 1.

158.   All references to RSS on public websites were removed on May 26, 2011.

- PX-1101 at RQC2076743 ("RSS Injunction Plan).

159.   Lawson removed RSS from its RFP tools.

- PX-1269 at Interrogatory No. 1.

- PX-1101 at RQC2076743 ("RSS Injunction Plan).

160.   Lawson removed RSS from its content management tools.

- PX-1269 at Interrogatory No. 1.

161.   All learning material related to RSS was removed.

- PX-1101 at RQC2076743 ("RSS Injunction Plan).

162.   Pages on Lawson.com and MyLawson.com that referenced RSS and M3 e-Procurement were deleted or updated to eliminate any mention or those products.

- PX-1269 at Interrogatory No. 1.

163.   References to Procurement Punchout in connection with RSS were changed to no longer reference RSS.

- PX-1269 at Interrogatory No. 1.

164.   Lawson used demonstration laptops with its RSS product.  Lawson removed all access to its demonstration team to demonstrate the RSS product.  No Lawson employee was allowed to demonstrate the RSS product.

- PX-1269 at Interrogatory No. 1.

165.   Lawson stopped marketing, selling, and supporting all customers of M3 e-Procurement in the United States.

- PX-1269 at Interrogatory No. 1.

166.     Maintenance is not available on a decommissioned product.

- Tr. 815:8-11 (Homewood).

167.     By decommissioning RSS, Lawson eliminated the ability to download RSS as well as any patches to RSS.

- PX-1269 at Interrogatory No. 1.
- PX-1101 at RQC2076743.

168.     ePlus offered no evidence of any maintenance on RSS after the date of the Injunction.

## 2.     Service

169.     Lawson provided hosting services for customers, which involves hosting software on Lawson servers.

- Tr. 807:24-808:7 (Homewood).

170.     For those customers with enjoined software configurations hosted by Lawson, Lawson, immediately migrated them to RQC after the injunction.

- Tr. 808:8-13 (Homewood).

171.     Lawson provided system administration services for customers, pursuant to which Lawson acted as system administrator for software hosted on the customer's server.

- Tr. 808:14-18 (Homewood).

172.     For those customers with enjoined software configurations for which Lawson served as system administrator, Lawson installed to RQC immediately after the Injunction.

- Tr. 808:19-23 (Homewood).

173.     At the time of the Injunction, Scott Hanson was the Global S3 Installation Team Manager in the Lawson Professional Services organization.

- DX-587.

42

174.   At the time of his deposition in December 2011, Mr. Hanson was the Practice Director of Technology in the Lawson Consulting Services organization.

- Tr. 564:25-565:5 (Hanson).

175.   Mr. Hanson's responsibilities as Practice Director of Technology include managing consultants that perform installations and general oversight for installation-related activities for RQC and Procurement Punchout (and before the Injunction, RSS), which involves taking software and putting it on customers' computers.

- Tr. 565:6-10; 565:15-566:1; 590:3-12 (Hanson).

176.   Mr. Hanson's group, the Lawson Consulting Services organization, which does the installations of the software, gets involved in an installation project after the customer purchases the software and a project manager is assigned.

- Tr. 592:19-593:3 (Hanson)

177.   As Mr. Hanson stated four separate times, he is not in the support organization.

- Tr. 583:22-23 (Hanson) ("A: I am not in the support organization, so I do not know what she was doing or what she was referring to."); *see also* Tr. Tr. 584:15-16; Tr. 585:23-586:5; Tr. 589:4-5.

178.   On May 27, 2011, Mr. Hanson issued a directive to all installers to stopped providing service on RSS and instructed that if an installer was asked to install RSS as part of their current engagement, they should install RQC.

- Tr. 605:21-607:11 (Hanson)

179.   Mr. Hanson's May 27, 2011 directive to the installers states:  "Cease all work you might be asked to do regarding RSS."

- DX-587.

180.   Mr. Hanson's May 27, 2011 directive to the installers states:  "If you are asked to *install* RSS as part of your engagement, you should install Requisition Center (RQC) instead.

43

And notify the P[roject] M[anager], client and myself of those actions" (emphasis in original). For example, when Mr. Hanson learned of an installer asking what to do in connection with a customer contract providing for installation of RSS, Mr. Hanson directed that "we will install RQC instead of RSS."

- DX-587.

- Tr. 607:19-22; 608:4-10; 611:2-7 (Hanson)

181. ePlus offered no evidence that Lawson provided service on RSS to a customer after the Injunction.

182. After the Injunction issued, Lawson held webinars to inform customers about the Injunction and migrating to RQC.

- PX-1269 at Interrogatory No. 1.

183. Customers submitted questions during the webinar. Lawson prepared responses to the customer questions and posted the final version of the responses for access by Lawson's customers.

- PX-1057 (draft responses to questions).

- PX-1002 (final responses to questions).

- Tr. 596:18-597:2; 598:7-24 (Hanson).

184. No customers ever saw a draft of the answers Lawson provided.

- Tr. 553:18-554:7 (Lohkamp: To his knowledge, Lawson customers did not see draft versions of the answers drafted by Lawson).

185. Lawson encouraged its customers to migrate from RSS to RQC as soon as possible.

- PX-1002

44

186.    Lawson created a SWAT team to encourage and assist customers to transition from RSS to RQC.

- PX-1269 at Interrogatory No. 1.

- Tr. 566:4-7 (Hanson).

187.    The RQC SWAT team's responsibilities involved answering any questions that customers had on RQC, installing RQC product on customer systems, and stopping installers from working on RSS.

- Tr. 566:8-12; 605:13-20 (Hanson) ("Q: And were there -- were you given a policy to follow as far as the mission of the SWAT team relating to RQC?  A: Yes.  Q: What was that?  A: It was to transition all of our existing RSS customers to RQC, answering any questions or doing installs as part of the SWAT team.  Additionally was to stop doing any work on RSS.").

188.    Mr. Hanson was designated as the head of the RQC SWAT team.

- Tr. 566:2-3; 591:10-12; 605:10-12 (Hanson).

189.    Mr. Hanson's role in the SWAT team involved supervising the same installation processes he supervised in his regular job in the services organization.

- Tr. 592:2-9 (Hanson) ("Q: And what was your -- what expertise did you bring to the SWAT team?  A: Technical.  Q: Involving the same installation processes you supervised in your regular job? . . . A: Exactly.").

190.    Members from the SWAT team were drawn from parts of Lawson with different expertise, such as from the technical, application, and learning areas.

- Tr. 591:13-592:1 (Hanson).

191.    As an incentive to migrate to RQC, Lawson offered 8 hours of free service and support from the SWAT team RQC to customers that took advantage of the free product.

- PX-1269 at Interrogatory No. 10.

- PX-1002.

192.     As of December 2011, the RQC SWAT team had communication with about 240 customers about transitioning to RQC.

- Tr. 568:3-7 (Hanson).

193.     The RQC SWAT team performed at least 60 RQC installations for its customers.

- Tr. 612:6-8 (Hanson) ("Q: Do you have any recollection of approximately how many installs were completed as of, let's say, December 2011?  A: We did roughly 60 installs or assistance of installs.").

194.     The SWAT team's objective was to get the installations done in a customer's production environment.

- Tr. 611:20-612:5 (Hanson) ("Q: In terms of the work that the SWAT team did, . . . was RQC installed at customers in a production environment under your supervision?  A: Yes.  Q: [S]o during the summer of 2011, were such installs completed by you?  A: Yes.  Q: And . . . was the objective of such installs and the work of the SWAT team to get installs done in a production environment?  A: Yes.").

195.     Customers with RSS could and did accomplish the RQC installation themselves.

- Tr. 593:4-8 (Hanson) ("Q: Is it necessary to have Lawson installers install the software?  A: No, not necessarily. Partners can do it, the client could try to do it, but most likely they're going to need our assistance installing it.").

- Tr. 593:15-21 (Hanson) ("Q: And let's talk about installing the redesigned RQC to someone who is already a Lawson customer.  Must that installation be performed by a Lawson installer?  A: No.  Q: So if a customer has a sophisticated IT department, could that IT department perform the install?  A: Yes, they could.").

- Tr. 594:8-14 (Hanson) ("Q: For example, in the service organization, do you sometimes receive queries from customers who are performing installs?  A: Yes.  Q: So these are customers who have attempted to do an installation on their own; correct?  A: Correct.").

- Tr. 595:3-6 (Hanson) ("Q: So, customers are capable of installing and receiving instruction on how to install the RQC redesign, and they can do it by themselves; correct?  A: That is correct.").

46

196.    The first step to install and integrate RQC into the S3 Procurement System is to download RQC.

●    Tr. 566:13-17 (Hanson).

197.    After downloading the RQC software, the customer must follow the steps in the RQC installation guide, which is provided by Lawson, to install the program.

●    Tr. 566:18-21 (Hanson).

198.    If a customer has both a test system and a production system, the customer would install RQC on each system.

●    Tr. 566:25-567:4 (Hanson).

199.    A production system is the "live" system where the actual requisitioning process is occurring.

●    Tr. 567:5-8 (Hanson).

200.    A customer must also configure its system.

●    Tr. 567:9-11 (Hanson).

201.    The nature of the tasks associated with configuration include determining and setting up Punchout companies, item masters, item locations, and setting up the procurement system.

●    Tr. 567:12-16 (Hanson).

202.    Other steps that are required for implementation include user training, applying security, and setting up requisitioners.

●    Tr. 567:20-23 (Hanson).

203.    End user training is performed by the customer.

●    Tr. 596:1-12 (Hanson).

204.     The amount of work to install RQC for a client transitioning from RSS to RQC is

less than for a client installing RQC from scratch.

- Tr. 595:11-25 (Hanson) ("Q: From your perspective as an installer, could you compare the amount of work required to install RQC and the procurement suite at a new Lawson customer to that required to install RQC at an existing Lawson customer?  A: So if a client is installing it from scratch, they would have a lot more activities that they would need to do as far as setting up procurement, setting up item masters, doing the configuration, testing, and then doing the end user training because they'd be seeing it for the first time.  From a client transitioning, a lot of that has been set up, so a transition client would only need to get the new product and then do product testing and, again, end user training, but now differences, not trying to explain everything. So it will vary greatly.").

- Tr. 600:11-19 (Hanson) ("Q: From an installation perspective, why do you advise not to uninstall RSS before installing RQC?  A: If you uninstall RSS, again, you are getting back to having to re-implement it to get all the configurations back. You could lose some of those configurations in trying to get it back, so to save time in doing the transition, we installed RQC on top of RSS so we could retain those configurations and thereby making RSS inaccessible as well.").

- PX-1002 at RQC0000645 ("At CUE, I seen a session on RSS Config. Can you do same configs w/ RQC?  Yes, the Requisition Center configuration file will provide the same options.  So you will be able to leverage the learnings from that class.").

- PX-1002 at RQC0000645 ("Requisition Center uses the same security that was set up for RSS.").

**3.     Support**

205.     Elizabeth Homewood is the Senior Director for Support Operations.

- Tr. 797:20-21 (Homewood).

206.     Ms. Homewood was initially notified of the Injunction by her boss at the time,

Nancy Anderson.

- Tr. 799:12-19 (Homewood).

207.     Ms. Homewood was given responsibilities at Lawson for ceasing support for RSS

in compliance with the Injunction.

- Tr. 799:20-800:2 (Homewood).

208.    Lawson instructed its support teams not to assist any customer who was using

RSS.

- PX-1269 at Interrogatory No. 1.

209.    Lawson implemented restrictions related to the login status of its customers to

prevent users of RSS from obtaining customers support on RSS.

- PX-1269 at Interrogatory No. 1.

210.    After the Injunction issued, Lawson's policy mandate for the support organization

was to direct all customers with RSS to download and install the new RQC product.

- Tr. 866:9-13 (Homewood) ("Q: Indeed, that was the mandate from the policy mandate of Lawson for all of its customers who had been running RSS, to download and to install RQC, correct?  A: Yes.").

211.    As of May 2011, approximately 320 people worked in Lawson's customer

support team.

- Tr. 804:15-20 (Homewood) ("Q: How many support -- how many people work in the support area for Lawson?  A: Currently or --  Q: At the time of the injunction, May 2011.  A: At that time the Lawson support team was just over 320 people or so.").

- Tr. 834:11-13 (Homewood) ("Q: How many were there total at that time in the support personnel team or organization for Lawson?  A: About 325.").

212.    Ms. Homewood communicated Lawson's policy "to stop providing support" to all

of them.

- Tr. 804:21-805:2 (Homewood) ("Q: Did you disseminate to the support team policy regarding the provision of support after the injunction?  A: Yes.  Q: How did you do that?  A: It was done through a combination of verbal meetings and emails.").

- Tr. 805:7-9 (Homewood) ("Q:  Did you communicate the direction to stop providing support to the support technicians?  A: Yes, I did.").

213.    Once a customer downloaded RQC, they would receive support on products, but

not RSS.

- Tr. 848:16-25 (Homewood) ("THE COURT: Ms. Homewood, is that what
  was going on, that customers who had RSS, once they downloaded the
  RQC, they could get support, and there were no questions asked about
  what was going on?  Is that right?  THE WITNESS: No. The downloading
  it would change their product configuration.  They could get support on
  other products, not RSS, but they could get support on HR, and payroll,
  and all the products that they own.").

214.    Under the policy, if a support technician learned in the course of an interaction

that a customer was running RSS, support would be denied.

- Tr. 861:16-862:5 (Homewood) ("Q: You were also asked about whether
  support would stop being provided if in the course of a support interaction
  the technician learned that the customer was running RSS. Do you recall
  those questions?  A: Yes.  Q: Turn if you would to 115251, and do you see
  the entries on June 1, 2011, between Megan Anderson and Mike Meyer?
  Do you see the entry there?  A: Yes, I do.  Q: Does that reflect a denial of
  support?  A: Yes, that is.  Q: Does that reflect a denial of support after the
  support entity learned that the customer was running RSS?  A: Yes.").

- Tr. 852:9-11 (Homewood) (Lawson's support personnel "would provide
  support initially.  If at any point during that interaction it became apparent
  they were running RSS, we would stop support at that point.").

- Tr. 853:3 (Homewood) (Lawson would provide support "[u]ntil we
  discovered if they were running RSS.").

215.    Customers requesting support from Lawson log onto a customer portal and into a

ticket incident management system.

- Tr. 801:18-802:16 (Homewood).

216.    To provide a consistent message to customers seeking support on RSS, Lawson

issued "canned messages" to customers who sought support for RSS telling them, as one

example:

> Thank you for contacting Lawson Global Support with your questions regarding
> requisition self-service, RSS.  Due to the recent court ruling regarding the ePlus
> patent litigation, Lawson is no longer supporting the requisition self-service, RSS

50

product. For additional information regarding the Court ruling, please visit MyLawson.com.  Requisition Center, RQC, the replacement product for RSS, is available to you at this time free of charge from Lawson. For more information, please visit MyLawson.com or contact your account executive.  At this point, I will be closing your RSS case.  I look forward to supporting you on Requisition Center

- PX 1058 at RQC0115251.

- Tr. 602:4-21 (Hanson).

- Tr. 863:6-9 (Homewood) ("Q: And in the support interactions, canned messages were used to deliver a consistent message to customers when support was stopped, correct?  A: Correct.").

217.    On May 25, 2011, Ms. Homewood "[r]eceived initial notice to discontinue service/support and distribution of collateral of RSS, Procurement Punchout (not part of RQC) and M3 e-Procurement in the US for all non-healthcare customers while emergency stay is being reviewed."

- DX-563.

218.    The Knowledge Base (KB) is Lawson's online customer self-service database of information regarding Lawson's entire product line.

- Tr. 805:13-19 (Homewood).

219.    After the Injunction, Lawson conducted "a comprehensive search on the terms related to the [enjoined] products and removed all of the articles, the documentation.  Any patches or information related to the products was taken out of the knowledge base for customer view."  Lawson Global Support worked with Lawson's Knowledge Base team to conduct keyword searches throughout the Knowledge Base to identify all documentation and information related to the RSS product.  As a precautionary measure, all documents containing any of the keywords, such as RSS, Requisition Self Service, Shopping Cart, e-requisition, SIP, and SIPP, were automatically removed from customers' view.  Lawson then reviewed the documents to

determine whether any of the documents were "false positive" hits.  Any "false positive"
documents were later made available to customers.

- Tr. 805:20-806:5 (Homewood).

- PX-1269 at Interrogatory No. 1.

- DX-563 at RQC0561907.

- PX-1101 at RQC2076743.

- PX-1002 at RQC000654.

220.    On May 27, 2011, Lawson "[f]inalized removal of all RSS related KB articles,
downloads, documentation, patches, etc. from customer viewing on MyLawson."

- DX-563.

221.    With that removal, articles on how to fix or adjust RSS could not be obtained
from Lawson's web-based library.

- Tr. 806:6-10 (Homewood).

222.    Lawson directed customers upgrading to RQC to Knowledge Base material that
provided instruction on how to uninstall RSS.

- PX-1002 at RQC0000643.

223.    On June 6, 2011, Lawson expanded its policy to stop support on all product lines
that run on the LSF platform until the customer in question had downloaded RQC.

- DX-563.

- Tr. 863:14-864:6 (Homewood) ("Q: What's the nature of the change from
  what was the policy to what became the policy on June 6?  A: On June 6
  we expanded the stop support to all product lines that run on the LSF
  platform until such time that the product configuration containing RSS had
  changed.'  So that would include all product lines such as HR, payroll,
  financials, anything that ran on the LSF platform.  Q: That policy
  continued in force?  A: Yes, it did.").

224.    Lawson's support function receives between 7,000 and 8,000 support queries per month.

- Tr. 810:14-18 (Homewood).

225.    Ms. Homewood had no concerns that RQC did not adequately address the aspects of RSS that were found to have infringed.

- Tr. 855:1-9 (Homewood) ("Q: Let me ask it a different way.  From the period after the injunction when you found out about the injunction about what products it affected and you learned that there was going to be this RQC module made available.  Did you have any concerns that no one outside the Lawson organization had said, We agree that this RQC solution solves the legal problems that we're having?  A: No, not to my recollection.").

226.    A month after the Injunction had issued, a lot of the tasks to comply with the injunction for the other departments were complete, but support was still dealing with compliance questions on a daily basis.

- Tr. 856:16-857:18 (Homewood) ("Q: What did you mean when you told Mr. Bragstad you were absolutely scared as much as him that nobody in the courts or ePlus had said that RQC complied?  A: I wasn't scared so much whether the product complied as much as what the impact that would have on our customers and our operations if that were to be the case.  Q: Now, you see Mr. Bragstad responds to you at 2:03 p.m.'  He says -- before I ask you that, was it your understanding at the time that neither the Court nor ePlus had said that RQC was in compliance with the Court's injunction?  A: If I recall correctly, it was just a comment that there was a question as to there was something in question as to whether or not RQC would be in compliance.  Q: And that scared you?  . . . A: It didn't.  Again, I just said it didn't scare me whether that would be found in compliance as much as what scared me was we had just spent a month working with our customers to migrate them and encourage them to use RQC, and then to hear that potentially we'd have to go through all that pain and impacted on our customers again is what scared me, not the actual product.").

- Tr. 858:6-20 (Homewood) ("Q: What did you mean when you said that the rest of the company besides support was not taking this seriously and seemed like everyone had just checked out?  A: I don't think he said they weren't taking it seriously.  I think what he said is support was taking it more seriously, and at this point in time we're a month after the

injunction, a lot of the tasks to comply with the injunction for the other departments were complete.  Support was still dealing with this on a day in and day out basis.  So I think he was saying it seems as if support is still dealing with this and is more fully engaged, whereas, you know, the marketing team that had already removed all of their documentation, their role was done.'.").

227.   There were 11 non-U.S. customers on maintenance for RSS, and six of those had downloaded RQC as of September 6, 2011.

- PX-1038 at RQC2657684.

- Tr. 864:16-22 (Homewood).

228.   Although the decommission notice stated that RSS would not be decommissioned until November 23, 2011 for international customers, rather than send out a corrected notice, Lawson handled international customers by asking them to download RQC when they called in for support.

- PX-1038 at RQC2657684.

- Tr. 866:5-13 (Homewood) ("Q: Was the mandate from Lawson to the support organization to direct the international customers to download and install RQC?  A: Yes, it was.").

229.   At the time of the Injunction, about 200 of Lawson's 325 support personnel were located outside of the United States.

- Tr. 834:11-20.

230.   Lawson installed RQC for a United Kingdom customer.

- PX-1067.

- Tr. 599:22-600:3 (Hanson).

231.   ePlus offered no evidence of U.S. based maintenance, service, or support for non-U.S. customers on RSS after the Injunction.

C. **ePlus's Customer-Specific Evidence Does Not Show Contempt By Lawson Or Inducement Of Customer's To Continue Using Configuration Nos. 3 And 5 With RSS**

232.    Lawson repeatedly told its customers that if they re-enabled RSS, it was at their own risk since "Lawson will only support RQC."

  •    PX-1002 at RQC0000646.

233.    Lawson repeatedly told its customers that they will "ultimately need to uninstall RSS."

  •    PX-1002 at RQC0000643.

234.    ePlus's damages expert offered no opinion as to the identity or number of customers who allegedly use RSS after the Injunction.

  •    Tr. 933:1-15 (Ugone) ("You've offered no opinion in this case as to the identity or number of customers that allegedly used RSS after the effective date of the injunction; true? A: If you are saying to me have I taken my numbers and split out those customers that are still using the RSS versus the Requisition Center as part of the infringing configuration, I haven't separated those numbers if that's what your question is. Q: Thank you. I appreciate that, but I'll take it a step further. You haven't even analyzed what customers are or aren't using RSS; right? A: I would have to go back and look and see if that's actually in our work papers, if one could tell that or not, but that's not a calculation that I have separately done.").

D. **Designing RQC To Run In Parallel With RSS Is Not Evidence of Contempt Or Bad Faith**

235.    When RQC is installed, customers lose access to RSS.

  •    Tr. 581:15-23 (Hanson) ("Q: Why don't you turn, if you would, to interrogatory number three in Lawson's answer. It's on the sixth page of the document. I'd like to direct you to the last sentence of Lawson's response to interrogatory number three. What does that sentence say? A: When RQC is installed, customers automatically lose access to RSS. Q: That statement is false, isn't it? A: No, it is not.").

  •    Tr. 600:20-22 (Hanson) ("Q: So that once the installation of RQC is completed in a production environment, RSS is inaccessible? A: That's correct.").

236.    The installation of RQC automatically overwrites the existing RSS "bookmarks" to point to RQC, which has the effect of making RSS "inaccessible" to end users.

- Tr. 546:23-547:7 (Lohkamp) ("Q: Mr. Lohkamp, you were asked by counsel for ePlus about issues regarding running RSS and RQC in parallel. When RQC is installed, what happens to the user's ability to access RSS? A: When RQC is installed, the bookmarks change and the users who previously had access to RSS are directed via the bookmarks to RQC.  Q: Does the installation program for RQC give users the option of keeping the RSS bookmarks?  A: No.").

- Tr. 600:11-22 (Hanson) ("Q: From an installation perspective, why do you advise not to uninstall RSS before installing RQC?  A: If you uninstall RSS, again, you are getting back to having to re-implement it to get all the configurations back. You could lose some of those configurations in trying to get it back, so to save time in doing the transition, we installed RQC on top of RSS so we could retain those configurations and thereby making RSS inaccessible as well.  Q: So that once the installation of RQC is completed in a production environment, RSS is inaccessible?  A: That's correct.").

- PX-1002 at RQC0000645 ("Requisition Center uses the same bookmark file as Requisitions Self-Service.  User book marks will automatically be updated when you migrate.").

- PX-1002 at RQC0000645 ("[T]he installation of RQC will automatically update the existing bookmarks.  No changes to the user.xml file are required.").

237.    A regular production installation in no way contemplates "running in parallel," and if a customer were to try that it would require "additional actions," "additional configuration," or "additional setups" that are not inherent in the installation process.

- Tr. 580:22-24 (Hanson).

- Tr. 581:24-582:3 (Hanson).

- Tr. 612:23-613:2 (Hanson).

- Tr. 547:2-7 (Lohkamp).

- Tr. 841:11-13 (Homewood).

- Tr. 860:13-16 (Homewood).

56

238.    The bookmarks that are changed in connection with an installation of RQC, and that render RSS inaccessible are not available to regular end users and can only be reached by a system administrator.

- Tr. 549:7-25 (Lohkamp).

- Tr. 601:2-4 (Hanson).

- Tr. 600:23-601:4 (Hanson).

- Tr. 601:5-12 (Hanson).

239.    Of the thousands of customer support incidents logged by customers a month, there were only "a couple isolated incidents" where customers received instructions on how to do those additional steps.

- Tr. 860:17-22 (Homewood) ("Q: And is it your understanding that Lawson provided support and instruction to its customers on how to do that additional configuration, to design RQC and RSS to run in parallel? A: I've seen a couple isolated incidents on that, yes.").

240.    ePlus offered no evidence that Lawson provided what could be considered support on running RQC and RSS in parallel to a customer with Configurations 3 or 5.

241.    Western Lake Superior Sanitary is not a Configuration 3 or 5 customer.

- PX-1078.

- PX-1242.

- PX-1245.

- ePlus PFF 106 (mischaracterizing service of Western Lake Superior Sanitary as impermissible, even though that customer does not have an infringing configuration).

242.    Western Lake Superior Sanitary wanted to test RQC before running it in production, a typical process followed by customers when migrating to a new product.

- Tr. 603:23-604:7 (Hanson) ("Q: Now, does this appear to be a dialogue relating to running a system in test? . . .A: My understanding, based upon

right at the very beginning, Jacobson is saying, I am running in this test. I am attaching the ic234 from test. So my assumption is this is on a test system.").

- Tr. 604:14-17 ("Q: And from Jennifer Nordby to Grant Brown. What does that entry state? A: You can go into Portal Administration under Bookmark Manager and rename these bookmarks for now if you want.").

- Tr. 604:18-605:9 (Hanson) ("Q: If you would turn to page ending 793, the first entry on the page, June 9th at 7:58:31 p.m., Grant Brown to Jennifer Nordby. Would you read that entry, please? A: This appears to have changed the names. So when I install RQC (since it used the same names as the old bookmarks) they will not get overridden. I changed all the RSS bookmarks with a preface of RSS (ex. RSS Utilities). I just need to make sure our users can continue unsupported with RSS until we have tested RQC and trained them. Q: That responsive testing and training something, response from a customer that typical something you have experienced in doing installs? A: Yes. Q: Customers would want to test their system before completing a production install? A: Correct.").

243.    Western Lake Superior recognized that if it ran RSS and RQC in parallel its users would "continue unsupported with RSS until [they] have tested RQC and trained them."

- PX-1058 at RQC0113793.

244.    When Western Lake Superior attempted to open a case on June 20, 2011, it received a "canned message" denying of support.

- PX-1058 at RQC0113794.

245.    Similar denials of support appear in over half of the 20 or so support interactions that ePlus extracted to present as PX-1058 out of the thousands of interactions that were produced in discovery.

- PX-1058 at RQC0114814-16 (Columbia Association).

- PX-1058 at RQC0115251-52 (WI Schools Consortium).

- PX-1058 at RQC0115259 (Arvest Bank Operations Inc.).

- PX-1058 at RQC0113787-88 (Western Lake Superior Sanitary).

- PX-1058 at RQC0113794 (Western Lake Superior Sanitary).

- PX-1058 at RQC0113844-45 (BFS Retail & Commercial).

**E.** **Lawson's Customers Did Not Continue To Use RSS, But Rather Installed And Implemented RQC**

246. Of the thousands of customer support incidents logged by customers a month, there were only a "handful of incidents" where Lawson provided some amount of support on RSS after the Injunction, and when Lawson discovered such mistakes, measures were put in place to stop the support and ensure that it did not happen again.

- Tr. 849:1-12 (Homewood) ("THE COURT: How did they get support on RSS for the people who were getting support on RSS that he asked you about at the beginning back in, say, like in September? How did that happen? Was it just a mistake? THE WITNESS: The only RSS, there was a handful of incidents out of the several thousand we get every month that there were a few incidents, isolated incidents where we had an issue. It was a mistake on the part of the support engineer, and when we discovered it, we put in measures to make sure we stopped the support and that it didn't happen again.").

247. ePlus's only example of Lawson's purported non-compliance by providing customer support with respect to requisitions being created in RSS was actually "done in RQ10," which is part of the Requisitions module in all configurations, and did not involve support being provided on RSS.

- PX-1058 at RQC0114819.

