**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | | |
|---|---|---|
| ePLUS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:09CV620 (REP) |
| | ) | |
| LAWSON SOFTWARE, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT LAWSON SOFTWARE, INC.'S POST-HEARING BRIEF ON MORE
THAN COLORABLE DIFFERENCES
[AMENDED]**

Josh A. Krevitt (admitted *pro hac vice*)
Daniel J. Thomasch (admitted *pro hac vice*)
Richard W. Mark (admitted *pro hac vice*)
Christopher D. Dusseault (admitted *pro hac vice*)
Jason C. Lo (admitted *pro hac vice*)
jkrevitt@gibsondunn.com
dthomasch@gibsondunn.com
rmark@gibsondunn.com
cdusseault@gibsondunn.com
jlo@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

*Attorneys for Defendant Lawson Software, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................ 3

I.  The Changes To Punchout Functionality In RQC Are Not In Dispute ............................. 3

II.  The Colorable Differences Inquiry Under *TiVo* Mandates Consideration Of The Underlying Trial Record .............................................................................................. 3

III.  ePlus's Positions Are Factually Incorrect And Legally Baseless ...................................... 5

    A.  ePlus's Argument That The Changes Are "Not Related To Claim 26" Is Entirely Contrary To The Contempt Framework Established In *TiVo* .................. 5

    B.  ePlus's Argument That "Lawson Made No Changes To The Core Procurement Functionality" Is A Red Herring ...................................................... 8

    C.  ePlus's Argument That Lawson Characterized The Modifications As A "Slight Change" Or "No Change" Is Irrelevant And Ignores The Undisputed Facts Of The Impact Of Lawson's Modifications ............................ 10

    D.  ePlus's Argument That The Changes Were Not Innovative Misstates The Law ...................................................................................................................... 13

    E.  ePlus's Remaining Arguments Are Irrelevant ...................................................... 15

IV.  Under A Proper *TiVo* Analysis, Lawson's Changes Are Significant .............................. 16

    A.  Lawson's Modifications Remove Features ePlus Relied Upon At Trial To Prove Infringement ............................................................................................... 16

    B.  The Features Lawson Removed From RQC Are A "Big Deal In The Context Of The Patent" ...................................................................................... 17

        1.  ePlus Represented To The Court And The Jury That The Functionality Lawson Has Since Removed From RQC Was A Core Feature Of The Invention ............................................................. 17

        2.  The Inventors Of The Patent-In-Suit Called The Lost Functionality A Distinct Advantage Of The Invention ................................................... 18

        3.  The Changes To Punchout Functionality Have Significantly Changed The User Experience ................................................................. 19

**TABLE OF CONTENTS (Cont'd.)**

<u>**Page**</u>

4.    Lawson And Its Customers Opposed The Changes To Punchout
Functionality ............................................................................................. 21

CONCLUSION.................................................................................................................... 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arbek Mfg. v. Moazzam*, 55 F. 3d 1567 (Fed. Cir. 1995) ............................................................. 6

*nCUBE Corp. v. SeaChange Int'l, Inc.*,
   C.A. No. 01–011–LPS, 2012 WL 4863049 (D. Del. Oct. 9, 2012) ......................................... 15

*Taser Int'l, Inc. v. Stinger Sys., Inc.*,
   No. CV07-42-PHX-JAT (D. Ariz. Jan. 18, 2012) .................................................................. 15

*TiVo Inc. v. EchoStar Corp.*,
   646 F.3d 869 (Fed. Cir. 2011) .................................................................. 1, 3, 4, 5, 8, 9, 14, 15

**Rules**

Fed. R. Evid. 201 .......................................................................................................................... 19

## INTRODUCTION

Throughout these proceedings, ePlus has consistently tried to steer the Court away from conducting a proper contempt analysis pursuant to *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011), steadfastly attempting to keep the issues in the contempt proceeding separate and apart from the infringement contentions advanced at the underlying trial.  In so doing, ePlus invites clear error.  *TiVo* instructs district courts in contempt proceedings to conduct a two-step approach: (1) compare the features of the newly-accused product against the features of the adjudged-infringing product that were a basis for the prior finding of infringement to determine whether the differences between the two are more than colorable, and (2) if not, compare the newly-accused product against the limitations of the asserted claim(s) to determine whether the newly-accused product continues to infringe.  The first-step colorable differences analysis necessitates a district court consider the trial record to determine what features the plaintiff alleged and proved as a basis for infringement.

ePlus's efforts to sequester its trial contentions should be seen for what they are—a concession that it cannot win this case under a proper application of the *TiVo* framework. Unable to argue plausibly that the severe limitations placed on the functionality of Punchout do not render the modified RQC configurations more than colorably different from the adjudged-infringing RSS product, ePlus argues that the colorable differences analysis is not to be reached here because the modifications to the newly-accused product allegedly do not render it non-infringing.  While ePlus is careful to cloak its infringement-driven analysis in terms of "relevance," its evaluation of the significance of the modified features by reference to patent claims, not prior trial contentions, is *exactly* what the Federal Circuit rejected in *TiVo*.

The facts of this case are simple:  At trial, ePlus expressly contended that certain features were central to the patented invention and demonstrated those features to the jury in an attempt

to establish infringement of the '683 patent, including claim 26.  ePlus's own expert witness trumpeted the features at issue as being "a real benefit," "a cost saver," "a time saver," "a convenience," and "a big deal."  Lawson considered and responded to the theory ePlus used to prove infringement by creating a redesigned product incorporating RQC that eliminated those specific, desirable features.  As a result, Lawson's customers must now "wait in the check-out line" for each channel from which they decide to purchase items, which is *precisely* the burden the inventors of the asserted patent sought to remedy.

Because the trial record is replete with evidence demonstrating the significance of the removed features, ePlus has pursued a theory of contempt that conflates colorable differences and infringement and it advances an argument utterly disconnected from the evidence, asserting that it did not rely on the infringement proof it offered at the merits trial because "such [proof] is not necessary to establish infringement of claim 26."  ePlus Color. Diff. Br. at 8.  While the statement that ePlus did not "rely" on the functionality at issue at trial is demonstrably false, the ultimate irony is that ePlus does not want the Court to look at the trial record to test the veracity of its assertion.  In fact, it is the trial record that evidences what plaintiff relied on to prove infringement, not an abstract analysis of the minimum requirements to prove infringement.  That record establishes that the removed functionality (a) was a basis for ePlus's infringement contentions at trial, and (b) is significant "*in the context of the patent*."  Trial demonstrations that were central to ePlus's infringement case can no longer be performed because Lawson eliminated the features of the infringing configurations that were and are necessary to perform such demonstrations.  Those facts end a contempt analysis under *TiVo*.  Proceeding to an infringement analysis in the face of such facts would deny Lawson both patent law protections provided by *TiVo* and the right to a jury trial provided by the Seventh Amendment.

