**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | | |
|---|---|---|
| ePLUS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:09CV620 (REP) |
| | ) | |
| LAWSON SOFTWARE, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT LAWSON SOFTWARE, INC.'S POST-HEARING BRIEF ON
NONINFRINGEMENT
[AMENDED]**

Josh A. Krevitt (admitted *pro hac vice*)
Daniel J. Thomasch (admitted *pro hac vice*)
Richard W. Mark (admitted *pro hac vice*)
Christopher D. Dusseault (admitted *pro hac vice*)
Jason C. Lo (admitted *pro hac vice*)
jkrevitt@gibsondunn.com
dthomasch@gibsondunn.com
rmark@gibsondunn.com
cdusseault@gibsondunn.com
jlo@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

*Attorneys for Defendant Lawson Software, Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

I.    ePLUS HAS FAILED TO SHOW BY CLEAR AND CONVINCING
      EVIDENCE THAT THE NEWLY-ACCUSED RQC CONFIGURATIONS
      ARE CAPABLE OF INFRINGING THE METHOD OF CLAIM 26 ............................ 2

      A.    ePlus Has Advanced Only Two Infringement Theories ......................................... 3

            1.    The Item Master-EDI Path Theory Of Infringement Was Rejected
                  By The Jury ................................................................................................. 4

            2.    The Single Punchout Path Constitutes A New Theory Of
                  Infringement That ePlus Impermissibly Raised For The First Time In
                  The Contempt Proceeding ............................................................................. 7

            3.    Nothing In The Record Demonstrates That The Use Of Punchout To
                  Procure Items From Multi-Vendor Punchout Sites Infringes Claim
                  26 ............................................................................................................... 11

II.   ePLUS HAS FAILED TO SHOW BY CLEAR AND CONVINCING
      EVIDENCE THAT LAWSON INFRINGES CLAIM 26 ............................................. 11

      A.    The Infringement Record Is Devoid Of Any Evidence Showing That
            Lawson Directly Infringes Claim 26 In Its Procurement Activities .................... 12

            1.    There Is No Evidence That Lawson Uses EDI For Any Purpose ............... 12

            2.    ePlus Cannot Prove By Clear And Convincing Evidence That
                  Lawson Performs All Steps Of Claim 26 Using Punchout ........................ 13

      B.    ePlus Cannot Point To Any Evidence Showing That Lawson Indirectly
            Infringes Claim 26 ............................................................................................ 14

            1.    ePlus Cannot Show That Lawson Indirectly Infringes Claim 26
                  Because The Record Contains No Evidence Showing That Any Of
                  Lawson's Customers Practice Claim 26 with RQC .................................... 14

            2.    ePlus Cannot Show That Lawson Has Induced The Infringement Of
                  Claim 26 ................................................................................................... 15

## TABLE OF CONTENTS
(continued)

Page

III. ePLUS HAS FAILED TO PROVE THAT LAWSON INDUCED ITS CUSTOMERS TO USE ENJOINED CONFIGURATIONS WITH RSS TO INFRINGE CLAIM 26 ................................................................................... 16

A. Terminology:  Maintenance, Service, Support ...................................... 17

B. Lawson's Compliance With The Court's Injunction ............................. 17

     1. Maintenance ................................................................................. 18

     2. Service............................................................................................ 19

     3. Support .......................................................................................... 20

     4. Additional Compliance Activities.............................................. 20

C. ePlus Has Failed To Show Any Intentional Or Systematic Support Of Enjoined Configurations With RSS In Disregard Of The May 2011 Injunction ............................................................................................. 21

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Accent Packaging, Inc. v. Leggett & Platt, Inc.*,
707 F.3d 1318 (Fed. Cir. 2013) ............................................................................ 23

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
692 F.3d 1301 (Fed. Cir. 2012) ............................................................................ 12

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
363 F.3d 1263 (Fed. Cir. 2004) ............................................................................ 14

*Global-Tech Appliances, Inc. v. SEB S.A.*,
131 S. Ct. 2060 (2011) .......................................................................................... 15

*Ormco Corp. v. Align Tech., Inc.*,
463 F.3d 1299 (Fed. Cir. 2006) ............................................................................ 12

*TiVo Inc. v. EchoStar Corp.*,
646 F.3d 869 (Fed. Cir. 2011) ....................................................................... passim

*Toshiba Corp. v. Imation Corp.*,
681 F.3d 1358 (Fed. Cir. 2012) ............................................................................ 15

*United States v. Darwin Constr. Co.*,
679 F. Supp. 531 (D. Md. 1988) ........................................................................... 25

*Vita-Mix Corp. v. Basic Holding, Inc.*,
581 F.3d 1317 (Fed. Cir. 2009) ............................................................................ 15

*Warner-Lambert Co. v. Apotex Corp.*,
316 F.3d 1348 (Fed. Cir. 2003) ............................................................................ 16

**Statutes**

35 U.S.C. § 271(a) ........................................................................................................... 12

35 U.S.C. § 271(b) ........................................................................................................... 12

35 U.S.C. § 271(c) ........................................................................................................... 12

## <u>INTRODUCTION</u>

ePlus contends that RQC Configuration No. 3 (consisting of Core S3 Procurement System, RQC, and Punchout) and No. 5 (which adds EDI to Configuration 3) are not more than colorably different from the adjudged-infringing RSS configurations, and that both configurations continue to be capable of infringing claim 26.  If the Court concludes, as it should, that ePlus has failed to carry its burden regarding the significance of Lawson's modifications, and Lawson's modified product is therefore more than colorably different from the adjudged-infringing product, the infringement question will be rendered moot and the contempt proceeding must be dismissed.  *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011).  The opposite outcome on the colorable differences test does not end the case.  *TiVo* makes clear that a modified product found in a contempt proceeding to be not more than colorably different from an adjudged-infringing product does not inevitably infringe.  *Id.* at 883. In such situations, a separate infringement analysis is required.  Here, in the event that the Court reaches the infringement issue, it should find for Lawson.

