**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | | |
|---|---|---|
| ePLUS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:09CV620 (REP) |
| | ) | |
| LAWSON SOFTWARE, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT LAWSON SOFTWARE, INC.'S POST-HEARING BRIEF ON REMEDIES
[AMENDED]**

Josh A. Krevitt (admitted *pro hac vice*)
Daniel J. Thomasch (admitted *pro hac vice*)
Richard W. Mark (admitted *pro hac vice*)
Christopher D. Dusseault (admitted *pro hac vice*)
Jason C. Lo (admitted *pro hac vice*)
jkrevitt@gibsondunn.com
dthomasch@gibsondunn.com
rmark@gibsondunn.com
cdusseault@gibsondunn.com
jlo@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

*Attorneys for Defendant Lawson Software, Inc.*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 2

I.  DISGORGEMENT IS NOT AN APPROPRIATE REMEDY HERE ............................. 2

    A.  Disgorgement Without Proof of Actual Loss Is Not a Compensatory Remedy ......................................................................................................... 2

    B.  Disgorgement Is Not an Appropriate Remedy in this Case ................................. 3

    C.  ePlus Gambled by Limiting the Remedial Options Before the Court ................... 6

II.  ePLUS'S DISGORGEMENT MEASURE IS INFLATED AND INACCURATE .......... 6

    A.  ePlus Overstates Lawson's Revenue from Configuration Nos. 3 and 5 ............... 7

    B.  ePlus Advocates a Gross Profit Measure That Its Own Damages Expert Admitted Is Not The "Correct" Measure of Lawson's Gain ................................. 8

    C.  ePlus's Incremental Profits Measure Is Inflated Because It Fails To Deduct Lawson's Variable Operating Costs ..................................................... 9

    D.  The Best Measure of Lawson's Gain Is Its Net Profit ......................................... 12

    E.  Disgorgement of All Profits Related to Configuration Nos. 3 and 5 Overstates Lawson's True Gain ......................................................................... 15

        1.  ePlus Improperly Seeks to Disgorge Profits Related to Lawful, Non-Infringing Uses of Configuration Nos. 3 and 5 ............................... 15

        2.  ePlus Improperly Seeks to Disgorge Profits that Lawson Could Have Earned in Compliance with the Injunction .................................... 17

III.  A MULTIPLIER IS WHOLLY UNWARRANTED HERE ............................................ 18

    A.  Lawson Attempted in Good Faith to Redesign Its Products ................................. 19

    B.  Lawson Did Not Mislead the Court During Injunction Proceedings .................... 20

IV.  ePLUS IS NOT ENTITLED TO RECOVER ITS ATTORNEYS' FEES ....................... 22

V.  ePLUS'S SUGGESTED PROSPECTIVE COERCIVE REMEDIES ARE UNPRECEDENTED AND PREMATURELY SOUGHT ............................................... 24

**Page**

VI.    ePLUS HAS PROVED NO REMEDY FOR ALLEGED USE OF RSS ......................... 25

CONCLUSION .................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

### Cases

*Andrew Corp. v. Gabrial Electronics, Inc.*,
    785 F. Supp. 1041 (D. Me. 1992) ........................................................................... 11

*Ashcraft v. Conoco, Inc.*,
    218 F.3d 288 (4th Cir. 2000) (quotation omitted) ..................................................... 3

*Brine, Inc. v. STX, L.L.C.*,
    367 F. Supp. 2d 61 (D. Mass. 2005) .......................................................................... 5

*Broadview Chem. Corp. v. Loctite Corp.*,
    311 F. Supp. 447 (D. Conn. 1970) ........................................................................... 19

*Columbia Gas Transmission Corp. v. Mangione Enterprises of Turf Valley*,
    964 F. Supp. 199 (D. Md. 1996) ........................................................................ 22, 23

*Fisher-Price, Inc. v. Safety 1st, Inc.*,
    2008 WL 1976624 (D. Del. May 5, 2008) ................................................................ 20

*Fred L. Pirkle, Therm-Omega-Tech, Inc. v. Ogontz Controls Co., Thomas M. Kenny*,
    1996 WL 146306 (E.D. Pa. Mar. 29, 1996) ................................................................ 5

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
    512 U.S. 821 (1994) ................................................................................................. 24

*Kamar Int'l Inc. v. Russ Berrie & Co.*,
    752 F.2d 1326 (9th Cir. 1984) .................................................................................. 14

*Lane v. Prima Marketing LLC*,
    2008 WL 793642 (S.D. W.Va. Mar. 20, 2008) ......................................................... 23

*Leman v. Krentler-Arnold Hinge Last Co.*,
    284 U.S. 448 (1932) ................................................................................................... 2

*LMK Enter., Inc. v. Perma-Liner Indus., Inc.*
    2012 U.S. Dist. LEXIS 31542 (M.D. Fla. Mar. 9, 2012) .......................................... 23

*Manhattan Indus., Inc. v. Sweater Bee By Banf, Ltd.*,
    885 F.2d 1(2d Cir. 1989) .......................................................................................... 14

*Omega World Travel, Inc. v. Omega Travel and Shipping Agencies, Inc.*,
    905 F.2d 1530 (4th Cir. May 10, 1990) .............................................................. 22, 23

**Page**

*Omega World Travel, Inc. v. Omega Travel, Inc.*,
   710 F. Supp. 169 (E.D. Va. 1989) ......................................... 23

*Rite-Hite Corp v. Kelley Co., Inc.*,
   56 F.3d 1538 (Fed. Cir. 1995) ............................................ 16

*S.E.C. v. Dowdell*,
   2002 WL 424595 (W.D. Va. Mar. 14, 2002) ................................ 23

*Schnadig Corp. v. Gaines Mfg. Co.*,
   620 F.2d 1166 (6th Cir. 1980) ............................................ 12

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
   106 F.2d 45 (2d Cir. 1939) ............................................ 12, 13

*Spindelfabrik Suessen-Schurr v. Schubert & Salzer Maschinenfabrik
   Aktiengesellschaft*,
   903 F.2d 1568 (Fed. Cir. 1990) .......................................... 19

*State Indus. Inc. v. A.O. Smith Corp.*,
   751 F.2d 1226 (Fed. Cir. 1985) ........................................... 4

*TiVo Inc. v. Dish Network Corp.*,
   655 F. Supp. 2d 661 (E.D. Tex. 2009) ................................ 2, 5, 6

*TiVo, Inc. v. EchoStar Corp.*,
   646 F.3d 869 (Fed. Cir. 2011) .......................................... 3, 4

*Wagner v. Board of Educ. of Montgomery County, Maryland*,
   340 F. Supp. 2d 603 (D. Md. 2004) ...................................... 23

*Walman Optical v. Quest Optical Inc.*,
   2012 WL 3248150 (D. Minn. Aug. 9, 2012) .............................. 2, 3

**Other Authorities**

90 Tex. L. Rev. 1399 (2012) ............................................. 3, 19

## INTRODUCTION

In its Post-Hearing Brief on Remedies, ePlus attempts to bootstrap what is, at worst, an unsuccessful workaround of a single method claim into a windfall payday of well over $50 million through November 2012 alone.  To get from activities that earned Lawson at most $3.7 million in net profit over a year-and-half to this stratospheric figure in a case where it has proved no harm at all, ePlus applies to an inflated revenue base a "gross profit" measure of disgorgement that its own damages expert admitted at trial is not the "correct" measure of Lawson's gain (Tr. 976:23-977:5) (Ugone).  It also ignores myriad contempt cases in which courts have imposed less extreme remedies, and mischaracterizes the record evidence to create the illusion that trebling, attorneys' fees, and other extreme additional remedies are appropriate here.

ePlus's position on remedies is the epitome of over-reaching.  If this Court decides that the appropriate remedy here is one that compensates ePlus for its actual loss, then ePlus has failed to meet its burden of proof and should recover nothing.  If this Court instead decides that the appropriate remedy here is one that disgorges from Lawson the "gains" from its alleged violation of this Court's injunction, then the Court should disgorge Lawson's net profit because that is the best measure of Lawson's actual gain in this case.  However, the Court should disgorge only that portion of Lawson's net profits that derive from the infringing uses of Configuration Nos. 3 and 5, and should not disgorge profits that Lawson could lawfully have earned while complying with the injunction.  Coercive sanctions, multipliers, attorneys' fees, and burdensome court-approval procedures are completely unwarranted.  The measures addressed in this brief are set forth for the Court's convenience in the attached Exhibit A.

