# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| *e*PLUS INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 3:09-CV-620** |
| | ) | **(REP)** |
| **v.** | ) | |
| | ) | |
| **LAWSON SOFTWARE, INC.,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF *e*PLUS INC.'S POST-HEARING REPLY
## <u>BRIEF ON REMEDIES</u>

Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB#35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000


Michael G. Strapp (admitted *pro hac vice*)     Craig T. Merritt (VSB #20281)
**GOODWIN PROCTER LLP**                          Paul W. Jacobs, II (VSB #16815)
Exchange Place                                   **CHRISTIAN & BARTON, LLP**
53 State Street                                  909 East Main Street, Suite 1200
Boston, MA 02109-2881                            Richmond, Virginia 23219-3095
Telephone:  (617) 570-1000                       Telephone: (804) 697-4100

*Attorneys for Plaintiff ePlus Inc.*

# TABLE OF CONTENTS

Page

I.      DISGORGEMENT OF LAWSON'S GAINS IS AN APPROPRIATE REMEDY ............1

II.     *e*PLUS ACCURATELY MEASURED LAWSON'S GAINS .........................................2

    A.      *e*Plus Has Accurately Calculated Lawson's Revenue ...............................................2

        1.      Lawson's Contempt Revenues Should Include All LSF/Process Flow Revenue ........................................................................................ 3

        2.      Lawson's Contempt Revenues Should Include License Revenue From Lawson's Healthcare Customers ...................................................... 3

    B.      The Court Should Award *e*Plus Disgorgement of Lawson's Gross Profits............4

III.    LAWSON'S ATTEMPTS TO QUANTIFY DISGORGEMENT ARE FLAWED ...........6

    A.      Dr. Putnam's Incremental Profit Regression Model Is Unreliable .........................6

    B.      Disgorgement of Lawson's Net Profits Would Be Inappropriate...........................7

    C.      A Disgorgement Award Based On Purported "Non-Infringing Uses" Of The Infringing Configurations Would Be Error ........................................................8

IV.     *e*PLUS IS ENTITLED TO ENHANCED DAMAGES FOR LAWSON'S WILLFUL INFRINGEMENT .....................................................................................9

V.      THE COURT SHOULD FIND THIS CASE EXCEPTIONAL AND AWARD ePLUS ATTORNEYS' FEES AND COSTS ..................................................13

VI.     COERCIVE REMEDIES ARE APPROPRIATE TO PREVENT ONGOING CONTEMPT ...........................................................................................................14

VII.    CONCLUSION.........................................................................................................15

<u>**TABLE OF AUTHORITIES**</u>

Page(s)

**Cases**

*Alopex Indus., Inc. v. Seibel*,
   61 F.3d 919, 1995 WL 424845 (Fed. Cir. July 18, 1995) .......................................................... 10

*August Tech. Corp. v. Camtek Ltd.*,
   2011 WL 7615088 (D. Minn. Aug. 11, 2011) ......................................................................... 10

*Brine, Inc. v. STX, L.L.C.*,
   367 F. Supp. 2d 61 (D. Mass 2005) *aff'd*, 139 Fed. App'x 281 (Fed. Cir. 2005) ..................... 6

*Broadcom Corp. v. Qualcomm Inc.*,
   Case No. 8:05-cv-00467-JVS-RNB, Dkt. No. 1313 (C.D. Cal. Aug. 28, 2008) ................... 2, 6

*Buffalo Wings Factory, Inc. v. Mohd*,
   574 F. Supp.2d 574 (E.D. Va. 2008) ...................................................................................... 15

*Celanese Corp. v. BP Chemicals, Ltd.*,
   78 F.3d 1575 (Fed. Cir.1996) ................................................................................................ 11

*ePlus, Inc. v. Lawson Software, Inc.*,
   700 F.3d 509 (Fed. Cir. 2012) ............................................................................................. 8, 9

*Harris Research, Inc. v. Perrine*,
   2009 WL 1457674 (D. Utah May 22, 2009) ........................................................................... 10

*Highmark, Inc. v. Allcare Health Mgmt. Sys. Inc.*,
   701 F.3d 1351 (Fed. Cir. 2012) ............................................................................................. 14

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) ............................................................................................... 11

*In re Seagate Tech., LLC*,
   497 F.3d 1360 (Fed. Cir. 2007) ............................................................................................. 10

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
   512 U.S. 821 (1994) .......................................................................................................... 14, 15

*Leman v. Krentler-Arnold Hinge Last Co.*,
   284 U.S. 448 (1932) ................................................................................................................. 1

*Powell v. Home Depot U.S.A., Inc.*,
   663 F.3d 1221 (Fed. Cir. 2011) ............................................................................................. 14

*Proveris Scientific Corp. v. Innovasystems, Inc.*,
   Case No. 1:05-cv-12424, Dkt. No. 266 (D. Mass. Sep. 5, 2012) ........................................ 2, 6

*Read Corp. v. Portec*,
   970 F.2d 816 (Fed. Cir. 1992) ............................................................................................... 11

