# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CASE NO: SACV 05-467 JVS(RNBx)

BROADCOM CORPORATION ,

                      Plaintiff,

              v.

QUALCOMM INCORPORATED,

                  Defendant.

ORDER RE

MOTION FOR CONTEMPT

On May 13, 2008, upon Application by Broadcom Corporation ("Broadcom"), the Court ordered Qualcomm Incorporated ("Qualcomm") to show cause why it should not be held in contempt for failing to comply with portions of the Permanent Injunction, entered December 31, 2007, as amended by the Court's subsequent orders. (Docket Nos. 995, 1072, 1183.)[1] Specifically, the Court directed Qualcomm to show cause why it should not be held in contempt for failing

---

[1] Unless otherwise indicated, all references herein to the Permanent Injunction are to the Second Amended and Restated Permanent Injunction, entered March 11, 2008, Docket No. 1183.

1

to comply with the '686 injunction,[2] the '010 injunction,[3] and the reporting requirements. (Order Granting in Part and Denying in Part Broadcom Corporation's Application for Order to Show Cause re Contempt of Permanent Injunction, §§ I-III, VIII.) The Court also ordered limited discovery.

Having considered the parties' further briefing and oral argument, the Court now enters its ruling, granting the Motion in part, denying the Motion in part, and ordering further proceedings.

I.    Legal Standards.

The parties are in agreement concerning the basic principles which govern this Motion, and they need be recited only briefly.

The Ninth Circuit has summarized this Circuit's law of contempt in In re Dual-Deck Video Cassette Recorder Antitrust Litigation, 10 F.3d 693, 95 (9th Cir. 1993):

> Civil contempt in this context consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply. The contempt need not be willful, and there is no good faith exception to the requirement of obedience to a court order. But a person should not be held in contempt if his action appears to be based on a good faith and reasonable interpretation of the [court's order]. Substantial compliance with the court order is a defense to civil contempt, and is not

---

[2] U.S. Patent No. 6,847,686.

[3] U.S. Patent No. 6,389,010.

2

<u>vitiated by a few technical violations</u> where every reasonable effort has been made to comply.

(Internal citations and quotation marks deleted; emphasis supplied.) Having initiated this proceeding, Broadcom bears the burden of proving contempt by clear and convincing evidence. <u>Id.</u>; <u>KSM Fastening Systems, Inc. v. H.A. Jones Co., Inc.</u>, 776 F.2d 1522, 1524 (Fed. Cir. 1985).

Substantive principles of patent law also come into play, particularly the doctrine of implied license. A patentee who has been fully compensated for the infringer's wrongful conduct has, as a matter of law, granted a license for continued use:

A patentee, in demanding and receiving full compensation for the wrongful use of his invention in devices made and sold by a manufacturer adopts the sales as though made by himself, and therefore <u>necessarily licenses the use of the devices, and frees them from the monopoly of the patent</u>. This license continues during the life of the machine; it does not end when repairs become necessary.

<u>Union Tool Co. v. Wilson</u>, 259 U.S. 107, 113 (1922) (emphasis supplied); <u>King Instrument Corp. v. Otari Corp.</u>, 814 F.2d 1560, 1564 (Fed. Cir. 1987).

II.     <u>The '686 Patent.</u>

   A.  <u>Scope of the '686 Injunction.</u>

The jury found that Qualcomm infringed the '686 patent, and awarded

3

$11,187,194 in damages.  Certain of the infringing products could be used on WCDMA networks, certain could be used on CDMA 1x/EV-DO ("CDMA") networks.  In crafting the '686 injunction, the Court carefully considered the differences between the market for chips in both environments, including competition and the availability of competitive alternatives.  (Memorandum of Decision re Injunctive Relief, p. 19, Docket No. 996 ["Injunction Memo"].)  Those considerations caused the Court to adopt a sunset provision for CDMA uses but not WCDMA uses.  The Court stayed the Injunction for CDMA uses:

> PROVIDED, . . . that with respect to '686 Infringing Products (i)  capable of operating on a CDMA2000 1xEV-DO network, (ii) which were on sale in or imported into the United States on or before May 29, 2007,[4] and (iii) with regard only to existing or prior customers of '686 Infringing Products as of May 29, 2007 (which status shall be determined separately with respect to each '686 Infringing Product), the injunction against activities listed in paragraphs (a) and (b) above shall be stayed until January 31, 2009, so long as:

> (a)      Qualcomm pays to Broadcom an ongoing royalty, consisting of 6% of all revenues received by Qualcomm for sales occurring after May 29, 2007 of '686 Infringing Products that are sold in or imported into the United States;

---

[4]Footnote 1 in original: With respect to each '686, '317, and '010 Infringing Product, such Infringing Product shall deemed to have been sold or imported into the United States if the sale resulted in an intermediate delivery outside the United States for purposes of manufacture, modification, incorporation into another device, or for like purposes, so long as the ultimate purpose of the transaction was for sale or importation of the Infringing Product into the United States.

4

(Permanent Injunction, § I, Proviso.)  Broadcom asserts that Qualcomm has violated the inunction in multiple contexts with regard to its sale and other practices surrounding chips for WCDMA, for convenience "WCDMA sales." Thus the first question is the effect of the Injunction on WCDMA sales.

