```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                    RICHMOND DIVISION

 4

 5

 6    -----------------------------------
                                        :
 7    ePLUS, INC.                       :    Civil Action No.
                                        :    3:09CV620
 8    vs.                               :
                                        :
 9    LAWSON SOFTWARE, INC.             :    April 26, 2013
                                        :
10    -----------------------------------

11

12        COMPLETE TRANSCRIPT OF THE CLOSING ARGUMENTS

13          BEFORE THE HONORABLE ROBERT E. PAYNE

14             UNITED STATES DISTRICT JUDGE

15

16    APPEARANCES:

17    Craig T. Merritt, Esquire
      Christian & Barton, LLP
18    909 East Main Street
      Suite 1200
19    Richmond, Virginia  23219-3095

20    Jennifer A. Albert, Esquire
      Goodwin Procter, LLP
21    901 New York Avenue, NW
      Washington, D.C.  20001

22

23

24               Peppy Peterson, RPR
               Official Court Reporter
25            United States District Court
```

```
 1    APPEARANCES:  (cont'g)

 2    Michael G. Strapp, Esquire
      Goodwin Procter, LLC
 3    Exchange Place
      53 State Street
 4    Boston, Massachusetts  02109
      Counsel for the plaintiff;

 5

 6    Daniel J. Thomasch, Esquire
      Gibson Dunn & Crutcher, LLP
 7    200 Park Avenue
      New York, New York  10166-0193
 8
      Josh Krevitt, Esquire
 9    Gibson Dunn & Crutcher, LLP
      200 Park Avenue
10    New York, New York  10166-0193

11    Jason C. Lo, Esquire
      Gibson Dunn & Crutcher, LLP
12    333 South Grand Avenue
      46th Floor
13    Los Angeles, California  90071

14    Dabney J. Carr, IV, Esquire
      Troutman Sanders, LLP
15    1001 Haxall Point
      Richmond, Virginia  23219
16
      Richard W. Mark, Esquire
17    Gibson Dunn & Crutcher, LLP
      200 Park Avenue
18    New York, New York  10166-0193

19    Christopher D. Dusseault, Esquire
      Gibson Dunn & Crutcher, LLP
20    333 South Grand Avenue
      46th Floor
21    Los Angeles, California  90071

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3          THE CLERK:  Civil action number 3:09CV00620,

 4  ePlus, Incorporated, versus Lawson Software, Incorporated.

 5  Ms. Jennifer A. Albert, Mr. Michael G. Strapp, and Mr.

 6  Craig T. Merritt represent the plaintiff.

 7          Mr. Jason C. Lo, Mr. Daniel Thomasch, Mr. Josh

 8  Krevitt, Mr. Dabney J. Carr, IV, Mr. Richard W. Mark, and

 9  Mr. Christopher D. Dusseault represent the defendant.  Are

10  counsel ready to proceed?

11          MS. ALBERT:  ePlus is ready, Your Honor.

12          MR. THOMASCH:  Ready for defendant, Your Honor.

13          THE COURT:  All right.  We'll start with the

14  colorability analysis.  Just because you have an hour

15  doesn't mean you need to use an hour, but it's available

16  to you.  That will be the duration.  All right.

17          MS. ALBERT:  Good morning, Your Honor.

18          THE COURT:  Good morning.

19          MS. ALBERT:  I'm going to reserve any of my 30

20  minutes that might be remaining for rebuttal to Lawson's

21  arguments.

22          THE COURT:  Good.  Just remember, somebody on

23  your side needs to kind of keep the time, because we're

24  not.

25          MS. ALBERT:  I'm going to be addressing the
```

1    no-colorable-difference and infringement issues, and my

2    partner Mr. Strapp will be addressing the remedies issues.

3         After a five-day evidentiary hearing, ePlus has

4    established by clear and convincing evidence that Lawson's

5    sole modification to infringing configurations three and

6    five does not render those configurations more than

7    colorably different from the infringing configurations and

8    that the modified configurations continue to infringe

9    claim 26 of ePlus's '683 patent.

10        The evidence on these issues comes from the

11   admissions of Lawson's own witnesses and its own documents

12   and system.  It certainly meets the clear and convincing

13   evidence standard.

14        I would like to review just briefly the

15   configurations that were found to infringe.  This slide

16   shows configurations three and five and all of the modules

17   --

18        THE COURT:  Do you have paper versions of this?

19   If you do, hand them out, please.  Oh, demonstratives,

20   okay, I see.  On colorability.  I apologize.  When did

21   that book show up here?

22        MS. ALBERT:  There is no dispute between the

23   parties that the sole modification at issue was made to

24   just one module of these multi-module configurations.  The

25   green box for Requisition Self-Service was modified, and

1    Lawson renamed that Requisition Center.

2              There's also no dispute that the sole

3    modification at issue is that Lawson removed from RQC a

4    user ability to combine either, one, items from item

5    master and a Punchout vendor, or, two, items from multiple

6    Punchout vendors in a single requisition.

7              The clear and convincing evidence established

8    that the sole modification made to RSS did not render the

9    RQC configurations three and five more than colorably

10   different than configurations three and five with RSS for

11   several reasons.  First --

12             THE COURT:  May I ask you this question so that

13   I'm sure I understand your positions on it?  In

14   configuration three, can Requisition Self-Service be used

15   without the S3 procurement modules and the platform

16   technology foundation?

17             MS. ALBERT:  No.

18             THE COURT:  Can Procurement Punchout be used

19   without Requisition Self-Service and the S3 procurement

20   module and the platform together?

21             MS. ALBERT:  No, Your Honor.  That evidence was

22   established at the underlying trial.

23             THE COURT:  And the electronic data interchange,

24   can that be used without the S3 procurement modules and

25   the platform technology foundation?

1          MS. ALBERT:  No, Your Honor.

2          THE COURT:  And can the electronic data

3    interchange be used without Requisition Self-Service?

4          MS. ALBERT:  It can be used without Requisition

5    Self-Service and Procurement Punchout.  That's why it's

6    shown on the other side of the blue building block, that

7    it requires all of the modules underneath it, but it can

8    operate side by side with the Requisition Center and

9    Procurement Punchout.

10         THE COURT:  But you can't just use -- can you

11   just use electronic data interchange by itself?

12         MS. ALBERT:  Well, you would need to generate a

13   purchase order --

14         THE COURT:  Is the answer no --

15         MS. ALBERT:  No.  The answer is no.

16         THE COURT:  You can't use it by itself.  All

17   right, I understand.

18         MS. ALBERT:  Now --

19         THE COURT:  Do you understand there to be no

20   dispute over those facts?

21         MS. ALBERT:  I understand there to be no dispute

22   those facts were established at trial and affirmed by the

23   Federal Circuit.

24         THE COURT:  All right.

25         MS. ALBERT:  Your Honor, ePlus contends for at

1    least three reasons that the sole modification that's been

2    made to configurations three and five does not render

3    those configurations more than colorably different from

4    infringing configurations with RSS.

5          First, the sole modification relates to a feature

6    that has no relevance to claim 26.  It is a randomly

7    chosen feature and cannot render the RQC configurations

8    more than colorably different from the infringing

9    configurations with RSS as a matter of law.

10          Second, there were no modifications made to the

11   modules of configurations three and five that perform the

12   infringing functionality of claim 26.  Third, Lawson

13   itself --

14          THE COURT:  That is your argument based on

15   *Arlington Industries*; is that correct?

16          MS. ALBERT:  Correct.

17          THE COURT:  Is there any case other than

18   *Arlington Industries,* or is there any case including

19   *Arlington Industries* that takes the ruling -- that takes

20   the principle that you are relying on as far as you take

21   it, or are you asking me to be the first court to do that?

22          MS. ALBERT:  Well --

23          THE COURT:  In that a court has held that if a

24   modification is not related to any requirement of a claim,

25   that perforce it -- that is not -- there isn't a change

1    that makes any difference in the case.

2             MS. ALBERT:  Well, *TiVo* itself said that the

3    analysis must focus not on differences between randomly

4    chosen features of the product found to infringe.

5             THE COURT:  I understand that's what it says.

6    I'm asking you if there's been any case where that

7    principle was applied in precisely the same way that you

8    are asking me to apply it here.

9             MS. ALBERT:  I'm aware of *Arlington Industries v.*

10   *Bridgeport*.

11            THE COURT:  And that's all?

12            MS. ALBERT:  I'm not sure if there are any other

13   cases subsequent to *TiVo*.

14            THE COURT:  It's the only one that comes close.

15   I'm not even sure it does, but I certainly -- I couldn't

16   find anything else.  All right.  Excuse me, go ahead.

17            MS. ALBERT:  The third reason why ePlus believes

18   that the change does not render the configurations more

19   than colorably different is because Lawson itself

20   acknowledged, both internally and externally to its

21   customers, that the modification it made to RSS was

22   insignificant, insubstantial, minor, and trivial, and did

23   not impact on the procurement functionality needed by its

24   customers.

25            As I mentioned, the Court's analysis as to

1   whether the RQC configurations are more than colorably

2   different from the infringing configurations must focus on

3   whether the modifications were made to randomly chosen

4   features of the product found to infringe or, instead, to

5   features that were the basis for the prior finding of

6   infringement, and the Federal Circuit made clear that

7   modifications that relate only to randomly chosen features

8   of the product found to infringe, in other words,

9   modifications that relate to features that have nothing to

10  do with the claim elements are irrelevant.  They cannot

11  render the product more than colorably different from the

12  infringing product.

13          THE COURT:  In your view, the analysis is to

14  compare the product, the feature of the product that was

15  found to infringe, using the jury's verdict of what was

16  infringed, against the modification, and that's as far as

17  you go.

18          MS. ALBERT:  No.  *TiVo* says --

19          THE COURT:  In making colorability.

20          MS. ALBERT:  *TiVo* says to compare the infringing

21  product to the newly accused product.  That's why we look

22  to the configuration as a whole and ask whether the

23  modification made renders the configuration as a whole

24  more than colorably different.

25          THE COURT:  Don't you have to find out that which

1    was the feature that was alleged to be infringed?

2              MS. ALBERT:  Yes.  You first --

3              THE COURT:  In other words, let's say there were

4    three features, and only one of them was the topic of the

5    charge of infringement.  If they modified feature two and

6    three, it doesn't make any difference according to you.

7              MS. ALBERT:  Correct.

8              THE COURT:  Because that's not the analysis that

9    you make.  It's whether they modified feature one.

10             MS. ALBERT:  Correct.

11             THE COURT:  All right.

12             MS. ALBERT:  And cases subsequent to *TiVo* have

13   provided further guidance on this question of whether the

14   modification was made to a randomly chosen feature, and we

15   mention this *Arlington Industries v. Bridgeport* case.

16             THE COURT:  But that's the only one that deals

17   with this.  You say cases subsequent, and you mention

18   that, but there isn't another one, is there?

19             MS. ALBERT:  Not to my knowledge.

20             THE COURT:  Has somebody else come out with one

21   since you all --

22             MS. ALBERT:  No, Your Honor.  Here, because claim

23   26 of the '683 patent does not require the ability to

24   combine either items from item master and the Punchout

25   vendor or items from multiple Punchout vendors in a single

1    requisition, it is a randomly chosen feature and is
2    irrelevant to step one of the *TiVo* analysis.
3           Now, the clear and convincing evidence
4    established that there are no changes made to many of the
5    modules of the infringing configurations that perform the
6    actual steps of claim 26.
7           THE COURT:  And they don't dispute that.
8           MS. ALBERT:  They don't dispute that.  Indeed,
9    Lawson's development team analyzed each of these
10   infringing modules and functionalities and determined that
11   they could not be removed without crippling the product,
12   and we heard from Mr. Christopherson on that.
13          Lawson's own brochures and documents also confirm
14   that there are no changes made to the core procurement
15   functionality used to practice the elements of claim 26.
16   For example --
17          THE COURT:  Does it make a difference to the
18   ultimate finding that there was no change made to the
19   functionality?
20          MS. ALBERT:  Well, then --
21          THE COURT:  Or is that just evidence of how
22   insignificant the change is?
23          MS. ALBERT:  That is evidence of how
24   insignificant the change is.
25          THE COURT:  And that is the importance of that

1    argument.

2              MS. ALBERT:  Correct.  When you compare the

3    infringing system configurations to the accused system

4    configurations, the fact that there were no modifications

5    made to the modules and the features that are used to

6    perform the steps of claim 26 indicates that the change

7    that was made is insignificant, trivial, and one to a

8    randomly chosen feature that's irrelevant under *TiVo*.

9              THE COURT:  But under a set of facts different

10   than this one, you would not contest that there could be

11   changes that would be made to only one small component of

12   the functionality and that that could be colorably

13   different conceptually.

14             MS. ALBERT:  Correct, Your Honor.

15             THE COURT:  It's just that it is not in this case

16   based on the evidence in this case.  That's your position.

17             MS. ALBERT:  That's correct, Your Honor.

18   Lawson's own brochures and documents confirm that there

19   are no changes made to the core procurement functionality

20   used to practice the elements of claim 26.

21             For example, Lawson's Requisition Center and

22   Procurement Punchout brochure, which is found at

23   Plaintiff's Exhibit 1003, confirms that a system having

24   RQC and Punchout can be used to search the item master for

25   desired items, can be used to connect to a Punchout site

1   to shop for items.  It further confirms that a user

2   continues to have the capability to consolidate multiple

3   types of products and services into a single requisition

4   which the system can process to generate multiple purchase

5   orders from that single requisition.

6          Additionally, the PowerPoint from Lawson's RQC

7   customer webinar found at Plaintiff's Exhibit 1102

8   confirms that there are no modifications made to either

9   EDI or Punchout, and EDI and Punchout, as you recall, were

10  the features that were relied upon for the determining

11  availability and inventory step of claim 26.

12         The clear and convincing evidence established

13  that Lawson itself, both internally and externally,

14  described the modification made to RSS to form RQC as

15  being a minor, trivial, and insignificant one.

16         Lawson's own personnel that had technical and

17  support responsibilities related to RQC acknowledged that

18  the modification made to RQC -- or made to RSS to form RQC

19  was insignificant in their internal communications.  For

20  example, one document that we saw during the hearing was

21  Plaintiff's Exhibit 1030.  There, Matthew Bragstad of

22  Lawson is describing the changes RQC has brought to

23  Lawson's support leadership team.

24         He said, "The process in which Punchout is being

25  performed has changed slightly.  You now get a warning

1    popup that you are about to leave the Lawson site when you

2    punch out.  The process remains completely the same except

3    if you try to punch out on a req that is already in use

4    with non-Punchout items, it will tell you that you need to

5    open a separate req, and it will perform that action for

6    you."

7            THE COURT:  After that statement was made, were

8    there any changes made, any modifications made to get to

9    the modification that's at issue here?

10           MS. ALBERT:  This describes the Punchout

11   modification, or the modification to the requisitioning --

12           THE COURT:  I know, but the process was ongoing

13   at one time or another, and my question is, after this

14   statement was made, were there any other alterations of

15   any kind that show up in the modification that we're

16   dealing with here?

17           MS. ALBERT:  This particular document talks about

18   the change that was made to prevent an item master item

19   and a Punchout item from appearing on the same

20   requisition.  There is an additional change that prevents

21   an item from one Punchout website from being on a

22   requisition with another Punchout website.  That is not

23   discussed in this particular --

24           THE COURT:  Was that change, the latter one that

25   you just described, made before or after this memorandum

1    was prepared is my question, I suppose.

2              MS. ALBERT:  I believe the memorandum predates

3    the second change.

4              THE COURT:  All right.  Thank you.

5              MS. ALBERT:  As you recall, in the same

6    communication, Mr. Bragstad asked Mr. Christopherson, who

7    led the RQC development team, to confirm whether his

8    description of the changes was accurate, and Mr.

9    Christopherson replied, "Matt, you summed it up very

10   well."

11             Mr. Christopherson also confirmed in his

12   testimony at the hearing that he had told Lawson

13   personnel, quote, there was not one moving part in our RSS

14   that changed for RQC.

15             We also saw numerous documents authored by Scott

16   Hanson, the head of the RQC SWAT team responsible for

17   assisting customers in installing RQC, acknowledging the

18   trivial nature of the modifications made to RSS.  For

19   example, in Plaintiff's Exhibit 1072, Mr. Hanson confirmed

20   that RQC was a change to the user interface only.  "The

21   procurement business functionality and data remains the

22   same.  If the user uses RSS already, they will intuitively

23   be able to use the RQC product.  There is very little

24   change in the functionality."

25             So he concluded his communication by stating,

1  "test what has changed, which is really nothing."

2          In Plaintiff's Exhibit 1124, Mindy Klebe, one of

3  two Lawson employees responsible for customer support on

4  RQC, indicated in an internal communication, quote,

5  Requisition Center is installed here.  I've tested it.  It

6  works the same as RSS xml.  There are some cosmetic

7  changes.  It looks, appears exactly like RSS xml did.

8  Users will probably not even notice the difference really.

9          The clear and convincing evidence, namely

10  Lawson's own documents and witnesses, also establish that

11  Lawson told its customers that RQC delivered the same

12  functionality as RSS.  For example, at the RQC customer

13  webinar that had over 800 customer attendees, Lawson told

14  its customers, quote, RQC contains 100 percent of

15  functionality customers require.  That's at Plaintiff's

16  Exhibit 1102.

17          Lawson told its customer Cleveland Clinic, quote,

18  with regard to Punchout and SciQuest, RQC will function as

19  RSS did.  We support one Punchout vendor website per

20  connection.  SciQuest will come back with multiple vendors

21  on the same requisition with one punch-out.

22          There was also evidence that Lawson's customers

23  considered the modification to be insignificant and

24  trivial.

25          THE COURT:  Go to the point that you are

1   describing changes called competing adjectives, number 11.
2   The statement attributed to Lawson's outside counsel, what
3   document are you citing to there and when was that
4   statement made?  April 22, 2013.
5            MS. ALBERT:  That's in Lawson's post-hearing
6   brief.
7            THE COURT:  That's the briefing in this case.
8            MS. ALBERT:  Correct.
9            THE COURT:  And you are comparing that with what
10  the people at Lawson said later -- I mean earlier.
11           MS. ALBERT:  Correct.  The statement in the
12  column on the left is from Lawson's post-hearing briefing
13  where they are contending that the changes have severely
14  limited the circumstances under which a user has the
15  ability to comparison shop.
16           THE COURT:  Okay.
17           MS. ALBERT:  In contrast, in their user
18  administration guide with respect to Punchout, they say
19  that you can seamlessly browse Punchout-enabled websites.
20  In Lawson's post-hearing brief, they say claim 26 proved
21  to be impossible for Lawson to design around without
22  significantly impairing functionality, whereas in the RQC
23  customer webinar, Lawson's employees told customers that
24  RQC contains 100 percent of the functionality customers
25  would require.

1          Now, Lawson does seek to run away from its

2     statements in its documents by saying that those were

3     merely marketing puffery, but Mr. Lohkamp testified during

4     the hearing that Lawson intends to be truthful and

5     accurate in its statements and presentations to its

6     customers.

7          Lawson contends now in this contempt hearing that

8     the modification impacts the users' experience, but that

9     is belied by representations that Lawson made to its

10    customers that they would see no negative impact from the

11    slight product configuration change and that RQC was

12    actually better than RSS.

13         And on the right-hand side of slide 13, we have a

14    statement from Lawson's CEO, Harry Debes, that was made in

15    a communication to its customers after the Court entered

16    an injunction where he said, quote, we have developed a

17    replacement solution, Lawson Requisition Center, which we

18    believe to be superior to the existing RSS solution.

19         Now, Lawson represents that users are unable to

20    perform comparison shopping; however, Mr. Christopherson

21    of Lawson confirmed that a user of the Lawson system with

22    RQC and Punchout can still comparison shop among the

23    products offered by different vendors by performing

24    searches of different items in item master in the same way

25    that a user of the Lawson system with RSS and Punchout

1  could.

2          Lawson's expert, Dr. Goldberg, also confirmed

3  that users of the Lawson systems can compare items found

4  in searching a Punchout site in the same way that

5  comparison shopping functionality existed in the systems

6  with RSS and Punchout.

7          Now, Lawson also contends that the change is

8  significant because it impacts the requisition approval

9  process, but this argument is really a red herring.

10  There's no element of claim 26 that relates to approvals

11  of a requisition, and there was no evidence presented at

12  the hearing that the requisition approval process took

13  longer than for systems having RSS.  No customer testified

14  to that, no one demonstrated the requisition approval

15  process.  In fact, Lawson told its customers that RQC

16  actually streamlined purchasing processes.

17          The Lawson litigation-inspired arguments about

18  the significance of the modification cannot be squared

19  with what its employees said internally and to its

20  customers about the insignificant nature of the change

21  made to RSS.

22          In conclusion, ePlus has established through

23  clear and convincing evidence through Lawson's own

24  admissions that configurations three and five with RQC are

25  not more than colorably different from infringing

1    configurations three and five with RSS.

2         THE COURT:  All right, I'll hear Mr. Thomasch on

3    colorability at this time or whoever is going to argue it.

4         MR. THOMASCH:  I will.  Good morning, Your Honor.

5         THE COURT:  Good morning.

6         MR. THOMASCH:  May I first have the configuration

7    slide.

8         THE COURT:  Do you have these on paper?

9         MR. THOMASCH:  This is actually just their slide.

10   I don't have a separate slide show, Your Honor.

11        THE COURT:  There's 1-A and 1-B.

12        MR. THOMASCH:  1-A.  I just want to follow up on

13   questions that Your Honor asked of Ms. Albert and make

14   sure that the record is complete on that.  I do agree with

15   her that, for instance, to use Procurement Punchout on

16   configuration three or five you must have the things that

17   are directly below it in that chain.  To use Requisition

18   Center, you need to have the S3 and the platform

19   technology.  That's accurate.

20        Looked at the other way, of course, you can use

21   the S3 procurement module and the platform technology

22   alone.  Those are a self-standing configuration.  That's

23   configuration two.  It's configuration one if it just has

24   the S3 procurement and the platform technology.  That's a

25   fully serviceable operation that was at issue.  If you add

1    Requisition Center to that without Punchout, that can be

2    used.  That's fully functional.  That's configuration

3    number two.

4         The other thing you asked then was over on five.

5    You said, will electronic data interchange, can you use

6    that by itself, and the answer was no.  And as far as that

7    answer goes, that's correct.  You can't use electronic

8    data interchange alone, but you can use electronic data

9    interchange with just the things underneath it, with S3

10   procurement and with platform technology.

11        THE COURT:  Without requisition self-service or

12   Punchout procurement.

13        MR. THOMASCH:  Right.  You don't need those, and

14   if you're --

15        THE COURT:  I think she said that.

16        MR. THOMASCH:  If you are using electronic data

17   interchange with those that are underneath it, that's

18   using item master and EDI together, and they accused item

19   master and EDI of infringing claim 26 at issue in this

20   case, and the jury said no infringement on claim 26.  EDI

21   and item master were present, and that was the theory of

22   infringement in configuration four, and the jury said

23   claim 26, no infringement.

24        Your Honor, the eligibility issue is where

25   they're sort of all in.  They -- really, after that, I

1    think, it's pretty much going through the motions, but

2    they say that we're not eligible to be considered for

3    colorability because under the *Arlington Industries* test,

4    we can't link up what we modified to the claim element

5    with enough connection for their purposes.

6            Now, the question of how much connection is

7    necessary -- because I think we all agree there has to be

8    some connection.  The question of how much --

9            THE COURT:  I'm not sure they do.

10           MR. THOMASCH:  Well, I think actually their

11   position is that the change needs to so link to the claim

12   element that the claim element is no longer practiced, and

13   if you change something so that you lose what they call

14   losing the infringing capability, then they would say,

15   well, that's good enough.  That, of course, conflates the

16   infringement analysis together --

17           THE COURT:  What position -- what do you take to

18   rebut their position?  What does the modification do that

19   infringes or that deals with some claim of 26 to begin

20   with?

21           MR. THOMASCH:  Your Honor, claim 26 has six

22   elements.  The two-part limitation on the functionality of

23   Punchout has direct relevance to element one, two, three,

24   and four.  It does not affect element five or six, at

25   least directly.

1          So it doesn't affect the creation of purchase

2     orders or the checking of inventory.  Those can be done,

3     but it is relevant to maintaining at least two product

4     catalogs, and it's clearly relevant --

5               THE COURT:  One, two, three, and what?

6               MR. THOMASCH:  Four.  It is clearly relevant to

7     selecting the catalogs to search.  It puts a prohibition

8     on the circumstances under which you can select a catalog

9     to search.  It affects the searching criteria among the

10    selected catalogs, because if you put a limitation on what

11    you can select to search, then you have a limitation on

12    what you can search, and that limitation carries through

13    to the requisition that you are building with a product of

14    the search of the selected catalogs.

15              THE COURT:  So I understand it, you are saying in

16    the way you've described, the modification affects

17    elements one, two, three, and four of claim 26.

18              MR. THOMASCH:  Yes.  Now, Your Honor --

19              THE COURT:  And, therefore, the principles of

20    *Arlington* don't apply here.

21              MR. THOMASCH:  Correct.  *Arlington*, I just want

22    to note, Your Honor, it is fascinating that they go to

23    *Arlington* to explain the *TiVo* standard.  *Arlington* is a

24    Middle District of Pennsylvania district court opinion not

25    binding on this Court, of course.  *Arlington* is a consent

1    decree case.  They rely on consent decree cases and

2    confession-of-judgment cases.  They are not relying on

3    cases where there was an underlying trial.  There was no

4    underlying trial.

5         Now, Your Honor is fully aware, if you have a

6    consent decree, you confess judgment, then you confess

7    judgment to everything.  You can't later come back and

8    say, well, my confession of judgment was only as to this

9    theory, not as to that theory.  There is no underlying

10   trial to go to in *Arlington Industries*.  There was in

11   *TiVo*, and Your Honor asked us for a list of cases.

12        I would commend Your Honor in particular to read

13   the *Taser* case and the *nCUBE* case, because those cases had

14   a record of evidence, and you will see the Court in those

15   cases doing what the Federal Circuit did in *TiVo* and going

16   back and looking at the evidence.  They look at the

17   expert's testimony to see what was clearly stated by the

18   expert.

19        You can't do that in *Arlington* for the simple

20   reason that *Arlington* is a consent decree.  The other case

21   they rely heavily on was *Merial, Ltd. v. Cipla*.  That was

22   a default judgment.  There was no trial.  If there's no

23   trial, the entire analysis is totally different.

24        Now, Your Honor is aware that Lawson made other

25   changes to RSS.  The changes that we're talking about, the

1    two-part changes to Punchout, that's not the whole story.

2    We made other changes at a time when other patent claims

3    were in this case.  Claim one of the '172 patent had a --

4    had language in it about an order list.

5         THE COURT:  You mean after the verdict was

6    returned --

7         MR. THOMASCH:  The verdict was returned --

8         THE COURT:  -- there were changes made to parts

9    or components that aren't at issue here.

10        MR. THOMASCH:  Correct, but they're also within

11   RSS.  That's very, very important to understanding the

12   documents that you've been shown, is that RSS was the

13   place where -- sort of the nerve center where all of these

14   changes were made.  So there were changes to direct -- to

15   requisitioning technology that eliminated the use of an

16   order list as a separate holding pen, so to speak, before

17   you then looked at what was in your order list and then

18   you moved some items to requisition.  They changed it so

19   that when you selected the item, you went right to the

20   requisition eliminating something that was in the patent

21   claim.

22        THE COURT:  What difference does any of that

23   evidence make with respect to the accused change that is

24   involved here?

25        MR. THOMASCH:  It makes -- in two very important

1    respects it makes a difference.  First respect is that if

2    we had argued in this proceeding that that was a big

3    change, that change to go direct to requisition was very

4    important, and as a result of the significance of that

5    change the whole product should be considered more than

6    colorably different and we don't get to infringement, then

7    they would be correct in raising the argument that they

8    incorrectly raise in this case.

9              That order list --

10             THE COURT:  Which argument are you talking about?

11             MR. THOMASCH:  The issue of whether the change

12   relates to a claim element.  The change to the order list

13   related to a claim element in a different patent.  It's

14   not a good enough change.  It doesn't relate to the claims

15   in claim 26, the elements in claim 26.

16             By the same token, we made changes to UNSPSC

17   searching.  Again, that was relevant to claim 28 and 29.

18   It's not relevant to claim 26.  Claim 26 has no converting

19   data step which UNSPSC, at the trial, was said to fulfill.

20   So when you look, there are changes that are not the kind

21   of change that should lead to a colorability and

22   infringement analysis.

23             THE COURT:  They don't make the claim that those

24   changes do.

25             MR. THOMASCH:  We don't claim that they do.

1          THE COURT:  And neither do they.

2          MR. THOMASCH:  Right, but we claim that the

3    changes made to Punchout and the interaction of Punchout

4    and item master do relate.  They relate right onto the

5    first, second, third, and fourth elements of claim 26.

6          THE COURT:  I still am having trouble

7    understanding what pertinence that point has to the

8    analysis of what is accused here.  In simple terms, why

9    are you pointing me to all that?

10         MR. THOMASCH:  The first reason, and I'll finish,

11   the first reason was just by way of example.  I agree with

12   their argument that some changes could be made, and the

13   change could be a very significant change but having

14   nothing to do with the claim at issue, and in this

15   situation, examples of that that are not relevant are the

16   other changes we made.

