IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

F I L E
AUG 16 2013
CLERK, U.S. DISTRICT COURT
RICHMOND. VA

ePLUS INC.,

     Plaintiff,

v.                         Civil Action No. 3:09cv620

LAWSON SOFTWARE, INC.,

     Defendant.

## MEMORANDUM OPINION

This matter is before the Court on plaintiff ePlus, Inc.'s ("ePlus") MOTION TO SHOW CAUSE WHY LAWSON SOFTWARE, INC. SHOULD NOT BE HELD IN CONTEMPT (Docket No. 798). For the reasons set forth below, the Court concludes, by clear and convincing evidence, that Lawson Software, Inc. ("Lawson") is in contempt of the May 23, 2011 Permanent Injunction (Docket No. 729). Accordingly, ePlus' motion will be granted.

## PROCEDURAL BACKGROUND

On May 19, 2009, ePlus filed this action against Lawson for infringement of three patents: U.S. Patent Nos. 6,023,683 (the "'683 Patent"), 6,055,516 (the "'516 Patent"), and 6,585,173 (the "'172 Patent"). Following a three week trial, a jury determined that the '683 Patent and '172 Patent were infringed, and it found that the '562 Patent was not infringed, by Lawson's products. The jury further found that all asserted claims of the

patents-in-suit were valid. On May 23, 2011, the Court issued a permanent injunction enjoining Lawson, its officers, agents, and employees and "any person in active concert or participation with them" "from directly or indirectly making, using, offering to sell, or selling within the United States or importing into the United States" certain product configurations (so-called Configurations Two, Three, and Five) and services. (Docket No. 729). Lawson appealed to the United States Court of Appeals for the Federal Circuit and ePlus cross-appealed.

On September 9, 2011, while the appeals were pending, ePlus filed its motion for order to show cause, alleging that Lawson was in contempt of the injunction. The focus of ePlus' contempt motion concerned a module of the adjudged infringing system configurations called Requisition Self-Service ("RSS"). After the trial, Lawson redesigned RSS and created Requisition Center ("RQC") in its stead. ePlus alleged that the new RQC product was not more than colorably different from RSS and that it infringed ePlus' patents. On November 23, 2011, the Court entered a Scheduling Order (Docket No. 849) setting the contempt proceedings to commence on February 27, 2012.

By Memorandum Opinion and Order dated February 21, 2012 (Docket No. 917), following extensive briefing, the Court found that Lawson had waived attorney-client privilege for a number of documents relating to the redesign process and ordered their

2

production. On February 24, 2012, the Court entered an Order (Docket No. 930) staying the contempt proceedings to permit Lawson to seek a Writ of Mandamus in the Federal Circuit to review the Order of February 21. On August 16, 2012, the Federal Circuit denied the petition for a Writ of Mandamus (Docket No. 957). The Federal Circuit's Order was followed by ePlus' Motion to Enforce the Order of February 21 (Docket No. 958) which was, in turn, granted in part and denied in part by an Order dated December 14, 2012 (Docket No. 988).

Meanwhile, on November 21, 2012, the Federal Circuit had issued its decision reversing-in-part, vacating-in-part, affirming-in-part and remanding the action. In its decision, the Federal Circuit found that claim 1 of the '172 patent and claim 3 of the '683 patent were invalid for indefiniteness. ePlus, Inc. v. Lawson Software, Inc., 700 F.3d 509, 519-20 (Fed. Cir. 2012). The Court of Appeals also held that claims 28 and 29 of the '683 patent were not "supported by substantial evidence" and vacated the judgment of infringement as to those claims. Id. at 521-22. The Court of Appeals, however, affirmed the finding of infringement as to claim 26 of the '683 patent and affirmed the breadth of the injunction. Id. at 520, 522.[1] ePlus filed a

_____

[1] By Order dated June 11, 2013 (Docket No. 1083) and for the reasons set forth in the accompanying Memorandum Opinion of that date (Docket No. 1082), the Court modified the original injunction by eliminating from its scope the product

petition for rehearing and rehearing en banc. On January 29, 2013, the Federal Circuit denied that petition. The mandate of Federal Circuit was received and entered on February 11, 2013 (Docket No. 1006). The contempt proceedings thereafter resumed in this Court.

A hearing was held on the contempt motion on April 2, 2013 through April 9, 2013. Closing arguments were held on April 26, 2013. Pursuant to an Order entered January 24, 2013 (Docket No. 1002), ePlus filed post-hearing briefs on colorability (Docket No. 1057), infringement (Docket No. 1058) and remedies (Docket No. 1059). Lawson filed responses (Docket Nos. 1070, 1072, & 1072). ePlus filed replies (Docket Nos. 1073, 1074, & 1075). The parties also filed proposed findings of fact and conclusions of law (Docket Nos. 1060 & 1069). The issues were thereafter argued.

## FINDINGS OF FACT

### The Redesign Process

Following the jury verdict in this action, Lawson began efforts to design around ePlus' patent. Lawson had its first meeting to that end on the day after the jury verdict and placed Dale Christopherson in charge of redevelopment. Christopherson's

---

configuration known as "Configuration 2" in perspective of the Federal Circuit decision. The Court left the injunction in effect in all other respects.

redesign team consisted of a variety of Lawson individuals including technical people and representatives of the legal department. Principally, Christopherson's team included Bruce McPheeters, Lawson's General Counsel; members of the law firm that represented Lawson during the underlying infringement action; Todd Dooner, who was responsible for actually writing the computer code; and Keith Lohkamp, who was to represent the "business side" of Lawson during the design effort. The team also included Keith Knuth, a product architect; Stephanie Lim, who was in charge of quality assurance testing; Dwight DeLancey, a software engineer; Darci Snyder, who was responsible for product management; and Donna Hircate, whose role in the redesign process is unclear. In addition, Lawson hired an independent attorney to assist with the redesign process.

The redesign team began work on February 8, 2011. It began unit testing of the redesigned product on March 1, 2011 and held a "start-up meeting" on March 30, 2011. The new product was released to customers on May 18, 2011. Patch 1 to the new product was made available to customers on June 9, 2011.

Lawson's initial plan was to present the redesigned product to the Court for approval before its public release; specifically, Lawson intended to present the product to the Court at the hearing scheduled on whether to enter a permanent injunction. Lawson decided not to follow that course.

The redesign team proposed several alternative "redesigns" that the Lawson attorneys rejected as being insufficient. Patch 1 was implemented at the behest of Lawson's attorneys who were concerned that the redesign effort had not gone far enough. However, additional redesign proposals were rejected because they would unacceptably limit the functionality of Lawson's software. For example, Lawson considered, and rejected, changes that would remove the search capabilities of the systems, the requisition building capabilities, and the purchase order creation capability completely. Most notably, the redesign team and the attorneys disagreed over whether the inventory checking capability of the product would, or must, be removed from the new product. The views of counsel on the subject were rejected by Christopherson, and the change was not made.

## The Redesigned Product: RQC

RSS was the only component of the Infringing Configurations of Claim 26 of the '683 patent that was modified.[2] One of the primary goals of the redesign process was to minimize the impact on Lawson's current customers. For the present purposes, Lawson relies on two changes made to RSS which it claims renders RQC "more than colorably different" than RSS. First, Lawson made

---

[2] Other changes were made to address other aspects of the adjudged Infringing Configurations. They are not at issue here because of the Federal Circuit's decision setting aide part of the verdict.

changes to RSS intended to prevent a customer from simultaneously using Item Master and Punchout in the same session. Essentially, RQC requires that a user using Item Master and Punchout place the products ordered from each on a different requisition form than the other. On May 18, 2011, Lawson released RQC with this modification.

The second change took place following the release of RQC when Lawson developed and released so-called "Patch 1." Lawson approved the development of Patch 1 on June 3, 2011 and released it on June 9, 2011. Patch 1 expanded the Item Master/Punchout "limitation" to sessions involving multiple Punchout vendors, so that once a user accesses a Punchout vendor's website, RQC prevents the user from accessing another Punchout vendor's website without closing the first window. As a result of RQC and Patch 1, while a user can place multiple items from Item Master on one requisition or multiple items from a single Punchout vendor on one requisition, the user can no longer combine items from Item Master with items from Punchout vendors on the same requisition nor can he combine items from multiple Punchout vendors onto a single requisition. Further, as a general principle, there is no way for Lawson's users to disable these changes in the RQC module.[3]

_____

[3] As discussed _infra_, while it is not possible to circumvent the feature when running RQC, Lawson designed RQC so that a user can

The foregoing findings of fact provide a basic factual context for discussion of the procedural and substantive legal issues relevant to the contempt hearing. Further findings of fact are made as appropriate in the ensuing legal discussion and conclusions.

## DISCUSSION

### The TiVo Test

Contempt is a "severe remedy and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct." Cal. Artificial Stone Paving Co. v. Molitor, 113 U.S. 609, 618 (1885). The analysis for whether a party should be held in contempt for violating an injunction issued in a patent infringement case as the result of its redesigned product is governed by the decision of the United States Court of Appeals for the Federal Circuit in TiVo Inc. v. EchoStar Corp., 646 F.3d 869 (Fed. Cir. 2011). TiVo instructs that a contempt proceeding is appropriate upon a "detailed accusation from the injured party setting forth the alleged facts constituting the contempt." Id. at 881.

The contempt analysis is two-fold: "the party seeking to enforce the injunction must prove both that the newly accused product is not more than colorably different from the product

----

change the settings to allow the Lawson user to continue to run RSS, even after installing RQC.

found to infringe and that the newly accused product actually infringes." Id. at 882. Throughout the analysis, the Court must be mindful that "legitimate design-around efforts should always be encouraged as a path to spur further innovation." Id. at 883 (citing State Indus. Inc. v. A.O. Smith Corp., 751 F.2d 1226, 1236 (Fed. Cir. 1985)). Nonetheless, "a defendant's diligence and good faith efforts are not a defense to contempt." TiVo, 646 F.3d at 880.

The Federal Circuit has emphasized that the "not more than colorably different" test should not be guided by the question of whether the new product actually infringes the patent. See TiVo, 646 F.3d at 882 ("Today, we reject that infringement-based understanding of the colorably different test."). Rather, the focus must be on "the differences between the features relied upon to establish infringement and the modified features of the newly accused products." Id. Further,

> The analysis must focus not on differences
> between randomly chosen features of the
> product found to infringe in the earlier
> infringement trial and the newly accused
> product, but on those aspects of the accused
> product that were previously alleged to be,
> and were a basis for, the prior finding of
> infringement, and the modified features of
> the newly accused product. Specifically, one
> should focus on those elements of the
> adjudged infringing products that the
> patentee previously contended, and proved,
> satisfy specific limitations of the asserted
> claims. Where one or more of those elements
> previously found to infringe has been

9

> modified, or removed, the court must make an
> inquiry into whether that modification is
> significant.

