

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

EPLUS INC.,

    Plaintiff,

v.                                    Civil Action No. 3:09cv620

LAWSON SOFTWARE, INC.,

    Defendant.


## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT LAWSON SOFTWARE, INC.'S MOTION FOR A STAY PENDING APPEAL (Docket No. 1090). For the reasons set forth below, the motion will be denied.

## BACKGROUND

ePlus Inc. ("ePlus") filed this action against Lawson Software, Inc. ("Lawson") for infringement of three patents: U.S. Patent Nos. 6,023,683 (the "'683 Patent"), 6,055,516 (the "'516 Patent") and 6,585,173 (the "'173 Patent"). Following a three week trial, a jury determined that the '683 Patent and '172 Patent were infringed and that the '152 Patent was not. The jury found that all asserted claims of the patents-in-suit were valid. On May 23, 2011, the Court entered a permanent injunction enjoining Lawson, its officers, agents and employees and "any person in active, concert or participation with them"

"from directly or indirectly making, using, offering to sell, or selling within the United States or importing into the United States" certain product configurations (so-called configurations 2, 3 and 5) and services (Docket No. 729).

On appeal, the United States Court of Appeals for the Federal Circuit affirmed the finding of infringement as to Claim 26 of the '683 Patent and affirmed the breath of the injunction. ePlus Inc. v. Lawson Software, Inc., 700 F.3d 509, 520, 522 (Fed. Cir. 2012).[1]  However, the Federal Circuit also remanded the action for this Court "to consider what changes are required to the terms of the injunction, consistent with this opinion." Id. at 523.   Thereafter, and following an opportunity for briefing and hearing, the Court, to assure consistency with the Federal Circuit's opinion, entered an Order dated June 11, 2013 (Docket No. 1083) modifying the original injunction by eliminating from its scope the product configuration known as Configuration 2. The injunction was left in effect in all other respects.[2]

---

[1] The Court of Appeals also held that Claims 28 and 29 of the '683 Patent were not "supported by substantial evidence" and that Claim 1 of the '712 Patent and Claim 3 of the '683 Patent were invalid for indefiniteness. It, therefore, vacated the judgment of infringement as to those claims. Id. at 519-20.

[2] The reasoning for that Order was set forth in an accompanying Memorandum Opinion issued on the same date (Docket No. 1082).

While the appeals were pending before the Federal Circuit, ePlus filed, on September 9, 2011 (approximately three months after the issuance of the injunction on May 23, 2011), its motion for an order to show cause, alleging that Lawson was in contempt of the injunction. The contempt motion concerned a module of the adjudged infringing system configurations called Requisition Self-Service ("RSS"). After the trial in 2011, Lawson redesigned RSS and created Requisition Center ("RQC") for use in its stead. ePlus alleged that the new RQC product was not more than colorably different from RSS and that it too infringed Claim 26 of the '683 Patent.

Following a hearing on the issue of contempt and full briefing, the Court issued a Memorandum Opinion and Order (Docket Nos. 1087 and 1088) (the "Contempt Opinion" and "Contempt Order," respectively) finding, by clear and convincing evidence, that Lawson was in contempt of the injunction against Configurations 3 and 5 which had been in place since May 23, 2011. The basis of that finding was that Configurations 3 and 5 with RQC were not more than colorably different than the adjudged Infringing Configurations using RSS and that Lawson and its customers were using the RQC configurations in a manner that infringed Claim 26 of the '683 Patent. Also, the Court determined that Lawson was in contempt of the injunction for "instructing (and permitting) its employees and agents to

3

continue to service the infringing configuration and by deliberately instructing its customers on how to continue to use RSS, even after the RQC product had been released, without providing any method for Lawson's customers to disable the infringing RSS. (Contempt Opinion (Docket No. 1087) at 43).