- Tr. 603:5-18 (Hanson) ("Q: The entry on page -- the page ending 819, do you see an entry for 6/30/2011, 10:08:22 p.m. from Debbie Gunn -- it appears to be from Debbie Gunn to Deb Stark; do you see that? A: Yes, I do. Q: What does that entry say? A: Deb, the example Imane sent earlier in the case was done in RQ 10. I don't requisitions. Q: Are you able to determine from this entry whether the product the customer was asking about was RQ 10 or RSS? A: This, to me, looks like it was done in RQ 10. Q: That would not be providing support to RSS then; correct? A: That is correct.").

- Tr. 586:6-11 (Hanson) ("Q: So they were providing support with respect to requisition self-service; correct? MR. MARK: Objection; misstates the witness's testimony. THE WITNESS: She was providing support on RQ 10.").

248. ePlus offered no evidence that any Lawson customer downloaded and installed RQC but continued to run RSS as its production—with or without maintenance, service, or support from Lawson.

249. As a member of the support organization, Ms. Homewood can often glean from a customer's queries in the support tickets whether a customer has installed RQC or uninstalled RSS.

- Tr. 810:19-24 (Homewood) ("Q: And turn in the binder to Exhibit 1058, which is in evidence. Are these printouts of the type of support communications you described earlier where a customer will send in a query to Lawson and Lawson will respond?  A: Yes, that does look like what these are.").

- Tr. 811:5-10 (Homewood) ("Q: Are you able to, from your experience, are you able when you look at various of these queries, are you able to gather from the nature of the query what the issue the customer is seeking to have Lawson resolve?  A: Generally, I can, yeah. Not always.").

- Tr. 811:15-22 (Homewood) ("Q: Is there information in some of these queries that allows you to understand whether from the query you can tell that the customer is running RQC?  A: Yes. You often can tell that.").

- Tr. 814:4-11 (Homewood) ("Q:  Taking the judge's question, you're aware from reviewing these records that there are customers who after the RQC upgrade to that new redesigned product was made available they implemented RQC, correct?  A: Correct.  Q: And that activity started right from when the injunction was entered and carried through, correct?  A: That's correct.").

250. Customers installed RQC and reported that fact to Lawson.

- Tr. 812:6-13 (Homewood) ("Q: Do you see in the entry 6/7/2011 at 3:00:44 from Debbie Gunn to Scott Hanson where it says, 'Hi, Scott, I received this error after installing RQC.'  Do you see that?  A: Yes.  Q: Is that an indication that the customer has installed RQC?  A: Yes, absolutely.").

251. A support record showing that the customer is inquiring concerning the "rqc_config.xml" file shows the customer is running RQC.

- Tr. 812:14-19 (Homewood) ("Q: Do you see in the response below that in reference to a computer file RQC_config.XML? A: Yes, I see that. Q: Is that a file that is associated with implemented RQC on a customer's system? A: Yes, it is.").

252. Columbia Association was running RQC at least as of June 7, 2011.

- Tr. 811:20-812:19 (Homewood).

- PX-1058 at RQC0114815.

253. WI School Schools Consortium was running RQC at least as of June 21, 2011.

- PX-1058 at RQC0115252.

- Tr. 813:7-14 (Homewood) ("Q: Do you see the reference there where Anna Perez is asking Mike Meyer, 'Hi, Mike. Please send your RQC_config.XML file for my review.' Do you see that entry? A: Yes. Q: Does that indicate that the customer is running RQC on its system? A: Yes, it does.").

254. A review of the excerpts selected by ePlus demonstrates that Western Lake Superior Sanitary was running RQC at least as of June 15, 2011.

- PX-1058 at RQC0113794.

255. A review of the excerpts selected by ePlus demonstrates that an unidentified customer was running RQC at least as of August 9, 2011.

- PX-1058 at RQC0113785.

256. A review of the excerpts selected by ePlus demonstrates that Jackson Laboratory was running RQC at least as of September 23, 2011.

- PX-1058 at RQC0114258.

257. For privacy purposes, Lawson does not directly connect to a customer's system without authorized permission and cannot determine the status of the software on a customer's system without direct interaction with a customer.

- PX-1269 at Interrogatory No. 3.

258. In response to questioning by the Court, Ms. Homewood testified that in early February of 2012, Lawson affirmatively reached out to determine whether customers that had a license to RSS had uninstalled or removed RSS from their systems.

- Tr. 838:1-4 (Homewood) ("Q: Lawson did not attempt to determine whether customers that had a license to RSS uninstalled or removed RSS from their systems, did it?  A: We did eventually, yes.").

- Tr. 840:9-15 ("THE COURT: You said earlier today at some point in time you had tried to find out who had uninstalled it.  THE WITNESS: Correct. THE COURT: When did that happen?  THE WITNESS: That happened early February of 2012.").

259. ePlus offered no proof that any of Lawson's customers continue to use RSS.

260. ePlus offered no proof that any of Lawson's customers that continue to use RSS are receiving maintenance, service, and support on RSS.

## IV.   EVIDENCE RELATING TO NONINFRINGEMENT

### A.   RQC Configuration Nos. 3 and 5 Were Not Proven To Be Capable of Infringing Claim 26 of the '683 Patent

#### 1.   ePlus Advanced Two Infringement Theories At The Contempt Hearing

261. Claim 26 of the '683 Patent claims:

A method comprising the steps of:

- maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources;

- selecting the product catalogs to search;

- searching for matching items among the selected product catalogs;

- building a requisition using data relating to selected matching items and their associated source(s);

- processing the requisition to generate one or more purchase orders for the selected matching items; and

- determining whether a selected matching item is available in inventory.

262.     ePlus's infringement theories as to RQC—containing configurations 3 and 5—were advanced through Dr. Weaver.

- Tr. 515-32, 685-730, 741-796

263.     During his testimony, Dr. Weaver presented two demonstrations to illustrate his opinion that the Accused Configurations could be used to infringe claim 26.  Those demonstrations are reflected by the following trial exhibits.

- PX-1134 (video of Dr. Weaver's second demonstration relating to the use of Punchout)

- PX-1134A (screenshots of PX-1134)

- PX-1135 (video of Dr. Weaver's first demonstration relating to UNSPSC Category Search)

- PX-1135A (screenshots of PX-1135)

264.     During his first demonstration, Dr. Weaver used the UNSPSC Categories Search feature to search for items in Item Master.

- PX-1135 (video of Dr. Weaver's first demonstration)

- PX-1135A (screenshots of PX-1135)

- Tr. 518:5-529:8, 686:16-710:4 (Dr. Weaver's testimony related to his first demonstration).

265.     According to Dr. Weaver, the steps he performed in the first demonstration in combination with EDI demonstrate how a user of RQC Configuration 5 can infringe claim 26.  That demonstration will be referred to hereinafter as the "Item Master-EDI Path".

- Tr. 744:22-745:4 (Weaver: Indicating that his first demonstration, PX-1135, was meant to demonstrate how the first five elements of claim 26 can be practiced in RQC by shopping for items in Item Master alone.).

- Tr. 765:18-21 (Weaver: The purpose of his first demonstration was to show that the use of Item Master and EDI can infringe claim 26).

- Tr. 745:21-746:6 (Weaver: Punchout was not involved, mentioned, or used in any way during his first demonstration.)

- Tr. 766:5-9 (Weaver: His first demonstration was meant to show how Configuration 5 could infringe claim 26.)

- Tr. 769:22-770:4 (Weaver: EDI is necessary to perform the last element of claim 26—determining whether a selected matching item is available in inventory. EDI is not used to satisfy any of the first five elements of claim 26.).

266.    Dr. Weaver conceded that without Punchout, Configuration 3 cannot be used to infringe claim 26, because using Punchout is the only way Configuration 3 can accomplish the "determining . . . inventory" limitation of claim 26.

- Tr. 766:10-17 (Weaver) (Q: Configuration three, without the use of Punchout, could never infringe claim 26; correct? A: Correct. Q: You are in configuration three. Even under your view of infringement and your view of the claims, you need to use Punchout in order to infringe claim 26 because there's no other way to check inventory? A: Correct.).

267.    According to Dr. Weaver, his second demonstration showed how the Accused Configurations can be used to infringe claim 26 by procuring an item from one Punchout website. That demonstration will be referred to hereinafter as the "Single Punchout Path" demonstration.

- PX-1134 (video of Dr. Weaver's second demonstration)

- Tr. at 716:23-717:24 (Weaver: Stating how, in his opinion, his second demonstration satisfied all the elements of claim 26.)

268.    Dr. Weaver walked through each element of claim 26 and described how, in his opinion, the steps he performed satisfied the limitations of claim 26.

- Tr. 716:23-717:24

269.    Dr. Weaver's second demonstration did not involve Item Master or multi-vendor Punchout sites.

- Tr. 770:14-16 (Weaver: Item Master did not come into play at all in his second demonstration).

- Tr. 772:21-24 (Weaver: His second demonstration was a Punchout-only demonstration).

- Tr. 774:15-19 (Weaver: His second demonstration did not show punching out to a multi-vendor Punchout website.).

270.    Aside from Dr. Weaver's testimony, ePlus did not offer any other evidence regarding how the Accused Configurations can be used to infringe claim 26.

**2.    The Item Master-EDI Path Of Infringement Was Not Proved At The Infringement Trial**

271.    The jury in the infringement trial found that Configuration No. 4, which contained Item master an EDI, did not infringe claim 26.

- D.I. 600 (Jury Verdict).

272.    Only configurations that included Punchout were found by the jury to infringe claim 26.

- D.I. 600 (Jury Verdict).

273.    At the infringement trial, ePlus failed to prove that using Item Master and EDI to procure items, without using Punchout, infringes any of the '683 Patent claims.

- *See supra*, DPFF ¶¶ 1-2.

**3.    Dr. Weaver's Item Master-EDI Path Demonstration Failed To Show That Users Can Select A Product Catalog To Search In Item Master**

274.    Claim 26 requires "selecting the product catalogs to search" and "searching for matching items among the selected product catalogs."

275.    In the Item Master-EDI Path demonstration, Dr. Weaver used the UNSPSC Categories search feature in RQC to shop for items in Item Master.

- PX-1135 (video of Dr. Weaver's first demonstration)

276.    Dr. Weaver's Item Master-EDI Path demonstration consisted of the following steps: 1) drilling down to the UNSPSC for Computers, which listed five items; 2) selecting the first item on the list, which had an item description of "IBM ThinkPad T20", to bring up a screen showing the item details of that computer; 3) determining from the item detail page that Office Max was the vendor for the IBM ThinkPad T20; adding the IBM ThinkPad T20 to Requisition Lines in RQC; 4) returning to the list of five products coded to the UNSPSC for "Computers"; 5) selecting the second item on the list, which had an item description of "Dell Inspiron 8000 Intel Pentium, 111 Processor, to bring up a screen showing the item details of that computer: 6) determining from the item detail page that Diablo was the vendor for the Dell Dimension 8000; 7) adding the Dell Dimension 8000 to Requisition Lines in RQC; 8) deleting the IBM ThinkPad T20 from Requisition Lines; 9) drilling down to the UNSPSC for "Laboratory environmental conditioning equipment," which listed two items; 10) selecting the first item on the list, which had an item description of "glove, sterile surgical, SZ 7", to bring up a screen showing the item details of that product; 11) determining from the item detail page that Baxter Healthcare was the vendor for the box of sterile surgical gloves; 12) adding the box of sterile surgical gloves to Requisition Lines in RQC; 13) releasing the requisition containing the Dell Dimension 8000 and box of sterile surgical gloves; 14) approving the requisition; and 15) generating two purchase orders—one to Diablo and one to Baxter Healthcare—from the requisition.

- PX-1135 (video of Dr. Weaver's first demonstration)
- PX-1135A (screenshots of Dr. Weaver's first demonstration)

277.    Dr. Weaver stated that his first demonstration, PX-1135, showed three catalogs contained in the Item Master—Office Max, Diablo, and Baxter Healthcare.

- Tr. 708:18-20.

278. Dr. Weaver acknowledged that the Office Max catalog only contains items sold by Office Max, and the Diablo catalog contains only items sold by Diablo.

- Tr. 749:5-13

279. Dr. Weaver did not select any of the three catalogs he mentioned—Office Max, Diablo, and Baxter Healthcare—to search during his first demonstration.

- PX-1135 & PX-1135A (video and screenshots of Dr. Weaver's first demonstration at no point show Dr. Weaver selecting the Office Max, Diablo, or Baxter Healthcare catalogs and then performing a search for items within that specific catalog).

280. The UNSPSC Category search provides a list of all the items from all the vendors in Item Master, corresponding to the UNSPSC code selected by the user.

- PX-1135A.008 (screenshots from Dr. Weaver's first demonstration listing the items coded to the UNSPSC for "Computers")

- Tr. 692:14-20 (Weaver: Describes screenshot PX-1135A.008 as follows: "So we've now searched for *all the items from all the vendors in the item master* that are coded to the UNSPSC class for computers".) (emphasis added).

281. The UNSPSC Category search feature, demonstrated by Dr. Weaver in PX-1135, allows users to search for and select items.  It does not permit users to select catalogs to search and then search from among the selected product catalogs.

- Tr. 759:18-760:3 (Weaver: Selecting the IBM ThinkPad from the list of five items coded to the UNSPSC class for computers reveals that the catalog for the IBM ThinkPad was Office Max.  The item detail page shows only one item from the Office Max catalog—the IBM ThinkPad.  It does not show any other items available from Office Max.).

- Tr. 755:18-20 (Weaver) (Q: Can you click using UNSPSC and find only items from a specific vendor?  A: No.).

- Tr. 756:3-8 (Weaver) (Q: Can you use UNSPSC to search and bring up only, for instance, laptops sold by Office Max and Diablo and not also bring up laptops sold by other vendors that are in item master? A: If they are coded to the same code, then it will bring up all of them.).

- PX-1006 at RQC0364606 (internal Lawson document indicating that RSS does not allow for selection of individual catalogs to search).

282.  Using the UNSPSC Category Search feature, users can only determine the source of an item after selecting the item from the list of items.

- Tr. 754:11-20 (Weaver: To determine which catalog an item listed in a UNSPSC search comes from, a user must select the item from the UNSPSC search results list.)

- Tr. 760:24-761:1 (Weaver) (Q: So you figured out what catalog you had *after* the search result was made apparent to you; is that right? A: Yes.) (emphasis added).

283.  Dr. Weaver stated that, in his first demonstration, he performed the second and third elements of claim 26 simultaneously.

- Tr. 756:9-12 (Weaver: In his first demonstration, he searched for items and catalogs simultaneously).

- Tr. 756:17-22 (Weaver: He performed elements two and three of claim 26 simultaneously in his first demonstration).

- Tr. 759:4-8 (Weaver: He performed elements two and three of claim 26 simultaneously in his first demonstration).

284.  Dr. Weaver testified to his opinion that limitations 2 and 3 of claim 26 do not have to be performed in order; instead, they can be done simultaneously.

- Tr. 752:17-21 (Weaver: Stating that, in his opinion, the second and third limitations of claim 26 do not have to be performed in order).

- Tr. 761:2-11 (Weaver: Stating that, in his opinion, the second and third limitations of claim 26 do not have to be performed in order).

- Tr. 761:20-762:5 (Weaver: Stating that, in his opinion, the second and third limitations of claim 26 do not have to be performed in order).

285.  Dr. Weaver's testimony that limitations 2 and 3 of claim 26 do not have to be performed in order was based on his reading of the claim.

- Tr. 762:6-23.

68

286.   Dr. Weaver's understanding that limitations 2 and 3 of claim 26 do not have to be performed in order is a new claim construction that was never requested at the merits trial, nor incorporated in this Court's April 30, 2010 Claim Construction Order.

- D.I. 204 (*Markman* Order)

287.   Dr. Weaver's statement during his testimony that he could have selected a specific catalog to search using a keyword search in Item Master is factually incorrect, and he did not show he could select a particular catalog to search.

- Tr. 754:21-755:5 (Weaver: Indicating that he could have selected the Office Max catalog using a keyword search in Item Master, but that was not what his first demonstration was about).

288.   Dr. Weaver did not demonstrate keyword searching in the Item Master in his first demonstration.

- Tr. 757:11-19 (Weaver: He discussed and performed keyword searching in his second demonstration, not his first demonstration).

- Tr. 758:12-14 (Weaver: He did not use a keyword search in his first demonstration.).

289.   Dr. Weaver did not demonstrate keyword searching during these contempt proceedings.

290.   Dr. Weaver did not provide any testimony about how keyword searching works during these contempt proceedings.

### 4.   ePlus Never Alleged That The Single Punchout Path Could Infringe Claim 26 During The Infringement Trial

291.   At the infringement trial, ePlus never unequivocally alleged that procuring items from a single Punchout site could infringe claim 26.

292.     There was no dispute at the infringement trial that users of configurations containing RSS and Punchout could combine items from any source onto a single requisition. *See supra*, ¶¶ 48-49.

293.     At this contempt proceeding, ePlus alleged that placing one item from one Punchout site onto one requisition satisfies the fourth limitation of claim 26.

- Tr. 778:15-18 (Weaver: Stating that, in his opinion, a single item in a requisition satisfies the fourth element of claim 26.)

- Tr. 779:3-7 (Weaver: A single item from Staples Punchout site is sufficient to satisfy the fourth element of claim 26).

294.     At the infringement trial, neither party asked the Court to construe the fourth limitation of claim 26, which requires "building a requisition using data relating to selected matching items and associated source(s)."

- D.I. 204 (Court's *Markman* Order does not provide a construction for the fourth limitation of claim 26)

- Tr. 780:20-23 (Weaver) (Q: Are you aware that neither party in the underlying litigation asked the Court to construe the fourth element of claim 26?  A: Yes.).

295.     The assertion that placing one item from one Punchout site onto one requisition is sufficient to satisfy the fourth limitation of claim 26 is a new theory of infringement, not alleged by ePlus at trial, or found by the jury to infringe.

**5.     Punchout Catalogs Are Maintained By The Punchout Vendor, Not Lawson or Lawson Customers**

296.     The first element of claim 26 requires "maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources".

- Claim 26, '683 Patent.

297.     Punchout catalogs are maintained by Punchout vendors, not Lawson or its customers.

70

- Tr. 771:18-19 (Weaver) (Q: Where is the database for the Punchout catalogs? A: One of those is at Staples, and one is at Dell.);

- Tr. 771:24-772:8 (Weaver) (Q: Does the customer maintain a database containing data related to items associated with the respective sources? A: There would be the seller, Staples or Dell. Q: And does Staples maintain the Dell catalog on its database? A: No. Q: Does Dell maintain the Staples catalog? A: No. Q: Are there one database or two databases? A: Those are two separate databases.);

- Tr. 774:20-775:6 (Weaver: Indicating that the database for the Staples Punchout catalog is maintained "at Staples", and that the database for the Dell Punchout catalog is maintained "at Dell." The Dell Punchout catalog and Staples Punchout catalog are maintained by separate companies.).

298.    Lawson provides the ability for an RQC user to remain connected to a Punchout catalog, which is maintained by the Punchout vendor.

- Tr. 775:7-22 (Weaver: Lawson's Punchout module allows users to remain connected to a Punchout site, which is maintained by the Punchout vendor.).

299.    Other than providing the ability for an RQC user to remain connected to a Punchout catalog, no other evidence was introduced regarding any business relationship between Lawson and the entities that maintain the Punchout websites.

**6.    The Punchout Partner Program Was Eliminated**

300.    Lawson previously had a program called the Punchout partner program.

- Tr. 388:1-8 (Lohkamp: Lawson eliminated the Punchout partner program).

301.    When Punchout vendors signed up for the Punchout partner program, Lawson would do some testing with the Punchout website and list the Punchout website on a its Punchout trading partner list.

- Tr. 389:7-11 (Lohkamp: Describing the Punchout partner program as one where "[Lawson] would sign up vendors that can provide Punchout and agreed to do some testing with them. And then [Lawson] would add them to [Lawson's] Punchout trading partner list").

71

302.     Mr. Lohkamp said that Lawson ended the Punchout partner program to eliminate the erroneous perception, which had been raised at the infringement trial, that Lawson had any control over the contents of a Punchout vendor's website.

- Tr. 389:12-17 (Lohkamp: Punchout partner program was eliminated "because during trial it had come up that it seemed to be an issue in terms of perception that we were controlling what was going on at the [Punchout] vendor websites.").

**7.     ePlus Did Not Prove That Claim 26 Could Be Infringed By Procuring Items From Multi-Vendor Punchout Sites**

303.     Dr. Weaver provided some testimony as to how a user could use a "multi-vendor" Punchout website to infringe claim 26. Dr. Weaver identified only one Lawson customer that he understood to have a business relationship with a multi-vendor Punchout site, and he provided no information based on personal knowledge as to how, if at all, that Lawson customer has utilized its multi-vendor Punchout site.

- Tr. 720:14-721:13 (Weaver: Stating that if users select items from different vendors in a mulit-vendor Punchout site to add to a requisition in RQC, the requisition will contain items from different vendors and multiple purchase orders will be generated)

- Tr. 722:11-20 (Weaver: Stating that the selecting the product catalogs to search and searching for matching items elements of claim 26 can be performed by selecting one or more vendor catalogs to search at a multi-vendor Punchout site.)

- Tr. 790:7-792:7 (Weaver: Stating that he's read about the Cleveland Clinic having access to SciQuest, but he does not know what the Cleveland Clinic has done at the SciQuest site)

304.     Mr. Lohkamp testified to his understanding that approximately five Lawson customers have a business relationship with SciQuest as a Punchout vendor, and further testified that he did not know how those customers used SciQuest.

- Tr. 552:10-553:17

305.     No evidence was introduced as to whether multi-vendor Punchout sites include catalogs, as construed by the Court's *Markman* Order.  D.I. 204.

306.     No evidence was introduced as to which entity maintains the catalogs on a multi-vendor Punchout site, if catalogs as construed by the Court are available at all on multi-vendor Punchout sites.

307.     No evidence was introduced as to whether, if catalogs as construed by the Court are available on multi-vendor Punchout sites, whether such catalogs can be selected.

308.     No evidence was introduced as to whether, if catalogs as construed by the Court are available on multi-vendor Punchout sites and such catalogs can be selected, whether such selected catalogs are separately searchable.

309.     No evidence was introduced as to whether the ability to determine inventory as required by claim 26 is available on any multi-vendor Punchout site.

- Tr. 791:21-792:7 (Weaver) (Q: What is your understanding about the capacity of SciQuest or partners of SciQuest to do -- to determine whether selected matching items are available in inventory? A: We know that the SciQuest system has hundreds or thousands of catalogs, and so I believe it's possible to check inventory there. Q: Through which catalogs? A: I don't know their names. Q: You are just making an assumption based on numbers; is that correct? A: Yes.)

310.     No evidence was introduced at the contempt proceeding that any Lawson customer infringed claim 26 of the '683 Patent by procuring items from a multi-vendor Punchout site.

**B.     ePlus Failed To Prove That Lawson Has Directly Or Indirectly Infringed Claim 26**

311.     The last element of claim 26 requires "determining whether a selected matching item is available in inventory."  Claim 26, '683 Patent.

312.    According to ePlus, to perform the "determining . . . inventory" step, Punchout or EDI must be used.

- Tr. 723:13-22 (Weaver: Stating that the determining inventory step can be satisfied using Punchout or EDI.).

313.    According to ePlus, to perform the determining inventory step using EDI, the user would have to use EDI to send a purchase order to a vendor, and a vendor would have to respond with a purchase order acknowledgement.  The user's EDI module would have to then compile a purchase order acknowledgement report that could potentially inform the user whether an item is available in inventory.

- Tr. 709:18-710:4 (Weaver: "The EDI module could have sent these purchase orders to the vendors, the vendors would have responded with a purchase order acknowledgement, and the EDI module would have compiled a purchase order acknowledgement report that would have told us whether these items were available in the inventory and vendor.").

314.    According to ePlus, to perform the determining inventory step of claim 26 using Punchout, the Punchout vendor must have the capacity to report inventory to the user on the Punchout website.   Procuring items from Punchout vendors that do not have this capacity does not infringe claim 26.

- Tr. 788:2-8 (Weaver: Lawson users engaging in a transaction with Punchout or EDI vendors who do not have the capability to determine inventory cannot infringe claim 26.)

- Tr. 788:9-13 (Weaver) (Q: Punchout vendors must support the capacity of reporting whether the item you want is in inventory in order for you -- that vendor to be part of an infringement of claim 26; correct? A: Correct.) (emphases added).

315.    According to ePlus, if the Punchout vendor has the capacity to report inventory to the user, the user must "query the [Punchout] vendor's inventory" to determine whether the item the user wants to procure is available in the vendor's inventory.

- Tr. 723:15-17 (Weaver: Stating that to determine inventory at a Punchout site, one must "query[] the vendor's inventory as [he] showed in [his] demonstration")

316.    To demonstrate determining inventory in his second demonstration, Dr. Weaver clicked on the "Check Delivery Date" link shown on the Staples Punchout site to prompt Staples to report whether a selected item was backordered.

- PX-1134A-011-012 & Tr. 713:9-23 (Weaver: Clicking on the "Check Delivery Date" link for Ameriwood desk showed that the desk was backordered).

- PX-1134A-014-015 & Tr. 714:3-12 (Weaver: Clicking on the "Check Delivery Date" link for the Global Laurent desk showed that the desk was not backordered).

317.    Even if a Punchout vendor has the capability of determining inventory, a customer may procure items from that Punchout site without querying the vendor's inventory.

- Tr. 710:5-716:18 (Weaver) (At no point in Dr. Weaver's narrative of the Single Punchout Path demonstration did he state that users must query the vendor's inventory before finalizing a transaction with a Punchout site).

**1.    ePlus Failed To Prove That Lawson Has Directly Infringed Claim 26**

318.    Lawson uses RQC internally to order items off the Item Master.

- Tr. 377:16-378:1 (Christopherson: Explaining that Lawson itself uses RQC to order supplies internally off of Item Master).

- Tr. 429:15-20 (Lohkamp: Lawson, as of May 21, 2011, was running RQC internally for internal procurement.)

319.    There is no evidence in the record showing that Lawson uses the EDI module.

320.    Lawson does not use the Punchout module in its own internal procurement requisitioning process.

- Tr. 378:2-4 (Christopherson: He has never used systems within Lawson that has Punchout to purchase items internally at Lawson.)

- Tr. 430:1-4 (Lohkamp: The RQC Lawson was running as of May 31, 2011 did not include the Punchout module).

321.    Lawson uses systems with RQC and Punchout to perform customer demonstrations, but there was no evidence introduced at the contempt proceeding to show that such demonstrations include the actual generation of purchase orders or the checking of inventory (as opposed to the capacity to do so), as would be required to practice the method of claim 26.

- Tr. 378:9-379:12 (Christopherson: Indicating that Lawson uses RQC and Punchout to perform customer demonstrations and describing the capabilities Lawson demonstrates, including the "capability to check the pricing and availability of the items that are found in a [Punchout] search.").

322.    There was no evidence introduced to show which Punchout vendors Lawson uses for its demonstrations.

323.    There was no evidence introduced to show that Lawson queries a Punchout vendor's inventory in its demonstrations.

324.    There was no evidence introduced to show that the Punchout vendors Lawson uses for its demonstrations have the capacity to determine and report inventory to the user.

### 2.    ePlus Failed To Prove That Any of Lawson's Customers Have Directly Infringed Claim 26

325.    There is no evidence in the record showing that Lawson's customers use the EDI module to determine inventory.

326.    There is no evidence in the record indicating which of Lawson's customers' vendors, if any, are capable of providing inventory information via EDI.

327.    There is no evidence in the record showing which Punchout sites Lawson's customers have access to.

328.    There is no evidence in the record indicating whether the Punchout sites Lawson's customers have access to have the capability of determining inventory.

329.    There is no evidence in the record indicating that any Lawson customer has actually queried a Punchout vendor's inventory by, for example, selecting a "Check Delivery Date" link on a Punchout vendor's website.

### 3.    ePlus Failed To Prove That Lawson Induced Its Customers To Infringe Claim 26 Through It's Support And Marketing Materials

330.    Lawson provides its customers with instructions—PX-1000—for connecting to a Punchout website using RQC.

- PX-1000 (Lawson Procurement Punchout and PO Dispatcher Installation and Administration Guide for Lawson Applications 8.1.x and 9.x.)

331.    The instructions found in PX-1000 do not mention how to determine inventory at a Punchout vendor's website.

332.    Lawson discusses Punchout in its RQC marketing materials.

- PX-1003 (Lawson marketing document describing RQC and Punchout).

- PX-1010 (Powerpoint presentation entitled "Introducing Lawson Requisition Center", dated June 3, 2011).