2

## ARGUMENT

### I.  The Changes To Punchout Functionality In RQC Are Not In Dispute

There is no dispute that Lawson made changes to the Punchout functionality of the adjudged-infringing products, and that those changes degraded the usefulness of the Lawson software for users who rely on Punchout.  Specifically, Lawson made two related modifications: first, removing the ability to combine items from Item Master and a Punchout vendor on a single requisition ("Change 1"), and second, removing that same feature as to items from multiple Punchout vendor websites ("Change 2").  Tr. 446:14-19, 460:8-16 (Goldberg); Tr. 172:4-8, 172:17-24 (Weaver); Defendant's Proposed Findings of Fact and Conclusions of Law ("DPFF") ¶¶ 86-87.  If the current requisition already includes an item from Item Master, the user cannot initiate a Punchout session, and if the current requisition already includes an item from a Punchout vendor, the user cannot search the Item Master or another Punchout vendor site.  Tr. 446:14-19; 458:7-25; 459:15-460:1 (Goldberg); Tr. 171:14-172:8, 172:17-24 (Weaver); DPFF ¶¶ 86-87.  These changes are hard-coded into the Lawson software and cannot be ignored or undone by users.  Tr. 459:1-6 (Goldberg); Tr. 358:1-5, 359:2-8 (Christopherson); Tr. 178:13-17 (Weaver); DPFF ¶ 88.

### II.  The Colorable Differences Inquiry Under *TiVo* Mandates Consideration Of The Underlying Trial Record

The Federal Circuit's *TiVo* decision dictates the proper framework for determining whether a party may be held in contempt for selling a product that was modified from an adjudged-infringing product.  *TiVo,* 646 F.3d at 882.  Specifically, the party seeking to enforce the injunction must first prove, by clear and convincing evidence, that the newly accused product is not more than colorably different from the product found to infringe.  *Id.*  In performing this analysis, the Court must focus on "those elements of the adjudged-infringing products that the

patentee previously contended, and proved, satisfy specific limitations of the asserted claims." *Id.* "Instead of focusing solely on infringement, the contempt analysis must focus initially on the differences between the *features* relied upon to establish infringement and the modified *features* of the newly accused products." *Id.* (emphases added). Thus, a proper colorable differences test under *TiVo* must compare the modified features of the newly-accused product against the related features of the adjudged-infringing produc—that comparison does not include or incorporate an infringement analysis.[1]

Because the colorable differences test is a feature-versus-feature comparison, it is necessary to first determine the specific features of the adjudged-infringing products that were contended and proved as a basis for the prior finding of infringement because it is those features against which the modifications must be measured. Indeed, this Court has acknowledged that predicate. 2/29/12 Hearing Tr. (the Court) 66:25-67:3 ("But the first task is going to be to figure out how we apply the first part of [*TiVo*'s two-part test], and that is how we define the animal against which we measure the -- whether there is a colorable difference in the first place . . ."); DPFF ¶ 520. *TiVo* provides the answer by directing the Court to analyze what was "contended and proved" as a basis for plaintiff's infringement case at trial. Allowing ePlus to now expand upon its merits trial infringement theory is flatly inconsistent with *TiVo*.

---

[1]     The Federal Circuit's rejection of any infringement-based approach to the colorable differences test in *TiVo* was so complete that it held evidence—uncontested—that the defendant's product continued to infringe was irrelevant to the contempt analysis. *TiVo,* 646 F. 2d at 879. The Federal Circuit vacated the district court's finding of contempt because the conceded infringing feature was not "unequivocally alleged" at trial as a basis for infringement. *Id.* at 883-84.

### III.   ePlus's Positions Are Factually Incorrect And Legally Baseless

ePlus proffers several arguments for its opinion that Modified Configuration Nos. 3 and 5 are not more than colorably different than the adjudged-infringing products.  While ePlus's arguments run the gamut from factually incorrect to staunchly defiant of controlling law, one common theme pervades: ePlus never even *attempts* to compare the modified features of RQC against the RSS features it relied on as a basis to prove infringement at trial, despite the Federal Circuit's explicit instruction do to so.  ePlus has not made such an attempt because it would fall far short of meeting ePlus's clear and convincing evidentiary burden.  Indeed, ePlus has taken every opportunity possible to *prevent* this Court from looking at what it contended at trial.  ePlus's unrelenting opposition to examination of *its own case* at the merits trial record is telling.

### A.   ePlus's Argument That The Changes Are "Not Related To Claim 26" Is Entirely Contrary To The Contempt Framework Established In *TiVo*

ePlus's first argument on the issue of colorability, that the changes to Punchout functionality "are not related to any requirement of Claim 26," disregards controlling law.  ePlus Color. Diff. Br., Section III. A.; *see also* Tr. 167:16-17 (Weaver); DPFF ¶¶ 111-12, 117.  ePlus's argument that the changes "are not related to any claim element in Claim 26" is a poorly-disguised contention that, because RQC is purportedly capable of infringing claim 26, the configurations with RQC cannot be more than colorably different than the adjudged-infringing products.  This is *precisely* the infringement-based colorable differences test that the Federal Circuit explicitly rejected in *TiVo*.  *TiVo*, 646 F. 3d at 882 ("Today, we reject that infringement-based understanding of the colorably different test.").  ePlus's denial that it is relying on an infringement-based analysis of the modifications is thoroughly disproven by the testimony of its compliant expert witness, on direct examination. Tr. 89:4-8 (Weaver) ("The capability of RQC in the procurement system is the same with regard to claim 26.  *All elements of claim 26 can still be*

*practiced.*  So there is -- there is no significant difference in the operation of RQC as viewed in

light of claim 26."); DPFF ¶¶ 111-13.  This statement, in no uncertain terms, demonstrates

ePlus's position that, regardless of how significantly RQC differs from RSS, RQC's asserted

infringement of claim 26 establishes that the new product is not more than colorably different

from the adjudged-infringing products.  If there were any doubt ePlus offers nothing more than

an infringement-based colorable differences analysis in defiance of *TiVo*, ePlus's counsel, *during

the colorable differences phase of the contempt hearing*, walked Dr. Weaver through claim 26 on

an element-by-element basis to elicit testimony that each claim element continued to be met by

the modified product.  No fair reading of *TiVo* supports such an approach to the threshold

colorable differences test.  Tr. 99:5-14; 102:13-19; 104:1-7; 107:11-24; 108:3-19; *see also* ePlus

Color. Diff. Br. at 7; DPFF ¶ 113.