In these contempt proceedings, ePlus presented only two infringement theories: 1) alleged infringement through procuring items from Item Master alone and receiving purchase order acknowledgements via EDI; and 2) alleged infringement through procuring an item or items from a single Punchout website.  Because neither theory was "contended and proved" at the infringement trial, neither can be asserted against Lawson for the first time in a non-jury contempt proceeding.  Indeed, the first theory, which alleges that RQC Configuration 5 can infringe claim 26 without the use of Punchout, was *rejected* by the jury at the infringement trial. It cannot be resurrected under the guise of contempt.  The second theory, which alleges that RQC Configurations 3 and 5 ("Accused Configurations") can infringe claim 26 via the procurement of

one item from one Punchout website, is totally new to this case.  That theory was never

"unequivocally alleged" (much less proved) at the infringement trial, and it cannot debut in a

contempt proceeding.  *Id.* at 883-84.  Allowing new infringement theories (*i.e.*, focusing

infringement on features / functionality present in the original product but not unequivocally

alleged to be infringing) would contravene the clear dictates of *TiVo*, and would strip Lawson of:

1) its Seventh Amendment right to trial by jury; 2) its right to seek claim constructions never

requested at the infringement trial because they did not become relevant until Lawson redesigned

its products; and 3) prior art invalidity arguments that, again, only became relevant after Lawson

redesigned its product and ePlus refashioned its theory of infringement.

ePlus advances an alternative argument that Lawson's interaction with its Configuration

Nos. 3 and 5 customers after May 23, 2011 violated the Injunction.  A fair reading of the record

shows that Lawson complied with the Court's Injunction.  ePlus's arguments to the contrary are

unsupported by the evidence, and thus insufficient to carry ePlus's burden of proof.

## ARGUMENT

I.    **ePLUS HAS FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE
      THAT THE NEWLY-ACCUSED RQC CONFIGURATIONS ARE CAPABLE OF
      INFRINGING THE METHOD OF CLAIM 26**

At the "infringement" stage of *TiVo*, the presentation of evidence again is restricted to

what was "contended and proved" at trial.  *TiVo*, 646 F.3d at 882 (specifying that contempt

proceedings "must focus" on product aspects that "were a basis for[] the *prior finding of*

*infringement*") (emphasis added).  Unchanged features that were not *proven* to be infringing at

the merits trial cannot form the basis of any infringement allegations.  *Id.* at 883; Lawson's

Proposed Findings of Fact ("DPFF")  ¶ 534.  Here, the capacity of Configuration Nos. 3 and 5 to

requisition items from Item Master alone or items from a single Punchout site is unchanged

functionality from the adjudged-infringing configurations (which also contained far greater

2

functionality).  At trial, ePlus did not allege unequivocally that the limited functionality that remains was sufficient to infringe claim 26 of the '683 patent, choosing instead to focus on the greater functionality present in RSS—functionality since eliminated through redesign.  It is too late for ePlus to change theories now.

### A.    ePlus Has Advanced Only Two Infringement Theories

ePlus bears the burden to prove infringement under *TiVo* by clear and convincing evidence.  The only evidence ePlus proffered to show that the Accused Configurations are capable of infringing claim 26 are the two demonstrations Dr. Weaver performed.  PX-1134, PX-1135; DPFF ¶¶ 262-70.

The first demonstration, reflected in PX-1135, purported to show how RQC Configuration 5 could be used to infringe claim 26 via the procurement of items using Item Master and EDI alone, *without the use of Punchout* ("Item Master-EDI Path").  Tr. 744:22-745:4 (Weaver); DPFF ¶¶ 264-65.  Dr. Weaver expressly conceded that the Item Master-EDI Path only applies to RQC Configuration 5.  DPFF ¶¶ 265-66.

Dr. Weaver's second demonstration, reflected in PX-1134, purported to demonstrate how the Accused Configurations could be used to perform all the steps of claim 26 by procuring items from a *single* Punchout website ("Single Punchout Path").  DPFF ¶¶ 267-69.  Dr. Weaver also alleged, but without demonstration or foundation concerning the actual operation of such sites, that Lawson customers can use multi-vendor Punchout sites to infringe claim 26.  DPFF ¶ 303.  None of this evidence shows that the Accused Configurations are capable of infringing claim 26, much less in a way contended and proved at the infringement trial.

1.   **The Item Master-EDI Path Theory Of Infringement Was Rejected By The Jury**

Dr. Weaver alleged that his first demonstration, PX-1135, using Item Master in combination with EDI, satisfied the elements of claim 26, without any involvement of Punchout. DPFF ¶ 265.  That argument is impermissible.  At the infringement trial, ePlus asserted claims 3, 26, 28, and 29 of the '683 Patent against Lawson's products.  DPFF ¶ 2.  The only configurations the jury found to infringe any claims of the '683 Patent were configurations that included Punchout, *i.e.* Configurations 3 and 5.  *Id.*  The jury found that Configuration 2, which allowed users to procure items from Item Master but not Punchout, did not infringe *any* of the asserted '683 Patent claims.  *Id.*  The jury also found that Configuration 4, the only configuration with Item Master and EDI, but not Punchout, did *not* infringe claim 26, the only claim at issue in this contempt proceeding.  *Id.*  In short, at the infringement trial, ePlus failed to prove that using Item Master and EDI to procure items, without using Punchout, infringes any of the '683 Patent claims.  ePlus may not now pursue a theory that the jury rejected or did not even consider in the infringement case.  *TiVo*, 646 F.3d at 883-84.

That the jury rejected ePlus's argument that procuring items from Item Master alone infringes is not surprising given that Item Master does not permit users to select specific product catalogs to search.[1]  DPFF ¶ 281.  That "selecting" step, a required element of all of the

---

[1]  Lawson maintains that Item Master does not contain any product catalogs, and cannot be used to satisfy the "maintaining at least two product catalogs" limitation.  However, this Court struck all of Dr. Goldberg's opinions in this regard on the ground that "Dr. Goldberg improperly re-argues the Court's claim construction in these portions of his testimony."  Dkt. 1034 (striking paragraphs 355-359 of Dr. Goldberg's report).  Because this testimony was improperly excluded, Lawson was foreclosed from presenting such additional evidence of non-infringement during the contempt proceeding.

previously asserted '683 Patent method claims, including claim 26, cannot be fulfilled with Item

Master alone, as Dr. Weaver's Item Master-EDI Path demonstration conclusively proved.

The first three limitations of claim 26 require:

- maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources;

- selecting the product catalogs to search;

- searching for matching items among the selected product catalogs;

Claim 26, '683 Patent.  In his Item Master-EDI Path demonstration, Dr. Weaver asserted that the

Item Master database he used included at least three catalogs: the Office Max, Diablo, and

Baxter Healthcare catalogs.  DPFF ¶ 277.  Dr. Weaver testified that each catalog contains only

those items sold by one vendor; for example, the Office Max catalog contains only those items

sold by Office Max, and not another vendor.  DPFF ¶ 278.