## ARGUMENT

### I.    DISGORGEMENT IS NOT AN APPROPRIATE REMEDY HERE

#### A.    Disgorgement Without Proof of Actual Loss Is Not a Compensatory Remedy

Disgorgement of gain is not an appropriate compensatory civil contempt remedy in the patent infringement context absent *any* evidence of ePlus's actual loss.[1]  Although ePlus contends that *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 455-57 (1932) permits disgorgement as a compensatory remedy in the patent context *even where it has failed to prove it was harmed at all*, the continuing viability of this 81-year-old decision for that principle is highly questionable.  What is crystal clear, however, is the trend *away* from disgorgement among modern courts operating under the backdrop of the modern Patent Act.

*Among all the post-TiVo cases in which civil contempt was found, a list of which the parties jointly submitted pursuant to the Court's request at Docket 1061, not a single one awarded disgorgement*.  DPFF ¶ 577.  In the most recent case touching on the topic, *Walman Optical v. Quest Optical Inc.*, 2012 WL 3248150, at *8-10 & n.10 (D. Minn. Aug. 9, 2012), which post-dated the Ugone briefing and is included in the parties' joint submission, the court noted a "*split of authority over whether a contemnor's profits may be the proper measure of compensation in a civil-proceeding*." (emphasis added).  The court implicitly distinguished "compensatory damages" from disgorgement and reasoned that "*compensatory damages must be based upon evidence of the complainant's actual loss*." *Id.* at *10 (emphasis added). Likewise in *TiVo Inc. v. Dish Network Corp.*, 655 F. Supp. 2d 661, 665 (E.D. Tex. 2009), *aff'd*

---

[1]  Lawson recognizes that the Court stated a contrary view in its pre-hearing Memorandum Opinion Denying Lawson's Motion to Strike Expert Opinions of Dr. Keith Ugone.  D.I. 1032 ("Ugone Order").  Because the Court is not bound by this pre-hearing evidentiary ruling (DPFF ¶ 566), and because Lawson respectfully submits that it would be reversible error to award a disgorgement remedy here in the complete absence of proof of actual harm, Lawson reasserts its argument and preserves the issue for all purposes.  DPFF ¶¶ 567-80.

*in relevant part*, *TiVo, Inc. v. EchoStar Corp.*, 646 F.3d 869, 890 (Fed. Cir. 2011), the court rejected a disgorgement remedy proposed by Dr. Ugone on the ground that it was designed "to *punish* EchoStar for its actions."  (emphasis added).

ePlus is not entitled to disgorgement as a compensatory remedy here because it "has not introduced evidence that it suffered any loss due to" Lawson's allegedly contumacious conduct, "much less that it suffered a loss" commensurate with Lawson's gains.  *Walman*, 2012 WL 3248150 at *8-10.  ePlus *did not even try* to present evidence that it has been harmed by Lawson's post-injunction activities allegedly infringing Claim 26 as to a discreet group of 146 customers, and the only evidence in the record is to the contrary.  DPFF ¶¶ 345-47.  The Court stated in its Ugone Order that disgorgement awards "are meant to ensure that the injured party is fully compensated for the harm done," Ugone Order at 19, but here ePlus has proven no harm at all.[2]

### B.      Disgorgement Is Not an Appropriate Remedy in this Case

Even if disgorgement is available as a matter of law, it is not an appropriate remedy on the facts and circumstances here.  As the Court noted at the evidentiary hearing: "[w]hether [disgorgement] is an appropriate remedy is different than whether it's available."  Tr. 13:10-11.

In contempt actions predicated on patent infringement, even among the few courts assuming the continuing availability of the remedy, "***disgorgement of the entirety of a contemnor's profits appears to be considered an extreme sanction reserved for egregious behavior***."  John M. Golden, Injunctions As More (or Less) Than "Off Switches":  Patent-Infringement Injunctions' Scope, 90 Tex. L. Rev. 1399, 1412 n.54 (2012) (emphasis added).  A

---

[2]  General Fourth Circuit civil contempt law indeed requires ePlus to "show[] by clear and convincing evidence: . . . that [it] suffered harm as a result" just to establish liability. *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000) (quotation omitted).

finding of "willfulness" is present in virtually *every* case awarding disgorgement in the patent context, including cases cited by the Court in the Ugone Order.  DPFF ¶¶ 581-84.  This stands in sharp contrast with contempt actions predicated on trademark or copyright infringement, both of which statutorily permit disgorgement even absent intent or harm (as did the Patent Act at the time of *Leman*).[3]  Whereas disgorgement is the norm in trademark and copyright contempt actions, disgorgement awards are *substantially* outnumbered in the patent contempt arena by awards of lost profits and reasonable royalties, and appear to arise only in the most extreme of circumstances.  DPFF ¶ 585.

While the Court has stated that retroactive contempt sanctions should "make sure that the defendant or the enjoined party is *deterred from further misconduct* by taking away whatever benefit has been had by violating the injunction" (D.I. 943, Feb. 29, 2012 Tr. 130:25-131:3 (emphasis added)), Lawson respectfully submits that this cannot justify a retroactive award of disgorgement here.  DPFF ¶¶ 586-91.  Assuming *arguendo* that it is even appropriate to impose a *retroactive* remedy for the purpose of deterring *future* conduct (which Lawson submits is not correct), the Court does not have an interest in "deterring" a patent infringement defendant from trying to work around the plaintiff's patent, even if there is some risk that a court might later find the work-around insufficient.  The Federal Circuit has repeatedly recognized that "***legitimate design-around efforts should always be encouraged***."  *TiVo*, 646 F.3d at 883 (emphasis added); *State Indus. Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985).  The Court need not and should not "deter" good faith design-arounds encouraged by the Federal Circuit in the same

---

[3] In contexts where the underlying infringement is itself remediable through disgorgement (as in most of the cases on which *ePlus* has relied), it is more logical that this remedy would be available in a contempt proceeding without a showing of willful or egregious conduct because it would make no sense to place a heavier burden at the contempt stage than in the underlying infringement lawsuit.  DPFF ¶¶ 572-73.

manner that it might seek to deter blatant disregard of an injunction accompanied by no effort to comply. "Contempt . . . is not a sword for wounding a former infringer who has made a good-faith effort to modify a previously adjudged or admitted infringing device to remain in the marketplace." *Fred L. Pirkle, Therm-Omega-Tech, Inc. v. Ogontz Controls Co., Thomas M. Kenny*, 1996 WL 146306, at *1 (E.D. Pa. Mar. 29, 1996). It thus makes sense that, aside from the *Brine* case essentially finding the defendant's "identical" redesign to be a sham, none of the modern, post-1950 cases cited in the Ugone Order awarded the "extreme" disgorgement sanction in the product design-around context. *Cf. Brine, Inc. v. STX, L.L.C.*, 367 F. Supp. 2d 61, 65, 69 (D. Mass. 2005).