*Schaefer Fan Co., Inc. v. J&D Mfg.*,
   265 F.3d 1282 (Fed. Cir. 2001) ................................................................. 2

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
   106 F.2d 45 (2d Cir. 1939) ....................................................................... 8

*Spectralytics, Inc. v. Cordis Corp.*,
   649 F.3d 1336 (Fed. Cir. 2011) .......................................................... 11, 14

*Synqor, Inc. v. Artesyn Techs., Inc.*,
   709 F.3d 1365 (Fed. Cir. 2013) ............................................................... 11

*Takeda Chem. Indus. v. Mylan Labs. Inc.*,
   549 F.3d 1381 (Fed. Cir. 2008) ............................................................... 14

*TiVo Inc. v. EchoStar Corp.*,
   655 F. Supp. 2d 661 (E.D. Tex. 2009) ....................................................... 1

*TiVo, Inc. v. EchoStar Corp.*,
   646 F.3d 869 (Fed. Cir. 2011) ................................................................... 1

*Transclean Corp. v. Bridgewood Servs., Inc.*,
   290 F.3d 1364 (Fed. Cir. 2002) ............................................................... 14

*United States v. Darwin Construction Co., Inc.*,
   873 F.2d 750 (4th Cir. 1988) ................................................................... 15

*Whitserve, LLC v. Computer Packages, Inc.*,
   694 F.3d 10 (Fed. Cir. 2012) .............................................................. 11, 14

**Statutes**

35 U.S.C. § 285 .................................................................................... 13, 14

## I.  DISGORGEMENT OF LAWSON'S GAINS IS AN APPROPRIATE REMEDY

Lawson argues that disgorgement of gain "is not an appropriate compensatory civil contempt remedy," Dkt. 1072 at 2, even though the Court already ruled that "disgorgement of profits remains an available compensatory remedy in civil contempt cases."  Dkt. 1032 at 8-11 (considering "the continuing validity" of the Supreme Court's holding in *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448 (1932), and deciding that *Leman* remains valid).  Lawson also suggests that disgorgement is inappropriate because there is no "evidence of ePlus's actual loss," Dkt. 1072 at 2, notwithstanding the Court's decision that "[d]isgorgement of profits remains a viable remedy in civil contempt proceedings, even when a plaintiff cannot demonstrate 'actual pecuniary' loss," Dkt. 1032 at 9, and that *e*Plus in fact suffered "lost sales of Procure+ and Content+, lost market share in the e-procurement software market, lost opportunities to cross-sell and up-sell its VAR technology, reputational injury, and its need to have diverted a substantial amount of its limited resources away from research and development of Procure+ and Content+ toward litigation expenses."  Dkt. 728 at 13.

Lawson claims that disgorgement is "an extreme sanction reserved for egregious behavior," citing a few post-*TiVo* cases where district courts fashioned awards other than disgorgement after findings of contempt.  Dkt. 1072 at 3.  However, *TiVo* set the standard for determining when contempt may be found; it did not purport to limit the remedies available in a contempt action.  *TiVo, Inc. v. EchoStar Corp.*, 646 F.3d 869, 890 (Fed. Cir. 2011).[1]

---

[1] *TiVo* itself was a case where the plaintiff was awarded damages that included, in part, a disgorgement of the contemnor's profits.  The district court in *TiVo* enhanced the jury's royalty rate ($1.25 per DVR subscriber) by imposing an additional sanction ($1 per DVR subscriber) to promote EchoStar's compliance with the court order.  *TiVo Inc. v. EchoStar Corp.*, 655 F. Supp. 2d 661, 666 (E.D. Tex. 2009).  The additional sanction was effectively a disgorgement of the additional revenue generated from each sale of the infringing DVR product.  *Id.* at 665.

Furthermore, courts in several jurisdictions have awarded disgorgement of the contemnor's profits to the injured party in patent contempt proceedings. *See Broadcom Corp. v. Qualcomm Inc.*, Case No. 8:05-cv-00467-JVS-RNB, Dkt. No. 1313, at 24-25 (C.D. Cal. Aug. 28, 2008) (awarding gross profits and holding that "[d]isgorgement of Qualcomm's unjust gain is not punitive; it merely transfers that gain to the party harmed by its conduct") (Ex. A); *Schaefer Fan Co., Inc. v. J&D Mfg.*, 265 F.3d 1282, 1290-91 (Fed. Cir. 2001) (affirming award of damages that reflected gross sales of the entire functional unit and attorneys' fees and costs to the plaintiff); *Proveris Scientific Corp. v. Innovasystems, Inc.*, Case No. 1:05-cv-12424, Dkt. No. 266 (D. Mass. Sep. 5, 2012) (awarding disgorgement of gross profits and attorneys' fees in patent contempt proceeding ) (Ex. B).