Broadcom takes the position that the Injunction provides no sunset protection for WCDMA sales subsequent to December 31, 2007, the date of the Injunction.  Qualcomm does not directly dispute this, but takes a different and expansive view on the theory that subparagraph (a) requires it to pay a sunset royalty on all "'686 Infringing Products," including WCDMA Infringing Products, in order to avail itself of the CDMA sunset provision.  But Qualcomm does not stop there:  It argues that having paid a royalty on such WCDMA Infringing Products, it is entitled to the benefit of an implied license.  Qualcomm's reading is mistaken for several reasons.

Had the Court intended to grant a sunset provision for WCDMA Infringing Products, it would have done so directly and expressly.  Clearly, the sunset provision, as quoted above, is for CDMA chips only.  Moreover, Qualcomm's reading is directly contrary to the Court's express rationale for not adopting a sunset provision for WCDMA products: The Court intended to free Broadcom from head-to-head competition with Qualcomm using Broadcom's patented technology.  Thus the Court enjoined sales of those '686 chips in the market where Qualcomm and Broadcom compete.  (Injunction Memo, pp. 17-19.)

In the full context of '686 injunction, it is plain that the royalty provision refers to "Infringing '686 Products" which meet the further requirement that they serve CDMA networks.  Qualcomm enjoys neither the right nor does it have the obligation to pay a royalty on WCDMA products sold after May 29, 2007.

5

Qualcomm is ordered to revise and resubmit the April 14, 2008 royalty report accordingly.

At oral argument, Qualcomm asserted that during the meet-and-confer process leading to a motion to clarify the original Injunction, Broadcom had conceded that upon payment of royalties on WCDMA sales during the period between the jury's verdict, May 29, 2007, and the entry of the Injunction, December 31, 2007 (the "Window"), Qualcomm would have the right to support such WCDMA sales. Broadcom denied such agreement, and none is memorialized in the pleadings or otherwise. However, both parties asserted that their views were reflected in the subsequent briefing on the motion for clarification (Docket No. 1049). The Court invited limited additional letter briefs on the issue.

The original Injunction contained no express discussion of Qualcomm's right to support infringing chips. Among the clarifications adopted in the Amended and Restated Permanent Injunction, entered February 5, 2008 (Docket No. 1072), was a new Section VI entitled "Permissible Technical Support":

> Nothing is this Amended and Restated Permanent Injunction shall prohibit the Qualcomm Parties from providing service or technical support, including without limitation software debugging, for a '686, '317, or '010 Infringing Product for which Broadcom has been compensated under the jury's Verdict or for which Qualcomm is obligated to and makes a timely royalty payments in accordance with the sunset provisions in Section I, II, and III, supra. [5]

---

[5]The provision in the currently operative Second Amended and Restated Permanent Injunction is identical except for insertion of the word "Second" in the first line. (Permanent Injunction, § VI, Docket No. 1183.)

6

(Amended and Restated Permanent Injunction, Section VI; emphasis supplied.) Qualcomm argues that because it was obligated to pay royalties on WCDMA chip sales during the Window, the new provision permits it to support those chips. But that is the flaw. As discussed above, no such royalty obligation exists. Moreover, during the briefing on the motion for clarification, Qualcomm realized that the above formulation would potentially leave some infringing chip sales without support: "Qualcomm opposes Broadcom's proposed modification because the wording suggests there may be a subset of Qualcomm production that are not entitled to technical support." (Qualcomm Corporation's Opposition to Broadcom's Newly Proposed Modification to the Court's Injunction, p. 12.) The language which Broadcom had proposed is substantially similar to the language which the Court adopted.[6] At oral argument, the most favorable gloss Qualcomm could put on the provision was that it "doesn't speak to WCDMA one way or another." (Transcript, July 21, 2008, p. 41 ["Tr."].)

Admittedly, the Court's ruling leaves a lacuna in the relief granted under the '686 Patent. The jury awarded damages through the date of verdict, May 29, 2007; the Court enjoined sales of WCDMA Infringing Products on December 31, 2007. Neither form of relief addresses sales for WCDMA Infringing Products during the Window. However, such sales were clearly infringing, and by virtue of the verdict, Qualcomm was on notice. The Court leaves to Broadcom whether and how this lacuna should be filled. It declines to put that choice in Qualcomm's hands to

---

[6]Broadcom proposed:

> Nothing in this Permanent Injunction shall prohibit the Qualcomm Parties from providing service or technical support for any Infringing Product for which Qualcomm has paid damages or for which Qualcomm has paid or intends to pay a royalty as permitted by this Injunction.

(Broadcom Corporation's Proposed Clarifications to the Court's Permanent Injunction, p. 6.)

7

make a unilateral decision.

Obviously, Qualcomm could not have been on notice of the Court's Injunction between the date of verdict and the entry of the Injunction. Thus, for contempt purposes, the Court evaluates its conduct with regard to WCDMA Infringing Products subsequent to December 31, 2007.