17         THE COURT:  But -- and if those were accused,

18   then the *Arlington* issue would be in play.

19         MR. THOMASCH:  And it would be properly in play.

20         THE COURT:  But they are not.  Let's leave that

21   aside.

22         MR. THOMASCH:  So we made other changes, and they

23   are misusing the *Arlington* theory against those other

24   changes, because those other changes do relate to the

25   claims.  The second reason I want to raise it is --

1          THE COURT:  Those other changes you are talking

2     about are the changes that you made that affect elements

3     one, two, three, and four in claim 26.

4          MR. THOMASCH:  Right, the changes to Punchout

5     which are undisputed.  The changes to Punchout

6     functionality are not in dispute, and it's those changes

7     that relate to the first four.

8          Now, the second reason I raise the issue of the

9     other changes is because the verdict that came in on

10    configuration two, three, and five affected 864 customers.

11    Everyone who had RSS was affected by that verdict.  So the

12    changes that were made that went to the order list and the

13    UNSPSC was made broadly to deal with the problems for

14    everyone.

15         The changes we're dealing with are specific to

16    Punchout.  So you have people out there, 700 of the 864,

17    more than 700 of them where this change has nothing to do

18    with them.  If that person says, gee, the product looks

19    the same to me, they don't even have Punchout.  Of course

20    it looks the same to them.

21         THE COURT:  So the point of that argument is that

22    it helps put in context the comments of the customers and

23    the comments of Lawson's people about the significance vel

24    non of the changes.

25         MR. THOMASCH:  Absolutely.

1          THE COURT:  That's the relevance of the argument.

2          MR. THOMASCH:  That is the key relevance, because

3    if you don't understand that, you could think that a

4    document that says, oh, RSS and RQC look alike, well, then

5    maybe that's someone commenting on Punchout, but only a

6    small portion of the people even had access to Punchout.

7          The ones who don't have access to it can't

8    possibly be commenting on it.  They don't have it.  That's

9    the overwhelming majority of the people that were affected

10   by the jury verdict.

11         THE COURT:  Is there something in the record that

12   tells me whether the persons who made those comments,

13   customers who made those comments, actually what they had

14   or what they didn't have?

15         MR. THOMASCH:  We will get there, because the

16   comments that have been shown to the Court are people that

17   don't have configuration three and five.  The record

18   doesn't always have that evidence in it, because they

19   didn't want to put that evidence in.  They wanted to

20   use --

21         THE COURT:  You had a chance, though.

22         MR. THOMASCH:  We did have a chance.  We didn't

23   have a burden, but we had a chance.  Now, the fact of the

24   matter is, the fact of the matter is the expert witnesses

25   on both sides have the names of the 150-some-odd Punchout

1   customers.

2          If you don't have Punchout, you're not a

3   configuration three or five customer.  So they have the

4   full list.  They did all their calculations.  Everybody

5   knows who the people are.  The information was available

6   to them.  They know who the customers are, and it can be

7   crosschecked.  There's no disputing.  They don't have to

8   take our word for it.  Their own expert has a list of

9   configuration three and five customers.

10         THE COURT:  That's not in a record that I can

11  check.

12         MR. THOMASCH:  I believe it is in the record.  I

13  believe through the damages case that did come in.  And we

14  would stipulate to the Court having that information.  I

15  believe it's before you already, but if there's any doubt

16  about it, it's a fact, and both sides agreed on it, and

17  both side preface their damages calculation on it.  We're

18  happy to have it come into evidence.  More than happy.

19         I think you will find they are going to come back

20  on the rebuttal and say that we say it affects the first,

21  second, third, and fourth elements, but it doesn't because

22  we didn't rely on that, and that's a situation where --

23  that's a situation where the view of *TiVo* and Wednesday's

24  order precludes from me addressing that point.  I can't

25  respond to theirs anyway, but I will tell you that our

1    position is that -- that you have changes that go directly

2    to the evidence and the theories and the issue of whether

3    or not there's infringement of element one, two, three,

4    and four of claim 26, and you do not have to do a

5    full-fledged infringement analysis before you decide if

6    something is eligible for the colorability analysis.  That

7    would turn *TiVo* on its head.

8            I want to turn to colorability before my time

9    runs quickly.  I want to respect the Court's limits.  Our

10   colorability analysis focused on the modified feature of

11   the adjudged infringing product.  We significantly limited

12   the functionality of Punchout, and our case went in, from

13   opening statement to today, comparing the differences

14   between the functionality of Punchout in RSS and in RQC.

15   And the functionality of Punchout is directly relevant to

16   the issue of infringement of configuration three and five.

17           Your Honor heard here today a comment made --

18   sort of surprised me because it came up late -- by

19   plaintiff's counsel that you don't look at the infringing

20   feature, you look at the product as a whole.  And this

21   issue has been before the Court, and I don't want to

22   reargue --

23           THE COURT:  I think she retrenched from that

24   statement and said you do look at the feature.  You are

25   right, she did make that statement which I found to be

1   surprising, and she changed that view, I think.

2           MR. THOMASCH:  In case she didn't, if I could

3   show the Court the November 8th --

4           THE COURT:  It's in *TiVo*.  It says what you do.

5           MR. THOMASCH:  That's fine, Your Honor.

6           THE COURT:  I don't think that's open to dispute.

7           MR. THOMASCH:  I think that's right in *TiVo* at

8   page 882.  So the change to the functionality of Punchout,

9   if you get to the issue of whether its significant,

10  there's only one answer.  The change to the functionality

11  of Punchout, of course it was significant.

12          Our -- defendant's proposed findings of fact at

13  89 to 118 lay out the evidence in chapter and verse on

14  that subject.  It was in this proceeding -- I'm not

15  talking about prior trial testimony that I'm banned from

16  discussing.  It was this proceeding that Dr. Weaver

17  himself said that the functionality that was extracted out

18  of, blocked off of, that functionality was beneficial to

19  product users.  That's our finding of fact 90 with a

20  quote.

21          It was a convenience, it was a time-saver, it

22  was, quote, probably a cost-saver, it was a real benefit,

23  and he said in this courtroom in this proceeding, it was,

24  quote, a big deal in the context of the patent.

25          It's a big deal in the context of the patent.

1    That ends the colorability analysis by all rights.  You

2    can't have something that's a big deal but insignificant.

3    Big deal means it's significant.  In any common use of the

4    language, that testimony is case dispositive or should be.

5    If having the functionality is a big deal, then blocking

6    someone from it and taking it away from them is a big deal

7    as well.

8         It's mathematical.  It works the same way.  Dr.

9    Weaver admitted as much, agreeing that from a

10   technological vantage point, it was a step back by more

11   than a decade.  That's not cosmetic.  That's not labeling.

12   That's a big deal if you are in the marketplace and your

13   product is suddenly ten years out of date, and we don't

14   want to have a product that's ten years out of date.

15        We have a product that's ten years out of date

16   for one reason, because there's an injunction and an

17   infringed patent claim, and we respect those.  So we

18   changed our product, and we changed it to get rid of that

19   which was found infringing.

20        The inventors on a 63 patent recognize it was --

21   and this came into evidence in this case in this

22   proceeding through Dr. Goldberg, admitted testimony.  The

23   inventor said it was, quote, a distinct advantage of

24   applicant's invention to be, quote, able to purchase all

25   of the selected items from all of the desired sources

1    without having to wait in the checkout line at each of

2    those stores.

3            That's what this is about.  Yes, Your Honor, you

4    can still go to Punchout, buy something, go to another

5    Punchout, buy something in a different requisition.  You

6    can keep opening new requisitions going through the whole

7    thing, generating a purchase order, getting it approved,

8    checking the inventory.

9            What you can't do is combine all of that and go

10   through the checkout line one time, and the applicants,

11   when they are trying to get the patent, said it's a

12   distinct advantage of our technology that you can combine

13   all sources on one requisition.  You can no longer do

14   that.

15           Mr. Christopherson wanted to try to have a

16   solution that --

17           THE COURT:  In your view, is that point even in

18   dispute?

19           MR. THOMASCH:  No, it's not in dispute.  The only

20   thing that's in dispute is what the inventor said was a

21   distinct advantage and what the expert says was a big

22   deal, the only question that's in dispute is, does a

23   distinct advantage and a big deal mean it's significant.

24           The significance bar is not so high that it isn't

25   encompassed by something that is a distinct advantage and

1    a big deal.  The changes at issue undisputedly negatively

2    impacted the process at the two key points in the

3    requisition process.  At the front end, it eliminated the

4    ability to see items from any and all sources at the same

5    time.  That's what you used to be able to do.

6              THE COURT:  What do you think about their

7    argument that is in their papers that if it's a

8    degradation, you don't even count it as part of the

9    analysis because, I suppose, because it's insignificant?

10             MR. THOMASCH:  It's absolutely unsupported by the

11   law.  It is a complete mistake of what was said in *TiVo*.

12   In *TiVo*, if you are having --

13             THE COURT:  You are talking about the part of

14   *TiVo* which talks about we don't want to stifle innovation.

15             MR. THOMASCH:  Correct.  Because there's two ways

16   to handle a situation.  There's three ways to handle a

17   situation when you have an infringement, and every IP

18   lawyer in this room knows it and they deal with their

19   customers on it, their clients on it if they're found

20   infringing.

21             Now, one way is just stop selling that thing

22   altogether.  Another way is to eliminate that which was in

23   the product that was the basis for the infringement.

24   That's the one we chose.  Another way is if we had said,

25   geez, we don't want to, that's really setting the product

1    back by a decade, let's figure out a new way to do this

2    that is going to be an advancement, an innovation, it's so

3    improved, it's so different that even though it has all

4    the functionality that the infringing product has, it's

5    more than colorably different.

6           If that's your argument, if you are arguing that

7    I kept the functionality but I changed the way I did it,

8    you better be able to argue that its innovative, because

9    if all you did was increase a little functionality that

10    anyone who was skilled in the art would have known how to

11    do already, then that's not a significant change.

12           THE COURT:  That's what they're talking about.

13    That's what the statement in *TiVo* relates to.

14           MR. THOMASCH:  Correct.  It doesn't apply in a

15    case where you are removing functionality.  It's when you

16    are keeping the functionality that innovation matters.  We

17    didn't keep functionality.  The suggestion -- Dr. Weaver

18    actually said on the stand one of the most remarkable

19    things I've ever heard.  He said, it doesn't matter how

20    much functionality you take away, taking away

21    functionality could never make it more than colorably

22    different.

23           Under Dr. Weaver's theory, we could stop selling

24    Requisition Center and Punchout and just sell

25    configuration one, and we'd still be infringing.

1          THE COURT:  That's not changing functionality.

2    That's stopping selling the product.  I'm not sure that

3    analogy helps out very much.

4          MR. THOMASCH:  Well, there is no support, none

5    for the idea that removing functionality is not eligible

6    for something to be a more than colorable change.  There's

7    none.  They don't cite to any, and it's a mistaken

8    application of *TiVo*.

9          I said at the front end of the process you

10   changed -- you don't eliminate all ability to do

11   comparison shopping.  You do significantly decrease it.

12   They show a quote from Dr. Goldberg.  Dr. Goldberg said,

13   you can go to a Punchout site, and you can see -- if you

14   go to the Dell site, you can see Dell has three laptops,

15   and you can look at those three laptops and comparison

16   shop among them and pick the one you want.  Absolutely

17   true.

18          You always could do that, but you used to be able

19   to say, and let's see what's over at the Apple store and

20   let's see what's over at Staples and let's see what's in

21   item master, and let me take a look at all of them at

22   once.  That's comparison shopping.  You can't do that.

23          THE COURT:  What is the state of the record as to

24   whether in the first instance, example that you gave, you

25   can go and look at the first store, and then you can save

1   it and then open another window, and you can look at

2   what's in that store and save it, and then you can go to

3   the next store and you can save that.  Then when you want

4   to retrieve the saved information, you can pull that up

5   and put it into the same purchase order.  What is the

6   state of the record on that?

7        MR. THOMASCH:  The state of the record is you

8   cannot do that.  Now, what you can do, you can go to

9   Punchout site one, you could put something in the

10  requisition lines.  Then you could close out of that.  It

11  won't lose it.  It will save it, but you are closed out of

12  that session.

13       THE COURT:  But you can come back to that

14  session.

15       MR. THOMASCH:  You can come back to it --

16       THE COURT:  Or not.  That's what I'm asking.  Can

17  you come back to that session after you've looked at the

18  several other sessions and pick up what you saved in that

19  session and decide, well, I'm going to buy that?

20       MR. THOMASCH:  Right, but what you couldn't do,

21  and what you said at the end is, and then combine.  You

22  could say, I've done six different shopping sessions, I've

23  gone through the whole process, and I think number two was

24  best.  You could then go back to number two, reopen that,

25  purchase that.  You couldn't say, but the fourth one had a

1    different item I want, too.  You can't combine them.

2              THE COURT:  Because you have to put each one on a

3    different purchase order.

4              MR. THOMASCH:  You have to put each one on a

5    different requisition.

6              THE COURT:  Can you combine requisitions in one

7    purchase order?

8              MR. THOMASCH:  You can't combine items from

9    different -- selected from different websites.  Different

10   Punchout websites can't be put on the same requisition.

11   Can't do it.

12             THE COURT:  I know that, but once you get

13   requisitions and you made your requisition, can you put

14   more than one requisition on a purchase order?

15             MR. THOMASCH:  No, you don't put requisitions on

16   a purchase order.  It's a terminology issue.  If you had

17   item master -- they made a big deal out of this.  If you

18   had item master, you could go to item master, and you

19   could pick items that were in stock, or you could pick

20   special items, and they might be items that you made

21   arrangements, I get a special price on these pens and a

22   special price on that typing paper.  Those might come from

23   different vendors, and since you are only in item master,

24   you could combine those.  You could put those on a

25   requisition, and that would lead to two purchase orders.

1          That's why we say the purchase order aspect

2     hasn't been changed.  But that's only when you use item

3     master, and we can't be found liable for infringing

4     through item master for reasons we'll talk about in the

5     next half-hour slot.

6          They made a host of arguments -- as I say, I

7     think really they're all in on the *Arlington Industries*,

8     and you're not even allowed to consider it, because

9     there's just no way to work with what their inventor said

10    and what their expert said and say, the change to the

11    functionality of the feature that's been modified is not

12    significant, and they make arguments like, it didn't take

13    long to do the coding, it didn't make the product hard to

14    install, it didn't require major retraining of users, and

15    they put documents in and they questioned witnesses and

16    they --

17          THE COURT:  Well, you don't really disagree --

18          MR. THOMASCH:  We don't disagree with any of

19    that.  That is so much irrelevance.  It doesn't matter how

20    many lines of code are involved, and if there are not many

21    lines of code, it doesn't matter how long it takes you to

22    do it or whether you have great coders or terrible coders.

23          The functionality of Punchout is the feature.

24    The functionality is not in dispute.  We know exactly what

25    it is.  Both sides agree.  I told you what it was in

1    opening statement.  When Dr. Weaver took the stand, I put

2    the opening statement slide on, I read it to him, he

3    agreed.  I put the second change on, I read it to him, he

4    agreed.

5         No reservation, no argument about terms, no,

6    well, if that's the way you want to say it, sir, that's

7    okay with me.  Yes, yes, yes.  We played it straight.  We

8    told it like it is, they agreed.  There's no dispute.

9    It's significant.

10        THE COURT:  So, in essence, there is no need in

11   the ultimate analysis to go beyond assessing the

12   assertions made here with respect to whether the changes

13   are significant as made by ePlus and comparing them with

14   what the inventor said and with what Dr. Weaver said, and

15   if I conclude that I believe them as the finder of the

16   fact, and that, in fact, it is significant, that's the end

17   of the colorability analysis, and, of course, that's the

18   end --

19        MR. THOMASCH:  That is correct.

20        THE COURT:  Is that basically where you are in

21   this case?

22        MR. THOMASCH:  That is exactly where we are.

23   It's not basically.  It is exactly.

24        THE COURT:  Yes, I used an inappropriate word.

25        MR. THOMASCH:  You didn't give yourself credit

1   for the precision which you got it.  You are dead on.

2   That's our position full stop.

3        Now, I do think that it was remarkably unfair to

4   have documents coming in, and we talked about this, that

5   just relate to Punchout -- I'm sorry, just relate to RSS

6   or RQC without any reference whatsoever to Punchout.

7   That's my concern.  There were lots of issues about

8   whether or not the new user interface, which is the direct

9   to requisition use of requisition lines to replace a

10  shopping cart, whether that mattered, and the truth of the

11  matter is, that whole change was behind the user

12  interchange.

13       The change that was made that was relevant to the

14  patent claim was out of sight of the consumer.  The

15  consumer looked at it, and it looked very similar, and so

16  everybody was happy about that.  We wanted that.

17       THE COURT:  That argument essentially boils down

18  to that the evidence to which they point, that there was

19  no significant change, which evidence comes out of your

20  mouth --

21       MR. THOMASCH:  Right.

22       THE COURT:  Really has no relation to Punchout.

23  It relates to something else.

24       MR. THOMASCH:  Absolutely.  And let me just in my

25  last --

1          THE COURT:  And you can't use -- therefore, you

2    can't use those statements in assessing vel non whether

3    Punchout is a significant change or not.

4          MR. THOMASCH:  Correct, Your Honor.  I mean, for

5    goodness sake, the standard here is clear and convincing

6    evidence.  It is not clear and convincing evidence that

7    the functionality of Punchout has not been changed by

8    looking at a document that makes no reference to Punchout

9    whatsoever when you know full well --

10          THE COURT:  Do you think maybe you could get up

11    to another RPM or two so the court reporter will break her

12    hands?

13          MR. THOMASCH:  Your Honor, it makes no sense at

14    all to suggest that you can take a document that doesn't

15    reference Punchout whatsoever but references RSS and RQC

16    when everyone in this courtroom knows we took discovery

17    for months on other changes to RSS that have nothing to do

18    with the case we just tried, and people are making

19    comments on those other changes, and they say, hey, this

20    looks great.  The user interface is virtually identical,

21    it looks just the same.  It's an improvement.  It's a

22    superior product.

23          I mean, you've had your share of trials.  That

24    must have set off a bell.  Superior?  What's superior?

25    Well, their documents say RQC is superior.  Why?  Because

1    the direct to requisition has some real benefits.  We

2    would have gone into them had that been an issue in this

3    case.  We would have talked about innovation, we would

4    have gone through all of that, but that's not at issue in

5    this case, but it had real benefits.

6           Secondly, the RQC application was designed to be

7    able to use mobile requisitioning so you could take your

8    iPhone, and you could be on the road, and you could go

9    right into the website and you could go out to Punchout

10   sites, and you could do that.

11          You can't do that with RSS.  People said, as long

12   as we're doing those changes, let's make it better, and

13   they did, and so people say it's superior.  No one said,

14   oh, it's a good thing that you have to check out from

15   every single Punchout site before you can go to the next.

16   No one said it's an advantage you can't see item master

17   and Punchout together.  That's just not so.

18          So evidence that they use -- I mean one document

19   they use that actually says Punchout, Exhibit 1030, does

20   make reference to Punchout.  It's a document that was sent

21   to Dale Christopherson.  Dale Christopherson completely

22   disagreed with the reading they tried to give to that

23   document, but the document says -- you will recall it --

24   other than what Dale so equivalently says is lipstick on a

25   pig, there are three functional changes, one, two, three.

1    The third one is Punchout, and they talk about how there's

2    a slight difference to the process.

3          Read Exhibit 1030.  A slight difference to the

4    process by which Punchout works.  I would agree with that.

5    The process is not changed significantly.  You still go to

6    a Punchout site, but what happens, and it says right here,

7    but when you shop at one site, you have to close out

8    before you can go to another.

9          That's the functional limitation.  The functional

10   limitation was not slight, not if somebody is a

11   professional at requisitioning and used to doing

12   comparison shopping between the item master items and the

13   Punchout items and they no longer can do it.  That's

14   functionality, that's lost.  That has nothing to do with

15   document 1030.

16         THE COURT:  What is the significance of the fact

17   or the evidence that they argue that not one of your

18   customers made any complaint about the change that was

19   made to Punchout and -- or at least it wasn't put into

20   evidence if it was.  What is the significance of that?

21         MR. THOMASCH:  There were multiple -- I think

22   what it shows you is that in the overall deal, you know,

23   there's a lot of things you do with this system.  Punchout

24   is a small part.

25         THE COURT:  But there isn't any evidence that I

1    know of about any customer complaining about the way

2    Punchout or new Punchout worked, was there?

3              MR. THOMASCH:  I would disagree with Your Honor.

4              THE COURT:  Where is it then?

5              MR. THOMASCH:  In the answers to the webinar --

6    in the questions in the webinar, multiple customers

7    asked -- and we put this into evidence.  Multiple

8    customers asked, if you get past this court proceeding,

9    will you reinstate that functionality.  I hear that we can

10   no longer do X and Y.  Will you change that back if you

11   win the case.  And we said, this is our product now.

12   People asked about it.

13             THE COURT:  That is the answer to the question?

14   I can go read answers to the webinar questions and

15   answers, and I can find where they complain?

16             MR. THOMASCH:  Yes.

17             THE COURT:  All right.

18             MR. THOMASCH:  At the end of the day, if a

19   customer chooses not to complain, because we told the

20   customer, we told the customer that they had to make the

21   change, that they, themselves, could be infringing.  We

22   said it over and over again.  We say, you know, that you

23   should move swiftly to RQC, and you are at risk if you

24   don't.  "At risk" was at risk of a patent infringement

25   lawsuit brought by ePlus.

1          That's through the documents, and so if a

2     customer gets that, they're not going to say, well, you

3     should leave me at risk, you should let me do that.   It

4     makes sense that a customer wouldn't respond when a patent

5     claim covers it and they themselves could be sued as a

6     user.  So that's very, very important.

7          There was a customer, Cleveland Central DuPage,

8     during the testimony of Keith Lohkamp.  Mr. Lohkamp

9     specifically talked about complaints made to him by

10     Cleveland Central DuPage.  That's there as well.

11          Documents that I would not go through because of

12     time but ask Your Honor to look at, 1027, a Mindy Klebe

13     memo about Providence Health.  What do we know?  We know

14     that Providence Health didn't have -- not a configuration

15     three or five customer, doesn't have Punchout.  We know

16     that.  It's not in dispute.

17          We have 1124 which they used today.  Exact same

18     issue.  Mindy Klebe said, I tested Punchout.  Lawson

19     doesn't use Punchout.  It's not in -- she says -- I'm

20     sorry.  I spoke too fast because I'm short on time.  I

21     misspoke.  Mindy Klebe says in 1124, I tested RSS.

22     There's not a word about Punchout in 1124.  They didn't

23     ask Mindy Klebe anything, not a word about it.  She tested

24     RSS.  RRSS is not accompanied by Punchout.  The evidence

25     is undisputed in that regard.

1          THE COURT:  "Ours" meaning what you use
2     internally.
3          MR. THOMASCH:  Right.
4          THE COURT:  What she tested, in other words.
5          MR. THOMASCH:  Right.  What she tested didn't
6     have Punchout, so her comments about the user interface
7     don't relate to it.  1066 is about Scott Hanson.
8     Goodness, Scott Hanson installs and supervises people who
9     install.  He testified he didn't know anything at the time
10    of these documents about the functionality of Punchout,
11    and he still has only at the very highest level an
12    understanding of what Punchout even means.
13         He is a product installer.  To use his documents
14    and to say, oh, he is head of the SWAT team, he must know,
15    no, they didn't put on any evidence that he didn't know.
16    They put him on their witness list.  We brought him to
17    court, and they didn't call him in the colorability phase.
18         If they wanted to make that argument, they should
19    have put him on the stand.  When he got on the stand, he
20    said, I don't know about this, that's not my job.  I don't
21    have anything to do with it.
22         Document 1110 is a Dean Hager to Langer about no
23    training.  Again, has nothing to do with Punchout.  1266
24    is Dean Hager about Summa Health Care.  Summa Health Care
25    was not even a customer.  They didn't have Punchout.  He

1    said, I wrote them about the concerns you raised in the

2    conversation, and when he testified at the second

3    deposition, they asked him, and he said it had nothing to

4    do with Punchout.

5            They are using documents that don't reference

6    Punchout, that reference the user interface that go to the

7    other changes, and they are trying to use them against us

8    in this case, and they have a clear and convincing

9    standard of proof that is wrong.

10           The last two I would mention would be from

11   plaintiff's opening demonstrative.  They referenced

12   Crandall, and they referenced Children's Health.  Those

13   are not -- Crandall is not a customer at all, and there's

14   no evidence Crandall has any exposure to Punchout.

15           Children's Hospital is not a configuration three

16   or five customer.  The quote that they use, RQC looks like

17   RSS.  Well, of course it looks like RSS if you don't have

18   Punchout.  It's not going to look different anyway.  It's

19   software code.  The user interface is what you see.  The

20   user interface, if you didn't have Punchout before and you

21   don't have Punchout now, there's no difference.  It

22   doesn't have Punchout on it.  It looks identical.  That

23   doesn't mean that the functionality of Punchout is somehow

24   identical.  It's not.

25           You can't seriously argue that it is not a

1   colorable change to the functionality of Punchout.  Their

2   argument, and their only argument, is, don't worry about

3   the functionality of Punchout, because Mr. Thomasch may

4   say that it relates to items one, two, three, and four,

5   but we didn't need any of that fancy functionality in

6   order to infringe one, two, three, and four, so that

7   played no part in the last case.

8           That argument is wrong.  These were functional,

9   significant functional changes, and the best evidence of

10  it comes out of their mouth, their inventors, their

11  expert.  It was a big deal, it was a distinct advantage,

12  and we blocked it, and we took it out, and there are

13  documents in this case that show that they did it because

14  of what Dr. Weaver testified to.  I won't go there in this

15  argument, but our briefs and our findings of fact make it

16  clear.  Thank you, Your Honor.

17          THE COURT:  Thank you.  Ms. Albert, how do you

18  reconcile the testimony of the inventor, the testimony of

19  Dr. Weaver, and the fact that degradation of the product

20  which seems to me -- the utility of the product, which

21  seems to me to be undisputed with your insignificant

22  argument?  How can I come to that conclusion, the

23  conclusion you want me to come to in the face of that

24  evidence that Mr. Thomasch pointed to?

25          MS. ALBERT:  Of course, Dr. Weaver said during

1    his testimony that, yes, it's a big deal to be able to

2    combine line items associated with multiple sources on a

3    single requisition, but then he clarified that it's not

4    required by claim 26.  Can I have slide 20, please.

5            Claim 26, the fourth element has building a

6    requisition using data relating to selected matching items

7    and their associated source or sources.  So claim 26

8    doesn't require that you have multiple line items

9    associated with multiple sources on a single requisition.

10           Yes, that's one circumstance that satisfies that

11   claim requirement, but there are additional circumstances

12   that also satisfy that claim requirement, and that's what

13   Dr. Weaver said when he was testifying at the hearing.

14           THE COURT:  At this hearing.

15           MS. ALBERT:  This hearing.  And I just want to

16   clarify, Lawson counsel referred repeatedly to changes

17   made to Punchout.  There were no changes made to the

18   Punchout application.  Mr. Christopherson confirmed that

19   there were no changes made to the Punchout application.

20   Lawson's own documents confirmed there were no changes

21   made to the Punchout application, and I would refer the

22   Court to plaintiff's proposed findings of fact 37 through

23   39 and 50.

24           So, therefore, the facts that numerous documents

25   refer to the only change that's made as a change to the

1    user interface, those documents are absolutely correct,

2    because RSS and RQC are just that.  They are the user

3    interface for the entire system.  So of course the Lawson

4    employees are referring to the only change made as a

5    change to the user interface, because RQC and RSS are the

6    user interface.

7         I want to address the comment about the fact that

8    customers that commented may not have had Punchout;

9    however, if we go to slide ten, which were the customers'

10   comments, those were comments that customers made during

11   the course of Lawson's demonstration of RQC which also

12   included a demonstration of RQC with Punchout.

13        So their comments were addressed to the entirety

14   of Lawson's demonstration during that webinar which

15   involved a demonstration of Punchout as well, and I would

16   refer to the fact that Lawson did not lose a single

17   customer because of the transition of RSS to RQC, and that

18   was confirmed by Mr. Lohkamp's testimony which is on slide

19   14.

20        Now, with respect to this big deal feature about

21   being able to include multiple line items associated with

22   multiple sources on a single requisition, that capability

23   does still exist in configurations three and five.

24   Indeed, Lawson's own documents confirm that the capability

25   still exists.  If you would refer to slide six, that

1    statement on slide six comes from Lawson's Requisition

2    Center and Procurement Punchout brochure, and in that

3    brochure that deals with RQC and Punchout, Lawson confirms

4    that you can still consolidate multiple types of products

5    and services into a single requisition and that the system

6    will then generate multiple purchase orders from that

7    requisition.

8              Now, Mr. Thomasch mentioned that Lawson contends

9    that the modification relates to elements one, two, three,

10   and four of claim 26.  I mean, this is the first time

11   we've heard this.  It was not in Lawson's post-hearing

12   brief on either colorability or infringement, but I would

13   just mention that this theory of Lawson's relies upon a

14   new claim construction, because the Court has already

15   construed the selecting product catalogs to search and

16   searching among the selected product catalogs claim

17   elements to be satisfied by a selection of only one

18   catalog from the at least two product catalogs included in

19   the system.