Id. At the most basic level, a product is not more than
colorably different from another product if it "performs
substantially the same function in substantially the same way
with substantially the same result." Arlington Indus., Inc. v.
Bridgeport Fittings, Inc., Civ. A. No. 3:02-cv-134, 2013 WL
1149230, at *3 (M.D. Penn. March 19, 2013) (citing Graver Tank &
Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608 (1950)).[4]

---

[4] The "colorability" analysis derives from the so-called doctrine
of equivalents. See KSM Fastening Systems, Inc. v. H.A. Jones
Co., Inc., 776 F.2d 1522, 1527 (Fed. Cir. 1985) ("This doctrine
was adapted from the familiar doctrine of equivalents . . .").
The Supreme Court of the United States has explained that an
infringing product is equivalent when it is "a copy of the thing
described in the specification of the patentee, either without
variation, or with such variations as are consistent with its
being in substance the same thing." Burr v. Duryee, 68 U.S. 531,
573 (1863). The Court has explained, "one thing is substantially
the same as another, if it performs substantially the same
function in substantially the same way to obtain the same
result" Union Paper-Bag Mach. Co. v. Murphy, 97 U.S. 120, 125
(1877). "[M]ere colorable departures from the patented device do
not avoid infringement." Sanitary Refrigerator Co. v. Winters,
280 U.S. 30, 42 (1929) (emphasis added). "A close copy which
seeks to use the substance of the invention, and, although
showing some change in form and position, uses substantially the
same devices, performing precisely the same offices with no
change in principle, constitutes an infringement." Id. (citing
Ives v. Hamilton, 92 U.S. 426, 430 (1875)).
While the doctrine of equivalents was designed to address
infringement by a "process that does not literally infringe upon
the express terms of a patent claim," Warner-Jenkinson Co. v.
Hilton Davis Chemical Co., 520 U.S. 17, 21 (1997), it appears to
be the origin of the "colorable differences" concept. See Graver
Tank, 339 U.S. at 612 ("Though infringement was not literal, the
(continued)

The precise meaning of the Federal Circuit's instruction that the Court frame the "more than colorably different" analysis in perspective of "those elements . . . that the patentee previously contended, and proved," id. at 882, has been a source of considerable debate in this action. Lawson has doggedly maintained that the Court must first examine the trial record in the underlying infringement action and determine which arguments the jury accepted in finding that Lawson's product infringed. See generally (Def. Br. on More than Colorable Differences (Docket No. 1070) at 3-4). The parties agree that "only product features relied upon to prove infringement at trial, and subsequently modified by the infringer, are relevant." (Pl. Br. on TiVo (Docket No. 833) at 4); (Def. Br. on TiVo (Docket No. 837) at 5).

---

changes which avoid literal infringement are colorable only."). It is sensible to apply, as the Federal Circuit directs, a similar "colorable differences" test to the redesigned product. Not to determine whether or not the new product is "equivalent" to the patented product (for such a determination would tread upon the alleged contemnor's right to try that issue), but rather to determine whether the redesigned product "performs substantially the same function in substantially the same way to obtain the same result" as the product previously found to infringe. TiVo instructs that the test is "whether the newly accused product is . . . different from the product previously found to infringe." TiVo, 646 F.3d at 882. TiVo did not reject KSM's definition of colorability, rather it rejected the perceived tendency of district courts to "focus solely on infringement by the newly accused devices in deciding contempt." Id.

TiVo plainly instructs that the Court must compare the elements of the infringing products with the elements of the newly designed product. "If those differences between the old and new elements are significant, the newly accused product as a whole shall be deemed more than colorably different . . . ." TiVo, 646 F.3d at 882. The question, then, is where the Court should look to determine which "elements" were found to infringe and to what extent, if any, the Court is permitted to inquire into the bases underlying the jury's determination that the original product infringed.

Lawson is undoubtedly correct that that ePlus is confined, in a contempt proceeding, to the theories of infringement that were advanced in the underlying infringement action and, similarly, is bound by the results in that action. As Lawson correctly argues, "where a plaintiff's infringement argument against a newly-accused product differs from that previously presented to the jury, [a] defendant is entitled to have a jury, not the Court, adjudicate the new theory." (Def. Br. on Colorable Differences at 6); see also Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc., 154 F.3d 1345, 1350 (Fed. Cir. 1998); Arbek Mfg., Inc. v. Maozzam, 55 F.3d 1567, 1570 (Fed. Cir. 1995).

Ordinarily, the Court would turn to the complaint to determine what was "contended." However, the complaint in this

12

action contains nothing more than the cursory allegations that ePlus owns a patent, that Lawson "makes, uses, sells, offers to sell and/or imports" certain "products, services, methods, or processors that infringe" the patent, and that ePlus is, therefore, entitled to damages and injunctive relief. See (Complaint (Docket No. 1) at ¶¶ 20-23).[5] However, shortly before the Initial Pre-Trial Conference, the parties agreed to a scheduling and discovery order which required, inter alia, ePlus to file "a statement identifying, for each Defendant[,] the product, products, or part thereof, that are accused of infringement, and, for each such product or part thereof, shall identify on an element-by-element, claim-by-claim basis how such product or part thereof infringes." See (Proposed Discovery Plan filed November 18, 2009 (Docket No. 121)). As a result, on December 8, 2009, ePlus filed "Infringement Claim Charts" detailing the manner in which ePlus alleged that Lawson's products infringed upon three of ePlus' patents. See (Exs. To Pl.'s Infringement Claim Charts (Docket No. 133) ("Infringement

---

[5] The applicability of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) to patent actions, and to this action in particular, was a matter of significant discussion during the Initial Pre-Trial Conference held on November 13, 2009. See generally (Tr. of Pre-Trial Conference (Docket No. 131) at 3:25-4:16). At that conference, the Court observed, "I don't know how long this case has been going, but we are pretty far down the road. And from what I see . . . we still don't know what patents or what claims of what patents are infringed by what products." (Id. at 4:10-16).

Chart")). These claims, as therein outlined, were pursued by ePlus in discovery and at trial. The Court concludes that the proper vehicle through which to determine what ePlus "contended" to be infringing is by an examination of the Infringement Charts as they apply to the relevant claims of the relevant patent.

The next question is the manner in which the Court is to determine what ePlus "proved" at the original trial. See TiVo, 646 F.3d at 882 (noting that the Court must focus on "those elements of the adjudged infringing products that the patentee previously contended, and proved, satisfy specific limitations of the asserted claims.") (emphasis added). Lawson insists that the proper approach is for the Court independently to examine the underlying trial evidence in an effort to determine exactly what the jury found. The Court consistently has taken the view that "the Federal Circuit, in TiVo, did not intend for district courts to attempt to devine [sic] what was in the mind of juries when they returned their verdicts." See Memorandum Opinion dated March 27, 2013 (Docket No. 1035) at 7.[6] The approach urged by Lawson runs afoul of a fundamental principle of our jurisprudence: that "the controlling distinction between the power of the court and that of the jury is that the former is the power to determine the law and the latter to determine the

---

[6] To that end, the Court barred from the contempt proceeding expert testimony that attempted "to explain what the documents in the trial showed." Id. at 8.

14

facts." <u>Dimick v. Schiedt</u>, 293 U.S. 474, 485 (1935). Indeed, as a general matter, "it would be constitutionally impermissible for the district court to re-examine the jury's verdict." <u>Duro-Last, Inc. v. Custom Seal, Inc.</u>, 321 F.3d 1098, 1107 (Fed. Cir. 2003); <u>see also</u> <u>Connell v. Sears, Roebuck & Co.</u>, 722 F.2d 1542, 1545 (Fed. Cir. 1983 ("Jury verdicts must be treated with great deference. The Seventh Amendment to the Constitution preserves the right to trial by jury in suits at common law and also provides that United States Courts shall not re-examine facts tried by jury except under the rules of common law.").

Lawson relies, principally, on two decisions to support its contention that the Court must "go[] back and look[] at the evidence" at the original trial in order to determine what was "contended and proved" at trial. <u>See</u> (Tr. of Closing Argument (Docket No. 1078) at 24:12-18). First, Lawson points to <u>Taser International, Inc. v. Stinger Systems, Inc.</u>, No. CV07-42-PHX-JAT (D. Az. Jan 18, 2012). In <u>Taser</u>, the district court had decided the underlying case on summary judgment and later was faced with the claim that a redesigned product was "apart from a few cosmetic changes, essentially the same" as the infringing product. <u>Taser</u>, Slip Op. at 2. After setting forth the <u>TiVo</u> "colorable differences" test, the district court examined its summary judgment opinion, and the findings contained therein, to determine the nature of the previous infringement and the

relevant features of the product in order to determine the elements relevant to the colorability analysis. The court detailed those features that it had "emphasized" in its opinion finding infringement as well as the evidence upon which it relied in arrived at its conclusion. Id. at 8. The court then examined the features of the new product in perspective of those features. After its analysis, the Taser court concluded that the products were more than colorably different and that, therefore, a contempt proceeding was not appropriate. Id. at 10.

Taser is not helpful to the present analysis simply because it was a summary judgment case. A court assessing the reasons underlying its own decision does not threaten the "traditional sanctity of jury verdicts" nor does it invite "speculation as to the manner in which the jurors arrived at it." Midwest Underground Storage, Inc. v. Porter, 717 F.2d 493, 501 (10th Cir. 1983).

Second, Lawson emphasizes the decision in nCube Corp. v. Seachange International, Inc., 809 F. Supp. 2d 337 (D. Del. 2011). There, the injunction at issue followed a jury verdict. In nCube, the district court compared the trial testimony with the testimony at the contempt hearing. See e.g. id. at 355 ("The Court concurs that [the witnesses] hearing testimony was consistent with his trial testimony."). The court went on to articulate the expert's trial testimony and then contrast it

with the record established during the contempt hearing. Id.
Indeed, the nCube court addressed the argument that, because the
plaintiff's expert had testified at trial that a particular
feature of the infringing product satisfied a particular
limitation, the removal of that feature made the product more
than colorably different. Id. at 354. The court rejected that
argument both on the basis that the expert had not limited his
opinion to that particular feature and on the basis that TiVo
permitted a contempt finding if the infringing feature was
merely replaced with a component that "does not amount to a
significant change." Id. at 354 n. 6, 355.

The nCube court provided no analysis or explanation for its
decision to return to the trial testimony other than the
statement that "any analysis about whether colorable differences
exist with respect to the modified ITV product must focus on how
ARRIS alleged and proved to the jury that" the original product
infringed. Id. at 354. The court neither addressed nor
acknowledged the problems inherent in a court's attempt at
analyzing what the jury found and why.

That renders nCube of no utility because "[c]ourts have
always resisted inquiring into a jury's thought processes."
United States v. Powell, 469 U.S. 57, 67 (1984). nCube offers no
reason to deviate from that time-honored practice. The Court is
ill-equipped to attempt to determine which evidence the jury

17

relied upon to reach which conclusion, and long-standing policy counsels against such an endeavor. It would impermissibly intrude upon the sanctity of the jury verdict for the Court to assess the trial evidence and attempt any conclusion as to what was proven, beyond the fact of the verdict itself. In sum, the Court will assess what was "contended" in light of ePlus' claims at the commencement of the action and what was "proved" is the verdict of the jury, which stands for itself.