Lawson filed timely Notices of Appeal of the order (Docket No. 1083) modifying the injunction (Docket No. 729) in response to the remand issued by the Federal Circuit. Lawson also has appealed the finding of contempt and the Order assessing damages therefor and imposing a coercive fine (Docket No. 1088). Lawson has tendered a proposed supersedeas bond (Docket No. 1098-1, Ex. A) to secure the payment of the money judgment entered in favor of ePlus and against Lawson. The Court has approved the form of that bond and directed that the enforcement of that aspect of the contempt judgment be stayed pending appeal as soon as the supersedeas bond actually is posted. Order entered September 9, 2013 (Docket No. 1102).

The motion presently before the Court is somewhat confusing as to its intended reach. In the motion, Lawson "moves for a stay of this Court's order of injunction and imposing coercive fines (D.I. 1088) extending the deadline for Lawson to be 'in compliance with the injunction' and the corresponding start date of any coercive fine until 30 days after the Federal Circuit issues is [sic] decision on appeal of the order." (DEFENDANT

4

LAWSON SOFTWARE, INC.'S MOTION FOR A STAY PENDING APPEAL, Docket No. 1090). The supporting memorandum (Docket No. 1091) ("Lawson's Opening Br., p. __"), in the section entitled "CONCLUSION" repeats the same language. However, in its reply brief (Docket No. 1101), Lawson takes a somewhat different tack, stating that:

> Lawson seeks to stay two aspects of the Court's August 16, 2013 Order:
>
> First, Lawson seeks to stay enforcement of the monetary judgment by ePlus, and has proposed a supersedeas bond in the amount of $18,217,950 to secure the full amount of that judgment, plus interest that will accrue during the appeal.
>
> * * *
>
> Second, Lawson seeks to stay only the portion of the Court's August 16, 2013 Order that requires it to come into (and demonstrate) compliance with the Injunction by September 20, 2013 in regard to the sale, maintenance, support and service of the redesigned Configurations 3 and 5 containing RQC . . . To be clear, Lawson does not seek or need to stay that portion of the Court's order requiring demonstration of compliance by September 20, 2013 with regard to its complete cessation of enjoined activities regarding RSS. Lawson does not require or request such a stay because it has long since ended sales, maintenance, service and support for RSS, and it has gone well beyond the policies disclosed at the contempt hearing to ensure compliance. Lawson fully intends to demonstrate its compliance with the Injunction with respect to the RSS-containing configurations before the September 20, 2013 deadline.

(DEFENDANT LAWSON SOFTWARE, INC.'S CONSOLIDATED REPLY IN SUPPORT OF MOTION FOR A STAYPENDING APPEAL AND MOTION TO APPROVE LAWSON'S SUPERSEDEAS BOND AND STAY THE ENFORCEMENT OF THE COURT'S ORDER ENTERING JUDGMENT FOR DAMAGES PENDING APPEAL AND TO STAY EXECUTION, p. 1) ("Lawson's Reply Br., p. ___.").

It thus appears at first glance, that Lawson does not seek a stay of the injunction that was modified upon remand (Docket No. 1083). At the same time, Lawson's papers make it clear that, if a stay is granted, it does not intend to demonstrate compliance with the injunction, as modified (Docket No. 1083) as to RQC by September 20, 2013.

Lawson contends that it needs this stay "so that it may seek appellate relief without suffering harm to its customer relationships that could result from complying with the Injunction that may, on appeal, be vacated, or ruled not to apply to RQC. In the absence of a stay, Lawson will have to choose between the certain harm that will flow to it from its customer disruption or the abandonment of a substantial appeal . . . ." (Docket No. 1101, p. 5). Taken together, Lawson's papers seek a stay of the injunction as modified on June 13, 2013 (Docket No. 1083) and the coercive provisions of the Contempt Order issued on August 16, 2013 (Docket No. 1088).

## DISCUSSION

Lawson apparently considers that its motion is governed by Fed. R. Civ. P. 62(b) and 62(c) because it mentions both rules in the argument section of its opening brief. Rule 62(b) pertains to stays pending the disposition of motions under Rule 50, Rule 52(b), Rule 59 or Rule 60. None of those circumstances obtain here.