- PX-1155 (Powerpoint presentation entitled "Lawson Requisition Center What's New and Different", dated June 2011).

333.    None of the marketing materials admitted into evidence discuss how to determine inventory at a Punchout vendor's website.

### 4.    ePlus Failed To Prove That Lawson Had The Intent Necessary For Induced Or Contributory Infringement

334.    Lawson's goal in designing RQC was to design a product that did not infringe ePlus's asserted patents.

- Tr. 332:12-17 (Christopherson: His first goal in beginning the RSS redesign process was "to find design-arounds for each of the claims" that Lawson was found to infringe.).

335.    Lawson relied on legal counsel to determine what the software designers were permitted to do in its redesign efforts.

- Tr. 328:18-20 (Christopherson: Stating that the decisions for what the software designers were "permitted" to do came from legal).

336.   Legal had final say and veto power over the finished redesigned product.

- Tr. 330:13-331:16 (Christopherson: Legal had veto power and final say over any proposed redesign.).

**C.   The Accused RQC Configurations Are Capable Of Many Substantial Noninfringing Uses**

337.   Using Configuration 3 without using Punchout is noninfringing.

- Tr. 766:5-17 (Weaver: To infringe claim 26 using Configuration 3, Punchout must be used).

338.   Using Configuration 5 without using Punchout or EDI is noninfringing.

- Tr. 723:13-22 (Weaver: Punchout or EDI is used to perform the determining inventory step of claim 26.)

339.   Ordering stock items from Item Master is noninfringing.

- Tr. 784:8-785:3 (Weaver: Ordering stock items from Item Master is noninfringing because no requisitions or purchase orders are generated).

340.   Dr. Weaver has seen reference that Lawson customers use Item Master to acquire stock items.

- Tr. 789:24-790:3.

341.   Requisitioning special items by manually filling out requisitions is noninfringing.

- Tr. 785:4-16 (Weaver: Requisitioning special items by manually filling out requisition forms is noninfringing because no search is performed).

342.   Procuring items using prefilled templates is noninfringing.

- Tr. 785:17-23 (Weaver: Purchasing items through pre-completed templates does not infringe claim 26 because no search is performed).

343.   Engaging in a transaction using Punchout or EDI with a vendor that does not have the capacity to determine inventory for the user is noninfringing.

- Tr. 788:2-13 (Weaver: Engaging in transaction with Punchout or EDI vendor who does not have the capacity to report inventory to the user cannot does not infringe claim 26).

344.   Procuring items from Punchout vendors that are capable of reporting inventory without performing the active step of querying the Punchout vendor's inventory.

- PX-1134A-011-012 & Tr. 713:9-23 (Weaver: During his second demonstration, showing how one can perform the determining inventory step at the Staples Punchout site by selecting the "Check Delivery Date" link.)

- PX-1134A-014-015 & Tr. 714:3-12 (Weaver: During his second demonstration, showing how one can perform the determining inventory step at the Staples Punchout site by selecting the "Check Delivery Date" link.)

- Tr. 723:15-17 (Weaver: Performing determining inventory step at a Punchout vendor's website is done by "querying the vendor's inventory as [he] showed in [his] demonstration.")

## V.   DAMAGES

### A.   DISGORGEMENT IS NOT AN APPROPRIATE REMEDY HERE

#### 1.   Disgorgement Without Proof of Actual Loss Is Not a Compensatory Remedy

345.   ePlus did not offer any evidence that Lawson's allegedly contumacious conduct actually harmed ePlus.

- Tr. 60:2-322:17, 514:16-615:9, 685:7-797:4, 871:1-1000:18 (ePlus's case in chief on more than colorable difference, infringement and remedies).

346.   ePlus did not try to make the product sales for which it now seeks recovery. ePlus had no business plan or strategy to take advantage of the injunction and convert Lawson customers to ePlus and contacted only one Lawson customer, Trinity, following the injunction's issuance, despite the fact that ePlus knew many of them.

- Farber Dep., Dec. 27, 2011, at 28:20-30:10 (Farber: "At a corporate level, I don't quite believe that we had any matured plans that were rolled out to anybody in the organization that said here is our, you know, attack plan to convert a Lawson customer to ePlus.")

- *Id.* (Farber: admitting there was no "form of contingency planning by ePlus as to how ePlus might be able to take advantage of an injunction from a business perspective if an injunction were entered by Judge Payne").

- *Id.* (Farber: admitting that at no time "following the May 23rd, 2011 entry of an injunction, did ePlus form a strategy to try to take advantage of the injunction from a business perspective").

- *Id.* at 61:7-20 (Farber: admitting no specific contact was made with Lawson customers other than Trinity).

- *Id.* at 78:5-18 (Farber: admitting that after the injunction, ePlus did not consider attempting to make direct appeals to Lawsons customers to replace RSS with its own product).

347.    Dr. Ugone did not consider any market share data from on or after the date of the injunction, and did not consider any information about ePlus's profits post-injunction, any data regarding ePlus's post-injunction sales, or whether ePlus went out and tried to win business from Lawson's customers in formulating his remedy recommendations.

- Tr. 922:16-923:13 (Ugone: "Q: Now, in coming to your opinions in this case, you didn't see any market share data specifically pertaining to the period from the injunction forward; correct? A: That's correct. Q: You didn't see any data about ePlus's post-injunction revenues; correct? A: I believe that to be correct, yes. Q: You didn't consider any information about ePlus's profits post-injunction; correct? A: That would be correct. Q: You didn't have any data concerning the number of post-injunction sales made by ePlus; correct? A: Correct . . . Q: Let me ask it again and see if you can answer yes or no for me. You can't speak to whether, in fact, after the injunction was entered, ePlus went out and tried to win business from Lawson's customers; correct? A: That's correct.").

   **2.     ePlus Gambled by Limiting The Remedial Options Before the Court**

348.    ePlus did not provide the Court with a lost profits calculation or a reasonable royalty calculation.

- Tr. 926:12-17 (Ugone: "Q: Counsel for ePlus didn't ask you to do a reasonable royalty in this case; right? A: I would agree with that. Q: So you didn't do it; right? A: That's correct. There was discussion -- you've seen what I presented, the disgorgement approach.");

- Tr. 921:4-921:9 (Ugone: admitting "I haven't done that calculation" as to the profits "that ePlus lost as a result of any alleged contempt").

349.    ePlus's damages expert, Dr. Ugone,  did not try to determine whether lost profits

or a reasonable royalty would be quantifiable.

- Tr. 921:19-922:15 (Ugone: admitting he "made no attempt to determine whether ePlus lost any profits at all as a result of Lawson's alleged contempt, as he did not "ask Mr. Farber how much profits" ePlus lost even though he did talk to Farber).

- Tr. 926:12-17 (Ugone: "Q: Counsel for ePlus didn't ask you to do a reasonable royalty in this case; right? A: I would agree with that. Q: So you didn't do it; right? A: That's correct. There was discussion -- you've seen what I presented, the disgorgement approach.").

350.    Dr. Ugone has calculated lost profits in patent cases somewhere between 20 and

50 times and reasonable royalties at least 50 times.

- Tr. 924:7-12 (Ugone: "Q: Now, you've calculated lost profits in patent cases somewhere between 20 and 50 times; correct? A: I'm not sure if I remember the number, but I've done it many times, yes. Q: Do you have any reason to disagree with that? A: No, no.").

- Tr. 925:6-8 (Ugone: "Q: You've calculated reasonable royalties in patent cases at least 50 times, sir; correct? A: I would probably agree with that.").

351.    Dr. Ugone did not opine that he was incapable of doing a reasonable royalty or

lost profits calculation in this case.

- Tr. 923:23-924:6 (Ugone: stating he is "not offering an independent opinion that lost profits are incapable of calculation").

- Tr. 926:8-11 (Ugone) ("Q: You are not offering any opinion that you are incapable of doing a reasonable royalty calculation in this case; correct? A: I'm not giving that opinion, no.").

352.    Dr. Ugone could not remember a single case in the patent context in which he

provided a court with neither a lost profit calculation nor a reasonable royalty calculation.

- Tr. 925:23-926:7 (Ugone: when asked whether he could think of any other patent-related case in his career where he offered neither a reasonable royalty or lost profits opinion, he identified no such case and

acknowledged that he "usually offers a lost profits or a reasonable royalty opinion.").

- Tr. 927:3-22 (Ugone: acknowledging that he was an expert in the *TiVo* case and he offered disgorgement *and* a reasonable royalty option in that case).

353.    ePlus's counsel did not ask Dr. Ugone to calculate a reasonable royalty or lost profits remedy.  Dr. Ugone relied on counsel's representation that disgorgement is an appropriate remedy in this proceeding and offered only disgorgement measures to the Court.

- Tr. 919:13-16 (Ugone: "Q: But, in fact, sir, you relied on a representation from ePlus's lawyers that disgorgement is an appropriate remedy in this proceeding; you relied on that, correct? A: I would agree with that, yes.").

- Tr. 918:6-10 (Ugone: Dr. Ugone "offered three measures" for remedies, but admitted that "every one of the measures is a disgorgement of either revenues or profits.").

- Tr. 926:12-17 (Ugone) ("Q: Counsel for ePlus didn't ask you to do a reasonable royalty in this case; right? A: I would agree with that. Q: So you didn't do it; right? A: That's correct. There was discussion -- you've seen what I presented, the disgorgement approach.").

354.    ePlus has only provided the Court with one type of remedy: disgorgement.

- *See* DPFF ¶¶ 348-53.

- ePlus Rem. Br. at 1-9 (offering no remedies other than disgorgement).

355.    Dr. Ugone did not calculate Lawson's incremental profits in his initial damages report, despite his belief that incremental profits is the correct way to measure Lawson's gain.

- Tr. 978:6-13 (Ugone) ("Q: In your original report, there was no calculation of incremental profits. Dr. Putnam responded and attempted to give an economic measure of incremental profit as a menu item, correct? A: Yes. Q: It was only after he did that that you tried to calculate another incremental profit figure, correct? A: Yes.").

- Tr. 976:23-977:5 ("THE COURT: I think the bottom line, though, in your judgment, is the correct way to equate your figures with the gain the incremental profit?  THE WITNESS: Yes.  THE COURT: That's what you're trying to get at?  THE WITNESS: Yes, Your Honor.  And I want to – yes, Your Honor.  I'll stop there.").

**B.    EPLUS'S DISGORGEMENT MEASURE IS INFLATED AND INACCURATE**

356.    Both damages experts agree that gains are measured by subtracting costs associated with any violations from corresponding revenues.

- Tr. 1016:18-25 (Putnam: "Q: Let's stay for now within a response to Dr. Ugone's disgorgement approach. What steps, if any, are necessary to calculate a disgorgement measure under that approach? A: Basically there's two. You've got to identify the revenues in question and measure those accurately, and then you need to deduct the appropriate costs from those revenues to determine what Lawson's gain is.").

- Tr. 934:21-935:2 (Ugone: "Q: And the gain to Lawson by not complying with the injunction order, assuming that's what the Court finds, is the difference between the profits that Lawson earned by engaging in enjoined conduct versus what it would have or could have earned if it hadn't engaged in enjoined conduct; right? A: I believe that could be a way of phrasing it, sure.").

- Tr. 973:7-14 (Ugone: "what Lawson gains is the difference between revenue and what it costs to get the revenue").

357.    Dr. Ugone admits that revenues and gross profits are not the correct measures of Lawson's gain.

- Tr. 976:23-977:5 (Ugone: "THE COURT: I think the bottom line, though, in your judgment, is the correct way to equate your figures with the gain the incremental profit?  THE WITNESS:  Yes.  THE COURT: That's what you're trying to get at?  THE WITNESS: Yes, Your Honor.  And I want to – yes, Your Honor.  I'll stop there." ),

- Tr. 973:3-6 (Ugone: "Q: Total revenue is not a measure of Lawson's gain, correct?  A: Not from an economic perspective because there's costs that could be deducted.").

- Tr. 974:19-22 (Ugone: agreeing that his gross profit measure "fails to deduct all variable costs from Lawson's revenue").

**1.    ePlus Overstates Lawson's Revenue from Configuration Nos. 3 and 5**

358.    The first step in determining Lawson's gain from allegedly violating the Court's injunction is to calculate Lawson's revenues associated with Configuration Nos. 3 and 5.

- Tr. 1016:18-25 (Putnam: stating there are two steps to determine an award, the first is to appropriately calculate revenues).

359.    LSF and Process Flow are the foundational software for all Lawson products, including not only the S3 e-procurement software undergirding Configuration Nos. 3 and 5, but also suites unrelated to this case such as Human Resources and Financial software.

- Tr. 959:13-23 (Ugone: agreeing that "LSF and process flow serve as the foundation for Lawson's S3 software program," including suites such as Financial software and Human Resources).

- Tr. 1018:1-19 (Putnam: explaining that apportionment of LSF/Process Flow revenue reflects the portion of that "foundation software" that "is used for non-infringing modules or product lines").

360.    Dr. Ugone proposed an apportionment of LSF/Process Flow revenues on his own initiative (not in response to any calculation by Lawson's expert), addressed it in each of his four reports, and even prepared a slide to explain the apportionment to the Court, but ultimately chose not to share that slide during direct.

- Tr. 960:11-961:14, 959:6-12 (Ugone: admitting that he "proposed the apportionment of LSF process flow in this case on [his] own initiative, not in response to anything that Dr. Putnam argued," addressed it in his "very first report," and in "all four, that [he] issued in the case," and prepared a slide to explain the apportionment to the Court.).

361.    Dr. Ugone made the LSF/Process Flow Apportionment to revenues in addition to the "Large Suite SKU" apportionment to make sure he was "using the right revenue base".

- Tr. 958:16-959:12 (Ugone: confirming that he "proposed two apportionments in [his] analysis" to "make sure we're using the right revenue base.").

362.    Dr. Ugone calculated that only 15% of revenues from LSF and Process flow are attributable to the challenged configurations.

- Tr. 964:4-13 (Ugone: attributing 15% of revenues from LSF and process flow to the infringing configuration, and 85 percent of the revenues to other modules like HR and financial).

84

363.   Dr. Putnam agreed that only approximately 15% of LSF Process Flow revenue should be attributed to Configuration Nos. 3 and 5.

- Tr. 1019:1-4 (Putnam: explaining that he reached "basically the same" conclusion as Dr. Ugone, that 15% of the revenues from LSF/Process Flow were attributable to Configuration Nos. 3 and 5).

364.   Dr. Putnam opined that apportionment of LSF/Process Flow revenue is "mandatory," and while Dr. Ugone presented it as an "option" he conceded that he calculated to use "the right revenue base".

- Tr. 1115:25-1116:9 (Putnam Cross) ("Q: Are you and Dr. Ugone in agreement regarding the apportionment of licensing and maintenance revenue that you calculated? A: There were two apportionments.  I agree with Dr. Ugone on both of them. I think both are mandatory.  He thinks one is optional, but other than that we agree.  Q: Do you agree with the way in which Dr. Ugone calculated service revenues? A: Yes.").

- Tr. 960:11-961:3, 961:9-14, 964:4-13 (Ugone: discussing the LSF/Process Flow apportionment as an "option to the [C]ourt[]").

- Tr. 958:16-959:12 (Ugone: confirming that he "proposed two apportionments in [his] analysis" to "make sure we're using the right revenue base.").

365.   ePlus improperly advances measures of remedy that fail to account for the LSF/Process Flow apportionment.

- ePlus Rem. Br. at 5 n.4, 6, 8, 9, 9 n.7 (ePlus's proposed remedies primarily do not include the LSF/Process Flow apportionment).

366.   ePlus's argument that "revenue associated with LSF and PF is revenue that Lawson earned from licensing, maintaining, and servicing the Infringing Configurations" ignores the fact, admitted by its expert, that the vast majority of LSF/Process Flow's revenues (indeed, 85%) is *not* related to Configuration Nos. 3 and 5 but rather to other Lawson products.

- ePlus Rem. Br. at 5 n.4 (ePlus's proposed remedies primarily do not include the LSF/Process Flow apportionment).

85

- Tr. 964:4-13 (Ugone: attributing 15% of revenues from LSF and process flow to the infringing configuration, and 85 percent of the revenues to other modules like HR and financial).

367.    Apportioning the revenues from LSF and Process Flow decreases the relevant revenues ePlus calculated by Dr. Ugone through November 30, 2012 from $29.4 million to $23.0 million.

- Tr. 965:8-13 (Ugone: "using the LSF process flow apportionment that [he] discussed in all four of [his] reports but not today, that reduces the revenue base as of [November] 30, 2012, from $29.1 million to 23 million.").

368.    ePlus also overstates the revenue base by treating as improper the revenue earned from licensing Configuration Nos. 3 or 5 to designated healthcare customers during the six-month sunset period.

- Tr. 886:2-887:7 (Ugone: explaining that he treated the licensing revenue for healthcare customers differently that maintenance and service revenue because of the injunction)

- Tr. 966:8-967:11 (Ugone: explaining that he was instructed by ePlus's counsel to treat licensing revenues from the healthcare customers as improperly gained even during the six-month sunset period).

369.    The purpose of the sunset provision was to "alleviate any harm" to healthcare customers from having to make a fast transition to a different e-Procurement software vendor and to provide them "adequate time to transition to non-infringing systems."

- D.I. 728 at 48.

370.    The injunction does not, by its terms, prevent the 277 healthcare customers from making necessary changes to the number or identity of users during the sunset period.

- D.I. 728 at 48.

371.    The injunction's express language permitting Lawson to engage in "installation, implementation, design, configuration, consulting, upgrade, maintenance, support, training, and other related and associated services" for designated healthcare customers encompasses licensing

that flows from an existing customer's addition of users or change in identified users.  Licensing

revenue from the 277 designated healthcare customers during the sunset period was not earned

improperly under the Court's Injunction.

- D.I. 729 at 4.

372.    Properly excluding licensing revenues for the designated healthcare customers

reduces the revenue base used by Dr. Ugone by about $900,000.

- Tr. 967:12-16 (Ugone: between Dr. Ugone's including and Dr. Putnam's excluding license revenues from the healthcare customers during the sunset period, "there is about a 900,000-dollar difference.").

- Tr. 1020:9-14 (Putnam: "The amount of health care revenues that Lawson received during the contempt period from health care customers was about $900,000").

373.    After properly apportioning to account for LSF and Process Flow, and excluding

healthcare revenue during the sunset period, revenues associated with Configuration Nos. 3 and

5 through November 30, 2012 are correctly measured at $21.7 million.

- Tr. 1020:15-1021:5 (Putnam: "the total revenues are $21.7 million.").

    **2.    ePlus Advocates a Gross Profit Measure That Its Own Damages Expert Admitted Is Not The "Correct" Measure of Lawson's Gain**

374.    In order to measure the gains to Lawson from allegedly violating the Court's

injunction, costs associated with any violations must be subtracted from corresponding revenues.

- Tr. 1016:18-25 (Putnam: there are two steps to calculating a disgorgement measure: "[y]ou've got to identify the revenues in question and measure those accurately, and then you need to deduct the appropriate costs from those revenues to determine what Lawson's gain is.").

- Tr. 934:21-935:2, 973:7-14 (Ugone: agreeing that "the gain to Lawson by not complying with the injunction order, assuming that's what the Court finds, is the difference between the profits that Lawson earned by engaging in enjoined conduct versus what is would have or could have earned if it hadn't engaged in enjoined conduct" and "what Lawson gains is the difference between revenue and what it costs to get the revenue").

375.    The measure ePlus requests the Court award as ostensibly the best measure of Lawson's gain – gross profits – fails to deduct costs that should be deducted to measure Lawson's true gain, such as variable costs that could have been avoided had Lawson ceased to license, maintain or service Configuration Nos. 3 and 5.

- Tr. 974:15-975:16 (Ugone: "[g]ross profits is revenues minus what economists call costs of goods sold" and therefore "fails to deduct all variable costs from Lawson's revenues," including even "directly variable sales commission.").

- Tr. 979:8-15 (Ugone: admitting "that some portion of Lawson's sales and marketing expenses may have been avoided had Lawson ceased to license, maintain, and service the infringing system configurations," and yet his "gross profits calculation doesn't deduct" those costs.).

- Tr. 975:23-976:3, 976:22-977:5 (Ugone: the correct way to equate his figures with Lawson's gains are incremental profit, which deduct more costs from gross profit).

376.    The gross profit measure reflects only a limited set of costs identified for accounting purposes as "cost of sales" or "cost of goods sold."

- Tr. 637:21-638:21 (Samuelson: explaining the costs identified as costs of goods sold as only those that are allocable to only one specific revenue line under GAAP procedures, and giving examples of such costs).

- Tr. 974:15-18 (Ugone: agreeing that "[g]ross profits is revenues minus what economists call the costs of goods sold").

377.    "Costs of sales" or "costs of goods sold" account for costs such as commissions Lawson pays to resellers of its software or royalties it pays to third parties when it licenses a product.

- Tr. 638:16-639:5 (Samuelson: partner commissions and third party royalties are included in "costs of goods sold.").

378.    Gross profits do not deduct *any* operating costs, even those that are indisputably variable.  For example, it disregards sales and marketing expenses that ePlus has identified as

100% variable, which include such costs as sales commissions paid by Lawson for each license sold.

- Tr. 974:19-975:16 (Ugone: agreeing that his "gross profit figure fails to deduct all variable costs from Lawson's revenues," including "directly variable sales commission" costs.).

- Tr. 979:8-15 (Ugone: admitting that although "some portion of Lawsons sales and marketing expenses may have been avoided had Lawson ceased to license, maintain, and service the infringing system configurations," the gross profits calculation does not deduct those costs.).

- Tr. 980:10-15 (Ugone: he treats sales and marketing costs as 100% variable for purposes of his incremental profit calculation).

- Tr. 1022:21-25 (Putnam: gross profits and revenues "overstate Lawson's gain, because by definition they fail to deduct all of the costs that Lawson incurred in order to make the sales that it made.").

- Tr. 647:22-648:13 (Samuelson: "commissions we pay to our sales force that are completely variable" are included in operating costs).

379. Dr. Ugone admits that revenues and gross profits are not the correct measures of Lawson's gain, and that incremental profits are the correct measure.

- Tr. 976:23-977:5 (Ugone: "THE COURT: I think the bottom line, though, in your judgment, is the correct way to equate your figures with the gain the incremental profit? THE WITNESS: Yes. THE COURT: That's what you're trying to get at? THE WITNESS: Yes, Your Honor. And I want to – yes, Your Honor. I'll stop there.").

- Tr. 973:3-6 (Ugone: admitting that "total revenue is not a measure of Lawson's gain" from "an economic perspective because there's costs that could be deducted.").

380. Dr. Ugone admitted at trial that revenue "is not a measure of Lawson's gain" from an economic perspective.

- Tr. 973:3-6 (Ugone: admitting that "total revenue is not a measure of Lawson's gain" from "an economic perspective because there's costs that could be deducted.").

### 3. ePlus's Incremental Profits Measure Is Inflated Because It Fails To Deduct Lawson's Variable Operating Costs

381. Dr. Ugone testified that incremental profit is the "correct" measure of gain.

- Tr. 976:23-977:5 (Ugone: "THE COURT: I think the bottom line, though, in your judgment, is the correct way to equate your figures with the gain the incremental profit? THE WITNESS: Yes. THE COURT: That's what you're trying to get at? THE WITNESS: Yes, Your Honor. And I want to – yes, Your Honor. I'll stop there.").

382. Both parties' experts agreed that incremental profit calculations should subtract all variable costs.

- Tr. 897:22-898:10 (Ugone: stating that incremental profits "go beyond just those direct costs that I talked about, because there might be other costs within a company that may vary as sales vary. So that's what you're trying to capture. Any other incremental or variable costs, you take those away from the gross profits, and you'll get what's call incremental profits.").

- Tr. 1023:11-24 (Putnam: stating regarding incremental profits, "it's the increment to the profit that occurs form an increment to sales given that certain costs are fixed in the short run" . . . "THE COURT: you and Dr. Ugone don't differ in the conceptual articulation of that concept, do you? THE WITNESS: No, we don't, Your Honor, that's correct. It's a very common economic concept, and we would use the word the same way.").

383. Dr. Ugone opined that 100% of Lawson's R&D and G&A costs are fixed, and he did not deduct costs associated with either.

- Tr. 908:21-909:7 (Ugone: stating that G&A costs are fixed so he "would not deduct G&A costs to calculate incremental profits.").

- Tr. 909:25-910:8 (Ugone: stating that R&D costs are fixed so he "didn't deduct product development costs to calculate incremental profits").

384. To support his view that there were no R&D costs associated with the accused configurations, Dr. Ugone relied on Mr. Samuelson's deposition testimony: "Q: Okay. And again, there isn't any specific employee costs associated with employees in product development that you could say should be properly allocated just to infringing products and services, in the

90

sense that those product development costs are for an employee who is specifically focused on developing infringing products and services?  A: I don't -- I don't understand your question. But there are no -- there are no developers, to my knowledge, specifically focused on developing infringing products, period."

- Tr. 984:14-24, Tr. 985:5-8 (Ugone: counsel for Lawson read the above transcript portion to the witness, and Dr. Ugone agreed he relied on the quote).

385.   The statement on which Dr. Ugone places such heavy reliance does not support his conclusion that R&D expenses are 100% fixed.  Mr. Samuelson simply stated that Lawson did not have developers "developing infringing products"; he did not state that Lawson incurred no R&D expenses in connection with Configuration Nos. 3 and 5 which Lawson contends are not infringing.  Samuelson was, at most, referring to the configurations already found to have infringed, which included RSS rather than RQC.

- Tr. 986:12-987:4 (Ugone: agreeing that when referring to "infringing products and services," Mr. Samuelson is "referencing his understanding of what the jury verdict was.").

386.   Dr. Ugone extended Mr. Samuelson's answer to RQC, even though he was not sure if Mr. Samuelson was referring to configurations with RSS or RQC in his answer regarding expenditure of R&D.

- Tr. 982:17-22 (Ugone: stating there is testimony that "there's been no R&D specific to the [allegedly] infringing configurations" with RQC).

- Tr. 983:3-9 (Ugone: admitting he "can't speak to what was in [Mr. Samuelson's] mind when Mr. Samuelson was talking about "infringing configurations" and whether Mr. Samuelson meant "those specified in the injunction order with RSS or similar configurations with the new product RQC.").

387.   With regard to the general and administrative costs, Dr. Ugone relied on Mr. Samuelson's deposition that "most of G&A would probably be fixed."

- Tr. 909:11-14 (Ugone: "Q: Was there any documentation you relied on to come to that conclusion [that general and administrative costs are fixed]? A: Actually, there was deposition testimony.)";

- Tr. 988:20-25 (Ugone: "Q: Does that make economic sense to you, sir? A Yes. Q: That G&A costs are 100 percent fixed over a two-year period? A: Given the answers of Mr. Samuelson in his deposition . . .").

388.   Dr. Ugone did not note that Mr. Samuelson stated he was using "fixed" in that context to mean costs that do not vary directly or "automatically" with revenue.  Dr. Ugone also did not mention that Mr. Samuelson stated that much of Lawson's "people costs" are in fact variable.

- Tr. 681:17-682:15 (Samuelson: "Multiple times during the deposition [variable costs] came up and I think I was clear on multiple occasions. There is the what I'll call the theoretical deposition of a cost automatically changing with revenue, but also the practical definition that we work with where we do adjust our costs manually when revenue changes. I think I gave multiple examples in the deposition in areas such as G&A and others where we do that on a regular basis.").

- Tr. 665:6-12 (Samuelson: "Q: Most of Lawson's general and administrative costs would probably be fixed, correct? A: Again, we're back to this definition of fixed versus variable. Most of Lawson's G&A costs, if you look at will they automatically vary? No. But would we take actions in the event of a change in revenue? Yes, we would.");

- Tr. 1143:10-14 (Putnam: stating that when "Mr. Samuelson testified that most general and administrative costs are probably fixed costs," Mr. Samuelson had a particular meaning.).

- Tr. 1170:13-1171:14 (Putnam: explaining that he relied on Samuelson's testimony as a whole, which included testimony that people are "the largest portion of [Lawson's] cost structure," and that "to the extent we sold less product, we would need less people.  So at some level, it is variable.").

389.   Many costs do not fluctuate automatically with revenue, but do adjust over a short time horizon because management would take action within a short period of time; therefore, these costs are correctly grouped as variable.

- Tr. 624:11-19 (Samuelson: "like any company, we have a cost base. Some of those costs will automatically adjust depending on what our revenue is. So think of third party costs that are only paid when something is sold. But also, for example, we have a sales force, and the size of our sales force is dictated by the amount of our sales.  And we can adjust it when sales are up or when sales are down.").