      Besides ignoring governing law, ePlus's argument also ignores the fundamental nature of

contempt proceedings.  Contempt in a patent context is only appropriate where the newly-

accused product is so similar to the adjudged-infringing product that the jury's verdict is

reasonably applied to the newly-accused product.  *See Arbek Mfg. v. Moazzam*, 55 F. 3d 1567,

1570 (Fed. Cir. 1995) (affirming that contempt is inappropriate where trial court's "found that

the modified product was substantially different on its face" from adjudged-infringing products

because "[c]ontempt, however, is not a sword for wounding a former infringer who has made a

good-faith effort to modify a previously adjudged or admitted infringing device to remain in the

marketplace…[r]ather, the modifying party generally deserves the opportunity to litigate the

infringement question at a new trial…").  Where a plaintiff's infringement argument against a

newly-accused product differs from that previously presented to the jury, defendant is entitled to

have a jury, not the Court, adjudicate the new theory.  Allowing a new infringement theory to be

advanced in a contempt proceeding would deny a defendant's right to due process (as well as to trial by jury) and convert contempt into an offensive tool it was never meant to be.

ePlus's argument that it did not "rely" on the ability to combine all items onto one requisition to prove infringement because claim 26 does not require that specific functionality is nonsense. ePlus Color. Diff. Br. at 7-8. ePlus chose its infringement theory at trial from a menu of available options. For example, ePlus could have argued that:

    (1)  purchasing a single item from the Item Master could infringe claim 26;

    (2)  purchasing a single item from a single Punchout site could infringe claim 26;

    (3)  purchasing multiple items from different sources in the Item Master could infringe claim 26;

    (4)  purchasing items from Punchout and the Item Master on a single requisition could infringe claim 26; and

    (5)  purchasing items from at least two different Punchout sites on a single requisition could infringe claim 26.

ePlus could have argued all of these theories, but it did not. ePlus never argued theories (1) and (2) at the merits trial—certainly not unequivocally.[2] *See TiVo*, 646 F. 3d at 883. ePlus argued infringement theory (3), but the jury rejected it. Dkt. 600 (jury verdict). In contrast, ePlus was successful at trial with both theories (4) and (5), obtaining a narrow verdict of infringement on some asserted claims against some configurations, but now claims it did not "rely" on those arguments because they are not "required" by claim 26. ePlus Color. Diff. Br. at

---

[2]    Lawson submits that the reason ePlus did not make these arguments at trial was strategic—by adopting an infringement theory that required more than what ePlus now argues is necessary for infringement, ePlus minimized the risk of having its patents invalidated. As the ability to purchase an item from a single channel of commerce had long existed in the prior art, the validity of ePlus's patent hinged on the purported novelty of enabling users to combine all desired items on a single requisition, regardless of where each item originated. Accordingly, this "big deal" capability played a prominent role in ePlus's case at trial by strategic design, as discussed below in Section IV.

7-8.  The Federal Circuit, however, did not instruct courts to focus the colorable differences analysis on that which, *in theory*, provides the bare minimum functionality to satisfy the claims. The colorable differences test focuses on the features that the plaintiff *actually* "contended, and proved" satisfy the claims.  *TiVo*, 646 F. 3d at 882.  *TiVo* makes clear that, while other bases for infringement may exist, modified features are not excluded from the colorable differences analysis if they were "*a* basis for[] the prior finding of infringement."  *Id.* (emphasis added). While modification to "randomly chosen" features cannot excuse continued infringement, that caveat to *TiVo* has no possible application here:  The features of the infringing configurations that allowed for Item Master and Punchout items and/or items from two or more Punchout websites to be combined on a single requisition were the foundation of ePlus's trial court theory of infringement.  To now claim those features were "randomly chosen," *see TiVo*, 646 F. 3d at 882, by Lawson for modification, and have no relevance to the colorable differences test, lacks even superficial plausibility.

> **B.** **ePlus's Argument That "Lawson Made No Changes To The Core Procurement Functionality" Is A Red Herring**

ePlus's second argument for its claim that the differences are merely colorable, that "Lawson has made no changes to the core procurement functionality of the Infringing Configurations," is a red herring.  ePlus Color. Diff. Br. at 8; *see also* Tr. 87:9-20 ("None of the core functionality that enables procurement has been changed."); *accord* 140:3-13, 146:6-11, 148:7-14, 149:19-24, 155:17-24, 159:18-160:3, 183:16-18; DPFF ¶ 114.  ePlus's focus on what has *not* changed in RQC is simple misdirection.  ePlus Color. Diff. Br., Section III. B; Tr. 167:18-20; DPFF ¶¶ 113-14.  The Federal Circuit's opinion in *TiVo* is clear:  the colorable differences analysis examines the *modified* features of the newly accused products, *see TiVo*, 646 F.3d at 882, and, as the court observed, in most cases only a single modification is at issue.  *Id.* at

882 n.1.  ePlus's obsessive focus on what has *not* changed, *see* ePlus Color. Diff. Br. Sections III. B, III. D, III. F, III. G; DPFF ¶¶ 113-14, is yet another attempt to divert attention from the concededly significant modifications Lawson made.

ePlus's newfound "core functionality" construct fails for two additional reasons.  First, nothing in *TiVo* describes a product's "core functionality" as something that must be discerned as a part of the colorable differences test, or that must be changed to avoid contempt.  Second, and even more important, *ePlus has no ownership right to "core procurement functionality."*  Core procurement functionality (as ePlus now describes it) long predates ePlus's patent.  *See*, *e.g.*, '683 Patent at col. 1:10-17; *Id.* at "References Cited," p. 1-2; DPFF ¶ 115.  The narrow ownership right conferred on the inventors of the '683 patent was for an *improvement* on core procurement functionality, not core procurement functionality itself.  Indeed, ePlus's counsel belabored this point to the jury at trial.  Trial Tr. (ePlus Opening Statement) 124:11-19; 124:23 ("'Only God creates from nothing.'"); 126:5-7; 126:15-20; DPFF ¶ 116.  ePlus possesses no patent right to "core procurement functionality," and its suggestion to the Court that Lawson must alter such functionality to avoid contempt is an improper attempt to expand the scope of its patent to cover functionality that it did not invent.