Dr. Weaver's demonstration *failed* to perform the distinct catalog selection step, as

required by claim 26, and he conceded that failure.  As the video, screenshots, and meticulously

scripted direct testimony describing this demonstration made clear, Dr. Weaver searched for

*items*—without regard to vendor—in Item Master by using UNSPSC Categories.  DPFF ¶ 276,

279-80.  Dr. Weaver pulled up the IBM computer sourced from Office Max by drilling down to

the UNSPSC class code for "Computers," which returned a list of five items, including but not

limited to the IBM Computer from Office Max, all coded to the UNSPSC code for Computers.

*See* PX-1135A.008-009.  The search pulled all matching items in Item Master; it was not limited

to any particular catalog Dr. Weaver had selected.  Indeed, it was only *after* selecting the IBM

ThinkPad from the list of five items that Dr. Weaver could even see the source—in this case

Office Max.  *See* PX-1135A.009-010; DPFF ¶ 282.  Other matching items came from other

vendors whose items had been placed in Item Master—searching catalogs had no part in the demonstration.  DPFF ¶¶ 280-81.

On cross examination, Dr. Weaver conceded that it is *impossible* to perform the catalog selection step in Item Master with the Lawson software.  Searching by UNSPSC is a search for items, not catalogs.  DPFF ¶¶ 280-81.  ePlus did not prove that one can *select* a specific catalog or catalogs to search in Item Master for the most obvious reason—it cannot be done.  Tr. 755:18-20 (Weaver); 756:3-8 (Weaver); DPFF ¶ 281.  Because a "product catalog" was never selected to search, as required by claim 26, Dr. Weaver's first demonstration did not show that procuring items from Item Master can infringe claim 26.[2]

Dr. Weaver tried to force his demonstration into the language of claim 26 by testifying that *one act* can simultaneously satisfy both the selecting catalogs and the searching for items among the selected product catalogs steps because, he asserted, these claim elements do not have to be performed in order.  *See, e.g.*, Tr. 756:9-12; DPFF ¶¶ 283-84.  Dr. Weaver based this assertion not on a construction provided by the Court, but on his "[p]lain reading of the claim."  Tr. 762:6-10; DPFF ¶¶ 285-86.

Dr. Weaver's reading of the claim is improper for at least two reasons.  First, Dr. Weaver's testimony unequivocally demonstrates that his infringement analysis incorporates and relies on a new claim construction of his own purported invention.  Under *TiVo*, however, the merits of such a new theory cannot be first presented during a contempt proceeding.  *TiVo*,

---

[2]  Dr. Weaver stated that he "could have" selected specific catalogs to search in Item Master (as opposed to selecting UNSPSC Categories) using the keyword search feature.  *See* Tr. 754:21-755:5.  He did not present *any* proof regarding the keyword search functionality, however, because the use of a keyword (such as "Dell") will pull up all items labeled with the keyword regardless of source (such as Dell products sold by Staples, Office Max, or any other vendor attached to the keyword in Item Master).  DPFF ¶¶ 287-90.

646 F.3d at 883-84.  Not only would considering Dr. Weaver's new construction here violate *TiVo*, it would also violate this Court's direct admonition to the parties prohibiting the experts from proffering new claim constructions.  Dkt. 943 (2/29/12 Hearing Tr. at 20:13-16).  If ePlus wishes to assert Dr. Weaver's new, personal construction, it is free to do so, but only at a new trial where Lawson also would have an opportunity to proffer another construction.

Second, Dr. Weaver's explanation of simultaneity is a poor cover for the fact that there was no selection of a catalog as he had defined it.  The Court can look at the information retrieved by the UNSPSC search from every possible angle.  It will not see any catalog present because there is none.  Dr. Weaver searched for items and retrieved matching items; he did not select the catalogs to search, nor search for matching items among the selected product catalogs.

Limitations 2 and 3 of claim 26 require "selecting the product catalogs to search" and "*searching* for matching items *among the selected product catalogs*."  To search for items "among the selected product catalogs" (limitation 3) requires first "selecting the product catalogs to search" (limitation 2).  In other words, limitation 3 is a method step that is performed based on the completed results of the method step of limitation 2.  Dr. Weaver's simultaneous approach is thus incontrovertibly wrong.  *See* DPFF ¶¶ 542-43.

Both the jury verdict from the infringement trial and the evidence introduced in these contempt proceedings demonstrate that procuring items from Item Master alone cannot infringe claim 26.  ePlus has thus failed to carry its burden to prove by clear and convincing evidence that the Accused Configurations are capable of infringing claim 26 when used without Punchout.

### 2.     The Single Punchout Path Constitutes A New Theory Of Infringement That ePlus Impermissibly Raised For The First Time In The Contempt Proceeding

ePlus's Single Punchout Path infringement theory is also unavailable as a predicate for contempt, as it is a new allegation that was not previously contended or proved at the

infringement trial.  At the infringement trial, Dr. Weaver never demonstrated purported

infringement by procuring items from one Punchout website (*e.g.*, Staples) (s*ee* PX-1134), and

ePlus never unequivocally advocated such an infringement theory—choosing instead to claim as

a key advantage of the patented invention the capability of combining items from different

sources (from both Punchout and Item Master, and from multiple Punchout sites) on a single

requisition.  DPFF ¶¶ 51-52; 291-95.  At the contempt proceeding, however, Dr. Weaver testified

that placing one item from one Punchout site onto one requisition satisfies the fourth limitation

of claim 26, which requires "building a requisition using data relating to selected matching items

and associated source(s)."  *See* PX-1134; Tr. 716:21-717:24; DPFF ¶ 293.  *TiVo*  precludes ePlus

from raising this new infringement theory for the first time in a contempt setting.  In *TiVo*, the

district court found EchoStar in contempt because its newly-redesigned product still infringed

TiVo's patent by the use of the PID filter.  *TiVo*, 646 F.3d at 883.  The Federal Circuit reversed

because "TiVo never *unequivocally alleged* prior to the contempt stage that the PID filter met"

the claim limitation at issue.  *Id.* (emphasis added).  "That was a new allegation . . . that should

not be decided in a contempt proceeding."  *Id.* at 883-84.

Like TiVo's PID filter contention, ePlus's Single Punchout Path was "never

unequivocally alleged prior to the contempt stage" as a method of infringing claim 26.  DPFF ¶

291.  As detailed in Lawson's Colorability Brief, ePlus focused on the ability to combine on a

single requisition items from Item Master and Punchout, or from multiple Punchout websites, to

contend that Configurations 3 and 5 satisfied the fourth limitation of claim 26.  *See* Lawson

Color. Br. at IV.A.  At no point during the infringement trial did ePlus argue clearly, much less

unequivocally, that building requisitions from items from a *single* Punchout site satisfied the

8

fourth limitation of claim 26, nor did either party request this Court to construe this limitation in that manner.  DPFF ¶¶ 291-95.  ePlus cannot rely on a newly-minted infringement theory here.