The district court's decision in *TiVo* reflects this principle in action, and directly contradicts ePlus's position that disgorgement is somehow the automatic remedy for contempt in a patent case. *See* 655 F. Supp. 2d. at 665. There, despite finding the contemnor's redesign efforts insufficient and specifically finding contempt, the court rejected Dr. Ugone's disgorgement measure, labeling it "unreasonable." *Id.* (emphasis added). The court dismissed all the same arguments that ePlus advances in favor of disgorgement here (*see* DPFF ¶¶ 589-91), and despite having "found that the harm suffered by TiVo due to EchoStar's noncompliance is substantial"—unlike here where ePlus has proved no harm—the court concluded it "cannot approve such an award" so clearly evidencing a "desire to see EchoStar punished." *Id.* The Federal Circuit affirmed the district court's sanction determination, although it remanded the case on other grounds. *TiVo*, 646 F.3d at 890.

As explained *infra* and in Lawson's Briefs on Colorability and Infringement, the evidence in this case establishes that Lawson's attempt to work around Claim 26 of the '683

patent was genuine and amounted to a very real change to a feature on which ePlus had focused at trial, so no "deterrent" is justifiable here.

### C.     ePlus Gambled by Limiting the Remedial Options Before the Court

ePlus will no doubt argue that it would be unjust for the Court to leave it with no remedy if the Court finds contempt.  ePlus is wrong.  ePlus made a calculated gamble to present the Court with *only* disgorgement remedies in this proceeding, providing neither a lost profits calculation nor a reasonable royalty calculation, and ePlus's expert, Dr. Ugone conceded that he did not even *try* to determine whether either was quantifiable despite having calculated lost profits in patent cases somewhere between 20 and 50 times and reasonable royalties at least 50 times.  DPFF ¶¶ 348-50.  Dr. Ugone did not opine that he was incapable of doing such alternative calculations.  Tr. 923:23-924:6, 926:8-11 (Ugone); DPFF ¶ 351.  Indeed, he could not remember a single patent case in which he provided a court with neither alternative.  Tr. 925:23-926:7, 927:3-22 (Ugone); DPFF ¶ 352; *see, e.g., TiVo*, 655 F. Supp. 2d. at 665 (adopting Dr. Ugone's recommended royalty remedy over his disgorgement remedy).  But here, ePlus's counsel directed Dr. Ugone not to make such calculations, and Dr. Ugone dutifully complied.  Tr. 919:13-16, 918:6-10, 926:12-17 (Ugone); DPFF ¶ 353.

ePlus has deliberately put all its eggs in the disgorgement basket, hoping the Court will choose an overly austere sanction over no sanction at all.  Tr. 918:6-10 (Ugone); DPFF ¶¶ 354-55.  Should the Court conclude that disgorgement is unavailable or inappropriate on the facts and circumstances of this case, ePlus should get nothing.   DPFF ¶ 592.

## II.     ePLUS'S DISGORGEMENT MEASURE IS INFLATED AND INACCURATE

If the Court determines that the appropriate remedy in this proceeding is disgorgement of Lawson's gains, it must decide how best to measure those gains.  Both damages experts agreed that this is accomplished by subtracting costs associated with any violations from corresponding

revenues.  Tr. 1016:18-25 (Putnam); Tr. 934:21-935:2 (Ugone); DPFF ¶¶ 356, 597.  But remarkably, ePlus advocates a measure in its Remedies Brief that disregards its own expert's opinions on *both* revenues *and* costs.

### A.  ePlus Overstates Lawson's Revenue from Configuration Nos. 3 and 5

The first step in determining Lawson's gain from allegedly violating the Court's injunction is to calculate Lawson's revenues associated with Configuration Nos. 3 and 5.  Tr. 1016:18-25 (Putnam); DPFF ¶ 358.  ePlus's favored calculations overstate those revenues by improperly including *all* revenues from LSF/Process Flow as revenues derived from Configuration Nos. 3 and 5 even though it is used as the foundation for numerous Lawson software modules other than procurement.  Tr. 959:13-23 (Ugone); DPFF ¶ 359.  Based on the use of LSF/Process Flow with other modules, Dr. Ugone affirmatively proposed an apportionment of 15% of revenues from LSF/Process Flow to Configuration Nos. 3 and 5, with the remaining 85% attributed to use with modules not subject to this Court's injunction.  DPFF ¶¶ 360-62.  Lawson's damages expert, Dr. Putnam, agreed with performing this apportionment and testified it was necessary.  Tr. 1019:1-4 (Putnam); DPFF ¶¶ 363-34.

Although ePlus called Dr. Ugone as its damages expert at trial, it tried to sweep his LSF/Process Flow apportionment under the rug, failing to even mention it on direct examination.  When forced to address it on cross-examination, Dr. Ugone conceded that he had proposed the LSF/Process Flow apportionment on his own, had addressed it in each of his four reports, and had even prepared a slide to explain the apportionment to the Court.  Tr. 960:18-961:8 (Ugone); DPFF ¶ 360.  Dr. Ugone also conceded that he made the LSF/Process Flow apportionment "***to make sure we're using the right revenue base***."  Tr. 958:16-959:12 (Ugone); DPFF ¶ 364.  Apparently less concerned with "using the right revenue base" than its expert, ePlus now advances measures that fail to account for the LSF/Process Flow apportionment at all.  ePlus

7

Rem. Br. at 5 n.4, 6, 8, 9; DPFF ¶¶ 365-66.  Properly apportioning the revenues from LSF/Process Flow decreases the relevant revenues through November 30, 2012, as calculated by ePlus's expert, from $29.4 million to $23.0 million.  Tr. 965:8-13 (Ugone); DPFF ¶ 367.

ePlus further overstates the revenue base by treating as improper any revenue that Lawson earned from licensing Configuration Nos. 3 or 5 to designated healthcare customers during the six-month sunset period.  Tr. 886:2-887:7, 966:8-12 (Ugone); DPFF ¶ 368.  The purpose of the sunset period was to "alleviate any harm" to these healthcare customers from having to make a fast transition to a different e-Procurement software vendor by providing them "adequate time to transition to non-infringing systems."  D.I. 728 at 48; DPFF ¶ 369.  It simply makes no sense that the Court intended to prevent those same customers from making necessary changes to the number or identity of their users and force them to overhaul their systems instead of allowing those existing customers to add licenses during the sunset period; and the language of the injunction is consistent with this.  D.I. 728 at 48; D.I. 729 at 4; DPFF ¶¶ 369-71.  After apportioning to account for LSF and Process Flow, and excluding healthcare revenue during the sunset period, revenues associated with Configuration Nos. 3 and 5 through November 30, 2012 are correctly measured at $21.7 million.  Tr. 1020:15-1021:5 (Putnam); DPFF ¶¶ 372-73.