## II.    *e*PLUS ACCURATELY MEASURED LAWSON'S GAINS

The Court can use any of the following measures to determine the gains associated with the infringing configurations: (1) Lawson's revenues, (2) Lawson's gross profits, or (3) Lawson's incremental profits. Any disgorgement award should rely on the revenue and profit calculations provided by Dr. Ugone, *e*Plus's expert.[2] These calculations are demonstrably more reliable than Lawson's attempts to estimate the revenues and profits it received from licensing, maintaining and servicing the Infringing Configurations.

### A.    *e*Plus Has Accurately Calculated Lawson's Revenue

Lawson acknowledges that *e*Plus has accurately measured the license, maintenance and service revenue Lawson gained from the Infringing Configurations in almost all respects. Lawson disagrees only with the inclusion in its revenues regarding (1) LSF/Process Flow and (2) licensing the Infringing Configurations to its healthcare customers during the sunset period. PFF

---

[2] Attached for the Court's convenience as Exhibit C are the disgorgement measures addressed in *e*Plus's opening post-hearing brief on remedies and herein.

¶¶ 156-157.  The Injunction Order makes clear that the LSF/Process Flow revenue and the license revenue Lawson earned from healthcare customers should be included in calculating revenues Lawson earned from the Infringing Configurations.

### 1. Lawson's Contempt Revenues Should Include All LSF/Process Flow Revenue

Lawson's insistence that the Court apportion both the Large Suite SKU and LSF/Process Flow revenues it earned from the Infringing Configurations ignores the important differences between the two:  apportionment for Large Suite SKUs is necessary, but apportionment for LSF/Process Flow is optional.  Dr. Ugone explained that revenues realized from Large Suite SKUs should be apportioned because some of the revenue that Lawson receives for those SKUs are attributable to software modules that are not part of the Infringing Configurations.  PFF ¶ 161.  Unlike the modules that make up the Large Suite SKUs, however, ***there is no dispute that both the LSF and Process Flow modules are part of the Infringing Configurations***.  Dkt. 729 at 2-3.  Thus, unlike the Large Suite SKUs, LSF and Process Flow cannot be further subdivided into infringing and non-infringing modules.  To determine how much revenue Lawson receives for licensing, maintaining, and servicing the Infringing Configurations, all revenues Lawson has earned from licensing, maintaining and servicing LSF and Process Flow should be counted.  PFF ¶ 163.

### 2. Lawson's Contempt Revenues Should Include License Revenue From Lawson's Healthcare Customers

Lawson's licensing of the Infringing Configurations to healthcare customers during the sunset period violated the Injunction Order.  The sunset provision carves out the specific acts Lawson was permitted to engage in for a six-month period for its healthcare customers:  "installation, implementation, design, configuration, consulting, upgrade, maintenance, support, training, and other related and associated services."  Dkt. 729 at 4.  ***The Injunction Order does***

***not permit Lawson to license the Infringing Configurations to anyone during the sunset
period.***  Furthermore, the sunset provision was expressly limited to "customers who previously
purchased the adjudicated infringing systems."  *Id*.  The purpose of the sunset provision was not
to permit Lawson to sell additional Infringing Configurations to its existing healthcare customers
or to sell Infringing Configurations to new healthcare customers.  Because the sunset provision
did not provide a carve-out for Lawson to sell additional or new licenses to healthcare customers,
Lawson's revenue from licensing the Infringing Configurations should include revenue Lawson
obtained from selling the Infringing Configurations to its healthcare customers during the six-
month period after the Injunction Order.

### B.   The Court Should Award *e*Plus Disgorgement of Lawson's Gross Profits

Dr. Putnam and Dr. Ugone agree that the direct costs of licensing, maintenance and
service are properly deducted from Lawson's revenues to calculate the gross profits associated
with the Infringing Configurations.  PFF ¶¶ 174-175.  In fact, *e*Plus and Lawson agree that the
applicable gross profit margin for the Infringing Configurations is 66%.  PFF ¶ 175.
Nonetheless, Lawson argues that an award of gross profits would be "rank overreaching" because
gross profits is a measure of gain that Dr. Ugone "recognizes is incorrect."  Dkt. 1072 at 8-9.

Dr. Ugone did not reject an award of "gross profits" as incorrect.  Dr. Ugone testified that
disgorgement of gross profits is an option the "Court may consider."  (Ugone Cross) Tr. 976:4-5.
While Dr. Ugone acknowledged that the best economic measure of a contemnor's gain from its
wrongful conduct would be an award of incremental profits, he also explained that ***in this case***
there is no evidence to suggest that Lawson actually incurred additional incremental costs that
are specific to the Infringing Configurations.  Thus, when Dr. Ugone was asked why he had not
deducted some portion of Lawson's research and development ("R&D") costs to calculate
Lawson's incremental profits, Dr. Ugone testified that "there's been no R&D specific to the

infringing configurations that have been identified by Lawson."  (Ugone Cross) Tr. 982:17-20;
PFF ¶ 184.  Indeed, the Court itself noted that "the evidence is all of this happened in about two
days.  So the R&D costs, whatever they would be, would be negligible."  (Ugone Cross) Tr.
985:21-986:2.  Similarly, when asked whether it made sense not to deduct any general and
administrative ("G&A") costs to calculate Lawson's incremental profits, Dr. Ugone explained
that, "*in the facts and circumstances of this case* when we look at the infringing situations over
the injunction period, and you look at the nature of what comprises each of these costs, and you
look at the smallness of the revenues as a percentage of overall Lawson revenues, then yes, it
makes sense."  (Ugone Cross) Tr. 989:14-990:1; PFF ¶ 184.