B. Qualcomm's Activities in Contempt of the '686 Injunction.

The Court enjoined Qualcomm from:

making, using, importing, selling, and/or offering to sell in the United States the MSM6275, MSM6280, MSM6550, MSM6800, MSM7200, MSM7500, and MSM7600 baseband chips, or any device not more than colorably different therefrom (collectively, the "'686 Infringing Products"), or any device that includes any '686 Infringing Product (including, without limitation, cellular telephone handsets, Form Factor Accurate ("FFA") devices, and Subscriber Unit Reference ("SURF") devices);

(Permanent Injunction, § I(a).) In their showings on this Motion, the parties parse each of these activities.

Qualcomm offers two basic defenses for its conduct with regard to WCDMA sales after December 31, 2007. First, a portion of its activities were carried out under its agreement with Verizon. The parties have agreed that such activities carried out under the license which Broadcom granted to Verizon are not infringing. (Joint Stipulation Regarding Licensing Agreement and Order Thereon, Feb. 5, 2008, Docket No. 1002.) Second, by virtue of its payment of (1) damages

8

through May 29, 2007 under the verdict, and (2) its payment of royalties from the date of the verdict through March 31, 2008, and a purported continuing obligation to pay royalties, Qualcomm contends that it has an implied license. For the reasons stated above, the Court rejects the second component of the implied license defense. Qualcomm is entitled to an implied license only with respect to WCDMA sales for which damages were assessed under the verdict.

The Court now considers the list of activities specifically challenged by Broadcom.

1. Sales Prior to December 31, 2007.

Qualcomm concedes that sales of WCDMA Infringing Products were made in the Window which were subsequently imported into the United States. The Court finds no contempt, because, by definition Qualcomm was not on notice of the Permanent Injunction.

Additionally, the Court finds that sales of WCDMA Infringing Products for Verizon products are permitted under the Permanent Injunction, and do not constitute a contempt.[7]

2. Customer Support.

The analysis breaks into three parts.

---

[7]The same is true with regard to support and all other activities covered by the Verizon Agreement which would otherwise amount to actionable infringement. For that reason, the Court will not discuss those activities in the balance of the Order unless otherwise relevant.

9

First, with respect to sales of WCDMA Infringing Products for which damages were awarded under the verdict, Qualcomm is entitled to provide those specific customers  on-going support with respect to those specific purchases. King Instrument Corp., 814 F.2d at 1564.  The Court refers to these and other activities and uses permitted by virtue of the verdict as "Licensed Activities."

Second, the Court finds no contempt for support provided in the Window for WCDMA Infringing Products sold during the Window.

Third, the Court finds that Qualcomm violated the '686 injunction when it provided support after December 31, 2007 for WCDMA Infringing Products, except for Licensed Activities.  On the present record, the Court cannot define the full extent of such violations.

Because Qualcomm's interpretation of the '686 sunset provision is not reasonable, the Court finds by clear and convincing evidence that its support activities after December 31, 2007, other than Licensed Activities, constitute contempt.

3. Employee Use of Paid-For WCDMA Phones.

The same three-part analysis applied to customer support, above, is equally applicable to Qualcomm employee use of WCDMA phones.

On the present record, the Court cannot define the full extent of such violations subsequent to December 31, 2007.

Because Qualcomm's interpretation of the '686 sunset provision is not

10

reasonable, the Court finds by clear and convincing evidence that its employee use of WCDMA phones after December 1, 2007, other than Licensed Activities, constitutes contempt.

### 4. Selling WCDMA SURFs.

Qualcomm concedes that after the Injunction it sold a SURF with a socket, or socket SURF, that could accommodate one of the WCDMA Infringing Products, but argues that the unit was shipped with an empty socket. (Qualcomm Memo, p. 16.) The SURF is not the patented product, nor is it component of a patented product–i.e., the broadband chip. The Court thus finds that Qualcomm is correct when it argues that the provisions of 35 U.S.C. § 271(f) are inapplicable.[8]

This conduct does not constitute contempt.

Next, the Court considers whether Qualcomm has complied with the remaining generic portions of the Injunction.[9]

### 1. Making.

The Court is satisfied that all manufacturing activities for broadband chips take place outside the United States, and thus the activity is not covered by the Permanent Injunction. (Permanent Injunction, § IV.)

---

[8]This assumes that Broadcom asserted a Section 271(f) claim for the '686 Patent. (See Tr. 75.)

[9]"[M]aking, using, importing, selling, and/or offering to sell in the United States." (Permanent Injunction, ¶ 1(a).)

11

Qualcomm asserts that all manufacture of SURFs or FFAs containing WCDMA Infringing Products has been carried out directly or indirectly as part of the Verizon arrangement. It does acknowledge other manufacturing which it asserts is outside the Injunction: including a "socketed SURF" (MSM7200A); versions of the MSM 6290 with the texture engine ("TE") function disabled or the fuse blown; and MSM 7225 chips with the TE function disabled.

The Court finds no violation of the Injunction.

2. Chip Use.

Qualcomm asserts that it has used chips for testing only to support Verizon, to support its development of TE-disabled design-around chips,[10] or for uses of chips with the video fuse blown.

Use of chips in third-party devices is subject to the three-part analysis discussed above. On the present record, the Court cannot define the full extent of such violations subsequent to December 31, 2007.