20             So, again, *TiVo* says that you cannot -- you need

21   to rely on the claim constructions that were used in the

22   underlying trial --

23             THE COURT:  Are you saying that his contention

24   that the modifications affect elements one, two, three,

25   and four depend upon a new claim construction as to what?

```
1              MR. THOMASCH:  Well --

2              THE COURT:  As to what element?

3              MR. THOMASCH:  It appears that --

4              THE COURT:  Excuse me.  I said claims one, two,

5    three, and four.  I mean elements one, two, three, and

6    four of claim 26.

7              MS. ALBERT:  It would appear that --

8              THE COURT:  What new claim construction are you

9    talking about?

10             MS. ALBERT:  I'm referring to the Court's claim

11   construction relating to elements two and three, the

12   selecting and searching claim elements.  As to those, the

13   Court already rejected Lawson's prior contention that

14   those claim elements would require the selection of

15   multiple catalogs to be searched.

16             THE COURT:  So they are retrenching back to the

17   claim construction argument on element two and three in

18   order to make the argument that the modification affects

19   elements one, two, three, and four of claim 26; is that

20   what you are saying?

21             MS. ALBERT:  That would appear to be the case.

22   Additionally, element four, by its express terms, allows a

23   requisition having line items associated with either a

24   single source or multiple sources.

25             THE COURT:  What is the significance of that
```

1    statement in responding to the fact that the modification

2    affects element four of claim 26?

3         MS. ALBERT:  It's irrelevant if the system no

4    longer allows you to combine an item selected from an item

5    master catalog with an item selected from a Punchout

6    catalog on a single requisition.  That's not required.

7         THE COURT:  I see.

8         MS. ALBERT:  Nor is the combination of an item

9    selected from one Punchout site with an item selected from

10   another Punchout site required by element four.

11        THE COURT:  I see.

12        MS. ALBERT:  Now, as far as comparison shopping

13   goes, of course the system still enables you to go to a

14   single multi-vendor Punchout site and compare among the

15   various items offered by the multiple vendors --

16        THE COURT:  If you have a Punchout site that has

17   multiple vendors itself in it, you can do that.

18        MS. ALBERT:  You could search among those

19   multiple catalogs in a single Punchout session, select

20   items from multiple different catalogs associated with

21   multiple vendors, bring those back to the Lawson user

22   interface, build a requisition, and generate multiple

23   purchase orders --

24        THE COURT:  And that infringes?

25        MS. ALBERT:  Yes.  Additionally, you can select

1    to search among the multiple product catalogs stored in

2    the item master and compare the items offered by different

3    vendors with respect to those catalogs, and as Lawson's

4    own documents and their witnesses confirm, the system can

5    build a requisition having multiple line items associated

6    with multiple vendors and generate multiple purchase

7    orders from a single shopping session within the item

8    master.

9              THE COURT:  You are referring to slide six.

10             MS. ALBERT:  Slide six, yes.  And finally,

11   counsel mentioned the *Taser* and *nCUBE* cases.  Those cases

12   are distinguishable because the feature that was relied

13   upon for infringement was entirely removed from the newly

14   accused systems.  That is not the case here.

15             THE COURT:  All right.

16             MS. ALBERT:  Thank you, Your Honor.

17             THE COURT:  We'll next deal with infringement,

18   but before we do that, we'll take a 15-minute recess.

19

20             (Recess taken.)

21

22             THE COURT:  I may have to interrupt this session

23   and take a quick phone call, but if I do, you just stay in

24   place, and we'll be combat ready as soon as I'm finished

25   with that, and I apologize in advance.

1          MS. ALBERT:  May it please the Court, ePlus

2     established by clear and convincing evidence that

3     configurations three and five with RQC continue to

4     infringe claim 26.  The clear and convincing evidence

5     presented included demonstrations with an actual Lawson

6     system by Dr. Weaver, Lawson's own documents, testimony of

7     Lawson's own witnesses.

8          Indeed, Lawson did not proffer any witnesses to

9     rebut ePlus's evidence concerning infringement of claim 26

10    using RQC configurations three and five.

11         Slide 19 presents a summary of the infringement

12    evidence.  Clear and convincing evidence established that

13    RQC configuration five with item master and EDI is used to

14    infringe claim 26.  Clear and convincing evidence

15    established that RQC configurations three and five with

16    Punchout are used to infringe claim 26 and that RQC

17    configurations three and five, when connected to

18    multi-vendor Punchout sites, are used to infringe claim

19    26.

20         THE COURT:  You make the statement in your brief

21    that they offer no infringement defense.  What do you see

22    that the defendant offered by way of evidence opposing the

23    infringement?

24         MS. ALBERT:  I didn't see any non-infringement

25    evidence presented with respect to the RQC configurations.

1          THE COURT:  Do you consider that what they asked

2    on cross-examination of your witnesses to be considered as

3    evidence of non-infringement from their side assuming that

4    it qualifies -- in other words, suppose that the evidence

5    came out on cross-examination of Dr. Weaver that

6    demonstrated non-infringement.  That could be considered.

7          MS. ALBERT:  Yes, correct.

8          THE COURT:  But other than cross-examination of

9    witnesses, they offered none; is that your point?

10          MS. ALBERT:  That's my point.  Now, slide 20

11    shows all of the elements of claim 26.  As we know, claim

12    26 is a method claim comprising six steps, and clear and

13    convincing evidence established that configurations three

14    and five with RQC perform each and every step.

15          Now, my next slides are similar to those used in

16    opening but now include citations to record evidence in

17    support of ePlus's contentions for the Court's

18    convenience.

19          The evidence showed that the step of maintaining

20    at least two product catalogs on a database containing

21    data relating to items associated with the respective

22    sources is satisfied by RQC configurations three and five

23    in any one of four ways:  First, an item master containing

24    at least two product catalogs; second, connections to at

25    least two Punchout sites; or, three, connection to a

1    single Punchout site that hosts multiple vendor catalogs;

2    or four, the element is also satisfied if the system has

3    any combination of these.

4           For example, the system could have an item master

5    containing a catalog and a connection to one Punchout

6    site, and that would satisfy the requirements for at least

7    two product catalogs.

8           The modification made to RSS does not prevent a

9    user from maintaining at least two product catalogs in any

10   of these ways, and we saw that at the trial.

11          With respect to the second and third elements of

12   claim 26, the evidence showed that the sole modification

13   made to RSS does not prevent a user from selecting the

14   product catalogs to search and searching for matching

15   items among the selected product catalogs as required by

16   the second and third steps of claim 26.

17          As we discussed earlier, the Court has already

18   held that the proper construction for selecting the

19   product catalogs and searching among the selected product

20   catalogs must allow for selecting and searching of only

21   one catalog, and in doing so, the Court specifically

22   rejected Lawson's claim construction argument that a user

23   must select two or more catalogs to search.

24          THE COURT:  In making these statements under the

25   heading Satisfied By and the citations that you make at

1    the end of the numbered instances there, are you saying

2    that those citations establish that the modification

3    doesn't preclude any or all of those?  In other words,

4    where do I draw the proof, or are you saying that the

5    cited authority simply stands for the proposition that the

6    claim can be satisfied if item master does this, this,

7    this, or this?  Or multiple -- or if any of these things

8    happen.

9          MS. ALBERT:  The proof in those proposed findings

10   of fact was the evidence that was adduced at trial which

11   included --

12         THE COURT:  I guess what I'm getting at, is it

13   the proof that the element is satisfied if one of these

14   things happen, or is it the proof -- is it proof that, in

15   your view, the modification didn't preclude any of those

16   things which are satisfying --

17         MS. ALBERT:  It's proof that the system, as

18   modified, still -- a user can still select one or more of

19   the catalogs in the item master, and that was

20   demonstrated, for example, by Dr. Weaver in a product

21   demonstration and also by testimony from Lawson witnesses,

22   and additionally, the evidence showed that the system as

23   modified, you know, with the RQC module still allows a

24   user to select, to search a Punchout catalog, or the

25   system as modified still enables a user to select and

1   search one or more catalogs at a multi-vendor Punchout

2   site.

3         With respect to the fourth element of claim 26,

4   the evidence also established that notwithstanding the

5   modification made to RSS to form RQC, the fourth element

6   of claim 26 is satisfied by configurations three and five

7   that require building a requisition using data relating to

8   selected matching items and their associated source or

9   sources.

10        The language in the claim clearly states that the

11  element is satisfied by building a requisition using

12  associated -- using items associated with one source or is

13  satisfied by building a requisition having items

14  associated with more than one source.  And the evidence at

15  the hearing demonstrated that RQC -- requisitions built

16  using configurations three and five with RQC can use data

17  relating to selected matching items associated with a

18  single source or multiple sources from one or more

19  catalogs in the item master, a single source from a single

20  vendor Punchout site, or a single source or multiple

21  sources from one or more catalogs within a multi-vendor

22  Punchout site.

23        With respect to the fifth element of claim 26,

24  the modification that was made to RSS has no bearing on

25  the capability of configurations three and five to process

1   the requisition to generate one or more purchase orders

2   for the selected matching items.  Again, this element, by

3   its plain terms, is satisfied by processing the

4   requisition to generate either one purchase order for the

5   selected matching items or multiple purchase orders, and

6   requisitions built using configurations three and five

7   with RQC can, indeed, be used to generate one purchase

8   order for selected matching items associated with a single

9   source or more than one purchase order for selecting

10  matching items associated with multiple sources.

11          For example, we saw in Dr. Weaver's first

12  demonstration a requisition having multiple line items

13  associated with multiple sources.  That was processed to

14  generate two purchase orders, and that demonstration was

15  found at Plaintiff's Exhibit 1135 and 1135-A.

16          We saw in Dr. Weaver's second demonstration a

17  requisition having a single line item associated with a

18  single source.  That was processed to generate a single

19  purchase order, and that was Plaintiff's Exhibit 1134 and

20  1134-A, and both circumstances satisfy the requirements of

21  claim 26.

22          We also had evidence in the form of admissions of

23  Lawson's own witnesses and in its documents that the RQC

24  configurations three and five can, indeed, process a

25  requisition to generate either one or multiple purchase

1    orders for selected matching items.

2         With respect to the sixth element of claim 26,

3    Lawson does not even contend that the modification that

4    was made to RSS has any impact whatsoever on the sixth

5    element of claim 26 that requires determining whether a

6    selected matching item is available in inventory.  This

7    claim element is satisfied when a user of configurations

8    three or five checks whether an item is available in

9    inventory either through querying the Punchout vendor

10   inventory database, or with respect to configuration five,

11   through an EDI purchase order acknowledgment report that

12   confirms whether or not an ordered item is available in

13   the vendor's inventory.

14        Besides the demonstrations performed by Dr.

15   Weaver using the Lawson system produced in discovery,

16   Lawson's own witnesses confirmed the infringing

17   capabilities of RQC configurations three and five.  For

18   example, there was testimony from Mr. Lohkamp confirming

19   many of the infringing capabilities of the RQC

20   configurations.  He testified here in the transcript, page

21   532 and 534, he confirmed that the RQC configurations

22   three and five continue to have the capability to maintain

23   multiple catalogs in item master, that the user can select

24   and search among those item master catalogs, that you can

25   build a multiline requisition with items associated with

1    multiple sources.

2          He says here, as mentioned here, you can have an

3    item associated with vendor A and an item associated with

4    vendor B and place both of those items in a single

5    requisition, and when you click release, the purchase

6    order module will generate two purchase orders, one to

7    vendor A and one to vendor B.

8          THE COURT:  The first question relates to element

9    one.

10          MS. ALBERT:  Right.

11          THE COURT:  What does the second question relate

12   to?

13          MS. ALBERT:  That relates to searching the

14   catalogs and then --

15          THE COURT:  Which elements; two and three?

16          MS. ALBERT:  Two, three, and somewhat to four,

17   because once you get the search results, you can select

18   multiple items for inclusion in a requisition.

19          THE COURT:  And the last question on that slide,

20   element what?

21          MS. ALBERT:  That relates to four and five,

22   because it talks about the facts that you can have an item

23   master item associated with vendor A and an item master

24   item associated with vendor B and place both of those

25   items in a single requisition.  That's element four.

1          Then the last part of that question talks about

2     processing the requisition to generate two purchase

3     orders, one to vendor A and one to vendor B.  That relates

4     to element five.

5          THE COURT:  All right.

6          MS. ALBERT:  Now, Mr. Lohkamp also confirmed the

7     infringing capabilities of the RQC configurations when

8     using Punchout.  He testified here at pages 534 and 535 of

9     the transcript that a user of a Lawson procurement system

10    that includes RQC and Punchout can have multiple Punchout

11    sites configured to the system.  So that relates to the

12    first element of claim 26.

13         Then on the next slide, slide 28, Mr. Lohkamp

14    confirmed that a user of RQC configurations three and five

15    can select items from multiple different vendors at a

16    multi-vendor Punchout site such as SciQuest, and those

17    items can be returned to the user interface of the Lawson

18    system where the Lawson system requisition module will

19    build a multiline requisition with items associated with

20    multiple sources, here vendor A and vendor B.

21         He also confirmed --

22         THE COURT:  The first question relates to what

23    element?

24         MS. ALBERT:  The first question relates to

25    searching and selecting items from multiple different

1   vendor catalogs while in a single Punchout shopping

2   session at the SciQuest site.  So that's the second,

3   third, and fourth elements of claim 26.

4           THE COURT:  All right.

5           MS. ALBERT:  Then the last question on that page

6   refers to the fifth element of claim 26 where the system

7   processes the multiline requisition that has line items

8   associated with multiple sources and generates multiple

9   purchase orders from a single requisition.

10          Also, if I can go back to slide nine, Mr.

11  Lohkamp's --

12          THE COURT:  Slide nine.

13          MS. ALBERT:  I just wanted to say that Mr.

14  Lohkamp's testimony confirms what Lawson previously told

15  its customer Cleveland Clinic in Plaintiff's Exhibit 1022,

16  that with regard to Punchout and SciQuest, RQC functions

17  as RSS did.  We support one Punchout vendor website per

18  connection, and when you conduct a shopping session at

19  SciQuest, you can come back with multiple vendors on the

20  same requisition with a single Punchout session.

21          THE COURT:  All right.

22          MS. ALBERT:  So there was also testimony

23  presented at the hearing that Lawson itself uses

24  configurations three and five to infringe claim 26.  Both

25  Mr. Christopherson and Mr. Lohkamp confirmed that Lawson

1    uses systems with RQC and Punchout to perform customer

2    demonstrations.

3         On slide 29, I present here Mr. Christopherson's

4    testimony that confirms that when Lawson conducts customer

5    demonstrations of the RQC configurations with Punchout, it

6    performs each and every element of claim 26.  Here I've

7    highlighted within the slide the selecting claim element,

8    the search claim element, the checking availability of

9    items claim element, generating the requisition, and

10   generating the purchase order.  So Lawson itself does,

11   indeed, use the systems having RQC and Punchout.

12        And Mr. Lohkamp also testified that Lawson

13   demonstrates systems with RQC and Punchout to its

14   customers.

15        Lawson's own documents also confirm that Lawson

16   uses the RQC systems to perform procurement for its own

17   business operations, and we have here --

18        THE COURT:  Do you take all of this evidence to

19   mean that Lawson uses this -- uses it in their own

20   operations or that they used it only to make sure and

21   satisfy themselves that it did work so they could tell

22   their customers it did work?

23        MS. ALBERT:  Lawson uses it in its own operations

24   to market, offer for sale, and sell the infringing

25   configurations three and five with RQC and Punchout to its

1    customers.

2             THE COURT:  That's to show that it works.  I'm

3    asking you a different question.  Is there any evidence

4    that they actually use it, the infringing configurations,

5    in their own business?

6             MS. ALBERT:  The evidence on slide 30 is evidence

7    that came into the record that Lawson uses the RQC

8    configurations in its own business to perform procurement

9    operations.

10            THE COURT:  All right.

11            MS. ALBERT:  The evidence also confirmed that

12   Lawson's customers use RQC configurations three and five

13   to perform the steps of claim 26, and as you recall, the

14   Federal Circuit held that there remains no serious dispute

15   that Lawson's customers infringe claim 26.

16            Given that the modules that perform the claim

17   functionality remain unchanged within configurations three

18   and five, the Federal Circuit's holding remains true

19   today.  Of course, customers must either be continuing to

20   use the RSS infringing configurations three and five or

21   using the RQC configurations three and five.  There is no

22   third option, and we know from the evidence at the hearing

23   that Lawson did not lose a single customer due to the

24   transition to RQC.

25            So, I mean, we have to conclude from that that

1  the customers are either using the infringing RSS

2  configurations three and five or they are using the RQC

3  configurations three and five.

4         Indeed, Mr. Christopherson did actually confirm

5  that Lawson customers use configurations with RQC and

6  Punchout to perform each step of claim 26.  He confirmed

7  over 100 customers are using RQC configurations and that

8  they use those systems to select catalogs to search,

9  search the selected catalogs, build requisitions from

10 selected matching items, and generate purchase orders from

11 those requisitions.  And this testimony is found on slide

12 32.

13        The evidence also showed that Lawson has realized

14 millions of dollars in licensing and maintenance revenues

15 attributed to the accused RQC configurations three and

16 five.  So one would have to deduce from that that the

17 customers are, indeed, using the RQC configurations three

18 and five given that they've paid Lawson millions of

19 dollars for such use.

20        The evidence shows that Lawson induced its

21 customers to use the RQC configurations in a variety of

22 different ways.  It offered RQC free of charge for

23 download from its support website.  It provided an RQC

24 SWAT team to assist its customers with the installation of

25 RQC.

```
 1            THE COURT:  There isn't any dispute that
 2    customers use RQC, do they?
 3            MS. ALBERT:  Well, in Lawson's post-hearing
 4    brief, they say variously at different portions of the
 5    brief that there was no evidence that Lawson's customers
 6    used the RQC configurations.  Then they say at other
 7    portions of the brief that there's no evidence that
 8    Lawson's customers are continuing to use the RSS
 9    infringing configurations; rather, they are using the RQC
10    configurations.
11            So they make contradictory contentions in their
12    post-hearing brief, but we believe the clear and
13    convincing evidence adduced at the hearing did, in fact,
14    establish that the customers are using configuration --
15    RQC configurations three and five as established by
16    Lawson's own admissions.
17            Lawson induces the customers to use the RQC
18    configurations --
19            THE COURT:  Do they -- is the evidence they get
20    paid for that?
21            MS. ALBERT:  They've been paid over $20 million
22    for licensing RQC and providing maintenance and support
23    services for those systems.
24            THE COURT:  So are we to infer from that that
25    because somebody pays -- there's $20 million worth of
```

1  payments to get the right to use RQC and have it

2  maintained, installed, serviced, et cetera, that they, in

3  fact, are using RQC; is that what you are saying?

4        MS. ALBERT:  Yes.  But, additionally, we have

5  direct evidence that they were using it from the mouths of

6  Lawson's own witnesses.  All of the activities mentioned

7  on slide 33 were previously held by the Federal Circuit to

8  constitute evidence of Lawson's inducement.  Lawson

9  continues these inducing activities to this day.  There is

10 no real dispute about these activities.

11       Now, Lawson is in contempt of the Court's

12 injunction not only because the configurations with RQC

13 are being used to infringe claim 26 but also because

14 Lawson has encouraged and assisted its customers with use

15 of the original infringing software configurations with

16 RSS.

17       And as the Court may recall, the express terms of

18 the injunction prohibit Lawson from aiding and abetting,

19 actively inducing, or in any way contributing to the

20 making, use of the infringing products with RSS.

21       Indeed, Lawson specifically designed RQC so that

22 it could be run in parallel with RSS.  Lawson told its

23 customers during the RQC webinar that RQC is designed to

24 work in an environment where multiple users are using RSS

25 and others are using RQC at the same time, and that is

1   found in Plaintiff's Exhibit 1105.

2         Lawson provided instruction to its customers for

3   how to change the bookmarks so that they could run RSS in

4   parallel with RQC, and Mr. Lohkamp testified that the

5   customers continue to have this capability today.

6         Now, the injunction also precludes Lawson from

7   provision of any instruction, encouragement, installation,

8   implementation, maintenance, or support for any of the

9   infringing products and services.  Both Mr. Lohkamp and

10   Mr. Hanson testified that in the course of Lawson's RQC

11   customer webinars, Lawson provided instruction to its

12   customers to enable them to continue to run RSS, and the

13   evidence at the hearing also showed that Lawson provided

14   maintenance and support services to customers on systems

15   that had RSS --

16         THE COURT:  Excuse me, go ahead.

17         MS. ALBERT:  But Lawson continued to provide

18   maintenance and support services to customers on systems

19   with RSS after the date of the entry of the injunction.

20         THE COURT:  Isn't their position that that was

21   only for a short period of time and a few isolated

22   instances and generally they did comply with the

23   injunction because they gave the customers the right to

24   download the RQC, and they can't do anything else about

25   that?  Isn't that their position?

1            MS. ALBERT:  That is their position.

2            THE COURT:  What's wrong with that?  If they gave

3    them a download, how can they control -- what is Lawson

4    supposed to do in order to comply, in your judgment?  Tell

5    them you can't use RSS anymore?

6            MS. ALBERT:  They could have disabled the RSS

7    functionality upon the installation of RQC.

8            THE COURT:  In the systems then being operated by

9    the customers.

10           MS. ALBERT:  Correct.

11           THE COURT:  What evidence is there that they

12   could have done that?

13           MS. ALBERT:  The evidence in the record is that

14   they didn't even try to do that.

15           THE COURT:  But is there any evidence that you

16   can do it?  In other words, I take it from what you are

17   saying you could have built a program for RQC such that

18   when you installed it, RSS would shut down.

19           MS. ALBERT:  Right.

20           THE COURT:  Is there any evidence that that could

21   have been done?

22           MS. ALBERT:  No, there's no evidence in the

23   record to that effect.

24           THE COURT:  There's evidence they didn't do that.

25           MS. ALBERT:  Right.  And there's evidence that

1    they specifically designed RQC so that it could run in

2    parallel with RSS and the customers would not have to

3    uninstall RSS.

4              THE COURT:  Is your argument on this point just

5    essentially that this is just simply willful blindness,

6    that essentially what they did is enable the systems to

7    operate in an infringing manner, put a little bit of

8    information out, make it look like that, in fact, there

9    was no -- that there's an alternate system out there, but

10   they knew good and well people were going to run it

11   because people liked it, and they just shut their eyes to

12   the whole situation?  Is that your argument?

13             MS. ALBERT:  That is our argument, but not only

14   did they shut their eyes to whether the customers

15   continued to use RSS, but they also expressly instructed

16   them and encouraged them how they could continue to use

17   RSS.

18             THE COURT:  Right, but the evidence of that is

19   that it occurred in probably, what, ten instances out of a

20   hundred customers?

21             MS. ALBERT:  Well, they presented the instruction

22   for how the systems could run in parallel at the RQC

23   customer webinar that was attended by over 800 customers.

24             THE COURT:  So they told everybody.

25             MS. ALBERT:  Correct.

```
 1              THE COURT:  What is this; sort of a wink/wink
 2   nod/nod kind of compliance?
 3              MS. ALBERT:  That seems to be what it is, or bury
 4   your head in the sand.
 5              THE COURT:  That's your theory.
 6              MS. ALBERT:  That is our theory.
 7              THE COURT:  Bury your head in the sand or
 8   wink/wink nod/nod.
 9              MS. ALBERT:  All they checked on was whether the
10   customer downloaded the RQC, and a download does nothing
11   as Mr. Lohkamp and Mr. Hanson both testified.
12              THE COURT:  And they knew it did nothing.
13              MS. ALBERT:  They knew it did nothing.  You have
14   to actually install it before it would be operational.
15              THE COURT:  Even once you do install it, you can
16   still run RSS.
17              MS. ALBERT:  Correct.
18              THE COURT:  Did they ever tell the customers, you
19   have to stop running RSS now?
20              MS. ALBERT:  No.  They actually expressly told
21   them they could continue to run RSS.
22              THE COURT:  I thought somebody said you are
23   running a heck of a risk if you keep running RSS.
24              MS. ALBERT:  I think there were a few statements
25   that indicated that they told the customers they would be
```

1    at risk if they continued to run RSS, but then they

2    continued to provide instruction for how they could do so.

3            So in conclusion, the clear and convincing

4    unrebutted evidence established that RQC configurations

5    three and five are used to infringe claim 26.  Lawson

6    itself uses RQC configurations three and five to infringe

7    claim 26, and Lawson's customers also use the

8    configurations to infringe claim 26.  The clear and

9    convincing evidence also established that Lawson induces

10   its customers' use of the RQC configurations three and

11   five.

12           Therefore, Lawson is in contempt of the Court's

13   injunction based on its activities with respect to the RQC

14   configurations.  Lawson is also in contempt of the Court's

15   injunction based on its aiding and abetting of its

16   customers' ongoing use of the infringing RSS

17   configurations.

18           For all of these reasons, ePlus requests that the

19   Court find Lawson in contempt.  Thank you.

20           MR. THOMASCH:  Your Honor, there are serious

21   charges here, and a lot has been made that is simply not

22   accurate.  I want to start, because I just am offended by

23   it.  You asked counsel very specifically, does Lawson use

24   infringing configurations in its own business.  You asked

25   that question.  The first answer was a deflection.  It

1    was, they use it to sell and demonstrate to their

2    customers, and you went back and you said, does Lawson use

3    infringing configurations in its own business, and the

4    answer you got was that they use RQC in their own

5    business.  Yes, they do.  They don't use infringing

6    configurations.

7         THE COURT:  But basically isn't that an answer

8    that because she thinks RQC infringes, they are using

9    infringing configurations?

10        MR. THOMASCH:  No.  The infringing configuration

11   is defined in the contempt order.  There's no dispute

12   between the parties as to what it is.  It is a series of

13   modules.  One of those modules is Punchout.  Punchout is

14   in configuration three, Punchout is in configuration five.

15        Let's just start with the fact that if you don't

16   have the Punchout module, you are not possessing an

17   infringing configuration.  Full stop.  There are not two

18   sides to that issue.  There is one side to that issue.

19        THE COURT:  Are you saying then that the record

20   establishes that Lawson does not use Punchout in its own

21   operations?

22        MR. THOMASCH:  I am saying exactly that, and I

23   would direct the Court to defendant's proposed finding of

24   fact 320.  The evidence was in, it was uncontradicted, and

25   Your Honor deserved a straightforward answer.  It's not an

1    infringing configuration if it doesn't have Punchout.  We

2    don't use Punchout in our own business.  That fact is not

3    in dispute.

4              THE COURT:  What finding of fact are you saying?

5              MR. THOMASCH:  320, Your Honor.  Defendant's

6    proposed finding of fact 320 was a very carefully phrased

7    series of answers to avoid answering the question Your

8    Honor asked.

9         Now, the infringement argument, as Your Honor

10   understands, is one that I don't believe we ever get to.

11   I don't believe the Court ultimately needs to write a

12   decision on infringement.  I don't think it's appropriate

13   to have argument on infringement, and my hands are tied in

14   trying to do so given that we have a fundamentally

15   significantly changed product that doesn't fit into the

16   infringement analysis that was used at the first trial.

17        But I have limitations on what I can say, and I'm

18   going to try to make a couple of specific points within

19   Your Honor's framework that you set out in Wednesday's

20   order, and then I'm going to move over to RSS, but I want

21   to deal with RQC first because it's important.

22        Dr. Weaver was their evidence of infringement.

23   Dr. Weaver put forth two modes of alleged infringement.

24   They were separate, they were distinct, and the

25   distinction is important because there are two

1    configurations at issue.

2          His first mode of infringement was the item

3    master EDI route.  He did a demonstration that showed how

4    you can go through the first five steps, making a

5    selection of items from the item master, and then he

6    testified that you could then add on a confirming

7    inventory step using EDI.

8          He then did a second infringement demonstration.

9    He used Punchout only.  He went to one Punchout site,

10   Staples.  Cross-examination made clear that which was a

11   little vague on direct which was these were entirely

12   separate examples.  There is no overlapping.  You don't

13   select in one example and search in the other.  You don't

14   build a requisition in one with item master and then send

15   out a purchase order with Punchout.

16         It doesn't work that way, because the new

17   configuration, of course, does not allow you to combine

18   item master and Punchout.  So they have to be distinct.

19   That's the whole point of the first of the two changes, is

20   you have to have them distinct.

21         Now, why is that important?  ePlus argues

22   collectively as to configurations three and five in its

23   infringement analysis, but that's wrong because three and

24   five are different in how they work.  If you use item

25   master, you can only perform the confirming inventory

1    check through EDI.  So item master and EDI are married up

2    together.

3            If you are using Punchout, then Punchout can

4    operate on its own to both allow you to -- in Punchout you

5    can actually select a catalog, and you can build a

6    requisition, and you can go forward and check inventory

7    with Punchout, but it's different.  Item master doesn't

8    allow that, but item master married to EDI is a different

9    story.

10           When they questioned our witnesses, they didn't

11   distinguish between which route are you talking about, so,

12   for instance, in slide 26 that you were just shown, Mr.

13   Lohkamp is asked about item master items A and B and how

14   you could put them together on the same requisition.  They

15   are correct.  Mr. Lohkamp answered the questions.  He

16   didn't fight.  He answered correct, yes.  He gave the

17   answers.

18           But what are the questions?  The questions asked

19   on slide 26, if a user using the S3 procurement system

20   including RQC searches the item master, that user can

21   select multiple items for inclusion in a requisition that

22   can be purchased from multiple different vendors; correct?