**The Features Contended and Proved**

Claim 26 of United States Patent No. 6,023,683 (the "'683 Patent") claims:

> A method comprising the steps of: maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources; selecting the product catalogs to search; searching for matching items among the selected product catalogs; building a requisition using data relating to selected matching items and their associated source(s); processing the requisition to generate one or more purchase orders for the selected matching items; and determining whether a selected matching item is available in inventory.

Elec. Sourcing & Sys. Method, U.S. Patent No. 6,023,683 (filed Aug. 10, 1994) (issued Feb. 8, 2000).

In its Infringement Chart for the '683 patent, (Docket No. 133-2), ePlus laid out the manner in which it believed that

18

Lawson's products infringed Claim 26. (Id. at 56-69).[7] ePlus advanced several theories regarding the infringement of each element of Claim 26. As a result of the Federal Circuit decision in ePlus, the only claim remaining for which a valid finding of infringement remains is Claim 26 of the '683 patent. See ePlus, 700 F.3d at 521 (affirming the jury verdict as to Claim 26). Accordingly, the features found to infringe at trial must necessarily be those that infringed Claim 26 for purposes of the TiVo analysis.

In essence, ePlus contended that Lawson's products infringed Claim 26 of the '683 patent in the following ways: First, that the Item Master component of the Inventory Control module and Purchase Order application allowed the importation of multiple product catalogues into a centralized database and/or the "Punchout Procurement" module allowed a used to access multiple supplier catalogues through vendor websites and "digital marketplaces." (Infringement Chart at 56-63).

Second, that a user could "select among (1) catalogs hosted by suppliers [i.e., Punchout vendors], (2) an internal database containing multiple supplier catalogs [i.e., Item Master], and

---

[7] As a result of the Federal Circuit decision in ePlus, the only claim remaining for which a valid finding of infringement remains is Claim 26 of the '683 patent. See ePlus, 700 F.3d at 521 (affirming the jury verdict as to Claim 26). Accordingly, the features found to infringe at trial must necessarily be those that infringed Claim 26.

(3) digital marketplaces with multiple suppliers' catalog data."
(Id. at 63). In addition, when a Lawson user elected to use the
Punchout module, the user would be able to select products from
the external website (which appeared in a "separate browser
session"), place them in an "electronic 'shopping cart,'" and
return "the selected cart contents to the Lawson Requisitions
Self-Service application." (Id. at 64).

Third, ePlus alleged that Lawson's systems allowed users to
search the product catalogues based on criteria such as product
name, manufacturer code, or partial descriptions. (Id. at 64-
65).

Fourth, ePlus contended that Lawson's products would allow
the creation of a single requisition from Item Master or
Punchout. (Id. at 65-66). Specifically, ePlus identified
"Requisition Self-Service" as enabling "web-based requisitioning
from approved product catalogs." (Id. at 66).

Fifth, ePlus contended that Lawson's products had the
ability to generate purchase orders from the requisitions,
specifically emphasizing the ability of Requisition Self-Service
("RSS") to automatically generate purchase orders for items on
approved requisitions with no additional data input. (Id. at
67).

Finally, ePlus contended that either through the Electronic
Data Interchange ("EDI") or the Punchout Module, Lawson's

20

software permitted the end user to confirm with the supplier
whether or not the requested item is in inventory. Such
information is either contained in the supplier's catalog or can
be requested by the end user by electronic notification. (Id. at
68).

These contentions were pressed at trial. To see, what was
proved at trial, the Court relies on the verdict that the jury
returned.

Here, the jury returned a mixed verdict. See Verdict Form
(Docket No. 600). The jury found that Configuration 3 (which
consisted of the Core S3 Procurement System, RSS and Punchout)
and Configuration 5 (Core S3 Procurement System, RSS, Punchout,
and EDI) infringed Claim 26 of the '693 patent. The jury found
that Configuration 4 (Core S3 Procurement System with EDI) did
not infringe Claim 26.[8] For the reasons set forth above, the jury
verdict stands for itself. It suffices to say, however, that
ePlus proved, at trial, that Configurations 3 and 5 infringed
Claim 26 of the '693 patent and did not prove that Configuration
4 did.

---

[8] The jury also found that Configurations 3 and 5, as well as
Configuration 2 (Core S3 Procurement System plus RSS), infringed
Claim 1 of the '172 patent. The jury also found that
Configurations 3 and 5 infringed Claims 3, 28, and 29 of the
'683 patent. Those findings were vacated by the Federal
Circuit's decision in ePlus v. Lawson, 700 F.3d 509 (Fed. Cir.
2012).

**"More than Colorably Different"**

TiVo instructs the Court to first determine whether "the newly accused product is so different from the product previously found to infringe that it raises a fair ground of doubt as to the wrongfulness of the defendant's conduct." 646 F.3d at 882. In so doing, the Court is to examine "those differences between the old and new elements" and determine whether or not they are "significant." Id. Both Lawson and ePlus place great emphasis on the word "elements" and "products" as used by the Federal Circuit in TiVo. According to Lawson, the Court must determine whether the change to the modified element is "significant." See (Def. Colorability Br. at 17). ePlus, on the other hand, argues that the test is whether or not the modification has made the new product more than colorably different. (Pl. Reply Br. on Colorability at 6). That is, under Lawson's view, the change must be assessed in a vacuum, looking only at the feature before and after the modification, while in ePlus' view the modification must be assess in relation to the infringing product as a whole.

Unfortunately, TiVo uses the terms rather interchangeably. For example, TiVo instructs that, "if those differences between the old and new elements are significant, [then] the newly accused product as a whole shall be deemed more than colorably different," 646 F.3d at 882 (emphasis added), which would seem

22

to support Lawson's position. At the same time, TiVo directs that "the primary question on contempt should be whether the newly accused product is so different from the product previously found to infringe," id. (emphasis added), and then say that it is necessary to examine the "significance of the differences between the two products," id. (emphasis added), which would seem to support ePlus' claim that the proper analysis focuses on the changes to the overall infringing product. TiVo also instructs that the significance of the modifications "is much dependent on the nature of the products at issue. The court must also look to the relevant prior art, if any is available, to determine if the modification merely employs or combines elements already known in the prior art in a manner that would have been obvious to person of ordinary skill in the art at the time the modification was made." Id. (emphasis added).[9]

The Court concludes that the correct analysis is somewhere between the positions advanced by Lawson and ePlus. The Court must examine the changes to the elements to determine whether there has been a modification to an element that was adjudged to infringe. This determination, which will likely generally be uncontested, must take place in a relative vacuum, focusing only

_____

[9] The parties agree that no prior art assessment need be made in this case.

23

on the element as existed before and as modified. But, in conducting the next step of the analysis, "whether that modification is significant," id., the Court must, as directed, focus on the "nature of the products." Id. That is to say, TiVo instructs that the Court must assess the significance of the modification in the context of the product that was found to infringe. That makes sense, of course, because a change to an element that may seem substantial when viewed in insolation may have no bearing on the manner in which the product was found to infringe. Similarly, a modification that might, on its own, seem insignificant could be quite significant in the context of the product.

For example, Lawson made changes to RSS in order to "design around" the findings of infringement as to Claim 1 of the '172 patent and Claim 28 and 29 of the '683 patent.[10] As a result of the Federal Circuit's decision, which vacated the finding of infringement as to those claims, those changes were not presented, or discussed more than cursorily, at the hearing on ePlus' contempt motion. Tellingly, however, Lawson does not rely on those changes as "elements" of the product that have been modified. Even if those modifications were, in and of

---

[10] Mr. Christopherson explained that there were three broad areas of changes on which the redesign process focused: Punchout (which changes are at issue here); the "shopping cart," and "UNSPSC." (Tr. at 333:13-14).

themselves, "significant," they are not significant with respect to the manner in which Lawson's product was found to have infringed Claim 26 of the '683 patent. It is for this reason that the "colorability" analysis must be undertaken in the context of the manner in which the <u>product</u> itself was found to infringe.

There is no serious dispute over the nature of the changes made to RSS to produce RQC. The dispute is over whether the changes were made to "those aspects of the accused product that were previously alleged to be, and were a basis for, the prior finding of infringement" or whether they are "randomly chosen features of the product found to infringe." <u>TiVo</u>, 646 F.3d at 882.[11]

According to ePlus, the modifications made to RSS to create RQC were not related to Claim 26 of the '683 patent and, thus, the analysis need not go further. (Pl. Br. on Colorability at 6). In ePlus' estimation, the changes to RSS constitute "randomly chosen features" and there the Court does not need to

---

[11] Both parties have bandied about the phrase "randomly chosen features." Although the word "random" can be defined as "made without definite aim, reason, or pattern," Random House Dictionary (2013), the Court interprets the distinction drawn in <u>TiVo</u> to require the Court to consider whether or not the modification was to the infringing aspects of the product and, if they were not, then they were "random." It is, of course, true that there will always be <u>some</u> purpose behind the selection of a particular element to modify.

determine whether they are substantial in nature. In essence,
ePlus contends that, because, in its view, systems with RQC
continue to infringe Claim 26 in the same way as systems with
RSS, the modifications cannot be related to the infringing
aspects of the Configurations at issue. Lawson responds that the
features that were modified to create RQC were central to the
demonstrations used by ePlus' expert at trial and were referred
to positively by that expert when questioned about them. (Def.
Br. on Colorability at 16-17). Indeed, Lawson argues, the "only"
demonstrations that were relevant to show what ePlus "contended
and proved" at trial involved the combination of items from
Punchout and Item Master or from multiple Punchout sites. (Id.
at 17).

Although Lawson's argument appears simply to reiterate its
view that the proper mode of analysis is for the Court to parse
through the trial record and determine for itself what the jury
found was proven - an argument that the Court has continually
rejected - the Court nevertheless finds that, whatever
significance the modifications have to the overall product, the
modifications to RSS relate to the features of Lawson's products
that were contended and proven to infringe at trial. It is
uncontested that interplay between RSS, Punchout, and Item
Master formed at least one of the bases for a finding of

26

infringement of Claim 26 of the '683 patent,[12] and that recognition of the infringing nature of the interplay formed the central issue in the redesign process. Similarly, the alterations to RSS to create RQC related to the manner in which Lawson's products infringed ePlus' patent, at least insofar as they focused on the manner in which Lawson's product performed steps 3 through 5 of Claim 26.

Having determined that the modifications are relevant to elements of Lawson's products, the Court must determine "whether th[ose] modification[s are] significant." TiVo, 646 F.3d at 882. ePlus began its assessment by outlining the features of RSS that were not changed as evidence that the changes that were made were not relevant to Claim 26. See (Pl. Br. on Colorability at 8). While there is no requirement under TiVo that Lawson make many changes to many things – indeed contempt is inappropriate if there is any significant change made to any relevant feature – identification of the features of RSS that remain unchanged is helpful in assessing the significance of the modifications that were made to the infringing product. Thus, while Lawson is correct that TiVo does not ask the Court to examine the aspects of the product that are unmodified, the significance of the

---

[12] Indeed, the only configuration to lack RSS and Punchout (Configuration 4) was found not to infringe.

modification to the product can be assessed with some reference to what remained unchanged.