Rule 62(c) provides that a court "may suspend, modify, restore or grant an injunction on terms for bond or other terms that secure the opposing party's rights." That provision applies only if there is an appeal pending from a judgment that "grants, dissolves, or denies an injunction." Because, the Court construes Lawson's briefs to be seeking a stay of the injunction (Docket No. 729 as modified by Docket No. 1083) as well as the coercive provisions of the Contempt Order (Docket No. 1088), Rule 62(c) will provide the framework for analysis of Lawson's motion.

Lawson and ePlus agree that whether to stay the injunction (Docket No. 729 as modified by Docket No. 1083) and the Contempt Order (Docket No. 1088) should be governed by the now familiar factors recited in Hilton v. Braunskill, 481 U.S. 770 (1987). In Hilton, the Supreme Court defined those factors:

> (1) whether the stay applicant has made a
> strong showing that he is likely to
> succeed on the merits;

7

>    (2)  whether   the   applicant   will   be
>         irreparably injury absent a stay;
>
>    (3)  whether   issuance   of   a   stay   will
>         substantially injure the other parties
>         interested in the proceeding;
>
>    (4)  where the public interest lies.

Id. at 776 (citations omitted).   See also Standard Havens Prods., Inc. v. Gencor Indus., Inc., 897 F.2d 511, 512 (Fed. Cir. 1990).  Each factor need not be given equal weight.  Id. In addition, "likelihood of success in the appeal is not a rigid concept."  Id.  Hence, to obtain a stay pending appeal, a movant must establish a strong likelihood of success on appeal, or, failing that, "'demonstrate a substantial case on the merits,' provided the other factors militate in movant's favor."  Id. at 513 (emphasis in original) (quoting Hilton, 481 U.S. at 778)). In other words, the Court "assesses movant's chances for success on appeal and weighs the equities as they affect the parties and the public."  E.I. du Pont de Nemours and Co. v. Phillips Petroleum Co., 835 F.3d 277, 278 (Fed. Cir. 1987).  Adopting the Second Circuit's view, the Federal Circuit held in Standard Havens that:

>    it is not necessary that plaintiff's right
>    to a final decision, after trial, be
>    absolutely certain, wholly without doubt; if
>    the other elements are present (i.e., the
>    balance of hardships tips decidedly toward
>    plaintiff), it will ordinarily be enough
>    that the plaintiff has raised questions
>    going to the merits so serious, substantial,

> difficult and doubtful, as to make them a
> fair ground for litigation. . . .

Standard Havens, 897 F.2d at 513.   Each factor will be
considered in turn mindful that the "four stay factors case
effectively merge" on occasion.   Id.

## 1.   Likelihood Of Success On The Merits

Lawson's opening brief posits in one sentence, bullet point
format seventeen topics on which it proposes to be able to
succeed on appeal.   It does so by incorporating certain
arguments and submissions from previous filings.   Lawson's
Opening Br., p. 6.   That, of course, is an unacceptable method
by which to address the question of likelihood of success on the
merits, and the Court declines to plow through old pleadings to
determine how what is said there might be thought by Lawson to
constitute a substantial likelihood on the merits, or even a
substantial question accompanied by a strong case on the other
three stay factors.   However, in its opening brief, Lawson does
posit two "exemplary points" that it thinks are strong
candidates for likely success.

First, Lawson says that there is ground for disagreement
between reasonable jurists respecting how to conduct a contempt
analysis under TiVo, Inc. v. Echo Star Corp., 646 F.3d 869 (Fed.
Cir. 2011).   In particular, Lawson says it is likely to succeed
because, when the district court is deciding what has been

alleged and proved at the original trial in making the colorability analysis, TiVo requires the district court to review the trial record and ascertain what therein the jury found convincing in returning its verdict. To show that reasonable jurists may differ on that issue, Lawson cites the decision in nCube Corp. v. SeaChange International, Inc., 2012 WL 4863049 at *3-5 (D. Del. Oct. 9, 2012). Lawson is correct in saying that the Contempt Opinion considered the approach reflected in nCube and found that the decision there was not helpful because, in nCube, the court was not called upon to decide the issues that Lawson raised here respecting the mode of analysis required by TiVo and because nCube offered no explanation why, as Lawson contends, it is appropriate for district courts to probe the mind of the jury and re-examine the verdict when making the colorability analysis required by TiVo. Consequently, nCube did not address the constitutional infirmity presented by the approach urged by Lawson.