- Tr. 640:8-21 (Samuelson: some costs vary automatically, including a partner commission; 70-80% of costs in Lawson's business are people costs which do not vary automatically.  Other costs also do not vary automatically.  If costs do not vary automatically Lawson "need[s] to make decisions about where and how to cut costs.").

- Tr. 648:24-649:14 (Samuelson: costs that require Lawson to take action include sales representatives which may be cut when a manager sees that their ration of sales to sales representatives is incorrect.  Lawson has to take action in these cases, because the costs would not decrease automatically).

390.    Lawson considers a cost to be variable if it the cost can be changed "quickly" within "weeks or months" after Lawson determines that there is going to be a shift in revenue.

- Tr. 640:22-641:5 (Samuelson) ("over an unlimited amount of time everything is variable. But the way we think about it is can the cost come out of the business quickly after we determine there's going to be a change in revenue.  And by quickly, I would say within weeks or months.").

391.    Lawson's costs of goods, including license, maintenance, and service costs, are variable.

- Tr. 641:6-19 (Samuelson: license costs are variable, including various directly variable costs).

- Tr. 643:20-24 (Samuelson: maintenance costs are variable, as Lawson "would be able to and would take action quickly, like in days, weeks, or months").

- Tr. 644:21-645:5 (Samuelson: service costs would be adjusted if Lawson lost revenues from the products at issue).

392.    Mr. Samuelson testified in detail concerning the variability of Lawson's operating costs.  *See* DPFF ¶¶ 389-91, 393-403.  ePlus does not account for any of this testimony in its analysis of the hearing record.

93

- *See generally*, ePlus Remedies Brief.

393.   Each of Lawson's three operating cost categories: sales and marketing, general and administrative, and research and development, varies with revenue.  The amount of money Lawson spends varies with the amount of revenue the company earns; Lawson considers its operating costs to be variable because when Lawson's revenue changes, its management takes action to cut costs to keep its profit margins.

- Tr. 624:7-10 (Samuelson: agreeing that "absolutely" "the amount of money that Lawson has to spend var[ies] based on the amount of revenue coming into the company.").

- Tr. 624:11-19 (Samuelson: "like any company, we have a cost base. Some of those costs will automatically adjust depending on what our revenue is . . . But also, for example, we have a sales force, and the size of our sales force is dictated by the amount of our sales.  And we can adjust it when sales are up or when sales are down.").

- Tr. 647:7-21 (Samuelson: explaining that operating costs are sales, marketing, research and development, and general and administrative; "Q: Do you consider Lawson's operating expenses to be variable? A: Yes.").

- Tr. 647:14-17 (Samuelson: explaining that the vast majority of "each of the categories of operating expenses" are variable.).

- *See* DPFF ¶¶ 394-403 (following).

394.   Like most software companies, 70-80% of Lawson's costs are for employee salaries, which are variable because Lawson can quickly manage its headcount as demand and revenue fluctuates.

- Tr. 647:22-648:5 (explaining that 85-90% of Lawson's costs are variable, in large part because 70-80% of their costs are employee-based, which are variable costs).

- Tr. 640:8-21 (Samuelson: "Q: Does a variable cost necessarily vary automatically meaning the moment a sale isn't made, the revenue isn't there?  A: Some costs vary automatically. Those examples I just gave, if a channel partner sells a product, we may them a commission. If they don't sell it, we don't pay a commission.  So that commission would vary automatically.  But other costs in our business, and our business is 70 to

80 percent people, you make cost decisions very quickly. And they are based on revenue or demand. And they vary, but it doesn't happen automatically. We need to make decisions about where and how to cut costs.").

395.    Software companies like Lawson have few fixed costs.

- Tr. 648:6-9 (Samuelson: "We don't have much of what I would call fixed costs, like factories or we don't own buildings or anything like that").

396.    Lawson's sales costs are variable.

- Tr. 652:23-653:3 (Samuelson: explaining that sales costs are variable: Lawson is "constantly looking at demand and making adjustments to our sales force based on where we see demand or lack thereof.").

- Tr. 648:24-649:14 (Samuelson: A sales manager will cut the number of salespersons for a product in order to "obtain the correct ratio of sales to sales reps.").

- Tr. 648:10-13: (Samuelson: "commissions we pay to our sales force [] are completely variable.").

- Tr. 653:4-10 (Samuelson: Commissions for salespersons, which are part of Lawson's operating costs, are automatically variable, and headcount is an area where "we would take actions, which we do on a regular basis.").

397.    Lawson's marketing costs are variable.

- Tr. 654:21-655:3 (Samuelson: stating that marketing costs are variable and vary because "marketing teams decide where to spend costs. As a budgeting matter, we generally look at marketing cost as a percent of revenue" and "if demand isn't there, we have a tendency to cut back . . . in order to keep our margins intact.").

398.    Research and development spending is variable because when demand changes

for a specific product, Lawson adjusts its R&D spending.

- Tr. 657:16-20 (Samuelson: stating that "when we see demand change for a specific product, we adjust our R&D spending.").

399.    Research and development costs consist of more than the initial coding and

launch of a product, but also include developing and creating upgrades, updates, and patches to

existing products, which Lawson's customers pay maintenance fees to obtain.

- Tr. 655:20-656:22 (Samuelson: describing R&D costs as costs going to developers writing code for products – which would be for development initially and also for updates to products, bug fixes – and costs of third parties who develop or help market).

- Tr. 622:18-623:21 (Samuelson: explaining maintenance revenues, Mr. Samuelson explains that "updates to the products, bug fixes, any kind of advancements we work on in our research and development group all go to customers who annually pay maintenance.")

400.    If Lawson were to discontinue a product such as Punchout and no longer be allowed to support customers on that product, Lawson would not spend R&D dollars to improve or patch it.  Absent the allegedly infringing licensing, maintenance, and service revenues, the research and development costs associated with the infringing configurations would not exist.

- Tr. 656:23-657:4 (Samuelson: "Q: If Lawson were to discontinue offering a particular product, say, a Punchout, would it continue to incur any R&D type expenses for maintenance of that product? A: If we were no longer allowed to sell and no longer allowed to support customers on a product, we would not spend R&D dollars on it, no.").

401.    Lawson's general and administrative costs are variable in that Lawson will look at general and accounting expenses as a percent of revenue and adjust its cost structure based on demand for its products.  Even though G&A costs do not vary automatically, less business means there is less need for people to provide services in the legal, information technology, and human resources departments, and vice versa.  G&A is variable particularly because G&A is largely "people cost" that can be easily changed with a loss of revenue.

- Tr. 660:25-661:10 (Samuelson: "Q: Based on your experience at Infor and Lawson, do you consider Lawson's G&A costs to be variable in the sense of including both automatically variable and variable requiring some action?  A: Sure.  There aren't many automatically variable costs in G&A, but, clearly, if we're doing less business, that means we need to do fewer contracts in our legal departments, send fewer bills, unfortunately collect less cash.  So, therefore, again, we look at G&A as a percent of revenue and are constantly adjusting our cost structure based on demand.").

- *See* DPFF ¶¶ 400, 402.

96

402.    Lawson has previously faced situations where it has had to vary costs that do not vary automatically, and has done so successfully.  As one example of this, during the recent economic downturn when revenues decreased substantially, Lawson took action to make sure "margins stayed intact."

- Tr. 649:15-24 (Samuelson: there were "many, many examples" of "actual experiences while [Mr. Samuelson] was at Infor or Lawson where [he] had the opportunity to observe the impact of a loss of sales on the amount that the money spends on operating expenses," the "most obvious one is the economic downturn where Infor and Lawson, like every other software company, saw significant decline in revenues" but Lawson's "margins stayed intact.").

403.    In a situation such as a permanent injunction where Lawson faces a permanent loss of revenue on a particular product, Lawson would take action to cut costs.

- Tr. 624:20-625:11 (Samuelson: stating that if "Lawson were to learn it would permanently lose a particular stream of revenues from a particular product," the management team, and other specific groups would look at demand and adjust spending accordingly).

- Tr. 650:8-14 (Samuelson: "Q: What would you do if you saw a loss of revenue that you understood for some reason was to be a permanent loss of revenue?  A: We would clearly take cost action.  Again, looking at the economic example, that wasn't even permanent, but we felt it would be protracted, so we took fairly aggressive action.").

- Tr. 651:19-22 (Samuelson: "A:  If for any reason we were to get no more revenue on a specific product, we would take cost action to make sure our margin stayed intact just like we did in economic [the] downturn example.").

404.    Dr. Putnam performed an economic regression analysis to arrive at his expert conclusions regarding incremental profits, using nearly twelve years of publicly available financial data.

- Tr. 1119:13-15 (Putnam: to calculate incremental profits, Dr. Putnam used a regression analysis).

- Tr. 1038:4-21 (Putnam: summarizing his regression analysis results and stating that "there [is] enough data to tell us reliably whether there's a

relationship between costs and revenues" and that "we have 47 observations, 47 quarters, so that's almost 12 years of data, and that's more than enough to give a reliable answer in principle.").

405.    The regression analysis plotted Lawson's various operating costs against its

revenue fluctuations to establish scientifically the relationship between the two.

- Tr. 1032:14-1033:5 (Putnam: stating that to determine whether costs are variable "we looked at the financials that Lawson submitted to the Securities and Exchange Commission since the year 2000. They've got to file quarterly reports that, among other things, name their revenues and also various categories of their operating costs, in particular the three categories that we discussed here. That gives us a data set that allows us to ask the following question: When Lawson's revenues varied in the past, how did Lawson vary its expenditures in these three cost categories accordingly. And by summarizing the relationship between revenues and the various categories of operating costs, we can then ask the question, which is relevant to these proceedings, had Lawson's revenues varied by $21.7 million over the injunction period, how would we expect Lawson to have responded by adjusting its costs if it were to have responded as it has in the past.").

406.    Dr. Putnam's regression analysis showed that 89% of Lawson's costs were

cumulatively variable, and that for every $1 change in Lawson's revenues, Lawson's sales and

marketing costs would change by 17.7 cents, its R&D expenses would change by 8.3 cents, and

its G&A expenses would change by 13.5 cents.

- Tr. 1049:24-1050:14 (Putnam: "So when I did the regression results, I computed the share of costs that were variable and found that overall about 89% is variable.").

- Tr. 1050:23-1051:2 (Putnam: the specific breakdown of how much each category of costs would change based on his regression results: 0.177, 0.083, and 0.135).

407.    By subtracting the variable portion of operating costs (89% overall) from the

gross profit margin, Lawson's incremental profit margin is calculated to be 26%.

- Tr. 1051:3-12 (Putnam: to calculate incremental profits, "start with Lawson's accused revenue, subtract the costs of goods sold. That gives you the gross margin of about 65.5 percent. Then if you subtract the variable sales and marketing, the variable R&D, and variable G&A, which

98

I've together said make 39.5 percent, 65.5 minus 39.5 gives you an incremental profit margin of 26 percent.").

408.    Although ePlus's damages expert, Dr. Ugone, is a Ph.D. economist, he did not testify that he performed any regression analysis over any time period to test the variability of Lawson's operating expenses, either for purposes of his own affirmative opinions or to correct any supposed errors in Dr. Purnam's approach.  Dr. Ugone also did not raise a single criticism of Dr. Putnam's regression methodology when testifying under oath and subject to cross-examination.

- Tr. 871:17-1000:14 (Ugone: entire testimony contains no mention of regression analysis performed by Dr. Ugone or any criticism of the regression methodology used by Dr. Putnam).

409.    Company-wide data is a reasonable proxy for the incremental costs associated with Configuration Nos. 3 and 5, because there is no evidence that the configurations at issue are idiosyncratic in any way affecting their cost structure.

- Tr. 1047:6-13 (Putnam: stating that he "though it was reasonable to use . . . overall cost figures as a proxy for the costs of the configurations three and five, the modules at issue" because "there was nothing idiosyncratic about these particular modules" that he found in the evidence.).

- Tr. 628:8-629:7 (Samuelson: the accused configurations are "middle of the road or common or average relative to our product" so he thinks that "overall profits are a pretty good proxy for the specific profits of those products.").

- Tr. 629:15-629:20 (Samuelson: stating that profits for the products at issue are similar to the company-wide profits and that "the amount of not just cost of goods, but sales costs that goes into them, the R&D cost that goes into them. G&A costs, all of those costs are probably about the same for these products as they are for the average of the company").

- Tr. 974:9-14 (Ugone: stating he used Lawson's company-wide financial information for his remedies calculations).

- Tr. 629:10-20 (Samuelson: "THE COURT: You said your overall profits were a proxy for the kind of products that we're talking about here.  You mean the percentage, the gross, the net? What are you talking about when

you say that?"  THE WITNESS: I would say operating profits are pretty similar.  So the amount of not just cost of goods, but sales cost that goes into them, the R&D cost that goes into them.  G&A costs, all of those costs are probably about the same for these products as they are for the average of the company.").

- Tr. 630:6-15 (Samuelson: "I believe the company's profit margins are roughly comparable to the products in question".).

410.    Dr. Ugone used Lawson's company-wide data to calculate each of his proposed measures, including the gross profit measure favored by ePlus.

- Tr. 974:9-14 (Ugone: stating he used Lawson's company-wide financial information for his remedies calculations).

- ePlus Remedies Br. at 6 (proposing gross profits as the appropriate remedy measure).

411.    The dataset Dr. Putnam used was the most reliable dataset to use for a regression because it is based on reported SEC data and contains enough data points to arrive at a reliable result.  Dr. Putnam did not run a regression on data from 2011 through 2012 alone because doing so would have involved only 8 data points, which would not have been reliable.

- Tr. 1164:12-1165:2 (Putnam: "Q: Why did you -- I want to take these in parts. Why did you not create a separate regression analysis that analyzed just that time period?  A: Well, for that time period, we only have eight observations.  So you will recall when I put up the regression result initially, I pointed to the fact that there were 47 observations.  When you have eight observations, you've got a necessarily less reliable regression. I didn't think that it was -- would be reliable to try to use so few observations for the 2011/2012 time period.  Also, I didn't marry the earlier data to the later data because the earlier data were reported on a worldwide basis, and the later data were reported on a U.S. basis.").

- Tr. 1123:11-15 (Putnam: Dr. Putnam did not "create a new regression based on this 2012 and 2011 profit and loss data for the Americas" because "there are only eight observations that would be less reliable.").

- Tr. 1124:17-23 (Putnam: Dr. Putnam did not "consider it reliable to rely on new data from 2011 and 2012 and create a regression and test that data versus your old regression model.").

100

- Tr. 1119:23-1120:6 (Putnam: stating he would only use the more recent data that he determined to be unreliable only if he "had reason to believe that the behavior was different further back in time" which he did not.)

- Tr. 1038:18 (Putnam: "we have 47 observations, 47 quarters, so that's almost 12 years of data, and that's more than enough to give a reliable answer in principle.").

412.    Dr. Putnam could not combine 2011 and 2012 data with 2000-2011 for his regression analysis.

- Tr. 1164:23-1165:2 (Putnam: "I didn't marry the earlier data to the later data because the earlier data were reported on a worldwide basis, and the later data were reported on a U.S. basis. So one can't simply append them to each other and increase the sample size that way.").

- Tr. 1123:6-10 (Putnam: "Q: You say you could not update your old regression because the old regression was worldwide data that was publicly reported and this data is limited to the U.S, correct? A: That's right.").

413.    Using data from 2000-2011 was reliable because there was no evidence that anything changed to alter the relationship between Lawson's revenues and costs and the data contained no outliers.

- Tr. 1120:21-1121:20 (Putnam: to determine whether the data set was reliable, "from an economic perspective, the question is, is there any evidence that the behavior of the firm changed at any point during this period. One would look for evidence of that change by saying that those -- instead of those dots clustering along that line, that there were some dots that appeared far off the line and seemed to be different. They are called outliers. I didn't find any outliers. So I had no reason to believe that the behavior of the firm changed over time, particularly with respect to a relatively small change in revenue of about 3 percent.").

414.    Comparing Dr. Putnam's regression to actual results in specific quarters ignores the purpose of a regression, which is to determine an average relationship over time. Dr. Putnam's regression precisely predicts the average relationship between Lawson's revenues and costs.

101

- Tr. 1168:12-1169:16 (Putnam: referring to the scatter plot of data with the regression line result, Dr. Putnam stated, "in every one of those data points, if you were to look at it with a large enough magnifying glass, every one of those data points differs from the regression line itself which means that the regression line is incorrect in the sense it doesn't get the actual data exactly for any of the quarters in question. About half the time, the situation is as Mr. Strapp describes which is that the regression predicts more expenditures than actually occurred. About half the time the regression predicts lower expenditures than actually occurred which is what you would expect of any average. Half the time the actual data is below the average and half the time it's above the average. So it doesn't concern me at all that in the example that Mr. Strapp pointed to, that prediction is not equal to the outcome. If that were truly a critique, one couldn't do data analysis at all, because one would be held to a standard of invariably having to predict the data exactly which can't be right. We're only trying to predict the average relationship here, and we've done that precisely.").

415.    The reliability of Dr. Putnam's regression analysis is reinforced by its consistency with Mr. Samuelson's testimony concerning the variability of costs during the time period specifically at issue in this action. Mr. Samuelson, who was CFO of Lawson and then of Infor during the relevant time period, testified extensively regarding the different operating costs Lawson incurs and their respective variability. *See* DPFF ¶¶ 389-91, 393-403. Also, Mr. Samuelson estimated that 85 to 90 percent of Lawson's costs are variable, a number consistent with, and confirming, Dr. Putnam's independent regression analysis calculating 89% variability.

- Tr. 647:22-648:5 (Samuelson: explaining that 85-90% of Lawson's costs are variable, in large part because 70-80% of their costs are employee-based, which are variable costs).

- Tr. 1049:24-1050:14 (Putnam: "So when I did the regression results, I computed the share of costs that were variable and found that overall about 89% is variable.").

416.    Incremental profits on all of Lawson's revenues derived from Configuration Nos. 3 and were $5.6 million through November 30, 2012.

- Tr. 1063:3-8 (Putnam: stating his result for incremental profit is $5.6 million).

417.    The daily rate associated with incremental profits is $12,761.

- DX-759.

- Tr. 1072:20-1073:9 (Putnam: stating the daily rate for incremental profit is $12,761).

### 4.    The Best Measure of Lawson's Gain Is Its Net Profit

418.    Dr. Ugone agreed that "[t]he premise of disgorgement is that you're allegedly taking away the gain of the wrongdoer."

- Tr. 969:8-21 (Ugone)

419.    Lawson's profits and liabilities spreadsheets are audited by outside accounting firms, filed with the SEC, and used for tax purposes; they are accordingly extremely reliable.

- Tr. 627:23-628:7 (Samuelson: Samuelson testified that Lawson's financial were audited by PricewaterhouseCoopers and the SEC.  He considers it "absolutely" reliable.).

- Tr. 635:16-23 (Samuelson: Lawson's general ledger is reliable because it is audited by accountants, the SEC, and tax authorities.).

420.    The most accurate picture of Lawson's profits is what it tells its shareholders in its SEC-regulated reports.  Dr. Putnam obtained Lawson's net profit margin from that source.

- Tr. 1105:6-14, 1106:7-15 (Putnam: "THE COURT: That seems -- what they're telling the public seems to me to be the most important component and I haven't heard it. And since you examined the SCC, I thought maybe you could tell me. A: Your Honor, if I could direct your attention, this is the best I can do sitting here, to Exhibit 9 of my supplemental report, the one filed in March. . . . THE COURT: Then they told the shareholders -- they told their -- no, they made statements and said it was what? 17 percent in 2012? THE WITNESS: That's over the entire period, Your Honor.  It was 15.8 in 2012 and an average over the two years of 17 percent, which is the number that I used for the net profit margin. THE COURT: 17 percent?  THE WITNESS: That's right, Your Honor.").

421.    Lawson's expenditures on sales and marketing, R&D, and G&A benefit and assist in the production and sale of the configurations at issue in this proceeding.  Without these expenses, the allegedly infringing licensing, maintenance, and service could not have occurred.

- Tr. 623:22-624:6 (Samuelson: Lawson's "operating costs, things like a sales force, a finance group, and HR group" are "all things that re required to operate a business and sell product.").

- Tr. 639:6-21 (Samuelson: costs of licenses pertain to the configurations at issue in this proceeding and would not exist if those revenues were lost.).

- Tr. 644:10-645:5 (Samuelson: costs of services pertain to the configurations at issue in this proceeding and would be cut if the revenues for those products did not exist.).

- Tr. 645:14-646:3 (Samuelson: Mr. Samuelson testified that gross profits does not reflect operating costs such as "the people that are out there selling the product," "the people who create the product," "the finance people who spend the bills and collect the cash", and "all those are required to operate the business and ultimately sell and deploy the product.").

- Tr. 653:11-22 (Samuelson: Sales costs incurred generally benefit the products at issue, and sales personnel are "required" in order to make sales.).

- Tr. 655:6-13 (Samuelson: Marketing cots benefit Configuration Nos. 3 and 5.).

- Tr. 657:21-658:4 (Samuelson: R&D spending benefits RQC because there is "significant development, much more so, frankly, than normal going on around RQC.").

- Tr. 661:11-25 (Samuelson: G&A costs benefit the products at issue. "There, again, if a customer were to purchase those products, we'd need to write a contract with them. We'd need to send them an invoice. We'd need to collect the cash. So the G&A department has a role in making sure that those products -- the business goes on as long as those products exist, effectively.").

422.   ePlus does not challenge the manner in which Lawson calculated its net profits; it simply argues that it is not the best measure of Lawson's gain because it includes fixed costs.

- Tr. 898:11-899:3 (Ugone).

423.   Like almost all software companies, Lawson does not specifically track costs on a product by product basis.

- Tr. 627:6-19 (Samuelson: Mr. Samuelson testified that Lawson does not "specifically track its costs or its profitability on a SKU by SKU or configuration by configuration basis." He also stated that in his fifteen years of experience in finance, he has done diligence on 100 software companies and has never seen a software company track profitability in that way.).

424. Because the products at issue are "middle of the road or common or average" as far as Lawson's products go, the company-wide profits and costs are a good proxy for the specific profits of Configuration Nos. 3 and 5.

- Tr. 628:8-629:7 (Samuelson: Mr. Samuelson stated that Lawson generally had three "tranches" of products: newer products with low profit margins, older products with high profit margins, and those in the middle. "The products we're talking about here today are more middle of the road or common or average relative to our products. . . So I think our overall profits are a pretty good proxy for the specific profits of those products.").

425. For example, Lawson's operating costs are the same for the products in question as the company on whole.

- Tr. 629:10-20 (Samuelson: "So the amount of not just cost of goods, but sales cost that goes into them, the R&D cost that goes into them. G&A costs, all of those costs are probably about the same for these products as they are for the average of the company.")

- 630:6-15 (Samuelson: "I believe the company's profit margins are roughly comparable to the products in question, if that's what you ask.")

426. Dr. Ugone used Lawson's company-wide data to compute his own gross profit measure that ePlus now asks the Court to adopt.

- Tr. 974:9-14 ("Q: Now, you used Lawson's company-wide financial information? A Yes.").

- ePlus Remedies Br. at 6.

427. Costs that ePlus characterizes as "fixed" are, in fact, not "fixed" in either the time period relevant to Lawson's decision-making process or the injunction/contempt period.

- Tr. 1024:10-1025:10. (Putnam: "costs that are fixed in the short run become variable in the long run").

- Tr. 1024:20-1025:3 (Putnam: "THE COURT: You mean if I look at the period of time of a couple, three days, incremental profit might be an appropriate measure, but if I look at the same basic figures or parameters but for a period of time of a year, then you don't use incremental profit, you use net profit. THE WITNESS: That's right, Your Honor. THE COURT: Because the cost structure shifts from fixed to variable costs? THE WITNESS: That's right, exactly.").

- Tr. 640:22-641:5 (Samuelson: "over an unlimited amount of time everything s variable. But the way we think about it is can the cost come out of the business quickly after we determine there's going to be a change in revenue. And by quickly, I would say within weeks or months.").

- Tr. 652:23-653:3 (Samuelson: explaining that sales costs are variable: Lawson is "constantly looking at demand and making adjustments to our sales force based on where we see demand or lack thereof.").

- Tr. 648:24-649:14 (Samuelson: A sales manager will cut the number of salespersons for a product in order to "achieve the right ratio of sales to sales reps.").

- Tr. 648:10-13: (Samuelson: "commissions we pay to our sales force [] are completely variable.").

- Tr. 653:4-10 (Samuelson: Commissions for salespersons, which are part of Lawson's operating costs, are automatically variable, and headcount is an area where "we would take actions, which we do on a regular basis.").

- Tr. 654:21-655:3 (Samuelson: stating that marketing costs are variable and vary because "marketing teams decide where to spend costs. As a budgeting matter, we generally look at marketing cost as a percent of revenue" and "if demand isn't there, we have a tendency to cut back . . . in order to keep our margins intact.").

- Tr. 657:16-20 (Samuelson: stating that "when we see demand change for a specific product, we adjust our R&D spending.").

- Tr. 660:25-661:10 (Samuelson: "Q: Based on your experience at Infor and Lawson, do you consider Lawson's G&A costs to be variable in the sense of including both automatically variable and variable requiring some action? A: Sure. There aren't many automatically variable costs in G&A, but, clearly, if we're doing less business, that means we need to do fewer contracts in our legal departments, send fewer bills, unfortunately collect less cash. So, therefore, again, we look at G&A as a percent of revenue and are constantly adjusting our cost structure based on demand.").

- Tr. 650:8-14 ("Q: What would you do if you saw a loss of revenue that you understood for some reason was to be a permanent loss of revenue? A: We would clearly take cost action.  Again, looking at the economic example, that wasn't even permanent, but we felt it would be protracted, so we took fairly aggressive action.").

- Tr. 651:19-22. ("A:  If for any reason we were to get no more revenue on a specific product, we would take cost action to make sure our margin stayed intact just like we did in economic [the] downturn example.").

428.   Because any loss of revenues that Lawson would have suffered as a result of this court's permanent injunction is, by definition, permanent, it follows that Lawson could have looked to cut costs not only in areas that can be adjusted quickly, but also in those areas that may take longer to reduce.

- Tr. 1052:24-1053:2 (Putnam) ("If it was faced with a permanent loss of revenue as of that date, then it would be making permanent decisions with respect to the costs that correspond to those revenues.").

- Tr. 650:8-14 (Samuelson: "Q: What would you do if you saw a loss of revenue that you understood for some reason was to be a permanent loss of revenue?  A: We would clearly take cost action.  Again, looking at the economic example, that wasn't even permanent, but we felt it would be protracted, so we took fairly aggressive action.").

- Tr. 651:19-22.  (Samuelson: "If for any reason we were to get no more revenue on a specific product, we would take cost action to make sure our margin stayed intact just like we did in [the] economic downturn example.").

429.   Lawson's net profits on all the revenues associated with Configuration Nos. 3 and 5, not accounting for non-infringing uses, are $3.7 million from the Injunction to November 30, 2012.

- Tr. 1063: 3-8 (Putnam).

430.   The daily rate associated with this disgorgement remedy is $8,329.

- Tr. 1072:20-1073:3 (Putnam).

5.      **Disgorgement of All Profits Related to Configuration Nos. 3 and 5 Overstates Lawson's True Gain**

a.      **ePlus Improperly Seeks to Disgorge Profits Related to Lawful, Non-Infringing Uses of Configuration Nos. 3 and 5**

431.    Configuration Nos. 3 and 5 have substantial non-infringing uses, as conceded by ePlus's own software expert.

- Tr. 766:5-17 (Weaver: Dr. Weaver conceded that "Configuration three, without the use of Punchout, could never infringe claim 26." Dr. Weaver testified that even under his view of infringement and the claims, Punchout is required "in order to infringe claim 26 because there's no other way to check inventory.")

- Tr. 723:13-22 (Weaver: Punchout or EDI is used to perform the determining inventory step of claim 26. Without using or activating Punchout or EDI, there is no infringement.)

- Tr. 784:8-785:3 (Weaver: Dr. Weaver testified that using Configuration Nos. 3 or 5 to order stock items (such as yellow pads for a law firm) does not infringe claim 26 "because there's no requisition and purchase order.")

- Tr. 789:24-790:3 (Weaver: Dr. Weaver admitted that he has reviewed documents reflecting that customers use item master to purchase stock items.)

- Tr. 785:4-16 (Weaver: requisitioning special items using Configuration Nos. 3 and 5 does not infringe because no search is conducted.)

- Tr. 785:17-787:5 (Weaver: procuring items using prefilled templates is non-infringing because no search is conducted.)