If the Court were to adopt ePlus's backwards, patent-based approach to the colorable differences analysis, the Court would then presumably be required to consider novelty of the patented features, not "core functionality" *that existed in the prior art*.  And as discussed below, one of the "distinct advantages" disclosed by the '683 patent is the ability to combine all items on a single requisition regardless of where a user finds those items.  *See*, *infra*, Section IV.B.1, IV.B.2.  Dr. Weaver characterized this feature as "a big deal in the context of the patent." Tr. 219:11 (Weaver); DPFF ¶ 89.  Lawson's RQC product now lacks the "big deal" feature that

ePlus relied on at trial as a novel feature of the asserted patent, and an infringing feature of Lawson's products.

**C.    ePlus's Argument That Lawson Characterized The Modifications As A "Slight Change" Or "No Change" Is Irrelevant And Ignores The Undisputed Facts Of The Impact Of Lawson's Modifications**

ePlus's third argument for its claim that the differences are merely colorable, that Lawson's internal and external communications to customers characterize the changes as "no change at all or just a slight change," is misleading.  ePlus Color. Diff. Br. at 10; *see also* Tr. 168:3-5 (Weaver); DPFF ¶¶ 119-29.  Initially, it is misleading because ePlus concedes that Lawson changed its product.  Tr. 173:13-15 (Weaver); DPFF ¶¶ 86-87.  ePlus's suggestions to the contrary ignore their own expert's admissions.

Moreover, and most tellingly, the documents that ePlus relies on do not even support the argument.  First, many of the documents bear no indication that they relate to the changes now at issue.  And indeed, the testimony supporting some of these documents is that they do *not* relate to the only changes now relevant.  RQC incorporates a number of changes that are not relevant to these proceedings.  *See* Tr. 192:18-22, 194:19-195:11 (Weaver); DPFF ¶¶ 58-59.  To the extent offered documents address the significance or insignificance of changes no longer at issue (such as to the RQC user interface), it is utterly inappropriate to put those documents before the Court.

Second, ePlus relies on evidence that does not relate to accused configurations.  A customer who does not have the Punchout module, by definition, does not have an accused configuration, as both Configurations 3 and 5 include Punchout.  If a customer does not have Punchout, communications to and from these customers obviously would not concern Punchout's functionality, and thus do not bear on the changes before the Court.  Yet, customer-related documents ePlus relies on do not indicate whether the customer in question has Punchout or not—indeed, in at least one case it is clear that the customer did not have the Punchout

module.[3]  DPFF ¶ 129 (showing that Children's Health of Atlanta, referenced at ePlus Color. Diff. Br. at 15, did not have Punchout).  Multiple changes were made to RQC to address, *inter alia*, Lawson's temporary need to design around ePlus's invalid patent claims.  Documents discussing those changes and making no reference to Punchout are completely irrelevant to this proceeding.  It is an outrage to suggest that Lawson documents that do not even reference Punchout functionality can somehow rise to the level of "clear and convincing" evidence about the functionality of Punchout.

Documents in the hearing record provide clear examples of ePlus's attempt to persuade the Court with material unrelated to the Punchout functionality changes at issue.  These include:

- PX-1072, in which Scott Hanson states that there is little change in functionality between RSS and RQC concerning the user interface.  *Id.*; *see* ePlus Color. Diff. Br. at 9, 12, 16.  The changes to Punchout functionality at issue are *not* the user interface. Moreover, while Dr. Weaver assumed Mr. Hanson was knowledgeable about the changes to Punchout functionality, Mr. Hanson was a product installation employee who had no knowledge about the business function of Punchout.  206:2-12 Tr. (Weaver); Tr. 590:21-591:7 (Hanson); DPFF ¶ 121.  Thus, he could not have been commenting on the changes at issue.  There is not even any indication that the message concerned any Configuration 3 or 5 customers.

- PX-1027, in which Mindy Klebe downplays the differences between RSS and RQC. ePlus Color. Diff. Br. at 10.  Ms. Klebe's comment concerned the RQC user interface, and other changes to the product removed from the case by the Federal Circuit judgment, not Punchout functionality.  There is no indication or testimony that the customer in PX-1027 has Punchout.  Tr. 206:13-207:15 (Weaver); DPFF ¶ 125.

- PX-1124, in which Mindy Klebe downplays the differences between RSS and RQC. ePlus Color. Diff. Br. at 11-12, 15.  As with PX-1027, the document plainly does *not* relate to the modifications in Punchout functionality, because it explicitly references the other changes in RQC and the RQC user interface, and it does *not* reference the changes to Punchout functionality.  PX-1124 at RQC2214590; DPFF ¶ 126. Moreover, there is no indication that PX-1124 was directed to a user with Punchout or that the product configuration tested by Mindy Klebe included Punchout.  Dr. Weaver admitted that he did not know whether this document described an accused

---

[3]    Of all the customers who have a product configuration that includes RQC, *most do not have Punchout*. Tr. 1017:15-25 (Putnam); DPFF ¶ 66.

configuration or a configuration irrelevant to these proceedings. Tr. 202:2-23 (Weaver); DPFF ¶ 126.

- PX-1266,[4] in which Dean Hager characterizes the differences between RSS and RQC as "slight." ePlus Color. Diff. Br. at 12. Again, the document has no indication that the potential customer was seeking a product configuration with Punchout. To the contrary, Mr. Hager testified that he believed the document was *not relevant to the modifications to Punchout functionality*. Dep. Tr. of Dean Hager, March 22, 2013, 161:18-162:18; DPFF ¶ 127.

- PX-1105, in which two entities comment on the similarities between RSS and RQC. ePlus Color. Diff. Br. at 15-16. As noted above, one of these entities was a customer who did not have Punchout. DPFF ¶ 129. The other, a purported contractor for Lawson, gives no indication that he is referencing the configurations with Punchout. DPFF ¶ 128.