Allowing ePlus to prove contempt using its new Single Punchout Path theory would be fundamentally unfair to Lawson.  There was no dispute at the infringement trial that users of configurations containing RSS and Punchout could combine items from any source onto a single requisition.  DPFF ¶ 292.  The discovery and demonstrations at trial were all oriented to ePlus's touted advance that allowed users to combine items from multiple sources onto a single requisition.  Given the framing of the issues at the infringement trial, neither party had any reason to ask the Court to construe whether the fourth element of claim 26 requires that requisitions contain items from more than one catalog, and neither did.  Similarly, there was no reason for Lawson to introduce prior art that disclosed systems or methods capable of generating a requisition with items from a single catalog.  Lawson's modifications to RQC, however, which prohibit combining items from Item Master and Punchout, or items from different Punchout sites, on a single requisition, make the fourth limitation of claim 26 highly pertinent.

One of the purported novelties of the '683 Patent is "being able to purchase all of the selected items from all of the desired sources without having to wait in the check-out line at each of the stores."  Applicant's 4/6/98 Response to Office Action dated 12/8/97, at 15.  ePlus's new construction of the building a requisition step, however, eliminates the very novelty the patent sought to claim.  Any construction that lowers the bar for infringement similarly lowers the bar for invalidity—had ePlus previously pursued its current theory, it would have opened itself up to potentially invalidating prior art.  A contempt proceeding, where ePlus is immune from invalidity attacks, is not a proper forum for a new infringement theory.  If ePlus desires a construction stating that the fourth element of claim 26 is satisfied by the inclusion of products

from a single catalog, ePlus should seek that in a new trial.  Lawson would then be entitled to 1) rebut that construction; 2) if that construction is adopted, assert prior art that is implicated by such a construction; and 3) present its defense to a jury.

Indeed, a trial of ePlus's new theory would show that procuring items from Punchout sites *does not infringe claim 26* for an additional reason shown during the contempt proceedings. Claim 26 requires "maintaining at least two product catalogs on a database containing data relating to items associated with respective sources."  Claim 26, '683 Patent.  The catalogs that are searched and the items that are eventually selected from such search must come from the "at least two product catalogs" that are "maintained" on "a database."  Claim 26, '683 Patent.  Thus, if the product procured comes from a Punchout site, the catalog on the Punchout site must also be one of the "at least two product catalogs" "maintained" on "a database."

Dr. Weaver unambiguously testified in the contempt hearing that catalogs available on Punchout sites are *not* maintained by the user (or Lawson); rather, they are maintained *by the Punchout vendor itself*.  DPFF ¶ 297.  Dr. Weaver further confirmed that any "partnership" that allegedly exists between Lawson and Punchout sites like Staples or Dell does not relate to maintaining catalogs on a database, but merely the communication channel by which Lawson's systems and the Punchout sites communicate.  DPFF ¶¶ 298-99.  Dr. Weaver's contempt testimony undercuts ePlus's contention that procuring items from Punchout infringes claim 26.

The Single Punchout Path is a new theory of infringement that could only be considered in a new trial, and not in a contempt proceeding.  ePlus seeks to avoid this new trial, knowing that its Single Punchout Path theory is fatally flawed.  That underscores the inappropriateness of using new infringement theories in a contempt proceeding.

### 3. Nothing In The Record Demonstrates That The Use Of Punchout To Procure Items From Multi-Vendor Punchout Sites Infringes Claim 26

ePlus's assertions that the use of multi-vendor Punchout sites infringes claim 26 (see ePlus Inf. Br. at 13-15) is not supported by the evidence introduced at the contempt hearing.  At best, the evidence in the record only demonstrates that 1) one or a small number of multi-vendor Punchout sites exist; and 2) if items purchased from a multi-vendor Punchout site come from different vendors, the RQC requisition will contain items from multiple vendors, and multiple purchase orders will be generated.  That is insufficient to prove infringement because there is *no* evidence in *either* the infringement or contempt record, to suggest any of the following, all of which are required to infringe claim 26: 1) whether multiple *catalogs*, as construed by the court, exist on multi-*vendor* Punchout sites (as required by limitation 1 of claim 26); 2) if catalogs are available on multi-vendor sites, which entity maintains such catalogs (limitation 1 of claim 26); 3) if so, whether users can select specific catalogs (limitation 2 of claim 26); 4) if so, whether such catalogs are separately searchable (limitation 3 of claim 26); and 5) whether vendors on multi-vendor Punchout sites support the capacity to determine inventory (limitation 6 of claim 26).  DPFF ¶¶ 303-10.  Because the record contains no evidence showing that this theory was contended and proved at trial, much less that the above-referenced limitations can be met using a multi-vendor Punchout site, this infringement theory fails.

## II. ePLUS HAS FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT LAWSON INFRINGES CLAIM 26

Even assuming *arguendo*, that this Court finds that ePlus has proven by clear and convincing evidence that RQC Configurations 3 and 5 are capable of infringing claim 26, ePlus is still not entitled to a finding of contempt against Lawson.  This is because claim 26 is a method claim, and method claims are not infringed unless all the steps of the method are actually performed.  *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1307 (Fed. Cir.

2012).  Method claims are not infringed simply by the sale or dissemination of a system capable of infringing use.  *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006).  Thus, to show that Lawson infringes claim 26, ePlus must prove by clear and convincing evidence either that 1) Lawson directly infringes claim 26 by "perform[ing] all the steps of the claimed method," *Akamai*, 692 F.3d at 1307; or 2) Lawson indirectly infringes claim 26.  35 U.S.C. § 271(a)- (c); *see TiVo*, 646 F.3d at 883.  ePlus demonstrated neither.

### A.  The Infringement Record Is Devoid Of Any Evidence Showing That Lawson Directly Infringes Claim 26 In Its Procurement Activities

The last limitation of claim 26—"determining whether a selected matching item is available in inventory"—can only be accomplished in the Accused Configurations in two ways: 1) querying a Punchout vendor's inventory during a Punchout session; or 2) receiving a purchase order acknowledgement report containing inventory information via EDI.  DPFF ¶¶ 312-14.  Thus, the determining inventory step cannot be performed without the use of either Punchout or EDI.  DPFF ¶¶ 311-17.  Nothing in the infringement record suggests that Lawson uses either.  Thus, Lawson cannot be held liable for directly infringing claim 26.