### B.    ePlus Advocates a Gross Profit Measure That Its Own Damages Expert Admitted Is Not The "Correct" Measure of Lawson's Gain

While ePlus asks the Court to disgorge Lawson's gross profits, testimony from *both* damages experts—as well as economic common sense—exposes this as rank overreaching, as that measure fails to deduct most of the costs associated with Lawson's gains, including costs ePlus identifies as 100% variable.  DPFF ¶¶ 375-78, 594-95.  ***Dr. Ugone conceded that neither gross profits nor revenues, but rather incremental profits, is the "correct way" to measure gain*** in his opinion:

THE COURT: I agree. Just answer the question yes or no. I think the bottom line, though, is in your judgment, is the correct way to equate your figures with the gain the incremental profit?
THE WITNESS: Yes.
THE COURT: That's what you're trying to get at?
THE WITNESS: Yes, Your Honor. And I want to -- yes, Your Honor. I'll stop there.

Tr. 976:23-977:5 (Ugone); DPFF ¶¶ 379-82, 593.  The Court should decline ePlus's invitation to use a measure of gain that its own professional expert recognizes is incorrect.

### C.      ePlus's Incremental Profits Measure Is Inflated Because It Fails To Deduct Lawson's Variable Operating Costs

While Dr. Ugone testified that incremental profit is the "correct" measure of gain, his actual calculation of that measure is flawed and inaccurate.  Dr. Ugone concedes that incremental profit calculations must subtract out all variable costs, but he incorrectly opines that *100%* of Lawson's R&D and G&A costs are fixed, and he therefore deducts *none* of those costs.  DPFF ¶¶ 381-83.  This opinion is unfounded, and its impact is to inflate Lawson's supposed "incremental profits" beyond recognition.  ***Dr. Ugone performed no meaningful economic analysis of whether Lawson's operating costs were fixed or variable.***  Instead, he took a couple of isolated snippets from Mr. Samuelson's deposition testimony—completely out of context— and used them to make broad-stroke and illogical assumptions that all of Lawson's R&D and G&A costs are fixed.[4]

---

[4] For example, Dr. Ugone founded his opinion that Lawson's R&D costs are 100% fixed on a statement in Mr. Samuelson's deposition that "there are no developers, to my knowledge, specifically focused on developing infringing products, period."  Tr. 984:14-24, 985:5-8 (Ugone); DPFF ¶¶ 384-86.  Such a leap is not only devoid of economic analysis, it defies common sense.  It is hardly surprising that Lawson does not have developers focused on "developing infringing products," and that unremarkable statement does not even suggest that Lawson did not incur variable R&D expenses supporting Configuration Nos. 3 and 5 (which Lawson firmly believes are *not* infringing products).  Similarly unsound is Dr. Ugone's decision to base his sweeping opinion that Lawson's G&A costs are 100% fixed not on economic analysis or even Dr. Ugone's extensive experience with businesses as a

Lawson established at the evidentiary hearing that its R&D costs vary with revenue, and that Lawson would have spent less on R&D had it permanently lost all revenues relating to Configuration Nos. 3 and 5.  DPFF ¶¶ 389-400.  Importantly, these variable R&D costs are not limited to money spent developing RQC, but rather include work to fix bugs and other issues in these configurations and to improve the products for customers, including R&D costs pertaining specifically to Punchout and/or EDI.  DPFF ¶ 399.  Lawson similarly established at the evidentiary hearing that its G&A costs vary with revenue and that Lawson would have spent less on these operating expenses were it faced with the permanent loss of revenue from Configuration Nos. 3 and 5.  DPFF ¶¶ 401-403.  Mr. Samuelson, the former CFO of Lawson and Infor, explained that G&A is largely "people cost" that can be easily changed with a loss of revenue, and that Lawson carefully monitors the relationship between such spending and revenues.  DPFF ¶¶ 388-89, 393-94, 401-402.

In contrast to Dr. Ugone, who conducted no meaningful *economic* analysis of Lawson's cost variability, Lawson's damages expert, Dr. Putnam, performed an economic regression analysis using nearly twelve years of financial data to arrive at his expert conclusions.  Tr. 1038:4-21 (Putnam); DPFF ¶ 404.  He plotted Lawson's various operating costs against its revenue fluctuations to scientifically establish consistent historical correlations between them. Tr. 1032:14-1033:5 (Putnam); DPFF ¶ 405.  Through this tested regression method, Dr. Putnam was able to confirm that 89% of Lawson's overall operating costs were variable.  Tr. 1049:24-

---

damages expert, but rather on a single sound-bite from the Samuelson deposition that "most of G&A would probably be fixed."  DPFF ¶ 387.  Dr. Ugone failed to note that Mr. Samuelson stated he was using "fixed" in that context to mean costs that do not vary directly or "automatically" with revenue, nor does he acknowledge that Mr. Samuelson went on to clarify that much of Lawson's "people costs" are in fact variable.  DPFF ¶¶ 388.  While it may be good business for a professional damages expert to offer sweeping opinions based on nothing more than his cherry-picking of deposition testimony, it is not good economics, and the Court is more than capable of evaluating witness testimony for itself.

1050:14, 1050:23-1051:2 (Putnam); DPFF ¶ 406.  Subtracting these variable operating costs

from the gross profit margin, Dr. Putnam concluded that Lawson's incremental profit margin

was 26%.  Tr. 1051:3-12 (Putnam); DPFF ¶ 407.  This is the type of scientific analysis through

which economic experts bring value to the finder of fact, but Dr. Ugone bypassed it entirely.  In

fact, ePlus's own Ph.D. damages expert did not present any regression analysis of his own (or

any scientific study for that matter), and he offered *no* testimony raising a single concern about

Dr. Putnam's methods.  DPFF ¶ 408.[5]

  Courts have consistently credited regression techniques like Dr. Putnam's to assess the

relative variability of costs, indeed finding them *more* reliable than the "technique" employed by

Dr. Ugone predicated on mere anecdotal lay testimony or interviews.  *See, e.g., Andrew Corp. v.*

*Gabrial Electronics, Inc.*, 785 F. Supp. 1041, 1050-51 (D. Me. 1992) ("hard data" regression

analysis credited over broad-stroke cost bucketing from "information gained from interviews and

observation"); *see also* DPFF ¶ 596.  The reliability of Dr. Putnam's regression analysis is

further reinforced by its striking consistency with Mr. Samuelson's testimony on the subject

regarding different operating costs Lawson incurs and their respective variability.  DPFF ¶ 415.

Most significantly, Mr. Samuelson estimated that 85-90% of Lawson's costs are variable

---

[5] While ePlus's lawyers levy criticisms at Dr. Putnam's regression analysis that their own
Ph.D. economist did not advance while under oath and subject to cross-examination (ePlus
Rem. Br. at 11-12), those criticisms are trivial and meritless.  While ePlus attacks Dr.
Putnam's regression for relying on company-wide data, Dr. Putnam explained why the
company-wide data was a reasonable proxy for the incremental costs associated with
Configuration Nos. 3 and 5, and Dr. Ugone used company-wide data to for his calculations as
well.  DPFF ¶¶ 409-10.  Second, ePlus's criticism that Dr. Putnam used "old" data has no
merit as Dr. Putnam used the most reliable data set available for predicting the relationship
between Lawson's revenues and expenditures, and doing so generated a result entirely
consistent with Mr. Samuelson's testimony about the time period in question here.  DPFF ¶¶
411-13.  Third, ePlus's aspersions that Dr. Putnam's regression differs from actual results in
specific quarters reflects a striking (or intentional) lack of understanding of regressions,
which determine an average based on quarterly results which are, of course, typically over or
below the line generated by the regression.  Tr. 1168:12-1169:16 (Putnam); DPFF ¶ 414.

cumulatively, a number perfectly consistent with, and indeed confirming, Dr. Putnam's independent regression calculation of 89% variability.  Tr. 648:11-17 (Samuelson); DPFF ¶ 415. Between Dr. Ugone's self-serving anecdotal snippets and Dr. Putnam's scientific calculations confirmed by Mr. Samuelson's first-hand experience, the Court should credit the latter.