Just as there was no evidence that Lawson incurred incremental R&D or G&A costs
specific to the Infringing Configurations, there was no evidence that Lawson incurred any sales
and marketing costs allocable to the Infringing Configurations.  Although Dr. Ugone
acknowledged that it was possible that portions of Lawson's sales and marketing expenses, such
as sales commissions, could vary with revenue Lawson gained from the Infringing
Configurations, he testified that "[i]t's highly unlikely that all [sales and marketing expenses]
would be variable related to the infringing configurations during the injunction period."  (Ugone
Direct) Tr. 911:13-21.  Nevertheless, in a conservative effort to estimate Lawson's incremental
profits, Dr. Ugone "subtract[ed] out all of the sales and marketing expenses."  *Id.*; PFF ¶ 183.

The parties disagree about how to estimate Lawson's incremental profits related to the
Infringing Configurations.  Lawson relies on a deeply flawed regression model to "calculate"
incremental profits; ePlus proffers a conservative estimate of incremental profits based on the
deduction of all of Lawson's sales and marketing expenses.  Instead of relying on either parties'
incremental profit approach, *in this case and under these circumstances* it is appropriate to look

to a measure of profits the parties agree on and that Lawson reports in its profit and loss statements, namely Lawson's gross profits.  Disgorgement of gross profits, not incremental profits, is especially appropriate because there is no evidence in the record to suggest that Lawson actually incurred additional incremental costs that are specific to the Infringing Configurations.  *See* Dkt. 1032 at 18 ("As an initial matter, it should be noted that 'the burden of proof rests on the defendants to prove any deductions for its costs from the gross revenues attributable to contempt.'") (quoting *The Colonial Williamsburg Found. v. The Kittinger Co*, 792 F. Supp. 1397, 1407 (E.D. Va. 1992), aff'd 38 F.3d 133 (4th Cir. 1994)).

Lawson's claim that disgorgement of its gross profits would be unprecedented is incorrect.  Several courts have disgorged a contemnor's gross profits under very similar circumstances.  In 2005, for example, the Federal Circuit affirmed an award of gross profits in *Brine, Inc. v. STX, L.L.C.*, 367 F. Supp. 2d 61 (D. Mass 2005) *aff'd*, 139 Fed. App'x 281 (Fed. Cir. 2005).  The district court in *Brine* explained that in a contempt proceeding an award of gross profits was appropriate because of a "risk that the plaintiff will [otherwise] not be made whole" and because a "sanction in the amount of gross profit . . . provides a natural means of imposing a penalty that is proportional to the severity of the contempt."  *Id.* at 71.  Similarly, in *Broadcom*, Dkt. No. 1313 at 24-25 (Ex. A), and in *Proveris Scientific*, Dkt. No. 266 (Ex. B), district courts awarded gross profits as remedies in patent contempt proceedings.

## III.   LAWSON'S ATTEMPTS TO QUANTIFY DISGORGEMENT ARE FLAWED

### A.   Dr. Putnam's Incremental Profit Regression Model Is Unreliable

Lawson praises Dr. Putnam's "scientific" regression model, but ignores the fact that Dr. Putnam's model measures the wrong data.  Dkt. 1072 at 11.  Dr. Putnam computed an incremental profit margin based on Lawson's company-wide revenue, yet sought to apply it to specific products.  PFF ¶ 194; (Putnam Cross) Tr. 1045:10-18.  His calculations were based on

Lawson's global financial statements, although they are to be applied to only U.S. revenue and costs.  PFF ¶¶ 194–195.  All data points for Dr. Putnam's analysis occurred *before* Lawson was taken private, even though the Injunction Period began *after* that change, and Dr. Putnam admitted that a change in control of a business can lead to differences in the ways management addresses expenses.  (Putnam Cross) Tr. 1127:4-8; PFF ¶ 196–197; (Putnam Cross) Tr. 1125:8-12.  Dr. Putnam even admitted that the old, worldwide data he used for his regression and the new, U.S. data regarding Lawson's profits and losses from 2011 and 2012 "are not comparable." (Putnam Cross) Tr. 1126:18-1127:3.  Dr. Putnam ultimately chose to rely on data that was, by his own admission, not even "comparable" with recent, relevant data regarding Lawson's revenues and costs.[3]

###     B.    Disgorgement of Lawson's Net Profits Would Be Inappropriate

Lawson argues that net profits are the best measure of Lawson's gains because all categories of Lawson's spending benefit the Infringing Configurations.  Dkt. 1072 at 13.  The testimony of Mr. Samuelson, Lawson's former CFO, and Lawson's interrogatory responses reveal that many of Lawson's costs have nothing to do with the Infringing Configurations.  For example:

- Lawson's sales costs include salaries and commissions for *all* Lawson sales employees, as well as *all* costs associated with sales events and travel costs. (Samuelson Cross) Tr. 663:13-22.