Qualcomm asserts that it prohibits the use of SURFs/FFAs unless permitted under the Verizon arrangment in a use exclusively for Verizon's benefit.

3. Importing.

Qualcomm asserts that it has imported WCDMA Infringing Products only for four purposes: (1) to modify on importation to render non-infringing by

---

[10]See discussion of design-arounds in Section VI.A, infra.

12

Case 3:05-cv-00020-RJS-RNB Document 1073-1 Filed 04/23/13 Page 14 of 31 PageID #:36171
Case 3:05-cv-00020-RJS-RNB Document 1316 Filed 03/28/08 Page 13 of 30 PageID
#:3527

disabling the TE function; (2) to modify on importation to render non-infringing by blowing the video fuse; (3) for destruction upon importation; and (4) for Verizon activities. All of these uses are permitted under the Permanent Injunction. (Permanent Injunction, §§ V, VII.)[11]

Qualcomm has outlined its screening procedures for shipments coming via courier and freight forwarder to ensure importation only for a permitted purpose. The Court finds that those procedures are reasonable and constitute substantial compliance.

Broadcom has not shown by clear and convincing evidence that Qualcomm's importation activities constitute a contempt.

4. <u>Selling.</u>

*Broadband Chips.*

Qualcomm admits that it has sold WCDMA Infringing Products in 2008 in violation of the Permanent Injunction. (Qualcomm Memo, pp. 27-28.) The parties describe these sales differently, but they amount to slightly more than 1000 chips, of three different models, made to four customers.[12] Qualcomm asserts that the chips were samples, and that it received revenue for only two sales ($18,508.65.)

---

[11]"Nothing is this Second Amended and Restated Permanent Injunction shall prohibit the Qualcomm Parties from importing into the United States any '686 Infringing Product, '317 Infringing Product, or '010 Infringing Product solely for the purpose of engaging in design, development, or testing so as to eliminate infringement and/or effecting modification to eliminate infringement." (Permanent Injunction, § V.)

[12]Qualcomm describes fourteen shipments (Qualcomm Memo, p. 28); Broadcom describes seven shipments (Broadcom Opp., p. 7).

13

Qualcomm explains that certain customers with research, but not manufacturing, facilities in the United States were taken off "hold" which allowed WCDMA Infringing Products to be sold and shipped to them. Qualcomm contends that it has modified its shipment compliance procedures in light of this error. In its reply, Qualcomm also points to the remedial steps it has taken to procure the return of these chips or assurances that chips from foreign sales will not be imported for use in the United States. (Qualcomm Reply, p. 2.)

The Court finds substantial compliance in light of the remedial steps taken to resolve the initial internal systems defect and the efforts to secure return of the chips. In the overall analysis, the number of chips is inconsequential, particularly when spread over four customers and several types of chips.

*SURFs/FFAs.*

Broadcom asserts that since December 31, 2007, Qualcomm has sold over 2,000 SURFs/FFAs in models MSM 6290, MSM7225, MSM7600, and MSM7601. The combination of Darin Tripi's deposition testimony and declaration provide a sufficient explanation with regard to the first two products. He testified that none of the MSM6290 and MSM7225 products could be used for video encoding. (Ex. 18, pp. 47-48, 51, 142-147 [Tripi ].) Similarly, the MSM7601 product cannot be used for video encoding. (Roy Decl., ¶ 13.) The remaining device, the MSM7600, was sold to Research in Motion whose only customer is Verizon. (Ex. 7, p. 28 [Roy].)

Broadcom has not offered clear and convincing evidence of contempt.

5. Offering to Sell.

14

Qualcomm describes a compliance program for issuing quotations for WCDMA Infringing Products only through foreign regional offices for delivery to customers outside the United States. However, Qualcomm concedes that some quotations issued after December 31, 2007 were sent to United States addresses. (Qualcomm Memo, p. 30.)

Through discovery, Broadcom has documented that such offers were made to LG International America, Samsung Electronic America, Kyocera Wireless, Motorola, Inc., Novatel Wireless, Palm, Inc., and AnyData Corporation. (Broadcom Opp., pp. 9-11.) The number of offers and quoted volumes convinces the Court that Qualcomm failed to take all reasonable steps to comply with the Injunction against "offering to sell in the United States." (Permanent Injunction, § I(a).)

The Court finds that these offers are likely contempts in violation of the Permanent Injunction. The Court finds that it is sufficient that the offers were made in the United States. Wesley Jessen Corp. v. Bausch & Lomb, Inc. 256 F.Supp. 2d 228, 233-34 (D. Del. 2003); SEB, S.A. v. Montgomery Ward & Co., Inc., 412 F.Supp. 2d 336 341-43 (S.D. N.Y. 2006). This result is implicitly consistent with the Federal Circuit's treatment of the issue in Rotec Industries, Inc. v. Mitsubishi Corp., 215 F.3d 1246, 1258 (Fed. Cir. 2000) (Newman, J., concurring).

Qualcomm official Leonard Territo ("Territo") was unclear at deposition whether actual sales had resulted from any of these offers. However, in his declaration, Territo asserts that Qualcomm's shipment histories indicate that no

15

shipments were made to the United States in response to any of the quotes.[13] (Territo Decl., ¶ 7.)