23   And he said, yes.

24           Now, Your Honor, you have to go to the claim 26.

25   Claim 26 doesn't ask for a selection of items.  The second

1    claim element in claim 26 is, quote, selecting the product

2    catalogs to search.  You cannot do that in item master.

3    You search items in item master.  You don't search

4    catalogs in item master.

5           They asked Mr. Lohkamp about item master, and

6    they didn't use the word catalog.  They used the word

7    catalog when they spoke to Mr. Christopherson.  They did

8    that in slide 32 which references catalogs but doesn't

9    reference checking inventory.  There's two ways to do it,

10   and there's six claim elements, and they have to find that

11   somebody did it one way, and they hit all six of those

12   claim elements, and they don't do that, but item master

13   and EDI, that can only be done in configuration five.  You

14   couldn't do that in configuration three at all.

15          Dr. Weaver made no -- he admitted that.  He had

16   to admit that.  The transcript at 766, he conceded that if

17   you are using configuration three, the only possible way

18   to infringe is with Punchout, and he said only

19   configuration five is claimed to be infringed without

20   Punchout.

21          But configuration five does not allow for

22   infringement by item master and EDI.  It is absolutely

23   clear, there is no evidence to the contrary.  Item master

24   does not allow the selection of discrete catalogs for

25   searching as element two.  Dr. Weaver tried to slide

1    through that.  You asked him when he got on the stand, it

2    would be helpful if you'd tell me, you know, when you are

3    reaching each one of those steps, and he said, you know,

4    it will be easier, I think, if at the end I summarize it

5    all.

6         So there was never a time when he said, I'm now

7    performing the second element, because he never did

8    perform the second element.  And in the end, he said,

9    well, I did it all together, did two and three together by

10   using UNSPSC searching.

11        UNSPSC searching searches for items.  If you

12   search for laptops, you get all the laptops that are in

13   item master.  It doesn't come up by catalog.

14        THE COURT:  What is the difference between a

15   product and an item?

16        MR. THOMASCH:  A product can be an item, an item

17   can be a product, but it's not a catalog.  You defined

18   catalog.  We will live with your claim construction

19   happily, and we'll talk about claim construction in a

20   minute, but you defined what a catalog is, and item master

21   does not allow you to select a catalog to search.

22        What item master allows you to do is to --

23   because catalog is linked to a vendor.  So he, Dr. Weaver,

24   identified three separate catalogs that he was picking

25   items from, Diablo, Office Max, and Baxter.

1          He never selected Diablo to search.  He never

2    selected Office Max to search.  He never selected Baxter

3    to search.  That wasn't an oversight.  It can't be done.

4    It doesn't allow it.  So if you put in laptops, you will

5    get every laptop sold by any of those and any other vendor

6    who is in your item master.  That's what happens.  And if

7    you put in Dell laptop, you would get every Dell laptop,

8    whether that Dell laptop was sold by Dell or sold by

9    Office Max.  You get them all.  You cannot say, I'm going

10   to select a catalog.

11         Dr. Weaver's testimony was unambiguous.  It was

12   clear.  It is evidence.  Cross-examination is evidence.

13   There's an element of the claim not practiced, no proof

14   that it can be practiced, and, frankly, this is -- the

15   rules about not rearguing should apply two ways.  First,

16   we have never suggested that we can reargue or retry the

17   first case.  Never.

18         We have said that we should look at the case to

19   understand what happened which is different than retrying

20   it.  We're not trying to get a different outcome from the

21   first trial.  We're trying to understand what the outcome

22   was of the first trial.

23         They are actually trying to retry the theory that

24   item master and EDI infringe claim 26.  They tried that,

25   they tried it at the first trial.  There was a judgment of

1    non-infringement.  Claim 26, non-infringement for

2    configuration four which is item master and EDI.  The fact

3    that configuration four doesn't have RSS is utterly

4    irrelevant to that.

5         RSS does not prevent you from combining item

6    master items and EDI, and that's what they testified to,

7    and the jury rejected it.  They don't get to reargue what

8    they argued and lost.

9         So much of their evidence is about how you can do

10   things through item master alone, because, yes, we have

11   conceded that if item master alone contains items from

12   multiple different vendors, you can take those items, and

13   you can put them on a single requisition, and you can

14   generate multiple purchase orders.

15        We have never taken issue with that.  That is

16   irrelevant to this case.  It's been all through the

17   evidence, they're talking about item master, but item

18   master without Punchout has never been found to infringe,

19   and they don't get to argue it for the first time here.

20        To infringe you must use Punchout, not Punchout

21   alone.  We've never said that.  You have to use Punchout

22   with RSS and with the underlying componentry.  That

23   system, which can operate without Punchout, when used with

24   Punchout allows you to do requisitioning.  The way that

25   system was configured at the time of the first trial

1    allowed you to infringe claim 26.  We have changed

2    Punchout, and in so doing, we have changed the ability of

3    Punchout alone to infringe.

4         And so there's two separate routes.  They proved

5    infringement with regard to neither, but they absolutely

6    can't even try to prove infringement on EDI and item

7    master because it's been litigated, it's been resolved,

8    and we don't get to lose it when we won it.

9         Now, I want to go to the issue of claim

10   construction because, you know, you set this up, and you

11   said colorability and then infringement.  And so the

12   plaintiff gets a rebuttal, at least did before.  They used

13   their whole time this time but last time saved time for

14   rebuttal.

15        They got up on rebuttal, and I didn't think it

16   appropriate to object, but the first comments are about

17   claim construction.  Well, now is the time to talk about

18   claim construction if we're going to talk about claim

19   construction.  The *TiVo* case could be not be clearer at

20   page 883.  The issue of claim construction comes into

21   effect at the time of the infringement analysis.  You

22   don't get to the infringement analysis if the product is

23   more than colorably different.

24        And it's very important, and it makes a whole lot

25   of sense if you think about it, because --

1          THE COURT:  Are you saying that you can't

2   consider even the concept of a claim construction, not in

3   finally deciding whether there's colorability but in

4   analyzing the issue of colorability?

5          MR. THOMASCH:  Yes.  Claim construction does not

6   relate to colorability.

7          THE COURT:  You can't even consider what was

8   said?

9          MR. THOMASCH:  No.

10          THE COURT:  So you have to do it in a vacuum?

11          MR. THOMASCH:  No, Your Honor --

12          THE COURT:  You have to make colorability in a

13   vacuum?

14          MR. THOMASCH:  No, absolutely you do not do it in

15   a vacuum, Your Honor.  You don't.  Now, I'd like to answer

16   that question, but I think you issued an order to me two

17   days ago that says I can't answer your question.

18          THE COURT:  I just want to know if that's your

19   position.

20          MR. THOMASCH:  Our position is not that you look

21   at it in a vacuum.  You do not look at it in a vacuum, but

22   you do not look at it against claim construction rulings.

23          THE COURT:  I didn't ask that, though.  I said,

24   can you consider the claim construction as part of the

25   context in which you are analyzing the colorability

1    question, not in making the comparison, not in making the

2    ultimate decision.  Your answer is no, you can't consider

3    it.  It's as if there's no claim at all; right?  No claim

4    construction at all, doesn't exist.

5           MR. THOMASCH:  No.  You look at the product.  You

6    look at the features of the product that were modified,

7    and the problem is, what they're trying to do is say that

8    the features fit some other claim construction.  In this

9    case, they've been telling you about a claim construction

10   that really was a construction of a different claim, a

11   means plus function claim.

12          There were different issues that were at issue

13   when the claim construction came up.  Because the product

14   has been changed, if we were going to have a new trial,

15   and that is the option, the right course of conduct here

16   is clear.  This product is more than colorably different,

17   this case should be dismissed, and if they think we

18   infringe they should sue us, but when they sue us, if they

19   sue us, we will be able to take that lawsuit, and we will

20   be able to defend ourselves utilizing claim construction

21   and evidence of invalidity that relate to this product.

22          THE COURT:  How could you, in another case

23   involving the same patent, come up with a different claim

24   construction?

25          MR. THOMASCH:  Not a different --

1          THE COURT:  You'd be precluded on it.  They said

2     it's dealt with in the Federal Circuit's decisions.

3          MR. THOMASCH:  Not a different claim

4     construction.  There was no claim construction of the

5     fourth element of claim 26.  It was not construed.  They

6     would like to read a claim construction of a different

7     claim and a different element and say, well, if you read

8     it that way, it only makes sense.

9          No one asked for a construction as to the

10    fourth -- the fourth element of claim 26, because in

11    regard to the product that was being tried, it wasn't

12    important.  Everybody conceded that that product had the

13    capacity to combine together multiple items from multiple

14    sources.  Everybody knew that, so no one asked for a

15    construction, and the Court didn't give a construction.

16         That construction would be very important.  We

17    might win it or lose it, but we have a right to ask for

18    it.  We would never have asked for it at the first trial

19    because it was wholly irrelevant at the first trial.

20    That's because the product was a different product at the

21    first trial.  That's the problem here.

22         THE COURT:  I still don't understand what your

23    point is here.  I'm sorry.

24         MR. THOMASCH:  My point is, Your Honor, is that

25    the fourth element, the fourth element has never been

1    construed.

2            THE COURT:  What are they doing now to construe

3    it?

4            MR. THOMASCH:  They're just assuming that the

5    construction is satisfied by one item even if the system

6    does not have the capacity to have more than one item from

7    different sources.

8            THE COURT:  You mean they are applying the plain

9    language of the claim.

10           MR. THOMASCH:  Actually not.  The plain language

11   of the claim says -- when it says sources, it has a paren,

12   an S, and a paren, and we would say -- just to be clear,

13   we would say that if you have a system that has the

14   capacity to put something from one source or multiple

15   sources on, then you infringe regardless of whether it's

16   one or more.

17           It doesn't have to be more than one, but it has

18   to have the possibility of being more than one or the

19   claim makes no sense.  The paren S paren makes no sense

20   if -- Dr. Weaver talked about one or a hundred.  That's a

21   different thing than one or one.  When you are using

22   Punchout, as I said, you have to distinguish.  Item

23   master, EDI is out.  We litigated it, and we won.

24           Punchout is the accusation.  Punchout

25   functionality allows one source and only one source, and

1    when that's the case, you are not infringing, and we would

2    say.  Now, we would say that.

3            Now, whether that's true or not depends on claim

4    construction that's never been rendered, never been asked

5    for, and does not have anything to do with the

6    colorability section.  That was my point, was that she was

7    arguing claim construction, and the Federal Circuit's

8    decision in *TiVo* talks about claim construction in the

9    context of infringement, because you only get to

10   infringement if the product is not different.  If the

11   product is not different, the same claim construction

12   makes sense.

13           If the product is different, which is the case

14   here, new claim construction -- it's not different.  New

15   claim constructions --

16           THE COURT:  How can a claim construction differ

17   on the basis of whether it's a different product?  The

18   claim construction is an interpretation of words, not an

19   interpretation of the product.  In fact, if I interpreted

20   it with relation to the product, that's an error.

21           MR. THOMASCH:  Case after case after case says

22   that courts don't have an obligation to construe every

23   word in a claim.  You only construe claim elements where

24   there's a dispute, where the claim construction matters.

25           THE COURT:  That's beyond dispute.  You made the

1    statement -- you are trying to make a statement about

2    claim construction and product, and I don't understand

3    what the relation -- I thought in interpreting claims, you

4    interpreted the word of the claim, not the product --

5              MR. THOMASCH:  You do --

6              THE COURT:  -- that's used as an illustration of

7    how the claim functions.

8              MR. THOMASCH:  You are 100 percent correct, Your

9    Honor.  You are 100 percent correct.  But you are missing

10   my point, and that's because I'm not articulating it well.

11             The theory of infringement, the theory of

12   infringement that a plaintiff brings to the courthouse

13   will lead to a dispute about certain elements of the

14   claims.  Based on that theory, you'll see which elements

15   of the claims are in dispute, and you will then limit the

16   claim construction to only those proposed by the parties

17   on those that matter.

18             What I'm saying is that with the changed product,

19   they had to change the theory of infringement.  By

20   changing their theory of infringement to now say that one

21   and only one Punchout vendor site is sufficient to fulfill

22   the fourth element of claim 26, by changing their theory,

23   they now are putting us in a situation where that would be

24   contested.

25             It wasn't needed to be contested at the first

1    trial.  There was no dispute at the first trial.  There

2    would now be a dispute.  It's not --

3               THE COURT:  How are they changing their theory?

4               MR. THOMASCH:  They are changing their theory

5    because their theory now is that if you have the capacity

6    to only have an item from one source on a requisition, if

7    that's your maximum capacity, which is what it is with a

8    regular Punchout website, if you only have that capacity,

9    that's enough to infringe they say now.

10              They never said that at the last trial.  Their

11   theory was directly to the contrary.  They sold the jury

12   on this unique ability to combine things from multiple

13   sources.  We eliminated that ability.  That's why our

14   product is more than colorably different and why our

15   product can't fairly be evaluated on infringement, because

16   we are -- we have -- they have a new theory of

17   infringement, the one and one only.  Their old theory was

18   one or a hundred.  Their new theory is one or one.  Those

19   are different theories.

20              Your Honor, because I don't want to go into what

21   was alleged and proved at the last trial, I want to move

22   ahead and deal quickly with RSS, because the

23   misinformation there has been manifest.  Let's start with

24   the obvious.  An injunction came down on May 23rd, 2011.

25   Since that date, an infringing configuration as defined

1    with RSS has never been sold.  We stopped selling it, we

2    decommissioned the RRS product.

3              I understand there's an issue --

4              THE COURT:  How can you say you decommissioned it

5    when there's no evidence that the customers who are using

6    it have stopped using it?

7              MR. THOMASCH:  The decommissioning is a term of

8    art.  It's in the decommission notice.

9              THE COURT:  What does that mean?

10             MR. THOMASCH:  It means that we stopped

11   supporting it.  You can no longer give -- if you have a

12   problem with your RSS, you can't get help.  If you went to

13   the website and said, how do I operate RSS, there's

14   nothing there to tell you.  You get no information about

15   RSS, no support about RSS.

16             THE COURT:  You bought it, and you know how to

17   run it.  Why do you need to go back and get instruction on

18   how to run it again?  Your customer is using a product

19   they've used for years.

20             MR. THOMASCH:  Your Honor talked about people

21   paying $20 million.  They pay that money --

22             THE COURT:  She talked about it.  I was asking

23   her a question.

24             MR. THOMASCH:  It came up in a prior discussion.

25   It came up because this is software.  Software problems

1    happen constantly.  People have maintenance because they

2    have problems, and if they have a problem on RSS, it

3    doesn't get solved.  They get no support, and they can't

4    go to the website, they can't get maintenance.  There's

5    nothing there.

6         Now, we should define what the dispute between us

7    is, because there's no evidence that we sold it.  There's

8    no evidence -- there's no dispute about the fact that we

9    control some of our customers.  We host their systems.

10   Other customers, I would say, we don't control them, but

11   we darn well have an awful lot of influence.  Those are

12   the ones where we're the administrator of their system.

13        The evidence is undisputed, for those customers

14   who we hosted, we converted them.  We installed them, we

15   had them up and running on RQC.  For those that we

16   administer --

17        THE COURT:  But you didn't take out RSS.

18        MR. THOMASCH:  You don't take out RSS.  RQC goes

19   over the top of it, and RQC then replaces RSS, and the

20   prior functionality of RSS with respect to Punchout is

21   altered, it is blocked, it is diminished, eliminated.

22        THE COURT:  I thought Mr. Christopherson said you

23   could run them in parallel as long as you changed the

24   bookmarks.

25        MR. THOMASCH:  If you are a system administrator

1   and you do some sophisticated changes, you can change the

2   bookmarks to allow yourself to do that.  I want to go to

3   that, but that's not what happened with regard to those we

4   hosted and those we administered.

5           Maintenance ended.  Maintenance ended, we took

6   everything off the website, we stopped doing that.

7   Service ended.  There is uncontradicted testimony.  See

8   the DX-587.  See what Scott Hanson says and ask yourself,

9   is this a company that took my injunction seriously.  They

10  made Scott Hanson a big witness.  I commend Your Honor to

11  read DX-587 where he tells his people, don't do anything.

12          Indeed, I got to tell you, Your Honor, we had a

13  company so scared they didn't want to touch RSS.  He says,

14  don't install it, don't uninstall it.  Just put in RQC.

15  RQC is our product.  Don't get near RRS, you may not

16  service RSS.

17          That document doesn't require experts.  Read

18  DX-587.  What's at issue is support.  Service was Scott

19  Hanson.  Support was Elizabeth Homewood.  Support is the

20  issue about when people call up, 7- to 8,000 phone calls a

21  month, and ask questions, what do they get told.  That's

22  the support.

23          Now, there are a number of interrelated claims

24  that have been made here, Your Honor, one that we designed

25  RQC to run in parallel; two, that we told some customers

1    how to run them in parallel; three, that we gave service

2    to other parts of the configuration after a download of

3    RQC without having proven that the person who got the

4    service to other parts of the configuration was using RQC

5    and not RSS; and finally, that we didn't insist on

6    uninstalling.

7              The last one really is -- think about it.  We

8    sell a product to the federal courthouse.  The federal

9    court has to buy supplies for court personnel, so we sell

10   them a procurement product.  We can't go into the federal

11   courthouse and uninstall their products.  We can make new

12   products available, we can make the new product the one

13   that we're going to support in the future, but we can't

14   uninstall documents --

15             THE COURT:  You can say RSS infringes, clerk's

16   office, stop using it.

17             MR. THOMASCH:  Yes, we could.

18             THE COURT:  Did you do that?

19             MR. THOMASCH:  Yes, we did.  I would ask Your

20   Honor to review the following documents:  PX-1105,

21   PX-1057, and PX-1002, 1002.  This is the famed webinar and

22   how that played out.

23             THE COURT:  Which is the webinar?

24             MR. THOMASCH:  Well, that's what I was going to

25   explain.  1105 are the questions that were asked live, and

1    you can see in very isolated instances a number of

2    questions were answered on the spot, very few.  1105 is

3    the questions.

4           1057 is an internal draft of the answers to the

5    questions.  So the question number comes off of 1105, and

6    then you have the internal draft of the answers.  That

7    draft did not go to customers.  They want to make a big

8    deal about one of the answers.  Because it was on an

9    internal draft, it didn't go to a customer, didn't induce

10   anyone to do anything.

11          Then Exhibit 1002 is the webinar.  The webinar

12   has 295 questions.  That's the final one.  We took the

13   questions that came in off of 1105, and we answered them

14   in Exhibit 1002, and we posted the answers on the website.

15          I ask Your Honor to read the questions and

16   answers in their full, not to look at cherry-picked

17   examples but to read them in the full.  First, you will

18   not find anything where we instruct people how to run in

19   parallel.  There are statements that it can be run in

20   parallel.  There is no instruction, and there is certainly

21   no inducement to get them to do so.

22          But to answer Your Honor's question, we say over

23   and over again, customers are strongly encouraged to make

24   this change from Requisition Self-Service to Requisition

25   Center as soon as possible to allow for continued support

1    by Lawson and to mitigate any future risk of infringement

2    actions brought against individual customers.  We're

3    telling people you are at risk of being sued and we're not

4    going to support you, so do this as quickly as possible.

5            We responded to that at questions 12, 22, 39, 45,

6    53, 107, 130, 136, 271, 275.  Similar responses at 25 and

7    at 29.  At 29, customers are strongly encouraged to make

8    this change from Requisition Self-Service to Requisition

9    Center as soon as possible to allow for continued support

10   by Lawson and to mitigate any future risk of infringement

11   claims brought against individual customers.

12           Question 106, answer to question 106, we

13   recommend you install RQC as soon as possible to avoid a

14   potential interruption in support.  Not to download it, to

15   install it.  66, we recommend you install RQC as soon as

16   possible.  Questions three and 143, customers are

17   encouraged, however, to stop using RSS.  Lawson will only

18   support RQC, and customers will mitigate risks by moving

19   to RQC.  157, it is risky to wait to mitigate.  We

20   strongly encourage you to do so quickly.

21           I ask Your Honor to read the document and say, is

22   this a secret wink/wink nod/nod plan, because if it is,

23   find us in contempt.  It's not.  It's not even close.

24   It's a plan to get people to do something that's going to

25   be a problem for them, but we want to get them to do it,

1    and we told them if you don't do it, it's risky because we

2    won't support you, and you will be subject to patent

3    infringement actions.

4           Read the document in its entirety, and you cannot

5    draw the conclusions that they have tried to spoon-feed to

6    the Court by taking isolated examples, and, again, they

7    know who our customers are.  They didn't go out, and they

8    don't prove a thing.  I would say to Your Honor that in a

9    contempt case, if they want to show contempt with RSS,

10   they must show that a configuration three or five customer

11   continued to use RSS after the applicable effective date

12   of the injunction which differed depending on whether you

13   were one of the 277 health cares or not, and they need to

14   show that we provided service to that customer.

15          THE COURT:  Is there any evidence of that?

16          MR. THOMASCH:  None.  None.  And during opening

17   statements, Mr. Strapp made a big deal about the

18   possibility that customers might be still out there

19   running RSS in parallel, and Your Honor interjected, and

20   you said at page 23 of the transcript, are there systems

21   out there right now that are running RSS?  The answer was

22   an implication that there may well be, that's what we

23   learned in discovery, the discovery, of course, 14,

24   15 months ago in December of 2011.  Then I got up.  I said

25   right at the beginning of my opening, quote, you will not

1   hear any evidence that any of Lawson's customers are

2   running RSS.

3   　　　　THE COURT:  Is it your view that they cannot meet

4   the clear-and-convincing-evidence standard on this aspect

5   of the case without having testimony from customers that

6   during the period at issue following the injunction, the

7   customers were running RSS either alone or in parallel

8   with RQC?

9   　　　　MR. THOMASCH:  They need two things.  They need

10  that, and -- if a customer is running RSS, that is not an

11  infringement of the -- that is not a violation of the

12  injunction unless we then provide support to that

13  customer.  If we have a customer who just says, hey, I

14  like RSS, I'm going to keep using it, then we have to say,

15  not with our help, you're not, and we have to disassociate

16  ourselves from that customer, and in one instance that

17  happened.  But that's different.  They have to have

18  someone who is doing it, and then we have to actually

19  support it.

20  　　　　There's no proof of that.  I made a statement

21  that there would be no proof that customers are doing that

22  today.  My statement was true.  I had confirmed it before

23  I said it, and nothing came in at trial to contradict me,

24  nothing, and the brief, the reply brief says that I didn't

25  prove that there was no evidence.  That one --

1            THE COURT:  Well, you didn't.

2            MR. THOMASCH:  That's right, I didn't.  I didn't

3    because I believe in the burden of proof, and the burden

4    of proof at all stages of this proceeding is on the

5    plaintiff, and it is a heavy burden, and that heavy burden

6    is not met by raising questions.  The heavy burden can

7    only be met by evidence.

8            They did not introduce the evidence.  To the

9    extent that they came up with anything, they came up with

10   a series of early isolated mistaken and corrected phone

11   calls out of the thousands per month that occur, and they

12   made a big deal about Western Lake Superior Sanitary, and

13   they said, that's not a health care customer; correct?

14   Western Sanitary.  Of course it's not a health care

15   customer as if that's damning evidence.

16           What's the reality?  They're not a configuration

17   three or a configuration five customer.  They're not in

18   this case.  They're not in this case, but, nevertheless,

19   they said, oh, you told -- you answered a question about

20   RSS with them and that took place on the 9th day of June,

21   2011, and on the 15th day of June, 2011, they called back

22   for a call after installing RQC.  Six days later.  Exhibit

23   1058, they had installed RQC six days later.

24           Is it contempt that there was a phone call on

25   June 9?  That's not what contempt is.  We made a real

1   serious effort.  We took this injunction very seriously.

2   We took a design-around.  We tried.  Whether we succeeded

3   or not could some day be determined in another

4   infringement trial, but this is the wrong mechanism for

5   doing so.  This is not a contempt case, and it is not even

6   close.  They did not prove anyone was using this product

7   and received service from us.

8         It is not enough to say it's theoretically

9   possible.  Theoretical possibilities are not contempt,

10  particularly when we don't control that theoretical

11  possibility.

12        And you asked -- you just asked did anyone say it

13  was possible to do this disabling step.  Answer, no, there

14  was no evidence on that.  Now, they had a source code

15  expert, Mr. Niemeyer.  They didn't call him to testify.

16  They don't want to make that part of the case.  They don't

17  want to get there.  They don't want to talk about

18  specifics.

19        They want to make allegations, and they want to

20  say we didn't disprove them.  Their brief is replete with

21  Lawson didn't show this, Lawson didn't prove that.

22        Your Honor, I didn't need to say a thing in this

23  trial.  We don't have the burden.  They never carried the

24  burden, and they didn't carry it on colorability, and they

25  didn't carry it on infringement, and they haven't shown

1    that somehow other than those two ways we are somehow in

2    contempt of Your Honor's -- we have tried, we have made

3    mistakes potentially.  If we did, they were isolated, and

4    they were corrected.  There is no wink/wink nod/nod.

5               THE COURT:  The record is pretty clear that you

6    made some mistakes, isn't it?

7               MR. THOMASCH:  The record is clear.  I said we

8    made mistakes, and we corrected them.

9               THE COURT:  You said possibly.

10              MR. THOMASCH:  No, we made some mistakes.  We

11   made some mistakes.  That's not what this is about.

12              THE COURT:  The mistakes aren't contempt is your

13   point.

14              MR. THOMASCH:  They are not.  They are not.

15              THE COURT:  All right.

16              MR. THOMASCH:  Thank you, Your Honor.  This is my

17   last opportunity.  I do want to thank you again.  The

18   injunction was obviously a very serious issue.  I had a

19   conflict that took me to Sacramento, California, and you

20   were good enough to oblige me to allow me to make that

21   argument, and I really do appreciate that.

22              THE COURT:  All right.  I think Mr. Thomasch may

23   have gone a little over his time, so you get a little bit

24   of extra.

25              MR. MERRITT:  He's into you for about 16 minutes.

1          THE COURT:  Well, you know what?  That happens

2     every once in a while.  Sometimes you can't control all

3     the dynamics.  We are not as stringent as --

4          MS. ALBERT:  I think I still have a few minutes

5     left on my time, and I'm going to try to stay within the

6     time limit.

7          THE COURT:  Tell me this:  Have you changed your

8     theory of infringement because of the argument you are

9     making about item master and EDI, because you did lose a

10    configuration four argument at the trial, and he says you

11    are trying to stick them with that coming through the back

12    door and that you are doing that by virtue of a

13    different -- of a construction of claim -- element four

14    which would take the word S out of items, in essence.

15         MS. ALBERT:  Okay.

16         MR. THOMASCH:  Your Honor, I'm sorry to

17    interrupt, but you were quoting me.  Those are two

18    separate things they said.  That is not why they lost with

19    configuration four.  I was not making that argument.

20         THE COURT:  I'm not saying that.  I didn't mean

21    to say that.  I'm saying that you are -- the way you are

22    trying to get the item master and EDI into the case is

23    through a construction of element four.

24         MR. THOMASCH:  I want to say we did not argue

25    that, and we don't take that position.

1          THE COURT:  You didn't argue that now?

2          MR. THOMASCH:  No.

3          THE COURT:  What were you arguing when you were

4    arguing about four, element four talking about not

5    having -- that they went from a hundred to one?

6          MR. THOMASCH:  That went to the Punchout only.

7    The two configurations, EDI and item master, the issue

8    about the fourth element, that issue is unique to Punchout

9    alone.

10         Item master can have multiple items on there.

11   That can possibly exist.  I agree with counsel on that.

12   They tried to argue and they lost, and they lost for

13   different reasons.

14         THE COURT:  All right.  As to Punchout, are you

15   changing your theory --

16         MS. ALBERT:  We are not changing our theory, and

17   indeed the -- well, I don't know if Your Honor recalls.

18   Lawson made this contention in its post-trial JMOLs that

19   the verdict could only be sustained on the basis of the

20   Punchout module.  ePlus opposed that.  You denied the

21   JMOL.

22         We went up on appeal.  In our briefs to the

23   Federal Circuit, we specifically briefed the fact that

24   claim 26 could be infringed in multiple different ways.

25   The Federal Circuit decision addresses item master, EDI,

1   Punchout.  It addresses all of the components of

2   configurations three and five and how those components are

3   used in the context of claim 26, and I would refer Your

4   Honor to *ePlus v. Lawson Software*, 700 F.3d 509 at pages

5   514 and 520.

6         We're not changing our theory, and, indeed, *TiVo*

7   says there is to be no retrial on elements conclusively

8   established at trial which remain unchanged.  It's

9   undisputed that item master has not been changed.  It's

10  undisputed that EDI has not been changed.

11        These infringement issues, as you'll see in the

12  Federal Circuit opinion, have been conclusively

13  established, affirmed on appeal, and are now law of the

14  case.

15        THE COURT:  He also says -- I made a mistake as

16  to what I'd written down.  I can't read my own writing.

17  He also says that item master and EDI don't violate

18  element two.

19        MS. ALBERT:  Item master and EDI.  That issue,

20  again, was already addressed in the underlying trial.

21  It's already been decided at the Federal Circuit.  They've

22  lost on that issue.  It's law of the case.  We can't retry

23  whether or not you can select catalogs --

24        THE COURT:  He says item master can't select --

25  that you can't -- he can't meet the selecting product

1    catalogs to search element.  You can add EDI and item

2    master together.