Here, it is undisputed that Lawson made no relevant changes to the core systems, including the Inventory Control, Requisition, and Purchase Order modules. Similarly, the only change that Lawson made to Punchout itself was the "Multiple Punchout" limitation; each Punchout session works exactly the same as before. Lawson rejected any proposed changes to the inventory checking capability of Punchout and EDI, the requisition capabilities of the modules, or the purchase order creation aspects of the modules. All that has changed is the interplay between RQC and Punchout.

Although not dispositive, evidence of how Lawson described the redesign, both internally and externally, is both pertinent and compelling. See Merial Ltd. v. Cipla Ltd., 681 F.3d 1283, 1301 (Fed. Cir. 2012) (finding testimonial evidence particularly compelling when the "statements come from the defendant's chief executive regarding his own product"). Here, Lawson consistently presented the changes between RSS and RQC as insubstantial. Internally, Lawson explained that the only change in functionality between RSS and RQC was "a warning pop-up that you are about to leave the Lawson site when you punch out." (Pl. Ex. 1030). The internal documents explained, "the process remains completely the same except if you try to punch out on a req.

28

that is already in use with non-Punchout items, it will tell you that you need to open a separate req., and it will perform that action for you." (Id.).

To its customers, Lawson stressed that RQC has "100% of the functionality" that they had with RSS. Lawson emphasized the similarities between RQC and RSS in order to assuage concerns over the stability of code itself. See e.g., (Pl. Ex. 1123 ("And, when you look at the differences [between RSS and RQC], most changes would have very minimal code impact and thus a limited risk")). Stressing the simplicity of the installation process, Lawson explained that "RQC is just a new user interface to access [customers'] requisition functionality." (Pl. Ex. 1065); see also (Pl. Ex. 1072 ("[T]he new product is a change to the user interface only.")). Lawson's customer support staff took the view that RQC "looks/appears exactly like RSS XML did" and that "users will probably not even notice the difference, really." (Pl. Ex. 1124).

Indeed, Lawson concluded that the changes in RSS were so minimal that no training would be required for users of RQC. ePlus' expert explained that the significance of this fact is that, "if RQC requires minimal or no retraining, then RQC must

be very similar to RSS." (Tr. at 166:20-22).[13] That view is
supported by Lawson's internal communications which reflect
concern from some that, if RQC were different from RSS,
retraining would be required, followed by consolation from the
design team that "since RQC has 100% of the existing
functionality of RSS, no training issues have been identified to
date." (Pl. Ex. 1057).[14] In essence, Lawson consistently
maintained, both to its customers and its employees, that RQC is
"really the same thing as RSS XML was except for a few
adjustments. (however, I'm not allowed to say that.)." (Pl. Ex.
1027). Evidence of this ilk is compelling, particularly when
those statements come from Lawson's key staff "regarding [their]
own product." Merial Ltd., 681 F.3d at 1301.

---

[13] Citations to the Transcript of the contempt hearing ("Tr.")
refer to the consecutively paginated transcripts filed at Docket
Nos. 1052, 1053, 1054, 1055 & 1056.
[14] "Functionality" appears to be a word with many connotations.
In most of the contexts in which Lawson assures customers that
RQC retains "100% of the functionality" of RSS, it would be a
plausible reading to conclude that Lawson intends to assure its
customers (as well as its internal sales people) that the new
product will continue to meet the customers' needs. This is
apparent in, for example, the reference to "100% functionality
you require." (Pl. Ex. 1056). In the training context, however,
the focus would naturally have been on how the product is used,
rather than on the results achieved. After all, the customer
needs to be trained on how to use the product (as well as on
what the product does). That RQC was so similar to RSS that no
retraining was required, despite some apparent cosmetic
difference, certainly suggests that RQC "performs substantially
the same function in substantially the same way to obtain the
same result" Union Paper-Bag Mach. Co., 97 U.S. at 125.

Lawson's principal argument as to why RQC is more than colorably different from RSS relies on Lawson's claim that RQC altered the features that ePlus relied on in its demonstrations to prove infringement at trial. See (Def. Br. on Colorability at 16-17). Of course, even "if a redesigned product replaces a component that practiced a limitation, the redesigned component may still be held to be infringing (and therefore a basis for contempt) if the redesigned component does not amount to a significant change." nCube, 809 F. Supp. 2d at 354 n. 6. Moreover, for the reasons discussed previously, the Court rejects Lawson's call to reexamine the trial evidence and explore the jury verdict.

Lawson's other argument stems from its view that the RSS to RQC modifications constituted a degradation in function of the Lawson software because the modification altered the user experience. (Def. Br. on Colorability at 19). Lawson identifies two principal changes to the user experience: first, it argues that Lawson's software is no longer "a one-stop shop for whatever a customer may want to purchase." (Id. at 19). Second, Lawson asserts that "the changes have severely limited the circumstances under which a user has the ability to comparison shop" (id.) because the redesigned product generates more requisitions to review, and thus "increase[s] the burden on

31

those employees of Lawson's customers who are 'approvers.'" (Id. at 20).

Lawson argues, in essence, that the mere fact that the product may be less desirable makes it more than colorably different. In support of this, Lawson relies almost entirely on its view of what features were emphasized at the trial, but presented no evidence that it lost any customers on account of the asserted degradation, assuaging customer concerns by consistently emphasizing the insignificance of the modifications. At best (or worst), the modification makes the process slightly slower. Customers are subjected to a "warning pop up" and, depending on the Punchout sites used, may require multiple requisition orders to be generated. These changes, while perhaps degrading the customer experience, are not significant modifications in perspective of the infringing nature of the initial product.

In sum, the Court concludes that Lawson's Configurations 3 and 5 with RQC are not more than colorably different than those with RSS. While the Court agrees that the changes "relate" to the features that were contended and proved to infringe, the Court concludes that, the modifications were not significant. See TiVo, 646 F.3d at 882 ("Where one or more of those elements previously found to infringe has been modified, or removed, the court must make an inquiry into whether that modification is

32

significant."). Although no one factor is dispositive, the Court
notes that Lawson, both internally and externally, presented the
modifications as insignificant; the time of development is
indicative of (although by no means dispositive of) an
insignificant modification; and the modification did not
substantially alter the manner in which Lawson's product
performed the various steps of Claim 26 of the '683. For all the
foregoing reasons, the Court finds, by clear and convincing
evidence, that Configurations 3 and 5 with RQC, and those
configurations with RSS, "perform[] substantially the same
function in substantially the same way to obtain the same
result." <u>Union Paper-Bag Mach. Co.</u>, 97 U.S. at 125. That is, the
newly accused product is not more than colorably different from
the adjudged infringing product.

**<u>Infringement</u>**

Once it is determined that the products are no more than
colorably different, <u>TiVo</u> instructs that "a finding that the
newly accused product continues to infringe the relevant claims
is additionally essential for a violation of an injunction
against infringement." <u>TiVo</u>, 646 F.3d at 883. Accordingly, it is
necessary now "to evaluate the modified elements of the newly
accused product against the asserted claim, on a limitation by

limitation basis, to ensure that each limitation continues to be met." Id.[15]

The Court credits the testimony and demonstrations of Dr. Weaver, ePlus' expert, as establishing the infringement component of the TiVo analysis. As Dr. Weaver demonstrated, the product configurations with RQC can still be used to perform all the steps of Claim 26; i.e., they can be used to (i) maintain at least two product catalogs; (ii) select one or more vendor catalogs in Item Master and search those catalogs; (iii) connect to external Punchout sites and search those catalogs; (iv) combine one or more selected items from one or more vendors into a single requisition; (v) generate one or more purchase orders from a single requisition; and (vi) determine the availability of a selected item. Dr. Weaver demonstrated how the configurations with RQC could perform each of the steps and how the replacement of RSS with RQC did not alter or eliminate the capability of the Lawson configurations to perform the steps of Claim 26 in the manner that the configurations with RSS did. His testimony is accepted as credible and reliable. The record, as a whole, fully corroborates Dr. Weaver's testimony.

---

[15] TiVo makes clear that "the party seeking to enforce the injunction must prove both that the newly accused product is not more than colorably different from the product found to infringe and that the newly accused product actually infringes." Id. at 882.

Lawson's primary argument in response to Dr. Weaver's testimony is that ePlus did not use a similar demonstration (involving infringement by purchasing a product from a single multi-vendor Punchout site) during the underlying trial. As discussed previously, the Court's task is not to review the trial evidence. However, the Court will note that this method of infringement was specifically contended in the Infringement Charts as a manner in which Lawson's products infringed. (Infringement Chart at 56-63). While Lawson describes this as a "newly-minted infringement theory," ePlus plainly identified the ability of Punchout to connect to "vendor website catalogs and digital marketplaces" as a basis for its contention of infringement. (Infringement Chart at 59).

In truth, Lawson's argument on infringement is not that the configurations cannot be used to infringe Claim 26 of the '683 patent, but that "even assuming arguendo that this Court finds that ePlus has proven by clear and convincing evidence that RQC Configurations 3 and 5 are capable of infringing claim 26, ePlus is still not entitled to a finding of contempt against Lawson." (Def. Br. on Infringement at 11). This, says Lawson, is so because "[m]ethod claims are only infringed when the claimed process is performed, not by the sale of an apparatus that is capable of infringing use," Ormco Corp. v. Align Tech., Inc., 463 F.3d 199, 1311 (Fed. Cir. 2006). And, Lawson argues, ePlus

35

has failed to demonstrate that Lawson performed, directly or indirectly, the method. (Def. Br. on Infringement at 12).

Dr. Weaver testified, and ePlus' exhibits showed, that Lawson had installed and implemented Configurations 3 and 5 with RQC on its own systems and had trained its personnel to use those configurations in a manner that infringed ePlus' patent. Lawson also developed training videos and "webinars," as well as live demonstrations for customers, in which it demonstrated for its customers the use of the configurations in a manner that infringe Claim 26 of the '683 patent. In each of these situations: in the live demonstrations, in the recorded demonstrations, and in its own internal use, the evidence presented established that Lawson took all steps necessary to perform the steps of Claim 26. It is settled that, "where an alleged infringer designs a product for use in an infringing way and instructs users to use the product in an infringing way, there is sufficient evidence for a jury to find direct infringement." Toshiba Corp. v. Imation Corp., 681 F.3d 1358, 1365 (Fed. Cir. 2012); see also Lucent Technologies, Inc. v. Gateway, Inc., 580 F.3d 1301, 1318 (Fed. Cir. 2009) ("As Lucent notes 'Microsoft not only designed the accused products to practice the claimed invention, but also instructed its customers to use the accused products in an infringing way.'"). ePlus has proved direct infringement by RQC.