Lawson has presented no cogent explanation for why it is appropriate to diverge from the well-settled constitutional strictures upon intruding into and disturbing the sanctity of jury verdicts. Thus, Lawson has not established a reasonable basis for difference of opinion between the approach in this case and the approach taken in TiVo. Nor was nCube asked to consider how the approach urged by Lawson does not run afoul of

the admonition from the Federal Circuit in TiVo not to expand contempt proceedings into a new trial of the previously adjudicated infringement issues. TiVo, 646 F.3d at 883, 889; Merial Ltd v. Cipla Ltd., 681 F.3d 1283, 1300 (Fed. Cir. 2012).

Second, Lawson argues that the Court broke new legal ground in determining whether RQC is more than colorably different than RSS. That argument is based upon a substantial mischaracterization of the colorability analysis conducted in the Contempt Opinion. It is true that, in making that analysis, the opinion recites the origins of the colorability analysis as the doctrine of equivalence. However, the colorability section of the Contempt Opinion undertakes a rather lengthy substantive analysis adhering to the instructions given by the Federal Circuit in TiVo to determine the issue of colorability. Contempt Opinion (Docket No. 1087, pp. 22 - 33). There is no need to recount that discussion now. Rather, it is sufficient to say that Lawson cannot create a showing of a substantial likelihood on appeal by misquoting out of context parts of the Contempt Opinion and ignoring the fundamental analysis conducted therein.

Third, Lawson once again argues that the re-examination proceedings in the Patent and Trademark Office constitute a warrant to excuse it from its contempt and supplies a reason to stay this action. The Court has rejected that argument on its

merits several times: before trial; at trial; after trial; and when issuing the injunction. Certainly, the Federal Circuit was well aware of the re-examination proceedings when it had the case, and it did not consider the pendency of those proceedings as a ground for entering a stay of the injunction. Indeed, mindful of those proceedings the Federal Circuit denied a stay of the injunction, affirmed the verdict on Claim 26 of the '683 Patent, and affirmed the issuance of the permanent injunction.

Measured by the strong-showing formulation, Lawson has not shown a strong likelihood of success on appeal. In its reply brief, Lawson retrenches from that aspect of stay jurisprudence and, instead, argues that it has raised substantial issues for appeal, a somewhat different kind of likelihood of success calculus in which Lawson must show the presence of substantial issues and that the other three factors of the Hilton analysis militate in Lawson's favor. See Standard Havens, 897 F.2d at 513 (quoting Hilton, 481 U.S. at 778).[3]

However, the three points on which Lawson relies do not raise "questions going to the merits so serious, substantial,

---

[3] In its reply brief, Lawson contends that there is a substantial basis for appeal because the Contempt Opinion relied on so-called mischaracterized documents. Although Lawson did outline that question as part of its summary bullet points in its opening brief, Lawson did not substantively discuss the issue in its opening brief and the Court declines to consider that issue further except to say that the Contempt Opinion speaks for itself in respect of the documents which it cited.

difficult and doubtful as to make them fair ground for litigation. . . ." Standard Havens, 897 F.2d at 513.  The mode of analysis point runs squarely into the Seventh Amendment.  The colorability point is based on a distortion of the Contempt Opinion.  And, the re-examination proceedings point has no more currency now than in its previous incarnations.  In any event, as discussed below, the other three stay factors do not militate in Lawson's favor even if its likelihood of success is measured by the lesser "substantial issue" formulation.