- Tr. 788:2-13 (Weaver: procuring items from Punchout vendors incapable of providing inventory information is non-infringing because inventory-checking step cannot be performed).

- *See* DPFF ¶¶ 337-344 (Non-infringing uses)

432.    Configuration No. 2, which is adjudged *non*-infringing, comprises most of the modules within Configurations No. 3 and 5, excluding Punchout or Punchout and EDI, and its functionality can be used in the challenged configurations without implicating claim 26.

- D.I. 600, Jury Verdict (ePlus did not allege that Configuration No. 2, which has RSS but neither Punchout nor EDI, infringed claim 26).

108

- *ePlus, Inc. v. Lawson Software*, Inc., 700 F.3d 509, 523 (Fed. Cir. 2012) (invalidating claims system claims and finding no infringement as a matter of law with respect to claims 28 and 29 of the '683 patent).

- Tr. 67:24-68:6 (Weaver: listing modules of Configuration No. 3 as Lawson System Foundation and Process Flow, the S3 Procurement Modules, RSS, and Procurement Punchout.).

- *See* DPFF DPFF ¶¶ 266, 337-344 (Non-infringing uses)

433.    It is only when Punchout, or Punchout and EDI, are added-on to Configuration No. 2, and used in conjunction with those modules, that the asserted claim is supposedly implicated.

- Tr. 766:5-17 (Weaver: Dr. Weaver conceded that "Configuration three, without the use of Punchout, could never infringe claim 26." Dr. Weaver testified that even under his view of infringement and the claims, Punchout is required "in order to infringe claim 26 because there's no other way to check inventory.")

- Tr. 723:13-22 (Weaver: Punchout or EDI is used to perform the determining inventory step of claim 26. Without using or activating Punchout or EDI, there is no infringement.)

- D.I. 600, Jury Verdict (Configurations without Punchout found not to infringe claim 26.).

434.    ePlus did not establish that Claim 26's functionality drives the sales of the challenged configurations. ePlus admitted in prior briefing, citing and relying on testimony from Lawson's employees that "Procurement Punchout does not drive S3 sales," and "Lawson has never won a sale merely because of its Punchout product."

- Plaintiff ePlus Inc.'s Brief in Support of Motion for Permanent Injunction, D.I. 641, at 20.

435.    Sales of Punchout do not drive sales of Lawson's e-procurement configurations. When Lawson did not have a design-around pertaining to Punchout, it planned to hold Punchout out of deals with potential customers. Punchout could be held out of deals and still close them.

- PX-1091 at RQC0328897 (Email from Jim Millard to Dean Hager stating that Lawson can "hold Punchout out of the deal" with Jackson healthcare).

- PX-1091 at RQC0328897 (Email from Dean Hager to Jim Millard stating to "hold punchout out of [the deal]").

- Hager Mar 22, 2013 Dep. at 174:16-175:20 (Hager:  Mr. Hager testified that there was a plan in place where if there was a solution to RSS but no solution to Punchout, Lawson would "simply go through with deals but pull the Punchout product out of the deal."  Additionally, Punchout was not considered a "critical component" to these deals, meaning that "there would be no deal" without it, the way that RSS was critical.)

- Tr. 947:1-14 (Ugone: While there used to be 800 customers at issue having Configuration 2, 4 or 5, there are only 146 customers with Configuration No. 3 or 5; a small subset of customers have Punchout.).

436.    Dr. Ugone agreed that under the Federal Circuit's Ruling, Lawson is free to do business with customers as to any configurations other than Configuration Nos. 3 and 5.

- Tr. 935:7-16 (Ugone).

437.    ePlus did not provide any measure of what portion of Lawson's profits is properly attributable to the add-on modules that convert Lawson's lawful Configuration 2 into allegedly infringing software.

- Tr. 942:6-19 (Ugone: "What I calculated was the revenues associated with the two infringing configurations.  I didn't calculate anything else.").

- Tr. 949:20-951:2 (Ugone: Dr. Ugone included in his disgorgement measure 100 percent of all of the revenues for a Configuration 3 customer without subtracting revenues for modules Lawson lawfully could have sold.)

- Tr. 950:19-951:2 (Ugone: Dr. Ugone calculated revenues "associated with the infringing configurations, which would be all the modules that I showed.").

- *See generally* Tr. 871:22-1000:14 (Ugone Direct)

438.    The most reliable way to value such a specific feature within a larger system is to compare the system's value to the customer both with and without that incremental feature—the difference corresponds to the real value customers place on the feature/functionality.

- Tr. 1083:2-12 (Putnam: To calculate "the value contributed by a particular feature to a system" one should "look at the . . . market value of a system having that feature, compare that to the market value of a system that was otherwise identical that didn't have that feature.")

439.    Dr. Putnam calculated the incremental value of the allegedly infringing features of Configuration Nos. 3 and 5 by subtracting the price of a non-accused configuration (Configuration No. 2) from an accused configuration.

- Tr. 1083:2-1084:3 (Putnam: "So we look at the market price of an accused configuration, which can be 3 or 5 depending on whether EDI is included or not, we subtract from that the price of a non-accused configuration, which is an otherwise identical system lacking the accused functionality, and then the difference is the benefit, as determined in the marketplace, of the accused functionality . . . .").

- Tr. 1084:4-18 (Putnam: Dr. Putnam had price and sales data for each module individually, which allowed him to calculate the price of the accused configurations minus the price of a non-accused configuration to determine the incremental value of the infringing feature.).

- Tr. 1087:5-16 (Putnam: Dr. Putnam explained that his method puts an economic measure on the value of being able to practice claim 26.  It does not depend on how a user used Configuration No. 3 or 5.)

- Tr. 1087:17-1088:5 (Putnam: Dr. Putnam's calculation was conservative because it assumes that "the entire value of Punchout or Punchout plus EDI is based on the ability to practice claim 26.  If there were other uses of Punchout or Punchout with EDI that did not practice Claim 26, then they should not be included in this calculation, but conservatively I have included them.")

440.    Dr. Putnam's calculation of "incremental value" was based on actual sales data for the sales of Configuration Nos. 3 and 5 and established prices for the modules making up non-infringing configurations.

111

- Tr. 1086:15-1087:4 (Putnam: Dr. Putnam "look[ed] at what [customers] paid for the total configuration as they purchased it" and then subtracted "broken out pricing for the pieces that would make up configuration 2 for that customer.")

- Tr. 1084:4-18 (Putnam: Dr. Putnam had price and sales data for each module individually, which allowed him to calculate the price of the accused configurations minus the price of a non-accused configuration to determine the incremental value of the infringing feature.).

441. Dr. Putnam's calculation was conservative because it assumes that the entire value of Punchout or Punchout plus EDI is based on the ability to practice Claim 26.

- Tr. 1087:17-1088:5 (Putnam: Dr. Putnam's calculation was conservative because it assumes that "the entire value of Punchout or Punchout plus EDI is based on the ability to practice claim 26.  If there were other uses of Punchout or Punchout with EDI that did not practice Claim 26, then they should not be included in this calculation, but conservatively I have included them.")

442. The net profits on the incremental value of the infringing method for all of the customers at issue, using the above method, was $1.2 million through November 30, 2012.

- Tr. 1093:5-10 (Putnam)

- DX-759

443. The $1.2 million figure assumes that both Punchout and EDI make up the incremental feature that enable a customer with Configuration Nos. 3 and 5 to practice Claim 26 in a way that customers with Configuration No. 2 cannot.  However, the evidence reflects that Punchout is the is the only relevant add-on module to determine whether or not a configuration is infringing, given, *inter alia*, that Configuration No. 4, which includes EDI and Item Master but not Punchout, was found by the jury to be non-infringing.  Treating the price paid for Punchout alone as the measure of the incremental value of the feature that allows a customer to practice Claim 26, the incremental value measure is $1.0 million through November 30, 2012 , with a corresponding daily rate of $2,172.

112

- DX-759

444.    If the Court chooses to award incremental profits on the incremental value of the infringing feature, then the measure of damages is $1.9 million for Punchout and EDI through November 30, 2012 with a daily rate of $4,129, and $1.5 million for just Punchout through November 30, 2012, with a daily rate of $3,328.

- DX-759.

445.    Dr. Putnam also testified to a System Apportionment method for calculating the value of the infringing uses of Configuration Nos. 3 and 5.  The System Apportionment method first calculates a ratio of expenditures on Procurement Punchout and EDI to expenditures on Procurement Punchout, EDI, and RQC to define the percentage of add-on module revenues that is due to modules unique to infringing systems (46.4%).

- Tr. 1093:21-1095:15 (Putnam Direct) (A: . . . So I took the ratio of expenditures on Procurement Punchout and EDI to expenditures on Procurement Punchout, EDI and Requisition Center or RQC and discovered that that's just under half. Knowing that the value of the two infringing modules or the two modules that convert a non-infringing configuration to an infringing configuration is approximately half, I then apportioned all of the expenditures by that fraction.  It's actually 46.4 percent for the record. And said that half of the system should be apportioned to the infringing uses and the remainder to non-infringing uses as reflected in the ratio of Procurement Punchout and EDI to the three requisition modules.").

446.    The resulting percentage is applied to the revenues from modules present in both non-infringing and infringing systems (LSF/Process Flow, RQ, PO, IC, RQC), to yield the portion of those modules contributing to infringing uses, as opposed to non-infringing uses that could be performed with non-infringing systems.

- Tr. 1093:21-1095:15 (Putnam)

447.    To be conservative, this apportioned amount is then added to *all* revenues attributable to Punchout and EDI from infringing systems.

113

- Tr. 1093:21-1095:15 (Putnam)

448.    The net profits measure for the System Apportionment calculation is $2.4 million

through November 30, 2012 with a daily rate of $5,328.

- Tr. 1096:1-10 (Putnam Direct) ("Q: Do you have an opinion as between the four measures under system apportionment approach as to which is the most accurate?  A: Well, again, I would say that the one on the lower left, which is 2.4 million, reflects the net profit margin, just a long run decision horizon.  And it includes both Punchout and EDI. And so, conservatively, it addresses any ambiguity as to whether EDI itself should be included as an infringing module.").

449.    The incremental profits measure for the System Apportionment calculation is

$3.6 million through November 30, 2012, with a daily rate of $8,163.  If the Court determines

EDI should not be included as a module required for infringement, then net profits would be

$1.9 million through November 30, 2012, with a daily rate of $4,254, and incremental profits

would be $2.9 million through November 30, 2012, with a daily rate of $6,518.

- DX-759

**b.    ePlus Improperly Seeks to Disgorge Profits that Lawson Could Have Earned in Compliance with the Injunction**

450.    Each of ePlus's proffered disgorgement measures looks at the revenues that

Lawson earned in with Configuration Nos. 3 and 5 and treats *all* of those revenues as improper

gain, *i.e.* gain that Lawson would not have earned had it complied with the injunction.

- Tr. 942:6-19 (Ugone: "What I calculated was the revenues associated with the two infringing configurations.  I didn't calculate anything else.").

- Tr. 949:20-951:2 (Ugone: Dr. Ugone included in his disgorgement measure 100 percent of all of the revenues for a Configuration 3 customer without subtracting revenues for modules Lawson lawfully could have sold.)

- Tr. 950:19-951:2 (Ugone: Dr. Ugone calculated revenues "associated with the infringing configurations, which would be all the modules that I showed.").

114

451.    This is not a correct measure of the "gain" to Lawson because it does not account for revenues Lawson could have earned by selling non-accused configurations such as Configuration No. 2 in place of Configuration Nos. 3 or 5.

- Tr. 934:21-935:2 (Ugone: Dr. Ugone conceded that "the gain to Lawson by not complying with the injunction order, assuming that's what the Court finds, is the difference between the profits that Lawson earned by engaging in enjoined conduct versus what it would have or could have earned if it hadn't engaged in enjoined conduct.").

- Tr. 935:7-16 (Ugone:  Dr. Ugone agreed that under the Federal Circuit's Ruling, Lawson is free to do business with customers as to any configurations other than Configuration Nos. 3 and 5, including Configuration No. 2.).

452.    A proper measure of Lawson's gain should be limited to those profits Lawson could not lawfully have earned consistent with the Court's injunction as impacted by the Federal Circuit's decision.  This amount is, in effect, the profit related to Punchout since Punchout is the difference between an infringing system and a non-infringing system.

- Tr. 1172:12-1173:2 (Putnam: Dr. Putnam explained that the correct analysis is a "counterfactual" looking at "what would Lawson have done had it complied with the injunction.".)

- Tr. 1083:2-1084:18 (Putnam: Dr. Putnam, in the context of his incremental value calculation, calculated the revenues associated with Punchout.).

- Tr. 1086:15-1087:4 (Putnam: Dr. Putnam "looked at what [customers] paid for the total configuration as they purchased it" and then subtracted "broken out pricing for the pieces that would make up configuration 2 for that customer.")

- Tr. 1084:4-18 (Putnam: Dr. Putnam had price and sales data for each module individually, which allowed him to calculate the price of the accused configurations minus the price of a non-accused configuration to determine the incremental value of the infringing feature.).

453.    Lawson's net profit relating to Punchout amounted to $1.0 million through November 30, 2012.

115

- DX-759.

## C.   A MULTIPLIER IS WHOLLY UNWARRANTED HERE

### 1.   Lawson Attempted in Good Faith to Redesign Its Products

454.   Lawson attempted in good faith to design around the claims, ultimately deciding on a design-around that was mandated by counsel, even though it significantly and negatively impacted Lawson's customers.

- DPFF ¶¶ 80, 82 (Lawson's counsel mandated the design-around)

- DPFF ¶¶ 35-85 (Lawson's design-around and counsel's involvement).

- DPFF ¶¶ 131-260 (Lawson's good faith actions in response to Injunction).

- DPFF ¶¶ 96-100, 103-108 (The changes to Punchout negatively impacted the product.)

455.   Lawson engaged special independent patent counsel (Robert Crawford) to consult with its trial counsel and in-house counsel.

- Tr. 301:14-16 (Christopherson: "[Mr. Crawford] was yet another independent lawyer that we brought in to help advise us on these proceedings.").

- Tr. 329:8-330:12 (Christopherson:  Mr. Crawford was outside counsel, not from the Merchant & Gould law firm who joined the legal team after the initial trial and worked on the design-around.).

456.   Lawson's goal was "first and foremost [] to find design-arounds for each of the claims that [they] were found guilty of."

- Tr. 332:12-17 (Christopherson).

457.   Far from disregarding the Court's injunction, Lawson planned to "hold Punchout out of [its deals]" entirely unless its lawyers were satisfied that claim 26 circumnavigated.

- PX-1091 at RQC0328897 (Email from Jim Millard to Dean Hager stating that "we can hold Punchout out of the deal" with Jackson healthcare).

- PX-1091 at RQC0328897 (Email from Dean Hager to Jim Millard stating to "hold punchout out of [the deal]").

116

- Hager Mar 22, 2013 Dep. at 174:16-175:20 (Hager: Mr. Hager testified that there was a plan in place where if there was a solution to RSS but no solution to Punchout, Lawson would "simply go through with deals but pull the Punchout product out of the deal." Additionally, Punchout was not considered a "critical component" to these deals, meaning that "there would be no deal" without it, the way that RSS was critical.)

458.    Mr. Hager stated: "Ultimately, this is a legal decision. Throughout this process, we have been depending on legal opinion to formulate our plans. We need to do what we need to do…."

- PX-1096 at RQC0914944

- Hager Dep. January 6, 2012 at 185:10-186:1.

459.    Many alternative design ideas less impactful on customers were rejected because they "did not go far enough" to address the infringement findings.

- PX-1019 at RQC2291408 (Email in which Keith Lohkamp says his alternative suggestions "did not go far enough" as determined by legal.).

- PX-1018.

- Tr. 353:24-354:17 (Christopherson: describing change to Punchout that was not implemented because "legal does not think this will work.")

- Tr. 406:4-407:11 (Lohkamp: describing "alternative approach" that was less detrimental to customers but was not implemented.).

460.    Lawson's counsel proposed an idea whereby Lawson would instruct Punchout vendors to customize their websites for Lawson to remove inventory checking and UNSPSC scripts and would block access to Punchout vendors who were not in compliance.

- PX-1256.

461.    The UNSPSC scripts referred to in PX-1256 have nothing at all to do with the changes at issue in the contempt proceeding, but instead relate to now invalidated claims.

- Tr. 302:21-25 (Christopherson: "Q: Does this reference to UNSPSC relate to the Punchout changes that you first conceived of around April 18 and were later implemented on May 23 and June 9? A: No.").

462.    Outside counsel specifically stated with respect to its idea to instruct Punchout vendors to customize their web sites that "[t]his idea is still in the early stages" and asked Mr. Christopherson for his thoughts from an engineering perspective.

- PX-1256 at RQC3002883.

463.    Mr. Christopherson's disagreement with counsel was based on an engineering analysis as to feasibility, not a business or legal analysis related to the impact of counsel's proposal.  Specifically, Mr. Christopherson pointed out that (1) as a technical matter there was no way to prevent the Punchout connection; (2) there would be no way from a technical perspective to ensure that approved Punchout partners did not allow for inventory determining or UNSPSC capability; and (3) vendors would not customize the shopping experience of their sites specifically for Lawson.

- PX-1256 at RQC3002882 (email from Dale Christopherson giving "list of issues" why the proposal would not work).

- Tr. 262:1-3 (Christopherson: "What I raised in this [email] is from an engineering standpoint why I felt that it was not something that would be viable.").

464.    Lawson's support staff took compliance with the injunction seriously. Ms. Homewood testified, consistent with her instant message exchange with Mr. Bragstad (PX-1044) that support was taking compliance more seriously than other departments because at this point in time support was dealing with RQC on a day-to-day basis whereas other departments had finished their tasks related to the design-around.  ePlus's proposed findings based on PX-1044 are not correct.

- Tr. 858:6-21 (Homewood: Ms. Homewood testified that she never said support was not taking the injunction seriously.  She testified that for teams other than support, "a lot of the tasks to comply with the injunction for the other departments were complete."  But "[s]upport was still dealing with this on a day in and day out basis.").

465.    ePlus mischaracterizes the relevant evidence when arguing that Lawson's personnel were "scared" that RQC did not comply with the Injunction.  Ms. Homewood testified that "[she] wasn't scared so much whether the product complied as much as what the impact that would have on our customers and our operations if that were to be the case."

- Tr. 856:16-22 (Homewood).

- Tr. 857:7-18 (Homewood: "Again, I just said it didn't scare me whether that would be found in compliance as much as what scared me was we had just spent a month working with our customers to migrate them and encourage them to use RQC, and then to hear that potentially we'd have to go through all that pain and impacted on our customers again is what scared me, not the actual product.").

466.    Lawson attempted in good faith to comply with the Court's injunction, to encourage customers to use RQC, and to not support users with RSS.

- DPFF ¶¶ 131-260.

   **2.    Lawson Did Not Mislead The Court During Injunction Proceedings**

467.    Lawson disclosed, during the injunction proceedings, information about its purported design-around to the Court and ePlus.  As early as March 30, 2011, in the midst of the injunction hearing proceedings, Lawson accurately informed the Court in its opposition to ePlus's motion for a permanent injunction that "Lawson is working on redesigning RSS and Punchout to avoid the infringed claims, [although] the design around is not done and Lawson has not determined when it will be done."

- D.I. 705 at 19 (Lawson Opposition to Motion for Permanent Injunction).

468.    In its reply brief, ePlus acknowledged that Lawson was developing a redesigned product, highlighting Lawson's "claims that it has a 'design-around' in the works."

- D.I. 708 at 15 (ePlus Reply ISO Motion For Permanent Injunction).

469.   At oral argument on April 4, 2011, both parties mentioned a potential design-around, and the Court commented that "that's stuff that's really not before me on either side, is it?" and "I think it would be speculative if I did that."  ePlus agreed that a potential design-around was not before the Court.

- D.I. 720, Apr. 4, 2011 Tr. 79:21-80:3 (Lawson counsel noting "We're at that point now, and they're working on it, the changeover now.").

- *Id.* at 112:10-12 (ePlus counsel: "The only other thing was suggested, Your Honor, that they're working on some sort of design-around already.")

- *Id.* at 112:15-19 (The Court: "[b]asically that's stuff that's really not before me on either side, is it?  I can't make any findings based on that one way or the other.  I think it would be speculative if I did that.").

- *Id.* at 112:19.  (ePlus counsel: "I agree with Your Honor.").

470.   On May 6, 2011, Lawson again informed the Court of its design around in a letter that described in detail the features of a redesigned product and stated that the product would be released "in the next few weeks."

- D.I. 727 at 1.  ("While we will need to continue to service existing RSS products, Lawson will introduce a new product called Requisition Center (RQC) in the next few weeks."  The letter explained over seven pages the change that had been made to RQC at that point in time and why it did not infringe.)

471.   In its May 23, 2012 Memorandum Opinion, the Court specifically discussed Lawson's design-around and noted that RQC was made generally available to customers on May 18, 2011.

- D.I. 728, Memorandum Opinion Concerning Permanent Injunction at 42 & n.10.

472.   Lawson had no finalized design-around product at the time of an April 13, 2011 email in which a Lawson marketing employee was asked to retract a statement that Lawson was prepared with a design-around product.

- Hager Dep., March 22, 2013 at 181:6-19 (Hager: "I know at this time [April 13, 2011] there was not a final redesign on the product.").

473.    Lawson had not conceived of the modifications to Punchout functionality at issue in this contempt proceeding by April 13, 2011.

- DPFF ¶¶ 75-77.

474.    When Lawson did have a product in near final form, it told ePlus and the Court in detail.

- D.I. 727 (Docketed letter to ePlus announcing that "The RQC product is not yet complete" but will be released "in the next few weeks.").

475.    Lawson has a policy of not announcing software prior to its official release because release dates often get cancelled or pushed back due to the unpredictable nature of IT projects.

- Hager Dep. Mar. 22, 2013 at 189:10-19 (Hager: Mr. Hager stated that it was the general policy at Lawson "to not identify to the public projected release dates for new software."

- Hager Dep. Mar. 22, 2013 at 189:14-19 (Hager: Lawson's policy exists because "IT projects are so unpredictable, it's very hard to predict with accuracy into the future when they will deliver.  Many of them push or get cancelled, so it was our policy not to communicate to clients future delivery of product.")

- Hager Dep. Mar. 22, 2013 at 95:4-15 (Hager: Mr. Hager stated that it was Lawson's policy not to about projects before shipment because "IT projects so often slip or don't deliver.").

- Hager Dep. Mar. 22, 2013 at 102:8-17 (Hager: Until the product is ready, it is generally not talked about with customers).

476.    At the March 25, 2011 evidentiary hearing on the injunction, Mr. Hager was asked about the time it would take to select, verify, and implement a third party replacement system.

- D.I. 699, Mar. 25, 2011 Tr. 219:1-16 (Transcript:  Mr. Hager was asked "Do you have an estimate as to how long it would take a customer to

121

actually select and verify and implement a system that would replace the Lawson eProcurement functionality?").

- D.I. 699, Mar. 25, 2011 Tr. 261:25-263:20 (questions concerning costs and time of changing to a third party system);

- Hager Dep., January 6, 2012 at 67:12-15 (Hager: "The context I was answering the question in, the phrase "away from RSS," I answered it as if it was away from RSS into an alternative third-party solution").

- Hager Dep., January 6, 2012 at 88:12-17 (Hager: Mr. Hager understood Mr. McDonald's questions to refer to the costs to replace RSS with a third party solution)

- Hager Dep., January 6, 2012 at 89:3-7 (Hager: same)

- Hager Dep., January 6, 2012 at 357:11-365:15 (Hager:  Mr. Hager understood questions to refer to costs to replace RSS with a third party solution because previous questions asked about swapping out RSS with a third party solution and he "was still within that context."  Many questions referred to switching to "an alternative system.")

477.    ePlus asked questions of its own witness at the March 25, 2011 injunction

hearing about the time and cost to switch to a different solution from a new party.

- D.I. 699, Mar. 25, 2011 Tr. 80:4-17 (Farber:  Farber testified regarding the time and cost to implement an ePlus system for a new customer.).

478.    Neither Lawson, ePlus, nor the Court asked any questions regarding a potential

design-around.

- Hager Dep., January 6, 2012 at 366:4-367:19 (Hager: "I was never asked about any Lawson work-around product.  The entire dialogue that we were looking at was referring to third-party alternative solutions.").

479.    Any testimony by Mr. Hager regarding a design-around at the March 25, 2011

evidentiary hearing would have been speculative as, while development and brainstorming of a

potential design-around was in progress, no design-around had been completed or approved at

that time.

- Hager Dep. January 6, 2012 at 67:16-20 (Hager: Mr. Hager stated he had no understanding at the time of the March 25, 2011 hearing what the costs would be involved to change from RSS to another Lawson product.)

- DPFF ¶¶ 35-85 (Development Timeline).

480.    Mr. Hager knew at the time of the March 25, 2011 evidentiary hearing that any proposed design-around lacked legal approval, committed delivery, and development commitment, and Lawson was unsure whether a sufficient redesign was even possible.

- Hager Dep., January 6, 2012 at 69:1-4 (Hager: "I was aware that there was a proposed design-around that did not have legal approval, did not have committed delivery, that we didn't even know for certain that we could deliver. I knew that a project proposal was underway.").

- Hager Dep., January 6, 2012 at 71:16-17 (Hager: "It was a proposal. I didn't know that it could happen.").

- Hager Dep., January 6, 2012 at 356:6-357:1 (Hager: As of March 29, 2011, four days after the hearing, Mr. Hager did not know of any projected release date for RQC.).

- Hager Dep., January 6, 2012 at 377:5-17 (Hager: "[E]very communication to me up until my testimony was, we don't know whether this gets around the infringement, we don't have development commitment yet. So there was no committed project that I was aware of, nor any service estimates that I could possibly project on that day.").

481.    Particularly, the RQC modification to Punchout functionality at issue in this contempt proceeding was not even conceived until nearly a month after Mr. Hager's March 25, 2011 testimony. And several design-around options on the table on March 25, 2011 were rejected by the time of RQC's release.

- DPFF ¶¶ 75-77.

482.    There is no indication that Mr. Hager intentionally overstated the harm to healthcare customers should Lawson be enjoined or overstated the number of healthcare customers. Mr. Hager testified based on his own knowledge, cross-checked by an email inquiry

to Keith Lohkamp, H-II 56:9-25; 57:9-14; 65:13-24, and believed that his testimony was truthful. H-I 367:17-19.

- Hager Dep., March 22, 2013 at 56:9-25 (Hager: Mr. Hager testified that the conversation he had with Mr. Lohkamp regarding healthcare customers was "not the only conversation on this topic" and that it was "essentially to double check what had been previously told me so that my testimony culd be as accurate as possible.").

- Hager Dep., March 22, 2013 at 65:13-24 (Hager: "I was cross checking with Keith.").

- Hager Dep., January 6, 2012 at 367:17-19 ("Q: Was the testimony you gave on March 25th as truthfulas you could be?  A:  Yes.").

483.    If Mr. Hager was inaccurate as to the number of Lawson healthcare customers, it appears that he understated the amount.

- PX-1229 (Email in which sales person asks Mr. Hager: "Can we go back to the court to get additional 38 customers [to] cover until November? The 277 number is not enough.")

- Hager Dep., Mar. 22, 2012 at 198:15-199:5 (Hager: Mr. Hager indicated that the final count of healthcare customers was actually higher than 277. He stated, "I recall being informed after that reports that were being generated came in higher than 277, as this e-mail would indicate.")

484.    In addition to downloading RQC, customers must install and implement it to render it operational.

- Tr. 572:13-15 (Hanson)

- Tr. 573:3-5 (Hanson)

485.    Installation and implementation of RQC at a customer that had not previously installed RSS is more complex and time consuming than performing that installation at a customer that had previously installed RSS.  A new installation involves, among other things, setting up procurement, setting up Item Master, performing configuration, performing testing, and providing end-user training.

- Tr. 595:11-20 (Hanson)

486. ePlus elicited no testimony as to the amount of time and effort customers actually expended to install and implement RQC.

### D. ePLUS IS NOT ENTITLED TO RECOVER ITS ATTORNEYS' FEES

487. Lawson attempted in good faith to carry out its work-around and disclosed its specifics to both the Court and ePlus before the redesigned product's release and even the injunction's issuance.

- *See* DPFF ¶¶ 454-66.