- PX-1066, in which Scott Hanson describes the difference between RSS and RQC as that between Internet Explorer and Firefox. ePlus Color. Diff. Br. at 16. Mr. Hanson's analogy explicitly references the user interface, not the Punchout functionality at issue. Even Dr. Weaver conceded that PX-1066 does not deal with the changes to Punchout functionality. Tr. 207:24-208:18 (Weaver); DPFF ¶ 120.

- PX-1044, an "instant messaging" conversation between Elizabeth Homewood and Matthew Bragstad, is willfully distorted by ePlus. ePlus Color. Diff. Br. at 10. ePlus relies on PX-1044 to claim that Elizabeth Homewood was "'scared' that RQC did not comply with this Court's injunction order . . . ." Ms. Homewood's testimony, however, was that she was *not* scared that RQC did not comply with the Court's injunction order. Tr. 857:7-11 ("Q. And that scared you? … A. It didn't."); DPFF ¶ 464. Instead, Ms. Homewood explained she was scared that, after Lawson had just put a substantial amount of work into migrating customers onto RQC, Lawson and its customers might "have to go through all that pain" again if it turned out the Court did not agree that RQC was in compliance. Tr. 857:7-18; DPFF ¶ 464.

ePlus's unconstrained willingness to rely on documents that are clearly unrelated to the modifications at issue is indicative of the hollowness of its case. Offering irrelevant documents as if they relate to the issues at hand—when they clearly do not—falls far short of a clear and convincing evidentiary standard.

---

[4]     Lawson notes that PX-1266 has not yet been admitted as evidence. The document was submitted as an exhibit along with the deposition testimony of Dean Hager, and the Court has yet to rule on its admissibility.

To the extent ePlus cites documents that do downplay the significance of the functional limitations Lawson imposed on its products, Lawson's representations to customers in marketing materials do not alter the objective reality of the modifications themselves.[5]  The nature of the modifications here is a matter of fact, is not disputed, and is not diminished by what Lawson tells its customers in an effort to ease apprehension regarding the forced move to RQC.  A review of such representations is not a substitute for comparing the modified features of the newly-accused product against the adjudged-infringing product, as the Federal Circuit has instructed.  It is an inescapable fact that Lawson removed functionality that Dr. Weaver has freely characterized as "a big deal," "a real benefit," a "cost saver," a "time saver," and a "convenience."  Trial Tr. (Weaver) 505:9-17, 550:22-551:9; Tr. 213:7-18, 218:20-25, 219:5-9 (Weaver); DPFF ¶¶ 89-94. ePlus's attempts to use Lawson's positive marketing spin is an attempt to move the spotlight away from what ePlus previously contended was significant.[6]

### D.   ePlus's Argument That The Changes Were Not Innovative Misstates The Law

ePlus's fourth argument for its claim that the differences are merely colorable, that Lawson's changes are not "innovative," is unfounded.  ePlus Color. Diff. Br. at 9.  Applying ePlus's logic, a modification that consists of removing an infringing feature such that the product no longer performs its intended function would, nonetheless, be insignificant.  By that logic,

---

[5]   Indeed, one would normally expect positive spin in customer-facing documents.  *See* Tr. 485:1-486:11 (Goldberg); DPFF ¶ 122.

[6]   Not only does ePlus rely on documents that are not relevant to the modifications at issue, it affirmatively ignores evidence showing that the modifications are significant, *even when that evidence is in the very same document ePlus otherwise relies on*.  Dr. Weaver conceded that he reviewed documents evidencing Lawson's and its customers' resistance to the modifications, yet he chose not to consider such evidence formulating his opinion.  Tr. 190:10-191:23, 229:8-230:11, 225:23-228:21, 222:11-225:22 (Weaver); DPFF ¶ 118.

*Lawson could have removed its software's ability to procure goods and services altogether* and ePlus would still maintain that change to be insignificant.

By arguing that a modification must be innovative to be significant, ePlus expressly disregards the nature of the changes and the severity of the limitations imposed on the functionality of the infringing feature. ePlus's expert went even further, simply making up yardsticks by which to measure significance that find no support in law or logic. First, Dr. Weaver testified that for a modification to be significant, it must necessarily involve changing at least 50% of the functionality of the infringing product. Tr. 200:6-11; DPFF ¶ 110. Then, Dr. Weaver went further, disregarding any and all reductions in functionality, by stating that there is no "amount of lost functionality that would be sufficient to make something more than colorably different." Tr. 201:6-9 (Weaver); DPFF ¶ 109. The error of that pronouncement is self-evident.

Indeed, in *TiVo*, the Court observed the following:

> The significance of the differences between the two products is much dependent on the nature of the products at issue. The court must also look to the relevant prior art, if any is available, to determine if the modification merely employs or combines elements already known in the prior art in a manner that would have been obvious to a person of ordinary skill in the art at the time the modification was made. A nonobvious modification may well result in a finding of more than a colorable difference . . . . The analysis may also take account of the policy that legitimate design-around efforts should always be encouraged as a path to spur further innovation . . . .

*TiVo*, 646 F.3d at 882-83.

In its footnote to this passage, the Court explained that **"[it] do[es] not suggest that the law on obviousness is binding in contempt proceedings, where, in most cases, a single limitation that has been modified by an infringer is at issue."** *Id.* at 882 n.1 (emphasis added). Further, the Court observed that "[w]here one or more of those elements previously found to infringe has been modified, *or removed*, the court must make an inquiry into whether

14

that modification is significant." *Id.* at 882 (emphasis added).  Reference to the removal of a feature undercuts any argument that a modification must necessarily be non-obvious or innovative to satisfy the first prong of the *TiVo* test.

While the non-obvious nature of a modification may be indicative that the change is significant, it does not follow that the "obvious" nature of a change is indicative of its insignificance.  Innovation is in no way required to establish the significance of a design-around modification.  Courts routinely deem simple (and therefore "obvious") changes significant.  *See, e.g., Taser Int'l, Inc. v. Stinger Sys., Inc.*, No. CV07-42-PHX-JAT (D. Ariz. Jan. 18, 2012) (plaintiff did not satisfy its burden of proving no more than colorable differences because the defendant removed the full-wave rectifier, which was the basis for the prior finding of infringement); *nCUBE Corp. v. SeaChange Int'l, Inc.*, C.A. No. 01–011–LPS, 2012 WL 4863049, at *4 (D. Del. Oct. 9, 2012) ("[C]ontempt can only be based on features that were 'unequivocally alleged' at trial as infringing, which [plaintiff] cannot claim here, since it is undisputed that the feature which was accused at trial—the ClientID—was redesigned ***to remove it***" and that "[plaintiff] cannot now seek a finding of contempt based on that newly accused feature.") (emphasis added).