### 1.  There Is No Evidence That Lawson Uses EDI For Any Purpose

ePlus asserts that Lawson uses EDI, *see* ePlus Inf. Br. at 16, but none of the evidence it cites even suggests that this is the case.  In fact, the evidence ePlus cites to support its contention, ePlus's Proposed Finding of Fact ¶ 100, is, explicitly, a proposed finding about Configuration 3, which does *not* include EDI.  PFF ¶ 100 ("Lawson uses . . . a system having all modules of the S3 procurement system, RQC and Punchout.").  The record contains absolutely no evidence showing that Lawson uses EDI.

### 2.      ePlus Cannot Prove By Clear And Convincing Evidence That Lawson Performs All Steps Of Claim 26 Using Punchout

Both Mr. Christopherson and Mr. Lohkamp testified during these contempt proceedings that Lawson does not use Punchout in its own procurement activities.  DPFF ¶ 320.  Thus, the only way Lawson can directly infringe claim 26 is if it performs all the steps of claim 26 using Punchout in its sales, marketing, or support activities.

To perform the inventory checking step on a Punchout vendor's website, the Punchout vendor must support the capacity of reporting inventory.  DPFF ¶ 314.  Even Dr. Weaver acknowledged that purchasing items from Punchout vendors who do not support this capacity cannot infringe claim 26.  DPFF ¶ 314.

While the record contains evidence showing that Lawson demonstrates Punchout, nothing cited by ePlus or in the record shows by clear and convincing evidence that Lawson has ever performed the determining inventory step of claim 26.  *See* ePlus Inf. Br. at 15-16.  In fact, the *only* evidence that suggests Lawson has performed this step came when Mr. Christopherson confirmed that Lawson demonstrates the "capability" to "check the pricing and availability of items that are found in a [Punchout] search."  Tr. at 378:25-379:3.  But no testimony was solicited as to what Lawson *actually does* to demonstrate this capability with RQC.  Thus, the record does not show that Lawson has actually *performed* the affirmative step of querying a Punchout vendor's inventory, or that the Punchout vendor had the capacity to report on inventory.  Standing alone, this testimony fails to show clearly and convincingly that Lawson has practiced all steps of claim 26.  Accordingly, ePlus has failed to carry its burden as concerns direct infringement.

13

**B.** **ePlus Cannot Point To Any Evidence Showing That Lawson Indirectly Infringes Claim 26**

**1.** **ePlus Cannot Show That Lawson Indirectly Infringes Claim 26 Because The Record Contains No Evidence Showing That Any Of Lawson's Customers Practice Claim 26 with RQC**

To hold Lawson liable for indirect infringement, ePlus must first prove by clear and convincing evidence that one of Lawson's customers has directly infringed claim 26. *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1277 (Fed. Cir. 2004). ePlus cannot.

As an initial matter, nothing in the record shows that Lawson's RQC customers actually use EDI. Indeed, it appears that ePlus concedes as much, as ePlus's Infringement Brief and Proposed Findings of Fact nowhere assert that any Lawson customer has actually used EDI to satisfy the determining inventory step. *See* ePlus Inf. Br. at 16-18 (Part I.F); PFF ¶¶ 108-115; DPFF ¶¶ 325-26.

Similarly, there is no evidence in the record showing that any Lawson customer has ever performed the determining inventory step using Punchout. All the evidence ePlus relies on either shows that some Lawson customers use Punchout or that Lawson's customers have systems capable of infringing claim 26. *See* ePlus Inf. Br. at 16-17. But using Punchout, without determining inventory, does not infringe claim 26, and the record has no evidence of such use. DPFF ¶¶ 327-29.

Simply showing that customers have devices *capable* of infringing claim 26 cannot, as a matter of law, establish that they have directly infringed claim 26 if the devices are capable of substantial non-infringing uses. *Dynacore*, 363 F.3d 1274-76. Here, it is undisputed that the Accused Configurations include many non-infringing uses. *See, e.g.*, Tr. 766:5-17 (use of Configuration 3 without Punchout can never infringe claim 26 because inventory checking step cannot be performed); 784:8-785:3 & 789:2-790:3 (ordering stock items from Item Master,

which Dr. Weaver admits that Lawson customers do, is non-infringing because no requisition or purchase order is generated); 785:4-16 (requisitioning special items by manually filling out requisition is non-infringing because no search is conducted); 785:17-787:5 (procuring items using prefilled templates is non-infringing because no search is conducted); 788:2-13 (procuring items from Punchout vendors incapable of providing inventory information is non-infringing because the inventory checking step cannot be performed); DPFF ¶¶ 337-44.  ePlus's contention that Lawson's customers' RQC systems are *capable* of infringing claim 26 fails to prove actual performance of all steps of the method, as is necessary for infringement.

### 2. ePlus Cannot Show That Lawson Has Induced The Infringement Of Claim 26

Even if this Court were to find that ePlus demonstrated by clear and convincing evidence that Lawson's customers directly infringe claim 26, ePlus cannot show that Lawson induced any of its customers to infringe.[3]  To prove induced infringement, the plaintiff has the burden of showing that "the alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a specific intent to encourage another's infringement of the patent."  *Vita-Mix*, 581 F.3d at 1328 (emphasis added); *see also Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011).  Further, "where a product has substantial noninfringing uses, intent to

---

[3]   Although ePlus asserts in PFF ¶ 122 that "Lawson continues to induce *or contribute* to its customers' direct infringement," ePlus does not contend in its Infringement Brief that Lawson indirectly infringes claim 26 via contributory infringement.  ePlus has therefore waived this argument.  Nevertheless, if the Court considers this theory, it should be rejected.  To establish contributory infringement, the patent owner—ePlus—bears the burden of showing that there are no substantial non-infringing uses for the accused products.  *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1362 (Fed. Cir. 2012).  "'[N]on-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.'"  *Id.* (quoting *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1327 (Fed. Cir. 2009)).  ePlus did not attempt to show that the Accused Configurations have no substantial non-infringing uses.  To the contrary, Dr. Weaver admitted that the accused configurations have many non-infringing uses.  DPFF ¶¶ 337-44.

induce infringement cannot be inferred even when the defendant has actual knowledge that some users of its product may be infringing the patent." *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365 (Fed. Cir. 2003).

ePlus has failed to put on any evidence of Lawson's "knowledge," or even suspicion, that RQC continued to infringe. No such evidence exists. Lawson's purpose for its redesign, "first and foremost, was to find design-arounds for each of the claims that we were found guilty of . . . ." DPFF ¶ 334. From the time of the jury verdict onward, Lawson relied on legal counsel for all "decision-making as to what [Lawson] was permitted to do." DPFF ¶ 335. Lawson's legal team had "final say" and "veto power" over the finished redesign product. Tr. 330:13-331:16, 332:3-11; DPFF ¶ 336. There is no evidence whatsoever that, despite Lawson's legal counsel having signed off on the product changes at issue, Lawson management knew that RQC infringed any patent claim. In the absence of such evidence, there is no basis for a finding of induced infringement or contempt.