If the Court decides to award incremental profits from Configuration Nos. 3 and 5 as a measure of Lawson's gain (which it should not for the reasons explained directly below), it should award Dr. Putnam's measure of those profits, which is $5.6 million through November 30, 2012.  Tr. 1063:3-8 (Putnam); DPFF ¶ 416.  The associated daily rate is $12,761. DX-759; Tr. 1073:9-10 (Putnam); DPFF ¶ 417.

### D.   The Best Measure of Lawson's Gain Is Its Net Profit

If the Court chooses to disgorge Lawson's gains, the best and most accurate measure of that gain—and the measure adopted by the weight of the precedential authority—is *net* profit. ePlus's damages expert agreed that "[t]he premise of disgorgement is that you're allegedly taking away the gain of the wrongdoer."  Tr. 969:8-21 (Ugone); DPFF ¶¶ 418, 597-601.  The best measure of a company's actual gain is its net profit, as "[t]he fixed expenses are as necessary to the infringing production as are the variable expenses, and should be similarly treated."  *Schnadig Corp. v. Gaines Mfg. Co.*, 620 F.2d 1166, 1172 (6th Cir. 1980).

This principle was most famously recognized in *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 51 (2d Cir. 1939), where the court, in an opinion penned by Judge Learned Hand, rejected the plaintiff's argument that recovery for fixed "overhead" requires a showing "that it had been increased by the production of the infringing" product.  *Id.* at 54.  Instead, it straightforwardly held that "'overhead' which does not assist in the production of the infringement should not be credited to the infringer; that which does, should be," and it affirmed the use of an estimate of overhead expenses based on a proportion of the overall cost of

production.  *Id.* at 52-54.  The Supreme Court affirmed, writing: "Petitioners also complain of deductions allowed in the computation of *net* profits. . . . [W]e find no ground for disturbing the court's conclusions."  309 U.S. 390, 409 (1940) (emphasis added).  The majority of courts awarding disgorgement remedies have since permitted deductions for fixed expenses that assist in the production and sale of the products at issue, determining that *net* profit is the appropriate measure both in disgorgement cases in the first instance, *see* DPFF ¶¶ 602-03, and specifically in the civil contempt context, *see* DPFF ¶ 604.

Net profit is a better fit than the inflated profit measures that ePlus has offered. Mr. Samuelson, Lawson's former CFO, testified to Lawson's net profit margin as calculated in Lawson's profits and liabilities spreadsheets, financial statements audited by outside accounting firms, filed with the SEC, and used for tax purposes.  Tr. 627:23-628:7, 635:16-23 (Samuelson); DPFF ¶ 419.  The most accurate and reliable picture of Lawson's profits is what it discloses pursuant to federal securities laws.  DPFF ¶ 420.  Moreover, Mr. Samuelson explained at the contempt hearing how Lawson's various categories of spending benefit and assist in the production and sale of the configurations at issue in this proceeding.  DPFF ¶ 421.  Like almost all software companies, Lawson does not specifically track costs on a product by product basis. Tr. 627:6-19 (Samuelson); DPFF ¶ 423.  However, because the products at issue are "middle of the road or common or average" as far as Lawson's products go, they "are a pretty good proxy for the specific profits of those products," as Lawson's operating costs are the same for the products in question as the company on whole.  Tr. 628:8-629:7 (Samuelson); DPFF ¶¶ 424-425. Indeed, there is no dispute that Lawson's company-wide profit measures can fairly be applied to the products at issue, as ePlus's own favored gross profit measure is based on this same

information.  Tr. 974:9-14 (Ugone); ePlus Rem. Br. at 6; DPFF ¶426.[6]  Moreover, the cases

using net profit as a measure of gain do not require that fixed costs be "attributable" to the

product at issue in the sense that they are specifically traced, in the ordinary course, to specific

products.  *See generally Manhattan Indus., Inc. v. Sweater Bee By Banf, Ltd.*, 885 F.2d 1, 7 (2d

Cir. 1989) (the alleged infringer "need not prove its overhead expenses and their relationship to

the production of the contemptuous goods in 'minute detail'").  Indeed, classic fixed costs (such

as a long term lease, for example) typically are *not* tracked in such a manner.  Rather, what the

cases require is evidence that the costs are attributable to the product at issue in the sense that

they assist or benefit in the production and sale of those products.  Because the products at issue

here are "middle of the road" products sold by Lawson at the same time it is selling other

products, Lawson has established the unsurprising proposition that any fixed costs it may incur

benefit these products to the same extent as its other products, and ePlus has not established

otherwise.

　　　　Net profit is an appropriate measure of Lawson's gain here for the additional reason that

even costs that may be "fixed" in the short term are not "fixed" in either the time period relevant

to Lawson's decision-making process or the injunction/contempt period.  As Dr. Putnam

explained, "costs that are fixed in the short run become variable in the long run," and the nearly

two-year injunction period is indisputably a "long run" in the software industry.  DPFF ¶ 427.

The Court made a similar point in the following exchange with Dr. Putnam:

> THE COURT:  You mean if I look at the period of time of a couple, three days,
> incremental profit might be an appropriate measure, but if I look at the same basic

---

[6]  ePlus's argument that using net profit would result in a "windfall" to Lawson is wrong, as the
case law reflects.  Lawson's fixed costs, much like its variable costs, "actual[ly] assist[ed] in
the production, distribution, or sale of the [allegedly] infringing product[s]."  *Kamar Int'l
Inc. v. Russ Berrie & Co.*, 752 F.2d 1326, 1332 (9th Cir. 1984).  DPFF ¶¶ 421, 605.

> figures or parameters but for a period of time of a year, then you don't use
> incremental profit, you use net profit.
> THE WITNESS:  That's right, Your Honor.
> THE COURT:  Because the cost structure shifts from fixed to variable costs?
> THE WITNESS: That's right, exactly.

Tr. 1024:20-1025:3 (Putnam); DPFF ¶ 427.  Moreover, because any loss of revenues that

Lawson would have suffered as a result of this Court's permanent injunction is, by definition,

permanent, Lawson could have cut costs that might be deemed "fixed" in the very short term.

DPFF ¶ 428.

If the Court decides to disgorge Lawson's profits from Configuration Nos. 3 and 5 and

not account for non-infringing uses (discussed below), the Court should award net profits, which

Dr. Putnam calculated to be $3.7 million from the date of the Injunction to November 30, 2012.

Tr. 1063:3-8 (Putnam); DPFF ¶ 429.  The daily rate associated with this disgorgement remedy is

$8,329.  Tr. 1072:20-1073:3 (Putnam); DPFF ¶ 430.