- Lawson's G&A costs include *all* audit costs, costs associated with closing books, and IT infrastructure costs.  (Samuelson Cross) Tr. 664:5-21.

- Lawson's product development costs include *all* salaries for software developers, including developers who work on products unrelated to the Infringing Configurations.  (Samuelson Cross) Tr. 662:25-663:6.

---

[3] Unsurprisingly, Dr. Putnam's regression model built on company-wide, global, pre-acquisition financial statements yields predictions about U.S., post-acquisition costs and revenues that are wildly off the mark.  Dkt. 1058 at 12.

In fact, Lawson quantified its total development and testing costs for RQC as $38,000 to develop

RQC and $75,000 to test RQC.  PX-1269 at Interrog. No. 10.  Mr. Samuelson could not identify

a single additional cost associated with the development of RQC beyond the costs Lawson

identified in its interrogatory response.  (Samuelson Cross) Tr. 680:24-681:3.  Mr. Samuelson

even acknowledged that none of the costs associated with Lawson's product development, sales

and marketing, or G&A expenses can be specifically allocated to revenues for the Infringing

Configurations.  (Samuelson Cross) Tr. 672:21-673:8.[4]  For all of these reasons, net profit is an

inappropriate measure here for disgorgement.

### C.    A Disgorgement Award Based On Purported "Non-Infringing Uses" Of The Infringing Configurations Would Be Error

Lawson's contention that the Infringing Configurations have substantial non-infringing

uses has no basis.  It is pointless to argue hypothetically that a particular module could, in

isolation, be used in a non-infringing way; this Court enjoined the Infringing Configurations, not

individual software modules.  Dkt. 729 at 2-3.  The modules that comprise the Infringing

Configurations work together to perform the steps of the patented method of claim 26.  *ePlus,*

*Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 513-14 (Fed. Cir. 2012).  Lawson twice tried to

elicit testimony from Dr. Weaver to demonstrate that the Infringing Configurations could

theoretically be used in non-infringing ways, and it failed both times:  first, Lawson's counsel

got sidetracked trying to question Dr. Weaver about what was alleged about Configuration 2 at

trial ((Weaver Cross) Tr. 170:8-15); later, Lawson asked Dr. Weaver about the issue and he

---

[4] Lawson's reliance on *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45 (2d Cir. 1939), for the proposition that its net profits should be disgorged is misplaced.  Dkt. 1072 at 12-13.  In this 1939 case, the Second Circuit held that "'***Overhead' which does not assist in the production of the infringement should not be credited to the infringer***; that which does, should be; it is a question of fact in all cases."  *Sheldon*, 106 F.2d at 54.  Lawson's proposed net profits measure deducts from Lawson's revenues ***all of its overhead costs***, without regard for what did or did not "assist in the production of the infringement."  PFF ¶ 187.

testified that the Infringing Configurations have **no** substantial non-infringing uses. (Weaver Cross) Tr. 783:21-784:1.  Lawson presented no testimony or evidence of any customer who has ever used the Infringing Configurations in any non-infringing way.  In fact, the only witness who testified regarding non-infringing uses was Dr. Putnam, Lawson's economics expert.  Dr. Putnam is not an expert in intellectual property law or computer science, and this Court agreed that Dr. Putnam was not qualified "to establish what is and what is not a non-infringing use." (Putnam Cross) Tr. 1110:22-1111:18.

Lawson also argues that "where a larger product's infringing feature does not drive the product's demand, as a matter of law, damages must be apportioned to represent only the value of the patented feature," and therefore damages must be apportioned to represent only the value of Punchout.  Dkt. 1072 at 16.  This argument makes no sense as Punchout is not the "infringing feature"; the infringing features of the Infringing Configurations are based on the functionality of all the modules that make up those configurations and that are used to perform the steps of the method in claim 26.  *ePlus, Inc.*, 700 F.3d at 513-14.[5]

## IV.  *e*PLUS IS ENTITLED TO ENHANCED DAMAGES FOR LAWSON'S WILLFUL INFRINGEMENT

Lawson suggests that an award of enhanced damages in this case would require the Court to "forge new ground," ignoring black-letter law that permits courts to order enhanced damages