Qualcomm apparently offered to produce the purchase orders related to the quotations, but then declined to do so. Before coming to a final conclusion on the legal and factual issues raised by the offers, the Court believes further discovery should be made to Broadcom. The Court orders production of all such purchase orders.

### 6. Technical Support.

Qualcomm indicates that it has responded to more than 54,000 requests for technical support in the past year with regard to Infringing WCDMA Products, but that such response have been limited to Verizon and "downstream customers" who purchased the relevant chips prior to December 31, 2007.

For reasons discussed above, support for WCDMA Infringing Products sold during the Window and rendered after December 31, 2007 violates the Permanent Injunction, and constitutes a contempt. On the present record, the Court cannot assess the extent of the violations.

### III. The '010 Patent.

### A. Sunset Royalty Payments.

---

[13]Given the high standard of proof on the present motion, the Court accepts Territo's declaration, and declines too parse to finely whether Territo as Qualcomm's rule 30(b)(6) designee took a different position or whether his declaration simply filled in incomplete knowledge. See Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp., 441 F. Supp. 2d 695, 723 & n. 17 (M.D. Pa. 2006).

Case 3:05-cv-00640-RFP-RNB Document 1073-13 Filed 04/23/08 Page 18 of 31 PageID #:3575
Case 8:05-cv-00640-RFS-RNB Document 1315 Filed 03/28/08 Page 17 of 30 PageID
#:3531

In the Permanent Injunction, the Court provides a sunset royalty for use of Q-Chat technology under the '010 Patent:

> PROVIDED . . . that with respect to '010 Infringing Products (i) which were on sale in or imported into the United States on or before May 29, 2007,[14] and (ii) with regard only to existing or prior customers of '010 Infringing Products as of May 29, 2007 (which status shall be determined separately with respect to each '010 Infringing Product), the injunction against activities listed in paragraphs (a) and (b) above shall be stayed until January 31, 2009, so long as:
>
> (a)     Qualcomm pays to Broadcom an ongoing royalty, consisting of 15% of all revenues received by Qualcomm for sales occurring after May 29, 2007 of '010 Infringing Products, including revenues received from pre- and post-commercialization development fees and licenses, that are sold in, or imported into, or licensed in the United States.

(Permanent Injunction, § III, Proviso.)  This provision evolved in several respects from the original Injunction issued on December 31, 2007.  First, the Court effectively limited the sunset provision to Q-Chat Version 3.0 by restricting it to "versions of software which had been delivered, accepted, and paid for as of May 29, 2007."  (Id., p. 8, n. 7, quoted below in footnote 14.)  Second, the Court clarified the types of revenues subject to the royalty payment to include "pre- and post-commercialization development fees and licenses."  (Id., §III, Proviso (a).)

---

[14] Footnote 7 in original:  With respect to software encompassed within the '010 Infringing Products, this sunset provision shall be limited to versions of software which had been delivered, accepted, and paid for as of May 29, 2007.

1   Qualcomm claims that it is not required to avail itself of the '010 sunset

2   provision, contends that it has not done so, and has made no royalty payments.

3

4   For the reasons set forth below, the Court finds by clear and convincing

5   evidence that Qualcomm is in contempt.

6

7   As Broadcom documents, Qualcomm has received more than $93 million in

8   Q-Chat-related payments from Sprint since the date of the verdict. (Broadcom

9   Opp., pp. 33-36; Ex. 24.)

10

11   Qualcomm's principal defense is that Broadcom received full compensation

12   under the verdict, and thus is not entitled to further compensation in view of the

     implied license conferred. King Instrument Corp., 814 F.2d at 1564. The Court

13   disagrees. Broadcom could not have presented evidence of future revenues which

14   did not then exist prior to commercialization. Some of the post-commercialization

15   services were not contracted for until after the entry of the Injunction on December

16   31, 2007. (Ex. 75.) Tellingly, even as of the date of recent discovery which the

17   Court allowed on this Motion, Qualcomm officials could still not predict the future

18   revenue flow under the Sprint agreement. (Ex. 52, p. 52 [Vrechek].) The present

19   situation is simply not akin to supplying spare parts for repair. King Instrument

20   Corp., 814 F.2d at 1564.

21

22   Qualcomm argues that there has been no sale since the verdict, so that the

23   royalty provision does not come into play. Given the Court's revisions to the '010

24   royalty provision to include "revenues received from pre- and post-

25   commercialization development fees and licenses," this linguistic gamut fails.

26   Moreover, the language in footnote 7 to the sunset provision would, under

27   Qualcomm's logic, render the sunset provision a complete nullity from the outset.

28                                       18

B. Versions 3.1 and 3.2.

The record indicates that Qualcomm has received $17 million in fees from Sprint in connection with follow-on versions. The Permanent Injunction explicitly allows Qualcomm to engage in design-around activities. (Permanent Injunction, § V.) The record does not establish by clear and convincing evidence that Qualcomm has done anything more than permitted activities. (See Ex. 52, pp. 22, 24 [Vrechek].)