3           MS. ALBERT:  That was Lawson's contention at

4    trial.  They lost on that issue with respect to

5    configurations three and five.  That's been conclusively

6    established and affirmed on appeal, and, moreover, the

7    modification that was made to RSS to form RQC has no

8    relationship to item master at all, nor does it have any

9    relationship to the capability of searching item master.

10   The functionalities remain unchanged, and *TiVo* tells us

11   there is to be no retrial on elements conclusively

12   established at trial which remain unchanged.

13          Now, as to the claim construction argument with

14   respect to element four, *TiVo* prohibits the Court from

15   reinterpreting the patent.  It says specifically --

16          THE COURT:  Was there a claim construction on

17   element four?

18          MS. ALBERT:  There wasn't, but no one asked for

19   it in either the underlying trial or in this proceeding.

20   They never asked for it.  Under *TiVo*, *TiVo* directs the

21   Court that in making the infringement evaluation in a

22   contempt proceeding, out of fairness, the district court

23   is bound by any prior claim construction that it had

24   performed in the case.

25          THE COURT:  What if there's no claim

1    construction?  He says you are trying to change the claim

2    construction -- I mean you are trying to use this against

3    the different product and that, therefore -- and that

4    product doesn't offend element four.

5            MS. ALBERT:  Well, as Your Honor was mentioning

6    during the colloquy with Mr. Thomasch, the claim

7    construction is to be considered in light of the intrinsic

8    evidence, and the most valuable intrinsic evidence here is

9    the language of the claim element itself which says

10   building a requisition using data relating to selected

11   matching items and associated source --

12           THE COURT:  So does that include data relating to

13   a selected matching item and its associated source?

14           MS. ALBERT:  Yes.  It also includes a requisition

15   that would have data relating to multiple selected items

16   associated with multiple sources.

17           THE COURT:  All right.

18           MS. ALBERT:  Now, as far as whether or not Lawson

19   uses RQC configurations three and five, Your Honor's

20   original question was, does Lawson use RQC configurations

21   three and five in its business.  I said yes.  It is,

22   indeed, a business purpose to use those systems to try to

23   sell those systems to customers or for demonstration and

24   training purposes.

25           THE COURT:  Yes, but I also asked you whether or

1  not they use -- this was related to slide 30.  Whether

2  they have installed and used RQC for its own procurement

3  operations as in its own business, and he says, no, and

4  the answer to that is in their finding of fact number 320,

5  I believe, and you said, yes.  I don't think you cited the

6  finding of fact or evidence, but you may have and I didn't

7  write it down.

8          MS. ALBERT:  The evidence that we rely on, some

9  of which is found on slide 30, is the statements of

10  Lawson's own personnel indicating that Requisition Center

11  is installed here, and Lawson moved to Requisition Center

12  with one day's work.

13          THE COURT:  Does that mean in their own business

14  operations is the only question.

15          MS. ALBERT:  Mr. Christopherson testified that

16  Lawson uses the RQC systems in its own business operations

17  for procurement.

18          THE COURT:  My recollection is that there was

19  testimony that says that, and I don't know where it is,

20  but I just have felt that that was true.  In reading some

21  of the briefs, I remember coming across that and saying,

22  yes, I remember that testimony.

23          MS. ALBERT:  Yes, he did say that.  I think the

24  dispute with Mr. Thomasch may lie in whether or not

25  Lawson's internal procurement systems with RQC also

1    include Procurement Punchout.

2          THE COURT:  Yes, that's his point.  It says,

3    Lawson does not use Punchout.  That was his point as

4    demonstrated in finding of fact of his, 320.

5          MS. ALBERT:  And I think at the time the

6    documents that are cited on slide 30 were drafted, Lawson

7    had not installed Procurement Punchout in conjunction with

8    the RQC systems.  So that evidence was evidence directed

9    to only an RQC system, and it was unclear whether or not

10   Punchout had been installed.

11         THE COURT:  Is there any evidence since these

12   documents were prepared, any evidence in the record that

13   Lawson uses RQC with Punchout installed?

14         MS. ALBERT:  The only evidence in the record that

15   Lawson uses RQC configurations with Punchout are -- is the

16   testimony of Mr. Christopherson and Mr. Lohkamp that they

17   use such systems to perform customer demonstrations.  But

18   this type of use is also an infringing use.

19         THE COURT:  I'm not suggesting that it isn't.

20   The issue is whether you make a finding of fact that they

21   use it in their own business as opposed to using it for a

22   business purpose which is -- it's just a matter of

23   accuracy.

24         MS. ALBERT:  Well, our findings of fact, I

25   believe, said that Lawson uses the systems with RQC for

1   internal procurement which was Mr. Christopherson's

2   testimony, and then also Lawson uses systems with RQC and

3   Punchout to perform customer demonstrations for sales

4   purposes, marketing purposes, and training, and the

5   Federal Circuit specifically found that the fact that

6   Lawson demonstrated its systems to customers was evidence

7   of direct infringement, and I would cite you to the

8   Federal Circuit opinion at 700 F.3d at pages 520 through

9   521.

10          THE COURT:  All right.

11          MS. ALBERT:  Now, with respect to the issues

12   relating to the customers' ongoing use of RSS, the

13   testimony --

14          THE COURT:  His basic position is it doesn't make

15   any difference if the customers still use it.  The only

16   violation of the injunction would be if the customer is

17   using it and they service it, help maintain it, et cetera.

18          MS. ALBERT:  But there was evidence in both

19   Lawson witness testimony as well as documents that

20   customers having RSS live in their systems were being

21   provided maintenance and support and instructional

22   services by Lawson after the date of the injunction.

23          THE COURT:  Yes.  What I think he says is, yes,

24   that is true, they made a mistake, and that if you look at

25   the picture as a whole, what has happened is that that did

1  happen, but they realized -- they shut that operation down

2  fairly quickly, and while there was several statements in

3  the webinar that would argue to the contrary, if you look

4  at the final statement of the webinar, questions and

5  answers that were posted on the website, that, in essence,

6  what they -- that they said, we are no longer maintaining

7  this, you are using it at your own risk, and the risk you

8  are running is a suit for infringement, and that under the

9  circumstances you can't make an infringement finding on

10 the basis of a few isolated statements and comments in a

11 few documents that occurred in a relatively short period

12 of time that ultimately were straightened out at the end

13 of that short period of time.  As I understand his

14 argument, that's really what he's saying.  Why isn't that

15 right?

16      MS. ALBERT:  Well, it's not an isolated statement

17 when you tell over 800 customers how to change the

18 bookmarks so that they can continue to use RSS in parallel

19 with RQC.

20      THE COURT:  So your real point is that they told

21 them how to change the bookmarks.

22      MS. ALBERT:  Right.

23      THE COURT:  That's the evidence that they

24 actually are maintaining the system or violating the

25 injunction.

1          MS. ALBERT:  They are violating the injunction by

2     providing instruction and assistance for the ongoing use

3     of the infringing configurations which was a separate

4     provision --

5          THE COURT:  They've given maintenance

6     instruction, service instruction about how to violate the

7     injunction, and they did that by telling them how you can

8     function if you just change the bookmarks.

9          MS. ALBERT:  Right.

10         THE COURT:  He says in response to that, that

11    isn't so, that, yes, those instructions were given, but

12    you had to be a system administrator in order to do that

13    and that there's no proof that anybody ever did that.

14         MS. ALBERT:  Well --

15         THE COURT:  Isn't that what his response to your

16    argument is there?

17         MS. ALBERT:  There was proof that people were

18    doing it because people in the Plaintiff's Exhibit 1058, I

19    believe, we saw evidence that customers were actually

20    asking questions to Lawson for how to do this.

21         THE COURT:  All right.

22         MS. ALBERT:  And not only was instruction

23    provided to run RSS and RQC in parallel, but, for example,

24    Ms. Homewood testified that as long as the customer had

25    downloaded RQC, that was the flag to allow Lawson to

1    continue to provide maintenance and support services to

2    that customer.  They never checked whether or not the

3    customer had actually installed RQC.

4            THE COURT:  So by providing instruction in how to

5    operate them in parallel, by making the trigger a download

6    -- for continued service a download, and the evidence that

7    a download alone doesn't do anything constitutes the

8    evidence of inducing the customer to violate the

9    injunction; is that the structure there, your point?

10           MS. ALBERT:  That is my point.  Additionally, Ms.

11   Homewood testified that as long as the customer had

12   downloaded RQC, they changed that flag.  They would

13   continue to provide maintenance and support, and they

14   would continue to provide maintenance and support for

15   other modules in the infringing configurations.

16           So the fact that they may not have asked the

17   question whether they were still running RSS, because they

18   saw the download flag, they then proceeded to provide

19   maintenance and support services on the actual infringing

20   configuration.  And I would direct you to her testimony at

21   pages 849 and 850 of the transcript, for example.

22           THE COURT:  What is her name?

23           MS. ALBERT:  Ms. Homewood.  The question was

24   asked, "Question:  If you could turn in your notebook just

25   for reference back to Plaintiff's Exhibit 1034, we'll

1   leave this on the screen here.  Now, let's say a customer

2   of Lawson downloaded RQC and that customer had

3   configuration five on their system.  Okay?

4           Answer:  Okay.

5           Question:  And the customer didn't actually

6   install and implement RQC but just continued running RSS.

7   Do you understand my question?

8           Answer:  I believe so, yes.

9           Question:  Now, if that customer contacted Lawson

10  after the injunction and asked for support on Procurement

11  Punchout, Lawson would provide support for Procurement

12  Punchout, correct?

13          Answer:  Correct.  If they downloaded RQC and the

14  product configuration records showed RQC.

15          Question:  That's even if the customer hadn't

16  actually installed and implemented RQC, correct?

17          Answer:  Potentially, yes.

18          Question:  And that's even if the customer was

19  still running RSS, correct?

20          Answer:  It could be as we don't know that at

21  that point in time, no.

22          THE COURT:  What transcript pages are you

23  referring to?

24          MS. ALBERT:  849 through 850.  So it's not just

25  -- the relevance isn't just with respect to our continuing

1    to provide support on RSS.  The injunction prohibits

2    Lawson from continuing to provide maintenance and support

3    on the entire configuration.  And Ms. Homewood said they

4    would do so as long as there was the download flag which

5    doesn't really mean that the customer has actually

6    implemented RQC.

7              Does Your Honor have any further questions?

8              THE COURT:  No.

9              MS. ALBERT:  Thank you.

10             MR. THOMASCH:  Your Honor, may I make one

11   correction to this one document, give you a page cite?

12             THE COURT:  Yes.

13             MR. THOMASCH:  I would direct Your Honor to

14   Exhibit 1002.

15             THE COURT:  You cited that before.

16             MR. THOMASCH:  That's the webinar.

17             THE COURT:  The final versions of the --

18             MR. THOMASCH:  You just heard that 800 people

19   were told -- were given instructions as to how to

20   download.  I would ask Your Honor to review page nine of

21   18 which, on my copy, is RQC 0000646.  There are ten

22   questions under a heading, Running Requisition Center in

23   Parallel with Requisition Self-Service.  Those are the ten

24   questions.  There are no such instructions.  It is said on

25   June 3rd that it can be done.  There are no instructions

1   as to how to do it.

2           THE COURT:  All right.  We'll take an hour for

3   lunch, and I'll hear the remedies section after that.

4

5           (Luncheon recess.)

6

7           MR. STRAPP:  Your Honor, I'm going to be

8   addressing ePlus's request for damages in this matter.

9   And in the binder that we handed to you earlier, we have a

10  tab marked remedies.  Underneath that tab are the slides

11  I'm going to run through in my presentation.

12          ePlus makes the following request for relief if

13  Lawson is found in contempt:  First, ePlus seeks a

14  disgorgement of Lawson's gains, and as I'll explain, we

15  present different measures of disgorgement.  There are

16  disgorgement of Lawson's revenues, disgorgement of

17  Lawson's gross profits, and disgorgement of Lawson's

18  incremental profits.

19          The second measure of remedies that ePlus seeks

20  here is pursuant to section 284 of the patent statute, and

21  that section of the patent statute authorizes courts to

22  enhance up to three times the amount of damages found.

23          Third, ePlus seeks, pursuant to section 285,

24  attorneys' fees and costs, and fourth, ePlus seeks as well

25  a course of remedy from the date that contempt is entered

 1    until such time as Lawson is in compliance with the Court

 2    order.  And finally, ePlus would seek that if Lawson

 3    intends to design around or attempts to design around

 4    again, that it first request -- first be required to

 5    request pre-approval from the Court.

 6              THE COURT:  If I grant that motion and I approve

 7    it, can I be disqualified from any further litigation in

 8    the case?  Or if I disapprove it, either way.

 9              MR. STRAPP:  I hope you don't mind if I choose

10    not to answer that one.

11              THE COURT:  Discretion and valor.

12              MR. STRAPP:  So, let me start off with gross

13    profits.  Gross profits is an award that is not uncommon.

14    Contrary to Lawson's suggestions in its post-hearing

15    briefing, it's not uncommon in a patent contempt

16    proceeding.

17              In fact, just since 2005, there have been three

18    separate district court opinions, including one which was

19    affirmed by the Federal Circuit, in which disgorgement of

20    gross profits was awarded after contempt was found in a

21    patent case.

22              And I think it's instructive, the rationale that

23    each of those courts gave, because I think they apply with

24    equal force here, and I want to turn first to a decision

25    from 2005 that was affirmed by the Federal Circuit called

1    *Brine v. STX*.

2           In that case, the district court gave three

3    different reasons for its disgorgement award of gross

4    profits.  First it said, there is a risk that if

5    disgorgement of gross profits is not awarded, the

6    plaintiff won't be made whole.

7           Second, the court said, there's a specific and

8    acute need in a contempt proceeding to make sure that the

9    plaintiff is fully compensated, and finally, the Court

10   said, gross profits is appropriate because it bears a

11   direct relationship and is directly proportional to the

12   degree of infringing activity.

13          The *Broadcom* court -- that's the Central District

14   of California, 2008 -- said, disgorgement of gross profits

15   is not a punitive measure, as Lawson has suggested in its

16   papers, but rather it's merely transferring gain from the

17   contemnor to the patent owner.  And finally there's a

18   third case, 2012, decided a few months ago where, again,

19   disgorgement of gross profits was awarded.

20          Disgorgement of gross profits in this case is

21   particularly appropriate because it's one area where the

22   parties agree.  The parties don't agree on much in this

23   contempt proceeding, but the parties do agree on what

24   Lawson's gross margin is and on how to calculate that

25   gross margin.

1          There was evidence from both experts that the way

2    you get down to a gross margin line is by taking the

3    direct costs of licensing, maintenance, and service from

4    the revenue that Lawson has gained for its infringing

5    configurations, and when you look at the purchase and

6    profit-and-loss statements that Lawson produced for its

7    fiscal year 2012 --

8          THE COURT:  You all are in agreement on the

9    method, not the amount, because you differ as to the

10   revenues.

11         MR. STRAPP:  That's correct, and I'll get to

12   that, but the gross margin percentage, that's where

13   there's agreement, and I have that on the slide here.  The

14   parties agree that gross margin is 66.1 percent.

15         So that's one area where the parties do agree,

16   and that comes from Lawson's own documents.  That's not a

17   construct or a calculation you need a regression model for

18   or you need to estimate based on some party's testimony.

19   You can just look at the profit-and-loss statement.  You

20   have a gross margin, you deduct that gross margin from

21   whatever revenue number you start with, and there you have

22   Lawson's gross profits.

23         Unlike the gross profits, the incremental profits

24   really are purely an economic construct.  Lawson and --

25   and no other public company reports incremental profits in

1    internal documents or in public SEC statements, and Dr.

2    Putnam, when he was asked on the stand about incremental

3    profits, he said, it's not a concept that would be used by

4    any accountant, it would never appear on a profit-and-loss

5    statement, it's purely an economic construction.  Those

6    are the words of Lawson's expert.

7          So the question then is, if you're going to look

8    at incremental profits --

9          THE COURT:  But your man said that he thought

10   that incremental profits was the right way to measure the

11   gain.

12         MR. STRAPP:  He did say that, and what he said

13   was, in an economic concept -- in an economic construct,

14   incremental profits is the appropriate measure of the

15   gain.  Now, the question is whether or not you can

16   accurately calculate it, and Dr. Ugone, ePlus's expert,

17   attempted to calculate what the incremental profits are,

18   and the way that he did it in this case was he said,

19   there's no evidence that any of Lawson's operating

20   expenses varied directly with revenues associated with the

21   infringing configurations, but in a conservative effort to

22   estimate incremental profits, I'm going to deduct all

23   sales and marketing operating expenses, and that's what he

24   did to provide an estimate of incremental profits.

25         In this case, though, I would submit that you can

1   use that measure as one measure of disgorgement.  You can

2   also use gross profits, but if you are going to use an

3   incremental profit measure, the one that I would strongly

4   urge you not to use is that one which is proffered by

5   Lawson's expert, Dr. Putnam, and the reason why is, first

6   of all, as Your Honor recognized in docket 1032, it's

7   Lawson's burden of proof to prove any deductions for its

8   costs from gross revenues when it's trying to show you

9   what the appropriate profit margin is here, and the way

10  Lawson went about trying to discharge that burden of

11  proof, especially with respect to incremental profits, we

12  would submit, is fatally flawed.

13          The reason is Dr. Putnam created a regression

14  model, and he said, I'm going to use this regression

15  model, and I'm going to use it to predict exactly what

16  Lawson's incremental profits are, but the inputs and the

17  data he used for his regression model bear no relationship

18  to the predictions he was trying to make with his model.

19          The inputs were worldwide revenue, worldwide

20  costs.  The prediction was for U.S. revenues, U.S. costs.

21  The input was all Lawson products worldwide.  The

22  prediction was for only the infringing configurations.

23  The input was for pre-Infor acquisition, pre-injunction

24  data.  The prediction was for post-acquisition injunction

25  period data.

1          And when Dr. Putnam was asked, well, why didn't

2    you use the more relevant data set that you did have, you

3    had them, the fiscal year 2011 and fiscal year 2012

4    profit-and-loss statements, he said -- and it was telling.

5    He said, the reason I didn't use it is because it was not

6    comparable to the data I actually did use.

7          Obviously that begs the question, if you are

8    using data that's not comparable to the period you are

9    trying to predict, you should scratch that data, discard

10   it, and create a new model using the data that's relevant.

11         He chose not to do so, and we submit that that's

12   the reason the predictions he actually came up with using

13   his regression model were wildly off the mark.

14         Now, Lawson also asked the Court to consider a

15   measure of disgorgement based on its net profits, but

16   Lawson recognizes, you know, Mr. Samuelson recognized, Dr.

17   Putnam recognized that measure of net profits deducts all

18   costs of doing business.  Mr. Samuelson described some of

19   those costs were in his cross-examination, things like

20   audit costs, costs with closing books, costs for salaries

21   of developers and other people who don't work on the

22   infringing configurations.  All of those costs would be

23   deducted if you were going to use a net profits

24   disgorgement measure.

25         Lawson searched far and wide to find some

1  authority for its position, and what it came up with was a

2  1939 copyright case from the Second Circuit.  That case,

3  though --

4            THE COURT:  Pretty good judge, though.

5            MS. ALBERT:  It was a great judge.  It was

6  Learned Hand, and if we want to look at Learned Hand's

7  words of wisdom from that case, this is what he said.  He

8  said, overhead -- that is overhead costs -- which do not

9  assist in the production of the infringement should not be

10 credited to the infringer.

11           Lawson made no showing whatsoever that costs

12 associated with auditing its books or closing its books or

13 costs associated with all of its travel costs or with all

14 of its developers somehow assisted in the production of

15 the infringing configurations.  And, in fact, the only

16 evidence that did come into the record was from a

17 document, PX-1269, which showed that the only costs that

18 Lawson could identify specifically with respect to the

19 infringing configurations were, for example, development

20 costs of $38,000, testing costs of $75,000.

21           These were the de minimus expenses that Lawson

22 said they actually did incur that had to do with the

23 infringing configurations, and you may recall at the end

24 of Mr. Samuelson's testimony, I asked him on

25 cross-examination, are there any other costs that you can

1  specifically identify that Lawson incurred that relate to

2  the infringing configurations beyond these de minimus

3  costs that you are -- that Lawson identified in its

4  interrogatory responses, and he said no.

5          And Your Honor also asked Dr. Ugone, you remark

6  that it's not surprising that they didn't incur additional

7  costs because the development time was so quick.  It only

8  took a couple of weeks to come out with these products, so

9  how could it be that they had vast operating expenses or

10 vast overhead expenses that are attributable to these

11 infringing configurations?

12         For those reasons, we submit that in this case,

13 even though as a pure economic construct incremental

14 profits may be the appropriate measure, in this case we

15 would submit that disgorgement of gross profits is the

16 appropriate measure for a disgorgement remedy.

17         The bottom line is, Lawson has not met its burden

18 to show any costs beyond the direct costs associated with

19 licensing, maintenance, and service that should be

20 deducted, and, therefore, direct costs is the correct

21 measure, we would submit.

22         Now, we've put in this slide here, 43, a chart

23 that has all the different disgorgement measures that we

24 have presented through the evidence, both through Dr.

25 Ugone and Dr. Putnam.  On the left-hand side of the chart

1    are the measures, the revenues measures, the gross profit

2    measures, and the incremental profits measures, and we

3    have three columns in this chart.

4          The first column is the actual data we have from

5    Lawson.  That data only goes through the end of

6    November 2012.

7          The second column says, if you take the average

8    daily rate based on the actual data that we have, how much

9    are they making per day in revenue, how much are they

10   making per day in gross profits and incremental profits,

11   and then the third column, we take that daily rate from

12   the end of November 2012 through today, and we present you

13   with some numbers here that reflect what it would be --

14   what the total would be if they were getting a -- going

15   forward in a straight line of revenue, a straight line of

16   gross profits.

17         Of course we don't have the data, so we don't

18   know that the numbers on the third column are exactly

19   accurate, but they are estimated based on Lawson's average

20   daily rate through November 2012.

21         Now, I want -- Your Honor asked about the revenue

22   and the disagreement on the revenue.  There are really

23   only two disagreements about what the appropriate revenue

24   measure should be.  The first disagreement is whether or

25   not Lawson fairly earned license revenue from its health

1    care customers during the injunction period.  I mean

2    during the sunset period.

3          Lawson takes the position that under the terms of

4    the sunset provision, it was permitted to license, to sell

5    new licenses, sell new software, sell licenses for

6    additional users to use the software that was infringing

7    to its health care customers.

8          ePlus takes the position that the fair and

9    natural reading of the sunset provision is that that was a

10   provision that was directed to service and maintenance for

11   customers that already had the infringing configurations.

12         THE COURT:  Is there any evidence of what they

13   did in getting -- issuing licenses, making license revenue

14   during that period?

15         MR. STRAPP:  That evidence suggests that, I think

16   it's about $1.5 million to $2 million worth of license

17   revenue for health care customers during the sunset

18   provision, and so that's one area where the parties'

19   revenue figures differ.

20         The other revenue disagreement is -- well, it's

21   not really even a disagreement.  It's just that there is

22   two different approaches to apportioning LSF and process

23   flow, and Dr. Ugone explained both apportionment methods.

24   One measure says you take all LSF and process flow

25   revenue, because LSF and process flow are part and parcel

1    of the infringing configurations just as are the core

2    system procurement modules, just as are Punchout and EDI,

3    and, therefore, 100 percent of the LSF and process flow

4    revenues should be included in the revenue base.  And the

5    numbers that we've presented on slide 43 take all LSF and

6    process flow revenue into account.

7         A second way of handling LSF and process flow

8    revenue is to apportion LSF and process flow revenue.  If

9    Your Honor was inclined to apportion LSF and process flow

10   revenue, because LSF and process flow are models that can

11   be theoretically used with other software beyond the

12   infringing configurations, Dr. Ugone presented an

13   apportionment method which said, take only 15 percent of

14   the LSF process flow revenues, discard the other

15   85 percent.

16        Now, Lawson says -- the difference between Lawson

17   and ePlus with respect to LSF and process flow is Lawson

18   says you must apportion LSF and process flow revenue.

19   ePlus says it's at your discretion whether to apportion

20   LSF and process flow revenue.  We've presented as Exhibit

21   A, I believe, maybe it's Exhibit C to our reply

22   post-hearing brief what the numbers would look like if you

23   apportioned LSF and process revenue, but those are the

24   only two disagreements about revenue.  The parties

25   otherwise agree on how to calculate revenue, the SKU

```
 1    approach, apportionment for service, apportionment for

 2    large suite SKUs.  Those are the only two disputes.

 3            I want to turn now to willfulness.  The question

 4    is, if Your Honor finds Lawson in contempt, finds that

 5    there are no more than colorable differences and that

 6    Lawson has infringed, is that infringement willful

 7    infringement or not.

 8            The case that sets the standard for willfulness

 9    is a 2007 case called In re: Seagate decided by the

10    Federal Circuit in an en banc opinion, and it sets out a

11    two-part test for willfulness.  The first part of the test

12    is, is there an objectively high likelihood that the

13    infringer's actions constituted infringement of a valid

14    patent.

15            The second part of the test is, was this

16    objectively defined risk either known or so obvious that

17    it should have been known to the accused infringer.

18            Almost every case that I've seen where there was

19    a finding of contempt, there was also a finding of

20    willfulness, and it's not surprising because once you get

21    to a contempt stage, there can be no dispute that the

22    infringer knew about the patent, knew that it had been

23    decided to be valid and infringed by a jury, knew that

24    there was an injunction, yet proceeded to either use the

25    original infringing product or come out with a
```

1    design-around, and I think it's interesting and noteworthy

2    that although Lawson submitted voluminous post-hearing

3    briefing, over 250 pages, the *Seagate* case, which is the

4    seminal case, doesn't get mentioned even a single time.

5         THE COURT:  250 pages?  Are you talking about --

6    does that include the colorability and the infringement

7    briefs, too?

8         MR. STRAPP:  That includes all of their briefs,

9    colorability, infringement, remedies.

10        THE COURT:  Why would they mention *Seagate* in two

11   of those?

12        MR. STRAPP:  I don't know, but since I didn't

13   find it in the remedies brief, I thought maybe I would

14   find it somewhere else, they had made reference to it, or

15   maybe in the 175-page proposed findings of fact, but it's

16   nowhere.  It's not in any of those briefs, and I think

17   that the reason why Lawson doesn't really even present any

18   defense to willfulness is the following:  First of all,

19   with respect to the original configurations with RSS,

20   objectively, there can be no dispute.  Lawson knew about

21   the patent, knew that it had been found valid, knew that

22   they were infringing, and knew that there was an

23   injunction, and yet, notwithstanding that knowledge,

24   Lawson designed RQC to run in parallel with RSS, Lawson

25   aided, abetted, and instructed its customers on how to

1    continue using RSS even after downloading RQC, and I think

2    that as well the evidence is overwhelming on willfulness

3    with respect to the RQC configurations.

4         The first point I want to make here is that

5    although Lawson suggested that this was a lawyer-driven

6    process and that the lawyers had final veto or approval

7    power over changes that were proposed by the business and

8    the product development individuals, in some instances, it

9    actually worked the opposite way.

10        Lawson's lawyers proposed modifications to Lawson

11   businesspeople and to Lawson product development people

12   and said, if you want to avoid infringement, here's what

13   you need to do, and Lawson rejected it.  So, for

14   example --

15        THE COURT:  Is there any record evidence that

16   shows why Mr. Christopherson did not accept that advice?

17        MR. STRAPP:  Not through his testimony.  The only

18   evidence of record is the particular email exchange from

19   which Mr. Christopherson received this suggestion from

20   counsel but decided not to accept it.

21        THE COURT:  Is there a reason given?

22        MR. STRAPP:  I think that reason set forth in the

23   document is that it would have been too disruptive to --

24   it was an unworkable proposal.  It would have been too

25   disruptive to its businesspeople, and it would have had --

1    it would not have satisfied its customers.

2         Beyond that, I can only surmise why Lawson chose

3    not to accept the advice of its counsel.  But there's

4    other evidence as well.  It's not just based on the

5    rejection of the advice of counsel.  There's also, for

6    example, knowledge in admissions by Lawson that claim 26

7    is, quote, right on the mark, so it's going to be a tough

8    one to navigate.  This is at slide 47.  That Lawson, when

9    it studied the issue, said, with respect to the

10   functionality of Punchout, we have no easy answers.

11        Now, you heard a lot of talk about the

12   functionality of Punchout and how it was severely changed.

13   What Lawson first thought internally was, we don't have

14   any answers on the functionality of Punchout.  If we're

15   going to have a solution, it's going to mean we're going

16   to have to do some alternative where we use what they

17   called the crippled Punchout option which was meant to

18   suggest that ePlus -- Lawson customers could only punch

19   out to licensees of the ePlus patent.  That was eventually

20   rejected.

21        And we also have evidence that internal Lawson

22   personnel said to each other, does it scare you as much as

23   me that at this point nobody at the courts or ePlus has

24   said that RQC complies.  Answer, absolutely, exclamation

25   point.  So we submit that this is overwhelming evidence of

1    willfulness.

2           Lawson doesn't even address the willfulness

3    standard in its briefing, and once the question of

4    willfulness is decided, the appropriate place to move is

5    to the question of whether to enhance damages.