To begin, there was substantial evidence establishing that Lawson induced infringement. To show "induced infringement" ePlus "must show direct infringement, and that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." i4i Ltd. v. Microsoft Corp., 598 F.3d 831, 851 (Fed. Cir. 2010) (internal quotation omitted). In Toshiba, the Federal Circuit considered (and rejected) both of the arguments that Lawson makes in this case: first, that there are substantial non-infringing uses and, second, that ePlus has failed to put on direct evidence of Lawson's customers directly infringing the ePlus' patent.

The Federal Circuit has explained that "the existence of a substantial non-infringing use does not preclude a finding of infringement." Toshiba, 681 F.3d at 1364 (citing Erbe Elektromedizin GmbH v. Canady Tech. LLC, 629 F.3d 1278 (Fed. Cir. 2010)). In Erbe Elektromedizin, the Federal Circuit explained that while, under a contributory infringement theory, the plaintiff has to prove that a product has no substantial non-infringing uses, "no such requirement . . . exists for induced infringement." 629 F.3d at 1284.

Similarly, it is clear that the showing of "direct infringement can be proven by circumstantial evidence." Vita-Mix Corp. v. Basic Holding, Inc., 581 F.3d 1317, 1326 (Fed. Cir. 2009). Here, there is extensive circumstantial evidence showing

that, at Lawson's direction, Lawson's customers are using RQC and using it a manner that infringes the patent. Indeed, it is rather facile for Lawson to suggest that the Court should find, for the purposes of one argument, that Lawson's customers had made the switch to RQC and then, in another argument, claim that there is no evidence that its customers are not simply continuing to use RSS. Nevertheless, "a finding of infringement can rest on as little as one instance of he claimed method being performed." Lucent, 580 F.3d at 1317. While Lawson did not keep records of how many of its customers switched over to RQC, Mr. Hanson testified that Lawson installed RQC on at least 60 customers' systems follow its release. (Tr. at 612:6-8). Lawson designed its products "to be used in an infringing way and instructed users to use them in the infringing way." Toshiba, 681 F.3d at 1365. The record is replete with evidence that Lawson specifically encouraged, trained, and developed demonstrations and materials to assist its customers in infringing the patent. That, coupled with the fact that Lawson installed the products on the machines of some 60 customers, is sufficient for the Court to find that Lawson induced infringement of Claim 26 of the '683 patent. Moreover, Lawson installed and used RQC itself.

For the reasons set forth above, the Court concludes, by clear and convincing evidence, that ePlus has met its burden of

establishing that the Configurations 3 and 5 with RQC continue to infringe ePlus' patent. Thus, the Court finds that Lawson is in contempt of the May 23, 2011 injunction.

## Direct Violation of the Injunction

"The power of civil contempt, inherently vested in every court which exercises equity jurisdiction, makes the injunction an effective judicial remedy." Landman v. Royster, 354 F. Supp. 1292, 1300 (E.D. Va. 1973). When a court "employs the extraordinary remedy of injunction, it directs the conduct of a party, and does so with the backing of its full coercive powers." Nken v. Holder, 556 U.S. 418, 428 (2009) (internal citations omitted). Quite apart from the analysis established by TiVo respecting a redesigned product, it is well-settled that violation of an injunction is subject to contempt proceedings. See e.g., Bessette v. W.B. Conkey Co., 194 U.S. 324, 330 (1904).

Here, the Injunction Order enjoined Lawson, "including its officers, directors, agents, servants, [and] employees" from "directly or indirectly making, using, offering to sell or selling within the United States" any of the infringing products, as well as enjoined Lawson from "circulating, publishing, or disseminating within the United States any literature or information that encourages the use, sale, or importation of" the infringing products. Injunction Order (Docket No. 729) at 2-3. In addition, the Order provided, and

39

the Federal Circuit affirmed, that Lawson was enjoined from "servicing and maintaining products sold before the injunction issued." ePlus, 700 F.3d at 522; see also Injunction Order at 2. The Injunction Order provided a sunset provision for some 277 enumerated health care customers of Lawson who were to be afforded a period of time to undertake the transition to the new product and who could continue to be provided maintenance services for that period.[16]

Following the issuance of the injunction, Lawson informed its customers that they could continue to run RSS. While Lawson kept records of how many customers had downloaded RQC, it made no effort to determine how many customers had actually installed and used RQC. Indeed, RQC was specifically designed so that, even after installation of RQC, the only thing that would need to be changed in order to allow RSS to continue to run on the customers systems were the "RSS bookmarks." (Tr. at 548:2-6 (The Court: "[I]f I were a customer of Lawson running RSS in June of 2011, do I still have that capacity if I have RSS and RQC today? Mr. Lohkamp: "Yes, you have that capability to change the bookmarks.")). In fact, the only change required in order to run RSS after the installation of RQC is to the bookmarks. (Tr. at

---

[16] As shown at the contempt hearing, the testimony on which the Court decided that the sunset provision was necessary was simply not true. Indeed, it was, at best, a deliberate, gross exaggeration. But, in fact, it was a deliberate untruth sponsored by Mr. Hager.

542:12-20). Although the RQC installation process changes the bookmarks, the customer is able to change them back, provided that he has the appropriate "administrator" access to his own computers. (Tr. at 548:10-549:25).

While the mere ability to circumvent the design around would be insufficient to support a finding of contempt, the record indicates that Lawson employees provided customers with instructions on how to run RQC and RSS in parallel. While most of the customers for which Lawson provided this information were "healthcare" customers, subject to the sunset provision of the Injunction Order, not all were. The evidence demonstrated that Lawson provided specific information to, at least, two non-healthcare Lawson customers: Western Lake Superior Sanitary and Columbia Association. See (Tr. at 588:23-25 & 582:13-16).

Further, the installation of RQC did not automatically result in the uninstallation of RSS. (Tr. at 576:3-8). To the contrary, Lawson specifically instructed its clients not to uninstall RSS before installing RQC. (Tr. at 580:11-16). While this allowed (and Lawson instructed) the healthcare customers to test-run RQC during the sunset period, Lawson's instructions also permitted those customers to run RSS even after the sunset period expired. Lawson made no effort to determine if any of its customers who had been instructed on how to continue to run RSS ever actually switched over to RQC. Lawson made no effort to

41

ever determine if any customer actually used RQC and had no information on which customers were running RQC and if any customer had ever downloaded Patch 1. See (Tr. at 854:7-10).[17] However, despite being aware of the fact that users could (and did) continue to use RSS after downloading RQC, Lawson instructed its employees to provide support to customers merely upon the verification of RQC download. See (Tr. at 850:6-852:16). While Lawson purported to have instructed its employees to discontinue service once it became apparent that the customer was using RSS, it is abundantly clear that Lawson employees would (and did) service the Infringing Configurations substantially in their entirety. (Tr. at id.). Further, Lawson made no effort to identify which customers had downloaded Patch 1, so that despite Lawson's concerns that RQC without Patch 1 would be in violation of the injunction, Lawson would provide service to customers who had never downloaded or installed Patch 1. (Tr. at 854:7-14).

Based on this record, the Court concludes that, quite apart from the TiVo contempt analysis pertaining to Lawson's redesign effort, Lawson was in contempt of the Court's May 23, 2011

---

[17] Lawson did keep records of which customers downloaded RQC, but because RQC required a separate installation process following the download, the mere download of RQC is not indicative of installation and (because RQC can be modified to allow a user to continue to use RSS) installation is not indicative of use.

injunction by instructing (and permitting) its employees and agents to continue to service the Infringing Configurations and by deliberately instructing its customers on how to continue to use RSS, even after the RQC product had been released.

**Remedy**

Measure of Compensatory Damages

Having determined that Lawson is in contempt of the May 23, 2011 injunction, it is next necessary to fashion an appropriate remedy. The "appropriate remedy for civil contempt in within the court's broad discretion." In re General Motors Corp., 61 F.3d 256, 259 (4th Cir. 1995).[18] Civil contempt implicates "the power of a court to grant the relief that is necessary to effect compliance with its decree. The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief." McComb v. Jacksonville Paper Co., 336 U.S. 187, 193 (1949). Nevertheless, "the remedies and sanctions must be remedial and compensatory and, unlike criminal contempt, nonpunitive." In re General Motors, 61 F.3d at 259. "Generally,

---

[18] "Because civil contempt proceedings are not unique to patent law," the law of the regional circuit governs the available remedies for contempt. Eagle Comtronics, Inc. v. Arrow Communication Laboratories, Inc., 305 F.3d 1303, 1313 (Fed. Cir. 2002) (Applying "regional circuit" law to the issue of civil contempt "because civil contempt proceedings are not unique to patent law."); see also Graves v. Kemsco Group, Inc., 864 F.2d 754, 755 (Fed. Cir. 1998) (applying regional circuit law because, "although this contempt proceeding arose out of a patent infringement suit, the damages issues before us are not unique to patent cases.").

a compensatory sanction 'may not exceed the actual loss to the complainant caused by the actions of respondent, lest the contempt fine become punitive in nature, which is not appropriate in a civil contempt proceeding." Id. (quoting In re Tetracycline Cases, 927 F.2d 411, 413 (8th Cir. 1991)). On the whole, however, the Court "has broad discretion to fashion a remedy based on the nature of the harm and the probable effect of alternative sanctions." Colonial Williamsburg Found. v. Kittinger Co., 792 F. Supp. 1397, 1407 (E.D. Va. 1992) (quoting Connolly v. J.T. Ventures, 851 F.2d 930, 933 (7th Cir. 1998)). In addition, while a civil contempt fine must be nonpunitive, it "need not always be dependent on a demonstration of actual pecuniary loss." Colonial Williamsburg Found., 792 F. Supp. at 1407.

ePlus asks the Court to order disgorgement of Lawson's profits for the period following the entry of the injunction and continuing to the present.[19] Specifically, ePlus asks the Court to order disgorgement of Lawson's gross profits for that time period, which ePlus defines as "the difference between the revenue and the direct costs of providing a good or service." (Pl. Br. on Remedies at 6). In the alternative, ePlus suggests a

---

[19] As ePlus correctly notes, and Lawson does not appear to contest, the injunction dates runs from May 23, 2011 for all but Lawson's enumerated "healthcare" customers and from November 23, 2011 for the "healthcare" customers encompassed in the "sunset provision" in the original Injunction Order.

disgorgement of incremental profits, which were estimated by both ePlus' and Lawson's experts. Incremental profits are, roughly speaking, calculated by determining the "gross profits" and then deducting certain expenses, for example, administrative expenses, research and development expenses, and certain sales and marketing expenses. The goal of an incremental profit calculation is identify profits that are made "if a decision is made to go ahead (or stop) some activity, but not otherwise." Sidney Davidson et al., Managerial Accounting: An Introduction to Concepts, Methods and Uses 901 (2005). As ePlus' expert explained, "the easiest way to think about incremental profit is, if I sell one more unit, or maybe if I get one more dollar of revenue, what's the profitability associated with that incremental unit I've sold." (Tr. at 897:25-898:3). Lawson's expert agreed with that basic articulation of the incremental profit approach, explaining: "[A]n incremental profit means the profit that one - a firm earns from making an additional sale in the short run, given the understanding that in the short run, certain costs cannot be varied." (Tr. at 1023:14-17). According to him, the key difference between "net" and "incremental" profits is the time frame over which they are analyzed. Essentially, incremental profit determinations must be conducted over a shorter time period because "the longer the period of time over which you measure incremental profit, the more

45

incremental profit becomes net profit, and the reason why is because costs that are fixed in the short run become variable in the long run." (Tr. at 1024:10-14).