2.  **Whether Lawson Has Established That It Will Be Irreparably Harmed Absent A Stay**

The only mention in Lawson's opening brief of any harm to Lawson absent a stay is the statement that there is "a serious likelihood of harm to Lawson in the form of dissatisfied customers and increased costs if it [Lawson] is unnecessarily forced to redesign or abandon its products. . . ."  (Opening Br., p. 5).  Lawson offers no proof that there will be "dissatisfied customers."  What is more, according to Lawson, only 160 customers use Configurations 3 and 5 with RQC.  Given Lawson's size and financial strength, it can hardly be said that 160 dissatisfied customers constitutes irreparable injury. Perhaps that is why Lawson did not actually argue that the dissatification of customers would be for it an irreparable injury.  Nor did Lawson offer proof of the "increased cost"

13

associated with the redesign of its product. That is
unsurprising given that, according to the record at the contempt
hearing, Lawson incurred less than $100,000 in its redesign to
RQC.[4]  In any event, Lawson did not argue, or show, that the
increased cost, whatever it might be, constituted irreparable
injury.

In its reply brief, Lawson contends that it will suffer
irreparable harm if "the August 16, 2013 Order is not stayed and
Lawson is forced to stop sales, maintenance, service, and
support of RQC."  (Reply Br., p. 14).  That is the opening
sentence in a twelve line section entitled "Lawson Will Be
Irreparably Harmed Absent A Stay."  Id.  Nothing in that entire
section substantiates the conclusory assertion in the first
sentence.  Taken together, Lawson's opening and reply briefs are
simply legally insufficient to discharge Lawson's burden to show
that it will be irreparably injured absent a stay.

Unable to demonstrate irreparable injury absent a stay,
Lawson argues that the effect of the coercive remedy is to force
it to pay some $23 million[5] in order to exercise its right of
appeal or, as Lawson puts the point:  its only alternative is to

---

[4] To the extent that Lawson intends to suggest that it will incur
increased costs to "abandon its products," there is no evidence
that such cost (presumably the loss of daily incremental profit
of $62,362) would present irreparable harm to Lawson.

[5] The amount of the daily coercive remedy multiplied by the
estimated time for conclusion of the appeal.

"pay the Court an access fee of some $23 million per year merely to exercise its right of appeal." Lawson Opening Br., p. 1. That, of course, is not true. Lawson can abide by the May 23, 2011 injunction, as modified, and proceed with its appeal. If it prevails on appeal, it will owe none of the coercive fine. Or, if it wishes to continue the conduct adjudged to infringe, it must pay a fine equal to the daily incremental profit it earns from having done so, unless it prevails on appeal in which event it will owe nothing by way of a fine. In either event, the coercive fine will not be collected until after the appeal is concluded.

Moreover, Lawson does not explain how this contention fits into the jurisprudence applicable to stays pending appeal. However, absent proof that, having to pay that sum will irreparably injure Lawson, the contention does not support the grant of a stay. And, Lawson does not assert that having to pay the coercive fine if it loses the appeal will irreparably injure it.

In any event, Lawson's cry of hardship is not well-taken. The coercive remedy is directly linked to the daily incremental profit that Lawson gained from the consequences of its contempt. And, the record shows that the business and the profits derived from Configurations 3 and 5 are significant, they are not a

significant part of Lawson's financial strength.[6]  Lawson has not
contended otherwise.    In  moving  to  dissolve  the  injunction
earlier this year, Lawson argued that the number of Lawson's
clients using the infringing configurations now was smaller than
at the time of trial and that the number of customers was so
small, as a portion of Lawson's business, that any harm to ePlus
simply did not merit injunctive relief.

Further, in connection with previous proceedings on the
injunction, Lawson has assured the Court that it had cash and
cash equivalents of nearly $376 million.  And, when its counsel
was asked recently on a telephone conference respecting a
briefing schedule for its stay motion whether the argument was
that the coercive fines posed the potential for financial ruin
to Lawson, the answer was no.

Thus, on this record, Lawson's "fee for access" theory does
not hold up even if it somehow should be considered as part of
the stay calculus (which it should not).   It certainly does not
establish irreparable injury absent a stay.