488. There is no evidence that Lawson willfully disobeyed or refused to comply with the Court's injunction.

- *See* DPFF ¶¶ 454-66

489. When ePlus commenced this contempt proceeding, it was based on multiple claims within multiple patents. Lawson incurred substantial attorneys' fees defending against ePlus's contempt allegations as to all of these claims. For instance, the "direct to requisition" modification, which was the subject of extensive discovery, pertained exclusively to claim 1 of the '172 Patent, an invalid claim asserted against Lawson. Only after Lawson had incurred substantial attorneys' fees did the Federal Circuit rule on Lawson's merits appeal, finding two of ePlus's asserted patent claims to be invalid, and further finding a lack of evidence of infringement of the remaining claims other than Claim 26.

- D.I. 799 (Memorandum in Support regarding Motion for Order to Show Cause Why Lawson Software Inc. Should Not Be Held in Contempt of the Courts Permanent Injunction and Request for Expedited Briefing, asserting Lawson in contempt for continuing to infringe 5 claims of three patents).

- D.I. 983 (Federal Circuit order, invalidating ePlus's system claims, and finding non-infringement of two of the three method claims).

490.   ePlus should not be awarded any fees that it incurred pursuing a contempt

proceeding as to invalid patents or reversed jury findings in light of the Federal Circuit's

decision.

- *See* DPFF ¶¶ 12-19.

491.   While ePlus has incurred fees in conjunction with the contempt proceeding as to

Claim 26, Lawson has incurred substantial attorneys' fees defending a contempt proceeding that

was based on invalid and/or uninfringed claims.

### E.   ePLUS'S SUGGESTED PROSPECTIVE REMEDIES ARE UNPRECEDENTED, UNWARRANTED AND PREMATURELY SOUGHT

492.   The Court has not yet ruled on the continuing propriety of the injunction, which

the Federal Circuit has mandated must be modified and Lawson has moved to dissolve.

- D.I. 1006 (Federal Circuit mandate to the District Court to consider what changes are required to the terms of the May 23, 2011 Injunction, consistent with its opinion reversing the District Court's findings regarding the validity and infringement of claims).

- D.I. 1011 (Lawson's Motion Pursuant to Fed. R. Civ. P. 60 to Dissolve or Modify the May 23, 2011 Injunction).

493.   ePlus's suggested remedies—beyond expanding the injunction to reflect RQC—

would effectively require the Court to monitor the parties' conduct until the patent expires in

2017.

- ePlus Rem. Br. at 24-25 (suggesting that: the "Court could require a certification from Lawson's CEO that Lawson has shut down, in its entirely, all business activities associated with the Infringing Configurations," the Court could impose a daily fine "until such time as the Court deems Lawson is in compliance with the injunction," and "the Court should require Lawson submit for the Court's preapproval any proposed 'second design-around' that it contends avoids the Court's Injunction Order.").

494.    ePlus's proposal with respect to prospective remedy could improperly require Lawson to pay a coercive daily fine ($62,362 per day) even if it Lawson immediately while awaiting the Court's official approval.

- ePlus Rem. Br. at 24-25 (proposing that the Court impose a daily fine "until such time as the Court deems Lawson is in compliance with the injunction.").

**F.    ePLUS HAS NOT OFFERED ANY EVIDENCE OF INJURY OR DAMAGE FOR ALLEGED USE OF RSS AFTER THE MAY 23, 2011 INJUNCTION**

495.    ePlus has not attempted to quantify:  (1) how many or which customers allegedly used RSS after the injunction;  (2) any associated revenue or profit to Lawson; or (3) how ePlus was damaged by this purported conduct.

- Tr. 933:16-934:11 (Ugone: admitting that he did not analyze what customers are or are not using RSS, has not offered an opinion as to the identity or number of those customers, and has not "offered this Court a measure of damages in the event the Court finds configurations with RQC are non-infringing, but folks who continue to use RSS, [] are infringing.")

- *See generally*, ePlus Remedies Brief (offering no evidence of customers using RSS after the injunction, any associated revenue or profit to Lawson, or how ePlus may have been damaged).

- DPFF ¶¶ 325-329.

496.    Proposed remedies discussed in Lawson's April 19, 2013 remedies brief are provided in the following table for the Court's convenience:

| | **Through Nov. 30, 2012** | *Daily Rate* | **Through Apr. 9, 2013** |
|---|---|---|---|
| **Compensatory Remedy** | $0 | *$0* | $0 |
| **Configuration Nos. 3 and 5 (Net Profit)** | $3.7M | *$8,329* | $4.8M |

| Incremental Value of Infringing Feature (Net Profit) | $1.2M | *2,695* | $1.6M |
|---|---|---|---|
| Punchout Only (Net Profit) | $1.0M | *2,172* | $1.3M |

- Tr. 1063: 3-8 (Putnam: Net profits are $3.7 million from the Injunction to November 30, 2012).

- Tr. 1072:20-1073:3 (Putnam: daily rate for net profits is $8,329).

- Tr. 1075:18-1076:2 (Putnam: net profit through April 9, 2013 would be $4.8 million).

- Tr. 1092:19-1093:10. (Putnam: net profit on incremental value of infringing feature, including Punchout and EDI is $1.2 million).

- DX-759 (daily rate for incremental value of infringing feature including Punchout and EDI is $2,695).

- Tr. 1097:24-1098:12 (Putnam: net profits on incremental value of infringing feature approach, including Punchout and EDI, through April 9, 2013, are $1.6 million).

- DX-759 (daily rate for Punchout only is $2,172; calculated for all the days from the injunction to November 30, 2012 is $1.0 million; Punchout only calculated through April 9, 2012 is $1.3 million).

## VI.    CONCLUSIONS OF LAW

### A.    Civil Contempt

497.    The manner in which Courts treat civil contempt is distinctly different from criminal contempt.  *United States Catholic Conf. v. Abortion Rights Mobilization*, 487 U.S. 72, 78 (1988) (unlike for criminal contempt, "the better practice is to enter civil contempt to persuade a party to comply, reserving the more drastic, punitive sanction only if disobedience continues").

498.    The purpose of civil contempt is not to punish a contemnor for willful conduct, but is instead "to enforce compliance with an order of the court or to compensate losses or damages sustained by reason of noncompliance." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949); *see also Hicks v. Feiock*, 485 U.S. 624, 632 (1988) (where the relief provided in a contempt proceeding is a fine, "it is remedial when it is paid to the complainant"); *LMK Enters. v. Perma-Liner Indus.*, 2012 U.S. Dist. LEXIS 31542, at *10 (M.D. Fla. Mar. 9, 2012) (In the context of patent contempt proceedings, "[t]he purpose of any sanction imposed on Defendant must be remedial and/or coercive rather than punitive.  To the extent the sanction serves a remedial function, it should compensate Plaintiffs for damages caused by Defendant's noncompliance.").

499.    Sanctions for criminal contempt are punitive in nature, imposed to vindicate the court's authority.  *See United States v. United Mine Workers of Am.*, 330 U.S. 258, 302 (1947).  Because criminal contempt defendants are entitled to various procedural safeguards to which civil contempt defendants are not, *Young v. U.S. ex rel. Vuitton Et Fils S.A.*, 481 U.S. 787, 798-99 (1987) (citations omitted), criminal contempt sanctions are permissible for clear violations of all court orders, even orders later rendered inoperative or void (provided, of course, that criminal sanctions are substantively justifiable and the more demanding procedures for criminal contempt are followed).  *United Mine Workers,* 330 U.S. at 294 ("Violations of an order are punishable as criminal contempt even though the order is set aside on appeal, or though the basic action has become moot."); *McLean v. Central States, Se. & Sw. Areas Pension Fund*, 762 F.2d 1204, 1210 (4th Cir. 1985).

500.    In *civil* contempt actions, in contrast, it is hornbook constitutional law that a party cannot be held in contempt for historical violations of an inoperative injunction.  Civil contempt

is not designed to vindicate the authority of the court; rather, it is an action to address private rights created by injunctions. *See Carbon Fuel Co. v. United Mine Workers of Am.*, 517 F.2d 1348, 1349 (4th Cir. 1975) ("Civil contempt, on the [other] hand, is 'wholly remedial' [and] serves only the purpose of a party litigant.") (quotation omitted).

501.    A civil contempt proceeding is similar to an ordinary damage action. *Latrobe Steel Co. v. United Steelworkers of Am., AFL–CIO*, 545 F.2d 1336, 1345-46 (3d Cir. 1976) (contempt proceeding "is similar in several particulars to an ordinary damage action, since it is in essence an action between private parties, with rights created by the injunctive order rather than by a statute or the common law.").

502.    Once an injunction ceases to be operative, the right to relief in civil contempt also ceases. *Id.* at 1346 (The dissolution of an injunction "is equivalent to a holding that the plaintiff never had a legally cognizable interest."); *United Mine Workers of Am.*, 330 U.S. at 295 ("The right to remedial relief [in civil contempt] falls with an injunction which events prove was erroneously issued.").  This principle has been applied unwaveringly by the Supreme Court, the Fourth Circuit (whose law on contempt governs here), the Federal Circuit, and all other circuit courts to address the issue, both in broad application and in the patent infringement context specifically. *See, e.g., Worden v. Searls*, 121 U.S. 14, 27 (1887) (reversing civil contempt fines imposed for accused patent infringer's violation of a preliminary injunction later found invalid); *McLean*, 762 F.2d at 1210 ("reversal of the underlying order ordinarily invalidates any civil contempt sanctions predicated thereon"); *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302-03 (4th Cir. 2000) (same); *Sandler v. Tarr*, 345 F. Supp. 612, 621-22 (D. Md. 1971), *aff'd*, 463 F.2d 1096 (4th Cir. 1972) (rejecting argument that relief in a civil contempt action "may now be based on the fact that the order had existed at an earlier time"); *Hi-Lo TV Antenna Corp. v. Rogers*, 275

F.2d 452, 453-54 (7th Cir. 1960) (where contempt was predicated on finding of infringement that had been vacated on appeal, "we hold that the judgment finding defendants guilty of civil contempt should be set aside.  The question of infringement by defendants' latest accused structure can be more properly determined in the new trial of the principal action."); *Flat Slab Patents Co. v. Turner*, 285 F. 257, 285 (8th Cir. 1922) ("As we have determined that the Nevins construction was not an infringement the order in the contempt proceeding should be and is reversed with instructions to dismiss the same."); *Salvage Process Corp. v. Acme Tank Cleaning Process Corp.*, 86 F.2d 727 (2d Cir. 1936) (in patent infringement action, reversing contempt finding alongside the incorrectly issued preliminary injunction because "[t]o let the liability stand for past contumacy would be to give the plaintiff a remedy not for a right but for a wrong, which the law should not do."); *Broadcom Corp. v. Qualcomm Inc.*, 585 F.Supp.2d 1187, 1191 (C.D. Cal. 2008) (noting in patent infringement action, "[a]s a general matter, a claimant cannot retain fines assessed for civil contempt of an injunction that has subsequently been vacated"); *Karaha Bodas Co., L.L.C. v. Negara*, 335 F.3d 357, 374 (5th Cir. 2003) ("We and several other circuits have expressly adopted this [*United Mine Workers*] rule."); *Klett v. Pim*, 965 F.2d 587, 590 (8th Cir. 1992) ("[c]ompensatory civil contempt does not survive if the underlying injunction is vacated"); *Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 966 (6th Cir. 1976) (same); *Latrobe Steel Co.*, 545 F.2d at 1346 ("The *United Mine Workers'* doctrine thus recognizes that a private party should not profit [in civil contempt] as a result of an order to which a court determines, in retrospect, he was never entitled"); *Hampton Tree Farms, Inc. v. Yeutter*, 956 F.2d 869, 871 (9th Cir. 1992) (same); *Scott & Fetzer Co. v. Dile*, 643 F.2d 670, 675 (9th Cir. 1981) (same); *Hoskins Lumber Co., Inc. v. United States*, 20 F.3d 1144, 1147 (Fed. Cir. 1994) (same); *Universal*

*Athletic Sales Co. v. Salkeld*, 511 F.2d 904, 910 (3d Cir. 1975) ("[a] vacation of the injunction establishes that there was no basis for any claim for loss based on the invalid court order").

503.    A defendant cannot be held in retroactive civil contempt of a newly modified injunction because that modified injunction was not a valid decree in existence at the time of the alleged contumacious behavior, nor could the defendant have had actual or constructive knowledge of an order that had not yet issued.  Both conditions are necessary elements of civil contempt.  *See generally Ashcraft*, 218 F.3d at 301-03 (substantively appropriate but improperly sealed order was not a "valid decree" and thus could not form the basis for civil contempt).

504.    The contempt standard in the context of a patent infringement suit is bound up with the incentives that potential competitors have to innovate.  *See, e.g., Read Corp. v. Portec, Inc.*, 970 F.2d 816, 828 (Fed. Cir. 1992).  The Federal Circuit has acknowledged, civil contempt is a "potent weapon," *KSM Fastening Sys., Inc. v. H.A. Jones Co., Inc.*, 776 F.2d 1522, 1526 (Fed. Cir. 1985), and a "'severe remedy,'" *id.* at 1525 (quoting *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)).

505.    Contempt proceedings can offer substantial advantages to patent holders.  *KSM*, 776 F.2d at 1524 ("[T]he advantages of [a patent holder] proceeding on a motion to hold his adversary in contempt are substantial."); *see also United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942) (stating, in the context of uncertainty over infringement, that a "zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims would discourage invention only a little less than unequivocal foreclosure of the field.").

506.    In the context of patent cases, departing from the well-established rule that civil contempt is remedial in nature would greatly deter innovation and competition.  *Id.*

507.    As acknowledged by the Federal Circuit, rules that govern patent remedies implicate the intersection between a patent holder's intellectual property rights and a potential competitor's incentives to innovate.  *See, e.g., State Indus. Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1235-36 (Fed. Cir. 1985); *Westvaco Corp. v. Int'l Paper Co.*, 991 F.2d 735 (Fed. Cir. 1993).

508.    Patent remedies that are too far reaching therefore can potentially allow a patent holder to extract an expanded profit by chilling innovation and eliminating potential competition in a realm that, as a matter of law, may be beyond the scope of the patent.  *State Indus.*, 751 F.2d at 1236 (stating that infringing design-around efforts "should not be discouraged by punitive damage awards except in cases where conduct is so obnoxious as clearly to call for them"); *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 396 (2006) (Kennedy, J., concurring) (observing that in some cases firms "use patents not as a basis for producing and selling goods but, instead, primarily for obtaining licensing fees" and noting that "[f]or these firms, an injunction, and the potentially serious sanctions arising from its violation, can be employed as a bargaining tool to charge exorbitant fees to companies that seek to buy licenses to practice the patent"); *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) ("patent law encourages competitors to design or invent around existing patents"); *Read Corp.*, 970 F.2d at 828 (observing that design-arounds spur innovation and promote competition, which benefit consumers).

509.    Patent remedies that are too far reaching may also eliminate legitimate competition.  *State Indus.*, 751 F.2d at 1235-36 ("[K]eeping track of a competitor's products and designing new and possibly better or cheaper functional equivalents is the stuff of which competition is made and is supposed to benefit the consumer.").

133

510.    To avoid unnecessarily restricting legitimate competition, courts limit the availability of punitive damages to claims of willful infringement, reasoning that infringement remedies can function as a deterrent to design-arounds.  *Id.* at 1236 (noting that "[i]t [designing around] should not be discouraged by punitive damage awards except in cases where conduct is so obnoxious as clearly to call for them," and that "[o]ne of the benefits of a patent system is its so-called 'negative incentive' to 'design around' a competitor's products, even when they are patented, thus bringing a steady flow of innovations to the marketplace"); *Westvaco*, 991 F.2d at 745 (refusing to award punitive damages in the face of a good faith design around effort, noting that "[d]esigning or inventing around patents to make new inventions is encouraged.")  (quoting *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991)).

511.    As recognized by the Supreme Court, civil contempt power is particularly vulnerable to abuse.  *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) (noting that power to hold a party in civil contempt is "uniquely is liable to abuse" because it "leave[s] the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct.") (quotation omitted).

512.    These principles have guided courts to punish for contempt only in the most severe circumstances.  *Clark v. United States*, 61 F.2d 695, 719 (8th Cir. 1932) (noting the "well-established and oft-repeated rule that the power to punish for contempt of court should be used sparingly and with great caution and deliberation"); *see also Cf. United States v. Wilson*, 421 U.S. 309, 319 (1975) ("only the least possible power adequate to the end proposed should be used in contempt cases") (quotations omitted); *Arbek Mfg. v. Moazzam*, 55 F.3d 1567, 1570 (Fed. Cir. 1995) ("[c]ontempt…is not a sword for wounding a former infringer who has made a good-faith effort to modify a previously adjudged or admitted infringing device to remain in the

marketplace…[r]ather, the modifying party generally deserves the opportunity to litigate the infringement question at a new trial…").

513.    Contempt in a patent context is only appropriate where the newly-accused product is so similar to the adjudged infringing product that the jury's verdict is reasonably applied to the newly-accused product.  *See, e.g., id.* (affirming that contempt is inappropriate where trial court's "found [that] the modified [product was] substantially different on its face" from adjudged infringing products); *KSM*, 776 F.2d at 1526 ("[C]ontempt proceedings…are available only with respect to devices previously admitted or adjudged to infringe, and to other devices which are no more than colorably different therefrom and which clearly are infringements of the patent….An enjoined party is entitled to design around the claims of a patent without the threat of contempt proceedings with respect to every modified device although he bears the risk that the enjoining court may find changes to be too insubstantial to avoid contempt.").

514.    Evidence of a "handful" of "isolated" mistakes is insufficient to find contempt. *See General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986) ("If a party has taken 'all reasonable steps' to comply with the court order, technical or inadvertent violations of the order will not support a finding of civil contempt."); *United States v. Darwin Constr. Co.*, 679 F. Supp. 531, 536 (D. Md. 1988).

    **B.    *TiVo* Step 1: More Than Colorable Differences**

515.    The Federal Circuit's *TiVo* decision dictates the proper framework for determining whether a party may be held in contempt for selling a product that was designed-around a patent.  *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 881-882 (Fed. Cir. 2011).

516.    Prior to *TiVo*, to initiate a contempt proceeding, the Court first had to "determine whether a contempt hearing is an appropriate setting in which to adjudge infringement by the redesigned product." *TiVo*, 646 F.3d at 880 (citing *KSM*, 776 F.2d at 1532.).  To do so, the

135

Court would compare the accused product with the adjudged infringing product to determine if there was "more than a colorable difference" between the accused product and the adjudged infringing product such that "substantial open issues with respect to infringement" existed. *KSM*, 776 F.2d at 1532, 1535. Where the court found that to be the case, contempt proceedings could not be initiated. *Id.* at 1532. Only in cases where the court was satisfied on the threshold inquiry of the appropriateness of a contempt proceeding could a court inquire whether the redesigned product infringed the claims as previously construed. *Id.*

517. In *TiVo*, the Federal Circuit overruled the above *KSM* two-step test. 646 F.3d at 880. Specifically, the Court held that:

> *KSM*'s two-step inquiry has been unworkable and now overrule that holding of *KSM*. *KSM* crafted a special rule for patent infringement cases, in that it required a threshold inquiry on the propriety of initiating a contempt proceeding. We recognize now that that inquiry confuses the merits of the contempt with the propriety of initiating contempt proceedings. Moreover, as a practical matter, district courts do not separately determine the propriety of a contempt proceeding before proceeding to the merits of the contempt itself. As a result, we will telescope the current two-fold *KSM* inquiry into one, eliminating the separate determination whether contempt proceedings were properly initiated. That question, we hold, is left to the broad discretion of the trial court to be answered based on the facts presented.

*Id.* at 881.

518. As a result, under *TiVo*, a party seeking to enforce an injunction must now "prove both that the newly accused product is not more than colorably different from the product found to infringe and that the newly accused product actually infringes." *Id.* at 882.

### 1.    First Prong Of *TiVo* Inquiry: Colorability

519. The first prong of the *TiVo* test requires that the plaintiff prove, by clear and convincing evidence, that the newly accused product is not more than colorably different from the product found to infringe. *Id.* at 882.

520.    To determine the nature of the modifications made to elements previously found to infringe, the Court must focus on "those elements of the adjudged infringing products that the patentee previously contended, and proved, satisfy specific limitations of the asserted claims." *Id.*

521.    To determine the modifications to consider, the Court must determine what specific allegations formed the basis for the infringement findings:

> The analysis must focus not on differences between ***randomly*** chosen features of the product found to infringe in the earlier infringement trial and the newly accused product, but on those aspects of the accused product that were previously alleged to be, and were ***a basis for, the prior finding of infringement***, and the modified features of the newly accused product.  Specifically, one should focus on those elements of the adjudged infringing products that the patentee ***previously contended, and proved, satisfy specific limitations of the asserted claims***.  Where one or more of those elements previously found to infringe has been modified, ***or removed***, the court must make an inquiry into whether that modification is significant.  If those differences between the old and new elements are significant, the newly accused product as a whole shall be deemed more than colorably different from the adjudged infringing one, and the inquiry into whether the newly accused product actually infringes is irrelevant. Contempt is then inappropriate.

*Id.* (emphases added).

522.    It is entirely improper to base any part of the colorability inquiry on infringement of the redesigned products.  *Id.* (The Federal Circuit explicitly rejected an "infringement-based understanding of the colorably different test," explaining that "[i]nstead of focusing solely on infringement, the contempt analysis must focus initially on the differences between the features relied upon to establish infringement and the modified features of the newly accused products.").

523.    The colorability inquiry must take into account "the policy that legitimate design-around efforts should always be encouraged as a path to spur further innovation."  *Id.* at 883; *see also State Indus.*, 751 F.2d at 1236 ("One of the benefits of a patent system is its so-called 'negative incentive' to 'design around' a competitor's products.").

137

524.    To the extent that the presentation of alternative theories or the absence of a special verdict renders unclear whether the jury found a particular feature to infringe an asserted claim limitation, the plaintiff lacks an essential predicate for contempt.  *Abbott Labs. v. TorPharm, Inc.*, 503 F.3d 1372, 1380 n.3 (Fed. Cir. 2007) ("[T]his court has stated that '[t]he presence of [] disputed issues creates a fair ground for doubt that the decree has been violated.' Requiring disputed issues to be tried through full litigation, rather than summary proceedings eliminates due process concerns for the defendant accused of violating an injunction.") (citations omitted).

525.    A judgment that rests on more than one independent basis cannot be relied upon to preclude later litigation of either issue.  *cf. C.B. Marchant Co. v. Eastern Foods, Inc.*, 756 F.2d 317, 319 (4th Cir. 1985) ("if a judgment rests on independent grounds, either of which would support the result, the judgment is not conclusive with respect to either issue standing alone").

526.    A change need not be non-obvious to be significant.  In *TiVo*, the Court observed the following:

> The significance of the differences between the two products is much dependent on the nature of the products at issue.  The court must also look to the relevant prior art, if any is available, to determine if the modification merely employs or combines elements already known in the prior art in a manner that would have been obvious to a person of ordinary skill in the art at the time the modification was made. A nonobvious modification may well result in a finding of more than a colorable difference. . . . The analysis may also take account of the policy that legitimate design-around efforts should always be encouraged as a path to spur further innovation . . . .

*TiVo*, 646 F.3d at 882-883 (In its footnote to this passage, the Court explained that *"[it] do[es] not suggest that the law on obviousness is binding in contempt proceedings, where, in most cases, a single limitation that has been modified by an infringer is at issue." Id.* at 882 n.1 (emphasis added).

527.    Express reference to the removal of a feature in *TiVo* by the Federal Circuit demonstrates that a modification must not necessarily be non-obvious or additive in nature to satisfy the first prong of the *TiVo* test.  *Id.* at 882 (The Court observed that "[w]here one or more of those elements previously found to infringe has been modified, *or removed*, the court must make an inquiry into whether that modification is significant.")  (emphasis added).

528.    While the non-obvious nature of a modification may be indicative that the change is significant, it does not follow that the "obvious" nature of a change is indicative of its insignificance.  In fact, courts routinely deem simple (and therefore "obvious") changes significant.  *See, e.g., Taser Int'l, Inc. v. Stinger Sys., Inc.,* No. CV07-42-PHX-JAT (D. Ariz. Jan. 18, 2012) (The court held that the plaintiff did not satisfy its burden of proving no more than colorable differences, because the defendant removed the full-wave rectifier, which was the basis for the prior finding of infringement.); *nCUBE Corp. v. SeaChange Int'l, Inc.*, C.A. No. 01–011–LPS., 2012 WL 4863049, at *4 (D. Del. Oct. 9, 2012) (The Court agreed with the defendant that "contempt can only be based on features that were 'unequivocally alleged' at trial as infringing, which ARRIS cannot claim here, since it is undisputed that the feature which was accused at trial— the ClientID—was redesigned *to remove it*" and that "ARRIS cannot now seek a finding of contempt based on that newly accused feature.") (emphasis added).

529.    The modifications made to the functionality of Punchout resulted in the modified features being more than colorably different from the features of the adjudged-infringing products that were contended and proved to be infringing at trial.  Accordingly, it is improper to conduct an infringement analysis or reach any judgment regarding RQC's alleged infringement of claim 26 of the '683 Patent.  The necessity for the following proposed conclusions of law,

therefore, is entirely contingent on ePlus carrying its burden of proof on the more than colorable differences test.

### 2. The Second Prong Of *TiVo* Inquiry: Infringement Analysis [Contingent Findings]

530.    Under the second prong of the *TiVo* test, the Federal Circuit directs courts to consider the issue of infringement only if the colorability prong is satisfied by clear and convincing evidence.  *TiVo*, 646 F.3d at 882.

531.    Only if the Court finds that the plaintiff has carried its burden of proof by clear and convincing evidence on the colorability issue should it proceed its inquiry as to whether the design-around products infringe the asserted claim.  *Id.*

532.    As with the colorability inquiry, the plaintiff bears the burden of proof on the issue of infringement by clear and convincing evidence.  *Id.*

533.    At the "infringement analysis" stage, the presentation of evidence again is restricted to what was "contended, and proved" at trial.  *Id.* (specifying that contempt proceedings "must focus" on product aspects that "were a basis for[] the *prior finding of infringement*") (emphasis added).

534.    Unchanged features that were not contended *and proved* to be infringing at the merits trial cannot form the basis of any infringement allegations.  *Id.* at 883 (Rejecting as improper in a contempt proceeding a finding of infringement based on an unmodified feature [the PID filter] because "TiVo never unequivocally alleged prior to the contempt stage that the PID filter met that claim limitation.").

535.    The infringement analysis of the modified elements of the newly accused product must be performed "on a limitation by limitation basis, to ensure that each limitation continues to be met."  *Id.*

536.    New and unproven infringement theory cannot be raised by a party for the first

time in the contempt setting.  *See TiVo*, 646 F.3d at 882-84 (specifying that contempt

proceedings "must focus" on product aspects that "were a basis for[] the prior finding of

infringement" and "a new allegation . . . should not be decided in a contempt proceeding.").

### 3.    Use Of Expert Testimony

537.    Expert testimony is not admissible when it addresses "lay matters which a jury is

capable of understanding and deciding without the expert's help."  *Andrews v. Metro N.*

*Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989) (jury did not need special training or

expertise to decide whether dimly-lit, icy train platform with trash on it was a "safe place")

(citing *McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1272 (6th Cir. 1988); *Scott v. Sears,*

*Roebuck & Co.*, 789 F.2d 1052, 1055-56 (4th Cir. 1986)).

538.    An expert must possess and apply "specialized expertise."  *Elcock v. Kmart*

*Corp.*, 233 F.3d 734, 741 (3d Cir. 2000); *Grdinich v. Bradlees*, 187 F.R.D. 77, 82 (S.D.N.Y.

1999) ("Here, a juror needs no special training or expertise to understand whether ironing boards

are safely displayed. In fact, Torphy's own admissions during his deposition reveal that no

specialized knowledge is required -- as he bases his opinion on non-existent industry standards

and his limited professional experience in the field of merchandise display safety.").

539.    Where it is not established that the testimony is directly tied to the expert's area of

expertise, that expert testimony is inadmissible.  *Malletier v. Dooney & Bourke, Inc.*, 525 F.

Supp. 2d 558, 642 (S.D.N.Y. 2007) ("Testimony on subject matters unrelated to the witness's

area of expertise is prohibited by Rule 702."); *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242

(SAS), 2002 U.S. Dist. LEXIS 12975, at *5-6 (S.D.N.Y. July 15, 2002) ("An expert who 'does

not reveal how he has made use of his extensive qualifications . . . . [and] fails to articulate

industry customs or standards for consideration . . . . has failed to establish a basis for his

opinion.'"); *In re Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d at 541 ("in requiring that expert testimony be directed to 'scientific, technical or specialized' knowledge, Rule 702 ensures that expert witnesses will not testify about 'lay matters which a jury is capable of understanding and deciding without the expert's help.' In other words, experts should not be permitted to 'supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence.'").