### E.     ePlus's Remaining Arguments Are Irrelevant

At the end of its brief, ePlus unleashes scattershot arguments purporting to support its position that Lawson's changes are not significant.  None of these arguments has weight.  First, ePlus argues that the changes are not significant because no new training or testing was required for customers using RQC.  ePlus Color. Diff. Br. at 16.  But Dr. Weaver acknowledged that no new training was needed because, in light of the message shown to users during usage of the Lawson software, the changes are easily understandable.  Tr. 180:25-182:18; *see also* Tr. 368:25-369:7 (Christopherson); DPFF ¶ 62.  Dr. Weaver even acknowledged that whether or

not training is necessary in this instance does not show the significance of the change. Tr. 180:25-182:18; DPFF ¶ 63.  Second, ePlus argues that changes are not significant because the download, installation, and implementation process for RQC was "simple and straightforward."  ePlus Color. Diff. Br. at 17.  This argument fails.  The simplicity of download, installation, and implementation of a piece of software is not indicative of the similarities or differences from another piece of software.  Third, ePlus argues that the changes are not significant because they took a short time to code.  This argument is likewise unavailing.  The length of time it takes to code is not indicative of the significance of the changes.

## IV.     Under A Proper *TiVo* Analysis, Lawson's Changes Are Significant

As stated above, any proper *TiVo* analysis must first take account of what features ePlus relied upon at trial.  After determining those features, the Court must then compare the modifications to those features to decide whether the modifications are significant.  Under that correct standard and approach, even ePlus's own expert agrees that the changes are significant.

### A.     Lawson's Modifications Remove Features ePlus Relied Upon At Trial To Prove Infringement

At trial, ePlus relied upon two demonstrations to prove infringement of claim 26.[7]  In the first demonstration, ePlus's expert, Dr. Weaver, demonstrated the system's capability to combine items from two Punchout sites on one requisition.  Trial Tr. at 683:6-698:2; Trial Exhs. PX-367,

---

[7]     ePlus also offered a third demonstration in which a user only purchases items from Item Master and Punchout was not utilized.  This demonstration was offered to show infringement of claims 3 and 28, but not claim 26.  Even so, the jury rejected this theory when it returned a verdict of non-infringement for Configuration 2, which did not include the Punchout module. Dkt. 600 at 1; DPFF ¶¶ 2, 53.  The only configurations that the jury found to infringe *any* claim of the '683 patent were configurations that included Punchout.  Dkt. 600; DPFF ¶¶ 17, 55.  Thus, an infringement theory that does not utilize Punchout cannot be the basis for contempt.  This point is discussed further in Lawson's Post-Hearing Brief on Non-infringement.  *See* Lawson Software, Inc.'s Post-Hearing Brief on Noninfringement Section I.A.1, I.A.2.

PX-368; DX-734; DPFF ¶ 49.  In the second demonstration, Dr. Weaver demonstrated the

system's capability to combine items from the Item Master and a Punchout site.  Trial Tr. at

760:11-766:12; Trial Exhs. PX-379, PX-380; DX-735; DPFF ¶ 48.  Further, in its Brief in

Support of Motion for Judgment as a Matter of Law of Direct and Indirect Infringement, ePlus

pointed to the first demonstration as its proof for infringement of claim 26.  Dkt. 582 at 11;

DPFF ¶ 50.  Thus in the *only* demonstrations arguably relevant to show what was contended and

proven at trial, ePlus relied on the Lawson system's capability to combine on a single requisition

(a) items from Punchout and Item Master, and (b) items from two different Punchout sites, to

establish infringement of the method of claim 26.  Accordingly, these are the features against

which Lawson's modifications must be compared.  It is not disputed that neither demonstration

could be performed using RQC.

### B. The Features Lawson Removed From RQC Are A "Big Deal In The Context Of The Patent"

**1. Once it is acknowledged that ePlus relied on the "one-stop shopping" feature as a basis for its infringement case at trial, it becomes indisputable that the modifications Lawson made are significant.  It is this very fact that forced ePlus to argue the modifications are not relevant.  Faced with a trial record that is brimming with representations by ePlus that the features Lawson removed are significant, ePlus knew it could escape only by denying that these significant changes have any relevance.  As discussed above, however, the modifications are acutely relevant to a colorable differences analysis, and, as discussed below, those modifications are undeniably significant. ePlus Represented To The Court And The Jury That The Functionality Lawson Has Since Removed From RQC Was A Core Feature Of The Invention**

At the infringement trial, ePlus repeatedly celebrated the ability to combine on a single

requisition (a) items from Punchout and Item Master, and (b) items from two different Punchout

sites, as a core advantage of the patent-in-suit.  Indeed, Dr. Weaver gushed about this advantage

at trial, calling it "a big deal," "a real benefit," a "cost saver," a "time saver," and a

17

"convenience." Trial Tr. (Weaver) 505:9-17, 550:22-551:9; DPFF ¶ 51. Dr. Weaver then repeated these opinions at the contempt hearing. Tr. 213:7-18, 218:20-25, 219:5-9 (Weaver); DPFF ¶¶ 89-94. Dr. Weaver even conceded that the functionality Lawson removed in RQC was "a big deal *in the context of the patent*." Tr. 219:11 (Weaver) (emphasis added); DPFF ¶ 89. Such a concession mandates a finding that the modification was more than colorably different -- almost by definition, "a big deal in the context of the patent" is a significant feature eliminated through the modifications at issue. Dr. Weaver also agreed that, from a technological perspective, the changes Lawson implemented were a step back *by more than a decade*. Tr. 228:22-229:7 (Weaver); *see also* Tr. 386:19-387:3 (Lohkamp). No Court has issued a reported contempt decision that set the colorability bar so high that a loss of functionality sufficient to set a product back by more than a decade is deemed merely colorable.