## III.   ePLUS HAS FAILED TO PROVE THAT LAWSON INDUCED ITS CUSTOMERS TO USE ENJOINED CONFIGURATIONS WITH RSS TO INFRINGE CLAIM 26

ePlus contends that Lawson violated the Injunction by not stopping "maintenance, support and service for the infringing products." Tr. 806:12-16 (Counsel for ePlus). But ePlus failed to demonstrate in a clear and convincing manner that such misconduct occurred. Indeed, the evidence shows beyond legitimate dispute that Lawson responded to the Injunction with policies and actions that stopped maintenance, support, and service for the enjoined products.[4]

---

[4]   ePlus argues that "[i]n the course of this proceeding, Lawson has never claimed that any of those actions [installing, demonstrating, performing live testing, maintaining and managing the infringing systems for its customers] ceased." ePlus Inf. Br. at 3. But that argument is preposterous. Keith Lohkamp, Scott Hanson, and Elizabeth Homewood all testified to the cessation of such activities.

16

The "handful of incidents" ePlus selectively highlights only prove the policy to deny support for the enjoined configurations.  *See* Tr. 849:1-12 (Homewood); DPFF ¶¶ 239, 246.  When such incidents—an isolated few from an operation that handles thousands of customer support interactions every month—were brought to the attention of supervisors, Lawson acted to terminate support to that customer and avoid repeating the mistake.  DPFF ¶¶ 239, 246.  The record shows compliance and respect for the Court's order, not contempt.[5]

### A.    Terminology:  Maintenance, Service, Support

Maintenance, service, and support are three distinct activities relating to software licensed to a customer.  "Maintenance" relates to fixing problems with software code, or improvements subsequent to an original release, and providing the code to licensees for installation.  Tr. 803:15-804:2 (Homewood); DPFF ¶ 152.  Lawson's "service" function installs licensed software for customers.  Tr. 803:5-11 (Homewood); DPFF ¶ 153.  "Support" describes "the department that's responsible for providing support to [Lawson's] customers if they have questions on the software or if they're experiencing a problem running the software, or anything like that . . . ."  DPFF ¶ 154.

### B.    Lawson's Compliance With The Court's Injunction

Immediately after the Court issued the Injunction on May 23, 2011, Lawson stopped selling RSS.  DPFF ¶ 136.  ePlus offered no evidence of any RSS sale after the date of the Injunction and has failed to prove any such conduct as a basis for contempt.  Lawson stopped

---

[5]  It is undisputed that Lawson sent a copy of the Court's Injunction to every one of its 864 customers, active on maintenance or not, that had, at some point, licensed a configuration that the jury found to infringe any asserted patent claim.  DPFF ¶ 138.

maintenance, service, and support of enjoined products after the Injunction as well.[6]  DPFF ¶¶ 148, 155-168, 178-181, 208-214, 216-217.  ePlus made no serious effort to prove that either maintenance or service was provided in violation of the Injunction, and the record shows why: contemporaneous documents and testimony at the hearing establish that such activity ceased.  As for support, ePlus offers meager proof of isolated instances of customer support interactions involving RSS after the Injunction.  Such errors, which management addressed by terminating support, cannot carry ePlus's clear and convincing burden.  Finally, the record shows (contrary to ePlus's distorted view) that Lawson actively pressed its customers to download *and install* the new RQC product.  *See, e.g.*, PX-1002 (over 25 responses to questions where Lawson "encouraged" or "recommend[ed]" to switch from RSS to RQC); DPFF ¶¶ 185-86.  It is reasonable to expect that licensees would need little encouragement to stop using a product for which there would no longer be any support or maintenance and install the replacement.  ePlus's inference that customers on maintenance would continue with an outdated, superseded, and unsupported product contradicts the record, and common sense.  In any event, ePlus offers no evidence of Configuration 3 or 5 customers receiving support without having installed RQC.

### 1.    Maintenance

Lawson decommissioned RSS after the injunction.  DPFF ¶ 149.  Decommissioning a product ends development, sales, and related activity for the product.  DPFF ¶ 150.  Maintenance is not available on a decommissioned product, DPFF ¶ 166, and none was shown by ePlus.[7]

---

[6]  The May 2011 Injunction allowed Lawson to provide maintenance, service, and support through November 23, 2011 to 277 customers in the healthcare industry.  *See* Tr. 806:17-807:21; DPFF ¶¶ 7, 131.  ePlus cannot contend that such permitted activity could be a basis for contempt.

[7]  ePlus attempted to suggest that an error in the decommission notice allowed for maintenance and support up to November 23, 2011 for non-U.S. non-healthcare customers.  Tr. 833:5-23

*(Cont'd on next page)*

## 2.    Service

The record on provision of service is clear and unambiguous.  Scott Hanson, who

oversaw Lawson's service function at the time of the May 2011 Injunction, issued a directive on

May 27, 2011 to all of the installers to "[c]ease all work that you might be asked to do regarding

RSS," and instructed that if an installer was "asked to <u>install</u> RSS as part of your current

engagement, you should install Requisition Center (RQC) instead.  And notify the P[roject]

M[anager], client, and myself of those actions."  DX-587 (emphasis in original); DPFF ¶¶ 179-

80.  The policy was effective immediately:  for example, when Mr. Hanson learned of an

installer asking what to do in connection with a customer contract providing for installation of

RSS, Mr. Hanson directed that "we will install RQC instead of RSS."  DPFF ¶¶ 179-80.  There is

no evidence of delay, subterfuge, or secret installation of RSS after the Injunction.  Mr. Hanson,

who headed a SWAT team through 2011 to assist in transitioning RSS customers to RQC,

testified that the team completed or assisted with "roughly 60 installs" through the year, and that

the SWAT team's objective was to get the installations done in the customer's production

environment.  Tr. 611:20-612:8; DPFF ¶¶ 193-94.[8]  ePlus offered no evidence that Lawson

provided any service to a customer, *viz.*, the installation of an enjoined configuration using RSS,

at any time after the May 2011 Injunction.