**E.    Disgorgement of All Profits Related to Configuration Nos. 3 and 5 Overstates Lawson's True Gain**

**1.    ePlus Improperly Seeks to Disgorge Profits Related to Lawful, Non-Infringing Uses of Configuration Nos. 3 and 5**

While it is ePlus's burden to prove otherwise—which it did not even attempt—the

evidence establishes that Configuration Nos. 3 and 5 have substantial non-infringing uses, as

conceded by ePlus's own software expert.  *See* Lawson Infr. Br. at 14-15; DPFF ¶¶ 431, 608-09.

ePlus's expert conceded, among other things, that Configuration No. 2, which undisputedly does

*not* infringe, comprises most of the modules within Configuration Nos. 3 and 5, and its

functionality can be used in the challenged configurations without implicating Claim 26.  DPFF

¶¶ 431-32.  It is only when those modules are used *in conjunction with Punchout* that

infringement can occur.  DPFF ¶¶ 432-33.  This has two important implications for any potential

award.  First, because the mere sale of products with substantial non-infringing uses cannot

constitute infringement as a matter of law, *see* D.I. 1012, Lawson Memo.  ISO Mot. To Dissolve Inj. at 5-8, Lawson's gains from mere licensing must be stripped out of any remedy the Court might award.  ePlus and its damages expert have not done so.

Second, where a larger product's infringing feature does not drive the product's demand, as a matter of law, damages must be apportioned to represent only the value of the patented feature.  *See, e.g.*, *Rite-Hite Corp v. Kelley Co., Inc.*, 56 F.3d 1538, 1566-67 (Fed. Cir. 1995); DPFF ¶ 610.  In addition to failing to establish the absence of substantial non-infringing uses, ePlus has not shown that the incrementally infringing feature (namely Punchout) drives sales for the broader configurations.  Indeed, ePlus argued just the opposite to this Court in prior briefing, citing and relying on testimony from Lawson's employees that "Procurement Punchout does not drive S3 sales," and "Lawson has never won a sale merely because of its Punchout product." ePlus Brief ISO Mot. For Perm. Inj., D.I. 641 at 20; DPFF ¶¶ 434-35, 611.  And as Dr. Ugone admits, ePlus has also made no effort to prove what portion of Lawson's profits is properly attributable to the added functionality that converts Lawson's lawful Configuration No. 2 into allegedly infringing software.  Tr. 876:15-20 (Ugone); DPFF ¶ 437.

If the Court decides that only the apportioned value of the infringing features is subject to disgorgement, as the law requires, ePlus has not met its burden.  Although it is not Lawson's burden to do so, it presented evidence at the hearing as to how the Court might measure the incremental value of the allegedly infringing features of Configuration Nos. 3 and 5.  DPFF ¶¶ 439-443.  The most economically reliable way to value such a specific feature within a larger system is to compare the system's market value both with and without that incremental feature— the difference corresponds to the real value customers place on the feature/functionality.  Tr. 1083:2-12 (Putnam); DPFF ¶¶ 438, 612.  Here, the infringing feature is the patented method, and

16

the customer data underlying both damage experts' testimony contains all the information necessary to determine the values customers placed on this incremental functionality by simply comparing the prices those customers actually paid for Configuration No. 2 (non-infringing) with the prices they actually paid for Configuration Nos. 3 and 5 (assumed infringing).  DPFF ¶ 440.

Dr. Putnam applied this straightforward method by determining the total revenues from the 146 customers attributable to Configuration Nos. 3 and 5 ($21.7M) and then subtracting the price the 146 customers paid for each of the modules comprising non-infringing Configuration No. 2.  Tr. at 1083:13-1084:3 (Putnam); DPFF ¶¶ 439-441.  He concluded that the net profits on the difference—the cumulative incremental value of the infringing method to all customers at issue, which also necessarily reflects the prices customers paid for Punchout and EDI—was $1.2 million through November 30, 2012.  Tr. 1092:24-1093:10 (Putnam).  The daily rate associated with this metric is $2,695.[7]  DX-759; DPFF ¶¶ 442, 613.[8]

### 2.    ePlus Improperly Seeks to Disgorge Profits that Lawson Could Have Earned in Compliance with the Injunction

ePlus's disgorgement measures are also flawed for another fundamental reason.  Each of ePlus's proffered disgorgement measures looks at the revenues that Lawson earned in connection with Configuration Nos. 3 and 5 and treats *all* of those revenues as improper gain, i.e. gain that Lawson would not have earned had it complied with the injunction.  But this is simply not right.  In light of the Federal Circuit's ruling, Lawson could have fully complied with the Court's injunction *without swearing-off all revenues from these 146 customers*, but rather by either

---

[7]  Alternatively, if the Court determines that only Punchout can be used to infringe, and EDI is irrelevant for infringement purposes, or that incremental profits on the incremental value measure should be awarded, then Dr. Putnam has also provided those calculations.  DPFF ¶ 443.

[8]  Dr. Putnam also testified to a System Apportionment, as an alternative to the incremental value method.  DPFF ¶¶ 445-449.

refusing to license them Punchout or disabling Punchout for those customers who previously

licensed it.  Given ePlus's concession that Punchout does not drive sales, there is no reason to

believe that Lawson would not have been able to do so.  Indeed, when Lawson believed it had a

potential workaround for the system claims but not for the method claim related to Punchout,

Lawson's plan was to hold Punchout out of future deals entirely.  DPFF ¶ 435.  Thus, any proper

measure of Lawson's gain should be limited to those profits Lawson could not lawfully have

earned consistent with the Court's injunction as impacted by the Federal Circuit's decision,

which is in effect the profit related to Punchout.[9]  Lawson's net profit relating to Punchout

amounted to $1.0 million through November 30, 2012.  DX-759; DPFF ¶¶ 450-53.

## III.    A MULTIPLIER IS WHOLLY UNWARRANTED HERE

If the Court opts to disgorge Lawson's profits despite ePlus's utter lack of any showing

of harm, the Court should apply no multiplier to that amount, let alone the trebling requested by

ePlus.  Whereas a multiplier might make sense in some circumstances where a remedy is applied

that likely *undercompensates* the plaintiff for alleged harm, the opposite is true here.[10]  The

Court noted in its Ugone Order that disgorgement awards "are meant to ensure that the injured

party is fully compensated for the harm done."  Ugone Order at 19.  Should the Court opt to

---

[9] Lawson did not know at the time of its *actual* work around that it could continue doing business with the 146 customers who have Configuration Nos. 3 and 5 by effectively converting them to Configuration No. 2, because the injunction at the time erroneously extended to Configuration No. 2 as well.  The issue that the Court must now consider, however, is what profits Lawson would have earned in the "counter-factual" situation where it complied with an injunction, if any, entered on the premises required by the Federal Circuit's ruling.  Whatever remedy that might be, it cannot extend in any way to Configuration No. 2.  Lawson's "gain" is the difference between the profit it actually earned and the profit it could still have earned while complying with such an injunction.

[10] As the Court recognized, a disgorgement award here would dwarf any remedy typically available for patent infringement, even a trebled reasonable royalty or lost profit calculation.  Ugone Order at 15.

"ensure" that "full[] compensat[ion]" through disgorgement, enhancing such an already severe fine would provide a windfall for ePlus, impose a punitive penalty on Lawson, and frankly be a reversible abuse of discretion. "[T]o the extent that double or treble damages serve a punitive purpose, they may not be awarded in a civil contempt proceeding." *Broadview Chem. Corp. v. Loctite Corp.*, 311 F. Supp. 447, 453 (D. Conn. 1970). Lawson is not aware of a single case in the patent contempt arena—even in circumstances reflecting the most willful and egregious conduct—in which a court awarded disgorgement of gains *and then additionally multiplied that measure*. As noted above, the post-*TiVo* patent contempt cases do not even impose a disgorgement remedy, let alone multiplied disgorgement. To couple an already overcompensating remedy with an even more excessive enhancement would be well beyond the pale. This Court should not forge such new ground.