---

[5] Moreover, the suggestion that Punchout did not drive sales of Infringing Configurations is baseless.  Lawson's only support for this position comes from sound bites plucked with no regard for context.  In October 2009, when the depositions cited by Lawson were taken, all five configurations of Lawson's software were at issue, implicating nearly 2000 Lawson customers, less than 10% of whom had Punchout.  Dkt. 1072 at 16 (quoting Dkt. 641 at 20, which paraphrases statements made by Mr. Hager and Mr. Lohkamp at depositions in October 2009). At that time, testimony from Lawson witnesses that Punchout did not drive sales of all five software configurations to all of Lawson's customers made sense.  However, it would be absurd to suggest, now that 100% of the customers still at issue have chosen to pay to license Punchout, that the desire to license Punchout is not a driver of the sales at issue in this proceeding.

if a defendant's conduct was willful.[6]  Dkt. 1072 at 19.  Lawson's argument that enhanced

damages would be "a reversible abuse of discretion" is simply not credible, especially in light of

the fact that Lawson does not even offer a defense to willfulness, failing to cite even once the

seminal *Seagate* case in its 250 pages of post-hearing briefs.  *See In re Seagate Tech., LLC*, 497

F.3d 1360 (Fed. Cir. 2007).

Furthermore, Lawson's contention that double or triple damages would be an abuse of

discretion because a disgorgement award would fully compensate *e*Plus, is contrary to its prior

admission that ***a compensatory award of damages can be doubled or tripled by a district court***

***in a contempt proceeding***:

> ***The cases have held that the compensatory award has to be tied***
> ***to actual loss.  It doesn't have to be only the amount of the actual***
> ***loss. Some cases have doubled it, some have tripled it.  Some***
> ***have doubled the actual loss, some have tripled it.***

Dkt. 943 (Feb. 29, 2012 Hearing Tr.) at 136:24-137:12.; *see also Harris Research, Inc. v.*

*Perrine*, 2009 WL 1457674, at *9 (D. Utah May 22, 2009) (ordering in a contempt proceeding

enhanced penalties and attorneys' fees and costs for willful infringement because defendants'

business showed substantial growth from continuing to market and distribute the infringing

products and because defendants' infringing activities continued unabated until the week before

the contempt hearing).

Moreover, on multiple occasions, the Federal Circuit has upheld a district court's award

of enhanced damages, stating that the "paramount determination in deciding to grant

enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all

---

[6] *See, e.g., Alopex Indus., Inc. v. Seibel*, 61 F.3d 919, 1995 WL 424845, at *3 (Fed. Cir. July 18,
1995) (affirming award of treble damages for contempt); *August Tech. Corp. v. Camtek Ltd.*,
2011 WL 7615088, at *5 (D. Minn. Aug. 11, 2011) (finding enhanced damages and award of
attorney fees appropriate for contempt).

the facts and circumstances." *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1349 (Fed. Cir. 2011); *Synqor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1385 (Fed. Cir. 2013) (affirming award of enhanced damages for post-trial infringement because of egregious conduct "in continuing, and even increasing, sales in the face of an infringement verdict"); *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 37 (Fed. Cir. 2012) (holding that "[a]n act of willful infringement satisfies th[e] culpability requirement and is, without doubt, sufficient to meet the first requirement to increase a compensatory damages award"); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 858 (Fed. Cir. 2010) (affirming award of enhanced damages).[7]

The evidence of Lawson's egregious conduct is substantial.  First, Lawson's claim that it "attempted in good faith to design around the claims" and that there is no evidence that "Lawson and its counsel did not genuinely believe they had complied with the Court's injunction" is contrary to the record.  Dkt. 1072 at 19-20.  In fact, Lawson rejected its counsel's advice to make further design changes to avoid infringing *e*Plus's patent.  Even after Lawson released RQC, Lawson's lawyers advised that additional changes to the Infringing Configurations were still necessary, but Lawson ignored that advice by refusing to remove the inventory determination capabilities from the Punchout sites:

---

[7] The factors courts may consider when determining whether to enhance damages include (1) whether the infringer deliberately copied the ideas or design of another, (2) whether the infringer knew of the patent, investigated the patent's scope and formed a good-faith belief of its invalidity or non-infringement, (3) the infringer's behavior as a party to the litigation, (4) the infringer's size and financial condition, (5) the closeness of the case, (6) the duration of Defendant's misconduct, (7) remedial action by the infringer, (8) the infringer's motivation for harm and (9) whether the infringer attempted to conceal its misconduct.  *Read Corp. v. Portec*, 970 F.2d 816, 826 (Fed. Cir. 1992), *superseded on other grounds* as recognized by *Hoechst Celanese Corp. v. BP Chemicals, Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir.1996); *see also Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1241 (Fed. Cir. 2011) (affirming award of enhanced damages for willfulness because court properly applied the *Read* factors to find that enhancement was appropriate).

> Q:      When your lawyers told you you had to make another change to Punchout to remove the inventory capabilities from the Punchout sites, you didn't accept their advice, did you?
>
> A:      We had a discussion on that, and I did not accept it, correct.

PFF ¶ 30.  Furthermore, Lawson personnel stated that they were "scared" that RQC did not comply with the Injunction Order, yet Lawson continued to sell, maintain and support configurations with RQC.  PFF ¶ 203.