While it may be frustrating to Broadcom to be denied the particulars of Qualcomm's Q-Chat design-around efforts (Broadcom Opp., p. 34), the Court agrees with Qualcomm that it has no burden to prove that it is not infringing with its Version 3.1 and 3.2 efforts.

IV.   Inventory Adjustments.[15]

In its April 14, 2008 initial royalty report, Qualcomm made a one-time $4.6 million so-called inventory adjustment to eliminate double-counting. Such double-counting could result if a product included in Broadcom's damage calculation were counted a second time when subsequently imported into the United States. Broadcom challenges the calculation in several particulars.

Qualcomm queried two of its largest customers who responded that their inventory lag between sale and importation was 6 weeks and 5.2 weeks.

---

[15]While the Court agrees in theory with the notion of an inventory adjustment to avoid double counting, the preferable course would have been to air the issue with the Court and Broadcom before Qualcomm made a unilateral determination that it was entitled to a reduction in the initial royalty payment.

19

Broadcom points out that Samsung, another major customer, reported an inventory lag of 3.2 weeks, although Qualcomm excluded Samsung in its analysis because its response was deemed incomplete. Broadcom also points to testimony of Qualcomm personnel that its inventory analysis would not meet audit standards. On this record, the Court cannot say that the use of 5.2 weeks was unreasonable.

Broadcom also objects that the adjustment was not tied to chips for which the jury actually awarded damages. Qualcomm's assertion that this would require "some sort of a magic tracer" is colorful, but off the mark. (Qualcomm Br., p. 44.) Broadcom points to three chips used in the inventory adjustment–the MSM6500, MSM 6550A, and MSM6800A–which did not figure in Broadcom's damages, but which nevertheless form a major part of the adjustment calculation. (See Ex. 78.) Broadcom also notes that sales to customers not included in the damage award were nevertheless included in the adjustment. (Broadcom Opp., p. 50.) The Court believes that substantial improvement in the calculation can be achieved even if one accepts that the adjustment is at best an estimate.

Within thirty days, Qualcomm is ordered to submit a revised inventory adjustment calculation which is based only on chips included in the damage award which were sold to customers included in the damage award. Any challenge to the revised calculation may be brought by motion within thirty days of service of the revised calculation.

V.    Identification of Sunset Customers.

In crafting the sunset provisions in the Permanent Injunction, the Court gave weight to the reliance Qualcomm's existing customers had placed on the availability of Qualcomm's products, particularly in the CDMA environment. For

that reason, the Court crafted the sunset provisions to serve only the needs of that set of customers. For example, for the '686 Patent, the Court limited sunset sales "to existing or prior customers of '686 Infringing Products as of May 29, 2007 (which status shall be determined separately with respect to each '686 Infringing Product)." (Permanent Injunction, § I, Proviso; see id., p.3 n. 1.) Broadcom contends that Qualcomm has failed to take sufficient measures to ensure sunset sales only to permitted customers.

The Court cannot say that the steps taken by Qualcomm were not reasonable or do not constitute substantial compliance with the customer set limitation. The Court finds that it is reasonable to aggregate affiliates, reasonable to make a determination on the basis of chip model rather than individual chips, and reasonable to treat the ship/billing date as the date of sale for purposes of the Permanent Injunction.

The Court cannot fault Qualcomm for taking iterative steps when it concluded that its initial customer identifications contained a loophole. Any shortcomings in the language of the "intent letters" solicited from customers must be weighed against the fact that all customers were supplied a copy of the Permanent Injunction. (Permanent Injunction, § VIII.)

Broadcom has failed to offer clear and convincing evidence of contempt with respect to sunset customer limitations.[16]

---

[16]Broadcom also asserts that certain revenues were not reported in the April 14, 2008 royalty reports. (Broadcom Opp., pp. 45-47.) The Court finds Qualcomm's explanation satisfactory. (Qualcomm Reply, pp. 25-27.) In any event, this does not rise to clear and convincing evidence of evasion of Qualcomm's royalty obligations.

VI.  Remedies.

In a contempt proceeding, the Court has the power to fashion appropriate sanctions. Lasar v. Ford Motor Co., 399 F.3d 1101, 1118 (9th Cir. 2005).

A.  Enjoining the xxx1 Design-Around Chips.

Broadcom contends that by virtue of its activities in contempt, Qualcomm got an unfair "head-start" in the development of its xxx1 design-around chip with disabled TE function.  For this, Broadcom urges the Court to enjoin sale of the chips for a period of six months.  The Court declines to do so.

In the context of developing design-arounds for its products, Qualcomm is entitled to undertake activities which would otherwise violate the Permanent Injunction and amount to actionable continuing infringement:

> Nothing is this Second Amended and Restated Permanent Injunction shall prohibit the Qualcomm Parties from engaging in the design, development, or testing of any product or service which does not infringe the '686 Patent, the '317 Patent, and/or the '010 Patent.  Nothing is this Second Amended and Restated Permanent Injunction shall prohibit the Qualcomm Parties from engaging in modification of any '686 Infringing Product, '317 Infringing Product, or '010 Infringing Product so as to eliminate infringement, nor from engaging in design, development, or testing for said purpose.  Nothing in this Second Amended and Restated Permanent Injunction shall prohibit the Qualcomm Parties from importing into the United States any '686 Infringing Product, '317 Infringing Product, or '010 Infringing Product solely for the purpose of engaging in design, development, or testing so as to

22

eliminate infringement and/or effecting modification to eliminate
infringement.