6           THE COURT:  What are the choices there?

7           MR. STRAPP:  The choices there are either not to

8    enhance damages at all or to enhance damages up to three

9    times.

10          THE COURT:  How do you chose between doubling or

11   tripling?

12          MR. STRAPP:  Your Honor, after you get through

13   the culpability threshold, whether or not enhanced damages

14   can be awarded, which is based on whether there's a

15   finding of willfulness, the question as to whether to

16   enhance damages and to what extent, courts have looked to

17   these factors that are set out in the case called *Read v.*

18   *Portec*.  It's a 1992 Federal Circuit case.  We have the

19   cite on slide 48.

20          It's a totality-of-the-facts-and-circumstances

21   test, and Your Honor has the discretion to look at all

22   facts and circumstances, but the particular factors laid

23   out in *Read v. Portec*, we would submit in this case,

24   should lead to a finding of enhanced damages.

25          There was a suggestion by Lawson in its

1    post-hearing briefs that Your Honor would be somehow

2    charting new waters if you enhanced damages in this case,

3    but actually Lawson's counsel, I think about a year ago,

4    at a hearing when we had motions in limine pending

5    suggested that that's not the case, that in instances like

6    this, courts have doubled the actual loss, have tripled

7    it.   That comes from Lawson counsel.   That's at the bottom

8    of slide 48.

9            I want to go through some of these *Read* factors

10   that you look to in order to determine whether or not to

11   enhance damages.   One factor says, whether the infringer,

12   when he knew of the other's patent protection,

13   investigated the scope of the patent and formed the

14   good-faith belief that it was invalid or that it was not

15   infringed.

16           Under this factor, we would submit that Lawson --

17   this factor would suggest that enhanced damages are

18   appropriate, because, first of all, Lawson did know of the

19   patent and the Court's injunction.   Lawson, nonetheless,

20   instructed its customers go ahead and continue using the

21   product that was found to infringe, and Lawson knew all

22   along and had investigated the scope of the claim, but

23   instead of coming to a good-faith belief that it was not

24   infringing claim 26, it came to a good-faith belief that

25   claim 26 was right on the mark.

 1          Further to this point, there are cases

 2   interpreting this particular factor that say, one thing

 3   you do look to that can be a reason not to enhance damages

 4   under this factor is if the party who was found in

 5   contempt went out and sought formal opinion of counsel

 6   that they didn't infringe, and if competent patent counsel

 7   said, you don't infringe, that can be a reason not to

 8   apply this factor and enhance damages.

 9          In this case, Lawson answered an interrogatory

10   response.  This was interrogatory number 17.  It's in the

11   record at PX-1269, and they said in that interrogatory

12   response that they did not seek a formal written opinion

13   of counsel, and, in fact, as I mentioned just previously,

14   Lawson actually ignored the advice of counsel it did get

15   with respect to additional modifications that were

16   necessary to design around claim 26.

17          Another factor that the Court in *Read v. Portec*

18   says you look to is whether or not the defendant took any

19   remedial action after it was found to infringe a valid

20   patent.  In this instance, Lawson took action, but we

21   would submit that it was not remedial whatsoever.  In

22   fact, we would submit that it was just a coverup, because

23   what Lawson did was require its customers to download RQC

24   with nothing more.  And once the download was complete, as

25   Ms. Albert read from Ms. Homewood's testimony, support and

1  maintenance continued with respect to the original

2  infringing configuration.

3       I have here a quote from Mr. Hanson who confirms

4  that the act of downloading RQC doesn't actually render

5  RQC operational.  He said, that's correct.  You still need

6  to install it.

7       There's a document that's in the record at

8  PX-1034 where Lawson says, downloading RQC changes their

9  configuration.  We have no knowledge of if they are

10 running it or not, so we will support them again.

11      Lawson took no remedial action here, and, in

12 fact, the action it took was affirmatively to instruct its

13 customers on how to continue using the original infringing

14 configurations even after the download of RQC which, in

15 and of itself, did nothing.

16      Another factor that the *Read* decision says to

17 look to is the duration of defendant's misconduct.  Now,

18 there's a 2009 district court case called *Funai v. Daewoo*

19 *Electronics* that interprets this factor and says, when you

20 look at this factor, what's most important is whether or

21 not the infringer continued to infringe after the judicial

22 finding that a particular device infringes, and here, we

23 would submit that there's been a judicial finding, both at

24 the verdict stage, at the injunction stage, at the Federal

25 Circuit stage, and yet we're still here, Lawson continues

1   its activities even today.

2            Finally, another factor that the *Read* court says

3   to look at is whether or not there was any misconduct in

4   the litigation.  Part of this litigation included the

5   injunction proceedings.  If you could turn to slide 53,

6   what we've done here is provided Your Honor with a

7   timeline of the events between February 2011 and May 18th,

8   2011, and I touched on this a little bit in the opening

9   statement a little while back, but what you'll see here in

10  this timeline is that between February 8th and March 25th,

11  Lawson had begun working on a development -- had begun

12  developing a replacement of RSS, had already begun unit

13  testing.

14           When Mr. Hager got to the stand on March 25th,

15  2011, he didn't say one word about RQC or about any

16  development plans.  And Lawson suggested that's okay --

17           THE COURT:  They say to the contrary in their

18  brief.

19           MR. STRAPP:  Lawson suggests -- well, what they

20  say in their brief, I believe, Your Honor, is that he

21  wasn't asked any questions about RQC.  They say that after

22  the hearing was over, that they submitted a paper to the

23  Court in which they suggested that there was a

24  design-around in the works.

25           THE COURT:  A letter.

1          MR. STRAPP:  A letter, exactly.  But the

2     letter -- neither in the letter nor anywhere else did

3     Lawson ever suggest the testimony Mr. Hager had provided

4     to the Court was inaccurate in any way with respect to the

5     public interest factors.  Never did they say, this

6     design-around is going to alleviate the morale issues that

7     Mr. Hager testified about, the loss of jobs, or that a

8     hospital's quality of care would somehow be interrupted,

9     but what I think is most telling on this timeline, Your

10    Honor, is that five days after Mr. Hager got up on the

11    stand and made his testimony and gave his parade of

12    horribles, he said internally at Lawson, we have a

13    solution for RSS now.  That was on March 30th, 2011, five

14    days later.

15         Now --

16         THE COURT:  What was being said in the briefs

17    that ensued the injunction hearing?  The briefs were

18    filed -- I mean the hearing was March 25th, and the briefs

19    were filed after that.  What was said in the briefs that

20    were filed about this issue?

21         MR. STRAPP:  There was a footnote in Lawson's

22    brief after this hearing in which they said Lawson is

23    working on a design-around.  That was all it said.  It

24    offered no more detail.

25         THE COURT:  Didn't say anything except it was

1  working on a design-around.

2           MR. STRAPP:  That was all that was said in their

3  briefing.  Now, Mr. McPheeters and Mr. Cohen, you see

4  statements from them here on April 6 and April 13th on a

5  timeline.  Those are Lawson's general counsel and another

6  Lawson in-house counsel.

7           Now, the statements in these documents, these are

8  part of the Hager deposition exhibits that were provided

9  to Your Honor which Your Honor hasn't yet ruled on the

10 admissibility of, but I would suggest that they are

11 instructive for the following point:  On April 6th and on

12 April 14th, what Mr. McPheeters and what Mr. Cohen advised

13 Lawson was, withhold any press release concerning RQC,

14 retract any statements about the design-around, and the

15 reason given was, quote, these statements may be used by

16 ePlus or the judge to negate any efforts to obtain a stay.

17          That's the motivation in a nutshell for the

18 testimony that was provided by Mr. Hager and for the

19 course of conduct that followed that testimony.

20          I want to direct Your Honor's attention to some

21 of Mr. Hager's testimony at that hearing.  On slide 54,

22 Mr. Hager was asked about the costs and the time to change

23 away from RSS, and this was the exchange in which he said

24 at the hearing, it's going to take about nine months, it's

25 going to cost somewhere north of 300,000, maybe 750,000 on

1   average, some will be greater than a million.

2           Now, what Mr. Hager was testifying about with

3   respect to these costs were what costs and what time are

4   associated with ripping out RSS and replacing it with a

5   third-party system.

6           THE COURT:  He wasn't asked that.  He was asked

7   if he had any idea how much of a cost for a hospital to

8   make a change away from RSS.

9           MR. STRAPP:  Right.  That morning --

10          THE COURT:  He put the construct on it himself in

11  the answer --

12          MR. STRAPP:  That's correct.

13          THE COURT:  -- about pulling it out and putting

14  something else in.

15          MR. STRAPP:  That's correct.  And earlier in the

16  same hearing, he was asked a question about --

17          THE COURT:  Isn't it fair to interpret the

18  question as going away -- changing away from RSS to mean

19  basically pulling it out and putting it in?

20          MR. STRAPP:  It is fair to interpret it that way,

21  and, in fact, it's not only fair to interpret it that way,

22  that's corroborated by the email exchange that he had, Mr.

23  Hager had with Mr. Lohkamp the morning of March 25th.

24          That morning, he sent an email to Mr. Lohkamp,

25  and this is part of the record, asking what's the cost and

1    time -- pick your most complex user, what is the cost and

2    time associated with taking RSS away from that user and

3    switching that user over to ePlus.

4         Now, here's the real question:  Was the testimony

5    that Mr. Hager was providing about this cost and time

6    associated with any plans that were in the works at

7    Lawson, or was it just a construct and an artificial cost

8    and time that Lawson never contemplated actually

9    incurring?

10        Well, what Mr. Lohkamp said on the stand, this is

11   at slide 55 -- he said, Lawson -- he was asked, Lawson

12   never had a contingency plan, though, to have its

13   customers rip out RSS and replace with ePlus; correct?

14        Answer:  Correct.

15        So when Mr. Hager was asked on March 25th, what

16   are you going to do if the Court enjoins maintenance and

17   support, he could have said two things.  He could have

18   said, well, we have a plan in the works to mitigate the

19   harm to our customers.  If it works out -- it's still in

20   development -- our customers won't be harmed.  They'll be

21   able to just take a download.  There won't be any cost,

22   there won't be any time associated with it.  But if that

23   plan doesn't work out, it's going to be a really horrible

24   situation.  It's going to cost hundreds of thousands of

25   dollars, it's going to take months of time.

1          He didn't say that.  He just said, this is what's

2     going to happen, it's going to be terrible, even though

3     that parade of horribles was never even contemplated as a

4     possibility that could happen within Lawson.

5          Your Honor was challenged back in November 2011

6     by Lawson's counsel that this entire line of evidence

7     about the injunction proceeding was irrelevant to the

8     contempt, and Your Honor said, well, it may be relevant to

9     the remedy, because if there were misrepresentations at

10    the time of the injunction proceeding, that can implicate

11    the remedy that's appropriate in this instance.

12         And specifically, Your Honor said, if there were

13    misrepresentations about the length of time it would take

14    to accomplish this and the expense it would require,

15    that's going to inform a remedy here.

16         What I've put here on slide 56 are some of the

17    representations that were made, including the dates on

18    which they were made, and side by side what actually

19    happened with respect to RQC.  March 25th, March 30th,

20    April 1st, statements were made by Lawson to Your Honor

21    that it would take nine months on average for

22    implementation, that it could take many months to several

23    years to install, implement, and deploy software, and that

24    this was software that can't be uploaded over the weekend.

25         Less than two months later, or a little bit over

 1  two months later, Lawson said internally, Lawson was the

 2  first implementation, we went live using our internal IT

 3  department in under one day of elapsed time.

 4       Your Honor, I'm going to turn briefly to

 5  attorneys' fees.  Attorneys' fees is governed by section

 6  285.  Under section 285, the Court has the authority to

 7  award reasonable attorneys' fees in exceptional cases.  In

 8  a patent contempt proceeding, or even in a patent trial,

 9  where willfulness is found, several courts have said that,

10  in and of itself, can be a justification for attorneys'

11  fees.

12       THE COURT:  If there's no willfulness finding,

13  how can it be an exceptional case?

14       MR. STRAPP:  If it's not willfulness, I think I

15  would agree with you that it's not going to be an

16  exceptional case.  But if it is willful, what courts have

17  said is a finding of willfulness is a sufficient basis for

18  an award of attorneys' fees.

19       There's obviously a lot more, and some of the

20  reasons why damages should be enhanced are also reasons

21  why attorneys' fees should be awarded.

22       Finally, Your Honor, coercive remedies are

23  appropriate in a civil case insofar as they are only in

24  place until such time as Lawson comes into compliance with

25  the requirements set forth in the injunction.  Those can

1   take the form of, for example, a daily or weekly fine or

2   pre-approval requirement, and if Your Honor was inclined

3   --

4           THE COURT:  How do we know when they come into

5   compliance?

6           MR. STRAPP:  They would submit a statement to

7   Your Honor from their executives that says, we have now

8   complied with every single paragraph --

9           THE COURT:  And the first thing that would happen

10  is that you're going to say, well, they haven't proved

11  that.  I don't know that that's necessarily going to work.

12          MR. STRAPP:  Your Honor, at the time they

13  submitted they were in compliance, you could suspend the

14  fine pending agreement by all parties and the Court that

15  they were in compliance, and if they --

16          THE COURT:  Who is the fine paid to?

17          MR. STRAPP:  To the Court.  Not to ePlus.

18          THE COURT:  I argued a case sort of like this one

19  time in front of Judge Merhige, and when I finished, do

20  you know what he asked me?  He said, how come you didn't

21  ask for me to hang them?  Is there anything else you think

22  I ought to do?

23          MR. STRAPP:  Well, I just have a measure of the

24  daily fines that Your Honor could impose if it found it

25  fit, but that is all that I have.

 1           THE COURT:  That's the daily revenue, the gross

 2    profit, or the incremental profits.

 3           MR. STRAPP:  Those are just measures of fines

 4    based on revenues and profits that Your Honor could impose

 5    as a daily fine.  Thank you, Your Honor.

 6           THE COURT:  All right.

 7           MR. DUSSEAULT:  Thank you, Your Honor.  You know,

 8    I know you were joking when you said, how come you didn't

 9    ask me to hang them, but I think maybe a good place to

10    start after Mr. Strapp's presentation is to remind the

11    Court of the purpose of a civil as opposed to criminal

12    contempt proceeding which is twofold, and the Court

13    recognized this in the ruling on the motion concerning Dr.

14    Ugone.

15           It is compensatory or coercive.  It is coercive,

16    and I believe the parties agree with this, only in a

17    forward-looking sanction that can be readily resolved and

18    taken away by compliance.

19           Otherwise, it is purely compensatory, and what I

20    ask you, Judge, is when you listen to that presentation,

21    the patchwork quilt they are putting together, this kind

22    of crazy quilt of so-and-so said this here, they may have

23    been talking about RQC, they were talking RSS, and

24    somebody said this at this hearing two years later.

25           What I ask you is, are they trying to show you

1    what is a relevant and fair compensatory remedy, or are

2    they trying to get you to punish Lawson.

3          My submission, Your Honor, is that what they're

4    trying to do is get you to punish Lawson, and they're

5    doing it, frankly, through the same kind of smoke and

6    mirrors that Mr. Thomasch talked about earlier today, and

7    it's out of order, but it's kind of so outrageous, I

8    really want to take it first.

9          This point about Mr. Hager, who they've just been

10   bashing on throughout, Mr. Hager, Mr. Hager, and Your

11   Honor asked what I think is exactly the right question

12   which is, what was this point made in the briefs that

13   somebody basically told everyone that this work-around,

14   design-around was being done.  I just want to remind

15   everyone of the dates involved here.

16         On March 30th of 2011, Lawson -- while the

17   injunction proceeding was going along, Lawson disclosed

18   that it was working on a redesign of RSS and Punchout to

19   avoid the infringed claimed.  That's an exact quote.

20   ePlus then filed its reply injunction brief, and they

21   acknowledged this.  They acknowledged that they were aware

22   of that.

23         You then had a hearing.  Both parties, both

24   parties, Your Honor, mentioned the design-around, and Your

25   Honor's response was, that stuff, that's not really before

1    me on either side, is it.

2         After the hearing, Your Honor, Lawson submitted a

3    letter, which is docketed at docket entry 727 on May 6th,

4    2011, again disclosing and describing this work-around,

5    and then -- and I think this may be the only piece you

6    need to know, Your Honor.  In your injunction ruling, your

7    ruling that had the sunset provision as to health care

8    customers, you reference the work-around, and you mention

9    that in your view, that meant that some of what Mr. Strapp

10   called the parade of horribles was, in your view, not

11   likely to occur.

12        So Mr. Strapp and ePlus are going to stand here

13   today and say that that conduct is willfulness that should

14   lead you to award treble damages and coercive sanctions

15   and attorneys' fees, and let me make one other point

16   that's kind of interesting.  At the time of the testimony,

17   was the design change that is at issue in this contempt

18   proceeding even conceived?  No, it wasn't.

19        THE COURT:  No, but here's the problem I have,

20   Mr. Dusseault.  They came in here and ponied up something

21   they knew was not even under consideration.  They knew,

22   Mr. Hager knew, Mr. Lohkamp knew, the lawyers knew that

23   that wasn't what they were considering, and they led the

24   Court to believe that that was actually what might have

25   happened, and because of that, I issued an injunction with

1    a sunset provision in it.

2            And I agree -- I think the record shows that if

3    I -- I don't remember the time frame exactly from the

4    testimony, but there was an early-stage look-see at the

5    matter, and then they were trying to do some other

6    options, and the final decision hadn't been made as of the

7    time of that hearing.  But that said, what he said was

8    just not right, and it was intended, I think, to get the

9    Court to focus on a way to -- and to focus on the harm

10   that would befall in the event of an injunction, and I

11   think that's the part of it that troubles me

12   notwithstanding the chronology, and maybe you could

13   address that aspect of it.

14           MR. DUSSEAULT:  And, Your Honor, I understand,

15   and Your Honor has expressed it before that Your Honor is

16   troubled by that presentation.  I would note that nobody,

17   Lawson's counsel, ePlus's counsel, nobody asked questions

18   about is there a redesign.  Nobody did on either side.  I

19   understand.

20           Now, I understand that that is a source of

21   frustration.  We have explained in our briefing why we

22   believe that what Mr. Hager did was answer truthfully the

23   questions that were underway, that works were, in fact --

24   excuse me, that work-around was actually being worked on

25   but yet not finalized.  We've explained that.

1          But I think that the ultimate question, Your

2   Honor, is when they're trying to prove -- and they bear

3   the burden of proof, and they're trying to prove

4   willfulness with clear and convincing evidence, that this

5   is what they're giving you.  It's willfulness, Your Honor,

6   as to the infringement of claim 26 with a design change

7   that was not conceived at the time of the testimony.

8          So I understand, Your Honor, and you've made very

9   clear your frustration.  Obviously, we were not in the

10  case at that time.  I understand that.

11         THE COURT:  That ought to be made clear on the

12  record, too.  I understand that.

13         MR. DUSSEAULT:  And the question is, if that's

14  what Mr. Strapp and ePlus are spending five or ten minutes

15  talking to you about today, is this really a case where

16  you ought to be doing what they are asking you to do?

17         And so what I'd like to do if I could -- Mr.

18  Strapp walked through the different remedies that they're

19  asking for.  What I'd like to do, because they haven't, is

20  show you what happens when you put them together just very

21  briefly.  So if we can have the first slide.

22         Through most of their briefing, and today, I

23  think, is the first time they've done anything different,

24  what they've done is, they've given a remedy number

25  through November 30 of 2012, and then they said, oh, yeah,

1    and there's a daily rate, but they've never multiplied

2    that out to show you what that number would be.

3          Now, they do that in their slide presentation

4    today up to the hearing date.  What we've done is we've

5    multiplied out the daily rate to give you the total number

6    were the Court to decide this on July 1 of this year.  We

7    picked it just because it's halfway through the year.

8          If you look at this number, Your Honor, you see

9    that their remedy for disgorgement, which is the only

10   choice they've given the Court, ranges from the 17 million

11   at the bottom, which is the one that Ugone really stood

12   behind, and we'll talk about that in detail, all the way

13   up to $42.7 million.

14         But they don't stop there.  They asked for

15   trebling.  So what happens if you treble it.  The range of

16   damages in this supposedly compensatory proceeding, Your

17   Honor, is 51 million to $128.1 million.  They don't stop

18   there, and if you look at the next step, attorneys' fees.

19   They ask for attorneys' fees, but they don't tell us what

20   the attorneys' fees are.  Clearly they know what

21   attorneys' fees they've incurred -- they have a range in

22   the ballpark -- but they don't disclose that number.

23         And then lastly, and they did talk about this,

24   the daily coercive fee.  In their briefing, they asked for

25   62,000 per day under any scenario, so that's the only

1    number that we've given.

2         So, again, what I ask Your Honor is when you look

3    at these numbers, and I'm going to walk through the steps

4    that they've gone through to get to these numbers, is this

5    anything even slightly resembling a compensatory remedy.

6         Let me give you a couple of reality checkpoints

7    to check that against, Your Honor.  If you look in the

8    record and say how much business have they shown you that

9    they've lost, any evidence, even if they can't prove it

10   with precision, even if they can't prove anything, how

11   much business have they shown you that they've lost as a

12   result of the RQC design change after the injunction?  The

13   answer is zero.  They made a deliberate strategic decision

14   to make no effort whatsoever to show harm.

15        Your Honor also can refer back to the fact that

16   in the underlying trial, they took the position that five

17   percent royalty was appropriate, and Your Honor struck

18   that as, in fact, too high and unreasonable.  Five percent

19   of the total revenue, by our calculation, of $21.7 million

20   is about a million dollars.

21        But what if you even wanted to get into

22   disgorgement of what Lawson actually earned?  So I'm going

23   to talk in a bit more detail about net profits, but what's

24   the real gain to Lawson of making these sales?  It is the

25   net profit.  It's the money that's left over after all of

1    the costs, Your Honor, that are necessary to run the

2    business.  And that figure is $3.7 million through the end

3    of November 2012 and $5.5 million up to July 13.

4           So what ePlus is asking you to do today, based on

5    conduct that through July 1st of this year earned our

6    company $5.5 million of net profit, is to award somewhere

7    between $51 million and $128.1 million plus attorneys'

8    fees as a supposedly compensatory sanction.  That's

9    inappropriate.

10          Now, what I want to do, having totalled it up to

11   start, Your Honor, is spend a letter bit of time walking

12   through the steps that ePlus uses to get from compensation

13   to something that I would suggest bears no resemblance at

14   all to compensation.

15          The first point is one that we have addressed

16   with Your Honor before which is, is disgorgement even an

17   available or appropriate remedy here, and I want to talk

18   about that very briefly.  And Mr. Strapp said that there

19   are very few points on which the parties can agree.  I

20   think there's another point that's important that the

21   parties can agree to here which is that ePlus chose to

22   present no evidence of harm, and I want to be really clear

23   when I talk about that.

24          This is not a case, Your Honor, where there's

25   difficulty proving harm and they've presented some

1   evidence, but the defendant is saying, well, you can't

2   prove it with precision.  They made a choice, Your Honor,

3   not to make any effort at all to prove that they've lost

4   any business or that they even tried to get the business.

5          But there's something else that they haven't

6   tried to do.  They haven't presented any evidence that it

7   would be difficult to do that.  They didn't have Mr.

8   Farber take the stand and say, well, I can't really show

9   you what our actual harm is in case you want to use that

10  as a gauge for a compensatory remedy.

11          And interestingly, Dr. Ugone, who we're hearing a

12  lot about today and we'll talk about a lot more, testified

13  under oath that he's not taking the position that he

14  couldn't have measured something like an actual loss.

15  He's done that in 20-plus cases.  He's not saying he

16  couldn't have done a reasonable royalty.  He's done that

17  in 20-plus cases.

18          They made no showing, and what's even more than

19  that, Your Honor, is that the evidence there is in the

20  record actually shows there is no harm.  So if we could

21  look at the slide of Mr. Farber's testimony which we

22  submitted to the Court via designation.

23          THE COURT:  What is the number on the slide?

24          MR. DUSSEAULT:  Slide 1208, Your Honor.  So we

25  put a couple of questions here.

1          Question:  Before the injunction entered, was

2     there any form of contingency planning by ePlus as to how

3     ePlus might be able to take advantage of an injunction

4     from a business perspective if an injunction was entered

5     by Judge Payne?

6               Answer:  I don't believe so at that point, no.

7               Question:  At any time following the May 23rd,

8     2011, entry of an injunction, did ePlus form a strategy to

9     try to take advantage of the injunction from a business

10    perspective?

11              Answer:  No.

12              Can we have the second page of the slide?

13              Question:  In light of the fact that, as you

14    testified, ePlus had the capability of selling a

15    requisition system to replace RSS with a customer who was

16    otherwise using the Lawson system foundation, did you

17    consider attempting to make direct appeals to Lawson

18    customers to accomplish that?

19              Answer:  Before litigation?

20              Question:  No, after the date of the injunction.

21              Answer:  No.  I had mentioned earlier in this

22    deposition that it was ill-advised by me to do so.

23              THE COURT:  Is there any testimony as to what

24    ill-advised by me meant --

25              MR. DUSSEAULT:  No, Your Honor.  I don't know.  I

1    don't know what it means.  But I think what is absolutely

2    clear, and the only evidence before you is that they

3    didn't take any steps at all to try and win business here.

4         Now, I would submit, Your Honor, and I know we've

5    briefed this, we've had the Ugone briefing, but when a

6    remedy is inherently compensatory in nature and a party

7    makes a strategic gambit to just not give Your Honor any

8    evidence, can you award anything as a compensatory remedy,

9    or have they failed to meet their burden of proof?

10        I understand that there's a disagreement, Your

11   Honor.  We take the position under controlling case law,

12   including Supreme Court precedent, that any compensatory

13   remedy must be based upon proof of actual harm.  You ruled

14   in the Ugone ruling that in the case of disgorgement, that

15   may not be necessary.

16        Now, the difference here, I would submit, is the

17   total strategic decision to present absolutely nothing,

18   again, without any showing that there was a difficulty in

19   doing it, and if you award the remedies that they're

20   asking for here, Your Honor, this will be a case that will

21   go up on appeal, and the question will be, is it an

22   appropriate compensatory remedy to award what may be

23   millions of dollars if ePlus has its way, tens or hundreds

24   of millions of dollars where there was a complete and

25   deliberate absence in the record of any harm, and I would

1    submit, Your Honor, that that is not a compensatory

2    remedy.  But even if it's available as a matter of law,

3    Your Honor, even if the remedy is available, it is not an

4    appropriate remedy here.

5            Now, I think there's another point that we can

6    all agree on.  ePlus chose to give you just one choice of

7    remedy.  They chose to give you just one which is

8    disgorgement, and Mr. Strapp says, well, there's cases

9    that have done it.  There's some cases that have done it.

10           Of course, that doesn't show that it is, in fact,

11   the appropriate remedy, and, again, when Dr. Ugone, a

12   Ph.D. economist, took the stand, did he say, I think this

13   is an appropriate remedy?  No, he did not.  He said, the

14   lawyers told me to assume that it was an appropriate

15   remedy in this case.

16           Now, it is, Your Honor, a rarely used remedy in

17   the context of patent contempt cases.  It is an extreme

18   remedy, and we cited to Your Honor a law review article by

19   John Golden in the Texas Law Review in which he says,

20   quote, disgorgement of the entirety of a contemnor's

21   profits appears to be considered an extreme remedy

22   reserved for egregious behavior, but it's the only option

23   ePlus has given you here.

24           THE COURT:  Are you saying that you can't -- it's

25   inappropriate here because they first have to show, before

1   a court can resort to disgorgement, that a remedy based on

2   actual loss is difficult or unsusceptible of proof?

3          MR. DUSSEAULT:  I would make two points, Your

4   Honor, and they are in two steps.  Where a party fails to

5   present any evidence of the fact of harm, the fact of

6   harm, not just the amount but the fact, and there is no

7   evidence that they could not have done so, that to --

8          THE COURT:  Could not have produced the evidence?

9          MR. DUSSEAULT:  Yeah.  If they come in and say,

10  here's why we're unable to prove it or unable to prove it

11  with some certainty, that would be different than the

12  scenario we have, but I would submit that it is not

13  available in the utter absence of such proof, but the

14  second point I was making is that it is inappropriate in

15  that it is an extreme remedy, and it is rarely used.

16         It is not used in any of the *TiVo* cases that the

17  parties agreed on and submitted to you in a list.  You

18  will not find one of them that gives disgorgement.  There

19  are to this day cases that are being decided that are not

20  awarding this, are awarding much more commonly lost

21  profits or reasonable royalty, and we've cited to Your

22  Honor the *Walman* case, and I want to just point that out

23  very briefly.

24         This is a case that came out after the briefing

25  on the Ugone decision, and it's one of the cases that the

parties agree is a post-*TiVo* case applying that standard.
Here, the Court takes the position that the Court notes
that there appears to be a split authority over whether a
contemnor's profits may be the proper measure of
compensation in a civil contempt proceeding.  And then
they go on and say -- they do note that disgorgement was
not specifically requested in that case, and they say,
therefore, we don't have to reach the issue, but they do
say in the second highlighted passage, but as noted above,
compensatory damages must be based upon evidence of the
complainant's actual loss.

Before I move on from this point, Your Honor,
there's one other thing I want to bring up that I don't
think any party has yet raised with the Court, and that
is, what is the Fourth Circuit's standard for civil
contempt, and so we can go to the Ashcroft slide.