Lawson opposes any remedy of disgorgement arguing, in the first instance, that it is unavailable as a matter of law and, in the alternative, that it is inappropriate under the facts of this case. Finally, Lawson argues that, even if disgorgement were available and appropriate, the proper calculation would be the "incremental profit" or "net profit" analysis and not the gross profit analysis. Of course, the parties also disagree over the calculation of the relevant profits, both gross and incremental.

As an initial matter, Lawson contends that disgorgement is "not an appropriate compensatory civil contempt remedy in the patent infringement context absent any evidence of ePlus' actual loss." (Def. Br. on Remedies at 2). In support of its position that disgorgement is not available, Lawson relies principally on the fact that none of the post-TiVo decisions in which a party was found in civil contempt award disgorgement as a remedy. Id. Lawson also relies on the district court decision in Walman Optical Co. v. Quest Optical, Inc., 2012 WL 3248150, at *10 (D. Minn. Aug. 9, 2012), in which the district court declined to award the contemnor's profits as compensatory damages absent evidence that the complainant suffered losses. The court in

46

Walman Optical recognized a split in authority "whether a contemnor's profits may be the proper measure of compensation in a civil-contempt proceeding," id., at *10 n.10, but declined to address the issue as it drew a distinction between disgorgement and profits as the measure of compensatory damages.

As Lawson acknowledges, its argument that disgorgement is contrary to a previous decision in this case. See Memorandum Opinion (Docket No. 1032), 2013 WL 1287714, __ F. Supp. 2d ___, (E.D. Va. March 26, 2013). In that Memorandum Opinion, the Court considered, and rejected, Lawson's contention that the decision of the Supreme Court of the United States in Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448 (1932) was no longer good law. In Leman, the Supreme Court noted that:

> The Circuit Court of Appeals refused recovery of profits upon the ground that in a proceeding for civil contempt the relief should be based upon the 'pecuniary injury or damage' which the act of disobedience caused the complaining party, including such reasonable expenses as were incurred in the bringing of the proceeding. There is no question here that the respondent had made profits through the infringing sales in violation of the injunction, and the amount of the profits was ascertained, but the appellate court held that the petitioners were limited to the damages caused by such sales and that no damages had been shown. We think that the court erred in imposing this limitation. The fact that a proceeding for civil contempt is for the purpose of compensating the injured party, and not, as in criminal contempt, to redress the public wrong, does not require so narrow a view of

> what should be embraced in an adequate
> remedial award.

Id. at 455-56. The Court went on to hold that:

> While the distinction is clear between
> damages, in the sense of actual pecuniary
> loss, and profits, the latter may none the
> less be included in the concept of
> compensatory relief. In a suit in equity
> against an infringer, profits are
> recoverable not by way of punishment but to
> insure full compensation to the party
> injured.

Id. at 456. Thus, "it is apparent that there is no necessary

exclusion of profits from the idea of compensation in a remedial

proceeding." Id. at 457.

Fifteen years after Leman, the Supreme Court decided United

States v. United Mine Workers of Am., 330 U.S. 258 (1947). In

that decision, the Court observed that, "[w]here compensation is

intended [in civil contempt], a fine is imposed. . . [It] must

of course be based upon evidence of complainant's actual loss."

Id. at 304. As this Court, among others, previously noted,

"United Mine Workers did not overrule Leman." ePlus, 2013 WL

1287714, at *8; see also Connolly v. J.T. Ventures, 851 F.2d

930, 934 (7th Cir. 1988) ("We are persuaded that United Mine

Workers does not affect the Leman holding."); National Drying

Machinery Co. v. Ackoff, 245 F.2d 192, 195 (3d Cir. 1957)

(Biggs, C.J., dissenting from denial of rehearing en banc)

("[T]he Leman decision was not overruled by" United Mine

Workers.).  Lawson  marshals  no  further  authority  for  the
proposition  that  Leman  has  been  overruled  or  that  compensatory
damages  require  a  showing  of  actual  loss.  Thus,  for  the  reasons
set  forth  in  the  previous  Memorandum  Opinion,  and  the  decisions
relied  upon  therein,  the  Court  concludes  that  "profits  are
recoverable  not  by  way  of  punishment  but  to  insure  full
compensation  to  the  party  injured."  Leman,  284  U.S.  at  456;  see
also  Marshak  v.  Treadwell,  595  F.3d  478,  495  (3d  Cir.  2009)
("[A]n  accounting  of  an  infringer's  profits  is  available  if  the
defendant  is  unjustly  enriched,  if  the  plaintiff  has  sustained
damages,  or  if  an  accounting  is  necessary  to  deter
infringement.")  (internal  quotations  omitted;  emphasis  in
original).  Manhattan  Indus.,  Inc.  v.  Sweater  Bee  by  Banff,  Ltd.,
885  F.2d  1,  6  (2d  Cir.  1989)  ("[P]rofits  are  an  equivalent  or  a
substitute  for  legal  damages,  when  damages  have  not  been  shown,
and  are  recoverable  not  by  way  of  punishment  but  to  insure  full
compensation  to  the  party  injured.")  (internal  citations  and
quotations  omitted);  Connolly,  851  F.  2d  at  934  ("[W]e  conclude
that  an  award  of  defendants'  profits  was  a  proper  measure  of
damages  to  compensate  the  plaintiff  in  this  civil  contempt
proceeding.").

Nevertheless,  even  where  a  particular  remedy  is  available,
it  is  not  necessarily  appropriate.  ePlus  appears  to  argue  that,
because  disgorgement  is  available,  it  is  therefore  appropriate.

49

See (Pl. Br. on Remedies at 2 (arguing that, because other "courts in this Circuit and in this district have often held disgorgement . . . is appropriate," that it is therefore appropriate here)). Lawson, on the other hand, argues that disgorgement is an extreme sanction, appropriate only when there is a showing of willful or egregious conduct by the contemnor. (Def. Br. on Remedies at 3-4 (citing John M. Golden, Injunctions as More (or Less) Than "Off Switches": Patent-Infringement Injunctions' Scope, 90 Tex. L. Rev. 1399 (2012))). Lawson argues that the evidence demonstrates that its attempts to design-around ePlus' patent were in good-faith, and, therefore, that a remedy of disgorgement is inappropriate. However, as Leman explained, the remedy of disgorgement is not punitive nor is it designed to be coercive. Rather, disgorgement is a measure by which the Court can determine compensatory damages for contumacious behavior where actual damages have not been shown. As the Court previously explained, "limiting the courts [by not allowing disgorgement] would thwart rather than aid the hand of justice." ePlus, 2013 WL 1287714, at *7.

The Court concludes that disgorgement of profits is the appropriate compensatory remedy in this instance. As the Supreme Court previously explained, "[t]he profits which are recoverable against an infringer of a patent are in fact a compensation for the injury the patentee has sustained from the invasion of his

right. They are the measure of his damages. Though called profits, they are really damages." Mowry v. Whitney, 81 U.S. 620, 653 (1871). Where, as here, "awarding a reasonable royalty would simply encourage continued defiance of court orders and promote disrespect for the law, where a defendant's profits from wrongdoing are so much greater than any estimated royalty amount, and where it is difficult if not impossible to calculate the actual loss of the plaintiff attributable to the contempt," the remedy of disgorgement of profits is appropriate. ePlus, 2013 WL 1287714, at *7.

The next question is the measure of the profits to be disgorged. ePlus suggests two measures of disgorgement for the Court's consideration: Lawson's gross profits or Lawson's incremental profits.[20] ePlus argues that the appropriate measure is "gross profits" because "there is no evidence in the record to suggest that Lawson actually incurred additional incremental costs that are specific to the Infringing Configurations." (Pl. Reply Br. on Remedies at 6). In addition, ePlus argues for disgorgement of gross profits because it is "the measure of profits the parties agree on and that Lawson reports in its

---

[20] ePlus' briefs suggest that Lawson's revenues might be an appropriate measure of disgorgement. However, ePlus' expert did not endorse that notion. Nor is there any other support for it. Hence, it will not be considered.

profit and loss statements," thus making it easier to quantify. (Id. at 5-6).

Lawson argues that, if the Court were to determine that disgorgement was appropriate, that the proper quantum would be "net profits," which would deduct "fixed costs" from the calculation in the same way that "variable costs" are deducted. (Def. Br. on Remedies at 12). Lawson takes the view that "net profits" are easily quantifiable because they are calculated in Lawson's internal spreadsheets, audited financial statements, SEC filings, and for tax purposes. (Id. at 13).

Not even ePlus' expert agrees with ePlus that the appropriate calculation of Lawson's ill-gotten gains is a disgorgement of Lawson's gross profit. Rather, Dr. Ugone testified that, in his opinion, that proper measure of Lawson's gain was the "incremental profits." (Tr. at 976:23-977:1 (The Court: "I think the bottom line, though, is in your judgment, is the correct way to equate your figures with the gain the incremental profit?" The Witness: "Yes."). In contrast, Lawson's expert, Dr. Putnam, posited that the appropriate measure of gain was "net profits." (Tr. at 1052:13-18). Dr. Putnam took this view in part because it was the "conceptually simplest" measure, but primarily because he viewed "the exercise" as "contemplating the position Lawson would have been in had it complied with the Court's order on May 23, 2011." (Tr. at 1052:18-23). In Dr.

Putnam's view, Lawson would have undertaken to reduce a variety of costs that might be viewed as "fixed" in the incremental analysis, but would have necessarily become variable as a result of the permanent nature of the injunction.

The purpose of disgorgement is "deprive the wrongdoer of his ill-gotten gain." SEC v. Blatt, 583 F.2d 1325, 1335 (5th Cir. 1978). It is "remedial and not punitive. The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing" Id. Thus the Court can quickly dispense with gross profits finding that they are inappropriate measures of disgorgement, because they are not an appropriate measure of the extent to which Lawson has profited from its contemptuous conduct.

The primary distinction between Dr. Puntam's and Dr. Ugone's "incremental" profit calculations are the nature of the costs that are deducted.[21] As a general matter, both parties agree that "incremental profits" is an economic concept, and not an accounting principle. Thus, it is not tracked by Lawson in the ordinary course of business. Both experts accept the basic principle that incremental profits should be determined by deducting variable costs, but not fixed costs. Lawson criticizes

---

[21] Dr. Putnam's "net" profit calculation dispenses with the debate over which costs are fixed and which are variable by deducting all costs. ePlus disputes the propriety of using that calculation, but not its accuracy.

ePlus' expert for failing to undertake "meaningful economic analysis of whether Lawson's operating costs were fixed or variable." (Def. Br. on Remedies at 9). ePlus counters that Lawson's expert performed his economic analysis based on outdated and overly general data. (Pl. Br. on Remedies at 11). Lawson's expert performed a "regression analysis" on cost variability to arrive at his conclusions, plotting historical costs against revenue fluctuations. In contrast, ePlus' expert based his analysis principally on the deposition of Kevin Samuelson, formerly Lawson's Chief Financial Officer, who testified for Lawson on various financial matters, and financial spreadsheets produced by Lawson. Lawson is correct that a scientific analysis is, conceptually, superior, but ignores that (as with all scientific analyses) the deficiencies in the data used by Dr. Putnam render his conclusion unhelpful.