To the extent that Lawson may be arguing that it will be
irreparably injured if the injunction (Docket No. 729), as
modified pursuant to the mandate (Docket No. 1083) is not
stayed,  that  argument  has  been  fully  dealt  with  in  the

---

[6] The record shows that following the trial, Lawson was acquired
by Infor Corp. for $2 billion.

injunction opinion issued here on remand (Docket No. 1082, pp. 22-25) and in the injunction opinion on May 23, 2011 (Docket No. 728, pp. 40-43) and need not be further revisited because the conditions, as respects Lawson, are the same with the possible exception that it has fewer customers now using the infringing configurations, a factor that certainly does not auger in favor of a stay.

3.   **The Issuance Of A Stay Would Substantially Injury ePlus**

For reasons set forth in the injunction opinion issued on May 23, 2011 (Docket No. 728, pp. 12-33) and in the injunction opinion issued on June 11, 2013 (Docket No. 1083, pp. 21-23), absent an injunction, ePlus will be substantially injured. Those reasons remain the same today as they existed in June 2013 and in May 2011.

Moreover, Lawson has been violating the injunction for more than two years.  In so doing, it is has continued to foreclose ePlus from the right secured to it by the law, the jury's verdict, and the affirmance by the Federal Circuit to exclude Lawson from making, using, offering for sale, or selling its invention.  A stay will continue to effect the same deprivation. As ePlus correctly points out, "a patent is a wasting outset" and the window of opportunity for ePlus to exploit its patent is limited.  Lawson has for several years acted in such a way as to adversely affect the ability of ePlus fully to exploit its

patent rights under the '683 Patent.   A stay pending appeal will perpetuate that situation.

The Court previously has held, and there is nothing in the record to suggest a change in the situation, that ePlus sells patented products and services that compete with Lawson's infringing configurations and services.   Further, ePlus has lost sales in which customers chose Lawson's infringing products and services over the lawful products and services of ePlus.   For this reason, the Court previously concluded (Memo. Opn., Docket. No. 728) that ePlus would lose market share with respect to its patented products, suffer losses on sales of its other products, and experience reputational injury in the loss of business opportunity were the injunction not to issue.   The same is true if the injunction is not enforced by means of the coercive fine which was found to be necessary because of Lawson's contumacious conduct.   In sum, it is obvious that, without coercion, Lawson will not abide by the injunction and hence to effectuate the injunction and to give ePlus the protection provided therein, the coercive fine cannot be stayed.

**4.   The Public Interest Does Not Lie In Favor Of A Stay**

Lawson deliberately set upon a course to violate the injunction and to cover its conduct with a very thin veneer. The public has an interest, a very strong interest, in enforcing valid patents and in enforcing valid court decrees.   Here, a

jury found that the '683 Patent was infringed, the Court of Appeals upheld that judgment as well as the injunction and, if Lawson is not given the necessary incentives to stop its infringing conduct, the interest of the public in enforcing patents, court decrees, and valid injunctions will be significantly eroded.

As the Court previously has found, Lawson's conduct in contempt "reflects a willingness to be casual about its obligation to obey the injunction." Contempt Opinion, p. 69. That is reflected in many of the documents surrounding the attempted design around, but it is also reflected in the fact that Lawson advised its customers "to run RSS and RQC in parallel" and it failed to verify whether those any of those customers had ever stopped using RSS. Id. Lawson's conduct necessitated use of the coercive power to assure compliance with the injunction. Lawson has demonstrated that the mere presence of an injunction is insufficient incentive to bring its infringing conduct to heel. Now it is necessary to use a more effective mechanism for providing that incentive. The public interest clearly calls for the use of that power and, by the same token, the public interest warrants its use.

## CONCLUSION

For the reasons set forth above, the DEFENDANT LAWSON SOFTWARE, INC.'S MOTION FOR A STAY PENDING APPEAL (Docket No. 1090) will be denied.

It is so ORDERED.

_____/s/_____ *REP*
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  September 10, 2013

20