### 4.    Infringement Of Method Claims Generally

540.    Method claims are not infringed unless all steps of the method are actually performed. *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1307 (Fed. Cir. 2012).

541.    Method claims are not infringed simply by the sale or dissemination of a system capable of infringing use. *See Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1335 (Fed. Cir. 2008) ("[W]e hold that a party that sells or offers to sell software containing instructions to perform a patented method does not infringe the patent under § 271(a)."); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) ("Method claims are only infringed when the claimed process is performed, not by the sale of an apparatus that is capable of infringing use."); *Joy Techs. Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 ("The law is unequivocal that the sale of equipment to perform a process is not a sale of the process within the meaning of section 271(a).").

542.    Method steps must be performed in a specific order when "the sequential nature of the claim steps is apparent from the plain meaning of the claim language and nothing in the written description suggests otherwise." *Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1376 (Fed. Cir. 1998). *See also Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369

(Fed. Cir. 2003) (holding that if "as a matter of logic or grammar, [the claim] must be performed in the order written," then the order of the limitations is itself a limitation of the claim).

543.    When a claim step refers to the completed results of a prior step, the order is necessarily a claim limitation. *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) ("because the language of most of the steps of [patentee's] method claim refer to the completed results of the prior step, [the patentee] must show that all of those steps were performed in order").

### 5.    Direct Infringement of Method Claims

544.    Direct infringement of a method claim only occurs if each step of the claimed method is actually performed. *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008). *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005) ("Because a process is nothing more than the sequence of actions of which it is comprised, the use of a process necessarily involves doing or performing each of the steps recited.").

545.    And where more than one party is required to infringe a method claim, direct infringement can be found only if one party *controls or directs* the others. *Akamai*, 692 F.3d at 1307 (per curiam) ("[a]bsent an agency relationship between the actors or some equivalent . . . a party that does not commit all the acts necessary to constitute infringement" is not liable for direct infringement).

546.    Evidence of direct infringement must be grounded in facts. *Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 715 (E.D. Tex. 2011), *aff'd*, 692 F.3d 1351 (Fed. Cir. 2012) ("[D]irect infringement of a method claim cannot be determined on speculation, assumptions, or inferences."). *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222-23 (Fed. Cir. 2007) ("[I]f it [i]s inconceivable to [plaintiff] that the accused [method claim] w[as] not practiced by [the

infringer], it should have had no difficulty in meeting its burden of proof and in introducing testimony of such use.").

547.     A finding of infringement may not be based on evidence that an alteration to the accused product enables it to satisfy the limitation of an asserted claim. *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326-27 (Fed. Cir. 2013) ("A device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim.").

548.     As a matter of law, the theoretical possibility that an RQC installation could be manipulated after the fact to allow RSS to run in parallel does not give rise to any infringement. *See Accent Packaging, Inc. v. Leggett & Platt, Inc.,* 707 F.3d 1318, 1326-27 (Fed. Cir. 2013) ("A device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim.").

549.     In the absence of sufficient evidence of *direct* infringement, there can be no liability for *indirect* infringement. *Akamai*, 692 F.3d at 1308 ("That principle, that there can be no indirect infringement without direct infringement, is well settled."); *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement.").

**6.     Induced Infringement of Method Claims**

550.     The Federal Circuit has recently confirmed that liability for indirect infringement is necessarily predicated on actual performance of each and every step of the asserted method by one or more entities, in addition to the alleged infringer's "specific intent to encourage another's infringement." *Akamai*, 692 F.3d at 1307-09.

551.    It is well-settled that the mere sale or distribution of a system with substantial non-infringing uses does not, by itself, constitute induced infringement under 35 U.S.C. § 271(b).  *See Joy Techs.*, 6 F.3d at 775 ("the act of selling equipment which will not be used so as to directly infringe a method claim cannot constitute one of the dependent types of infringement, that is, either contributory infringement or inducement of infringement"); *Dynacore*, 363 F.3d at 1275 ("The mere sale of a product capable of substantial non-infringing uses does not constitute indirect infringement of a patent."); *MGM Studios Inc. v. Grokster, Ltd*., 545 U.S. 913, 937 (2005) (noting that in patent infringement cases "ordinary acts incident to product distribution, such as offering customers technical support or product updates" do not give rise to inducement liability); *see also ACCO Brands, Inc. v. ABA Locks Mfr. Co*., 501 F.3d 1307; *Jansen v. Rexall Sundown Inc.*, 342 F.3d 1329 (Fed. Cir. 2003); *Warner-Lambert Co. v. Apotex Corp*., 316 F.3d 1348, 1365 (Fed. Cir. 2003).

552.    The burden of establishing that there are no substantial non-infringing uses for an accused product falls on the plaintiff.  *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1362 (Fed. Cir. 2012) (holding that the burden of persuasion is on the plaintiff).

553.    "'[N]on-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.'"  *Id.* (quoting *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009)).

554.    Where a product does not have substantial non-infringing uses, circumstantial evidence showing direct infringement by a customer could include, for example, evidence showing that an alleged indirect infringer instructed a customer as to how to use a device *in an infringing way*.  *See, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009) (holding that evidence of extensive sales of accused products and dissemination of

instruction manuals instructing users to use the accused products in an infringing way, combined with some expert testimony, "was just barely sufficient to permit the jury to find direct infringement by a *preponderance of the evidence*") (emphasis added); *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:02-CV-0134, 2013 US Dist. LEXIS 37503, at *48-51 (M.D. Pa. Mar. 19, 2013) (evidence of sales of accused products and instructions teaching *infringing use* of products sufficient to show that customers directly infringed patent).

555.    Where substantial non-infringing uses exist, a plaintiff may not rely on evidence of hypothetical capabilities of an accused system to establish direct infringement.  *See Dynacore*, 363 F.3d 1274-76 (holding that evidence of hypothetical direct infringement was insufficient to support vicarious liability, explaining that where products incorporating the accused indirect infringer's technology do not necessarily infringe, the patent holder must "point to a specific instance of direct infringement and restrict its suit to liability stemming from that specific instance."); *ACCO Brands,* 501 F.3d at 1313 (Where the accused product worked in two modes, only one of which could possibly infringe the asserted patent claims, evidence showing that the accused products were capable of infringement, including instructions for the product that showed it could operate in an infringing manner, was held to be insufficient to support a verdict of induced infringement); *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010) (holding that the plaintiff had "failed to establish a genuine issue of material fact regarding direct infringement for all but the four accused models" because evidence such as manuals and expert testing "only show that the products are capable of infringing, they do not provide evidence of direct infringement"); *E-Pass*, 473 F.3d at 1222 (affirming summary judgment of no induced infringement where direct infringement was supported only by hypothetical evidence and the device allegedly used to practice the infringing method was capable of non-infringing uses).

556.    In addition to sufficient proof of direct infringement, to establish induced infringement under 35 U.S.C. § 271(b), the plaintiff must prove that "the alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a specific intent to encourage another's infringement of the patent." *Vita-Mix*, 581 F.3d at 1328. *See also Global-Tech Appliances, Inc. v. SEB S.A*, 131 S. Ct. 2060, 2067-68 (2011) ("induced infringement under §271(b) requires knowledge that the induced acts constitute patent infringement").

557.    The accused infringer's knowledge of the patent alone is not sufficient to establish induced infringement. *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006); *Vita-Mix*, 581 F.3d at 1328-29 (affirming summary judgment of no induced infringement despite the alleged inducer's knowledge of the patent where its product instructions disclosed acts that it could have reasonably believed were non-infringing); *Veritas Operating Corp. v. Microsoft Corp.*, 562 F. Supp. 2d 1141 (W.D. Wash. 2008) ("having 'knowledge' of a single patent only because it was cited during prosecution of two patents among thousands (and then only through imputing that knowledge from Microsoft's attorneys) does not give Microsoft sufficient 'knowledge' to formulate the 'intent' required for inducement").

558.    Where a product has substantial non-infringing uses, proof of knowledge that the induced acts constitute patent infringement is particularly important. *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365 (Fed. Cir. 2003) ("where a product has substantial non-infringing uses, intent to induce infringement cannot be inferred even when the defendant has actual knowledge that some users of its product may be infringing the patent").

559.    Further, in *DSU*, 471 F.3d at 1304, Judge Rader, writing the *en banc* portion of decision, made clear that the intent required for liability under § 271(b) requires that the alleged inducer ***knew or should have known its actions would induce actual infringement***. *Id.*

147

 Specifically, "inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *Id.* at 1306.

560.    Proof of the requisite intent "may be inferred from all of the circumstances [and] may be established where an alleged infringer who knew or should have known his actions would induce actual infringements, is shown to have induced infringing acts through his actions." *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 699 (Fed. Cir. 2008).

561.    The opinion of counsel is relevant to whether a defendant knew or should have known its actions would cause direct infringement by another. *DSU*, 471 F.3d at 1307 (the intent requirement was defeated because the alleged inducer had obtained an opinion of counsel concluding that the accused product did not infringe); *Manville Sales Corp. v. Paramount Sys.,* 917 F.2d 544 (Fed. Cir. 1990) (defendant not liable for inducement where it relied upon the opinion of counsel that its device did not infringe); *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*, 350 F.3d 1327, 1342 (Fed. Cir. 2003) ("[*Manville*] makes clear that 'it must be established that the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute infringement.'" (quoting *Manville*, 917 F.2d at 553)).

562.    Proof of an in-house evaluation of the patents and infringement may evidence good faith belief, and as such negate the specific intent required to establish for inducement. *Cohesive Techs., Inc. v. Waters Corp.*, 526 F. Supp. 2d 84, 105-06 (D. Mass. 2007), *aff'd in part, vacated in part, rev'd in part* on other grounds, 543 F.3d 1351 (Fed. Cir. 2008) (after conducting a bench trial on the issue of willful infringement, ruling that even though the jury found infringement, the infringement was not willful where the infringer did not copy the patentee's

product and it obtained in good faith an opinion from its in-house counsel before proceeding to manufacture its product).

### 7.    Contributory Infringement of Method Claims

563.    35 U.S.C. § 271(c) provides:

> Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

564.    Sale of an article, though adapted for an infringing use, is also adapted to other and lawful uses, does not lead to contributory infringement liability.  35 U.S.C. § 271(c); *see also Dynacore*, 363 F.3d 1263; *Joy Techs.*, 6 F.3d at 774 ("To hold that the sale of equipment which performs a patented process is itself a direct infringement would make that portion of Section 271(c) relating to the sale of an apparatus for use in practicing a patented process meaningless.").  Such an interpretation is also improper because it would "block the wheels of commerce."  *Henry v. A.B. Dick Co.*, 224 U.S. 1, 48 (1912) (emphasis added); *see also ACCO Brands,* 501 F.3d at 1307 (Patentees are denied "any right to control the distribution of unpatented articles unless they are unsuited for any commercial non-infringing use, because the sale of an article which though adapted to an infringing use is also adapted to other and lawful uses, is not enough to make the seller a[n indirect] infringer.").

565.    Because ePlus failed to prove infringement by clear and convincing evidence, even if ePlus prevails on the more than colorable differences test, which it should not, no damages or remedies are appropriate here.  The following proposed findings therefore are entirely contingent on ePlus carrying all prior burdens.

C.      **Remedies [Contingent Findings]**

1.      **DISGORGEMENT IS NOT AN APPROPRIATE REMEDY HERE**

a.      **Disgorgement Without Proof of Actual Loss Is Not a Compensatory Remedy**

566.    The Court is not bound by conclusions expressed in its pre-trial Memorandum Opinion denying Lawson's Motion to Strike Expert Opinions of Dr. Keith Ugone, Dkt No. 1032 ("Ugone Order").

- *Filebark v. U.S. Dept. of Transp.*, 555 F.3d 1009, 1013 (D.C. Cir. 2009) ("The district court's first denial of dismissal was never a final judgment and never subject to appeal, and such interlocutory orders are not subject to the law of the case doctrine and may always be reconsidered prior to final judgment.") (quotation omitted)

- Fed. R. Civ. P. 54(b) ("any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities")

567.    Remedies for civil contempt are restricted to those that (1) compensate an innocent party for the contemnor's wrongdoing, or (2) prospectively coerce a contemnor to comply with a court order.

- *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994) ("A contempt fine accordingly is considered civil and remedial if it either coerces the defendant into compliance with the court's order, or compensates the complainant for losses sustained. . . . Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge.") (internal quotation marks and citations omitted)

568.    While vindication of judicial authority might be an "indirect consequence" of a remedial award, as a matter of law it may not be the Court's objective.

- *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441-43 (1911) ("If it is for civil contempt the punishment [i]s remedial, and for the benefit of the complainant.  But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court.")

- *Carbon Fuel Co. v. United Mine Workers of Am.*, 517 F.2d 1348, 1349 (4th Cir. 1975) ("Civil contempt . . . is wholly remedial [and] serves only the purpose of a party litigant. . . . On the other hand, criminal contempt is punitive in nature, is intended to vindicate the authority of the court, and cannot be purged by any act of the contemnor. ") (quotation omitted)

569.   Supreme Court, Fourth Circuit, and Federal Circuit precedent mandate that retroactive contempt awards be compensatory, and this requires that they "be based upon evidence of complainant's actual loss."

- *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947)

- *Bradley v. Am. Household Inc.*, 378 F.3d 373, 378 (4th Cir. 2004) (overturning retrospective contempt award because the "amounts of the fines were not determined by reference to any losses incurred by the Bradleys as a result of Sunbeam's alleged failure" to comply with the court's order)

- *Spindelfabrik Suessen-Schurr v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 903 F.2d 1568, 1579 (Fed. Cir. 1990) (quoting *United Mine Workers* standard and overturning fine that was "not 'based upon evidence of [Suessen's] actual loss'")

570.   Courts are split on whether disgorgement is available at all in a civil contempt proceeding absent a showing of harm.

- *Walman Optical v. Quest Optical Inc.*, 2012 WL 3248150, at *10 n.10 (D. Minn. Aug. 9, 2012) (noting the "split of authority over whether a contemnor's profits may be the proper measure of compensation in a civil-contempt proceeding")

- *National Drying Mach. Co. v. Ackoff*, 245 F.2d 192, 195 (3rd Cir. 1957), cert. denied, 355 U.S. 832 ("But there can be no 'equity' in a compensatory award except as it provides a fair equivalent for some loss. If, on the other hand, the reference to changed 'equities' means that the defendant deserved punishment for a willful wrong, the procedure must be that of criminal contempt rather than the employment of civil contempt as a punitive device.")

- Dan B. Dobbs, Dobbs Law of Remedies, Volume 2 § 6.2(4) at 41 (2nd ed. 1993) (citing split in authority)

- Caprice L. Roberts, *The Case for Restitution and Unjust Enrichment Remedies in Patent Law*, 14 Lewis & Clark L. Rev. 653, 683-84 (2010) (same)

571.   The better approach is that disgorgement is not available where, as here, there has been no showing of harm, and disgorgement is not a remedy in the underlying statute governing the infringement finding.

- *Walman Optical v. Quest Optical Inc.*, 2012 WL 3248150, at *10 (D. Minn. Aug. 9, 2012) (no compensatory award where the plaintiff "ha[d] not introduced evidence that it suffered any loss due to Quest's sale of 80 bottles of UVMP to ECCA, much less that it suffered a loss of $24,000 [the requested amount]")

- *National Drying Mach. Co. v. Ackoff*, 245 F.2d 192, 1995 (3rd Cir. 1957), cert. denied, 355 U.S. 832 ("But there can be no 'equity' in a compensatory award except as it provides a fair equivalent for some loss. If on the other hand, the reference to changed 'equities' means that the defendant deserved punishment for a willful wrong, the procedure must be that of criminal contempt rather than the employment of civil contempt as a punitive device.")

572.   Disgorgement may be appropriate only where (1) the act underlying the civil contempt itself permits disgorgement as an award, or (2) it is shown that a defendant's profits are the best approximation of a patentee's harm.

- *Connolly v. J.T. Ventures*, 851 F.2d 930, 933 (7th Cir. 1988) ("'Although a fine based upon the defendant's gains is not compensatory, it operates to prevent unjust enrichment and would seem appropriate *whenever the same general sort of act would permit an unjust enrichment claim in law or equity*.'") (quoting Dobbs, Handbook on the Law of Remedies § 2.9 at 100, n.31 (West 1973)) (emphasis added)

573.   Both the Copyright Act, 17 U.S.C. § 504(b) and the Lanham Act, 15 U.S.C. § 1117(a) explicitly permit disgorgement as a remedy for a violation in the first instance.

- 17 U.S.C. § 504(b) ("The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.")

- 15 U.S.C. § 1117(a) ("When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125 (a) or (d) of this title, or a willful violation under section 1125 (c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover . . . defendant's profits.")

574.   Since it was amended in 1946, the Patent Act, 35 U.S.C. § 284 has not permitted disgorgement as a remedy for a violation in the first instance.

- *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964) (explaining that "the present statutory rule is that only 'damages' may be recovered. These have been defined by this Court as compensation for the pecuniary loss he (the patentee) has suffered from the infringement, without regard to the question whether the defendant has gained or lost by his unlawful acts.") (quotation omitted)

575.   While "a number [of courts] have permitted a civil contempt sanction in this form [disgorgement]" in the patent infringement civil contempt context (Ugone Order at 12, quotation omitted), none has expressly approved disgorgement without a showing of actual harm after the Patent Act was modified to remove disgorgement as a remedy in 1946.

576.   Courts in the patent contempt context have held that if compensatory, the sanction must not exceed the aggrieved party's actual damages and must be based on evidence of that party's actual loss linked to the contemptuous behavior.

- *Fisher-Price, Inc. v. Safety 1st, Inc.*, 2008 WL 1976624, at *4 (D. Del. May 5, 2008) ("The sanction imposed on a civil contemnor for his past conduct may not exceed the actual damages caused by his violation of the court's order.") (quotation omitted)

- *GE Harris Ry. Electronics, L.L.C. v. Westinghouse Air Brake Co.*, 2004 WL 1854198, at *12 (D. Del. Aug. 18, 2004) ("sanction must not exceed the aggrieved party's actual damages and must be based on evidence of that party's actual loss linked to the contemptuous behavior.")

577.   Among all the post-*TiVo* cases in which civil contempt was found, a list of which the parties jointly submitted at Docket 1061, not one awarded disgorgement.

- *Aevoe Corp. v. AE Tech Co., Ltd.*, 2012 WL 4960357, at *1-2 (D. Nev. Oct. 16, 2012) (lost profits)

- *August Tech. Corp. v. Camtek Ltd.*, 2011 WL 7615088, at *5 (D. Minn. Aug. 11, 2011) (lost profits)

- *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 2012 WL 5296165, at *2 (M.D. Pa. Oct. 25, 2012) (plaintiff proposed lost profits)

- *Merial Ltd. v. Cipla Ltd.*, 2011 WL 2489753, at *16 (M.D. Ga. Jun. 21, 2011) ("damages . . . , including lost profits or a reasonable royalty for all sales.")

- *Walman*, 2012 WL 3248150 at *8-10 (no compensatory sanction awarded given lack of "evidence of the complainant's actual loss")

578.    In *Walman Optical v. Quest Optical*, which arose in the patent contempt context, the court implicitly distinguished "compensatory damages" from disgorgement, and reasoned as follows:

> [A]s noted above, compensatory damages must be based upon evidence of the complainant's actual loss.  *United Mine Workers of Am.*, 330 U.S. at 304.  Here, Walman has not introduced evidence that it suffered *any* loss due to Quest's sale of 80 bottles of UVMP to ECCA, much less that it suffered a loss of $24,000.  Therefore, the Court denies Walman's request for compensatory damages.

- *Walman Optical v. Quest Optical Inc.*, 2012 WL 3248150, at *8-10 (D. Minn. Aug. 9, 2012) (original emphasis) (while the *Walman* court noted that the plaintiff "did not specifically ask the Court to disgorge Quest's profits, [so] the Court need not address this question," *id.* at *10 n.10, the text quoted above clearly reflects that court's view that an award based solely on the defendant's gain, without evidence of actual loss by the plaintiff, is not compensatory).

579.    In *TiVo Inc. v. Dish Network Corp*, the district court rejected a disgorgement remedy, deeming it "unreasonable" and designed "to *punish* EchoStar for its actions."

- *TiVo, Inc. v. Dish Network Corp.*, 655 F. Supp. 2d 661, 665 (E.D. Tex. 2009), *aff'd in relevant part*, *TiVo, Inc. v. EchoStar Corp.*, 646 F.3d 869, 890 (Fed. Cir. 2011) (emphasis added)

580.    ePlus "has not introduced evidence that it suffered *any* loss due to" Lawson's allegedly contumacious conduct, "much less that it suffered a loss" commensurate with Lawson's gains, so disgorgement is not compensatory and thus unavailable.

- *Walman*, 2012 WL 3248150 at *8-10 (original emphasis).

### b.    Disgorgement Is Not an Appropriate Remedy in this Case

581.    As the Court noted at trial: "[w]hether [disgorgement] is an appropriate remedy is different than whether it's available."

- Tr. 13:10-11

582.    In contempt actions predicated on patent infringement, even among the few courts assuming the continuing availability of the remedy, "disgorgement of the entirety of a contemnor's profits appears to be considered an extreme sanction reserved for egregious behavior."

- John M. Golden, Injunctions As More (or Less) Than "Off Switches": Patent-Infringement Injunctions' Scope, 90 Tex. L. Rev. 1399, 1412 n.54 (2012)

- *TiVo*, 646 F.3d at 880 ("diligence and good faith efforts . . . may be considered in assessing penalties")

583.    A finding of "willfulness" is present in virtually every case in which disgorgement has been awarded in the patent contempt context.  Among the patent contempt cases cited in the Court's Ugone Order in which disgorgement was awarded, virtually every one exhibited willfulness, or at least substantial aggravating circumstances:

- *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 450-51 (1932) (highlighting district court's finding of a "**deliberate** violation of the injunction") (emphasis added)

- *Kiwi Coders Corp. v. Acro Tool & Die Works*, 250 F.2d 562, 564-65 (7th Cir. 1957) (noting the "**deliberate** violation of the injunction" and differences only in "trivial detail") (emphasis added)

- *Brine, Inc. v. STX, L.L.C.*, 367 F. Supp. 2d 61, 65, 69 (D. Mass. 2005) (effectively finding redesign to be a sham, crediting expert opinion that the pre- and post-"modification" products "were '**identical**'") (emphasis added)

- *Schlegel Mfg. Co. v. USM Corp.*, 525 F.2d 775, 783 (6th Cir. 1975) ("The District Court found that USM's conduct was **willful** contempt, and we agree.") (emphasis added)

- *Shell Oil Co. v. Barco Corp.*, 1971 U.S. Dist. LEXIS 13395, at *2-4 (N.D. Iowa May 7, 1971) ("Defendants were convicted for **criminal contempt**" for the same violation prior to the civil contempt action, thus establishing wrongful intent) (emphasis added)

- *But see Town v. Willis*, 89 F. Supp. 437, 440 (W.D. Mo. 1950) (outdated, out-of-circuit outlier that predated *Aro*, 377 U.S. at 507 (1964), in which the Supreme Court resolved a dispute among lower courts by establishing that "the present statutory rule is that only 'damages' may be recovered. . . , without regard to the question whether the defendant has gained or lost by his unlawful acts.")

584.   *Peterson Filter & Engineering Company v. Envirotech Corporation* and

*Broadview Chemical Corporation v. Loctite Corporation*, which were cited in the Court's Ugone

Order in the footnote listing cases in which disgorgement was awarded in the patent contempt

context, were royalty and lost profits cases, respectively, not disgorgement cases.

- *Peterson Filter & Engineering Co. v. Envirotech Corp.*, 1973 U.S. Dist. LEXIS 15599, at *40, *49 (D. Utah Apr. 30, 1973) (awarding reasonable royalties despite noting the "unusually flagrant disregard of [this] court's order")

- *Broadview Chem. Corp. v. Loctite Corp.*, 311 F. Supp. 447, 449 (D. Conn. 1970) (awarding lost profits and rejecting a requested multiplier despite the "element of turpitude involved in the conduct of Broadview in reselling, and in making and selling more of the very sealants which it had agreed were infringements of Loctite's patents")

585.   Typical awards in contempt actions in patent cases stand in sharp contrast with

those predicated on trademark or copyright infringement, both of which statutorily permit

disgorgement in the first instance, even absent intent or harm.  Whereas disgorgement is the

norm in trademark and copyright contempt actions, disgorgement awards are substantially

outnumbered in the patent contempt arena by the "traditional" patent awards, and appear to arise only in the most extreme of circumstances.

- Reasonable royalties were awarded in the following demonstrative patent contempt cases: *TiVo Inc. v. Dish Network Corp.*, 655 F. Supp. 2d 661, 665 (E.D. Tex. 2009), *aff'd in relevant part*, *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869 (9th Cir. 2011); *American St. Gobain Corp. v. Armstrong Glass Co.*, 434 F.2d 1216, 1218 (6th Cir. 1970); *Glasstech, Inc. v. AB Kyro OY*, 1989 WL 151672, at *6 (N.D. Ohio May 13, 1989); *Stryker Corp. v. Davol, Inc.*, 75 F. Supp. 2d 741, 744 (W.D. Mich. 1999), *aff'd* 234 F.3d 1252, 1260 (Fed. Cir. 2000); *Peterson Filter & Engineering Co. v. Envirotech Corp.*, 1973 U.S. Dist. LEXIS 15599 (D. Utah Apr. 30, 1973); *Alopex Indus., Inc. v. Seibel*, 61 F.3d 919, 1995 WL 424845, at *2-3 (Fed. Cir. July 18, 1995); *LMK Enter., Inc. v. Perma-Liner Ind., Inc.*, 2012 U.S. Dist. LEXIS 31542, at *12 (M.D. Fla. Mar. 9, 2012) (royalty and lost profits hybrid).

- Lost profits were awarded in the following demonstrative patent contempt cases: *Broadview Chem. Corp. v. Loctite Corp.*, 311 F. Supp. 447, 449 (D. Conn. 1970); *Aevoe Corp. v. AE Tech Co., Ltd.*, 2012 WL 4960357, at *1 (D. Nev. Oct. 16, 2012); *Upjohn Co. v. Medtron Laboratories, Inc.*, 894 F. Supp. 126, 135 (S.D.N.Y. 1995); *Dow Chem. Co. v. Chem. Cleaning, Inc.*, 434 F.2d 1212, 1214 (5th Cir. 1970); *Seiko Epson Corp. v. Nu-Kote Int'l, Inc.*, 190 F.3d 1360, 1372 (Fed. Cir. 1999); *August Tech. Corp. v. Camtek Ltd.*, 2011 WL 7615088, at *2 (D. Minn. Aug. 11, 2011); *GE Harris Ry. Electronics, L.L.C. v. Westinghouse Air Brake Co.*, 2004 WL 1854198, at *12 (D. Del. Aug. 18, 2004); *Kerwit Medical Products, Inc. v. N & H Instruments, Inc.*, 224 U.S.P.Q. 679, 691 (N.D. Tex. July 12, 1984); *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 2012 WL 5296165, at *2 (M.D. Pa. Oct. 25, 2012) (lost profits requested).

586. It is not the function of the retroactive award to deter or coerce conduct.

- D.I. 943, Feb. 29, 2012 Tr. 162:3-14 ("THE COURT: In deciding whether to impose disgorgement as a remedy or how much disgorgement, is it proper for the Court to take into account the deterrent effect of that sum on future potential violations by Lawson? . . . MR. STRAPP: I would submit that in a civil contempt proceeding, the sanction award that's to deter [is] . . . not the retrospective sanction. The retrospective sanction is intended to be compensatory, and on this point, Lawson and ePlus counsel agree.").

- *Bagwell*, 512 U.S. at 829 ("Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge.")

- *Carbon Fuel*, 517 F.2d at 1349 ("Civil contempt is conditional or contingent in nature, terminable if the contemnor purges himself of the contempt.")

587. The Court does not have an interest in "deterring" a patent infringement defendant from trying to work around the plaintiff's patent, even if there is some risk that a court might later find the work-around insufficient.

- *TiVo, Inc. v. EchoStar Corp.*, 646 F.3d 869, 883 (Fed. Cir. 2011) ("legitimate design-around efforts should always be encouraged as a path to spur further innovation")

- *State Indus. Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985) ("One of the benefits of a patent system is its so-called 'negative incentive' to 'design around' a competitor's products")

- *Fred L. Pirkle, Therm-Omega-Tech, Inc. v. Ogontz Controls Co., Thomas M. Kenny*, 1996 WL 146306, at *1 (E.D. Pa. Mar. 29, 1996) ("Contempt . . . is not a sword for wounding a former infringer who has made a good-faith effort to modify a previously adjudged or admitted infringing device to remain in the marketplace.")