### 2. The Inventors Of The Patent-In-Suit Called The Lost Functionality A Distinct Advantage Of The Invention

ePlus's celebration of these capabilities was well-founded, as the patent's inventors also claimed the ability to combine all items on a single requisition was a core advantage to the patent-in-suit. The inventors represented to the examiner that one of the "distinct advantages of applicant's invention" is "being able to purchase all of the selected items from all of the desired sources *without having to wait in the check-out line at each of the stores*." Applicant's April 6, 1998 Response to Office Action dated December 8th, 1997, at 15 (emphasis added)[8]; *see also* Tr. 470:7-17 (Goldberg); DPFF ¶ 95. Lawson took the "distinct advantage" out of the RQC product.

---

[8]    Lawson requests the Court take judicial notice of the '683 file history pursuant to Fed. R. Evid. 201.

### 3.      The Changes To Punchout Functionality Have Significantly Changed The User Experience

The changes Lawson implemented are significant not only because they remove the purported novelty of the patent-in-suit and the functionality upon which ePlus relied to prove infringement, but also because they cause a substantial change in the way Punchout users are able to utilize the accused configurations.

The changes to the Punchout functionality have altered the customer experience in several respects.  First, and most importantly, the changes prevent Lawson's procurement suite from being a one-stop shop for whatever a customer may want to purchase.  Tr. 461:3-13 (Goldberg); DPFF ¶ 97.  Instead, a user must initiate and complete a separate shopping session for each avenue from which she wants to procure items.  For example, if a user wants to purchase items from Item Master and from two different Punchout sites, the user must initiate and complete three separate shopping sessions; this means three separate searches, three separate requisitions, and three separate checkouts.  *See* Tr. 460:2-16 (Goldberg); Tr. 285:14-286:11 (Christopherson); DPFF ¶¶ 97, 99.  Prior to the changes, the user could have acquired the same items in a less time-consuming manner with only one requisition and only one checkout.  Tr. 460:2-16 (Goldberg); Tr. 288:4-13 (Christopherson); DPFF ¶ 97.

Second, the changes have severely limited the circumstances under which a user has the ability to comparison shop.  Because, for example, a user can no longer add a printer from both the Office Max Punchout site and the Staples Punchout site to a single requisition, the user has no way to compare the features and prices of those two printers unless he makes a mental note or copies the information down on scratch paper or some other medium external to the Lawson software.  Tr. 452:5-13, 460:19-461:2 (Goldberg); DPFF ¶ 98.  At trial, Dr. Weaver claimed the ability to comparison shop was one of the benefits of the purported invention in the patent-in-

suit, DPFF ¶ 52 (Trial Tr. (Weaver) at 504:16-505:4), and Dr. Weaver conceded during the contempt hearing that Lawson's changes made comparison shopping more difficult.  Tr. 186:18-21 (Weaver); DPFF ¶ 98.  The changes in Punchout functionality cripple a user's ability to conveniently comparison shop between Item Master and Punchout-sourced items or any items offered through different Punchout websites.

Moreover, the product modifications increase the burden on those employees of Lawson's customers who are "approvers," that is, employees who are tasked with approving or rejecting requisitions submitted by other employees (who are called "requesters").  Because separate requisitions are now required for each avenue of purchase, approvers will receive more requisitions to review.  An approver under RQC may be faced with reviewing multiple requisitions where, for an identical order, an approver under RSS would have to review only one requisition.  The impact of this effect is even more detrimental where approval or rejection turns on a requester's order as a whole, rather than by line item.  For example, if certain items are deemed to be mutually exclusive (*e.g.* a requester is not allowed to purchase both Bic and Pentel pens), or if overall orders are subject to price constraints (*e.g.* a requester's total order must be under $1,000), an approver must now piece together each individual requisition in order to get a complete picture before approving or rejecting the requester's order.  *See* Tr. 286:12-287:4 (Christopherson) (explaining Change 1 and Change 2's effect on the approval process); DPFF ¶¶ 99-100.

Dr. Weaver did not deny any of these obvious indicators of significance.  Instead, he cast them aside as irrelevant because convenience, cost, comparison shopping and the like are "not part of the claim."  Tr. 219:12-221:25; DPFF ¶ 117.  This is the very infringement-based view of colorable differences that *TiVo* rejected.

**4.      Lawson And Its Customers Opposed The Changes To Punchout Functionality**

Lawson implemented the changes knowing they would degrade its product, and ePlus concedes that the changes are a significant step backwards.  Tr. 228:22-229:7 (Weaver); Tr. 461:25-462:1 (Goldberg); Tr. 355:18-356:1 (Christopherson); DPFF ¶¶ 89, 99, 103-105. ePlus also concedes that Lawson only removed the functionality to comply with the Injunction, and Lawson would reinstate the functionality if no longer precluded from doing so.  *See* Tr. 233:4-9 (Weaver); Tr. 430:10-18 (Lohkamp); DPFF ¶ 107.

Lawson's goal "first and foremost, was to find design-arounds for each of the claims that [they] were found guilty of, and second, to have as little impact as possible upon the customers." Tr. 332:14-17 (Christopherson); DPFF ¶ 456.  Lawson achieved and sometimes exceeded these goals, except with respect to claim 26—the only claim that remains at issue.  Tr. 333:15-20 (Christopherson), Tr. 440:5-21 (Lohkamp); DPFF ¶¶ 61, 96.  Claim 26 proved to be impossible for Lawson to design around without significantly impairing functionality.  Tr. 334:12-19 (Christopherson); DPFF ¶ 96.

Lawson came up with many alternative designs around claim 26 that would have minimized the redesign's impact on Lawson's customers.  *See, e.g.*, Tr. 353:24-354:17 (Christopherson); Tr. 406:4-407:11 (Lohkamp); DPFF ¶¶ 73-74, 459.  However, even though "the change that was ultimately made was more detrimental" than these alternatives, Lawson's legal counsel rejected those designs because they "did not go far enough."  Tr. 407:7-11; PX-1019 at RQC2291408; PX-1018 at RQC822226; DPFF ¶¶ 459.

The Lawson redesign team, comprised of numerous lawyers, developers and business people, worked for months with the RSS redesign as its top priority, but was unable to devise a redesign for the configurations that infringed claim 26 that would not be disruptive to Lawson's

customers.  Tr. 301:14-16, 324:21-24, 325:4-14, 326:23-327:1, 345:22-346:21, 348:16-349:5, 360:2-8, 365:4-9 (Christopherson); DPFF ¶¶ 36-43.  By early April, having failed to develop a viable work-around for Punchout, Lawson was tentatively planning on pulling Punchout from fourth quarter sales (ending May 31, 2011).  *See* Tr. 174:24-175:3 (Hager); DPFF ¶ 70.