---

*(Cont'd from previous page)*

(Homewood); PPFF ¶ 152.  ePlus offered no evidence of U.S.-based maintenance or support
for non-U.S. customers using RSS after the Injunction.  In fact, the evidence is to the
contrary.  DPFF ¶¶ 227-31.

[8]   As an incentive to migrate to RQC, 8 hours of free support on RQC was offered to customers
that took advantage of the free product.  PX-1269 at Interrogatory No. 10; PX-1002; DPFF ¶
191.  It is not necessary for Lawson to perform installation, however, and customers with
RSS could install RQC themselves.  DPFF ¶ 195.  As of December 2011, the RQC SWAT
team had communicated with about 240 customers about RQC issues.  DPFF ¶ 192.

### 3.   Support

Elizabeth Homewood, Senior Director for Support Operations, is responsible for the support function that addresses customer questions and problems in running software.  DPFF ¶¶ 154, 205.  After the Injunction issued, Lawson's policy mandate for the support organization was to direct all RSS customers to download and install the new RQC product.  DPFF ¶ 210.  In May 2011, Ms. Homewood communicated Lawson's policy "to stop providing support" to each of the approximately 320 people who worked in the customer support function.  DPFF ¶¶ 211-12. Under the policy, if a support technician learned in the course of an interaction that a customer was running RSS, support would be denied.  DPFF ¶ 214.  To provide a consistent message to customers seeking support, Lawson issued "canned messages" to customers who sought support for RSS telling them that

> Lawson is no longer supporting the Requisition Self Service (RSS) product.  For additional information regarding this court ruling, please visit MyLawson.com. Requisition Center (RQC), the replacement product for RSS, is available to you at this time free of charge from Lawson . . . .  At this point I will be closing your RSS case.  I look forward to supporting you on Requisition Center.

PX 1058 at RQC0115251; DPFF ¶ 216.  As of June 6, 2011, Lawson stopped support on all product lines that run on the LSF platform (*e.g.*, "HR, payroll, financials, anything that ran on the LSF platform") until the customer in question had downloaded RQC.  DX-563; DPFF ¶ 223. The record shows that was done.

### 4.   Additional Compliance Activities

After the Injunction issued, Lawson created a task force to formulate and implement compliance actions.  DPFF ¶ 145.  Ms. Homewood was part of the team, which met at least daily to start.  DPFF ¶ 145.  The team comprised 31 individuals from different functional groups affected by the Injunction.  *See* PX-1101 at RQC2076740; DPFF ¶ 145.  An "RSS Injunction Plan" was created, outlining the tasks and due date for compliance from different groups.  DPFF

¶ 145.  As of June 1, 2011, many of the tasks had been completed and "[a]ctivities by many groups [were] progressing extremely fast."  DPFF ¶ 146.

Lawson maintains an online customer self-service database of information, the "Knowledge Base," regarding Lawson's entire product line.  DPFF ¶ 218.  After the Injunction, Lawson conducted "a comprehensive search on the terms related to the [enjoined] products and removed all of the articles, the documentation.  Any patches or information related to the products was taken out of the knowledge base for customer view."  DPFF ¶¶ 219-20.   With that removal, articles on how to fix or adjust RSS could not be obtained from Lawson's web-based library.  DPFF ¶ 221.[9]

For some of its RSS customers, Lawson actually hosted the software on Lawson servers. DPFF ¶ 169.  Lawson contacted those customers after the Injunction to "immediately migrate them or change them over to RQC."  DPFF ¶ 170.  Likewise, Lawson also performs system administration services for some of its customers who host Lawson software on their own computer servers.  DPFF ¶ 171.  For them, Lawson changed the software from RSS to installing and implementing RQC.  DPFF ¶ 172.  ePlus ignores this evidence.

### C.     ePlus Has Failed To Show Any Intentional Or Systematic Support Of Enjoined Configurations With RSS In Disregard Of The May 2011 Injunction

ePlus suggests that Lawson disregarded the Court's Injunction by fostering and suggesting the continued use of RSS by its customers.  It points to the possibility of running RSS and RQC "in parallel" (without clearly explaining what that means, or showing that any customer actually did so in a way that would violate the injunction currently at issue in this

---

[9]  Lawson did direct customers upgrading to RQC to Knowledge Base material that provided instruction on how to *uninstall* RSS.  *See* PX-1002 at RQC0000643; DPFF ¶ 222.

case); that Lawson's policy was to provide support to customers who had downloaded RQC without determining first whether the customer had installed the software; and that records show support actually being provided post-Injunction to customers who appear to be running RSS.

There is no evidence that any Lawson customer downloaded, installed, and implemented RQC but continued to run RSS as its production software—with or without support from Lawson.  What is in the record shows Lawson pushing customers to implement RQC, consistent with Lawson's policy of Injunction compliance.  Indeed, ePlus has not cited even one case of Lawson providing what could be considered support on running RQC and RSS in parallel to a customer with Configurations 3 or 5.  To the contrary:  Lawson repeatedly told its customers that while RSS and RQC could be run in parallel, "Lawson will only support RQC," (PX-1002 at RQC0000646; DPFF ¶ 232), and that they will "ultimately need to uninstall RSS."  PX-1002 at RQC0000643; DPFF ¶ 233.  ePlus's lead example of where it appears a customer received instructions on running in parallel involved a customer named "Western Lake Superior Sanitary."  *See* ePlus Inf. Br. at 22; PX-1058 (RQC0113787-94).  The citation undercuts ePlus's position.  First, Western Lake Superior Sanitary is not a Configuration 3 or 5 customer, (PX-1078, PX-1242, and PX-1245 (showing no maintenance revenue for the Punchout SKU for this customer); DPFF ¶ 241[10]), and so the interaction actually shows nothing whatsoever that could be considered pertinent to the issues at the contempt hearing.  *See* Dkt. 1002, ¶ (B).  Second, consistent with Lawson's compliance policy, the customer recognized that its users would "continue unsupported with RSS until [they] have tested RQC and trained them."  PX-1058 at RQC0113793; DPFF ¶¶ 242-43.  Indeed, when the customer attempted to open a case on June

---

[10]  ePlus's damages expert offered no opinion as to the identity or number of customers who allegedly use RSS after the Injunction.  Tr. 932:15-934:10 (Ugone); DPFF ¶ 234.

20, 2011, it received a "canned message" denying support.[11]  PX-1058 at RQC0113794; DPFF ¶ 244.  Finally, although ePlus suggests that running in a parallel was rampant, Ms. Homewood testified she only saw "a couple isolated incidents on that."  DPFF ¶ 239.