Multipliers are warranted in only the most egregious of cases. *Spindelfabrik Suessen-Schurr v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 903 F.2d 1568, 1578 (Fed. Cir. 1990) (multipliers permissible where a contemnor's actions are "justifiably characterized . . . as 'flagrant contemptuous conduct'"). They are "reserved for particularly obnoxious—and thus readily avoidable—forms of contempt." Golden, 90 Tex. L. Rev. at 1411. By no stretch of the imagination can the conduct challenged in this case fairly be deemed willful, let alone "flagrant" or "obnoxious," so no multiplier should be applied regardless of the damages metric the Court might ultimately pick. *See Fisher-Price, Inc. v. Safety 1st, Inc.*, 2008 WL 1976624, at *6 (D. Del. May 5, 2008).

### A.    Lawson Attempted in Good Faith to Redesign Its Products

As explained in Lawson's Brief on Colorability at pages 16 through 25, contrary to ePlus's aspersions, Lawson attempted in good faith to design around the claims, engaging special independent patent counsel (Robert Crawford) to consult with its trial counsel and in-house

counsel, and ultimately deciding on a design-around that was mandated by counsel, even though it significantly and negatively impacted Lawson's customers. DPFF ¶ 454-459. Pursuant to Court order, Lawson produced several thousands of pages of privileged documents reflecting the lawyers' intimate involvement in the design-around process, yet ePlus can point to no evidence of bad faith or fraud or any evidence that Lawson and its counsel did not genuinely believe they had complied with the Court's injunction.

ePlus offers nothing but mischaracterizations of testimony and distortions of documents to argue that Lawson lacked good faith in its substantial redesign efforts. DPFF ¶¶ 460-465. As just one example, it is patently untrue that "Lawson Ignored Counsel's Advice That The Modification It Did Make Was Insufficient" (ePlus Rem. Br. at 14), as Lawson made modifications at counsel's advice *despite* the misgivings of its business personnel. DPFF ¶¶ 80, 82, 96-100, 103-108. ePlus's accusations of bad faith are contrary to the facts. *See* Lawson Color. Br. at 21-25; Lawson Infr. Br. at 16-25; DPFF ¶¶ 454, 460-66, 614-19.

### B.    Lawson Did Not Mislead the Court During Injunction Proceedings

ePlus's allegations that Lawson misled the Court during the injunction proceeding are demonstrably untrue. First, Lawson did not hide evidence about its design-around. As early as March 30, 2011, in the very midst of the injunction hearing proceedings, Lawson accurately informed the Court in its opposition to ePlus's motion for a permanent injunction that "Lawson is working on redesigning RSS and Punchout to avoid the infringed claims." D.I. 705 at 19; DPFF ¶ 467. Even ePlus acknowledged Lawson's redesign efforts in its reply. D.I 708 at 15; DPFF ¶ 468. And at oral argument on April 4, 2011, *both* parties mentioned the potential design-around, but the Court commented that "that's stuff that's really not before me on either side, is it?" D.I. 720 at 112; DPFF ¶ 469. ePlus agreed that the propriety of Lawson's developing design-around was not before the Court. *Id.* Rebutting any possible challenge about

Lawson's forthrightness, Lawson again informed the Court and ePlus of its design-around in a May 6, 2011 *docketed* letter that described in detail the features of the redesigned product and Lawson's intention to release it "in the next few weeks." D.I. 727 at 1; DPFF ¶470. And the Court specifically discussed Lawson's design-around—including its general availability—in its May 23, 2012 Memorandum Opinion. D.I. 728 at 42 & n.10; DPFF ¶ 471. Even though it was not legally required to share its redesign efforts, particularly before it had concluded that a workaround was feasible, Lawson did so in the interest of full transparency. While ePlus points to an April 13, 2011 email in which a Lawson marketing employee was asked to retract a prior internal statement regarding RQC's feasibility, the reality is that Lawson had no finalized product at that time, had not even *conceived* of the modifications at issue in this case, and Lawson has a policy of not announcing software prior to its official release because release dates often get delayed or cancelled unpredictably. DPFF ¶¶ 472-73, 475. When Lawson did have a product in near-final form, it told ePlus and the Court in detail. D.I. 727; DPFF ¶ 474.

ePlus's personal attack on Mr. Hager and his testimony at the March 25, 2011 evidentiary hearing is equally misguided. Mr. Hager was asked no questions about a design-around—he was asked only about the implications of a customer having to replace Lawson's entire system with a third-party solution. DPFF ¶¶ 476-78. Moreover, at that time, Mr. Hager knew that any proposed design-around lacked legal approval, committed delivery, and development commitment, and Lawson was unsure whether a sufficient redesign was even possible, so there was nothing non-speculative to even testify about. DPFF ¶¶ 479-80. Indeed, the RQC modification at issue in this contempt proceeding was not even *conceived* until nearly a month after Mr. Hager testified. DPFF ¶ 481. Finally, there is no indication that Mr. Hager intentionally overstated the harm to healthcare customers should Lawson be enjoined, or that he

overstated the number of healthcare customers.  Mr. Hager testified based on his own

knowledge, cross-checked by an email inquiry to Keith Lohkamp, and believed that his

testimony was truthful.  DPFF ¶¶ 482.  ePlus brazenly tries to impeach Mr. Hager's intentions by

displaying an email *not admitted into evidence*, PX-1229, which has not been authenticated and

contains multiple levels of inadmissible hearsay.  Indeed, Mr. Hager's testimony at the injunction

hearing actually *understated* the number of healthcare customers Lawson had and that the Court

ultimately carved out in its order.  DPFF ¶ 483.

## IV.    ePLUS IS NOT ENTITLED TO RECOVER ITS ATTORNEYS' FEES

While ePlus glosses over the applicable legal standard with regard to attorneys' fee

awards in the civil contempt arena, citing only the standard applicable in underlying

infringement actions, the law in the Fourth Circuit is well established.  Fees can be awarded only

upon a finding of "'willful disobedience' of a court order."  *Omega World Travel, Inc. v. Omega*

*Travel and Shipping Agencies, Inc.,* 905 F.2d 1530, at *4 (4th Cir. May 10, 1990) (rejecting fee

award despite civil contempt finding).  This requires "more than a finding of contemnor

knowledge of its violation of the terms of the decree."  *Columbia Gas Transmission Corp. v.*

*Mangione Enterprises of Turf Valley*, 964 F. Supp. 199, 204 (D. Md. 1996).  Rather, ePlus must

prove that Lawson's conduct "r[o]se to the level of obstinacy, obduracy or recalcitrance."