Second, Lawson took no steps to ensure that its customers uninstalled RSS and, in fact, has encouraged and instructed its customers to continue using the Infringing Configurations with RSS.  PFF ¶¶ 124, 126, 127.  RQC was specifically designed by Lawson so that Lawson's customers could run RQC in parallel with RSS.  PFF ¶ 124.  And Lawson instructed its customers about how to run RSS in parallel with RQC even if those customers were not covered by the sunset provision of the Court's Injunction Order.  PFF ¶ 210.

Third, Lawson misled the Court at the March 25, 2011 injunction evidentiary hearing. Lawson defends its material omission of evidence with this argument:  "Mr. Hager was asked no questions about a design-around—he was asked only about the implications of a customer having to replace Lawson's entire system with a third-party solution."  Dkt. 1072 at 21-22.  The argument is remarkable at two levels.  Mr. Hager was a senior executive, overseer of the S3 product line, reporting directly to the CEO, and involved in the plan to offer customers a "design around" that had its genesis in February 2011.  Mr. McDonald, as Lawson points out, was its lead trial counsel and worked on the redesign effort.  Defendant's Proposed Findings of Fact ("DPFF") ¶ 38.  Neither the Court nor *e*Plus had any knowledge of Lawson's "design around" plan on March 25, 2011.  Lawson simply elides the obvious question:  given what was at stake

for the parties, for Lawson's customers, and for the Court, why did Mr. McDonald fail to elicit testimony from Mr. Hager that presented an accurate picture of Lawson's design-around plans?[8]

More to the point, the record shows that Mr. McDonald did ask Mr. Hager a neutral, open-ended question that should have led to testimony about the ongoing plan to release the RQC "design-around."  Mr. Hager was asked, "If Lawson were enjoined from servicing its existing RSS and Punchout customers, how would that work?"  Dkt. 727 (Inj. Hr. Tr.) 211:18-212:1.   Mr. Hager launched into a description of the very scenario Lawson was planning to avoid, testifying that an injunction that would prohibit Lawson from servicing and maintaining RSS and Punchout would be extraordinarily difficult to implement, particularly for Lawson's healthcare customers, and that to replace RSS with "something else" would take, nine months, thousands of hours and hundreds of thousands of dollars for Lawson's "average" healthcare customer.  PFF ¶¶ 211-212. Mr. Lohkamp admitted at the contempt hearing that no plan existed that would have resulted in such a cataclysmic outcome for customers.  PFF ¶¶ 223-224; (Lohkamp Cross) Tr. 433:4-6 ("Q: Lawson never had a contingency plan, though, to have its customers rip out RSS and replace with ePlus; correct?  A:  Correct.").

## V.    THE COURT SHOULD FIND THIS CASE EXCEPTIONAL AND AWARD ePLUS ATTORNEYS' FEES AND COSTS

Lawson's argues that under the Fourth Circuit standard, *e*Plus should not be awarded attorneys' fees.  Dkt. 1072 at 22-23.  However, *e*Plus is seeking attorneys' fees and costs under 35 U.S.C. § 285, a section dealing specifically with the grant of attorneys' fees in a patent

---

[8] At the time of the injunction hearing, Lawson had already begun unit testing for RQC and Lawson developers had already been meeting on nearly a daily basis for six weeks to configure and design RQC.  PFF ¶¶ 15, 17.  And within five days of the injunction hearing, Lawson held a launch meeting for RQC, and Mr. Hager confirmed that Lawson had already come up with a solution for its "design-around" product and that the "design-around" would be ready by May. PFF ¶¶ 18, 216, 218.

infringement action, and the applicable standard is the Federal Circuit standard for attorneys' fees. *See, e.g.*, *Spectralytics, Inc.*, 649 F.3d at 1349; *Pharmacia & Upjohn Co. v. Mylan Pharmaceuticals, Inc.*, 182 F.3d 1356, 1359 (Fed. Cir. 1999) (Federal Circuit "precedent governs the substantive interpretation of 35 U.S.C. § 285, which is unique to patent law").

The Federal Circuit has repeatedly held that ***the standard for awarding enhanced damages for willful infringement and that for attorneys' fees is the same***. *See, e.g., Highmark, Inc. v. Allcare Health Mgmt. Sys. Inc.*, 701 F.3d 1351, 1353 (Fed. Cir. 2012). The Federal Circuit has upheld awards of attorneys' fees and costs in several patent infringement cases under this standard. *See, e.g., Takeda Chem. Indus. v. Mylan Labs. Inc.*, 549 F.3d 1381, 1390 (Fed. Cir. 2008) (affirming award of the total amount of fee request and award of expert fees); *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1241 (Fed. Cir. 2011) (affirming determination of exceptional circumstances and award of attorneys' fees).[9]   Lawson's conduct in violating the Court's Injunction Order was both willful and egregious, and an award of fees is appropriate.