(Permanent Injunction, § V; emphasis supplied.) Thus, the use of WCDMA
Infringing Products is permitted as part of the design-around efforts. The Court
does not believe that Broadcom has established by clear and convincing evidence
that Qualcomm has used unfair means in developing its xxx1 chips. The objection
that Qualcomm may have used WCDMA Infringing Products after Qualcomm
developed an initial design ignores the fact that there is substantial testing required
at subsequent stages leading to introduction of a successful commercial product.
(Peron Reply Decl., ¶¶ 7-10.) Moreover, the use of the WCDMA Infringing
Products was not for developing the infringing TE function, but to develop a chip
that would operate with that function disabled. The result is a product which lacks
the patented feature.

Even assuming that Qualcomm used unfair means to develop a non-
infringing design-around, the Court would have some reluctance to enjoin a
product which does not infringe. The Court does not find Broadcom's analogy to
trade secret law convincing. (Broadcom Opp., pp 32-33.) As noted, the Court
finds that the predicate for this theory is lacking, and to the extent that the Court
has found other contempts with regard to the '686 Patent, they do not warrant this
remedy.

At oral argument, Broadcom stressed that its goal had been to secure an
unfettered market opportunity, not monetary relief in the form of royalties for
prospective sales of infringing WCDMA chips. (Tr. 20-21.) The most direct way
to preserve that opportunity was to enjoin the sales of WCDMA chip after
December 31, 2007, which is what the Court did. Whatever may be said for post-

23

Injunction support for infringing sales of WCDMA chips made in the Window, those were sale which by definition were lost. The Court believes that support of chips already sold had a secondary effect on Broadcom's ability to compete, and now even that support must cease. With regard to testing, it is hard to see how competition from the xxx1 chips, even if unfairly accelerated, had a significant effect where the Broadcom chip had the TE function and the xxx1 had none. The xxx1 chips cannot supply the patented, competitively advantageous function which Broadcom offers.

### B. '010 Patent Payment.

Of the contempts which the Court has found, the failure to pay the '010 sun set royalty is the most egregious. As Broadcom contended at oral argument, payment, even with interest, merely requires Qualcomm to do what is should have done in the first place. (Tr. 24.) The Court agrees that there was more than a "failure to pay": so long a Qualcomm did not pay the royalty it was using technoloy it had no right to use. In formulating a remedy, the Court finds the district court's approach in Brine, Inc. v. STX, L.L.C., 367 F.Supp. 2d 61, 71 (D. Mass. 2005), instructive. There the court was searching for the appropriate punishment for a second infringement violation of its injunction, and concluded that gross profit was an appropriate measure. The court considered awarding net profits from the infringing activities, but concluded that gross profits were a better measure for two reasons:

> 1. As is recognized in other areas of the law, there are evidentiary difficulties inherent in calculating net profit (i.e. profit after all expenses, depreciation and tax). Given such uncertainty, there is increased risk that the plaintiff will not be made whole. In a contempt proceeding, the need to

24

ensure that the plaintiff is fully compensated and that the defendant is
deterred, is acute.

2. While an award of gross profit may overcompensate [the plaintiff] Brine,
it will do so in an amount which bears a direct relationship to the degree of
infringement: the more X2+s that were sold, the greater the award. As such,
a sanction in the amount of gross profit from the sales of the X2+ provides a
natural means of imposing a penalty that is proportionate to the severity of
the contempt.[17]

(Id. at 71; citation deleted; emphasis supplied.)  One could argue that contempt
here is different, in that Qualcomm did not engage in infringing conduct but simply
failed to pay.  But so long a Qualcomm failed to pay it was in fact infringing.
Moreover,  the Court regards the egregiousness of the conduct here of similar
caliber to the contempt in Brine.[18]

Within thirty days, Qualcomm shall render under oath an accounting of all
post-verdict Q-Chat payments related to Version 3.0 received from Sprint from
May 29, 2007 through the date of this order and present calculation of its gross
profit on such revenues.  (Permanent Injunction, § VIII.)  With respect to North

---

[17]In view of this monetary award which can be measured with respect to the conduct in
contempt, the Court deletes from this Order provisions in its Tentative Minute Order imposing a
surcharge on the award of attorney's fees.  (Tentative Minute Order re Motion for Contempt, p.
18 ("The Court imposes a fifty percent surcharge on the award of attorney's fees and costs by
way of monetary sanction for Qualcomm's contempts.  The Court has no convenient way to
assess the economic impact of Qualcomm's contempts, and a measure based on attorney's fees
and costs is at least related to the burdens which Broadcom undertook by initiating this
proceeding.").)

[18]Disgorgement of Qualcomm's unjust gain is not punitive; it merely transfers that gain
to the party harmed by its conduct.

25

American Exclusivity payments, Qualcomm shall make a proration to include that portion of the payments reasonably attributable to the United States and shall state the basis for the proration. Within the same thirty days, Qualcomm shall pay Broadcom the calculated gross profits. The amount shown in the accounting shall be paid without regard to any challenge of the accuracy of the accounting; any such dispute shall be resolved by the Court, but shall not delay payment.[19] The payment shall satisfy Qualcomm's royalty obligation under the '010 sunset provision through the date of this Order.