THE COURT:  Do we use the Fourth Circuit law, the
regional circuit, for contempt, or the law of the Federal
Circuit when it's contempt of an injunction that was
issued by virtue of patent infringement?

MR. DUSSEAULT:  Your Honor, my understanding is
that because the contempt procedure is not unique to
patent law, you follow the Fourth Circuit's contempt
procedure.  That is my understanding.

And the Fourth Circuit standard, if you see,

1    says, to establish civil contempt, each of the following

2    elements must be shown by clear and convincing evidence,

3    and the fourth element is that the movant suffered harm as

4    a result.

5         So I would submit, Your Honor, that in the

6    absence of proof of harm, if, in fact, it's correct, as I

7    believe, that the Fourth Circuit standard controls, they

8    have not established liability let alone a remedy for

9    contempt in this case.

10        So our position, Your Honor, as stated in the

11   briefs, is that because they took a gamble and chose to

12   give you just one option, and it's an option that I

13   believe is unavailable under the law, but even if

14   available is used only very rarely, that having taken that

15   gamble, if Your Honor decides it's an inappropriate

16   remedy, it is entirely appropriate to award nothing.

17        And I would submit, Your Honor, remember, Dr.

18   Ugone was the witness in the *TiVo* case, and in the *TiVo*

19   case he actually gave the Court multiple options.  And

20   what happened there was that the Court looked at multiple

21   options and said, no, disgorgement of profits as proposed

22   by Dr. Ugone is unreasonable and punitive.  And, instead,

23   they awarded a reasonable royalty.  It was enhanced.

24        Now, ePlus says in its brief that somehow that

25   enhancement is a disgorgement.  I would simply note that

1    nobody has ever taken that position but ePlus.  That's not

2    described as profit disgorgement in the decision.  In

3    fact, what the decision does is reject profit

4    disgorgement.

5           So our position is that disgorgement is not

6    appropriate, but what if the Court wants to give a

7    disgorgement remedy here?  The question then becomes, what

8    is the reasonable compensatory measure of that award under

9    the facts and circumstances.  So what I'd like to do is

10   take sort of the measurement and number issues first and

11   then get into some of this enhancement discussion that

12   they turn to.

13          So let me try and take these questions in order.

14   The first which we address is agreeing on the revenue

15   base, and I do agree with Mr. Strapp.  The only two

16   disputes are should you allocate or apportion for LSF and

17   process flow revenues, and should you be counting revenue

18   to health care customers.

19          So let's take LSF and process flow first.  Now,

20   as we established at trial through Dr. Ugone, this is

21   something that Dr. Ugone proposed.  He proposed it as

22   potentially appropriate.  I admit, he said it's not

23   mandatory, but his reasoning, which he brought up, is that

24   LSF and process flow is the foundation for configuration

25   three and four but also for many, many, many other

1    modules.

2            And he devised a methodology that calculated that

3    85 percent of that revenue is properly attributed to other

4    modules.  Dr. Putnam weighed in and looked at this and

5    said, yes, this seems to be appropriate.

6            THE COURT:  You don't quarrel with the allocation

7    of 1585.

8            MR. DUSSEAULT:  We do not.  We embrace it.  We

9    believe it's correct.  What's interesting is ePlus

10   quarrels with it.  Not the percentage, but ePlus is trying

11   to run away from it, and what I think is interesting -- if

12   we could put up a slide of Dr. Ugone's testimony, when

13   they say, well, Dr. Ugone said that it was optional, I

14   want to look at the reason he did it.  And this is -- I

15   was reading impeaching testimony to him, Your Honor,

16   during the proceeding, and this is what it said.

17           Let me read this testimony to you, sir.

18           Question:  Now, in an effort to make sure you're

19   using the right revenue base, you propose two

20   apportionments in your analysis; correct?

21           Answer:  Yes.

22           Did I ask you that question and you gave me that

23   answer?

24           Yes, and I still stand by that answer.

25           Now, the two apportionments that he made, and he

1    stands by this position, he made them to make sure we're

2    using the right revenue base, include LSF.  They ought not

3    be permitted to run away from that, and I would warn Your

4    Honor their brief and slides today are loaded with figures

5    that don't make Dr. Ugone's LSF apportionment.  So if

6    you're giving an award of any kind, you have to be very

7    careful that you use the number that has two

8    apportionments and includes LSF.

9              The second issue I think is pretty easy which is

10   health care customers --

11             THE COURT:  The two apportionments is the large

12   suite apportionment and the LSF.

13             MR. DUSSEAULT:  Yes, Your Honor, that's correct.

14   The second one, the second --

15             THE COURT:  That is in the briefs, isn't it?

16             MR. DUSSEAULT:  It is.

17             THE COURT:  Well, it's in your brief.

18             MR. DUSSEAULT:  Well, they have -- what they do

19   in their brief, Your Honor, is they have a big grid on the

20   pages that gives the no LSF apportionment number, and then

21   they drop a footnote usually and say, if you do LSF --

22             THE COURT:  Okay.

23             MR. DUSSEAULT:  The other one is health care

24   customers, and I think this one is pretty straightforward,

25   and I think because it's straightforward, ePlus tends to

1    overstate the issue here a bit.

2           These are not new licenses to new customers.

3    That's not what's at issue, and I think both experts agree

4    on this.  What's at issue here is licensing revenue when

5    one of the specifically identified customers, health care

6    customers, says, hey, you know what, we've had five people

7    leave, and I need five new licensees because new people

8    are coming in, or, we're growing our department a little

9    bit, so to meet the need I need five more licenses.

10          THE COURT:  Well, they argue licenses.  It's not

11   a situation where there was an agreement reached and then

12   the payment occurred later.  They are licenses that were

13   granted after the date of the injunction, but they are to

14   extant customers who are expanding the number of licenses.

15          MR. DUSSEAULT:  Yes, Your Honor, or just

16   changing.  My understanding of how it works is, if your

17   lineup of employees changes, you may need to get a new

18   license to be compliant, and you do that.  That's the

19   revenue that we're talking about here.

20          So Your Honor, obviously, is in the best position

21   to know what Your Honor meant in granting this provision,

22   but ePlus's position seems to be the moment a health care

23   customer gets to the point where it needs to add some

24   licensees, it would either have to immediately replace

25   Lawson or use two different systems.

1          THE COURT:  There wasn't any testimony, if I

2     recall, at the trial about that contractual necessity to

3     have a new license if you were expanding the number of

4     users in your company.  Do you know whether there was such

5     testimony as that?

6          MR. DUSSEAULT:  Your Honor, there was definitely

7     testimony from Dr. Ugone, because I asked him about this,

8     about whether the issue here would be that they would

9     treat as improper the addition of a customer -- of a user

10     for an existing customer, and he said yes.  That's what we

11     need, not fact testimony about it happening, but I don't

12     think there's any disagreement, Your Honor, that that's

13     what's making the adjustment for an existing health care

14     customer.

15          THE COURT:  Well, I was going back to your

16     statement that we ought to focus on what was intended by

17     the injunction as to whether or not the issuance of a

18     license of this sort was a violation of the injunction,

19     and to that extent I expect we should.  Does anybody put

20     on any evidence about this kind of licensing being extant

21     in the trial record?

22          MR. DUSSEAULT:  In the underlying trial record, I

23     can't speak to that.

24          THE COURT:  I don't remember, but there's a lot I

25     don't remember.

1          MR. DUSSEAULT:  So that's an adjustment that we

2     believe their reading is not reasonable, but, again, Your

3     Honor is in the best position, and that would be a

4     reduction of Dr. Ugone's revenue base of about 900,000.

5          So then the question is, once you have the

6     revenue base, what's the right profit margin to use, and

7     Mr. Strapp said, well, you should use gross profits

8     because everybody agrees on it, everybody agrees on the

9     measure, but what is interesting is there's another thing

10    that everybody agrees on, and that's that gross profit is

11    not the best measure of gain.

12         We testified to that through Dr. Putnam, and

13    ePlus testified to that through Dr. Ugone, and what I'd

14    like to do is put up Dr. Ugone's testimony, because I

15    believe that Mr. Strapp mischaracterized what he was

16    saying.  You may recall that Mr. Strapp's explanation was,

17    sure, Dr. Ugone said this, but he was talking in terms of

18    economic principles, not about the facts and circumstances

19    of this case.

20         But look at the context of the question and

21    answer.  It was my question, and I said, Question:  And

22    gross profit is not the correct measure of Lawson's gain

23    as you defined it; correct?

24         Answer:  There are some incremental costs that

25    can be deducted.

1          And then you intervened, said, just answer the

2     question yes or no.  I think the bottom line, though, is

3     in your judgment, is the correct way to equate your

4     figures with the gain the incremental profit?

5          The Witness:  Yes.

6          He was not talking, Your Honor, about esoteric

7     principles of economics.  He was talking about the figures

8     that he offered the Court, and what he told you was that

9     the best measure of gain is incremental.

10          Now, they can't run away from that testimony fast

11     enough, but I would submit that if you were to use a

12     number offered by ePlus, it needs to be the only one that

13     their witness has endorsed.

14          Now, then the question becomes, if you use an

15     incremental measure, which incremental measure should you

16     use, Dr. Ugone's or Dr. Putnam's.  And there's really only

17     one difference between the two.

18          THE COURT:  Excuse me a minute.  As opposed to

19     the incremental, it looks to me like actually the dispute

20     here may be that if you assume the gross profits is not

21     the proper or best measure but that you use net profit,

22     there's a dispute with respect to whether you have

23     established that which is necessary to be deducted to

24     reach properly net profits given that Dr. Putnam takes one

25     view of the matter and Mr. -- what is the CFO's name?

1              MR. DUSSEAULT:  Kevin Samuelson.

2              THE COURT:  Mr. Samuelson gave different

3    testimony, and that ties into the meaning of fixed and

4    variable, and all of that focuses on meaning fixed and

5    variable costs.  So it looks to me as if the bottom line

6    point that they're making is that net profit would be okay

7    and probably proper if I had -- if you had carried your

8    burden to establish what one deducts from gross to get to

9    the net, but you haven't.  Therefore, I should use the

10   gross.  I think that's what their point is.

11             MR. DUSSEAULT:  It's wrong for a number of

12   reasons.

13             THE COURT:  Why isn't that right?

14             MR. DUSSEAULT:  Well, first of all, you shouldn't

15   jump to gross, because their own expert has said that

16   gross isn't the correct measure of gain.  If the purpose,

17   as everyone has assumed, of disgorgement is to disgorge

18   gain, then Your Honor ought to disgorge the best measure

19   of gain, and Dr. Ugone said it's not gross.

20             The reason that it's not appropriate is, just as

21   one example, gross includes sales commissions.  There's no

22   question that if Lawson is selling modules, configurations

23   with RQC that it's paying a sales commission and that in

24   order to earn that revenue it had to spend that variable

25   amount of sales commission.  Gross doesn't deduct that.

 1              THE COURT:  He's willing to take off all the

 2    sales and marketing, isn't he?

 3              MR. DUSSEAULT:  Only in his incremental number.

 4    The gross number that they're advocating does not take off

 5    sales and marketing.

 6              THE COURT:  But the number that you would take

 7    off of gross, at least the figure that you all agree on as

 8    to sales and marketing, is in the record, isn't it?

 9              MR. DUSSEAULT:  It is, Your Honor.

10              THE COURT:  Could I make that calculation, or is

11    there nothing on which I could make that calculation?

12              MR. DUSSEAULT:  I don't think you need to make

13    the calculation, Your Honor, because that is Dr. Ugone's

14    incremental figure.  Dr. Ugone's incremental figure is

15    gross profits minus 100 percent of sales and marketing.

16    That's what he's calling incremental.

17              So you don't need to make that calculation.

18    That's the incremental number that ePlus is now saying is

19    not the best number.  But what I was trying -- I'm sorry.

20    I'll try and slow down.

21              What I was starting to say with respect to

22    incremental is what Dr. Ugone does is he treats sales and

23    marketing as 100 percent variable.  So the only difference

24    between his gross figure and his incremental is that he

25    takes out sales and marketing as he clearly must.

1        THE COURT:  So his figure is really a net

2   figure -- his incremental figure is really a net profit

3   figure of sorts.  But it's not as complete as you think it

4   ought to be.

5        MR. DUSSEAULT:  I wouldn't call it net, Your

6   Honor.  I would call it -- it's sort of gross minus.  It's

7   really very, very close to gross with one adjustment.  I

8   won't dwell a lot -- we've briefed this, I think, to high

9   heavens, but the parties took different approaches in

10   figuring out what variable costs should come out of

11   incremental.  Dr. Ugone relied on a couple of sound bites

12   from depositions, and what we relied on was a regression

13   analysis of 11 years of data which showed that these

14   categories of costs were 89 percent variable, and that was

15   then double checked and confirmed against the

16   contemporaneous testimony of Mr. Samuelson who is the CFO

17   who estimated that, in his view, the costs were between 85

18   and 90 percent variable.  They came to the same answer.

19        THE COURT:  Doesn't that depend ultimately on the

20   length of time in which you assess whether a cost -- that

21   you use to assess whether a cost is variable or not?

22        MR. DUSSEAULT:  Well, our position, Your Honor,

23   is that one of the several reasons that net profit is the

24   better measure here, and one that's used repeatedly by

25   courts, and we have cited in defendant's proposed findings

1    of fact 603 and 604 to numerous cases that have used net

2    profit as the correct measure of disgorgement.

3            One reason that it's appropriate is that it

4    includes the costs that it really takes to sell the

5    products and run the business.  That's the true cost.  But

6    another is that when you are looking at a longer period of

7    time, more things are variable.

8            So one may say, you know, instantly a given cost

9    is fixed or it's not going to vary within a week, but is

10   it going to vary over the course of a year, or is it going

11   to vary when the decision that Lawson is actually making

12   is, we're facing the loss of $21.7 million of revenue over

13   the next year and a half, let's start cutting costs.

14           They wouldn't limit their cost-cutting, Your

15   Honor, to the costs that are instantly variable.  They

16   would be able to vary some that were longer as well.  So,

17   Your Honor, the net profit, we would submit, is the

18   appropriate measure, and the measure of net profit, if you

19   take it out to July 1 of 2013, is $5.5 million.

20           I will dwell on this very, very briefly, Your

21   Honor, because I do want to get to the enhancement points

22   during the time.  There's a point that we've made in our

23   brief that I think is very important which is that if Your

24   Honor decides to disgorge, the assumption by ePlus is that

25   you should disgorge 100 percent of the revenues from

1    configurations three and five.

2            We submit that that is wrong for two reasons, and

3    I think both reasons are very sound, although I think they

4    have been misunderstood or mischaracterized by ePlus.

5            One is that compliance with this Court's

6    injunction in light of the Federal Circuit's decision does

7    not require ePlus to sit on the sidelines and forfeit all

8    revenues from customers with configurations three and

9    five.  The most that it requires is to refrain from doing

10   business with them as to Punchout.

11           You would have to not sell Punchout, to somehow

12   find a way to deactivate that, and there's evidence in the

13   record that before a design-around was arrived at, Mr.

14   Hager and others were contemplating and planning to do

15   exactly that.

16           So the world in which ePlus complies with the

17   injunction if Your Honor finds that we haven't complied

18   through RQC is not one where they have to leave all

19   revenue on the table, walk away from a customer.  It is

20   one where they could continue to do business as to the

21   various other modules as long as they don't do business as

22   to Punchout and they take Punchout out of the equation.

23           The other measure that we offered is if you try

24   and look at the value that customers are paying, the

25   incremental value of getting to do claim 26, you can look

1    at what they pay for a configuration three, for example,

2    versus the cost of the modules that make up two.

3         Now, we are now saying that Punchout is the only

4    infringing piece here.  We're not saying that.  We

5    understand that it works collectively as a system, but

6    what we have said, and I think it's absolutely correct, is

7    that you can discern the extra value of getting to

8    practice claim 26 by looking at the extra amount that they

9    paid.

10        So if you look at the slide that's up here on the

11   screen, Your Honor, our net profit calculation, if you

12   were to take it out to July 1 of 2013, is $5.5 million.  I

13   would submit that is what we actually earned, and Your

14   Honor raised, and I want to be sure I address it, the

15   argument that we've somehow not met our burden of proof.

16        THE COURT:  Excuse me.  This 5.5 million on

17   number 1213 is based on only what it would take to

18   practice claim 26 and not the underlying configurations.

19        MR. DUSSEAULT:  No, Your Honor.  I want to

20   clarify that.  The $5.5 million figure is net profit on

21   all license, service, and maintenance revenue for

22   configurations three and five.

23        THE COURT:  Including everything that's in

24   configuration five.

25        MR. DUSSEAULT:  Yes, Your Honor, including all

1    the other modules.

2         THE COURT:  Then what about -- what is the figure

3    that you are proposing for just what you -- you are saying

4    if you leave out the bottom two components on the chart.

5    It's actually more than two, but it's LSF and process

6    flow.

7         MR. DUSSEAULT:  No, Your Honor.  If you leave

8    out -- the net profits on incremental values -- if you are

9    basically saying the incremental price that they pay is

10   the price they pay for Punchout and EDI, that's the extra

11   price versus a configuration two, that's 1.2 million

12   through November 30th of 2012 and 1.8 million through

13   July 1st of 2013.

14        If you were to say the only thing that they have

15   to do to comply with the injunction is forego dealings

16   with customers on Punchout, forego revenues from Punchout,

17   that's the next figure, 1 million or 1.4 million, and then

18   the final figure, Your Honor, because I do want this to be

19   very clear, the final figure is Dr. Putnam's adjusted

20   incremental profits on configurations three and five.

21   That's 8.4 million through July 1 of 2013, and that's all

22   license, maintenance, and service revenue for three and

23   five using the incremental number.

24        The one point I want to respond to before I go

25   to the --

```
 1              THE COURT:  "Using the incremental number"
 2    meaning paying only for Punchout with EDI.
 3              MR. DUSSEAULT:  No, Your Honor.  I don't think --
 4              THE COURT:  The line net profits on incremental
 5    value, 1.2 million and 1.8, is using Punchout and EDI
 6    only.
 7              MR. DUSSEAULT:  Can I try it this way?
 8              THE COURT:  Am I right or wrong?
 9              MR. DUSSEAULT:  I think that's wrong.  Can I try
10    it this way?
11              THE COURT:  Yes.
12              MR. DUSSEAULT:  The top entry, net profits on
13    configuration numbers three and five and incremental
14    profits on configuration number three and five are both
15    for all the modules in configuration three and five.
16              THE COURT:  Both the top two levels.
17              MR. DUSSEAULT:  The top line, net profits on
18    configuration numbers three and five and the bottom line,
19    incremental profits on configurations three and five,
20    those are on all modules in those configurations.  The
21    only difference between those two numbers is one uses an
22    incremental profit margin, and one uses the better, more
23    reliable net profit number.
24              And then the middle two lines, Your Honor, are --
25    the second line, net profit on incremental value is
```

1   essentially what the customers paid for Punchout and EDI,

2   and the third line is net profits on what the customers

3   pay for Punchout only.

4           THE COURT:  So the second line is Punchout and

5   EDI.

6           MR. DUSSEAULT:  Correct, and the third line is

7   Punchout only.

8           THE COURT:  Okay.

9           MR. DUSSEAULT:  The one final point before I move

10  to the add-ons, because Your Honor specifically raised

11  this --

12          THE COURT:  Excuse me.  For the record, you are

13  talking about on 1213.

14          MR. DUSSEAULT:  Yes, on slide 1213.  Your Honor

15  mentioned that ePlus has argued that we failed to meet our

16  burden to show, under a net profit measurement, what costs

17  should come out, and I do not believe that's correct, and

18  we put on --

19          THE COURT:  You don't believe they argued that?

20          MR. DUSSEAULT:  I'm sorry.  They do argue it.  I

21  don't believe it's a correct position, Your Honor, for the

22  following reasons:  Mr. Samuelson testified, I think, very

23  directly and very candidly.  He said, look, we, like most

24  companies in this business, do not specifically track, you

25  know, a cost to all 4,000 of our SKUs.  We don't do that.

1    Here is our overall companywide costs, and I have looked

2    at this, and these products are -- the words he used were

3    middle of the road, typical, mainstream products of the

4    company, and he explained in his testimony that some

5    products require more costs, especially the newer ones.

6    Other products that are at the end of their life require

7    less cost support.

8           His testimony was that these products are up the

9    middle, typical products of the company.  So his view was

10   that the most reasonable way to look at this is that these

11   products draw on the costs to the same extent as the other

12   typical products of the company, and that's a reasonable

13   way to look at it.

14          And the case law doesn't require, Your Honor,

15   that you get into this in some minute detail and

16   specifically track every cost directly to the product.  In

17   fact, I would submit you cannot do that with overhead.

18   Overhead, by definition, is not for a particular product,

19   but it is a very different question --

20          THE COURT:  It's often allocated by divisions or

21   by subsets within a company.

22          MR. DUSSEAULT:  It could be allocated, absolutely

23   right, but it is not specifically tracked saying, well,

24   this is the air-conditioning for this group.  It's not

25   tracked in that way, but what Mr. Samuelson said under

1    oath in this proceeding is that those costs benefit these

2    products to the same extent as they benefit any other

3    typical products within our company, and they are

4    variable.

5           THE COURT:  Right, but in assessing the

6    reliability of that statement applied to Lawson's

7    structure, there's no testimony that I'm aware of that

8    Lawson allocates it by division that would -- or by

9    service that -- or in any way that would permit one to

10   determine what is appropriate to a particular line of

11   products, and so what he's doing is saying now it's

12   appropriate to take the overhead that he's used for the

13   entire company even though you are only talking about a

14   small component of it, and they are saying, that isn't

15   enough to carry the burden of proof.

16          You can't -- I guess that ultimately you can't

17   carry it ever, according to their theory, simply because

18   you don't allocate it that way.

19          MR. DUSSEAULT:  Their position would be that

20   software companies, for example, can never get the benefit

21   of this, and if that just means they get overcompensated,

22   so be it.  I don't think that's what the cases require.

23   They don't say that only companies that specifically

24   allocate it can recover it.

25          We have presented evidence showing how those

1    costs actually benefit and support, and one confusion that

2    I think they've raised is there's a suggestion in their

3    brief that we're taking all the overhead costs and somehow

4    lumping them with configurations three and five.  That is

5    incorrect.

6            What we're doing is we are taking the overhead

7    costs in proportion so the percentage that you get when

8    you look at total companywide costs versus total

9    companywide revenues, and you apply it to what Mr.

10   Samuelson testified are mainstream, up-the-middle

11   products, and his testimony --

12           THE COURT:  Proportion to what?

13           MR. DUSSEAULT:  The cost that's being incurred in

14   proportion to the overall revenues of the company.  That's

15   how the calculation is made at the companywide level, and

16   what Mr. Samuelson says is, if you apply the same

17   percentage, the percentage that is spent on overhead costs

18   companywide is a reasonable percentage to apply to the

19   specific products, because they are mainstream,

20   up-the-middle products.

21           There's no question, Your Honor, no one would say

22   that audits don't relate to or benefit or enable us to

23   sell configuration two.  Nobody is taking a question that

24   that isn't the way the company looks at it.  ePlus just

25   wants to say, well, in this case, because it's

1  configurations three and five at issue, we want to carve

2  out something there and say they're not going to get those

3  costs.

4         THE COURT:  I think maybe you may be at the end

5  of your time here.

6         MR. DUSSEAULT:  I am, and I apologize.  I really

7  want to spend a little bit of time on the add-on

8  issues which I think are important.

9         THE COURT:  You mean the enhancements?

10        MR. DUSSEAULT:  Yeah, the enhancement issues.

11        THE COURT:  Well, I have to give him extra time.

12  We've been at this since, what, two o'clock?  Do we need a

13  break?

14        How much longer are you going to take so he can

15  plan his?  I also have a conference call I need to deal

16  with.

17        MR. DUSSEAULT:  No more than 15.  I'll try to

18  keep it to ten.

19

20        (Recess taken.)

21

22        MR. DUSSEAULT:  Thank you, Your Honor.  What I'd

23  like to do is, as we turn to the remedies beyond the

24  disgorgement and the issue over whether ePlus is entitled

25  to disgorgement, I want to pause and talk about this issue

1  of willfulness, and then I'm going to address treble

2  damages, attorneys' fees, and the coercive fine.

3       Mr. Strapp rightly puts great emphasis on

4  willfulness, because I think without proof of willfulness,

5  they don't recover, frankly, any of the remedies that

6  they're seeking.  And we pointed out the disgorgement is,

7  itself, a rare remedy.  There is a finding of willfulness

8  in virtually every patent case that has awarded

9  disgorgement.  It is an extreme and rarely given remedy,

10  and there is a finding of willfulness in virtually every

11  such case.

12       So I would submit that willfulness is not only

13  essential to treble damages, attorneys' fees, and coercive

14  fine, but even to disgorgement.  But the bottom line, Your

15  Honor, and I think Mr. Thomasch hit on this very

16  effectively earlier today and I don't want to revisit it,

17  is that there is simply no basis here whatsoever to

18  conclude that what Lawson did constitutes a willful

19  violation of this Court's order.  It's that simple.

20       What does the evidence show?  The evidence shows

21  that when Your Honor issued an injunction, Lawson went to

22  work trying to find a design-around.  Now, Your Honor has

23  raised in earlier argument about the Ugone motion the

24  issue of they're trying to deter parties from willfully

25  violating courts' orders.  There is no policy that would

1   favor a party being deterred from trying to work around an

2   existing patent so that they could continue to serve their

3   customers.  That is a legitimate activity, and it's an

4   entirely appropriate way to respond to Your Honor's

5   injunction, and that is what we did here, and we did it

6   with considerable effort.

7            THE COURT:  It's actually an encouraged activity.

8            MR. DUSSEAULT:  It is encouraged.  Absolutely.

9   And there is absolutely no basis to use a measure of

10  damage or a coercive fine or trebling that would be

11  intended to somehow discourage that.  That is exactly what

12  we should try to do.

13           So what did we do?  We went back to work and

14  looked for ways to design around the patent, and what we

15  did, what Lawson did, was Lawson changed features of the

16  product that had been focused on in the trial and that

17  seemed to be significant and important, and it took away

18  those capabilities.

19           There is simply nothing in the record, Your

20  Honor, nothing at all, to suggest that the people you

21  heard from, Mr. Christopherson, the other witnesses who

22  testified, were somehow part of some secret plan that we

23  all knew, yeah, we're just violating the Court's

24  injunction, let's pretend we've worked around it.

25           The evidence shows that they tried to and

1    believed they had designed around claim 26 by making the

2    two changes at issue here.  That's what the evidence

3    shows.

4              THE COURT:  They rely heavily on the statements

5    of people who are employees who basically say, well, this

6    isn't much of a change and it really is nothing

7    significant, but I'm not allowed to say that, and things

8    like that to point out that, in fact, what was going on is

9    that they knew good and well that this effort for -- or

10   what they called a design-around was a charade, in

11   essence; isn't that what the theory is in their briefs?

12             MR. DUSSEAULT:  That's the theory that I referred

13   to earlier as smoke and mirrors, Your Honor, and because

14   it's based in predominant part on documents that are

15   talking about features of RQC and the products other than

16   the change that's at issue.  It's smoke and mirrors.

17             They've gone through all of our documents,

18   they've gone through thousands of privileged documents,

19   Your Honor, and they find a couple documents, and without

20   discerning whether, is this customer one of the 146

21   customers who have these configurations, is this talking

22   about the claim 26 change versus some other change, they

23   just stick them up in front of you and say, doesn't this

24   look bad, doesn't this look bad, and, Your Honor, as Mr.

25   Thomasch said earlier today, and he's absolutely correct,

1    that is not clear and convincing evidence.

2            I don't dispute that's their theory.  That's the

3    horse they're riding, Your Honor, but that is not clear

4    and convincing evidence.

5            Let me give -- I don't think in the time allowed

6    I can go through all the examples that Mr. Strapp did, but

7    he uses as an example this -- the documents -- let me find

8    it here, Dale Christopherson, and he focuses on this and

9    says, well, Dale Christopherson received a communication

10   from a lawyer suggesting a change, and that wasn't done so

11   that's bad faith.

12           If you look at that document, it's just one

13   example, Your Honor.  It's one member of the trial team

14   floating what is proposed as an early concept idea, and

15   it's suggesting a change that would require us to dictate

16   to Punchout partners, third parties, what they do.

17           Mr. Christopherson responds that technically

18   that's not a feasible thing to do.  Is that bad faith?  Is

19   that clear and convincing evidence, Your Honor, of a

20   deliberate desire to violate this Court's injunction?

21   Absolutely not.  They've got all our privileged documents.

22           I don't believe that you can take anything that

23   any lawyer proposes and say, if you don't do every single

24   one of them, no matter how preliminary, no matter how

25   early, that that's somehow evidence of bad faith, and

1    where in those piles of privileged documents are the

2    documents saying, you know, obviously this doesn't get

3    around the patent, but let's just kind of dress it up.

4    There's no documents like that Your Honor.  None.

5         The evidence shows that we believe this, and we

6    go through these facts, and I would just defer to this:

7    In the proposed findings of fact, which is, obviously, a

8    very long document, we go through each of the misuses of

9    evidence and show why it's a misuse, but this is not a

10   case, Your Honor, of willfulness or bad faith conduct.