A principal problem is Dr. Putnam's attempt to take company-wide financial information and use it as a proxy for the products at issue. Dr. Putnam testified that the sole basis for his conclusion that it was appropriate to "treat companywide date as a proxy for the sale of the accused configurations and the accused modules" was because Mr. Samuelson told him so. (Tr. at 1046:7-13). The Court did not find Mr. Samuelson to be a credible witness on that point and, at best, Dr. Putnam's

reliance on Mr. Samuelson's "say-so" undermines the potentially compelling nature of his regression analysis.

Another difficulty with Dr. Putnam's analysis is that it was based entirely on data from when Lawson was a public company, even though the "injunction period" occurred after Lawson had gone private. Dr. Putnam conceded that, "as a matter of principle," a change in "control of management of a business can lead to differences" in the regulation of expenses and costs." (Tr. at 1127:4-8). Yet, he did not attempt to include data from after Lawson went private in his analysis because it was not "comparable" to the earlier data. (Tr. at 1126:25-1127:3).

Moreover, Dr. Putnam's regression analysis was based on data for Lawson's worldwide operations. However, there was no evidence from which one can conclude that the worldwide data was representative of the domestic data. (Tr. at 1127:24-1128:2).

Thus, although the Court can take no issue with the concept of a regression analysis itself, the result here raises the age old question: "If you put into the machine wrong figures, will the right answers come out?"[22] In this case, the answer is no.

Dr. Ugone, in contrast, began with the undisputed amount of gross profits and made a series of deductions. Dr. Ugone

---

[22] Charles Babbage, <u>Passages from the Life of a Philosopher</u> 67 (London, Longman Roberts & Green 1864).

concluded that there were three basic categories of expenses: (1) general and administrative; (2) research and development; and (3) sales and marketing. Dr. Ugone deducted all sales and marketing expenses in an effort to be "conservative" although he felt that "it's highly unlikely that all of them would be variable." (Tr. at 911:16-21). He did not, however, deduct the other two categories of expenses. As Dr. Ugone explained, most of the administrative costs are "going to be there anyway" and will not vary "with revenue associated with the infringing configurations during the injunction period." (Tr. at 909:3-10). The Court agrees that those costs are not properly viewed as variable in these circumstances because the vast majority of Lawson's administrative overhead would not vary based on the revenue from the infringing configurations. Similarly, Dr. Ugone declined to deduct "product development costs." While Dr. Ugone agreed that it is sometimes appropriate to deduct those costs, (Tr. at 910:22-23), it was not appropriate in this instance because the evidence suggested that Lawson's development costs would not have varied with the revenues associated with the infringing configurations. (Tr. at 910:24-911:3). In fact, Lawson booked research and development costs for RQC in an amount between $38,000 and $75,000. (Tr. at 987:17-20). That fact supports Dr. Ugone's conclusion. Thus, Dr. Ugone presented an incremental profits figure that represented the deduction of

all direct costs and all sales and marketing costs from Lawson's revenues, but without further deduction.

The Court finds Dr. Ugone's calculations to be reliable and a more credible calculation than Dr. Putnam's analysis. The Court is not inclined to follow Lawson's suggestion and adopt the "net" profit proposal because the analysis presented to support it is not reliable. The Court finds Dr. Ugone's incremental profit calculations to be an appropriate approximation of Lawson's gains from its contumacious behavior.

In his calculations, Dr. Ugone also prepared an apportionment of the incremental profits that were fairly attributable to the infringing aspects of Configurations Nos. 3 and 5, specially by attempting to divide out the revenues from Lawson's foundational modules (LSF and Process Flow) which served as the basis for Lawson's entire S3 software line, including financial and human resources software. Based on his calculations, with which Dr. Putnam agreed, Dr. Ugone concluded that approximately fifteen percent of the revenues from LSF/Process Flow related to Configurations 3 and 5. The analysis conducted by both experts indicated that an apportionment was appropriate because the majority of the LSF/Process Flow revenues were related to products other than the Infringing Configurations.

Thus, adopting both Dr. Ugone's incremental profit and apportionment analyses, the Court concludes that the proper quantum for disgorgement is $17 million from the date of the injunction to July 1, 2013 and a daily rate of $24,850 thereafter to the present date.

Enhancement and Attorneys' Fees

Finally, ePlus seeks enhanced damages for willful infringement and attorneys' fees, pursuant to 35 U.S.C. § 285.

As a threshold matter, it is unclear what law governs the assessment of enhanced damages or the award of attorneys' fees. As previously noted, "[b]ecause civil contempt proceedings are not unique to patent law," the law of the regional circuit governs the available remedies for contempt. Eagle Comtronics, Inc. v. Arrow Communication Laboratories, Inc., 305 F.3d 1303, 1313 (Fed. Cir. 2002). However, the question of willfulness of infringement, as well as the grant of authority present in 35 U.S.C. § 285 to award attorneys' fees, necessarily raise questions that are unique to patent law.[23] Thus, Lawson relies on familiar regional principles which instruct that an award of enhanced damages and attorneys' fees in a contempt proceeding is

---

[23] At argument, ePlus argued that "willful" in a "term of art that's used specifically with respect to patent infringement." (Tr. of Closing Arguments at 194:17-19). However, as the Federal Circuit has recognized, "the term willful is not unique to patent law, and it has a well-established meaning in the civil context." In re Seagate Technology, LLC, 497 F.3d 1360, 1370 (Fed. Cir. 2007).

only appropriate when the contemnor's conduct rises "at least to the level of obstinance or recalcitrance." Omega World Travel, Inc. v. Omega Travel, Inc., 710 F. Supp. 169, 173 (E.D. Va. 1989). ePlus, on the other hand, relies on patent cases which routinely award enhanced damages based on a finding of willful infringement.   In re Seagate Technology, LLC, 497 F.3d at 1368 ("[W]e have held that an award of enhanced damages requires a showing of willful infringement.").

There has been no clear guidance from the Federal Circuit on what standard to apply to civil contempt actions. For example, in Spindelfabrik Suessen-Schurr v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 903 F.2d 1568, 1578 (Fed. Cir. 1990), the district court trebled the damages award "by reason of the willful and deliberate nature of the infringement" and awarded attorneys' fees "by reason of the exceptional nature of the case." Thus, employing the conventional patent law analysis. The Federal Circuit affirmed the finding that "the [district] court justifiably characterized [the contemnor's] actions as 'flagrant contemptuous conduct'" and "[i]n these circumstances, the district court did not abuse its discretion." Id. This is language which sounds more in the law of the regional circuit, which indeed, the Federal Circuit applied in Spindelfabrik, to reverse a $2 million fine as being "punitive." Id.

Similarly, in Alopex Industries, Inc. v. Seibel, 61 F.3d 919 (Fed Cir. 1995) (unpublished), the Federal Circuit affirmed an award of treble damages for "willful" infringement of a consent decree, citing to Smithkline Diagnostics, Inc. v. Helena Labs. Corp., 926 F.2d 1161 (Fed. Cir. 1995). In Smithkline, the Federal Circuit observed that "enhancement of damages and attorney fee awards are expressly committed to the court's discretion," Id. at 1164 n.2, citing to 35 U.S.C. §§ 284 and 285. Section 284 permits the court to "increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284.[24] However, "enhanced damages are punitive, not compensatory." Sesonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 1574 (Fed. Cir. 1996); see also Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 383 F.3d 1337, 1348 (Fed. Cir. 2004) (Dyk, J., concurring-in-part and dissenting-in-part) ("We have often recognized that enhanced damages awarded pursuant to 35 U.S.C. § 284 are a form of punitive damages."); Crystal Semiconductor Corp. v. TriTech Microelectronics International, Inc., 246 F.3d 1336, 1361 (Fed. Cir. 2001) ("Damages for willfulness are

---

[24] Although ePlus does not cite to § 284 as a basis for enhancement, the nine-part test that ePlus relies on in support of its request for enhanced damages is the test for enhancement under § 284. See (Pl. Br. on Remedies at 13 (citing Read Corp. v. Portec, Inc., 970 F.2d 816 (Fed. Cir. 1992); see also Read Corp., 970 F.2d at 826 ("Under section 284 of Title 35, damages may be enhanced up to three times the compensatory award.") (internal emphasis omitted).

punitive."); <u>Beatrice Foods Co. v. New England Printing and Lithographing Co.</u>, 923 F.2d 1576, 1580 (Fed. Cir. 1991) ("As we have held, the enhanced portion of the damage award in this case cannot be compensatory, and it, therefore, is punitive."); <u>Paper Converting Machine Co. v. Magna-Graphics Corp.</u>, 745 F.2d 11, 23 (Fed. Cir. 1984) ("[D]amages are trebled as punishment.").

Of course, the distinction between civil and criminal contempt is one of "character and purpose" in that the punishment for civil contempt is "remedial" while the punishment for criminal contempt is "punitive." <u>Gompers v. Buck's Stove & Range Co.</u>, 221 U.S. 418, 441 (1911). It is well-settled that the Court cannot impose a purely punitive sanction during a civil contempt proceeding. <u>See</u> <u>United Mine Workers of America v. Bagwell</u>, 512 U.S. 821 (1994); <u>In re General Motors Corp.</u>, 61 F.3d 256, 259 (4th Cir. 1995) (punitive sanction "not appropriate in a civil contempt proceeding").

While the law is, at best, muddled, the Court concludes that enhancement of damages for willful infringement, as contemplated in 35 U.S.C. § 284 and as provided for in the authorities to which ePlus cites, is, as the Federal Circuit has recognized, punitive in nature. This is particularly true where, as here, the Court has employed disgorgement of profits as a compensatory remedy which is, in itself, inherently an estimate of damages. Under the circumstances of this action, at least,

any enhancement of the disgorgement remedy would be punitive. Thus, enhanced damages are not appropriate remedy in this situation. And, accordingly, ePlus' request for enhanced damages will be denied.