588. Among the post-1950 cases awarding disgorgement in the patent civil contempt context cited in the Ugone Order, *Brine* was the only case in which profits were disgorged without an express willfulness finding—willfulness was not addressed one way or other in that order. The *Brine* court did, however, effectively find the redesign underlying the contempt action to be a sham, crediting expert opinion that the pre- and post-"modification" products "were 'identical.'" In *Kiwi Coders Corp. v. Acro Tool & Die Works* and in *Schlegel Manufacturing Company v. USM Corporation*, while the respective defendants argued that their products no longer infringed, the courts held the changes alleged to be "trivial" and both expressly found "deliberate" or "willful" violations of their injunctions, thus essentially determining that the challenged products were not true attempted redesigns.

- *Kiwi Coders Corp. v. Acro Tool & Die Works*, 250 F.2d 562, 564-65 (7th Cir. 1957) (noting the "**deliberate** violation of the injunction" and differences only in "trivial detail") (emphasis added)

158

- *Brine, Inc. v. STX, L.L.C.*, 367 F. Supp. 2d 61, 65, 69 (D. Mass. 2005) (effectively finding redesign to be a sham, crediting expert opinion that the pre- and post-"modification" products "were '**identical**'") (emphasis added)

- *Schlegel Mfg. Co. v. USM Corp.*, 525 F.2d 775, 783 (6th Cir. 1975) ("The District Court found that USM's conduct was **willful** contempt, and we agree.") (emphasis added)

- *Shell Oil Co. v. Barco Corp.*, 1971 U.S. Dist. LEXIS 13395, at *2-4 (N.D. Iowa May 7, 1971) ("Defendants were convicted for **criminal contempt**" for the same violation prior to the civil contempt action, thus establishing wrongful intent, and the product underlying the contempt finding was entirely unmodified) (emphasis added)

589.    The district court's decision in *TiVo* establishes that disgorgement is not an automatic remedy for contempt in a patent case.  There, despite finding the contemnor's redesign efforts insufficient and specifically finding contempt, the court rejected Dr. Ugone's disgorgement measure, labeling it "unreasonable," and dismissed all the same arguments that ePlus advances in favor of disgorgement here, such as: "the existence of a profit incentive that encourages EchoStar to violate the injunction"; that a disgorgement was justified by "EchoStar's financial strength"; or that a royalty rate would amount to a "compulsory license."  Despite having "found that the harm suffered by TiVo due to EchoStar's noncompliance is substantial," the court concluded that it "cannot approve such an award," as the disgorgement request clearly evidenced a "desire to see EchoStar punished."

- *TiVo*, 655 F. Supp. 2d at 663-65

590.    The Federal Circuit affirmed the district court's sanction determination in *TiVo*, although it remanded the case on other grounds.

- *TiVo*, 646 F.3d at 890

591.    A disgorgement award under the circumstances of this case is unwarranted and would be improperly punitive.

159

- *TiVo*, 655 F. Supp. 2d at 663-65

**c.      ePlus Gambled by Limiting The Remedial Options Before the Court**

592.    Because a disgorgement remedy is inappropriate under the circumstances, and because ePlus has not even attempted to provide the Court with any other remedial options, ePlus is not entitled to a damages award in this case.

- *Walman Optical v. Quest Optical Inc.*, 2012 WL 3248150, at *10 (D. Minn. Aug. 9, 2012) (no compensatory award where the plaintiff "ha[d] not introduced evidence that it suffered *any* loss due to Quest's sale of 80 bottles of UVMP to ECCA, much less that it suffered a loss of $24,000 [the requested amount]") (original emphasis)

- *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 522-23 (Fed. Cir. 2012) (upholding this Court's decision following trial to reject ePlus's only damages calculation, leaving ePlus with no monetary remedy)

**2.      ePLUS'S DISGORGEMENT MEASURE IS INFLATED AND INACCURATE**

**a.      ePlus Advocates a Gross Profit Measure That Its Own Damages Expert Admitted Is Not The "Correct" Measure of Lawson's Gain**

593.    Gross profit is not an appropriate measure of gain, as ePlus's damages expert Dr. Ugone conceded.

- Tr. 976:23-977:5 (THE COURT: I agree. Just answer the question yes or no. I think the bottom line, though, is in your judgment, is the correct way to equate your figures with the gain the incremental profit? THE WITNESS: Yes.  THE COURT: That's what you're trying to get at?  THE WITNESS: Yes, Your Honor. And I want to -- yes, Your Honor. I'll stop there.)

594.    The only case ePlus cites for its suggested "gross profit" measure, *Brine*, 367 F. Supp. 2d at 71, is a non-binding outlier, and its reasoning does not apply here.  Given that ePlus was provided Lawson's financials—and given that ePlus's expert purports to have successfully calculated an incremental profit figure—there are no "evidentiary difficulties in calculating" Lawson's actual profits, unlike in *Brine*.  Nor is it compelling that gross profits "bear[] a direct

relationship to the degree of infringement"—the same is true of net and incremental profit, and even revenue.

- *Liquid Glass Enterprises, Inc. v. Liquid Glass Products Intern., Inc.*, 1993 WL 315644, *9 (E.D. Pa. Aug. 17, 1993) (given contemnor's "cooperation" in financial discovery, plaintiff "cannot be heard to complain that it is unable to assemble an accurate net profit figure for respondents and that this Court should award it a special 'adjusted net' profit figure based on gross revenues minus cost of goods sold")

595.    While *Brine* was affirmed by the Federal Circuit in a one-word, unpublished opinion, the damage measure and calculation were not appealed, so the Federal Circuit's affirmance is not relevant to the damages issue here.

- *Brine, Inc. v. STX, L.L.C.,* 139 Fed. Appx. 281 (Fed. Cir. 2005) ("Affirmed.")

> **b.    ePlus's Incremental Profits Measure Is Inflated Because It Fails To Deduct Lawson's Variable Operating Costs**

596.    The Court finds Dr. Putnam's regression analysis to be more credible than Dr. Ugone's because it is based on economic and scientific principles that courts have consistently found both reliable and more credible than opinions predicated on mere anecdotal lay testimony or interviews, such as Dr. Ugone's.

- *Andrew Corp. v. Gabrial Electronics, Inc.*, 785 F. Supp. 1041, 1050-51 (D. Me. 1992) (defense expert's regression analysis of five years of "hard data" was credited over plaintiff's expert's broad stroke cost bucketing from "information gained from interviews and observation" because it established conclusively "that costs treated as fixed by Plaintiff did in fact vary over time")

- *Polaroid Corp. v. Eastman Kodak Corp.*, 1990 U.S. Dist. LEXIS 17968, at *185-87 (D. Mass. Oct. 12, 1990) (finding expert's regression analysis "much more accurate, credible, and appropriate" for purposes of identifying cost variability than the opposing expert's method because "[h]istorical data are objective facts")

- *Schneider (Europe) AG v. Scimed Life Systems*, 852 F. Supp. 813, 847, 859 (D. Minn. 1994) (crediting regression analysis with regard to cost

161

variability to arrive at "a reasonable calculation of . . . actual profit margins")

### c.   The Best Measure of Lawson's Gain Is Its Net Profits

597.   The disgorgement remedy deducts all costs related to an infringing article from its corresponding revenues.

- *Schnadig Corp. v. Gaines Mfg. Co.*, 620 F.2d 1166, 1173 (6th Cir. 1980) ("'Profit,' as so used, is no mysterious phrase. It means simply all financial gains. Such gains are the difference between expenditures made to produce and sell the infringing articles and the receipts therefrom.")

598.   There is no better measure of a company's actual gain than its net profit, as "[t]he fixed expenses are as necessary to the infringing production as are the variable expenses, and should be similarly treated."

- *Schnadig Corp. v. Gaines Mfg. Co.*, 620 F.2d 1166, 1172 (6th Cir. 1980)

599.   "'[O]verhead' which does not assist in the production of the infringement should not be credited to the infringer; that which does, should be."

- *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 51 (2d Cir. 1939) (Hand, J.)

600.   In *Sheldon v. Metro-Goldwyn Pictures,* the keystone case on disgorgement profit measures for most courts in the country, the court rejected the plaintiff's argument that recovery for fixed "overhead" requires a showing "that it had been increased by the production of the infringing" product, and it affirmed the use of an estimate of overhead expenses based on a proportion of the overall cost of production.

- *Id.* at 52-54

601.   The Supreme Court affirmed this *net* profit calculation measure, writing: "Petitioners also complain of deductions allowed in the computation of the net profits. . . . [W]e

162

find no ground for disturbing the court's conclusions." *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 409 (1940)

602.    The majority of courts awarding disgorgement remedies have permitted deductions for fixed expenses that assist in the production and sale of the products at issue, determining that *net* profit is the appropriate measure.

603.    Examples of cases in which net profit was deemed the appropriate disgorgement measure for violations in the first instance—where, of course, permitted by statute—include the following:

- *Kamar Int'l Inc. v. Russ Berrie & Co.*, 752 F.2d 1326, 1332 (9th Cir. 1984) ("allowing a deduction for overhead . . . when the infringer can demonstrate it was of actual assistance in the production, distribution, or sale of the infringing product")

- *Hamil America, Inc. v. GFI*, 193 F.3d 92, 104-07 (2d Cir. 1999) ("the district court erred in excluding an allocation of general overhead expenses")

- *Neal v. Thomas Organ Co.*, 241 F. Supp. 1020, 1022 (C.D. Cal. 1965) (permitting deduction for fixed costs calculated as the ratio of the overhead to the firm's overall sales, noting that "[i]t is common knowledge that any business has indirect costs and this per cent should apply in the selling and handling of the [infringing goods] by defendant")

- *Schnadig v. Gaines*, 620 F.2d 1166, 1172 (6th Cir. 1980) (permitting deduction of two-thirds of fixed expenses in disgorging design patent profits)

- *Bergstrom v. Sears, Roebuck & Co.*, 496 F. Supp. 476, 497-98 (D. Minn. 1980) (determining "the net profit" by awarding "60% of the claimed fixed expenses," noting that "it would be unrealistic to ignore the costs of salaries, overhead and the like" as appropriate deductions when disgorging design patent profits)

- *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 51-54 (2d Cir. 1939) (*Hand*, J.)

604.     Examples of cases in which net profits were deemed the appropriate measure in civil contempt actions—all of which arose in situations where the underlying statute permitted disgorgement—include the following:

- *Manhattan Indus. Inc. v. Sweater Bee by Banff Ltd.*, 885 F.2d 1, 7 (2d Cir. 1989) ("Of course, by 'profits' we mean net profits.")

- *Cancer Research Institute, Inc. v. Cancer Research Society, Inc.*, 744 F. Supp. 526, 531 (S.D.N.Y. 1990) ("plaintiff may recover defendant's net profits derived from the continued use of the prohibited listing after the injunction issued.")

- *Colonial Williamsburg Found. v. The Kittinger Co.*, 792 F. Supp. 1397, 1408 (E.D. Va. 1992), *aff'd*, 38 F.3d 133, 136 (4th Cir. 1994) (without specifying a profit measure by name, applying a 33% margin to the sales in question because the defendant "certainly incurred substantial overhead in the production of the Licensed Products" and "the quality of workmanship added value to the finished product")

605.     Fixed costs should be deducted from revenues where they "actual[ly] assist[ed] in the production, distribution, or sale of the [allegedly] infringing product[s]."

- *Kamar Int'l*, 752 F.2d at 1332

606.     The cases using net profit as the measure of a defendant's gain do not require that fixed costs be "attributable" to the product at issue in the sense that they are specifically traced, in the ordinary course, to specific products.

- *Manhattan Indus., Inc. v. Sweater Bee By Banf, Ltd.*, 885 F.2d 1, 7 (2d Cir. 1989) (the alleged infringer "need not prove its overhead expenses and their relationship to the production of the contemptuous goods in 'minute detail'")

607.     Net profit is a better fit for measuring Lawson's "gains" than incremental or gross profit here.

**d.    Any Disgorgement Measure Must Apportion For Lawful, Non-Infringing Uses the Challenged Configurations**

**(1)    ePlus Improperly Seeks to Disgorge Profits Related to Lawful, Non-Infringing Uses of Configuration Nos. 3 and 5**

608.    ePlus bears the burden of establishing that there are no substantial non-infringing uses of the products in question.

- *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1362 (Fed. Cir. *2012*)

609.    Because the challenged configurations have substantial non-infringing uses, their mere sale cannot constitute infringement as a matter of law.  Thus, any damage award must not include profits relating to licensing.

- *See Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1335 (Fed. Cir. 2008) ("[W]e hold that a party that sells or offers to sell software containing instructions to perform a patented method does not infringe the patent under § 271(a).")

- *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) ("Method claims are only infringed when the claimed process is performed, not by the sale of an apparatus that is capable of infringing use.")

- *Joy Techs. Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993) ("The law is unequivocal that the sale of equipment to perform a process is not a sale of the process within the meaning of section 271(a).")

- *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1275 (Fed. Cir. 2004) ("The mere sale of a product capable of substantial non-infringing uses does not constitute indirect infringement of a patent.")

- *ACCO Brands, Inc. v. ABA Locks Mfr. Co*., 501 F.3d 1307, 1312-13 (Fed. Cir. 2007) (the sale of a product with no other non-infringing uses may support a finding of indirect infringement)

- *Joy Techs.*, 6 F.3d at 775 ("[T]he act of selling equipment which will not be used so as to directly infringe a method claim cannot constitute one of the dependent types of infringement, that is, either contributory infringement or inducement of infringement")

165

610.    Where a larger product's infringing feature does not drive the demand for that product, damages must be apportioned to represent only the value of the patented feature.

- *Rite-Hite Corp v. Kelley Co., Inc.* 56 F.3d 1538, 1566-67 (Fed. Cir. 1995)

- *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012)

- *Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*, 225 U.S. 604, 614-15 (1912) ("if plaintiff's patent only created a part of the profits, he is only entitled to recover that part of the net gains.").

611.    ePlus has not proven that the accused features of Configuration Nos. 3 and 5 that render it different from undisputedly non-infringing Configuration No. 2—namely Punchout or Punchout and EDI together—drive sales.  ePlus argued just the opposite to this Court earlier in the case.

- ePlus Brief ISO Mot. For Perm. Inj., D.I. 641 at 20 ("Procurement Punchout does not drive S3 sales," and "Lawson has never won a sale merely because of its Punchout product.")

612.    The most economically reliable way to value a specific infringing feature within a larger system is to compare the system's market value both with and without that incremental feature—the difference corresponds to the real value customers place on the feature/functionality.

### (2)    ePlus Improperly Seeks to Disgorge Profits that Lawson Could Have Earned in Compliance with the Injunction

613.    In light of the Federal Circuit's ruling, Lawson could have fully complied with the Court's injunction without foregoing all revenues from the 146 customers at issue, but rather by either refusing to license them Punchout or disabling Punchout for those customers who previously licensed it.

- *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 516, 520 (Fed. Cir. 2012) (reversing jury finding "that Lawson directly and indirectly infringes claim 1 of the '172 patent by making systems that include the

166

Core Procurement and RSS modules (but not Punchout and EDI) [Configuration No. 2]," "hold[ing] that ePlus's system claims are indefinite")

### 3.    A MULTIPLIER IS WHOLLY UNWARRANTED HERE

614.    To the extent that double or treble damages serve a punitive purpose, they may not be awarded in a civil contempt proceeding.

- *Broadview Chem. Corp. v. Loctite Corp.*, 311 F. Supp. 447, 453 (D. Conn. 1970) ("to the extent that double or treble damages serve a punitive purpose, they may not be awarded in a civil contempt proceeding")

615.    While an enhancement might properly be utilized in those cases where the actual injury may be elusive of proof and thus there is a risk of undercompensating a plaintiff, that justification is not available when a remedy awarded fairly compensates the plaintiff or overcompensates the plaintiff.

- *Broadview Chem. Corp. v. Loctite Corp.*, 311 F. Supp. 447, 453 (D. Conn. 1970) ("Since an award for double or treble damages in a patent infringement suit is remedial rather than penal, [citations], it is more properly utilized in those cases where the actual injury may be elusive of proof, than in this case where full discovery has been allowed and had on the question of damages.")

616.    In no patent contempt case has a court ever awarded disgorgement of gains and then taken the additional step of multiplying that measure.  None of the cases ePlus cites in support of a multiplier were disgorgement cases.

- *Alopex Indus., Inc. v. Seibel*, 61 F.3d 919, 1995 WL 424845, at *3 (Fed. Cir. July 18, 1995) (enhanced lost profits award)

- *August Tech. Corp. v. Camtek Ltd.*, 2011 WL 7615088, at *5 (D. Minn. Aug. 11, 2011) (enhanced lost profits award)

- *Harris Research, Inc. v. Perrine*, 2009 WL 1457674 (D. Utah May 22, 2009) (no award at all beyond a $10,000 sanction for failing to appear at a hearing, let alone an enhanced award, although future sanctions are contemplated—disgorgement is not referenced)

167

617.     Multipliers are warranted in only the most egregious of cases in which a contemnor's actions are justifiably characterized as flagrant contemptuous conduct.  They are reserved for particularly obnoxious—and thus readily avoidable—forms of contempt.

- *Spindelfabrik*, 903 F.2d at 1578 (multipliers permissible where a contemnor's actions are "justifiably characterized . . . as 'flagrant contemptuous conduct'")

- Golden, 90 Tex. L. Rev. at 1411 (Multipliers are "reserved for particularly obnoxious—and thus readily avoidable—forms of contempt.")

618.     The challenged conduct in this case was not willful, let alone flagrant and obnoxious.

- *TiVo, Inc. v. Dish Network Corp.*, 655 F. Supp. 2d 661, 665 (E.D. Tex. 2009) (despite "not[ing] the contentious nature of this case and . . . disapproval for some of the tactics used by the parties," and also finding the defendant's conduct in the marketplace "distasteful" as it related to the plaintiff, the court  "decline[d] to find that EchoStar's contempt has been willful" given the testimony from defendant's employees "as to their belief that EchoStar had successfully designed around the '389 Patent. For the purpose of these contempt sanctions, the Court will take these representations at face value."

- DPFF ¶¶ 454-66.

619.     No multiplier or enhancement of damages is appropriate.

- DPFF ¶¶ 454-66.

- *LMK Enters. v. Perma-Liner Indus.*, 2012 U.S. Dist. LEXIS 31542, at *17 (M.D. Fla. Mar. 9, 2012) (no enhancement where award was sufficient to compensate for any harm suffered, noting "[a] finding of willful infringement permits, but does not mandate, the enhancement of damages.")

- *Broadview Chem. Corp. v. Loctite Corp.*, 311 F. Supp. 447, 453 (D. Conn. 1970) (declining to enhance damages that fairly compensated the plaintiff)

- *Fisher-Price, Inc. v. Safety 1st, Inc.*, 2008 WL 1976624, at *4 (D. Del. May 5, 2008) (even despite a finding of willfulness, "[t]he court declines, however, to award Fisher-Price the enhanced damages or additional sanctions that it has requested")

- *Compare Spindelfabrik*, 903 F.2d at 1578 (multipliers permissible where a contemnor's actions are "justifiably characterized . . . as 'flagrant contemptuous conduct'")

**4.    ePLUS IS NOT ENTITLED TO RECOVER ITS ATTORNEYS' FEES**

620.    Fourth Circuit law applies to any request for attorneys' fees in this case, and in the Fourth Circuit, fees can be awarded for civil contempt only upon a finding of "'willful disobedience' of a court order," which requires establishing that a contemnor's conduct rose "to the level of obstinacy, obduracy or recalcitrance."

- *Omega World Travel, Inc. v. Omega Travel and Shipping Agencies, Inc.*, 905 F.2d 1530, at *4 (4th Cir. May 10, 1990)

- *S.E.C. v. Dowdell*, 2002 WL 424595, at *16 (W.D. Va. Mar. 14, 2002) ("A court is required to make a finding of obstinance and recalcitrance before it can assess attorney's fees for the willful disobedience of a court order. . . . Indeed, such attorneys' fees awards are to be granted only in exceptional circumstances.")

- *Lane v. Prima Marketing LLC*, 2008 WL 793642, at *7 (S.D. W.Va. Mar. 20, 2008) ("An award of attorneys' fees . . . requires the Court to find that the contemnor acted with 'willful disobedience.'")

- *Omega World Travel, Inc. v. Omega Travel, Inc.*, 710 F. Supp. 169, 172-73 (E.D. Va. 1989) (same)

- *Columbia Gas Transmission Corp. v. Mangione Enterprises of Turf Valley*, 964 F. Supp. 199, 204 (D. Md. 1996) (same)

- *Wagner v. Board of Educ. of Montgomery County, Maryland*, 340 F. Supp. 2d 603, 620 (D. Md. 2004) (same)

621.    A finding of willful disobedience sufficient to warrant a fee award requires "more than a finding of contemnor knowledge of its violation of the terms of the decree."

- *Columbia Gas Transmission Corp. v. Mangione Enterprises of Turf Valley*, 964 F. Supp. 199, 204 (D. Md. 1996)

622.    The only decision within the Fourth Circuit that ePlus cites for its attorneys' fees proposition is distinguishable, as that court's accompanying published opinion explained that

fees were being awarded specifically pursuant to a provision in the parties' Consent Order, and also found egregious willfulness on the part of the contemnor.

- *Buffalo Wings Factory, Inc. v. Mohd*, 574 F. Supp. 2d 574, 582 (E.D. Va. 2008) (justifying fee award against repeat contemnors because they had "purposefully and continuously ignored their obligations under the [Consent Order]" and "paragraph 12 of the [Consent Order] . . . call[s] for Defendants to pay any reasonable attorneys' fees incurred by Plaintiff for enforcing Defendants' payment obligations").

623.   ePlus has failed to establish that Lawson's conduct was exceptional or that it was willfully disobedient to the level of obstinacy, obduracy, or recalcitrance, so no fee award is warranted here.

### 5. ePLUS'S SUGGESTED PROSPECTIVE REMEDIES ARE UNPRECEDENTED AND PREMATURELY SOUGHT

624.   While coercive remedies are theoretically possible upon findings of civil contempt to the degree they are applied prospectively, it would be premature for this Court to even consider awarding them here, as the Court has not yet ruled on the continuing propriety *vel non* of the injunction, which the Federal Circuit has mandated must be modified and Lawson has moved to dissolve.

- *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 523 (Fed. Cir. 2012) ("remand[ing] for the district court to consider what changes are required to the terms of the injunction")

625.   Moreover, the coercive remedies ePlus suggests—beyond expanding the injunction to reflect RQC—lack precedential support in the patent contempt context and are impermissible.

- *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 842-43 (1994) (Scalia, J., concurring)

626.   Daily fines are awardable only to coerce affirmative discreet acts, not to prohibit sweeping categories of activity such that "determining compliance becomes much more

difficult."  The conduct ePlus wishes to coerce is not sufficiently defined to be an appropriate

subject for a coercive remedy.

- *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821,
  842-43 (1994) (Scalia, J., concurring)

627.   The daily fines ePlus proposes are also impermissible insofar as they cannot be

purged through compliance.  Coercive sanctions are permissible only where they are prospective

in nature and thus provide the contemnor with an ability to purge them.

- *Windsor Power House Coal Co. v. District 6 United Mine Workers of Am.*,
  530 F.2d 312, 316 (4th Cir. 1976) ("The definition has two parts: (1) civil
  contempt is forward-looking, terminable if the contemnor purges himself
  of the contempt and (2) it is compensatory of any losses sustained by the
  (injured party) as a result of the contempt.") (quotation omitted)

- *Bagwell*, 512 U.S. at 829 ("Where a fine is not compensatory, it is civil
  only if the contemnor is afforded an opportunity to purge.")

- *Carbon Fuel Co.*, 517 F.2d at 1349 ("Civil contempt is conditional or
  contingent in nature, terminable if the contemnor purges himself of the
  contempt.")

628.   The cases ePlus cites in support of its coercive daily fines are inapposite.  Only

one of the three cases cited even awarded a coercive daily fine, and that was only to coerce the

contemnor to produce certain identified documents in its possession.  And none of the cases

exhibits circumstances such as this, where the conduct to be coerced is not an affirmative and

discreetly defined activity, but rather a prohibition from an amorphous and undefined category of

conduct that could be considered "infringement."

- *United States v. Darwin Construction Co., Inc.*, 873 F.2d 750, 752 & n.4,
  756 (4th Cir. 1988) (coercive daily fine imposed for six days until
  defendants produced specific, identified documents)

- *Diamond Heads, LLC v. Everingham*, 2011 WL 833986, at *6 (M.D. Fla.
  Jan. 28, 2011) (no fine awarded; rather, the court threatened to coercively
  incarcerate a repeatedly offending individual unless she undertook three
  discreet, affirmative acts: removing specific content from her website;

171

notifying specific customers about the contempt finding; and forfeiting specific infringing engine parts to the court)

- *Buffalo Wings Factory*, 2008 WL 4642163 at *4 (nowhere in this opinion is a fine even referenced.  In a *prior* order by the same court, *Buffalo Wings Factory, Inc. v. Mohd*, 574 F. Supp. 2d 574, 873 F. Supp. 2d 750, 752 * n.4 (E.D. Va. 1989), the defendants were ordered to pay as a *retroactive compensatory fine* $9,000 "per week . . . *since* June 1 that Defendants *have failed* to comply with the [Consent Order]," not as a prospective and coercive daily fine.) (emphasis added)

629.    The Court rejects ePlus's suggestion that it would permissible or equitable to shutter Lawson's entire business operation prospectively under the circumstances.  The one case ePlus cites in support of this proposal did not even award this remedy; it simply mentioned it as an option to consider in the future if the already repeat contemnor continued to violate the operative order.

- *Buffalo Wings Factory*, 2008 WL 4642163 at *13 (despite second contempt finding for trademark infringement and theft of confidential information, Court *declined* to shut down the offending contemnors' restaurant until they performed the discreet, affirmative acts required by the court's order)

## VII.  CONCLUSION

630.    The modifications made to the adjudged-infringing products render the modified features more than colorably different from the features that ePlus contended and proved to be infringing at the infringement trial.

631.    ePlus remains free to bring a patent infringement suit against Lawson based on claim 26 of the '683 Patent, in which action Lawson may pursue all available defenses, and in the event the action proceeds to trial, Lawson is constitutionally entitled to demand a jury.

632.    While this Court will not enter a judgment on ePlus's infringement allegations, the evidence does not show clearly and convincingly that Lawson's redesigned product infringes claim 26 of the '683 Patent.

633.    While unnecessary to the Court's findings, the evidence reflects that Lawson acted in good faith to comply with the May 23, 2011 Injunction, and ePlus's claims with respect to violation of the Injunction through Lawson's interaction with its RSS customers are rejected as unproven.

634.    ePlus has failed entirely to prove harm to it by Lawson's conduct and thus no damages are appropriate under any circumstances.

635.    Each party shall bear its own costs and attorneys' fees.

636.    ePlus's Motion To Show Cause Why Lawson Software, Inc. Should Not Be Held In Contempt Of The Court's Permanent Injunction is DENIED, and the application for contempt is DISMISSED.

Dated:  April 22, 2013

                              LAWSON SOFTWARE, INC.


                              By:  _____/s/_____

Dabney J. Carr, IV, VSB #28679
Robert A. Angle, VSB #37691
**TROUTMAN SANDERS LLP**
P. O. Box 1122
Richmond, Virginia  23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com


Josh A. Krevitt (admitted *pro hac vice*)
Daniel J. Thomasch (admitted *pro hac vice*)
Richard W. Mark (admitted *pro hac vice*)
Christopher D. Dusseault (admitted *pro hac vice*)
Jason C. Lo (admitted *pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

*Attorneys for Defendant Lawson Software, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 22nd day of April, 2013, a true copy of the foregoing will be filed electronically with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Craig T. Merritt
Paul W. Jacobs, II
Henry I. Willett, III
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
cmerritt@cblaw.com
pjacobs@cblaw.com
hwillett@cblaw.com

Michael G. Strapp
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, MA 02109-2881
mstrapp@goodwinprocter.com

Jennifer A. Albert
David M. Young (VSB No. 35997)
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001
jalbert@goodwinprocter.com
dyoung@goodwinprocter.com

*Attorneys for Plaintiff*

                              /s/
_____
Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
Megan C. Rahman (VSB No. 42678)
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
megan.rahman@troutmansanders.com
**TROUTMAN SANDERS LLP**
1001 Haxall Point
Richmond, VA 23219
Telephone:  (804) 697-1200
Facsimile:  (804) 697-1339
*Counsel for Defendant Lawson Software, Inc.*