The first change to Punchout functionality—conceived of on or about April 18, 2011— was disturbingly significant to Lawson's non-lawyers.  During this time, Lawson's head of development for RQC, Dale Christopherson, voiced his disappointment with what he termed a "significant change," PX-1178 at RQC10357, DPFF ¶¶ 99-100, from a developer's perspective: "My view at that time is it was a significant change. . . . I wasn't happy with it because I like to have good product, and I feel that, okay, in my words, I'm deprecating or removing functionality product.  I don't like that, but I understand and I could live with the legal decision, and we did so."  Tr. 361:16, 367:5-9 (Christopherson); DPFF ¶ 99.

At the same time, Keith Lohkamp, who is in charge of customer requirements for RQC, voiced similar concerns from a customer perspective:  "I told Mr. Christopherson that I was concerned about the impact on our customers and it wasn't going to be a good experience for them because it was basically taking away functionality.  So I expressed my concern about it."  Tr. 398:17-21 (Lohkamp); DPFF ¶ 103.  Mr. Lohkamp further expressed his concerns as he presented the proposed changes to Lawson's management for approval, stating that he "would prefer not to do this, but [legal's] advice is that we need to do something like this."  PX-1019 at RQC2291408; Tr. 405:15-16 (Lohkamp); DPFF ¶ 103.

Mr. Christopherson and Mr. Lohkamp felt similarly about the second Punchout functionality change, made effective on June 9, 2011.  Mr. Christopherson initially recommended against the change, and then "[h]ad a separate discussion with Mr. Lohkamp about

the change and expressed to him how [he] really didn't like to do it." Tr. 367:18-19, 368:13-15 (Christopherson); DPFF ¶ 104. Mr. Lohkamp explained his own concerns during the hearing: "Because in my experience and my belief, customers who are using one Punchout had that ability to be able to take Punchout items from different Punchout sites, combine on a single requisition, submit a single requisition, and then go through a single approval process. And so if we took that away, it would add extra work on the requestors who would have to create more than one requisition and potentially have more than one approval process. Tr. 410:9-17 (Lohkamp); DPFF ¶ 105.

As with the first change, Mr. Lohkamp again detailed his concerns to Lawson's management: "The legal team has requested that we consider another change related to Procurement Punchout . . . . This will have a negative impact on our customers . . . . If we need this, I think customers could live with this but will be unhappy." DX-691 at RQC1000157; Tr. 409:9-15, 409:25-411:8 (Lohkamp); DPFF ¶ 105. In a subsequent email, Mr. Lohkamp explained further: "This will be a step backwards for customers and we've been talking about RQC as a superior product. Cleveland Clinic, for example, specifically asked during the webinar Q&A, about whether they could put two punchout vendors on a single requisition." PX-1096 at RQC914945; Tr. 414:8-415:7 (Lohkamp); DPFF ¶¶ 105.

The impact of these changes is real, as reflected by contemporaneous Lawson documents, prepared long before this proceeding commenced. DPFF ¶¶ 99, 103-05. The changes at issue prompted negative feedback from Lawson's customers. Mr. Lohkamp heard complaints from various customers, including from such key customers as Central DuPage, Trinity Health, and Cleveland Clinic. Tr. 413:7-17 (Lohkamp); DPFF ¶ 108. Customer concern toward the changes is further evidenced by their questions to Lawson during its June 3, 2011 webinar introducing

RQC.  For example, Ms. Swanson of Central DuPage Hospital inquired about the first Punchout change:  "Will the functionality be changed in the future so a requisition can contain both Punchout and item master items?"  Tr. 426:17-25 (Lohkamp); PX-1057 at attachment page 12; DPFF ¶ 108.  From Cleveland Clinic Foundation, Ms. Klag asked about the second Punchout change:  "Can you mix punchout vendor items example Granger and Staples?"  Tr. 427:16-23 (Lohkamp); PX-1057 at attachment page 17; DPFF ¶ 108.  Mr. Stanley from Trinity Health also inquired about this change:  "Can you mix punchout vendors on the same Req?"  PX-1057 at attachment page 27; DPFF ¶ 108.  Similar concerns were echoed by other users.  *See, e.g.*, PX-1057; PX-1269 at Response to Interrogatory No. 18; DPFF ¶ 108.  Minimal, or merely cosmetic, changes would not have drawn such notice.

## CONCLUSION

For the foregoing reasons, Lawson respectfully submits that the Court should hold that the modified features of Punchout are more than colorably different from the features that formed a basis for ePlus's infringement contentions asserted against Configuration Nos. 3 and 5 at the infringement trial.  Accordingly, plaintiff's motion for contempt should be denied and this matter dismissed.

Dated:  April 22, 2013

LAWSON SOFTWARE, INC.


By: _____/s/_____

Dabney J. Carr, IV, VSB #28679
Robert A. Angle, VSB #37691
**TROUTMAN SANDERS LLP**
P. O. Box 1122
Richmond, Virginia  23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com

Josh A. Krevitt (admitted *pro hac vice*)
Daniel J. Thomasch (admitted *pro hac vice*)
Richard W. Mark (admitted *pro hac vice*)
Christopher D. Dusseault (admitted *pro hac vice*)
Jason C. Lo (admitted *pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

*Attorneys for Defendant Lawson Software, Inc.*

## CERTIFICATE OF SERVICE

I certify that on this 22nd day of April, 2013, a true copy of the foregoing will be filed

electronically with the Clerk of Court using the CM/ECF system, which will send a notification

of such filing (NEF) to the following:

Craig T. Merritt
Paul W. Jacobs, II
Henry I. Willett, III
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
cmerritt@cblaw.com
pjacobs@cblaw.com
hwillett@cblaw.com

Jennifer A. Albert
David M. Young (VSB No. 35997)
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001
jalbert@goodwinprocter.com
dyoung@goodwinprocter.com

*Attorneys for Plaintiff*

Michael G. Strapp
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, MA 02109-2881
mstrapp@goodwinprocter.com

 

 

 

 

 

 

/s/
Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
Megan C. Rahman (VSB No. 42678)
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
megan.rahman@troutmansanders.com
**TROUTMAN SANDERS LLP**
1001 Haxall Point
Richmond, VA 23219
Telephone:  (804) 697-1200
Facsimile:  (804) 697-1339
*Counsel for Defendant Lawson Software, Inc.*

26