In any case, the RQC installation process eliminates the "bookmarks" needed to run RSS, thereby making RSS "inaccessible" to end users.  DPFF ¶ 236.  Only a system administrator can conduct an unauthorized reversal of that process.  DPFF ¶¶ 238.  A regular production installation in no way contemplates "running in parallel," and if a customer were to try that it would require "additional actions," "additional configuration," or "additional setups" that are not inherent in the installation process.  DPFF ¶ 237.  As a matter of law, the possibility that an RQC installation could be manipulated after the fact to allow RSS to run in parallel does not give rise to infringement.  *See Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326-27 (Fed. Cir. 2013) ("A device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim.").

Regarding Lawson's providing support to its customers on the basis of their download of RQC, ePlus offers only speculation and conjecture concerning the possibility that support was regularly provided to purported RSS users in disregard of the Injunction.[12]  What the evidence actually shows is that Lawson's support function received between 7- and 8,000 support queries

---

[11]  Similar denials of support appear in over half of the 20 or so support interactions that ePlus itself selected as the few prize extracts it offered to the Court as PX-1058 from the thousands that were produced in discovery.  *See* PX-1058 at RQC0114814-16, RQC0115251-52, RQC0115259, RQC0113787-88, RQC0113794, RQC0113844-45; DPFF ¶ 245.  These, presumably, are the best examples ePlus could muster.

[12]  Of course, nothing in the May 2011 Injunction required Lawson to enter the property of non-party customers and remove RSS or verify that they had stopped doing so.  What the Injunction required, and what Lawson did do, was stop all of *its* activities of maintenance, service, and support and, where it actually controlled servers running the program (as in hosting and system administration services for customers) it immediately installed and implemented RQC, which would render RSS inaccessible.

per month (DPFF ¶ 224) and, with that volume, there were "a handful of incidents . . . , isolated incidents where [Lawson] had an issue.  It was a mistake on the part of the support engineer, and when [Lawson] discovered it, [they] put in measures to make sure [they] stopped the support and that it didn't happen again."  DPFF ¶ 246.

The *only* example ePlus shows the Court of Lawson's purported non-compliance by providing customer support with respect to requisitions being created in RSS falls flat.  *See* ePlus Inf. Br. at 23; PX-1058 at RQC0114812-19.  First, the document reveals that the requisition was "done in RQ10," not in RSS (PX-1058 at RQC0114819; DPFF ¶ 247), and Mr. Hanson confirmed on cross-examination that the support incident involved RQ10, and did not involve providing support on RSS.  DPFF ¶ 247.  Thus it would appear that the interaction with that customer was outside the scope of the Injunction.  Second, one of the prior cases logged by that same customer illustrates that it "install[ed] RQC" weeks earlier, which fact is confirmed by the customer sending a question concerning the "rqc_config.xml" file.[13]  PX-1058 at RQC0114815; DPFF ¶¶ 250-52.  In sum, this was not an incident of RSS support at all.

Ultimately, ePlus has no proof to cite on the central issue—whether any of Lawson's customers continue to use RSS and are receiving support, service, and maintenance on that product.  As discussed above, the record is replete with evidence that RQC was installed, by the SWAT team and by individual customers as reflected by their inquiries in the support ticket files.  Such information was testified to by both Mr. Hanson and Ms. Homewood in their depositions

---

[13]  The "rqc_config.xml" file is unique to RQC and does not exist for RSS.  Tr. 812:14-814:8 (Homewood); DPFF ¶¶ 251.  In addition to this example above, which shows that the customer "Columbia Association" was indeed running RQC, a review of the excerpts selected by ePlus demonstrates that other customers were also running RQC.  *See, e.g.*, PX-1058 at RQC0115252 (WI Schools Consortium), RQC0113794 (Western Lake Superior Sanitary), RQC0113785 (unidentified customer), RQC0114258 (Jackson Laboratory); DPFF ¶¶ 253-56.

and available in documents produced in discovery.  ePlus's criticism that Lawson had no information or did not care whether customers were actually running RQC lacks merit.  And, in any event, cannot substitute for actual evidence of contemptuous conduct.

ePlus filed its Order to Show Cause in September 2011 alleging that Lawson made a series of cosmetic changes.  ePlus's evidence on that contention falls short and the record establishes instead that the changes were real and significant.  Its original theory in tatters, ePlus also tried to introduce a theory of induced infringement via RSS.  The evidence there is just as lacking.  At best, ePlus's argument rests on a handful of isolated mistakes, individually and collectively, that are insufficient to find support contempt.  *See General Signal Corp. v. Donallco, Inc.*, 787 F.2d, 1376, 1379 (9th Cir. 1986); *United States v. Darwin Constr. Co.*, 679 F. Supp. 531, 536 (D. Md. 1988).

## CONCLUSION

For the foregoing reasons, this Court should deny ePlus's motion to show cause why Lawson should not be held in contempt.

Dated:  April 22, 2013

                                    LAWSON SOFTWARE, INC.


                                    By:  _____/s/_____

Dabney J. Carr, IV, VSB #28679
Robert A. Angle, VSB #37691
**TROUTMAN SANDERS LLP**
P. O. Box 1122
Richmond, Virginia  23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com


Josh A. Krevitt (admitted *pro hac vice*)
Daniel J. Thomasch (admitted *pro hac vice*)
Richard W. Mark (admitted *pro hac vice*)
Christopher D. Dusseault (admitted *pro hac vice*)
Jason C. Lo (admitted *pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

*Attorneys for Defendant Lawson Software, Inc.*

## CERTIFICATE OF SERVICE

I certify that on this 22nd day of April, 2013, a true copy of the foregoing will be filed electronically with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Craig T. Merritt
Paul W. Jacobs, II
Henry I. Willett, III
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
cmerritt@cblaw.com
pjacobs@cblaw.com
hwillett@cblaw.com

Jennifer A. Albert
David M. Young (VSB No. 35997)
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001
jalbert@goodwinprocter.com
dyoung@goodwinprocter.com

*Attorneys for Plaintiff*

Michael G. Strapp
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, MA 02109-2881
mstrapp@goodwinprocter.com

                              /s/
_____
Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
Megan C. Rahman (VSB No. 42678)
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
megan.rahman@troutmansanders.com
**TROUTMAN SANDERS LLP**
1001 Haxall Point
Richmond, VA 23219
Telephone:  (804) 697-1200
Facsimile:  (804) 697-1339
*Counsel for Defendant Lawson Software, Inc.*

27