*Omega*, 905 F.2d at *4; *Columbia Gas*, 964 F. Supp. at 204.[11]

---

[11]  ePlus first concedes that fee awards are justified only in "exceptional cases," ePlus Rem. Br.
at 23, but then implies a contempt finding is itself sufficient, citing *dictum* in *LMK Enter.,*
*Inc. v. Perma-Liner Indus., Inc.* 2012 U.S. Dist. LEXIS 31542 (M.D. Fla. Mar. 9, 2012), an
inapposite out-of-circuit case, for the proposition that willfulness is unnecessary.  Fourth
Circuit law establishes otherwise.  *Omega*, 905 F.2d at *4; *see also, e.g., S.E.C. v. Dowdell*,
2002 WL 424595, at *16 (W.D. Va. Mar. 14, 2002) ("A court is required to make a finding
of obstinance and recalcitrance before it can assess attorney's fees for the willful
disobedience of a court order. . . . Indeed, such attorneys' fees awards are to be granted only
in exceptional circumstances."); *Lane v. Prima Marketing LLC*, 2008 WL 793642, at *7

ePlus falls far short of its heavy burden to set this case apart as "exceptional," or to prove that Lawson has willfully disobeyed the Court's order to the level of obstinacy, obduracy or recalcitrance.  As described, Lawson attempted in good faith to carry out its work-around and disclosed its specifics to both the Court and ePlus before the redesigned product's release and even the injunction's issuance.  D.I. 727; DPFF ¶¶ 454-86, 620-23.  The record is devoid of evidence that Lawson willfully disobeyed or refused to comply with the Court's injunction, and any fair assessment points to the contrary.  *See* Lawson Color. Br. at 21-25; Lawson Infr. Br. at 16-25; DPFF ¶¶ 487-88.  Thus, no fee award is warranted or permissible under the prevailing law.

An award of attorneys' fees is particularly inappropriate here based on the particular facts and circumstances of this case.  As this Court is well aware, when ePlus commenced this contempt proceeding, it was based on multiple claims within multiple patents.  Lawson incurred substantial attorneys' fees defending against ePlus's contempt allegations as to all of these claims.  Then, the Federal Circuit ruled on Lawson's appeal and found several of ePlus's patents to be invalid, and further found a lack of evidence of infringement on all of the remaining claims except for Claim 26.  There is of course no basis on which this Court should, or could, award ePlus any fees that it incurred pursuing a contempt proceeding as to invalid patents or reversed jury findings.  But more than just limiting an award of attorneys' fees, the unusual procedural posture and facts of this case counsel against any award of attorneys' fees at all.  While ePlus has incurred fees pursuing the contempt proceeding as to Claim 26, Lawson has incurred substantial

---

(S.D. W.Va. Mar. 20, 2008) ("An award of attorneys' fees . . . requires the Court to find that the contemnor acted with 'willful disobedience.'"); *Omega World Travel, Inc. v. Omega Travel, Inc.*, 710 F. Supp. 169, 172-73 (E.D. Va. 1989); *Columbia Gas*, 964 F. Supp. at 204; *Wagner v. Board of Educ. of Montgomery County, Maryland*, 340 F. Supp. 2d 603, 620 (D. Md. 2004).

attorneys' fees defending a contempt proceeding that was based on invalid patents.  Unless this Court is inclined to award Lawson its fees as to that portion of the contempt proceeding that was based on invalid patents that ePlus has decidedly *lost* on the merits, fairness and equity would counsel that each party should bear its own attorneys' fees.

## V.   ePLUS'S SUGGESTED PROSPECTIVE COERCIVE REMEDIES ARE UNPRECEDENTED AND PREMATURELY SOUGHT

Any discussion of prospective coercive remedies is premature, as the Court has not yet ruled on the continuing propriety *vel non* of the injunction, which the Federal Circuit has mandated must be modified and Lawson has moved to dissolve.  But even if the injunction's viability is assumed, ePlus's suggested remedies—beyond expanding the injunction to reflect RQC—lack *any* precedential support in the patent contempt context, are impermissible as a matter of both law and common sense, and would place this Court as the day-to-day monitor of the parties' toxic relationship until the patent expires in 2017.  This is the wrong sort of case for coercive remedies, as the conduct to be "coerced" is insufficiently identified.  **Daily fines are awardable only to coerce affirmative discreet acts, not to prohibit sweeping categories of activity such that "determining compliance becomes much more difficult."**  *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 842 (1994) (Scalia, J., concurring).  They are also permissible only if they can be purged through compliance (*id.* at 828-29), but ePlus's proposals would force Lawson to pay excessive daily fines even if it complied *immediately* while awaiting the Court's stamp of approval.  Finally, the idea of shuttering Lawson's entire business operation because modifications made to one minor add-on feature proved insufficient to remove it from method Claim 26's ambit is facially absurd.  None of the cases ePlus cites are remotely apposite, and, frankly, no case in history supports the sweeping and amorphous "coercive" remedies ePlus seeks.  *Id.* at 842.  DPFF ¶¶ 624-29.

24

## VI.    ePLUS HAS PROVED NO REMEDY FOR ALLEGED USE OF RSS

In addition to alleging that Lawson's modified products fail the *TiVo* test, ePlus also alleges that Lawson violated the injunction by providing continuing support or maintenance to customers running unmodified versions of Configuration Nos. 3 or 5 containing RSS.  If the Court finds against Lawson on these claims (which it should not), no remedy should be awarded because ePlus has not even attempted to quantify:  (1) how many or which customers allegedly used RSS after the injunction; (2) any associated revenue or profit to Lawson; or (3) how ePlus was damaged.  Tr. 933:16-934:11 (Ugone); DPFF ¶ 495.

## CONCLUSION

If the Court finds contempt and determines that the appropriate remedy in this case must compensate ePlus for the harm it has suffered as a result, then ePlus should recover nothing because it has not proved actual harm.  If instead the Court determines that the appropriate remedy is one that disgorges from Lawson the gains that it earned by violating the Court's injunction, it should disgorge Lawson's net profits, and it should limit that disgorgement to an amount reflecting the substantial non-infringing uses of Configuration Nos. 3 and 5 and that subtracts the profits Lawson could still have earned while complying with the injunction.  The measures addressed in this brief are set out on the attached Exhibit A.

Dated:  April 22, 2013

LAWSON SOFTWARE, INC.


By: _____/s/_____

Dabney J. Carr, IV, VSB #28679
Robert A. Angle, VSB #37691
**TROUTMAN SANDERS LLP**
P. O. Box 1122
Richmond, Virginia  23218-1122
Telephone: (804) 697-1200
Facsimile: (804) 697-1339
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com


Josh A. Krevitt (admitted *pro hac vice*)
Daniel J. Thomasch (admitted *pro hac vice*)
Richard W. Mark (admitted *pro hac vice*)
Christopher D. Dusseault (admitted *pro hac vice*)
Jason C. Lo (admitted *pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

*Attorneys for Defendant Lawson Software, Inc.*

## CERTIFICATE OF SERVICE

I certify that on this 22nd day of April, 2013, a true copy of the foregoing will be filed electronically with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Craig T. Merritt
Paul W. Jacobs, II
Henry I. Willett, III
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
cmerritt@cblaw.com
pjacobs@cblaw.com
hwillett@cblaw.com

Jennifer A. Albert
David M. Young (VSB No. 35997)
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001
jalbert@goodwinprocter.com
dyoung@goodwinprocter.com

*Attorneys for Plaintiff*

Michael G. Strapp
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, MA 02109-2881
mstrapp@goodwinprocter.com

 

_____ /s/
Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
Megan C. Rahman (VSB No. 42678)
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
megan.rahman@troutmansanders.com
**TROUTMAN SANDERS LLP**
1001 Haxall Point
Richmond, VA 23219
Telephone:  (804) 697-1200
Facsimile:  (804) 697-1339
*Counsel for Defendant Lawson Software, Inc.*