## VI.   COERCIVE REMEDIES ARE APPROPRIATE TO PREVENT ONGOING CONTEMPT

Lawson relies on *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 842 (1994), to support its argument that coercive remedies would be "unprecedented." The *Int'l Union* court focused on distinguishing a coercive civil fine from a retrospective criminal fine. *Int'l Union*, 512 U.S. at 837 (declining to conclude that the mere fact that the sanctions were

---

[9] Moreover, the Federal Circuit has held that if a district court denies a request for attorneys' fees after finding willful infringement, the district court *must* explain its decision not to award attorney fees. *See, e.g., Spectralytics*, 649 F.3d at 1349; *Whitserve, LLC,* , 694 F.3d at 37 (court abused its discretion in denying motion for enhanced damages and failing to explain why attorneys' fees were unwarranted); *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1379 (Fed. Cir. 2002) ("[T]he general rule [is] that the district court must normally explain why it decides that a case is not exceptional under 35 U.S.C. §285 when a factual finding of willful infringement has been established and, if exceptional, why it decides not to award attorney fees.").

announced in advance rendered them coercive and civil as a matter of constitutional law).  In its discussion of civil contempt sanctions, the Supreme Court expressly acknowledged that a coercive remedy is appropriate in a civil contempt proceeding so long as the contemnor ***"carries the keys of his prison in his own pocket: At any moment, he can end the sentence and discharge himself ... by doing what he had previously refused to do*.**"  *Int'l Union*, 512 U.S. at 844-5.  All of the coercive remedies *e*Plus has proposed are remedies that would be in place only until such time as Lawson complies with the Court's Injunction Order.  Because Lawson could end the sentence and discharge itself by doing what it previously refused to do – *i.e.,* by complying with the Injunction Order – the coercive remedies *e*Plus proposes are the types of coercive remedies the Supreme Court has endorsed.[10]

## VII.   CONCLUSION

*e*Plus respectfully requests that the Court find Lawson in contempt of the Court's injunction and enter an award imposing both compensatory remedies and coercive remedies to ensure that Lawson complies with the permanent injunction.  Additionally, *e*Plus respectfully requests that the Court award *e*Plus its attorney fees and costs incurred in the prosecution of this contempt proceeding.  Furthermore, the Court should exercise its discretion and enhance the amount of any compensatory award.

---

[10] Indeed, the coercive remedy of a daily fine that *e*Plus has proposed, is a remedy the Fourth Circuit has affirmed in a situation where a contemnor failed to abide by a court order.  *See United States v. Darwin Construction Co., Inc.*, 873 F.2d 750, 756 (4th Cir. 1988).  A similar remedy was imposed by this Court in a recent trademark infringement case where the defendant was ordered to pay a weekly fine as a coercive sanction for violation of consent decree.  *See Buffalo Wings Factory, Inc. v. Mohd,* 574 F. Supp.2d 574, 578 (E.D. Va. 2008).

Respectfully Submitted,

April 23, 2013                                    _____/s/_____
David M. Young (VSB #35997)
Jennifer A. Albert (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile: (202) 346-4444
dyoung@goodwinprocter.com
jalbert@goodwinprocter.com

Michael G. Strapp (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
Facsimile: (617) 523-1231
mstrapp@goodwinprocter.com

Craig T. Merritt (VSB #20281)
Paul W. Jacobs, II (VSB #16815)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
Facsimile: (804) 697-4112
cmerritt@cblaw.com

*Attorneys for Plaintiff ePlus Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of April, 2013, I will serve

### PLAINTIFF *e*PLUS INC.'S POST-HEARING
### BRIEF ON REMEDIES

with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) via email to the following:

| | |
|---|---|
| Daniel J. Thomasch, *pro hac vice*<br>Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, NY 10166-0193<br>(212) 351-3800<br><br>Jason C. Lo, *pro hac vice*<br>Gibson, Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071-3197<br>(213) 229-7153<br>VAED-620ExternalServiceList@gibsondunn.com | Robert A. Angle, VSB#37691<br>Dabney J. Carr, IV, VSB #28679<br>TROUTMAN SANDERS LLP<br>P.O. Box 1122<br>Richmond, Virginia 23218-1122<br>(804) 697-1238<br>(804) 698-5119 (Fax)<br>robert.angle@troutmansanders.com<br>dabney.carr@troutmansanders.com<br><br>***Counsel for Defendant Lawson Software, Inc.*** |
| Donald R. Dunner, *pro hac vice*<br>Erika H. Arner, *pro hac vice*<br>Finnegan, Henderson, Farabow, Garrett &<br>Dunner, LLP<br>901 New York Avenue, NW<br>Washington, DC 20001<br>(202) 408-4000<br>(202) 408-4400<br>EXT-Lawson-FinneganCorrespondence@finnegan.com | |

                    _____/s/_____
                    David M. Young (VSB #35997)
                    GOODWIN PROCTER LLP
                    901 New York Avenue, N.W.
                    Washington, DC 20001
                    Telephone:  (202) 346-4000
                    Facsimile:   (202) 346-4444
                    dyoung@goodwinprocter.com