Should Qualcomm fail to make the accounting and payment as provided in this Order, the sunset provision for the '010 Patent shall automatically lapse, and shall only be reinstated upon further application to the Court by Qualcomm.

C. Suspension of Sunset Provisions.

The Court declines to suspend the sunset provisions for the '686 and '317 Patents.[20] Such a course would ignore the public interest aspects which figured prominently in the Court's decision to adopt sunset provisions in the first place. (Injunction Memo, pp. 8-9, 17-18.) With regard to the '010, the Court has set suspension as the penalty for failure to comply with royalty obligations ordered here.

D. Attorney's Fees.

---

[19]Upon appropriate application, the Court would consider allowing Broadcom to test the calculation by way of a Rule 30(b)(6) deposition and supporting request for production.

[20]U.S. Patent No. 6,657,317.

An award of attorney's fees is a customary remedy in favor of a party who has successfully mounted a contempt proceeding. Perry v. O'Donnell, 759 F.2d 702, 704 (9th Cir. 1985). If Broadcom prevailed on no other portions of its claims than those related to WCDMA Infringing Products after December 31, 2007 and the failure to pay '010 sunset royalties, it would be the substantial victor here.

The Court has no doubt that litigating this contempt proceeding has been a substantial expense for both sides. Qualcomm's attorney's fees are a penalty which it must bear. Qualcomm must also pay Broadcom's reasonable attorney's fees and expenses.

Within thirty days, Broadcom shall present its application for reasonable attorney's fees and costs. The application shall be in sufficient detail for the Court to make the usual lodestar analysis. See Hanlon v. Chrysler Corp., 150 F.3d 1011, 1029 (9th Cir. 1998). Within twenty days thereafter, Qualcomm may file any objections. Should the Court determine that a hearing would be useful, the Court will schedule one.

VII.    Reporting Requirements.

Under the Permanent Injunction, each sunset provision carries a similar reporting requirement. Qualcomm must provide "periodic reports from which Broadcom can assess the proper royalties owed, detailing at least the volume of, and revenue derived by Qualcomm from, any post-May 29, 2007 sales of" the relevant Infringing Products. (E.g. Permanent Injunction, § I, Proviso § (b).) The sunset provisions permit sales and require royalty payment only on sales made to customers as of May 29, 2007 for products which the customer purchased prior to that date. (E.g., id., § I, Proviso.) Without the latter information for sales, one

27

1    cannot determine whether Qualcomm is paying the "proper royalty."

2

3            In its April 14, 2008 report, Qualcomm did not provide detail by customer

4    and the chip purchased by the customer.  Qualcomm did provide such detailed

5    information as part of the limited discovery allowed by the Court on this Motion.

6    (Order Granting in Part Broadcom's Application for Order to Show Cause re

7    Contempt of Permanent Injunction, ¶ 3(a)-(e); see Qualcomm Opening Br., p. 40.)

8

9            While the Court cannot say that Qualcomm's report constituted substantial

10   compliance, neither can it say that a contempt has been proved by clear and

11   convincing evidence.  Henceforth, Qualcomm shall support is periodic royalty

12   reports with same level of detail subsequently provided for the April 14, 2008

13   report.  With respect to the report for the second quarter of 2008, Qualcomm shall

14   provide such information within thirty days.

15   VIII.  <u>Conclusion.</u>

16

17          The Court finds that Broadcom has proven by clear and convincing evidence

18   that the following activities by Qualcomm constitute contempt:

19

20          • Customer support for WCDMA Infringing Products after December 31,

21   2007, except for Licensed Activities and Verizon support.

22

23          • Employee use of WCDMA phones after December 31, 2007,  except for

24   Licensed Activities and Verizon support.

25

26          • Technical support rendered to WCDMA customers after December 31,

27   2007, except for Licensed Activities and Verizon support.

28                                          28

• Failure to pay sunset royalties under the '010 Patent.

Qualcomm is ordered to cease its contemptuous conduct with regard to the '686 injunction immediately if it has not already done so and to comply with this Order's provisions regarding the '010 Patent.

The Court reserves determination whether Qualcomm should be held in contempt for offering to sell WCDMA Infringing Products in the United States, pending production of invoices for purchases associated with such offers.

The Court orders Qualcomm to prepare a revision to the April 14, 2008 royalty statement within thirty days which:

• Eliminates payment of royalties of WCDMA Infringing Products.

• Includes a revised inventory adjustment limited to product sales covered by the verdict to customers covered by the verdict.

The Court orders Qualcomm to render an accounting of '010 sunset revenues and gross profits and to make the payment described in Section VI.B within thirty days. A failure to do so will result in an automatic lapse of the '010 sunset license.

29

1     The Court orders Broadcom to submit an application for attorney's fees and

2 costs in accordance with this Order within thirty days; Qualcomm may file any

3 objections within twenty days thereafter.

4

5 DATED:  August 28, 2008

6

7

8 JAMES V. SELNA
UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28