11        So with that in mind, let me take each of these

12   additional remedies that ePlus is asking you to add on to

13   the already unusual remedy of disgorgement.  The first is

14   trebling, treble disgorgement, and I think my point here

15   can be very simple.  I'm not aware of a case --

16        THE COURT:  Is there any case that holds you can

17   treble disgorgement as opposed to trebling damages?

18        MR. DUSSEAULT:  Certainly not in the patent

19   context, Your Honor, and I haven't seen one, frankly, in

20   any context, but it's particularly inappropriate in the

21   patent context, because it's not a remedy that's

22   available --

23        THE COURT:  So if disgorgement is intended to

24   deprive one of gain, and that's a compensatory approach,

25   then trebling the gain is creating a windfall for the

1    other side and smacks of being punitive is your argument.

2              MR. DUSSEAULT:  Absolutely.

3              THE COURT:  I understand that.

4              MR. DUSSEAULT:  And any sort of --

5              THE COURT:  Actually that's not right.  It's not

6    smacks of being punitive, it is punitive.

7              MR. DUSSEAULT:  It is punitive, Your Honor, and

8    the bottom line point is the one you went to first.  There

9    is not a single case cited by either party where a court

10   has, in a patent contempt proceeding, awarded disgorgement

11   and then multiplied it.  None.  None, Your Honor, that

12   have ever done that, and nobody cites to it.

13             And multipliers are under the law reserved for

14   flagrant contemptuous conduct, obnoxious conduct.  These

15   are the phrases that are used.  It is not intended where a

16   party tries to design around a patent, and if the Court

17   concludes that's what happened, falls short or doesn't

18   succeed in the design-around.

19             I would also add, before moving on from trebling,

20   is that many of the decisions say, well, I think there's

21   willfulness, there could be a basis here to multiply, but

22   I'm not going to, because I'm awarding a remedy that I

23   think is sufficient for compensation, and I would submit,

24   Your Honor, if you actually are going to disgorge profits,

25   in the absence of any proof of any effort to make these

 1   sales post injunction, that is more than enough

 2   compensation, and this is the last case, Your Honor, where

 3   an enhancement of trebling or doubling or even adding some

 4   fraction would be appropriate.

 5           Now, attorneys' fees, this is a fascinating one

 6   to me.

 7           THE COURT:  A predicate for attorneys' fees is

 8   also a finding of willfulness, I think, Mr. Strapp said.

 9   That's what makes it an exceptional case here.

10           MR. DUSSEAULT:  That's right, but here's what's

11   interesting, Your Honor.  As the authority for this, he

12   relies on the Patent Act and says, well, the standard that

13   we should apply isn't contempt proceeding law but the

14   Patent Act, but under the Patent Act, disgorgement isn't

15   even allowed.

16           They are mixing and matching remedies here, Your

17   Honor, where they say when it comes to the disgorgement

18   remedy, which is the only choice they're giving you, the

19   Patent Act doesn't control, it's general contempt law, but

20   for this standard they want to say this comes from the

21   Patent Act, and I would say you cannot draw from the fact

22   that the Patent Act -- the way it allows attorneys' fees

23   when there is a lesser measure like a reasonable royalty

24   that's given, that you can necessarily translate that

25   here.

1          There is, in fact, a Fourth Circuit standard that
2     has been established for when attorneys' fees are
3     available in a contempt proceeding, and if we can put up
4     the slide -- Your Honor, this is the *Omega World Travel*
5     case, and it's a fascinating case.  It's an appeal from a
6     very thoughtful decision by Judge Merhige where he walks
7     through the circumstances under which attorneys' fees can
8     be provided.
9          And that goes up on appeal, and this is what the
10    Fourth Circuit says:  In exercising that discretion, its
11    discretion to give or not give attorneys' fees, a court
12    may assess attorneys' fees as part of the fine to be
13    levied on the contemnor for willful disobedience of a
14    court order, and then if you go down to the next
15    highlighting, what the Fourth Circuit has held is a
16    contemnor's refusal to comply with the court order must
17    rise to the level of obstinacy, obduracy, or recalcitrance
18    to satisfy the willful disobedience standard.
19         I would submit, Your Honor, there's no proof of
20    willfulness, but there's certainly no proof of obstinacy,
21    obduracy, and recalcitrance.  Tellingly, ePlus doesn't
22    talk about this standard in their brief, it doesn't try
23    and satisfy the civil contempt standard.  It just jumps to
24    the Patent Act because it's convenient for it to do so in
25    this setting as opposed to the underlying award.

1          The next additional remedy that they ask you for,

2    Your Honor, is a coercive fine.  Now, Your Honor asked a

3    question about this, which, I think, is an absolutely

4    spot-on question which is basically, how would I do this,

5    how would I know when compliance has occurred.  And not

6    surprisingly, Your Honor, every case that we have been

7    able to find, and there are very, very few and far

8    between, every case we have found that gives a coercive

9    remedy does so where the injunction is an affirmative act,

10   a discrete affirmative act, and it's something like, you

11   know, you need to produce these documents by X date, or

12   you need to take this down from your website.

13         Now, obviously, a coercive fine going forward

14   that's based on something that's provable and that

15   discrete is one thing, but Your Honor hit on exactly the

16   issue.  This is a prohibitive injunction.  This is an

17   injunction that has to do with our dealings with 146

18   customers, and as you've noted, we often don't have

19   control or even full insight into what the customer is

20   doing and using.

21         You know full well, I think it's absolutely

22   something the Court needs to consider, that if you impose

23   this sort of a fine, a going-forward sanction, there will

24   be protracted battles over whether we have complied, and

25   that is why it is, in fact, not applied in such

1    circumstances where there is a prohibitive injunction that

2    is difficult to measure compliance.

3          It has not been used.  It's rarely used in any

4    event, Your Honor, but I think the parties are in absolute

5    agreement that a coercive going-forward fine is only

6    appropriate when it can be purged readily through

7    compliance, you can avoid it as the party found liable for

8    contempt.

9          THE COURT:  Is it your view that the law of the

10   regional circuit, as opposed to the Federal Circuit, is to

11   be used in determining whether there can be an award of

12   attorneys' fees on a motion for civil contempt?

13         MR. DUSSEAULT:  Your Honor, my --

14         THE COURT:  You cited the Fourth Circuit case.

15         MR. DUSSEAULT:  Yes, sir.  My understanding is

16   that in a civil contempt proceeding in this court with

17   issues that are not unique to patent law, that -- and from

18   reading the cases, this is what I have seen.  They

19   typically draw from the circuit in which the Court is

20   presiding because it's not unique to patent law.

21         And, Your Honor, in a way, we're going in an

22   interesting circle.  If this case is uniquely one of

23   patent law, then disgorgement should be off the table

24   because disgorgement is not available under patent laws.

25         But we have treated this case as one that's

1    proceeding as a civil contempt proceeding, and in civil

2    contempt proceedings, the law of this circuit would

3    control.

4            THE COURT:  But it's a civil contempt proceeding

5    for violating an injunction issued in a Patent Act.  I

6    don't think either one of you have really addressed that

7    issue in your papers.  You have cited Fourth Circuit

8    cases, but the issue about what law applies hasn't really

9    been squared up.

10           MR. DUSSEAULT:  I believe, Your Honor, just to

11   make sure one distinction --

12           THE COURT:  Your view is it's regional circuit

13   law.

14           MR. DUSSEAULT:  Yes, but to be clear, ePlus's

15   view is not just that it's Federal Circuit law, it's that

16   it's the actual Patent Act, it's the standard under the

17   Patent Act, and yet they are disregarding the Patent Act

18   with respect to the core remedy they are asking for.

19           THE COURT:  Yes, I understand that.

20           MR. DUSSEAULT:  The last point I'll make, Your

21   Honor, and I do appreciate the indulgence of time, is this

22   issue of RSS.  Setting aside infringement and remedy for

23   infringement as to RQC, what about if the Court finds that

24   there's some ongoing use of RSS, and I would make two

25   points.

1    The first is, ePlus has the burden of proof and
2    has not submitted any proof, Your Honor, any proof at all,
3    that any of the 146 customers is continuing to use RSS.
4    They have to prove that.  They have to prove that by clear
5    and convincing evidence.  They can't just surmise and say,
6    well, you didn't turn it off so maybe people are doing it.
7    They haven't proven that, and that's not a remedies issue.
8    That's actually really a liabilities issue.
9    I would submit to Your Honor, if you are at all
10   concerned that you don't know whether a given customer who
11   had a given communication is one of the 146 customers or
12   is not, that's something that the parties could easily
13   agree on.  There's no dispute over that.  We could submit
14   a list to you, but I can tell you, Your Honor, that there
15   is no evidence in the record of actual use of RSS by the
16   146 customers at issue, and secondly, even if you could
17   find liability based on RSS, Dr. Ugone admitted in his
18   testimony that he chose not to calculate a measure of
19   remedy for customers using RSS.
20   Now, clearly, you can't just assume that the same
21   measure that applies for RQC use applies for RSS.  There
22   would have to be some actual showing of which of the 146
23   customers used RSS and which of those revenues are
24   attributable to it, and there's no such evidence in the
25   record.

1          So, Your Honor, just to wrap up, we believe that

2     the appropriate remedy here is that they recover no remedy

3     because of their failure of proof.  If the Court is to

4     award damages, it should be disgorgement only of the net

5     profit measure, either the net profit of the Punchout/EDI

6     or Punchout alone measure that we've set forth, or if the

7     Court believes that disgorgement of all revenues as to

8     configuration three and five is appropriate, then it

9     should be the net profit measure of that, or in no

10    instance, Your Honor, worse than the incremental profit

11    margin, nothing higher than the incremental profit margin

12    that ePlus's own expert endorsed is correct.  Thank you.

13         THE COURT:  Mr. Strapp, you don't have in your

14    brief either what law applies to the determination here of

15    the -- determination of entitlement to attorneys' fees and

16    a determination of willfulness here, the regional circuit

17    law or the Federal Circuit law.

18         MR. STRAPP:  Both as to willfulness and as to

19    attorneys' fees, the governing standard is that of the

20    Federal Circuit, and we set that forth in our reply brief.

21    It's docket 1073.  As to attorneys' fees, it's docket

22    1073, page 13 and 14 of the brief.

23         We quote a case called *Pharmacia & Upjohn v.*

24    *Mylan Pharmaceuticals*.  It's 182 F.3d 1356 at 1359.

25         THE COURT:  What page?

1          MR. STRAPP:  Well, it's page 14 of the brief.  If

2     you look at the top header, it will say page 18 of 21.

3     It's docket 1073.

4          THE COURT:  I don't know that I have that

5     docket -- you all don't give me a docket number.  Is it

6     footnote -- what page is it?

7          MR. STRAPP:  If you carry over to the top of page

8     14, we have the site, second line.  That case said that

9     Federal Circuit precedent governs the substantive

10    interpretation of 38 U.S.C. Section 385 which is unique to

11    patent law.

12         THE COURT:  Well, is that where you are seeking

13    the attorneys' fees?  285 is the --

14         MR. STRAPP:  Patent statute.

15         THE COURT:  You are seeking a contempt citation.

16    You are not seeking attorneys' fees -- you are seeking

17    attorneys' fees under the patent law; is that right?

18         MR. STRAPP:  Just like we're seeking contempt

19    under the patent law.  We're applying the *TiVo* standards,

20    not the Fourth Circuit standards for contempt proceedings

21    here.  We're working with the Federal Circuit structure

22    and foundation for how a contempt proceeding works.

23         THE COURT:  You say, precedent governs the

24    substantive interpretation of 285 which is unique to

25    patent law.  285 is what statute?

1          MR. STRAPP:  That's the attorneys' fees statute.

2          THE COURT:  Right.  That's where you are seeking

3     your attorneys' fees under; right?

4          MR. STRAPP:  That's right.

5          THE COURT:  Exceptional cases statute.

6          MR. STRAPP:  That's right.

7          THE COURT:  What case holds that in deciding this

8     case I look at -- in willfulness and attorneys' fees for

9     civil contempt, I use the law of the Federal Circuit

10    instead of the law of the regional circuit?  They are

11    proposing the law of the regional circuit in their brief.

12    It's just a couple, three sentences.

13         MR. STRAPP:  Your Honor, I think there was some

14    confusion, because there was, I think, an equation whether

15    intentional or not between willfulness and willful

16    violations.  Those are two separate concepts.

17         The concept of willfulness is a term of art in

18    the patent law.  Willfulness is a term of art that's used

19    specifically with respect to patent infringement.  That's

20    governed by *In re: Seagate*, and that's both --

21         THE COURT:  That's willful infringement.

22         MR. STRAPP:  Correct.

23         THE COURT:  I have to find out whether the

24    infringement that is the second component of the *TiVo*

25    analysis has been established, and to do that I look at

1  the test under the Federal Circuit law.

2            MR. STRAPP:  That's correct.

3            THE COURT:  And not the Fourth Circuit case he

4  cited on --

5            MR. STRAPP:  Right.  Our point is that *TiVo* has a

6  two-part test on colorability and infringement.  You can

7  resolve both of those questions, and then the question is,

8  as to the infringement, was that willful infringement or

9  not willful infringement, and our point is that's governed

10  by *In re: Seagate*.

11            THE COURT:  Because you are dealing with whether

12  an infringement is willful.

13            MR. STRAPP:  Right.

14            THE COURT:  Why aren't you dealing whether a

15  contempt is willful?  Then, in that case, the Fourth

16  Circuit law applies as in --

17            MR. STRAPP:  Your Honor, I would suggest it's a

18  multistep process.  First you have colorability and

19  infringement under *TiVo*.  Then you have willful

20  infringement under *Seagate*.  That's the 2007 case.  Then

21  you've got two additional questions.  One is, do you or do

22  you not enhance damages, and you can enhance damages not

23  at all --

24            THE COURT:  Whose law do I apply to determine

25  that?

1          MR. STRAPP:  That, we also submit, is Federal

2     Circuit that governs.  And the case there is *Read v.*

3     *Portec*.

4          THE COURT:  What is the authority for trebling

5     it?

6          MR. STRAPP:  The authority for trebling it is 35

7     U.S.C. 284.

8          THE COURT:  That's the three times in the

9     event --

10         MR. STRAPP:  It just says that the Court, in its

11    discretion, may enhance damages up to three times, and

12    then the substantive law that's developed interpreting

13    284, the most prominent case is the 1992 case, *Read v.*

14    *Portec*, and there's subsequent case law that looks to the

15    factors set forth in *Read* to determine whether or not the

16    infringement was such that damages should be enhanced.

17         And then finally, the question of attorneys'

18    fees, we submit, is governed by 35 U.S.C. 285.  Now, there

19    was a suggestion and a colloquy about in a disgorgement

20    setting, can there ever be enhanced damages, can there

21    ever be attorneys' fees.  The three cases that I

22    mentioned --

23         THE COURT:  You are asking for disgorgement.

24         MR. STRAPP:  Correct.

25         THE COURT:  You are asking to turn over the gain.

1           MR. STRAPP:  Right.

2           THE COURT:  But if you triple the amount of the

3    gain, aren't you being punitive instead of depriving the

4    gain, depriving them of the gain?

5           MR. STRAPP:  The compensatory remedy of

6    disgorgement, you are right, would be the gain.  Now,

7    enhanced damages --

8           THE COURT:  If you go three times the gain, then

9    you are no longer -- what you are doing is imposing a

10   punishment, not a compensatory remedy, as I understand the

11   argument being made by Lawson, and, frankly, there's a

12   fair amount of logical force to that.  Whether there's

13   case law or not, I'm not sure.

14          MR. STRAPP:  What the cases say is that the

15   compensatory remedy, per se, has to be compensatory.  It

16   has to disgorge gains.  It shouldn't be punitive.  I agree

17   on that point of law.  But the question is whether or not

18   that is sufficient remedy in this case, and Your Honor has

19   the authority to add on an additional remedy that wouldn't

20   be strictly compensatory in the sense that enhancing the

21   damages --

22          THE COURT:  Wait just a minute.  Let me ask you

23   this:  Do you know of any case in which the Court has, in

24   a contempt situation, found disgorgement to be proper and

25   then multiplied the quantum of the disgorgement as the

1   amount of appropriate compensatory damages?

2            MR. STRAPP:  No.  The cases that --

3            THE COURT:  This would be a landmark case then to

4   do that; right?

5            MR. STRAPP:  I'm aware of three cases in the last

6   decade where there was disgorgement of gross profits

7   awarded in a patent contempt proceeding, and what's

8   interesting is that although enhanced damages -- there was

9   no multiplier in any of those three cases.  All three of

10  those cases, attorneys' fees and costs were awarded.

11  That's the *Brine* case --

12           THE COURT:  That's different.  Attorneys' fees

13  and costs are different.

14           MR. STRAPP:  That's true, and I agree that they

15  are two different standards.

16           THE COURT:  I'm asking you now about the

17  enhancement.

18           MR. STRAPP:  Right, and I'm answering candidly,

19  I'm not aware of a case where there was --

20           THE COURT:  We're turning mother's picture to the

21  wall on that and going somewhere else.

22           MR. STRAPP:  I'm not saying that either, because,

23  Your Honor --

24           THE COURT:  I'm saying it.

25           MR. STRAPP:  All right.

```
 1            THE COURT:  We'll quit discussing that now if you
 2    don't know the case.  If you want to argue by analogy,
 3    then you can say, but by analogy, et cetera, and argue,
 4    but that's all I'm saying.
 5            MR. STRAPP:  Understood.  The only analogous
 6    point I would make, Your Honor, is that what courts have
 7    looked to in underlying patent infringement cases, not
 8    patent contempt where enhanced damages was found and
 9    upheld by the Federal Circuit, the predicate threshold for
10    getting there is whether there's willful infringement.
11            So we agree there's got to be a finding of
12    willfulness.  There has to be this finding under Seagate
13    before you get to the question of enhanced damages, but if
14    you make that finding of willful infringement, we would
15    submit and strongly urge Your Honor to look at the Read v.
16    Portec factors and determine whether, in the totality of
17    the circumstances here and in your discretion, enhanced
18    damages are appropriate.  That's all we would submit.
19            THE COURT:  But Read wasn't a contempt case.
20            MR. STRAPP:  It was not.  It was not.  Your
21    Honor, Mr. Dusseault made the point in his argument --
22            THE COURT:  And you agree that in order to get
23    attorneys' fees, you have to qualify under the exceptional
24    case principle, and that here, you qualify by virtue of a
25    finding of willfulness or not at all?
```

1          MR. STRAPP:  We qualify by a finding of

2    willfulness.

3          THE COURT:  Willful infringement or not at all;

4    is that right?

5          MR. STRAPP:  That's right.  And I would submit

6    that there's additional factors Your Honor can take into

7    account in determining whether this was exceptional or not

8    beyond just willfulness, and some of those we've already

9    discussed.

10         Now, Mr. Dusseault said, in trying to explain Mr.

11   Hager's --

12         THE COURT:  Excuse me.  I think you just backed

13   away from what you just told me.  As I understand it, the

14   finding of exceptional case under the facts of this case

15   can occur only if there's a finding of willfulness; is

16   that right?

17         MR. STRAPP:  That's right.

18         THE COURT:  What other factors would I take into

19   account other than willfulness?

20         MR. STRAPP:  Litigation misconduct courts have

21   looked to in determining whether or not to award

22   attorneys' fees.

23         THE COURT:  But there's no litigation misconduct

24   pointed to here.

25         MR. STRAPP:  Well, we point to the --

1          THE COURT:  I know about litigation misconduct.

2          MR. STRAPP:  Your Honor, we point to the

3     misleading testimony at the injunction hearing.

4          THE COURT:  So that's what you're saying.

5          MR. STRAPP:  In combination with the --

6          THE COURT:  Hager's testimony.

7          MR. STRAPP:  The willful infringement alone is

8     sufficient.  Your Honor can look to other circumstances

9     such as Mr. Hager's testimony if Your Honor decides that's

10    appropriate.

11         THE COURT:  On Hager's testimony, Mr. Dusseault

12    pointed to a number of places and the brief points to a

13    number of places where in the briefing subsequent to the

14    hearing the topic of the design-around is mentioned.

15         Your point is simply to say that while a

16    design-around was mentioned, that they didn't disclose

17    what the actual facts were in order to clear up the

18    misapprehension left by Mr. Hager's testimony.

19         MR. STRAPP:  That's correct.  And if they had,

20    there wouldn't have been a sunset provision in the

21    injunction.  One of the explanations that they offer is

22    they say nobody was asked -- nobody asked Mr. Hager

23    questions about a redesign at the actual injunction

24    hearing, and I just want to make two quick points about

25    that.

1        First of all, at the injunction hearing, neither

2    Your Honor nor ePlus at that point yet was aware of a

3    redesign, so there were no questions to ask.  It wasn't

4    known.

5        The second point is, Mr. McDonald did actually

6    ask a question of Mr. Hager as follows:  This is at pages

7    211 and 212 of the injunction hearing transcript, docket

8    727.  You said, quote, if Lawson were enjoined from

9    servicing its existing RSS and Punchout customers, how

10   would that work?

11       So that was an opportunity for Mr. Hager to say,

12   well, if there is an injunction that prohibits servicing

13   existing customers, we'll either roll out a design-around

14   or our customers are going to be in trouble, but he didn't

15   mention the design around option.

16       THE COURT:  Who asked that question?

17       MR. STRAPP:  Mr. McDonald, who was, Lawson says

18   in its proposed findings of fact, actually involved in the

19   design-around, and that's defendant's proposed findings of

20   fact paragraph 38.  They say that Mr. McDonald was one of

21   the lawyers who oversaw the design-around.  So he knew

22   about it when he got up and asked that question.

23       Another point Mr. Dusseault made was there's no

24   evidence at all that ePlus suffered any harm, but I would

25   direct Your Honor's attention both to the first page of

1   ePlus's post-hearing reply brief on remedies and the

2   portion of that brief at page one where we quote from Your

3   Honor's order memorandum opinion concerning the

4   injunction, and that's docket 728 at 13 where Your Honor

5   found that ePlus had suffered harm in the form of lost

6   sales, lost market share, lost opportunities to cross-sell

7   and up-sell, and had to divert its resources away from

8   research and development.  So that is evidence of harm

9   that's in the record.

10          Mr. Dusseault pointed on one of his slides to

11   deposition testimony that Mr. Farber gave in these

12   contempt proceedings, and specifically on slide 1208, Mr.

13   Farber was asked, did ePlus form a strategy to take

14   advantage of the injunction from a business perspective

15   after the injunction was entered, and Mr. Farber answered

16   no.

17          Now, I think that answer actually makes a lot of

18   sense because Lawson had made a free download available to

19   its customers and had also told its customers they could

20   continue using RSS.  How was ePlus supposed to take

21   business away from customers who could continue using the

22   software they had been using?

23          THE COURT:  Is there any evidence ePlus knew

24   about that, that they knew about it at the time when they

25   were making the decision not to go after the business?

1    Excuse me.  I don't mean to be yelling at you,

2    but in an attempt to get this frog out of my throat, I

3    think I'm being loud.  Is there any evidence that ePlus

4    knew about what Lawson was doing?  No?

5    MR. STRAPP:  The only evidence that ePlus knew at

6    the time was that -- the question was as to May 23rd,

7    2011, and afterwards.  What ePlus knew at that time was a

8    free 20-minute download had been available on the

9    MyLawson.com website.

10   THE COURT:  The answer to that question is no.

11   MR. STRAPP:  The answer to that question is ePlus

12   didn't know a lot of facts, but it knew one fact which was

13   a design-around was made free to the customers.

14   THE COURT:  But your point was, under the

15   circumstances that Lawson then actually had engaged in,

16   there would be no point for ePlus to go after the

17   business, and that was -- and the circumstances in which

18   ePlus had engaged were, one, making the download

19   available; two, telling them they could run it in parallel

20   with RSS.

21   MR. STRAPP:  As to point two, ePlus did not know

22   at the time about point two, only point one.

23   THE COURT:  Which brief are you talking about?

24   As to the remedies brief and mention of harm?

25   MR. STRAPP:  Yes.  That's ePlus's post-hearing

 1   reply brief on remedies, very first page of the brief.

 2              THE COURT:  Opening brief?

 3              MR. STRAPP:  The reply brief.  It's the one that

 4   was filed on April 23rd.

 5              THE COURT:  I just want to know what you are

 6   citing to.  I didn't see it in the opening brief.

 7              MR. STRAPP:  Reply brief, it's the end -- the

 8   last five lines of the first paragraph of the page

 9   starting "and that ePlus in fact suffered."

10              THE COURT:  Yes.

11              MR. STRAPP:  Okay.  Your Honor, Mr. Dusseault

12   made the point that under Fourth Circuit law, ePlus needed

13   to show but did not show that it was actually harmed in

14   order to have the disgorgement remedy available to it.

15              THE COURT:  But you are saying that the Fourth

16   Circuit law doesn't apply.  It either does or doesn't.

17   I'm not going to be switching back and forth between --

18              MR. STRAPP:  Let's assume that -- I just want to

19   -- I don't want --

20              THE COURT:  Is your point first that it doesn't

21   apply, that the Fourth Circuit law doesn't apply to the

22   remedy?

23              MR. STRAPP:  My only point on this point is that

24   Your Honor already made a finding on this in the motion

25   denying the request to strike Dr. Ugone's testimony.

1    That's at docket 1032.

2            THE COURT:  I can always revisit, but I'll hear

3    you on that, but I'm asking another question, and that is,

4    are you taking the position -- and that's the *Ashcraft*

5    case he's citing; is that right?

6            MR. STRAPP:  That's what he's citing.

7            THE COURT:  Is it your view that the Fourth

8    Circuit law doesn't apply here and I shouldn't be

9    considering that law?  Yes or no?  You said twice it

10   doesn't.  I assume --

11           MR. STRAPP:  Your Honor, as to disgorgement, I

12   don't have an answer to that question except to point you

13   to the Supreme Court precedent which controls here, and

14   that's the *Leman v. Krentler* case from the 1930s that Your

15   Honor still said --

16           THE COURT:  That's not a Fourth Circuit case.  I

17   mean that's not a Federal Circuit case.

18           MR. STRAPP:  It's a Supreme Court case.  It would

19   be binding on the Federal Circuit as well.

20           THE COURT:  Now, your other point was?

21           MR. STRAPP:  My other point was, if Your

22   Honor could turn to -- well, I don't have this in front of

23   everyone here, but at docket 1032, that is Your Honor's

24   order on the Ugone motion.

25           At page 11, Your Honor cited four cases, *Colonial*

1   *Williamsburg*, which is 792 F.Supp. 1397, that's an EDVA

2   case from 1992; *Buffalo Wings Factory*, 574 F.Supp. 2d 574.

3   That's EDVA, 2008.  *Omega World Travel*, that's Fourth

4   Circuit, May 10th, 1990.  Just three cases, I'm sorry, in

5   which Your Honor found those cases had all awarded

6   disgorgement of profits in civil contempt cases even where

7   the plaintiff did not quantify the harm.

8           So even under the Fourth Circuit standard that

9   Mr. Dusseault cites, Your Honor has already found that

10  Fourth Circuit cases hold otherwise.

11          THE COURT:  What if I was wrong about that?

12  Shouldn't I correct it, or do I just go on marching along

13  with the wrong rule?

14          MR. STRAPP:  I think it's important to get the

15  law right, and I would submit you got the law right the

16  first time around.

17          THE COURT:  All right.

18          MR. STRAPP:  I want to turn to the notion that

19  the appropriate award here would be net profits just on

20  the Punchout or just on the Punchout and EDI modules, and,

21  frankly, to me, that's sort of beyond the pale because --

22          THE COURT:  1213, slide 1213 is what he was

23  talking about?

24          MR. STRAPP:  Yes.  Because I think the one thing

25  that everyone agrees on here is we've seen maybe too much

1    of those building block charts.  You don't want to go to

2    sleep and have nightmares over them in your head, but

3    you'll remember that there's lots of colors floating

4    around, and all of those colors and all of those modules

5    together make up configurations three and five, and

6    disgorging Lawson's gains from configurations three and

7    five means you look to all the modules, not just to the

8    ones floating around at the top.  That's the only point I

9    want to make there.

10           Finally, with respect to the idea that this

11   proposal that Mr. Christopherson rejected from his

12   attorney about an additional modification that needed to

13   be made, Mr. Dusseault characterized that as an early

14   stage proposal or early on in the development.

15           Actually, that proposal was made by Lawson's

16   outside counsel in a document that's been admitted,

17   PX-1256.  The date of that document is May 26th.  That's

18   eight days after RQC had already been made generally

19   available to the public.

20           THE COURT:  Didn't he also make the point that it

21   was something that was utterly impracticable to achieve?

22           MR. STRAPP:  That's why they rejected the change.

23   You are right, Your Honor.  But that was a change that the

24   attorney had proposed.  Thank you.

25           THE COURT:  That takes care of it?

```
 1              MR. STRAPP:  Yes.

 2              THE COURT:  The matter is submitted.  Are you

 3    all, as you usually do, getting transcripts of this

 4    argument?

 5              MR. STRAPP:  Yes, sir.

 6              THE COURT:  Is there anything else that needs to

 7    be done?

 8              MR. DUSSEAULT:  No, Your Honor.

 9              MR. STRAPP:  No, Your Honor.

10              THE COURT:  Thank you all very much.

11

12                   (End of proceedings.)

13

14

15              I certify that the foregoing is a correct

16    transcript from the record of proceedings in the

17    above-entitled matter.

18

19

20    _____/s/_____                  _____

21    P. E. Peterson, RPR                  Date

22

23

24

25
```