It is similarly unclear whether (and under what authority) attorneys' fees are available in this proceeding. "In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." Alyeska Pipeline Serv. Co. v. Wilderness Soc., 421 U.S. 240, 247 (1975). There is no general rule permitting the award of attorneys' fees. However, Congress has made "specific and explicit provisions for the allowance of attorneys' fees under selected statutes granting or protecting various federal rights." Alyeska, 421 U.S. at 260. In the absence of statutory authority, the Court may only award attorneys' fees in "narrowly defined circumstances" in which the award is authorized by the Court's "inherent power." Roadway Express, Inc. v. Piper, 447 U.S. 752, 765 (1980). The situations in which the Court has inherent authority to award attorneys' fees fall into three categories. First, "known as the 'common fund exception,' derives not from a court's power to control litigants, but from its historic equity jurisdiction, and allows a court to award attorney's fees to a party whose litigation efforts directly benefit others." Chambers v. NASCO, Inc., 501 U.S. 32, 45 (1991) (internal

citations omitted). Second, "a court may assess attorney's fees as a sanction for the willful disobedience of a court order." Id. (internal quotations omitted). Finally, "a court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Id. at 45-46 (internal quotations omitted).

ePlus stresses that it is seeking the award of attorneys' fees pursuant to the statutory grant of authority in 35 U.S.C. § 285. See (Pl. Reply Br. on Remedies at 13 ("ePlus is seeking attorneys' fees and costs under 35 U.S.C. § 285.")). Whether or not § 285, which permits the Court to award attorneys' fees upon a finding that the case is "exceptional," applies in a contempt proceeding appears to be an under-analyzed issue. In several decisions, the Federal Circuit has affirmed an award of attorney's fees following a contempt finding, but has done so without apparent reference to § 285, or the apparent tension between the settled principle that the law of the regional circuit governs the available remedies for contempt, Eagle Comtronics, Inc. v. Arrow Communication Laboratories, Inc., 305 F.3d 1303, 1313 (Fed. Cir. 2002), and the attempt to enhance (or alter) those remedies with reference to the patent statutes. In Stryker Corp. v. Davol Inc., 234 F.3d 1252, 1260 (Fed. Cir. 2000), the Federal Circuit affirmed an award of enhanced damages and attorneys' fees "considering the conclusory nature of the

opinion of counsel used by Davol to justify selling the revised device and the minor changes made to the original device." In Spindelfabrik, the Federal Circuit affirmed an award of attorneys' fees where the district court found that the contemnor's actions amounted to "flagrant contemptuous conduct." 903 F.2d at 1578.

In contrast, the United States Court of Appeals for the Fifth Circuit considered this issue in Dow Chemical Company v. Chemical Cleaning, Inc., 434 F.2d 1212 (5th Cir. 1970) cert. denied 402 U.S. 945 (1971). The Fifth Circuit explained that the discussion of "willfulness," as set forth in 35 U.S.C. § 284 and applied in § 285, "fails to recognize that this is a civil contempt proceeding, not a patent infringement suit." Id. at 1214. The court explained,

> The patent infringement was established in the previous round of litigation; we here determine the appropriateness of damages, compensatory and exemplary, for willful violation of a court order. In dealing with a civil contempt proceeding the district court was not bound by the provisions of Title 35, U.S.C., 284. Rather it was free to exercise the inherent discretion possessed by a court to correct willful violations of its solemnly passed orders.
>
> CCI's confusion over the distinction between patent cases and contempt of court cases carries over into the area of attorney's fees and other expenses. CCI urges that the district court erred in awarding Dow $24,371.05 in attorney's fees, $5,917.77 for attorney's expenses and $12,984.85 for

salary costs for several Dow employees
involved in the investigation by Dow. CCI
argues that attorney's fees and other
expenses may only be awarded in patent cases
in accordance with statutes enacted by
Congress. Title 35, U.S.C., 285 provides:

'The Court in exceptional cases may award
reasonable attorney fees to the prevailing
party'.

The court found that the facts of this case
did not qualify it as an 'exceptional' case.

We iterate that this is not a patent
infringement case- it is a civil contempt
proceeding. There are contempt cases in
abundant number holding that a court has
discretion to award reasonable attorney's
fees and other expenses necessary to make an
innocent party whole.

Id. at 1214-15 (internal citations omitted). The Eighth Circuit

drew a similar distinction in upholding an award of attorneys'

fees despite the lack of finding of an "extraordinary case"

under § 284, explaining,

We are told by appellant that in patent
infringement cases attorney fees should be
awarded only in extraordinary cases bottomed
on a finding of unfairness or bad faith.
And, of course, appellant insists that this
is not such a case. To be sure, the law is
clear that in an action for patent
infringement attorney fees should not be
allowed except in the extraordinary case.
The statute so provides as do the cases
cited and relied upon by appellant.
. . . From the argument made by appellant
and the authorities relied upon by him, it
is apparent that he views this as an
ordinary patent infringement action. This
position is untenable. As we have tried to
demonstrate, this is a civil contempt

65

> proceeding growing out of the continued
> infringement of the Hansen patent in the
> face of an injunction proscribing such
> infringement.

Siebring v. Hansen, 346 F.2d 474, 480 (8th Cir. 1965) (internal

citations omitted).[25] Although ePlus cites a number of decisions

in which attorneys' fees were imposed following a finding of

contempt, none of those decisions address the fundamental

question of whether § 285 applies to a civil contempt proceeding

and, indeed, those decisions all appear to frame their analysis

consistent with a court's inherent authority to impose

attorneys' fees for "willful disobedience of a court order."

Chambers, 501 U.S. at 46.[26] Conceptually, however, it is sensible

---

[25] It is true, of course, that Dow Chemical and Siebring
addressed situations in which a district court awarded fees in
situations that § 285 may not have permitted them. However, the
reasoning of those decisions would apply with equal force to
circumstances in which fees might be appropriate under § 285,
but would not be under the law of the regional circuit for civil
contempt actions. Because the Court concludes that § 285 does
not apply, the Court does not consider which category, if
either, is presented here.

[26] During argument, ePlus relied principally on the decision of
the Federal Circuit in Pharmacia & Upjohn Co. v. Myland
Pharmaceuticals, Inc., 182 F.3d 1356 (Fed Cir. 1999), for the
proposition that the law of the Federal Circuit governs
attorneys' fees. (Tr. of Closing Argument at 192:18-24). That
decision is inapposite here. In Pharmacia & Upjohn Co., the
Federal Circuit instructed that "our precedent governs the
substantive interpretation of 35 U.S.C. § 285" and rejected the
district court's reliance on the stricter Fourth Circuit
standard. 182 F.3d at 1359. However, that decision involved an
appeal from a patent infringement suit in which § 285 clearly
applied. It provides no insight into whether § 285 is properly
applied to a civil contempt action that arises out of an

that if, "the law of the regional circuit" applies to "a district court's imposition of civil contempt sanctions," Zip Dee, Inc. v. A & E Systems, Inc., 935 F.2d 280, at *1 (Fed. Cir. 1991) (unpublished), then that law is adopted whole cloth to avoid a result that becomes untethered from any comprehensive remedial scheme. The Court is persuaded by the logic of Dow Chemical and Siebring and concludes that, because this is a civil contempt action, § 285 does not apply and the civil contempt damages scheme of the regional circuit controls. Thus, if attorneys' fees are to be awarded in this case, they must be awarded under the Court's inherent authority and consistent with the law of the Fourth Circuit.

In the Fourth Circuit, "no one seriously questions the right of the Court to award civil contempt damages which have long been recognized. So also to the right to include attorneys' fees as an element of the award." Folk v. Wallace Business Forms, Inc., 394 F.2d 240, 244 (4th Cir. 1968) (internal citations omitted). However, before attorneys' fees can be awarded, "a contemnor's refusal to comply with a court order must rise to the level of obstinacy, obduracy, or recalcitrance to satisfy the 'willful disobedience' standard." Omega World Travel, Inc. v. Omega Travel and Shipping Agencies, Inc., 905

---

injunction which, in turn, arose out of a patent infringement suit.

F.2d 1530, at *4 (4th Cir. 1990) (unpublished) (<u>citing</u> <u>Wright v.</u> <u>Jackson</u>, 522 F.2d 955, 958 (4th Cir. 1975)). This requirement has consistently been applied by the district courts in this circuit when addressing an award of attorneys' fees for disobedience of a court order in a civil contempt proceeding. <u>See e.g.</u>, <u>JTH Tax, Inc. v. Noor</u>, 2012 WL 5286955, at *1 (E.D. Va. Oct. 23, 2012); <u>Lane v. Prima Marketing, LLC</u>, 2008 WL 793642, at *7 (S.D.W.V. March 20, 2008); <u>Wagner v. Bd. of Educ.</u> <u>of Montgomery Cnty.</u>, 340 F. Supp. 2d 603, 620 n.8 (D. Md. 2004). Even assuming <u>arguendo</u> that Lawson's disobedience was willful, the Court cannot conclude that Lawson's behavior rises to the level of "obstinate," "obdurate," or "recalcitrant."

For the foregoing reasons, ePlus' request for an award of attorneys' fees will be denied.

<u>Coercive Remedies</u>

Finally, ePlus asks the Court to impose a coercive remedy either by shutting down Lawson's business or imposing a daily fine to ensure compliance with the Injunction Order. There is no question that the Court has the ability to impose sanctions "to coerce obedience to a court order." <u>In re General Motors Corp.</u>, 61 F.3d 256, 258 (4th Cir. 1995). "The paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command such as an order to pay alimony, or to surrender property ordered to

be turned over to a receiver, or to make a conveyance." Int'l
Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 828
(1994). "This dichotomy between coercive and punitive
imprisonment has been extended to the fine context. . . . Where
a fine is not compensatory, it is civil only if the contemnor is
afforded an opportunity to purge." Id. at 829. A coercive fine
must be forward-looking and becomes punitive, and thus criminal,
if it serves as "punishment for the completed act of
disobedience." Gompers, 221 U.S. at 443. Lawson's contumacious
conduct, while not sufficiently egregious to warrant enhanced
damages or attorneys' fees, is nonetheless quite troubling
because it reflects a willingness to be casual about its
obligation to obey the injunction. Also, Lawson's conduct in
advising customers about how to run RSS and RQC in parallel and
in not verifying whether customers had stopped using RSS
illustrates the need to use the coercive power of the Court to
assure compliance with the injunction henceforth. However,
Lawson must be given an opportunity to purge the contempt before
a coercive remedy is enforced. The appropriate coercive remedy
is a fine of $ 62,362 per day for every day that Lawson remains
in contempt. If, however, Lawson demonstrates by September 20,
2013, that it is in compliance with the injunction, no coercive
remedy will be imposed. If Lawson fails in that objection, the
fine will attach nunc pro tunc to August 16, 2013.

**CONCLUSION**

For the reasons set forth above, ePlus' MOTION TO SHOW CAUSE WHY LAWSON SOFTWARE, INC. SHOULD NOT BE HELD IN CONTEMPT (Docket No. 798) will be granted. The Court finds that Lawson is in contempt of the Court's May 23, 2011 injunction. The Court will award damages in the form of disgorgement of Lawson's incremental profits from the infringing configurations, calculated at $17 million from the date of the injunction until July 1, 2013 with a daily rate $24,850 thereafter until the present. The Court will deny ePlus' request for enhanced damages and attorneys' fees. The request for a coercive fine will be provisionally granted.

It is so ORDERED.

_____ /s/      _REP_____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August _16_, 2013